RECORD NO. 21-2116

# In the United States Court of Appeals for the Fourth Circuit

LULA WILLIAMS; GLORIA TURNAGE;
GEORGE HENGLE; DOWIN COFFY; MARCELLA P. SINGH,
ON BEHALF OF THEMSELVES AND ALL INDIVIDUALS SIMILARLY SITUATED,

*Plaintiffs-Appellees*

v.

MATT MARTORELLO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, NO. 3:17-CV-00461 (PAYNE, R.)

## JOINT APPENDIX VOL. I

Bernard R. Given II
William N. Grosswendt
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
(310) 282-2000

John D. Taliaferro
LOEB & LOEB LLP
901 New York Ave. NW, Suite 300
Washington, DC 20001
(202) 618-5000
***Counsel for Appellants***

Matthew W.H. Wessler
GUPTA WESSLER PLLC
2001 K Street, NW,
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Kristi C. Kelly
Andrew Guzzo
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7570
***Counsel for Appellees***

# TABLE OF CONTENTS

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | **VOLUME I OF VIII** | |
| | Docket Sheet | 1 |
| 06/22/2017 | Class Action Complaint (ECF 1) | 131 |
| 09/29/2017 | Defendant Big Picture Loans, LLC's Brief in Support of Its Motion to Dismiss for Failure to Exhaust Tribal Remedies and Under the Doctrine of *Forum Non Conveniens* (ECF 27) | 163 |
| 12/21/2017 | Defendants Big Picture Loans, LLC, Ascension Technologies, LLC, James Williams, Jr., Gertrude McGeshick, Susan McGeshick, and Giiwegiizhigookway Martin's Reply Memorandum in Support of Motion to Dismiss (ECF 99) | 198 |
| 12/21/2017 | Big Picture Loan's Reply in Support of Its Motion to Dismiss for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens (ECF 100) | 220 |
| 07/27/2018 | Memorandum and Opinion Re: Defendants' Big Picture Loans and Ascension Technologies' Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 146) | 236 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 10/23/2018 | Defendant Matt Martorello's Opposition to Plaintiffs' Motion for Class Certification (ECF 222) | 317 |
| 12/20/2018 | Plaintiffs-Appellees' Response Brief (USCA4 18-1827, Dkt. 33) | 368 |
| 05/20/2019 | Plaintiffs' Memorandum in Support of Motion for Leave to File Supplemental Evidence in Support of Oppositions to Motion to Dismiss (Case No. 3:18-cv-00406-REP, Dkt. 233) | 433 |
| 06/04/2019 | Plaintiffs-Appellees' Supplemental Letter under Rule 28 (j) (USCA4 18-1827, Dkt. 125) | 455 |
| 06/07/2019 | Defendants-Appellants' Response to Plaintiffs-Appellees' Supplemental Letter under Rule 28 (j) (USCA4 18-1827, Dkt. 126) | 464 |
| 06/28/2019 | Plaintiffs' Statement of Position Regarding Material Misrepresentations Made to the Court in Support of Their Motions to Dismiss for Lack of Jurisdiction (Case No. 3:18-cv-00406-REP, Dkt. 249) | 466 |
| 07/03/2019 | Published Decision - Fourth Circuit Case No. 18-1827 (ECF 581) | 500 |
| 07/03/2019 | Judgment - Fourth Circuit Case No. 18-1827 (ECF 582) | 528 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 07/23/2019 | Order Setting Evidentiary Hearing on Subject Matter Jurisdiction on October 28, 2019 (Case No. 3:18-cv-00406-REP, Dkt. 270) | 530 |
| 07/24/2019 | Defendants Big Picture Loans and Ascension Technologies' Statement Regarding Plaintiffs' Claims of Material Misrepresentation (Case No. 3:18-cv-00406-REP, Dkt. 271) | 534 |
| 07/25/2019 | Mandate - Fourth Circuit Case No. 18-1827 (ECF 600) | 585 |
| 08/09/2019 | Defendant Matt Martorello's Response to Plaintiffs' Statement of Position Regarding Purported Material Misrepresentations Made to the Court (Case No. 3:18-cv-00406-REP, Dkt. 272) | 587 |
| 08/23/2019 | Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Statement of Position to Court's July 22, 2019 Order (ECF 611) | 622 |
| 08/23/2019 | Defendants Brian McFadden and Simon Liang's Joint Statement of Position (ECF 612) | 631 |
| 08/23/2019 | Defendant Matt Martorello's Statement of Position (ECF 613) | 640 |
| **VOLUME II OF VIII** | | |
| 09/16/2019 | Plaintiffs' Response to Matt Martorello's Statement of Position (ECF 624) | 650 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 09/16/2019 | Plaintiffs' Response to Brian McFadden and Simon Liang's Joint Statement of Position (ECF 626) | 669 |
| 09/23/2019 | Defendants Big Picture Loans' and Ascension Technologies' Reply in Support of their Statement of Position (ECF 630) | 676 |
| 10/04/2019 | Memorandum in Support of Motion to Strike (1) Declaration of Joette Pete, (2) Documents Produced By Joette Pete, and (3) Joette Pete from Plaintiffs' Witness List (Case No. 3:18-00406-REP, Dkt. 325) | 685 |
| 10/21/2019 | Order Re: Extension of Time to Accommodate Finalization of Settlement Between Plaintiffs and Defendants Big Picture Loans, LLC and Ascension Technologies, LLC (ECF 637) | 702 |
| 02/18/2020 | Order Re: Dismissal of Action Against Defendants Big Picture Loans, LLC and Ascension Technologies, LLC for Lack of Subject Matter Jurisdiction Pursuant to Judgment of the United States Court of Appeals for the Fourth Circuit (ECF 668) | 705 |
| 02/20/2020 | Order Re: Necessity of Holding an Evidentiary Hearing on Plaintiffs' Misrepresentation Filing (ECF 673) | 706 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 03/04/2020 | Defendant Matt Martorello's Notice Regarding Evidentiary Hearing (ECF 679) | 710 |
| 03/05/2020 | Plaintiffs' Notice Regarding Evidentiary Hearing (ECF 680) | 717 |
| 05/21/2020 | Plaintiffs' Response to Defendant Matt Martorello's Supplemental Brief Re: Effect of the Fourth Circuit's Decision on Class Certification (ECF 734) | 722 |
| 06/17/2020 | Plaintiffs' Statement of Position Regarding Material Misrepresentations and Omissions Made to the Court (ECF 784) | 759 |
| 07/13/2020 | Defendant Matt Martorello's Response to Plaintiffs' Statement of Position (ECF 843) | 812 |
| 07/25/2020 | Transcript of Evidentiary Hearing (ECF 882) | 873 |
| 07/25/2020 | Transcript of Evidentiary Hearing (ECF 883) | 1047 |
| 07/26/2020 | Plaintiff's Reply to Defendant Matthew Martorello's Statement of Position with Respect to Plaintiffs' Motion for Leave to File Supplemental Authority (ECF 884) | 1144 |
| 07/29/2020 | Defendant Matt Martorello's Statement of Position in Response to July 23, 2020 Order (Paragraph 4) (ECF 895) | 1149 |

| DATE FILED | DESCRIPTION | JA NO. |
|:---:|:---:|:---:|
| 07/30/2020 | Matt Martorello's Statement of Position in Response to July 23, 2020 Order (Paragraph 2) (ECF 902) | 1161 |
| 07/31/2020 | Matt Martorello's Supplemental Brief Regarding Alleged Misrepresentations (ECF 909) | 1186 |
| 11/18/2020 | Memorandum and Opinion Re: Misrepresentations (ECF 944) | 1218 |
| 11/24/2020 | Order Re: Amended Schedule for Amended Motion for Class Certification (ECF 945) | 1257 |
| 11/30/2020 | Defendant Matt Martorello's Memorandum in Support of his Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 947) | 1258 |
| 12/14/2020 | Plaintiffs' Response in Opposition to Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 959) | 1273 |
| 12/21/2020 | Defendant Matt Martorello's Reply in Support of his Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 962) | 1291 |
| **VOLUME III OF VIII** | | |
| 12/23/2020 | Plaintiffs' Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 967) | 1302 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 12/23/2020 | Plaintiffs' Memorandum in Support of Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | 1305 |
| 02/03/2021 | Matt Martorello's Opposition to Plaintiffs' Renewed Motion for Class Certification (ECF 999) | 1347 |
| 02/23/2021 | Opposition to Plaintiffs' Renewed Motion For Class Certification Against Matt Martorello (ECF 1007) | 1377 |
| 03/22/2021 | Plaintiffs' Reply in Support of Renewed Motion for Class Certification Against Defendant Matt Martorello (ECF 1055) | 1427 |
| 05/19/2021 | Memorandum and Opinion Re: Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 1090) | 1467 |
| 05/19/2021 | Order Denying Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 1091) | 1476 |
| 06/29/2021 | Transcript of Hearing on Plaintiffs' Renewed Motion for Class Certification (ECF 1104) | 1478 |
| 07/12/2021 | Memorandum Opinion Re: Class Certification Waiver (ECF 1106) | 1656 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 07/12/2021 | Appendix to Memorandum Opinion Re: Class Certification Waiver (ECF 1106-1) | 1675 |
| 07/20/2021 | Memorandum Opinion Re: Plaintiffs' Motion for Class Certification (ECF 1110) | 1689 |
| 07/20/2021 | Order Granting Plaintiffs' Renewed Motion to Certify a Class (ECF 1111) | 1725 |
| 08/04/2021 | Notice of Appeal (ECF 1119) | 1729 |
| 08/04/2021 | Defendant Matt Martorello's Petition for Permission to Appeal (ECF 1119-2) | 1730 |
| 10/07/2021 | Order on Permission to Appeal (USCA4 21-2116, Dkt. 16) | 1873 |

## TABLE OF CONTENTS – EXHIBITS

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | **VOLUME IV OF VIII** | |
| 12/21/2017 | Exhibits to Defendants Big Picture Loans and Ascension Technologies' Reply in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 106) | |
| | 1.    Matt Martorello Declaration (ECF 106-1) | 1874 |
| 10/22/2018 | Exhibits to Defendant Matt Martorello's Memorandum in Opposition to Plaintiffs' Motion for Class Certification (ECF 216) | |
| | 11.  Demand Letter (ECF 216-11) | 1891 |
| 10/23/2018 | Exhibits to Defendant Matt Martorello's Memorandum in Opposition to Plaintiffs' Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 222) | |
| | F.    The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (ECF 222-7) | 1896 |
| 05/21/2020 | Exhibits to Plaintiffs' Response to Matt Martorello's Addressing the Effect of the Fourth Circuit's Decision on Plaintiffs' Class Certification (ECF 734) | |
| | 1.    Big Picture Loans Transaction Consent (ECF 734-1) | 1932 |

9

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 06/08/2020 | Exhibits to Matt Martorello's Supplemental Memorandum in Support of Motion Under Rule 30(d) for Further Deposition (ECF 769) | |
| | 1.   Excerpt of Joette Pete Deposition (ECF 769-1) | 1939 |
| 06/17/2020 | Exhibits to Plaintiffs' Statement of Position Regarding Materials Misrepresentations and Omissions Made to the Court (ECF 784) | |
| | 17. Declaration of Joette Pete (ECF 784-17) | 1993 |
| 07/13/2020 | Exhibits to Matt Martorello's Response to Plaintiffs' Statement of Position (ECF 844) | |
| | 1.   Summary of Facts in Support of Martorello's Response to Plaintiffs' Statement of Position (ECF 844-1) | 2003 |
| 07/17/2020 | Exhibits to Plaintiffs' Reply in Support of Statement of Position Regarding Material Misrepresentations Made to the Court by Defendants (ECF 864) | |
| | 1.   Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Reply in Support of Their Motion to Dismiss For Lack of Subject Matter Jurisdiction (ECF 864-1) | 2053 |
| | 2.   12/31/2013 Email from Martorello re: Memo Regarding Structure of | 2071 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Possible Acquisition of SPVI (ECF 864-2) | |
| | 3. 12/08/2013 Email from Martorello re: Bellicose Capital Valuation (ECF 864-3) | 2074 |
| | 4. 04/18/2016 Email to Martorello re: Project (ECF 864-4) | 2078 |
| | 5. 08/26/2015 Email from Martorello re: Forecasts for Evaluation (ECF 864-5) | 2080 |
| | 6. 03/10/2017 Email to Martorello re: DRAFT memorandum regarding timing of evolution of CFPB rule (ECF 864-6) | 2083 |
| | 7. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 864-7) | 2093 |
| | 8. 01/14/2016 Email from Martorello re: AT BPL SA (ECF 864-8) | 2098 |
| | 9. 12/17/2016 Email to Martorello re: PR Hybrid (ECF 864-9) | 2108 |
| | 10. Michelle Hazen Affidavit (ECF 864-10) | 2115 |
| | 11. 07/22/2014 Email from Wichtman (ECF 864-11) | 2122 |
| | 12. The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal | 2127 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Government Resolution No. T2014-066 (ECF 864-12) | |
| | 13. Excerpt of Testimony from Deposition of James Williams (ECF 864-13) | 2131 |
| | 14. 08/22/2014 Email from Martorello re: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final (ECF 864-14) | 2135 |
| | 15. 04/16/2013 Email from Martorello re: Significant Ruling in Colorado Western Sky Case (ECF 864-15) | 2138 |
| | 16. 10/03/2013 Email attaching Notice to Cease Servicing Origination of New Loans to NY Consumers (ECF 864-16) | 2156 |
| | 17. 10/14/2013 Email from Martorello re: LVD to take ownership of Bellicose VI (ECF 864-17) | 2167 |
| | 18. 10/14/2013 Email from Martorello re: SPVI Equity Transfer to LVD (ECF 864-18) | 2169 |
| | 19. 10/29/2013 Email from Martorello re: Payday US Offer Deactivation Notice (ECF 864-19) | 2172 |
| | 20. 08/26/2014 Email from Martorello re: Modal for Tribal Council to Review (ECF 864-20) | 2177 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 21. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 864-21) | 2193 |
| | 22. 10/10/2014 Email from Martorello re: AG Letters (ECF 864-22) | 2199 |
| | 23. 11/04/2014 Email from Martorello re: WSJ Press (ECF 864-23) | 2206 |
| | 24. Joette Pete Declaration (ECF 864-24) | 2211 |
| | 25. Spreadsheet of texts (ECF 864-25) | 2221 |
| | 26. 09/15/2014 Email from Martorello re: Docs (ECF 864-26) | 2224 |
| | 27. 08/26/2011 Email from Martorello re: Question on Docs (ECF 864-27) | 2227 |
| | 28. 02/23/2015 Email from Martorello re: New Agreement with O2 (ECF 864-28) | 2235 |
| | 29. 09/03/2015 Email from Martorello re: Attached Image (ECF 864-29) | 2240 |
| | 30. 07/09/2015 Email from Martorello re: M-1, Agreement and Plan of Merger (ECF 864-30) | 2246 |
| | 31. 08/20/2014 Agreement and Plan of Merger (ECF 864-31) | 2257 |
| | 32. Excerpt of Testimony from Martorello Deposition (ECF 864-32) | 2274 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 33. 09/14/2015 Agreement and Plan of Merger ECF 864-33 | 2278 |
| | 34. Excerpt of Testimony from Deposition of John Williams (ECF 864-34) | 2300 |
| | 35. Subpoena to Produce Documents Issued to Rosette, LLP (ECF 864-35) | 2304 |
| | 36. 03/01/2019 Email from T. Nelson re: Williams v. Big Picture Loans, Subpoena to Rosette, LLP: First Wave of Production (ECF 864-36) | 2315 |
| | 37. 05/31/2019 Email from T. Nelson re: Williams v. Big Picture Loans, Subpoena to Rosette, LLP: First Wave of Production (ECF 864-37) | 2322 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Loan Criteria (ECF 886) | |
| | 1. Big Picture Website re: Rates (ECF 886-1) | 2324 |
| | 2. Excerpt of Testimony from Deposition of Michelle Hazen (ECF 886-2) | 2331 |
| | 3. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 886-3) | 2345 |
| | 4. Excerpt of Testimony from Deposition of Karrie Wichtman ECF 886-4 | 2351 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 5.  Excerpt of Testimony from Deposition of Craig Mansfield (ECF 886-5) | 2354 |
| | 6.  Employee Profiles - Bellicose VI, LLC and Bellicose Capital, LLC (ECF 886-6) | 2358 |
| | 7.  Excerpt of Testimony from Deposition of James Williams (ECF 886-7) | 2367 |
| | 8.  Excerpt of Testimony from Deposition of Susan McGeshick (ECF 886-8) | 2373 |
| | 9.  Excerpt of Testimony from Deposition of Gertrude McGeshick (ECF 886-9) | 2377 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Structure of Martorello's Companies and Flow of Funds (ECF 896) | |
| | 1.  Bellicose Capital Corporate Structure (ECF 896-1) | 2380 |
| | 2.  Bluetech Irrevocable Trust Registration (ECF 896-2) | 2392 |
| | 3.  Amended and Restated Operating Agreement of Bellicose Capital, LLC (ECF 896-3) | 2393 |
| | 4.  Operating Agreement of Bellicose VI, LLC (ECF 896-4) | 2419 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 5. Secured Promissory Note (ECF 896-5) | 2438 |
| | 6. Addendum to Secured Promissory Note (ECF 896-6) | 2446 |
| | 7. Summary of Payments and Distributions from Tribal Lending Businesses from 01/01/2012 – 01/31/2016 (ECF 896-7) | 2447 |
| | 8. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 896-8) | 2448 |
| | 9. Statement of Financial Affairs of Eventide Credit Acquisitions, LLC (ECF 896-9) | 2449-2470 |
| | 10. Eventide Distribution Calculation (ECF 896-10) | 2471 |
| **VOLUME V OF VIII** | | |
| 12/23/2020 | Exhibits to Plaintiffs' Memorandum in Support of Renewed Motion For Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | |
| | 1. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 968-1) | 2472 |
| | 2. Excerpt of Testimony from Deposition of Warren Scott Merritt (ECF-986-2) | 2473 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
|  | 3.  08/26/2011 Email from Martorello re: Question on Docs (ECF 986-3) | 2481 |
|  | 4.  Declaration of Joette Pete (ECF 986-4) | 2491 |
|  | 5.  Servicing Agreement dated 10/25/2011 (ECF 986-5) | 2501 |
|  | 6.  12/21/2012 Email from Martorello re: Valuation Method (ECF 986-6) | 2542 |
|  | 7.  04/16/213 Email from Martorello re: Order Granting Plaintiffs' Motion for Summary Judgment (ECF 986-7) | 2547 |
|  | 8.  Letter from state of Connecticut dated 05/07/2013 (ECF 968-8) | 2565 |
|  | 9.  08/12/2013 Email from Martorello re: Draft Complaint (ECF 968-9) | 2567 |
|  | 10.  08/09/2013 Email from Martorello re: NY AG Letter Cease & Desist Letter (ECF 968-10) | 2595 |
|  | 11.  08/09/2013 Email from Martorello re: Tribal Lawsuit (ECF 968-11) | 2600 |
|  | 12.  10/03/2013 Email from Duck Creek Tribal re: Notice to Cease Servicing Origination of New Loans to NY consumers (ECF 968-12) | 2605 |
|  | 13.  10/14/2013 Email from Martorello re: LVD to take ownership of Bellicose VI (ECF 968-13) | 2616 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 14. 10/29/2013 Email from Martorello re: Payday Deactivation Notice (ECF 968-14) | 2618 |
| | 15. 11/08/2013 Email from Martorello re: LVD and legal bills (ECF 968-15) | 2620 |
| | 16. 12/31/2013 Email from Martorello re: Memo Regarding Structure of Possible Acquisition of SPVI (ECF 968-16) | 2624 |
| | 17. 01/06/2014 Email from Martorello re: Meeting with Cheryl Parker Rose @ CFPB (ECF 968-17) | 2627 |
| | 18. 01/08/2014 Email re: Justice Department Action (ECF 968-18) | 2636 |
| | 19. 01/09/2014 Email from Kim Anderson re: DOJ filing (ECF 968-19) | 2639 |
| | 20. 02/12/2014 Email from Martorello re: ACH Pre Application (ECF 968-20) | 2641 |
| | 21. 07/22/2014 Email from Wichtman re: Rebrand from Payday (ECF 968-21) | 2645 |
| | 22. 08/22/2014 Email re: Martorello re: TC Resolution 2014 (ECF 968-22) | 2650 |
| | 23. The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal | 2674 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Government Resolution No. T2014-066 (ECF 968-23) | |
| | 24. 10/10/2014 Email from Martorello re: AG Letters (ECF 968-24) | 2678 |
| | 25. 11/04/2014 Email from Wichtman re: WSJ Press (ECF 968-25) | 2685 |
| | 26. 12/01/2014 Email from Wichtman re: EIN Big Picture Loans (ECF 968-26) | 2690 |
| | 27. Resolution #2015-10 Approving the Creation of the Wholly Owned and Operated Tribal Servicing Entity Ascension Technologies, LLC (ECF 968-27) | 2695 |
| | 28. 02/19/2015 Meeting Minutes – Ascension (ECF 968-28) | 2700 |
| | 29. 02/24/2015 Email from J. Martorello re: Sourcepoint VI Assignment Notification: DRAFT REVIEW - Acquisition of Source Point VI US173700 - Assignment letter (ECF 968-29) | 2703 |
| | 30. Operating Agreement of Eventide Credit Acquisitions, LLC (ECF 968-30) | 2709 |
| | 31. Agreement and Plan of Merger dated 09/14/2015 (ECF 968-31) | 2728 |
| | 32. 10/02/2015 Email from Martorello re: Forecasts (ECF 968-32) | 2750 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 33. 12/05/2015 Email from Martorello re: Bellicose Capital Valuations (ECF 968-33) | 2753 |
| | 34. 12/07/2016 Email from Martorello re: PR Hybrid (ECF 968-34) | 2757 |
| | 35. 08/26/2015 Email from Martorello re: Forecasts for Valuation (ECF 968-35) | 2764 |
| | 36. 03/10/2017 Email from Martorello re: Draft Memorandum re: timing of evolution of CFPB Rule (ECF 968-36) | 2767 |
| | 37. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 968-37) | 2777 |
| | 38. 09/15/2014 Email from Martorello re: Docs (ECF 968-38) | 2784 |
| | 39. 09/03/2015 Email from Martorello attaching Image (ECF 968-39) | 2787 |
| | 40. 01/15/2016 Email from John Williams re: Delegation of Authority (ECF 968-40) | 2793 |
| | 41. 01/14/2016 Email from Wichtman re: Ascension Manager Issue (ECF 968-41) | 2795 |
| | 42. Recorded Certificate of Merger date 01/26/2016 (ECF 968-41) | 2801 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 43. Ascension Technologies Designation of Authority Policy (ECF 968-43) | 2805 |
| | 44. Loan and Security Agreement dated 09/14/2015 (ECF 968-44) | 2810 |
| | 45. Intratribal Servicing Agreement dated 02/16/2016 (ECF 968-45) | 2840 |
| | 46. Secured Promissory Note (ECF 968-46) | 2855 |
| | 47. Eventide Distribution Calculation (ECF 968-47) | 2863 |
| | 48. Timeline (ECF 968-48) | 2864 |
| | 49. Declaration of George Hengle (ECF 968-49) | 2871 |
| | 50. Big Picture Loans Confidential Investment Opportunity (ECF 968-50) | 2874 |
| | 51. Supplemental Declaration of American Legal Claim Services, LLC Regarding Notice of Dissemination (ECF 968-51) | 2878 |
| | 52. 02/11/2020 Letter from Rosette Firm re: Request for Consumer Loan Data (ECF 968-52) | 2882 |
| | 53. Order Granting Renewed Motion to Certify Class (ECF 968-53) | 2886 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 54. Declaration of Kristi C. Kelly (ECF 968-54) | 2910 |
| | 55. Declaration of Leonard A. Bennett (ECF 968-55) | 2918 |
| | 56. Declaration of E. Michelle Drake in Support of Plaintiffs' Renewed Motion for Class Certification (ECF 968-56) | 2928 |
| | 57. Declaration of Beth E. Terrell in Support of Plaintiffs' Renewed Motion for Class Certification Claims Against Defendant Matt Martorello (ECF 968-57) | 2980 |
| | 58. Declaration of Matthew W. H. Wessler (ECF 968-58) | 2988 |
| | 59. Declaration of Michael A. Caddell (ECF 968-59) | 2995 |
| | 60. Declaration of American Legal Claim Services, LLC (ECF 968-60) | 3013 |
| 02/03/2021 | Exhibits to Matt Martorello's Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF 999) | |
| | 11. Resolution #2011-041 Approving the Creation of the Lac Vieux Desert Band of Lake Superior Indians Tribal Enterprise – Red Rock Tribal Lending, Inc. (ECF 999-11) | 3015 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 12. Articles of Organization of Red Rock Tribal Lending (ECF 999-12) | 3017 |
| | 14. Deposition of Jennifer Weddle (ECF 999-14) | 3019 |
| | 15. Email from Martorello to Wichtman (ECF 999-15) | 3056 |
| | **VOLUME VI OF VIII** | |
| 02/23/2021 | Exhibits to Opposition to Plaintiffs' Renewed Motion For Class Certification Against Matt Martorello (ECF 1007) | |
| | A. Affidavit of Michelle Hazen (ECF 1007-1) | 3064 |
| | D. The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (ECF 1007-5) | 3070 |
| | E. Affidavit of Jennifer Weddle in Support of Motion to Quash (ECF 1007-6) | 3105 |
| | F. Default Letter dated December 12, 2019 (ECF 1007-7) | 3114 |
| | G. Transcript of Deposition of Michelle Hazen (ECF 1007-8) | 3127 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
|  | H.   Transcript of Deposition of Matt Martorello (ECF 1007-9)[1] | 3377 |
|  | G.   Excerpt of Transcript of Deposition of Daniel Gravel (ECF 1007-12)[2] | 3485 |
|  | **VOLUME VII OF VIII** | |
|  | H.   Transcript of Deposition of Craig Mansfield (ECF 1007-13) | 3538 |
|  | N.   Red Rock Capital Lending Closing Checklist (ECF 1007-23) | 3762 |
|  | M.   Deposition of James Dowd (ECF 1007-24)[3] | 3765 |
|  | YY. Declaration of James Williams, Jr. in Support of Motion for Preliminary Injunction (ECF 1007-32) | 4004 |
|  | ZZ.  Affidavit of Brian McFadden (ECF 1007-33) | 4037 |

[1] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

[2] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

[3] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 03/22/2021 | Exhibits to Plaintiffs' Reply in Support of Renewed Motion For Class Certification Against Defendant Matt Martorello (ECF 1055) | |
| | 1.   Consent to Electronic Communications (ECF 1055-1) | 4041 |
| | 2.   08/27/2012 Email from Martorello re: SourcePoint – Tribal Consumer Financial Services Regulatory Code (ECF 1055-2) | 4048 |
| | 3.   04/02/2013 Email from Daniel Gravel re: TCFSR Code (ECF 1055-3) | 4051 |
| | 4.   08/27/2012 Email from Blake Sims re: SourcePoint – Tribal Consumer Financial Services Regulatory Code (ECF 1055-4) | 4053 |
| | 5.   The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (part 1) (ECF 1055-5) | 4055 |
| | 5.   The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (part 2) (ECF 1055-6) | 4075 |
| | 6.   Otoe Missouria Tribe of Indians Resolution OMTC#050341 FY-2018 (ECF 1055-7) | 4091 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 7.   Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LL's Reply in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 1055-8) | 4120 |
| | 8.   Consent to Electronic Communications (ECF 1055-9) | 4138 |
| | 9.   12/12/2011 Email from J. Weddle re: RRTL and Pepper Cash Loan Docs (ECF 1055-10) | 4145 |
| | 10.  Class Action Settlement Agreement and Release (ECF 1055-11) | 4166 |
| | 11.  01/14/2016 Email from Martorello re: AT BPL SA (ECF 1055-12) | 4224 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| **VOLUME VIII OF VIII (SEALED EXHIBITS)** | | |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Loan Criteria (ECF 886) | |
| | 2. Excerpt of Testimony from Deposition of Michelle Hazen (ECF 886-2) | 4232 |
| | 5. Excerpt of Testimony from Deposition of Craig Mansfield (ECF 886-5) | 4246 |
| | 8. Excerpt of Testimony from Deposition of Susan McGeshick (ECF 886-8) | 4250 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Structure of Martorello's Companies and Flow of Funds (ECF 896) | |
| | 7. Summary of Payments and Distributions from Tribal Lending Businesses from 01/01/2012 – 01/31/2016 (ECF 896-7) | 4254 |
| | 8. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 896-8) | 4260 |
| | 10. Eventide Distribution Calculation (ECF 896-10) | 4268 |
| 12/23/2020 | Plaintiffs' Memorandum in Support of Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | |

| | | |
|---|---|---|
| | 1. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 968-1) | 4271 |
| | 47. Eventide Distribution Calculation (ECF 968-47) | 4279 |

JURY,PROTO,REMAND,STAYED

# U.S. District Court
## Eastern District of Virginia - (Richmond)
### CIVIL DOCKET FOR CASE #: 3:17-cv-00461-REP

Williams et al v. Big Picture Loans, LLC et al
Assigned to: District Judge Robert E. Payne
related Cases:    3:18-mc-00001-REP
                  4:18-cv-00075-HCM-RJK
                  3:18-cv-00100-REP
                  3:20-mc-00008-REP
Case in other court:  USCA, 18-01827
Cause: 28:1331 Fed. Question: Racketeering (RICO) Act

Date Filed: 06/22/2017
Jury Demand: Plaintiff
Nature of Suit: 470 Racketeer/Corrupt
Organization
Jurisdiction: Federal Question

**Plaintiff**

**Lula Williams**
*on behalf of themselves and all individuals
similarly situated*

represented by **Craig Carley Marchiando**
Consumer Litigation Associates
763 J Clyde Morris Boulevard
Suite 1A
Newport News, VA 23601
(757) 930-3660
Fax: (757) 930-3662
Email: craig@clalegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristi Cahoon Kelly**
Kelly Guzzo PLC
3925 Chain Bridge Road
Suite 202
Fairfax, VA 22030
703-424-7570
Fax: 703-591-9285
Email: kkelly@kellyguzzo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy L. Austin**
Office of the Federal Public Defender
701 E. Broad St.
Suite 3600
Richmond, VA 23219
804-565-0880
Fax: 804-648-5033
Email: amy_austin@fd.org
*TERMINATED: 09/14/2021*

**Andrew Joseph Guzzo**

**JA1**

Kelly Guzzo PLC
3925 Chain Bridge Road
Suite 202
Fairfax, VA 22030
703-424-7576
Fax: 703-591-0167
Email: aguzzo@kellyguzzo.com
*ATTORNEY TO BE NOTICED*

**Beth Ellen Terrell**
Terrell Marshall Law Group PLLC
936 North 34th St
Suite 300
Seattle, WA 98103-6689
**NA**
(206) 816-6603
Fax: (206) 319-5450
Email: bterrell@terrellmarshall.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Shannon Nash**
Kelly Guzzo PLC
3925 Chain Bridge Road
Suite 202
Fairfax, VA 22030
703-424-7571
Fax: 703-591-0167
Email: casey@kellyguzzo.com
*ATTORNEY TO BE NOTICED*

**Eleanor Michelle Drake**
Berger Montague PC
1229 Tyler Street NE
Suite 205
Minneapolis, MN 55413
612-594-5933
Fax: 612-584-4470
Email: emdrake@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Adams**
Terrell Marshall Law Group PLLC
936 North 34th St
Suite 300
Seattle, WA 98103-6689
**NA**
(206) 816-6603
Fax: (206) 319-5450
Email: eadams@terrellmarshall.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA2**

**Elizabeth W. Hanes**
Consumer Litigation Associates
(Richmond)
626 E Broad Street
Suite 300
Richmond, VA 23219
(757) 930-3660
Fax: (757) 930-3662
Email: elizabeth@clalegal.com
*TERMINATED: 04/14/2020*

**James Patrick McNichol**
Kelly Guzzo PLC
Gateway Plaza
3925 Chain Bridge Road
Suite 202
Fairfax, VA 22030
703-424-7573
Email: pat@kellyguzzo.com
*ATTORNEY TO BE NOTICED*

**James Wilson Speer**
Virginia Proverty Law Center
919 E Main Street
Suite 610
Richmond, VA 23219
804-782-9430
Fax: (804) 649-0974
Email: jay@vplc.org
*ATTORNEY TO BE NOTICED*

**Jennifer Rust Murray**
Terrell Marshall Law Group PLLC
936 North 34th St
Suite 300
Seattle, WA 98103-6689
**NA**
(206) 816-6603
Fax: (206) 319-5450
Email: jmurray@terrellmarshall.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Albanese**
Berger Montague PC
1229 Tyler Street NE
Suite 205
Minneapolis, MN 55413
612-594-5997
Fax: 612-584-4470
Email: jalbanese@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA3**

**Leonard Anthony Bennett**
Consumer Litigation Associates
763 J Clyde Morris Boulevard
Suite 1A
Newport News, VA 23601
757-930-3660
Fax: 757-930-3662
Email: lenbennett@clalegal.com
*ATTORNEY TO BE NOTICED*

**Matthew William Wessler**
Gupta Wessler PLLC
1900 L Street NW
Suite 312
Washington, DC 20036
**NA**
(202) 888-1741
Fax: (202) 888-7792
Email: matt@guptawessler.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Allen Caddell**
Caddell & Chapman
628 East 9th St.
Houston, TX 77007-1722
**NA**
713-751-0400
Fax: (713) 751-0906
Email: mac@caddellchapman.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gloria Turnage**                    represented by    **Craig Carley Marchiando**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristi Cahoon Kelly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy L. Austin**
(See above for address)
*TERMINATED: 09/14/2021*

**Andrew Joseph Guzzo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Beth Ellen Terrell**
(See above for address)
*PRO HAC VICE*

**JA4**

*ATTORNEY TO BE NOTICED*

**Casey Shannon Nash**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eleanor Michelle Drake**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Adams**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth W. Hanes**
(See above for address)
*TERMINATED: 04/14/2020*

**James Patrick McNichol**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Wilson Speer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Rust Murray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Albanese**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leonard Anthony Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Allen Caddell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**George Hengle**                    represented by **Craig Carley Marchiando**
                                     (See above for address)
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

                                     **Kristi Cahoon Kelly**
                                     (See above for address)

**JA5**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy L. Austin**
(See above for address)
*TERMINATED: 09/14/2021*

**Andrew Joseph Guzzo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Beth Ellen Terrell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Shannon Nash**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eleanor Michelle Drake**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Adams**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth W. Hanes**
(See above for address)
*TERMINATED: 04/14/2020*

**James Patrick McNichol**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Wilson Speer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Rust Murray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Albanese**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leonard Anthony Bennett**
(See above for address)

**JA6**

*ATTORNEY TO BE NOTICED*

**Matthew William Wessler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Allen Caddell**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Dowin Coffy**                    represented by    **Craig Carley Marchiando**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristi Cahoon Kelly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy L. Austin**
(See above for address)
*TERMINATED: 09/14/2021*

**Andrew Joseph Guzzo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Beth Ellen Terrell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Casey Shannon Nash**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eleanor Michelle Drake**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Adams**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth W. Hanes**
(See above for address)
*TERMINATED: 04/14/2020*

**James Patrick McNichol**

**JA7**

(See above for address)
*ATTORNEY TO BE NOTICED*

**James Wilson Speer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Rust Murray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Albanese**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leonard Anthony Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew William Wessler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Allen Caddell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marcella P. Singh**
*Administrator of the Estate of Felix M.*
*Gillison, Jr.*

represented by **Craig Carley Marchiando**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristi Cahoon Kelly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy L. Austin**
(See above for address)
*TERMINATED: 09/14/2021*

**Andrew Joseph Guzzo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Beth Ellen Terrell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA8**

**Casey Shannon Nash**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eleanor Michelle Drake**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Adams**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth W. Hanes**
(See above for address)
*TERMINATED: 04/14/2020*

**James Patrick McNichol**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Wilson Speer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Rust Murray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Albanese**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leonard Anthony Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew William Wessler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Allen Caddell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Big Picture Loans, LLC**
*TERMINATED: 02/18/2020*

represented by **Craig Thomas Merritt**
Merritt Law, PLLC
919 E. Main Street
Suite 1000

**JA9**

Richmond, VA 23219
804-916-1600
Email: cmerritt@merrittfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Neal Anthony**
Troutman Pepper Hamilton Sanders LLP
(Richmond)
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23219
804-697-5410
Fax: 804-698-5118
Email: david.anthony@troutman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannan Marie Fitzgerald**
Office of the Richmond City Attorney
900 East Broad Street
Suite 400
Richmond, VA 23219
804-646-7946
Email: Shannan.Fitzgerald2@rva.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna Marek Bruty**
Rosette LLP
44 Grandville Ave SW
Sutie 300
Grand Rapids, MI 49503
**NA**
949-922-8586
Fax: 517-913-6443
Email: abruty@rosettelaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harrison Mann Gates**
Christian & Barton LLP
909 E Main St
Suite 1200
Richmond, VA 23219
(804) 697-4105
Fax: (804) 697-6105
Email: hgates@cblaw.com
*TERMINATED: 12/06/2018*

**James Edward Moore**
Christian & Barton LLP
909 East Main Street

**JA10**

Suite 1200
Richmond, VA 23219-3095
(804) 697-4100
Email: jmoore@cblaw.com

**Julie Diane Hoffmeister**
Troutman Sanders LLP (Richmond)
1001 Haxall Point
Suite 1500
Richmond, VA 23219
(804) 697-1200
Email:
julie.hoffmeister@troutmansanders.com
*ATTORNEY TO BE NOTICED*

**Justin Alexander Gray**
Rosette LLP (NA-MI)
25344 Red Arrow Hwy
Mattawan, MI 49071
**NA**
(269) 283-5005
Fax: 517-916-6443
Email: jgray@rosettelaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karrie Sue Wichtman**
Rosette, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
NA
269-283-5005
Fax: 517-913-6443
Email: kwichtman@rosettelaw.com
*TERMINATED: 08/21/2018*
*PRO HAC VICE*

**Timothy James St. George**
Troutman Pepper Hamilton Sanders LLP
(Richmond)
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23219
804-697-1254
Email: tim.stgeorge@troutman.com
*ATTORNEY TO BE NOTICED*

**William Henry Hurd**
Troutman Sanders LLP (Richmond)
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23219

(804) 697-1335
Email: william.hurd@troutmansanders.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Matt Martorello**                                     represented by **David Neal Anthony**
Troutman Sanders LLP (Richmond)
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23218
804-697-5410
Fax: 804-698-5118
Email:
david.anthony@troutmansanders.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bernard Robert Given , II**
Loeb & Loeb LLP (NA-LA)
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, CA 90067
**NA**
(310) 282-2235
Fax: (310) 282-2200
Email: bgiven@loeb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Palella**
Armstrong Teasdale LLP (NY-NA)
919 Third Avenue
37th Floor
New York, NY 10022
NA
(212) 209-4403
Fax: (212) 409-8385
Email: cpalella@armstrongteasdale.com
*TERMINATED: 09/17/2020*
*PRO HAC VICE*

**David Foster Herman**
Armstrong Teasdale LLP (NA-PA)
2005 Market Street
29th Floor
One Commerce Square
Philadelphia, PA 19103
NA
215-246-3467
Fax: 215-569-8228
Email: dherman@armstrongteasdale.com
*TERMINATED: 01/15/2019*
*PRO HAC VICE*

**JA12**

**Douglas Marsh**
Armstong Teasdale, LLP
4643 S. Ulster Street
Suite 800
Denver, CO 80327
NA
720-200-0676
Fax: 314-612-2378
Email: dmarsh@armstrongteasdale.com
*TERMINATED: 09/17/2020*
*PRO HAC VICE*

**Hugh McCoy Fain , III**
Spotts Fain PC
411 E Franklin St
PO Box 1555
Richmond, VA 23218-1555
(804) 788-1190
Email: hfain@spottsfain.com
*TERMINATED: 12/09/2020*

**John Michael Erbach**
Spotts Fain PC
411 E Franklin St
Suite 600
Richmond, VA 23219
804-697-2044
Fax: 804-697-2144
Email: jerbach@spottsfain.com
*TERMINATED: 12/09/2020*

**John Benjamin Rottenborn**
Woods Rogers PLC (Roanoke)
10 South Jefferson Street
Suite 1400
Roanoke, VA 24011
(540) 983-7600
Fax: (540) 983-7711
Email: brottenborn@woodsrogers.com
*ATTORNEY TO BE NOTICED*

**John David Taliaferro**
Loeb & Loeb LLP (DC)
901 New York Ave NW
Suite 300 East
Washington, DC 20001
202-618-5015
Fax: 202-318-0691
Email: jtaliaferro@loeb.com
*ATTORNEY TO BE NOTICED*

**Jonathan Peter Boughrum**
Armstrong Teasdale LLP (NA-PA)

**JA13**

2005 Market Street
29th Floor
One Commerce Square
Philadelphia, PA 19103
NA
267-780-2012
Fax: 215-405-9070
Email: jboughrum@armstrongteasdale.com
*TERMINATED: 09/17/2020*
*PRO HAC VICE*

**Jonathan Frank Hollis**
Woods Rogers PLC (Richmond)
Riverfront Plaza, West Tower
901 East Byrd Street
Suite 1550
Richmond, VA 23219
804-956-2048
Fax: (804) 495-2098
Email: jhollis@woodsrogers.com
*TERMINATED: 05/12/2021*

**Karen M. Stemland**
Woods Rogers PLC (Charlottesville)
123 East Main Street
Suite 500
Charlottesville, VA 22902
434-220-6826
Fax: 434-566-0473
Email: kstemland@woodsrogers.com
*ATTORNEY TO BE NOTICED*

**Maurice Francis Mullins**
Spotts Fain PC
411 E Franklin Street
Suite 600
Richmond, VA 23219
804-697-2000
Fax: 804-697-2169
Email: cmullins@spottsfain.com
*TERMINATED: 12/09/2020*

**Michael Christopher Witsch**
Armstrong Teasdale LLP (NA-PA)
2005 Market Street
29th Floor
One Commerce Square
Philadelphia, PA 19103
NA
(267) 780-2016
Fax: 215-405-9070
Email: mwitsch@atllp.com
*TERMINATED: 09/17/2020*
*PRO HAC VICE*

**JA14**

**Michelle Lynne Alamo**
Armstrong Teasdale LLP (CO-NA)
4643 S Ulster Street
Suite 800
Denver, CO 80237
NA
(720) 722-7189
Fax: (720) 200-0679
Email: malamo@armstrongteasdale.com
*TERMINATED: 07/07/2020*
*PRO HAC VICE*

**Paul Louis Brusati**
Armstrong Teasdale LLP
7700 Forsyth Blvd
Suite 1800
St. Louis, MO 63105
NA
(314) 552-6602
Fax: (314) 613-8522
Email: pbrusati@armstrongteasdale.com
*TERMINATED: 09/17/2020*
*PRO HAC VICE*

**Richard Lawrence Scheff**
Armstrong Teasdale LLP (NA-PA)
2005 Market Street
29th Floor
One Commerce Square
Philadelphia, PA 19103
NA
267-780-2010
Fax: 215-405-9070
Email: rlscheff@atllp.com
*TERMINATED: 09/17/2020*
*PRO HAC VICE*

**Timothy James St. George**
Troutman Sanders LLP (Richmond)
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23218
804-697-1254
Email: tim.stgeorge@troutmansanders.com
*ATTORNEY TO BE NOTICED*

**Tod Daniel Stephens**
Armstrong Teasdale LLP
7700 Forsyth Blvd
Suite 1800
St. Louis, MO 63105
NA

**JA15**

(314) 342-8065
Fax: (314) 621-5065
Email: tstephens@armstrongteasdale.com
*TERMINATED: 09/17/2020*
*PRO HAC VICE*

**William Nathaniel Grosswendt**
Loeb & Loeb LLP (NA-LA)
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, CA 90067
**NA**
310-282-2348
Fax: 310-282-2200
Email: wgrosswendt@loeb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Ojile**
Armstrong Teasdale LLP (CO-NA)
4643 S Ulster Street
Suite 800
Denver, CO 80237
NA
(303) 575-4000
Fax: (720) 200-0679
Email: bojile@armstrongteasdale.com
*TERMINATED: 09/17/2020*
*PRO HAC VICE*

**Defendant**

**Ascension Technologies, Inc.**
*TERMINATED: 02/18/2020*

represented by **Craig Thomas Merritt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Neal Anthony**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannan Marie Fitzgerald**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna Marek Bruty**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harrison Mann Gates**
(See above for address)
*TERMINATED: 12/06/2018*

JA16

**James Edward Moore**
(See above for address)

**Julie Diane Hoffmeister**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Justin Alexander Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karrie Sue Wichtman**
(See above for address)
*TERMINATED: 08/21/2018*
*PRO HAC VICE*

**Timothy James St. George**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Henry Hurd**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Daniel Gravel**
*TERMINATED: 10/18/2017*

represented by **David Neal Anthony**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**James Williams, Jr.**
*TERMINATED: 04/05/2018*

represented by **David Neal Anthony**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Alexander Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karrie Sue Wichtman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy James St. George**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

JA17

**Gertrude McGeshick**
*TERMINATED: 04/05/2018*

represented by **David Neal Anthony**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Alexander Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karrie Sue Wichtman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy James St. George**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Susan McGeshick**
*TERMINATED: 04/05/2018*

represented by **David Neal Anthony**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Alexander Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Karrie Sue Wichtman**
Rosette, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
**NA**
269-283-5005
Fax: 517-913-6443
Email: kwichtman@rosettelaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy James St. George**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Giiwegiizhigookway Martin**
*TERMINATED: 04/05/2018*

represented by **David Neal Anthony**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Alexander Gray**
(See above for address)
*PRO HAC VICE*

**JA18**

*ATTORNEY TO BE NOTICED*

**Karrie Sue Wichtman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy James St. George**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**Eventide Credit Acquisition Company, LLC**
represented by **John Michael Erbach**
(See above for address)
*TERMINATED: 12/09/2020*

**Interested Party**

**Rosette, LLP**
represented by **Craig Crandall Reilly**
Law Office of Craig C. Reilly
209 Madison Street
Suite 501
Alexandria, VA 22314
703-549-5354
Fax: 703-549-2604
Email: craig.reilly@ccreillylaw.com

**Interested Party**

**Justin Gray**
represented by **Craig Crandall Reilly**
(See above for address)

**Leonard Anthony Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Conner & Winters, LLC**
represented by **Wyatt B. Durrette , Jr.**
Durrette Arkema Gerson & Gill PC
1111 East Main Street
16th Floor
Richmond, VA 23219
(804) 775-6900
Fax: (804) 775-6911
Email: wdurrette@dagglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Greenberg Traurig, LLP**
represented by **John F. O'Connor , Jr.**
Steptoe & Johnson LLP
1330 Connecticut Ave NW
Washington, DC 20036
202-429-3000
Fax: 202-429-3902

**JA19**

Email: joconnor@steptoe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/22/2017 | 1 | COMPLAINT against All Defendants (Filing fee: $400, receipt number: 0422-5585119) filed by George Hengle, Felix Gillison, Jr, Lula Williams, Dowin Coffy, and Gloria Turnage. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Civil Cover Sheet) (jsmi, ) (Entered: 06/23/2017) |
| 06/23/2017 | 2 | Summons Issued as to All Defendants. NOTICE TO ATTORNEY: Print out two electronically issued summons and one copy of the attachments for each defendant to be served with the complaint. (jsmi, ) (Entered: 06/23/2017) |
| 06/30/2017 | 3 | WAIVER OF SERVICE Returned Executed as to all defendants waiver sent on 6/29/2017, answer due 8/28/2017. (Attachments: # 1 Letter) (jsmi, ) (Entered: 07/03/2017) |
| 07/14/2017 | 4 | Certificate of Compliance as to All Defendants. See 3 Waiver of Service Returned Executed for answer deadline. (jsmi, ) (Entered: 07/14/2017) |
| 07/25/2017 | 5 | Motion to appear Pro Hac Vice by Karrie Sue Wichtman and Certification of Local Counsel David N. Anthony Filing fee $ 75, receipt number 0422-5633481. by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Anthony, David) (Entered: 07/25/2017) |
| 07/25/2017 | 6 | Motion to appear Pro Hac Vice by Justin Alexander Gray and Certification of Local Counsel David N. Anthony Filing fee $ 75, receipt number 0422-5633503. by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Anthony, David) (Entered: 07/25/2017) |
| 07/28/2017 | 7 | ORDER granting 5 Motion for Pro hac vice and 6 Motion for Pro hac vice. Karrie Sue Wichtman and Justin Alexander Gray for Giiwegiizhigookway Martin, Susan McGeshick, Ascension Technologies, Inc., Big Picture Loans, LLC, Gertrude McGeshick, James Williams, Jr. Signed by District Judge Robert E. Payne on 7/28/2017. (jsmi, ). Modified to add additional defendants on 8/7/2017 (nbrow). (Entered: 07/28/2017) |
| 08/28/2017 | 8 | Consent MOTION for Extension of Time to File Answer by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Attachments: # 1 Exhibit 1 (Proposed Order)) (Anthony, David) (Entered: 08/28/2017) |
| 08/28/2017 | 9 | Consent MOTION for Extension of Time to File Answer by Matt Martorello. (Attachments: # 1 Exhibit 1 (Proposed Order))(Anthony, David) (Entered: 08/28/2017) |
| 08/28/2017 | 10 | Consent MOTION for Extension of Time to File Answer by Daniel Gravel. (Attachments: # 1 Exhibit 1 (Proposed Order))(Anthony, David) (Entered: 08/28/2017) |
| 08/28/2017 | 11 | Motion to appear Pro Hac Vice by David Foster Herman and Certification of Local Counsel David N. Anthony Filing fee $ 75, receipt number 0422-5685554. by Matt Martorello. (Anthony, David) (Entered: 08/28/2017) |
| 08/29/2017 | 12 | Motion to appear Pro Hac Vice by Richard Lawrence Scheff and Certification of Local Counsel David N. Anthony Filing fee $ 75, receipt number 0422-5686427. by Matt |

JA20

| | | Martorello. (Anthony, David) (Entered: 08/29/2017) |
|---|---|---|
| 08/29/2017 | 13 | Motion to appear Pro Hac Vice by Jonathan Peter Boughrum and Certification of Local Counsel David N. Anthony Filing fee $ 75, receipt number 0422-5686442. by Matt Martorello. (Anthony, David) (Entered: 08/29/2017) |
| 08/30/2017 | 14 | ORDER granting 12 Motion for Richard Lawrence Scheff to appear as Pro Hac Vice for Matt Martorello. Signed by District Judge Robert E. Payne on 8/29/2017. (sbea, ) (Entered: 08/30/2017) |
| 08/30/2017 | 15 | ORDER granting 13 Motion for Jonathan Peter Boughrum to appear as Pro Hac Vice for Matt Martorello. Signed by District Judge Robert E. Payne on 8/29/2017. (sbea, ) (Entered: 08/30/2017) |
| 08/30/2017 | 16 | ORDER granting 11 Motion for David Foster Herman to appear as Pro Hac Vice for Matt Martorello. Signed by District Judge Robert E. Payne on 8/30/2017. (sbea, ) (Entered: 08/30/2017) |
| 08/30/2017 | | Minute Entry for proceedings held before District Judge Robert E. Payne:Telephone Conference held on 8/30/2017. (Court Reporter Peppy Peterson, OCR.)(khan, ) (Entered: 09/08/2017) |
| 09/01/2017 | 17 | ORDER that Defendants' several CONSENT MOTIONS FOR EXTENSION OF TIME TO FILE RESPONSIVE PLEADINGS (ECF Nos. 8 , 9 , and 10 ) are denied. Defendants shall file their Answers to the Complaint by September 29, 2017. Furthermore, it is ORDERED that Defendants shall file any motions to dismiss by September 29, 2017; Plaintiffs shall respond by October 31, 2017, and Defendants shall reply by November 8, 2017. Furthermore, it is ORDERED that Plaintiffs shall submit to Defendants any discovery requests respecting the Court's jurisdiction over the Defendants by September 14, 2017, and Defendants shall submit to Plaintiffs any discovery requests respecting the Court's jurisdiction by September 29, 2017. Furthermore, it is ORDERED that Plaintiffs shall, as necessary, conduct depositions concerning the Court's jurisdiction over Defendants by October 31, 2017. It is so ORDERED. Signed by District Judge Robert E. Payne on 8/31/2017. (sbea, ) (SEE ORDER 42 AMENDING DEADLINES entered on 10/10/17. Modified on 10/11/2017 (jtho, ). (Entered: 09/01/2017) |
| 09/20/2017 | 18 | Joint MOTION for Protective Order by Ascension Technologies, Inc., Big Picture Loans, LLC, Daniel Gravel, Giiwegiizhigookway Martin, Matt Martorello, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Attachments: # 1 Exhibit 1 (Proposed Stipulated Protective Order))(Anthony, David) (Entered: 09/20/2017) |
| 09/22/2017 | 19 | STIPULATED PROTECTIVE ORDER. See Order for details. Signed by District Judge Robert E. Payne on 9/22/2017. (Attachments: # 1 Exhibit A) (jsmi, ) (Entered: 09/22/2017) |
| 09/28/2017 | 20 | NOTICE of Appearance by Casey Shannon Nash on behalf of Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams (Nash, Casey) (Entered: 09/28/2017) |
| 09/29/2017 | 21 | Consent MOTION for Extension of Time to File Response/Reply *Pleadings* by Daniel Gravel. (Attachments: # 1 Exhibit 1)(Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | 22 | MOTION to Dismiss for Lack of Jurisdiction by Ascension Technologies, Inc., Big Picture Loans, LLC. (Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | 23 | Memorandum in Support re 22 MOTION to Dismiss for Lack of Jurisdiction filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7 # 8 |

JA21

| | | |
|---|---|---|
| | | Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17, # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26, # <u>27</u> Exhibit 27, # <u>28</u> Exhibit 28, # <u>29</u> Exhibit 30, # <u>30</u> Exhibit 31, # <u>31</u> Exhibit 32, # <u>32</u> Exhibit 33, # <u>33</u> Exhibit 34, # <u>34</u> Exhibit 35, # <u>35</u> Exhibit 36, # <u>36</u> Exhibit 37, # <u>37</u> Exhibit 38, # <u>38</u> Exhibit 39, # <u>39</u> Exhibit 40, # <u>40</u> Exhibit 41, # <u>41</u> Exhibit 42, # <u>42</u> Exhibit 43, # <u>43</u> Exhibit 44)(Anthony, David) (Attachment 19 replaced on 10/2/2017) (jsmi, ). (Attachment 33 replaced on 10/2/2017) (jsmi, ). (Attachment 36 replaced on 10/2/2017) (jsmi, ). (Attachment 34 replaced on 10/2/2017) (jsmi, ). (Attachment 37 replaced on 10/2/2017) (jsmi, ). (Attachment 4 replaced on 11/21/2017 per Order <u>81</u> entered on 11/21/17) (jtho, ). (Attachment 24 replaced on 7/27/2018) (jsmi, ). (Attachment 29 replaced on 7/27/2018) (jsmi, ). (Attachment 31 replaced on 7/27/2018) (jsmi, ). (Attachment 34 replaced on 7/27/2018) (jsmi, ). (Entered: 09/29/2017) |
| 09/29/2017 | <u>24</u> | MOTION to Dismiss for Failure to State a Claim by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | <u>25</u> | Memorandum in Support re 24 MOTION to Dismiss for Failure to State a Claim filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | <u>26</u> | MOTION to Dismiss *for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens* by Big Picture Loans, LLC. (Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | <u>27</u> | Memorandum in Support re 26 MOTION to Dismiss *for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens* filed by Big Picture Loans, LLC. (Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | <u>28</u> | MOTION to Dismiss for Lack of Jurisdiction *(Subject Matter Jurisdiction, Personal Jurisdiction, and Article III Standing)* by Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | <u>29</u> | Memorandum in Support re 28 MOTION to Dismiss for Lack of Jurisdiction *(Subject Matter Jurisdiction, Personal Jurisdiction, and Article III Standing)* filed by Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Attachments: # <u>1</u> Affidavit G. McGeshick, # <u>2</u> Affidavit J. Williams, # <u>3</u> Affidavit S. McGeshick, # <u>4</u> Affidavit G. Martin)(Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | <u>30</u> | ANSWER to <u>1</u> Complaint, by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr.(Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | <u>31</u> | MOTION to Seal by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | <u>32</u> | Memorandum in Support re 31 MOTION to Seal filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Attachments: # <u>1</u> Appendix 1, # <u>2</u> Exhibit 1)(Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | <u>33</u> | Notice of Filing Sealing Motion LCvR5(C) by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan |

JA22

| | | |
|---|---|---|
| | | McGeshick, James Williams, Jr re 28 MOTION to Dismiss for Lack of Jurisdiction *(Subject Matter Jurisdiction, Personal Jurisdiction, and Article III Standing)*, 24 MOTION to Dismiss for Failure to State a Claim , 26 MOTION to Dismiss *for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens*, 22 MOTION to Dismiss for Lack of Jurisdiction (Anthony, David). (Entered: 09/29/2017) |
| 09/29/2017 | 34 | Sealed Attachment/Exhibit(s). (Attachments: # 1 Exhibit 2, # 2 Exhibit 19, # 3 Exhibit 20, # 4 Exhibit 22, # 5 Exhibit 24, # 6 Exhibit 30, # 7 Exhibit 32, # 8 Exhibit 33, # 9 Exhibit 35, # 10 Exhibit 36, # 11 Exhibit 38)(Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | 35 | ANSWER to 1 Complaint, by Matt Martorello.(Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | 36 | MOTION to Dismiss for Failure to State a Claim by Matt Martorello. (Anthony, David) (Entered: 09/29/2017) |
| 09/29/2017 | 37 | Memorandum in Support re 36 MOTION to Dismiss for Failure to State a Claim filed by Matt Martorello. (Anthony, David) (Entered: 09/29/2017) |
| 10/02/2017 | 38 | Financial Interest Disclosure Statement (Local Rule 7.1) by Big Picture Loans, LLC. (Anthony, David) (Entered: 10/02/2017) |
| 10/02/2017 | 39 | Financial Interest Disclosure Statement (Local Rule 7.1) by Ascension Technologies, Inc.. (Anthony, David) (Entered: 10/02/2017) |
| 10/03/2017 | 40 | ORDER that 21 CONSENT MOTION FOR EXTENSION OF TIME TO FILE RESPONSIVE PLEADINGS is granted. It is further ORDERED that the defendant, Daniel Gravel, shall file his Answer and any other motions with respect to the Complaint by October 13, 2017. Signed by District Judge Robert E. Payne on 10/2/2017. (jsmi, ) (Entered: 10/03/2017) |
| 10/09/2017 | 41 | Joint MOTION for Extension of Time to File Response/Reply as to 28 MOTION to Dismiss for Lack of Jurisdiction *(Subject Matter Jurisdiction, Personal Jurisdiction, and Article III Standing)*, 24 MOTION to Dismiss for Failure to State a Claim , 36 MOTION to Dismiss for Failure to State a Claim , 26 MOTION to Dismiss *for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens*, 22 MOTION to Dismiss for Lack of Jurisdiction *to Extend Briefing Schedule* by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Matt Martorello, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Attachments: # 1 Exhibit 1 (Proposed Order))(Anthony, David) (Entered: 10/09/2017) |
| 10/11/2017 | 42 | ORDER having considered the Joint Motion to Extend Briefing Schedule and for good cause shown, it is hereby ORDERED that the Joint Motion to Extend Briefing Schedule 41 is granted. It is further ORDERED that the Order 17 entered on September 1, 2017 is amended to reflect that plaintiffs shall file their response to the motions to dismiss by November 3, 2017 and the defendants shall file their replies by November 11, 2017. In all other respects the Order entered on September 1, 2017 shall remain unaffected and shall continue in full force and effect. Signed by District Judge Robert E. Payne on 10/10/17. (jtho, ) (Entered: 10/11/2017) |
| 10/11/2017 | 43 | ORDER that having considered DEFENDANTS BIG PICTURE LOANS, LLC, ASCENSIONTECHNOLOGIES, LLC, JAMES WILLIAMS, JR., GERTRUDE MCGESHICK, SUSANMCGESHICK, AND GIIWEGIIZHIGOOKWAY MARTIN'S Motion to Seal 31 and for good cause shown and the requirements of Local Civil Rule 5 having been met, it is hereby ORDERED that the Motion to Seal 31 is GRANTED and certain exhibits 34 to the pleadings as outlined in the Order are filed under seal provided that appropriately redacted versions thereof are filed in the public record. (SEE ORDER FOR DETAILS). Signed by District Judge Robert E. Payne on 10/10/17. (Entered: 10/11/2017) |

**JA23**

| | | |
|---|---|---|
| 10/12/2017 | 44 | ORDER that any disputes related to the parties' discovery concerning the Court's jurisdiction over the Defendants are referred to United States Magistrate Judge Roderick C. Young for disposition. Signed by District Judge Robert E. Payne on 10/11/2017. (jsmi, ) (Entered: 10/12/2017) |
| 10/12/2017 | | Case referred to Magistrate Judge Roderick C. Young. (jsmi, ) (Entered: 10/12/2017) |
| 10/13/2017 | 45 | VACATED PER 47 ORDER ENTERED ON 10/16/2017 - ORDER that the parties file a joint motion - in accordance with this Order - addressing the current discovery disputes no later than 10 days from the entry of this Order. The parties are reminded that discovery disputes requiring judicial intervention are strongly disfavored and that the Court will consider imposing sanctions pursuant to Federal Rule of Civil Procedure 37 and Local Rule 37 against any party not acting in good faith to resolve a dispute before involving the Court. See Order for details. Signed by Magistrate Judge Roderick C. Young on 10/13/2017. (jsmi, ) Modified on 10/16/2017 (jsmi, ). (Entered: 10/13/2017) |
| 10/13/2017 | 46 | Joint MOTION to Voluntarily Dismiss *(Defendant Daniel Gravel)* by Daniel Gravel. (Attachments: # 1 Exhibit 1 (Proposed Dismissal Order))(Anthony, David) (Entered: 10/13/2017) |
| 10/16/2017 | 47 | ORDER that the Court hereby vacates 45 Order previously issued on October 13, 2017. See Order for details. Signed by Magistrate Judge Roderick C. Young on 10/16/2017. (jsmi, ) (Entered: 10/16/2017) |
| 10/16/2017 | 48 | TRANSCRIPT of proceedings held on October 16, 2017, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 11/15/2017. Redacted Transcript Deadline set for 12/18/2017. Release of Transcript Restriction set for 1/16/2018.(peterson, peppy) (Entered: 10/16/2017)** |
| 10/16/2017 | | Minute Entry for proceedings held before District Judge Robert E. Payne:Telephone Conference held on 10/16/2017. (Court Reporter Peppy Peterson, OCR.)(khan, ) (Entered: 11/02/2017) |
| 10/18/2017 | 49 | ORDER that Plaintiffs' motion for waiver of the privileges claimed in Defendants' attorney-client and work-product privilege logs and their supporting brief shall be filed by October 23, 2017; Defendants' response shall be filed by October 30, 2017, and Plaintiffs' reply shall be filed by November 8, 2017; Documents relating to the vendors of Big Picture Loans,LLC, may be produced in redacted form; All documents concerning the capital sources of Big Picture Loans, LLC, shall be produced in un-redacted form, and Defendants' objection to providing documents relating to the structure and operation of the business is OVERRULED; Defendants' objection to Plaintiffs ' subpoenas on the ground that they are intended to frustrate business operations is OVERRULED; All of Defendants' discovery requests are stricken, with the exception of Defendants' depositions of Plaintiffs; Defendants' request for a limitation on discovery to "Tier One" only is DENIED as premature; The provisions of this Court's 42 ORDER of October 11, 2017 requiring Plaintiffs to file their responses to Defendants' motions to dismiss by November 3, 2017 and Defendants to file their replies by November 11, 2017 shall be held in suspension until the parties have |

JA24

| | | |
|---|---|---|
| | | conferred with respect to the discovery required by this ORDER and a new schedule can be determined. See Order for additional details and deadlines. Signed by District Judge Robert E. Payne on 10/17/2017. (jsmi, ) (Entered: 10/18/2017) |
| 10/18/2017 | 50 | DISMISSAL ORDER. It is, hereby ORDERED, ADJUDGED, and DECREED that the Complaint against DANIEL GRAVEL is DISMISSED without prejudice. Signed by District Judge Robert E. Payne on 10/17/2017. (jsmi, ) (Entered: 10/18/2017) |
| 10/23/2017 | 51 | MOTION to Compel *Documents Withheld on the Basis of Attorney-Client Privilege* by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 10/23/2017) |
| 10/23/2017 | 52 | Memorandum in Support re 51 MOTION to Compel *Documents Withheld on the Basis of Attorney-Client Privilege* filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Oct. 2 Privilege Log, # 2 Exhibit 2 - Oct. 10 Privilege Log, # 3 Exhibit 3 - Oct. 13 Privilege Log, # 4 Exhibit 4 - July 2012 Amended & Restated Servicing Agreement (Redacted), # 5 Exhibit 5 - BPL's Interrogatory Responses (Redacted), # 6 Exhibit 6 - Resume of James Dowd (Redacted), # 7 Exhibit 7 - Sept. 2015 Loan and Security Agreement (Redacted), # 8 Exhibit 8 - Ascension Employee List (Redacted), # 9 Exhibit 9 - Feb. 2015 Letter from McFadden (Redacted), # 10 Exhibit 10 - Promissory Note (Redacted), # 11 Exhibit 11 - Sept. 14, 2015 Agreement and Plan of Merger (Redacted))(Kelly, Kristi) (Entered: 10/23/2017) |
| 10/23/2017 | 53 | MOTION to Seal by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 10/23/2017) |
| 10/23/2017 | 54 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams re 53 MOTION to Seal (Kelly, Kristi) (Entered: 10/23/2017) |
| 10/23/2017 | 55 | Sealed Memorandum in Support re 53 MOTION to Seal . (Kelly, Kristi) (Entered: 10/23/2017) |
| 10/23/2017 | 56 | Sealed Attachment/Exhibit(s) re 53 MOTION to Seal . (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit)(Kelly, Kristi) (Entered: 10/23/2017) |
| 10/23/2017 | 57 | Memorandum in Support re 53 MOTION to Seal filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 10/23/2017) |
| 10/24/2017 | 58 | NOTICE of Appearance by Timothy James St. George on behalf of Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Matt Martorello, Gertrude McGeshick, Susan McGeshick, James Williams, Jr (St. George, Timothy) (Entered: 10/24/2017) |
| 10/24/2017 | 59 | Joint MOTION for Entry of Agreed Order by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1. Agreed Order) (Kelly, Kristi) (Entered: 10/24/2017) |
| 10/26/2017 | 60 | AGREED ORDER. It is ORDERED that the deadlines set forth in the Court's September 1, 2017 17 Order regarding the Defendants' motions to dismiss are hereby AMENDED as follows: Plaintiffs shall respond to the Defendants' motions to dismiss by December 7, 2017, and Defendants shall file their replies by December 21, 2017. Signed by District Judge Robert E. Payne on 10/26/2017. (jsmi, ) (Entered: 10/26/2017) |
| 10/27/2017 | 61 | MOTION for Protective Order *to Protect Privileged Attorney-Client Communications* by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (St. George, Timothy) (Entered: 10/27/2017) |

JA25

| | | |
|---|---|---|
| 10/27/2017 | 62 | Memorandum in Support re 61 MOTION for Protective Order *to Protect Privileged Attorney-Client Communications* filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Attachments: # 1 Exhibit A)(St. George, Timothy) (Entered: 10/27/2017) |
| 10/30/2017 | 63 | RESPONSE in Support re 53 MOTION to Seal filed by Matt Martorello. (St. George, Timothy) (Entered: 10/30/2017) |
| 10/30/2017 | 64 | RESPONSE in Support re 53 MOTION to Seal filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (St. George, Timothy) (Entered: 10/30/2017) |
| 10/30/2017 | 65 | Memorandum in Opposition re 51 MOTION to Compel *Documents Withheld on the Basis of Attorney-Client Privilege* filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(St. George, Timothy) (Entered: 10/30/2017) |
| 10/30/2017 | 66 | Second MOTION to Seal by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (St. George, Timothy) (Entered: 10/30/2017) |
| 10/30/2017 | 67 | Memorandum in Support re 66 Second MOTION to Seal filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Attachments: # 1 Appendix 1)(St. George, Timothy) (Entered: 10/30/2017) |
| 10/30/2017 | 68 | Notice of Filing Sealing Motion LCvR5(C) by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr re 66 Second MOTION to Seal (St. George, Timothy) (Entered: 10/30/2017) |
| 10/30/2017 | 69 | Sealed Response/Reply/Opposition. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Certificate of Service)(St. George, Timothy) (Entered: 10/30/2017) |
| 11/02/2017 | 70 | ORDER that the plaintiffs' 53 MOTION TO SEAL is granted in part and denied in part. The Motion is granted with respect to the PLAINTIFFS' 55 MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DOCUMENTS WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE and Exhibits 4, 5, 7, 8, 9, 10, and 11 thereto and those documents are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. The plaintiffs' MOTION TO SEAL is denied with respect Exhibit 6, the Resume of James V. Dowd, and the plaintiffs are directed to file a version of the resume redacting the personal identifiers of Mr. Dowd forthwith. Signed by District Judge Robert E. Payne on 11/1/2017. (jsmi, ) (Entered: 11/02/2017) |
| 11/08/2017 | 71 | REPLY to Response to Motion re 51 MOTION to Compel *Documents Withheld on the Basis of Attorney-Client Privilege* filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Kelly, Kristi) (Entered: 11/08/2017) |
| 11/08/2017 | 72 | Memorandum in Opposition re 61 MOTION for Protective Order *to Protect Privileged Attorney-Client Communications* filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Kelly, Kristi) (Entered: 11/08/2017) |
| 11/09/2017 | 73 | ORDER granting 66 TRIBAL DEFENDANTS' Motion to Seal MEMORANDUM IN |

JA26

| | | |
|---|---|---|
| | | OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL and Exhibits 2, 3, 4, and 5 thereto provided that appropriately redacted versions thereof are filed in the public record. It is so ORDERED. Signed by District Judge Robert E. Payne on 11/09/2017. (nbrow) (Entered: 11/09/2017) |
| 11/17/2017 | 74 | MOTION For Leave to Replace Exhibit No. 4 re 23 Memorandum in Support,,,, *(Unopposed)* by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 11/17/2017) |
| 11/17/2017 | 75 | Memorandum in Support re 74 MOTION For Leave to Replace Exhibit No. 4 re 23 Memorandum in Support,,,, *(Unopposed)* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit A)(St. George, Timothy) (Entered: 11/17/2017) |
| 11/20/2017 | 76 | REPLY to Response to Motion re 61 MOTION for Protective Order *to Protect Privileged Attorney-Client Communications* filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(St. George, Timothy) (Entered: 11/20/2017) |
| 11/20/2017 | 77 | MOTION Leave to File Sur-Reply in Opposition to Plaintiffs' Motion to Compel re 52 Memorandum in Support,,, by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (St. George, Timothy) (Entered: 11/20/2017) |
| 11/20/2017 | 78 | Memorandum in Support re 77 MOTION Leave to File Sur-Reply in Opposition to Plaintiffs' Motion to Compel re 52 Memorandum in Support,,, filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Attachments: # 1 Exhibit A)(St. George, Timothy) (Entered: 11/20/2017) |
| 11/21/2017 | 79 | Memorandum in Opposition re 77 MOTION Leave to File Sur-Reply in Opposition to Plaintiffs' Motion to Compel re 52 Memorandum in Support,,, filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 11/21/2017) |
| 11/21/2017 | 80 | REPLY to Response to Motion re 77 MOTION Leave to File Sur-Reply in Opposition to Plaintiffs' Motion to Compel re 52 Memorandum in Support,,, filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (St. George, Timothy) (Entered: 11/21/2017) |
| 11/21/2017 | 81 | ORDER having considered the Unopposed 74 Motion for Leave to Replace Exhibit, 23-4, and there being no objection, it is hereby ORDERED that the Clerk is directed to substitute the corrected Exhibit (ECF No. 75-1) in place of Exhibit 4 (ECF No. 23-4) to Big Picture Loans, LLC and Ascension Technologies, Inc.'s Brief in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction. Signed by District Judge Robert E. Payne on 11/21/17. (jtho, ) (Entered: 11/21/2017) |
| 11/27/2017 | 82 | NOTICE by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams re 70 Order on Motion to Seal,, *(Notice of Filing Regarding Plaintiffs' Motion to Seal)* (Attachments: # 1 Exhibit (Redacted Amended Servicing Agreement), # 2 Exhibit (Redacted Interrogatory Resume of James Dowd), # 3 Exhibit (Redacted Resume of James Dowd), # 4 Exhibit (Redacted Loan and Security Agreement), # 5 Exhibit (Redacted Ascension Employee List), # 6 Exhibit (Unredacted Feb. 2015 Letter), # 7 Exhibit (Redacted Promissory Note), # 8 Exhibit (Redacted Plan of Merger))(Kelly, Kristi) (Entered: 11/27/2017) |

JA27

| 12/07/2017 | 83 | Memorandum in Opposition re: 22 MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit). Modified docket entry on 12/08/2017. (walk, ). (Attachment 5 replaced on 2/22/2018) (jsmi, ). (Attachment 2 replaced on 7/27/2018) (jsmi, ). (Attachment 4 replaced on 7/27/2018) (jsmi, ). (Attachment 5 replaced on 7/27/2018) (jsmi, ). (Attachment 6 replaced on 7/27/2018) (jsmi, ). (Attachment 7 replaced on 7/27/2018) (jsmi, ). (Attachment 8 replaced on 7/27/2018) (jsmi, ). (Attachment 11 replaced on 7/27/2018) (jsmi, ). (Attachment 13 replaced on 7/27/2018) (jsmi, ). (Attachment 15 replaced on 7/27/2018) (jsmi, ). (Attachment 16 replaced on 7/27/2018) (jsmi, ). (Attachment 17 replaced on 7/27/2018) (jsmi, ). (Attachment 22 replaced on 7/27/2018) (jsmi, ). (Attachment 23 replaced on 7/27/2018) (jsmi, ). (Attachment 24 replaced on 7/27/2018) (jsmi, ). (Attachment 25 replaced on 7/27/2018) (jsmi, ). (Attachment 26 replaced on 7/27/2018) (jsmi, ). (Attachment 30 replaced on 7/27/2018) (jsmi, ). (Attachment 32 replaced on 7/27/2018) (jsmi, ). (Entered: 12/07/2017) |
| 12/07/2017 | 84 | Memorandum in Opposition re 24 MOTION to Dismiss for Failure to State a Claim filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 12/07/2017) |
| 12/07/2017 | 85 | Memorandum in Opposition re 36 MOTION to Dismiss for Failure to State a Claim filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Excerpt of Hearing Transcript)(Kelly, Kristi) (Entered: 12/07/2017) |
| 12/07/2017 | 86 | Memorandum in Opposition re: 26 MOTION to Dismiss *for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens* filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit). (Kelly, Kristi). Modified docket entry on 12/08/2017. (walk, ). (Entered: 12/07/2017) |
| 12/07/2017 | 87 | Memorandum in Opposition re 28 MOTION to Dismiss for Lack of Jurisdiction *(Subject Matter Jurisdiction, Personal Jurisdiction, and Article III Standing)* filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 12/07/2017) |
| 12/07/2017 | 88 | MOTION to Seal *83 Memorandum in Opposition re: 22 MOTION to Dismiss for Lack of Subject Matter Jurisdiction* by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order). (Kelly, Kristi). Modified docket entry on 12/08/2017. (walk, ). (Entered: 12/07/2017) |
| 12/07/2017 | 89 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams re 88 MOTION to Seal (Kelly, Kristi) (Entered: 12/07/2017) |
| 12/07/2017 | 90 | Sealed Memorandum in Opposition to 22 MOTION to Dismiss for Lack of Subject Matter Jurisdiction re: 88 MOTION to Seal. (Kelly, Kristi). Modified docket entry on 12/08/2017. (walk, ). (Entered: 12/07/2017) |
| 12/07/2017 | 91 | Sealed Exhibits re: 90 Sealed Memorandum in Opposition to 22 MOTION to Dismiss for Lack of Subject Matter Jurisdiction re: 88 MOTION to Seal. (Attachments: # 1 Exhibit #2 to Plaintiffs' Opposition, # 2 Exhibit #3 to Plaintiffs' Opposition, # 3 Exhibit |

**JA28**

| | | |
|---|---|---|
| | | #4 to Plaintiffs' Opposition, # <u>4</u> Exhibit #5 to Plaintiffs' Opposition, # <u>5</u> Exhibit #6 to Plaintiffs' Opposition, # <u>6</u> Exhibit #7 to Plaintiffs' Opposition, # <u>7</u> Exhibit #8 to Plaintiffs' Opposition, # <u>8</u> Exhibit #9 to Plaintiffs' Opposition, # <u>9</u> Exhibit #10 to Plaintiffs' Opposition, # <u>10</u> Exhibit #11 to Plaintiffs' Opposition, # <u>11</u> Exhibit #12 to Plaintiffs' Opposition, # <u>12</u> Exhibit #13 to Plaintiffs' Opposition, # <u>13</u> Exhibit #14 to Plaintiffs' Opposition, # <u>14</u> Exhibit #15 to Plaintiffs' Opposition, # <u>15</u> Exhibit #16 to Plaintiffs' Opposition, # <u>16</u> Exhibit #17 to Plaintiffs' Opposition, # <u>17</u> Exhibit #18 to Plaintiffs' Opposition, # <u>18</u> Exhibit #19 to Plaintiffs' Opposition, # <u>19</u> Exhibit #20 to Plaintiffs' Opposition, # <u>20</u> Exhibit #21 to Plaintiffs' Opposition, # <u>21</u> Exhibit #22 to Plaintiffs' Opposition, # <u>22</u> Exhibit #23 to Plaintiffs' Opposition, # <u>23</u> Exhibit #24 to Plaintiffs' Opposition, # <u>24</u> Exhibit #25 to Plaintiffs' Opposition, # <u>25</u> Exhibit #26 to Plaintiffs' Opposition, # <u>26</u> Exhibit #27 to Plaintiffs' Opposition, # <u>27</u> Exhibit #28 to Plaintiffs' Opposition, # <u>28</u> Exhibit #29 to Plaintiffs' Opposition, # <u>29</u> Exhibit #30 to Plaintiffs' Opposition, # <u>30</u> Exhibit #31 to Plaintiffs' Opposition, # <u>31</u> Exhibit #32 to Plaintiffs' Opposition). (Kelly, Kristi). Modified docket entry on 12/08/2017. (walk, ). (Attachment 4 replaced on 2/22/2018) (jsmi, ). (Entered: 12/07/2017) |
| 12/07/2017 | <u>92</u> | Memorandum in Support re <u>88</u> MOTION to Seal filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 12/07/2017) |
| 12/07/2017 | <u>93</u> | MOTION to Seal *86 Memorandum in Opposition re: <u>26</u> MOTION to Dismiss for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Proposed Order). (Kelly, Kristi). Modified docket entry on 12/08/2017. (walk, ). (Entered: 12/07/2017)* |
| 12/07/2017 | <u>94</u> | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams re <u>93</u> Second MOTION to Seal (Kelly, Kristi) (Entered: 12/07/2017) |
| 12/07/2017 | <u>95</u> | Sealed Memorandum in Opposition re: <u>26</u> MOTION to Dismiss *for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens* re: <u>93</u> MOTION to Seal. (Kelly, Kristi). Modified docket entry on 12/08/2017. (walk, ). (Entered: 12/07/2017) |
| 12/07/2017 | <u>96</u> | Sealed Exhibits re: <u>95</u> Sealed Memorandum in Opposition re: <u>26</u> MOTION to Dismiss *for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens* re: <u>93</u> MOTION to Seal. (Attachments: # <u>1</u> Exhibit #2 to Plaintiffs' Opposition, # <u>2</u> Exhibit #3 to Plaintiffs' Opposition, # <u>3</u> Exhibit #4 to Plaintiffs' Opposition, # <u>4</u> Exhibit #5 to Plaintiffs' Opposition, # <u>5</u> Exhibit #6 to Plaintiffs' Opposition). (Kelly, Kristi). Modified docket entry on 12/08/2017. (walk, ). (Entered: 12/07/2017) |
| 12/07/2017 | <u>97</u> | Memorandum in Support re: <u>93</u> MOTION to Seal filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi). Modified docket entry on 12/08/2017. (walk, ). (Entered: 12/07/2017) |
| 12/21/2017 | <u>98</u> | REPLY to Response to Motion re <u>36</u> MOTION to Dismiss for Failure to State a Claim filed by Matt Martorello. (St. George, Timothy) (Entered: 12/21/2017) |
| 12/21/2017 | <u>99</u> | REPLY to Response to Motion re <u>24</u> MOTION to Dismiss for Failure to State a Claim filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Anthony, David) (Entered: 12/21/2017) |
| 12/21/2017 | <u>100</u> | REPLY to Response to Motion re <u>26</u> MOTION to Dismiss *for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens* filed by Big Picture |

| | | |
|---|---|---|
| | | Loans, LLC. (Anthony, David) (Entered: 12/21/2017) |
| 12/21/2017 | 101 | REPLY to Response to Motion re 28 MOTION to Dismiss for Lack of Jurisdiction *(Subject Matter Jurisdiction, Personal Jurisdiction, and Article III Standing)* filed by Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (Anthony, David) (Entered: 12/21/2017) |
| 12/21/2017 | 102 | REPLY to Response to Motion re 22 MOTION to Dismiss for Lack of Jurisdiction filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22)(Anthony, David) (Attachment 3 replaced on 7/27/2018) (jsmi, ). (Attachment 4 replaced on 7/27/2018) (jsmi, ). (Attachment 5 replaced on 7/27/2018) (jsmi, ). (Attachment 6 replaced on 7/27/2018) (jsmi, ). (Attachment 7 replaced on 7/27/2018) (jsmi, ). (Attachment 11 replaced on 7/27/2018) (jsmi, ). (Attachment 13 replaced on 7/27/2018) (jsmi, ). (Attachment 22 replaced on 7/27/2018) (jsmi, ). (Entered: 12/21/2017) |
| 12/21/2017 | 103 | MOTION to Seal by Ascension Technologies, Inc., Big Picture Loans, LLC. (Anthony, David) (Entered: 12/21/2017) |
| 12/21/2017 | 104 | Memorandum in Support re 103 MOTION to Seal filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Appendix 1)(Anthony, David) (Entered: 12/21/2017) |
| 12/21/2017 | 105 | Notice of Filing Sealing Motion LCvR5(C) by Ascension Technologies, Inc., Big Picture Loans, LLC re 103 MOTION to Seal (Anthony, David) (Entered: 12/21/2017) |
| 12/21/2017 | 106 | Sealed Response/Reply/Opposition. (Attachments: # 1 Exhibit 1, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10, # 10 Exhibit 11, # 11 Exhibit 12, # 12 Exhibit 13, # 13 Exhibit 14, # 14 Exhibit 17, # 15 Exhibit 19, # 16 Exhibit 20, # 17 Exhibit 21, # 18 Exhibit 22, # 19 Certificate of Service)(Anthony, David) (Entered: 12/21/2017) |
| 12/28/2017 | 107 | ORDER that the plaintiffs' 88 MOTION TO SEAL is granted and PLAINTIFFS' 83 MEMORANDUM IN OPPOSITION TO DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, INC.'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION and Exhibits 1-30, and 32 thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 12/28/2017. (jsmi, ) (Entered: 12/28/2017) |
| 12/28/2017 | 108 | ORDER that the plaintiffs' 93 SECOND MOTION TO SEAL is granted and PLAINTIFFS' 95 OPPOSITION TO DEFENDANT BIG PICTURE LOANS, LLC'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS FOR FAILURE TO EXHAUST TRIBAL REMEDIES AND UNDER THE DOCTRINE OF FORUM NON CONVENIENS and 96 Exhibits 1, 2, 3, 4, 5 and 6 thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 12/28/2017. (jsmi, ) (Entered: 12/28/2017) |
| 01/03/2018 | 109 | NOTICE by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr re 73 Order on Motion to Seal, *(Notice of Filing Regarding Defendants' Motion to Seal)* (Attachments: # 1 Exhibit 2 (Redacted), # 2 Exhibit 3, # 3 Exhibit 4 (Redacted), # 4 Exhibit 5 (Redacted))(St. George, Timothy) (Entered: 01/03/2018) |
| 01/03/2018 | 110 | ORDER that 103 TRIBAL DEFENDANTS' THIRD MOTION TO SEAL is granted and |

**JA30**

| | | |
|---|---|---|
| | | 106 BIG PICTURE LOANS AND ASCENSION TECHNOLOGIES' REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 1/3/2018. (cgar, ) (Entered: 01/03/2018) |
| 01/12/2018 | 111 | ORDER re submissions made by the defendants, Big Picture Loans, LLC, Ascension Technologies, LLC, James Williams, Jr., Gertrude McGeshick, Susan McGeshick, and Giiwegiizhiigookway Martin, respecting claims of privilege. It is hereby ORDERED that the claims of privilege are sustained, overruled, or modified as outlined. Documents as to which the claims of privilege have been overruled in whole or in part shall be produced to plaintiffs' counsel by January 20, 2018. See Order for details. Signed by District Judge Robert E. Payne on 1/12/2018. (jsmi, ) (Entered: 01/12/2018) |
| 02/02/2018 | 112 | MOTION for Leave to File *Supplemental Authority* by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order) (Kelly, Kristi) (Entered: 02/02/2018) |
| 02/02/2018 | 113 | Memorandum in Support re 112 MOTION for Leave to File *Supplemental Authority* filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Memorandum Opinion in Pennsylvania v. Think Finance, # 2 Exhibit 2 - Finding of Fact and Conclusion of Law in CFPB v. CashCall)(Kelly, Kristi) (Entered: 02/02/2018) |
| 02/06/2018 | 114 | Response to 112 MOTION for Leave to File *Supplemental Authority* filed by Ascension Technologies, Inc., Big Picture Loans, LLC, Giiwegiizhigookway Martin, Gertrude McGeshick, Susan McGeshick, James Williams, Jr. (St. George, Timothy) (Entered: 02/06/2018) |
| 02/08/2018 | 115 | Response to 114 Response, filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 02/08/2018) |
| 02/27/2018 | 116 | ORDER that the following motions are denied as moot: PLAINTIFFS' 51 MOTION TO COMPEL DOCUMENTS WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE; DEFENDANTS 61 MOTION FOR PROTECTIVE ORDER TO PROTECT PRIVILEGED ATTORNEY-CLIENT COMMUNICATIONS; and TRIBAL DEFENDANTS' 77 MOTION FOR LEAVE TO FILE SUR-REPLY. See Order for details. Signed by District Judge Robert E. Payne on 2/27/2018. (jsmi, ) (Entered: 02/27/2018) |
| 03/12/2018 | 117 | ORDER that defendants' 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED is granted in part and taken under advisement in part. The motion is taken under advisement to the extent that Big Picture Loans, LLC and Ascension Technologies, Inc. seek dismissal under Rule 12(b)(6). However, the motion is granted to the extent that the Tribal Officer Defendants seek dismissal under Rule 12(b)(6. By April 5, 2018, Plaintiffs may file an Amended Complaint as to the Tribal Officer Defendants; and the Tribal Officer Defendants shall, by April 30, 2018, file their Answers thereto and any motions respecting the adequacy of the Amended Complaint. It is further ORDERED that the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process. See Order for details. Signed by District Judge Robert E. Payne on 3/9/2018. (jsmi, ) (Entered: 03/12/2018) |
| 03/12/2018 | 118 | ORDER that Plaintiffs' 112 MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY is granted. Signed by District Judge Robert E. Payne on 3/9/2018. (jsmi, ) (Entered: 03/12/2018) |

JA31

| | | |
|---|---|---|
| 03/12/2018 | 119 | ORDER that 36 MOTION OF DEFENDANT MATT MARTORELLO TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12 is denied. It is further ORDERED that the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process. See Order for details. Signed by District Judge Robert E. Payne on 3/12/2018. (jsmi, ) (Entered: 03/12/2018) |
| 03/12/2018 | 120 | ORDER that DEFENDANTS JAMES WILLIAMS, JR., GERTRUDE MCGESHICK, SUSAN MCGESHICK, AND GIIWEGIIZHIGOOKWAY MARTIN'S 28 MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, PERSONAL JURISDICTION, AND ARTICLE III STANDING is denied as moot. The Tribal Officer Defendants shall file any motions regarding the Court's lack of jurisdiction based on the Amended Complaint by April 30, 2018. Signed by District Judge Robert E. Payne on 3/12/2018. (jsmi, ) (Entered: 03/12/2018) |
| 04/04/2018 | 121 | NOTICE of Voluntary Dismissal *Without Prejudice as to the Tribal Officials* by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams (Kelly, Kristi) (Entered: 04/04/2018) |
| 04/05/2018 | 122 | ORDER that Plaintiffs' 121 notice shall be construed as a notice of its intent not to file an Amended Complaint against the Tribal Officer Defendants. Accordingly, those defendants may be terminated as defendants in this action (please see Order for additional information.) It is so ORDERED. Signed by District Judge Robert E. Payne on 04/04/2018. (walk, ) (Entered: 04/05/2018) |
| 06/25/2018 | 123 | ORDER that the foregoing documents will be unsealed unless the Defendants demonstrate by 5:00 p.m., June 28, 2018 that there are valid reasons for keeping the documents under seal in perspective of the rights of public access to court documents under the common law and the First Amendment, especially those that are key to an understanding of a court decision on an important issue. Signed by District Judge Robert E. Payne on 6/25/2018. (jsmi, ) (Entered: 06/25/2018) |
| 06/26/2018 | 124 | ORDER that DEFENDANTS BIG PICTURE LOANS AND ASCENSION TECHNOLOGIES' 22 MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION is denied. It is further ORDERED that the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process. As all pending motions to dismiss have been resolved, it is further ORDERED that the parties shall communicate with chambers to set a pretrial and trial schedule in this action. Signed by District Judge Robert E. Payne on 6/26/2018. (jsmi, ) (Entered: 06/26/2018) |
| 06/26/2018 | 125 | ORDER that DEFENDANTS BIG PICTURE LOANS, LLC, ASCENSION TECHNOLOGIES, LLC, JAMES WILLIAMS, JR., GERTRUDE MCGESHICK, SUSAN MCGESHICK, AND GIIWEGIIZHIGOOKWAY MARTIN'S 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED is denied as to Big Picture and Ascension. It is further ORDERED that the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process. Signed by District Judge Robert E. Payne on 6/26/2018. (jsmi, ) (Entered: 06/26/2018) |
| 06/28/2018 | 126 | MOTION To File an Opinion Under Seal or, Alternatively, to Permanently Seal 37 Documents by Ascension Technologies, Inc., Big Picture Loans, LLC. (Anthony, David) (Entered: 06/28/2018) |
| 06/28/2018 | 127 | Memorandum in Support re 126 MOTION To File an Opinion Under Seal or, Alternatively, to Permanently Seal 37 Documents filed by Ascension Technologies, Inc., |

| | | |
|---|---|---|
| | | Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Anthony, David) (Entered: 06/28/2018) |
| 07/03/2018 | 128 | ORDER SETTING PRETRIAL CONFERENCE. *See for complete details*. Signed by Nikki Brown with the permission of District Judge Robert E. Payne on 07/03/2018. (nbrow) (Entered: 07/03/2018) |
| 07/03/2018 | 129 | SCHEDULING ORDER: Initial Pretrial Conference set for 7/24/2018 at 11:45 AM in Richmond Judges Chamber before District Judge Robert E. Payne. *See for complete details*. Signed by Nikki Brown with the permission of District Judge Robert E. Payne on 07/03/2018. (Attachment: # 1 Schedule A) (nbrow) (Entered: 07/03/2018) |
| 07/03/2018 | 131 | AMENDED PER ORDER 132 ORDER that TRIBAL DEFENDANTS' 126 MOTION TO FILE AN OPINION UNDER SEAL OR, ALTERNATIVELY, TO PERMANENTLY SEAL 37 DOCUMENTS is granted to the extent that the Tribal Defendants seek to have the Memorandum Opinion regarding DEFENDANTS BIG PICTURE LOANS AND ASCENSION TECHNOLOGIES' 22 MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION temporarily filed under seal. The Clerk is directed to file the Memorandum Opinion under seal, and to provide counsel for Plaintiffs, Big Picture, and Ascension with copies of the Opinion. The Opinion will remain sealed for 14 days. See Order for additional details. Signed by District Judge Robert E. Payne on 7/3/2018. (jsmi, ) Modified on 7/5/2018 (tjoh, ). (Entered: 07/03/2018) |
| 07/05/2018 | 132 | ORDER. Having reconsidered the process described in the Court's previous ORDER (EOF No. 131), it is hereby ORDERED that the Order is amended such that any notebook submitted to the Court for in camera review shall also be provided to Plaintiffs, which may review the notebook consistent with the STIPULATED PROTECTIVE ORDER (EOF No. 19). If Plaintiffs have any response to the request that certain documents remain sealed, they shall respond within ten (10) days of the submission of the notebook, and the party requesting redaction shall reply within three (3) days thereof. Signed by District Judge Robert E. Payne on 07/03/2018. (tjoh, ) (Entered: 07/05/2018) |
| 07/17/2018 | 133 | Response to 131 Order on Motion for Miscellaneous Relief,, filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (St. George, Timothy) (Entered: 07/17/2018) |
| 07/17/2018 | 134 | NOTICE by Ascension Technologies, Inc., Big Picture Loans, LLC re 132 Order,, *of Submission of Documents for In Camera Review Pursuant to the Court's July 3, 2018 Order* (St. George, Timothy) (Entered: 07/17/2018) |
| 07/19/2018 | 135 | NOTICE OF APPEAL as to 124 Order on Motion to Dismiss/Lack of Jurisdiction,, by Ascension Technologies, Inc., Big Picture Loans, LLC. Filing fee $ 505, receipt number 0422-6185152. (St. George, Timothy) (Entered: 07/19/2018) |
| 07/20/2018 | 136 | ORDER that the Initial Pretrial Conference scheduled for 11:45 a.m. July 24, 2018 is rescheduled to 11:30 a.m. July 25, 2018. Signed by District Judge Robert E. Payne on 7/19/2018. (jsmi, ) (Entered: 07/20/2018) |
| 07/20/2018 | | Reset Hearing: Initial Pretrial Conference set for 7/25/2018 at 11:30 AM in Richmond Judges Chamber before District Judge Robert E. Payne. (nbrow) (Entered: 07/20/2018) |
| 07/20/2018 | 137 | MOTION to Stay *Proceedings Pending Appeal* by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 07/20/2018) |
| 07/20/2018 | 138 | Memorandum in Support re 137 MOTION to Stay *Proceedings Pending Appeal* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit A, # 2 |

JA33

| | | Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(St. George, Timothy) (Entered: 07/20/2018) |
|---|---|---|
| 07/20/2018 | 139 | Transmission of Notice of Appeal to US Court of Appeals re 135 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lgar, ) (Entered: 07/20/2018) |
| 07/23/2018 | | USCA Case Number 18-1827, Case Manager Cathy Herb for 135 Notice of Appeal filed by Big Picture Loans, LLC, Ascension Technologies, Inc.. (lgar, ) (Entered: 07/23/2018) |
| 07/24/2018 | 140 | MOTION to Stay by Matt Martorello. (St. George, Timothy) (Entered: 07/24/2018) |
| 07/24/2018 | 141 | Memorandum in Support re 140 MOTION to Stay filed by Matt Martorello. (St. George, Timothy) (Entered: 07/24/2018) |
| 07/25/2018 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Initial Pretrial Conference held on 7/25/2018. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 07/25/2018) |
| 07/25/2018 | 142 | ORDER that DEFENDANT BIG PICTURE LOANS, LLC'S 26 MOTION TO DISMISS FOR FAILURE TO EXHAUST TRIBAL REMEDIES AND UNDER THE DOCTRINE OF FORUM NON CONVENIENS is denied. It is further ORDERED that the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process. See Order for details. Signed by District Judge Robert E. Payne on 7/24/2018. (jsmi, ) (Entered: 07/25/2018) |
| 07/25/2018 | 143 | ORDER that the Clerk shall unseal entirely the following documents: ECF Nos. 34, 34-1, 34-2, 34-3, 34-4, 34-8, 34-10, 34-11, 90, 91-8, 91-9, 91-11, 91-13, 91-17, 91-18, 91-26, 91-27, 91-28, 91-30, 106, 106-1, 106-7, 106-8, 106-9, 106-11, 106-13, 106-16, and 106-17. Furthermore, it is ORDERED that Plaintiffs or Big Picture and Ascension whichever party originally filed the document noted shall re-file the following documents with redactions consistent with those described: ECF Nos. 23-24, 23-29, 23-31, 23-34, 83-2, 83-4, 83-5, 83-6, 83-7, 83-8, 83-11, 83-13, 83-15, 83-16, 83-17, 83-22, 83-23, 83-24, 83-25, 83-26, 83-30, 83-32, 102-3, 102-4, 102-5, 102-6, 102-7, 102-11, 102-13, and 102-22. All other documents not referenced in this Order shall remain sealed. Signed by District Judge Robert E. Payne on 7/25/2018. (jsmi, ) (Entered: 07/25/2018) |
| 07/26/2018 | 144 | JURY INITIAL PRETRIAL ORDER. At a pretrial conference held on July 25, 2018, this action was set for trial by a jury on March 18, 2019, at 9:30 o'clock, a.m. The Scheduling Order and Pretrial Schedule A previously issued in this action shall remain in effect. A Final Pretrial Conference will be conducted at 10:00 o'clock, a.m. on March 11, 2019, at which time trial counsel shall appear and present for entry a Final Pretrial Order setting forth: (*See for complete details*). It is so ORDERED. Signed by District Judge Robert E. Payne on 07/26/2018. (nbrow) (Entered: 07/26/2018) |
| 07/26/2018 | | Set Hearings: Final Pretrial Conference set for 3/11/2019 at 10:00 AM in Richmond Judges Chamber before District Judge Robert E. Payne. Jury Trial set for 3/18/2019 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 07/26/2018) |
| 07/26/2018 | 145 | ORDER that the settlement conference and proceedings required by paragraph 3 of the Scheduling Order are referred to United States Magistrate Judge David J. Novak. Counsel shall be responsible for contacting the Chambers of Magistrate Judge Novak within 5 days of the date of this Order to schedule the conference to occur within the fifty-day period required by paragraph 3 of the Scheduling Order or at such other time as Magistrate Judge Novak shall approve. Signed by District Judge Robert E. Payne on 7/26/2018. (jsmi, ) (Entered: 07/26/2018) |

**JA34**

| | | |
|---|---|---|
| 07/26/2018 | | Case referred to Magistrate Judge David J. Novak. (jsmi, ) (Entered: 07/26/2018) |
| 07/27/2018 | 146 | REDACTED MEMORANDUM OPINION re: (SEALED MEMORANDUM OPINION 130 ). Signed by District Judge Robert E. Payne on 07/27/2018. (tjoh, ) Modified docket text on 5/24/2019 (jtho, ). (Entered: 07/27/2018) |
| 07/31/2018 | 147 | TRANSCRIPT of proceedings held on July 25, 2018, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 8/30/2018. Redacted Transcript Deadline set for 10/1/2018. Release of Transcript Restriction set for 10/29/2018.(peterson, peppy) (Entered: 07/31/2018)** |
| 08/02/2018 | 148 | MOTION to Overrule Defendant Martorello's Discovery Objections by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 08/02/2018) |
| 08/02/2018 | 149 | Memorandum in Support re 148 MOTION to Overrule Defendant Martorello's Discovery Objections filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Kelly, Kristi) (Entered: 08/02/2018) |
| 08/03/2018 | | Conference Call set for 8/3/2018 at 11:00 AM before Magistrate Judge David J. Novak. (cgar) (Entered: 08/03/2018) |
| 08/03/2018 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Telephone Conference held on 8/3/2018. (cgar) (Entered: 08/03/2018) |
| 08/03/2018 | 150 | Memorandum in Opposition re 137 MOTION to Stay *Proceedings Pending Appeal* filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 08/03/2018) |
| 08/07/2018 | 151 | Memorandum in Opposition re 140 MOTION to Stay filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Oct. 31, 2017 e-mail correspondence, # 2 Exhibit 2 - Aug. 2018 letter correspondence) (Kelly, Kristi) (Entered: 08/07/2018) |
| 08/09/2018 | 152 | REPLY to Response to Motion re 137 MOTION to Stay *Proceedings Pending Appeal* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit A)(St. George, Timothy) (Entered: 08/09/2018) |
| 08/13/2018 | 153 | Consent MOTION for Extension of Time to File Response/Reply *in Support of Motion to Stay* by Matt Martorello. (Attachments: # 1 Proposed Order)(St. George, Timothy) (Entered: 08/13/2018) |
| 08/14/2018 | 154 | ORDER that 153 Motion for Extension of Time to File Reply Brief in Support of Motion to Stay is granted, and that Matt Martorello shall have up to and including August 16, 2018 to file his reply brief in support of his Motion to Stay. Signed by District Judge Robert E. Payne on 8/14/2018. (jsmi, ) (Entered: 08/14/2018) |
| 08/16/2018 | 155 | NOTICE of Appearance by Maurice Francis Mullins on behalf of Matt Martorello (Mullins, Maurice) (Entered: 08/16/2018) |

**JA35**

| 08/16/2018 | 156 | REPLY to Response to Motion re 140 MOTION to Stay filed by Matt Martorello. (Mullins, Maurice) (Entered: 08/16/2018) |
|---|---|---|
| 08/16/2018 | 157 | Memorandum in Opposition re 148 MOTION to Overrule Defendant Martorello's Discovery Objections filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Mullins, Maurice) (Entered: 08/16/2018) |
| 08/17/2018 | 158 | MOTION to Withdraw as Attorney *Karrie Sue Wichtman* by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1 (Proposed Order))(St. George, Timothy) (Entered: 08/17/2018) |
| 08/17/2018 | 159 | Memorandum in Support re 158 MOTION to Withdraw as Attorney *Karrie Sue Wichtman* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 08/17/2018) |
| 08/17/2018 | 160 | NOTICE of Appearance by Hugh McCoy Fain, III on behalf of Matt Martorello (Fain, Hugh) (Entered: 08/17/2018) |
| 08/17/2018 | 161 | NOTICE of Appearance by John Michael Erbach on behalf of Matt Martorello (Erbach, John) (Entered: 08/17/2018) |
| 08/20/2018 | 162 | ORDER REGARDING PROCEDURES FOR SETTLEMENT CONFERENCE. The Court has scheduled this case for a settlement conference on **September 4, 2018, at 10:00 a.m.** At that time, the parties shall report to the chambers of United States Magistrate Judge David J. Novak. In addition to counsel, each party must have a representative physically present with the full authority to settle this action. The failure of a party to have a representative physically present with full authority to settle the case may result in the imposition of sanctions upon that party. SEE ORDER FOR DETAILS. Signed by Magistrate Judge David J. Novak on 08/17/2018. (smej, ) (Entered: 08/20/2018) |
| 08/20/2018 | | Settlement Conference set for 9/4/2018 at 10:00 AM in Richmond Judges Chamber before Magistrate Judge David J. Novak. (cgar) (Entered: 08/20/2018) |
| 08/21/2018 | 163 | ORDER that the MOTION TO WITHDRAW COUNSEL [sic] 158 is granted. It is further ORDERED that the Clerk shall remove Karrie Sue Wichtman, Esquire as counsel of record for the defendants, Big Picture Loans, LLC and Ascension Technologies, Inc. Signed by District Judge Robert E. Payne on 08/20/2018. (smej, ) (Entered: 08/21/2018) |
| 08/22/2018 | 164 | REPLY to Response to Motion re 148 MOTION to Overrule Defendant Martorello's Discovery Objections filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Kelly, Kristi) (Entered: 08/22/2018) |
| 08/22/2018 | 165 | MOTION to Seal by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 08/22/2018) |
| 08/22/2018 | 166 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams re 165 MOTION to Seal (Kelly, Kristi) (Entered: 08/22/2018) |
| 08/22/2018 | 167 | Sealed Document re 165 MOTION to Seal . (Attachments: # 1 Exhibit 4 to Reply Brief, # 2 Exhibit 5 to Reply Brief)(Kelly, Kristi) (Entered: 08/22/2018) |
| 08/22/2018 | 168 | Memorandum in Support re 165 MOTION to Seal filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 08/22/2018) |
| 08/24/2018 | 169 | MOTION for Leave to File *a Sur Reply in Opposition to Plaintiffs' Motion to Overrule* |

JA36

| | | |
|---|---|---|
| | | *Discovery Objections* by Matt Martorello. (Attachments: # 1 Proposed Order)(Mullins, Maurice) (Entered: 08/24/2018) |
| 08/24/2018 | 170 | Memorandum in Support re 169 MOTION for Leave to File *a Sur Reply in Opposition to Plaintiffs' Motion to Overrule Discovery Objections* filed by Matt Martorello. (Attachments: # 1 Exhibit Proposed Sur Reply)(Mullins, Maurice) (Entered: 08/24/2018) |
| 08/27/2018 | 171 | NOTICE by Dowin Coffy, Felix Gillison, Jr., George Hengle, Gloria Turnage, Lula Williams Regarding Defendant Martorello's 169 MOTION for Leave to File *a Sur-Reply in Opposition to Plaintiffs' Motion to Overrule Discovery Objections*. (Kelly, Kristi). Modified docket entry on 08/27/2018. (walk, ). (Entered: 08/27/2018) |
| 08/31/2018 | 175 | ORDER that the Plaintiffs' 165 MOTION TO SEAL is granted and PLAINTIFFS' 167 REPLY BRIEF IN SUPPORT OF THEIR MOTION TO OVERRULE DEFENDANT MARTORELLO'S DISCOVERY ORDER and Exhibits 4 and 5 thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 8/30/2018. (jsmi, ) (Entered: 08/31/2018) |
| 09/04/2018 | | Settlement Conference set for 10/16/2018 at 10:00 AM in Richmond Judges Chamber before Magistrate Judge David J. Novak. (cgar) (Entered: 09/04/2018) |
| 09/04/2018 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Settlement Conference held on 9/4/2018. (cgar) (Entered: 09/05/2018) |
| 09/06/2018 | 176 | Motion to appear Pro Hac Vice by Matthew Wessler and Certification of Local Counsel Leonard A. Bennett Filing fee $ 75, receipt number 0422-6260707. by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 09/06/2018) |
| 09/06/2018 | 177 | Motion to appear Pro Hac Vice by Jennifer Rust Murray and Certification of Local Counsel Leonard A. Bennett Filing fee $ 75, receipt number 0422-6260719. by Dowin Coffy, Felix Gillison, Jr, George Hengle. (Bennett, Leonard) (Entered: 09/06/2018) |
| 09/06/2018 | 178 | Motion to appear Pro Hac Vice by Elizabeth Anne Adams and Certification of Local Counsel Leonard A. Bennett Filing fee $ 75, receipt number 0422-6260729. by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 09/06/2018) |
| 09/06/2018 | 179 | Motion to appear Pro Hac Vice by Beth Ellen Terrell and Certification of Local Counsel Leonard A. Bennett Filing fee $ 75, receipt number 0422-6260749. by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 09/06/2018) |
| 09/11/2018 | 180 | Motion to appear Pro Hac Vice by Eleanor Michelle Drake and Certification of Local Counsel Kristi C. Kelly Filing fee $ 75, receipt number 0422-6266950. by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 09/11/2018) |
| 09/11/2018 | 181 | Motion to appear Pro Hac Vice by John Gerard Albanese and Certification of Local Counsel Kristi C. Kelly Filing fee $ 75, receipt number 0422-6266970. by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 09/11/2018) |
| 09/11/2018 | 182 | NOTICE by Ascension Technologies, Inc., Big Picture Loans, LLC *OF COMPLIANCE WITH ORDER ENTERED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO* (Attachments: # 1 Exhibit A)(St. George, Timothy) (Entered: 09/11/2018) |

| 09/12/2018 | 183 | ORDERS granting 176 , 177 , 178 , and 179 Motiona for Pro hac vice. Matthew William Wessler, Jennifer Rust Murray, Elizabeth Anne Adams, and Beth Ellen Terrell appointed for Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix Gillison, Jr. Signed by District Judge Robert E. Payne on 9/11/2018. (jsmi, ) (Entered: 09/12/2018) |
|---|---|---|
| 09/12/2018 | 184 | NOTICE of Appearance by Elizabeth W. Hanes on behalf of Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams (Hanes, Elizabeth) (Entered: 09/12/2018) |
| 09/13/2018 | 185 | NOTICE by Ascension Technologies, Inc., Big Picture Loans, LLC *of Compliance with Order Entered by the United States District Court for the District of Puerto Rico* (St. George, Timothy) (Entered: 09/13/2018) |
| 09/14/2018 | 186 | MOTION to Substitute Party by Dowin Coffy, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 09/14/2018) |
| 09/14/2018 | 187 | Memorandum in Support re 186 MOTION to Substitute Party filed by Dowin Coffy, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1)(Kelly, Kristi) (Entered: 09/14/2018) |
| 09/14/2018 | 188 | ORDER granting 180 and 181 Motions for Pro hac vice. Eleanor Michelle Drake and John Gerard Albanese added for Dowin Coffy, Felix Gillison, Jr., George Hengle, Gloria Turnage, and Lula Williams. Signed by District Judge Robert E. Payne on 9/13/2018. (jsmi, ) ( (Entered: 09/14/2018) |
| 09/14/2018 | 189 | MOTION to Certify Class *against Defendant Matt Martorello* by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 09/14/2018) |
| 09/14/2018 | 190 | Memorandum in Support re 189 MOTION to Certify Class *against Defendant Matt Martorello* filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27)(Kelly, Kristi) (Entered: 09/14/2018) |
| 09/14/2018 | 191 | MOTION to Seal by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 09/14/2018) |
| 09/14/2018 | 192 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams re 191 MOTION to Seal (Kelly, Kristi) (Entered: 09/14/2018) |
| 09/14/2018 | 193 | Sealed Document re 191 MOTION to Seal . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 11, # 10 Exhibit 12, # 11 Exhibit 13, # 12 Exhibit 15, # 13 Exhibit 16, # 15 Exhibit 17, # 16 Exhibit 21)(Kelly, Kristi) (Entered: 09/14/2018) |
| 09/14/2018 | 194 | Memorandum in Support re 191 MOTION to Seal filed by Dowin Coffy, Felix Gillison, Jr, George Hengle, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 09/14/2018) |
| 09/20/2018 | 195 | ORDER that DEFENDANT MARTORELLO'S 169 MOTION FOR LEAVE TO FILE A SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION TO OVERRULE DISCOVERY OBJECTIONS is granted. It is further ORDERED that the defendant, Matt Martorello, shall electronically file his proposed Sur-Reply forthwith. Signed by District Judge Robert E. Payne on 9/20/2018. (jsmi, ) (Entered: 09/20/2018) |

JA38

| 09/20/2018 | 196 | Reply to 148 MOTION to Overrule Defendant Martorello's Discovery Objections *(Defendant Matt Martorello's Sur-Reply in Opposition to Plaintiffs' Motion to Overrule Discovery Objections)* filed by Matt Martorello. (Erbach, John) (Entered: 09/20/2018) |
| 09/26/2018 | 197 | ORDER that Plaintiffs' 191 MOTION TO SEAL is granted and PLAINTIFFS' 193 MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 9/26/2018. (jsmi, ) (Entered: 09/26/2018) |
| 09/28/2018 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Telephone Conference (w/David Anthony) held on 9/28/2018. (cgar) (Entered: 09/28/2018) |
| 10/02/2018 | 198 | Supplemental MOTION to Stay *All Proceedings Pending Appeal of the Court's June 26, 2018 Order* by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 10/02/2018) |
| 10/02/2018 | 199 | Memorandum in Support re 198 Supplemental MOTION to Stay *All Proceedings Pending Appeal of the Court's June 26, 2018 Order* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(St. George, Timothy) (Entered: 10/02/2018) |
| 10/03/2018 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Telephone Conferences held on 10/3/2018. (cgar) (Entered: 10/03/2018) |
| 10/09/2018 | 200 | ORDER that the plaintiffs' 186 MOTION TO SUBSTITUTE PARTY is granted. It is further ORDERED that the Clerk shall substitute Marcella P. Singh, as Administrator of the Estate of Felix M. Gillson, Jr., as the party in place of the plaintiff, Felix M. Gillson, Jr., deceased. Signed by District Judge Robert E. Payne on 10/8/2018. (jsmi, ) (Entered: 10/09/2018) |
| 10/11/2018 | 201 | Motion to appear Pro Hac Vice by Anna Marek Bruty and Certification of Local Counsel Timothy J. St. George Filing fee $ 75, receipt number 0422-6310914. by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 10/11/2018) |
| 10/11/2018 | 202 | NOTICE of Appearance by Craig Thomas Merritt on behalf of Ascension Technologies, Inc., Big Picture Loans, LLC (Merritt, Craig) (Entered: 10/11/2018) |
| 10/11/2018 | 203 | NOTICE of Appearance by Harrison Mann Gates on behalf of Ascension Technologies, Inc., Big Picture Loans, LLC (Gates, Harrison) (Entered: 10/11/2018) |
| 10/12/2018 | 204 | Consent MOTION for Extension of Time to File Response/Reply as to 189 MOTION to Certify Class *against Defendant Matt Martorello* by Matt Martorello. (Attachments: # 1 Exhibit 1 (Proposed Order))(St. George, Timothy) (Entered: 10/12/2018) |
| 10/16/2018 | 205 | ORDER that Defendant's 204 Motion for Extension of Time is granted. It is further ORDERED that, by October 22, 2018, the defendant, Matt Martorello, shall file his response to PLAINTIFFS' 189 MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO and, by November 5, 2018, the plaintiffs shall file their reply. Signed by District Judge Robert E. Payne on 10/16/2018. (jsmi, ) (Entered: 10/16/2018) |
| 10/16/2018 | 206 | ORDER granting 201 Motion for Pro hac vice. Anna Marek Bruty appointed for Ascension Technologies, Inc. and Big Picture Loans, LLC. Signed by District Judge Robert E. Payne on 10/16/2018. (jsmi, ) (Entered: 10/16/2018) |

**JA39**

| 10/16/2018 | 207 | Memorandum in Opposition re 198 Supplemental MOTION to Stay *All Proceedings Pending Appeal of the Court's June 26, 2018 Order* filed by Dowin Coffy, George Hengle, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Aug. 2018 E-mail Chain, # 2 Exhibit 2 - Sept. 4 E-mail, # 3 Exhibit 3 - Aug. 2018 E-mail Chain, # 4 Exhibit 4 - filed under seal, # 5 Exhibit 5 - filed under seal, # 6 Exhibit 6 - Aug. 6, 2018 Interrogatory Responses, # 7 Exhibit 7 - Aug. 14, 2018 Interrogatory Responses)(Kelly, Kristi) (Entered: 10/16/2018) |
| 10/16/2018 | 208 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 10/16/2018) |
| 10/16/2018 | 209 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 208 MOTION to Seal (Kelly, Kristi) (Entered: 10/16/2018) |
| 10/16/2018 | 210 | Sealed Attachment/Exhibit re 208 MOTION to Seal . (Attachments: # 1 Exhibit 5) (Kelly, Kristi) Modified to correct docket text on 2/8/2019 (jsmi, ). (Entered: 10/16/2018) |
| 10/16/2018 | 211 | Memorandum in Support re 208 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 10/16/2018) |
| 10/17/2018 | | Telephone Conference (w/Kristi Kelly)set for 10/16/2018 at 04:15 PM before Magistrate Judge David J. Novak. (cgar) (Entered: 10/17/2018) |
| 10/17/2018 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Telephone Conferences held on 10/16/2018. (cgar) (Entered: 10/17/2018) |
| 10/18/2018 | 212 | Consent MOTION to Exceed Page Limitation of Local Civil Rule 7(F)(3) by Matt Martorello. (St. George, Timothy) (Entered: 10/18/2018) |
| 10/18/2018 | 213 | Memorandum in Support re 212 Consent MOTION to Exceed Page Limitation of Local Civil Rule 7(F)(3) filed by Matt Martorello. (Attachments: # 1 Exhibit 1 (Proposed Order))(St. George, Timothy) (Entered: 10/18/2018) |
| 10/19/2018 | 214 | STATUS REPORT by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(St. George, Timothy) (Entered: 10/19/2018) |
| 10/19/2018 | 215 | ORDER GRANTING Defendant, Matt Martorello's 212 Motion to Exceed Page Limitation of Local Civil Rule 7(f)(3) with respect to his forthcoming memorandum in opposition to Plaintiffs' Motion for Class Certification (Dkt. No. 189 and 1. Martorello may file a memorandum in opposition to Plaintiffs' Renewed Motion for Class Certification not to exceed 40 pages in length; and, 2. Plaintiffs, if desired, may file a reply brief in support of their Motion for Class Certification not to exceed 30 pages in length. It is so ORDERED. Signed by District Judge Robert E. Payne on 10/19/2018. (walk, ) (Entered: 10/19/2018) |
| 10/22/2018 | 216 | **DISREGARD FILING. SEE 22 .** Memorandum in Opposition re 189 MOTION to Certify Class *against Defendant Matt Martorello* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B (proposed to be filed under seal), # 3 Exhibit C, # 4 Exhibit D (proposed to be filed under seal), # 5 Exhibit E (proposed to be filed under seal), # 6 Exhibit F, # 7 Exhibit G (proposed to be filed under seal), # 8 Exhibit H, # 9 Exhibit I (proposed to be filed under seal), # 10 Exhibit J (proposed to be filed under seal), # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M (proposed to be filed under seal), # 14 Exhibit N, # 15 Exhibit O (proposed to be filed under seal), # 16 Exhibit P (proposed to be filed under seal), # 17 Exhibit Q, # 18 Exhibit R (proposed to be filed under seal), |

JA40

| | | |
|---|---|---|
| | | # 19 Exhibit S (proposed to be filed under seal), # 20 Exhibit T (proposed to be filed under seal), # 21 Exhibit U (proposed to be filed under seal), # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X (proposed to be filed under seal), # 25 Exhibit Y (proposed to be filed under seal), # 26 Exhibit Z (proposed to be filed under seal), # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC (proposed to be filed under seal), # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II (proposed to be filed under seal), # 36 Exhibit JJ (proposed to be filed under seal), # 37 Exhibit KK, # 38 Exhibit LL (proposed to be filed under seal), # 39 Exhibit MM, # 40 Exhibit NN (proposed to be filed under seal), # 41 Exhibit OO (proposed to be filed under seal), # 42 Exhibit PP (proposed to be filed under seal), # 43 Exhibit QQ, # 44 Exhibit RR)(St. George, Timothy) Modified on 10/26/2018 (jsmi, ). (Entered: 10/22/2018) |
| 10/22/2018 | 217 | MOTION to Seal *Certain Exhibits and Information in 220 Memorandum in Opposition to Plaintiffs' Motion for Class Certification* by Matt Martorello. (St. George, Timothy). Modified docket entry on 10/24/2018. (walk, ). (Entered: 10/22/2018) |
| 10/22/2018 | 218 | Memorandum in Support re: 217 MOTION to Seal *Certain Exhibits and Information in 220 Memorandum in Opposition to Plaintiffs' Motion for Class Certification* filed by Matt Martorello. (St. George, Timothy). Modified docket entry on 10/24/2018. (walk, ). (Entered: 10/22/2018) |
| 10/22/2018 | 219 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re: 217 MOTION to Seal *Certain Exhibits and Information in 220 Memorandum in Opposition to Plaintiffs' Motion for Class Certification.* (St. George, Timothy). Modified docket entry on 10/24/2018. (walk, ). (Entered: 10/22/2018) |
| 10/22/2018 | 220 | SEALED Memorandum in Opposition to Plaintiffs' Motion for Class Certification re: 217 MOTION to Seal *Certain Exhibits and Information in 220 Memorandum in Opposition to Plaintiffs' Motion for Class Certification.* (Attachments: # 1 Exhibit B, # 2 Exhibit D, # 3 Exhibit E, # 4 Exhibit G, # 5 Exhibit I, # 6 Exhibit J, # 7 Exhibit M, # 8 Exhibit O, # 9 Exhibit P, # 10 Exhibit R, # 11 Exhibit S, # 12 Exhibit T, # 13 Exhibit U, # 14 Exhibit X, # 15 Exhibit Y, # 16 Exhibit Z, # 17 Exhibit CC, # 18 Exhibit II, # 19 Exhibit JJ, # 20 Exhibit LL, # 21 Exhibit NN, # 22 Exhibit OO, # 23 Exhibit PP)(St. George, Timothy). Clerk replaced attachment (8) Exhibit O on 10/23/2018 at the request of filing attorney. NEF was regenerated. Modified docket text on 10/23/2018 (sbea, ). Modified docket entry on 10/24/2018. (walk, ). (Entered: 10/23/2018) |
| 10/23/2018 | 221 | Motion to appear Pro Hac Vice by Michael Christopher Witsch and Certification of Local Counsel John Michael Erbach Filing fee $ 75, receipt number 0422-6329274. by Matt Martorello. (Erbach, John) (Entered: 10/23/2018) |
| 10/23/2018 | | Notice of Correction re 216 Memorandum in Opposition. Notified filing attorney regarding proper procedure for splitting documents over 10MB size limit and for filing redacted exhibits for the public record. Attorney will refile Memorandum in Opposition with appropriately redacted exhibits. (jsmi, ) (Entered: 10/23/2018) |
| 10/23/2018 | 222 | Memorandum in Opposition re 189 MOTION to Certify Class *against Defendant Matt Martorello (Corrected, redacted exhibits)* filed by Matt Martorello. (Attachments: # 1 Exhibit A (Part I), # 2 Exhibit A (Part II), # 3 Exhibit B (proposed to be filed under seal), # 4 Exhibit C, # 5 Exhibit D (proposed to be filed under seal), # 6 Exhibit E (proposed to be filed under seal), # 7 Exhibit F, # 8 Exhibit G (proposed to be filed under seal), # 9 Exhibit H, # 10 Exhibit I (proposed to be filed under seal), # 11 Exhibit J (proposed to be filed under seal), # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M (proposed to be filed under seal), # 15 Exhibit N, # 16 Exhibit O (proposed to be filed under seal), # 17 Exhibit P (proposed to be filed under seal), # 18 Exhibit Q, # 19 Exhibit R (proposed to be filed under seal), # 20 Exhibit S (proposed to be filed under |

| | | |
|---|---|---|
| | | seal), # 21 Exhibit T (proposed to be filed under seal), # 22 Exhibit U (proposed to be filed under seal), # 23 Exhibit V, # 24 Exhibit W, # 25 Exhibit X (proposed to be filed under seal), # 26 Exhibit Y (proposed to be filed under seal), # 27 Exhibit Z (proposed to be filed under seal), # 28 Exhibit AA, # 29 Exhibit BB, # 30 Exhibit CC (proposed to be filed under seal), # 31 Exhibit DD, # 32 Exhibit EE, # 33 Exhibit FF, # 34 Exhibit GG, # 35 Exhibit HH, # 36 Exhibit II (proposed to be filed under seal), # 37 Exhibit JJ (proposed to be filed under seal), # 38 Exhibit KK, # 39 Exhibit LL (proposed to be filed under seal), # 40 Exhibit MM, # 41 Exhibit NN(proposed to be filed under seal), # 42 Exhibit OO (proposed to be filed under seal), # 43 Exhibit PP (proposed to be filed under seal), # 44 Exhibit QQ, # 45 Exhibit RR)(St. George, Timothy) (Entered: 10/23/2018) |
| 10/23/2018 | 223 | Consent MOTION for Extension *of Time to File Reply Memorandum to Supplemental Motion to Stay All Proceedings Pending Appeal of the Courts June 26, 2018 Order* by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1)(St. George, Timothy) (Entered: 10/23/2018) |
| 10/25/2018 | 224 | ORDER that 223 Consent Motion for Extension of Time to File Their Reply to Supplemental Motion to Stay All Proceedings Pending Appeal of the Court's June 26, 2018 Order is granted. The time by which Big Picture Loans, LLC and Ascension Technologies, LLC must file their reply is extended until October 30, 2018. Signed by District Judge Robert E. Payne on 10/24/2018. (jsmi, ) (Entered: 10/25/2018) |
| 10/26/2018 | 225 | ORDER granting 221 Motion for Pro hac vice. Michael Christopher Witsch appointed for Matt Martorello. Signed by District Judge Robert E. Payne on 10/26/2018. (jsmi, ) (Entered: 10/26/2018) |
| 10/29/2018 | 226 | Consent MOTION for Extension of Time to File Response/Reply as to 189 MOTION to Certify Class *against Defendant Matt Martorello* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order) (Kelly, Kristi) (Entered: 10/29/2018) |
| 10/29/2018 | 227 | Memorandum in Support re 226 Consent MOTION for Extension of Time to File Response/Reply as to 189 MOTION to Certify Class *against Defendant Matt Martorello* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 10/29/2018) |
| 10/29/2018 | 228 | REPLY to Response to Motion re 198 Supplemental MOTION to Stay *All Proceedings Pending Appeal of the Court's June 26, 2018 Order* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (St. George, Timothy) (Entered: 10/29/2018) |
| 10/30/2018 | 229 | ORDER that 217 NON-CONFIDENTIAL MOTION TO FILE CERTAIN EXHIBITS AND INFORMATION IN MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION UNDER SEAL is granted and the OPPOSITION TO PLAINTIFFS' 220 MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 10/30/2018. (jsmi, ) (Entered: 10/30/2018) |
| 10/31/2018 | 230 | ORDER that the PLAINTIFFS' 226 CONSENT MOTION FOR EXTENSION OF TIME TO FILE REPLY BRIEF IN SUPPORT OF THEIR MOTION TO CERTIFY CLASS AS TO DEFENDANT MATT MARTORELLO is granted. It is further ORDERED that the plaintiffs shall file their reply in support of PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT |

JA42

| | | |
|---|---|---|
| | | MARTORELLO by November 19, 2018. Signed by District Judge Robert E. Payne on 10/31/2018. (jsmi, ) (Entered: 10/31/2018) |
| 11/01/2018 | 231 | MOTION to Strike *Reply in Support of Supplemental Motion to Stay* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 11/01/2018) |
| 11/01/2018 | 232 | Memorandum in Support re 231 MOTION to Strike *Reply in Support of Supplemental Motion to Stay* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 (Hearing Transcript), # 2 Exhibit 2 (Interrogatory Responses))(Bennett, Leonard) (Entered: 11/01/2018) |
| 11/08/2018 | | Settlement Conference set for 11/13/2018 at 03:00 PM in Richmond Judges Chamber before Magistrate Judge David J. Novak. (cgar) (Entered: 11/08/2018) |
| 11/08/2018 | | *****SETTLEMENT CONFERENCE SET IN ERROR***Telephone Conference (w/Richard Scheff) set for 11/13/2018 at 03:00 PM in Richmond Courtroom 5400 before Magistrate Judge David J. Novak. (cgar) (Entered: 11/08/2018) |
| 11/09/2018 | 233 | Memorandum in Opposition re 231 MOTION to Strike *Reply in Support of Supplemental Motion to Stay* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 11/09/2018) |
| 11/09/2018 | 234 | NOTICE of Appearance by Craig Carley Marchiando on behalf of Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams (Marchiando, Craig) (Entered: 11/09/2018) |
| 11/13/2018 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Telephone Conference held on 11/13/2018. (cgar) (Entered: 11/29/2018) |
| 11/15/2018 | 235 | RESPONSE in Support re 231 MOTION to Strike *Reply in Support of Supplemental Motion to Stay* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 11/15/2018) |
| 11/19/2018 | 236 | RESPONSE in Support re 189 MOTION to Certify Class *against Defendant Matt Martorello* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1. Aug. 2016 Loan Agreement, # 2 Exhibit 2. Oct. 28, 2018 Letter Opinion, # 3 Exhibit 3. Williams Depo. Trans. (filed under seal), # 4 Exhibit 4. McGeschick Depo. Trans. (filed under seal), # 5 Exhibit 5. Martorello Depo. Trans., # 6 Exhibit 6. Dowd Depo. Trans. (filed under seal), # 7 Exhibit 7. BPL Investment Opportunity Brochure, # 8 Exhibit 8. Feb. 28, 2015 Resolution, # 9 Exhibit 9. Feb. 21, 2015 Written Consent, # 10 Exhibit 10. Jan. 26, 2016 Assignment Agreement, # 11 Exhibit 11. Feb. 17, 2015 Valuation Report (filed under seal), # 12 Exhibit 12. Dec. 31, 2015 Ownership of Bellicose)(Kelly, Kristi) (Entered: 11/19/2018) |
| 11/19/2018 | 237 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 11/19/2018) |
| 11/19/2018 | 238 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 237 MOTION to Seal (Kelly, Kristi) (Entered: 11/19/2018) |
| 11/19/2018 | 239 | Sealed Response/Reply/Opposition re 237 MOTION to Seal . (Kelly, Kristi) (Entered: 11/19/2018) |
| 11/19/2018 | 240 | Sealed Attachment/Exhibit(s) re 237 MOTION to Seal . (Attachments: # 1 Exhibit 4, # 2 Exhibit 6, # 3 Exhibit 7, # 4 Exhibit 11, # 5 Exhibit 12)(Kelly, Kristi) (Entered: 11/19/2018) |

**JA43**

| | | |
|---|---|---|
| 11/19/2018 | 241 | Memorandum in Support re 237 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 11/19/2018) |
| 11/20/2018 | 242 | NOTICE by Ascension Technologies, Inc., Big Picture Loans, LLC *Notice of Change of Firm Address* (St. George, Timothy) (Entered: 11/20/2018) |
| 11/21/2018 | 243 | Consent MOTION for Extension *of Expert Discovery Deadline* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 11/21/2018) |
| 11/21/2018 | 244 | Memorandum in Support re 243 Consent MOTION for Extension *of Expert Discovery Deadline* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 11/21/2018) |
| 11/21/2018 | 245 | MOTION to Quash *and for Protective Order* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 11/21/2018) |
| 11/21/2018 | 246 | Memorandum in Support re 245 MOTION to Quash *and for Protective Order* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 11/21/2018) |
| 11/26/2018 | 247 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 245 MOTION to Quash *and for Protective Order*, 246 Memorandum in Support (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H)(Bennett, Leonard) (Entered: 11/26/2018) |
| 11/30/2018 | 248 | MOTION to Withdraw as Attorney by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Proposed Order)(Gates, Harrison) (Entered: 11/30/2018) |
| 12/05/2018 | 249 | NOTICE by Ascension Technologies, Inc., Big Picture Loans, LLC *(Notice of Transferred Motions to Quash and Appearances)* (St. George, Timothy) (Entered: 12/05/2018) |
| 12/05/2018 | 250 | MOTION for Leave to File *Supplemental Authority* by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 12/05/2018) |
| 12/05/2018 | 251 | Memorandum in Support re 250 MOTION for Leave to File *Supplemental Authority* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1)(St. George, Timothy) (Entered: 12/05/2018) |
| 12/05/2018 | 252 | NOTICE by Ascension Technologies, Inc., Big Picture Loans, LLC re 198 Supplemental MOTION to Stay *All Proceedings Pending Appeal of the Court's June 26, 2018 Order*, 137 MOTION to Stay *Proceedings Pending Appeal (Request for Expedited Ruling)* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(St. George, Timothy) (Entered: 12/05/2018) |
| 12/05/2018 | 253 | Memorandum in Opposition re 245 MOTION to Quash *and for Protective Order* filed by Matt Martorello. (Attachments: # 1 Exhibit A)(Mullins, Maurice) (Entered: 12/05/2018) |
| 12/06/2018 | 254 | ORDER that the Motion to Withdraw As Counsel 248 is GRANTED, and Harrison M. Gates is permitted to withdraw as counsel of record for Big Picture and Ascension in this matter. It is so ORDERED. Signed by District Judge Robert E. Payne on 12/04/2018. (smej, ) (Entered: 12/06/2018) |
| 12/06/2018 | 255 | ORDER that the Plaintiffs' MOTION TO SEAL 237 is granted and PLAINTIFFS' |

| | | |
|---|---|---|
| | | REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO 239 and Exhibits 4, 6, 7, 11 and 12 thereto 240 are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. It is so ORDERED. Signed by District Judge Robert E. Payne on 12/04/2018. (smej, ) (Entered: 12/06/2018) |
| 12/07/2018 | 256 | RESPONSE to Motion re 250 MOTION for Leave to File *Supplemental Authority* filed by Dowin Coffy, George Hengle, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 12/07/2018) |
| 12/07/2018 | 257 | Response to 252 NOTICE, *Plaintiffs' Response to Motion to Expedite Ruling on Big Picture Loans and Ascension Technologies, LLC's Motion to Stay Pendidng Appeal and Supplemental Motion to Stay all Proceedings Pending Appeal* filed by Dowin Coffy, George Hengle, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 12/07/2018) |
| 12/07/2018 | 258 | NOTICE by Matt Martorello re 252 NOTICE, *Joinder in Support of Request for Expedited Ruling on Pending Motions to Stay* (Attachments: # 1 Exhibit A)(Mullins, Maurice) (Entered: 12/07/2018) |
| 12/10/2018 | 259 | Reply to 257 Response, *to Request for Expedited Ruling on Motion to Stay Pending Appeal and for Supplemental Motion to Stay All Proceedings Pending Appeal* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 12/10/2018) |
| 12/10/2018 | 260 | Consent MOTION to Substitute Corrected Exhibits to Matt Martorellos Memorandum in Opposition to Plaintiffs Motion for Class Certification by Matt Martorello. (St. George, Timothy) (Entered: 12/10/2018) |
| 12/10/2018 | 261 | Memorandum in Support re 260 Consent MOTION to Substitute Corrected Exhibits to Matt Martorellos Memorandum in Opposition to Plaintiffs Motion for Class Certification filed by Matt Martorello. (Attachments: # 1 Proposed Order Exhibit 1, # 2 Exhibit I, # 3 Exhibit U, # 4 Exhibit PP, # 5 Exhibit QQ, # 6 Exhibit RR, # 7 Exhibit SS) (St. George, Timothy) (Entered: 12/10/2018) |
| 12/10/2018 | 262 | MOTION to Seal *Exhibits Filed in Support of Consent Motion to Substitute Corrected Exhibits to Martorellos Memorandum in Opposition to Plaintiffs Motion for Class Certification* by Matt Martorello. (St. George, Timothy) (Entered: 12/10/2018) |
| 12/10/2018 | 263 | Memorandum in Support re 262 MOTION to Seal *Exhibits Filed in Support of Consent Motion to Substitute Corrected Exhibits to Martorellos Memorandum in Opposition to Plaintiffs Motion for Class Certification* filed by Matt Martorello. (St. George, Timothy) (Entered: 12/10/2018) |
| 12/10/2018 | 264 | NOTICE by Matt Martorello re 260 Consent MOTION to Substitute Corrected Exhibits to Matt Martorellos Memorandum in Opposition to Plaintiffs Motion for Class Certification *of Filing Documents Under Seal* (St. George, Timothy) (Entered: 12/10/2018) |
| 12/10/2018 | 265 | Sealed Attachment/Exhibit(s) re 261 Memorandum in Support,. (Attachments: # 1 Exhibit I, # 2 Exhibit U, # 3 Exhibit QQ, # 4 Exhibit RR, # 5 Exhibit SS)(St. George, Timothy) (Entered: 12/10/2018) |
| 12/11/2018 | 266 | Reply to Motion re 245 MOTION to Quash *and for Protective Order* filed by Dowin Coffy, George Hengle, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 12/11/2018) |
| 12/12/2018 | 267 | Response to 258 NOTICE *Plaintiffs' Response to Defendant Matt Martorello's Joinder in Support of Request for Expedited Ruling on Motions to Stay* filed by Dowin Coffy, |

| | | |
|---|---|---|
| | | George Hengle, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 12/12/2018) |
| 12/13/2018 | 268 | MOTION for Leave to File *a Sur Reply in Opposition to Plaintiffs' Motion for Class Certification* by Matt Martorello. (Attachments: # 1 Proposed Order)(Mullins, Maurice) (Entered: 12/13/2018) |
| 12/13/2018 | 269 | Memorandum in Support re 268 MOTION for Leave to File *a Sur Reply in Opposition to Plaintiffs' Motion for Class Certification* filed by Matt Martorello. (Attachments: # 1 Exhibit A - Proposed Sur Reply, # 2 Exhibit A to Proposed Sur Reply (original to be filed under seal))(Mullins, Maurice) (Entered: 12/13/2018) |
| 12/13/2018 | 270 | MOTION to Seal *Ex A to Proposed Sur Reply in Opposition to Plaintiffs' Motion for Class Certification* by Matt Martorello. (Attachments: # 1 Proposed Order)(Mullins, Maurice) (Entered: 12/13/2018) |
| 12/13/2018 | 271 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 270 MOTION to Seal *Ex A to Proposed Sur Reply in Opposition to Plaintiffs' Motion for Class Certification* (Mullins, Maurice) (Entered: 12/13/2018) |
| 12/13/2018 | 272 | Memorandum in Support re 270 MOTION to Seal *Ex A to Proposed Sur Reply in Opposition to Plaintiffs' Motion for Class Certification* filed by Matt Martorello. (Mullins, Maurice) (Entered: 12/13/2018) |
| 12/13/2018 | 273 | Sealed Document re 270 MOTION to Seal *Ex A to Proposed Sur Reply in Opposition to Plaintiffs' Motion for Class Certification*. (Mullins, Maurice) (Entered: 12/13/2018) |
| 12/14/2018 | 274 | ORDER that the MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY 250 is granted. It is so ORDERED. Signed by District Judge Robert E. Payne on 12/14/2018. (smej, ) (Entered: 12/14/2018) |
| 12/14/2018 | 275 | CONSENT ORDER that the 260 Motion to Substitute Corrected Exhibits is GRANTED. The Exhibits attached to Martorello's Consent Motion are hereby accepted and incorporated into Martorello's earlier-filed Memorandum in Opposition to Plaintiffs' Motion for Class Certification and replace the following previously-filed exhibits: Exhibit I, Exhibit U,Exhibit PP, Exhibit QQ, Exhibit RR, and Exhibit SS. See Order for details. Signed by District Judge Robert E. Payne on 12/14/2018. (ccol, ) (Entered: 12/14/2018) |
| 12/14/2018 | 276 | Opposition to 268 MOTION for Leave to File *a Sur Reply in Opposition to Plaintiffs' Motion for Class Certification* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 12/14/2018) |
| 12/18/2018 | 277 | Reply to 267 Response, 258 NOTICE *of Joinder of Request for Expedited Ruling on Big Picture Loans, LLC and Ascension Technologies, LLC's Motion to Stay Pending Appeal and Supplemental Motion to Stay All Proceedings Pending Appeal* filed by Matt Martorello. (Mullins, Maurice) (Entered: 12/18/2018) |
| 12/19/2018 | 278 | ORDER that 262 MOTION TO FILE 273 CERTAIN EXHIBITS AND INFORMATION IN CONSENT MOTION TO SUBSTITUTE CORRECTED EXHIBITS TO MARTORELLO'S 261 MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION UNDER SEAL is granted and certain exhibits in connection with DEFENDANT MATT MARTORELLO'S MEMORANDUM IN SUPPORT OF CONSENT MOTION TO SUBSTITUTE CORRECTED EXHIBITS TO MARTORELLO'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICAITON are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 12/18/2018. (jsmi, ) (Entered: 12/19/2018) |

| 12/20/2018 | 279 | REPLY to Response to Motion re 268 MOTION for Leave to File *a Sur Reply in Opposition to Plaintiffs' Motion for Class Certification* filed by Matt Martorello. (Mullins, Maurice) (Entered: 12/20/2018) |
|---|---|---|
| 12/20/2018 | 280 | Motion to appear Pro Hac Vice by Tod Daniel Stephens and Certification of Local Counsel Maurice Mullins Filing fee $ 75, receipt number 0422-6417683. by Matt Martorello. (Mullins, Maurice) (Entered: 12/20/2018) |
| 12/20/2018 | 281 | Motion to appear Pro Hac Vice by Paul Louis Brusati and Certification of Local Counsel Maurice Mullins Filing fee $ 75, receipt number 0422-6417714. by Matt Martorello. (Mullins, Maurice) (Entered: 12/20/2018) |
| 01/02/2019 | 282 | Motion to appear Pro Hac Vice by Michelle Lynne Alamo and Certification of Local Counsel Maurice Mullins Filing fee $ 75, receipt number 0422-6427126. by Matt Martorello. (Mullins, Maurice) (Entered: 01/02/2019) |
| 01/02/2019 | 283 | ORDER granting 280 and 281 Motions for Pro hac vice. Paul Louis Brusati and Tod Daniel Stephens for Matt Martorello. Signed by District Judge Robert E. Payne on 1/2/2019. (jsmi, ) (Entered: 01/02/2019) |
| 01/04/2019 | 284 | ORDER granting 282 Motion for Pro hac vice. Michelle Lynne Alamo appointed for Matt Martorello. Signed by District Judge Robert E. Payne on 1/3/2019. (jsmi, ) (Entered: 01/04/2019) |
| 01/04/2019 | 285 | NOTICE by Dowin Coffy, George Hengle, Gloria Turnage, Lula Williams *Plaintiffs' Notice of Request for In-Person Conference to Address Outstanding Discovery Disputes* (Bennett, Leonard) (Entered: 01/04/2019) |
| 01/06/2019 | 286 | Response to 285 NOTICE filed by Matt Martorello. (Mullins, Maurice) (Entered: 01/06/2019) |
| 01/07/2019 | 287 | ORDER re PLAINTIFFS' 285 NOTICE OF REQUEST FOR IN-PERSON CONFERENCE TO ADDRESS OUTSTANDING DISCOVERY DISPUTES. It is hereby ORDERED that by 5:00 p.m. on January 8, 2019, the Plaintiffs shall file a document setting out discovery issues that they wish the Court to address in a conference before the Court; by 5:00 p.m. on January 10, 2019, Defendant Matt Martorello shall respond to the Plaintiffs' filing; and by 5:00 p.m. on January 11, 2019, the Plaintiffs shall reply to Defendant Martorello's filing. A hearing pertaining to these discovery issues shall take place on January 15, 2019 at 10:30 a.m. in Courtroom 7400. Signed by District Judge Robert E. Payne on 1/7/2018. (jsmi, ) (Entered: 01/07/2019) |
| 01/07/2019 | | Set Hearing: Discovery Hearing set for 1/15/2019 at 10:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 01/07/2019) |
| 01/08/2019 | 288 | ORDER that Paragragh 2 of the Court's previous 287 Order applies to any other defendant that wishes to respond to the Plaintiffs' discovery issues. All parties shall participate in the hearing that shall take place on January 15, 2019. Signed by District Judge Robert E. Payne on 1/7/2019. (jsmi, ) (Entered: 01/08/2019) |
| 01/08/2019 | 289 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 287 Order,, *Notice of Plaintiffs' Statement of Outstanding Discovery Disputes* (Kelly, Kristi) (Entered: 01/08/2019) |
| 01/08/2019 | 290 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 289 NOTICE *of Filing of Exhibits* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21)(Kelly, Kristi) (Entered: 01/08/2019) |

| 01/08/2019 | 291 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 01/08/2019) |
| 01/08/2019 | 292 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 291 MOTION to Seal (Kelly, Kristi) (Entered: 01/08/2019) |
| 01/08/2019 | 293 | Sealed Document re 291 MOTION to Seal . (Attachments: # 1 Exhibit 7, # 2 Exhibit 15, # 3 Exhibit 18)(Kelly, Kristi) (Entered: 01/08/2019) |
| 01/08/2019 | 294 | Memorandum in Support re 291 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 01/08/2019) |
| 01/09/2019 | 295 | NOTICE of Appearance by Shannan Marie Fitzgerald on behalf of Ascension Technologies, Inc., Big Picture Loans, LLC (Fitzgerald, Shannan) (Entered: 01/09/2019) |
| 01/09/2019 | 296 | NOTICE of Appearance by James Edward Moore on behalf of Ascension Technologies, Inc., Big Picture Loans, LLC (Moore, James) (Entered: 01/09/2019) |
| 01/10/2019 | 297 | ORDER that the DEFENDANTS' 270 MOTION TO FILE EXHIBIT TO PROPOSED SUR-REPLY TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION UNDER SEAL is granted and 273 Exhibit A to the proposed SUR-REPLY IN OPPOSITION TO PLAINTIFFS' [269-1] MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO is filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 1/9/2019. (jsmi, ) (Entered: 01/10/2019) |
| 01/10/2019 | 298 | Response to 289 NOTICE filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 01/10/2019) |
| 01/10/2019 | 299 | Response to 289 NOTICE filed by Matt Martorello. (Attachments: # 1 Exhibit 1) (Mullins, Maurice) (Entered: 01/10/2019) |
| 01/11/2019 | 301 | Response to 299 Response filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Kelly, Kristi) (Entered: 01/11/2019) |
| 01/11/2019 | 302 | Response to 298 Response filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Kelly, Kristi) (Entered: 01/11/2019) |
| 01/11/2019 | 303 | MOTION for Entry of Order by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 01/11/2019) |
| 01/14/2019 | 304 | MOTION to Withdraw as Attorney *by David Foster Herman for Matt Martorello* by Matt Martorello. (St. George, Timothy) (Entered: 01/14/2019) |
| 01/15/2019 | 306 | ORDER that 304 MOTION FOR WITHDRAWAL OF APPERANCE PURSUANT TO LOCAL CIVIL RULE 83.1(G) is granted. The Clerk is directed to remove David Foster Herman, Esquire, of Armstrong Teasdale, LLP, as pro hac vice counsel for the defendant, Matt Martorello. Attorney David Foster Herman terminated. Signed by District Judge Robert E. Payne on 1/14/2019. (jsmi, ) (Entered: 01/15/2019) |
| 01/15/2019 | 307 | Minute Entry for proceedings held before District Judge Robert E. Payne: Discovery Status Hearing held on 1/15/2019. Arguments heard on discovery and motions to stay (ECF Nos. 137 , 140 ); plaintiffs to file brief on motion to compel by 01/25/19, response by 02/01/19, reply by 02/06/19; parties to confer and meet in joint conference room on |

**JA48**

| | | |
|---|---|---|
| | | 7th floor (room #7202) at 9:00 a.m. on 01/18/19; parties to submit new electronic authorization forms; response to motion for entry of order (ECF No. 303 ) due 01/21/19; reply by 01/23/19; matter continued for additional hearing on 01/24/19 at 1:30 p.m. (Court Reporter Peppy Peterson, OCR.)(nbrow ) (Entered: 01/15/2019) |
| 01/17/2019 | 309 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 307 Discovery Hearing,, 303 MOTION for Entry of Order (Attachments: # 1 Exhibit Declaration of E. Michelle Drake, # 2 Exhibit "A" to Drake Declaration) (Bennett, Leonard) (Entered: 01/17/2019) |
| 01/17/2019 | 310 | ORDER that counsel shall meet and confer on Friday, January 18, 2019, to attempt to resolve issues; by 3:30 p.m., Friday, January 18, 2019, counsel shall report to the Court: (a) the issues that have been resolved (and shall place the resolution on the record); and (b) the issues that are to be the subject of motions to compel (or other motions) and briefed; by January 25, 2019, the parties shall file any such motions and supporting briefs; by February 1, 2019, the parties shall file any briefs in response to any such motions; by February 6, 2019, the parties shall file their reply briefs to the response briefs; to help the Court understand the position of the parties, the motion shall identify the general subject area to which the discovery is addressed; and if the parties cannot agree about whether the Plaintiffs agreed to allow Defendant Martorello to submit his privilege logs late, then an evidentiary hearing shall take place in Courtroom 7400 during the hearing at 3:30 p.m. on January 18, 2019 about the issue. See Order for details. Signed by District Judge Robert E. Payne on 1/16/2019. (jsmi, ) (Entered: 01/17/2019) |
| 01/17/2019 | 311 | TRANSCRIPT of proceedings held on January 15, 2019, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/19/2019. Redacted Transcript Deadline set for 3/19/2019. Release of Transcript Restriction set for 4/17/2019.(peterson, peppy) (Entered: 01/17/2019)** |
| 01/17/2019 | 312 | ORDER that by January 21, 2019, the Defendants and non-party TranDotCom Solutions, LLC shall file any responses to Plaintiffs' 303 MOTION FOR ENTRY OF ORDER and by January 23, 2019, the Plaintiffs shall file any reply to any response. Signed by District Judge Robert E. Payne on 1/16/2019. (jsmi, ) (Entered: 01/17/2019) |
| 01/17/2019 | 313 | ORDER that the trial date set to begin on March 18, 2019 is continued until further order of the Court, with the condition that no new discovery other than the discovery that has already been requested can be served on any party at this point. Further, the motion for summary judgment deadline set for January 25, 2019 will also be extended. Counsel shall confer and suggest a new date for the filing of motions for summary judgment and the briefing thereof. Signed by District Judge Robert E. Payne on 1/16/2019. (jsmi, ) (Entered: 01/17/2019) |
| 01/17/2019 | | Set Hearing: Discovery Status Hearing set for 1/18/2019 at 03:30 PM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 01/17/2019) |
| 01/18/2019 | 316 | Minute Entry for proceedings held before District Judge Robert E. Payne: Discovery Status Hearing held on 1/18/2019. Parties to file agreed order to include spoliation and ESI discovery plan by 01/22/19; Court modified briefing schedule to Order (ECF No. |

JA49

| | | |
|---|---|---|
| | | 310 ) re: motions to compel by agreement of the parties - brief due 01/28/19, response due 02/04/19, reply due 02/08/19. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 01/18/2019) |
| 01/18/2019 | 317 | AGREED ORDER finding as moot 245 Plaintiffs' Motion for Protective Order. *See for complete details*. IT IS SO ORDERED. Signed by District Judge Robert E. Payne on 01/18/2019. (nbrow) (Entered: 01/18/2019) |
| 01/21/2019 | 318 | Memorandum in Opposition re 303 MOTION for Entry of Order filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 01/21/2019) |
| 01/21/2019 | 319 | TRANSCRIPT of proceedings held on January 18, 2019, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/20/2019. Redacted Transcript Deadline set for 3/25/2019. Release of Transcript Restriction set for 4/22/2019.(peterson, peppy) (Entered: 01/21/2019)** |
| 01/22/2019 | 320 | ORDER that the Court's prior order regarding the parties' 310 motion to compel schedule is modified to the following dates: by January 28, 2019, the parties shall file any motions to compel discovery and any supporting briefs; by February 4, 2019, the parties shall file any briefs in response to any such motions; and by February 8, 2019, the parties shall file their reply briefs to the response briefs. Signed by District Judge Robert E. Payne on 1/22/2019. (jsmi, ) (Entered: 01/22/2019) |
| 01/22/2019 | 321 | ORDER that by January 24, 2019, the parties shall submit a joint order regarding the protocol for additional discovery and electronically stored information; and by January 24, 2019, the parties shall submit a report to the Court outlining all discovery issues that they have agreed upon and all discovery issues that are still in dispute. Signed by District Judge Robert E. Payne on 1/22/2019. (jsmi, ) (Entered: 01/22/2019) |
| 01/22/2019 | 322 | Joint MOTION to Enter Agreed Orders by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Kelly, Kristi) (Entered: 01/22/2019) |
| 01/23/2019 | 323 | MEMORANDUM ORDER that the Court remains of the view that TRIBAL DEFENDANTS' 137 MOTION TO STAY ALL PROCEEDINGS PENDING APPEAL OF THE COURT'S JUNE 26, 2018 ORDER and TRIBAL DEFENDANTS' 198 SUPPLEMENTAL MOTION TO STAY ALL PROCEEDINGS PENDING APPEAL OF THE COURT'S JUNE 26, 2018 ORDER and DEFENDANT MATT MARTORELLO'S 140 MOTION TO STAY are moot for the reasons set forth. Finally, the Court is concerned that allowing the case against Martorello to go forward in its current posture could pose a risk to any class claim against the Corporate Defendants if Martorello were to prevail in the trial of a case against him alone. The Court will order further briefing on that issue before further considering class certification. See Order for additional details. Signed by District Judge Robert E. Payne on 1/22/2019. (jsmi, ) (Entered: 01/23/2019) |
| 01/23/2019 | 324 | ORDER that 291 MOTION TO SEAL is granted and PLAINTIFFS' 293 STATEMENT OF OUTSTANDING DISCOVERY DISPUTES and certain exhibits thereto are filed |

**JA50**

| | | |
|---|---|---|
| | | under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 1/23/2019. (jsmi, ) (Entered: 01/23/2019) |
| 01/23/2019 | 325 | Reply to Motion re 303 MOTION for Entry of Order *Plaintiffs' Reply in Support* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Bennett, Leonard) (Entered: 01/23/2019) |
| 01/23/2019 | 326 | ORDER that the parties may take depositions of the following individuals or entities regarding the location, collection, preservation and uploading of documents and information for potential review in this case: Matt Martorello, Zayra Emanuelli, Adil Karem, and Kryonyx. The parties shall each designate ESI Liaisons who will meet, in person or by videoconference or telephone, to establish a formal ESI Protocol. The protocol shall be filed with the Court on or before March 1, 2019. On or before January 25, 2019 Defendants shall produce image and load files for their previous productions which substantially comply with the formatting requirements set forth in the Instructions to and Exhibit A of Plaintiff Galloway's First Set of Requests for Production to Matt Martorello in Galloway et al v. Big Picture Loans, et. al. Case No. 3:18-CV-00406. See Order for details. Signed by District Judge Robert E. Payne on 1/23/2019. (jsmi, ) (Entered: 01/23/2019) |
| 01/23/2019 | 327 | ORDER REGARDING DISCOVERY DISPUTES. See Order for complete details. Signed by District Judge Robert E. Payne on 1/23/2019. (jsmi, ) (Entered: 01/23/2019) |
| 01/25/2019 | 328 | ORDER that that a hearing shall take place on the plaintiffs' 303 MOTION FOR ENTRY OF ORDER on February 4, 2019 at 10:00 a.m. Signed by District Judge Robert E. Payne on 1/24/2019. (jsmi, ) (Entered: 01/25/2019) |
| 01/25/2019 | | Set Hearing: Motion *for Entry of Order* Hearing set for 2/4/2019 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 01/25/2019) |
| 01/25/2019 | 329 | ORDER that the parties in William V. Big Picture Loans, LLC, No. 3:17-cv-461, shall comply with the following schedule in relation to the plaintiffs' subpoena upon Rosette: the plaintiffs shall modify their subpoena to Rosette by January 29, 2019; after the subpoena is modified and before February 19, 2019, counsel shall meet and confer to resolve any disputes about the subpoena; if Rosette continues to object to any part of the modified subpoena, the plaintiffs shall file any motion to compel production by February 19, 2019; Rosette shall file any response to the plaintiffs' motion to compel by March 5, 2019; the plaintiffs shall file any reply to the plaintiffs' motion to compel by March 12, 2019. Signed by District Judge Robert E. Payne on 1/25/2019. (jsmi, ) (Entered: 01/25/2019) |
| 01/28/2019 | 330 | TRANSCRIPT of proceedings held on January 24, 2019, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/27/2019. Redacted Transcript Deadline set for 4/1/2019. Release of Transcript Restriction set for 4/29/2019.(peterson, peppy) (Main Document 330 replaced on 1/29/2019) (jtho, ). (Entered: 01/28/2019)** |
| 01/28/2019 | 331 | **DISREGARD - FILED IN ERROR (SEE TRANSCRIPT 330 ** TRANSCRIPT of |

JA51

| | | |
|---|---|---|
| | | proceedings held on January 24, 2019, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at <u>www.vaed.uscourts.gov</u> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/27/2019. Redacted Transcript Deadline set for 4/1/2019. Release of Transcript Restriction set for 4/29/2019.(peterson, peppy) Clerk Modified on 1/29/2019 to correct docket as transcript filed in error. (jtho, ). (Entered: 01/28/2019)** |
| 01/28/2019 | <u>332</u> | MOTION for Protective Order *Regarding Defendant Martorello's Second Set of Interrogatories* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | <u>333</u> | Memorandum in Support re 332 MOTION for Protective Order *Regarding Defendant Martorello's Second Set of Interrogatories* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2)(Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | <u>334</u> | MOTION to Overrule Martorello's Objections and Compel Discovery Responses by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | <u>335</u> | Memorandum in Support re 334 MOTION to Overrule Martorello's Objections and Compel Discovery Responses filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17)(Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | <u>336</u> | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Proposed Order)(Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | <u>337</u> | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 336 MOTION to Seal (Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | <u>338</u> | Sealed Document re 336 MOTION to Seal . (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 6, # <u>3</u> Exhibit 7, # <u>4</u> Exhibit 8, # <u>5</u> Exhibit 9, # <u>6</u> Exhibit 11, # <u>7</u> Exhibit 13, # <u>8</u> Exhibit 14, # <u>9</u> Exhibit 15, # <u>10</u> Exhibit 16)(Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | <u>339</u> | Memorandum in Support re <u>336</u> MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | <u>340</u> | MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | <u>341</u> | Memorandum in Support re 340 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1. Dec. 2018 Interrogatories, # <u>2</u> Exhibit 2. FILED UNDER SEAL, # <u>3</u> Exhibit 3. Weddle Declaration, # <u>4</u> Exhibit 4. Jan. 2014 Email Thread, # <u>5</u> Exhibit 5. FILED UNDER |

**JA52**

| | | |
|---|---|---|
| | | SEAL, # 6 Exhibit 6. FILED UNDER SEAL, # 7 Exhibit 7. FILED UNDER SEAL, # 8 Exhibit 8. FILED UNDER SEAL, # 9 Exhibit 9. Raining Bird Depo., # 10 Exhibit 10. FILED UNDER SEAL, # 11 Exhibit 11. FILED UNDER SEAL, # 12 Exhibit 12. FILED UNDER SEAL, # 13 Exhibit 13. FILED UNDER SEAL, # 14 Exhibit 14. FILED UNDER SEAL, # 15 Exhibit 15. FILED UNDER SEAL, # 16 Exhibit 16. FILED UNDER SEAL, # 17 Exhibit 17. FILED UNDER SEAL, # 18 Exhibit 18. FILED UNDER SEAL, # 19 Exhibit 19 - Oct. 2017 Gray Email, # 20 Exhibit 20. FILED UNDER SEAL, # 21 Exhibit 21. FILED UNDER SEAL, # 22 Exhibit 22. FILED UNDER SEAL, # 23 Exhibit 23. FILED UNDER SEAL, # 24 Exhibit 24. Oct. 2, 2017 Privilege Log, # 25 Exhibit 25. Oct. 7, 2017 Privilege Log)(Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | 342 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | 343 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 342 MOTION to Seal (Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | 344 | Sealed Attachment/Exhibit(s) re 342 MOTION to Seal . (Attachments: # 1 Exhibit 2. Sept. 2015 Merger Agreement, # 2 Exhibit 5. July 2012 Servicing Agreement, # 3 Exhibit 6. Red Rock Revenue, # 4 Exhibit 7. Bellicose Formation Doc., # 5 Exhibit 8. Email to Gravel, # 6 Exhibit 10. Aug. 2014 Email to Williams, # 7 Exhibit 11. Dec. 2014 EIN Email, # 8 Exhibit 12. Feb. 2015 Resolution Creating Ascension, # 9 Exhibit 13. Eventide Formation Certificate, # 10 Exhibit 14. Williams Depo. Excerpt, # 11 Exhibit 15. McGeshick Depo. Excerpt, # 12 Exhibit 16. Eventide Operating Agreement, # 13 Exhibit 17. Eventide Distributions, # 14 Exhibit 18. Martorello Text Messages, # 15 Exhibit 20. Nov. 2012 Legal Opinion, # 16 Exhibit 21. April 2014 Weddle Article, # 17 Exhibit 22. April 2015 Weddle Article, # 18 Exhibit 23. Nov. 2014 Rosette Opinion Letter)(Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | 345 | Memorandum in Support re 342 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 01/28/2019) |
| 01/31/2019 | 346 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 303 MOTION for Entry of Order (Attachments: # 1 Exhibit Declaration of E. Michelle Drake, # 2 Exhibit "A" to Drake Declaration)(Bennett, Leonard) (Entered: 01/31/2019) |
| 01/31/2019 | 347 | Consent MOTION to Modify Briefing Schedule re 340 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* by Matt Martorello. (Attachments: # 1 Proposed Order)(Mullins, Maurice) (Entered: 01/31/2019) |
| 02/01/2019 | 348 | ORDER GRANTING CONSENT MOTION TO MODIFY BRIEFING SCHEDULE. Martorello shall file his Response in Opposition to the Plaintiffs' 340 Motion to Compel Information Withheld on the Basis of Attorney-Client Privilege by February 11,2019 (the "Privilege Motion"); and Plaintiffs shall file their Reply in Support of the Privilege Motion by February 18, 2019. Signed by District Judge Robert E. Payne on 2/1/2019. (jsmi, ) (Entered: 02/01/2019) |
| 02/01/2019 | 349 | ORDER that PLAINTIFFS' 148 MOTION TO OVERRULE DEENDANT MARTORELLO'S DISCOVERY OBJECTIONS is denied as moot. Signed by District Judge Robert E. Payne on 2/1/2019. (jsmi, ) (Entered: 02/01/2019) |
| 02/03/2019 | 351 | NOTICE of Appearance by Julie Diane Hoffmeister on behalf of Ascension Technologies, Inc., Big Picture Loans, LLC (Hoffmeister, Julie) (Entered: 02/03/2019) |

| | | |
|---|---|---|
| 02/04/2019 | 352 | Minute Entry for proceedings held before District Judge Robert E. Payne: Motion Hearing 303 Motion for Entry of Order held on 2/4/2019. Arguments heard; matters submitted; Court will have decision. (Court Reporter Krista Harding, OCR.) (nbrow) (Entered: 02/04/2019) |
| 02/04/2019 | 353 | Memorandum in Opposition re 332 MOTION for Protective Order *Regarding Defendant Martorello's Second Set of Interrogatories* filed by Matt Martorello. (Attachments: # 1 Exhibit A)(Erbach, John) (Entered: 02/04/2019) |
| 02/04/2019 | 354 | Memorandum in Opposition re 334 MOTION to Overrule Martorello's Objections and Compel Discovery Responses filed by Matt Martorello. (Attachments: # 1 Exhibit A) (Erbach, John) (Entered: 02/04/2019) |
| 02/06/2019 | 355 | TRANSCRIPT of proceedings held on 2/4/2019, before Judge Robert E. Payne, Court Reporter/Transcriber Krista Liscio, Telephone number 804 916-2296. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 3/8/2019. Redacted Transcript Deadline set for 4/8/2019. Release of Transcript Restriction set for 5/7/2019.(liscio, krista) (Entered: 02/06/2019)** |
| 02/07/2019 | 356 | Consent MOTION to Modify Briefing Schedule by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order) (Kelly, Kristi) (Entered: 02/07/2019) |
| 02/07/2019 | 357 | Memorandum in Support re 356 Consent MOTION to Modify Briefing Schedule filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 02/07/2019) |
| 02/08/2019 | 358 | ORDER that the plaintiffs shall file their reply briefs in support of their 332 Motion for a Protective Order Regarding Defendant Martorello's Second Set of Interrogatories, 334 Motion to Overrule Martorello's Objections and Compel Discovery Responses, and 340 Motion to Compel Information Withheld on the Basis of Attorney-Client Privilege by February 19, 2019. Signed by District Judge Robert E. Payne on 2/7/2019. (jsmi, ) (Entered: 02/08/2019) |
| 02/08/2019 | 359 | ORDER that plaintiffs' 243 CONSENT MOTION TO EXTEND EXPERT DISCOVERY DEADLINE is denied as moot. Signed by District Judge Robert E. Payne on 2/8/2019. (jsmi, ) (Entered: 02/08/2019) |
| 02/08/2019 | 360 | ORDER that 208 MOTION TO SEAL is granted and 210 Exhibits 4 and 5 to the PLAINTIFFS' 207 OPPOSITION TO DEFENDANT BIG PICTURE, LLC AND ASCENSION TECHNOLOGIES, INC.'S SUPPLEMENTAL MOTION TO STAY ALL PROCEEDINGS PENDING APPEAL OF THE COURT'S JUDGE 26, 2018 ORDER are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 2/8/2019. (jsmi, ) (Entered: 02/08/2019) |
| 02/08/2019 | 361 | ORDER that 336 MOTION TO SEAL is granted and PLAINTIFFS' 338 MEMORANDUM IN SUPPORT OF THEIR MOTION TO OVERRULE MARTORELLO'S OBJECTIONS AND COMPEL DISCOVERY RESPONSES and certain exhibits thereto are filed under seal; provided that appropriately redacted |

JA54

| | | |
|---|---|---|
| | | versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 2/8/2019. (jsmi, ) (Entered: 02/08/2019) |
| 02/08/2019 | 362 | ORDER that PLAINTIFFS' 231 MOTION TO STRIKE TRIBAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF SUPPLEMENTAL MOTION TO STAY ALL PROCEEDINGS PENDING APPEAL OF THE COURT'S JUNE 26, 2018 ORDER (ECF No. 231) is denied as moot. Signed by District Judge Robert E. Payne on 2/8/2019. (jsmi, ) (Entered: 02/08/2019) |
| 02/11/2019 | 363 | ORDER that 342 MOTION TO SEAL is granted and PLAINTIFFS' 344 MEMORANDUM IN SUPPORT OF MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 2/8/2019. (jsmi, ) (Entered: 02/11/2019) |
| 02/11/2019 | 364 | MOTION to Seal by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 02/11/2019) |
| 02/11/2019 | 365 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 364 MOTION to Seal (Erbach, John) (Entered: 02/11/2019) |
| 02/11/2019 | 366 | Sealed Document re 364 MOTION to Seal . (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit D, # 4 Exhibit F, # 5 Exhibit G, # 6 Exhibit H, # 7 Exhibit I, # 8 Exhibit K, # 9 Exhibit L, # 10 Exhibit N, # 11 Exhibit O, # 12 Exhibit P, # 13 Exhibit R, # 14 Exhibit S, # 15 Exhibit T, # 16 Exhibit U, # 17 Exhibit V, # 18 Exhibit W, # 19 Exhibit X, # 20 Exhibit Y, # 21 Exhibit Z, # 22 Exhibit AA, # 23 Exhibit BB, # 24 Exhibit CC, # 25 Exhibit DD, # 26 Exhibit EE, # 27 Exhibit FF, # 28 Exhibit GG, # 29 Exhibit HH, # 30 Exhibit II, # 31 Exhibit JJ, # 32 Exhibit KK, # 33 Exhibit LL, # 34 Exhibit MM, # 35 Exhibit NN, # 36 Exhibit OO, # 37 Exhibit PP, # 38 Exhibit QQ)(Erbach, John) (Entered: 02/11/2019) |
| 02/11/2019 | 367 | Memorandum in Support re 364 MOTION to Seal filed by Matt Martorello. (Erbach, John) (Entered: 02/11/2019) |
| 02/11/2019 | 368 | Memorandum in Opposition re 340 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Exhibit OO, # 42 Exhibit PP, # 43 Exhibit QQ, # 44 Exhibit RR, # 45 Exhibit SS, # 46 Exhibit TT, # 47 Exhibit UU)(Erbach, John) (Entered: 02/11/2019) |
| 02/12/2019 | 369 | ORDER of USCA as to 135 Notice of Appeal filed by Big Picture Loans, LLC, Ascension Technologies, Inc. : Upon consideration of appellants motion to stay and motion to exceed type-volume limitation, and defendants motion for leave to intervene, the court denies the motions. (lbre, ) (Entered: 02/12/2019) |
| 02/15/2019 | 370 | Consent MOTION for Extension of Time to File Response/Reply as to 340 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 02/15/2019) |

| | | |
|---|---|---|
| 02/15/2019 | 371 | Memorandum in Support re 370 Consent MOTION for Extension of Time to File Response/Reply as to 340 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 02/15/2019) |
| 02/15/2019 | 372 | ORDER granting 370 Motion for Extension of Time to File Response/Reply re 340 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* Replies due by 2/26/2019. Signed by Magistrate Judge David J. Novak on 02/15/2019. (tjoh, ) (Entered: 02/15/2019) |
| 02/18/2019 | 373 | Motion to appear Pro Hac Vice by William Ojile and Certification of Local Counsel John Michael Erbach Filing fee $ 75, receipt number 0422-6498486. by Matt Martorello. (Erbach, John) (Entered: 02/18/2019) |
| 02/19/2019 | 374 | REPLY to Response to Motion re 332 MOTION for Protective Order *Regarding Defendant Martorello's Second Set of Interrogatories* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 02/19/2019) |
| 02/19/2019 | 375 | REPLY to Response to Motion re 334 MOTION to Overrule Martorello's Objections and Compel Discovery Responses filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12)(Kelly, Kristi) (Entered: 02/19/2019) |
| 02/19/2019 | 376 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 02/19/2019) |
| 02/19/2019 | 377 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 376 MOTION to Seal (Kelly, Kristi) (Entered: 02/19/2019) |
| 02/19/2019 | 378 | Sealed Document re 376 MOTION to Seal . (Attachments: # 1 Exhibit 5, # 2 Exhibit 6, # 3 Exhibit 7, # 4 Exhibit 11, # 5 Exhibit 12)(Kelly, Kristi) (Entered: 02/19/2019) |
| 02/19/2019 | 379 | Memorandum in Support re 376 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 02/19/2019) |
| 02/19/2019 | 380 | Consent MOTION to Modify Briefing Schedule by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order) (Kelly, Kristi) (Entered: 02/19/2019) |
| 02/19/2019 | 381 | Memorandum in Support re 380 Consent MOTION to Modify Briefing Schedule filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 02/19/2019) |
| 02/21/2019 | 382 | Consent MOTION for Leave to File *Corrected Memorandum and Related Relief* by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 02/21/2019) |
| 02/21/2019 | 383 | Memorandum in Support re 382 Consent MOTION for Leave to File *Corrected Memorandum and Related Relief* filed by Matt Martorello. (Attachments: # 1 Exhibit A) (Erbach, John) (Entered: 02/21/2019) |
| 02/25/2019 | 384 | ORDER granting 373 Motion for Pro hac vice. William Ojile appointed for Matt Martorello. Signed by District Judge Robert E. Payne on 2/22/2019. (jsmi, ) (Entered: 02/25/2019) |

| 02/26/2019 | 385 | ORDER that DEFENDANT'S 364 MOTION TO FILE UNDER SEAL is granted and DEFENDANT MATT MARTORELLO'S 366 MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 2/25/2019. (jsmi, ) (Entered: 02/26/2019) |
|---|---|---|
| 02/26/2019 | 386 | ORDER that Defendant's 340 Consent Motion For Leave To File Corrected Memorandum In Opposition To Plaintiffs' Motion To Compel Information Withheld On The Basis Of Attorney-Client Privilege And Modify Briefing Schedule is GRANTED. Plaintiffs shall have until March 5, 2019, to file their reply brief in support of their Motion to Compel Information Withheld on the Basis of Attorney-Client Privilege. Signed by District Judge Robert E. Payne on 2/25/2019. (jsmi, ) (Entered: 02/26/2019) |
| 02/26/2019 | 387 | ORDER that this Court hereby grants Plaintiffs' Consent Motion to Modify Briefing Schedule. It is hereby ordered that Plaintiffs shall file any necessary motion to compel regarding Rosette's production on or before March 5,2019; Rosette shall file any response to the Plaintiffs' motion to compel on or before March 19, 2019, and the Plaintiffs' shall file any reply to their motion to compel on or before March 26, 2019. Signed by District Judge Robert E. Payne on 2/25/2019. (jsmi, ) (Entered: 02/26/2019) |
| 02/27/2019 | 388 | Sealed Response/Reply/Opposition re 386 Order on Motion to Compel,. (Erbach, John) (Entered: 02/27/2019) |
| 02/27/2019 | 389 | Memorandum in Opposition re 340 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege (filed per Order at Dkt. No. 386)* filed by Matt Martorello. (Erbach, John) (Entered: 02/27/2019) |
| 03/01/2019 | 390 | Consent MOTION for Extension *of Deadline to File ESI Protocol* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/01/2019) |
| 03/01/2019 | 391 | Memorandum in Support re 390 Consent MOTION for Extension *of Deadline to File ESI Protocol* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/01/2019) |
| 03/04/2019 | 392 | MOTION for Entry of Order Allowing Production of Consumer Reports by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 03/04/2019) |
| 03/05/2019 | 393 | Consent MOTION to Modify Briefing Schedule by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order) (Kelly, Kristi) (Entered: 03/05/2019) |
| 03/05/2019 | 394 | Memorandum in Support re 393 Consent MOTION to Modify Briefing Schedule filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 03/05/2019) |
| 03/05/2019 | 395 | RESPONSE in Support re 340 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Placeholder (filed under seal), # 2 Exhibit 2 - Placeholder (filed under seal), # 3 Exhibit 3 - Feb. 2016 Loan Agreement, # 4 Exhibit 4 - Placeholder (filed under seal), # 5 Exhibit 5 - Placeholder (filed under seal), # 6 Exhibit 6 - Placeholder (filed under seal), # 7 Exhibit 7 - Placeholder (filed under seal), # 8 Exhibit 8 - Placeholder (filed under seal), # 9 Exhibit 9 - Placeholder (filed under seal), # 10 Exhibit 10 - Placeholder (filed under seal), # 11 Exhibit 11 - Placeholder (filed under seal), # 12 Exhibit 12 - Placeholder (filed under seal), # 13 Exhibit 13 - Placeholder (filed under seal), # 14 Exhibit 14 - Placeholder (filed under seal), # 15 Exhibit 15 - Placeholder (filed under seal), # 16 Exhibit 16 - |

JA57

| | | |
|---|---|---|
| | | Placeholder (filed under seal), # 17 Exhibit 17 - Placeholder (filed under seal), # 18 Exhibit 18 - Placeholder (filed under seal), # 19 Exhibit 19 - Placeholder (filed under seal), # 20 Exhibit 20 - Placeholder (filed under seal), # 21 Exhibit 21 - Placeholder (filed under seal))(Kelly, Kristi) (Entered: 03/05/2019) |
| 03/05/2019 | 396 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 03/05/2019) |
| 03/05/2019 | 397 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 396 MOTION to Seal (Kelly, Kristi) (Entered: 03/05/2019) |
| 03/05/2019 | 398 | Sealed Attachment/Exhibit(s) re 396 MOTION to Seal . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10, # 10 Exhibit 11, # 11 Exhibit 12, # 12 Exhibit 13, # 13 Exhibit 14, # 14 Exhibit 15, # 15 Exhibit 16, # 16 Exhibit 17, # 17 Exhibit 18, # 18 Exhibit 19, # 19 Exhibit 20, # 20 Exhibit 21)(Kelly, Kristi) (Entered: 03/05/2019) |
| 03/05/2019 | 399 | Memorandum in Support re 396 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 03/05/2019) |
| 03/06/2019 | 400 | ORDER this Court hereby grants Plaintiffs' Consent 390 Motion for Extension of the Deadline to File ESI Protocol. It is hereby ordered that Plaintiffs and Defendant Matthew Martorello shall file their ESI Protocol, in accordance with the requirements outlined in the Court's January 23, 2019 326 Order, on or before March 22, 2019. Signed by District Judge Robert E. Payne on 3/6/2019. (jsmi, ) (Entered: 03/06/2019) |
| 03/06/2019 | 401 | ORDER that 376 MOTION TO SEAL is granted and Exhibits 2, 5, 6, 7, 11 and 12 to the PLAINTIFFS' 378 REPLY IN SUPPORT OF THEIR MOTION TO OVERRULE MARTORELLO'S OBJECTIONS AND COMPEL DISCOVERY RESPONSES are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 3/6/2019. (jsmi, ) (Entered: 03/06/2019) |
| 03/06/2019 | 402 | ORDER that this Court hereby grants Plaintiffs' 393 Consent Motion to Modify Briefing Schedule. It is hereby ordered that Plaintiffs shall file any necessary motion to compel regarding Rosette's production on or before March 7,2019; Rosette shall file any response to the Plaintiffs' motion to compel on or before March 21, 2019, and the Plaintiffs' shall file any reply to their motion to compel on or before March 28, 2019.. Signed by District Judge Robert E. Payne on 3/6/2019. (jsmi, ) (Entered: 03/06/2019) |
| 03/07/2019 | 403 | MOTION for Leave to File *Supplemental Authority In Support of Motion to Compel Information Withheld on the Basis of Attorney-Client Privilege* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 404 | Memorandum in Support re 403 MOTION for Leave to File *Supplemental Authority In Support of Motion to Compel Information Withheld on the Basis of Attorney-Client Privilege* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 405 | MOTION to Compel *Response to Subpoena Issued to Rosette, LLP* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 406 | Memorandum in Support re 405 MOTION to Compel *Response to Subpoena Issued to* |

JA58

| | | |
|---|---|---|
| | | *Rosette, LLP* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 407 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 408 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 407 MOTION to Seal (Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 409 | Sealed Document re 407 MOTION to Seal . (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7)(Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 410 | Memorandum in Support re 407 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 411 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 412 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 411 MOTION to Seal (Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 413 | Sealed Document re 411 MOTION to Seal . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Kelly, Kristi) (Entered: 03/07/2019) |
| 03/07/2019 | 414 | Memorandum in Support re 411 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 03/07/2019) |
| 03/13/2019 | 415 | MEMORANDUM OPINION. Signed by District Judge Robert E. Payne on 3/12/2019. (jsmi, ) (Entered: 03/13/2019) |
| 03/13/2019 | 416 | ORDER that the plaintiffs' 303 MOTION FOR ENTRY OF ORDER is granted. It is further ORDERED that TranDotCom Solutions, LLC, shall segregate and preserve the data that it has agreed to produce and, by March 30, 2019, file a pleading in this Court certifying under oath that it has segregated and preserved the data that it has agreed to produce so that the data can be produced after the Court decides the pending motion for class certification. Signed by District Judge Robert E. Payne on 3/12/2019. (jsmi, ) (Entered: 03/13/2019) |
| 03/19/2019 | 417 | ORDER that 396 MOTION TO SEAL is granted and PLAINTIFFS' 398 REPLY IN SUPPORT OF MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 3/18/2019. (jsmi, ) (Entered: 03/19/2019) |
| 03/19/2019 | 418 | ORDER that 407 MOTION TO SEAL is granted and the PLAINTIFFS' 409 MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL RESPONSE TO SUBPOENA ISSUED TO ROSETTE, LLP and Exhibits 2, 3, 4, 5, 6, and 7 thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 3/18/2019. (jsmi, ) (Entered: 03/19/2019) |

| 03/19/2019 | 419 | ORDER that 411 MOTION TO SEAL is granted and the plaintiffs' 413 MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE and Exhibits 1, 2, 3 and 4 thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 3/18/2019. (jsmi, ) (Entered: 03/19/2019) |
|---|---|---|
| 03/19/2019 | 420 | Memorandum in Opposition re 392 MOTION for Entry of Order Allowing Production of Consumer Reports filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(St. George, Timothy) (Entered: 03/19/2019) |
| 03/21/2019 | 421 | Memorandum in Support re 403 MOTION for Leave to File *Supplemental Authority In Support of Motion to Compel Information Withheld on the Basis of Attorney-Client Privilege (Redacted Version)* filed by Matt Martorello. (Attachments: # 1 Exhibit VV, # 2 Exhibit WW, # 3 Exhibit XX, # 4 Exhibit YY, # 5 Exhibit ZZ, # 6 Exhibit AAA, # 7 Exhibit BBB, # 8 Exhibit CCC, # 9 Exhibit DDD, # 10 Exhibit EEE, # 11 Exhibit FFF, # 12 Exhibit GGG, # 13 Exhibit HHH, # 14 Exhibit III, # 15 Exhibit JJJ, # 16 Exhibit KKK, # 17 Exhibit LLL, # 18 Exhibit MMM, # 19 Exhibit NNN, # 20 Exhibit OOO, # 21 Exhibit PPP, # 22 Exhibit QQQ)(Erbach, John) (Entered: 03/21/2019) |
| 03/21/2019 | 422 | MOTION to Seal *Unredacted Memorandum in Opposition to Plaintiffs' Motion for Leave to File Supplemental Authority and Exhibits VV, XX, YY, ZZ, AAA, BBB, CCC, FFF, GGG, HHH, KKK, and OOO thereto* by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 03/21/2019) |
| 03/21/2019 | 423 | Memorandum in Support re 422 MOTION to Seal *Unredacted Memorandum in Opposition to Plaintiffs' Motion for Leave to File Supplemental Authority and Exhibits VV, XX, YY, ZZ, AAA, BBB, CCC, FFF, GGG, HHH, KKK, and OOO thereto* filed by Matt Martorello. (Erbach, John) (Entered: 03/21/2019) |
| 03/21/2019 | 424 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 422 MOTION to Seal *Unredacted Memorandum in Opposition to Plaintiffs' Motion for Leave to File Supplemental Authority and Exhibits VV, XX, YY, ZZ, AAA, BBB, CCC, FFF, GGG, HHH, KKK, and OOO thereto* (Erbach, John) (Entered: 03/21/2019) |
| 03/21/2019 | 425 | Sealed Response/Reply/Opposition re 422 MOTION to Seal *Unredacted Memorandum in Opposition to Plaintiffs' Motion for Leave to File Supplemental Authority and Exhibits VV, XX, YY, ZZ, AAA, BBB, CCC, FFF, GGG, HHH, KKK, and OOO thereto*, 403 MOTION for Leave to File *Supplemental Authority In Support of Motion to Compel Information Withheld on the Basis of Attorney-Client Privilege*. (Attachments: # 1 Exhibit VV, # 2 Exhibit XX, # 3 Exhibit YY, # 4 Exhibit ZZ, # 5 Exhibit AAA, # 6 Exhibit BBB, # 7 Exhibit CCC, # 8 Exhibit FFF, # 9 Exhibit GGG, # 10 Exhibit HHH, # 11 Exhibit KKK, # 12 Exhibit OOO)(Erbach, John) (Entered: 03/21/2019) |
| 03/22/2019 | 426 | DISREGARD-FILED IN ERROR: RESPONSE in Support re 392 MOTION for Entry of Order Allowing Production of Consumer Reports filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit Castle Payday now BPL, # 2 Exhibit Pepper Cash now BPL)(Bennett, Leonard) Modified on 3/22/2019 to seal document-counsel will refile corrected document (wtuc, ). (Entered: 03/22/2019) |
| 03/22/2019 | 427 | Consent MOTION for Extension *of Deadline to File ESI Protocol* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/22/2019) |
| 03/22/2019 | 428 | Memorandum in Support re 427 Consent MOTION for Extension *of Deadline to File* |

| | | |
|---|---|---|
| | | *ESI Protocol* filed by Dowin Coffy, George Hengle, Marcella P. Singh. (Bennett, Leonard) (Entered: 03/22/2019) |
| 03/22/2019 | | Notice of Correction re 426 Response in Support of Motion; DISREGARD document; attorney filed incorrect document containing sealed information; counsel will refile Notice, Motion to Seal, corrected sealed document and redacted document promptly. (jtho, ) (Entered: 03/22/2019) |
| 03/22/2019 | 429 | REPLY to Response to Motion re 392 MOTION for Entry of Order Allowing Production of Consumer Reports *(Corrected)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Bennett, Leonard) (Entered: 03/22/2019) |
| 03/22/2019 | 430 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/22/2019) |
| 03/22/2019 | 431 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 430 MOTION to Seal (Bennett, Leonard) (Entered: 03/22/2019) |
| 03/22/2019 | 432 | Sealed Document re 430 MOTION to Seal . (Attachments: # 1 Exhibit 4, # 2 Exhibit 5) (Bennett, Leonard) (Entered: 03/22/2019) |
| 03/22/2019 | 433 | Memorandum in Support re 430 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/22/2019) |
| 03/26/2019 | 434 | ORDER that plaintiffs' 427 CONSENT MOTION FOR EXTENSION OF DEADLINE TO FILE ESI PROTOCOL is granted. By April 1, 2019, the parties shall file a status report that describes their efforts to collect the electronically stored information ("ESI") relevant in this case; that states whether the parties have come to an agreement about what data must be collected and the methods of such collection; and that proposes a deadline for when the parties will file their proposed ESI protocol. Signed by District Judge Robert E. Payne on 3/26/2019. (jsmi, ) (Entered: 03/26/2019) |
| 03/26/2019 | 435 | ORDER PLAINTIFFS' 332 MOTION FOR A PROTECTIVE ORDER REGARDING DEFENDANT MARTORELLO'S SECOND SET OF INTERROGATORIES is granted; and, therefore, it is ORDERED that, because the defendant, Matt Martorello, served interrogatories in excess of those permitted by the Federal Rules of Civil Procedure without first obtaining leave of Court so to, the plaintiffs shall not be required to answer any of the interrogatories. It is further ORDERED that, by April 15, 2019, Martorello may serve on the plaintiffs a new set of interrogatories within the proper limits proscribed by the Federal Rules of Civil Procedure; provided, however, that none of those interrogatories may be contention interrogatories. See Order for further details. Signed by District Judge Robert E. Payne on 3/26/2019. (jsmi, ) (Entered: 03/26/2019) |
| 03/27/2019 | 436 | Reply to Response to Motion re 403 MOTION for Leave to File *Supplemental Authority In Support of Motion to Compel Information Withheld on the Basis of Attorney-Client Privilege* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) Modified docket text on 4/1/2019 (smej, ). (Entered: 03/27/2019) |
| 03/27/2019 | 437 | MOTION to Strike Defendant Matt Martorello's Memorandum in Opposition to Plaintiffs' Motion for Leave to File Supplemental Authority by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/27/2019) |

**JA61**

| 03/27/2019 | 438 | Memorandum in Support re 437 MOTION to Strike Defendant Matt Martorello's Memorandum in Opposition to Plaintiffs' Motion for Leave to File Supplemental Authority filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/27/2019) |
|---|---|---|
| 03/28/2019 | 439 | ORDER - It is hereby ORDERED that, for good cause shown and in the interest of justice, the MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY CLIENT PRIVILEGE 403 is granted and the Court will consider the supplemental authority and information. Signed by District Judge Robert E. Payne on 03/28/2019. (smej, ) (Entered: 03/28/2019) |
| 03/28/2019 | 440 | ORDER - It is hereby ORDERED that the MOTION FOR ENTRY OF ORDER ALLOWING PRODUCTION OF CONSUMER REPORTS 392 is granted because it seeks relevant information from the consumer reporting agency, DataX, Ltd., and production of that information does not violate the Fair Credit Reporting Act. **SEE ORDER FOR DETAILS.** Signed by District Judge Robert E. Payne on 03/28/2019. (smej, ) (Entered: 03/28/2019) |
| 03/28/2019 | 441 | MEMORANDUM ORDER re 334 MOTION TO OVERRULE MARTORELLO'S OBJECTIONS AND COMPEL DISCOVERY RESPONSES is granted. The documents required to be produced by paragraphs (2) (A) through (J) shall be produced to counsel for plaintiffs by April 27, 2019 and shall be identified and keyed to the discovery request to which they are being produced; and the filing required by paragraphs (1)(B) shall be made by April 29, 2019. See Order for additional details. Signed by District Judge Robert E. Payne on 3/28/2019. (jsmi, ) (Entered: 03/28/2019) |
| 03/28/2019 | 442 | REDACTED REPLY in Support re 405 MOTION to Compel *Response to Subpoena Issued to Rosette, LLP* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Jan. 15, 2019 Hr'g Trans., # 2 Exhibit 2 - Placeholder, # 3 Exhibit 3 - Placeholder, # 4 Exhibit 4 - Placeholder, # 5 Exhibit 5 - Placeholder, # 6 Exhibit 6 - July 2018 Initial Pretrial Conf. Trans.)(Kelly, Kristi) Modified to correct docket text on 4/1/2019 (smej, ). (Entered: 03/28/2019) |
| 03/28/2019 | 443 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 03/28/2019) |
| 03/28/2019 | 444 | Memorandum in Support re 443 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 03/28/2019) |
| 03/28/2019 | 445 | Sealed Attachment/Exhibit(s) re 443 MOTION to Seal . (Attachments: # 1 Exhibit 2 - Sealed Excerpt from Martorello Depo, # 2 Exhibit 3 - Sealed Excerpt from Merritt Deposition, # 3 Exhibit 4 - Sealed E-mail with Business Plan, # 4 Exhibit 5 - Sealed E-mail)(Kelly, Kristi) (Entered: 03/28/2019) |
| 03/28/2019 | 446 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 443 MOTION to Seal (Kelly, Kristi) (Entered: 03/28/2019) |
| 03/29/2019 | 447 | ORDER that DEFENDANT MARTORELLO'S 268 MOTION FOR LEAVE TO FILE A SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION is denied. See Order for additional details. Signed by District Judge Robert E. Payne on 3/28/2019. (jsmi, ) (Entered: 03/29/2019) |
| 03/29/2019 | 448 | Consent MOTION for Extension *of Deadline for TranDotCom Filing* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 03/29/2019) |

**JA62**

| | | |
|---|---|---|
| 03/29/2019 | 449 | Memorandum in Support re 448 Consent MOTION for Extension *of Deadline for TranDotCom Filing* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 03/29/2019) |
| 03/29/2019 | 450 | ORDER that PLAINTIFFS' 437 MOTION TO STRIKE DEFENDANT MATT MARTORELLO'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY is denied as moot because by 439 ORDER the Court granted the plaintiffs' 403 Motion for Leave to File Supplemental Authority. Signed by District Judge Robert E. Payne on 3/29/2019. (jsmi, ) (Entered: 03/29/2019) |
| 04/01/2019 | 451 | STATUS REPORT *(Joint) Regarding ESI Protocol* by Matt Martorello. (Mullins, Maurice) (Entered: 04/01/2019) |
| 04/02/2019 | 452 | ORDER that for good cause shown, this Court hereby grants Plaintiffs' 448 Consent Motion for Extension of the Deadline for TranDotCom Filing. It is hereby ordered that TranDotCom Solutions, LLC, in accordance with the requirements outlined in the Court's March 13, 2019 Order (ECF No. 416 ), shall segregate and preserve the data for production and file a pleading certifying the same on or before April 12, 2019. It is so ORDERED. Signed by District Judge Robert E. Payne on 04/02/2019. (walk, ) (Entered: 04/02/2019) |
| 04/03/2019 | 453 | MOTION For Leave to File a Sur-Reply re 340 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* by Matt Martorello. (Mullins, Maurice) (Entered: 04/03/2019) |
| 04/03/2019 | 454 | ORDER re 422 DEFENDANT'S MOTION TO FILE UNDER SEAL HIS UNREDACTED RESPONSE AND EXHIBITS VV, XX, YY, ZZ, AAA, BBB, CCC, FFF, GOG, HHH, KKK, AND 000 IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY. It is hereby ORDERED that henceforth no document shall be entered for filing under seal unless the terms of 19 STIPULATED PROTECTIVE ORDER have been satisfied and there has been a demonstration by the Defendants that, in fact, specific information in a document is entitled to protection because it is truly confidential business information or a trade secret and by a certification of counsel for the Plaintiffs wherein counsel agrees that the specified information is confidential business information or a trade secret. See Order for additional details and deadlines. Signed by District Judge Robert E. Payne on 4/3/2019. (jsmi, ) (Entered: 04/03/2019) |
| 04/03/2019 | 455 | Memorandum in Support re 453 MOTION For Leave to File a Sur-Reply re 340 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* filed by Matt Martorello. (Attachments: # 1 Exhibit Proposed Sur-Reply, # 2 Exhibit RRR, # 3 Exhibit SSS, # 4 Exhibit TTT, # 5 Exhibit UUU, # 6 Exhibit VVV, # 7 Exhibit WWW, # 8 Exhibit XXX, # 9 Exhibit YYY, # 10 Exhibit ZZZ, # 11 Exhibit AAAA, # 12 Exhibit BBBB, # 13 Exhibit CCCC, # 14 Exhibit DDDD, # 15 Exhibit EEEE, # 16 Exhibit FFFF, # 17 Exhibit GGGG, # 18 Exhibit HHHH, # 19 Exhibit IIII)(Mullins, Maurice) (Entered: 04/03/2019) |
| 04/03/2019 | 456 | MOTION to Seal by Matt Martorello. (Attachments: # 1 Proposed Order)(Mullins, Maurice) (Entered: 04/03/2019) |
| 04/03/2019 | 457 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 456 MOTION to Seal (Mullins, Maurice) (Entered: 04/03/2019) |
| 04/03/2019 | 458 | Memorandum in Support re 456 MOTION to Seal filed by Matt Martorello. (Mullins, Maurice) (Entered: 04/03/2019) |

JA63

| 04/03/2019 | 459 | Sealed Response/Reply/Opposition re 456 MOTION to Seal . (Attachments: # 1 Exhibit RRR, # 2 Exhibit SSS, # 3 Exhibit UUU, # 4 Errata WWW, # 5 Exhibit XXX, # 6 Exhibit ZZZ, # 7 Exhibit AAAA, # 8 Exhibit BBBB, # 9 Exhibit CCCC, # 10 Exhibit DDDD, # 11 Exhibit EEEE, # 12 Exhibit FFFF, # 13 Exhibit GGGG)(Mullins, Maurice) (Entered: 04/03/2019) |
| 04/05/2019 | 460 | ORDER re 451 JOINT STATUS REPORT REGARDING ESI PROTOCOL. The parties shall have until May 13, 2019 to complete the ESI Protocol and to submit to the Court for resolution any disputes over aspects of the Protocol as to which they cannot agree. To that end, on May 13, 2019, the parties shall file: (1) the ESI Protocol on which they have agreed; and (2) a list of topics as to which they are in disagreement and, as to the topics therein listed, the Plaintiffs shall file their Statement of Position on May 16, 2019; the Defendant shall file his response on May 21, 2019; and the Plaintiffs shall file their reply on May 24, 2019. Signed by District Judge Robert E. Payne on 4/5/2019. (jsmi, ) (Entered: 04/05/2019) |
| 04/05/2019 | 461 | ORDER that Defendant's 456 DEFENDANT'S MOTION TO FILE PROPOSED SURREPLY AND CERTAIN EXHIBITS IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE UNDER SEAL is denied as moot because the Court denied DEFENDANT MARTORELLO'S 453 MOTION FOR LEAVE TO FILE A SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE. Signed by District Judge Robert E. Payne on 4/5/2019. (jsmi, ) (Entered: 04/05/2019) |
| 04/05/2019 | 462 | ORDER that DEFENDANT MARTORELLO'S 453 MOTION FOR LEAVE TO FILE A SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE is denied. See Order for details. Signed by District Judge Robert E. Payne on 4/5/2019. (jsmi, ) (Entered: 04/05/2019) |
| 04/10/2019 | 463 | Reply to Motion re 443 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 04/10/2019) |
| 04/12/2019 | 464 | MOTION to Strike 395 Response in Support of Motion,,,,, by Matt Martorello. (Mullins, Maurice) (Entered: 04/12/2019) |
| 04/12/2019 | 465 | Memorandum in Support re 464 MOTION to Strike 395 Response in Support of Motion,,,,, filed by Matt Martorello. (Mullins, Maurice) (Entered: 04/12/2019) |
| 04/12/2019 | 466 | Second MOTION for Extension *of Deadline for TranDotCom Filing* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 04/12/2019) |
| 04/12/2019 | 467 | Memorandum in Support re 466 Second MOTION for Extension *of Deadline for TranDotCom Filing* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 04/12/2019) |
| 04/16/2019 | 468 | ORDER - This Court hereby grants Plaintiffs' Consent Motion for Extension of the Deadline for TranDotCom Filing 466 . It is hereby ordered that TranDotCom Solutions, LLC, in accordance with the requirements outlined in the Court's March 13, 2019 Order, shall segregate and preserve the data for production and file a pleading certifying the same on or before April 19, 2019. Signed by District Judge Robert E. Payne on 04/15/2019. (jsau, ) (Entered: 04/16/2019) |
| 04/16/2019 | 469 | NOTICE by Matt Martorello *Change of Address of Richard L. Scheff, Jonathan P. Boughram & Michael C. Witsch* (Erbach, John) (Entered: 04/16/2019) |

**JA64**

| 04/16/2019 | 470 | Memorandum in Opposition re 464 MOTION to Strike 395 Response in Support of Motion,,,,, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Oct. 2013 Email Chain)(Kelly, Kristi) (Entered: 04/16/2019) |
|---|---|---|
| 04/19/2019 | 471 | Third MOTION for Extension *of Deadline for TranotCom Filing* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 04/19/2019) |
| 04/19/2019 | 472 | Memorandum in Support re 471 Third MOTION for Extension *of Deadline for TranotCom Filing* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 04/19/2019) |
| 04/22/2019 | 473 | REPLY to Response to Motion re 464 MOTION to Strike 395 Response in Support of Motion,,,,, filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Erbach, John) (Entered: 04/22/2019) |
| 04/23/2019 | 474 | ORDER that this Court hereby grants Plaintiffs' 471 Consent Motion for Extension of the Deadline for TranDotCom Filing. It is hereby ordered that TranDotCom Solutions, LLC, in accordance with the requirements outlined in the Court's 416 March 13, 2019 Order shall segregate and preserve the data for production and file a pleading certifying the same on or before May 3,2019. No further extension will be granted. Signed by District Judge Robert E. Payne on 4/23/2019. (jsmi, ) (Entered: 04/23/2019) |
| 04/24/2019 | 475 | MOTION for Leave to File *Supplemental Authority* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Gingras Opinion, # 2 Proposed Order)(Kelly, Kristi) (Entered: 04/24/2019) |
| 04/24/2019 | 476 | Memorandum in Support re 475 MOTION for Leave to File *Supplemental Authority* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 04/24/2019) |
| 05/03/2019 | 477 | Motion to appear Pro Hac Vice by Charles Palella and Certification of Local Counsel Maurice Mullins Jr. Filing fee $ 75, receipt number 0422-6623214. by Matt Martorello. (Mullins, Maurice) (Entered: 05/03/2019) |
| 05/03/2019 | 478 | VACATED PER 954 ORDER ENTERED ON 12/8/2020 - MEMORANDUM OPINION. Signed by District Judge Robert E. Payne on 05/03/2019. (smej, ) Modified on 12/8/2020 (jsmi, ). (Entered: 05/03/2019) |
| 05/03/2019 | 479 | VACATED PER 954 ORDER ENTERED ON 12/8/2020 - ORDER - It is hereby ORDERED that: The PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE 340 is granted in part and denied in part; and Further, having considered DEFENDANT MATT MARTORELLO'S MOTION TO STRIKE PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE AND RELATED EXHIBITS 464 and the supporting, opposing, and reply memoranda, it is hereby ORDERED that the motion is denied. SEE ORDER FOR DETAILS. Signed by District Judge Robert E. Payne on 05/03/2019. (smej, ) Modified on 12/8/2020 (jsmi, ). (Entered: 05/03/2019) |
| 05/03/2019 | 480 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 416 Order on Motion for Miscellaneous Relief,, (Attachments: # 1 Exhibit TranDotCom Certification)(Bennett, Leonard) (Entered: 05/03/2019) |
| 05/08/2019 | 481 | Memorandum in Opposition re 475 MOTION for Leave to File *Supplemental Authority* filed by Matt Martorello. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Erbach, John) (Entered: 05/08/2019) |

**JA65**

| 05/09/2019 | 482 | Response *Regarding Rosette, LLP's Citation of Supplemental Authority* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 05/09/2019) |
|---|---|---|
| 05/10/2019 | 483 | ORDER granting 477 Motion for Pro hac vice. Charles Palella appointed for Matt Martorello. Signed by District Judge Robert E. Payne on 5/9/2019. (jsmi, ) (Entered: 05/10/2019) |
| 05/13/2019 | 484 | Response to 481 Memorandum in Opposition filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 05/13/2019) |
| 05/13/2019 | 485 | STATUS REPORT *(Joint Submission Regarding ESI Protocol)* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 05/13/2019) |
| 05/16/2019 | 486 | MOTION for Reconsideration re 479 Order on Motion to Compel,,, Order on Motion to Strike,, by Matt Martorello. (Erbach, John) (Entered: 05/16/2019) |
| 05/16/2019 | 487 | Memorandum in Support re 486 MOTION for Reconsideration re 479 Order on Motion to Compel,,, Order on Motion to Strike,, filed by Matt Martorello. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Erbach, John) (Entered: 05/16/2019) |
| 05/16/2019 | 488 | MOTION for Sanctions *for Failure to Comply with Court Order Dated May 3, 2019* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 05/16/2019) |
| 05/16/2019 | 489 | Memorandum *Regarding ESI Disputes* to 460 Order,, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit Declaration of E. Michelle Drake, # 2 Exhibit "1", # 3 Exhibit "2", # 4 Exhibit "3", # 5 Exhibit "4", # 6 Exhibit "5" FILED UNDER SEAL, # 7 Exhibit "6", # 8 Exhibit "7", # 9 Exhibit "8", # 10 Exhibit "9", # 11 Exhibit "10", # 12 Exhibit "11" FILED UNDER SEAL, # 13 Exhibit "12")(Bennett, Leonard) (Entered: 05/16/2019) |
| 05/16/2019 | 490 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 05/16/2019) |
| 05/16/2019 | 491 | Memorandum in Support re 490 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 05/16/2019) |
| 05/16/2019 | 492 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 490 MOTION to Seal , 491 Memorandum in Support, 489 Memorandum,, (Bennett, Leonard) (Entered: 05/16/2019) |
| 05/16/2019 | 493 | Sealed Memorandum in Support re 489 Memorandum,,. (Bennett, Leonard) (Entered: 05/16/2019) |
| 05/16/2019 | 494 | Sealed Attachment/Exhibit(s) re 490 MOTION to Seal , 491 Memorandum in Support, 492 Notice of Filing Sealing Motion LCvR5(C), 489 Memorandum,,. (Bennett, Leonard) (Entered: 05/16/2019) |
| 05/16/2019 | 495 | Sealed Attachment/Exhibit(s) re 490 MOTION to Seal , 491 Memorandum in Support, 492 Notice of Filing Sealing Motion LCvR5(C), 489 Memorandum,,. (Bennett, Leonard) (Entered: 05/16/2019) |
| 05/16/2019 | 496 | Memorandum in Support re 488 MOTION for Sanctions *for Failure to Comply with Court Order Dated May 3, 2019* filed by Dowin Coffy, George Hengle, Marcella P. |

**JA66**

| | | |
|---|---|---|
| | | Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1 - Oct. 2013 Email Chain, # <u>2</u> Exhibit 2 - Dec. 2012 Email Chain)(Bennett, Leonard) (Entered: 05/16/2019) |
| 05/20/2019 | <u>497</u> | NOTICE of Appearance by William Henry Hurd on behalf of Ascension Technologies, Inc., Big Picture Loans, LLC (Hurd, William) (Entered: 05/20/2019) |
| 05/20/2019 | <u>498</u> | NOTICE OF FILING by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Main Document 498 replaced on 5/22/2019) (jsmi, ). (Additional attachment(s) added on 5/22/2019: # <u>1</u> Proposed Scheduling Order) (jsmi, ) (Entered: 05/20/2019) |
| 05/21/2019 | | Notice of Correction re <u>498</u> NOTICE. Filing attorney notified that Proposed Order should be filed as attachment to the Notice. (jsmi, ) (Entered: 05/21/2019) |
| 05/21/2019 | <u>499</u> | MOTION Certification of Interlocutory Appeal under 28 U.S.C. Sec. 1292(b) re <u>479</u> Order on Motion to Compel,,, Order on Motion to Strike,, <u>478</u> Memorandum Opinion by Matt Martorello. (Attachments: # <u>1</u> Proposed Order)(Erbach, John) (Entered: 05/21/2019) |
| 05/21/2019 | <u>500</u> | MOTION to Stay re <u>479</u> Order on Motion to Compel,,, Order on Motion to Strike,, <u>478</u> Memorandum Opinion *(Stay Pending Interlocutory Appeal and/or Decision on a Petition for Writ of Mandamus)* by Matt Martorello. (Attachments: # <u>1</u> Proposed Order) (Erbach, John) (Entered: 05/21/2019) |
| 05/21/2019 | <u>501</u> | Memorandum in Support re <u>499</u> MOTION Certification of Interlocutory Appeal under 28 U.S.C. Sec. 1292(b) re <u>479</u> Order on Motion to Compel,,, Order on Motion to Strike,, <u>478</u> Memorandum Opinion , <u>500</u> MOTION to Stay re <u>479</u> Order on Motion to Compel,,, Order on Motion to Strike,, <u>478</u> Memorandum Opinion *(Stay Pending Interlocutory Appeal and/or Decision on a Petition for Writ of Mandamus)* filed by Matt Martorello. (Erbach, John) (Entered: 05/21/2019) |
| 05/21/2019 | <u>502</u> | ORDER that the Court has reviewed the allegedly privileged documents in Binders 1 through 9 submitted by Martorello to assure that they are closely related to the subject matter waiver found in <u>478</u> MEMORANDUM OPINION and <u>479</u> ORDER, and to the basis for the criminal/fraud exception found therein. Martorello shall produce all documents in Binders 1 through 9 except those listed above as not closely related. Production shall be made within 10 days after the Court decides MATT MARTORELLO'S <u>479</u> MOTION FOR RECONSIDERATION OF ORDER GRANTING IN PART PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE AND REQUEST FOR ORAL ARGUMENT. See Order for details. Signed by District Judge Robert E. Payne on 5/21/2019. (jsmi, ) (Entered: 05/21/2019) |
| 05/21/2019 | <u>503</u> | Response to <u>489</u> Memorandum,, *Matt Martorello's Response to Plaintiffs' Memorandum Regarding ESI Disputes* filed by Matt Martorello. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E, # <u>6</u> Exhibit F, # <u>7</u> Exhibit G) (Erbach, John) (Entered: 05/21/2019) |
| 05/23/2019 | <u>504</u> | Reply to <u>489</u> Memorandum,, *Regarding ESI Disputes* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2)(Kelly, Kristi) (Entered: 05/23/2019) |
| 05/24/2019 | <u>505</u> | MOTION to Seal *Unredacted Memorandum in Support and Certain Exhibits in Support of Motion for Leave to File Supplemental Exhibits in Support of Motion for Reconsideration* by Matt Martorello. (Erbach, John) (Entered: 05/24/2019) |
| 05/24/2019 | <u>506</u> | Memorandum in Support re <u>505</u> MOTION to Seal *Unredacted Memorandum in Support and Certain Exhibits in Support of Motion for Leave to File Supplemental Exhibits in* |

**JA67**

| | | |
|---|---|---|
| | | *Support of Motion for Reconsideration* filed by Matt Martorello. (Erbach, John) (Entered: 05/24/2019) |
| 05/24/2019 | 507 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 505 MOTION to Seal *Unredacted Memorandum in Support and Certain Exhibits in Support of Motion for Leave to File Supplemental Exhibits in Support of Motion for Reconsideration* (Erbach, John) (Entered: 05/24/2019) |
| 05/24/2019 | 508 | Sealed Memorandum in Support re 505 MOTION to Seal *Unredacted Memorandum in Support and Certain Exhibits in Support of Motion for Leave to File Supplemental Exhibits in Support of Motion for Reconsideration.* (Attachments: # 1 Exhibit Tab A, # 2 Exhibit 3, # 3 Exhibit 9, # 4 Exhibit 10, # 5 Exhibit 12, # 6 Exhibit 13, # 7 Exhibit 14, # 8 Exhibit 15, # 9 Exhibit 16, # 10 Exhibit 19, # 11 Exhibit 20, # 12 Exhibit 21, # 13 Exhibit 22, # 14 Exhibit 23, # 15 Exhibit 24)(Erbach, John) (Entered: 05/24/2019) |
| 05/24/2019 | 509 | MOTION for Leave to File *Supplemental Exhibits in Support of Motion for Reconsideration* by Matt Martorello. (Attachments: # 1 Exhibit Tab A, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28)(Erbach, John) (Entered: 05/24/2019) |
| 05/24/2019 | 510 | Memorandum in Support re 509 MOTION for Leave to File *Supplemental Exhibits in Support of Motion for Reconsideration* filed by Matt Martorello. (Attachments: # 1 Exhibit Tab A, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28)(Erbach, John) (Entered: 05/24/2019) |
| 05/24/2019 | 511 | ORDER having considered Plaintiffs' Memorandum Regarding ESI Disputes 489 , for the reasons stated on the record during conference call, it is hereby ORDERED that by May 29, 2019, Defendant Matt Martorello shall produce all documents that are responsive to search terms contained in "Exhibit 1" [489-2] of Plaintiffs' Memorandum Regarding ESI Disputes 489 . SEE ORDER FOR DETAILS. Signed by District Judge Robert E. Payne on 5/24/19. (jtho, ) (Entered: 05/24/2019) |
| 05/24/2019 | 512 | Joint MOTION for Protective Order *Joint Motion to Enter Amended Stipulated Protective Order* by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1 (Proposed Amended Stipulated Protective Order))(Anthony, David) (Entered: 05/24/2019) |
| 05/28/2019 | 513 | MEMORANDUM ORDER that if Rosette, LLP fails to produce a privilege log by June 17, 2019, then the failure to produce such privilege log will be deemed as a waiver of any claim of privilege due to unjustified delay. The plaintiffs contend that Rosette already waived its ability to submit a privilege log based on its failure to produce a privilege log already. The plaintiffs shall brief that issue pursuant to a motion to compel if they wish to pursue it. The opening brief shall be filed by June 17, 2019; Rosette, LLP shall respond by July 1, 2019; and the reply brief shall be filed by July 10, 2019. The unredacted documents covered herein shall be produced to the plaintiffs by June 17, 2019. See Order for details. Signed by District Judge Robert E. Payne on 5/28/2019. (jsmi, ) (Entered: 05/28/2019) |
| 05/29/2019 | 514 | AMENDED STIPULATED PROTECTIVE ORDER. See Order for details. Signed by |

JA68

| | | District Judge Robert E. Payne on 5/29/2019. (Attachments: # <u>1</u> Exhibit A) (jsmi, ) (Entered: 05/29/2019) |
|---|---|---|
| 05/29/2019 | <u>515</u> | MEMORANDUM ORDER re issues involving the collection of electronically stored information ("ESI") raised in PLAINTIFFS' MEMORANDUM REGARDING ESI DISPUTES (ECF Nos. 489 (redacted) and 493 (sealed)), the response thereto (ECF No. 503), and the reply (ECF No. 504). See Order for complete details and deadlines. Signed by District Judge Robert E. Payne on 5/29/2019. (jsmi, ) (Entered: 05/29/2019) |
| 05/30/2019 | <u>516</u> | NOTICE by Ascension Technologies, Inc., Big Picture Loans, LLC *Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Statement of Position on Plaintiffs' Requested Rule 30(b)(6) Deposition Practice* (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B)(St. George, Timothy) (Entered: 05/30/2019) |
| 05/30/2019 | <u>517</u> | TRANSCRIPT of the conference call held on May 22, 2019, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at <u>www.vaed.uscourts.gov</u> Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/1/2019. Redacted Transcript Deadline set for 7/30/2019. Release of Transcript Restriction set for 8/28/2019.(peterson, peppy) (Main Document 517 replaced on 7/19/2019) (jtho, ). (Entered: 05/30/2019)** |
| 05/30/2019 | <u>518</u> | NOTICE of Appearance by Craig Crandall Reilly on behalf of Rosette, LLP, Justin Gray (Reilly, Craig) (Entered: 05/30/2019) |
| 05/30/2019 | <u>519</u> | Response to <u>498</u> NOTICE, *Statement of Position Opposing Deposition of Justin Gray, Esq.* filed by Justin Gray, Rosette, LLP. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Proposed Order)(Reilly, Craig) (Entered: 05/30/2019) |
| 05/30/2019 | <u>520</u> | RESPONSE to Motion re <u>505</u> MOTION to Seal *Unredacted Memorandum in Support and Certain Exhibits in Support of Motion for Leave to File Supplemental Exhibits in Support of Motion for Reconsideration* filed by Rosette, LLP. (Reilly, Craig) (Entered: 05/30/2019) |
| 05/30/2019 | <u>521</u> | RESPONSE in Opposition re <u>488</u> MOTION for Sanctions *for Failure to Comply with Court Order Dated May 3, 2019* filed by Matt Martorello. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4)(Erbach, John) (Entered: 05/30/2019) |
| 05/30/2019 | <u>522</u> | Memorandum in Opposition re <u>486</u> MOTION for Reconsideration re <u>479</u> Order on Motion to Compel,,, Order on Motion to Strike,, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16)(Kelly, Kristi) (Attachment 3 replaced on 5/31/2019) (jsmi, ). (Entered: 05/30/2019) |
| 05/30/2019 | <u>523</u> | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams *(Statement of Position Regarding Spoliation Discovery)* (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4)(Kelly, Kristi) (Entered: 05/31/2019) |
| 05/31/2019 | <u>524</u> | MOTION for Leave to Serve Requests for Production and Third-Party Subpoenas by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, |

| | | Kristi) (Entered: 05/31/2019) |
|---|---|---|
| 05/31/2019 | 525 | Memorandum in Support re 524 MOTION for Leave to Serve Requests for Production and Third-Party Subpoenas filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Kelly, Kristi) (Entered: 05/31/2019) |
| 05/31/2019 | 526 | NOTICE by Dowin Coffy, Justin Gray, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 454 Order,,, *Plaintiffs' Submission Regarding Sealing Documents Relating to Pending Motions* (Bennett, Leonard) (Entered: 05/31/2019) |
| 05/31/2019 | 527 | Response to 454 Order,,, *Martorello's Statement Regarding Sealed Exhibits in Response to April 3, 2019 Order* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Erbach, John) (Entered: 05/31/2019) |
| 05/31/2019 | 528 | MOTION for Reconsideration re 515 Order, 511 Order, *Partial Reconsideration of Memorandum Order (ECF No. 515) and Clarification or Modification of Memorandum Order (ECF No. 515) and Order (ECF No. 511)* by Matt Martorello. (Erbach, John) (Entered: 05/31/2019) |
| 05/31/2019 | 529 | Memorandum in Support re 528 MOTION for Reconsideration re 515 Order, 511 Order, *Partial Reconsideration of Memorandum Order (ECF No. 515) and Clarification or Modification of Memorandum Order (ECF No. 515) and Order (ECF No. 511)* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Erbach, John) (Entered: 05/31/2019) |
| 06/03/2019 | 530 | Consent MOTION for Extension of Time to File Response/Reply as to 486 MOTION for Reconsideration re 479 Order on Motion to Compel,,, Order on Motion to Strike,, , 522 Memorandum in Opposition,, by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 06/03/2019) |
| 06/04/2019 | 531 | ORDER that 530 CONSENT MOTION FOR EXTENSION OF TIME TO FILE REPLY MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION is granted. It is further ORDERED that the defendant. Matt Martorello, shall file his reply in support of his 486 Motion for Reconsideration by June 12, 2019. Signed by Magistrate Judge David J. Novak on 6/4/2019. (jsmi, ) (Entered: 06/04/2019) |
| 06/04/2019 | 532 | Opposition to 499 MOTION Certification of Interlocutory Appeal under 28 U.S.C. Sec. 1292(b) re 479 Order on Motion to Compel,,, Order on Motion to Strike,, 478 Memorandum Opinion filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 06/04/2019) |
| 06/05/2019 | 533 | REPLY to Response to Motion re 488 MOTION for Sanctions *for Failure to Comply with Court Order Dated May 3, 2019* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Taylor Order, # 2 Exhibit 2 - Davis Order, # 3 Exhibit 3 - Tamblay Order, # 4 Exhibit 4 - Oct. 29, 2013 E-mail, # 5 Exhibit 5 - Aug. 12, 2013 E-mail, # 6 Exhibit 6 - Nov. 4, 2014 E-mail, # 7 Exhibit 7 - Gravel Depo. Excerpt)(Kelly, Kristi) (Entered: 06/05/2019) |
| 06/06/2019 | 534 | ORDER that this matter is before the Court on MATT MARTORELLO'S MOTION FOR RECONSIDERATION OF ORDER, ECF NO. 479, GRANTING IN PART PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE AND REQUEST FOR ORAL ARGUMENT (ECF No. 486 ). Having considered MATT MARTORELLO'S MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION OF ORDER, ECF NO. 479, GRANTING IN PART PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASISOF ATTORNEY-CLIENT PRIVILEGE (ECF No. 487 ), |

**JA70**

it is hereby ORDERED that, by June 11, 2019, the plaintiffs shall file a response to Martorello's contention that the Court erred in holding that Bellicose was the funding source of Red Rock's loans and that the plaintiffs have alleged that there are other funding sources for Red Rock's loans. See Memorandum Opinion (ECF No. 378 ) at 5 n.2; MATT MARTORELLO'S MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION OF ORDER, ECF NO. 479 , GRANTING IN PART PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE (ECF No. 487 ) at 2 n.1. It is so ORDERED. Signed by Magistrate Judge David J. Novak on 06/06/2019. (walk, ) (Entered: 06/06/2019)

| | | |
|---|---|---|
| 06/07/2019 | 535 | RESPONSE to Motion re 505 MOTION to Seal *Unredacted Memorandum in Support and Certain Exhibits in Support of Motion for Leave to File Supplemental Exhibits in Support of Motion for Reconsideration*, 486 MOTION for Reconsideration re 479 Order on Motion to Compel,,, Order on Motion to Strike,, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 06/07/2019) |
| 06/07/2019 | 536 | Memorandum *Martorello's Opening Brief Explaining Why He Is Entitled To Proceed With A Privilege Review* to 515 Order, filed by Matt Martorello. (Erbach, John) (Entered: 06/07/2019) |
| 06/07/2019 | 537 | RESPONSE to Motion re 509 MOTION for Leave to File *Supplemental Exhibits in Support of Motion for Reconsideration* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Weddle Depo Excerpt)(Kelly, Kristi) (Entered: 06/07/2019) |
| 06/07/2019 | 538 | Response to 534 Order,,,, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Jan. 2012 Loan Agreement, # 2 Exhibit 2 - Organization Charts, # 3 Exhibit 3 - Dec. 2016 E-mail, # 4 Exhibit 4 - Sept. 2015 Merger, # 5 Exhibit 5 - Dec. 2014 Promissory Note, # 6 Exhibit 6 - Nov. 2013 Promissory Note, # 7 Exhibit 7 - Nov. 2013 Promissory Note, # 8 Exhibit 8 - Aug. 2014 Promissory Note)(Kelly, Kristi) (Entered: 06/07/2019) |
| 06/07/2019 | 539 | MOTION for Protective Order *Regarding Plaintiffs' Demand for Second Deposition of Matt Martorello Related to Alleged Spoliation Issues* by Matt Martorello. (Erbach, John) (Entered: 06/07/2019) |
| 06/07/2019 | 540 | Memorandum in Support re 539 MOTION for Protective Order *Regarding Plaintiffs' Demand for Second Deposition of Matt Martorello Related to Alleged Spoliation Issues* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Erbach, John) (Entered: 06/07/2019) |
| 06/10/2019 | 541 | REPLY to Response to Motion re 499 MOTION Certification of Interlocutory Appeal under 28 U.S.C. Sec. 1292(b) re 479 Order on Motion to Compel,,, Order on Motion to Strike,, 478 Memorandum Opinion , 500 MOTION to Stay re 479 Order on Motion to Compel,,, Order on Motion to Strike,, 478 Memorandum Opinion *(Stay Pending Interlocutory Appeal and/or Decision on a Petition for Writ of Mandamus)* filed by Matt Martorello. (Erbach, John) (Entered: 06/10/2019) |
| 06/10/2019 | 542 | MOTION to Quash *in part Non-Party Subpoena or, in the Alternative, Motion for Protective Order* by Matt Martorello, Eventide Credit Acquisition Company, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Erbach, John) (Entered: 06/10/2019) |
| 06/10/2019 | 543 | MOTION for Protective Order *(in the Alternative to Motion to Quash)* by Eventide Credit Acquisition Company, LLC, Matt Martorello. (Attachments: # 1 Exhibit 1, # 2 |

| | | |
|---|---|---|
| | | Exhibit 2, # 3 Exhibit 3)(Erbach, John) (Entered: 06/10/2019) |
| 06/10/2019 | 544 | Memorandum in Support re 543 MOTION for Protective Order *(in the Alternative to Motion to Quash)*, 542 MOTION to Quash *in part Non-Party Subpoena or, in the Alternative, Motion for Protective Order* filed by Eventide Credit Acquisition Company, LLC, Matt Martorello. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Erbach, John) (Entered: 06/10/2019) |
| 06/12/2019 | 545 | REPLY to Response to Motion re 486 MOTION for Reconsideration re 479 Order on Motion to Compel,,, Order on Motion to Strike,, filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T)(Erbach, John) (Entered: 06/12/2019) |
| 06/13/2019 | 546 | Financial Interest Disclosure Statement (Local Rule 7.1) by Eventide Credit Acquisition Company, LLC. (Erbach, John) (Entered: 06/13/2019) |
| 06/13/2019 | 547 | REPLY to Response to Motion re 509 MOTION for Leave to File *Supplemental Exhibits in Support of Motion for Reconsideration* filed by Matt Martorello. (Attachments: # 1 Exhibit 1)(Erbach, John) (Entered: 06/13/2019) |
| 06/14/2019 | 548 | RESPONSE to Motion re 524 MOTION for Leave to Serve Requests for Production and Third-Party Subpoenas filed by Matt Martorello. (Erbach, John) (Entered: 06/14/2019) |
| 06/14/2019 | 549 | MOTION to Strike *Declaration of John Norman in Support of Motion for Reconsideration* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 06/14/2019) |
| 06/14/2019 | 550 | Memorandum in Support re 549 MOTION to Strike *Declaration of John Norman in Support of Motion for Reconsideration* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 (Rule 26(a)(2) Disclosure), # 2 Exhibit 2 (Norman Report))(Bennett, Leonard) (Entered: 06/14/2019) |
| 06/14/2019 | 551 | Memorandum in Opposition re 528 MOTION for Reconsideration re 515 Order, 511 Order, *Partial Reconsideration of Memorandum Order (ECF No. 515) and Clarification or Modification of Memorandum Order (ECF No. 515) and Order (ECF No. 511)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit Declaration of E. Michelle Drake)(Bennett, Leonard) (Entered: 06/14/2019) |
| 06/14/2019 | 552 | MOTION to Compel *Production of Documents and Information Withheld on the Basis of Attorney-Client Privilege* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Guzzo, Andrew) (Entered: 06/14/2019) |
| 06/14/2019 | 553 | Memorandum in Support re 552 MOTION to Compel *Production of Documents and Information Withheld on the Basis of Attorney-Client Privilege* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Oct. 2, 2017 Privilege Log, # 2 Exhibit 2 - Oct. 11, 2017 Privilege Log, # 3 Exhibit 3 - Weddle Depo. Excerpt)(Guzzo, Andrew) (Entered: 06/14/2019) |
| 06/14/2019 | 554 | MOTION to Strike 523 NOTICE, *Plaintiffs' Statement of Position* by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 06/14/2019) |
| 06/14/2019 | 555 | Memorandum in Support re 554 MOTION to Strike 523 NOTICE, *Plaintiffs' Statement of Position* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 06/14/2019) |

| 06/17/2019 | <u>556</u> | MOTION to Compel *Documents Withheld by Rosette, LLP* by Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Proposed Order)(Bennett, Leonard) (Entered: 06/17/2019) |
|---|---|---|
| 06/17/2019 | <u>557</u> | Memorandum in Support re <u>556</u> MOTION to Compel *Documents Withheld by Rosette, LLP* filed by George Hengle, Rosette, LLP, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Ex. 1, # <u>2</u> Ex. 2, # <u>3</u> Ex. 3, # <u>4</u> Ex. 4, # <u>5</u> Ex. 5, # <u>6</u> Ex. 6, # <u>7</u> Ex. 7, # <u>8</u> Ex. 8, # <u>9</u> Ex. 9)(Bennett, Leonard) (Entered: 06/17/2019) |
| 06/17/2019 | <u>558</u> | Response to <u>536</u> Memorandum filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1 - Drake Decl.) (Guzzo, Andrew) (Entered: 06/17/2019) |
| 06/20/2019 | <u>559</u> | Reply to Motion re <u>524</u> MOTION for Leave to Serve Requests for Production and Third-Party Subpoenas *(REPLY IN SUPPORT)* filed by Dowin Coffy, Justin Gray, George Hengle, Marcella P. Singh. (Bennett, Leonard) (Entered: 06/20/2019) |
| 06/20/2019 | <u>560</u> | REPLY to Response to Motion re <u>528</u> MOTION for Reconsideration re <u>515</u> Order, <u>511</u> Order, *Partial Reconsideration of Memorandum Order (ECF No. 515) and Clarification or Modification of Memorandum Order (ECF No. 515) and Order (ECF No. 511)* filed by Matt Martorello. (Mullins, Maurice) (Entered: 06/20/2019) |
| 06/21/2019 | <u>561</u> | Consent MOTION for Extension of Time to File Response/Reply as to <u>554</u> MOTION to Strike <u>523</u> NOTICE, *Plaintiffs' Statement of Position* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Proposed Order) (Kelly, Kristi) (Entered: 06/21/2019) |
| 06/21/2019 | <u>562</u> | Memorandum in Support re <u>561</u> Consent MOTION for Extension of Time to File Response/Reply as to <u>554</u> MOTION to Strike <u>523</u> NOTICE, *Plaintiffs' Statement of Position* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 06/21/2019) |
| 06/21/2019 | <u>563</u> | Opposition to <u>539</u> MOTION for Protective Order *Regarding Plaintiffs' Demand for Second Deposition of Matt Martorello Related to Alleged Spoliation Issues* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1 (Martorello Dep. excerpts))(Bennett, Leonard) (Entered: 06/21/2019) |
| 06/21/2019 | <u>564</u> | MOTION for Leave to File *Reply to Plaintiffs' Response to Court's Order Dated June 6, 2019* by Matt Martorello. (Erbach, John) (Entered: 06/21/2019) |
| 06/21/2019 | <u>565</u> | Memorandum in Support re <u>564</u> MOTION for Leave to File *Reply to Plaintiffs' Response to Court's Order Dated June 6, 2019* filed by Matt Martorello. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit A, # <u>3</u> Exhibit B, # <u>4</u> Exhibit C, # <u>5</u> Exhibit D, # <u>6</u> Exhibit E, # <u>7</u> Exhibit F, # <u>8</u> Exhibit G, # <u>9</u> Exhibit H, # <u>10</u> Exhibit I, # <u>11</u> Exhibit J, # <u>12</u> Exhibit K, # <u>13</u> Exhibit L, # <u>14</u> Exhibit M, # <u>15</u> Exhibit N, # <u>16</u> Exhibit O, # <u>17</u> Exhibit P) (Erbach, John) (Entered: 06/21/2019) |
| 06/24/2019 | <u>566</u> | MOTION for Protective Order by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 06/24/2019) |
| 06/24/2019 | <u>567</u> | Memorandum in Support re <u>566</u> MOTION for Protective Order filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D)(St. George, Timothy) (Entered: 06/24/2019) |
| 06/24/2019 | <u>568</u> | Reply to <u>515</u> Order, *Martorello's Reply Brief Explaining Why He Is Entitled To Proceed With A Privilege Review* filed by Matt Martorello. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B)(Erbach, John) (Entered: 06/24/2019) |

**JA73**

| | | |
|---|---|---|
| 06/24/2019 | <u>569</u> | Memorandum in Opposition re <u>542</u> MOTION to Quash *in part Non-Party Subpoena or, in the Alternative, Motion for Protective Order* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17, # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26)(Guzzo, Andrew) (Entered: 06/24/2019) |
| 06/24/2019 | <u>570</u> | Memorandum in Opposition re <u>543</u> MOTION for Protective Order *(in the Alternative to Motion to Quash)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17, # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26)(Guzzo, Andrew) (Entered: 06/24/2019) |
| 06/24/2019 | <u>571</u> | Cross MOTION to Compel *Against Non-Party Conner & Winters, LLP* by Dowin Coffy, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Proposed Order)(Guzzo, Andrew) (Entered: 06/24/2019) |
| 06/24/2019 | <u>572</u> | Memorandum in Support re <u>571</u> Cross MOTION to Compel *Against Non-Party Conner & Winters, LLP* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17, # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26)(Guzzo, Andrew) (Entered: 06/24/2019) |
| 06/25/2019 | <u>573</u> | ORDER that Plaintiff's <u>561</u> Motion for Extension of Time to File is granted. The plaintiffs shall file, by July 5, 2019, their response to DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, LLC'S <u>554</u> MOTION TO STRIKE PLAINTIFFS' STATEMENT OF POSITION and the defendants shall file their reply by July 18, 2019. Signed by District Judge Robert E. Payne on 6/25/2019. (jsmi, ) (Entered: 06/25/2019) |
| 06/26/2019 | <u>574</u> | ORDER that the plaintiffs are directed to file a response to DEFENDANT MARTORELLO'S <u>564</u> MOTION FOR LEAVE TO FILE A REPLY TO PLAINTIFFS' RESPONSE TO COURT'S ORDER DATED JUNE 6, 2019 by June 28, 2019, addressing whether Defendant Matt Martorello's attached proposed reply. No reply in support of DEFENDANT MARTORELLO'S MOTION FOR LEAVE TO FILE A REPLY TO PLAINTIFFS' RESPONSE TO COURT'S ORDER DATED JUNE 6, 2019 is necessary. Signed by District Judge Robert E. Payne on 6/26/2019. (jsmi, ) (Entered: 06/26/2019) |
| 06/27/2019 | <u>575</u> | REPLY to Response to Motion re <u>539</u> MOTION for Protective Order *Regarding Plaintiffs' Demand for Second Deposition of Matt Martorello Related to Alleged Spoliation Issues* filed by Matt Martorello. (Attachments: # <u>1</u> Exhibit A)(Erbach, John) (Entered: 06/27/2019) |
| 06/28/2019 | <u>576</u> | RESPONSE in Opposition re <u>549</u> MOTION to Strike *Declaration of John Norman in Support of Motion for Reconsideration* filed by Matt Martorello. (Mullins, Maurice) (Entered: 06/28/2019) |
| 06/28/2019 | <u>577</u> | RESPONSE in Opposition re <u>552</u> MOTION to Compel *Production of Documents and* |

JA74

| | | |
|---|---|---|
| | | *Information Withheld on the Basis of Attorney-Client Privilege* filed by Matt Martorello. (Attachments: # 1 Exhibit A)(Mullins, Maurice) (Entered: 06/28/2019) |
| 06/28/2019 | 578 | Memorandum in Opposition re 564 MOTION for Leave to File *Reply to Plaintiffs' Response to Court's Order Dated June 6, 2019* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Bennett, Leonard) (Entered: 06/28/2019) |
| 07/01/2019 | 579 | REPLY to Response to Motion re 543 MOTION for Protective Order *(in the Alternative to Motion to Quash)*, 542 MOTION to Quash *in part Non-Party Subpoena or, in the Alternative, Motion for Protective Order* filed by Eventide Credit Acquisition Company, LLC, Matt Martorello. (Erbach, John) (Entered: 07/01/2019) |
| 07/01/2019 | 580 | Memorandum in Opposition re 556 MOTION to Compel *Documents Withheld by Rosette, LLP* filed by Rosette, LLP. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Reilly, Craig) (Entered: 07/01/2019) |
| 07/03/2019 | 581 | Opinion of USCA re 135 Notice of Appeal : Reversed and remanded with instructions by published opinion. (lbre, ) (Entered: 07/03/2019) |
| 07/03/2019 | 582 | USCA JUDGMENT as to 135 Notice of Appeal filed by Big Picture Loans, LLC, Ascension Technologies, Inc. In accordance with the decision of this court, the judgment of the district court is REVERSED. This case is REMANDED to the district court for further proceedings consistent with the court's decision. This judgment shall take effect upon issuance of this court's mandate in accordance with Fed. R. App. P. 41. (lbre, ) (Entered: 07/03/2019) |
| 07/03/2019 | 583 | MOTION to Stay *Deadlines to File Responses to Big Picture and Ascension's Motion for Protective Order and Big Picture and Ascension's Motion to Strike Plaintiffs' Statement of Position* by Dowin Coffy, Justin Gray, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 07/03/2019) |
| 07/03/2019 | 584 | Memorandum in Support re 583 MOTION to Stay *Deadlines to File Responses to Big Picture and Ascension's Motion for Protective Order and Big Picture and Ascension's Motion to Strike Plaintiffs' Statement of Position* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 07/03/2019) |
| 07/05/2019 | 585 | REPLY to Response to Motion re 549 MOTION to Strike *Declaration of John Norman in Support of Motion for Reconsideration* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Guzzo, Andrew) (Entered: 07/05/2019) |
| 07/05/2019 | 586 | REPLY to Response to Motion re 564 MOTION for Leave to File *Reply to Plaintiffs' Response to Court's Order Dated June 6, 2019* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Erbach, John) (Entered: 07/05/2019) |
| 07/08/2019 | 587 | MOTION to Stay re 571 Cross MOTION to Compel *Against Non-Party Conner & Winters, LLP* by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 07/08/2019) |
| 07/08/2019 | 588 | Memorandum in Support re 587 MOTION to Stay re 571 Cross MOTION to Compel *Against Non-Party Conner & Winters, LLP* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 07/08/2019) |
| 07/08/2019 | 589 | Memorandum in Opposition re 571 Cross MOTION to Compel *Against Non-Party* |

**JA75**

| | | |
|---|---|---|
| | | *Conner & Winters, LLP* filed by Eventide Credit Acquisition Company, LLC, Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q)(Mullins, Maurice) (Entered: 07/08/2019) |
| 07/09/2019 | 590 | RESPONSE to Motion re 571 Cross MOTION to Compel *Against Non-Party Conner & Winters, LLP* filed by Conner & Winters, LLC. (Durrette, Wyatt) (Entered: 07/09/2019) |
| 07/09/2019 | 591 | MOTION for Extension of Time to File Response/Reply as to 580 Memorandum in Opposition by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Hanes, Elizabeth) (Entered: 07/09/2019) |
| 07/10/2019 | 592 | ORDER that the Plaintiffs' 583 Motion to Stay is denied. See Order for additional details and deadlines. Signed by District Judge Robert E. Payne on 7/10/2019. (jsmi, ) (Entered: 07/10/2019) |
| 07/10/2019 | 593 | ORDER that the TRIBAL DEFENDANTS' 587 MOTION TO STAY PLAINTIFFS' CROSS MOTION TO COMPEL AGAINST NON-PARTY CONNER & WINTERS, LLP is denied. See Order for additional details and deadlines. Signed by District Judge Robert E. Payne on 7/10/2019. (jsmi, ) (Entered: 07/10/2019) |
| 07/12/2019 | 594 | REPLY to Response to Motion re 552 MOTION to Compel *Production of Documents and Information Withheld on the Basis of Attorney-Client Privilege* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Guzzo, Andrew) (Entered: 07/12/2019) |
| 07/12/2019 | 595 | ORDER - It is hereby ORDERED that the motion (ECF No. 591) is granted. It is further ORDERED that the plaintiffs shall file, by July 17, 2019, their reply (with respect to Non-Party Rosette, LLC only) in support of PLAINTIFFS' MOTION TO COMPEL (ECF No. 571). Their reply with respect to the defendants. Big Picture Loans, LLC and Ascension Technologies, Inc., shall be filed by August 14, 2019. (See ORDER, ECF No. 593). Signed by District Judge Robert E. Payne on 07/11/2019. (tjoh, ) (Entered: 07/12/2019) |
| 07/15/2019 | 596 | RESPONSE in Support re 571 Cross MOTION to Compel *Against Non-Party Conner & Winters, LLP* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Guzzo, Andrew) (Entered: 07/15/2019) |
| 07/15/2019 | 597 | Reply to 589 Memorandum in Opposition,, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Guzzo, Andrew) (Entered: 07/15/2019) |
| 07/17/2019 | 598 | Reply to 580 Memorandum in Opposition filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Bennett, Leonard) (Entered: 07/17/2019) |
| 07/22/2019 | 599 | ORDER - It is hereby ORDERED that: By August 23, 2019, the parties to this case, other than Lula A. Williams, et al., shall file a Statement of Position ("SOP"), or, if appropriate, a motion, setting out their positions on: (a) the effect, if any, of the Fourth Circuit's Decision on further proceedings in this case. **SEE ORDER FOR DEADLINES AND DETAILS.** Signed by District Judge Robert E. Payne on 07/22/2019. (smej, ) (Entered: 07/22/2019) |
| 07/25/2019 | 600 | USCA Mandate re 135 Notice of Appeal : The judgment of this court, entered July 03, 2019, takes effect today. This constitutes the formal mandate of this court issued |

**JA76**

| | | pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. (lbre, ) (Entered: 07/25/2019) |
|---|---|---|
| 07/29/2019 | 601 | ORDER that the Statements of Position required by paragraph (1) entered on July 22, 2019, shall state positions in summary form and shall not exceed 7 pages in length. The response required in paragraph (2) of the July 22 Order shall not exceed 7 pages and the replies required in paragraph (2) of the July 22 Order shall not exceed 5 pages. It is furthe ORDERED that the Statements of Position required by paragraph (3) of the July 22 Order shall state positions in summary form and shall not exceed 7 pages in length. The response required in paragraph (4) of the July 22 Order shall not exceed 7 pages and the replies required in paragraph (4) of the July 22 Order shall not exceed 5 pages. Signed by Magistrate Judge David J. Novak. on 7/29/2019. (jsmi, ) (Entered: 07/29/2019) |
| 08/08/2019 | 602 | Response to 566 MOTION for Protective Order filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 08/08/2019) |
| 08/08/2019 | 603 | Opposition to 554 MOTION to Strike 523 NOTICE of *Plaintiffs' Statement of Position* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Guzzo, Andrew). Modified docket entry on 08/09/2019. (walk, ). (Entered: 08/08/2019) |
| 08/12/2019 | 604 | MOTION for Entry of Judgment under Rule 54(b) *and* 58(d) by Ascension Technologies, Inc., Big Picture Loans, LLC. (Attachments: # 1 Exhibit 1 (Proposed Order))(Anthony, David) (Entered: 08/12/2019) |
| 08/12/2019 | 605 | Memorandum in Support re 604 MOTION for Entry of Judgment under Rule 54(b) *and 58(d)* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Anthony, David) (Entered: 08/12/2019) |
| 08/14/2019 | 606 | REPLY to Response to Motion re 554 MOTION to Strike 523 NOTICE, *Plaintiffs' Statement of Position* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 08/14/2019) |
| 08/15/2019 | 607 | MOTION for Extension of Time to File Response/Reply *Motion for Extension of Time to File Response to Plaintiffs' Cross Motion to Compel Against Non-Party Conner & Winters, LLP* by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 08/15/2019) |
| 08/15/2019 | 608 | Memorandum in Opposition re 607 MOTION for Extension of Time to File Response/Reply *Motion for Extension of Time to File Response to Plaintiffs' Cross Motion to Compel Against Non-Party Conner & Winters, LLP* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Aug. 8, 2019 Email)(Guzzo, Andrew) (Entered: 08/15/2019) |
| 08/15/2019 | 617 | MDL Hearing Order re: MDL No. 2906 - Section A (Designated for Oral Argument). Panel Hearing set for 9/26/19 in Los Angeles, CA. Notices of Presentation or Waiver of Oral Argument due on or before 9/9/19. Notice of Presentation or Waiver of Oral Argument form (JPML form 9) can be downloaded from website. Signed by Judge Sarah S. Vance, Chair, Panel on Multi-District Litigation on 8/15/19. (Attachments: # 1 MDL Advisory). (jtho, ) (Entered: 08/28/2019) |
| 08/16/2019 | 609 | ORDER that DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLGOIES, LLC'S 566 MOTION FOR PROTECTIVE Order is denied as moot. See Order for details. Signed by District Judge Robert E. Payne on 8/15/2019. (jsmi, ) (Entered: 08/16/2019) |

**JA77**

| | | |
|---|---|---|
| 08/21/2019 | 610 | REPLY to Response to Motion re 607 MOTION for Extension of Time to File Response/Reply *Motion for Extension of Time to File Response to Plaintiffs' Cross Motion to Compel Against Non-Party Conner & Winters, LLP* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 08/21/2019) |
| 08/23/2019 | 611 | NOTICE by Ascension Technologies, Inc., Big Picture Loans, LLC re 599 Order, *Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Statement of Position in Response to Court's July 22, 2019 Order [ECF No. 599]* (St. George, Timothy) (Entered: 08/23/2019) |
| 08/23/2019 | 612 | NOTICE by Ascension Technologies, Inc. re 599 Order, *(Joint Statement of Position of Brian McFadden and Simon Xu Liang)* (Attachments: # 1 Exhibit 1 (Hearing transcript excerpts))(St. George, Timothy) (Entered: 08/23/2019) |
| 08/23/2019 | 613 | NOTICE by Matt Martorello re 599 Order, 601 Order,,, *(Statement of Position)* (Attachments: # 1 Exhibit A)(Erbach, John) (Entered: 08/23/2019) |
| 08/26/2019 | 614 | MOTION for Extension of Time to File Response/Reply as to 604 MOTION for Entry of Judgment under Rule 54(b) *and 58(d)* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 08/26/2019) |
| 08/26/2019 | 615 | Memorandum in Support re 614 MOTION for Extension of Time to File Response/Reply as to 604 MOTION for Entry of Judgment under Rule 54(b) *and 58(d)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1)(Bennett, Leonard) (Entered: 08/26/2019) |
| 08/26/2019 | 616 | RESPONSE in Opposition re 571 Cross MOTION to Compel *Against Non-Party Conner & Winters, LLP* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 08/26/2019) |
| 08/28/2019 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Conference Calls held on 8/28/2019. (cgar) (Entered: 09/03/2019) |
| 08/29/2019 | 618 | ORDER that 607 MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO PLAINTIFFS' CROSS MOTION TO COMPEL AGAINST NON-PARTY CONNER & WINTERS, LLP is granted. It is further ORDERED that the defendants, Big Picture Loans, LLC and Ascension Technologies, LLC, shall file their response to PLAINTIFFS' 571 CROSS MOTION TO COMPEL AGAINST NON-PARTY CONNER & WINTERS, LLP by August 26, 2019. Signed by District Judge Robert E. Payne on 8/29/2019. Filed nunc pro tunc August 15, 2019. (jsmi, ) (Entered: 08/29/2019) |
| 09/03/2019 | 619 | Reply to Motion re 571 Cross MOTION to Compel *Against Non-Party Conner & Winters, LLP* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 09/03/2019) |
| 09/03/2019 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak: Conference Call held on 9/3/2019. (cgar) (Entered: 09/03/2019) |
| 09/04/2019 | 620 | Memorandum in Opposition re 604 MOTION for Entry of Judgment under Rule 54(b) *and 58(d)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Guzzo, Andrew) (Entered: 09/04/2019) |
| 09/06/2019 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak Conference Call held on 9/6/2019. (cgar) (Entered: 09/06/2019) |
| 09/10/2019 | 621 | REPLY to Response to Motion re 604 MOTION for Entry of Judgment under Rule |

| | | |
|---|---|---|
| | | 54(b) *and 58(d)* filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (Anthony, David) (Entered: 09/10/2019) |
| 09/10/2019 | 622 | MOTION for Leave to File *Supplemental Authority* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order) (Kelly, Kristi) (Entered: 09/10/2019) |
| 09/10/2019 | 623 | Memorandum in Support re 622 MOTION for Leave to File *Supplemental Authority* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1- Neff Opinion, # 2 Exhibit 2 - Davis Opinion) (Kelly, Kristi) (Entered: 09/10/2019) |
| 09/16/2019 | 624 | Response to 613 NOTICE *Matt Martorello's Statement of Position* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "1")(Bennett, Leonard) (Entered: 09/16/2019) |
| 09/16/2019 | 625 | Response to 611 NOTICE, *Big Picture Loans, LLC's and Ascension Technologies, LLC's Statement of Position* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 09/16/2019) |
| 09/16/2019 | 626 | Response to 612 NOTICE *Brian McFadden's and Simon Liang's Joint Statement of Position* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 09/16/2019) |
| 09/20/2019 | 627 | ORDER that 607 MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO PLAINTIFFS' CROSS MOTION TO COMPEL AGAINST NON-PARTY CONNER & WINTERS, LLP is granted. The documents agreed to be produced (see ECF No. 607, paragraph 3) will be produced by September 20, 2019; and the 3,000 additional documents referred to in ECF No. 607, paragraph 4, will be reviewed and produced (or a privilege log served) by September 30, 2019. Signed by District Judge Robert E. Payne on 9/17/2019. (jsmi, ) (Entered: 09/20/2019) |
| 09/20/2019 | 628 | MDL ORDER DEEMING MOTION WITHDRAWN AND VACATING THE SEPTEMBER 26, 2019 HEARING SESSION ORDER (31 in CAN/5:18-cv-03476, 33 in GAN/1:18-cv-03217, 34 in MA/1:18-cv-12277, 54 in MDL No. 2906, 34 in OR/3:18-cv-01651, 31 in VAE/3:17-cv-00461, 32 in VAE/3:18-cv-00406, 43 in VAE/3:19-cv-00314), ( 1 in MDL No. 2906) THIS MDL IS CLOSED Signed by Clerk of the Panel John W. Nichols on 9/20/2019. Associated Cases: MDL No. 2906, CAN/5:18-cv-03476, GAN/1:18-cv-03217, MA/1:18-cv-12277, OR/3:18-cv-01651, VAE/3:17-cv-00461, VAE/3:18-cv-00406, VAE/3:19-cv-00314 (SM). Signed by Clerk on 9/20/2019. (jsmi, ) (Entered: 09/20/2019) |
| 09/23/2019 | 629 | Reply to 624 Response *In Support of Statement of Position Pursuant to ECF Nos. 599 & 601* filed by Matt Martorello. (Erbach, John) (Entered: 09/23/2019) |
| 09/23/2019 | 630 | Reply to 625 Response filed by Ascension Technologies, Inc., Big Picture Loans, LLC. (St. George, Timothy) (Entered: 09/23/2019) |
| 09/23/2019 | 631 | Reply to 626 Response *in Support of Statement of Position of Brian McFadden and Simon Liang* filed by Ascension Technologies, Inc.. (St. George, Timothy) (Entered: 09/23/2019) |
| 09/24/2019 | 632 | Memorandum in Opposition re 622 MOTION for Leave to File *Supplemental Authority* filed by Matt Martorello. (Attachments: # 1 Exhibit 1)(Mullins, Maurice) (Entered: 09/24/2019) |
| 09/30/2019 | 633 | RESPONSE in Support re 622 MOTION for Leave to File *Supplemental Authority* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 09/30/2019) |

JA79

| 10/08/2019 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak: Conference Call held on 10/8/2019. (cgar) (Entered: 10/09/2019) |
|---|---|---|
| 10/16/2019 | | Minute Entry for proceedings held before Magistrate Judge David J. Novak:Attorney Appointment Meeting held on 10/16/2019. (cgar) (Entered: 10/16/2019) |
| 10/21/2019 | 634 | ORDER REGARDING PROCEDURES FOR SETTLEMENT CONFERENCE. The Court has scheduled this case for a settlement conference on October 28, 2019, at 10:00 a.m. At that time, the following parties shall report to the chambers of United States District Judge David J. Novak: (1) Plaintiffs; (2) Matt Martorello; (3) Justin Martorello; (4) Rebecca Martorello; (5) Jeremy Davis; (6) Eventide Credit Acquisitions, LLC; (7) Bluetech Irrevocable Trust; (8) Kairos Holdings, LLC; (9) Liont, LLC; (10) Breakwater Holdings, LLC; and, (11) Gallant Capital, LLC. See Order for additional details. Signed by Magistrate Judge David J. Novak on 10/21/2019. (jsmi, ) (Entered: 10/21/2019) |
| 10/21/2019 | | Settlement Conference set for 10/28/2019 at 10:00 AM in Richmond Judges Chamber before District Judge David J. Novak. (cgar) (Entered: 10/21/2019) |
| 10/21/2019 | 637 | ORDER that because the Parties have advised the Court that they have reached a settlement and require extension of some deadlines to finalize the formal settlement, by October 29, 2019, the Parties shall finalize the settlement agreement and file it along with a Motion (with supporting papers and brief) seeking Preliminary Approval of the Settlement and therewith shall submit a proposed Order, proposed notices, and proposed dates for all steps necessary for final approval of the settlement. Any deadlines associated with 554 and 604 motions or Orders are STAYED until 60 days from date of this ORDER or further Order of the Court, whichever shall first occur. This ORDER shall have no effect on any pending motions or deadlines as between Plaintiffs and Matt Martorello. All counsel in this case shall meet in person with United States District Judge David J. Novak on October 28, 2019 at 9:30 a.m. to discuss settlement of the claims against Matt Martorello. See Order for additional details and deadlines. Signed by District Judge Robert E. Payne on 10/21/2019. (jsmi, ) (Entered: 10/21/2019) |
| 10/28/2019 | | Minute Entry for proceedings held before District Judge David J. Novak:Settlement Conference held on 10/28/2019. (cgar) (Entered: 10/29/2019) |
| 10/31/2019 | 640 | ORDER that by November 21, 2019, the Parties shall finalize the settlement agreement and file it along with a Motion (with supporting papers and brief) seeking Preliminary Approval of the Settlement and therewith shall submit a proposed Order, proposed notices, and proposed dates for all steps necessary for final approval of the settlement. This Order shall have no effect on any pending motions or deadlines as between Plaintiffs and co-Defendant Matt Martorello. See Order for details. Signed by District Judge Robert E. Payne on 10/31/2019. (jsmi, ) (Entered: 10/31/2019) |
| 11/13/2019 | | Conference Call set for 11/14/2019 at 11:15 AM before District Judge David J. Novak. (cgar) (Entered: 11/13/2019) |
| 11/18/2019 | 641 | ORDER that by November 21, 2019, counsel for the Parties shall file the Certification and pleading required by Paragraph (3) of 637 October 21 Order. See Order for details. Signed by District Judge Robert E. Payne on 11/18/2019. (jsmi, ) (Entered: 11/18/2019) |
| 11/21/2019 | 642 | NOTICE by Ascension Technologies, Inc., Big Picture Loans, LLC re 641 Order *of Compliance with November 18, 2019 Order* (St. George, Timothy) (Entered: 11/21/2019) |
| 11/21/2019 | 643 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 637 Order,,,, 641 Order *Plaintiffs' Certification* (Bennett, Leonard) (Entered: 11/21/2019) |

| 11/22/2019 | 644 | ORDER that, by 5:00 p.m. November 26, 2019, counsel shall finalize the settlement agreement with respect to the plaintiffs and the defendants. Big Picture Loans, LLC and Ascension Technologies, LLC, and file it along with a Motion (with supporting papers and brief) seeking Preliminary Approval of the Settlement and therewith shall submit a proposed Order, proposed notices, and proposed dates for all steps necessary for final approval of the settlement. Signed by District Judge Robert E. Payne on 11/22/2019. (jsmi, ) (Entered: 11/22/2019) |
|---|---|---|
| 12/20/2019 | 645 | ORDER that **any deadlines associated with the following motions are STAYED until further Order of the Court**: (a) DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, LLC'S MOTION TO STRIKE PLAINTIFFS' STATEMENT OF POSITION (ECF No. 554 ); and (b) MOTION FOR ENTRY OF JUDGMENT OF DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, LLC (ECF No. 604 ). It is so ORDERED. Signed by District Judge Robert E. Payne on 12/20/2019. (sbea, ) (Entered: 12/20/2019) |
| 01/08/2020 | 646 | ORDER - It appearing that, in Renee Galloway, et al. v. James Williams, Jr., et al., Civil Action No. 3:19cv470 ("Galloway III"), a number of defendants in Lula Williams, et al. v. Big Picture Loans, LLC, et al., Civil Action No. 3:17cv461 ("Williams"), Renee Galloway, et al. v. Big Picture Loans, LLC, et al., Civil Action No. 3:18cv406 ("Galloway I"), and Renee Galloway, et al. v. Justin Martorello, et al., Civil Action No. 3:19cv314 ("Galloway II"),(the "Settling Defendants") have agreed to settle the plaintiffs' claims against them in Williams, Galloway I, and Galloway II, and it appearing that numerous motions are pending in those three cases against the defendants who did not settle the "Non-Settling Defendants") and against Third-Parties, and finding that, considering the length of time that this case has been pending, it is necessary to proceed expeditiously to resolve: (a) the plaintiffs' claims against the Non-Settling Defendants in Williams, Galloway I, and Galloway II; and (b) the motions affecting Third-Parties. The Clerk is directed to file a copy of this Order in Williams, Galloway I, and Galloway II. (SEE ORDER FOR ALL DEADLINES AND DETAILS). Signed by District Judge Robert E. Payne on 1/8/20. (jtho, ) (Entered: 01/08/2020) |
| 01/08/2020 |  | Set Hearing: Status Conference set for 1/29/2020 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 01/08/2020) |
| 01/22/2020 | 648 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 646 Order,,,,, *(Joint Notice of Agreed List of Outstanding Motions)* (Attachments: # 1 Exhibit 1 - Agreed List of Outstanding Motions, # 2 Exhibit 2 - Agreed List of Miscellaneous Proceedings)(Kelly, Kristi) (Entered: 01/22/2020) |
| 01/22/2020 | 649 | NOTICE by Matt Martorello re 646 Order,,,,, *Defendant's Proposed Order in Which Pending Motions Should Be Resolved* (Erbach, John) (Entered: 01/22/2020) |
| 01/22/2020 | 650 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams *(Plaintiffs' Statement of Position on Suggested Order for Resolution of Pending Motions)* (Kelly, Kristi) (Entered: 01/22/2020) |
| 01/23/2020 | 651 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 646 Order,,,,, *(Joint Supplemental Notice)* (Attachments: # 1 Exhibit 1 - Amended List of Miscellaneous Actions)(Kelly, Kristi) (Entered: 01/23/2020) |
| 01/29/2020 | 654 | Minute Entry for proceedings held before District Judge Robert E. Payne: Status Conference held on 1/29/2020. Defendant Martorello to file supplemental brief re: class certification (fourth circuit decision) by 02/12/20, response by 02/26/20, oral argument set for 03/06/20 at 10:00 a.m.; parties to discuss order denying sur-reply; defendant Martorello to file motion to consolidate by 02/07/20, response by 02/17/20, reply 02/24/20; plaintiffs and defendant Martorello to compile list identifying evidence |

**JA81**

| | | |
|---|---|---|
| | | destroyed re: Jennifer Weddle; parties to tender agreed order for counsel John O'Connor/client to not further destroy evidence; Court grants motion for leave to file supplemental authority (ECF Nos. 475 & 622 in case 3:17-cv-461). (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 01/29/2020) |
| 01/30/2020 | 655 | ORDER that for the reasons set forth on the record at the hearing on January 29, 2020, it is hereby ORDERED that: (1) Defendant Matt Martorello shall file by February 7, 2020 his motion to consolidate Lula Williams, et al. v. Big Picture Loans, LLC, et al., Civil Action No. 3:17-cv-461, Renee Galloway, et al. v. Big Picture Loans, LLC, et al., Civil Action No. 3:18-cv-406, and Renee Galloway, et al. v. Justin Martorello, et al., Civil Action No. 3:19-cv-314; (2) The Plaintiffs shall file their opposition by February 17, 2020; and, (3) Defendant Matt Martorello shall file his reply by February 24, 2020. It is so ORDERED. Signed by District Judge Robert E. Payne on 01/30/2020. (walk, ) (Entered: 01/30/2020) |
| 01/30/2020 | 656 | ORDER that Defendant Matt Martorello shall file supplemental briefing addressing the effect of the Fourth Circuit's decision on PLAINTIFFS' 189 MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO by February 12, 2020; Plaintiffs shall file their response by February 26, 2020; the Court shall hear oral argument on this motion on March 6, 2020 at 10.00 A.M; Plaintiffs' 475 MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY is GRANTED; Plaintiffs' 622 MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY is GRANTED. Signed by District Judge Robert E. Payne on 1/30/2020. (jsmi, ) (Entered: 01/30/2020) |
| 01/30/2020 | | Set Hearing: Motion Hearing set for 3/6/2020 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 01/30/2020) |
| 01/31/2020 | 657 | TRANSCRIPT of proceedings held on January 29, 2020, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 3/2/2020. Redacted Transcript Deadline set for 4/1/2020. Release of Transcript Restriction set for 4/30/2020.(peterson, peppy) (Entered: 01/31/2020)** |
| 02/05/2020 | 658 | STRIKEN PER 659 ORDER ENTERED ON 2/6/2020 - NOTICE by Matt Martorello *of Correction of the January 29, 2020 Status Conference Record Related to the Deposition Testimony of Greenberg Traurig, LLP Attorney Jennifer Weddle* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6) (Erbach, John) Modified to add docket text on 2/6/2020 (jsmi, ). (Entered: 02/05/2020) |
| 02/06/2020 | 659 | ORDER that 658 NOTICE OF CORRECTION OF THE JANUARY 29, 2020 STATUS CONFERENCE RECORD RELATED TO THE DEPOSITION TESTIMONY OF GREENERG TRAURIG, LLP, ATTORNEY JENNIFER WEDDLE be stricken as an improper pleading. If counsel desire to address the matters raised in NOTICE OF CORRECTION OF THE JANUARY 29, 2020 STATUS CONFERENCE RECORD RELATED TO THE DEPOSITION TESTIMONY OF GREENERG TRAURIG, LLP, ATTORNEY JENNIFER WEDDLE that should be done in a format recognized by the Federal Rules of Civil Procedure. Signed by District Judge Robert E. Payne on 2/6/2020. (jsmi, ) (Entered: 02/06/2020) |

| | | |
|---|---|---|
| 02/07/2020 | 660 | MOTION to Consolidate Cases by Matt Martorello. (Mullins, Maurice) (Entered: 02/07/2020) |
| 02/07/2020 | 661 | Memorandum in Support re 660 MOTION to Consolidate Cases filed by Matt Martorello. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Mullins, Maurice) (Entered: 02/07/2020) |
| 02/10/2020 | 662 | MOTION for Leave to File *Supplemental Authority Related to Motion for Class Certification* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - MacDonald Opinion, # 2 Exhibit 2 - Proposed Order)(Kelly, Kristi) (Entered: 02/10/2020) |
| 02/10/2020 | 663 | Memorandum in Support re 662 MOTION for Leave to File *Supplemental Authority Related to Motion for Class Certification* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 02/10/2020) |
| 02/12/2020 | 664 | Memorandum in Opposition re 189 MOTION to Certify Class *against Defendant Matt Martorello Supplemental Brief Addressing the Effect of the Fourth Circuit's Decision on Plaintiffs' Motion for Class Certification per Order at ECF No. 656* filed by Matt Martorello. (Erbach, John) (Entered: 02/12/2020) |
| 02/12/2020 | 665 | MOTION to Amend/Correct 447 Order on Motion for Leave to File, *Motion for Amended Decision on Sur-Reply per Court's Direction at ECF No. 654* by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 02/12/2020) |
| 02/12/2020 | 666 | Memorandum in Support re 665 MOTION to Amend/Correct 447 Order on Motion for Leave to File, *Motion for Amended Decision on Sur-Reply per Court's Direction at ECF No. 654* filed by Matt Martorello. (Attachments: # 1 Exhibit A)(Erbach, John) (Entered: 02/12/2020) |
| 02/17/2020 | 667 | Memorandum in Opposition re 660 MOTION to Consolidate Cases filed by Lula Williams. (Bennett, Leonard) (Entered: 02/17/2020) |
| 02/18/2020 | 668 | ORDER that in accordance with, and as instructed by, the Judgment of the United States Court of Appeals for the Fourth Circuit entered on July 3, 2019, and the mandate entered on July 25, 2019, this action is dismissed with prejudice against the defendants, Big Picture Loans, LLC and Ascension Technologies, LLC for lack of subject matter jurisdiction. Signed by District Judge Robert E. Payne on 2/18/2020. (jsmi, ) (Entered: 02/18/2020) |
| 02/19/2020 | 669 | ORDER that 665 MOTION FOR AMENDED DECISION ON SUR-REPLY is granted and the defendant. Matt Martorello, shall immediately file his SUR-REPLY IN OPPOSITION TO PLAINTIFFS' 269 MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO and the exhibit thereto. Signed by District Judge Robert E. Payne on 2/18/2020. (jsmi, ) (Entered: 02/19/2020) |
| 02/19/2020 | 670 | ORDER that 662 PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY RELATED TO THEIR MOTION FOR CLASS CERTIFICATION is granted. Signed by District Judge Robert E. Payne on 2/18/2020. (jsmi, ) (Entered: 02/19/2020) |
| 02/19/2020 | 671 | Reply to 669 Order on Motion to Amend/Correct, 189 MOTION to Certify Class *against Defendant Matt Martorello (Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification of Claims Against Defendant Matt Martorello)* filed by Matt Martorello. (Attachments: # 1 Exhibit A)(Erbach, John) (Entered: 02/19/2020) |
| 02/19/2020 | 672 | NOTICE by Lula Williams re 654 Status Conference,,, *(Log of Weddle Documents)* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Bennett, Leonard) (Entered: 02/19/2020) |

| | | |
|---|---|---|
| 02/20/2020 | 673 | ORDER. It is hereby ORDERED that the hearing on MARTORELLO'S 664 SUPPLEMENT set for March 6, 2020 is cancelled and that, by March 4, 2020, counsel shall file a Notice advising whether it is necessary to have an evidentiary hearing on the PLAINTIFFS' 249 MISREPRESENTATION FILING filed in Galloway I before the commencement of the briefing and hearing schedule set forth above for the Amended Motion for Class Certification. See Order for additional details. Signed by District Judge Robert E. Payne on 2/20/2020. (jsmi, ) (Entered: 02/20/2020) |
| 02/21/2020 | | Set Hearing: Amended Motion *for Class Certification* Hearing set for 6/5/2020 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 02/21/2020) |
| 02/21/2020 | 674 | MOTION to Transfer Case *to the Northern District of Texas* by Matt Martorello. (Mullins, Maurice) (Entered: 02/21/2020) |
| 02/21/2020 | 675 | Memorandum in Support re 674 MOTION to Transfer Case *to the Northern District of Texas* filed by Matt Martorello. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Mullins, Maurice) (Entered: 02/21/2020) |
| 02/24/2020 | 676 | REPLY to Response to Motion re 660 MOTION to Consolidate Cases filed by Matt Martorello. (Erbach, John) (Entered: 02/24/2020) |
| 02/26/2020 | 677 | MOTION to Strike 672 NOTICE *Regarding Compliance with ECF No. 654 (Documents Pertaining to Jennifer Weddle)* by Matt Martorello. (Erbach, John) (Entered: 02/26/2020) |
| 02/26/2020 | 678 | Memorandum in Support re 677 MOTION to Strike 672 NOTICE *Regarding Compliance with ECF No. 654 (Documents Pertaining to Jennifer Weddle)* filed by Matt Martorello. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Erbach, John) (Entered: 02/26/2020) |
| 03/04/2020 | 679 | NOTICE by Matt Martorello re 673 Order,, *Notice of Matt Martorello Regarding Evidentiary Hearing* (Erbach, John) (Entered: 03/04/2020) |
| 03/05/2020 | 680 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 673 Order,, (Attachments: # 1 Exhibit "1")(Bennett, Leonard) (Entered: 03/05/2020) |
| 03/05/2020 | 681 | MOTION for Extension *of Time to File Plaintiffs' Notice Regarding Evidentiary Hearing* by Dowin Coffy, George Hengle, Marcella P. Singh, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/05/2020) |
| 03/05/2020 | 682 | Memorandum in Support re 681 MOTION for Extension *of Time to File Plaintiffs' Notice Regarding Evidentiary Hearing* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/05/2020) |
| 03/06/2020 | 683 | Memorandum in Opposition re 674 MOTION to Transfer Case *to the Northern District of Texas* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "1", # 2 Exhibit "2", # 3 Exhibit "3", # 4 Exhibit "4", # 5 Exhibit "5")(Bennett, Leonard) (Entered: 03/06/2020) |
| 03/09/2020 | 684 | ORDER that that 681 MOTION FOR EXTENSION OF TIME TO FILE PLAINTIFFS' NOTICE REGARDING EVIDENTIARY HEARING is granted and the filing of PLAINTIFFS' NOTICE REGARDING EVIDENTIARY HEARING is considered timely filed. Signed by District Judge Robert E. Payne on 3/9/2020. (jsmi, ) (Entered: 03/09/2020) |
| 03/10/2020 | 685 | ORDER that DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION |

JA84

| | | |
|---|---|---|
| | | TECHNOLOGIES, LLC'S 554 MOTION TO STRIKE PLAINTIFFS' STATEMENT OF POSITION; 604 MOTION FOR ENTRY OF JUDGMENT OF DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, LLC; and PLAINTIFFS' 614 MOTION FOR EXTENSION OF TIME TO FILE THEIR OPPOSITION TO DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, LLC'S MOTION FOR ENTRY OF JUDGMENT are denied as moot. Signed by District Judge Robert E. Payne on 3/10/2020. (jsmi, ) (Entered: 03/10/2020) |
| 03/11/2020 | 686 | Memorandum in Opposition re 677 MOTION to Strike 672 NOTICE *Regarding Compliance with ECF No. 654 (Documents Pertaining to Jennifer Weddle)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage. (Attachments: # 1 Exhibit "1", # 2 Exhibit "2" FILED UNDER SEAL, # 3 Exhibit "3", # 4 Exhibit "4", # 5 Exhibit "5", # 6 Exhibit "6")(Bennett, Leonard) (Entered: 03/11/2020) |
| 03/11/2020 | 687 | MOTION re 654 Status Conference,,, *To Enforce Court's Minute Order* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/11/2020) |
| 03/11/2020 | 688 | Memorandum in Support re 687 MOTION re 654 Status Conference,,, *To Enforce Court's Minute Order* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "1", # 2 Exhibit "2" FILED UNDER SEAL, # 3 Exhibit "3", # 4 Exhibit "4", # 5 Exhibit "5", # 6 Exhibit "6")(Bennett, Leonard) (Entered: 03/11/2020) |
| 03/11/2020 | 689 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/11/2020) |
| 03/11/2020 | 690 | Memorandum in Support re 687 MOTION re 654 Status Conference,,, *To Enforce Court's Minute Order*, 689 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/11/2020) |
| 03/11/2020 | 691 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, Justin Gray, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 687 MOTION re 654 Status Conference,,, *To Enforce Court's Minute Order*, 686 Memorandum in Opposition, 688 Memorandum in Support, 689 MOTION to Seal (Bennett, Leonard) (Entered: 03/11/2020) |
| 03/11/2020 | 692 | Sealed Response/Reply/Opposition re 686 Memorandum in Opposition, 688 Memorandum in Support,. (Attachments: # 1 Exhibit "2" FILED UNDER SEAL, # 2 Certificate of Service for Sealed Docs)(Bennett, Leonard) (Entered: 03/11/2020) |
| 03/12/2020 | 693 | REPLY to Response to Motion re 674 MOTION to Transfer Case *to the Northern District of Texas* filed by Matt Martorello. (Attachments: # 1 Exhibit Exhibit 1)(Erbach, John) (Entered: 03/12/2020) |
| 03/17/2020 | 694 | REPLY to Response to Motion re 677 MOTION to Strike 672 NOTICE *Regarding Compliance with ECF No. 654 (Documents Pertaining to Jennifer Weddle)* filed by Matt Martorello. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Erbach, John) (Entered: 03/17/2020) |
| 03/18/2020 | 695 | RESPONSE to Motion re 689 MOTION to Seal filed by Matt Martorello. (Erbach, John) (Entered: 03/18/2020) |
| 03/18/2020 | 696 | ORDER - Having considered Paragraph (2) of General Order No. 2020 - 03 entered on March 16, 2020, it is hereby ORDERED that the filing deadlines with respect to: (1) |

JA85

| | | |
|---|---|---|
| | | MATT MARTORELLO'S MOTION TO STRIKE PLAINTIFFS' NOTICE REGARDING COMPLIANCE WITH ECF NO. 654 (DOCUMENTS PERTAINING TO JENNIFER WEDDLE) (ECF No. 677); and (2) PLAINTIFFS' MOTION TO ENFORCE COURT'S MINUTE ORDER, ECF NO. 654 (ECF No. 687) remain in accord with Local Rule 7(F). Signed by District Judge Robert E. Payne on 03/18/2020. (tjoh, ) (Entered: 03/18/2020) |
| 03/18/2020 | 697 | ORDER - It is hereby ORDERED that an evidentiary hearing shall be held on the issues raised in the PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS MADE TO THE COURT BY DEFENDANTS IN SUPPORT OF THEIR MOTIONS TO DISMISS FOR LACK OF JURISDICTION (ECF No. 249) filed in Galloway I. It is ORDERED that the briefing scheduled for the Amended Motion for Class Certification set in paragraph B of the ORDER (ECF No. 673) is suspended; and that an evidentiary hearing on the issues raised in the PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS MADE TO THE COURT BY DEFENDANTS IN SUPPORT OF THEIR MOTIONS TO DISMISS FOR LACK OF JURISDICTION (ECF No. 249) filed in Galloway I will be held on June 5, 2020 at 10:00 a.m. At the conclusion of the hearing on June 5, 2020, the Court will set a new schedule for the filing and briefing of an Amended Motion for Class Certification. Signed by District Judge Robert E. Payne on 03/18/2020. (tjoh, ) (Entered: 03/18/2020) |
| 03/18/2020 | | Set Hearing: Evidentiary Hearing set for 6/5/2020 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 03/18/2020) |
| 03/24/2020 | 698 | RESPONSE in Opposition re 687 MOTION re 654 Status Conference,,, *To Enforce Court's Minute Order* filed by Greenberg Traurig, LLP. (Attachments: # 1 Exhibit Exhibit 1 -- Letter of 2/14/20, # 2 Exhibit Exhibit 2 -- Excerpts from Weddle Deposition, # 3 Exhibit Exhibit 3 -- Letter of 3/16/20)(O'Connor, John) (Entered: 03/24/2020) |
| 03/24/2020 | 699 | NOTICE of Appearance by John F. O'Connor, Jr on behalf of Greenberg Traurig, LLP (O'Connor, John) (Entered: 03/24/2020) |
| 03/25/2020 | 700 | Memorandum in Opposition re 687 MOTION re 654 Status Conference,,, *To Enforce Court's Minute Order* filed by Matt Martorello. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Erbach, John) (Entered: 03/25/2020) |
| 03/30/2020 | 701 | Reply to 698 Response in Opposition to Motion, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/30/2020) |
| 03/31/2020 | 702 | Reply to 687 MOTION re 654 Status Conference,,, *To Enforce Court's Minute Order*, 700 Memorandum in Opposition, filed by Dowin Coffy, Justin Gray, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/31/2020) |
| 04/06/2020 | 703 | ORDER that the DEFENDANT'S 422 MOTION TO FILE UNDER SEAL HIS UNREDACTED RESPONSE AND EXHIBITS W, XX, YY, ZZ, AAA, BBB, CCC, FFF, GGG, HHH, KKK, AND 000 IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY is granted See Order for details. Signed by District Judge Robert E. Payne on 4/6/2020. (jsmi, ) (Entered: 04/06/2020) |
| 04/06/2020 | 704 | ORDER that the Plaintiffs' 430 MOTION TO SEAL is granted; and the PLAINTIFFS' 432 REPLY IN SUPPORT OF MOTION FOR ENTRY OF ORDER ALLOWING PRODUCTION OF CONSUMER REPORTS and certain exhibits thereto are filed |

**JA86**

| | | |
|---|---|---|
| | | under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 4/6/2020. (jsmi, ) (Entered: 04/06/2020) |
| 04/06/2020 | 705 | ORDER that the Plaintiffs' 443 MOTION TO SEAL is granted; and the PLAINTIFFS' 445 REPLY IN SUPPORT OF MOTION TO COMPEL AS TO NON-PARTY ROSETTE, LLP and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 4/6/2020. (jsmi, ) (Entered: 04/06/2020) |
| 04/06/2020 | 706 | ORDER that the Plaintiffs' 490 MOTION TO SEAL is granted; and the PLAINTIFFS' 493 MEMORANDUM REGARDING ESI DISPUTES and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 4/6/2020. (jsmi, ) (Entered: 04/06/2020) |
| 04/06/2020 | 707 | ORDER that 505 Motion to Seal is granted; and MATT MARTORELLO'S 508 MOTION AND MEMORANDUM IN SUPPORT OF LEAVE TO FILE SUPPLEMENTAL EXHIBITS IN SUPPORT OF MOTION FOR RECONSIDERATION and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 4/6/2020. (jsmi, ) (Entered: 04/06/2020) |
| 04/07/2020 | 708 | ORDER - It is hereby ORDERED that MATT MARTORELLO'S MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXHIBITS IN SUPPORT OF MOTION FOR RECONSIDERATION (ECF No. 509) is granted. Signed by District Judge Robert E. Payne on 04/06/2020. (tjoh, ) (Entered: 04/07/2020) |
| 04/08/2020 | 709 | ORDER that, by April 25, 2020, counsel shall advise whether the PLAINTIFFS' 524 MOTION FOR LEAVE TO SERVE REQUESTS FOR PRODUCTION AND THIRD-PARTY SUBPOENAS is affected by the Settlement Agreement and, if so, how. Signed by District Judge Robert E. Payne on 4/7/2020. (jsmi, ) (Entered: 04/08/2020) |
| 04/13/2020 | 710 | MEMORANDUM OPINION. Signed by District Judge Robert E. Payne on 4/9/2020. (jsmi, ) (Entered: 04/13/2020) |
| 04/13/2020 | 711 | ORDER that 660 MOTION FOR CONSOLIDATION is denied. Signed by District Judge Robert E. Payne on 4/9/2020. (jsmi, ) (Entered: 04/13/2020) |
| 04/13/2020 | 712 | MOTION to Withdraw as Attorney by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Hanes, Elizabeth) (Entered: 04/13/2020) |
| 04/14/2020 | 713 | ORDER that 712 MOTION TO WITHDRAW AS COUNSEL is granted. It is further ORDERED that the Clerk shall remove Elizabeth W. Hanes, Esquire as counsel of record for the plaintiffs. Signed by District Judge Robert E. Payne on 4/14/2020. (jsmi, ) (Entered: 04/14/2020) |
| 04/15/2020 | 714 | MEMORANDUM OPINION. Signed by District Judge Robert E. Payne on 4/14/2020. (jsmi, ) (Entered: 04/15/2020) |
| 04/15/2020 | 715 | ORDER that 674 MOTION TO TRANSFER VENUE is denied. It is further ORDERED that the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process. Signed by District Judge Robert E. Payne on 4/14/2020. (jsmi, ) (Entered: 04/15/2020) |
| 04/24/2020 | 716 | NOTICE by Matt Martorello re 709 Order, *(Statement of Position in Response to Order at ECF 709)* (Mullins, Maurice) (Entered: 04/24/2020) |

JA87

| | | |
|---|---|---|
| 04/24/2020 | 717 | STATUS REPORT *Regarding Plaintiffs' Motion for Leave to Serve Requests for Production and Third-Party Subpoenas* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12)(Kelly, Kristi) (Entered: 04/24/2020) |
| 05/04/2020 | 718 | MOTION for Clarification *or, in the Alternative, to Adjourn Evidentiary Hearing Scheduled for June 5, 2020* by Matt Martorello. (Erbach, John) (Entered: 05/04/2020) |
| 05/04/2020 | 719 | MOTION to Continue *(Seeking Adjournment of June 5, 2020 Evidentiary Hearing in the Alternative to Motion for Clarification)* by Matt Martorello. (Erbach, John) (Entered: 05/04/2020) |
| 05/04/2020 | 720 | Memorandum in Support re 718 MOTION for Clarification *or, in the Alternative, to Adjourn Evidentiary Hearing Scheduled for June 5, 2020*, 719 MOTION to Continue *(Seeking Adjournment of June 5, 2020 Evidentiary Hearing in the Alternative to Motion for Clarification)* filed by Matt Martorello. (Erbach, John) (Entered: 05/04/2020) |
| 05/04/2020 | 721 | Request for Hearing by Marcella P. Singh, Gloria Turnage, Lula Williams re Set/Reset Hearings (Bennett, Leonard) (Entered: 05/04/2020) |
| 05/05/2020 | 722 | Response to 721 Request for Hearing filed by Matt Martorello. (Attachments: # 1 Exhibit A)(Erbach, John) (Entered: 05/05/2020) |
| 05/07/2020 | 723 | NOTICE of Appearance by Amy Leigh Austin on behalf of Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams (Austin, Amy) (Entered: 05/07/2020) |
| 05/07/2020 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference held on 5/7/2020. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 06/05/2020) |
| 05/08/2020 | 724 | STATUS REPORT *(Second Status Report Regarding Plaintiffs' Motion for Leave to Serve Requests for Production and Third-Party Subpoenas )* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 05/08/2020) |
| 05/08/2020 | | Minute Entry for proceedings held before District Judge Robert E. Payne:Telephone Conference held on 5/8/2020. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 06/05/2020) |
| 05/09/2020 | 725 | TRANSCRIPT of proceedings held on May 7, 2020, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267, email peppypeterson@gmail.com. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/8/2020. Redacted Transcript Deadline set for 7/9/2020. Release of Transcript Restriction set for 8/7/2020.(peterson, peppy) (Entered: 05/09/2020)** |
| 05/10/2020 | 726 | TRANSCRIPT of proceedings held on May 8, 2020, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267, email peppypeterson@gmail.com. **NOTICE RE REDACTION OF TRANSCRIPTS: The** |

| | | |
|---|---|---|
| | | **parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/9/2020. Redacted Transcript Deadline set for 7/10/2020. Release of Transcript Restriction set for 8/10/2020.(peterson, peppy) (Entered: 05/10/2020)** |
| 05/11/2020 | 727 | ORDER - It is hereby ORDERED that: The Plaintiffs shall file their response to MATT MARTORELLO'S SUPPLEMENTAL BRIEF ADDRESSING THE EFFECT OF THE FOURTH CIRCUIT'S DECISION ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (EOF No. 664) by May 21, 2020; and Defendant Matt Martorello shall file his reply by June 4, 2020. Signed by District Judge Robert E. Payne on 05/11/2020. (tjoh, ) (Entered: 05/11/2020) |
| 05/11/2020 | 728 | MOTION for Reconsideration re 714 Memorandum Opinion, 715 Order on Motion to Transfer Case, by Matt Martorello. (Erbach, John) (Entered: 05/11/2020) |
| 05/11/2020 | 729 | Memorandum in Support re 728 MOTION for Reconsideration re 714 Memorandum Opinion, 715 Order on Motion to Transfer Case, filed by Matt Martorello. (Attachments: # 1 Exhibit A)(Erbach, John) (Entered: 05/11/2020) |
| 05/12/2020 | 730 | ORDER - The Court shall hold an evidentiary hearing and hear argument on the issues set out in paragraph (1) at 9:30 a.m. on July 21, 2020, continuing to July 22, 2020, if needed. SEE ORDER FOR DETAILS AND DEADLINES. Signed by District Judge Robert E. Payne on 05/12/2020. (tjoh, ) (Entered: 05/12/2020) |
| 05/12/2020 | | Set Hearing: Evidentiary Hearing set for 7/21/2020 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 05/12/2020) |
| 05/12/2020 | 731 | STATUS REPORT *Regarding Attempts to Schedule Telephonic Hearings on Miscellaneous Subpoena Cases* by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Erbach, John) (Entered: 05/12/2020) |
| 05/21/2020 | 732 | Consent MOTION for Leave to File Excess Pages by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order) (Kelly, Kristi) (Entered: 05/21/2020) |
| 05/21/2020 | 733 | Memorandum in Support re 732 Consent MOTION for Leave to File Excess Pages filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 05/21/2020) |
| 05/21/2020 | 734 | Response to 664 Memorandum in Opposition, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18) (Kelly, Kristi) (Entered: 05/21/2020) |
| 05/21/2020 | 735 | MOTION to Seal *Regarding ECF 734* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 05/21/2020) |
| 05/21/2020 | 736 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 735 MOTION to Seal *Regarding ECF 734* (Kelly, Kristi) (Entered: 05/21/2020) |

| 05/21/2020 | 737 | Sealed Attachment/Exhibit(s) re 735 MOTION to Seal *Regarding ECF 734*. (Attachments: # 1 Exhibit 14, # 2 Exhibit 15)(Kelly, Kristi) (Entered: 05/21/2020) |
|---|---|---|
| 05/21/2020 | 738 | Memorandum in Support re 735 MOTION to Seal *Regarding ECF 734* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 05/21/2020) |
| 05/22/2020 | 739 | Witness List by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 05/22/2020) |
| 05/22/2020 | 740 | ORDER granting 524 PLAINTIFFS' MOTION FOR LEAVE TO SERVE REQUESTS FOR PRODUCTION AND THIRD-PARTY SUBPOENAS. SEE ORDER FOR DETAILS. It is further ORDERED that plaintiffs are permitted to serve a subpoena for certain documents on Ascension. However,it is ORDERED that the reasonable cost of searching for those documents shall be paid by the plaintiffs. Signed by District Judge Robert E. Payne on 05/22/2020. (tjoh, ) (Entered: 05/22/2020) |
| 05/22/2020 | 741 | RESPONSE in Opposition re 728 MOTION for Reconsideration re 714 Memorandum Opinion, 715 Order on Motion to Transfer Case, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 05/22/2020) |
| 05/26/2020 | 742 | ORDER - Pursuant to the ORDER (ECF No. 730) entered on May 12, 2020, it is hereby ORDERED that the evidentiary hearing scheduled for 10:00 a.m. June 5, 2020 is continued to 9:30 a.m. July 21, 2020. It is further ORDERED that MATT MARTORELLO'S MOTION FOR CLARIFICATION OR, IN THE ALTERNATIVE, TO ADJOURN EVIDENTIARY HEARING SCHEDULED FOR JUNE 5, 2020 (ECF Nos. 718 and 719) and PLAINTIFFS' REQUEST FOR A STATUS CONFERENCE REGARDING MISREPRESENTATION HEARING (ECF No. 721) are denied as moot. Signed by District Judge Robert E. Payne on 05/26/2020. (tjoh, ) (Entered: 05/26/2020) |
| 05/28/2020 | 743 | REPLY to Response to Motion re 728 MOTION for Reconsideration re 714 Memorandum Opinion, 715 Order on Motion to Transfer Case, filed by Matt Martorello. (Erbach, John) (Entered: 05/28/2020) |
| 05/28/2020 | 744 | ORDER that Plaintiffs' 732 Motion for Leave to Exceed Page Limit regarding the Plaintiffs' Response to Matt Martorello's Supplemental Brief Addressing the Effect of the Fourth Circuit Decision on Plaintiffs' Motion for Class Certification is GRANTED. Plaintiffs' response shall not exceed 35 pages and Martorello's reply shall not exceed 25 pages. Signed by District Judge Robert E. Payne on 5/28/2020. (jsmi, ) (Entered: 05/28/2020) |
| 05/28/2020 | 745 | Joint MOTION for Extension of Time to File Response/Reply as to 727 Order, 730 Order, by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 05/28/2020) |
| 05/29/2020 | 746 | ORDER that Plaintiffs shall file their renewed position on alleged misrepresentations as described in 730 order entered May 12, 2020, on or before June 3, 2020. Plaintiffs shall file their exhibits for the hearing on or before June 3, 2020. Martorello shall file his reply in support of his Supplemental Brief Addressing the Effect of the Fourth Circuit's Decision on Plaintiffs' Motion for Class Certification as described in 727 order entered May 11, 2020, on or before June 15, 2020. Signed by District Judge Robert E. Payne on 5/28/2020. (jsmi, ) (Entered: 05/29/2020) |
| 06/03/2020 | 747 | MOTION Under Rule 30(d) for Further Deposition Based on Conduct that Impeded Questioning by Matt Martorello. (Erbach, John) (Entered: 06/03/2020) |
| 06/03/2020 | 748 | MOTION to Expedite *Motion Under Rule 30(d) for Further Deposition Based on* |

**JA90**

| | | |
|---|---|---|
| | | *Conduct that Impeded Questioning* by Matt Martorello. (Erbach, John) (Entered: 06/03/2020) |
| 06/03/2020 | 749 | Memorandum in Support re 747 MOTION Under Rule 30(d) for Further Deposition Based on Conduct that Impeded Questioning , 748 MOTION to Expedite *Motion Under Rule 30(d) for Further Deposition Based on Conduct that Impeded Questioning* filed by Matt Martorello. (Attachments: # 1 Exhibit A (Under Seal), # 2 Exhibit B, # 3 Exhibit C (Under Seal))(Erbach, John) (Entered: 06/03/2020) |
| 06/03/2020 | 750 | MOTION to Seal *Unredacted Memorandum and Exhibits Containing Material Designated Confidential-Attorneys' Eyes Only by Plaintiffs* by Matt Martorello. (Erbach, John) (Entered: 06/03/2020) |
| 06/03/2020 | 751 | Memorandum in Support re 750 MOTION to Seal *Unredacted Memorandum and Exhibits Containing Material Designated Confidential-Attorneys' Eyes Only by Plaintiffs* filed by Matt Martorello. (Erbach, John) (Entered: 06/03/2020) |
| 06/03/2020 | 752 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 750 MOTION to Seal *Unredacted Memorandum and Exhibits Containing Material Designated Confidential-Attorneys' Eyes Only by Plaintiffs* (Erbach, John) (Entered: 06/03/2020) |
| 06/03/2020 | 753 | UNSEALED PER 40 ORDER ENTERED ON 7/30/2020 - Sealed Memorandum in Support re 750 MOTION to Seal *Unredacted Memorandum and Exhibits Containing Material Designated Confidential-Attorneys' Eyes Only by Plaintiffs*, 747 MOTION Under Rule 30(d) for Further Deposition Based on Conduct that Impeded Questioning , 748 MOTION to Expedite *Motion Under Rule 30(d) for Further Deposition Based on Conduct that Impeded Questioning*. (Attachments: # 1 Exhibit A, # 2 Exhibit C)(Erbach, John) Modified on 7/30/2020 (jsmi, ). (Entered: 06/03/2020) |
| 06/03/2020 | 754 | Exhibit List by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams.. (Kelly, Kristi) (Entered: 06/03/2020) |
| 06/03/2020 | 755 | Memorandum *Regarding Material Misrepresentations* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 06/03/2020) |
| 06/04/2020 | 756 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 755 Memorandum *(Volume I of Exhibits)* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit, # 46 Exhibit, # 47 Exhibit, # 48 Exhibit, # 49 Exhibit, # 50 Exhibit, # 51 Exhibit, # 52 Exhibit, # 53 Exhibit)(Kelly, Kristi) (Entered: 06/04/2020) |
| 06/04/2020 | 757 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 755 Memorandum *(Volume II of Exhibits)* (Attachments: # 1 Exhibit 54, # 2 Exhibit 55, # 3 Exhibit 56, # 4 Exhibit 57, # 5 Exhibit 58, # 6 Exhibit 59, # 7 Exhibit 60, # 8 Exhibit 61, # 9 Exhibit 62, # 10 Exhibit 63, # 11 Exhibit 64, # 12 Exhibit 65, # 13 Exhibit 66, # 14 Exhibit 67, # 15 Exhibit 68, # 16 Exhibit 69, # 17 Exhibit 70, # 18 Exhibit 71, # 19 Exhibit 72, # 20 Exhibit 73, # 21 Exhibit 74, # 22 Exhibit 75, # 23 Exhibit 76, # 24 Exhibit 77, # 25 Exhibit 78, # 26 Exhibit 79, # 27 Exhibit 80, # 28 Exhibit 81, # 29 Exhibit 82, # 30 Exhibit 83, # 31 Exhibit 84, # 32 Exhibit 86, # 33 Exhibit 87, # 34 Exhibit 88, # 35 Exhibit 89, # 36 Exhibit 90, # 37 Exhibit 91, # 38 |

| | | |
|---|---|---|
| | | Exhibit 92, # 39 Exhibit 93, # 40 Exhibit 94, # 41 Exhibit 95, # 42 Exhibit 96, # 43 Exhibit 97, # 44 Exhibit 98, # 45 Exhibit 99, # 46 Exhibit 101, # 47 Exhibit 102, # 48 Exhibit 107)(Kelly, Kristi) (Entered: 06/04/2020) |
| 06/04/2020 | 758 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 06/04/2020) |
| 06/04/2020 | 759 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 758 MOTION to Seal (Kelly, Kristi) (Entered: 06/04/2020) |
| 06/04/2020 | 760 | UNSEALED PER 799 ORDER ENTERED ON 6/24/2020 - Sealed Attachment/Exhibit(s) re 758 MOTION to Seal . (Attachments: # 1 Exhibit Ex. 3, # 2 Exhibit Ex. 5, # 3 Exhibit Ex. 6, # 4 Exhibit Ex. 18, # 5 Exhibit Ex. 31, # 6 Exhibit Ex. 39, # 7 Exhibit Ex. 40)(Kelly, Kristi) Modified on 6/24/2020 (jsmi, ). (Entered: 06/04/2020) |
| 06/04/2020 | 761 | Memorandum in Support re 758 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 06/04/2020) |
| 06/04/2020 | 762 | Motion to appear Pro Hac Vice by Michael Allen Caddell and Certification of Local Counsel Leonard Bennett Filing fee $ 75, receipt number 0422-7232323. by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 06/04/2020) |
| 06/04/2020 | 763 | ORDER that 728 MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION TO TRANSFER will be denied. See Order for details. Signed by District Judge Robert E. Payne on 6/4/2020. (jsmi, ) (Entered: 06/04/2020) |
| 06/04/2020 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference held on 6/4/2020. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 07/06/2020) |
| 06/05/2020 | 764 | ORDER granting 762 Motion for Pro hac vice. Michael Allen Caddell appointed for Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, and Lula Williams. Signed by District Judge Robert E. Payne on 6/5/2020. (jsmi, ) (Entered: 06/05/2020) |
| 06/05/2020 | 765 | Witness List by Matt Martorello. (Erbach, John) (Entered: 06/05/2020) |
| 06/08/2020 | 766 | TRANSCRIPT of proceedings held on June 5, 2020, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267, email peppypeterson@gmail.com. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/8/2020. Redacted Transcript Deadline set for 8/10/2020. Release of Transcript Restriction set for 9/8/2020.(peterson, peppy) (Entered: 06/08/2020)** |
| 06/08/2020 | 767 | ORDER - it is hereby ORDERED that the plaintiffs' MOTION TO SEAL (ECF No. 735) is granted and Exhibits 14 and 15 (ECF No. 737) to PLAINTIFFS' RESPONSE TO MATT MARTORELLO'S SUPPLEMENTAL BRIEF ADDRESSING THE EFFECT OF THE FOURTH CIRCUIT'S DECISION ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (ECF No. 734) are filed under seal; provided that |

JA92

| | | |
|---|---|---|
| | | appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 06/08/2020. (tjoh, ) (Entered: 06/08/2020) |
| 06/08/2020 | <u>768</u> | ORDER - ORDER - By June 8, 2020, Defendant Matt Martorello ("Martorello") shall file a supplement and Martorello shall certify that he has given the list of questions that is the subject of paragraph (1) to the U.S. Attorney for the Western District of Michigan and to the FBI office in Detroit, Michigan; By June 11, 2020, the Plaintiffs shall file their response; By June 17, 2020, the United States shall file a statement of position; by June 20, 2020, Martorello shall file his reply. It is further ORDERED that the Clerk shall send a copy of this ORDER to the U.S. Attorney for the Western District of Michigan. SEE ORDER FOR DETAILS. Signed by District Judge Robert E. Payne on 06/08/2020. Copies distributed as directed. Signed by District Judge Robert E. Payne on 06/08/2020. (tjoh, ) (Entered: 06/08/2020) |
| 06/08/2020 | <u>769</u> | Memorandum *Supplementing per Order* to <u>768</u> Order,,, <u>747</u> MOTION Under Rule 30(d) for Further Deposition Based on Conduct that Impeded Questioning filed by Matt Martorello. (Attachments: # <u>1</u> Exhibit 1)(Erbach, John) (Entered: 06/08/2020) |
| 06/08/2020 | <u>770</u> | CERTIFICATE of Service *on Special Agent in Charge of Detroit FBI Field Office and U.S. Attorney for the Western District of Michigan* re <u>768</u> Order,,, by John Michael Erbach on behalf of Matt Martorello (Erbach, John) (Entered: 06/08/2020) |
| 06/10/2020 | <u>771</u> | RESPONSE in Support re <u>758</u> MOTION to Seal filed by Rosette, LLP. (Reilly, Craig) (Entered: 06/10/2020) |
| 06/10/2020 | <u>772</u> | RESPONSE in Opposition re <u>758</u> MOTION to Seal filed by Matt Martorello. (Attachments: # <u>1</u> Exhibit 1)(Erbach, John) (Entered: 06/10/2020) |
| 06/11/2020 | <u>773</u> | RESPONSE to Motion re <u>747</u> MOTION Under Rule 30(d) for Further Deposition Based on Conduct that Impeded Questioning , <u>748</u> MOTION to Expedite *Motion Under Rule 30(d) for Further Deposition Based on Conduct that Impeded Questioning* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B - FILED UNDER SEAL)(Bennett, Leonard) (Entered: 06/11/2020) |
| 06/11/2020 | <u>774</u> | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Proposed Order)(Bennett, Leonard) (Entered: 06/11/2020) |
| 06/11/2020 | <u>775</u> | Memorandum in Support re <u>774</u> MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 06/11/2020) |
| 06/11/2020 | <u>776</u> | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re <u>773</u> Response to Motion, <u>775</u> Memorandum in Support, <u>774</u> MOTION to Seal (Bennett, Leonard) (Entered: 06/11/2020) |
| 06/11/2020 | <u>777</u> | UNSEALED PER <u>40</u> ORDER ENTERED ON 7/30/2020 - Sealed Response/Reply/Opposition re <u>773</u> Response to Motion,. (Bennett, Leonard) Modified on 7/30/2020 (jsmi, ). (Entered: 06/11/2020) |
| 06/11/2020 | <u>778</u> | UNSEALED PER <u>901</u> ORDER ENTERED ON 7/30/2020 - Sealed Document re <u>773</u> Response to Motion,. (Attachments: # <u>1</u> Certificate of Service)(Bennett, Leonard) Modified on 7/30/2020 (jsmi, ). (Entered: 06/11/2020) |
| 06/12/2020 | <u>779</u> | Consent MOTION to Amend/Correct <u>755</u> Memorandum by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Proposed Order)(Kelly, Kristi) (Entered: 06/12/2020) |

| | | |
|---|---|---|
| 06/12/2020 | 780 | Memorandum in Support re 779 Consent MOTION to Amend/Correct 755 Memorandum filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Proposed Brief)(Kelly, Kristi) (Entered: 06/12/2020) |
| 06/15/2020 | 781 | REPLY to Response to Motion re 189 MOTION to Certify Class *against Defendant Matt Martorello Reply in Support of Supplemental Brief Addressing the Effect of the Fourth Circuit's Decision on Plaintiffs' Motion for Class Certification [Reply to ECF No. 734]* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Erbach, John) (Entered: 06/15/2020) |
| 06/16/2020 | 782 | ORDER - It is hereby ORDERED that PLAINTIFFS' CONSENT MOTION FOR LEAVE TO FILE AN AMENDED MEMORANDUM REGARDING MATERIAL MISREPRESENTATIONS (3:17-cv- 461, ECF No. 779; 3:18-cv-406, ECF No. 429) is GRANTED. It is further ORDERED that Plaintiffs shall file the Amended Memorandum within one business day of entry of this Order. Signed by District Judge Robert E. Payne on 6/15/2020. (smej, ) (Entered: 06/16/2020) |
| 06/16/2020 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference held on 6/16/2020. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 07/06/2020) |
| 06/17/2020 | 783 | Response to 768 Order,,, *Statement of Position* filed by UNITED STATES OF AMERICA. (Hambrick, Jonathan) (Entered: 06/17/2020) |
| 06/17/2020 | 784 | Memorandum *Regarding Material Misrepresentations (Replacement Memorandum)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50)(Kelly, Kristi) (Entered: 06/17/2020) |
| 06/17/2020 | 785 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 784 Memorandum,,,, *(Notice Attaching Remaining Exhibits)* (Attachments: # 1 Exhibit 51, # 2 Exhibit 52, # 3 Exhibit 53, # 4 Exhibit 54, # 5 Exhibit 55, # 6 Exhibit 56, # 7 Exhibit 57, # 8 Exhibit 58, # 9 Exhibit 59, # 10 Exhibit 60, # 11 Exhibit 61, # 12 Exhibit 62, # 13 Exhibit 63, # 14 Exhibit 64, # 15 Exhibit 65, # 16 Exhibit 66, # 17 Exhibit 67, # 18 Exhibit 68, # 19 Exhibit 69, # 20 Exhibit 70, # 21 Exhibit 71, # 22 Exhibit 72, # 23 Exhibit 73, # 24 Exhibit 74, # 25 Exhibit 75, # 26 Exhibit 76, # 27 Exhibit 77, # 28 Exhibit 78, # 29 Exhibit 79, # 30 Exhibit 80, # 31 Exhibit 81, # 32 Exhibit 82, # 33 Exhibit 83, # 34 Exhibit 84, # 35 Exhibit 85, # 36 Exhibit 86, # 37 Exhibit 87, # 38 Exhibit 88, # 39 Exhibit 89, # 40 Exhibit 90, # 41 Exhibit 91, # 42 Exhibit 92, # 43 Exhibit 93, # 44 Exhibit 94, # 45 Exhibit 95, # 46 Exhibit 96, # 47 Exhibit 97, # 48 Exhibit 98)(Kelly, Kristi) (Entered: 06/17/2020) |
| 06/17/2020 | 786 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 06/17/2020) |
| 06/17/2020 | 787 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 786 MOTION to Seal (Kelly, Kristi) |

**JA94**

| | | |
|---|---|---|
| | | (Entered: 06/17/2020) |
| 06/17/2020 | 788 | UNSEALED PER 813 ORDER - Sealed Attachment/Exhibit(s) re 786 MOTION to Seal . (Attachments: # 1 Exhibit 5, # 2 Exhibit 40, # 3 Exhibit 41)(Kelly, Kristi) Modified docket text on 7/7/2020 (jsmi, ). (Entered: 06/17/2020) |
| 06/17/2020 | 789 | Memorandum in Support re 786 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 06/17/2020) |
| 06/18/2020 | 790 | REPLY to Response to Motion re 747 MOTION Under Rule 30(d) for Further Deposition Based on Conduct that Impeded Questioning filed by Matt Martorello. (Attachments: # 1 Exhibit A)(Erbach, John) (Entered: 06/18/2020) |
| 06/22/2020 | 791 | RESPONSE in Support re 786 MOTION to Seal *re EXHIBITS 40 & 41* filed by Rosette, LLP. (Attachments: # 1 Proposed Order)(Reilly, Craig) (Entered: 06/22/2020) |
| 06/22/2020 | 792 | MOTION *to Bar Testimony from Defendant Matt Martorello's Experts At the Misrepresentation Hearing* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 06/22/2020) |
| 06/22/2020 | 793 | Memorandum in Support re 792 MOTION *to Bar Testimony from Defendant Matt Martorello's Experts At the Misrepresentation Hearing* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "1", # 2 Exhibit "2", # 3 Exhibit "3", # 4 Exhibit "4", # 5 Exhibit "5", # 6 Exhibit "6", # 7 Exhibit "7")(Bennett, Leonard) (Entered: 06/22/2020) |
| 06/23/2020 | 794 | MOTION Plaintiffs' Motion to Exclude Testimony from Witnesses Not Identified in Discovery at the Misrepresentations Hearing by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 06/23/2020) |
| 06/23/2020 | 795 | Memorandum in Support re 794 MOTION Plaintiffs' Motion to Exclude Testimony from Witnesses Not Identified in Discovery at the Misrepresentations Hearing filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "A", # 2 Exhibit "B")(Bennett, Leonard) (Entered: 06/23/2020) |
| 06/23/2020 | 796 | MOTION Plaintiffs' Rule 32 Motion to Exclude Prior Deposition Testimony from Defendant Matt Martorello's Witnesses at the Misrepresentations Hearing by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 06/23/2020) |
| 06/23/2020 | 797 | Memorandum in Support re 796 MOTION Plaintiffs' Rule 32 Motion to Exclude Prior Deposition Testimony from Defendant Matt Martorello's Witnesses at the Misrepresentations Hearing filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "A", # 2 Exhibit "B", # 3 Exhibit "C", # 4 Exhibit "D", # 5 Exhibit "E")(Bennett, Leonard) (Entered: 06/23/2020) |
| 06/24/2020 | 798 | TRANSCRIPT of proceedings held on June 16, 2020, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/24/2020. Redacted Transcript Deadline set for 8/24/2020.** |

JA95

| | | |
|---|---|---|
| | | Release of Transcript Restriction set for 9/22/2020.(peterson, peppy) (Entered: 06/24/2020) |
| 06/24/2020 | 799 | ORDER that that 758 MOTION TO SEAL is DENIED and that the Plaintiffs' Statement of Position, Exhibit 3, Exhibit 5, Exhibit 6, Exhibit 18, Exhibit 31, Exhibit 39, and Exhibit 40 shall be removed from under seal by the Clerk and placed in the public record. See Order for details. Signed by District Judge Robert E. Payne on 6/24/2020. (jsmi, ) (Entered: 06/24/2020) |
| 06/24/2020 | 800 | TRANSCRIPT of proceedings held on June 24, 2020, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/24/2020. Redacted Transcript Deadline set for 8/24/2020. Release of Transcript Restriction set for 9/22/2020.(peterson, peppy) (Entered: 06/24/2020)** |
| 06/24/2020 | 801 | ORDER - It is hereby ORDERED that: By July 1, 2020, Matt Martorello ("Martorello") shall file his response to PLAINTIFFS' MOTION TO BAR TESTIMONY FROM DEFENDANT MATT MARTORELLO'S "EXPERTS" AT THE MISREPRESENTATIONS HEARING (3:17-cv-461 ("Williams"), ECF No. 792; 3:18-cv-406 ("Galloway I"), ECF No. 440); By July 8, 2020, Plaintiffs shall file their reply; By July 1, 2020, Martorello shall file his response to PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY FROM WITNESSES NOT IDENTIFIED IN DISCOVERY AT THE MISREPRESENTATIONS HEARING (Williams, ECF No. 794; Galloway I, ECF No. 442); By July 8, 2020, Plaintiffs shall file their reply; By July 1, 2020, Martorello shall file his response to PLAINTIFFS' RULE 32 MOTION TO EXCLUDE PRIOR DEPOSITION TESTIMONY FROM DEFENDANT MATT MARTORELLO'S WITNESSES AT THE MISREPRESENTATIONS HEARING (Williams, ECF No. 796; Galloway I, ECF No. 444); and By July 8, 2020, Plaintiffs shall file their reply. Signed by District Judge Robert E. Payne on 06/24/2020. (tjoh, ) (Entered: 06/24/2020) |
| 06/24/2020 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference held on 6/24/2020. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 07/06/2020) |
| 06/30/2020 | 802 | ORDER re 34 MOTION TO QUASH OR MODIFY SUBPOENAS DIRECTED TO KARRIE WICHTMAN. The Motion is DENIED AS MOOT with respect to the Plaintiffs' subpoena. The MOTION is GRANTED as to Martorello's subpoena to the extent that Martorello seeks to question Wichtman on topics other than those outlined in paragraph 2. The MOTION is DENIED WITHOUT PREJUDICE as to the refiling of a motion to quash that correctly frames and briefs the issues. By July 9, 2020, the Plaintiffs, Martorello, and Wichtman shall inform the Court of their proposed briefing schedule. By July 9, 2020, Martorello and Wichtman shall inform the Court of the date on which Wichtman's deposition shall take place. The Clerk is directed to file this Order in Williams v. Big Picture Loans, LLC, 3:17-cv-461, and in Galloway v. Big Picture Loans, LLC, 3:18-cv-406. Signed by District Judge Robert E. Payne on 6/30/2020. (jsmi, ) (Entered: 06/30/2020) |
| 06/30/2020 | 803 | MOTION to Withdraw as Attorney *by Michelle L. Alamo* by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 06/30/2020) |

| | | |
|---|---|---|
| 07/01/2020 | 804 | Memorandum in Opposition re 796 MOTION Plaintiffs' Rule 32 Motion to Exclude Prior Deposition Testimony from Defendant Matt Martorello's Witnesses at the Misrepresentations Hearing filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(Erbach, John) (Entered: 07/01/2020) |
| 07/01/2020 | 805 | Memorandum in Opposition re 792 MOTION *to Bar Testimony from Defendant Matt Martorello's Experts At the Misrepresentation Hearing* filed by Matt Martorello. (Erbach, John) (Entered: 07/01/2020) |
| 07/01/2020 | 806 | Memorandum in Opposition re 794 MOTION Plaintiffs' Motion to Exclude Testimony from Witnesses Not Identified in Discovery at the Misrepresentations Hearing filed by Matt Martorello. (Attachments: # 1 Exhibit A)(Erbach, John) (Entered: 07/01/2020) |
| 07/02/2020 | 807 | Response to 802 Order,,, *JOINT RESPONSE TO COURT'S ORDER REGARDING THE DEPOSITION OF KARRIE WICHTMAN IN RELATION TO JULY 21 EVIDENTIARY HEARING* filed by Matt Martorello. (Erbach, John) (Entered: 07/02/2020) |
| 07/07/2020 | 808 | *(AMENDED)* Witness List by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 07/07/2020) |
| 07/07/2020 | 809 | MOTION *for Entry of Agreed Order Governing Discovery Designations for July 21-22 Hearing* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 07/07/2020) |
| 07/07/2020 | 810 | ORDER GOVERNING DISCOVERY DESIGNATIONS FOR JULY 21 HEARING. The 809 MOTION FOR ENTRY OF AGREED ORDER GOVERNING DISCOVERY DESIGNATIONS is GRANTED. See Order for details and deadlines. Signed by District Judge Robert E. Payne on 7/7/2020. (jsmi, ) (Entered: 07/07/2020) |
| 07/07/2020 | 811 | ORDER that the July 16, 2020 hearing at 10:00AM on the parties' discovery designation objections shall take place by video conference. Counsel will receive a Zoom invitation to this hearing. Counsel wishing to attend in person may do so. Signed by District Judge Robert E. Payne on 7/7/2020. (jsmi, ) (Entered: 07/07/2020) |
| 07/07/2020 | 812 | ORDER that the Motion to Withdraw as Counsel for defendant Matt Martorello filed by Michelle L. Alamois GRANTED. The Clerk is DIRECTED to remove Ms. Alamo from the docket and ECF distribution list in this case. Signed by District Judge Robert E. Payne on 7/7/2020. (jsmi, ) (Entered: 07/07/2020) |
| 07/07/2020 | 813 | ORDER that the Plaintiffs' 786 MOTION TO SEAL is DENIED and that the PLAINTIFFS' 788 STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT, Exhibit 5, Exhibit 40, and Exhibit 41 shall be removed from under seal by the Clerk and placed in the public record. See Order for details. Signed by District Judge Robert E. Payne on 7/7/2020. (jsmi, ) (Entered: 07/07/2020) |
| 07/07/2020 | 814 | ORDER that the refiling of a motion to quash shall occur on the following schedule: (1) The motion to quash shall be filed by September 4, 2020; (2) The response thereto shall be filed by September 18, 2020; and (3) A reply shall be filed by September 24, 2020. The Clerk is directed to file this Order in Williams v. Big Picture Loans, 3:17-cv-461, and in Galloway v. Big Picture Loans, LLC, 3:18-cv-406. Signed by District Judge Robert E. Payne on 7/7/2020. (jsmi, ) (Entered: 07/07/2020) |
| 07/07/2020 | | Set Hearing: Discovery Designation Objections Hearing set for 7/16/2020 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 07/07/2020) |

JA97

| | | |
|---|---|---|
| 07/08/2020 | 815 | RESPONSE in Support re 794 MOTION Plaintiffs' Motion to Exclude Testimony from Witnesses Not Identified in Discovery at the Misrepresentations Hearing filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "1")(Bennett, Leonard) (Entered: 07/08/2020) |
| 07/08/2020 | 816 | Reply to Motion re 796 MOTION Plaintiffs' Rule 32 Motion to Exclude Prior Deposition Testimony from Defendant Matt Martorello's Witnesses at the Misrepresentations Hearing filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 07/08/2020) |
| 07/08/2020 | 817 | Reply to Motion re 792 MOTION *to Bar Testimony from Defendant Matt Martorello's Experts At the Misrepresentation Hearing* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 07/08/2020) |
| 07/08/2020 | 818 | Motion to appear Pro Hac Vice by Douglas Nelson Marsh and Certification of Local Counsel John Michael Erbach Filing fee $ 75, receipt number 0422-7289998. by Matt Martorello. (Erbach, John) (Entered: 07/08/2020) |
| 07/09/2020 | 819 | ORDER that, by 5:00 PM on July 9, 2020, Matt Martorello shall file the expert reports of J. Howard Beales, Eric C. Henson, John M. Norman, Richard E. Ross, Lawrence S. Roberts, Lance Morgan, and Gregory Cowhey. See Order for details. Signed by District Judge Robert E. Payne on 7/9/2020. (jsmi, ) (Entered: 07/09/2020) |
| 07/09/2020 | 820 | ORDER that MATT MARTORELLO'S 747 MOTION UNDER RULE 30(d) FOR FURTHER DEPOSITION BASED ON CONDUCT THAT IMPEDED QUESTIONING AND FOR EXPEDITED RULING is GRANTED. MATT MARTORELLO'S 748 MOTION UNDER RULE 30(d) FOR FURTHER DEPOSITION BASED ON CONDUCT THAT IMPEDED QUESTIONING AND FOR EXPEDITED RULING is DENIED AS MOOT. See Order for additional details and deadlines. Signed by District Judge Robert E. Payne on 7/9/2020. (jsmi, ) (Entered: 07/09/2020) |
| 07/09/2020 | 821 | NOTICE by Matt Martorello re 819 Order, (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Mullins, Maurice) (Entered: 07/09/2020) |
| 07/09/2020 | 822 | MOTION to Seal *Expert Reports* by Matt Martorello. (Attachments: # 1 Proposed Order)(Mullins, Maurice) (Entered: 07/09/2020) |
| 07/09/2020 | 823 | Memorandum in Support re 822 MOTION to Seal *Expert Reports* filed by Matt Martorello. (Mullins, Maurice) (Entered: 07/09/2020) |
| 07/09/2020 | 824 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 822 MOTION to Seal *Expert Reports* (Mullins, Maurice) (Entered: 07/09/2020) |
| 07/09/2020 | 825 | Sealed Document re 822 MOTION to Seal *Expert Reports*. (Attachments: # 1 Exhibit 3, # 2 Exhibit 4, # 3 Exhibit 7)(Mullins, Maurice) (Entered: 07/09/2020) |
| 07/10/2020 | 826 | ORDER that Defendant Matt Martorello shall file by 12:00 PM on July 13, 2020 a notice detailing which experts he intends to call at the misrepresentations hearing to be held on July 21-22, 2020. Signed by District Judge Robert E. Payne on 7/10/2020. (jsmi, ) (Entered: 07/10/2020) |
| 07/10/2020 | 827 | ORDER that PLAINTIFFS' 794 MOTION TO EXCLUDE TESTIMONY FROM WITNESSES NOT IDENTIFIED IN DISCOVERY AT THE MISREPRESENTATIONS HEARING is HELD IN ABEYANCE as to whether Kym Bunn and Monique Castera may testify at the misrepresentations hearing to be held on July 21-22, 2020. The Plaintiffs shall have leave to depose the Witnesses at Issue. By July 14, 2020 at 9:00 AM, Defendant Matt Martorello shall file a notice detailing the |

**JA98**

| | | topics on which he intends to examine the Witnesses at Issue on direct examination. Signed by District Judge Robert E. Payne on 7/10/2020. (jsmi, ) (Entered: 07/10/2020) |
|---|---|---|
| 07/10/2020 | 828 | ORDER that PLAINTIFFS' 796 RULE 32 MOTION TO EXCLUDE PRIOR DEPOSITION TESTIMONY FROM DEFENDANT MATT MARTORELLO'S WITNESSES AT THE MISREPRESENTATIONS HEARING is GRANTED. See Order for additional details. Signed by District Judge Robert E. Payne on 7/10/2020. (jsmi, ) (Entered: 07/10/2020) |
| 07/10/2020 | 829 | ORDER that the Plaintiffs and Defendant Matt Martorello shall file by July 13, 2020 at 9:00 AM notices detailing: (1) Which witnesses the parties intend to call in person; (2) Which witnesses the parties intend to call via video conference; and (3) Which witnesses the parties intend to call through deposition testimony. Signed by District Judge Robert E. Payne on 7/10/2020. (jsmi, ) (Entered: 07/10/2020) |
| 07/12/2020 | 830 | NOTICE by Matt Martorello re 820 Order on Motion for Miscellaneous Relief,, Order on Motion to Expedite, *Joint Notice Regarding Continued Deposition of Joette Pete* (Erbach, John) (Entered: 07/12/2020) |
| 07/12/2020 | 831 | NOTICE by Matt Martorello re 829 Order, *Regarding Witness Testimony at July 21 Hearing* (Erbach, John) (Entered: 07/12/2020) |
| 07/12/2020 | 832 | NOTICE by Matt Martorello re 827 Order,, *Regarding Witnesses Kym Bunn and Monique Castero* (Erbach, John) (Entered: 07/12/2020) |
| 07/12/2020 | 833 | *(Amended)* Witness List by Matt Martorello. (Erbach, John) (Entered: 07/12/2020) |
| 07/12/2020 | 834 | NOTICE by Matt Martorello re 826 Order, *Regarding Expert Witness Testimony at July 21 Hearing* (Erbach, John) (Entered: 07/12/2020) |
| 07/13/2020 | 835 | Plaintiff' Second Amended Witness List by Lula Williams. (Bennett, Leonard). Modified docket entry on 07/13/2020. (walk, ) (Entered: 07/13/2020) |
| 07/13/2020 | 836 | ORDER that the PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY FROM WITNESSES NOT IDENTIFIED IN DISCOVERY AT THE MISREPRESENTATIONS HEARING (Williams, ECF No. 794 ; Galloway I, ECF No. 442 ) is DENIED AS MOOT. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 7/13/2020. (sbea,) (Entered: 07/13/2020) |
| 07/13/2020 | 837 | ORDER that Defendant Matt Martorello having represented that "he no longer intends to call Ms. Bunn and Ms. Castero at the evidentiary hearing,"(Williams v. Big Picture Loans, LLC, 3:17-cv-461 (E.D. Va.) ("Williams"), ECF No. 832 ; Galloway v. Big Picture Loans, LLC, 3:18-cv-406 (E.D. Va.) ("Galloway I"), ECF No. (492), it is hereby ORDERED that the PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY FROM WITNESSES NOT IDENTIFIED IN DISCOVERY AT THE MISREPRESENTATIONS HEARING (Williams, ECF No. 794 ; Galloway I, ECF No. (442) is DENIED AS MOOT. It is so ORDERED. Signed by District Judge Robert E. Payne on 07/13/2020. (walk, ) (Entered: 07/13/2020) |
| 07/13/2020 | 838 | ORDER that: 1) The PLAINTIFFS' NOTICE REGARDING COMPLIANCE WITH ECF NO. 654 (DOCUMENTS PERTAINING TO JENNIFER WEDDLE) (Williams, ECF No. 672 ) be stricken as an improper pleading because it does not comply with the Federal Rules of Civil Procedure's motion requirements; 2) The RESPONSE OF NON-PARTY JENNIFER WEDDLE TO PLAINTIFFS' NOTICE REGARDING COMPLIANCE WITH ECF NO. 654 (Weddle, ECF No. 41) be stricken as an improper response to the Plaintiffs' Document; 3) Counsel for all parties are admonished to ensure that their filings comply with the Federal Rules of Civil Procedure; 4) MATT MARTORELLO'S MOTION TO STRIKE PLAINTIFFS' NOTICE (Williams, ECF No. |

**JA99**

| | | |
|---|---|---|
| | | 677 ) is DENIED AS MOOT; and 5) The PLAINTIFFS' MOTION TO ENFORCE COURT'S MINUTE ORDER (Williams, ECF No. 687 ) is DENIED because the Court required that counsel for Jennifer Weddle ("Weddle") and the Plaintiffs, not counsel for Martorello, create a list of documents that were destroyed and the Minute Sheet (Williams, ECF No. 654 ) contained a clerical error. See Order for details. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 7/13/2020. (sbea,) (Entered: 07/13/2020) |
| 07/13/2020 | 839 | Discovery Designation by Matt Martorello.(Mullins, Maurice) (Entered: 07/13/2020) |
| 07/13/2020 | 840 | Discovery Designation by Dowin Coffy, Marcella P. Singh, Gloria Turnage, Lula Williams.(Bennett, Leonard) (Entered: 07/13/2020) |
| 07/13/2020 | 841 | Discovery Designation by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams.(Bennett, Leonard) (Entered: 07/13/2020) |
| 07/13/2020 | 842 | Discovery Designation by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams.(Bennett, Leonard) (Entered: 07/13/2020) |
| 07/13/2020 | 843 | Response to 784 Memorandum,,,, *Matt Martorello's Response to Plaintiffs' Statement of Position (Redacted Version)* filed by Matt Martorello. (Erbach, John) (See Dkt. Entry 851 Ex. 1 Sealed (Unredacted) Response. Modified docket event on 9/1/2020 (jtho, ). (Entered: 07/13/2020) |
| 07/13/2020 | 844 | NOTICE by Matt Martorello re 843 Response *(Exhibits Volume I)* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Exhibit OO, # 42 Exhibit PP, # 43 Exhibit QQ, # 44 Exhibit RR, # 45 Exhibit SS, # 46 Exhibit TT, # 47 Exhibit UU, # 48 Exhibit VV, # 49 Exhibit WW, # 50 Exhibit XX, # 51 Exhibit YY, # 52 Exhibit ZZ)(Erbach, John) (Entered: 07/13/2020) |
| 07/13/2020 | 845 | NOTICE by Matt Martorello re 843 Response *(Exhibits Volume II)* (Attachments: # 1 Exhibit AAA, # 2 Exhibit BBB, # 3 Exhibit CCC, # 4 Exhibit DDD, # 5 Exhibit EEE, # 6 Exhibit FFF, # 7 Exhibit GGG, # 8 Exhibit HHH, # 9 Exhibit III, # 10 Exhibit JJJ, # 11 Exhibit KKK, # 12 Exhibit LLL, # 13 Exhibit MMM, # 14 Exhibit NNN, # 15 Exhibit OOO, # 16 Exhibit PPP, # 17 Exhibit QQQ, # 18 Exhibit RRR, # 19 Exhibit SSS, # 20 Exhibit TTT, # 21 Exhibit UUU, # 22 Exhibit VVV, # 23 Exhibit WWW, # 24 Exhibit XXX, # 25 Exhibit YYY, # 26 Exhibit ZZZ, # 27 Exhibit AAAA, # 28 Exhibit BBBB, # 29 Exhibit CCCC, # 30 Exhibit DDDD, # 31 Exhibit EEEE, # 32 Exhibit FFFF, # 33 Exhibit GGGG, # 34 Exhibit HHHH, # 35 Exhibit IIII, # 36 Exhibit JJJJ, # 37 Exhibit KKKK, # 38 Exhibit LLLL, # 39 Exhibit MMMM, # 40 Exhibit NNNN, # 41 Exhibit OOOO, # 42 Exhibit PPPP, # 43 Exhibit QQQQ, # 44 Exhibit RRRR, # 45 Exhibit SSSS, # 46 Exhibit TTTT, # 47 Exhibit UUUU, # 48 Exhibit VVVV, # 49 Exhibit WWWW, # 50 Exhibit XXXX, # 51 Exhibit YYYY, # 52 Exhibit ZZZZ)(Erbach, John) (Entered: 07/13/2020) |
| 07/13/2020 | 846 | Exhibit List by Matt Martorello.. (Mullins, Maurice) (Entered: 07/13/2020) |
| 07/13/2020 | 847 | NOTICE by Matt Martorello re 843 Response *(Exhibits Volume III)* (Attachments: # 1 Exhibit AAAAA, # 2 Exhibit BBBBB, # 3 Exhibit CCCCC, # 4 Exhibit DDDDD, # 5 Exhibit EEEEE, # 6 Exhibit FFFFF, # 7 Exhibit GGGGG, # 8 Exhibit HHHHH, # 9 |

| | | |
|---|---|---|
| | | Exhibit IIIII, # <u>10</u> Exhibit JJJJJ, # <u>11</u> Exhibit KKKKK, # <u>12</u> Exhibit LLLLL, # <u>13</u> Exhibit MMMMM, # <u>14</u> Exhibit NNNNN, # <u>15</u> Exhibit OOOOO, # <u>16</u> Exhibit PPPPP, # <u>17</u> Exhibit QQQQQ, # <u>18</u> Exhibit RRRRR, # <u>19</u> Exhibit SSSSS, # <u>20</u> Exhibit TTTTT, # <u>21</u> Exhibit UUUUU, # <u>22</u> Exhibit VVVVV, # <u>23</u> Exhibit WWWWW, # <u>24</u> Exhibit XXXXX, # <u>25</u> Exhibit YYYYY, # <u>26</u> Exhibit ZZZZZ, # <u>27</u> Exhibit AAAAA, # <u>28</u> Exhibit BBBBB, # <u>29</u> Exhibit CCCCC, # <u>30</u> Exhibit DDDDD, # <u>31</u> Exhibit EEEEE, # <u>32</u> Exhibit FFFFF, # <u>33</u> Exhibit GGGGG, # <u>34</u> Exhibit HHHHH, # <u>35</u> Exhibit IIIII, # <u>36</u> Exhibit JJJJJ, # <u>37</u> Exhibit KKKKKK, # <u>38</u> Exhibit LLLLLL, # <u>39</u> Exhibit MMMMMM, # <u>40</u> Exhibit NNNNNN, # <u>41</u> Exhibit OOOOOO, # <u>42</u> Exhibit PPPPPP, # <u>43</u> Exhibit QQQQQQ, # <u>44</u> Exhibit RRRRRR, # <u>45</u> Exhibit SSSSSS, # <u>46</u> Exhibit TTTTTT, # <u>47</u> Exhibit UUUUUU, # <u>48</u> Exhibit VVVVVV, # <u>49</u> Exhibit WWWWWW, # <u>50</u> Exhibit XXXXXX, # <u>51</u> Exhibit AAAAAAA)(Erbach, John) (Entered: 07/13/2020) |
| 07/13/2020 | <u>848</u> | MOTION to Seal *Exhibits Filed With Martorello's Response to Plaintiffs' Statement of Position* by Matt Martorello. (Erbach, John) (Entered: 07/13/2020) |
| 07/13/2020 | <u>849</u> | Memorandum in Support re <u>848</u> MOTION to Seal *Exhibits Filed With Martorello's Response to Plaintiffs' Statement of Position* filed by Matt Martorello. (Erbach, John) (Entered: 07/13/2020) |
| 07/13/2020 | <u>850</u> | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re <u>848</u> MOTION to Seal *Exhibits Filed With Martorello's Response to Plaintiffs' Statement of Position* (Erbach, John) (Entered: 07/13/2020) |
| 07/13/2020 | <u>851</u> | Sealed Attachment/Exhibit(s) re <u>848</u> MOTION to Seal *Exhibits Filed With Martorello's Response to Plaintiffs' Statement of Position*, <u>843</u> Response. (Attachments: # <u>1</u> Unredacted Response, # <u>2</u> Exhibit A, # <u>3</u> Exhibit D, # <u>4</u> Exhibit G, # <u>5</u> Exhibit I, # <u>6</u> Exhibit J, # <u>7</u> Exhibit L, # <u>8</u> Exhibit M, # <u>9</u> Exhibit U, # <u>10</u> Exhibit V, # <u>11</u> Exhibit W, # <u>12</u> Exhibit Y, # <u>13</u> Exhibit AA, # <u>14</u> Exhibit BB, # <u>15</u> Exhibit CC, # <u>16</u> Exhibit DD, # <u>17</u> Exhibit FF, # <u>18</u> Exhibit GG, # <u>19</u> Exhibit HH, # <u>20</u> Exhibit II, # <u>21</u> Exhibit KK, # <u>22</u> Exhibit NN, # <u>23</u> Exhibit PP, # <u>24</u> Exhibit RR, # <u>25</u> Exhibit SS, # <u>26</u> Exhibit TT, # <u>27</u> Exhibit UU, # <u>28</u> Exhibit VV, # <u>29</u> Exhibit WW, # <u>30</u> Exhibit XX, # <u>31</u> Exhibit DDD - Part 1, # <u>32</u> Exhibit DDD - Part 2, # <u>33</u> Exhibit FFF, # <u>34</u> Exhibit KKK, # <u>35</u> Exhibit LLL, # <u>36</u> Exhibit MMM, # <u>37</u> Exhibit NNN, # <u>38</u> Exhibit QQQ, # <u>39</u> Exhibit YYY) (Erbach, John) (Entered: 07/13/2020) |
| 07/13/2020 | <u>852</u> | Sealed Attachment/Exhibit(s) re <u>848</u> MOTION to Seal *Exhibits Filed With Martorello's Response to Plaintiffs' Statement of Position*, <u>843</u> Response. (Attachments: # <u>1</u> Exhibit AAAA, # <u>2</u> Exhibit BBBB, # <u>3</u> Exhibit DDDD, # <u>4</u> Exhibit EEEE, # <u>5</u> Exhibit FFFF, # <u>6</u> Exhibit GGGG, # <u>7</u> Exhibit HHHH, # <u>8</u> Exhibit IIII, # <u>9</u> Exhibit JJJJ, # <u>10</u> Exhibit KKKK, # <u>11</u> Exhibit MMMM, # <u>12</u> Exhibit OOOO, # <u>13</u> Exhibit PPPP, # <u>14</u> Exhibit QQQQ, # <u>15</u> Exhibit RRRR, # <u>16</u> Exhibit TTTT, # <u>17</u> Exhibit UUUU, # <u>18</u> Exhibit WWWW, # <u>19</u> Exhibit XXXX, # <u>20</u> Exhibit YYYY, # <u>21</u> Exhibit ZZZZ, # <u>22</u> Exhibit AAAAA, # <u>23</u> Exhibit BBBBB, # <u>24</u> Exhibit CCCCC, # <u>25</u> Exhibit DDDDD, # <u>26</u> Exhibit EEEEE, # <u>27</u> Exhibit FFFFF, # <u>28</u> Exhibit GGGGG, # <u>29</u> Exhibit HHHHH, # <u>30</u> Exhibit IIIII, # <u>31</u> Exhibit JJJJJ, # <u>32</u> Exhibit KKKKK, # <u>33</u> Exhibit NNNNN, # <u>34</u> Exhibit OOOOO, # <u>35</u> Exhibit PPPPP, # <u>36</u> Exhibit RRRRR, # <u>37</u> Exhibit SSSSS, # <u>38</u> Exhibit TTTTT, # <u>39</u> Exhibit UUUUU, # <u>40</u> Exhibit WWWWW, # <u>41</u> Exhibit XXXXX, # <u>42</u> Exhibit YYYYY, # <u>43</u> Exhibit AAAAAA, # <u>44</u> Exhibit BBBBBB, # <u>45</u> Exhibit DDDDDD, # <u>46</u> Exhibit EEEEEE, # <u>47</u> Exhibit FFFFFF, # <u>48</u> Exhibit GGGGGG, # <u>49</u> Exhibit IIIIII, # <u>50</u> Exhibit JJJJJJ, # <u>51</u> Exhibit KKKKKK, # <u>52</u> Exhibit LLLLLL, # <u>53</u> Exhibit MMMMMM, # <u>54</u> Exhibit NNNNNN, # <u>55</u> Exhibit QQQQQQ, # <u>56</u> Exhibit RRRRRR, # <u>57</u> Exhibit SSSSSS, # <u>58</u> Exhibit UUUUUU)(Erbach, John) (Entered: 07/13/2020) |

**JA101**

| 07/14/2020 | 853 | MEMORANDUM OPINION. Signed by District Judge Robert E. Payne on 7/14/2020. (jsmi, ) (Entered: 07/14/2020) |
|---|---|---|
| 07/14/2020 | 854 | UNSEALED PER 40 ORDER ENTERED ON 7/30/2020 - SEALED MEMORANDUM OPINION. (See Redacted Memorandum Opinion 853 ). Signed by District Judge Robert E. Payne on 7/14/2020. Copy mailed to counsel as directed. (jsmi, ) Modified on 7/30/2020 (jsmi, ). (Entered: 07/14/2020) |
| 07/14/2020 | 855 | ORDER that the accompanying MEMORANDUM OPINION, MATT MARTORELLO'S 753 MEMORANDUM IN SUPPORT OF MOTION UNDER RULE 30(d) FOR FURTHER DEPOSITION BASED ON CONDUCT THAT IMPEDED QUESTIONING AND FOR EXPEDITED RULING, accompanying Exhibit A, accompanying Exhibit C, and the PLAINTIFFS' 777 RESPONSE TO DEFENDANT MATT MARTORELLO'S MOTIONS UNDER RULE 30(d) and the accompanying exhibit shall be removed from under seal by the Clerk and placed in the public record after 14 days of entry of this ORDER, unless a party demonstrates why sealing is appropriate. Signed by District Judge Robert E. Payne on 7/14/2020. (jsmi, ) (Entered: 07/14/2020) |
| 07/15/2020 | 856 | ORDER granting 818 Motion for Douglas Nelson Marsh to appear as Pro hac vice for Matt Martorello. Signed by District Judge Robert E. Payne on 7/14/2020. (smej, ) (Entered: 07/15/2020) |
| 07/15/2020 | 857 | ORDER - For the reasons stated on the record during the conference call on July 15, 2020, it is hereby ORDERED that the hearing scheduled for 10:00 AM on July 16, 2020 is CANCELLED. Signed by District Judge Robert E. Payne on 07/15/2020. (smej, ) (Entered: 07/15/2020) |
| 07/15/2020 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference held on 7/15/2020. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 08/05/2020) |
| 07/16/2020 | 858 | ORDER that the July 21-22 evidentiary hearing shall be accessible by video conference. Counsel and witnesses are strongly encouraged to attend in person if possible. However, counsel will also receive a Zoom invitation to this hearing. Signed by District Judge Robert E. Payne on 7/16/2020. (jsmi, ) (Entered: 07/16/2020) |
| 07/17/2020 | 859 | ORDER that Matt Martorello' s 822 Motion to Seal is GRANTED with respect to the expert reports of Gregory Cowhey, John M. Norman, and Richard E. Ross. See Order for details. Signed by District Judge Robert E. Payne on 7/17/2020. (jsmi, ) (Entered: 07/17/2020) |
| 07/17/2020 | 860 | Discovery Designation by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams.(Bennett, Leonard) (Entered: 07/17/2020) |
| 07/17/2020 | 861 | Discovery Designation by Matt Martorello.(Mullins, Maurice) (Entered: 07/17/2020) |
| 07/17/2020 | 864 | Response to 843 Response filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37)(Kelly, Kristi) (Entered: 07/17/2020) |
| 07/17/2020 | 865 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, |

| | | |
|---|---|---|
| | | Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 07/17/2020) |
| 07/17/2020 | 866 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 865 MOTION to Seal (Kelly, Kristi) (Entered: 07/17/2020) |
| 07/17/2020 | 867 | Sealed Response/Reply/Opposition re 865 MOTION to Seal . (Kelly, Kristi) (Entered: 07/17/2020) |
| 07/17/2020 | 868 | Memorandum in Support re 865 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 07/17/2020) |
| 07/17/2020 | 869 | *Rebuttal* Exhibit List by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams.. (Kelly, Kristi) (Entered: 07/17/2020) |
| 07/19/2020 | 870 | *Second Amended* Witness List by Matt Martorello. (Erbach, John) (Entered: 07/19/2020) |
| 07/20/2020 | 871 | Discovery Designation by Matt Martorello.(Mullins, Maurice) (Entered: 07/20/2020) |
| 07/20/2020 | 872 | TRANSCRIPT of proceedings held on July 15, 2020, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 8/19/2020. Redacted Transcript Deadline set for 9/21/2020. Release of Transcript Restriction set for 10/19/2020.(peterson, peppy) (Entered: 07/20/2020)** |
| 07/20/2020 | 873 | *Supplemental* Exhibit List by Matt Martorello.. (Mullins, Maurice) (Entered: 07/20/2020) |
| 07/21/2020 | 875 | Minute Entry for proceedings held before District Judge Robert E. Payne: Evidentiary Hearing held on 7/21/2020. Opening statements made; testimony of witness Matt Martorello heard; matter continued tomorrow 07/22/2020 at 9:30 a.m. (Attachment: # 1 Exhibit & Witness List) (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 07/21/2020) |
| 07/21/2020 | | Set Hearing: Evidentiary Hearing: Part II set for 7/22/2020 at 09:30 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 07/21/2020) |
| 07/22/2020 | 876 | MOTION for Leave to File *to File Supplemental Authority Regarding Fourth Circuit's Decision in Gibbs* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Guzzo, Andrew) (Entered: 07/22/2020) |
| 07/22/2020 | 877 | Memorandum in Support re 876 MOTION for Leave to File *to File Supplemental Authority Regarding Fourth Circuit's Decision in Gibbs* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Gibbs Opinion)(Guzzo, Andrew) (Entered: 07/22/2020) |
| 07/22/2020 | 878 | Minute Entry for proceedings held before District Judge Robert E. Payne: Evidentiary Hearing held on 7/22/2020. Testimony of Matt Martorello heard; plaintiffs moved to admit all exhibits into evidence - no objection from defendant; parties to file charts & |

JA103

| | | |
|---|---|---|
| | | statement of positions on loan criteria by 07/29/2020, briefs on misrepresentations by 07/31/2020; defendant to file statement of position on plaintiffs' motion for leave to file supplemental authority by 07/24/2020; parties to order transcripts, if needed. (Attachment: # 1 Exhibit & Witness List) (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 07/22/2020) |
| 07/23/2020 | 879 | ORDER that 792 PLAINTIFFS' MOTION TO BAR TESTIMONY FROM DEFENDANT MATT MARTORELLO'S "EXPERTS" AT THE MISREPRESENTATIONS HEARING is DENIED AS MOOT. Signed by District Judge Robert E. Payne on 7/23/2020. (jsmi, ) (Entered: 07/23/2020) |
| 07/23/2020 | 880 | ORDER that by July 24, 2020, Matt Martorello shall file a statement of position with respect to the Plaintiffs' 876 MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY. By July 29, 2020, the parties shall file in both listed actions a chart showing how and through which trusts, corporations, people, or other entities money flows through from the time a borrower makes a payment until the money is distributed to Martorello and others; describing all trusts, corporations, people, and other entities involved in these transactions and how each trust, corporation, person, or other entity relate to each other; and explaining what Martorello's interest, involvement, or relationship is as to each trust, corporation, person, or entity. If the parties are unable to jointly submit the document described in paragraph (2), the Plaintiffs shall submit their document by July 29, 2020 and Martorello shall file his proposed changes by July 30, 2020. By July 29, 2020, the parties shall file in both listed actions a statement of position setting out the evidence in the record that explains who or what entity sets the loan criteria. By July 31, 2020, the parties shall file in both listed actions supplemental briefs regarding the alleged material misrepresentations. Signed by District Judge Robert E. Payne on 7/23/2020. (jsmi, ) (Entered: 07/23/2020) |
| 07/24/2020 | 881 | RESPONSE to Motion re 876 MOTION for Leave to File *to File Supplemental Authority Regarding Fourth Circuit's Decision in Gibbs (Martorello's Statement of Position with Respect to Plaintiffs' Motion for Leave to File Supplemental Authority per Order at ECF No. 880)* filed by Matt Martorello. (Erbach, John) (Entered: 07/24/2020) |
| 07/25/2020 | 882 | TRANSCRIPT of proceedings held on July 21, 2020, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 8/24/2020. Redacted Transcript Deadline set for 9/24/2020. Release of Transcript Restriction set for 10/23/2020.**(peterson, peppy) **(Entered: 07/25/2020)** |
| 07/25/2020 | 883 | TRANSCRIPT of proceedings held on July 22, 2020, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 8/24/2020. Redacted Transcript Deadline set for 9/24/2020.** |

JA104

| | | |
|---|---|---|
| | | Release of Transcript Restriction set for 10/23/2020.(peterson, peppy) (Entered: 07/25/2020) |
| 07/26/2020 | 884 | Reply to 881 Response to Motion, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 07/26/2020) |
| 07/27/2020 | 885 | ORDER that 876 MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY is GRANTED. Signed by District Judge Robert E. Payne on 7/27/2020. (jsmi, ) (Entered: 07/27/2020) |
| 07/29/2020 | 886 | Memorandum *Regarding Plaintiffs' Statement of Position Regarding the Loan Criteria* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Kelly, Kristi) (Entered: 07/29/2020) |
| 07/29/2020 | 887 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 07/29/2020) |
| 07/29/2020 | 888 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 887 MOTION to Seal (Kelly, Kristi) (Entered: 07/29/2020) |
| 07/29/2020 | 889 | Sealed Attachment/Exhibit(s) re 887 MOTION to Seal . (Attachments: # 1 Exhibit 2 (unredacted version), # 2 Exhibit 5 (unredacted version), # 3 Exhibit 8 (unredacted version))(Kelly, Kristi) (Entered: 07/29/2020) |
| 07/29/2020 | 890 | Memorandum in Support re 887 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 07/29/2020) |
| 07/29/2020 | 891 | MOTION to Seal *Exhibits Submitted with Statement of Position in Response to July 23, 2020 Order (Paragraph 4)* by Matt Martorello. (Erbach, John) (Entered: 07/29/2020) |
| 07/29/2020 | 892 | Memorandum in Support re 891 MOTION to Seal *Exhibits Submitted with Statement of Position in Response to July 23, 2020 Order (Paragraph 4)* filed by Matt Martorello. (Erbach, John) (Entered: 07/29/2020) |
| 07/29/2020 | 893 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 891 MOTION to Seal *Exhibits Submitted with Statement of Position in Response to July 23, 2020 Order (Paragraph 4)* (Erbach, John) (Entered: 07/29/2020) |
| 07/29/2020 | 894 | Sealed Document re 891 MOTION to Seal *Exhibits Submitted with Statement of Position in Response to July 23, 2020 Order (Paragraph 4)*, 880 Order,,,,,. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit D, # 4 Exhibit E, # 5 Exhibit I, # 6 Exhibit J, # 7 Exhibit L, # 8 Exhibit M, # 9 Exhibit N, # 10 Exhibit O, # 11 Exhibit P, # 12 Exhibit Q, # 13 Exhibit R, # 14 Exhibit S, # 15 Exhibit T, # 16 Exhibit U, # 17 Exhibit W, # 18 Exhibit X, # 19 Exhibit Y, # 20 Exhibit Z, # 21 Exhibit AA, # 22 Exhibit BB, # 23 Exhibit CC, # 24 Exhibit DD, # 25 Exhibit EE, # 26 Exhibit FF, # 27 Exhibit II, # 28 Exhibit JJ, # 29 Exhibit KK)(Erbach, John) (Entered: 07/29/2020) |
| 07/29/2020 | 895 | Response to 880 Order,,,,, *Matt Martorello's Statement of Position in Response to July 23, 2020 Order (Paragraph 4)* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, |

**JA105**

| | | |
|---|---|---|
| | | # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL)(Erbach, John) (Entered: 07/29/2020) |
| 07/29/2020 | 896 | Memorandum *Regarding Structure of Martorello's Companies and Flow of Funds* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7 (filed under seal), # 8 Exhibit 8 (filed under seal), # 9 Exhibit 9, # 10 Exhibit 10 (filed under seal))(Kelly, Kristi) (Entered: 07/29/2020) |
| 07/29/2020 | 897 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 07/29/2020) |
| 07/29/2020 | 898 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 897 MOTION to Seal (Kelly, Kristi) (Entered: 07/29/2020) |
| 07/29/2020 | 899 | Sealed Attachment/Exhibit(s) re 897 MOTION to Seal . (Attachments: # 1 Exhibit 7, # 2 8, # 3 10)(Kelly, Kristi) (Entered: 07/29/2020) |
| 07/29/2020 | 900 | Memorandum in Support re 897 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 07/29/2020) |
| 07/30/2020 | 901 | ORDER that MATT MARTORELLO'S 750 MOTION TO FILE UNDER SEAL UNREDACTED MEMORANDUM AND EXHIBITS CONTAINING MATERIAL DESIGNATED CONFIDENTIAL ATTORNEYS' EYES ONLY BY PLAINTIFFS is DENIED. The Plaintiffs' 774 MOTION TO SEAL is DENIED. The 854 MEMORANDUM OPINION, 753 MATT MARTORELLO'S MEMORANDUM IN SUPPORT OF MOTION UNDER RULE 30(d) FOR FURTHER DEPOSITION BASED ON CONDUCT THAT IMPEDED QUESTIONING AND FOR EXPEDITED RULING, accompanying Exhibit A, Exhibit C, and the PLAINTIFFS' 777 RESPONSE TO DEFENDANT MATT MARTORELLO'S MOTIONS UNDER RULE 30 (d) and 778 accompanying exhibit shall be removed from under seal by the Clerk and placed in the public record. See Order for details. Signed by District Judge Robert E. Payne on 7/30/2020. (jsmi, ) (Entered: 07/30/2020) |
| 07/30/2020 | 902 | Response to 880 Order,,,,, *Matt Martorello's Statement of Position in Response to July 23, 2020 Order (Paragraph 2)* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Erbach, John) (Entered: 07/30/2020) |
| 07/31/2020 | 903 | MOTION to Seal *Unredacted Supplemental Brief Regarding Alleged Misrepresentations* by Matt Martorello. (Erbach, John) (Entered: 07/31/2020) |
| 07/31/2020 | 904 | Memorandum in Support re 903 MOTION to Seal *Unredacted Supplemental Brief Regarding Alleged Misrepresentations* filed by Matt Martorello. (Erbach, John) (Entered: 07/31/2020) |
| 07/31/2020 | 905 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 903 MOTION to Seal *Unredacted Supplemental Brief Regarding Alleged Misrepresentations* (Erbach, John) (Entered: 07/31/2020) |
| 07/31/2020 | 906 | MOTION for Leave to File Excess Pages by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 07/31/2020) |
| 07/31/2020 | 907 | Sealed Response/Reply/Opposition re 903 MOTION to Seal *Unredacted Supplemental Brief Regarding Alleged Misrepresentations*. (Erbach, John) (Entered: 07/31/2020) |

| | | |
|---|---|---|
| 07/31/2020 | 908 | Memorandum in Support re 906 MOTION for Leave to File Excess Pages filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 07/31/2020) |
| 07/31/2020 | 909 | Response to 880 Order,,,,, *Redacted Version of Matt Martorello's Supplemental Brief Regarding Alleged Misrepresentations (Responding to Order at ECF No. 880 Paragraph 5)* filed by Matt Martorello. (Erbach, John) (Entered: 07/31/2020) |
| 07/31/2020 | 910 | Memorandum to 880 Order,,,,, filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 07/31/2020) |
| 08/04/2020 | 911 | RESPONSE to Motion re 891 MOTION to Seal *Exhibits Submitted with Statement of Position in Response to July 23, 2020 Order (Paragraph 4)* filed by Rosette, LLP. (Reilly, Craig) (Entered: 08/04/2020) |
| 08/05/2020 | 912 | Memorandum in Support re 897 MOTION to Seal filed by Matt Martorello. (Attachments: # 1 Proposed Order)(Mullins, Maurice) (Entered: 08/05/2020) |
| 08/06/2020 | 913 | Reply to 912 Memorandum in Support filed by Dowin Coffy, Conner & Winters, LLC, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 08/06/2020) |
| 08/07/2020 | 914 | ORDER granting 906 Motion for Leave to File Excess Pages. Plaintiffs' Brief shall not exceed 38 pages. Signed by District Judge Robert E. Payne on 08/07/2020. (tjoh, ) (Entered: 08/07/2020) |
| 08/17/2020 | 915 | MOTION for Protective Order by Matt Martorello. (Attachments: # 1 Proposed Order) (Erbach, John) (Entered: 08/17/2020) |
| 08/17/2020 | 916 | MOTION to Stay *Enforcement of Subpoenas Pending Arbitration (filed in the alternative to Motion for Protective Order at ECF No. 915)* by Matt Martorello. (Erbach, John) (Entered: 08/17/2020) |
| 08/17/2020 | 917 | Memorandum in Support re 916 MOTION to Stay *Enforcement of Subpoenas Pending Arbitration (filed in the alternative to Motion for Protective Order at ECF No. 915)*, 915 MOTION for Protective Order filed by Matt Martorello. (Erbach, John) (Entered: 08/17/2020) |
| 08/20/2020 | 918 | MOTION to Seal *Exhibits Designated Confidential by Third Parties with Motion for Leave to File Supplemental Exhibits in Support of Motion for Reconsideration and Request for Hearing [ECF No. 486]* by Matt Martorello. (Erbach, John) (Entered: 08/20/2020) |
| 08/20/2020 | 919 | Memorandum in Support re 918 MOTION to Seal *Exhibits Designated Confidential by Third Parties with Motion for Leave to File Supplemental Exhibits in Support of Motion for Reconsideration and Request for Hearing [ECF No. 486]* filed by Matt Martorello. (Erbach, John) (Entered: 08/20/2020) |
| 08/20/2020 | 920 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 918 MOTION to Seal *Exhibits Designated Confidential by Third Parties with Motion for Leave to File Supplemental Exhibits in Support of Motion for Reconsideration and Request for Hearing [ECF No. 486]* (Erbach, John) (Entered: 08/20/2020) |
| 08/20/2020 | 921 | Sealed Attachment/Exhibit(s) re 918 MOTION to Seal *Exhibits Designated Confidential by Third Parties with Motion for Leave to File Supplemental Exhibits in Support of Motion for Reconsideration and Request for Hearing [ECF No. 486]*. (Attachments: # 1 Exhibit A-1, # 2 Exhibit A-2, # 3 Exhibit A-7, # 4 Exhibit B-2, # 5 Exhibit B-4, # 6 |

**JA107**

| | | |
|---|---|---|
| | | Exhibit B-6, # 7 Exhibit B-8, # 8 Exhibit C-5, # 9 Exhibit D-1)(Erbach, John) (Entered: 08/20/2020) |
| 08/20/2020 | 922 | MOTION for Leave to File *Supplemental Exhibits in Support of Motion for Reconsideration and Request for Hearing [ECF No. 486]* by Matt Martorello. (Erbach, John) (Entered: 08/20/2020) |
| 08/20/2020 | 923 | Memorandum in Support re 922 MOTION for Leave to File *Supplemental Exhibits in Support of Motion for Reconsideration and Request for Hearing [ECF No. 486]* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit A-1, # 3 Exhibit A-2, # 4 Exhibit A-3, # 5 Exhibit A-4, # 6 Exhibit A-5, # 7 Exhibit A-6, # 8 Exhibit A-7, # 9 Exhibit A-8, # 10 Exhibit A-9, # 11 Exhibit B, # 12 Exhibit B-1, # 13 Exhibit B-2, # 14 Exhibit B-3, # 15 Exhibit B-4, # 16 Exhibit B-5, # 17 Exhibit B-6, # 18 Exhibit B-7, # 19 Exhibit B-8, # 20 Exhibit B-9, # 21 Exhibit B-10, # 22 Exhibit B-11, # 23 Exhibit B-12, # 24 Exhibit B-13, # 25 Exhibit B-14, # 26 Exhibit B-15, # 27 Exhibit B-16, # 28 Exhibit B-17, # 29 Exhibit C, # 30 Exhibit C-1, # 31 Exhibit C-2, # 32 Exhibit C-3, # 33 Exhibit C-4, # 34 Exhibit C-5, # 35 Exhibit C-6, # 36 Exhibit C-7, # 37 Exhibit C-8, # 38 Exhibit C-9, # 39 Exhibit C-10, # 40 Exhibit C-11, # 41 Exhibit C-12, # 42 Exhibit D, # 43 Exhibit D-1, # 44 Exhibit D-2)(Erbach, John) (Entered: 08/20/2020) |
| 08/25/2020 | 924 | RESPONSE to Motion re 918 MOTION to Seal *Exhibits Designated Confidential by Third Parties with Motion for Leave to File Supplemental Exhibits in Support of Motion for Reconsideration and Request for Hearing [ECF No. 486]* filed by Rosette, LLP. (Reilly, Craig) (Entered: 08/25/2020) |
| 08/26/2020 | | Conference Call with Martorello Deft's Counsel set for 9/3/2020 at 01:00 PM before District Judge David J. Novak. Conference Call with Pls.' Counsel set for 9/3/2020 at 01:30 PM before District Judge David J. Novak. (cgar) (Entered: 08/26/2020) |
| 08/31/2020 | 925 | Memorandum in Opposition re 916 MOTION to Stay *Enforcement of Subpoenas Pending Arbitration (filed in the alternative to Motion for Protective Order at ECF No. 915)*, 915 MOTION for Protective Order filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit)(Bennett, Leonard) (Entered: 08/31/2020) |
| 09/02/2020 | 926 | ORDER that the Plaintiffs' 689 Motion to Seal is granted and the PLAINTIFFS' 672 MEMORANDUM OF POINTS AND AUTHORITIES (1) IN OPPOSITION TO MATT MARTORELLO'S MOTION TO STRIKE PLAINTIFFS' NOTICE REGARDING COMPLIANCE and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. See Order for details. Signed by District Judge Robert E. Payne on 9/1/2020. (jsmi, ) (Entered: 09/02/2020) |
| 09/02/2020 | 927 | ORDER that plaintiffs' 865 MOTION TO SEAL is granted and PLAINTIFFS' 867 REPLY IN SUPPORT OF STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS MADE TO THE COURT BY DEFENDANTS is filed under seal; provided that appropriately redacted versions thereof are filed in thepublic record. Signed by District Judge Robert E. Payne on 9/1/2020. (jsmi, ) (Entered: 09/02/2020) |
| 09/02/2020 | 928 | ORDER that the plaintiffs' 887 MOTION TO SEAL is granted and PLAINTIFFS' 889 STATEMENT OF POSITION REGARDING THE LOAN CRITERIA is filed under seal; provided that an appropriately redacted version thereof is filed in the public record. Signed by District Judge Robert E. Payne on 9/1/2020. (jsmi, ) (Entered: 09/02/2020) |
| 09/02/2020 | 929 | ORDER that 848 Motion to Seal is granted and MATT MARTORELLO'S 851 |

| | | |
|---|---|---|
| | | RESPONSE TO PLAINTIFFS' STATEMENT OF POSITION and certain exhibits thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 9/1/2020. (jsmi, ) (Entered: 09/02/2020) |
| 09/03/2020 | 930 | RESPONSE to Motion re 922 MOTION for Leave to File *Supplemental Exhibits in Support of Motion for Reconsideration and Request for Hearing [ECF No. 486]* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Bennett, Leonard) (Entered: 09/03/2020) |
| 09/03/2020 | | Minute Entry for proceedings held before District Judge David J. Novak:Telephone Conferences held on 9/3/2020. (cgar) (Entered: 09/04/2020) |
| 09/08/2020 | 931 | Consent MOTION for Extension of Time to File Response/Reply as to 916 MOTION to Stay *Enforcement of Subpoenas Pending Arbitration (filed in the alternative to Motion for Protective Order at ECF No. 915)*, 915 MOTION for Protective Order by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 09/08/2020) |
| 09/09/2020 | 932 | ORDER that Matt Martorello's Motion for Extension of Time seeking an extension until Friday, September 11, 2020, to file his reply brief in support of Motion for Protective Order or, in the Alternative, to Stay Subpoenas Pending Arbitration is GRANTED. Matt Martorello shall file his reply brief in support of his Motion for Protective Order or, in the Alternative, to Stay Subpoenas Pending Arbitration no later than Friday, September 11, 2020. Signed by District Judge Robert E. Payne on 9/9/2020. (jsmi, ) (Entered: 09/09/2020) |
| 09/09/2020 | 933 | REPLY to Response to Motion re 922 MOTION for Leave to File *Supplemental Exhibits in Support of Motion for Reconsideration and Request for Hearing [ECF No. 486]* filed by Matt Martorello. (Erbach, John) (Entered: 09/09/2020) |
| 09/10/2020 | 934 | NOTICE of Appearance by Jonathan Frank Hollis on behalf of Matt Martorello (Hollis, Jonathan) (Entered: 09/10/2020) |
| 09/11/2020 | 935 | MOTION to Withdraw as Attorney *for all counsel of record at Armstrong Teasdale LLP* by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 09/11/2020) |
| 09/11/2020 | 936 | REPLY to Response to Motion re 916 MOTION to Stay *Enforcement of Subpoenas Pending Arbitration (filed in the alternative to Motion for Protective Order at ECF No. 915)*, 915 MOTION for Protective Order filed by Matt Martorello. (Erbach, John) (Entered: 09/11/2020) |
| 09/16/2020 | 937 | NOTICE of Appearance by Jonathan Frank Hollis on behalf of Matt Martorello (Hollis, Jonathan) (Entered: 09/16/2020) |
| 09/17/2020 | 938 | ORDER that 935 MOTION TO WITHDRAW AS COUNSEL is granted. It is further ORDERED that the Clerk shall remove the following attorneys and the law firm of Armstrong Teasdale, LLP as counsel of record for the defendant, Matt Martorello: Richard L. Scheff, Jonathan P. Boughrum, Michael C. Witsch, Douglas Marsh, Paul Louis Brusati, Tod Daniel Stephens, William Ojile, Charles Palella. Signed by District Judge Robert E. Payne on 9/17/2020. (jsmi, ) (Entered: 09/17/2020) |
| 09/18/2020 | 939 | ORDER that Martorello's 70 CONSENT MOTION FOR EXTENSION OF TIME is GRANTED in case 3:20mc008. The deadlines set forth in 65 Order entered July 7, 2020 are modified as follows: (1) Matt Martorello shall file his response to the Supplemental Motion to Quash Defendant Martorello' s Subpoena Directed to Non-Party Witness Karrie Wichtman and/or for Relief from or Modification of the Consent and Protective |

|  |  |  |
|---|---|---|
|  |  | Order of June 3, 2019 on or before Wednesday, September 23, 2020; (2) Non-party witness Karrie Wichtman shall file her reply in support of the Supplemental Motion to Quash on or before Tuesday, September 29, 2020. The Clerk is directed to file this Order in Williams v. Big Picture Loans, LLC, 3:17cv461, and in Galloway v. Big Picture Loans, LLC, 3:18cv406. Signed by District Judge Robert E. Payne on 9/18/2020. (jsmi, ) (Entered: 09/18/2020) |
| 09/30/2020 | 940 | Joint MOTION for Entry of Stipulated Order Concerning the Applicability of the Motion for Protective Order [ECF No. 915] to the Subpoena Issued to Dropbox, Inc. on September 17, 2020 re 917 Memorandum in Support, 936 Reply to Response to Motion, 915 MOTION for Protective Order by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 09/30/2020) |
| 10/08/2020 | 941 | Joint MOTION for Entry of Stipulated Order Concerning the Applicability of the Motion for Protective Order [ECF No. 915] to the Subpoena Issued to GoDaddy.com, LLC on September 30, 2020 re 917 Memorandum in Support, 936 Reply to Response to Motion, 925 Memorandum in Opposition,, 915 MOTION for Protective Order by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 10/08/2020) |
| 10/13/2020 | 942 | ORDER that Defendant Matt Martorello's Motion for a Protective Order with respect to the First Dropbox Subpoena, Memorandum in Support of the Motion, and Reply, and any ruling thereon, shall apply to the subpoena that Plaintiffs served on Dropbox, Inc. on September 17, 2020. Martorello's Motion for a Protective Order shall constitute a motion for a protective order with respect to the Second Dropbox Subpoena. Signed by District Judge Robert E. Payne on 10/13/2020. (jsmi, ) (Entered: 10/13/2020) |
| 10/13/2020 | 943 | ORDER that Defendant Matt Martorello's Motion for a Protective Order with respect to the First GoDaddy Subpoena, Memorandum in Support of the Motion, and Reply, and any ruling thereon, shall apply to the subpoena that Plaintiffs served on GoDaddy on September 30, 2020. Martorello's Motion for a Protective Order shall constitute a motion for a protective order with respect to the Second GoDaddy Subpoena. Signed by District Judge Robert E. Payne on 10/13/2020. (jsmi, ) (Entered: 10/13/2020) |
| 11/18/2020 | 944 | MEMORANDUM OPINION. Signed by District Judge Robert E. Payne on 11/18/2020. (jsmi, ) (Entered: 11/18/2020) |
| 11/24/2020 | 945 | ORDER - Having decided the misrepresentations issues (ECF No. 944), it is now appropriate, as set out in the last paragraph of the ORDER (ECF No. 697), to set a schedule for the filing and briefing on an Amended Motion for Class Certification. Accordingly, it is hereby ORDERED that counsel shall confer and submit, by December 31, 2020, a schedule for the filing and briefing of an Amended Motion for Class Certification. Signed by District Judge Robert E. Payne on 11/24/2020. (tjoh, ) (Entered: 11/24/2020) |
| 11/30/2020 | 946 | MOTION Certification of Interlocutory Appeal under 28 U.S.C. Sec. 1292(b) re 944 Memorandum Opinion by Matt Martorello. (Attachments: # 1 Proposed Order)(Hollis, Jonathan) (Entered: 11/30/2020) |
| 11/30/2020 | 947 | Memorandum in Support re 946 MOTION Certification of Interlocutory Appeal under 28 U.S.C. Sec. 1292(b) re 944 Memorandum Opinion filed by Matt Martorello. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Hollis, Jonathan) (Entered: 11/30/2020) |
| 11/30/2020 | 948 | MOTION Stay Pending Interlocutory Appeal and/or Decision on re 944 Memorandum Opinion by Matt Martorello. (Attachments: # 1 Proposed Order)(Hollis, Jonathan) (Entered: 11/30/2020) |
| 11/30/2020 | 949 | Memorandum in Support re 948 MOTION Stay Pending Interlocutory Appeal and/or Decision on re 944 Memorandum Opinion filed by Matt Martorello. (Hollis, Jonathan) |

JA110

| | | (Entered: 11/30/2020) |
|---|---|---|
| 12/03/2020 | 950 | VACATED PER 954 ORDER ENTERED ON 12/8/2020 - ORDER that the following motions are denied without prejudice: 1) MATT MARTORELLO'S MOTION FOR RECONSIDERATION OF ORDER, ECF NO. 479 , GRANTING IN PART PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE AND REQUEST FOR ORAL ARGUMENT (ECF No. 486 ); 2) PLAINTIFFS' MOTION TO STRIKE THE DECLARATION OF JOHN M. NORMAN IN SUPPORT OF MOTION FOR RECONSIDERATION (ECF No. 549 ); 3) DEFENDANT MARTORELLO'S MOTION FOR LEAVE TO FILE A REPLY TO PLAINTIFFS' RESPONSE TO COURT'S ORDER DATED JUNE 6, 2019 (ECF No. 564 ); and 4) MATT MARTORELLO'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXHIBITS IN SUPPORT OF MOTION FOR RECONSIDERATION AND REQUEST FOR HEARING (ECF No. 922 ) It is further ORDERED that, if Matt Martorello desires to have the MEMORANDUM OPINION and ORDER (ECF Nos. 478 and 479 ) reconsidered, he shall file a renewed motion and supporting brief to which the plaintiffs shall respond, and to which Matt Martorello shall reply. These submissions shall be made on the following schedule: 1) December 31, 2020: supporting brief; Matt Martorello's motion and 2) January 30, 2021: Plaintiffs' response; 3) February 12, 2021: Matt Martorello's reply. The renewed motion and briefs shall not incorporate by reference any previous motions, briefs or exhibits because such incorporation by reference effectively evades the pages limitations in the Local Civil Rules and makes substantive analysis so difficult that there is a substantial risk of improper analysis. **If the Court determines that oral argument is necessary, counsel will be advised. Argument, if any, will be heard on March 8, 2021 at 10:00 AM.** It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 12/2/2020. (sbea,) Modified on 12/8/2020 (jsmi, ). (Entered: 12/03/2020) |
| 12/03/2020 | | Set Hearing: Motion Hearing (if necessary) set for 3/8/2021 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 12/03/2020) |
| 12/07/2020 | 951 | MOTION to Withdraw as Attorney *for all counsel of record at Spotts Fain, P.C.* by Matt Martorello. (Attachments: # 1 Proposed Order)(Erbach, John) (Entered: 12/07/2020) |
| 12/08/2020 | 952 | NOTICE of Appearance by Karen M. Stemland on behalf of Matt Martorello (Stemland, Karen) (Entered: 12/08/2020) |
| 12/08/2020 | 953 | NOTICE of Appearance by John Benjamin Rottenborn on behalf of Matt Martorello (Rottenborn, John) (Entered: 12/08/2020) |
| 12/08/2020 | 954 | ORDER that 950 ORDER is VACATED; 478 MEMORANDUM OPINION and 479 ORDER are VACATED. PLAINTIFFS' 340 MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE is denied without prejudice. The following motions are denied as moot: MATT MARTORELLO'S 479 MOTION FOR RECONSIDERATION OF ORDER GRANTING IN PART PLAINTIFFS' 486 MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE AND REQUEST FOR ORAL ARGUMENT; PLAINTIFFS' 549 MOTION TO STRIKE THE DECLARATION OF JOHN M. NORMAN IN SUPPORT OF MOTION FOR RECONSIDERATION; DEFENDANT 564 MARTORELLO'S MOTION FOR LEAVE TO FILE A REPLY TO PLAINTIFFS' RESPONSE TO COURT'S ORDER DATED JUNE 6, 2019; MATT MARTORELLO'S 922 MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXHIBITS IN SUPPORT OF MOTION FOR RECONSIDERATION AND REQUEST FOR HEARING. The Plaintiffs shall file any renewed motion(s) to compel privileged documents by January 9, 2021. Defendant, Matt Martorello, shall file his response(s) by February 5, 2021. Plaintiffs' shall file their reply(ies) by February 22, 2021. See Order |

JA111

| | | |
|---|---|---|
| | | for additional details and deadlines. Signed by District Judge Robert E. Payne on 12/8/2020. (jsmi, ) (Entered: 12/08/2020) |
| 12/08/2020 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference held on 12/8/2020. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 01/06/2021) |
| 12/09/2020 | 955 | ORDER that by January 15, 2021, Martorello shall file any motion(s) under Rule 19 or 56 seeking the relief/remedy apparently sought in MARTORELLO'S 613 STATEMENT OF POSITION PURSUANT TO ECF NOS. 599 & 601 and MATT MARTORELLO'S 664 SUPPLEMENTAL BRIEF ADDRESSING THE EFFECT OF THE FOURTH CIRCUIT'S DECISION ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION. By February 15, 2021, Plaintiffs' shall file their responses, By February 24, 2021, Martorello shall file his replies. Counsel will be notified if oral argument is needed, and, if needed, argument will be held on March 12, 2021 at 10:00 AM. See Order for details. Signed by District Judge Robert E. Payne on 12/9/2020. (jsmi, ) (Entered: 12/09/2020) |
| 12/09/2020 | 956 | ORDER that 951 MOTION TO WITHDRAW AS COUNSEL is granted. It is further ORDERED that the Clerk shall remove Hugh M. Fain, Esquire; M.F. Connell Mullins, Jr., Esquire; John M. Erbach; and the law firm of Spotts Fain, P.C. as counsel of record for the defendant. Matt Martorello. Signed by District Judge Robert E. Payne on 12/9/2020. (jsmi, ) (Entered: 12/09/2020) |
| 12/10/2020 | 957 | ORDER - In preparing the boxes of in camera documents for retrieval by Martorello's new counsel, the Court found that it was unable to locate the binders that were sent in the box labeled June 11, 2019 submission. Signed by District Judge Robert E. Payne on 12/10/2020. (tjoh, ) (Entered: 12/10/2020) |
| 12/14/2020 | 958 | Memorandum in Opposition re 948 MOTION Stay Pending Interlocutory Appeal and/or Decision on re 944 Memorandum Opinion filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - LVD Tribal Code, # 2 Exhibit 2 - Otoe Tribal Code)(Kelly, Kristi) (Entered: 12/14/2020) |
| 12/14/2020 | 959 | Opposition to 946 MOTION Certification of Interlocutory Appeal under 28 U.S.C. Sec. 1292(b) re 944 Memorandum Opinion filed by Dowin Coffy. (Bennett, Leonard) (Entered: 12/14/2020) |
| 12/18/2020 | 960 | ORDER that DEFENDANT MATT MARTORELLO'S 916 MOTION TO STAY SUBPOENAS PENDING ARBITRATION is DENIED as moot; and DEFENDANT MATT MARTORELLO'S 915 MOTION FOR PROTECTIVE ORDER is DENIED. See Order for details. Signed by District Judge Robert E. Payne on 12/18/2020. (jsmi, ) (Entered: 12/18/2020) |
| 12/21/2020 | 961 | Reply to Motion re 948 MOTION Stay Pending Interlocutory Appeal and/or Decision on re 944 Memorandum Opinion filed by Matt Martorello. (Stemland, Karen) (Entered: 12/21/2020) |
| 12/21/2020 | 962 | Reply to Motion re 946 MOTION Certification of Interlocutory Appeal under 28 U.S.C. Sec. 1292(b) re 944 Memorandum Opinion filed by Matt Martorello. (Stemland, Karen) (Entered: 12/21/2020) |
| 12/22/2020 | 963 | MOTION to set Scheduling Conference re 945 Order, *and related pending matters* by Matt Martorello. (Attachments: # 1 Proposed Order Regarding Scheduling)(Hollis, Jonathan) (Entered: 12/22/2020) |
| 12/23/2020 | 964 | MOTION For Leave to Exceed Page Limit by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 12/23/2020) |

| | | |
|---|---|---|
| 12/23/2020 | 965 | Memorandum in Support re 964 MOTION For Leave to Exceed Page Limit filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - Dec. 9, 2020 Email, # 2 Exhibit 2 - Dec. 23, 2020 Email) (Kelly, Kristi) (Entered: 12/23/2020) |
| 12/23/2020 | 966 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 945 Order, (Attachments: # 1 Exhibit "1")(Bennett, Leonard) (Entered: 12/23/2020) |
| 12/23/2020 | 967 | MOTION to Certify Class *(Plaintiffs' Renewed Motion for Class Certification of Claims Against Matt Martorello)* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 12/23/2020) |
| 12/23/2020 | 968 | Memorandum in Support re 967 MOTION to Certify Class *(Plaintiffs' Renewed Motion for Class Certification of Claims Against Matt Martorello)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "1" FILED UNDER SEAL, # 2 Exhibit "2", # 3 Exhibit "3", # 4 Exhibit "4", # 5 Exhibit "5", # 6 Exhibit "6", # 7 Exhibit "7", # 8 Exhibit "8", # 9 Exhibit "9", # 10 Exhibit "10", # 11 Exhibit "11", # 12 Exhibit "12", # 13 Exhibit "13", # 14 Exhibit "14", # 15 Exhibit "15", # 16 Exhibit "16", # 17 Exhibit "17", # 18 Exhibit "18", # 19 Exhibit "19", # 20 Exhibit "20", # 21 Exhibit "21", # 22 Exhibit "22", # 23 Exhibit "23", # 24 Exhibit "24", # 25 Exhibit "25", # 26 Exhibit "26", # 27 Exhibit "27", # 28 Exhibit "28", # 29 Exhibit "29", # 30 Exhibit "30", # 31 Exhibit "31", # 32 Exhibit "32", # 33 Exhibit "33", # 34 Exhibit "34", # 35 Exhibit "35", # 36 Exhibit "36", # 37 Exhibit "37", # 38 Exhibit "38", # 39 Exhibit "39", # 40 Exhibit "40", # 41 Exhibit "41", # 42 Exhibit "42", # 43 Exhibit "43", # 44 Exhibit "44", # 45 Exhibit "45", # 46 Exhibit "46", # 47 Exhibit "47" FILED UNDER SEAL, # 48 Exhibit "48", # 49 Exhibit "49", # 50 Exhibit "50", # 51 Exhibit "51", # 52 Exhibit "52", # 53 Exhibit "53", # 54 Exhibit "54", # 55 Exhibit "55", # 56 Exhibit "56", # 57 Exhibit "57", # 58 Exhibit "58", # 59 Exhibit "59", # 60 Exhibit "60")(Bennett, Leonard) (Entered: 12/23/2020) |
| 12/23/2020 | 969 | MOTION to Seal by Dowin Coffy, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 12/23/2020) |
| 12/23/2020 | 970 | Memorandum in Support re 969 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 12/23/2020) |
| 12/23/2020 | 971 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 968 Memorandum in Support,,,,,,,, 969 MOTION to Seal , 970 Memorandum in Support (Bennett, Leonard) (Entered: 12/23/2020) |
| 12/23/2020 | 972 | Sealed Document re 971 Notice of Filing Sealing Motion LCvR5(C), 968 Memorandum in Support,,,,,,,, 969 MOTION to Seal , 970 Memorandum in Support. (Attachments: # 1 Certificate of Service)(Bennett, Leonard) (Entered: 12/23/2020) |
| 12/23/2020 | 973 | Sealed Document re 971 Notice of Filing Sealing Motion LCvR5(C), 968 Memorandum in Support,,,,,,,, 969 MOTION to Seal , 970 Memorandum in Support. (Attachments: # 1 Certificate of Service)(Bennett, Leonard) (Entered: 12/23/2020) |
| 12/29/2020 | 974 | ORDER that the PLAINTIFFS' MOTION FOR LEAVE TO EXCEED PAGE LIMIT (ECF No. 964 ) is granted. It is further ORDERED that: 1) The plaintiffs shall have an additional ten (10) pages and their memorandum in support of their Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello shall not exceed 40 pages; and 2) The defendant, Matt Martello, shall have an additional ten (10) pages and his opposition to the Renewed Motion for Class Certification of Claims shall not exceed |

| | | |
|---|---|---|
| | | 40 pages. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 12/29/2020. (sbea,) (Entered: 12/29/2020) |
| 12/30/2020 | 975 | TRANSCRIPT of proceedings held on December 28, 2020, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 1/29/2021. Redacted Transcript Deadline set for 3/1/2021. Release of Transcript Restriction set for 3/30/2021.(peterson, peppy) (Entered: 12/30/2020)** |
| 12/30/2020 | 976 | ORDER that Counsel for Defendant Matt Martorello will file the response to PLAINTIFFS' 967 RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO on Monday, February 8, 2021. Plaintiffs' Counsel will file their reply on February 26, 2021. The Court's December 9, 2020 955 Order is reaffirmed, including the briefing schedule therein. See Order for details. Signed by District Judge Robert E. Payne on 12/30/2020. (jsmi, ) (Entered: 12/30/2020) |
| 01/08/2021 | 977 | Consent MOTION for Extension *To File Renewed Motion to Compel Privileged and Work Product Documents* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Kelly, Kristi) (Entered: 01/08/2021) |
| 01/08/2021 | 978 | Memorandum in Support re 977 Consent MOTION for Extension *To File Renewed Motion to Compel Privileged and Work Product Documents* filed by George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 01/08/2021) |
| 01/08/2021 | 979 | Consent MOTION for Leave to File Excess Pages by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order) (Kelly, Kristi) (Entered: 01/08/2021) |
| 01/08/2021 | 980 | Memorandum in Support re 979 Consent MOTION for Leave to File Excess Pages filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 01/08/2021) |
| 01/08/2021 | 981 | ORDER having considered the PLAINTIFFS' CONSENT MOTION FOR EXTENSION OF TIME TO FILE THEIR RENEWED MOTION TO COMPEL PRIVILEGED AND WORK PRODUCT DOCUMENTS (ECF No. 977) and the supporting memorandum, and there being no objection by the defendant, Matt Martorello, it is hereby ORDERED that the plaintiffs' Consent Motion 977 is granted. See Order for deadlines and details. Signed by District Judge Robert E. Payne on 1/8/21. (jtho, ) (Entered: 01/08/2021) |
| 01/11/2021 | 982 | ORDER - This matter comes before the Court on Plaintiffs' Motion for Leave to Exceed Page Limit for Plaintiffs' forthcoming Renewed Motions to Compel Privileged and Work Product Documents. Upon consideration of the Motion, and for good cause shown, it is hereby ORDERED that the Motion is GRANTED. Plaintiffs shall be permitted to file 45-page memorandum in support of both their Motion to Compel Privileged Documents, as well as their Motion to Compel Work Product Documents. Martorello shall be permitted to file oppositions of 45 pages, as well. Signed by District Judge Robert E. Payne on 1/11/2021. (smej, ) (Entered: 01/11/2021) |

| | | |
|---|---|---|
| 01/11/2021 | 983 | MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 01/11/2021) |
| 01/11/2021 | 984 | Memorandum in Support re 983 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "1", # 2 Exhibit "2", # 3 Exhibit "3", # 4 Exhibit "4", # 5 Exhibit "5", # 6 Exhibit "6", # 7 Exhibit "7", # 8 Exhibit "8", # 9 Exhibit "9", # 10 Exhibit "10", # 11 Exhibit "11", # 12 Exhibit "12", # 13 Exhibit "13", # 14 Exhibit "14", # 15 Exhibit "15", # 16 Exhibit "16", # 17 Exhibit "17", # 18 Exhibit "18", # 19 Exhibit "19", # 20 Exhibit "20", # 21 Exhibit "21", # 22 Exhibit "22", # 23 Exhibit "23", # 24 Exhibit "24", # 25 Exhibit "25", # 26 Exhibit "26", # 27 Exhibit "27", # 28 Exhibit "28", # 29 Exhibit "29", # 30 Exhibit "30", # 31 Exhibit "31", # 32 Exhibit "32", # 33 Exhibit "33", # 34 Exhibit "34", # 35 Exhibit "35", # 36 Exhibit "36", # 37 Exhibit "37", # 38 Exhibit "38", # 39 Exhibit "39", # 40 Exhibit "40", # 41 Exhibit "41', # 42 Exhibit "42", # 43 Exhibit "43", # 44 Exhibit "44", # 45 Exhibit "45", # 46 Exhibit "46", # 47 Exhibit "47", # 48 Exhibit "48", # 49 Exhibit "49", # 50 Exhibit "50", # 51 Exhibit "51", # 52 Exhibit "52", # 53 Exhibit "53", # 54 Exhibit "54", # 55 Exhibit "55", # 56 Exhibit "56", # 57 Exhibit "57", # 58 Exhibit "58")(Bennett, Leonard) (Entered: 01/11/2021) |
| 01/11/2021 | 985 | MOTION to Compel *Production of Documents That Martorello Claims Are Covered By the Work-Product Doctrine* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 01/11/2021) |
| 01/11/2021 | 986 | Memorandum in Support re 985 MOTION to Compel *Production of Documents That Martorello Claims Are Covered By the Work-Product Doctrine* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58)(Bennett, Leonard) (Entered: 01/11/2021) |
| 01/15/2021 | 987 | MOTION to Dismiss *Plaintiff's Complaint Pursuant to Federal Rules of Civil Procedure 19 And 12(b)(7)* by Matt Martorello. (Hollis, Jonathan) (Entered: 01/15/2021) |
| 01/15/2021 | 988 | Memorandum in Support re 987 MOTION to Dismiss *Plaintiff's Complaint Pursuant to Federal Rules of Civil Procedure 19 And 12(b)(7)* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Hollis, Jonathan) (Entered: 01/15/2021) |
| 01/20/2021 | 989 | MOTION for Preliminary Injunction by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 01/20/2021) |
| 01/20/2021 | 990 | Memorandum in Support re 989 MOTION for Preliminary Injunction filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, |

| | | |
|---|---|---|
| | | # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Bennett, Leonard) (Entered: 01/20/2021) |
| 01/20/2021 | 991 | MOTION for Sanctions *under Rule 37(b)* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 01/20/2021) |
| 01/20/2021 | 992 | Memorandum in Support re 991 MOTION for Sanctions *under Rule 37(b)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Bennett, Leonard) (Entered: 01/20/2021) |
| 01/21/2021 | 993 | ORDER that the Plaintiffs' 969 MOTION TO SEAL is granted and 972 and 973 Exhibit Nos. 1 and 47 (ECF Nos. 972 and 973) to PLAINTIFFS' MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO (ECF No. 967) are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 1/21/2021. (jsmi, ) (Entered: 01/21/2021) |
| 01/21/2021 | 994 | ORDER that Matt Martorello's 963 MOTION TO SET SCHEDULING CONFERENCE is denied as moot. Signed by District Judge Robert E. Payne on 1/21/2021. (jsmi, ) (Entered: 01/21/2021) |
| 01/21/2021 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference held on 1/21/2021. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 02/04/2021) |
| 01/22/2021 | 995 | ORDER re conference call on January 21, 2021. See Order for details and deadlines. Signed by District Judge Robert E. Payne on 1/22/2021. (jsmi, ) (Entered: 01/22/2021) |
| 01/25/2021 | 996 | TRANSCRIPT of proceedings held on January 21, 2021, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/24/2021. Redacted Transcript Deadline set for 3/29/2021. Release of Transcript Restriction set for 4/26/2021.(peterson, peppy) (Entered: 01/25/2021)** |
| 01/25/2021 | 997 | TRANSCRIPT of proceedings held on January 21, 2021, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/24/2021. Redacted Transcript Deadline set for 3/29/2021. Release of Transcript Restriction set for 4/26/2021.(peterson, peppy) (Entered: 01/25/2021)** |
| 02/03/2021 | 998 | Opposition to 991 MOTION for Sanctions *under Rule 37(b)* filed by Matt Martorello. (Attachments: # 1 Exhibit 1)(Hollis, Jonathan) (Entered: 02/03/2021) |

| 02/03/2021 | 999 | RESPONSE in Opposition re 989 MOTION for Preliminary Injunction filed by Matt Martorello. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8, # 9 Exhibit Exhibit 9, # 10 Exhibit Exhibit 10, # 11 Exhibit Exhibit 11, # 12 Exhibit Exhibit 12, # 13 Exhibit Exhibit 13, # 14 Exhibit Exhibit 14, # 15 Exhibit Exhibit 15, # 16 Exhibit Exhibit 16, # 17 Exhibit Exhibit 17, # 18 Exhibit Exhibit 18, # 19 Exhibit Exhibit 19, # 20 Exhibit Exhibit 20)(Stemland, Karen) (Entered: 02/03/2021) |
| 02/08/2021 | 1000 | REPLY to Response to Motion re 991 MOTION for Sanctions *under Rule 37(b)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 02/08/2021) |
| 02/08/2021 | 1001 | Reply to 999 Response in Opposition to Motion,, *for Prel Injunction (ECF 989) and Memorandum in Support (ECF 990)* filed by Lula Williams. (Bennett, Leonard) (Entered: 02/08/2021) |
| 02/10/2021 | 1002 | Consent MOTION for Leave to File Excess Pages by Matt Martorello. (Hollis, Jonathan) (Entered: 02/10/2021) |
| 02/10/2021 | 1003 | Memorandum in Support re 1002 Consent MOTION for Leave to File Excess Pages filed by Matt Martorello. (Attachments: # 1 Proposed Order Proposed Order)(Hollis, Jonathan) (Entered: 02/10/2021) |
| 02/15/2021 | 1004 | Memorandum in Opposition re 987 MOTION to Dismiss *Plaintiff's Complaint Pursuant to Federal Rules of Civil Procedure 19 And 12(b)(7)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit 1 - LVD Tribal Code)(Kelly, Kristi) (Entered: 02/15/2021) |
| 02/17/2021 | 1005 | ORDER -This matter comes before the Court on Martorello's Consent Motion for Leave to Exceed Page Limit for Martorello' forthcoming Opposition to Motion for Class Certification. Upon consideration of the Motion, and for good cause shown, it is hereby ORDERED that the Motion is GRANTED. Martorello's opposition brief shall not exceed 50 pages and Plaintiffs' reply brief shall not exceed 35 pages. Signed by District Judge Robert E. Payne on 2/16/2021. (smej, ) (Entered: 02/17/2021) |
| 02/23/2021 | 1006 | ORDER - It is hereby ORDERED that MATT MARTORELLO'S MOTION TO FILE CONFIDENTIAL EXHIBITS UNDER SEAL STATEMENT OF POSITION IN RESPONSE TO JULY 23, 2020 (PARAGRAPH 4) (ECF No. 891) is granted in part and denied in part. The Motion (ECF No. 891) is granted and the following documents are filed under seal: MATT MARTORELLO'S STATEMENT OF POSITION IN RESPONSE TO JULY 23, 2020 ORDER (PARAGRAPH 4) (ECF No. 894) and Exhibits B, D, S, U, W, X, BB, CC, DD, JJ, and KK; provided that appropriately redacted versions thereof are filed in the public record. The Motion (ECF No. 891) is denied with respect to Exhibits A, E, I, J, L, M, N, 0, P, Q, R, T, Y, Z, AA, EE, FF and II; and the Clerk is directed to remove those exhibits from seal. Signed by District Judge Robert E. Payne on 2/23/2021. (smej, ) (Entered: 02/23/2021) |
| 02/23/2021 | 1007 | Opposition to 967 MOTION to Certify Class *(Plaintiffs' Renewed Motion for Class Certification of Claims Against Matt Martorello)* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit CC, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit EEE, # 8 Exhibit F, # 9 Exhibit FFF, # 10 Exhibit GG, # 11 Exhibit GGG, # 12 Errata H, # 13 Exhibit G, # 14 Exhibit HH, # 15 Exhibit HHH, # 16 Exhibit I, # 17 Exhibit III, # 18 Exhibit J, # 19 Exhibit JJJ, # 20 Exhibit Ki, # 21 Exhibit Kii, # 22 Exhibit KKK, # 23 Exhibit LLL, # 24 Exhibit M, # 25 Exhibit MMM, # 26 Exhibit N, # 27 Exhibit OOO, # 28 Exhibit Q, # 29 Exhibit S, # 30 Exhibit SS, # 31 Exhibit VV, # 32 Exhibit Z, # 33 Exhibit ZZ)(Hollis, Jonathan) (Entered: 02/23/2021) |

**JA117**

| | | |
|---|---|---|
| 02/23/2021 | 1008 | MOTION to Seal *Exhibits Submitted in Opposition to Renewed Motion for Class Certification* by Matt Martorello. (Hollis, Jonathan) (Entered: 02/23/2021) |
| 02/23/2021 | 1009 | Memorandum in Support re 1008 MOTION to Seal *Exhibits Submitted in Opposition to Renewed Motion for Class Certification* filed by Matt Martorello. (Hollis, Jonathan) (Entered: 02/23/2021) |
| 02/23/2021 | 1010 | EXHIBIT *A to Memorandum in Support of His Motion to Seal Exhibits in Opposition to Renewed Motion for Class Certification* by Matt Martorello.. (Hollis, Jonathan) (Entered: 02/23/2021) |
| 02/23/2021 | 1011 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 1008 MOTION to Seal *Exhibits Submitted in Opposition to Renewed Motion for Class Certification* (Hollis, Jonathan) (Entered: 02/23/2021) |
| 02/23/2021 | 1012 | Sealed Attachment/Exhibit(s) re 1008 MOTION to Seal *Exhibits Submitted in Opposition to Renewed Motion for Class Certification*. (Attachments: # 1 Exhibit AAA, # 2 Exhibit BB, # 3 Exhibit BBB, # 4 Exhibit C, # 5 Exhibit DDD, # 6 Exhibit EE, # 7 Exhibit FF, # 8 Exhibit III, # 9 Exhibit JJ, # 10 Exhibit KK, # 11 Exhibit KKK, # 12 Exhibit L, # 13 Exhibit LL, # 14 Exhibit MM, # 15 Exhibit MMM, # 16 Exhibit NN, # 17 Exhibit O, # 18 Exhibit OO, # 19 Exhibit P, # 20 Exhibit PP, # 21 Exhibit QQ, # 22 Exhibit R, # 23 Exhibit RR, # 24 Exhibit RRR, # 25 Exhibit T, # 26 Exhibit U, # 27 Exhibit UU, # 28 Exhibit W, # 29 Exhibit WW, # 30 Exhibit X, # 31 Exhibit XX, # 32 Exhibit Y)(Hollis, Jonathan) (Entered: 02/23/2021) |
| 02/23/2021 | 1013 | EXHIBIT *RRR to Opposition to Plaintiffs's Renewed Motion for Class Certification against Matt Martorello* by Matt Martorello.. (Hollis, Jonathan) (Entered: 02/23/2021) |
| 02/23/2021 | 1014 | STRICKEN PER 1020 ORDER ENTERED ON 2/24/2021 - Opposition to 983 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege*, 985 MOTION to Compel *Production of Documents That Martorello Claims Are Covered By the Work-Product Doctrine* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit BB, # 4 Exhibit CC, # 5 Exhibit D, # 6 Exhibit DDD, # 7 Exhibit E, # 8 Exhibit EEE, # 9 Exhibit F, # 10 Exhibit FF, # 11 Exhibit FFF, # 12 Exhibit G, # 13 Exhibit GG, # 14 Exhibit GGG, # 15 Exhibit H, # 16 Exhibit HH, # 17 Exhibit I, # 18 Exhibit III, # 19 Exhibit J, # 20 Exhibit JJJ, # 21 Exhibit Ki, # 22 Exhibit Kii, # 23 Exhibit L, # 24 Exhibit M, # 25 Exhibit N, # 26 Exhibit PPP, # 27 Exhibit Q, # 28 Exhibit QQQ, # 29 Exhibit RR, # 30 Exhibit RRR, # 31 Exhibit S, # 32 Exhibit SS, # 33 Exhibit SSS, # 34 Exhibit UU, # 35 Exhibit Y, # 36 Exhibit YY) (Hollis, Jonathan) Modified on 2/24/2021 (jsmi, ). (Entered: 02/23/2021) |
| 02/23/2021 | 1015 | MOTION to Seal *Exhibits Submitted in Opposition to Motions to Compel* by Matt Martorello. (Hollis, Jonathan) (Entered: 02/23/2021) |
| 02/23/2021 | 1016 | Memorandum in Support re 1015 MOTION to Seal *Exhibits Submitted in Opposition to Motions to Compel* filed by Matt Martorello. (Attachments: # 1 Exhibit 1)(Hollis, Jonathan) (Entered: 02/23/2021) |
| 02/23/2021 | 1017 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 1015 MOTION to Seal *Exhibits Submitted in Opposition to Motions to Compel* (Hollis, Jonathan) (Entered: 02/23/2021) |
| 02/23/2021 | 1018 | Sealed Attachment/Exhibit(s) re 1015 MOTION to Seal *Exhibits Submitted in Opposition to Motions to Compel*. (Attachments: # 1 Exhibit AAA, # 2 Exhibit C, # 3 Exhibit CCC, # 4 Exhibit DD, # 5 Exhibit EE, # 6 Exhibit HHH, # 7 Exhibit II, # 8 Exhibit JJ, # 9 Exhibit KK, # 10 Exhibit KKK, # 11 Exhibit LL, # 12 Exhibit LLL, # 13 Exhibit MM, # 14 Exhibit NN, # 15 Exhibit O, # 16 Exhibit OO, # 17 Exhibit OOO, # 18 Exhibit P, # 19 Exhibit PP, # 20 Exhibit QQ, # 21 Exhibit R, # 22 Exhibit T, # 23 |

**JA118**

| | | |
|---|---|---|
| | | Exhibit TT, # 24 Exhibit TTT, # 25 Exhibit U, # 26 Exhibit UUU, # 27 Exhibit V, # 28 Exhibit VV, # 29 Exhibit W, # 30 Exhibit WW, # 31 Exhibit X, # 32 Exhibit XX, # 33 Exhibit Z, # 34 Exhibit ZZ)(Hollis, Jonathan) (Entered: 02/23/2021) |
| 02/24/2021 | 1019 | Joint MOTION for Extension of Time to File Response/Reply as to 983 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege*, 985 MOTION to Compel *Production of Documents That Martorello Claims Are Covered By the Work-Product Doctrine*, 967 MOTION to Certify Class *(Plaintiffs' Renewed Motion for Class Certification of Claims Against Matt Martorello)* by Matt Martorello. (Attachments: # 1 Proposed Order)(Hollis, Jonathan) (Entered: 02/24/2021) |
| 02/24/2021 | 1020 | ORDER that DEFENDANT MATT MARTORELLO'S 1014 OPPOSITION TO PLAINTIFFS' MOTIONS TO COMPEL INFORMATION AND DOCUMENTS is stricken. The defendant, Matt Martorello, shall file, by March 1, 2021, separate responses to the plaintiffs' Motions (ECF Nos. 983 and 985) as required in 995 ORDER entered on January 22, 2021. See Order for details. Signed by District Judge Robert E. Payne on 2/24/2021. (jsmi, ) (Entered: 02/24/2021) |
| 02/24/2021 | 1021 | ORDER that MATT MARTORELLO'S 918 MOTION TO FILE CONFIDENTIAL EXHIBITS UNDER SEAL WITH HIS MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXHIBITS IN SUPPORT OF HIS 486 MOTION FOR RECONSIDERATION AND REQUEST FOR HEARING is granted in part and denied in part. See Order for details. Signed by District Judge Robert E. Payne on 2/24/2021. (jsmi, ) (Entered: 02/24/2021) |
| 02/24/2021 | 1022 | ORDER that MATT MARTORELLO'S 903 MOTION TO FILE UNDER SEAL THE UNREDACTED VERSION OF HIS SUPPLEMENTAL BRIEF REGARDING ALLEGED MISREPRESENTATIONS is granted and MATT MARTORELLO'S 907 SUPPLEMENTAL BRIEF REGARDING ALLEGED MISREPRESENTATIONS is filed under seal; provided that an appropriately redacted version thereof is filed in the public record. Signed by District Judge Robert E. Payne on 2/24/2021. (jsmi, ) (Entered: 02/24/2021) |
| 02/24/2021 | 1023 | ORDER that the Plaintiffs' 897 MOTION TO SEAL is granted and PLAINTIFFS' 899 STATEMENT OF POSITION REGARDING THE STRUCTURE OF MARTORELLO'S COMPANIES AND FLOW OF FUNDS and Exhibit Nos. 7, 8, and 10 thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. See Order for details. Signed by District Judge Robert E. Payne on 2/24/2021. (jsmi, ) (Entered: 02/24/2021) |
| 02/24/2021 | 1024 | Reply to Motion re 987 MOTION to Dismiss *Plaintiff's Complaint Pursuant to Federal Rules of Civil Procedure 19 And 12(b)(7)* filed by Matt Martorello. (Hollis, Jonathan) (Entered: 02/24/2021) |
| 02/26/2021 | 1025 | Opposition to 985 MOTION to Compel *Production of Documents That Martorello Claims Are Covered By the Work-Product Doctrine* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit BB, # 4 Exhibit CC, # 5 Exhibit D, # 6 Exhibit DDD, # 7 Exhibit E, # 8 Exhibit EEE, # 9 Exhibit F, # 10 Exhibit FF, # 11 Exhibit FFF, # 12 Exhibit G, # 13 Exhibit GG, # 14 Exhibit GGG, # 15 Exhibit H, # 16 Exhibit HH, # 17 Exhibit I, # 18 Exhibit III, # 19 Exhibit J, # 20 Exhibit JJJ, # 21 Exhibit Ki, # 22 Exhibit Kii, # 23 Exhibit L, # 24 Exhibit M, # 25 Exhibit N, # 26 Exhibit PPP, # 27 Exhibit Q, # 28 Exhibit QQQ, # 29 Exhibit RR, # 30 Exhibit RRR, # 31 Exhibit S, # 32 Exhibit SS, # 33 Exhibit SSS, # 34 Exhibit UU, # 35 Exhibit Y, # 36 Exhibit YY)(Hollis, Jonathan) (Attachment 12 replaced on 3/3/2021) (jsmi, ). (Entered: 02/26/2021) |
| 02/26/2021 | 1026 | MOTION to Seal *Exhibits Submitted in Opposition to Plaintiffs' Motion to Compel* |

| | | |
|---|---|---|
| | | *Information and Documents Withheld on the Basis of Work Product Immunity* by Matt Martorello. (Hollis, Jonathan) (Entered: 02/26/2021) |
| 02/26/2021 | 1027 | Memorandum in Support re 1026 MOTION to Seal *Exhibits Submitted in Opposition to Plaintiffs' Motion to Compel Information and Documents Withheld on the Basis of Work Product Immunity* filed by Matt Martorello. (Attachments: # 1 Exhibit 1)(Hollis, Jonathan) (Entered: 02/26/2021) |
| 02/26/2021 | 1028 | Notice of Under Seal Filing LCvR5 (B) by Matt Martorello re 1026 MOTION to Seal *Exhibits Submitted in Opposition to Plaintiffs' Motion to Compel Information and Documents Withheld on the Basis of Work Product Immunity* (Hollis, Jonathan) (Entered: 02/26/2021) |
| 02/26/2021 | 1029 | Sealed Attachment/Exhibit(s) re 1026 MOTION to Seal *Exhibits Submitted in Opposition to Plaintiffs' Motion to Compel Information and Documents Withheld on the Basis of Work Product Immunity.* (Attachments: # 1 Exhibit AAA, # 2 Exhibit C, # 3 Exhibit CCC, # 4 Exhibit DD, # 5 Exhibit EE, # 6 Exhibit HHH, # 7 Exhibit II, # 8 Exhibit JJ, # 9 Exhibit KK, # 10 Exhibit KKK, # 11 Exhibit LL, # 12 Exhibit LLL, # 13 Exhibit MM, # 14 Exhibit NN, # 15 Exhibit O, # 16 Exhibit OO, # 17 Exhibit OOO, # 18 Exhibit P, # 19 Exhibit PP, # 20 Exhibit QQ, # 21 Exhibit R, # 22 Exhibit T, # 23 Exhibit TT, # 24 Exhibit TTT, # 25 Exhibit UUU, # 26 Exhibit V, # 27 Exhibit VV, # 28 Exhibit W, # 29 Exhibit WW, # 30 Exhibit X, # 31 Exhibit XX, # 32 Exhibit Z, # 33 Exhibit ZZ)(Hollis, Jonathan) (Additional attachment(s) added on 4/20/2021: # 34 Exhibit U) (jsmi, ). (Entered: 02/26/2021) |
| 02/26/2021 | 1030 | Opposition to 983 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege* filed by Matt Martorello. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit BB, # 4 Exhibit CC, # 5 Exhibit D, # 6 Exhibit DDD, # 7 Exhibit E, # 8 Exhibit EEE, # 9 Exhibit F, # 10 Exhibit FF, # 11 Exhibit FFF, # 12 Exhibit G, # 13 Exhibit GG, # 14 Exhibit GGG, # 15 Exhibit H, # 16 Exhibit HH, # 17 Exhibit I, # 18 Exhibit III, # 19 Exhibit J, # 20 Exhibit JJJ, # 21 Exhibit Ki, # 22 Exhibit KK, # 23 Exhibit L, # 24 Exhibit M, # 25 Exhibit N, # 26 Exhibit PPP, # 27 Exhibit Q, # 28 Exhibit QQQ, # 29 Exhibit RR, # 30 Exhibit RRR, # 31 Exhibit S, # 32 Exhibit SS, # 33 Exhibit SSS, # 34 Exhibit UU, # 35 Exhibit Y, # 36 Exhibit YY)(Hollis, Jonathan) (Attachment 12 replaced on 3/3/2021) (jsmi, ). (Entered: 02/26/2021) |
| 02/26/2021 | 1031 | MOTION to Seal *Exhibits Submitted in Opposition to Plaintiffs' Motion to Compel Information Withheld on the Basis of the Attorney-Client Privilege* by Matt Martorello. (Hollis, Jonathan) (Entered: 02/26/2021) |
| 02/26/2021 | 1032 | Memorandum in Support re 1031 MOTION to Seal *Exhibits Submitted in Opposition to Plaintiffs' Motion to Compel Information Withheld on the Basis of the Attorney-Client Privilege* filed by Matt Martorello. (Attachments: # 1 Exhibit 1)(Hollis, Jonathan) (Entered: 02/26/2021) |
| 02/26/2021 | 1033 | Notice of Filing Sealing Motion LCvR5(C) by Matt Martorello re 1031 MOTION to Seal *Exhibits Submitted in Opposition to Plaintiffs' Motion to Compel Information Withheld on the Basis of the Attorney-Client Privilege* (Hollis, Jonathan) (Entered: 02/26/2021) |
| 02/26/2021 | 1034 | Sealed Attachment/Exhibit(s) re 1031 MOTION to Seal *Exhibits Submitted in Opposition to Plaintiffs' Motion to Compel Information Withheld on the Basis of the Attorney-Client Privilege.* (Attachments: # 1 Exhibit AAA, # 2 Exhibit C, # 3 Exhibit CCC, # 4 Exhibit DD, # 5 Exhibit EE, # 6 Exhibit HHH, # 7 Exhibit II, # 8 Exhibit JJ, # 9 Exhibit KK, # 10 Exhibit KKK, # 11 Exhibit LL, # 12 Exhibit LLL, # 13 Exhibit MM, # 14 Exhibit NN, # 15 Exhibit O, # 16 Exhibit OO, # 17 Exhibit OOO, # 18 Exhibit P, # 19 Exhibit PP, # 20 Exhibit QQ, # 21 Exhibit R, # 22 Exhibit T, # 23 Exhibit TT, # 24 |

| | | |
|---|---|---|
| | | Exhibit TTT, # <u>25</u> Exhibit U, # <u>26</u> Exhibit UUU, # <u>27</u> Exhibit V, # <u>28</u> Exhibit VV, # <u>29</u> Exhibit W, # <u>30</u> Exhibit WW, # <u>31</u> Exhibit X, # <u>32</u> Exhibit XX, # <u>33</u> Exhibit Z, # <u>34</u> Exhibit ZZ)(Hollis, Jonathan) (Entered: 02/26/2021) |
| 03/01/2021 | <u>1035</u> | MOTION for Extension *of Time to File and Serve Updated Privilege Log* by Matt Martorello. (Attachments: # <u>1</u> Proposed Order)(Hollis, Jonathan) (Entered: 03/01/2021) |
| 03/01/2021 | <u>1036</u> | Memorandum in Support re <u>1035</u> MOTION for Extension *of Time to File and Serve Updated Privilege Log* filed by Matt Martorello. (Hollis, Jonathan) (Entered: 03/01/2021) |
| 03/03/2021 | <u>1037</u> | MOTION for Extension of Time to File Response/Reply as to <u>983</u> MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege*, <u>984</u> Memorandum in Support,,,,,,,, <u>985</u> MOTION to Compel *Production of Documents That Martorello Claims Are Covered By the Work-Product Doctrine*, <u>986</u> Memorandum in Support,,,,, by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # <u>1</u> Proposed Order)(Bennett, Leonard) (Entered: 03/03/2021) |
| 03/03/2021 | <u>1038</u> | Memorandum in Support re <u>1037</u> MOTION for Extension of Time to File Response/Reply as to <u>983</u> MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege*, <u>984</u> Memorandum in Support,,,,,,,, <u>985</u> MOTION to Compel *Production of Documents That filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/03/2021)* |
| 03/03/2021 | <u>1039</u> | NOTICE by Matt Martorello *Concerning His First Amended Privilege Log* (Attachments: # <u>1</u> Exhibit First Amended Privilege Log of Defendant Matt Martorello) (Hollis, Jonathan) (Entered: 03/03/2021) |
| 03/03/2021 | <u>1040</u> | ORDER that <u>1019</u> JOINT MOTION FOR EXTENSION OF TIME TO FILE OPPOSITION AND REPLIES TO THE RENEWED MOTION FOR CLASS CERTIFICATION AND MOTIONS TO COMPEL PRIVILEGED AND WORK PRODUCTS is granted in part and denied in part. The JOINT MOTION is granted with respect to the plaintiffs' reply to the pending renewed motion for class certification and it is ORDERED that the plaintiffs shall file, by March 22, 2021, their reply to the PLAINTIFFS' <u>967</u> RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO. The JOINT MOTION is denied as moot with respect to all other extension requests. Signed by District Judge Robert E. Payne on 3/3/2021. (jsmi, ) (Entered: 03/03/2021) |
| 03/03/2021 | <u>1041</u> | ORDER that <u>1035</u> MOTION FOR EXTENSION OF TIME TO FILE AND SERVE UPDATED PRIVILEGE LOG filed by the defendant, Matt Martorello, is granted and Matt Martorello shall serve an updated privilege log by March 3, 2021. Signed by District Judge Robert E. Payne on 3/3/2021. (jsmi, ) (Entered: 03/03/2021) |
| 03/03/2021 | <u>1042</u> | ORDER that PLAINTIFFS' <u>1037</u> CONSENT MOTION FOR AN ENLARGEMENT OF TIME is granted. It is further ORDERED that by March 22, 2021, the plaintiffs shall file their reply in support of <u>983</u> MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE; by March 22, 2021, the plaintiffs shall file their reply in support of <u>985</u> MOTION TO COMPEL PRODUCTION OF DOCUMENTS MARTORELLO CLAIMS ARE COVERED BY THE WORK-PRODUCT DOCTRINE; and the oral argument scheduled for 10:00 a.m. March 12, 2021 is continued to 10:00 a.m. April 13, 2021. Signed by District Judge Robert E. Payne on 3/3/2021. (jsmi, ) (Entered: 03/03/2021) |
| 03/04/2021 | | Reset Hearing: Motion Hearing set for 4/13/2021 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 03/04/2021) |
| 03/05/2021 | <u>1043</u> | MOTION re <u>990</u> Memorandum in Support, *Motion for Leave to Supplement the Record* |

| | | |
|---|---|---|
| | | by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/05/2021) |
| 03/05/2021 | 1044 | Memorandum in Support re 1043 MOTION re 990 Memorandum in Support, *Motion for Leave to Supplement the Record* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "1", # 2 Exhibit "2" - FILED UNDER SEAL)(Bennett, Leonard) (Entered: 03/05/2021) |
| 03/05/2021 | 1045 | MOTION to Seal by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/05/2021) |
| 03/05/2021 | 1046 | Memorandum in Support re 1045 MOTION to Seal filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/05/2021) |
| 03/05/2021 | 1047 | Notice of Filing Sealing Motion LCvR5(C) by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 1045 MOTION to Seal , 1046 Memorandum in Support (Bennett, Leonard) (Entered: 03/05/2021) |
| 03/09/2021 | 1048 | ORDER that MATT MARTORELLO's 1008 MOTION TO SEAL EXHIBITS SUBMITTED IN OPPOSITION TO RENEWED MOTION FOR CLASS CERTIFICATION is granted and certain exhibits to the OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AGAINST MATT MARTORELLO are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 3/9/2021. (jsmi, ) (Entered: 03/09/2021) |
| 03/09/2021 | 1049 | ORDER that MARTORELLO'S 1015 MOTION TO SEAL EXHIBITS SUBMITTED IN OPPOSITION TO MOTIONS TO COMPEL is denied as moot because, by 1020 ORDER entered on February 24, 2021, the Court struck DEFENDANT MATT MARTORELLO'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL INFORMATION AND DOCUMENTS from the record herein. Signed by District Judge Robert E. Payne on 3/9/2021. (jsmi, ) (Entered: 03/09/2021) |
| 03/09/2021 | 1050 | ORDER that MATT MARTORELLO'S 1026 MOTION TO SEAL EXHIBITS SUBMITTED IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL INFORMATION AND DOCUMENTS WITHHELD ON THE BASIS OF WORK PRODUCT IMMUNITY is granted and certain exhibits to DEFENDANT MATT MARTORELLO'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL INFORMATION AND DOCUMENTS WITHHELD ON THE BASIS OF WORK PRODUCT IMMUNITY are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 3/9/2021. (jsmi, ) (Entered: 03/09/2021) |
| 03/09/2021 | 1051 | ORDER that MATT MARTORELLO'S 1031 MOTION TO SEAL EXHIBITS SUBMITTED IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF THE ATTORNEY-CLIENT PRIVILEGE is granted and certain exhibits to DEFENDANT MATT MARTORELLO'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF THE ATTORNEY-CLIENT PRIVILEGE are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 3/9/2021. (jsmi, ) (Entered: 03/09/2021) |
| 03/15/2021 | | Notice of Correction re 1044 Memorandum in Support re 1043 MOTION. Plaintiff's counsel shall file sealed version of 1044 Memorandum in Support and Sealed Exhibit 2. |

**JA122**

| | | |
|---|---|---|
| | | (jsmi, ) (Entered: 03/15/2021) |
| 03/19/2021 | 1052 | Opposition to 1044 Memorandum in Support, filed by Matt Martorello. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5)(Stemland, Karen) (Entered: 03/19/2021) |
| 03/19/2021 | 1053 | Consent MOTION for Extension of Time to File Response/Reply by Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/19/2021) |
| 03/19/2021 | 1054 | Memorandum in Support re 1053 Consent MOTION for Extension of Time to File Response/Reply filed by Lula Williams. (Bennett, Leonard) (Entered: 03/19/2021) |
| 03/22/2021 | 1055 | Reply to Motion re 967 MOTION to Certify Class *(Plaintiffs' Renewed Motion for Class Certification of Claims Against Matt Martorello)* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Exhibit "1", # 2 Exhibit "2", # 3 Exhibit "3", # 4 Exhibit "4", # 5 Exhibit "5" - Part 1, # 6 Exhibit "5" - Part 2, # 7 Exhibit "6", # 8 Exhibit "7", # 9 Exhibit "8", # 10 Exhibit "9", # 11 Exhibit "10", # 12 Exhibit "11")(Bennett, Leonard) (Entered: 03/22/2021) |
| 03/24/2021 | 1056 | Sealed Memorandum in Support re 1044 Memorandum in Support,. (Bennett, Leonard) (Entered: 03/24/2021) |
| 03/24/2021 | 1057 | Sealed Attachment/Exhibit(s) re 1044 Memorandum in Support,. (Attachments: # 1 Certificate of Service for Sealed docs)(Bennett, Leonard) (Entered: 03/24/2021) |
| 03/24/2021 | 1058 | ORDER that plaintiffs' 1045 MOTION TO SEAL is granted and the plaintiffs' 1056 MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO SUPPLEMENT THE RECORD IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION and Exhibit 2 thereto are filed under seal; provided that appropriately redacted versions thereof are filed in the public record. Signed by District Judge Robert E. Payne on 3/24/2021. (jsmi, ) (Entered: 03/24/2021) |
| 03/25/2021 | 1059 | Reply to Motion re 1043 MOTION re 990 Memorandum in Support, *Motion for Leave to Supplement the Record* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/25/2021) |
| 03/25/2021 | 1060 | MOTION to Strike 1052 Opposition by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/25/2021) |
| 03/25/2021 | 1061 | Memorandum in Support re 1060 MOTION to Strike 1052 Opposition filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/25/2021) |
| 03/25/2021 | 1062 | ORDER that PLAINTIFFS' 1053 CONSENT MOTION FOR AN ENLARGEMENT OF TIME TO FILE REPLIES IN SUPPORT OF MOTIONS TO COMPEL is granted. It is further ORDERED that, by April 7, 2021, the plaintiff shall file their replies in support of 983 MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE and 985 MOTION TO COMPEL PRODUCTION OF DOCUMENTS THAT MARTORELLO CLAIMS ARE COVERED BY THE WORK-PRODUCT DOCTRINE. Signed by District Judge Robert E. Payne on 3/25/2021. (jsmi, ) (Entered: 03/25/2021) |
| 03/26/2021 | 1063 | ORDER that 488 MOTION FOR SANCTIONS FOR FAILURE TO COMPLY WITH COURT ORDER DATED MAY 3, 2019 is denied as moot. See Order for details. Signed by District Judge Robert E. Payne on 3/26/2021. (jsmi, ) (Entered: 03/26/2021) |
| 03/26/2021 | 1064 | ORDER that MATT MARTORELLO'S 499 and 500 MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292 (b) AND MOTION FOR |

| | | |
|---|---|---|
| | | STAY PENDING INTERLOCUTORY APPEAL AND/OR DECISION ON A PETITION FOR WRIT OF MANDAMUS are denied as moot. See Order for details. Signed by District Judge Robert E. Payne on 3/26/2021. (jsmi, ) (Entered: 03/26/2021) |
| 03/26/2021 | 1065 | ORDER that MARTORELLO'S 539 MOTION FOR PROTECTIVE ORDER REGARDING PLAINTIFFS' DEMAND FOR SECOND DEPOSITION OF MATT MARTORELLO RELATED TO ALLEGED SPOLIATION ISSUES TO COMPEL is denied. See Order for details. Signed by District Judge Robert E. Payne on 3/26/2021. (jsmi, ) (Entered: 03/26/2021) |
| 03/26/2021 | 1066 | NOTICE by Matt Martorello *attaching Supplemental Privilege Log* (Attachments: # 1 Exhibit Supplemental Privilege Log of Defendant Matt Martorello)(Hollis, Jonathan) (Entered: 03/26/2021) |
| 03/29/2021 | 1067 | ORDER that 542 MOTION TO QUASH, IN PART, NON-PARTY SUBPOENA, OR IN THE ALTERNATIVE MOTION FOR PROTECTIVE ORDER is granted without prejudice to the future litigation, in this Court, of the issues raised therein pending upon reconsideration of the issues addressed in ECF Nos. 478 and 479. It is further ORDERED that the that the PLAINTIFFS' 571 CROSS MOTION TO COMPEL AGAINST NON-PARTY CONNER & WINTERS, LLP is denied without prejudice for the same reasons. See Order for details. Signed by District Judge Robert E. Payne on 3/29/2021. (jsmi, ) (Entered: 03/29/2021) |
| 03/31/2021 | 1068 | MOTION for Extension of Time to File Response/Reply as to 983 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege*, 984 Memorandum in Support,,,,,,,,, 985 MOTION to Compel *Production of Documents That Martorello Claims Are Covered By the Work-Product Doctrine*, 986 Memorandum in Support,,,,, by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 03/31/2021) |
| 03/31/2021 | 1069 | Memorandum in Support re 1068 MOTION for Extension of Time to File Response/Reply as to 983 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege*, 984 Memorandum in Support,,,,,,,,, 985 MOTION to Compel *Production of Documents That filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 03/31/2021)* |
| 04/01/2021 | 1070 | ORDER that the PLAINTIFFS' 556 MOTION TO COMPEL is denied as moot, as respects the production of a privilege log and without prejudice as respects production of the requested documents in the event that such production is appropriate based upon the resolution of pending motions to compel relating to waiver of the attorney-client privilege. See Order for details. Signed by District Judge Robert E. Payne on 4/1/2021. (jsmi, ) (Entered: 04/01/2021) |
| 04/06/2021 | 1071 | Memorandum in Opposition re 1060 MOTION to Strike 1052 Opposition filed by Matt Martorello. (Stemland, Karen) (Entered: 04/06/2021) |
| 04/09/2021 | 1072 | ORDER - It is hereby ORDERED that PLAINTIFFS' CONSENT MOTION FOR AN ENLARGEMENT OF TIME TO FILE REPLIES IN SUPPORT OF MOTIONS TO COMPEL (ECF No. 1068) is granted. It is further ORDERED that, by April 23, 2021, the plaintiff shall file their replies in support of the MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE (ECF No. 983) and the MOTION TO COMPEL PRODUCTION OF DOCUMENTS THAT MARTORELLO CLAIMS ARE COVERED BY THE WORK-PRODUCT DOCTRINE (ECF No. 985). It is further ORDERED that oral argument set for 10:00 a.m. April 13, 2021 is continued to 10:00 May 28, 2021. Signed by District Judge Robert E. Payne on 4/9/2021. (smej, ) (Entered: 04/09/2021) |

| 04/12/2021 | | Reset Hearing: Renewed Motion *to Compel* Hearing set for 5/28/2021 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne (if necessary). (nbrow) (Entered: 04/12/2021) |
|---|---|---|
| 04/12/2021 | 1073 | Reply to 1044 Memorandum in Support, 1052 Opposition filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Bennett, Leonard) (Entered: 04/12/2021) |
| 04/15/2021 | 1074 | MOTION for Hearing *Pending Motions ECF Nos. 946, 948, 987, 967, 989* by Matt Martorello. (Attachments: # 1 Proposed Order)(Hollis, Jonathan) (Entered: 04/15/2021) |
| 04/20/2021 | 1075 | Withdrawal of Motion by All Plaintiffs re 983 MOTION to Compel *Information Withheld on the Basis of Attorney-Client Privilege*, 985 MOTION to Compel *Production of Documents That Martorello Claims Are Covered By the Work-Product Doctrine* (Attachments: # 1 Proposed Order)(Bennett, Leonard) (Entered: 04/20/2021) |
| 04/20/2021 | 1076 | ORDER that the defendant, Matt Martorello, shall file, by 5:00 p.m. April 21, 2021, a response to 1075 NOTICE OF WITHDRAWAL OF MOTIONS advising the Court whether he intends to oppose the withdrawal of 983 MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY CLIENT PRIVILEGE and 985 MOTION TO COMPEL PRODUCTION OF DOCUMENTS THAT MARTORELLO CLAIMS ARE COVERED BY THE WORK-PRODUCT DOCTRINE. Signed by District Judge Robert E. Payne on 4/20/2021. (jsmi, ) (Entered: 04/20/2021) |
| 04/21/2021 | 1077 | Response to 1075 Withdrawal of Motion, filed by Matt Martorello. (Stemland, Karen) (Entered: 04/21/2021) |
| 04/23/2021 | 1078 | MOTION for Leave to File *Supplemental Authority* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order) (Kelly, Kristi) (Entered: 04/23/2021) |
| 04/23/2021 | 1079 | Memorandum in Support re 1078 MOTION for Leave to File *Supplemental Authority* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order 1 - Brice Order Granting Class Certification)(Kelly, Kristi) (Entered: 04/23/2021) |
| 04/26/2021 | 1080 | Motion to appear Pro Hac Vice by Bernard Robert Given and Certification of Local Counsel Jon Hollis Filing fee $ 75, receipt number AVAEDC-7753373. by Matt Martorello. (Hollis, Jonathan) (Entered: 04/26/2021) |
| 04/26/2021 | 1081 | Motion to appear Pro Hac Vice by William Nathaniel Grosswendt and Certification of Local Counsel Jon Hollis Filing fee $ 75, receipt number AVAEDC-7753577. by Matt Martorello. (Hollis, Jonathan) (Entered: 04/26/2021) |
| 04/29/2021 | 1082 | ORDER that the plaintiff's 983 MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE and the plaintiff's 985 MOTION TO COMPEL PRODUCTION OF DOCUMENTS THAT MARTORELLO CLAIMS ARE COVERED BY THE WORK-PRODUCT DOCTRINE are denied as moot having been withdrawn. It is further ORDERED that oral argument scheduled for 10:00 a.m. May 28, 2021 is canceled. Signed by District Judge Robert E. Payne on 4/29/2021. (jsmi, ) (Entered: 04/29/2021) |
| 05/05/2021 | 1083 | ORDERS granting 1080 and 1081 Motions for Pro hac vice. Bernard Robert Given, II, and William Nathaniel Grosswendt appointed for Matt Martorello. Signed by District Judge Robert E. Payne on 5/5/2021. (jsmi, ) (Entered: 05/05/2021) |
| 05/06/2021 | 1084 | NOTICE of Appearance by John David Taliaferro on behalf of Matt Martorello (Taliaferro, John) (Entered: 05/06/2021) |

JA125

| 05/07/2021 | 1085 | MOTION to Withdraw as Attorney by Matt Martorello. (Attachments: # 1 Proposed Order Proposed Order)(Hollis, Jonathan) (Entered: 05/07/2021) |
|---|---|---|
| 05/07/2021 | 1086 | Response to 1079 Memorandum in Support, 1078 MOTION for Leave to File *Supplemental Authority* filed by Matt Martorello. (Attachments: # 1 Exhibit 1-2) (Taliaferro, John) (Entered: 05/07/2021) |
| 05/11/2021 | 1087 | REPLY to Response to Motion re 1078 MOTION for Leave to File *Supplemental Authority* filed by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Kelly, Kristi) (Entered: 05/11/2021) |
| 05/12/2021 | 1088 | ORDER that 1085 Motion to Withdraw as Counsel is granted. The law firm of Woods Rogers PLC and the following counsel shall be withdrawn as counsel in this matter for Defendant Matt Martorello: Jonathan Frank Hollis. Signed by District Judge Robert E. Payne on 5/12/2021. (jsmi, ) (Entered: 05/12/2021) |
| 05/19/2021 | 1089 | MEMORANDUM ORDER that Martorello meets none of the requirement for a stay in these cases and DEFENDANT MATT MARTORELLO'S 948 MOTION TO STAY is denied. See Order for details. Signed by District Judge Robert E. Payne on 5/18/2021. (jsmi, ) (Entered: 05/19/2021) |
| 05/19/2021 | 1090 | MEMORANDUM OPINION. Signed by District Judge Robert E. Payne on 5/18/2021. (jsmi, ) (Entered: 05/19/2021) |
| 05/19/2021 | 1091 | ORDER that DEFENDANT MATT MARTORELLO'S 946 MOTION FOR ORDER CERTIFYING NOVEMBER 18, 2020 MEMORANDUM OPINION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b) is denied. See Order for details. Signed by District Judge Robert E. Payne on 5/18/2021. (jsmi, ) (Entered: 05/19/2021) |
| 05/20/2021 | 1092 | MEMORANDUM ORDER that DEFENDANT MATT MARTORELLO'S 987 MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 19 AND 12(b)(7) is denied. See Order for details. Signed by District Judge Robert E. Payne on 5/20/2021. (jsmi, ) (Entered: 05/20/2021) |
| 06/02/2021 | 1093 | NOTICE of Change of Address by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams (Bennett, Leonard). Modified to correct docket text on 6/8/2021 (sbea,) (Entered: 06/02/2021) |
| 06/08/2021 | | Notice of Correction re: 1093 NOTICE; Filing attorney selected the wrong filing event. The correct event is Notice "Change of Address". Clerk corrected docket text to reflect same. No further action is required at this time. (sbea,) (Entered: 06/08/2021) |
| 06/10/2021 | 1094 | ORDER that the plaintiffs' MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY (ECF No. 1078 ) is granted and the Court will consider the class certification order in Brice v. Stinson, No. 19-cv-1481 (N.D. Cal.) and the decision in Smith v. Martorello, et al., No. 3:18-cv-1651 (D. Or., March 16, 2021). It is further ORDERED that the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 6/10/2021. (sbea,) (Entered: 06/10/2021) |
| 06/10/2021 | 1095 | ORDER that **argument for PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO (ECF No. 967 ) will be held, in person, on June 29, 2021 at 10:00 AM.** It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 6/10/2021. (sbea,) (Entered: 06/10/2021) |

**JA126**

| 06/10/2021 | | Set Hearing: Renewed Motion *for Class Certification* Hearing set for 6/29/2021 at 10:00 AM in Richmond Courtroom 7400 before District Judge Robert E. Payne. (nbrow) (Entered: 06/10/2021) |
|---|---|---|
| 06/10/2021 | 1096 | ORDER that the plaintiffs' MOTION FOR LEAVE TO SUPPLEMENT THE RECORD (ECF No. 1043 ) is granted and that Supplemental Exhibits 1 and 2 shall be accepted as part of the record pertaining to PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 989 ). It is further ORDERED that the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 6/10/2021. (sbea,) (Entered: 06/10/2021) |
| 06/28/2021 | 1097 | ORDER that by 9:00 AM on June 29, 2021, each party shall file a statement of position listing, for Counts II-V of the Complaint (ECF No. 1 : 1 ) the elements of the claim; and 2) the statute of limitations applicable to each claim. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 6/28/2021. (sbea,) (Entered: 06/28/2021) |
| 06/28/2021 | 1098 | Statement of Position Re: Elements and Statute of Limitations by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 1097 Order (Kelly, Kristi). Modified docket text on 6/30/2021. (sbea,) (Entered: 06/28/2021) |
| 06/28/2021 | 1099 | Statement of Position Re: Elements and Statute of Limitations by Matt Martorello re 1097 Order (Taliaferro, John). Modified docket text on 6/30/2021. (sbea,) (Entered: 06/28/2021) |
| 06/29/2021 | 1102 | Minute Entry for proceedings held before District Judge Robert E. Payne: Motion *for Class Certification of Claims as to Matt Martorello* Hearing held on 6/29/2021. Arguments heard; counsel to file status report w/ statement of position by 7/01/2021 re: rule 37 & injunction (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 06/29/2021) |
| 07/01/2021 | 1103 | Joint Status Report Regarding Motions Pursuant to Rule 37 and for Preliminary Injunction by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams (Bennett, Leonard). Modified docket text on 7/2/2021. (sbea,) (Entered: 07/01/2021) |
| 07/05/2021 | 1104 | TRANSCRIPT of proceedings held on June 29, 2021, before Judge Robert E. Payne, Court Reporter Peppy Peterson, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty (30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER Redaction Request due 8/4/2021. Redacted Transcript Deadline set for 9/7/2021. Release of Transcript Restriction set for 10/4/2021.(peterson, peppy) (Entered: 07/05/2021)** |
| 07/09/2021 | 1105 | Joint Supplemental Status Report Regarding Motions Pursuant to Rule 37 and Preliminary Injunction by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams (Kelly, Kristi). Modified docket text on 7/9/2021. (sbea,) (Entered: 07/09/2021) |
| 07/12/2021 | 1106 | MEMORANDUM OPINION. See Opinion for details. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 7/12/2021. (Attachments: # 1 |

JA127

| | | Appendix). (sbea,) (Entered: 07/12/2021) |
|---|---|---|
| 07/13/2021 | 1107 | NOTICE by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 967 MOTION to Certify Class *(Plaintiffs' Renewed Motion for Class Certification of Claims Against Matt Martorello)* (Attachments: # 1 Proposed Order) (Kelly, Kristi) (Entered: 07/13/2021) |
| 07/15/2021 | 1108 | STATUS REPORT *(Joint Supplemental) Regarding Motions Pursuant to Rule 37 and Preliminary Injunction* by Matt Martorello. (Attachments: # 1 Proposed Order) (Taliaferro, John) (Entered: 07/15/2021) |
| 07/16/2021 | 1109 | ORDER that Defendant Matt Martorello, will produce the deposition transcripts of Simon Liang, Brian McFadden, and Alan Reeves, as well as the expert reports of William Metzdorff and Robert Miller to the Plaintiffs within eleven (11) court days of the entry of this Order unless the Tribal Entities move for relief from this Order in this Court within ten (10) court days of entry of this Order. If the Tribal Entities move for relief from this Order in this Court within ten (10) court days of entry of this Order, Defendant Matt Martorello shall not produce the deposition transcripts of Simon Liang, Brian McFadden, and Alan Reeves, as well as the expert reports of William Metzdorff and Robert Miller to the Plaintiffs until after the Court resolves the Tribal Entities' challenge to their disclosure. Plaintiffs' Rule 37(b) Motion (ECF No. 991 ) is WITHDRAWN, and thus is denied as moot. IT IS SO ORDERED. Signed by Senior United States District Judge Robert E. Payne on 7/16/2021. (sbea,) (Entered: 07/16/2021) |
| 07/20/2021 | 1110 | MEMORANDUM OPINION. See Opinion for details. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 7/19/2021. (sbea,) (Entered: 07/20/2021) |
| 07/20/2021 | 1111 | ORDER that comes before the Court on Plaintiffs' Renewed Motion to Certify a Class (ECF No. 967 ). Upon consideration of the Motion, and Defendant's opposition thereto, the Court hereby GRANTS the Motion. The Court certifies the following Classes: (a) Big Picture RICO Class and (b) Red Rock RICO Class. The Court appoints Lula Williams, George Hengle, Gloria Turnage, Dowin Coffy and Marcella Singh, as administrator for Felix Gillison, Jr.'s estate as the Class Representatives. The Court also appoints the law firms of Kelly Guzzo, PLC, Consumer Litigation Associates, P.C., Terrell Marshall Law Group, PLLC, Berger Montague, P.C., and Caddell & Chapman as counsel for the Class ("Class Counsel"). Pursuant to the Court's March 12, 2019 Order (ECF No. 416 ), Class Counsel shall notify TranDotCom Solutions, LLC of this decision to arrange for the transmission of the necessary data to notify the Classes. Class Counsel and Defendant Martorello shall confer to file a Notice Plan no later than two weeks from the date of the entry of this Order. If the parties cannot agree on a Notice Plan, each side shall submit a pleading no longer than five pages no later than 21 days after the entry of this Order. See Order for complete details. IT IS SO ORDERED. Signed by Senior United States District Judge Robert E. Payne on 7/19/2021. (sbea,) (Entered: 07/20/2021) |
| 07/22/2021 | 1112 | STATUS REPORT *(Joint Supplemental) Regarding Preliminary Injunction Motion* by Matt Martorello. (Taliaferro, John) (Entered: 07/22/2021) |
| 07/23/2021 | | Minute Entry for proceedings held before District Judge Robert E. Payne: Telephone Conference held on 7/23/2021. (Court Reporter Peppy Peterson, OCR.) (nbrow) (Entered: 08/03/2021) |
| 07/26/2021 | 1113 | Joint MOTION for Protective Order *on Attorney Eyes Only Arbitration Materials* by Matt Martorello. (Attachments: # 1 Proposed Order for Supplemental Protective Order) (Taliaferro, John) (Entered: 07/26/2021) |

JA128

| 07/27/2021 | 1114 | STIPULATED SUPPLEMENTAL PROTECTIVE ORDER REGARDING CERTAIN DOCUMENTS DESIGNATED ATTORNEYS' EYES ONLY IN AAA ARBITRATION BETWEEN TRIBAL ENTITIES AND EVENTIDE. See Order for complete details. IT IS SO ORDERED. Signed by Senior United States District Judge Robert E. Payne on 7/27/2021. (sbea,) (Entered: 07/27/2021) |
|---|---|---|
| 07/29/2021 | 1115 | Motion to Withdraw Without Prejudice, Motion for Preliminary Injunction by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams (Bennett, Leonard). Modified docket text on 7/30/2021. (sbea,) (Entered: 07/29/2021) |
| 07/30/2021 |  | Notice of Correction re: 1115 MOTION to Withdraw; the pleading contains more than one motion for relief. In the future, you will be requested to re-file THE copy of the same document separately for each motion relief. No further action is required at this time. (sbea,) (Entered: 07/30/2021) |
| 07/30/2021 | 1116 | ORDER that 1) PLAINTIFFS' NOTICE AND MOTION TO WITHDRAW, WITHOUT PREJUDICE, MOTION FOR PRELIMINARY INJUNCTION (ECF No. 1115 ) is GRANTED; and 2) PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 989 ) is DENIED as moot. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 7/30/2021. (sbea,) (Entered: 07/30/2021) |
| 08/03/2021 | 1117 | ORDER entered on June 10, 2021 (ECF No. 1096 ), the Court granted the plaintiffs' MOTION FOR LEAVE TO SUPPLEMENT THE RECORD (ECF No. 1043 ). Accordingly, PLAINTIFFS' MOTION TO STRIKE DEFENDANT MATT MARTORELLO'S OPPOSITION TO PLAINTIFFS' MOTION TO SUPPLEMENT THE MOTION FOR PRELIMINARY INJUNCTION {ECF No. 1060 ) is denied as moot. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 8/2/2021. (sbea,) (Entered: 08/03/2021) |
| 08/04/2021 | 1118 | PROPOSED CLASS Notice Plan by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re: 1111 Order. (Attachments: # 1 Exhibit 1 - Proposed Notice, # 2 Exhibit 2 - Declaration, # 3 Proposed Order)(Bennett, Leonard). Clerk replaced the "Proposed Order" on 8/5/2021. NEF was regenerated. Modified docket text on 8/5/2021. (sbea,) (Entered: 08/04/2021) |
| 08/04/2021 | 1119 | USCA Notification of Permission to Appeal, USCA Case #21-211, Case Manager C.Halupa. (Attachment-Petition for Permission to Appeal Under Rule 23(f)).(lbre, ) (Additional attachment(s) added on 8/5/2021: # 2 Petition) (lbre, ). (Entered: 08/05/2021) |
| 08/12/2021 | 1120 | NOTICE by Dowin Coffy, Justin Gray, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams re 1118 NOTICE, 1111 Order on Motion to Certify Class,,,,, *(Amended Proposed Notice Plan)* (Attachments: # 1 Exhibit Supplemental Declaration, # 2 Proposed Order)(Bennett, Leonard) (Entered: 08/12/2021) |
| 08/13/2021 | 1121 | ORDER re [1119-2] Appeal. It is hereby ORDERED that all proceedings in this case are stayed pending resolution of Martorello's interlocutory appeal. Signed by District Judge Robert E. Payne on 08/13/2021. (tjoh, ) (Entered: 08/13/2021) |
| 08/26/2021 | 1122 | NOTICE of Appearance by James Patrick McNichol on behalf of Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams (McNichol, James) (Entered: 08/26/2021) |
| 09/13/2021 | 1123 | MOTION to Withdraw as Attorney *Amy L. Austin* by Dowin Coffy, George Hengle, Marcella P. Singh, Gloria Turnage, Lula Williams. (Attachments: # 1 Proposed Order) (Austin, Amy) (Entered: 09/13/2021) |
| 09/14/2021 | 1124 | ORDER that the MOTION TO WITHDRAW AS COUNSEL (ECF No. 1123 ) is |

JA129

| | | granted. It is further ORDERED that the Clerk shall remove Amy L. Austin, Esquire as counsel of record for the plaintiffs. It is so ORDERED. Signed by Senior United States District Judge Robert E. Payne on 9/14/2021. (sbea,) (Entered: 09/14/2021) |
|---|---|---|
| 09/23/2021 | 1125 | JOINT NOTICE Pursuant to the Court's Instruction by Matt Martorello (Taliaferro, John). Modified docket text on 9/24/2021. (sbea,) (Entered: 09/23/2021) |
| 10/07/2021 | 1126 | USCA Order - Upon consideration of submissions relative to the petition for permission to appeal, the court grants the petition. This case is transferred to the regular docket and assigned docket number 21-2116. The record shall be retained in the court below unless requested by this court. (21-2116)(tjoh, ) (Entered: 10/07/2021) |
| 10/07/2021 | | Appeal Remark re 1126 . Case transferred to general docket: [No. 21-2116]. Originating case number: 3:17-cv-00461-REP. [21-2116] (tjoh, ) (Entered: 10/08/2021) |
| 10/13/2021 | 1127 | USCA Appeal Fees received $ 505.00, receipt number 34683051799 re 1126 Order granting petition for permission to appeal on behalf of Matt Martorello. Modified on 10/14/2021 (lbre, ). (Entered: 10/13/2021) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/06/2022 12:01:57 | | | |
| **PACER Login:** | ll1352 | **Client Code:** | 233953-10004 |
| **Description:** | Docket Report | **Search Criteria:** | 3:17-cv-00461-REP |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**JA130**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LULA WILLIAMS, GLORIA TURNAGE,   :
GEORGE HENGLE, DOWIN COFFY, and  : Civil Case No. _____3:17cv461_____
FELIX GILLISON, JR., *on behalf of themselves* :
*and all individuals similarly situated*,   :
               :
     Plaintiffs,     :
                :
v.               :
                :
BIG PICTURE LOANS, LLC; MATT MARTORELLO; :
ASCENSION TECHNOLOGIES, INC.;   :
DANIEL GRAVEL; JAMES WILLIAMS, JR.;  :
GERTRUDE MCGESHICK; SUSAN MCGESHICK; :
and GIIWEGIIZHIGOOKWAY MARTIN,   :
                :
     Defendants.    :
_____ :

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy and

Felix Gillison, Jr. ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by

counsel, and for their Class Action Complaint against Defendants, they allege as follows:

### INTRODUCTION

1.  It is well established that Virginia's usury laws "are founded upon considerations

of public policy." *Town of Danville v. Pace*, 66 Va. 1, 19 (1874). Even in an era where "state-by-

state lobbying campaigns" have persuaded state legislators to reverse "nearly three hundred years"

of prohibitions against "double- or even single-digit interest rate caps," Virginia has remained

committed to its *longstanding* view that it is contrary to public policy to charge excessive interest

rates to Virginians. Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for*

*Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 (2012) (providing

historical context on usury laws). Virginia's strong public policy against excessive interest rates is

not only hammered home by its criminalization of such conduct, but its civil remedies are also severe for it has long been established that "[h]owever small amount of usurious interest contracted for, and however large amount of money loaned, *the contract is declared void, and the lender forfeits the whole amount of the debt and interest.*" *Brockenbrough's Ex'rs v. Spindle's Adm'rs*, 58 Va. 21, 32 (1866) (emphasis added).

2.    This case involves a criminal enterprise that was established with the intent of evading state usury laws. In an apparent attempt to insulate themselves from any legal liability, Defendants established what is commonly referred to as a "rent-a-tribe" business model, where a payday lending scheme associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe—or to at least create the illusion that it enjoys tribal immunity.

3.    To facilitate blatant violations of state usury laws, Defendant Matt Martorello ("Martorello") approached the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") for the purpose of establishing a rent-a-tribe scheme. Under the rent-a-tribe model, Defendants made high interest loans in the name of Big Picture Loans, LLC ("Big Picture Loans"), which claim to be owned and operated by the Tribe. In reality, Martorello's company, Bellicose Capital, LLC ("Bellicose Capital"), funded the loans, controlled the underwriting, and handled the day-to-day operations of the business. In return for the use of its name, the Tribe received 2% of the revenue,[1] but otherwise the Tribe had no control over the income or expenses of Big Picture Loans.

---

[1] Zeke Faux, *Payday Lenders are Changing the Game Ahead of a U.S. Crackdown,* Bloomberg (Feb. 4, 2016) ("Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue, according to documents provided by a person involved in the deal."), https://www.bloomberg.com/news/articles/2016-02-04/payday-lenders-are-changing-the-game-ahead-of-a-u-s-crackdown.

4.      This lawsuit challenges the legality of Defendants' loans and seeks to enforce Virginia's longstanding public policy against usurious loans. Plaintiffs seek a declaratory judgment that the loan agreements related to Defendants' rent-a-tribe scheme are void and unenforceable. Defendants' usurious loans were void *ab initio* pursuant to Va. Code. § 6.2-1541(A), which provides that any loan containing an interest rate above 12% "shall be void."[2] Further, Plaintiffs seek a judgment declaring that the loan agreement's choice-of-law and forum selection provisions are unenforceable as a matter of public policy and because the provisions attempt to deprive consumers of both a remedy and of a day in court.

5.      Plaintiffs also seek an injunction against all Defendants, prohibiting them from lending or collecting loans in Virginia[3] as well as actual damages and treble damages from Defendants Big Picture, Ascension Technologies, Martorello, and Daniel Gravel for their participation in the unlawful lending enterprise, which violated Virginia's usury laws, unjustly enriched the Defendants, and violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").[4] As a result of their participation in the enterprise, Big Picture, Ascension Technologies,

---

[2] *Rahmani v. Resorts Intern. Hotel, Inc.*, 20 F. Supp. 2d 932, 935 (E.D. Va. 1998) (Ellis, J.) (explaining that a gambling contract "is void under Virginia law, it is a complete legal nullity, one that has no legal force or binding effect").

[3] Defendants James Williams, Jr., Giiwegiizhigookway Martin, Gertrude McGeshick, and Susan McGeshick are the chief executive officers of the Tribe. This lawsuit seeks to enjoin these tribal officials from ongoing violations of federal law, and, thus, the tribal officials are not protected by the Tribe's immunity. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978) ("As an officer of the Pueblo, petitioner Lucario Padilla is not protected by the tribe's immunity from suit."); *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2034 (2014) ("As this Court has stated before . . . tribal immunity does not bar such a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct." (citing *Santa Clara Pueblo*, 436 U.S. at 59). Plaintiffs do not seek any monetary damages from any of the tribal officials as a result of their participation in the rent-a-tribe scheme.

[4] Plaintiffs anticipate that Big Picture Loan's will claim to be "an arm of the tribe" and thus protected by tribal immunity. Although the doctrine of tribal sovereign immunity protects the Tribe itself, it does not automatically extend to economic subdivisions of a tribe, and the Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citing *Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 293 (Minn.1996)). In addition to the allegations alleged in this Complaint concerning the creation, purpose, and structure of Big Picture Loans, Big Picture is not entitled to sovereign immunity because 98% of the profits of the scheme went to non-tribal participants and the companies were established for the sole purpose of

Martorello, and Daniel Gravel violated Virginia's usury laws and RICO's prohibition against the "collection of unlawful debt," which RICO defines as a debt incurred in "the business of lending money" where "the usurious rate is at least twice the enforceable rate" under State of Federal law. 18 U.S.C. § 1961(6).

## JURISDICTION

6.    This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a majority of Plaintiffs are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

8.    Plaintiff Lula Williams ("Williams") is a natural person and resident of this Division and District.

9.    Plaintiff Gloria Turnage ("Turnage") is a natural person and resident of this Division and District.

10.    Plaintiff George Hengle ("Hengle") is a natural person and resident of this Division and District.

11.    Plaintiff Felix Gillison, Jr. ("Gillison") is a natural person and resident of this Division and District.

---

evading state usury laws. Further, extending the protections of tribal immunity to the scheme alleged in this case would not serve the policies underlying tribal sovereign immunity.

12.    Plaintiff Dowin Coffy ("Coffy") is a natural person and resident of this Division and District.

13.    Defendant Big Picture Loans is a limited liability company doing business as an internet lending website under the domain name www.bigpictureloans.com. In return for a small fraction of the revenue, the Tribe allowed the lending scheme to use its name and falsely claim that it is operated by the Tribe. At all times relevant hereto, the Tribe did not participate in the day-to-day operations of Big Picture Loans and did not fund the loans or handle the servicing or collection of the loans. Big Picture Loans was formerly known as Red Rock Tribal Lending, LLC, who did business under the domain name www.castlepayday.com.[5] Big Picture Loans is the successor in interest of Red Rock.

14.    Defendant Martorello is a natural person and resident of Puerto Rico. Martorello was the founder and chief executive officer of Bellicose Capital, which Martorello created to make and collect the usurious loans described herein. As explained below, Martorello was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.

15.    Defendant Ascension Technologies, LLC, f/k/a Bellicose Capital, LLC was a limited liability company previously organized under the laws of the U.S. Virgin Islands and then Puerto Rico. Bellicose Capital was formed by Martorello in 2011 to make the usurious loans to Virginia consumers. Although Defendants held it out as a "managing consulting company," Bellicose Capital was the actual entity that procured the investment capital, serviced the loans, and received the vast majority of the revenue from the loans, which was then funneled to Martorello. Due to various lawsuits against Martorello's competitors and anticipated regulation from the

---

[5] Castle Payday, *We Have Big News! Castle Payday is now Big Picture Loans*,
https://www.bigpictureloans.com/CastlePaydayRedirectLanding (last visited June 22, 2017).

JA135

Consumer Financial Protection Bureau ("CFPB"), Martorello transferred Bellicose to the Tribe in April 2016 in an attempt to shield Bellicose Capital's illegal business practices. The Tribe rebranded Bellicose as Ascension Technologies, which continues to operate with minimal tribal involvement or benefit to the Tribe.

16.     Defendant Daniel Gravel ("Gravel") was the general counsel for Bellicose Capital and was one of the masterminds of the rent-a-tribe lending scheme described herein. As early as August 2012, Gravel had direct personal involvement in the day-to-day operations of the illegal enterprise and participated in the management of the legal affairs of the company, including drafting and reviewing the software, financial, payment processing, and servicing contracts that enabled the enterprise to operate. Additionally, Gravel drafted and reviewed all advertising and marketing materials for the enterprise and made the decisions regarding the legal content in the websites and contracts.

17.     Defendant James Williams, Jr. ("Mr. Williams") is the tribal chairman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

18.     Defendant Giiwegiizhigookway Martin ("Ms. Martin") is the tribal chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

19.     Defendant Gertrude McGeshick is the secretary of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

20.     Defendant Susan McGeshick is the treasurer of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

JA136

## FACTUAL BACKGROUND

**A.    Virginia's Longstanding Public Policy Prohibiting Usurious Loans.**

21.    More than forty years before the signing of the Declaration of Independence, Virginia enacted its first usury law, which capped interest rates at 6 percent. John W. Edmonds, *Virginia Law of Interest and Usury*, 10 U. Rich. L.R. 77 (1975) (citing 4 Hennings Stat. 194).

22.    Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).

23.    The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972).

24.    In accordance with this longstanding public policy, a person may not charge an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

25.    The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders like Defendants. Virginia's licensing requirements include physical presence in the commonwealth and a minimum amount of liquid assets. Va. Code § 6.2-1507(A)(2). Additionally, before granting a license, the Commission must make specific findings concerning the applicant lender such as the character and fitness of the applicant and the applicant's knowledge of applicable Virginia laws and regulations. Va. Code § 6.2-1507.

**B.     Defendants Established an Enterprise to Evade Virginia's Licensing Requirements and Usury Laws.**

26.     Over the last decade, businesses have sought to evade state lending laws like Virginia's by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

27.     Defendant Matt Martorello recognized the exorbitant profits he could achieve by not complying with Virginia's usury laws and lending out high interest loans to some of Virginia's most vulnerable consumers.

28.     Recognizing this, Martorello established a rent-a-tribe business model for his company, Bellicose Capital, associating themselves with the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), a federally recognized tribe located in the Upper Peninsula of Michigan.

29.     With the assistance of Gravel, Martorello and Bellicose helped form Big Picture Loans and Red Rock—two companies formed as "business enterprises" of the Tribe, which claimed to be "wholly owned" and "operated as an instrumentality of the Tribe."[6]

30.     Although the Tribe holds itself out as the actual lender of the internet payday loans, the Tribe is merely a front, and Bellicose Capital provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

---

[6] *See, e.g.*, Lac Vieux Desert Band of Lake Superior Chippewa Indians, Resolution # T2014-066, Approving the Creation of the Wholly Owned and Operated Lending Entity—Big Picture Loans, LLC (Aug. 26, 2014), http://www.lvdtribal.com/pdf/BPL%20Organizing%20Documents.pdf.

31.     Upon information and belief, the Tribe had no control over the income or expenses of either Red Rock or Big Picture Loans.

32.     Instead, the Tribe allowed Defendants to use their name as a front and, in return, received a nominal, 2% flat fee of the revenue. Delvin D. Hawley, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("Matt Martorello's company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. The tribe gets 2 percent of the revenue, while Martorello makes millions.").

33.     Upon information and belief, tribal members do not participate in the day-to-day operations of Red Rock or Big Picture Loans and nearly all the activities associated with these companies occurred off the Lac Vieux Reservation, such as the call centers, payment processing, and servicing of the loans.

34.     Despite representations in the loan agreements that Big Picture Loans and Red Rock were owned and operated by the Tribe, Bellicose Capital was the *de facto* owner and controlled the operations of the Big Picture Loans and Red Rock.

35.     Moreover, nearly all activities performed on behalf of Big Picture and Red Rock were performed by officers and employees of Bellicose who were not located on the Lac Vieux Reservation. Instead, they were Bellicose Capital employees located in the Virgin Islands, Puerto Rico, and the Philippines.

36.     Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by Bellicose Capital and Martorello, and neither the Tribe nor its officials were allowed to access the accounts.

JA139

37.     Furthermore, neither Big Picture Loans nor Red Rock ever accepted consumer payments after the loan agreement was executed. Rather, all payments went to Bellicose Capital, who then kicked back, at most, the 2% flat fee to the Tribe.

38.     Additionally, Bellicose Capital also handled the lead generation used to identify and solicit potential consumers.[7]

39.     For example, Bellicose Capital procured consumer reports from Trans Union in an attempt to identify consumers who may be susceptible or in need of a loan.

40.     If a Virginia consumer's report showed that he or she may be susceptible to a high-interest loan, then Bellicose Capital sent correspondences to the home of the consumer in Virginia stating that he or she is "one of 1,442 people in Richmond" that are pre-approved, that the loan is "a smarter way to borrow," and that funds can be deposited "as early as tomorrow." (Feb. 27, 2017 Letter to Turnage).

41.     If a consumer called the number on the letter, he or she would reach a call center in the Philippines, who took direction and instructions from Bellicose Capital and not the Tribe.

42.     Upon information and belief, Bellicose Capital's lead generation procedures were developed by Martorello and Gravel.

43.     In the past few years, federal regulators have begun cracking down on rent-a-tribe arrangements.

---

[7] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. Pew Charitable Trust, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/~/media/assets/2014/10/payday-lending-report/fraud_and_abuse_online_harmful_prac-tices_in_internet_payday_lending.pdf. Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id.*

44.     For example, the United States Attorney for the Southern District of New York has indicted Scott Tucker and Timothy Muir, competitors of Defendants, for engaging in exactly the same unlawful-lending "rent a tribe" and collection practices alleged herein.

45.     The Tucker indictment, which sets out a strikingly similar set of facts, includes: (1) Mr. Tucker, through the use of shell companies, personally lent money to thousands of consumers through payday loans; (2) Tucker personally controlled virtually every aspect of the operations of these sham entities; (3) these sham entities shared employees, computer systems, and "other operating costs and infrastructure of a single lending business"; and (4) Mr. Muir acted as general counsel for one of the Tucker entities. *United States v. Tucker*, Case No. 16-crim-091 (S.D. N.Y. Feb. 9, 2016) (Dot. 1 at ¶¶ 1–3).

46.     For example, the indictment explains:

In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1–3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

Similarly, to create the sham appearance that Tribes 1–3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

**JA141**

*Id.* at ¶¶ 23-24.

47.     Just like the Tucker defendants, Defendants' business relationship with the Tribe was nothing more than an attempt to mislead consumers and regulators by an illusion that Defendants were protected by tribal immunity.

48.     After these rent-a-tribe schemes were uncovered through private lawsuits and governmental enforcement actions against Defendants' competitors, Martorello "sold" Bellicose Capital to the Tribe in an effort to further insulate the scheme from liability. Faux, *supra* note 1.

49.     As part of this arrangement, the Tribe paid Martorello $1.3 million dollars, plus he is entitled to receive as much as $300 million in future payments. Faux, *supra* note 1. In other words, the Tribe continues to accept a nominal fee in return for the use of its name.

50.     And while it is now organized under the laws of the Tribe, Ascension Technologies continues to be operated in the same manner and by the same individuals who ran Bellicose Capital—none of whom are affiliated with the Tribe.

51.     For example, approximately 20 individuals identify Ascension Technologies as their employers on LinkedIn. However, none of these people are located on the reservation.

52.     Instead, many of them list Atlanta, Mississippi, or Puerto Rico as the place where they are located.

53.     Upon information and belief, none of these people are members of the Tribe and nearly all of the activities of Ascension Technologies are performed by these non-tribal members who are not located on the reservation.

JA142

**C.      Defendants Made Loans to Virginia Consumers Charging Interest in Excess of 12% APR.**

54.      Defendants marketed, initiated, and collected usurious loans in Virginia. Martorello and Gravel chose Virginia as a place where loans and collection efforts would ensue, and they participated in and knew of the actions of Red Rock, Big Picture, and Bellicose in Virginia.

55.      Martorello and Gravel knew the subject loans were illegal under Virginia law, but they pursued the scheme anyway through Red Rock, Big Picture, and Bellicose in Virginia.

56.      In order to qualify for Defendants' loan product, consumers were required to electronically sign a form contract created by Defendants—not created by the Tribe.

57.      Under the terms of the standard Loan Agreements, the interest rates charged were significantly greater than 12% APR.

58.      For example, Defendants charged Williams with an APR of 649.8%—more than 50 times the 12% interest cap in Virginia for companies that are not licensed by the Commission. Va. Code § 6.2-303(A).

59.      Similarly, Defendants charged Turnage with an APR of 693.2%; Hengle with an APR of 607.5%; Coffy with an APR of 607.5%; and Gillison, Jr. with an APR of 627.2%.

60.      None of the Defendants had a consumer finance license permitting them to make loans charging interest in excess of 12% APR when they made the loans to Plaintiffs nor did they ever attempted to obtain such a license. *See* Va. Code § 6.2-1501. The Tribe also did not have a consumer finance license in Virginia.

61.      Accordingly, Defendants' loans are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

**JA143**

62.     Defendants received at least $1,330 from Williams as a result of Defendants' illegal loan to her—most of which Defendants credited as payment for interest or other fees.

63.     Defendants received at least $319.80 from Turnage as a result of Defendants' illegal loans to her—most of which Defendants credited as payment for interest or other fees.

64.     Defendants received at least $2,500 from Hengle as a result of Defendants' illegal loans to him—most of which Defendants credited as payment for interest or other fees.

65.     Defendants received at least $1,150 from Coffy as a result of Defendants' illegal loans to him—most of which Defendants credited as payment for interest or other fees.

66.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c); *see also* 18 U.S.C. § 1961(6) (defining "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate").

67.     As a result of Defendants' conduct, including participation in the Enterprise, Defendants are liable to Plaintiffs and the class for twice the total amount of interest paid on the usurious loans pursuant to Va. Code § 6.2-305(A), and Defendants are also jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**D.     Defendants' Loan Agreements Are Void and Unenforceable Under Virginia Law.**

68.     Because the loans were made without a consumer finance license and used an annual APR in excess of 12%, the agreements were void *ab initio* under Virginia law. Va. Code. § 6.2-1541(A) ("A loan contract shall be void if any act has been done in the making or collection thereof that violates § 6.2-1501.").

JA144

69.     Defendants' loan agreements not only violate Virginia's public policy against usurious loans as codified in Va. Code. § 6.2-1541(A), but they also contain unconscionable and unenforceable choice of law and forum selection provisions that seek to disclaim all laws and deprive consumers of their day in court.

70.     For example, Williams' Loan Agreement provides:

**GOVERNING LAW AND FORUM SELECTION**: This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for your convenience.

. . .

**TRIBAL DISPUTE RESOLUTION PROCEDURE**: The The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by you or on your behalf relating to or arising from this Agreement. . . . The Tribe and Enterprise intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by you or on your behalf to follow the Procedure. Under the Procedure, a consumer who, in the course of his otherwise lawful and proper use of Enterprise's business believes himself to be harmed by some aspect of the operation of any part of Enterprise's business, ***shall direct his concerns or dispute to Enterprise in writing***. A person's complaint to the Enterprise shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, ***and does not create any binding procedural or substantive rights for a petitioner***. The Enterprise will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of the complaint. In the event that the consumer is dissatisfied with Enterprise's determination, he may initiate Formal Dispute Resolution by requesting an administrative review of Enterprise's determination by submitting such request in writing to the Tribal Financial Services Regulatory Authority ("Authority"), P.O. Box 249, Watersmeet, MI 49969, no later than ninety (90) days after receiving Enterprise's determination.

(Feb. 15, 2016 Loan Agreement, attached as Ex. 1 at 5).

71.     Turnage, Hengle, Coffy, and Gillison, Jr.'s loan agreements contained virtually identical governing law and forum selection clauses.

JA145

72.     Upon information and belief, the governing law and forum selection clauses were template language included in all loan agreements involving Red Rock and Big Picture.

73.     Defendants' governing law clause is unenforceable because it violates public policy concerns in Virginia and was procured through fraud and misrepresentations, including that Red Rock and Big Picture Loans were "wholly owned" and "operated by" the Tribe.

74.     These statements were false, misleading, and designed to create the appearance that consumers were doing business with a neutral, government-like entity.

75.     In reality, the loans were owned and operated by Bellicose Capital, who funded the loans, controlled the underwriting, and handled the day-to-day operations of the businesses, including the interactions with consumers and collections.

76.     Likewise, the forum selection clause is also unenforceable because it seeks to deprive consumers of a remedy and their day in court. Rather than selecting an alternative dispute resolution procedure, Defendants use the forum selection clause as a means of depriving consumers of a remedy and a day in court.

77.     For example, the Tribal Dispute Resolution Procedure claims that consumers do not have "any binding procedural or substantive rights" against Big Picture.

78.     Additionally, the Tribal Dispute Resolution Procedure purportedly allows consumers to lodge a "Formal Dispute Resolution" with the "Tribal Financial Services Regulatory Authority."

79.     However, the Formal Dispute Resolution is a sham because the Tribal Financial Services Regulatory Authority does not have subject matter jurisdiction to consider: (1) any claims brought under state or federal law or (2) claims regarding the legality of the debt. Tribal Financial

Services Authority Comm. Regs., Reg. 1.1 § 4, *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf.

80.     In particular, the Regulations indicate that the Tribal Financial Services Regulatory Authority will not "grant the consumer an opportunity be heard" if the only allegation is that the loan "is illegal in a jurisdiction outside the jurisdiction of the Tribe." Tribal Financial Services Authority Comm. Regs., Reg. 1.1 § 4(b).

81.     Additionally, the Regulations provide that the Tribal Financial Services Regulatory Authority may "resolve the dispute in favor of the consumer upon a finding that the [tribal entity] *violated a law or regulation of the Tribe*." Tribal Financial Services Authority Comm. Regs., Reg. 1.1 § 4(c) (emphasis added).

82.     In essence, Defendants used the forum selection and choice of law clauses to convert it into "a choice of no law clause." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016).

83.     Accordingly, Plaintiffs request the Court to enter a declaratory judgment that the governing law and forum selection provisions are unenforceable as to Virginia consumers.

## COUNT ONE:
## DECLARATORY JUDGMENT
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

84.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

85.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Declaratory Judgment Class**: All persons who: (1) received a loan with either Red Rock or Big Picture Loans (2) when they resided or were located in Virginia and (3) where the loan contained an interest rate greater than 12%.

**JA147**

**Declaratory Judgment Sublass**: All persons who: (1) received a loan with either Red Rock or Big Picture Loans (2) when they resided or were located in Virginia (3) and the agreement concerning the loan included a choice-of- law or forum selection clause similar or identical to one in Paragraph 70.

Plaintiffs are members of the Declaratory Judgment Class and Subclass.

86.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

87.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loan agreements are void under Va. Code. § 6.2-1541(A); (2) whether the loan agreements are void as a matter of public policy; and (3) whether the choice-of-law and forum selection provisions are enforceable.

88.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

89.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of

**JA148**

the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this action.

90.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

91.    As explained above, Defendants' loan agreements not only violate Virginia's usury statutes and public policy, but they also contain unconscionable choice of law and forum-selection provisions that are void and unenforceable for public policy concerns.

92.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the choice of law and forum-selection provisions.

93.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

94.     Accordingly, Plaintiffs seek a declaratory judgment that the choice of law and forum-selection provisions are void and unenforceable under Va. Code. § 6.2-1541(A) and as a matter of Virginia's well-established public policy.

## COUNT TWO:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

95.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.[8]

96.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia RICO Class"—initially defined as:

> All Virginia residents who executed a loan with Red Rock or Big Picture where the loan was originated and/or any payment was made on or after June 22, 2013.

Plaintiffs are members of the Virginia RICO Class.

97.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by Defendants, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

98.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether the Enterprise constitutes an "enterprise" under RICO; (2) whether

---

[8] For Counts II and III, Plaintiffs do not seek any monetary relief from Defendants Williams, Jr., Martin, Gertrude McGeshick, and Susan McGeshick. Plaintiffs seek injunctive relief only as to Defendants Williams, Jr., Martin, Gertrude McGeshick, and Susan McGeshick.

JA150

Defendants participated in the Enterprise; (3) whether the loans violated Va. Code § 6.2-1501 because the interest rates were too high; and (4) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

99. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

100. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

101. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised

**JA151**

by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

102.    **Injunctive Relief Appropriate for the Class.**   **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the Enterprise, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the Enterprise; and ordering the dissolution of any entity associated with the Enterprise.

103.    As alleged above, Defendants violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

104.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

105.    All of the loans made to Virginia residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in Virginia.

106.    Martorello and Gravel, during the pertinent times, were directly and materially involved in this intentional misconduct and knew the subject loans were illegal under Virginia law, but they pursued the scheme anyway through Bellicose Capital.

107.    This conduct began sometime as early as 2011, continues to date, and will be repeated again and again in the future to the detriment of Virginia consumers.

108.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c).

109.    Accordingly, Defendants Big Picture Loans, Matt Martorello, Ascension Technologies, and Daniel Gravel are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

### COUNT THREE:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

110.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

111.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All Virginia residents who executed a loan with Red Rock or Big Picture where the loan was originated and/or any payment was made on or after June 22, 2013.

112.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

113.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

114.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

115.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

116.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of the Enterprise, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the Enterprise; and ordering the dissolution of each entity that has engaged in the Enterprise.

117.    As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c) and Virginia's usury laws, including the agreement between Defendants and Tribe that established the terms and operations of the rent-a-tribe business.

118.    Accordingly, Defendants Big Picture Loans, Matt Martorello, Ascension Technologies, and Daniel Gravel are jointly and severally liable to Plaintiffs and the putative class

JA154

USCA4 Appeal: 21-2116    Doc: 26-1    Filed: 02/07/2023    Pg: 184 of 678

members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C.

§ 1964(c).

## COUNT FOUR:
## VIOLATIONS OF VIRGINIA USURY LAWS
## (CLASS CLAIM AGAINST BIG PICTURE LOANS, MATT MARTORELLO,
## ASCENSION TECHNOLOGIES, DANIEL GRAVEL)

119.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth

at length herein.[9]

120.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this

action for themselves and on behalf of a class—the "Virginia Usury Class and Subclass"—initially

defined as follows:

> **Virginia Usury Class**: All Virginia residents who executed a loan with Red Rock
> or Big Picture where any amount of principal, interest, fees, or other charges were
> repaid.

> **Virginia Usury Subclass**: All Virginia residents who executed a loan with Red
> Rock or Big Picture where any interest was paid on or after June 23, 2015.

121.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs

allege that the class members are so numerous that joinder of all is impractical. The names and

addresses of the class members are identifiable through the internal business records maintained

by Defendants, and the class members may be notified of the pendency of this action by published

and/or mailed notice.

122.    Based on the estimated size of the class and the volume of loans offered by

Defendants, Plaintiffs believe that the amount in controversy easily exceeds $5 million when

considering the amounts repaid by Virginia borrowers, as well as the amount of outstanding debt

---

[9] For Counts IV and V, Plaintiffs do not seek any relief from Defendants Williams, Jr., Martin, Gertrude McGeshick, and Susan McGeshick. Plaintiffs use of the term "Defendants" in Count IV and V only refers to the defendants identified under the headings, *i.e.*, Big Picture Loans, Matt Martorello, Ascension Technologies, and Daniel Gravel.

**JA155**

that will be cancelled as part of the relief sought in this lawsuit. Settlements involving similar tribal lending enterprises have far exceeded $5 million, including a settlement recently approved by this Court. *See, e.g., Hayes v. Delbert Servs. Corp.*, Preliminary Approval Order, 3:14-cv-00258-JAG, Doc 193 (Jan. 30, 2017) (granting preliminary approval of a class action settlement that included $9.43 million in compensation and forgiving $5.9 million in outstanding debt) https://secure.dahladmin.com/VACASH/content/docu-ments/PreliminaryApprovalOrder.pdf; Press Release, Office of Att'y Gen., Ga., Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,00 attorney's fees and costs).[10]

123. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made by Defendants of the Virginia Usury Class claims violated Virginia Code Section § 6.2-1501 because their interest levels were too high and (2) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

---

[10] *See also* News Release, Attorney Gen. Pam Bondi, Fl., Attorney General Bondi and OFR Reach Multimillion Dollar Settlements with Online Lender (Jan. 12, 2017), http://myfloridalegal.com/__8525622-20065EE67.nsf/0/2F836464563D0EB5852580A600709370?Open&Highlight=0,western,sky ($11 million in compensation, $15 million in loan forgiveness, $500,000 civil penalty, $500,000 administrative fine, and $250,000 for costs); *Internet Lender CashCall, Inc. Barred from Doing Business in Minnesota*, Minn. Att'y Gen. Lori Swanson, https://www.ag.state.mn.us/Office/PressRelease/20160819InternetLender.asp (last visited May 24, 2017) ($11.7 million in monetary relief including a $4.5 million restitution fund).

124. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

125. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

126. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

**JA157**

127.    All of the loans made by Defendants to Virginia consumers used an interest rate greater than 12% and none of the exceptions to Va. Code § 6.2-303 apply.

128.    Accordingly, Plaintiffs and the class Members are entitled to recover from Defendants an amount equal to the total amount of interest paid in excess of 12% plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action, attorney's fees, and costs. Va. Code § 6.2-305(A).

**COUNT FIVE:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST BIG PICTURE LOANS, RED ROCK, MATT MARTORELLO, ASCENSION TECHNOLOGIES, DANIEL GRAVEL)**

129.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

130.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia Unjust Enrichment Class"—initially defined as follows:

> **Virginia Unjust Enrichment Class**: All Virginia residents who executed a loan with Red Rock or Big Picture where any amount of principal, interest, fees, or other charges were repaid.

131.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

132.    Based on the estimated size of the class and the volume of loans offered by Defendants, Plaintiffs believe that the amount in controversy easily exceeds $5 million when considering the amounts repaid by Virginia borrowers, as well as the amount of outstanding debt

that will be cancelled as part of the relief sought in this lawsuit. Settlements involving similar tribal lending enterprises have far exceeded $5 million, including a settlement recently approved by this Court. *See, e.g., Hayes v. Delbert Servs. Corp.*, Preliminary Approval Order, 3:14-cv-00258-JAG, Doc 193 (Jan. 30, 2017) (granting preliminary approval of a class action settlement that included $9.43 million in compensation and forgiving $5.9 million in outstanding debt) https://secure.dahladmin.com/VACASH/content/docu-ments/PreliminaryApprovalOrder.pdf; Press Release, Office of Att'y Gen., Ga., Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,00 attorney's fees and costs).

133.    **Predominance of Common Questions of Law and Fact.** Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants of the Virginia Unjust Enrichment Class claims; (2) whether Defendant knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

134.    **Typicality.** Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

**JA159**

135. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

136. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

137. All of the loans made by Defendants to Virginia consumers were void and unenforceable.

JA160

138. Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

139. Accordingly, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Big Picture or Red Rock.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request the Court enter judgment for themselves and the class they seek to represent against Defendants, including for:

A. Certification of this matter to proceed as a class action;

B. Declaratory, injunctive, and compensatory relief as pled herein;

C. Attorney's fees, litigation expenses, and costs of suit; and

D. Any further relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

> Respectfully submitted,
> **LULA WILLIAMS, GLORIA TURNAGE, GEORGE HENGLE, DOWIN COFFY, and FELIX GILLISON, JR.,** *on behalf of themselves and all individuals similarly situated***,**
>
> By:_____*/s/ Kristi C. Kelly*_____
> Kristi C. Kelly, Esq., VSB #72791
> Andrew J. Guzzo, Esq., VSB #82170
> KELLY & CRANDALL, PLC
> 3925 Chain Bridge Road, Suite 202
> Fairfax, VA 22030
> (703) 424-7572
> (703) 591-0167 Facsimile
> Email: kkelly@kellyandcrandall.com
> Email: aguzzo@kellyandcrandall.com
>
> James W. Speer, VSB#23046
> VIRGINIA POVERTY LAW CENTER
> 919 E. Main Street, Suite 610
> Richmond, VA 23219

JA161

(804) 782-9430
(804) 649-0974
Email: jay@vplc.org

*Counsel for Plaintiffs*

**JA162**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

LULA WILLIAMS, GLORIA TURNAGE,
GEORGE HENGLE, DOWIN COFFY, and               Civil Case No. 3:17-cv-00461-REP
FELIX GILLISON, JR., *on behalf of themselves
and all individuals similarly situated*,

          Plaintiffs,

v.

BIG PICTURE LOANS, LLC; MATT MARTORELLO;
ASCENSION TECHNOLOGIES, INC.;
DANIEL GRAVEL; JAMES WILLIAMS, JR.;
GERTRUDE MCGESHICK; SUSAN MCGESHICK;
and GIIWEGIIZHIGOOKWAY MARTIN,

          Defendants.

_____ /

**DEFENDANT BIG PICTURE LOANS, LLC'S BRIEF IN SUPPORT
OF ITS MOTION TO DISMISS FOR FAILURE TO EXHAUST TRIBAL REMEDIES
AND UNDER THE DOCTRINE OF *FORUM NON CONVENIENS***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

FACTS ...................................................................................................................... 2

The Lac Vieux Desert Band of Lake Superior Chippewa Indians..................... 2

LVD has authorized online lending from its Reservation. ................................. 3

Big Picture .......................................................................................................... 4

LVD's Dispute Resolution Procedures ............................................................... 5

Plaintiffs' choice of law and forum provisions................................................... 8

ARGUMENT ............................................................................................................ 9

I.    Under the doctrine of tribal exhaustion, the Court should dismiss this case and require

Plaintiffs to exhaust tribal remedies. ................................................................. 9

A.    Legal standard for tribal exhaustion. ...................................................... 9

B.    Tribal Exhaustion is a core component of tribal sovereignty. ................. 10

C.    A "colorable" claim of tribal jurisdiction requires dismissal or abeyance. .............. 12

D.    Big Picture has made a colorable claim that the TFSRA and the LVD Court have

jurisdiction over Plaintiffs' claims. ........................................................ 13

1.    Plaintiffs have entered into a consensual contractual relationship. ........................ 14

2.    The contract occurred on Indian lands.................................................... 14

II.   The Court should dismiss Plaintiffs' claims under the doctrine of *forum non conveniens*

because Plaintiffs are bound by their contracts................................................. 17

A.    Legal Standard for *forum non conveniens*. ............................................ 17

B.    Here, the forum selection clause is valid. ............................................... 18

i

1.    Plaintiffs do not allege fraud. ................................................................. 18

2.    The forum selection clause guarantees Plaintiffs a "day in court." ........................ 19

3.    Plaintiffs' forum selection clause allows for remedies if Plaintiffs' disputes have merit. 21

4.    Plaintiffs' forum selection clauses is consistent with Virginia's public policy. ..... 21

C.    The Court should enforce the forum selection clause and dismiss the case. .............. 23

1.    The Plaintiffs' choice of forum here merits no weight as the forum selection clause in Plaintiffs' loan agreements are valid. ......................................................... 24

2.    The Plaintiffs and Big Picture's private interest should not be considered. ........... 25

3.    The case should be heard according to the loan agreements' choice of law provisions. ................................................................................................. 25

4.    As the parties' chosen forum is a tribal forum, public policy favors dismissal. ...... 26

CONCLUSION ................................................................................................. 27

**JA165**

## TABLE OF AUTHORITIES

**Cases**

*Albemarle Corp. v. AstraZeneca UK Ltd.*
628 F.3d 643 (4th Cir. 2010) ................................................................................ 17, 18

*Allen v. Lloyd's of London*
94 F.3d 923 (4th Cir. 1996) ......................................................................................... 18

*Altheimer & Gray v. Sioux Mfg. Corp.*
983 F.2d 803 (7th Cir. 1993), cert. denied, 510 U.S. 1019 (1993) ............................ 10

*Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*
134 S. Ct. 568 (2013) ........................................................................................... passim

*Bell v. Hood*
327 U.S. 678 (1946) ..................................................................................................... 13

*Bowen v. Doyle*
230 F.3d 525 (2d Cir. 2000) ........................................................................................ 10

*Brown v. Western Sky Financial, LLC*
84 F. Supp. 3d 467 (M.D.N.C. 2015) .................................................................... 12, 16

*Buchanan v. Sokaogon Chippewa Tribe*
40 F. Supp. 2d 1043 (E.D. Wis. 1999) ....................................................................... 10

*Com., State Lottery Dep't v. Settlement Funding, LLC*
75 Va. Cir. 248, 2008 WL 6759945 (2008) ................................................................ 22

*Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians*
746 F.3d 167 (5th Cir 2014), aff'd, Dollar General Corp., 136 S.Ct. 2159 ................ 14

*Dollar General Corp. v. Miss. Band of Choctaw Indians*
-- U.S. --, 136 S.Ct. 2159 (2016) ................................................................................ 10

*Egboh v. United States*
672 F. App'x 284 (4th Cir. 2017) ................................................................................ 12

*El Paso Natural Gas Co. v. Neztsosie*
526 U.S. 473 (1999) ..................................................................................................... 12

*Essex Ins. Co. v. Y&J Constr., Inc.*
E.D. Va. No. 1:15-CV-1597, 2016 WL 8254921 (E.D. Va. Dec. 30, 2016) ............... 15

*Ferens v. John Deere Co.*
494 U.S. 516 (1990) ........................................................................................ 25


*FTC v. Payday Fin.*
935 F. Supp. 2d 926 (D.S.D. 2013) ............................................................ 15, 16

*Hayes v. Delbert Services Corp.*
E.D. Va. No. 3:14-CV-258, 2015 WL 269483 (E.D. Va. Jan. 21, 2015), rev'd and remanded on
other grounds, 811 F.3d 666 (4th Cir. 2016) ............................................ 9, 19, 20

*Heldt v. Payday Financial, LLC*
12 F. Supp. 3d 1170 (D.S.D. 2014) ................................................................. 15

*Holloway v. Schweiker*
724 F.2d 1102 (4th Cir. 1984), cert. denied, 467 U.S. 1217 (1984) ........................ 13

*Intranexus, Inc. v. Siemens Med. Solutions Health Servs. Corp.*
227 F. Supp. 2d 581 (E.D. Va. 2002) ............................................................... 17

*Iowa Mut. Ins. Co. v. LaPlante*
480 U.S. 9 (1987) ................................................................. 10, 11, 14, 25

*Jackson v. Payday Fin., LLC*
764 F.3d 765 (7th Cir. 2014) ............................................................................ 9

*Jensen v. Schweiker*
709 F.2d 1227 (8th Cir. 1983) ......................................................................... 13

*Jian Pan v. Gonzales*
489 F.3d 80 (1st Cir. 2007) ............................................................................. 12

*Lumataw v. Holder*
582 F.3d 78 (1st Cir. 2009) ............................................................................. 12

*Madewell v. Harrah's Cherokee Smokey Mountains Casino*
730 F.Supp.2d 485 (W.D.N.C. 2010) ............................................................... 13

*Medrano v. Lynch*
673 F. App'x 320 (4th Cir. 2017) ..................................................................... 12

*Meridian Imaging Sols., Inc. v. OMNI Bus. Sols. LLC*
E.D. Va. No. 1:17-CV-186, 2017 WL 1491134 (E.D. Va. Apr. 25, 2017) .................. 17

*Merrion v. Jicarilla Apache Tribe*
455 U.S. 130, 102 S.Ct. 894 (1982) ................................................................. 25

*Montana v. United States*
450 U.S. 544 (1981) ................................................................................................ 11, 14

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*
471 U.S. 845 (1985) .......................................................................................... 9, 10, 12, 13

*New Mexico v. Mescalero Apache Tribe*
462 U.S. 324, 103 S. Ct. 2378 (1983) ........................................................................ 26

*Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*
207 F.3d 21 (1st Cir. 2000) ........................................................................................ 12

*Plains Commerce Bank v. Long Family Land & Cattle Co.*
554 U.S. 316 (2008) .................................................................................................. 14

*Pro Football Inc. v. Paul*
39 Va. App. 1 (2002) ................................................................................................ 15

*Rahmani v. Resorts Int'l Hotel, Inc.*
20 F. Supp. 2d 938 (E.D. Va. 1998), aff'd, 182 F.3d 909 (4th Cir. 1999) ................. 15

*Settlement Funding, LLC v. Von Neumann-Lillie*
274 Va. 76 (2007) ............................................................................................ 21, 22, 25

*Stewart Org., Inc. v. Ricoh Corp.*
487 U.S. 22 (1988) .................................................................................................... 24

*Stock W. Corp. v. Taylor*
942 F.2d 655 (9th Cir. 1991), on reh'g, 964 F.2d 912 (9th Cir. 1992) ..................... 11

*Three Affiliated Tribes v. Wold Engineering*
476 U.S. 877, 106 S.Ct. 2305 (1986) ........................................................................ 25

*United States Steel Corp., Gary Works v. Indus. Com. of Illinois*
161 Ill. App. 3d 437 (1987) ...................................................................................... 15

*United States v. Wheeler*
435 U.S. 313 (1978) .................................................................................................. 10

*Williams v. Lee*
358 U.S. 217, 79 S.Ct. 269 (1959) ............................................................................ 25

**Statutes**

12 U.S.C. § 5481 ........................................................................................................ 4
12 U.S.C. § 5481(12) ............................................................................................ 4, 21
12 U.S.C. § 5481(27) ............................................................................................ 4, 21

12 U.S.C. § 5495 ............................................................................................. 4, 21
12 U.S.C. § 5551 ............................................................................................. 4, 21
12 U.S.C. § 5552 ............................................................................................. 4, 21
25 U.S.C. § 1300h ................................................................................................. 2


**Rules**
Fed. R. Civ. P. 9(b) ............................................................................................... 18


**Regulations**
12 CFR 1040 ........................................................................................................... 9
12 CFR 1040.3 (b)(2)(ii) ........................................................................................ 9
12 CFR 1040.4(a)(2)(vi) ......................................................................................... 9
82 Fed. Reg. 4915 ................................................................................................... 2
82 Fed. Reg. 4917 ................................................................................................... 2
Tribal Consumer Financial Services Regulatory Code § 1.1 (d) ........................... 3
Tribal Consumer Financial Services Regulatory Code § 1.1(a) ............................ 3
Tribal Consumer Financial Services Regulatory Code § 1.2(e) .......................... 21
Tribal Consumer Financial Services Regulatory Code § 1.2(f) ........................... 21
Tribal Consumer Financial Services Regulatory Code § 4.1 ............................... 21
Tribal Consumer Financial Services Regulatory Code § 4.13 ............................... 6
Tribal Consumer Financial Services Regulatory Code § 4.13(c) ........................ 21
Tribal Consumer Financial Services Regulatory Code § 4.14 ............................... 6
Tribal Consumer Financial Services Regulatory Code § 4.8(c) ............................ 5
Tribal Consumer Financial Services Regulatory Code § 6.2 ............................... 21
Tribal Consumer Financial Services Regulatory Code § 9 .................................... 5
Tribal Consumer Financial Services Regulatory Code § 9.3 ................................. 6
Tribal Consumer Financial Services Regulatory Code § 9.3(a) ............................ 6
Tribal Consumer Financial Services Regulatory Code § 9.3(c) ............................ 7
Tribal Consumer Financial Services Regulatory Code § 9.3(d) ............................ 6
Tribal Consumer Financial Services Regulatory Code § 9.3(e)(i) ........................ 7
Tribal Consumer Financial Services Regulatory Code § 9.3(e)(ii) ....................... 7
Tribal Consumer Financial Services Regulatory Code § 9.3(f) ............................. 7
Tribal Consumer Financial Services Regulatory Code § 9.3(h) ............................ 7
Tribal Consumer Financial Services Regulatory Code § 9.4 ................................. 7
Tribal Consumer Financial Services Regulatory Code § 9.4(b) ............................ 7
Tribal Consumer Financial Services Regulatory Code § 9.4(f) ............................. 7
Tribal Consumer Financial Services Regulatory Code § 9.4(g) ............................ 7

**Other Sources**
Black's Law Dictionary (10th ed. 2014) ............................................................. 13

**JA169**

Defendant, Big Picture Loans, LLC ("Big Picture"), by counsel, hereby moves the Court to dismiss Plaintiffs' Complaint on the bases of: (1) failure to exhaust tribal remedies; and (2) under the doctrine of *forum non conveniens*.

## INTRODUCTION

Plaintiffs sued Big Picture in this Court in an attempt to avoid the choice of law and forum selection provisions in their loan agreements. However, Plaintiffs' speculative and unsupported allegations that the Lac Vieux Desert Band of Lake Superior Chippewa Indians' ("LVD's") dispute resolution procedures and Tribal Court are a "sham" are insufficient to support their forum-shopping. (Plaintiffs' Compl., ¶ 79.)

This Court presumes that forum selection and choice of law clauses are valid and enforceable (unless proven otherwise). *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 581 (2013). Significantly, the forum selection clause in Plaintiffs' loan agreements is unlike a typical forum selection clause in that the chosen forum is a tribal governmental regulator and tribal court. That ensures a robust and fair dispute resolution process, and it places this case into the innumerable instances where a forum selection clause has been honored and enforced by a federal court. Hence, the forum selection clause is valid and enforceable, and Plaintiffs' counsel's boilerplate allegations from each of their many pending like cases that the chosen forum is a "sham" are wholly unsupportable under these facts and insufficient to show the forum selection and choice of law provisions are unenforceable.

At bottom, Plaintiffs entered into consensual contractual relationships with an arm of LVD, a relationship that is wholly within LVD's jurisdiction, which, under the long-standing doctrine of tribal exhaustion, requires the Court to dismiss this matter until Plaintiffs have exhausted tribal remedies, which they indisputably have not done. Moreover, due to the valid and enforceable

1

forum selection clauses, this Court should dismiss this matter under the doctrine of *forum non conveniens*.

## FACTS

### The Lac Vieux Desert Band of Lake Superior Chippewa Indians.

LVD is a federally recognized Indian tribe with reservation lands near Watersmeet, Michigan ("Reservation"). 25 U.S.C. § 1300h; 82 Fed. Reg. 4915, 4917 (Jan. 17, 2017). On May 14, 1992, LVD adopted its Constitution ("LVD Constitution") "to govern [] under [its] own laws and customs, to maintain and foster [its] tribal culture, to protect [its] homeland" and "for the government, protection and common welfare of [LVD]." (*See* Def.'s Big Picture Loans, LLC and Ascension Technologies, Inc. Br. in Supp. of Mot. to Dismiss, Attach. #1, LVD's Const., Preamble). Under the LVD Constitution, LVD's jurisdiction shall be exercised to the full extent of [LVD]'s sovereign power." (*Id.* at Art. I § 2).

LVD's Constitution establishes a Tribal Court ("LVD Court") that is "independent from the legislative and executive functions of the tribal government." (*Id.* at Art V § 6). The LVD Court is empowered with general jurisdiction over "all cases, matters or controversies arising under th[e] [LVD] Constitution and the laws, ordinances, regulations, customs, and judicial decisions of [LVD] [which] shall be exercised to the fullest extent consistent with self-determination." (*Id.* at Art. V § 2(a)).

On December 27, 1994, the LVD Court adopted its court rules to "govern all proceedings[,] . . . practice and procedure in all courts established by the Constitution and [LVD]" and has kept its court rules updated to manage the evolving practice of litigation. (*See* Def.'s Big Picture Loans, LLC and Ascension Technologies, Inc. Br. in Supp. of Mot. to Dismiss, Attach. #41, Lac Vieux Desert Band of Lake Superior Chippewa Indians Court Rules of 2008, LVD 2008-1.003. *See also*

Attach. #1, Art V § 7).  The Tribal Court has a strong relationship with Michigan's courts and has worked with the Michigan State Court Administrator to establish a clear avenue for comity and reciprocity for the recognition of Tribal Court judgments by Michigan, and vice versa.  (*See* Def.'s Big Picture Loans, LLC and Ascension Technologies, Inc. Br. in Supp. of Mot. to Dismiss, Attach. #42, LVD Court Admin. Ord. 2013-002).[1]

Since its inception, the Tribal Court has heard approximately 1,151 criminal cases, 2,248 civil cases, 324 juvenile cases, and 410 custody cases, and has overseen 20 adoptions.   The Tribal Court was recently remodeled and equipped with Polycom video conference capability to allow remote parties to participate in judicial proceedings.  Chief Judge Mark S. Esqueda currently presides over the LVD Court and oversees the Court Clerk, Probation Officer/Bailiff, and Receptionist/File Clerk.

### LVD has authorized online lending from its Reservation.

As fully briefed by Defendant Big Picture Loans, LLC ("Big Picture"), LVD enacted the Tribal Consumer Financial Services Regulatory Code ("Regulatory Code") to authorize online consumer lending to help "improve the Tribe's economic self-sufficiency, to enable the Tribe to better serve the social, economic, educational, and health and safety needs of its members and visitors, and to provide its members with opportunities to improve their own economic circumstances."  (*See* Def.'s Big Picture Loans, LLC and Ascension Technologies, Inc. Br. in Supp. of Mot. to Dismiss, Attach. #3, Resolution # 2011-053; Attach. #4, Regulatory Code, § 1.1(a), (d), as amended).

The Regulatory Code governs every aspect of tribal consumer financial services with strict oversight over licensees' operations to ensure that consumers are protected by the Regulatory Code

---

[1] *Available at* http://courts.mi.gov/Courts/tribalCourts/Pages/default.aspx

and all applicable federal laws.  (*Id.* at §§ 1.2(h); 1.3(d), 2.4; 5.1; 5.2(b)(8); 6; 7.2).  LVD created the Tribal Financial Services Regulatory Authority ("TFSRA"), a government subdivision, to protect consumers, enforce the law,[2] and to regulate all consumer financial services occurring within LVD's jurisdiction.  (*See* Def.'s Big Picture Loans, LLC and Ascension Technologies, Inc. Br. in Supp. of Mot. to Dismiss, Attach. #5, Resolution 2011-030; Attach. #4, §§ 1.1(i), 4.16.2)).

Significant here is the TFSRA's capacity to investigate consumer complaints and preside over an administrative dispute resolution procedure to address and resolve consumer complaints and grievances.  (*See* Def.'s Big Picture Loans, LLC and Ascension Technologies, Inc. Br. in Supp. of Mot. to Dismiss, Attach. #4, § 9).

## Big Picture

LVD created Big Picture as its premiere lending entity.  Big Picture is organized under LVD law, and headquartered and operating on LVD's reservation.  (*See* Def.'s Big Picture Loans, LLC and Ascension Technologies, Inc. Br. in Supp. of Mot. to Dismiss, Attach. #10, Resolution T2014-066; Attach. #12, Big Picture First Amended Articles).  Big Picture's websites are hosted on servers that are located on the Reservation.  (*See* Def.'s Big Picture Loans, LLC and Ascension Technologies, Inc. Br. in Supp. of Mot. to Dismiss, Attach. #2, Affd. Michelle Hazen, ¶30(a)).  With Big Picture's business model, consumers apply for loans on Big Picture's website and Big Picture evaluates the application.  If the applicant meets Big Picture's criteria, Big Picture informs

---

[2] The Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5481 *et seq.*, authorizes tribal regulators to enforce any of the enumerated federal consumer protection laws in the same manner as their state and federal counterparts.  *See* 12 U.S.C. § 5481(12) (listing the "enumerated consumer laws" enforceable under the CFPA); 12 U.S.C. § 5481(27) (including federally recognized Indian tribes within the definition of "State."); 12 U.S.C. § 5495 (requiring the CFPB to coordinate with State regulators); 12 U.S.C. §§ 5551-52 (allowing a State attorney general or regulator to bring a civil action to enforce the CFPA in State court over State licensed entities).

4

the applicant of the available terms and interest rates.  If the applicant proceeds to take the loan, they execute the loan agreement and submit it to Big Picture for approval or denial.  If approved, Big Picture then executes the agreement and originates the loan from the Reservation.  (Attach. #2, ¶30(c)(8)).

Significantly, before an applicant is able to electronically sign a loan agreement, the applicant is required to review and acknowledge several disclosures, including disclosures related to the dispute resolution procedure available should any dispute arise related to the loan.

### LVD's Dispute Resolution Procedures

LVD's consumer dispute resolution procedures are codified in Section 9 of the Regulatory Code,[3] much of which is repeated in Big Picture's loan agreements.  (*See* Compl., ¶ 70, Document 1-1 pp. 4-5).  The dispute resolution procedure mirrors federal and state administrative procedures by empowering an administrative executive body—the TFSRA—to sit in a quasi-judicial capacity and preside over consumer dispute hearings with ultimate oversight through an administrative appeal to a court—the LVD Court.  The LVD law entitles consumers to a three-step process.

The first step allows a dissatisfied consumer to raise their concerns with the lender (or any licensee) to allow the lender an opportunity to resolve the dispute.  (*See* Def.'s Big Picture Loans, LLC and Ascension Technologies, Inc. Br. in Supp. of Mot. to Dismiss, Attach. #4, § 9.2).  Essentially, this requires the parties to attempt to resolve the matter amicably.  It is much simpler than requiring formal arbitration or mediation procedures.

If the consumer is dissatisfied with the lender's attempt to resolve the dispute, the consumer may elevate the matter and rely on the formal dispute resolution procedure—*i.e.*, an administrative procedure—and request that the TFSRA review the complaint and the lender's proposed

---

[3]  http://www.lvdtribal.com/tfsra.html .

resolution. (*Id.*, § 9.3). The TFSRA is comprised of two appointed agents that are LVD tribal members and qualified as required by the Regulatory Code. (*Id., §* 4.8(c)). The TFSRA's responsibilities are detailed thoroughly in the Regulatory Code and primarily focus on licensure, including oversight of licensees, and consumer protection. (*See generally Id.,* § 4).

Significant here are the codified steps the TFSRA follows to resolve consumer disputes. Under the Regulatory Code, the TFSRA is empowered to investigate any consumer complaint and has the authority to compel licensees to produce records and testify, and, if necessary, hold a hearing on the matter. (*Id.*, § 9.3. *See also* §§ 4.13, 4.14).

The Regulatory Code details a very specific "Formal Dispute Procedure" that is available to every consumer to take action against anyone within the TFSRA's jurisdiction. (*Id., §* 9.3). The procedure first requires that an aggrieved consumer demonstrate they have attempted to resolve their dispute directly with their lender and requires the consumer to submit a written request to invoke the Formal Dispute Resolution Procedure that includes the consumer's identify and contact information, a copy of the consumer's loan agreement, information explaining their lender's determination, a summary of the complaint, and whether the consumer is requesting a hearing. (*Id.,* § 9.3(a)).

With a documented complaint, the TFSRA has broad powers to investigate the complaint detailed by the Regulatory Code and is the only regulatory entity that does not face the jurisdictional bar of a licensee's sovereign immunity—licensees accept the TFSRA's jurisdiction by virtue of their license.

At an administrative hearing, any party may be represented by legal counsel and the TFSRA has broad authority to establish pretrial procedures, motion practice, and discovery as appropriate for each particular complaint. (*Id., §* 9.3(d)). As to the hearing itself, the TFSRA is

empowered to preside or designate a presiding officer, and the parties are given the opportunity to make opening and closing statements, present witnesses and evidence, testify and cross-examine testimony. On its own or by request, the parties may be allowed to file post-hearing briefs. Significantly, unlike any other jurisdiction, under the Regulatory Code a lender is required to appear and provide records or the lender will be defaulted. *(Id., §§* 9.3(e)(i)-(ii), 9.3(h)). The TFSRA is empowered to resolve a consumer's complaint without a hearing in situations where the law and appropriate resolution are clear and a hearing would be unnecessary. *(Id., §* 9.3(c)).

To conclude the formal procedure, the TFSRA will issue a written decision and order that is binding on a licensee and includes the TFSRA's factual findings, conclusions of law, its decision on the compliant, and a notice of the right to appeal to the LVD Court. *(Id.*, § 9.3(f)).

To ensure as much protection as possible to consumers, LVD has made any TFSRA decision appealable to the LVD Court *(Id.,* § 9.4). In the dispute resolution process, a consumer is afforded every opportunity to build a record and make legal arguments to support their position. On appeal to the LVD Court, that administrative record and the TFSRA's decision are scrutinized by a sitting judge presiding over LVD's judiciary branch. As described above, the LVD Court is well established and beyond reproach.

The LVD Court must allow oral argument over any appeal, and reviews the administrative record and decision according to the codified standards. In a written decision and order, the LVD Court may affirm, reverse, or remand the TFSRA's decision upon a finding that the TFSRA's decision is arbitrary, capricious, not supported by evidence, or conflicts with the applicable law or the LVD Constitution. *(Id.*, §§ 9.4(b), (f), (g)). Outside the Regulatory Code, the LVD Court is free to manage the appeal according to its rules and as otherwise necessary to ensure a just

JA176

disposition of the matter.  The LVD Court is required to issue an opinion and order as a final

decision in the matter which exhausts a consumer's administrative remedies.  (*Id.*, § 9.4(g)).

**Plaintiffs' choice of law and forum provisions.**

Plaintiffs correctly allege that their loan agreements all contain "virtually identical

governing law and forum selection clauses," which reads as follows:

> GOVERNING LAW AND FORUM SELECTION: This
> Agreement will be governed by the laws of the Lac Vieux Desert
> Band of Lake Superior Chippewa Indians ("Tribal law"), including
> but not limited to the Code *as well as applicable federal law*. All
> disputes shall be solely and exclusively resolved pursuant to the
> Tribal Dispute Resolution Procedure set forth in Section 9 of the
> Code and summarized below for your convenience.
>                          *        *        *
> TRIBAL DISPUTE RESOLUTION PROCEDURE: The Tribe has
> established a Tribal Dispute Resolution Procedure (the "Procedure")
> to review and consider any and all types of complaints made by you
> or on your behalf relating to or arising from this Agreement. . . . The
> Tribe and Enterprise intend and require, to the extent permitted by
> Tribal law, that any complaint lodged, filed, or otherwise submitted
> by you or on your behalf to follow the Procedure.  Under the
> Procedure, a consumer . . .  shall direct his concerns or dispute to
> Enterprise in writing.  . . .  In the event that the consumer is
> dissatisfied with Enterprise's determination, he may initiate Formal
> Dispute Resolution by requesting an administrative review . . . by
> submitting such request in writing to the Tribal Financial Services
> Regulatory Authority ("Authority") . . . .  [See Compl., ¶¶ 70-71;
> emphasis added.]

Plaintiffs do not allege that they have ever attempted to rely on the choice of law and forum

selection provisions in their agreements, nor do they allege that they have exhausted the remedies

available to them under their loan agreements.

Moreover, all solicitations, Big Picture's website, and Plaintiffs' loan agreements clearly

explain that the contract is formed with Big Picture, a duly licensed Financial Services Licensee

by the TFSRA. (Compl., Doc. 1-1, pp 1, 2, 4-5; 1-2; Big Picture Loans, www. bigpictureloans.com

**JA177**

(2017)[4]).  The loan agreement also makes it clear that when the consumer consents to the terms of the agreement electronically it is the same as if the consumer physically signs the document on LVD's Reservation, and that Big Picture is shielded from unconsented suit by tribal sovereign immunity.  (Compl., Doc. 1-1, pp. 1, 2, 4-5).  Finally, the loan agreements contain clear waivers of any right to a jury trial, to arbitration,[5] and to class action litigation related to the loan.  (Compl., Ex. 1, p. 5).

<h1 align="center">ARGUMENT</h1>

**I.     Under the doctrine of tribal exhaustion, the Court should dismiss this case and require Plaintiffs to exhaust tribal remedies.**

**A.     Legal standard for tribal exhaustion.**

Under the doctrine of tribal exhaustion, "[u]ntil petitioners have exhausted the remedies available to them in the Tribal Court system, it would be premature for a federal court to consider any relief."  *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 857 (1985).  This Court in *Hayes v. Delbert Services Corp.*, has acknowledged that, "[t]he tribal exhaustion doctrine requires federal courts to abstain from 'hearing certain claims relating to Indian tribes until the plaintiff has first exhausted those claims in tribal court.'"  *Hayes v. Delbert Services*

---

[4] "If Big Picture Loans approves your loan it will be governed by Tribal law, applicable federal law and your loan agreement. The laws of your resident state may have interest rate limits and other protective laws that are more favorable. If you wish to have your resident state law apply, you should consider taking a loan from a licensed lender in your state. Availability of installment loans are subject to change from time to time as determined by Big Picture Loans."

[5] On July 10, 2017, Part 12 CFR Part 1040 was added to Chapter X in Title 12 of the Code of Federal Regulations regulating Arbitration Agreements.  Significantly, Section 1040.3 (b)(2)(ii) exempts "[a]ny State, Tribe, or other person to the extent such person qualifies as an 'arm' of a State or Tribe under Federal sovereign immunity law and the person's immunities have not been abrogated by Congress."  In addition to the 1040.3 (b)(2)(ii) exemption, the new regulation addresses concerns regarding unintended waivers by adding 1040.4(a)(2)(vi) related to required disclosure/notice provisions and provides language to alleviate any waiver of sovereign immunity questions.

*Corp.*, E.D. Va. No. 3:14-CV-258, 2015 WL 269483, at *2 (E.D. Va. Jan. 21, 2015), *rev'd and remanded on other grounds*, 811 F.3d 666 (4th Cir. 2016) (quoting *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 784 (7th Cir. 2014)).

The application of the tribal exhaustion doctrine requires that before a federal court adjudicate a case, in the first instance a tribal court should conduct "a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes" to determine its jurisdiction over a plaintiff's claims. *Nat'l Farmers Union Ins. Cos.*, 471 U.S. at 855–56. If, after a tribal court determines its jurisdiction, there is a question over whether the tribal court has exceeded its jurisdiction, only then is a motion under 28 U.S.C. § 1331 appropriate to challenge "whether a tribal court has exceeded the lawful limits of its jurisdiction." *Id.* at 857.

### B.    Tribal Exhaustion is a core component of tribal sovereignty.

"Tribal courts play a vital role in tribal self-government . . . and the Federal Government has consistently encouraged their development." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14–15 (1987) (citing *United States v. Wheeler,* 435 U.S. 313, 332 (1978)). "[T]he Seventh Circuit has explained that the exhaustion doctrine is meant to implement Congress's policy of promoting tribal self-government and self-determination." *Buchanan v. Sokaogon Chippewa Tribe*, 40 F. Supp. 2d 1043, 1048 (E.D. Wis. 1999) (citing *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 815 (7th Cir. 1993), *cert. denied*, 510 U.S. 1019 (1993).

Respecting tribal sovereignty, the Supreme Court has long recognized that when there is a "question whether a tribal court has the power to exercise civil subject-matter jurisdiction over non-Indians" that the "examination should be conducted in the first instance in the Tribal Court itself." *Nat'l Farmers Union Ins. Cos.*, 471 U.S. at 855−56. *See also Dollar General Corp. v.*

*Miss. Band of Choctaw Indians,* -- U.S. --, 136 S.Ct. 2159 (2016); *Bowen v. Doyle*, 230 F.3d 525, 529–30 (2d Cir. 2000) ("The tribal exhaustion rule . . . bars federal courts from exercising jurisdiction over matters pending in tribal courts.  Even when the jurisdiction of the tribal court is challenged, 'the Tribal Court itself' must be permitted to determine the issue 'in the first instance.'" (internal citations omitted)).  "This exhaustion requirement, then, serves to ensure that the tribal court may protect its own jurisdiction, thereby promoting the tribe's 'authority over reservation affairs' and preventing infringement upon tribal law-making authority." *Stock W. Corp. v. Taylor*, 942 F.2d 655, 660 (9th Cir. 1991), *on reh'g,* 964 F.2d 912 (9th Cir. 1992) (quoting *Iowa Mut. Ins. Co.,* 480 U.S. at 16).

Courts recognize two instances in which tribal jurisdiction may reach non-members: (1) when non-members enter into consensual commercial dealings such as contracts or leases with the tribe or its members; or (2) when non-member conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana v. United States,* 450 U.S. 544, 566 (1981).  "Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty.  Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." *Iowa Mut. Ins. Co.*, 480 U.S. at 18 (internal citations omitted).

Here, it is clear that Plaintiffs have entered into consensual commercial dealings—*i.e.*, loan agreements—with Big Picture.  It is also clear that Plaintiffs loan agreements contain specific dispute resolution procedures requiring that disputes are to be heard by the TFSRA and if necessary, the LVD Court.  Plaintiffs have not honored the choice of law and forum selection provisions in their loan agreements.  Given the importance of Big Picture's revenues are essential tribal government programs and services, there is no question that Plaintiffs' lawsuit threatens

11

**JA180**

LVD's political integrity, economic security, and welfare by challenging the integrity of LVD's economic arms and instrumentalities and its online consumer lending operations. As both *Montana* situations are present here, this Court should dismiss this lawsuit and require Plaintiffs to exhaust tribal remedies.

## C.    A "colorable" claim of tribal jurisdiction requires dismissal or abeyance.

Recognizing that they have failed to exhaust the dispute resolution procedures required under the loan agreements, Plaintiffs have pled a preemptive attack to the tribal exhaustion doctrine by alleging that the choice of law and forum selection provisions in their loan agreements are a "sham" because the TFSRA and LVD Court lack subject matter jurisdiction. (Compl., ¶ 79). Those claims lack merit.

The doctrine of tribal exhaustion dictates that federal courts "give the tribal court precedence and afford it a full and fair opportunity to determine the extent of its own jurisdiction over a particular claim or set of claims" when a "*colorable claim* of tribal court jurisdiction" can be asserted. *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 31 (1st Cir. 2000) (citing *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 483 (1999) and *Nat'l Farmers,* 471 U.S. at 856–57) (emphasis added)).

Neither the Supreme Court nor the Fourth Circuit have addressed the question of what constitutes a *colorable claim* of jurisdiction for purposes of tribal exhaustion. *Brown v. Western Sky Financial, LLC*, 84 F. Supp. 3d 467, 476 (M.D.N.C. 2015). However, the Fourth Circuit has often relied upon the First Circuit to state that an underlying constitutional or legal question must be colorable, "that is, the argument advanced must, at the very least, have some potential validity." *Medrano v. Lynch*, 673 F. App'x 320, 321 (4th Cir. 2017) *(per curiam)* (citing *Jian Pan v. Gonzales*, 489 F.3d 80, 84 (1st Cir. 2007)). *See also, Egboh v. United States*, 672 F. App'x 284,

12

284 (4th Cir. 2017) (per curiam) (citing *Lumataw v. Holder*, 582 F.3d 78, 84 (1st Cir. 2009)).  In another context, the Fourth Circuit has held that a putative constitutional claim should be dismissed if it "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial or frivolous."  *Holloway v. Schweiker*, 724 F.2d 1102, 1105 (4th Cir. 1984), *cert. denied,* 467 U.S. 1217 (1984) (quoting *Bell v. Hood,* 327 U.S. 678, 682–83 (1946) (internal quotation marks omitted)).

Black's Law defines a colorable claim as "[a] claim that is legitimate and that may reasonably be asserted, given the facts presented and the current law (or a reasonable and logical extension or modification of the current law)."  Black's Law Dictionary (10th ed. 2014).  The Eight Circuit has held that a colorable claim is one that is "not without some merit" and that has some possible validity.  *Jensen v. Schweiker*, 709 F.2d 1227, 1230 n. 2 (8th Cir. 1983).

Consistent with this authority, the Court should consider whether it is plausible that the tribal court *could* have jurisdiction over the matter, not *whether* the tribal court actually has jurisdiction.  *See Madewell v. Harrah's Cherokee Smokey Mountains Casino*, 730 F.Supp.2d 485, 488–89 (W.D.N.C. 2010).  The question is not whether the underlying allegations have merit.  *See Nat'l Farmers Union Ins. Cos.*, 471 U.S. at 856 ("Moreover the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.").  If the tribal court *could* have jurisdiction, exhaustion is appropriate.  That is plainly true here.

### D.  Big Picture has made a colorable claim that the TFSRA and the LVD Court have jurisdiction over Plaintiffs' claims.

Big Picture has made a colorable claim for tribal jurisdiction over Plaintiffs' claims.  Plaintiffs' allegations all arose from their consensual contractual relationship with Big Picture and Plaintiffs' on-reservation conduct.  Whether or not Plaintiffs' claims have merit is irrelevant

to the analysis.  As courts have consistently held, tribal jurisdiction is present here on two independent grounds because Plaintiffs entered into a contractual relationship with a tribal business and because the contract was consummated on tribal lands.

### 1. Plaintiffs have entered into a consensual contractual relationship.

When a nonmember enters into a commercial transaction with a tribal member or reservation-based tribal business, receives a benefit coming from the reservation as a result, and consents in a written contract to tribal jurisdiction, that nonmember has engaged in the sort of "consensual relationship[] with the tribe or its members, through commercial dealing" that subjects the nonmember to tribal jurisdiction.  *Montana,* 450 U.S. at 565. *See also Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 337 (2008); *Iowa Mut. Ins. Co.,* 480 U.S. at 18 ("Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty."); *Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians*, 746 F.3d 167 (5th Cir 2014), *aff'd, Dollar General Corp.*, 136 S.Ct. 2159 (upholding tribal jurisdiction over non-Indian company lessee that employed unpaid Indian interns, which constituted a relationship of a commercial nature under *Montana*).

The existence of a consensual relationship and a contract here requires very little analysis. Plaintiffs have pled the relationship and contracts exist.  Thus, the analysis could end here.

### 2. The contract occurred on Indian lands.

In addition to the tribal nature of the transaction, under the laws applicable in the loan agreement, and even under Virginia law, it is clear that the activity here occurred on the Reservation.  Under the Regulatory Code and as explained in the Plaintiffs' loan agreements, the contract is formed on the Reservation, which is where the application is either approved or denied.

Regulatory Code § 2.4 defines consumer financial services as conduct that occurs on the Reservation or within LVD's jurisdiction.

The requirements in the Regulatory Code are in accord with Virginia law, which recognizes that "[t]he place where the last act necessary to give validity to the contract occurs is the place where the contract was made." *Pro Football Inc. v. Paul*, 39 Va. App. 1, 9 (2002) (quoting *United States Steel Corp., Gary Works v. Indus. Com. of Illinois*, 161 Ill. App. 3d 437, 455 (1987)) (internal quotation marks omitted). Additionally, other federal courts recognize the last act rule as well. In fact, at least one federal court has already determined that a borrower's contract with a tribal online lending company is formed on the tribe's reservation:

> But, in cases involving a contract formed on the reservation in which the parties agree to tribal jurisdiction, treating the nonmember's physical presence as determinative ignores the realities of our modern world that a defendant, through the internet or phone, can conduct business on the reservation and can affect the Tribe and tribal members without physically entering the reservation. [*FTC v. Payday Fin.,* 935 F. Supp. 2d 926, 939 (D.S.D. 2013).]

The *FTC v. Payday Fin.* court concluded that "the contract between the Borrowers and Lending Companies appears to be formed on the Reservation in South Dakota." *FTC v. Payday Fin.,* 935 F. Supp. 2d at 938; *see also Rahmani v. Resorts Int'l Hotel, Inc.*, 20 F. Supp. 2d 932, 934 (E.D. Va. 1998), *aff'd,* 182 F.3d 909 (4th Cir. 1999) ("Under the traditional First Restatement rule, the place of contracting is determined by the location of the last act necessary to complete the contract."); *Essex Ins. Co. v. Y&J Constr., Inc.*, E.D. Va. No. 1:15-CV-1597, 2016 WL 8254921, at *6 (E.D. Va. Dec. 30, 2016) ("In this respect, '[u]nder Virginia law, a contract is made when the last act to complete it is performed . . . .'").

Also applying the last-act rule to online contracting, a South Dakota District Court stated: "The borrower certainly does not enter onto a reservation, but in today's modern world of business

transactions through internet or telephone, requiring physical entry on the reservation particularly in a case of a business transaction with a consent to jurisdiction clause, seems to be requiring too much." *Heldt v. Payday Financial, LLC*, 12 F. Supp. 3d 1170, 1186 (D.S.D. 2014). The Middle District of North Carolina followed the *Heldt* reasoning and also applied the doctrine of tribal exhaustion to online contracts. *Brown v. W. Sky Fin., LLC*, 84 F. Supp. 3d 467, 479 (M.D.N.C. 2015). Thus, the location of the borrower is irrelevant to the analysis and application of the tribal exhaustion doctrine. *See FTC v. Payday Fin., LLC*, 935 F. Supp. 2d 926 at 940 (D.S.D. 2013) ("Reducing the *Montana* jurisdictional analysis from a thorough investigation of the nonmember's course of conduct and contact with the reservation, to a mere determination of the nonmember's physical location is improper and would render *Montana's* jurisdictional inquiry inapplicable to many modern-day contracts involving a reservation-based business.");

As described above, Plaintiffs' loan agreements bearing their electronic signature were submitted via Big Picture's website for final review, verification, and approval or denial. The loan agreements themselves say this much: "There will be no binding contract formed between You and Us until this Agreement is electronically signed by You and then is received and verified by Us on the Lac Vieux Desert Reservation." (Complaint Exhibit 1-1 p. 2).

The Big Picture employees that review, verify, and make the final act to approve each tendered loan agreements are located on the Reservation. No contract is formed unless and until a Big Picture employee, located on the Reservation, verifies and approves the loan agreements after the loan agreements are executed by the customer.

Because the final act necessary to consummate each of Plaintiffs' Agreements occurred on the Reservation, the Reservation is the place of contracting. Therefore, the commercial conduct underlying Plaintiffs' claims all occurred on the Reservation.

For these reasons, it is clear that there is a colorable claim here requiring dismissal based on the doctrine of tribal exhaustion. Plaintiffs' on-Reservation consensual contractual relationship with Big Picture undoubtedly creates *at minimum* a colorable claim that the LVD Court's has jurisdiction, if not removing any doubt that the matter, in the first instance is properly heard by the TFSRA and, if appealed— the LVD Court.

## II.   The Court should dismiss Plaintiffs' claims under the doctrine of *forum non conveniens* because Plaintiffs are bound by their contracts.

Courts presume parties' forum selection provisions should be honored. As the Supreme Court has held, "a forum clause should control absent a strong showing that it should be set aside." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).

The Court's review of Plaintiffs' forum selection provisions is a two-step process: first, the Court should find that the forum-selection provisions are reasonable; second, that dismissal is appropriate under the doctrine of *forum non conveniens*.

### A.   Legal Standard for *forum non conveniens.*

The appropriate way to enforce a forum-selection clause requiring adjudication in a state or foreign forum is through the doctrine of *forum non conveniens,* which requires dismissal. *Atl. Marine Const. Co., Inc.*, 134 S. Ct. at 580; *Meridian Imaging Sols., Inc. v. OMNI Bus. Sols. LLC*, E.D. Va. No. 1:17-CV-186, 2017 WL 1491134, at *1 (E.D. Va. Apr. 25, 2017); *Intranexus, Inc. v. Siemens Med. Solutions Health Servs. Corp.*, 227 F. Supp. 2d 581, 583 (E.D. Va. 2002). When a valid forum-selection clause applies, "the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Atl. Marine Const. Co., Inc.*, 134 S. Ct. at 581. The Supreme Court has held that a forum selection clause should control "absent a strong showing [by a plaintiff] that it should be set aside. The correct approach would have been to enforce the forum clause specifically unless [plaintiff] could clearly show that enforcement

would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 649–50 (4th Cir. 2010) (quoting *M/S Bremen*, 407 U.S. at 15).

### B.   Here, the forum selection clause is valid.

A forum selection clause is presumptively valid and enforceable unless the party wishing to avoid such clause can "clearly show that enforcement would be unreasonable" under the circumstances.  *M/S Bremen*, 407 U.S. at 15 (1972).  *See also Albemarle Corp*, 628 F.3d at 650 ("Even though *The Bremen* was an admiralty case, its rationale is applicable to forum selection clauses generally.").  A forum selection clause is unreasonable if (1) it was "induced by fraud or overreaching;" (2) the party wishing to avoid the clause will be "deprived of his day in court because of the grave inconvenience or unfairness of the selected forum;" (3) "the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy;" or (4) enforcement of the clause "would contravene a strong public policy of the forum state."  *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996).

### 1.   Plaintiffs do not allege fraud.

First, Plaintiffs did not allege fraud in their Complaint and there is no basis to support any such allegation.[6]  Plaintiffs sought out Big Picture's website and applied for a loan without inducement by Big Picture.  As described above, every critical aspect of Big Picture and its lending is disclosed to any interested consumer before, during, and after the loan application process.

---

[6] Although the Complaint alleges that the governing law clause in Plaintiffs' loan agreements "was procured by fraud and misrepresentations," none of Plaintiffs counts mention fraud. (Compl. ¶¶ 73-74).  Furthermore, no allegations meet the heightened pleading standards that require fraud to be pled with specificity.  *See* Fed. R. Civ. P. 9(b).

Big Picture's website clearly explains that Big Picture is an arm of LVD and operates from the Reservation.  Plaintiffs' were forced to review disclosures explaining that when Plaintiffs' executed the agreements, the parties agreed that "all disputes [would] be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the [Regulatory] Code . . . ."  (Compl., Ex. 1, p. 9).  Plaintiffs cannot claim that they were deceived about Big Picture's status as an arm of LVD.

### 2.    The forum selection clause guarantees Plaintiffs a "day in court."

"[I]t should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court.  Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain."  *M/S Bremen*, 407 U.S. at 18. Plaintiffs are wrong to rely on *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016), to argue that the forum selection clause will deprive them of their day in court.  (*See* Compl., ¶¶ 76, 82).  The case has no application to the facts here.

*Hayes* considered the validity of an online lender's arbitration provision.  The online lender operated from an Indian reservation but was not a tribally-owned business.  Plaintiff sued a non-tribal servicer who attempted to have the case dismissed and sent to arbitration.

*Hayes* held that the arbitration provision in the plaintiff's loan agreement was not enforceable by the non-tribal defendant-servicer.  *Hayes*, 811 F.3d at 675.  *Hayes* also held that choice of law and forum selection provisions that explicitly disclaimed all applicable law were impermissible.  *Id.* at 669, 673, 676.  Plaintiffs' reliance on *Hayes* in their Complaint is a straw man.

19

JA188

Here, the forum selection clause in Plaintiffs' loan agreements are with Big Picture, an economic arm and instrumentality of LVD—a significantly different type of entity than the online lender and the non-tribal servicer defendant in *Hayes*. Next, as described above, LVD has established a clear and consumer-friendly dispute resolution process that begins with an amicable approach between a borrower and a lender, then allows a full administrative review and hearing before the TFSRA, meticulously controlled by the Regulatory Code, but significantly, the process is ultimately accountable to the LVD Court, an independent constitutionally established judiciary with clear authority to ensure any consumer dispute is resolved according to the applicable law. This is not an arbitration provision designed "to avoid state and federal law and to game the entire system" like examined in *Hayes. Id.* at 676. In fact, this is the type of forum selection agreement that is on "the up-and-up and avoid[s] the kind of mess that Delbert" faced in *Hayes. Id.* To compare the LVD Court to the faux procedure in *Hayes* insults the integrity of all tribal courts.

Finally, both LVD's laws and the loan agreement specifically require that any dispute is governed by LVD law and "applicable federal law," which is nothing like the arbitration agreement in *Hayes*, which specifically excluded federal law, and which was *the factor* that served as the basis for the Court's decision. (*Cf.* Compl., ¶ 70) ("This Agreement will be governed by the laws of [LVD] . . . including but not limited to the Code as well as applicable federal law."); *Hayes*, 811 F. 3d at 673 ("This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims.") As such, Plaintiffs have not clearly shown that the forum selection clause contained in their loan agreements deprives them of their day in court. Plaintiffs' Complaint proves otherwise.

**3.      Plaintiffs' forum selection clause allows for remedies if Plaintiffs' disputes have merit.**

Plaintiffs also have not supplied facts to show that the tribal dispute resolution process deprives them of a remedy.  As stated above, Plaintiffs' loan agreements provide that tribal and applicable federal law shall govern, thus allowing Plaintiffs to seek appropriate redress under both bodies of law.  To be direct, Plaintiffs are simply wrong to allege that the TFSRA "does not have subject matter jurisdiction to consider: (1) any claims brought under state or federal law or (2) claims regarding the legality of debt."  (Complaint ¶ 79.)  As noted above, when Congress enacted the CFPA, it empowered tribal regulators with the exact same authority as their state counterparts—*i.e.*, the TFSRA has the exact same jurisdiction to enforce federal consumer protection laws as, *e.g.*, the Virginia Attorney General or the Virginia State Corporations Commission.  *See* 12 U.S.C. §§ 5481(12), (27); 5495; 5551–52.

Moreover, the TFSRA is empowered under the Regulatory Code to assess the legality of the Plaintiffs' debts and whether the debts violate the law.  (See, e.g., Regulatory Code §§ 1.2(e)-(f); 4.1; 4.13(c), (i); 6.2; see also 12 USC § 5481(12); 12 USC § 5481(27); 12 USC § 5495; 12 USC §§ 5551-52.)  Additionally, Big Picture, as a licensee, has submitted solely to the jurisdiction of the TFSRA and the LVD Court and no other jurisdiction.  Big Picture is therefore susceptible to an order from the TFSRA or the LVD Court granting Plaintiffs' relief through the process outlined in Section 9 of the Regulatory Code.

**4.      Plaintiffs' forum selection clauses is consistent with Virginia's public policy.**

The Supreme Court of Virginia has also recognized the state's strong public policy favoring valid forum selection and choice of law provisions, mutually agreed to by the parties, even when

the enforcement of the provisions may be incompatible with Virginia public policy against usury. *Supra*.

The Virginia Supreme Court has ruled that Virginia's usury policy can be set aside by contracting parties that agree to the application of other substantive law—even laws wholly inapposite to Virginia's usury policy. *Settlement Funding, LLC v. Von Neumann-Lillie*, 274 Va. 76 (2007). In *Settlement Funding*, on remand, the circuit court adhered to the Virginia Supreme Court's decision and held that the plaintiff's "usury defense must be determined under Utah state law [and] Utah does not have an affirmative claim for usury" so the "[l]oan [a]greement is not usurious and Settlement Funding may collect both the principal sum of [plaintiff's] loan and all interest owed thereon." *Com., State Lottery Dep't v. Settlement Funding, LLC,* 75 Va. Cir. 248, 2008 WL 6759945, at *2 (2008).

Just like the parties in *Settlement Funding*, Big Picture and Plaintiffs agreed to a substantive law of another jurisdiction that authorizes interest rates in excess of Virginia's usury laws as well as the selection of the dispute resolution process contained in the Regulatory Code for all disputes arising between them. As such, enforcement of the forum selection clause in the instant case is fully compatible with recent Virginia Supreme Court's holding that the state's usury laws do not overcome mutually agreed upon provisions regarding what law and where a dispute must be brought. So, regardless of Plaintiffs' assertion that "Virginia's usury laws 'are founded upon considerations of public policy,'" the Virginia Supreme Court respects valid choice of law provisions despite that policy.

Because Plaintiffs have not pled nor can they argue that the forum-selection clause within their loan agreements is unreasonable, the provisions are valid and enforceable.

C.      **The Court should enforce the forum selection clause and dismiss the case.**

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*," and not under Section 1404(a). *Atl. Marine Const. Co., Inc.*, 134 S. Ct. at 580 ("Section 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer.").

Typically, just as with a motion to dismiss under § 1404(a), a district court considering a *forum non conveniens* motion to dismiss must evaluate both the convenience of the parties and various public-interest considerations:

> *Factors relating to the parties' private interests* include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Public-interest factors* may include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *The Court must also give some weight to the plaintiffs' choice of forum.* [*Id.* at 581 n. 6 (internal citations omitted; emphasis added).]

The court balances these relevant factors, and decides if a transfer would serve the convenience of the parties and witnesses and otherwise promote the "the interest of justice." *Id.* at 581.

However, unlike a typical motion under § 1404(a), with a valid forum selection clause, "the calculus [under a *forum non conveniens* analysis] changes" in that:

- First, "the plaintiff's choice of forum merits no weight," and instead, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted. *Id.* at

23

**JA192**

574.  *See also Kettler Int'l, Inc. v. Starbucks Corp.*, 55 F. Supp. 3d 839, 845 (E.D. Va. 2014)

- Second, the Court is not to "consider arguments about the parties' private interests;" because when parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation. *Atl. Marine Const. Co., Inc.*, 134 S. Ct. at 582.  *See also Kettler Int'l, Inc.*, 55 F. Supp. 3d at 845; and

- Third, the district court's review is limited to only the public-interest factors and "transfer of venue will not carry with it the original venue's choice-of-law rules" to prevent the parties from invoking the laws of another jurisdiction. *Atl. Marine Const. Co., Inc.*, 134 S. Ct. at 582.  *See also Kettler Int'l, Inc.*, 55 F. Supp. 3d at 845.

Here, weighing only the public interest factors, it is clear this Complaint should be dismissed.

### 1.    The Plaintiffs' choice of forum here merits no weight as the forum selection clause in Plaintiffs' loan agreements are valid.

A forum-selection clause "represents the parties' agreement as to the most proper forum." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988).  The "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system."  *Id.* at 33 (Kennedy, J., concurring).  As such "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases."  *Id.* at 33.

Here, as the Supreme Court has explained, Plaintiffs' choice of this forum in this district is given no weight.  The "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." *Atl. Marine Const. Co., Inc.*, 134 S. Ct. at 581 (internal quotations omitted) (quoting *Stewart Org.*, 487 U.S. at

33 (Kennedy, J., concurring)).  Without considering the Plaintiffs' choice, the interests of justice here are best served honoring the parties' agreements, which requires dismissal.

> ### 2.    The Plaintiffs and Big Picture's private interest should not be considered.

Next, Plaintiffs have "waive[d] the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation," which requires the court to "deem the private-interest factors to weigh entirely in favor of the preselected forum." *Atl. Marine Const. Co., Inc.*, 134 S. Ct. at 582.  Moreover, the Plaintiffs' have not identified any private interests to challenge the forum-selection clause other than that it is invalid, which, as described above, is unsupported and incorrect.  Collectively, the parties' interests are memorialized in their agreements.

> ### 3.    The case should be heard according to the loan agreements' choice of law provisions.

Finally, just as Plaintiffs are bound to bring their action in the forum they agreed to, they are similarly bound to the choice of law in their agreement: "If a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied." *Settlement Funding, LLC*, 274 Va. at 80.

Under Plaintiffs' loan agreements, the matter will be decided by LVD's laws and all applicable federal laws.  To allow Plaintiff to avoid the choice of law provision "[n]ot only would it be inequitable to allow the plaintiff to fasten its choice of substantive law to the venue transfer, but it would also encourage gamesmanship." *Atl. Marine Const. Co., Inc.*, 134 S. Ct. at 583 (quoting *Ferens v. John Deere Co.,* 494 U.S. 516, 523 (1990)).  Simply put, venue transfer and *forum non conveniens* "should not create or multiply opportunities for forum shopping," *See id.*

Even if, *arguendo*, this Court declined to follow the doctrine of tribal exhaustion and the doctrine of *forum non conveniens,* under *Settlement Funding*, the Court must still follow the loan agreements' choice of law provision.

### 4. As the parties' chosen forum is a tribal forum, public policy favors dismissal.

Finally, the public interests favoring dismissal here are best identified by the federal government's policy on encouraging tribal self-sufficiency. "We have repeatedly recognized the Federal Government's longstanding policy of encouraging tribal self-government." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14, 107 S. Ct. 971, 975, 94 L. Ed. 2d 10 (1987); *see also, e.g., Three Affiliated Tribes v. Wold Engineering*, 476 U.S. 877, 890, 106 S.Ct. 2305 (1986); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 138, n. 5, 102 S.Ct. 894 (1982); *Williams v. Lee*, 358 U.S. 217, 220–221, 79 S.Ct. 269 (1959). The Supreme Court has "stressed that Congress' objective of furthering tribal self-government encompasses far more than encouraging tribal management of disputes between members, but includes Congress' overriding goal of encouraging 'tribal self-sufficiency and economic development.'" *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335, 103 S. Ct. 2378 (1983).

The public interests are best served by adhering to federal Indian policy and recognizing that respecting tribal governance includes respecting tribal courts and tribal law. Federal Indian policy coupled with the federal and Virginia interests of enforcing valid choice of law and forum selection provisions outweigh Plaintiff's interests in Virginia's usury laws. And, as the selected forum here is a tribal forum, transfer is unavailable and dismissal is the only viable option for the Court.

Plaintiffs' choice of law and forum selection provisions are not invalid simply because the arbitration provision in *Hayes* was invalid. Plaintiffs have not made sufficient allegations to justify

breaching their loan agreements and continuing this matter in this district. Plaintiffs' loan agreements are valid and enforceable and therefore, because the forum selection clauses rely on another jurisdiction, the Complaint must be dismissed under the doctrine of *forum non conveniens.*

## CONCLUSION

For the reasons above, there is a colorable claim that the LVD Court has jurisdiction over Plaintiffs' claims and under the doctrine of tribal exhaustion, the Court must dismiss this Complaint until the LVD Court makes a determination over its jurisdiction.

Additionally, Plaintiffs' Complaint must be dismissed under the doctrine of *forum non conveniens* because there are valid and enforceable forum-selection provisions in Plaintiffs' loan agreements.

**BIG PICTURE LOANS, LLC**

By:/s/David N. Anthony
David N. Anthony
Virginia State Bar No. 31696
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutmansanders.com

Karrie Sue Wichtman (admitted *pro hac vice*)
Justin A. Gray (admitted *pro hac vice*)
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: (269) 283-5005
Facsimile: (517) 913-6443
Email: kwichtman@rosettelaw.com
Email: jgray@rosettelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Kristi C. Kelly
Andrew J. Guzzo
Casey S. Nash
KELLY & CRANDALL PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: 703-424-7570
Facsimile: 703-591-0167
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com
*Counsel for Plaintiffs*

James W. Speer
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA 23219
Telephone: 804-782-9430
Facsimile: 804-649-0974
Email: jay@vplc.orga
*Counsel for Plaintiffs*

David F. Herman
Jonathan P. Boughrum
Richard L. Scheff
MONTGOMERY MCCRACKEN WALKER
& RHOADS LLP
123 S Broad Street
Philadelphia, PA 19109
Telephone: 215-772-1500
Facsimile: 215-772-7620
Email: dherman@mmwr.com
Email: jboughrum@mmwr.com
Email: rscheff@mmwr.com
*Counsel for Defendant Matt Martorello*

/s/ David N. Anthony
David N. Anthony
Virginia State Bar No. 31696
*Counsel for Defendants*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutmansanders.com

JA197

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LULA WILLIAMS, GLORIA TURNAGE,
GEORGE HENGLE, DOWIN COFFY, and
FELIX GILLISON, JR., *on behalf of themselves
and all individuals similarly situated*,

                    Plaintiffs,

v.

BIG PICTURE LOANS, LLC, *et al.*,

                    Defendants.

Civil Case No. 3:17-cv-00461-REP

## DEFENDANTS BIG PICTURE LOANS, LLC, ASCENSION TECHNOLOGIES, LLC, JAMES WILLIAMS, JR., GERTRUDE MCGESHICK, SUSAN MCGESHICK, AND GIIWEGIIZHIGOOKWAY MARTIN'S
### REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Specially-Appearing Defendants Big Picture Loans, LLC, Ascension Technologies, LLC,

James Williams, Jr., Gertrude McGeshick, Susan McGeshick, and Giiwegiizhigookway Martin,

(the "Tribal Defendants"), by counsel, submit this reply in support of their Motion to Dismiss

under Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

This lawsuit is from a playbook of sensational arguments that have been recycled against

several defendants in other cases.[1]  However, the claims against Defendants here are unique and

cannot be shoehorned to fit into their preexisting arguments.  By failing to recognize the unique

circumstances presented by Indian tribes and their economic arms and instrumentalities, Plaintiffs

reliance on preformed legal positions and unsupported accusations is insufficient.

---

[1] *See, e.g.*, *Gibbs v. Rees*, No. 3:17-cv-386, ECF No. 1 (E.D. Va. May 19, 2017); *Inscho v. Johnson*, No. 1:17-cv-674, ECF No. 1 (E.D. Va. June 15, 2017); *Wiley v. Jardine*, No. 3:17-cv-11, ECF No. 1 at ¶ 2 (Jan. 5, 2017); *Hunter v. NHCash.com, LLC*, No. 3:17-cv-348, ECF No. 1 at ¶ 2 (E.D. Va. May 8, 2017).

To date, this litigation has focused on whether or not the Court has jurisdiction over this matter and the moving Tribal Defendants. As a result, this Motion to Dismiss ("Motion") is limited to the single argument that the tribal choice of law and forum selection provision is an agreement by Plaintiffs that "all disputes" will be governed by LVD law and applicable federal laws, and requires Plaintiffs to use the tribal dispute resolution procedures. (Dkt. 1-1, p. 4 (quoted in full *infra* § I.B)). As presently limited by the Court, the Tribal Defendants reserve the right to raise additional bases for dismissal should, *arguendo*, there be a final determination that the Tribal Defendants are not immune from suit. *See generally* FED. R. CIV. P. 12.

Plaintiffs are flatly wrong to claim that "the provision's choice-of-law clause prospectively waives all of a consumer's federal statutory rights and remedies, while the chosen law mandates a sham dispute resolution procedure that ensures a consumer will never be able to make it into any court to raise any claims against Big Picture, Martorello, and others associated with the enterprise." (Opp. p. 2). Federal law is expressly adopted in the loan agreements. Moreover, Plaintiffs provide no facts to show the parties, facts, and law here are analogous in any way to the parties, facts, and law in *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 335 (4th Cir. 2017). Quite the contrary, as detailed below, Plaintiffs' loan agreements' Governing Law and Forum Selection provision is explicitly different than that in *Dillion* as it expressly incorporates applicable federal law both directly in the loan agreement and indirectly through operation of LVD law.

The clear language of Plaintiffs' Governing Law and Forum Selection provision makes it apparent that there is no prospective waiver of any federal law, provides that Plaintiffs have a fair forum to ensure their "day in court," and ensures that remedies are available in the event of wrongdoing. Plaintiffs cannot support their allegations that the loan agreements, or, more precisely here, the Governing Law and Forum Selection provision within the loan agreements, was

procured with fraud.  Finally, Virginia public policy does nothing to support Plaintiffs claims that the choice-of-law provision in the loan agreements that they voluntarily entered into are invalid. Thus, they must be enforced and this case dismissed.

## ARGUMENT

"While legal conclusions can provide the framework for a complaint, all claims must be supported by factual allegations."  *Zaklit v. Glob. Linguist Sols.*, *LLC*, No. 1:14CV314 JCC/JFA, 2014 WL 3109804, at *4 (E.D. Va. July 8, 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  Plaintiffs cannot meet that basic requirement.

### I.     The Governing Law and Forum Selection provision is valid and enforceable.

"Since its seminal decision in *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1 (1972), the Supreme Court has consistently accorded choice of forum and choice of law provisions presumptive validity, rejecting the 'parochial concept' that 'notwithstanding solemn contracts . . . all disputes must be resolved under our laws and in our courts.'" *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (parallel citations omitted); *see also Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 538-39 (1995); *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595 (1991); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 631 (1985); *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519 (1974).  Valid forum selection or choice of law provisions should be "given controlling weight in all but the most exceptional cases." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring).

Virginia law also provides that where "a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied."  *Olawole v. ActioNet, Inc.*, 258 F. Supp. 3d 694, 705 (E.D. Va. 2017) (quoting *Settlement Funding, LLC v. Von Neumann–Lillie*, 274 Va. 76, 81 (2007)); *see also Hitachi Credit*

*Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) ("Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances."). The rationale most often used to support application of this rule is that it comports with traditional concepts of freedom of contract and recognizes the present nationwide and worldwide scope of business relations which generate potential multi-jurisdictional litigation. *The Bremen,* 407 U.S. at 11. Plaintiffs' attempt to invalidate the choice-of-law provision on the basis that it violates federal rights and because it is unreasonable and unfair. But these claims are without merit.

Any refusal to enforce forum selection clauses must "be overcome by a clear showing that they are 'unreasonable' under the circumstances." *Allen*, 94 F.3d at 928 (quoting *The Bremen,* 407 U.S. at 10). "Choice of forum and law provisions may be found unreasonable if (1) the complaining party 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (2) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; (3) their formation was induced by fraud or overreaching; or (4) their enforcement would contravene a strong public policy of the forum state." *Id.* (citing *Carnival Cruise Lines,* 499 U.S. at 595). Under the criteria in *Allen*, the Plaintiffs' Governing Law and Forum Selection provision is reasonable and therefore enforceable.

### A.   The Governing Law and Forum Selection provision ensures due process and fairness.

The administrative process identified in Plaintiffs' loan agreements and codified in Section 9 of the Tribal Consumer Financial Services Regulatory Code ("Code")[2] guarantees Plaintiffs the same process and remedies found in virtually every state and federal administrative procedure. With the administrative process being parented by the LVD Tribal Court ("Tribal Court"), all consumers are guaranteed due process.

---

[2] Dkt. 23, Attach. #4.

**JA201**

The administrative process begins with an informal alternative dispute resolution procedure.  LVD recognized that formal adjudication can at times get expensive and stressful for consumers, so in the first instance, the process requires that consumers bring their complaints to their lender to afford the parties an opportunity to resolve the matter without extensive adjudication.  (*Compare, e.g.,* Code § 9.2 *with* Local Civil Rule 83.6(A) (encouraging parties to "achieve settlement") *and* Va. Code § 8.01-576.5 (allowing a court to refer a matter to an orientation session to "encourage the early resolution of disputes.")).

The next step – the formal dispute resolution procedure – closely mirrors most state and federal administrative processes.  *See, e.g.*, Administrative Procedures Act, 5 USC § 554; Virginia Administrative Procedures Act, 40 VCA § 2.2-4000 *et seq*.; Michigan Administrative Procedures Act, MCL 24.271 *et seq*.  Just as any sovereign exercising its police powers through regulation and regulatory agencies, LVD has done the same with its Code and its Tribal Financial Services Regulatory Authority ("TFSRA").  The TFSRA is empowered to resolve consumer disputes including, when necessary, conducting administrative hearings.  (Code at §§ 9.3(b) and (c)).

Finally, in the same manner that judicial review is afforded for all state and federal administrative decisions before original court actions may proceed, consumers may appeal any TFSRA decision to the Tribal Court.  The Tribal Court's review in an administrative appeal is limited in the same manner as most federal and state courts presiding over an administrative appeal.  *See, e.g.,* FED. R. APP. P. 10(a); Va. Code § 2.2-4027; Mich Comp. Law 24.306.  Section 9.4(g) of the Code ensures that any party understands that a Tribal Court decision exhausts tribal and administrative remedies to allow opportunity for an original action in a court of competent jurisdiction.

Plaintiffs attack the Governing Law and Forum Selection provision by arguing that the Tribal Court lacks jurisdiction. The argument has no merit. Plaintiffs cite the LVD Constitution, which bestows the Tribal Court with jurisdiction over any matter or controversy arising under Tribal law. The Code was enacted by LVD under its constitutional authority to enact laws that control activity within LVD's jurisdiction. (*See* LVD Constitution Art I § 2). The Code explains that any consumer financial service offered by any tribally owned licensee is within the jurisdiction of LVD. (*See* Code, §§ 1.1(c), (e), (g); 2.4; 5.1(c); 7.2(a), (g); 8.1). Plaintiffs' loans were issued under the Code by a licensee that is a wholly-owned arm of LVD, and so this matter clearly arises under LVD law. In fact, nothing anywhere supports Plaintiffs' contention that LVD, through the TFSRA and Tribal Court, does not have jurisdiction.

Plaintiffs also argue that the Governing Law and Forum Selection provision is unfair and will deprive them of their day in court because, *arguendo*, the TFSRA "[w]ill not grant the consumer an opportunity to be heard if the only allegation contained in the consumer complaint is an allegation that the consumer finance service provider is illegal in a jurisdiction outside the jurisdiction of the Tribe." (Opp. p. 20 (quoting TFSRA Regulation 1.1(B)(4)(c)).

Plaintiffs overstate the import of TFSRA Regulation 1.1(B)(4)(c) and its role in the dispute resolution process. First, TFSRA Regulation 1.1(B)(4)(c) specifically states that "[t]he [TFSRA] will adhere to the dispute resolution procedures set out under section 9.3 of the Code," which allows any relief appropriate. Next, Plaintiff fail to recognize that TFSRA Regulation 1.1(B)(4(c) has been superseded by subsequent amendments to the Code. TFSRA Regulation 1.1 was adopted in 2013, while the Code and the dispute resolution process was last amended in 2015. When two laws conflict, the more recently enacted law controls. *W.S. Forbes & Co. v. Southern Cotton Oil Co.*, 130 Va. 245, 108 S.E. 15, 25 (1921) (citing *Gaines' Adm'r v. Marye*, 94 Va. 225, 227 (Va.

6

1897)).  *See also Inter-Cont. Promotions, Inc. v. MacDonald*, 367 F.2d 293, 301 (5th Cir. 1966)

("[T]he conflicting provision which is last in time or last in order of arrangement prevails.").  Thus,

TFSRA Regulation 1.1 does not deprive consumers of their day in court.

> **B.     The Governing Law and Forum Selection provision incorporates applicable federal law to ensure fairness and that consumers have adequate available remedies.**

*Plaintiffs are protected by applicable federal law*.     The Governing Law and Forum

Selection provision makes absolutely clear that the loan agreements are governed by "applicable

federal law."  (Compl. ¶ 70; Dkt. 1-1 p 4).  But in their Opposition, Plaintiffs argue that the

inclusion of this language in the Governing Law and Forum Selection provision is negated by other

language in the loan agreements.  (Opp. pp. 6–7).  In particular, the loan agreement includes certain

acknowledgements:

> You acknowledge and agree that this Agreement is subject solely and exclusively to the Tribal law and jurisdiction of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.
>
> You acknowledge and agree that the Tribal Dispute Resolution Procedure is the sole and exclusive forum for resolving disputes and/or claims arising from or relating to this Agreement.

Dkt. 1-1 p. 6.

Plaintiffs assert the above provisions result in an "unambiguous" exclusion of federal law,

despite the clear reference to "applicable federal law" within the Governing Law and Forum

Selection Provision., which controls over any other general provision cited by Plaintiffs.  *See, e.g.,*

*Girgis v. Salient Solutions, Inc.*, 2012 U.S. Dist. LEXIS 94764, at *1 (E.D. Va. Jul. 9, 2012);

*Macke Laundry Serv. Ltd. P'ship v. Alleco Inc.*, 743 F.Supp. 382, 386 (D. Md. 1989) (noting the

"settled rule of contract construction that a specific provision will control over a general provision

where such provisions are arguably in conflict").

Furthermore, the provisions of the agreement must be read together and do not require extensive interpretation. The "important acknowledgements" section that references Tribal law refers to the Code, which ***does include*** applicable federal law. In the Code, federal consumer protection laws are incorporated in §§ 1.1(f), 6.1, and 6.2. Of these sections, Code § 6.2 requires that a licensee "shall conduct business in a manner consistent with principles of federal consumer protection law," and lists several federal laws. For a tribal licensee, this section requires compliance with federal consumer protection laws.

Plaintiffs misconstrue Code § 6.2 in an attempt to show that compliance with applicable federal law is "voluntary." Under the code, a licensee must "conduct business in a manner consistent with principles of federal consumer protection law." Failure to do so subjects the licensee to enforcement action. (*See, e.g.*, Code § 5.4(a)(5).)

*No limits to remedies.* Plaintiffs also attack the dispute resolution process, claiming that the Tribal Court and TFSRA are unable to grant appropriate remedies. However, the TFSRA is free to impose any relief it deems appropriate.[3] (Code § 9.3(f)). And if the TFSRA's relief is inadequate—*e.g.*, it is not consistent with the principles of federal consumer protection law, or does not consider applicable federal law as required in the loan agreement—the Tribal Court may remand the matter to the TFSRA with instructions to grant appropriate relief. (Code § 9.4(f)). While the Tribal Court defers to the TFSRA in the same manner as federal courts defer to government agencies, the Tribal Court may ensure proper relief is granted. *See Taubman Realty Group Ltd. Partnership v. Mineta*, 198 F. Supp. 2d 744, 764 (E.D. Va 2002) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).

---

[3] Plaintiffs cite TFSRA Regulation 1.1(B)(4)(c) to argue that the TFSRA is limited in the relief it can grant. Plaintiffs fail to recognize that such regulation has been superseded by subsequent amendments., as argued in *supra* § I(A).

*Immunity precluding any remedy would be unfair.*  It is peculiar that Plaintiffs argue that tribal sovereign immunity should prevent them from recourse.  Plaintiffs argue that if Big Picture and Ascension were true arms of LVD, they would simply assert tribal sovereign immunity against any consumer claims, including in the instant matter.  (Opp. p. 17).  While it is true that without the Code, as arms of LVD, Big Picture and Ascension could simply assert sovereign immunity, such an extreme one-sided business approach would not be successful.[4]  "When tribes back up sovereignty with stable, fair, effective, and reliable governing institutions, they create an environment that is favorable to sustained economic development."  MATTHEW L.M. FLETCHER, AMERICAN INDIAN TRIBAL LAW 866 (2014).  Indeed, all sovereigns, at times, consent to suit.  LVD's decision to subordinate licensees to administrative action and recourse is not unique.  In fact, according to the Governing Law and Forum Selection provision the Plaintiffs agreed to, the Tribal Court may be the only court with jurisdiction over the claim as licensees, including Big Picture and Ascension, expressly subordinate themselves to the jurisdiction of the Tribe.

*The prospective waiver doctrine is inapplicable.*  Plaintiffs argue that *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), stands for the premise that "where 'choice-of-forum and choice-of-law clauses' operate 'in tandem as a prospective waiver of a party's right to pursue statutory remedies,' they are unenforceable."  (Opp. p. 5 (quoting *Mitsubishi*, 473 U.S. at 637 n. 19)).  *Mitsubishi* does not support Plaintiffs' position here.

In *dicta* in a footnote in *Mitsubishi*, the Supreme Court opined that there is no reason for a court to presume that (international) arbitration will be inadequate and that arbitration provisions should be enforced without speculation on possible outcomes.  But, the Supreme Court continued, if the arbitration outcome was contrary to United States public policy, there would be recourse in

---

[4] *See* STEPHEN L. PEVAR, THE RIGHTS OF INDIANS AND TRIBES 308-09 (4th ed. 2012) (discussing circumstances under which Indian tribes provide for waivers of sovereign immunity).

federal court. *Mitsubishi*, 473 U.S. at 637 n.19 (1985); *see also Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334 (4th Cir. 2017) ("A foreign choice of law provision, of itself, will not trigger application of the prospective waiver doctrine.").

Here, according to *Mitsubishi*, the Court must enforce the Governing Law and Forum Selection provision. Plaintiffs' mere speculation that they would be deprived of federal remedies, despite the plain language of the loan agreements and the Code stating otherwise, is not a prospective waiver sufficient to render the provision unenforceable. And, if the administrative procedure is somehow infirm, Plaintiffs have recourse to the Tribal Court, as is further discussed in the pending Motion to Dismiss for Failure to Exhaust Tribal Remedies and Under the Doctrine of *Forum Non Conveniens*.

*Hayes and Dillon are inapplicable.* Rather than rely on the language of their own loan agreements, Plaintiffs make every effort to shoehorn this matter into the decisions in *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016), and *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017). Both cases are readily distinguishable.

In both *Hayes* and *Dillon*, *non-tribal entities* attempted to enforce arbitration provisions in loan agreements. *Hayes*, 811 F. 3d at 669–70; *Dillon*, 856 F.3d at 332–33. Both *Hayes* and *Dillon* found that the loan agreements' choice-of-law provisions expressly disclaimed the application of all federal law to the arbitration proceeding rendering the arbitration agreements invalid and unenforceable. In *Hayes*, as Plaintiffs point out, the arbitration provision in the loan agreement "renounce[d] wholesale the application of any federal law to the plaintiffs' federal claims." *Hayes*, 811 F.3d at 673. Similarly, in *Dillon*, the choice of law provision "functions as a prospective waiver of federal statutory rights and, therefore, is unenforceable as a matter of law." *Dillon*, 856 F.3d 336. Because of the explicit language in the *Hayes* and *Dillon* agreements, the Fourth

Circuit held in both cases that the choice of law provisions prospectively disclaimed applicable federal law and found neither enforceable.

The loan agreements at issue differ from those in *Hayes* and *Dillon*. Indeed, the Governing Law and Forum Selection provision in Plaintiffs' loan agreement does not disclaim federal law but *explicitly incorporates it*.

### C. The Governing Law and Forum Selection provision was not procured by fraud or overreaching.

Plaintiffs attempt to avoid the Governing Law and Forum Selection provision in their loan agreement with conclusory allegations that the "governing law clause . . . was procured through fraud and misrepresentations . . . ." (Compl. ¶ 73). However, "[w]hile all factual allegations in the Complaint must be presumed true at this stage in the proceedings, the fraud allegations must nevertheless meet the heightened pleading requirements set forth in Rule 9(b) of the Federal Rules of Civil Procedure." *Chien v. Virginia*, No. 1:17-CV-677, 2017 WL 3758716, at *3 (E.D. Va. Aug. 28, 2017) (citing *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)).

Generally, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). However, when alleging that a dispute resolution provision within an agreement was procured by fraud, "Virginia law requires that allegations of fraud and overreaching be directed specifically at the inclusion of a dispute resolution provision . . . ." *Zaklit*, 2014 WL 3109804, at *4. "In other words, to avoid the operation of a choice-of-law provision on the basis of overreaching or fraud, as is the case here, the party resisting the clause must establish by clear and convincing evidence that the clause itself, as opposed to the contract as a whole, was the product of impropriety." *Id.* at *7.

Here, Plaintiffs have failed to supply clear and convincing evidence that the Governing Law and Forum Selection provision was procured by fraud. Instead, Plaintiffs' whole lawsuit

**JA208**

alleges a deceitful lending operation that was a "rent-a-tribe" scheme designed to "create the illusion that it enjoys tribal sovereign immunity."  (Compl. ¶¶ 2, 3; *see also id.* at ¶¶ 13, 30, 47).

Plaintiffs' claims of misrepresentation underlie the entire Complaint, but Plaintiffs do not identify any particular instance where there was alleged fraud related to the Governing Law and Forum Selection provision itself."  *See, e.g., In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 884 (W.D.N.C. 2001) ("Rule 9(b) requires that plaintiffs plead all of the elements of fraud with particularity. Particularity of pleading is required with regard to the time, place, speaker, and contents, as well as the manner in which statements are false and the specific acts raising an inference of fraud- the 'who, what, where, why and when.'") (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999)).  This was the exact situation in *Zaklit*, where the plaintiffs attempted to invalidate the choice of law provision but only made allegations about "the entire contract rather than to the choice-of-law clause in particular."  *Zaklit*, No. 1:14CV314 JCC/JFA, 2014 WL 3109804, at *8.  Thus, the *Zaklit* court ruled that plaintiffs "failed to make the requisite showing to invalidate the choice-of-law provision" because the plaintiffs did not allege that they were misled concerning the legal effect of the choice-of law provision.  *Id.*

Also like in *Zaklit*, "Plaintiffs have presented no evidence to support their claim that the choice-of-law provision is invalid," to overcome their "heavy burden of proof."  *Id.* (citing *Anchor Seafood, Inc. v. CMA–CGB (Caribbean), Inc.,* No. 05–23097–CIV, 2005 WL 4674292, at *3 (S.D. Fla. May 4, 2005)).  "While the amount of evidence needed to satisfy this burden may be debatable, one thing is certain, it takes more than conclusory allegations in the pleadings, none of which are directed specifically at the choice-of-law provision, as is the case here.  *Zaklit*, No. 1:14CV314 JCC/JFA, 2014 WL 3109804, at *8.  Plaintiffs rely solely on conclusory allegations to support the

claim that the Governing Law and Forum Selection provision are invalid, therefore they have fallen far short of their burden to invalidate the provision.

**D.    Enforcement of the Governing Law and Forum Selection Clause does not contravene Virginia public policy.**

Virginia's public policy is to honor and enforce choice of law and forum selection provisions.  The Supreme Court of Virginia has squarely held: "Where, however, the parties to the contract have themselves expressly declared that their contract shall be held and construed as made with reference to a certain jurisdiction, that shows by what law they intended the transaction to be governed." *Klein v. Verizon Communications, Inc.*, 674 F. App'x 304, 308 (4th Cir. 2017) (quoting *Union Cent. Life Ins. v. Pollard,* 94 Va. 146 (1896) and citing *Settlement Funding, LLC v. Von Neumann-Lillie*, 274 Va. 76 (2007)).

Plaintiffs' Complaint contains a lengthy diatribe against online lenders, which is "supported" by anecdotes describing Virginia's public policy against usury.  (*See, e.g.,* Complaint ¶ 1–3, 21–23).  However, Virginia honors forum selection and choice of law provisions, even when the selected law has different usury policies then Virginia, such as those present in the relevant loan agreements.  *See generally Settlement Funding,* 274 Va. 76.

In *Settlement Funding,* the Supreme Court of Virginia held that "[i]f a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied" *without consideration of the fact that* "Utah has not established any limits on maximum rates of interest for consumer loans."[5] The choice-of-law clause was enforceable.  *Id.* at 81.

---

[5] Thus, any attempt by Plaintiff to limit Settlement Funding to the consideration of the specific interest rate at issue in that case is without merit.

13

**JA210**

Plaintiffs' public policy arguments were presented to, and directly rejected by, the Supreme

Court of Virginia in *Settlement Funding*, where the opening lines of the consumer's brief read:

> Although the Loan Agreement provides that Utah laws govern the contract, Virginia Courts do not blindly accept a contract provision requiring another state's laws to be applied.  Instead, courts will only uphold the choice of law if there is a reasonable basis for the choice, and the law chosen is not contrary to the public policy of the Commonwealth of Virginia.  In the case at bar, there was no reasonable basis proven at trial for choosing Utah law, and *Virginia public policy requires Virginia law to be applied*.

BRIEF FOR APPELLEE, *Settlement Funding v. Von Neumann-Lillie*, No. 061373, at *1 (Va. Jan. 5,

2007) (emphasis added, internal citations omitted).  The same result must occur here.

Simply put, "not every situation where contractually chosen law diverges merely in degree

from that of the state whose law would otherwise apply impinges upon the fundamental policy of

that state."  *Barnes Grp., Inc. v. C & C Prods., Inc.*, 716 F.2d 1023, 1031 (4th Cir. 1983).  As the

Fourth Circuit has recognized, "[t]his is seen most clearly in regard to usury statutes, where the

parties' choice of law has been held to validate interest rates that would be usurious and

unenforceable in the jurisdiction whose law would prevail absent the contractual stipulation of

controlling law."  *Barnes Grp.*, 716 F.2d at 1031 (collecting cases).  Plaintiffs ignore that Fourth

Circuit authority, and scores of other trial court decisions like it, based on their misperception of

tribal sovereignty and the extension of tribal sovereign immunity.

Here, it is undisputed that the Plaintiffs voluntarily executed their loan agreements

confirming they read, understood, and agreed to the choice of law provisions.  Under *Settlement

Funding*, Plaintiffs therefore cannot recover for alleged violations of Virginia usury laws because

LVD law – not Virginia law – applies to Plaintiffs' loan agreements with Big Picture.  And, like

the laws of Utah, LVD law allows interest in excess of Virginia's rates.  (Dkt. 23 p. 4).  Thus, the

true issue here is the recognition of LVD's ability to enact laws as a sovereign nation in the same

manner as Utah, and the deference to those laws by Virginia and this Court.  Virginia's strong

14

public policy honoring choice of law and forum selection provisions compels a straightforward–
and dispositive– proposition that the loan agreements are not governed by Virginia law, but by the
laws of LVD. *Zaklit*, 2014 WL 3109804, at *5.

The Supreme Court of Virginia's controlling holding in *Settlement Funding* is dispositive
of the alleged "usury" here. Plaintiffs thus spend substantial space to muddy its clear import. (*See*
Reply at pp. 10-14.) This Court, however, can go straight to the text of the decision, where the
Supreme Court addressed the application of the law of a state (Utah) with no maximum rate of
interest that could be charged by the lender, and held. "If a contract specifies that the substantive
law of another jurisdiction governs its interpretation or application, the parties' choice of
substantive law should be applied." *Settlement Funding*, 274 Va. at 79.

Plaintiffs attempt to discredit *Settlement Funding* with an assertion that the Supreme Court
of Virginia correctly enforced the choice of law clause "because the 'National Bank Act expressly
preempts national banks,' like the lender in *Settlement Funding*, to 'charge on any loan interest at
the rate allowed by the laws of the State . . . .'" (Opp. p. 25 (internal citations omitted)). The
Supreme Court did not address any such issue, nor did the underlying briefing mention a
"preemption" argument.[6] Also, in 2006, WebBank was "a Utah-chartered industrial loan
corporation," not a bank. Moreover, as Congress has not enacted any federal usury law, case law
interpreting the National Bank Act, 12 USC § 85, is directly analogous to instances of tribal
sovereign lending laws, supporting the Tribal Defendants' position, not Plaintiffs'. The Supreme
Court has held that Congress could have but chose not to impede the "exportation" of interest rates
despite perceived impediments to states' enforcement of state usury laws. *Marquette Nat. Bank*

---

[6] *See* BRIEF FOR APPELLANT, *Settlement Funding v. Von Neumann-Lillie*, No. 061373 (December 11, 2006); BRIEF FOR APPELLEE, *Settlement Funding v. Von Neumann-Lillie*, No. 061373 (Va. Jan. 5, 2007); REPLY BRIEF FOR APPELLANT, *Settlement Funding v. Von Neumann-Lillie*, No. 061373 (Va. Jan. 19, 2006).

*of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 317 (1978). Similarly, Congress could have, but chose not to, impede Indian tribes from acting in the same manner.

## II.     Virginia law does not apply to the loan agreements.

### A.     The loan agreements were formed on LVD's reservation.

Virginia adheres to the traditional First Restatement rule for contracts cases, namely that the laws of the place of contracting govern the validity of a contract, and the place of contracting is determined by the location of the last act necessary to complete the contract. *Rahmani v. Resorts Int'l Hotel, Inc.*, 20 F. Supp. 2d 932, 934 (E.D. Va. 1998), *aff'd,* 182 F.3d 909 (4th Cir. 1999); *Fuisz v. Selective Ins. Co.,* 61 F.3d 238, 241 (4th Cir. 1995). Additionally, other federal courts recognize the last act rule as well. In fact, at least one federal court has already determined that a borrower's contract with a tribal online lending company is formed on the tribe's reservation:

> But, in cases involving a contract formed on the reservation in which the parties agree to tribal jurisdiction, treating the nonmember's physical presence as determinative ignores the realities of our modern world that a defendant, through the internet or phone, can conduct business on the reservation and can affect the Tribe and tribal members without physically entering the reservation.

*FTC v. Payday Fin., LLC,* 935 F. Supp. 2d 926, 939 (D.S.D. 2013). The *Payday Financial* court concluded that "the contract between the Borrowers and Lending Companies appears to be formed on the Reservation in South Dakota." *Id.* at 938; *see also Rahmani,* 20 F. Supp. 2d at 934.

The Code § 2.4 expressly states that the contract is formed on the Reservation where Plaintiffs' applications were received, background information was reviewed, applications were either approved or denied, and loans originated. The loan agreements ensure that Plaintiffs understand that the loan agreement is formed on Indian land and controlled by LVD law. (Dkt. 1-1 p. 2). Thus, Virginia law does not control.

**B.    A "firm offer of credit" does not change where the loan agreements were formed.**

Plaintiffs are mistaken to argue that "Defendants made an offer to Plaintiffs, which was accepted." (Opp. p. 27–28.) One Plaintiff allegedly received a "firm offer of credit" in the mail. By calling it an offer in attempt to rely on common law contract formation principles, Plaintiffs mischaracterize "firm offer of credit" as it is used under the Fair Credit Reporting Act ("FCRA"). Under the FCRA, "[t]he term 'firm offer of credit or insurance' means any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer . . . ." 15 U.S.C. § 1681a(l). The offer may be further conditioned on: (1) a determination by the lender of the consumer's ability "to meet specific criteria bearing on credit worthiness"; (2) verification by the lender "that the consumer continues to meet the specific criteria used to select the consumer for the offer"; and (3) furnishing of any require collateral by the consumer. *Id.*

Thus, under the FCRA, a firm offer of credit is not the final step in creating a contract between the consumer and the lender—instead, the firm offer of credit only includes a guarantee that the consumer will not be denied credit if he meets the criteria spelled out in the offer. *See, e.g., Sullivan v. Greenwood Credit Union*, 520 F.3d 70, 76 (1st Cir. 2008) (citing *Kennedy v. Chase Mountain Bank USA, NA*, 369 F.3d 833, 841 (5th Cir. 2004)). To be a true firm offer a credit, then, the mailing must provide some "value" to the consumer, but is not a true "offer" as defined under state law. *See Sullivan*, 520 F.3d at 77.

Federal courts have distinguished an FCRA firm offer of credit from a common law offer to contract. Under the FCRA, a "firm offer of credit" is a term of art, and despite the word "offer" appearing in the name, the term is not meant to be understood under state law definitions of "offer" or notions of contract law. *See, e.g., Cole v. US Capital*, 389 F.3d 719, 726-27 (7th Cir. 2009)

17

**JA214**

(explaining firm offers of credit under the FCRA). While the firm offer of credit must be more than a "guise for solicitation," "[d]efining a firm offer of credit as merely any offer that will be honored elevates form over substance, 'exalt[s] artifice above reality and ... deprive[s] the statutory provision in question of all serious purpose.'" *Cole*, 389 F.2d at 727.

Plaintiffs misconstruction and misuse of a "firm offer of credit" does not migrate the last act of the transaction from LVD's reservation to Virginia. Thus, LVD law rightfully governs.

## C. The Governing Law and Form Selection provision applies to both contract, tort, and statutory claims.

"'Virginia law favors contractual choice of law clauses' and they are generally found to 'encompass contract-related tort claims.'" *Zaklit*, 2014 WL 3109804, at *9 (quoting *Cyberlock Consulting, Inc. v. Info. Experts, Inc.,* 876 F. Supp. 2d 672, 678 (E.D. Va. 2012)).

Under Virginia's choice of law rules, tort claims are governed by the law of the place of the wrong. *Rahmani*, 20 F. Supp. 2d at 937 ; *McMillan v. McMillan,* 219 Va. 1127, 1128 (1979); *Quillen v. International Playtex, Inc.,* 789 F.2d 1041, 1044 (4th Cir.1986). The place of the wrong is the place where the injury was suffered, not where the tortious act took place. *Rahmani*, 20 F. Supp. 2d at 937 (citing *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 511 (4th Cir.1986)); 4A MICHIE'S JURISPRUDENCE, CONFLICT OF LAWS § 36.

Regardless, Virginia acknowledges that choice of law provision can encompass all claims related to a contract, including tort and statutory claims. "'Where a choice-of-law clause in the contract is sufficiently broad to encompass contract-related tort claims,' Virginia courts will 'honor[ ] the intent of the parties to choose the applicable law' and apply the provision to related, non-contract claims." *Zaklit*, 2014 WL 3109804, at *9 (quoting *Hitachi Credit Am. Corp. v. Signet Bank,* 166 F.3d 614, 628 (4th Cir.1999)). "The rationale underlying this rule is straightforward; allowing parties to negotiate the rules that govern their relationship creates certainty and avoids

applying the laws of multiple jurisdictions to a controversy having its origin in a single, contract-based relationship." *Zaklit*, 2014 WL 3109804, at *9 (citing *Pyott–Boone,* 918 F. Supp. 2d at 544).

Also, the Supreme Court has recognized that alternative dispute resolution mechanisms are capable, and in some instances, intended, to adjudicate statutory rights. In *Mitsubishi*, the Supreme Court considered whether arbitration (under the Arbitration Act) could be employed to adjudicate the parties' statutory rights under the Sherman Antitrust Act. The Court found "'[t]he preeminent concern of Congress in passing the [Arbitration] Act was to enforce private agreements into which parties had entered,' a concern which 'requires that we rigorously enforce agreements to arbitrate.'" *Mitsubishi,* 473 U.S. at 625–26 (quoting *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221 (1985)). While the Supreme Court's focus was on the Arbitration Act, its reasoning applies generally here:

> By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration. We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history. Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue. Nothing, in the meantime, prevents a party from excluding statutory claims from the scope of an agreement to arbitrate.

*Mitsubishi,* 473 U.S. at 628 (internal citations omitted). The Supreme Court also acknowledged that contractual provisions requiring alternative dispute resolution, in *Mitsubishi* specifically arbitration, should be enforced even when enforcement took to the matter outside the jurisdiction of federal courts:

> A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is ... an almost

> indispensable precondition to achievement of the orderliness and
> predictability essential to any international business transaction....
> A parochial refusal by the courts of one country to enforce an
> international arbitration agreement would not only frustrate these
> purposes, but would invite unseemly and mutually destructive
> jockeying by the parties to secure tactical litigation advantages.... [It
> would] damage the fabric of international commerce and trade, and
> imperil the willingness and ability of businessmen to enter into
> international commercial agreements."

*Mitsubishi*, 473 U.S. at 631 (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516–17 (1974)).

Therefore, whether Plaintiffs' claims are rooted in contract, tort, or statutory law, the Governing

Law and Forum Selection provision requires that LVD Law apply to the claims.  Virginia law has

no application.  And, because Virginia law does not apply, Plaintiffs' claims – all of which hinge

on the application of Virginia's statutory interest rate cap – must all be dismissed with prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court: (1) grant their

Motion to Dismiss, thereby dismissing the claims with prejudice; and (2) grant them such other

and further relief as may be warranted.

**BIG PICTURE LOANS, LLC, ASCENSION
TECHNOLOGIES, INC., JAMES WILLIAMS,
JR., GERTRUDE MCGESHICK, SUSAN
MCGESHICK, AND
GIIWEGIIZHIGOOKWAY MARTIN**


By:/s/David N. Anthony
David N. Anthony
Virginia State Bar No. 31696
Timothy J. St. George
Virginia State Bar No. 77349
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutmansanders.com
Email: tim.stgeorge@troutmansanders.com

Karrie Sue Wichtman (admitted *pro hac vice*)
Justin A. Gray (admitted *pro hac vice*)
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: (269) 283-5005
Facsimile: (517) 913-6443
Email: kwichtman@rosettelaw.com
Email: jgray@rosettelaw.com

**JA218**

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December, 2017, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF System which will then send a notification of such

filing (NEF) to the following:

Kristi C. Kelly
Andrew J. Guzzo
Casey S. Nash
KELLY & CRANDALL PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA  22030
Telephone: 703-424-7570
Facsimile: 703-591-0167
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com
*Counsel for Plaintiffs*

James W. Speer
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA  23219
Telephone: 804-782-9430
Facsimile: 804-649-0974
Email: jay@vplc.orga
*Counsel for Plaintiffs*

David F. Herman
Jonathan P. Boughrum
Richard L. Scheff
MONTGOMERY MCCRACKEN WALKER
& RHOADS LLP
123 S Broad Street
Philadelphia, PA 19109
Telephone: 215-772-1500
Facsimile: 215-772-7620
Email: dherman@mmwr.com
Email: jboughrum@mmwr.com
Email: rscheff@mmwr.com
*Counsel for Defendant Matt Martorello*

/s/ David N. Anthony
David N. Anthony
Virginia State Bar No. 31696
*Counsel for Defendants*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutmansanders.com

33452145

**JA219**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

LULA WILLIAMS, GLORIA TURNAGE,
GEORGE HENGLE, DOWIN COFFY, and
FELIX GILLISON, JR., *on behalf of themselves*
*and all individuals similarly situated*,

Civil Case No. 3:17-cv-00461-REP

                Plaintiffs,

v.

BIG PICTURE LOANS, LLC; *et al.*

                Defendants.

**BIG PICTURE LOANS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS FOR**
**FAILURE TO EXHAUST TRIBAL REMEDIES AND UNDER**
**THE DOCTRINE OF *FORUM NON CONVENIENS***

Specially Appearing Defendant Big Picture Loans, LLC, by counsel, hereby submits this

reply in support of its motion to dismiss Plaintiffs' claims for failure to exhaust tribal remedies

and under the doctrine of *forum non conveniens*.

**INTRODUCTION**

The Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD") enacted the

Tribal Consumer Financial Services Regulatory Code ("Code") to govern tribal lending, and it

established the Tribal Financial Services Regulatory Authority ("TFRSA") as a governmental

regulator to enforce the Code.  To ensure consumer protection, LVD included a dispute

resolution process in the Code to resolve any customer complaints against all entities' operation

within LVD's jurisdiction.

To avoid their contractual commitments, Plaintiffs repeatedly attack LVD's jurisdiction

and the LVD Tribal Court's ("LVD Court's") jurisdiction without any compelling evidence or

authority.  In doing so, Plaintiffs call on this Court to use *Montana v. United States*, 450 U.S. 544

**JA220**

(1981), to obliterate Indian tribes' civil jurisdiction over a nonmember when that nonmember consents to such jurisdiction and then sues the tribe after such consent in federal court. To twist *Montana* in that new direction, the Court would effectively destroy the potential benefits of the internet and e-commerce to all Indian tribes.

This Court, however, need not reach such an extreme outcome. Rather, *Montana* and its progeny confirm the jurisdictional reach of tribal courts and promote the contemporary federal policy of self-determination against the ever-changing landscape of the economic development of tribes.[1] Under *Montana*, Plaintiffs' loan agreements are consensual contractual relationships with choice of law and forum selection provisions, which require application of LVD and applicable federal law in a tribal forum. Plaintiffs sued elected tribal officials and tribally-owned businesses (that are organized and operating under tribal law from LVD lands), which directly challenges LVD's self-determination by undercutting LVD's constitutional jurisdiction and ability to enact its own laws and be governed by them. Plaintiffs explicitly and voluntarily consented to tribal jurisdiction over their on-reservation agreement. To find otherwise would not only be a slight to tribal self-determination, but also militate against the long-standing authority honoring forum selection clauses in contracts more generally.

Plaintiffs' attempt to skirt their duty to exhaust tribal remedies by arguing that there is no pending tribal court action to exhaust such remedies is unsupported. While several courts have considered tribal exhaustion under circumstances that involve ongoing tribal court litigation,

---

[1] Memorandum letter from U.S. OFFICE OF THE SOLICITOR TO SECRETARY OF THE INTERIOR, U.S. DEPARTMENT OF THE INTERIOR, M-37045 (Jan. 18, 2017), *available at* https://www.doi.gov/sites/doi.gov/files/uploads/m-37045.pdf ("[T]he Department of the Interior's (Department's) current policy and regulatory approaches are aimed at empowering tribes to more directly manage their own resources and lands, engage in economic development opportunities based on their own strategies and priorities, and self-govern through their own independent judgment and cultural values.").

2

there is no requirement that a tribal court lawsuit must be filed before the requirement to exhaust tribal remedies is honored and enforced.

Plaintiffs also degrade LVD's integrity with unsupported aspersions of bias and corruption, which are insufficient to resist tribal court jurisdiction under established law. Plaintiffs improperly presume bias by the TFSRA's regulatory agents merely because of familial relationships to councilmembers. And without evidence, Plaintiffs claim that LVD enacted the Tribal Dispute Resolution Process solely to shield Defendant Matt Martorello. Despite five depositions and tens of thousands of pages of discovery, Plaintiffs continue to raise unsupported claims. The truth remains that there is no "influence and relationship" between Martorello, the TFSRA, and the LVD Court and there never has been.

Additionally, Plaintiffs failed to address Big Picture's position that *forum non conveniens* requires dismissal. Under the circumstances here, *forum non conveniens* is a basis for dismissal independent of the tribal exhaustion doctrine. As Plaintiffs have chosen not to address the doctrine, Big Picture will rely on its Motion and opening brief.

## ARGUMENT

### I.    Tribal exhaustion and comity do not require simultaneous tribal court litigation.

Although the Fourth Circuit has not addressed the issue, many circuits have found that ongoing tribal court actions are not a prerequisite to the tribal exhaustion doctrine. For example, the Ninth Circuit has held that federal courts must "dismiss or abstain from deciding cases in which concurrent jurisdiction in an Indian tribal court [is] asserted," and that "[w]hether proceedings are actually pending in the appropriate tribal court is irrelevant." *Crawford v. Genuine Parts Co.*, 947 F.2d 1405, 1407 (9th Cir. 1991); *see also Sharber v. Spirit Mountain Gaming, Inc.*, 343 F.3d 974, 976 (9th Cir. 2003) (*per curiam*) ("The absence of any ongoing

litigation over the same matter in tribal courts does not defeat the tribal exhaustion requirement.").

Other circuits have similarly held that pending tribal litigation is unnecessary. *See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth*., 207 F.3d 21, 31 (1st Cir. 2000) ("Where applicable, this prudential doctrine has force whether or not an action actually is pending in a tribal court."); *United States v. Tsosie*, 92 F.3d 1037, 1041 (10th Cir. 1996) ("[T]he exhaustion rule does not require an action to be pending in tribal court."); *Weeks Constr., Inc. v. Oglala Sioux Hous. Auth*., 797 F.2d 668, 674 (8th Cir. 1986) ("Because a grant of federal jurisdiction based on diversity would impinge on the tribe's right to self-government, the district court did not err when it refused to assume jurisdiction and referred the case for an initial determination by the tribal court of whether the Housing Authority is a member of the tribe."); *see also Heldt v. Payday Fin., LLC*, 12 F. Supp. 3d 1170, 1180 (D.S.D. 2014) ("Here, there is no pending tribal court action between Plaintiffs and Defendants to which this Court may defer. However, the doctrine of tribal court exhaustion applies even when there is no pending concurrent tribal action.").

Within the Fourth Circuit, different district courts have addressed tribal exhaustion, but have not squarely addressed the issue of parallel proceedings. Perhaps the most detailed inquiry is in *Dillon v. BMO Harris Bank*, *N.A.*, No. 1:13CV897, 2015 WL 6619972 (M.D.N.C. Oct. 30, 2015), where the district court allowed jurisdictional discovery to determine whether a colorable claim of tribal court jurisdiction existed for purposes of tribal exhaustion, even though there was no tribal action pending. *Id.* at *9.[2]

---

[2] Other courts have stated a different position. The Second Circuit, for instance, seems to require the prerequisite of a pending tribal court action; however, it recognized that "the application of the doctrine of exhaustion of tribal remedies has not been uniform among the circuits, the general principle can be easily stated: parties who challenge,

Big Picture urges this Court to recognize the federal policies underlying comity and the tribal exhaustion doctrine and align with the First, Eight, Ninth, Tenth Circuits finding that a pending action in tribal court is not a prerequisite to dismissal. Relying on *Garcia v. Akwesasne Hous. Auth.,* 268 F.3d 76, 82 (2d Cir. 2001), Plaintiffs urge the opposite and argue that "tribal exhaustion applies in cases where a plaintiff attempts to litigate a 'previously-filed, ongoing tribal court action' and asks the federal court 'to interfere with those tribal proceedings.'" (Opp. p. 4 (quoting *Garcia,* 268 F.3d at 80)). However, as in *Garcia*, a review of the circumstances here does not require a steadfast rule, as the facts here favor exhaustion. Here, the dispute arises over the validity of loans and enforceability of loan agreements issued by Big Picture, a tribal licensee operating pursuant to LVD law. Moreover, the parties chose to have the loan agreement governed by LVD law and applicable federal law using the Tribal Dispute Resolution Procedure.[3] Plaintiffs pose a direct attack on tribal self-determination by suing Big Picture and Ascension, LVD instrumentalities, and LVD Officials acting under LVD law—the suit challenges whether LVD can enact laws and be governed by them.

Indeed, the facts here are a sharp contrast to *Garcia*. In *Garcia*, the tribal party sought to have the matter removed to the *tribal council* despite the existence of a *tribal court*, which meant that the federal proceeding did not implicate any tribal court's jurisdiction. *Garcia,* 268 F.2d at

---

under federal law, the jurisdiction of a tribal court to entertain a cause of action must first present their claim to the tribal court before seeking to defeat tribal jurisdiction in any collateral or parallel federal court proceeding." *Basil Cook Enterprises, Inc. v. St. Regis Mohawk Tribe*, 117 F.3d 61, 65 (2d Cir. 1997) (citing Laurie Reynolds, *Exhaustion of Tribal Remedies: Extolling Tribal Remedies While Expanding Federal Jurisdiction*, 73 N.C. L. Rev. 1089, 1107–08 (1995)). And, four years later, the Second Circuit retreated from its rigid rule for a broader application more in-line with the federal government's "policy of supporting tribal self-government and self-determination,' the recognition that a 'federal court's exercise of jurisdiction over matters relating to reservation affairs can . . . impair the authority of tribal courts,' and the view that tribal courts 'play a vital role in tribal self-government,' militate in favor of an expansion of the doctrine in this case." *Garcia v. Akwesasne Hous. Auth*., 268 F.3d 76, 82 (2d Cir. 2001) (internal citations omitted).

[3] *See* Dkt. 25; Defs.' Reply to Pls.' Opp. to Defs.' Mot. To Dismiss filed concurrently.

82-83. Additionally, the court found that because the matter could have initially been brought in state court then removed to federal court and the dispute did not concern a tribal ordinance, the substantive claim was of a non-tribal character. *Id*. at 83-84.

Moreover, it is common sense that a rule requiring a pending tribal court action in order to enforce exhaustion would be futile to the tribal exhaustion doctrine and elevate form over substance. If federal authority required a pending tribal court lawsuit as a prerequisite to a federal court's application of the tribal exhaustion doctrine, then tribal defendants could file tribal court actions upon service of a federal lawsuit against them in order to create a colorable claim of tribal court jurisdiction. For example, here, if such a prerequisite were necessary, the Tribal Defendants could simply file a declaratory action in the LVD Court for the determination of the parties' rights under the loan agreement. Such an argument is unprincipled and illogical.

## II.    The LVD Tribal Court has jurisdiction over Plaintiffs claims because Plaintiffs voluntarily entered into valid and enforceable loan agreements with Big Picture Loans.

### A.    Plaintiffs entered into a consensual, contractual relationship with Big Picture, which is the type of consensual relationship contemplated by the first *Montana* exception.

The Supreme Court has made it clear that Indian tribes retain "*some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands*," over "the activities of *nonmembers who enter consensual relationships with the tribe or its members*, through commercial dealing, contracts, leases, or other arrangements." *Montana v. U. S*., 450 U.S. 544, 565–66 (1981) (emphasis added).[4] It is undisputed in this case that there is a consensual contractual relationship.

_____

[4] Plaintiffs misquote the first exception in *Montana* then add emphasis to "**on reservation**," while ignoring that Montana considers jurisdiction even on non-Indian fee land. See (Opposition p 9 ("Under the first exception, a tribe

**JA225**

The *Montana* basis for jurisdiction has already been contemplated in an online lending scenario such as the present case:

> The Supreme Court never has addressed the issue of tribal court jurisdiction over a non-Indian when the non-Indian enters into a written contract containing clauses that select the tribal court as the forum for all disputes and by which the non-Indian consents to tribal court jurisdiction.  Under the language of the first *Montana* exception, the tribal court would have jurisdiction based on 'the activities of nonmembers who enter into consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.'  When a nonmember enters into a commercial transaction with a tribal member or reservation-based tribal business, receives a benefit coming from the reservation as a result, and consents in a written contract to tribal jurisdiction, that nonmember seems to have engaged in the sort of 'consensual relationship with the tribe or its members, through commercial dealing' that would subject the nonmember to tribal jurisdiction.

*FTC v. Payday Fin., LLC*, 935 F. Supp. 2d 926, 936 (D.S.D. 2013).

However, Plaintiffs argue that *Montana* does not apply because none of their conduct occurred on LVD's reservation.  Plaintiffs implication that *Montana* only applies when the non-Indian is physically present within the reservation is contrary (1) to *Montana*, which reads "*even on non-Indian fee lands*," (2) to *Payday Financial*, which says that *Montana* should apply under these circumstances, and (3) to *Hayes*, which is not a case about any tribally owned entities and is absent of any factual support or relevant legal authority.[5]  Indeed, "the Supreme Court has

---

may 'exercise … civil jurisdiction over non-Indians **on their reservations** through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members through commercial dealing, contracts leases, or other arrangements.").

[5] In a footnote, Plaintiffs also rely on *Colorado v. Western Sky Fin., LLC*, 845 F. Supp. 2d 1178 (D. Colo. 2011); *Suthers v. Cash Advance*, 205 P.3d 389, 400-01 (Colo. App. 2008); *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 782; *Parnell v. W. Sky Fin.*, LLC, No. 4:14-CV-0024-HLM, 2014 WL 11460814, at *9 (N.D. Ga. Apr. 28, 2014), none of which involve entities wholly-owned by an Indian tribe; *Philip Morris USA, Inc. v. King Mountain Tobacco Co*., 569 F.3d 932, 941 (9th Cir. 2009), where *Montana* did not apply; and *Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Servs*., 769 F.3d 105, 115 (2d Cir. 2014) where there was insufficient evidence to determine whether the online lending occurred on- or off-Indian lands.

never explicitly held that Indian tribes lack inherent authority to regulate nonmember conduct that takes place outside their reservations." *Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians*, 746 F.3d 167, 176 (5th Cir. 2014). Plaintiffs do not allege anything more than residing in Virginia, so even the Complaint taken as true for purposes here, does not allege they were in Virginia when they took the loan, received the funds, banked in Virginia with a Virginia bank, spent the funds in Virginia, made payments on the loan from Virginia, etc.

But making a decision on tribal court jurisdiction based solely on the physical location of the non-member would render the *Montana* exceptions inapplicable to many modern-day contracts involving reservation-based businesses, and it would also completely cripple any attempts for geographically isolated tribes to further their economic standpoint.[6]

> The controlling principle[s] [of tribal civil authority over nonmembers] are broad and abstract and must be carefully applied to the myriad disparate factual scenarios they govern. Determining the contours of tribal civil jurisdiction and the boundaries of tribal sovereignty requires consideration of the historical scope of tribal sovereignty and the evolving place of the tribes within the American constitution order, careful study of precedent, and ultimately a 'proper balancing' of the conflicting interests of the tribes and nonmembers.

*Attorney's Process & Investigation Services, Inc. v. Sac & Fox Tribe of Mississippi in Iowa*, 609 F.3d 927, 934 (2010) (citing *Nevada v. Hicks*, 533 U.S. 353, 374 (2001)).

In addition to these economic and sovereignty concerns, "treating the nonmember's physical presence as determinative ignores the realities of our modern world that a [nonmember], through the internet or phone, can conduct business on the reservation and can affect the Tribe and tribal members without physically entering the reservation." *Payday Fin.*, 935 F. Supp. 2d at

---

[6] The advent of e-commerce has helped geographically isolated tribes have allowed them to steadily increase health and welfare of their members through additional streams of revenue generation while still maintaining their sovereignty. Plaintiffs argument, if accepted, will devastate hundreds of tribes across the country and their ability to provide for their members.

939.  "[I]n today's modern world of business transactions through internet or telephone, requiring physical entry on the reservation particularly in a case of a business transaction with a consent to jurisdiction clause, seems to be requiring too much."  *Heldt v. Payday Financial, LLC*, 12 F. Supp. 3d 1170, 1186 (D.S.D. 2014); *see also Sprint Commc'ns Co. L.P. v. Wynne*, 121 F. Supp. 3d 893, 900 (D.S.D. 2015) ("That position is inconsistent with the increasingly electronic nature of modern commerce and the overarching federal policy to encourage tribal self-government and self-sufficiency.").  Here, while Plaintiffs may not have physically entered the LVD Reservation, they voluntarily applied for and received loans over the internet from Big Picture, an arm of LVD.  That is sufficient.  The technical distinction that is advanced by Plaintiffs is unpersuasive, especially in the context of these internet-based lending transactions.

Disregarding the illogic and negative policy consequences of their positions, Plaintiffs mistakenly rely on *Jackson v. Payday Financial, LLC*, and *Otoe-Missouri Tribe of Indians v. N.Y. State Dept. of Fin. Servs.*  In *Jackson*, the court found that "[t]here simply is no allegation here that the dispute involves activities of the Plaintiffs on the reservation."  *Jackson,* 764 F.3d at78, n.42 (emphasis added).  In fact, whether the plaintiffs had conducted on-reservation activity was not even submitted to the *Jackson* court.  In contrast here, discovery has supplied ample and unrefuted evidence of all lending conduct occurring on LVD's reservation.

Similarly, in *Otoe-Missouria*, the Second Circuit specifically noted that it did not have sufficient evidence to demonstrate where the lending conduct occurred but acknowledged that "the tribes may have built the electronic equivalent of a 'modern[,] . . . comfortable, clean, attractive facilit[y.]'"  *Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Servs.*, 769 F.3d 105, 114, 116 (2d Cir. 2014) (quoting *State of California v. Cabazon Band of Mission*

*Indians,* 480 U.S. 202, 220 (1987)).   Therefore, Plaintiffs reliance on *Jackson* and *Otoe-Missouria* is misplaced.

### III.     Big Picture has asserted LVD Tribal Court jurisdiction in good faith.

The Supreme Court has held "that examination [of whether a tribal court has jurisdiction] should be conducted in the first instance in the Tribal Court itself."  *Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 856 (1985).  Indeed, the Court has held that tribal exhaustion will "provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge"; serve "the orderly administration of justice in the federal court . . . by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed"; "encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction"; and "provide other courts with the benefit of their expertise in such matters in the event of further judicial review."  *Id.* at 856–57.

"When a nonmember plaintiff sues a tribal member defendant, the suit in effect seeks to regulate the tribal member, implicating the 'right of the Indians to make their own laws and be governed by them.'"  *Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 862 F.3d 1236, 1247 (10th Cir. 2017)  (citing *Hicks*, 533 U.S. at 361).  The LVD Court has jurisdiction over Plaintiffs' claims under the LVD Constitution and the Code, as well as by the parties' loan agreements.  Plaintiffs quote the LVD Constitution, which clearly states that the LVD Court's jurisdiction extends to "all cases, matters or controversies arising under this Constitution and the laws, ordinances, regulations, customs, and judicial decisions."  (Opp. p. 15 (quoting LVD Constitution Art. V § 2(a))).  That provision does not exclude jurisdiction over federal law

10

**JA229**

claims.  What is more, the Code expressly grants jurisdiction for all claims arising under the Code.  (*See, e.g.*, Code §§ 1.1(c), (e); 2.4; 3.1; 5.1(c); 7.2(a); 8.1; 10.5.)

LVD's jurisdiction over this matter, as well as the jurisdiction of the LVD Court and the TFSRA, are discussed further in the Tribal Defendants' briefs seeking dismissal under Rule 12(b)(6) pursuant to the parties' choice of law and forum selection provision as well as under *forum non conveniens*.  These briefs clearly explain that all consumer complaints related to Big Picture are governed by applicable federal law as well as LVD law and explains that the TFSRA is not bound by superseded regulations or limited in any way to remedy any violations of tribal or federal law.[7]

LVD enacted the Code in an effort to "legalize lending over the internet provided that such lending is consistent with federal and Tribal laws and regulations," and "to ensure [LVD] adequately regulates loan operations on [LVD's] Reservation land."  (Dkt. 23, Ex. 5).  Under the Code, the TFSRA is required to protect the public interest and ensure the maintenance of public confidence in Tribal lending.  Dkt. 23, Ex. 4 at § 3.1.  The Plaintiffs' assertions that the TFSRA will act unfairly to consumers are both unsupported by evidence and not consistent with the requirements of the Code.  (*See* Opp. p. 17).

### A.    Martorello never had any control over the TFSRA.

Despite gathering substantial evidence to the contrary, Plaintiffs resort to two emails in an attempt to show that Martorello somehow controls the TFSRA.  (Opp. p. 17, Ex. 1 and 2).  The emails, circulated among lending and vendor employees are about the TFSRA and do not include the TFSRA regulatory agents.  Rather, the emails reflect an internal discussion between employees of dissolved companies about upcoming meetings scheduled with the TFSRA.  (*See*

---

[7] *See* Defs.' Reply to Pls.' Opp. to Defs.' Mot. To Dismiss filed concurrently.

*generally* Opp. Ex. 1-3). Their strategy comments on how they interact with the TFSRA and their "general discontent" with the TFSRA does not show control over the TFSRA.

Moreover, no evidence exists that shows any of the discussions were ever shared with the TFSRA or implemented by the TFSRA. In fact, the evidence shows much of the pre-meeting communication was not discussed with the TFSRA. (*See. e.g.*, Opp. Ex. 3 summarizing the "caucus" meeting with the TFSRA.)

**B.      Plaintiffs allegations of bias on the part of the TFSRA alone are insufficient to show bad faith.**

"The Supreme Court has declined to permit parties to excuse themselves from the exhaustion requirement by *merely alleging* that tribal courts will be incompetent or biased." *Duncan Energy Co. v. Three Affiliated Tribes of Ft. Berthold Reservation*, 27 F.3d 1294, 1301 (8th Cir. 1994) (citing *Iowa Mutual Ins. Co. v. La Plante*, 480 U.S. 9, 18-19 (1987) and *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65-66 n.21 (1978)). Indeed, a party "cannot merely assume that it would not receive a fair trial in tribal court – it must present evidence of bias." *Fine Consulting, Inc. v. Rivera,* 915 F. Supp. 2d 1212, 1229 (D.N.M. Jan. 10, 2013). "Speculative allegations of bias or futility do not excuse exhaustion of tribal remedies." *Id.* That is all that is alleged here.

Furthermore, "[i]t must be the tribal court that acts in bad faith to exempt the party from exhausting available tribal court remedies," *Norton*, 862 F.3d at 1249; *Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1201 (9th Cir. 2013) (interpreting *Nat'l Farmers* 471 U.S. 845). And it must be proven by plaintiffs that the tribal court is acting in bad faith because, "under a contrary reading, '[a] party would need only allege bad faith by the opposing party, or a third party, to remove the case to federal court.'" *Norton*, 862 F.3d at 1249 (quoting *Grand Canyon Skywalk*, 715 F.3d at 1201). "Comity principles require that we trust that our

tribal court counterparts can identify and punish bad faith by litigants as readily as we can." *Id.* The exception does not apply in this instance as the Plaintiffs have not made bad faith allegations on the part of the LVD Court. *Id.*

Plaintiffs accuse the TFSRA regulatory agents of an inherent bias claiming that consumers will never receive a fair resolution to a dispute. Plaintiffs based their insulting accusations solely on the familial relationships between two councilmembers and two TFSRA regulatory agents. However, "allegations of bias alone are insufficient to make a showing of bad faith." *Ares v. Blue Lake Rancheria*, No. 16-CV-05391-WHO, 2017 WL 733114, at *2 (N.D. Cal. Feb. 24, 2017), *aff'd*, 692 F. App'x 894 (9th Cir. 2017). Plaintiffs have presented no evidence of bias. Without evidence, there is no reason for this Court to presume bias, and indeed, to do so would demonstrate prejudice to the Tribe and its sovereign authority.

Significantly, any perceived bias may be raised by appeal to the LVD Court, which gives deference to the TFSRA's reasonable interpretation and application of the Code, but is in no way bound by "conclusions of law and factual findings of Chairman Williams' sister and Treasurer McGeshick's nephew," as somehow claimed by Plaintiffs. (Opp. p. 19.) Federal courts have addressed similar pejorative arguments in the past:

> We also reject the officers' arguments that they will suffer undue bias and a lack of due process if subjected to tribal jurisdiction. The officers offer little support for their allegations, which boil down to baseless 'attacks' on the competence and fairness of the Ute Tribal Court. The Supreme Court has already explained that such arguments are contrary to federal policy and thus have no bearing on our tribal exhaustion analysis. The Court has also 'repeatedly' recognized tribal courts 'as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians.'

*Norton*, 862 F.3d at 1249 (internal citations omitted.). BRIEF FOR THE CHEROKEE NATION, THE CHICKASAW NATION, THE CHOCTAW NATION OF OKLAHOMA, THE MUSCOGEE (CREEK) NATION,

THE SEMINOLE NATION OF OKLAHOMA, AND THE INTER-TRIBAL COUNCIL OF THE FIVE CIVILIZED TRIBES AS AMICUS CURIAE, pp. 16–26, *Dollar Gen. Corp. v. Mississippi Band of Choctaw Indians*, 136 S. Ct. 2159 (2016).

There is a sufficient basis to find a colorable claim of tribal court jurisdiction to allow the LVD Court to preside over the matter. And after the *ad hominem* and unsupported claims are removed from Plaintiffs' arguments, it is clear there is no basis to find bad faith. The Court should promote comity and dismiss this matter under the doctrine of tribal exhaustion.

## IV.    *Forum non conveniens* requires dismissal.

Plaintiffs merely summarize their "prospective waiver" arguments in an effort to combat the assertion of *forum non conveniens*.

As discussed above, with a colorable claim of tribal court jurisdiction, Plaintiffs' speculation about a prospective waiver must be first determined by the LVD Court. As this issue has been heavily briefed above and in the Tribal Defendants' Motion to Dismiss pursuant to Rule 12(b)(6), Big Picture similarly summarizes its arguments that the Governing Law and Forum Selection provision is valid and the matter should be dismissed under *forum non conveniens*.

## CONCLUSION

For the foregoing reasons, Big Picture Loans, LLC respectfully requests that the Court: (1) grant its motion, thereby dismissing the case against it; and (2) grant it such other and further relief as may be appropriate.

JA233

**BIG PICTURE LOANS, LLC**


By:/s/David N. Anthony
David N. Anthony
Virginia State Bar No. 31696
Timothy J. St. George
Virginia State Bar No. 77349
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutmansanders.com
Email: tim.stgeorge@troutmansanders.com


Karrie Sue Wichtman (admitted *pro hac vice*)
Justin A. Gray (admitted *pro hac vice*)
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: (269) 283-5005
Facsimile: (517) 913-6443
Email: kwichtman@rosettelaw.com
Email: jgray@rosettelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Kristi C. Kelly
Andrew J. Guzzo
Casey S. Nash
KELLY & CRANDALL PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA  22030
Telephone: 703-424-7570
Facsimile: 703-591-0167
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com
*Counsel for Plaintiffs*

James W. Speer
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA  23219
Telephone: 804-782-9430
Facsimile: 804-649-0974
Email: jay@vplc.orga
*Counsel for Plaintiffs*

David F. Herman
Jonathan P. Boughrum
Richard L. Scheff
MONTGOMERY  MCCRACKEN  WALKER
& RHOADS LLP
123 S Broad Street
Philadelphia, PA 19109
Telephone: 215-772-1500
Facsimile: 215-772-7620
Email: dherman@mmwr.com
Email: jboughrum@mmwr.com
Email: rscheff@mmwr.com
*Counsel for Defendant Matt Martorello*

/s/ David N. Anthony
David N. Anthony
Virginia State Bar No. 31696
*Counsel for Defendants*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutmansanders.com

16

**JA235**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, et al.,
on behalf of themselves and all
individuals similarly situated,

     Plaintiffs,

v.                   Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, et al.,     **PUBLIC VERSION**[1]

     Defendants.

### MEMORANDUM OPINION

This matter is before the Court on DEFENDANTS BIG PICTURE LOANS AND ASCENSION TECHNOLOGIES' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (ECF No. 22). Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, Inc. ("Ascension") argue that the Court lacks subject matter jurisdiction over all claims asserted against them because they qualify as arms of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("the

---

[1] This opinion was initially filed under seal on July 3, 2018. See Memorandum Op. (ECF No. 130). The Clerk provided copies of the sealed opinion to Plaintiffs, Big Picture, and Ascension, who were given fourteen days to request that certain information in the public version of the opinion remain sealed. See ECF No. 131 at 1-2. Following that order, Big Picture and Ascension indicated that the majority of the documents cited or discussed in the opinion could be unsealed, or could remain sealed with only limited redactions that would not affect the opinion. See Response to July 3 Order (ECF No. 133) at 4-9. The Court agreed with their proposed approach, and minor changes have been made to the opinion to account for the unsealing and re-filing of certain documents. See ECF No. 143.

Tribe") and are thereby entitled to tribal sovereign immunity. For the reasons set forth below, the motion was denied. <u>See</u> ECF No. 124.

**BACKGROUND**

**A.  Factual Background**

**1. Tribal Regulatory Structure**

The Tribe is a federally recognized Indian tribe, and its members reside close to their ancestral homeland near Watersmeet, Michigan. 25 U.S.C. § 1300h(1)-(2). Its status as an "independent tribal entity" has consistently been reaffirmed. <u>See</u> <u>id.</u> § 1300h-2(a). As a result, the Tribe is a sovereign entity that can create its own laws and regulations.

To that end, the Tribe adopted its current constitution on May 14, 1992 ("the LVD Constitution") for the Tribe's "government, protection and common welfare." ECF No. 23-1 at 1, 19. Among other things, the LVD Constitution established the Tribe's council ("the LVD Council"), granting it the authority to, <u>inter alia</u>, enact law, including ordinances and regulations; manage the Tribe's economic affairs; and "promote and protect the health, safety, education, and general welfare of the [Tribe] and its members." <u>Id.</u> art. IV, § 1(a)-(b), (f). The Council could also charter organizations and delegate them with

2

**JA237**

the authority to manage the Tribe's economic affairs. Id. § 1(j).

The Tribe initially pursued economic self-sufficiency by opening a casino in the late 1990s. The casino provided significant revenue for the Tribe until 2008, when the recession severely limited the casino's revenue stream and forced the Tribe to explore other avenues to improve its finances. One of these steps was to start tribal businesses in certain areas, such as online lending, that would yield profits for the Tribe. Hazen Aff. (ECF No. 34-1) ¶¶ 2-5.

On July 8, 2011, the LVD Council enacted the Tribal Consumer Financial Services Regulatory Code ("the Code"), which legalized online lending by the Tribe. July 8, 2011 Resolution (ECF No. 23-5) at 1; Nov. 18, 2011 Resolution (ECF No. 23-3) at 1-2. The purpose of the Code was, inter alia: (1) to "[d]iversify and expedite the development of the [Tribe's] economy" in order to "improve the Tribe's economic self-sufficiency [and] to enable the Tribe to better serve the social, economic, educational, and health and safety needs of its members and visitors"; (2) to "[e]nsure that all consumer financial services profits are used for the benefit of the Tribe and [it]s community"; and (3) to "[e]nsure that the Tribe provides a Tribal-based forum for the fair and orderly

3

JA238

resolution of consumer financial services disputes consistent with the Tribe's preservation of sovereign immunity." Code (ECF No. 23-4) §§ 1.1(a), 1.2(a), (c), (g). The Code required that all entities offering tribal consumer financial services obtain licenses through a particular licensing process, as part of which licensees had to certify that they would "abide by all applicable Tribal and Federal laws, regulations and policies." Id. §§ 1.3(d), 5-7, 5.2(b)(8). It also established specific rules for certain financial services transactions, including small loans transactions. See id. § 11.

The Code also created the Tribal Financial Services Regulatory Authority ("the TFSRA") to enforce the Code and regulate licensees. Id. § 4.1. As a governmental subdivision of the Tribe, the TFSRA was "under the direction and control of the [LVD] Council." Id. § 4.4. However, the Code granted the TFSRA certain independent powers, including, as relevant here, the powers: (1) to "promulgate, adopt, and enforce regulations and rules furthering the purpose and provisions of the th[e] Code"; (2) to discipline licensees and other persons "by ordering immediate compliance, issuing fines and sanctions, and suspending or revoking any [l]icense pursuant to the hearings and due process required by Section 4.18 of th[e] Code"; and (3) to investigate any licensee or person engaging in consumer

4

financial services within the Tribe's jurisdiction. Id. § 4.13(a)-(d), (h)-(i); id. §§ 4.14, 4.16, 4.18.

In addition, the Code placed the TFSRA at the center of a three-tiered dispute resolution process for loan borrowers from tribal licensees. First, consumers that are "aggrieved" by a licensee's action must submit a written complaint to the licensee. The licensee must respond in writing within thirty days, and if it does not, it may be fined by the TFSRA in an amount equivalent to the greater of the outstanding principal loan amount or $1,500. Id. § 9.2(a)-(b). Second, consumers dissatisfied with a licensee's response (or who receive no response at all) may submit a written request for administrative review to the TFSRA within ninety days of the licensee's determination. The TFSRA may then "investigate the dispute in any manner it chooses," including by granting an administrative hearing. If such a hearing occurs, consumers can be represented by counsel at their own expense, and the TFSRA can conduct matters before and during the hearing in a quasi-judicial manner. After any hearing, the TFSRA must issue a written decision that contains its factual findings and conclusions of law, and "may grant or deny any relief as the [TFSRA] determines

**JA240**

appropriate."[2] Consumers can then request rehearing, which the
TFSRA may grant or deny at its discretion. Id. § 9.3(a)-(g).
Finally, consumers may appeal adverse TFSRA decisions by filing
a written petition for review with the Tribal Court ("the LVD
Court") within ninety days of the TFSRA's decision. The LVD
Court's review is limited to the TFSRA's administrative record,
and the Court must give deference to the TFSRA's interpretations
and applications of the Code. It can only reverse a decision
that is "arbitrary and capricious, or that . . . is not
supported by the evidence," and must not reverse because of
"[m]ere disagreement with the [TFSRA]'s factual findings." The
LVD Court's subsequent opinion is final and cannot be appealed.
Id. § 9.4.

---

[2] Plaintiffs allege that the TFSRA's powers with regard to a
hearing are constrained by TFSRA Regulation 1.1. Compl. ¶¶ 79-
81. That regulation states that the TFSRA "will adhere to the
dispute resolution procedures set out under section 9.3 of the
Code." However, the regulation also indicates that the TFSRA:
(1) "[m]ay grant a fair opportunity to be heard about the
dispute if . . . the [TFSRA] finds the existence of a material
issue as to whether or not the alleged act or practice is unfair
or deceptive, or in violation of existing tribal consumer
finance laws or regulations"; (2) "[w]ill not grant the consumer
an opportunity to be heard if the only allegation contained in
[a] consumer complaint is an allegation that the consumer
finance service provided is illegal in a jurisdiction outside
the jurisdiction of the Tribe"; and (3) "[m]ay resolve the
dispute in favor of the consumer upon a finding that the
[l]icensee has violated a law or regulation of the Tribe."

The latest development in the Tribe's history of economic regulation occurred on August 26, 2014, when the LVD Council enacted the Business Entity Ordinance ("the Business Ordinance"). Aug. 28 Resolution (ECF No. 23-6) at 1-2. The Business Ordinance created comprehensive procedures for the creation, operation, and dissolution of various tribal entities, including limited liability companies ("LLCs"). See generally Business Ordinance (ECF No. 23-7). Relevant to this dispute, the Ordinance stated that a tribally-owned LLC with the Tribe as its sole member would "be considered a wholly owned and operated instrumentality of the Tribe and . . . have all the privileges and immunities of the Tribe, including but not limited to the Tribe's sovereign immunity from suit, except as explicitly waived by the [LVD] Council." Id. Ch. 5, § 8(E). The Ordinance further indicated that those LLCs would be subject to the LVD Court's jurisdiction, but that such provision would not waive any claim to sovereign immunity in state or federal court. Id. Ch. 1, § 3(A), (D).

### 2. Beginning of Tribal Lending Operations

Soon after the Code was enacted, the Tribe began operating in the online lending arena when the LVD Council organized Red Rock Tribal Lending, LLC ("Red Rock") as a tribally-owned LLC on September 14, 2011. See Sept. 14, 2011 Resolution (ECF No. 23-

7

**JA242**

8). The company was managed by two members of the Tribe, and the Tribe was Red Rock's sole member. Red Rock Arts. of Organization (ECF No. 23-9), Art. 7; Hazen Aff. ¶¶ 6-7. The Complaint alleges that Matt Martorello ("Martorello")—along with Bellicose Capital, LLC ("Bellicose")[3] and Bellicose's general counsel, Daniel Gravel ("Gravel")—associated with the Tribe to form Red Rock. Compl. (ECF No. 1) ¶¶ 13, 29. Martorello, however, states that he was never a manager or member of Red Rock, nor were any of the companies that he owned or managed. Martorello Decl. (ECF No. 106-1) ¶¶ 18-21. Red Rock provided loans to consumers from its offices on the Reservation, and its employees, computers, and records were all located there. Moreover, as a tribal business, Red Rock was regulated by the TFSRA. Hazen Aff. ¶¶ 8-9.

Red Rock subsequently decided to contract with an outside entity to better learn the lending industry. The Tribe had identified Martorello as a potential consultant in mid-2011, but he was not involved in the creation of Red Rock. Martorello Decl. ¶¶ 14, 17. Then, on October 25, 2011, Red Rock contracted with Bellicose VI, LLC ("Bellicose VI")—a subsidiary of Bellicose—for it to provide Red Rock with vendor management

---

[3] Martorello was the founder and chief executive officer of Bellicose. Compl. ¶ 14.

8

services, compliance management assistance, marketing material development, and risk modeling and data analytics development. Hazen Aff. ¶ 10; Servicing Agm't[4] (ECF No. 83-2) at 1. On April 15, 2012, Bellicose VI assigned its interest in the contract to SourcePoint VI, LLC ("SourcePoint"), another Bellicose subsidiary. Hazen Aff. ¶ 12; Servicing Agm't at 1.

The Servicing Agreement detailed the revenue distribution structure for Red Rock's lending business and each party's duties as to that business. Under the contract, revenues were distributed first to Red Rock, which received 2% of all gross revenues "plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs." Servicing Agm't §§ 2.25, 6.4.1. The remainder was then distributed in the following order: (1) to SourcePoint, to reimburse it for advances made to Red Rock and for servicing expenses; (2) to any of Red Rock's creditors, to pay outstanding debt that was then due; and (3) to SourcePoint, to pay its monthly servicing fee. Id. § 6.4.2-.5. The servicing fee was a variable performance-based fee equivalent to whatever cash basis revenue remained after the distributions above, and was at a minimum $20,000. Id. § 3.5.1. Martorello claims that

---

[4] The parties have not provided the original servicing agreement between Red Rock and Bellicose VI, but there is no indication that its provisions were substantially different than those in the Servicing Agreement between Red Rock and SourcePoint.

9

JA244

the Tribe itself suggested this revenue split because it
guaranteed monthly income for the Tribe's general fund while
also incentivizing SourcePoint to help the Tribe grow its
businesses. Martorello Decl. ¶ 36. In addition, aside from these
distributions, Red Rock received and retained ownership of all
intellectual property developed under the Servicing Agreement by
SourcePoint. Id. ¶ 35.

The Agreement also assigned specific responsibilities to
SourcePoint. For instance, after noting that SourcePoint was
being engaged as Red Rock's "independent contractor" to perform
the services noted, the Agreement granted to SourcePoint "the
authority and responsibility over all communication and
interaction whatsoever between [Red Rock] and each service
provider, lender and other agents of [Red Rock]." Id. § 3.1. The
contract also prevented Red Rock from operating its lending
business anywhere without using SourcePoint to provide its
management and consulting services for those operations.
Id. § 3.3.1. In addition, the Servicing Agreement required
SourcePoint to select a bank account to store all funds
generated by Red Rock's lending, and gave SourcePoint—unless
otherwise agreed between Red Rock and SourcePoint—the "sole
signatory and transfer authority over such bank accounts," as
well as "sole authority to sweep monies from such bank accounts"

**JA245**

to distribute revenues under the priority structure. Id. § 4.4.
Finally, the Agreement gave SourcePoint numerous other duties
concerning the day-to-day functioning of Red Rock's lending
business, such as: (1) "[s]creening of and selecting service
providers and lenders, and negotiating agreements with such
service providers and lenders on behalf of [Red Rock]"; (2)
"[d]evelopment and promotion of sound and positive business
relationships on behalf of [Red Rock] with the designated
service providers and lenders"; (3) preparation of regulatory,
compliance, training, education, financial reporting and
accounting, website content, and marketing standards; (4)
"providing pre-qualified leads to [Red Rock] and providing the
necessary credit-modeling data and risk assessment strategies"
to Red Rock; and (5) "training and monitoring [Red Rock]
employees . . . that operate [Red Rock]'s call center."
Id. § 4.2.1.[5]

However, the Servicing Agreement also limited the ultimate
authority of SourcePoint over Red Rock's management decisions.

---

[5] Based, presumably, on the Servicing Agreement, Plaintiffs
allege that: Bellicose funded and underwrote Red Rock's loans;
the money loaned was transferred from a bank account controlled
by Bellicose and Martorello, which tribal officials could not
access; Bellicose accepted consumer payments directly; and the
only funds that Red Rock, Big Picture, or the Tribe ever
received or handled was the specified revenue percentage under
the Servicing Agreement. Compl. ¶¶ 30-32, 36-37.

11

JA246

For instance, the provision allowing SourcePoint to provide leads and credit-modeling data to Red Rock also said that "[t]he criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of [Red Rock] and [Red Rock] shall execute all necessary loan documentation." Id. § 4.2.1(i). Similarly, SourcePoint "ha[d] no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to third parties. Final determination as to whether to lend to a consumer rest[ed] with [Red Rock]." Id. § 4.1.1. SourcePoint also needed the Tribe's written consent "to do any of the following: (1) to borrow, pledge, assign, convey, encumber, grant security interest in, guaranty, or otherwise restrict the assets of [Red Rock]; (2) to sell or otherwise dispose of all or substantially all of the assets of [Red Rock]; [or] (3) to waive the sovereign immunity of [Red Rock]." Id. § 4.1.2. In other words, SourcePoint's duties, although numerous, were to be limited to providing "reasonable measures for the orderly administration and management" of Red Rock. Id. § 4.2.1.

Some evidence also indicates that Red Rock's role under the Servicing Agreement was more substantial than Plaintiffs suggest. Red Rock's co-manager, Michelle Hazen ("Hazen"), says that, "[w]hile Red Rock received advice and consulted with

12

JA247

Bellicose about operations, all final decisions about operations were made by Red Rock's managers." Hazen Aff. ¶ 11; see also ECF No. 83-4 (e-mail from SourcePoint employee to tribal members recommending adoption of direct mail campaign prepared by SourcePoint). Similarly, Martorello indicates that, as a consultant,[6] he "made suggestions and offered advice to Red Rock's co-managers," but "Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operation." Furthermore, Martorello, Bellicose, and SourcePoint never, on Red Rock's behalf, made lending decisions; originated a consumer loan; purchased a loan originated by Red Rock; or took any action to collect a Red Rock loan. Instead, Red Rock always made the final decision to lend to a particular consumer, and Red Rock's co-managers, including Hazen, always reviewed and approved marketing materials, including the prescreening of credit reports.[7] Finally, Bellicose's and SourcePoint's access to

---

[6] As permitted by the Servicing Agreement, SourcePoint hired Bellicose employees, including Martorello, to perform certain services for Red Rock. Martorello Decl. ¶ 31.

[7] Plaintiffs cite Big Picture's interrogatory response to assert that Red Rock's role in the lending process was limited to "final verification of the applicant's information in the loan agreement," including "the applicant's e-signature, the due dates, the payment schedule, [and] the applicant's bank information." Big Picture Interrogatory Responses (ECF No. 91-4) ¶ 24. This statement is misleading. First, the response addressed Big Picture's loan evaluation procedure, and thus had

13

USCA4 Appeal: 21-2116   Doc: 26-1   Filed: 02/07/2022   Pg: 278 of 678

Red Rock's bank accounts was limited by deposit access control agreements provided by Red Rock, which Red Rock or the Tribe could terminate at any time. Furthermore, although Martorello was a signatory on certain Red Rock accounts, he claims that he was listed that way only "to facilitate accounts payable, and never without express contractual or delegated authority." Martorello Decl. ¶¶ 22-28.

Red Rock then began making loans to consumers, including some in New York. In February 2013, the New York Department of Financial Services ("the Department") sent cease-and-desist letters to a number of lending entities, including the Tribe, accusing them of "using the Internet to offer and originate illegal payday loans to New York consumers, in violation of New York's civil and criminal usury laws."[8] Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013) (internal quotations omitted). The Department also sent letters to third parties that credit and debit payday loan payments, advising them that the Department

---

nothing to do with Red Rock. Second, the response did not concern Big Picture's relationship with third parties, and even noted that "[n]o third party participates in Big Picture's [loan] evaluation." Id.

[8] New York prohibits annual interest above 16% on loans greater than $250,000, N.Y. Gen. Obligations Law § 5-501; N.Y. Banking Law § 14-a(1), and criminalizes annual interest above 25%, N.Y. Penal Law § 190.40.

would pursue enforcement actions against lenders that refused to cease and desist. Id. at 356-57. This threat of regulatory enforcement caused the lending entities' business partners to limit or end their relationship with the entities, which in turn led the entities to seek a preliminary injunction preventing the Department from enforcing New York's anti-usury statutes against them—in part because any regulation would infringe on the entities' tribal sovereignty. See id. at 357-58. However, the court denied the entities' request, finding that they had not shown a likelihood of success on the merits because their online lending to New York consumers constituted off-reservation activity, and could therefore be properly regulated under New York's non-discriminatory anti-usury laws. See id. at 360-61. The Second Circuit affirmed this decision in October 2014. See Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 769 F.3d 105 (2d Cir. 2014). The Tribe's response to these decisions is unknown.

### 3. Expansion of Tribal Lending Business

After 2011, through its operation of Red Rock and relationship with Bellicose and Martorello, the Tribe gained knowledge of the online lending industry. Hazen Aff. ¶ 13; Martorello Decl. ¶¶ 47-48. The Tribe wanted to apply that knowledge to expand its online lending platform and increase

15

profitability for the Tribe, employ more tribal members, and acquire its vendors' businesses so that the Tribe would earn more money. Hazen Aff. ¶ 13. As part of that strategy, the LVD Council organized Big Picture on August 26, 2014. Aug. 26, 2014 Resolution (ECF No. 23-10). Big Picture was formed "as a wholly owned and operated instrumentality of the Tribe," and was managed by two tribal members, Hazen and James Williams ("Williams"). Id. at 2-3. Big Picture was meant to serve as an independent tribal lending entity that would "ultimately consolidate the business" of the Tribe's other lending entities, Red Rock and Duck Creek Tribal Financial, LLC. Id. at 1.

On February 5, 2015, the LVD Council formed another entity, Tribal Economic Development Holdings, LLC ("TED"), to operate the Tribe's current and future lending companies. Feb. 5, 2015 TED Resolution (ECF No. 23-13). The Tribe was the sole member of TED, and Hazen and Williams were designated as its co-managers. Id. at 3; TED Arts. of Organization (ECF No. 23-14), Arts. 8-9. Big Picture's membership was also restructured so that TED became its sole member. Big Picture Arts. of Organization (ECF No. 23-13), Arts. 8-9. Then, also on February 5, the LVD Council formed Ascension as a subsidiary of TED "for the purpose of engaging in marketing, technological and vendor services" to support the Tribe's lending entities. Feb. 5, 2015 Ascension

16

**JA251**

Resolution (ECF No. 23-16) at 1. Ascension was created "as a wholly owned and operated instrumentality of the Tribe," with TED as its sole member, and was managed by Hazen and Williams. Id. at 2-3; Ascension Arts. of Organization (ECF No. 23-17), Arts. 8-9. Hazen and Williams named Brian McFadden ("McFadden") as Ascension's President. Feb. 5, 2015 Ascension Resolution at 3.

### 4. Tribe's Acquisition of Bellicose

Since 2012, Martorello and the Tribe had engaged in multiple conversations about the potential sale of Martorello's consulting companies to the Tribe, which would allow the Tribe to engage in online lending without relying on outside vendors for support services. The creation of TED and Ascension and reorganization of Big Picture in February 2015 were undertaken to enable the Tribe to more easily purchase Bellicose, in part because those steps added layers to protect the Tribe from liability. Martorello Decl. ¶¶ 49-50; Martorello Sept. 11, 2015 E-mail (ECF No. 83-8) at LVD-DEF00014697. In addition, around that time, the LVD Council formed Tribal Acquisition Company, LLC ("TAC"), with TED as its sole member and Hazen and Williams as co-managers, for the sole purpose of acquiring Bellicose without creating a nexus between TED and Delaware. Sept. 14,

2015 Merger Resolution (ECF No. 34-2) ("the Merger Resolution")
at 2; Martorello Sept. 11, 2015 E-mail at LVD-DEF00014697.

In early 2015, the parties agreed on the basic framework of
the merger: a seller-financed transaction with non-fixed
payments over a seven-year term, with any outstanding amount due
being forgiven at the end of that term. According to Martorello,
the Tribe requested this structure because it would enable the
Tribe to accomplish its goals of economic self-sufficiency more
easily. Martorello Decl. ¶ 51. The seller-financier would be
Eventide Credit Acquisitions, LLC ("Eventide"), a company
managed and majority-owned by multiple entities of which
Martorello was the president. Merger Resolution at 3; Eventide
Operating Agm't, Sched. A (ECF No. 91-11). Eventide would
provide a $300 million loan to TED, which TED would then use to
purchase Bellicose. Merger Resolution at 3. After this structure
was set, Martorello continued negotiating with the Tribe over
the next several months. Martorello Decl. ¶ 52. The parties
reached a final agreement on September 14, 2015, memorializing
the terms of the deal in a loan agreement ("the Loan Agreement")
and a promissory note ("the Note"). Merger Resolution at 7-9;
see generally Loan Agreement (ECF No. 83-17); Note (ECF No. 83-
11). As part of the transaction, the LVD Council approved a
limited waiver of TED's and Big Picture's sovereign immunity in

18

JA253

connection with TED's repayment of the Eventide loan during its seven-year term. See Sept. 14, 2015 Immunity Waiver Resolution (ECF No. 34-3) at 2-8. On January 26, 2016, the Tribe finally completed its purchase of Bellicose, including subsidiaries like SourcePoint, and acquired all of Bellicose's data, software, and corporate goodwill. Martorello Decl. ¶ 53; Hazen Aff. ¶ 22.

Under the Note, revenues from Big Picture's lending business are distributed monthly in several steps. First, Big Picture makes a distribution to TED of Big Picture's gross revenues. Note § 1.2(a); Martorello Decl. ¶ 57. TED then distributes 2% of those gross revenues to the Tribe, until half of the total loan amount has been paid, at which time the distribution percentage increases from 2% to 4%. Note § 1.2(b)(1). The parties agreed to increase the monthly distribution from 2% to 3% in or around September 2016.[9] Note Addendum (ECF No. 91-18); Martorello Decl. ¶ 57. If TED defaults under the Loan Agreement, then the monthly distribution to the Tribe reduces to zero. Note § 1.2(b)(1); see also Loan Agreement § 6.1 (describing events triggering default). Second, TED pays an additional 2% of gross revenues to the Tribe to be

---

[9] That agreement also indicated that the percentage distribution would increase from 3% to 6% when half the loan had been repaid. Note Addendum; Martorello Decl. ¶ 57.

reinvested "in growing the loan portfolio."[10] Note § 1.2(b)(2). That reinvestment amount must "stay in equity within [TED] or [Big Picture] conducting lending" until the Note and Loan Agreement terminate. As with the first distribution, this payment reduces to zero if TED defaults. Note § 1.2(b)(2). Third, TED and Big Picture must pay any interest and principal due to other creditors. Id. § 1.2(b)(3).

Fourth, an amount is deducted to pay "[o]rdinary and necessary business expenses" incurred in connection with Big Picture's lending business, including payments to tribal and non-tribal vendors.[11] Id. § 1.2(b)(4); Martorello Decl. ¶ 57. Those expenses may not exceed reasonable rates for particular services, and TED and Big Picture have a fiduciary duty to Eventide to ensure that they do not "undermine the [p]arties' intent to maximize the cash flows directed to retire the Note as soon as possible." Note § 1.2(b)(4). Accordingly, TED must

---

[10] The initial reinvestment amount was $1.3 million, but the amount was reduced to 2% of gross revenues for each month thereafter. Note § 1.2(b)(2).

[11] The Note also identifies certain "[n]on-deductible expenses," which are taken instead from the Tribe's 2% monthly distribution or the 2% reinvestment amount at TED's choice. These include: (1) any tax, fine, or licensing fee charged by the Tribe, except for certain regulatory fees or fines charged by the TFSRA; (2) any attorneys' fees award from a suit related to the Bellicose merger documents; or (3) any ordinary and necessary expenses that Eventide does not agree to pay and that, in the aggregate, exceed $25,000 per year. Note § 1.2(b)(5).

20

submit a monthly budget and expense report to Eventide, which Eventide uses to ensure that the expenses are reasonable and not inflated to deprive Eventide of payments it will receive under the Note. Id. § 1.2(c); Martorello Decl. ¶ 59. The Note allows expenses based on a "reasonable expansion" of Big Picture's lending operations in light of "industry climate and norms." Note § 1.2(b)(4)(b). Nonetheless, Eventide must approve a budget for such expansion to ensure that TED's repayment of the loan is not affected. Id. Martorello claims that Eventide has "never unreasonably withheld its consent to expenses, nor has it objected to the reasonable expansion of the business—even when expansion created additional debt for Big Picture which meant smaller (or no) payments to Eventide." Martorello Decl. ¶ 60.

Finally, TED pays to Eventide the "Net Cash Available"—that is, Big Picture's gross revenues minus all the distributions and deductions above. That amount is applied first to any unpaid principal, and then to unpaid interest.[12] Note § 1.2. As Martorello explains, because Eventide receives payments last under the Note's distribution structure, it is possible that Eventide will not receive a principal payment in some months

---

[12] The Note carries a fixed interest rate of 1.8% per year, Note at 1, which Martorello claims is "significantly below the rate at which [the Tribe] could go into the marketplace and borrow funds," Martorello Decl. ¶ 64.

because TED has no net income from which to make a payment. This situation has occurred on at least five occasions. TED, on the other hand, has always received all of Big Picture's net income, and is guaranteed to receive its 3% distribution and reinvestment amount every month. Martorello Decl. ¶ 63.

Each payment to Eventide under the waterfall structure is accompanied by a payment schedule. Note § 1.2(c). Based on these schedules, and other financial statements, Martorello states that TED has consistently paid down its principal under the Note, such that the Tribe has been receiving an equity interest in the lending support services that it acquired through Bellicose. He notes that, since the close of the acquisition, Eventide's Note payments have amounted to $21,375,922.10, whereas the total economic consideration obtained by the Tribe under the Note has been $28,184,007.69. Martorello Decl. ¶ 63; McFadden Aff. (ECF No. 106-17) ¶ 17. However, the exact basis of those figures is unclear. In fact, Plaintiffs cite two documents with different numbers than those provided by Martorello. One indicates that, as of June 2017, the cumulative repayment to Eventide was $17,968,528.36, and the cumulative amount to TED was $4,924,930.94 ($1,963,708.81 in distributions, and $2,961,222.13 in reinvestments). Pls. Opp. (ECF No. 90) at 11, 21-22. The second shows slightly higher numbers than those

22

through December 2017. <u>See</u> <u>id.</u> Those figures are consistent with Big Picture's assertion that, by September 2017, TED had distributed approximately $20.5 million in loan payments to Eventide and nearly $5 million to the Tribe ($3,035,374.90 in distributions, and $1,948,999.53 in reinvestments). Big Picture Suppl. Interrogatory Responses (ECF No. 102-3) ¶ 1. Martorello's calculations might include amounts not accounted for in those spreadsheets, such as the economic value of Bellicose's data or corporate goodwill, but that is hard to discern. In any event, the Note is fixed to expire seven years after its execution date—thus, by September 14, 2022—at which time "the remaining balance is forgiven." Note § 1.3.

The Tribe finished restructuring its lending businesses soon after the Bellicose purchase. TAC dissolved in late January 2016 after control of Bellicose had been transferred to TED. Arts. of Dissolution (ECF No. 91-9). Around the same time, Bellicose's assets were assigned to Ascension and its liabilities were assigned to Big Picture, and Bellicose ceased to exist. Shortly thereafter, on February 16, 2016, Big Picture engaged Ascension as an independent contractor to provide Big Picture with the servicing support services that Ascension had carried over from Bellicose. Intratribal Servicing Agm't (ECF No. 91-17) § 3.1; <u>see also</u> McFadden Feb. 24, 2015 Letter (ECF

23

No. 91-30) (noting that all Bellicose VI positions and operations would be merged into Ascension).

The Intratribal Servicing Agreement is similar to the earlier Servicing Agreement between Red Rock and SourcePoint. In particular, the contract requires that Ascension "develop and recommend to [Big Picture] . . . reasonable measures for the orderly administration and management of [Big Picture] in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of vendor relationships, collections and risk assessment," and then describes most of the same day-to-day operational responsibilities that SourcePoint had. Intratribal Servicing Agm't § 4.2.1; see also Servicing Agm't § 4.2.1. Ascension also receives a monthly fee, which is the sum of the following: (1) "[m]anpower charges," which are Ascension's salary costs, payroll taxes, and other employment expenses; (2) internal expenses, which are capped by Ascension's servicing budget; (3) overhead expenses, in different amounts based on whether Big Picture is the beneficiary of such expenses; and (4) a bonus plan for Ascension's employees. Intratribal Servicing Agm't § 3.4.

Big Picture, however, retains the same managerial authority as Red Rock. To that end, the Intratribal Servicing Agreement specifically provides that "[t]he criteria used to extend funds

24

**JA259**

to individual borrowers will remain within the sole and absolute discretion of [Big Picture] . . . and [Big Picture] . . . shall execute all necessary loan documentations." Id. § 4.2.1(k). Likewise, Ascension "has no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to consumers. Final determination as to whether to lend to a consumer rests with [Big Picture] . . . ." Id. § 4.1. In addition, even though McFadden and Simon Liang ("Liang"), Ascension's controller, were added as authorized signers for Big Picture's bank accounts, ECF No. 83-23, their authority is bound by deposit account control and lockbox agreements, Intratribal Servicing Agm't §§ 4.4, 4.7. The only real limitation on Big Picture's authority is the Loan Agreement, which prevents TED or Big Picture from amending or terminating the Intratribal Servicing Agreement during the loan's seven-year term without Eventide's written consent. Loan Agm't § 5.12.

On the same day that Big Picture contracted with Ascension, the LVD Council also authorized Red Rock to assign the majority of its consumer loans and obligations to Big Picture. Hazen Aff. ¶ 23; Feb. 16, 2016 Assignment Resolution (ECF No. 23-23) at 2-3; see generally Assignment Agm't (ECF No. 23-24). All unassigned loans were written off as bad debt, and Red Rock subsequently dissolved. Hazen Aff. ¶ 23; Red Rock Arts. of

25

**JA260**

Dissolution (ECF No. 23-27); Feb. 16, 2016 Dissolution Resolution (ECF No. 23-26). Hazen, as co-manager of Red Rock, gave the appropriate notice of dissolution to the TFSRA and to any party that might have claims against Red Rock. See ECF Nos. 23-28, 23-29. Big Picture then sent a notice of assignment to all consumers whose loans it had received, instructing them that Big Picture would begin collecting their loan payments effective February 17, 2016. ECF No. 23-25.

### 5. Current Management of Big Picture and Ascension

TED now oversees both Big Picture and Ascension. All three entities have their headquarters on the Reservation. TED Operating Agm't (ECF No. 23-33) § 1.3; Big Picture Operating Agm't (ECF No. 23-30) § 1.3; Ascension Operating Agm't (ECF No. 23-18) § 1.3. Big Picture currently employs fifteen individuals on the Reservation. Ascension employs thirty-one individuals, most of whom work outside the Reservation at Ascension's satellite offices, Hazen Aff. ¶¶ 24-25, which appear to be in (at least) Atlanta, Mississippi, and Puerto Rico, Compl. ¶¶ 50-53. Hazen and Williams, both LVD Council members, co-manage all three companies. Hazen Aff. ¶¶ 2, 15, 18-20; Williams Aff. (ECF No. 23-36) ¶¶ 1, 11-13. That position grants them the broad authority to, in the case of Big Picture, "perform all actions as may be necessary or appropriate to carry out the business of

26

**JA261**

[Big Picture] including but not limited to the power to enter into contracts for services, to manage vendor relationships, to manage personnel issues and affairs of [Big Picture]." Big Picture Operating Agm't § 5.1(a).[13] Where the managers' power is limited by the operating agreements, the ultimate authority resides in the LVD Council. See id. § 5.2. Similarly, all three entities must submit quarterly reports to either the LVD Council (for TED) or TED (for Big Picture and Ascension). Id. § 5.8; TED Operating Agm't § 4.7; Ascension Operating Agm't § 5.8.

Hazen has been Big Picture's CEO since December 2015. Hazen Aff. ¶ 20. However, as for Ascension, Hazen and Williams have delegated to McFadden: (1) the "approval of Ascension strategic direction," which must be communicated at least quarterly to the co-managers; (2) "authority to execute documents on behalf of Ascension"; (3) "authority to open and maintain bank accounts"; (4) "authority to adopt, terminate, or change employee benefit plans or programs"; and (5) "authority regarding all matters necessary for . . . day to day management." Ascension Delegation of Authority Policy (ECF No. 91-13) § 1.4. McFadden must report regularly to Hazen and Williams about the authority exercised

---

[13] Hazen and Williams are granted similarly broad management authority under nearly identical provisions in TED's and Ascension's operating agreements. See TED Operating Agm't § 5.1(a); Ascension Operating Agm't § 5.1(a).

under those provisions and any matters that might fall under their purview. Id. § 1.5. McFadden also must obtain co-manager approval "for changes in operations, personnel, and distributions." McFadden Aff. ¶ 8.

Martorello asserts that he has had limited contact with the Tribe since it purchased Bellicose in January 2016. As he states, he has never been involved in TED's operations, made any decisions on its behalf, provided any consulting services to it, or solicited any investors on its behalf. Likewise, he has never provided any consulting services to Big Picture or Ascension; suggested marketing strategies, underwriting criteria, or other policies to them; accessed any of their software systems, databases, bank accounts, or records; or hired or fired their employees. Martorello has interacted with Hazen and Williams when they have requested Eventide's permission to undertake expenses for Big Picture that exceeded budgeted expenses under the Note, but Martorello never proposed that they incur those expenses, nor did he object to their requests. Martorello Decl. ¶¶ 70-97; see also McFadden Aff. ¶¶ 13-16. Furthermore, says McFadden, neither Eventide nor Martorello participates in Ascension's day-to-day operations, and Ascension does not seek Eventide's or Martorello's consent for those operations, except if Ascension needs to expand its budget. Even in that case,

28

**JA263**

explains McFadden, he would first obtain Hazen's or Williams' approval before contacting Eventide. McFadden Aff. ¶¶ 10-12.

Big Picture operates in some ways as an independent financial entity. It maintains its operating account with a regional bank, where it funds all its loans, receives all consumer payments, pays all payroll and vendors, deposits all its investments, and makes distributions to TED and the Tribe.[14] Big Picture relies on private investors to fund its lending operation, including the loans themselves. These investments are made through traditional loan agreements and promissory notes, under which Big Picture is responsible to each investor. Hazen Aff. ¶¶ 26-27. The Tribe itself has invested over $7 million. Williams Aff. ¶ 8.

Moreover, Big Picture's lending operation has yielded concrete financial benefits for the Tribe. Any profits that Big Picture earns are allocated to its sole member, TED, which in turn allocates those profits to the Tribe. Big Picture Operating Agm't § 6.1; TED Operation Agm't § 6.1.[15] If Big Picture's cash

---

[14] As with Red Rock, Plaintiffs allege that Big Picture does not ever handle the money loaned to or paid by consumers. See Compl. ¶¶ 30-32, 36-37.

[15] Ascension has an identical provision in its operating agreement, Ascension Operating Agm't § 6.1, but Ascension does not generate any profit that it could allocate.

JA264

account balance exceeds $500, it must declare an immediate distribution and transfer the excess to TED. Big Picture Operating Agm't § 6.2. It is unclear if this always occurs, as e-mails from Liang to Martorello about repayment of Eventide's loan contain language indicating that Big Picture's cash balance was greater than $500, but that Big Picture "would like to keep [the balance] for lead acquisition and loan origination in future months." See, e.g., ECF No. 83-24 at MARTORELLO_000218. In any event, beyond the profits obtained through the Note's revenue distributions, the Tribe also receives interest payments as a substantial investor in Big Picture. Proceeds from Big Picture's business now comprise more than 10% of the Tribe's general fund, and those profits could possibly fund more than 30% of the Tribe's budget over the next few years. Williams Aff. ¶¶ 9-10.

The Tribe relies on Big Picture's funds for governmental programs and services. Id. ¶ 10. Specifically, Big Picture's revenues have been used to, in whole or in part: meet requirements necessary to secure $14.1 million in financing for the Tribe's new health clinic; refinance casino debt; fund college scholarships and pay for educational costs for members such as student housing, books, school supplies and equipment; create home ownership opportunities for members through

30

tribally-purchased homes; subsidize tribal members' home
purchases and rentals; provide a bridge loan to complete the new
tribal health clinic that offers services to the regional
community; fund new vehicles for the Tribe's Police Department;
fund an Ojibwe language program and other cultural programs;
provide foster care payments for eligible children, propane
purchase assistance, and assistance for family care outside of
the community; cover burial and other funeral expenses for
members' families; fund renovations and new office space for the
Tribe's Social Services Department; fund youth activities;
renovate a new space for the LVD Court and bring in telecom
services for remote court proceedings; and fund tribal elder
nutrition programs and tribal elder home care and transport
services. Hazen Aff. ¶ 31.

### 6. Big Picture's Lending Process

As noted, Big Picture has its principal place of business
on the Reservation, and its employees are all located there. The
servers for Big Picture's websites are also stored on the
Reservation. And, because all loan applications are approved by
Big Picture employees on the Reservation, all consumer loans are
originated there. Id. ¶¶ 28, 30(a).

To obtain a loan from Big Picture, consumers must log onto
the company's website and complete and submit an application.

31

**JA266**

Big Picture then conducts a review using a software-based underwriting process and either accepts or denies the application. Id. ¶ 30(a)-(b). That software consolidates consumer credit data from third-party service providers to verify applicants' information and determine creditworthiness. Big Picture Interrogatory Responses ¶ 24. An applicant receives a notice of denial if the application is denied. Hazen Aff. ¶ 30(d).

Even if an application is accepted, the consumer must complete several more steps before the loan is finalized. First, the website prompts applicants to select their desired loan amount, which may be as high as $5,000. Second, applicants must select the term of the loan, and Big Picture in turn provides an estimated annual percentage rate ("APR") based on the underwriting software's determination of an applicant's repayment ability. Third, applicants must review Big Picture's standard loan agreement, which includes the loan's APR and repayment schedule. Fourth, applicants must acknowledge their review of, and agree to, the loan agreement—including the choice-of-law, forum-selection, and jury trial waiver clauses—and Big Picture's privacy disclosures. Finally, applicants must select their payment method. Id. ¶ 30(c)(1)-(6).

32

**JA267**

Once a consumer signs the loan agreement, the contract goes to Big Picture for its employees' review. Employees on the Reservation perform a final verification of the applicant's information in the loan agreement and other details. If there are no issues, the reviewing employee manually enters the date of disbursal of funds, which authorizes electronic approval of the agreement. This action also causes the loan to be originated and triggers the transmission of instructions for the particular application to a third-party payment processor, which then disburses the funds to the consumer. Id. ¶ 30(c)(7)-(8).

### 7. Tribe's Lending Activities in Virginia

The parties have not provided evidence regarding Red Rock's or Big Picture's lending activities in Virginia specifically. However, the Complaint alleges that Martorello and Gravel intentionally chose Virginia as a place where Red Rock and Big Picture would offer loans and collect payments, and they proceeded with this plan notwithstanding their knowledge that the loans would be illegal under Virginia's usury laws. Certain defendants then began marketing, initiating, and collecting loans in Virginia. Consumers were required to electronically sign the form loan agreement described above. Under the terms of that contract, the loans were subject to an APR that was much higher than 12%. However, neither the Tribe nor any of the

33

defendants had a consumer finance license permitting them to charge interest at such a high rate, and they never attempted to obtain such a license. Compl. ¶¶ 54-57, 60.

Lula Williams, Gloria Turnage ("Turnage"), George Hengle ("Hengle"), Dowin Coffy ("Coffy"), and Felix Gillison, Jr. ("Gillison"; with Lula Williams, Turnage, Hengle, and Coffy, collectively, "Plaintiffs") all entered into loans with Big Picture, and their loan agreements with Big Picture specified that interest would be charged at greater than 12% APR. Lula Williams' loan was subject to an APR of 649.8%; Turnage's loan was subject to an APR of 693.2%; Hengle's and Coffy's loans were subject to an APR of 607.5%; and Gillison's loan was subject to an APR of 627.2%. Based on those rates, Plaintiffs paid various amounts to Big Picture, most of which were credited as payment for interest or other loan-related fees. Id. ¶¶ 58-59, 62-65.

The loan agreements also contained the following provisions:

> GOVERNING LAW AND FORUM SELECTION: This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the [Tribal Consumer Financial Services Regulatory] Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code

**JA269**

and summarized below for your convenience. . . .

TRIBAL DISPUTE RESOLUTION PROCEDURE: The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by You or on Your behalf relating to or arising from this Agreement. The Procedure is found at Section 9 of the Code. You can find the Code at [Big Picture's] website, . . . or You may request a physical copy by written request mailed . . . to the Tribal Financial Services Regulatory Authority, P.O. Box 249, Watersmeet, Michigan 49969. The Tribe and [Big Picture] intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by you or on your behalf to follow the Procedure. Under the Procedure, a consumer who, in the course of his otherwise lawful and proper use of [Big Picture]'s business believes himself to be harmed by some aspect of the operation of any part of [Big Picture]'s business, shall direct his concerns or dispute to [Big Picture] in writing. A person's complaint to [Big Picture] shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner. [Big Picture] will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of the complaint. In the event that the consumer is dissatisfied with [Big Picture]'s determination, he may initiate Formal Dispute Resolution by requesting an administrative review of [Big Picture]'s determination by submitting such request in writing to the Tribal Financial Services

35

> Regulatory Authority ("Authority"), P.O. Box
> 249, Watersmeet, MI 49969, no later than
> ninety (90) days after receiving [Big
> Picture]'s determination.

ECF No. 1-1 at 4-5; see also Compl. ¶¶ 70-71. These are the
choice-of-law and forum-selection provisions referenced above.

## B. Procedural Background

On June 22, 2017, Plaintiffs brought suit against Big
Picture, Ascension, Martorello, Williams, Gertrude McGeshick,
Susan McGeshick, Giiwegiizhigookway Martin,[16] and Gravel. They
asserted five class claims:

(1) COUNT ONE, Declaratory Judgment, against all
defendants, stating that the choice-of-law and forum-
selection provisions in all loan agreements made by
Big Picture or Red Rock to Virginia residents are void
and unenforceable;

(2) COUNT TWO, Violations of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"),
18 U.S.C. § 1962(c), against all defendants;

---

[16] Williams, the McGeshicks, and Martin (collectively, "the LVD
Officers") are all members of the LVD Council: Williams is the
Chairman, Gertrude McGeshick is the Secretary, Susan McGeshick
is the Treasurer, and Martin is the Vice-Chairwoman.
Compl. ¶¶ 17-20.

36

**JA271**

     (3)   COUNT THREE, Violations of RICO, 18 U.S.C. § 1962(d), against all defendants;[17]

     (4)   COUNT FOUR, Violations of Virginia Usury Laws, against Big Picture, Martorello, Ascension, and Gravel; and

     (5)   COUNT FIVE, Unjust Enrichment, against Big Picture, Martorello, Ascension, and Gravel.

Compl. ¶¶ 84-139.

After some defendants indicated that they would seek dismissal of the Complaint on the basis of, among other grounds, lack of subject matter jurisdiction and personal jurisdiction, the Court ordered the parties to conduct jurisdictional discovery. ECF No. 17. Following discovery disputes, the Court ordered Defendants to produce some documents that it had previously withheld as privileged. ECF No. 49. That same day, the Court granted Plaintiffs' and Gravel's joint motion to dismiss Gravel from the action without prejudice. ECF Nos. 46, 50. The Court later granted the LVD Officers' motion to dismiss the claims against them on Rule 12(b)(6) grounds, and Plaintiffs chose not to file an Amended Complaint. ECF Nos. 117, 122.

---

[17] For Counts Two and Three, Plaintiffs seek injunctive relief only as to the LVD Officers, and both damages and injunctive relief as to Big Picture, Ascension, and Martorello. Compl. ¶ 95 n.8.

Accordingly, Big Picture and Ascension are the only remaining defendants besides Martorello.

## DISCUSSION

### I. Legal Standard

Fed. R. Civ. P. 12(b)(1) tests whether the court has subject matter jurisdiction to resolve the claims before it.[18] Sovereign immunity issues are generally considered jurisdictional in nature and, as a result, are appropriately resolved in the context of a Rule 12(b)(1) motion. See United States v. Jones, 225 F.3d 468, 469 (4th Cir. 2000) ("Sovereign immunity deprives a court of jurisdiction."); Best Med. Belgium, Inc. v. Kingdom of Belgium, 913 F. Supp. 2d 230, 236 (E.D. Va. 2012) ("Subject matter jurisdiction encompasses the scope of sovereign immunity."). When a defendant seeks dismissal under Rule 12(b)(1), the plaintiff bears the burden of proving subject matter jurisdiction. Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991); see also Lucas v. Henrico Cty. School Bd., 822 F. Supp. 2d 589, 599 (E.D. Va. 2011). Nonetheless, as explained below, there is some

---

[18] Big Picture and Ascension also assert that the Court lacks personal jurisdiction over them, but they spend little time arguing this point given the Fourth Circuit's broad reading of RICO's nationwide service of process provision. See ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 627 (4th Cir. 1997). Thus, the Court will not address any personal jurisdiction issues in this opinion.

JA273

disagreement here about which party bears the burden with respect to tribal sovereign immunity.

Two types of Rule 12(b)(1) motions exist:

> First, a 12(b)(1) motion may attack the complaint on its face, asserting that the complaint fails to state a claim upon which subject matter jurisdiction can lie. In such a challenge, a court assumes the truth of the facts alleged by plaintiff, thereby functionally affording the plaintiff the same procedural protection he or she would receive under Rule 12(b)(6) consideration.

> However, a 12(b)(1) motion may also . . . challenge the existence of subject matter jurisdiction in fact, apart from the pleadings. In such a challenge, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Lucas, 822 F. Supp. 2d at 599 (internal citations omitted). Moreover, in the latter situation—including where, as here, a defendant asserts sovereign immunity—the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459 (4th Cir. 2005) (internal quotations omitted); see also Blitz v. Napolitano, 700 F.3d 733, 736 n.3 (4th Cir. 2012) ("[On] a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings . . . ." (second

39

JA274

alteration in original) (internal quotations omitted)). The court then must "weigh[] the evidence to determine its jurisdiction." Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

## II. Tribal Sovereign Immunity

### A. Legal Standard

#### 1. In General

Federally-recognized Indian tribes are "separate sovereigns pre-existing the Constitution" that, "unless and until Congress acts, . . . retain their historic sovereign authority." Michigan v. Bay Mills Indian Cmty., 572 U.S. ___, 134 S. Ct. 2024, 2030 (2014) (internal quotations omitted). "Among the core aspects of sovereignty that tribes possess . . . is the common-law immunity from suit traditionally enjoyed by sovereign powers," which shields tribes from liability "absent congressional authorization (or a waiver)." Id. at 2030-31 (citing Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 756 (1998)). The Supreme Court has on multiple occasions refused to "confine [tribal] immunity . . . to transactions on reservations and to governmental activities." Kiowa, 523 U.S. at 754-55; see also Bay Mills Indian Cmty., 134 S. Ct. at 2036 (declining to revisit Kiowa and recognize "any exceptions for commercial or off-reservation conduct"). Thus, even though this broad scope of

40

JA275

immunity may have "unfortunate consequences," it is "settled law." Everette v. Mitchem, 146 F. Supp. 3d 720, 723 (D. Md. 2015) (citing Bay Mills Indian Cmty., 134 S. Ct. at 2052 (Thomas, J., dissenting) ("In the wake of Kiowa, tribal immunity has also been exploited in new areas that are often heavily regulated by States. For instance, payday lenders . . . often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality.")); see also Kiowa, 523 U.S. at 756 (acknowledging that tribal immunity is "settled law," even if "[t]here are reasons to doubt the wisdom of perpetuating the doctrine").[19]

Consistent with the idea that "an arm or instrumentality of the State generally enjoys the same immunity as the sovereign itself," Lewis v. Clarke, 581 U.S. ___, 137 S. Ct. 1285, 1290 (2017), courts in other circuits have universally held that "an

---

[19] The Supreme Court has not addressed whether, under Kiowa, "immunity should apply in the ordinary way if a tort victim, or other plaintiff who has not chosen to deal with a tribe, has no alternative way to obtain relief for off-reservation commercial conduct." Bay Mills Indian Cmty., 134 S. Ct. at 2036 n.8; see also Kiowa, 523 U.S. at 758 ("[I]mmunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims."). However, Plaintiffs willingly chose to contract with Big Picture when obtaining their loans, and Big Picture's association with the Tribe (and possible protection by sovereign immunity) was obvious from the face of Big Picture's loan agreements, so none of those hypothetical situations present themselves here.

41

JA276

entity that functions as an arm of a tribe shares in the tribe's immunity," Alabama v. PCI Gaming Auth., 801 F.3d 1278, 1287-88 (11th Cir. 2015); see also White v. Univ. of Cal., 765 F.3d 1010, 1025 (9th Cir. 2014); Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1183 (10th Cir. 2010); Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 29 (1st Cir. 2000); Hagen v. Sisseton-Wahpeton Cmty. Coll., 205 F.3d 1040, 1043 (8th Cir. 2000); In re IntraMTA Switched Access Charges Litig., 158 F. Supp. 3d 571, 575 (N.D. Tex. 2015). Although the Fourth Circuit has implicitly approved of this conclusion, it has never affirmatively adopted it. See United States v. Bly, 510 F.3d 453, 465 (4th Cir. 2007) (Motz, J., concurring); Aleman v. Chugach Support Servs., Inc., 485 F.3d 206, 213 (4th Cir. 2007). Nonetheless, several courts in the Fourth Circuit have taken the consensus approach. See Howard v. Plain Green, LLC, No. 2:17CV302, 2017 WL 3669565, at *3 (E.D. Va. Aug. 7, 2017), report and recommendation adopted, 2017 WL 3669096 (E.D. Va. Aug. 24, 2017); Everette, 146 F. Supp. 3d at 723; Madewell v. Harrah's Cherokee Smokey Mountains Casino, No. 2:10CV8, 2010 WL 2574079, at *3 (W.D.N.C. May 3, 2010), report and recommendation adopted, 730 F. Supp. 2d 485 (W.D.N.C. 2010).

42

JA277

The parties do not dispute that Big Picture and Ascension would be immune from suit if they qualify as arms of the Tribe, so the sole question here is whether they do so. Federal and state courts have employed several tests to determine if an entity is an arm of a tribe, but the most common was laid out in Breakthrough. See 629 F.3d at 1187-88 & n.10; Howard, 2017 WL 3669565, at *3 ("Federal courts have not settled on a uniform test, but the Tenth Circuit's analysis is the most comprehensive . . . ."). Under that framework, courts consider six factors to decide if the relationship between tribes and entities is close enough to justify immunity: "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities."[20] Breakthrough

_____

[20] The court did "not conclude[] that those factors constitute an exhaustive listing or that they will provide a sufficient foundation in every instance for addressing the tribal-immunity question." Breakthrough Mgmt., 629 F.3d at 1187 n.10 (emphasis in original). However, the parties do not suggest that the Court should rely on any factors other than those listed, so this limitation is not meaningful here.

43

Mgmt., 629 F.3d at 1183, 1187-88. Courts should apply these factors only to the entity claiming tribal immunity, but the entity's "prior operations under [different] names may shed light on the inquiry." People ex rel. Owen v. Miami Nation Enters., 386 P.3d 357, 376 (Cal. 2016).[21] The central question "'is not whether the activity may be characterized as a business, which is irrelevant under Kiowa, but whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe.'" In re IntraMTA, 158 F. Supp. 3d at 576 (quoting Allen v. Gold Country Casino, 464 F.3d 1044, 1046 (9th Cir. 2006)). In resolving that issue, courts should "take[] into account both formal and functional considerations—in other words, not only the legal or organizational relationship between the tribe and the entity,

---

[21] Big Picture and Ascension criticize Plaintiffs' frequent citations to Miami Nation on the basis that the case's discussion of tribal immunity tried to align Breakthrough with California law, not federal law. But tribal immunity is a common-law immunity that operates the same way in state and federal court, so the location of the underlying lawsuit in Miami Nation does not make that case any less helpful here. Indeed, Breakthrough itself relied heavily on cases from state courts, including California courts. See 629 F.3d at 1187-88. Moreover, the Tenth Circuit, which authored Breakthrough, has agreed with Miami Nation's more practical view of tribal immunity (albeit to require more jurisdictional discovery, and not to decide the ultimate immunity question). See Finn v. Great Plains Lending, LLC, 689 F. App'x 608, 611 (10th Cir. 2017). Thus, Miami Nation can help explain the Breakthrough factors even if the tests in those cases are different.

44

but also the practical operation of the entity in relation to the tribe." Miami Nation, 386 P.3d at 365. "These functional considerations illuminate the degree to which imposition of liability on the entity would practically impair tribal self-governance." Id. at 371.

### 2. Burden of Proof

Before turning to the merits of the jurisdictional dispute, the Court must first address which party bears the burden of proof as to a tribal arm's entitlement to sovereign immunity. Big Picture and Ascension contend that this question is easily answered because, in the Fourth Circuit, a plaintiff responding to a Rule 12(b)(1) motion must prove that subject matter jurisdiction exists. Richmond, Fredericksburg & Potomac R. Co., 945 F.2d at 768. However, this cursory assertion ignores the complexity of the jurisdictional issues raised by sovereign immunity. It is well-settled that the plaintiff bears the burden of showing subject matter jurisdiction, and that tribal immunity—like any sovereign immunity—"'deprives a court of jurisdiction'" over a defendant. Everette, 146 F. Supp. 3d at 723 (quoting Jones, 225 F.3d at 469). But those statements do not necessarily imply that tribal immunity is a matter of subject matter jurisdiction in the traditional sense—like, for instance, diversity of citizenship—or, instead, a factual issue

45

JA280

with jurisdictional implications. In fact, "the jurisdictional nature of tribal immunity has never been definitively settled," and has sometimes been discussed in terms of personal jurisdiction, at least in California courts. Miami Nation, 386 P.3d at 370. Federal courts have also reached differing conclusions on the point. Compare Miner Elec., Inc. v. Muscogee (Creek) Nation, 505 F.3d 1007, 1009 (10th Cir. 2007) ("Tribal sovereign immunity is a matter of subject matter jurisdiction . . . .") with In re Prairie Island Dakota Sioux, 21 F.3d 302, 305 (8th Cir. 1994) (tribal immunity "is a jurisdictional consideration separate from subject matter jurisdiction"). This categorization is important: pure subject matter jurisdictional issues, unlike tribal immunity, cannot be waived, and must be raised sua sponte by a court if it might lack the ability to hear a case. See Miami Nation, 386 P.3d at 370. Given these contrasts, it is possible that the burden for tribal immunity issues should be allocated differently than the burden for subject matter jurisdictional issues.

Moreover, even assuming that tribal immunity is a question of subject matter jurisdiction, that should not necessarily put the burden on Plaintiffs to prove that Big Picture and Ascension are not entitled to sovereign immunity. Such placement would effectively assume the truth of Big Picture's and Ascension's

46

**JA281**

assertion that they should be immune from suit in the same way as the Tribe itself. "Arm-of-the-tribe cases, however, require the court to decide an antecedent question: whether [the entities] can claim sovereign immunity in the first instance." Id. (alteration in original) (internal quotations omitted). Big Picture and Ascension may be right that Plaintiffs, having received extensive information from jurisdictional discovery, can prove that Big Picture and Ascension are not entitled to tribal immunity just as easily as those entities can prove that they are entitled to it. At the same time, even if the parties can access the same evidence, one side must present it in a way that convinces the Court to make a particular decision, and there is no reason that Big Picture and Ascension should be freed from having to do so before the Court finds that they are entitled to tribal immunity. Stated differently, it would be odd to treat Big Picture and Ascension as immune entities without making them show it first. See id. at 371 ("An entity that is formally distinct from the tribe will be immune from suit only insofar as it benefits from the tribe's own immunity. . . . But until the entity has proven it should be treated as an extension of the tribe, it is no more entitled to a presumption of immunity than any other party.").

47

With these considerations in mind, most courts have concluded that an entity seeking tribal immunity must show by a preponderance of the evidence that it is entitled to that immunity, either as an arm of the tribe or as the tribe itself. See Gristede's Foods, Inc. v. Unkechuage Nation, 660 F. Supp. 2d 442, 465 (E.D.N.Y. 2009); City of N.Y. v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966, 2009 WL 705815, at *4 (E.D.N.Y. Mar. 16, 2009); Miami Nation, 386 P.3d at 371. But see Cash Advance & Preferred Cash Loans v. State, 242 P.3d 1099, 1113 (Colo. 2010) (requiring plaintiff to prove by a preponderance of the evidence that tribal entities are not entitled to immunity because tribal immunity "bears a substantial enough likeness to subject matter jurisdiction to be treated as such for procedural purposes"). Besides the practical aspects noted above, those courts found considerable support in cases involving arms of the state, in which courts have held that the governmental entity invoking the Eleventh Amendment must show that it qualifies as an arm of the state. See, e.g., Golden Feather, 2009 WL 705815, at *4; see also U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 147 (4th Cir. 2014) (Traxler, C.J., concurring in judgment in part and dissenting in part) ("[T]he circuits that have considered similar assertions of arm-of-state status have uniformly concluded that it is an affirmative defense to be

48

JA283

raised and established by the entity claiming to be an arm of the state."). Because the arm-of-the-tribe and the arm-of-the-state analyses are functionally identical in the sovereign immunity context, it is illogical to place the burden on different parties in each situation.

The problem here is that the Fourth Circuit has not addressed which party bears the burden on the arm-of-the-state question. Plaintiffs claim that the Fourth Circuit has held that "'arm-of-state status . . . must be treated as an affirmative defense.'" Pls. Opp. at 17 (quoting Oberg, 745 F.3d at 148 (Traxler, C.J., concurring in judgment in part and dissenting in part)). That contention is plainly wrong, as the language quoted is from Chief Judge Traxler's opinion concurring in the judgment and dissenting, which is not precedent. The majority in Oberg, however, did acknowledge that "arm-of-the-state status may well constitute an affirmative defense in the related Eleventh Amendment context." 745 F.3d at 136. Relying on that brief statement, another judge in the Court has concluded that the entity asserting sovereign immunity bears the burden of demonstrating that it is an arm of the state. Pele v. Pa. Higher Educ. Assistance Agency, 13 F. Supp. 3d 518, 522 (E.D. Va. 2014); see also Pope v. Barnwell Cty. Sch. Dist. No. 19, No. 1:16-CV-01627-JMC, 2017 WL 1148741, at *4 (D.S.C. Mar. 28,

49

**JA284**

2017). Accordingly, the arm-of-the-state framework is just as influential here in determining which side has the burden in the arm-of-the-tribe inquiry as it was in Miami Nation and Golden Feather. As a result, the Court will join those courts in concluding that the entities claiming tribal sovereign immunity—here, Big Picture and Ascension—bear the burden of establishing by a preponderance of the evidence that they are entitled to that immunity as arms of the tribe.

### B. Application of Breakthrough Factors

Reviewing the six Breakthrough factors in the context of the parties' jurisdictional discovery, the Court concludes that Big Picture and Ascension have not met their burden of proof and, therefore, are not entitled to sovereign immunity.

#### 1. Method of Creation

The first factor "focuse[s] on the law under which the entity was formed. Formation under tribal law weighs in favor of immunity, whereas formation under state law has been held to weigh against immunity." Miami Nation, 386 P.3d at 372 (internal citations omitted). Consistent with that statement, courts have found that this factor supports sovereign immunity where entities' formation documents showed that they were organized under and operated pursuant to tribal law. See White, 765 F.3d at 1025; Breakthrough Mgmt., 629 F.3d at 1191-92; Allen, 464

50

F.3d at 1046; Howard, 2017 WL 3669565, at *3; Everette, 146 F. Supp. 3d at 724; In re IntraMTA, 158 F. Supp. 3d at 576; Miami Nation, 386 P.3d at 376. In contrast, this factor has weighed against sovereign immunity where it was clear that the purported tribal entities were incorporated under state law. See Somerlott v. Cherokee Nation Distributors, Inc., 686 F.3d 1144, 1149 (10th Cir. 2012); J.L. Ward Assocs., Inc. v. Great Plains Tribal Chairmen's Health Bd., 842 F. Supp. 2d 1163, 1176 (D.S.D. 2012).

Applying that rationale here, this factor weighs in favor of immunity. Big Picture and Ascension were both organized through resolutions by the LVD Council, which was itself exercising the power given to it by the LVD Constitution, and the entities operated pursuant to the Tribe's Business Ordinance. See Aug. 26, 2014 Resolution at 1-2 (Big Picture); Big Picture Arts. of Organization at 1; Feb. 5, 2015 Ascension Resolution at 1-2; Ascension Arts. of Organization at 1. The same is true of Red Rock, the loans of which were assigned to Big Picture after TED acquired Bellicose. Sept. 14, 2011 Resolution at 1; Red Rock Arts. of Organization at 1. As in the cases noted above, these tribal formation documents justify Big Picture's and Ascension's claims to sovereign immunity.

Plaintiffs contend that looking only to the documents under which Big Picture and Ascension were organized fails to account

for other circumstances surrounding their formation—namely, the cease-and-desist letter issued to Red Rock by the New York Department of Financial Services, the "mounting pressure" against rent-a-tribe schemes, and Hazen's inability to explain who decided to create Big Picture. Pls. Opp. at 18. It is true that "[t]he circumstances under which the entity's formation occurred, including whether the tribe initiated or simply absorbed an operational commercial enterprise," may be relevant to this factor. Miami Nation, 386 P.3d at 372. Here, it is telling that Big Picture and Ascension were not formed until after the Tribe was denied an injunction against the New York cease-and-desist. See Otoe-Missouria, 974 F. Supp. 2d at 353. Plaintiffs have presented credible evidence that, following that decision, Martorello and the Tribe looked for ways to restructure Red Rock's lending operation in order to reduce exposure to liability. Indeed, several steps in February 2015—the formation of TED and Ascension, the reorganization of Big Picture with TED as its sole member, and the initiation of the Tribe's Bellicose purchase—were apparently taken with that very goal in mind. Moreover, although Red Rock was formed as a tribal entity, Bellicose and its subsidiaries, like SourcePoint, were a critical part of Red Rock's business. Thus, by creating Big Picture and Ascension, the Tribe was not starting an independent

52

**JA287**

lending operation but rather facilitating the absorption of Red
Rock's fully-functioning lending enterprise—which had a
decidedly non-tribal character, given Bellicose's involvement.
Big Picture and Ascension may be right that Hazen's lack of
knowledge about the decision to create Big Picture is not
meaningful on its own. But, viewed in context, Hazen's
unawareness teaches that the impetus behind the formation of Big
Picture and Ascension was Martorello and Bellicose's desire to
avoid liability, more so than the Tribe's interest in starting
its own business. Consequently, these circumstances limit the
extent to which this factor weighs in favor of sovereign
immunity. Moreover, the real significance of this evidence is in
the second Breakthrough factor: the purpose factor.

However, Plaintiffs' second assertion—that Ascension's
registration as a foreign LLC in Puerto Rico also affects the
formation factor—is much less persuasive. Somerlott held that
the Breakthrough factors are "inapplicable to entities which are
legally distinct from their members and which voluntarily
subject themselves to the authority of another sovereign which
allows them to be sued." Somerlott, 686 F.3d at 1149-50.
Plaintiffs point out that, although Ascension may be organized
under tribal law, it subjected itself to the laws and the
possibility of being sued in Puerto Rico by registering as a

53

foreign LLC there. See P.R. Laws tit. 14, §§ 3522(a), 3806(b), 4021(a)(1). But Somerlott's holding was premised entirely on the entity's incorporation under state law, which distinguished the case from others in which entities claiming to be arms of a tribe were "organized, in some form or another, under tribal law." 686 F.3d at 1149; see also J.L. Ward, 842 F. Supp. 2d at 1176 (entity was "created by incorporation under South Dakota, rather than tribal, law" (emphasis added)). Plaintiffs' attempt to skirt this limitation is unsupported by Somerlott, which demonstrated its holding by explaining that a corporation owned by the United States but incorporated under New York law would not share the United States' sovereign immunity. 686 F.3d at 1150. Ascension's background is obviously different, as it is both owned by the Tribe and incorporated under its laws. See Rassi v. Fed. Program Integrators, LLC, 69 F. Supp. 3d 288, 291 (D. Me. 2014) (distinguishing Somerlott where tribe formed subordinate entity under similar circumstances). Thus, this argument misses the mark. As a result, the first Breakthrough factor supports a finding of sovereign immunity for both Big Picture and Ascension, albeit with the caveat noted above.

### 2. Purpose of Entities

The second factor "encompasses both the stated purpose for which the entity was created and the degree to which the entity

54

actually serves that purpose." <u>Miami Nation</u>, 386 P.3d at 372; <u>see also Breakthrough Mgmt.</u>, 629 F.3d at 1192-93 (considering both elements). The initial question is whether the entity has a stated purpose that "relates to broader goals of tribal self-governance" separate from the entity's commercial activities, like developing the tribe's economy or funding governmental services, or whether "the entity was created solely for business purposes and without any declared objective of promoting the tribe's general tribal or economic development." <u>Miami Nation</u>, 386 P.3d at 372 (internal quotations omitted). If such a purpose exists, the inquiry then turns to the entity's "execution" of that purpose; the "fit . . . need not be exact, but the closer the fit," the more it supports tribal immunity. <u>Id.</u> For instance, evidence of "the number of jobs [the entity] creates for tribal members or the amount of revenue it generates for the tribe" suggests that it is an arm of the tribe, but "evidence that the entity engages in activities unrelated to its stated goals or that [it] actually operates to enrich primarily persons outside of the tribe or only a handful of tribal leaders" shows the opposite.[22] <u>Id.</u> at 373.

---

[22] <u>Miami Nation</u> cites no case law in support of this required "fit" between purpose and execution. <u>See</u> 386 P.3d at 372-73. Nonetheless, <u>Miami Nation</u>'s conclusion makes sense logically, and <u>Breakthrough</u> supports the more exacting inquiry called for

The stated purposes of both Big Picture and Ascension relate to the Tribe's goal of economic self-sufficiency. Big Picture's stated purpose is "[t]o engage in the business of operating one or more Tribal lending business(es)," Big Picture Arts. of Organization, Art. 5, which it does as part of the LVD Council's "strategic economic development efforts" that are aimed at "diversify[ing] the economy of the Tribe's reservation in order to improve the Tribe's economic self-suffiency," Aug. 26, 2014 Resolution at 1. Similarly, Ascension's stated purpose is "[t]o engage in the business of operating one or more Tribal marketing, technology and vendor service business(es)," Ascension Arts. of Organization, Art. 5, which helps fulfill the same tribal economic development efforts, see Feb. 5, 2015 Ascension Resolution at 1. Those stated purposes must also be read in conjunction with that of TED, the sole member of both entities, which works "[t]o promote the economic development of the Tribe through the development of business opportunities." TED Arts. of Organization, Art. 5. Along the same lines, TED's management activities are intended "to further the economic development of the Tribe." Feb. 5, 2015 TED Resolution at 1. These goals—development and execution of an online lending

---

by Miami Nation. See Breakthrough Mgmt., 629 F.3d at 1192-93 (examining entity's revenue allocation in considering purpose).

business to gain revenue for the Tribe's economic benefit—are
extremely similar to those that other courts have found relate
to tribal self-governance. See Breakthrough Mgmt., 629 F.3d at
1192 (casino was created to "further[] the economic prosperity
of the Tribe"); Howard, 2017 WL 3669565, at *3 (stated purposes
included "increase[ing] [sic] Tribal revenues and enhance[ing]
[sic] the Tribe's economic self-sufficiency and self-
determination" (alterations in original)); Everette, 146 F.
Supp. 3d at 724 (entity's purpose was "to engage in lending
related activities that will generate additional revenues for
the Tribe"); Gavle v. Little Six, Inc., 555 N.W.2d 284, 294
(Minn. 1996) (stated purpose was "improv[ing] the business,
financial or general welfare" of the entity and tribe
(alteration in original)).

On the surface, these stated purposes seem to favor Big
Picture and Ascension. However, as set out in Section II.B.1
above, the record shows that the formation of Big Picture and
Ascension, and indeed, much of the tribal restructuring, was for
the real purpose of helping Martorello and Bellicose to avoid
liability, rather than to help the Tribe start a business. And,
that finding means that Big Picture and Ascension have not
carried their burden on the purpose factor.

57

JA292

Plaintiffs also contend that Big Picture and Ascension do not fulfill their stated purposes in practice. First, they say, Big Picture and Ascension have not provided any information about the number of jobs created for the Tribe or the amount of revenue received by the Tribe from their business. Second, they note that Ascension does not employ any tribal members and generates no revenue for the Tribe. Third, they assert that Big Picture is structured such that the primary beneficiaries are Hazen (who is paid more than the other tribal employees of Big Picture) and Martorello (given that TED uses most of Big Picture's revenue to make loan payments to Eventide).[23]

All three arguments have merit. First, Plaintiffs are wrong to claim that Big Picture and Ascension have provided no information about the revenue generated for the Tribe; Williams has explained that money from Big Picture constitutes more than 10% of the Tribe's general fund, and may contribute more than 30% of the fund within the next few years. Williams Aff. ¶ 10.

---

[23] Plaintiffs also argue that Red Rock's distribution of limited revenue to the Tribe in 2014 and 2015 should influence the Court's decision. However, Red Rock is a defunct entity that made distributions pursuant to a servicing agreement with another entity, SourcePoint, that also no longer exists, and that agreement has no bearing on the parties asserting tribal immunity (the relationship of which is governed by an entirely different contract). Given those differences, Red Rock's situation does not "shed light on the [purpose] inquiry" and will not affect the Court's consideration of this factor. Miami Nation, 386 P.3d at 375.

The Tribe obtains these funds both through TED's monthly 3%
distributions, and as interest on its substantial investment in
Big Picture's enterprise. See id. ¶¶ 8-10. Nonetheless, courts
assessing an entity's execution of purpose have examined how
much revenue the tribe actually received from the entity. See
Breakthrough, 629 F.3d at 1192-93 (concluding that entity's
business "clearly benefit[ed] the Tribe" based on percentage
allocation of revenue to certain tribal governmental functions);
Everette, 146 F. Supp. 3d at 724 (noting that revenue was used
"to fund various tribal governmental, educational, and social
services" and to provide specified "essential services"). In
that regard, Hazen's statement that those funds "support LVD
governmental essential services and support the LVD community"
in numerous ways, Hazen Aff. ¶ 31, is far too general, as it
sheds no light on how much Big Picture's revenue helped fund
those services. That money might, for instance, constitute only
a small, insignificant part of the funding for the services that
Hazen has identified. If that is true, then Big Picture would
not be effectively serving the Tribe's economic development. The
evidence provided by Big Picture and Ascension, which bear the
burden of proof here, is too vague to eliminate that
possibility.

Furthermore, even if Big Picture's revenue is a meaningful portion of the Tribe's general fund, the revenue received by the Tribe is a sliver of Big Picture's total earnings. The entity seeking immunity in Breakthrough provided 100% of its revenue to various tribal services. 629 F.3d at 1192-93. Here, in contrast, the Note expressly limits the funds available to the Tribe to 5% of Big Picture's monthly revenue—the 3% monthly distribution and the 2% reinvestment amount, if the latter is treated as a current benefit to the Tribe.[24] See Note § 1.2. Breakthrough did not specify any revenue allocation percentage that must be reached to reflect an adequate fit between purpose and execution, but Miami Nation noted that a similarly small revenue distribution—a monthly payment of either 1% of the entity's revenue or $25,000—would not economically benefit the tribe. See 386 P.3d at 377-78. The evidence here further indicates that Big Picture has, over time, given the Tribe a little less than $5 million, whereas TED has made loan repayments to Eventide of

---

[24] Plaintiffs assert that this amount is not a current benefit because TED will not receive any reinvestment amount if it defaults on the loan. No evidence shows that TED is likely to default in the near future, and the Big Picture balance sheets cited by Plaintiffs appear to treat that reinvestment amount as a current asset. Plaintiffs' assertion thus relies on the wholly speculative premise that TED will, at some future date, take some action that qualifies as an event of default. See Loan Agm't § 6.1. The Court will not base its conclusion about Big Picture's purpose on a guess about the future.

about $20 million.[25] Big Picture Suppl. Interrogatory Responses ¶ 1. In other words, even under this broader view—which accounts for the months in which Eventide has not received any distribution—the Tribe has only received about 20% of Big Picture's total revenue, still a relatively small percentage. That imbalance shows that Big Picture has not served its stated purpose very well. And, even if Big Picture will not owe Eventide anything after the Note terminates in several years, Note § 1.3, the revenue distribution disparity will almost certainly have increased in that period, assuming Big Picture's revenue stream remains similar to what it has been since the parties entered into the Note.

Ascension is in a very similar position. That company supports Big Picture's lending operations and generates no revenue itself, see Intratribal Servicing Agm't § 3.4, so the purpose analysis for Big Picture applies to Ascension in much the same way. Some evidence also demonstrates that Ascension

---

[25] As noted, Martorello claims that the Tribe has actually obtained more economic consideration than Eventide since the Bellicose purchase. Martorello Decl. ¶ 63. However, that assertion is based on his valuation of equity consideration from some unknown "audited financial statements." Id. Because Big Picture and Ascension have not provided those statements here, it is impossible to verify the accuracy of Martorello's statement in the face of conflicting evidence showing that the Tribe's actual economic benefit under the Note has been dwarfed by Eventide's.

fulfills its nominal purpose even less effectively than Big Picture. Whereas Big Picture's employees primarily belong to the Tribe and work on its reservation, Ascension does not employ any non-tribal members, instead relying mostly on employees that previously worked at Bellicose. That composition may have been justified when Ascension was formed in 2015 because the company needed individuals with certain technical knowledge for the required support services, and Bellicose's employees were the perfect candidates. But, in the several years since, Hazen's and Williams' testimony instructs that the Tribe has done little more than encourage tribal members to pursue educational opportunities that would allow them to work for Ascension and Big Picture in the future.[26] Thus, Ascension has failed to contribute much to the Tribe's self-governance, either directly (by supporting Big Picture's minimal revenue generation) or indirectly (by hiring tribal employees).

Finally, Big Picture's and Ascension's compensation structures underscore the companies' poor execution of their purposes. Despite what Plaintiffs claim, the evidence does not

---

[26] Plaintiffs' assertion that Ascension or the Tribe has not started any training programs for tribal members to work at the company assumes, without any apparent basis in the evidence, that the Tribe has both the capacity and the funds to do so. This failure to pursue some possibly unachievable hypothetical goal does not count against Ascension in the purpose analysis.

62

indicate that Martorello himself has received any substantial economic benefit from Big Picture, certainly not in the same sense as the non-tribal individuals in <u>Miami Nation</u>. <u>See</u> 386 P.3d at 363, 378 (noting that individuals used alleged tribal entities' checks to pay for their personal expenses). However, Plaintiffs' breakdown of the compensation of Hazen, other tribal employees of Big Picture, all employees of Ascension, and the total amount paid to Ascension by Big Picture clearly illustrates two things: (1) Hazen has profited from Big Picture's lending operation far more than any other tribal members, and (2) Ascension's employees are paid handsomely compared to Big Picture's employees. These compensation differences lead to the conclusion that Big Picture and Ascension primarily benefit individuals and entities outside the Tribe, or only one tribal leader, both of which are inconsistent with the goal of economic development. <u>See</u> <u>id.</u> at 373.

Given these circumstances—and even granting that the fit between purpose and execution need not be exact, <u>id.</u> at 372—Big Picture and Ascension have largely failed to fulfill their stated purposes. Accordingly, this factor weighs against sovereign immunity for both entities.

63

### 3. Structure, Ownership, and Management of Entities, Including Amount of Tribe's Control

This factor focuses primarily on the leadership of the entity claiming immunity. See Breakthrough Mgmt., 629 F.3d at 1193. "Relevant considerations include the entity's formal governance structure, the extent to which it is owned by the tribe, and the entity's day-to-day management." Miami Nation, 386 P.3d at 373. However, an entity's "outsourc[ing] management to a nontribal third party is not enough, standing alone, to tilt this factor against immunity." Id.; see also Gavle, 555 N.W.2d at 295 ("[C]ontrol of a corporation need not mean control of business minutiae; the tribe can be enmeshed in the direction and control of the business without being involved in the actual management."). In that case, the inquiry turns to the tribe's involvement despite the nontribal leadership. "Evidence that the tribe actively directs or oversees the operation of the entity weighs in favor of immunity; evidence that the tribe is a passive owner, neglects its governance roles, or otherwise exercises little or no control or oversight weighs against immunity." Miami Nation, 386 P.3d at 373.

Big Picture is an LLC that is 100% owned and operated by its sole member, TED, which in turn is 100% owned and operated by its sole member, the Tribe. Big Picture Arts. of

64

JA299

Organization, Arts. 8-9; TED Arts. of Organization, Arts. 8-9. Big Picture is also managed by two tribal members, Hazen and Williams, who were appointed by majority vote of the LVD Council and must be removed in the same way. Hazen Aff. ¶ 15; Williams Aff. ¶ 12; Big Picture Operating Agm't § 5.1(a), (d). As co-managers, Hazen and Williams are granted the broad authority to "bind [Big Picture] individually," and "to do and perform all actions as may be necessary or appropriate to carry out the business of [Big Picture] including but not limited to the power to enter into contracts for services, to manage vendor relationships, [and] to manage personnel issues and affairs of [Big Picture}." Big Picture Operating Agm't § 5.1(a). They are precluded only from restricting or selling Big Picture's assets or waiving its sovereign immunity, for which they must obtain TED's consent (by majority vote of the LVD Council). Id. § 5.2. Furthermore, to the extent that Hazen and Williams are not involved in the day-to-day operations of Big Picture, the Tribe has a substantial role in those operations, as the entity employs a number of tribal members and conducts all of its operations on the Reservation. Hazen Aff. ¶ 24. Finally, the executive leadership of Big Picture preserves the Tribe's influence, as Hazen is the company's CEO. Id. ¶ 20; see also Breakthrough, 629 F.3d at 1193 (factor weighed both for and

against immunity where directors of entity were all tribal members but some executive officers were non-tribal members). This general structure is to assure that Big Picture is answerable to the Tribe at every level, which supports immunity. See Howard, 2017 WL 3669565, at *4; Everette, 146 F. Supp. 3d at 724-25; In re IntraMTA, 158 F. Supp. 3d at 577; J.L. Ward, 842 F. Supp. 2d at 1176-77.

Plaintiffs claim, however, that Big Picture's formal structure is overcome in practice by Ascension's substantial role. In support of this assertion, Plaintiffs highlight the Intratribal Servicing Agreement,[27] which, they contend, confers significant day-to-day responsibilities on Ascension and permits little oversight by Big Picture. They acknowledge that the Agreement does not grant Ascension the authority to "engage in origination activities, execute loan documentation, or approve the issuance of loans to consumers." Intratribal Servicing Agm't § 4.1. However, they note, the Agreement assigns to Ascension the duties to give "pre-qualified leads" to Big Picture and to provide "the necessary credit-modeling data and

---

[27] Plaintiffs are correct that the Intratribal Servicing Agreement and the Servicing Agreement delegate nearly identical responsibilities to Ascension and SourcePoint, respectively. See Intratribal Servicing Agm't § 4.2.1; Servicing Agm't § 4.2.1. However, it is unclear how this similarity affects the control inquiry, as Plaintiffs do not explain how the Servicing Agreement limited the Tribe's control over Red Rock.

66

risk assessment strategies" used by Big Picture to decide whether to issue a loan. Id. § 4.2.1(k). Because Ascension generally identifies potential loan applicants by prescreening credit reports and then directs mass mailings to those consumers, Plaintiffs say, Big Picture's role is limited to verifying details at the loan approval stage. This minimal involvement is further shown by Williams' lack of knowledge about entities owned by Big Picture.

Plaintiffs' argument relies on two underlying contentions: (1) that the Tribe's formal oversight of Big Picture is meaningless given Ascension's dominant role in Big Picture's lending operations; and (2) that, assuming Ascension has such a role, that entity is not controlled by the Tribe. Both arguments are persuasive. As to the first assertion, it is true that the Intratribal Servicing Agreement also states that "[t]he criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion" of Big Picture, and that Big Picture "shall execute all necessary loan documentation." Id. Nonetheless, considering that Ascension's responsibilities allow it to identify borrowers based on Ascension's own credit-modeling system and then prepare mass mailings to those consumers, it does not appear that Big Picture has much discretion to exercise when it receives recommendations or

67

JA302

documents from Ascension. Indeed, Ascension's actions in effect reduce Hazen's and William's responsibilities in the loan process to pro forma review and approval of key business decisions. See ECF No. 91-3; see also Big Picture Interrogatory Responses ¶ 24. Viewed in conjunction with Ascension's numerous other responsibilities under Section 4.2.1, this control is too limited to support a finding of tribal immunity. See Miami Nation, 386 P.3d at 373.

Moreover, evidence that Williams is not familiar with three Big Picture subsidiaries shows that Hazen and Williams do little to oversee Big Picture's operations as co-managers. Big Picture and Ascension point to several documents that, they say, suggest just the opposite: that those individuals "actively direct[] or oversee[] the operation of [Big Picture]." Id. For instance, Hazen and Williams have discussed items like Big Picture's operating budget and employee handbook, ECF Nos. 102-15, 102-16; and approved forms sent by employees concerning, inter alia, company policies and procedures, compliance management, and personnel decisions, ECF No. 106-13. This evidence reflects that Hazen and Williams exercise some managerial oversight over Big Picture's operations. However, Williams' testimony about other issues, like his non-involvement in Big Picture's day-to-day and lack of knowledge about customer service representatives'

68

responsibilities operations, demonstrates that such oversight is narrow in both scope and depth. Consequently, Big Picture has not shown by a preponderance of the evidence that the Tribe, through Hazen and Williams, controls Big Picture, so this factor weighs against immunity for that entity.

The question of Ascension's tribal control is not as close. Just like Big Picture, Ascension is an LLC that is 100% owned and operated by its sole member, TED. Ascension Arts. of Organization, Arts. 8-9. Hazen and Williams also manage Ascension, and the operating agreement gives them the same broad powers as with Big Picture and requires an LVD Council vote for their appointment and removal. Hazen Aff. ¶ 19; Williams Aff. ¶ 13; Ascension Operating Agm't §§ 5.1-5.2. At the same time, as in Breakthrough, the Tribe's control is diminished by the appointment of a non-tribal member, McFadden, as Ascension's president. See 629 F.3d at 1193. Likewise, Ascension conducts most activities outside the Reservation and employs only non-tribal members. In light of this non-tribal management, the Court must consider whether the Tribe is an active or passive owner. See Miami Nation, 386 P.3d at 373. Here, that inquiry revolves around the extent of Hazen and Williams' oversight of Ascension and the influence of non-tribal actors on Ascension's decisions.

Ascension has presented evidence that McFadden must obtain Hazen's or Williams' approval for "changes in operations, personnel, or distributions," McFadden Aff. ¶ 8, and that Ascension employees have submitted request and approval forms to Hazen and Williams for certain business decisons, ECF No. 106-13. Ascension's operating agreement also reserves primary oversight of the company's actions for Hazen and Williams. See Ascension Operating Agm't § 5.1(a). Nonetheless, those assertions of oversight are undercut materially because Hazen and Williams have delegated to McFadden the authority to approve Ascension's "strategic direction, goals and targets"; execute documents on the company's behalf; open and maintain Ascension's bank accounts; adopt, terminate, or change employee benefit plans; and oversee "all matters necessary for the day to day management of Ascension." Ascension Delegation of Authority Policy § 1.4. These actions are all important managerial ones that can significantly affect an entity's directions and its decisions. And, the evidence tends to show that the real management function lies not with Hazen and Williams, but with McFadden. On balance, that evidence augurs against Ascension's immunity claim.

Plaintiffs make much of provisions in the Loan Agreement that prevent TED and Ascension from modifying the Intratribal

Servicing Agreement or terminating or replacing any managers or officers of Ascension, among other entities, without Eventide's consent. Loan Agreement §§ 5.12, 5.14. Although there is no evidence that these rights have been exercised, their mere presence is evidence that goes against a finding of immunity because they confer on Eventide, and hence Martorello, significant control mechanisms over significant aspects of Ascension's operations. On balance, the control factor slightly favors a finding against immunity. At best for Big Picture and Ascension, it is neutral, and thus does not aid them in meeting their burden of proof.

### 4. Tribe's Intent with Respect to Sharing of Sovereign Immunity

Big Picture's and Ascension's formation documents show that the Tribe intended for both entities to share its immunity. The resolutions organizing each company state:

> [T]he [LVD] Council believes it to be in the best interest of the Tribe to create such an entity which, as a wholly owned and operated instrumentality of the Tribe, shall be possessed of all the privileges of the Tribe, including but not limited to the sovereign immunity of the Tribe which shall not be waived unless authorized by the [LVD] Council . . . .

Aug. 26 2014 Resolution at 2; Feb. 5, 2015 Ascension Resolution at 2. Each entity's articles of organization reiterate that

71

"[t]he sovereign immunity of the [entity] shall remain intact unless waived by [TED] pursuant to a duly authorized resolution of the [LVD] Council." Big Picture Arts. of Organization, Art. 7; Ascension Arts. of Organization, Art. 7. Other courts have found similar language sufficient for this factor to support tribal immunity. See Breakthrough, 629 F.3d at 1193-94; Howard, 2017 WL 3669565, at *4; Everette, 146 F. Supp. 3d at 725.

Plaintiffs concede that this factor weighs in Big Picture's and Ascension's favor, but argue that the Court should accord it the least weight out of all the factors. Plaintiffs are right that the intent factor "reveals little about 'whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe,'" Miami Nation, 386 P.3d at 379 (emphasis in original) (quoting Allen, 464 F.3d at 1046), but they mistake the significance of that statement. Miami Nation simply held that tribal intent "cannot, without more, . . . tip the balance in favor of immunity" where that factor is the only one to point "unequivocally" in that direction. Id. (internal quotations omitted). Big Picture and Ascension do not ascribe to this factor such outsized importance in the immunity analysis; indeed, they discuss it the least of any Breakthrough factor. Moreover, neither Miami Nation nor any other case holds that the

72

intent factor should be given any less weight. Therefore, the Court will consider this factor as it would any other.

But here the intent factor must be assessed in perspective of the context in which Big Picture and Ascension were created. As explained above, the record shows that those entities were intended to be vehicles that would shield Martorello and Bellicose from liability. Then, on this record, the intent factor weighs against a finding of immunity because to do otherwise is to ignore the driving force for the Tribe's intent to share its immunity. Here, the Tribe's intent no doubt was, in part, to help the Tribe, but to do so by providing its immunity to shelter outsiders from the consequences of their otherwise illegal actions.

### 5. Financial Relationship Between Tribe and Entities

The "starting point" for this factor is "whether a judgment against the entity would reach the tribe's assets." Miami Nation, 386 P.3d at 373; see also J.L. Ward, 842 F. Supp. 2d at 1176 (factor weighed against immunity because "[a] suit against [the entity] would not appear to affect, at least not directly, any particular tribe's fiscal resources"). However, "direct tribal liability . . . is neither a threshold requirement for immunity nor a predominant factor in the overall analysis." Miami Nation, 386 P.3d at 373; see also Breakthrough Mgmt., 629

73

F.3d at 1187 ("Although . . . the financial relationship between a tribe and its economic entities is a relevant measure of the closeness of their relationship, . . . it is not a dispositive inquiry.").[28] After all, "[s]ome tribes rely on [an entity's] business revenues to an extent that a judgment against the entity could effectively strike a blow against the tribal treasury, regardless of whether the tribe is directly liable." Miami Nation, 386 P.3d at 373. Consequently, courts consider the extent of the tribe's dependence on the entity "'for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities.'" Id. (quoting Breakthrough Mgmt., 629 F.3d at 1195). Accordingly, "[i]f a significant percentage of the entity's revenue flows to the tribe, or if a judgment against the entity would significantly affect the tribal treasury, this factor will weigh in favor of immunity even if the entity's liability is formally limited." Id.

---

[28] Miami Nation specifically rejected holdings by other state courts that the tribe's direct liability (or lack thereof) was dispositive of the financial relationship factor. See 386 P.3d at 373 (citing Sue/Perior Concrete & Paving, Inc. v. Lewiston Golf Course Corp., 25 N.E.3d 928, 935 (N.Y. 2014); Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents, 84 P.3d 437, 440-41 (Alaska 2004)). Given that Sue/Perior and Runyon represent the minority approach on this issue, the Court will not follow them here.

74

The Tribe would not be directly affected by any judgment against Big Picture or Ascension. Each entity's operating agreement contains a liability limitation provision that makes the entity's "debts, liabilities, and obligations" its own. Big Picture Operating Agm't § 4.3; Ascension Operating Agm't § 4.3. The entities' interrogatory responses confirm that the Tribe would not be liable for any judgment against the entities because they are LLCs. Big Picture Interrogatory Responses ¶ 23; Ascension Interrogatory Responses (ECF No. 83-13) ¶ 18. Accordingly, neither company can satisfy this aspect of the financial relationship factor.

Other evidence further establishes that Big Picture and Ascension lack a strong financial connection to the Tribe. The structure of the Note ensures that the Tribe's monthly gains will only consist of, at most, 5% of Big Picture's revenue. Thus, as described above, the Tribe has received a little less than 20% of the total revenue distributed under the Note. Because the Tribe receives a very small part of Big Picture's revenue, this factor does not cut the same way as in cases where "all of [the entity's] profits inure[d] to the benefit of the Tribe." Howard, 2017 WL 3669565, at *4; see also Breakthrough Mgmt., 629 F.3d at 1195 ("One hundred percent of the Casino's revenue goes to the Authority and then to the Tribe.").

75

Furthermore, the other evidence that Big Picture and Ascension claim weighs in favor of immunity is unconvincing. First, notwithstanding the interest payments that the Tribe receives as an investor in Big Picture, Williams Aff. ¶¶ 8-9, the total distributions to the Tribe under the Note are limited. Consequently, although it might be true in theory that "any reduction in [Big Picture]'s revenue that could result from an adverse judgment against it would therefore reduce the Tribe's income," Breakthrough Mgmt., 629 F.3d at 1195, the actual effect on the Tribe appears to be insubstantial. Second, Big Picture's revenue does not play as important a role in the Tribe's general fund as in other cases where this factor supported immunity. See Breakthrough Mgmt., 629 F.3d at 1195 (tribe "depend[ed] heavily on the [entity]" for funding); Everette, 146 F. Supp. 3d at 724. As noted, Big Picture has not provided an exact breakdown of revenue allocation to different tribal services, so it is impossible to discern how the Tribe would be affected, if at all, if a judgment harmed Big Picture's operations. Third, there is evidence that Big Picture does not comply with its operating agreement's mandatory cash distribution requirement when balances exceed $500. See, e.g., ECF No. 83-24 at MARTORELLO_000218; see also Big Picture Operating Agmt' § 6.2. If Big Picture does not transfer its funds to TED when it

76

should, then the Tribe likely does not need that money on a timely basis. Given these circumstances, this factor weighs against Big Picture.

Ascension's financial relationship with the Tribe is not very different. By its own admission, Ascension does not generate revenue for itself or for the Tribe, so a judgment against Ascension could not possibly affect the Tribe's revenue directly. However, given that Ascension performs critical services for Big Picture, any judgment that limited Ascension's operations or forced it to close would, by extension, drastically reduce Big Picture's revenue. This potential indirect effect on the Tribe's general fund is important in the financial relationship framework. See Breakthrough Mgmt., 629 F.3d at 1195; Miami Nation, 386 P.3d at 373. Yet, for the reasons detailed above, any reduction in Big Picture's revenue would not be felt strongly by the Tribe itself. Consequently, this factor also weighs against immunity for Ascension.

### 6. Fulfillment of Purposes Underlying Tribal Immunity

The final factor assesses "the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." Breakthrough Mgmt., 629 F.3d at 1187. "Those policies include protection of the tribe's

monies, as well as preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians." Id. at 1188 (internal citations and quotations omitted); cf. Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla., 498 U.S. 505, 510 (1991) (federal statutes affirming tribal immunity "reflect Congress' desire to promote the goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development" (internal quotations omitted)).

At first glance, granting sovereign immunity to Big Picture and Ascension would appear to serve these purposes. As noted, more than 10% of the Tribe's general fund comes from Big Picture's revenue, and that percentage will increase to more than 30% in the next few years. In addition, Hazen has stated that those funds "are used to provide a variety of social services and other benefits for the Tribe." Howard, 2017 WL 3669565, at *4. Even though Ascension does not make any money itself, it necessarily contributes to Big Picture's revenues by providing crucial technical and marketing services. As a result, both entities seem to "promote and fund the Tribe's self-determination through revenue generation and the funding of

diversified economic development." <u>Breakthrough Mgmt.</u>, 629 F.3d at 1195; <u>see also</u> <u>Everette</u>, 146 F. Supp. 3d at 725.

However, a closer look reveals that neither Big Picture nor Ascension fulfills those goals very well, if at all. The inadequacies of Hazen's general statements about the Tribe's use of Big Picture's revenues are detailed above. Because the extent to which the Tribe has actually used Big Picture's funds for the services noted by Hazen is unclear, the Court cannot tell whether granting immunity here "directly protects the . . . Tribe's treasury, which is one of the historic purposes of sovereign immunity in general." <u>Allen</u>, 464 F.3d at 1047. Moreover, even assuming that Big Picture's lending operation and Ascension's support have contributed to the Tribe's economic self-development to some extent, those entities' actions have primarily enriched non-tribal entities like Eventide and, possibly, individuals like Martorello. The Bellicose purchase, and the resulting Note and Loan Agreement, have undoubtedly yielded some benefits for the Tribe. Yet, by limiting the Tribe's monthly distribution to a very small percentage of Big Picture's revenue, the Note forces the Tribe to receive those benefits at substantial cost—a reality that is illustrated by the sharp disparity in distributions received by the Tribe and Eventide since TED began repaying the loan.

79

JA314

Consequently, as Plaintiffs note, granting immunity here might have the unintended consequence of preventing the Tribe from obtaining favorable terms in future business transactions, as non-tribal entities would not be inclined to offer repayment above a certain rate. Thus, even if the Tribe is not bound by the Note's distribution structure forever, the example will have been set. Therefore, although Big Picture and Ascension serve the core purposes of tribal immunity to some extent, these circumstances cause this factor to weigh against immunity for both entities.

### C. Weight of Factors

For the reasons discussed above, Big Picture and Ascension have the burden to prove arm-of-the-tribe immunity by a preponderance of the evidence. That means the weighing of factors must permit a finding of immunity. On this record, that balance actually falls the other way, and weighing everything on the balance, the Court finds that neither entity qualifies as an arm of the Tribe. Therefore, Big Picture and Ascension are not immune from suit here.

80

**CONCLUSION**

For the foregoing reasons, DEFENDANTS BIG PICTURE LOANS AND
ASCENSION TECHNOLOGIES' MOTION TO DISMISS FOR LACK OF SUBJECT
MATTER JURISDICTION (ECF No. 22) was denied.

It is so ORDERED.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  July 27, 2018

81

JA316

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| LULA WILLIAMS, GLORIA TURNAGE, GEORGE HENGLE, DOWIN COFFY, and FELIX GILLISON, JR., *on behalf of themselves and all individuals similarly situated,* | : : : : : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. 3:17-cv-461 |
| v. | : : | |
| BIG PICTURE LOANS, LLC, MATT MARTORELLO, ASCENSION TECHNOLOGIES, INC., DANIEL GRAVEL, JAMES WILLIAMS, JR., GERTRUDE MCGESHICK, SUSAN MCGESHICK, and GIIWEGIIZHIGOOKWAY MARTIN, | : : : : : : : : : | |
| | : | |
| Defendants. | : | |

**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT
MARTORELLO**

# TABLE OF CONTENTS

**BACKGROUND** ................................................................................................ 3

    A.    LVD's Decision to Enter into the Online Lending Industry Was Made Entirely Independently from Martorello. ........................................................................ 3

    B.    LVD's Decision to Seek Out and Do Business with Martorello. ................... 5

    C.    RRTL, SourcePoint, and SourcePoint's Relationship and Involvement with RRTL Were Constantly Changing from 2012 Through 2016. ......................... 7

    D.    Martorello's Involvement with SourcePoint Was Constantly Changing from 2012 Through 2016. ..................................................................................... 11

    E.    LVD Purchased Bellicose and Its Subsidiaries on January 26, 2016. ........... 12

    F.    Martorello Has Never Had Any Involvement in the Operations of BPL or Ascension. ................................................................................................. 14

    G.    LVD's Ownership and Operation of RRTL and BPL Has Resulted in Significant Benefits to the Tribe. ................................................................................. 15

    H.    All Documents and Data Relating to LVD Were Transferred to the Tribe in Connection with Its January 2016 Purchase of Bellicose, and the Tribal Defendants Refuse to Provide Those Materials in Discovery. ...................... 16

**ARGUMENT** ................................................................................................. 18

**I.**    **PLAINTIFFS HAVE WAIVED THE ABILITY TO PURSUE A CLASS ACTION.** ................................................................................................. 19

**II.**    **THE PROPOSED CLASSES ARE NOT ASCERTAINABLE.** ................... 21

**III.**    **COMMON ISSUES DO NOT PREDOMINATE AND THE CONTROVERSY WOULD NOT BE MANAGEABLE AS A CLASS ACTION.** ................................................................................................. 24

    **A.**    **Martorello's Conduct as to Each Putative Class Member Is Not Uniform.** ........... 24

    **B.**    **Individualized Issues Regarding RICO's Causation Requirement Predominate over Common Questions.** ...................................................... 29

    **C.**    **Common Issues Do Not Predominate as to Plaintiffs' Unjust Enrichment Claims.** ...................................................................................................... 31

**IV.**    **THE CLASS DEFINITION FAILS.** .......................................................... 35

    **A.**    **The Proposed Classes Are Not Limited Temporally.** ............................... 35

    **B.**    **The proposed Unjust Enrichment and RICO Injunctive Relief Classes Include Many Members Who Were Not Injured.** .................................... 36

**V.**    **PLAINTIFFS DO NOT DEMONSTRATE THAT A CLASS ACTION WOULD BE SUPERIOR.** .................................................................... 37

A.    The Motion's Failure to Address Issues Associated with a Class Action
      Involving Defendants Other than Martorello Precludes a Finding of
      Manageability. ..................................................................................................37

VII.  THE ADMINISTRATOR OF MR. GILLISON'S ESTATE IS NOT AN
      ADEQUATE CLASS REPRESENTATIVE. .................................................39

CONCLUSION .................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Abdul-Hasib v. Aerotek, Inc.*,
   2017 WL 5903555 (D. Md. Nov. 30, 2017) ...................................... 20

*Adashunas v. Negley*,
   626 F.2d 600 (7th Cir. 1980) .......................................................... 35

*Airlines Reporting Corp. v. Pishvaian*,
   155 F. Supp. 2d 659 (E.D. Va. 2001) .............................................. 27

*Allen v. SSC Lexington Operating Co. LLC*,
   2017 WL 4357449 (M.D.N.C. Sept. 29, 2017)................................ 20

*Allstate Ins. Co. v. Seigel*,
   312 F. Supp. 2d 260 (D. Conn. 2004)............................................. 36

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013) ....................................................................... 20

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ....................................................................... 31

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)........................................................................ 20

*Bearden v. Honeywell Int'l, Inc.*,
   2010 WL 1223936 (M.D. Tenn. Mar. 24, 2010) ....................... 32, 35

*Berger v. Home Depot USA, Inc.*,
   741 F.3d 1061 (9th Cir. 2014) ....................................................... 31

*Black v. Boyd*,
   248 F.2d 156 (6th Cir. 1957) .......................................................... 33

*Branch v. Gov't Employees Ins. Co.*,
   323 F.R.D. 539 (E.D. Va. 2018) (Payne, J.) ............................... 1, 21

*Bunker Holdings, Ltd. v. Green Pac. A/S*,
   346 F. App'x 969 (4th Cir. 2009) ................................................... 20

*Carter v. PJS of Parma, Inc.*,
   2016 WL 3387597 (N.D. Ohio June 20, 2016)............................... 32

*Chappelle v. E. I. DuPont DeNemours & Co.*,
   75 F.R.D. 74 (E.D. Va. 1977) ............................................................ 39

*Chevron Corp. v. Donziger*,
   833 F.3d 74 (2d Cir. 2016) ................................................................ 36

*Chisolm v. TranSouth Fin. Corp.*,
   95 F.3d 331 (4th Cir. 1996) .............................................................. 29

*City of St. Petersburg v. Total Containment, Inc.*,
   265 F.R.D. 630 (S.D. Fla. 2010) ...................................................... 32

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ............................................................................ 24

*Consumer Fin. Prot. Bureau v. Cashcall, Inc.*,
   2018 WL 485963 (C.D. Cal. 2018) .................................................... 4

*Covert v. LVNV Funding, LLC*,
   779 F.3d 242 (4th Cir. 2015) ............................................................ 31

*DAGS II, LLC v. Huntington Nat'l Bank, NA*,
   2016 WL 4536328 (W.D. Mich. Aug. 31, 2016) .............................. 33

*Daigle v. Ford Motor Co.*,
   2012 WL 3113854 (D. Minn. July 31, 2012) .................................... 32

*Dillon v. BMO Harris Bank, N.A.*,
   856 F.3d 330 (4th Cir. 2017) ............................................................ 21

*Doe I v. Wal–Mart Stores, Inc.*,
   572 F.3d 677 (9th Cir. 2009) ............................................................ 31

*Douglas Cty. Fed'n v. Douglas Cty. Sch. Dist. RE-1*,
   325 F.R.D. 355 (D. Colo. 2018) ...................................................... 32

*Dykes v. Portfolio Recovery Associates, LLC*,
   2016 WL 346959 (E.D. Va., Jan. 28, 2016) .................................... 23

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) .......................................................................... 38

*EQT Prod. Co. v. Adair*,
   764 F.3d 347 (4th Cir. 2014) ...................................................... 21, 22

*Fielding v. Dolgen, LLC*,
   2018 WL 3091012 (E.D. Va. June 21, 2018) ........................... 20

*Fisher v. Virginia Elec. & Power Co.*,
   217 F.R.D. 201 (E.D. Va. 2003) ........................................ 38

*Freeman v. Capital One Bank*,
   2008 WL 2661990 (E.D. Va. July 3, 2008) ............................. 20

*Gariety v. Grant Thornton, LLP*,
   368 F.3d 356 (4th Cir. 2004) ...................................... 18, 25

*Hayes v. Delbert Servs. Corp.*,
   811 F.3d 666 (4th Cir. 2016) ........................................ 21

*Hegel v. Brunswick Corp.*,
   2010 WL 2900379 (E.D. Wis. July 20, 2010) .......................... 32

*Hemi Group., LLC v. City of New York*,
   559 U.S. 1 (2010) ................................................ 29, 30

*Henry v. Cash Today, Inc.*,
   199 F.R.D. 566 (S.D. Tex. 2000) .................................. 25, 30

*Holmes v. Sec. Inv'r Prot. Corp.*,
   503 U.S. 258 (1992) ................................................. 29

*Howard v. Great Plains*,
   2017 WL 3669565 (E.D. Va., Aug. 7, 2017) ........................... 15

*In re Asacol Antitrust Litigation*,
   2018 WL 4958856 (1st Cir. Oct. 15, 2018) ........................... 22

*In re Citizens Corp.*,
   2013 WL 4039048 (Bankr. M.D. Tenn. Aug. 7, 2013) ................... 33

*In re Dial Complete Mktg. & Sales Practices Litig.*,
   312 F.R.D. 36 (D.N.H. 2015) ........................................ 31

*In re Safety-Kleen Corp. Bondholders Litig.*,
   2004 WL 3115870 (D.S.C. Nov. 1, 2004) .............................. 19

*In re: McCormick & Co., Inc.*,
   217 F. Supp. 3d 124 (D.D.C. 2016) .................................. 32

*Inetianbor v. Cashcall Inc.*,
    No. 13-CIV-60066 (S.D. Fla. Sept. 19, 2016) ............................... 21, 25

*Karhu v. Vital Pharm., Inc.*,
    621 F. App'x 945 (11th Cir. 2015) ............................................ 23

*Lloyd v. Gen. Motors Corp.*,
    275 F.R.D. 224 (D. Md. 2011) ................................................ 38

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) ............................................. 21, 22

*McFarland v. Virginia Ret. Servs. of Chesterfield, L.L.C.*,
    477 F. Supp. 2d 727 (E.D. Va. 2007) ..................................... 27, 28

*Mendelovitz v. Vosicky*,
    40 F.3d 182 (7th Cir. 1994) ................................................ 29

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ............................................... 36

*Mid Atlantic Telecom, Inc. v. Long Distance Serv., Inc.*,
    18 F.3d 260 (4th Cir. 1994) ................................................ 29

*Muriithi v. Shuttle Express, Inc.*,
    712 F.3d 173 (4th Cir. 2013) ............................................... 20

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*,
    769 F.3d 105 (2d Cir. 2014) ................................................ 13

*Pearce v. UBS PaineWebber, Inc.*,
    2004 WL 5282962 (D.S.C. Aug. 13, 2004) ..................................... 25

*Petersen v. Am. Gen. Life Ins. Co.*,
    2016 WL 7365187 (M.D. Fla. Mar. 30, 2016) .................................. 38

*Piotrowski v. Wells Fargo Bank, NA*,
    2015 WL 4602591 (D. Md. July 29, 2015) ................................... 23, 24

*Pitt v. City of Portsmouth, Va.*,
    221 F.R.D. 438 (E.D. Va. 2004) ............................................. 37

*Plotnick v. Computer Scis. Corp. Deferred Comp. Plan for Key Executives*,
    182 F. Supp. 3d 573 (E.D. Va. 2016) ........................................ 35

**JA323**

*Plotnick v. Computer Scis. Corp. Deferred Comp. Plan for Key Executives*,
   875 F.3d 160 (4th Cir. 2017) ..................................................................... 35

*Pro Bono Inv., Inc. v. Gerry*,
   2005 WL 2429777 (S.D.N.Y. Sept. 30, 2005) ........................................... 33

*Purdie v. Ace Cash Express, Inc.*,
   2003 WL 22976611 (N.D. Tex. 2000) ....................................................... 25

*Quick Serve Concepts, LLC v. Cedar Fair*, L.P.,
   83 Va. Cir. 59 (Va. Cir. Ct. 2011) ............................................................ 31

*Russell v. Citigroup, Inc.*,
   2015 WL 9424144 (E.D. Ky. Dec. 22, 2015) ............................................ 32

*Shiring v. Tier Techs., Inc.*,
   244 F.R.D. 307 (E.D. Va. 2007) ................................................................ 40

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*,
   226 F. Supp. 3d 589 (E.D. Va. 2017) ........................................................ 29

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*,
   884 F.3d 489 (4th Cir. 2018) ..................................................................... 29

*Snowden v. Checkpoint Check Cashing*,
   290 F.3d 631 (4th Cir. 2002) ..................................................................... 20

*Supler v. FKAACS, Inc.*,
   2012 WL 5430328 (E.D.N.C. Nov. 6, 2012) ............................................. 23

*Thorn v. Jefferson–Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) ..................................................................... 19

*United States v. Pepe*,
   747 F.2d 632 (11th Cir. 1984) ................................................................... 37

*Upshaw v. Georgia (GA) Catalog Sales, Inc.*
   206 F.R.D. 694 (M.D. Ga. 2002) ............................................................... 25

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) ................................................................. 32

*Wal–Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ............................................................................ 18, 28

**JA324**

*Whorley v. Kuchera Indus., Inc.*,
    2011 WL 3812632 (W.D. Pa. Aug. 26, 2011) ................................................ 37

*Whorley v. Kuchera Indus., Inc.*,
    2011 WL 3812957 (W.D. Pa. July 29, 2011) ................................................ 36

*Williams v. Mohawk Industries*,
    568 F.3d 1350 (11th Cir. 2009) ................................................................ 30

*Windham v. Am. Brands, Inc.*,
    435 U.S. 968 (1978) ................................................................................. 38

*Windham v. Am. Brands, Inc.*,
    565 F.2d 59, 71 (4th Cir. 1977) (en banc) .............................................. 2, 38, 39

*Young v. Nationwide Mutual Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ................................................................... 35

## <u>Statutes</u>

Va. Code Ann. § 13.1-1019 ................................................................................. 27

## <u>Other Authorities</u>

*Federal Practice & Procedure* § 1760 (3d ed. 2005) ........................................ 21

*Newberg on Class Actions* § 4:72 (5th ed.) ..................................................... 37

## <u>Rules</u>

Fed. R. Civ. P. 23(b)(3) ............................................................................ 24, 37, 38

## <u>Treatises</u>

1 McLaughlin on Class Actions § 5:60 (11th ed.) ............................................. 32

Defendant, Matt Martorello ("Martorello"), by counsel, hereby states as follows for his memorandum in opposition to Plaintiffs' Motion for Class Certification.

Unlike a motion to dismiss, on a motion for class certification, allegations in the Complaint are no longer sufficient. The movant must present **facts** sufficient for the Court to take a "close look," perform a "rigorous analysis," and make specific findings that Rule 23's requirements are satisfied.[1] Plaintiffs' Motion for Class Certification, Dkt. #190 ("Motion") fails to meet this heavy burden. The Motion relies on argument, speculation, and holdings from **other** lending cases involving **different** material facts, but it provides few **facts relating to Martorello**. Ultimately, the Motion rests on repeated and unsubstantiated assertions of "uniformity" or "standardized conduct." *Motion* at 3, 16, 19, 22–24, 26. But in so doing, it assumes these critical conclusions rather than proving them. Plaintiffs' *ipse dixit* does not suffice.

The Motion thus fails to establish several of Rule 23's requirements. Each failure independently requires class certification be denied in whole or in part. Plaintiffs cannot establish ascertainability because they have no current means of obtaining loan data that would allow identification of class members. All putative class members' loan agreements include an enforceable class action waiver provision.[2] Plaintiffs' unusual decision to present the Court with a motion limited to certification as to **only** Martorello—but not the other Defendants (including the Tribal Defendants who actually made the loans and possess the overwhelming majority of the information needed to mount a defense consistent with due process in this case, including defenses to class treatment) against whom Plaintiffs presumably will seek certification later if they are able—makes it impossible for the Court to determine whether class treatment is the

---

[1] *Branch v. Gov't Employees Ins. Co.*, 323 F.R.D. 539, 545 (E.D. Va. 2018) (Payne, J.).
[2] At their depositions, each Plaintiff (except for Coffy, who has taken a dozen small-dollar loans) testified that they read the loan agreement, including this waiver provision prior to signing it. Hengle Dep. Tr. 28:2-10; Williams Dep. Tr. 50:18-51:16; Turnage Dep. Tr. 42:7-46:19.

superior method of adjudication for the "case as a whole."[3]

The need for individualized hearings and findings that defeat predominance and superiority infect multiple aspects of Plaintiffs' claims. Plaintiffs' analysis incorrectly lumps all Defendants together into an undifferentiated unity, disregarding the critical differences in the evidentiary presentations that would be required to try to prove the operative facts as to claims against each Defendant. Plaintiffs' path to prove their claims against Martorello is particularly complicated and indirect. Martorello is not the lender, *de facto* or *de jure*, and never has been. Neither Martorello, nor SourcePoint VI ("SourcePoint") ever collected, directly or indirectly, any loan payments and thus is not associated with the alleged predicate act in the first place. Those were exclusively the province of the Lac Vieux Desert ("LVD") tribal Defendants. He is not an officer, director, employee, or shareholder of any of those LVD entities. Rather, Martorello was associated with SourcePoint, a non-defendant LLC that, in addition to other unrelated business dealings, provided various support services for LVD's lending operations. To warrant class certification as to their claims ***against Martorello***, Plaintiffs must prove ***first***, that the relevant conduct of the Lenders is uniform as to all class members; ***second***, that SourcePoint's involvement in supporting the lending operations made it the *de facto* lender (a position that has not been alleged in the claim); and ***finally***, that the nature, scope, and level of Martorello's involvement and purported control over Bellicose (a holding company), SourcePoint (a Bellicose subsidiary), and Red Rock Tribal Lending ("RRTL") and/or Big Picture Loans, LLC ("BPL"), was so extensive and direct as to render him personally liable for the Lenders' conduct ***throughout the Class Periods***.

This endeavor is complex and intensely fact-specific. And those facts were constantly

---

[3] *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 71 (4th Cir. 1977) (en banc).

changing. The role, responsibilities, and authority of SourcePoint in LVD's lending operations varied significantly from 2012 through January 26, 2016, when SourcePoint's involvement ended completely upon LVD's purchase of Bellicose and its subsidiaries. Martorello's involvement with SourcePoint similarly waxed and waned from 2012 through January 2016.

There are ***not*** common answers to multiple issues dispositive of Martorello's liability. Each member of the putative class is differently situated vis-à-vis Martorello depending on when his or her loans and each loan payment was made. If the proposed Classes were certified, the Court would be required to make detailed factual findings regarding the relationships among each of the Tribal entities, SourcePoint, Eventide, Bellicose, and Martorello, throughout the Class Periods. The need for such detailed factual findings defeats predominance and renders the litigation and trial of this lawsuit on a class basis unmanageable.

## BACKGROUND

### A.    LVD's Decision to Enter into the Online Lending Industry Was Made Entirely Independently from Martorello.

In the late 2000's, LVD was struggling due to a downturn in the economy, its geographic isolation, and a drop in revenue from LVD's casino. *See* Dkt. #146 at 3. Attempting to achieve economic self-sufficiency and foreseeing the vital need for diversification as an important component of economic development, LVD developed a comprehensive legal framework and planned to start new businesses. In March 2010, the Tribe enacted the LVD Limited Liability Code. *See* Ex. A, Williams Aff. ¶ 11; *see also* Ex. B, Email from K. Wichtman to M. Martorello, et al., Feb. 6, 2011, LVD-DEF00006161 (LVD's counsel describing LVD's economic history and reasons for entering the online lending business, its choice of structure, and its " ███████

███████████████████████████████████████████████████████████████████

███████ "). In the first half of 2011, before ever hearing of Martorello, the Tribe began

operating in the online lending business. Ex. C, Chico Harlan, *Indian Tribes Gambling on High-Interest Loans to Raise Revenue*, Wash. Post, Mar. 1, 2015; Ex. D, Hazen Aff. ¶ 5.[4]

On July 8, 2011, LVD created Sovereign Lending Solutions, LLC, to make online automobile title loans. Ex. E, PowerPoint presentation "Lac Vieux Desert Band of Lake Superior Chippewa Indians wholly owned and operated Consumer Financial Services Business", at LVD-DEF00021734. At the same time, the Tribe enacted the Tribal Consumer Financial Services Regulatory Code (the "Code"), "which legalized online lending by the Tribe," Mem. Op., Dkt. #146, at 1, and comprehensively regulates conduct across a wide range of "Consumer financial services," including "the business of providing goods, services, or credit," Ex. F, Tribal Consumer Financial Services Regulatory Code §§ 1.1(a), 1.1(f), including detailed regulations governing small dollar loans, *id.* §§ 11.1–11.4; 12.1–12.4, and all vendors assisting "Consumer financial services" entity. *Id.* § 5.1(a). The Code requires all regulated entities to "conduct business in a manner consistent with principles of federal consumer protection law," including TILA, ECOA, and other statutes. *Id.* § 6.2.

The Code also created the Tribal Financial Services Regulatory Authority ("TFSRA"), and vested it with expansive powers to investigate and ensure compliance with the Code. Regulatory agents, required to be enrolled members of LVD, are answerable to the Tribal Council via quarterly reports and are empowered to "order compliance" with the Code, issue

---

[4] Plaintiffs' claims are laden with insinuations that the participation of sovereign tribes in the online lending business is an attempt to evade state or federal law or somehow illegitimate. Nothing could be further from the truth (and would have no bearing on Martorello's intent or understanding of the objective, which did not involve any state usury consideration (i.e. targeting of Virginia) because state law does not apply to LVD's on-reservation transactions). *See Consumer Fin. Prot. Bureau v. Cashcall, Inc.*, 2018 WL 485963, at *12 (C.D. Cal. 2018) (rejecting claims that tribal lending program violated Consumer Protection Act, recognizing that "businesses are generally free to structure their affairs as they see fit, including lawful structuring" and that the program served "a legitimate need for these types of loans").

-4-

fines, suspend and revoke licenses, and generally investigate any person engaging in consumer financial services. Dkt. #146 at 4–5; Code §§ 4.1–4.18.

The TFSRA did not hesitate to use its authority, when necessary. For example, in 2014, TFSRA revoked the license for the primary vendor assisting LVD in its title loan business. Ex. E at LVD-DEF00021738. Both Red Rock Tribal Lending ("RRTL") and Big Picture Loans ("BPL") were also subject to the TFSRA's regulation, and investigatory and enforcement powers. *See, e.g., id.* at LVD-DEF00014853, LVD-DEF0014781, LVD-DEF00006496.

**B.    LVD's Decision to Seek Out and Do Business with Martorello.**

In mid-2011, the Tribe sought to develop an additional lending business, one that would provide consumers with unsecured, small-dollar loans offered pursuant to the Code and under the auspices of the TFSRA. As it had never operated in this area before, the Tribe recognized its needs to "better learn the lending industry" and for help organizing and growing this business. Dkt. #146 at 8; Ex. D, Hazen Aff. ¶ 10. LVD's search led them to approach Martorello, based on his prior experience helping another online lender to build its lending operations. Ex. G, Martorello Dep. Tr. 21:22–24:24. The Tribe thoroughly vetted Martorello. *Id.* at 23:14–24:24. LVD formed RRTL in September 2011, Ex. H, Articles of Organization of the Red Rock Tribal Lending, LLC at LVD-DEF00006021, and in October 2011, after six months of the parties' legal counsel negotiations and review, LVD and Martorello agreed that Martorello would provide service and support for LVD's new consumer lending business. *See* Dkt. #146 at 7–9; Ex. I, RRTL Servicing Agreement, MARTORELO_003598; Ex. G, Martorello Dep. Tr. at 31:1–10, 23:25-24:5.

Several entities Martorello established assisted with these servicing goals. Bellicose VI, for example, performed services including "vendor management services, compliance management assistance, marketing material development, and risk modeling and data analytics

**JA330**

development." Dkt. #146 at 8–9. The service agreement specifies that Bellicose's role was to provide *advice* or *recommendations* to RRTL, as well as creating valuable intellectual property which RRTL "received and retained ownership of" under to the servicing agreement. *Id.* at 10.[5]

In 2012, SourcePoint VI, LLC, ("SourcePoint") began performing these servicing functions. Although SourcePoint could make recommendations, "all final decisions about operations were made by Red Rock's managers." Ex. D, Hazen Aff. ¶ 11. As the Court noted:

> Martorello, Bellicose, and SourcePoint never, on Red Rock's behalf, made lending decisions; originated a consumer loan; purchased a loan originated by Red Rock; or took any action to collect a Red Rock loan. Instead, Red Rock always made the final decision to lend to a particular consumer, and Red Rock's co-managers, including Hazen, always reviewed and approved marketing materials, including the prescreening of credit reports.

Dkt. #146 at 13.[6, 7]

Iron Fence Investments, LLC ("Iron Fence") was formed to identify and aggregate capital sources for the Tribe, as required by the contract between SourcePoint and RRTL. In January 2011, RRTL entered into an up-to $██████ line of credit agreement that required Iron Fence to raise capital. Yet, despite claims that Martorello funded LVDs loans, the capital raised was *from third parties*, which RRTL could draw upon and pay down at its discretion. Ex. J Loan

---

[5] RRTL's retention right survived even in the event that LVD decided to voluntarily notice SPVI of termination, shrink the business plan (even to unmanageable levels), or to take other actions (for example, tightening underwriting standards) that would stem the origination of loans. Were LVD to ever find SourcePoint's fee off-market or unreasonable, RRTL could, among other remedies, terminate the relationship and bring the IP to a SourcePoint competitor.

[6] As the Court observed, although SourcePoint and Bellicose had access to RRTL's bank accounts, that access "was limited by deposit access control agreements provided by Red Rock, which Red Rock or the Tribe could terminate at any time." Dkt. at 13–14.

[7] As Martorello explained at his deposition, the servicing arrangement was negotiated over a period of roughly six months, with the assistance of sophisticated counsel, and was modeled on similar ██████████████████████████████ Ex. G, Martorello Dep. Tr. 26:9-26:25. Pursuant to the agreement ████████████████████████ ██████████████████. *Id.* at 41:5-16.

Agreement MARTORELLO_003564; *see also* Ex. G Martorello Dep. Tr., 120:1-2 (███████████

███████████████████████████). Separately, Bellicose Capital, LLC, maintained

relationships with a number of employees who SourcePoint could use, while also serving as the

corporate parent to other unrelated FinTech investment subsidiaries. Dkt. #146 at 13 n.6.

RRTL began making loans on January 17, 2012. RRTL was the entity that extended and

authorized all of the loans, held 100% ownership of the loans, was responsible for all collections,

and received all payments from consumers. Ex. D, Hazen Aff. ¶¶ 26–28; Ex. A, Williams Aff. ¶

19. All of the funds for the loans came from LVD-owned bank accounts. *Id.*

## C.    RRTL, SourcePoint, and SourcePoint's Relationship and Involvement with RRTL Were Constantly Changing from 2012 Through 2016.

As the Motion concedes, *see Pls. Mem. in Support of Mot. for Class Cert.* at 4, the

limited discovery that is available to Martorello demonstrates that from 2012 through the Tribe's

purchase of Bellicose in January 2016, there were significant changes to the structures utilized

by LVD to operate its lending businesses, the relationship between those tribal entities and

SourcePoint, and the level of Martorello's participation in SourcePoint's operation.

As LVD learned the lending business, SourcePoint's guidance became less necessary,

and its involvement in LVD's businesses decreased. *See* Dkt. #146 at 15–16. For example,

during the class period, RRTL actively managed and changed the loan collections practices for

RRTL. *See* Ex. K, June 18, 2014 Letter from K. Wichtman to ██████████, at LVD-

DEF00017869 (LVD's outside legal counsel managing dispute with debt purchaser on behalf of

RRTL). RRTL became more active in the hiring, firing, and overseeing collections vendors. *Id*.

RRTL also changed the frequency of communications to debtors, the content of those

communications, and whether the debt was ever sold to third parties. *See, e.g., id.* at LVD-

DEF00016826        (debt sale to third party); *see also, e.g.*, Ex L January 22, 2014 letter from

K. Wichtman to ████████, LVD-DEF00018405 at 18406 (describing RRTL's operations entirely separate from SourcePoint). For example, when it first started lending through RRTL, LVD kept all collection efforts in-house until the loans were ultimately charged off after 30 days, at which point loan collection activities would cease or the loans would be sold to a third party.[8]

LVD also managed the front-line customer service employees, increasing the number of employees operating on tribal land from just one to over a dozen by the time of the Bellicose sale in January 2016. This was part of LVD's plan "to expand its online lending platform and increase profitability for the Tribe, employ more tribal members, and acquire its vendors' businesses so that the Tribe would earn more money." Dkt. #146 at 15–16. The Tribe routinely revised its consumer policies, including developing a complete compliance management program internally. In fact, in late 2012, the Tribe replaced a SourcePoint/Bellicose compliance program with the program it developed internally. Ex. G, Martorello Dep. Tr. at 138:4–139:7.

Throughout 2012, SourcePoint provided consumer marketing and leads to RRTL. Ex. M, June 18, 2014 Letter from K. Wichtman to ████████, at LVD-DEF00018579. But in 2013, RRTL increased its direct involvement in selecting and purchasing consumer loan leads, and required SourcePoint to end its relationship with certain marketing lead sources. *Id.* at LVD-DEF00018579. While SourcePoint would occasionally recommend strategies to RRTL relating

---

[8] RRTL's decision to sell charged off debt to third-parties was not without difficulties. For example, through diligent adherence to procedures established to ensure *lawful* operations across all businesses and vendors (*see, e.g.*, Martorello Dep. Tr. 82:1-25), it became apparent in 2014 that at least one third-party debt purchaser had inappropriately re-sold debt to other unapproved debt purchases, potentially subjecting consumers to collection attempts from unlicensed and unmonitored debt collectors through unauthorized and noncompliant methods. *See* Ex. M, June 18, 2014 Letter from K. Wichtman to ████████, LVD-DEF00017869. RRTL's attorneys intervened in an effort to protect RRTL and bring the collections practices back to normal. *Id.* The TFSRA also became involved in ensuring that RRTL was remediating any potential violations of the Code by the third-party debt purchasers.  *See* Ex. N ,RRTL 2014 Annual Compliance Findings and Recommendations to TFSRA, LVD-DEF00018648.

to marketing leads, RRTL had full control over the marketing of its product. *Id.* at LVD-DEF00014339. RRTL's Co-Managers increasingly became the point people dealing directly with vendors. Ex. G, Martorello Dep. Tr. at 40:18–41:19.

RRTL also began directly contracting with other vendors, including check verification services (May 2014), Ex. O, Tribal Resolution # 2014-070, at LVD-DEF00010607, and new sources of consumer leads (May 2014), *id.* at LVD-DEF00017226; Ex. G, Martorello Dep. Tr. at 141:1–11. RRTL entered into two settlement agreements with an ACH provider that had provided services to the Tribe's lending entities prior to 2014. Ex. O Tribal Resolution # 2014-071, at LVD-DEF00010623. RRTL's legal counsel advised as to negotiating the terms of each new vendor contract.

SourcePoint's role in connecting LVD to sources of external capital from third parties also significantly decreased as LVD was able to obtain capital directly from investors. By 2015, LVD paid back the line of credit from Iron Fence and the Tribe obtained direct investments from hedge funds such ███████████. Ex. G, Martorello Dep. Tr. at 128:2–131:14. Today, BPL does not use any funds from Iron Fence or any entity associated with Martorello, and instead "uses capital from private investors such as hedge funds, individual trusts, and businesses." Ex. D, Hazen Aff. ¶ 27. Since 2016, BPL has sought new investors and has successfully negotiated with new investors who could help LVD grow its business (in both size and products). Ex. E PowerPoint presentation "Lac Vieux Desert Band of Lake Superior Chippewa Indians wholly owned and operated Consumer Financial Services Business." at 00022074. Indeed, since mid-2016 BPL has made significant changes to their product—including the introduction of entirely new loan products and adjusted risk profiles—without any interaction or involvement with Martorello. *Id.* at LVD-DEF00022051-60.

Other changes to the servicing relationship that occurred between January 2012 and January 2016 include:

- Increasing involvement of the Tribal Council and co-managers in the selection of vendors utilized by RRTL. Ex. G, Martorello Dep. Tr. at 136:19–137:18.

- The Tribe's increasing use of outside legal counsel unaffiliated with Martorello, and entirely absent Martorello or SourcePoint's guidance, in compliance management, contract negotiations, regulatory audits, and marketing. *Id.* at 138:4–139:7, 140:5–14.

- Involvement of LVD's treasurer, ███████ in financial reporting and budgetary planning for LVD. *Id.* at 139:20–140:4.

- LVD's insistence in the businesses' involvement in, and certification by, the Native American Financial Services Alliance ("NAFSA"). *Id.* at 140:15–18.

- RRTL's direct involvement in the purchase of marketing leads. *Id*. at 141:1–11.

- Management of employee training and employee management. *Id.* at 142:5–20.

- Involvement of the RRTL's co-managers and the TFSRA in compliance management and monitoring of third-party debt collectors. *Id.* at 142:21–143:16.

LVD's Tribal Council exercised significant control over both RRTL and BPL through the co-managers of those businesses—James Williams Jr. (Tribal Council Chairman) and Tribal Council member Michelle Hazen (current CEO of BPL and previous CEO of RRTL). *See* Ex. H, RRTL Articles of Organization at Articles 6-7, LVD-DEF-00006021 ("Management of the limited liability company is vested in a single Manager or Co-Managers as appointed or hired by [LVD]. This role may also be filled by a management contractor should the Company so desire."). ***Every*** change to ***any aspect*** of RRTL's lending program—even changes as insignificant as font sizes for advertisements—required evaluation and approval by one of its two co-managers. Indeed, the documents produced contain scores of RRTL co-manager approvals, relating to all aspects of the lending program, including approval of marketing, website changes, adjustments to underwriting and risk modeling, revisions to the loan agreement, vendor

-10-

**JA335**

management, changes to compliance policies, and more. *See*, Ex P, Compilation of RRTL Co-Manager Approvals at LVD-DEF00017246 (June 5, 2014 approval of Direct Mail campaign); LVD-DEF00017206 (April 9, 2014 approval of marketing lead purchases); LVD-DEF00017189 (March 18, 2014 approval of underwriting changes); LVD-DEF00017083 (May 19, 2015 approval and legal department approval of lead generation marketing channel); LVD-DEF00017062 (May 5, 2015 approval and legal department approval of changes to fraud verification methods and risk modeling); LVD-DEF00016826 (November 12, 2014 approval of changes to debt sale process and vendors). Where appropriate, and in yet another effort to ensure the lawful operation of its business, these co-manager approvals were also vetted through and approved by RRTL's independent counsel. *Id.*

**D.    Martorello's Involvement with SourcePoint Was Constantly Changing from 2012 Through 2016.**

From late 2011 through January 26, 2016, the only constant in Martorello's relationship with the Tribe and the Lenders was his minority ownership of Bellicose (or a related entity—with Martorello's individual ownership level varying over the years), the holding companies that owned (among several unrelated businesses) SourcePoint, and (at various times) Iron Fence. Ex. G, Martorello Dep. Tr. at 27:12–22, 47:5–11, 119:10–18. Martorello's involvement in LVD's lending business—through SourcePoint—was constantly changing (decreasing) as various individuals were hired to assume control of the businesses. In 2012 and 2013, Martorello brought on operations manager Brian McFadden and JD/CPA Dan Gravel. Across the years he delegated increasing responsibility to Justin Martorello, McFadden, data analyst James Dowd, accountant Simon Liang, and Gravel, who served as general counsel and compliance lead.

In 2012, McFadden was hired as the operations manager for SourcePoint, responsible for overseeing call center operations and improving operational efficiency. *Id.* at 94:23–95:11.

-11-

McFadden quickly " 

" *Id.* at 95:13–97:13. McFadden started " ████████████████████ " and " ██

████████████████████████ " *Id.* at 95:25–96:19. Soon McFadden " ████████

████████████████████████████████████ " *Id.* at 97:14–98:21. In 2014,

McFadden replaced Martorello as president of SourcePoint's corporate parent, Bellicose.[9]

Due to the greatly expanded roles of Tribal staff, McFadden, and others, Martorello stepped down as president of Bellicose and SourcePoint in 2014 and his involvement substantially decreased until January, 2016, when it ended entirely.

### E.    LVD Purchased Bellicose and Its Subsidiaries on January 26, 2016.

As a further, definitive step toward LVD's objective of economic self-determination and to ensure successful completion of its vital economic development goal of diversification for the long-term, on January 26, 2016, the Tribe purchased Bellicose Capital and its subsidiaries SourcePoint and Iron Fence. Though the sale closed in January 2016, it had been contemplated by LVD and SourcePoint since at least 2012. *See* Dkt. #146 at 16–17; *see also* Ex. Q, Martorello Decl. ¶ 49.[10] At the time of sale, LVD expected the purchase of Bellicose to allow the Tribe to

---

[9] McFadden was issued equity in Bellicose as recognition of his services and increased role.

[10] Plaintiffs offer a convoluted explanation that, notwithstanding over 18 months of active negotiations with LVD over the terms of a potential sale, Martorello was so concerned with certain legal and regulatory developments that he engineered a sham sale to the Tribe. *Pls.' Mem. in Support of Mot. to Certify Class*, Dkt. #190 at 7–8. That story is fiction. At the time of the sale, the purported regulatory concerns that Plaintiffs highlight had largely dissipated. By May 2014, Congress had already flagged the illegal actions of the Justice Department in improperly targeting "the short-term lending industry—an indisputably lawful financial service." Comm. on Oversight and Gov't Reform, *The Department of Justice's "Operation Choke Point": Illegally Choking Off Legitimate Businesses?*, May 29, 2014, *available at* https://oversight.house.gov/wp-content/uploads/2014/05/Staff-Report-Operation-Choke-Point1.pdf; *see also* Ken Blackwell, "Obama's Operation Choke Point finally unmasked," THE WASHINGTON EXAMINER, Oct. 17, 2018, available at https://www.washingtonexaminer.com/opinion/op-eds/obamas-operation-choke-point-finally-unmasked?_amp=true (noting recently unsealed documents evidenced "just

generate over **$58 million per year** by January 2023, if not sooner. Ex. R, September 2014, pro

forma report], LVD-DEF00014706 (showing yearly profits to LVD of $ ▮▮▮▮▮▮▮ after

payment of note or expiration of seven-year term). The purchase has already provided tens of

millions to the Tribe, allowed it to continue developing valuable intellectual property, diversified

its income sources, created jobs and provided the intrinsic value of a self-determined lending

business  Ex. U, Promissory Note § 1.2, Ex. D, Hazen Aff. ¶ 31(a)–(l).

---

how far reaching and destructive Operation Choke Point really was to small businesses," including small-dollar lenders).

BPL was created in August **2014**, with the purpose of "ultimately consolidat[ing] the business of the Tribe's other lending entities." Dkt. #146 at 16. Relatedly, Plaintiffs' mischaracterization of the *Otoe-Missouria* opinion as a "death-knell" and a "crushing loss" for Martorello are unavailing in light of the fact that the opinions there, and the legal arguments put forth, dealt only with the failure to obtain a preliminary injunction on an incomplete record; with a more complete record, as here, the court acknowledged in that case, "the transaction being regulated by New York could be regarded as **on-reservation**." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 114–15, 118 (2d Cir. 2014) (denying preliminary injunction largely because "the record presented to the district provided ambiguous answers to what are fundamentally factual questions," though "[w]ith the benefit of discovery, plaintiffs . . . may ultimately prevail in this litigation"). Indeed, Plaintiffs offer no explanation for why, if the regulatory landscape was as Plaintiffs represent, Martorello engaged in a year-and-a-half of protracted negotiations with LVD over the sale. Martorello sold his business to the Tribe because it fulfilled his earlier-stated objectives of " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " Ex.S, Email from M. Martorello to ▮▮▮▮▮▮, Apr. 15, 2014, MARTORELLO_003731. The deal, which was consummated long after the allegedly "mounting" regulatory pressures Plaintiffs invoke as supposed evidence of bad intent had *waned*, simply made good business sense for both parties and brought their long-stated plan to develop the Tribe's self-sufficiency in the lending space to fruition.  Perhaps most telling is that none of the emails Plaintiffs cite as evidence of a regulatory concern, and in fact not a single bit of evidence in the record, demonstrate Martorello ever expressing *any* concern whatsoever about the outcome of the Department of Financial Services litigation.   Instead, Martorello's contemporaneous emails demonstrate his belief that LVD's lending companies would survive notwithstanding the illegal weaponization of government regulators that was repeatedly rebuked by Congress.  Ex. T, Email chain between K. Wichtman and M. Martorello, LVD-DEF00006161 at 00006162 (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ").

-13-

To accomplish the sale in compliance with the tenets of tribal sovereignty, LVD—without any involvement or influence from Martorello—created new entities under LVD's laws to accomplish the transfer of intellectual property, contracts, and other assets. Ex. D, Hazen Aff. ¶¶14, 16–17, 22–23; Ex. V, Tribal Council Resolution #2015-025, at LVD-DEF00000317. The "complex business transactions" Plaintiffs decry as a "complicated scheme to avoid Delaware law," did nothing to benefit Martorello. The mechanics of the transaction through which LVD purchased Bellicose were exclusively dictated by the Tribe.

## F.    Martorello Has Never Had Any Involvement in the Operations of BPL or Ascension.

After LVD's purchase of Bellicose on January 26, 2016, Martorello's involvement with LVD's lending operations ended completely. Martorello has no involvement in the day-to-day activities of any entity owned or operated by LVD, including BPL and Ascension Technologies, LLC. *See* Ex. SS, McFadden Decl. ¶ 10; Ex. Q, Martorello Decl. ¶¶ 68, 87–97; Dkt. #146 at 27–28.[11]

---

[11] Martorello's only relationship with those entities since then is that he is President and indirect minority shareholder of the entity that manages Eventide Credit Acquisitions, the LLC that holds the Promissory Note given by LVD as part its purchase of Bellicose. Ex. G, Martorello Dep. Tr. 120:3–15. Eventide is granted only certain limited contractual rights—all of which are considered normal in any seller-financed or collateral-backed transaction. These rights have never been exercised. *See* Dkt. #146 at 21.

Notwithstanding this conclusion, Plaintiffs' Motion points to a single e-mail in which an Ascension Employee, Simon Liang, asks Martorello to verify the accuracy of wire amounts, as proof of Martorello's continued control over the acts of BPL and Ascension Technologies. Pls.' Mem. in Support of Mot. to Certify Class, Dkt. #190 at 11. First, Plaintiffs' citation to a single and misspelled e-mail from an employee whose first language is not English, as proof of Martorello's continued involvement and control over BPL and Ascension borders of farcical in the face of *overwhelming* evidence of the systemic control of BPL and AT exercised by LVD, its co-managers, and employees working for both companies. Second, given that Mr. Liang's native language is not English, it is clear that the one e-mail Plaintiffs' point to is an example of Liang merely asking Martorello to *confirm* the correct amounts of his wires and calculations on note payments—an act Liang regularly did for wire transfers while employed at Ascension. *See* Ex. W, March 28, 2016 E-mail from S. Liang to B. McFadden and M. Martorello, LVD-

-14-

## G. LVD's Ownership and Operation of RRTL and BPL Has Resulted in Significant Benefits to the Tribe.

The Tribe has realized tens of millions of dollars in profit since 2012.[12] The LVD has used those dollars for construction/purchase of housing on the reservation, development of youth programs, assisting in the construction of an on-reservation health clinic, funding of college scholarships, the purchase of new vehicles for the LVD police department, the modernization of LVD's court system, enhancement of cultural programs targeted at the preservation of LVD's Ojibwe language, elder care services, and propane purchase assistance programs allowing LVD's members to stay warm during the harsh winters. Ex. D, Hazen Aff. ¶ 31(a)–(l); Ex A, Williams Aff. ¶¶ 21–23, 25. Both RRTL and BPL have provided jobs for LVD members on the reservation. Ex. D, Hazen Aff. ¶ 24; Ex. A, Williams Aff. ¶ 24; *see generally* Ex. C, Wash. Post. The Tribe, using new products and investments from third-parties, predicts it could make up to $██████ of net income per year within five years, at which point LVD's (and Martorello's)

_____

DEF00009633; Ex. X, July 7, 2017 E-mail from S. Liang to B. McFadden, LVD-DEF00020555 (confirming amounts of multiple wire transfers from BPL operating accounts to third-parties). It is clear that Mr. Liang was not requesting permission from Mr. Martorello to initiate wire transfers because Mr. Martorello exercised control over those wire transfers, but rather simply asked Martorello **and** the president of Ascension for **confirmation** of the **amounts** of the wire transfers.

[12] Plaintiffs' misrepresentations have already succeeded in confusing the Court when it concluded that the Tribe receives "a very small part of Big Picture's revenue…." Dkt. #146 at 75. That statement is incorrect. It bears repeating, however, that BPL receives 100% of the consumer loan payments (interest being BPL's revenue) and BPL receives 100% of the *net profits* of BPL, *see* Ex. Q, Martorello Decl. ¶ 62, just as was the case in *Howard v. Great Plains*, 2017 WL 3669565 (E.D. Va., Aug. 7, 2017) , at *4. From the BPL profits, just like any other business with a loan, it uses those BPL profits to pay its debt and build equity value of its business. Indeed, the dual reinvestments and loan payments ensure that LVD continues to build *significant* equity value of BPL while consistently growing that business. Yet, the structure of payments selected by LVD necessitated that there were many months where the Tribe obtained significant distributions from RRTL or BPL increased its value of RRTL (the growing IP value) or reinvestment in BPL, while Eventide/Sourcepoint obtains less value, and/or fails to obtain any note or service payment at all. Ex. Q, Martorello Decl. ¶¶ 58, 60–61.

-15-

longstanding objective of creating a self-determined and self-sufficient Tribal business will be fully executed. Ex. D, Big Picture Loans Confidential Investment Opportunity Powerpoint presentation, at LVD-DEF00022047 (financial model predicting almost $ ███████ in gross revenue for BPL in 2022 and $ ███████████ in profits).

This sustained and predictable economic growth would have been impossible but for the Tribe's decision to structure the profits it receives from its lending businesses as a function of the overall gross revenue of the business, rather than being subject to the whims of cost-overruns or downturns in the lending business. This Tribally-selected structure ensures that each and every month the Tribe can use the lending business profits to support its economic development and providing on-reservation services, while allowing the costs (and residual net income) of the business to be allocated amongst the Tribe's vendors as payment for services. The Tribe's lending business has represented upwards of 46% of the Tribe's governmental budget at times. Ex. A, Williams Aff. ¶ 22. In contrast to the Tribe's other more volatile businesses, the waterfall payment structure allows the Tribe to reliably plan and perform its governmental functions.

**H.     All Documents and Data Relating to LVD Were Transferred to the Tribe in Connection with Its January 2016 Purchase of Bellicose, and the Tribal Defendants Refuse to Provide Those Materials in Discovery.**

As Plaintiffs have correctly observed, "Big Picture and Ascension possess the vast majority of the evidence that is required for both Plaintiffs and Martorello in litigating this case." Dkt. #151 at 19. As part of the sale of Bellicose to the Tribe, Bellicose and its subsidiaries were required "███████████████████████████████████████████████ ██████████" Ex Y, Agreement and Plan of Merger § 2.6(d) at MARTORELO_000100. To accomplish this, Martorello and his staff went through all files, electronic and physical, to locate and transfer all Bellicose information unrelated to tax information—accomplishing that goal in

June of 2016 when Martorello provided the last set of electronic files to Ascension Technologies. Ex. Z, June 27, 2016 e-mail from M. Martorello, MARTORELO_003755. Martorello therefore does not possess, or have access to, any of the IP, loan data, documents, emails, correspondence, consumer loan agreements, loan files, co-manager report and recommendation approvals, marketing materials, or collections procedures relating to LVD's lending.

Martorello expects these documents, the lack of which impinges on Martorello's due process rights given the practical absence of necessary and indespensible parties in BPL and AT while on appeal, will vindicate him and refute Plaintiffs' allegations.[13] But all materials relating to the operation of LVD's lending programs (and Martorello's limited involvement therein) are now held by the Tribe. Both Plaintiffs and Martorello have sought these materials from the Tribal Defendants through discovery and subpoenas. *See, e.g.*, Ex. AA, Pls.' Subpoenas to Tribal Defendants' Employees; Ex. BB", Martorello's Subpoenas to Tribal Defendants' Employees. But the Tribal Defendants have refused to produce them based on their position that the filing of

---

[13] It appears from Plaintiffs' depositions that Plaintiffs were transferred by the Virginia Poverty Law Center ("VPLC") to the lawyers at Kelly & Crandall, PLC. *E.g.*, Coffy Dep. Tr. at 5:13-19 (" ███████████████████████████████████████████████████████████████████████ ███████"); Turnage Dep. Tr. 21:24-22:1 (similar). Questioned about their personal knowledge about their claims, including in their verified discovery responses, Plaintiffs lacked substantive knowledge of the basis for those claims, instead pointing to the lawyers at Kelly & Crandall as the source of their information. *E.g.*, Turnage Dep. Tr. at 75:17-24 (" ██████████████████████████████ ████████████████████████████████████████████████████████"), 82:1-16 (similar); Hengle Dep. Tr. 39:12-40:13 ( ████████████████████████████████████████ ██████████████████████████████████); 46:11-47:19 (similar); Williams Dep. Tr. 8:8-10 ( █████████████████████████████████████), 10:13-15 ( ████████████████ █████████████████████████████████████████████), 58:22-59:18 (similar); Singh Dep. Tr. 31:7-32:1 ( ███████████████████████████████████████████████████████). Portions of the Plaintiffs' depositions are attached as Exhibits "**" LL, NN, OO and QQ" Plaintiffs, who received the full benefit of the bargain under their loan agreements (indeed, often as repeat customers), appear to have brought this lawsuit at the direction of their counsel, as perhaps put best by Plaintiff Turnage: " ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████" Turnage Dep. Tr. 50:6-8 (emphasis added). Four of the Plaintiffs are also plaintiffs in other VPLC-backed litigations.

their notice of appeal to the Fourth Circuit divests the District Court of jurisdiction. Tribal Defs.' Br. in Supp. of Mot. to Stay, Dkt. #138 at 2. Martorello has even recently initiated an arbitration proceeding against LVD in an effort to obtain the documents that he and Plaintiffs have been unable to obtain through the normal discovery process. *See* Ex. RR, Case Management Order No. 1, *Eventide Credit Acquisitions, LLC v. Tribal Economic Development Holdings, LLC.*[14]

The Tribal Defendants' refusal to provide this information has prevented Martorello and Plaintiffs from obtaining ***any*** consumer loan information. As LVD's attorney confirmed in a 2015 e-mail, consumer loan information does not exist outside of ███████████████ ██████" within the Tribe's loan management system(s). Ex. CC, [May 18, 2015 E-mail from K. Wichtman to ██████] at LVD-DEF00018525.

## ARGUMENT

The Court is familiar with Rule 23's requirements and the general rules for applying them. "The Court must perform a 'rigorous analysis' to determine whether the plaintiff has met its required showing as to each class certification factor. *Branch*, 323 F.R.D. at 545 (citing *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). Allegations in pleadings and unsubstantiated conclusions need not be credited: the Court is not required "to accept plaintiff[s'] pleadings when assessing whether a class should be certified;" rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that [Rule 23's requirements] are *in fact* [satisfied]." *Id.* (emphasis in original) (quoting *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004) and citing *Dukes*, 564 U.S. at 350); *see also In re Safety-Kleen Corp. Bondholders Litig.*, 2004 WL 3115870

---

[14] Martorello attaches the Case Management Order as evidence of the arbitration action; however, he notes his present belief that the existing order may shortly be superseded by a revised order.

(D.S.C. Nov. 1, 2004). "[T]he district court must take a 'close look' at the facts relevant to …

certification … and, if necessary, make specific findings on the propriety of certification." *Id.*

(citing *Thorn v. Jefferson–Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006)).

## I.    PLAINTIFFS HAVE WAIVED THE ABILITY TO PURSUE A CLASS ACTION.

The express class action waiver in Plaintiffs' loan agreements precludes class

certification. Plaintiffs' loan contracts provide:

> **WAIVER OF JURY TRIAL**:
> …
> 2. You acknowledge and agree that by agreeing to this Waiver of Jury Trial
> provision:
> **(a) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE,
> AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER
> REPRESENTATIVECAPACITY, AND/OR TO PARTICIPATE AS A MEMBER
> OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US
> AND/OR RELATED THIRD PARTIES**;
> …
> 3.…**NO JUDGE OR ARBITRATOR SHALL CONDUCT CLASS
> PROCEEDINGS; THAT IS, YOU SHALL BE INELIGIBLE TO SERVE AS A
> CLASS ACTION REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL,
> OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN
> LITIGATION OR ARBITRATION.**

Ex. DD, Williams Loan Agmt. at Williams 000075. All named Plaintiffs have agreed to loan

contracts with similar if not identical waiver provisions. *See* Ex. EE, Coffy Loan Agmt. at

Williams 000010; Ex. FF, Turnage Loan Agmt. at 000040–41; Ex. GG, Hengle Loan Agmt. at

Williams 000020; Ex. HH, Gillison Loan Agmt. at Williams 009955.[15]

The Supreme Court, the Fourth Circuit, and courts within the Circuit have repeatedly

found such class action waivers to be valid and enforceable. *See AT&T Mobility LLC v.*

---

[15] Although Martorello has no access to the loan agreements other than those produced by the
named Plaintiffs (creating significant issues of due process in presenting his defense), his
understanding is that similar class action waiver provisions exist in all loan agreements. To the
extent some putative class members have not agreed to class action waivers, or to the extent such
waivers differ from borrower to borrower, those individual variations are another reason why
common issues do not predominate, and why certification should be denied.

*Concepcion*, 563 U.S. 333, 351–52 (2011); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 238 (2013); *Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 180 (4th Cir. 2013); *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002); *Abdul-Hasib v. Aerotek, Inc.*, 2017 WL 5903555, at *3 (D. Md. Nov. 30, 2017). The Fourth Circuit and Eastern District of Virginia have unambiguously held that the "inability to bring a class action ... cannot by itself suffice to render the provision unenforceable." *Freeman v. Capital One Bank*, 2008 WL 2661990, at *3 (E.D. Va. July 3, 2008); *see also Fielding v. Dolgen, LLC*, 2018 WL 3091012, at *2 (E.D. Va., June 21, 2018). Courts will find class action waivers enforceable even where the contractual provisions are unclear or ambiguous. *Allen v. SSC Lexington Operating Co. LLC*, 2017 WL 4357449, at *3 (M.D.N.C. Sept. 29, 2017) (denying class cert even where class action waiver provision was ambiguous).

Plaintiffs expressly agreed to "give[ ] up [their] right to serve as [ ] representatives[s] … and/or to participate as [ ] member[s] of a class," and have agreed that they "shall be ineligible to serve as [ ] class action representative[s] … for others in litigation." Ex. DD, Williams Loan Agmt. at Williams 000075. Plaintiffs have "clearly contracted away the right to pursue [a] class" action. *Freeman*, 2008 WL 2661990, at *3. They may not now violate this agreement and seek to certify a class.[16]

---

[16] Nothing in the Court's orders denying Defendants' motions to dismiss undermines the enforceability of the class action waiver. In its orders, the Court concluded that Plaintiffs have "plausibly and adequately" "pleaded" deficiencies in the choice-of-law and forum selection provisions of the loan agreements. *See* Dkt. #119 at 1; Dkt. #125 at 1–2. These decisions are based on the pleadings and do not appear to be final determinations regarding the enforceability of those provisions, the decision on which will require more than unchallenged allegations. *See, e.g.*, *Bunker Holdings, Ltd. v. Green Pac. A/S*, 346 F. App'x 969, 973 (4th Cir. 2009) (Court on motion for summary judgment reconsidering choice of law decision it previously made on motion to vacate attachment of assets).

Even if the Court ultimately concludes that the choice-of-law and forum selection clauses of Plaintiffs' loan agreements are unenforceable, that would not affect the class action waiver.

## II.   THE PROPOSED CLASSES ARE NOT ASCERTAINABLE.

"Ascertainability" is a "threshold requirement" to class certification, *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014), and is satisfied only if "it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* at 358 (quoting 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1760 (3d ed. 2005)). A proposed class is not ascertainable if "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials.'" *Id.*; *see also Branch*, 323 F.R.D. at 545 (same).

Plaintiffs cannot demonstrate ascertainability for two reasons. **First**, Plaintiffs do not possess and cannot obtain the loan-level data required to identify class members without the need for individualized fact-finding, including the likely need for mini-trials. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (ascertainability problematic where requisite parts manifest was in possession of third-party foreign corporation). Plaintiffs' proposed classes

---

The Court's orders did not discuss the class action waiver and the class action waiver is an entirely separate section from the choice-of-law and forum selection provisions of the loan agreements. Ex. DD, Williams Loan Agmt. at Williams 000074–75. On occasion, arbitration provisions or class action waivers that accompany unenforceable choice-of-law and forum-selection provisions requiring adjudication under tribal law have been held unenforceable, but on grounds that the provisions at issue were "essential" to the "central," impermissible purpose of depriving plaintiffs recourse under federal law, and thus not severable. *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 337 (4th Cir. 2017); *see also Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016); *Inetianbor v. Cashcall Inc.*, No. 13-CIV-60066 at *7 (S.D. Fla. Sept. 19, 2016) (unpublished; attached to Pls.' Mot. for Class Cert at Ex. 22). The same reasoning does not apply here. Unlike *Hayes* and *Dillon*, the loan agreements here expressly **allow** federal statutory claims. *See* Ex. DD, Williams Loan Agmt. at Williams 000074 ("This Agreement will be governed by the laws of the [LVD] … as well as applicable federal law."). Thus, the class action waiver provision is not part of any "central," impermissible purpose of denying Plaintiffs federal statutory rights. In addition, unlike the provisions in *Hayes*, *Dillon*, and *Inetianbor*, the class action waivers here are entirely separate provisions with no connection to the choice-of-law and forum-selection provisions. There is no logical relationship between choosing a forum and law to apply, on the one hand, and choosing whether plaintiffs may proceed collectively, on the other. *Cf.*, *Inetianbor*, at *7 (emphasizing that class action waiver "pervade[d]" the invalid arbitration agreement and was therefore not severable). The class action waiver in this case does not rise and fall with the choice-of-law and forum-selection provisions.

-21-

JA346

are defined by consumers' (1) residency, (2) date of borrowing, (3) payment histories, and (4) outstanding balances. *See* Motion at 12, 15. Neither Plaintiffs nor Martorello possess this loan-level information. *See* page 17-18, *supra*. Nor are Plaintiffs or Martorello able to obtain the data from the Tribe; both have requested the data in discovery and subpoenaed the data, but the Tribe has refused to produce it. *See* Dkt. #138 at 2–3; *supra* at 17-18. In fact, Martorello has gone so far as to initiate arbitration against the Tribe to obtain these data and other information that he believes will vindicate him, but thus far all of his efforts have been stymied. *See* page 18, *supra*.

Without these loan records, the only way to identify class members is to try to obtain documents and/or testimony regarding loan and payment details from each individual putative class member. This is precisely the type of individualized review that renders a class not ascertainable. *See Adair*, 764 F.3d at 358 (rejecting ascertainability where identification of class members would have required a "complicated and individualized process" of reviewing records). Moreover, identifying class members based on their "say so" is not constitutionally sound. *Marcus*, 687 F.3d at 594 ("Forcing [defendants] to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications."); *see also In re Asacol Antitrust Litigation*, 2018 WL 4958856 (1st Cir. Oct. 15, 2018) ("A 'claims administrator's' review of contested forms completed by consumers concerning an element of their claims would fail to be "protective of defendants' Seventh Amendment and due process rights."). Even if the Court were to allow such individualized and granular review, it might not be possible because the active parties cannot even identify who the

Virginia borrowers are. *See Supler v. FKAACS, Inc.*, 2012 WL 5430328, at *3 (E.D.N.C. Nov. 6, 2012) (concluding ascertainability was "impossible" for lack of records).[17]

 **Second**, even if Plaintiffs were able to obtain loan records from the Tribe, Plaintiffs have not demonstrated that those records would provide the information needed to identify the individuals that meet Plaintiffs' Class criteria, or that the process of identification would be administratively feasible. The Motion claims that the classes would be "readily ascertainable through loan records obtainable from Big Picture and/or third parties in discovery," *Motion* at 15, but it provides no substantiation of this this bald conclusion. "A plaintiff cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Piotrowski v. Wells Fargo Bank, NA*, 2015 WL 4602591, at *18 (D. Md. July 29, 2015) (quoting *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015)). Contrary to Plaintiffs' assertions, there is no assurance either that ***anything*** will be obtainable from the Tribal entities or, even if the records can be obtained, that they contain the information needed to ascertain the class. *See also Dykes v. Portfolio Recovery Associates, LLC*, 2016 WL 346959 (E.D. Va., Jan. 28, 2016), at *4–5

---

[17] The insinuation that this information could be cobbled together from bank records is false for numerous reasons. Plaintiffs have already served a subpoena on at least one banking institution, Chippewa Valley Bank, used by RRTL and BPL to provide banking services. Despite receiving tens of thousands of pages of information from Chippewa Valley Bank, Plaintiffs fail to demonstrate ***any*** indicia that they will be able to satisfy the threshold inquiry described by *EQT Prods.*, or that such data could be used to reliably demonstrate the bounds of a class without an individualized analysis for each Plaintiff. Martorello believes that even if such data could be assembled it would not provide the type of customer-specific data needed of each individual putative class member, and would certainly exclude non-monetary adjustments to accounts available only in LVD's databases. To the extent the information cannot be practically engineered from the data already possessed by Plaintiffs, it also cannot, practically, be obtained from individual consumers' banks, since there is no way for Plaintiffs' counsel or Martorello to identify those consumers and their (perhaps thousands) of banks, and obtain access to that information.

(rejecting ascertainability of a class that, although theoretically identifiable by available records, would require examination of each putative member's file); *Piotrowski*, 2015 WL 4602591, at *16–18 (rejecting class that would have required "loan by loan review" of defendant's data). Plaintiffs have described no records they hope to use, no reliable account of what data they contain, and no assessment of the complexity of compiling the data, nor could they. Instead, Plaintiffs point only to a hypothetical set of "discrete steps" and vaguely reference "electronic data analysis." *Motion* at 15.

Plaintiffs lack the records they claim will allow ascertainability; they cannot demonstrate that they will be able to obtain those records; and, even if they could obtain them, they have not established that the records will be sufficient to ascertain class membership without burdensome individualized mini-trials. Plaintiffs fail to meet their burden. Certification must be denied.

## III.   COMMON ISSUES DO NOT PREDOMINATE AND THE CONTROVERSY WOULD NOT BE MANAGEABLE AS A CLASS ACTION.

Fed. R. Civ. P. 23(b)(3) requires "questions of law or fact common to class members [to] predominate over any questions affecting only individual members." While "similar" to Rule 23 (a)'s commonality requirement, this test is "even more demanding." *Branch*, 323 F.R.D. at 550 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).

### A.     Martorello's Conduct as to Each Putative Class Member Is Not Uniform.

Instead of providing facts establishing predominance, the Motion presents conclusory assertions of uniform conduct. Its entire predominance discussion merely asserts that "common issues necessarily predominate because Plaintiffs' claims are based on standardized conduct by Defendants … namely, employing the rent-a-tribe scheme to issue and collect on usurious loans

JA349

in Virginia," followed by quotes from ***other*** lending cases.[18] *Motion* at 22–23. This is insufficient to demonstrate predominance as to Martorello in ***this case***. *See Gariety v. Grant Thornton*, LLP, 368 F.3d 356, 359 (4th Cir. 2004) (vacating class cert.: "the district court's reliance on mere assertions did not fulfill the requirements that the district court take a 'close look' …, conduct a 'rigorous analysis,' and make findings … that the requirements of Rule 23 (b)(3) have been satisfied"); *Pearce v. UBS PaineWebber, Inc.*, 2004 WL 5282962, at *8 (D.S.C. Aug. 13, 2004).

The point is perhaps best illustrated by the block quote at the heart of Plaintiffs' argument, from a case (*Purdie*) that found predominance "***[g]iven*** the standardized nature of the payday loan transactions and the uniform manner in which Defendants made, processed, and collected on the loans, and that few variations exist in the claims of the factual bases underlying the claims." *Motion* at 24. But the *Purdie* quote begs the question; of course predominance exists if the transactions are "standardized," the conduct is "uniform," and there are "few [factual] variations." But the uniformity that was a "given" in *Purdie* is precisely what Plaintiffs ***are required to establish here as to Martorello***. Such a showing is inherently fact-specific. *See Gariety*, 368 F.3d at 359; *Pearce*, 2004 WL 5282962, at *8 (D.S.C. Aug. 13, 2004). Plaintiffs cannot bootstrap their claims onto factual findings from ***other cases***; they must establish that in ***this*** case ***Martorello's*** conduct towards the putative class members was, "standardized," "uniform," and with "few [factual] variations." *Purdie v. Ace Cash Express, Inc.*, 2003 WL

---

[18] As one would expect, the lending cases Plaintiffs cite involve facts different than those present here. In *Purdie*, the claims against the individual officers of the lender were ***dropped*** by Plaintiffs after their second amended complaint was dismissed with prejudice. *Purdie v. Ace Cash Express, Inc.*, 2003 WL 22976611 at *1 (N.D. Tex. 2000). *Henry* involved claims only against the lenders. *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 568 (S.D. Tex. 2000). *Upshaw* involved claims against the lender and the person "who allegedly owned and operated the business," *Upshaw v. Georgia (GA) Catalog Sales, Inc.* 206 F.R.D. 694 (M.D. Ga. 2002), and *Inetianbor* involved claims against the CEO and sole shareholder who was alleged to be the "de facto lender," Motion Ex. 20, at 2, but neither includes any discussion of the type of changing circumstances of the individual defendant that are present with respect to Martorello here.

JA350

22976611, at \*4. Plaintiffs must prove Martorello's relationship to putative class members, as to all of the loans and all of the payments, was materially the same throughout the Class period.

This is no small task. Because Martorello is not the lender, never collected any payments, and had no direct involvement or interaction with any consumer whatsoever, Plaintiff's theory of Martorello's liability must traverse multiple causal steps and satisfy multiple legal tests. ***First***, Plaintiffs must show predominance as to the class members' claims against the Lenders. Even as to these direct claims, predominance may be defeated based on many potential differences across class members, including differences in interest rates, other loan terms, marketing of the loans, collection practices, the amounts of any payments, individual class members' knowledge and understanding of the loan terms, and benefits individual class members realized.

***Second,*** even if Plaintiffs could establish predominance as to claims against the Lenders, that does not automatically establish predominance as to their claims against Martorello. Martorello's only relevant conduct was through his involvement with SourcePoint. Changes in SourcePoint's responsibilities, authority, and other interaction with the Lenders over the relevant time period may lead to different conclusions regarding whether SourcePoint as a whole can be held responsible for the Lenders' conduct. For example, since neither Martorello nor SourcePoint had any involvement with the Lenders after the Tribe purchased Bellicose, any possible connection between Martorello and putative class members' claimed injuries abruptly and definitively ended as of January 26, 2016. *See* page 14, *supra*.[19]  Class members who took loans or made payments after January 26, 2016, are thus very differently situated vis-à-vis SourcePoint and Martorello from class members who took loans or made payments before that date. And

---

[19] Of course, Martorello lacks the information that would be required to inform the Court of developments post-sale, since, as discussed elsewhere, he does not have the relevant records from that period.

between late 2011 and January 2016, SourcePoint's role changed and decreased significantly, as RRTL took greater responsibility for a wide range of operations, including managing vendors and customer service employees, marketing, generating loan leads, and raising capital from venture capitalists and other third parties. *See* page 11-14, *supra.*

**Finally,** Plaintiffs must show that Martorello's level of involvement with, and control over, the allegedly infringing lending practices was so high and so direct throughout the relevant time period that he should be held personally liable.

The standard for holding a corporate agent liable for the conduct of the corporation is demanding and fact-specific. It is blackletter law that the agents of a corporation or limited liability company "are not personally liable for the debt or actions of the company." *McFarland v. Virginia Ret. Servs. of Chesterfield, L.L.C.*, 477 F. Supp. 2d 727, 738 (E.D. Va. 2007); *see also* Va. Code Ann. § 13.1-1019 ("no member, manager, organizer or other agent of a limited liability company … shall have any personal obligation for any liabilities of a limited liability company, whether such liabilities arise in contract, tort or otherwise, solely by reason of being a member, manager, organizer or agent of a limited liability company."). Rather, "an officer or director of a corporation is liable only for those **intentional torts** he or she **commits or authorizes** on behalf of the corporation." *McFarland* at 739 (emphasis added). In determining whether the agent "committed" or "authorized" the intentional tort, Virginia courts consider a series of factors to determine whether the officer or director played a key role, with a focus on the directness and importance of the individual's conduct in causing the corporate action. *Airlines Reporting Corp. v. Pishvaian*, 155 F. Supp. 2d 659, 666–67 (E.D. Va. 2001). The plaintiff must actually establish that the agent "participated in, ratified, or otherwise authorized" the intentional tort. *Id.* Indirectly facilitating the tort or "setting the stage" does not suffice. *Id.* Indirect or inconsistent involvement

or presence at a company while a tort occurs is insufficient. *Id.* at 666–67. Thus, unless Plaintiffs can prove Martorello personally originated the loans, or his personal actions caused any harm to Plaintiffs' that is cognizable under RICO or in an unjust enrichment claim, Plaintiffs' claims against him fail. *See McFarland*, 477 F. Supp. 2d at 738 (rejecting claims against members for lack of personal involvement). And, to the extent these facts vary across the Classes, there is no predominance.

As discussed above, Martorello's involvement with SourcePoint diminished significantly throughout the 2012–16 period, culminating in his being replaced as president by McFadden in 2014. *See* page 11-14, *supra.* The Motion itself admits that various Martorello-specific factors that varied throughout the Class Periods are material issues, including the nature of Martorello's participation in the operations of the Tribal Lenders, Martorello's knowledge regarding the lending operations, whether he "agreed" to the "objective" of the enterprise, and whether amounts paid by each consumer are recoverable against Martorello. *See Motion* at 16 (listing these as common questions). As the Supreme Court held in *Dukes*, however, what matters is not whether a dispute will generate common *questions*, but whether it will generate common *answers*. 564 U.S. at 350. Here, the answers will *not* be common as to Mr. Martorello's knowledge and involvement because all of those factors *varied significantly* over the class period, and so vary significantly from class member to class member.

Moreover, despite its acknowledgment of these variables and Martorello-specific issues, even Plaintiffs' own assertions of predominance are insufficient. The Motion claims "standardized conduct *by Defendants*." *Motion* at 22. It also discusses the relationships between the Tribal Lenders and "Martorello *and his companies*." *Id.* at 6. By generically grouping Martorello with all Defendants or "his companies," Plaintiffs skirt past the pesky issues relating

to the complex and changing relationships among RRTL, BPL, SourcePoint, Bellicose Capital, Eventide, Bellicose VI, Iron Fence, and Mr. Martorello.

Plaintiffs cannot ignore the significant changes in the key relationships of the Defendants across the Class Period; they must present facts demonstrating that Martorello's relationship to each putative class member and each challenged transaction is materially the same. By failing even to attempt to do so, the Motion cannot establish predominance.[20]

### B. Individualized Issues Regarding RICO's Causation Requirement Predominate over Common Questions.

The same dynamic prevents a finding of predominance as to Plaintiffs' RICO claims. To prevail on a civil RICO claim, a plaintiff must show that "the ***defendant's*** [RICO] violation" "proximately caused the harm." *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996) (emphasis added) (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)) (emphasis added). "Proximate cause is a necessary element of analysis to 'limit a person's responsibility for the consequences of that person's own act,'" and requires "some direct relation between the injury asserted and the injurious conduct alleged." *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 226 F. Supp. 3d 589, 595 (E.D. Va. 2017), *aff'd*, 884 F.3d 489 (4th Cir. 2018). Thus, a RICO action cannot lie where "[t]he causal connection [is] considered too tenuous, and the Plaintiffs' theory ignore[s] the more immediate causes of their injuries" or "[w]here the injuries [are] more appropriately attributable to intervening causes." *Id.* (quoting *Mid Atlantic Telecom, Inc. v. Long Distance Serv., Inc.*, 18 F.3d 260, 263 (4th Cir. 1994); *see also Mendelovitz v. Vosicky*, 40 F.3d 182, 185 (7th Cir. 1994) (similar).

---

[20] At the least, subclasses or a re-definition of the Classes is necessary to exclude periods where Martorello's involvement was insufficient to hold him personally liable. However, the factual complexity of this task underscores why denying certification altogether is the correct approach.

For example, in *Hemi Group., LLC v. City of New York*, 559 U.S. 1 (2010), the City of New York brought RICO claims against a cigarette vendor, claiming the vendor failed to report to the State of New York information regarding its cigarette sales to customers in the City. As a result, the City argued, the State could not pass information on to the City that would have allowed the City to identify customers who failed to pay required taxes and pursue those customers for payment, causing the City to lose millions in tax revenues. *Id.* at 9. The Supreme Court assumed as true that this failure to report constituted a RICO predicate act. *Id.* at 7. But the Court held that the plaintiff had failed to establish proximate cause, reasoning that the "City's harm was directly caused by the customers, not [the vendor]." *Id.* at 11. Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 9. That the harm was "foreseeable" to, or "intended, indeed desired" by, the vendor, was immaterial: the absence of a "sufficiently 'direct relationship'" between the defendant's alleged conduct and the claimed harm precluded liability under RICO. *Id.* at 12.[21]

Plaintiffs do not address this critical element at all, instead asserting that "[n]o reliance or causation need be shown." *Motion* at 23. But the sole case on which Plaintiffs' argument rests is inapposite. In *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 572 (S.D. Tex. 2000), the plaintiffs "provided evidence … that demonstrate[d] that Defendants operated in essentially the same

---

[21] The Motion asserts that this case is a candidate for class certification simply because it asserts RICO claims. *Motion* at 23. This is incorrect. Even the authority the Motion cites shows that individualized issues may still preclude certification. *See, e.g., Williams v. Mohawk Industries*, 568 F.3d 1350, 1357–58 (11th Cir. 2009) ("It is primarily when there are significant individualized questions going to liability that the need for individualized assessment of damages is enough to preclude 23(b)(3) certification."). Plaintiffs also selectively quote *Klay*, 382 F.3d 1255 to make it seem as though the court made broad statements about the certifiability of RICO claims. *See Motion* at 23. But consideration the ***entire*** statement shows that the quote is based on facts specific to that case. *Id.* ("The existence of a conspiracy, and whether the defendants aided and abetted each other, were also issues common to all of the plaintiffs ***that*** tend***ed*** to predominate.") (emphasis added). Again, Plaintiffs assume away the many individualized issues.

manner … with regard to all customers." 199 F.R.D. at 572. Plaintiffs **assume** the same is true here, claiming that Martorello's conduct was "substantially the same as to all members of the classes." *Motion* at 23. But that assumes the very conclusion that Plaintiffs must establish. Adjudicating the class members' claims will require the Court to consider each class member's claims and trace them to actions by Martorello to determine whether the alleged conduct "led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). That fact-specific analysis will vary across the relevant time periods, defeating predominance.[22]

## C.    Common Issues Do Not Predominate as to Plaintiffs' Unjust Enrichment Claims.

Under Virginia law,[23] "[t]o prevail on a claim for unjust enrichment, a plaintiff must prove (1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Quick Serve Concepts, LLC v. Cedar Fair*, L.P., 83 Va. Cir. 59 (Va. Cir. Ct. 2011). These are inherently fact-specific inquiries: "an 'unjust enrichment' claim would typically require a factual inquiry into the circumstances of each [transaction] to determine whether it would be 'unjust' for the defendant to retain the alleged benefit." *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 62–63 (D.N.H. 2015) (denying class certification for unjust enrichment claims); *see also Berger v. Home Depot USA, Inc.*, 741 F.3d

---

[22] The conclusion should also be rejected for the simple reason that here, as the court has previously noted, Martorello did not originate nor collect the loans made to Plaintiffs—BPL and RRTL did so from LVD's reservation.

[23] Martorello's position is that LVD law applies to all of Plaintiffs' claims. But for purposes of this Motion the distinction is likely immaterial. As to the usury claim, if LVD law applies, then there is no Virginia usury law to apply and all the claims should be dismissed. As to unjust enrichment, the focus is on issues that are likely to be the same regardless of which jurisdiction's law applies: whether Martorello received a benefit that it would be unjust for him to retain.

-31-

1061, 1070 (9th Cir. 2014) (issue of whether receipt of benefit was unjust or inequitable "necessarily rests on individualized determinations"); *Covert v. LVNV Funding, LLC,* 779 F.3d 242, 247 (4th Cir. 2015); *Doe I v. Wal–Mart Stores, Inc.*, 572 F.3d 677, 684 (9th Cir. 2009).

Because of the need for such individual-specific considerations, unjust enrichment claims are especially poor candidates for class certification. "[D]emonstrating that individual questions will not predominate common questions is particularly problematic where a claim of unjust enrichment is asserted." *Hegel v. Brunswick Corp.*, 2010 WL 2900379, at *5 (E.D. Wis. July 20, 2010). There is widespread agreement that "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009); *see also Douglas Cty. Fed'n v. Douglas Cty. Sch. Dist. RE-1*, 325 F.R.D. 355, 367 (D. Colo. 2018) ("Because of the individualized nature of each class member's intentions and expectations, courts generally find that unjust enrichment claims are not appropriately certified for class treatment, as common questions will rarely, if ever, predominate.") (internal quotation marks omitted); *In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 145 (D.D.C. 2016) (collecting cases and noting that "courts often refuse to certify classes for unjust enrichment claims because these equitable claims require courts to evaluate the plaintiffs' individual circumstances").[24]

As a leading treatise observes,

[t]he majority view is that unjust enrichment claims usually are not amenable to class treatment because the claim requires evaluation of the individual circumstances of each claimant to determine whether a benefit was conferred on

---

[24] *Accord Carter v. PJS of Parma, Inc.*, 2016 WL 3387597, at *5 (N.D. Ohio June 20, 2016); *Russell v. Citigroup, Inc.*, 2015 WL 9424144, at *9 (E.D. Ky. Dec. 22, 2015); *Daigle v. Ford Motor Co.*, 2012 WL 3113854, at *5 (D. Minn. July 31, 2012); *City of St. Petersburg v. Total Containment, Inc., 2*65 F.R.D. 630, 640 (S.D. Fla. 2010); *Bearden v. Honeywell Int'l, Inc.*, 2010 WL 1223936, at *10–11 (M.D. Tenn. Mar. 24, 2010).

defendant and whether the circumstances surrounding each transaction would make it inequitable for the Defendant to fail to return the benefit to each claimant.

1 McLaughlin on Class Actions § 5:60 (11th ed.).

Plaintiffs here fail to show that their unjust enrichment claims are an exception to this rule. Take, for example, the very first element of unjust enrichment: whether a plaintiff conferred a benefit upon Defendants. Plainly, not every putative class member did. Unlike most unjust enrichment claims, putative class members did not provide a service or pay up front for a product. Here, Defendant Lenders *gave money to class members* as the better alternative than some expense they needed the loan for, relying on the promise that class members would repay with interest. Some members may have made all their payments, likely yielding some profit for the LVD Defendants. But many others paid back less than the principal of their loans. In such transactions, even ignoring the economic benefit receiving the principal provided such a Plaintiff, Defendants clearly did not receive a benefit because Defendants gave those class members more money than they received in return. *See In re Citizens Corp.,* 2013 WL 4039048, at *8 (Bankr. M.D. Tenn. Aug. 7, 2013) ("Fi–Data paid far more than what it received … and was not unjustly enriched") (citing *Black v. Boyd*, 248 F.2d 156, 162 (6th Cir. 1957) (no unjust enrichment where bank applied monies received against a loan previously made)). In fact, for those transactions, the opposite is true: the *class member* benefitted, to *Defendants'* detriment. *See Pro Bono Inv., Inc. v. Gerry*, 2005 WL 2429777, at *9 (S.D.N.Y. Sept. 30, 2005) ("[If] funds were paid … and never repaid, the [lender] may have a valid claim of unjust enrichment. Indeed, if [the borrower] really borrowed money but failed to repay the loan, then those funds should arguably be returned even though the Note itself fails."); *DAGS II, LLC v. Huntington Nat'l Bank, NA*, 2016 WL 4536328, at *17 (W.D. Mich. Aug. 31, 2016) (similar).

The third element—acceptance of the benefit in circumstances that render it inequitable to retain the benefit without paying for its value—is equally problematic for predominance. As noted by the laundry list of cases cited above, the equities of each loan can only be determined on a case-by-case basis. Some class members may claim they were unaware of the terms of the loans and how they compared to other available financing options (if any); many others have been fully informed of the loan terms and willingly accepted them, perhaps because they had need and decided taking the loan and repaying the state interest was the most economically beneficial alternative.

████████████████████████████████████████████

████████████████████████████████████████████

Some putative class members may contend they were aggrieved by the loans; others may be completely satisfied by their experience, and are even grateful for the loans. *See Bearden v. Honeywell Int'l, Inc.*, 2010 WL 1223936, at \*10–11 (M.D. Tenn. Mar. 24, 2010) (finding no predominance where "there are undoubtedly many other class members who are satisfied with" the product sold by defendants; "for their money, the consumers received a product that met their expectations and performed adequately"). Clearly named Plaintiffs Hengle, Williams, and Turnage were sufficiently satisfied with their loans to go back to Defendants on multiple occasions. *See also* https://www.trustpilot.com/review/bigpictureloans.com (more than 4,000 favorable BPL reviews).

As noted above, most attempts to collectivize unjust enrichment claims fail to satisfy the predominance requirement. There is nothing special about Plaintiffs' unjust enrichment claims that direct a different result here.

## IV.    THE CLASS DEFINITION FAILS.

### A.    The Proposed Classes Are Not Limited Temporally.

Plaintiffs fail to limit the classes temporally, and thus, if certified, class membership would be constantly changing. The proposed classes are defined based on whether any payments were made on or after certain dates, or whether the class member has a remaining balance. *See Motion* at 12. Consumers who take new loans or make payments for the first time will be added to the RICO, Usury, and Unjust Enrichment classes. Consumers who pay off their loans (and so have no remaining balance) will be removed from the RICO Injunctive Relief Class. An amorphous class cannot be certified. *See, e.g., Young v. Nationwide Mutual Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012); *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980); *Plotnick v.*

-35-

JA360

*Computer Scis. Corp. Deferred Comp. Plan for Key Executives*, 182 F. Supp. 3d 573, 587 (E.D. Va. 2016), *aff'd*, 875 F.3d 160 (4th Cir. 2017) (rejecting certification where class membership changed "on a daily basis"). Plaintiffs' class definitions are defective and cannot be certified.[25]

### B.    The proposed Unjust Enrichment and RICO Injunctive Relief Classes Include Many Members Who Were Not Injured.

A class cannot be defined so broadly that it includes "a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824–25 (7th Cir. 2012).

Plaintiffs seek certification of a Virginia Unjust Enrichment Class comprised of "[a]ll Virginia consumers who paid any amount on their" relevant loans. *See Motion* at 12. As discussed above, any putative class member who made payments totaling less than the amount of the principal he or she borrowed received a net benefit and so, by definition, suffered no injury cognizable in an unjust enrichment claim. By including "all" consumers who paid "***any amount***" on their loans, rather than only ***amounts exceeding the principal he or she received***, Plaintiffs' Unjust Enrichment Class definition is impermissibly broad, and cannot be certified.

Similarly, the RICO Injunctive Relief class includes all Virginia consumers with "remaining balances," regardless of whether the consumer ever made a payment. *See Motion* at 12. Consumers who made no payment have suffered no injury, and so cannot assert a RICO claim, thus rendering the class definition impermissibly overbroad.

To sustain a RICO claim, the plaintiff must still show that he or she suffered a concrete injury to business or property. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 137 (2d Cir. 2016) ("a federal court is authorized to grant equitable relief to a private plaintiff ***who has proven***

---

[25] It is also dubious for Plaintiffs to seek to certify a class based on their payment dates as the trigger dates for defining the class periods, when in fact the more appropriate date would be the date on which the loans were originated.

-36-

*injury* to its business or property by reason of a defendant's violation of ... § 1962") (emphasis added); *see also Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260, 264 (D. Conn. 2004); *Whorley v. Kuchera Indus., Inc.*, 2011 WL 3812957, at *2 (W.D. Pa. July 29, 2011) ("in a RICO action a private party can move for injunctive relief, but that does not do away with the requirement ... [to prove that] he was injured"), *report and recommendation adopted*, *Whorley v. Kuchera Indus., Inc.*, 2011 WL 3812632 (W.D. Pa. Aug. 26, 2011). It is far from clear that putative class members who paid nothing—or paid less than the full amount of principal—on their loans suffered this predicate injury. Indeed, those individuals who have paid back less than the full amount of the loan principal they received from RRTL or BPL will require an individualized inquiry as to the nature of their "injury," so as to determine whether their receipt of loan principal caused them to suffer a loss to business or property.  At a minimum, such "injury" is not concrete, but would be, instead, speculative.[26]

## V.  PLAINTIFFS DO NOT DEMONSTRATE THAT A CLASS ACTION WOULD BE SUPERIOR.

### A.  The Motion's Failure to Address Issues Associated with a Class Action Involving Defendants Other than Martorello Precludes a Finding of Manageability.

The second prong of Rule 23 (b)(3) requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Principal among the "superiority" considerations are the "likely difficulties in managing the class action." *Id.* Manageability "is perhaps the most important consideration in a

---

[26] Perhaps, as Plaintiffs suggest, it is theoretically possible to have suffered some injury as a result of the mere effort to collect on the loan without cash actually exchanging hands. *See, e.g., United States v. Pepe*, 747 F.2d 632, 674 (11th Cir. 1984) (presuming that "a loan shark who killed his victim before the victim could hand over the money" could still be charged under RICO). But even this would raise factual inquiries as to the alleged injury, and depend upon the specific circumstances of each such individual class member. Thus, the class definition is both overbroad and would necessitate individualized mini-trials that would defeat predominance.

Rule 23(b)(3) determination." *Pitt v. City of Portsmouth, Va.*, 221 F.R.D. 438, 446 (E.D. Va. 2004); *accord* 2 William B. Rubenstein, *Newberg on Class Actions* § 4:72 (5th ed.) (manageability is "the most critical concern" in determining superiority). Manageability "'encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit.'" *Fisher v. Virginia Elec. & Power Co.*, 217 F.R.D. 201, 213 (E.D. Va. 2003) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974)). In order to address manageability, the "Court must envision how a class action would unfold. This requires a mental dress rehearsal of the anticipated proof, the jury instructions, the verdict sheet, and the burdens imposed on the jury." *Lloyd v. Gen. Motors Corp.*, 275 F.R.D. 224, 232 (D. Md. 2011). Crucially, Rule 23(b)(3 speaks in terms of "fairly and efficiently adjudicating **the controversy**," Fed. R. Civ. P. 23(b)(3) (emphasis added), not "disputes against some of the defendants" or "part of the controversy." Thus, the Fourth Circuit has sternly directed that "[a] trial judge cannot, in determining the manageability … look exclusively to only one aspect of the case … he can and must look at the case as a whole…." *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 71 (4th Cir. 1977) (en banc), *cert. denied*, 435 U.S. 968 (1978).

A variety of issues may defeat manageability. For example, manageability is not satisfied if a putative class action would force the jury to undertake a "daunting" analysis of complex facts, *Lloyd*, 275 F.R.D. at 232; if the case presents a "multiplicity" of parties; if undue "complexity of … claims as they would relate to injury and damages" require "highly individualized … proof of injury and damages," *Windham*, 565 F.2d at 66; or if there are significant "intraclass differences" in a proposed class. *See Petersen v. Am. Gen. Life Ins. Co.*, 2016 WL 7365187, at *14 (M.D. Fla. Mar. 30, 2016).

Plaintiffs' decision to seek class certification of only the claims against Martorello—albeit with the possibility of later seeking certification of their claims against one or more of the other Defendants—presents a structural obstacle to a finding of superiority that cannot be cleared in this instance. The Fourth's Circuit directive to evaluate manageability based on "the case as a whole" and to avoid "look[ing] exclusively at one aspect of the case" ***cannot*** be satisfied here, because the issue of certification of the claims against most of the Defendants—and indeed the ***primary*** Defendants—have not been presented to the Court for consideration.

Plaintiff's Motion ignores potential manageability issues associated with the wide range of possible combinations and permutations of certified classes and claims against any or all of the differently situated Defendants. Plaintiffs provide no analysis showing that a jury can readily resolve liability and damages as to all of these Defendants, that the factual and legal issues related to all of these diverse parties are not overly complex, or that the evidentiary presentation needed to establish liability and damages as to each of the defendants will be manageable. Of particular concern, Plaintiffs have not shown (or even discussed) how the jury would go about determining liability of each Defendant in light of their ever-shifting roles, relationships, responsibilities, authority, and control over time.

Because Plaintiffs have not and cannot demonstrate superiority as to "the case as a whole," *Windham*, 565 F.2d at 71, certification must be denied.

## VII.   THE ADMINISTRATOR OF MR. GILLISON'S ESTATE IS NOT AN ADEQUATE CLASS REPRESENTATIVE.

Plaintiffs substituted the administrator of Mr. Gillison's estate, Marcella Singh, for Mr. Gillison. *See* Dkt. #200. As this Court has observed, "the administrator of the deceased plaintiff's estate is not an adequate [class] representative for obvious reasons." *Chappelle v. E. I. DuPont DeNemours & Co.*, 75 F.R.D. 74, 79 n.10 (E.D. Va. 1977). Ms. Singh is also not an adequate

class representative because she has virtually no knowledge—firsthand or otherwise—of any facts relating to this case. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████. *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 316 (E.D. Va. 2007).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied.

**MATT MARTORELLO**

By:   /s/ Timothy J. St. George
Timothy J. St. George
Virginia State Bar No. 77349
David N. Anthony
Virginia State Bar No. 31696
*Counsel for Defendant Matt Martorello*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutmansanders.com
Email: tim.stgeorge@troutmansanders.com

David F. Herman (admitted *pro hac vice*)
Jonathan P. Boughrum (admitted *pro hac vice*)
Richard L. Scheff (admitted *pro hac vice*)
*Counsel for Defendant Matt Martorello*
ARMSTRONG TEASDALE LLP
1500 Market Street
12th Floor, East Tower
Philadelphia, PA 19102
Telephone: 215.246.3479
Facsimile: 215.569.8228
Email: dherman@armstrongteasdale.com
Email: jboughrum@ armstrongteasdale.com
Email: rscheff@ armstrongteasdale.com

-40-

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd of October 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Leonard A. Bennett
Elizabeth W. Hanes
CONSUMER LITIGATION ASSOCIATES
763 J. Clyde Morris Blvd., Suite 1A
Newport News, VA  23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: lenbennett@clalegal.com
Email: elizabeth@clalegal.com
*Counsel for Plaintiffs*

Beth E. Terrell (admitted *pro hac vice*)
Elizabeth A. Adams (admitted *pro hac vice*)
Jennifer R. Murray (admitted *pro hac vice*)
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th St., Suite 300
Seattle, WA 98103-6689
Telephone: 206-816-6603
Facsimile: 206-319-5450
Email: bterrell@terrellmarshall.com
Email: eadams@terrellmarshall.com
Email: jmurray@terrellmarshall.com
*Counsel for Plaintiffs*

Eleanor M. Drake (admitted *pro hac vice*)
John G. Albanese (admitted *pro hac vice*)
BERGER & MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN  55414
Telephone: 612-594-5999
Facsimile: 612-584-4470
Email: emdrake@bm.net
Email: jalbanese@bm.net
*Counsel for Plaintiffs*

Justin Alexander Gray
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: 269-283-5005
Facsimile: 517-916-6443
Email: jgray@rosettelaw.com
*Counsel for Big Picture Loans, LLC and Ascension Technologies, LLC*

/s/ Timothy J. St. George
Timothy J. St. George
Virginia State Bar No. 77349
*Counsel for Defendants*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1245
Facsimile: (804) 698-6013
Email: tim.stgeorge@troutmansanders.com

32904810

**JA367**

**No. 18-1827**

# In the United States Court of Appeals
# for the Fourth Circuit

_____

LULA WILLIAMS, GLORIA TURNAGE, GEORGE HENGLE, DOWIN COFFY, and FELIX GILLISON, JR., on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellees,*

v.

BIG PICTURE LOANS, LLC and ASCENSION TECHNOLOGIES, LLC,
*Defendants-Appellants,*

and

MATT MARTORELLO, DANIEL GRAVEL, JAMES WILLIAMS, JR., GERTRUDE MCGESHICK, SUSAN MCGESHICK, and GIIWEGIIZHIGOOKWAY MARTIN,
*Defendants.*

_____

On Appeal from the United States District Court
for the Eastern District of Virginia

_____

**BRIEF OF APPELLEES**
_____

KRISTI C. KELLY
ANDREW GUZZO
CASEY S. NASH
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
kkelly@kellyandcrandall.com


MATTHEW W. H. WESSLER
ALEXANDRIA TWINEM
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
matt@guptawessler.com


December 20, 2018                    *Counsel for Plaintiffs-Appellees*

JA368

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __18-1518__    Caption: __Williams et al. v. Big Picture Loans et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix Gillison Jr.__
(name of party/amicus)

_____

 who is _____appellees_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

**JA369**

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Matthew Wessler                    Date:        12/20/2018

Counsel for: Plaintiffs-Appellees

## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on  December 20, 2018   the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Matthew Wessler                              12/20/2018
        (signature)                                  (date)

**JA370**

# TABLE OF CONTENTS

Table of authorities ............................................................................... ii

Introduction ............................................................................................ 1

Jurisdictional statement ........................................................................ 4

Statement of the issues ......................................................................... 4

Statement of the case ............................................................................ 5

I.   The Big Picture lending scheme. ................................................... 5

    A.   States have long regulated payday lenders. ........................... 5

    B.   The tribal lending model reflects the newest effort to create a loophole around lending laws. ................................................. 7

    C.   Martorello sets up a tribal lending scheme. ......................... 8

    D.   Martorello and the tribe strike a new deal. ......................... 11

    E.   The current tribal lending enterprise. ................................... 15

    F.   The revenue structure of the tribal lending enterprise........ 20

II.  This litigation. ............................................................................. 20

    A.   The plaintiffs' loans. ............................................................ 20

    B.   The borrowers sue Martorello, Big Picture, and Ascension. .............. 21

    C.   The district court's decision. ............................................... 21

Summary of argument ......................................................................... 25

Standard of review .............................................................................. 28

Argument ............................................................................................. 28

I.   The district court correctly placed the burden on the defendants to establish an entitlement to arm-of-the-tribe sovereign immunity. ............... 28

II.  The district court carefully weighed the *Breakthrough* factors and correctly decided that the defendants are not entitled to arm-of-the-tribe immunity. ................................................................ 33

    A.   The district court was correct to consider the practical application of the factors as well as the formal structures created by the defendants. ................................................. 34

    B.   The district court weighed the *Breakthrough* factors correctly. ............ 36

Conclusion ........................................................................................... 54

i

# TABLE OF AUTHORITIES

## Cases

*Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort,*
    629 F.3d 1173 (10th Cir. 2010)...............................................................*passim*

*Cash Advance & Preferred Cash Loans v. Colorado ex rel. Suthers,*
    242 P.3d 1099 (Colo. 2010) ...................................................................... 32

*City of New York v. Golden Feather Smoke Shop, Inc.,*
    2009 WL 705815 (E.D.N.Y. Mar. 16, 2009)............................................ 32

*Dixon v. Picopa Construction Co.,*
    772 P.2d 1104 (Ariz. 1989)........................................................................ 50

*E.F.W. v. St. Stephen's Indian High School,*
    264 F.3d 1297 (10th Cir. 2001) ................................................................. 32

*Eckert International v. Government of the Sovereign Democratic Republic of Fiji,*
    32 F.3d 77 (4th Cir. 1994) ........................................................................... 4

*Finn v. Great Plains Lending,*
    689 Fed. App'x 608 (10th Cir. 2017)................................................... 34, 36

*Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico & the Caribbean Cardiovascular Center Corp.,*
    322 F.3d 56 (1st Cir. 2003) ........................................................................ 31

*Gibbs v. Plain Green, LLC,*
    331 F. Supp. 3d 518 (E.D. Va. 2018) ...................................................... 35

*Gristede's Foods, Inc. v. Unkechuage Nation,*
    660 F. Supp. 2d 442 (E.D.N.Y. 2009)..................................................... 32

*Hayes v. Delbert Services Corp.,*
    811 F.3d 666 (4th Cir. 2016) .................................................................. 5, 11

*Howard v. Plain Green, LLC,*
    2017 WL 3669565 (E.D. Va Aug. 7, 2017) ............................................. 50

*Hutto v. South Carolina Retirement System,*
    773 F.3d 536 (4th Cir. 2014)..................................................................*passim*

*In re Prairie Island Dakota Sioux,*
    21 F.3d 302 (8th Cir. 1994) .................................................................. 29

*In re KBR, Inc.,*
    893 F.3d 241 (4th Cir. 2018) ........................................................... 33, 36

*Lubrizol Enterprises v. Richmond Metal Finishers, Inc.,*
    756 F.2d 1043 (4th Cir. 1985) .............................................................. 45

*Metzgar v. KBR, Inc.,*
    744 F.3d 326 (4th Cir. 2014) ......................................................... 28, 41

*Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services,*
    769 F.3d 105 (2d Cir. 2014) ................................................................ 11

*Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services,*
    974 F. Supp. 2d 353 (S.D.N.Y. 2013) .................................................. 11

*People ex rel. Owen v. Miami Nation Enterprises,*
    386 P.3d 357 (Cal. 2016) ............................................................ *passim*

*Pistor v. Garcia,*
    791 F.3d 1104 (9th Cir. 2015) ............................................................ 32

*Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.,*
    506 U.S. 139 (1993) ............................................................................ 4

*Ristow v. South Carolina Ports Authority,*
    58 F.3d 1051 (4th Cir. 1995) .............................................................. 35

*U.S. ex rel. Oberg v. Pa. Higher Education Assistance Agency,*
    745 F.3d 131 (4th Cir. 2014) ......................................................... 26, 35

*United States v. Chandia,*
    675 F.3d 329 (4th Cir. 2012) .............................................................. 28

*United States v. Span,*
    789 F.3d 320 (4th Cir. 2015) .............................................................. 28

*Wisconsin Department of Corrections v. Schacht,*
    524 U.S. 381 (1998) .......................................................................... 29

JA373

*Woods v. Rondout Valley Central School District Board of Education.*,
  466 F.3d 232 (2d Cir. 2006) ............................................................30, 31

*Yousef v. Samantar,*
  552 F.3d 371 (4th Cir. 2009) ............................................................ 32

## Other Authorities

Center for Community Capital,
  *North Carolina Consumers after Payday Lending: Attitudes and Experiences
  with Credit Options* 1 (Nov. 2007) ................................................7

Center for Responsible Lending,
  *Payday Loan Quick Facts: Debt Trap by Design* (July 2014),
  https://bit.ly/2LffVaT..........................................................................5, 6

Center for Responsible Lending,
  *Springing the Debt Trap: Rate caps are only proven payday lending reform*
  (Dec. 13, 2007) ...............................................................................7

Department of Defense,
  *Report on Predatory Lending Practices Directed at Members of the Armed Forces
  and Their Dependents* (Aug. 9, 2006)..........................................6

Ronald J. Mann,
  *Just Until Payday*, 54 UCLA L. Rev. 855 (Apr. 2007) ...........................7

Nathalie Martin & Joshua Schwartz,
  *The Alliance Between Payday Lenders and Tribes: Are both Tribal Sovereignty
  and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev 751 (2012)....................6, 7, 8

*Payday Lending State Statutes*,
  Nat'l Conference of State Legislatures (Jan. 23, 2018), https://bit.ly/2ktRfkU .....6

Pew Charitable Trusts,
  *Payday Loan Facts and the CFPB's Impact*
  (May 2016), https://bit.ly/2EtiWnt ................................................5, 6

Press Release,
  *CFPB Sues CashCall for Illegal Online Loan Servicing* (Dec. 16, 2013),
  https://bit.ly/2UdynVA............................................................2, 11, 12

iv

**JA374**

Jessica Silver-Greenberg,
 *Payday Lenders Join with Indian Tribes*, Wall Street Journal (Feb. 10,
 2011), https://on.wsj.com/2UGVfx2 ..................................................................... 8

Usury Laws by State,
 https://bit.ly/2LtcRrN ........................................................................................... 6

13 Charles A. Wright et al.,
 *Federal Practice and Procedure* § 3524 (1984 & 1993 Supp.) ......................................... 29

## INTRODUCTION

The plaintiffs in this case are Virginians who obtained payday loans over the Internet through an enterprise doing business as Big Picture. Although Virginia caps interest rates at 12%, these loans carried triple-digit interest rates that topped 600%—more than 50 times the legal limit. A typical $800 Big Picture loan put a borrower on the hook for about $6,200, or about eight times the principal.

This appeal concerns the defendants' effort to free themselves from any legal accountability for this unlawful lending scheme. For years, Big Picture did its lending under a different name—Red Rock Tribal Lending. That operation was the brainchild of Matt Martorello, a non-tribe member who struck a deal with the Lac Vieux Desert Band of Chippewa Indians to serve as the front for his online lending operation. Under the arrangement, the tribe would allow its name to be used to offer loans to consumers nationwide through Red Rock's website. And Martorello would handle nearly every aspect of the lending operations through his company in the Virgin Islands. In exchange, Martorello paid the tribe 2% of his revenue.

This arrangement was lucrative for Martorello. But several years in, pressure began to mount. To evade courts and regulators, the enterprise sought to cloak itself in immunity by claiming arm-of-the-tribe status—an analogue of arm-of-the-state sovereign immunity that permits an entity that functions as an arm of a tribe to share in the tribe's immunity. But both courts and regulators disagreed. The Second

1

JA376

Circuit rejected a tribal-immunity defense to a New York enforcement action brought against Red Rock. And, after suing a similar tribal lender, federal regulators denounced the idea that a lender's "relationship with a tribe" could free it from having to comply with state laws. *See* Press Release, *CFPB Sues CashCall for Illegal Online Loan Servicing* (Dec. 16, 2013), https://bit.ly/2UdynVA.

Martorello was worried. ████████████████████████

████████████████████████████████████████████

████████████████████████████ To protect the business, Martorello convinced the tribe to wrap the entire lending operation in newly-created tribal entities. Through a series of complicated transactions, the tribe formally absorbed the enterprise: Red Rock became Big Picture, and Ascension, a new entity created by the tribe, purchased Martorello's lending company. On paper, the tribe now appeared to be in control.

But in practice, things stayed the same. As with Red Rock, Big Picture played almost no role in the actual lending. It employed just four tribe members in entry-level positions and installed a tribal council member as token CEO. Ascension had even less to do with the tribe. It hired no tribal employees and kept all the old operations in place. As far as the tribe was concerned, although it formally owned the companies, ████████████████████████████████████████

████████████████████████████████

2

JA377

Since this corporate reshuffle, the enterprise's lending has continued apace. So too has the defendants' insistence that allowing "unhappy borrowers" to challenge the scheme would constitute "an assault" on tribal sovereignty. But arm-of-the-tribe status is reserved only for those entities whose activities are really those of the tribe—not for entities that, as the district court explicitly found here, were formed to "facilitat[e] the absorption" of a "decidedly non-tribal" and "fully-functioning" lending enterprise. JA202. In an 81-page decision, after thoroughly analyzing the record evidence and making careful factual findings, the district court concluded that the "driving force" behind Big Picture and Ascension was "to shelter outsiders from the consequences of their otherwise illegal actions." JA222.

This Court should affirm that conclusion. Extending tribal immunity on this record would offer a roadmap for payday lenders and others looking for ways to disregard federal and state laws: find a tribe, offer a sliver of revenue, and move the operations over on paper. Virtually nothing has to change: fill a few entry-level positions with tribe members, install a nominal CEO, and keep the core of the business (and profit-sharing) as-is. The tribe collects its checks, profit soars, and the chance of dodging liability in the event of any enforcement effort increases. Arm-of-the-tribe immunity is not designed to immunize this sort of arrangement. The Court should decline the defendants' invitation to do so here.

3

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1367. The district court issued an order denying the defendants' motion to dismiss on the basis of tribal sovereign immunity on June 26, 2018. JA141. The appellants timely appealed on July 19, 2018. JA145-47. This Court has jurisdiction to review this order under the collateral-order doctrine. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993) (denial of sovereign immunity appealable under 28 U.S.C. § 1291); *Eckert Int'l v. Gov't of the Sovereign Democratic Republic of Fiji*, 32 F.3d 77, 79 (4th Cir. 1994).

## STATEMENT OF THE ISSUES

**1.** Did the district court correctly place the burden of proof on the entity claiming arm-of-the-tribe sovereign immunity, just as this Court has placed the burden of proof on an entity claiming arm-of-the-state sovereign immunity?

**2.** Did the district court correctly join the majority of other courts in determining that the arm-of-the-tribe analysis requires assessing the actual relationship between the tribe and the entity rather than relying exclusively on formal documents?

**3.** Did the district court commit clear error in finding facts and applying the relevant factors to determine that the entities are not arms of the tribe?

4

## STATEMENT OF THE CASE

I. **The Big Picture lending scheme.**

    A.     **States have long regulated payday lenders.**

In a payday loan, a consumer who can't afford to wait until payday receives a cash advance and, in exchange, the lender subtracts a larger amount from the consumer's paycheck. Typically, a consumer borrows several hundred dollars but has to repay the loan at triple-digit interest rates in installments over the course of months—a process that easily ends up quadrupling or quintupling the total dollar amount ultimately owed. *See*, *e.g.*, *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 668-69 (4th Cir. 2016).

Although these loans are marketed as a source of short-term cash to be used in financial emergencies, they are often used to meet chronic budget shortfalls—"7 in 10 borrowers use them for regular, recurring expenses such as rent and utilities." Pew Charitable Trs., *Payday Loan Facts and the CFPB's Impact* (May 2016), https://bit.ly/2EtiWnt. But because borrowers "typically cannot repay the loan *and* cover their basic living expenses," they take out another loan, and then another. Ctr. for Responsible Lending, *Payday Loan Quick Facts: Debt Trap by Design* (July 2014), https://bit.ly/2LffVaT.

Lenders, in fact, rely on this feature. As one CEO put it, the "profitability" in payday lending is "to get that customer in" and "work to turn him into a repetitive

5

customer long-term." *Id.* The strategy has worked. On average, a "payday loan borrower is in debt for five months of the year, spending an average of $520 in fees to repeatedly borrow $375." Pew Charitable Trs., *Payday Loan Facts*. No surprise, then, that the Department of Defense has observed that the "debt trap is the rule not the exception." Dep't of Defense, *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* 15 (Aug. 9, 2006).

States and federal agencies have enacted measures to curb the abuses that frequently arise in this lending context. Many states typically cap interest rates at somewhere between 7% and 36%. *See Usury Laws by State*, https://bit.ly/2LtcRrN. And five states plus the District of Columbia—home to more than 10% of Americans—prohibit the use of payday loans altogether. *Payday Lending State Statutes*, Nat'l Conference of State Legislatures (Jan. 23, 2018), https://bit.ly/2ktRfkU. These efforts reflect a core policy: that low-income borrowers in need of credit to help them through an unexpected expense or emergency should be able to access affordable alternatives without sinking into high-cost, long-term debt. *See* Ctr. for Responsible Lending, *Payday Loan Quick Facts*.

The results have been significant. "State interest rate caps have been very effective at eliminating payday loan abuses." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 766 (2012). States that have imposed

6

reasonable interest-rate caps on small loans "saved their citizens an estimated $1.4 billion per year." Ctr. for Responsible Lending, *Springing the Debt Trap: Rate caps are only proven payday lending reform* 5 (Dec. 13, 2007). And those states that have restricted— or even eliminated—payday loans saw no demonstrable effect on the availability of short-term credit. *See, e.g.*, Ctr. for Community Capital, *North Carolina Consumers after Payday Lending: Attitudes and Experiences with Credit Options* 1 (Nov. 2007).

### B.   The tribal lending model reflects the newest effort to create a loophole around lending laws.

Still, some lenders continue to hunt for ways to circumvent lending laws. One strategy—popularized in the early 2000s—involved internet lenders partnering with unscrupulous nationally-chartered banks to use the national banks' "federal preemptive shelter" to shield their lending from liability. Ronald Mann, *Just Until Payday*, 54 UCLA L. Rev. 855, 873 (Apr. 2007). Once this approach—known as the "rent-a-bank" model—became public, federal regulators shut it down. *Id.*

As the "rent-a-bank" arrangement began to falter, a similar business model— tribal payday lending—began to take its place. Under this "most recent incarnation of payday lending regulation-avoidance," existing payday lenders "team with Indian tribes in order to gain the benefit of tribal sovereign immunity and avoid state usury laws, small loan regulations, and payday loan laws." Martin & Schwartz, *The Alliance Between Payday Lenders and Tribes*, at 753.

7

The tribal-lending market "is exploding." Jessica Silver-Greenberg, *Payday Lenders Join with Indian Tribes*, Wall Street J. (Feb. 10, 2011), https://on.wsj.com/2UGVfx2. One consultant disclosed that "more than 1,000 payday lenders have expressed interest in cloning" the tribal lending model. *Id.* The appeal from a lender's perspective is obvious. "All it takes to make a deal are a willing tribe and an eager payday lender." *Id.* As one major lender observed, tribal lending is "the new financial strategy that many are using as a loophole through the strict payday loan laws" because "[t]he revenue is quite high and promising for these tribes who often find themselves struggling." Martin & Schwartz, *The Alliance Between Payday Lenders and Tribes*, at 766. In short, internet lenders see "escaping US lending laws," as the way to "save their business." *Id.*

## C.   Martorello sets up a tribal lending scheme.

Several years into the tribal lending experiment, Matt Martorello, a 31-year old from Chicago, decided to get into the business. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  So it was, in the spring of 2011, that an intermediary introduced Martorello to the Lac Vieux Desert Band of Chippewa Indians, a federally-recognized tribe located in Watersmeet, Michigan,

which had "decided" to try to "start tribal online lending businesses." JA262.

Martorello started a new company—Bellicose Capital—to transact business with the

tribe. *See* JA747; ███████████████████████████

The parties formalized their relationship that summer. ████████████

███████████████████████████████████ the tribe passed a resolution

creating an entity called Red Rock Tribal Lending. *See* █████████████████████

JA304, JA360, JA362. Although Red Rock's stated purpose was to create "a tribally-

owned lending enterprise," JA360, it outsourced almost all the enterprise's

operations to Martorello and his businesses. *See* JA755-57. According to the

arrangement, a Bellicose subsidiary, SourcePoint, controlled the day-to-day

operations of the enterprise from the Virgin Islands. Among other duties,

SourcePoint:

- Screened and selected providers and lenders, JA755-56;

- Prepared standards for Red Rock to follow for operations, regulatory
  compliance, training, financial reporting, accounting, Red Rock's website,
  marketing, and consumer relations, JA756;

- Provided "pre-qualified leads" to Red Rock and generated the "credit-
  modeling data and risk assessment strategies" for lending decisions, *id.*;

- ███████████████████████████████████████████████
  █████████████████████

9

**JA384**

- Sold or transferred defaulted loans to third-party debt collectors, JA757.

SourcePoint's control also extended beyond even these lending responsibilities. It held "authority and responsibility" for "all communication and interaction whatsoever" between the operation and any "service provider, lender and other agents." JA751. It also controlled the selection of Red Rock's bank and had "sole signatory and transfer authority" over the account. JA758. And it held authority to "collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock.]" JA761.

Red Rock's duties, by contrast, were narrow and circumscribed. It was prohibited from engaging in any lending business anywhere without using SourcePoint to "service[]" the operation. JA752. And while Red Rock retained "[f]inal determination as to whether to lend to a consumer," JA755, it based this decision on predetermined underwriting criteria set by SourcePoint, JA756.

The unequal distribution of responsibility was intentional. As the parties' agreement expressly recognized, "the success of the business is based in large part upon the services provided . . . by [SourcePoint]." JA754. So too for the profits. Under the arrangement, Red Rock received 2% of the enterprise's gross revenue; after accounting for any outstanding obligations, SourcePoint took the rest. *Id.*; *see also* JA751, JA763.

10

JA385

### D.  Martorello and the tribe strike a new deal.

*1. **The lending enterprise faces mounting pressure.*** Less than two years after Red Rock and Martorello began offering online loans, pressure began to mount. JA163-165. In early 2013, New York regulators sent a cease-and-desist letter to the tribe for "using the Internet to offer and originate illegal payday loans to New York consumers." JA163 (quoting *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013)).

The tribe refused to comply. It called New York's effort to enforce its laws "an affront to [the tribe's] inherent sovereignty" and sought to enjoin the state from further enforcement. *See Otoe-Missouria Tribe*, 974 F. Supp. 2d at 357. But because the tribe's lending practices targeted "New York residents who never le[ft] New York State," the court rejected the challenge. *Id.* at 360; *see Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014) (affirming).

In the midst of this skirmish, Martorello confronted another development—the fall of the Western Sky tribal lending scheme. One of the first internet tribal lenders, Western Sky "issued payday loans to consumers across the country" from the Cheyenne River Indian Reservation in South Dakota. *Hayes*, 811 F.3d at 668. Although "keenly aware of the dubious nature of its trade," the lender claimed tribal immunity from the "host of state and federal lending laws" that it flaunted. *Id.* at 669. In late 2013, Western Sky was hit with a federal enforcement action. *See* Press Release,

11

**JA386**

*CFPB Sues CashCall*. As the CFPB explained, the lender's "relationship with a tribe" could not "exempt Western Sky from having to comply with state laws when it [made] loans over the Internet to consumers in various states." *Id.*

This gave Martorello pause. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Martorello also believed, given the similarities between the two operations, ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

**2. *Martorello restructures the lending enterprise.*** Facing this unsettled landscape, Martorello devised a plan to restructure the lending operation by means of a deliberately obscure and interlocking set of new business structures.

Before getting to work, he first emailed the head of the tribal council, Jim Williams, that he was "working" on a "potential bigger deal" for the tribe. JA808.

████████████████████████████████████████████████████

████████████████ Two weeks later, the parties began a restructure.

The corporate moves were complicated. As a formal matter it was the tribe that created a new lending entity—called Big Picture Loans—to centralize all of its

12

lending activities. JA364-66. Formed "as a wholly owned and operated instrumentality of the Tribe," Big Picture was managed by two members of the tribal council, and nominally run by one of them—Michelle Hazen—who was installed as CEO. JA365. Then, to create an extra layer of insulation from liability, the tribe created a holding company—called Tribal Economic Development Holdings, LLC or TED—that formally held Big Picture. JA372-74, JA165. Like Big Picture, TED was itself wholly owned by the tribe and managed by the same tribal council members. *Id.*; JA376.

On the servicer side, the tribe created a new company called Ascension Technologies. Documents stated that Ascension was a "wholly owned and operated tribally owned business entity" created to "engag[e] in marketing, technological and vendor services" to support Big Picture. JA380-81. Like Big Picture, Ascension was held by TED and managed by tribal council members. *Id.*; JA385. But unlike Big Picture, a non-tribe-member, Brian McFadden, was designated president. JA382.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ By creating Ascension and designating McFadden as president, the parties hoped "to enable the Tribe to more easily

13

purchase Bellicose"—the nerve center of the lending operation—from Martorello. JA166.

But purchasing Bellicose was no small matter—the tribe had nowhere near enough capital. *See* JA1345. Martorello came up with a workaround. He formed a new entity, called Eventide Credit Acquisitions, with the express purpose of enabling a seller-financed sale of Bellicose to the tribe. *See* JA825, JA828; ███████████

██ Martorello secured an 85% ownership stake in Eventide (the other 15% went to friends and family, including McFadden). JA835. Then, on paper, Martorello loaned the tribe $300 million which it used to purchase Bellicose. JA828, JA916; ████████

██████████ No money actually changed hands. *See* JA917.

Martorello pushed the tribe to accept the deal. JA1331. ███████████

██████████████████████████████████████

██████████ The tribe agreed and Bellicose was merged into Ascension. ██

████████████ JA826. Red Rock then assigned all of its loans and obligations to Big Picture and dissolved. JA441. Three weeks later, Big Picture and Ascension signed a contract that installed Ascension as the servicer of Big Picture's loans. *See* JA945-58. Ascension (now with Bellicose's resources and operations) agreed to service the loans in nearly the same way as SourcePoint did for Red Rock. *See* JA173.

The lending enterprise now consists of three main entities: TED, Big Picture, and Ascension. TED serves as a holding company for the other entities; Big Picture

14

assumed responsibility for the lending side of the business, originating loans and providing customer service; and Ascension formally became the loan servicer.

### E.   The current tribal lending enterprise.

Despite the shifting corporate facade, ample record evidence demonstrates that little about the actual lending operation changed.

*1. **Big Picture's structure.*** Big Picture is located on the tribe's reservation in Watersmeet and managed by two tribal council members, Hazen and Williams. JA850-52, JA1351. Hazen acts as CEO. *Id.* It was created, according to Hazen, to employ tribe members and "allow them to make a better life for themselves." JA1083. But of its fifteen employees, only four (other than Hazen) are tribe members,[1] and they are employed as customer service representatives (known as CSRs) who make between $11 and $14 per hour for an annual salary of between $20,800 and $22,880. JA1077. Since Big Picture began, they have received one pay raise totaling $1-$1.50 per hour. JA1078. As CEO, Hazen makes $90,000 per year, has "never tried" to pay her employees a livable wage, and raised no objection after learning that Big

---

[1] The district court stated that "Big Picture's employees primarily belong to the Tribe," JA211, but the record doesn't bear this out. Big Picture's CEO testified that, although the company had fifteen employees, only five, including herself, were members of the tribe. JA1084; *see also* JA1620-22. The district court was correct, however, that all fifteen employees work from the tribe's reservation. JA214.

Picture's CSRs were paid less than every Ascension employee, all of whom are non-tribe-members. JA1077, JA1079-80.

Big Picture is a limited liability corporation. *See* JA449 (stating that Big Picture's owner, TED, "shall not be obligated" by any debt, obligation, or liability "solely by reason" of owning Big Picture). And, because this structure largely insulates TED from liability, the tribe—as sole owner of TED—would also "not be directly affected by any judgment against Big Picture." JA224.

**2. *Big Picture's role*.** As with Red Rock, Big Picture employees perform highly circumscribed duties. Virtually all of the lending decisions—from whether to accept a borrower's initial loan application to estimating a borrower's interest rate—rely on proprietary underwriting software created by Bellicose. *See* JA787, JA1137. Big Picture employees make one decision in the course of originating loans—confirming that the borrower meets lending criteria that are pre-set by Ascension. JA264-65. Beyond this task, Big Picture employees play no other role in the actual lending process. They do, just as they did with Red Rock, respond to customer service emails and calls. JA1519-20. And, as before, the funds for these loans come from private investors, along with a small fraction from the tribe. JA263-64.

**3. *Ascension's structure*.** Like Big Picture, Ascension is managed by Hazen and Williams and is a limited liability corporation. JA381, JA385; JA389. But that is where the similarities end. Unlike Big Picture, although Ascension's nominal

16

**JA391**

headquarters is on the reservation, all 31 of its employees (before Hurricanes Irma and Maria displaced some) were located in Puerto Rico, the Virgin Islands, or Atlanta, Georgia. JA848, JA1081. And neither its president nor any of its employees are tribe members. JA1369, JA1541. No surprise: the company does not even bother to post Ascension job notices on the tribe's job board. JA860, JA1086. The company's co-managers claim that this is because Ascension requires employees with specialized skills that no member of the tribe possesses, JA858, JA1085-86, but the tribe has never attempted to create any training programs to qualify tribe members for these higher-paying jobs, JA884, JA1087-88.

Ascension's president, McFadden, makes almost all decisions for the company. JA460-63. Under the parties' contract, McFadden is expressly authorized to conduct a broad range of actions, including "approval of Ascension strategic direction" and, most significantly, "authority regarding all matters necessary for . . . day to day management." JA461. McFadden, though, must "report regularly" to the co-managers, who retain approval for any "obligation for Ascension over $100,000" and "any new major employee benefit plan." JA460-61. The co-managers are also responsible for appointing McFadden's successor. JA460.

*4. Ascension's role.* Ascension's role is identical to its predecessor SourcePoint. Ascension is charged with developing Big Picture's standards across the full range of lending operations—primarily from locations outside the reservation.

17

JA392

JA950. It likewise retains SourcePoint's responsibility for the full range of business operations. *Id.* And Ascension, like SourcePoint, "[c]oordinat[es] pre-qualified leads" and "provid[es] the necessary credit-modeling data and risk assessment strategies" for evaluating whether or not to extend funds to an individual borrower. JA951. Indeed, the key "duties" section of the contract is nearly identical to the same section in the Red Rock-SourcePoint agreement. *Compare* JA950-52, *with* JA755-57.

There is, in fact, no practical difference between SourcePoint and Ascension. As McFadden told Bellicose employees just before its acquisition, "all" of the current positions that would be "assigned to Ascension" would be "at the same or substantially similar rates of pay/benefits/conditions of employment." JA1090. Bellicose employees retained their "accrued and unused vacation and sick time, seniority, and personnel files" at Ascension. *Id.* And no positions were eliminated in the transition at all. *Id.* From the tribe's perspective, "everything that was being done [at SourcePoint] was just transferred over to Ascension to keep the flow going." JA862-63; *see also* JA883 ("[Bellicose] did like the—the same thing as Ascension does today.").

*5. Lack of tribal management and oversight.* The entities that make up the lending enterprise may be formally owned by the tribe and managed by tribal council members, but, as the record evidence reveals, the tribe exercises little actual oversight. As but one example, although Williams and Hazen formally approve

18

numerous documents related to the entities—including operating budgets, *see* JA1231, and employment materials, JA1233, JA1236—they do not know basic facts about the operations of either company. Consider the following:

- **The companies' data collection practices.** When asked what data Ascension collects and why, Williams explained "I'm not sure. I mean that— that's why we hired those guys, to figure out what's needed for the business. . . . I just trust that they're doing what they need to do to be successful." JA863.

- **The day-to-day work of the companies' employees.** Williams knew the majority of Big Picture's employees were CSRs, but did not know what CSR stood for. ██████████████████████████████████ ███████████████████████████████████████████████ Hazen could not say whether Ascension's employees have the same responsibilities now as they did when they were employed by Bellicose/SourcePoint. JA1076. In fact, she believed only McFadden would know this. *Id.*

- **The companies' formation and roles.** Hazen largely could not recall any of the details of Big Picture's formation. She did not know whose idea it was to form a new entity, who suggested the entity's name, or when it was chosen. JA1073-74; *see also* JA1557-58. Williams could not explain basic facts about what Big Picture does or how. JA864-65; *see also* JA1375-76

19

(acknowledging that he could not describe how loan decisions are made). And although Williams is a co-manager of Big Picture's subsidiaries, BPL A-1, BPL B-1, and BPL F-1, he admitted that he was "not familiar" with them and could only guess that they had "something to do with" Big Picture. JA870; *see also* JA1382.

### F.  The revenue structure of the tribal lending enterprise.

The distribution of revenue generated by the lending operation is governed by a Promissory Note between TED and Eventide that mirrors the prior arrangement—at the end of the day, the tribe receives 2% of the gross revenue (recently that increased to 3%) and Martorello's company Eventide pockets the remaining profit (structured as loan repayment).[2] JA754, JA829-30, JA959. Ascension, for its part, does not receive *any* share of the revenue. JA949.

## II.  This litigation.

### A.  The plaintiffs' loans.

The plaintiffs in this case are Virginians who found themselves in need of small loans to cover personal expenses and obtained payday loans from Big Picture. JA30-

---

[2] Once Big Picture has repaid $150 million to Eventide, the tribe's monthly distribution will jump to 6%. JA959. However, if TED defaults under the Loan Agreement, the distribution drops to zero. JA829. TED also distributes another 2% of gross revenue to the tribe to be "reinvested" in "growing the loan portfolio." JA829. Although this money is designated as a disbursal to the tribe, it must "stay in equity within [TED] . . . until the termination" of the Note's seven-year term. JA829-30.

20

32, JA40. They received advertisements from Big Picture that pitched the company's ability to process and fund a small personal loan very quickly and with little hassle. JA237. After just a few clicks, the borrowers were able to take out loans. *See* JA264-65.

Although the loans were advertised for small amounts, the total annual percentage rate of the loan topped 600%. JA40. That rate clearly ran afoul of Virginia law—which caps any interest rate chargeable to consumers at 12%. In total, for a true-dollar loan of $800, the defendants charged borrowers around $6,200— nearly eight times the amount borrowed. JA232.

### B.    The borrowers sue Martorello, Big Picture, and Ascension.

To curtail the defendants' unlawful conduct, the Virginia borrowers brought a putative class action against Martorello, Big Picture, and Ascension. JA28-59. They asserted violations of various Virginia usury laws and federal laws related to the illegal loans offered by Big Picture and its affiliated entities. *See* JA44-58 (asserting both common-law and statutory claims). After jurisdictional discovery, Big Picture and Ascension moved to dismiss on the basis of tribal sovereign immunity, arguing that they are "arms of the tribe" and therefore entitled to share the tribe's immunity. JA12.

### C.    The district court's decision.

In a thorough, 81-page decision, the district court rejected the defendants' attempt to invoke arm-of-the-tribe immunity to shield themselves from suit. After

21

carefully considering and weighing the evidence, it held that there was "no doubt" that the "driving force" behind the formation of Big Picture and Ascension was to use the tribe's immunity "to shelter outsiders from the consequences of their otherwise illegal actions." JA222. Because tribal immunity is reserved only for those entities that genuinely function "as an arm of the tribe so that [their] activities are properly deemed to be those of the tribe," it was unavailable here. JA221 (citation omitted).

The court began its analysis by explaining that a party seeking arm-of-the-tribe immunity bears the burden of proof on that issue. JA196. The defendants had argued that, because "tribal immunity is a matter of subject matter jurisdiction," it must fall to the plaintiff to prove that the defendants "are not entitled to sovereign immunity." JA194-95. The court rejected this claim. JA194. Placing the burden on the party seeking immunity accords with the settled approach taken in the analogous arm-of-the-state immunity context. JA197-98. And, as the court observed, the evidence required to answer the immunity question will usually be in the possession of the entity seeking immunity. JA196 (rejecting the invitation to treat the defendants "as immune entities without making them show it first").

On the merits, the court held that the defendants had "not met their burden of proof and, therefore, are not entitled to sovereign immunity." JA199. In reaching this conclusion, the court carefully applied the six-factor framework first announced

22

by the Tenth Circuit in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010). *See* JA192 (describing the framework). Given the evidentiary record, the court explained, only one of the factors—method of creation—cut in favor of immunity, and only weakly. All five of the other factors weighed against conferring immunity on the defendants.

On the first *Breakthrough* factor—method of creation—the court determined that the entities were organized under tribal law, which generally supported the claim that the defendants were an arm of the tribe. JA199-200. But the weight of this factor was "limit[ed]" because "credible evidence" established that Big Picture and Ascension were only formed so that "Martorello and the Tribe" could "restructure Red Rock's lending operation in order to reduce exposure to liability." JA201.

The court found that the second *Breakthrough* factor—the purpose of the organizations—weighed substantially against immunity. Despite a stated purpose of "economic self-sufficiency," JA205, the court found that the "real purpose" of creating Big Picture and Ascension was to "help[] Martorello and Bellicose to avoid liability" for their otherwise-illegal operation "rather than to help the Tribe start a business," JA206.

The court further observed that Big Picture and Ascension "have largely failed to fulfill their stated purposes," which weighed against extending immunity. JA212. For starters, the tribe received only "a sliver of Big Picture's total earnings." JA209.

23

And the district found that the evidence "clearly illustrates" that Hazen, Big Picture's CEO "has profited from Big Picture's lending operation far more than any other tribal members," while Ascension's non-tribal employees "are paid handsomely compared to Big Picture's employees." JA212. These facts, the court explained, were "inconsistent with the goal of economic development." *Id.*

Turning to the third *Breakthrough* factor—structure, ownership, and management of the entities—the court noted that both entities are formally owned by TED, which in turn is owned wholly by the tribe, and both are managed by Hazen and Williams. JA213-14, JA218. But after thoroughly analyzing the entities' actual management, the court found that the tribe's oversight was largely "pro forma." JA217. Hazen and Williams have delegated virtually all their authority to McFadden, the non-tribal president of Ascension which, in turn, handles virtually all of the core lending duties. JA217-18.

The fourth *Breakthrough* factor—the tribe's intent—also weighed against immunity. As before, although formal documents superficially reflected the tribe's intention that both entities would share its immunity, the evidence established that the "driving force" behind the tribe's actions was to "shield Martorello and Bellicose from liability" rather than to serve as a true arm of the tribe. JA222.

So too for the fifth *Breakthrough* factor—the financial relationship between the entities and the tribe. The tribe would not be liable for any judgment against Big

24

Picture or Ascension because both companies' operating agreements included a liability limitation provision. JA224. And, given the financial arrangements, reducing Big Picture's income (via judgment) would be unlikely to have a substantial effect on the tribe. JA225.

Finally, the sixth *Breakthrough* factor—whether granting immunity would serve the policies underlying tribal sovereign immunity—also weighed against immunity. The court gave weight to the funds the tribe has received under the loan enterprise and the "variety of social services and other benefits" that have been funded through the distribution. JA227. But the court made clear that Big Picture and Ascension have "primarily enriched non-tribal entities like Eventide and, possibly, individuals like Martorello." JA228. Weighing all the factors, the court concluded that "neither entity qualifies as an arm of the Tribe." JA229.

## SUMMARY OF ARGUMENT

The district court correctly concluded that Big Picture and Ascension do not act as arms of the tribe. The lending enterprise has been designed, from the start, to empower an outside entrepreneur to sell illegal loans and escape liability. Regardless of form, a company that primarily benefits outsiders and is primarily controlled by outsiders is not entitled to share a tribe's sovereign immunity.

**I.** As the majority of courts to consider the issue have made clear, an entity seeking arm-of-the-tribe sovereign immunity bears the burden of proving that it

qualifies as an arm of the tribe. That rule follows the approach taken in the analytically similar context of arm-of-the-state immunity. There, "the defendant bears the burden of demonstrating" its arm-of-the-state status because it is, "as a practical matter, structurally necessary to require the defendant to assert the immunity." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014). The same is true here. Both types of immunity are "akin to an affirmative defense"—they can be waived and courts have no independent obligation to raise the issue. *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 147 (4th Cir. 2014) (Traxler, C.J., concurring in judgment in part and dissenting in part). And both ask whether the entity is sufficiently related to the sovereign—a question for which the relevant facts will be in the possession of the party claiming immunity. The district court therefore correctly placed the burden of proof on the defendants.

**II.A.** The district court also correctly concluded that the test for arm-of-the-tribe immunity encompasses both formal and functional considerations. Because the inquiry is intended to determine whether an entity has a sufficiently close relationship with the tribe that the entity should be treated like the tribe itself, any test must look at the relationship between the two in practice rather than relying solely on what the parties have written down on paper. This Court has embraced just this approach in analogous arm-of-the-state cases and, given the similarities, it should do so here as well. A purely formalistic approach like the one embraced by the defendants would

26

fail to ensure that arm-of-the-tribe sovereign immunity is extended only to entities that, in practice, further the goals of tribal immunity, and would invite all manner of abuse.

**II.B.** The district court correctly analyzed and weighed the relevant factors. After carefully evaluating the record, it found that one of the factors—method of creation—cuts weakly in favor of immunity. JA200-02. But it also concluded that all five of the other factors weighed against immunity. JA206, JA220, JA222, JA226, JA229. Those conclusions are sound. Formal arrangements notwithstanding, the record easily demonstrates that "the real purpose" of creating Big Picture and Ascension was to deliver tribal immunity to outsiders and "shield" them "from liability." JA206, JA222. Coupled with the facts that (1) only a "sliver of Big Picture's total earnings" reaches the tribe, JA209, (2) the defendants' lending enterprise was "fully-functioning" and "decidedly non-tribal" before it was absorbed by the tribe and continued its operation in virtually the same way after, JA202, (3) the enterprise "primarily benefit[s] individuals and entities outside the Tribe," JA212, (4) neither the tribe nor its tribal leaders actually "control[]" Big Picture or Ascension, JA218, and (5) the tribe "would not be directly affected by any judgment against Big Picture or Ascension," JA224, the district court correctly concluded that the defendants failed to carry their burden.

## STANDARD OF REVIEW

"On appeal from a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)," this Court reviews "the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." *Metzgar v. KBR, Inc.*, 744 F.3d 326, 333 (4th Cir. 2014). "Under the clear error standard of review," the Fourth Circuit "will not reverse a lower court's finding of fact simply because [it] would have decided the case differently." *United States v. Span*, 789 F.3d 320, 325 (4th Cir. 2015). Rather, it "will only reverse if left with the definite and firm conviction that a mistake has been committed." *United States v. Chandia*, 675 F.3d 329, 337 (4th Cir. 2012).

## ARGUMENT

## I.   The district court correctly placed the burden on the defendants to establish an entitlement to arm-of-the-tribe sovereign immunity.

The district court held that a party seeking arm-of-the-tribe status "must show by a preponderance of the evidence" that it qualifies "as an arm of the tribe" and is therefore entitled to tribal immunity. JA197. That is correct. As most courts considering this issue have explained, the "burden of proof on the issue of immunity properly falls on the entity claiming immunity." *People ex rel. Owen v. Miami Nation Enters.*, 386 P.3d 357, 369 (Cal. 2016). The reason is straightforward: until the entity

28

"has proven it should be treated as an extension of the tribe, it is no more entitled to a presumption of immunity than any other party." *Id.* at 371.

The defendants begin their appeal by attacking this commonsense rule. They claim that the district court committed a "fundamental error" when it required them to prove an entitlement to immunity because, in their view, tribal immunity "is a matter of subject matter jurisdiction." Opening Br. 24 (citations omitted). This argument fails because sovereign immunity "is a jurisdictional consideration separate from subject matter jurisdiction." *In re Prairie Island Dakota Sioux*, 21 F.3d 302, 305 (8th Cir. 1994). Indeed, courts have long held that sovereign immunity is "not of the same character as subject matter jurisdiction." *Id.* at 304 (citing 13 Charles A. Wright et al., *Federal Practice and Procedure* § 3524 at 167-70 (1984 & 1993 Supp.)).

Several distinct features of sovereign immunity explain why. *First*, unlike traditional questions of subject-matter jurisdiction, sovereign immunity "can always" be affirmatively waived. *Hutto*, 773 F.3d at 543. The same is not true for traditional subject-matter jurisdiction questions—"[n]o party can waive" a defect in subject-matter jurisdiction or otherwise "consent to jurisdiction." *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). *Second*, "a court need not raise the issue [of sovereign immunity] on its own initiative." *Hutto*, 773 F.3d at 543. Instead, unless a party "raises the matter, a court can ignore it." *Schacht*, 524 U.S. at 389. That position is "inconsistent with the principle that a court must always raise on its own motion any

defect in subject matter jurisdiction." *Woods v. Rondout Valley C. Sch. Dist. Bd. of Ed.*, 466 F.3d 232, 238 (2d Cir. 2006).

These "notable deviations from core jurisdictional principles," *id.*, have led courts—including this one—to treat sovereign immunity "as akin to an affirmative defense." *Hutto*, 773 F.3d at 543. As this Court explained in *Hutto*, because a defendant "can waive its [immunity] protection," it is, "as a practical matter, structurally necessary to require the defendant to assert the immunity." *Id.* And that, in turn, means that the burden of proof falls to the entities seeking to share a sovereign's immunity. *Id.*[3]

This approach makes sense. Treating sovereign immunity like other affirmative defenses "comports with the traditional principle that a party in possession of facts tending to support its claim should be required to come forward with that information." *Woods*, 466 F.3d at 238. In the analytically equivalent arm-of-the-state cases, a governmental entity seeking to avoid suit must show that it "is, in fact, an arm of the state" and not just "a municipal corporation or other political subdivision." *Id.* at 236. And because the facts supporting an entity's claim that it "ought to be treated as an arm of the state" will "often be 'peculiarly within the

---

[3] Below, the district court concluded "the Fourth Circuit has not addressed which party bears the burden on the arm-of-the-state question." JA198. But *Hutto* squarely addressed it, aligning this Court with "every other court of appeals that has addressed the issue." 773 F.3d at 543.

knowledge'" of the entity asserting it, "placing the burden upon that party will encourage prompt disclosure of the facts relevant to resolving the immunity claim." *Id.* at 238-39.

The defendants offer no principled reason why arm-of-the-*tribe* immunity warrants different treatment. They assert (at 28) that "tribal and state immunities are different," but we are left to guess what those difference might be (other than that "Indian tribes were not at the Constitutional Convention") and how such differences might affect the analysis here. After all, the goals of tribal sovereign immunity are similar to those of state sovereign immunity. Just as tribal immunity serves to "protect the sovereign Tribe's treasury" and "encourag[e] tribal self-sufficiency," *Breakthrough*, 629 F.3d at 1183, arm-of-the-state immunity is informed, by analogy, to the "twin goals of the Eleventh Amendment—protection of the state's treasury and of its dignitary interests," *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 63 (1st Cir. 2003). And the defendants' case-specific justifications (at 26-27) for a different rule—*i.e.*, that they did not waive immunity and "supported" their claim with evidence—miss the point. It is the "structural[]" nature of an entity's claim that it should share in a sovereign's

31

**JA406**

immunity that justifies placing the burden on the defendant. *See Hutto*, 773 F.3d at 543.[4]

The three cases that the defendants say prove "the burden of proof should have been placed on Plaintiffs" offer no sound basis for departing from the settled rule. Opening Br. 24-25 (citing *E.F.W. v. St. Stephen's Indian High Sch.*, 264 F.3d 1297, 1302-03 (10th Cir. 2001), *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015), and *Cash Advance & Preferred Cash Loans v. Colo. ex rel. Suthers*, 242 P.3d 1099, 1113 (Colo. 2010)). None addressed the analytically identical relationship between arm-of-the-state and arm-of-the-tribe immunity claims. (*Pistor* and *E.F.W.* were not even arm-of-the-tribe immunity cases). And contrary to the defendants' argument, those courts that *have* actually considered the parallels have reached the same conclusion—the "rationales for placing the initial burden of proof on state-affiliated entities" are just as "persuasive with regard to tribally affiliated entities." *Miami Nation*, 386 P.3d at 370; *see also Gristede's Foods, Inc. v. Unkechuage Nation*, 660 F. Supp. 2d 442, 465 (E.D.N.Y. 2009) (same); *City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 2009 WL 705815, at *4 (E.D.N.Y. Mar. 16, 2009) (same).

---

[4] To the extent the defendants suggest that the nature of the dismissal vehicle matters, that is wrong as well. Regardless of whether a party raises immunity in a Rule 12(b)(1) or 12(b)(6) motion, the "structural[]" burden analysis is the same. *Hutto*, 773 F.3d at 541; *see Yousef v. Samantar*, 552 F.3d 371 (4th Cir. 2009) (reversing 12(b)(1) dismissal based on FSIA immunity).

32

JA407

Bottom line: the district court was right to place the burden on the defendants to establish their claim. Even so, as we now explain, this case doesn't turn on who shoulders the burden because the record overwhelmingly establishes that the defendants do not have a sufficiently close relationship with the tribe to warrant arm-of-the-tribe status.

## II. The district court carefully weighed the *Breakthrough* factors and correctly decided that the defendants are not entitled to arm-of-the-tribe immunity.

In challenging the district court's denial of immunity, the defendants press two main arguments. For starters, they claim that arm-of-the-tribe immunity is not "a factual inquiry" but instead is "a legal one," focused exclusively on "the official actions" of the tribe. Opening Br. 15, 22. Falling back, they assert that, "even if" the inquiry is factual, the district court "clearly erred" in weighing the relevant factors. Opening Br. 15, 18. But the first argument is a nonstarter: arm-of-the-tribe status, like its state counterpart, turns on "both formal and functional considerations" that require a thorough factual inquiry. *Miami Nation*, 386 P.3d at 365. And the second poses a nearly insurmountable hurdle: the clear error standard. So long as the district court's "account of the evidence is plausible," affirmance is required. *In re KBR, Inc.*, 893 F.3d 241, 258-59 (4th Cir. 2018).

A.   **The district court was correct to consider the practical application of the factors as well as the formal structures created by the defendants.**

Although the defendants acknowledge that the district court was right to apply the *Breakthrough* factors to analyze arm-of-the-tribe status, they insist (at 31-32) that it was wrong to consider, as part of the analysis, *any* facts beyond the tribal legislature's "official records." Doing so, the defendants say, opens up the possibility that "tribal governments" may not be "taken at their word" and turns what should be a purely legal inquiry into a factual one. Opening Br. 34. That is wrong. Any careful analysis of arm-of-the-tribe status requires more than just looking at actions of the tribal legislature.

The very court responsible for the *Breakthrough* factors has made this clear. In *Finn v. Great Plains Lending, LLC*, the Tenth Circuit explained that a "thorough consideration of the *Breakthrough* factors" involves a focus on the "actual workings" of the entity seeking immunity, not just the "formal arrangements as set forth in [a tribe-created payday lender's] organizational paperwork." 689 F. App'x 608, 610-611 (10th Cir. 2017). That is because any meaningful assessment of arm-of-the-tribe status requires understanding "not only the legal or organizational relationship between the tribe and the entity, but also the practical operation of the entity in relation to the tribe." *Miami Nation*, 386 P.3d at 365. Applying the *Breakthrough* factors, in other

34

words, undoubtedly "takes into account both formal and functional considerations." *Id.*; *see also Gibbs v. Plain Green, LLC*, 331 F. Supp. 3d 518, 531-32 (E.D. Va. 2018) (same).

This approach again sensibly tracks the type of inquiry that governs arm-of-the-state immunity claims. Arm-of-the-state status does not turn on mere formality; it requires demonstrating that "an entity is 'truly subject to sufficient state control to render [it] a part of the state.'" *Oberg*, 745 F.3d at 135. And "whether a state-created entity is so closely connected to its creating state that it should be permitted to share in the state's immunity from suit generally is a fact-intensive inquiry dependent on an understanding of the *actual* operations of the entity and the *actual* relationship between the entity and the state." *Id.* at 156-57 (Traxler, J., concurring in the judgment in part and dissenting in part). This Court has repeatedly embraced this basic point. *Hutto*, 773 F.3d at 544 (considering whether the state "is *functionally* liable, even if [it's] not legally liable"); *Oberg*, 745 F.3d at 139-40 (relying on an entity's annual reports to determine whether the entity was independent of the state); *Ristow v. S.C. Ports Auth.*, 58 F.3d 1051, 1053 (4th Cir. 1995) (looking to "the practical effect" of a judgment on the state treasury). It should do the same here.

Creating a different rule for arm-of-the-tribe immunity would unacceptably neuter the analysis. Tribal immunity is a practical doctrine "intended to promote the federal policy of tribal self-governance." *Miami Nation*, 386 P.3d at 371. But determining whether extending it to an entity associated with a tribe would "further

35

that federal policy," *id.*, requires more than a review of the "formal arrangements" between tribe and entity. *Finn*, 689 F. App'x at 611. A court instead must undertake an inquiry into "the extent to which the entity actually promotes tribal self-governance," the "degree to which the tribe actually, not just nominally, directs the entity's activities," and "the degree to which the entity's liability could impact the tribe's revenue." *Miami Nation*, 386 P.3d at 371. Those lines of inquiry cannot be answered by "[o]rganizational arrangements on paper"—which "do not necessarily illuminate how businesses operate in practice"—and so restricting the analysis to just those arrangements will not cut it. *Finn*, 689 F. App'x at 611. The district court's decision to look beyond the paper records should be affirmed.

### B. The district court weighed the *Breakthrough* factors correctly.

The defendants' second challenge to the district court's conclusion faces an even more arduous climb. The defendants argue (at 32) that, "even if" facts outside the four corners of the official records are considered, the district court clearly erred when it weighed the factors and concluded that the record established that the entities do not qualify for arm-of-the-tribe status. But throughout fifteen pages of argument (at 32-58) on this account, the defendants do little more than pick at the margins and recycle their claim that it was wrong for the court to "go beyond" the formal documents. That comes nowhere close to establishing, as they must, that the district court's view of the record was implausible. *In re KBR*, 893 F.3d at 258-59.

36

The *Breakthrough* factors afford a straightforward starting point. In *Breakthrough*, after canvassing the relevant caselaw, the Tenth Circuit identified six non-exhaustive factors that "are helpful" in deciding if the relationship between tribes and entities is close enough to justify immunity:

- (1) the entities' method of creation;

- (2) their purpose;

- (3) their structure, ownership, and management, including the amount of control the tribe has over the entities;

- (4) whether the tribe intended for the entities to have tribal sovereign immunity;

- (5) the financial relationship between the tribe and the entities; and

- (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities.

*Breakthrough*, 629 F.3d at 1183, 1187-88. Taken together, the Tenth Circuit observed, these factors allow courts to determine whether entities are "so closely related to the Tribe that they should share in the Tribe's sovereign immunity." *Id.* at 1195. As we explain below, the district court carefully evaluated these factors and reached a decisive conclusion: the balance weighs against conferring arm-of-the-tribe status on the defendants.

37

**1. *Method of creation.*** Although the first *Breakthrough* factor focuses on "the law under which the entity was formed," "[t]he circumstances under which the entity's formation occurred, including whether the tribe initiated or simply absorbed an operational commercial enterprise," are "also relevant." *Miami Nation*, 386 P.3d at 372; *see also Breakthrough*, 629 F.3d at 1191-92. The district court held that this factor "weighs in favor of immunity" because both Big Picture and Ascension were formally created pursuant to tribal resolutions under the tribal code. JA200. But the court found the weight "limit[ed]" because the entities were formed not to "start[] an independent lending operation" but instead to "facilitat[e] the absorption" of Red Rock—a "decidedly non-tribal" and "fully functioning lending enterprise." JA201-02.

This conclusion is correct. When Big Picture and Ascension were created, Martorello and the tribe were already several years into their lending arrangement with Red Rock and Bellicose. *See* JA360, JA364, JA380. Although Red Rock claimed to be "a tribally-owned lending enterprise," it outsourced almost all the actual lending to Martorello and his businesses—which ran "an operational commercial enterprise" owned by, managed by, and employing exclusively non-tribe members. *See* JA755-58. The defendants simply absorbed these two entities: (1) Big Picture assumed Red Rock's role as nominal, outward-facing lender; and (2) Ascension

38

JA413

swallowed SourcePoint—and its lending management, technology and expertise— nearly whole. JA264-65, JA436, JA755-58, JA862-63, JA883, JA950-52, JA1090.

In the face of this "credible" evidence, JA201, the defendants argue (at 32) only that circumstances beyond the law governing the entities' formation are irrelevant to this factor. That is wrong. As the district court explained, the circumstances outlined above concern *how* Big Picture and Ascension were created—a core question bearing on formation. *See Miami Nation*, 386 P.3d at 372. And where "close[] scrutiny" of the entities' origins reveals that the "capital and intellectual property" on which the "lending businesses were founded did not come from [the] tribe" but instead from "an outside commercial entity that continue[s] to play a significant role in the lending operations after [the Tribe] formally took ownership," this factor does not weigh "unequivocally in favor of extending tribal immunity. *Id.* at 379. That is exactly what happened here.

***2. Purpose***. The second *Breakthrough* factor concentrates on "both the stated purpose for which the entity was created and the degree to which the entity actually serves that purpose." JA203-04 (quoting *Miami Nation*, 386 P.3d at 372); *see also Breakthrough*, 629 F.3d at 1192-93 (assessing the allocation of the entity's revenue as part of purpose). For this factor, what really matters is the "fit between that stated purpose and its practical execution"—which "need not be exact, but the closer the fit, the more it will weigh in favor of immunity." *Miami Nation*, 386 P.3d at 372. Several

39

elements guide this assessment, including (1) the number of tribal jobs created, (2) the amount of revenue generated for the tribe, (3) whether the entity engages in any activities unrelated to its stated goals, and (4) whether the entity primarily enriches non-tribe members or only tribal leaders. *Id.* at 373. The district court found that the defendants had "largely failed to fulfill their stated purposes" and, therefore, that this factor "weighs against" immunity. JA212. Exactly right.

To begin, the district court acknowledged that, on the "surface," the defendants' stated purpose was to improve the tribe's "economic self-sufficiency." JA206. But that purpose conflicted with the record evidence, which revealed that the "real purpose" of creating the lending entities was not to "help the Tribe start a business" but instead to "help[] Martorello and Bellicose . . . avoid liability." JA206.

Recall that the entities were created just as pressure was mounting against similar schemes around the country. The Western Sky lending scheme had begun to crumble and ███████████████████████████████████████████████████ ████████████████ JA1323. Red Rock itself was in fact *already* caught in the crosshairs— multiple federal courts had refused to block New York's enforcement of its usury laws. *See supra* 11. ████████████████████████████████████████████ ███████████████████████████████████

Big Picture and Ascension were intended as a response to this existential threat. *See supra* 12-13. It is telling that Big Picture's first and only CEO—tribal council

40

**JA415**

member Hazen—could not "explain who decided to create Big Picture" and demonstrated a general "lack of knowledge" around the circumstances of the entities' formation. JA201-02.[5] From the start, these companies were Martorello's idea. Certainly, the defendants have not met their burden on appeal to show that the district court's findings on this score were "clear error." *Metzgar*, 744 F.3d at 333.

The district court also held that the defendants failed to prove that they fulfill their claimed purpose of economic self-sufficiency. JA207-12. The "fit" considerations bear this out. Consider the number of tribal jobs created. As of late 2017—two years after Big Picture and Ascension were formed and seven years into the lending enterprise—the *entire* operation had created *five* jobs for the tribe. JA1084, JA1620-22. Four were low-paying positions at Big Picture as CSRs and one was for Big Picture's CEO. JA1077-78, JA1084. Ascension, like Bellicose before it, does not employ even one member of the tribe. JA1369, JA1541. It gets worse. Ascension jobs are not advertised to tribe members, JA860, JA1086; they are not performed on the reservation—Ascension has instead opened facilities in Georgia and the Caribbean, JA1081, JA1084-86, JA1363; and they require skills that tribe members do not have,

---

[5] The defendants assert that the district court was wrong to impute Hazen's "lack of knowledge" to the entire tribal council, but other council members, including Williams, confirmed the point. *See supra* 20; JA1401, JA1409-13, JA1421-22. And the defendants offered no evidence to the contrary.

41

JA858, JA1085-86. The tribal council, moreover, has taken no steps to help tribe members acquire these skills or pursue Ascension jobs. JA884, JA1087-88.

The allocation of Big Picture's revenue further undermines the fit between stated purpose and practical execution. The record establishes that the operation primarily benefits Martorello and his businesses rather than the tribe. As the district court explained, under the entities' revenue sharing arrangement, the tribe receives only a "sliver"—2% to 3%—of Big Picture's gross revenue. JA209, JA829, JA959. And although that meant the tribe had received approximately $2 million in direct distributions by June 2017, the defendants failed to show how this money was being used—offering only "vague" and "general" statements that "shed[] no light" on how the revenue "helped fund" any services. JA208.[6] In contrast, as a result of the

---

[6] The defendants assert (at 39) that "the Tribe received 'nearly $5 million' (JA-172) from Big Picture, and these funds were used 'to fund various tribal governmental, educational, and social services.'" That claim explicitly misrepresents the facts and record below—even as it was presented by the defendants. The $5 million includes both direct distributions to the tribe ($2 million) and the amount reinvested and held as equity by TED ($3 million). JA171-72. But the "reinvestment" amount cannot be distributed to the tribe for any purpose until the seven-year contract term ends. JA829-30. It therefore cannot be used to "fund various" services and thus "belongs" to the tribe only on paper. Beyond that, no case supports the defendants' restrictive claim (at 40) that courts may not look past a "general fund" to determine whether the revenue went to specific tribal services. And *Breakthrough* itself contradicts the defendants' view. *See* 629 F.3d at 1192-93 (looking to specific allocations).

42

corporate restructuring, Martorello's company Eventide has raked in "about $20 million" from the scheme. JA210.[7]

Given this record, the defendants are left to argue (at 30) that only the dollar amount received by the tribe is relevant (and not the percentage of profit). But an absolute dollar amount in a vacuum says nothing about whether the entities are aimed at carrying out their stated purpose or are instead primarily serving a different purpose—like shielding private actors from state law. In *Breakthrough*, the court made clear that what matters is (1) the *percentage* of revenue that goes to the tribe and (2) the specific *allocation* of revenue and how it benefits the tribe. There, "[o]ne hundred percent of the Casino's revenue" went to the tribe and the record established that the specific allocation was 50% to governmental functions, 15% for economic development, 10% to a trust fund, and 25% distributed to each member of the tribe. 629 F.3d at 1192-95. Compared with the record here—3% of the revenue and no specific allocations—the differences are stark. *See Miami Nation*, 386 P.3d at 378 (explaining that it is "instructive" to compare the entities in a particular case with "entities that other courts have recognized as arms of their respective tribes"). Where

---

[7] The defendants (at 35) ultimately embrace the fit inquiry, but only "to ferret out sham purposes." That gives away the game: even under the defendants' test, purpose cannot be assessed solely through "official records." This unsupported "sham purposes" proposal fails anyway. An entity does not receive arm-of-the-tribe status so long as it avoids being an outright fraud. Rather, it must "actually promote[] tribal self-governance" enough to be treated as "the tribe itself." *Miami Nation*, 386 P.3d at 371.

43

the "vast majority of revenue from the lending businesses flow[s]" away from the tribe, the fit is weak. *Id.* at 376.

Other facts in the record, aside from the profit distribution, demonstrate that the primary purpose of the arrangement was not to benefit the tribe. The district court specifically concluded that Big Picture and Ascension "primarily benefit individuals and entities outside the Tribe" and "one tribal leader." JA212. For instance, it is undisputed that every Ascension employee (all of whom are non-tribe members) "are paid handsomely"—far more than the four tribe members who work as CSRs. JA212, JA1077-78, JA1081-82. Yet Hazen—who herself has "profited from Big Picture's lending operation far more than any other tribal members," JA212—has only raised wages for Big Picture's employees once, and by less than $2 per hour. *Supra* 15. And as compensation for exercising "pro forma" oversight over Big Picture, Hazen nets $90,000 a year—a greater annual salary than the tribe-member CSRs' salaries combined. JA1077. The defendants offer no understanding of this evidence that would cut in favor of immunity, let alone that the district court clearly erred.

What the defendants do offer is one last-ditch argument to avoid the consequences of this record. They say (at 41) that the current financial arrangement "should not cause concern" because, after seven years, the portion of Big Picture's revenue that flows to Eventide will (absent any changes) reverse course and flow to the tribe. But what matters is whether the arrangement *currently* benefits the tribe. *See,*

44

*e.g.*, *Breakthrough*, 629 F.3d at 1192-93 (focusing on the current record and revenue streams); *Miami Nation*, 386 P.3d at 378 (same). A rule that would allow an entity to claim arm-of-the-tribe status *now* based on a revenue-sharing arrangement that might deliver meaningful economic benefit *years from now* would green light all manner of corporate gamesmanship. Outside entities seeking to set up a tribal scheme would need only to satisfy one requirement: structure the lion's share of outsider revenue as debt repayment rather than pure profit.

This case well illustrates the concern. TED—the tribe's holding company—did not acquire debt in the ordinary course of the lending operation; instead, it acquired debt from Eventide as "payment" for Martorello's previous company. *See supra* 14. Structuring the deal this way created a payment framework nearly identical to the preexisting one between Red Rock and Bellicose—where the tribe received 2% of gross revenue and Martorello's company pocketed the rest of the proceeds. *Supra* 10. The only difference now is that Martorello's cut is reframed as "debt" instead of "profit." Arm-of-the-tribe immunity was not designed to encourage this form of subterfuge.[8]

---

[8] The defendants' odd invitation (at 41-42) to import the business judgment rule into the analysis fails. No court has employed this rule when considering arm-of-the-tribe sovereign immunity because it concerns whether a court can reject—and thereby undo—decisions made by a business. *See Lubrizol Enters. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985). The only question here is whether to extend the tribe's sovereign immunity to these for-profit corporations, thereby handing them immunity from suit.

45

**3. *Structure, ownership, and management.*** The third *Breakthrough* factor concerns "the entity's formal governance structure, the extent to which it is owned by the tribe, and the entity's day-to-day management." *Miami Nation*, 386 P.3d at 373. Relevant here is whether the entity has "outsource[d] management to a nontribal third party." *Id.* Evidence that the tribe "is a passive owner, neglects its governance roles, or otherwise exercises little or no control or oversight" weighs against immunity. *Id.*

As before, the district court was correct that this factor cuts strongly against immunity. Although the tribe retains "formal oversight" of Big Picture and Ascension, it is, in the district court's words, "overcome in practice." JA215-16. The handful of evidence the defendants point to as suggesting that the tribe exercises some control over the entities is dwarfed by evidence that the lending operation is actually run by private actors with little tribal involvement. For instance, although nominally owned by the tribe, Ascension is run out of offices in Georgia and the Caribbean by a non-tribal president and with no tribe-member employees. JA1081, JA1084-86, JA1363, JA1369, JA1541. And it, not Big Picture or TED, controls virtually all of the lending operations, including delivering "pre-qualified leads" to Big Picture and providing the key "credit-modeling data and risk assessment strategies" that determine whether to issue a loan. JA160. Ascension alone effectively dictates loan approval, regardless of whether Big Picture employees actually click the button to

46

originate the loans. Ascension is also responsible for, among other things, soliciting potential borrowers, marketing, ensuring regulatory compliance, running human resources, negotiating vendor contracts and enforcing them, overseeing the financing of the enterprise, and collecting on loans. *Supra* at 17-18.

The relationship is decidedly not, as defendants describe it (at 45-46), one in which Big Picture "relies on another entity to perform certain agreed-upon tasks." To the contrary, Big Picture relies on Ascension to perform *all* tasks necessary to operate the business except the "pro forma" actions required to originate a loan and to provide some customer service support. That means the management, control, and structure of Big Picture are of little significance relative to those same aspects of Ascension. And the tribe does not exercise meaningful control over Ascension. True, Williams and Hazen are technically co-managers of the entity. But in practice, they have delegated nearly all of their authority to McFadden, Ascension's president. It is therefore McFadden, not anyone affiliated with the Michigan-based tribe, who controls Ascension's strategic direction, its bank account, and its day-to-day management. *Supra* 17. And McFadden cannot be replaced as president without the approval of Eventide and, by extension, its owner and manager—and McFadden's longtime friend and business associate—Martorello. JA929.

This delegation of authority is not a mere formality. Hazen and Williams do not provide substantive oversight of Ascension: Both lack basic knowledge about its

47

**JA422**

operations and employees. *Supra* 19-20. This makes sense. Ascension does not employ tribe members. It does not typically operate from the tribe's reservation. And it employs skilled professionals knowledgeable about the lending business in a way the co-managers seemingly are not. *See supra* 19-20; JA1085-86. And the only thing that changed when the tribe bought Bellicose was its name. *Supra* 17-18.

But a name change is not enough to confer immunity. Where "the balance of evidence suggests that" outsiders "exercise[] a high degree of practical control" over the lending operation, a tribe is not sufficiently "enmeshed in the direction and control of the businesses." *Miami Nation*, 386 P.3d at 377. Because the tribe is at best a "passive owner" of Ascension, it should not share the tribe's broad immunity. *See id.* at 373.

Not only does the tribe fail to control Ascension, it also fails to control Big Picture. Indeed, there is good reason to doubt that Hazen and Williams exercise real oversight over the company. In particular, Williams did not know basic facts about Big Picture, including what its employees do. JA1379. Nor did he know that Big Picture has several subsidiaries, of which he is the manager, or what those subsidiaries do, ████████████████████████████████████████████ ████████████████████████████████████████. JA870, JA1336, JA1382. This evidence points strongly in one direction: tribal leaders provide, at most, passive oversight and rubber-stamp approval of Big Picture's operation.

48

***4. The tribe's intent.*** The fourth *Breakthrough* factor considers whether the tribe expressed an intent to share its sovereign immunity with the entity. *Miami Nation*, 386 P.3d at 372. The district court recognized that the tribe expressed its intent that Big Picture and Ascension share its sovereign immunity. JA220-21. But it also recognized that the context of this decision was relevant, namely that the tribe sought to grant the entities tribal sovereign immunity primarily to "shelter outsiders from the consequences of their otherwise illegal actions." JA222. Therefore, as the district court correctly concluded, this factor weighs against immunity.

The defendants argue (at 51) that this factor should be limited to "*whether* the Tribe intended to share its immunity . . . , not *why* it intended to do so." But this is little more than self-serving semantics. The tribe's "self-interested and unsupported claim" that they "intended their sovereign immunity to extend to [the lending entities] cannot, without more," support immunity. *Miami Nation*, 386 P.3d at 379 (citation omitted). The district court properly asked whether Big Picture and Ascension were created for a core purpose of tribal sovereign immunity or to help non-tribe members conduct an otherwise-illegal business. It was the latter. JA222. Given this improper purpose, it does not matter that the tribe expressed an intent to share its immunity with these outsiders because a "formal statement of immunity is not sufficient to tip the balance in favor of immunity." *Id.* The district court correctly concluded that Big Picture and Ascension were not entitled to share this immunity.

49

*5. Financial relationship.* The "starting point" of the next *Breakthrough* factor is "whether a judgment against the entity would reach the tribe's assets." *Miami Nation*, 386 P.3d at 373. If not, this weighs against immunity, *see Dixon v. Picopa Constr. Co.*, 772 P.2d 1104, 1109-1110 (Ariz. 1989), but this fact is not dispositive, *Miami Nation*, 386 P.3d at 373. The ultimate issue is whether "a significant percentage of the entity's revenue flows to the tribe, or if a judgment against the entity would significantly affect the tribal treasury." *Id.*

The district court was correct to conclude that this factor weighs against immunity. *First*, it is undisputed that the tribe will not be directly affected by any judgment against the entities. Both entities have limited liability provisions that prevent liability from passing to the tribe, *supra* 16, so right out of the gate the financial relationship is attenuated.

*Second*, the tribe does not receive a "significant portion" of Big Picture's revenue. Under the contract, only 3% is actually distributed to the tribe. *Supra* 20. Unlike a case in which "all of [the entity's] profits inure to the benefit of the Tribe," *Howard v. Plain Green, LLC*, 2017 WL 3669565, at *4 (E.D. Va Aug. 7, 2017), because the distribution here is both "a very small part of Big Picture's revenue" and concretely "limited," the "actual effect" on the tribe's general fund "appears to be insubstantial." JA224-25.

50

**JA425**

*Third*, the defendants failed to prove how the revenue flows to the tribe. They did not provide "an exact breakdown of revenue allocation to different tribal services," making it "impossible to discern how the Tribe would be affected, if at all, if a judgment harmed Big Picture's operations." JA225. That failure is significant. Where the record is "too vague and conclusory to establish that a judgment against the entities would appreciably impair tribal revenues," this factor weighs against immunity. *Miami Nation*, 386 P.3d at 378.[9]

*Finally*, the defendants attempt (at 52) to redefine the inquiry by claiming that "[a]ll that is necessary for this factor to weigh in favor of immunity is for the Tribe to lose revenue if a judgment is entered against the entity" fails. No court has adopted this broad interpretation, which would favor extending sovereign immunity to any entity that provides only *de minimis* payments to a tribe.

Contrary to the defendants' assertion, *Breakthrough* does not support the argument that *any* reduction in payment is enough. The tribe in *Breakthrough* received "[o]ne hundred percent of the Casino's revenue" and "up to $1,000,000 per month,"

---

[9] The defendants' late-breaking effort to supplement their inadequate evidentiary presentation adds nothing new. On December 12, 2018, the tribe passed a new resolution purporting to address certain business revenue it received this year. *See* Tribal Resolution T2018-086. This self-serving document (it was created by the same tribe members who manage Big Picture) offers no breakdown of how the revenue is allocated to tribal services and simply reiterates what the defendants argued to the district court below—that proceeds from Big Picture "could possibly fund more than 30% of the Tribe's budget over the next few years." JA207. But what matters is the relative, not absolute, amount of revenue the tribe receives.

and it established that it "depend[ed] heavily" on that revenue. 629 F.3d at pp. 1194-95. The tribe here, by contrast, receives only 3% of Big Picture's gross revenue and nowhere close to that million-per-month draw. Because the entities function essentially as "intermediaries to commercial enterprises that have only a minimal financial relationship" with the tribe, the defendants were unable to establish that a reduction in revenue would meaningfully affect the tribe. *Miami Nation*, 386 P.3d at 378 (noting that the "vast majority of revenue" flowed to outsiders). Indeed, given the corporate structure, any losses suffered by Big Picture would be felt primarily by the lending enterprise's primary beneficiary—Eventide—not the tribe. JA226 (concluding that reduction in revenue would "not be felt strongly by the Tribe itself").

That is all the more so when one considers that, unlike Eventide's cut, the tribe's share is 3% of Big Picture's *gross* revenue—which is calculated by the inflow of income *before* any deductions (like a judgment against Big Picture). *See* JA828-29, 959. The defendants' claim (at 52), unadorned by any record cites, that "any judgment against Big Picture would reduce the Tribe's income" is, yet again, contradicted by the record. The defendants have come nowhere close to carrying their burden here.

**6. *Purposes underlying tribal immunity.*** Finally, the last *Breakthrough* factor addresses "the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served

52

JA427

by granting immunity to the economic entities." *Breakthrough*, 629 F.3d at 1187. These goals include protection of the tribe's monies, preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between tribes and non-tribe members. *Id.* Some courts analyzing arm-of-the-tribe immunity have treated this as a separate factor, *see, e.g.*, *id.* at 1195; JA226-27, while others have treated it as a principle that governs analysis of each of the other five factors, *see, e.g.*, *Miami Nation*, 386 P.3d at 371-72. The choice of approach does not affect the outcome of the analysis.

The district court correctly concluded that this factor weighed against immunity. The entities have "primarily enriched non-tribal entities"—Martorello's company Eventide and even "Martorello himself." JA212, JA228. Extending immunity to these entities would primarily continue to benefit these outsiders rather than primarily protect the tribe's coffers. It would also set a troubling precedent. Granting arm-of-the-tribe immunity on this record would deliver a blueprint to all manner of outside commercial operations of how to push joint ventures with tribes on starkly disparate financial terms. If a corporation can blanket itself in a tribe's immunity in exchange for only 2% or 3% of its revenue, what incentive would exist for corporations to ever negotiate more favorable contracts with a tribe? Even if some tribes might resist these bargain-basement offers, others might not—which is all it

53

would take for tribes to lose any negotiating leverage. That undermines, rather than promotes, the broad goals of tribal sovereign immunity.

**_Weighing the factors._** Ultimately, the district court weighed the evidence and determined that five of the six factors weighed against treating Big Picture and Ascension as arms of the tribe. *Supra* 27. As the record makes clear, that conclusion is sound. But even if one might think that one or more of the factors come out differently, the bottom line conclusion does not change—Big Picture and Ascension were created to provide cover for Martorello's illegal lending scheme. Big Picture and Ascension have fulfilled this goal while, in exchange, providing a sliver of their revenue to the tribe. And the tribe, for its part, has collected its distribution checks, declining to oversee these businesses or control how they operate.

At bottom, arm-of-the-tribe immunity is not designed to shield this type of arrangement. However one threads these facts through the analysis, the conclusion is the same: Big Picture and Ascension do not operate as arms of the tribe and are not entitled to share in its immunity.

## CONCLUSION

The decision of the district court should be affirmed.

54

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
ALEXANDRIA TWINEM
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
*matt@guptawessler.com*

KRISTI C. KELLY
ANDREW GUZZO
CASEY S. NASH
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
*kkelly@kellyandcrandall.com*

December 20, 2018          *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,866 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Baskerville font.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2018, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the appellate CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| RENEE GALLOWAY, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | Civil Action No. 3:18-cv-406-REP |
| | : | |
| BIG PICTURE LOANS, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**REPLY IN RESPONSE TO CORPORATE DEFENDANTS' OPPOSITION TO**
**MOTION FOR LEAVE TO FILE SECOND AMENDED CLASS COMPLAINT**

Plaintiffs, by counsel, submit this reply brief in response to Defendant Big Picture Loans, LLC, and Ascension Technologies, LLC's (collectively, the "Corporate Defendants") Opposition to Plaintiffs' Motion for Leave to File Second Amended Class Complaint (Dkt. 213). In their opposition, the Corporate Defendants provide six overarching bases why the motion should be denied; none of which are sufficient. Plaintiffs address each in turn.

**I.      The proposed amendment will not delay resolution of the Corporate Defendants' pending motion to dismiss.**

The Corporate Defendants first argue that the proposed amendment should not delay resolution of the pending motions to dismiss, which they claim "should be decided first." Dkt. 213 at 3. According to the Corporate Defendants, "the subject matter jurisdiction of the Court has been called into question through motions to dismiss that are fully briefed, and which should be decided first before assessing whether an amended version of the current complaint should be put on file against them." *Id*. For several reasons, the proposed amendment will not delay resolution of the pending motion to dismiss.

*First*, adding the alleged co-conspirators does nothing to change the sovereign immunity issue before the Court. Upon the filing of the Second Amended Complaint, the Corporate Defendants may simply refile their motion to dismiss, Plaintiffs could refile their opposition, and the Court could resume considering the issue. Put differently, the proposed amendments did not change the theories against the Corporate Defendants or any evidence they would use to demonstrate their entitlement to share in the LVD's immunity. *Second*, "questions of subject-matter jurisdiction may be raised at any point during the proceedings and may (or, more precisely, must) be raised *sua sponte* by the court." *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (citations omitted). Because challenges to "subject matter jurisdiction may be raised at any point," the Court could grant the requested amendment, but still

1

**JA434**

consider the issue of sovereign immunity fully briefed and ripe for determination. *Third*, Plaintiffs have a pending motion requesting additional jurisdictional discovery. *See* Dkt. 152. If the motion is granted, the Court will likely allow for additional briefing and has already expressed the possibility of holding an evidentiary hearing due to co-manager's contradictory testimony and new documents that Plaintiffs have received from third parties. Accordingly, the proposed amendment should not delay the pending motion to dismiss.

## II.   The Corporate Defendants' "good cause" arguments miss the mark.

### A.   Rule 15 is the proper standard when no deadlines will need to be altered.

Next, the Corporate Defendants argue that Plaintiffs failed to establish "good cause" because this request comes after the deadline for seeking amendment in the Court's Pretrial Scheduling Order dated September 27, 2018, which established October 12, 2018, as the deadline for amendment of pleadings. *See* Dkt. 52. Although the good cause standard *typically* applies after the deadline for amendment passes, this Court has not applied the good cause standard where, as here, the request for amendment will not alter the other deadlines in the Court's Scheduling Order. *PBM Prod. v. Mead Johnson Nutrition Co.*, No. 3:09-CV-269, 2009 WL 4665746, at *2 (E.D. Va. Dec. 1, 2009) ("Because no additional discovery is required, the Scheduling Order will not need to be altered. As a result, the liberal amendment provision of Rule 15 applies in this case."); *Capital One Servs., LLC v. Foster*, 2010 WL 582175, at *2 (E.D. Va. Feb. 11, 2010) (same).

The rationale behind the Court's decisions in *PBM Products* and *Foster* applies equally here. Although the deadline for joining parties expired on October 12, 2019, this case remains in the same posture as it did when the Court entered the Pretrial Scheduling Order on September 27, 2018. Dkt. 52. Among other things, no trial date or discovery cut-off has been set, primarily due to the voluminous motions filed by Defendants pursuant to Rule 12, as well as Defendants'

discovery non-compliance and efforts to obstruct third-party discovery. As this Court observed in January, "the record is clear that the [corporate] defendants are taking any approach that will delay this case as long and spread it out as much as possible." Jan. 15, 2019 Motins Hr'g, 98:25-99:3. Because of this approach—which continues to this day—the remaining deadlines in the Pretrial Scheduling Order "will not need to be altered," the "liberal amendment provision of Rule 15" should be applied to this request. *PBM Products*, 2009 WL 4665746 at *2.

**B.    Even if the Court applies Rule 16's good cause standard, it is satisfied under the circumstances of this case.**

Like Martorello, the Corporate Defendants argue that good cause does not exist because "the materials in *Williams* have been available to the Plaintiffs in *Galloway* since October 19, 2018," *i.e.*, "six months before they moved to amend in this action." Dkt. 213 at 7. Because this information was available, the Corporate Defendants argue that new evidence could not have possibly prompted Plaintiffs to amend the complaint. In making this argument, the Corporate Defendants ignore two important considerations.

*First*, while Plaintiffs have certainly known the *identities* of each of the proposed defendants, they have been obstructed of discovery from a number of different sources showing the depth, extent, and importance of the co-conspirator's participation throughout the years. This obstruction has been caused, in part, because Plaintiffs in *Williams* were "precluded from conducting discovery against the Corporate Defendants because of their appeal." *McFadden v. Williams*, No. CV 3:18-MC-8, 2019 WL 542300, at *2 (E.D. Va. Feb. 11, 2019). The *Williams* Plaintiffs were not only precluded from discovery, but "the Corporate Defendants thwarted the discovery efforts of the plaintiffs and Martorello to adequately prepare for trial." *McFadden*, 2019 WL 542300, at *1. And, the Corporate Defendants have taken the same position in this case, refusing to respond to basic discovery or participate in third-party discovery.

3

**JA436**

The Corporate Defendants have not only thwarted the efforts in this case, but they admittedly deleted Martorello's emails "shortly after the time of the acquisition according to the requirements in the acquisition documents."[1] In addition to this destruction, the Corporate Defendants—as the post-merger successor in interest to Bellicose Capital—instructed Bellicose/Martorello's attorneys at Greenberg Traurig to delete their files. Because of the spoliation of this key evidence, Plaintiffs have undertaken an exhaustive effort to uncover pre-2016 information, which provided key details regarding each participant's role in the creation, development, and continuation of the enterprise.

*Second*, the Corporate Defendants have obstructed efforts to obtain discovery from key witnesses, such as Brian McFadden, Simon Liang, James Dowd, and the Rosette law firm. For example, before discovery was even provided to Plaintiffs in this case, the Corporate Defendants refused to produce McFadden for a deposition in *Williams*. *See McFadden v. Williams*, Case No. 1:18-cv-83 (W.D. Mich. 2018). Instead, the Corporate Defendants moved to quash the deposition in Michigan and opposed both informal and formal requests to transfer the issue to this Court, who clearly and determined by its sister court to be in the best position to address the factual and legal issues presented by the motion. *McFadden v. Williams*, Case No. 1:18-cv-83 (W.D. Mich. 2018), Oct. 4, 2018 Order at Dkt. 14 (transferring the matter to the Eastern District of Virginia). And, while the Court agreed to delay this deposition pending its ruling on class certification as to Martorello, it specifically noted that "problems with discovery and delay caused by dealing with broad claims of immunity from discovery interposed by the Corporate Defendants, this case is now out of kilter." *McFadden v. Williams*, No. CV 3:18-MC-8, 2019 WL 542300, at *3 (E.D. Va. Feb.

---

[1] October 18, 2017 E-mail, attached at *Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-461. Dkt. 341-1. The Corporate Defendants not only deleted Martorello's emails, but it appears that they deleted all pre-2016 email correspondence of Bellicose's executives.

11, 2019). Plaintiffs should not be penalized due to what has been described by the Court as "unprecedent approaches to discovery under the notion as to which there is no case law for support that these people have immunity." Jan. 15, 2019 Motins Hr'g, 4:13-15.

And finally, a number of third-party discovery disputes remain outstanding and have been recently transferred to this Court, including the subpoenas to Jennifer Galloway and Jennifer Weddle. *See Galloway v. Martorello*, Case No. 3:19-mc-00009 (E.D. Va.) (transferred to this Court on February 22, 2019); *Weddle v. Williams*, 1:18-mc-225 (D. Colo) (transferred to this Court on April 15, 2019). In addition to these issues, important discovery issues still remain pending in *Williams*, such as discovery related to the spoliation issue, which must be concluded by August 30, 2019. *Williams*, Case No. 3:17-cv-461, May 3, 2019 Order at Dkt. 479. Until these issues are resolved (as well as class certification), it is unlikely that a trial date will be set at any time in the near future, and the proposed defendants (many of whom will likely be represented by the same defense teams) will have ample time to prepare their defense without further delaying this matter.

## III. The Second Amended Complaint provides detailed allegations as to each defendant.

The Corporate Defendants also half-heartedly argue that the claims in the Second Amended Complaint "are impermissibly group-pled." Dkt. 213 at 7. According to the Corporate Defendants, "Plaintiffs make no attempt to differentiate among the various actors, explain how the elements of their claim… apply to each defendant, or provide any factual allegations satisfying the claims asserted." Dkt. 213 at 8-9. This argument is frivolous.

For starters, the Second Amended Complaint contains separate paragraphs differentiating the roles of the various co-conspirators. In particular, Paragraphs 147 through 161 provided an overview of the scheme. Then, Paragraphs 162 through 178 explain the necessity for the restructure, as well as some of the direct evidence that it occurred in response to the *Otoe-*

*Missouria* litigation and other regulatory actions. Paragraphs 179 through 206 provided an overview of the mechanics of the lending operation after the restructure, including the control mechanisms retained by Martorello and other non-tribal participants. After detailing the initial structure and restructure, Paragraphs 207 through 216 provide specific details regarding Justin Martorello, Brian McFadden, James Dowd, and Simon Liang, including citations to exhibits detailing their roles at Bellicose, Ascension, and ownership in Eventide. Paragraphs 217 through 232 then details the role of the "Investor Defendants," including the date and amount of capital each one provided to the lending enterprise. Paragraphs 233 through 240 details the allegations against Rebecca Martorello, and finally, Paragraphs 241 through 249 contain specific allegations of the role of each one of Martorello's companies in the scheme. Thus, Plaintiffs clearly differentiated among the various actors and their specific actionable conduct.

Further, this argument ignores the legal standard, which mandates that leave to amend should be freely given "unless 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008) (citations omitted). Of these options, the only potential basis for denial would be futility, which only applies "when the proposed amendment is clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986). Here, the 81-page proposed amended complaint is not clearly insufficient or obviously frivolous. And, even if the Court finds that some of the claims are impermissibly group-pled, those issues may be cured.

## IV.    The Second Amended Complaint satisfies Rule 20's joinder requirements.

Rule 20(a)(1) of the Federal Rules of Civil Procedure allows persons to be joined "in one action as plaintiffs" if: (1) they assert any right to relief "arising out of the same transaction,

occurrence, or series of transactions or occurrences;" and (2) "any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. Proc. 20(a)(1). Similarly, Rule 20(b)(1) allows persons to be "joined in one action as defendants" under the same parameters. Fed. R. Civ. Proc. 20(b)(1). If the requirements of Rule 20 are satisfied, the Supreme Court has instructed that the "impulse" should be "towards entertaining the broadest possible scope of action consistent with fairness to the parties." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966). In other words, "joinder of claims, parties, and remedies is strongly encouraged." *Id*. In determining whether permissive joinder is appropriate, district courts have "wide discretion." *Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 218, n. 5 (4th Cir. 2007).

Each of the requirements of Rule 20(a)(1)(A) and Rule 20(b)(1)(A) are easily satisfied in this case. First, each of Plaintiffs assert a right to relief arising from the same "series of transactions or occurrences," *i.e.*, each received a similar loan through the scheme. *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 618 (4th Cir. 2001) (finding joinder appropriate where the "plaintiffs alleged that ***they participated in the same kind of transaction*** in which the Hinsons had participated and ***that all the transactions involved similar loans from Norwest***. The joining plaintiffs also alleged ***the same or similar types of violations*** committed by Norwest in these transactions." (emphasis added)); *Sanford v. Virginia*, No. CIV.A. 3:08CV835, 2009 WL 1765769, at *1 (E.D. Va. 2009) (finding claims against two medical administrators who allegedly concealed the circumstances of a death satisfied Rule 20's joinder requirements in a case against their employer and police officers who allegedly caused the death). And second, "[j]oinder of multiple defendants in RICO prosecutions is particularly appropriate even if each defendant is charged with committing different predicate acts as part of the alleged" violation. *United States v. Triumph Capital Grp.*,

**JA440**

Inc., 260 F. Supp. 2d 432, 438 (D. Conn. 2002).[2] In addition to the common sense benefits of

joining co-conspirators in the same lawsuit, "where defendants are alleged to be jointly liable, they

may be joined under Rule 20 because the transaction-or-occurrence test is always satisfied." *In re

EMC Corp.*, 677 F.3d 1351, 1356 (Fed. Cir. 2012). Because RICO imposes joint and several

liability on the co-conspirators,[3] Rule 20(b)(1) is satisfied.

There are a significant number of common questions of fact and law to satisfy the second

prong of Rule 20's joinder requirement. In this case, the questions of fact and law are entirely

common. From a factual standpoint, the claims asserted by Plaintiffs and the class members

originate from the same conduct, practice, and procedure on the part of Martorello, the Corporate

Defendants, and the other co-conspirators, namely the use of the common scheme to evade interest

rate laws of each state. Based on these facts, Plaintiffs and the class members share a number of

common questions of law. Among others, the common questions include: (1) whether the interest

rates used on loans violate state usury laws; (2) whether the choice-of-law provision prospectively

waive consumer's rights and, thus, are unenforceable; (3) whether a choice-of-law provision may

be used to avoid compliance with licensing requirements; (4) whether Defendants constituted an

enterprise; (5) whether the Plaintiffs' debt constituted unlawful debt as defined by RICO; and (6)

whether the amounts paid by each consumer are recoverable against Defendants.

---

[2] *See also United States v. Davis*, 707 F.2d 880, 883 (6th Cir.1983) ("[W]here two defendants are
charged with a RICO conspiracy it is not improper to join such defendants and include the
individual illegal actions that constitute the pattern of racketeering alleged."); *United States v.
Boylan*, 898 F.2d 230, 245 (1st Cir. 1990) ("[C]harging an omnibus RICO conspiracy normally
supplies the glue necessary to bond multiple defendants together in a single proceeding where all
are accused of participating in the conspiracy.").

[3] *See, e.g., United States v. Philip Morris*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) ("Every circuit in
the country that has addressed the issue has concluded that the nature of both civil and criminal
RICO offenses requires imposition of joint and several liability because all defendants participate
in the enterprise responsible for the RICO violations.").

JA441

Courts have found common questions in cases based on similar factual allegations and legal claims. For example, in *Inetianbor v. CashCall, Inc.*, a case involving a similar rent-a-tribe scheme, the court found that:

> The proposed class' claims share multiple questions of law and fact. For example, it is a common question of fact whether CashCall improperly used Western Sky as a "front" for its lending business, invoking Tribal law in an attempt to shield the enterprise from State regulation and consumer laws. Additionally, all class members entered into loan agreements with materially similar terms; therefore, whether the loan contracts are void for charging usurious interest rates is a legal question common to all or nearly all members of the class. Further, whether the loans violated Florida lending and consumer protection law and whether Reddam can be held personally liable are legal questions common to the class.

No. 13-cv-60066-JIC, Doc. 284 at 17–18 (S.D. Fla. Sept. 19, 2016). Other decisions involving non-tribal usurious loans are in accord.[4]

Tellingly, despite their voluminous Rule 12 motions practice, the Corporate Defendants never asserted that they were improperly joined with Martorello. *See generally* Dkt. Nos. 37-44. Although Martorello was the architect and primary beneficiary of the scheme, the other defendants played integral roles in the creation, development, and facilitation of this nationwide scheme to prey on financially vulnerable consumers; and they all profited significantly from the scheme. Because the claims against the co-conspirators arise from the same series of transactions or occurrences and involve common questions, joinder of the co-conspirators is appropriate.

## A.    Severance of the claim is inefficient and premature.

Even though the plaintiffs and defendants *may* be joined under Rule 20, it does not mean they *should* be joined if it will cause "prejudice, expense, or delay." *Sanford*, 2009 WL 1765769,

---

[4] *See, e.g., Purdie v. Ace Cash Express*, 2003 WL 22976611, at *3 (N.D. Tex. Dec. 11, 2003) ("Here, the members of the putative class share a common factual circumstances of having obtained payday loans that were originated, serviced and collected in a uniform manner according to policies and procedures implemented by Defendants on a nationwide basis."); *Upshaw v. Georgia (GA) Catalog Sales, Inc.*, 206 F.R.D. 694, 699 (M.D. Ga. 2002) (same); *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 155 (S.D.N.Y. 2017) (same).

at *4. In this regard, the Corporate Defendants argue that joinder will "lead to a wholly unmanageable discovery and trial process" and that "prejudice, confusion, inefficiency" is inevitable. Dkt. 213 at 12-13. According to the Corporate Defendants, "any joint trial in this matter would involve a single jury presiding over the 3,500 claims of 24 Plaintiffs who assert varied factual grievances to be proved by different evidence against 22 Defendants." *Id*. at 12.

Despite the Corporate Defendants' efforts to exaggerate the complexity of this case, it boils down to a few common questions, provable through common evidence, with respect to each one of the Plaintiffs and Defendants. As mentioned above, "[j]oinder of multiple defendants in RICO prosecutions is ***particularly appropriate*** even if each defendant is charged with committing different predicate acts as part of the alleged" violation. *Triumph Capital Grp.*, Inc., 260 F. Supp. 2d at 438. Joinder is "particularly appropriate," in part, because "there is little danger of prejudice from spillover evidence because evidence is generally admissible against all RICO defendants to prove the existence and nature of the racketeering enterprise and the relationship and continuity of the predicate acts which is needed to establish a pattern of racketeering." *Id*.[5] Put differently, a jury would need to hear duplicative evidence regarding the co-conspirators' alleged misconduct in order to determine, *inter alia*, whether: (1) an enterprise existed, (2) it was involved in the unlawful collection of debt, (3) any co-conspirator participated in the operation and management, (4) any co-conspirator maintained an interest in the enterprise, or (5) any co-conspirators had knowledge of and agreed to the overall objective of the conspiracy.

---

[5] Although this case alleges a violation of RICO's prohibition against the collection of unlawful debt (not racketeering), the overarching point remains the same—all plaintiffs will need to prove the existence of an enterprise involved in the collection of unlawful debt and each defendants' relationship thereto.

10

JA443

The Corporate Defendants' opposition also attempts to make the state law claims more complicated than they are. Almost every state law claim theory of liability, and by extension theory of damages, is based on the collection or *receipt* of proceeds arising from illegal debt under their state's law. For example, California law provides that "[n]o person, company, association or corporation ***shall directly or indirectly*** take or ***receive*** in money, goods or things in action, ***in any other manner whatsoever***, any greater sum or any greater value for the loan or forbearance of money, goods or things" at a rate greater than 12% per year. CAL. CIV. CODE § 1916-2 (emphasis added). There is nothing complex about this—all of the loans to California consumers contained interest rates greater than 12%. Each one of the Defendants—either directly or indirectly—received money from the loans, and thus, Defendants would be liable to California consumers due to their receipt of the money.[6] Most of the claims are that simple, dependent only on apportioning the amounts received by each defendant.[7]

---

[6] *See also, e.g.*, Va. Code § 6.2-305 (allowing recovery from "the person taking or ***receiving***" usurious interest from Virginia consumers); Fla. Stat. § 516.02(2)(a) ("A person who is engaged in the business of making loans of money . . . may not directly or ***indirectly*** charge, contract for, or ***receive*** any interest or consideration greater than 18 percent per annum . . ."); Fla. Stat. § 687.03 (deeming unlawful the taking of usurious interest "either directly or ***indirectly***"); RCW 19.52.020(1) ("No person shall directly or ***indirectly*** take or receive in money, goods, or things in action, or in any other way, any greater interest for the loan or forbearance of any money, goods, or things in action.").

[7] The Corporate Defendants also summarily argue that Plaintiffs' "claims will vary across all defendants based on the peculiarities of each state's law." Dkt. 213 at 12. To support this argument, the Corporate Defendants cite their erroneous interpretation of *Settlement Funding LLC v. Neumann-Lillie*, 274 76, 80 (2007), which was rejected by this Court. *Id.* But the Corporate Defendant and Martorello's erroneous interpretation of *Settlement Funding* did not create any individualized issues—they both argued that it required application of tribal law, as opposed to Virginia law. This is not a unique or dispositive defense, it is a common question that applies to Martorello, the Corporate Defendants, and all the co-conspirators. Further, this *sole* cited "individualized issue" ignores that loan agreement and chosen law prospectively waives federal law, rendering it uniformly unenforceable for consumers in every state.

11

**JA444**

And even taking the Corporate Defendants' claim of prejudice, expense, and inefficiency at face value, the history of this case and others show that a single trial will inevitably be more efficient, cost effective, and negate any risk of inconsistent judgments. For example, a trial against another two rent-a-tribe pioneers, Charles Hallinan and Wheeler Neff, lasted more than *four weeks* before a federal jury convicted them for criminally violating the Racketeer and Corrupt Organizations Act and Pennsylvania's usury laws.[8] Similarly, a case against Scott Tucker and Timothy Muir, two others involved in a rent-a-tribe enterprise, lasted more than *five weeks* before a federal jury convicted them of multiple crimes, including violations of RICO.[9] Considering the anticipated length of trial alone, it is obvious that joinder will reduce expense and promote efficiency, as opposed to ten or more separate trials involving presentation of virtually the same evidence and instructions.

And, putting aside the merits, any objection regarding a joint trial is premature in this early stage of the litigation. Rule 42 of the Federal Rules of Civil Procedure allows the Court to "order a separate trial of one or more separate issues" for the purpose of "convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. Proc. 42(b). "Federal trial courts have wide discretion" with regard to Rule 42 motions, but it "should be exercised only after the court is fully informed." *Tarin v. RWI Const., Inc.*, 2012 WL 12354227, at *3 (D.N.M. July 13, 2012) (finding a severance

---

[8] *See, e.g.*, Jeremy Roebuck, Philadelphia Inquirer, *Teacher: $200 payday loan pushed me to brink of bankruptcy* (Oct. 10, 2017), http://www.philly.com/philly/news/crime/payday-loans-hallinan-lending-philly-rico-racketeering-trial-20171010.html; Jeremy Roebuck, Philadelphia Inquirer, *Teacher: Federal jury finds Main Line payday lender Hallinan guilty of racketeering conspiracy* (Nov. 27, 2017), http://www.philly.com/philly/news/crime/main-line-payday-lender-hallinan-convicted-of-racketeering-conspiracy-20171127.html.

[9] Steve Vockrodt, The Kansas City Star, *Payday lender Scott Tucker gets 16 years, 8 months in prison for $2 billion ripoff scheme* (Jan. 5, 2018), http://www.kansascity.com/news/business/article193241289.html.

12

JA445

request was premature because it was unclear whether a joint trial would be prejudicial or promote judicial economy).[10] Here, the question of severance for the purpose of trial is best left for another day when the Court is more fully informed of: (1) the defendants who will go to trial, (2) the uniformity or lack thereof of the evidence against them, (3) the uniformity of any defenses, and (4) after determination of the Plaintiffs' motion for class certification.

## V. The Court has personal jurisdiction over the proposed defendants.

The Corporate Defendants challenge the Court's personal jurisdiction over the proposed defendants. However, this is not "a proper basis for denying [Plaintiffs] leave to amend the complaint under these circumstances." *Mylan Pharm., Inc. v. Kremers Urban Dev.*, No. CIV. A. 02-1628 GMS, 2003 WL 22711586, at *4 (D. Del. Nov. 14, 2003).[11] Further, the personal jurisdiction requirement—which "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty"—can be waived. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Accordingly, the issue of the Court's personal jurisdiction over the proposed defendants would more appropriately be addressed when raised by them and in light of a more developed record. *See Mylan*, 2003 WL 22711586, at *4 ("In view of this consideration, along with the fact that the parties have not yet developed a record on the possible contacts Dr. Seth and Dr. Stamm may or may not have in the state of Delaware, denying Mylan leave to amend its complaint for lack of personal jurisdiction over these

---

[10] *See also Benitez v. Am. Standard Circuits, Inc.*, 2009 WL 742686, at *6 (N.D. Ill. Mar. 18, 2009) (denying a motion for separate trials as premature, finding that the "appropriate time to decide" severance issues is "at the conclusion of discovery"); *Cramer v. Fedco Auto. Components Co.*, 2002 WL 1677694, at *2 (W.D.N.Y. July 18, 2002) ("because this Court is unable to develop its knowledge as to the merits and sustainability of plaintiffs' case beyond what is represented in the pleadings, granting a motion for separate trials at this time would be premature.").

[11] *See also Pegasus Int'l, Inc. v. Crescent Mfg. Co.*, 2007 WL 1030457, at *7 (E.D. Pa. Apr. 2, 2007) (granting leave over personal jurisdiction objection).

13

two defendants would be inappropriate."). At any rate, the Court has personal jurisdiction over the proposed defendants for the reasons discussed below.

### A.    RICO provides the Court with jurisdiction over the proposed defendants.

RICO provides the Court with personal jurisdiction over the proposed defendants. Section 1965(a) provides that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Section 1965(b) authorizes nationwide service of process. *Id.* § 1965(b). "As a result, personal jurisdiction over a defendant with respect to RICO claims may be exercised anywhere in the United States, as long as the defendant was properly served under Section 1965(d) and exercising jurisdiction does not violate the Fifth Amendment." *Hengle v. Curry*, No. 3:18-CV-100, 2018 WL 3016289, at *8 (E.D. Va. June 15, 2018); *see also Trustees of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Services, Inc.*, 791 F.3d 436, 443 (4th Cir. 2015); *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626–27 (4th Cir. 1997).

Under the national contacts test, the question of whether the assertion of jurisdiction comports with due process in a RICO action looks to the requirements of the Fifth Amendment instead of the Fourteenth, focusing not on the foreigner's contacts with the forum state but, rather, whether the defendant had minimum contacts with the United States of America. *L-3 Servs., Inc. v. Szekely*, No. 2:10CV350, 2010 WL 11579457, at *10 (E.D. Va. Sept. 24, 2010). To show jurisdiction is proper, the plaintiff need only make a prima facie showing that the defendant had minimum contacts with the United States generally. *Myers v. Lee*, No. 1:10CV131 (AJT/JFA), 2010 WL 2757115, at *8 (E.D. Va. July 12, 2010). And, "[f]or the Fifth Amendment to be implicated, a court's exercise of personal jurisdiction would have to 'result in such extreme

14

**JA447**

inconvenience or unfairness as would outweigh the congressionally articulated policy evidenced by a nationwide service of process provision.'" *Hengle*, 2018 WL 3016289, at *8 (quoting *Plumbers & Pipefitters*, 791 F.3d at 444).

The Corporate Defendants do not even attempt to argue that the proposed defendants would suffer extreme inconvenience by a lawsuit in the United States. Defendants' silence is not surprising because courts, including the Fourth Circuit and this Court, have repeatedly found that "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern" when the defendant is a United States resident and the national contacts test applies. *Hengle*, 2018 WL 3016289, at *8 (quoting quoting *Plumbers & Pipefitters*, 791 F.3d at 444); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947 (11th Cir. 1997) (same).[12]

The Corporate Defendants urge the Court to ignore the Fourth Circuit's binding precedent in *ESAB*. *See* Dkt. 213 at 17-18. While they argue that the *ESAB* decision should be disregarded as outdated, they fail to mention the Fourth Circuit's recent decision applying *ESAB*. *See Plumbers & Pipefitters*, 791 F.3d at 443-45. Accordingly, it is unsurprising that this Court has recently declined to stray from the Fourth Circuit's binding precedent in *ESAB*. *See Gibbs v. Haynes Investments, LLC*, No. 3:18CV48, 2019 WL 1314921, *18 (E.D. Va. Mar. 22, 2019) ("The Fourth

---

[12]  This reasoning would apply to Justin Martorello (Texas), Brian McFadden (Michigan), James Dowd (Illinois), Simon Liang (South Carolina), Eventide (Delaware), Rebecca Martorello (Texas), Brian Jedwab (New York), Amlaur Resources (Delaware), Columbia Pipe (Illinois), Timothy Arenberg (Illinois), Terrance Arenberg (Illinois), DMA Trinity Wealth Transfer Trust (Illinois), DTA Trinity Wealth Transfer Trust (Illinois), Jeremy Davis (Puerto Rico), Kairos Holdings (Delaware), Gallant Capital (Delaware), and Liont (Delaware). Further, it would be appropriate for the Court to exercise personal jurisdiction over the remaining proposed defendants, Breakwater Holding and Bluetech Irrevocable Trust, given their use by Matt Martorello to perpetrate the illegal lending enterprise in the United States and their receipt of substantial profits from the illegal scheme. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 372 (3d Cir. 2002) (stating "personal jurisdiction appropriate where a foreign corporation has directly solicited investment from the American market").

15

Circuit has not overruled *ESAB*, and the Court declines to stray from binding precedent here."); *Hengle*, 2018 WL 3016289, at *8-9 (same). Accordingly, the Court has personal jurisdiction over the co-conspirators and "the doctrine of pendent personal jurisdiction would also permit that court to exercise jurisdiction over the closely-related usury and unjust enrichment claims." *Hengle*, 2018 WL 3016289, at *9.

      **B.**    ***Bristol-Meyers* is inapplicable to this case.**

      The Corporate Defendants further claim that the Court lacks jurisdiction over the claims of non-resident class members because of the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California*, __ U.S. __, 137 S. Ct. 1773 (2017). According to the Corporate Defendants, *Bristol-Meyers*—which applies only to mass actions brought under state law—should apply to class actions and should cause the dismissal of any class members who are not residents of Virginia. However, the great weight of authority counsels against adoption of this position. *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 126 (D.D.C. 2018) ("In this instance, the court agrees with Plaintiffs and concludes that *Bristol-Myers* does not apply to class actions," and collecting cases so holding). Further, this Court expressed serious doubts that *Bristol-Meyers* applies to class actions earlier this year, in *Branch v. Government Employees Insurance Company*, 323 F.R.D. 539, 553 n.10 (E.D. Va. 2018).

**VI.**    **Plaintiffs' RICO claims are not facially futile.**

      The Corporate Defendants contend that the motion for leave to amend should be denied because Plaintiffs' claims against the Investor Defendants would be futile. The Fourth Circuit, however, has made clear that leave to amend "should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous *on its face*." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986) (emphasis added). Put differently, "[u]nless a proposed amendment may clearly be seen to be futile because of substantive or procedural

16

**JA449**

considerations, conjecture about the merits of the litigation should not enter into the decision whether to allow amendment." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir.1980) (citation omitted).

Here, the Corporate Defendants ignore this standard (and Plaintiffs' allegations) in arguing that the Amended Complaint must fail. However, similar allegations in other tribal lending cases have been held to be sufficient to survive a motion to dismiss. *See Gibbs*, 2019 WL 1314921; *Solomon v. Am. Web Loan*, 2019 WL 1320790 (E.D. Va. Mar. 22, 2019); *Brice v. Plain Green, LLC*, 2019 WL 1500361 (N.D. Cal. Mar. 12, 2019). Surely, the Amended Complaint is not futile on its face if similar allegations have survived a motion to dismiss. And, the Corporate Defendants' arguments stem largely from their position that the Investor Defendants were merely third-party investors that were not actually involved in the illegal lending enterprise. However, this argument flatly ignores the allegations in the Amended Complaint, and courts have rejected similar attempts to mischaracterize allegations of a defendant's active role in an illegal lending enterprise as a typical third-party investor. *See Gibbs*, 2019 WL 1314921; *Solomon*, 2019 WL 1320790; *Brice*, 2019 WL 1500361. Plaintiffs address each of the Corporate Defendants' arguments below.

**A. The amended complaint adequately alleges proximate causation.**

Plaintiffs do not dispute that proximate cause "for RICO purposes" requires "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp. v. City of New York*, 559 U.S. 1 (2010) (quoting *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). Put differently, a link between the predicate act and the injury "that is too remote, contingent, or indirect is insufficient." *Id.* "This is not a case where the injury alleged was caused by intervening acts of third parties or where the injuries were unexpected or speculative." *Brice*, 2019 WL 1500361, at *19. "Instead, the injury here was expressly contemplated, and allegedly designed and

specifically intended" by Defendants, including the Investor Defendants. *Id.* As alleged, the Investor Defendants "provided substantial capital to fund the loans to consumers and worked together with the other entities described herein to systemically perpetrate fraud and to scam consumers." Am. Compl. ¶ 217. The Amended Complaint includes allegations regarding the Investor Defendants' role in the enterprise. Am. Compl. ¶¶ 218-32. Plaintiffs also allege that the payment of unlawful debt would not have occurred "but for their investment and participation in the enterprise." Am. Compl. ¶¶ 374, 378. Thus, the Corporate Defendants' argument that the Amended Complaint is facially frivolous is unsupported. *See Brice*, 2019 WL 1500361, at *19.

**B. Plaintiffs adequately alleges RICO claims against the Investor Defendants.**

The Corporate Defendants make several arguments regarding the sufficiency of Plaintiffs' RICO allegations against the Investor Defendants. However, they fail to demonstrate that Plaintiffs' Amended Complaint is facially futile. Indeed, the Corporate Defendants largely mischaracterize or ignore the allegations in the Amended Complaint while presenting their own version of the facts. Plaintiffs specifically address each of the arguments below.

*First*, the Corporate Defendants attempt to characterize the Investor Defendants as disinterested, third-party lenders who had no involvement in the illegal lending enterprise. *See* Dkt. 213 at 24-28. This argument ignores the allegations in the Amended Complaint that the Investor Defendants "worked together with the other entities described herein to systematically perpetrate fraud and to scam consumers." Am. Compl. ¶ 217. Plaintiffs specifically allege that the Investor Defendants received updates regarding the business operations and ongoing litigation, which if true, would at least be circumstantial evidence of their control. Am. Compl. ¶¶ 226-28. Additionally, Plaintiffs allege that the Investor Defendants were involved in the restructure of the lending enterprise to avoid liability for their violations of applicable law. Am. Compl. ¶¶ 228-31.

JA451

**Second**, the Corporate Defendants assert that "Plaintiffs have not alleged that the investor defendants are part of any 'distinct enterprise.'" Dkt. 213 at 27-28. By artfully quoting from cases regarding the RICO enterprise and the RICO distinctness requirement, the Corporate Defendants suggest that Plaintiffs may not make out a RICO claim without identifying specifically how they "fit into the hierarchal 'structure' of the lending 'enterprise' or participated in the enterprise's affairs rather their own." Dkt. 213 at 28. In short, this is not required by any applicable law, and it certainly does not render the Amended Complaint facially futile. Plaintiffs have adequately pled the existence of an association in fact enterprise that includes at least the Defendants listed in the Amended Complaint and the Tribe. *See Gibbs v. Haynes*, 2019 WL 1314921, at *19 (recognizing that a RICO enterprise may be an association of more than one entity).

**Third**, the Corporate Defendants mistakenly claim that Plaintiffs cannot state any RICO claims against certain Investor Defendants because Plaintiffs have not pled a pattern of racketeering activity. Dkt. 213 at 29. However, the predicate for a RICO claim may be either "a pattern of racketeering activity" or "collection of an unlawful debt." 18 U.S.C. § 1962. Here, Plaintiffs alleged that the Investor Defendants derived income through the collection of unlawful debt. *See* 18 U.S.C. § 1961(6) (defining "unlawful debt"). In *Gibbs v Haynes*, this Court concluded that allegations that an investor and participant in the unlawful lending enterprise received unlawful interest through profit sharing was sufficient to allege that the investor "derived income through the collection of unlawful debt." *Gibbs v. Haynes*, 2019 WL 1314921, at *21, 22 n.54; *see also Brice v. Haynes*, No. 3:18-cv-01200, Dkt. 127 at 33 (concluding that similar allegations were sufficient). Accordingly, the Corporate Defendants' argument that Plaintiffs are required to allege a pattern of racketeering activity is unsupported.

19

**JA452**

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that their Motion for Leave to

File Their Second Amended Complaint be granted.

Respectfully submitted,
**PLAINTIFFS**

By: ____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

*Counsel for Plaintiffs*

**JA453**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of May, 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

By: _____ */s/ Kristi C. Kelly* _____
Kristi C. Kelly, Esq., VSB #72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
*Counsel for Plaintiffs*

**JA454**

# Gupta / Wessler    *Issues & Appeals*

June 4, 2019

Patricia S. Connor, Clerk of Court
U.S. Court of Appeals for the Fourth Circuit
1100 E. Main Street, Suite 501
Richmond, VA 23219

> **Re:** ***Williams v. Big Picture Loans, et al.*, No. 18-1827**
> **Supplemental letter under Rule 28(j)**

Dear Ms. Connor:

    I write to bring to the Court's attention the attached order issued on May 29, 2019 in a related case against the same defendants, *Galloway v. Big Picture Loans, LLC*, 3:18-cv-406 (E.D. Va.). In that case, which involves similar arm-of-tribe immunity claims, discovery "about other aspects" of the litigation has continued. Add. 2.

    As the order makes clear, this discovery has uncovered "significant new and important" evidence "that raises substantive doubts about the accuracy of evidence presented in this case and the *Williams* Case by the Corporate Defendants and Martorello." Add. 3. The scope of this new evidence is far-reaching—it covers matters including "(1) the genesis of the tribal lending arrangements; (2) the creation and structure of the Corporate Defendants, including the sale and merger transactions that were involved in the corporate restructuring; (3) the role of Rosette, LLP and its leader, Rob Rosette, in the sale and merger transactions involved in the corporate restructure; and (4) the value (or lack of value) of the key asset (Bellicose Capital, LLC) involved in the corporate restructuring." Add. 3. And it potentially implicates "serious allegations" of "material misrepresentations" made to the court by the corporate defendants "regarding their . . . method of creation, purpose" and the "intent that motivated the creation of the tribal lending enterprise at issue in this case." Add. 3. Because, as the district court found, this new record evidence will "be critical to deciding whether Big Picture and Ascension enjoy sovereign immunity," it ordered new briefing on these issues and extended jurisdictional discovery. Add. 5, 7-8.

    Given these new developments, if this Court concludes that, on the original record, the district court erred in denying sovereign immunity, it should consider remanding to allow the district court to re-evaluate that decision in light of any new and relevant evidence.

        Respectfully,

        */s/ Matthew Wessler*
        Matthew Wessler
        *Counsel for Plaintiffs-Appellees*

Gupta Wessler PLLC
1900 L Street NW, Suite 312, Washington, DC 20036
P 202 888 1741    F 202 888 7792
guptawessler.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

RENEE GALLOWAY, et al.,

     Plaintiffs,

v.                                    Civil Action No. 3:18-cv-406

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.


**MEMORANDUM ORDER**

This matter is before the Court on DEFENDANT ASCENSION TECHNOLOGIES, LLC'S MOTION TO DISMISS FOR LACK OF JURISDICTION (ECF No. 37) and DEFENDANT BIG PICTURE LOANS, LLC'S MOTION TO DISMISS FOR LACK OF JURISDICTION UNDER FED. R. CIV. P. 12(b)(1) (ECF No. 39), the supporting, opposing and reply memoranda. In their motions, Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension") (collectively, the "Corporate Defendants") claim to have sovereign immunity from suit by virtue of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe").

These motions were scheduled for hearing after jurisdictional discovery. In their opposition briefs, the plaintiffs advised that additional jurisdictional discovery was not necessary for the Court to be able to decide the motions to dismiss based on

**JA456**

assertions of sovereign immunity by Big Picture and Ascension. While the jurisdictional motions filed by Big Picture and Ascension were pending, the plaintiffs have continued to conduct discovery about other aspects of this case and of the related case of <u>Williams v. Big Picture Loans, LLC</u>, 3:17-cv-461, (the "<u>Williams</u> Case"), as they relate to Defendant Matt Martorello ("Martorello") by obtaining information from Martorello (as to whom this case and the <u>Williams</u> Case continues while the appeal of Big Picture and Ascension in the <u>Williams</u> Case is pending). Additionally, the plaintiffs have conducted discovery of third persons, including Rosette, LLP, which represented the Tribe in transactions. The validity of these transactions is important to decide the claims of sovereign immunity by Big Picture and Ascension.

On May 20, 2019, two days before the scheduled hearing on the jurisdictional motions, the plaintiffs filed PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN SUPPORT OF OPPOSITIONS TO MOTIONS TO DISMISS (ECF No. 232) and a supporting memorandum (ECF Nos. 233 (redacted) and 236 (sealed)). Therein, the plaintiffs argued that, in the discovery from Martorello and third-parties (including Rosette, LLP), they have uncovered considerable evidence from Martorello and the third parties that has substantial probative value on matters that are important to resolution of the sovereign immunity issues presented by the pending motions to

2

**JA457**

dismiss, including: (a) the purpose and the intent that motivated
the creation of the Corporate Defendants; (b) the conduct of the
lending activities at issue in this case; (c) the corporate
restructuring that led to the creation of the Corporate Defendants,
including the sale and merger transactions that were part of that
restructuring; and (d) the intent in effectuating that
restructuring.

As the plaintiffs contend, the documents attached as exhibits
to the MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO
FILE SUPPLEMENTAL EVIDENCE (ECF Nos. 233 (redacted) and 236
(sealed)) present evidence that raises substantive doubts about
the accuracy of evidence presented in this case and the Williams
Case by the Corporate Defendants and Martorello about: (1) the
genesis of the tribal lending arrangements; (2) the creation and
structure of the Corporate Defendants, including the sale and
merger transactions that were involved in the corporate
restructuring; (3) the role of Rosette, LLP and its leader, Rob
Rosette, in the sale and merger transactions involved in the
corporate restructure; and (4) the value (or lack of value) of the
key asset (Bellicose Capital, LLC) involved in the corporate
restructuring. Thus, as the plaintiffs contend, there is
significant new and important evidence that will be critical to
deciding whether Big Picture and Ascension enjoy sovereign

3

**JA458**

immunity.

Additionally, counsel for the plaintiffs have represented that, within the last few days, they have been provided additional discovery from Martorello and Rosette, LLP in response to document requests that were designed to obtain factual information on all the issues outlined above that are important in deciding the question of sovereign immunity. Counsel for plaintiffs explained that it will be necessary to have time to analyze those recently produced documents in order to determine the extent to which all, or some, of the documents must be offered as evidence in the resolution of the motions to dismiss filed by Big Picture and Ascension.

Further, counsel for the plaintiffs identified two other issues that are ripe for resolution, which, in the plaintiffs' view, are reasonably calculated to provide information relevant to the same topics. Those issues are presented in filings made in Williams v. Big Picture Loan, LLC, Misc. Nos. 3:19-mc-1 and 3:19-mc-2, and in the discovery in the Williams Case of electronically stored information ("ESI") as outlined in the JOINT STATUS REPORT REGARDING ESI PROTOCOL (ECF No. 451) and further briefing of the parties respecting the ESI protocol (ECF Nos. 489, 503, and 504).[1]

_____

[1] The issues involving ESI are decided in a separate opinion.

4

**JA459**

Because of these developments, the plaintiffs assert that it is now necessary to have further jurisdictional discovery[2] and to file replacement briefs in opposition to both motions to dismiss for lack of subject matter jurisdiction (ECF No. 37 and 39) so that there is an accurate record on the sovereign immunity issue. They propose to file the replacement briefs thirty (30) days after production of any documents that are required to be produced as a result of decisions on these issues of discovery in the miscellaneous cases and the ESI issue. The Corporate Defendants then requested that they be permitted to file replacement replies thirty (30) days thereafter.[3]

Further, in the plaintiffs' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE (ECF Nos. 233 (redacted) and 236 (sealed)), the plaintiffs asserted that the documents submitted with that motion (as well as other documents) "demonstrate that Big Picture and Ascension Technologies have made material representations to the Court

---

[2] For example, the plaintiffs have shown that the very recently produced (but not yet analyzed) documents from Martorello and Rosette, LLP appear to contain important information. And, it seems clear that documents that will be produced in the miscellaneous cases likewise can yield important information.

[3] The defendants indicated that they might ask for additional time to file a reply depending upon the volume of information filed along with the plaintiffs' replacement briefs.

5

**JA460**

regarding their [Big Picture's and Ascension's] method of creation, purpose and intent that motivated the creation of the tribal lending enterprise at issue in this case." Id. at 2. Those are most serious allegations that implicate decisions made, and to be made, in this Court and to be made by the United States Court of Appeals for the Fourth Circuit in the Williams Case.

The Court will require the plaintiffs to file a Statement of Position to identify precisely what material misrepresentations were made, by whom they were made, and in what papers or arguments they were made. And, of course, Big Picture and Ascension have the right to respond to that filing. That too will require time.

Accordingly, the Court determined that it was in the interest of justice and fairness to both sides to allow the plaintiffs to file replacements of their response (ECF No. 72) to the motions to dismiss (ECF Nos. 37 and 39); thus, it is hereby ORDERED that, for good cause shown and in the interest of justice, the plaintiffs are granted leave to file replacement responses[4] to DEFENDANT ASCENSION TECHNOLOGIES, LLC'S MOTION TO DISMISS FOR LACK OF JURISDICTION (ECF No. 37) and DEFENDANT BIG PICTURE LOANS, LLC'S MOTION TO DISMISS FOR LACK OF JURISDICTION UNDER FED. R. CIV. P. 12(b)(1) (ECF No. 39) and that the defendants, Ascension and Big

---

[4] Plaintiffs shall file separate responses for each motion to which they respond.

**JA461**

Picture, respectively, are granted leave to file replacement reply memoranda replacing BIG PICTURE LOANS, LLC'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF JURISDICITON UNDER FED. R. CIV. P. 12(b)(1) (ECF No. 87) and ASCENSION TECHNOLOGIES, LLC'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF JURISDICTION UNDER FED. R. CIV. P. 12(b)(1) (ECF No. 88).

In perspective of the developments recited above, it is hereby ORDERED that PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN SUPPORT OF OPPOSITIONS TO MOTIONS TO DISMISS (ECF No. 232) is denied as moot.

It is further ORDERED that:

(1) By June 28, 2019, the plaintiffs shall file separate replacement briefs for the previously filed consolidated PLAINTIFFS' RESPONSE TO MOTION OF DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, LLC MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION (ECF No. 72) and that each replacement brief shall not exceed fifty (50) pages; and

(2) By June 28, 2019, the plaintiffs shall file a Statement of Position, not to exceed thirty (30) pages, setting out each material misrepresentation referred to on page 2 of their MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE (ECF No. 236), identifying who made the

7

JA462

alleged misrepresentation and when and where each misrepresentation was made; and

(3) By July 23, 2019, the defendants, Big Picture and Ascension, shall file their replies, not to exceed fifty (50) pages to the responses filed pursuant to paragraph (1) above and their response Statements of Position, not to exceed thirty (30) pages, in response to plaintiffs' position filed in paragraph (2) above; and

(4) By August 1, 2019, the plaintiffs shall file their sur-replies, not to exceed twenty (20) pages, and their reply Statements of Position, not to exceed fifteen (15) pages, to the filings made by the defendants pursuant to paragraph (3) above.

It is so ORDERED.

_____  /s/  REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 29, 2019

JA463

Troutman Sanders LLP
Troutman Sanders Building, 1001 Haxall Point
Richmond, VA 23219

troutman.com



**William H. Hurd**
william.hurd@troutman.com

June 7, 2019

Patricia S. Connor, Clerk of Court
U.S. Court of Appeals for the Fourth Circuit
1100 E. Main Street, Suite 501
Richmond, VA 23219

Re:  ***Williams v. Big Picture Loans, et al.***, No. 18-1827
       **Response to Plaintiffs-Appellees' "Rule 28(j) Letter"**

Dear Ms. Connor:

Appellees' June 4 letter, purportedly filed under "Rule 28(j)", provides no "pertinent and significant authorit[y]" relevant to this case.  Instead, Appellees seek to distract this Court from deciding the present appeal by belatedly raising irrelevant materials outside the appellate record.

Here is what happened.  In a different case before the same district court (*Galloway v. Big Picture Loans, LLC*, 3:2018-cv-406 (E.D. Va.)), different plaintiffs brought another putative class action against Big Picture and Ascension, the Defendants-Appellants in *Williams*.  (The *Galloway* and *Williams* plaintiffs share many of the same lawyers). As in *Williams*, Big Picture and Ascension moved to dismiss the *Galloway* complaint based on arm-of-the-tribe immunity.  Briefing on these motions ended in November 2018.  Then, following oral argument before this Court in *Williams* on May 2, the district court scheduled argument on the immunity motion in *Galloway*.

On May 20 – two days before the *Galloway* immunity hearing – the *Galloway* plaintiffs moved to add 40 documents to the record there, and the district court's order, which Appellees submit here, followed.  Big Picture and Ascension look forward to the opportunity to explain that they did nothing wrong in the *Galloway* briefing.

Relevant to *this* case, even if Appellees could move to re-open the *Williams* appellate record,[1] they have filed no such motion and, by their delay, have waived any right to do so.  Appellees obtained their "new" documents in *Galloway* through discovery in *Williams*, and they had the vast majority (34/40) in their possession well before this Court's May 2 argument in *Williams*; indeed, many since October 2018.  *See Galloway*, ECF 233, at 3-13.  Moreover, those documents deal principally with alleged motives of other parties (not Big Picture or Ascension), making them both cumulative and irrelevant.  (ECF 21, at 49-52.)

---

[1]  Such a motion would be "facially at odds with Rule 10(e)."  *Salama v. Virginia*, 605 F.2d 1329, 1330 (4th Cir. 1979).

**JA464**

**Patricia S. Connor, Clerk of Court**
June 7, 2019
Page 2



---

      Appellees' improper letter should not deter this Court from rendering its decision here, based on the appellate record, especially given the need for guidance on the legal standard for deciding arm-of-the-tribe issues in multiple other cases pending in this Circuit.


Sincerely,

/s/ <u>Wm. H. Hurd</u>

William H. Hurd

**JA465**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| RENEE GALLOWAY, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 3:18-cv-406-REP |
| | : | |
| BIG PICTURE LOANS, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL**
**MISREPRESENTATIONS MADE TO THE COURT BY DEFENDANTS IN SUPPORT**
**OF THEIR MOTIONS TO DISMISS FOR LACK OF JURISDICTION**

Plaintiffs, pursuant to the Court's Order (ECF 246 at 7), submit this Statement detailing the material misrepresentations made by Defendants Big Picture Loans, LLC ("BPL"), and Ascension Technologies, Inc. ("Ascension") ("Corporate Defendants") in support of their Motion to Dismiss for Lack of Jurisdiction (ECF Nos. 38 & 40).

Nearly all of the supporting "evidence" offered by Defendants was either: (1) generated after the litigation commenced, such as attorney-drafted declarations and self-serving deposition testimony; or (2) public-facing documents Plaintiffs now understand were created largely for the very use to which they are now being put, which is to build a litigation defense. Now, however, after forcing substantial discovery productions from third parties, the real background and history of the BPL operation is objectively known.

## I. Defendants misrepresented the genesis of the tribal lending arrangement, including the LVD, Tribal Council, and the Co-Manager's roles in Red Rock's lending operations.

BPL spends a significant portion of its "facts" section to purportedly provide "context" for its origin, purpose, and structure, none of which is true: (1) the Lac Vieux Desert Band of Chippewa Indians ("LVD") created Red Rock to "learn the lending industry,"; (2) Red Rock was "managed by appointed LVD members and under the control of the LVD Council," and (3) LVD "had acquired years of knowledge and business acumen related to the online lending industry," thereby prompting it to purchase Bellicose "to begin in-housing services." ECF 40 at 5-9. The declarations submitted by its co-managers follow this same story. Ex. 1 at ¶ 8 ("To learn the lending industry, Red Rock contracted with Bellicose … for vendor management services, compliance management assistance, marketing material development…Red Rock consulted with Bellicose about operations, but ultimately all decisions were made by Red Rock's managers."); *id.* at ¶ 9 ("While Red Rock received advice and consulted with Bellicose about operations, all final decisions about operations were made by Red Rock managers.") (emphasis added).

JA467

In both this case and in *Williams*,[1] the Corporate Defendants have relied heavily on similar statements by their co-defendant, Matt Martorello. For example, in their replies in support of their motions to dismiss on sovereign immunity grounds in *Williams*, the Corporate Defendants used a Martorello Declaration containing a significant number of misrepresentations, including that "Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operation. I have never made a decision on behalf of Red Rock. No company I own or manage has ever made any decision on behalf of Red Rock." Ex. 2 at ¶ 17.[2] This grossly misrepresents the lending arrangement, including the roles of LVD, Tribal Council, and the co-managers. As is now known from Defendants' internal correspondence, Red Rock was specifically designed to be a front, and Martorello's companies handled <u>all</u> of the material aspects of the lending business without any meaningful involvement of the LVD, Tribal Council or the co-managers. After regulators caught onto the scheme, Martorello and Red Rock attempted to enhance what he called the "optics" of the co-managers' involvement, while allowing Martorello to retain operational control.

### A. *Rosette & Martorello initially structured the tribal lending agreement with an express understanding that the co-managers would not be involved.*

Under Red Rock and Bellicose's initial arrangement the Tribal co-managers were meant to be mere figureheads. Recently produced internal communications confirm this. For example, when setting up the venture, Martorello wrote an Aug. 2011 email to Red Rock's attorney, Robert

---

[1] *Williams, et al. v. Big Picture Loans, LLC, et al.*, Case No. 3:17-cv-461(REP).

[2] Similarly, the Corporate Defendants rely on the following misrepresentations that Martorello made at his deposition: Red Rock "was always involved extensively," in the enterprise and Hazen was involved in "every single element that would happen within Red Rock" (ECF 87-1 at 40:21-22, 115-116); "Red Rock and [its] counsel were actively involved and Red Rock and their management team were actively involved in meeting with, you know, vendors and screening vendors and making decisions on, you know, who they liked or didn't like," and that the individuals involved in that process included Chairman Williams and numerous other officials and Tribal Council members." *Id.* at 36:7-37. Red Rock sourced its own leads and become self-sufficient before BPL was formed. *Id.* at 141:1-142:20.

Rosette, and his business partner, Flint Richardson, discussing the structure of the venture. Ex. 3 at 052501. Martorello asked if "the tribal lending entity had a tribal management company, which was going to be the Bellicose customer[?]" *Id*. Richardson responded "no," and in all-caps, clarified that Martorello's "ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE <u>BUT ARENT INVOLVED IN THE BUSINESS</u>." *Id*. at 052498 (caps in the original, underline added). And when asked by Martorello to further elaborate on this point, Richardson explained that "REPRESENTATIVES FROM THE TRIBE ARE THE LLC's "MANAGERS". THE SERVICER, <u>BELLICOSE OPERATES THE BUSINESS COMPLETELY</u>." *Id*. (caps in the original, underline added). The only purpose of this "cornerstone of the sovereign model," Richardson explained, was the ability to characterize "loan originations" as technically those of the tribal lending entity. *Id*. at 052497. This purportedly exempted the loans from state interest rates. *Id*. at 052499.

The enterprise was not only initially designed to allow "Bellicose to operate[] the business completely" but the co-managers had a nominal role going forward. In Martorello's internal email dated January 14, 2016, *i.e.*, four years into the business and two weeks before the closing of the merger, he confidentially wrote: "<u>[a]s far as I know, the Manager's don't really do anything</u>." *Contrast* Ex. 4 at 043978 (emphasis added); *with* Ex. 2 at ¶ 17 ("Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operation. I have never made a decision on behalf of Red Rock."). In his email, Martorello further added that the enterprise's investors "care about the person who runs the business at AT," implying that it could not be a Tribal co-manager or the investors would back out. Ex. 4 at 043978. Martorello continued that he would "defer" to his attorney on what the transaction documents "say if that jives, and what the

authority is of [Brian McFadden] vs the Managers, but if Managers <u>are really only involved</u> per the [Operating Agreement] to get feedback from the CEO/President[,] then seems OK." *Id.* (emphasis added).[3]

That Defendants' previous descriptions mischaracterize the co-managers' involvement is obvious. In September 2013, Red Rock's attorneys had to provide a declaration of Chairman Williams in the *Otoe-Missouria* litigation. But Williams did not actually know how Red Rock operated and so his attorneys had to obtain information from Martorello to provide in the declaration. Ex. 6. They asked Justin Martorello for information so that they could "supplement Chairman Williams' declaration with regard to the specific operational impacts that RRTL has faced post-DFS action."[4] *Id.* at 046388. The Martorellos—not Chairman Williams, Hazen, or Mansfield—solely possessed this information. Moreover, Red Rock's general counsel did not even know the operational structure of the lending enterprise, asking the Martorellos to review the "attached diagram" and let them know if it was "consistent with Red Rock's structure?" *Id*. There are numerous other such examples showing this lack of co-manager knowledge and involvement. In another 2013 email, Karrie Wichtman indicated that she had been questioned by a bank's compliance team regarding Red Rock's products. She then wrote:

> While I am fairly familiar with the fact that both [Red Rock] and [Duck Creek] offer installment loan products… there was a question raised from [the bank's] compliance department that the product offered is just a 'dressed up' payday loan product—<u>that requires me and the Co-managers to gain a better understanding of our short term finance products in order to be comfortable handling these questions</u>. While I assured [the bank] that our product is not a pay day product and does not

---

[3] Because the co-managers did not "really do anything" and were "really only involved" on paper, it is not surprising that in February 2016, the Vice Chairwoman of LVD, Joette Pete-Baldwin, had "rallied support that it is a 'rent a tribe' in the community," prompting Martorello to work on a "community outreach message outlining how they [were] not a 'rent a tribe' and highlighting the benefits to the community." Ex. 5 at 00155.

[4] Asserting a joint defense agreement here, Defendants have not revealed the role of Martorello in the drafting of the declarations in this case or of other cooperation to "educate" Williams.

**JA470**

require ACH… <u>that was about all I could say. Is there more that we can offer regarding the product that would be useful for the Co-managers and I to become familiar with to better answer these questions</u>?"

Ex. 7 at 047091 (emphasis added).

Despite all of the direct evidence to the contrary—including emails expressly indicating the co-managers were not involved and Bellicose was to operate the business completely—Defendants repeatedly attempted to mislead the Court regarding Red Rock's operations.

**B.  *After regulators caught onto the scheme, the enterprise attempted to enhance the "optics," but not the substantive involvement of the co-managers, who were specifically prohibited from learning key information about the business.***

Bellicose not only "completely operated the business," but it intentionally kept Red Rock's co-managers in the dark about basic details of the business, such as vendor contracts and underwriting formulas. This is evident from an email from August 2014—almost three years into the lending business—where Bellicose's general counsel sent a request for approval to the co-managers. Ex. 8. Bellicose sought the approval for a direct mail campaign, and when Wichtman forwarded it to Hazen, she wrote "due to the desire to learn and the pending restructure," she recommended that Hazen "set up a conference call with SPVI so she could learn the specifics regarding the direct mail launch." *Id*. at 045269. In response, Martorello asserted that they would "opt to continue <u>to keep any details of SPVI IP (including DM) explicitly for internal eyes only</u>[.]" *Id*. at 045268 (emphasis added).[5] Such "internal eyes only" correspondence directly contradicts Martorello's Declaration, as does Wichtman's response, which stated that she "wasn't

---

[5] Ex. 2 at ¶ 35 ("LVD received and retained the significant additional economic value of ownership of all intellectual property developed under the agreement by SourcePoint."); *id*. at ¶ 43 ("SourcePoint was required to develop intellectual property for the benefit of LVD and which LVD owned. Obtaining this intellectual property provided significant assets to LVD[.]"); *see also* Ex. 9 (showing Martorello was "paranoid" about transferring SPVI's intellectual property prior to repayment of the note).

**JA471**

recommending that SPVI disclose its secret sauce but only that SPVI be willing to explain to the Co-Managers what exactly they are approving." *Id.* at 045267. She added "do [Chairman Williams] and [Hazen] even know what 'DM' means because I don't" *Id.* If LVD actually received and retained "all intellectual property," it should have been able to access basic information about a direct mailing performed on Red Rock's behalf.

Martorello's response further demonstrates that the genesis of the tribal lending arrangement was a front. In particular, Martorello responded "[r]emember when we started, that all of these vendors and systems" were "tied internally within SPVI systems behind the scenes[.]" Ex. 8 at 045267 (emphasis added). He further added that "[t]he vendor contracts and formulas used were [our] very closely guarded internal IP and entirely unattainable by [Red Rock and Duck Creek]." *Id.* (emphasis added).[6] The only reason this changed, he stated, was "because the risk of working with tribal clients was more and more dangerous and optics became very important." *Id.* (emphasis added). While the "optics became very important," the Aug. 2014 reality was that Martorello continued to withhold basic information from Red Rock, even while trying to cosmetically enhance the appearance of co-manager involvement by creating a check-the-box review of the tasks. *Id.*[7]

---

[6] Even though Martorello "guarded the formulas used," his Declaration nonetheless asserts that "SourcePoint made underwriting recommendations to Red Rock's co-managers who reviewed and independently decided whether to implement." Ex. 2 at ¶ 41. But without access to the formulas used, there would be no way for the co-managers to meaningfully participate in developing the underwriting criteria.

[7] By way of another example, Wichtman emailed Martorello on February 4, 2015, writing that if "the [tribal servicing entity] is going to survive after the sale sunsets or is complete—it cannot operate in a vacuum—it's tribal business and the Tribe needs to know what is happening and be learning about the operation of the [TSE] through building relationships with TSE employees." Ex. 10 at 050595. In response, Martorello stated "I believe the TSE execs will be able to communicate things to the Co-Managers in layman's terms so they can understand how things work and can handle the communications to Tribal Council." *Id.* But if this was already

This evidence directly contradicts that LVD and the co-managers had "acquired years of knowledge and business acumen related to online lending" prompting it to want to purchase Bellicose. *See, e.g.*, ECF 40 at 5-6; Ex. 1 at ¶¶ 8, 9.

### C. *The depositions of Red Rock's co-managers demonstrate the lack of involvement.*

BPL also asserts that "Red Rock consulted with Bellicose about day-to-day operations, but all decisions were either made by Red Rock's managers or expressly delegated and overseen by Red Rock's managers." ECF 40 at 5; Ex. 1 at ¶¶ 8-9. This directly contradicts the initial design crafted by Martorello, Richardson, and Rosette, and the evidence cited above. Additionally, the depositions of Red Rock's co-managers, Michelle Hazen and Craig Mansfield, demonstrate the nominal involvement of Red Rock's co-managers.[8]

Mansfield, along with Hazen, was one of the designated co-managers of Red Rock until he resigned in January 2014. Ex. 11. Despite supposedly working hand-in-hand for more than two years, Hazen could not recall whether Mansfield was even a Red Rock co-manager.[9] Despite not being able to recall *who* the other manager was, Hazen nonetheless signed a declaration somehow claiming that "all final decisions about operations were made by Red Rock's managers." ECF 40-3; Ex. 1 ¶ 9. If Hazen could not recall even the most basic information regarding the identity of the other co-managers, she cannot credibly testify as to the decisions they purportedly made.[10]

---

happening—as repeatedly asserted—this should never have been part of the conversation in February 2015.

[8] *See also* ECF 11 at 20-21; ECF 13 at 7; ECF 38 at 4; *Williams* ECF 34-1 (Hazen Decl.) ¶ 11; ECF 87 at 4 (citing Martorello Dep. (ECF 87-1) at 36:7-37:7, 40:21-22, 115-116, 138:1-142:20, 143); *Williams* ECF 102 (relying on Martorello Decl. (ECF 102-1)).

[9] In particular, Hazen was expressly asked "[d]o you know if Mr. Williams or Craig Mansfield were a co-manager of Red Rock Tribal Lending with you?" Ex. 12, Hazen Dep. at 26:4-6. In response to this question, she testified "I don't recall." *Id.* at 26:7.

[10] Other aspects of Hazen's deposition confirm her superficial involvement. Hazen could not recall the identity of the tribal council member who came up with the idea to create Big Picture Loans (Hazen Dep. at 34:4-14); any details regard the Big Picture Loans portfolio (*id.* at 38:19-21); how

Mansfield's testimony also demonstrates the Corporate Defendants misrepresented Red Rock's operations. For example, when asked if Red Rock made loans under a particular name, Mansfield testified "I don't know the answer to that," and he could not explain its association with Castle Payday. Ex. 13, Mansfield Dep. at 104:5-13. In other words, Mansfield could not identify or explain the most basic piece of information about Red Rock, *i.e.*, the name it did business as and used when interacting with consumers. *See, e.g.*, Ex. 14 (loan agreement: (1) identifying the lender as "Red Rock Tribal Lending, LLC d/b/a CastlePayday.com," and (2) instructing consumers to email "support@castlepayday.com."). He also could not explain why the enterprise created two separate entities, Red Rock and Duck Creek, as opposed to operating a single entity—a seemingly important detail for a manager of a business.[11] Mansfield demonstrated a lack of knowledge for each of the material aspects of the lending business—even for the limited tasks ostensibly designated to Red Rock under the Servicing Agreement. For example, Mansfield did not know the process of "how the decision of whether to fund the loan occurred." Mansfield Dep. at 114:25-115:3. Or whether that process occurred on the reservation. *Id.* at 115:4-14. He did not know how

---

much the loan portfolio was worth when assigned (*id.* at 45:11-14); details regarding a loan Martorello had received with Iron Fence Investments when Red Rock dissolved (*id.* at 45:20-46:18); the terms of Red Rock's contract with Bellicose (*id.* at 51:14-17); whether Red Rock's bank accounts were swept after payment of 2 percent to the Tribe (*id.* at 53:5-11); the reason she received a notice of violation from the TFSRA (*id.* at 71:15-20); the identity of the person who performed a pro form to determine the amount the Tribe could earn through BPL (*id.* at 74:1-7); the amount the Tribe made in 2014 from its lending business with Red Rock or even a ballpark estimate (*id.* at 75:9-76:11); why the amount of money going to the Tribe increased from 2% to 3% in 2017 (*id.* at 80:5-82:2); the amount the Tribe had received from BPL's business before January 1, 2017 (*id.* at 83:10-17); the minimum portfolio BPL maintains (*id.* at 89:16-18); how BPL located Capstone Opportunities as an investor (*id.* at 113:7-11); when Big Picture borrowed money from Capstone (*id.* at 114:6-10); why BPL borrowed $30 million from Capstone (*id.* at 114:12-18); whether the Tribe needed permission from Martorello to take out a $600,000 bridge loan (*id.* at 123:21-124:4); how much interest was charged for the bridge loan (*id.* at 126:21-127:1).
[11] Mansfield Dep. at 91:12-14 ("Q. Why do you need two different entities to make unsecured loans? A. I don't know the answer to that.").

loans were originated, including "whether the ultimate determination to fund the loan was made on tribal grounds." *Id*. at 115:15-22. He further testified that he did not know what verifications were completed to ensure that borrowers provided the correct information, *id*. at 112:15-18, how Red Rock obtained the money it needed to fund the loans, *id*. at 128:24-129:12, or any details about the call center in the Philippines or what it did on behalf of Red Rock. *Id*. at 119:20-120:1.

**D.** ***The Corporate Defendants materially misrepresented Red Rock's revenue share and desire to enter into business with Martorello, who sought out the relationship.***

The Corporate Defendants and Martorello also misrepresented that LVD approached him; not vice versa. Ex. 2 at ¶ 14 ("In mid-2011, I learned that LVD had identified me as a potential consultant."). They did the same before the Fourth Circuit. Ex. 15, Reply Brief at 10, n. 7 ("The Tribe approached Martorello in 2011 after independently deciding to explore tribal lending, *not* the other way around.").[12] There is no other way to say it than that Martorello lied under oath during his deposition when he claimed that Merritt approached him and said "Hey, I represent a tribe. They're in the online lending business today. They've got a code, they're operating, and they are looking for a good servicer." Ex. 16, Martorello Dep. at 21:22-22:4. After that testimony, Plaintiffs deposed third party Merritt, who would have absolutely no reason to lie about the introduction, and who unequivocally testified: (1) he met Martorello at a conference, (2) Martorello "indicated that he had an interest in working with Native American tribes," and (3) as a result, Merritt introduced him to Robert Rosette, "a very well-known attorney in that space." Ex. 17, Merritt Dep. at 28:12-32:11. Moreover, Merritt testified that he did not introduce Rosette and Martorello "with the LVD in mind," *id*. at 71:2-5, and neither Rosette nor Wichtman indicated to

---

[12] As the Court is aware, Martorello has also repeatedly tried to develop this theme that LVD sought him out, not vice versa. *See, e.g.*, *Williams* ECF 222 at 5 ("LVD's search led them to approach Martorello, based on his prior experience helping another online lender to build its lending operations."); *Williams* ECF 389 at 3-4 (same).

Merritt "that LVD was interested in finding a service provider." *Id*. at 32:12-17. Merritt's deposition could not be clearer:

> Q. So if Mr. Martorello said that, Scott Merritt approached me indicating that he represented the tribe, that would be inaccurate; right?
> A. Inaccurate.
> Q. And it would also be inaccurate if-- that, Scott Merritt told Mr. Martorello that the LVD was involved in the -- in an online lending business and was looking for a servicer?
> A. Inaccurate as well.
> Q. Okay. And it would also be inaccurate that you told him the LVD had a tribal code and was set to make loans?
> A. Inaccurate.
> …
> Q. Well -- okay -- And after [Martorello] was introduced to you, he was the one that indicated his willingness or his desire to find a tribal partner; right?
> A. That's correct.
> Q. Yeah. And if Matt testified that you introduced him to members of the LVD's tribal council, that would be inaccurate too; right?
> A. Correct.

*Id*. at 92:16-93:24.

Another material misrepresentation and omission presented throughout this case has been that "LVD developed a comprehensive economic development strategy to build a more diversified economy." ECF 40 at 3. In reality, the LVD did not develop anything—this is one of several partnerships designed by Robert Rosette and his firm, who facilitated the transaction for their own personal benefit; and not just in the form of legal fees. In addition to their substantial legal fees for their services, Rosette's company, Tribal Loan Management, received a "brokerage fee" of 50% of Red Rock's revenue share. Ex. 18 at § 7.15. Hazen lied about Red Rock's revenue share under oath,[13] and it had never been disclosed in any other form (including to the court in *Otoe-Missouria*) until it was revealed during the deposition of Scott Merritt. Merritt Dep. at 101:22-102:10.

---

[13] When asked "[w]hat percentage contribution would [the government] receive on a monthly basis from Red Rock Tribal Lending out of the revenue?" Hazen Dep. at 35:19-36:1. Hazen testified "2 percent of the gross." *Id*. at 36:2.

Martorello's Declaration also misrepresented Red Rock's revenue share. Ex. 2 at ¶ 34 (claiming that Red Rock did not receive 2% of net revenue, but gross revenue). He did so because Rosette's profit sharing presented a number of obvious problems for a business claiming to be "wholly owned and operated by LVD." ECF 40 at 5. In July 2012, Martorello raised concerns with Rosette's 50% cut, explaining that "TLM shouldn't be profit sharing like an owner." Ex. 19 at 046397. This component "really [was] an issue to" Martorello, who believed TLM's revenue share put his "capital lent at risk." *Id*. He thought it was "very important we remove TLM as a 'profit sharing 50% of retained earnings broker' because it sounds like '50% owner,'" which "negates the entire tribal owned component that makes [him] as financer/servicer feel like [he was] safe." *Id*.[14]

## II. The Corporate Defendants have materially mispresented the reasons for the restructure and their own creation and purpose.

BPL and Ascension then shift to their next theme: after several years, LVD "had acquired years of knowledge and business acumen related to the online lending industry," thereby prompting it to purchase Bellicose "to begin in-housing services." ECF 40 at 5-6. The Corporate Defendants told this same story in *Williams*,[15] and Hazen's Declaration misrepresents the same. Ex. 1 at ¶ 11 ("After four years of operating Red Rock, LVD had gained considerable experience and knowledge about the sophisticated online lending industry. LVD looked to expand its online

---

[14] Wichtman expressed similar concerns, asserting that "the TLM piece is problematic for a whole host of reasons," and while she did not "have any doubt that for bringing the regulatory structure and the Servicers to the table there should be a fee paid to TLM," that "50% of the Tribe's profits ha[d] always been a bit excessive" in her opinion. Ex. 20 at 044603.

[15] *Williams* ECF 23 at 3 ("LVD's long-term strategy was to grow its lending operation by acquiring its service providers" to "maximize the benefits to LVD."); *Williams* ECF 34-1 ¶ 13 (stating LVD "looked to … acquire our vendors' businesses so the lending would be more profitable"); Brief of Appellants at 8 (informing Fourth Circuit that the tribe "wanted to apply" the knowledge it obtained Red Rock to, among other things "acquire its vendors' businesses so that the Tribe would earn more money"); *Williams* ECF 11 at 5 ("LVD had acquired years of knowledge and business acumen related to online lending, and therefore had the expertise to begin in-housing services that were previously provided by outside vendors.").

11

JA477

lending business to earn more money for LVD, to employ more members and area residents, and to acquire our vendors' businesses so the lending would be more profitable."). Similarly, despite all the evidence to the contrary below, the Corporate Defendants submitted a declaration from Martorello, which asserts that "the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies." Ex. 2 ¶ 69 (emphasis added). This is false—there is an abundance of evidence that the sale was motivated by the litigation. Although Martorello and the Corporate Defendants destroyed this evidence as part of the sale, Plaintiffs were able to obtain it from third parties during the merits phase in *Williams*.

## A. *Regulators begin attacking the business model in 2012-13, prompting LVD & Red Rock to file a lawsuit in New York.*

As early as **November 2012**—a little over a year into the business—Martorello had concerns about the viability of the tribal lending model. Ex. 21. In this email, Martorello wrote that he had "some urgent questions" for them "on valuation." *Id*. at 038990. Among other things, he asked how they would value several illegal businesses, such as online poker sites, medical marijuana stores, and drug cartels. *Id*. He further added that "[t]his industry is going to be living in the grey area of its legality for another year or two," and that they had already "received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders." *Id*. In his view, there was "no business with such risk to it" as the tribal lending model, and the "bottom line" was that "this business will simply not exist in 2 to 3 years," at least how it did then. *Id*. at 038991-2. In addition to monetary risks, Martorello explained that Greenberg Traurig provided him with a 20-page legal opinion, concluding that he could be liable "for aiding and abetting felony crime[s]" in states like Georgia. *Id.*

The arrangement between Martorello and Red Rock was supposed to last until December 31, 2018, per the Servicing Agreement. Ex. 18 at § 3.2. But less than two years in, state and federal

regulators caught on to Red Rock's illegal lending practices and threatened to take action. *See,
e.g.,* Ex. 22 at 040489, Sept. 2012 Ltr. from Atty. Gen. for Ark.; 040859, July 2013 Ltr. from Atty.
Gen. from Conn.; 041125, Aug. 2012 Ltr. from Atty. Gen. for N.C.; 043269, July 2012 Cease &
Desist from Atty. Gen. for KY.

The biggest threat came on August 6, 2013, when the New York Department of Financial
Services ("NY DFS") issued a cease and desist to 35 online lending companies, including Red
Rock.[16] The NY DFS not only issued a cease and desist sent to the "lenders," but the bigger threat
posed was the letters it sent to 117 banks and the National Automated Clearinghouse Association,
requesting that "they work with DFS to cut off access to New York customer accounts for illegal
payday lenders." *Id*. In his public comments on the letters, the Superintendent of Financial Services
warned: "Companies that abuse New York consumers should know that they can't simply hide
from the law in cyberspace. We [a]re going to use every tool in our tool-belt to eradicate these
illegal payday loans that trap families in destructive cycles of debt." *Id*. Six days after the issuance
of the cease and desist, Rosette—who represented multiple other tribal lenders—had already
drafted a complaint against the NY DFS "for LVD's consideration." Ex. 23 at 041064. In an email
to Martorello, Rosette wrote that he "believed strongly if we do nothing we may forever lose the
tribal online lending opportunity," which was significant to him considering his receipt of 50% of
Red Rock's revenues. *Id*. Rosette further added that it would be "impossible to unwind or undo
what the State of New York (in collaboration with federal agencies) have started without a
legitimate piece of litigation being filed." *Id*. In a separate email to Martorello, Wichtman echoed

---

[16] *See, e.g.*, The Official Website of New York State, *Press Room*, *Cuomo Administration
Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New
York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-
administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

these concerns, writing "[w]hat do we achieve by laying low waiting for the next bomb to drop—hoping that it doesn't blow us up?" Ex. 24 at 049126. She further added that "[n]othing will be filed unless and until fully vetted with the Tribe and you." *Id.*

On multiple occasions, Martorello expressed concern with joining the litigation as he believed the litigation would be all regulators needed "to do to shut down the business at LVD b/c we simply would not be able to afford to stay in business anymore." *Id.* at 049215 Additionally, he added that the "LVD's house" was not "completely in order yet." *Id.* Because of Martorello's dominance over operations, he cautioned that "LVD" did not "represent the best facts" at the moment because they were not originating the loans on the LVD's reservation. Ex. 25 at 046605. Although the Corporate Defendants have represented that "the contracts for all loans … are formed on the reservation,"[17] the loan contracts actually originated through an "automated process" that did not require handling by BPL employees. Hazen Dep. at 191:5-21, 192:1-5. And although Defendants assert that a final verification of loan agreements was performed on the reservation, Hazen testified that employees located in a call center in the Philippines also would perform that task. *Id.* at 193:4-22. Ms. Hazen did not know what percentage of the approximately 10,000 loans originated each month were verified by employees located on tribal lands. *Id.* at 194:1-18. Given the enterprise contracted with 200 customer service representatives in the Philippines, Ex. 26, and only had ten customer service representatives on tribal land (Ex. 27 at Att. 2), the vast majority of the final verifications inevitably had to occur off the reservation.

Ultimately, Martorello became comfortable enough with the lawsuit and it was filed on August 21, 2013. But, the lawsuit backfired—the district court not only denied Red Rock's motion

---

[17] *See, e.g.*, Ex. 1 at ¶ 30 ("All loans are originated on the Reservation after applications are approved by Big Picture employees located on the Reservation.").

for a preliminary injunction, its findings jeopardized the entire business model. Most notably, in an opinion issued on September 30, 2013, the court found that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands." *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013). The court further noted that Red Rock "built a wobbly foundation for their contention" that the activity was occurring on "on the Tribes' lands," and contrary to their argument, consumers did not "in any legally meaningful sense, travel[] to Tribal land." *Id.* at 360. Thus, there was "simply no basis" to conclude that the Tribes were "treated differently from any other individuals or entities that enter New York to lend to New York resident." *Id.* at 361.

### B. *Within two weeks of the court's decision, Martorello contacts Rosette regarding a potential sale to provide his companies with sovereign immunity.*

*Otoe-Missouria* created a significant liability for Martorello and Bellicose, who did not have a colorable claim of sovereign immunity. In an email sent two days after the district court's decision, Martorello wrote that the decision "presents a significant liability for [Bellicose] and we do not believe that we should service any new New York loans." Ex. 28 at 006304. He further indicated that they were willing to see existing loans through completion, "but [they] <u>simply cannot flaunt the clear ruling from Judge Sullivan's order</u>, however legally incorrect it might be." *Id.* at 006305 (emphasis added). Martorello further stated a concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final… such that it will precipitate their potential investigation and prosecution of us personally and our companies if we continue" to conduct business in New York. *Id.* at 006304.

Two weeks after the district court's decision, Martorello sent an email to Rosette regarding a restructure to protect Martorello/Bellicose. In this email, which had a subject line entitled "<u>LVD</u>

**JA481**

to take ownership of Bellicose VI," Martorello presented some options for a restructure so that Bellicose could attempt to share in LVD's immunity. Ex. 29 (emphasis added).[18] One of those options was for Bellicose to "[a]ssign <u>today</u> LVD 51% of Bellicose via Equity only membership interest tied to the SPVI subsidiary only." *Id.* (emphasis added). Additionally, he proposed assigning 51% of the interests in his other businesses involved in the scheme. *Id.* Each of these transactions, per Martorello, would be "<u>structured to provide all entities sovereign immunity.</u>" *Id.* (emphasis added). And trying to maximize his profits before the business was shut down, Martorello further proposed that BlueTech, his trust, would "own 49% equity, but 100% profits interests until 49 months," *i.e.*, ensuring Martorello would retain the profits until the business was gone. *Id.*[19]

A few weeks later, Martorello reiterated his concerns to Wichtman. In an email dated October 29, 2013, he informed Wichtman that vendors and debt providers of Red Rock were "asking what would happen to everything if the ruling in NY were upheld[?]" Ex. 31. The repercussions, according to Martorello, would be "<u>certain death</u>" and "all vendors including [SourcePoint], banks, ACH processors, bureaus etc would all obviously shut down if it were

---

[18] Before the Fourth Circuit, the Corporate Defendants argued that "there was no evidence" that the restructure was intended to provide Martorello/his companies with immunity. Fourth Circuit Court of Appeals, Oral Argument/Listen to Oral Arguments, Opening Argument of William Hurd, Audio File at 13:53-14:30, http://www.ca4.uscourts.gov/OAarchive/mp3/18-1827-20190507.mp3 (Hurd: "Essentially, the idea below seems to be that by doing business with Martorello" and "acquiring SourcePoint, that we are protecting him from something or other or we are cloaking him with sovereign immunity, how can that be?" The Court: "Well, what is the evidence of that in any event?" Hurd: "There is no evidence. In fact, the evidence is quite to the contrary. . . . He has no sovereign immunity. And the idea that somehow that that is the purpose" that this was some "extravagant of altruism to protect this non-tribal guy, it just makes no sense.").

[19] On a different occasion, Martorello urged Wichtman to consider a previous idea of the LVD adopting him, writing "something that really struck me [in *Otoe-Missouria*] was they mentioned the citizenship of the participants a lot. At council we talked about adoption. It seems like an excellent next step, not to mention an honor to me personally as well." Ex. 30 at 053384.

considered off reservation activity[.]" *Id.* (emphasis added). He further added that "class actions" and "personal threats of enforcement actions against individuals by regulators" has "everyone spooked," causing "several of the biggest servicers" to "shut down." *Id.* In closing, Martorello proclaimed "[d]esperately hoping that Rule 19 works and a favorable outcome on the appeal!" *Id.*[20]

On December 30, 2013, Rosette circulated a legal memorandum regarding Martorello's proposed transaction, analyzing whether "whether formation of a new entity that is co-owned by the Tribe and Source Point and subject to the proposed profit, management and voting controls" suggested by Martorello would be "sufficient to pass muster with the 'am of the tribe' test to extend the Tribe's sovereign immunity from suit to the new LLC." Ex. 33 at 052248. In response, Martorello indicated that one of the proposed features—a 10% revenue allocation to the tribal entity—was not "going to work from a business standpoint" and he "might as well be a state licensed lender[.]" *Id.* at 052247. If litigation occurred, he further added "[w]hat I think you'd tell a court" is "that if the deal were not done," then the Tribe would not know: (1) "if SPVI would be around in 10 days given the industry," (2) execute "its termination provision in accordance with the" servicing agreement, or (3) "hike rates as risk has gone through the roof with detractors now seeking out SPVI's of the world for major attacks." *Id.* Martorello also stressed the urgency of the deal, writing "[c]lock is ticking before I end up in a Cash Call type attack though, at which point,

---

[20] On November 8, 2013, Martorello sent similar email to Wichtman, explaining that Red Rock was "down now about 55% from where it was in July" and that SourcePoint was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims" coming in the first quarter of 2014. Ex. 32 at 052787 (emphasis added). He further noted that there was a "very significant possibility that should we even survive long enough to get there," he would need "to defend [him]self even personally (in more than civil matters), with no ongoing business or revenue at all should the decision be made in the appeal that the activity is in fact OFF reservation (a certain end to the industry)." *Id.* (emphasis added)/

I think the deal is about dead." *Id*. at 052248; *see also* Ex. 34 at 00018128 (characterizing the CFPB's position in its litigation against CashCall as "without question a major attack on legit tribal lending operations."); *id*. (stating that if a similar "attack" on the Red Rock operation happened, he warned, "the stakes are very literally everything.").

In January 2014, with the appeal pending, things continued to get worse for the industry, as well as for Martorello's enterprise. On January 8, 2014, the DOJ announced a consent decree with a major ACH provider, which Robert Rosette described as "the most disastrous result we have seen yet," and he predicted that he "would not be surprise[d] if we lost the last remaining banks and ach processors servicing tribal accounts after reading the consent decree." Ex. 35 at 052155. Sure enough, the enterprise lost its only ACH processer the following day, which "obviously ha[d] major implications for [M]att since he ha[d] no other processors." Ex. 36. And when the enterprise attempted to obtain a different processor, one bank explained that they were told "if the bank so much as processes a single transaction [t]he DOJ will be relentless in shutting them down under the full weight of the US government." Ex. 37 at 036580. By this time, Red Rock had also received more than a dozen warnings from state attorney generals' offices. Ex. 22.[21]

## C.  *With appeal pending, Martorello makes overture to the Chairman in Aug. 2014.*

Martorello was also paying close attention to the litigation involving others industry, including cases filed against CashCall, Scott Tucker, and others.[22] By August 2014, even with the appeal still pending, he had seen enough. Although the term of the Servicing Agreement was effective until December 31, 2018, Martorello knew the business model was at risk and the

---

[21] *See also* Ex. 20.

[22] Ex. 38 at 048497 (email from Martorello to Rosette in response to *CashCall* opinion, asserting "Let's zero in asap on minimizing my risk for being individually liable like CO just successfully did to Butch [W]ebb. . . . I don't want my company on anything that goes to the CFPB."); Ex. 39 (email to Wichtman about Tucker/AMG Services settlement with the Federal Trade Commission).

consequences would be severe. Ex. 34 at 00018129 (explaining the CFPB would go after "all revenue ever collected from consumers" and that "number" was "unobtainable by every investor combined."). On August 11, 2014, Martorello sent an email to Chairman Williams—not vice versa—"we're working on something" that "will have some talking points to go over about the concept for a potential bigger deal for LVD learning the Servicing business." Ex. 40 at 00020786 (emphasis added). Martorello suggested to start "with a phone call, and then if we're close you can come to Puerto Rico to finalize" the terms. *Id*.

On August 26, 2014, Martorello sent another email to Chairman Williams providing more details and stressing the urgency of the restructure. Ex. 41. He wrote that Bellicose wanted to "move quickly to transition the business into very capable hands." *Id*. at 048541. Martorello further explained that he had "to stress the urgency on [his] end" and "SPVI/BVI are looking to move very quickly on such an exit." *Id*. at 048541-2. Far from being the LVD's idea to restructure, he further noted that "rather than putting the business on the 'auction block' to the highest bidder," they were coming "exclusively to LVD," but it was "important that LVD knows that time is of the essence for SPVI/BVI in getting a sale done." *Id*. Martorello indicated that he wanted to know "if LVD is interested or not interested," so they could "move as quickly as SPVI/BVI needs to so that we're not inadvertently disadvantaged." *Id*.; *see also* Ex. 42 ("If we can't reach terms with LVD to buy SPVI, then SPVI will be sold to another Tribe (likely Middletown).").

Williams did not respond to Martorello's email that day, prompting Martorello to email Wichtman later that evening. He had not heard "anything back from the Chairman," nor did he get "any sense of excitement from anyone[.]" Ex. 9 at 045272.[23] Instead, as far as Martorello knew,

---

[23] The October 14, 2013 email to Rosette is the first document mentioning any potential sale to the LVD. *See* Ex. 29. Yet, to facilitate their fabrication regarding the sale, Martorello's Declaration falsely asserts that "since at least 2012, LVD and I have engaged in multiple conversations relating

Tribal Council "only approved evolving the term sheet into something that would be reviewed later to ask questions about, and if approved, then it'd be binding." *Id*. He further stressed that there would be "a lot of legal details to go through" on the deal and "the seller will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid." *Id*. (emphasis added). Martorello made clear he did not want anything beyond cosmetic changes, explaining there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id*.

On October 1, 2014, the need for cosmetic changes became urgent when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. The Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014). The court also observed that "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] … otherwise applicable to all citizens of that [State]." *Id*. at 113 (quotations omitted).

After the Second Circuit issued its decision, Martorello wrote to Wichtman on October 10, 2014, urging her (as general counsel for LVD and Red Rock) to drop the case. Ex. 43 at 043659 ("I can't urge any stronger that LVD not proceed"). He indicated that "SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id*. Ultimately, Wichtman agreed and, as she explained in a subsequent email,

---

to the potential sale of my consulting businesses to LVD to accelerate LVD's ability to maintain a profitable online consumer lending business with no outsourced consulting services." Ex. 2 ¶ 49. There is not a <u>single</u> piece of paper or email supporting Martorello's testimony that they contemplated a sale in 2012—something that would certainly exist for an arrangement where the participants worked thousands of miles away from each other. And tellingly, after Martorello made the first overture regarding the sale, he did not get "any sense of excitement from anyone." Ex. 9.

their best option was to "go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation." Ex. 44 at 001130 (emphasis added); *see also* Ex. 45 at 044075 (Martorello proclaiming that he wanted "BPL to be born from the learnings of all 2nd Circuit commentary possible…").

The parties started moving quickly to restructure the business—even though they had not reached an agreement in principle to the major terms, including the price to be paid. Among other things, Wichtman obtained a tax EIN for BPL on December 1, 2014. Ex. 46. On February 5, 2015, the Tribal Council adopted a resolution creating Ascension and designating Brian McFadden as its president. Ex. 47. Immediately following Ascension's creation, SourcePoint began assigning its contracts to Ascension—another sign that the restructure was not an arm's length transaction, but a façade designed to protect Martorello and his team. *See, e.g.*, Ex. 48. Similarly, Ascension designated McFadden and Simon Liang as the signatories on its bank account on February 19, 2015. All of these steps—creation of Ascension, designation of McFadden as its president, assignment of contracts, adding signatories to bank accounts—were taken months before the parties entered into the Agreement and Plan of Merger dated September 14, 2015. Ex. 49.

Despite all of this evidence, Martorello falsely stated in his Declaration that "the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies." Ex. 2 ¶ 69. He went as far as to characterize the connection between litigation and the sale as "nonsensical" and "temporally problematic" because the sale "occurred eighteen months to three years" after the litigation. *Id*. The Corporate Defendants argued the same, including to the Fourth Circuit. *See* supra, fn. 18; *see also* Ex. 15 at 10, n. 7 (dismissing that this Court "somehow found material" the *Otoe-Missouria* litigation).

**D.** ***The Corporate Defendants misrepresented the genesis of the creation of Big Picture,*** ***which had been developed by Martorello for another tribe.***

**JA487**

Defendants further misrepresent the circumstances surrounding the formation of BPL, which they contend "was created to be an online lending business in order to bring revenue to LVD[.]" Hazen Dep. at 14; *see also* ECF 38 at 5 ("LVD began by creating Big Picture in August 2014."). This part of the story is designed to create the appearance that the LVD was the driving force and came up with the idea for the creation of BPL. And consistent with this, when asked "whose idea" was it "to create Big Picture Loans," Hazen testified that it was the "tribe's." Hazen Dep. at 34:4-8. But other than testifying it was the Tribe's idea to create BPL, Hazen could not recall which tribal member's idea it was or when the idea first came into existence. *Id*. at 34:12-21. And when asked "who picked the name," she testified "[i]t was a group discussion." *Id*. at 38:7-9.

In reality, documents produced from Martorello's third party marketing firm show that he created BPL at least a year before Defendants claimed LVD did so. One of these documents is a "Communications Plan," for Bellicose dated September 30, 2013, *i.e.*, the same day the district court issued its opinion in *Otoe-Missouria*. Ex. 50 at 002899. Bellicose had anticipated launching BPL with a totally unrelated tribe located at the Fort Belknap Indian Reservation, *id.* at 02904, but the launch of the lending enterprise was on hold pending ACH configuration. *Id.* at 02908. And shortly after the district court's decision in *Otoe-Missouria*, Justin Martorello emailed the marketing company, instructing that tasks associated with "Big Picture" should be a "FULL STOP," and "given the massive attacks on the industry we do not plan [to] use these sites." Ex. 51 at 0003894. Two weeks later, Bellicose terminated its contract with the marketing firm, citing "the various challenges and legal uncertainty in the lending industry," had caused Bellicose to reassess and reprioritize "its current projects and relationships with third party vendors." Ex. 52.

Evidence produced by Rosette further proves that the Tribe did not come up with the idea

**JA488**

to create BPL. Instead, in July 2014, Martorello emailed that "CastlePayDay needs a rebrand." Ex. 53 at 058409. Martorello further explained that "RRTL ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. *Id*. He further added that "it's time to get away from the word 'payday' and the black mark of RRTL before rules come out and things get hotter." *Id*. Thus, he suggested "forming ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id*. Bellicose would "facilitate the work," but it needed "the entity formed and approv[ed] to begin doing so as to step 1." *Id*. In response, Wichtman emailed Hazen asking "as CEO for RRTL," whether she felt "comfortable representing RRTL to council" on the rebranding. *Id*. at 058408. Wichtman further added "we need to make sure we have someone who can 'own the process' to get it over the finish line." *Id*. In response, Hazen wrote: "I certainly do agree and yes I would be happy to present this to the Council." *Id*. Three days later, Martorello had "the work and imaging done for ChorusLoans." *Id*. at 058407.

On August 25, 2014, Martorello emailed Wichtman that "Chorus has been sold." Ex. 54 at 043435. But Martorello had "another really great brand" known as Big Picture Loans. *Id*. In this email, he attached a document entitled "Big Picture Site Design" showing a fully developed website and brand for BPL. *Id*. at 043437-57. "Assuming LVD" bought SPVI, Martorello claimed that "BigPictureLoans.com would be an excellent domain," but he also had available "FirstNationLoans.com." *Id*. at 043437. Wichtman responded "[w]hich one do you want me to use?" *Id*. at 043435. It was left up to Martorello to decide on "BigPictureLoans.com." The following day, Wichtman submitted his resolution for the creation of BPL, as well as approving its Articles of Organization and Operating Agreement. Ex 55 ("the Council has been presented with Articles of Organization and an Operating Agreement for the tribally chartered business entity

**JA489**

to be known as Big Picture Loans, LLC….").

**E.** ***The restructure was designed to maintain Martorello's control while, at the same time, insulating his childhood friend & business partner.***

Contrary to their theme that the restructure would enhance LVD's ability to learn the business, discovered evidence shows that it was designed to ensure—and required—the Martorello team's continued control of operations. As Martorello explained to Wichtman, there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." Ex. 9 at 045272. When Hazen appears to have been originally uncomfortable with the idea, Wichtman convinced her "to leave the org chart unchanged" and understood the "importance of keeping status quo to ensure success!" Ex. 5 at 00135. And all of this came at the orders of Martorello, who insisted that "<u>the Bellicose Companies will be sold only 'as is', with existing Management in place and the company remaining substantially the same</u>." Ex. 56 at 040179; *id.* (explaining the tribal servicing entity "needs to be run in the same format it is today.").

They maintained the status quo even though one of Rosette's lawyer identified the structure opened them up to rent-a-tribe arguments similar to "the current class action litigation pending in Vermont," *Gingras v. Rosette.* Ex. 57 at 043997. To avoid this, she wondered whether they needed to "to put these things in writing." *Id.* Martorello insisted the term be in writing, saying it was "take it or leave it[.]" *Id.* at 043996. He further added that "Servicer comfort" was the "only way" that an important investor would "be involved." *Id.* From "their perspective," if LVD "was to cut SPVI out of the picture, then [it] simply cannot perform as a business." *Id.* And, as Martorello explained in a different email before closing, BPL's "[l]enders care about the person who runs the business at AT." Ex. 4 at 043978. So long as the restructure documents were "clear that the position in question and under scrutiny to the lenders is President and CEO (Brian)," then it was ok. *Id.* And

**JA490**

this is exactly what they did—BPL contractually relinquished the right to control operations to its "servicer," Ascension, who contractually relinquished the right to control its operations to McFadden. *See* Exs. 58, 59. It all remained exactly the same except for one change: it was now ostensibly "structured to provide all entities sovereign immunity" as per Martorello. Ex. 29.

The structure was also designed to "insulate" McFadden. Ex. 10. As Wichtman explained, she and Matt "contemplated" in 2015 that "the co-managers would be named as Shelly and the Chairman in order to further insulate Brian as a tribal employee." *Id*. at 050593. This "co-manager insulate model," as labeled by Wichtman, would provide an extra layer of protection for McFadden "as President." *Id*. at 050595. McFadden "would then have his duties defined by his position description, his contract and certain delegations of authority by the Co-Managers" to ensure control over the operations as needed by Martorello. *Id*. at 050593.[24]

**F.** ***To bolster the appearance of a legitimate transaction, Defendants have materially misrepresented the value of Bellicose at the time of the sale, including to the Fourth Circuit Court of Appeals.***

BPL asserts that "Bellicose was valued at just over $100 million" at the time of the sale. ECF 40 at 7. Unsurprisingly, it did not cite any evidence to support this assertion, which is directly contradicted by a significant number of documents showing that Bellicose had little, *if any*, value at the time of the merger and closing. At the oral argument before the Fourth Circuit in *Williams*, the Corporate Defendants' counsel asserted "there has been no suggestion and certainly no

---

[24] Consistent with this plan, members of the Tribal Council have confirmed that things have stayed the same after the restructure. For example, when asked about the differences after the restructure, Chairman Williams testified "As far as I'm concerned, everything that was being done was just transferred over to Ascensions to keep the flow going." Ex. 60, Williams Dep. at 19:22-20:22. Another member, Secretary McGeshick, echoed this belief. Ex. 61, S. McGeshick Depo., 16:12-15 ("Q. Okay. So, do you know what services Bellicose provided to Red Rock? A. They would have to do -- they were -- they did like the -- the same thing as Ascension does today.")).

JA491

evidence and no finding that the Tribe somehow paid too much for" Bellicose.[25] They made a similar representation in their Fourth Circuit reply brief. *See* Ex. 15 at 12 ("There is no evidence the purchase price exceeded the value of the assets acquired."). While unavailable in *Williams*, there is now an abundance of evidence showing that the Corporate Defendants have misrepresented the value of the business, which was worthless as it was about to be shutdown.

For example, in an email dated October 2, 2015, Martorello provides his thoughts on "FMV vs. FV" of Bellicose, i.e., its fair market value v. future value. Ex. 62. Explaining his certainty in the business' low fair market value, Martorello provided 11 points, including "1) the Tribe is buying it b/c our contract gets terminated and they want this to continue[,] 2) Operation Chokepoint is a risk for SPVI owners but not for the Tribe[,] 3) All lawsuits against Servicers is removed from the equation for the Tribe to lose us… 7) They risk that they lose their debt investors if we go away, this deal keeps debts investors comfortable to remain, whereas they'd leave if a new vendor replaced us… 10) IN THE UNLIKELY EVENT that the CFPB rule doesn't take them down, then they pay as they go via a Seller financed deal rather than taking risk. . . ." *Id*. at 09845-6. Martorello further added "there is the risk that we get shut off from banking immediately (or the Tribe does) and we suffer catastrophic damages even worse than CFPB rule." *Id*. at 09846.

Martorello sent a similar email to a business valuation firm on December 5, 2015, *i.e.*, about six weeks before the closing, explaining that "efforts would be attempted by [s]tate governments to shut down tribal lenders (and are being attempted in fact)." Ex. 63 at 005530. One of those was an action filed by the Pennsylvania Attorney General, which Martorello characterized as "the most significant issue/risk to SPVI" as "PA could bring the same claims against SPVI for

---

[25] Fourth Circuit Court of Appeals, Oral Argument/Listen to Oral Arguments, Opening Argument of William Hurd, Audio File at 4:47-4:55, http://www.ca4.uscourts.gov/OAarchive/mp3/18-1827-20190507.mp3.

sure." *Id.* at 005530-1. Martorello further added that Red Rock had already "received threats from several state AGs demanding they stop lending or they will come after them." *Id.* at 005531. In addition to attorney general threats, he further opined that the NY DFS has "issues too" with tribal lending "and they could go after SPVI as well." *Id.* Martorello encouraged the firm to include all "of the support that says CFPB rule <u>will shut this business down</u>, and how operation choke point is hurting everyone." *Id.* (emphasis added). He similarly wrote that "It was estimated that <u>the</u> industry would be wiped out in Feb. 2014 by the new CFPB, and/operation chokepoint tactics." Ex. 64 at 01446. Martorello offered that "[a]ccurately enough, the clients lost ability to debit borrower bank accounts in January 2014" and they "made no loans for many months after out of fear banking would be fully cut off for good." *Id.* Consistent with this, he sent a similar e-mail to the President of the Online Lender's Association ("OLA"), asking for a simple report "that justifies a position I have taken on the industry in a valuation study." Ex. 65. That position, as Martorello explained, was that "Servicing of Tribal Lending will be shut down from new originations and forced into orderly liquidation mode (at best)… as a result of two factors: 1) CFPB (new rule or otherwise)" and "(2) Operation choke point (in this case that terms includes AG lawsuits like VT/PA v. Think [Finance].")." He asked for "all the bullet point support I can get, ideally with references to articles perhaps." *Id.* There are multiple emails reiterating this position that the tribal lending would be shut down.[26]

### G.   *The Corporate Defendants have materially misrepresented that cost savings was the impetus behind the acquisition of Bellicose*.

The Corporate Defendants claim that they "acquired years of knowledge and business

---

[26] *See also* Ex. 66 at 05387 ("Lawsuits by AGs and regulators against SPVI, myself, or the client (as the reports and cases filed to date against competitors supports) may end the business or seriously shrink the business"); Ex. 67 at 011671 ("we thought (and data supported) 'end of days in 2015'" because of Operation Chokepoint).

acumen related to online lending," and "had the expertise to begin in-housing services that were previously provided by outside vendors" like Bellicose. ECF 40 at 6; ECF 38 at 5; *see also* Ex. 1 ¶ 11 ("LVD looked to expand its online lending business to earn more money for LVD[.]"). To that end, the Corporate Defendants claim that the acquisition of Bellicose enabled them to bring "'in-house' many of the activities… resulting in significant cost savings and efficiencies." ECF 40 at 7; *see also* ECF 38 at 15 (arguing that Ascension enhances self-sufficiency because it is "a below-cost service provider," which "in turn generates more profit for LVD."); Hazen Dep. at 63:3-6.

That cost savings, according to the Corporate Defendants, resulted in a decrease of "approximately $1.4 million per month on outsourced services," to spending "on average "$224,262.71 per month through its relationship with Ascension." ECF 38 at 22. In other words, the Corporate Defendants claim that "$1.2 million saved per month is more profit to LVD." *Id*. It is not—rather than paying for "outsourced services," BPL is paying the same amount to Eventide as a creditor. It is not saving "$1.2 million" per month in profits; they just changed the form of the transaction.

Even putting these misleading statements aside, it is false to assert that Ascension is "a below-cost service provider." ECF 38 at 15. In reality, the Intratribal Servicing Agreement requires BPL to pay "**110%** of the hourly salary costs" for Ascension's employees. Ex. 58 at § 3.4 (emphasis added). Additionally, because Bellicose's employees were scared about continuing to work for the illegal enterprise,[27] the restructure contemplated "a bonus plan" of "no more than

---

[27] Ex. 68 at 040216 (Martorello email: "keeping these employees" who "are frightened already" was "vital to not have a mutiny on [their] hands."); Ex. 56 at 040179 (explaining the tribal lender and the tribal servicer needed to remain separate because "the PR effect of hiring on (existing or new) very talented/vested career professionals who will understand they risk being labeled by

150% of employee wages[.]" *Id.* Consistent with this, McFadden went from making $171,285.00 at Bellicose to $265,000.00 at Ascension. *Compare* Ex. 69, *with* Ex. 70. Similarly, James Dowd and Simon Liang's salaries increased by $60,000.00. *Compare* Ex. 69, *with* Ex. 70. Far from "saving" by bringing these services "in-house," BPL is now paying more for the same services provided by Bellicose.[28]

### H. *The Corporate Defendants materially misrepresented Martorello's authority and ability to control operations after the sale.*

BPL claims that "[a]fter the acquisition was complete, Martorello's relationship" changed from "a consultant employed by Bellicose" to "a creditor as owner of Eventide." ECF 40 at 8; ECF 40-3 ¶ 22; ECF 38-5 ¶ 22. To that end, BPL asserts that Martorello "has no authority over Big Picture" and that he "had no involvement in any aspect of Big Picture's operations" since the acquisition. *Id.*; *see also* ECF 87 at 3; ECF 88 at 3. This is false and misleading. Understanding Martorello's continued authority over the business requires an understanding of the various, inter-related agreements crafted as part of the restructure. First, through the Intratribal Servicing Agreement, BPL relinquished to Ascension the right to control the vast majority of the responsibilities for its operations. Ex. 58. Ascension then contractually relinquished the right to

---

peers as working for some 'illegal' lender is a major handicap on the organization, as opposed to working for a cutting edge tech/analytics shop that is more protected from the biased media.").

[28] Martorello has also materially misrepresented the impetus behind the sale of Bellicose, asserting that it "was motivated by a tax savings opportunity," not a desire to shield himself while continuing the illegal enterprise. *Williams* ECF Nos. 368 at 2; 389 at 2; 455-1 at 7; 487 at 23. But in August 2014—right after Martorello first emailed Chairman Williams about the concept for the sale—Martorello wrote that he would "likely have a massive negative tax consequence" associated with the sale, but he was nonetheless "ready to proceed with a potential sale/discussion." Ex. 71 at 052619. Moreover, Martorello was still determining the tax implications on January 30, 2017*, i.e.*, a year after the sale. Ex. 5 at 00160-1 ("you won't pay any taxes for the next 3 years no matter where you live," and he would "know for sure in like 2 months," to which his brother responded "that's a 180 from a few months ago.").

29

control its operations to McFadden, Martorello's childhood friend and business partner.[29] Under the Delegation of Authority Policy, Ascension delegated McFadden with the authority to handle Ascension's "strategic direction, goals and targets," and over "all matters necessary for the day to day management of Ascension." Ex. 59 at § 1.4(a)-(e)). And while Hazen and Williams' authority to appoint the president seems to provide some control, the Loan Agreement neutralizes this power because it requires Hazen and Williams to obtain approval from Martorello (albeit via Eventide) to replace McFadden. Ex. 74.

Martorello created a check on McFadden's power through Eventide's operating agreement, which allows him to revoke McFadden's shares within 14-days' notice. Ex. 72 at § II(I). Martorello considered wielding this power in August 2016 as evidenced by a text message exchange with his brother, another former officer of Bellicose and now owner of Eventide. Ex. 5. In this text exchange, Martorello expressed concern that "Brian [McFadden] and James [Dowd] are getting too big for their britches." *Id.* at 00157. He further explained that "they see monthly wires and are starting to think they deserve a lot more of it now than the $1mm a year Brian makes for being a hired CEO." *Id.* Martorello wrote that McFadden "may have to be disappointed somewhere down the near term road," as "he's not the founder and $1mm a year buys a lot of very capable replacements." *Id.* Put differently, even after the sale, Martorello remained in control through this ability to remove McFadden, albeit by revoking his shares and equity in Eventide.

Respectfully submitted,

Date: June 28, 2019

_____/s/_____
Leonard A. Bennett, VSB #37523
Elizabeth W. Hanes, VSB #75574

---

[29] Martorello Dep. at 94:20-22 ("A. I've known Brian McFadden from riding bikes in the fourth grade."); Ex. 69 (showing McFadden owned shares in Bellicose); Ex. 72 (showing McFadden's ownership in Eventide); Ex. 73 (showing Martorello and McFadden co-own SunUp Financial, *i.e.*, a state licensed lender operating out of Utah).

CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
elizabeth@clalegal.com

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

E. Michelle Drake
John G. Albanese
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel.: 612.594.5999
Fax: 612.584.4470
emdrake@bm.net
jalbanese@bm.net

Beth E. Terrell
Jennifer Rust Murray
Elizabeth A. Adams
TERRELL MARSHALL LAW GROUP PLLC
bterrell@terrellmarshall.com
jmurray@terrellmarshall.com
eadams@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: (206) 816-6603
Fax.: (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*

JA497

## CERTIFICATE OF SERVICE

       I hereby certify that on June 28, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

Date: June 28, 2019

                                         /s/
                                Leonard A. Bennett, VSB #37523
                                Elizabeth W. Hanes, VSB #75574
                                CONSUMER LITIGATION ASSOCIATES, P.C.
                                763 J. Clyde Morris Blvd., Ste. 1-A
                                Newport News, VA 23601
                                Telephone: (757) 930-3660
                                Facsimile: (757) 930-3662
                                Email: lenbennett@clalegal.com
                                elizabeth@clalegal.com

                                Kristi C. Kelly, Esq., VSB #72791
                                Andrew J. Guzzo, Esq., VSB #82170
                                Casey S. Nash, Esq., VSB #84261
                                KELLY GUZZO, PLC
                                3925 Chain Bridge Road, Suite 202
                                Fairfax, VA 22030
                                (703) 424-7572
                                (703) 591-0167 Facsimile
                                Email: kkelly@kellyguzzo.com
                                Email: aguzzo@kellyguzzo.com
                                Email: casey@kellyguzzo.com

                                E. Michelle Drake
                                John G. Albanese
                                BERGER MONTAGUE PC
                                43 SE Main Street, Suite 505
                                Minneapolis, MN 55414
                                Tel.: 612.594.5999
                                Fax: 612.584.4470
                                emdrake@bm.net
                                jalbanese@bm.net

                                Beth E. Terrell
                                Jennifer Rust Murray
                                Elizabeth A. Adams
                                TERRELL MARSHALL LAW GROUP PLLC
                                bterrell@terrellmarshall.com
                                jmurray@terrellmarshall.com
                                eadams@terrellmarshall.com

JA498

936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: (206) 816-6603
Fax.: (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*

JA499

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 18-1827**

───────────

LULA WILLIAMS; GLORIA TURNAGE; GEORGE HENGLE; DOWIN COFFY; FELIX GILLISON, JR., on behalf of themselves and all individuals similarly situated,

                Plaintiffs – Appellees,

      v.

BIG PICTURE LOANS, LLC; ASCENSION TECHNOLOGIES, LLC,

                Defendants – Appellants,

    and

DANIEL GRAVEL; JAMES WILLIAMS, JR.; GERTRUDE MCGESHICK; SUSAN MCGESHICK; GIIWEGIIZHIGOOKWAY MARTIN; MATT MARTORELLO,

                Defendants.

------------------------------

NATIONAL CONGRESS OF AMERICAN INDIANS; NATIONAL INDIAN GAMING ASSOCIATION; NATIONAL CENTER FOR AMERICAN INDIAN ENTERPRISE DEVELOPMENT; CONFERENCE OF TRIBAL LENDING COMMISSIONERS; ONLINE LENDERS ALLIANCE,

                Amici Supporting Appellant.

DISTRICT OF COLUMBIA; STATE OF CONNECTICUT; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MAINE; STATE OF MARYLAND; STATE OF MASSACHUSETTS; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF NORTH

CAROLINA; STATE OF PENNSYLVANIA; STATE OF VERMONT; STATE
OF VIRGINIA; CENTER FOR RESPONSIBLE LENDING,

Amici Supporting Appellee.

———————————

Appeal from the United States District Court for the Eastern District of Virginia, at
Richmond.  Robert E. Payne, Senior District Judge.  (3:17–cv–00461–REP–RCY)

———————————

Argued:  May 7, 2019                          Decided:  July 3, 2019

———————————

Before GREGORY, Chief Judge, AGEE, and DIAZ, Circuit Judges.

———————————

Reversed and remanded with instructions by published opinion.  Chief Judge Gregory
wrote the opinion, in which Judge Agee and Judge Diaz joined.

———————————

**ARGUED:**  William H. Hurd, TROUTMAN SANDERS, LLP, Richmond, Virginia, for
Appellants.  Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for
Appellees.  **ON BRIEF:**  David N. Anthony, Timothy J. St. George, TROUTMAN
SANDERS, LLP, Richmond, Virginia; Justin A. Gray, ROSETTE, LLP, Mattawan,
Michigan, for Appellants.  Kristi C. Kelly, Andrew Guzzo, Casey S. Nash, KELLY &
CRANDALL, PLC, Fairfax, Virginia; Alexandria Twinem, GUPTA WESSLER PLLC,
Washington, D.C., for Appellees.  Pilar M. Thomas, LEWIS ROCA ROTHGERBER
CHRISTIE LLP, Tucson, Arizona; Derrick Beetso, NATIONAL CONGRESS OF
AMERICAN INDIANS, Washington, D.C., for Amici National Congress of American
Indians, National Indian Gaming Association, and National Center for American Indian
Enterprise Development.  Sarah J. Auchterlonie, BROWNSTEIN HYATT FARBER
SCHRECK LLP, Denver, Colorado; Brendan Johnson, Sioux Falls, South Dakota,
Luke A. Hasskamp, ROBINS KAPLAN LLP, Minneapolis, Minnesota, for Amicus
Conference of Tribal Lending Commissioners.  Brian Foster, Michael Nonaka,
Luis Urbina, COVINGTON & BURLING LLP, Washington, D.C., for Amicus Online
Lenders Alliance.  William Corbett, Diane M. Standaert, CENTER FOR RESPONSIBLE
LENDING, Durham, North Carolina, for Amicus Center for Responsible
Lending. Karl A. Racine, Attorney General, Loren L. AliKhan, Solicitor General,
Caroline S. Van Zile, Deputy Solicitor General, Richard S. Love, Senior Assistant
Solicitor General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA, Washington, D.C.; George Jepsen, Attorney General, OFFICE OF THE
ATTORNEY GENERAL FOR THE STATE OF CONNECTICUT, Hartford,
Connecticut; Lisa Madigan, Attorney General, OFFICE OF THE ATTORNEY

**JA501**

GENERAL FOR THE STATE OF ILLINOIS, Chicago, Illinois; Janet T. Mills, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF MAINE, Augusta, Maine; Maura Healey, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF MASSACHUSETTS, Boston, Massachusetts; Gurbir S. Grewal, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF NEW JERSEY, Trenton, New Jersey; Joshua H. Stein, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF NORTH CAROLINA, Raleigh, North Carolina; Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF VERMONT, Montpelier, Vermont; Russell A. Suzuki, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF HAWAII, Honolulu, Hawaii; Tom Miller, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF IOWA, Des Moines, Iowa; Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF MARYLAND, Baltimore, Maryland; Lori Swanson, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF MINNESOTA, St. Paul, Minnesota; Barbara D. Underwood, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF NEW YORK, New York, New York; Josh Shapiro, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF PENNSYLVANIA, Harrisburg, Pennsylvania; Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF VIRGINIA, Richmond, Virginia, for Amici District of Columbia, State of Connecticut, State of Hawaii, State of Illinois, State of Iowa, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of Minnesota, State of New Jersey, State of New York, State of North Carolina, Commonwealth of Pennsylvania, State of Vermont, and Commonwealth of Virginia.

———————

JA502

GREGORY, Chief Judge:

The Lac Vieux Desert Band of the Lake Superior Chippewa Indians ("the Tribe") formed two business entities under tribal law. This appeal arises from a suit brought by five Virginia residents against those entities, Big Picture Loans, LLC and Ascension Technologies, LLC (collectively "the Entities"). In the underlying action, the Virginia residents claimed that they obtained payday loans on the internet from Big Picture and that those loans carried unlawfully high interest rates. The Entities moved to dismiss the case for lack of subject matter jurisdiction on the basis that they are entitled to sovereign immunity as arms of the Tribe. After concluding that the Entities bore the burden of proof in the arm-of-the-tribe analysis, the district court found that the Entities failed to prove that they are entitled to tribal sovereign immunity.

The Entities now appeal that decision. Although the district court properly placed the burden of proof on the Entities claiming tribal sovereign immunity, we hold that the district court erred in its determination that the Entities are not arms of the Tribe. We therefore reverse the district court's decision and remand the case with instructions to dismiss the complaint.

I.

The Tribe entered the business of online lending in 2011 when it organized Red Rock Lending as a tribally owned LLC. Two members of the Tribe managed Red Rock, and the Tribe was its sole member. Red Rock provided loans to consumers from its offices on the Reservation and was subject to the Tribe's Tribal Financial Services

4

**JA503**

Regulatory Code, which is enforced by the Tribal Financial Services Regulatory Authority.  Red Rock contracted with Bellicose, a non-tribal LLC, to provide vendor management services, compliance management assistance, marketing material development, and risk modeling and data analytics development.  Matt Martorello, a non-tribe member, was its founder and chief executive officer.[1]

Two years after the formation of Red Rock, in February 2013, the New York Department of Financial Services sent cease and desist letters to several lending entities, including Red Rock, accusing them of "using the Internet to offer and originate illegal payday loans to New York consumers, in violation of New York's civil and criminal usury laws."  *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).  The Tribe and entities sought a preliminary injunction based in part on a claim that New York's regulation would infringe on tribal sovereignty.  The district court denied the request, however, finding that the entities had not shown a likelihood of success on the merits because their online lending to New York customers constituted off-reservation activity and could thus be properly regulated under New York's anti-usury law.  *See id.* at 360–61.  The Second Circuit affirmed this decision in October 2014.  *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014).

Around the same time, the Tribe formed three entities central to this appeal.  On August 26, 2014, months before the Second Circuit's decision in *Otoe-Missouria*, the

---

[1] Bellicose assigned its interest in the contract to SourcePoint, a Bellicose subsidiary, in 2012. J.A. 158.

5

Tribe organized Big Picture as an independent tribal lending entity that would ultimately consolidate the activities of its other lending entities, including Red Rock.  On February 5, 2015, the Tribe Council formed another entity, Tribal Economic Development Holdings, LLC ("TED"), to operate the Tribe's current and future lending companies. Also on February 5, 2015, the Tribe formed Ascension as a subsidiary of TED for the purpose of engaging in marketing, technological, and vendor services to support the Tribe's lending entities.  The Tribe was the sole member of TED, and TED became Big Picture's and Ascension's sole member.

Also in early 2015, Martorello and the Tribe agreed on a basic framework for the sale of Bellicose:  a seller-financed transaction with non-fixed payments over a seven-year term, with any outstanding amount due to be forgiven at the end of that term.  Prior to that time, the Tribe and Martorello had engaged in multiple conversations about the potential sale of Martorello's consulting companies to the Tribe, which would allow the Tribe to engage in online lending without relying on outside vendors for support services. The seller-financier would be Eventide Credit Acquisitions, LLC, a company managed and majority-owned by multiple entities of which Martorello was the president.  In short, Eventide would provide a $300 million loan to TED, which TED would then use to purchase Bellicose.

After continuing negotiations, the parties reached a final agreement in September 2015, memorializing the terms of the deal in a loan agreement and a promissory note. Under those terms, Big Picture would first make a distribution to TED of its gross revenues.  TED would then distribute 2% of those revenues to the Tribe and reinvest an

additional 2% of gross revenues in growing Big Picture's loan portfolio. The parties agreed to increase the monthly distribution to the tribe from 2% to 3% in September 2016, and the agreement also provided that the percentage distribution would increase to 6% when half the loan had been repaid. In January 2016, the Tribe completed its purchase of Bellicose and acquired all of Bellicose's data and software. By September 2017, TED had distributed approximately $20 million in loan payments to Eventide and nearly $5 million to the Tribe.

TED now oversees both Big Picture and Ascension, and all three entities have their headquarters on the Reservation. Big Picture currently employs 15 tribal members on the Reservation, and Ascension employs 31 individuals, most of whom work outside the Reservation. An Intratribal Servicing Agreement sets forth the relationship between Big Picture and Ascension, with Ascension handling certain day-to-day aspects of the loan operations for Big Picture. Michelle Hazen and James Williams, both Tribe Council members, co-manage all three companies. Hazen is also chief executive officer of Big Picture, but Ascension's president is a non-tribal member.

In June 2017, Plaintiffs Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix Gillison, Jr. brought a putative class action against Big Picture and Ascension, as well as individual defendants who are not parties to this appeal. Plaintiffs sought declaratory and injunctive relief, alleging that Big Picture charges interest rates on its loans that are substantially–50 times–higher than would be allowed if Virginia law were applicable. Before the district court, the Entities appeared specially to claim that

7

they are entitled to tribal sovereign immunity, submitting documentation in support of their assertion that they are arms of the Tribe.

Following jurisdictional discovery, the district court rejected the Entities' invocation of arm-of-the-tribe immunity.  In reaching its decision, the district court determined that the driving force behind the formation of Big Picture and Ascension was "to shelter outsiders from the consequences of their otherwise illegal actions."  J.A. 222.  The district court placed the burden of proof for the immunity issue on the Entities.  The Entities timely appealed.

## II.

On appeal from a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), we review "the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo."  *In re KBR*, *Inc.*, *Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014).  A factual finding is clearly erroneous if we are "left with the definite and firm conviction that a mistake has been committed."  *United States v. Chandia*, 675 F.3d 329, 337 (4th Cir. 2012).

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories."  *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991) (quoting *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831)).  The Supreme Court has recognized that tribal immunity may remain intact when a tribe elects to engage in commerce using tribally created entities, *i.e.*, arms of the tribe, but the Court has not articulated a framework for

8

determining whether a particular entity should be considered an arm of the tribe.  *See*
*Inyo Cty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S.
701, 704, 705 n.1 (2003) (holding that a tribe and its wholly-owned gaming corporation,
an arm of the tribe, were not "persons" who could sue under 42 U.S.C. § 1983).  This
Court has recognized the existence of arm-of-the-tribe immunity but has likewise never
applied the doctrine to determine whether an entity qualifies as an arm of a tribe.  *See*
*United States v. Bly*, 510 F.3d 453, 465 (4th Cir. 2007) (acknowledging the Supreme
Court's ruling in *Inyo County*).

## III.

### A.

As an initial matter, the parties dispute the proper allocation of the burden of proof
in the arm-of-the-tribe analysis.  The district court held that Big Picture and Ascension, as
the parties claiming arm-of-the-tribe immunity, bore the burden of proving their
entitlement to immunity.  Big Picture and Ascension contend that this was in error,
arguing that the tribal documents establishing the Entities should create a presumption of
immunity to be rebutted by Plaintiffs.  Plaintiffs argue, by contrast, that the district court
properly looked to arm-of-the-state doctrine in reaching its decision as to the burden of
proof.  We agree with Plaintiffs on this point.

In determining the proper burden allocation in this context, this Court's arm-of-
the-state doctrine guides our analysis.  Given the unique attributes of sovereign
immunity, we have held that the burden of proof falls to an entity seeking immunity as an

arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction. *Hutto v. S.C. Retirement Sys.*, 773 F.3d 536, 543 (4th Cir. 2014). The same burden allocation applies to an entity seeking immunity as an arm of the tribe. Placing the burden of proof on the defendant entity aligns with our reasoning in *Hutto* that sovereign immunity is "akin to an affirmative defense" and gives proper recognition to the similarities between state sovereign immunity and tribal sovereign immunity. *Id.* Moreover, such an allocation recognizes that an entity that is formally distinct from the tribe should only be immune from suit to the extent that it is an arm of the tribe. Unlike the tribe itself, an entity should not be given a presumption of immunity until it has demonstrated that it is in fact an extension of the tribe. Once a defendant has done so, the burden to prove that immunity has been abrogated or waived would then fall to the plaintiff. Finally, as a practical matter, it makes sense to place the burden on defendants like Ascension and Big Picture, as they will likely have the best access to the evidence needed to demonstrate immunity. For these reasons, the district court properly determined that Ascension and Big Picture must prove that they are entitled to tribal immunity as arms of the Tribe by a preponderance of the evidence.

## B.

Turning to the arm-of-the-tribe immunity analysis, the district court applied the factors set forth in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010). Those non-exhaustive factors are: (1) the method of the entities' creation; (2) their purpose; (3) their structure, ownership, and management; (4) the tribe's intent to share its sovereign immunity; (5) the financial

10

relationship between the tribe and the entities; and (6) the policies underlying tribal sovereign immunity and the entities' "connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." *Id.* at 1187.  The Ninth Circuit has adopted the first five *Breakthrough* factors to analyze arm-of-the-tribe immunity and also considers the central purposes underlying the doctrine of tribal sovereign immunity.  *See White v. Univ. of Cal.*, 765 F.3d 1010, 1026 (9th Cir. 2014).  The parties did not and do not dispute that these factors should guide our analysis.

Like the Ninth Circuit, we adopt the first five *Breakthrough* factors to analyze arm-of-the-tribe sovereign immunity and allow the purpose of tribal immunity to inform our entire analysis.  The sixth *Breakthrough* factor, whether the purposes underlying tribal sovereign immunity would be served by granting an entity immunity, overlaps significantly with the first five *Breakthrough* factors.  Thus, the extent to which a grant of arm-of-the-tribe immunity promotes the purposes of tribal sovereign immunity is too important to constitute a single factor and will instead inform the entire analysis.

Here, we find no clear error in the district court's factual findings.  Reviewing the district court's legal conclusions de novo, however, we hold that the Entities are entitled to sovereign immunity as arms of the Tribe and therefore reverse the district court's decision.

### 1. *Method of Creation*

In considering the "method of creation of the economic entities," we focus on the law under which the entities were formed.  *Breakthrough*, 629 F.3d at 1191–92. Formation under tribal law weighs in favor of immunity.  *Id.* at 1191; *see also White*, 765

F.3d at 1025.  Here, as the district court found, Big Picture and Ascension were both organized through resolutions by the Tribe Council, exercising powers delegated to it by the Tribe's Constitution, and the Entities operated pursuant to the Tribe's Business Ordinance.  It is therefore undisputed that Big Picture and Ascension were "created under tribal law," which "weighs in favor of the conclusion that these entities are entitled to tribal sovereign immunity."  *Breakthrough*, 629 F.3d at 1191.  Accordingly, this factor weighs in favor of tribal sovereign immunity for both Entities.  *See Breakthrough*, 629 F.3d at 1191–92 (finding first factor weighed in favor of immunity where entities were created under tribal law).

### 2.  *Purpose*

The second *Breakthrough* factor incorporates both the stated purpose for which the Entities were created as well as evidence related to that purpose.  629 F.3d at 1192–93. The stated purpose need not be purely governmental to weigh in favor of immunity as long as it relates to broader goals of tribal self-governance.   For example, in *Breakthrough*, the Tenth Circuit found that this factor weighed in favor of immunity where the stated purpose of a casino was to financially benefit the tribe and enable it to engage in various governmental functions–even though the entities themselves engaged in commercial activities.  *Id.* at 1192; *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 789 (2014) (holding that tribal immunity extends to "suits arising from a tribe's commercial activities, even when they take place off Indian lands").

Here, the district court accurately noted that the Tribe has stated a purpose for each Entity that relates to broader goals of tribal self-governance separate from the

Entity's commercial activities, *i.e.*, tribal economic development and self-sufficiency. Big Picture's stated purpose, included in its articles of organization, is to "engage in the business of operating one or more Tribal lending business(es)" as part of the Tribe's "strategic economic development efforts" aimed at "diversify[ing] the economy of the Tribe's Reservation in order to improve the Tribe's economic self-sufficiency." J.A. 365, 370. Similarly, Ascension's stated purpose, also included in its articles of organization, is to "engage in the business of operating one or more Tribal marketing, technology and vendor service business(es)," thereby fulfilling the same tribal economic development efforts. J.A. 380, 387. Thus, the stated purpose of the Entities supports the conclusion that this factor weighs in favor of immunity.

In holding otherwise, the district court reasoned: (1) the formation of the businesses was "for the real purpose of helping Martorello and Bellicose to avoid liability, rather than to help the Tribe start a business"; and (2) Big Picture and Ascension "do not fulfill their stated purposes in practice." J.A. 206–07. Neither rationale holds up.

The record indeed shows that the Tribe created Big Picture and Ascension following the Second Circuit's adverse ruling and the Consumer Financial Protection Bureau's enforcement action against another online lender, Western Sky, that claimed immunity based on its relationship with another tribe. *See* J.A. 1321–22 (Martorello emailing Tribal Council members and the Tribe's counsel regarding his concerns about the CFPB and New York enforcement actions); J.A. 1329 (emails after the enforcement actions between Martorello and the head of the Tribal Council scheduling a time to discuss "a potential bigger deal for [the Tribe] learning the Servicing business").

13

However, the evidence does not support the district court's conclusion that the creation of the Entities was only or primarily intended to benefit Martorello or that the creation of Big Picture and Ascension was solely the product of Martorello's design and urging. Indeed, the district court recognized that both Martorello *and* the Tribe "looked for ways to restructure Red Rock's lending operations to reduce exposure to liability." J.A. 201. The email communications among Martorello, the Tribe Council members, and the Tribe also indicate that the Tribe and Martorello were both interested in avoiding a potential CFPB enforcement action so that the lending operations could continue. As the district court found, the evidence "does not indicate that Martorello himself has received any substantial economic benefit from Big Picture." J.A. 212.

While Martorello certainly stood to benefit from the creation of Big Picture and Ascension and the continuation of the Tribe's lending operation, so too did the Tribe. Thus, the district court's conclusion that the "real purpose" of Big Picture and Ascension was simply to protect Martorello does not hold up (and is in fact contradicted by other findings in the district court's order). Unlike the tribe in *People ex rel. Owen v. Miami Nation Enters*, a California Supreme Court case relied upon heavily by the district court, the Tribe here did not create Big Picture and Ascension solely, or even primarily, to protect and enrich a non-tribe member. *See* 386 P.3d 357, 378 (Cal. 2016). Rather, the Tribe created Big Picture and Ascension so that its lending operations could continue, along with the economic benefits associated with that continuation. The fact that the Tribe created Big Picture and Ascension in part to reduce exposure to liability does not necessarily invalidate or even undercut the Tribe's stated purpose, *i.e.*, tribal economic

14

development.  Indeed, in order to reach its stated goal, the Tribe may have deemed it necessary to reduce its exposure to liability.  The district court therefore erred in finding this factor weighed against tribal sovereign immunity on this basis.

The district court's reasoning as to the fulfillment of the Entities' stated purposes was also in error.  The district court determined that Big Picture and Ascension do not fulfill their stated purposes, because:  (1) the Tribe's explanation as to how revenue from Big Picture is used is too vague, and the revenue received by the Tribe is a sliver of Big Picture's total earnings; (2) Ascension does not employ Tribe members; and (3) Ascension and Big Picture's compensation structures indicate that the Entities primarily benefit individuals and entities outside of the Tribe.

As to the first conclusion, the district court found that the money generated by Big Picture constitutes more than 10% of the Tribe's general fund and may contribute more than 30% of the fund within the next few years.  Despite this evidence that Big Picture's revenue constituted a significant percentage of the Tribe's general fund, the district court nevertheless deemed the information provided by the Tribe as to the specific uses of those funds to be too vague.  Without pointing to any evidence casting doubt on Hazen's assertions, the district court hypothesized that Big Picture's revenue might not actually fund the "governmental essential services" identified by Tribe Council member Hazen. J.A. 208.

The district court's conclusion on this front was wrong for three reasons.  First, one of the primary purposes underlying tribal immunity is the promotion of tribal self-governance, which counsels against courts demanding exacting information about the

minutiae of a tribe's budget. That these funds constitute a significant portion of the Tribe's general fund in and of itself suggests that Big Picture's revenue has contributed to the Entities' stated purpose of tribal economic development.

Second, even applying the district court's exacting standard, the record shows–and the district court recognized–the specific Tribal activities that Big Picture's revenue has funded. Indeed, the district court explicitly recognized that Big Picture's funds had been used, in whole or in part, to:

- meet requirements necessary to secure $14.1 million in financing for the Tribe's new health clinic;

- refinance casino debt;

- fund college scholarships and pay for educational costs for members such as student housing, books, school supplies and equipment;

- create home ownership opportunities for members through tribally purchased homes;

- subsidize tribal members' home purchases and rentals;

- provide a bridge loan to complete the new tribal health clinic that offers services to the regional community;

- fund new vehicles for the Tribe's Police Department;

- fund an Ojibwe language program and other cultural programs;

16

- provide foster care payments for eligible children, propane assistance, and assistance for family care outside of the community; cover burial and other funeral expenses for members' families;

- fund renovations and new office space for the Tribe's Social Services Department; fund youth activities;

- renovate a new space for the Tribe's Court and bring in telecom services for remote court proceedings;

- and fund tribal elder nutrition programs and tribal elder home care and transport services. J.A. 179–80.

In deeming the Tribe's evidence "far too general," the district court appeared to require a breakdown of exactly what percentage of the Tribe's budget went to each of these activities and exactly what percentage of the funding for these activities constituted Big Picture revenue. Such a requirement is at odds with policy considerations of tribal self-governance and economic development.

The district court also erred in determining that this factor weighed against tribal sovereign immunity on the basis that the Tribe did not receive enough of a benefit from Big Picture compared with Eventide. The district court found that the promissory note between TED and Eventide limits the funds available to the Tribe to 5% of Big Picture's total monthly earnings–a 3% monthly distribution and a 2% reinvestment amount. The district court also found that Big Picture has given the Tribe a little under $5 million (about $3 million in distributions and $2 million for reinvestment) and that TED has made loan repayments to Eventide of approximately $20 million. On these facts, the

17

JA516

district court concluded that "the Tribe has only received about 20% of Big Picture's total revenue, still a relatively small percentage." J.A. 210. The district court further recognized that Big Picture will not owe Eventide anything after the note terminates in seven years. Nevertheless, based on these facts, the district court concluded that the "revenue distribution disparity" between Big Picture and Eventide was so great that it weighed against a finding of immunity. We disagree.

As an initial matter, the district court cited to no authority suggesting that a tribe must receive a certain percentage of revenue from a given entity for the entity to constitute an arm of the tribe. Indeed, the evidence suggests that the Tribe would not have been able to finance a loan operation on its own and thus entered a loan agreement with a non-tribal entity in order to obtain revenue both now and in the future. Indeed, when the loan was originally signed, the Tribe received a one-time reinvestment of $1.3 million. J.A. 1346. Currently, the Tribe receives 5% of Big Picture's gross revenue distribution, and this percentage will increase to 8% upon payment of half the loan.[2] Finally, after seven years, the remaining balance will be forgiven, with all net revenue to the Tribe. At that time, in only a few years, not only will all revenue belong to the Tribe, but it will own outright all of the components of the commercial lending enterprise.

Thus, the facts of this case are a far cry from the circumstances in *Miami Nation*, where the evidence indicated that the tribe received barely any revenue, and the entities could not identify the percentage of profits from the lending operations that flowed to the

---

[2] This total includes a distribution of 6% of Big Picture's gross revenues to the Tribe plus 2% for reinvestment into Big Picture. *See* J.A. 1607.

tribe or how those profits were used.  386 P.3d at 378.  Even more importantly, policy considerations of tribal self-governance and self-determination counsel against second-guessing a financial decision of the Tribe where, as here, the evidence indicates that the Tribe's general fund has in fact benefited significantly from the revenue generated by an entity.

In addition to its concerns about revenue sharing, the district court found the Entities' employment opportunities and compensation structures to be problematic. While the district court recognized that Big Picture's employees consist mainly of the Tribe's members, it noted that Ascension does not employ any Tribe members, instead relying on employees who previously worked at Bellicose.  The district court reasoned that this "composition may have been justified when Ascension was formed in 2015 because the company needed individuals with certain technical knowledge for the required support services, and Bellicose's employees were the perfect candidates."  J.A. 211.  The district court found the current lack of tribal employees unacceptable, however, and faulted the Tribe for doing "little more than encourag[ing] tribal members to pursue educational opportunities that would allow them to work for Ascension and Big Picture in the future."  J.A. 211.  At the same time, the district court rejected Plaintiffs' argument that the Tribe should have started training programs for tribal members to work at the company, because there was no indication that the Tribe had the capacity or funds to do so.  The district court nevertheless found that Ascension had failed to contribute to the Tribe's stated purposes for the Entities, because Ascension only supported Big Picture's

"minimal revenue generation" and did not provide hiring opportunities for tribal members.  J.A. 211.

While employment of tribe members may be an indication that an entity is contributing to a tribe's self-governance or economic development, it is not required for this factor to weigh in favor of immunity.  As the district court noted, there is no evidence that the Tribe had the capacity to train its members to take on skilled employment at Ascension, but the district court nonetheless faulted the Tribe for not doing more to increase tribal employment.  More importantly, Ascension's support of Big Picture's lending operations, which the evidence indicates is important to Big Picture's operations, is directly related to achievement of the Tribe's stated purposes.

As to the compensation structures at Ascension and Big Picture, the district court found it problematic that Tribe Council member Hazen has been paid more than other tribal members at Big Picture and that Ascension's employees are paid more than Big Picture's employees.  The district court determined that these differences "lead to the conclusion that Big Picture and Ascension primarily benefit individuals and entities outside the Tribe, or only one tribal leader, both of which are inconsistent with the goal of economic development."  J.A. 212.  The Entities accurately point out that Hazen is chief executive officer of Big Picture and that it should therefore not be surprising that she is paid more than other Tribe members at the company.  The district court also found that Big Picture's employees require less technical training than Ascension employees, which may naturally lead to a pay differential.  At any rate, the district court erroneously determined that these pay differences necessitate a conclusion that the Entities *primarily*

20

benefit individuals and entities outside the Tribe. Such a conclusion disregards the substantial revenue that the Tribe has received (and will continue to receive) in the form of payouts and reinvestments.

In sum, because Big Picture and Ascension serve the purposes of tribal economic development and self-governance, this factor weighs in favor of immunity for both Entities.

### 3. Control

The third *Breakthrough* factor examines the structure, ownership, and management of the entities, "including the amount of control the Tribe has over the entities." 629 F.3d at 1191. Relevant to this factor are the entities' formal governance structure, the extent to which the entities are owned by the tribe, and the day-to-day management of the entities. Here, the district court found that this factor weighed against a finding of immunity for both Entities. We conclude, however, that this factor weighs in favor of immunity for Big Picture and only slightly against a finding of immunity for Ascension.

Big Picture is an LLC managed by two Tribe Council members, Hazen and Williams, who were appointed by majority vote of the Tribe Council and must be removed in the same way. As co-managers, Hazen and Williams are granted broad authority to bind Big Picture individually and "to do and perform all actions as may be necessary or appropriate to carry out the business of Big Picture including but not limited to the power to enter into contracts for services, to manage vendor relationships, and to manage personnel issues and affairs of Big Picture." J.A. 458. Hazen and Williams are precluded only from selling Big Picture's assets or waiving its sovereign immunity. J.A.

450–51.  The district court found that the Tribe has a substantial role in the operations of Big Picture, "as the entity employs a number of tribal members"–including Hazen as its chief executive officer–and "conducts all of its operations on the Reservation."  J.A. 214. On these facts, the district court correctly recognized that this "general structure is to assure that Big Picture is answerable to the Tribe at every level, which supports immunity."  J.A. 215.  Despite this conclusion, the district court found that this factor ultimately weighed against immunity for Big Picture, because its structure was outweighed by Ascension's substantial role in Big Picture's operations. We disagree.

The district court's determination rested on two underlying conclusions:  "(1) that the Tribe's formal oversight of Big Picture is meaningless given Ascension's dominant role in Big Picture's lending operations; and (2) that, assuming Ascension has such a role, that entity is not controlled by the Tribe."  J.A. 216.

As to the first conclusion, while Ascension does manage many of the day-to-day activities associated with Big Picture's lending, an entity's decision to outsource management in and of itself does not weigh against tribal immunity, as the district court recognized.  *See Miami Nation*, 336 P.3d at 373.  The Intratribal Servicing Agreement, which lays out the relationship between the two Entities, indicates that Big Picture remains in control of its essential functions.  Indeed, the Intratribal Servicing Agreement expressly forbids Ascension from engaging in origination activities, executing loan documentation, or approving the issuance of loans to consumers.  The Agreement assigns Ascension the duties to give "pre-qualified leads" to Big Picture and to provide the "necessary credit-modeling data and risk assessment strategies" used by Big Picture to

22

decide whether to issue a loan.  J.A. 419.  But the Agreement also provides that the "criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion" of Big Picture and that Big Picture "shall execute all necessary loan documentation."  J.A. 420.  The district court discounted these facts and instead speculated that, given Ascension's responsibility to identify borrowers based on its credit-modeling system, "it does not appear that Big Picture has much discretion to exercise when it receives recommendations or documents from Ascension." J.A. 216–17. But the Agreement itself provides that Big Picture may always "within [its] sole and absolute discretion" change the criteria used to extend funds when and if it deems such a change appropriate.  J.A. 420.  In other words, the fact that Big Picture currently chooses to utilize Ascension's criteria does not mean that it does not have the power to choose differently in the future.

The district court recognized that Hazen and Williams have been actively involved in discussing items like Big Picture's operating budget and employee handbook and have approved forms sent by employees concerning a variety of policies and procedures.  J.A. 217.  The district court also discounted this evidence, however, finding that Williams's testimony that he was not knowledgeable about certain Big Picture subsidiaries or customer service representatives demonstrated that the Tribe did not actually control Big Picture.  J.A. 218.  Given the evidence of the Tribe's broad power, through Hazen and Williams, over Big Picture's important business decisions and management and evidence that Hazen and Williams in fact exercised that power with frequency, the district court erred in concluding that Big Picture was not controlled by the Tribe simply because of

Hazen and Williams's outsourcing of certain day-to-day management tasks and their lack of knowledge of some aspects of the lending operation. Indeed, even assuming Hazen and Williams lack knowledge as to certain aspects of the operation and did outsource aspects of day-to-day management to a non-tribal entity, such an arrangement would not in itself weigh against immunity, given the other evidence of Tribal control. *See Miami Nation*, 336 P.3d at 373.

As to Ascension, we agree with the district court that the control question is closer. Like Big Picture, Ascension is owned by its sole member, TED, and Hazen and Williams serve as managers of the company with a Tribe Council vote required for their removal. J.A. 218. Unlike Big Picture, Ascension has a non-tribal president, Brian McFadden, and it conducts most of its business outside the Reservation with non-tribe members. J.A. 218. McFadden must obtain Hazen's or Williams's approval for "changes in operations, personnel, or distributions," and the evidence demonstrates that Ascension employees have submitted request and approval forms to Hazen and Williams for certain business decisions. J.A. 219. However, Hazen and Williams have delegated to McFadden the authority to approve Ascension's strategic direction, execute documents on the company's behalf, open and manage Ascension's bank accounts, and oversee all matters necessary for the daily management of Ascension. Additionally, the Loan Agreement prevents TED and Ascension from modifying the Intratribal Servicing Agreement or terminating or replacing any managers or officers of Ascension without Eventide's consent. Given Hazen and Williams's delegation of authority as to certain aspects of

24

JA523

Ascension, this evidence, on balance, tends to weigh slightly against a finding of immunity for Ascension.

In sum, this factor weighs in favor of immunity for Big Picture and slightly against a finding of immunity for Ascension.

### 4.  *Tribal Intent*

The fourth *Breakthrough* factor assesses the tribe's intent to extend its immunity to the entities.  In some cases, the tribal ordinances or articles of incorporation creating the entities will state whether the tribe intended the entities to share in the tribe's immunity.  That was the case here.  The Tribe unequivocally stated its intention to share its immunity in Big Picture and Ascension's formation documents.  Before the district court, Plaintiffs conceded that this factor weighed in favor of Big Picture and Ascension but argued that the district court should accord it the least weight out of all the factors.  The district court rejected this argument but nevertheless concluded that this factor weighed against a finding of immunity "because to do otherwise is to ignore the driving force for the Tribe's intent to share its immunity."  J.A. 222.  This conclusion was in error, because the district court improperly conflated the purpose and intent factors.  This factor focuses solely on whether the Tribe intended to provide its immunity to the Entities.  As Plaintiffs conceded, it did.  This factor thus weighs in favor of immunity for both Entities.

### 5.  *Financial Relationship*

The fifth *Breakthrough* factor considers the financial relationship between the tribe and the entities.  629 F.3d at 1194.  As the district court recognized, whether a judgment against an entity would reach the tribe's assets is a relevant consideration.  However,

25

direct tribal liability for an entity's actions "is neither a threshold requirement for immunity nor a predominant factor in the overall analysis." *Miami Nation*, 386 P.3d at 373. Instead, courts consider the extent to which a tribe "depends . . . on the [entity] for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities." *Breakthrough*, 629 F.3d at 1195. If a judgment against the entity would significantly impact the tribal treasury, this factor will weigh in favor of immunity even if the tribe's liability for an entity's actions is formally limited. *Id.*

Here, as the district court recognized, the Tribe would not be directly liable for a judgment against Big Picture or Ascension. This fact alone has little significance in the analysis. Rather, the relevant inquiry evaluates the extent to which the Tribe depends on these Entities for revenue to fund its governmental functions and other tribal development. The district court found that this factor weighed against immunity, because the actual effect on the Tribe of a reduction in Big Picture's revenue "appears to be insubstantial" and Big Picture's revenue "does not play as important a role in the Tribe's general fund as in other cases where this factor supported immunity." J.A. 225.

Neither the cases cited by the district court nor the record support the proposition that the Tribe does not significantly depend on Big Picture's revenue. Given that 10% of the Tribe's general fund comes from Big Picture, a judgment against Big Picture or Ascension could in fact significantly impact the tribal treasury, which is at the heart of this analysis, even if it is unclear what the exact repercussions of that impact might be on

tribal members and services.[3]  Where, as here, a judgment against the Entities could significantly impact the Tribe's treasury, this factor weighs in favor of immunity even though the Tribe's formal liability is limited.  *See Breakthrough*, 629 F.3d at 1195.

## C.

In summary, we find that all of the factors weigh in favor of immunity for Big Picture and all but one of the factors weigh in favor of immunity for Ascension. Accordingly, both Entities are entitled to immunity as arms of the Tribe.

We reach this conclusion with due consideration of the underlying policies of tribal sovereign immunity, which include tribal self-governance and tribal economic development as well as protection of "the tribe's monies" and the "promotion of commercial dealings between Indians and non-Indians."  *Breakthrough*, 629 F.3d at 1187–88.  The evidence here shows that the Entities have increased the Tribe's general fund, expanded the Tribe's commercial dealings, and subsidized a host of services for the Tribe's members.  Accordingly, the Entities have promoted "the Tribe's self-determination through revenue generation and the funding of diversified economic development."  *Breakthrough*, 629 F.3d at 1195.  A finding of no immunity in this case, even if animated by the intent to protect the Tribe or consumers, would weaken the Tribe's ability to govern itself according to its own laws, become self-sufficient, and develop economic opportunities for its members.

---

[3] As the district court acknowledged, a judgment against Ascension could "drastically reduce Big Picture's revenue."  J.A. 226.  Thus, a judgment against either Entity could impact the Tribe's treasury.

27

JA526

Although Plaintiffs stress the injuries they allegedly face as a result of the Entities' commercial activities, an entity's entitlement to tribal immunity cannot and does not depend on a court's evaluation of the respectability of the business in which a tribe has chosen to engage. Accordingly, the potential merit of the borrowers' claims against Big Picture and Ascension–and the lack of a remedy for those alleged wrongs–does not sway the tribal immunity analysis. It is Congress–not the courts–that has the power to abrogate tribal immunity. *See Bay Mills*, 572 U.S. at 800 ("[I]t is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity.").

Because a proper weighing of the factors demonstrates by a preponderance of the evidence that the Entities are indeed arms of the Tribe, Big Picture and Ascension are entitled to tribal sovereign immunity.

IV.

For the foregoing reasons, we reverse the district court's order and remand with instructions to grant the Entities' motion to dismiss for lack of subject matter jurisdiction.

*REVERSED AND REMANDED WITH INSTRUCTIONS*

28

FILED: July 3, 2019

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 18-1827
(3:17-cv-00461-REP-RCY)

———————————

LULA WILLIAMS; GLORIA TURNAGE; GEORGE HENGLE; DOWIN
COFFY; FELIX GILLISON, JR., on behalf of themselves and all individuals
similarly situated

          Plaintiffs - Appellees

v.

BIG PICTURE LOANS, LLC; ASCENSION TECHNOLOGIES, LLC

          Defendants - Appellants

 and

DANIEL GRAVEL; JAMES WILLIAMS, JR.; GERTRUDE MCGESHICK;
SUSAN MCGESHICK; GIIWEGIIZHIGOOKWAY MARTIN; MATT
MARTORELLO

          Defendants

------------------------------

NATIONAL CONGRESS OF AMERICAN INDIANS; NATIONAL INDIAN
GAMING ASSOCIATION; NATIONAL CENTER FOR AMERICAN INDIAN
ENTERPRISE DEVELOPMENT; CONFERENCE OF TRIBAL LENDING
COMMISSIONERS; ONLINE LENDERS ALLIANCE

**JA528**

Amici Supporting Appellant

DISTRICT OF COLUMBIA; STATE OF CONNECTICUT; STATE OF
HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MAINE;
STATE OF MARYLAND; STATE OF MASSACHUSETTS; STATE OF
MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE
OF NORTH CAROLINA; STATE OF PENNSYLVANIA; STATE OF
VERMONT; STATE OF VIRGINIA; CENTER FOR RESPONSIBLE LENDING

Amici Supporting Appellee

————————————————

J U D G M E N T

————————————————

In accordance with the decision of this court, the judgment of the district

court is reversed. This case is remanded to the district court for further proceedings

consistent with the court's decision.

This judgment shall take effect upon issuance of this court's mandate in

accordance with Fed. R. App. P. 41.

/s/ PATRICIA S. CONNOR, CLERK

JA529



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

RENEE GALLOWAY, <u>et al.</u>,

    Plaintiffs,

v.                                    Civil Action No. 3:18cv406

BIG PICTURE LOANS, LLC,
<u>et al.</u>,

    Defendants.


**ORDER**

Having considered the case file and the pleadings therein,
the NOTICE OF OBJECTIONS TO HEARING (ECF No. 267), the JOINT
SUBMISSION ON PROPOSED PREHEARING SCHEDULING ORDER (ECF No. 268),
and the PROPOSED PREHEARING SCHEDULING ORDER (ECF No. 268-1), it
is ORDERED that:

(1) an evidentiary hearing on subject matter jurisdiction
shall be held on October 28, 2019 at 10:00 a.m. and shall continue
thereafter until completed; and

(2) the Plaintiffs shall file their reply brief (in support
of PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL
MISREPRESENTATIONS MADE TO THE COURT BY DEFENDANTS IN SUPPORT OF
THEIR MOTIONS TO DISMISS FOR LACK OF JURISDICTION (ECF No. 249) to
the response briefs on August 30, 2019 (the date set in the ORDER
(ECF No. 259, ¶1(c)); and

JA530

(3)  in their reply brief the Plaintiffs shall identify which representation(s) pertain to which of the so-called <u>Breakthrough</u> factors and how that representation pertains to the identified factor; and, in perspective of this added requirement, the page limitation for the reply brief shall be fifty (50) pages; and

(4)  after considering PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS MADE TO THE COURT BY DEFENDANTS IN SUPPORT OF THEIR MOTIONS TO DISMISS FOR LACK OF JURISDICTION (ECF No. 249) (and the exhibits therewith filed), the defendants' response briefs, and the plaintiffs' reply brief, the Court will determine the scope of the issues to be addressed at the evidentiary hearing; and

(5)  On October 21, 2019 or on October 24, 2019 (the Court will advise counsel) at 10:00 a.m., a final prehearing conference will be held, if the Court determines that such a hearing is needed; and

(6)  On September 5, 2019, Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, Inc. ("Ascension") shall file a list of:  (a) all witnesses intended to be called at the evidentiary hearing; (b) all proposed exhibits; and (c) all discovery materials, specifying the appropriate portions thereof; and

(7)  On September 13, 2019, Plaintiffs shall file a corresponding list of: (a) all witnesses intended to be called at

2

JA531

the evidentiary hearing; (b) all proposed exhibits; and (c) all discovery materials, specifying the appropriate portions thereof, including any fairness designations; and

(8)  On September 17, 2019, Big Picture and Ascension shall file a list containing any rebuttal witnesses, exhibits, and discovery materials, specifying the appropriate portions thereof, including any fairness designations; and

(9)  On September 30, 2019, any objection to any witness, exhibit, or discovery designation shall be filed by each of the parties.  Such objection shall be deemed to have been waived if not timely filed; and

(10) By October 7, 2019, counsel shall have met and conferred to resolve objections to exhibits and discovery designations, and by October 9, 2019, shall file a list of all resolved objections. If objections are not resolved, they shall be determined at the Final Pretrial Conference or at the evidentiary hearing.  To the extent possible, objections will be placed in categories to make the process of considering objections more efficient; and

(11) Motions *in limine* will be neither necessary nor entertained; and

(12) By October 14, 2019, counsel shall file Stipulations of Uncontroverted Facts; and

(13) Not later than twenty-one (21) days after the conclusion of the hearing, Big Picture and Ascension shall file new briefs in

support of their motions to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction (ECF No. 37 and 39) (the "Motions to Dismiss"). The new briefs shall be no more than fifty (50) pages each; and

(14) No later than twenty-one (21) days after the Defendants file their briefs, Plaintiffs' shall file their response briefs to the Motions to Dismiss. Plaintiffs' new response briefs shall be no more than fifty (50) pages each; and

(15) No later than fourteen (14) days after the Plaintiffs file their response briefs, the Defendants shall file their reply briefs in support of their Motions to Dismiss. The reply briefs shall be no more than thirty (30) pages each; and

(16) At the time of the filings required in paragraphs (13) and (14) above (but separate therefrom), the parties shall file proposed Findings of Fact (not to exceed fifty (50) pages) with citations to the record.

It is so ORDERED.

                                    /s/        REP
                    _____
                    Robert E. Payne
                    Senior United States District Judge


Richmond, Virginia
Date: July 23, 2019

JA533

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**RENEE GALLOWAY,** *et al.,*
**as individuals and as representatives**
**of the classes,**

       **Plaintiffs,**

**v.**                           **Civil Action No. 3:18-cv-00406-REP**

**BIG PICTURE LOANS, LLC,** *et al.,*

       **Defendants.**
_____

**TRIBAL DEFENDANTS' STATEMENT OF POSITION**
**REGARDING PLAINTIFFS' CLAIMS OF "MATERIAL MISREPRESENTATIONS"**

**JA534**

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Summary of Factual Rebuttals .................................................................................. 2

Argument ................................................................................................................... 6

    I.     Plaintiffs' "misrepresentations" claims are a stale and irrelevant sideshow .......... 6

         A.    Plaintiffs' "misrepresentations" arguments were made and rejected in *Williams*; *Williams* establishes the Tribal Defendants had sufficient factual bases for their positions .................................................. 8

         B.    The *Williams* opinion shows that much of the purported new "misrepresentations" evidence is irrelevant ............................................. 10

             1.    *Williams* decided what evidence is relevant to determine the "purpose" factor ................................................................ 11

             2.    Plaintiffs point to evidence made irrelevant by *Williams* ............ 12

         C.    Under *Williams*, the "method of creation" and "intent to share immunity" factors hinge on the Tribe's statements contained in formation documents ................................................................... 15

         D.    Plaintiffs had the purported new "misrepresentation" evidence well before the *Williams* argument and opinion, but the misrepresentation claims were not advanced until Plaintiffs needed an argument to try to explain away *Williams* ........................................... 17

    II.    The claims of "misrepresentations" fall flat when faced with the facts ............. 22

         A.    Plaintiffs portray the Tribe as a pawn in Martorello's scheme; the truth is that the Tribe instigated the lending business for its own business purposes ................................................................... 22

             1.    The Tribe had a plan to enter the lending business before Martorello's involvement ................................................. 22

             2.    "Who first said what to whom first" at a conference is a concocted dispute ................................................................ 25

             3.    The Tribe purchased Bellicose because it was worth a lot to the Tribe ................................................................... 26

             4.    The Tribe created Big Picture ................................................. 28

             5.    Martorello's purpose is not the Tribe's purpose ......................... 28

             6.    All loans originate on the reservation ......................................... 30

          B.    Plaintiffs claim that Martorello controls Big Picture and Ascension, but in fact the Tribe holds and exercises ownership control rights ................................................................... 31

39638789v8

**TABLE OF CONTENTS**
**(cont'd)**

1.      A lack of Tribal control over Bellicose and SourcePoint does not mean the Tribe lacked control over Red Rock; Red Rock was designed to operate under Tribal control and have the ultimate say over the business .................................... 32

2.      An abundance of evidence demonstrated Tribal control over Big Picture and Ascension.................................... 37

C.      Plaintiffs claim "financial relationship" misrepresentations, but controlling fact that the Tribe has benefitted by millions of dollars is unchallenged...................................................................... 41

Conclusion ...................................................................................................... 43

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amerind Risk Mgmt. Corp. v. Malaterre,* 633 F.3d 680 (8th Cir. 2011) ......................................38

*Atl. Richfield Co. v. Pueblo of Laguna*,
    No. 1:15-CV-56-JAP/KK, 2016 WL 3574152 (D.N.M. Mar. 1, 2016)..................................38

*Bowen v. Doyle*, 880 F. Supp. 99 (W.D.N.Y. 1995).........................................................................8

*Breakthrough Mgmt. Group, Inc. v. Chukchansi Gold Casino & Resort*,
    629 F.3d 1173 (10th Cir. 2010) .................................................................... *passim*

*In re Facebook Inc.*,
    42 F. Supp. 3d 556 (S.D.N.Y. 2014)..........................................................................8

*Galloway et al. v. Big Picture Loans, LLC*,
    3:18-cv-00406-REP (Dkt. No. 10, 11)..........................................................1, 7, 17

*Kroll v. Bd. of Trs. of Univ. of Ill*., 934 F.2d 904 (7th Cir. 1991)..................................................38

*Maysonet-Robles v. Cabrero*, 323 F.3d 43 (1st Cir. 2003).............................................................38

*People ex rel. Owen v. Miami Nation Enters.*,
    211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016)...................................................10, 16

*Williams v. Big Picture Loans, LLC*,
    329 F. Supp. 3d 248 (E.D. Va. 2018), *rev'd*, 929 F.3d 170 (4th Cir. 2019)...............11, 16, 17

*Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019) .................................... *passim*

**Statutes**

28 U.S.C. § 1407.................................................................................................................7

28 U.S.C. § 1927.................................................................................................................2

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)...........................................................................2

Defendants, Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension") (collectively, the "Tribal Defendants"), specially appearing, submit their statement of position regarding Plaintiffs' claims of "material misrepresentations" supposedly made in support of the Tribal Defendants' Motion to Dismiss for Lack of Jurisdiction in *Williams*[1] and here.[2]

## **Introduction**

The Tribal Defendants have no other way to say their position than this: the Plaintiffs' "misrepresentations" brief (Dkt. No. 249) is desperate and wrong.

Following the May 7, 2019 oral argument before the Fourth Circuit in *Williams*[3] – and correctly anticipating a ruling in favor of the Tribal Defendants given the cold-shoulder their arguments received at oral argument – Plaintiffs came running to this Court saying that they were being cheated out of victory based on the unfounded and scandalous allegation that the Tribal Defendants[4] and their counsel lied to this Court *and* the Fourth Circuit. Plaintiffs seek to delegitimatize the binding authority of the Fourth Circuit's decision to keep their claims against the Tribal Defendants alive here and in other cases. Worse yet, Plaintiffs engage in the very misconduct of which they wrongfully accuse the Trial Defendants: making misrepresentations to the Court.

---

[1] *Williams v. Big Picture Loans, LLC,* 3:17-cv-00461-REP (Dkt. 22, 23).
[2] *Galloway v. Big Picture Loans, LLC*, 3:18-cv-00406-REP (Dkt. 10, 11).
[3] *Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019).
[4] "The Lac Vieux Desert Band of the Lake Superior Chippewa Indians ("the Tribe") formed two business entities under tribal law," Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension")." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 174 (4th Cir. 2019). Big Picture and Ascension are immune arms of the Tribe. *Id*. at 185.

Plaintiffs' motion lacks the "objective"[5] evidence of the misrepresentations they promise, and their allegations are spurious and sanctionable. The Tribal Defendants and their counsel did not lie or mispresent the facts. Rather, the so-called "misrepresentations" are nothing but Plaintiffs' mischaracterizations of stale evidence and repackaged arguments already made and rejected in *Williams*. And, the evidentiary hearing scheduled for October 28, 2019 will be nothing more than a shameful sideshow during which Plaintiffs will try to degrade the Tribe in the guise of claiming that the Fourth Circuit got it wrong. These same types of baseless and bigoted accusations have been borne by Indian tribes for hundreds of years and have oppressed Indian peoples and stifled the growth of Indian communities.

Plaintiffs' insistence on prosecuting claims against the Tribal Defendants in the face of the decisive Fourth Circuit opinion neatly fits into the definition of vexatiously multiplying litigation that is illegal under 28 U.S.C. § 1927. This Court should not countenance this conduct. It should cancel the hearing, apply the binding precedent of *Williams* (as it is duty-bound to do), and dismiss the Tribal Defendants forthwith.

## **Summary of Factual Rebuttals**

While much will be said about the Plaintiffs' dilatory tactics, the legal irrelevance of the Plaintiffs' arguments under *Williams*, and the fact that Plaintiffs' misrepresentation claims are old wine in new bottles (arguments made and lost in *Williams*), let there be no mistake: the Tribal Defendants and their counsel unequivocally deny that *any* of the misrepresentation claims have even a scintilla of merit. In trying to argue the Tribal Defendants made misrepresentations, Plaintiffs themselves misrepresent the truth.

---

[5] The term "objective" means: "Of, relating to, or based on externally verifiable phenomena, as opposed to an individual's perceptions, feelings, or intentions;" and "Without bias or prejudice; disinterested; Existing outside the mind as something real, not only as an idea." See Black's Law Dictionary (11th ed. 2019) (edited).

**JA539**

In Section II below, each and every claimed "misrepresentation" is debunked with actual objective facts found in the attached voluminous record. Attached as Exhibit D-1 to this brief is an index, showing where in this brief the Tribal Defendants are responding to each and every argument advance by Plaintiffs. The lack of merit of Plaintiffs' factual allegations, while debunked in detail below, is illustrated here as follows:

1.      "Genesis" of the Tribal lending business.  Plaintiffs charge the Tribal Defendants "misrepresented the genesis of the" Tribal lending business because, Plaintiffs say, the idea was Martorello's, not the Tribe's. Dkt. No. 249 at pp. 1, 9. In essence, Plaintiffs claim the Tribe had no "purpose" for the lending business under the *Breakthrough*[6] factors adopted by *Williams*; instead, Martorello's purpose is the only one that existed.

The Fourth Circuit in *Williams* rejected Plaintiffs' claim that Martorello's purpose even matters, rendering this portion of Plaintiffs motion irrelevant. Moreover, this charge is false. Before the Tribe first met Martorello, the Tribal Council had declared its purpose to enter into the lending business to further the economic development of the Tribe and enacted a lending law ordinance. *See* Ex. D-2 at ROSETTE_REVISED_048833. Indeed, before any deal was struck with Martorello, the Tribe was already "ready to go live today." *See* Ex. D-3 at ROSETTE_REVISED_052365. And how do we know these things? Among other sources of proof, contemporaneous written statements showing these existing preparations were made by Scott Merritt, who, according to Plaintiffs, "would have absolutely no reason to lie about the introduction" of Martorello to the Tribe. Dkt. No. 249 at p. 9. Even when Martorello entered the picture, initial conversations were as much about the Tribe educating Martorello about tribal

---

[6] *Breakthrough Mgmt. Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010).

3

lending as they were Martorello educating the Tribe about how to execute a web-based lending business.  *See* Ex. D-2 at ROSETTE_REVISED_048833.

    2.    <u>Tribal purpose for Ascension and Big Picture</u>.    Plaintiffs charge the Tribal Defendants "misrepresented the reasons for" the creation of Big Picture and Ascension.  According to Plaintiffs, the Tribal Defendants must have been created to somehow protect Martorello from personal liability as a result of the *Otoe* litigation, not to create much-needed revenue for the Tribe. <u>This accusation is also false.</u>

    The record is devoid of any evidence supporting Plaintiffs' assertion.  Rather, the record is replete with evidence proving the Tribe had a long-standing goal of owning the marketing and loan origination services housed in Bellicose/SourcePoint.  For example, one of the emails Plaintiffs primarily rely upon to show Martorello's alleged intent to protect himself from legal risk arising from the *Otto* litigation result also documents that the discussions for the acquisition dated back to 2012 – well before the *Otoe* litigation decision.  See Ex. D-4 at ROSETTE_REVISED_052248. As the Fourth Circuit summarized the evidence: "the Tribe here did not create Big Picture and Ascension solely, or even primarily to protect and enrich a non-tribe member." *Williams*, 929 F.3d at 179.   The Fourth Circuit concluded in *Williams* that, while the Tribe "created Big Picture and Ascension *in part* to reduce exposure to liability," this fact "does not invalidate or even undercut the Tribe's stated purpose, i.e., tribal economic development.  Indeed, in order to reach its stated goal, the Tribe may have deemed it necessary to reduce its exposure to liability." *Id.* (emphasis added).  "Rather, the Tribe created Big Picture and Ascension so that its lending operations could continue, along with the economic benefits associated with the continuation. *Id.*  In sum, the Tribe's stated purpose of economic development and self-determination is true and is not undercut

even if an element of the Tribe's purpose was to extend Tribal immunity to the servicing function owned by Ascension, a company owned by the Tribe.

       3.    <u>Tribal control over Ascension and Big Picture</u>.  Plaintiffs charge the Tribal Defendants "misrepresented Martorello's authority and ability to control operations" of the Tribal Defendants after their creation in 2015 because, they say, the lending operation was set up originally in 2011 to give Martorello all meaningful control, which carried forward after the creation of Big Picture and Ascension. <u>This charge is also wrong</u>.

       Again, *Williams* forecloses Plaintiffs' claim the Tribal Defendants lacked a basis for their position that they control Big Picture and Ascension. As the Fourth Circuit described the evidence, the organizational documents for Big Picture and Ascension – particularly, the Intratribal Servicing Agreement – show even if Ascension's management by Brian McFadden on balance "slightly" weighed against Tribal control, Big Picture was clearly under Tribal control, had a meaningful role in the business, and was independent from Ascension. *Id.* at 183. Indeed, the Fourth Circuit found these undisputed documents are significant "evidence of the Tribe's broad power, through Hazen and Williams, over Big Picture's important business decisions." *Id.* The Fourth Circuit fully considered Plaintiffs' argument Big Picture's decision to outsource management decisions to Ascension, and the Ascension's manager's delegation of responsibility to Brian McFadden, meant that the Tribe lacked control of Big Picture. In rejecting this argument, the Fourth Circuit noted: "to outsource management in and of itself does not weigh against immunity." *Id.* at 182-83. Incredibly, Plaintiffs cite as "new" evidence of misrepresentations a *2017* deposition of Michelle Hazen where she was unable to recall granular information about details of the business to show lack of control – an argument specifically made to the Fourth Circuit and rejected by the Fourth Circuit. Compare Dkt. No. 249 at p. 7 & fns. 9, 10 ("Hazen could not recall even the most basic

information") *with* Sealed Brief of Appellees pp. 19, 20, 47 (Hazen "lack[ed] basic knowledge")
and *Williams* at 183 ("even assuming Hazen . . . lack[ed] knowledge . . . [this] would not in itself
weigh against immunity, given the other evidence of Tribal control").  True, Plaintiffs now cite
deposition testimony from a former co-manager of Red Rock, Craig Mansfield, taken in January
2019 (still months before the Fourth Circuit argument and decision) who was only involved with
Red Rock and Duck Creek and not Big Picture or Ascension.  Even as to the Red Rock and Duck
Creek, the evidence is wholly cumulative of the 2017 Hazen deposition and prior arguments, and
represents nothing "new" despite Plaintiffs' histrionic rhetoric.  In sum, the Plaintiffs made the
same arguments to the Fourth Circuit that they advance in the misrepresentation brief based on the
same factual points, the Fourth Circuit acknowledged the power of the Tribal Defendants'
evidence and rejected the Plaintiffs' arguments, yet Plaintiffs claim the Tribal Defendants are
"misrepresenting" the facts by sticking to positions and evidence that the Fourth Circuit accepted!

What is more, Plaintiffs' arguments that they now have "new" evidence are based on a
deceptive sleight of hand.  Repeatedly, and without acknowledging what they are doing, Plaintiffs
use documents discussing the operation of *Bellicose/SourcePoint* as evidence that the Tribe did
not control *Red Rock, Big Picture or Ascension.*  This twisting of the record will be further revealed
below, but one of the emails relied on by Plaintiffs contains a quote, not mentioned by Plaintiffs,
that aptly sums up the actual planned relationship between the Tribe and Bellicose: "THE TRIBE
ESTABLISHES THE LENDING CRITERIA" and "BELLICOSE IS JUST CARRYING OUT
THE TRIBE'S DIRECTION."  Dkt. No. 249-4 at ROSETTE_REVISED_052497.

<u>Argument</u>

## I. Plaintiffs' "misrepresentations" claims are a stale and irrelevant sideshow.

The Tribal Defendants object to, and have been prejudiced by, Plaintiffs'
"misrepresentation" gambit.  Plaintiffs' ruse has convinced this Court, thus far, to divert what

should have been a straightforward application of *Williams* into a complicated and expensive process leading up to an evidentiary hearing. Meanwhile, other plaintiffs in parallel proceedings have been parroting loudly, and at every opportunity, these "misrepresentations," as well as this Court's allowance of an evidentiary hearing, to try and both undercut the credibility of the Tribal Defendants' positions and the efficacy of *Williams*. For example, in seeking consolidation of various cases into multi-district litigation, Plaintiffs' reply brief, to which the Tribal Defendants had no right of sur-reply, mentioned the alleged "misrepresentations" and the evidentiary hearing no less than 11 times. Another example is in *Cummings*, where the plaintiffs directly attacked the precedential effect of *Williams* by repeatedly claiming it was based on "misrepresentations." [7]

While Plaintiffs energetically launch unsupported collateral attacks on *Williams*, what Plaintiffs did *not* do is more telling: they never advised the Fourth Circuit before or at the oral argument of their position, or petition for a panel rehearing or a rehearing *en banc* with the Fourth Circuit. As explained below, Plaintiffs had the "new" evidence, such as it is, well before oral argument in *Williams*. If Plaintiffs' counsel were genuinely troubled that the Tribal Defendants presented "misrepresentations" of the facts to the Fourth Circuit, surely they would have bestirred themselves to point out the problem to the Fourth Circuit before or after the oral argument. The complete lack of action prior to seeing the looming Fourth Circuit defeat speaks loudly here,

---

[7] *See In re: Big Picture Loans, LLC Litigation,* No. 2906, Reply Brief in Support of Plaintiffs' Motion for Transfer and Consolidation Pursuant to 28 U.S.C. § 1407, ECF No. 29 at p. 3 (Jud. Panel Multi Dist. Lit. July 29, 2019) ("Judge Payne ordered this hearing [in *Galloway*] because Plaintiffs brought to the Court's attention serious material misrepresentations made by Defendants in support of their motions to dismiss for lack of subject matter jurisdiction. . . . The new evidence that continues to be unearthed in the *Williams* and *Galloway I* matters impacts all the related cases."); *Cumming v. Big Picture Loans, LLC, et al.,* No. 5:18-cv-3476, Opp. to Big Picture Loan, LLC's Motion to Dismiss for Lack of Jurisdiction, ECF No. 151 at pp. 5-6 (N.D. Cal. July 26, 2019) ("Indeed, since the district court's initial decision, evidence has come to light regarding Defendants' spoliation of evidence, the involvement of counsel engaged "to achieve their criminal ends," some of whom received a cut of the Tribe's meager profits, and significant material misrepresentations made by Defendants to the district court in Williams regarding the origin, purpose, and structure of Big Picture, which they similarly make here. . . . None of this was before the Fourth Circuit, and Plaintiffs respectfully submit that if the Fourth Circuit were presented with the evidentiary record available today, it would not have reached the same conclusion.").

representing a high-decibel admission that the "misrepresentations" gambit is legal gamesmanship, not an effort to seek redress for a meritorious argument, which it is not.

In *Williams,* the Fourth Circuit clearly and concisely rejected Plaintiffs' view of the law and the application of the law to the facts, both of which sought to equate Martorello and Bellicose with the Tribe and the Tribal Defendants, a view that twisted the assessment of the evidence and set the stage for reversal. Plaintiffs now seek to lead the Court away from the clear path laid down by the Fourth Circuit in *Williams,* and down the same path the Fourth Circuit rejected, somehow hoping for a different result this time around. The Tribal Defendants object. [8]

A. **Plaintiffs' "misrepresentations" arguments were made and rejected in *Williams*; *Williams* establishes the Tribal Defendants had sufficient factual bases for their positions.**

As a threshold matter, Plaintiffs' list of alleged "misrepresentations" is nothing more than an attempt at a second bite at the apple. Plaintiffs' factual allegations were previously made in *Williams* but did not prevent the Fourth Circuit from ruling the Tribal Defendants are immune. The chart below illustrates key arguments Plaintiffs claim are new are actually not new, and in reality, were made in their brief to the Fourth Circuit:

| Plaintiffs alleged "new" evidence that shows "misrepresentations" | Plaintiffs previously argued the same points in *Williams* | The Fourth Circuit ruled against Plaintiffs after consideration of the same arguments |
|---|---|---|
| "Defendants misrepresented the genesis of the tribal lending arrangement. . ." Dkt. No. 249 at 1.

"Martorello's response further demonstrates that the genesis of | "That operation was the brainchild of Matt Martorello, a non-tribe member who struck a deal with the La Vieux Band of Chippewa Indians to serve as the front for his online | The Fourth Circuit concluded the law under which the Tribal Defendants were formed is the most important evidence when evaluating the method of creation. In reaching its conclusion, the Fourth Circuit |

---

[8] Indeed, immunity doctrines are meant to give sovereigns "a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery." *In re Facebook Inc*., 42 F. Supp. 3d 556, 558 (S.D.N.Y. 2014) (*quoting Behrens v. Pelletier,* 516 U.S. 299, 308 (1996)); *see also Bowen v. Doyle,* 880 F. Supp. 99, 134 (W.D.N.Y. 1995) ("A claim of sovereign immunity is forever lost by subjecting [the party] to the very process from which he asserts he is immune.").

JA545

| Plaintiffs alleged "new" evidence that shows "misrepresentations" | Plaintiffs previously argued the same points in *Williams* | The Fourth Circuit ruled against Plaintiffs after consideration of the same arguments |
|---|---|---|
| the tribal lending arrangement was a front." *Id.* at 7. | lending operation." *Williams v. Big Picture Loans, LLC*, No. 18-1827, Sealed Brief of Appellees, at *1. | only cited to the resolutions of the Tribal Council and not to Plaintiffs' arguments relating to Martorello's involvement. *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 177-78 (4th Cir. 2019). |
| "Similarly, despite all the evidence to the contrary below, the Corporate Defendants submitted a declaration from Martorello, which asserts that 'the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies.' Ex. 2 ¶ 69 (emphasis added). This is false—there is an abundance of evidence that the sale was motivated by the litigation." *Id.* at 13. | "Recall that the entities were created just as pressure was mounting against similar schemes around the country…If the feds cracked down on the operation, Martorello worried, 'the stakes are very literally *everything*." *Id.* at 40. | "The fact that the Tribe created Big Picture and Ascension in part to reduce exposure to liability does not necessarily invalidate or even undercut the Tribe's stated purpose, *i.e.*, tribal economic development. Indeed, in order to reach its stated goal, the Tribe may have deemed it necessary to reduce its exposure to liability." *Id.* at 179. |
| ***Martorello makes overture to the Chairman in 2014*** . . . On August 11, 2014, Martorello sent an email to Chairman Williams—not vice versa—'we're working on something' that 'will have some walking points to go over about the concept for a potential bigger deal for LVD learning the Servicing business.' Ex. 40 at 00020786." *Id.* at 18-19. | "***Martorello restructures the lending enterprise***. . . Before getting to work, he emailed the head of the tribal council, Jim Williams, that he was 'working' on a 'potential bigger deal' for the tribe. JA808." *Id.* at 12 (emphasis in original). | Once again, the Fourth Circuit considered Plaintiffs' arguments relating to Martorello's relationship with Chairman Williams, but held that the resolutions of the Tribal Council were the most important documents relating to the method of creation. *Id.* at 177-78. |
| "Rosette & Martorello initially structured the tribal lending arrangement with an express understanding that the co-managers would not be involved." *Id.* at 3 (emphasis removed). | "[T]he tribe does not exercise meaningful control over Ascension. True, Williams and Hazen are technically co-managers of the entity. But in practice, they have delegated nearly all of their authority to | "Indeed, even assuming Hazen and Williams lack knowledge as to certain aspects of the operation and did outsource aspects of day-to-day management to a non-tribal entity, such an arrangement would not in itself weigh |

9

**JA546**

| Plaintiffs alleged "new" evidence that shows "misrepresentations" | Plaintiffs previously argued the same points in *Williams* | The Fourth Circuit ruled against Plaintiffs after consideration of the same arguments |
|---|---|---|
| "After regulators caught onto the scheme, the enterprise attempted to enhance the 'optics,' but not the substantive involvement of the co-managers, who were specifically prohibited from learning key information about the business." *Id.* at 6 (emphasis removed). | McFadden, Ascension's president." *Id.* at 47. | against immunity, given the other evidence of Tribal control. *See Miami Nation,* 336 P.3d at 373." *Id.* at 183. |

As this chart shows, the October 28 hearing will be nothing more than a rehashing of arguments previously made to the Fourth Circuit, which the Fourth Circuit already rejected in holding Tribal Defendants were entitled to tribal sovereign immunity.

> **B.    The *Williams* opinion shows that much of the purported new "misrepresentations" evidence is irrelevant.**

In *Williams*, the Fourth Circuit both adopted the five *Breakthrough* factors as stating the basic test for arm-of-the-tribe immunity and addressed how specific items of evidence did or did not bear upon the factors. The Fourth Circuit's decision represents a clear repudiation of Plaintiffs' fundamental approach to the *Breakthrough* analysis, which was not only to misconstrue the "purpose" factor, but to distort other *Breakthrough* factors by evaluating them in light of that misconstrued purpose. The ruling makes clear it is the purpose of the *Tribe* that governs– *not* Martorello or any other third party. *Williams* gutted Plaintiffs' legal argument, and in the process rendered the majority of the "misrepresentations" claimed by Plaintiffs as irrelevant to the arm-of-the-tribe analysis.[9]

---

[9] This Court erroneously found Martorello's purpose infected several of the *Breakthrough* factors. *See, e.g.*, *Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 273-74, 280, 282 (E.D. Va. 2018), *rev'd*, 929 F.3d 170 (4th Cir. 2019).

1.      *Williams* **decided what evidence is relevant to determine the "purpose" factor.**

The purpose factor under *Breakthrough* includes "both the stated purpose for which the Entities were created as well as evidence related to that purpose." *Williams*, 929 F.3d at 178-182. In deciding this factor in favor of immunity, the Fourth Circuit looked to the:

- *The Tribe's* stated purpose for Big Picture and Ascension, and whether the stated purpose relates to the broader goal of tribal self-governance, as shown by the undisputed Articles of Incorporation;

- Evidence the Tribe created Big Picture and Ascension for "continuation of the Tribe's lending operations" despite adverse legal ruling in Second Circuit and CFPB enforcement against Western Sky, as shown by email correspondence between Martorello and the Tribe; and

- A showing that revenue was a "significant percentage" of the Tribe's general fund, as evidence of use of fund for specific purpose.

In the process, the Fourth Circuit considered and discounted the Plaintiffs' evidence:

- *Martorello's purpose* to have "continuation of the Tribe's lending operations" despite adverse legal ruling in Second Circuit and CFPB enforcement against Western Sky was considered and found irrelevant, as it was the *Tribe's purpose* that is at issue;

- Failure to attribute use of funds for specific Tribal projects, as such detail is not required;

- Revenue from lending operation going to non-Tribal persons is also irrelevant, so long as a "significant" amount is received by the Tribe;

- Lack of employment at Ascension, finding that employment opportunities for Tribal members can support the purpose, but is not required, and hence the lack of employment of Tribal members does not cut against immunity; and

- Pay disparities between tribal and non-tribal employees was considered and found not persuasive.

In sum, the "purpose" factor under *Williams* requires identification of the *Tribe's* stated purpose(s) of the entities and whether the purpose(s) as stated by the *Tribe* are furthered by the

11

JA548

entity.  And the degree of fulfillment of the Tribe's purpose is not the issue so long as the purpose is "significantly" met.

Perhaps most importantly for the "misrepresentation" arguments, the Fourth Circuit rejected a view that the supposed purpose of Martorello matters, which was Plaintiffs' principal argument with respect to *Breakthrough*.  Instead, the Fourth Circuit focused on the "purpose" from the Tribe's perspective.  With that firmly in mind, the Fourth Circuit held the evidence showed that "the Tribe here did not create Big Picture and Ascension solely, or even primarily to protect and enrich a non-tribe member."  *Id.* at 179.

### 2.    Plaintiffs point to evidence made irrelevant by *Williams*.

Plaintiffs' now-debunked efforts to attribute Martorello's alleged purposes to the Tribe lives on in zombie-like fashion in the "misrepresentation" brief despite the mortal blow this tactic took in *Williams*.

Plaintiffs make no better use of the record as to Martorello than they did with the Tribe. Plaintiffs' primary tactic is to twist and distort emails written by Martorello.  But these attacks directed at Martorello are *legally irrelevant* to the Tribe.  Plaintiffs' documents in this regard include the following:

- Plaintiffs misuse statements from 2011 by Flint Richardson, a business associate of Rob Rosette, that the managers of the Tribal lending LLC "AREN'T INVOLVED IN THE BUSINESS" and "BELLICOSE OPERATES THE BUSINESS COMPLETELY."  Dkt. No. 249 at p. 3; Dkt. No. 249-3. (Plaintiffs' mischaracterize the email, which was discussing the business of *Bellicose* as applying to *Red Rock* – at the advent of the relationship between the two, providing a graphic example of the deceptive briefing tactics Plaintiffs use here.)  Even if these statements actually reflected the operation of Red Rock or the lending business as a whole – which they do not – these statements would be irrelevant to proving the *Tribe's* intent.

- In an August 2014 email, Martorello described decisions made in structuring the roles of Red Rock and Bellicose in 2011.  He states that key vendor contracts in other businesses would be handled by the servicer entity – i.e., Bellicose – rather than with the lender – i.e., Red Rock – because "the risk of working with tribal clients was more and more dangerous and optics became very important."  Dkt. No. 249 at p. 6;

Dkt. No. 249-8. (Again, these are statements about Bellicose and Red Rock, *not* Big Picture and Ascension.) It is clear from context, however, that the "optics" was for vendors not regulators. Even if these statements were germane to Bellicose and Red Rock, however, they would be irrelevant as the statement of intent by Martorello, not the Tribe.

- Plaintiffs rely on a December 2012 email where Martorello corresponds with his business advisors about valuation issues. In it, he ruminated about potential future legal risks to the Tribal lending model and speculated that these risks could wipe out the business in "2 to 3 years." Dkt. No. 249 at p. 12; Dkt. No. 249-2. Plaintiffs say this shows that when Martorello sold Bellicose to the Tribe in 2015—*three years later*—that he viewed Bellicose as worthless. But, these are statements by Martorello, not the Tribe. Moreover, when read in full and as part of Martorello's several discussions regarding valuation, the communication shows that Martorello sought a method to value a business he knew was lawful but faced potential legal challenges nonetheless. No evidence shows Martorello believed or even considered his business to be unlawful.[10] No evidence shows that the Tribe ever believed its business to be unlawful. These are statements by Martorello, not the Tribe.

- Plaintiffs also cite an August 2013 email, where Martorello is quoted as being cautious about litigation because, in his view, the business was not "completely in order yet." Dkt. No. 249 at p. 14; Dkt. No. 250-24. Plaintiffs imply this is an admission that Red Rock's claim of immunity was weak "because of [Martorello's] dominance over operations" and "they were not originating loans on the LVD's reservation." Dkt. No. 249 at p. 14; Dkt. No. 250-25. However, with a full reading, Martorello describes in the email why he thinks the business was not "completely in order," and it has nothing to do with his dominance or the lack of origination on the reservation. Rather, his reason stated is that the business is "too young, too small, too poor and not enough depth in the bench with ACH/Bank." He observes that there is not a budget for the litigation. And yet again, even if the document said what Plaintiffs say it does, it would be irrelevant to prove the Tribe's purposes for the enterprise under the Fourth Circuit's analysis in *Williams*.

- Plaintiffs spend six and half pages of their 30-page misrepresentation brief quoting a number of Martorello emails where he expressed his interest in pursuing a sale of Bellicose to the Tribe at a time when he was concerned about various potential regulatory threats. Dkt. No. 249 at p. 15-21. Plaintiffs claim Martorello's statements show that the Tribe's reasons to purchase Bellicose are misrepresentations and the Tribe's only reason was to protect Martorello from litigation or enforcement actions. Dkt. No. 249 at p. 21. As clearly found by the Fourth Circuit, however, Martorello's statements of his intent are simply irrelevant to the Tribe's purposes in engaging in

---

[10] At the May 22 hearing, Plaintiffs counsel misled the Court by selectively reading from an email in which Martorello wondered, about how to value various sorts of illegal operations, thereby suggesting to the Court that Martorello was confessing that his business was also illegal. What counsel omitted, however, was the conclusion of that email, where Martorello states in no uncertain terms that his business is perfectly lawful. Dkt. No. 233-1 at 15 ("[T]hey are still comfortable that I am not doing anything wrong/illegal.").

**JA550**

the acquisition of Bellicose. And, the Fourth Circuit did not allow Martorello's ideas to eclipse the Tribe's purposes. It is common sense that when parties A and B negotiate a deal, Party A may have different motivations than Party B. So to understand the intent of Party B, any reasonable person would look to the motivations of Party B, not Party A. The Fourth Circuit clearly understood the distinction. Plaintiffs' theory here leads to reversible error.

Plaintiffs similarly use statements made by *Martorello* as attempted admissions made by

*the Tribe* on "control" facts and financial relationships associated with the business:

- Plaintiffs use a statement by Martorello in a January 2016 email written shortly after the 2015 acquisition by the Tribe of Bellicose. Dkt. No. 249 at 3; Dkt. No. 249-4. Said Martorello: "[a]s far as I know, the Manager's don't really do anything." Plaintiffs claim that this shows that the Tribe did not control the lending business. Again, Plaintiffs use a nasty piece of deceptive brief writing to suggest that Martorello was talking about Big Picture when, in fact, he was discussing Bellicose / SourcePoint. But again, even if Martorello's statements applied to Big Picture or the lending business as a whole – which they do not – these statements are not admissions by the Tribal Defendants and hence are irrelevant to proving a fact against the *Tribe*. (And, Big Picture's CEO runs the day-to-day operations of Big Picture, Big Picture and Ascension work together on business issues on a daily basis, so the 2016 statement is not indicative of the true operation of the business in any event.)

- Plaintiffs challenge the fact that the Tribe has earned millions from Big Picture and Ascension – validating the business justifications for the acquisition of Bellicose – by asserting that Bellicose "had little, *if any*, value at the time of the merger and closing." Dkt. No. 249 at p. 25. As support for this demonstrably false proposition shown by the earnings of the business, Plaintiffs yet again resort not to statements or valuations by the Tribe, but rather to emails written by Martorello. *Id*. at p. 25, Dkt. No. 252-62, 252-63. And Plaintiffs ignore other evidence that shows Martorello and his agents used several different accounting principles to value the business several different ways, with values ranging to upwards of $100 million. Again, statements by Martorello as to his valuation are not admissions by the Tribe, are not admissible against the Tribe, and are irrelevant. There is no evidence to show that the Tribe was even aware of Martorello's efforts to determine the value of his businesses. As the Fourth Circuit noted, "the evidence indicates that the Tribe's general fund has in fact benefited significantly from the revenue generated by an entity." *Williams*, 929 F.3d at 181.

In conclusion, Plaintiffs claim that the Tribal Defendants committed "misrepresentations" by truthfully and accurately arguing to the Fourth Circuit the *Tribe's* purpose in creating Big Picture and Ascension – which was to further the Tribe's economic independence by gaining ownership and control over the entire lending operation. Moreover, the Tribe supplied ample

14

**JA551**

evidence of its intent, as argued below in Section II(A)(1). Plaintiffs believe that Big Picture and Ascension should have argued Martorello's purpose, instead, but that is simply wrong.

In *Williams*, Plaintiffs asked this Court and the Fourth Circuit to discount the Tribe's evidence and to accept as determinative their view of Martorello's purposes. The Fourth Circuit rejected this approach, focusing clearly on the Tribe's purposes. *Williams*, 929 F.3d at 181-82. Plaintiffs not only persist here, they double down asking this Court to ignore the Fourth Circuit's holdings in *Williams*. The Tribal Defendants object.

### C. Under *Williams*, the "method of creation" and "intent to share immunity" factors hinge on the Tribe's statements contained in formation documents.

Of the five *Breakthrough* factors used by the Fourth Circuit, the first factor (method of creation) and the fourth factor (intent to share immunity) are similar because (i) this Court looked beyond the Tribe's governmental documents to evaluate the factor, and (ii) despite arguments made by the *Williams* plaintiffs, the Fourth Circuit declined to follow suit, but focused solely on the documents by which the Tribal Defendants were created. For purposes of the "misrepresentation" brief, this means that nothing Plaintiffs may say can be relevant to these two factors, unless they can show that the Tribal Defendants fabricated the formation documents on which they rely. Plaintiffs make no such claim and provide no such evidence.

**Method of Creation**: Heading into the Fourth Circuit, the *Williams* plaintiffs had the benefit of a decision that used not just *Breakthrough,* but also *Miami Nation*[11] to evaluate the first factor: "method of creation." Using that expanded approach, this Court considered not just the law under which the Tribal Defendants were created, but also "'[t]he *circumstances* under which the entity's formation occurred, including whether the tribe initiated or simply absorbed an operational commercial enterprise'...." *Williams*, 329 F. Supp. 3d at 273 (emphasis added). Thus,

---

[11] *People ex rel. Owen v. Miami Nation Enters.*, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016).

while this Court found the first factor favored immunity, it also found there were "circumstances [that] limit the extent to which this factor weighs in favor of sovereign immunity." *Id.* at 273.

On appeal, the *Williams* plaintiffs urged the Fourth Circuit to follow this Court and consider circumstances surrounding the Tribal Defendants' creation, as suggested by *Miami Nation*.[12] The Fourth Circuit chose not to do so. Never mentioning *Miami Nation* or any "circumstances," the Fourth Circuit considered only "the law under which the entities were formed." Thus, the Court said it is "undisputed that Big Picture and Ascension were 'created under tribal law,'" and it held that "this factor weighs in favor of tribal sovereign immunity for both Entities." *Williams*, 929 F.3d at 177-178 (quoting and citing *Breakthrough*, 629 F.3d at 1191). Moreover, nothing in the Fourth Circuit's opinion suggests that the weight to be placed on this factor is in any way limited for the Tribal Defendants.

Nowhere do Plaintiffs deny that Big Picture and Ascension were created under tribal law. Thus, nothing they say in their "misrepresentation brief" has any relevance whatsoever to the first *Breakthrough* factor. This Court should follow the Fourth Circuit decision in *Williams* and recognize that the method of creation weighs fully in favor of immunity for the Tribal Defendants.

**Intent to Share Immunity**: Similarly, when this case reached the Fourth Circuit, the *Williams* plaintiffs had the benefit of a decision that was highly favorable on the fourth factor: the Tribe's intent to share immunity. As this Court correctly recognized, "Big Picture's and Ascension's formation documents show that the Tribe *intended* for both entities to share its immunity." *Williams*, 329 F. Supp. 3d at 280 (emphasis added). Even so, the Court went the other way, ruling that "the intent factor weighs *against* a finding of immunity." *Id.* (emphasis added). This was because of what the Court viewed as the underlying purpose of the Tribal Defendants,

---

[12] *See* Fourth Circuit, Case No. 18-1827, Response Brief, ECF 33, pp. 46, 47.

which the Court said was "shield[ing] Martorello and Bellicose from liability." *Id.*

On appeal, the *Williams* Plaintiffs again urged the Fourth Circuit to follow the same analysis used by this Court,[13] but the Fourth Circuit rejected the argument in no uncertain terms:

> The district court… concluded that this factor weighed against a finding of immunity "because to do otherwise is to ignore the driving force for the Tribe's intent to share its immunity." J.A. 222. This conclusion was in error, because the district court improperly conflated the purpose and intent factors. This factor focuses *solely* on whether the *Tribe* intended to provide its immunity to the Entities. As Plaintiffs conceded, it did. This factor thus weighs in favor of immunity for both Entities.

*Williams*, 329 F.3d at 184 (emphasis added).

As the Fourth Circuit also noted: "The Tribe unequivocally stated its intention to share its immunity in Big Picture and Ascension's formation documents." *Id.* Nowhere do the *Galloway* Plaintiffs suggest those formation documents say something different from what the Fourth Circuit read in them. Thus, nothing the *Galloway* Plaintiffs say in their "misrepresentation brief" has any relevance whatsoever to the fourth *Breakthrough* factor. This Court should follow the Fourth Circuit decision in *Williams* and recognize that this factor – the Tribe's intent to share immunity – weighs fully in favor of immunity for the Tribal Defendants.

> **D.** **Plaintiffs had the purported new "misrepresentation" evidence well before the *Williams* argument and opinion, but the misrepresentation claims were not advanced until Plaintiffs needed an argument to try to explain away *Williams*.**

Plaintiffs cite 74 exhibits as evidence of the "objective" truth that proves the purported misrepresentations. The theme is that Plaintiffs did not have this evidence before the *Williams* appeal, and the result would have been different had they had access to the evidence – i.e., Big Picture and Ascension would have not been found to be arms of the Tribe and immune from their suit. To the contrary, the truth is the Plaintiffs had much of the "new" evidence in time to seek

---

[13] *See* Fourth Circuit, Case No. 18-1827, Response Brief, ECF 33, p. 57 of 65.

relief in *Williams* but did nothing. Plaintiffs' delay belies any claims that their "misrepresentations" gambit is legitimate complaint, but rather exposes it is as a desperate attempt to avoid another defeat of claims against the Tribal Defendants and to continue their mission to destroy the very core and purpose of sovereignty and sovereign immunity.

Here are four outstanding examples of evidence that Plaintiffs argued to this Court was "new," but in fact was something they long knew about:

1.   <u>Brokerage fee</u>.   Plaintiffs argue that Michelle Hazen "lied about Red Rock's revenue share under oath" (Dkt. No. 249 at page 10) when in October 2017 she described Red Rock's share of revenue as "2 percent of the gross," but allegedly failed to disclose that Red Rock then owed someone else half of that 2 percent as a brokerage commission. *Id*. at p. 10, fn. 10. Along the same line, Plaintiffs also claim that Martorello misrepresented Red Rock's income by describing it in a declaration as two percent, while similarly omitting Red Rock's brokerage fee. *Id*. at p. 11. Plaintiffs say describing the income as "2 percent" is untrue because of (a) the failure to disclose a one-percent brokerage fee owed to Tribal Loan Management, and (b) that Red Rock had agreed that 50 percent of its profit would be used to pay the fee. Plaintiffs claim that the one-percent fee "had never been disclosed in any other form . . .  until it was revealed during the deposition of Scott Merritt," which occurred on March 21, 2019. Dkt. No. 250-19.

Plaintiffs' accusation is itself a gross misrepresentation.  A 2011 Servicing Agreement between Red Rock and Bellicose, produced on February 6, 2019, expressly disclosed the one-percent fee in Sections 6.4.1 and 7.15 therein. Ex. D-5 at p. 17, 21. Plaintiffs feign shock, but that is just as fabricated as their accusations. Plaintiffs knew about this brokerage fee, but they said nothing to the Fourth Circuit – before the oral argument, at oral argument, before the opinion was released, or thereafter.  And this is all aside from the fact that (i) whatever it may have been

**JA555**

obligated to pay from what it received, the Tribe did receive two-percent all along. Moreover, the brokerage fee, approved and paid by the Tribe to a third-party, is wholly irrelevant to the *Breakthrough* analysis of Big Picture and Ascension.

      2.    <u>Who-said-what-to-whom issue</u>.  Plaintiffs charge the Tribal Defendants misrepresented the facts when they said that the Tribe approached Matt Martorello, not vice versa. They are wrong. As support for their charge, Plaintiffs compare (i) Martorello's deposition, where he said that Scott Merritt approached him on behalf of the Tribe, with (ii) Merritt's deposition on March 21, 2019, where, according to Plaintiff's theory, he clearly contradicted Martorello's account of events. *See* Dkt. No. 249 at p. 9-10. However, this was well before the oral argument in the *Williams* appeal (May 7). Yet, Plaintiffs did nothing – until the *Williams* defeat loomed and they ran crying to this Court.

      3.    <u>Martorello emails regarding the value of Bellicose.</u>  Plaintiffs argue that, based on a handful of Martorello drafted emails, the sale to the Tribe was a sham that provided no value to the Tribe and was done only to protect Martorello. Not only is this an issue they have argued all along, but the particular emails they cite were produced long ago. Plaintiffs argument is dilatory.

      Given a starring role in Plaintiffs' story is Ex. 21, an email thread from December 2012 between Martorello and his advisors. Dkt. No. 249 at 12; Dkt. No. 250-21. In it, he ruminated about emerging legal risks to the Tribal lending model and speculated that these risks could wipe out the business in "2 to 3 years." *Id*. This email thread was produced April 27, 2019, before oral argument in *Williams* and two months before the *Williams* appellate decision was issued. Yet, Plaintiffs did nothing to raise it before this Court or the Fourth Circuit.

      Aside from their delay in raising this evidence, Plaintiffs spend two and a half pages of their "misrepresentation" brief further developing the theory that Bellicose was worthless, which

they say rendered false the statement of Tribal Defendants' counsel during oral argument to the Fourth Circuit in *Williams* that there is "no suggestion and certainly no evidence and no finding that the Tribe paid too much for" Bellicose.  Dkt. No. 249 at pp. 25-26.

Of course, appellate counsel is not required to scour the countryside looking for adverse facts outside the record to contradict favorable facts inside the record.  Moreover, if one side's counsel finds new evidence they think makes the opposing side's brief inaccurate, they should bring it to opposing counsel's attention before oral argument.  At least in the absence of such a development, it is the record that matters, and references to "the evidence" are obviously references to the evidence in the record.  In the record that was before the Fourth Circuit, there was *no evidence* that the Tribe paid too much, *no finding* by this Court that the Tribe paid too much, and *no argument* by Plaintiffs that the Tribe paid too much.  The argument before the Fourth Circuit was absolutely accurate.

Moreover, even if Martorello's melancholic speculations about the possibility of Bellicose's future loss of value had been part of the record, they would not show that Bellicose/SourcePoint had no value.  It had value to the Tribe because it was essential to the Tribe's lending business.   The Tribe acquired SourcePoint a little over three-and-a-half years ago and, during that time, the Tribe has reaped over $5 million above and beyond the note payments it has made to acquire the business. That proves value.  Moreover, in a little less than three-and-a-half years from now, the note obligations will end, and the income stream to the Tribe will increase many times over, adding more than $10 million per year.  Again, that proves value.

Plaintiffs, of course, had in hand the December 2012 email since April 27, 2019, but withheld it from the Fourth Circuit, presumably because it does not reveal the *Tribe's* evaluation of the value of Bellicose.  It gets worse.  To further their argument, Plaintiffs also cite Exhibit 63,

JA557

another Martorello email, dated December 2015, where he describes as a risk that "efforts would be attempted by [s]tate governments to shut down tribal lenders" and other regulatory actions that "will shut this business down." Dkt. No. 252-67. This email was produced on January 31, *2018* – more than a year before the *Williams* oral argument and opinion. It makes essentially the same point as the December 2012 email – yet the Plaintiffs did nothing. It is incredible that Plaintiffs now cite to this as "new" evidence in support of their allegations that the Tribal Defendants misrepresented facts to the Fourth Circuit.

       4.   <u>Manager's role/lack of control of Red Rock</u>. Perhaps some of the most egregious examples of Plaintiffs' argument are the two pages of the "misrepresentations" brief where Plaintiffs attempt to show that managers of Red Rock had minimal involvement. Plaintiffs argue that Hazen and Mansfield in particular had no substantive involvement in Red Rock, contradicting any claim by the Tribe that it controlled Red Rock. Dkt. No. 249 at pp. 7-9. What the Plaintiffs actually cite is a deposition taken by Hazen on October 17, 2017 and one of Mansfield on January18, 2019. Dkt. No. 250-12; Dkt. No. 250-13. According to the Plaintiffs, Hazen's deposition showed lack of control, and Mansfield's did as well. So, according to Plaintiffs' own story they knew of these "objective" facts showing lack of Tribal control of the Tribal Defendants since at least *October 2017*. Indeed, Plaintiffs cited to the 2017 Hazen deposition more than 20 time in their appellate brief in *Williams* – proving beyond any quibbling that Plaintiffs were fully aware of the deposition long ago. Yet Plaintiffs' did nothing until defeat was written on the wall at the oral argument in *Williams*. And Plaintiffs fail to show how incomplete recollection of two deponents, years after the events described in their testimony, can negate the contemporaneous documentary evidence showing current control of Big Picture and Ascension, much less that Tribal Defendants lack "objective" evidence of control given this documentary evidence.

II.    **The claims of "misrepresentations" fall flat when faced with the facts.**

As shown above, the Plaintiffs' arguments are irrelevant, recycled, and stale.  As shown below, they are also false.

A.    **Plaintiffs portray the Tribe as a pawn in Martorello's scheme; the truth is that the Tribe instigated the lending business for its own business purposes.**

As discussed above in Section I, the Fourth Circuit made clear in *Williams* that the relevant purpose for the *Breakthrough* analysis is that of the *Tribe – not* Martorello or any other third party. This aspect of *Williams* eviscerates Plaintiffs' main theory that the relevant purpose is that of Martorello.

While the relevance of Plaintiffs' "purpose" arguments has been consigned to the ash heap by *Williams*, the Plaintiffs' purpose arguments are also meritless factually.  Plaintiffs contend that the Tribe was passive, and that Martorello was the instigator, of the lending business.  Therefore, Plaintiffs seem to be arguing that the Tribe had no purpose, as Big Picture and Ascension were created to serve Martorello's purposes, not the Tribes' purposes.

Plaintiffs' gruesome recycling of stereotypes as to Native Americans – that they lack the ability to envision, much less engage, in sophisticated business transactions – is easily debunked. Entering into tribal lending was the *Tribe's* idea.

1.    **The Tribe had a plan to enter the lending business *before* Martorello's involvement.** [14]

Plaintiffs claim that the Tribal Defendants falsely represented that it went into the short-term lending business as part of its economic development plan, as "LVD did not develop anything."

---

[14] This section addresses the following alleged misrepresentations: "Defendants misrepresented the genesis of the tribal lending arrangement." Dkt. No. 249 at p. 2.

The Tribe had achieved important milestones in establishing a lending business before the Tribe even first met Martorello in August 2011. This was pursuant to a plan to diversify Tribal revenues in light of declining revenues from its casino business. Before meeting Martorello, the Tribe had passed a lending law ordinance, and established a lending regulatory commission. *See* Ex. D-2 at ROSETTE_REVISED_048833. By Tribal resolution dated July 8, 2011, the Tribal Council stated that:

- "The Tribe desires to diversify the economy of the Tribe's Reservation in order to improve the Tribe's economic self-sufficiency";

- "The Tribe, by this Resolution is legalizing lending over the internet …"; and

- "It is the intent and desire of the Tribe to hire various consultant, managers, and employees to assist the Tribe in operating its lending enterprises."

Ex. D-6 at p. 1. By the same resolution the Tribal Council adopted a Tribal Lending Regulatory Code. *Id.* Indeed, before any deal was struck with Martorello in the fall of 2011, the Tribe was already "ready to go live today." *See* Ex. D-3 at ROSETTE_REVISED_052365.

Confirming the Tribal initiative are the initial conversations between the Tribe and Martorello, which were as much about the Tribe educating Martorello about unique aspects of Tribal lending as Martorello educating the Tribe about how to execute a web-based lending business. *See* Ex. D-2 at ROSETTE_REVISED_048833. Plaintiffs' Exhibit 3, an August 2011 email thread between Martorello, Scott Merritt, and Robert Rosette further illustrates that Martorello was not the original instigator, leading the Tribe down the tribal lending path through promises of easy money. Dkt. No. 249-3. Wholly to the contrary, it is Martorello who was very much the tribal lending novice seeking the most basic information about the model from the Tribe's representatives. For example, he asked at the start of the thread basic questions showing his tribal lending naivete:

> So the Tribal Lending entity has a Tribal Management Company, which is going to
> be the Bellicose customer. Do we want to service the Tribal Management Company
> or do we want to service the Tribe directly? What's the advantage of the Tribal
> Lender having the Tribal Service Entity? Trying to get these docs done and still not
> certain what the structure looks like in this regard.

*Id.* at ROSETTE_REVISED_052501-502. Tribal representatives explained the nuances of the

tribal world at length.  Ultimately, Martorello engaged Jennifer Weddle as counsel to him in the

proposed deal, as she provided the expertise on Tribal law and business structures that he lacked

and needed.

Even after initial concepts were discussed and both parties had decided to move forward,

the Tribe and Bellicose worked cooperatively in putting together the business.  For example,

Martorello and the Tribe worked together to finalize consumer loan documents (Ex. D-7 at

ROSETTE_REVISED_011010), other forms to be used in communications with consumers(Ex.

D-8 at ROSETTE_REVISED_035946), and planning for the call center operation (Ex. D-9 at

ROSETTE_REVISED_036356).  Meanwhile, the Tribe was advertising and ultimately hiring an

Operations Manager for Red Rock. Ex. D-10 at ROSETTE_REVISED_045079.   While

Martorello's lending expertise was sought and relied upon, the process was not simply Martorello

foisting concepts and documents on the Tribe, but rather an interactive process of two parties

working together to get a deal done.

In sum, Plaintiffs' assertion that the tribal lending business "genesis" was all Martorello

and not the Tribe is belied by the "objective" evidence.

JA561

2.      **"Who first said what to whom first" at a conference is a concocted dispute.**[15]

Plaintiffs charge that the "objective" shows that the Tribal Defendants misrepresented the facts when they said that the Tribe approached Matt Martorello, not vice versa.  They are wrong.  As support for their charge, Plaintiffs compare (i) Martorello's deposition, where he said that Scott Merritt approached him on behalf of the Tribe, with (ii) Merritt's deposition, where he seemingly contradicted Martorello's account of events.  See Dkt. No. 249 at pp. 9-10.  Whatever superficial appeal Plaintiffs' argument may have, it falls apart when examined.

First, the unspoken premise in Plaintiffs' argument is that the *Tribal Defendants* identified Merritt as the one who approached Martorello on the Tribe's behalf.  But, the Tribal Defendants did not say it was Merritt, and Plaintiffs point to nothing in the record to show otherwise.   Thus, the premise for Plaintiffs' argument is false, and they know it.

Second, Martorello's deposition was not taken until August 2018.  This was *after* this Court had already issued its decision denying tribal immunity, and the Tribal Defendants made no effort to use Martorello's deposition on appeal.  Indeed, they objected when Plaintiffs sought to do so.[16]  Thus, for Plaintiffs to suggest that the Tribal Defendants somehow relied on Martorello's deposition statement shows that is they – not the Tribal Defendants – who have sought to mislead.  Instead of relying on a *deposition* that was not yet taken, the Tribal Defendants included in the record Matt Martorello's *declaration*, dated December 21, 2107, where he says he was approached by a Tribal representative, but without saying who it was. *Williams*, Dkt. No. 106-1.

---

[15] This section addresses the following alleged misrepresentations: (1) "The Corporate Defendants materially misrepresented Red Rock's revenue share and desire to enter into business with Martorello, who sought out the relationship; and (2) "The Corporate Defendants and Martorello also misrepresented that LVD approached him; not vice versa."  Dkt. No. 249 at p. 10.
[16] Redacted Brief by Ascension Techns., Inc. and Big Picture Loans, LLC at 7, 8, *Williams v. Big Picture Loans, LLC*, No. 18-1827 (4th Cir. May 2, 2019) at Dkt. No. 119.

The Tribal Defendants have every reason to believe that their statement is true: the Tribe approached Martorello. By the time of the conference, the Tribe had already enacted it tribal lending code (July 2011) and had engaged TLM, a consulting group, to assist in finding appropriate resources (August 2011). One principal of TLM was Rob Rosette and, as Plaintiffs admit, Merritt introduced Martorello to Rosette at the conference (and, according to Merritt, did so without mentioning LVD). *See* Dkt. No. 249 at p. 9. Sometime after this introduction, Rosette (acting on behalf of the Tribe) would have presumably mentioned LVD and its interest in tribal lending. In sum, there is no reason to discount the Tribal Defendants' version of events in favor of Plaintiffs' interpretation.

Whether Martorello correctly or incorrectly remembered who first mentioned the Tribe to him – Merritt or Rosette – is immaterial. And there is no evidence that Martorello went looking for a tribal lender. Nor would it be material if he had. The Tribe had taken significant steps toward forming a lending business (lending code and engagement of TLM) well before talking with Martorello, and Plaintiffs point to no evidence showing otherwise.

At the end of the day, perhaps the best response to Plaintiffs' attack is "who cares who approached whom first?" Plaintiffs obviously did not until they foresaw losing in *Williams*. Merritt's deposition was taken on <u>March 21, 2019</u>. Dkt. No. No. 250-17. This was well before the oral argument in the Williams appeal (May 7). Yet, Plaintiffs did nothing – until the *Williams* defeat loomed.

### 3.   The Tribe purchased Bellicose because it was worth a lot to the Tribe.[17]

Plaintiffs claim that Bellicose was worthless, meaning that the Tribe could not have had any purpose in purchasing Bellicose other than to protect Martorello. However, the undisputed

---

[17] This section addresses the following alleged misrepresentations: (1) "Defendants have materially misrepresented the value of Bellicose at the time of the sale, including to the Fourth Circuit Court of Appeals" (Dkt. No. 249 at p.

**JA563**

evidence is that the Tribe received a pro forma from Martorello indicating that Bellicose could be worth $100 million. Ex. D-11 at p. 12:9-11. The Tribe did not second guess the pro forma, but "being in the business, we knew it was successful and we agreed with that." *Id.* at p. 14: 6-10. The Tribe also anticipated cost savings by "bringing those services in-house that would, in turn, save the business money and ultimately be more revenue to the Tribe." *Id.* at p. 34:2-10.[18]  As Karrie Wichtman had contemporaneously described:

> Bottom line – the sales price, while nothing to sneeze at, is really of no consequence to them considering the sunset provisions that you seemed ok with including.  The inventive is really all on you to produce in order to realize the full sales price contemplated.  If the portfolio performs as you modeled or even better the only consequence if the Tribe makes more for TNP and pays the note down faster.  It really is a win win for the Tribe.

Ex. D-12 at ROSETTE_REVISED 045283.   In sum, from the Tribe's perspective, it was purchasing assets of great value and getting a good deal for them, a savvy business transaction.

Plaintiffs, in a familiar refrain, cite emails written by Martorello discussing regulatory threats and the possibility that the business could be ended.  Dkt. No. 249 at p. 27; Dkt. No. 251-40. However, these documents are Martorello's, not the Tribe's, and are irrelevant to the issue of the Tribe's purposes.  Moreover, a business, or anything for that matter, can be valued differently by two separate entities or individuals.  The *Tribe's* perspective that it was purchasing assets of value stands vindicated given the continuing track record of the profitable operation of the business, and the recent vindication of Tribal immunity for Big Picture and Ascension in *Williams*.

---

26); and (2) "The Corporate Defendants have materially misrepresented that cost savings was the impetus behind the acquisition of Bellicose."  *Id.* at 28.

[18] Plaintiffs assert that these cost savings were fictitious because they were offset by loan repayments.  Dkt. No. 245 at p. 29.  However, the cost savings benefit the Tribe by funding the loan payments, and increasing the profitability and hence the value of the enterprise that it wholly owned.

### 4.    The Tribe created Big Picture.[19]

Plaintiffs claim that the Tribe did not create Big Picture.  There is no other way to say it than that the Tribe created the lending entity, Big Picture.  The company was created under Tribal law by act of the Tribe, through the efforts of its counsel.  Ex. 15 at Resolution #T2014-066 (Aug. 26, 2014.  Plaintiffs' claim to the contrary is another bit of deception.  The Tribe created the *legal entity,* Big Picture, but did not originate the *name,* "Big Picture."  The domain name and trade name were acquired from Martorello, in whose hands the name sat, among others, in reserve.  This decision to obtain the name from Martorello was part of the decision by the Tribe to change the business by using a new name and a new image as of the creation of Big Picture.  Ex. D-11 at p. 33:15-18.  Plaintiffs' argument is a *non sequitur*.  The Tribe created a tribal lending entity to be an arm of the tribe and bought a domain name, *i.e*., Big Picture, plain and simple.

### 5.    Martorello's purpose is not the Tribe's purpose.[20]

Plaintiffs make use of extensive quotes of emails written by Martorello about his reasons for selling Bellicose to the Tribe.  Focusing on the Tribe's purpose, as *Williams* directs, shows that the Tribe's purpose was for economic development.  The Tribe has articulated repeatedly that the purpose of entering into the tribal lending industry was to promote its goals of economic development and self-sufficiency.   "After the 2008 recession, after making significant cuts to government programs and services due to drastically decreased casino revenue, the LVD Tribal

---

[19] This section addresses the following alleged misrepresentations: (1) "The Corporate Defendants have materially misrepresented the reasons for the restructure and their own creation and purpose" (Dkt. No. 249 at p. 12); (2) "The Corporate Defendants misrepresented the genesis of the creation of Big Picture, which had been developed by Martorello for another tribe." Dkt. No. 249 at p. 22.)

[20] This section addresses the following alleged misrepresentations: (1) "Another material misrepresentation and omission presented throughout this case has been that 'LVD developed a comprehensive economic development strategy to build a more diversified economy'" (Dkt. No. 249 at p. 11); (2) "Martorello falsely stated in his Declaration that 'the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies." (*Id.* at p. 22); (3) "The restructure was designed to maintain Martorello's control while, at the same time, insulating his childhood friend & business partner" (*Id.* at p. 25); (4) "Martorello has also materially misrepresented the impetus behind the sale of Bellicose, asserting that it 'was motivated by a tax savings opportunity,' not a desire to shield himself while continuing the illegal enterprise" (*Id.* at p. 30).

Council began to explore other options to support its goals of self-sufficiency and self-determination.  LVD developed a comprehensive economic development strategy to build a more diversified economy."  Ex. D-13 at ¶ 4.  After pursuing the tribal lending industry, "Big Picture was created to be an online lending business in order to bring revenue to LVD that would advance the public health, safety, and welfare of LVD's citizens through provision of essential governmental services."  *Id.* at 2.  When describing how the lending industry furthered the Tribe's long-term goal of economic development, Chairman Williams further enforced these principles stating, "really looking at what this business is capable of doing for the Tribe, for our future generations to come. . . it's the focus of our future."  Ex. D-14 at pp. 200:23-201:2.

In *Williams*, in discerning the Tribe's purpose, the Fourth Circuit looked to the official statement of Tribal purpose as contained in resolutions.  As noted above, by Tribal resolution dated July 8, 2011, the Tribal Council stated that "[t]he Tribe desires to diversify the economy of the Tribe's Reservation in order to improve the Tribe's economic self-sufficiency." The Fourth Circuit cited to and relied on a later resolution regarding the formation of Big Picture and Ascension. *Williams v. Big Picture Loans , LLC*, 929 F.3d 170, 177-178 (4th Cir. 2019).   However, these resolutions are but one of many where the Tribe stated its purpose in taking numerous steps in furthering the tribal lending business.  Attached as Ex. D-15 is a sample of these many resolutions.

These purposes of the Tribe are, of course, the exact purposes that tribal immunity is designed to promote.  *See Williams*, 929 F.3d at 185 (noting that immunity serves "the Tribes' self-determination through revenue generation and the funding of diversified economic development") (quoting *Breakthrough*, 629 F.3d at 1195).

That tribal self-determination was the actual purpose of acquiring the servicing business, and not a *post facto* and artificial rationalization, is confirmed by witnesses who dealt with the

Tribe at the time.  As described by Hazen, "it had always been a discussion at the Council table to be able to purchase the servicer" and the idea was raised by the Tribe with Martorello in 2012. Hazen Dep. Tr. in *Smith*, 81:21-23.  "I think it was always just a bunch of stop and starts from that point on – start and stops, not stop and starts." Ex. D-11 at pp. 81:18-82:9.  James Dowd described "their intention was ultimately to have a self-sufficient business that they could run for themselves." Ex. D-16 at 202:17–203:12. The Tribe "fiercely" has pride in their "sovereignty and independence" and owning the entire operation "would give them a lot more confidence in the security of their – future of their tribe and the members of the Tribe." *Id.* at pp. 203:23–205:13. Chairman Williams "envisioned . . . the acquisition of a servicer and, kind of, complete tribal ownership as a path to that financial sustainability to – to, you know, protect the history and the future of the Tribe. *Id.* at pp. 203:23–205:13.  As observed by Weddle, "[t]he model that many tribes follow is to hire the best service provider they can to help them learn a business, develop their internal capacity, grow it over time, and then eventually they don't need that service provider anymore." Ex. D-17 at pp. 116:11-117:16.[21]

### 6.    All loans originate on the reservation.[22]

Plaintiffs say the Tribal Defendants misrepresent that "contracts for all loans . . . are formed on the reservation."  Dkt. No. 249 at 15.  Plaintiffs say this is a lie because some loan approvals involve use of an automated process, and that verification steps in the loan origination process are often handled by workers at a Philippines call center.  *Id.*  This argument is based on yet another effort to confuse.  The evidence is undisputed, and the point established beyond reasonable dispute,

---

[21] Plaintiffs argue that the idea for purchase of the servicing business originated only in August 2014 by an email written by Matt Martorello.  Dkt. No. 248 at p. 20; Dkt. No. 251-40.  However, as discussed above, another Matt Martorello email confirms that discussion dates back to 2012.

[22] This section addresses the following alleged misrepresentations: "Although the Corporate Defendants have represented that 'the contracts for all loans …are formed on the reservation,' the loan contracts actually originated through an 'automated process' that did not require handling by BPL employees." Dkt. 249 at p. 15.

that all loans are approved and the contracts formed on the reservation, and that is the statement by the Tribal Defendants being challenged.   However, the loan origination *process* – including information verification and other underwriting steps leading up to but ending before the actual approval and contract formation – occurs both on the and off the reservation.  Ex. 16 at pp. 44-84. And while parts of the loan origination process involves use of technology, the bottom line is that the approvals and contract formation *always* occur on the reservation.  In sum, the Plaintiffs' assertion that an automated process is used and verifications occur off-reservation does nothing to belie the truth that on-reservation final approval and contract formation is occurs on reservation.

### B.    Plaintiffs claim that Martorello controls Big Picture and Ascension, but in fact the Tribe holds and exercises ownership control rights. [23]

The third *Breakthrough* factor "examines the structure, ownership, and management of the entities, 'including the amount of control the Tribes has over the entities.'"  *Williams* 929 F.3d at 182 (quoting *Breakthrough*, 629 F.3d at 1191).  In *Williams*, the Fourth Circuit held that the Tribe had control over Big Picture, noting the organizational documents of Big Picture provided significant "evidence of the Tribe's broad power, through Hazen and Williams, over Big Picture's business decisions," given their position as co-managers of a LLC.  *Id.* at 183.  Plaintiffs do not fundamentally contest whether the Tribe has control over Big Picture.   However, the Fourth Circuit held the "control" factor weighed "slightly" against immunity as to Ascension due to the role of Brian McFadden, a non-tribal member, as President.

---

[23] This section addresses the following alleged misrepresentations: (1) "Defendants misrepresented the genesis of the tribal lending arrangement, including the LVD, Tribal Council, and the Co-Manager's role in Red Rock's lending operations" (Dkt. No. 249 at p. 2); (2) "the Corporate Defendants used a Martorello Declaration containing a significant number of misrepresentations, including that 'Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operation.'" (*Id.* at p. 3); (3) "Rosette & Martorello initially structured the tribal lending agreement with an express understanding that the co-managers would not be involved" (*Id.* at p. 3); (4) "After regulators caught onto the scheme, the enterprise attempted to enhance the 'optics,' but not the substantive involvement of the co-managers, who were specifically prohibited from learning key information about the business" (*Id.* at p. 6); (5) "The Corporate Defendants materially misrepresented Martorello's authority and ability to control operations after the sale." *Id.* at p. 30.

31

Plaintiffs claim the Tribal Defendants "materially mispresented Martorello's authority and ability to control operations after the" creation of Big Picture and Ascension; specifically, Plaintiffs take umbrage with the Tribal Defendants' statement that after the sale Martorello's role was only that of a "creditor as owner of Eventide." Instead, they claim that Martorello controlled the business at all times, as the business arrangements at the start wholly marginalized Red Rock, and that this arrangement continued unchanged after the creation of Big Picture and Ascension. Plaintiffs claim that Ascension runs everything, the Tribe has no control over Ascension, and Martorello pulls all the strings. In sum, Plaintiffs claim that the Tribal managers of Big Picture and Ascension had no "substantive involvement" in the management of the lending business is shown by "objective" evidence and that any claim that they do is a "misrepresentation."

On point after point, Plaintiffs' arguments are themselves based on distortions and outright misuses of the record.

> **1.  A lack of Tribal control over Bellicose and SourcePoint does not mean the Tribe lacked control over Red Rock; Red Rock was designed to operate under Tribal control and have the ultimate say over the business.**

Bellicose and SourcePoint were not owned or controlled by the Tribe. Indeed, this lack of ownership and control was one of the reasons why the Tribe became interested as early as 2012 in acquiring the servicing business. Hence, it is easy for Plaintiffs to cite to emails and facts showing that the Tribe lacked control over Bellicose and SourcePoint. For example, Plaintiffs make much of email exchanges where the Tribe sought details about Bellicose/SourcePoint's intellectual property, and Martorello, then engaged in negotiations to sell the business and hence the intellectual property to the Tribe, was reluctant to give away what he was trying to sell. Dkt. No. 249 at p. 6; Dkt. No. 249-8. These emails show the Tribe did not control Bellicose/SourcePoint, which may be true but also irrelevant. Indeed, even on its face Plaintiffs' argument requires two

more leaps. First, Plaintiffs need to show that control over Bellicose/SourcePoint also gave Martorello control over Red Rock. Second, Plaintiffs need to show that this control, arguendo, over both Bellicose/SourcePoint and Red Rock transferred over to Big Picture and Ascension.

On the first point – control of Red Rock – Plaintiffs resort to a slight of hand. Whenever an email discusses the control over Bellicose/SourcePoint, Plaintiffs claim, falsely through their own *ipse dixit* statements, that the email is actually referring to Red Rock.

Illustrating the Plaintiffs' fallacious briefing is Ex. 3, an August 2011 email thread between Martorello and Flint Richardson, Scott Merritt and Rob Rosette. Dkt. No. 249-3. This email is given special prominence in Plaintiffs' brief, leading off the brief as the first support for the argument that the Tribal Defendants misrepresented that Red Rock was substantively involved in the business, when "Red Rock was specifically designed a front" and Red Rock's managers of Red Rock "were meant to be figureheads." *Id.* at p. 2. And the August 2011 email contains juicy quotes, such as Bellicose "OPERATES THE BUSINESS COMPLETELY." Dkt. No. 249-3 at 052498. However, reading the email thread in its entirety makes amply clear that the quote is referring to *Bellicose* operating <u>its</u> business completely, that Red Rock would be operating *its* business under Tribal control, and the lending business as a whole would be subject to fundamental business decisions by the Tribe. Proving these points come from Exhibit 3 itself, which contains the following statements, omitted from the Plaintiffs' misrepresentation brief:

- "THE TRIBE ESTABLISHES THE LENDING CRITERIA, AND IS THE LENDER BELLICOSE IS JUST CARRYING OUT THE TRIBE'S DIRECTION."

- "Bellicose can have nothing to do with "Loan Originations", it can only provide the Analytics and such, and I think the Tribe has to be the originator anyway, correct? YES, CORRECT – THE CORNERSTONE OF THE SOVEREIGN MODEL."

Once it is understood that there are two entities being discussed, then the emails can be properly understood as establishing, not undercutting, that it was the design from the very

beginning that Red Rock would not only operate independently under Tribal control but also control key business decisions of the lending business.  Later in an August 24, 2011 email, Martorello described the emerging concept for the relationship between the Tribe and Bellicose as follows:  the Tribe will make the "decision on how to operate and underwrite" while "Bellicose suggest new ideas and changes to the operations," and it would be "the Tribe [that] is making the decision on how to operate and underwrite."  Ex. D-18 at ROSETTE_REVISED_052323.  At all times the lenders were "tribe's businesses that were controlled by the tribe."  Ex. D-17 at pp. 105:25-106:20. Based on her experience as an attorney helping Martorello with respect to the business, Weddle testified:

> these were tribal entities formed by the tribe, for the tribe, under tribal law, and the tribe was, at all instances, in my observation, directing the companies. Directing their legal decisioning, directing their contracting, acting with recommendations from Bellicose and later from SourcePoint, but at no point was Mr. Martorello, or any entity he was ever involved in, controlling anything. Those were determinations made by the appropriate tribal officials.

Ex. D-17 at Weddell Dep. 108:1-14.  Weddell is an attorney at Greenberg Traurig with almost 20 years of experience.  Plaintiffs have suggested no reason to doubt her credibility.

Another bit of deceptive use of the record was Plaintiffs' quote taken out of a Martorello January 2016 email as discussed above at Section II(B)(2).  The quote says the "Manager's don't really do anything." Dkt. No. 249-4.  Given that this quote was so shortly after the acquisition of Bellicose / SourcePoint, and Martorello had dropped out of management of any part of the lending business with that acquisition, the only fair inference is that he was discussing the involvement of Red Rock's managers in the operation of Bellicose / SourcePoint prior to the acquisition – and not discussing Red Rock itself or the post-acquisition operation.

No matter the Plaintiffs' contentions based on quotes-of-context and mischaracterization of the record, the fact is that during the period that Red Rock was operating, the Tribe exercised

full control over its operations. All loans were approved by Tribal employees on the reservation. Ex. D-16 at pp. 183:9–15; 184:11–16. Problems arising from Red Rock's loan approval process were presented to Chairman Williams and Hazen for review, discussion and resolution. *Id.* at pp. 2-12. The Tribe handled hiring at Red Rock's affiliate, Duck Creek, which provided loan servicing services to Red Rock. Ex. D-19 at CM0000286-87. Duck Creek, also operating under Tribal control, provided a wide variety of services for Red Rock (directly or indirectly), including: (a) mail processing; (b) email processing; (c) manual review of applications; (d) responding to customer inquiries or complaints; (e) work with Better Business Bureau customer complaints to maintain reputation; (f) processing bankruptcy notices and filings; (g) customer payment processing; (h) settlement of accounts in default status; (i) oversight of call center quality, including monitoring call center compliance; (j) handle processing of withdrawn applications; and (k) providing legal counsel with customer information as needed. Ex. D-20 at ROSETTE_REVISED_14047-48.

The ongoing relationship between Red Rock and Bellicose in practice conformed to the fundamental concepts outlined by Martorello's August 24, 2011 email: Bellicose providing advice and Red Rock making decisions. For example, Red Rock determined which states to market to. Ex. D-21 at ROSETTE_REVISED_042898. In 2013, SourcePoint was advising Red Rock on a new installment loan product, including providing example consumer loan documents, new webpages, landing pages; all of this was done to obtain approval from Red Rock and the Tribe. Ex. D-22 at ROSETTE_REVISED_037615. Also in 2013, SourcePoint was advising Red Rock to adopt a new compliance management system. *Id.* As testified by James Dowd, Bellicose would make recommendations on the criteria for making a loan, but "that all would have been ultimately approved by the co-managers of – of either Duck Creek or Red Rock." Ex. D-16 at p. 36:2–10.

Marketing campaigns were always approved by either Chairman Williams or Hazen, although "Michelle Hazen would be the one approving those things. She was more involved in the day-to-day operations of the lending company's offices." *Id*. at 173:7–20. Indeed, according to Dowd, business problems at Red Rock or Big Picture in his experience would be presented to Chairman Williams or Hazen. *Id*. at 181:23–182:25.

This Red Rock approval was no sham. Red Rock did not accept all Bellicose/SourcePoint's recommendations. Dowd testified that this occurred "a lot of instances over the years." Ex. D-16 at p. 37:3–9. By way of example much highlighted in Plaintiffs' papers, Martorello was vehemently against bringing litigation against New York to challenge a cease and desist letter, Dkt. No. 250-24; 251-25 at ROSETTE_REVISED_052702, and Red Rock rejected that recommendation and proceeded with the litigation that led, ultimately, to the Second Circuit's decision in *Otoe*. In any event, decisions were made on recommendations after substantive review by Red Rock including, for example, recommendations on a new form of loan agreement, (Ex. D-23 at ROSETTE_REVISED_030688) and a recommendation for a new lead provider (Ex. D-24 at ROSETTE_REVISED_058462). Indeed, Duck Creek hired a compliance manager, who was "not afraid to ask the tough questions" of SourcePoint and not afraid "to push back if she is not 100% convinced in order to satisfy her compliance requirement." Ex. D-25 at ROSETTE_REVISED_029171.

Over time, moreover, as Red Rock grew in confidence and expertise, it provided more and more independent perspective on business issues. For example, by 2015 Red Rock felt it could offer "front line input" regarding possible revisions to the customer loan agreement. Ex. D-26 at ROSETTE_REVISED_029088. By 2015, Red Rock had "learned a lot," allowing it to "gains

momentum on good compliance methodology and policies." Ex. D-27 at ROSETTE_REVISED_054875.[24]

Finally, while the Tribal Defendants did not misrepresent tribal control over Red Rock, it should also be noted that, even if Red Rock were somehow not an arm of the Tribe, it would not affect whether Big Picture and Ascension are arms of the Tribe. An entity otherwise entitled to sovereign immunity does not lose its that immunity by absorbing a non-sovereign entity.[25]

### 2. An abundance of evidence demonstrated Tribal control over Big Picture and Ascension.

Per Plaintiffs' deceptive briefing scheme, once Martorello's control is shown over Bellicose and then imputed to Red Rock through sleight of hand, all that is left is to say that this control persisted in its same form to Big Picture and Ascension. Plaintiffs claim that "objective" evidence – irrefutable evidence – exists establishing beyond reasonable argument the fact that Big Picture and Ascension continue to operate under the control of Martorello, rendering any contention by the Tribal Defendants that they are controlled by the Tribe to be a "misrepresentation." Dkt. No. 249 at 29-30.

Consistent with the recurring pattern of Plaintiffs' misrepresentation brief, Plaintiffs' argument that control persisted confuses discussions about *continuity in operations* with *control.* There is no dispute that the Tribe's initial plans for the servicing business was to ensure continuity

---

[24] Plaintiffs say that the Tribe's growing confidences had no role in its decision to purchase the servicing business, and the claim that it did is a "misrepresentation." Dkt. No. 249 at pp. 2, 28-29. This claimed "misrepresentation" is refuted by these emails.

[25] *See, e.g., Amerind Risk Mgmt. Corp. v. Malaterre,* 633 F.3d 680, 686 n.7 (8th Cir. 2011) ("A sovereign entity does not automatically waive its sovereign immunity through the mere act of succeeding a corporation that is either not entitled to sovereign immunity or that has waived such immunity.") (case involved tribal sovereignty); *Maysonet-Robles v. Cabrero,* 323 F.3d 43 (1st Cir. 2003) (Puerto Rico immunity successfully asserted); *Kroll v. Bd. of Trs. of Univ. of Ill.,* 934 F.2d 904 (7th Cir. 1991) (Illinois immunity successfully asserted); *Atl. Richfield Co. v. Pueblo of Laguna,* No. 1:15-CV-56-JAP/KK, 2016 WL 3574152, at *6 (D.N.M. Mar. 1, 2016), *on reconsideration in part,* No. 1:15-CV-56-JAP/KK, 2016 WL 3574150 (D.N.M. May 20, 2016) (tribal immunity successfully asserted, except where expressly waived), *judgment entered sub nom. Atl. Richfield Co. v. United States,* No. 1:15-CV-56-JAP/KK, 2016 WL 7437138 (D.N.M. Dec. 6, 2016), and *judgment entered sub nom. Atl. Richfield Co. v. United States,* No. 1:15-CV-56-JAP/KK, 2016 WL 7437138 (D.N.M. Dec. 6, 2016).

of operations; the business was successful and generating profits and disrupting operations could only damage the value of the asset the Tribe was purchasing.

However, a plan to ensure continuity of operations says nothing about a continuity of control, and to equate the two itself is wholly inaccurate. Even the decision by the Tribe to initially ensure continuity of operations is itself an exercise of the Tribe's control. Plaintiffs' quotations out of context about a desire to "keeping status quo to ensure success!" prove nothing about control, other than reflecting that it would be the Tribe's decision to maintain the status quo. As described by Hazen, as a result of the acquisition, the Tribe gained "several different control mechanisms now on the tribal side that weren't there previously with the prior relationship." Ex. D-11 at pp. 110:23-111:6.

Plaintiffs do address the actual post-sale control argument directly with two pieces of evidence: documents showing that the managers of Ascension had delegated multiple operational tasks to Brian McFadden; and an email thread discussing how the structure would "insulate Brian as a tribal employee." The conclusion Plaintiffs reach is that the delegation to McFadden and the "insulate model" would "ensure control over the operations as needed by Martorello." Dkt. No. 249 at p. 25.

As discussed above, the first problem with Plaintiffs' control argument is that they made the same control argument in the *Williams* appeal, the Fourth Circuit noted the evidence in favor of control, and held that the special role of McFadden weighed only "slightly" against the control factor for Ascension. And, of course, the Fourth Circuit found that Ascension was entitled to arm of the tribe immunity, notwithstanding McFadden's role. So this argument is simply relitigation of an issue already disposed of in *Williams*. Plaintiffs present what amounts to cumulative, albeit new, evidence in the form of Exhibit 10 (Dkt. No. 249-10) that McFadden's position was

intentionally designed to provide him with protection. However, Plaintiffs engage in another deceptive briefing practice by attaching only a partial email thread – and not the complete email that explains that the insulation was not designed to allow Martorello to control Ascension, but rather to protect McFadden as a key man against short-term political winds at the Tribal council, by providing for what amounts to separation of powers within the Tribal governance structure by vesting and defining termination powers in the managers of Ascension. Attached as Exhibit 28 is the complete email thread making this clear. And as McFadden acknowledged, he was hired by approval of the LVD Tribal Council, McFadden Dep. 75:15–76:21, and the managers can fire him as he is an at will employee of Ascension. McFadden Dep. 73:6–74:12.

In any event, Plaintiffs' argument that Martorello controls Big Picture and Ascension is itself a misrepresentation belied by a wealth of evidence. Plaintiffs make a convoluted argument that Martorello controlled McFadden, who controlled Ascension, which controlled Big Picture. Dkt. No. 249 at pp. 30-31. But the argument is specious, starting from the beginning. Plaintiffs say that Martorello controlled McFadden because, under Eventide's operating agreement, Martorello could "revoke McFadden's shares within 14-days' notice." Dkt. No. 249 at p. at 30 (emphasis added) (citing Ex. 252-72 at § II(I)). But, even a quick glance at the cited Eventide operating agreement shows that Plaintiffs are, again, shaving the truth. There is no power of revocation. Instead, the manager of Eventide has the ability to "repurchase" the interests its Eventide members for "Fair Market Value." See Dkt. No. 252-72 at § II(I)). However, there is no evidence that (a) Matt Martorello ever tried to invoke this pressure specifically; (b) that Matt Martorello ever tried to control the business of Ascension generally; (c) that Matt Martorello ever even expressed displeasure with a business decision after sale of the servicing business; or (d) that any particular business decision by Brian McFadden was bent in favor of Matt Martorello. Indeed,

Brian McFadden was not even aware whether Matt Martorello could buy out his interest in Eventide. Ex. D-30 at pp. 70:17–21. Plaintiffs' argument is a tower of speculation and certainly does not show that Matt Martorello controls Big Picture or Ascension.[26]

James Dowd testified that he is not aware of Martorello making any decisions on behalf of Big Picture and Ascension at any time. Ex. D-16 at pp. 208:13–209:8. Martorello does not appear on documents reflecting decisions at Ascension and Big Picture because "he's not involved in the day-to-day operations of Big Picture." Ex. D-16 at pp. 218:11–14; 221:1–6]. McFadden testified that in contrast he works closely with Hazen in particular, "Shelly [Hazen] and I talk, I mean, near daily, just about everything about the business." Ex. 29 at pp. 84:2–85:17. In contrast, McFadden testified at his deposition that the last time he interacted with Martorello about business was "probably the day after the Bears/Viking football game, whatever that day was" and as a general matter he has spoken to Martorello about Ascension business matters "maybe a handful at most." *Id.* at pp. 35:18–36:14.

The Intratribal Servicing Agreement that Plaintiffs rely upon so heavily to show the dominance of Ascension over Big Picture, moreover, provides that *Big Picture* may always "within [its] sole and absolute discretion" change the lending criteria. *Williams*, 929 F.3d at 183. This power is consistent with the original design of the relationship between Red Rock and Bellicose/SourcePoint and shows control because "the fact that Big Picture currently chooses to utilize Ascension's criteria does not mean it does not have the power to choose differently in the future." *Id.*

---

[26] Nor do Plaintiffs improve their argument by citing a colorful text message exchange between Martorello and his brother in August 2016. Pls. Mis. Br. at 30 (citing Ex. 5). First, the exchange does not mention repurchasing – much less revoking – McFadden's shares in Eventide. Second, even if Eventide were to repurchase McFadden's shares, such action would not displace McFadden as President of Ascension. Finally, Plaintiffs point to no evidence that Martorello ever communicated to McFadden the sentiments he shared with his brother, or that Martorello sought to pressure McFadden in his decision-making as President of Ascension.

After the acquisition of Bellicose, the Tribe did, in fact, exercise its control to make many important improvements to the operation. These Tribe-initiated and Tribe-effected changes demonstrate control and debunks Plaintiffs' theory that the business continued exactly as it had before in all ways. Here are some examples:

- Overall, the Tribe achieved approximately $1.2 million in expense saving on an annualized basis. Ex. 13 at ⁋ 26].

- Tribal involvement in the operations of the servicing agreement increased dramatically, with McFadden, Hazen, and Williams working together on essentially a daily basis on all issues. *See, e.g., Williams* Dep. Tr. 6:24-7:6.

- Ascension reported to the Tribal Council directly, with McFadden traveling on a monthly basis to the reservation to meet with and report to the Tribal Council. *See* Galloway, Dkt. No. 13 at 7 (citing Exs. 2, 16, 17).

As the Fourth Circuit held in *Williams*, given the other evidence of Tribal control, Hazen's inability to recall some details of the business in her 2017 deposition is probative of a lack of control. *Williams*, 929 F.3d at 183. The "new" testimony of Craig Mansfield in an early 2019 deposition adds nothing new. Craig Mansfield was not involved with Big Picture and Ascension, having resigned in January 2014 prior to formation of either. Basically, Plaintiffs want to re-litigate a point argued and lost in *Williams* using cumulative evidence that is even less pertinent than the evidence they had before. Again, this point was never raised with the Fourth Circuit or this Court before the *Williams* ruling.

**C.    Plaintiffs claim "financial relationship" misrepresentations, but controlling fact that the Tribe has benefitted by millions of dollars is unchallenged.[27]**

The fifth *Breakthrough* factor looks to the "financial relationship between the Tribe and the entities." *Williams* 929 F.3d at 184. "If a judgment against the entity would significantly

---

[27] This section addresses the following alleged misrepresentations: "The Corporate Defendants materially misrepresented Red Rock's revenue share…" Dkt. No. 249 at p. 10.

**JA578**

impact the tribal treasury, this factor will weigh in favor of immunity even if the tribe's liability for an entity's action is formally limited." *Id.*

The Plaintiffs do not confront the evidence of Big Picture's millions of dollars of financial contributions to the Tribe. Instead, they go back in time to assail testimony that Red Rock was entitled to two percent of revenue, because (a) of the failure to disclose a one-percent brokerage fee owed to Tribal Loan Management, and (b) that Red Rock had agreed that 50 percent of its two percent share of revenues would be used to pay the fee.

With high drama, Plaintiffs claim that the fee "had never been disclosed in any other form . . . until it was revealed during the deposition of Scott Merritt," which occurred on March 21, 2019. Ex. 19. However, a Servicing Agreement between Red Rock and Bellicose, produced on February 6, 2019, disclosed the brokerage fee in Sections 6.4.1 and 7.15 of the agreement. So the Plaintiffs' gripe of late disclosure is incorrect; and even under their story they were fully advised of the fee by Scott Merritt's deposition, so they admit they knew well before the *Williams* oral argument. If this was a truly-felt complaint, Plaintiffs had plenty of time and plenty of opportunity to raise it with the Fourth Circuit.

In another effort to distort the facts, Plaintiffs attack the Tribal Defendants for their claim that Ascension is "a below-cost service provider." Pls. Mis. Br. 28. They say that Big Picture actually pays Ascension "**110%** of the hourly salary costs" of Ascension's employees. *Id.* (citing Ex. 58 at § 3.4) (Intratribal Servicing Agreement) (emphasis added by Plaintiffs). Among other problems with their argument, Plaintiffs are comparing apples and oranges. The "cost" to which the Tribal Defendants were referring when they said "below-cost" was obviously the total cost of the services at *market* rates for similar work, not Ascension's actual out-of-pocket costs for one segment of its expenses. Similarly, Plaintiffs go awry when they challenge the Tribal Defendant's

JA579

statement that Big Picture saved money by bringing services in-house.  *Id.* at 29.  They base their challenge on nothing more than the fact that some salaries were increased.  But, again, it is total cost that matters, not isolated elements, and nothing Plaintiffs have said comes close to refuting the annual savings of $1.2 million cited by the Tribal Defendants.

In the end, the evidence that the Fourth Circuit found material and decisive remains unrebutted – the millions of dollars of financial contributions received by the Tribe from its lending operation.  *Williams*, 929 F.3d at 181.

## Conclusion

The Plaintiffs' "misrepresentation" claims were first substantively raised moments before the scheduled hearing on the Tribal Defendants' Motion to Dismiss where dismissal seemed certain in light of *Williams*.  The stratagem is aimed at undercutting the Fourth Circuit's binding decision and hence to open a window to a do-over to keep claims alive against the Tribal Defendants.  So far, the gambit appears to be working. This Court has diverted this case from a prompt decision on tribal immunity, fully briefed and pending for over eight months, onto a complicated and expensive track leading to an evidentiary hearing over irrelevant evidence. Plaintiffs, meanwhile, are crying "misrepresentations" at every opportunity in other cases in an effort to discredit the defeat suffered in *Williams*.

Once Plaintiffs' briefing shenanigans are perceived and discounted, however, there is nothing left that is triable and no reason why *Williams* should not be applied.  Martorello's purpose, the linchpin of so much of Plaintiffs' arguments, is wholly irrelevant and inadmissible to prove the Tribe's purpose, the relevant inquiry.  The Tribe's purposes are clear and legitimate.  As for control, the "new" evidence are rehashed points already advanced in *Williams* unsuccessfully.

The "misrepresentation" brief is not a roadmap to reasons to overstep *Williams*.  Instead, it is a path to reversible error.  To give the "misrepresentation" claim credence would be to accept

43

deceptive use of evidence and incorrect legal propositions. What the Court should do is shut down this unproductive, expensive and erroneous process, and take up the Tribal Defendants' Motion to Dismiss without delay and without further expensive proceedings.  The law after *Williams* is clear. How the evidence in this case should be applied under that law is also clear and established by *Williams*.  At this point, all that needs and should be done is to accept the clear import of *Williams* and bring this litigation against the Tribal Defendants to a clean and prompt end.  At this late stage, immunity is a legal, not factual issue.  An aggrieved party always has recourse to the Fourth Circuit if they disagree with this Court's application of controlling authority on an immunity issue.

**BIG PICTURE LOANS, LLC, ASCENSION TECHNOLOGIES, INC.**

By: _____ */s/ Timothy J. St. George* _____
Timothy J. St. George
Virginia State Bar No. 77349
David N. Anthony
Virginia State Bar No. 31696
William H. Hurd
Virginia State Bar No. 16967
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA  23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutman.com
Email: tim.stgeorge@troutman.com

Cindy D. Hanson (admitted *pro hac vice*)
TROUTMAN SANDERS LLP
600 Peachtree St. NE
Suite 3000
Atlanta, GA 30308-2216
Telephone: (404) 885-3830
Facsimile: (404) 885-3900
Email: cindy.hanson@troutman.com

**JA581**

Justin A. Gray (admitted *pro hac vice*)
Anna M. Bruty
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: (269) 283-5005
Facsimile: (517) 913-6443
Email: jgray@rosettelaw.com
Email: abruty@rosettelaw.com

*Counsel for Big Picture Loans, LLC and
Ascension Technologies, Inc.*

JA582

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of August 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Kristi C. Kelly
Andrew J. Guzzo
Casey S. Nash
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: 703-424-7570
Facsimile: 703-591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
*Counsel for Plaintiffs*

Craig Carley Marchiando
Elizabeth W. Hanes
Leonard A. Bennett
CONSUMER LITIGATION ASSOCIATES
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: craig@clalegal.com
Email: elizabeth@clalegal.com
Email: lenbennett@clalegal.com
*Counsel for Plaintiffs*

Beth Ellen Terrell
Elizabeth Anne Adams
Jennifer Rust Murray
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th St., Suite 300
Seattle, WA 98103-6689
Telephone: 206-816-6603
Facsimile: (206) 319-5450
Email: bterrell@terrellmarshall.com
Email: eadams@terrellmarshall.com
Email: jmurray@terrellmarshall.com
*Counsel for Plaintiffs*

Eleanor Michelle Drake
James Gerard Albanese
BERGER & MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612-594-5999
Facsimile: (612) 584-4470
Email: emdrake@bm.net
Email: jalbanese@bm.net
*Counsel for Plaintiffs*

JA583

Charles Palella
ARMSTRONG TEASDALE LLP
919 Third Avenue, 37th Floor
New York, NY 10022
Telephone: 212-209-4403
Facsimile: (212) 409-8385
Email: cpalella@armstrongteasdale.com
*Counsel for Defendant Matt Martorello*

Jonathan P. Boughrum
Richard L. Scheff
Michael C. Witsch
ARMSTRONG TEASDALE LLP
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
Telephone: 215-246-3467
Facsimile: 215-569-8228
Email: jboughrum@armstrongteasdale.com
Email: rlscheff@armstrongteasdale.com
Email: mwitsch@armstrongteasdale.com
*Counsel for Defendant Matt Martorello*

Hugh McCoy Fain, III
John M. Erbach
Maurice F. Mullins
SPOTTS FAIN PC
411 E Franklin St
PO Box 1555
Richmond, VA 23218-1555
Telephone: 804-788-1190
Facsimile: 804-697-2144
Email: hfain@spottsfain.com
Email: jerbach@spottsfain.com
Email: cmullings@spottsfain.com
*Counsel for Matt Martorello*

Michelle Lynne Alamo
Alec Paul Harris
ARMSTRONG TEASDALE LLP
4643 S Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720-722-7189
Facsimile: (720) 200-0679
Email: malamo@armstrongteasdale.com
Email: aharris@armstrongteasdale.com
*Counsel for Matt Martorello*

_____*/s/ Timothy J. St. George*_____
Timothy J. St. George
Virginia State Bar No. 77349
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA  23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: tim.stgeorge@troutman.com

*Counsel for Big Picture Loans, LLC and
Ascension Technologies, Inc.*

47

**JA584**

FILED: July 25, 2019

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 18-1827
(3:17-cv-00461-REP-RCY)
_____

LULA WILLIAMS; GLORIA TURNAGE; GEORGE HENGLE; DOWIN
COFFY; FELIX GILLISON, JR., on behalf of themselves and all individuals
similarly situated

             Plaintiffs - Appellees

v.

BIG PICTURE LOANS, LLC; ASCENSION TECHNOLOGIES, LLC

             Defendants - Appellants

 and

DANIEL GRAVEL; JAMES WILLIAMS, JR.; GERTRUDE MCGESHICK;
SUSAN MCGESHICK; GIIWEGIIZHIGOOKWAY MARTIN; MATT
MARTORELLO

             Defendants

------------------------------

NATIONAL CONGRESS OF AMERICAN INDIANS; NATIONAL INDIAN
GAMING ASSOCIATION; NATIONAL CENTER FOR AMERICAN INDIAN
ENTERPRISE DEVELOPMENT; CONFERENCE OF TRIBAL LENDING
COMMISSIONERS; ONLINE LENDERS ALLIANCE

**JA585**

Amici Supporting Appellant

DISTRICT OF COLUMBIA; STATE OF CONNECTICUT; STATE OF
HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MAINE;
STATE OF MARYLAND; STATE OF MASSACHUSETTS; STATE OF
MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE
OF NORTH CAROLINA; STATE OF PENNSYLVANIA; STATE OF
VERMONT; STATE OF VIRGINIA; CENTER FOR RESPONSIBLE LENDING

Amici Supporting Appellee

—————————————

## M A N D A T E

—————————————

The judgment of this court, entered July 03, 2019, takes effect today.

This constitutes the formal mandate of this court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

*/s/Patricia S. Connor, Clerk*

**JA586**

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| RENEE GALLOWAY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:18-cv-406 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MATT MARTORELLO'S RESPONSE TO PLAINTIFFS' STATEMENT OF POSITION REGARDING PURPORTED MATERIAL MISREPRESENTATIONS MADE TO THE COURT (ECF 249)**

JA587

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................ 1

II.  RESPONSE TO PLAINTIFFS' PURPORTED MISREPRESENTATIONS ................. 2

    A.   The LVD, Tribal Council, and Co-Managers' significant involvement in Red
    Rock's lending operations. ..................................................................... 2

        1.   Plaintiffs' purported "new" evidence confirms the active involvement of
        Red Rock's co-managers. .................................................................. 2

        2.   Red Rock's co-managers were active participants in the operation of their
        business. ......................................................................................... 7

    B.   Purported misrepresentations regarding the ownership and value of the
    intellectual property ............................................................................ 13

        1.   SourcePoint developed IP for Red Rock under the terms of the Servicing
        Agreement ....................................................................................... 13

        2.   SourcePoint developed valuable IP for Red Rock. ............................ 16

    C.   Purported misrepresentations about Martorello's introduction to LVD. ............... 16

        1.   Two witnesses having different recollections of events that occurred over
        seven years ago does not constitute perjury. ....................................... 17

        2.   LVD, not Martorello, drove the genesis of the relationship. ................ 18

    D.   Purported misrepresentations about Red Rock's revenue share. ............................ 21

    E.   Purported misrepresentations about Martorello's motivation for selling ................. 22

        1.   The Fourth Circuit has already definitively rejected Plaintiffs' attempts
        to place a sinister veneer on the restructuring. ................................... 23

        2.   The parties began discussing a potential sale to the Tribe in 2012 and
        Martorello was motivated to sell for economic reasons. ...................... 25

III. CONCLUSION ............................................................................................ 30

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Hammer v. United States*,
    271 U.S. 620 (1926)..................................................................................17

*In re Microsoft Antitrust Litigation Corp.*,
    355 F.3d 322 (4th Cir. 2004) ..................................................................1

*United States v. Beach*,
    296 F.2d 153 (4th Cir. 1961) ................................................................17

*United States v. Davis*,
    380 F.3d 183 (4th Cir. 2004) ................................................................17

*Williams v. Big Picture Loans, LLC*,
    329 F.Supp.3d 248 (E.D. Va. 2018) ............................................ *passim*

*Williams v. Big Picture Loans, LLC*,
    929 F.3d 170 (4th Cir. 2019) ........................................................ *passim*

**JA589**

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

## I.  INTRODUCTION

Desperate to avoid the Fourth Circuit's *binding* decision in *Williams* that the Tribal Defendants are arms of the Tribe entitled to sovereign immunity,[1] Plaintiffs and their counsel (who also represent the plaintiffs in *Williams*) have manufactured alleged misrepresentations that they contend warrant a different result in this case.  Notably, although Plaintiffs' counsel possessed the majority, if not all, of the purported "new" information prior to oral argument before the Fourth Circuit, they made no attempt in *Williams* to submit it.  The reason is simple. Their purported misrepresentations are bunk[2] and their filing, on the whole, lacks merit.  When Plaintiffs' "new" evidence is examined, the inescapable conclusion is that the evidence actually supports *the truth* of Martorello's statements.

This response both exposes Plaintiffs' purported misrepresentations as baseless and highlights significant *available* evidence confirming the veracity of Martorello's prior statements.  Martorello has been significantly prejudiced by the fact that the Tribal Defendants' document production was limited to post-January 1, 2014, *see* ECF 49 at 2, and the Rosette Law Firm agreed only to produce emails with Martorello, Bellicose and SourcePoint personnel, or other third parties, *see* Case No. 19-mc-00001, ECF 38-1.  There undoubtedly exists a significant quantity of unproduced pre-January 2014 emails in the Tribe's possession, as well as emails

---

[1]  *See Williams et al. v. Big Picture Loans,* LLC, et al., 929 F.3d 170, 185 (4th Cir. 2019). Plaintiffs are effectively collaterally estopped from arguing the sovereign immunity issue again here.  *See In re Microsoft Antitrust Litigation Corp.*, 355 F.3d 322, 326 (4th Cir. 2004).

[2]  A prime example is Plaintiffs' counsel's representation to the Court during the May 22, 2019 telephone conference that they would present "[d]irect evidence [of] Mr. Martorello sending an email that says, I'm creating this company in order to shelter myself from liability.  There's no insinuation or induction that's necessary or inference that's necessary."  Ex. B, 5/22/2019 Hr'g Tr. at 17:6-10.  Despite their direct representation to the Court that such an email exists, Plaintiffs fail to identify it in their submission, ECF 249, and none of their eighty-four exhibits fits Plaintiffs' counsel's description—because no such email exists.

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

between Rosette and the Tribal Defendants, further supporting Martorello's statements. Moreover, Martorello could not summarize all of the available evidence supporting his statements without far exceeding the 30-page limit imposed by the Court.

## II. RESPONSE TO PLAINTIFFS' PURPORTED MISREPRESENTATIONS

### A. The LVD, Tribal Council, and Co-Managers' significant involvement in Red Rock's lending operations.

Regurgitating meritless arguments that have been debunked in previous filings in both this case and *Williams*, Plaintiffs again assert that Martorello has misrepresented the co-managers' roles in Red Rock's lending operations.   Specifically, Plaintiffs assert that the following averments and testimony by Martorello contain material misrepresentations of fact:

1. "Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operation. I have never made a decision on behalf of Red Rock. No company I own or manage has ever made any decision on behalf of Red Rock." Martorello Declaration at ¶ 17 (ECF 249 at 2:4-7).

2. Red Rock "was always involved extensively," in the enterprise and Hazen was involved in "every single element that would happen within Red Rock" (ECF 87-1 at 40:21- 22, 115-116) (ECF 249 at n.2).

3. "Red Rock and [its] counsel were actively involved and Red Rock and their management team were actively involved in meeting with, you know, vendors and screening vendors and making decisions on, you know, who they liked or didn't like," and that the individuals involved in that process included Chairman Williams and numerous other officials and Tribal Council members." *Id.* at 36:7-37 (ECF 249 at n.2).

4. Red Rock sourced its own leads and become self-sufficient before BPL was formed. *Id.* at 141:1-142:20 (ECF 249 at n.2).[3]

As detailed below, each of these statements from Martorello is verifiably correct.

### 1. Plaintiffs' purported "new" evidence confirms the active involvement of Red Rock's co-managers.

The very emails Plaintiffs cite as proof of Martorello's misrepresentations confirm that

---

[3]  For the Court's convenience, a side-by-side comparison of Plaintiffs' *characterizations* of Martorello's statements and his *actual* testimony is provided in Exhibit A.

**JA591**

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

from the very beginning, the parties contemplated an arrangement in which Bellicose was in complete control of **its servicing business**, while LVD's co-managers were in complete control of the **lending business**.[4]  For example, Plaintiffs first point to an email chain from *August 2011* discussing *preliminary questions* Martorello had about the initial proposed deal structure pitched to him by LVD's general counsel and agents of LVD.[5]  ECF 249 at 2-3.  The email is clear in that Mr. Richardson (LVD's agent) contemplated and was proposing an arrangement in which Bellicose was in complete control of **its servicing business**, while LVD's co-managers were in complete control of their **lending business:** "THE TRIBE ESTABLISHES THE LENDING CRITERIA, AND IS THE LENDER[,] BELLICOSE IS JUST CARRYING OUT THE TRIBE'S DIRECTION." *Id.*  (emphasis in original).  This is not a matter open to interpretation.

Martorello, for his part, states within the same email chain that he would not be comfortable with any deal where the Tribe was not in full control of its lending business, confirming that "Bellicose can have nothing to do with 'Loan Originations', it can only provide the Analytics and such," and that while "Bellicose wants to provide the IP," it must be the case that the "Consumer Lender should be the one making the final decision and originating the loans on Tribal Land." *Id.*  By doing so, Martorello was specifically **rejecting** a potential business arrangement in which Bellicose performed loan approvals made "based on Consumer Lender's credit granting standards duly adopted from time to time by Consumer Lender and applied by

---

[4] Plaintiffs made the same argument and cited the same emails in their purported "Additional Evidence" in support of the Court's crime-fraud opinion in *Williams*, to which Martorello fully responded.  *See* Ex. C, ECF 589 at 6-12.

[5]  The August 2011 email, which *predates negotiations* with the Tribe (and demonstrates the lawful intention of the parties at its genesis), does nothing to show the purported lack of involvement by Red Rock's co-managers or how the business actually operated.  For this reason alone the Court should ignore the email other than to the extent it shows, as explained in more detail below, that LVD brought **their** proposal to Martorello.

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

Servicer." [6]  *Id.*  LVD's agent also confirmed in the same chain that while Bellicose would be required to maintain certain information on behalf of the Tribal lending entities as its servicer, the Tribe agreed with Martorello that it should control all of their vendors. *Id.* at ROSETTE_REVISED_052498 (noting agreement that **"TRIBE SHOULD BE ON ALL VENDOR DOCUMENTS[,] WEB-SITE, ACH AGREEMENTS ETC"**) (emphasis in original). Plaintiffs ignore these statements **found in the very email they highlight to the Court**.[7]

Next, Plaintiffs contort a chain of emails reviewing the draft operating agreement of *Ascension Technologies*—a *future* servicing company not yet in business—to assert that LVD's co-managers *historically* had no involvement in a lending business, *Red Rock*.  ECF 249 at 3-4. But, Martorello's declaration speaks only to Red Rock.  Plaintiffs cannot take a statement made about one company (Ascension Technologies) and blindly apply it to a different company (Red Rock) in an attempt to manufacture a misrepresentation that does not exist.  The Court expressly rejected Plaintiffs' counsel's attempt to conflate different companies in *Williams* as "misleading."  *See Williams v. Big Picture Loans, LLC*, 329 F.Supp.3d 248, 257 n.7 (E.D. Va. 2018) (addressing Plaintiffs' counsel's attempt to attribute interrogatory response regarding Big

---

[6] Even if Plaintiffs were correct in their assertions concerning SourcePoint's role in loan originations, servicing and collecting—and they are not—there would be nothing improper about the business model Plaintiffs allege.  An arrangement in which a servicer uses and applies a lender's pre-determined credit criteria to evaluate and recommend action on a particular loan application on behalf of a lender, and then purchases an interest in those loans, is neither irregular, nor controversial.  Rather, such an arrangement is, in fact, the **industry standard** for fintech companies, which market their brand and originate, service and collect on behalf of banks,  under the supervision of the FDIC and OCC, and non-bank lenders.  *See* Ex. D, FDIC Financial Institution Letter 50-2016, FDIC Proposed Examination Guidance for Third-Party Lending (available at https://www.fdic.gov/news/news/financial/2016/fil16050a.pdf) (approving of relationships where banks originate <u>loans for third parties</u>); *see also* Ex. E, Financial Institution Letter 44-2008;  Ex. F, Ross Rep. ¶¶ 69-72

[7] For a time, certain servicing agreements were in SourcePoint's name rather than Red Rock at Red Rock's express direction because, ████████████████████████████████████████ ██████████████████████████  *See* Ex. G, ROSETTE_REVISED_006281.

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

Picture's loan evaluation procedure to Red Rock).

Even if the Court were to consider the underlying email chain, the chain (again) fails to support the conclusions for which Plaintiffs have offered it. When read in its entirety, the email chain shows Martorello's statement about "the Managers" was not an admission that *Red Rock's* co-managers were mere "figureheads," as Plaintiffs assert. Rather, Martorello's comment was about a concern that the transaction documents convey enough to third-party lenders that Ascension's day-to-day management had the necessary experience needed to operate a servicing business, albeit under the ownership and oversight of the Tribe. ECF 249 at Ex. 4 (noting that lenders to the Tribe "care about the person who runs the business *of AT*.") (emphasis added). As the Fourth Circuit recognized, the day-to-day operation of Ascension continues to fall to Mr. McFadden, subject to the express delegation of authority provided by the co-managers and Tribal Council to whom McFadden continues to report to and takes directives from. *Williams,* 929 F.3d at 183-84 (detailing delegation of authority policies and clarifying that Ascension is only the servicing entity and BPL is unequivocally the lender). Neither Martorello, nor any other party, has ever argued or asserted to the contrary. There is simply no misrepresentation.

Finally, Plaintiffs point to an email chain containing a request from legal counsel for the Tribe to Justin Martorello to evaluate whether an operational diagram drafted by another counsel was consistent with Red Rock's structure and to summarize certain information that he had provided during a telephone call.[8] From this, Plaintiffs jump to the hyperbolic conclusion that Chairman "Williams did not actually know how Red Rock operated and so his attorneys had to obtain information from Martorello to provide in the declaration," and "[t]he Martorellos—not

---

[8] The unredacted email, which Plaintiffs do not provide to the Court, indicates that the diagram was drafted by counsel for a co-plaintiff in the *Otoe-Missouria* litigation. Ex. H (unredacted copy of Plaintiffs' Exhibit 6).

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

Chairman Williams, Hazen, or Mansfield—solely possessed this information." ECF 249 at 4.

      Plaintiffs' exceptional leap has no basis in the actual emails, which say **nothing** about the knowledge of Red Rock's co-managers. Nothing in the email reflects that counsel for LVD did not also review the operational diagram with Red Rock's co-managers and employees, or gather additional information for Chairman Williams' declaration directly or from other Red Rock representatives. In short, Plaintiffs' Exhibit 6 establishes nothing beyond LVD's legal counsel acting as a diligent attorney in gathering accurate information to *supplement* Chairman Williams's declaration.

      Plaintiffs take a similarly duplicitous tact in seeking to have the Court believe that Red Rock's counsel, Karrie Wichtman, did not understand the loan product offered by RRTL by providing a block quote to the Court which omits sentences in which Ms. Wichtman recites key metrics describing the loan products offered by Red Rock. ECF 249 at 4-5 (quoting Ex. 7). Rather than acknowledge that this email, and dozens of others like it, reveal the ongoing and independent involvement of the co-managers and legal counsel, Plaintiffs attempt to leave the Court with a false impression as to the facts. Specifically, Plaintiffs would have the Court believe that Ms. Wichtman could only identify that Red Rock "offer[ed] installment loan products," and that her lack of knowledge required her to "gain a better understanding of our short term finance products" before responding to a bank officer. *Id.* That is unequivocally false, and contradicted by the full email.

      The full quotation from Ms. Wichtman reveals that she easily provided the bank officer with: (1) the range of loan principal amount offered by Red Rock, (2) the range of loan terms offered by Red Rock, (3) the number of states in which Red Rock accepted applications, (4) the APRs offered by Red Rock for both new and returning customers, and (5) that customers can pay

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

off their loans early with no penalty.[9]  Plaintiffs also leave out that Ms. Wichtman emphasized to the bank that the loans comply with TILA and do not require pre-authorized electronic transfers for approval of the loan—a fact which proves Red Rock's compliance with another federal statute, EFTA.  *Id.*; *see also* Ex. I, ROSETTE_REVISED_032369 (Red Rock Compliance Management System requiring "███████████████████████████████████████████████████████████████████████████████████.").  The truth as revealed in the email cited by Plaintiffs is that Red Rock's attorney had nearly full knowledge of her client's loan product.

In sum, Plaintiffs' purported new evidence confirms Martorello's prior statements attesting to the active involvement of Red Rock's co-managers.

## 2. Red Rock's co-managers were active participants in the operation of their business.[10]

Beyond the fact that Plaintiffs' proffered evidence fails to demonstrate a

---

[9] So that Plaintiffs' deceptive quote-mining tactics are abundantly clear, Martorello provides Ms. Wichtman's quote, in full, and with Plaintiffs' calculated omissions emphasized in bold:

> While I am fairly familiar with the fact that both RRTL and DCTF offer installment loan products **in amounts between $200 - $1500 that range from 7 months to 33 months in 47 states with a representative APR of 912.50% for new customers and 651.79% for returning customers which can be paid off early with no penalty**– there was a question raised from Zion's compliance department that the product offered is just a "dressed up" pay day loan product – that requires me and the Co-Managers to gain a better understanding of our short term finance products in order to be comfortable handling these questions. While I assured Ben that our product is not a pay day product and does not require ACH **or other debit authorizations in order for approval and that includes, and in fact requires, pay down of principal within the terms of the loan which is displayed in the TILA box –** that was about all I could say. Is there more that we can offer regarding the product that would be useful for the Co-Managers and I to become familiar with to better answer these questions? **Like at what point in the term of the loan does a principal payment occur, what does pay off early with no penalty mean exactly, etc.?**

ECF 249-8 (emphasis added).

[10] In addition to the overwhelming evidence that the co-managers were involved in the operations of Red Rock, there is also significant evidence that members of LVD's Tribal Council were also involved in overseeing the business.

JA596

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

misrepresentation, Plaintiffs also ignore *significant* evidence that refutes their position and conclusively shows the veracity of Martorello's prior statements.

As Martorello previously highlighted in *Williams*, there is ample support within the current evidentiary record, including numerous written approvals from Red Rock's co-managers, confirming, as this Court has already found, that "Red Rock's role under the Servicing Agreement was more substantial than Plaintiffs suggest." *Williams*, 329 F.Supp.3d at 257. While such approvals were not necessarily required in every instance, they demonstrate the co-managers' involvement in and control over Red Rock's operations. *See, e.g.,* Ex. J, ROSETTE_REVISED_035674 (e-mail chain in which Red Rock's co-managers and legal counsel approved ▓▓▓▓▓▓▓▓▓▓ absent formal recommendation from SourcePoint, and SourcePoint employees discussing whether written approval of recommendation was necessary). These written approvals related to all aspects of Red Rock's lending operations, and included approval of marketing materials, website changes, adjustments to underwriting and risk modeling, revisions to the loan agreements, revisions to scripts used by customer service representatives, vendor management, changes to compliance policies, and more. *See, e.g.,* Exs. OOO, PPP, & QQQ (exemplar written requests for approval and related email correspondence).

An example—one of dozens in the record—underscores the depth of information provided to the co-managers to assist them in making their decision whether to accept a recommendation from SourcePoint.  In June 2014, SourcePoint had ▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. K, LVD-DEF00017101. ▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

███████████████████████████████████████████████████████

██████████████████████████████████████████ *Id.*[11]

The email from SourcePoint was not merely a narrative—it also included attachments detailing "the proposed creative, an outline of our model development process, the direct mail processing procedure, the prescreen criteria used for this campaign and the matrix of risk and response scores used to select the 1.7mm consumers." *Id.* (attachments to Dowd email, including a "matrix file" that allowed the co-managers to evaluate the "targets for this campaign" as well as a "more modest" approach which would allow the lender to take on less risk while "collect[ing] additional data and learn how to better underwrite preapproved customers…"). Co-manager Craig Mansfield confirmed that this process was standard. Ex. L, C. Mansfield Dep. at 55:16-56:3 (testifying that "████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████"); *id.* at 58:15-25 (noting that the direct mail criteria "███████████████████████████████████████████████████████.").

The co-managers did not just evaluate one limited aspect of the business—they were required to evaluate (and if appropriate approve) **all aspects of the business**. The co-managers were required to approve new lead providers, and LVD's Tribal Council had another level of review and approval for such agreements given the limited sovereign immunity waiver present in

---

[11] This email confirms the standard process by which formal recommendations were made to Red Rock's co-managers for approval. That is, Dowd asked Red Rock's co-managers if they could ███████████████████████████████████████████████████

███████████████████████████████████████████ Ex. K, LVD-DEF00017113 (emphasis added). As this email illustrates, formal written recommendations were submitted to the co-managers for approval **only after** a full and frank discussion occurred between SourcePoint and Red Rock's co-managers to ensure they were comfortable with the proposed change. This is precisely the process Mr. Dowd testified to during his deposition. Ex. M, J. Dowd 36:2-37:9; 190:22-191:13.

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

each contract.  Ex. N, ROSETTE_REVISED_058149. The co-managers were also required to review and approve proposed changes to Red Rock's annual business plan.  *See, e.g.*, Ex. O, ROSETTE_REVISED_002331 (April 2012 email to Red Rock's co-managers detailing proposed changes to Red Rock's operations including "the sale of denied loan applications" and "remarketing efforts" for existing customers, **taking nearly a month to consider and approve**, even at the demise of additional revenue streams).  For each proposed change, the co-managers were provided with specifics detailing the change, the financial impact the change would have on the business, a discussion of the regulatory basis for the change, and a request to "provide formal approval of the revised business plan and associated revenue generating activity."  *Id.*  After a full discussion and evaluation of the business plan by the co-managers and their attorney, the plan could be approved.  Contrary to the "rubber stamp" allegations of the Plaintiffs, the approvals were not immediate and often involved providing additional information to the co-managers, or the outright rejection of a recommendation.

Red Rock's co-managers did not stand alone in evaluating these proposals.  As the Rosette productions make clear, from the genesis of the relationship, before being presented with a written request for approval, each proposal had been through extensive legal and compliance reviews by Red Rock's counsel.  This legal review dated to before Red Rock made its first consumer loan.  Ex. P, ROSETTE_REVISED_006657 (January 11, 2012 email from K. Wichtman stating that she ████████████████████████████████████████
████████████████████████████████████████████████████); Ex. O, ROSETTE_REVISED_002331 (May 7, 2012 email from co-manager, ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

10

**JA599**

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

██████████████████████). If any recommendation did not first meet with counsel's approval, it would not be sent to the co-managers for approval. Ex. Q, ROSETTE_REVISED_030688 (email from counsel to Red Rock noting that she had ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████).

Beyond reviewing and approving material aspects of the business, Red Rock's co-managers had weekly meetings with key employees and Tribal Council members to discuss ongoing business operations. Ex. R, ROSETTE_REVISED_031984 at 031985-86 (email summary of January 30, 2013 weekly meeting that details 15 separate discussion items ranging from ██████████████████████████████████████████

████████████████████████████); Ex. S, ROSETTE_REVISED_031987 at 031988-89 (March 5, 2013 meeting notes from co-manager discussing ███████████████

████████████████████████████████████████████████

████████████████████). These weekly meetings were internal to Red Rock and LVD, and did not include SourcePoint employees (who only received a summary of the meetings). *Id.*

Contemporaneous emails reveal that the co-managers were also actively involved in the day-to-day operations of Red Rock. *See* Ex. T, LVD-DEF00018406 (letter from counsel for Red Rock detailing on-reservation activities and affirming that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████); Ex. U, ROSETTE_REVISED_035993 (e-mail from legal counsel setting forth on-reservation activity, including that ███████████████

JA600

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

███████████████████████████████████████████). The co-managers

hired and fired employees. *See, e.g.,* Ex. V, ROSETTE_REVISED_053208 (co-manager hiring

compliance manager, Jennifer Steiner); Ex. W, ROSETTE_REVISED_040016 (termination of

employee).

As early as June 2012, Craig Mansfield was tasked with reviewing and evaluating

settlement offers for delinquent loan accounts as part of his role as Operations Manager for Red

Rock.[12] Ex. Y, ROSETTE_REVISED_045131. Mr. Mansfield also drafted job descriptions and

advertisements for customer service representatives in May 2012, while also "working on the

Policy Handbook," for the lender. Ex. Z, CM0000286; Ex. AA, CM000287; Ex. L, C. Mansfield

Dep. at 47:3-7 (testimony from Mansfield that the lender's policy handbook was exclusively

drafted by Mansfield and Wichtman). And, as Mansfield testified, he "helped set up the—our

call center that we had on our property," including the purchase of cubicles, computers, hiring of

all call center employees, and the set-up of computers and internet. C. Mansfield 45:7-46:3.

These duties were on top of the standard co-manager duties of "reviewing contracts," with Red

Rock's lawyer, looking at "marketing strategies," discussing "customer acquisition[s],"

developing "call center scripts," and updating tribal council on the business. *Id.*; *see also* Ex. BB

Hazen Dep. 14:19-22; Ex. L Mansfield Dep. at 46:13-19, 54:9-18, 55:16-56:6, 58:15-19, 57:4-

11, 112:24-113:2, 114:7-19, 118:4-10, 149:22-150:4, 187:9-20 (discussing how the co-managers

were involved in the hiring and interviewing personnel, the loan funding and approval process

---

[12] Co-manager Hazen interviewed multiple candidates for the position of Operations Manager
for the lender, ultimately deciding on Mansfield. Ex. X, ROSETTE_REVISED_053462 at
053468. For Hazen, when deciding between the final two candidates, Hazen ████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████ *Id.* (emphasis added). ████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ *Id.* at 053464. Mansfield was
ultimately selected for his "████████████." Ex. L, C. Mansfield Dep. at 43:4-18.

**JA601**

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

on-reservation, the direct mail strategy, determination of who Red Rock bought leads from, and that many other processes, including collection activities, were done by the people that worked on reservation at RRTL.

This evidence (and more) **confirms** that Red Rock's co-managers "were ultimately responsible for all decisions regarding Red Rock's operation," as attested to by Martorello and corroborated by numerous others. Plaintiffs, not Martorello, have misrepresented the record.

**B. Purported misrepresentations regarding the ownership and value of the intellectual property.**

Plaintiffs next assert that Martorello made several misrepresentations about the ownership and value of the intellectual property developed by SourcePoint for Red Rock under the Servicing Agreement. In support, Plaintiffs point to an August 2014 email exchange in which Martorello refused to turn over SourcePoint's models and formulas used to develop a proposed direct mail campaign for Red Rock. ECF 249 at at 5 n.5 & 6 n.6. Because Martorello refused to turn over SourcePoint's IP used to develop the underlying models, Plaintiffs assert that the following averments and testimony by Martorello contain misrepresentations:

1. LVD received and retained the significant additional economic value of ownership of all intellectual property developed under the agreement by SourcePoint. Ex. 2 at ¶ 35 (ECF 249 at n.5).

2. SourcePoint was required to develop intellectual property for the benefit of LVD and which LVD owned. Obtaining this intellectual property provided significant assets to LVD[.] *id*. at ¶ 43 (ECF 249 at n.5).

3. SourcePoint made underwriting recommendations to Red Rock's co-managers who reviewed and independently decided whether to implement." Ex. 2 at ¶ 41 (ECF 249 at n.6).

Again, none of Plaintiffs' purported "new" evidence contradicts Martorello's averments.

**1. SourcePoint developed IP for Red Rock under the terms of the Servicing Agreement.**

Plaintiffs' new evidence does not contradict that LVD received ownership of valuable

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

intellectual property "developed **under the agreement**" by SourcePoint.  Martorello Decl. at ¶¶ 35, 43 (emphasis added).  Consistent with Martorello's declaration, under the Servicing Agreement, SourcePoint was paid to develop and recommend procedures and policies for **certain items** for Red Rock, "including, but not limited to: financial reporting, financing, compliance, marketing, human resources, managing third-party vendor relationships, collections, and risk assessment."  *See* Ex. A; ECF 249-3 at ¶ 43.  This intellectual property was a significant asset to LVD throughout their relationship with SourcePoint.  *See id.*  Under the Servicing Agreement, SourcePoint also made underwriting *recommendations* to Red Rock's co-managers, "who reviewed and independently decided whether to implement."  *See* Ex. A; ECF 249-3 at ¶ 41.  These statements are true.

Yet, on pages 5-6 of their submission, Plaintiffs identify several emails they contend show that Bellicose "intentionally kept Red Rock's co-managers in the dark about basic details of the business, such as vendor contracts and underwriting formulas" and that these emails confirm "the genesis of the tribal lending arrangement was a front." ECF 249 at 5-6.  Plaintiffs' purported "new" evidence does not support the conclusion advanced by Plaintiffs or that Martorello has misrepresented anything.

First, Plaintiffs' statement that "Red Rock's co-managers [were] in the dark about basic details of the business" is (again) based on their improper attempt to conflate the operations of a servicer (SourcePoint) with the operations of a lender (Red Rock).  Red Rock was a lender.  Red Rock made loans to individual consumers based on recommendations and strategies suggested by its servicer, SourcePoint.  Red Rock's co-managers had full visibility into the details of **its** lending business.  Those co-managers, however, did not have full visibility into the confidential and proprietary aspects of *SourcePoint*'s servicing business.  This distinction is made clear in the

14

**JA603**

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

Servicing Agreement that governed the parties' relationship.

Under the Servicing Agreement, SourcePoint was required to provide certain valuable services to, and create specific IP for, Red Rock. ECF 250-7 at § 4.2.1. Despite this general provision, the Servicing Agreement makes clear that SourcePoint was to provide "credit-modeling data and risk assessment strategies by which [Red Rock] may evaluate whether or not to extend funds to an individual borrower based on criteria that has been established by [Red Rock]." *Id.* at § 4.2.1(i). This provision makes clear that while SourcePoint created and provided certain intellectual property to Red Rock, it was only responsible for providing data and strategies—not the underlying formulas—to Red Rock. *Id.* This is, **precisely** what Martorello told Wichtman—the "formulas used were [sic] are very closely guarded internal IP and entirely unattainable by the clients. **Running clients through it all is what we built and do**." Ex. 8.[13]

These emails do nothing to show that the business was a "front" or that Red Rock did not obtain the valuable IP it was entitled to under the Servicing Agreement.

---

[13] Plaintiffs also make the unsupported statement that "without access to the formulas used, there would be no way for the co-managers to meaningfully participate in developing the underwriting criteria." ECF 249 at 6 n.5. That assertion is ridiculous. In modern banking relationships, while proprietary "credit-scoring model[s] employing various algorithms," such as a FICO score, are used to evaluate loan applications, "it is the approver of the predetermined non-discretionary underwriting criteria that actually makes the credit decision," which in this case is "the lender co-managers, and Tribal Representative, and or the Tribal Council…." Ex. F, Ross Rep. at ¶ 115. This is the same process used by the credit card industry as well as Freddie Mac and Fannie Mae. *Id.* at ¶ 114. In this respect, "Red Rock and BPL operate as typical companies with the specialist recommending and management approving." *Id.* at ¶ 115. Yet even if all of this were not the case, SourcePoint provided Red Rock's co-managers with overwhelmingly detailed background, data, and procedures to assist the co-managers in making their decision to approve or deny a particular campaign. *See* Ex. K, LVD-DEF00017101 - 17113 (June 2014 email and attachments from SourcePoint to Red Rock's co-managers proposing ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████). This extensive documentation and consultation process belies Plaintiffs' unsupported statement.

15

JA604

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

### 2. SourcePoint developed valuable IP for Red Rock.

The Court should not dwell on Plaintiffs' argument that Red Rock failed to receive significant and valuable IP from SourcePoint. While SourcePoint did not provide Red Rock with all of SourcePoint's internal IP (none of which was developed for Red Rock), it did catalogue all the valuable IP it **did** produce under the Servicing Agreement. *See* Ex. CC, MARTORELLO_009283 at 009287-90 (four pages of contracted-for services and IP provided to Red Rock). And, as detailed below, the Tribe considered buying a copy of SourcePoint's valuable IP—which formed the backbone of the services provided to Red Rock—as early as November 2012. Ex. DD, ROSETTE_REVISED_053374 at 053375-76 (Martorello discussing logistics and tasks needed ahead of any sale of SourcePoint's IP). This was part of an ongoing discussion that began earlier in 2012—but by November ████████████████████████████

████████████████████████████ *Id.* Plaintiffs ignore this significant evidence that SourcePoint was, in fact, providing invaluable services and creating IP—to the extent required by the Servicing Agreement—for the benefit of Red Rock.

### C. Purported misrepresentations about Martorello's introduction to LVD.

On pages 9-10 of their submission, Plaintiffs accuse Martorello of misrepresenting that LVD approached him in 2011 and lying under oath when he testified that Warren "Scott" Merritt approached him in 2011, not vice versa. Specifically, Plaintiffs assert that the following averments and testimony by Martorello contain misrepresentations:

1. In mid-2011, I learned that LVD had identified me as a potential consultant. Ex. 2 at ¶ 14 (ECF 249 at 9:9-10).

2. Martorello lied under oath during his deposition when he claimed that Merritt approached him and said "Hey, I represent a tribe. They're in the online lending business today. They've got a code, they're operating, and they are looking for a good

16

**JA605**

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

servicer." Ex. 16, Martorello Dep. at 21:22-22:4 (ECF 249 9:13-16).[14]

Again, Plaintiffs' omit key portions of Martorello's deposition testimony on this subject. *See* Ex. A (side-by-side comparison).

### 1. Two witnesses having different recollections of events that occurred over seven years ago does not constitute perjury.

In what is their most unfounded attack on Martorello, Plaintiffs explicitly accuse him of perjury, stating that he "lied under oath during his deposition," in testifying that LVD approached him to serve as a potential servicer, rather than Martorello seeking out LVD. ECF 249 at 9. Plaintiffs' sole basis for this accusation is the testimony of a single witness, Scott Merritt, who himself repeatedly warned during his deposition that he could not remember key details of these events that occurred over seven years ago. *See* Ex., FF, S. Merritt Dep. 120:10-16, 76:18-21, 106:25-107-7. Inconsistency between two witnesses' memories does not, by itself, constitute perjury. *United States v. Beach*, 296 F.2d 153, 155 (4th Cir. 1961) (holding that evidence of perjury "must consist of something more convincing than one man's word against another's"); *see also United States v. Davis*, 380 F.3d 183, 195 (4th Cir. 2004) (noting that a perjury conviction can be sustained only on the testimony of a single witness where there is also independent corroboration); *Hammer v. United States*, 271 U.S. 620, 626 (1926) (noting that the "general rule" is that "the uncorroborated oath of one witness is not enough to establish the falsity of the testimony…").

Plaintiffs also ignore contemporaneous evidence reflecting that Merritt's testimony may not have been accurate. For example, Merritt repeatedly testified that he had no prior involvement with LVD before meeting Martorello at a conference, and that he did not represent

---

[14] On this point, Martorello has also testified "I believe that LVD had contracted to have Scott go out and find someone who could help them start their online lending business, and somehow Scott found me. I'm not sure how." Ex. EE, M. Martorello 2/25/2019 Dep. at 42:15-25.

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

LVD's interests during the deal.  Ex. FF, S. Merritt Dep. at 28:8-11 ███████████████

██████████████████████████████████████████████); 40:5-9 ("Q. Well,

how did you become involved in these negotiations? A. Because I was introduced to Matt, and I

handed him off to Rosette, and Matt still kept me in the loop…").  Yet contemporaneous emails

reveal that Merritt was directly working with Rosette *on behalf of LVD* in the deal.  *See* Ex. GG,

ROSETTE_REVISED_048832 (August 4, 2011 email from S. Merritt stating ██████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████.") (emphasis added).

When Martorello asked a series of preliminary questions about LVD, it was Merritt who

responded, "[t]he good news is the tribe is ready, **and we'd be glad to arrange a visit at your**

**convenience**.  […]  **We can drill down to a much more granular level regarding origination**

**from the tribe on our next call – we've only provided a high-level outline in our**

**documentation, so we can clarify the process**."  Ex. HH, ROSETTE_REVISED_052365

(emphasis added).   In each of these foregoing statements, the "we" Merritt referred to

unquestionably was the Tribe's negotiation team.  Merritt's contemporaneous written statements

thus belie his claim to have ████████████████████████████████████████

███████████████████  Ex. FF, S. Merritt 85:3-10.  Merritt was closely aligned with, and assisted

closing the transaction for, both LVD and TLM—casting doubt on the accuracy of Merritt's

recollection and deposition testimony.

### 2.  LVD, not Martorello, drove the genesis of the relationship.

More notably, *LVD admits* that it "approached Martorello in 2011 after independently

deciding to explore tribal lending, *not* the other way around"—a fact which even Plaintiffs admit.

**JA607**

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

ECF 249 at 9 (citing BPL's briefing to the Fourth Circuit, which admits"[t]he Tribe approached Martorello in 2011 after independently deciding to explore tribal lending, *not* the other way around") (emphasis in original).  Contemporaneous emails also show that when Martorello was first approached by the Tribe in 2011, it already decided to expand, had a basic framework for the lending operation, had formed an LLC, had a lending code, had set up a tribal regulator, and even had preliminary deal structure in mind and draft deal documents that it provided to Martorello.  *See, e.g.*, Ex. II, Rosette_Revised_048773 (initial "Intro Call" conference call invitation from the Tribe's broker to Martorello); Ex. GG, ROSETTE_REVISED _048832 (Tribe has established a Tribally charted LLC and has passed a lending law ordinance with its lending commission); Ex. JJ, ROSETTE_REVISED _048835 (LVD's agents *inform Martorello* of LVD's minimum Tribal Net Profits requirements, proposed contractual term, and other deal terms); Ex. KK, ROSETTE_REVISED _052381 (LVD's agents forwarded initial draft of servicing agreement); Ex. HH, ROSETTE_REVISED _052365 (Scott Merritt indicating that "tribe is ready" and he would "be glad to arrange a visit" to LVD); Ex. LL, ROSETTE_REVISED _004067 (LVD has already established Red Rock and secured the EIN); Ex. MM, ROSETTE_REVISED _007017 (LVD already had ACH processor); Ex. NN, ROSETTE_REVISED_007004 (LVD already had its "Tribal Consumer Financial Services Regulatory Agent").  Most notably, LVD's counsel, Ms. Wichtman, confirmed in an email dated June 18, 2012, that █████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████

JA608

REDACTED - UNREDACTED VERSION FILED UNDER SEAL



Ex. OO, Rosette_Revised_044598. Plaintiffs completely ignore this email.

The foregoing emails also confirm another point of contention in this case: the genesis of LVD's lending code. Merritt's and Richardson's email communications—some of the earliest in the case—confirm LVD had a lending code in place before it was introduced to Martorello. Ex. JJ, ROSETTE_REVISED_048835 (August 5, 2011 email from Flint Richardson informing Martorello that he will provide the Tribe's laws to Martorello, that those laws required Martorello to comply with federal consumer protection laws, and that any loan carried a maximum rate of interest or fee of $50 per $100). These emails also appear to confirm what Wichtman stated in 2014: that LVD had ███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Ex. PP, LVD-DEF00006161. In other words, LVD's foray into online lending was **not** driven by Martorello. Instead, LVD had long before meeting Martorello established its lending laws, and its desire to create an online lender was driven by external factors important to LVD. These contemporaneous emails also contradict Merritt's apparent efforts during his deposition to retroactively distance himself from TLM, Rosette, and the genesis of the relationship between Martorello and LVD.

In short, despite Merritt's testimony that he was relatively uninvolved in the deal between

JA609

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

Martorello and LVD, the contemporaneous emails tell a different story. Merritt and his company Tribal Lending Solutions, LLC were both heavily involved in the deal and worked closely with Rosette and TLM, rather than on behalf of Martorello.

**D. Purported misrepresentations about Red Rock's revenue share.**

On page 11 of their submission, Plaintiffs accuse Martorello of misrepresenting *Red Rock's* revenue share because he did not mention that, for a period of time,[15] *LVD* paid a brokerage fee to another company, TLM, for connecting Martorello to LVD. Plaintiffs specifically state that "Martorello's Declaration also misrepresented Red Rock's revenue share." *See* ECF 249 at 11:1-2) (citing Martorello Decl. at ¶ 34). As illustrated in Exhibit A, however, paragraph 34 of Martorello's declaration states only that "***Red Rock*** did not receive two percent of the *net* revenues under the terms of the Servicing Agreements," and further clarifies that "***LVD*** chose to structure their arrangement to stabilize their monthly income as a percentage of *gross* revenues, adjusted for bad debts." (bold italics emphasis added). Plaintiffs again attempt to confuse and conflate two different entities—Red Rock and LVD—to manufacture the appearance of a misrepresentation that does not exist. The fact that LVD paid a brokerage fee to TLM out of the funds it received from operating Red Rock does not contradict Martorello's declaration that "LVD chose to structure their arrangement to stabilize their monthly income as a percentage of *gross* revenues, adjusted for bad debts." Ex. 2 at ¶ 34.

And, Red Rock's audited financials tell the complete story, and confirm that Martorello

---

[15] Plaintiffs omit that LVD paid the brokerage fee to TLM only from January 2012, through July 2012, with a total of $164,462.27. *See* Ex. QQ, MARTORELLO_041389. Plaintiffs also strangely misstate that the TLM brokerage fee "had never been disclosed in any other form (including to the court in *Otoe-Missouria*) until it was revealed during the deposition of Scott Merritt." ECF 249 at 10. But at Merritt's deposition an exhibit was introduced, MARTORELLO_026275, which Mr. Merritt was asked to review and determine whether Section 6.4.1 **of the bates stamped document** described the TLM brokerage fee. 56:7-16. Clearly, the bates-stamped document must have existed **prior** to the deposition of Mr. Merritt, and was (in fact) produced in February 2019.

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

has been truthful.  For example, in 2013, Red Rock had gross revenues of ██████████, and made distributions to the owner of ████████████████████ Ex. RR, LVD-DEF00016235 at LVD-DEF00016241.  In 2014, Red Rock had gross revenues of ████████, and made distributions to the owner of ████████████████ *Id.*  These numbers are clear and indisputable.  If there has been any misstatement made by any party in the case to date about the revenue split in those years, it would have been *underestimating* the income to the tribe as "two-percent of gross revenue," when it was actually higher.

And, of course, what LVD decided to do with its profits was a decision LVD made for itself in the best interests of the Tribe.  As the Fourth Circuit recognized, "policy considerations of tribal self-governance and self-determination counsel against second guessing a financial decision of the Tribe where, as here, the evidence indicates that the Tribe's general fund has in fact benefited significantly from the revenue generated by an entity." *Williams*, 929 F.3d at 181.

**E.  Purported misrepresentations about Martorello's motivation for selling.**

Next, Plaintiffs accuse Martorello of misrepresenting the reasons for the sale of Bellicose in 2016.  Specifically, Plaintiffs contend that the following averments and statements by Martorello contain misrepresentations:

1.  The decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies. Ex. 2 ¶ 69 (ECF 249 at 12:4-5).

2.  Since at least 2012, LVD and I have engaged in multiple conversations relating to the potential sale of my consulting businesses to LVD to accelerate LVD's ability to maintain a profitable online consumer lending business with no outsourced consulting services. Ex. 2 ¶ 49. (ECF 249 at 19 n.23).

3.  Martorello has also materially misrepresented the impetus behind the sale of Bellicose, asserting that it "was motivated by a tax savings opportunity," not a desire to shield himself while continuing the illegal enterprise. *Williams* ECF Nos. 368 at 2; 389 at 2; 455-1 at 7; 487 at 23 (ECF 249 at n.28).

Plaintiffs are wrong.

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

### 1. The Fourth Circuit has already definitively rejected Plaintiffs' attempts to place a sinister veneer on the restructuring.

Plaintiffs cite several emails on pages 12-15 of their submission that they contend contradict Martorello's averments and statement about his motivations to sell made in *Williams*. Plaintiffs are not only wrong, but the Fourth Circuit has confirmed that there is nothing nefarious about the Tribe restructuring to protect its lending operation in the face of pressures that threatened its business.[16]  *Williams*, 929 F.3d at 179 (noting that "the fact that the Tribe created Big Picture and Ascension in part to reduce exposure to liability does not necessarily invalidate or even undercut the Tribe's stated purpose, *i.e.*, tribal economic development").

As an initial matter, Martorello has already debunked much of what Plaintiffs' re-allege as misrepresentations in earlier briefing.  See Martorello Opp'n to Mot. for Sanctions, *Williams v. Big Picture Loans, LLC*, 3:17-cv-461, ECF No 521 at 7-9 (discussing identical email chain as Exhibit 21 and giving detailed explanation about how that email supports Martorello's prior testimony).  Plaintiffs have not even bothered to alter their arguments on this point—they simply repeat them as fact even though their narrative has been debunked before.  While Martorello will not reiterate his prior briefing, Plaintiffs' exhibits on this point reflect that Martorello confirmed, from inception, that numerous esteemed legal experts—including "former FTC Directors," a former U.S. Attorney, and numerous top Indian law lawyers at Greenberg Traurig, LLP—who represented Martorello from inception, and had evaluated SourcePoint's relationship with Red Rock and concluded Martorello was "not doing anything wrong/illegal." Ex. 21.  Martorello

---

[16]  Likewise Plaintiffs' purported "additional" evidence is not new.  Martorello has previously briefed the effect of overzealous regulators, the illegal actions of Operation Chokepoint, a failed CFPB rule, and the expense of resulting litigation, throughout the crime-fraud briefing in *Williams*.  *See, e.g.*, *Williams* ECF Nos. 389, 421, 455, 465, 487, 545. The CFPB rule itself was reported as reducing revenue of small payday lenders by 82%, forcing many payday lenders to close locations, particularly in rural areas.  *See* http://www.crai.com/sites/default/files/publications/Economic-Impact-on-Small-Lenders-of-the-Payday-Lending-Rules-under-Consideration-by-the-CFPB.pdf.

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

continues to believe this.

Plaintiffs also misrepresent several emails to conjure the appearance that Martorello was attempting to use a sale to shield himself using sovereign immunity. ECF 249 at 15-16.[17] To the extent that *the Tribe* and Martorello were discussing a restructure intended to ensure that *the Tribe's lending entities* were provided with sovereign immunity,[18] regardless of whether it related to OCP, or who began such discussions or developed the initial concept, the Fourth Circuit's recent opinion confirms that there is nothing nefarious about the parties' doing so.[19] Indeed, the Fourth Circuit found that both Tribal Defendants serve the purposes of tribal economic development and self-governance and are legitimate arms-of-the-tribe, even though the record showed "that the Tribe created Big Picture and Ascension following the Second Circuit's adverse ruling and the Consumer Financial Protection Bureau's enforcement action against another [non-tribal] online lender, Western Sky, that claimed immunity based on its relationship with another tribe." *Williams*, 929 F.3d at 178. As the Fourth Circuit further noted, "[h]owever, the evidence does not support the district court's conclusion that the creation of the Entities was only or primarily intended to benefit Martorello or that the creation of Big Picture and Ascension was solely the product of Martorello's design and urging." *Id.*

---

[17] Plaintiffs' also seek to fudge the timeline on this point, implying that "two weeks after the district court's decision" in *Otoe-Missouria* is when sale discussions began. They did not. As is made clear below, sale discussions between Martorello and LVD had been ongoing since 2012.

[18] Martorello has recognized since 2011 that he does not (and would not) possess sovereign immunity by providing services to LVD.

[19] Plaintiffs' Exhibit 30 also confirms that Martorello did not believe that the district court decision in *Otoe-Missouria* created a "significant liability" for the business as a whole—at least not at the time of the Second Circuit's decision. As Martorello confirmed in an email **Plaintiffs cite to the Court**, on October 1, 2014, it was his belief that the Second Circuit gave LVD "a whole lot to take away as LVD grows and refines it's [sic] business for the long term: tribal investment, adoption, perhaps more on-res activity (**which I think he got wrong**), tribal owned bank/ACH, etc. Let's get the take aways together and bake them in to see this thing to long term. **I thought this was an excellent result.**" Ex. 30 (emphasis added).

24

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

The Fourth Circuit also considered that, as this Court has recognized, "both Martorello *and* the Tribe 'looked for ways to restructure Red Rock's lending operations to reduce exposure to liability.'" *Id.* "The email communications among Martorello, the Tribe Council members, and the Tribe also indicate that the Tribe and Martorello were both interested in avoiding a potential CFPB enforcement action so that the lending operations could continue." *Id.* at 178-79.

### 2. The parties began discussing a potential sale to the Tribe in 2012 and Martorello was motivated to sell for economic reasons.

There is significant record evidence proving Martorello and the Tribe had been discussing a sale of the servicer to the Tribe since at least 2012. Such a transaction, in which a Tribe purchases a service provider after learning a business, is central to many Native American business relationships, and had led to tremendous economic development for Tribes throughout the last half-century. Ex. SS, Morgan Rep. at 3, 13-14, 28-29, 31-32; Ex. TT, Henson Rep. at ¶¶33,35 n.51, 64. This tracks LVD's actions in always seeking—since the genesis of the relationship—to eventually own and operate both a lender and servicer to secure their economic development. Contemporaneous emails confirm this.

In November 2012—long before any of the purported regulatory pressure and *Otoe-Missouria* litigation that Plaintiffs suggest was the impetus for the sale of Bellicose—LVD and Martorello were already deeply engaged in discussing a sale transaction that would see LVD take over Martorello's businesses. Ex. DD, ROSETTE_REVISED_053375. As Martorello described,

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████ *Id.* LVD and Martorello continued discussing the potential IP sale throughout 2013, with a draft of the deal documents being exchanged in June 2013, and revisions sent back in July 2013. Ex. UU, ROSETTE_REVISED_055695. Similarly, in December 2013, Martorello

**JA614**

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

expressed frustration about how the tribe has been discussing a potential sale for 18 months, but that the **economics** had still not gotten to a place where he was comfortable selling.  Ex. VV, ROSETTE_REVISED_052247.

Plaintiffs' purported reasoning for the sale—that Martorello feared regulatory action— also makes little sense given his contemporaneous acts and statements.  In December 2013, Martorello discussed █████████████████████████████████████████████████ ███████  Ex. WW - ROSETTE_REVISED_035991 at 035992.  This desire to meet and coordinate with the CFPB was a serious and genuine offer communicated to the CFPB.  Ex. XX, LVD-DEF00018126 at 00018131-32 (December 20, 2013 email from counsel for LVD ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████████).  Martorello embraced registration with the CFPB, stating ███████████████████████████████████████ █████████████████████████████████  Ex. YY, ROSETTE_REVISED_047091. This desire to contact and work with regulators extended to LVD's banker, Chippewa Valley Bank, who affirmatively reached out to the FDIC *during Operation Chokepoint* to ensure they were offering banking services LVD in compliance with the law.  Ex. ZZ, R. Gerber Dep. at 71:1-9; 73:13-23; 75:20-76:23.  The result was an affirmative statement from the FDIC to the CEO of Chippewa Valley Bank (which was then communicated to Martorello) that "TLE[]s [Tribal Lending Entities] are not illegal."  Ex. AAA, Gerber Dep. Ex. 16.

Running throughout Plaintiffs' narrative on this point is a simple, but ultimately incorrect, theme—that Martorello recognized the potential regulatory risk, and sold Bellicose to

26

**JA615**

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

the Tribe because of that risk and in an effort to limit his potential liability. Not only does such an argument ignore Martorello's contemporaneous emails embracing regulators and confirming compliance with federal laws—Plaintiffs' theory does not make any sense given the timing of the sale.  When Martorello was supposedly under the greatest pressure, the record evidence reveals that he was not urgently seeking to consummate a sale transaction, and he was prompting Red Rock to engage directly with the same regulators they claim were driving Martorello to sell the business.  These acts make little sense if Plaintiffs' slanted narrative is to be believed.

Plaintiffs yet again try to mischaracterize the decisions in *Otoe-Missouria*, as well as Martorello's reaction to those decisions, to have the Court believe that the sale of Bellicose was motivated (in part) by growing adverse legal authority.   But, the contemporaneous emails show that Martorello saw the *Otoe-Missouria* decision not as a sign of impending legal action or increased pressure, but as a victory for LVD and Native American lending.   After *Otoe-Missouria* was resolved, Martorello even noted, "there were so many comments by the panel that outright demonstrate the legality of tribal lending…" and called the opinion "rather victorious." Ex. BBB, at ROSETTE_REVISED_001118-19.   Martorello observed that the Second Circuit noted that ███████████████████████████████████████████████████████████████ ████████████████████████████████████████ Ex. CCC, ROSETTE_REVISED_053388; Ex. DDD, ROSETTE_REVISED_053386.  Litigation counsel was of the same mind, ████████████ ████████████████████████████████████████████████████████████████ ██████████ Ex. EEE, ROSETTE_REVISED_053383.  And, importantly, Martorello did not try to hide or quickly sell his business after *Otoe-Missouria*.  Instead, he immediately urged Red Rock to engage in "[f]ace to face meetings with state DFIs (for example) to talk about this case, co-regulation and the LVD lending business.  Ex. FFF, ROSETTE_REVISED_001110.

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

Similarly, if Martorello's true motivation to sell Bellicose was based on purported regulatory pressure, his actions during late 2013 make little sense. He repeatedly rejected opportunities to sell the business for purely **economic** reasons. Ex. VV, ROSETTE_REVISED_052247 (December 2013 email in which Martorello rejects a potential sale transaction—opting, instead for "status quo"—for purely economic reasons, stating that "10% certainly isn't going to work from a business standpoint (i.e. I might as well be a state licensed lender, as a comp.) The deal could be an outstanding deal and 1st of its kind, but we need to have it make sense"). Similarly in July and August 2014, the Tribe—not Martorello—was pursuing a different sale structure which was not, at least initially, economically advantageous to Martorello. Ex. GGG, ROSETTE_REVISED_047747 (███████████████████████

████████████████████████████████████████████████████████████████████

Shortly thereafter, Martorello put together a counter-offer to adequately capture the value of the business that LVD was intent on buying. Ex. HHH, LVD-DEF00020785; Ex. III, ROSETTE_REVISED_037600 (August 22, 2014 email responding to LVD's July 2014 proposed term sheet ███████████████████████████████████████████

Ex. III, ROSETTE_REVISED_037605 (attachment to August 22, 2014 email). In response to Martorello's proposal, LVD wanted to know ██████████████████████████

██████████████ Ex. JJJ, ROSETTE_REVISED_053244 (emphasis added). Yet, as the Court is well aware, a sale was not completed "at a rapid pace," in August 2014. Things dragged out. It was the Tribe, not Martorello, who wanted to consummate a deal as quickly as possible.

Similarly, the timing of when the sale *did* occur makes little sense in Plaintiff's narrative. Martorello sold his business to the Tribe in January 2016—at a time when the regulatory and

**JA617**

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

operational risks (such as the since-recognized-as-illegitimate[20] Operation Choke Point) had

faded. As former CFPB Assistant Director (later Hudson Cook attorney) Rick Hackett confirmed

in a memorandum to Martorello, "pressure on online lender access to banking services had

diminished **by the end of 2015**." Ex. LLL, MARTORELLO_011257 (emphasis added).  This

was part of a longstanding trend in which the CFPB and regulators were increasingly willing to

work with the online lending industry to develop innovative solutions to real-world problems

rather than imposing draconian restrictions.  *See id.* at MATORELLO_011262 (detailing how in

April 2015 the CFPB reached out to a group of online lenders to seek "industry ideas on how

their [Ability to Repay] approach could be made workable in the real world of automated

underwriting"; after these meetings, Hackett "felt it was likely that CFPB would be heavily

influenced by the [industry group]'s recommendation).  If Martorello was truly motivated to sell

in an effort to avoid regulatory action, waiting until early 2016 to sell was illogical. Martorello

was instead always motivated by economics, while the Tribe wished to own Bellicose as early as

possible.

As Martorello has stated, his taxes were a key reason driving the sale transaction's 2016

completion.  Specifically, as Martorello was contemplating a return to the United States (from

Puerto Rico) given the birth of his first child in August 2015, the tax benefits of a sale came into

focus.  As financial expert John Norman has stated, "by selling Bellicose Capital prior to his

contemplated move from Puerto Rico, the gains on the sale of Bellicose Capital were tax exempt.

On the other hand, if the sale took place after Mr. Martorello's potential contemplated move, the

---

[20] *See, e.g.,* Ex. KKK, May 22, 2019 Letter from Deputy General Counsel, FDIC (FDIC legal counsel admitting that "certain employees acted in a manner inconsistent with FDIC policies with respect to payday lenders in what has generically described as 'Operation Choke Point'"). Similarly, Congress and numerous agencies have explicitly admonished the FDIC and Justice Department over Operation Chokepoint.

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

sale would have been subject to United States federal capital gains taxes, likely at a rate of 20%.

[…] **As such, it appears that Mr. Martorello had a tax incentive to sell Bellicose Capital**

[…] prior to that contemplated move." Ex. MMM, Report of J. Norman at 13-14 (emphasis added). Similarly, Zayra Emanuelli, an employee of Martorello's home office (Liont, LLC), testified that she helped Martorello coordinate his Puerto Rican tax experts, and that she was aware of the differing tax treatments for capital gains under Puerto Rico's Act 22. Ex. NNN, Z. Emanuelli Dep. at 93:21-94:22 (describing capital gains tax treatment of sale transaction and difference between Puerto Rican sourced capital gains and United States sourced capital gains). Thus, as Martorello has stated, his reasons for a sale were motivated by a tax savings opportunity set to expire—the opportunity to consummate a sale pursuant to Puerto Rican tax law and Act 22. *Williams* ECF Nos. 368 at 2; 389 at 2; 455-1 at 7; 487 at 23.

## III. CONCLUSION

As the Fourth Circuit reinforced in its recent opinion, federal policies of tribal self-governance, and tribal economic development each expressly counsel for the "promotion of commercial dealings between Indians and non-Indians." *Williams*, 929 F.3d at 185. None of the purported new evidence submitted by Plaintiffs proves or suggests a misrepresentation by Martorello or the Tribal Defendants, or otherwise provides grounds for Plaintiffs to avoid the Fourth Circuit's binding decision that the Tribal Defendants are arms of the Tribe entitled to sovereign immunity. Their new evidence actually supports *the truth* of Martorello's statements as does the significant available evidence outlined above. Their filing, on the whole, lacks merit and should be stricken.

REDACTED - UNREDACTED VERSION FILED UNDER SEAL

Respectfully submitted,

MATT MARTORELLO

By:/s/  *John M. Erbach*
M. F. Connell Mullins, Jr. (VSB No. 47213)
Email: cmullins@spottsfain.com
Hugh McCoy Fain, III (VSB No. 26494)
Email: hfain@spottsfain.com
John Michael Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile:  (804) 697-2100

Richard L. Scheff (admitted *pro hac vice*)
Jonathan P. Boughrum (admitted *pro hac vice*)
Michael C. Witsch (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone: 267.780.2000
Facsimile: 215.405.9070
Email: rscheff@ armstrongteasdale.com
Email: jboughrum@ armstrongteasdale.com
Email: mwitsch@armstrongteasdale.com

Michelle Lynne Alamo (admitted *pro hac vice*)
William Ojile (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
4643 S. Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720.722.7189
Facsimile: 720.200.0679
Email: malamo@armstrongteasdale.com
Email:  bojile@armstrongteasdale.com

*Counsel for Defendant Matt Martorello And Non-Party Eventide Credit Acquisition Company, LLC*

JA620

**REDACTED - UNREDACTED VERSION FILED UNDER SEAL**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned counsel certifies that on this 9th day of August, 2019, the foregoing was filed using the Court's CM/ECF system, thereby serving a copy on all counsel of record electronically.

By: /s/  *John M. Erbach*
John M. Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile:  (804) 697-2100

**JA621**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

LULA WILLIAMS, GLORIA TURNAGE,
GEORGE HENGLE, DOWIN COFFY, and
FELIX GILLISON, JR., on behalf of themselves
and all individuals similarly situated,

                     Plaintiffs,             Civil Action No. 3:17-cv-00461-REP

v.

BIG PICTURE LOANS, LLC; MATT MARTORELLO;
ASCENSION TECHNOLOGIES, INC.;

                     Defendants.

_____ /

**DEFENDANTS BIG PICTURE LOANS, LLC AND
ASCENSION TECHNOLOGIES, LLC'S STATEMENT OF
POSITION IN RESPONSE TO COURT'S JULY 22, 2019 ORDER [ECF NO. 599]**

       Defendants, Big Picture Loans, LLC and Ascension Technologies, LLC (collectively, the

"Tribal Defendants"), by counsel, hereby submit this Statement of Position in response to the

Court's Order of July 22, 2019 [ECF No. 599].[1]

       The Tribal Defendants are arms of the Lac Vieux Desert Band of Lake Superior Chippewa

Indians ("Tribe") and share in the Tribe's sovereign immunity.  The Tribal Defendants file this

Statement of Position in support of their Motion for Entry of Judgment [ECF No. 604] and to

protect against future infringements upon their sovereignty and the sovereignty of the Tribe,

including with respect to the Tribe and Tribal Defendants' confidential, proprietary, and privileged

documents and information held by third parties.

---

[1] This Statement of Position is filed pursuant to the Court's July 22 and 29, 2019 Orders [ECF Nos. 599
and 601] and does not – and cannot – waive the sovereign immunity held by the Tribal Defendants.

**JA622**

## STATEMENT OF POSITION

On July 3, 2019, the Fourth Circuit held that the Tribal Defendants are sovereign arms of LVD and are immune from suit.  *See Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019).  The Fourth Circuit remanded this case back to this Court "with instructions to grant the [Tribal Defendants'] motion to dismiss for lack of subject matter jurisdiction." *Id.*

Under Fed. R. App. P. 35(c) and 40(a)(1), Plaintiffs' deadline to file a petition for panel rehearing or a rehearing *en banc* was July 17, 2019.  Plaintiffs failed to file any such petition. Thus, on July 25, 2019, and in accordance with Fed. R. App. P. 41(b), the Fourth Circuit issued a mandate directing that its July 3, 2019 Judgment took full effect that day, meaning that the Fourth Circuit's direction to this Court to dismiss the case against the Tribal Defendants then took effect. (*See* ECF No. 600).[2]

Even so, this Court has failed to enter judgment dismissing the Tribal Defendants.  Thus, the Tribal Defendants filed a motion for entry of final judgment as a reminder to the Court of the need to implement the mandate of the Fourth Circuit.  [*See* ECF No. 604].  The Tribal Defendants should not be part of this case at this stage.

In sum, this case is over for the Tribal Defendants except for the unnecessarily delayed entry of final judgment and a bill of costs.  Given the Fourth Circuit's clear mandate, this Court has nothing left to do – nor the jurisdiction to take any action – other than dismissing the Tribal Defendants from this case.  Again, the Tribal Defendants are not only immune from suit, but immune from all proceedings against them.  "Unless a federal court possesses subject matter

---

[2] Under the mandate rule, when a district court is directed to dismiss the case for lack of subject matter jurisdiction it "does not authorize the district court to open the case for further adjudication."  *Invention Submission Corp. v. Dudas,* 413 F.3d 411, 415 (4th Cir. 2005).  In fact, "the court [is] not free to do anything else but to dismiss the case."  *Id.*  "[O]nce a case has been decided on appeal and a mandate issued, the lower court may not deviate from that mandate but is required to give full effect to its execution." *Id.* at 414 (citing *Stamper v. Baskerville*, 724 F.2d 1106, 1107 (4th Cir. 1984)).

**JA623**

jurisdiction over a dispute . . . any order it makes (other than an order of dismissal or remand) is void." *Dahiya v. Talmidge Int'l, Ltd.,* 371 F.3d 207, 210 (5th Cir. 2004) (citing *John G. & Marie Stella Kenedy Mem'l Found. v. Mauro,* 21 F.3d 667, 674 (5th Cir. 1994)).[3]

Any legal action, including discovery, is an infringement upon the Tribe and Tribal Defendants' sovereignty.[4]  This includes subpoenas to the sovereigns themselves,[5] as well as subpoenas seeking the sovereign's records.[6]  Plaintiffs, thus, are prohibited from engaging in discovery against the Tribal Defendants, such as any attempts to (a) compel documents, (b) waive the attorney-client (or other) privilege, or (c) seek depositions of the Tribe, the Tribal Defendants, and/or their officers or agents – including Plaintiffs' improper requests identified in their Statement of Position [ECF No. 523].

---

[3] *See Vafokulova v. UA Int'l Consulting Corp.,* No. CV 17-2605, 2017 WL 5557923, at *1 (E.D. Pa. Nov. 17, 2017) ("It is axiomatic that a court without subject matter jurisdiction must dismiss the case . . . Subject matter jurisdiction is more than a mere formality: federal courts are courts of limited subject matter jurisdiction possessing 'only that power authorized by Constitution and statute.'") (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).))

[4] Immunity doctrines are meant to give sovereigns "a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery." *In re Facebook Inc.*, 42 F. Supp. 3d 556, 558 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (immunity is "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal [immunity] question.'")); *see Bowen v. Doyle*, 880 F. Supp. 99, 134 (W.D.N.Y. 1995) ("A claim of sovereign immunity is forever lost by subjecting [the party] to the very process from which he asserts he is immune.").

[5] *See Alltel Commc'ns, LLC v. DeJordy*, 675 F.3d 1100, 1105 (8th Cir. 2012) (Eighth Circuit concluded "from the plain language of the Supreme Court's definition of a 'suit' in *Dugan*,  and from the Court's 'well-established federal "policy of furthering Indian self-government,' 'that a federal court's third-party subpoena in private civil litigation is a 'suit' that is subject to Indian tribal immunity."); *Bonnet v. Harvest (U.S.) Holdings, Inc.*, 741 F.3d 1155, 1160 (10th Cir. 2014) ("According to binding precedent then: tribes are immune from 'suit' under *Kiowa*, 'suit' includes 'judicial process' under *Murdock*, and a subpoena duces tecum is a form of judicial process under *Becker*.  The logical conclusion, therefore, is that a subpoena duces tecum served directly on the Tribe, regardless of whether it is a party to the underlying legal action, is a 'suit' against the Tribe, triggering tribal sovereign immunity.")

[6] *See Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 206 F.R.D. 78, 87 (S.D.N.Y. 2002) (sovereign immunity applies to non-party subpoenas in a civil case); *Upsher-Smith Labs., Inc. v. Fifth Third Bank*, No. 16-CV-556, 2017 WL 7369881, at *4 (D. Minn. Oct. 18, 2017) (same); *see also Layman v. Junior Players Golf Acad., Inc.*, 314 F.R.D. 379, 385–86 (D.S.C. 2016) ("The leading treatises agree that although Rule 45 may apply to both parties and nonparties, resort to Rule 45 should not be allowed when it circumvents the requirements and protections of Rule 34 for the production of documents belonging to a party.")

Further, the Tribe's sovereign immunity prevents Plaintiffs or this Court from compelling productions and testimony based on past discovery requests. The Tribal Defendants' sovereign immunity was not created by the Fourth Circuit Opinion; it has existed since their creation and has been infringed by the unrestrained jurisdictional discovery as well as the numerous discovery actions pursuing Tribal records while the appeal was pending. To respect the sovereignty that predates Plaintiffs' claims, all ongoing efforts to discover Tribal records and to obtain testimony from Tribal Officials must be halted, including:

- Reversing the February 11, 2019 Orders requiring Ascension President, Brian McFadden, [No. 3:18mc8, ECF No. 24] and Ascension Controller, Simon Liang, [No. 3:18mc12, ECF No. 34] to testify about their employment at Ascension, as well as about the Tribe and the Tribal Defendants' privileged documents and information.

- Ceasing all actions by Plaintiffs to depose Joette Pete-Baldwin about her role as Vice Chairwoman of the Tribe, as well as about the Tribal Defendants' privileged documents and information.

- Reversing the March 13, 2019 Order against TranDotCom Solutions, LLC [ECF No. 416] and March 28, 2019 Order against DataX Ltd. [ECF No. 440] to produce tribal consumer loan records after any class certification that are owned by Big Picture and simply hosted by TranDotCom.

- Halting all actions by Plaintiffs to depose and obtain information from Adil Karam, Craig Mansfield, Dan Gravel, Ivellise Morales, Justin Martorello, and James Dowd concerning their employment at Ascension, as well as about the Tribe and the Tribal Defendants' privileged documents and information.

- Halting all actions by Plaintiffs to depose and obtain records from Microbilt Corporation, Clarity Services, Inc., Experian Information Solutions, Inc., and FactorTrust, Inc. about their vendor relationship(s) with the Tribe and the Tribal Defendants.

- Ceasing all actions against Rosette, LLP to obtain documents with the Tribe and/or Tribal Defendants' documents or information, as well as any actions by Plaintiff to depose attorneys Rob Rosette and Justin Gray about their representation of the Tribe and the Tribal Defendants.

**JA625**

- Ceasing all actions against Connor & Winters and Plaintiffs' intentions to depose John Williams concerning the Tribe and the Tribal Defendants' privileged documents and information.

- Ceasing all actions against Greenberg Traurig and Plaintiffs' intentions to depose Jennifer Weddle concerning the Tribe and the Tribal Defendants' privileged documents and information, acquired by the Tribe through the purchase of Bellicose.

- Ceasing all actions against Bradley Arant Bout Cummings LLP and Plaintiffs' intentions to depose Jennifer Galloway about the Tribe and the Tribal Defendants' privileged documents and information.

- Ceasing all actions by Plaintiffs to obtain information from Eventide Credit Acquisitions LLC; Colombia Pipe and Supply Co.; DTA Trinity Wealth Transfer Trust; Terrence Arenberg; Timothy Arenberg; Gallant Capital, LLC; Brian Jedwab; Kairos Holdings, LLC; Liont, LLC; and Amlaur Resources, LLC about their relationship(s) and any business activities with the Tribe and the Tribal Defendants.

- Ceasing all actions against Settler's Federal Credit Union, Lending Science DM, Inc., and The Better Business Bureau, Inc. concerning the Tribe and the Tribal Defendants' documents and information.

- Ceasing all actions by Plaintiffs to depose Karrie Wichtman about her role as General Counsel of the Tribe, her role at Rosette, LLP as counsel for the Tribe and the Tribal Defendants, and concerning the Tribal Defendants' privileged documents and information.

- Ceasing all actions to obtain records from Devon Bank, Chippewa Valley Bank, and Tolleson Private Bank concerning the Tribe and the Tribal Defendants.

- Ceasing all actions to obtain Tribal records and testimony about the Tribe and the Tribal Defendants from Park Cities Asset Management; Cliff Investment Fund; SW Management Company; the Native American Financial Services Association; and the Online Lenders Alliance.

- Ceasing all actions to obtain Tribal records and testimony about the Tribal Defendants from Rick Gerber, Luis Jimenez, and/or Scott Merritt.

In sum, the Tribal Defendants should be dismissed forthwith from this matter, as required by the Fourth Circuit's mandate. Any further action against the Tribal Defendants, the Tribe, their officers and agents, and/or their confidential and privileged documents and information held by third parties is contrary to the decision of the Fourth Circuit.

JA626

**BIG PICTURE LOANS, LLC; ASCENSION TECHNOLOGIES, LLC**

By:/s/ Timothy J. St. George
Timothy J. St. George
Virginia State Bar No. 77349
David N. Anthony
Virginia State Bar No. 31696
*Counsel for Big Picture Loans, LLC and Ascension Technologies, LLC*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1254
Facsimile: (804) 698-6013
Email: david.anthony@troutmansanders.com
Email: tim.stgeorge@troutmansanders.com

Justin A. Gray (admitted *pro hac vice*)
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: (269) 283-5005
Facsimile: (517) 913-6443
Email: jgray@rosettelaw.com

**JA627**

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of August 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Kristi C. Kelly
Andrew J. Guzzo
Casey S. Nash
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA  22030
Telephone: 703-424-7570
Facsimile: 703-591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
*Counsel for Plaintiffs*

James W. Speer
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA  23219
Telephone: 804-782-9430
Facsimile: 804-649-0974
Email: jay@vplc.orga
*Counsel for Plaintiffs*

Craig Carley Marchiando
Elizabeth W. Hanes
Leonard A. Bennett
CONSUMER LITIGATION ASSOCIATES
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: craig@clalegal.com
Email: elizabeth@clalegal.com
Email: lenbennett@clalegal.com
*Counsel for Plaintiffs*

Beth Ellen Terrell
Elizabeth Anne Adams
Jennifer Rust Murray
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th St., Suite 300
Seattle, WA 98103-6689
Telephone: 206-816-6603
Facsimile: (206) 319-5450
Email: bterrell@terrellmarshall.com
Email: eadams@terrellmarshall.com
Email: jmurray@terrellmarshall.com
*Counsel for Plaintiffs*

Eleanor Michelle Drake
James Gerard Albanese
BERGER & MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612-594-5999
Facsimile: (612) 584-4470
Email: emdrake@bm.net
Email: jalbanese@bm.net
*Counsel for Plaintiffs*

Matthew William Wessler
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington, DC 20036
Telephone: 202-888-1741
Facsimile: (202) 888-7792
Email: matt@guptawessler.com
*Counsel for Plaintiffs*

**JA628**

Charles Palella
ARMSTRONG TEASDALE LLP
919 Third Avenue, 37th Floor
New York, NY 10022
Telephone: 212-209-4403
Facsimile: (212) 409-8385
Email: cpalella@armstrongteasdale.com
*Counsel for Defendant Matt Martorello*

Jonathan P. Boughrum
Richard L. Scheff
Michael C. Witsch
ARMSTRONG TEASDALE LLP
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
Telephone: 215-246-3467
Facsimile: 215-569-8228
Email: jboughrum@armstrongteasdale.com
Email: rlscheff@armstrongteasdale.com
Email: mwitsch@armstrongteasdale.com
*Counsel for Defendant Matt Martorello*

Hugh McCoy Fain, III
John M. Erbach
Maurice F. Mullins
SPOTTS FAIN PC
411 E Franklin St
PO Box 1555
Richmond, VA 23218-1555
Telephone: 804-788-1190
Facsimile: 804-697-2144
Email: hfain@spottsfain.com
Email: jerbach@spottsfain.com
Email: cmullings@spottsfain.com
*Counsel for Matt Martorello*

Michelle Lynne Alamo
William Ojile
ARMSTRONG TEASDALE LLP
4643 S Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720-722-7189
Facsimile: (720) 200-0679
Email: malamo@armstrongteasdale.com
Email: bojile@armstrongteasdale.com
*Counsel for Matt Martorello*

Paul Louis Brusati
Todd D. Stephens
ARMSTRONG TEASDALE LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105
Telephone: 314-552-6602
Facsimile: (314) 613-8522
Email: pbrusati@armstrongteasdale.com
Email: tstephens@armstrongteasdale.com
*Counsel for Matt Martorello*

JA629

/s/ Timothy J. St. George
Timothy J. St. George
Virginia State Bar No. 77349
*Counsel for Big Picture Loans, LLC and Ascension Technologies, LLC*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1254
Facsimile: (804) 698-6013
Email: tim.stgeorge@troutmansanders.com

39758153

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**LULA WILLIAMS, GLORIA TURNAGE,**
**GEORGE HENGLE, DOWIN COFFY, and**
**FELIX GILLISON, JR., on behalf of themselves**
**and all individuals similarly situated,**

                        **Plaintiffs,**                **Civil Action No. 3:17-cv-00461-REP**

**v.**

**BIG PICTURE LOANS, LLC; MATT MARTORELLO;**
**ASCENSION TECHNOLOGIES, INC.;**

                    **Defendants.**

---

**BRIAN MCFADDEN,**

                **Plaintiff,**

**v.**                                     **Civil Action No. 3:18-mc-8**

**LULA WILLIAMS,** *et al.*,
**as individuals.**

                    **Defendants.**

---

**LULA WILLIAMS,** *et al.*,
**as individuals,**

                **Plaintiffs,**

**v.**                                     **Civil Action No. 3:18-mc-12**

**BIG PICTURE LOANS, LLC,** *et al.*,

                    **Defendants.**
_____ /

**JOINT STATEMENT OF POSITION BY BRIAN MCFADDEN AND SIMON XU LIANG**

       Pursuant to the Court's July 22 and 29, 2019 Orders [ECF Nos. 599 and 601] requiring

parties to the case, and parties to related miscellaneous cases, to file a Statement of Position

**JA631**

("SOP") on the effect of *Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019) (the "Fourth Circuit Opinion"), Ascension Technologies, LLC ("Ascension") President Brian McFadden ("McFadden") and Ascension Controller Simon Xu Liang ("Liang") (collectively, "Tribal Officers") hereby submit their joint SOP.[1]

## BACKGROUND

### I.    Deposition Subpoena to McFadden

On August 17, 2018, Plaintiffs subpoenaed McFadden to testify at a deposition in the *Williams* matter, No. 3:17-cv-00461.  On August 31, 2018, McFadden filed a motion to quash that subpoena in the Western District of Michigan.  *See Williams, et al. v. Big Picture Loans, LLC et al.,* No. 1:18-mc-00083 (W.D. Mich.) ("*McFadden Matter*").  The matter was heard on October 3, 2018.  During the hearing, the court recognized that: "Judge Robert Payne has denied a motion to dismiss based on sovereign immunity, that is on appeal to the Fourth Circuit regarding that immunity issue," Oct. 3, 2018 Hearing Transcript at p. 5:4-6, attached hereto as **Exhibit 1**, and even though "I do understand your position and I understand the jurisdictional arguments, and if this were my case, I might quash the subpoena," Ex. 1 at 12:16-18), the court ultimately agreed to transfer the motion to this Court.  *See McFadden Matter*, No. 1:18-mc-00083, ECF No. 14.

### II.    Deposition Subpoena to Liang

On August 17, 2018, Plaintiffs subpoenaed Liang to testify at a deposition in the *Williams* matter.  On August 31, 2018, Liang filed a motion to quash in the District of South Carolina. *Williams v. Big Picture Loans, LLC et al.,* No. 6:18-mc-00303 (D.S.C) ("*Liang Matter*").  The matter was heard on November 5, 2018.  That court reached a similar conclusion to the Western District of Michigan, finding that "this case involves very complex and nuanced issues involving

---

[1] This Statement of Position is filed pursuant to the Court's July 22 and 29, 2019 Orders [ECF Nos. 599 and 601] and does not – and cannot – waive the sovereign immunity held by the Tribal Officers.

**JA632**

sovereignty and the scope of discovery permissible during the pending appeal . . . [thus], the court in the underlying case is in the best position to determine whether Movant's subpoena should be quashed." *See Liang Matter*, ECF No. 22.

## III.    The February 11, 2019 Orders

This Court considered the transferred motions on February 11, 2019.  In nearly identical Memorandum Opinions, the Court ordered McFadden and Liang to submit to deposition only after class certification in *Williams* is decided.  *See McFadden v. Williams*, No. CV 3:18-MC-8, 2019 WL 542300, at *1 (E.D. Va. Feb. 11, 2019) *Williams v. Big Picture Loans, LLC*, No. CV 3:18-MC-12, 2019 WL 542304, at *1 (E.D. Va. Feb. 11, 2019).

The Court, relying heavily upon its decision in *Williams,* emphasized that while "neither Ascension nor Big Picture Loans is an arm of the tribe . . . neither are entitled to immunity," so their appeal was merely a tactic to "thwart[] the discovery efforts of the plaintiffs and Martorello." *McFadden*, 2019 WL 542300, at *1; *Williams,* 2019 WL 542304, at *1.  However, the Court also held that "the appeal to the Fourth Circuit must be respected," and the matter against Martorello also must be continued "because of the delayed discovery caused by expansive assertions of sovereign immunity of which the assertion[s]" by McFadden and Liang "is but a part." *McFadden*, 2019 WL 542300, at *2; *Williams,* 2019 WL 542304, at *2.  In sum, the Court continued the case until immunity would no longer be an obstacle to ongoing discovery.

## STATEMENT OF POSITION

The decisions in Michigan and South Carolina to transfer the motions to quash to this Court were heavily dependent on the *Williams* decision and the denial of tribal sovereign immunity to Big Picture and Ascension.  This Court's decision to deny the motions to quash assumed that the

Fourth Circuit would affirm its decision denying tribal sovereign immunity to Big Picture and Ascension.

Yet, the Fourth Circuit Opinion held that Big Picture and Ascension are immune arms of the Lac Vieux Desert Band of Lake Superior Chippewa Indians:

> A finding of no immunity in this case, even if animated by the intent to protect the Tribe or consumers, would weaken the Tribe's ability to govern itself according to its own laws, become self-sufficient, and develop economic opportunities for its members.
>
> Although Plaintiffs stress the injuries they allegedly face as a result of the Entities' commercial activities, an entity's entitlement to tribal immunity cannot and does not depend on a court's evaluation of the respectability of the business in which a tribe has chosen to engage. Accordingly, the potential merit of the borrowers' claims against Big Picture and Ascension–and the lack of a remedy for those alleged wrongs–does not sway the tribal immunity analysis. It is Congress–not the courts–that has the power to abrogate tribal immunity. *See Bay Mills*, 572 U.S. at 800, 134 S.Ct. 2024 ("[I]t is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity.").
>
> Because a proper weighing of the factors demonstrates by a preponderance of the evidence that the Entities are indeed arms of the Tribe, Big Picture and Ascension are entitled to tribal sovereign immunity.

*Williams*, 929 F.3d at 185.

In light of the Fourth Circuit Opinion, the basis for this Court's denial of the motions to quash, have been effectively overturned. Accordingly, the Court should reverse its denial of their motions to quash.[2]

---

[2] It should be noted that the current opinions resolving the *McFadden Matter* and *Liang Matter* are ambiguous and require clarification. The Court stated, "the deposition allowed here will not be scheduled until after class certification is decided." *McFadden*, 2019 WL 542300, at *3; *Williams,* 2019 WL 542304, at *3. It is unclear whether the depositions are inevitable, or if the depositions will only occur if a class is certified in this case. The Tribal Officers submit that it makes no sense to proceed with depositions if a class is not certified.

4

JA634

Along these same lines, the Court should consider that McFadden and Liang have filed motions to dismiss the claims against them in *Galloway et al v. Martorello et al.*, Case No. 3:19-cv-00314-REP ("*Galloway*"), for lack of subject matter jurisdiction based on their tribal sovereign immunity, lack of personal jurisdiction, failure to state a claim, and failure to join an indispensable party. (*Galloway*, ECF Nos. 125-128.)  Until their entitlement to immunity is addressed, any deposition is premature and unduly burdensome.  Indeed, immunity doctrines are meant to give sovereigns "a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery." *In re Facebook Inc.*, 42 F. Supp. 3d 556, 558 (*quoting Behrens v. Pelletier,* 516 U.S. 299, 308 (1996)); *see also Bowen v. Doyle*, 880 F. Supp. 99, 134 (W.D.N.Y. 1995) ("A claim of sovereign immunity is forever lost by subjecting [the party] to the very process from which he asserts he is immune.").

At the very least, the Court should allow McFadden and Liang to file a renewed motion to quash to address the Fourth Circuit Opinion and its impact on their arguments.

## CONCLUSION

For these reasons, the Tribal Officers respectfully request that the Court reverse its order and grant McFadden and Liang's motions to quash.  Alternatively, the Court should (a) continue any deposition until their motions to dismiss in *Galloway* are decided, or (b) allow briefing on a renewed motion to quash in light of the Fourth Circuit Opinion.

JA635

**BRIAN MCFADDEN; SIMON LIANG**


By:/s/ Timothy J. St. George
Timothy J. St. George
Virginia State Bar No. 77349
David N. Anthony
Virginia State Bar No. 31696
*Counsel for Brian McFadden and Simon Liang*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1254
Facsimile: (804) 698-6013
Email: david.anthony@troutmansanders.com
Email: tim.stgeorge@troutmansanders.com

Justin A. Gray (admitted *pro hac vice*)
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: (269) 283-5005
Facsimile: (517) 913-6443
Email: jgray@rosettelaw.com

**JA636**

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of August 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Kristi C. Kelly
Andrew J. Guzzo
Casey S. Nash
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: 703-424-7570
Facsimile: 703-591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
*Counsel for Plaintiffs*

James W. Speer
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA 23219
Telephone: 804-782-9430
Facsimile: 804-649-0974
Email: jay@vplc.orga
*Counsel for Plaintiffs*

Craig Carley Marchiando
Elizabeth W. Hanes
Leonard A. Bennett
CONSUMER LITIGATION ASSOCIATES
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: craig@clalegal.com
Email: elizabeth@clalegal.com
Email: lenbennett@clalegal.com
*Counsel for Plaintiffs*

Beth Ellen Terrell
Elizabeth Anne Adams
Jennifer Rust Murray
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th St., Suite 300
Seattle, WA 98103-6689
Telephone: 206-816-6603
Facsimile: (206) 319-5450
Email: bterrell@terrellmarshall.com
Email: eadams@terrellmarshall.com
Email: jmurray@terrellmarshall.com
*Counsel for Plaintiffs*

Eleanor Michelle Drake
James Gerard Albanese
BERGER & MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612-594-5999
Facsimile: (612) 584-4470
Email: emdrake@bm.net
Email: jalbanese@bm.net
*Counsel for Plaintiffs*

Matthew William Wessler
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington, DC 20036
Telephone: 202-888-1741
Facsimile: (202) 888-7792
Email: matt@guptawessler.com
*Counsel for Plaintiffs*

JA637

Charles Palella
ARMSTRONG TEASDALE LLP
919 Third Avenue, 37th Floor
New York, NY 10022
Telephone: 212-209-4403
Facsimile: (212) 409-8385
Email: cpalella@armstrongteasdale.com
*Counsel for Defendant Matt Martorello*

Jonathan P. Boughrum
Richard L. Scheff
Michael C. Witsch
ARMSTRONG TEASDALE LLP
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
Telephone: 215-246-3467
Facsimile: 215-569-8228
Email: jboughrum@armstrongteasdale.com
Email: rlscheff@armstrongteasdale.com
Email: mwitsch@armstrongteasdale.com
*Counsel for Defendant Matt Martorello*

Hugh McCoy Fain, III
John M. Erbach
Maurice F. Mullins
SPOTTS FAIN PC
411 E Franklin St
PO Box 1555
Richmond, VA 23218-1555
Telephone: 804-788-1190
Facsimile: 804-697-2144
Email: hfain@spottsfain.com
Email: jerbach@spottsfain.com
Email: cmullings@spottsfain.com
*Counsel for Matt Martorello*

Michelle Lynne Alamo
William Ojile
ARMSTRONG TEASDALE LLP
4643 S Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720-722-7189
Facsimile: (720) 200-0679
Email: malamo@armstrongteasdale.com
Email: bojile@armstrongteasdale.com
*Counsel for Matt Martorello*

Paul Louis Brusati
Todd D. Stephens
ARMSTRONG TEASDALE LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105
Telephone: 314-552-6602
Facsimile: (314) 613-8522
Email: pbrusati@armstrongteasdale.com
Email: tstephens@armstrongteasdale.com
*Counsel for Matt Martorello*

JA638

/s/ Timothy J. St. George

Timothy J. St. George
Virginia State Bar No. 77349
*Counsel for Brian McFadden and Simon Liang*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1254
Facsimile: (804) 698-6013
Email: tim.stgeorge@troutman.com

39793104v2

JA639

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LULA WILLIAMS, *et al.*,     )
            )
      Plaintiffs,  )
            )
    v.        )   Civil Action No. 3:17-cv-461 (REP)
            )
BIG PICTURE LOANS, LLC, *et al.*,  )
            )
      Defendants. )

## MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECF NOS. 599 & 601

Pursuant to the Court's Orders, ECF Nos. 599 and 601, Matt Martorello ("Martorello") submits the following Statement of Position with respect to the effect of the Fourth Circuit's Decision on: (a) further proceedings in this case and (b) each pending motion.

## I. EFFECT OF THE FOURTH CIRCUIT'S DECISION ON FURTHER PROCEEDINGS

The Fourth Circuit's legal and factual findings profoundly impact Plaintiffs' claims against Martorello and establish that this matter cannot go forward procedurally or substantively and should be dismissed with prejudice. As the Fourth Circuit concluded, the tribal lending businesses created by LVD and supported by Bellicose and SourcePoint were legitimate efforts in tribal economic development and self-governance which necessitate due consideration of "too important" federal law and policy underscoring the obligation of the US government to guard and preserve, and to promote outside expertise, outside capital, and commercial dealings with non-Indians. Tribal immunity derives from tribal sovereignty. The numerous federal policies and laws instructing immunity apply equally with respect to matters of tribal economic development and to "non-Indians," like Martorello, whom Congress urges to take action in support of such development. As the Fourth Circuit expressly noted, restrictions of tribal immunity are reserved for Congress. The Supreme Court has consistently acknowledged the same of broader tribal sovereignty. This deference to Congress is of particular importance here where the ability of Indian Country to use the internet in furtherance of tribal economic development and self-governance, in accordance with express directives of Congress, is at stake.

The Fourth Circuit also confirmed that the lending businesses are not, and were not, a "sham," that the Eventide Note is not improper, and that control rested with the Tribe, rejecting any significance to the financial details between the parties. Moreover, it expressly distinguished LVD's lending businesses as a "far cry" from *Miami Nation*, the case involving Scott Tucker plead in the Complaint and repeatedly cited by Plaintiffs throughout their crime-fraud and other

1

briefing.   The Fourth Circuit also found: (1) that both Tribal Defendants serve the purposes of tribal economic development and self-governance and are legitimate arms-of-the-Tribe even though the record showed that the Tribe created the Tribal Defendants following the Second Circuit's ruling in *Otoe-Missouria* and the CFPB's enforcement action against Western Sky; (2) that the evidence does not support that the creation of the Tribal Defendants was "only or primarily intended to benefit Martorello" or that the creation of the Tribal Defendants "was solely the product of Martorello's design and urging;" (3) that Big Picture is tribally owned and operated (contrary to Plaintiffs' "de facto" owner allegations); and (4) that Big Picture—not Bellicose, not SourcePoint, and not Martorello—**is the lender**.   The same reasoning applies to Red Rock. As a result of the Fourth Circuit's legal conclusions, class certification should be denied, the Court's crime-fraud opinion should be vacated, and the case should be dismissed in its entirety with prejudice.   If not dismissed in its entirety, the case should be promptly set for trial.

From a procedural standpoint, Plaintiffs' claims against Martorello must be dismissed *in their entirety* because Plaintiffs cannot proceed against necessary and indispensable parties Big Picture Loans and Ascension due to the Fourth Circuit's Decision finding that both entities are arms-of-the-Tribe entitled to the protections of sovereign immunity.   That threshold issue necessarily impacts the Tribe and Tribal Defendants—indeed all of Indian Country—and requires LVD's participation.   Martorello intends to file a Motion to Dismiss under Fed. R. Civ. P. 19, once the Tribal Defendants are dismissed.   Plaintiff's claims and remedy are with the lending entities, not Martorello as a legal strawman to get around tribal sovereignty.

From a substantive standpoint, Plaintiffs' claims against Martorello cannot survive following the Fourth Circuit's Decision.   It is the Fourth Circuit's narrative that must be

considered, not the Plaintiffs.  This case involves a poor, remotely-located Tribe, that through strategic relationships with non-tribal partners and creditors, entered into a new industry, pursuant to its own laws, and is now on the path to long-term economic self-sufficiency.  The commonplace commercial controversy and routine commercial agreements, promoted by numerous Federal laws and policies, is not a RICO enterprise.  Based on the Fourth Circuit opinion, state law is barred and *unenforceable*, thus no predicate offense exists.  This is furthered by the Virginia Supreme Court's prior decision in *Settlement Funding*, the Virginia Bureau of Financial Institutions' express recognition that arm of the tribe lending is not subject to its regulation, and the Virginia Code.

Furthermore, the laws and policy obligating the Federal government to guard, protect, and promote commercial dealings between Indians and non-Indians apply here, agnostic to industry, and the Fourth Circuit repeatedly recognized the substantial interest of LVD in "*its*" loans.  The same laws and policies did *not* exist in the sham arrangements of Tucker, Hallinan, or CashCall—none of which involved arm-of-the Tribe lending businesses, if a Tribe at all.  And entirely unlike those comparisons Plaintiffs often feature, LVD deployed tribally-owned and tribally-controlled arm-of-the-Tribe lending entities engaged in self-determination, consummating consensual loan transactions on the reservation subject to and fully compliant with Tribal and Federal law.  Plaintiffs' assertion that the routine commercial services here can support a RICO claim cannot survive this backdrop of Congressional directive and policy, particularly where there is simply no authority restricting sovereignty upon which one might believe state law preempts tribal law.  It is indeed even constitutionally the opposite.  The Federal law and policy at the center of nearly a dozen tribal expert non-privileged legal opinions forming the basis of Martorello's good faith has now been unanimously affirmed.  This, along

3

JA643

with the lack of predicate offense, the affirmed substantial interest of LVD in "*its*" loans and *Settlement Funding* leave no doubt that Tribal and federal law apply to the consumer loans at issue in this case. No court has ever held otherwise; and with their "sham" fiction now eviscerated by the Fourth Circuit, neither Martorello nor any of the tribal law experts involved with LVD's lending businesses could have had any basis upon which to believe (or advise Martorello) differently. Even irrespective of the threshold issue, a "far cry" from the sham of Tucker and Hallinan, Martorello's good faith belief in these underlying federal laws and policies has prevailed.

The Fourth Circuit's findings also require dismissal of Plaintiffs' usury and unjust enrichment claims against Martorello because Big Picture is the lender and Plaintiffs' remedy at law is limited only to it. This conclusion is also independent of any choice of law analysis and applies equally to Red Rock. For these reasons and others following the Fourth Circuit's Decision, this case should be dismissed in its entirety with prejudice. If not, it must be promptly set for trial so as to bring an end to Plaintiffs' meritless claims and related suite of meritless lawsuits.

## II. EFFECT OF THE FOURTH CIRCUIT'S DECISION ON PENDING MOTIONS

Absent dismissal, Martorello states as follows with respect to each pending motion. Martorello has attempted to group the pending motions and related filings by subject matter. Exhibit A contains a chart setting forth Martorello's position for each individual motion.

### A. Plaintiffs' Motion For Class Certification [ECF No. 189]; Plaintiffs' Motion for Leave to File Supplemental Authority [ECF No. 475]

The Fourth Circuit's Decision requires that Plaintiffs' Motion to For Class Certification and related Motion for Leave to File Supplemental Authority be denied. Plaintiff's loan agreements are not the product of a sham. They are valid, as are their dispute resolution

procedures and class action waiver.  Further, Plaintiffs cannot establish ascertainability because they have no current means of obtaining loan data that would allow identification of class members.  The only documents or data that might establish the identities of the class plaintiffs are in the Tribe's possession or belong to the Tribe. The Fourth Circuit's Decision puts an end to the possibility of that ascertainability-related discovery from the Tribal entities.  Even if Plaintiffs' theoretical "paths for obtaining the loan data" (Class Cert. Reply, ECF No. 236, at 14) were sufficient basis for a finding of ascertainability (which they are not), each of the "paths" hypothesized by Plaintiffs is now closed by virtue of the Fourth Circuit's Decision.

### B.  Martorello's Motion For Reconsideration Of Order, ECF No. 479 [ECF No. 486]

The Fourth Circuit's legal conclusions require that the Court's crime-fraud opinion be vacated.[1] The Fourth Circuit's narrative detailed above, citing the same key evidence relied on by the Plaintiffs (and mirroring the now alleged "new evidence" in *Galloway et al., v. Big Picture Loans, LLC, et al.,* 18-cv-406-REP) definitively rejected Plaintiffs' attempts to place a sinister veneer on the sale of Bellicose, as well as their attempts to improperly restrict tribal sovereignty.  In reversing the Court's sovereign immunity opinion, the Fourth Circuit—considering substantially the same evidence considered by the Court in support of its crime-fraud opinion—found that it was not inappropriate to restructure in an attempt to reduce its potential liability following *Otoe-Missouria, CashCall,* or other regulatory pressures at the time:  "The

---

[1]  The Fourth Circuit's Decision does not impact Martorello's Motion for Reconsideration directed to the Court's finding that Martorello waived the attorney-client privilege by asserting a good faith defense.  Accordingly, in the event Martorello's Motion to Dismiss is denied, this portion of Martorello's Motion for Reconsideration would require resolution.  Also, in the event that the Court determines that Plaintiffs' Motion for Class Certification or Martorello's Motion for Reconsideration require resolution despite the Fourth Circuit's Decision, the records related to these motions are now incomplete and require supplementation in light of the significant discovery that has occurred since the filing of the motions, including the production of a significant volume of documents by the Rosette law firm.

fact that the Tribe created Big Picture and Ascension in part to reduce exposure to liability does not necessarily invalidate or even undercut the Tribe's stated purpose, i.e., tribal economic development. Indeed, in order to reach its stated goal, the Tribe may have deemed it necessary to reduce its exposure to liability." *Id.* at 179. The Fourth Circuit also rejected the significance of the financial arrangement of the parties, another central theme in Plaintiffs' allegations. The narrative and findings of the Fourth Circuit must now be considered, which ,effectively eviscerates the rationale underlying the Court's crime-fraud ruling, which was based on the Court's errant belief that "the sale transaction was devised by Martorello to shield him and his closely-held corporations…." Mem. Opinion, ECF No. 478 at 18. The Court's crime-fraud ruling thus conflicts with the Fourth Circuit's opinion and must be set aside.

**C. Plaintiffs' Motion for Sanctions [ECF No. 488]; Proposed Scheduling Order for Spoliation Discovery [ECF No. 498]; Plaintiffs' Statement of Position [ECF No. 523]; Plaintiffs' Motion for Leave to Serve Requests for Production and Third-Party Subpoenas [ECF No. 524]; Plaintiffs' Motion to Strike The Declaration Of John M. Norman [ECF No. 549]; Plaintiffs' Motion to Compel [ECF No. 552]; Plaintiffs' Cross-Motion to Compel Against Non-Party Conner & Winters, LLP [ECF No. 571]; Martorello's Motion for Protective Order [ECF No. 539]; Motion to Quash, In Part, Non-Party Subpoena, Or, In the Alternative Motion for Protective Order [ECF Nos. 542, 543]; Defendant Martorello's Motion for Leave to File a Reply [ECF No. 564]**

Each of these filings spring from or relate to the Court's crime-fraud opinion and accordingly, should be denied (ECF Nos. 488, 524, 549, 552, 571), deemed moot (ECF Nos. 498, 523, 564), or granted (ECF Nos. 539, 542, 543) as indicated on Exhibit A because, as explained above, the Fourth Circuit's Decision eviscerates the rationale underlying the crime-fraud ruling, including its spoliation-related findings, and requires it to be set aside.[2]

---

[2] Also, Plaintiffs have waived the right to brief spoliation by not adhering to their own proposed deadlines in ECF No. 498-1 and failing to file their brief in sufficient time to allow for briefing to be completed by August 30, 2019, as required by Order, ECF No. 479, ¶ 2.

JA646

**D. Matt Martorello's Opening Brief Explaining Why He Is Entitled To Proceed With a Privilege Review [ECF No. 536]**

To the extent that Plaintiffs rely on the Court's crime-fraud opinion in Order ECF No. 479 as a basis for denying Martorello the right to conduct a privilege review or assert privilege, Plaintiffs' arguments should be denied because as explained above, the Fourth Circuit's Decision eviscerates the rationale underlying the Court's crime-fraud ruling and requires it to be set aside. To the extent that Plaintiffs raise other purported grounds for denying Martorello the right to proceed with a privilege review, this issue requires resolution by the Court.

**E. Motions That Are Not Impacted By The Fourth Circuit's Decision.**

The following motions are not impacted by the Fourth Circuit's Decision and accordingly will require resolution in the event that Martorello's Motion to Dismiss is denied as set forth in Exhibit A: ECF Nos. 499, 500, 505, 509, and 528.

Respectfully submitted,

MATT MARTORELLO
By:/s/ *John M. Erbach*
M. F. Connell Mullins, Jr. (VSB No. 47213)
Email: cmullins@spottsfain.com
Hugh McCoy Fain, III (VSB No. 26494)
Email: hfain@spottsfain.com
John Michael Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100

Richard L. Scheff (admitted *pro hac vice*)
Jonathan P. Boughrum (admitted *pro hac vice*)
Michael C. Witsch (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone: 267.780.2000

Facsimile: 215.405.9070
Email: rscheff@ armstrongteasdale.com
Email: jboughrum@ armstrongteasdale.com
Email: mwitsch@armstrongteasdale.com

Michelle Lynne Alamo (admitted *pro hac vice*)
William Ojile (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
4643 S. Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720.722.7189
Facsimile: 720.200.0679
Email: malamo@armstrongteasdale.com
Email: bojile@armstrongteasdale.com

*Counsel for Defendant Matt Martorello*

JA648

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on this 23rd day of August, 2019, the foregoing was filed using the Court's CM/ECF system, thereby serving a copy on all counsel of record electronically.

By:/s/  *John M. Erbach*
John M. Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile:  (804) 697-2100

JA649