RECORD NO. 21-2116

# In the United States Court of Appeals for the Fourth Circuit

LULA WILLIAMS; GLORIA TURNAGE;
GEORGE HENGLE; DOWIN COFFY; MARCELLA P. SINGH,
ON BEHALF OF THEMSELVES AND ALL INDIVIDUALS SIMILARLY SITUATED,

*Plaintiffs-Appellees*

v.

MATT MARTORELLO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, NO. 3:17-CV-00461 (PAYNE, R.)

## JOINT APPENDIX VOL. II

Bernard R. Given II
William N. Grosswendt
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
(310) 282-2000

John D. Taliaferro
LOEB & LOEB LLP
901 New York Ave. NW, Suite 300
Washington, DC 20001
(202) 618-5000
***Counsel for Appellants***

Matthew W.H. Wessler
GUPTA WESSLER PLLC
2001 K Street, NW,
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Kristi C. Kelly
Andrew Guzzo
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7570
***Counsel for Appellees***

# TABLE OF CONTENTS

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | **VOLUME I OF VIII** | |
| | Docket Sheet | 1 |
| 06/22/2017 | Class Action Complaint (ECF 1) | 131 |
| 09/29/2017 | Defendant Big Picture Loans, LLC's Brief in Support of Its Motion to Dismiss for Failure to Exhaust Tribal Remedies and Under the Doctrine of *Forum Non Conveniens* (ECF 27) | 163 |
| 12/21/2017 | Defendants Big Picture Loans, LLC, Ascension Technologies, LLC, James Williams, Jr., Gertrude McGeshick, Susan McGeshick, and Giiwegiizhigookway Martin's Reply Memorandum in Support of Motion to Dismiss (ECF 99) | 198 |
| 12/21/2017 | Big Picture Loan's Reply in Support of Its Motion to Dismiss for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens (ECF 100) | 220 |
| 07/27/2018 | Memorandum and Opinion Re: Defendants' Big Picture Loans and Ascension Technologies' Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 146) | 236 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 10/23/2018 | Defendant Matt Martorello's Opposition to Plaintiffs' Motion for Class Certification (ECF 222) | 317 |
| 12/20/2018 | Plaintiffs-Appellees' Response Brief (USCA4 18-1827, Dkt. 33) | 368 |
| 05/20/2019 | Plaintiffs' Memorandum in Support of Motion for Leave to File Supplemental Evidence in Support of Oppositions to Motion to Dismiss (Case No. 3:18-cv-00406-REP, Dkt. 233) | 433 |
| 06/04/2019 | Plaintiffs-Appellees' Supplemental Letter under Rule 28 (j) (USCA4 18-1827, Dkt. 125) | 455 |
| 06/07/2019 | Defendants-Appellants' Response to Plaintiffs-Appellees' Supplemental Letter under Rule 28 (j) (USCA4 18-1827, Dkt. 126) | 464 |
| 06/28/2019 | Plaintiffs' Statement of Position Regarding Material Misrepresentations Made to the Court in Support of Their Motions to Dismiss for Lack of Jurisdiction (Case No. 3:18-cv-00406-REP, Dkt. 249) | 466 |
| 07/03/2019 | Published Decision - Fourth Circuit Case No. 18-1827 (ECF 581) | 500 |
| 07/03/2019 | Judgment - Fourth Circuit Case No. 18-1827 (ECF 582) | 528 |

2

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 07/23/2019 | Order Setting Evidentiary Hearing on Subject Matter Jurisdiction on October 28, 2019 (Case No. 3:18-cv-00406-REP, Dkt. 270) | 530 |
| 07/24/2019 | Defendants Big Picture Loans and Ascension Technologies' Statement Regarding Plaintiffs' Claims of Material Misrepresentation (Case No. 3:18-cv-00406-REP, Dkt. 271) | 534 |
| 07/25/2019 | Mandate - Fourth Circuit Case No. 18-1827 (ECF 600) | 585 |
| 08/09/2019 | Defendant Matt Martorello's Response to Plaintiffs' Statement of Position Regarding Purported Material Misrepresentations Made to the Court (Case No. 3:18-cv-00406-REP, Dkt. 272) | 587 |
| 08/23/2019 | Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Statement of Position to Court's July 22, 2019 Order (ECF 611) | 622 |
| 08/23/2019 | Defendants Brian McFadden and Simon Liang's Joint Statement of Position (ECF 612) | 631 |
| 08/23/2019 | Defendant Matt Martorello's Statement of Position (ECF 613) | 640 |
| **VOLUME II OF VIII** | | |
| 09/16/2019 | Plaintiffs' Response to Matt Martorello's Statement of Position (ECF 624) | 650 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 09/16/2019 | Plaintiffs' Response to Brian McFadden and Simon Liang's Joint Statement of Position (ECF 626) | 669 |
| 09/23/2019 | Defendants Big Picture Loans' and Ascension Technologies' Reply in Support of their Statement of Position (ECF 630) | 676 |
| 10/04/2019 | Memorandum in Support of Motion to Strike (1) Declaration of Joette Pete, (2) Documents Produced By Joette Pete, and (3) Joette Pete from Plaintiffs' Witness List (Case No. 3:18-00406-REP, Dkt. 325) | 685 |
| 10/21/2019 | Order Re: Extension of Time to Accommodate Finalization of Settlement Between Plaintiffs and Defendants Big Picture Loans, LLC and Ascension Technologies, LLC (ECF 637) | 702 |
| 02/18/2020 | Order Re: Dismissal of Action Against Defendants Big Picture Loans, LLC and Ascension Technologies, LLC for Lack of Subject Matter Jurisdiction Pursuant to Judgment of the United States Court of Appeals for the Fourth Circuit (ECF 668) | 705 |
| 02/20/2020 | Order Re: Necessity of Holding an Evidentiary Hearing on Plaintiffs' Misrepresentation Filing (ECF 673) | 706 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 03/04/2020 | Defendant Matt Martorello's Notice Regarding Evidentiary Hearing (ECF 679) | 710 |
| 03/05/2020 | Plaintiffs' Notice Regarding Evidentiary Hearing (ECF 680) | 717 |
| 05/21/2020 | Plaintiffs' Response to Defendant Matt Martorello's Supplemental Brief Re: Effect of the Fourth Circuit's Decision on Class Certification (ECF 734) | 722 |
| 06/17/2020 | Plaintiffs' Statement of Position Regarding Material Misrepresentations and Omissions Made to the Court (ECF 784) | 759 |
| 07/13/2020 | Defendant Matt Martorello's Response to Plaintiffs' Statement of Position (ECF 843) | 812 |
| 07/25/2020 | Transcript of Evidentiary Hearing (ECF 882) | 873 |
| 07/25/2020 | Transcript of Evidentiary Hearing (ECF 883) | 1047 |
| 07/26/2020 | Plaintiff's Reply to Defendant Matthew Martorello's Statement of Position with Respect to Plaintiffs' Motion for Leave to File Supplemental Authority (ECF 884) | 1144 |
| 07/29/2020 | Defendant Matt Martorello's Statement of Position in Response to July 23, 2020 Order (Paragraph 4) (ECF 895) | 1149 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 07/30/2020 | Matt Martorello's Statement of Position in Response to July 23, 2020 Order (Paragraph 2) (ECF 902) | 1161 |
| 07/31/2020 | Matt Martorello's Supplemental Brief Regarding Alleged Misrepresentations (ECF 909) | 1186 |
| 11/18/2020 | Memorandum and Opinion Re: Misrepresentations (ECF 944) | 1218 |
| 11/24/2020 | Order Re: Amended Schedule for Amended Motion for Class Certification (ECF 945) | 1257 |
| 11/30/2020 | Defendant Matt Martorello's Memorandum in Support of his Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 947) | 1258 |
| 12/14/2020 | Plaintiffs' Response in Opposition to Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 959) | 1273 |
| 12/21/2020 | Defendant Matt Martorello's Reply in Support of his Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 962) | 1291 |
| **VOLUME III OF VIII** | | |
| 12/23/2020 | Plaintiffs' Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 967) | 1302 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 12/23/2020 | Plaintiffs' Memorandum in Support of Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | 1305 |
| 02/03/2021 | Matt Martorello's Opposition to Plaintiffs' Renewed Motion for Class Certification (ECF 999) | 1347 |
| 02/23/2021 | Opposition to Plaintiffs' Renewed Motion For Class Certification Against Matt Martorello (ECF 1007) | 1377 |
| 03/22/2021 | Plaintiffs' Reply in Support of Renewed Motion for Class Certification Against Defendant Matt Martorello (ECF 1055) | 1427 |
| 05/19/2021 | Memorandum and Opinion Re: Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 1090) | 1467 |
| 05/19/2021 | Order Denying Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 1091) | 1476 |
| 06/29/2021 | Transcript of Hearing on Plaintiffs' Renewed Motion for Class Certification (ECF 1104) | 1478 |
| 07/12/2021 | Memorandum Opinion Re: Class Certification Waiver (ECF 1106) | 1656 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 07/12/2021 | Appendix to Memorandum Opinion Re: Class Certification Waiver (ECF 1106-1) | 1675 |
| 07/20/2021 | Memorandum Opinion Re: Plaintiffs' Motion for Class Certification (ECF 1110) | 1689 |
| 07/20/2021 | Order Granting Plaintiffs' Renewed Motion to Certify a Class (ECF 1111) | 1725 |
| 08/04/2021 | Notice of Appeal (ECF 1119) | 1729 |
| 08/04/2021 | Defendant Matt Martorello's Petition for Permission to Appeal (ECF 1119-2) | 1730 |
| 10/07/2021 | Order on Permission to Appeal (USCA4 21-2116, Dkt. 16) | 1873 |

## **TABLE OF CONTENTS – EXHIBITS**

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | **VOLUME IV OF VIII** | |
| 12/21/2017 | Exhibits to Defendants Big Picture Loans and Ascension Technologies' Reply in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 106) | |
| | 1.   Matt Martorello Declaration (ECF 106-1) | 1874 |
| 10/22/2018 | Exhibits to Defendant Matt Martorello's Memorandum in Opposition to Plaintiffs' Motion for Class Certification (ECF 216) | |
| | 11.  Demand Letter (ECF 216-11) | 1891 |
| 10/23/2018 | Exhibits to Defendant Matt Martorello's Memorandum in Opposition to Plaintiffs' Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 222) | |
| | F.   The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (ECF 222-7) | 1896 |
| 05/21/2020 | Exhibits to Plaintiffs' Response to Matt Martorello's Addressing the Effect of the Fourth Circuit's Decision on Plaintiffs' Class Certification (ECF 734) | |
| | 1.   Big Picture Loans Transaction Consent (ECF 734-1) | 1932 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 06/08/2020 | Exhibits to Matt Martorello's Supplemental Memorandum in Support of Motion Under Rule 30(d) for Further Deposition (ECF 769) | |
| | 1.　Excerpt of Joette Pete Deposition (ECF 769-1) | 1939 |
| 06/17/2020 | Exhibits to Plaintiffs' Statement of Position Regarding Materials Misrepresentations and Omissions Made to the Court (ECF 784) | |
| | 17.　Declaration of Joette Pete (ECF 784-17) | 1993 |
| 07/13/2020 | Exhibits to Matt Martorello's Response to Plaintiffs' Statement of Position (ECF 844) | |
| | 1.　Summary of Facts in Support of Martorello's Response to Plaintiffs' Statement of Position (ECF 844-1) | 2003 |
| 07/17/2020 | Exhibits to Plaintiffs' Reply in Support of Statement of Position Regarding Material Misrepresentations Made to the Court by Defendants (ECF 864) | |
| | 1.　Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Reply in Support of Their Motion to Dismiss For Lack of Subject Matter Jurisdiction (ECF 864-1) | 2053 |
| | 2.　12/31/2013 Email from Martorello re: Memo Regarding Structure of | 2071 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Possible Acquisition of SPVI (ECF 864-2) | |
| | 3. 12/08/2013 Email from Martorello re: Bellicose Capital Valuation (ECF 864-3) | 2074 |
| | 4. 04/18/2016 Email to Martorello re: Project (ECF 864-4) | 2078 |
| | 5. 08/26/2015 Email from Martorello re: Forecasts for Evaluation (ECF 864-5) | 2080 |
| | 6. 03/10/2017 Email to Martorello re: DRAFT memorandum regarding timing of evolution of CFPB rule (ECF 864-6) | 2083 |
| | 7. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 864-7) | 2093 |
| | 8. 01/14/2016 Email from Martorello re: AT BPL SA (ECF 864-8) | 2098 |
| | 9. 12/17/2016 Email to Martorello re: PR Hybrid (ECF 864-9) | 2108 |
| | 10. Michelle Hazen Affidavit (ECF 864-10) | 2115 |
| | 11. 07/22/2014 Email from Wichtman (ECF 864-11) | 2122 |
| | 12. The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal | 2127 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Government Resolution No. T2014-066 (ECF 864-12) | |
| | 13. Excerpt of Testimony from Deposition of James Williams (ECF 864-13) | 2131 |
| | 14. 08/22/2014 Email from Martorello re: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final (ECF 864-14) | 2135 |
| | 15. 04/16/2013 Email from Martorello re: Significant Ruling in Colorado Western Sky Case (ECF 864-15) | 2138 |
| | 16. 10/03/2013 Email attaching Notice to Cease Servicing Origination of New Loans to NY Consumers (ECF 864-16) | 2156 |
| | 17. 10/14/2013 Email from Martorello re: LVD to take ownership of Bellicose VI (ECF 864-17) | 2167 |
| | 18. 10/14/2013 Email from Martorello re: SPVI Equity Transfer to LVD (ECF 864-18) | 2169 |
| | 19. 10/29/2013 Email from Martorello re: Payday US Offer Deactivation Notice (ECF 864-19) | 2172 |
| | 20. 08/26/2014 Email from Martorello re: Modal for Tribal Council to Review (ECF 864-20) | 2177 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 21. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 864-21) | 2193 |
| | 22. 10/10/2014 Email from Martorello re: AG Letters (ECF 864-22) | 2199 |
| | 23. 11/04/2014 Email from Martorello re: WSJ Press (ECF 864-23) | 2206 |
| | 24. Joette Pete Declaration (ECF 864-24) | 2211 |
| | 25. Spreadsheet of texts (ECF 864-25) | 2221 |
| | 26. 09/15/2014 Email from Martorello re: Docs (ECF 864-26) | 2224 |
| | 27. 08/26/2011 Email from Martorello re: Question on Docs (ECF 864-27) | 2227 |
| | 28. 02/23/2015 Email from Martorello re: New Agreement with O2 (ECF 864-28) | 2235 |
| | 29. 09/03/2015 Email from Martorello re: Attached Image (ECF 864-29) | 2240 |
| | 30. 07/09/2015 Email from Martorello re: M-1, Agreement and Plan of Merger (ECF 864-30) | 2246 |
| | 31. 08/20/2014 Agreement and Plan of Merger (ECF 864-31) | 2257 |
| | 32. Excerpt of Testimony from Martorello Deposition (ECF 864-32) | 2274 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 33. 09/14/2015 Agreement and Plan of Merger ECF 864-33 | 2278 |
| | 34. Excerpt of Testimony from Deposition of John Williams (ECF 864-34) | 2300 |
| | 35. Subpoena to Produce Documents Issued to Rosette, LLP (ECF 864-35) | 2304 |
| | 36. 03/01/2019 Email from T. Nelson re: Williams v. Big Picture Loans, Subpoena to Rosette, LLP: First Wave of Production (ECF 864-36) | 2315 |
| | 37. 05/31/2019 Email from T. Nelson re: Williams v. Big Picture Loans, Subpoena to Rosette, LLP: First Wave of Production (ECF 864-37) | 2322 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Loan Criteria (ECF 886) | |
| | 1. Big Picture Website re: Rates (ECF 886-1) | 2324 |
| | 2. Excerpt of Testimony from Deposition of Michelle Hazen (ECF 886-2) | 2331 |
| | 3. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 886-3) | 2345 |
| | 4. Excerpt of Testimony from Deposition of Karrie Wichtman ECF 886-4 | 2351 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 5. Excerpt of Testimony from Deposition of Craig Mansfield (ECF 886-5) | 2354 |
| | 6. Employee Profiles - Bellicose VI, LLC and Bellicose Capital, LLC (ECF 886-6) | 2358 |
| | 7. Excerpt of Testimony from Deposition of James Williams (ECF 886-7) | 2367 |
| | 8. Excerpt of Testimony from Deposition of Susan McGeshick (ECF 886-8) | 2373 |
| | 9. Excerpt of Testimony from Deposition of Gertrude McGeshick (ECF 886-9) | 2377 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Structure of Martorello's Companies and Flow of Funds (ECF 896) | |
| | 1. Bellicose Capital Corporate Structure (ECF 896-1) | 2380 |
| | 2. Bluetech Irrevocable Trust Registration (ECF 896-2) | 2392 |
| | 3. Amended and Restated Operating Agreement of Bellicose Capital, LLC (ECF 896-3) | 2393 |
| | 4. Operating Agreement of Bellicose VI, LLC (ECF 896-4) | 2419 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 5. Secured Promissory Note (ECF 896-5) | 2438 |
| | 6. Addendum to Secured Promissory Note (ECF 896-6) | 2446 |
| | 7. Summary of Payments and Distributions from Tribal Lending Businesses from 01/01/2012 – 01/31/2016 (ECF 896-7) | 2447 |
| | 8. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 896-8) | 2448 |
| | 9. Statement of Financial Affairs of Eventide Credit Acquisitions, LLC (ECF 896-9) | 2449-2470 |
| | 10. Eventide Distribution Calculation (ECF 896-10) | 2471 |
| **VOLUME V OF VIII** | | |
| 12/23/2020 | Exhibits to Plaintiffs' Memorandum in Support of Renewed Motion For Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | |
| | 1. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 968-1) | 2472 |
| | 2. Excerpt of Testimony from Deposition of Warren Scott Merritt (ECF-986-2) | 2473 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 3. 08/26/2011 Email from Martorello re: Question on Docs (ECF 986-3) | 2481 |
| | 4. Declaration of Joette Pete (ECF 986-4) | 2491 |
| | 5. Servicing Agreement dated 10/25/2011 (ECF 986-5) | 2501 |
| | 6. 12/21/2012 Email from Martorello re: Valuation Method (ECF 986-6) | 2542 |
| | 7. 04/16/213 Email from Martorello re: Order Granting Plaintiffs' Motion for Summary Judgment (ECF 986-7) | 2547 |
| | 8. Letter from state of Connecticut dated 05/07/2013 (ECF 968-8) | 2565 |
| | 9. 08/12/2013 Email from Martorello re: Draft Complaint (ECF 968-9) | 2567 |
| | 10. 08/09/2013 Email from Martorello re: NY AG Letter Cease & Desist Letter (ECF 968-10) | 2595 |
| | 11. 08/09/2013 Email from Martorello re: Tribal Lawsuit (ECF 968-11) | 2600 |
| | 12. 10/03/2013 Email from Duck Creek Tribal re: Notice to Cease Servicing Origination of New Loans to NY consumers (ECF 968-12) | 2605 |
| | 13. 10/14/2013 Email from Martorello re: LVD to take ownership of Bellicose VI (ECF 968-13) | 2616 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
|  | 14. 10/29/2013 Email from Martorello re: Payday Deactivation Notice (ECF 968-14) | 2618 |
|  | 15. 11/08/2013 Email from Martorello re: LVD and legal bills (ECF 968-15) | 2620 |
|  | 16. 12/31/2013 Email from Martorello re: Memo Regarding Structure of Possible Acquisition of SPVI (ECF 968-16) | 2624 |
|  | 17. 01/06/2014 Email from Martorello re: Meeting with Cheryl Parker Rose @ CFPB (ECF 968-17) | 2627 |
|  | 18. 01/08/2014 Email re: Justice Department Action (ECF 968-18) | 2636 |
|  | 19. 01/09/2014 Email from Kim Anderson re: DOJ filing (ECF 968-19) | 2639 |
|  | 20. 02/12/2014 Email from Martorello re: ACH Pre Application (ECF 968-20) | 2641 |
|  | 21. 07/22/2014 Email from Wichtman re: Rebrand from Payday (ECF 968-21) | 2645 |
|  | 22. 08/22/2014 Email re: Martorello re: TC Resolution 2014 (ECF 968-22) | 2650 |
|  | 23. The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal | 2674 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Government Resolution No. T2014-066 (ECF 968-23) | |
| | 24. 10/10/2014 Email from Martorello re: AG Letters (ECF 968-24) | 2678 |
| | 25. 11/04/2014 Email from Wichtman re: WSJ Press (ECF 968-25) | 2685 |
| | 26. 12/01/2014 Email from Wichtman re: EIN Big Picture Loans (ECF 968-26) | 2690 |
| | 27. Resolution #2015-10 Approving the Creation of the Wholly Owned and Operated Tribal Servicing Entity Ascension Technologies, LLC (ECF 968-27) | 2695 |
| | 28. 02/19/2015 Meeting Minutes – Ascension (ECF 968-28) | 2700 |
| | 29. 02/24/2015 Email from J. Martorello re: Sourcepoint VI Assignment Notification: DRAFT REVIEW - Acquisition of Source Point VI US173700 - Assignment letter (ECF 968-29) | 2703 |
| | 30. Operating Agreement of Eventide Credit Acquisitions, LLC (ECF 968-30) | 2709 |
| | 31. Agreement and Plan of Merger dated 09/14/2015 (ECF 968-31) | 2728 |
| | 32. 10/02/2015 Email from Martorello re: Forecasts (ECF 968-32) | 2750 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 33. 12/05/2015 Email from Martorello re: Bellicose Capital Valuations (ECF 968-33) | 2753 |
| | 34. 12/07/2016 Email from Martorello re: PR Hybrid (ECF 968-34) | 2757 |
| | 35. 08/26/2015 Email from Martorello re: Forecasts for Valuation (ECF 968-35) | 2764 |
| | 36. 03/10/2017 Email from Martorello re: Draft Memorandum re: timing of evolution of CFPB Rule (ECF 968-36) | 2767 |
| | 37. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 968-37) | 2777 |
| | 38. 09/15/2014 Email from Martorello re: Docs (ECF 968-38) | 2784 |
| | 39. 09/03/2015 Email from Martorello attaching Image (ECF 968-39) | 2787 |
| | 40. 01/15/2016 Email from John Williams re: Delegation of Authority (ECF 968-40) | 2793 |
| | 41. 01/14/2016 Email from Wichtman re: Ascension Manager Issue (ECF 968-41) | 2795 |
| | 42. Recorded Certificate of Merger date 01/26/2016 (ECF 968-41) | 2801 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 43. Ascension Technologies Designation of Authority Policy (ECF 968-43) | 2805 |
| | 44. Loan and Security Agreement dated 09/14/2015 (ECF 968-44) | 2810 |
| | 45. Intratribal Servicing Agreement dated 02/16/2016 (ECF 968-45) | 2840 |
| | 46. Secured Promissory Note (ECF 968-46) | 2855 |
| | 47. Eventide Distribution Calculation (ECF 968-47) | 2863 |
| | 48. Timeline (ECF 968-48) | 2864 |
| | 49. Declaration of George Hengle (ECF 968-49) | 2871 |
| | 50. Big Picture Loans Confidential Investment Opportunity (ECF 968-50) | 2874 |
| | 51. Supplemental Declaration of American Legal Claim Services, LLC Regarding Notice of Dissemination (ECF 968-51) | 2878 |
| | 52. 02/11/2020 Letter from Rosette Firm re: Request for Consumer Loan Data (ECF 968-52) | 2882 |
| | 53. Order Granting Renewed Motion to Certify Class (ECF 968-53) | 2886 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
|  | 54. Declaration of Kristi C. Kelly (ECF 968-54) | 2910 |
|  | 55. Declaration of Leonard A. Bennett (ECF 968-55) | 2918 |
|  | 56. Declaration of E. Michelle Drake in Support of Plaintiffs' Renewed Motion for Class Certification (ECF 968-56) | 2928 |
|  | 57. Declaration of Beth E. Terrell in Support of Plaintiffs' Renewed Motion for Class Certification Claims Against Defendant Matt Martorello (ECF 968-57) | 2980 |
|  | 58. Declaration of Matthew W. H. Wessler (ECF 968-58) | 2988 |
|  | 59. Declaration of Michael A. Caddell (ECF 968-59) | 2995 |
|  | 60. Declaration of American Legal Claim Services, LLC (ECF 968-60) | 3013 |
| 02/03/2021 | Exhibits to Matt Martorello's Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF 999) | |
|  | 11. Resolution #2011-041 Approving the Creation of the Lac Vieux Desert Band of Lake Superior Indians Tribal Enterprise – Red Rock Tribal Lending, Inc. (ECF 999-11) | 3015 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 12. Articles of Organization of Red Rock Tribal Lending (ECF 999-12) | 3017 |
| | 14. Deposition of Jennifer Weddle (ECF 999-14) | 3019 |
| | 15. Email from Martorello to Wichtman (ECF 999-15) | 3056 |
| | **VOLUME VI OF VIII** | |
| 02/23/2021 | Exhibits to Opposition to Plaintiffs' Renewed Motion For Class Certification Against Matt Martorello (ECF 1007) | |
| | A. Affidavit of Michelle Hazen (ECF 1007-1) | 3064 |
| | D. The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (ECF 1007-5) | 3070 |
| | E. Affidavit of Jennifer Weddle in Support of Motion to Quash (ECF 1007-6) | 3105 |
| | F. Default Letter dated December 12, 2019 (ECF 1007-7) | 3114 |
| | G. Transcript of Deposition of Michelle Hazen (ECF 1007-8) | 3127 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | H. Transcript of Deposition of Matt Martorello (ECF 1007-9)[1] | 3377 |
| | G. Excerpt of Transcript of Deposition of Daniel Gravel (ECF 1007-12)[2] | 3485 |
| | **VOLUME VII OF VIII** | |
| | H. Transcript of Deposition of Craig Mansfield (ECF 1007-13) | 3538 |
| | N. Red Rock Capital Lending Closing Checklist (ECF 1007-23) | 3762 |
| | M. Deposition of James Dowd (ECF 1007-24)[3] | 3765 |
| | YY. Declaration of James Williams, Jr. in Support of Motion for Preliminary Injunction (ECF 1007-32) | 4004 |
| | ZZ. Affidavit of Brian McFadden (ECF 1007-33) | 4037 |

---

[1] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

[2] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

[3] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 03/22/2021 | Exhibits to Plaintiffs' Reply in Support of Renewed Motion For Class Certification Against Defendant Matt Martorello (ECF 1055) | |
| | 1.   Consent to Electronic Communications (ECF 1055-1) | 4041 |
| | 2.   08/27/2012 Email from Martorello re: SourcePoint – Tribal Consumer Financial Services Regulatory Code (ECF 1055-2) | 4048 |
| | 3.   04/02/2013 Email from Daniel Gravel re: TCFSR Code (ECF 1055-3) | 4051 |
| | 4.   08/27/2012 Email from Blake Sims re: SourcePoint – Tribal Consumer Financial Services Regulatory Code (ECF 1055-4) | 4053 |
| | 5.   The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (part 1) (ECF 1055-5) | 4055 |
| | 5.   The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (part 2) (ECF 1055-6) | 4075 |
| | 6.   Otoe Missouria Tribe of Indians Resolution OMTC#050341 FY-2018 (ECF 1055-7) | 4091 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 7. Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LL's Reply in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 1055-8) | 4120 |
| | 8. Consent to Electronic Communications (ECF 1055-9) | 4138 |
| | 9. 12/12/2011 Email from J. Weddle re: RRTL and Pepper Cash Loan Docs (ECF 1055-10) | 4145 |
| | 10. Class Action Settlement Agreement and Release (ECF 1055-11) | 4166 |
| | 11. 01/14/2016 Email from Martorello re: AT BPL SA (ECF 1055-12) | 4224 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| **VOLUME VIII OF VIII (SEALED EXHIBITS)** | | |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Loan Criteria (ECF 886) | |
| | 2.   Excerpt of Testimony from Deposition of Michelle Hazen (ECF 886-2) | 4232 |
| | 5.   Excerpt of Testimony from Deposition of Craig Mansfield (ECF 886-5) | 4246 |
| | 8.   Excerpt of Testimony from Deposition of Susan McGeshick (ECF 886-8) | 4250 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Structure of Martorello's Companies and Flow of Funds (ECF 896) | |
| | 7.   Summary of Payments and Distributions from Tribal Lending Businesses from 01/01/2012 – 01/31/2016 (ECF 896-7) | 4254 |
| | 8.   Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 896-8) | 4260 |
| | 10.  Eventide Distribution Calculation (ECF 896-10) | 4268 |
| 12/23/2020 | Plaintiffs' Memorandum in Support of Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | |

| | 1. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 968-1) | 4271 |
|---|---|---|
| | 47. Eventide Distribution Calculation (ECF 968-47) | 4279 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LULA WILLIAMS, *et al.*,       )
                               )
                    Plaintiffs, )
          v.                   )          Civil Action No. 3:17-cv-461 (REP)
                               )
BIG PICTURE LOANS, LLC, *et al.*, )
                               )
                    Defendants. )

**PLAINTIFFS' RESPONSE TO MATT MARTORELLO'S STATEMENT OF POSITION**

Pursuant to the Court's orders (ECF Nos. 599, 601), Plaintiffs, by counsel, submit this response to Matt Martorello's Statement of Position (ECF No. 613).

Based on the record before it, the Fourth Circuit held that Big Picture Loans, LLC and Ascension Technologies, LLC (the "Corporate Defendants") were sufficiently "arms-of-the-tribe" such that the Corporate Defendants could share in the LVD Tribe's sovereign immunity from suit. However, critically, the Fourth Circuit ***did not*** bless any portion of the lending enterprise as legal. The Fourth Circuit said nothing about whether RICO or state usury laws apply to the loans. The Fourth Circuit ***did not*** in any fashion exonerate Matt Martorello from liability. The opinion merely held that the Corporate Defendants could not be sued. As the Corporate Defendants stated in their reply brief on appeal, "this appeal is not a policy debate about consumer finance, or whether state or tribal law governs Plaintiffs' consumer loan agreements." *Williams v. Big Picture Loans, LLC*, No. 18-1827, ECF No. 90 at 1 (4th Cir. Feb. 15, 2019).

Predictably, Martorello argues that the Fourth Circuit's limited opinion means that Martorello is somehow off the hook for his conduct in the lending enterprise. Plaintiffs have previously addressed the effect of the Fourth Circuit's ruling as to Martorello. (ECF No. 597 at 2-

**JA650**

6.)  To briefly summarize, the Fourth Circuit's ruling has no effect on the merits of the claims against Martorello.  As stated by the Supreme Court, "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them." *Kiowa Tribe of Okla. v. Mfg. Techs.*, *Inc.*, 523 U.S. 751, 755 (1998).  Although the questions often arise together, "whether an Indian tribe is subject to a statute and whether the tribe may be sued for violating the statute are **two entirely different questions**." *Fla. Paraplegic, Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1130 (11th Cir. 1999) (emphasis added).  Tribal sovereign immunity only addresses whether a tribe may be sued for violating the law.  It does not mean that the illegal activities conducted by a tribe are necessarily legal.  In other words, tribal sovereign immunity "does not transfigure debts that are otherwise unlawful under RICO into lawful ones." *United States v. Neff*, No. 18-2282, 2019 WL 4235218, at *7 (3d Cir. Sept. 6, 2019).  Nor does it render criminal behavior non-criminal.  *Id.* ("A debt can be 'unlawful' for RICO purposes even if tribal sovereign immunity might stymie a state civil enforcement action or consumer suit (or even a state usury prosecution, although tribal sovereign immunity does not impede a state from resort[ing] to its criminal law and prosecuting offenders . . . .") (internal citation and quotation omitted).  Sovereign immunity merely blocks certain lawsuits directly against arms-of-the-tribe.  State lending laws and RICO apply regardless of whether the Corporate Defendants can be sued for violations of those laws.

Nevertheless, Martorello argues that Plaintiffs' claims must be dismissed because the Corporate Defendants are necessary and indispensable parties, and that Plaintiffs' state law and RICO claims necessarily fail because of the Fourth Circuit's decision.  There are no motions pending regarding any of these issues, and to fully address those positions would far exceed the page limits allowed for this response.  Plaintiffs do note that similar Rule 19 efforts involving tribal

2

**JA651**

lending enterprises have failed. *See Commonwealth of Pennsylvania v. Think Finance, Inc.*, No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016) (holding that "[b]ecause the lenders are at most joint tortfeasors or co-conspirators, they are not necessary parties under Rule 19") (internal quotations omitted); *Dillon v. BMO Harris Bank, N.A.*, 16 F. Supp. 3d 605, 613 (M.D.N.C. 2014) (holding that tribal lenders were not necessary parties because "[t]he lenders are at most joint tortfeasors or co-conspirators. Neither are necessary parties under Rule 19."). And for the reasons stated above, the Fourth Circuit's ruling does not mean that RICO and state law do not apply to the loans at issue. It simply means that Plaintiffs cannot maintain a lawsuit for money damages against arms-of-the-tribe. Nor does the Fourth Circuit's opinion have any bearing on whether Plaintiffs' usury and unjust enrichment claims can proceed against Martorello.

As for the pending motions, Martorello argues that Plaintiffs' motion for class certification must be denied, Martorello's motion for reconsideration of the Court's crime-fraud ruling must be granted, and that all of the motions springing from the crime-fraud rulings are moot or should be granted in Martorello's favor. Martorello is wrong on all fronts. None of the pending motions are meaningfully affected by the Fourth Circuit's ruling. The Court should grant Plaintiffs' motion for class certification, and rule on the other pending motions so that trial against Martorello may proceed. Plaintiffs will address these motions in turn.

## I.   Plaintiffs' Motion for Class Certification Should Be Granted.

Martorello argues Plaintiffs' motion for class certification should be denied because the Fourth Circuit's opinion renders the dispute-resolution procedures and class-action waiver in Plaintiffs' contracts enforceable. The Fourth Circuit's ruling did no such thing and the Court expressed no opinion regarding whether any aspect of the underlying contracts were enforceable. Moreover, the Fourth Circuit, other Courts of Appeal, and this Court have repeatedly invalidated

dispute-resolution mechanisms contained in tribal lending contracts even when the tribal defendants are not part of the case. *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *MacDonald v. CashCall, Inc.*, 883 F.3d 220 (3d Cir. 2018); *Parnell v. Western Sky Fin. LLC*, 664 Fed. App'x 841 (11th Cir. 2016); *Parm v. Nat'l Bank of Cal.*, 835 F.3d 1331 (11th Cir. 2016); *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1354 (11th Cir. 2014); *Gingras v. Think Finance Inc.*, 922 F.3d 112, 126-27 (2d Cir. 2019); *see also Gibbs v. Haynes Investments, LLC*, 368 F. Supp. 3d 901 (E.D. Va. 2019); *Solomon v. American Web Loan*, 2019 WL 1324490, __ F. Supp. 3d __ (E.D. Va. Mar. 22, 2019).

Martorello also argues that Plaintiffs "cannot establish ascertainability because they have no current means of obtaining loan data that would allow identification of class members." (ECF No. 613 at 5.) This is false. As the Court is aware, non-tribal entities TranDotCom and DataX are in possession of information related to the loans. (ECF Nos. 415 and 440.) Tribal sovereign immunity does not protect documents that are possessed by non-tribal parties because subpoenas to those entities they are not "suits" against the tribe that implicate sovereign immunity. *Miccosukee Tribe of Indians of Florida v. United States*, 698 F.3d 1326, 1330 (11th Cir. 2012). This Court has already noted in granting Plaintiffs' motion regarding TranDotCom that it "agrees with the Eleventh Circuit's reasoning" in *Miccosukee*. (ECF No. 415 at 8 n.3.) There is no reason to revisit the Court's prior rulings on those issues. And if anything, Plaintiffs' case for class certification is stronger than it was when originally filed because it is now known for certain that the relevant data can be obtained.

## II.    Martorello's Motion for Reconsideration.

Martorello argues that the Fourth Circuit's ruling affects this Court's determination that

there was prima facie evidence that Martorello engaged in criminal activity. Martorello claims that the Fourth Circuit's ruling and its statement regarding the restructure of the lending enterprise "effectively eviscerates the rational underlying the Court's crime fraud ruling." (ECF No. 613 at 6.) Not so.

As this Court explained, the crime-fraud exception applied because:

> The plaintiffs have made a prima facie case that: (1) Martorello and the Corporate Defendants intended to lend at usurious rates of interest in violation of Virginia and other states' laws and that they intended to engage in conduct (collecting unlawful debt) in violation of RICO; and (2) Martorello and the Corporate Defendants engaged the lawyers to help in achieving their objectives. Virginia Code § 6.2-1540 makes clear that it is a crime to participate in the violation of Virginia's usury statute, which limits a business to contracting for a loan interest rate of greater than 12%. See Va. Code 6.2-1501. The plaintiffs have made a compelling case that Martorello participated in such an endeavor on his own and with the Corporate Defendants.

*Williams v. Big Picture Loans, LLC*, No. 17-cv-461, 2019 WL 1983048, at *13 (E.D. Va. May 3, 2019). In other words, this Court did not apply the crime-fraud exception because of the restructure; it applied the crime-fraud exception because Plaintiffs sufficiently made a prima facie showing that Martorello committed crimes and engaged lawyers to assist him with those efforts. In addition to this, the Court found that "the documents about the corporate restructure and the Tribe's lending operation" go to the "core of the alleged crimes and fraud by outlining how the restructuring and the lending operation are to be accomplished." *Id.* at *14. Put differently, the restructure is not *the* crime—it is the continued and ongoing violation of state usury laws and RICO.

Additionally, it is important to note that the Fourth Circuit made its decision regarding the restructure based on a limited record, *i.e.*, the e-mail from Martorello to Rosette in January 2014 regarding the Consumer Financial Protection Bureau and the August 2014 e-mail to Chairman Williams. *Williams v. Big Picture Loans, LLC*, No. 18-1827, 2019 WL 2864341, at *5 (4th Cir.

JA654

July 3, 2019) (citing J.A. 1321–22 (Martorello emailing Tribal Council members and the Tribe's counsel regarding his concerns about the CFPB and New York enforcement actions); J.A. 1329 (e-mails after the enforcement actions between Martorello and the head of the Tribal Council scheduling a time to discuss "a potential bigger deal for [the Tribe] learning the Servicing business")). Based on these two e-mails, the Fourth Circuit found that "the evidence does not support the district court's conclusion that the creation of the Entities was only or primarily intended to benefit Martorello or that the creation of Big Picture and Ascension was solely the product of Martorello's design and urging." *Id*. The record, of course, is now completely different and the additional evidence submitted by Plaintiffs shows: (1) that the creation of the Entities was primarily intended to benefit Martorello; and (2) they were the product of Martorello's design and urging. To ensure the record is complete, Plaintiffs submitted this additional evidence. *See generally* ECF Nos. 572-10 through 572-26.

Since the time of those submissions, Plaintiffs have additional compelling evidence supporting the Court's waiver decision. This evidence is the Declaration of Joette Pete, attached hereto as Exhibit 1. Ms. Pete is the former Vice Chairwoman of the LVD from 2010 until 2016, *i.e.*, from the inception of the business through the restructure. (Ex. 1 at ¶ 1.) Most notably, Pete explained that she "did not participate in the destruction of Martorello's e-mails," and, to her knowledge, "it was not presented to Tribal Council for approval." (*Id*. at ¶ 11.) However, Pete was not surprised "that the e-mails were destroyed because a shredding company was also hired to destroy paper records related to the business." (*Id*. at ¶ 11.) This step "had never been done in the past and <u>was performed specifically to conceal the truth about the business</u>." (*Id*. at ¶ 11 (emphasis added).) In light of this Declaration—as well as the significant new evidence submitted by Plaintiffs—the Court should deny the Motion for Reconsideration and expedite the spoliation-

**JA655**

related discovery ordered by the Court, which has been flouted by Martorello and the Corporate Defendants.

In sum, the primary basis for the application of the crime-fraud exception is Martorello's criminal activities (which occurred both before and after the restructure) —not whether the Tribe was entitled to sovereign immunity.

## III.  The Other Motions Are Unaffected by the Fourth Circuit's Ruling.

The other motions cited by Martorello as "spring[ing] from or relat[ing] to" the Court's crime-fraud ruling are likewise unaffected by the Fourth Circuit's ruling with the following exception:  Plaintiffs are no longer seeking to take the depositions of Ascension or Big Picture as parties to the case, and Plaintiffs are no longer seeking to depose Joette Pete.  (*See* ECF Nos. 524, 523.)

Plaintiffs have not waived the right to file a motion regarding spoliation, contrary to Martorello's suggestion.  (ECF No. 613 at n.6.)  All of the Defendants repeatedly obstructed the process and the proposed schedule was never entered by the Court.  Lastly, because the Court's crime-fraud ruling is unaffected, Plaintiffs' arguments opposing Martorello's entitlement to a privilege review still stand.

## CONCLUSION

Nothing in the Fourth Circuit's ruling meaningfully affects the claims against Martorello. The Court should grant Plaintiffs' motion for class certification and the case should proceed to trial.

Date: September 16, 2019

_____/s/_____
Leonard A. Bennett, VSB #37523
Elizabeth W. Hanes, VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601

JA656

Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
elizabeth@clalegal.com

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com


E. Michelle Drake
John G. Albanese
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel.: 612.594.5999
Fax: 612.584.4470
emdrake@bm.net
jalbanese@bm.net

Beth E. Terrell
Jennifer Rust Murray
Elizabeth A. Adams
TERRELL MARSHALL LAW GROUP PLLC
bterrell@terrellmarshall.com
jmurray@terrellmarshall.com
eadams@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: (206) 816-6603
Fax.: (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2019, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF)

to all counsel of record.

Date: September 16, 2019

_____/s/_____
Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

RENEE GALLOWAY, et al.,                     :
                                            :
                        Plaintiffs,         :
v.                                          :      Civil Action No. 3:18-cv-406-REP
                                            :
BIG PICTURE LOANS, LLC, et al.,             :
                                            :
                        Defendants.         :

## DECLARATION OF JOETTE PETE

I, Joette Pete, hereby make this Declaration under penalty of perjury, pursuant
to 28 U.S.C. § 1746, as follows:

1.    My name is Joette Pete. I am the former Vice Chairwoman of the Lac
Vieux Desert Band of Lake Superior Chippewa Indians. I served in this capacity
between 2010 and 2016. I am over the age of twenty-one and otherwise competent
to testify as to the matters contained herein. I have personal knowledge of these
matters contained herein based on my experience as Vice Chairwoman, as well as a
tribal member of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

2.    In 2011, Tribal Council was approached by Matt Martorello with an
opportunity to participate in a lending business. In the fall of 2011, Martorello visited
our reservation to meet with Tribal Council to present the deal. During this
presentation, Martorello explained that his company would run the business if LVD

1

**JA660**

allowed him to claim that LVD law applied to the loans. Under the deal, LVD would receive 2% of the gross revenue from the loans.

3. When Tribal Council initially agreed to the deal with Martorello, we understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans. Because Martorello was going to completely run the lending business, he received the most of the profits.

4. For Martorello to be able to claim that LVD law applied to the consumer loans, the deal required that Red Rock "originate" the loans. But, this responsibility was immaterial because Red Rock would have no reason to reject a loan that satisfied Martorello's lending criteria because Martorello ran the business and bore all the risk. After the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement.

5. I have read the declaration of Michelle Hazen submitted in connection with the lawsuits against Big Picture, Ascension, and Matt Martorello. It is my understanding that it is inaccurate for Hazen to assert that "All of Red Rock's employees, computers, and records were on LVD's reservation lands at all times." I

JA661

understand that Martorello operated Red Rock exclusively for a significant amount of time after its inception. I understand that some employees, computers, and records were located off the reservation.

6.     It is also inaccurate for Hazen to claim that Red Rock contracted with Bellicose VI "to learn the lending industry." That was never the goal when LVD formed Red Rock; nor did Martorello attempt to teach us anything about the business. Tribal Council and other members of the tribe did not have access to information regarding the business. Instead, the relationship with Martorello was presented as an opportunity to make money, with no risk of loss, in exchange for rubberstamping LVD's name on loans. And that is what occurred.

7.     Additionally, although business information was kept secret from Tribal Council, it was my understanding that the co-managers did not receive a salary or compensation for their roles as co-managers, at least for the first two years of the business. Instead, the co-managers were volunteers, who were involved for "optics" and to provide pro forma approval of recommendations provided by Bellicose. I believe both co-managers worked other full-time jobs, in addition to their service as tribal council members, at least until January 2014 after we started making structural changes due to lawsuits against the business model.

8.     Similarly, it is also inaccurate and misleading for Hazen to assert that "LVD had gained considerable experience and knowledge of the online lending

3

JA662

industry" thereby prompting it to look for ways "to expand its online lending business to earn money for LVD." This is inaccurate because Martorello initiated and developed the concept to restructure after the district court ruled against Red Rock in its litigation against the New York Department of Financial Services.

9.     For example, less than three weeks after the district court's decision in Otoe-Missouria, I received the e-mail attached hereto as Exhibit 1 from Martorello. In this e-mail, Martorello detailed his "concept" to "facilitate a transition to LVD" of his "businesses." This e-mail was sent shortly after another e-mail from Martorello, where he detailed his fears that the Otoe-Missouria decision would "precipitate" a potential investigation and prosecution of him personally. Attached as Exhibit 2 is a true and accurate copy of that e-mail correspondence. This is the first time we were ever presented with the opportunity "to own" the business, but it would still be controlled by Martorello as proposed.

10.     In 2014-2016, LVD's Tribal Council did not look for ways to expand its business and did not gain considerable experience and knowledge of the industry. The restructure was driven by Martorello's desire to attempt to obtain sovereign immunity for his businesses. Other than receiving our monthly proceeds, Tribal Council had nominal involvement and little understanding about the operations of the business, and the Tribe was not in a position to run the business.

4

**JA663**

11.   As part of the restructure, I have learned that Matt Martorello's emails were destroyed. I did not participate in the destruction of Martorello's emails. I do not know who performed this task, and to my knowledge, it was not presented to Tribal Council for approval. However, it does not surprise me that the e-mails were destroyed because a shredding company was also hired to destroy paper records related to the business. This had never been done in the past and was performed specifically to conceal the truth about the business.

12.   And unless they were deleted/destroyed, Tribal Council kept audio recordings of our monthly meetings. These audio recordings would be consistent with the statements herein and would show the lack of meaningful involvement of Tribal Council in the lending business.

I have reviewed this Declaration and declare under penalty of perjury that the foregoing statements are true to the best of my knowledge and belief.

Date: August 20, 2019

Joette Pete

**Joette Pete-Baldwin**

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Monday, October 14, 2013 4:14 PM |
| **To:** | Karrie Wichtman; Chairman James Williams; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| **Cc:** | Craig Mansfield (craig.mansfield@lvdcasino.com); Justin Martorello |
| **Subject:** | SPVI Equity Transfer to LVD |

Good afternoon,

Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses. The abrupt termination of RRTL/DCTF, as it is written in the existing servicing agreements, is an oversimplified end that we have for some time been meaning to revisit. I think it is time to move forward on the proper legacy plan for how our companies come together. I believe Rob and Karrie can provide some highlights, but I do believe the items below should be able to get us to a term sheet with the goal of FINAL documents delivered on 10/30/13. The documents will not be as daunting as the list below appears, for tax structuring reasons, it is a little more complicated than it appears.

- Assign today to LVD - 51% of Bellicose VI, LLC <u>Equity only</u> membership interest tied to the SPVI subsidiary only (i.e. SPVI is a wholly owned sub of Bellicose, as it must be for tax reasons. Therefore, LVD's equity share for the subsidiary would be at the Bellicose parent company level):
    o LVD will own 51% equity, but 0% profits interest until month 49 when it becomes 100% equity and 80% profits
    o BlueTech will own 49% equity, but 100% profits interest until month 49 when it becomes 0% equity and 20% profits
    o Current Manager (myself) will be locked in as the decision maker for 48 months, at which point they will hire a new Manager to replace me
    o In month 49, Profits will be 80% LVD and 20% BlueTech for 10 years, after which it is 100% profits to LVD.
- Assign today to LVD - 51% of 7X Services, LLC <u>Equity only</u> for a membership class tied to:
    o Iron Fence Investments, LLC
    o Obsidian Armor Fund, LLC (note this will be dissolved before the 48 month mark)
    o WMS (where both WMS and SPVI terminate the existing option agreements)
    o On January 1st, due to my forthcoming 2014 restructuring, Bellicose VI, LLC will be transferred 100% to 7X Services, LLC and LVD's Equity will be shifted to DIRECTLY to SPVI (as we move from the VIs to Puerto Rico)
- Other:
    o Appropriate waivers of SI to protect the Assignors and Managers
    o Structured to ensure the integrity of sovereign immunity
    o It is possible the currently Delaware and Virgin Islands LLCs, may need to be migrated to be LVD LLCs (perhaps AFTER the closing in the interest of time)
    o Castle stops NEW customer loans beginning on January 31, 2014 and only does VIP loans thereafter (same as DCTF today)
    o Tribe uses its own capital to launch a new portfolio in Q1 2014, in which SPVI generates the same fees from the TLE, but LVD gets to keep 75% of the profits interest on the SPVI side for servicing the portfolio, until that 48th month. Adjusts the same thereafter. (This is required for tax purposes)
    o Proper indemnities to the Assignors and Managers
    o No strings attached, no requirements, no liability to LVD by Assignors or Managers on the new LVD portfolio, RRTL, DCTF, or on anything that may happen after month 48. Best efforts basis.

1

## Joette Pete-Baldwin

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Wednesday, October 02, 2013 4:28 PM |
| **To:** | Karrie Wichtman; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield |
| **Cc:** | Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| **Subject:** | RE: Notice to Cease Servicing Origination of New Loans to NY consumers |

Thanks for the clarification on these points of distinction Karrie, we'll take a closer look at the details of the provisions and circle back shortly. Simply put in the meantime, we do recommend that RRTL and DCTF stop issuing new and returning customer loans in the State of NY at this time.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Wednesday, October 2, 2013 4:39 PM
**To:** Matt Martorello; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)
**Subject:** RE: Notice to Cease Servicing Origination of New Loans to NY consumers

Matt and SPVI Team,

Please advise as to the intent of your email as it is my understanding that your email and the citation to Section 9.4 of the Servicing Agreement is effectively a declaration of breach or dispute being asserted in writing in accordance with Section 18.1 of the Servicing Agreement, considering that that provision cited calls for cessation of the obligations of the parties to one another under the Agreement and states that the "Agreement shall be of no further force and effect". Claiming such a breach under 9.4 necessarily requires that such material change in law be based upon "a final judgment of a court of competent jurisdiction, after all appeals thereof". The Order of the Court denying the Plaintiff's Preliminary Injunction is certainly not such an order as it is not a final judgment of a court, appealable and while no such appeals have yet been file we have 30 days from yesterday's date to do so. Transmitting such a notice declaring a breach, if that is the intent here, is unwarranted and unsupported by the facts at hand. It matters not how Judge Sullivan's order will be regarded by overzealous regulatory agencies but rather that such an order IS NOT, in fact, a final order of the Court on the merits changing a material aspect of the Legal Requirements governing the agreement of the parties. Furthermore the provision does not appear to allow for the singling out of a particular state, in this case NY, to wind down business- which is the cause for my confusion – and leads me to believe that it is not your intent at all to make such a declaration of breach.

Indeed, your email, the concerns expressed, and the recommendations therein seem to fall more in line with Section 4.2 in that as the Servicer you have been contracted to advise the Enterprise regarding the "orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party servicer relationships, collections and risk assessment". Among other provisions included in Section 4.2 , your observations, and recommendation to the Enterprise not to lend to and wind down business involving residents in the State of New York surely fits within Section 4.2.1 (a) whereby the "Servicer will be responsible for providing pre-qualified leads to Enterprise and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise may evaluate to whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise." Note that the Agreement, in that same section, however,

1

JPB 00980
**JA666**

makes quite clear that "The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and the Enterprise shall execute all necessary loan documentation". Therefore, in the spirit of clarification of your earlier email, would you agree that a better way to approach this matter may be for the Servicer as provided for in Section 4.2.1 (a) to make a recommendation to the Enterprise that in light of recent enforcement actions taken by the State of NY Department of Financial Services, the pending litigation and the recent preliminary Order of the Court, that the Enterprise refrain, immediately, and until further notice, from making new loans in the State of New York and that current loans be wound down until paid in full or some other disposition of the debt to the Enterprise has been reached?

I look forward to your response so that I may advise my client.

Regards,

**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Wednesday, October 2, 2013 2:50 PM
**To:** Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Karrie Wichtman; Justin Martorello; Daniel Gravel
**Subject:** Notice to Cease Servicing Origination of New Loans to NY consumers

Dear Mr. Chairman and Team:

Due to Judge Sullivan's ruling, we believe we have an involuntary termination event under the Servicing Agreement as it relates to loans made in the State of New York. As you know, the Servicing Agreement provides:

## Involuntary Termination Due to Changes in Legal Requirements

It is the understanding and intention of the parties that the establishment and operation of Enterprise conforms to and complies with all Legal Requirements. If during the term of this Agreement, Enterprise, or any material aspect of the business conducted by Enterprise, becomes prohibited by operation of federal law or determined by final judgment of a court of competent jurisdiction, after all appeals thereof, to be unlawful under applicable law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect; provided that (i) the Servicer shall have the rights in Section 4.4 of this Agreement; (ii) the Servicer and the Enterprise shall retain all money previously paid to them pursuant to Section 6 of this Agreement; (iii) funds of Enterprise in any account shall be paid and distributed as

2

JPB 00981
**JA667**

provided in Section 6 of this Agreement, provided any Authorized Debt shall be paid in full; (iv) any money lent by or guaranteed by the Servicer or its affiliates to Servicer shall be repaid to the Servicer to the extent provided in a written agreement entered in connection therewith, with recovery of monetary payments or damages limited in recourse to Enterprise assets and any such payments or damages shall be made only after payment in full of any and all amounts under any Authorized Debt; and (v) the Enterprise, directly or indirectly, shall retain its interest in the title to all Enterprise assets, fixtures, supplies and equipment subject to any requirements of financing arrangements. Nothing contained in this Section 9.4 shall be read to preclude either or both parties from contesting any actions which could lead to the involuntary cessation of business by Enterprise.

While we understand that an appeal of Judge Sullivan's order is imminent, our concern is that Judge Sullivan's order finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final by the State of New York such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue to provide New York-related services at this time.

We might be able to resume servicing New York loans at some point in the future, but for now, Judge Sullivan's Order presents a significant potential liability for us and we do not believe that we should service any new New York loans. We are willing to wind down our New York services and see existing loans through to their completion, but we simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be.

This action applies both to services performed for the Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC portfolios.

**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com



\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

3

JPB 00982
**JA668**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, *et al*., ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 3:17-cv-461 (REP) |
| ) | |
| BIG PICTURE LOANS, LLC, *et al*., ) | |
| ) | |
| Defendants. ) | |

| | |
|---|---|
| BRIAN MCFADDEN, ) | |
| ) | |
| Movant, ) | |
| v. ) | Civil Action No. 3:18-mc-08 (REP) |
| ) | |
| LULA WILLIAMS, *et al*., ) | |
| ) | |
| Respondents. ) | |

| | |
|---|---|
| LULA WILLIAMS, *et al*., ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 3:18-mc-12 (REP) |
| ) | |
| BIG PICTURE LOANS, LLC, *et al*., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' RESPONSE TO BRIAN MCFADDEN'S & SIMON LIANG'S JOINT
STATEMENT OF POSITION**

Pursuant to the Court's orders (ECF Nos. 599, 601), Plaintiffs, by counsel, submit this response to Brian McFadden's and Simon Liang's Joint Statement of Position ("Jt. Stmt.," *Williams Big Picture Loans, LLC*, No. 3:17-cv-461, ECF No. 612 (E.D. Va.), *McFadden v. Williams*, No. 3:18-mc-8, ECF No. 25 (E.D. Va.); *Williams v. Big Picture Loans, LLC*, No. 3:18-mc-12, ECF No. 35 (E.D. Va.).

**JA669**

This Court has already denied Liang's and McFadden's motions to quash. *See McFadden v. Williams*, No. 3:18-mc-8, 2019 WL 542300, at *1 (E.D. Va. Feb. 11, 2019); *Williams v. Big Picture Loans, LLC*, No. 3:18-mc-12, 2019 WL 542304, at *1 (E.D. Va. Feb. 11, 2019). In deciding the motions to quash, the Court found that Liang and McFadden could testify about their employment at Bellicose and role as owners of Eventide, finding that McFadden or Liang had "failed to provide a single case in which a court has held that an officer of a tribal entity is protected by his employer's sovereign immunity from being questioned about his employment before working for the tribal entity." *McFadden*, 2019 WL 542300, at *2; *Williams*, 2019 WL 542304, at *2. Accordingly, the Court found that Liang and McFadden "can be deposed about all activities in [their] role[s] as an officer[s] or employee[s] or shareholder[s] of Bellicose and Eventide, the operation of Bellicose, the reasons for Bellicose's sale to the Tribe, and the structure of the Bellicose sale." *McFadden*, 2019 WL 542300, at *2; *Williams*, 2019 WL 542304, at *2.

With respect to testimony regarding their employment at Ascension, although the Court "doubt[ed] that [they] can altogether avoid testifying about [their] work at Ascension even if the Fourth Circuit decides that the Corporate Defendants are protected by the Tribe's immunity, the Court believes that prudence dictates that [they] should not be asked about [their] role at Ascension during the pendency of the appeal." *McFadden*, 2019 WL 542300, at *3; *Williams*, 2019 WL 542304, at *3. Because Liang's and McFadden's testimony related to the merits of the claims against Martorello, the Court held the depositions in abeyance pending a ruling on the motion for class certification against Martorello. *McFadden*, 2019 WL 542300, at *3; *Williams*, 2019 WL 542304, at *3.

McFadden and Liang now seek a do-over of the Court's prior order arguing that "[i]n light of the Fourth Circuit Opinion, the basis for this Court's denial of the motions to quash, have been

**JA670**

effectively overturned." (Jt. Stmt. at 4.) This is not true. The Court found that, with respect to testimony regarding their experiences with non-tribal entities Bellicose and Eventide, sovereign immunity did not protect any testimony from McFadden and Liang. Neither McFadden or Liang have pointed to any case that applied sovereign immunity to block such testimony, and the Fourth Circuit's opinion says nothing to the contrary. There is no reason to revisit that aspect of the Court's prior opinion.

Further, the Court's doubts about McFadden's and Liang's ability to "altogether avoid" testifying about their work at Ascension is well-founded. Tribal sovereign immunity does not protect against discovery from individuals who may have worked for the tribe because tribal sovereign immunity *is not* an absolute bar to suit for tribal officials operating in their official capacity. Indeed, as confirmed recently by the Second Circuit, tribal officials can be sued as defendants for injunctive and prospective relief for violations of state lending law under the doctrine set forth in *Ex parte Young,* 209 U.S. 123 (1908). *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019) ("The question before us, however, is whether Plaintiffs can sue tribal officials, in their official capacities, for prospective, injunctive relief to bar violations of *state* law. We hold that they can."). As stated by the Supreme Court, "tribal immunity does not bar such a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014); *see also Kodiak Oil & Gas (USA) Inc. v. Burr,* --- F.3d ---, 2019 WL 354023, at *2 (8th Cir. Aug. 5, 2019) ("The Supreme Court has extended the *Ex parte Young* doctrine from state officials to tribal officials . . . ."); *accord Puyallup Tribe, Inc. v. Dep't of Game of State of Wash.*, 433 U.S. 165, 171–72 (1977) ("The doctrine of sovereign immunity . . . does not immunize the individual members of the Tribe.").

Here, Plaintiffs are requesting that Liang and McFadden provide information and sit for depositions. That relief does not implicate sovereign immunity.

A district court in Nevada recently addressed whether sovereign immunity blocked a deposition subpoena to a tribe's lawyer. *Grand Canyon Skywalk Dev., LLC v. Cieslak*, No. 2:13-CV-00596, 2015 WL 4773585 (D. Nev. June 5, 2015), *objections overruled*, No. 2:15-CV-00663, 2016 WL 890921 (D. Nev. Mar. 7, 2016). There, the plaintiffs served a subpoena for deposition testimony to a lawyer who had formerly provided advice to the Hualapai Tribe. 2015 WL 4773585, at *1. The attorney argued because his "role was in the nature of an official function involving matters of internal [tribal] governance, the Tribe's immunity extend[ed] to him." *Id.* at *2.

After engaging in extensive analysis on the issue, the court held that the subpoena on the law firm did not violate the tribe's sovereign immunity. *Id.* at *2-7. In particular, the court highlighted *Ex parte Young*, which "'proceeds on the fiction that an action against a state official seeking only prospective injunctive relief is not an action against the state and, as a result, is not subject to the doctrine of sovereign immunity.'" *Id.* at *4 (quoting *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1162 n.1 (10th Cir. 2011)); *see also Crowe & Dunleavy*, 640 F.3d at 1154 (applying *Ex parte Young* to tribal sovereign immunity and collecting authority). After conducting its thorough review of the caselaw and the principles of sovereign immunity, the court concluded that the sovereign immunity did not provide a basis to quash the subpoena to the tribe's former lawyer. 2015 WL 4773585, at *7.

Principles of state sovereign immunity also weigh against Liang and McFadden's expansive view of sovereign immunity. While tribal sovereign immunity is not "co-extensive"

with state sovereign immunity,[1] the Supreme Court and other courts have recently applied "general rules" and "principles" governing the availability of state sovereign immunity "in the context of tribal sovereign immunity." *Lewis v. Clarke*, 137 S. Ct. 1285, 1290-91 (2017); *Saint Regis Mohawk Tribe v. Mylan Pharm. Inc.*, 896 F.3d 1322, 1326 (Fed. Cir. 2018) (applying state sovereign immunity precedent to find that sovereign immunity could not block inter partes review in front of the patent board). Just as a state would not be shielded from responding to a subpoena, neither would a tribal entity.

Courts routinely hold that a state must respond to discovery requests, including subpoenas, issued by federal courts. *See, e.g., Arista Records LLC v. Does 1-14*, No. 7:08-CV-00205, 2008 WL 5350246, at *3 (W.D. Va. Dec. 22, 2008) (overruling a state university's objection to a subpoena and holding "that the doctrine of sovereign immunity is inapplicable to Plaintiffs' subpoena requests."); *In re Mo. Dep't of Natural Res.*, 105 F.3d 434, 436 (8th Cir. 1997) ("There is simply no authority for the position that the Eleventh Amendment shields government entities from discovery in federal court."); *Allen v. Woodford*, 544 F. Supp. 2d 1074, 1078–79 (E.D. Cal. 2008); *United States v. University of Mass., Worcester*, 167 F. Supp. 3d 221 (D. Mass. 2016).

In sum, tribal sovereign immunity and the Fourth Circuit's opinion provide no basis to block testimony from Liang and McFadden about their experiences at Ascension that are relevant to the claims against Martorello.

Finally, Liang and McFadden ask the Court to delay any depositions until their motions to dismiss are decided in the related *Galloway v. Martorello*, No. 3:19-cv-314-REP, case where Liang and McFadden are defendants. However, the motions to dismiss in *Galloway* have no bearing on

---

[1] *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 756 (1998).

whether Liang and McFadden have relevant information to provide in this case against Martorello.
The case against Martorello should not be delayed.

The Court should grant Plaintiffs' motion class certification and the depositions of Liang
and McFadden should proceed.

Date: September 16, 2019                         _____/s/_____
                                                Leonard A. Bennett, VSB #37523
                                                Elizabeth W. Hanes, VSB #75574
                                                CONSUMER LITIGATION ASSOCIATES, P.C.
                                                763 J. Clyde Morris Blvd., Ste. 1-A
                                                Newport News, VA 23601
                                                Telephone: (757) 930-3660
                                                Facsimile: (757) 930-3662
                                                Email: lenbennett@clalegal.com
                                                Email: elizabeth@clalegal.com

                                                Kristi C. Kelly, Esq., VSB #72791
                                                Andrew J. Guzzo, Esq., VSB #82170
                                                Casey S. Nash, Esq., VSB #84261
                                                KELLY GUZZO, PLC
                                                3925 Chain Bridge Road, Suite 202
                                                Fairfax, VA 22030
                                                (703) 424-7572
                                                (703) 591-0167 Facsimile
                                                Email: kkelly@kellyguzzo.com
                                                Email: aguzzo@kellyguzzo.com
                                                Email: casey@kellyguzzo.com

                                                E. Michelle Drake
                                                John G. Albanese
                                                BERGER MONTAGUE PC
                                                43 SE Main Street, Suite 505
                                                Minneapolis, MN 55414
                                                Tel.: 612.594.5999
                                                Fax: 612.584.4470
                                                emdrake@bm.net
                                                jalbanese@bm.net

                                                Beth E. Terrell
                                                Jennifer Rust Murray
                                                Elizabeth A. Adams

JA674

TERRELL MARSHALL LAW GROUP PLLC
bterrell@terrellmarshall.com
jmurray@terrellmarshall.com
eadams@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: (206) 816-6603
Fax: (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2019, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF)

to all counsel of record.

Date: September 16, 2019

_____/s/_____
Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

JA675

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**LULA WILLIAMS, GLORIA TURNAGE,
GEORGE HENGLE, DOWIN COFFY, and
FELIX GILLISON, JR., on behalf of themselves
and all individuals similarly situated,**

                              **Plaintiffs,**                    **Civil Action No. 3:17-cv-00461-REP**

**v.**

**BIG PICTURE LOANS, LLC; MATT MARTORELLO;
ASCENSION TECHNOLOGIES, INC.;**

                              **Defendants.**
_____ /

**BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, LLC'S
<u>REPLY IN SUPPORT OF THEIR STATEMENT OF POSITION</u>**

Big Picture Loans, LLC and Ascension Technologies, LLC (collectively, the "Tribal

Defendants"), submit this reply brief in support of their Statement of Position [ECF No. 599].

Plaintiffs attempt to avoid the full impact of *Williams, et al. v. Big Picture Loans, LLC, et al.*, 929

F.3d 170 (4th Cir. 2019) ("Fourth Circuit Opinion"), by inaccurately claiming the Fourth Circuit's

finding – that the Tribal Defendants are sovereign arms of the Lac Vieux Desert Band of Lake

Superior Chippewa Indians ("Tribe") – means nothing to their claims in this lawsuit.  Regardless

of Plaintiffs' shortsightedness – "the [Tribal] Defendants could not be sued[,] [n]othing more" –

the Fourth Circuit's opinion is far from limited to an absolute defense from suit.

Although the ultimate issue before the Fourth Circuit was whether this Court has subject

matter jurisdiction, that issue hinged on whether the Tribal Defendants are arms of the Tribe and,

hence, sovereign.  It is only because the Fourth Circuit found the Tribal Defendants to be arms of

the Tribe that it found them to be sovereign and, hence, immune from suit so as to prevent this

**JA676**

Court from exercising subject matter jurisdiction.  That sovereignty has implications for the other issues pending before the Court that are subject to the current briefing requirement.

Not only is the case over for the Tribal Defendants, the Fourth Circuit Opinion confirmed this Court's holdings that:

> Big Picture has its principal place of business on the Reservation, and its employees are all located there. The servers for Big Picture's websites are also stored on the Reservation. And, because all loan applications are approved by Big Picture employees on the Reservation, all consumer loans are originated there.

*See Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 264 (E.D. Va. 2018).  This is significant in ways Plaintiffs ignore in their Response [ECF No. 625].

As arms of the Tribe operating from the Reservation, Big Picture operates under Tribal law.  But more so, as sovereign entities with sovereign immunity, Big Picture lends, and Ascension supports Big Picture, without regard to state regulation.  Plainly, Virginia laws and regulations do not apply to on-reservation activity.

## I.    Plaintiffs chose Tribal law with their loan agreements, which controls in the face of state laws and regulations.

Virginia law does not apply to Plaintiffs' loan agreements at issue in the same way that Virginia laws do not apply to agreements made in other jurisdictions – based on clear precedent from the Supreme Court of Virginia.  *See Settlement Funding, LLC v. Von Neuman-Lillie*, 274 Va. 76, 80 (2007) ("If a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied . . . Utah has not established any limits on maximum rates of interest for consumer loans," but nonetheless concluded that the choice-of-law clause was enforceable.).

Yet, the Tribal Defendants need not rely on Virginia law – nor even general principles of Indian law – to exclude application of state law to their loan agreements.  By treaty, no state can

JA677

regulate the Tribe's commercial activity.  In 1842, the Tribe entered into the Treaty of LaPointe with the federal government, which ensured that only Congress could regulate the Tribe's "trade and inter course with the whites."  Treaty of LaPointe, Article 2 (1842).  The Tribe's rights under this treaty have not been extinguished.  *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 365 (7th Cir 1983).  With the Fourth Circuit Opinion clearly identifying the Tribal Defendants as sovereign extensions of the Tribe, Virginia laws stop where the Tribe's treaty rights begin.[1]

With few exceptions, state laws and regulations do not apply to Indian tribes.  Tribal self-government includes Indian tribes' inherent sovereign right to "make their own laws and be ruled by them."  *Williams v. Lee*, 358 U.S. 217, 221-22 (1959).  "In the absence of federal authorization, tribal immunity, like all aspects of tribal sovereignty, is privileged from diminution by the States."  *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 891 (1986).  More directly, "[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply."  *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 170-71 (1973).

And, without action by Congress, tribal sovereignty supports regulation of non-members "through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."  *Montana v. United States*, 450 U.S. 544, 565-66 (1981) (citing *Lee,* 358 U.S. at 223).

Longstanding jurisprudence recognizes that "[t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they

---

[1] This decision makes it unnecessary to determine to what extent those treaty rights govern commerce undertaken by the Tribe through non-sovereign tribal entities.

were made on or off a reservation." *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 760 (1998). This was recently reaffirmed in *Bay Mills,* where the U.S. Supreme Court recognized that "tribes across the country, as well as entities and individuals doing business with them, have for many years relied on *Kiowa* (along with its forebears and progeny), negotiating their contracts and structuring their transactions against a backdrop of tribal immunity." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2037 (2014). When acknowledging "Congress's job" to determine whether to limit tribal immunity, *Bay Mills* held that "Congress should make the call whether to curtail a tribe's immunity for off-reservation commercial conduct – and the Court should accept Congress's judgment." *Bay Mills*, 134 S. Ct. at 2037-2038.

Whether based on the choice of law provisions in Plaintiffs' loan agreements or the fundamental principle that state laws do not apply to tribes (or these concepts collectively), Big Picture's loans are lawful as no state usury law can even be considered – let alone applied – to the loan agreements.

Plaintiffs misunderstand that *it is* <u>*sovereignty*</u> *– not immunity – that allows the Tribe to enact laws to regulate lending, create lending entities, and lend from the reservation without being subject to state regulation.* Plaintiffs argue the Fourth Circuit did not "cloak[] their entire lending operation in sovereign immunity," and also that immunity does not "transfigure debts that are otherwise unlawful under RICO into lawful ones." (*See* Response at p. 2, quoting *United States v. Neff*, No. 18-2282, 2019 WL 4235218, at *7 (3d Cir. Sept. 6, 2019).) But tribal sovereignty did not exist in *Neff*, so the lawfulness of the loans was not addressed. Here, the Court needs to look prospectively now that sovereignty is confirmed.

It is Plaintiffs' misunderstanding of federal Indian policy and Indian tribes that blind them from the breadth of the Fourth Circuit Opinion. Plaintiffs are not dealing with a generic online

**JA679**

business; they are dealing with a sovereign nation and the autonomy that comes with tribal sovereignty, backed by federal Indian policy promoting "tribal self-governance and tribal economic development as well as protection of 'the tribe's monies' and the 'promotion of commercial dealings between Indians and non-Indians.'" *Williams*, 929 F.3d at 185.

## II. Rulings made before the Fourth Circuit Opinion must necessarily be revisited because tribal sovereign immunity eliminates this Court's jurisdiction.

Inquiries into subject matter jurisdiction may be raised at any time, either by the court *sua sponte* or by one of the parties. *Nessell v. Crown Life Ins. Co.*, 92 F. Supp. 2d 523, 527 (E.D. Va. 2000). This obligation applies to rulings granting access to the Tribe's records. While the inapplicability of state laws to the Tribe's lending activities underscores the inappropriateness of those rulings, the now-established immunity of the Tribal Defendants is sufficient to require protection of those records against discovery seeking access to them.

Plaintiffs argue that "[t]ribal sovereign immunity does not protect against discovery from individuals who may have worked for the tribe because tribal sovereign immunity is not an absolute bar to suit for tribal officials operating in their official capacity." (Response at p. 5.) That is a misapplication of a Second Circuit anomaly applying *Ex Parte Young*, 209 U.S. 123 (1908). Plaintiffs rely on *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019), and its application of *Ex Parte Young* to argue that this Court should continue to allow Plaintiffs to subpoena Tribal records. (*See* Response at pp. 4-5.) *Ex Parte Young* sometimes allows prospective injunctive relief against state and tribal officials to prevent future violations of federal law. While not binding here, *Gingras* erroneously expanded that to allow injunctive relief against tribal officials to prevent violations of state law. Neither *Ex Parte Young* or *Gingras* abrogate immunity from subpoenas.

For these reasons, the Tribal Defendants should be dismissed from this matter and any further action against the Tribe, the Tribal Defendants, or Tribal officers should be abated.

JA680

**BIG PICTURE LOANS, LLC; ASCENSION TECHNOLOGIES, LLC**

By:/s/ Timothy J. St. George
Timothy J. St. George
Virginia State Bar No. 77349
David N. Anthony
Virginia State Bar No. 31696
*Counsel for Big Picture Loans, LLC and Ascension Technologies, LLC*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1254
Facsimile: (804) 698-6013
Email: david.anthony@troutman.com
Email: tim.stgeorge@troutman.com

Justin A. Gray (admitted *pro hac vice*)
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: (269) 283-5005
Facsimile: (517) 913-6443
Email: jgray@rosettelaw.com

**JA681**

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of September 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Kristi C. Kelly
Andrew J. Guzzo
Casey S. Nash
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: 703-424-7570
Facsimile: 703-591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
*Counsel for Plaintiffs*

James W. Speer
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA 23219
Telephone: 804-782-9430
Facsimile: 804-649-0974
Email: jay@vplc.orga
*Counsel for Plaintiffs*

Craig Carley Marchiando
Elizabeth W. Hanes
Leonard A. Bennett
CONSUMER LITIGATION ASSOCIATES
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: craig@clalegal.com
Email: elizabeth@clalegal.com
Email: lenbennett@clalegal.com
*Counsel for Plaintiffs*

Beth Ellen Terrell
Elizabeth Anne Adams
Jennifer Rust Murray
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th St., Suite 300
Seattle, WA 98103-6689
Telephone: 206-816-6603
Facsimile: (206) 319-5450
Email: bterrell@terrellmarshall.com
Email: eadams@terrellmarshall.com
Email: jmurray@terrellmarshall.com
*Counsel for Plaintiffs*

Eleanor Michelle Drake
James Gerard Albanese
BERGER & MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612-594-5999
Facsimile: (612) 584-4470
Email: emdrake@bm.net
Email: jalbanese@bm.net
*Counsel for Plaintiffs*

Matthew William Wessler
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington, DC 20036
Telephone: 202-888-1741
Facsimile: (202) 888-7792
Email: matt@guptawessler.com
*Counsel for Plaintiffs*

**JA682**

Charles Palella
ARMSTRONG TEASDALE LLP
919 Third Avenue, 37th Floor
New York, NY 10022
Telephone: 212-209-4403
Facsimile: (212) 409-8385
Email: cpalella@armstrongteasdale.com
*Counsel for Defendant Matt Martorello*

Jonathan P. Boughrum
Richard L. Scheff
Michael C. Witsch
ARMSTRONG TEASDALE LLP
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
Telephone: 215-246-3467
Facsimile: 215-569-8228
Email: jboughrum@armstrongteasdale.com
Email: rlscheff@armstrongteasdale.com
Email: mwitsch@armstrongteasdale.com
*Counsel for Defendant Matt Martorello*

Hugh McCoy Fain, III
John M. Erbach
Maurice F. Mullins
SPOTTS FAIN PC
411 E Franklin St
PO Box 1555
Richmond, VA 23218-1555
Telephone: 804-788-1190
Facsimile: 804-697-2144
Email: hfain@spottsfain.com
Email: jerbach@spottsfain.com
Email: cmullings@spottsfain.com
*Counsel for Matt Martorello*

Michelle Lynne Alamo
William Ojile
ARMSTRONG TEASDALE LLP
4643 S Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720-722-7189
Facsimile: (720) 200-0679
Email: malamo@armstrongteasdale.com
Email: bojile@armstrongteasdale.com
*Counsel for Matt Martorello*

Paul Louis Brusati
Todd D. Stephens
ARMSTRONG TEASDALE LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105
Telephone: 314-552-6602
Facsimile: (314) 613-8522
Email: pbrusati@armstrongteasdale.com
Email: tstephens@armstrongteasdale.com
*Counsel for Matt Martorello*

JA683

/s/ Timothy J. St. George
Timothy J. St. George
Virginia State Bar No. 77349
*Counsel for Big Picture Loans, LLC and Ascension Technologies, LLC*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1254
Facsimile: (804) 698-6013
Email: tim.stgeorge@troutman.com

39758153

JA684

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**RENEE GALLOWAY,** *et al.,*

      **Plaintiffs,**

**v.**                                  **Civil Action No. 3:18-cv-00406-REP**

**BIG PICTURE LOANS, LLC,** *et al.,*

      **Defendants.**

_____ /

**MEMORANDUM IN SUPPORT OF MOTION TO STRIKE
(1) DECLARATION OF JOETTE PETE, (2) DOCUMENTS PRODUCED
BY JOETTE PETE, AND (3) JOETTE PETE FROM PLAINTIFFS' WITNESS LIST**

        Defendants, Big Picture Loans, LLC ("Big Picture"), and Ascension Technologies, LLC

("Ascension") (collectively, the "Tribal Defendants"), pursuant to Fed. R. Civ. P. 37(c), state as

follows in support for their motion to strike (1) the Declaration of Joette Pete ("Pete Declaration")

[ECF No. 286-3], (2) the documents produced by Joette Pete and included on Plaintiffs' Second

Supplemental Disclosure ("Pete Documents"), and (3) Joette Pete as a witness at the evidentiary

hearing scheduled for October 28, 2019.

<u>**INTRODUCTION**</u>

        After two years of ongoing discovery by Plaintiffs' counsel in this matter and their

companion suit, *Williams et al. v. Big Picture Loans, LLC, et al.*, Case No. 3:17-cv-461-REP (E.D.

Va.) ("*Williams*"), on September 11, 2019, the Plaintiffs disclosed Joette Pete ("Pete") as a

potential witness – then named her on their formal witness list for the October 28, 2019 evidentiary

hearing.  On September 13, 2019, Plaintiffs submitted for the first time a declaration from Pete.

(ECF No. 286-3.)

**JA685**

The inclusion of Pete as a witness, the production of her (stolen Tribal) documents, and the production of the belated and plainly-ghostwritten[1] Pete Declaration, are late disclosures and should be stricken.  First, the Pete Declaration – and the substance of the documents used to support it – were first included in Plaintiffs' Reply in Support of their Statement of Position Regarding Material Misrepresentations.  Those submissions, however, were in no way responsive to the Tribal Defendants' opposition brief.  The practice of introducing new evidence for the first time in a reply is not allowed, and the Court should strike the Pete Declaration for that reason alone.[2]

Additionally, the creation and production of the Pete Declaration, the production of the Pete Documents, and her identified inclusion as a witness at the upcoming jurisdictional hearing, were done well after jurisdictional discovery had closed.  As such, Tribal Defendants have not had an opportunity to depose her or otherwise examine her claims.  That late disclosure violates Fed. R. Civ. P. 37(c), and the appropriate sanction is striking the Pete Declaration, the Pete Documents, and Joette Pete from the witness list.

Finally, as a matter of law, her testimony is irrelevant to the proceedings at hand.  It is not responsive to the *Breakthrough* factors used by the Fourth Circuit in determining Big Picture and Ascension were arms of the Tribe; it is not usable to support Plaintiffs' claims of "misrepresentation"; and it runs counter to the stated intent of the Tribe through resolutions.  The

---

[1] Multiple paragraphs in the Pete Declaration obviously were ghost-written because Pete makes allegations as to events that would be impossible for her to have knowledge of – much less personal knowledge.  (*See* ECF No. 286-3.)  By example, Pete cannot competently testify to the information contained in paragraphs 5, 6, 7, and 8 describing Red Rock's business operations, as she had no day-to-day involvement with operations of Red Rock or Big Picture at any time. She likewise cannot competently testify to the information contained in paragraph 11, as she had no involvement with operations of Big Picture at any time.

[2] Indeed, the Court has acknowledged this rule in this case.  (*See* ECF No. 81 at pp. 24-25.)

**JA686**

Court should find that the Pete Declaration, the Pete Documents, and Joette Pete's testimony would have no probative value, and therefore grant the Tribal Defendants motion to strike.

<u>RELEVANT FACTUAL BACKGROUND</u>

On October 11, 2018, the Court ordered that "[a]ny additional jurisdictional discovery that the plaintiffs wish to complete, including requests for production, must be served by October 11, 2018 . . .[; a]ll deposition notices must be served by the plaintiffs by November 2, 2018; and [a]ll briefing on the jurisdictional issues in this case must be filed October 17, 2018." (ECF No. 64 at pp. 1-2.) On October 19, 2018, the Court entered an Order denying Plaintiffs' Motion for Jurisdictional Discovery. (ECF No. 82.) Subject to those Court-ordered deadlines, jurisdictional discovery closed in this matter.

On January 15, 2019, the Court held a hearing a discovery issues and issued an Order requiring Plaintiffs to "file a notice [by January 21, 2019] that identifies their position as to what jurisdictional discovery (if any) is necessary for the pending jurisdictional motions in this case." (*See* ECF No. 147 at p. 1.) The parties briefed those issues in early 2019.

Then, on May 9, 2019, the Court <u>denied</u> Plaintiffs' Proposal for Completing Jurisdictional Discovery [ECF No. 156], thereby foreclosing Plaintiffs' attempt to re-open the discovery period in this matter.[3] (ECF No. 224.) As Plaintiffs have represented on multiple occasions, and per the Court's Order, <u>*discovery has been closed in this case since May 9, 2019*</u>.

Thereafter, Plaintiffs' filed their Statement of Position Regarding Material Misrepresentations on June 28, 2019 [ECF No. 249], and the Tribal Defendants filed their

---

[3] The next day, the Court denied Plaintiffs' request to file an amended complaint or alternatively amend the stipulated protective order given issues of complexity, prejudice to the Defendants, and delay. (ECF No. 228.)

**JA687**

competing Statement of Position on August 9, 2019.   (ECF No. 271.)  The Court scheduled an evidentiary hearing for October 28, 2019.  (*See* ECF No. 270.)

Despite this fact that discovery has been closed for many months, on September 11, 2019, Plaintiffs' served Second Supplemental Disclosures identifying for the very first time Joette Pete as a "witness" on their behalf, as well as over 2,000 stolen documents, the majority of which are confidential and/or privileged Tribal documents produced by Pete to Plaintiffs' counsel ("Pete Documents").  *See* **Exhibit A**.  Then, on September 13, 2019, Plaintiffs' filed their Reply in Support of their Statement of Position (the "Reply Brief") and attached a never-before-disclosed Pete Declaration as Exhibit 3.  (*See* ECF No. 286-3.)  The Pete Declaration was executed on August 20, 2019, and inevitably preceded by numerous communications with counsel, but not produced or even mentioned to Defendants' counsel until September 13, 2019.  Plaintiffs' Reply Brief [ECF No. 286] also cited and relied heavily on the stolen Tribal records that Pete produced to Plaintiffs' counsel at some point weeks ago.  The Pete Declaration is also featured prominently in Plaintiffs' reply brief, but its allegations are directly contradicted by documents produced by Pete.

On September 24, 2019, Plaintiffs' identified Joette Pete as a witness on their behalf at the evidentiary hearing scheduled for October 28, 2019.  (*See* ECF No. 298.)

To protect their interests to test the Pete Declaration and Pete's document production prior to the evidentiary hearing, both the Tribal Defendants and Matt Martorello served deposition and document subpoenas on Pete as a third party.  Her deposition is currently scheduled for October 15, 2019 in Hibbing, Minnesota.

Plaintiffs have notified Defendants' counsel that they intend to move to quash the Pete deposition on grounds that discovery has been closed since May 9, 2019 – despite the fact that Plaintiffs themselves engaged in discovery by obtaining a declaration and stolen Tribal documents

from a third-party witness less than 2 months before the evidentiary hearing, and concealed their conduct until the last possible moment.

**ARGUMENT**

**I.     The Pete Declaration and Pete Documents are new evidence improperly presented for the first time in Plaintiffs' reply brief.**

As a threshold matter, the Pete Declaration and Pete Documents are new evidence and arguments that were presented for the first time on September 13, 2019 in Plaintiffs' Reply in Support of their Statement of Position [ECF No. 286] (the "Reply Brief"). That violates well-established briefing principles and is improper.

This Court – and federal courts across the nation – prohibit the introduction of new evidence and arguments in a reply brief as a matter of fundamental litigation rule. Such evidence and arguments are inadmissible and disregarded. *See, e.g., DNT, LLC v. Sprint Spectrum, LP*, 750 F. Supp 2d 616, 630 (E.D. Va. 2010) ("Defendants did put forth new evidence and argument not offered in their opening brief which it will therefore not consider."); *Hegwood v. Ross Stores, Inc.*, 2007 WL 102993, n. 3 (N.D. Tex. 2007) ("The movant is not ordinarily permitted to introduce new evidence in support of a reply because such action would deprive the non-movant of a meaningful opportunity to respond.").[4]

Plaintiffs' filed their Statement of Position Regarding Material Misrepresentations ("Plaintiffs' SOP") on June 28, 2019. (*See* ECF No. 249.) They outlined twelve general allegations regarding, *inter alia*, the role of the Tribe in operating Big Picture and Ascension, as

---

[4] Plaintiffs also disclosed that they intend to call Pete as a live witness at the evidentiary hearing. (*See* ECF No. 298.) The Tribal Defendants have noticed Pete for a deposition to occur on October 15, 2019, which Plaintiffs have threatened to quash – taking the hypocritical position that the May 9, 2019 discovery closure date allows the presentation of their new evidence (*i.e.*, the Pete Declaration and Pete Documents) but somehow forecloses the Tribal Defendants' ability to question Pete or test the validity and relevance of her declaration and documents. That position is fundamentally unfair and contrary to the practice of this Court. However, if this motion is granted, then that discovery dispute will be mooted.

5

well as the degree of Matt Martorello and his businesses' involvement in Big Picture and Ascension's businesses. Much, if not all, of Plaintiffs' SOP dealt with the claimed intent of third parties, and their evidence centered around now-rejected arguments Plaintiffs made to the Fourth Circuit in *Williams v. Big Picture*, 929 F.3d 170 (4th Cir. 2019). **Critical here, Plaintiffs' SOP and accompanying exhibits *never relied upon or even mentioned Joette Pete*, the Pete Declaration, or the Pete Documents.**

On August 9, 2019, the Tribal Defendants responded to Plaintiffs' SOP in their Statement of Position Regarding Plaintiffs' Claims of Material Misrepresentations [ECF No. 271] ("Tribal Defendants' SOP"). Therein, the Tribal Defendants responded to Plaintiffs' claims, pointing out that many of them were largely irrelevant based on the *Breakthrough* factors outlined by the Fourth Circuit in *Williams*, and providing important factual context for other contentions made in Plaintiffs' SOP. **Because Joette Pete had never been relied upon or referenced in Plaintiffs' SOP, the Tribal Defendants' SOP also did not address Pete, the Pete Declaration, or the Pete Documents**.

Nevertheless, on September 13, 2019, Plaintiffs filed their reply brief in support of Plaintiffs' SOP [ECF No. 286] ("SOP Reply"). In the SOP Reply, Plaintiffs attached the Pete Declaration as Exhibit 3 and relied upon the Pete Declaration and Pete Documents throughout their filing. Plaintiffs did not engage the Tribal Defendants' SOP. Instead, their principal strategy was to dismiss it out of hand before attempting to sandbag the Tribal Defendants with the Pete Declaration and Pete Documents – materials she spirited away in violation of Tribal law.[5]

---

[5] Neither Plaintiffs' nor Pete have disclosed how they came into possession of these documents, but they constitute Tribal property and should be returned to the possession of the Tribe immediately. Anyone outside of the Plaintiffs' and Joette Pete who have reviewed them should be disclosed to the Tribal Defendants.

Plaintiffs even admitted in the SOP Reply that the Pete Declaration and Pete Documents were new, previously-undisclosed evidence. (*See* ECF No. 286, at pp. 5-6, n.4.)

There can be no doubt that the Pete Declaration and Pete Documents is new and untimely evidence. It was submitted well after the close of fact discovery, and it was submitted for the first time in a reply brief. For these reasons, the Court should strike the Pete Declaration and any references to the Pete Documents from Plaintiffs' SOP Reply.

## II. The Pete Declaration and Pete Documents should be stricken under Fed. R. Civ. P. 37(c) as untimely and unduly prejudicial.

The striking of the Pete declaration from the Reply Brief is only a small portion of the relief that is required based on Plaintiffs' improper discovery tactics. The Court should also impose sanctions under Rule 37 for the untimely submission of the Pete Declaration and Pete Documents, and it thus should preclude the introduction of the Pete Declaration or the Pete Documents from evidence, as well as preclude Pete from introducing any testimony at this jurisdictional stage of the case. Her testimony is delayed, harmful, and no sanction less than preclusion is adequate.

Sanctions under Rule 37 requires a three-step analysis: "(1) determining that a violation of a discovery order or one of the Federal Rules of Civil Procedure occurred; (2) determining whether that violation was harmless and substantially justified . . . ; and (3) fitting a sanction to the violation, if one is found." *Thomas v. FTS USA, LLC*, No. 3:13cv825, 2016 U.S. Dist. LEXIS 82679, at *12-13 (E.D. Va. June 24, 2016) (citing *Samsung Elecs. Co., Ltd. V. Nvidia Corp.*, 314 F.R.D. 190, 195-196 (E.D. Va. 2016)). All factors are satisfied here.

### A. The Plaintiffs violated this Court's discovery Order, as well as Rule 26.

With respect to the first factor, the late disclosure of Pete has violated this Court's discovery order preventing additional discovery, as well as the requirements of the Federal Rules of Civil Procedure.

**JA691**

Plaintiffs affirmatively obtained and used the Pete Declaration and Pete Documents after the close of discovery in this case. Those actions violated this Court's May 9, 2019 discovery Order denying Plaintiffs' attempt to engage in additional jurisdictional discovery. (*See* ECF No. 224.) The Fourth Circuit examined a similar situation in *Gomez v. Haystack Technology, Inc.*, 761 Fed. Appx. 220 (4th Cir. 2019). There, the appellant first disclosed two witnesses on the last day of the discovery deadline, and one witness three weeks after the discovery period had closed. *Id.* at 232. The appellant had been "aware of the witnesses for three weeks," and he had knowledge of the witnesses for months prior. *Id.* at 233-234. "Gomez was not entitled to delay disclosure in the name of unnecessary information even if, as Gomez's counsel argued, Gomez wanted to contact the witnesses before we placed them on a witness list." *Id.* Likewise, Plaintiffs' delay in disclosing Pete, the Pete Declaration, and the Pete documents is sanctionable, and those discovery materials should be excluded.

Furthermore, Plaintiffs' late disclosure also violates the requirement under Rule 26(e)(1)(A)(i) that a party must supplement or correct disclosures in a timely manner. Plaintiffs did not file their applicable Rule 26 disclosures identifying Pete until September 11, 2019 – less than two months before the evidentiary hearing and more than two years after the onset of this litigation. Moreover, they were in communication with Pete in August 2019, but failed to make any disclosures until mid-September. For these reasons, Plaintiffs' actions with respect to the Pete Declaration and Pete Documents violated a discovery Order of this Court, as well as Rule 26. The first prong of the test is met.

**B.      Plaintiffs' untimely disclosure of the Pete Declaration and Pete Documents was neither harmless nor justified.**

As to the second factor, the September 11, 2019 disclosure of the Pete Documents, and the September 13, 2019 disclosure of the Pete Declaration have caused significant harm and prejudice to the Tribal Defendants.

"The district court has 'broad discretion' to determine whether a disclosure violation is substantially justified or harmless under Rule 37(c)(1)."  *United States v. $134,750 United States Currency*, 2013 U.S. App. LEXIS 15015, *11-12 (4th Cir. July 24, 2013).  "[T]his discretion should be guided by an analysis of five factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence."  *Id.* at *12 (citing *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)); *accord Rambus, Inc. v. Infineon Techs. AG*, 145 F. Supp. 2d 721, 721 (E.D. Va. 2001).

"Four of these factors – surprise to the opposing party, ability to cure that surprise, disruption of the trial, and importance of the evidence – relate mainly to the harmlessness exception, while the remaining factor – explanation for the nondisclosure – relates primarily to the substantial justification exception."  *Southern States*, 318 F.3d at 597.  Bad faith is not a separate factor to consider when deciding whether to exclude evidence, "although under some circumstances, it might be relevant to the fifth factor of [the] test – the nondisclosing party's explanation for its failure to disclose evidence."  *Id.* at 598.

Against these standards, Plaintiffs cannot credibly argue that their late disclosure was justified given their attempts to quash her scheduled October 15, 2019 deposition.

**JA693**

First, the Pete Declaration and Pete Documents were a complete surprise to the Tribal Defendants, submitted *one week* before the Tribal Defendants' exhibit list, witness list, and discovery designations were due for the October 28, 2019 evidentiary hearing. The Tribal Defendants have not been able to depose her, yet and now must expend unnecessary resources to oppose Plaintiffs' attempts to quash her scheduled deposition. Given the timing of the evidentiary hearing and Pete's late disclosure, the harm to the Tribal Defendants is actual and significant. Indeed, the October 28 evidentiary hearing amounts to a trial on the Tribal Defendants' sovereignty (which has already been confirmed by the Fourth Circuit). Plaintiffs should not be allowed to belatedly disclosure an allegedly "key" witness at the eleventh hour in those circumstances. In sum, the prejudice and harm related to Pete's late disclosure is clear.

Second, Plaintiffs undoubtedly will argue that Pete was unknown to them until recently, and thus, her late disclosure is "substantially justified." That is false. At the very latest,[6] Plaintiffs have known about Pete since at least May 2019 in conjunction with her alleged spoliation evidence for the *Williams* matter, where Plaintiffs requested her deposition.[7] Plaintiffs then affirmatively engaged in third-party discovery after the discovery period closed to obtain confidential Tribal documents from Pete and construct her declaration. And, even if Pete's late disclosure is found to be somehow justified, Plaintiffs' refusal to allow her deposition on October 15, 2019 removes any doubt about Plaintiffs' true motives and fundamental unfairness of the circumstances.

This is sandbagging, pure and simple, and the Court should not condone it. *See, e.g., Hartford Cas. Ins. Co. v. McJ Clothiers,* 54 Fed. Appx. 384 (4th Cir. Dec. 27, 2002) (affirming

---

[6] The Tribal Defendants and the Tribal Officers in *Williams* produced documents dating back to 2014, including hundreds of emails and Tribal Council documents that identified Pete as the Vice Chairwoman.

[7] *Williams, et al. v. Big Picture Loans, et al.*, No. 3:17cv461-REP (E.D. Va.) (Dkt. No. 516-2, attaching correspondence where Plaintiffs had requested to depose Pete on the issue of "spoliation").

district court's decision to exclude bad faith claim because party disclosed claim only three weeks prior to the close of discovery and did not provide basis for the claim until five weeks after the close of discovery); *Spotnana, Inc. v. Am. Talent Agency, Inc.*, 2010 U.S. Dist. LEXIS 86457, *4-5 (S.D.N.Y. Aug. 17, 2010) ("prejudice to [the movant] is particularly great because discovery, which closed over four months ago, would have to be reopened for [the movant] appropriately to respond to ATA's damages calculations."); *see also Tex. Instruments, Inc. v. Hyundai Elecs. Indus.*, 50 F. Supp. 2d 619, 629 (E.D. Tex. 1999) ("To permit Hyundai to present evidence relating to the [belatedly disclosed theory] would endorse a veritable grab-bag of inexcusable conduct").

Plaintiffs' tactics and use of the Pete Declaration and Pete Documents has harmed the Tribal Defendants and lack any – much less a substantial – justification.

### C.    The appropriate sanction is striking the Pete Declaration and Pete Documents.

Upon the finding of a discovery violation, Rule 37(c)(1) states that a court "(A) may order payment of the reasonable expenses, including attorney's fees, cause by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i) – (vi)." Fed. R. Civ. P. 37(c)(1).

Given Plaintiffs' late disclosure and the significance of the issues to be presented at the evidentiary hearing, the Pete Declaration and Pete Documents should be stricken from the record and Pete should be prohibited from testifying at the evidentiary hearing.

Indeed, courts in the Fourth Circuit have consistently struck the testimony of witnesses identified in the first time in connection with motions practice after the close of discovery. *See, e.g., Manguiat v. Bd. of Educ.*, 2015 U.S. Dist. LEXIS 64346, at *12-13 (D. Md. May 18, 2015) ("Specifically, the School Board has been prejudiced by the surprise identification of the declarants as witnesses. Had Manguiat properly and timely identified the declarants as witnesses, the School

Board would have had the opportunity to depose the declarants in order to assess their degree of knowledge.  Without that opportunity, the School Board is unable to meaningfully refute or otherwise challenge the veracity of the statements contained in the declarations.  And at this late juncture, Manguiat cannot cure the impact of the surprise identification without causing significant disruption to this case.  Indeed, discovery is closed, the School Board's summary judgment motion is fully briefed, and this matter has been pending for more than two years.").

The result should be no different here.  There is no justification and no cure for the identification of a fact witness months after the close of discovery and weeks before an evidentiary hearing.

**IV.  The Pete Declaration is inadmissible because, as a matter of law, it cannot be used to impeach or contradict the action of the Tribal Council.**

Discovery violations aside, Plaintiffs undoubtedly will attempt to use the Pete Declaration and Pete Documents to impeach the stated purpose of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") and its tribal council (the "Tribal Council").  This is impermissible as a matter of law.  The Tribe legislates and speaks through the Tribal Council and its resolutions, which are consensus documents of all of the Tribal Council members.  Any individual Tribal Council member's motives or intent is *wholly irrelevant* to the Tribe's purpose or intent.  *See Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 598 (4th Cir. 2017) ("adher[ing] to the edict that courts 'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'") (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)).  The motive of an individual member is irrelevant to the actions of the representative body as a whole.  The same is true here, where Pete improperly seeks to contradict the formal resolutions and documented intent of the Tribe/Tribal Council with her own, unsupported allegations as an individual member.

"[I]t simply is 'not consonant with our scheme of government for a court to inquire into the motives of legislators.'"  *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998) (*citing Tenney v. Brandhove*, 341 U.S. 367 (1951)).  Yet, that is exactly what the Plaintiffs' would have the Court do.  The Tribe makes its intent known through the deliberative process and through the Tribal Council resolutions it passes.  Indeed, the Fourth Circuit – reversing this Court – held in *Williams*: "Big Picture and Ascension were both organized through resolutions by the Tribe Council, exercising powers delegated to it by the Tribe's Constitution, and the Entities operated pursuant to the Tribe's Business Ordinance."  *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 177 (4th Cir. 2019).  In fact, the only intent the Fourth Circuit deemed relevant to its analysis was "the tribe's intent to extend its immunity to the entities."  *Id*. at 184.

In *Flickinger*, this court previously ruled that the individual motives of three members of a seven-person board were irrelevant to its finding that the entire board, acting unanimously, did not share that improper motive.  *See Flickinger v. Sch. Bd. Of City of Norfolk, Va.*, 799 F. Supp. 586, 594-595 (E.D. Va. 1992) ("Since a binding action of the Norfolk School Board requires a majority vote, an improper motive cannot be imputed to the entire School Board, which consists of seven members, on the basis of the motives of only three of its members.").  Likewise, this court has also found that "an inquiry into whether [the Virginia General] Assembly's purported motives . . . was an inquiry that ran squarely afoul of the doctrine of legislative immunity."  *Lee v. Virginia State Bd. Of Elections*, No. 3:15-CV-357, 2015 WL 9461505, at *5 (E.D. Va. Dec. 23, 2015) (internal quotations omitted).

The Pete Declaration is improper and inadmissible for the same reasons.  The Tribal Council requires a majority vote to pass a resolution.  (*See* ECF No. 38-1, Constitution of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, Article III, Section 4(f)(3).)  The Pete

Declaration seeks to impute on the entire Tribal Council *her* understanding of the agreement regarding management of the business. She provides no support as to her proclamation of the intentions or motives of the other members of the Tribal Council. Her understanding, in the face of contradicting testimony from members of the Tribal Council, cannot be imputed to the Tribal Council as a whole – and is therefore irrelevant.

Tribal Council resolutions are legislative actions; and thus, the rules of construction regarding legislative intent apply. "The legislative intent must be ascertained by examination of the plain words used in the statute." *P.M. Palumbo, Jr., M.D., Inc., v. Bennett*, 242 Va. 248, 251, 409 S.E.2d 152 (1991). As but one example, the Tribal Council explicitly states the Tribe's intent in Resolution No. 2011-041, saying:

> WHEREAS, The Tribal Council wishes to diversify the economy of the Tribe's Reservation in order to improve the Tribe's economic self-sufficiency; and WHEREAS, the Tribal Council has determined that it is in the best interest of the Band to form… an independent tribally chartered entity, to transact business in the form of a tribally owned lending enterprise…."

(*See* ECF No.38-4, Tribal Council Resolution No. 2011-041, Approving the Creation of the Lac Vieux Desert Band of Lake Superior Indians Tribal Lending Enterprise.) Pete's Declaration, in part, conversely asserts that the Tribe had no involvement or oversight of the Big Picture lending operations. Her testimony is at complete odds with the Tribal Council's unanimous and stated intent.

The Pete Declaration should be stricken and disregarded by the Court for this additional reason.

<u>CONCLUSION</u>

WHEREFORE, the Tribal Defendants, by counsel, hereby request that the Court enter an Order striking (1) the Pete Declaration, (2) the Pete Documents, and (3) Pete from Plaintiffs' witness list for the October 28, 2019 evidentiary hearing.

**BIG PICTURE LOANS, LLC, AND
ASCENSION TECHNOLOGIES, LLC**

By:/s/ Timothy J. St. George
Timothy J. St. George
Virginia State Bar No. 77349
David N. Anthony
Virginia State Bar No. 31696
*Counsel for Defendants Big Picture Loans, LLC
and Ascension Technologies, LLC*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1254
Facsimile: (804) 698-6013
Email: david.anthony@troutman.com
Email: tim.stgeorge@troutman.com

Justin A. Gray (admitted *pro hac vice*)
Anna M. Bruty (admitted *pro hac vice*)
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: (269) 283-5005
Facsimile: (517) 913-6443
Email: jgray@rosettelaw.com
Email: abruty@rosettelaw.com

**JA699**

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of October 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Leonard A. Bennett
Elizabeth W. Hanes
CONSUMER LITIGATION ASSOCIATES
763 J. Clyde Morris Blvd., Suite 1A
Newport News, VA  23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: lenbennett@clalegal.com
Email: elizabeth@clalegal.com
*Counsel for Plaintiffs*

Beth E. Terrell (admitted *pro hac vice*)
Elizabeth A. Adams (admitted *pro hac vice*)
Jennifer R. Murray (admitted *pro hac vice*)
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th St., Suite 300
Seattle, WA 98103-6689
Telephone: 206-816-6603
Facsimile: 206-319-5450
Email: bterrell@terrellmarshall.com
Email: eadams@terrellmarshall.com
Email: jmurray@terrellmarshall.com
*Counsel for Plaintiffs*

Eleanor M. Drake (admitted *pro hac vice*)
John G. Albanese (admitted *pro hac vice*)
BERGER & MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN  55414
Telephone: 612-594-5999
Facsimile: 612-584-4470
Email: emdrake@bm.net
Email: jalbanese@bm.net
*Counsel for Plaintiffs*

David F. Herman (admitted *pro hac vice*)
Jonathan P. Boughrum (admitted *pro hac vice*)
Richard L. Scheff (admitted *pro hac vice*)
ARMSTRONG TEASDALE
1500 Market Street
12th Floor, East Tower
Philadelphia. PA 19102
Telephone: 215-246.3479
Facsimile: 215-569.8228
Email: dherman@armstrongteasdale.com
Email: jboughrum@ armstrongteasdale.com
Email: rscheff@ armstrongteasdale.com
*Counsel for Matt Martorello*

Kristi Cahoon Kelly
Kelly & Crandall PLC
3925 Chain Bridge Road
Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7570
Facsimile: (703) 591-9285
Email: kkelly@kellyandcrandall.com

**JA700**

/s/ *Timothy J. St. George*
Timothy J. St. George
Virginia State Bar No. 77349
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1254
Facsimile: (804) 698-6013
Email: tim.stgeorge@troutman.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, et al.,

    Plaintiffs,

v.                                  Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.

### ORDER

CAME NOW Plaintiffs and Defendants, Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension" and collectively, the "Parties").

WHEREAS, the Parties have represented to the Court that they have reached a settlement in principle as to the claims alleged by Plaintiffs against Big Picture and Ascension; and

WHEREAS, the Parties require additional time to finalize the formal settlement documentation to be submitted to the Court for approval, including the pleadings necessary to seek preliminary approval of the proposed class settlement; and

UPON CONSIDERATION WHEREOF, and for good cause shown, it is hereby ORDERED as follows:

(1) Because the Parties have advised the Court that they have reached a settlement and require extension of some deadlines to finalize the formal settlement, by October 29, 2019, the Parties

**JA702**

shall finalize the settlement agreement and file it along with a Motion (with supporting papers and brief) seeking Preliminary Approval of the Settlement and therewith shall submit a proposed Order, proposed notices, and proposed dates for all steps necessary for final approval of the settlement; and

(2)  Any deadlines associated with the following motions or Orders are STAYED until sixty (60) days from date of this ORDER or further Order of the Court, whichever shall first occur:

    (a)  DEFENDANTS  BIG  PICTURE  LOANS,  LLC  AND ASCENSION TECHNOLOGIES, LLC'S MOTION TO STRIKE PLAINTIFFS' STATEMENT OF POSITION (ECF No. 554);

    (b)  MOTION FOR ENTRY OF JUDGMENT OF DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, LLC (ECF No. 604); and

(3)  In  addition,  any  Third-Party  discovery  served  by Plaintiffs  implicating  Big  Picture,  Ascension,  the  Lac  Vieux Desert Band of Lake Superior Chippewa Indians, and/or their Council members, officers, present and former attorneys, banks, vendors, or employees, is hereby STAYED until sixty (60) days from date of this ORDER or further Order of the Court, whichever shall first occur; and, by October 28, 2019, counsel for the Parties shall serve a copy of this ORDER on all such Third-Parties, and, by November 5, 2019, shall file a Certification that all Third-Parties have been served; and shall advise the Court (in a formal pleading) of the identity of the Third-Parties that have been served and of

2

the style of the case (and/or motion, with ECF Numbers) involving those Third-Parties so that the Clerk can place a copy of this ORDER in the appropriate Miscellaneous Case files; and

(4)   This ORDER shall have no effect on any pending motions or deadlines as between Plaintiffs and Matt Martorello; and

(6)   All counsel in this case, including counsel for the Parties, shall meet in person with United States District Judge David J. Novak on October 28, 2019 at 9:30 a.m. to discuss settlement of the claims against Matt Martorello.

It is so ORDERED.

/s/   REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: October 21 , 2019

3

**JA704**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, et al.,

    Plaintiffs,

v.                                      Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.

### ORDER

In accordance with, and as instructed by, the Judgment of the United States Court of Appeals for the Fourth Circuit entered on July 3, 2019 (ECF No. 582), and the mandate entered on July 25, 2019 (ECF No. 600), this action is dismissed with prejudice against the defendants, Big Picture Loans, LLC and Ascension Technologies, LLC for lack of subject matter jurisdiction.

It is so ORDERED.

                            /s/    REP

                  Robert E. Payne
                  Senior United States District Judge

Richmond, Virginia
Date: February 18, 2020

JA705

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, et al.,

    Plaintiffs,

v.                                        Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.

### ORDER

In preparation for the hearing on PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO (ECF No. 189) that is currently set for oral argument on March 6, 2020 at 10:00 AM, the Court has reviewed the motion, the supporting, opposing and reply briefs (ECF Nos. 193, 220, 239 (sealed versions)); the sur-reply brief tendered by Matt Martorello (ECF No. 671); the decision of the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") in this case (ECF NO. 581); and MATT MARTORELLO'S SUPPLEMENTAL BRIEF ADDRESSING THE EFFECT OF THE FOURTH CIRCUIT'S DECISION ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (ECF No. 664) ("MARTORELLO'S SUPPLEMENT"). The review of MARTORELLO'S SUPPLEMENT necessitated a review of PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS MADE TO THE COURT BY DEFENDANTS IN SUPPORT OF THEIR MOTIONS TO DISMISS FOR LACK OF JURISDICTION (ECF No. 249)

**JA706**

("PLAINTIFFS' MISREPRESENTATION FILING") filed in <u>Galloway, et al.</u> <u>v. Big Picture Loans, LLC, et al.</u>, Civil Action No. 3:18cv406 ("<u>Galloway I</u>").

It is clear from the record in this case that:

(1) PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO (ECF No. 189) was filed and briefed well before the decision of the Fourth Circuit in this case (ECF No. 581); and

(2) In MARTORELLO'S SUPPLEMENT, Martorello, in opposing class certification, relies on what Martorello asserts to be findings that were made by the Fourth Circuit (or that necessarily result from the Fourth Circuit's decision); and

(3) In PLAINTIFFS' MISREPRESENTATION FILING (ECF No. 249) filed in <u>Galloway I</u>, the Plaintiffs assert that the record before the Fourth Circuit, when making its decision (ECF No. 581), was based on misrepresentations of material fact made, <u>inter alia</u>, by Martorello; and

(4) Many of those asserted representations pertain to the findings that are asserted by Martorello to have been made by the Fourth Circuit in its decision and that, according to Martorello, pertain to, and preclude, the certification of a class.

In perspective of the foregoing, the Court concludes that PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO (ECF No. 189) and the briefing thereon

2

no longer adequately address the issues of class certification. Accordingly, it is hereby ORDERED that:

(A)   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO (ECF No. 189) is denied without prejudice so that Plaintiffs can file an Amended Motion for Class Certification and the briefs thereon can adequately address the record as it now stands; and

(B)   The oral argument on class certification scheduled for March 6, 2020 at 10:00 AM is cancelled.

Accordingly, the Plaintiffs may file an Amended Motion for Class Certification; and that motion and new briefs on that subject will be filed on the following schedule:

| | |
|---|---|
| March 20, 2020 | Plaintiffs shall file an Amended Motion for Class Certification and supporting brief |
| April 15, 2020 | Martorello shall file his response brief |
| May 4, 2020 | Plaintiffs shall file their reply brief |
| June 5, 2020 10:00 AM | Hearing on Amended Motion for Class Certification |

Further, it is apparent that the PLAINTIFFS' MISREPRESENTATION FILING in Galloway I has become important to the class certification issue in this case. Therefore, in the interest of judicial efficiency, it is hereby ORDERED that the PLAINTIFFS' MISREPRESENTATION FILING (ECF No. 249), the response

3

**JA708**

of Martorello and the reply thereto (ECF Nos. 276 and 286, respectively) will be considered part of the record in this case that will be available for briefing on class certification.

The Court is aware that the Plaintiffs' response to MARTORELLO'S SUPPLEMENT is due on February 26, 2020 and that oral argument thereon is set for March 6, 2020 at 10:00 AM. Considering the provisions of paragraphs (A) and (B) of this ORDER, it is hereby ORDERED that the hearing on MARTORELLO'S SUPPLEMENT (ECF No. 664) set for March 6, 2020 is cancelled and that, by March 4, 2020, counsel shall file a Notice advising whether it is necessary to have an evidentiary hearing on the PLAINTIFFS' MISREPRESENTATION FILING (ECF 249) filed in Galloway I before the commencement of the briefing and hearing schedule set forth above for the Amended Motion for Class Certification.

It is so ORDERED.

/s/     _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 20, 2020

4

**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

LULA WILLIAMS, *et al.*,                    )
                                            )
                        Plaintiffs,         )
                                            )
            v.                              )        Civil Action No. 3:17-cv-461 (REP)
                                            )
BIG PICTURE LOANS, LLC, *et al.*,           )
                                            )
                        Defendants.         )

---

**NOTICE OF MATT MARTORELLO REGARDING EVIDENTIARY HEARING**

Matt Martorello respectfully submits this Notice Regarding Evidentiary Hearing pursuant

to the Court's Order (ECF 673) directing the parties to "file a Notice advising whether it is

necessary to have an evidentiary hearing on the PLAINTIFFS' MISREPRESENTATION FILING

(ECF 249) filed in <u>Galloway I</u> before the commencement of the briefing and hearing schedule set

forth . . . for the Amended Motion for Class Certification."[1]  ECF 673 at 4.  In response to the

Court's inquiry, Martorello does not believe an evidentiary hearing is necessary or warranted at

this time.

*First,* Martorello submits that proceedings related to class certification, including any

decision regarding an evidentiary hearing and any other proceedings in relation to Plaintiffs' Filing

(ECF 249) and amended class certification briefing should wait until other motions pending in the

Bankruptcy Court for the Northern District of Texas and this Court that may impact how these

proceedings are resolved.  Specifically, Martorello submits that any further proceedings related to

---

[1]  "Galloway I" refers to *Galloway et al. v. Big Picture Loans, LLC, et al.,* ED Va. Civil Action
No. 3:18-cv-00406-REP.

**JA710**

class certification should wait until after a decision on Debtor's Motion for Preliminary Declaratory and/or Injunctive Relief filed in the United States Bankruptcy Court for the Northern District of Texas, ECF 2, Case No. 20-40349-elm11; Adv. Proc. No. 4:20-ap-4008, in which Debtor Eventide Credit Acquisitions, LLC, requests an order extending the automatic stay to, and restraining and enjoining the continued prosecution of, various actions, including the above-captioned action. Eventide's motion to stay pending in the Bankruptcy Court should be fully-briefed and ready for resolution by mid-March 2020.

Related to the bankruptcy action, on February 21, 2020, Martorello filed a Motion to Transfer (ECF 674) this action, which is related to Eventide's pending bankruptcy case, to the United States District Court for the Northern District of Texas, where that court will refer the action to the Bankruptcy Court. Plaintiffs' response to the Motion to Transfer is due March 6, 2020, and Martorello's reply is due March 12, 2020, after which the motion will be ripe for resolution.

Finally, per the Court's Order (ECF 655), Martorello filed a Motion for Consolidation (ECF 661) of this action with *Galloway I* and *Galloway II*, on February 7, 2020.[2] That motion is fully briefed and ripe for resolution. Should the cases consolidate, potential class certification for a nationwide class—should Plaintiffs' nationwide class claims survive the parties' pending motions to dismiss in *Galloway I and Galloway II*—would be substantially different than the class certification briefing currently scheduled to occur in this case. As explained in Martorello's Proposed Order In Which Pending Motions Should Be Resolved (ECF 649) submitted prior to the January 29, 2020, status conference and in Martorello's Motion for Consolidation (ECF 661), the

---

[2] "Galloway II" refers to *Galloway et al. v. Martorello, et al.,* ED Va. Civil Action No. 3:19-cv-00314-REP.

motions to dismiss pending in *Galloway I* and *Galloway II* should be decided first.  Once it is determined which, if any, claims survive in those matters, any remaining claims should be consolidated with any claims remaining in this case*, such that the claims proceed as one consolidated action.  As set forth in the pending motions to dismiss, Defendants contend that the non-Virginia plaintiffs are not properly before the Court and should be dismissed. *See Galloway I,* ECF No. 46 at 7 & n.4; *Galloway I,* ECF No. 74 at 3; *Galloway II,* ECF No. 94 at 2, 30; ECF No. 99 at 2, 29; ECF No. 104 at 2, 29. Accordingly, it is Defendants' position that no class certification briefing is required with respect to the proposed non-Virginia classes because they should be dismissed.  But, should the cases be consolidated and the Plaintiffs' nationwide class claims survive the parties' pending motions to dismiss, class certification briefing would be substantially different than the class certification briefing currently scheduled to occur in this case.

Because each of the foregoing motions impact whether this action continues in this Court and if so, the scope of the action moving forward, Martorello submits that the foregoing motions should be resolved prior to any further proceeding related to class certification, including any decision on a potential evidentiary hearing related to Plaintiffs' Filing (ECF 249).

*Second*, as explained in Martorello's Supplemental Brief Addressing the Effect of the Fourth Circuit's Decision on Plaintiffs' Motion for Class Certification (ECF 664 at 16), as well as the Tribal Defendants Response to Plaintiffs' Filing in *Galloway I* (ECF 271),[3] Plaintiffs are not permitted to relitigate the Fourth Circuit's conclusions in this case with new evidence, including

---

[3]  Martorello was materially constrained in *Galloway I* by the Court to addressing only specific misrepresentations attributed to him, citing by page and line and quoting the text therein, but to refrain from addressing other allegations against him that were attributed to other subjects.  *See Galloway I* Order, ECF No. 259.  The Tribal Defendants were not similarly constrained with respect to their response.  *See id.*

**JA712**

against Martorello. *See In re Microsoft Antitrust Litigation Corp.*, 355 F.3d 322, 326 (4th Cir. 2004).

*Third,* as set forth in Martorello's original Response to Plaintiffs' Filing (*Galloway I* ECF 276), the Tribal Defendants' Response to Plaintiffs' Filing (*Galloway I* ECF 271), and Martorello's Memorandum in Opposition to Plaintiffs' Cross Motion to Compel Against Non-Party Conner & Winters, LLP, And Response to Plaintiffs' Purported "Additional Evidence" (ECF 589), in which Plaintiffs' raised, and Martorello responded to, essentially the same purported "new evidence" as cited in Plaintiffs' filing in *Galloway I*, a proper read of the purported "new evidence" only further confirms that the Tribal Defendants and Martorello engaged in entirely lawful conduct. Notably, although Plaintiffs' counsel possessed the majority, if not all, of the purported "new" information prior to oral argument before the Fourth Circuit, they made no attempt to submit it and Plaintiffs' counsel made no mention of it at oral argument. The reason is simple. Their purported misrepresentations are bunk. None of the purported new evidence submitted by Plaintiffs proves or suggests a misrepresentation by Martorello or the Tribal Defendants, or otherwise provides grounds for Plaintiffs to avoid the Fourth Circuit's binding evidentiary conclusions that the Tribe owned and controlled the lender; the lenders were Big Picture and Red Rock, originating and performing their loans on the reservation; not Ascension and not Martorello; the sale was no sham; avoiding liability was not improper and the transaction here invokes obligations of federal law and policy requiring due consideration of important federal interests to promote and protect the commercial dealings in this case.

When Plaintiffs' "new" evidence is examined, the inescapable conclusion is that the evidence actually supports *the truth* of Martorello's statements and the Fourth Circuit's decisive binding evidentiary conclusions, as does the significant available evidence outlined in the

responses filed by Martorello (*Galloway I* ECF No. 276) and the Tribal Defendants (*Galloway I* ECF No. 271).  No evidentiary hearing is needed to reach the conclusion that Plaintiffs' Filing, on the whole, lacks merit.  Indeed, consistent with the Fourth Circuit's binding evidentiary conclusions, Plaintiffs, who are also creditors in the bankruptcy action, admitted in a recent submission to the Bankruptcy Court that Big Picture and Ascension "operate the lending business." *See* ECF 43, Case No. 20-40349-elm11, at 7 n.2 ("TED is the parent company for Big Picture Loans, LLC, and Ascension Technologies, LLC, *i.e., the subsidiaries that operate the lending business*.") (emphasis added).

As indicated in Martorello's Supplemental Brief Addressing the Effect of the Fourth Circuit's Decision on Plaintiffs' Motion for Class Certification (ECF 664), if the Court is inclined to consider Plaintiffs' Filing in relation to this matter (which Martorello contends it should not), Martorello should be provided a full and fair opportunity to respond through an evidentiary hearing and briefing.

Respectfully submitted,

MATT MARTORELLO

By:/s/ *John M. Erbach*
M. F. Connell Mullins, Jr. (VSB No. 47213)
Email: cmullins@spottsfain.com
Hugh McCoy Fain, III (VSB No. 26494)
Email: hfain@spottsfain.com
John Michael Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile:  (804) 697-2100

Richard L. Scheff (admitted *pro hac vice*)
Jon Boughrum (admitted *pro hac vice*)

JA714

Michael Witsch (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone: 267.780.2000
Facsimile: 215.405.9070
Email: rscheff@ armstrongteasdale.com
Email: jboughrum@ armstrongteasdale.com
Email: mwitsch@armstrongteasdale.com

Michelle Lynne Alamo (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
4643 S. Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720.722.7189
Facsimile: 720.200.0679
Email: malamo@armstrongteasdale.com

*Counsel for Defendant Matt Martorello*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on this 4th day of March, 2020, the foregoing was filed using the Court's CM/ECF system, thereby serving a copy on all counsel of record electronically.

By:/s/  *John M. Erbach*
John M. Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile:  (804) 697-2100

**JA716**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

LULA WILLIAMS, *et al.*,

      Plaintiffs,

v.                                Civil Action No. 3:17-cv-461 (REP)

BIG PICTURE LOANS, LLC, *et al.*,

      Defendants.

## PLAINTIFFS' NOTICE REGARDING EVIDENTIARY HEARING

Plaintiffs, by counsel, hereby submit this Notice Regarding Evidentiary Hearing in accordance with the Court's Order dated February 20, 2020 (Dkt. 673).

Plaintiffs ask the Court to have an evidentiary hearing in advance of the Court's decision on Plaintiffs' Motion for Class Certification to address the issues raised in Plaintiffs' filing in *Galloway, et al. v. Big Picture Loans, LLC, et al.*, Civ. No. 3:18cv406, Dkt. 249 ("*Galloway I*") ("Plaintiffs' Misrepresentation Filing") regarding the Misrepresentations previous made by Defendant Matt Martorello and other Co-Defendants in support of the Tribal Immunity motion addressed by the United States Court of Appeals. *Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019).

Plaintiffs of course believe that there is sufficient evidence already in the record to establish the propriety of class certification and to refute Defendants' earlier misrepresentations to this Court and the United States Court of Appeals on tribal immunity. Still, at this posture and given the Fourth Circuit's decision, they believe that the Parties should make the most complete record for

JA717

what may be a new wave of procedural motions and appeals by Mr. Martorello and his controlled co-Defendants.

Any motion, especially one as significant as class certification, should be decided on the most complete record available to the Court. And where the parties present such varying views as to the facts and the meaning of those facts, an evidentiary hearing will undoubtedly assist the Court in sorting through those facts, including any necessary credibility determinations.

To be clear, Plaintiffs do not believe the Fourth Circuit's decision on tribal immunity impacts any fact or element necessary to certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure or even the merits of the claims against the non-Tribal Defendants. In fact, the Fourth Circuit made clear that "**the potential merit** of the borrowers' claims against Big Picture and Ascension–and the lack of a remedy for those alleged wrongs–does not sway the tribal immunity analysis." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 185 (4th Cir. 2019) (emphasis added). Just as important, the Fourth Circuit found "no clear error in the district court's factual findings." *Id*. Instead, it was the "district court's legal conclusions" with respect to sovereign immunity factors, which were reversed. *Id*.   Martorello is not a member of any Native American tribe, nor are his businesses owned by one. His assertions that the governmental protection afforded by tribal immunity should extend to his non-governmental businesses is more than a stretch. The Fourth Circuit's legal conclusions regarding Big Picture and Ascension's status as arms-of-the tribe is a completely separate inquiry from: (a) the merits; and (b) class certification.

In Defendants' effort to convince the Court (and then the Fourth Circuit) that the Tribal Defendants were not in fact controlled by Martorello, Martorello claimed in his original declaration that he only "had limited involvement with LVD and its businesses related to the Note and at times anecdotal ideas and recommendations to the online lending industry as a whole." Ex.

1 at ¶ 70. Martorello's declaration further claimed that he has: (i) "never made any decisions on behalf of Big Picture," (ii) "never provided any consulting services or advice to Big Picture, LLC as to how to operate their business, (iii) "never hired or fired any employee of Big Picture," (iv) "never made the decision whether or not to lend to any consumer on behalf of Big Picture[,]" (v) "never suggested marketing strategies to Big Picture," (vi) "never suggested policies and procedures to Big Picture," (vii) "never accessed any of the software systems, databases, bank accounts or records of Big Picture," and (viii) "never provided services of any kind to Big Picture." Ex. 1 at ¶¶ 76-84 (emphasis added). If all of these statements are true, then Martorello cannot possibly be an "agent" of Big Picture or otherwise entitled to any shelter from its Tribal Immunity.

Martorello's declaration should end this inquiry, but there is more. In particular, the Loan and Security Agreement between TED and Eventide expressly provides "[n]one of the covenants or other provisions contained in this Agreement or any of the other Transaction Documents shall, or shall be deemed to, give [Eventide] the right or power to exercise control over the day to day affairs or management of" TED or its subsidiaries, including Big Picture. Sept. 14, 2015 Loan and Security Agreement at § 7.15(a), attached as Ex. 2. The Loan Agreement further provides that "[t]he relationship between [Eventide], on the one hand, and [TED] and any Subsidiary, on the other hand, is solely that of creditor and debtor. [Eventide] shall not have (or be deemed to have) any fiduciary relationship… and there is no agency or joint venture relationship between" Eventide and TED. Ex. 4 at § 7.15(b) (emphasis added). In light of this express provision that "there is no agency" relationship, Martorello's more recent suggestion that he is an "agent" of Big Picture is a violation of Rule 11 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. Proc. 11(b)(3) (requiring "factual contentions" to have "evidentiary support").

Given these and other conflicting, inconsistent and ever-changing factual claims by Defendants, Mr. Martorello and any other witnesses he claims would support his story (whichever one he now intends to rely upon) should present their evidence and allow the Court to assess witness credibility and make fully informed findings of fact.

Accordingly, Plaintiffs propose the following additional deadlines:

1.      The Parties' shall file witness and exhibit lists by April 7, 2020;

2.      The Parties shall file any objections to witness and exhibit lists by April 14, 2020; and

3.      The Parties may file a supplemental brief on the facts and issues previously raised in Plaintiffs' Misrepresentation filing by April 21, 2020.

 March 5, 2020

_____/s/_____

Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste.
1-A Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:lenbennett@clalegal.com

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB
#82170 Casey S. Nash, Esq., VSB
#84261 KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030

E. Michelle
Drake John G.
Albanese
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414

Beth E. Terrell

USCA4 Appeal: 21-2116      Doc: 26-2      Filed: 02/07/2022      Pg: 101 of 681

Jennifer Rust
Murray Elizabeth
A. Adams
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103

*Attorneys for Plaintiffs and Proposed Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2020, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to

all counsel of record.

                                    /s/
                    Leonard A. Bennett, VSB #37523
                    CONSUMER LITIGATION ASSOCIATES, P.C.
                    763 J. Clyde Morris Blvd., Ste.
                    1-A Newport News, VA 23601
                    Telephone: (757) 930-3660
                    Facsimile: (757) 930-3662
                    Email:
                    lenbennett@clalegal.com

                    *Attorney for Plaintiffs and Proposed Classes*

JA721

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| v. ) | Civil Action No. 3:17-cv-461 (REP) |
| ) | |
| BIG PICTURE LOANS, LLC, *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFFS' RESPONSE TO MATT MARTORELLO'S SUPPLEMENTAL BRIEF**
**ADDRESSING THE EFFECT OF THE FOURTH CIRCUIT'S DECISION ON**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Plaintiffs, by counsel, submit this response to Defendant Matt Martorello's supplemental

brief (ECF 664) addressing the effect of the Fourth Circuit's decision on Plaintiffs' Motion for

Class Certification.

**INTRODUCTION**

Martorello has no basis for his reliance on *Williams v. Big Picture Loans, LLC*, 929 F.3d

170, 185 (4th Cir. 2019). The decision did not suggest, let alone hold, that its impact would extend

beyond its holding that Big Picture, as an arm of the tribe, could not be sued for damages in federal

court. Regardless of Big Picture's immunity, the class action waiver provision is simply

unenforceable by Martorello because the scope of it does not cover him. It only covers "Big

Picture" and its "employees, agents, directors, officers, shareholders, governors, managers,

members, parent company, or affiliated entities." Ex. 1 at 5. In fact, given Martorello's sustained

efforts to characterize himself and his entities as a mere lender and service providers, Martorello

has in effect conceded that the class waiver provision does not apply to him.

**JA722**

Even if Martorello convinced this Court that he is an agent or affiliated entity, the class action waiver is unenforceable for two other reasons. *First*, the class waiver is unenforceable because it is an integral part of a loan agreement and interconnected "tribal dispute resolution procedure" that attempts to preclude consumers from vindicating their federal and state rights, thereby violating the prospective waiver doctrine. *See MacDonald v. Cashcall, Inc.*, No. CV 16-2781, 2019 WL 5617511, at *15 (D.N.J. Oct. 31, 2019) (refusing to enforce a class waiver because it was "an integral part of an arbitration agreement" which was unenforceable). Second, Virginia law provides that "[a]ny agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and void." Va. Code § 6.2-306(A); *see also* Va. Code § 6.2-1541(A). Because the loan agreements attempt to waive the benefits of Virginia's usury laws and protections, the entire contract is "void," including the class waiver provision. *Id.*

## ARGUMENT

### I.    *Williams* addressed discrete issues related to sovereign immunity.

Martorello's supplemental brief addressing the effect of the Fourth Circuit's decision on class certification revolves around a fundamental misunderstanding of sovereign immunity and, in turn, its purported impact on the class waiver. In Martorello's view, tribal immunity provides tribal businesses, as well as those that partner with them, with a free pass to violate state laws with impunity. This is simply wrong. Sovereign immunity does not legalize conduct, it simply protects a sovereign from suit in federal court. As the Supreme Court has held and consistently reaffirmed: "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973) (citing *Puyallup Tribe*

*v. Department of Game*, 391 U.S. 392, 398 (1968)).[1] In other words, tribal immunity "limits how states can enforce their laws against tribes or arms of the tribes, but… <u>it does not transfigure debts that are otherwise unlawful under RICO into lawful ones</u>." *United States v. Neff*, 787 F. App'x 81, 92 (3d Cir. 2019) (emphasis added), *cert. denied*, 2020 WL 1906598 (U.S. Apr. 20, 2020).

Indeed, although tribal sovereign immunity broadly protects the coffers of a tribe, the Supreme Court has expressly acknowledged that there are a "panoply of tools" available to "shutter, quickly and permanently" unlawful conduct involving tribes. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). Most notably, "tribal immunity does not bar [] a suit for *injunctive* relief against individuals, including tribal officers, responsible for unlawful conduct." *Id.* (emphasis added) (citations omitted). Tribal sovereign immunity is also "simply not in play" when a person seeks recovery from a tribal employee in his or her individual capacity—even when the wrongful conduct was within the scope of tribal employment. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017).

From these principles, it naturally flows that sovereign immunity neither protects nor legalizes the conduct of Martorello, a non-tribal individual. The ongoing case against Martorello—the architect and primary beneficiary of the scheme—is one of the "panoply of tools" available to shutter the unlawful conduct and obtain recourse for those who have repaid these illegal loans. The Fourth Circuit's opinion did nothing to absolve him; and, in fact, it expressly stated that the

---

[1] *See also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) ("Unless federal law provides differently, 'Indians going beyond reservation boundaries' are subject to any generally applicable state law.") (quoting *Mescalero*, 411 U.S. at 148-49)); *Organized Village of Kake v. Egan*, 369 U.S. 60, 75-76, (1962); *Tulee v. Washington*, 315 U.S. 681, 683 (1942); *Shaw v. Gibson-Zahniser Oil Corp.*, 276 U.S. 575 (1928); *Ward v. Race Horse*, 163 U.S. 504 (1896)); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144, n.11 (1980) (reaffirming this principle from *Mescalero Apache Tribe*); *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 113 (2005) (same); *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465 (1995) (same).

"potential merit of the borrowers' claims… does not sway the tribal immunity analysis." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 185 (4th Cir. 2019). Put differently, the Fourth Circuit's decision provided Big Picture and Ascension with "a shield, [] not a sword," and it remains that the tribe and its "officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019), *cert. denied*, 2020 WL 129562 (U.S. Jan. 13, 2020).

Aside from ascertainability,[2] Martorello spends the majority of his brief arguing that the Fourth Circuit's decision "requires a finding that the class action waiver is valid and enforceable." Dkt. 664 at 1. More specifically, Martorello contends that the Fourth Circuit correctly found that the LVD created and controlled Big Picture, and so the argument goes, these "conclusions require a finding that the class action waiver provision is valid and enforceable." Dkt. 664 at 10. This inference defies logic—whether a tribal entity is entitled to immunity is a fundamentally different consideration from whether a class action waiver is valid and enforceable. Even if an entity is entitled to tribal immunity, it may nonetheless craft an unenforceable class waiver provision. And conversely, an otherwise non-immune entity can craft an enforceable class waiver provision. It happens all of the time. *See, e.g., AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011); *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 231 (2013).

---

[2] Despite mischaracterizing the Fourth Circuit's decision and the breadth of sovereign immunity, Martorello's brief only identifies two potential effects of the decision on class certification. One effect, according to Martorello, is that Plaintiffs will be unable to ascertain the class because the "Fourth Circuit's decision puts an end to the possibility" of "ascertainability-related discovery from the Tribal entities." Dkt. 664 at 13. This is not only an incorrect statement of the law, but it assumes that the Tribal Defendants will not *voluntarily* provide the data. As reflected by the attached letter from the Tribal Defendants' counsel, the Tribal Defendants "will ensure the appropriate class data is supplied" in the event the Court certifies the class. Ex. 2, Feb. 11, 2020 Letter from Gibbs to Kelly. This resolves this purported obstacle.

The factors related to the sovereign immunity analysis—the method of creation, intent, control, purpose, and financial relationship—are irrelevant to issues surrounding the enforceability of a class waiver in a consumer loan agreement. As to the latter, what matters is: (1) the plain language of the class waiver provision, (2) the broader language and context of the agreement as a whole, and (3) the various statutes and regulations governing the enforceability of the loan agreements. *See* ECF 236 at 4-13. Each one of these provides a separate basis sufficient to render the class waiver unenforceable, irrespective of Big Picture's entitlement to immunity.

Other than the erroneous argument regarding the enforceability of the class waiver, Martorello's inability to articulate any effect of the Fourth Circuit's decision on the elements of Rule 23 speaks for itself. Because the Fourth Circuit's decision involved a discrete determination regarding sovereign immunity, it has no impact on the enforceability of the class waiver provision.

## II.    The plain language of the class-action waiver does not cover Martorello.

Regardless of the enforceability of the class waiver by others, such as Big Picture, Martorello's bid to enforce it fails because the plain language of the provision does not cover him. In particular, the class waiver provision states:

> **YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST <u>US</u> AND/OR <u>RELATED THIRD PARTIES</u>.**

> 3. All disputes including any Representative Claims against <u>us</u> and <u>related third parties</u> shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with you as provided for pursuant to Tribal law.

Ex. 1 at 5 (caps and bold in original; underline added). In turn, the loan contract defines "Us" as Big Picture Loans, *id*. at 1, and the term "related third parties" as "[Big Picture Loans'] employees, agents, directors, officers, shareholders, governors, managers, members, parent company, or affiliated entities." Ex. 1 at 5 (emphasis added).

5

Despite devoting the vast majority of his brief to the enforceability of the class action waiver, Martorello's brief only contains a single sentence attempting to explain how the class waiver applies to him. *See* Dkt. 664 at 1-13. Martorello merely asserts "[b]e it through Martorello as a purported 'agent' or Martorello as a purported 'affiliated entity,'" he is covered by the class waiver. Dkt. 664 at 9-10. Other than this conclusory sentence, Martorello fails to establish or even articulate how he falls within these two possible categories. Martorello's silence is not surprising as the evidence unequivocally establishes that he is neither an agent nor an affiliated entity.

*Agent*. "Agency is a fiduciary relationship from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act." *Giordano v. Atria Assisted Living, Va. Beach, L.L.C.*, 429 F. Supp. 2d 732, 736 (E.D. Va. 2006) (quoting *Reistroffer v. Person*, 247 Va. 45, 439 (1994)). In "determining whether an agency relationship exists, the critical test is the nature and extent of control exercised by the purported principal over the agent." *Butterworth v. Integrated Res. Equity Corp.*, 680 F. Supp. 784, 789 (E.D. Va. 1988) (citing *Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 492 (1975)). And critically, the "burden of proving agency rests upon the party alleging that agency exists." *Atria Assisted Living*, 429 F. Supp. 2d at 737.

Here, Martorello does not come close to satisfying his burden of proving an agency relationship with Big Picture; nor could he given the positions he has taken throughout the litigation. As detailed in Martorello's own declaration, he claims only to have "had limited involvement with LVD and its businesses related to the Note and at times anecdotal ideas and recommendations to the online lending industry as a whole." Ex. 3 at ¶ 70. Martorello's declaration further claims that he has: (i) "never made any decisions on behalf of Big Picture," (ii) "never provided any consulting services or advice to Big Picture, LLC as to how to operate their business,

(iii) "never hired or fired any employee of Big Picture," (iv) "never made the decision whether or not to lend to any consumer on behalf of Big Picture[,]" (v) "never suggested marketing strategies to Big Picture," (vi) "never suggested policies and procedures to Big Picture," (vii) "never accessed any of the software systems, databases, bank accounts or records of Big Picture," and (viii) "never provided services of any kind to Big Picture." Ex. 3 at ¶¶ 76-84 (emphasis added). If these statements are true, then Martorello cannot possibly be an "agent" of Big Picture.[3]

Martorello's declaration should end this inquiry, but there is more. In particular, the Loan and Security Agreement (drafted by Martorello's attorney) between TED and Eventide also expressly states "[n]one of the covenants or other provisions contained in this Agreement or any of the other Transaction Documents shall, or shall be deemed to, give [Eventide] the right or power to exercise control over the day to day affairs or management of" TED or its subsidiaries, including Big Picture. Ex. 4 at § 7.15(a). The Loan Agreement further provides "[t]he relationship between [Eventide], on the one hand, and [TED] and any Subsidiary, on the other hand, is solely that of creditor and debtor. [Eventide] shall not have (or be deemed to have) any fiduciary relationship… and there is no agency or joint venture relationship between" Eventide and TED. Ex.4 at § 7.15(b) (emphasis added). Because "there is no agency" relationship between Eventide and Big Picture, there can be no agency relationship between Big Picture and Martorello, who claims to be nothing more than a representative of Eventide.

*Affiliated entity*. The class waiver includes "affiliated entities," but does not define the phrase so it must be interpreted in accordance with its common and ordinary meaning. *See, e.g., Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502, 518 (E.D. Va. 2011) (citing *D.C.*

---

[3] While much of this is a half-truth—because Martorello was the brains and created the structure—it is certainly inconceivable that Martorello is an "agent."

*McClain, Inc. v. Arlington Cnty.*, 249 Va. 131, 135 (1995)) ("Words that the parties used are normally given their usual, ordinary, and popular meaning."). "To determine the common and ordinary meaning, the Court looks to a reputable dictionary and considers a term's common usage." *Nationwide Mut.*, 785 F. Supp. at 518-19.

"The term 'affiliate' carries its own, independent legal significance." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009). It "refers to a 'corporation that is related to another corporation by shareholdings or other means of control. . . ." *Id.* (quoting *Delaware Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1077 (Del. 2006)); *see also Cacique, Inc. v. Reynaldo's Mexican Food Co., LLC*, No. 2:13-CV-1018-ODW MLG, 2014 WL 505178, at *5 (C.D. Cal. Feb. 7, 2014) ("There are a number of definitions of 'affiliate,' and all include some element of control."); *Texas Molecular Ltd. P'ship v. Am. Int'l Specialty Lines Ins. Co.*, 424 F. App'x 354, 357 (5th Cir. 2011) (defining an affiliate as a "company effectively controlled by another or associated with others under common ownership or control.") (quoting *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 88 (Tex. App.–Houston [1st Dist.] 2004, no pet.)).

Throughout this litigation, Martorello has argued that he "has never had any control over BPL, Ascension, Red Rock, or any other business which actually made loans to the Plaintiffs." ECF 37 at 4; *see also* ECF 664 (asserting that the "tribal lending businesses were owned and controlled by the Tribe"). Martorello should be judicially estopped from now asserting to the contrary. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (explaining that the doctrine of judicial estoppel prevents "parties from deliberately changing positions according to the exigencies of the moment" (*quoting United States v. McCaskey*, 9 F.3d 368, 378 (C.A. 5 1993))); *Pegram v. Herdrich*, 530 U.S. 211, 227, n.8 (2000) (explaining that judicial estoppel "generally

prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase").

To be clear, Plaintiffs contend that Eventide retained control mechanisms over significant aspects of the business, such as its consent to terminate the co-managers.[4] This type of control, however, does not amount to the type of control necessary to be considered an "affiliate." AFFILIATE, Black's Law Dictionary (11th ed. 2019) ("A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."). Further, the Loan and Security Agreement provides:

7.15   Lender is Not In Control; Lender-Credit Relationship.

(a)    None of the covenants or other provisions contained in this Agreement or any of the other Transaction Documents shall, or shall be deemed to, give Lender the right or power to exercise control over the day to day affairs or management of Borrower or any Subsidiary, the power of Lender being limited to the right to exercise the remedies provided for in this Agreement and the other Transaction Documents.

(b)    The relationship between Lender, on the one hand, and Borrower and any Subsidiary, on the other hand, is solely that of creditor and debtor. Lender shall not have (or be deemed to have) any fiduciary relationship or duty to any of Borrower or any Subsidiary, arising out of or in connection with, and there is no agency or joint venture relationship between Lender, on the one hand, and Borrower. . .

Ex. 4 at § 7.15(a)-(b) (emphasis added). In light of this provision, neither Eventide nor Martorello can establish the requisite control to be an affiliate. Further, it goes as far as asserting that there is not even a "joint venture," which would indicate even less control then affiliation. JOINT VENTURE, Black's Law Dictionary (11th ed. 2019) ("A business undertaking by two or more persons engaged in a single defined project.").

---

[4] Brian McFadden's dual role as Eventide shareholder and Ascension's president—as well as his compensation structure—further ensured that the enterprise would be run in a manner that protected Eventide's interest.

JA730

In addition to failing to establish affiliation, Martorello has a bigger problem: it is inconceivable that he is an "entity." ENTITY, Black's Law Dictionary (11th ed. 2019) (defining "entity" as an "organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners"). By using the word "entity," the drafter categorically excluded natural persons like Martorello. If the loan contract was intended to cover the affiliated entities' employees, officers, and directors, it could have easily stated so—just as it did for Big Picture's employees, officers, and directors. Because the language "could not be any plainer or less ambiguous," it must be enforced as written to exclude individuals. *Nat'l Am. Ins. Co.v. Ruppert Landscaping Co.*, 25 F. App'x 116, 120–21 (4th Cir. 2001).[5]

***Red Rock***. The same analysis applies to those consumers, like Mr. Hengle, who had loans with Red Rock. Ex. 5. Drafted largely by Martorello's attorney,[6] Red Rock's class waiver provision is virtually identical to Big Picture's, *i.e.*, waiving the right to bring a class action against Red Rock and "related third parties," which is expressly defined as Big Picture's "employees, agents, directors, officers, shareholders, governors, managers, members, parent company, or affiliated entities." Ex. 1 at 5.

With respect to Red Rock consumers, Martorello cannot establish agency or affiliation for similar reasons identified above. The Servicing Agreement between Bellicose/Sourcepoint (and, thus, potentially Martorello) repeatedly identifies the relationship as that of an "independent

---

[5] *See also Trex Co., Inc. v. ExxonMobil Oil Corp.*, 234 F. Supp.2d 572, 575 (E.D. Va. 2002) ("Virginia law specifically requires that, if the contract is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself[.]" (internal quotation marks omitted)).

[6] *See generally* Ex. 6 at Rosette 010990 (email from Jennifer Weddle, Martorello's attorney, with changes to the template contract); *id.* at Rosette 10998 (showing Weddle's substantial edits to the Tribal Dispute Resolution Procedure).

contractor." Ex. 7 at § 1.4 ("[Red Rock], through a contractual relationship, desires to retain and engage [SourcePoint] as its independent contractor. . . ."); *id.* at § 3.1 ("[Red Rock] hereby retains and engages [SourcePoint] as its independent contractor . . . .); *id.* ("[SourcePoint] hereby acknowledges such retention and engagement as an independent contractor."); *id.* at § 13 ("[SourcePoint] shall be deemed an independent contractor for all purposes hereunder."). Further, the Servicing Agreement provides SourcePoint with complete autonomy in performing its obligations. *Id.* at § 4.1.1.

In short, Martorello has failed to establish that he is either an agent or authorized entity as posited in the single sentence of his submission. To the extent the Court finds any ambiguity, it should be construed against the drafters, including Martorello. *Verizon Virginia, LLC v. XO Commc'ns, LLC*, 144 F. Supp. 3d 850, 867 (E.D. Va. 2015) ("In the case of contracts, ambiguity is construed against the drafter under the rule of contra proferentem." (citations omitted)).

## III. The class action waiver is unenforceable under established Fourth Circuit law because it is part of an integrated scheme to deprive consumers of their rights, remedies, and a fair opportunity to adjudicate their disputes.[7]

The enforceability of the consumer loan agreement is at the heart of this case. This includes the enforceability of a waiver of all state and federal law, the Tribal Dispute Resolution Procedure, and the selection of LVD law as the sole governing law. These provisions, including the class waiver, are part of an integrated scheme to deprive consumers of their rights, remedies, and a fair opportunity to adjudicate their disputes.

Whether or not the tribal lender is a sovereign entity is a distinct issue from the enforceability of the consumer loan agreement. The legal analyses are unrelated, the relevant

---

[7] For Parts III and IV, there is no need to distinguish between Red Rock and Big Picture because the loan contracts, tribal law, and evidence is the same for both entities. Accordingly, Plaintiffs reference to Big Picture for the purpose of simplicity.

evidence is separate, and the determination of one issue is not determinative of the other. For this reason, Martorello never conceded the illegality of the loans between June 2018 and July 2019, *i.e.*, between this Court's initial immunity determination and the Fourth Circuit's decision. Put differently, Martorello never treated Big Picture's entitlement to immunity as tethered to the legality of the loans. As discussed below, irrespective of the protection of the Tribe's coffers, the loan contract and class waiver are unenforceable because they are part of an integrated scheme to deprive consumers of their rights, remedies, and a fair opportunity to adjudicate their disputes.

### A. This Court's previous decisions regarding the potential unenforceability of the consumer loan agreement are bolstered by recent discovery.

As this Court explained, the "Supreme Court has consistently accorded choice of forum and choice of law provisions presumptive validity," but this presumption "is not absolute, and, therefore, may be overcome by a clear showing that they are 'unreasonable under the circumstances.'" *Hunter v. NHcash.com, LLC*, No. 3:17CV348-HEH, 2017 WL 4052386, at *3 (E.D. Va. Sept. 12, 2017) (quoting *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 9 (1972)). Those circumstances include if "(1) their formation was induced by fraud or overreaching; (2) the complaining party will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strong public policy of the forum state." *Hunter*, 2017 WL 4052386, at *3 (quoting *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996)).

As the Court will recall, it confronted many of these issues in the early stages of this case when Big Picture and Martorello moved to dismiss the Complaint. In denying these motions, the Court issued two important orders dated June 26, 2018 (ECF 125) and July 5, 2018 (ECF 142). The first order found, *inter alia*, that Plaintiffs plausibly and adequately alleged that: (1) the

choice-of-law provision in the loan agreements "prospectively effects a waiver of federally created rights and thus is not enforceable," (2) the "chosen law itself prospectively affects consumer federal claims and remedies by specifically limiting those rights under the Tribal Consumer Financial Services Regulatory Code," and (3) the choice-of-law provision at issue is "unreasonable and unfair." ECF 125, June 26, 2018 Order at ¶¶ 1-3. The second order further found that there was "evidence" that the "process and structure" required by the contract "lacks indicia of neutrality and validity." Dkt. 142, July 25, 2018 Order at ¶ 3.

The Court's earlier rulings regarding the choice-of-law, chosen law, and lack of neutrality are intertwined with the enforceability of the class action waiver. Discovery produced after the Court's earlier rulings further bolsters its previous conclusions as to the unenforceability of the consumer loan agreement. Notably however, those issues revolve around considerations fundamentally distinct from the sovereign immunity analysis. Even assuming the veracity of the evidence considered by the Fourth Circuit, the Fourth Circuit never considered or remotely addressed the enforceability of the Tribal Dispute Resolution Procedure, the LVD's law, or the fairness of its procedures. These issues go to the heart of the enforceability of the class action waiver, which is a part of this integrated scheme to deprive consumers of all rights, remedies, and a fair opportunity to adjudicate any violations of state and federal law.

**B.  The consumer loan agreement prospectively waives federal rights and remedies.**

The Supreme Court has repeatedly recognized that, where "choice-of-forum and choice-of-law clauses" operate "in tandem as a prospective waiver of a party's right to pursue statutory remedies," they are unenforceable. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *see also Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2313–14 (2013) ("[C]ourts will not enforce a prospective waiver of the right to gain redress for an

antitrust injury, whether in an arbitration agreement or *any other contract*." (emphasis added)); *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) ("[A] substantive waiver of federally protected civil rights will not be upheld."). Here, the loan contract's choice-of-law and forum selection provisions unambiguously waives a consumer's federal rights and remedies prospectively.

Two of the leading cases on the prospective waiver doctrine were decided by the Fourth Circuit and involved consumer loan agreements similar to the one Martorello attempts to enforce here. *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 331–32 (4th Cir. 2017); *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016). In *Hayes*, the loan contract considered by the Fourth Circuit expressly stated that no federal law or regulation would apply to the agreement. *Hayes*, 811 F.3d at 669. *Hayes* held that the loan agreement was unenforceable, reasoning that "a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of federal statutes to which it is and must remain subject." *Id*. at 675. This principle was reaffirmed in *Dillon* even though the lending agreement in that case did not expressly waive federal law. *Id.* at 332. Rather, when reading the contract as a whole, the *Dillon* court observed that the agreement "*implicitly accomplishe[d]* what the [agreement in *Hayes*] explicitly stated, namely, that the arbitrator shall not allow for the application of any law other than tribal law." *Id.* at 335.

Similarly, here, Big Picture's consumer loan contract includes choice-of-law and forum selection provisions that waive the application of all state and federal law. Like *Dillon*, the lending agreement's choice-of-law and forum selection is spread out across three different provisions that are closely intertwined and, at times, repetitive, *i.e.*, the "Governing Law and Forum Selection" provision, the "Tribal Dispute Resolution Procedure" provision, and the "Waiver of Jury Trial"

JA735

provision. These provisions must be considered together because they work together to prospectively waive all of a consumer's federal rights and remedies.

The "Governing Law and Forum Selection" provision, which precludes the application of any law other than tribal law, states,

> This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for your convenience.

Ex. 1 at 5. The first sentence of this provision provides the "Governing Law" law clause, specifying that the agreement will be governed by Tribal Law, while the second sentence provides that all disputes be "solely and exclusively" resolved pursuant to the Tribal Dispute Resolution Procedure. The meaning of this provision is clarified throughout the agreement.

While the first provision includes a reference to "applicable federal law," the contract later takes this away stating, in bold font:

> You acknowledge and agree that this Agreement is subject _solely and exclusively_ to the Tribal law and jurisdiction of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

Ex. 1 at 6 (emphasis added). Requiring the "exclusive" application of tribal law clarifies "that only the laws of the Tribe" shall apply to the dispute "to the exclusion" of any other laws, including federal laws. _Hengle v. Asner_, 2020 WL 113496, at *14 (E.D. Va. Jan. 9, 2020) (explaining why two similar provisions in an arbitration agreement operated in tandem to waive federal law).

In another similar case, this Court refused to enforce a nearly identical contract, explaining that a "solitary mention" that the loan was governed by "Tribal Law and such federal law as is applicable" could not save the contract when read as a whole. _Solomon v. Am. Web Loan_, 375 F.

JA736

Supp. 3d 638, 672 (E.D. Va. 2019) (explaining that a "solitary mention" that the agreement was governed by certain federal laws did not save the agreement); *see also Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 970 (N.D. Cal. 2019) (finding choice-of-law provision unenforceable by reading contract in its entirety and rejecting argument use of "tribal law and such federal law as is applicable" language salvaged the provision).

If there is any doubt of the prospective waiver of all federal rights and remedies, it is resolved by the contract's "Tribal Dispute Resolution Procedure" and "Waiver of Jury Trial" provisions. In particular, the summary of the Tribal Dispute Resolution Procedure provides:

> A person's complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner.

Ex. 1 at 5 (emphasis added). This means precisely what it says—the borrower's complaint "does not create any binding procedural or substantive rights."

The Waiver of Jury Trial provision reiterates that the Tribal Dispute Resolution Procedure is the sole forum for the adjudication of all of a consumer's claims for all claims relating to the transaction. *Id*. Notably, the language defines "dispute" and "disputes" broadly to include all U.S. federal or state law claims. *Id*. The Waiver of Jury Trial provision, which includes the class waiver clause, is intertwined with the Tribal Dispute Resolution Procedure provision. *Id*.

When considered together (and often alone), these provisions in the loan contract operate in tandem to prospectively waive a borrower's federal rights and remedies. First, the "Governing Law and Forum Selection" clause requires the sole and exclusive use of the Tribal Dispute Resolution Procedure. *Id*. at 5. Next, the "Tribal Dispute Resolution Procedure" clause provides that it "does not create any binding procedural or substantive rights for the petitioner," and the "Waiver of Jury Trial" provision defines covered disputes broadly to include all federal claims.

*Id*. And finally, the "Important Acknowledgments" section clarifies that the "Agreement is subject solely and exclusively to Tribal law" and reiterates that the "Tribal Dispute Resolution Procedure is the sole and exclusive forum for resolving disputes and/or claims from or relating to this Agreement." *Id*. at 6.

As the Fourth Circuit did in *Hayes* and *Dillon*, this Court should refuse to enforce the loan contract's choice-of-law and forum selection provisions (including the class waiver provision), which result in the prospective waiver of federal rights and remedies. The class waiver provision is part of this "integrated scheme to contravene public policy" that attempts to deprive consumers of their federal rights and remedies. *Hayes*, 811 F.3d at 676. Like *Dillon*, the Loan Agreement expressly states "that this Agreement is subject solely and exclusively to the Tribal law and jurisdiction of the Lac Vieux Desert Band of Lake Superior Chippewa Indians." Ex. 2 at p. 6. And, like *Hayes*, Big Picture's contract attempts to renounce the application of all rights and remedies, brazenly claiming that the Tribal Dispute Resolution Procedure "does not create any binding procedural or substantive rights for" borrowers. Accordingly, *Hayes* and *Dillon* are controlling authority in this case and require a finding that the entire agreement is unenforceable, including the class waiver provision. *See Dillon*, 856 F.3d at 337 (emphasis added).[8]

---

[8] Other courts have agreed with and adopted the Fourth Circuit's application of the prospective waiver doctrine in cases such as this one. *See Gingras*, 922 F.3d at 127 (concluding defendants, including tribal defendants, could not enforce arbitration agreement because they were designed to avoid federal and state consumer protection laws); *Brice*, 372 F. Supp. 3d at 972-73 (agreeing with and applying *Hayes* and *Dillon*); *Titus v. ZestFinance, Inc.*, 2018 WL 5084844, at *4 (W.D. Wash. Oct. 18, 2018) (applying *Hayes*); *Rideout v. CashCall, Inc.*, No. 2018 WL 1220565, at *6 (D. Nev. Mar. 8, 2018); *MacDonald v. CashCall, Inc.*, 2017 WL 1536427, at *13 (D.N.J. Apr. 28, 2017) (agreeing with and applying *Hayes*), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324, 344-45 (W.D.N.Y. 2017) (same); *Parnell v. CashCall, Inc.*, 181 F. Supp. 3d 1025, 1042 (N.D. Ga. 2016) (agreeing with and applying the analysis from *Hayes*), *aff'd sub nom. Parnell v. W. Sky Fin., LLC*, 664 Fed. App. 841 (11th Cir. 2016); *Smith v. W. Sky Fin., LLC*, 168 F. Supp. 3d 778, 785 (E.D. Pa. 2016) (agreeing with and applying *Hayes*).

## C. The chosen law and Tribal Dispute Resolution Procedure are also a part of the integrated scheme to deprive consumers of rights and remedies.

The consumer loan agreement not only disavows the application of all federal law, but the chosen law itself further accomplishes the waiver of a consumer's rights and prevents any opportunity to obtain remedies, as well as a neutral forum. There are numerous problems created by the "Tribal Law," the Tribal Dispute Resolution Procedure, and the interplay between the consumer loan agreement and the applicable Tribal Law. This is particularly troublesome because the Tribal Law and the consumer loan agreements were designed to work together, with each referencing the other. *See* Ex. 8, Tribal Consumer Fin. Servs. Reg. Code. (hereinafter "Code") §§ 7.2(a), 9.2(a). Plaintiffs attempt to list the most prominent issues below. These additional deprivations to consumers support Plaintiffs' position that the lending agreements are a part of an integrated scheme to insulate everyone involved from any adverse award and deprive consumers with a fair chance of prevailing.

***First***, the Tribal Code leaves the regulatory authority responsible for resolving consumer disputes powerless to award any relief to borrowers. The Tribal Financial Services Regulatory Authority's (the "TFSRA") authority is limited to only considering claims under tribal law. Under the TFSRA Regulations, the TFSRA may "resolve the dispute in favor of the consumer upon a finding that the [tribal lender] violated a law or regulation of the Tribe," *i.e.*, not a federal law or regulation.[9] Consistent with this regulation, the Code allows the tribal court to reverse the decision of the TFSRA where "the Authority's conclusions of law conflict with Tribal law or the Tribal Constitution," and nothing else. Ex. 8, Code at § 9.4(f)(iv). Further, the Regulations also limit the TFSRA's authority to award "monetary relief in excess of the amounts permitted under the Code,"

---

[9] Ex. 9, Tribal Financial Services Authority Comm. Regs., Reg. §1.1 (B)(4)(c) (emphasis added) (hereafter "Comm. Regs.").

*i.e.*, not federal statutes. Ex. 9, Regs. at §§ 1.1(B)(4)(a), (c). This is particularly problematic because the Code appears to have no corresponding provision allowing the TFSRA to award any amounts to the consumer. *See generally* Ex.8. It is altogether unclear how the TFSRA could award any monetary relief if Regulation § 1.1(B)(4)(a), (c) is given any effect.

**Second**, the loan agreement's definition of a covered dispute is inconsistent with the LVD's Code. On one hand, the "Waiver of Jury Trial" provision requires resolution of a broad definition of disputes, including all claims against "related third parties" through the Tribal Dispute Resolution procedure. However, the applicable law establishing the Tribal Dispute Resolution procedure only contemplates resolution of disputes by borrowers against the lender. *See* Code § 9.2 (providing for resolution of disputes of consumers "who are aggrieved by an action or inaction of a Licensee may raise the complaint with the <u>Financial Services Licensee</u>," not a third party) (emphasis added). By limiting the dispute resolution procedure to claims against the "Financial Services Licensee," the Code attempts to insulate claims against others with liability, such as Martorello. Thus, when the loan contract is viewed alongside the applicable law, the selected forum is illusory except for claims against Big Picture.

**Third**, and by extension, Tribal law does not appear to provide a borrower with a private right of action for any conduct by a lender or other person. *See generally*, Ex. 8. Instead, violations of the Code are enforced only by "civil fines" that "are designed to <u>compensate the Tribe</u>." Ex. 8, Code at § 8.5. Thus, even if the TFSRA finds that the tribal lender violated a law or regulation of the Tribe, there is no claim available to a borrower for a violation of Tribal law.

**Fourth**, the Code itself contemplates that the loans are exempt from all federal consumer protection laws. Specifically, it states that a licensee "shall conduct business in a manner consistent with principles of federal consumer protection laws." Ex. 8, Code § 6.2. This further demonstrates

that the Code is a part of the integrated scheme to waive all federal rights and remedies, and this voluntary compliance with federal law "provides no guarantee that federal and state statutory rights could be pursued, much less vindicated, in this arbitral forum." *Gingras*, 922 F.3d at 127; *Gibbs*, 368 F. Supp. 3d at 929 (refusing to enforce choice-of-law provision providing that the lender "may choose to voluntarily use certain federal laws as guidelines for the provision of services" but that such voluntary use did not "represent acquiescence of the [Tribe] to any federal law").

    **Fifth**, in addition to the lack of substantive recourse, the process and structure of the procedure further deprives consumers of all procedural rights and a neutral forum. Among other things, the LVD's laws permit the TFSRA to "<u>investigate the dispute in any manner it chooses</u>." Ex. 8, Code at § 9.3(b) (emphasis added). The TFSRA also has unilateral discretion as to whether to grant a hearing. *Id*. at § 9.3(d). Further, the Code unfairly provides:

> <u>In any proceeding</u> in which a Licensee is a party in interest with respect to any transactions with a consumer under this Code, <u>the Licensee's rights and remedies shall be granted based upon prima facie proof and entitlement based upon the terms of the written transaction documents</u> and the payment and business records maintained by the Licensee in the ordinary course of business. The <u>consumer may only defend on the basis of payment</u>.

*Id*. at § 7.2(g) (emphasis added).

    The Code's procedural rights—allowing the TFSRA to investigate a dispute in any manner it chooses and waiving all defenses— are problematic on their face, but disturbing when considering that one of two TFSRA agents is the sister of Chairman Williams—the head of the LVD and co-manager of Big Picture. Ex. 10, Williams Depo., 187:11-12. And, according to Chairman Williams' social media account, the siblings appear to be very close. Ex. 11 at May 7, 2012 Post ("Would like to wish my baby sister Lilly a Happy Birthday today. I love you with all my heart[.]"); *id*. at Oct. 20, 2016 Post ("Love you two more than words!!"). The other agent is also the nephew of another tribal council member. Ex.12, S. McGeshick Depo., 33:2-9.  It is hard

to imagine a more unfair dispute resolution system than one that forces a consumer to pursue their claim before the head of a company's family member, who is provided with absolute discretion in the handling and investigation of the dispute. *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999) (holding "promulgation of so many biased rules—especially the scheme whereby one party to the proceeding so controls the arbitral panel—breaches the contract entered into by the parties").

**Sixth**, and by extension to the previous point, the Tribal Code demonstrates that the TFSRA is not independent. The Code itself states that "the purpose and intent" of the Tribal Council in establishing the TFSRA is that it "be conducted on behalf of the Tribe for the sole benefit and interests of the Tribe, its members and residents of and visitors to the Tribe's reservation." Ex. 8 (Code at § 4.4). Additionally, the Regulatory Agents are appointed by and controlled by Tribal Council—the same authority responsible for overseeing Big Picture. *Id.* at §§ 4.8 (appointment and compensation by Tribal Council), 4.10 (oversight by Tribal Council), 4.12 (removal by Tribal Council), 4.13 (oversight by Tribal Council), 4.16 (approval of any regulations by Tribal Council), 4.17 (reporting to Tribal Council), 4.18 (allowing authority appeals to Tribal Council).

**Seventh**, the Tribal Dispute Resolution Procedure vests final review over borrower claims in the LVD Tribal Court. *See* Ex. 8, Code § 9.4. However, this feature is hollow for several reasons. Most notably, the Code provides that the Tribal Court "shall limit its review to the record," it must "give deference to the [TFSRA]'s reasonable interpretation and application of the Code," and "[m]ere disagreement with the [TFSRA's] factual findings is not a basis for reversal." *Id.* at § 9.4(f)(i)-(iii). Further, consistent with the TFSRA's limited power, the Code allows the Tribal Court to reverse the decision of the TFSRA where "the Authority's conclusions of law conflict with Tribal law or the Tribal Constitution," and nothing else. *Id.* at § 9.4(f)(iv).

What's more, the Tribal Court lacks jurisdiction over any dispute outside the Tribe's Constitution, which limits the jurisdiction of its courts to cases, matters, or controversies arising under Tribal Law.[10] The Tribal Court not only lacks jurisdiction under the LVD's Constitution, but it also lacks jurisdiction under federal law because a tribal court's subject matter jurisdiction does "not extend to the activities of nonmembers of [a] tribe" beyond the reservation's borders. *Montana v. United States*, 450 U.S. 544, 565 (1981).[11]

**Eighth**, the evidence further shows that the TFSRA was part of the façade designed to create the appearance of a legitimate, regulated business. For example, almost a year into the business, the TFSRA did not even have an employee. Ex. 13 at Rosette_044601, June 2012 email from Wichtman to Martorello ("We have a fight coming and I understand you wanting to lay low … Personally, I see only a few issues – on the regulatory side, the Tribal Regulatory Authority that is, it needs to have a designated employee, even if only part time, to ensure licensing is done correctly and tracked and audits of lending practices are performed."). And at this time, Wichtman

---

[10] *See* Constitution of the Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan, art. V, § 2(a) (1997), http://www.lvdtribal.com/pdf/constitution.pdf; *compare with* Constitution of the United States, Art. III, § 2.

[11] "A nonmember's consent to tribal authority is not sufficient to establish the jurisdiction of a tribal court." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 783 (7th Cir. 2014). While "consent may be sufficient to establish personal jurisdiction," a tribal court's "authority to adjudicate claims involving nonmembers concern its subject matter jurisdiction," which "depends upon a grant of judicial authority from Congress." *Smith v. W. Sky Fin., LLC*, 168 F. Supp. 3d 778, 782 (E.D. Pa. 2016), appeal dismissed (Apr. 19, 2016). Here, the Tribal Court does not have subject matter jurisdiction because Plaintiffs have not engaged in any activities on the reservation. *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327 (2008) ("[T]he sovereignty that the Indian tribes retain is unique and limited character. It centers on the land held by the tribe and on the tribal members within the reservation . . . *Montana* and its progeny permit tribal regulation of nonmember conduct *inside the reservation* that implicates the tribe's sovereign interests."); *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209 (1978) (observing that the tribes have lost any "right of governing every person within their limits except themselves"). As explained below, nearly every court to consider this issue has found that the conduct at issue involves off reservation activity.

was concerned that the Tribe had not "embrace[d] this as a new position intended to strengthen the model and protect the Tribe and consumers." *Id.*



.[12] Allowing outsiders, who received

[12]

23

the vast majority of the profits from the operations, to directly influence the regulatory structure construct is problematic and demonstrates that this was just a part of Martorello's charade.

## IV. The class action waiver is unenforceable under Virginia law.

### A. There is no federal policy in favor of enforcement of the class action waiver.

Before explaining why Virginia law renders the class waiver unenforceable, it is important to note that the vast majority of class waiver provisions are contained in arbitration agreements and thus trigger the "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Concepcion*, 563 U.S. at 346 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also Davis v. Oasis Legal Fin. Operating Co.*, 936 F.3d 1174, 1183 (11th Cir. 2019) (explaining that "[t]he Supreme Court, in multiple cases, has ruled that § 2 of the FAA overrides a state statute or common-law doctrine that attempts to undercut the enforceability of an arbitration agreement."). Where, as here, the "class action waiver is not contained in an arbitration agreement," the "FAA does not stand in the way of enforcing" state statutes or common law regarding the enforceability of contracts. *Davis*, 936 F.3d at 1183.

Of course, the lack of an arbitration agreement does not automatically invalidate a class-action waiver. But, the "logic behind the Supreme Court decisions on FAA preemption of class arbitration waivers is not readily transferable to class actions outside the arbitration setting." *Meyer v. Kalanick*, 185 F. Supp. 3d 448 (S.D.N.Y. 2016); *see also Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1144 (2013). Instead, when a class waiver is included without "an accompanying arbitration agreement, the appropriate test of determining the enforceability of a class-action waiver has two steps." *U1it4Less, Inc. v. FedEx Corp.*, 2015 WL 3916247, at *4 (S.D.N.Y. June 25, 2015). First, a court must ask if the class-action waiver is unenforceable "under applicable

state law," and, if not, the second step asks if the statute at issue "suggests legislative intent or policy reasons" weighing against enforcement. *Id*. "If the answer to both questions is 'no,'" then the waiver may be enforced without an arbitration agreement. *Id*. Here, the class waiver is unenforceable "under applicable state law" and, thus, the Court need not go beyond the first step.

### B.  The conduct at issue involves off reservation activity subject to state regulation.

Martorello's defense relies on the unfounded assumption that the conduct challenged by this lawsuit occurred on a Native American reservation. This fallacy is central to Martorello's case and the propriety of his business model. The issue of whether online lending takes place on tribal lands has been litigated in other cases, and the consensus is that it constitutes off the reservation activity.[13] Martorello has not and cannot establish that the outcome should be different in this case.

A recent decision by this Court rejected the argument that a tribal entity's lending activity constitutes on-reservation activity simply because the loan was purportedly originated on a tribe's reservation. *Hengle v. Asner*, No. 3:19CV250 (DJN), 2020 WL 113496, at *32 (E.D. Va. Jan. 9, 2020), *motion to certify appeal granted*, No. 3:19CV250 (DJN), 2020 WL 855970 (E.D. Va. Feb. 20, 2020). In *Hengle*, this Court noted that it was undisputed that consumers "did not travel to the

---

[13] *Gingras v*, 922 F.3d at 121 ("The Tribal Defendants here engaged in conduct outside of Indian lands when they extended loans to the Plaintiffs in Vermont."); *Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013) ("The undisputed facts demonstrate that the activity the State seeks to regulate is taking place in New York, off of the Tribes' lands."), *aff'd*, 769 F.3d 105 (2d Cir. 2014); *Colo. v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011) ("Business conducted over the Internet that would confer jurisdiction on a state court also demonstrates that the business activity constitutes off-reservation activity."); *United States v. Hallinan*, No. 16-130, 2016 WL 7477767, at *1 (E.D. Pa. Dec. 29, 2016) ("Because the loans at issue involve activity that takes place, at least in part, off a reservation, state law still applies."). *C.f.*, *Jackson*, 764 F.3d at 782 (finding, in the context of tribal jurisdiction, that "the Plaintiffs have not engaged in any activities inside the reservation. They did not enter the reservation to apply for the loans, negotiate the loans, or execute loan documents."); *State ex rel. Suthers v. Cash Advance & Preferred Cash Loans*, 205 P.3d 389, 400–01 (Colo. App. 2008) (same).

Tribe's lands at any point" and that they applied for, executed the loan documents, and made payments from Virginia. *Id.* The Court further explained that the challenged lending activities constituted, at a minimum, part off-reservation conduct because the tribal lender "reach[ed] into the sphere of a different sovereign and rel[ied] on conduct—including performance of the loan agreements—that occurred within that sphere." *Id.*

Like *Hengle* and the other cases cited above, the challenged conduct constitutes off the reservation activity. The loans were made to consumers who applied for the loans from Virginia, executed the loan agreements from Virginia, and used their Virginia bank accounts to receive the proceeds of the loans and make payments. *See, e.g.*, Ex. 16. By reaching into the sphere of the Commonwealth of Virginia, including the mailing of solicitation letters to consumers within the Commonwealth, the enterprise engaged in off the reservation activity and became "subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973); *see also* Ex. 17, Letter to Turnage.

It is unremarkable that a Native American tribe's internet lending business would constitute off-reservation activity that is subject to state regulation. As this Court explained in *Hengle*, "[i]f anything," allowing Native American tribes to use e-commerce without regard for applicable state law "would eviscerate the power of states to subject 'Indians going beyond reservation boundaries . . . to any generally applicable state law' by allowing tribes operating as payday lenders to reach far beyond their sovereignty and violate state consumer protection statutes with impunity." *Id.* at 33 (quoting *Bay Mills*, 572 U.S. at 795). These principles have been applied with equal force to non-tribal internet lenders as well.[14]

---

[14] *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1304 (10th Cir. 2008) (finding that usury statutes regulated in-state activity where Utah-based lender made loans over the internet to residents in Kansas); *State ex rel. Swanson v. Integrity Advance, LLC*, 846 N.W.2d 435, 442 (Minn. Ct. App.

Outside the lending context, this point is further illustrated by a recent case involving an online gambling website operated on tribal land. In that case, the Ninth Circuit addressed whether a Native American's internet bingo game occurred on tribal lands, even though the participants were located in California. *State of California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 962 (9th Cir. 2018). The internet gambling website operated on a set of servers located on tribal land. *Id.* The tribe argued that the "gaming activities" occurred on tribal land because the servers, "which determine the patterns on the bingo cards, draw the numbers, and daub the cards," were located on the reservation. *Id.* at 965. The tribe further argued that any activity conducted by the patrons of the website in California were "merely pre-game communications" between the patron and the tribe's agent. *Id.* at 965-66. The Ninth Circuit rejected the tribe's argument "that the patron's decision to submit a requested wager of a particular monetary denomination is merely a pre-gaming communication with the patron's designated proxy." *Id.* at 966. On that point, the Ninth Circuit concluded that "the patrons' act of placing a bet or wager on a game of [the bingo website] while located in California constitutes gaming activity that is not located on Indian lands . . . ." *Id.*

Here, Big Picture, Ascension, and the enterprise are involved primarily, if not exclusively, with matters beyond their borders—the commercial offer and sale of internet loans to consumers around the country. Beyond that, the *entirety*—100%—of the revenue and income is derived from out-of-state activity. Add to that the significant off-reservation operations integral to the business, *i.e.*, Ascension's headquarters in Puerto Rico and then Atlanta, and that is more than enough to find that the conduct involves "off the reservation" activity subject to state laws.[15]

---

2014) (holding that "extension of payday loans to Minnesota residents did not occur wholly outside Minnesota's borders" thereby requiring online lender from Utah to comply with lending statutes).
[15] Further, there appears to be little, if any, on the reservation activity. Although Martorello contends that the loans are "originated" on the reservation, Hazen testified that this is an automated

**C. Virginia's anti-waiver statute renders the entire contract, including the class waiver provision, void as a matter of law.**

The class action waiver is also unenforceable because it is part of a contract that violates §

6.2-306(A), which is a law of general applicability that applies to all lenders. This statutory section

found in Virginia's chapter entitled "Interest and Usury," provides:

> <u>Any agreement or contract</u> in which the borrower <u>waives the benefits of this
> chapter or releases any rights</u> he may have acquired under this chapter <u>shall
> be deemed to be against public policy and void</u>.

Va. Code § 6.2-306(A) (emphasis added). This statute, often referred to as an anti-waiver

provision, means what it says and renders the entire lending agreement void and unenforceable.

*See Rahmani v. Resorts Intern. Hotel, Inc.*, 20 F. Supp. 2d 932, at 935-936 (E.D. Va. 1998)

(explaining a void contract under Virginia law "is a complete legal nullity, one that has no legal

force or binding effect").

Here, there is no dispute that the consumer lending agreement attempts to waive the

benefits of the chapter and release all rights under Virginia law. Through a choice-of-law provision

selecting tribal law, the enterprise sought to waive, disclaim, and release all benefits and rights

created by Virginia's usury laws, such as the 12% interest rate cap mandated by § 6.2-303(A) and

the double recovery permitted by § 6.2-305(A). This has been Martorello's position throughout

the case, including in this latest submission. ECF 664 at 10-11; *see also* ECF 487 at pg. 13 (arguing

that state law does not apply to the loans). Enforcement of this contract "would make enforceable

a contract flatly unenforceable" under Virginia law, "surely impinging upon 'fundamental policy'

of" Virginia. *Barnes Grp., Inc. v. C & C Prod., Inc.*, 716 F.2d 1023, 1032 (4th Cir. 1983)

---

process with no involvement from Big Picture's employees on the reservation. Ex. 18, Hazen
Depo. at 191:6-11.

Because the anti-waiver provision is a "non-discriminatory state law otherwise applicable to all citizens," *Mescalero Apache*, 411 U.S. at 148-49, it applies to all contracts, including the loan contracts provided to Plaintiffs. What's more, the Virginia Supreme Court has strictly enforced similar anti-waiver statutes. *See, e.g.*, *Blake Const. Co./Poole & Kent v. Upper Occoquan Sewage Auth.*, 587 S.E.2d 711, 719 (Va. 2003); *Uniwest Const., Inc. v. Amtech Elevator Services, Inc.*, 280 Va. 428, 440 (2010).

For example, in *Blake Construction*, a dispute arose over a contract for construction of a waste water treatment facility. 587 S.E.2d at 713. The contractors sought a declaratory judgment that certain contract provisions, *i.e.*, "no damages for delay" clauses, were against public policy and void in light of an anti-waiver statute. Id. at 570. The anti-waiver statute, which is similar in relevant part to Virginia Code § 6.2-306, provided:

> Any provision contained in any public construction contract that purports to waive, release, or extinguish the rights of a contractor to recover costs or damages for unreasonable delay in performing such contract, either on his behalf or on behalf of his subcontractor if and to the extent  the delay is caused by acts or omissions of the public body, its agents or employees and due to causes within their control shall be void and unenforceable as against public policy.

*Id*. (quoting Va. Code § 2.2-4335(A)).

While recognizing the general principle that "courts will not rewrite a clear and unambiguous contract," the Virginia Supreme Court stated it was "bound to follow the plain meaning of a statute." *Id*. at 575. It further added that "a contract to perform an act prohibited by a statute is void." *Id.* (quoting *Palumbo v. Bennett*, 409 S.E.2d 152, 153  (Va. 1991)). Against this backdrop, the court found that, although the contract barred damages for unreasonable days, the "plain language of the statute mandate[d] the opposite result." *Id*. The court further added that the anti-waiver statute "means what it says" and that the "General Assembly's use of the inclusive and comprehensive 'any' is instructive and mandatory." *Id*. at 576.

**JA750**

Critical to this case, the Virginia Supreme Court further found that "damages for unreasonable delay may not be extinguished as a matter of public policy." *Id*. If the legislature intended to permit waiver by contract, "it certainly could have done so by codifying" exceptions. *Id*. Absent an exception, the parties could not simply "undo" Virginia policy through private agreement. *Id*. (citing *Blick v. Marks, Stokes, & Harrison*, 360 S.E.2d 345, 348 (Va. 1987) ("Generally, a contract based on an act forbidden by a statute is void and no action will lie to enforce the contract.")).

In sum, "[i]t is the responsibility of the legislature, not the judiciary to formulate" the Commonwealth's "public policy." *Wood v. Board of Supervisors of Halifax City*, 372 S.E.2d 611 (Va. 1988). "Once the legislature has acted, the role of the judiciary is the narrow one of determining what [it] meant by the words it used in the statute." *Dionne v. Southeast Foam Converting & Packaging, Inc*., 397 S.E.2d 110, 114 (Va. 1990); *Twin City Pipe Line Co. v. Harding Glass Co*., 283 U.S. 353, 357 (1931) ("Primarily it is for the lawmakers to determine the public policy of the state."). In unequivocal terms, § 6.2-306(A) is an express and direct statement from the Virginia legislature that contracts waiving the benefits or releasing the rights under Virginia's usury statutes is a violation of its public policy. Because the loan contracts take this forbidden step, the entire contract is void and unenforceable.[16]

---

[16] Throughout this case, Martorello has repeatedly relied on the Virginia Supreme Court's decision in *Settlement Funding v. Settlement Funding LLC v. Von Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007). According to Martorello, *Settlement Funding* stands for the proposition that any usurious loan—presumably even contracts with an interest rate of 5,000%—do not violate Virginia's public policy against usury so long as the selected law does not have a maximum interest rate. *Settlement Funding* does not stand for this proposition, and it did not come close to addressing whether enforcement of a choice-of-law provision violated Virginia's public policy. This Court, as well as others, has repeatedly rejected Martorello's interpretation of *Settlement Funding*. *Gibbs I*, 368 F. Supp. 3d at 929) (Lauck, J.); *Hengle v. Asner*, 2020 WL 113496, at *23 (Novak, J.); *NC Fin. Sols., of Utah, LLC*, 2018 WL 9372461 at *12. As detailed in the cases, Settlement Funding addressed a

**D.  The class-action waiver is unenforceable under Virginia's Consumer Finance Act, which renders each loan agreement void.**

In addition to the general usury laws embodied in Virginia's chapter entitled "Interest and Usury," Virginia's legislature has enacted the Consumer Finance Act ("CFA"), which is "part of a comprehensive statutory, financial, and regulatory structure dating back to at least 1918," when it was known as the Small Loan Act. *Commonwealth v. NC Fin. Sols. of Utah, LLC*, 100 Va. Cir. 232 at *5 (2018). The legislature enacted this statute because "the conduct of such business has long been the cause of general complaint and of much hardship and injustice to borrowers, and there is no regulation or provision of law which has proved effective for the protection of borrowers and for the punishment of usurious money lenders." *Id*. (quoting 1918 Va. Acts, ch. 402.); *see also Sweat v. Commonwealth*, 152 Va. 1041, 1057 (1929) (explaining that legislature enacted the Act in response "money loan sharks and salary-buyers.").

Unlike the general usury statutes, the CFA "requires all who engage in the business of making noncommercial personal loans in Virginia to be licensed, and therefore regulated and supervised by the [Secretary of the Commonwealth]." *Id*. at *6 (citing Va. Code § 6.2-1501(A)). "The Legislature intended such lenders be subject to distinct scrutiny, including examination of their affairs and records no less than once every three years." *Id*. at *6 (citing Va. Code § 6.2-1531). Critically, "[n]o distinction is made in the statute between domestic or foreign-based lending entities," such as Big Picture. *Id*. There is also "[n]o exception" provided "for loans made under a choice-of-law provisions purporting to apply the substantive laws of another state to adjudicate disputes among contracting parties." *Id*.

---

narrow issue and did not remotely canvass whether the choice-of-law provision violated Virginia's anti-waiver provision, licensing requirements, or public policy.

**JA752**

"If the General Assembly intended to exempt out-of-state noncommercial lenders," like Big Picture Loans "from licensing, it would have so stated." *Id*. This "requirement of licensure" applies to all lenders "doing business in Virginia" and "is not a discriminatory restraint on trade, but rather a prudent exercise of the constitutional police power afforded each of the several states" to regulate activity within its borders. *Id*. "This general obligation to obtain a license to engage in the business of making personal noncommercial loans" serves an important purpose—it ensures that the lender is "subject to the supervisory eye" of the Secretary of the Commonwealth. *Id*.

"By failing to obtain a license from the SCC prior to doing business in Virginia," Big Picture "chose to forego the generous exemption it would be afforded from the general usury, annual interest rate cap of twelve percent (12%)." *Id*. (citing Va. Code § 6.2-1520(A) (allowing licensees to charge up to thirty-six percent (36%)). By remaining unlicensed, Big Picture violated the CFA and, as a result, the loan contracts with Virginians are void pursuant to § 6.2-1541(A). This section provides "[a] loan contract shall be void if any act has been done in the making or collection thereof that violates § 6.2-1501." Va. Code § 6.2-1541(A).

Ignoring the plain language of the statute, Martorello argues that "the Virginia Consumer Finance Act does not require a license for online lenders without a physical presence in the Commonwealth." Dkt. 664 at 11. In support of this argument, Martorello first identifies a recently proposed legislation that "included language that tracked the licensing provisions in the Virginia statutes governing payday lenders and motor vehicle title lenders, to make the Virginia consumer finance company licensure requirement applicable 'to persons making loans over the Internet to residents of the Commonwealth, whether or not the person making the loans maintains a physical presence in the Commonwealth.'" Dkt. 664 at 12 (citing 2018 Virginia House Bill No. 1248).

Because this legislation failed, Martorello argues "that the license requirement continues to apply only to those offering loans from physical localities in Virginia and not Internet lenders." *Id*.

Martorello's novel theory—that the CFA does not cover online loans— should be rejected for a simple reason: it defies both the plain language and structure of the CFA and requires (contrary to basic principles of statutory interpretation) that a court read into the statute terms that do not exist. To see why, one must simply consider the plain text of Va. Code § 6.2-1501(A). That provision provides "[n]o person <u>shall engage in the business of making loans</u> to individuals for personal, family, household, or other nonbusiness purposes… without first having obtained a license from the Commission." Va. Code § 6.2-1501(A) (emphasis added). By its terms, Va. Code § 6.2-1501(A) draws no distinction between "storefront" or "online" loans; it simply covers a person engaged in the business of making loans. Put differently, the statute does not say or suggest that "no person, with a physical presence in the Commonwealth, shall engaged in the business. . . ." There is no basis in the text for Martorello's distinction.

The CFA's purpose reinforces this plain understanding of § 6.2-1501(A). This statute was enacted to "protect needy consumers from unjust terms and exploitation surrounding lending practices." *Commonwealth v. Car Pawn of Virginia, Inc.*, 37 Va. Cir. 412, *4 (1995). If online loans were exempted from its broad coverage, it would eviscerate the very protections and purpose of the statute. As the Virginia Supreme Court explained in a slightly different context:

> We reject Wiesen's argument that by making a small loan in the form of a mortgage loan a lender can avoid the application of the Act. Were we to adopt Wiesen's position, we would gut the Act because we would thereby allow a lender to escape the Act by doing exactly what it forbids. This would be an absurd result which would render the Act virtually meaningless.

*Valley Acceptance Corp. v. Glasby*, 230 Va. 422, 431 (1985). The same is true here. The purpose of the Act is not designed to protect the medium through which the loan is originated, but "the

needy consumers from unjust terms and exploitation." *Car Pawn of Virginia, Inc.*, 37 Va. Cir. at *4. Whether made at a storefront or over the internet, the result is the same—the loan exploits the needy consumer to unjust terms.

In addition to eviscerating all protections for Virginians, exempting online lending would also cut against the other primary reason for the Act, which ensures that the lender "be subject to the supervisory eye of the SCC." *NC Fin. Sols. of Utah*, 100 Va. Cir. 232 at *6. For over 100 years, the General Assembly "has expressed an intent" that "most financial institutions doing business in Virginia either be licensed in the case of those extending noncommercial personal loans or otherwise be 'regulated by appropriate laws.'" *Id.* (citing 1918 Va. Acts, ch. 402, sec. 19). Consistent with this, the CFA contains limited exceptions to ensure that the lenders are either by Virginia's State Corporation Commission or a comparable federal regulating body (*e.g.*, national and state-chartered banks). *Id.* at * 14 (citing Va. Code § 6.2-1503).

Under Martorello's construction, it would be possible for a lender, such as Virginia Federal Credit Union, to make a loan with an APR of 500% so long as it made the loan over the internet. This same loan, according to Martorello, would violate the CFA if a consumer physically entered the credit union's branch to obtain the loan. This would be an absurd outcome that defies the plain language of the statute, as well as its underlying purpose.

Nor can Martorello's citation to proposed amendments overcome the statute's clear text. Although Martorello cites a recently rejected bill, "a court may look only to the words of the statute to determine its meaning, and when the meaning is plain, resort to the rules of construction, legislative history, and extrinsic evidence is impermissible." *Doss v. Jamco, Inc.*, 254 Va. 362, 370 (1997) (citations omitted); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (explaining that "legislative history is itself often murky, ambiguous, and

contradictory" and "[j]udicial investigation of legislative history has a tendency to become… an exercise in ' looking over the crowd and picking out your friends.' " (citations omitted).

Further, to the extent the statutory text is ambiguous, the CFA "is a remedial statute" that must be construed "liberally" so as "to avoid the mischief at which it is directed and to advance the remedy for which it was promulgated." *Greenberg v. Commonwealth ex rel. Atty. Gen. of Virginia*, 255 Va. 594, 600 (1998). Because the CFA's primary purpose is to protect vulnerable consumers from unscrupulous lenders and ensure oversight of any such lending, any ambiguities in the CFA should be liberally construed to effectuate these purposes. To find online loans were exempt would destroy this remedial scheme and allow lenders to escape responsibility simply because of the medium through it was originated.

Additionally, Martorello's citation to an informal letter from the Virginia Bureau of Financial Institutions fares no better. As Judge Novak explained, this letter is "unavailing, because the letter lacks any explanation and has no binding effect on this Court." *Hengle*, 2020 WL 113496 at *25, n. 10. Further, the CFA authorizes "the Attorney General," not the Virginia Bureau of Financial Institutions, to bring enforcement actions for violations of its provisions, including against "any person, not licensed under th[e] chapter." Va. Code § 6.2-1537(A). The Virginia Attorney General has taken the position that online lenders must be licensed to make consumer finance loans in the Commonwealth of Virginia. *See generally NC Fin. Sols. of Utah, LLC*, 100 Va. Cir. 232 at *1. Accordingly, any value of the informal letter is less than the official position of the Virginia Attorney General, who is charged with enforcement of the CFA.

## **CONCLUSION**

For the reasons set forth above, the Fourth Circuit's decision in *Williams* has no effect on the enforceability of the class waiver.

35

Respectfully submitted,
**PLAINTIFFS**

By:      /s/ Kristi C. Kelly
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
*Counsel for Plaintiffs*

Leonard A. Bennett, Esq., VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of May, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.

By:＿＿＿*/s/ Kristi C. Kelly*＿＿＿＿＿＿
Kristi C. Kelly, Esq., VSB #72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
*Counsel for Plaintiffs*

JA758

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| LULA WILLIAMS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 3:17-cv-461 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| RENEE GALLOWAY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 3:18-cv-406 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL
MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT**

Plaintiffs, by counsel, submit this Statement detailing the material misrepresentations and omissions made during the sovereign immunity phase of the litigation.

## INTRODUCTION

Even in the calm and deliberate tone expected in federal litigation, there is no other way to say this than: Defendants' earlier filings were designed to deliberately and materially mislead the Court. Attempting to capitalize on their destruction of documents, Defendants offered a fictious storyline designed to convince the Court that: (1) the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD") created Red Rock to "learn the lending industry"; (2) Red Rock was "managed by appointed LVD members and under the control of the LVD Council"; (3) LVD "had acquired years of knowledge and business acumen related to the online lending industry," thereby prompting it to purchase Bellicose "to begin in-housing services"; and ultimately, "[t]hrough Ascension, LVD would be able to 'in-house' many of the activities previously performed by its third-party vendors, including Bellicose, resulting in significant cost savings and efficiencies." *Galloway v. Big Picture Loans, LLC*, Case No. 3:18-cv-406, ECF 40 at 5-7. Martorello was the architect and substantial part of this effort. His efforts to mislead the Court were in bad faith, vexatious, calculated, and in violation of his duty of candor to the Court.

Before addressing the misrepresentations, it is important to begin by noting that the Fourth Circuit's opinion does not help Martorello regardless of any misrepresentations. The court was grappling with whether Big Picture and Ascension benefited from tribal sovereign immunity, nothing else. As the Fourth Circuit made clear: "<u>the potential merit</u> of the borrowers' claims against Big Picture and Ascension—and the lack of a remedy for those alleged wrongs—<u>does not sway the tribal immunity analysis</u>." *Williams v. Big Picture Loans, LLC*, No. 18-1827 (4th Cir. 2019), ECF 127 at 28 (emphasis added). In other words, tribal immunity "limits how states can enforce

1

**JA760**

their laws against tribes or arms of the tribes, but… it does not transfigure debts that are otherwise unlawful under RICO into lawful ones." *United States v. Neff*, 787 F. App'x 81, 92 (3d Cir. 2019).

Indeed, although tribal sovereign immunity broadly protects the coffers of a tribe, the Supreme Court has expressly acknowledged that there are a "panoply of tools" available to "shutter, quickly and permanently" unlawful conduct involving tribes. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). Most notably, "tribal immunity does not bar [] a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Id*. (citations omitted). Tribal sovereign immunity is also "simply not in play" when a person seeks recovery from a tribal employee in his or her individual capacity—even when the wrongful conduct was within the scope of tribal employment. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017).

From these principles, it naturally flows that sovereign immunity neither protects nor legalizes the conduct of Martorello, a non-tribal individual. The ongoing case against Martorello— the architect and primary beneficiary of the scheme—is one of the "panoply of tools" available to shutter the unlawful conduct and obtain recourse for those who have repaid these illegal loans. The Fourth Circuit's opinion did nothing to absolve him; and, again, it expressly stated that the "potential merit of the borrowers' claims… does not sway the tribal immunity analysis." *Williams*, 929 F.3d at 185. Put differently, the Fourth Circuit's decision provided Big Picture and Ascension with "a shield, [] not a sword," and it remains that the tribe and its "officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

And to the extent the Court determines that the Fourth Circuit's decision has any effect as to the claims against Martorello, it should not consider the Fourth Circuit's decision as binding in

light of the of new evidence before the Court, which was intentionally destroyed to avoid the true nature of the method of creation, purpose, intent, and structure of Big Picture and Ascension.

**MISREPRESENTATIONS**

**I.    Defendants made misrepresentations designed to create a storyline that LVD created Red Rock to learn the lending industry and controlled the business.**

The Tribal Defendants and Martorello put together a false narrative to fabricate supposed context for the creation, purpose, and structure of Big Picture Loans and Ascension Technologies. The first part of this narrative was that the LVD created Red Rock to "learn the lending industry." The declarations submitted by its co-managers follow this same story. Ex. 1, Decl. of Michelle Hazen at ¶ 10("To learn the lending industry, Red Rock contracted with Bellicose … for vendor management services, compliance management assistance, marketing material development…Red Rock consulted with Bellicose about operations, but ultimately all decisions were made by Red Rock's managers.") (emphasis added); *id.* at ¶ 11 ("While Red Rock received advice and consulted with Bellicose about operations, all final decisions about operations were made by Red Rock's managers.").  To facilitate this story, the Martorello made a materially false declaration containing a significant number of misrepresentations designed to develop the false narrative that LVD created Red Rock to learn the lending industry.

As is now known from internal correspondence Defendants had attempted to destroy before discovery, Red Rock was meant to be just a front. Martorello's companies handled <u>all</u> of the material aspects of the lending business without any meaningful involvement of the LVD, Tribal Council or the co-managers. After regulators caught onto the scheme, Martorello and Red Rock attempted to enhance what Martorello actually called the "optics" of the co-managers' involvement, while continuing to allow him operational control.

**A.  Background on the creation of the tribal lending business model.**

3

To understand what happened in this case, it is helpful to have some background and context regarding the tribal lending industry in general, as well as Robert Rosette's prominent involvement within the industry. Most states have usury laws that limit the amount of interest that a lender can charge on a loan. To evade these laws, payday lenders originated their loan products in the name of national banks, who were exempt from state interest-rate caps under the National Bank Act. *See* 12 U.S.C. § 85. Under these arrangements, the bank served as a conduit for the loans in exchange for a fee, but the payday lender funded, serviced, and collected the loans—a tactic known as "rent-a-bank."

When federal regulators began cracking down on these rent-a-bank arrangements, the payday lenders developed a solution—they adapted the structure to use Native American tribal entities as the conduit to ostensibly cloak the loans in tribal sovereign immunity. *See, e.g.*, Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) (providing background on payday loans and describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance").

When the crackdown began, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV157522JFWRAOX, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016). Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*. Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and

would not have to comply with licensing and usury laws in states where borrowers resided." *Id.*

On the other side of the table was the law firm, Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, available at: https://www.rosettelaw.com/our-firm/ (last visited on April 4, 2019). According to a lawsuit filed against him, "Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes." *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2018 WL 2734946, at *5 (S.D. Cal. June 7, 2018) (citing Am. Compl. at ¶ 222). As reflected in this case, "a significant portion of the revenue from these enterprises goes to Rosette," *id.*, albeit through a management company known as Tribal Loan Management, LLC.

In the "world of tribal online lending," Rosette is "what's called a 'matchmaker,'" *i.e.*, a "middleman who brings together two worlds that would otherwise not meet: Native American tribes and payday lending enterprises." Joanna Zuckerman Bernstein & Julia Harte, *The Sovereign Matchmaker*, Al Jazeera America (June 19, 2014), available at: http://projects.aljazeera.com/2014/payday-nation/matchmaker-payday.html. Under the conventional wisdom at the time, matchmakers would solicit tribes to engage in these ventures, offering the incentive of revenue without the tribes doing any of the work, "as lenders typically manage business operations themselves." *Id.*

Rosette played the role of matchmaker between Martorello and LVD. On July 8, 2011, Rosette's company, Tribal Loan Management, LLC, ("TLM") entered into an Exclusivity Agreement and Letter of Intent "to develop and operate a lending operation providing small loans to consumer over the internet[.]" Ex. 2 at JPB00382. As part of this, TLM agreed "to provide an entire <u>turn-key lending operation</u> to provide consumers with small loans," and "a business structure

and <u>pro-forma models</u>" to "achieve maximum profitability to the Tribe in its first month of operation." *Id*. at JPB00383 (emphasis added). The agreement further acknowledged that TLM would be "required to spend significant resources both in up-front cash, and to exploit relationships" to "provide a <u>turn-key lending operation</u>." *Id*. (emphasis added). To that end, TLM was "to negotiate and enter into Transaction Documents with any and all parties… <u>to develop and manage all aspects</u> of the Project." *Id*. at JPB00383 (emphasis added).

The Exclusivity Agreement is important because it establishes that LVD did not create Red Rock to "learn the lending business" as repeatedly asserted. Instead, TLM was used—consistent with the conventional wisdom at the time—to provide a "turn-key operation," "pro-forma models," and "to develop and manage all aspects" of the business. *Id*.

## B. Martorello's post-declaration testimony and discovered communications surrounding the formation of the venture further demonstrate that Red Rock did not contract with Bellicose "to learn the industry."

After working several years at KPMG, Martorello "started online lending" in 2008. Ex. 3, Martorello Dep. 26:9-14. Before entering into tribal lending, Martorello had an ownership interest in an online lending company called "MMP Finance," which made "online payday loans." *Id*. at 33:18-35:20. Utilizing the domain name "www.peppercash.com," Martorello made usurious loans that claimed to be "governed by the laws of Costa Rica." Ex. 4 at ROS002-0000691. In the spring of 2011, Martorello attended an online lending conference with "breakout sessions" related to tribal lending. Ex. 5, Martorello Dep. II,. 21:10-21. According to Martorello, there "was a lot of favorable on-point case law that was coming out in 2010" regarding tribal lending, prompting large hedge funds like "TCV and Sequoia" to provide capital to these ventures. *Id*. at 21:12-16.[1]

---

[1] Technology Crossover Ventures and Sequoia Capital are venture capital firms https://www.sequoiacap.com/companies/. Both TCV and Sequoia were early investors in Think Finance, profiting significantly from its illegal business and are now subject to lawsuits for their

At the conference, a "mutual colleague" introduced Martorello to Scott Merritt, who was interested in selling software to Martorello for his online lending business. Ex. 6, Merritt Dep. at 28:16-21. During this conversation, Martorello "indicated that he had an interest in working with Native American tribes." *Id.* at 31:3-4; *see also id.* at 93:16-20 (testifying that Martorello expressed his desire to find a tribal partner during this initial meeting). Merritt introduced Martorello to Rosette, who was "a very well-known attorney in that space." *Id.* at 32:7-11. Thus, shortly after the execution of the Exclusivity Agreement between LVD and TLM, it appears that a non-disclosure agreement was executed between Martorello and Rosette. *See* Ex. 7 at ROS002-000149 (identifying the document as "Subject to Mutual Non-Disclosure Agreement Dated July 11, 2011).

Rosette and Martorello's communications over the next several months demonstrate that Red Rock was not created "to learn the industry," and it was intended to be a turnkey operation that allowed non-tribal members "to develop and manage all aspects" of the business. *Compare* Ex. 2 at JPB00383; *with* Ex. 1, Hazen Decl. at ¶ 10 ("In order to learn the lending industry, Red Rock contracted with Bellicose VI…"); *id.* at ¶ 11 ("While Red Rock received advice and consulted with Bellicose about operations, all final decisions about operations were made by Red Rock's managers."). Martorello's declaration attempted to facilitate this false narrative, brazenly asserting that he <u>was not involved in the creation of Red Rock</u>, but made aware Red Rock had been formed." Ex. 8, Martorello Decl. at ¶ 17 (emphasis added). The Tribal Defendants used this same narrative before the Fourth Circuit. Ex. 9, Reply Brief at 10, n. 7 ("The Tribe approached Martorello in 2011 after independently deciding to explore tribal lending, *not* the other way around.").

This story about the creation of Red Rock was a lie. Martorello not only selected the name,

---

involvement. *See, e.g., Gibbs v. Stinson*, No. 3:18CV676, 2019 WL 4752792, at *2 (E.D. Va. Sept. 30, 2019) (denying Sequoia's motion to dismiss the complaint).

but he was provided with Red Rock's organization documents and operating agreement for review prior to having it approved by the Tribe. For example, a contemporaneous email regarding the process confirmed, "Matt has indicated that the intended Tribal LLC should be established as 'Red Rock Lending, LLC' a Tribal Entity." Ex. 10 at ROS002-001889; *see also* Ex. 11 at ROS002-000695, Aug. 23, 2011 email from Flint Richardson[2] (telling Martorello "[y]ou can name [the tribal entity]!!"); Ex. 12 at ROS002-000681, Aug. 23, 2011 email from Martorello ("I like the name **Red Rock Tribal Cash, LLC**.") (emphasis in original).[3] Despite all of this, Martorello signed a declaration falsely claiming he "was not involved in the creation of Red Rock, but made aware Red Rock had been formed." Ex. 8, Martorello Decl. at ¶ 17 (emphasis added); *see also id*. at ¶ 102 ("Neither I, nor Bellicose, helped form Big Picture or Red Rock.")

Further evidence of the Defendants' efforts to mislead this Court and the Fourth Circuit comes from an email chain from August 2011 discussing the basic structure of the business model. The email chain started with an email from Martorello to Rosette and Richardson about the structure of the venture. Ex. 13 at ROSETTE_REVISED_052501.[4] Martorello asked if the "tribal lending entity had a tribal management company, which was going to be the Bellicose customer[?]" *Id*. Richardson responded "no," and clarified that Martorello's "ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS." *Id*. at ROS001 _052500 (caps in original; underline added for emphasis).

---

[2] Richardson was Rosette's business partner at TLM.

[3] *See also* Ex. 10 at ROS002-001889 ("PROVIDE A DRAFT OF THE RED ROCK TRIBAL LENDING, LLC ORGANIZATION DOCUMENT AND OPERATING AGREEMENT FOR [MARTORELLO'S ATTORNEY] TO REVIEW PRIOR TO HAVING IT APPROVED BY LVD AT THE NEXT SCHEDULED COUNCIL MEETING.") (caps in original).

[4] Hereafter, Plaintiff's uses ROS001 to refer to documents produced in Rosette's first production.

And when asked by Martorello to further elaborate on this point, Flint Richardson explained that "REPRESENTATIVES FROM THE TRIBE ARE THE LLC's "MANAGERS". THE SERVICER, <u>BELLICOSE OPERATES THE BUSINESS COMPLETELY</u>." *Id*. at ROS001 _052498 (caps in original; underline added for emphasis).

Richardson's email further explained the catch, *i.e.*, how this seemingly deceptive model was legal. According to Richardson, the "cornerstone of the sovereign model," was the delegation of "Loan Originations" to the tribal lending entity. *Id*. at ROS001 _052497. So long as the loans were originated by a server on tribal land, they were purportedly exempt from state laws. Richardson further recommended Martorello to "engage Claudia Callaway in order to assist" him "with the agreements." *Id*. Like Rosette and Richardson, Callaway too believed that origination of the loans by tribal entities—even with the servicer operating every other aspect of the business— would exempt the loans from compliance with state usury laws.[5]

Richardson's email explaining the business model is consistent with the Exclusivity Agreement. In unequivocal terms, Richardson explains that the "managers" are not "involved in the business," *i.e.*, a far different reality than the statements presented to this Court. And tellingly, Richardson then used a scare quote around the word "managers," signaling that the word was not being used in its traditional sense. Consistent with this, four years into the venture, Martorello sent an email explaining that "**<u>[a]s far as I know, the Manager's don't really do anything</u>**." Ex. 14 at ROS001_043978 (emphasis added).

---

[5] *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2018 WL 485963, at *3 (C.D. Cal. Jan. 19, 2018) (detailing advice provided by Callaway to CashCall, including she "advised that because the loans made pursuant to the Tribal Lending Model were originated by a tribe or tribal member, the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided.").

JA768

The initial draft of the servicing agreement mirrored the concept described in Richardson's email. Among other things, this proposed agreement made clear that Red Rock, "through a contractual relationship, desire[d] to retain and engage [Bellicose] as its independent contractor to develop, <u>manage</u>, <u>operate</u>, and <u>maintain</u> the Unsecured Lending Business[.]" Ex. 15 at ROS002-000527 (emphasis added); *id*. at Rosette002-000533 ("It is the Parties' intentions that all business and affairs in connection with the day-to-day operation, management, and maintenance of [Red Rock], including the establishment of operating days and hours, shall be the responsibility of the Servicer."). Martorello—not LVD, Red Rock, Tribal Council, or TLM—took issue with overtly representing his control in the contractual language, objecting to the use of the word "'management' all over it," which he characterized as "not good." Ex. 16 at ROS002-00493.

When considered together and alone, the Exclusivity Agreement, Richardson's email, and the initial draft of the proposed servicing agreement are significant because they directly contradict the false narrative and misrepresentations that LVD created Red Rock to learn the industry, it controlled the lending operation, and developed the business acumen to form Big Picture Loans. *See, e.g*., Ex. 8, Martorello Decl. at ¶ 48. This false narrative became necessary after government enforcement actions and private litigation uncovered the illegality of the tribal lending model.

The false narrative is also contrary to the testimony of Joette Pete, who served as the Vice Chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians from 2010 until 2016, *i.e.*, from the inception of Red Rock through the restructure of Big Picture. Ex. 17, Pete Decl. at ¶ 1. The former Vice Chairwoman explained: "When Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything[.]" *Id*. at ¶¶ 2-3. Pete, the second highest ranking Tribal Council

member during the relevant time, further confirmed that it is inaccurate that Red Rock "contracted with Bellicose VI 'to learn the lending industry'" as posited by the Tribal Defendants. *Id*. at ¶ 6. According to Pete, learning the industry was "never the goal when LVD formed Red Rock," and Martorello did not "attempt to teach [them] anything about the business." *Id*.[6]

### C. Martorello's payment of broker fees for the introduction, as well as his attempt to find another tribe, further shows that his declaration is false.

Martorello e-mail discovered after his false declaration was filed unequivocally establishes that he misrepresented the genesis of the relationship. For example, in email dated January 11, 2017, Martorello himself revealed what actually happened: "If I wanted to get a new contract," *i.e.*, servicing agreement, "I'd probably <u>call a broker who would introduce me to tribes and charge me a few hundred K</u> (<u>we sent how much we paid for the initial intro</u> in a prior email)." Ex. 19 at Martorello_008958 (emphasis added). At best for Martorello, this email proves his declaration is misleading. Ex. 8, Martorello Decl. at II(A) ("LVD approached Martorello in 2011 to assist them [*sic*] create and grow online lending business."). No one at LVD approached Martorello as posited; he <u>paid</u> hundreds of thousands of dollars for the introduction.

Martorello not only paid a broker for the introduction, but he also paid LVD an incentive payment of $10,000.00 for entering into the servicing agreements. Ex. 20 at ROS002-0000073-74, email from Martorello's attorney ("we're looking for two servicing agreements, one for the new business 'Red Rock' and one for the old business, Castle. We're thinking there should appropriately be two separate incentive payments to the tribe of $5,000 for each business. Are

---

[6] Although she was never disclosed or identified by the Defendants, Plaintiffs learned post-declaration of Pete's potential knowledge after Justin Martorello produced text messages from February 2016, indicating that "Joette has rallied support that it is 'rent a tribe' in the community." Ex. 18 at Justin_Martorello_00844.

there wire instructions so Matt could arrange for the money to be wired to the tribe at closing?"). If the LVD approached him, why would Martorello pay it a kickback? The kickback is further evidence that LVD did not approach Martorello to learn the industry, but rather an incentive payment from Martorello was made to entice it to enter this illegal business.

What's more, as early as June 2012, Martorello was looking for another tribal relationship in case LVD tried to renegotiate or terminated its relationship with him. Ex. 21 at FR0000068. At this time, Martorello wrote an e-mail to Merritt and Richardson, stating:

> I think I'd like to find a second tribal client. While I like the exclusivity and very much like the relationship with LVD, I am concerned about the long term as I think they likely have motives not aligned with an exclusive servicing arrangement, and I think they are starting to feel underpaid as the heat comes on at the federal level.
>
> To have second tribal client, even if just a small portfolio, provides so much needed comfort. …
>
> I'd like to do the exact same deal with a back up tribe. I know you guys got it taken care of, let me know what are options.

*Id*. Thus, the suggestion that LVD approached Martorello, who was disinterested in tribal lending, is false. In reality, Martorello paid for the introduction to attempt to exploit sovereign immunity and tribal law. And as soon as he felt like LVD was "starting to feel underpaid," he attempted to find "a second tribal client" for "much needed comfort." *Id*.

### D. Rosette and Richardson agree not to introduce any other payday lenders to LVD as part of the transaction.

Although characterized as a "servicing" agreement, internal documents show that Rosette, Richardson, and Karrie Wichtman (general counsel to the LVD) understood that Martorello's company was the lender. In particular, following a call with Martorello, Richardson wrote that they would agree "NOT to introduce <u>any new PDL's </u>to LVD as long as Bellicose ha[d] a relationship with LVD." Ex. 22 at ROS002-0001218 (underline added). Stated differently, this was

an acknowledgement that Martorello was a "PDL," *i.e.*, a payday lender (not merely a loan servicer), and his company should have the exclusive right to lend through the LVD. This email— which copied Rosette and Wichtman—shows the intention behind the lending arrangement, which was completely contrary to that represented to this Court.

### E.  New evidence shows that Red Rock did not have any employees and operations were conducted, at least initially, in Chicago.

To further support their false narrative, Hazen's declaration asserts that Red Rock provided its online loans "from its offices on LVD's reservation lands" and "[a]ll of Red Rock's employees, computers, and records were on LVD's reservation lands at all times." Ex. 1, Hazen Decl. at ¶ 8. This is objectively false. In a March 2012 e-mail chain (discovered after the original declaration and sovereign immunity motion), Martorello asks Craig Mansfield, tribal co-manager of Red Rock, to come to Chicago "where the duties that will be happening at LVD are occurring today (email, strategy, ACH)" so he could "see it live in action and sit with the crew, etc." Ex. 23 at CM0000869. Martorello's email—inviting Mansfield to come to Chicago to observe "the duties" that "will be happening at LVD"—directly contradicts Hazen's declaration that Red Rock's employees, computers, and records were on reservation lands "at all times." *Id*.

Worse yet, Hazen's declaration hid or misled as to the fact that Red Rock did not have a single employee. This was uncovered during the deposition of Justin Martorello, i.e., Defendant s brother and the Vice President of Bellicose who was "responsible for the oversight of the Tribal Lending Entities overall operations including: risk, analytics, compliance, marketing, P&L, operations, and technology." Ex. 24 at Martorello_005441. In his deposition, Justin Martorello testified "I don't believe that Red Rock had employees." Ex. 25 at 49:4-5; *compare with* Ex. 8, Martorello Decl. at ¶ 103 ("Bellicose did not control the operations of Big Picture or Red Rock."). Hazen's declaration, thus, either: (1) materially misrepresented the existence of Red Rock's

13

JA772

employees; or (2) shows that she had such little knowledge about operations that she could truthfully make those statements.

Martorello's declaration also misrepresents that he has "never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock." Ex. 8, Martorello Decl. at ¶ 26; *see also id.* at ¶ 105 ("Bellicose has never accepted or collected a consumer loan payment under any loan agreement originated by Big Picture or Red Rock."). This is completely false—the Servicing Agreement expressly provides that Bellicose "shall collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock]… and deposit proceeds daily into a bank account…" Ex. 26 at § 4.9, Martorello_026273. Further, Martorello's email to Hazen and Wichtman revealed that Red Rock did not handle collections as they did not occur on the reservation. Ex. 27 at ROS001_043487 ("Collections probably will begin in 2015 in Watersmeet[.]"). And in reality, "collections" were accomplished via an ACH transfer, which was overseen by Bellicose. Ex. 2 at Martorello_005441 (describing McFadden's responsibilities as the manager of "payment processing for Tribal client portfolios including: ACH, RCC, Debit/Credit Card."); *id.* at Martorello_005446 (describing Bellicose's payment processing responsibilities, including acquiring and maintaining processing relationships; maintaining procedures for daily processing; managing ACH upload process; controlling the state distribution to different payment processors).

**F. New evidence shows that the Defendants attempted to enhance the "optics" but not the substantive involvement of the co-managers, who were specifically prohibited from learning key information about the business.**

Bellicose not only "completely operated the business," but it intentionally kept Red Rock's co-managers in the dark about basic details of the business, such as vendor contracts and underwriting formulas. This is evident from an email from August 2014—almost three years into

the business—where Bellicose sent a request for approval. *See generally* Ex. 28. When Wichtman

forwarded the request to Hazen, she wrote "due to the desire to learn and the pending restructure,"

she recommended that Hazen "set up a conference call with SPVI so she could learn the specifics

regarding the direct mail launch." *Id.* at ROS001_45269. In response, Martorello wrote:

> Remember when we started, <u>that all of these vendors and systems</u> Jennifer is white
> boarding out <u>were tied internally within SPVI systems behind the scenes</u>, just like
> services do in the banking and credit card space. <u>The vendor contracts and formulas
> used were are very closely guarded internal IP and entirely unattainable by the
> clients.</u> Running clients through it all is what we built and do. <u>The only reason we
> moved elements to be direct with client was because the risk of working with tribal
> clients was more and more dangerous and optics became very important.</u> So the
> trust element came into play as a necessity and exposure of IP may have been the
> result.
>
> <u>If there is a fundamental disagreement on IP ownership though</u>, I'd Imagine the
> elements I mentioned required in a deal are far from obtainable. In fact, I think if
> that were the case<u>, LVD would essentially make the claim that they already own us
> today.</u>

*Id.* at ROS001_045267 (emphasis added).[7] Such "internal eyes only" correspondence directly

contradicts Martorello's Declaration, as does Wichtman's response, which stated that she "wasn't

recommending that SPVI disclose its secret sauce but only that SPVI be willing to explain to the

Co-Managers what exactly they are approving." *Id.* at ROSETTE045267. She added "do

[Chairman Williams] and [Hazen] even know what 'DM'[direct mail] means because I don't." *Id.*

Martorello's response establishes that the genesis of the tribal lending arrangement was a

front. In no uncertain terms, Martorello explained that "when we started, that <u>all of these vendors

and systems</u>" were "tied internally within SPVI systems <u>behind the scenes</u>[.]" Ex. 28 at

---

[7] Ex. 8 at ¶ 35 ("LVD received and retained the significant additional economic value of ownership
of all intellectual property developed under the agreement by SourcePoint."); *id.* at ¶; *see also* Ex.
29 (showing Martorello was "paranoid" about transferring SPVI's intellectual property prior to
repayment of the note).

ROS001_045267 (emphasis added). He further added that "[t]he vendor contracts and formulas used were [our] very closely guarded internal IP and entirely unattainable" by Red Rock. *Id.* (emphasis added).[8] The only reason this changed—requiring "elements to be direct" with Red Rock—was "because the risk of working with tribal clients was more and more dangerous and optics became very important." *Id.* (emphasis added). The importance of this email cannot be understated: it is direct evidence that: (1) all the vendors, systems, and formulas to run the business were internally tied to Martorello, (2) they were initially "entirely unattainable," and (3) they changed because "optics became very important." Stated differently, Red Rock was not created to allow LVD "to learn the industry." And even though the "optics became very important," the August 2014 reality was that Martorello continued to withhold all material operations information from Red Rock, even while trying to cosmetically enhance the appearance of co-manager involvement by creating a check-the-box review of the tasks. *Id.*

Another email from February 2015 demonstrates that LVD/Red Rock had not "acquired years of knowledge and business acumen related to the online lending industry," thereby prompting it to purchase Bellicose "to begin in-housing services." *Galloway v. Big Picture Loans, LLC*, Case No. 3:18-cv-406, ECF 40 at 5-6. In this email chain, Wichtman wrote to Martorello:

---

[8] Even though Martorello "guarded the formulas used," his Declaration nonetheless asserted that "SourcePoint made underwriting recommendations to Red Rock's co-managers who reviewed and independently decided whether to implement." Ex. 8 at ¶ 41. But without access to the formulas used, any approvals must have been pro-forma as there would be no way for the co-managers to meaningfully participate without the "formulas used," which were Martorello's "very closely guarded internal IP." Ex. 27 at ROSETTE045267. Martorello told a completely different story in his declaration. Ex. 8 at ¶ 41; *id.* at ¶ 45 ("Under the Servicing Agreement, Red Rock paid SourcePoint to develop underwriting criteria to recommend for implementation by Red Rock. SourcePoint did not simply implement these underwriting criteria on behalf of Red Rock, but instead presented the underwriting criteria to Red Rock's co-managers for their evaluation and ultimate approval or rejection."); *id.* at ¶ 101 ("Neither I nor Bellicose have 'controlled' any underwriting criteria used by and of LVD's lending businesses – at all times the LVD business retained full control over the underwriting criteria used to make loans to consumers.").

16

> If the [Tribal Servicing Entity] is going to survive after the sale sunsets or is complete – it cannot operate in a vacuum – it's a tribal business and the Tribe needs to know what is happening and be learning about the operation of the TSE through building relationships with TSE employees. Upper level management and tribal leadership should become aware of all aspects of operation of the [Tribal Servicing Entity].

Ex. 30 at ROS001 _050595 (emphasis added). Broken down, this email shows: (1) Wichtman's belief that the current business was being operated in a vacuum; (2) the Tribe did not know what was happening; and (3) the Tribe was not learning about the operation of the servicing entity or building relationships with its employees. In response, Martorello stated "I believe the TSE execs will be able to communicate things to the Co-Managers in layman's terms so they can understand how things work and can handle the communications to Tribal council." *Id*. But if the co-managers made "all decisions regarding the business"—as repeatedly asserted in Martorello and Hazen's declarations—this should never have been part of the conversation in February 2015.

Three weeks later, Martorello and Wichtman had a similar exchange. Wichtman raised concerns about the Tribe's ability to run the business with Bellicose's executives. Ex. 31 at ROS001_053119 ("I am not certain how this will work or how the Tribe won't need anyone when there is so much to do and learn."). Martorello replied: "I guess one question I have is who are you expecting to learn it? There isn't much to 'do' for the Buyer since it's built and designed to be sold to be self-sustaining as a passive investment opportunity." *Id*. at Rosette_53118. Martorello further added: "I think I need clarity on exactly who you are expecting to learn and what is you want them to learn. I can't learn science because the words frustrate me too much. Just the same, if you're hoping to jam a square peg through a round hole, something will get broke." *Id*. at ROS001 _053119. After Wichtman provided additional thoughts, Martorello even more candidly explained:

> I wouldn't buy Pfizer and then ask to be CEO, or everyone will be out of a job at Pfizer in 12 months when I destroy it. The optics are important due to the bastards

> out there against us, but the practicality and sustainability of the business is the
> basic necessary foundation over optics.

*Id.* at 053118 (emphasis added). Contrary to Martorello's declaration, the initial business model and subsequent restructure was all about "optics," not the LVD's desire to learn the industry or acumen gained through Red Rock.

### G. The Deposition Testimony of Red Rock's co-manager, Craig Mansfield, demonstrates the lack of involvement of the co-managers.

The Tribal Defendants, as well as Martorello, falsely asserted that "Red Rock consulted with Bellicose about day-to-day operations, but all decisions were either made by Red Rock's managers or expressly delegated and overseen by Red Rock's managers." ECF 40 at 5; Ex. 1, Hazen Decl. at ¶¶ 11. This directly contradicts the initial design crafted by Martorello and Rosette, as well as the evidence cited above. Additionally, the depositions of Red Rock's co-managers, Craig Mansfield and Hazen, demonstrate the nominal involvement of Red Rock's co-managers.

Mansfield, along with Hazen, was one of the designated co-managers of Red Rock until he resigned in January 2014. Ex. 32, Mansfield Depo. at 82:22-83:2. Despite supposedly working hand-in-hand for more than two years, Hazen could not recall whether Mansfield was even a Red Rock co-manager.[9] Despite not being able to recall *who* the other manager was, Hazen nonetheless signed a declaration somehow claiming that "all final decisions about operations were made by Red Rock's managers." Ex. 1 at ¶ 11. If Hazen could not recall regarding the identity of the other co-managers, she cannot credibly testify as to the decisions they purportedly made.

Mansfield's testimony also demonstrates that the Defendants misrepresented Red Rock's involvement and control over operations. For example, when asked if Red Rock made loans under

---

[9] In particular, Hazen was expressly asked "[d]o you know if Mr. Williams or Craig Mansfield were a co-manager of Red Rock Tribal Lending with you?" Ex. 33, Hazen Dep. at 26:4-7. In response to this question, she testified "I don't recall." *Id.*

a particular name, Mansfield testified "I don't know the answer to that," and he could not explain

its association with Castle Payday. Ex. 32, Mansfield Dep. at 104:5-13. In other words, Mansfield

could not identify or explain the most basic piece of information about Red Rock, *i.e.*, the name it

did business as and used when interacting with consumers.[10] He also could not explain why the

enterprise created two separate entities, Red Rock and Duck Creek, as opposed to operating a

single entity—a seemingly important detail for a manager of a business.[11]

Mansfield further demonstrated a lack of knowledge for each of the material aspects of the

lending business—even for the limited tasks ostensibly designated to Red Rock under the

Servicing Agreement. For example, Mansfield did not know the process of "how the decision of

whether to fund the loan occurred." Mansfield Dep. at 114:25-115:3. Or whether that process

occurred on the reservation. *Id*. at 115:4-14. He did not know how loans were originated, including

"whether the ultimate determination to fund the loan was made on tribal grounds." *Id*. at 115:15-

22. He further testified that he did not know what verifications were completed to ensure that

borrowers provided the correct information, *id*. at 112:15-18, how Red Rock obtained the money

it needed to fund the loans, *id*. at 128:24-129:12, or any details about the call center in the

Philippines or what it did on behalf of Red Rock. *Id*. at 119:20-120:1.

## H. Other evidence establishes that the co-Manager position was merely titular and such appointees had no meaningful involvement.

The co-manager's lack of involvement at Red Rock is also evident from several other

pieces of evidence, including the material omission that Red Rock's co-managers were unpaid

---

[10] *See* Ex. 34 (loan agreement: (1) identifying the lender as "Red Rock Tribal Lending, LLC d/b/a CastlePayday.com," and (2) instructing consumers to email "support@castlepayday.com.").

[11] Ex. 32, Mansfield Dep. at 91:12-14 ("Q. Why do you need two different entities to make unsecured loans? A. I don't know the answer to that.").

volunteers. For example, when asked during his deposition if he was "paid to be the co-manager," Mansfield testified "No, I wasn't." *Id*. at 121:11-15. He simply "received as much money as every tribal member received from it." *Id*. at 121:17-18. During this time, Mansfield was "still working [his] full-time position" at the casino. *Id*. at 122:6-13.[12] This is significant because someone cannot learn a complicated lending business—being operated thousands of miles away from their residence—when they are a full-time employee working for another company. Put differently, if the Tribe was genuinely committed to learning the business, it would have employed someone full-time so they could actually learn the business. The Tribe did not do this, however, because it was intentionally designed so that "BELLICOSE OPERATE[D] THE BUSINESS COMPLETELY," Ex. 13 at ROS001 _052498.

Other email, such as that from September 2013, *i.e.*, almost two years into the lending business, conclusively evidences that lack of any material involvement. During that time, Red Rock's attorneys were seeking information from Martorello to provide in Chairman Williams's declaration to be filed in *Otoe-Missouria* litigation. Ex. 35 at ROS001_46388. Rather than obtaining this basic information from Chairman Williams, Red Rock's lawyers asked Justin Martorello to provide operational information so that they could "supplement Chairman Williams' declaration with regard to the specific operational impacts that RRTL has faced post-DFS action." *Id*. That the Martorellos—not Chairman Williams, Hazen, or Mansfield—were the source of this information shows that the Tribal Defendants misrepresented the involvement of its co-managers.

---

[12] Similarly, it appears Hazen was a volunteer manager as well (unless she was receiving payments unbeknownst to the Tribal Council). Ex. 27 at ROSETTE_REVISED_043485, Dec. 2, 2014 email from Hazen ("I guess I have to ask you to take into consideration the fact that I have volunteered from the get go to do whatever it took to move this business forward…") (emphasis added); *see also* Ex. 17, Pete Decl. at ¶ 7 ("the co-managers were volunteers, who were involved for 'optics' and to provide pro forma approval of recommendations provided by Bellicose.").

Moreover, it is telling that LVD/Red Rock's general counsel did not even know the operational structure of the lending enterprise, asking the Martorello's to review the "attached operational diagram" and let them know if it was "consistent with Red Rock's structure?" *Id.*

In another email dated September 28, 2013, Wichtman expressed her concern to Martorello that she had been unable to answer basic questions about the business when asked by a bank, and thus she needed enough information "in order to be comfortable handling these questions." Ex. 36at ROS001_047091. In particular, Wichtman wrote:

> While I am fairly familiar with the fact that both [Red Rock] and [Duck Creek] offer installment loan products... there was a question raised from [the bank's] compliance department that the product offered is just a 'dressed up' payday loan product—<u>that requires me and the Co-managers to gain a better understanding of our short term finance products in order to be comfortable handling these questions</u>. While I assured [the bank] that our product is not a pay day product and does not require ACH... <u>that was about all I could say. Is there more that we can offer regarding the product that would be useful for the Co-managers and I to become familiar with to better answer these questions</u>?"

*Id.* Wichtman and the co-managers lacked even the most basic understanding of the loan product offered by Red Rock other than that it was "not a payday product and does not require ACH." *Id.*

In addition, new evidence shows that Wichtman was authorized to use the co-managers' signatures on documents. Ex. 37 at ROS001_058681 ("We have [Chairman Williams] and Shelly's signature on file for use when they are not available to sign."). Wichtman not only had the "signature on file," but she was signing "on a regular basis for quite some time[.]" *Id.*

### I. The Tribal Defendants and Martorello misrepresented LVD's revenue share and involvement in negotiating the waterfall.

Another material misrepresentation and omission presented throughout this case has been that "LVD developed a comprehensive economic development strategy to build a more diversified economy." ECF 40 at 3. In reality, the LVD did not develop anything—this is one of several partnerships designed by Robert Rosette and his firm, who facilitated the transaction for their own

personal benefit; and not just in the form of legal fees. Rather, Rosette's company, Tribal Loan Management, received a "brokerage fee" of 50% of Red Rock's revenue share. Ex. 26 at § 7.15. Hazen lied about Red Rock's revenue share under oath.[13] The same is true for Martorello's declaration. Ex. 8 at ¶ 34 (claiming that Red Rock received 2% of gross revenue).

Rosette's profit sharing—in an amount equivalent to LVD—is problematic for a business claiming to be "wholly owned and operated by LVD." ECF 40 at 5. Indeed, Martorello raised concerns with Rosette's 50% cut in July 2012, complaining that "TLM shouldn't be profit sharing like an owner." Ex. 38 at ROS001_046397. This component "really [was] an issue to" Martorello, who believed TLM's revenue share put his "capital lent at risk." *Id*. He thought it was "very important we remove TLM as a 'profit sharing 50% of retained earnings broker' because it sounds like '50% owner,'" which "negates the entire tribal owned component that makes [him] as financer/servicer feel like [he was] safe." *Id*. Wichtman, Rosette's law partner, expressed similar concerns. She believed that "the TLM piece is problematic for a whole host of reasons," and while she did not "have any doubt that for bringing the regulatory structure and the Servicers to the table there should be a fee paid to TLM," that "50% of the Tribe's profits ha[d] always been a bit excessive" in her opinion. Ex. 39 at ROS001_044603.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[13] When asked "[w]hat percentage contribution would [the government] receive on a monthly basis from Red Rock Tribal Lending out of the revenue?" Ex. 33, Hazen Dep. at 35:18-36:1. Hazen testified "2 percent of the gross." *Id*. at 36:2.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

The broker's fee is important because it shows the dominant role of Rosette in creating the lending venture, the lack of intended financial benefit to LVD and, thus, the LVD's lack of incentive to be actively involved in the business. What's more, Martorello misrepresented the origin of the revenue split, falsely claiming that "LVD suggested this form of revenue split as it guaranteed LVD's lending entities would always generate income for LVD's general fund while simultaneously incentivizing SourcePoint to assist LVD in the growth and the maintenance of an efficient and successful business for the benefit of LVD." Ex. 8, Martorello Decl. at ¶ 36. To the contrary, it was Martorello who proposed the 2% as it was the industry standard at this time. *See, e.g.*, Ex. 6, Merritt Depo. 48:2-5 ("the two percent was Matt's proposed revenue retention for LVD. So I took that ask to Rosette to see if it would fly, and that was what I remember happening."). Further, there is no evidence that "LVD" proposed anything to Martorello.

## II.    Defendants Misrepresented Big Picture Loan's method of creation and purpose.

The Tribal Defendants and Martorello lied about the reasons for creating Big Picture Loans. In particular, Martorello's declaration stated "the decision to sell Bellicose to LVD was not motived by impending threats of litigation or enforcement actions by government agencies." Ex. 8, Martorello Decl. at ¶ 69; *see also* Martorello Decl. at ¶ 49. Martorello further described this theory as "nonsensical and temporally problematic." *Id*. And before the Fourth Circuit, the Tribal

Defendants argued that "there was no evidence" that the restructure was intended to provide Martorello/his companies with immunity.[14]

The new evidence obtained shows the falsity of these misrepresentations. This evidence shows that: (1) Big Picture Loans was created for another tribe, but halted due to the district court's decision in *Otoe-Missouria*; (2) anticipating an unfavorable decision in *Otoe-Missouria*, Martorello urged the LVD to use Martorello's "Big Picture Loans" in order to "rebrand" Red Rock; (3) Martorello was desperate to sell the business because of fear of prosecution/investigation; and (4) LVD was not initially interested in the sale.

### A. New evidence unequivocally establishes that Martorello's declaration falsely proclaims that "the decision to sell Bellicose to LVD was not motived by impending threats of litigation or enforcement actions by government agencies."

As early as **November 2012**—a little over a year into the business—Martorello had concerns about the viability of the tribal lending model. Ex. 43. In this email, Martorello wrote that he had "some urgent questions" for them "on valuation." *Id*. at MARTORELLO_038990. Among other things, he asked how they would value several illegal businesses, such as online poker sites, medical marijuana stores, and drug cartels. *Id*. He further added that "[t]his industry is going to be living in the grey area of its legality for another year or two," and that they had already "received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders." *Id*. In his view, there was "no business with such risk to it" as the tribal lending

---

[14] Fourth Circuit Court of Appeals, Oral Argument/Listen to Oral Arguments, Opening Argument of William Hurd, Audio File at 13:53-14:30, http://www.ca4.uscourts.gov/OAarchive/mp3/18-1827-20190507.mp3 (Hurd: "Essentially, the idea below seems to be that by doing business with Martorello" and "acquiring SourcePoint, that we are protecting him from something or other or we are cloaking him with sovereign immunity, how can that be?" The Court: "Well, what is the evidence of that in any event?" Hurd: "There is no evidence. In fact, the evidence is quite to the contrary. . . . He has no sovereign immunity. And the idea that somehow that that is the purpose" that this was some "extravagant of altruism to protect this non-tribal guy, it just makes no sense.").

model, and the "bottom line" was that "this business will simply not exist in 2 to 3 years," at least how it did then. *Id*. at MARTORELLO_038990-1. In addition to monetary risks, Martorello explained that Greenberg Traurig provided him with a 20-page legal opinion, concluding that he could be liable "for aiding and abetting felony crime[s]" in states like Georgia. *Id*.

The arrangement was supposed to last until December 31, 2018, per the Servicing Agreement. Ex. 42 at § 3.2. But less than two years in, state and federal regulators caught on to Red Rock's illegal lending practices and threatened to take action. *See, e.g.,* Ex. 44 at ROS001_040489, Sept. 2012 Ltr. from Atty. Gen. for Ark.; , ROS001_040859, July 2013 Ltr. from Atty. Gen. from Conn.; ROS001_041125, Aug. 2012 Ltr. from Atty. Gen. for N.C.; EROS001 _043269, July 2012 Cease & Desist from Atty. Gen. for KY.

The biggest threat came on August 6, 2013, when the New York Department of Financial Services ("NY DFS") issued a cease and desist to 35 online lending companies, including Red Rock.[15] The NY DFS not only issued a cease and desist sent to the "lenders," but the bigger threat posed was the letters it sent to 117 banks and the National Automated Clearinghouse Association, requesting that "they work with DFS to cut off access to New York customer accounts for illegal payday lenders." *Id*. In his public comments on the letters, the Superintendent of Financial Services warned: "Companies that abuse New York consumers should know that they can't simply hide from the law in cyberspace. We [a]re going to use every tool in our tool-belt to eradicate these illegal payday loans that trap families in destructive cycles of debt." *Id*.

Six days after the issuance of the cease and desist, Rosette—who represented multiple other

---

[15] *See, e.g.*, The Official Website of New York State, *Press Room*, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

tribal lenders—had already drafted a complaint against the NY DFS "for LVD's consideration." Ex. 45 at ROSETTE_REVISED_041064. In an email to Martorello, Rosette wrote that he "believed strongly if we do nothing we may forever lose the tribal online lending opportunity." *Id.* Rosette further added that it would be "impossible to unwind or undo what the State of New York (in collaboration with federal agencies) have started without a legitimate piece of litigation being filed." *Id.* In a separate email to Martorello, Wichtman echoed these concerns, writing "[w]hat do we achieve by laying low waiting for the next bomb to drop—hoping that it doesn't blow us up?" Ex. 46 at ROSETTE_REVISED_049126. She further added that "[n]othing will be filed unless and until fully vetted with the Tribe and you." *Id.*

On multiple occasions, Martorello expressed concern with joining the litigation as he believed the litigation would be all regulators needed "to do to shut down the business at LVD b/c we simply would not be able to afford to stay in business anymore." *Id.* at ROS001_049125 Additionally, he added that the "LVD's house" was not "completely in order yet." *Id.* Because of Martorello's dominance over operations, he cautioned that "LVD" did not "represent the best facts" at the moment because they were not originating the loans on the LVD's reservation. Ex. 47 at ROS001_046605. Although the Tribal Defendants have represented that "the contracts for all loans … are formed on the reservation,"[16] the loan contracts actually originated through an "automated process" that did not require handling by BPL employees. Ex. 33, Hazen Dep. at 191:5-21, 192:1-7. And although Defendants assert that a final verification of loan agreements was performed on the reservation, Hazen testified that employees located in a call center in the Philippines also would perform that task. *Id.* at 193:4-22. Ms. Hazen did not know what percentage

---

[16] *See, e.g.*, Ex. 48, Hazen Decl. at ¶ 30 ("All loans are originated on the Reservation after applications are approved by Big Picture employees located on the Reservation."); Ex. 8, Martorello Decl.  at ¶ 107 (falsely claiming "all loans are made from LVD's reservation.").

of the approximately 10,000 loans originated each month were verified by employees located on tribal lands. *Id.* at 194:1-18. Given the enterprise contracted with 200 customer service representatives in the Philippines, Ex. 33 at 161:2-15, the vast majority of the final verifications inevitably had to occur off the reservation.

Martorello became comfortable enough with a lawsuit and it was filed in August 21, 2013. That lawsuit backfired—the district court not only denied Red Rock's motion for an injunction, its findings jeopardized the entire business model. Most notably, in an opinion issued on September 30, 2013, the court found that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands." *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013). The court further noted that Red Rock "built a wobbly foundation for their contention" that the activity was occurring on "on the Tribes' lands," and contrary to their argument, consumers did not "in any legally meaningful sense, travel[] to Tribal land." *Id.* at 360. Thus, there was "simply no basis" to conclude that the Tribes were "treated differently from any other individuals or entities" that "lend to New York residents." *Id.* at 361.

### i. Fearing prosecution and liability, Martorello immediately contacts Rosette regarding a restructuring "sale" to provide his companies with sovereign immunity.

*Otoe-Missouria* created a significant liability for Martorello and Bellicose, who did not have a colorable claim of sovereign immunity. In an email sent two days after the district court's decision, Martorello wrote that the decision "presents a significant liability for [Bellicose] and we do not believe that we should service any new New York loans." Ex. 49 at ROS001_006304-5. He further indicated that they were willing to see existing loans through completion, "but [they] simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it

might be." *Id.* at 6305 (emphasis added). Martorello further stated a concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final… such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue" to conduct business in New York. *Id.* at 6304.

Two weeks after the district court's decision, Martorello sent an email to Rosette regarding a restructure to protect Martorello/Bellicose. In this email, which had a subject line entitled "LVD to take ownership of Bellicose VI," Martorello presented some options for a restructure so that Bellicose could attempt to share in LVD's immunity.[17] One of those options was for Bellicose to "[a]ssign today LVD 51% of Bellicose via Equity only membership interest tied to the SPVI subsidiary only." Ex. 50. Additionally, he proposed assigning 51% of the interests in his other businesses involved in the scheme. *Id.* Each of these transactions, per Martorello, would be "<u>structured to provide all entities sovereign immunity.</u>" *Id.* (emphasis added). And trying to maximize his profits before the business was shut down, Martorello further proposed that BlueTech, his trust, would "own 49% equity, but 100% profits interests until month 49," *i.e.*, ensuring Martorello would retain the profits until the business was gone. *Id.*[18]  The importance of this email cannot be overstated:  Martorello sought to nominally transfer ownership of in a deal "structured to provide all entities sovereign immunity" while retaining 100% profits.

---

[17] Before the Fourth Circuit, the Tribal Defendants argued that "there was no evidence" that the restructure was intended to provide Martorello/his companies with immunity. Fourth Circuit Court of Appeals, Oral Argument/Listen to Oral Arguments, Opening Argument of William Hurd, Audio File at 13:53-14:30, http://www.ca4.uscourts.gov/OAarchive/mp3/18-1827-20190507.mp3.

[18] On a different occasion, Martorello urged Wichtman to consider a previous idea of the LVD adopting him, writing "something that really struck me [in *Otoe-Missouria*] was they mentioned the citizenship of the participants a lot. At council we talked about adoption. It seems like an excellent next step, not to mention an honor to me personally as well." Ex. 51 at ROS001_053384.

Less than six hours after his initial e-mail to Rosette, Martorello sent a similar, but <u>less candid</u> e-mail to the members of LVD's Tribal Council, which was never produced by Big Picture, Ascension, Rosette, or the Tribe. *See* Ex. 17 at pg. 6 (Exhibit 1 to Pete Decl.). In this e-mail, entitled "SPVI Equity Transfer to LVD," Martorello wrote: "Below is the <u>beginning of a concept</u> I have to facilitate a transition to LVD of MY businesses." *Id*. (emphasis added). The email provides the exact time and date for "the beginning of" the "concept" of the restructure. *Id*. In other words, the LVD's acumen was not the impetus behind the sale.

Martorello's email also provided the basic framework for the restructure. He would "[a]ssign today to LVD – 51% of Bellicose VI, LLC," but "0% profits interest" until four years after the restructure. *Id*. Martorello added: the "<u>Current Manager (myself) will be locked in as the decision maker for 48 months</u>, at which point they will hire a new Manager to replace me." *Id* (emphasis added). Martorello further expressed his belief that "the items below should be able to get us to a <u>term sheet with the goal of FINAL documents delivered on 10/30/13</u>." *Id*. (caps in original, underline added). Yet, despite Defendants' repeated contention the Tribe was "always" interested in buying the business, no member of the Tribal Council responded to this email or jumped at the opportunity to execute the term sheet by October 2013.

A few weeks later, Martorello reiterated his concerns to Wichtman. In an email dated October 29, 2013, he informed Wichtman that vendors and debt providers of Red Rock were "asking what would happen to everything if the ruling in NY were upheld[?]" Ex. 52. The repercussions, according to Martorello, would be "<u>certain death</u>" and "all vendors including [SourcePoint], banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity[.]" *Id*. (emphasis added). He further added that "class actions" and "personal threats of enforcement actions against individuals by regulators has everyone

spooked," causing "several of the biggest servicers" to "shut down." *Id*. In closing, Martorello proclaimed "[d]esperately hoping that Rule 19 works and a favorable outcome on the appeal!" *Id*.

On November 8, 2013, Martorello sent another email to Wichtman, explaining that Red Rock was "down now about 55% from where it was in July" and that SourcePoint was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims" coming in the first quarter of 2014. Ex. 53 at ROS001_052787. He further noted that there was a "very significant possibility that should we even survive long enough to get there," he would need "to defend [him]self even personally (in more than civil matters), with no ongoing business or revenue at all should the decision be made in the appeal that the activity is in fact OFF reservation (a certain end to the industry)." *Id*.

On December 30, 2013, Rosette circulated a legal memorandum regarding Martorello's proposed nominal transfer of ownership and retention of all profits, which analyzed whether "whether formation of a new entity that is co-owned by the Tribe and Source Point and subject to the proposed profit, management and voting controls" suggested by Martorello would be "sufficient to pass muster with the 'arm of the tribe' test to extend the Tribe's sovereign immunity from suit to the new LLC." Ex. 54 at ROS001 _052248.

In response, Martorello indicated that one of the proposed features—a 10% revenue allocation to the tribal entity—was not "going to work from a business standpoint" and he "might as well be a state licensed lender[.]" *Id*. at ROS001_052247. If litigation occurred, he further added "[w]hat I think you'd tell a court" is "that if the deal were not done," then the Tribe would not know if SPVI: (1) "would be around in 10 days given the industry," (2) execute "its termination provision in accordance with the" servicing agreement, or (3) "hike rates as risk has gone through the roof with detractors now seeking out SPVI's of the world for major attacks." *Id*. Martorello

also stressed the urgency of the deal, writing:

> **Clock is ticking before I end up in a Cash Call type attack though, at which point, I think the deal is about dead.**

*Id.* at 052248 (emphasis added).[19]

In early January, things continued to get worse for the industry, as well as for Martorello's enterprise specifically. On January 8, 2014, the Department of Justice announced a consent decree with a major ACH provider, which Robert Rosette described as "the most disastrous result we have seen yet," and he predicted that he "would not be a surprise if we lost the last remaining banks and ach processors servicing tribal accounts after reading the consent decree." Ex. 56 at ROS001_052155. Sure enough, the enterprise lost its only ACH processer the following day, which "obviously ha[d] major implications for [M]att since he ha[d] no other processors." Ex. 57. And when the enterprise attempted to obtain a different processor, one bank explained that they were told "if the bank so much as processes a single transaction [t]he DOJ will be relentless in shutting them down under the full weight of the US government." Ex. 58 at ROS001_036580.

Despite all of this evidence, Martorello still argues that "Plaintiffs' narrative on this point is a simple, but ultimately incorrect, theme—that Martorello recognized the potential regulatory risk, and sold Bellicose to the Tribe because of that risk and in an effort to limit his potential liability." ECF 277 at 26-27. But unquestionably these emails conclusively establish that Martorello: (1) created the concept for the restructure; (2) in an attempt to exploit the doctrine of sovereign immunity; (3) due to concerns that his company would be held liable for its violations of the law; and (4) accordingly, sought to transfer nominal ownership of the company yet retain

---

[19] *See also* Ex. 55 at LVD-00018128 (characterizing the CFPB's position as "without question a major attack on legit tribal lending operations"); *id.* (stating that if a similar "attack" on the Red Rock operation happened, he warned, "the stakes are very literally everything").

all of the net profits generated by the lending business. And they conclusively establish that the Defendants misrepresented the reasons for the restructure, including their false narrative that LVD "had acquired years of knowledge and business acumen related to the online lending industry," thereby prompting it to purchase Bellicose "to begin in-housing services." ECF 40 at 5-9.

       **ii.**    **New evidence shows that Martorello created Big Picture for another tribe, but halted the venture after the *Otoe-Missouria* decision.**

To facilitate their story, Defendants further misrepresented the circumstances surrounding the formation of Big Picture, which they contended "was created to be an online lending business in order to bring revenue to LVD[.]" ECF 40-3, Ex. 48, Hazen Decl. at ¶ 16; *see also* ECF 38 at 5 ("LVD began by creating Big Picture in August 2014."). This part of the story is designed to create the appearance that the LVD was the driving force behind, and came up with, the idea for the creation of Big Picture Loans. And when asked "whose idea" was it "to create Big Picture Loans," Hazen lied under oath that it was the "tribe's." Ex. 33 at Hazen Depo. 34:4-8. And when asked "who picked the name," she testified "[i]t was kind of a group discussion." *Id*. at 38:7-9.

In reality, documents produced from a third-party marketing firm show that Martorello created Big Picture Loans at least a year before LVD supposedly created/formed Big Picture. The domain name was registered on September 18, 2013. Ex. 59. Martorello's marketing company provided a "Communications Plan," for Bellicose Capital dated September 30, 2013, *i.e.*, the same day the district court issued its opinion in *Otoe-Missouria*. Ex. 60 at PHEN0002899. This document shows that Bellicose had anticipated launching Big Picture with another tribe located at the Fort Belknap Indian Reservation, *Id*. at PHEN0002904, but the launch of the lending enterprise was on hold pending ACH configuration. *Id*. at PHEN0002908. And shortly after the district court's decision in *Otoe-Missouria*, Justin Martorello e-mailed the marketing company, instructing

**JA791**

that tasks associated with "Big Picture" should be a "FULL STOP," and "given the massive attacks on the industry we do not plan [to] use these sites." Ex. 61 at PHEN0003894.

### iii.   Anticipating an affirmance by the Second Circuit, Martorello urges Wichtman and Hazen to "rebrand" Red Rock to Big Picture.

New evidence further shows that the Tribal Defendants and Martorello lied about the reason for creating Big Picture, which was formed <u>before</u> Martorello approached Chairman Williams about the potential restructure. Most notably, Hazen's declaration falsely claimed that "[a]fter four years of operating Red Rock, LVD had gained considerable experience and knowledge of the online lending industry," and, thus, "LVD looked to expand its online lending business to earn more money for LVD," and "to acquire our vendors' businesses so the lending would be more profitable." Ex. 1, Hazen Decl. at ¶ 13. Against this false backdrop, Hazen's declaration claimed that "LVD created Big Picture Loans" in August 2014. We now know conclusively that this is not what happened.

What actually happened was that Martorello urged Wichtman, Hazen, and Chairman Williams to "rebrand" Red Rock in July 2014. Ex. 62 at ROS001-058409. In this email, Martorello explained that that "RRTL ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. *Id*. He further added that "it's time to get away from the word 'payday' and the black mark of RRTL before rules come out and things get hotter." *Id*. Thus, Martorello suggested "form[ing] ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id*. Bellicose would "gladly facilitate the work," but it needed "the entity formed and approv[ed] to begin doing so as to step 1." *Id*. In conclusion, Martorello stated "the sooner we can get moving away from 'Payday' and the poor image of RRTL the better." *Id*. Despite this, Martorello's declaration misleadingly claims that "Neither I nor any company I own or manage <u>directed</u> or

**JA792**

controlled the creation of Big Picture." Ex. 8, Martorello Decl. at ¶ 67 (emphasis added); *see also id*. at ¶ 102 ("Neither I, nor Bellicose, helped form Big Picture[.]")

The evidence further shows that Red Rock was supposed to be rebranded into another concept developed by Martorello, known as Chorus Loans. On August 25, 2014, Martorello e-mailed Wichtman that "Chorus has been sold." Ex. 63 at ROS001-043437. But Martorello had "another really great brand" known as Big Picture Loans. *Id*. In this e-mail, Martorello attached a document entitled "Big Picture Site Design" showing a fully developed website, logo and brand for Big Picture. *Id*. at ROS001-043437-57. Wichtman, who was drafting the resolution for approval by tribal council, responded "[w]hich one do you want me to use?" Ex. 64 at ROS001-043435. It was left up to Martorello to decide on "BigPictureLoans.com," a domain name that he already owned. The following day, Wichtman presented a resolution for the creation of Big Picture, as well as approving its Articles of Organization and Operating Agreement. Ex. 65, Resolution # T2014-066.

The creation of Big Picture—before Martorello even communicated with Chairman Williams about the restructure—is significant to the *Breakthrough* factors addressing method of creation and purpose. Contrary to the story told to this Court and the Fourth Circuit, Big Picture was created as a "rebrand" after Red Rock "ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. Ex. 62 at ROS001-058409. And it was created at the insistence of Martorello, who urged the "forming ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id*. Put differently, the creation and its surrounding purpose was not the result of "years of knowledge and business acumen related to online lending," but rather an effort to rebrand the current product at the urging of Martorello.

     iv.    **In August 2014, Martorello makes first overture and conveys urgency to Chairman Williams, but LVD does not seem interested in the restructure.**

Martorello was also paying close attention to the litigation involving others industry, including cases filed against CashCall, Scott Tucker, and others.[20] Although the term of the Servicing Agreement was effective until December 31, 2018, Martorello knew the business model was at risk and the consequences would be severe. Ex. 55 at LVD-DEF00018129 (explaining the CFPB would go after "all revenue ever collected from consumers" and that "number" was "unobtainable by every investor combined."). On August 11, 2014, Martorello sent an email to Chairman Williams—not vice versa—"we're working on something" that "will have some talking points to go over about the concept for a potential bigger deal for LVD learning the Servicing business." Ex. 68 at LVD-DEF00020786 (emphasis added). Martorello suggested to start "with a phone call, and then if we're close you can come to Puerto Rico to finalize" the terms. *Id.*

On August 26, 2014, Martorello sent another email to Chairman Williams providing more details and stressing the urgency of the restructure. Ex. 69. He wrote that Bellicose wanted to "move quickly to transition the business into very capable hands." *Id.* at ROS001-048541. Martorello further explained that he had "to stress the urgency on [his] end" and "SPVI/BVI are looking to move very quickly on such an exit." *Id.* at ROS001-048541-2. Far from being the LVD's idea to restructure, he further noted that "rather than putting the business on the 'auction block' to the highest bidder," they were coming "exclusively to LVD," but it was "important that LVD knows that time is of the essence for SPVI/BVI in getting a sale done." *Id.* Martorello indicated

---

[20] Ex. 66 at Rosette_048497 (email from Martorello to Rosette in response to *CashCall* opinion, asserting "Let's zero in asap on minimizing my risk for being individually liable like CO just successfully did to Butch [W]ebb. . . . I don't want my company on anything that goes to the CFPB."); Ex. 67 (email to Wichtman about Tucker/AMG Services settlement with the Federal Trade Commission).

that he wanted to know "if LVD is interested or not interested," so they could "move as quickly as SPVI/BVI needs to so that we're not inadvertently disadvantaged." *Id*. At this same time, Martorello told Rosette: "If we can't reach terms with LVD to buy SPVI, then SPVI will be sold to another Tribe (likely Middletown).") Ex. 70.

Williams did not respond to Martorello's email that day, prompting Martorello to email Wichtman later that evening. He had not heard "anything back from the Chairman," nor did he get "any sense of excitement from anyone[.]" Ex. 29 at ROS001-045272. Instead, as far as Martorello knew, Tribal Council "only approved evolving the term sheet into something that would be reviewed later to ask questions about, and if approved, then it'd be binding." *Id*. He further stressed that there would be "a lot of legal details to go through" on the deal and "the seller will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid." *Id*. (emphasis added). Martorello made clear he did not want anything beyond cosmetic changes, explaining there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id*.

> **v.** **Following the Second Circuit decision, the parties decide "to go quietly into the night and restructure."**

On October 1, 2014, the need for cosmetic changes became urgent when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. The Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014). The court also observed that "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] … otherwise applicable to all citizens of that [State].'" *Id*. at 113 (quotations omitted).

After the Second Circuit issued its decision, Martorello wrote to Wichtman on October 10,

2014, urging her (as general counsel for LVD and Red Rock) to drop the case. Ex. 71 at ROS001-043659 ("I can't urge any stronger that LVD not proceed"). He indicated that "SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id*. Ultimately, Wichtman agreed and, as she explained in a subsequent email, their best option was to:

> **go quietly into the night and restructure** based on what we know from the opinion in order to build an even stronger case for future litigation.

Ex. 72 at ROS001_001130 (emphasis added); *see also* Ex. 73 at ROS001-044075 (Martorello proclaiming that he wanted "BPL to be born from the learnings of all 2nd circuit commentary[.]").

The parties started moving quickly to restructure the business—even though they had not reached an agreement in principle to the major terms, including the price to be paid. Among other things, Wichtman obtained a tax EIN for BPL on December 1, 2014. Ex. 74. On February 5, 2015, the Tribal Council adopted a resolution creating Ascension and designating Brian McFadden as its president. Ex. 75. Immediately following Ascension's creation, SourcePoint began assigning its contracts to Ascension—another sign that the restructure was not an arm's length transaction, but a façade designed to protect Martorello and his team. *See, e.g.*, Ex. 76. Similarly, Ascension designated McFadden and Simon Liang as the signatories on its bank account on February 19, 2015. Ex. 77. All of these steps—creation of Ascension, designation of McFadden as its president, assignment of contracts, adding signatories to bank accounts—were taken months before the parties entered into the Agreement and Plan of Merger dated September 14, 2015. Ex. 78.

Because Defendants' execution of the internal plan to destroy this evidence, it was not discovered until after the Defendants' motion had been decided and appealed. When examining the purpose factor, the Fourth Circuit then found that "the evidence does not support the district court's conclusion that the creation of the Entities was only or primarily intended to benefit

Martorello or that the creation of Big Picture and Ascension was solely the product of Martorello's

design and urging." *Williams*, 929 F.3d at 178 (emphasis added). Due to the destruction of

documents and discovery misconduct, the previous evidence available was confined to two emails:

(1) the January 2014 e-mail from Martorello regarding his concern about the CFPB and New York

enforcement actions; and (2) the August 2014 e-mail sent by Martorello asking Chairman Williams

for a time to discuss "a potential bigger deal for [the Tribe] learning the Servicing business." *Id*.

In other words, neither this Court nor the Fourth Circuit had the benefit of the extensive and direct

evidence above showing: (1) the creation of Big Picture was a rebranding at the urgence of

Martorello; and (2) the restructure was the product of Martorello's design and urging. When

considered alone and together, this new evidence (as opposed to the two e-mails in the record in

*Williams*), conclusively establishes that the restructure was "only or primarily intended to benefit

Martorello," and that it was a product "of his design and urging." *Williams*, 929 F.3d at 178.

**B. New evidence shows that the restructure was designed to maintain non-tribal control over operations while, at the same time, insulate Martorello's childhood friend and business partner.**

Contrary to Defendants' theme that the restructure would enhance LVD's ability to learn

the business, discovered evidence shows that it was designed to ensure—and required—the

Martorello team's continued control of operations. As Martorello explained to Wichtman, "the

seller will have to keep a final say so in business decisions to protect the business from being

destroyed by the new owner before paid." Ex. 29 at ROS001-045272. Martorello made clear he

did not want anything beyond cosmetic changes, explaining there was "[n]o need to reinvent the

wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks

with and do other things." *Id*. And while Hazen appears to have been originally uncomfortable

with the idea, Wichtman convinced her "to leave the org chart unchanged" and understood the

"importance of keeping status quo to ensure success!" Ex. 79 at 00135. And all of this came at the orders of Martorello, who insisted that "<u>the Bellicose Companies will be sold only 'as is', with existing Management in place and the company remaining substantially the same</u>." Ex. 80 at ROS001-040179; *id*. (explaining the business "needs to be run in the same format it is today.").

They maintained the status quo even though one of Rosette's lawyer identified the structure opened them up to rent-a-tribe arguments similar to "the current class action litigation pending in Vermont," *Gingras v. Rosette*. Ex. 81 at ROS001-043997. To avoid this, she wondered whether they needed "to put these things in writing." *Id*. Martorello insisted the term be in writing, saying it was "take it or leave it[.]" *Id.* at ROS001-043996. He further added that "Servicer comfort" was the "only way" that an important investor would "be involved." *Id*. From "their perspective," if LVD "was to cut SPVI out of the picture, then [it] simply cannot perform as a business." *Id*.

Consistent with this, Martorello explained in a different email before closing, BPL's "[l]enders care about the person who runs the business at AT." Ex. 14 at ROS001-043978. So long as the restructure documents were "clear that the position in question and under scrutiny to the lenders is President and CEO (Brian)," then it was ok. *Id*. And this is exactly what they did—BPL contractually relinquished the right to control operations to its "servicer," Ascension, who contractually relinquished the right to control its operations to McFadden. *See* Exs. 82 & 83. It all remained exactly the same except for one change: it was now ostensibly "structured to provide all entities sovereign immunity" per Martorello's desire. Ex. 50.

The structure was also designed to "insulate" McFadden. Ex. 30. As Wichtman explained, she and Matt "contemplated" in 2015 that "the co-managers would be named as Shelly and the Chairman in order to further insulate Brian as a tribal employee." *Id*. at ROS001-050593. This "co-manager insulate model," as labeled by Wichtman, would provide an extra layer of protection

for McFadden "as President." *Id*. at ROS001-050595. McFadden "would then have his duties defined by his position description, his contract and certain delegations of authority by the Co-Managers" to ensure control over the operations as needed by Martorello. *Id*. at ROS001-050593.

An email chain prior to closing further demonstrates that the restructure was a sham. This e-mail chain starts with an e-mail from John Williams, Bellicose's attorney, noting that Ascension's "Operating Agreement puts all the power in the hands of the Manager." Ex. 14 at ROS001-043978. John Williams added that the "office of President is not mentioned" and asked Wichtman "[s]houldn't Brian, as President, be the Manager of that sub?" *Id*. In response, Wichtman stated that she had not "looked at the AT docs in a while," but seemed "to remember Brian was appointed at Matt's direction as President but the Co Mrg[s] were still Shelly and the Chairman." *Id*. Wichtman further added "[c]ollateral is protected under the agreements not positions or people. What has changed?" *Id*.

In response to Wichtman's e-mail, Martorello explained that the enterprise's lenders "care about the person who runs the business at AT." *Id*. So long as the restructure documents were "clear that the position in question and under scrutiny to the lenders is President and CEO (Brian)," then it was ok. Martorello further wrote "**[a]s far as I know, the Manager's don't really do anything**." *Id* (emphasis added). In closing, Martorello explained that he would leave it up to John Williams on what the transaction documents "say if that jives, and what the authority is of BMF vs the Managers, **but if Managers are really only involved per the [operating agreement] to get feedback from the CEO/President**" then that seemed "OK." *Id*. (emphasis added). If the managers did "more than that" or the transaction documents "say the position of concern are the managers," then there was "some cleaning up to do" according to Martorello. *Id*. Two days after this exchange, John Williams e-mailed Wichtman a draft of the Delegation of Authority Policy to

ensure it was clear who had operational control. Ex. 84 at CW0001, Jan. 16, 2016 e-mail from John Williams. After a few minor edits, it was signed by Hazen and Williams on January 22, 2016. *Id*. at CW00009.

### C. Martorello retained control over McFadden through Eventide.

BPL claims that "[a]fter the acquisition was complete, Martorello's relationship" changed from "a consultant employed by Bellicose" to "a creditor as owner of Eventide." ECF 40 at 8; ECF 40-3 ¶ 22; ECF 38-5 ¶ 22. To that end, BPL asserts that Martorello "has no authority over Big Picture" and that he "had no involvement in any aspect of Big Picture's operations" since the acquisition. *Id*.; *see also* ECF 87 at 3; ECF 88 at 3. This is false and misleading. Understanding Martorello's continued authority over the business requires an understanding of the various, inter-related agreements crafted as part of the restructure. First, through the Intratribal Servicing Agreement, BPL relinquished to Ascension the right to control the vast majority of the responsibilities for its operations. Ex. 83. Ascension then contractually relinquished the right to control its operations to McFadden, Martorello's childhood friend and business partner.[21] Under the Delegation of Authority Policy, Ascension delegated to McFadden the authority to handle Ascension's "strategic direction, goals and targets," and over "all matters necessary for the day to day management of Ascension." Ex. 82 at § 1.4(a)-(e)). And while Hazen and Williams' authority to appoint the president seems to provide some control, the Loan Agreement neutralizes this power because it requires Hazen and Williams to obtain approval from Martorello (albeit via Eventide) to replace McFadden. Ex. 86.

Martorello created a check on McFadden's power through Eventide's operating agreement,

---

[21] Ex. 5, Martorello Dep. at 94:20-22 ("A. I've known Brian McFadden from riding bikes in the fourth grade."); Ex. 85 (showing McFadden owned shares in Bellicose).

which allows him to revoke McFadden's shares with 14-days' notice. Ex. 87 at § II(I). Martorello considered wielding this power in August 2016 as evidenced by a text message exchange with his brother, another former officer of Bellicose and now owner of Eventide. Ex. 79 In this text exchange, Martorello expressed concern that "Brian [McFadden] and James [Dowd] are getting too big for their britches." *Id.* at 00157. He further explained that "they see monthly wires and are starting to think they deserve a lot more of it now than the $1mm a year Brian makes for being a hired CEO." *Id.* Martorello wrote that McFadden "may have to be disappointed somewhere down the near term road," as "he's not the founder and $1mm a year buys a lot of very capable replacements." *Id.* Put differently, even after the sale, Martorello remained in control through this ability to remove McFadden, albeit by revoking his shares and equity in Eventide.

## III. To bolster the appearance of a legitimate transaction, Defendants materially misrepresented the value of Bellicose and the acquired assets.

*Value of Bellicose*. The Defendants have made material misrepresentations about the value of Bellicose, such as that it "was valued at just over $100 million" at the time of the sale. *See Galloway I*, ECF 40 at 7. Unsurprisingly, they did not cite any evidence to support this assertion, which is directly contradicted by a significant number of documents showing that Bellicose had little, *if any*, value at the time of the merger and closing. And at the oral argument before the Fourth Circuit in *Williams*, the Tribal Defendants asserted "there has been no suggestion and certainly no evidence and no finding that the Tribe somehow paid too much for" Bellicose.[22] They made a similar representation in their Fourth Circuit reply brief. *See* Ex. 9 at 12 ("There is no evidence the purchase price exceeded the value of the assets acquired."). While unavailable in *Williams*, there

---

[22] Fourth Circuit Court of Appeals, Oral Argument/Listen to Oral Arguments, Opening Argument of William Hurd, Audio File at 4:47-4:55, http://www.ca4.uscourts.gov/OAarchive/mp3/18-1827-20190507.mp3.

is now an abundance of evidence showing that the Tribal Defendants misrepresented the value of the business, which was worthless as it was about to be shutdown.

For example, in an email dated **October 2, 2015,**[23] Martorello provides his thoughts on "FMV vs. FV" of Bellicose, i.e., its fair market value v. future value. Ex. 88. Explaining his certainty in the business' low fair market value, Martorello provided 11 points, including "1) the Tribe is buying it b/c our contract gets terminated and they want this to continue[,] 2) Operation Chokepoint is a risk for SPVI owners but not for the Tribe[,] 3) All lawsuits against Servicers is removed from the equation for the Tribe to lose us… 7) They risk that they lose their debt investors if we go away, this deal keeps debts investors comfortable to remain, whereas they'd leave if a new vendor replaced us… 10) IN THE UNLIKELY EVENT that the CFPB rule doesn't take them down, then they pay as they go via a Seller financed deal rather than taking risk. . . ." *Id*. at LIONT_09845-6 (emphasis in original). Martorello further added "there is the risk that we get shut off from banking immediately (or the Tribe does) and we suffer catastrophic damages even worse than CFPB rule." *Id*. at LIONT_09846.

Similar e-mails reinforce the same core point. For instance, Martorello sent a similar e-mail to a business valuation firm on December 5, 2015, *i.e.*, about six weeks before the closing. Martorello's email explained that "efforts would be attempted by [s]tate governments to shut down tribal lenders (and are being attempted in fact)." Ex. 89 at Martorello_009775. One of those was an action filed by the Pennsylvania AG, which Martorello characterized as "the most significant issue/risk to SPVI" as "PA could bring the same claims against SPVI for sure." *Id*. He further added that Red Rock had already "received threats from several state AGs demanding they stop lending or they will come after them." *Id*. In addition to attorney general threats, the NYDFS has

---

[23] The Agreement and Plan of Merger was signed on September 14, 2015. *See* Ex. 79.

"issues too" with tribal lending "and they could go after SPVI as well." *Id*. In conclusion, Martorello encouraged the firm to include all "of the support you can that says CFPB rule <u>will shut this business down</u>, and how operation choke point is hurting everyone." *Id*. (emphasis added).

In another e-mail, Martorello wrote once again that "[i]t was estimated that the industry would be wiped out in Feb 2014 by the new CFPB, and/operation chokepoint tactics." Ex. 90 at Martorello_011446. Martorello further explained that "[a]ccurately enough, the clients lost the ability to debit borrower bank accounts in January 2014" and they "made no loans for many months after out of fear banking would be fully cut off for good." *Id*. Consistent with this, Martorello sent a similar e-mail to the President of the Online Lender's Association ("OLA"), asking for a simple report "that justifies a position I have taken on the industry in a valuation study." Ex. 91 at OLA_0000020. That position, as Martorello explained, was that "Servicing of Tribal Lending will be shut down from new loan originations and forced into orderly liquidation mode (at best)… as a result of two factors: 1) CFPB (new rule or otherwise)" and "(2) Operation choke point (in this case that terms includes AG lawsuits like VT/PA v. Think [Finance].")". There are multiple other emails reiterating this position that the tribal lending would be shut down.[24] All of this evidence blatantly contradicts the Defendants' claim that "Bellicose was valued at just over $100 million" at the time of the sale, as well as similar representations to the Fourth Circuit. *See* Ex. 9 at 12.

*Value of Assets*. The material misrepresentations are further apparent if one considers the specific "assets" involved in the transfer according to the Defendants, who have identified four assets acquired by the sale: (1) intellectual property, (2) goodwill, (3) existing data, and (4)

---

[24] *See also* Ex. 92 at LIONT_05387 ("Lawsuits by AGs and regulators against SPVI, myself, or the client (as the reports and cases filed to date against competitors supports) may end the business or seriously shrink the business"); Ex. 93 at MARTORELLO_011671 ("we thought (and data supported) 'end of days in 2015'" because of Operation Chokepoint).

software. Ex. 48, Hazen Declaration at ¶ 20.[25] Defendants never attempt to place a value on any of these "assets," and for good reason. These assets were (1) something the Tribe already owned (the intellect property), (2) something that had no value (the good will), (3) something licensed from a third party (the software), and (4) something the Tribe should have had access to (the data).

The first asset "intellectual property" was already owned by the Tribe. As Martorello detailed in an email to a tax professional: "**About IP**: The client/Tribe often argued with me that they view all of the IP and data as their property. They strongly believed that SPVI was paid to create the IP for them, and to facilitate them using it. Early on, I agreed with their position, but in 2014 I argued the opposite to that (as I wanted to sell the business, it felt pretty pertinent)." Ex. 90 MARTORELLO_011445 (bold in original; underline added). Martorello further noted, "[n]ow, reading the contracts" it is "very clear" that "SPVI [was] hired for the service of creating all of the business methods for the Tribe" and it is "pretty clear that the Tribe was correct" and the "IP created to service their business, was always their property." *Id*. (emphasis added); *id*. ("I am of the opinion that the only IP of any relevance was the [servicing] contracts with the [tribal] clients.").[26] Because the intellectual property was "always" the Tribe's property, it is materially misleading to suggest it purchased it as part of the sale.

Martorello's email further shows that the second asset, the goodwill, did not exist. As Martorello explained: "I'm not sure there could have been any GW [i.e., good will], since this was

---

[25] Exhibit 1 is Hazen's declaration from *Williams*; Exhibit 48 is her declaration from *Galloway*. Notably, Hazen's declaration from Williams never identified intellectual property as one of the items acquired by the merger. Ex. 48 at ¶ 20.

[26] Among the many others, this email shows that Martorello is willing to change his position on a whim, including on significant matters. This practice has continued before this Court, including in his declaration which falsely claims "Since the beginning of my relationship with LVD, I understood that LVD had always intended to utilize my consulting services to assist them to build their valuable IP. . . ." Ex 8 at ¶ 47.

1 contract/client business (1 tribe with 2 portfolios) and <u>there was no public face at all to the</u> <u>business (i.e. no reputation value)</u>." *Id*. (emphasis added). This was part of the design—no one was supposed to know about Martorello's involvement in operations. Ex. 53 at ROS001-052787 (email from Martorello complaining that he was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims.").

So that leaves the "existing data" and "software." Ex. 48, Hazen Declaration at ¶ 20; *see also* Ex. 1 at ¶ 6. But since Bellicose was a "1 contract/client business," any existing data should have been the Tribe's in the first place. In other words, if Red Rock was the lender and made all final decisions as posited, it would have no reason to acquire the servicer's existing data; it's the lender's data which is used by the servicer. That just leaves software, but there is no evidence that Bellicose developed or owned any software to transfer to the Tribal Defendants. Rather, like any other servicer, SourcePoint used loan management software; it did not own it.[27] Thus, even ignoring the direct evidence regarding Martorello's business being on the brink of shutdown, the math does not even come close to adding up to $100 million.

## IV. The Tribal Defendants and Martorello misrepresented that "cost savings" was the impetus behind the merger.

The Tribal Defendants claim that they "acquired years of knowledge and business acumen related to online lending," and "had the expertise to begin in-housing services that were previously provided by outside vendors" like Bellicose. ECF 40 at 6; ECF 38 at 5; *see also* Ex. 1 ¶ 13 ("LVD looked to expand its online lending business to earn more money for LVD[.]"). To that end, the Corporate Defendants claim that the acquisition of Bellicose enabled them to bring "'in-house'

---

[27] *See Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-461 (E.D. Va.), ECF 480-1 (certification from Big Picture's third-party loan software management company regarding its preservation of the loan data).

many of the activities… resulting in significant cost savings and efficiencies." ECF 40 at 7; *see also* ECF 38 at 15 (arguing that Ascension enhances self-sufficiency because it is "a below-cost service provider," which "in turn generates more profit for LVD."); Ex. 33, Hazen Dep. at 63:3-6.

That cost savings, according to Defendants, resulted in a decrease of "approximately $1.4 million per month on outsourced services," to spending "on average "$224,262.71 per month through its relationship with Ascension." *See Galloway I*, ECF 38 at 22. In other words, the Defendants claim that "$1.2 million saved per month is more profit to LVD." *Id*. That is simply untrue.  Rather than paying for "outsourced services," BPL is paying the same amount to Eventide as a creditor. And it still receives a percentage of the gross revenue. Because the LVD's income is based on gross revenue, it did not matter whether Ascension generated a savings to Big Picture Loans. Eventide and, thus, Martorello are receiving 100% of the "savings."

Even putting these misleading statements aside, it is false to assert that Ascension is "a below-cost service provider." ECF 38 at 15. In reality, the new contract requires BPL to pay "110% of the hourly salary costs" for Ascension's employees. Ex. 83 at § 3.4. Additionally, the restructure contemplated "a bonus plan" of "no more than 150% of employee wages[.]" *Id*. Consistent with this, McFadden went from making $171,285.00 at Bellicose to $265,000.00 at Ascension. *Compare* Ex. 85, *with* Ex. 94. Similarly, James Dowd and Simon Liang's salaries increased by $60,000.00. *Compare* Ex. 85, *with* Ex. 94. Far from "saving" by bringing these services "in-house," the lending business is now paying *more* for the *same* services provided by Bellicose.

And there is a reason why they did this. As Martorello explained: Bellicose's employees were "frightened about the deal already" and "keeping these employees" was "vital to not have a mutiny on [their] hands." Ex. 95 at ROS001-040216. In a similar email, Martorello explained that there needed to be continued separation because "the PR effect of hiring on (existing or new) very

47

**JA806**

talented/vested career professionals who will understand they risk being labeled by peers as working for some 'illegal' lender is a major handicap on the organization, as opposed to working for a cutting edge tech/analytics shop that is more protected from the biased media." Ex. 80 at Rosette040179.[28] Thus, to ensure that they could incentivize employees to continue to work for the illegal lending enterprise, the transaction required Big Picture to pay an increased cost.

## V. An adverse inference should be drawn against Martorello, who destroyed relevant evidence such as his emails.

"Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995). "As a general proposition," a district court has "broad discretion" to impose "adverse inferences from a party's failure to present evidence, loss of evidence, or the destruction of evidence." *Id*. at 156. Although it exists here, a finding of bad faith "is not always necessary." Id. (citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993)). "To draw an adverse inference from the absence, loss or destruction of evidence, it would have to appear that the evidence would have been relevant to an issue" or "would naturally have been introduced as evidence." *Id*. at 156.

An adverse inference should be drawn against Martorello at this posture because after the acquisition, Martorello's emails were intentionally destroyed when he knew or should have known of litigation. *Williams v. Big Picture Loans, LLC*, No. 3:17-CV-461, 2019 WL 1983048, at *15 (E.D. Va. May 3, 2019) (discussing the destruction of Martorello's emails). As reflected by the documents recently obtained from third parties, Martorello's old emails are highly relevant to many issues in this case and would have been used as evidence. And one important category has

---

[28] Even though it was his concept to keep the "lender" and "servicer" separate, Martorello's declaration falsely claims that "[n]either I nor any company I own or manage directed or controlled the creation of Ascension." Ex. 8, Martorello Decl. at ¶ 68.

been completely lost: Martorello's emails with the other officers and directors of Bellicose/SourcePoint. When considering the statements made to outsiders of his companies, it naturally follows that Martorello was speaking more candidly with insiders, such his brother.

**VI. Martorello's conduct since the settlement with the Defendants unmasks the truth.**

Martorello's sham claim that Eventide is a "mere creditor" for the Tribal Defendants was entirely dropped when the Tribal Defendants settled. Upon that settlement, Martorello moved to assert the actual control he intended and had to that point covertly exercised. The Tribal Defendants could not dare settle without his permission. By letter dated December 12, 2019, Eventide's counsel asserted that the Tribe or its affiliated entities are in material breach of their obligations to Eventide. Ex. 96. Specifically, Eventide claims that it has numerous controls and related rights to oversee the business operations based on the terms of the subject Secured Promissory Note, the Loan and Security Agreement, and the Parental Guarantee. *Id*. at 3–12.

On December 16, 2019, Eventide demanded arbitration, claiming that the tribe-affiliated companies are in default of the loan agreement. Ex. 97. In the demand for arbitration, Eventide asserts its right of control over the Tribal Defendants' "business model" and "[lending] product and business polic[ies]." *Id*. at 12, 18, 22, 25-26. Due to the Tribal Defendants' failure to operate in its best interest and subject to agreed controls, Eventide claims that the Tribal Defendants are in breach of their fiduciary duties. *Id*. at 17, 21-22.

The next day, in another attempt to exert his control, Martorello through Eventide sued the Tribal Defendants in the Western District of Michigan seeking a temporary restraining order to stay the settlement in this Court. *Eventide Credit Acquisitions, LLC v. Big Picture Loans, LLC*, No. 2:19-cv-00256-JTN-MV, Dkts. 1, 5 (W.D. Mich. Dec. 17, 2019). Two days later, on December 19, the Michigan court denied Eventide's motion for temporary injunctive relief. *Id*., Dkt. 14

(W.D. Mich. Dec. 19, 2019).  In its ruling, the court acknowledged that the loan agreement "attempts to place strict requirements on [Tribal] Defendants' conduct of their business," but Eventide failed to prove any of the requisite elements in support of the TRO.  *Id.*, Dkt. 14 at 3.

On December 18, 2019, Eventide moved to intervene and to object to the terms of the settlement, claiming the settlement would breach the Tribal Defendants' "fiduciary obligations" to maximize the recovery to Eventide and "would result in an improper subordination of Eventide's superior rights and interest." *Galloway v. Williams*, No. 3:19-cv-470, Dkt. 43-1 (E.D. Va. 2019). And seeking to revisit their rights and control over the lending operation, Martorello even had his company Eventide file a Chapter 11 bankruptcy and related adversary proceeding, seeking to stay the settlement pending in this Court as well as extend the stay of all litigation against Martorello and his affiliates.  *Eventide Credit Acquisitions, LLC v. Big Picture Loans, LLC*, No. 20-04008-elm (N.D. Tex. Bankr. Jan. 29, 2020).

Each of these positions directly contradicts the position Martorello has taken up to this point in this litigation, *i.e.*, claimed passivity as a creditor to, and LVD's supposed full control of, the lending scheme. As Rosette pointed out in his letter to Eventide's counsel on December 13, Eventide's efforts to "unduly exert control of Big Picture" demonstrate that it is "seeking to act as the *de facto* lender." Ex. 98 at 1. With Martorello "representing himself as an [Eventide] decisionmaker," their attempts to undermine the settlement demonstrate "Mr. Martorello's efforts to control Big Picture's business, which will certainly prove detrimental to his existing legal challenges." *Id.* at 2. Rosette also forecasted that the "exercise of the remedies Mr. Martorello seeks will . . . expose your client to a civil RICO claim." (*Id.* at 1.)

Respectfully submitted,

Date: June 17, 2020

_____/s/_____
Kristi C. Kelly, Esq., VSB #72791

Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

E. Michelle Drake
John G. Albanese
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
Email: emdrake@bm.net
Email: jalbanese@bm.net

Beth E. Terrell
Jennifer Rust Murray
Elizabeth A. Adams
TERRELL MARSHALL LAW GROUP PLLC
Email: bterrell@terrellmarshall.com
Email: jmurray@terrellmarshall.com
Email: eadams@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, WA 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*

**JA810**

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.

_____/s/_____
Kristi Cahoon Kelly (VSB# 72791)
KELLY GUZZO, PLC
3925 Chain Bridge Rd, Suite 202
Fairfax, VA 22039
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| LULA WILLIAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-cv-461 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| RENEE GALLOWAY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:18-cv-406 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MATT MARTORELLO'S RESPONSE TO
PLAINTIFFS' STATEMENT OF POSITION (ECF NO. 784)**

Matt Martorello respectfully responds to Plaintiffs' Statement of Position regarding

purported Material Misrepresentations and Omissions Made to the Court (ECF No. 784).

The Fourth Circuit's decision in *Williams* was guided by "the policies underlying tribal

sovereign immunity and its 'connection ***to tribal economic development***, and whether ***those***

***policies*** are served by granting immunity to the economic entities.'" *Breakthrough Mgmt. Group,*

*Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010) (emphasis added)

(citing *Dixon v. Picopa Const. Co.,* 772 P.2d 1104, 1111 (Az. 1989) ("***Tribal immunity should***

***only apply when*** doing so ***furthers*** the federal policies behind the immunity doctrine.")

(emphasis added)). "Those policies include protection of the tribe's monies … ***as well as***

'preservation of tribal cultural autonomy, preservation of tribal self-determination, ***and***

**JA812**

*promotion of commercial dealings between Indians and non-Indians*.'" *Id.* (citing *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987), and quoting *Dixon,* 772 P.2d at 1111) (emphasis added)). The Fourth Circuit in *Williams* determined this so-called "sixth" factor was in reality "too important to constitute a single factor and will instead inform the entire analysis." *Williams v. Big Picture Loans LLC*, 929 F.3d 170, 177 (4th Cir. 2019). Its decision expressly sought to "further" the activities of the Tribal Entities, leaving any restriction on the Tribe's sovereignty as a question for Congress. This rings a death knell to Plaintiffs' claims—not only as against the Tribal Entities, but also against ***all*** Defendants, given the federal policies that require the Court to promote the Tribe's legitimate efforts to advance its economic development.

Aware of this reality, Plaintiffs resort to allegations of misrepresentations as their last resort. But their attempt to unwind the Fourth Circuit's holdings in *Williams* by pointing to purportedly "new" evidence showing alleged "misrepresentations" fails, for many reasons. First, Plaintiffs' brief represents an improper collateral attack on the binding holding of a federal Circuit Court of Appeals with no basis in law. Second, the alleged misrepresentations have no legal relevance on the Fourth Circuit's holdings in *Williams* and their determination of the *Breakthrough* factors—the specific focus of this briefing as the Court ordered. Third, the allegations Plaintiffs raise are not new: in many instances, Plaintiffs have had the evidence and/or known about the issues raised in their brief before the Fourth Circuit issued its decision in *Williams*, yet failed to raise the issues with the Fourth Circuit in briefing, at oral argument, or in a motion for reconsideration. Indeed, the Parties have already briefed these same, stale issues in not one, but two rounds of briefing in both this case and the *Galloway* litigation. Finally, on the merits, the alleged "misrepresentations" by Martorello on which Plaintiffs' rely are in fact truthful and accurate statements. Far from showing any material misrepresentations, the "new"

**JA813**

evidence Plaintiffs identify only confirms the truth of Martorello's previous statements.[1] For all of these reasons, the Court should reject Plaintiffs' attempts to unwind the Fourth Circuit's holding, award Martorello his fees and costs incurred in responding to Plaintiffs' outlandish allegations, and proceed to trial with all possible haste.

## I.   INTRODUCTION

Plaintiffs suggest "the Fourth Circuit's opinion does not help Martorello regardless of any misrepresentations," because "[t]he court was grappling with whether Big Picture and Ascension benefitted from tribal sovereign immunity, nothing else." ECF No. 784 at 2. This is plainly false. As addressed in the parties' briefing on the effect of *Williams* on Plaintiffs' Motion for Class Certification (*see* ECF Nos. 734, 781), the same policy considerations that led the Fourth Circuit to determine the Tribal Entities are entitled to sovereign immunity require the Court to leave space for the sovereign's legitimate operations, and to facilitate and encourage the Tribe's efforts to advance its economic development. *See* ECF No. 781 at 5. Plaintiffs' claims are simply incompatible with the purposes and objectives of Congress and fundamental aspects of Tribal sovereignty that compelled the Fourth Circuit's holdings.

Apparently recognizing the impact of *Williams* on their claims, Plaintiffs try to make an end run around the holdings by arguing that various alleged misrepresentations render the decision non-binding. ECF No. 784 at 3–4. This contention is audaciously improper. The conclusions of a Court of Appeals are binding, not only upon a district court but even upon

---

[1] Notably, Martorello's positions have been seriously handicapped by the limitations of Tribe's jurisdictional discovery being limited to January 1, 2014 and after.

Even if Plaintiffs had a basis to continue to contest the truth of Martorello's statements, that would at most raise an issue of fact for a jury, not this Court to decide, assuming any such factual disputes are material to the merits. This is all the more reason why this case, already long overdue for resolution, should proceed to trial as soon as possible.

another panel of the Court of Appeals, "unless and until it is reconsidered *en banc*." *Warfaa v. Ali*, 811 F.3d 653, 661 (4th Cir. 2016) (quoting *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 642 (4th Cir. 1975)). If Plaintiffs believed that any portion of the *Williams* decision is or could have been impacted by these purported misrepresentations, they should have presented them to the Fourth Circuit in a motion to reconsider. They chose not to. Instead, they ask this Court to disregard the Fourth Circuit's decision, which they know it cannot do.

Plaintiffs' venture is also notable for its dearth of substantive discussion of how these purported misrepresentations impact *Williams* and its holdings. The Court expressly instructed Plaintiffs to show how these alleged misrepresentations affect "the extent to which the Fourth Circuit's decision is binding on this Court in deciding Plaintiffs' claims against Defendant Matt Martorello." ECF No. 730 at 2.[2] Yet Plaintiffs did not even try to do this. Plaintiffs cite to *Williams* on all of three pages of their entire fifty-page brief. *See* ECF no. 784 at 2, 37–38.[3] What's more, the first citation, on page 2, merely argues that *Williams* has no application no matter what the Court thinks of the alleged misrepresentations. In other words, Plaintiffs themselves admit that the alleged misrepresentations are immaterial.

In fact, Plaintiffs did not even bother trying to bring these alleged misrepresentations to the Fourth Circuit's attention until after oral arguments, during which the Fourth Circuit's criticisms of Plaintiffs' theories left no question as to what the outcome of the case would be. Immediately thereafter, Plaintiffs scrambled to identify purported misrepresentations and

---

[2] Martorello is also mindful of the Court's instruction to focus on the precise, specific statements by Martorello Plaintiffs claim are misrepresentations. To the extent Plaintiffs raise other issues, or claim statements by others constitute misrepresentations, Martorello addresses them briefly.

[3] Their brief is not unique in this respect. As noted in Martorello's Reply brief (ECF No. 781), Plaintiffs' brief on the effect of *Williams* gave the decision no discussion at all outside the first few pages. Plaintiffs plainly wish to direct the Court's attention away from *Williams*.

JA815

presented them not to the Fourth Circuit, but to *this* Court. The only mention of these alleged misrepresentations to the Fourth Circuit came in a letter Plaintiffs sent on June 4, 2019—after oral arguments, but before the decision was issued on July 3, 2019—alerting it of this Court's May 29, 2019 Order and asserting that discovery had uncovered "significant new and important" evidence "that raises substantive doubts about the accuracy of evidence presented in this case and the *Williams* case by the Corporate Defendants and Martorello." *See Williams*, 18-1827, Dkt. No. 125-1.[4] Plaintiffs requested that the Fourth Circuit "consider remanding to allow the district court to re-evaluate that decision in light of any new and relevant evidence." *Id.*[5] The Fourth Circuit declined to take the bait (and so should this Court), instead remanding "with instructions to grant the Entities' motion to dismiss for lack of subject matter jurisdiction." 929 F.3d at 185. Even then, Plaintiffs could have moved to reconsider, even if to do nothing more than request, once again, to remand with instructions to evaluate the purported "new and relevant evidence"— but they did not. Given that choice, it is all the more improper to ask this Court to disregard the controlling holdings of the Fourth Circuit.[6]

---

[4] Plaintiffs suggested that the scope of the evidence embraced "(1) the genesis of the tribal lending arrangements; (2) the creation and structure of the Corporate Defendants, including the sale and merger transactions that were involved in the corporate restructuring; (3) the role of Rosette, LLP and its leader, Rob Rosette, in the sale and merger transactions involved in the corporate restructure; and (4) the value (or lack of value) of the key asset (Bellicose Capital, LLC) involved in the corporate restructuring." *See Williams*, 18-1827, Dkt. No. 125-1. These are the same topics addressed by the purported misrepresentations Plaintiffs identify in their brief.

[5] Martorello made multiple efforts to correct Plaintiffs' false accusations, particularly insofar as they were directed at him. *See, e.g., Williams*, 18-1827 ECF No. 78-2 at 9 n.2.

[6] Plaintiffs' stratagem contrasts starkly with *Souter v. Equifax Info. Servs. LLC*, 299 F.R.D. 126 (E.D. Va. 2014). There, the Fourth Circuit "explicitly requested a new 'rigorous analysis' under all Rule 23(a) factors." *Souter v. Equifax Info. Servs. LLC*, 307 F.R.D. 183, 191 (E.D. Va. 2015). As part of that new analysis, a party submitted a new affidavit, attesting to certain facts (some of which had been presented to the Court before the appeal) based on personal knowledge—yet the party later acknowledged in deposition that his attestation of personal knowledge was false. The Court, acting on the Fourth Circuit's instruction to perform the

*Footnote continues….*

Plaintiffs' audacity is surprising—but less so as one reviews the alleged misrepresentations in the context of the *Williams* decision. *Williams* found that Big Picture and Ascension were arms of the LVD tribe based on its analysis of the *Breakthrough* factors: method of creation, purpose, control, intent, and financial relationship, as well as the policy purposes of promoting tribal self-government. For the alleged misrepresentations to have any effect on *Williams*'s applicability, they would have to somehow call into question the Fourth Circuit's holdings on these factors. They do not. In almost every instance, the alleged misrepresentation goes to a factual allegation immaterial to the basis of the Fourth Circuit's holdings. Often, the "new" information Plaintiffs claim expose the alleged misrepresentation is not "new" at all: it either was or could have been presented to the Fourth Circuit (and even this Court) before they made their respective decisions. Above all else, in every case in which Plaintiffs claim to have uncovered a material misrepresentation, the claim is simply false. Indeed, Martorello and the Tribe have already, in other briefing, disproven most of Plaintiffs' allegations about these purported misrepresentations, which fail upon even superficial scrutiny of the underlying evidence.[7]

The Court should reject Plaintiffs' overtures and give *Williams* its binding effect as it is

---

analysis anew, determined to apply the class certification factors anew, based on the new record and excluding facts from the stricken affidavit. Here, by contrast, the Fourth Circuit gave no leave for renewed review of its holdings and in fact rejected Plaintiffs' letter requesting it do so; instead, it simply mandated that its holdings be applied.

[7] *See*, *e.g.*, Matt Martorello's Response to Plaintiffs' Statement of Position Regarding Purported Material Misrepresentations, 3:18-cv-00406-REP, ECF No. 272 ("*Galloway* Brief"); Tribal Defendants' Statement of Position Regarding Plaintiffs' Claims of "Material Misrepresentations" 3:18-cv-00406-REP, ECF No. 271 ("Tribal Br."); his Motion for Reconsideration and Reply in Support, ECF Nos. 487, 545, and supplemental exhibits thereto, ECF No. 505; Eventide and Martorello's Response to Plaintiffs' Purported "Additional Evidence," ECF No. 589; his Motion to Strike, ECF No. 678; and all exhibits to these briefs. Martorello adopts these briefs and exhibits here by reference, as permitted by Fed. R. Civ. P. 10(c).

JA817

bound to do. The Court should also strike the hearing, award Martorello his fees and costs for having to respond to Plaintiffs' baseless arguments, and proceed to trial as soon as possible.

## II.   ARGUMENT

The Fourth Circuit analyzed arm-of-the-tribe immunity using the first five *Breakthrough* factors, including: (1) the method of the entities' creation; (2) their purpose; (3) their structure, ownership, and management; (4) the tribe's intent to share its sovereign immunity; and (5) the financial relationship between the tribe and the entities. *Williams*, 929 F.3d at 177 (citing *Breakthrough*, 629 F.3d 1173). As noted above, it also considered the "sixth factor" of whether immunity advanced federal policies of promoting Tribal self-governance.

In this brief, Martorello reviews each and every statement of Martorello that Plaintiffs claim to be a misrepresentation. Without exception, Plaintiffs' allegations of misrepresentations (1) are immaterial to the *Breakthrough* factors, and are thus irrelevant to the Court's analysis; (2) grossly misstate the evidence; or (3) both. Thus, Plaintiffs identify not one misrepresentation that in any way affects the scope or impact of *Williams*.

Moreover, a comprehensive assessment of all alleged misrepresentations makes clear that Martorello has been consistently and entirely truthful in his testimony. Rather, it is Plaintiffs who have taken unwarranted liberties with their factual representations to the Court. Given this record, Plaintiffs' allegations are misleading and vexatious, and warrant an award of fees.

**A.    The Statements in Question are Irrelevant to the Fourth Circuit's Application of the *Breakthrough* Factors.**

Even a casual review of Martorello's statements shows that they have little to no bearing on the *Breakthrough* analysis conducted by the Fourth Circuit. In any event, stripped of Plaintiffs' sleight of hand, the record shows that the statements are in fact accurate and truthful.

*1.   Plaintiffs Fail to Show any Alleged Misrepresentations Materially Affected the Fourth Circuit's Evaluation of the "Method of Creation" Factor.*

**JA818**

On the first *Breakthrough* factor—method of creation—the Fourth Circuit left no room to contend that the factor weighs in any direction except in favor of sovereign immunity. As *Breakthrough* directed, the Fourth Circuit focused "on the law under which the entities were formed" and acknowledged it is "undisputed that Big Picture and Ascension were 'created under tribal law.'" *Williams*, 929 F.3d at 177 (citing *Breakthrough*, 629 F.3d at 1191–92). That is because "Big Picture and Ascension were both organized through resolutions by the Tribe Council, exercising powers delegated to it by the Tribe's Constitution, and the Entities operated pursuant to the Tribe's Business Ordinance." *Id.* The Fourth Circuit therefore determined that the method of creation factor "weighs in favor of tribal sovereign immunity for both Entities." *Id.*

Of the alleged misrepresentations Plaintiffs identify, few even arguably touch on the method-of-creation factor; none have any impact on the Court's analysis. For example, Plaintiffs assert that "Defendants"—not Martorello—"misrepresented the circumstances surrounding the formation of Big Picture" by contending it "was created to be an online lending business in order to bring revenue to LVD." ECF No. 784 at 33 (citing ECF No. 40-3 (Hazen Decl.)). Plaintiffs assert that ***Hazen*** "lied under oath" by saying it was the Tribe's "idea" to "create Big Picture Loans," that "LVD created Big Picture Loans" in August 2014, and that a "group discussion" led to picking the name. *Id.* at 33–34.[8] In reality, Plaintiffs claim, "Martorello created Big Picture Loans at least a year before LVD supposedly created/formed Big Picture." *Id.*

This assertion misconstrues the facts: Martorello sold the ***name*** "Big Picture" to the Tribe, not the ***entity itself***. Prior briefing has already exposed Plaintiffs' attempted deceit:

---

[8] Plaintiffs' attempt to attribute alleged misstatements of other Defendants to Martorello is a recurring theme of their brief. This usually comes in the form we see here, where Plaintiffs broadly discuss statements of "Defendants" even though the alleged misstatement was in fact made by someone else—but in at least some instances they openly attribute to Martorello statements of other individuals.

There is no other way to say it than that the Tribe created the lending entity, Big Picture. The company was created under Tribal law by act of the Tribe, through the efforts of its counsel. Ex. 15 at Resolution #T2014-066 (Aug. 26, 2014). Plaintiffs' claim to the contrary is another bit of deception. The Tribe created the legal entity, Big Picture, but did not originate the name, "Big Picture." The domain name and trade name were acquired from Martorello, in whose hands the name sat, among others, in reserve. This decision to obtain the name from Martorello was part of the decision by the Tribe to change the business by using a new name and a new image as of the creation of Big Picture. Ex. D-11 at p. 33:15-18. Plaintiffs' argument is a non sequitur. The Tribe created a tribal lending entity to be an arm of the tribe and bought a domain name, i.e., Big Picture, plain and simple.

Tribal Br. at 32. Martorello's previous rights to the **name** do not change the fact that the ***entity itself*** was organized through resolutions by the Tribe Council, and under the Tribe's Business Ordinance. *Williams*, 929 F.3d at 177.

For similar reasons, Plaintiffs err when they assert that Martorello's declaration was misleading or false in stating that neither he nor any company he owns or managed "directed or controlled" the creation of Big Picture or Ascension fail. ECF No. 784 at 33–34, 49 n.28 (citing Martorello Decl. ¶¶ 67–68). These assertions appear to be based on a document showing that he "suggested" forming a new entity—work that Bellicose would "gladly facilitate," ***but only after*** the entity was "formed and approv[ed]." ECF No 784 at 34 (citing Pl. Ex. 62) (emphasis added). The very evidence Plaintiffs cite show that neither Martorello nor his companies "directed or controlled" the creation of Big Picture or Ascension; in fact, since he was not a member of the Tribal council, that would have been a legal impossibility. The evidence is clear that the creation of Big Picture was proposed, and executed, by the Tribe. *See, e.g.*, Ex. B (LVD Resolution No. 2014-066 (Aug. 26, 2014)) (forming BPL under Tribal law by act of the Tribe, through the efforts of its counsel); Ex. C (James Williams, Jr. 11/13/2017 Dep.) at 78:2–5 ("Q: Who created BPL? A The Tribe. Q And whose idea was it to create BPL? A It was the Tribe, the business and Tribal Council."); *see also* Ex. D (Rosette 6/29/2020 Dep.) at 182:8–17 (explaining that " ████

JA820

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ ").[9]

More importantly, Plaintiffs' assertion that whatever role Martorello may have played in the creation of Big Picture and Ascension is significant to the *Breakthrough* factor addressing method of creation (ECF No. 784 at 34) is just wrong. The Fourth Circuit, in evaluating the "method of creation" factor, gave no thought to whether non-Indians had any role in the entities' creation. Indeed, federal law expressly urges outsiders to support tribes with ideas for branding or potential business structures. Instead, the Fourth Circuit focused exclusively on the fact that "Big Picture and Ascension were both organized through resolutions by the Tribe Council, exercising powers delegated to it by the Tribe's Constitution, and the Entities operated pursuant to the Tribe's Business Ordinance"—in other words, that they were "created under Tribal Law." *Williams*, 929 F.3d at 177. That dispositive fact is, and remains, undisputed.

---

[9] In a similar vein, Plaintiffs contend that Martorello made misleading statements when he said that he "was not involved in the creation of Red Rock, but made aware Red Rock had been formed." ECF No 784 at 7 (citing Martorello Decl. at ¶ 17). As support for this proposition, Plaintiffs cite to emails purportedly showing that Martorello "selected the name" and "was provided with Red Rock's organization documents and operating agreement for review prior to having it approved by the Tribe. *Id.* at 7–8. Martorello's declaration on this point was provided specifically to support the Tribe in addressing the Plaintiff's claim that he "helped form Big Picture Loans and Red Rock," and to be read congruent with the proper method of creation standard, the legal formation (which the Tribe alone could accomplish). Any advice by Martorello in the branding of Red Rock would not only be immaterial because it is expressly encouraged that outsiders provide such expertise under federal law, but it would not change the fact that the entities themselves were created by the Tribal Council under Tribal law for the purpose of supporting Tribal operations. Finally, suggestions regarding the *branding* of an entity do not constitute participation in the *formation* of a legal entity and arm of the Tribe, and the evidence is clear that Martorello had no role in the latter—and could have no role, given that he was not a member of the Tribal council. *See, e.g.*, Ex. E (Gravel 4/5/19 Dep.) at 98:14–99:19 (testifying that it is not true that Gravel, Martorello and Bellicose "helped form Big Picture and Red Rock"); *see also* Ex. D (Rosette 6/29/2020 Dep.) at 182:8–17 (explaining that, though vendors or partners of tribe may suggest names, "It's ultimately the tribe that will enact a resolution or take a vote in a council meeting or otherwise that will accept the name").

10

2. *Plaintiffs Fail to Show Any Alleged Misrepresentations Materially Affected the Fourth Circuit's Evaluation of the "Purpose" Factor.*

For the second *Breakthrough* factor—purpose of creation—the Fourth Circuit focused on the Tribe's stated purpose for creating the entities and evidence related to that purpose. *Williams*, 929 F.3d at 178 (citing *Breakthrough*, 629 F.3d at 1191–92). Importantly, the Fourth Circuit instructed that this stated purpose "weigh[s] in favor of immunity as long as it relates to broader goals of tribal self-governance." *Id.* "For example, in *Breakthrough*, the Tenth Circuit found that this factor weighed in favor of immunity where the stated purpose of a casino was to financially benefit the tribe and enable it to engage in various governmental functions—even though the entities themselves engaged in commercial activities." *Id.*

Applying this factor here, the Fourth Circuit agreed with the Court that "the Tribe has stated a purpose for each Entity that relates to broader goals of tribal self-governance separate from the Entity's commercial activities, *i.e.*, tribal economic development and self-sufficiency." *Id.* Specifically, Big Picture and Ascension both state their purpose as engaging in business for tribal development—purposes that were "included in [their] articles of organization." *Id.* Nothing Plaintiffs raise questions this; that this is the entities' stated purpose is thus undisputed.

The Fourth Circuit also found that "the evidence does not support the district court's conclusion that the creation of the Entities was only or primarily intended to benefit Martorello or that the creation of Big Picture and Ascension was solely the product of Martorello's design and urging." *Id.* Rather, both "the Tribe and Martorello were both interested in avoiding a potential CFPB enforcement action so that the lending operations could continue." *Id.*

> While Martorello certainly stood to benefit from the creation of Big Picture and Ascension and the continuation of the Tribe's lending operation, so too did the Tribe. Thus, the district court's conclusion that the "real purpose" of Big Picture and Ascension was simply to protect Martorello does not hold up (and is in fact contradicted by other findings in the district court's order).... Rather, the Tribe created Big Picture and Ascension so that its lending operations could continue,

along with the economic benefits associated with that continuation.

*Id.* at 179.

Plaintiffs claim new evidence affirms their rejected contention that the creation of Big Picture or Ascension was "only or primarily intended to benefit Martorello," and that it was a product "of his design and urging." *Williams*, 929 F.3d at 178. Once again, their claims are irrelevant to the Fourth Circuit's analysis, and new evidence actually disproves their claims.

A cardinal error permeating throughout Plaintiffs' brief is their suggestion that evidence on ***Martorello's purposes*** for assisting the Tribe in its operations somehow contradicts holdings on the ***Tribe's purposes***. This improperly conflates Martorello's purposes as the purposes of the Tribe—as though an Indian Tribe cannot enter into a relationship for its own reasons. This paternalistic trope is both offensive and factually incorrect. As the Fourth Circuit explained, "[w]hile Martorello certainly stood to benefit from the creation of Big Picture and Ascension and the continuation of the Tribe's lending operation, ***so too did the Tribe.***" *Id.* at 179 (emphasis added). On the point that actually matters to the *Williams* decision, the evidence is irrefutable: the Tribal Entities serve their stated purpose and bring tremendous benefits to the Tribe.

a. Big Picture and Ascension were created as part of LVD's comprehensive economic development strategy to build a more diversified economy.

Plaintiffs contend that "The Tribal Defendants and Martorello" made a material misrepresentation and omission by asserting that "LVD developed a comprehensive economic development strategy to build a more diversified economy." ECF No. 784 at 21 (quoting ECF 40 at 3).[10] But this statement is objectively true, as previous briefing confirms. *See* Tribal Br. at 32–

---

[10] ECF No. 40 in this action, an Order on Daniel Gravel's Motion for Extension of Time, does not contain the language Plaintiffs quote. Martorello believes their citation to be to ECF No. 40 in the *Galloway* proceedings. This document is a brief in support of the motion to dismiss filed

*Footnote continues….*

34. Indeed, the Fourth Circuit explicitly found that continuing economic benefits, coupled with reduced liability exposure, evidences the Entities' stated purpose regardless of the benefits that may have been conferred on Martorello. *Williams*, 929 F.3d at 179.

The evidence corroborating this holding is overwhelming. In July 2011, the Tribe passed a resolution stating LVD's intent to "diversify the economy of the Tribe's Reservation in order to improve the Tribe's economic self-sufficiency" and to legalize internet lending and create lending enterprise to do so. Tribal Resolution No. 2011-30. And numerous witnesses confirm this intention. *See, e.g.*, Ex. F (Weddle 5/20/2019 Dep.) at 227:6–229:6, 75:17–78:6 (testifying that Tribe had a long-term vision for lending business, which was discussed in 2011 at the tribal council meeting, to create upward mobility for LVD members: "the tribe is very geographically isolated, lacks sources of reliable revenue, is not sufficiently located near a population sufficient to support significant gaming, for example. And they wanted to establish a long-term business that the tribe could grow over a number of years…."); Ex. G (Craig Mansfield 1/18/19 Dep.) at 26:20–27:7 ("it was always discussed ways to better the council—to better the tribe was to find other streams of revenue and somehow this idea came up."). The evidence also shows, as the Fourth Circuit detailed, that these efforts in tribal economic development have had the intended effect. *See, e.g.*, Ex. G (Craig Mansfield 01/18/19 Dep.) at 32:23–33:6 ("The businesses help fund a lot of the things that we do for our community. It helps, you know, with the funding…. I know it helped with our—building of our new clinic. I know it has helped with helping our elders, helping with our youth. The basic infrastructure of running of the government, in itself, it helped immensely. I mean without this the tribe would be in dire straits.").

---

by Big Picture Loans—*not* Martorello. Thus, it shows no alleged misrepresentations by Martorello.

   b. <u>LVD approached Martorello in 2011 to assist in creating and growing its online
   lending business.</u>

As they have done before, Plaintiffs claim that Martorello and the Tribe misrepresented

information about the genesis of the lending operations by stating that LVD approached

Martorello in 2011, rather than the other way around.[11] *See* ECF No. 784 at 8, 12–13. Martorello

has already refuted this false accusation:

> Contemporaneous emails also show that when Martorello was first approached by
> the Tribe in 2011, it already decided to expand, had a basic framework for the
> lending operation, had formed an LLC, had a lending code, had set up a tribal
> regulator, and even had preliminary deal structure in mind and draft deal
> documents that it provided to Martorello. *See, e.g.*, Ex. II,
> Rosette_Revised_048773 (initial "Intro Call" conference call invitation from the
> Tribe's broker to Martorello); Ex. GG, ROSETTE_REVISED _048832 (Tribe has
> established a Tribally charted LLC and has passed a lending law ordinance with
> its lending commission); Ex. JJ, ROSETTE_REVISED _048835 (LVD's agents
> inform Martorello of LVD's minimum Tribal Net Profits requirements, proposed
> contractual term, and other deal terms); Ex. KK, ROSETTE_REVISED _052381
> (LVD's agents forwarded initial draft of servicing agreement); Ex. HH,
> ROSETTE_REVISED _052365 (Scott Merritt indicating that "tribe is ready" and
> he would "be glad to arrange a visit" to LVD); Ex. LL, ROSETTE_REVISED
> _004067 (LVD has already established Red Rock and secured the EIN); Ex. MM,
> ROSETTE_REVISED _007017 (LVD already had ACH processor); Ex. NN,
> ROSETTE_REVISED _007004 (LVD already had its "Tribal Consumer Financial
> Services Regulatory Agent").

*Galloway* Br. at 22. *See also id.* at 19–24; Tribal Br. at 23, 30 ("The Tribal Defendants have

---

[11] Plaintiffs also claim that "[b]efore entering into tribal lending, Martorello had an ownership
interest in an online lending company called 'MMP Finance' which made 'online payday loans.'"
ECF No. 784 at 7. "Utilizing the domain name 'peppercash.com,'" Plaintiffs claim, "Martorello
made usurious loans that claimed to be 'governed by the laws of Costa Rica.'" *Id.* The actually
record and exhibit is remarkably different. The exhibit pages they cite refer to "Collect 500"—
not "PepperCash"—***six times***. Worse, his prior deposition expressly states that MMP Finance
"made online payday loans" under the name "Collect 500", not PepperCash.com, and under
***Utah*** law, not Costa Rica. Ex. H (Martorello 8/30/18 Dep.) at 17:3–21. He also stated
PepperCash launched in 2010, not 2008, and that "I didn't own PepperCash. Peppercash was the
d/b/a of Capeside Productions," a "Delaware LLC that Apriori had done work for" but was not
affiliated with. *Id.* at 124:10–125:7. Finally, Martorello's actual testimony was not that he
"started online lending" in 2008, but that he "tried to raise money to start an online lending
business" in "late 2008 or early 2009." Pl. Ex. 3, 26:9–14.

every reason to believe that their statement is true: the Tribe approached Martorello."); Ex. I
(Dowd 11/13/2018 Dep.) at 177:2–5 (testifying that ███████████████████████████

████). It is also noteworthy that Scott Merritt, who introduced Martorello to the Tribe, was

paid a referral fee for arranging the introduction—but this was paid not by Martorello, but by the

Tribe's entities, showing once again that the Tribe was the true driving force in initiating the

relationship. Ex. J (Merritt 3/21/19 Dep.) at 65:17–67:8 and 101:22–102:1 (testifying that Tribe

paid TLM for referral of Martorello to Tribe, and that Merritt received no fee from Martorello or

any of Martorello's entities).[12]

New evidence further disproves Plaintiffs' genesis narrative, revealing that ███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ Ex. D

(Rosette 6/29/2020 Dep.) at 77:7–13; 80:7–81:2; 94:13–22; 97:17–21 and 169:24–170:23. Also,

it was the Tribe's direction that Rosette partner with Merritt which caused the formation of TLM,

---

[12] Incredibly, Plaintiffs suddenly cite from a Servicing Agreement provision, which they have
possessed since the very beginning of this case, to mislead that court that they have suddenly
uncovered that Martorello paid LVD a "kickback." ECF No. 784 at 13. Plaintiffs' absurd
mischaracterization of a provision to pay the Tribe $10,000 upon the effective date of their
contract "to reimburse the Enterprise for due diligence-related costs" expended by the substantial
time and energy of tribal council is, once again, misleading at best. Ex. K (Servicing Agreement)
Section 6.1. Indeed, Rosette answered Plaintiffs' question of why this incentive payment was
made: ███████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████████████ Ex. D (Rosette 6/29/20 Dep.) at 184:18–185:8.

Plaintiffs previously admitted "this fee did not come out of Martorello's profits" and now state
again "LVD paid a flat-fee of $960k to TLM…", but now misleadingly suggest Martorello's use
of the word "we" in an email means that he had paid a brokerage fee to an unidentified recipient
to introduce him to LVD. ECF No. 784 at 12. This email refers to fees paid to TLM, ███████
████████████████████████████████████████████████████████████████████ Ex. D
(Rosette 6/29/20 Dep.) at 75:22–77:25 and 98:14–25.

as LVD simply could not afford the legal fees. *Id.* at 71:3–75:2; *see also* Ex. L (ROS002-0000007) (████████████████████████████████████████████████████████

████████████████). The Tribe had indeed determined its economic diversification plan in

2009, it suggested Rosette to partner with TLM, and Merritt identified Martorello in mid-2011.

More importantly, the question of who approached whom is utterly immaterial. *See*

Tribal Br. at 30 ("At the end of the day, perhaps the best response to Plaintiffs' attack is 'who

cares who approached whom first?'"). For one, even if Martorello **had** approached the Tribe, a

non-Indian approaching an Indian Tribe to help promote its economic development is exactly

what Congress intends. As tribal expert Lawrence Roberts explained in his expert report

summarizing centuries of federal tribal law and policy, "[t]he federal policy of tribal self-

governance and tribal self-determination includes a tribe's sovereign right to contract with or

license non-Indian businesses to promote economic development…. ***Federal policy is to***

***promote tribal self-governance*** by moving away from federal approvals of tribal actions,

***including contracting with third parties***." *see* ECF 821-5 (Roberts Rep.) at 4 (emphasis added).

Other experts agree that Tribes often seek to partner with non-Tribal businesses as a method of

economic diversification and development. *See* ECF 821-2 (Henson Rep.) at 3; ECF 821-6

(Morgan Rep.) at 13. And, as Tribal experts Eric Henson and Lance Moran have opined, this

approach to economic diversification is especially appropriate for tribes like LVD, which lack

access to other opportunities for economic development. *See* 821-2 (Henson Rep.) at 19–37

(explaining that LVD's remote location, small land base, limited federal funding, and other

barriers make online lending a particularly good option for economic development); 821-6

(Morgan Rep.) at 3, 13–14 (explaining that LVD's partnership with third party service providers

in online lending business reflects a "common business development technique" in tribal

**JA827**

business and matches LVD's goals for long-term economic development).

Congress has enshrined this policy in federal law through the Native American Business Development, Trade Promotion, and Tourism Act ("NABDA"), declaring:

Congress finds that—

…

(6) the United States has an obligation to guard and preserve the sovereignty of Indian tribes in order to foster … economic self-sufficiency among Indian tribes;

(7) the capacity of Indian tribes to build strong tribal governments and vigorous economies is hindered by the inability of Indian tribes to engage communities that surround Indian lands and outside investors in economic activities on Indian lands;

…

(9) the United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to—

(A) *encourage investment from outside sources* that do not originate with the tribes; and

(B) *facilitate economic ventures with outside entities* that are not tribal entities ….

25 U.S.C. § 4301(a)(7)–(9) (emphasis added).[13]

---

[13]The NABDA must be liberally construed and ambiguities resolved in favor of the Indians. *See Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1062 (D.S.D. 2016) (citing *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767 (1985) ("statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit")).

The NABDA also obligates the U.S. government to: "encourage[] the formation of new businesses"; "facilitate[] the movement of goods to and from Indian lands and the provisions of services by Indians"; "to promote private investment"; "encourage the sustainable development of resources of Indian tribes and Indian-owned businesses"; "to promote long-range sustained growth"; "to encourage intertribal, regional, and international trade and business development"; "to promote economic self-sufficiency and political self-determination"; to assist "Indian tribes… to enter into contracts and agreements to trade freely, and seek enforcement of treaty and trade rights"; to *make "available to address the challenges faced by those groups—(A) the resources of the private market [i.e. technology and the internet]; (B) adequate capital; and (C) technical expertise.*" (Emphasis added.)

Thus, even if Martorello had approached the Tribe in 2011 (and he did not), this would have been consistent with stated federal policy and Congressional purpose of "encouraging" and "facilitating" economic ventures with non-Tribal entities to promote "economic self-sufficiency among Indian tribes." *Id.*; *see also* Ex. F (Weddle 5/20/2019 Dep.) at 134:25–137:24; 138:2–15 (testifying that Bellicose/SourcePoint were hired by the Tribe for purposes consistent with the NABDA). In short, as the Fourth Circuit recognized in *Williams,* "policy considerations of tribal self-governance and self-determination counsel against second- guessing a financial decision of the Tribe where, as here, the evidence indicates that the Tribe's general fund has in fact benefited significantly from the revenue generated by an entity." *See Williams*, 929 F.3d at 181.

Above all else, the Fourth Circuit made no mention whatsoever of who initiated contact—Martorello or the Tribe. *See Williams*, 929 F.3d at 178–182. What matters is that LVD's purpose for Big Picture and Red Rock's creation was to promote tribal self-governance and economic development—and it did. The question of who approached whom is simply immaterial to the Fourth Circuit's holdings that the purpose of the Entities' creation weighed in favor of immunity.

c.  Red Rock was created to bring revenue to LVD.

Plaintiffs next claim Martorello and the Tribal Defendants "develop[ed] the false narrative that LVD created Red Rock to learn the lending industry." ECF No. 784 at 4. In reality, they assert, "Red Rock was meant to be just a front. Martorello's companies handled <u>all</u> of the material aspects of the lending business without any meaningful involvement of the LVD, Tribal Council, or the co-managers." *Id.* (emphasis in original).

First, Plaintiffs misconstrue the representations. Hazen's declaration states that "[t]he LVD Tribal Council decided to start tribal online lending businesses to bring revenue to LVD that would advance the public health, safety, and welfare of LVD's citizens through provision of

**JA829**

essential government services." ECF No. 756-1 ¶ 5. In other words, she does ***not*** state that the purpose of Red Rock's creation was "to learn the lending industry"; rather, it was to generate revenue for the Tribe. *See also* Ex. P (Declaration of James Williams, Jr. filed in *Otoe-Missouria*) ("Pursuant to Tribal law and their creation documents, Red Rock was created in order to advance the Tribe's economic development and to aid in addressing issues of public health, safety, and welfare."). Learning the industry, by contrast, was the reason it engaged Bellicose for its services. *See* ECF No. 784 (quoting ECF No. 756-1 ¶ 10) ("To learn the lending industry, Red Rock contracted with Bellicose…."). Thus, the actual stated purpose for LVD's creation of Red Rock is exactly the same as the Fourth Circuit found for Big Picture's stated purpose. Moreover, the evidence of achieving that stated purpose (i.e., generating revenue for tribal economic development) was no less significant or successful for Red Rock as it was for Big Picture.

Second, the evidence shows that LVD decided to enter into the lending business long before meeting Martorello. *See* Tribal Br. at 27 ("The Tribe had achieved important milestones in establishing a lending business before the Tribe even first met Martorello in August 2011. This was pursuant to a plan to diversify Tribal revenues in light of declining revenues from its casino business."). Indeed, as noted above, the new evidence shows that Rosette and Merritt had worked for the tribe towards this end since 2009. LVD could not have possibly created Red Rock solely or even primarily for Martorello's benefit given the steps it had taken before meeting him.

And though the point is irrelevant, the evidence overwhelmingly confirms that Red Rock hired Bellicose to learn the online lending business and grow its own lending operations. *See* Ex. D (Rosette 6/29/20 Dep.) at 88:20–89:20 (explaining ███████████████████████████

███████████████████████████████████████████████████████████████████

██████); Ex. F (Weddle 5/20/2019 Dep.) at 113:13–119:16 (explaining the "building capacity"

process modeled off NIGC agreements and was "consistent with what [she] observed about their rendering of services to the tribe"); Ex. G (Mansfield 1/18/2019 Dep.) at 47:9–22 (testifying that Tribe entered into arrangement with outside service providers because "[a]ny time you start a new business, you—you don't have expertise in it. You don't understand how to—to run it properly. So that's why you pay a service provider to help you learn this business."); Ex. Q (Pete 5/26/20 Dep.) at 139:16–140:3 145:12–22, 146:5–13 (stating Tribe's understanding at initiation of relationship that Martorello "would teach us how to run the business" and "[t]hat we would be taught everything, marketing, servicing, funding, and collection").

Experts confirm this course of dealing to be completely ordinary and proper:

> [LVD's] Sales and Service agreements together position [LVD] to utilize a common business development technique in other tribal industries.… [T]he tribes used their partnership relationships to gain experience, knowledge and capital. After gaining the necessary knowledge, the tribes no longer needed a partner and were able to increase their profitability by eliminating the need for a partner. The increased profits are key to fulfilling [LVD]'s socio-economic goals for its membership.

ECF 821-6 (Morgan Rep.) at 13.

> Noteworthy parallels exist between the development of tribal gaming enterprises and online lending. When tribes initially entered the highly-regulated gaming industry, they did not have the capital, managerial talent, or technical skills to start and operate successful casino businesses. As a result, tribal governments sought outside expertise to help them manage their gaming enterprises, as well as to provide technological solutions associated with many popular gaming products (such as electronic bingo and slot machines). In addition to facilitating tribal gaming operations, outside experts also trained tribal employees, so that tribes were better positioned to manage their enterprises themselves. These circumstances are mirrored in the similarly highly-regulated online lending industry, as tribes formalized contractual relationships with outside experts to facilitate their entry into a new industry.

ECF 821-2 (Henson Rep.) at 4.[14]

---

[14] Plaintiffs' reliance on the declaration of Joette Pete to dispute the Tribe's intention, ECF No. 784 at 11–12, is misplaced. Since Plaintiffs first introduced this declaration in this case (ECF No.

*Footnote continues….*

d. <u>All Evidence confirms that LVD created the entities to advance its stated purpose of generating revenue to support Tribal operations.</u>

Plaintiffs broadly assert that the alleged misrepresentations they identify suggest that the decision to create Big Picture Loans was motivated by impending threats of litigation. *See* ECF No. 784 at 24. But the Fourth Circuit assumed as much—and ***still*** found that this motive was consistent with the stated purpose of the Entities' creation:

> [T]he Tribe created Big Picture and Ascension so that its lending operations could continue, along with the economic benefits associated with that continuation. The fact that the Tribe created Big Picture and Ascension in part to reduce exposure to liability does not necessarily invalidate or even undercut the Tribe's stated purpose, *i.e.*, tribal economic development. Indeed, in order to reach its stated goal, the Tribe may have deemed it necessary to reduce its exposure to liability.

929 F.3d at 178–79. Thus, Plaintiffs' laborious efforts to show that the Entities were created to reduce exposure to liability move the needle not at all. Even if this were the motive, it is perfectly consistent with the stated purpose for the Entities' creation and does not affect the Fourth Circuit's holdings.

Plaintiffs also assume that if one participant in the transaction had one purpose for their participation (even for just a flash in time), then that must have been the ***only*** purpose ***any*** participant had. This senseless assumption, disabused in prior briefing, *see* Tribal Br. at 32 ("Martorello's purpose is not the Tribe's purpose."), contradicts common experience and the evidence. The Tribe may have intended to reduce litigation exposure ***and*** reduce costs ***and***

---

624-1) and the *Galloway* case (ECF No. 286-4), it has been confirmed that Plaintiffs' counsel drafted Ms. Pete's declaration for her. *See* Ex. R (JoettePetePlffsCounsel000001) (email from Plaintiffs' counsel to Ms. Pete: "Joette … attached hereto please find a declaration that summarizes the testimony that you would provide if called to testify in this case…."). And during her deposition, Ms. Pete made clear that she has barely any personal knowledge of the contents of her declaration. *See, e.g.*, Ex. Q (Pete 5/26/20 Dep.) at 141:22–143:4 (testifying that Ms. Pete did not know the meaning of several terms in her declaration); 165:6–13 (testifying that Ms. Pete did not know which period of time her declaration referred to), 169:1–170:1 (testifying that Ms. Pete did not know what the term "district court" meant, as used in her own declaration).

decrease reliance on outside servicers **and** promote tribal economic development, all at the same time; all of these goals are consistent and complimentary. Martorello's purposes, whether they did or did not include these or other goals, are immaterial to the Fourth Circuit's analysis.[15]

Notwithstanding the above, Plaintiffs assert that "The Tribal Defendants and Martorello" misrepresented the fact that "cost savings" provided a reason for the Bellicose merger, and that Ascension is "a below-cost service provider." ECF No. 784 at 47–48. Here, too, Plaintiffs attribute statements of others to Martorello, when in fact they can cite no statement from Martorello to this end. Nonetheless, this argument has already been refuted. *See* Tribal Br. at 46–47 ("nothing Plaintiffs have said comes close to refuting the annual savings of $1.2 million cited by the Tribal Defendants").

Plaintiffs also question representations that the Tribe had "always" considered acquiring Bellicose, based exclusively on the purported lack of response to a single email in 2013. ECF No. 784 at 30. Yet, as previously shown, discussions of a potential sale go back even further:

> Martorello and the Tribe had been discussing a sale of the servicer to the Tribe since at least 2012. Such a transaction, in which a Tribe purchases a service provider after learning a business, is central to many Native American business relationships, and had led to tremendous economic development for Tribes throughout the last half-century.

*Galloway* Br. at 28; *see also id.* at 28–30 (describing evidence showing discussion of potential sale); Tribal Br. at 33–34 (same); Ex. F (Weddle 5/20/19 Depo.) at 227:14–229:20 (detailing that the Chairman articulated the long-term vision to acquire the lending business at the signing of the contract in 2011); Ex. S (ROSETTE_REVISED_053374) (Nov. 2012 email from Martorello to Tribe's counsel stating the he has begun research to understand tax issues associated with

---

[15] For the same reasons, Plaintiffs' several suggestions that "Martorello had concerns about the viability of the tribal lending model" (ECF No. 784 at 25), are both misinformed and simply irrelevant. What matters are the ***Tribe's*** purposes, not Martorello's.

request to present tribal council a chance to buy a copy of SPVI's IP to start their own servicing business); Ex. D (Rosette 6/29/20 Dep.) at 146:4–147:11 (discussing ██████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████"); Ex. F (Weddle 5/20/2019 Dep.) at 75:17–78:6 (testifying that LVD wanted a consumer lending business for a long time); ECF 821-2 (Henson Rep.) at 4; ECF 821-6 (Morgan Rep.) at 7–8, 13–14, 24.

Ignoring all of this evidence, Plaintiffs insist that the Tribal Defendants lied by arguing that "there was no evidence" that the restructure was intended to provide Martorello with immunity. ECF No. 784 at 24–25. Here, Plaintiffs' argument is simply confused. "Martorello has recognized since 2011 that he does not (and would not) possess sovereign immunity by providing services to LVD." *Galloway* Br. at 27 n.18. Notably, Martorello could have easily structured the sale of Bellicose such that he, not McFadden, would have been the President of Ascension, and could have asserted an immunity defense while directing the business (just as McFadden has done). That he did not take this obvious step to create immunity for himself shows just how unmotivated he was by the improper regulatory threats of Operation Chokepoint.

Plaintiffs also depict the *Otoe-Missouria* decision as a sort of harbinger of doom, signaling the inevitable end of the Tribal online lending industry and forcing Martorello and the Tribe to scramble for cover. *See* ECF No. 784 at 28. Numerous emails reveal the opposite:

> Plaintiffs' Exhibit 30 [Ex. 49 in this round of briefing] also confirms that Martorello did not believe that the district court decision in *Otoe-Missouria* created a "significant liability" for the business as a whole—at least not at the time of the Second Circuit's decision. As Martorello confirmed in an email **Plaintiffs cite to the Court**, on October 1, 2014, it was his belief that the Second Circuit gave LVD "a whole lot to take away as LVD grows and refines it's [sic]

**JA834**

business for the long term: tribal investment, adoption, perhaps more on-res activity (**which I think he got wrong**), tribal owned bank/ACH, etc. Let's get the take aways together and bake them in to see this thing to long term. **I thought this was an excellent result**." Ex. 30 (emphasis added).

*Galloway* Br. at 27 n.19. Far from signaling the end of the lending operation, Martorello regarded the *Otoe-Missouria* decision as an affirmation of the business model on the whole:

> the contemporaneous emails show that Martorello saw the *Otoe-Missouria* decision not as a sign of impending legal action or increased pressure, but as a victory for LVD and Native American lending. After *Otoe-Missouria* was resolved, Martorello even noted, "there were so many comments by the panel that outright demonstrate the legality of tribal lending…" and called the opinion "rather victorious." Ex. BBB, at ROSETTE_REVISED_001118-19.

*Galloway* Br. at 30.[16] The Tribe's opinion—which is what actually matters to the *Williams* decision—was much the same. *See* Ex. D (Rosette 6/29/2020 Depo.) at 138:9–140:21 (███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████); Ex. E (Gravel 4/5/19 Dep.) at 71:12–79:4 (*Otoe-Missouria* was not a significant event for him and did not change his belief in the legality of the lending operations); Ex. F (Weddle 5/20/2019 Dep.) at 127:22–129:15 (case did not impact Ms. Weddle's belief that tribal law applied to LVD's loans).[17]

---

[16] Plaintiffs also seek to obfuscate the timeline on this point: "two weeks after the district court's decision" in *Otoe-Missouria* in September 2013 is when sale discussions began. ECF No. 784 at 29. As noted, however, sale discussions between Martorello and LVD had been ongoing since 2012. *See, e.g.*, Ex. S (ROSETTE_REVISED_053374) (Nov. 2012 email between Martorello and counsel for Tribe discussing sale).

[17] Plaintiffs' attempt to suggest that Martorello proposed the restructuring out of fear of prosecution or liability also ignores Martorello's efforts to build the SourcePoint brand as a ongoing consulting resource for multiple tribes—efforts he began before, and continued after, the *Otoe-Missouria* decision. *See, e.g.*, Ex. T (ROSETTE_REVISED 055756); Ex. U (ROSETTE_REVISED_055695); Ex. V (ROSETTE_REVISED_047736). ███████ ██████████████████████████ *See* Ex. U (Rosette_Revised_055695) ███████ *See* Ex. W (ROSETTE_REVISED_052243).

Indeed, Martorello's and the Tribe's conduct following *Otoe-Missouria* is strikingly at odds with Plaintiffs' narrative. Martorello "repeatedly rejected opportunities to sell the business for purely **economic** reasons." *Galloway* Br. at 31 (emphasis in brief); Ex. X (ROSETTE_REVISED_052247) (Dec. 2013 email in which Martorello rejects a potential sale transaction—opting, instead for "status quo"—for purely economic reasons). ███████████

███████████████████████████████████████████████████████████

███████████████████ Ex. Y (ROSETTE_REVISED_046264). When the Tribe pressed its attempt to buy the entire business in late July 2014, Martorello told the Tribe he wanted to focus on the long term and felt that "we're definitely on different planets." Ex Z (ROSETTE_REVISED_047744–46) ███████████████████████████████████████████

██████████████████████████████████ *See* Ex. AA (Middlemarch 001721); Ex. BB (Middlemarch 000268). This is hardly the conduct of one hoping to beat a hasty retreat out of the lending sector.

Martorello's efforts to sell to LVD initially floundered for economic (not legal) reasons, as Martorello felt the Tribe was trying to take "advantage of [him]" in his effort at being "generous," though he stated he was still focused on the "long term." Ex. V (ROSETTE_REVISED_047736). ███████████████████████████████

██████████████████████████████ Ex. CC (ROSETTE_REVISED_052280).

███████████████████████████████████████████████████████████

███████████ Ex. DD (ROSETTE_REVISED_052616–19). Yet Martorello spent months exploring the tax implications of the proposed transaction, rebuffing efforts to close in January 2015 and determining that "closing can't happen until 1/1/16" because of tax benefits set to

JA836

expire upon his relocation from Puerto Rico. *See* Ex. EE ((ROSETTE_REVISED_048520); Ex. FF (ROSETTE_REVISED_052400); Ex. GG (ROSETTE_REVISED_046191); Ex. HH (ROSETTE_REVISED_045972); Ex. II (ROSETTE_REVISED_044639); Ex. II (CW_01786); KK (Norman Rep.) at 13–14. Closing did not occur until January 26, 2016, "at a time when the regulatory and operational risks (such as the since-recognized-as-illegitimate Operation Choke Point) had faded." *Galloway* Br. at 31–32. ████████████████████████████████

████████████████████████████████████████████████████ Ex. FF (ROSETTE_REVISED_052400). This is not the conduct of one eager to jump a sinking ship.

Plaintiffs' caricature of Martorello selling the business in a mad panic in the wake of *Otoe-Missouria* conflicts with the overwhelming evidence showing his positive reception to the decision, the lack of any urgency to abandon his business model, or offload the business in the following two years, and the ultimate decision to sell once regulatory pressure reached its nadir. "If Martorello was truly motivated to sell in an effort to avoid regulatory action, waiting until early 2016 to sell was illogical. Martorello was instead always motivated by economics, while the Tribe wished to own Bellicose as early as possible." *Galloway* Br. at 32; *see also* ECF 821-3 (Norman Rep.) at 13–14 (describing Martorello's tax motivations to sell in 2016). In short, even if Martorello's motivations were in any way legally relevant (and they are not), his behavior establishes that regulatory and litigation risk were not significant motivating factors for him.

In sum, substantial evidence confirms non-litigation objectives motivated the Tribe's acquisition of Bellicose. There simply are no misrepresentations on this point—not by the Tribe, and certainly not by Martorello. Plaintiffs' attempt to reboot their story about ***Martorello's*** purposes badly misses the mark: all that matters to the *Williams* decision is the ***Tribe's*** purposes. And even were the creation of Big Picture and Ascension intended to reduce litigation exposure,

this would only confirm an assumption on which the Fourth Circuit expressly based its decision. As the Fourth Circuit found, the Tribe's efforts to ensure the ongoing viability of the lending operations—including any efforts to reduce exposure to threats of litigation, to the extent that mattered—promote the stated purpose of promoting tribal self-governance, tribal economic development, and self-sufficiency. The purported misrepresentations, which are not misrepresentations at all, are once again immaterial to the Fourth Circuit's holdings.

3. *Plaintiffs Fail to Show any Alleged Misrepresentations Materially Affected the Fourth Circuit's Evaluation of the "Control" Factor.*

The third *Breakthrough* factor examines the structure, ownership, and management of the entities, "including the amount of control the Tribe has over the entities." *Breakthrough Mgmt. Group, Inc.*, 629 F.3d at 1191. Relevant to this factor are the entities' formal governance structure, the extent to which the entities are owned by the tribe, and the day-to-day management of the entities. *Williams*, 929 F.3d at 182 (citing *Breakthrough*, 629 F.3d at 1191). The Fourth Circuit focused particularly on "formal governance structure," even more than on "day-to-day management" of the entities.[18] For example, in the panel's extensive review of the servicing agreement (which Plaintiffs have repeatedly stated is identical to that of Red Rock and SPVI's), it concluded "Big Picture remains in control of its essential functions" and "the fact that Big Picture currently chooses to utilize Ascension's criteria does not mean that it does not have the power to choose differently in the future." *Williams*, 929 F.3d at 183. As to the control of the lender, "[g]iven the evidence of the Tribe's broad power, through Hazen and Williams, over Big

---

[18] This makes sense, as control pertains to steering the business strategy, determining continuity, and promulgating rules downstream should a Tribe so choose. On the other hand, federal law expressly encourages outside expertise in day-to-day management for tribes to be "four times as likely to be profitable." *See* NABDA and IRS Tribal Business Structure Handbook: https://www.irs.gov/pub/irs-tege/tribal_business_structure_handbook.pdf pg. I-3.

Picture's important business decisions and management and evidence that Hazen and Williams in fact exercised that power with frequency, the district court erred in concluding that Big Picture was not controlled by the Tribe simply because of Hazen and Williams's outsourcing of certain day-to-day management tasks and their lack of knowledge of some aspects of the lending operation." *Id.* Rather, the Fourth Circuit determined that the "'general structure is to assure that Big Picture is answerable to the Tribe at every level, which supports immunity.'" *Id.* Even with respect to Ascension, the Fourth Circuit noted that, while Ascension retains a non-tribal president and conducts most of its business outside the reservation, McFadden must obtain Hazen's or William's approval for making certain decisions. *Id.* In addition, Hazen and Williams have delegated their authority to McFadden for making strategic decisions, executing agreements, opening bank accounts, and generally overseeing Ascension's daily management. *Id.* Based on these facts, the Fourth Circuit concluded "this factor weighs in favor of immunity for Big Picture and only slightly against a finding of immunity for Ascension." *Id.*

Plaintiffs offer nothing to set aside the Fourth Circuit's holdings on the "control" factor, nor possibly could they, as the formal governance and ownership has never differed.

a. <u>Plaintiffs improperly disregard temporal and operational distinctions between the lender and servicer in attempts to create alleged inconsistencies.</u>

Plaintiffs identify various purported misrepresentations that touch on the less-important day-to-day management portion of the "control" factor, to cast Martorello in the role of the man behind the curtain, exercising total control over the whole operation. To do this, Plaintiffs ignore at least two fundamental distinctions—sometimes simultaneously. The first is a ***temporal*** distinction between the operations of the businesses before the creation of the Tribal Entities as after. The second is an ***organizational*** distinction: as the Fourth Circuit determined, there is a ***lending*** business, represented first by Red Rock and later by Big Picture; and a ***servicing***

business, run first by Bellicose and SourcePoint and later by Ascension. This distinction is paramount because "from the very beginning, the parties contemplated an arrangement in which Bellicose was in complete control of **its servicing business**, while LVD's co-managers were in complete control of their **lending business**: 'THE TRIBE ESTABLISHES THE LENDING CRITERIA, AND IS THE LENDER[,] BELLICOSE IS JUST CARRYING OUT THE TRIBE'S DIRECTION.'" *Galloway* Br. at 6 (citing 2011 email correspondence) (emphasis in brief). Plaintiffs frequently confuse emails relating to the *servicing* business as suggesting control over the *lending* business, just as they often blindly apply emails describing *earlier* operations to manufacture misrepresentations about operations *after* the Entities' creation. The Court has already admonished Plaintiffs' improper attempts to misleadingly conflate one business with another. *See Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 257 n.7 (E.D. Va. 2018). Yet these deceptive tactics continue unabated.

The temporal distinctions Plaintiffs disregard are critical because, as noted above, evidence regarding operations before the Entities' creation have little bearing on the Tribe's control of the Entities as they exist now. This was pointed out in prior briefing:

> Bellicose and SourcePoint were not owned or controlled by the Tribe. Indeed, this lack of ownership and control was one of the reasons why the Tribe became interested as early as 2012 in acquiring the servicing business. Hence, it is easy for Plaintiffs to cite to emails and facts showing that the Tribe lacked control over Bellicose and SourcePoint.

Tribal Br. at 36.[19]

---

[19] Plaintiffs cite an email from November 2011, at the beginning stages of Bellicose's involvement with the Tribe, in which LVD's agent proposes not to "introduce any new PDL's [payday lenders] to LVD as long as Bellicose has a relationship with LVD." ECF No. 756-21. Plaintiffs make an unsupported logical leap that this somehow makes BELLICOSE a "PDL." ECF No. 784 at 14. Nothing about this inference upon inference goes to the role Bellicose actually performed for LVD, all of which is spelled out in the parties' agreements. *See generally* Ex. K (Red Rock-Bellicose Servicing Agreement) § 1.4 (MARTORELLO_ 026256 at 026260)

*Footnote continues….*

The operational distinctions are even more important than the temporal distinctions. For example, Plaintiffs cite an email that supposedly suggests that the managers of the Tribal lending LLC "AREN'T INVOLVED IN THE BUSINESS" and "BELLICOSE OPERATES THE BUSINESS COMPLETELY." ECF No. 784 at 9–10 (citing Pl. Ex. 13 at ROS001_052498–500). Plaintiffs' improper use of this email to conflate the lending and servicing businesses was previously exposed: "Plaintiffs' mischaracterize the email, which was discussing the business of *Bellicose* as applying to *Red Rock*—at the advent of the relationship between the two, providing a graphic example of the deceptive briefing tactics Plaintiffs use here." Tribal Br. at 16.

The same problem infects Plaintiffs' suggestions that Bellicose "intentionally kept Red Rock's co-managers in the dark about basic details of *the business*, such as vendor contracts and underwriting formulas." ECF No. 784 at 15. "*The business*" to which the contracts and formulas pertain is not the *lending* business (i.e., Red Rock, and later, Big Picture Loans)—but the *servicing* business (Bellicose/SourcePoint and Ascension). Martorello has already corrected Plaintiffs' misguided claim:

> Plaintiffs' statement that "Red Rock's co-managers [were] in the dark about basic details of the business" is (again) based on their improper attempt to conflate the operations of a servicer (SourcePoint) with the operations of a lender (Red Rock). Red Rock was a lender. Red Rock made loans to individual consumers based on recommendations and strategies suggested by its servicer, SourcePoint. Red Rock's co-managers had full visibility into the details of its lending business. Those co-managers, however, did not have full visibility into the confidential and proprietary aspects of SourcePoint's servicing business. This distinction is made clear in the Servicing Agreement that governed the parties' relationship.
>
> Under the Servicing Agreement, SourcePoint was required to provide certain valuable services to, and create specific IP for, Red Rock. ECF 250-7 at § 4.2.1. Despite this general provision, the Servicing Agreement makes clear that

---

("The Enterprise, through a contractual relationship, desires to retain and engage the Servicer as its independent contractor to consult to, develop, managing, and provide operation guidelines regarding the Unsecured Lending Business…").

> SourcePoint was to provide "credit-modeling data and risk assessment strategies by which [Red Rock] may evaluate whether or not to extend funds to an individual borrower based on criteria that has been established by [Red Rock]." Id. at § 4.2.1(i). This provision makes clear that while SourcePoint created and provided certain intellectual property to Red Rock, it was only responsible for providing data and strategies—not the underlying formulas—to Red Rock. Id. This is, **precisely** what Martorello told Wichtman—the "formulas used were [sic] are very closely guarded internal IP and entirely unattainable by the clients. **Running clients through it all is what we built and do.**" Ex. 8.

*Galloway* Br. at 17–18 (emphasis in brief). Martorello has also already pointed out this critical distinction in refuting Plaintiffs' previous assertions, repeated here, that "without access to the formulas used, any approvals must have been pro-forma as there would be no way for the co-managers to meaningfully participate" (ECF No. 784 at 17 n.8):

> That assertion is ridiculous. In modern banking relationships, while proprietary "credit-scoring model[s] employing various algorithms," such as a FICO score, are used to evaluate loan applications, "it is the approver of the predetermined non-discretionary underwriting criteria that actually makes the credit decision," which in this case is "the lender comanagers, and Tribal Representative, and or the Tribal Council…." Ex. F, Ross Rep. at ¶ 115. This is the same process used by the credit card industry as well as Freddie Mac and Fannie Mae. *Id*. at ¶ 114. In this respect, "Red Rock and BPL operate as typical companies with the specialist recommending and management approving." *Id*. at ¶ 115. Yet even if all of this were not the case, SourcePoint provided Red Rock's co-managers with overwhelmingly detailed background, data, and procedures to assist the co-managers in making their decision to approve or deny a particular campaign. See Ex. K, LVD-DEF00017101–17113.

*Galloway* Br. at 18 n.13.

SPVI was under no obligation to reveal its pre-qualified leads formulas to its clients, the service for which it was paid to provide. Until the purchase of Bellicose and Sourcepoint, these formulas belonged to the servicing businesses, not the lenders.

Plaintiffs next attempt to downplay the involvement of the Red Rock co-managers in the

"day-to-day management." They badly miss the mark.[20] The overwhelming evidence shows that

the co-managers had extensive involvement, including, among other things:

- Hiring and firing employees. *See, e.g.*, Ex. LL (ROSETTE_REVISED_053208) (co-
  manager hiring compliance manager, Jennifer Steiner); Ex. MM
  (ROSETTE_REVISED_040016) (termination of employee by co-manager); Ex. NN
  (ROSETTE_REVISED_046999) 

- Managing loan approval, origination, and collections. *See, e.g.*, Ex. OO
  (ROSETTE_REVISED_045131) (showing co-manager reviewing settlement offers for
  delinquent loan accounts); Ex. NN (ROSETTE_REVISED_046999) (Jan. 2013 email
  regarding processing payments); Ex. PP (ROSETTE_REVISED_037655) 
  ; Ex. QQ (ROSETTE_REVISED_031984–86) (Hazen instructing Jason
  Guzman to document origination process to standardize new employee training); Ex. RR
  (Ross 3/15/2019 Dep.) at 9, 74–75 
  ; Ex. G (Mansfield 1/18/2019 Dep.) at 53:5–25 (decision to make loans rested
  solely and absolutely in discretion of Red Rock, and was made by people working at call

---

[20] Particularly risible is Plaintiffs' alarm over the fact that Karrie Wichtman—the Tribe's attorney—was authorized to use an electronic signature on her clients' behalf. ECF No. 784. This is common practice among attorneys and even in the judiciary for electronic filing of documents.

center on the reservation in Watersmeet); Ex. E (Gravel 4/5/19 Dep.) at 158:1–19 (after

loan applications underwent the underwriting process, "all loan applications are reviewed

and [] approved by [Red Rock or Duck Creek] on tribal land before the loan is

originated."); Ex. I (Dowd 11/13/18 depo) at 185:15–23 (███████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████), 79:19–80:1.

- Reviewing and approving contracts and other legal documents. *See, e.g.*, Ex. G
  (Mansfield 1/18/19 Dep.) at 47:3–7; Ex. F (Weddle 5/20/19 Dep.) at 108:5–14; Ex. SS
  (ROSETTE_REVISED_029177–79) (███████████████████████████████████████████
  ████████████████████); ECF 272-67 (LLC co-manager recommendations
  beginning Jan. 2014); ECF 272-68 (LLC co-manager recommendations beginning May
  2014 through March 2015).

- Reviewing and approving marketing strategies and call center scripts. *See, e.g.*, Ex. G
  (Mansfield 1/18/19 Dep.) at 47:3–7; Ex. TT (ROSETTE_REVISED_030201) (Aug. 2013
  SPVI detailing direct mail strategy).

- Pursuing litigation in *Otoe-Missouria*—even over Martorello's objections and
  recommendations not to do so. *See* Ex. UU (ROSETTE_REVISED_052701); Ex. VV
  (ROSETTE_REVISED_053063).

As summarized by tribal law attorney Jennifer Weddle:

> [T]hese were tribal entities formed by the tribe, for the tribe, under tribal law, and
> the tribe was, at all instances, in my observation, directing the companies.
> Directing their legal decisioning, directing their contracting, acting with
> recommendations from Bellicose and later from SourcePoint, but at no point was
> Mr. Martorello, or any entity he was ever involved in, controlling anything. Those
> were determinations made by the appropriate tribal officials.

Ex. F (Weddle 5/20/19 Dep.) at 108:5–14; *see generally* Ex. E (Gravel 4/5/19 Dep.) at 20:18–23:18 (testifying that Bellicose provided servicer provider recommendations to the lender that hired it—Castle Payday and Pepper Cash, owned by Red Rock and Duck Creek Financial, owned by LVD—and the tribal entities had decision-making authority). In short, Plaintiffs' assertion that the co-manager's involvement amounted to mere "optics," ECF No. 784 at 16–19, is wrong on the merits and deeply condescending to the Tribe.

The deposition of Craig Mansfield in early 2019—five years after his resignation in 2014, and months before oral argument in *Williams*—does nothing to change this. Mr. Mansfield was an unpaid co-manager, thus working in his capacity as tribal councilmember. *See* Ex. P (Williams 8/22/13 Decl. in *Otoe-Missouria*) ¶ 20 ("Pursuant to the manager-managed LLC formation, Red Rock is managed by Tribal members who are engaged in business decisions for each company on a day to day basis."). ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████Ex.

WW (ROSETTE_REVISED_045533) (emphasis added). Clearly, Mr. Mansfield's increasing workload was about much more than "optics." Further, Mr. Mansfield's extensive involvement before his departure was noted in prior briefing. *See Galloway* Br. at 15–16. And if Plaintiffs believed Mr. Mansfield's testimony, offered months before oral arguments in *Williams*, was so crucial, they had ample opportunity to raise it to the Fourth Circuit. That they declined to do so speaks volumes about their own assessment of its materiality. *See* Tribal Br. at 25 ("So, according to Plaintiffs' own story they knew of these 'objective' facts showing lack of Tribal

**JA845**

control of the Tribal Defendants since at least October 2017. Indeed, Plaintiffs cited to the 2017

Hazen deposition more than 20 times in their appellate brief in *Williams*—proving beyond any

quibbling that Plaintiffs were fully aware of the deposition long ago. Yet Plaintiffs' did nothing

until defeat was written on the wall at the oral argument in *Williams*.").[21]

Similarly, Plaintiffs' suggestion that Wichtman and the co-managers "lacked even the

most basic understanding of the loan product offered by Red Rock," ECF No. 784 at 22, distorts

the record—just as they tried to do before:

> Plaintiffs take a similarly duplicitous tac[k] in seeking to have the Court believe
> that Red Rock's counsel, Karrie Wichtman, did not understand the loan product
> offered by RRTL by providing a block quote to the Court which omits sentences
> in which Ms. Wichtman recites key metrics describing the loan products offered
> by Red Rock. ECF 249 at 4-5 (quoting Ex. 7). Rather than acknowledge that this
> email, and dozens of others like it, reveal the ongoing and independent
> involvement of the co-managers and legal counsel, Plaintiffs attempt to leave the
> Court with a false impression as to the facts. Specifically, Plaintiffs would have
> the Court believe that Ms. Wichtman could only identify that Red Rock "offer[ed]
> installment loan products," and that her lack of knowledge required her to "gain a
> better understanding of our short term finance products" before responding to a
> bank officer. *Id.* That is unequivocally false, and contradicted by the full email.
>
> The full quotation from Ms. Wichtman reveals that she easily provided the bank
> officer with: (1) the range of loan principal amount offered by Red Rock, (2) the
> range of loan terms offered by Red Rock, (3) the number of states in which Red
> Rock accepted applications, (4) the APRs offered by Red Rock for both new and
> returning customers, and (5) that customers can pay off their loans early with no
> penalty. Plaintiffs also leave out that Ms. Wichtman emphasized to the bank that
> the loans comply with TILA and do not require pre-authorized electronic transfers
> for approval of the loan—a fact which proves Red Rock's compliance with

---

[21] Plaintiffs also criticize Hazen's inability to recall whether Mansfield was a Red Rock co-manager, and the fact that a Rosette lawyer (who was apparently not familiar with LVD and its lenders) asked for information from Justin Martorello to provide in Chairman Williams's declaration in the *Otoe-Missouria* litigation. ECF No. 784 at 19, 21. (Notably, the Operating Agreements only ever required one LLC Manager's approval.) The Fourth Circuit already rejected this criticism as meaningless: "even assuming Hazen and Williams lack knowledge as to certain aspects of the operation and did outsource aspects of day-to-day management to a non-tribal entity, such an arrangement would not in itself weigh against immunity, given the other evidence of Tribal control." *Williams*, 929 F.3d. at 183.

another federal statute, EFTA. *Id.*; *see also* Ex. I, ROSETTE_REVISED_032369…. The truth as revealed in the email cited by Plaintiffs is that Red Rock's attorney had nearly full knowledge of her client's loan product.

*Galloway* Br. at 9–10.

As with their disregard of the temporal and organization distinctions, Plaintiffs make unwarranted conflations: verifications are not originations, and underwriting is not the provision of pre-qualified leads. In illustration, James Dowd testified:



Ex. I (Dowd 11/13/18 Dep.) at 197:16–198:8.

Thus, Plaintiffs' attempts to find misrepresentations in Martorello's statements that "Sourcepoint presented the underwriting criteria to Red Rock's co-managers for their evaluation and ultimate approval or rejection" and that LVD "retained full control over the underwriting criteria used to make loans to consumers" (ECF No. 784 at 17 n.8), or that Red Rock's co-managers made "all decisions regarding the business" (*id.* at 18)[22] come up empty. The statements, besides having limited relevance to the Fourth Circuit's determinations regarding the Tribe's control over the subsequently created Entities, are completely accurate.

    b.  <u>Red Rock operated on the LVD reservation.</u>

Plaintiffs next question Michelle Hazen's declaration—**not** Martorello's—that loans were

---

[22] Plaintiffs' uncited quotation misstates Martorello's statement that Red Rock's co-managers were ultimately responsible "for all decisions regarding ***Red Rock's operation***." ECF No. 249 ¶ 17 (language omitted by Plaintiffs in emphasis). The omission, like the rest of Plaintiffs' brief, glosses over the important distinction between the lending operations and the servicing operations. Bellicose controlled the latter. Red Rock, and the Tribe, controlled the former.

originated on the reservation, and that Red Rock's employees, computers, and records were "on LVD's reservation lands at all times." ECF No. 784 at 14 (quoting Pl. Ex. 1 ¶ 8). This and much more was the intention of the parties from the beginning, even before the lending ever launched. Ex. PP (ROSETTE_REVISED_037655) (███████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *See* Ex. XX (ROSETTE_REVISED_036363).

Also, multiple other sources confirm that this is what actually happened at all relevant times, proving that these statements are objectively true. *See, e.g.*, Ex. E (Gravel 4/5/19 Dep.) at 158:1–19 ("all loan applications are reviewed and [] approved by [Red Rock or Duck Creek] on tribal land before the loan is originated."); Ex. I (Dowd 11/13/2018 Dep.) at 82:11–22, 83:9–15; 184:11–16 (███████████████████████████████████████████████); Ex. G (Mansfield 1/18/2019 Dep.) at 112:23–113:2 ("[W]e had the account the money went through that we were the ones that would actually put the money in and take the money out of the accounts. That was done at the tribe, at the call center."); Ex. YY (Gerber 12/17/18 Dep.) at 52:9–53:18 (the bank would only deal with customers that conducted business on tribal soil); Ex. D (Rosette 6/29/20 Dep.) at 124:15–125:6 (███████████████████████████████████ ██████████████████████████████████████████); and Ex. ZZ (ROSETTE_REVISED_014047) (detailing a long list of what Transunion would witness on reservation upon their visit, November 2, 2012, including approvals and payment processing) Moreover, lending expert Richard Ross has reviewed the evidence and come to the same

conclusion, reasoning that all three components of origination—including approval, dispersal of funds, and communication of final approval—occurred on Tribal lands in this case. ECF 821-4 (Ross Rep.) at 15.

Plaintiffs nevertheless claim that new evidence suggests Red Rock conducted operations in Chicago. This is based on a single email to one of Red Rock's co-managers inviting him to come to Chicago for four days of training, "where the duties that will be happening at LVD are occurring today (email, strategy, ACH)." ECF No. 784 at 14 (quoting Pl. Ex. 23 at CM0000869). This reference is irrelevant and misleading. First, as Plaintiffs acknowledge, this email refers to non-origination activities in the very early stages of Red Rock. *See id.* (suggesting operations were conducted "*at least initially*" in Chicago.[23] Second, Plaintiffs are wrong as a matter of fact. As illustrated above, the record is clear that at all times, the place of origination—i.e., the place where the non-ministerial function of "approval, disbursal and the extension of credit" occurred—was the LVD Reservation. *See* ECF 821-4(Ross Rep.) at 14–16 (defining elements of origination); Ex. RR (Ross 3/15/2019 Dep.) at 9 ███████████████████████████████████████ ███████████████████████████████████████; *id.* at 94–98 (explaining that approval is the key to origination process); Ex. BBB (Hazen 7/2/19 Dep.) at 52–54 (explaining that approval is key to origination process and that approval of Big Picture loans occurred on reservation). Indeed, co-manager Craig Mansfield addressed Plaintiffs' allegations

---

[23] Moreover, this Court and the Fourth Circuit have both acknowledged that relying on outside employees immediately after acquisition sale does not alter Tribal control. *Williams*, 929 F.3d at 181. Any tribal startup challenges during its first days of operations would be equally justified.

Furthermore, Plaintiffs themselves acknowledge Defendants' shared understanding of the "cornerstone of the sovereign model": that "[s]o long as the loans were originated by a server on tribal land, they were purportedly exempt from state laws." ECF No. 784 at 10. If so, then why would Defendants, after making such extensive efforts to structure their operations to comply with and be subject to Tribal law, risk voiding that protection?

JA849

about Chicago at his deposition more *than a year and a half ago*, explaining that Tribal members went to Chicago "to get an idea of how to set up the call center" the Tribe intended to operate. Ex. G (Mansfield 1/18/2019 Dep.) at 99:22–102:10. Mr. Mansfield further explained that the Chicago call center was not the one the Tribe used for its lending operations: "We had one call center, and that was Duck Creek." *Id.* at 106:6–12.

Along similar lines, Plaintiffs claim Martorello's declaration misrepresents that he has "never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock" and refer to Bellicose overseeing the ACH payment processing at LVD. But that overseeing role is not a "collection action" ("to demand, sue for, take or receive") which *only* Red Rock (or Big Picture after it) ever did.

Plaintiffs also contest statements that "Bellicose has never accepted or collected a consumer loan payment under any loan agreement originated by Big Picture or Red Rock" because "the Servicing Agreement expressly provides that Bellicose 'shall collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock]… and deposit proceeds daily into a bank account.…'" ECF No. 784 at 15 (quoting Pl. Ex. 8 ¶¶ 26, 105; Pl. Ex. 26 § 4.9, Martorello_026273). The statements are true: as the witnesses in this case have explained, the collection of the loans at issue occurred pursuant to a "batch renewal" process performed daily on Tribal lands. *See* Ex. CCC (Justin Martorello 1/9/19 Dep.) at 101:8–104:16 (explaining batch renewal process that occurred on Tribal land and was operated by Tribal employees). *See also* Pl. Ex. 24, where Plaintiffs ask Justin Martorello about this precise provision, and he states "I can tell you that the servicer Sourcepoint never collected any amounts ever." Through that process, funds were deposited in (or removed from) the Tribal entities' bank account. *See id.*; ECF 821-4 (Ross Rep.) at 17 (analyzing evidence and concluding, "[t]he

**JA850**

unsecured small dollar installment loans extended by Red Rock and Big Picture Loans were originated, approved, dispersed, and committed on Tribal Lands…. Red Rock or Big Picture Loans were the lenders to whom the small dollar consumer installment loans were first payable and therefore the lender, the only lender and the True Lender."). Indeed, Plaintiffs have 10 years' worth of bank statements showing this to be true. *See* Ex. DDD (Chippewa_000013) ██████

████████████████████████████████████████████████████████████████████

███████████████████████████████████. It is also undisputed that the consumers' loan payment checks, for consumers who paid with checks by mail, were always mailed to the reservation, where they were uploaded and applied against a consumer account. Here, again, the statements are objectively true. *See also* Ex. EEE (MARTORELLO_003936) (April 15, 2014 email from Martorello to potential investor: "My job is to provide … services to Tribal government lenders and I get paid for my services. I don't buy the loans they originate and then collect them. The tribe owns, manages, collects, and underwrites on tribal land, etc. My objective is to help the Tribe build their business in a self-sufficient manner.").[24]

Plaintiffs also claim that Hazen's declaration "hid or misled as to the fact that Red Rock did not have a single employee." ECF No. 784 at 14. Their sole support for this claim is the deposition of Justin Martorello—in which he says, **on the very page that Plaintiffs cite,** that Red

---

[24] Plaintiffs claim an email stating that "Collections probably will begin in 2015 in Watersmeet" suggests Red Rock did not handle collections, or that they did not occur on the reservation. ECF No. 784 at 15 (citing Pl. Ex. 27 at ROS001_043487). When read in context, this statement shows that LVD was attempting to stand up its own collection agency, confirming its efforts to expand its operations and reduce reliance on third-party vendors. *See also* Ex. FFF (LVD-DEF00017855); Ex. GGG (ROSETTE_REVISED_044075) (Nov. 2014 Wichtman email: "This brings me to collections in house - we really need to consider this as an option and encourage its development. In the long run I think the reward will be much greater to the model and the bottom line"—to which Martorello responds "I think everyone is super excited about collections being in Watersmeet."). It also does not change the fact that loan payments were made to LVD on the reservation.

Rock *did* have employees between 2011 and 2015:[25]

> Q. … So, to your knowledge, did Red Rock have employees between 2011 and 2015?
>
> . . .
>
> A. Yes.
>
> Q. Okay. And who were those employees?
>
> A. Shelly Hazan, Craigs Manfield (sic), Jason Guzman. There were a dozen or so others.

Pl. Ex. 24 at 49:7–23.

Plaintiffs' argument regarding the Philippines call center is just as much a contortion of

the facts, one that has already been corrected in other briefing:

> Plaintiffs say the Tribal Defendants misrepresent that "contracts for all loans … are formed on the reservation." Dkt. No. 249 at 15. Plaintiffs say this is a lie because some loan approvals involve use of an automated process, and that verification steps in the loan origination process are often handled by workers at a Philippines call center. *Id.* This argument is based on yet another effort to confuse. The evidence is undisputed, and the point established beyond reasonable dispute, that all loans are approved and the contracts formed on the reservation, and that is the statement by the Tribal Defendants being challenged. However, the loan origination process—including information verification and other underwriting steps leading up to but ending before the actual approval and contract formation—occurs both on the and off the reservation. Ex. 16 at pp. 44-84. And while parts of the loan origination process involves use of technology, *the bottom line is that the approvals and contract formation always occur on the reservation*. In sum, the Plaintiffs' assertion that an automated process is used and verifications occur off-reservation does nothing to belie the truth that on-reservation final approval and contract formation is occurs [*sic*] on reservation.

Tribal Br. at 34–35 (emphasis added). Plaintiffs' manipulation of the record should be rejected.[26]

---

[25] Plaintiffs' confusion seems to arise over the precise employment status of these individuals, who, though they performed work and services for both Duck Creek and Red Rock, were technically employees of Duck Creek. *See* Ex. HHH (J. Martorello Decl.) ¶ 19 ("DCTF was a servicer, akin to a Professional Employment Organization ("PEO"), for RRTL. As such, RRTL had no employees.").

JA852

Stripped of the conflation, the evidence shows exactly as Defendants represented, and both this Court the Fourth Circuit found: the lender "conducts all of its operations on the reservation."

    c.   <u>What few alleged misrepresentations relevant to Tribal control of Big Picture and Ascension likewise have no material impact on the Fourth Circuit's holdings.</u>

As the Fourth Circuit found, Big Picture is subject to Tribal control based on the Tribe's "substantial role" in its operations, Big Picture's employment of various tribal members, and the fact that it "conducts all of its operations on the Reservation"—all of which "assure[s] that Big Picture is answerable to the Tribe at every level, which supports immunity."[27] The evidence, detailed above, clearly supports these holdings. Plaintiffs' attempts to show otherwise fail.

Plaintiffs contest BPL's assertion that Martorello "has no authority over Big Picture" and

---

[26] Plaintiffs' reliance on a document noting Bellicose's supervision of ACH activities, ECF No. 784 at 1, 5, misses the mark. Bellicose's ministerial involvement in ACH transactions initiated by the Tribal Entities does not constitute collection. *See* ECF 821-4 (Ross Rep.) at 14. Moreover, at all relevant times, payments from borrowers went into Red Rock's bank account, a fact corroborated by 10 years of bank statements. ECF No. 565 ("Plaintiffs ignore the thousands of pages of bank records obtained from Chippewa Valley Bank which unquestionably demonstrate that loan repayments were made by consumers to an operating account belonging to Red Rock, and which Red Rock then used to pay bills and fund new loans using ACH providers").

[27] Moreover, as Martorello has already explained in *Galloway*, Plaintiffs' false assertions about SourcePoint's purported role in the collections process, even if true, are irrelevant:

> Even if Plaintiffs were correct in their assertions concerning SourcePoint's role in loan originations, servicing and collecting—and they are not—there would be nothing improper about the business model Plaintiffs allege. An arrangement in which a servicer uses and applies a lender's pre-determined credit criteria to evaluate and recommend action on a particular loan application on behalf of a lender, and then purchases an interest in those loans, is neither irregular, nor controversial. Rather, such an arrangement is, in fact, the **industry standard** for fintech companies, which market their brand and originate, service and collect on behalf of banks, under the supervision of the FDIC and OCC, and non-bank lenders. *See* Ex. D, FDIC Financial Institution Letter 50-2016, FDIC Proposed Examination Guidance for Third-Party Lending (available at https://www.fdic.gov/news/news/financial/2016/fil16050a.pdf) (approving of relationships where banks originate loans for third parties); *see also* Ex. E, Financial Institution Letter 44-2008; Ross Rep. ¶¶ 69–72.

*Galloway* Br. at 7 n.6.

"no involvement in any aspect of Big Picture's operations" following the Tribe's acquisition. ECF No. 784 at 42. In their search for evidence of Martorello's control over Big Picture, Plaintiffs claim that, "through the Intratribal Servicing Agreement, BPL relinquished to Ascension the right to control the vast majority of the responsibility for its operations," and that Ascension in turn "contractually relinquished the right to control its operations to McFadden, Martorello's childhood friend and business partner." ECF No. 784 at 42. Then Plaintiffs place Martorello at the head of this control structure by asserting that Hazen and Williams, Big Picture's current managers, must "obtain approval from Martorello via (albeit via Eventide) to replace McFadden." *Id.* The failure of even one plank of this Rube Goldberg apparatus would doom this contention. Here, they all fail.

First, as the Fourth Circuit found, the Intratribal Servicing Agreement places Big Picture firmly in control of Ascension:

> The Intratribal Servicing Agreement, which lays out the relationship between the two Entities, indicates that ***Big Picture remains in control of its essential functions***. Indeed, the Intratribal Servicing Agreement expressly forbids Ascension from engaging in origination activities, executing loan documentation, or approving the issuance of loans to consumers. The Agreement assigns Ascension the duties to give "pre-qualified leads" to Big Picture and to provide the "necessary credit-modeling data and risk assessment strategies" used by Big Picture to decide whether to issue a loan. J.A. 419. But the Agreement also provides that the "criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion" of Big Picture and that Big Picture "shall execute all necessary loan documentation." J.A. 420.

*Williams*, 929 F.3d at 183 (emphasis added). Plaintiffs' attempt to flip the script and suggest that Big Picture is actually subservient to Ascension depends on no alleged misrepresentation, but a simple wish that this Court disagree with the Fourth Circuit's holding, which was based on the document defining the Entities' relationship and applies identically to Red Rock.

Second, it is true that "Hazen and Williams … delegated to McFadden the authority to approve Ascension's strategic direction, execute documents on the company's behalf, open and

manage Ascension's bank accounts, and oversee all matters necessary for the daily management of Ascension"—but the Fourth Circuit already acknowledged all of that. *Williams*, 929 F.3d at 183–84. It is neither surprising nor concerning that a company would give its manager authority to make important decisions on its behalf. Additional evidence of McFadden's control over Ascension simply reestablishes a point the Fourth Circuit already found, and in so finding noted that it tended to weigh against a finding of immunity—but only slightly. *Id.* at 184. Moreover, as Martorello has already pointed out in *Galloway,* despite the co-managers' occasional delegation, they still retained in control of lending operations:

> The co-managers did not just evaluate one limited aspect of the business—they were required to evaluate (and if appropriate approve) all aspects of the business. The co-managers were required to approve new lead providers, and LVD's Tribal Council had another level of review and approval for such agreements given the limited sovereign immunity waiver present in each contract. Ex. N, ROSETTE_REVISED_058149. The co-managers were also required to review and approve proposed changes to Red Rock's annual business plan. See, e.g., Ex. O, ROSETTE_REVISED_002331 (April 2012 email to Red Rock's co-managers detailing proposed changes to Red Rock's operations including "the sale of denied loan applications" and "remarketing efforts" for existing customers, taking nearly a month to consider and approve, even at the demise of additional revenue streams). For each proposed change, the co-managers were provided with specifics detailing the change, the financial impact the change would have on the business, a discussion of the regulatory basis for the change, and a request to "provide formal approval of the revised business plan and associated revenue generating activity." *Id.* After a full discussion and evaluation of the business plan by the co-managers and their attorney, the plan could be approved. Contrary to the "rubber stamp" allegations of the Plaintiffs, the approvals were not immediate and often involved providing additional information to the comanagers, or the outright rejection of a recommendation.

*Galloway Br.* at 12–13. Many other sources confirm this control. *See, e.g.*, Ex. F (Weddle 5/20/2019 Dep.) at 107:12–108:24 ("[A]t no point was Mr. Martorello, or any entity he was ever involved in, controlling anything. Those were determinations made by the appropriate tribal officials."); Ex. III (ROSETTE_REVISED_044600) (6/15/2012 Karrie Wichtman: "we made every effort to ensure tribal control, and are tweaking things almost constantly, it seems, to allow

for more tribal control….”); Ex. JJJ (ROSETTE_REVISED_002331) (April 2012 email to Red

Rock’s co-managers seeking approval for changes to Red Rock’s operations including “the sale

of denied loan applications” and “remarketing efforts” for existing customers, taking nearly a

month to consider and approve, even at the demise of additional revenue streams); Ex. E (Gravel

4/5/19 Dep.) at 86:3–87:12 (Martorello did not control Red Rock or Duck Creek).

Finally, Plaintiffs’ claim that Martorello controlled McFadden through his ability to

revoke McFadden’s shares and equity in Eventide is pure fantasy, as already shown:

> Plaintiffs say that Martorello controlled McFadden because, under Eventide’s
> operating agreement, Martorello could “revoke McFadden’s shares within 14-
> days’ notice.” Dkt. No. 249 at p. 30 (emphasis added) (citing Ex. 252-72 at
> § II(I)). But, even a quick glance at the cited Eventide operating agreement shows
> that Plaintiffs are, again, shaving the truth. There is no power of revocation.
> Instead, the manager of Eventide has the ability to “repurchase” the interests its
> Eventide members for “Fair Market Value.” See Dkt. No. 252-72 at § II(I)).
> However, there is no evidence that (a) Matt Martorello ever tried to invoke this
> pressure specifically; (b) that Matt Martorello ever tried to control the business of
> Ascension generally; (c) that Matt Martorello ever even expressed displeasure
> with a business decision after sale of the servicing business; or (d) that any
> particular business decision by Brian McFadden was bent in favor of Matt
> Martorello. Indeed, Brian McFadden was not even aware whether Matt Martorello
> could buy out his interest in Eventide. Ex. D-30 at pp. 70:17–21. Plaintiffs’
> argument is a tower of speculation and certainly does not show that Matt
> Martorello controls Big Picture or Ascension

Tribal Br. at 43; *see also* ECF No. 106-17 (McFadden 12/21/17 Decl.) ¶¶ 10–16 (“Martorello has

no ownership in nor control over Ascension”).

In addition, whatever weight this argument may have held in the past is gone now that

McFadden has relinquished his equity interest in Eventide pursuant to his settlement agreement

with Plaintiffs. *See* Signed Settlement Agreement, ECF No. 55-1, *Galloway v. Williams*, No.

3:19-cv-00470-REP (E.D. Va.). Plaintiffs therefore seek to show Eventide’s efforts to assert its

control, such as by demanding arbitration in December 2019 on the contention that the Tribal

Entities were in default of the loan agreement and seeking to stay the Tribal Defendants’

settlement agreement in this Court. ECF No. 784 at 50. Here, however, Eventide has simply asserted its rights as a creditor—consistent with its claim that it is a "mere creditor." And as Plaintiffs themselves note, Eventide's efforts largely have not so far succeeded. ECF No. 784 at 50–51.[28] That is hardly compelling evidence of Eventide's resolute command over operations.

Plaintiffs' attempt to put Eventide in a position of control over Ascension also fails because the Fourth Circuit already noted that Eventide exercises influence over Ascension. *Williams*, 929 F.3d at 184. If Plaintiffs actually had any new evidence on this point, it would once again be cumulative to a point with which the Fourth Circuit has already agreed—albeit a minor point that did not change its ultimate conclusion.

Having failed to show any means by which Martorello could possibly exercise control over Bellicose and Ascension, all support for Plaintiffs' fantastic tale, under which the creation of Bellicose and Ascension were nothing more than an attempt to improve the "optics" "while continuing to allow [Martorello] operational control" (ECF No. 784 at 4), vanishes. What remains is what the Fourth Circuit found: while the Tribe's control over Ascension is sufficiently remote as to weigh slightly against immunity, Big Picture is answerable to the Tribe at every level, which supports immunity. Nothing Plaintiffs raise undermines these key holdings.

4. *Plaintiffs Fail to Show any Alleged Misrepresentations Materially Affected the Fourth Circuit's Evaluation of the "Tribal Intent" Factor.*

"The fourth *Breakthrough* factor assesses the tribe's intent to extend its immunity to the entities." *Williams*, 929 F.3d at 184. As the Fourth Circuit correctly noted, "[t]he Tribe unequivocally stated its intention to share its immunity in Big Picture and Ascension's formation

---

[28] In addition, Eventide's Chapter 11 bankruptcy, referenced at ECF No. 784 at 51, was dismissed. *See* Order of Dismissal, ECF No. 288, *In re: Eventide Credit Acquisitions, LLC*, No. 20-40349 (Bankr. N.D. Tex.).

documents." *Id.* "Plaintiffs conceded that this factor weighed in favor of Big Picture and Ascension…." *Id.* None of the alleged misrepresentations Plaintiffs attempt to raise call this concession into question. The Fourth Circuit's holding on this factor is remains undisputed.

5. *Plaintiffs Fail to Show any Alleged Misrepresentations Materially Affected the Fourth Circuit's Evaluation of the "Financial Relationship" Factor.*

As to the Fifth *Breakthrough* factor, the Fourth Circuit found that "a judgment against the Entities could significantly impact the Tribe's treasury" and agreed with this Court that it could "drastically reduce Big Picture's revenue." *Williams*, 929 F.3d at 184. In holding that this factor weighs in favor of immunity, the Fourth Circuit relied on the fact that 10% of the Tribe's general fund comes from the Entities. *Id.* This is beyond dispute. A judgment against Big Picture (or Red Rock) would "reach the tribe's assets" and nothing Plaintiffs offer can change that. *Id.*

Yet Plaintiffs allege that Hazen and Martorello lied about Red Rock's revenue share under oath when they testified that Red Rock received two percent of the gross revenue. ECF No. 784 at 23, n.13.[29] This issue does not change the fact that the Tribe benefits tremendously from the operations, and so is ultimately irrelevant. But Martorello also previously showed that this statement was absolutely true: "[i]f there has been any misstatement made by any party in the case to date about the revenue split in those years, it would have been *underestimating* the income to the tribe as 'two-percent of gross revenue,' when it was actually higher." *Galloway* Br. at 25 (and exhibits cited therein). Other sources confirm the same. *See, e.g.*, Ex. C (James

---

[29] Plaintiffs' issue with this alleged misrepresentation is dishonest, as shown previously: "[A] Servicing Agreement between Red Rock and Bellicose, produced on February 6, 2019, disclosed the brokerage fee in Sections 6.4.1 and 7.15 of the agreement. So the Plaintiffs' gripe of late disclosure is incorrect; and even under their story they were fully advised of the fee by Scott Merritt's deposition in March 2019, so they admit they knew about this well before the *Williams* oral argument. If this was a truly-felt complaint, Plaintiffs had plenty of time and plenty of opportunity to raise it with the Fourth Circuit." Tribal Br. at 46.

Williams, Jr. 11/13/2017 Dep.) at 57:8–61:25 (stating Red Rock received at least 2% and likely

more); Ex. RR (Ross Dep.) at 133:13–135:3 ████████████████████████████████

████████████████████████████████████████; ECF 821-4 (Ross Rep.) at 6–7

(explaining that Net Tribal Profit is a defined term of art unique to the Servicing Agreement and

not a typical accounting term, and noting that Net Tribal Profit does not amount to and often

exceeds "net profit" in an accounting sense).[30] In fact, as of August 2013, the Tribe's lending

enterprises accounted for 46 percent of the Tribe's government budget, far more than the 10% it

generated for Big Picture. Ex. P (Williams 8/22/13 Decl. in *Otoe-Missouria*) ¶ 22.

Plaintiffs also claim that "Martorello misrepresented the origin of the revenue split,

falsely claiming that 'LVD suggested this form of revenue split as it guaranteed LVD's lending

entities would always generate income for LVD's general fund while simultaneously

incentivizing SourcePoint to assist LVD in the growth and the maintenance of an efficient and

successful business for the benefit of LVD.'" ECF No. 784 at 24. This statement is irrelevant to

*Williams*, but nonetheless correct. Emails from negotiations between Martorello and the Tribe

show that initially, Martorello was not even familiar with the concept of the type of revenue split

ultimately agreed to by the parties. *See* ECF No. 756-11 (Flint Richardson 8/23/11 email to

Martorello, *inter alia*) at 3 (explaining methodology for calculating payments to Tribe); *see also*

Ex. BBB (Hazen 10/16/17 Dep.) at 35:21–38:6 (discussing the 2% of gross and that it was

Tribe's idea for revenue split). And, as tribal expert Lance Morgan confirms, these types of

splits—though rare in Martorello's world—are common in Indian business dealings. ECF 821-6

---

[30] Plaintiffs appear to suggest this is somehow impacted by the fact that LVD decided to pay a brokerage fee of 50 percent of the two percent it negotiated to receive to TLM (which it did until July 2012, at which point TLM and LVD entered into a transaction to buyout TLM at terms for which Martorello was not privy). ECF No. 784 at 23. What LVD decided to do with what it received does not change the fact that it received it—nor that LVD benefits enormously thereby.

(Morgan Rep.) at 22–24; *see also* Ex. J (Merritt 3/21/19 Dep.) at 49:1–13 and 53:8–20 (testifying that 2% revenue split was not out of the ordinary for tribal partnerships at the time while also market rate for similar services outside Indian country as well). Even if Martorello proposed the specific two-percent figure, that does not contradict his statement that the Tribe suggested the split.

Plaintiffs next complain that Rosette's company, Tribal Loan Management, received a "brokerage fee" of 50 percent of Red Rock's revenue Share. ECF No. 784 at 23. Addressed already above, Plaintiffs offer no detail on how this impacts if a judgment against Red Rock "could significantly impact the Tribe's treasury." What Red Rock did with the money it received does not change the fact that it received it.

Plaintiffs further contend that "Defendants" materially misrepresented the value of Bellicose as being just over $100 million at the time of the sale—but the statement they cite is the Tribal Defendants' brief, not any statement by Martorello. ECF No. 784 at 42 (citing *Galloway I*, ECF 40 at 7). In reality, Plaintiffs claim, the business was worthless, because it was on the brink of being shut down by regulators (never mind that six years on, the tribal lending industry is **growing**). The statement is of little note, given that it is not a statement by Martorello. But the proof is in the pudding: the entities have indeed provided significant value to the Tribe since their acquisition:

> The Tribe acquired SourcePoint a little over three-and-a-half years ago and, during that time, the Tribe has reaped over $5 million above and beyond the note payments it has made to acquire the business. That proves value. Moreover, in a little less than three-and-a-half years from now, the note obligations will end, and the income stream to the Tribe will increase many times over, adding more than $10 million per year. Again, that proves value.

Tribal Br. at 24.

Moreover, documentary evidence, testimony from Tribe members, and valuation experts

all confirm that the business was worth many millions at the time of sale. According to valuation expert Gregory Cowhey, the value of Combined Business—i.e., Bellicose Capital LLC and LVD Tribal Acquisition Company LLC—in January 2016 was $189,307,000. ECF 821-███████ ███████ And Tribal members confirm the immense value the business contributed to the Tribe. *See* Ex. G (Mansfield 1/18/2019 Dep.) at 48:4–7 ("I mean [the lending business is] just immensely important what this has done for our community. I just—I just can't keep saying that enough."). Indeed, even the Tribe's own pitch deck to investors estimates net income from the business in the hundreds of millions a year. *See* Ex. KKK (LVD-DEF00022047 at 22057) ████████████████████████████████████████████████████ ███████; Ex. AAA (ROSETTE_REVISED_048541) (forecasting revenues of over $58 million each year) Ex. KK (BDO-Bellicose000065).[31]

Plaintiffs' suggestion that Defendants "did not cite any evidence" in support of their position regarding valuation (ECF No. 784 at 43) is simply false: "the undisputed evidence is that the Tribe received a pro forma from Martorello indicating that Bellicose could be worth $100 million. Ex. D-11 at p. 12:9-11." Tribal Br. at 30–31; *see also id.* at 18 ("Plaintiffs ignore other evidence that shows Martorello and his agents used several different accounting principles to value the business several different ways, with values ranging to upwards of $100 million."). Plaintiffs also fail to mention that they received the emails on which they rely for this point well

---

[31] Plaintiffs identify as an alleged misrepresentation Martorello's statement that, "[s]ince the beginning of my relationship with LVD, I understood that LVD had always intended to utilize my consulting services to assist them to build their valuable IP. . . ." ECF No. 784 at 45 n.26 (citing Pls. Ex 8 ¶ 47). Plaintiffs point to Martorello and LVD's disagreement about what the arrangement is for certain IP. The Servicing Agreement, however, clarifies that IP generated for LVD was the property of SPVI, until it was disclosed to LVD at which point **each** would own the information. Moreover, Plaintiffs ignore the value of the intellectual property and systems at Red Rock, the brand, and the customer list, which expert Cowhey valued at **$24,729,000,** ██████████████████████ which substantially supports the Fourth Circuit's holdings.

in advance of the *Williams* decision, as previously noted:

> Plaintiffs also cite Exhibit 63, another Martorello email, dated December 2015, where he describes as a risk that "efforts would be attempted by [s]tate governments to shut down tribal lenders" and other regulatory actions that "will shut this business down." Dkt. No. 252-67 [cf. Ex. 89]. This email was produced on January 31, 2018—more than a year before the *Williams* oral argument and opinion…. It is incredible that Plaintiffs now cite to this as 'new' evidence in support of their allegations that the Tribal Defendants misrepresented facts to the Fourth Circuit.

Tribal Br. at 24–25.

As the Fourth Circuit noted, "the evidence indicates that the Tribe's general fund has in fact benefited significantly from the revenue generated by an entity." *Williams*, 929 F.3d at 181. So, Plaintiffs' complaints about alleged misrepresentations are not only stale and false, but also have no bearing on the holdings in *Williams*, which conclusively show that the Tribe does depend on the revenue from the entities.

6. *None of Plaintiffs' Alleged Misrepresentations Undermines the Key Holdings of the Fourth Circuit which Held its Obligation was to Promote and Further the Legitimate Federal and Tribal Interests in Tribal Economic Development.*

In sum, none of the alleged misrepresentations Plaintiffs identify have any impact on the Fourth Circuit's holdings on the five *Breakthrough* factors. But that is not all. The Fourth Circuit acknowledged that restrictions to sovereignty are reserved for Congress, and until then the obligation of the courts is to further and promote efforts in tribal economic development. This includes when tribes use "the resources of the private market" such as the internet, and "outside expertise." The alleged misrepresentations Plaintiffs attempt to marshal together in its vain resistance to *Williams* do nothing to affect its holdings in support of LVD's operations.

These same federal policies also require the Court to give "guard" and "promote" to the Tribe's operations, law, and commercial agreements with non-Indians—including Martorello, and even more fundamentally, including Plaintiffs. It is federal policy to promote Tribal self-

governance and economic development and the panel decided to further that policy here. Nothing Plaintiffs identify as alleged misrepresentations can or could possibly change that. The *Williams* decision is therefore binding despite Plaintiffs' attempts to evade it.

**B.      The Evidence Shows that All of Martorello's Statements Were Truthful.**

As discussed above, virtually all of the purported misrepresentations by "Defendants" about which Plaintiffs complain are irrelevant to the *Breakthrough* Factors and the *Williams* decision's application of those factors. The analysis can and should stop there.

That said, a complete accounting of all alleged misstatements by Martorello cited by Plaintiffs—whether relevant to the *Breakthrough* factors or not—shows definitively that Martorello's statements in this case have been consistently accurate and truthful, and that it is Plaintiffs whose candor is in question. This accounting is attached with detailed citations as Exhibit A, and summarized below:

| Cite in Pl.s' Brief | Martorello Statement | Why Statement Is True |
|---|---|---|
| Stmt. of position at 7, 8 | Martorello "was not involved in the creation of Red Rock, but made aware Red Rock had been formed." Martorello Decl. ¶ 17. | Red Rock was formed by the Tribe and its Tribal Council, a process in which Martorello could not participate as a matter of Tribal law and procedure. *See supra* at 9–10 & n.9. |
| Stmt. of Position at 8 | "Neither I, nor Bellicose, helped form Big Picture or Red Rock." Martorello Decl. ¶ 102. | Martorello and Bellicose did not and could not participate in the legal formation of Big Picture or Red Rock, acts undertaken exclusively by the Tribe and the Tribal Council. *See supra* at 9–10 & n.9. |
| Stmt. of Position at 11 | "LVD approached Martorello in 2011 to assist them [sic] create and grow online lending business." Martorello Decl. at Heading II.A. | LVD planned to create an online lending business and retained professionals to do so before meeting Martorello for the first time. *See supra* at 14–16. |

| Cite in Pl.s' Brief | Martorello Statement | Why Statement Is True |
|---|---|---|
| Stmt. of Position at 11 | "As LVD gained additional knowledge and sophistication, I understood that LVD had always intended to increase its ability to manage and run a successful lending business while decreasing outsourced consulting services." Martorello Decl. ¶ 48. | LVD took on more and more roles after launch, increasing tasks with the intent to eventually internalize outside services—a common approach in Tribal economic development. *See supra* at 18–20, 22–23. |
| Stmt. of Position at 14 | Martorello had "never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock." Martorello Decl. ¶ 26 | All collection actions—in particular taking or receiving loan payments— was done by Red Rock alone, on LVD lands. *See supra* at 39–41 & nn. 24, 26. |
| Stmt. of Position at 14 | "Bellicose has never accepted or collected a consumer loan payment under any loan agreement originated by Big Picture or Red Rock." Martorello Decl. ¶ 105 | Collection of all funds always went directly into LVD's bank account—and payments were applied against the consumer loans by the Tribe on LVD lands. *See supra* at 39–41 & nn. 24, 26. |
| Stmt. of Position at 16 | "Under the Servicing Agreement, Red Rock paid SourcePoint to develop underwriting criteria to recommend for implementation by Red Rock. SourcePoint did not simply implement these underwriting criteria on behalf of Red Rock, but instead presented the underwriting criteria to Red Rock's co-managers for their evaluation and ultimate approval or rejection." Martorello Decl. ¶ 45 | SourcePoint provided pre-qualified leads under the terms of the Servicing Agreement which were designed to fit Red Rock's underwriting criteria. There was no possible way to implement a change to any on-reservation verification (or other) procedure without discussion and the express approval and implementation by the lender's on reservation managers. *See supra* at 31–33, 36–37, 41. |
| Stmt. of Position at 16 | "Neither I nor Bellicose have 'controlled' any underwriting criteria used by and of LVD's lending businesses – at all times the LVD business retained full control over the underwriting criteria used to make loans to consumers." Martorello Decl. ¶ 101 | SourcePoint provided pre-qualified leads under the terms of the Servicing Agreement which were designed to fit Red Rock's underwriting criteria. There was no possible way to implement a change to any on-reservation verification (or other) procedure without discussion and the express approval and implementation by the lender's on reservation managers. *See supra* at 31–33, 36–37, 41. |

JA864

| Cite in Pl.s' Brief | Martorello Statement | Why Statement Is True |
|---|---|---|
| Stmt. of Position at 22 | "Contrary to what Plaintiffs have represented to the Court, Red Rock did not receive two percent of the *net* revenues under the terms of the Servicing Agreements. Instead, as the documents I have reviewed that were provided in discovery demonstrate LVD chose to structure their arrangement to stabilize their monthly income as a percentage of *gross* revenues, adjusted for bad debts." Martorello Decl. ¶ 34 | Under the Servicing Agreement, LVD negotiated to take out a guaranteed distribution to owner of 2% of "Tribal Net Profit"—a defined term of art unique to the Servicing Agreement and not a typical accounting term.  If anything, LVD received even more than this. *See supra* at 47–49 & nn. 29, 30. |
| Stmt. of Position at 23 | "LVD suggested this form of revenue split as it guaranteed LVD's lending entities would always generate income for LVD's general fund while simultaneously incentivizing SourcePoint to assist LVD in the growth and the maintenance of an efficient and successful business for the benefit of LVD." Martorello Decl. ¶ 36 | Martorello was unfamiliar with revenue sharing agreements of the kind at issue in this transaction when he began discussions with LVD. But these arrangements (including the two-percent payments) are common in Tribal enterprises. Such an arrangement suited the needs and goals of the Tribe. *See supra* at 47–49 & nn. 29, 30. |
| Stmt. of Position at 23 | "Contrary to the allegations of Plaintiffs', the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies. Indeed, much of the discussions as to the motivation behind the sale transaction described by Plaintiffs' Complaint are nonsensical and are temporally problematic. Plaintiffs claim there were certain 'motivating factors' for the sale which, in reality, occurred eighteen months to three years before the sale transaction closed." Martorello Decl. ¶ 69 | The Tribe's motivations are not one and the same as Martorello's. Martorello's plan of building a servicing business for tribes never changed until the Tribe made an attractive offer to purchase the entire business in August 2014. Martorello rejected previous purchase offers several times for purely economic reasons. The August 2014 agreement stalled for tax reasons and he refused to close because of those tax reasons until January 2016. All the while, Martorello repeatedly asserted his intent to still help other tribes even if LVD would buy SourcePoint and Bellicose. *See supra* at 22–26. |
| Stmt. of Position at 24 | "To that end, since at least 2012, LVD and I have engaged in multiple conversations relating to the potential | There were sale discussions between Martorello and LVD as early as 2012. *See supra* at 22, 29. |

54

**JA865**

| Cite in Pl.s' Brief | Martorello Statement | Why Statement Is True |
|---|---|---|
|  | sale of my consulting businesses to LVD to accelerate LVD's ability to maintain a profitable online consumer lending business with no outsourced consulting services." Martorello Decl. ¶ 49 |  |
| Stmt. of Position at 26 n. 16 | "all loans are made from LVD's reservation." Martorello Decl. ¶ 107 | The last act to consummate the transaction and the origination of the loan always occurred on LVD reservation. *See supra* at 32–33, 36–41. |
| Stmt. of Position at 26 n. 16 | "As I understand LVD's lending, all loans are made from LVD's reservation to customers based on criteria other than the customers' locations. I have never collected any debts from any consumers in Virginia. I have never had any control over Red Rock or Big Picture's lending decisions, including the decision to lend in any particular state." Martorello Decl. ¶ 107 | All loans are consummated on LVD lands. *See supra* at 32–33, 36–41. LVD maintained control over all aspects of the ***lending*** operation (which is distinct from the ***servicing*** business), including approval of lending criteria. *See supra* at 29– 33, 43. |
| Stmt. of Position at 33–34 | "Neither I nor any company I own or manage directed or controlled the creation of Big Picture." Martorello Decl. ¶ 67 | Martorello and his companies cannot legally participate in the legal formation of Big Picture, acts undertaken exclusively by the Tribe and the Tribal Council. *See supra* at 9–10 & n.9. |
| Stmt. of Position at 34 | "Neither I, nor Bellicose, helped form Big Picture[.]" Martorello Decl. ¶ 102 | Martorello and his companies cannot legally participate in the legal formation of Big Picture, acts undertaken exclusively by the Tribe and the Tribal Council. *See supra* at 9–10 & n.9. |
| Stmt. of Position at 42 | The Defendants have made material misrepresentations about the value of Bellicose, such as that it "was valued at just over $100 million" at the time of the sale. *See* Galloway I, ECF 40 at 7. *[Note that this statement was made in briefing by the Tribal Defendants—not Martorello.]* | Contemporaneous valuations by Martorello and the Tribe and retrospective valuations using historical data show that Bellicose was worth over $100 million. *See supra* at 49–50. |

| Cite in Pl.s' Brief | Martorello Statement | Why Statement Is True |
|---|---|---|
| Stmt. of Position at 45 n.26 | "Since the beginning of my relationship with LVD, I understood that LVD had always intended to utilize my consulting services to assist them to build their valuable IP and to better understand how to run a successful online consumer lending business." Martorello Decl. ¶ 47 | Bellicose developed for LVD operations and procedures it possessed and owned, and assisted Red Rock in building its brand and customers list. The value of the IP and systems at Red Rock approached $25 million as of the date of the sale. *See supra* at 50 n.31. |

In sum, this brief includes a complete survey of every statement of Martorello Plaintiffs allege to have been false, and shows that each statement is in fact true. Martorello respectfully suggests that the evidentiary hearing scheduled for July 21–22 is unnecessary and should be stricken; the Court may determine based on the papers alone that Martorello made no misstatements that could possibly affect the Fourth Circuit's holdings in *Williams*.

**C.    No Adverse Inference Should Be Drawn Against Martorello.**

Plaintiffs' assertion that the Court should draw an adverse inference against Martorello because of purported destruction of documents, ECF No. 784 at 49–50, is completely unwarranted. Plaintiffs do not even bother specifying what should be adversely inferred, or what documents were purportedly destroyed. Plaintiffs speculate that Martorello may have spoken more candidly in emails with other officers and directors of Bellicose and SourcePoint than with others (though they do not say on what subjects, and do not offer any evidence that any such emails were in fact destroyed).

Whatever topics these hypothetical emails would have treated, the emails would have shown only Martorello's understanding, and Martorello's purposes. As far as the *Williams* decision is concerned, what matters is what the Tribe understood and intended. So the spoliation issue is, in any event, immaterial to the *Williams* decision.

But more importantly, Martorello never directed anyone to destroy evidence. Ex. O (Adil Karam 2/12/19 Dep.) at 148:8–25 (Mr. Karam took no direction from Martorello after the acquisition of Bellicose); Ex. F (J. Weddle 5/20/19 Dep.) at 195:16–19 (stating that Martorello did not ever direct her to destroy Bellicose documents). Nor is there any evidence of what was purportedly destroyed—or, indeed, that anything was destroyed. Ex. O (Adil Karam 2/12/19 Dep.) at 148:17–22 (agreeing that "all files whether they be structured or unstructured relating to Bellicose Capital or Bellicose VI were to have been retained, not deleted); Ex. F (J. Weddle 5/20/19 Dep.) at 197:4–20 (when Ms. Weddle offered to transfer her files to Ms. Wichtman, Ms. Wichtman said this would be "unnecessary" because "anything in our files was either something the tribe already had copies of or were likely simply working files . . . and would be duplicative of materials already in Rosette Law and the tribe's possession"). Indeed, there has been abundant discovery in this case from a variety of sources—Weddle, Hazen, Wichtman, etc.—to document the activities of the lending operation, as shown throughout Defendants' briefs, belying any suggestion that relevant evidence has been lost. Notably, Plaintiffs cite no evidence at all in asking for the adverse inference—nothing to show what if anything was deleted, why, or that Martorello was involved deleting any evidence, or that any evidence was destroyed in anticipation of this litigation.

Plaintiffs' reliance on a provision of the Merger Agreement—§ 2.6(d)—requiring Bellicose to transfer all commercially sensitive documents to the LVD Tribal Acquisition Company and then remove copies is unavailing. This provision has a legitimate purpose given that Bellicose was conducting several businesses in addition to servicing for LVD. As transactional expert John Norman notes, the section merely "contemplates that any destruction of documents relates to *duplicative or extraneous materials that may remain*" after transfer to

JA868

LVD. Ex. N (Norman 6/12/19 Decl.) at 4, 6 [ECF No. 545-4] (emphasis added). As Mr. Norman explained, this provision is "common and customary," and "commercially reasonable and appropriate" for the transaction. *Id.* at 4, 6. There is no evidence that this provision was included for purposes of destroying evidence in anticipation of litigation or regulatory action. Ex. M (John Williams 6/22/20 Dep.) at 77:25–78:4 ████████████████████████████████████

████████████████████. Nor, again, was any evidence destroyed in anticipation of this litigation—and Plaintiffs offer no evidence to the contrary.

Plaintiffs' half-baked spoliation arguments, coming months after their deadline to conduct discovery on the spoliation issue passed, only confirms that they have nothing to say on the subject—especially not as it pertains to *Williams*. Thus, Plaintiffs fail to show that Martorello destroyed or directed the destruction of any documents in anticipation of this litigation, fail to show what adverse inference could possibly be drawn as a result, and fail to show how any such adverse inference would impact the holdings in *Williams*.

**D.     Plaintiffs' Renewed Attempts to Press Debunked Theories Call into Question Their Candor before the Court and Warrants an Award of Fees and Costs.**

Plaintiffs' renewed attempts to press debunked theories continue their efforts to conflate and mislead the Court for which they have already once been admonished, and advance irrelevant factual material in their Statement of Position calls into question their candor before this Court and warrants an award of fees and costs. Counsel have a duty of candor toward the tribunal. *See* VA. R. Prof. Cond. 3.3(a)(1) (prohibiting making "a false statement of material fact or law to a tribunal"). They also have a duty to avoid vexatious multiplying litigation proceedings:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of

**JA869**

such conduct.

28 U.S.C. § 1927. If a litigant violates these duties by vexatiously multiplying proceedings or otherwise acting in bad faith, a fee award to the opposing party is justified. *See Zuraf v. Clearview Eye Care, Inc.*, No. 2:15-CV-559, 2017 WL 1591877, at *3–5 (E.D. Va. Apr. 28, 2017) (granting Defendant's request for fees to sanction vexatious and bad faith conduct, pursuant to 28 U.S.C. § 1927 and the Court's "inherent powers").

Here, Plaintiffs' conduct implicates both duties and warrants a fee award. The evidence shows that Plaintiffs' purported "new" evidence is not new, does not impact the Fourth Circuit's decision in *Williams*, and does not show what Plaintiffs allege. Instead, Plaintiffs have had most of this information since before the oral argument in *Williams,* yet either failed to raise it before the Fourth Circuit or did so to no effect. Worse still, Plaintiffs raised virtually all of these "new" allegations a year ago in the *Galloway* case. *See Galloway,* ECF No. 249, Pl.'s Stmt. Of Position Re Material Misreps. (June 28, 2019). Defendants, in turn, explained in detail why the allegations were irrelevant, false, or both. *Galloway* Br. (filed Aug. 9, 2019); Tribal Br. (filed Aug. 9, 2019). Given this record, Plaintiffs' lengthy, renewed briefing on the same stale issues— particularly where Martorello, the Tribe, or both have corrected Plaintiffs' distortions of the record—is inappropriate, vexations, and less than candid. Their repeated sleight of hand and obfuscation are designed to confuse the Court. Thus, Martorello respectfully requests his fees incurred in briefing and hearing these same issues yet again.

## III.  CONCLUSION

The Fourth Circuit's holdings in *Williams* are binding on this Court and unaffected by Plaintiffs' purported "new" evidence. Further hearing on Plaintiffs' meritless claims is unnecessary. For all the above reasons, and for those outlined in Martorello's supplemental briefs on the effects of that decision, the Court should reject Plaintiffs' overtures, award

Martorello his fees for having to respond to these baseless accusations, and proceed to trial with all possible haste.

Respectfully submitted,

MATT MARTORELLO

By:/s/ *John M. Erbach*
M. F. Connell Mullins, Jr. (VSB No. 47213)
Email: cmullins@spottsfain.com
Hugh McCoy Fain, III (VSB No. 26494)
Email: hfain@spottsfain.com
John Michael Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100

Richard L. Scheff (admitted *pro hac vice*)
Jon Boughrum (admitted *pro hac vice*)
Michael Witsch (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone: 267.780.2000
Facsimile: 215.405.9070
Email: RLScheff@atllp.com
          JBoughrum@atllp.com
          MWitsch@atllp.com

Douglas N. Marsh
(*pro hac vice* admission pending)
ARMSTRONG TEASDALE, LLP
4643 South Ulster Street Suite 800
Denver, Colorado 80237
Telephone: 720.200.0676
Facsimile: 720.200.0679
Email: dmarsh@armstrongteasdale.com

*Counsel for Defendant Matt Martorello*

**JA871**

## **CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on this 13th day of July, 2020, the foregoing was filed using the Court's CM/ECF system, thereby serving a copy on all counsel of record electronically.

By: */s/ John M. Erbach*
John M. Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, VA 23219
(804) 697-2000 (Telephone)
(804) 697-2100 (Facsimile)

USCA4 Appeal: 21-2116    Doc: 26-2       Filed: 02/07/2022    Pg: 253 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 1 of 174 PageID# 27945

1

```
1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  RICHMOND DIVISION

4

5   --------------------------------------
                                        :
6   LULA WILLIAMS, et al., on behalf    :
    of themselves and all individuals   :   Civil Action No.
7   similarly situated                  :   3:17CV461
    vs.                                 :
8   BIG PICTURE LOANS, LLC, et al.      :
                                        :
9   and                                 :   July 21, 2020
                                        :
10  RENEE GALLOWAY, et al., as          :
    individuals and as representatives  :
11  of the classes                      :   Civil Action No.
    vs.                                 :   3:18CV406
12  BIG PICTURE LOANS, LLC, et al.      :
                                        :
13  --------------------------------------

14

15       COMPLETE TRANSCRIPT OF THE EVIDENTIARY HEARING

16        BEFORE THE HONORABLE ROBERT E. PAYNE

17             UNITED STATES DISTRICT JUDGE

18  APPEARANCES:

19  Leonard A. Bennett, Esquire
    Kevin Dillon, Esquire
20  Consumer Litigation Associates, PC      VOLUME 1 OF 2
    763 J Clyde Morris Boulevard
21  Suite 1A
    Newport News, Virginia  23601

22

23

24             Peppy Peterson, RPR
               Official Court Reporter
25           United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Amy L. Austin, Esquire
      Consumer Litigation Associates, PC
 3    626 East Broad Street
      Suite 300
 4    Richmond, Virginia  23219

 5    Kristi C. Kelly, Esquire
      Kelly Guzzo, PLC
 6    3925 Chain Bridge Road
      Suite 202
 7    Fairfax, Virginia  22030
      Counsel for the plaintiffs
 8

 9

10

11    Richard L. Scheff, Esquire
      Michael C. Witsch, Esquire
12    Armstrong Teasdale, LLP
      2005 Market Street
13    29th Floor
      One Commerce Square
14    Philadelphia, Pennsylvania  19103

15    Douglas Marsh, Esquire
      Armstrong Teasdale, LLP
16    4643 S. Ulster Street
      Suite 800
17    Denver, Colorado  80327

18    John M. Erbach, Esquire
      Spotts Fain, PC
19    411 East Franklin Street
      Suite 600
20    Richmond, Virginia  23219
      Counsel for Matt Martorello
21

22

23

24

25
```

USCA4 Appeal: 21-2116    Doc: 26-2        Filed: 02/07/2022    Pg: 255 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 3 of 174 PageID# 27947

3

1                    P R O C E E D I N G S

2

3          THE CLERK:  Case number 3:17CV461, Lula Williams, et

4    al., v. Big Picture Loans, LLC, et al., and case number

5    3:18CV406, Renee Galloway, et al., v. Big Picture Loans, LLC,

6    et al.  The plaintiffs are represented by Leonard Bennett,

7    Kristi Kelly, Amy Austin, and Kevin Dillon.  The defendant Matt

8    Martorello is represented by Richard Scheff, John Erbach,

9    Michael Witsch, and Doug Marsh.  Are counsel ready to proceed?

10         MR. BENNETT:  Plaintiffs are, Your Honor.

11         MR. SCHEFF:  Yes, Your Honor.

12         THE COURT:  All right.  This hearing is being also

13   conducted by Zoom, by way of Zoom; is that right?  Who is

14   present on Zoom, either audio or video?  Jon Hollis, who are

15   you with, Mr. Hollis?

16         MR. HOLLIS:  Good morning, Your Honor.  This is Jon

17   Hollis.  I'm with the law firm Woods Rogers, PLC.  I represent

18   the Bluetech Irrevocable Trust in the action Galloway 2.

19         THE COURT:  Karen Brewer, member of the public.  Ms.

20   Brewer, do you have any plan to try to make a statement or to

21   tell us anything?

22         MS. BREWER:  No, Your Honor.

23         THE COURT:  Are you a member of the class that is

24   proposed in either one of these cases?

25         MS. BREWER:  No, Your Honor.

1          THE COURT:  All right.  Casey Nash, that's your

2     partner, or your lawyer who is associated with the plaintiffs.

3     John Scofield, attorney --

4          MR. SCOFIELD:  Yes, Your Honor.

5          THE COURT:  Who are you a lawyer for, Mr. Scofield?

6          MR. SCOFIELD:  I'm not appearing today as counsel of

7     record for any parties.  I'm attending as a member of the

8     interested public.  I'm a co-counsel in the Oregon and

9     Massachusetts litigation on behalf of the plaintiffs.

10          THE COURT:  On behalf of the plaintiffs in the cases

11     in Oregon and Massachusetts?

12          MR. SCOFIELD:  Yes, Your Honor.

13          MR. BENNETT:  Your Honor, Mr. Scofield is also --

14     he's with the firm of Caddell & Chapman.  You met Mr. Caddell.

15     They are now joining up with us in this litigation.  Mr.

16     Scofield has been a lawyer that I've known for quite sometime

17     and worked with my partner, Craig Marchiando.

18          THE COURT:  Mr. Scofield, you're not planning to make

19     any statements or testify or anything, are you?

20          MR. SCOFIELD:  No, Your Honor.

21          THE COURT:  Mr. Marchiando is counsel of record in

22     these cases.  And there's no one else?  Are there any witnesses

23     who are not parties who we need to sequester?  No?  All right.

24     Thank you.

25          Sometime ago in one of the pleadings filed in one of

1   these cases or both of these cases, it was asserted that Matt

2   Martorello and others had made misrepresentations of material

3   fact in previous proceedings in the Williams case.  Those

4   misrepresentations were alleged to have been made to this Court

5   and to the United States Court of Appeals for the Fourth

6   Circuit.

7           Thereafter, Mr. Martorello filed papers -- Mr.

8   Martorello is in Galloway -- is in Williams and Galloway 1?

9           MR. SCHEFF:  Yes, Your Honor, that's correct.

10          THE COURT:  And I think he filed them in both cases,

11  saying that the Williams decision in the Fourth Circuit was an

12  important part of pending motions in this case, motions to

13  dismiss, motions for jurisdiction, other motions, and denied

14  that there were any misrepresentations that were made by him or

15  by anybody else.

16          Accordingly, the Court concluded that it was

17  necessary to understand, A, what the misrepresentations were,

18  and, B, what the proof was that they were, in fact,

19  misrepresentations, and, subsequently, it will be necessary to

20  determine the extent to which they were material or relied

21  upon, but, at this stage, the issue of materiality is not

22  really at issue, and the -- except as pertains to whether or

23  not evidence proffered is relevant.

24          I asked the parties to submit written -- make written

25  submissions, and they did, and there were revised written

USCA4 Appeal: 21-2116    Doc: 26-2      Filed: 02/07/2022    Pg: 258 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 6 of 174 PageID# 27950

6

1    submissions, as I recall, and the parties asked that there be

2    an evidentiary hearing, and I agreed that we could have an

3    evidentiary hearing.  I'm not quite sure one was necessary, but

4    I take the view that if parties believe they can demonstrate

5    matters better in person, then I'm perfectly happy to have

6    that.

7          Given that there were some credibility questions

8    raised in the papers, I concluded that the evidentiary hearing

9    was an appropriate way to understand better how to resolve the

10   matter.  It had been my intent to proceed in a way that I have

11   proceeded in other matters, and that is to allow the parties to

12   submit depositions and deal with the designations and any

13   objections to them and then to consider just the parts -- have

14   the parties edit the tapes just to the parts that I had not

15   sustained any objections to or to which there was no objection

16   made and was told last week that there's some -- in preparation

17   for that, that there's some 22,000 lines of deposition

18   testimony at issue, and that is an utterly ridiculous way to

19   try to deal with any evidentiary issue, for the judge to do it

20   on his own or argue line by line for thousands of lines.

21          Therefore, what I did was tell each side that you

22   have four hours to present whatever you're going to present at

23   this hearing, and I will consider it, and you are on your own

24   as to what you want to present.  If there's a video, you're

25   supposed to present the videotape and present it to me in that

1    fashion, or if you have somebody read from the stand in that

2    fashion, present it in that fashion, that's how you use your

3    time.  It's your business.

4          I'll consider in making the decisions those things

5    that have been appended to the written filings, because I have

6    begun the process -- I've read the papers, and I've seen a good

7    many of the supporting documents, but I don't know that I can

8    say I've seen them all.

9          So when we start, each person will have four hours.

10   Each side is supposed to have somebody keeping time.  When you

11   are talking, your time is running.  When I'm talking, your time

12   is -- no time is running.  So when I'm ruling on an objection,

13   for example, no time is running.

14         I expect during each recess each side to coordinate

15   and talk with the other side about the time and make sure that

16   we're roughly the same.  We're not going to quibble over

17   seconds.  I'm going to resolve -- if there's a discrepancy of

18   less than a couple of minutes, I'm going to resolve in favor of

19   giving the party with the lowest time the -- that will be the

20   time we will use, and then they'll have that rather than the

21   highest time.

22         That is the -- if the two representatives of the

23   parties quarrel over what the time is, then the lowest time

24   will be the time selected if it's less than two minutes.  If

25   it's more than that, I'm going to have to deal with it.  And I

1  may end up expanding that as we go along.  I'm hopeful we can

2  get it straight.  So I'm expecting to hear from you what you

3  have to say.

4          Did anyone one want to make an opening statement,

5  because I will not count that as part of the four hours, but I

6  will not allow it to go forever.  Do you wish to make an

7  opening statement?

8          MR. BENNETT:  Very brief.

9          THE COURT:  Do you wish to make an opening statement?

10         MR. SCHEFF:  Yes, Your Honor, very briefly.

11         THE COURT:  The time does not apply to the opening

12  statement.

13         THE CLERK:  Judge, if I can interrupt --

14         THE COURT:  Hold on a minute, please, Mr. Bennett.

15         THE CLERK:  I just submitted a phone number, 610704,

16  into the meeting.

17         THE COURT:  And who is that?

18         MR. GUZZO:  Thank you, Nikki.  This is Andrew Guzzo,

19  Your Honor.  Sorry, I was having difficulty dialing in.

20         THE COURT:  Andrew Guzzo is a member of Ms. Kelly's

21  law firm -- right? -- and counsel of record on the case.

22         MR. GUZZO:  Yes, Your Honor.

23         THE COURT:  Did you have something you need to take

24  up?

25         MR. BENNETT:  No, sir.

1          THE COURT:  All right.  Remember that when you are

2   speaking, you need to be at the lectern with your mask off so

3   that the court reporter can hear you, and my mask is off so she

4   can hear me.  If there's going to be a witness, the witness

5   will have the mask off, and after the testimony, the witness

6   will be handed a wipe and will wipe down the microphone and the

7   area around.  How many live witnesses are you planning to call,

8   Mr. Bennett?

9          MR. BENNETT:  Your Honor, we only plan on calling Mr.

10   Martorello.

11          THE COURT:  All right, Mr. Martorello.  And how many

12   live witnesses are you planning to call?

13          MR. SCHEFF:  Your Honor, we'll just be calling Mr.

14   Martorello as well.

15          THE COURT:  So the record is clear, you mean Matt

16   Martorello?

17          MR. SCHEFF:  That's correct, Your Honor.

18          THE COURT:  There was some -- Mr. Justin Martorello

19   was listed as someone who might attend by telephone, but that's

20   not happening; is that correct?

21          MR. SCHEFF:  Well, it will depend on the plaintiffs'

22   presentation, but presently we do not intend to call him, and

23   it would be remotely if we did call him.

24          THE COURT:  All right.  Thank you.  Mr. Bennett.

25          MR. BENNETT:  Thank you, Judge.

1          THE COURT:  So it is your intention to see if you

2     can -- you're going to hand some papers.  I couldn't figure out

3     why you were masking up.

4          MR. BENNETT:  Your Honor, this is just for the Court,

5     the court reporter, and Your Honor's law clerk's benefit a copy

6     of the declaration of Mr. Martorello that we'll be using as our

7     roadmap in our presentation.  That's also an exhibit that's

8     been designated, but we just provided a paper copy.

9          THE COURT:  That's document number 106-1 according to

10     the top.

11          MR. BENNETT:  Yes, sir.  Out of the Williams matter.

12          THE COURT:  Now, Mr. Scheff, I take it, has a copy.

13          MR. BENNETT:  I gave him a copy just now.

14          MR. SCHEFF:  I do, Your Honor.

15          MR. BENNETT:  The other thing, Judge, logistically,

16     the only other -- presently the only video deposition that we

17     intend to play is that of a gentleman -- I think both sides are

18     playing part of him -- Mr. Scott Merritt.  Part of the

19     deposition has some objections that the defendant has made.  I

20     would -- none of them are privilege or something I think that

21     would contaminate a record, and I've alerted Mr. Scheff to this

22     issue.

23          I would ask for the courtesy of allowing to play the

24     video, and if there are parts of that at the end of that --

25     it's an 18-minute clip -- that the defense counsel wishes to

1   address the Court on in terms of objection, that that be

2   permitted and that be permitted not part of the defendant's

3   time.

4            So, for example, rather than have to start and stop

5   the video dep logistically.

6            MR. SCHEFF:  Your Honor, this is -- as we see this,

7   this is a hearing where the Court is trying to determine

8   whether or not material misrepresentations have been made.  You

9   ought to hear the evidence.  You ought to hear all the

10  evidence.  To the extent that you choose to credit something,

11  you will.  To the extent you choose to give it less weight, you

12  will.  Unless there's something egregious in what they have

13  clipped from Mr. Merritt, I doubt we're going to have an

14  objection.

15           THE COURT:  All right.  If you proceed in that

16  fashion, you'll have to identify what part of it that you are

17  objecting to so they can go back and play the question and

18  answer so I can understand it.

19           MR. SCHEFF:  Yes, Your Honor.

20           MR. BENNETT:  May I have control over this briefly?

21  Just briefly in opening, Judge, and I don't, like in trial

22  maybe, intend to go through in full detail of what the

23  documents will show, but I do want to at least provide context,

24  at least from the plaintiffs' perspective, as to what we're

25  doing, what we think we're doing here today.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 264 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 12 of 174 PageID# 27956

12

1          The Court knows, of course, everyone knows that the

2     plaintiffs allege in Williams and Galloway and each of the

3     other cases that the defendant, that Matthew Martorello led the

4     creation of a business, of a business model that we have

5     characterized as rent-a-tribe, that is a business that paid a

6     small amount to a tribe, an Indian tribe, in order to provide

7     what Mr. Martorello has characterized as optics.  That is to

8     provide that technical contracts between the lender and the

9     consumer would originate, with quotes around it, from the

10    tribal defendants rather than from Mr. Martorello.

11          You will have an opportunity today to hear from Mr.

12    Martorello.  You will also have an opportunity to hear him

13    explain the paper trail that was left since 2011 in which Mr.

14    Martorello acted in a way that is very different than what his

15    declaration suggests.

16          That declaration -- the question the Court noted of

17    materiality would come later, but I think that the Court needs

18    to understand how material it was.  The tribe, before this

19    Court, challenged the defendant -- jurisdiction over the tribal

20    defendants based on sovereign immunity, and the argument there

21    was that the tribe defendants were protected using the

22    *Breakthrough* factors from suit in this and other federal

23    courts.

24          And the basis there, the argument there, was that the

25    tribe really genuinely was trying to make money for its

**JA884**

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 265 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 13 of 174 PageID# 27957

13

1    citizenry, was attempting to engage in what it believed to be a

2    legitimate business for the benefit of the tribe and that

3    questions even of control, which the Fourth Circuit said maybe

4    didn't go as well for the tribal defendants as the other

5    *Breakthrough* factors, that the tribal defendants, on paper, had

6    control.

7              You will have an opportunity to see the

8    behind-the-scenes paper trail and, in fact, the benefit of

9    seeing it through today, given the positions that Mr.

10   Martorello and his corporate empire have taken about the

11   litigation and the rights of the tribe to settle and to set its

12   own interest rates, you'll have all that now.

13             But the Court needs to understand why we're here

14   today, why all this effort, why all this work has gone into

15   determining whether Mr. Martorello told the truth in his

16   declaration.

17             One of our esteemed colleagues --

18             THE COURT:  Excuse me one minute.

19             MR. BENNETT:  Yes, sir.

20             THE COURT:  Your paper asserts that

21   misrepresentations were made by other people.

22             MR. BENNETT:  Yes, sir.

23             THE COURT:  Are you going to address that, too?

24             MR. BENNETT:  Well --

25             THE COURT:  You say, I think, Hazen made

1   misrepresentations, and you say that the -- the statements in

2   oral argument to the Fourth Circuit and in briefs to the Fourth

3   Circuit were misrepresentations as well.  Are you saying that

4   all of the Fourth Circuit misrepresentations you are talking

5   about in your papers you're going to talk about here and that

6   they're tied to Mr. Martorello's misrepresentations, alleged

7   misrepresentations, or are they tied to the other people's

8   misrepresentations as well?

9           MR. BENNETT:  Right.  Your Honor, to the extent that

10  Mr. -- for example, the extent that Michelle Hazen said the

11  tribe did this, entered into this so that we could learn about

12  the business model, learn how it's done, learn about

13  underwriting, you're going to hear direct evidence today where

14  Mr. Martorello says, why would I possibly give you that

15  information so you can learn about this, you're not capable of

16  learning, and if you learned what would I have, what value

17  would I have.

18          You're going to hear that evidence, and it directly

19  confronts Michelle Hazen's declaration, but, at this stage, the

20  tribal defendants are not here.  I think based on what has

21  happened after the settlement --

22          THE COURT:  They know about the hearing.

23          MR. BENNETT:  They do.

24          THE COURT:  They chose not to be here.  That's their

25  choices.

```
 1                MR. BENNETT:  Understood, Judge, but we're attempting

 2   to streamline to the core part of what the dispute was -- or

 3   what the misrepresentations were, Mr. Hurd, I think, suggested

 4   appropriately in his argument before the Fourth Circuit.

 5                (Audio played.)

 6                THE COURT:  Wait just a minute.  Excuse me.  Is this

 7   video?

 8                MR. BENNETT:  It's just audio.  But I don't have

 9   control over the sound.

10                THE COURT:  What's wrong with the sound?

11                MR. BENNETT:  I think that it's the system

12   controlling --

13                THE COURT:  You mean it's not coming or too loud?

14                MR. BENNETT:  Too loud, I think.

15                THE COURT:  Do you have it in writing somewhere?

16                MR. BENNETT:  Yes, we will provide it in writing.

17                THE COURT:  So at this point, the record will say

18   argument of Mr. Hurd at the Fourth Circuit what, pages what to

19   what?

20                MR. BENNETT:  We will provide that for the record at

21   a break.

22                THE COURT:  All right.  So now you want to start

23   again?

24                MR. BENNETT:  Yes, sir.

25                (Audio played.)
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 268 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 16 of 174 PageID# 27960

16

```
 1            MR. BENNETT:  You will hear as I go through Mr.
 2    Martorello's declaration the evidence, you will see the
 3    documentary evidence -- it's in the plaintiffs' exhibits -- and
 4    understand that that core declaration, what Mr. Hurd
 5    successfully used at the appellate level, Mr. Martorello's
 6    declaration contains material falsities.
 7            And the Court has to, of course, accept my view of
 8    what a material falsity is for that to matter.  The oath that
 9    someone traditionally gives is to tell the truth, the whole
10    truth, and nothing but the truth, and I think that there are
11    different approaches to how some witnesses, maybe some lawyers,
12    approach the truth.
13            A material misrepresentation on the plaintiffs' side
14    means a statement that is made that is incomplete such --
15    includes statements that are made that are incomplete such that
16    they would mislead the reader or the listener.
17            And so to the extent, for example, if Mr. Martorello
18    testifies in his declaration that he and the companies that he
19    was involved in never collected any money from consumers and
20    the basis for that statement is because technically, on paper,
21    he was acting as a delegee of a tribal defendant, the tribal
22    defendant, on paper, was collecting even though all the
23    actions, the processes, the people were working for Mr.
24    Martorello's company.
25            You're going to hear as we go through the declaration
```

1    the history of this.  The Court is probably maybe too familiar

2    at this point, and it really began -- if we take us to July of

3    2011, and this is where one of the core disputes that the Court

4    is going to hear begins.

5            Mr. Martorello, prior to July 2011, had worked for an

6    accounting firm -- he has an accounting degree -- KPMG, and he

7    learned about a company called ThinkCash, which then became

8    Think Finance, one of the leading tribal lenders, and Mr.

9    Martorello decided to get into the predatory lending business

10   himself.

11           His first really big company he operated as a

12   supposed Costa Rican entity.  That is, Costa Rica was the

13   originator of his loans, and that was posing problems, and he

14   testified --

15           THE COURT:  The country of Costa Rica was originating

16   the loans?

17           MR. BENNETT:  Yes.  So the consumers in America were

18   -- in the United States were borrowing from Costa Rica and,

19   thus, were not to be bound by Virginia law, for example.  And

20   that wasn't working as well.  I don't know why, travel,

21   logistics, language, but Mr. Martorello testified, contrary to

22   what you'll see in his declaration, that he had heard some good

23   things coming up with the law, his testimony was 2010 some good

24   tribal lending law, and that some big lenders such as Sequoia

25   and TCV -- and this is in our misrepresentation brief, his

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 270 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 18 of 174 PageID# 27962

18

1    actual deposition testimony -- that some big lenders were

2    getting involved in that.  These were hedge fund lenders.

3         And so he then wanted to get involved.  And this is

4    where the first dispute you'll see in his declaration will be,

5    and you will hear -- our first witness will be Mr. Merritt, and

6    we will put Mr. Merritt on for roughly 18 minutes.

7         Mr. Merritt is somebody who was deeply engaged in the

8    mechanical operation of a tribal lending business model.  He

9    did not know LVD, he didn't know this tribe, and he hadn't been

10   contacted by anybody related to it.  His testimony will be he

11   approached Mr. Martorello --

12        THE COURT:  LVD is the Indian tribe of which the

13   tribal defendants in the case are -- to which they're related;

14   is that right?

15        MR. BENNETT:  That's correct.  And so Mr. Merritt

16   will testify that he went to this Online Lenders Alliance,

17   which was primarily a tribal lending organization, conference

18   in July of 2011 and sought out Mr. Martorello and met him so

19   that Mr. Merritt could try to interest him in some software, a

20   software deal unrelated to tribal lending but with respect to

21   these online loans.

22        Mr. Merritt's testimony, you'll see, is that Mr.

23   Martorello asked him to put Mr. Martorello in touch with some

24   tribes so he, Mr. Martorello, could enter into that field.

25        I think that, Judge, we'll leave opening and continue

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 271 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 19 of 174 PageID# 27963

19

1    with Mr. Martorello's testimony at the full history of this,

2    but that will be the first witness, and that will be the first

3    untruth that you hear that we focus on in Mr. Martorello's

4    declaration.

5            Mr. Martorello claims in his declaration, and you

6    will not see any evidentiary support for this other than the

7    declaration itself -- there's no documents that support this,

8    there's no witnesses that support it -- that somehow the tribe

9    came to the Online Lenders Alliance, sought out Mr. Martorello,

10   asked Mr. Martorello if it would be the tribe's vendor for a

11   new lending operation that LVD was attempting to set up, and

12   there is no evidence of that, and you will hear Mr. Merritt

13   give you an honest explanation.

14           You will also hear Mr. Merritt explain that

15   ultimately Mr. Merritt was involved, his own intermediary

16   company, advocating for Mr. Martorello in the creation of what

17   became the Red Rock lending businesses and, in fact, the

18   explanation for how it is that the tribal defendants were to

19   receive essentially a net of two percent -- that was after

20   write-offs and charge-offs and uncollectibles, etcetera -- and

21   how half of that money, half of the two percent of Mr.

22   Martorello's gross less these other net expenses, how half of

23   that money got paid to the middleman to set the deal up.  So

24   the tribe received less than one percent of that.

25           You'll hear his short explanation on that, and then

JA891

1    we'll get right into Mr. Martorello and go through the

2    difference between the history of the Red Rock and Big Picture

3    lending models, the difference between the actual history and

4    the history that was presented to this Court and the Fourth

5    Circuit by Mr. Martorello in his declaration.

6         THE COURT:  You're going to play depositions and have

7    Mr. Martorello testify.

8         MR. BENNETT:  We're going to have Mr. Martorello

9    testify, but before we do that, we're going to play Mr.

10   Merritt, and I would cede the podium.

11        THE COURT:  Mr. Scheff, you have an opening

12   statement?

13        MR. SCHEFF:  Thank you, Your Honor.  Your Honor, I'm

14   going to be extremely brief.  Mr. Martorello's declaration,

15   according to the plaintiffs' brief, are materially -- has

16   material misrepresentations with respect to paragraph ten,

17   paragraph 17, paragraph 26, paragraph 36, paragraph -- excuse

18   me one second, Your Honor.  Paragraph 43, paragraph 47,

19   paragraph 69, paragraph 100, paragraph 102, paragraph 105,

20   paragraph 107.  There are other alleged misrepresentations in

21   the Hazen declaration and the Chairman Williams declaration.

22        As the Court noted, the tribal defendants are not

23   here today to defend their own statements.  Your Honor, the

24   declaration that was provided by Mr. Martorello was not

25   intended to detail every piece of evidence in the case or every

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 273 of 681
Case 3:17-cv-00461-REP    Document 882    Filed 07/25/20    Page 21 of 174 PageID# 27965

21

1   minutia in the case.  It was an overview of the way the parties

2   came together, the way the businesses were operated, who did

3   what, and what the present state of affairs were.

4          Like every case, Your Honor, this case is certainly

5   no different.  There are factual disputes in what happened.

6   People remember things differently.  Sometimes people remember

7   things the same way.  And the fact that there are factual

8   disputes does not mean that there have been material

9   misrepresentations.  And like every other case, there are

10  factual disputes in this case.  And some of those are important

11  factual disputes, and some of them are unimportant factual

12  disputes.

13         With respect to the one item that Mr. Bennett

14  highlighted for the Court with respect to sort of who came to

15  who and how the sort of calculation, if you will, of the

16  tribes's share of the business would be provided, you're going

17  to hear Mr. Martorello's story about how that came together,

18  you're going to hear Mr. Merritt's.  There are differences,

19  slight differences in what they say, but it doesn't mean that

20  anyone is providing material misrepresentations.  It means that

21  people may remember things differently.

22         I would refer the Court, again, not to that this is

23  the be-all and end-all, but just as an example, Defense

24  Exhibit 16, an email not from Mr. Martorello but an email to

25  him in the early stages of 2011 talking about how the

 1    calculation was to come together.  It doesn't come from Mr.

 2    Martorello, it comes from somebody else, a gentleman by the

 3    name of Flint Richardson.

 4            There are other documents which have been provided by

 5    both sides which demonstrate indisputably that the tribe was

 6    looking to get into online lending long before Mr. Martorello

 7    ever came on the scene, as early as 2009, and, in fact, had

 8    started another lending business before they even met Mr.

 9    Martorello.

10            That's undisputed.  The documents are undisputed on

11    that, and the witnesses are undisputed on that.

12            THE COURT:  The documents you are talking about,

13    they're exhibits you have already filed?

14            MR. SCHEFF:  Yes, Your Honor, that's correct.

15            THE COURT:  And are the ones referred to on that

16    point referred to in your brief?

17            MR. SCHEFF:  Yes, Your Honor, they are.  Your Honor,

18    we have attached to our brief what we call a matrix.  I think

19    it's Exhibit A.  What it has is all the so-called alleged

20    misrepresentations, and it has all the exhibits adjacent to it

21    by number which we say support our view of what the evidence is

22    and the truth and accuracy of Mr. Martorello's deposition --

23    his declaration, excuse me.

24            So you'll hear Mr. Martorello live.  He'll answer

25    whatever question anyone asks him.  He'll be truthful, he'll be

**JA894**

1    credible, he'll talk about the story himself, all the different

2    issues.

3    We're going to play a number of different deposition

4    designations by video.  We'll play Karrie Wichtman who was

5    counsel to the tribe and counsel to the lending businesses.

6    She knows what happened.  She lived it every day.  We'll play

7    some of Ms. Hazen, we'll play of some of Rob Rosette who was

8    involved from the inception.  We'll play some of Mr. Merritt as

9    well.  There will be a number of different deposition witnesses

10   we play.

11   The number we play will depend on our time.  We may

12   run short, and we may have to, obviously, cut back on what we

13   intend to play, but we'll play whatever we can as time permits.

14   THE COURT:  Have you all worked out the objections so

15   there isn't any objections to what you are playing, do you

16   know, or where do we stand on that?

17   MR. SCHEFF:  We have not.

18   THE COURT:  We'll deal with that later.

19   MR. SCHEFF:  It would seem to me, Your Honor, that,

20   again, the search here is for the truth, and Your Honor ought

21   to hear all the evidence.  We're going to try to limit the

22   number of objections we make, period, whether anyone's

23   testimony, because we think the Court ought to hear it, the

24   Court ought to assess it in terms of making whatever

25   determination the Court is going to make.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 276 of 681
Case 3:17-cv-00461-REP    Document 882    Filed 07/25/20    Page 24 of 174 PageID# 27968

24

1                THE COURT:  All right.

2                MR. SCHEFF:  Again, there will be factual disputes.

3     There's no question there's factual disputes.  That's a far cry

4     from material misrepresentations, and, ultimately, a jury will

5     have to decide what the truth is.  The jury will decide what

6     the merits are, the jury will listen to the witnesses, whether

7     it be live or in deposition, and they'll decide what happened.

8     But resolving factual disputes is different than material

9     misrepresentations.  Thank you, Your Honor.

10               THE COURT:  Thank you.  Now, at this point in time,

11    do you know if there are objections to your proposed

12    depositions that you're going to play, or have they been

13    resolved?

14               MR. SCHEFF:  I don't, Your Honor, but if you'll give

15    me one moment, I will confer with somebody at defense counsel

16    table to see what they can tell me about that.  Thank you.

17               Your Honor, the objections have not been resolved.

18               THE COURT:  When the deposition is being played,

19    you're going to stand up and make an objection to it at that

20    time; is that what you're going to do?

21               MR. BENNETT:  Given the way the timing of the day may

22    go, there probably will be a break, and maybe it will help to

23    know which of the 22,000 lines the defendant wishes to bring

24    up.  At this point, we don't have any idea.  We've not --

25               THE COURT:  I told you on the phone you all play what

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 277 of 681
Case 3:17-cv-00461-REP    Document 882    Filed 07/25/20    Page 25 of 174 PageID# 27969

25

1    you're going to play, and I'm going to rule on the basis of

2    objections unless you all -- on the basis of objections made

3    unless you all resolve things ahead of time, and I mean made at

4    the hearing so I can have the context.

5         MR. BENNETT:  Yes, sir.

6         THE COURT:  So I'll let you all talk during the

7    break.  If you have some way of solving them, okay.  I'm

8    surprised there wasn't an exchange of information ahead of time

9    after we had our conversation on the phone, but we didn't, so

10   I'll see what I can do.

11        Would you call GSA and ask them to find a way to cool

12   the room down a little bit.  Tell them that it was 100-plus

13   degrees yesterday, it's going to be 100 today, and I need them

14   to get on it right away if you would, please, ma'am.  Are you

15   ready with your first witness?

16        MR. BENNETT:  We are, Your Honor.  We would call

17   Matthew Martorello.

18        THE COURT:  All right, Mr. Martorello.

19

20                      **MATTHEW MARTORELLO,**

21   a defendant, called at the instance of the plaintiffs,

22   having been first duly sworn, testified as follows:

23

24        MR. BENNETT:  And actually, Judge, this is my

25   mistake.  I would not call --

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 278 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 26 of 174 PageID# 27970

26

1          THE COURT:  Wait a minute, Mr. Martorello.

2          MR. BENNETT:  I first intend to call Mr. Merritt by

3    video, just play his video dep.

4          THE COURT:  Mr. Martorello, you can just sit there if

5    you want to.  If you want to go back and be with your counsel,

6    you are free to, but you can just sit there.

7          THE WITNESS:  Thank you.

8          THE COURT:  This is the Merritt deposition.

9          MR. BENNETT:  Yes, sir.

10         THE COURT:  As soon as you start playing, the time

11   will begin.

12         (Discussion off the record.)

13         THE COURT:  Who is this?

14         MR. BENNETT:  This is Scott Merritt, Your Honor.

15         THE COURT:  Are we ready, or what?

16         MR. DILLON:  Your Honor, I think the issue just

17   resolved itself.

18         THE COURT:  Thank you.

19         (Video deposition of Warren Scott Merritt played.)

20         MR. BENNETT:  Thank you.  Your Honor, for the record,

21   that deposition was of Warren Scott Merritt taken March 21st,

22   2019.  We'll certainly provide a copy, paper copy for the

23   record.

24         THE COURT:  Copy of what you played?

25         MR. BENNETT:  Yes, sir.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 279 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 27 of 174 PageID# 27971

27

```
1                THE COURT:  And the copy will be what?

2                MR. BENNETT:  The transcript.

3                THE COURT:  What exhibit?

4                MR. BENNETT:  It will be -- Judge, I would offer that

5     as Exhibit 1.  I know we haven't -- 139.

6                THE COURT:  Plaintiff's Exhibit 139.

7                MR. BENNETT:  This was in the Williams case.  The

8     first voice examining the witness was Michelle Alamo

9     representing Mr. Martorello, and the second voice was Andrew

10    Guzzo representing the plaintiffs.  The third voice that was --

11    there was an objection.  I don't know the name of the

12    gentleman, but it was somebody representing the witness.  With

13    that, Judge, we could call Mr. Martorello.

14               THE COURT:  All right.  Mr. Martorello, the record

15    will reflect, has been sworn and, while that deposition was

16    playing, was sitting in the witness box.

17               MR. BENNETT:  Your Honor and Mr. Martorello, you have

18    the plaintiff's exhibits there, but to make it easy for you, I

19    also have a copy of Exhibit 106 which is your declaration.

20    It's in the books, but this one you can do anything you'd like

21    with.

22               THE WITNESS:  Thank you.

23               MR. BENNETT:  Ms. Brown, may I have control over the

24    system, please.  I'm sorry, I believe the witness was sworn --

25               THE COURT:  Yes.
```

```
 1                     DIRECT EXAMINATION
 2    BY MR. BENNETT:
 3    Q    Mr. Martorello, we've spoken by phone before and other
 4    depositions, discovery depositions, for example.  It's good to
 5    see you again.
 6    A    You as well, sir.
 7    Q    You currently reside in Texas?
 8    A    Yes, Dallas, Texas.
 9    Q    And you have a college degree from what university?
10    A    University of Illinois.
11    Q    And when did you earn that degree and in what major or
12    what was your degree?
13    A    It was 2002, and it was a major, double major in
14    accounting and finance.
15    Q    And, at some point, you worked for different businesses,
16    but then you began to work for the accounting firm KPMG?
17    A    That's correct.
18    Q    What did you do for that accounting firm?
19    A    I was in the transaction services group, so that involved
20    asset-based lending work.
21              THE COURT:  Pull that microphone a little closer to
22    you.
23              THE WITNESS:  I'm sorry, okay.
24    Q    One of the clients that you were exposed to of KPMG was a
25    company called ThinkCash; is that correct?
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 281 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 29 of 174 PageID# 27973

Matthew Martorello - Direct

29

1   A    At the time, I think it was -- was it ThinkCash or Think
2   Finance?  Maybe it was -- we were hired by Silver Point
3   Capital, and we were sent to figure out maybe some potential
4   breaches of contract or something that was going on with a
5   facility to Think Finance.
6   Q    Yes, sir.  And I appreciate that it's not your fault that
7   I volunteered to just do four hours, but my question to you was
8   that your client was ThinkCash, and you said you're not sure
9   whether it was ThinkCash or Think Finance; right?
10  A    Yes, but it's ThinkCash.  At the time, I think it was
11  ThinkCash.
12  Q    And ThinkCash was a lending model that consumers, maybe
13  pejoratively, refer to as rent-a-bank.  Have you heard that
14  expression, rent-a-bank?
15  A    I've heard the expression.
16  Q    But then Think Finance became a tribal lending business
17  model, an evolution of the ThinkCash entities.
18  A    At some point years later, I believe that's -- well, I
19  mean, they service tribes through whatever platform they had.
20  I'm not aware of those details.
21  Q    Now, you had -- prior to 2011, you had been engaged in
22  some internet lending operations of your own; correct?
23  A    That's correct.
24  Q    And what was the name of the entity that you associated
25  with Costa Rica?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 282 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 30 of 174 PageID# 27974

Matthew Martorello - Direct                                          30

1   A    I don't know that I associate it with Costa Rica, but

2   there was a client of ours that was called Cape Side, LLC,

3   which was a Delaware LLC that was a lender under the d/b/a

4   peppercash.com, and it did business in Costa Rica and in

5   accordance with U.S. federal law but choice of law Costa Rica

6   for the loans.

7   Q    And you were -- on paper, you were the servicer for this

8   other Delaware entity; right?

9   A    In actuality, we were the servicer for the entity.

10  Q    I understand.  And, again, that was PepperCash?

11  A    peppercash.com.  I believe that was early 2010.

12  Q    And, in 2010, you recall you previously testified that

13  there was -- quote, was a lot of favorable on point case law

14  that was coming out in 2010, close quote, regarding tribal

15  lending and that several large hedge funds like, quote, TCV,

16  all caps, and Sequoia, close quote, were providing capital for

17  those ventures.  Do you recall?

18         THE COURT:  The only question is do you recall

19  testifying that way.

20  A    I did testify similar to that, I think.

21  Q    And so in 2010 at least, you certainly were aware of the

22  issues of sovereign immunity in a tribal lending context?

23  A    No, that's not correct.

24  Q    You were aware of tribal lending business models

25  developing because of this, quote, a lot of favorable on point

Matthew Martorello - Direct

1  case law?

2  A    That's not correct.

3  Q    You were not so aware?

4  A    No.  I became aware of the case law after, and I learned

5  of tribal lending at the OLA conference when I met Scott

6  Merritt.

7            THE COURT:  At what lending --

8            THE WITNESS:  At the Online Lending conference when I

9  met Scott Merritt.

10  Q    And so when you testified in August 30th, 2018, that you

11  know -- quote, you know there was a lot of favorable on point

12  case law that was coming out in 2010, close quote, you were

13  testifying about what you learned about the online case law

14  coming out in 2010, or on point case law, you were testifying

15  what happened in 2011?

16  A    I was putting in context the conference and the

17  conversations that, you know, Think Finance had just -- excuse

18  me, ThinkCash had just partnered with these institutional funds

19  and that there had been a bunch of case law that had come out.

20  I didn't know that at the time.  I was putting that into

21  context of what was a big issue or talked about a lot at that

22  conference.

23  Q    So prior to attending the Online Lenders --

24            THE COURT:  So I understand, when you say it was

25  talked about a lot at that conference, are you talking about

```
 1    lending through tribes, or are you talking about sovereign
 2    immunity, or both?
 3              THE WITNESS:  I'm talking specifically about tribal
 4    lenders getting into business, and there was some case law, and
 5    Think Finance started working with tribes --
 6              THE COURT:  Does that include sovereign immunity for
 7    the tribes as well in your conversations?
 8              THE WITNESS:  No.  I don't think I was savvy enough
 9    to know even the distinction or what that was.  It was really
10    just kind of like talked about generally as the next tribal
11    gaming, and that was all kind of understood.
12              THE COURT:  Do you remember what this favorable case
13    law was all about?
14              THE WITNESS:  That spurred those discussions at the
15    conference, I couldn't recall off the top of my head.
16              THE COURT:  Okay.
17    Q    So you were not savvy enough to understand the legal
18    concepts or questions involved with tribal lending sovereignty?
19    A    I disagree.  I think what I meant was I wasn't aware of
20    tribal sovereignty at all, any more than any other layperson,
21    at the time that I was in the conference and met Scott Merritt.
22              THE COURT:  You weren't aware of tribal immunity
23    other than as a layperson?
24              THE WITNESS:  Correct.
25              THE COURT:  Tell me what you know about -- what you
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 285 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 33 of 174 PageID# 27977

33

Matthew Martorello - Direct

1  knew about tribal immunity at that time, then, of this

2  conference, Online Lenders conference with Mr. Merritt.

3          THE WITNESS:  Well, I didn't have any experience with

4  tribes in any capacity.  You know, the only thing I knew,

5  really, would be that tribes have casinos, just as any

6  layperson would, but I didn't have any knowledge or experience

7  or understanding about tribal sovereignty at all.

8          THE COURT:  All right.

9  Q    So you've heard Mr. Merritt.  You've heard his testimony;

10  correct?

11  A    I did.

12  Q    How much money did Mr. Merritt make before that

13  deposition, roughly?  How much did his company make by putting

14  you together with LVD?

15  A    So because he was Tribal Lending Solutions, he partnered

16  with Tribal Lending Management, and that was the firm

17  associated with Rosette Associates.  They got paid in

18  aggregate, from what I knew until very recently, $960,000.  His

19  portion of that, I don't know what that was, but that was an

20  arrangement they had together that I didn't even really have

21  any privy to.

22          THE COURT:  You are using indefinite pronouns, and

23  you used "in the aggregate," and I don't know who "they" is or

24  what you mean by "in the aggregate."  Who was it that got

25  $960,000?

Matthew Martorello - Direct

1          THE WITNESS:  I believe it went to -- I believe it

2    went to TLM, Tribal Loan Management, and then what I wasn't

3    privy to was that there was a partnership to share that with

4    Scott's firm, TLS.  When I said "they," I was referring to TLS

5    and TLM as a partner, as partners.

6          THE COURT:  You don't know what Merritt personally

7    got from TLS.

8          THE WITNESS:  I don't know what his participation

9    agreements were, no, I do not.

10   Q    You know Mr. Merritt made money by putting you together

11   with the LVD; right?  That's a fair assumption?

12   A    Yeah, the tribe paid him.

13   Q    And Mr. Merritt was heavily involved trying to create and

14   help create tribal lending models with his company; correct?

15   He's not a consumer advocate in terms of critical of tribal

16   lending; right?

17   A     I'm sorry, can you repeat the question?

18   Q    Sure.  Mr. Merritt was a supporter of tribal lending and

19   the tribal lending business model; correct?

20   A     Yes, I believe he said his company does pair together --

21   they are matchmakers, as he said.

22   Q    You're unaware of any axe to grind; Mr. Merritt and you

23   were not involved in litigation or any conflict?

24   A     No, not at all.

25          THE COURT:  What do we need?  I am connected.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 287 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 35 of 174 PageID# 27979

Matthew Martorello - Direct

35

```
 1              (Discussion off the record.)

 2              THE COURT:  We're not keeping time on these --

 3              MR. BENNETT:  We're good now.  I'm sorry, Judge.

 4              THE COURT:  I don't care if the people who are not

 5    here don't see anything on the Zoom.  Take it off the Zoom so

 6    we can see what's going on in the courtroom.  That's the key

 7    thing.  So forget the Zoom.  The people in Zoom can stay on,

 8    but we are not going to run the evidence through the Zoom.  I

 9    can't have that.  We'll be here forever doing that.

10              MR. BENNETT:  Right now I'm at Exhibit 1.  It should

11    be on your screen also.

12              THE COURT:  It's on the screen now.

13              MR. BENNETT:  Yes, sir.

14              THE COURT:  Is that this two-volume thing up here?

15              MR. BENNETT:  It is.  That's Exhibit 1, and I'm going

16    to go in order, generally in order.

17              THE COURT:  Go ahead and ask your question.  Can you

18    see it, Mr. Martorello?

19              THE WITNESS:  Yes, I can, Your Honor.

20              THE COURT:  And a hard copy is in that thing labeled

21    Volume 1 if you'd rather look at that.  It's up to you.

22    Q    Mr. Martorello, this is a letter of intent and exclusivity

23    agreement between Mr. Merritt's company and Mr. Rosette's

24    company.  Have you seen this document before today?

25    A    I've seen it through the discovery process.
```

Matthew Martorello - Direct                                    36

1    Q    But you're aware that such an agreement -- you were aware

2    before the lawsuit that such an agreement existed?

3    A    I knew there was -- I didn't -- actually I didn't know

4    that TLS and TLM had partnered.  My assumption was that he was

5    part of TLM.

6    Q    In your declaration, which is document, Exhibit 106, if

7    you could turn to paragraph 14, please.  You have a paper copy

8    as well?

9    A    I do.

10             THE COURT:  Paragraph 14?

11             MR. BENNETT:  Paragraph 14.

12   Q    Now, Mr. Martorello, you said that you learned that LVD

13   had identified you as a potential consultant.  That was your

14   under-oath testimony; correct?

15   A    Correct.

16   Q    Let's get the background on this declaration.  What type

17   of input did you have in the drafting of this declaration, you

18   personally?

19   A    I had significant input.

20   Q    What does that mean?

21   A    I don't remember exactly three years ago, but I know that

22   I read it and probably wrote many of the --

23             THE COURT:  Let's go back to square one.  Did you

24   start off by writing the text of it on a piece of paper or

25   dictating it into a machine or typing it on a computer?  At the

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 289 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 37 of 174 PageID# 27981

37

Matthew Martorello - Direct

1   very first shot at it, is it yours or somebody else's?

2          THE WITNESS:  I believe the first thing that I did is

3   I wrote the declaration in a computer.

4   Q    Let's -- we can go up to the very first paragraph

5   actually, and the heading, the declaration says that this is

6   true and correct to the best of your knowledge, information,

7   and belief.  And you understand that this declaration, and you

8   understood when you were drafting it and then signing it, that

9   you were to provide the truth, the whole truth, nothing but the

10  truth; correct?

11  A    That's correct.

12  Q    And turning to paragraph 14 again, under the heading LVD

13  approached Martorello in 2011, paragraph 14, you say, "In mid

14  2011, I learned that LVD had identified me as a potential

15  consultant."  Do you recall that?

16  A    I do.

17  Q    But at that point, your claim would have been that was Mr.

18  Merritt?

19  A    Mr. Merritt I viewed as LVD, as an agent of LVD who had

20  been seeking someone to help LVD for some time.

21  Q    And, of course, you are aware a lot of paper has been

22  produced in this case; right?

23  A    Of course.

24  Q    But you have not -- you're not aware of any documentary

25  evidence that shows that LVD was trying to reach out to you as

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 290 of 681
Case 3:17-cv-00461-REP    Document 882    Filed 07/25/20    Page 38 of 174 PageID# 27982

38

Matthew Martorello - Direct

1    a potential consultant.

2    A    I wouldn't use the word me specifically, but they were

3    seeking lending operations to start and help with it since

4    2009, 2010 with Scott Merritt.

5    Q    This says me. 14 says, "I learned that LVD had identified

6    me." So you say I wouldn't say me specifically. Does that

7    mean that you were incorrect in drafting paragraph 14?

8    A    No. I think we just have a difference of interpretation.

9    LVD identified me as, you know -- Scott was working for LVD as

10   an agent, and he was seeking someone to provide services to

11   LVD, and when I met his partner, his partner had introduced me

12   to the concept of Think Finance, working with tribes, and I

13   said that was interesting. He asked me if I would like to

14   learn about it, and I said, okay. And he went and got Scott,

15   and Scott came over, and I don't recall him trying to sell me

16   software because he doesn't have online software.

17   Q    Well, again, my question to you is, you said under oath

18   under penalty of perjury -- did you write the under penalty of

19   perjury at the top of this declaration?

20   A    I don't think so.

21   Q    But you know that you were accountable under penalty of

22   perjury if you made an untruthful statement here; correct?

23   A    Correct.

24   Q    You said in your declaration that you learned that LVD had

25   identified me, meaning Matt Martorello, as a potential

Matthew Martorello - Direct

39

1    consultant, and now what you are saying is that what you recall

2    is that you spoke to somebody that said if you're interested in

3    tribal lending, why don't you talk to my partner Scott.

4    A    I guess I don't associate those as being the same thing.

5    I'm saying that LVD had, at some point, identified me as a

6    suitable consultant for their business.

7    Q    You're not testifying that that occurred, that they had

8    identified -- LVD had identified you at the point of your

9    attendance of this Online Lending Alliance conference?

10   A    I think that's accurate if I heard you correctly.  Can you

11   please repeat that?

12   Q    Sure.  How about this:  When did you learn -- I'm sorry.

13   What is your testimony about the time, the month of 2011 that

14   LVD supposedly identified you specifically as a potential

15   consultant?

16   A    Well, because I know Scott to have been an agent of LVD.

17   That's why I associate it with that moment.

18           THE COURT:  So it's at the conference then.

19           THE WITNESS:  Yes.

20   Q    And, at that point, your testimony is that you understood

21   at that point that Scott was an agent, supposedly an agent of

22   LVD?

23   A    Like I said, I didn't understand that at that time, but I

24   learned that later on.

25   Q    Okay.  And contrary to his testimony that you've just

**JA911**

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 292 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 40 of 174 PageID# 27984

Matthew Martorello - Direct

40

```
 1   watched.

 2   A    I think his testimony was very specific to TLS.

 3              THE COURT:  Excuse me a minute.  Don't ask the

 4   witness to comment on another witness's testimony.

 5              MR. BENNETT:  I'll withdraw the question, Judge.

 6              THE COURT:  And I don't want to hear what he has to

 7   say about the other witness's testimony either.  It's up to me,

 8   as the finder of the fact, to judge the credibility without the

 9   assistance of the lawyers or the witness.  The lawyers may

10   argue the case.

11              MR. BENNETT:  Yes, sir.

12   Q    I want to -- I'll come back to a couple other paragraphs,

13   but if you could take a look at paragraph 17 of 106, paragraph

14   17 of your declaration.

15   A    Okay.

16   Q    Now, you said you were not involved in the creation of Red

17   Rock but made aware that Red Rock had been formed.  Did you

18   type that in your draft?

19   A    I don't know that I used those exact words, but it may

20   have evolved from what I wrote originally.

21   Q    But you read this?

22   A    Yeah.  I'm sorry.  You asked if I typed it.

23   Q    I understand.

24   A    If it was edited or if I originally typed it.

25   Q    Separate question.  You read and understood that you were
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 293 of 681
Case 3:17-cv-00461-REP    Document 882    Filed 07/25/20    Page 41 of 174 PageID# 27985

Matthew Martorello - Direct                                    41

1    swearing under penalty of perjury that you were not involved in

2    the creation of Red Rock but made aware Red Rock had been

3    formed.

4    A    Correct.

5    Q    Now, where did the name Red Rock Lending -- Red Rock come

6    from?

7    A    I asked the tribe what name -- what would the name of the

8    entity be, and they said, what would you like, what do you

9    like, and I said, I like Red Rock, and then they went with that

10   name.

11   Q    Okay.  Well, why don't we fill in that blank.  On your

12   screen, and if you want to look at this otherwise is Exhibit 3.

13   Exhibit 3 is an email chain that was produced in discovery in

14   this case, Bates number ROS002 through --

15            THE COURT:  You don't need to read all that.

16   Exhibit 3.

17            MR. BENNETT:  Yes, sir, Exhibit 3.

18   Q    And this starts, the email chain starts, the very last

19   page, August 9, 2011; is that right?

20   A    Yes, that's accurate.

21   Q    And at this point, you were heavily engaged with Scott

22   Merritt and Flint Richardson.  Flint Richardson was his partner

23   in his company; correct?

24   A    I don't know that we have been heavily engaged.  I don't

25   remember when the first emails began.

1    Q    Well, take a look at that last page.  You have August 9th.

2    A    So that may have been the beginning.  I don't remember the

3    exact date, but that may have been the first sort of email.

4    I'm not sure.

5    Q    You're not sure, but it was at least by August 9th.

6    A    Yes, yeah.

7    Q    And then over the course of this chain, working from the

8    back forward, the next page up says -- and this is sent Friday,

9    August 19th, from you to Flint Richardson, Scott Merritt, and

10   Rob Rosette, and this is your email asking is the tribe ready

11   to go live, and you wanted to talk about the detail of

12   origination occurring at the tribe, you wanted to discuss

13   operating bank account activity.  This was your email that you

14   sent to Mr. Merritt, Mr. Richardson, and Mr. Rosette; correct?

15   A    Yes.  I wanted to go visit their operation and understand

16   what they were doing.

17   Q    Okay.  I want to go ahead and skip to the third page up or

18   from the beginning which would be at the bottom 695, and I can

19   call it out here for you.

20        At this point, this is your -- right in the middle of

21   the page, your email, August 23rd, 2011, "Is there an entity

22   name for the tribal LLC?  Obviously an LLC that will only be

23   tied solely to us, with a unique name that doesn't expose our

24   relations if another lender tribe entity had problems."  You

25   wrote that email; correct?

Matthew Martorello - Direct

43

1    A    Correct.

2    Q    And then Mr. Richardson responded right above, "You can

3    name it"; correct?

4    A    That's correct.

5    Q    And then right above that, Mr. Merritt said, "I was about

6    to say the same thing"; correct?

7    A    Yes, that's correct.

8    Q    And then turning to, while we're on this -- well, let's

9    turn to Exhibit 2 real quick just so we complete that circle.

10   The first page of Exhibit 2, this is an email from you to

11   Mr. Rosette, Mr. Richardson, and Mr. Merritt again dated

12   August 23, 2011, and it says, "For the tribal entity, is it an

13   LLC or corp?  I like the name Red Rock Tribal Cash, LLC, or

14   corp."  Do you see that?

15   A    I do see that.

16   Q    And that, of course, that's how Red Rock came about.  It

17   was your brainchild; right?

18   A    No.  They just asked me the name or what name I liked.  I

19   actually asked them what name it was first, and I understood

20   they already had operations, but it couldn't be formed until

21   the tribe actually created the entity.

22   Q    Okay.  Well, you also have, and I'm showing you in that

23   same -- on your screen, the next paragraph says you plan to

24   have draft documents done by the end of the week.  Who was Ryan

25   Bloom?

USCA4 Appeal: 21-2116    Doc: 26-2      Filed: 02/07/2022    Pg: 296 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 44 of 174 PageID# 27988

Matthew Martorello - Direct

44

1    A    I think he was a tribal attorney in Michigan.

2    Q    And so you were going to have draft documents done and

3    then sent to Ryan Bloom for finalization; correct?

4    A    That's correct.

5    Q    So if you were going to send them to the attorney by the

6    end of the week, who was drafting the documents?

7    A    I don't recall.

8    Q    Look, we've got a lot -- we have whole binders here and

9    we'll go through all these, but it's fair to say that you were

10   very active, you were not passive in reviewing the documents

11   that were created in these various exchanges with Mr. Rosette

12   and LVD.

13   A    So the draft documents here, I believe, are like a term

14   sheet or inducement agreement or a relationship document, not

15   to be confused with corporate formation or anything like that.

16   Q    Okay.  Let me take a look at Exhibit 5 for you.

17            THE COURT:  Wait a minute.

18            MR. BENNETT:  Yes, sir.

19            THE COURT:  You weren't writing the draft documents

20   you are referring to there, were you?

21            THE WITNESS:  No, no.

22            THE COURT:  So were they legal documents?

23            THE WITNESS:  I believe it was -- I'd like to --

24            THE COURT:  You said it's a term sheet.  What do you

25   mean by term sheet?

Matthew Martorello - Direct

45

1          THE WITNESS:  Well, I remember --

2          THE COURT:  What do you mean by term sheet?

3          THE WITNESS:  I think it was called an inducement

4     agreement and like a term sheet of what the business

5     relationship would be between my company and the tribe.

6          THE COURT:  But clearly is contemplated that they be

7     executed.  That means signed to you?

8          THE WITNESS:  The term sheet, hopefully both parties

9     would sign the term sheet.

10          THE COURT:  So it was to be executed?

11          THE WITNESS:  If we could reach terms yes.

12          THE COURT:  Was a lawyer drafting the documents for

13     you?

14          THE WITNESS:  You know, I wouldn't have been drafting

15     them myself.  I do know that.

16          THE COURT:  What lawyer were you using at the time to

17     draft your documents?

18          THE WITNESS:  In terms of the term sheet

19     specifically?

20          THE COURT:  In terms of what you're talking about in

21     this paragraph.  Who was it that drafted the document?  It

22     wasn't you, it was a lawyer working for you.  Who was the

23     lawyer?

24          THE WITNESS:  Well, I'm actually saying -- I

25     apologize.  This is a long time ago, but it says that I plan to

**JA917**

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 298 of 681

1    have the draft documents done by the end of the week.  I don't

2    think that means I was actually drafting the documents.  So I

3    wouldn't have done that.

4            THE COURT:  You said that.  I plan to have them done.

5    You were going to have them done by somebody.  You said it was

6    a lawyer.  Who was the lawyer who was drafting the documents

7    for you?  Who was that?

8            THE WITNESS:  I mean, I guess my point is I'm not

9    sure what I meant by "I plan to have the draft documents done."

10   I don't think I was saying that somebody had -- that I had

11   drafted documents or someone else had.  I think what I was

12   saying was there were draft documents that had to be done.  I

13   haven't read all this right now, but I don't know what those

14   draft documents were for sure, but I've testified, obviously,

15   that they provided me their servicing agreement, and I just

16   presumed that, you know, those were the draft documents that I

17   was maybe looking at and going to send to Ryan Bloom.  That's

18   the best I can offer.

19           THE COURT:  All right.  If that's what you are

20   saying, that's what I'll interpret it to mean.  I will tell

21   you, to me, when you say I plan to have the draft documents

22   done by the end of the week, you are taking responsibility for

23   them, or the other meaning is I hope that they are done.

24   Either way, somebody is drafting them because you said you

25   weren't.  I want to know who it was that was drafting them

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 299 of 681
Case 3.17-cv-00461-REP   Document 882   Filed 07/25/20   Page 47 of 174 PageID# 27991

47

Matthew Martorello - Direct

```
1    according to what you know, or do you not know?
2              THE WITNESS:  Obviously, I'm sorry, I can't recall
3    exactly --
4              THE COURT:  You can't remember the lawyer who was
5    representing you at this time?
6              THE WITNESS:  That was Ryan Bloom.  I do know that.
7              THE COURT:  All right.  So you, then, were drafting
8    the documents and going to send them to Bloom, your lawyer?
9              THE WITNESS:  No.
10             THE COURT:  You were going to get them from somebody
11   and send them to Bloom?
12             THE WITNESS:  Yes.  I either had them from somebody
13   or I was going to get them from somebody and send them to the
14   lawyer.
15             THE COURT:  Okay.
16   Q   Mr. Martorello, could you take a look at Exhibit 5 which I
17   also, I believe, have on your screen.  Now, this is an email
18   from Flint Richardson to Karrie Wichtman who was a lawyer with
19   the Rosette law firm at this time; correct?
20   A   That's correct.
21   Q   And she and Rob Rosette were representing the tribe;
22   correct?
23   A   Yes, that's correct.
24   Q   And this also was sent to Ryan Bloom and you; correct?
25   A   Correct.
```

Matthew Martorello - Direct

1          THE COURT:  Who is Flint Richardson?

2          THE WITNESS:  He is one of the partners in TLM.

3    Flint, Rob Rosette, and Scott Merritt were partners as the

4    agents of LVD that we looked at that contract a little while

5    ago for.

6          THE COURT:  TLM is Rosette's partnership?

7          THE WITNESS:  That's correct.

8          THE COURT:  And Wichtman was a lawyer for the tribe,

9    and she was in Rosette; is that right?

10         THE WITNESS:  That's correct.

11   Q    Now, you have -- this is an email that is a to-do list

12   with respect to the documents that were still being exchanged

13   to create Red Rock; is that correct?

14   A    So Flint -- this is from Flint to Karrie.  It seems like

15   there was an email that they had provided that Ryan had sent,

16   and then he lists what they were providing, the tribe's

17   constitution, its lending code, its ordinances, its bank stuff,

18   EIN.

19   Q    So at the top, this was sent to your lawyer, Ryan, and the

20   tribe's lawyer, Karrie; correct?

21   A    Yeah, that's correct.

22   Q    And it says, "Matt has indicated that the intended tribal

23   LLC should be established as Red Rock Lending, LLC, a tribal

24   entity"; correct?

25   A    Yes.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 301 of 681

1   Q    And then your lawyer and Karrie had to provide certain

2   documents including the tribe's constitution, ordinances, and

3   any resolution as well as a draft of the Red Rock Lending

4   organization documents and operating agreement for Ryan to

5   review prior to having it approved by LVD; correct?

6   A    Yes.  I believe Ryan requested these items.

7   Q    Your lawyer requested to review the Red Rock -- the

8   documents that were going to create the Red Rock Lending

9   entity?

10  A    Right, among the other things, yes.

11  Q    So when you, in paragraph 17 of your declaration -- and we

12  can go on.  We've got stacks of these.  I'm burning through my

13  time --

14       THE COURT:  Why don't you do this:  Why don't you

15  just ask the question, not going on.  If he continues to

16  ramble, I'm going to extend the time.

17       MR. BENNETT:  Yes, sir.

18       THE COURT:  Either he answers directly and I won't

19  have to extend the time, but if he continues to ramble and

20  reframe questions, I'm going to extend the time.  I want to get

21  to the bottom of things here.

22       MR. BENNETT:  Yes, sir.

23       THE COURT:  It doesn't help get to the bottom of

24  things if you are telling him how much evidence you've got.  He

25  doesn't need to know that.  All right, let's go.  Start your

Matthew Martorello - Direct

50

1    question.

2    Q    Mr. Martorello, in paragraph 17 of your declaration when

3    you swore under penalty of perjury that you were not involved

4    in the creation of Red Rock but made aware Red Rock had been

5    formed, now, today, you know that to be an untruthful

6    statement.

7    A    No.  I think I just disagree with you what the creation of

8    Red Rock is.

9    Q    Okay.

10   A    For example, the way I've thought of it is, you know, I

11   can provide a name for my son's child, but I don't create the

12   child.  The only one who can create the entity and the business

13   is the tribe.  So whatever advice they asked me for, if I give

14   them a name or we look at due diligence documents to consider

15   partnership, it's -- that doesn't do creation.  That isn't the

16   formation, and this was all in the context of the *Breakthrough*

17   factors which was what was the --

18          MR. BENNETT:  Objection; not responsive to my

19   question, Judge.

20          THE COURT:  He's also not asking you about creation.

21   He's asking you about another word in the sentence, a verb.

22   He's asking you about the verb, involved in the creation.

23          THE WITNESS:  Okay, my mistake.

24          THE COURT:  What he wants to know is, were you

25   involved in the creation of it no matter how you were involved.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 303 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 51 of 174 PageID# 27995

51

Matthew Martorello - Direct

1  He can get into the next question, he'll ask you how if the
2  answer is yes.  If the answer is no, then the answer is no.  Do
3  you understand?
4          THE WITNESS:  I believe so.
5          THE COURT:  Were you involved in the creation of Red
6  Rock?
7          THE WITNESS:  No.
8          THE COURT:  All right, that's the answer.
9  Q    Did your lawyer -- was your lawyer's review of the
10 documents creating Red Rock -- the organizational documents
11 prior to their being submitted to LVD's counsel for approval,
12 was your lawyer authorized by you to be involved in that
13 process?
14 A    I'm sorry again.  What process?
15         THE COURT:  The creation of Red Rock.
16         THE WITNESS:  No.  We didn't participate in the
17 creation of Red Rock.
18 Q    Paragraph 19, you swore under penalty of perjury that you
19 personally reviewed Red Rock's articles of organization for Red
20 Rock, and that's something that was true; right?  You did
21 personally review Red Rock's articles of organization; correct?
22 A    That's correct.
23 Q    But, in fact, you reviewed Red Rock's -- you and/or your
24 lawyer reviewed Red Rock's articles of organization before
25 those articles were submitted to LVD for approval?

Matthew Martorello - Direct

52

1    A    That's correct.

2    Q    Now, continuing in your declaration here, paragraph 22,

3    you state, "As a consultant to Red Rock, I made suggestions and

4    offered advice to Red Rock's co-managers."  Do you see that?

5    A    I do.

6    Q    And you never made a decision on behalf of Red Rock, or no

7    company you manage ever made such decisions; correct?

8    A    Correct.

9    Q    That was your testimony?

10   A    Yes.

11   Q    Let's take a look at Exhibit 3, please.  I'm sorry,

12   Exhibit 4.  So Exhibit 4 on the second page is an email

13   exchange between you and Richardson, Merritt, and Rosette dated

14   August 26, 2011.  Do you see that?

15   A    Yes.

16   Q    And there's highlight, but this highlight was already in

17   here when we got it, but do you know who did the all caps in

18   the highlight?

19   A    I believe -- I believe that was Flint.

20   Q    And you reviewed this document.  Was this responding to

21   questions that you had?

22   A    It seems so, yes.

23   Q    And if you'll take a look at the third page, do you see in

24   the highlighted "No representatives from the tribe are the

25   LLC's managers.  The servicer Bellicose operates the business

JA924

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 305 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 53 of 174 PageID# 27997

53
Matthew Martorello - Direct

1   completely."

2   A    I see it.

3   Q    And that's what you understood at that point, that you

4   were structuring into the Red Rock deal?

5   A    I don't know -- no, I don't think that's what I

6   understood.

7   Q    Not what you understood.

8   A    I was asking questions at that time.  I didn't have an

9   understanding yet.

10  Q    Okay.

11        THE COURT:  I'm seeing in some instances where people

12  send an email, and then when somebody answers a question that's

13  embedded in an email, they type an answer right there, and

14  sometimes it's in different type.  Is that what was going on

15  here on page three do you know?

16        THE WITNESS:  Yes.

17        THE COURT:  Who was it that was answering -- who put

18  the question, "Does it mean that Bellicose is the manager,"

19  etcetera, in the lower case?  Who did that?

20        THE WITNESS:  I'm the one asking the questions, and

21  then -- I'm the lower case, and then the upper case is all

22  Flint Richardson.

23        THE COURT:  So Flint Richardson is answering that

24  question.  Who, again, is Richardson?

25        THE WITNESS:  He was one of the TLM partners.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 306 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 54 of 174 PageID# 27998

Matthew Martorello - Direct                                              54

```
1            THE COURT:  Rosette group.

2            THE WITNESS:  Yes.

3   Q    I have you called out at paragraph or page four --

4            THE COURT:  Of what?

5   Q    Of Exhibit 5, page four of Exhibit 5, which is also on

6   your screen called out, and you ask can you elaborate.

7            THE COURT:  Mr. Bennett, excuse me.  My copy of

8   Exhibit 5 is one page --

9            MR. BENNETT:  Sorry, Exhibit 4.

10           THE COURT:  So you are on page four --

11           MR. BENNETT:  Of Exhibit 4, I'm sorry.

12           THE COURT:  Do you have that, Mr. Martorello?

13           THE WITNESS:  Yes, sir.

14  Q    You were told the design of this business was -- and,

15  again, it's all capped, that "your entity would be the servicer

16  for the lending operations.  The LLC managers are managers of

17  the LLC entity on behalf of the tribe but aren't involved in

18  the business."  Is that correct?

19  A    That's what this says here.

20  Q    In fact, that is how the business ultimately operated,

21  with the managers were not actively involved in the business.

22  A    That is not correct.

23  Q    That is not correct.  All right.  So -- now, when Red Rock

24  was created, what was the servicing entity at that time?

25  A    Well, there was none yet until months later.
```

JA926

Matthew Martorello - Direct

55

1   Q    Who handled the servicing when Red Rock started operation

2   and when loans were being made in Red Rock's name?

3   A    That would have been Bellicose VI, Inc.

4   Q    That was your company?

5   A    Yes.

6   Q    And then at some point, it became Sourcepoint.

7   A    Yes.

8   Q    And at that point when either as Bellicose or Sourcepoint,

9   what intellectual property did you give to LVD's co-managers in

10  terms of underwriting?

11  A    Throughout the relationship you mean?

12  Q    Right now -- yes, with respect to the relationship between

13  Red Rock and Bellicose and Sourcepoint, what actual tangible,

14  by name and detailed description, underwriting intellectual

15  property did you give them?

16  A    Well, throughout the process, every recommendation that we

17  would make, they would receive.  So that could include

18  statements and procedures, how to do the verifications, the

19  underwriting criteria, and the systems and things.  So any of

20  the knowledge that we're transferring to them, they had to

21  implement at their call center, and so they received that.

22  They owned it, and that was their property we were creating for

23  them.

24  Q    Let's talk about that.  So when you say --

25            THE COURT:  Wait just a minute.  You're saying what

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 308 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 56 of 174 PageID# 28000

56

Matthew Martorello - Direct

1  you told them.  He's asking you what did you give them

2  physically.  What did you hand to Red Rock?  What did

3  Bellicose, Sourcepoint, whoever it was, actually, by way of

4  intellectual property, physically hand to Red Rock; any?  If it

5  was, what is it?

6            THE WITNESS:  Well, I believe it would be like the

7  scripts and -- the papers that speak to those things I

8  mentioned.

9            THE COURT:  What are you talking about?

10           THE WITNESS:  So, for example, certain leads or loans

11 would go through a certain system or process.  So we had to put

12 that on paper and then send it to them, discuss it with them,

13 and if they accepted the recommendation, they would own the

14 process and that was their paper and process.

15           THE COURT:  Are you saying, though, that Bellicose

16 was processing the loan and then send it to Red Rock, and if

17 Red Rock thought it was okay, then Red Rock got all of the

18 information that you had sent along with them to help them

19 evaluate the loan?

20           THE WITNESS:  No, I don't think that's what I'm

21 saying.

22           THE COURT:  I'm utterly baffled by what you are

23 saying.  So think about it over the 20-minute recess, and then

24 we will come back and talk about it again.  We'll be in recess

25 for 20 minutes.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 309 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 57 of 174 PageID# 28001

57
Matthew Martorello - Direct

```
 1              (Recess taken.)
 2              THE COURT:  All right, Mr. Martorello I remind you
 3    you are under the same oath that you took earlier in the day.
 4              THE WITNESS:  Yes, sir.
 5              THE COURT:  Mr. Bennett.
 6    Q    Mr. Martorello, regarding the creation of Red Rock and
 7    then, I guess, later the other tribal entities, you are aware,
 8    and I think in paragraph 16 of your declaration you noted that
 9    you reviewed the tribal council resolutions relating to the
10    lending entities Red Rock; right?
11    A    Yes, that's correct.
12    Q    And, in fact, in that time period when the tribe began to
13    implement the Red Rock program, you had hired a new lawyer to
14    help you; correct?
15    A    That's correct.
16    Q    And who was that?
17    A    I hired Jennifer Weddle of Greenberg Traurig.
18    Q    And she has a background in tribal lending?
19    A    Yeah, Native American law generally and tribal lending.
20    Q    If you take a look at Exhibit Number 10, please.  These
21    are sum of the emails we were able to get from Mr. Rosette's
22    subpoena.  This is an email from the tribe's lawyer, Ms.
23    Wichtman, to your lawyer, Ms. Weddle; correct?
24    A    Correct.
25    Q    And it states that Ms. Wichtman is sending a copy of the
```

Matthew Martorello - Direct

1    proposed tribal resolution for her review prior to the next

2    meeting regarding the execution of Red Rock documents, the next

3    meeting of the tribal council; correct?

4    A    That's correct.

5    Q    And the second to last sentence says, "Please note that

6    there were changes made to your form resolution based upon

7    input and request of the tribal council"; do you see that?

8    A    I do.

9    Q    And this was customarily the way that these resolutions

10   that had implications for the Red Rock and then later the Big

11   Picture businesses operated; that is, the resolutions were sent

12   to you or to your representatives before the tribal council

13   actually voted on them.

14   A    That was not customary.

15   Q    It was not customary.  And so when it says Ms. Weddle's

16   form was modified, she had submitted a form resolution for the

17   execution and transaction that became Red Rock that the tribe

18   then felt it should edit; correct?

19   A    That seems to be what this says here.

20   Q    Now, when Red Rock began, what assets did Red Rock receive

21   from Bellicose and then Sourcepoint?  Like what actual assets,

22   and specifically I want to point you in your declaration to

23   paragraph 35.  Paragraph 35, which says in addition to whatever

24   the cash distributions were, that LVD received and retained the

25   significant additional economic value of ownership of all

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 311 of 681

Matthew Martorello - Direct

1   intellectual property developed under the agreement by

2   Sourcepoint.  Did you write that, or did your lawyers write

3   that?

4   A    I believe I wrote that.

5   Q    So your statement under oath is that Sourcepoint gave LVD

6   all intellectual property developed under the agreement with

7   Sourcepoint.  That's how I read it.  Am I wrong?

8   A    Anything that was theirs developed through the agreement

9   would be their intellectual property, yes.

10  Q    So underwriting criteria, the formula, the special sauce,

11  LVD received that; it was given to them, they had actual

12  possession and ownership over all that special sauce, secret

13  sauce?

14  A    Not the secret sauce related to our pre-qualified leads

15  but the secret sauce related to their underwriting

16  verifications.

17  Q    All right.  Well, tell the Court what underwriting

18  verifications are because it sounds a lot more complicated.

19  Explain to me what that is.

20  A    Sure.  So they have a set of underwriting criteria which

21  is generally, you know, age, income, you know, formulas for

22  what they want the loans to look like based on what the data

23  is, and then it comes in, and then the call center will go

24  through certain processes to verify, you know, bank, are they

25  employed, is it really their bank account, is it fraudulent,

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 313 of 681
Case 3.17-cv-00461-REP    Document 882    Filed 07/25/20    Page 60 of 174 PageID# 28004

Matthew Martorello - Direct                                                    60

1    things like that.

2         That's part of their underwriting process.  That's all

3    their intellectual property and then, of course, there's the

4    final process to do the final verifications on the reservation

5    which is theirs as well, and separately, what I'm saying is

6    different.  Pre-qualified leads is our formulas for how we do

7    our algorithms to try and find leads that hopefully fit into

8    their box of processes like a lead provider would do.

9    Q    So you gave all that computer code and all those formulas

10   to a tribal member to own, possess, and keep?

11   A    I didn't give them our pre-qualified stuff, but I gave

12   them their statements and procedures, verification procedures,

13   and the underwriting box.

14        THE COURT:  What's this pre-qualified stuff that you

15   are talking about?

16        THE WITNESS:  Pre-qualified leads, kind of like when

17   you get pre-qualified for a mortgage, will run a bunch of data

18   to determine if you would be eligible, and then we'd solicit,

19   you know, a direct mail campaign or something, and then you

20   might apply if you're interested.  So we would generate leads

21   like marketing through analytics and such.

22        THE COURT:  And so the algorithms you developed for

23   pre-qualified leads, were they developed under the agreement by

24   Sourcepoint?

25        THE WITNESS:  No.  That was how we provided that

Matthew Martorello - Direct

61

1   service to them.  Our agreement required us to provide --

2            THE COURT:  That wasn't what I asked you.  I asked

3   you a different question.  Were those algorithms that you are

4   talking about respecting the pre-qualified leads developed

5   under the agreement by Sourcepoint?  Read your affidavit,

6   paragraph 35.

7            THE WITNESS:  Okay.  I've read it again.

8            THE COURT:  Were the algorithms that you spoke of for

9   the pre-qualified leads developed under the agreement by

10  Sourcepoint?

11           THE WITNESS:  No.

12           THE COURT:  And they were not given to the tribe.

13           THE WITNESS:  Correct.

14  Q    So what you are referring to when you discuss the

15  pre-qualified leads is the leads themselves.

16  A    Correct.

17  Q    That's what you are referring to as the significant

18  additional economic value of ownership of all intellectual

19  property developed under the agreement by Sourcepoint, is the

20  leads themselves?

21  A    No.

22  Q    All right.  The leads themselves is one of those.

23  A    No, the leads is the pre-qualified leads that I was

24  talking about.

25  Q    So the pre-qualified leads, that's the intellectual

Matthew Martorello - Direct                                        62

1    property to which you are referring.

2    A     No.  Maybe I'm not explaining this well, but the

3    pre-qualified leads, the way we generate those is our

4    intellectual property.  Then we provide the leads themselves

5    which is, I think, what you're saying.  So that becomes the

6    customer for them which is their intellectual property, is the

7    customer list, so it becomes theirs at that point.

8              THE COURT:  Excuse me just a minute.  Let's go back

9    to your affidavit and try it another way.  What intellectual

10   property was developed under the agreement by Sourcepoint that

11   is referred to in paragraph 35 that was given by Sourcepoint to

12   the tribe?  What was it?

13             THE WITNESS:  So that would be all of the procedures

14   for how to verify the pre-qualified lead when they got it.

15   That -- meaning how the call center would do their analysis for

16   bank verifications or employment verification, how the loan and

17   rate and term should match up to two different types of

18   pre-qualified leads, and, you know, I'm probably missing some

19   processes, but the compliance management system, for example.

20   Those would be examples of things that we would have developed,

21   recommended for them, and then once they adopted it, that was

22   theirs.

23             THE COURT:  All right.

24   Q     So the algorithms, the analytics, the machine from which

25   business was generated, that was not given to the tribe.

**JA934**

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 315 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 63 of 174 PageID# 28007

Matthew Martorello - Direct

63

1    A    Correct.

2    Q    The actual output, that is, here's the leads, and not all

3    leads but the leads that ultimately become their customers,

4    that intellectual property is the intellectual property that

5    you are referring to?

6    A    I think that sounds correct.

7    Q    Now, everything else you kept, and you guarded.

8    A    Our IP, how we did things --

9    Q    Your intellectual property --

10           THE COURT:  Wait a minute.  You are talking at the

11   same time, and I can't hear you and the court reporter can't

12   hear you.  Go ahead, start again.

13   Q    Everything else, all of the analytics, the --

14           THE COURT:  He has already answered --

15   Q    You retained and never gave that to the tribe?

16   A    Our systems and how we did our analytics and things, sort

17   of how we make the sausage, that's our IP.

18   Q    Okay.  So with the intellectual property that you gave,

19   that Sourcepoint gave to the tribe, the tribe could not operate

20   a business with that.  They didn't have -- they didn't know how

21   to cook the food, they just had the food; right?

22   A    I don't know that I would agree with that.  They could get

23   leads from other sources, for example.

24   Q    Okay.  But the analytics, the core of what made your

25   business special, what you were selling and charging 98 percent

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 316 of 681
Case 3:17-cv-00461-REP  Document 882  Filed 07/25/20  Page 64 of 174 PageID# 28008

64

Matthew Martorello - Direct

1   less some expenses, that was the analytics that you marketed as

2   being so valuable.

3   A    That was the most valuable thing that we had.

4   Q    Now, I want to take a look at a few of these types of

5   intellectual property that you -- again, referring to 35, and

6   this is my apology, but I'm reading it, and it says "of all

7   intellectual property developed under the agreement by

8   Sourcepoint."

9        So I want to, in that context, talk about some of your

10  emails.  Take a look at Exhibit 13.  So Exhibit 13 is an email

11  dated November 13th, 2011, from Mr. Richardson to you.  And

12  it's following up, apparently, a phone call suggesting that you

13  should discuss these issues with GT.  GT was the law firm, Ms.

14  Weddle's law firm; correct?

15  A    That's correct.

16  Q    Greenberg Traurig?

17  A    Yes.

18  Q    And one of the items was intangible asset ownership.  You

19  were going to talk to Jennifer, the lawyer, your lawyer, about

20  the language that they have relating to you obtaining ownership

21  of the intangibles, specifically domain names, if you're no

22  longer the servicer.  Do you see that?

23  A    Yes.

24  Q    In fact, that ultimately made it into your deal with Red

25  Rock or LVD.  If LVD no longer used you and your companies as

Matthew Martorello - Direct

1    the servicer, the domains for these lenders reverted back to

2    you.

3    A    I'm not sure that that was ever put into the final deal.

4    Q    All right.  Well, let's take a look at Exhibit 89 -- no,

5    let's take a look at Exhibit 56 and 57.  Exhibit 56, this is an

6    email.  The last of the emails was dated August 26th, 2014, and

7    this was an exchange occurring between you and Ms. Wichtman in

8    her capacity as a lawyer for the tribe; correct?

9    A    That's correct.

10   Q    And I want to turn to the second page of the exhibit which

11   is an email from you on August 26th which I think is also on

12   your screen.

13   A    Yes.

14   Q    Can you read that first sentence.

15   A    "We respectfully opt to continue to keep any details of

16   SPVI IP including DM explicitly for internal eyes only, both

17   for the protection of our business and maintaining integrity of

18   an acquisition of the SPVI business."

19   Q    All right.  Now, that IP, and, in fact, you -- the IP is

20   intellectual property; correct?

21   A    That's correct.

22   Q    Now, if you'll turn to the first page of that same

23   exhibit, and then this is Ms. Wichtman responding to your

24   email.  And she says, "I wasn't recommending that SPVI disclose

25   its secret sauce but only that SPVI be willing to explain to

Matthew Martorello - Direct

1    the co-managers what exactly they are approving."  By the way,

2    the process -- am I right the process was that Sourcepoint

3    would make recommendations, and I'm doing quote unquote for the

4    record, quote unquote recommendations to the co-managers of the

5    tribal lending entity; right?

6    A    Co-manager or CEO, yes.  For example, Shelly was both, in

7    both capacities.

8    Q    Okay.  So they would make the recommendation to them, and

9    then the, in this case Shelly which is Michelle Hazen; correct?

10   A    Correct.

11   Q    So Ms. Hazen would then approve, and, for the record, I'm

12   using quotes around the word approve.  So Ms. Hazen would

13   approve what SPVI was asking Red Rock to approve; correct?

14   A    She could approve or reject, but if it was going to be

15   implemented, she would approve.

16   Q    So Ms. Wichtman, in this exchange, was emailing you asking

17   for some details about what was being -- about the secret

18   sauce.  You responded you're not going to share the

19   intellectual property, and then she responds with this

20   sentence:  "I wasn't recommending that SPVI disclose its secret

21   sauce but only that SPVI be willing to explain to the

22   co-managers what exactly they are approving."  Do you see that?

23   A    I do.

24   Q    And this was August of 2014; correct?

25   A    Correct.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 319 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 67 of 174 PageID# 28011

Matthew Martorello - Direct

67

1   Q    Now, one of the secret sauce items that you guarded was

2   the vendor relationships with the third-party companies that

3   Sourcepoint would use to generate leads, for example; correct?

4   A    Some of the vendor relationships which were related to

5   pre-qualified leads, yes.

6   Q    Okay.  In fact, the top of this email you address that

7   very point which is your email back says that the vendor

8   contracts and formulas used are very closely guarded internal

9   IP and entirely unobtainable by the clients.  Do you see that?

10  A    Yes.

11  Q    "The only reason we moved elements to be direct with

12  client was because the risk of working with tribal clients was

13  more and more dangerous and optics become very important."  If

14  there is -- the last paragraph, "If there's a fundamental

15  disagreement on IP ownership, though, I imagine the elements I

16  mentioned required in a deal are far from obtainable."  What

17  did you mean by that sentence?

18  A    Well, she was making the point basically that if -- if she

19  was making the point that she owned our secret sauce, then they

20  effectively already owned our business, and there would be

21  nothing for us to sell to them.

22  Q    And, in fact, therefore, you disagreed when you suggest in

23  response, your point is that the analytics, the secret sauce,

24  the vendor relationships, those were not given or made

25  available to Red Rock, those still belonged to you and your

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 320 of 681

1  companies; correct?

2  A    They were at some point, which I mention I think here that

3  we did do that, because we had to -- the whole industry got

4  really -- they wanted full clarity on the life cycle of a

5  consumer, meaning from the website through to origination or

6  debt collection agency or anything.  So all the vendors wanted

7  to go direct, and they didn't want us involved in pre-qualified

8  leads by way of contract.

9  Q    And you wanted to get your name out of it because of the

10  impending regulatory and litigation risks that you saw at this

11  time.

12  A    I was definitely interested in not being mischaracterized

13  as the lender.

14        THE COURT:  Was that an answer yes or no?

15        THE WITNESS:  I don't remember the exact question.

16        THE COURT:  From now on, answer yes or no, and if you

17  then want to say something, okay, but any other answers that

18  aren't yes or no I'm not going to pay much attention to because

19  I can't follow what you are saying.

20        You have -- your practice seems to be to try to

21  restate the question or to say something that's not even

22  remotely implicated by the question, and, therefore, it's

23  confusing to the record and to me, and it's not helpful to me

24  to understand things in that fashion.

25        Ask the question again.  Answer it yes or no.  If

Matthew Martorello - Direct                                    69

1    there needs to be an explanation, your lawyer can call for it.

2    Go on.

3              THE WITNESS:  Okay.

4    Q    On your screen, I believe, is Exhibit 57, and I've called

5    out on page one the sixth paragraph down.  This document itself

6    is an email from you to Ms. Wichtman dated August 26, 2014;

7    correct?

8    A    Correct.

9    Q    And, at this point, you're, I guess, negotiating or

10   discussing with Ms. Wichtman the terms of some future sale to

11   turn over your servicer business?

12   A    At this point, we were discussing a sale, yes.

13   Q    And so the paragraph I've called out says, "The servicer

14   is a servicer, so the IP it builds is its own, and for the use

15   of its client (multiple) which it services, or has serviced

16   from even the pre-LVD days."  By the way, you are referring to

17   you, to your company, as the servicer in that sentence; right?

18   A    Correct.

19   Q    Now, at the top of this same email, in the first -- or in

20   the third paragraph -- by the way, do you recall this email

21   that you wrote?

22   A    No, but I'm familiar with it because I've seen it in the

23   production a few times.

24   Q    You are referring -- this is referring to a transition

25   from the Red Rock time period to some future time period or

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 322 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 70 of 174 PageID# 28014

70

Matthew Martorello - Direct

1   future structure that we now know became Big Picture; right?

2   A    I believe that's correct.

3   Q    So it's fair to say that when you are describing how

4   things are going to be under the Big Picture structure in terms

5   of what information is going to be shared or what control is

6   going to be provided to the tribal managers, that it would

7   be -- that with respect to Red Rock, there would have been less

8   sharing and less control than after the servicer is actually

9   owned by the LVD?

10              THE COURT:  I don't have any idea --

11              MR. BENNETT:  That was horrible.

12              THE COURT:  -- and I can't imagine --

13              MR. BENNETT:  Every third word.  If you heard every

14   third word, it was a great question, Judge.

15              THE COURT:  Cut it down by two-thirds then.

16   Q    So, here, in this email, you write, "The seller will have

17   to keep a final say-so in business decisions."  That means

18   whatever deal you're going to agree to with the new Big Picture

19   structure, one thing that you were going to insist on was that

20   the seller -- that's you; right?

21   A    Yes.

22   Q    The seller will keep a final say-so in business decisions;

23   right?

24   A    Correct.

25   Q    So obviously that means that as of the time of writing

1    this email, the seller, you, believed you had the final say-so

2    in business decisions.

3    A     No.

4    Q     No.  Now, continuing back to your declaration --

5              THE COURT:  Stop just a minute.  What did you mean by

6    business decisions in that sentence?  What business decisions

7    are you talking about?

8              THE WITNESS:  Well, at that point, it was very

9    premature because we hadn't gotten to documents, and I didn't

10   know yet what business decisions I was talking about, but I

11   just meant as a lender, interested in making sure the

12   collateral and IP were maintaining its integrity.  There had to

13   be some sort of, you know, control to make sure it wasn't just,

14   you know, degraded or trashed or something like that, but I

15   hadn't really thought through what that would mean yet at this

16   point in time.

17             THE COURT:  So you didn't know what business

18   decisions meant in that sentence?

19             THE WITNESS:  Correct.

20   Q    So that email, when you wrote that email, the seller you

21   are referring to was Sourcepoint; correct?

22   A    Eventide ultimately, but the entity sold was Sourcepoint.

23   Q    Now, continuing in your declaration, I want to talk about

24   the bank accounts.  So paragraph 27 of your declaration and 28,

25   you say, "Red Rock provided companies Bellicose and Sourcepoint

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 324 of 681

Matthew Martorello - Direct

1   certain limited access to bank accounts."  Do you see that?

2   A    Yes.

3   Q    So there was an operating account that was in the name of

4   Red Rock; correct?

5   A    Correct.

6   Q    Later there was an operating account in the name of Big

7   Picture; correct?

8   A    Yes, there was.

9   Q    And in the operating account, what money went into that

10  operating account, the Red Rock operating account?

11  A    Anything borrowed from creditors and any inbound revenue

12  or loan payments from the consumer loans.

13  Q    And who is Brian McFadden?

14  A    He is the CEO of the Ascension Technologies.

15  Q    At the time of this email -- I'm sorry, at the time of Red

16  Rock, rather, and of Sourcepoint, what was Brian McFadden's

17  role?

18  A    He was the -- just before the sale, he was the president

19  of Bellicose Capital.

20  Q    And then who was Simon Liang, L-i-a-n-g?

21  A    Simon was the controller at that time and then

22  subsequently the controller at Ascension.

23  Q    But prior to that, he worked for your companies?

24  A    Yes.

25  Q    And so the limited access to bank accounts, you actually

Matthew Martorello - Direct

```
 1   had complete access, your employees, your companies, Bellicose
 2   and Sourcepoint, had complete access to the operating account
 3   for Red Rock; correct?
 4   A    Within the scope of the deposit account control agreement,
 5   yes.
 6   Q    There's a word there that you put for a reason.  You say
 7   certain limited access to bank accounts, and I'm challenging --
 8   I'm asking you, in fact was not certain limited access, it was
 9   complete access to the bank accounts; correct?
10   A    There were accounts that I wasn't on, and I don't know if
11   that's what I was talking about at the time I wrote that.  The
12   operating account specifically I had complete access to.
13             THE COURT:  Whose operating account, Red Rock or
14   Bellicose?
15             THE WITNESS:  Red Rock.
16             THE COURT:  Big Picture?
17             THE WITNESS:  Red Rock.
18   Q    And that meant that you and your employees could write
19   checks out of that account if they wanted.
20   A    I actually think we had a restriction on BillPay from the
21   bank -- I'm sorry, we didn't have checks.  We were allowed to
22   do BillPay.
23   Q    But you could take money out --
24             THE COURT:  What does that mean, allowed to do
25   BillPay?
```

Matthew Martorello - Direct

1              THE WITNESS:  So BillPay is like an online version of

2    writing a check where you go in and type it, but they didn't

3    give us a checkbook to physically sign.

4              THE COURT:  So, in essence, you could write checks on

5    the account, and you did it through a technology called

6    BillPay?

7              THE WITNESS:  Yes, for some period of time, and then

8    they terminated that and only allowed us to do wires.

9              THE COURT:  Wire transfers.

10             THE WITNESS:  Yes.

11   Q    And by "they," you mean the bank.

12   A    The bank.

13   Q    Now, again, before Big Picture, Brian and Simon were

14   signators on that account; correct?

15   A    Yes, that's correct.

16   Q    And who were the co-managers for Red Rock?

17   A    At what point in time?

18   Q    At any time.  How about if I give you the second question.

19   Can you name any of the managers of Red Rock, the tribal

20   employees, that had signing capability, could use BillPay to

21   take money out of the account in the manner that you and your

22   designees or delegees could?

23   A    They could do that.  Shelly could do that, Chairman

24   Williams could do that, and Craig Mansfield -- those are the

25   managers over the course of the time -- if they were to remove

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 327 of 681
Case 3:17-cv-00461-REP    Document 882    Filed 07/25/20    Page 75 of 174 PageID# 28019

75

Matthew Martorello - Direct

1    me from the bank account, but without doing that, then I had

2    access at that time.

3    Q    So if they did not remove you from the bank account, then

4    you had control of the bank account.

5    A    Correct.

6    Q    When it says limited access to bank accounts, the key bank

7    account was the operating account?

8    A    Yeah, I think so.

9    Q    And you had total access, total unfettered access to

10   that -- correct? -- not limited?

11   A    To that one account, yes.

12   Q    That's the account that mattered; right?

13   A    It was the operating account.  It moved money in and out

14   for the things that I mentioned.

15   Q    Is there any account that Red Rock had that had as many

16   transactions or saw as much money coming in as the operating

17   account?

18   A    No.

19        THE COURT:  Excuse me a minute.  I want to make sure

20   I understand what you were saying.  As I understand what you

21   said, the Red Rock managers whose names you gave, Hazen and

22   Williams and somebody else, I couldn't hear what you said,

23   began with an M it sounded like, could have access to the

24   operating account only if your name was removed from the

25   account?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 328 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 76 of 174 PageID# 28020

Matthew Martorello - Direct

76

1           THE WITNESS:  Correct.

2           THE COURT:  How was your -- how would your name be

3  removed from the account?

4           THE WITNESS:  They would have to contact the bank and

5  request to do that.

6           THE COURT:  "They" meaning?

7           THE WITNESS:  The co-managers would have to do that.

8           THE COURT:  Was there any restriction on their

9  ability to do -- to contact the bank and remove you?

10          THE WITNESS:  Not that I'm aware.

11          THE COURT:  Pardon me.

12  Q    When you say there's no restriction, you do not believe

13  that -- you're not -- are you testifying that you don't think

14  that would have violated or been a breach of your agreement if

15  they removed you and your delegees from the account?

16  A    I don't recall that being a breach of any agreement.

17  Q    Well, if it --

18          THE COURT:  Excuse me a minute.  I don't think he's

19  asking you that, Mr. Martorello.  It was a little hard to

20  follow, though.  Do you want to try again, because the question

21  is, is he taking the position that removal would have been a

22  breach of some agreement; is that right?

23          MR. BENNETT:  Yes.

24          THE COURT:  Do you believe that removal of your name

25  from the account would have been a breach of any of the

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 329 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 77 of 174 PageID# 28021

77
Matthew Martorello - Direct

1    agreements between you and your companies and Red Rock?

2              THE WITNESS:  I'm not aware of any breach, a

3    provision that would breach as I sit here right now, but I

4    haven't looked to analyze it.

5    Q    Well, so -- in fact, what is a lockbox?

6    A    A lockbox is a bank account that receives cash and is

7    managed generally by some, you know, independent fiduciary

8    third party.

9    Q    And you insisted -- when Big Picture was created, you

10   insisted on a lockbox in addition to the DACA, the deposit

11   access control agreement; correct?

12   A    I believe we did ask for that, and it never got

13   implemented.

14   Q    All right.  And what were you asking for?

15   A    Some independent fiduciary to do the waterfall

16   calculations fairly between the parties.

17   Q    But instead of the lockbox in the Big Picture transition,

18   another DACA was implemented, and this time Brian McFadden and

19   Simon Liang remained as the signators on the operating account

20   of Big Picture.

21   A    I think you're correct.

22   Q    Now, in the paragraph just prior to 27, 26, you say, "No

23   company I own or manage has ever taken any action to collect,

24   in whole or in part, any consumer loan originated by Red Rock."

25   That's -- did you write that yourself, or did your lawyer write

1   that?

2   A    I don't specifically recall.

3   Q    So could you help the Court know or understand the process

4   that a consumer loan, the birth-to-death process, would go

5   through after a consumer executes online a Red Rock loan, then

6   how is the money collected from that consumer?

7   A    They can either mail a check to the reservation, or

8   there's an automatic ACH process that would debit on the due

9   date and clear the cash into the operating account.

10  Q    And then the most common, as well as the most preferred

11  from your standpoint, from Sourcepoint's standpoint, was the

12  ACH process; correct?

13  A    That was the most common, yes.

14  Q    And, in fact, it was a big concern of yours that the ACH

15  process -- that banks were not willing to accept ACH

16  relationships with tribal loans; correct?

17  A    There was a period of time where that was an issue through

18  2014.

19  Q    Okay.  And then if a consumer terminated or their bank

20  didn't have money in it, the ACH, how was the consumer billed

21  and collected from?

22  A    I'm sorry, if --

23  Q    Right.  Some consumers didn't pay their bills; right?

24  A    Yes.

25  Q    And how were they notified, the consumer?  How were they

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 331 of 681
Case 3:17-cv-00461-REP    Document 882    Filed 07/25/20    Page 79 of 174 PageID# 28023

79

Matthew Martorello - Direct

1    notified, hey, you're late, you didn't pay your bill?

2    A    There would be an automated email that would recognize

3    that it wasn't paid, and so it would trigger an email through

4    the technology.

5    Q    Okay.  And was that technology part of the secret sauce

6    that Sourcepoint owned?

7    A    No.

8    Q    The code and everything that was shared with Red Rock?

9    A    No, that would have been triggered from the loan

10   management software.

11   Q    Who owned the loan management software?

12   A    That was a third-party vendor.

13   Q    And with whom -- again, the Red Rock period, with whom was

14   the contract with the loan management software vendor;

15   Sourcepoint or Red Rock?

16   A    I can't remember right now.

17   Q    So when you say that no action was taken to collect, what

18   do you mean by that?  When you testified under oath here in

19   this declaration that Sourcepoint and Bellicose had no

20   involvement at all in the process of collecting money from

21   consumers, that's how I read it.  Is that what you meant to

22   say?

23   A    What I meant was that we did not take or receive any cash

24   from the consumer.

25           THE COURT:  "We" meaning who?

Matthew Martorello - Direct                              80

1          THE WITNESS:  Me or Bellicose or Sourcepoint, that
2     Red Rock was the entity that would collect through taking,
3     receiving, or demanding payment or something.
4     Q    And that was because you used an on-reservation post
5     office box to receive checks; correct?
6     A    It wasn't because of that.  It was just because that's the
7     account that would do the collection.  That was the company
8     that would do the collection.
9     Q    What do you mean that was the company?  What was the
10    company?
11    A    Red Rock.
12    Q    And can you identify the names of the individuals that
13    would call and try to collect money from consumers who were
14    employees of Red Rock?
15    A    Well, that's different than this.  That's debt
16    collections.  That's like past due debt, and I don't know -- I
17    guess those would have been probably outsourced to a third
18    party center to do.
19    Q    Sourcepoint would have hired a third-party call center to
20    outsource the debt collection?
21    A    For bad debt I think we did for awhile, and I don't know
22    if it then changed to direct or not.
23    Q    And then when you say collect, you are talking about the
24    process of receiving a check and putting it into the operating
25    account or having an ACH go into the operating account;

Matthew Martorello - Direct

1  correct?

2  A    Right, collection, yes.

3  Q    And that didn't take -- ACH, for example, that did not

4  take any action at all on the part of Red Rock?

5  A    No, that's not accurate.

6  Q    Well, it went into the Red Rock account, the operating

7  account automatically; correct?

8  A    Yeah.

9  Q    That's the operating account that unless you were taken

10 off, only you and your company had control over; correct?

11 A    Correct.  But what I'm saying is someone had to take the

12 action to make the collection happen, and that happens through

13 the batch renewal process.

14 Q    So your company did take action to collect bad debt;

15 right?

16 A    No.

17 Q    Hired a third party.

18 A    We did hire -- well, I don't know that we hired a third

19 party.  I think the tribe hired a third party to purchase its

20 defaulted loans.

21 Q    Prior to -- well, and who selected the third party?  Who

22 found, selected, and contracted, did the contracts with the

23 third party that would buy bad loans, Sourcepoint or Red Rock

24 or Bellicose and Red Rock?

25 A    I'm trying to remember who it was.  Capture Financial was

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 334 of 681
Case 3.17-cv-00461-REP   Document 882   Filed 07/25/20   Page 82 of 174 PageID# 28026

82

Matthew Martorello - Direct

1   contracted with the tribe.

2   Q    Who found the contract?

3   A    I found the company.

4   Q    You found the company.  Who negotiated the contract with

5   the debt buyer?

6   A    I don't know if we recommended -- the tribe's general

7   counsel.

8   Q    So you found the company, and then you had no involvement

9   in the pricing or any of that; that's what your testimony --

10  A    No, I didn't say that.  I would have recommended some

11  structure or pricing that I thought was best for the tribe.

12  Q    And then the tribe would have given you a true/false, yes

13  or no?

14  A    They would have had to have said they would like to do the

15  deal or not, or they didn't like the deal, whatever they wanted

16  to say.

17  Q    Do you have any recollection here sufficient for you to

18  swear in a federal courtroom that that's what you recall, that

19  is that the tribe actually approved the debt collection

20  contract?

21  A    They would have had to approve the debt collection

22  contract.

23  Q    That's not what I'm asking you.  I'm asking you if you

24  have any independent recollection here today that the tribe did

25  that.

USCA4 Appeal: 21-2116   Doc: 26-2      Filed: 02/07/2022   Pg: 335 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 83 of 174 PageID# 28027

83

Matthew Martorello - Direct

```
 1   A    I know it's an impossibility, so I don't know --
 2              THE COURT:  The answer to that is yes or no; yes, I
 3   have the recollection.  Do you or don't recall?
 4              THE WITNESS:  Well, I know that they did.  I just
 5   can't say -- maybe I'm not understanding the question right.
 6   Q    Take a look at paragraph 34 of your declaration.  Now, you
 7   say "Red Rock did not receive two percent of the net revenues
 8   under the terms of the servicing agreements.  Instead, as the
 9   documents I've reviewed that were provided in discovery
10   demonstrate, LVD chose to structure their arrangement to
11   stabilize their monthly income as a percentage of gross
12   revenues adjusted for bad debts."  Do you see that?
13   A    Yes.
14   Q    Now, first, I want to ask, did you write this, or did your
15   lawyer?
16   A    I presume that I wrote it, but I'm not certain.
17   Q    And when you say LVD chose, you are not suggesting that
18   this is a structure LVD wanted and it was their idea, are you?
19   A    It was their idea.
20   Q    It was their idea.  LVD said we want to pay two percent.
21   A    No, I'm talking about the structure of the arrangement.
22   Q    Well, you heard Mr. Merritt, so you suggested and asked
23   that he and then Mr. Rosette approach LVD and see if they would
24   accept two percent; correct?
25   A    Two percent was my counteroffer to their offer.
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 336 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 84 of 174 PageID# 28028

84

Matthew Martorello - Direct

1   Q    Okay.  Is there -- have you seen a document that says

2   that?

3   A    It was a verbal conversation.

4   Q    Oh, it was a verbal conversation.  All right, well, let's

5   take a look at Exhibit 16.  By the way, before we talk about

6   16, the tribe -- you know that the tribe didn't even get two

7   percent; right?

8   A    They -- TLM got one percent, and they got one percent.

9   Q    That was the middleman including Mr. Rosette's company?

10  A    Right.  That was until July 2012.

11  Q    So until July 2012, it was one percent that the tribe got,

12  one percent of gross less write-offs, bad debt; right?

13  A    Yes.

14  Q    And then after that, the tribe had a buyout where they had

15  to buy out TLM; correct?

16  A    I learned that a few weeks ago, yes.

17  Q    Now taking a look at Exhibit 16, this is an email chain

18  dated June 19, 2012, and then earlier between you and Karrie

19  Wichtman in her capacity as a lawyer at Rosette representing

20  the tribe; correct?

21  A    Correct.

22  Q    And then in this chain, this is one of those instances

23  that the Judge earlier asked about.  Some of it's colored that

24  has Matt Martorello's response to Ms. Wichtman's questions;

25  correct?

Matthew Martorello - Direct

85

1   A    Yes.  I can't see the colors.

2   Q    You don't have the colors, all right.

3          THE COURT:  Neither do I.

4   Q    After Matt Martorello, you'll see in each of the

5   paragraphs starting on page -- the fifth page of the exhibit,

6   on the fourth page of the exhibit --

7          THE COURT:  What's the last Bates digit, 602?

8          MR. BENNETT:  It's 601.

9   Q    Everywhere where it says Matt Martorello and italicized

10  brackets, what follows in each is your text responding; is that

11  correct?

12  A    Yes.

13  Q    And can you explain the context of this email?

14  A    It's a really long email.

15  Q    Well, do you recall the email?  I'm not asking you to

16  summarize.  I'm just asking the context of it.

17          THE COURT:  What do you mean by context?

18  Q    Why were you communicating with Ms. Wichtman in this email

19  exchange?

20  A    I did not like that TLM was receiving part of what I

21  thought the tribe should be getting.

22  Q    And then there was a discussion about -- there's a

23  discussion here about regulatory risks.  Do you know who Scott

24  Tucker is?

25  A    I've heard of him, yes.

**JA957**

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 338 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 86 of 174 PageID# 28030

Matthew Martorello - Direct

86

1    Q    Who do you understand him to be?

2    A    He was someone who had a complete fraudulent lending

3    enterprise.

4    Q    He did what you did but was not completely -- but in his

5    instance, it was completely fraudulent; right?

6    A    It was very, very different than this.

7    Q    He was a --

8             THE COURT:  Wait a minute.  What did you say?

9             THE WITNESS:  I said it was very, very different than

10   what happened here.

11   Q    Mr. Tucker was a non-tribal businessman who created a

12   servicing relationship with an Indian tribe to make high

13   interest loans to consumers; correct?

14   A    I think they found that the relationship didn't exist

15   effectively, that it was a total sham.

16   Q    And then he went to prison.

17   A    Yes.

18   Q    And prior to that, the regulatory agencies were suing Mr.

19   Tucker claiming that he was not a mere servicer but was the

20   true lender; right?

21   A    I think the suit against him was federal consumer lending

22   laws, like TILA and Reg E from the FTC.

23   Q    So I've called this out now on the screen, and starting

24   with -- and this is Ms. Wichtman.  You'll see on the screen it

25   said, "Personally, I see only a few issues on the regulatory

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 339 of 681

```
 1   side."  Do you see that?
 2   A    Yes.
 3             THE COURT:  What page are you on?
 4             MR. BENNETT:  We are on the fourth page, and I have
 5   this on the screen popped up.
 6             THE COURT:  The bottom paragraph.
 7             MR. BENNETT:  Bottom paragraph.
 8             THE COURT:  All right.
 9   Q    And one of the items that Ms. Wichtman told you about
10   was -- and she's outlining some of the possible regulatory
11   risks.  Right after your section, which your section in red
12   ends at the word "process."  Is everyone following me?  So your
13   insert was, "If so, I'd imagine just requiring somebody's
14   attention for two to three weeks a year to get through that
15   process."
16             And then she writes, "The second piece is the profit
17   to the servicer, we have to be prepared to show that the
18   percentage of net profit that the servicer is receiving is
19   defensible compared to what the tribe is receiving."  Do you
20   see that?
21   A    I do.
22   Q    And you responded to that on the next page; right?
23   A    Sorry, where on the next page are you?
24   Q    And I've called it out on the screen right there.  And you
25   defend saying that the Tucker case was tested in Colorado and
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 340 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 88 of 174 PageID# 28032

88

Matthew Martorello - Direct

1    the Supreme Court upheld it with just one percent.  Do you see

2    that?

3    A    Yes, that's correct.

4    Q    Okay.  Now, this conversation about money and the tribe's

5    questioning either directly or through its lawyers about money,

6    that was a topic that kept coming up.  It came up multiple

7    times from the tribe asking you either directly or impliedly

8    for more money.

9    A    You are talking pre-transaction?

10   Q    Pre-transaction.

11        THE COURT:  You're saying during the negotiations

12   that led to the creation of Red Rock, to sale, what?  Ask the

13   question in a way that puts some context --

14        MR. BENNETT:  Yes, sir.  This was 2012.  This was

15   before the sale.

16        THE COURT:  Just ask the question, though.

17        MR. BENNETT:  Sure.

18   Q    The tribe periodically would ask you for more money;

19   correct?

20   A    I don't recall them asking for more money pre-transaction.

21   Q    You don't.

22   A    No.

23   Q    So this -- this is in red on my screen, and I'm calling it

24   out on yours.  This is page, again of Exhibit 16, sixth page,

25   and you write, "Now all of that said, I get the feeling the

Matthew Martorello - Direct

```
 1    tribes may want more money."  Skipping two sentences, "However,
 2    the level of sophistication behind the scenes built into the IP
 3    that SPVI uses, which makes SPVI clients succeed while majority
 4    of lenders fail is massive.  Going it alone is an exercise in
 5    how much money do you want to lose before you make it up the
 6    learning curve high enough to know how to do it right.  That
 7    takes a lot of analytics to get there and the faster the
 8    better."  That was your response; correct?
 9    A    Yes, I wrote that.
10    Q    That's not the only time prior to the negotiations
11    starting in which you responded that the tribe is pushing for
12    more money, and you don't want to provide that; correct?
13    A    They weren't pushing.  I was saying that I -- my instinct
14    was that maybe they wanted to get more.  They never asked.
15    Q    Well, let's take on paragraph 15.  I'm sorry, document 15.
16              THE COURT:  SPVI is Sourcepoint 6?  Is that what it
17    is?
18              MR. BENNETT:  I think it's Sourcepoint Virgin
19    Islands.
20    Q    Mr. Martorello, in fact --
21              THE COURT:  Wait a minute.  Is that right, Mr.
22    Martorello?
23              THE WITNESS:  Sourcepoint VI, Virgin Islands, that's
24    correct.
25    Q    Part of your business was in the Virgin Islands, and then
```

JA961

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 343 of 681

```
 1   you moved to Puerto Rico?

 2   A    Yes.

 3   Q    Those were because of various tax structures that you were

 4   able to benefit from?

 5   A    There are the economic development programs of those

 6   jurisdictions.

 7   Q    And that's why you switched from Virgin Islands to Puerto

 8   Rico?

 9   A    I moved there, to Puerto Rico, to join their tax program,

10   their economic development program.

11   Q    Now, I'm showing you right now what is exhibit --

12            THE COURT:  What does that mean?  You were working

13   for the economic development people of Puerto Rico?

14            THE WITNESS:  Both Virgin Islands and Puerto Rico

15   have economic development programs, so they're recruiting

16   people to come down and create jobs and spend money on local

17   resources and things, and they give you an exemption to your

18   tax rates if you do it.

19            THE COURT:  So you moved for tax benefits.

20            THE WITNESS:  Yeah, to participate in that program.

21   Q    Now, this is an email just between you and Mr. Merritt

22   dated June 2012; do you see that?

23   A    Yes.

24   Q    Now, earlier today, you testified that you understood Mr.

25   Merritt worked for LVD, he was their agent; correct?
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 343 of 681

1   A     Through TLM.  I said he was -- TLM was an agent of LVD,

2   and he wash associated with that.

3   Q     And so let me clear that real quick.  At the top here of

4   this very email is Mr. Merritt speaking to you.  And he

5   includes the statement, "We're your advocate, so we'll act on

6   your behalf regardless."  This was just June of 2012, a year

7   after the OLA conference; right?

8   A     Yes.

9   Q     So your advocate -- you had written your advocate here,

10  and you didn't, in this instance, copy either Mr. Rosette or

11  Ms. Wichtman; is that correct?

12  A     Correct.

13  Q     Unlike the other exchanges that we've gone through today.

14  A     Correct.

15  Q     And, here, you say in your text that you would like to

16  find a second tribal client.  "While I like the exclusivity and

17  very much like the relationship with LVD, I am concerned about

18  the long term as I think they likely have motives not aligned

19  with an exclusive servicing arrangement, and I think they are

20  starting to feel underpaid as the heat comes on at the federal

21  level."  Do you see that?

22  A     Yes.

23  Q     So their long-term motives were that they wanted to be

24  able to do this themselves and not involve you; correct?

25  A     That was their long-term motive.

Matthew Martorello - Direct

1   Q    And because they had that motive, you started looking to

2   get out of business with LVD, to find a second tribal client.

3   A    I know I wanted to diversify tribal clients, but I don't

4   recall exactly what triggered me to say the exclusive servicing

5   arrangement here or what triggered the concern about them not

6   wanting an exclusive servicing arrangement.

7   Q    Let's continue through your declaration.  How about

8   paragraph 40 now.

9            THE COURT:  Mr. Bennett, it's a good place to have

10  lunch.  We'll have an hour for lunch.

11           MR. BENNETT:  Yes, sir.

12           THE COURT:  I believe -- I don't know where we stand

13  on the time.  Who is the timekeeper?

14           MR. DILLON:  Your Honor, I have us at roughly about

15  one hour 44 minutes.

16           THE COURT:  Mr. Martorello's answers are so often not

17  concise and rambling, and they are rambling, that I may give

18  you a little bit more time.  I'll kind of wait and see how it

19  goes after the lunch break.  We'll see how we're coming.  If

20  that's the case, what I'll do is give you the rest of the day

21  and give them the day tomorrow.  We'll be in recess.

22           (Luncheon recess.)

23           THE COURT:  All right.  I remind you, Mr. Martorello,

24  you're under the same oath you took earlier this morning.  All

25  right.  Have you gotten things sort of streamlined, Mr.

Matthew Martorello - Direct

1    Bennett, during the lunch recess?

2              MR. BENNETT:  Yes, sir.

3              THE COURT:  Good.

4    Q    Mr. Martorello, in your declaration, starting at paragraph

5    29, you discuss the servicing agreement between Red Rock and

6    Sourcepoint and Bellicose.  Do you see that?

7    A    Yes.

8    Q    And in particular, paragraph 33 says you are familiar with

9    the servicing agreement between the two; is that correct?

10   A    Sorry, which paragraph?

11   Q    33.

12   A    Yes.

13   Q    And you were heavily involved in the creation of that

14   servicing agreement; correct?

15   A    I was involved in the negotiation of the servicing

16   agreement.

17   Q    Well, you knew what was in it, you read it carefully?

18   A    While it was being negotiated, I did read it.

19   Q    So recall that we discussed the role that you played and

20   that your companies played in collection of the incoming

21   revenue from consumer borrowers, recall that just before lunch;

22   right?  Your testimony, your declaration is that none of your

23   companies collected --

24             THE COURT:  Wait a minute.  Give him a chance to

25   answer the question.  Do you remember the discussion you had

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 346 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 94 of 174 PageID# 28038

94

Matthew Martorello - Direct

1    before lunch about the collection of payments from consumers?

2              THE WITNESS:  I remember the conversation.

3              THE COURT:  You are talking about "I have never" --

4    paragraph 26, "I have never taken any action to collect, in

5    whole or in part, any consumer loan originated by Red Rock";

6    right?  Is that what you are talking about?

7              MR. BENNETT:  Yes, sir.

8              THE COURT:  We're there now.  We're all oriented.

9    Q    I'm orienting you now to document number 11, Exhibit

10   Number 11, which is the original servicing agreement dated

11   October 25th, 2011, between Red Rock Tribal Lending, LLC, and

12   Bellicose VI, Inc.  Do you have that before you?

13   A    Yes, now I do.

14   Q    And here it's on your screen now?

15   A    Yes.

16   Q    And I want to push us forward a little bit to page 15 of

17   it which is paragraph 4.9 which I've called out on our screens.

18   Do you see that?

19   A    I see it.

20   Q    And what does it say that you, as the servicer, did with

21   respect to the consumer loans revenue that was coming in?

22   A    Well, it doesn't say what we did.

23   Q    But it says, "The servicer shall collect all gross

24   revenues and other proceeds connected with or arising from the

25   operation of the enterprise"; right?

USCA4 Appeal: 21-2116  Doc: 26-2  Filed: 02/07/2022  Pg: 347 of 681
Case 3:17-cv-00461-REP  Document 882  Filed 07/25/20  Page 95 of 174 PageID# 28039

95

Matthew Martorello - Direct

1   A    That's what it says.  We didn't do that.

2   Q    You didn't do that?

3   A    No.

4   Q    You didn't?

5   A    We did not.

6   Q    I could walk you to document number 20, I will, but you

7   agree with me that this will have the same paragraph; right?

8   4.9.

9            THE COURT:  I don't know whether he understood that

10  or not, but I didn't.

11           THE WITNESS:  Yes, we're going to Exhibit 20?

12           THE COURT:  We're going on exhibit what?

13           MR. BENNETT:  20.

14           THE COURT:  And what is that?  That's the amended --

15           MR. BENNETT:  That's the amended servicing agreement,

16  Your Honor.

17           THE COURT:  And you're going to paragraph --

18           MR. BENNETT:  4.9.

19           THE COURT:  All right.

20  Q    Who did the first draft of the servicing agreement between

21  you and your team versus Red Rock?

22  A    Of this one specifically or the one before it?

23  Q    Either one.  Tell us about both.

24  A    They provided an agreement which I think when Jennifer

25  Weddle got involved, I think maybe she had introduced this

Matthew Martorello - Direct

96

1  agreement.

2  Q    All right.  Let's go back, and I'm sorry.  Now that I have

3  everybody's attention on 20, let's go back to 11.

4      Now, one of the questions I asked you was were you aware

5  that the tribe or LVD was receiving only one percent of the

6  defined revenue, and you said I just learned it last week;

7  right?

8  A    No.  I think my testimony was that I learned last week

9  about the buyout number, that they got bought out for some

10  additional 960,000.

11  Q    So you've always been aware that the tribe was only

12  receiving one percent.

13  A    No.  The tribe was receiving two percent, and then from

14  that it had an agreement to pay TLM one percent for the

15  brokerage services that it provided.

16          THE COURT:  Just so the record is clear, the

17  agreement was to pay half of the two percent to TLM.

18          THE WITNESS:  That was the tribe's agreement, yes.

19  Not my agreement.

20          THE COURT:  I understand that.  Literally, one

21  percent of two percent is quite different than half of two

22  percent.  So I want to make sure that we're all on the same

23  page, that TLM was receiving half of the two percent.

24          THE WITNESS:  Yes, the tribe was paying them gross

25  one percent, half of their two percent.

**JA968**

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 349 of 681

1   Q    On your screen, I believe, I have from Exhibit 11 at page

2   17 paragraph 6.4.1.  And this was in your original service

3   agreement; correct?

4   A    This was in the original one, I believe, not the amended.

5   Q    Right.  And it was taken out of the amended because there

6   was concern that it might look bad if you were challenged as

7   the true lender if the tribe was only receiving one percent

8   of -- according to how this tribal net profits?

9   A    Well, my understanding was that it was taken out because I

10  didn't --

11          THE COURT:  Go back again.  Remember what I told you.

12  The answer is yes or no.

13          THE WITNESS:  That's not the reason it was taken out.

14  Q    All right, what was the reason that you took it out?

15  A    I didn't take it out, but it was taken out -- the reason

16  why I didn't like it was because I didn't want TLM getting paid

17  from the tribe because I felt that made me less competitive

18  with the other opportunities the tribe could have contracted

19  with.  So it was a way for the tribe to get the whole two

20  percent and, you know, if they could get away from paying their

21  broker.  Then they went and renegotiated something.

22  Q    And I have a reason --

23          THE COURT:  Excuse me.  I thought I understood it,

24  but I don't know, so I'll clarify.  Is it correct that the

25  amended agreement, Exhibit 20, does not contain a provision

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 350 of 681
Case 3:17-cv-00461-REP  Document 882  Filed 07/25/20  Page 98 of 174 PageID# 28042

98

Matthew Martorello - Direct

1    such as is in Section 6.4.1 of the Exhibit 11, the original

2    agreement; is that right?

3              THE WITNESS:  That's correct.

4              THE COURT:  And it's that provision being taken out

5    that you were referring to about why it was taken out; is that

6    right?

7              THE WITNESS:  Yes.

8              THE COURT:  All right.  Thank you.

9    Q    Now, we talked a bit before about intellectual property.

10   Mr. Martorello, do you change your interpretation of a

11   contractual term or relationship depending upon who you are

12   speaking to or writing to?

13   A    No.

14   Q    So, in some instances, you have had to -- it was to your

15   benefit -- correct? -- to explain why you, your company had a

16   lot of value; right?

17   A    In some instances, yes.

18   Q    In some instances, it's important for you to show how your

19   company had very little value; right?

20   A    Correct.

21   Q    And you know where I'm going.  We have documents where

22   you've done both; right?

23   A    Yes.

24   Q    So let's take a look at document 115 which is on your

25   screen, but it is probably in volume two.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 351 of 681

Matthew Martorello - Direct

```
 1                THE COURT:  115?

 2                MR. BENNETT:  Yes, Judge.

 3                THE COURT:  Do you have it there, Mr. Martorello?

 4                THE WITNESS:  Yes.

 5                THE COURT:  All right.

 6                MR. BENNETT:  This is an email chain, and looking at

 7      the last page of it, that you started December 6, 2016, with

 8      some people from -- in this, it's from Budd Larner, B-u-d-d

 9      L-a-r-n-e-r.  Do you see that?

10      A    Yes.

11      Q    So who are these people?  In this case, who is JBradley of

12      buddlarner.com?

13      A    It's a law firm, and I believe he's probably a tax or IP

14      lawyer.

15      Q    Okay.  And then the beginning of the document, there's a

16      domain for a person from a company Aranca, A-r-a-n-c-a.  Do you

17      see that?

18      A    Yes.

19      Q    What was Aranca?

20      A    They were a valuation firm.

21      Q    And so in 2016, what were you trying to do?  What were you

22      trying to accomplish in your communications with Budd Larner

23      and Aranca?

24      A    So it looks like here I'm going to try and figure out a

25      2012 allocation done by Deloitte, and the allocation was
```

Matthew Martorello - Direct                                    100

1    $7.7 million.  It says liquidation value, and so that's what
2    Deloitte came up with as a portion of the valuation attributed
3    to liquidation value.  I needed more information to understand
4    how that broke down in terms of what specific assets made up,
5    quote, liquidation value.  So we had to do a little research
6    project.
7    Q    You didn't just need more information.  You were trying to
8    see if there was any way that the valuation, the liquidation
9    number of 7.7 million could be lowered; correct?
10   A    I'd have to look at the document to decide if that's what
11   I was trying to do.
12                THE COURT:  Well, read it.
13                THE WITNESS:  I wasn't trying to adjust the number.
14   I was trying to clarify the specific assets that were within
15   the number, one of which, I guess, is goodwill which we talk a
16   lot about here.
17   Q    Even though this is a 2016 correspondence, you are
18   discussing the status or state of asset ownership and valuation
19   of Sourcepoint and Bellicose in 2012; correct?
20   A    That is correct.
21   Q    So can you read, so that we all have it in the record
22   here, under 2012, potential for intangible assets, about IP,
23   and by that, that's what you are referring to as intellectual
24   property; right?
25   A    Yes.

**JA972**

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 353 of 681

1    Q    Did you read that paragraph?

2    A    "The client/tribe often argued with me that" --

3    Q    Do me a favor, Mr. Martorello.  Our court reporter is able

4    to transcribe me so you know she's good, but just keep it at a

5    regular pace, please.

6    A    Sure.  "The client/tribe often argued with me that they

7    view all of the IP and data as their property.  They strongly

8    believe that SPVI was paid to create the IP for them and to

9    facilitate them in using it.  Early on I agreed with their

10   position, but in 2014, I argued the opposite to that as I

11   wanted to sell the business and it felt pretty pertinent.  Now,

12   reading the contracts, nothing is stated about IP, but it is

13   very clear in Section 4.2 that SPVI is hired for the service of

14   creating all of these business methods for the tribe.  It

15   appears pretty clear that the tribe was correct in that the IP

16   created to service their business was always their property."

17   Q    Now, so I understand this, what you are writing to this

18   person here in 2016 is that in 2012, you agreed that

19   intellectual property was to go to the tribe; right?

20   A    No, I'm referring to 2014.

21   Q    But it says early on.  But then you had the opposite

22   position in 2014.

23   A    No, that's not correct.  The email we looked at earlier

24   where we're talking about prescreen direct mail and the

25   pre-qualified leads, that's where I was saying pre-qualified

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 354 of 681

1    leads are our IP, and I had that disagreement with the tribe

2    there, and I'm referencing it here, but, obviously, as I'm

3    writing it, I'm not recalling the difference -- I'm not

4    recognizing as I write it that that was pre-qualified leads and

5    not the developed and recommended underwriting and verification

6    and procedures and things.

7    Q    Do you tell the truth when you're not under oath?

8    A    Yes.

9    Q    And so as I understand here, it says early on you agreed

10   with the tribe's position which is that you were supposed to be

11   giving IP to the tribe; right?  So before 2014, you said you

12   agreed with that position?

13   A    All of the IP, all of it, that's what it says, yes.

14   Q    In 2014, you took the opposite position because, hey, I

15   was trying to sell the business; right?

16   A    No.  When I wrote this, I wasn't understanding that -- one

17   of the things we do is provide pre-qualified leads.  That's our

18   IP.  So when we had that dispute in 2014, she was saying, I

19   think that's ours, and you saw the email where I said, no,

20   that's our whole business, you know, you would own us if that

21   was yours.  So there's a segmentation or a difference between

22   that IP and this IP.

23          I didn't articulate that well when I was writing this

24   email sort of kind of on the fly, but -- nor had I really

25   studied in detail.  I just looked at the document and said --

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 355 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 103 of 174 PageID# 28047

103

Matthew Martorello - Direct

1   it says develop and recommend, so what we give to them is

2   theirs.  One of the other things we do is provide pre-qualified

3   leads, and that's our formulas.

4           THE COURT:  Is there any part of the paragraph that

5   you all are talking about on page 445 of Exhibit 115 that talks

6   about pre-qualified leads?  I just don't see it, and if it's

7   there, I want to know.

8           THE WITNESS:  It's not in there.  Just with all of

9   the IP and data includes -- their view of all IP included my

10  IP, and that was the disconnect that I had with the tribe.

11          THE COURT:  But at one time you agreed with them, and

12  then you had a change of mind; is that right?

13          THE WITNESS:  No, because there were different

14  subjects.  I just wasn't clear on that when I typed this at the

15  time.  So the thought was, you know, we develop and recommend

16  IP to the tribe, and then I'm saying there was a time in 2014

17  where they said, hey, Matt, your pre-qualified lead software or

18  algorithms are also ours, and I said, no, that's not yours.

19          And so I'm referencing back to that conversation here

20  and saying that, you know -- just inartfully, I guess, saying

21  that I said all of the IP was theirs, and then when we had that

22  disagreement, that I said the opposite with respect to that IP,

23  but the accurate -- so what I said was actually inaccurate here

24  because I wasn't articulating what we were disagreeing on in

25  2014.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 356 of 681

1           THE COURT:  All right.

2   Q    So what was the value of leads?  How would that have

3   changed the liquidation value if the story you are offering

4   today were so?  If all you were talking about there was leads,

5   how would that have had any real effect on the valuation in

6   your discussions with those two valuation companies handling

7   your tax issues?

8   A    Well, the 7.7 million is not classified.  So that would

9   include leads and everything else that we owned, not the tribe.

10  That was our IP value for purposes of a tax study end of 2012.

11  Q    Now, did you ever market to Bellicose and Sourcepoint and

12  Balance Credit, another company with which you were involved,

13  to investors to try to bring in money?

14  A    We had hired --

15          THE COURT:  Wait a minute.  Are you asking him if he

16  tried to sell another company he owned to those three or four

17  entities that you asked about?

18          MR. BENNETT:  No, sir.  I'm asking if he ever

19  marketed to Wells Fargo to try to bring in money for whatever

20  reason for one of his three companies.

21          THE COURT:  Ask him that, because I didn't understand

22  what you were saying.  Did he market what?  Start it again.

23  Did you try to sell another company; is that what it is?

24  Q    Well, how about if I bring you to Exhibit 47.  Let's help

25  us all out.  By the way, what is Balance Credit?

Matthew Martorello - Direct

1   A    Balance Credit is the d/b/a for a stay license lender in

2   Chicago.

3   Q    And it's just a random lender, or is there some connection

4   between you or any of your companies and Balance Credit?

5   A    I was the founder of Balance Credit.

6   Q    And what is Middlemarch?

7   A    Middlemarch is an investment bank that we hired to raise

8   capital for tribal lending between 2013 and July 2014 for the

9   tribal clients and also for Balance Credit.

10  Q    And so looking at 47, this is a pitch book that you and

11  Demetris P-a-p-a-d-e-m-e-t-r-i-o-u -- we'll say Demetris here

12  on out, that you and Demetris were putting together to market

13  to Wells Fargo; correct?

14  A    Let me take a look real quick, please.  The pitch book

15  was --

16  Q    That's not what I asked you.

17  A    The answer is no.

18  Q    So this was not -- you and Demetris were not putting

19  together a presentation to make to Wells Fargo?

20  A    We had one from a year ago that we were going to present

21  to Wells Fargo.

22  Q    But this document was a draft pitch book made by your

23  marketing company for your review to then submit to Wells

24  Fargo?

25  A    We did submit this to Wells Fargo, but it was made for a

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 358 of 681
Case 3:17-cv-00461-REP    Document 882    Filed 07/25/20    Page 106 of 174 PageID# 28050

Matthew Martorello - Direct

106

1   bunch of reasons.

2   Q    So this is the pitch book that went to Wells Fargo.

3   A    I believe so.

4   Q    Now, let's talk about that.  Let's go to page -- let's

5   talk about the first page, and I can draw your attention to the

6   second paragraph, really the last two sentences, which I'm

7   trying to highlight a bit -- I'll try this -- on your screen.

8        "We should also discuss how much we want to expose on the

9   tribal lending experience.  I hear you that we don't want to

10  overload them, but it is important to show your history as a

11  lender to establish credibility."  Do you see that?

12  A    I do.

13  Q    And you were concerned that if a lot of information became

14  public about your role at Sourcepoint and providing service for

15  a tribal lender, that it could expose you; right?

16  A    I was -- well --

17            THE COURT:  Yes or no?

18            THE WITNESS:  At this date?  I'm trying to think.  We

19  were marketing ourselves --

20            THE COURT:  Yes or no?

21            THE WITNESS:  I can't say on this date exactly.

22  Q    Okay.  Let's skip ahead to the presentation itself.

23            THE COURT:  According to my copy of Exhibit 47, it's

24  a draft.  It says in the first sentence it's a draft.

25            MR. BENNETT:  Yes, sir.

Matthew Martorello - Direct

1          THE COURT:  Is that correct, it's a draft of a

2    document that went to Wells Fargo, Mr. Martorello?

3          THE WITNESS:  I can't be --

4          THE COURT:  Did it actually go?  I'm confused whether

5    it went or whether it was a draft.

6          THE WITNESS:  I don't know if it actually went.

7          THE COURT:  Thank you.  He doesn't know.

8    Q    Mr. Martorello, you earlier, moments ago, testified that

9    this is what was used for Wells Fargo; right?

10   A    We're talking about sending it to Wells Fargo.

11         THE COURT:  Just a minute.  The answer to that is --

12   I'll answer that.  Yes, that is what he testified to, and that

13   is why I asked the question.  When I read the first line of it,

14   it says it's a draft, and -- but he testified this actually

15   went to -- was used to go to Wells Fargo.  And that's why I

16   asked the question.  So did there subsequently come about

17   another iteration of this draft?

18         THE WITNESS:  I was wrong with my testimony.  I

19   think --

20         THE COURT:  Yes or no with respect to my question?

21   Is there another iteration of this document later on?

22         THE WITNESS:  I don't know.

23         THE COURT:  You don't know.

24   Q    Now, in the document itself -- and, by the way, we only

25   have what was given to us.  Your lawyers received the same

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 360 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 108 of 174 PageID# 28052

108

Matthew Martorello - Direct

 1    thing.  We don't have another iteration of it, but if you want

 2    to take a look at the PowerPoint or pitch sheets themselves,

 3    that would be the third page of -- the fourth page of the

 4    document.

 5            THE COURT:  Still on Exhibit 47?

 6            MR. BENNETT:  We are.

 7    Q    And this was an investor presentation made by Middlemarch,

 8    your retained company, on behalf of Balance and Sourcepoint;

 9    correct?

10    A    Yes.

11    Q    And I have the executive summary which, at this point, is

12    the only version that we've ever been provided.  Do you see

13    under Sourcepoint and its predecessor companies have over

14    15 years of experience in the short-term online lending

15    industry?

16    A    I see it.

17    Q    And do you see that Middlemarch, on your behalf, wrote

18    "Sourcepoint began lending in 2011 through its relationship

19    with," I'm just going to say LVD.  Do you see that?

20    A    Yes, I see that.

21    Q    And --

22            THE COURT:  What are you talking about here?  Which

23    page?

24            MR. BENNETT:  Your Honor, I'm at page two of the

25    PowerPoint presentation.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 361 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 109 of 174 PageID# 28053

109

Matthew Martorello - Direct

```
1              THE COURT:  My page two of the PowerPoint says
2     executive summary.
3              MR. BENNETT:  Yes, sir.
4              THE COURT:  And the company overview industry
5     background.  The next page says executive summary to be
6     updated.
7              MR. BENNETT:  Yes, sir.
8              THE COURT:  Is that what you are talking about?
9              MR. BENNETT:  Yes, sir.  It's numbered page, on the
10    bottom, two, but it's page three of the document, and I've now
11    called out the question and the text that I've just asked and
12    received confirmation about.
13             THE COURT:  All right.
14             MR. BENNETT:  That Sourcepoint began lending in 2011
15    through its relationship with LVD.
16             THE COURT:  I'm now with you.  All right.
17             THE WITNESS:  That wasn't what I testified to, Mr.
18    Bennett.  I was just confirming what you read, but this is to
19    be updated.  It's a draft.  There's no way this would have gone
20    to Wells Fargo as I read it today.
21             THE COURT:  That isn't what he asked you.  What he
22    asked you is was that a correct statement that is made there
23    that he read.
24             THE WITNESS:  I thought he asked if I see that, and I
25    said yes, but it's definitely not correct.
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 362 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 110 of 174 PageID# 28054

Matthew Martorello - Direct

110

1          THE COURT:  Look at the text Sourcepoint began

2    lending in 2011 through its relationship with the LVD,

3    etcetera.  Is that correct or not?

4          THE WITNESS:  That's not a factual statement.

5          THE COURT:  Is it correct?

6          THE WITNESS:  It's not -- no, that's not what

7    happened.

8          THE COURT:  What's wrong about it?

9          THE WITNESS:  We weren't a lender.

10         THE COURT:  You weren't a lender.

11         THE WITNESS:  Correct.

12   Q    But, of course, you were here attempting to persuade --

13   whether or not you were a lender, you and Middlemarch, as your

14   spokesperson, were trying to persuade Wells Fargo and other

15   investors to invest in Sourcepoint and to invest in Matt

16   Martorello; correct?

17   A    No, incorrect.  It was to invest in our tribal clients.

18   Q    Okay.

19         THE COURT:  Wait a minute.  To invest in what?

20         THE WITNESS:  LVD, our tribal clients and other

21   tribes.

22   Q    The first page, the letter addressed to you says, "I hear

23   you that we don't want to overload them" -- that would be the

24   investors -- "but it is important to show your history as a

25   lender to establish credibility."  You understood that this was

Matthew Martorello - Direct

1    a pitch that you were connected to, was, hey, I'm Matt

2    Martorello, I've got a lot of experience, lend millions and

3    millions of dollars to whoever we ask you to; right?

4    A    I disagree.

5    Q    Well, where are the documents that update this or that

6    show that you made any corrections or an email back that said,

7    no, that's not right?

8    A    I don't know that there is one.

9    Q    I'm now showing you --

10            THE COURT:  Where did you get these documents?

11            MR. BENNETT:  We subpoenaed Middlemarch.  Third-party

12   subpoena.

13            THE COURT:  Of whom?

14            MR. BENNETT:  Middlemarch.

15            THE COURT:  How would he know what Middlemarch has?

16   He knows what he's got.

17            MR. BENNETT:  Then where is a document from him,

18   where is his email?

19            THE COURT:  Let's do this:  Did there come a time

20   when you -- when a presentation was made to Wells Fargo?

21            THE WITNESS:  Not that I recall.

22   Q    Now, I now have us on page six.  It says six on the bottom

23   which would be page seven of the PowerPoint, and top point says

24   "Sourcepoint VI History."  Are you with me, Mr. Martorello?

25   A    I am on the same page.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 364 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 112 of 174 PageID# 28056

112

Matthew Martorello - Direct

1   Q    I want to continue to ask you about parts of this that --

2              THE COURT:  What page are you on?

3              MR. BENNETT:  It's page six of the PowerPoint

4   presentation --

5              THE COURT:  There's no numbers on my copy of the

6   PowerPoint presentation.

7              MR. BENNETT:  At the top it says "Sourcepoint VI

8   History."

9              THE COURT:  All right, I see it now.  It's many pages

10  into it.  Okay.  I've got it now.  Do you have it, Mr.

11  Martorello?

12             THE WITNESS:  Yes.

13  Q    You've said that the pitch -- this pitch was to try to

14  convince your investors to lend money to your sovereign

15  clients -- right? -- your tribal sovereign clients?

16  A    No.  I said this never -- this is abundantly incorrect.

17             THE COURT:  Mr. Martorello, I'm sorry, but you did

18  say that the purpose of this was to make a pitch on behalf of

19  your tribal clients.  Every time you try to backtrack, every

20  time you evade, you create the impression that you're not

21  credible, and I have to decide your credibility.

22             So pay attention to the question that he asks you.

23  You were answering, I think, a different question, and that is

24  whether this document was used in doing anything.  He didn't

25  ask you that.  He asked you did you earlier testify that this

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 365 of 681

1   was prepared for the purpose of making a pitch for somebody,

2   and you said, no, it was on behalf -- to make a pitch on behalf

3   of the tribal clients.  And then he just asked you the same

4   question again, and you said, no, that wasn't what it was done

5   for.

6           Can you understand how a person trying to determine

7   whether someone else is telling the truth is confused by

8   conflicting answers of that sort?  If you want to go back and

9   say you're changing your testimony, you can do that, but you

10  can't expect me to hear two different versions of the same

11  thing and come to the conclusion that I can rely on your

12  testimony.

13          All right.  I know what he said.  I heard what he

14  said.  Now, have you got a question you want to ask?

15          MR. BENNETT:  I do.

16  Q    I'm showing you that same page, but I've called out --

17          THE COURT:  What same page?

18          MR. BENNETT:  The document Exhibit 47 that says

19  Sourcepoint VI History at the top.

20          THE COURT:  All right.

21  Q    Under the timeline, I've now pulled up on your screen the

22  block for 2013.  Do you see that?

23  A    Yes.

24  Q    And I'm going to use my pen here and circle that begins --

25  the second bullet point from the bottom, "Begins wind down of

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 366 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 114 of 174 PageID# 28058

114

Matthew Martorello - Direct

1   existing sovereign portfolios."  Do you see that?

2   A    Yes.

3   Q    In 2013, what sovereign portfolios did Sourcepoint have?

4   A    None.  The tribal portfolios, it may have been referencing

5   Duck Creek.

6            THE COURT:  Duck Creek?

7            THE WITNESS:  Yeah.  One of LVD's portfolios.

8   Q    It says portfolios, plural.  How many sovereign portfolios

9   did Sourcepoint ever have involvement with?

10  A    Just the two at LVD.

11  Q    So when it says 2013 begins wind down of existing

12  sovereign portfolios, plural, that would be referring to LVD if

13  Middlemarch, in the dec it sent you, had accurately summarized

14  information you gave them; right?

15  A    That's right.

16  Q    And, in fact, Middlemarch --

17           THE COURT:  Was it accurate?

18           THE WITNESS:  No.

19           THE COURT:  Did you have -- did Sourcepoint VI have

20  any so-called sovereign portfolios in 2013?  I thought you said

21  there was Duck Creek or something.

22           THE WITNESS:  Duck Creek is the portfolio at LVD that

23  winded down?

24           THE COURT:  In 2013?

25           THE WITNESS:  I believe it was 2013, yes.

Matthew Martorello - Direct

1          THE COURT:  And that portfolio, was it -- were you

2   helping somebody wind it down at that time?

3          THE WITNESS:  Yes, I was helping the tribe unwind it.

4          THE COURT:  Unwind it, undo it.  All right, thank

5   you.  All right, Mr. Bennett.

6   Q    Now --

7          THE COURT:  What was the other one that the tribe

8   had, Duck Creek and what else, Red Rock?

9          THE WITNESS:  Yes.

10          THE COURT:  Did you help unwind -- did Sourcepoint

11   help unwind Red Rock in 2013?

12          THE WITNESS:  No.

13          THE COURT:  Excuse me.  Go ahead, Mr. Bennett.

14   Q    Now, let's -- while we're -- pitches that you've made to

15   third parties, I want to talk about -- let me shift to

16   paragraph 69 of your declaration.

17          Now, there came a time when you began to shift towards

18   what became Big Picture Loans -- right? -- where you sold

19   Sourcepoint and then took a seller finance loan back to

20   Eventide, created Big Picture Loans; correct?

21   A    Correct.

22   Q    And on 69, paragraph 69, by the way, did you write this or

23   did your lawyers?

24   A    I believe I wrote this.

25   Q    And can you read that first sentence of which you swore

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 368 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 116 of 174 PageID# 28060

116

Matthew Martorello - Direct

1    under oath.

2    A    "Contrary to the allegations of plaintiffs, the decision

3    to sell Bellicose to LVD was not motivated by impending threats

4    of litigation or enforcement actions by government agencies."

5    Q    Do you want to change that now that we've had discovery?

6    A    No.

7    Q    So your position under oath was that impending threats of

8    litigation or enforcement actions by government agents was not

9    a motivation for why you wanted to sell Bellicose to LVD.

10   A    It was not the motivation, no.

11   Q    Let's go through a few documents, if you can.  Do you have

12   your first binder?  Will you turn to -- I'm going to do this in

13   the order of our exhibits.  Let's start with 18.

14   A    Okay.

15   Q    So this, by my count, in my binder, is the earliest one of

16   these, but this is a document that is dated July of 2012, and

17   you are discussing in this the possible problems from the CFPB;

18   right?  I'm looking in the 4:01 a.m. email from you to the

19   tribe's lawyer and particularly the first paragraph which I'm

20   calling out on our screens.

21              THE COURT:  What exhibit are we on?

22              MR. BENNETT:  We are on Exhibit 18.

23   Q    And this is -- you've already started to negotiate a

24   future sale; is that right?

25              THE COURT:  Future sale of what?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 369 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 117 of 174 PageID# 28061

Matthew Martorello - Direct

117

1          MR. BENNETT:  Of the business, I think.

2          THE COURT:  Which business?

3    Q    Mr. Martorello, will you tell me which business?  What

4    were you seeking to negotiate with Ms. Wichtman here?

5    A    This is actually about negotiating the TLM broker fee out,

6    that we didn't want that.  This isn't about the sale.

7    Q    Okay.  But here you acknowledge the possibility that in a

8    world where the CFPB could wipe out, in this case, Think and

9    Plain Green Loans, which were two other competitors; right?

10   A    Yes.

11   Q    That the valuation that was being discussed was too high?

12   A    Correct.  The TLM valuation was too high.

13         THE COURT:  The valuation that who wanted?

14         THE WITNESS:  TLM.

15         THE COURT:  TLM is the entity that's associated with

16   Red Rock, and they got one percent revenue share, and the tribe

17   got one percent revenue share.

18         THE WITNESS:  Yes.

19         THE COURT:  And TLM was charging a broker fee to whom

20   for what purpose?

21         THE WITNESS:  To LVD for having established the

22   tribal code and the lending laws and for finding me.

23         THE COURT:  And you were trying -- you or the tribe

24   was trying to get the fee down?

25         THE WITNESS:  Both of us.

Matthew Martorello - Direct

1          THE COURT:  So that's what we're talking about here?

2          THE WITNESS:  Correct.

3          THE COURT:  Excuse me, Mr. Bennett.

4    Q    But the concern, the argument you were making is that

5    there was a risk that the Consumer Financial Protection Bureau

6    could wipe it all out?

7    A    Correct.

8    Q    So if you could take a look now, let's move ahead a little

9    bit of time, Exhibit 19 which has an email and an attached

10   letter.  This is from you communicating or forwarding a CID

11   from the Department of Financial Institutions for the State of

12   Kentucky -- correct? -- or the Commonwealth of Kentucky?

13   A    A C&D, yes.

14          THE COURT:  C&D is meaning cease and desist letter?

15          THE WITNESS:  Correct.

16   Q    And if you look at the second page of the document, it was

17   addressed to a P.O. Box 704 to Pepper Cash.  Pepper Cash was

18   the trade name for one of the Red Rock loan products; right?

19   A    Correct.

20   Q    And how is it that you got this instead of the tribe's

21   lawyer?

22   A    Well, it looks like Brian McFadden forwarded it to me and

23   Justin, and then I forwarded it to the tribe's lawyer and

24   Jennifer Weddle.

25   Q    And this -- let's skip ahead to Exhibit 25.  Can you tell

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 371 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 119 of 174 PageID# 28063

Matthew Martorello - Direct

119

1    me what Exhibit 25 is.

2    A    Yes.  Hold on one second, please.  Sorry, it's very

3    lengthy.  So I am -- this is December 2012.  I have engaged

4    Deloitte & Touche to provide me with a valuation to determine

5    the tax impact if I am to, at the end of the year, convert

6    Bellicose Corporation into an LLC.  So that would be a taxable

7    event, and I needed them to determine the valuation at that

8    moment in time to figure out what the tax impact would be from

9    the conversion.

10   Q    So this time, did you want people to believe that the

11   company is worth a lot or worth a little?

12   A    I mean, I wanted people to believe it was worth a lot, but

13   the technical valuation here and impact would be less the lower

14   the valuation was.

15   Q    Well, I have us on the screen about 12 pages in but the

16   Bates number that ends 38990.  I'd like to talk a little bit

17   about your email here.  38990, this was -- and this page isn't

18   part of the email that you sent on December 10th, 2012.  Do you

19   recall writing this email?

20   A    Vaguely.

21   Q    And were you telling the truth in this email?

22   A    Yes.

23   Q    Okay.  Now, recall your declaration under oath where you

24   said that your desire to sell Bellicose to LVD was not

25   motivated by impending threats of litigation or enforcement

USCA4 Appeal: 21-2116    Doc: 26-2      Filed: 02/07/2022    Pg: 372 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 120 of 174 PageID# 28064

Matthew Martorello - Direct

120

1   actions by government agencies; correct?

2   A    Correct.

3   Q    Can you read the email starting "Hey guys"?

4   A    Yeah.  The whole thing?  It's three pages.

5   Q    Actually how about this.  Let's start with the third

6   paragraph that begins "This industry is going to be living in."

7   A    "This industry is going to be living in the grey area of

8   its legality for another year or two.  State governments will

9   continue to sue tribes and me saying their state laws apply.

10  Tribes will continue to say their laws apply."

11  Q    Next paragraph?

12  A    "The FTC right now is suing a competitor (FTC vs. AMG

13  Services and Scott Tucker, which you can Google) and are

14  alleging three or four violations of consumer lending laws.

15  Our client arguably employs similar practices and the FTC has

16  begun investigations of several tribal lenders like our

17  client."

18  Q    Can you read the next paragraph.

19  A    "Class action lawsuits follow and are already following

20  Tucker's case with the FTC.  Also see Martin Butch Webb/Western

21  Sky and look that up."

22  Q    And that was a company, Western Sky was a -- was owned by

23  a member of an Indian tribe and affiliated with a non-Indian

24  tribe entity named CashCall; correct?

25  A    I believe that's accurate, totally non-tribal.

Matthew Martorello - Direct

1   Q    Turn to the next page.  Let's drop halfway down, and if

2   you could start where it says "More equity risk."

3   A    "More equity risk you don't see in any business you'll

4   pull COE from:  Several states make it a felony crime to make

5   loans over a certain rate or without a license.  I had a 20

6   page document done for me to understand the risk that I have as

7   an equity owner for aiding and abetting felony crime in states

8   like Georgia and you will see the conclusion.  It says

9   something like... 'yes, it is possible the state will come

10  after you for helping the tribe lend against their laws and

11  charge you with aiding and abetting as a felony crime in their

12  state (in some capacities penalty could be jail time), but we

13  don't think it's going to happen.'  That's equity risk, how do

14  you price that into the equation?"

15  Q    Now, here, your position was that the valuation of this

16  business, one where the state could come and actually prosecute

17  Matthew Martorello for violating criminal laws against usury,

18  meant that your business shouldn't be highly valued; correct?

19  A    Correct.

20  Q    And your declaration said that you didn't -- you were not

21  motivated by threats of litigation or enforcement risk by

22  government agencies.

23  A    By impending threats, correct.

24  Q    Let's continue.  How about let's take a look at

25  Exhibit 26.  Exhibit 26 is an email dated April 16, 2013, from

Matthew Martorello - Direct

1    you to Rob Rosette regarding the significant ruling in Colorado

2    Western Sky case, order granting plaintiffs' motion for summary

3    judgment.  Do you see that?

4    A    Yes.

5    Q    And this was an order that was sent to you by your lawyer,

6    Jennifer Weddle, explaining how the tribal lending defendants

7    in that case had lost and were ordered to pay restitution and

8    monies for violating Colorado law; correct?

9    A    This was not a tribal lender.  That's incorrect.

10   Q    Well, it wasn't your model -- right? -- but it was

11   attempting -- the arguments that were being made were based on

12   the claim that there was sovereign immunity because the loans

13   were made on an Indian reservation?

14   A    No, there was no -- it wasn't an arm of the tribe.  They

15   didn't claim sovereign immunity.  I think it was choice of law,

16   tribal or otherwise, but it was only an individual tribal

17   member, not a government arm.

18   Q    And that you saw as significant or a big difference;

19   right?

20   A    Yes.  She said it would be significant.

21   Q    Okay.  So you were not at all fazed?  This was not

22   something that caused you any angst.

23   A    I was alarmed in 2012/2013.

24   Q    Okay.  We have a whole stack of ones bringing us up to

25   2016.  Take a look at Exhibit 27.  You were aware of this in

Matthew Martorello - Direct

1   May of 2013.  You received this communication from the

2   Department of Banking for the State of Connecticut; correct?

3   A    Correct.

4   Q    And this was related to the Castle Payday operation that

5   your company was servicing; correct?

6   A    Correct.

7   Q    Now, take a look at Exhibit 28, and this was an email of

8   July 23rd, 2013, that Jennifer Galloway, another lawyer, sent

9   to you regarding Scott Tucker having had to settle with the

10  Federal Trade Commission after a U.S. magistrate judge ruled;

11  correct?

12  A    Yes.

13  Q    And can you indicate how you responded to that?  Read that

14  sentence at the top from you.

15  A    Yes.  I responded, "I'm told the judge's conclusion was

16  wrong.  But is there anything anyone can do about it?"

17  Q    Now let's turn to page -- Exhibit 29.  This is an email

18  regarding the tribal lawsuit in New York.  Were you aware that

19  LVD had participated in litigation against the banking

20  regulators in the state of New York arguing that essentially

21  the Red Rock lending model was legal?

22  A    I was aware that they were suing the State of New York.  I

23  don't know -- I couldn't articulate if that was the argument.

24  It was a preliminary injunction.

25  Q    You wanted to keep LVD out of it because you didn't want

Matthew Martorello - Direct

124

1    to draw attention; is that correct?

2    A    I did want to keep LVD out of it.  I recommended they

3    didn't do it.  Why I made the recommendation, I think that was

4    part of the equation.

5    Q    Can you read the first sentence in the email that you sent

6    to Karrie Wichtman, the very top.

7    A    Yes.  It says, "LVD also" does not -- or "doesn't

8    represent the best facts on this either this minute."

9    Q    Can you take a look at Exhibit 30.

10            THE COURT:  What page are you on on 29?

11            MR. BENNETT:  29 was the very top, Judge, first page.

12            THE COURT:  I see it.

13            MR. BENNETT:  First sentence.

14            THE COURT:  All right.  30?

15   Q    Mr. Martorello, this is an email that you sent to Karrie

16   Wichtman on August 9th, 2013, regarding Think Finance, and the

17   litigation -- well, multiple lenders related to the New York

18   and CFPB actions; correct?

19   A    One second.  Let's see.  This is related to the Otoe

20   lawsuit against New York.

21   Q    And the question again was whether or not LVD should

22   participate in a lawsuit in New York; correct?

23            THE COURT:  Wait just a minute.  It's related to what

24   lawsuit?

25            THE WITNESS:  The lawsuit against the State of New

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 377 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 125 of 174 PageID# 28069

125

Matthew Martorello - Direct

1    York, the preliminary injunction lawsuit in Otoe-Missouria.

2            THE COURT:  You said Otoe lawsuit.

3            THE WITNESS:  I'm sorry, Otoe, O-t-o-e.

4            THE COURT:  Oh, the tribe's name.

5            THE WITNESS:  Yes.  The plaintiff tribe.

6    Q    And could you read the first two sentences in the second

7    paragraph of your email.

8    A    "LVD's house is not completely in order yet.  Time is our

9    most important commodity right now.  We don't have to be a

10   plaintiff, it will happen anyways with Think and Mark Curry.

11   RRTL/DCTF are too young for this right now."

12           THE COURT:  What does that mean?

13           THE WITNESS:  As you'll see down lower, I elaborate.

14   Too young, too small, too poor, not enough depth in the bench

15   with ACH and banks.  So this was a time during Operation Choke

16   Point where all they had to do was call the bank and turn off

17   your bank account, and we couldn't defend ourselves.

18           THE COURT:  But RRTL and DCTF means what?

19           THE WITNESS:  Sorry.  Red Rock Tribal Lending and

20   Duck Creek Tribal Financial.

21   Q    Your paragraph 69 of your declaration says under oath that

22   your decision to sell Bellicose to LVD was not motivated by

23   impending threats of litigation or enforcement actions by

24   government agencies.  That's what you said under oath; right?

25   A    Correct.

Matthew Martorello - Direct                                    126

1    Q    Now, Big Picture Loans is what ultimately was created, as

2    we know, when Bellicose Sourcepoint were sold; correct?

3    A    That's correct.

4    Q    All right.  And Big Picture Loans was actually registered

5    one month after those emails we've just been through; isn't

6    that correct?  And I'm showing you right now Exhibit 33 which

7    is the internet registry record.

8    A    I'm sorry, do you mean the entity or the domain was

9    registered?

10   Q    Let's start with the domain.

11   A    The domain, I'm sorry, it's not coming up.

12           THE COURT:  What exhibit?

13           MR. BENNETT:  This is 33, Your Honor.

14   A    So the domain is registered September 18th.

15   Q    And it was you or your companies that registered

16   bigpictureloans.com?

17   A    I believe it was Phenomenon Marketing but a hired

18   marketing firm.

19   Q    The firm hired by you or your companies?

20   A    By our companies.

21   Q    And, in fact, you set out shortly after to create a whole

22   set of marketing documents in the name of Big Picture; is that

23   correct?

24   A    Yes.  We had all that -- if you mean the branding

25   documents and imagery, yes.

Matthew Martorello - Direct

127

1   Q    The whole website was designed shortly after that; right?

2   A    I believe it was shortly after that.

3   Q    Now, you've -- again paragraph 69, you say that the threat

4   of enforcement actions and litigation was not a motivation for

5   why you wanted to move into the Big Picture project.  Is that

6   still the answer you want to hold to now?

7   A    Yes.

8   Q    All right.  Let's continue, let's go to document 34,

9   please.  This is an email dated September 29, 2013; is that

10  correct?

11  A    Yes.

12  Q    And you wrote to the tribe's lawyers, to your brother, and

13  your lawyer that "We know LVD is the next tribe to receive a

14  CID, and we know registering gets us favored treatment for

15  voluntary compliance versus the absolute torment a CID would

16  be."  This was discussing whether you would register your

17  relationship with Zion Bank; is that correct?

18  A    No.  This was discussing if LVD was going to register with

19  the CFPB.

20  Q    Okay, and you believed they should?

21  A    I recommended that they did because we have nothing to

22  hide and are fully federally compliant.

23  Q    Let's take a look at Exhibit 36.

24       THE COURT:  Excuse me.  On that Exhibit 34, the

25  second paragraph says, "We know LVD is the next tribe to

JA999

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 380 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 128 of 174 PageID# 28072

Matthew Martorello - Direct

128

1    receive a CID."  What is a CID?

2            THE WITNESS:  It's a civil investigative demand.

3            THE COURT:  From the CFPB?

4            THE WITNESS:  Correct.

5    Q    So take a look at Exhibit 36.  On October 3rd, 2013, you

6    learned that -- or I'd say October 3rd, 2013, after receiving a

7    cease and desist notice from the State of New York, you

8    notified Red Rock that you were going to stop lending to New

9    York consumers; is that correct?

10   A    No, that is incorrect.

11   Q    All right.  What's incorrect about it?

12           THE COURT:  Let's go somewhere else.  Who received

13   the cease and desist order?

14           THE WITNESS:  That was -- let me just check it.  I

15   think it was Red Rock Tribal Lending, but it was one of the

16   tribal lending entities.

17   Q    I'm reading now from page five of this email.

18           THE COURT:  Wait a minute.  The first paragraph, the

19   bottom says all.  Who is it from; Karrie Wichtman?  Is she the

20   author of that on the first page?

21           THE WITNESS:  Yes.

22           THE COURT:  "Please find approval documents for the

23   consideration of the co-managers of RRTL and DCTF (the TLEs)."

24   So that's Red Rock and Duck Creek, and TLEs is tribal lending

25   entities; is that right?

Matthew Martorello - Direct

1              THE WITNESS:  That's correct.

2              THE COURT:  "Issuing a moratorium on consumer loans

3    in the state of New York and the winding down of the business

4    currently existing in the state of New York immediately until

5    further notice, which I understand only constitutes five

6    percent of the current business of RRTL and DCTF, will have

7    little to no effect in tribal net profits."

8              The way I read that is they're going to stop lending

9    in New York.  Is that correct or incorrect?

10             THE WITNESS:  That is correct.

11   Q    So this is October -- this is the first week of October of

12   2013 that this exchange in Exhibit 36 takes place; correct?

13             THE COURT:  Wait a minute.  Before this date,

14   October 3rd, 2013, had RRTL and DCTF gotten cease and desist

15   notices from the State of New York in respect of their lending?

16             THE WITNESS:  That is correct.

17             THE COURT:  All right, sorry.

18   Q    So -- I'm going back to it again.  Paragraph 69 of your

19   declaration says "the decision to sell Bellicose to LVD was not

20   motivated by the impending threats of litigation or enforcement

21   actions" --

22             THE COURT:  I believe everybody in this thing can

23   recite that thing backwards, that one sentence.  Just ask the

24   question.  I think he knows the topic upon which you are doing

25   your examination at this time, and I do, too, so let's go

1    ahead.

2    Q    So take a look at Exhibit 37 now.

3         THE COURT:  She recommended approval of these

4    documents stopping this lending.  Did the lending subsequently

5    stop in New York?

6         THE WITNESS:  I just correct that.  I think we

7    recommended we're not willing to work for you if you're going

8    to lend to residents of New York, and she said you don't have

9    the right to tell us where to lend, and eventually she complied

10   with that suggestion.

11        THE COURT:  That isn't what happened here.  It said

12   from her, and she says, "All, please find attached approval

13   documents for the consideration of co-managers of RRTL and DCTF

14   (the TLEs) issuing a moratorium on consumer loans in the State

15   of New York."  Was that approval granted?  Did they stop

16   lending?

17        THE WITNESS:  Yes.

18        THE COURT:  And then the winding down of the business

19   currently existing in the state of New York.  What does that

20   mean?  How do you wind down business in New York?

21        THE WITNESS:  Um, it's in here if you go back to the

22   prior email, I believe.

23        THE COURT:  Okay.  In the same chain you mean?

24        THE WITNESS:  Yes.  So the first emails are at the

25   back here, and I believe --

1          THE COURT:  First email is from you; right?

2          THE WITNESS:  Yes.

3          THE COURT:  The first email is to you, and it's from

4     chairman and team; right?  That's what you are talking about?

5          THE WITNESS:  Page five from me to the chairman and

6     the co-managers and Karrie and my lawyer.

7          THE COURT:  Okay.  So is there something in there

8     about winding down?

9          THE WITNESS:  Yes, it's on page six, the second

10    page -- the next page.

11         THE COURT:  Hold on, I'll get there.  "And we do not

12    believe we should service any New York loans"; is that what you

13    are saying?

14         THE WITNESS:  Yes, and then the next --

15         THE COURT:  "We are willing to wind down our New York

16    services and see existing loans through to their completion but

17    we simply cannot flaunt the clear ruling from Judge Sullivan's

18    order however legally incorrect it might be."

19         THE WITNESS:  Correct.

20         THE COURT:  Now I understand.  Go ahead.  Pardon me.

21         MR. BENNETT:  Yes, sir.

22    Q    Mr. Martorello, can you turn to Exhibit 37, please.

23    A    Okay.

24    Q    Now, I understand I'm not going to reread the declaration

25    topic that refers to selling Bellicose to LVD.  What was the

**JA1003**

USCA4 Appeal: 21-2116    Doc: 26-2      Filed: 02/07/2022    Pg: 384 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 132 of 174 PageID# 28076

132

Matthew Martorello - Direct

1    subject of the email at Exhibit 37 dated October 14th, 2013,

2    the next week or so after the New York shutdown?

3    A    It reads, "LVD to take ownership of Bellicose VI."

4    Q    This was an email that you sent to Mr. Rosette; is that

5    correct?

6    A    Yes.

7    Q    And this was one of the emails where you begin to flesh

8    out what the sale of Bellicose to LVD was going to look like in

9    your view; correct?

10   A    That's incorrect.

11   Q    All right.  Were there earlier emails than this one?

12   A    There were on a different model, and then there's this

13   concept, and then there's the actual concept that got done in

14   2016.

15   Q    So when I said that -- so, in fact, we've just now gone

16   through about a quarter of these emails that we have here with

17   your discussion about the regulatory threat.  Your discussion

18   about the sale of Bellicose to LVD actually occurred earlier

19   than this one and during those others.

20   A    Not exactly.  The conversations in 2012, early 2013, were

21   to sell a copy of the intellectual property to the tribe and

22   engage in a ten-year contract to help them build their own

23   Sourcepoint so that they could be self-sufficient.

24   Q    But recall that you earlier confirmed to your investors

25   that Sourcepoint actually owned that intellectual property;

**JA1004**

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 385 of 681

1    right?

2    A    I don't recall that.

3    Q    That's what you actually believe today, is that

4    Sourcepoint was required to give its intellectual property to

5    the tribe?

6    A    Through the purchase.  They would have sold -- our

7    intellectual property was sold to the tribe.

8    Q    I mean the original.  All the intellectual property

9    generated by Sourcepoint was to go to Red Rock.  That's the

10   view you came up with later; right?

11   A    I'm sorry.  You said all of the original intellectual

12   property generated by us through our services went to Red Rock,

13   yes.

14   Q    Yes.

15   A    Agreed.

16   Q    And that included marketing methods, financial

17   forecasting, budgets, standard operating procedures for leads

18   and open accounts, collections strategy, vendor relationship,

19   all that was supposed to be included; right?

20   A    That was the IP that they already had, yes.

21   Q    But you didn't give that to them.  Red Rock never got

22   that; right?

23   A    They did.

24   Q    They did?

25   A    Yes.

Matthew Martorello - Direct

1    Q    Now, if you take a look at Exhibit 37, here you are

2    proposing a structure to Mr. Rosette; is that correct?

3    A    In some form or another, yeah.

4    Q    You are proposing some form or another of a structure by

5    which LVD will take ownership of Bellicose; correct?

6    A    Yes.

7    Q    And one of them was that you would give majority ownership

8    but zero profits.  That's the fourth bullet point down; right?

9    That LVD will own 51 percent of equity but zero profits until

10   month 49; correct?

11   A    Hold on one second, please.  Yes, I'm sorry.  I'm

12   struggling because that sounds incomplete and inaccurate, but

13   that is what it says.

14   Q    But you wrote it; right?

15   A    I did.

16   Q    And then the last sub bullet point under specific to

17   Bellicose SPVI equity says, "All structured to provide all

18   entities sovereign immunity."  Do you see that?

19   A    Yes.

20   Q    And that was important to you because of all the pending

21   threats of litigation and enforcement actions by government

22   agencies; correct?

23   A    It was a requirement of the tribe.

24   Q    This was your email to them, and it was all entities, not

25   just yourself -- I mean not just the tribes; right?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 387 of 681

1   A    In theory I think yes, it was -- I know it was their

2   requirement, but I think the 49 percent owner would have been

3   my company which would have -- if it passed the

4   arm-of-the-tribe test had immunity.

5   Q    And you needed that immunity because of the impending

6   threats of litigation and enforcement actions by government

7   agencies.

8   A    Not necessarily.  They're not immune from federal actions.

9        THE COURT:  Who is not immune?

10       THE WITNESS:  The tribe.

11       THE COURT:  They're not immune from federal actions?

12       THE WITNESS:  I'm sorry, from the FTC or CFPB.

13  Q    Take a look at Exhibit 38.  This is an email that we were

14  able to obtain from a third party, former tribal council member

15  Joette Pete, P-e-t-e.  But this is an email that you sent to

16  the tribal council following the email we've just discussed

17  that you sent to Mr. Rosette, this one dated October 14th,

18  2013; is that correct?

19  A    Yes.

20       THE COURT:  What exhibit are you on?

21       MR. BENNETT:  I'm on Exhibit 38, Your Honor.

22  Q    Let's take a look at Exhibit 39.  This is an email that

23  Bellicose's general counsel sent at your instruction, sent to a

24  third-party marketing company, Phenomenon Marketing; is that

25  correct?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 388 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 136 of 174 PageID# 28080

136

Matthew Martorello - Direct

1   A   Yes.

2   Q   The first sentence says, "Given the various challenges and

3   legal uncertainty in the lending industry, Bellicose VI, LLC,

4   is in the process of reassessing and re-prioritizing current

5   projects and relationships with third-party vendors"; do you

6   see that?

7   A   Yes.

8   Q   These are -- the challenges and legal uncertainty in the

9   lending industry are those we've talked about with various

10  state regulators and class actions; correct?

11  A   Those were Dan Gravel's words.  I would presume that was

12  what he was referring to.

13  Q   Okay.  Take a look at Exhibit 41.  Exhibit 41.

14        THE COURT:  Do you have a copy of this number 39, Mr.

15  Martorello, that's down here?  It says you got a copy of it.

16        THE WITNESS:  It does say that.  I do remember Mr.

17  Gravel showing me the letter before he sent it.

18        THE COURT:  Before he sent it.

19        THE WITNESS:  Yeah.

20  Q   Exhibit 41, this was an email communication that you had

21  just passed along, not specifically about Red Rock, to Ms.

22  Wichtman when you received it from somebody in the United

23  Kingdom; correct?

24  A   Yes.

25  Q   And you note in there that the industry, particularly with

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 389 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 137 of 174 PageID# 28081

137

Matthew Martorello - Direct

1   the ruling in New York, could jeopardize -- and class actions

2   and personal threats of enforcement against individuals by

3   regulators has everyone spooked.  And this was communication

4   that you sent to Ms. Wichtman a couple weeks after you made the

5   first -- the proposal, rather, October 14th proposal we just

6   talked about; right?

7   A    Yes.

8   Q    Now, take a look at Exhibit 42.  This is an email that you

9   sent to Karrie Wichtman responding to her request for

10  consideration of whether you would agree to pay some of the

11  legal bills related to the New York court litigation and Second

12  Circuit appeal; correct?

13  A    Sorry.  Yeah, she's asking contribution for the legal

14  fight that they brought against New York, yes.

15          THE COURT:  "They" meaning?

16          THE WITNESS:  The tribe is requesting that we fund

17  the litigation against New York or help fund or contribute to

18  it.

19          THE COURT:  And Red Rock sued, or the tribe sued New

20  York seeking to enjoin certain conduct on their part, and that

21  led to the decision of the district court, Judge Sullivan and

22  subsequently the Second Circuit, and it's that litigation you

23  are being asked to contribute to fund; is that correct?

24          THE WITNESS:  That's correct.

25          THE COURT:  All right, I'm with you, Mr. Bennett.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 390 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 138 of 174 PageID# 28082

138

Matthew Martorello - Direct

1    What about it?

2    Q    So in the third paragraph you respond "And considering."

3    Can you read those two paragraphs.

4    A    "Considering, a) where this puts us (i.e. SPVI is about to

5    be discovered and will need extreme resources to defend itself

6    against all kinds of aiding and abetting and 'true lender'

7    claims come Q1; b) and the very significant possibility that

8    should we even survive long enough to get there, I'll have to

9    defend myself even personally (in more than civil matters) with

10   no ongoing business or revenue at all should the decision be

11   made in the appeal that the activity is in fact off reservation

12   (a certain end to the industry).  Or if LST folds, I still have

13   those battles to face now on account of this suit."

14   Q    All right.  Take a look at Exhibit --

15            THE COURT:  Had Bellicose been sold yet by the time

16   of this memo?

17            THE WITNESS:  No.  It was 2016 when it was sold.

18   Q    The transaction was formally in what, January of 2016?

19   A    Yes.

20   Q    And the negotiations were ongoing even as we're going

21   through this chain right here; correct?

22   A    The transaction began negotiated August 15th of 2014.

23   Q    The transaction by which LVD purchased Sourcepoint.

24   A    Correct.

25   Q    Okay.  Take a look at Exhibit 46.

USCA4 Appeal: 21-2116   Doc: 26-2   Filed: 02/07/2022   Pg: 391 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 139 of 174 PageID# 28083

139

Matthew Martorello - Direct

1                  THE COURT:  Are you moving to a different topic now?

2                  MR. BENNETT:  No, sir.

3                  THE COURT:  How much more have you got on this topic?

4                  MR. BENNETT:  I will move quickly.

5                  THE COURT:  I'm just asking how much more you've

6       got --

7                  MR. BENNETT:  Judge, I probably have another

8       30 minutes.

9                  THE COURT:  We're going to take a 20-minute recess.

10      All right.

11                 (Recess taken.)

12                 THE COURT:  All right, do you want to proceed.

13      Q    So we were --

14                 THE COURT:  You were about to get into Exhibit 43, I

15      think.

16                 MR. BENNETT:  Yes, sir.

17      Q    Exhibit 43, this is an email chain in December 31st, 2013.

18      The top of it is from Mr. Martorello to Nicole St. Germain,

19      G-e-r-m-a-i-n, and -- with the Rosette law firm amongst others.

20      Do you recall this email, Mr. Martorello?

21      A    Generally.

22      Q    You've reviewed it before today; right?

23      A    Correct.

24      Q    And this was the continuing discussion about finding a way

25      for -- to get the tribe to acquire Sourcepoint or Bellicose;

**JA1011**

Matthew Martorello - Direct

1  correct?

2  A    No, incorrect.  This was the end of the discussion to sell

3  51 percent of Bellicose to the tribe.  This is about where that

4  conversation ended.

5  Q    Okay.  And I'm looking at the middle of this.  The

6  question was as to what percentage of equity would go to the

7  tribe.  Is it fair to say that your position was the percentage

8  of equity that went to the tribe was not the difficult part, it

9  was the amount of money that would go to the tribe; right?

10 A    One second, please.  I don't know that I would -- I don't

11 know which one was more difficult.  I hadn't really thought of

12 it that way.

13 Q    All right.  Well, so I'm looking at under subparagraph D

14 on the proposed changes, the bottom half of that, that big

15 paragraph over to the right, it says, "What I think you'd tell

16 a court that would challenge the immunity."  Do you see that?

17 A    I do.

18 Q    And "is that if a deal were not done," and that means a

19 deal by which the tribe would buy Sourcepoint; right?

20 A    51 percent, yes.

21 Q    You would tell them that, A, if Sourcepoint -- the tribe

22 didn't know if, A, Sourcepoint would be around in ten days

23 given the industry; B, executed its termination provision in

24 accordance with the service agreement; or, C, hike rates.

25 That's what you wrote; right?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 393 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 141 of 174 PageID# 28085

Matthew Martorello - Direct

141

1    A    That's right.

2    Q    And you were saying that implicitly the tribe needs to

3    understand that Sourcepoint was intending or had the right to

4    walk?

5    A    We had that right, yes.

6    Q    And this was an implicit threat or maybe explicit threat

7    that if the tribe didn't buy your business, that you might

8    walk?

9    A    I disagree.  Because it does say I thought we agreed to

10   status quo on the next page.

11   Q    Okay.  So let's take a look at the second page at the top.

12   Just a detour here.  This was your writing where you said if

13   this issue isn't worked out -- "Management - if this issue

14   isn't worked out in some very particular way, the deal just

15   won't get done."  What was the management issue that had to be

16   worked out in a very particular way, otherwise you wouldn't do

17   a deal?

18   A    Yeah, it says it here.  "All the investors (institutional,

19   personal, and myself) won't allow the deal to occur without

20   being 100 percent certain that adequate management resources

21   are in control."  That was the first major hurtle to

22   accomplish, so it was just that they needed to have adequate

23   management to run a tribal servicing entity or institutional

24   investors wouldn't lend to them.

25   Q    Take a look at Exhibit 53, please.  This is an email from

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 394 of 681
Case 3:17-cv-00461-REP    Document 882    Filed 07/25/20    Page 142 of 174 PageID# 28086

142

Matthew Martorello - Direct

1    you to Robert Rosette dated August 25th, 2014.  You were

2    sending this August 2014 to the tribe's lawyer.  Can you read

3    the sentence at the top.

4    A    "So here is what I'm thinking (for now).  If we can't

5    reach terms with LVD to buy SPVI, then SPVI will be sold to

6    another tribe (likely Middletown).  If we do reach terms, some

7    of my team will likely proceed with Middletown in a new entity

8    to help them stand up a business.  So I'm sort of on hold, and

9    so is Middletown, until we know if LVD is going to be able to

10   come to terms on SPVI or not."

11          THE COURT:  What exhibit are you on?

12          MR. BENNETT:  Exhibit 53.

13   Q    So August 25th, 2014, is ten months after the October 2013

14   first proposal where you sent your suggested structure for LVD

15   to purchase Bellicose; right?

16   A    Yes.

17   Q    And the tribe still had not agreed to buy your business,

18   and this was a threat to the tribe's lawyers -- correct? --

19   that if it didn't come to terms with you, then you were going

20   to sell it to a competitor?

21   A    Incorrect.

22   Q    Well, did you -- were you meaning what you wrote in this

23   email to the tribe's lawyer?

24   A    Yes.  What you were incorrect about is the October to

25   December 2013 deal died, and we chose status quo.  A week

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 395 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 143 of 174 PageID# 28087

143

Matthew Martorello - Direct

1    before this, or ten days before this, the tribe sent a deal to

2    buy the whole company on August 15th, and their lawyers sent --

3              THE COURT:  Deal to buy what?

4              THE WITNESS:  Offer, term sheet to buy all of

5    Bellicose.  That was like, I think, August 15th, and so we had

6    a new, totally new deal, totally new structure.  So I think

7    that's where the incorrect part is.

8    Q    Okay.  So what you are saying is that whenever I'm

9    referring to the purchase of your business that became the Big

10   Picture Loan/Ascension business, that you characterize that as

11   totally unrelated to all of the negotiations that had taken

12   place in 2013, 2014?

13   A    They were very different.

14   Q    The structures are different; right?

15   A    One was an IP copy sale.  One was 49 percent, and then the

16   tribe came and wanted the whole thing.

17   Q    So let's take a look at Exhibit 54.  Before there was Big

18   Picture Loans, you were trying to pitch the tribe to shift its

19   brand to something called Chorus Loans; correct?

20   A    No.  That was a name they picked from several that I

21   provided to them.

22   Q    So you provided several possible names for a new business.

23   One was Chorus Loans, and that's the one they picked; correct?

24   A    Correct.

25   Q    Taking a look at Exhibit 54, the bottom email, you

USCA4 Appeal: 21-2116    Doc: 26-2       Filed: 02/07/2022    Pg: 396 of 681
Case 3:17-cv-00461-REP  Document 882  Filed 07/25/20  Page 144 of 174 PageID# 28088

Matthew Martorello - Direct                                    144

1    received a proposed resolution approving Chorus Loans in Word

2    document format; correct?

3    A    Correct.

4    Q    And because that -- it was customary for you to have to

5    pre-approve tribal resolutions related to your business;

6    correct?

7    A    I testified earlier that is incorrect.

8    Q    Okay.  So two resolutions we know of that that's true on,

9    though; right?

10   A    It says final.  It doesn't say that I'm reviewing

11   anything.  I don't know what the exhibit looks like, and I

12   think we talked about the other one.

13   Q    So then you say, "Okay," and this is October 25th, '14,

14   "sorry for the runaround here, Karrie... Chorus has been sold.

15   Attached is another really great brand with just as much

16   energy, money, and time spent in developing.  Assuming LVD buys

17   SPVI, BigPictureLoans," with the three words all together,

18   BigPictureLoans.com but the three words all capitalized, "would

19   be an excellent domain.  If LVD doesn't buy SPVI, then

20   firstnationloans.com is the domain we can provide.  We haven't

21   gotten around to doing the build-out or design."

22        And so right above, you respond to her question,

23   "Which one do you want me to use" -- this is Karrie Wichtman

24   the Rosette lawyer, and you say, "BigPictureLoans.com";

25   correct?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 397 of 681
Case 3:17-cv-00461-REP    Document 882    Filed 07/25/20    Page 145 of 174 PageID# 28089

Matthew Martorello - Direct

145

1  A    Correct.

2  Q    That's how Big Picture, the brand, and bigpictureloans.com

3  came into being; correct?

4  A    That's how the name was selected.

5  Q    Taking a look at Exhibit 55, please.  They selected that

6  name; right?

7  A    Correct.

8  Q    Now, this email, Exhibit 55, is the same email as 54

9  except it didn't have that top part where you say use Big

10 Picture Loans; right?

11 A    Correct.

12 Q    Except this one also has an attachment.  If you look at

13 the second page, Phenomenon, your marketing company, has

14 created the bigpictureloans.com website; right?

15 A    Right.

16 Q    And this was even before the tribe had picked it; right?

17 A    Yes.  They had created several names before the tribe

18 picked this one.

19 Q    Not just several names but everything.  The privacy

20 policy, the forms, everything had been designed, the marketing

21 materials, all created before you even informed Ms. Wichtman

22 about Big Picture Loans; correct?

23 A    I never noticed that.  I presume they took the same text

24 from Castle Payday or something and put it on here.

25 Q    By "they" took the --

1   A    The marketing company.

2   Q    Your marketing company, Phenomenon?

3   A    Phenomenon.

4   Q    The one you just terminated because of all the problems in

5   the lending industry.  We went through that email a short time

6   ago; right?

7   A    Yeah.

8   Q    This was done before you terminated them for future

9   service; right?

10  A    Correct.

11  Q    You've had this in the bank for awhile?

12  A    I hired them July 2013.  So since August 2013.

13  Q    Right, but certainly -- did you rehire them after you

14  terminated them?

15  A    For limited work, yes.

16  Q    But not for this; this was done before you terminated

17  them?

18  A    Yes, I believe it was a different statement of work for

19  this versus the subsequent determination work they did.

20  Q    Trying to find the date of that.  So this is Exhibit 39

21  we'll flip back to real quick.  So Exhibit 39 is the letter

22  that we've talked about, Mr. Gravel terminating the agreement

23  to use the services of Phenomenon Marketing; right?

24  A    Correct.

25  Q    And so now going back to 55 again -- I'm sorry for all the

USCA4 Appeal: 21-2116    Doc: 26-2        Filed: 02/07/2022    Pg: 399 of 681
Case 3:17-cv-00461-REP  Document 882  Filed 07/25/20  Page 147 of 174 PageID# 28091

Matthew Martorello - Direct

147

 1   paper movement.  Going back to Exhibit 55, we see the date on

 2   the front of the marketing presentation which is the second

 3   page of Exhibit 55, and it says September 23rd, 2013; do you

 4   see that?

 5   A    Yes.

 6   Q    So you hired Phenomenon, they designed the new

 7   bigpictureloans.com, and, in fact, it includes Red Rock in

 8   here; right?

 9   A    I'm sorry, how do you mean?

10   Q    Well, if you'll take a look at --

11         THE COURT:  What includes Red Rock?  You said "it."

12   That's an indefinite pronoun.

13         MR. BENNETT:  I'm sorry.

14   Q    The privacy policy, for example, which is within the

15   PowerPoint, let's see, after the cover or including the cover,

16   one, two, three, 13, page 13 --

17         THE COURT:  What's at the head of it?

18         MR. BENNETT:  Says privacy policy at the top.

19         THE COURT:  What about it?

20         MR. BENNETT:  It says privacy policy, Red Rock Tribal

21   Lending, LLC, doing business as Big Picture Loans.

22   Q    Mr. Martorello, so when you were speaking to the tribe's

23   lawyer, Karrie Wichtman, you told her that chorusloans.com had

24   been sold and that she should use bigpictureloans.com because

25   you thought it would be an excellent domain.  That was -- at

USCA4 Appeal: 21-2116   Doc: 26-2   Filed: 02/07/2022   Pg: 400 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 148 of 174 PageID# 28092

Matthew Martorello - Direct

148

1    that point, you knew you were already sitting on all this

2    material for Big Picture.  You had been sitting on it for a

3    year?

4    A    Correct.

5    Q    Now, the problems with regulators did not end in 2013 or

6    2014; right?

7    A    Which regulators?

8    Q    Well, state and federal regulators.

9    A    The federal regulators as far as FDIC/OCC did end in early

10   2014.  FTC really was a nonissue after 2012.  CFPB, probably

11   more like '15 or something, 2016.

12   Q    And it continued -- the CFPB risks and state regulators

13   continued as a risk to you all the way up until the actual

14   consummation, formal transaction of the sale of Big Picture and

15   Ascension, or the merger that became Big Picture and Ascension;

16   correct?

17   A    In a much more limited way.

18   Q    Between 2013 and 2014, you continued to receive -- the

19   companies continued to receive communications from state AGs,

20   cease and desist orders for example; correct?

21   A    Correct.

22   Q    And did that ever abate while Red Rock was around?

23   A    That was from day one and probably still continues today.

24   Q    Okay.  And in October of 2014, you were informed that the

25   Second Circuit, Court of Appeals for the Second Circuit had

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 401 of 681
Case 3:17-cv-00461-REP  Document 882  Filed 07/25/20  Page 149 of 174 PageID# 28093

149

Matthew Martorello - Direct

1   affirmed the district court's decision in the New York matter;

2   right?

3   A    That's right.

4            THE COURT:  When?

5            THE WITNESS:  October 1st, 2014.

6   Q    Take a look at Exhibit 65, please.  This is an email from

7   you to Karrie Wichtman dated November 11, 2014; is that

8   correct?

9   A    That is correct.

10  Q    And you were, at this point, discussing, because of the

11  takeaways from the Second Cir -- or in part because of what you

12  learned from the Second Circuit's panel's comments, you changed

13  over to Big Picture Loans as the brand; is that correct?

14           THE COURT:  What was the question again?

15           MR. BENNETT:  Sure.

16  Q    The move to Big Picture Loans and the creation of Big

17  Picture Loans as a company occurred, in part, because of the

18  fear about what the Second Circuit was going to do.

19  A    No, that's not correct.

20  Q    That's not true.  Take a look at 65.

21  A    Yes.

22  Q    You begin at the top by saying, "What were some of the key

23  takeaways from the Second Circuit's panel's comments?"  Do you

24  see that?

25  A    Yes.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 402 of 681

1  Q    And then you begin to discuss what to do with respect to
2  the different vendors and the move from Red Rock and Castle
3  Payday; correct?
4  A    There's a whole lot more in here.  I'm not sure what
5  you're trying --
6  Q    I'm trying to get to the second page.  At the top, Ms.
7  Wichtman had sent you an email, and the first sentence of it
8  says, "As far as Big Picture - BPL has already been created as
9  a company so legal work has already been done there aside from
10 contract review and legal issues resulting from migration and
11 whatever else comes out of your conference room systems chat."
12 Do you see that?
13 A    Yes.
14 Q    And so as of this point, which is November 2014, you are
15 about to make the transition fully from Castle Payday over to
16 Big Picture Loans; correct?
17 A    No.  That must have happened roughly a year later.
18 Q    The move to Big Picture Loans?
19 A    Yes.
20 Q    Okay.
21 A    As an operating business, yes.
22 Q    All right.  Can you take a look at --
23         THE COURT:  Wait a minute.  What?
24         THE WITNESS:  I said as an operating business, yes.
25 Q    Can you take a look at Exhibit 67.  This was in

1    November 2014, November 24, 2014, you receive a copy of a cease
2    and desist notice sent by the consumer protection section of
3    the Department of Law at the State -- for the State of
4    Colorado; correct?
5    A    I don't know if I received it.  I don't see me on an email
6    or recall it.
7    Q    Do you recall it?
8    A    No, I don't recall it.
9    Q    Take a look at Exhibit 69.  This is an email from you to
10   Michelle Hazen, known here as Shelly H, and then her email with
11   your comments at the end of each paragraph.  What was the
12   purpose -- what was the subject of her email?  Why was she
13   communicating with you?
14   A    I'm sorry.  Let me look at this.  It's kind of a long
15   thread.  It looks like we were discussing what the 2015 budget
16   would look like.  They sent us their proposed budget, and we
17   had disagreement about some of the deductions to our revenue.
18   Q    Well, in fact, one of the reasons was that they started
19   paying their general manager, an interim general manager,
20   salaries without your approval of those ranges; correct?
21   A    I'd have to take a close look and see.  I'm sorry, where
22   would I find this, please?
23   Q    How about on the second page.  The bottom of the second
24   page is your email that had been sent to Ms. Hazen.
25   A    Starting with "Hi guys"?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 404 of 681

1  Q    Yes.

2  A    Okay.  Let me finish the paragraph, please.  There was --

3  it seems like -- and I vaguely recall this.  There was a salary

4  study sent over to Duck Creek for a position or positions with

5  some generalized sort of demographic data and geographies and

6  things, and that's what I see in that part.  Is there another

7  part you'd like me to --

8  Q    Well, the first is your -- you have input here on the

9  salary of individuals at Duck Creek; right?  Those were not

10 your employees purportedly; right?  Those would have been Red

11 Rock?

12 A    They were Duck Creek employees as a PEO to Red Rock, so

13 they serviced both entities.  But they would -- if there was an

14 annual increase over five percent for the total line item, then

15 we'd have to agree to that.

16 Q    But that would have been an entity that you would have

17 claimed had tribal immunity; right?  Duck Creek.

18 A    Duck Creek's labor expense, I think the documents in the

19 servicing agreement say that there was a five percent annual

20 increase without mutual agreement by the parties, and so I

21 think that's what we're talking about -- something -- some

22 growth in excess of the terms of the contract.

23 Q    And the third page, for example -- about halfway down it

24 says, "I can't say yet" -- this is you.  "I can't say yet about

25 hiring a compliance manager, but I don't think it's necessary

USCA4 Appeal: 21-2116    Doc: 26-2       Filed: 02/07/2022    Pg: 405 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 153 of 174 PageID# 28097

Matthew Martorello - Direct                                              153

1   given the seven or eight touches everything receives today from

2   trained personnel and the deeper touch of the Duck Creek TF

3   compliance board."  You wrote that; right?

4   A    Yes.

5   Q    So they wanted to hire a compliance manager, and you said

6   no?

7   A    I said I can't say yet.  I don't know if I said no.

8   Q    But it was your decision?

9   A    Well, she says here we will not hire a compliance manager

10  in the prior email.

11  Q    Dropping two paragraphs down, under travel, you confirm

12  your agreement -- right? -- that Ms. Hazen can attend the NAFSA

13  which is a trade group for Native American Financial Services

14  Association; right?

15  A    That's the tribal lenders, yeah.

16  Q    And then OLA, the Online Lender Alliance, you indicate

17  that maybe she shouldn't attend that, but, again, you're

18  providing the approval as to whether Michelle Hazen can attend

19  these industry trade groups because, in theory, it would cost

20  money; correct?

21  A    It says here that I --

22            THE COURT:  Correct or not correct?

23            THE WITNESS:  Not correct.

24  Q    The next paragraph says, "A lot of this will be moot if we

25  can get the sale across the finish line, so my focus is much

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 406 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 154 of 174 PageID# 28098

154

Matthew Martorello - Direct

1  more so on exactly that and what the purchased business will

2  exactly do after acquisition (facilitating a transition to the

3  new owner)."  Do you see that?

4  A    Yes.

5  Q    So what you are saying is that if they'll buy your

6  business, then you could afford -- it could afford to do

7  certain other things; right?

8  A    No, I wouldn't characterize it that way.

9  Q    Read the rest of that paragraph.

10 A    Would you like me to read it out loud?

11 Q    Let me just ask you, the rest of the paragraph --

12         THE COURT:  Read it to yourself.

13         THE WITNESS:  Okay.  Okay, I've read that.

14 Q    So your point was that they'll be able to save money if

15 you do it that way, and, therefore, they would have the freedom

16 to do the hiring, make the raises, and do the industry travel

17 they were requesting.

18 A    I don't think that clarifies what I was saying, no, I

19 disagree.

20 Q    Take a look at the next page which -- actually two pages

21 in.  On the bottom right it has Bates number 43489.  This is

22 your email, and you state, "The recommended revisions to the

23 budget sent by Duck Creek were not accepted by SPVI."  Do you

24 see that?

25 A    Yes.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 407 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 155 of 174 PageID# 28099

155

Matthew Martorello - Direct

```
 1   Q   So the sale actually occurred, the technical sale occurred
 2   in, you said, 2016; correct?
 3   A   Yes.
 4   Q   Take a look at Exhibit 71.  Is it still your position that
 5   you weren't negotiating during this time period here?
 6   A   Oh, no, we were still negotiating.
 7   Q   So Exhibit 71, you were continuing --
 8           THE COURT:  Time period here is January of 2015.
 9           MR. BENNETT:  Yes, sir.
10           THE WITNESS:  Correct.
11   Q   And this was your email, Exhibit 71, detailing the
12   different things that you were going to have to do and the
13   employment details for your folks, that is the employees of
14   Sourcepoint, how were they going to be employed; correct?
15   A   Hold on one second, please.  It looks like it's addressing
16   the employment details of my folks, is what it says, for the
17   transaction.
18   Q   And in particular Brian McFadden and Simon Liang; right?
19   A   Among others.  I see Chelsea in here as well.
20   Q   And your brother Justin as well; correct?
21   A   I don't see their names, but it would have been everybody.
22           THE COURT:  You are dropping off.
23           THE WITNESS:  I'm sorry.  I said I don't see their
24   names, but it would have been everybody at the company.
25   Q   So take a look at Exhibit 72 and then Exhibit 73.  These
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 408 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 156 of 174 PageID# 28100

156

Matthew Martorello - Direct

1   are the operating agreements for -- actually it says first

2   amended operating agreement of Big Picture Loans dated February

3   of 2015 -- that's Exhibit 72 -- and the operating agreement of

4   Ascension February 4th, 2015; is that right?

5           THE COURT:  72 doesn't have a day in it.

6           MR. BENNETT:  72 does not have a date in it, Your

7   Honor.

8           THE COURT:  It says February, but it doesn't have a

9   day of the month.  Is this the final?

10          MR. BENNETT:  Says first amended, Your Honor.  It's

11  what they gave us.

12          THE COURT:  Is it the final document, or is it some

13  kind of --

14          MR. BENNETT:  It's signed, so I believe it's final.

15  Q    So Big Picture Loans was actually created sometime at

16  least prior to February 2015 or prior to the date of this first

17  amended operating agreement; right?

18  A    Yes.

19  Q    And Ascension was created by operating agreement

20  February 4th, 2015; is that correct?

21  A    At least the operating agreement date is that, but I don't

22  know if it was formed prior or the same day.

23  Q    Now, at this time, in 2015, there wasn't anything for

24  Ascension to do -- right? -- because you still had Sourcepoint;

25  correct?

Matthew Martorello - Direct

1    A    That's correct.

2    Q    And then if you'll take a look at Exhibit 76, you created

3    Eventide by operating agreement February 9th, 2015, just right

4    after the Ascension creation; correct?

5    A    Correct.

6    Q    And this is the operating agreement for Eventide; right?

7    A    Yes, it looks accurate.

8    Q    Take a look --

9    A    Yes, yeah.

10   Q    Take a look at the last page of Exhibit 76 while we're

11   here.  What is Kairos Holdings which apparently owned

12   100 percent of the voting interest, K-a-i-r-o-s, Kairos

13   Holdings, LLC?

14   A    Yes, Kairos was -- I don't want to speculate, but I

15   believe it was the owner of Bellicose.

16   Q    Who owns Kairos Holdings, LLC?

17   A    The Cook Islands trust.

18   Q    Which Cook Islands trust?

19   A    Bluetech.

20   Q    And who are the beneficiaries of the Bluetech Cook Island

21   trust that owns all of Kairos Holdings which owns 100 percent

22   of the voting interest of Eventide?

23   A    My wife and my future -- my current kids and any future

24   descendants.

25   Q    Where did you learn about the Cook Island trust as a place

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 410 of 681

1  to store money?

2  A    I didn't learn about it as a place to store money.

3  Q    What did you learn about it?

4  A    It was in 2010, and probably an attorney of some kind.

5  I'm not sure.

6  Q    Mark Curry, who is Mark Curry?

7  A    Mark Curry was, I think, or is the maybe executive of

8  American Web Loans.

9  Q    Which is another lending entity, in fact one that's also

10 now sued in this same court; right?  Are you aware of that?

11 A    I think it is a lending entity.  Is it a lending entity or

12 a servicer?  I'm not sure.

13 Q    It's associated with an Indian tribe?

14 A    In some way, yes.

15 Q    And it had to defend the same types of true lender

16 arguments that you've had to defend; correct?

17 A    I believe so.

18 Q    Mark Curry would be the Matt Martorello of that --

19 A    I don't know --

20 Q    He's the non-Indian individual that invested money and

21 supposedly owned a servicing company; right?

22 A    I'm not sure of the facts of Mark Curry.

23 Q    But Mark Curry is actually the one who talked to you about

24 putting your money in a Cook Island trust; right?

25 A    No.  I never knew Mark Curry in 2010.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 411 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 159 of 174 PageID# 28103

Matthew Martorello - Direct                                    159

1  Q    When did you first create Bluetech and direct its

2  ownership of Kairos?

3  A    2010.  And I didn't direct.  I'm sorry, I didn't direct

4  the ownership of Kairos or something that you had said.

5           THE COURT:  I'm losing what you are saying.

6           THE WITNESS:  I'm sorry.  I said I didn't direct the

7  trust ownership of the entity.

8           THE COURT:  Who did?

9           THE WITNESS:  The trustee.

10           THE COURT:  Who is the trustee?

11           THE WITNESS:  It's Asia City Pacific Limited, Tine --

12  I can't remember her last name right now.  Tine, T-i-n-e,

13  P-o-i-n-t-e, Pointe.

14  Q    So taking a look at Exhibit 80, please, this was an email

15  chain, the top email of which was Matt Martorello to Karrie

16  Wichtman dated February 23rd, 2015, and you are discussing here

17  the possible purchase that we've just talked about -- right? --

18  of Sourcepoint into Ascension?

19           THE COURT:  You mean Ascension is going to buy

20  Sourcepoint?

21           MR. BENNETT:  I think the assets that are Sourcepoint

22  will become part of Ascension.

23  A    It looks like we're talking about assigning a contract or

24  how we will go about assigning Sourcepoint contracts into the

25  buyer or ultimately to Ascension.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 412 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 160 of 174 PageID# 28104

160

Matthew Martorello - Direct

1  Q    Okay.  And Ms. Wichtman, at the second page of the

2  document, her email up top, this was at 9:16 p.m. on

3  February 23rd, 2015.  She says about this particular vendor --

4  O2 is a vendor; correct?

5  A    Yes.

6  Q    And the tribe, you are asking for approval of a contract

7  with O2; right?

8  A    I'm sorry, I'm not sure.

9  Q    The contract price is going up with O2?

10         THE COURT:  What are you talking about?  I don't know

11  what O2 is, I don't know what contract price you are talking

12  about, price going up.  What on earth are we talking about

13  here?

14         MR. BENNETT:  Yes, sir.

15  Q    So O2 was a vendor that Sourcepoint had used; correct?

16  A    Correct.

17  Q    And O2 was going to have an increase in its contract price

18  or some other change in its contract terms that you were

19  telling Ms. Wichtman that the tribal entities would have to

20  agree to, they need a new resolution for that; right?

21  A    We're discussing it.  I don't see myself saying that

22  specifically.

23  Q    Okay.  So now I've highlighted part of the paragraph that

24  is in the middle of page two, and the sentence begins, "Also, I

25  can see the logic in an increase in contract price."  Do you

Matthew Martorello - Direct

1  see that?

2  A    So this is Karrie's email.

3  Q    It is.

4  A    Yes, I see her saying that.

5  Q    And she says, "However, the tribe needs to understand what

6  O2 did and what they will do under the new terms.  Also, how

7  does putting a company in charge of things Matt used to do help

8  the tribe learn the business?  At the end of the day,

9  especially if you guys are out in two years, with the tribe

10  holding all the cards they need to be playing with a full deck.

11  Sounds to me like we will be short some aces."  Do you recall

12  receiving that email?

13  A    I do.

14       THE COURT:  What page are you on?

15       MR. BENNETT:  Your Honor, I'm on the second page in

16  the middle of the document.  There's an email from Karrie

17  Wichtman to Justin copying Matt, and halfway in the paragraph

18  it says, "Also I can see the logic."  And the question is, how

19  will the tribe learn if you don't -- if we have to hire this O2

20  to run the business.

21       THE COURT:  Run what business?

22       MR. BENNETT:  According to this, whatever work Matt

23  used to do, quote unquote, in charge of things that Matt used

24  to do.

25       THE COURT:  What business was going to pay these

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 414 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 162 of 174 PageID# 28106

Matthew Martorello - Direct

162

1  people, O2?

2         THE WITNESS:  We did, and after the acquisition,

3  Ascension would pay them.

4         THE COURT:  So Ascension is hiring and paying for

5  somebody to do, after the acquisition or sale, what you did

6  before the sale; is that what she's saying here?

7         THE WITNESS:  No.

8         THE COURT:  Is that what happened?

9         THE WITNESS:  No.  We had all of our vendor

10  contracts.

11         THE COURT:  What?

12         THE WITNESS:  All of our vendor contracts at

13  Bellicose they were purchasing, and so their company would need

14  to engage with all those vendors, and O2 was one of those

15  vendors.  So I guess we're presenting her the contract to

16  review and approve, you know, for when it closed.

17  Q    So Ms. Wichtman was emailing you in this communication and

18  asking how are we going -- how is the tribe going to learn the

19  business if you are making us hire these outside vendors to do

20  the work; right?

21  A    Let me see what she's saying.  She seems to be asking how

22  O2's role will help them learn the business.

23  Q    All right.  Now, could you turn to the first page of this

24  Exhibit 80.  Your email back responding to that is at the

25  bottom of the first page, 8:16 p.m. on February 23rd, 2015.

Matthew Martorello - Direct                                    163

1    And you say, quote, I guess one question I have is who are you

2    expecting to learn it?  There isn't much to do for the buyer

3    since it's built and designed to be self-sustaining as a

4    passive investment opportunity.  That's what you wrote, that

5    and what followed; correct?

6    A     I wrote that, yes.

7    Q     And the last paragraph of that email you wrote, "I think I

8    need clarity on exactly who you are expecting to learn and what

9    it is you want them to learn.  I can't learn science because

10   the words frustrate me too much.  Just the same if you're

11   hoping to jam a square peg through a round hole, something will

12   get broke."

13          By that you were meaning the co-managers and the

14   persons that were actually at the tribe you did not expect to

15   understand tribal lending business any more than you understood

16   complicated science words; right?

17   A     Incorrect.  It was related to the servicing business.  I

18   said that the servicing business needed to have adequate

19   management or it could fall apart and wouldn't be able to raise

20   institutional capital.

21   Q     Take a look at Exhibit 81, please.  In addition to O2, in

22   this creation of Ascension and the assignment from Sourcepoint,

23   you were requiring that, or strongly insisting that the tribal

24   entities rehire MicroBilt, your allied vendor; correct?

25   A     I'm sorry.  I'm just catching up on the thread.  I'm

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 416 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 164 of 174 PageID# 28108

164

Matthew Martorello - Direct

1    recommending that they take assignment through the purchase of

2    our MicroBilt relationship and take a look at the changes to

3    the contract or something here.  She rejects them.  And then

4    they speak.

5    Q    And you tell her, essentially, if you don't hire

6    MicroBilt, the business can't work; right?

7    A    No, that's not --

8    Q    That's not what you said?

9    A    Well, it can work without it.  I don't think I said it,

10   though.  Let me see.  Did I say that?

11          THE COURT:  What?

12          THE WITNESS:  I'm checking to see if I said it.  I

13   don't have these memorized.  I'm just going to look real quick.

14   Q    Justin says it would cause significant performance issues

15   if you don't bring MicroBilt in and agree to their terms.

16   A    I'm sorry, where is that, please?

17   Q    The very first email at the top of the exhibit.

18          THE COURT:  As best I can tell, that doesn't have

19   anything to do with Matt Martorello.  He didn't write it.  He

20   got a copy of it.

21          MR. BENNETT:  Yes, sir.  Withdraw the question and

22   move to Exhibit 85, please.

23   Q    Now, who did you hire to help put together the Eventide

24   merger papers?

25   A    Initially Greenberg Traurig and then Conner & Winters.

Matthew Martorello - Direct

165

1   Q    And the merger agreement, you had a go-by.  Do you know

2   what a go-by is?

3   A    No.

4   Q    You had a document that was used -- unrelated tribe that

5   you had gotten hold of which you weren't involved; right?

6   A    Are you referring to the term sheet, the original term

7   sheet or merger agreement?

8   Q    Yes.

9   A    You mean the go-by meaning that it was a transaction

10  document from a different tribal acquisition deal that Rosette

11  did with another tribe?

12  Q    Yes.

13  A    That's what I understood it to be, yes.

14  Q    And I think that is Exhibit 136.  This was a document, a

15  merger agreement that was from Clear Lake Tacs, T-a-c-s, and

16  Nagus, N-a-g-u-s, Enterprises and Latinum Funding,

17  L-a-t-i-n-u-m, Funding, and this document was the basis for the

18  same document that is Exhibit 91, the agreement and plan of

19  merger for LVD and Bellicose and Eventide; correct?

20  A    I've never seen this document before.

21       THE COURT:  How does LVD merge with Eventide?

22  They're not merged.

23       MR. BENNETT:  LVD Tribal Acquisition Company, LLC,

24  was created, and that is the company --

25       THE COURT:  Doesn't merge with it.  It's a lender to

**JA1037**

USCA4 Appeal: 21-2116 Doc: 26-2 Filed: 02/07/2022 Pg: 418 of 681
Case 3:17-cv-00461-REP Document 882 Filed 07/25/20 Page 166 of 174 PageID# 28110

166

Matthew Martorello - Direct

1    it.

2              MR. BENNETT:  Well --

3              THE COURT:  Eventide was a lender to the -- a tribal

4    entity.  I don't know whether it was a tribe.  I think it was a

5    tribe entity.  We just had a whole big fight over that.

6              MR. BENNETT:  Yes, sir, but they created a new entity

7    called LVD Tribal Acquisition Company that formally acquired

8    and then --

9              THE COURT:  Formally acquired what?

10             MR. BENNETT:  Bellicose Capital.

11             THE COURT:  Yeah, but it didn't acquire Eventide.

12             MR. BENNETT:  Judge, I'm reading the name of the

13   document as Agreement and Plan of Merger.

14             THE COURT:  That may be, but that isn't what

15   happened.  It's 5:00 p.m.

16             MR. BENNETT:  Yes, sir.

17   Q    So I note that there's a document destruction paragraph in

18   your document that requires certain documents as part of the

19   sale to be destroyed.  Are you aware of that?

20   A    I know there is --

21             THE COURT:  Which document are you talking about?

22   You said your document.

23             MR. BENNETT:  Yes, sir.  I'm referring to Exhibit 91

24   which is the agreement and plan of merger among LVD Tribal

25   Acquisition Company and Bellicose Capital and Eventide Credit

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 419 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 167 of 174 PageID# 28111

Matthew Martorello - Direct

167

1  Acquisitions.

2          THE COURT:  So what are you asking?  Where is it,

3  what page?  I don't know who wrote these documents, but they

4  sure do not accurately describe what's going on.

5          MR. BENNETT:  Your Honor, page five of --

6          THE COURT:  I don't know how much you paid for these,

7  but they're certainly confusing.

8          MR. BENNETT:  It's page five of the document, Your

9  Honor.  It's actually paragraph 2.6(d).  Clarification on

10  company assets is the heading they put in there.

11          THE COURT:  Page what?

12          MR. BENNETT:  Page five.

13          THE COURT:  So what about it?  He's read it now.

14  Have you read it now, Mr. Martorello?

15          THE WITNESS:  Just about, yes, sir.

16  Q    So this is not in the model document that's Exhibit 136.

17  I'm wondering where did this come from?  Who drafted the

18  language that said, "All company information now or that may be

19  discovered on equipment of any kind or in any written materials

20  shall be immediately provided to acquirer," which is the LVD

21  acquiring entity, "and deleted or destroyed by the holder so

22  the holder retains no copies of company information"?

23  A    You are asking who created that provision?

24  Q    Yes.

25  A    I believe it was Conner & Winters.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 420 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 168 of 174 PageID# 28112

Matthew Martorello - Direct                                        168

1   Q    That's your lawyers that did that; right?

2   A    Correct.

3   Q    And take a look at Exhibit 85, please.  And, in fact, you

4   recall it was Conner & Winters because in this, for example,

5   this email chain where Mr. Williams, John Williams, who was a

6   lawyer, emailed you document 85.

7   A    Okay, I'm on the document.

8   Q    This is an email from the lawyer John Williams to you

9   dated July 9, 2015, the subject regarding M-1, Agreement and

10  Plan of Merger.  And Mr. Williams suggested to you --

11  correct? -- that you should include a document retention policy

12  with a destruction schedule which, according to him, provides a

13  lot of cover should documents be destroyed that a government

14  agency wants some day.  Do you see that?

15  A    Sorry, let me just look at the thread, please, real quick.

16  Okay, I'm seeing discussions about transferring --

17            THE COURT:  What page is it on?

18            MR. BENNETT:  Page one.  That that I just read from

19  is in the top email.

20  A    The last email in the thread?

21  Q    Well...

22  A    So I see the provision in here on July 8th, 5:13 p.m.

23  Q    Yes.

24  A    Where he's asking if this addresses the concerns.

25            THE COURT:  What is your question again?

USCA4 Appeal: 21-2116   Doc: 26-2      Filed: 02/07/2022   Pg: 421 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 169 of 174 PageID# 28113

169

Matthew Martorello - Direct

1    Q    Well, this is the inclusion of a document destruction term
2    within the merger so that, in this case, it would provide
3    cover, quote, a lot of cover should documents be destroyed that
4    a government agency wants some day.
5    A    That's incorrect.  The correct reason is on the pages just
6    before.
7              THE COURT:  I couldn't understand you.
8              THE WITNESS:  The correct reason for the provision is
9    in the pages just prior.
10   Q    Okay, where?
11   A    So this is Bates number ending 196 where I say -- well,
12   might even be earlier.  So I say here, "It's just that on the
13   server and employee computers there must be lingering
14   information that doesn't belong and should be destroyed.  For
15   example, there may be code, data, or underwriting models on a
16   Bellicose Capital server that is a former customer's, not
17   LVD's.  Or more likely on some employee's computer somewhere or
18   in an old email.  They aren't buying that.  It needs to be
19   destroyed if it's left there.  Bellicose Capital was also at
20   one time the shared services entity" --
21             THE COURT:  Slow down.
22             THE WITNESS:  "Bellicose Capital was also at one time
23   a shared services entity for a bunch of affiliate businesses
24   and so it has all of those legal contracts and data, you name
25   it, floating around out there."  He proposed that section.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 422 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 170 of 174 PageID# 28114

Matthew Martorello - Direct

170

1    Q    In the paragraph above he also responds, and I'm now

2    reading from the first page at the bottom --

3              THE COURT:  Who is "he"?

4              MR. BENNETT:  "He" is the lawyer John Williams,

5    Judge.

6    Q    Mr. Williams says, "Justin and Matt" -- attorney-client

7    communication.  "Justin and Matt, I have changed the wording to

8    exclude everything that was not related to a tribal entity for

9    the merger; however, as I thought through this, is there any

10   stale data that you might want to leave within the tribal

11   entity?  It will have sovereign immunity from subpoena where

12   your entities will not.  Just a thought as we finish this off.

13   John."

14   A    I see.

15   Q    In fact, you did transfer a lot of data into the tribal

16   entity such as your previous emails at Bellicose; correct?

17   A    Yes.  I say right here there certainly is data they will

18   be buying that is in the history.

19             THE COURT:  Mr. Bennett, we're past the four hours

20   originally allotted.  I told you I'd give you the day, but I

21   didn't mean that the day would end at midnight.

22             MR. BENNETT:  Yes, sir, if we can take a ten-minute

23   break and if I could have another 45 minutes.

24             THE COURT:  You've got to be kidding me.

25             MR. BENNETT:  Another half hour.

```
 1            THE COURT:  Why do you get anything more?

 2            MR. BENNETT:  Judge, because of the challenge that

 3    we've now had, and as I understand tomorrow, the defendant will

 4    get the day tomorrow.

 5            THE COURT:  If I were Mr. Scheff, what I would do is

 6    say the defense rests and say nothing and leave.

 7            MR. BENNETT:  Okay.

 8            THE COURT:  He wants 45 more minutes which is not

 9    going to come tonight, I will tell you that.  It will come

10    tomorrow.  How much time do you have?

11            MR. SCHEFF:  For the entire case, Your Honor --

12            THE COURT:  For whatever you've got.  We've gone the

13    four-hour period, and I'm not going to make you suffer

14    because -- but part of the reason I went beyond the four-hour

15    period, in fact most of the reason was that Mr. Martorello

16    doesn't really do a very good job of answering the questions

17    directly.  He reframes them, thereby necessitating further

18    inquiry and makes it difficult to understand him and rambles on

19    with some answers, and some of them are appropriate and some of

20    them aren't, and it just went on so I gave him extra time.

21            MR. SCHEFF:  Yes, sir.

22            THE COURT:  I'm not going to give you extra time

23    beyond the four hours either, but I want to know what you think

24    you have in mind because you're going to call Mr. Martorello,

25    but I imagine most of what you were going to have him say he's
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 424 of 681
Case 3:17-cv-00461-REP  Document 882  Filed 07/25/20  Page 172 of 174 PageID# 28116

172

1  already said unless I've been in the wrong room.

2          MR. SCHEFF:  You have not been in the wrong room,

3  Your Honor.  I appreciate the flexibility and direction of the

4  Court.  We're trying to keep it to four hours.  If we go over a

5  little bit it will be a little bit, but we're trying to keep it

6  to four hours.

7          I think Your Honor is correct.  We are going to work

8  tonight to try to streamline more than we've already done, but

9  if we run over a little bit, then we would appreciate Your

10  Honor's easing.

11          THE COURT:  It's only fair for you.

12          MR. SCHEFF:  Your Honor, it seems to me -- I don't

13  object to Mr. Bennett taking a few minutes to wrap up, and if

14  he wants to do it in the morning I'm okay with that, but I

15  don't see the need for another 30 or 45 minutes.  I really

16  don't.

17          I think Your Honor is correct about what we're going

18  to do.  We'll probably have a couple questions for Mr.

19  Martorello just to tie some things together, and then we're

20  going to play depositions is really what we're going to do.

21          THE COURT:  I understand.  All right.  Have you

22  consulted with the brains of the outfit back there, Mr.

23  Bennett?

24          MR. BENNETT:  Yes, but I didn't get a response yet.

25  We do -- I'd have to work through the numbers, but apparently

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 425 of 681
Case 3:17-cv-00461-REP   Document 882   Filed 07/25/20   Page 173 of 174 PageID# 28117

173

1    the time I've been talking is three hours and 40 minutes.

2                THE COURT:  Is that right?

3                MR. DILLON:  Roughly speaking, Your Honor, yes.

4                THE COURT:  Did you check him?

5                MR. ERBACH:  We have, I think, about a ten-minute

6    discrepancy from them.  As of now, I'm understanding they have

7    about five minutes left, but that's trying to reconcile several

8    discrepancies --

9                THE COURT:  Okay, but that's about -- as the old boy

10   said, that's about good enough for government work, isn't it?

11               MR. ERBACH:  I think that's fair, Your Honor.

12               THE COURT:  I'm astounded you only got three hours

13   and 40 minutes, but I guess I was -- I was pouring through

14   things at the break, during the breaks and lunch, so here's

15   what we'll do:  We'll come back at 10:00 tomorrow morning, and

16   you'll have 30 minutes.  Does that take care of it?

17               MR. BENNETT:  If I could have 35, Your Honor.

18   30 minutes, of course, Judge.  Yes, sir.

19               THE COURT:  If your wife ever wants a witness, have

20   her call me.  All right, and then you go, Mr. Scheff.

21               MR. SCHEFF:  Thank you, Your Honor.

22               THE COURT:  I'm kind of worn out.  I'm not paying

23   attention -- I mean I'm not going to be able to pay attention

24   for another 45 minutes and give you all the full attention you

25   need.  That's a toleration you have to put up with, as Judge

1    Williams said, when you're with old people.

2         MR. BENNETT:  I was going to read the Eventide merger

3    agreement into the record.

4         THE COURT:  I think you ought to do that.  You can do

5    that, and the court reporter will turn the recorder on and

6    you'll have it.

7         MR. SCHEFF:  Just one thing, Your Honor.

8         THE COURT:  Yes, sir.

9         MR. SCHEFF:  If we could start at 9:30 instead of

10   10:00 just for flight issues and things of that nature.

11        THE COURT:  Yes, we'll start at 9:30.

12        MR. SCHEFF:  Thank you, sir.

13        THE COURT:  Thank you very much.  We'll be in

14   adjournment.

15

16

17                  (End of proceedings.)

18

19

20        I certify that the foregoing is a correct transcript

21   from the record of proceedings in the above-entitled matter.

22

23

24   _____/s/_____          _____
     P. E. Peterson, RPR          Date

25

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 427 of 681
Case 3:17-cv-00461-REP    Document 883    Filed 07/25/20    Page 1 of 97 PageID# 28119

175

```
1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                      RICHMOND DIVISION

4

5    --------------------------------------
                                          :
6    LULA WILLIAMS, et al., on behalf     :
     of themselves and all individuals    :   Civil Action No.
7    similarly situated                   :   3:17CV461
     vs.                                  :
8    BIG PICTURE LOANS, LLC, et al.       :
                                          :
9    and                                  :   July 22, 2020
                                          :
10   RENEE GALLOWAY, et al., as           :
     individuals and as representatives   :
11   of the classes                       :   Civil Action No.
     vs.                                  :   3:18CV406
12   BIG PICTURE LOANS, LLC, et al.       :
                                          :
13   --------------------------------------

14

15        COMPLETE TRANSCRIPT OF THE EVIDENTIARY HEARING

16           BEFORE THE HONORABLE ROBERT E. PAYNE

16               UNITED STATES DISTRICT JUDGE

17

18   APPEARANCES:

19   Leonard A. Bennett, Esquire
     Kevin Dillon, Esquire
20   Consumer Litigation Associates, PC          VOLUME 2 OF 2
     763 J Clyde Morris Boulevard
21   Suite 1A
     Newport News, Virginia  23601
22

23

24                    Peppy Peterson, RPR
                     Official Court Reporter
25               United States District Court
```

**JA1047**

USCA4 Appeal: 21-2116    Doc: 26-3    Filed: 02/07/2022    Pg: 428 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 2 of 97 PageID# 28120

176

```
 1   APPEARANCES:  (cont'g)

 2   Amy L. Austin, Esquire
     Consumer Litigation Associates, PC
 3   626 East Broad Street
     Suite 300
 4   Richmond, Virginia  23219

 5   Kristi C. Kelly, Esquire
     Kelly Guzzo, PLC
 6   3925 Chain Bridge Road
     Suite 202
 7   Fairfax, Virginia  22030
     Counsel for the plaintiffs
 8

 9

10

11   Richard L. Scheff, Esquire
     Michael C. Witsch, Esquire
12   Armstrong Teasdale, LLP
     2005 Market Street
13   29th Floor
     One Commerce Square
14   Philadelphia, Pennsylvania  19103

15   Douglas Marsh, Esquire
     Armstrong Teasdale, LLP
16   4643 S. Ulster Street
     Suite 800
17   Denver, Colorado  80327

18   John M. Erbach, Esquire
     Spotts Fain, PC
19   411 East Franklin Street
     Suite 600
20   Richmond, Virginia  23219
     Counsel for Matt Martorello
21

22

23

24

25
```

**JA1048**

```
 1                     P R O C E E D I N G S

 2

 3            THE CLERK:  Case number 3:17CV461, Lula Williams, et

 4   al., versus Big Picture Loans, LLC, et al., and case number

 5   3:18CV406, Renee Galloway, et al., versus Big Picture Loans,

 6   LLC, et al.  The plaintiffs are represented by Leonard Bennett,

 7   Kristi Kelly, Amy Austin, and Kevin Dillon.  The defendant Matt

 8   Martorello is represented by Richard Scheff, John Erbach,

 9   Michael Witsch, and Doug Marsh.  Are counsel ready to proceed?

10            MR. BENNETT:  Plaintiffs are, Your Honor.

11            MR. SCHEFF:  Yes, Your Honor.

12            MR. BENNETT:  Your Honor, may I remove my mask?

13            THE COURT:  Please do.  Do you have the same people

14   on the telephone that were on yesterday?

15            THE CLERK:  Yes, sir.  The sheet is to your right.

16            THE COURT:  All right.  But Casey Nash is not on the

17   phone; is that right?

18            THE CLERK:  Correct.

19            THE COURT:  So Hollis, Brewer, Scofield, Marchiando,

20   Guzzo.  All right, Ms. Austin is here.

21            MS. AUSTIN:  Good morning, Your Honor.  I apologize.

22            MR. DILLON:  Good morning, Your Honor.  I apologize,

23   too.

24            THE COURT:  Everything ready to go?

25            MR. BENNETT:  Yes, Your Honor --
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2023    Pg: 430 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 4 of 97 PageID# 28122

178

1   THE COURT:  When I left yesterday, I was told that I

2 shorted you the promised four hours by not giving you

3 40 minutes, and then I realized you said 3:40, so there was

4 20 minutes left on your time, and I've given you 30 minutes,

5 and you have -- notwithstanding your effort to negotiate it to

6 a higher figure.  Are you ready to proceed on that schedule?

7   MR. BENNETT:  Yes, except there is a housekeeping,

8 agreed housekeeping matter to discuss.

9   THE COURT:  All right, housekeeping will be

10 discussed.

11   MR. BENNETT:  So yesterday afternoon or after we

12 left, rather, we received the defendant's intended deposition

13 presentations for today.

14   THE COURT:  You're going to video them.

15   MR. BENNETT:  Videos.  And we had an opportunity

16 overnight to go through them and this morning to go through

17 them.  A number of the provisions we had objected to.  The

18 proposal that I made to my opposing counsel, to Mr. Scheff,

19 this morning and as I understand to which he has agreed is that

20 we will not prosecute those objections.

21   The Court can determine the relevance or usefulness

22 of the evidence because we don't want to interrupt the flow of

23 the video presentations and insert an hour-long argument about

24 objections.

25   In lieu of our prosecution of those evidentiary

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 431 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 5 of 97 PageID# 28123

179

```
 1    objections, Mr. Scheff and his client have agreed that we can

 2    put on roughly 20 minutes of counter designations to the part

 3    of the depositions that Mr. Scheff is presenting without that

 4    counting against our time.  Of course, the Court has the say.

 5              THE COURT:  That's agreeable to you, Mr. Scheff?

 6              MR. SCHEFF:  It is, Your Honor.

 7              THE COURT:  When counsel agree to reasonable things,

 8    I think it's obligatory on the Court to abide by the reasonable

 9    judgments of informed counsel, and we'll proceed in that

10    fashion.

11              MR. SCHEFF:  Thank you, Your Honor.

12              THE COURT:  And I thank you all for working things

13    out.  That's the way things ought to go in the practice of law.

14    In the face of zealous advocacy, reason in approaching problems

15    is, nonetheless, critically important to the operation of the

16    system.  And I benefit from it, and so do your clients, so I'm

17    grateful.

18              Mr. Martorello, I'll remind you you are under the

19    same oath that you took yesterday, sir.

20

21                    MATTHEW MARTORELLO,

22    a witness, called at the instance of the plaintiff, having

23    been previously duly sworn, testified as follows:

24

25              THE COURT:  All right, Mr. Bennett, you may proceed.
```

**JA1051**

1          MR. BENNETT:  And, Your Honor, I'm going to be brief

2     here so we can reserve a couple minutes to cross-examine, as

3     necessary, Mr. Martorello when he's presented by the defendant.

4

5                        DIRECT EXAMINATION

6     BY MR. BENNETT:   (resuming)

7     Q    Mr. Martorello, we talked yesterday about a number of

8     statements of fact that you made in your original declaration.

9     You represented in your declaration that you had no involvement

10    with the creation of Red Rock.  Is that still your testimony

11    today?

12    A    Yes.

13    Q    And you represented that you had no involvement in the

14    creation of Big Picture.  Is that also still your testimony

15    that you would offer to the Court today?

16    A    It is.

17    Q    You represented that notwithstanding what the service

18    agreement says and the testimony regarding debt collection,

19    that your companies had no involvement in the collection of

20    money from consumers.  That's still your testimony?

21    A    I can't remember exactly what the provision said, but I

22    believe it was still accurate.

23    Q    Okay.  And you testified --

24          THE COURT:  Wait a minute.  You believe what you said

25    yesterday was still accurate?  You left with the impression --

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 433 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 7 of 97 PageID# 28125

181
Matthew Martorello - Direct

1    the "it" was an indefinite pronoun, and its antecedent noun was

2    the provision in the agreement, so your statement that you just

3    made is, I believe the statement in the agreement, in the

4    contract is still an accurate statement, but yesterday you said

5    it wasn't accurate.  So I want to make sure I know what your

6    answer is.  Is your testimony about that section of the

7    agreement still as it was yesterday?

8              THE WITNESS:  I believe both, I testified it

9    accurately yesterday.

10             THE COURT:  What?

11             THE WITNESS:  I believe I testified accurately

12   yesterday.

13             THE COURT:  Okay.

14   Q    And that testimony that you offered yesterday is that your

15   company was involved in debt collection or coordinating with

16   the debt collector; correct?

17   A    We were -- my testimony was that we identified debt

18   collection agency for the tribe to sell its bad debt, past due

19   loans to them for collection.

20   Q    And you were involved --

21             THE COURT:  Excuse me a minute.  When you all use --

22   the word collection has at least two different meanings that

23   are relevant here.  One is the actual collecting of money from

24   someone who owes a debt and receiving it in the tills of the

25   entity, and that's collecting.  I'm collecting the payments

**JA1053**

Matthew Martorello - Direct

1    that are due me every month.

2           There is collection in another sense and collection

3    in the context of this business, and it's been -- the other

4    sense is that I am a debtor, I am owed -- I am in default;

5    therefore, collection efforts are made to forcibly collect the

6    money from me either -- or by legal means.  And I'm not sure

7    what you all are talking about in each -- you seem to be at one

8    point in time talking about the receipt of the loan payments

9    and another point in time implementing formal collection

10   efforts for those who are in default, and I'm not sure -- you

11   are somehow going to have to differentiate between the meanings

12   of collections that we're talking about.  Do you understand me?

13          MR. BENNETT:  I do.  I've tried -- really there are

14   three aspects of this.

15          THE COURT:  That's fine, but you cover them

16   separately then so I understand you're not commingling.  What's

17   the third one?

18          MR. BENNETT:  One is the receipt of money, the

19   other --

20          THE COURT:  In the ordinary course.

21          MR. BENNETT:  Ordinary course into the operating

22   account, and that's about what the service agreement says.

23   Service agreement says --

24          THE COURT:  Stop.  Do you agree that that is the kind

25   of collection that is referred to in the paragraph of the

Matthew Martorello - Direct

1   service agreement that we're talking about, Mr. Martorello, the

2   receipt of money from those who owe it to the lending

3   institution?

4              THE WITNESS:  Yes, I believe that is correct.

5              THE COURT:  All right.  All right, now, Mr. Bennett,

6   there's another one.

7              MR. BENNETT:  And in that regard, just to make sure

8   that we have --

9              THE COURT:  Do you need the system on?  Is it on?

10  There's nothing on the televisions.

11             MR. BENNETT:  So this, we're talking about Exhibit 11

12  which is the original service agreement, and we're talking

13  about paragraph 4.9.

14  Q    This was in your service agreement.  In fact, this

15  paragraph was in every iteration of the service agreements that

16  you had with Red Rock; correct?

17  A    That's correct.

18  Q    All right.  Servicer --

19             THE COURT:  Red Rock and Big Picture?

20             MR. BENNETT:  Well, this was not in the service

21  agreement --

22             THE COURT:  This is just Big Picture --

23             MR. BENNETT:  This is just Red Rock.

24  Q    "Servicer will collect all gross revenue and all

25  proceeds"; correct?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 436 of 681
Case 3:17-cv-00461-REP  Document 883  Filed 07/25/20  Page 10 of 97 PageID# 28128

184

Matthew Martorello - Direct

1   A    That's what it says.

2   Q    When you say your company -- in your declaration, you say

3   your company didn't collect.  What you mean is in a legal

4   standpoint -- from a technical contract perspective in -- the

5   actual collection was done in the name of the tribe; right?

6   The receipt of the revenue was done into the operating account,

7   and that operating account was in the name of the tribe.

8   A    Are you asking me what my testimony was?

9           THE COURT:  No, he's asking you what you mean by the

10  word -- he's asking you what you mean when you say in paragraph

11  26 "I have never taken any action to collect in whole or in

12  part any consumer loan originated by Red Rock," and then you

13  said yesterday that included you, Bellicose, and Sourcepoint.

14  So he's asking you what you mean by the word collect in that

15  sentence.

16          THE WITNESS:  Thank you.  It was your interpretation,

17  Your Honor, the collection of unlawful debt, the ordinary

18  course of taking or receiving money into the bank account.

19  That's what I was talking about.

20          THE COURT:  Of lawful then?  The collection of lawful

21  debt.  Is that what you said?

22          THE WITNESS:  The allegation was collection of an

23  unlawful debt, and so to your point, the first interpretation

24  of collection, which does mean many things, the ordinary course

25  of receiving payments.  That's what I'm talking about.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 437 of 681

Matthew Martorello - Direct

```
 1              THE COURT:  I understand.
 2   Q    And this was into a bank account that the tribe did not
 3   have a signator authorized to take money out of?
 4   A    I testified that I was the signer --
 5   Q    Is that yes or no?
 6              THE COURT:  Wait just a minute.  Let me start again.
 7   You started that sentence with what word?
 8              MR. BENNETT:  Yes, sir.  I'll rephrase the question.
 9              THE COURT:  I don't know if he can understand it, but
10   I can tell you I didn't understand it.  For today's purposes,
11   it's important that both of us understand it.  So rephrase your
12   question and put some specificity to it so I can follow along.
13   Q    So your interpretation in your declaration of the process
14   of collection is the payment of money by consumers in the
15   ordinary course into the operating account of Red Rock.
16   A    No.  That's inaccurate.  It's the other side of the
17   equation.  It's not the payment but the actual taking or
18   receiving of the payment on the lender's side like the Judge
19   just described.
20   Q    Understood.  And the taking and receiving is the payment
21   by consumers into the operating account in the name of Red
22   Rock?
23              THE COURT:  What you mean is what are you taking and
24   receiving.  Answer, you are taking and receiving the payment
25   from the consumer; right so far?
```

Matthew Martorello - Direct

1         THE WITNESS:  Correct.

2         THE COURT:  The next part of the question is into

3   what account does that payment go.  What's the answer?

4         THE WITNESS:  Red Rock Tribal Lending.

5         THE COURT:  Red Rock what?

6         THE WITNESS:  The Red Rock bank account, the tribe's

7   bank account.

8         THE COURT:  Now we're at the point we're talking

9   about payments from the consumers that go into the Red Rock

10  Tribal Lending operating account; is that right?

11        THE WITNESS:  Yes, sir.

12        THE COURT:  What's your next question?

13  Q    So that was an operating account that so long as it was

14  open, you don't recall any time in which a tribal member was

15  the signator on the Red Rock operating account.

16  A    No, I don't recall any time that any tribal member was on

17  the account.

18  Q    And during the entire time that you recall, only you and

19  your employees were authorized on that account.

20  A    Yes, that is accurate.

21  Q    Now, I want to go to an area that we talked maybe too much

22  about.  This is your paragraph 69 of your declaration where you

23  represent that the decision to sell Bellicose was not motivated

24  by impending threats of litigation or enforcement actions.

25        Now, your explanation as to why that's not untrue is

Matthew Martorello - Direct

1    because you are breaking down the sale discussions into two

2    discrete time periods; one, you are asserting the 2012, '13,

3    and '14, that proposed sale of your assets, that didn't go

4    anywhere.  You would agree that that was motivated -- certainly

5    a significant motivation was your fear of impending litigation

6    and government action.

7    A    The one you are specifically talking about starting in

8    2012, 2013, that was not.

9              THE COURT:  That was not what?

10             THE WITNESS:  Motivated by regulatory threat or

11   impending litigation.  That's the one you are specific asking

12   about, no.

13   Q    What time period were you motivated to try to sell the

14   assets to the tribe because of impending government regulation

15   or action and/or threat of litigation?

16   A    The sort of, I guess, second arrangement that I had

17   hypothesized was to sell the 40 -- 51 percent equity in a

18   ten-year deal, and that was in September 2013.  I'm sorry,

19   October 2013, and that was at the height of Operation Choke

20   Point and the Otoe-Missouria district court ruling when I

21   proposed that.  So that I am saying was motivated by the

22   pressures around the industry at that time.

23   Q    And the Otoe ruling and the Second Circuit affirmance,

24   that occurred in October 2014; correct?

25   A    Second Circuit -- yes, that was October 2014.

Matthew Martorello - Direct

1    Q    And let's take a look at Exhibit 93.

2              THE COURT:  Are you saying there's a third -- you're

3    really saying there were three tries to sell this thing; is

4    that right?  One was in 2012/'13, it didn't go anywhere.  Then

5    the next one was the second arrangement, 51 percent,

6    October 2013, it didn't go anywhere, and then there's the one

7    that did go?

8              THE WITNESS:  That's very close.

9              THE COURT:  Is that right?  You keep talking about --

10   yesterday you said a couple of times there were three different

11   efforts to effectuate the sale.  Just for my purposes before he

12   gets to Exhibit 93, when was the third?  I understand when the

13   first two were.  When was the third?

14             THE WITNESS:  The third one was August 2014.

15             THE COURT:  And that was the one that worked.

16             THE WITNESS:  That's correct.  That's the one that

17   ultimately worked.

18             THE COURT:  I'm going to call that this sale for

19   purposes of a quick reference, and the other two were aborted

20   sales.  Aborted sale one was 2012/'13, aborted sale two was

21   October 2013.

22             THE WITNESS:  Correct.

23             THE COURT:  Am I correct in framing it that way?

24             THE WITNESS:  Yes.  The only distinction would be the

25   first aborted sale was to sell a copy of our IP, our secret

Matthew Martorello - Direct

1    sauce, to the tribes, and then we would get a seven-year

2    consulting agreement to help build their own tribal servicing

3    agency.  So it was very different.  We weren't selling our

4    assets.  We were trying to re-create who we were for the tribe

5    to own in an urban center where they could service themselves

6    with MBAs, Ph.D.s, and statisticians and such for their own

7    ownership.

8                THE COURT:  So 2012/'13, first aborted sale was not

9    an asset sale, it was an IP sale, and then you would have

10   replicated what you were selling, and it would be -- that's

11   what the tribe would get out of the sale.

12               THE WITNESS:  Yes.

13               THE COURT:  The second aborted was an asset sale in

14   the sense that it was a 51 percent ownership interest.

15               THE WITNESS:  Correct.

16               THE COURT:  And the third one was the sale of the

17   whole shooting match?

18               THE WITNESS:  Yes, sir.  Yes, Your Honor.

19               THE COURT:  Thank you very much.  Excuse me, Mr.

20   Bennett.  I interrupted you and Exhibit 93.

21               MR. BENNETT:  Let's go to his declaration instead,

22   Your Honor.

23               THE COURT:  All right.

24   Q    Mr. Martorello, this whole -- there were three distinct

25   sale periods is nowhere in your declaration at all; right?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 442 of 681
Case 3:17-cv-00461-REP  Document 883  Filed 07/25/20  Page 16 of 97 PageID# 28134

190

Matthew Martorello - Direct

1   A    No, I did not elaborate on it here.

2   Q    Elaborate on it?

3            THE COURT:  Now, now, now, don't get argumentative.

4            MR. BENNETT:  Yes, sir.

5            THE COURT:  Remember the old way to do it.

6   Q    Will you take a look at paragraph -- let's start actually

7   with paragraph 47, and the heading is the sale of Bellicose to

8   LVD.  Now, first, yesterday we went through some of the emails

9   where you discussed positions that you were taking with your

10  valuation companies at different stages.

11  A    Yes.

12  Q    And would you agree with me that you believe that in the

13  business, it's okay to change your truth based on who is

14  listening and who is reading?

15  A    No, I disagree.

16  Q    So there's one truth?

17  A    There's one truth.

18  Q    There's the truth that you tell the Court, there's the

19  truth that you tell the Court two years ago, there's the truth

20  that you tell your investors, the truth that you told the

21  tribe.  One truth, you agree with that.

22  A    The truth is the truth.

23  Q    And you agree you have taken different truth positions in

24  some documents we've been through depending whether you're

25  talking to Wells Fargo, whether you're talking to the tribe,

1    whether you're talking to your valuation people?

2    A    I disagree.

3    Q    Well, let's talk about your declaration.  Your explanation

4    is that this sale process starting in 2012 did not -- was not a

5    fluid ongoing process; right?  It was three discrete time

6    periods.  That's what your testimony moments ago was.

7    A    It was three discrete time periods, but it was fluid in

8    the sense that the tribe always wanted that discussion since

9    2012, and I tried to find things that might accommodate them.

10   Q    Sure.  So paragraph 49, take a look at it, please.

11   A    I'm sorry, did you say 47 or --

12   Q    49.  Start with 49.  49 says, "To that end," that is the

13   end of trying to help the tribe, your objective you claim,

14   "since at least 2012, LVD and I have engaged in multiple

15   conversations relating to the potential sale of my consulting

16   businesses to LVD."  Do you see that?

17   A    Yes, sir, I do.

18   Q    And this was to accelerate, according to your paragraph,

19   LVD's ability to maintain a profitable online consumer lending

20   business with no outsourced consulting services; do you see

21   that?

22   A    Yes.

23   Q    So the next paragraph, 50, please, you see you write, "As

24   a result of these discussions" -- that is the discussions that

25   began in 2012 to try to sell your business.  As a result of

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 444 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 18 of 97 PageID# 28136

192

Matthew Martorello - Direct

1   these discussions, you were aware that on or about February 15,

2   LVD transformed its tribal lending business infrastructure to

3   prepare to purchase Bellicose and ensure protections for LVD

4   including liability limitations.  Did you write those two

5   paragraphs, or did your lawyers?

6   A    I believe that -- I mean, I don't know perfect knowledge

7   here, but I believe that I would have written that.

8   Q    So when you were writing this in 2017 to support a motion

9   to dismiss for the tribe, you suggested in those paragraphs

10  that this was one ongoing process beginning in 2012 and

11  culminating in February 2015.  That's what you told the Court

12  in 2017; correct?

13  A    I said the result of these discussions.  That was pretty

14  general.  It wasn't referring to IP sale in 2012.  I don't

15  understand the question, I guess.

16  Q    Okay.  You have the declaration in front of you.

17  A    Yes.

18  Q    Where in that declaration in any regard do you suggest

19  this three time periods of trying to sell the business to the

20  tribe?

21  A    That detail is not in the declaration.

22  Q    And, in fact, you would agree with me that any person

23  reading this, without the benefit of your new position today,

24  would conclude that this was a seamless process starting in

25  2012, ending in February of 2015?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 445 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 19 of 97 PageID# 28137

193

Matthew Martorello - Direct

1    A    I'm sorry.  By seamless you mean there were no stops and

2    starts?

3    Q    That it was one process, negotiation that culminated in

4    what we see in 2015.

5    A    I guess someone could read it that way.  Yeah, it's

6    possible someone could read it that way.

7    Q    Now, take a look at Exhibit 93, please.

8    A    I said multiple conversations.  I don't know if that was

9    maybe not definitive, what it was in reference to.  I'm sorry,

10   93?

11   Q    Yes.  Now, this is an email from you to Zayra, Z-a-y-r-a,

12   dated October 2nd, 2015.  Who is Zayra?

13   A    I'm sorry, what's the exhibit, please?

14   Q    93.

15             THE COURT:  Exhibit 93?

16             MR. BENNETT:  Yes, sir.

17             THE COURT:  It's in the second book there, Mr.

18   Martorello.

19             THE WITNESS:  Thank you, Your Honor.

20             THE COURT:  Zayra Emanuelli, talking about the first

21   one?

22             MR. BENNETT:  Yes, sir, but I was trying to avoid

23   having to spell it which is E-m-a-n-u-e-l-l-i.

24   A    Zayra, she was a CPA at Liont, LLC, in Puerto Rico, and

25   she was assisting me with valuations for income tax purposes.

Matthew Martorello - Direct

1   Q    And Liont, LLC, is -- was the new name or new entity that

2   succeeded Bellicose; correct?

3   A    No.  It was not affiliated with Bellicose or similar to

4   Bellicose.

5   Q    But Liont was your company, still your company today?

6   A    Correct.  It's a management company effectively.

7   Q    And you run it, so she worked for you?

8   A    She did, yes.

9   Q    And she's an accountant that worked for you?

10  A    She's a CPA, yes.

11  Q    Here, you were explaining the state of affairs, and this

12  was as of October 2015, the state of affairs related to the Red

13  Rock business; correct?

14  A    Incorrect.  It was -- the email is October 2015.  The

15  state of affairs was in a fair market value buyer's view

16  June 2015.

17           THE COURT:  For what purposes?

18           THE WITNESS:  For tax purposes.

19           THE COURT:  Whose tax?

20           THE WITNESS:  For my taxes.

21           THE COURT:  I know, but who was imposing the tax?

22           THE WITNESS:  It would be --

23           THE COURT:  Federal income tax, sales, what kind of

24  tax?

25           THE WITNESS:  It was income tax -- capital gains tax

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 447 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 21 of 97 PageID# 28139

195

Matthew Martorello - Direct

1   to the U.S. and Puerto Rico.

2            THE COURT:  For your personal returns?

3            THE WITNESS:  Yes.  They would have -- yes.

4   Q    Now, as I understood, yesterday you were trying to explain

5   that whatever fear that motivated you as to government

6   regulators shutting down the business, that that had abated

7   before the negotiations, your fear had abated before the

8   negotiations that led to the 2015 transaction.

9   A    That's correct.

10  Q    Okay.  So in this Exhibit 93, this is October of 2015, and

11  you've just said it's describing your view of the world as of

12  June 2015; right?

13  A    No.  I said distinctly describing the fair market value or

14  public perception view of the world, not my view.  That's the

15  difference between the tax perspective or, you know, a

16  knowledged market participant in the industries.  Unique

17  knowledge.

18            THE COURT:  I don't understand what you said.

19            THE WITNESS:  So for the tax valuation studies, you

20  have to use the perspective of a random sort of Joe Public fair

21  market value buyer, not necessarily someone who is, you know,

22  knowledgeable about, you know, the goings-on of the changes in

23  the industry or, at a more intimate level, for example, with

24  successful lobbying efforts with federal agencies or Congress.

25  Like those sort things would be a unique -- it's not the same

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 448 of 681

```
1    as the fair market value buyer.  Is that helpful?
2              THE COURT:  I think I understand, but what you are
3    saying is that this fair market value you are talking about,
4    the buyer -- the person establishing that, whether it be an
5    appraiser or a buyer, is unaware of the things in the
6    particular industry that affect the market value; is that what
7    you are saying?
8              THE WITNESS:  Correct.  For better or worse, that's
9    correct.
10             THE COURT:  And that's created because of what?  Why
11   is that so?  Why is that a relevant framework; because of the
12   law of somebody, because of a tax ruling, or what?
13             THE WITNESS:  Yes.  The tax -- the way the valuations
14   have to be done for tax purposes have to be from the perceptive
15   of any general outsider.  So mainly it's going on in the press
16   or how do they see the regulatory impact or things going on,
17   not necessarily a unique individual -- I wouldn't be a fair
18   market value buyer because I have more specialized knowledge.
19   So for valuation purposes --
20             THE COURT:  Wait a minute.  As I understand the
21   regulations, the fair market value is determined by the
22   generally available knowledge in the industry -- about the
23   industry and the business.
24             THE WITNESS:  That's correct.
25             THE COURT:  So if, for example, there were lawsuits
```

Matthew Martorello - Direct

1   pending against a business, that would be considered in

2   assessing the fair market value.

3           THE WITNESS:  Precisely, yes.

4           THE COURT:  But the fair market value does not

5   include the insider's knowledge of that particular business;

6   right?  Is that what you are saying?

7           THE WITNESS:  Correct, either the business or the

8   pending threats of changes in legislation or Choke Point,

9   things like that.

10          THE COURT:  But if the business -- if the public were

11  aware of Choke Point, lawsuits, whatever, that affected the

12  value of the business, then that's considered in the general

13  assessment of the fair market value.

14          THE WITNESS:  Yes.

15          THE COURT:  Okay.  But not your personal perception

16  of it all.

17          THE WITNESS:  Precisely, yes, sir.  Yes, Your Honor.

18  Thank you.

19          THE COURT:  All right, I understand.  Go ahead, Mr.

20  Bennett.  I apologize for interrupting.

21  Q   So what you are saying is that the valuation that you

22  would tell the tax authorities assume facts which you believed

23  were false as they pertain to your company?

24  A   Yes.  They were not necessarily what I would have believed

25  as we discussed, yes.

1    Q    And so I've circled from Exhibit 93 some of the

2    assumptions that you said you could use.  I guess, what, if you

3    were audited, this is what you'd say?  It says, "We will

4    provide all the support in the world for this so we can support

5    fair market value.  If nobody could argue with us about fair

6    market value, then we did it right, and it doesn't matter what

7    the future value is later on."  That's what FV stands for, is

8    future value?

9    A    It could be fair value, or it could be future value.  I'm

10   not sure.  I'd have to look at the whole email.

11           THE COURT:  Where are you reading from?

12           MR. BENNETT:  I'm sorry, Judge.  I'm reading

13   Exhibit 93 --

14           THE COURT:  I know.  Where?

15           MR. BENNETT:  Bottom paragraph that has the numbered

16   subparagraphs.

17           THE COURT:  "Some thoughts to share."

18           MR. BENNETT:  Yes, sir.

19           THE COURT:  "Some thoughts to share on FMV versus

20   FV."  FMV is fair market value.  What is FV again?  I lost

21   that.

22           THE WITNESS:  I believe that would be fair value then

23   as a comparative.  For example, the tribe is a fair value

24   buyer, not a fair market value buyer.

25           THE COURT:  All right, go ahead.

USCA4 Appeal: 21-2116    Doc: 26-2      Filed: 02/07/2022    Pg: 451 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 25 of 97 PageID# 28143

Matthew Martorello - Direct

199

1    Q    So the explanation that you would tell the tax authorities

2    would include, number one, that the tribe is buying your

3    business because your contract gets terminated and the tribe

4    wants it to continue.  That's what you're saying; right?

5    A    From a fair market value perspective, these would be, yes,

6    the positions that I'm just sort of hypothesizing would be in

7    play.

8    Q    So the first point is that you were intending to terminate

9    your contract with the tribe?

10   A    No.  It was that the contract naturally terminates at some

11   date after however many -- I think it was a seven-year

12   contract, and they wanted self-sufficiency and continuity.  So

13   that purchasing would provide them that.

14          THE COURT:  Excuse me.  Paragraph one, the tribe is

15   buying it.  What does that mean, "it"?

16          THE WITNESS:  The Sourcepoint -- Bellicose and

17   Sourcepoint.

18          THE COURT:  So the tribe is buying Sourcepoint and

19   Bellicose because our contract -- what's our?

20          THE WITNESS:  That is the servicing agreement from

21   2012.

22          THE COURT:  And the parties to that were?

23          THE WITNESS:  That was through Sourcepoint VI and Red

24   Rock Tribal Lending.

25          THE COURT:  Because that contract gets terminated and

**JA1071**

Matthew Martorello - Direct

1    they want this to continue.  Who is "they"?

2            THE WITNESS:  The tribe would like the business to

3    continue.

4            THE COURT:  "This" is the business?

5            THE WITNESS:  They would like the services to

6    continue.

7            THE COURT:  All right.  So under that sentence, you

8    are saying, but if someone asks, you're going to tell them

9    this:  The tribe is buying Sourcepoint because the Sourcepoint

10   contract gets terminated, and the tribe wants the servicing to

11   continue.  Is that what we're saying there with the indefinite

12   pronouns as you've corrected them?

13   A    I believe you are correct, Your Honor.

14   Q    Now, the second reason supporting your lowered valuation

15   would be number two, that Operation Choke Point is a risk for

16   Sourcepoint owners but not for the tribe; correct?

17   A    Yes, I can see that.

18   Q    And that Operation Choke Point was one of the leading

19   government crackdowns that was interfering with the operation

20   of the tribal lending businesses; right?

21   A    I disagree with the -- I would define it differently, I

22   think.

23           THE COURT:  What is Operation Choke Point?

24           THE WITNESS:  So Operation Choke Point was a

25   coordination between government agencies.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 453 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 27 of 97 PageID# 28145

Matthew Martorello - Direct

201

1           THE COURT:  Which agencies?

2           THE WITNESS:  It was the FDIC, the DOJ, and some

3    state agencies like New York DFS.

4           THE COURT:  Did it involve the Consumer Protection

5    Bureau?

6           THE WITNESS:  Some would argue they were involved,

7    yes.

8           THE COURT:  So it's federal agencies and state

9    agencies.  When you said agencies, you mean federal and state

10   agencies.

11          THE WITNESS:  Correct.  It was a collaboration of

12   efforts, team effort sort of, and it was not a sanctioned

13   effort by any agency.  It was sort of factions had bonded

14   together to try and choke off bank accounts.

15          THE COURT:  Well, Operation Choke Point had a name,

16   did it?  Did you give it the name, or did the government give

17   it the name?

18          THE WITNESS:  The government gave it the name.

19          THE COURT:  All right.  You say the tribe doesn't

20   have any risk from federal regulation.  Yesterday you told me

21   the tribe did have risk from federal regulation.  What's the

22   difference?

23          THE WITNESS:  Well, they are subject to the federal

24   lending laws, but Operation Choke Point is not a federal

25   regulation.

Matthew Martorello - Direct

1      THE COURT:  I know, but the tribe could be prosecuted

2   by the federal government for violation of federal law no

3   matter where it occurs; right?

4      THE WITNESS:  That's correct, yes.

5      THE COURT:  If there's a conclusion that federal law

6   is violated by whatever is being done by the tribe, the tribe

7   is amenable to the judicial process in the federal system to

8   adjust that; right?

9      THE WITNESS:  That's correct.  They don't have

10  immunity from that.

11     THE COURT:  Okay.  Excuse me, Mr. Bennett.  Go ahead.

12     MR. BENNETT:  Yes, sir.

13     THE COURT:  All right, Mr. Bennett, what else?

14  Q   So, Mr. Martorello, your declaration says that, and I'm

15  looking at paragraph 67, that "neither I nor any company I own,

16  manage, directed, or controlled the creation of Big Picture."

17  And, in fact, yesterday, we saw that you created

18  bigpictureloans.com, designed all the materials, suggested this

19  adoption, and then participated in the transition from Castle

20  Payday to Big Picture Loans; right?

21  A   That's correct.

22  Q   Now, what type of control did you have -- let me try it

23  this way:  With Red Rock, if the co-managers -- by the way,

24  with respect to the co-managers --

25     THE COURT:  Of what?  Co-managers of what?

Matthew Martorello - Direct

1          MR. BENNETT:  Co-managers of Red Rock.

2    Q    During the time that Red Rock had these co-managers,

3    you're aware that they had full-time jobs unrelated to Red

4    Rock; correct?

5    A    That's incorrect in the total context.

6    Q    For Red Rock.  At what point did they not have a full-time

7    job unrelated to Red Rock?

8    A    Ms. Hazen, she did not have another full-time job when she

9    became the full-time CEO of Red Rock, and I think that was

10   probably sometime in 2014.

11   Q    Okay.  In late 2014.

12   A    I don't know the exact date.

13   Q    Okay.  But nobody else had a -- I mean everybody else had

14   a full-time job.

15   A    Yes, I believe that's correct.

16   Q    How many employees did Red Rock have, actual Red Rock

17   Lending have in 2011?

18   A    I don't know.  In 2011 -- they didn't start lending until

19   2012, so none.

20   Q    Okay.  Are you aware that your brother has testified in a

21   declaration that Red Rock, even 2012, didn't have any

22   employees?

23   A    Well, it had the Duck Creek employees.

24          THE COURT:  Excuse me, I think the question was are

25   you aware that your brother testified that way.

**JA1075**

Matthew Martorello - Direct

1          THE WITNESS:  I believe that's an inaccurate --

2          THE COURT:  Wait a minute.

3          THE WITNESS:  It's inaccurate.

4          THE COURT:  There's an old movie star named John

5    Wayne, and he said listen tight, and what he meant by that is

6    listen to the question and just answer the question.

7          So the only question on the floor is are you aware

8    your brother testified that way, not whether he was correct or

9    not.  That can be dealt with later.  Are you aware he testified

10   that way or not?

11         THE WITNESS:  No, I don't think he testified that

12   way --

13         THE COURT:  No then.

14   Q    Duck Creek was a separate corporate entity; correct?

15   A    That's correct.

16   Q    I'm asking you about Red Rock Lending.  That's the company

17   you had a servicing agreement with; right?

18   A    One of them, yes.

19   Q    So with Red Rock Lending, Red Rock had no employees in

20   2012; right?

21   A    I'm sorry, as a technical answer to that, I don't know how

22   to answer it, because -- so Duck Creek had all the employees.

23   It was a PEO, so it provided all the --

24         THE COURT:  What's PEO?

25         THE WITNESS:  Professional employment organization

Matthew Martorello - Direct

 1   similar to how ADP, for example, could be -- like I'm an

 2   employee technically of Insperity although I work for Balance

 3   Credit.  So everyone was employees of Duck Creek although they

 4   worked for Red Rock full time.  It's --

 5          THE COURT:  It's a big temp agency contract.

 6          THE WITNESS:  Similar to that, but it's, you know,

 7   internally owned.  So the tribe put their employees in Duck

 8   Creek to work for Red Rock.  So it's correct that there were no

 9   employees in Red Rock, but it's technically incorrect because

10   they were employees of Duck Creek acting as employees of Red

11   Rock.  That's what I'm trying to say.

12          THE COURT:  What, did they just throw them over

13   there, or was there an agreement, you go over and work for Red

14   Rock?

15          THE WITNESS:  All the employee benefits and

16   everything were in Red Rock, and there was an agreement -- I'm

17   sorry, Duck Creek, and there was an agreement between Duck

18   Creek to provide the services for Red Rock.

19          THE COURT:  So Duck Creek is just providing services,

20   not providing employees.

21          THE WITNESS:  It's providing --

22          THE COURT:  Providing people to do the services, not

23   providing temporary employment through like a temporary

24   employment agency.

25          THE WITNESS:  I think that's pretty close.  The

Matthew Martorello - Direct

1    reason generally you do this is to isolate employee liability.

2    So the employees will be in an entity, and then it will service

3    the actual business.  So that's how they structured it.

4            THE COURT:  Who tells you that that kind of system

5    works -- well, I'll get to that later.  I understand, I think,

6    what it is.  Go right ahead.

7    Q    So with Red Rock, could the tribe determine, without any

8    approval of Sourcepoint, to -- what interest rate to charge

9    consumers?

10   A    Yes, they could.

11   Q    And could Big Picture determine what interest rate to

12   charge consumers?

13   A    Yes.

14   Q    And --

15           THE COURT:  He said yes.

16           MR. BENNETT:  Yes.

17           THE COURT:  Let him answer the question.  Did you

18   answer yes?  I thought you did.

19           THE WITNESS:  Yes, they can.

20           THE COURT:  Is that through today?

21           THE WITNESS:  Yes.

22   Q    And Eventide does not have any legal right to determine

23   what interest rate Big Picture charges; right?

24   A    That's correct.

25   Q    Could Red Rock determine to settle any governmental action

USCA4 Appeal: 21-2116    Doc: 26-2      Filed: 02/07/2022    Pg: 459 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 33 of 97 PageID# 28151

Matthew Martorello - Direct                                    207

1   with a governmental authority without Sourcepoint's approval?

2   A    Yes.

3   Q    And could Red Rock settle any lawsuit without

4   Sourcepoint's approval?

5   A    I believe they could.

6   Q    With respect to Big Picture now, can Big Picture resolve

7   any complaints or settle any matter with the governmental

8   authority without Eventide's approval?

9   A    They could.

10  Q    Could Big Picture settle any civil action with consumers

11  who have sued without Eventide having the right to approve

12  that?

13  A    They can do anything they want.  They can do that.

14  Q    And, legally, they're allowed to do that under their

15  contract without being in violation of the contract.

16  A    That's a little different.  They can take actions that are

17  in default of their agreements.

18  Q    And so when I say that they can do something, when I say

19  Red Rock can charge whatever interest rate, of course they can

20  do anything.  They could murder someone.  I'm asking could they

21  legally, without violating the contract, settle a lawsuit, Red

22  Rock, without Sourcepoint's approval and your approval?

23  A    You are asking about Big Picture?

24  Q    I'm asking about Red Rock first.

25  A    I don't really know the servicing agreement well enough to

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 460 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 34 of 97 PageID# 28152

208

Matthew Martorello - Direct

1    say that would violate a provision.  I don't recall any

2    provision that that would violate off the top of my head.

3    Q    What about setting an interest rate?  Could Red Rock set

4    any interest rate it wanted to set without violating any

5    provision?

6    A    I believe they could.

7    Q    Then Red Rock became Big Picture Loans; right?

8    A    In some respect, yes.

9    Q    And Red Rock can charge consumers any interest rate

10   that -- I'm sorry, Big Picture Loans is allowed to charge any

11   interest rate that it believes appropriate without violating

12   any prohibition that you and your companies could assert;

13   right?

14   A    I'm sorry.  Can you rephrase that, please.

15   Q    Do you believe that Red Rock -- I'm sorry, do you believe

16   that Big Picture has the authority and discretion to control

17   its own business?

18   A    Yes.

19   Q    And Eventide cannot interfere in that business because, as

20   you've said in your declaration, it's merely a creditor; right?

21   A    I'm sorry, you said it cannot interfere in the business.

22   Is that what you said?

23   Q    Why don't we look at your declaration.  We can talk about

24   86.  "As far as I'm aware, Big Picture's co-managers make all

25   decisions on behalf of that company"; right?

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 461 of 681
Case 3:17-cv-00461-REP  Document 883  Filed 07/25/20  Page 35 of 97 PageID# 28153

209

Matthew Martorello - Direct

1    A    Yes.

2    Q    One of those decisions the co-managers could make is what

3    interest rates to charge consumers; correct?

4              THE COURT:  He's already said this about three times.

5              MR. BENNETT:  But, Judge, then he said, he said, yes,

6    they could charge whatever interest rate, but then he says I'm

7    not conceding that they're allowed to charge any interest rate.

8              THE COURT:  Mr. Bennett, the problem lies in that you

9    didn't frame the question with particularity as to what

10   particular entity.  Your first line of questioning was whether

11   they could decide what interest rate to charge without Mr.

12   Martorello's permission or Sourcepoint's permission or

13   violating any contract they had.  You did the same thing with

14   respect to settling with or without the permission of those

15   folks or violating those contracts.  Then you shifted to

16   Eventide.  If you want to ask him about Eventide, ask about

17   Eventide, because you can't merge the two.  They are different

18   agreements.

19             MR. BENNETT:  Yes, sir.

20   Q    So is Big Picture -- I know we have the issue of the class

21   settlement, but prior to the class settlement, if Big Picture

22   had decided it only wanted to charge a 50 percent interest

23   rate, did Big Picture have the authority, did its co-managers

24   have the authority to do that?

25   A    They can do that, yes.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 462 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 36 of 97 PageID# 28154

Matthew Martorello - Direct

210

1   Q    And had the authority to do it under their contracts with

2   Eventide as well.

3   A    You use the word authority.  They had the authority to do

4   it, but I believe that would have been a default of their loan

5   agreements.

6   Q    And if Big Picture's co-managers decide to resolve a

7   governmental action or a consumer class action, you believe

8   they can't do that without Eventide's approval without

9   violating Eventide's contract.

10  A    I don't know as to the former, but as to the latter, I'm

11  aware of the additional indebtedness provision, that it would

12  violate the additional indebtedness.

13          THE COURT:  Eventide can always -- Sourcepoint can

14  always waive any default provision in any contract; right?

15          THE WITNESS:  Absolutely.

16          THE COURT:  The bottom line is that they couldn't do

17  these things that he's asking about, charge interest rates,

18  settle cases without the permission of Sourcepoint or

19  Eventide -- is that right? -- in the form of a waiver of

20  default.

21          THE WITNESS:  Close.  I'm saying that they can do

22  them.  It may result in a default, and that can be worked out

23  through a waiver.  They can freely do -- they can default if

24  they can --

25          THE COURT:  One thing is the doing of it.  Of course

1  they can do it.

2             THE WITNESS:  Yes.

3             THE COURT:  They can do anything they want to do.

4             THE WITNESS:  Exactly, yes.

5             THE COURT:  The question is whether it has legal

6  consequences, and to avoid legal consequences, they have to

7  secure the approval of Eventide and Sourcepoint; is that right?

8             THE WITNESS:  That's absolutely correct.

9             THE COURT:  By way of the waiver.

10            THE WITNESS:  That's absolutely correct for Eventide.

11 I don't remember Sourcepoint's contract to articulate that.

12            MR. SCHEFF:  Your Honor, I believe Mr. Bennett is at

13 his time.

14            THE COURT:  How much time, because I talked a lot.

15            MR. DILLON:  Your Honor, I have Mr. Bennett having

16 roughly four minutes and 30 seconds left.

17            MR. SCHEFF:  Our folks call it differently, but four

18 minutes and 30 seconds is fine.

19            MR. BENNETT:  Judge, I would also --

20            THE COURT:  You're on your clock because you started

21 talking.  Four minutes and 30 seconds.  Go.

22 Q   Mr. Martorello, turn to Exhibit 100, please.  Now, after

23 the sale by -- after the merger that created Big Picture,

24 Ascension and Eventide's transaction, your former employees at

25 Sourcepoint became the management individuals or became the

Matthew Martorello - Direct

1    president and the controlling authority within Ascension;

2    correct?

3    A    I disagree.

4    Q    At 100, the lender had authority.  Eventide had authority

5    over the firing and hiring of the president; correct?

6    A    That's -- I don't agree with that interpretation.

7    Q    All right.  So you take a look at 100.  Do you have it in

8    front of you?

9    A    I do.

10   Q    And take a look at the top paragraph.  This is an email

11   from you to Karrie Wichtman dated January 14, 2016.  Do you see

12   that?

13   A    Yes, sir.

14   Q    It says, "The lenders care" -- and this would be the

15   investing lenders -- right? -- including Eventide?

16   A    Yes, institutional, private, and Eventide.

17   Q    They care about the person who runs the business of AT,

18   Ascension Technology; correct?

19   A    That's correct.

20   Q    And "If the transaction documents are clear that the

21   position in question and under scrutiny to lenders is president

22   and CEO" -- that's Brian McFadden; right?

23   A    Yes, that's correct.

24   Q    "Then I think we're okay."  You wrote, "As far as I know,

25   the managers don't really do anything"; is that correct?

Matthew Martorello - Direct

1    That's what you wrote?

2    A    That's what I wrote.

3    Q    Okay.

4         MR. BENNETT:  I don't have any other questions right

5    now, Judge.

6         THE COURT:  The word lenders, does that include any

7    of the entities that you own or control an interest in?

8         THE WITNESS:  Yes.

9         THE COURT:  The term lenders.

10        THE WITNESS:  That would include Eventide, yes.

11        THE COURT:  Anybody else?

12        THE WITNESS:  Yes.  The hedge funds that were lending

13   to the tribe, and there were maybe eight or nine --

14        THE COURT:  I mean companies in which you had an

15   interest.

16        THE WITNESS:  Oh, no.  There might have been an

17   entity that was involved for working capital at the inception

18   for a short period, but I can't articulate that off the top of

19   my head.

20        THE COURT:  All right, thank you.

21        MR. SCHEFF:  Thank you, Your Honor.

22        MR. BENNETT:  Your Honor, we also yesterday, in terms

23   of a housekeeping matter, offered a new exhibit which is

24   Exhibit 139.  The court reporter and Your Honor's law clerk

25   already have a copy as does, I believe, Ms. Brown, but this is

**JA1085**

1    the Court's copy.

2           THE COURT:  What are we doing about all these

3    exhibits?  I've got exhibits numbered one through what here in

4    these two notebooks?  What are they?

5           MR. BENNETT:  Those are the exhibits we've gone

6    through.  We would move for their admission.

7           THE COURT:  You didn't go through all of them.

8           MR. BENNETT:  No, we didn't, Judge, but the exhibits

9    themselves still are evidence.  They're all documents produced

10   by the defendant or parties against interest.

11          THE COURT:  So you are saying that you all have

12   agreed that these can be considered as exhibits; is that what

13   you are saying?

14          MR. BENNETT:  There are some objections to exhibits.

15   We would move for their admission of the exhibits and can

16   defend if there's any objection that counsel has to any

17   particular exhibit.  With respect to those that we formally

18   examined the witness about, the defendants certainly could have

19   said something as we were examining the witness.  But we would

20   move for their mission.

21          THE COURT:  All of these including 139?

22          MR. BENNETT:  Yes, sir.

23          THE COURT:  Any objection?

24          MR. SCHEFF:  I just have a question for Mr. Bennett.

25          THE COURT:  All right, sure.

1        (Counsel conferring.)

2            MR. SCHEFF:  Your Honor, as I recall from yesterday

3    morning when you -- when we opened court, you said that you

4    would be considering all of the materials that have been

5    submitted with the briefs.

6            THE COURT:  That had been submitted with the briefs.

7            MR. SCHEFF:  That's correct.  So to the extent that

8    Mr. Bennett's exhibits match what's attached to his brief, we

9    obviously have no objection.  To the extent there are

10   additional exhibits, we have no objection either.  I believe,

11   and I'll have to verify this with my team, that all of the

12   materials that we have provided to the Court, which I'm not

13   going to reference through Mr. Martorello's testimony, have

14   been attached to our briefs as well.

15           THE COURT:  All right.  Then Exhibits 1 through what?

16   What are the numbers?  One through 139 are admitted; is that

17   it, Mr. Bennett?

18           MR. BENNETT:  Yes, Your Honor.

19           (Plaintiffs' Exhibits 1 through 139 admitted.)

20           THE COURT:  Are you going to be using these

21   documents, these two notebooks, or am I going to shift to some

22   other notebook?

23           MR. SCHEFF:  Your Honor, I may make reference to --

24   with the exception of the declaration, which obviously Your

25   Honor has, I may make reference to one document that's in the

1    binder, but other than that, no.  I'm just going to ask Mr.

2    Martorello a handful of questions.  Your Honor is correct that

3    the overwhelming vast majority of his testimony has come in

4    through Mr. Bennett's testimony, or his questioning.

5

6                        CROSS-EXAMINATION

7    BY MR. SCHEFF:

8    Q    Mr. Martorello, I believe in response to the Court's

9    question and to Mr. Bennett's questions, you were describing

10   the difference between the fair market value valuation and the

11   fair value valuation; do you remember that testimony?

12   A    I do.

13   Q    What was the valuation that was used for tax purposes that

14   you actually used to pay tax on?

15   A    Of the note was 108 million.

16   Q    And --

17            THE COURT:  You mean the fair market value of the

18   company or of what?  I didn't hear what you said.  The fair

19   market value of what was 108 million?

20            THE WITNESS:  The fair market value of Bellicose

21   equity January 2016, date of the sale, was valued for tax

22   purposes at 108 million.

23   Q    And did you use --

24            THE COURT:  That's the date of the sale to the tribe.

25            THE WITNESS:  Yes, that's correct.

Matthew Martorello - Cross

```
 1              MR. BENNETT:  I object as hearsay, Judge, and no
 2    foundation.
 3              THE COURT:  All right.  Well, you need to lay
 4    foundation, but I rather much assume he knows that, but it
 5    hasn't been laid.
 6    Q    Mr. Martorello, did you hire tax advisors for purposes of
 7    establishing a valuation for tax purposes?
 8    A    I hired Aranca, yes.
 9    Q    Did you work closely with Aranca?
10    A    Yes.
11              THE COURT:  What are you saying?
12              MR. SCHEFF:  Aranca is the name of the company, Your
13    Honor, A-r-a-n-c-a.
14              THE COURT:  Aranca.
15    Q    And, Mr. Martorello, did you work closely with Aranca as
16    they worked to establish a valuation for tax purposes?
17    A    I did.
18    Q    And did you have other tax consultants and lawyers who you
19    used for that process as well?
20    A    I believe I used -- maybe BDO.  I can't recall.
21    Q    BDO meaning BDO Seidman?
22    A    BDO, yes.
23              THE COURT:  I understood him to say that the stated
24    FMV for the purposes of the sale was 108.  He wasn't opining
25    personally that it was; is that correct?
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 470 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 44 of 97 PageID# 28162

Matthew Martorello - Cross

218

1          MR. SCHEFF:  Yes, that's right, Your Honor.

2          THE COURT:  What objection is there to that, Mr.

3    Bennett, that he's saying that's what the stated purpose was --

4    I mean the stated value in the sale document at the time of

5    sale as opposed to his opinion that that was actually the fair

6    market value?

7          MR. BENNETT:  We don't have any objection to the

8    testimony that Mr. Martorello put down, wrote that it was 108,

9    but the testimony heard to me seemed to suggest that that was a

10   value.

11         THE COURT:  Mr. Scheff has made clear he was just

12   asking him what was the stated value in the transaction, not

13   what Mr. Martorello's opinion was as to the value, and I am not

14   accepting the testimony as anything other than the stated value

15   in the sale transaction of Bellicose in January of -- what was

16   it?

17         THE WITNESS:  2016.

18         THE COURT:  2016 was $108 million per and that he

19   used Aranca in arriving at that figure.

20         MR. BENNETT:  Your Honor, as to that second, I would

21   object to that as hearsay and purported expert testimony, that

22   is having -- what the witness would say --

23         THE COURT:  It's relevant for the purpose that he

24   relied on it, not for the purpose of whether it's true or not.

25         MR. BENNETT:  Yes, sir.

Matthew Martorello - Cross

```
 1              THE COURT:  It's not a hearsay objection.

 2              MR. BENNETT:  Yes, sir.

 3              THE COURT:  It's only relevant for the fact that he

 4    relied upon what they said, not whether what they said from an

 5    expert's testimony is correct.

 6              MR. BENNETT:  Yes, sir.

 7              THE COURT:  All right, Mr. Scheff.

 8              MR. SCHEFF:  Thank you, Your Honor.

 9    Q    In your testimony, Mr. Martorello, you referred to

10    Operation Choke Point; correct?  Do you remember that?

11    A    Yes.

12    Q    And are you -- in the summer of 2014, what was your

13    understanding about what the status of Operation Choke Point

14    was?

15    A    It was expressly acknowledged by Congress and congressmen

16    and the agencies themselves as inappropriate abuse of

17    investigatory threats to choke off banking, and it was

18    admonished and ceased.

19              MR. BENNETT:  Object.  Again, objection, Judge.  It's

20    hearsay.  It's also opinion testimony by a lay witness, that is

21    to the extent that Mr. Martorello's testifying that Congress

22    and everyone else had decided that this governmental action was

23    inappropriate.

24              MR. SCHEFF:  Your Honor, it's relevant to state of

25    mind.  Mr. Bennett has been saying that Mr. Martorello's
```

**JA1091**

USCA4 Appeal: 21-2116    Doc: 26-2       Filed: 02/07/2022    Pg: 472 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 46 of 97 PageID# 28164

220

Matthew Martorello - Cross

1    declaration with respect to his motivation for sale was driven

2    by regulatory risk and potential litigation risk.  He

3    testified, Your Honor --

4         THE COURT:  It's not admissible to prove that

5    Congress or anybody else did what he said they did.  It is

6    admissible so long as he says it was his understanding that

7    Congress had done that and that it had been suspended, because

8    it informs his state of mind.

9         In other words, if the threat has been dissipated by

10   dissolution, then it's not any longer a threat to be considered

11   in making a business decision as I understand your point.  Is

12   that correct?

13        MR. SCHEFF:  Yes, Your Honor.

14        THE COURT:  Objection is sustained to the extent that

15   if that testimony was proffered as true of what Congress

16   actually did or the agencies did, that's inadmissible for that

17   purpose.  It is admissible for the limited purpose of Mr.

18   Martorello's understanding and his state of mind respecting the

19   threat of litigation and government regulatory action.

20        MR. SCHEFF:  Thank you, Your Honor.

21   Q    What's the basis of your understanding, Mr. Martorello?

22   A    August 2013 letter from Congress to the FDIC and the DOJ

23   followed by the FDIC removing the word payday off what was --

24   what they title as a hit list for banks to not provide services

25   to anyone with the word payday, and then in June 2014 Congress

USCA4 Appeal: 21-2116   Doc: 26-2       Filed: 02/07/2022   Pg: 473 of 681

1    issued --

2           MR. BENNETT:  Objection.  Judge, now this is beyond

3    this.

4           MR. SCHEFF:  It's not, Your Honor.

5           THE COURT:  Wait a minute.

6           MR. BENNETT:  It's hearsay, and it's lay opinion.  To

7    the extent that the witness says I believe that this was no

8    longer the case, that's one thing.  To the extent the witness

9    is now saying there's this document, this document, and this

10   document, which, by the way, aren't even proffered here or in

11   this case and we think are untrue, but they're not proffered

12   and is contradicted by his own emails where he said Operation

13   Choke Point in 2015 was an issue.

14          THE COURT:  That's all right.  You can deal with

15   that.  He can say he relied on documents.  The documents aren't

16   in the record.  I'll give that whatever weight I can give it

17   which is nothing.  I don't have any documents that have been

18   offered into evidence about Congress or anybody else, but he

19   can say I read these things, and I formed the belief that

20   such-and-such, and it's admissible for that limited purpose.

21          So you can ask him what documents he relied on.  One

22   of them was an August 2013 letter, one was a June 2013

23   something.  I don't know what it was because the objection

24   interceded.

25          MR. SCHEFF:  I think it was 2014, but Mr. Martorello

USCA4 Appeal: 21-2116      Doc: 26-2      Filed: 02/07/2022      Pg: 474 of 681

Matthew Martorello - Cross

222

```
1   --
2             THE COURT:  What is it?
3             THE WITNESS:  It was a report from the -- one of the
4   Congressional -- it was from Congress.  I'm sorry I can't
5   articulate exactly who it was in Congress, but they had done a
6   multi-week study of Operation Choke Point and issued a --
7             THE COURT:  When was this?
8             THE WITNESS:  This was June 2014.
9             THE COURT:  What?
10            THE WITNESS:  It was June 2014, and it was, I think,
11  the House oversight committee.
12            THE COURT:  You read these things?
13            THE WITNESS:  Yes.  And it issued their study after
14  multi weeks of study what Operation Choke Point was and how
15  inappropriate it was.
16            THE COURT:  You read it, you interpreted it to mean
17  those things.
18            THE WITNESS:  That's correct.
19            THE COURT:  Whether it said that or not, I don't
20  know.  All right, go ahead.  And I don't know that it's
21  relevant.  Go ahead.
22  Q   Mr. Martorello, in your declaration -- strike that.  Mr.
23  Martorello, you've been asked several times yesterday and this
24  morning about your declaration insofar as it speaks to your
25  lack of involvement in the formation of either Red Rock or Big
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 475 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 49 of 97 PageID# 28167

223
Matthew Martorello - Cross

1    Picture.  Do you remember those questions and your testimony?

2    A    Yes.

3    Q    In your declaration, what did you mean by the words

4    formation or creation?

5              THE COURT:  Can you point me to a paragraph?

6              MR. SCHEFF:  I can, Your Honor.  I believe paragraph

7    17.  And if you'll give me just a moment.  I believe the other

8    paragraph is 102.

9              THE COURT:  102 is creation or both or what?

10             MR. SCHEFF:  It is form, the word form, and 17 is

11   creation.

12             THE COURT:  All right, you are asking about 17 first,

13   what does he mean by creation.

14             MR. SCHEFF:  Yes.

15   Q    What did you mean by the word creation in paragraph 17?

16   A    I meant -- I was responding specifically to the statement

17   in the complaint which was that I had helped Dan Gravel and I

18   had helped form Red Rock or Big Picture, and we didn't help

19   form it.

20        Tribal council is the only one who can form it.  So it was

21   the formation of the LLC.  It was not advice as to, you know,

22   business advice.  It was the formation of the entity pursuant

23   to the method of creation factor which we were providing this

24   for, for the *Breakthrough* factors.

25   Q    In paragraph 102 --

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 476 of 681

1          THE COURT:  When you say you weren't involved in the

2     formation of the LLC or the creation of the LLC, you, do you

3     mean your lawyers were not involved and with your lawyers --

4     and that you didn't communicate with your lawyers on that

5     topic?

6          THE WITNESS:  No, that's not what I mean.

7          THE COURT:  In fact, you and your lawyers both

8     communicated on that topic with the tribe, did you not?

9          THE WITNESS:  That's correct.

10         THE COURT:  And that had to do with exactly how this

11    thing was to be formed and why; right?

12         THE WITNESS:  Correct.

13         THE COURT:  And it was in detail; right?  Your people

14    were thorough when they did that; right?

15         THE WITNESS:  I believe so.

16         THE COURT:  All right.  So there's no question from

17    the record that I'm aware of that his lawyers and he had

18    intimate discussions with the lawyers for the tribe about how

19    the documents were to be structured, what they were to provide,

20    etcetera, etcetera.  There was extensive back and forth on it.

21         MR. SCHEFF:  Your Honor, the issue is what Mr.

22    Martorello meant --

23         THE COURT:  I know, but I want to make clear so you

24    understand what I understand the record to be as of today.

25         MR. SCHEFF:  I understand.  I don't disagree with

Matthew Martorello - Cross

1    that.  The question is what Mr. Martorello meant in his

2    declaration when he said formation and creation.

3    Q    In paragraph 102, Mr. Martorello, when you are --

4              THE COURT:  102 are you saying?

5              MR. SCHEFF:  Yes, Your Honor.

6    Q    When you are quoting paragraph 29 of the complaint, what

7    did you mean when you said, "Neither I nor Bellicose helped

8    form Big Picture or Red Rock"?

9    A    I meant that tribal council is the only one that can form

10   the entity.  They are the only ones that can do that.  I wasn't

11   involved or in the room or part of that process.

12             THE COURT:  Excuse me.  You've been citing paragraph

13   101 related to the formation, and it actually is paragraph 102

14   because he's quoting -- he's quoting the complaint and then

15   uses the word "form" there.  I don't see formation dealt with

16   in 101.  I think that's operation and control.

17             MR. SCHEFF:  Your Honor, if I said 101, I misspoke.

18   I was actually looking at 102 when I was asking the question.

19             THE COURT:  That's what he meant, that's what I

20   understood, because he was actually referring to that document.

21             MR. SCHEFF:  Thank you, Your Honor.

22   Q    Can you look at paragraph 69 of your declaration, Mr.

23   Martorello.

24   A    Yes.

25   Q    What motivated -- at the point in time that you agreed to

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 478 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 52 of 97 PageID# 28170

226

Matthew Martorello - Cross

1  sell Bellicose and Sourcepoint, what were the motivations for

2  that sale?

3  A    It was the attractive offer that I received from the

4  tribe's council and the tribe.

5  Q    And what do you mean by attractive offer?

6  A    They presented to me a summary of what a term sheet or

7  terms might look like, and they said it would be on a multiple

8  of revenue.  I asked what the multiple of revenue might be in

9  terms of comparable transactions.  They gave me a multiple that

10  was very attractive, and now, for the first time, because the

11  offers had economically been pretty low because I think they

12  thought I was a motivated seller from the Choke Point stuff,

13  this one was a real offer, and I was motivated by the price.

14  Q    And why did the transaction close in January of '16 as

15  opposed to some earlier time?

16  A    I had studied the -- if it would work from a tax

17  perspective for me.  At one point I found out that it wouldn't,

18  and I wasn't going to refuse to sell.  That was October 2014,

19  and then eventually I concluded that the sale would have to

20  close January 1st, 2016, because then that would allow me and

21  my family to move back to the mainland to raise our first kid.

22  Q    And why was that a factor in your decision to sell at the

23  time you sold?

24  A    Because if we sold in 2015, I would have had to have

25  stayed on the island until 2020, but in 2016, we could move

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 479 of 681
Case 3:17-cv-00461-REP  Document 883  Filed 07/25/20  Page 53 of 97 PageID# 28171

227

Matthew Martorello - Cross

```
 1   back, and we were having -- our child was born, you know,

 2   August 2015, so we were around first trimester, January,

 3   February 2015.  So by that time, I knew that it was less likely

 4   my wife would want to be away from family.

 5   Q    Where is your wife's family?

 6              THE COURT:  Wait a second.  Move back to the mainland

 7   from where?

 8              THE WITNESS:  From Puerto Rico.

 9   Q    Where is your wife's family?

10   A    Southern Illinois.

11   Q    Would you look at the --

12              THE COURT:  So you moved back to where?

13              THE WITNESS:  We moved to Chicago and eventually to

14   Dallas.

15              THE COURT:  To Dallas?

16              THE DEFENDANT:  Dallas, Texas.

17              THE COURT:  You needed to get away from her family

18   then.

19              THE WITNESS:  We wish they were around more.

20              THE COURT:  You don't have to answer that.

21   Q    Mr. Martorello, I want you to take a look at the last

22   sentence of paragraph 69.  Read that to yourself.

23   A    "Plaintiffs claim were certain 'motivating factors' for

24   the sale which, in reality, occurred 18 months to three years

25   before the sale transaction closed."
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 480 of 681
Case 3:17-cv-00461-REP  Document 883  Filed 07/25/20  Page 54 of 97 PageID# 28172

228

Matthew Martorello - Cross

1   Q    What were those motivating factors which occurred 18 moths
2   -- strike that.  What occurred 18 months to three years before
3   the sale closed?
4   A    That was Operation Choke Point, the Otoe-Missouria
5   litigation, and the New York DFS actions to choke off the banks
6   with the cease and desist.
7   Q    And at this point in time that you made the sale, were
8   they the motivating factors in the sale?
9   A    No.
10          MR. SCHEFF:  Your Honor, may I have a moment, please?
11          THE COURT:  Yes, sir.
12          MR. SCHEFF:  I have no further questions of Mr.
13  Martorello, Your Honor.
14          THE COURT:  Any cross-examination?
15          MR. BENNETT:  No, Your Honor.
16          THE COURT:  All right.  Mr. Martorello, you may step
17  down, and you are free -- he can leave if he wants so.  Nobody
18  is going to call him back.  If he wants to leave, he can leave.
19  He's a party.  He can stay if he wants to.
20          THE WITNESS:  Thank you, Your Honor.  Appreciate the
21  time.
22          MR. SCHEFF:  Your Honor, we're going to move into
23  playing our depositions, and I'll find out from my colleagues
24  who we're going to play first.  What we have for the Court is
25  there'll be video.  We do have the excerpted transcript for

```
 1   Your Honor to follow along if you'd like with the exhibits
 2   attached that are referenced in the deposition.  I believe
 3   we've also provided the Court -- because those exhibits are
 4   numbered differently, but we've corresponded them to the record
 5   so Your Honor ultimately can match those up.
 6            THE COURT:  All right.  Do you have those?
 7            MR. SCHEFF:  I think so.
 8            THE COURT:  For me and my law clerk.  Mr. Bennett,
 9   somebody over there stood up.  Was it Ms. Kelly?  I just saw
10   some action.  Did somebody stand up?
11            MR. BENNETT:  Yes, Your Honor.  It was not something
12   controversial.  I wanted to make sure that the exhibit book
13   has -- I'm seeing mine as missing a page of a particular
14   exhibit.
15            THE COURT:  Fix it at the break.  Coordinate with Mr.
16   Scheff, make sure it's okay and just fix it.
17            MR. BENNETT:  Yes, sir.
18            THE COURT:  You have one for the law clerk?  Now,
19   she's not going to be required to transcribe what's being
20   played because what's in this book is what we're doing; right?
21            MR. SCHEFF:  Yes, Your Honor.
22            THE COURT:  Are we going to mark that book designated
23   testimony of Warren Scott Merritt as an exhibit?
24            MR. SCHEFF:  We'll mark it as our next sequential
25   exhibit, and I'll get that number from my colleagues, and we'll
```

1    continue to do that for the rest of your presentation.

2            THE COURT:  How long does this go?  Just

3    approximately.

4            MR. SCHEFF:  Eight minutes and 20 seconds.

5            THE COURT:  We'll take our break sometime after this

6    before we start.

7            MR. SCHEFF:  Your Honor, while that's playing may I

8    sit at counsel table?

9            THE COURT:  Sure.

10           MR. SCHEFF:  Thank you.

11           THE COURT:  Unless you're of a mind to stand up to

12   exercise yourself.  You want to go back somewhere else?  You

13   can sit anywhere you want to.

14           All right, this is the deposition of Merritt,

15   March 21, 2019.

16           (Video deposition of Warren Scott Merritt played.)

17           THE COURT:  Is that it?

18           MR. SCHEFF:  Yes, Your Honor.

19           THE COURT:  How long is the next one?

20           MR. SCHEFF:  It's about an hour, Your Honor.

21           THE COURT:  We'll take a break of 20 minutes at this

22   time.  I'd like to tell you something.  In listening to this

23   testimony and reading these exhibits in preparation for and

24   during the proceedings, I have very great difficulty

25   understanding who is who, and I need a chart that tells me from

1   the time the borrower pays until Mr. Martorello receives, if he

2   receives anything, what's the chain that money goes through,

3   because I don't understand -- it's so convoluted with offshore

4   trusts and whatever, but ultimately it appears to me from what

5   I've been able to read that Mr. Martorello receives the money,

6   and so do other people, investors and other people.

7          I have no idea what that is.  I just need to see that

8   so I know who the players are.  My suggestion is that the --

9   you all agree on a chart or the plaintiffs submit a chart based

10  on what they know and you object to it and correct it if you

11  want to do it.  I don't care how you do it, but I don't think

12  given your collective knowledge, I would think it wouldn't take

13  you long to get that together.  Is there any reason you can't

14  do that?

15         MR. SCHEFF:  No, Your Honor.  My suggestion is that

16  the parties work together to try and prepare a chart that we

17  can submit jointly to the Court.

18         THE COURT:  Are you agreeable to that, Mr. Bennett?

19         MS. KELLY:  Yes, Judge.  We would agree to do that.

20         THE COURT:  Get me something by the first of the

21  week, Monday.

22         MR. SCHEFF:  Yes, Your Honor.

23         THE COURT:  Thank you.  And then the next part of it

24  is, I want to know the percentage of the monies that go this

25  way so I understand where the money that goes to the tribe goes

1   and where the money that goes to any of these entities.  If it

2   drops off along the way to some corporation and then that's

3   spun off to somebody else, I need to know, but it's so

4   complicated from the documents that I really had some

5   difficulty, and I think you all know all that, and you assume

6   in your questions that I know it, Mr. Martorello assumed in the

7   answers that I knew some of it, and I thought I had a pretty

8   good handle on it until I was really wrapping myself in the

9   papers to get ready for this, and I concluded that my knowledge

10  was inadequate to the task.  So if I could get those two things

11  by Monday, I would appreciate it.

12            MR. SCHEFF:  Yes, Your Honor.

13            THE COURT:  If you can't agree on them, then Monday

14  you submit yours, Mr. Bennett, or Ms. Kelly, and then on

15  Tuesday, you submit your corrections.

16            MR. SCHEFF:  Yes, Your Honor.

17            MS. KELLY:  Judge, can I ask for clarification?  Do

18  you want through the different time periods through today,

19  because we don't have all the discovery of like what's been

20  going on, so we may not have all of the information, but is it

21  from inception to the present?

22            THE COURT:  From Red Rock on.

23            MS. KELLY:  Would you like amounts as well?

24            THE COURT:  Separately.  No, I don't -- just in a

25  gross way what was the take for each.  You all continue to work

1  that out.  We'll take a recess of 20 minutes and then be ready

2  to go.

3              (Recess taken.)

4              THE COURT:  All right, the next thing is the

5  deposition of Ms. Wichtman?

6              MR. SCHEFF:  Yes, Your Honor.  That will be, and that

7  transcript you should have, should be marked 327.

8              THE COURT:  Hers is --

9              MR. SCHEFF:  Yes, sir.

10             THE COURT:  And the other one is 326?

11             MR. SCHEFF:  Yes, Your Honor.

12             THE COURT:  DX-326 and DX-327.  All right.

13             MR. SCHEFF:  Thank you, Your Honor.

14             (Video deposition of Karrie Wichtman played.)

15             THE COURT:  Excuse me just a minute.  Hold on.

16  There's something up on the screen.  What's that?  Is that the

17  way you want this depicted, or is there something wrong with

18  the machinery?

19             MR. SCHEFF:  Your Honor, this is the exhibit she was

20  looking at at the time.

21             THE COURT:  Did they say what it was?  The exhibit

22  attached here is Exhibit 2 which is a statement of position

23  regarding material misrepresentations, and Exhibit 6, Defense

24  Exhibit 325, which is a memo.

25             MR. SCHEFF:  Your Honor, I apologize.  That's not

 1   attached to the transcript.  We had intended to do that.

 2   That's an oversight.  I apologize.

 3          THE COURT:  All right.  I'll hear what she has to

 4   say.  You're going to give me the exhibit?  Do we have it?

 5          MR. SCHEFF:  Your Honor, if we can have a moment,

 6   we'll get you the exhibit.

 7          THE COURT:  Go ahead with it.  Find it and hand it

 8   up.

 9          (Video deposition of Karrie Wichtman played.)

10          THE COURT:  Stop that a minute.  She, at the

11   beginning of this discussion, mentioned the timeframe, and I

12   didn't catch it, but I thought -- because her voice dropped,

13   and I thought -- I wrote down 2013 to '16.  Can you tell me if

14   that's correct or not from your knowledge, or can we go back?

15          MR. SCHEFF:  In terms of her testimony, I thought --

16          MR. BENNETT:  Judge --

17          THE COURT:  What page was that?

18          MR. BENNETT:  This is at page 55, line 17, "Question:

19   And over what period of time" --

20          THE COURT:  Wait a minute.  Let me find it.  Okay,

21   hold on.  I need to get it.  I don't have that page.  I don't

22   have page 55.

23          MR. BENNETT:  It would be numbered Section 8.

24          THE COURT:  55, line 14; is that right?

25          MR. BENNETT:  Yes, sir.

1          THE COURT:  "Probably centralized in 2013,

2    maybe 2015, '16."  Is that the timeframe we're talking about

3    here?

4          MR. SCHEFF:  Yes, that was her testimony, Your Honor.

5          THE COURT:  You may resume.  I just lost it, and I

6    need to understand it.  Go ahead and play.

7          (Video resumed.)

8          THE COURT:  Do we have a lot of this asking her to

9    vouch for what somebody else is saying?  That testimony is not

10   admissible.  You all know that.

11         MR. SCHEFF:  Your Honor, she has personal knowledge,

12   as she testified, that she observed the co-managers, so she is

13   in a position to determine whether someone's statement --

14         THE COURT:  You cannot have one witness testify that

15   another witness is telling the truth.  That's a credibility

16   judgment for the Court or the jury.  It's not allowed.  I don't

17   know where on earth you got the notion that it is just because

18   she has some personal knowledge about the circumstances -- are

19   you asking her a whole bunch of questions like that?

20         MR. SCHEFF:  Your Honor, there are a series of

21   questions like that, yes.

22         THE COURT:  Can you get rid of them?  Is it easier to

23   listen to them all?

24         MR. SCHEFF:  Probably easier to listen.

25         THE COURT:  I'm going to listen to them all but not

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 488 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 62 of 97 PageID# 28180

236

1   pay attention to them because that's not something I can
2   consider.
3           (Video resumed.)
4           THE COURT:  What paragraph are we on?  I'm having
5   trouble.
6           MR. SCHEFF:  As she was observing it, it appeared one
7   page ahead, so it's your page seven, last sentence of the last
8   full paragraph.  That's what she's referring to.
9           THE COURT:  "Thus, shortly after"?
10          MR. SCHEFF:  No.  On page seven of the exhibit,
11  starting, I believe, with the words "the tribal defendants."
12          THE COURT:  What paragraph -- what's the first words
13  in the paragraph?
14          MR. SCHEFF:  The first word in the paragraph is
15  "Rosette."
16          THE COURT:  Okay.  And then where, down there?
17          MR. SCHEFF:  If you look at the last sentence in the
18  paragraph, so it's the third line from the end of that --
19          THE COURT:  "The tribal defendants used"?
20          MR. SCHEFF:  Yes, Your Honor, I believe that's what
21  she's about to testify about.
22          THE COURT:  All right.
23          (Video resumed.)
24          THE COURT:  Where are we talking about?
25          MR. SCHEFF:  That is on page 12 of the exhibit --

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 489 of 681

```
 1                THE COURT:  12, okay.

 2                MR. SCHEFF:  First sentence under D.

 3                THE COURT:  I just couldn't hear the page number.  So

 4     that's the heading D, Rosette and Richardson.

 5                MR. SCHEFF:  Yes, sir, that's correct.

 6                THE COURT:  Go ahead.

 7                (Video resumed.)

 8                THE COURT:  Where are we in the deposition?  I'm

 9     having trouble following here.  What page?

10                Okay, I've got it.  Thank you.  Thank you.  You can

11     play.

12                (Video resumed.)

13                THE COURT:  All right, that's the end of that

14     deposition?

15                MR. SCHEFF:  Your Honor, we could do another before

16     the lunch break.

17                THE COURT:  How long do you have?

18                MR. SCHEFF:  We're going to do James Dowd.  It's

19     18 minutes.  Is that all right?

20                THE COURT:  That will put us a little bit into the

21     lunch hour -- have you all ordered your lunch?

22                MR. SCHEFF:  Yes, Your Honor.

23                THE COURT:  I signed some kind of document that said

24     you could bring it into the building.  Do we need to take an

25     hour for lunch?
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 490 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 64 of 97 PageID# 28182

238

```
 1              MR. SCHEFF:  I don't believe so, Your Honor.

 2              THE COURT:  So who -- who do you have after the

 3    18-minute Dowd one?  What do you have?

 4              MR. SCHEFF:  Well, we have a variety, but the next

 5    one that we were intending to play was --

 6              THE COURT:  How much time total?

 7              MR. SCHEFF:  How much time total?

 8              THE COURT:  Mr. Bennett said he wanted to play

 9    something.

10              MR. SCHEFF:  25 minutes I think he said.

11              THE COURT:  A total of 25 minutes?  Do you want to do

12    your response to the Wichtman deposition now, or do you want to

13    do it later?

14              MR. BENNETT:  We discussed, because ours are not that

15    long individually, that we would just put them together at the

16    end of all this.

17              THE COURT:  Okay.  All right.  So how long?  Total.

18              MR. SCHEFF:  Your Honor, the total number that we

19    have remaining is 159 minutes.  We're going to talk over the

20    lunch break to see if we can pare that down, but that would

21    bring us in under the four hours.

22              THE COURT:  I'm just trying to figure out when's the

23    best time.  Maybe it's better to give you time to pare some of

24    it down at lunch.  Would you rather do that?

25              MR. SCHEFF:  That's fine, Your Honor.  We're happy to
```

1   do that.

2           THE COURT:  Is there any reason you all can't do

3   yours and get ready, Mr. Bennett?  Sounds to me like it will

4   help to take the lunch hour now as opposed to waiting.

5           MR. SCHEFF:  Right.  I believe Your Honor's shortened

6   lunch hour would be fine if that's okay with everybody else.

7           MR. BENNETT:  Logistically, Judge, we just now would

8   be ordering our lunch, and we would need to ask the Court for

9   the permission slip to save us the trouble of going out of

10  security and coming back --

11          THE COURT:  You can have it, but it has to be signed.

12          MR. BENNETT:  Yes, sir.  What I might suggest is --

13          THE COURT:  Ms. Tashima, will you do a thing like I

14  did for the others, and I'll sign it and send it down there.

15          MR. BENNETT:  There are a handful of really small

16  depositions that the defendant has designated, like five

17  minutes, two minutes.  So I don't want to interfere with the

18  Court's schedule, but in terms of by the time we get our lunch

19  here -- and I'm certainly not hurting for it --

20          THE COURT:  How are you going to get your lunch?  Why

21  am I dealing with that?

22          MR. BENNETT:  I said if we could put 15 more minutes

23  of time into this hearing by playing --

24          THE COURT:  That's fine by me.  Play Dowd.  That's

25  18 minutes.  I need to have something down to the CSOs, I

1    guess.

2              MR. SCHEFF:  Your Honor, this will be 328.

3              (Discussion off the record.)

4              THE COURT:  All right, go ahead, please.

5              (Video deposition of James Dowd played.)

6              THE COURT:  All right.  We'll take 30 minutes for

7    lunch at this time.

8              (Luncheon recess.)

9              THE COURT:  All right.  We have more depositions?

10             MR. SCHEFF:  Your Honor, with the -- I think the

11   Court has already permitted this, but Mr. Martorello is going,

12   with leave of Court, is going to go to the airport to catch his

13   flight back to Texas.

14             THE COURT:  Sure.  He was excused from when he

15   testified.

16             MR. MARTORELLO:  Thank you, Your Honor.

17             THE COURT:  Thank you, Mr. Martorello.

18             MR. BENNETT:  Your Honor, in terms of housekeeping, I

19   just had a conversation with Mr. Scheff.  There is quite a lot

20   of paper flying, information.  Mr. Scheff does not contemplate

21   us making any argument at the end of the evidence today which

22   we would be okay with if that's the Court's preference.  We've

23   asked, and I understand Mr. Scheff has agreed, that when we do

24   our other filings that the Court has asked for, a chart or the

25   money, that we supplement and provide maybe a short, not an

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 493 of 681
Case 3:17-cv-00461-REP    Document 883    Filed 07/25/20    Page 67 of 97 PageID# 28185

241

1    argument brief but a short brief that would summarize the

2    evidence as to the categories of misrepresentation we've

3    alleged so that we don't have argument.

4            THE COURT:  Tied to the transcript?

5            MR. BENNETT:  Tied to the transcript.

6            THE COURT:  Have you arranged for the transcript and

7    determined when it can be delivered to you?

8            MR. BENNETT:  Our court reporter, as I understand,

9    probably had today's transcript done last week given the

10   timing, but we certainly will order it as expeditiously as

11   possible.

12           THE COURT:  Well, she probably needs to work all

13   night, I guess, to get it done on the schedule that we're

14   talking about.  You've arranged with her to get it done?

15           MR. BENNETT:  I've not arranged it, but I'm a safe

16   distance from her so staplers --

17           THE COURT:  I don't know that that's correct.  All

18   right, we'll see.  Let's proceed with what we're doing, and

19   I'll reflect upon it.

20           MR. SCHEFF:  Your Honor, the next witness we're going

21   to call by deposition is Adil, A-d-i-l, Karam, K-a-r-a-m.  This

22   transcript that we handed up to the Court will be marked as

23   329.

24           THE COURT:  All right.  You are giving these to the

25   clerk for the record?

1          MR. SCHEFF:  Yes, Your Honor.

2          (Video deposition of Adil Karam played.)

3          MR. SCHEFF:  Your Honor, this relates to the

4    testimony of Jennifer Weddle, and it will be Exhibit 330.

5          (Video deposition of Jennifer Weddle played.)

6          MR. SCHEFF:  Your Honor, we're going to move on to

7    the testimony of Rob Rosette, and that transcript that we just

8    handed up will be marked as Defense Exhibit 331.

9          (Video deposition of Robert Rosette played.)

10          THE COURT:  Just so you all know, that answer is

11    exemplary of Mr. Rosette's utter disregard for answering the

12    question and for serving as a lobbyist on behalf of the tribe,

13    and that's exactly how I'm going to view all his testimony.  He

14    didn't answer the question.  He just spewed out something he

15    thought was okay, and wherever that appears in this testimony,

16    that's how I'm going to regard it, because he's just being a

17    lawyer there.  He's not being a witness at all.

18          He didn't answer the question, and the question

19    before that he didn't do and many others like that.  Just so

20    you know, don't cite him to me in any subsequent papers for

21    anything, because it's his -- at best, his opinion, and he's

22    not qualified to give it, and it's not relevant.  It wasn't

23    responsive to the question, and I'm kind of worn thin with a

24    lot of this stuff.  Ms. Weddle was the same way, and Ms.

25    Wichtman was worse.

```
 1              So, anyway, maybe I should have reviewed all these

 2      things ahead of time and stricken them, but I'm not paying

 3      attention to them.  So in structuring your argument, you stay

 4      to the facts instead of the nonsense that these people have

 5      spewed by way of nonresponsive answers.

 6              I'll let you figure out what fits that bill, and I'll

 7      consider it as it comes in for what it's worth, but you'll do

 8      well by yourselves and your clients if you will confine

 9      yourselves to what the facts are, not to these side comments

10      that are not responsive.  Next question begins with "And did

11      Mr. Martorello," I believe.

12              (Video resumed.)

13              MR. SCHEFF:  Your Honor, this is Michelle Hazen, and

14      that will be Exhibit 332.

15              (Video deposition of Michelle Hazen played.)

16              THE COURT:  Stop just a minute.  What was that first

17      stuff?  It was a bunch of language I didn't understand.  Was

18      that just her name in the language of the tribe?

19              MR. SCHEFF:  That's my understanding, Your Honor.

20              THE COURT:  Oh, okay.  So when she said all that long

21      name and then said Michelle Hazen, she was answering what was

22      my name.

23              MR. SCHEFF:  Yes, Your Honor, that's my

24      understanding.

25              THE COURT:  Seeing it in writing is much better.  You
```

**JA1115**

 1   can understand what it was.  Sorry.  All right, go right ahead.

 2              (Video resumed.)

 3              MR. SCHEFF:  Your Honor, the next witness will be

 4   Craig Mansfield, Exhibit 333.

 5              (Video deposition of Craig Mansfield played.)

 6              MR. SCHEFF:  Your Honor, next one is Joette Pete, and

 7   that's Exhibit 334.

 8              (Video deposition of Joette Pete played.)

 9              MR. SCHEFF:  Your Honor, this is Dan Gravel, and this

10   will be Exhibit 335, I believe.

11              (Video deposition of Daniel Gravel played.)

12              THE COURT:  You don't really expect me to pay

13   attention to that kind of stuff.  How can you ask a question

14   about somebody else's -- what's his state of mind opinion

15   without -- why am I listening to stuff like this?

16              MR. BENNETT:  Your Honor, this was our team that was

17   questioning.  We were asking --

18              THE COURT:  Why would you question it?

19              MR. BENNETT:  We expected him, as a lawyer, to say I

20   can't tell you about state of mind.  We didn't expect --

21              THE COURT:  That's why you asked the question, to get

22   an answer you couldn't -- put that one back in the box.  They

23   used it because it helps them, but it's something I'm not going

24   to consider because it's not something that's admissible under

25   any kind of rules of evidence, and it's logically inconsistent

```
 1   that I can consider that.

 2            Okay, go ahead.  What else have we got from this

 3   fellow?  Anything else?

 4            (Video resumed.)

 5            THE COURT:  Can somebody tell me who Mr. Gravel is?

 6            MR. SCHEFF:  Yes.  Mr. Gravel, Your Honor, was

 7   in-house counsel to Bellicose and Sourcepoint.

 8            THE COURT:  To who?

 9            MR. SCHEFF:  Bellicose and Sourcepoint.

10            THE COURT:  Okay.

11            MR. SCHEFF:  Your Honor, the next witness is

12   26 minutes, and then we have one other after that.

13            THE COURT:  I thought you were going to cut some

14   stuff out.

15            MR. SCHEFF:  We did.

16            THE COURT:  Are you familiar in your readings in

17   history with water torture visited by -- I believe it was first

18   envisioned as a method of punishment in China in about the 11th

19   century.  I thought maybe we had gone beyond that.

20            MR. SCHEFF:  We're not trying to punish, Your Honor.

21   So would Your Honor prefer that we play the next witness or

22   take the afternoon break?

23            THE COURT:  We'll take the afternoon break with a

24   view to getting you to cut down some.  A lot of this stuff is

25   just not helpful.  It's opinions from people who are not
```

1    qualified to render opinions.  It's opinions on topics they

2    can't render opinions on like the credibility of witnesses or

3    the state of mind of somebody else.  That's just not helpful to

4    me in making decisions that need to be made.

5              The issue here is very simple:  As to

6    misrepresentations pointed out by the plaintiffs, what is the

7    evidence as to whether they were true or not.  That's what's

8    the issue here.  All right, we'll take 20 minutes.

9              (Recess taken.)

10             MR. SCHEFF:  Thank you, Your Honor.  We've completed

11   our presentation.

12             THE COURT:  Thank you very much.  I think you've got

13   enough.  All right, I'm going to let you now address what you

14   want to do.  Mr. Bennett suggested something about briefing.

15   First thing is I assume in the interim you talked to the court

16   reporter and figured out when you're going -- we will get a

17   transcript if you're going to tie things to the transcript.

18             MR. BENNETT:  That would have been the wise thing to

19   do, Judge.

20             THE COURT:  You didn't do it.  Here's the thing.  We

21   need to have this done quickly, because the brains of the

22   operation won't be here for a whole lot longer.

23             MR. BENNETT:  I understand.

24             THE COURT:  It's going to be some work, I guess.

25             MR. BENNETT:  So the --

```
 1              THE COURT:  Come to the lectern.  Have you told Mr.
 2   Scheff what it is -- it's Scheff.
 3              MR. SCHEFF:  Yes, Your Honor.
 4              THE COURT:  I keep trying to put an I into it, but I
 5   know how to say it.
 6              MR. SCHEFF:  I understand.
 7              THE COURT:  Have you told Mr. Scheff what it is you
 8   think you want to do?
 9              MR. BENNETT:  I have, but generally what I had
10   envisioned was rather than another brief that repeats all the
11   argument was something more akin to a chart where we would
12   identify the specific misrepresentations and then identify the
13   parts of the record that we think address those.
14              THE COURT:  You would have to identify the testimony,
15   too.
16              MR. BENNETT:  The testimony --
17              THE COURT:  I don't mean cite to the transcript.  I
18   mean identify -- put the testimony where I can read it all in
19   one document.
20              MR. BENNETT:  So that is what I would imagine.  I
21   imagine all we'd be doing would be --
22              THE COURT:  I understand.  Mr. Scheff, do you agree
23   with that approach?
24              MR. SCHEFF:  Your Honor, I hadn't heard that or Matt.
25   We had talked about short briefs.  That's fine.  We can do
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 500 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 74 of 97 PageID# 28192

248

1    that.  I have no objection to that.

2         THE COURT:  Now, I think you all followed basically

3    the briefing in the structure of what you were talking about,

4    you were following in your presentations the briefs that you

5    had filed.  I have something I need to get from you all,

6    though.  Maybe you all already know.

7         I've been checking the Fourth Circuit, and I've been

8    checking the other record, and it says that the purchase price

9    for Bellicose was $300 million, and the question I don't know

10   -- Ms. Kelly, I think, asked, she said $300 million, and you

11   objected to it and said that wasn't the price.

12        But the Fourth Circuit has -- and I think -- probably

13   they took that from my opinion.  I didn't go back and check my

14   opinion -- held that the purchase price was $300 million.

15   Aren't we stuck with that as the price for whatever purpose

16   there is or not?

17        MR. SCHEFF:  I don't recall that from the Fourth

18   Circuit opinion.  I'd have to go back and read it.

19        THE COURT:  I read it.

20        MR. SCHEFF:  I have no doubt if Your Honor says that

21   it's in the Fourth Circuit opinion that's what it says.  I

22   believe the document, the sales documents that are in the

23   record use the phrase up to $300 million, because the way the

24   payment works is through a monthly payment, certain monthly

25   payment which is not fixed.  It's variable, and it can be zero.

```
 1            And the note expires at a certain point in time --
 2            THE COURT:  Seven years.
 3            MR. SCHEFF:  Whether or not the 300 million has been
 4   paid or not.  So the way it works is that if $300 million was
 5   paid, just by way of hypothetical, within five years, there
 6   would be no further payments due under the note.  If you got to
 7   the end of the seven years and 30 million had been paid, that's
 8   all that would be paid for the business.
 9            THE COURT:  Do you agree with that?
10            MR. BENNETT:  Yes, Your Honor.
11            THE COURT:  Then that takes care of that.  What is
12   the evidence of record as to who is it that establishes the
13   loan criteria?  That is, whether Payne, when he calls, can get
14   a loan.  I need to know what the record says about that.  Coach
15   Kelly is summonsing you, I assume.
16            MR. BENNETT:  Probably to sit down, Judge.  She's
17   putting out something unrelated.  Judge, we would have to
18   organize different parts of the record that address that
19   specific point.
20            THE COURT:  I need to know the answer to that
21   question.
22            MR. BENNETT:  Yes, sir.
23            THE COURT:  And that is, somebody has -- by that, I
24   am essentially, I guess, asking for the underwriting factors
25   that govern whether somebody can get a loan.  That, to me, is
```

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 502 of 681
Case 3:17-cv-00461-REP    Document 883    Filed 07/25/20    Page 76 of 97 PageID# 28194

250

1    the loan criteria.

2            MR. BENNETT:  Yes, sir.

3            THE COURT:  That's what I mean by it.  Is it set by

4    Red Rock, Duck Creek Lending, Big Picture, Ascension, TED, Mr.

5    Martorello?  Who sets the criteria by which, when I pick up the

6    phone and dial, I measure up to get a loan or not?  And then

7    the next part of it, is there any variability to that, because

8    there are certain instances, for example if my credit score is

9    800 I can get a loan, but if it's at 700 I can't get a loan,

10   but if I'm willing to pay triple, I can get a loan or pay

11   points.

12           That's how it ordinarily works in the banking

13   industries.  I want to know if there's any variability in the

14   criteria that are set and who is it that has the authority to

15   exercise that criteria.  I need to know that.

16           MR. BENNETT:  We're going to be challenged about the

17   detail with regard to credit score, for example.

18           THE COURT:  I don't mean for you to get into what the

19   credit -- I was using that as an example.  I'm saying, is there

20   anything -- asking is there anything in the record that says

21   here are the criteria that apply to the loans that are going to

22   be made, and, if so, who is it that establishes those criteria,

23   and that is you have to be over 25, you have to have a minimum

24   income of X, you have to have no credit or a credit history of

25   some kind, whatever it is.  I don't know what they are.

1          It may just be that there aren't any criteria.  If

2   you pick up the phone, you breathe, and you are willing to pay

3   600 percent interest, you can get a loan.  I don't know.

4   That's what I'm talking about, is the criteria for the loan and

5   who is it that sets those criteria that the people who are

6   processing the loans actually use to determine whether somebody

7   is or is not going to get a loan.  Do you understand?

8          MR. BENNETT:  I do.  I think we have to address some

9   misconceptions that we've left Your Honor with, that is that

10  there is an individual processing -- an individual as if you

11  might have if somebody applies for a mortgage and you're

12  weighing paper and looking at job, employment data or that type

13  of thing.

14         These are lead-generated loans.  That is, they hire

15  -- in fact, they hire MicroBilt to go find prospective targets,

16  and they prescreen those individuals on criteria that has not

17  been, to my knowledge, revealed in the discovery.

18         THE COURT:  I don't care what the criteria are.  I

19  want to know who sets those criteria.

20         MR. BENNETT:  Yes, sir.  We can present that

21  evidence.  I don't believe it was presented the last two days

22  other than --

23         THE COURT:  No, it wasn't, but it's referred to in

24  some of the papers.

25         MR. BENNETT:  Yes, sir.

1          THE COURT:  Mr. Scheff, did you want to say anything

2     about that?

3          MR. SCHEFF:  Not in terms of the details.  We'll comb

4     the record and provide that information to the Court as well.

5          THE COURT:  Make a separate filing.

6          MR. BENNETT:  Yes, sir.

7          THE COURT:  Caption it something creative or mundane,

8     but have it -- statement of position respecting loan

9     origination criteria would be sufficient.

10          MR. BENNETT:  Yes, sir.

11          THE COURT:  The other thing is in those charts that I

12     was asking you to prepare about the corporate entities and

13     trusts and everything, I need to know associated with that what

14     is Mr. Martorello's interest in those particular entities, each

15     particular entity so that I understand where he personally fits

16     in as well to evaluate some of the testimony that's been given

17     here.

18          So those -- in part of your charts you have that to

19     be done.  All right, now, when do you want to submit these

20     summaries or summary charts of evidence based on the record

21     made in the last two days?

22          MR. BENNETT:  Your Honor, may we go off the record

23     for a second?

24          THE COURT:  Yes.

25          (Discussion off the record.)

```
 1              MR. BENNETT:  So if we're able to get the transcript
 2    Sunday, counsel believes ten days --
 3              THE COURT:  Huh-uh.  Sunday is what day?
 4              MR. BENNETT:  26th.
 5              THE COURT:  That puts it into August.
 6              MR. BENNETT:  Yes, sir.
 7              THE COURT:  Friday.  You get it Sunday, file it
 8    Friday.
 9              MR. BENNETT:  Yes, sir.
10              THE COURT:  That's as far as I'm willing to go on it.
11    We can do some work in the meantime, but Friday is as far as
12    I'm willing to go.
13              MR. BENNETT:  May we have to that same date to submit
14    the charts and the statement of position as well regarding the
15    underwriting --
16              THE COURT:  Can you get it earlier?
17              MR. BENNETT:  We can.  I don't want to throw my
18    opponent under the bus.
19              MR. SCHEFF:  We can as well, Your Honor.
20              THE COURT:  It will help me to read and understand
21    what you are doing if I get some of this stuff in increments
22    instead of having to adjust it.  Could you do it on Wednesday?
23              MR. SCHEFF:  Yes, sir.
24              THE COURT:  Wednesday will be the charts and the
25    other information that I asked for.
```

1          MR. BENNETT:  Your Honor, next Wednesday?

2          THE COURT:  Wednesday will be the --

3          MR. SCHEFF:  Wednesday, the 29th.

4          THE COURT:  And that will -- you all are agreed on

5    what the purchase price is.  The charts showing the various

6    corporate structures and trusts and Martorello's interest

7    therein will be also on Wednesday, and then the evidence as to

8    who sets the loan criteria statement will be due on Wednesday,

9    and the other chart of what you've accomplished tied to which

10   misrepresentation in these last two days will be on Friday.

11         MR. BENNETT:  Yes, sir.

12         THE COURT:  One other -- here's something I think you

13   all need to focus on and I'm going to need to focus on.  I need

14   to really understand quite clearly what *Breakthrough* factor,

15   what evidence relates to as it pertains to the analysis of the

16   *Breakthrough* factor as presented by the Fourth Circuit, because

17   that's the only way a misrepresentation can keep me from

18   applying the Fourth Circuit's rules.

19          The Fourth Circuit evaluated all of the *Breakthrough*

20   factors, and I've asked, in the original order for this hearing

21   and the run-up papers, I asked that you tell me what was the

22   effect of the misrepresentation on the Fourth Circuit's --

23   applicability of the Fourth Circuit's opinion, and what that

24   really means is -- I'm not quite sure was maybe the best way to

25   say it, but it really is which of the misrepresentations

USCA4 Appeal: 21-2116    Doc: 26-2      Filed: 02/07/2022    Pg: 507 of 681
Case 3:17-cv-00461-REP  Document 883  Filed 07/25/20  Page 81 of 97 PageID# 28199

255

1    pertains to which *Breakthrough* factor as analyzed by the Fourth

2    Circuit or other finding of the Fourth Circuit that you think

3    it affects, specific finding, and then I have the basis for

4    making the decision about, A, whether there's a

5    misrepresentation and whether it pertains to the Fourth

6    Circuit opinion in such a way as there's some way that the

7    Fourth Circuit's opinion does not apply, because the way this

8    whole thing got started, don't forget, is that you all made

9    these statements that there had been a number of

10   misrepresentations made to me and the Fourth Circuit, and Mr.

11   Scheff said we believe that the analysis, several of the

12   analyses in the motion to dismiss and the other papers are

13   governed by the Fourth Circuit's opinion.

14           And you said, well, that's not the case because the

15   Fourth Circuit's opinion was predicated on something that

16   wasn't true, and, by the way, I think that same scenario

17   occurred in another -- in a Fair Credit Act case you had

18   before.  I think it was *Soutter* where the Fourth Circuit didn't

19   certify a class, sent it back down, and Equifax then admitted

20   that what they told the Court, the Fourth Circuit, was

21   incorrect, because in the proceeding on remand, the deposition

22   was taken that proved that what they had said to the Fourth

23   Circuit wasn't true.

24           And then there's case law in there that discusses

25   what happens in that situation, and, in essence, what it means

USCA4 Appeal: 21-2116    Doc: 26-2       Filed: 02/07/2022    Pg: 508 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 82 of 97 PageID# 28200

256

1   is not that you jettison the Fourth Circuit decision, but the

2   Fourth Circuit decision doesn't have any binding effect because

3   of the misrepresentation.

4           Now, in this instance, there isn't any admission that

5   there was a misrepresentation.  I understand that.  Do you

6   remember the name of that case that I'm talking about?

7           MR. BENNETT:  It was *Soutter v. Equifax*, Judge.

8           THE COURT:  I had a written opinion on that.  I don't

9   know whether it was published or not.

10          MR. BENNETT:  Yes, sir.

11          THE COURT:  You all both might consult that.  I

12  regard any effort -- I regard it obligatory on a district court

13  to follow the requirements of a Fourth Circuit opinion in a

14  very serious way.

15          MR. BENNETT:  Yes, sir.

16          THE COURT:  So I certainly will require you all to

17  adhere to the rules if I'm not --

18          MR. BENNETT:  Yes, sir.  If I could also note for the

19  Court, of course, that the second argument for why the Fourth

20  Circuit did not dispose of the claims regarding Mr. Martorello

21  is the misrepresentation point.  The first argument is that

22  it's because the Fourth Circuit found something totally

23  unrelated to whether Mr. Martorello is liable which is --

24          THE COURT:  You are talking about the merits of the

25  motion, his motion.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 509 of 681
Case 3:17-cv-00461-REP  Document 883  Filed 07/25/20  Page 83 of 97 PageID# 28201

257

1            MR. BENNETT:  The motion --

2            THE COURT:  To dismiss.

3            MR. BENNETT:  To dismiss, to apply the tribal

4    immunity to a non-tribal defendant.  The Court notes that we

5    filed in this case our supplemental authority from two Fourth

6    Circuit decisions yesterday, one of which we were opposite Mr.

7    Scheff in a different matter, and in both of those decisions,

8    the defendants were non-tribal entities, and the Fourth Circuit

9    opinion as written by Justice Agee, or Judge Agee, found

10   that -- and those were arbitration clauses were not enforceable

11   because tribal law did not apply.

12           They both footnote, footnote one making the

13   distinction between the defendants are not tribal defendants,

14   those individuals have sovereign immunity, but that's not

15   applicable here.

16           THE COURT:  You say you filed something since then?

17           MR. BENNETT:  We did.  We filed supplemental --

18           THE COURT:  This morning?

19           MR. BENNETT:  This morning, yes, sir.

20           THE COURT:  Those are Judge Lauck's two cases.

21           MR. BENNETT:  They are.  One, the appellant was Mr.

22   Hanes, and the other appellant was Sequoia, but both of them

23   were in the Gibbs district court case, and she was affirmed.

24           THE COURT:  All right.  Anything else, Mr. Scheff?

25           MR. SCHEFF:  No.  I don't think that Mr. Bennett has

**JA1129**

1   characterized our position accurately, but we can deal with

2   that in the papers.

3           THE COURT:  That will be dealt with.

4           MR. SCHEFF:  I understand.

5           THE COURT:  What I was trying to direct your

6   attention to is insofar as we're dealing with

7   misrepresentations and the effect of the application of the

8   Fourth Circuit decision to the motion to dismiss, and there's

9   one other pleading, I can't remember what it is, that's been

10  briefed, then there is authority about how that occurs and what

11  can happen and what can't happen.

12          MR. BENNETT:  Judge, respectfully, we have five

13  minutes of counter designations, very short, for two of the

14  depositions that you heard, very, we think, pointed and

15  important testimony in each.

16          THE COURT:  And do you have the designations in

17  written form?

18          MR. BENNETT:  We do.

19          THE COURT:  We'll hear them then.

20          MR. BENNETT:  Yes, sir.

21          THE COURT:  I told you you could do that.  You

22  reserved some time.

23          MR. BENNETT:  I believe we would have as our

24  traveling witness Ms. Austin, and the examining lawyer would be

25  Mr. Dillon.

USCA4 Appeal: 21-2116      Doc: 26-2        Filed: 02/07/2022      Pg: 511 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 85 of 97 PageID# 28203

259

1           THE COURT:  That's not on videotape.

2           MR. BENNETT:  Not on videotape, but they're short.

3           THE COURT:  What you do is come be sworn and swear

4    truthfully to read -- to read accurately that which is in the

5    deposition transcript that you are reading.  Raise your right

6    hand and put it on the Bible.

7           Do you swear that you will truthfully and accurately

8    read the deposition transcript that you're about to read?

9           MS. AUSTIN:  Yes.

10          THE COURT:  And you're going to give me a copy and

11   the law clerk a copy as well?  Do you have it in writing?

12          MR. DILLON:  Yes, Your Honor, just one moment.  I'm

13   organizing, getting the papers for you.

14          THE COURT:  We'll mark it as a plaintiffs' exhibit

15   like we did the defendant.  Is this from one witness or more

16   than one witness?

17          MR. DILLON:  Three witnesses, Your Honor.

18          THE COURT:  As soon as we get that all accomplished,

19   we'll make the record straight on that.

20          MR. DILLON:  Your Honor, in terms of timing, I

21   believe it's hopefully going to be about ten minutes or so.

22   Two of these are fairly short.  One of these we have a couple

23   more designations.

24          THE COURT:  Who are you reading?

25          MR. DILLON:  So one counter designation are from the

1    deposition of James Dowd.

2              THE COURT:  What plaintiffs' exhibit is that?

3              MR. DILLON:  This plaintiffs' exhibit -- one moment,

4    Your Honor.  140.

5              THE COURT:  And the next one is?

6              MR. DILLON:  Deposition of Karrie Wichtman.

7              THE COURT:  And that is?

8              MR. DILLON:  141.

9              THE COURT:  And the last one?

10             MR. DILLON:  The deposition of Robert Rosette.

11             THE COURT:  And you have copies of all those to give

12   the clerk.

13             MR. DILLON:  Yes.  I gave the copies.  And the

14   Exhibit 142 for Mr. Rosette.

15             THE COURT:  Yes, I know.

16             MR. DILLON:  I'd like to start with the deposition

17   for James Dowd.

18             THE COURT:  All right.

19             MR. DILLON:  All right.  So our counter designations

20   begin page 17, line six.

21             THE COURT:  Go right ahead.

22             (Deposition transcript of James Dowd read.)

23             MR. DILLON:  Next designation is page 19, line 17.

24             (Reading of deposition resumed.)

25             MR. DILLON:  Your Honor, for our next counter

1    designation on page 75, this is a continuation of defendant's

2    designations.  This is paragraph 17 in defendant's

3    designations.  We're just continuing the next several

4    subsequent lines.

5         THE COURT:  What?  I don't know what you are talking

6    about.  75, line two through four.  "Honestly, I don't work

7    with that specific process very closely, so I think it would be

8    better as to somebody else" is what's on my page.

9         MR. DILLON:  So, Your Honor, the designation here

10   from defendants, this was page 74, line 16, to page 75, line

11   one.

12        THE COURT:  I don't have that.  I have page 75, and

13   line one is not designated at all, and then I have lines three

14   and four.

15        MR. BENNETT:  Your Honor, this is our copy of the

16   defendant's text of what they submitted in the record for Mr.

17   Dowd, and this is a continuation starting at numbered paragraph

18   17.  The next lines after that text are what we are counter

19   designating.

20        THE COURT:  So this counter designates what?  Say

21   what it is.

22        MR. BENNETT:  It's a counter designation expanding --

23        THE COURT:  Here's the thing:  It's a counter

24   designation to the deposition of Dowd put on by the plaintiffs,

25   defendant's exhibit whatever it is, entry number 19, page 82 to

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 514 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 88 of 97 PageID# 28206

262

1    whatever it is.  That's what you put into the record and

2    explains -- your counter designation is 75, lines two through

3    four; is that right?

4              MR. BENNETT:  Yes, sir.

5              THE COURT:  That's how you do it.

6              MR. BENNETT:  Yes, sir.

7              THE COURT:  I'm not going to go through all that for

8    you.

9              MR. DILLON:  So beginning with defense designation

10   starting at page 74, line 16.

11             THE COURT:  What exhibit is that?

12             MR. DILLON:  This is exhibit number --

13             MR. BENNETT:  Judge, I don't have the exhibit number

14   for Mr. Dowd's deposition.  328.

15             THE COURT:  What?

16             MR. BENNETT:  This is the counter designation to

17   Exhibit 328 which was Mr. Dowd's original designation, and the

18   two sentences we intend to read, the Court needs to be able to

19   follow what the original text was because we believe that was

20   incorrect.

21             THE COURT:  I have 328 in front of me.  What is this

22   proposed counter designation on page 75 of plaintiff's

23   Exhibit 140, where does it fit?

24             MR. BENNETT:  It continues -- the next sentence after

25   the end of this.  So it says --

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 515 of 681

1           THE COURT:  No, not this --

2           MR. BENNETT:  Of and all that.

3           THE COURT:  First let's get the entry number.

4           MR. BENNETT:  Entry number 17, numbered paragraph 17.

5           THE COURT:  Hold on.  And that is page 74, line 16,

6    to 75-01.

7           MR. BENNETT:  Yes, sir.  And the defendant stopped at

8    75-01.  We're going to read 75-2, three, and four so it will be

9    complete.

10          THE COURT:  I'm seeing Plaintiffs' Exhibit 140, page

11   75, lines two through four.  Is that right?

12          MR. BENNETT:  Yes, sir.

13          THE COURT:  Now I understand where this fits.

14          MR. DILLON:  If Your Honor would like, I can reread

15   defense designation just to provide context before we provide

16   our counter designation.

17          THE COURT:  I don't know what you are doing.  Your

18   next thing is on page 82.

19          MR. DILLON:  Okay.  For this designation, I'm going

20   to reread from Defendant's Exhibit 328 to provide the context

21   so Ms. Austin can provide our counter designation.

22          THE COURT:  Take the 328 and tell me which entry you

23   are talking about.  It's got bold numbers there.

24          MR. DILLON:  It's entry 17 beginning --

25          THE COURT:  You just did that.

```
 1            MR. DILLON:  Okay.  Then we'll continue -- the reason
 2   we wanted to read this was just to give context for this second
 3   portion because it was a continuation of the same response.
 4            THE COURT:  I understand, and I've made a note to see
 5   this particular next thing.
 6            (Reading of deposition resumed.)
 7            THE COURT:  That is a counter designation to entry 17
 8   on DX-328.
 9            MR. DILLON:  Yes, Your Honor.
10            THE COURT:  He says essentially what he's talking
11   about in entry 17 he doesn't know about.  All right.
12            MR. DILLON:  Next counter designation is page 82,
13   line one.
14            (Reading of deposition resumed.)
15            MR. DILLON:  Next is page 83, line four.
16            (Reading of deposition resumed.)
17            MR. DILLON:  Page 95, line 16.
18            THE COURT:  There's a whole lot more underscored here
19   on my copy.
20            MR. DILLON:  Your Honor, I think that was a
21   formatting error.  Our designation cuts off on line 14 after
22   "it works."
23            THE COURT:  All right.  Make sure that you mark an X
24   through what you give the clerk.
25            MR. DILLON:  Okay, yes, Your Honor.  Make a note of
```

1    that.  Next designation, page 95, line 16.

2              (Reading of deposition resumed.)

3              MR. DILLON:  Your Honor, that's the end of our

4    designations from the James Dowd deposition.

5              THE COURT:  All right.

6              MR. DILLON:  Next will be counter designations from

7    Karrie Wichtman's deposition.  I believe that's Exhibit 141.

8              THE COURT:  What's her deposition exhibit?

9              MR. BENNETT:  The original is 327, Your Honor.

10             THE COURT:  All right.

11             MR. DILLON:  Our first designation here, there are a

12   few extra pages at the beginning of the document I handed to

13   the Court.  We're starting on page 212.

14             THE COURT:  What was Mansfield's exhibit number?

15             MR. DILLON:  One moment, Your Honor.

16             THE COURT:  Mr. Scheff, do you know?

17             MR. SCHEFF:  I do, Your Honor.  333.

18             THE COURT:  And Wichtman is 327; right?

19             MR. DILLON:  Yes, Your Honor.  So our first counter

20   designation, page 212, line 13.

21             (Deposition designations of Karrie Wichtman read.)

22             THE COURT:  Wait a minute.  What are you reading

23   from?

24             MR. DILLON:  This is page 212 --

25             THE COURT:  You are talking about from Wichtman?

1              MR. DILLON:  Yes, Your Honor.

2              THE COURT:  First page I have is 161.  The next one I

3    have is page 193.

4              MR. DILLON:  There were some formatting issues with

5    the pages included, so there was some extraneous pages included

6    at the beginning.

7              THE COURT:  I have 184.

8              MR. DILLON:  I believe it's the first five or so

9    pages --

10             THE COURT:  How many?  Give me page numbers.

11             MR. DILLON:  So page two --

12             THE COURT:  161 and then 183 through 186 come out; is

13   that right?

14             MR. DILLON:  Yes.

15             THE COURT:  Everybody takes that out.  Now you want

16   to go back to page 212, you say?

17             MR. DILLON:  Yes, Your Honor.

18             THE COURT:  All right.  I've got that now.  Go ahead.

19             (Reading of deposition resumed.)

20             MR. DILLON:  Next counter designation is on page 229,

21   line 11.

22             (Reading of deposition resumed.)

23             MR. DILLON:  A third designation, counter

24   designations are from the deposition of Robert Rosette,

25   Exhibit 142.

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 519 of 681

1          THE COURT:  What is his; number 331?

2          MR. SCHEFF:  That's correct.

3          MR. DILLON:  Yes, Your Honor, 331.

4          THE COURT:  Okay, and yours is PX-142.

5          MR. DILLON:  Yes, Your Honor.

6          THE COURT:  That's it?

7          MR. DILLON:  Yes, Your Honor.

8          THE COURT:  All right.  Allergies, not COVID.  Is

9   that it?

10         MR. BENNETT:  Yes, Your Honor.

11         THE COURT:  Is there anything else we need to do?

12         MR. BENNETT:  Not from the plaintiffs' perspective.

13         MR. SCHEFF:  Not from Mr. Martorello's perspective,

14  Your Honor.

15         THE COURT:  Let's go off the record.

16         (Discussion off the record.)

17         THE COURT:  We're discussing the suggestion that

18  choice of law provision needs to be decided, and I need to

19  figure out where it is.  It's pleading number what, 379?

20         MS. KELLY:  Judge, it is --

21         THE COURT:  Come to the lectern, if you would.

22         MS. KELLY:  If the Court recalls, the reason -- part

23  of the reason we had this hearing was because in the briefing

24  leading up to class certification, Mr. Martorello raised the

25  defenses about the effect of the Fourth Circuit on the issue of

1    the class action waiver in his briefing for class

2    certification.

3          And so we briefed that issue, and plaintiffs' brief

4    is ECF 734, and in that brief, the arguments that are made deal

5    with whether the class action waiver provision applies to Mr.

6    Martorello.  It also deals with whether the loan agreements

7    prospectively waive federal law which is why we just filed the

8    supplemental authority brief --

9          THE COURT:  Wait a minute.  Whether the loan

10   agreement prospectively what?

11         MS. KELLY:  Prospectively waives federal law, because

12   the loan agreements require consumers to go through a dispute

13   process under tribal law that we have asserted is --

14   prospectively waives federal law, because the consumers don't

15   have rights and remedies that be would available to them under

16   federal law, because, for example, the tribal code does not

17   allow a consumer certain damages --

18         THE COURT:  Too much information right now.  Your

19   position is that the decisions yesterday from the Fourth

20   Circuit help you in that analysis; is that what you are saying?

21         MS. KELLY:  Yes.

22         THE COURT:  They dealt with arbitration clauses.

23         MS. KELLY:  It did, but in the decision as to the

24   Sequoia defendant, which is the one that we filed, it also

25   dealt with the tribal code, because if a consumer also had to

USCA4 Appeal: 21-2116    Doc: 26-2    Filed: 02/07/2022    Pg: 521 of 681
Case 3:17-cv-00461-REP   Document 883   Filed 07/25/20   Page 95 of 97 PageID# 28213

269

1    go -- the option, if they opted out of arbitration or if

2    arbitration was unsuccessful, they would have to go through the

3    tribal dispute resolution procedure.

4            THE COURT:  Slow down.

5            MS. KELLY:  Sorry.  They would have to go through --

6    a consumer would have to go through the tribal dispute

7    resolution procedure, and in the case of Plain Green and Great

8    Planes, which are related to the Think Finance enterprise, that

9    tribal dispute resolution procedure was also -- is very similar

10   to the Red Rock/Big Picture tribal dispute resolution

11   procedure, and the Fourth Circuit found that the tribal dispute

12   resolution procedure deprived a consumer of their federal

13   rights and remedies and, essentially, prospectively waived

14   federal law as the arbitration -- analogous to the arbitration

15   prospective waiver doctrine that the Fourth Circuit has, you

16   know, routinely rejected enforcing arbitration on that ground.

17           So we think the language and the Court's analysis

18   looking at the tribal dispute resolution procedure in the Plain

19   Green/Great Plain scenario and finding that the provisions of

20   the rights and remedies available waiving prospective federal

21   law helps our position in this brief.  And we think that once

22   the Court rules on this issue, it is essentially --

23           THE COURT:  Rules on what issue?

24           MS. KELLY:  The issue in ECF 734 with whether or not

25   class, the class waiver is enforceable, because the analysis

 1    essentially goes to the very heart of the case regarding choice

 2    of law.  It's the same exact analysis, and so that would be the

 3    law of the case, and, from our perspective, the summary

 4    judgment or -- the loans would be illegal, these would be

 5    unlawful debts, and the case would essentially be over in our

 6    position.

 7                THE COURT:  But what you are asking is for me to look

 8    at and rule on the class waiver issue presented in his paper

 9    number what discussed in your paper number what and responded

10    to in his paper number what?

11                MS. KELLY:  So Mr. Martorello's brief was ECF 664.

12                THE COURT:  What section of it are we talking about?

13    He has a table of contents, I think, in the front.

14                MS. KELLY:  The brief is addressing the effect of the

15    Fourth Circuit's decision on the motion for class

16    certification.  In section one, Mr. Martorello asserts that the

17    Fourth Circuit decision requires a finding that the class

18    action waiver is valid and enforceable.

19                THE COURT:  All right.  And then you respond to that

20    in?

21                MS. KELLY:  In ECF 734, and we cite multiple reasons

22    why we don't think it is enforceable.

23                THE COURT:  And then you have supplemented that with

24    a citation to one of the two cases yesterday?

25                MS. KELLY:  Mr. Martorello did reply to our response

1    at ECF 781, and then we filed today, Mr. Guzzo filed it, a

2    notice of -- motion for leave to file supplemental authority.

3    It was filed today.

4            THE COURT:  Is there any objection to the motion for

5    leave to file the supplemental authority, Mr. Scheff?

6            MR. SCHEFF:  Your Honor, I haven't seen the motion at

7    all.  I doubt there is, but at least I'd like the opportunity

8    to take a look at the motion.

9            THE COURT:  Seems reasonable to me.

10           MS. KELLY:  Thank you, Judge.

11           THE COURT:  Will you file something Friday, let me

12   know whether you object to it, just that part of it?

13           MR. SCHEFF:  Will do.

14           THE COURT:  Thank you very much.  We'll be in

15   adjournment.

16

17                   (End of proceedings.)

18

19

20       I certify that the foregoing is a correct transcript

21   from the record of proceedings in the above-entitled matter.

22

23

24   _____/s/_____           _____

     P. E. Peterson, RPR           Date

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| LULA WILLIAMS, *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| v. ) | Civil Action No. 3:17-cv-461 (REP) |
| ) | |
| BIG PICTURE LOANS, LLC, *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

**REPLY TO DEFENDANT MATTHEW MARTORELLO'S STATEMENT OF
POSITION WITH RESPECT TO PLAINTIFFS' MOTION FOR LEAVE TO FILE
SUPPLEMENTAL AUTHORITY**

Plaintiffs, by counsel, respectfully submit this brief reply to address the arguments raised

in Defendant Matthew Martorello's Statement of Position (Dkt. 881).

Martorello's response wisely concedes that the Lac Vieux Desert Band of Chippewa

Indian's regulatory code is virtually identical to that of the Otoe-Missouria Tribe's Code

considered by the Fourth Circuit in *Gibbs*. Faced with this insurmountable obstacle—that the

Fourth Circuit has found that the tribe's law prospectively waives all federal rights and remedies—

Martorello offers two unavailing reasons why the class waiver provision remains enforceable.

First, Martorello claims that the "prospective waiver doctrine is exceedingly narrow, and

has no application outside of the arbitration context." Dkt. 881 at pg. 3. It is no surprise that

Martorello offers no support for this theory as it expressly contradicts the prospective waiver

doctrine as first articulated by the Supreme Court. *Mitsubishi Motors Corp. v. Soler Chrysler-*

*Plymouth, Inc.*, 473 U.S. 614, 637 n. 19 (1985) (explaining that "in the event the ***choice-of-forum***

***and choice-of-law clauses*** operated in tandem as a prospective waiver of a party's right to pursue

statutory remedies for antitrust violations, we would have little hesitation in condemning the

**JA1144**

agreement as against public policy.") (emphasis added). Although it often arises in the context of arbitration, the prospective waiver docrtrine is unquestionably applicable to "choice-of-forum and choice-of-law clauses" as first proclaimed in *Mitsubishi*. *Id*. And this makes perfect sense because "[a]rbitration provisions" are "species of forum-selection clauses." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 698 (2010) (Ginsburg, J., dissenting) (citing *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519 (1974) ("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute.").

Second, Martorello asserts that "the prospective waiver doctrine has no applicability in the context of class waivers," and the "Supreme Court has already twice ruled as such." Dkt. 881 at 1-2 (citing *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350-51 (2011). A cursory review of these cases, however, reveals that they addressed different issues. *Italian Colors*, 570 U.S. at 231 ("We consider whether a contractual waiver of class arbitration is enforceable under the Federal Arbitration Act when the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery."); *Concepcion*, 563 U.S. 333 at 336 ("We consider whether the FAA prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures.").

Here, Plaintiffs do not argue that the class waiver is unenforceable because the cost of individually proceeding before the Tribal Financial Services Regulatory Authority exceeds their potential recovery. Nor do Plaintiffs argue that the class waiver—in and of itself—prospectively waives their ability to vindicate their statutory rights. Instead, the crux of Plaintiffs' argument is that the chosen law (*i.e.*, LVD's Consumer Financial Regulatory Code) and the forum selection

JA1145

clause (*i.e.*, the "Tribal Dispute Resolution Procedure" clause), operate in tandem to prospectively waive their federal rights. Because the class waiver is a component of the forum-selection clause in this case, it is unenforceable just like the class waiver residing in the arbitration agreement in *Gibbs*. *Gibbs v. Haynes Investments, LLC*, 2020 WL 4118239, at \*8 (4th Cir. July 21, 2020) (finding the "entire arbitration agreement is unenforceable.") (quoting *Dillon v. BMO Harris*, 856 F.3d at 335-37 (4th Cir. 2017)).

Without saying it, Martorello's real argument is that the class waiver provision is somehow severable from the unenforceable choice-of-forum provision where it resides. But as *Dillon* teaches: "Unlawful portions of a contract may be severed *only if*: (1) the unlawful provision is not central or essential to the parties' agreement; *and* (2) the party seeking to enforce the remainder negotiated the agreement in good faith." *Dillon*, 856 F.3d at 336 (emphasis added). Martorello's request for severance defies both of these requirements and, in fact, every case to consider such a request. *See, e.g.*, *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016) ("Good authority counsels that severance should not be used when an agreement represents an 'integrated scheme to contravene public policy.'") (citations omitted);*Gingras v. Think Finance, Inc.*, 922 F.3d 112, 126 (2nd Cir. 2019) (finding no basis "to sever any particular provision of the arbitration agreement because, given the pervasive, unconscionable effects of the arbitration agreement interwoven within it, nothing meaningful would be left to enforce"); *MacDonald v. CashCall, Inc*, 883 F.3d 220, 232 (3d Cir. 2018) ("We therefore join our sister circuits in concluding that the CRST arbitral forum clause is integral to the entire arbitration agreement and cannot be severed."); *Williams v. Medley Opportunity Fund II, LP*, 2020 WL 3968078, at \*9 (3d Cir. 2020) ("Because tribal law provisions are 'integral to the entire arbitration agreement,' they 'cannot be severed.'")

JA1146

(citations omitted). In short, contracts containing choice of law and choice of forum clauses that

waive all federal rights and remedies cannot be blue-penciled to save a class waiver provision.

Respectfully submitted,
**PLAINTIFFS**


Date: July 26, 2020

_____/s/_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

*Attorneys for Plaintiffs and Proposed Classes*

**JA1147**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 26, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

Date: July 26, 2020

_____/s/_____
Kristi C. Kelly, Esq., VSB #72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
*Attorneys for Plaintiffs and Proposed Classes*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| LULA WILLIAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-cv-461 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| RENEE GALLOWAY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:18-cv-406 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### MATT MARTORELLO'S STATEMENT OF POSITION
### IN RESPONSE TO JULY 23, 2020 ORDER (PARAGRAPH 4)

On July 23, 2020, the Court issued an Order (*Williams*, ECF No. 880; *Galloway*, ECF No. 539) directing the parties to, among other things, file on or before this date "in both listed actions a statement of position setting out the evidence in the record that explains who or what entity sets the loan criteria." *Id*. ¶ 4. At the July 22, 2020 hearing in this matter, the Court further clarified that it was seeking from the parties to understand, "Who sets the criteria by which, when I pick up the phone and dial, I measure up to get a loan or not? And then the next part of it, is there any variability to that …. I want to know if there's any variability in the criteria that are set and who is it that has the authority to exercise that criteria." Hr'g Tr., Jul. 22, 2020, at 249-

JA1149

250.[1] Mr. Martorello respectfully responds as follows:

It would be difficult to exhaustively proffer all relevant evidence in response to the Court's questions, and the answers may depend upon when the subject loan was applied for. But the response is perhaps best addressed by way of an illustrative example (a flow chart contained in the record) summarizing ██████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████. *See* Ex. A (██████████████████) (the "Flow Chart").[2] The Flow Chart illustrates ████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

At the outset, and to be clear, the tribe's lending companies retained the ability to approve or disapprove any loan, regardless of whether that loan had satisfied all of the underwriting criteria or not, and Bellicose and SourcePoint ("SPVI") had no authority to approve

---

[1] As Plaintiffs' counsel noted at the conclusion of the July 22, 2020 evidentiary hearing, evidence on this point was not addressed or presented at the hearing. Hr'g Tr. Jul. 22, 2020, at 251 ("MR. BENNETT: Yes, sir. We can present that evidence. I don't believe it was presented in the last two days other than – THE COURT: No, it wasn't, but it's referred to in some of the papers."). Martorello agrees—and urges that Plaintiffs failed to meet their burden on the point by not putting on such evidence at the hearing, to the extent it implicates one of their alleged "material misrepresentations." Nevertheless, Martorello has combed the evidence and supplements in this filing the evidence previously outlined in his pre-hearing brief on the point. *See Williams*, ECF No. 843, *Galloway*, ECF No. 503. To the extent that the Court does not intend to consider additional evidence on this issue, Martorello respectfully submits that Plaintiffs have failed to meet their burden of proof and, accordingly, the Court should find in Martorello's favor on this issue.

[2] To the extent that the Court's inquiry is focused on any particular alleged "misrepresentation(s)" by Martorello, as identified by Plaintiffs, Martorello respectfully requests the Court consider the evidence Martorello listed in the matrix rebutting Plaintiffs' allegations, which details, among other things, the testimony of numerous witnesses in regard to the authority of the underwriting residing with RRTL. The matrix was attached to Martorello's response brief as Exhibit "A." *See Williams*, ECF No. 844-1; *Galloway*, ECF No. 505-1.

or disapprove a loan at any time, and they never did so. *See* Ex. B, ██████████████

███████████████████████████████████████████████ [3]

The answer is no different with regard to the Court's question about authority over the underwriting process and who established those criteria. In fact, this was the intention dating back to at least 2011.[4] While the contracts pertaining to lead providers and data vendors were

---

[3] *See also* ████████

██████████████████████ *see also* Ex. C, Gravel 4/15/19 Dep. at 158:1-19 confirming that after loan applications complete the underwriting process, "all loan applications are reviewed and[] approved by [Red Rock or Duck Creek] on tribal land before the loan is originated"), and Ex. D (████████████); Ex. E, ████████ ████████████████████

[4] *See* Ex. F (Rosette_Revised_052323) (Aug. 24, 2011 email in which Martorello explains the Tribe will make the "decision on how to operate and underwrite" while "Bellicose suggests new ideas and changes to the operations"); *see also* Ex. B, ████████ ██████████████████████████████ Ex. G, Mansfield 1/18/19 Dep. at 53:5-25 (testifying that the decision to make loans rested solely and absolutely in the discretion of Red Rock, and was made by people working at the call center in Watersmeet, Michigan); Ex. C, Gravel 4/5/19 Dep. at 86:3-87:12 (testifying Martorello did not control Red Rock, and it is "extremely common" in the industry for entities to serve as servicers to lending entities); 20:18-23:18 (tribal entities had decision-making authority regarding how to act on servicer recommendations); 152:12-18 ("[W]e were merely making recommendations and acting as a service provider."); Ex. H, Weddle 5/20/19 Dep. at 62:9-63:22 (testifying any business matter must have had the approval of the designated Tribal officials and Bellicose was not the decision maker "because Bellicose VI was simply providing services pursuant to its contract"); 110:4-15 (describing "a significant number of conversations over that period of years that demonstrated to me the tribe's control over decision-making"); Ex. I (████████████████) (████████████

3

**JA1151**

originally with SPVI,[5] eventually all key vendor contracts (aside from the fintech technology platform packaged by SPVI) were with RRTL.[6]

SourcePoint would have made recommendations with respect to all of the various steps in the Flow Chart, starting with ███████████████████████[7] which would have been



---

[5] ████████████████████████████████████████████████████████████
███████████ Ex. J (███████████████████████). It had been Martorello's original intention in 2011 for those vendors to engage in commercial dealings directly with LVD. However, for "certain vendors who remain resistant to the tribal licensing process such as lead providers and credit reporting agencies" this was not always feasible. Ex. ██ (ROSETTE_REVISED_006281) (K. Wichtman email of Oct. 26, 2011, 6:29 pm). As a result, Martorello ███████████
██████████████████████████ (██████████████████████████████). It is likely that additional records from this relevant time period may exist; however, because jurisdictional discovery relating to the Tribe was cut off earlier in the case at January 1, 2014, and along with the Tribal Defendants' dismissal from the case, Martorello's ability to supply the Court a full picture of the evidence from that period has been materially impeded.

[6] *See, e.g.*, Ex. M (████████████████ ) (



); Ex. N (█████████████ ) (
██████████████████████████); Ex. O (██████ )
██████████████████████████); Ex. P
(██████████ ) (████████████); Ex. Q
(██████████ ) (
██████ ).

[7] ████████████████████████████████████████████████████████████



████████████ *See, e.g.*, Ex. M (████████████ ) (
█ ), Ex. R (██████████████████ ) (
██████████████); Ex. S (█████████ )
██████████ ). Prior to mid-2013, these services fell within the provision of pre-qualified leads where SPVI applied its internal formulas and processes to generate leads fitting the tribe's set "underwriting box," and the general nature of these services and volume were always first discussed with RRTL and approved in advance. The provision of pre-qualified leads having been SPVI's "secret sauce," was inadvertently turned over directly to RRTL while

4

**JA1152**

reviewed, discussed with, and approved by the Tribe.[8] The next field in the Flow Chart,



[9]

The Flow Chart next illustrates, ████████ [10] ████████████████

---

the industry generally demanded end-to-end transparency of a consumer with elevated accountability for and vendor oversight and auditing (an effort which SPVI and RRTL indeed launched), particularly as it pertained to lead generation through third party online marketing agencies.

[8] ████████████████████████████████████████. *See, e.g.,* Ex. T (████████████████████) (████████████); *see also, e.g.,* Ex. U (████████████████); Ex. V (LVD-DEF00017206) (SPVI recommending price points on a new campaign).

[9] *See, e.g.,* Ex. W (████████████) (████████); Ex. B , Ex. X (████████) (████; Ex. Y (████████) (████; Ex. Z (████████); Ex. Z (████████████).

[10] The Flow Chart was provided to potential banking partners and the columns are labeled for illustrative purposes only and do not necessarily indicate the name of any particular strategy, or all particular strategies in practice.

JA1153



████████████████████████████████████████████ [11] ████████████
████████████████████████████████ With limited exception, these codes and filters were originally developed by SPVI by analyzing RRTL data and performance; however, they were implemented in consultation with and only after RRTL's approval. For example, ████████████ potential leads would be checked against ████████████ (*see* Flow Chart, Ex. A ¶ at 1), whereby banks known for negative performance and association with fraudulent activity would be identified, as would ████████████████ for instances of prior fraudulent activity, thereby blocking and rejecting any matches at the top of the lead-qualification process.[12]

If a lead passed the ████████████, it would be assigned to ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ [13] As detailed above, these vendor contracts became direct with

_____

[11] The intermediary step of ████████████████████████████████████ is a reference to SourcePoint's fintech platform, which had two primary components, including a "decision engine," which was placed on top of the tribal server and would coordinate the various processes through the use of technology, and a "CRM" or "LMS" (loan management software) for relationship management of the RRTL portfolio. This technology platform was provided by SPVI through the sub-contracting and integration of with those technology firms. RRTL required and was provided levels of access to the LMS ranging from CSR to Administrator, in order to perform their related tasks including the origination activities and ACH processing. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ . *See* Ex. AA (████████████████████████).

[12] As used in the schematic, the acronym ████████ means ████ ████████████████████████████████████████████████ ████████████████████████

[13] Those processes changed, evolved, and expanded to additional strategies, routinely, through the data analytics performed by SPVI but only with approval and discussion with RRTL, and

JA1154

RRTL, subject to termination of SPVI's agent access at any time or download and transfer of the embedded intellectual property. The third-party vendors ████████████████████ ████████████████████████,[14] which were recommended by SPVI and discussed with RRTL (and received compliance board approval), prior to any decision by RRTL to implement them. *See, e.g.,* Ex. DD (██████████████) (████████████████████ ████████████████████); Ex. EE (███████████████████) (██████████ █████████████████████████████████████████████████ ██████████████████████████████████████).

If a lead failed those various services, it would be rejected. If a lead passed those checks, it would be purchased or accepted and ready for underwriting. This is depicted in the Flow Chart by the green box titled ████████. At this stage, the potential borrower is served the loan agreement and terms offered by the Tribe from the tribal reservation server and signs, or rejects, the agreement on the tribal server.[15]

In the case of a borrower subject to ██████████████ (i.e., the highest quality leads sometimes inartfully called "auto originate" or "auto fund"),[16] the application would

---

after April 2014, also their compliance board. *See, e.g.,* Ex. BB (██████████████) (██████████████████████████).

[14] In fact, the vendors themselves typically consulted and recommended settings, changes and new products for presentation to RRTL as well, not only for underwriting but also for the provision of pre-qualified leads. Ex. ██ (LVD-DEF00017191) (adding new sources, as recommended by the lead provider).

[15] *See, e.g.,* Ex. FF (██████████████████) (██████████████████████ ███████████████).

[16] *See, e.g.,* Ex. B, ██████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

bypass the outsourced call center manual verifications and be sent to the tribe for review. However, in certain instances, additional underwriting was still necessary at this juncture. For example, it was sometimes necessary for a manual verification to be performed to ensure borrowers met certain income requirements. *See, e.g.,* Ex. GG (MARTORELLO_ROSS_001528) ("Strategy R" requiring manual income verification for returning customers applying for more than $800).

If a lead was instead assigned to ███████████████ (i.e., the mid-grade or low-grade leads), they would be subject to a different series of data checks, and if they passed those checks and the lead was purchased or accepted, the underwriting manual verifications would be significantly more involved. For example, the call center employees would perform certain verifications (e.g., verification of employment, verification of income and a valid bank account provided). *See, e.g.,* Ex. GG MARTORELLO_ROSS_001529 (merchant requirements detailing the call center full verification process).

Once those manual verifications were performed, or bypassed in most instances under ██████████████, *all* potential borrowers would then be passed on to a DCTF/RRTL employee to review. It is important to note that all three ████████████ scenarios end with the same final two processes on the reservation, the same processes are outlined in steps 7 and 8 in the declaration of Michelle Hazen with respect to Big Picture Loans, and were not materially different for RRTL.[17] First, RRTL CSRs act as senior loan officers confirming the

███████████████████████████████████████████████████████
███████████████████████████████████████████████████

---

[17] *See also* Ex. HH Hazen 10/16/17 Dep at 196:2-8 (testifying that step 7 in her declaration was exclusively performed on the reservation); 224:8-13 (testifying that CSR employees on tribal land review every loan document and then verify the bank information on every origination); and at 197:15-20 (stating that no employees that are not on tribal land would ever perform this task).

proper processing by the offshore call center operators, the proper e-signature is on the agreement (screening for, as examples, instances where a wife signing for a husband, or a bogus invalid signature field was entered), the due dates match the payment schedule, identity information confirmed, and so on. CSRs review every variable on the application, as well as every call center notation documenting the verifications specific to the application in order to ensure proper processing transpired, qualifications for strategy are reviewed,[18] verification of the Philippines call center's adherence to RRTLs "merchant requirements,"[19] and CSRs then ultimately prepare the application for ████████████████████████████

████████. Ex. A (Flow Chart).[20] In no instance (at least during the pre-sale period, about which Martorello has access to some relevant evidence) was an application verified by automated means or otherwise without this final important process of examination by the Tribe of its applications, nor could it be automated as to the time period before the sale.

Second, the loans were not consummated nor were notices of obligation provided to borrowers until those RRTL personnel initiated and completed the "batch renewal processing" from administrator account access within the loan management system, depicted as the eighth step in Ms. Hazen's declaration. *See* Ex. JJ (███████████) (████████████

███████████████). In completing this last step (which is actually three separate steps, each with sub-steps), even a perfect application under any underwriting strategy

---

[18] *See, e.g.*, Ex. █ (███████████████████) (█

███████████████████).

[19] *See, e.g.*, Ex. GG (MARTORELLO_ROSS_001529) (thirteen-point merchant requirements).

[20] Even the on-reservation final processes at times result in variability. *See* Ex. B, ████

████████████████████████.

could be caused to be withdrawn or sent for further verifications. For example, there may be inconsistencies identified in the application with misaligned due date to payroll frequency, the software is queried to test if bank routing and account numbers exist for another customer, debit amounts exceeding balance due, or various flags, like bankruptcy. Any such identified issues would cause the application to be either withdrawn or sent to the call center to attempt further verification.

Once this process was completed, the loan would be consummated, the balance due would be recorded in the loan management system (conversely a payment applied against for any collections), the consumer would be notified, and the tribe would send the ACH files with both credits and debits to its payment processors to effectuate the movement of RRTL's funds.[21] Only after these final processes were completed would the loan application be originated by RRTL, which had sole authority to do so.[22] [23]

---

[21] *See, e.g.*, Ex. KK ( )
 .

[22] Moreover, RRTL also had the ultimate authority on a corporate and formalistic level. For example, RRTL could alter any process at the highest levels by simply ceasing its necessary on-reservation activities overnight, by firing or replacing SPVI through the agreed-upon 120-day voluntary termination provision, by contacting its directly contracted vendors and revoking agent level access to SPVI, or notifying any vendor that they desired a contract directly, so as to bypass SPVI entirely.

[23] In the interest of completeness, Martorello notes that the Big Picture Loans ("BPL") processes may differ in the wake of the sale of Bellicose and Sourcepoint in 2016. Neither he, nor any associated entity, has access to their systems processes, or records, and without that access Martorello is unable to verify one way or the other whether that is the case. There is, however, evidence that suggests the process remains the same (or similar), such as Michelle Hazen's declaration, the identical Intratribal Servicing Agreement as that between RRTL and SPVI, and other testimony, such as Chairman Williams's November 2017 deposition, in which he recounted that Big Picture Loans handles the loans, not Ascension Technologies. *See* Ex. LL, Williams 11/13/17 Dep. at 107:17-108:8. While Martorello lacks the information necessary to verify these statements for certain, he also has no reason to doubt that evidence, the Tribe's arguments with respect to BPL's relationship with Ascension, or the Fourth Circuit's conclusion that control over

RESPECTFULLY SUBMITTED AND DATED this 29th day of July, 2020.


Dated: July 29, 2020                          Respectfully submitted,

                                              /s/ John M. Erbach
                                              John M. Erbach (VSB No. 76695)
                                              jerbach@spottsfain.com
                                              M. F. Connell Mullins, Jr. (VSB No. 47213)
                                              cmullins@spottsfain.com
                                              SPOTTS FAIN PC
                                              411 E Franklin Street Suite 600
                                              Richmond, VA 23219
                                              Tel: (804) 697-2044
                                              Fax: (804) 697-2144

                                              Richard Lawrence Scheff (pro hac vice)
                                              Jonathan P. Boughrum (pro hac vice)
                                              Michael C. Witsch (pro hac vice)
                                              ARMSTRONG TEASDALE LLP
                                              2005 Market Street, 29th Floor
                                              One Commerce Square
                                              Philadelphia, PA 19103
                                              Tel: (267) 780-2012
                                              Fax: (215) 405-9070
                                              rlscheff@armstrongteasdale.com
                                              jboughrum@armstrongteasdale.com
                                              mwitsch@armstrongteasdale.com

                                              *Attorneys for Defendant Matt Martorello*

---

BPL's lending resides with BPL and LVD, and not Ascension, and that the tribal co-managers exercised their authority with frequency. *See Williams v. Big Picture Loans*, 929 F.3d 170, 187-88 (4th Cir. 2019). Martorello respectfully submits that the same ultimate authority was exercised by RRTL through an identical servicing agreement with SPVI.

11

**JA1159**

## CERTIFICATE OF SERVICE

I, John M. Erbach, hereby certify that on July 29, 2020, I filed the foregoing using the

Court's CM/ECF electronic filing system, which will serve an electronic copy on all counsel of

record by Notice of Electronic Filing (NEF).

*/s/ John M. Erbach*
John M. Erbach (VSB No. 76695)

**JA1160**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

LULA WILLIAMS, et al.,       )
                                    )
           Plaintiffs,      )
                                    )
    v.                   )     Civil Action No. 3:17-cv-461 (REP)
                                    )
BIG PICTURE LOANS, LLC, et al.,  )
                                    )
          Defendants.     )
_____

RENEE GALLOWAY, et al.,      )
                                    )
           Plaintiffs,      )
                                    )
    v.                   )     Civil Action No. 3:18-cv-406 (REP)
                                    )
BIG PICTURE LOANS, LLC, et al.,  )
                                    )
          Defendants.     )
_____

## MATT MARTORELLO'S STATEMENT OF POSITION
## IN RESPONSE TO JULY 23, 2020 ORDER (PARAGRAPH 2)

On July 23, 2020, the Court issued an Order (*Williams*, ECF No. 880; *Galloway*, ECF No. 539) directing the parties to, among other things, file on or before this date "in both listed actions a chart (a) showing how and through which trusts, corporations, people, or other entities money flows through from the time a borrower makes a payment until the money is distributed to Martorello and others; (b) describing all trusts, corporations, people, or other entities involved in these transactions and how each trust, corporation, person, or other entity relate to each other; and (c) explaining what Martorello's interest, involvement, or relationship is as to each trust, corporation, person, or entity." *Id*. ¶ 2.  Further, "if the parties are unable to jointly submit the document described in paragraph (2), the Plaintiffs shall submit their document by July 29, 2020 and Martorello shall file his proposed changes by July 30, 2020." Mr. Martorello respectfully

**JA1161**

responds to correct Plaintiffs' submission as follows:

Due to various structural changes which occurred as a result of tax planning relating to Martorello's move to the U.S. Virgin Islands[1], followed by a subsequent move to Puerto Rico to participate in its Act 20 and Act 22 economic development programs, it is difficult to distill the history of the organizational structure into one or two charts. As a result, attached as Exhibit "A" is a series of schematic charts illustrating the organizational structure from 2012 to 2018, which notes the restructuring events that occurred surrounding the launch of Bellicose VI and Bellicose Capital, and the subsequent sale of the assets of Bellicose Capital (and its wholly-owned company SourcePoint VI, LLC) to the LVD.[2] In spite of the numerous small structural

---

[1] Martorello moved to the U.S. Virgin Islands in July of 2011 to participate in its U.S. government sanctioned economic development program (see: https://www.usvieda.org/incentives/edc-program). In advance of doing so, he formed Bellicose VI, Inc. as the corporate entity receiving the government decree detailing a broad mandate as to the activities that Bellicose VI Inc. would perform. More specifically, Bellicose VI Inc., or its successor, Bellicose VI, LLC (collectively referred to herein as "Bellicose VI"), owned interests in companies that developed algorithms and code to create a voice transcription service used by emergency services personnel and financial markets; a voice brokering licensed arm; a proprietary trading arm; funded a debt investment in a maritime operation; a slot lease arrangement with a tribal casino; managing and ownership of a casino cruise ship; and providing management and investment services to related entities. See Ex. B, N.D. Tex. May 28, 2020 Hrg. Tr. at 138:15-141:6, where Martorello describes to the Court the breadth of "family office" Bellicose Capital and its various US investments and ventures.

[2] The primary restructurings can be summarized as follows: On July 18, 2012, for estate planning and limited liability purposes, Martorello transferred 100% of the voting rights of Bellicose VI to Breakwater and 70% of the economic rights to 7X Services, LLC, both wholly-owned by the Trust. On December 31, 2012, Bellicose VI Inc. converted to an LLC for tax efficiency purposes. On January 1, 2014, the structure changed to accommodate the Martorellos' relocation from the U.S. Virgin Islands to Puerto Rico, where he received an Act 20 and Act 22 economic development decree from the Puerto Rican government, through Bellicose VI, and kept an office in St. Croix, U.S. Virgin Islands as well (see: https://www.ddec.pr.gov/wp-content/uploads/2019/11/Performance_of_Incentives_Report-Act_20_and_Act_22.pdf). In June of 2015, Bellicose ownership for the trust and Martorello each changed to a hybrid LLC (i.e. taxed as a corporation on Puerto Rico sourced income and disregarded on US sourced income) in the form of Kairos PR, LLC and Gallant PR, LLC. In preparation for the sale of Bellicose Capital, LLC (which housed the employees central to the performance of SourcePoint VI)

*Footnote continues….*

2

**JA1162**

changes over time, the common general ownership structure of Bellicose VI, Bellicose Capital, and Eventide Credit Acquisitions remained virtually the same from July 2012 to present.[3]  The details of the ownership structure are discussed in thorough detail below, but first we will address the money flows.

**Discussion of how and through which trusts, corporations, people, or other entities money flows through from the time a borrower makes a payment until the money is distributed to Martorello and others**

When a consumer made a loan payment to Red Rock Tribal Lending ("RRTL"), the interest received was recognized as revenue to RRTL, while the principal either stayed in cash in RRTL for RRTL's growth, or reduced one of the debt facilities of the Tribe (See ECF 565-1, detailing the funding of RRTL's debt capital as ultimately sourced from third parties nearly entirely at all times, with some exception early in the relationship where Bellicose made a minority co-investment).  In other words, the Tribe could decide to pay debt to third parties that it owed in connection with the lending business.  As can be seen below, payments from that

---

Bellicose Capital had to migrate out of the family office all entities, data, information, and IP that were not a part of what the Tribe was purchasing, which included sensitive personal and family information, and that of Martorello's partners (see Ex. C (with personal information redacted).  From time to time, restructurings occurred in efforts to segregate entities with U.S. sourced income in one segment of the organizational structure for simplification, and any entities with Puerto Rico sourced income in another segment.  Finally, upon relocation back to the mainland United States, the structure again changed and simplified.

[3] Notwithstanding two subsequent dilutive events impacting ownership pro rata via issuing equity to key management personnel across the first half of 2014, Bellicose VI and its successors' profits interests were generally owned 70% by Guardian Trust Corporation, as trustee of the Bluetech Irrevocable Trust, the vehicle for Martorello's estate plan (his mother, brother, and sister as initial beneficiaries, replaced by his wife and their future descendants in late 2012 after their marriage in March of 2012), and 30% by Martorello personally, through his wholly owned LLC, initially MBM Services, LLC, which was later succeeded in interest by Liont, LLC and Gallant Capital, LLC.  These distributions would amount to a substantial amount of income to Martorello personally.

JA1163

revenue to SourcePoint VI, LLC ("SPVI") were wholly untied to the loans themselves.[4]  Rather, whether or not SPVI was paid in any given month was based on the operational success or failure of the services it provided to RRTL, and thereby related to its efforts to build the good customer list and IP of LVD's business over time (See Ex. E, Servicing Agreement at § 6.4).[5]  The following are the operational steps, in order, RRTL would take in the disbursement of its revenue:

1.  RRTL would send the Tribe ("LVD") the greater of the $20,000 monthly minimum, or 2% of Gross Revenue less Bad Debt expense, as a distribution.

2.  RRTL would repay SPVI for any reimbursements advanced to it, if applicable.

3.  RRTL would pay its vendor's bills, which included marketing agencies, underwriting expenses, technology, ACH processors, bank fees, call center expense, non-SPVI related consultants, legal, accounting and audit fees, interest expense, payment to its affiliate Duck Creek for employee personnel, and miscellaneous fees.[6]  (See Ex. G, Financial

---

[4] During the Parties' attempts to reach agreement on the form of the requested charts, Martorello repeatedly emphasized that "SourcePoint VI's servicing fee was wholly untied to consumer loans, but rather predicated on the success or failure of RRTL's business."  (See Ex. D at 4; see also Ex. D at 2 ("Disagree that payment is misleading, it demonstrates the payment to SPVI, and thus to its member, were entirely untied to the consumer loans, but instead based on the performance of the tribe's business holistically.")  While Plaintiffs may take umbrage with this undisputed fact, and mischaracterize it as "misleading," they cannot dispute that given SPVI's fee and Eventide's note payment stem from the success or failure of the Tribe's bottom line, and the demonstrative variability in any given month or period of time, SPVI's payments indeed were wholly untied to the consumer loans.

[5] See Ex. F, expert report Greg Cowhey of RSM at 20 (noting the "Value Allocation to the Tribal Entity" on the date of sale as "24,729,000")..  See also Ex. G, demonstrating RRTL's spending $59 million on marketing, by date of sale, to develop its most valuable IP, its customer list.

[6] Plaintiffs mention markup at the call center and improperly characterize Iron Fence Investments Interest Income.  These had no net impact on Tribal Net Profit or Martorello's share versus the trust.  No separate hidden fees were received by Martorello outside of his 30% interest in SPVI (owned indirectly through Bellicose).  As stated above, loans made to RRTL to provide

*Footnote continues….*

4

**JA1164**

Statements demonstrating RRTL paid $294 million in total expenses, $223 million for costs other than "Servicing Fee – SPVI"). Additionally, RRTL would retain capital for reserves if required.

4. RRTL would pay its creditors to the extent required for either interest or principal, or reserve therefor.

5. RRTL would pay net revenues to SPVI, in the event any such amounts remained.[7]

Once SPVI received payment, if any, from RRTL, SPVI would pay its expenses, including a fee allocated for the engagement of the employees of its parent company, Bellicose Capital, LLC, and any overhead before it would make profit distributions to its parent company, Bellicose Capital, LLC. Additional expenses of Bellicose Capital would then determine whether the services SPVI provided were profitable or not profitable to the members of Bellicose Capital.

From Bellicose Capital, disbursements of remaining cash were not formulaic, but irregular and sporadic. As a holding company and family office designed to invest in US entities (rather than distribute offshore as Plaintiffs allege the design), Bellicose focused attention on growing and diversifying its family office investments and holdings, in entirely US subsidiaries. As such, Bellicose would assess its cash liquidity, its business or investment opportunities, and existing forecasted cash requirements and then (i) choose to retain its earnings for investment

capital were almost entirely made from third party capital sources; to the extent a loan was made from a Trust-owned subsidiary to RRTL, the interest payments back to that entity were a debt expense to RRTL that reduced SPVI revenue, resulting in a net effect of zero.

[7] To demonstrate that no given loan could be tied to the Servicing Fees, after the launch of RRTL in January 2012, SPVI received no payment for services in January, February, March, April, May, July or September. Clearly, it received no dollars from those loans and was far from guaranteed to. And notwithstanding the ability for LVD to voluntarily terminate the contract with SPVI with just 120 days' notice to engage increasing competition to SPVI, even before many loans originated could mature, after netting SPVI's expenses and overhead allocations, SPVI lost money through its provision of services to RRTL in the year of 2012.

JA1165

into new ventures, (ii) grow its businesses and its own US subsidiaries, or (iii) distribute excess funds to its members. Any such distributions to its members were made pro rata to the members of Bellicose Capital owning economic interests: (i) 70% to the LLC owned by Guardian Trust Corporation, as trustee of the Bluetech Irrevocable Trust (the "Trust")[8] and (ii) 30% to the LLC owned by Martorello[9]. The Trust's LLC owner (also, always a Delaware LLC from January 1, 2014 to date of sale) would either invest in its own subsidiary ventures or private equity vehicles (all US entities and investments again), or make a distribution up to the Trust. Martorello's LLC owner would similarly elect to invest such distributions into his own US entities, or pay them to Martorello, who (contrary to the actions of one seeking an offshore shelter) generally reinvested them in his personally-owned interests in illiquid US start-ups he co-founded (since 2013) and other business ventures.

In 2014, the management team members of Bellicose Capital were issued their equity interests. Thereafter, distributions would additionally be made pro rata to Justin Martorello (9.9%), Brian McFadden (2%), James Dowd (1.5%) and Simon Liang (1.5%) in accordance with their ownership percentages per the operating agreement. The Trust's LLC owner's interest was thereby diluted to 59.6% and Martorello's LLC owner's interest was thereby diluted to 25.5%.

Since the sale of the Bellicose assets (the "Bellicose Sale") to the Tribe on January 26, 2016, payments from the Tribe have followed the same formula, except that the formula was changed from $20,000 to 2% for the Tribe's distribution, plus an additional 2% to be reinvested

---

[8] The trust held its interest in Bellicose VI and Bellicose Capital from time to time through three **Delaware holding companies**: 7X Services, LLC, Alpha Tau Capital, LLC, or Kairos Holdings, LLC (or its Puerto Rico holding company, Kairos PR, LLC).

[9] Martorello held his interest in Bellicose VI and Bellicose Capital, LLC from time to time through three **Delaware holding companies**: MBM Services, LLC, Liont, LLC or Gallant Capital, LLC (or its Puerto Rico holding company, Gallant PR, LLC).

as equity capital to grow the health and self-sufficiency of LVD's lending business and move it closer to self-sufficiency. However, the LVD economy entered two periods of economic strife following the sale, and the Tribe called upon Eventide to renegotiate the distribution calculation from 2% so as to help support the Tribal members' struggle. Eventide and Martorello were eager to oblige, and increased the distribution to 3%, with a 2% retention in November 2016 (See Ex. H), and in May 2018 "in order to assist the financial needs of the Tribe, to alleviate Tribal budgetary stress and to aid the Tribe to avoid cuts to essential government services" Eventide agreed to forego the retention so that LVD could distribute a full 6% of the formula on a monthly basis and that arrangement stands today (Ex. I).

Unlike Bellicose, which was a holding company and family office, Eventide is a special purpose entity holding only the LVD debt obligation. As such, upon receipt of its note payments beginning in 2016, distributions to Eventide's members occurred regularly, pro rata, through early 2019 under the auspices of ample projected note payments based on the forecast. Since early 2019, however, upon suspicion that the borrower's material changes in lending operations and product over the years post-sale would result in a material degradation to Eventide's note payments, it ceased all distributions to its members and reserved all of its cash for legal expenses associated with the litigation.[10] Eventide's earlier distributions to Breakwater have been invested in U.S. private equity funds, with any excess being distributed up to the Trust. Eventide's distributions to Gallant Capital have been distributed to Martorello for further substantial investment in his personal US investments since 2013, including Braviant, a US start-

---

[10] Another example of the consumer loan payment being wholly untied to the payments under the waterfall methodology, which was discussed with plaintiffs the day before this filing but omitted from their brief, the Tribe has made **no payments** on the note by waterfall calculation from November of 2018 through the date of this filing.

JA1167

up entity with a long-term investment horizon founded by Martorello, or used by Martorello personally.

**Discussion describing all trusts, corporations, people, or other entities involved in these transactions and how each trust, corporation, person, or other entity relate to each other**

Martorello, as settlor, and Guardian Trust Corporation, as trustee, established the M. Martorello Irrevocable Trust (the "Trust"), a Cook Islands Trust, on November 1, 2010.[11]  On June 10, 2011, by trustee resolution, the Trust name was changed to the Bluetech Irrevocable Trust.  Prior to Martorello's marriage in March of 2012, the beneficiaries were his mother and siblings; following his marriage and the birth of his children, the trustee added Martorello's wife and descendants as beneficiaries.  Simultaneously with the establishment of the Trust, the trustee created Breakwater Holding, LLC ("Breakwater"), a Cook Islands limited liability company owned by the Trust as its sole member, for the purpose of holding assets of the Trust.  Breakwater's initial manager was ATP Directors Ltd., a director company wholly owned by Asiaciti Trust Pacific Limited, the parent company of Guardian Trust Corporation, a duly-licensed Cook Islands trust company.  The trust agreement of this Trust does not grant the settlor any power, control, or authority over the Trust's administration or its assets.  The settlor's role is limited to creating and funding the Trust.  While Plaintiffs make hay of Martorello referring to Bellicose as "my business" (as certainly all members did) in this case, Martorello is also treated as the grantor (or tax "owner") for U.S. federal income tax purposes, meaning that he is

---

[11] There are a variety of reasons to choose a foreign jurisdiction to administer a trust, including, but not limited to: (i) cost efficiency vs US trustees (ii) economic diversification; (iii) access to certain types of offshore private placement life insurance policies (for which Martorello has); (iv) estate planning; (v) asset protection from the creditors of its beneficiaries; (vi) premarital planning; and (vi) tax planning, if available.  Dynastic trusts are a common estate planning vehicle that permit a settlor to transfer property to a trustee to be invested, managed, and administered for the benefit of the settlor's family and future generations. There are many motivations and purposes for establishing a trust, but preservation of family wealth and ensuring financial security for the settlor's spouse and descendants is often a primary goal.

JA1168

obligated to report and pay taxes on the Trust's earnings, and he in fact does so.  Martorello has never been a beneficiary of the Trust, nor has he ever received a distribution from the Trust. Likewise, Martorello has never served as a Protector of the Trust or in any other fiduciary capacity.[12]  Assets held by the Trust or subsidiaries owned by the Trust are <u>legally</u> owned by the trustee for the benefit of the Trust beneficiaries.[13]  Assets owned by Martorello or by subsidiaries owned by Martorello are legally owned by Martorello.  Martorello's status as the grantor and tax "owner" of the Trust does not in any way grant to him legal or beneficial ownership of, or control over, the Trust assets; it merely indicates that he is obligated to pay the income taxes on Trust earnings.[14] In fact, both he and the beneficiaries are powerless to compel the trustee to take *any* action.

As mentioned above and generally at footnote 3, supra, the charts attached as Exhibit "A" depict the Trust and its various subsidiaries owned from time to time, as well as entities owned

---

[12] Plaintiffs pointed out the NDTX opinion had stated that Martorello admitted he was the "protector".  This was clear error of the Court.  Martorello stated rather that the trust document referred to him as "principal" (See Ex. J, N.D. Tex. May 21, 2020 Hrg. Tr. at 77:22-78:2), while he also stated he has never been "protector" and there has not been since 2011 (see Ex. J at 178:3-24).

[13] To the extent that the trustee elects to make distributions to the beneficiaries of the Trust, it does so in its sole discretion, and distributions may not be made to anyone who is not a beneficiary of the Trust. The beneficiaries may not compel distributions from the trustee. The Trust is a spendthrift trust, meaning that the trustee has the power to deny requests for distributions from creditors of the beneficiaries, as well as requests for distributions from the beneficiaries themselves. The trustee can, and often does, exercise its discretion and refuse to make distributions to a beneficiary. A trustee will not distribute funds to satisfy a creditor claim of a beneficiary, particularly when doing so would harm the other current beneficiaries and future remainder beneficiaries. The trust is irrevocable, meaning that no person has the power to revoke the trust. Once the settlor transfers property to the trustee to hold in trust for the beneficiaries, the settlor relinquishes all control over the trust property and retains no beneficial rights so long as the settlor is not a beneficiary of the trust.

[14] This is not optional: Section 679 of the Internal Revenue Code requires that a U.S. person who directly or indirectly transfers property to a foreign trust with at least one U.S. beneficiary shall be treated as the tax owner of the trust.

JA1169

by Martorello that were involved in these transactions. From the time of the formation of Bellicose VI and Bellicose Capital leading up to the Bellicose Sale, multiple reorganizations occurred to the ownership structure to facilitate the tax planning in the U.S. Virgin Islands, followed by a reorganization for Puerto Rico tax purposes upon the Martorellos' relocation from the USVI to Puerto Rico.

Below are more granular details explaining the Trust and various entities.

- **Bluetech Irrevocable Trust** (the "Trust") was established by Matt Martorello, as grantor, and Guardian Trust Corporation, as trustee, on November 1, 2010. The beneficiaries of the Trust, since late 2012, are Rebecca Martorello and the descendants of Rebecca and Matt Martorello. **<u>Matt Martorello was never a beneficiary of the Trust, never the protector, nor has he ever had any beneficial interest in an entity or affiliated sub-trust owned by the Trust</u>**. The Trust's holdings include various holding companies (each described in more detail below), namely Breakwater Holding, LLC 7X Services, LLC, Alpha Tau Capital, LLC, and Kairos Holdings, LLC, and sub-trusts. All directly-owned holding companies have been dissolved except for Breakwater.

- **Guardian Trust Corporation** is a provider of professional fiduciary services and a wholly-owned subsidiary of **Asiaciti Trust Pacific Limited**, Cook Islands, the Cook Islands branch of Asiaciti Trust, an international trust and corporate services provider that has been operating in multiple jurisdictions globally (except the U.S.) for the past 40 years and oversees several billion dollars in trust and corporate assets (see www.asiacititrust.com). The current managing director of the Cook Islands operation, Ms. Tine Ponia, a New Zealand attorney, is the trust officer in charge of the Trust.

- **Breakwater Holding, LLC** ("Breakwater"), a Cook Islands LLC, was created by the

**JA1170**

trustee simultaneously upon the establishment of the Trust, November 1, 2010, to serve as the Trust's holding company for the Trust's private company investments. From 2010 to March 2013, Breakwater's manager was ATP Directors Ltd., a special purpose company owned by the trustee to serve as corporate director and manager. The trustee later appointed Martorello's entities MBM Services, LLC and then Liont, LLC as the successor managers of Breakwater from March 2013-June 2018.  Contrary to one using offshore entities for protection, on December 31, 2013, Martorello transferred the Bellicose equity ***out*** of the Cook Islands LLC and into Delaware LLC, Alpha Tau Capital.  In June 2018, the trustee, as member, then removed Liont as manager and replaced it once again with ATP Directors Ltd. ATP Directors consulted with managers of its underlying private company investment entities, including Matt Martorello, as needed, to satisfy its fiduciary obligation to its member, the Trust.  Breakwater only **briefly** owned an interest in Bellicose VI in July of 2012 (prior to which it was owned by Martorello personally) until it transferred its interest to Delaware LLC Alpha Tau Capital in December 31, 2013. From that point on, it did not hold a direct interest in the Bellicose entities.

- **MBM Services, LLC**, a Delaware LLC, was wholly-owned by Matt Martorello and served as his management company. The trustee named MBM Services, LLC as manager of Breakwater, Bellicose Capital, LLC, Kairos Holdings, LLC, 7X Services, LLC, and Alpha Tau Capital, LLC. This allowed day-to-day oversight of the operating entities held by the Trust by MBM Services, LLC, with the help of its staff and oversight by Matt Martorello, as its manager. MBM Services, LLC was later succeeded by Liont, LLC as manager of the companies it managed. Although MBM Services and Liont, LLC handled

JA1171

administrative and ministerial tasks for the companies they managed, substantial decisions relating to the Trust-owned private companies continued to require the consent of the trustee of the Trust, as member.

- **Liont, LLC** ("Liont"), a Delaware LLC, is the family office entity wholly-owned by Martorello and has served as manager of multiple entities, some owned by the Trust and some owned by Martorello. Liont was a successor to Martorello's initial management company, MBM Services. Liont has employed staff to facilitate with its management services. In July 2015, Matt contributed Liont (at that time it had a zero value and no assets) to Kairos to allow Liont to hire Puerto Rican employees and to qualify for Puerto Rico tax benefits as a subsidiary of Kairos PR. Upon the Martorellos' departure from Puerto Rico, Martorello repurchased Liont, LLC from Kairos, rendering Kairos obsolete and it was later dissolved.

- **Bellicose VI, Inc.** was formed in 2011 by Martorello and later restructured as **Bellicose VI, LLC** for tax purposes (collectively referred to as "Bellicose VI"). It was initially a Virgin Islands company wholly owned by Martorello personally, and was later converted to a Delaware LLC. Contrary to the mischaracterization of the Plaintiffs that Martorello had some nefarious scheme with regard to LVD's lending, Martorello engaged Bellicose VI under his personal ownership in 2011. It was not until July 18, 2012 when Martorello transferred 70% of his interest in Bellicose VI to Delaware LLC 7X Services, LLC (a wholly owned entity of the Trust). In early 2013, when Bellicose VI was converted to an LLC, it issued a Class A equity interest to Breakwater (100%, transferred a few months after to Alpha Tau Capital, a Delaware LLC described below), and Class A economic interests to Delaware LLCs 7X Services (70%) and MBM Services (30%). Bellicose VI

was later merged into Bellicose Capital, LLC in 2014 upon the companies' move from the USVI to Puerto Rico (described below).

- o 7X Services LLC held a 70% economic interest in Bellicose VI and Martorello, through MBM Services, held a 30% economic interest. 7X was wholly-owned by the Trust, so the 70% economic interest owned by 7X constituted the Trust's profits interest in Bellicose VI. The 30% economic interest held by MBM Services, LLC constituted the profits interest received by Matt Martorello for his services to Bellicose VI.

- o Bellicose VI was the initial owner, later transferred to Bellicose Capital, of a number of U.S. investments through various entities, including Alpha Tau Capital, LLC, Indian Country Analytics, LLC, Iron Fence Investments, LLC, SPVI, and Green Key Markets, LLC, the marketing arm of GreenKey Technologies, described below (all US entities).

- o On December 31, 2013, the holding structure was reorganized in conjunction with the companies' planned move to Puerto Rico and the Trust replaced 7X with Alpha Tau Capital as its new holding company for the Bellicose VI structure. The economic interest remained the same: Alpha Tau Capital (70%) and MBM Services (30%) (both Delaware LLCs).

- **Bellicose Capital, LLC**, a Delaware LLC,  was created January 2014 as a subsidiary of Alpha Tau Capital (70%) and MBM Services (30%) and began operations in Puerto Rico. Bellicose Capital had three classes of ownership interest, which is incompletely disclosed in Plaintiff's brief: Class A Members (with general rights to the assets of Bellicose Capital other than SPVI and GreenKey Technologies), divided further into voting, equity,

and economic interests; Class B Members (with rights to the investment in SPVI), divided into equity and economic interests; and Class C Members (with rights to the investment in GreenKey Technologies, LLC), divided into equity and economic interests. The business activities of SPVI and GreenKey Technologies are described in more detail below. Having noted the 2011 and 2012 ownership and the short duration in 2013 when Breakwater owned Bellicose VI, the ownership of Bellicose Capital evolved as follows:

> **2014 (All US ownership)**
> Class A Members:
> *Alpha Tau Capital, LLC* ("ATC") - 100% voting; 70% economic; and 100% equity
> *MBM Services, LLC* ("MBMS") - 30% economic
> Class B Members:
> *ATC* - 60% economic, and 90% equity.
> *MBMS* - 30% economic.
> *Justin Martorello* - 10% economic and equity.
> Class C Members:
> *ATC* - 80% economic and equity.
> *Justin Martorello* - 20% economic and equity.
>
> **January 1, 2016 (All US Ownership)**
> Class A Members:
> *Kairos Holdings* ("KH") - 100% voting; 70% economic; and 100% equity
> *Gallant PR* ("GPR;" PR Holding company of Gallant Capital, LLC) - 30% economic
> Class B Members:
> *KH* - 59.6% economic, and 59.6% equity
> GPR - 25.5% economic and 25.5% equity
> *Justin Martorello* - 9.9% economic and equity
> *Brian McFadden* - 2.0% economic and equity
> *Simon Liang* - 1.5% economic and equity
> *James Dowd* - 1.5% economic and equity
> Class C Members:
> *No changes.*

o   The succession of ownership of Martorello's 30% profits interest in Bellicose Capital evolved as follows: MBM Services, LLC, followed by Liont, LLC, followed by Gallant Capital, LLC, then briefly Gallant PR, LLC. Gallant PR,

LLC was created for Puerto Rico tax purposes and briefly owned Gallant Capital. Again, all US entities.  Martorello's 30% interest was diluted to 25.5% upon the issuance of equity interests to key personnel in 2014.

  o  The management was initially MBM Services, LLC and later Liont, LLC.

  o  Bellicose VI transferred its interest in SPVI to Bellicose Capital.

  o  In January 2016, SPVI and Bellicose VI were merged into Bellicose Capital, LLC in anticipation of the Bellicose Sale, which occurred on January 26, 2016.

- **SourcePoint VI, LLC** ("SPVI"), initially a Virgin Islands LLC and later a Delaware LLC,  was owned by Bellicose VI and later Bellicose Capital and managed by MBM Services and later Liont. Its business purpose was to serve as a fintech platform for lenders.  Payments from RRTL were made to SPVI.

- **7X Services, LLC** ("7X"), a Delaware LLC,  was wholly-owned by the Trust and was the initial owner of BVI, Inc. Its manager was MBM Services, LLC. 7X held a 70% economic interest in Bellicose VI, which interest was later transferred to Alpha Tau Capital (described below).

- **Alpha Tau Capital, LLC** ("ATC"), a Delaware LLC,  was wholly-owned by the Trust and served as the Trust's holding company for investments such as Alpha One Investments and Iron Fence Investments. It also held a 70% economic interest in Bellicose VI for a time. Its manager was MBM Services, LLC.

- **Kairos Holdings, LLC** ("Kairos"), a Delaware LLC,  was formed by the trustee in 2014 to serve as another holding company for the Trust's U.S. investments. It was always owned directly by the Trust, with initial management by MBM Services, LLC, followed by Liont, LLC.

**JA1175**

- o In 2014, Martorello and his family relocated to Puerto Rico and Kairos, along with its subsidiaries, were transferred to newly-formed Kairos PR, LLC for Puerto Rico tax planning purposes.

- o Kairos was dissolved by its member (the trustee) in 2019, after liquidating its de minimis remaining assets following the Bellicose Sale.

- **Eventide Credit Acquisitions, LLC** ("Eventide"), a Delaware LLC, was formed February 9, 2015 for the purpose of holding the debt obligation from the LVD following the Bellicose Sale. Its initial manager was Liont, LLC and is currently Martorello. As explained above, its ownership was designed to mirror the ownership of the Class B Membership interests in Bellicose Capital. The Trust initially owned 85% of Eventide through its holding company, Kairos Holdings. Leading up to the sale, Kairos transferred a 25.5% interest in Eventide to Martorello's holding company, Gallant Capital, as payment for Martorello's efforts brokering the Bellicose Sale and to mirror the economic arrangement between Gallant Capital and Bellicose Capital, which was also 25.5%. Kairos simultaneously transferred the remaining 59.6% of its interest in Eventide to its sister subsidiary, Breakwater Holding, which was to remain as the Trust's primary holding company following the Bellicose Sale and simplification of the holding structure.

- **Gallant Capital, LLC** ("Gallant Capital"), a Delaware LLC, was formed June 30, 2015, by Martorello as member and Liont, LLC as manager, to hold Martorello's interest in Eventide.  In 2018, Martorello transferred 15% of his ownership in Gallant Capital to Gallant Distributions LLC (Delaware) in turn owned by a Family Limited Partnership owned by two US trusts formed for tax planning purposes in 2018.

**JA1176**

- **GreenKey Technologies, LLC** ("GreenKey"), a Delaware LLC, was created in January 2014, and Martorello is a co-founder. Its initial managing member was Bellicose Capital. Its current managing member is Dorado Analytics, LLC. GreenKey is a fintech start-up developing voice transcription technology for use in the financial sector (referred to as "Alexa for Wall Street"), as well as for 911 call centers and use by police forces.

  - Bellicose Capital purchased a 75% membership interest in GreenKey Technologies in 2014. A Class C Membership interest in Bellicose Capital was formed to segregate GreenKey's profits from those of SPVI and Bellicose Capital. The Class C Members were the Trust (through Alpha Tau Capital) (80%) and Justin Martorello (20%).

  - In January 2015, Justin Martorello and Bellicose Capital formed Dorado Analytics to serve as a holding company for GreenKey Technologies and shortly thereafter Bellicose Capital assigned its interest in Dorado Analytics to Kairos Holdings, which at that time was holding the Trust's U.S. investments that were unrelated to tribal lending services.

- Other Entities Owned by the Trust Structure

  - **Dorado Analytics, LLC**, a Delaware LLC, was created as a holding company for a portion of GreenKey, as described above.

  - **Indian Country Analytics, LLC**, a Delaware LLC, was created early on and was never significantly capitalized or utilized.

  - **Source Point, LLC**, a Delaware LLC, was a slot lessor to a tribal casino in Oklahoma and also owned a maritime asset backed loan in Florida.

  - **Palm Beach Gaming, LLC**, a Delaware LLC, owned a maritime lease and Blue

**JA1177**

Horizons Casino Cruises.

- o **Blue Horizons Casino Cruises, LLC** served as the operating entity for the casino cruise operation in Florida.

- o **Iron Fence Investments, LLC**, a Delaware LLC, was used as a fundraising entity and earned a 1% profits interest for deals it helped to broker.

- o **Alpha One Investments, LLC**, a Delaware LLC, served as a proprietary trading firm pertaining to US securities.

- **Matt Martorello** has served as manager of MBM Services and Liont, which were named by the trustee of the Trust to manage a number of the trust-owned entities from time to time, as explained above. Martorello, through his wholly-owned holding companies, has received 25.5% to 30% of the net revenues from Bellicose VI, Bellicose Capital, and Eventide, as explained above. Martorello has founded or co-founded a number of U.S. start-up companies, and has invested millions of his personal capital in these business ventures owned outside of the Trust structure. Entities owned by the Trust have provided debt financing to Martorello and/or entities majority owned by Martorello. Some of the business entities majority owned by Martorello appear on Exhibit "A" and are described below:

  - o **Braviant Holdings, LLC** ("Braviant"), a Delaware LLC, is an online consumer lending company founded by Martorello in 2013. Martorello made substantial investments into Braviant over the years. It is currently managed by its CEO, Stephanie Klein.  Braviant owns the following affiliates: Braviant Consumer, Braviant, LLC, SunUp Financial (non-prime consumer lender), Chorus Credit (near prime consumer lender), and Promovere (a Phillippine company that

**JA1178**

operates a customer call center).

- ○ **Jet Business Loans, LLC's** primary activity is small business factoring. Martorello founded Jet in 2015 and continues to be the sole owner, having made substantial investments in this US start-up company since 2015.

- ○ **MBM Services,** described above.

- ○ **Liont, LLC,** described above also owns a share in a Dallas restaurant.

- ○ **Gallant Capital, LLC,** described above.

- ○ **GFLP Entity 1, LP** owns a small equity interest in a real estate development project in Dallas, Texas.

**Explanation of Martorello's interest, involvement, or relationship as to each trust, corporation, person, or entity**

Martorello's role as manager of MBM Services and Liont is described in more detail above. Martorello's participation and consultation with the trustee via his management entities allowed the Trust to benefit from his expertise and to grow the Trust investments on behalf of the Trust beneficiaries, satisfying its fiduciary obligation to its current and remainder beneficiaries. In exchange, Martorello received the benefit of his own profits interest in the Trust majority-owned companies as described above (30% of Bellicose VI, and later 25.5% of Bellicose Capital and Eventide). This was the primary source of compensation to Martorello for his efforts in working with Bellicose and Eventide. He received a reasonable salary over the years, but after that did not receive any other regular source of income or wages from any other Trust-owned subsidiary, until his recent appointed Management position this year at Eventide.

As explained above, Martorello has never received a distribution or any other financial benefit from the Trust and has never been a beneficiary, trustee, or protector of the Trust. He has no power to compel the Trustee to make distributions or turn over Trust assets, nor does he have

JA1179

the power to change the beneficiaries or cause himself to be added as a beneficiary. Martorello also does not hold the power to change the trustee. By design, the Trust's investments are preserved for the benefit of the trust beneficiaries, Martorello's wife, children, and all future descendants, and the disposition of the Trust assets during his lifetime and after his death are governed by the terms of the Bluetech Irrevocable Trust agreement.

The trustee of the Trust has *full discretion* as to whether to make distributions, or not, to its beneficiaries; there is no set amount to be paid to any beneficiary. That said, in the history of the Trust, the trustee has made one single distribution since its establishment in 2010 to one of its beneficiaries, Rebecca Martorello. Rebecca Martorello used the full amount of that distribution to purchase a life insurance policy on Matt Martorello's life.

Rebecca Martorello received a $70,000 salary from Bellicose VI until her employment was terminated in mid-2013. Rebecca was also employed by Liont to assist with paying invoices and received a similar salary from mid-2017 through early 2019. She has not otherwise received any payments or distributions from Trust-owned subsidiaries.

While Martorello objected to Plaintiff's providing actual dollar figures, as the Court stated it did not want or need them, Plaintiffs have used the figures to allege that for some period of time SPVI received about 90% net vs LVD's distributions of 10%, implying the impropriety of the SPVI and RRTL relationship. Setting aside federal policy regarding self-determination in such matters, Martorello respectfully responds as follows:

The economic split of Plaintiffs ignores entirely the nearly $25mm in equity value created by date of sale and continuing to accrue to the Tribe as the Eventide note nears termination. (See Ex. F at 20). Moreover, this servicing arrangement (including the economic split) is entirely market rate in fintech platforms, even outside of Indian country. Indeed, a

JA1180

comparative non-bank lending model is diagrammatically presented by the state of Texas:  https://occc.texas.gov/sites/default/files/uploads/what-is-a-cab-6-26-14.pdf.    Here, the Credit Access Businesses ("CAB") even **owns the website**, markets, underwrites, originates and collects, performing all of the lending functions, but the lender provides the dollars to be loaned, and it receives the non-usurious "interest" rate (usury cap is 10% APR) while the CAB gets all of the remainder as its fees equating to a combined triple digit cost to the borrower.  This split, on a net basis, is approximately 90% to the CAB and 10% to the lender within the "Components of the Finance Charge" at 90% net vs 10% net: See https://www.checkngo.com/wp-content/uploads/2018/02/TX_PDL_CNG_ONLINE_2018V1.pdf).    Dozens of comparative examples publicly exist across Texas, and similar statutory arrangements to the CAB model have existed in FL, OH and MD.[15]

Even more broadly, fintech platforms working with both bank and non-bank lenders, typically provide and **own** the website the consumer visits. They also own the technology and they originate, underwrite, service, collect, market and fund the loans for the lender.   See examples: *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014): at 1367–68; *Hudson v. ACE Cash Express, Inc*., 2002 WL 1205060 (S.D. Ind.): where the agreement required ACE to purchase a **95% interest** in any loan made (in ACE storefronts) under the agreement, which determined irrelevant to the court, as was the fact that ACE was responsible for collecting payments under the loans.  *See id*. at *3; See also *Meade v. Avant of Colorado, LLC*, 2018 WL 1101672 (D.Colo.) consumer applied for and obtained loans from servicer's website; servicer

---

[15] See Ex. K, Scott Merritt deposition transcript excerpts at 49:7-15 (testifying that the financial arrangement was ordinary and "actually pretty decent") and 53:4-20 (testifying that this relationship is typical outside of the tribal lending context, particularly in the Texas Credit Service Organization lending model and regarding economics that the Texas lending model "[has] similar rev shares as the tribal."

buys loans within 2-days, paid all lender legal fees and fees to initiate the program, bore all expenses incurred, determined which loan applicants received loans and bore all costs of making such recommendations, was responsible for compliance with federal and state laws, indemnified the Lender, bore all risk of default, and conducted underwriting, servicing, and collection; **Servicer retained 99% of profits** on the loans); and *Beechum v. Navient Solutions, Inc.*, 2016 WL 5340454 (C.D. Cal. Sept. 20, 2016): where the non-bank lender originated, underwrote, marketed, and funded private student loans for which the bank would be identified as the lender. The non-bank lender would subsequently purchase 100% of the loans from the bank within 90 days of disbursement for principal, plus accrued interest, and less the amount paid for indemnification of loan loss.

These fintech relationships have been promoted by modern policy and recognized as legitimate by Treasury and bank regulators, in their efforts to clarify the legal uncertainty plaguing these relationships. See: https://www.fdic.gov/fditech/guide.pdf; https://www.fdic.gov/news/news/financial/2005/fil1405a.html#foot1 revised November 2015, describing what a bank lender/Fintech platform relationship involves in order to "export favorable interest rates provided under the laws of the state where the bank is located" for a "typical charge…APR of nearly 400%". Here the banks "enter into arrangements with third parties" "in which the institution funds payday loans originated through the third party" which "may be underwritten off-site" by "third party originators" and "may involve the sale to the third party of the loans or servicing rights to the loans" and "additional services that the bank would normally provide, including collections, advertising and soliciting applications." See also: https://home.treasury.gov/sites/default/files/2018-08/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financials-Fintech-and-Innovation_0.pdf describing the

JA1182

"uncertainties created by these court cases" as "pressure" resulting in FinTech Platforms altering "their economic relationships with partnering banks to better account for the risks presented by these court cases" and recommending that "Congress codify that the existence of a service or economic relationship between a bank and a third party (including financial technology companies) does not affect the role of the bank as the true lender of loans it makes" and "federal banking regulators should also reaffirm…"

Indeed, just one week ago, the OCC obliged by issuing its proposed rule, stating "the relationships have been subject to increasing uncertainty about the legal framework that applies to loans made as part of these relationships. This uncertainty may discourage banks and third parties from entering into relationships, limit competition, and chill the innovation that results from these partnerships—all of which may restrict access to affordable credit. The proposed rule would resolve this uncertainty by specifying that a bank makes a loan and is the "true lender" if, as of the date of origination, it (1) is named as the lender in the loan agreement or (2) funds the loan."    See    https://www.occ.gov/news-issuances/news-releases/2020/nr-occ-2020-97.html, putting to an end once and for all the "true lender" controversy.  The alleged 90% to 10% split here, is similarly an issue reserved for Congress or the CFPB.

RESPECTFULLY SUBMITTED AND DATED this 30th day of July, 2020.


Dated: July 30, 2020                              Respectfully submitted,

                                                  */s/ John M. Erbach*
                                                  John M. Erbach (VSB No. 76695)
                                                  jerbach@spottsfain.com
                                                  M. F. Connell Mullins, Jr. (VSB No. 47213)
                                                  cmullins@spottsfain.com
                                                  SPOTTS FAIN PC
                                                  411 E Franklin Street Suite 600

Richmond, VA 23219
Tel: (804) 697-2044
Fax: (804) 697-2144

Richard Lawrence Scheff (pro hac vice)
Jonathan P. Boughrum (pro hac vice)
Michael C. Witsch (pro hac vice)
ARMSTRONG TEASDALE LLP
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
Tel: (267) 780-2012
Fax: (215) 405-9070
rlscheff@armstrongteasdale.com
jboughrum@armstrongteasdale.com
mwitsch@armstrongteasdale.com

*Attorneys for Defendant Matt Martorello*

**JA1184**

## **CERTIFICATE OF SERVICE**

I, John M. Erbach, hereby certify that on July 30, 2020, I filed the foregoing using the Court's CM/ECF electronic filing system, which will serve an electronic copy on all counsel of record by Notice of Electronic Filing (NEF).

*/s/ John M. Erbach*
John M. Erbach (VSB No. 76695)
jerbach@spottsfain.com
SPOTTS FAIN PC
411 E Franklin Street Suite 600
Richmond, VA 23219
Tel: (804) 697-2044
Fax: (804) 697-2144

JA1185

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| LULA WILLIAMS, et al., | ) | |
| | ) | **REDACTED** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-cv-461 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| RENEE GALLOWAY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:18-cv-406 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**MATT MARTORELLO'S SUPPLEMENTAL**
**BRIEF REGARDING ALLEGED MISREPRESENTATIONS**

Pursuant to the Court's order (ECF No. 880), Defendant Matt Martorello provides this supplemental brief summarizing evidence demonstrating the veracity of his statements at issue in the hearing before the Court on July 21, 2020 and July 22, 2020.

**JA1186**

## TABLE OF CONTENTS

I.    Introduction ........................................................................................... 1

II.   The Fourth Circuit's Methodology in *Williams* ................................ 3

III.  Argument ............................................................................................... 5

   A.    Method of Creation Factor ........................................................ 5

     1.   *"I was not involved in the creation of Red Rock, but made aware Red Rock had been formed." (Martorello Decl. ¶ 17)* ............................ 5

     *"Neither I, nor Bellicose, helped form Big Picture or Red Rock." (Martorello Decl. ¶ 102)* ....................................................................... 5

     *"Neither I nor any company I own or manage directed or controlled the creation of Big Picture." (Martorello Decl. ¶ 67)* ................................. 5

   B.    Purpose Factor .......................................................................... 7

     1.   *"LVD approached Martorello in 2011 to assist them [sic] create and grow online lending business." (Martorello Decl. at Heading II.A.)* .......... 7

     2.   *"Since the beginning of my relationship with LVD, I understood that LVD had always intended to utilize my consulting services to assist them to build their valuable IP and to better understand how to run a successful online consumer lending business." (Martorello Decl. ¶ 47)* .................................. 9

     *"As LVD gained additional knowledge and sophistication, I understood that LVD had always intended to increase its ability to manage and run a successful lending business while decreasing outsourced consulting services." (Martorello Decl. ¶ 48)* .............................................................. 9

     3.   *"To that end, since at least 2012, LVD and I have engaged in multiple conversations relating to the potential sale of my consulting businesses to LVD to accelerate LVD's ability to maintain a profitable online consumer lending business with no outsourced consulting services." (Martorello Decl. ¶ 49)* .............. 11

     4.   *"Contrary to the allegations of Plaintiffs, the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies. Indeed, much of the discussions as to the motivation behind the sale transaction described by Plaintiffs' Complaint are nonsensical and are temporally problematic. Plaintiffs claim there were certain 'motivating factors' for the sale which, in reality, occurred eighteen months to three years before the sale transaction closed." (Martorello Decl. ¶ 69)* .................. 12

   C.    Control Factor ........................................................................ 16

     1.   *"I have never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock." (Martorello Decl. ¶ 26)* ...................... 16

     *"I have never collected any debts from any consumers in Virginia." (Martorello Decl. ¶ 107)* ............................................................... 16

i

**JA1187**

*"Bellicose has never accepted or collected a consumer loan payment under any loan agreement originated by Big Picture or Red Rock." (Martorello Decl. ¶ 105)* .............................................................................................. 16

2. *"I have never had any control over Red Rock or Big Picture's lending decisions, including the decision to lend in any particular state." (Martorello Decl. ¶ 107)* ...................................................................................... 18

*"Neither I nor Bellicose have 'controlled' any underwriting criteria used by and of LVD's lending businesses – at all times the LVD business retained full control over the underwriting criteria used to make loans to consumers." (Martorello Decl. ¶ 101)* ................................................................... 18

*"Under the Servicing Agreement, Red Rock paid SourcePoint to develop underwriting criteria to recommend for implementation by Red Rock. SourcePoint did not simply implement these underwriting criteria on behalf of Red Rock, but instead presented the underwriting criteria to Red Rock's co-managers for their evaluation and ultimate approval or rejection." (Martorello Decl. ¶ 45)* ...................................................................... 18

3. *"As I understand LVD's lending, all loans are made from LVD's reservation" (Martorello Decl. ¶ 107)* ...................................................................... 20

**D.**      **Tribal Intent Factor** .............................................................................. 22

**E.**      **Financial Relationship Factor** ............................................................. 22

1. *"Contrary to what Plaintiffs have represented to the Court, Red Rock did not receive two percent of the net revenues under the terms of the Servicing Agreements. Instead, as the documents I have reviewed that were provided in discovery demonstrate LVD chose to structure their arrangement to stabilize their monthly income as a percentage of gross revenues, adjusted for bad debts." (Martorello Decl. ¶ 34)* ........................................................... 22

2. *"LVD suggested this form of revenue split as it guaranteed LVD's lending entities would always generate income for LVD's general fund while simultaneously incentivizing SourcePoint to assist LVD in the growth and the maintenance of an efficient and successful business for the benefit of LVD." (Martorello Decl. ¶ 36)* ...................................................................... 22

3. Bellicose *"was valued at just over $100 million" at the time of the sale. (Galloway I, ECF No. 40 at 7)* ........................................................... 24

**F.**      **Federal Policies Factor** ....................................................................... 25

**G.**      **Plaintiffs' Spoliation Argument may be Rejected as Baseless** ........... 26

**IV.**      **Conclusion** ........................................................................................... 26

**JA1188**

# I.    INTRODUCTION

As outlined in Martorello's Response to Plaintiffs' Statement of Position (ECF No. 843), under the *Breakthrough* analysis, tribal immunity applies where doing so "further[s] the federal policies behind the immunity doctrine." *Breakthrough Mgmt. Group, Inc. v. Chukchansi Gold Casino & Resort,* 629 F.3d 1173, 1187 (10th Cir. 2010) (quoting *Dixon v. Picopa Const. Co.,* 772 P.2d 1104, 1111 (Ariz. 1989)). "Those policies include protection of the tribe's monies . . . as well as preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians.'" *Id.* at 1188 (citing *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218–19 (1987) and quoting *Dixon*, 772 P.2d at 1111). Advancing these policies, as the Fourth Circuit recognized in its decision in *Williams v. Big Picture Loans LLC*, 929 F.3d 170 (4th Cir. 2019), is in reality "too important" to be condensed into a single factor and "will instead inform the entire analysis." *Id.* at 177 There is no question—not before the recently completed hearing, and certainly not after—that in *Williams*, the Fourth Circuit sought to further these federal policies by promoting LVD's tribal sovereignty, self-determination, and economic development. Nothing Plaintiffs have raised since the Fourth Circuit's decision affects that outcome at all.

Plaintiffs ostensibly attempt to raise a collateral attack on the Fourth Circuit's controlling decision in *Williams*. In reality, their intention is little more than to prejudice the Court against Martorello with unsupported accusations of misrepresentations, "even if they are immaterial" to *Williams*. ECF No. 864 (Plaintiffs' Reply Brief) at 20. Either way, Plaintiffs' effort fails for numerous reasons, including that Plaintiffs already had much of the purportedly "new" evidence they now raise **before** the Fourth Circuit rendered its decision and that the Fourth Circuit, recognizing the immateriality of these alleged misrepresentations, rejected Plaintiffs' request to consider them. Most importantly for purposes of this brief, and as Martorello explained in detail

in his Response Brief (ECF No. 843), (1) as a legal matter, the misrepresentations alleged by Plaintiffs are irrelevant to the Fourth Circuit's decision or its analysis of the *Breakthrough* factors; and (2) as a factual matter, the statements at issue are true. Plaintiffs' misguided and often self-contradictory attempts to contort the record, regularly taking statements from Martorello's Declaration in isolation from the whole, ultimately do nothing to undermine the Fourth Circuit's decision.[1]

Martorello previously provided a table listing the evidence corroborating each of his disputed statements (ECF No. 843-1). For the sake of brevity, Martorello will not repeat the entirety of the contents of that table or his Response brief, but instead, as the Court instructed, provides a summary of some of the most important evidence validating his contested statements, incorporating testimony adduced at the hearing before the Court on July 21, 2020 and July 22, 2020. This summary affirms that Martorello's statements are truthful and accurate.[2]

---

[1] Tellingly, after arguing for nearly a year that the Fourth Circuit's decision had nothing to do with Martorello, in their Reply, Plaintiffs switched tacks and now claim that *Williams* was rendered following a "fact intensive inquiry" and that evidence regarding Martorello and his conduct is indeed "relevant to the sovereign immunity analysis" after all. ECF No. 864 at 2, 5. Thus, there is no now question that the *Williams* decision has important, and indeed dispositive, implications for the claims against Martorello.

[2] Plaintiffs' stratagem to disregard *Williams* contrasts starkly with *Souter v. Equifax Info. Servs. LLC*, 299 F.R.D. 126 (E.D. Va. 2014). There, the Fourth Circuit "explicitly requested a new 'rigorous analysis' under all Rule 23(a) factors." *Souter v. Equifax Info. Servs. LLC*, 307 F.R.D. 183, 191 (E.D. Va. 2015). As part of that new analysis, a party submitted a new affidavit, attesting to certain facts (some of which had been presented to the Court before the appeal) based on personal knowledge—yet the party later acknowledged in deposition that his attestation of personal knowledge was false. The Court, acting on the Fourth Circuit's instruction to perform the analysis anew, determined to apply the class certification factors anew, based on the new record and excluding facts from the stricken affidavit. Here, by contrast, the Fourth Circuit gave no leave for renewed review of its holdings and in fact rejected Plaintiffs' letter requesting it do so; instead, it simply mandated that its holdings be applied. *Souter* is also inapposite because it involved a clear, unmistakable admission that prior sworn statements were demonstrably untrue, as opposed to the situation here—a dispute of fact in which the declarant's statements are all supported by corroborating evidence.

JA1190

## II.    THE FOURTH CIRCUIT'S METHODOLOGY IN *WILLIAMS*

In *Williams*, the Fourth Circuit analyzed arm-of-the-tribe immunity using the first five *Breakthrough* factors:

A.    **Method of Creation.** On this factor, the Fourth Circuit focused "on the law under which the entities were formed" and acknowledged it is "undisputed that Big Picture and Ascension were 'created under tribal law.'" *Williams*, 929 F.3d at 177 (citing *Breakthrough*, 629 F.3d at 1191–92). That is because "Big Picture and Ascension were both organized through resolutions by the Tribe Council, exercising powers delegated to it by the Tribe's Constitution, and the Entities operated pursuant to the Tribe's Business Ordinance." *Id*. No statement by Martorello could possibly change those core facts. Thus, no alleged misrepresentation could impact the Fourth Circuit's decision on this factor.

B.    **Purpose of Creation**. Here, the Fourth Circuit focused on two aspects: "the stated purpose for which the Entities were created as well as evidence related to that purpose." *Williams*, 929 F.3d at 178. The Fourth Circuit identified the stated purpose for which the entities were created by relying exclusively on recitals by the Tribal Council in the entities' articles of organization. *Id.* No statement by Martorello could impact this analysis. As for the second aspect, the Fourth Circuit listed by bullet the specific Tribal activities that Big Picture's revenue has funded, ultimately concluding that "the evidence indicates that the Tribe's general fund has in fact benefited significantly from the revenue generated." *Id.* at 180–81. No statement by Martorello affects these facts either (and indeed, all the evidence confirms that the lending operations helped the Tribe accomplish these stated objectives). Thus, no alleged misrepresentation could impact the Fourth Circuit's decision on this factor.

C.    **Control.** Here, the Fourth Circuit looked to "the structure, ownership, and management of the entities," and in particular "the entities' formal governance structure, the

JA1191

extent to which the entities are owned by the tribe, and the day-to-day management of the entities." *Williams*, 929 F.3d at 182. It determined the formal governance structure assured "that Big Picture is answerable to the Tribe at every level" despite the servicer's "dominant role in Big Picture's lending operations"; and detailed that the Intratribal Servicing Agreement (which is identical to the one between SPVI and RRTL) left Big Picture in control as the lender, and the servicer providing support. *Id.* at 182–83. Based on these facts, the Fourth Circuit determined this factor weighed in favor of immunity for Big Picture, while also stating that "while Ascension does manage many of the day-to-day activities associated with Big Picture's lending, an entity's decision to outsource management in and of itself does not weigh against tribal immunity." *Id.* Here, too, none of Martorello's alleged misrepresentations change these key facts. Furthermore, all the evidence adduced at the hearing confirm the Tribe's ultimate control of the operations, a fact confirmed in other briefing filed with the Court (*see* ECF No. 895).

D.     **Intent to Share Immunity.** Here, the dispositive fact is that the Tribe intended to share its immunity with the entities. *See Williams*, 929 F.3d at 184. Plaintiffs do not even try to contest this factor.

E.     **Financial Relationship between the Tribe and the Entities.** The "heart of this analysis" is whether a judgment against the entities "could in fact significantly impact the tribal treasury." *Id.* at 185. The Fourth Circuit concluded that it would, "[g]iven that 10% of the Tribe's general fund comes from Big Picture." *Id.* Once again, none of Martorello's alleged misstatements could affect these facts; it is self-evident that a judgment against Big Picture or Ascension would affect the Tribal treasury.

F.     **Federal Policies.** In addition to these five *Breakthrough* factors, the Fourth Circuit noted the "sixth *Breakthrough* factor, whether the purposes underlying tribal sovereign

4

JA1192

immunity would be served by granting an entity immunity." *Id.* at 177. Giving "due consideration of the underlying policies of tribal sovereign immunity," the Fourth Circuit determined that "[t]he evidence here shows that the Entities have increased the Tribe's general fund, expanded the Tribe's commercial dealings, and subsidized a host of services for the Tribe's members." *Id.* at 185. The Fourth Circuit therefore concluded that "[a] finding of no immunity in this case . . . would weaken the Tribe's ability to govern itself according to its own laws, become self-sufficient, and develop economic opportunities for its members." *Id.* Once again, none of Martorello's alleged misstatements affect these conclusions.

## III.    ARGUMENT

As shown above and in Martorello's Response brief (ECF No. 843), Plaintiffs' allegations regarding Martorello's purported misrepresentations—though mistaken in any event—have absolutely no relevance to the Fourth Circuit's analysis of the *Breakthrough* factors. This analysis remains dispositive; for this reason alone, the Fourth Circuit's decision remains binding. In addition, the evidence presented at the hearing shows his statements are in fact true.[3]

### A.    Method of Creation Factor

1.  *"I was not involved in the creation of Red Rock, but made aware Red Rock had been formed." (Martorello Decl. ¶ 17)*

    *"Neither I, nor Bellicose, helped form Big Picture or Red Rock." (Martorello Decl. ¶ 102)*

    *"Neither I nor any company I own or manage directed or controlled the creation of Big Picture." (Martorello Decl. ¶ 67)*

    Each of these statements is true. It is undisputed that Red Rock, Big Picture, and

---

[3] To date, Plaintiffs have largely ignored the *Breakthrough* factors, making essentially no attempt to show how any alleged misrepresentation relates to a given factor. Martorello organizes the alleged misrepresentations based on his best understanding of how Plaintiffs intend to argue they affect a given *Breakthrough* factor. As shown throughout, however, the alleged misrepresentations are both immaterial to these factors and, in any event, absolutely true.

JA1193

Ascension were formed by a formal act of the Tribe. *See* ECF No. 845-14 (CM0000341) (Sept. 14, 2011 LVD Tribal resolution creating Red Rock Tribal Financial, LLC); ECF No. 844-2 (LVD Resolution No. 2014-066) (Aug. 26, 2014) (forming Big Picture under Tribal law by act of the Tribe, through the efforts of its counsel); DX 327 (Wichtman Dep.) at 43:2–24 (the Tribe formed Red Rock, Duck Creek, Big Picture Loans, and Ascension); DX. 332 (Hazen Dep.) at 34:4–8 (it was the Tribe's idea to create Big Picture Loans).

Plaintiffs try to show Martorello had some ancillary involvement in helping the Tribe realize its vision for its business, such as providing advice in structuring the entities or responding to the Tribe's request to suggest their names. But as he was not a member of the Tribal council, in spite of whatever other interaction he had with the Tribe, Martorello was not involved, and could not be involved, in the legal process of forming or creating the entities. *See* DX 327 (Wichtman Dep.) at 43:2–24 ("[t]here were many discussions with regard to structure, how things would—how things would be structured in order to approximate the purchase," but "as far as **formation**, Matt Martorello played no role; that was the tribe approving by resolution") (emphasis added). This, as Martorello testified, is what he meant by the statements at issue. *See* 7/21/20 Tr. at 51:5–8, 51:12–17; 7/22/20 Tr. at 223:3–24 ("Tribal council is the only one who can **form** it."), 225:3–11 ("I meant that tribal council is the only one that can **form** the entity. They are the only ones that can do that. I wasn't involved or in the room or part of that process.") (emphases added). And those statements are true.[4]

---

[4] Plaintiffs also improperly attempt to take Martorello's statement out of context. A review of Martorello's Declaration in its entirety shows there was nothing misleading about his statement. For example, in his Declaration, Martorello acknowledges that "LVD approached Martorello in 2011 to assist them [sic] **create** and grow online lending business." Mart. Dec. at Heading II.A. Thus, it was no secret that Martorello helped LVD create the online lending business: the Declaration itself makes that clear.

JA1194

Notably and as Martorello testified, when he made these statements, they were offered in the specific context of establishing the *Breakthrough* factors—and in particular, the "Method of Creation" factor. 7/21/20 Tr. at 50:15–17. When the Fourth Circuit reviewed the Method of Creation factor, it noted that its focus is "on the law under which the entities were ***formed***." *Williams*, 929 F.3d at 177 (emphasis added). The sole fact the Fourth Circuit considered in connection with this factor, which is consistent with Martorello's declaration and all evidence adduced at the hearing on this point, is that "Big Picture and Ascension were both organized through resolutions by the Tribe Council, exercising powers delegated to it by the Tribe's Constitution"—a process in which Martorello could not have been personally involved. *Id.* "It is therefore undisputed"—and remains the case—"that Big Picture and Ascension were 'created under tribal law'" (as is true for Red Rock as well); "[a]ccordingly, this factor weighs in favor of tribal sovereign immunity for both Entities." *Id.*

## B.    Purpose Factor

1. *"LVD approached Martorello in 2011 to assist them [sic] create and grow online lending business." (Martorello Decl. at Heading II.A.)*

This statement is, first and foremost, immaterial to the *Williams* decision: the issue of who approached whom played no role in the Fourth Circuit's analysis on any *Breakthrough* factor. Rather, the Fourth Circuit focused on two issues which pertain ***exclusively*** to the purposes of the Tribe: "the stated purpose for which the Entities were created as well as evidence related to that purpose." *Williams*, 929 F.3d at 178. Nevertheless, Martorello's statement is also true in all respects.

*First*, the evidence shows that the Tribe had taken significant steps toward establishing a lending business well before making Martorello's acquaintance. *See, e.g.*, ECF No. 845-17 (LVD-DEF00000716) (███████████████████████████████████████████

7

██████████████████████████████████████████████

███████████████████████████████████████ ); ECF No. 845-18

(ROSETTE_REVISED_048773) (Aug. 4, 2011 email setting up an "Intro Call" with Martorello

in August 2011 regarding the "Tribal Lending Program"); DX 327 (Wichtman Dep.) at 72:23–

73:5 (the Tribe had already entered into contracts with TLM to explore lending opportunities,

"they had developed the codes; they had done all of the things that they needed to do, and they

had already created the lending institute that they wanted to use" before the trade show where it

met Martorello); DX 012 (ROSETTE_REVISED_048832) (Aug. 4–5, 2011 email chain among

Martorello, Flint Richardson, Rob Rosette, and Scott Merritt showing that at the time Martorello

first met those three, LVD had already taken substantial steps towards launching the lending

business including forming an LLC and establishing a tribal lending ordinance and regulatory

commission). In fact, the Tribe had set up lending operations in 2008 and 2009, years before

meeting Martorello. DX 331 (Rosette Dep.) at 71:16–73:05; *see also* DX 328 (Dowd Dep.) at

179:3–6 (Tribe had other lending businesses before Red Rock).

     *Next*, the introduction between Martorello and the Tribe was arranged by Scott Merritt,

who had a pre-existing relationship with the Tribe; he was working with the Tribe in 2010 as part

of LVD's efforts to establish its lending operations (*see* DX 326 (Merritt Dep.) at 24:10–20, 36)

but had never met Martorello before meeting him at the trade show where he arranged the

introduction to the Tribe and its general counsel (*id.* at 36:17–19). Given that pre-existing

relationship and Martorello's conversations with LVD's general counsel, Martorello understood

Merritt to be an agent of LVD. *See* 7/22/20 Tr. at 37:12–20. And in fact, Merritt was paid for

referring Martorello to the Tribe—***not*** by Martorello, but by TLM, which the Tribe had hired in

2010 to "develop" an online lending business. DX 326 (Merritt Dep.) at 65:25–66:21; Merritt

was **never** paid any type of fee by Martorello. *Id.* at 67:5–8. Thus, the evidence confirms that the Tribe approached Martorello, and not the other way around (even though, again, this point means nothing to the *Breakthrough* factors). *See also* DX 328 (Dowd Dep.) at 177:2–5 (confirming the Tribe approached Martorello, not vice versa).

2.  *"Since the beginning of my relationship with LVD, I understood that LVD had always intended to utilize my consulting services to assist them to build their valuable IP and to better understand how to run a successful online consumer lending business." (Martorello Decl. ¶ 47)*

    *"As LVD gained additional knowledge and sophistication, I understood that LVD had always intended to increase its ability to manage and run a successful lending business while decreasing outsourced consulting services." (Martorello Decl. ¶ 48)*

Note that the Tribe's stated purpose for forming the Entities, as acknowledged in *Williams*, was "tribal economic development and self-sufficiency" and "diversify[ing] the economy of the Tribe's Reservation." *Williams*, 929 F.3d at 178. Tribes are encouraged under federal law to hire outside expertise to assist in their operations. Thus, the Tribe's intention of building its intellectual property and increasing its ability to manage and run the lending business while decreasing reliance on outsourced consulting services is entirely consistent with the Fourth Circuit's holdings on the *Breakthrough* factor. What matters to the *Breakthrough* factor is that the entities helped the Tribe develop economically, and all evidence the Fourth Circuit reviewed shows that they did. None of Martorello's statements affect this evidence.

Martorello's statements are true nonetheless, as he confirmed in his testimony. *See* 7/22/20 Tr. at 191:18–22 (confirming that sale conversations were intended to "accelerate . . . LVD's ability to maintain a profitable online consumer lending business with no outsourced consulting services"). Indeed, over the course of the relationship between Red Rock/Duck Creek and Bellicose/SourcePoint, Bellicose and SourcePoint helped Red Rock and Duck Creek develop significant and valuable intellectual property, including: underwriting criteria (i.e., formulas for

**JA1197**

what the Tribe wanted the loans to look like) (7/21/20 Tr. at 59:17–60:13); customer lists, procedures for how to verify pre-qualified leads (including how loan and rate and term should match up to pre-qualified leads), how to run the call center to do its analysis for verifications, and processes such as the compliance management system (*id.* at 62:2–63:6); *see also* PX 115 (Martorello_011448-9) (Dec. 7, 2016 email where Martorello itemized what Tribal intellectual property was as of December 31, 2012, including the underwriting methods).

Michelle Hazen similarly confirmed that over the course of time, LVD gained considerable knowledge and experience in running the business (DX 332 (Hazen Dep.) at 56:22– 27) and that acquiring Bellicose and SourcePoint would make the business more profitable because it would reduce reliance on third parties (*id.* at 62:22–63:11). Multiple other witnesses involved in the operation from its inception confirmed the Tribe's intent to increase its control over the operations and reduce its dependence on outside support. *See, e.g.*, DX 330 (Weddle Dep.) at 116:3–15 ("The model that many tribes follow is to hire the best service provider they can to help them learn a business, develop their internal capacity, grow it over time, and then eventually they don't need that service provider anymore"), 117:6–10 (agreeing that this is what occurred with respect to LVD and Bellicose and SourcePoint, which "ultimately culminated in LVD purchasing Bellicose and Sourcepoint").

Based on Plaintiffs' presentation at the hearing, it does not appear they contest that the Tribe intended to learn the business and grow its operations (and abundant evidence confirms that they did so intend, and did in fact learn and grow); as such, rather than recite this evidence again here, Martorello refers the Court to his table showing evidence on this point. *See* ECF No. 843-1. Instead, Plaintiffs apparently suggest that Martorello tried to keep the Tribe from learning the business. Plaintiffs make much of the fact that, up until the sale of SourcePoint and Bellicose,

in addition to the intellectual property that Martorello's companies helped the Tribe's entities develop, there was also certain pre-qualified lead intellectual property that SourcePoint aggressively protected (even internally) and reserved for itself until it was purchased. But Plaintiffs fail to distinguish the ***lending*** business (which was Red Rock and Duck Creek) from the ***consulting*** business (which was Bellicose and SourcePoint). Martorello explained this distinction at various points during the hearing. *See*, *e.g.*, 7/21/20 Tr. at 59:5–13. That Bellicose and SourcePoint helped Red Rock and Duck Creek develop their intellectual property—customer lists, underwriting criteria, methods of operations, etc.—while retaining their own intellectual property (how to generate pre-qualified leads) up to the point where LVD purchased Bellicose and SourcePoint and acquired that highly guarded intellectual property is perfectly consistent with Martorello's statements. It is also exactly what the evidence showed at the hearing.

3. *"To that end, since at least 2012, LVD and I have engaged in multiple conversations relating to the potential sale of my consulting businesses to LVD to accelerate LVD's ability to maintain a profitable online consumer lending business with no outsourced consulting services." (Martorello Decl. ¶ 49)*

This statement is also true. It is beyond dispute that Martorello and LVD had many conversations relating to a possible sale from 2012 onward (with the Tribe attempting to acquire the entire business even as Martorello contemplated a smaller-scale transaction involving the sale of a copy of SourcePoint's intellectual property). *See, e.g.*, ECF No. 847-30 (ROSETTE_REVISED_037492) (███████████████████████████████████████ ███████████████████████████████████ ECF No. 844-19 (ROSETTE_REVISED_053374–6) (Nov. 2, 2012 email showing sale discussions); DX 069 (ROSETTE_REVISED_048729) (██████████████████████████████ DX 157 (ROSETTE_REVISED_047737) (█████████████████████████████████ ████████████████████████); DX 198 (ROSETTE_REVISED_045972) (████████

**JA1199**

████████████████████████████████████████

DX 327 (Wichtman Dep.) at 30:1–31:12 (████████████████████████████

████████████████████████████████████████

████████████████████████ ).

4.  *"Contrary to the allegations of Plaintiffs, the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies. Indeed, much of the discussions as to the motivation behind the transaction described by Plaintiffs' Complaint are nonsensical and are temporally problematic. Plaintiffs claim there were certain 'motivating factors' for the sale which, in reality, occurred eighteen months to three years before the sale transaction closed." (Martorello Decl. ¶ 69)*

Plaintiffs' focus on **Martorello's** purpose for selling Bellicose and SourcePoint is misguided. *Williams* focused on the **Tribe's** purposes—not Martorello's. *See* 929 F.3d at 178–82. And even then, *Williams* took for granted that one of the Tribe's purposes could have been "in part to reduce exposure to liability," noting that this "does not necessarily invalidate or even undercut the Tribe's stated purpose, *i.e.*, tribal economic development." *Id.* at 179. Thus, evidence as to **Martorello's** purpose for the transaction, or that the Tribe might have thought of the sale as a means of mitigating litigation risk, is truly immaterial. Nothing Plaintiffs raised at the hearing contradicts either that the Tribe's purposes for forming the entities were to promote tribal economic development or that the entities in fact fulfilled that purpose. *See*, *e.g.*, DX 332 (Hazen Dep.) at 34:4–8, 35:7–15 (Tribe created Big Picture Loans "To further our economic development efforts."); DX 333 (Mansfield Dep.) at 32:23–33:06 (revenue from lending has "helped with helping our elders, helping with our youth. The basic infrastructure of running of the government, in itself, it helped immensely. I mean without this the tribe would be in dire straits.").

Martorello's statement, however, is also true. As Martorello explained during the hearing, the discussions to sell the business involved "multiple conversations" ranging back to 2012—just

12

**JA1200**

as he acknowledged in Paragraph 49 of his declaration. 7/22/20 Tr. at 193:8. There were three discrete phases to the discussions, with multiple "aborted sales"—one in 2012/13, another around October 2013, and a third in August 2014 to January 2016. *Id.* at 188:2–21. The first "aborted sale" was a sale of copies of SourcePoint's intellectual property—the "secret sauce" it used to generate pre-qualified leads—to "re-create who we were for the tribe to own in an urban center where they could service themselves." *Id.* at 188:24–189:7.[5] The second aborted sale was an equity sale, through which Martorello would convey a 51% ownership interest. *Id.* at 189:13–15. The third sale, which was ultimately consummated, sold the entire business. *Id.* at 189:16–18. *See e.g.,* DX 081 - ROSETTE_REVISED_055695 (July 18, 2013 email subject "IP sale" with attached deal documents)

This third phase did not begin until August 2014—after the unsanctioned regulatory threat of Operation Chokepoint had waned. *See* 7/22/20 Tr. at 219:12–18, 220:21–221:1, 222:2–18 (as of the summer of 2014, Martorello understood that Congress, Members of Congress, and eventually the governmental agencies themselves published reports acknowledging Operation Choke Point to be an "inappropriate abuse of investigatory threats to choke off banking, and it was admonished and ceased"); *see also* 7/21/20 Tr. at 138:15–24; ECF No. 847-45

---

[5] There was another attempt to sell a copy of SourcePoint's intellectual property—presenting the same concept as the first "aborted sale"—in July 2014. *See* ECF No. 844-22 (ROSETTE_REVISED_047736–7) (██████████████████████████████████████████ ██████). This was the business plan Martorello reverted back to in early 2014, paying a marketing firm $300,000 a month to market SourcePoint as "a tech company that helps make Native American tribes self-sufficient," while creating multiple brands for already identified potential clients. DX 080 (PHEN0002519). At this point in time, Martorello had limited interest in the sale—that did not change until the Tribe changed what it was willing to offer. *See* ECF No. 847-23 (ROSETTE_REVISED_047747) (█████████████████████████████████████ ████████████); ECF No. 847-25 (ROSETTE_REVISED_053089) (██████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████).

**JA1201**

(ROSETTE_REVISED_029547) ( ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████[6]

        Prior to that time, Martorello's primary interest was still to sell SourcePoint's intellectual

property and " ███████████████████ ECF No. 844-22 (ROSETTE_REVISED_047737)

( ███████████████████████████████ ). Indeed, Martorello rejected

some of the Tribe's earlier inquiries to purchase the entire business, suggesting that the parties

were " ██████████████████████ " in terms of a possible sale. ECF No. 847-23

(ROSETTE_REVISED_047747) ( ████████████████████ ); *see also* DX 255

(ROSETTE_REVISED_052247) (Dec. 31, 2013 email in which Martorello rejects a potential

sale transaction for purely economic reasons, opting instead for the "status quo"). And

Martorello rejected offers and delayed a possible sale even during the *Otoe-Missouria* litigation,

making clear the economics—not legal risk—was the motivation for the sale.

        As Martorello explained in his testimony, his "motivations for that sale"—and the reason

this sale went through where others failed—was "the attractive offer that I received from the

tribe's council and the tribe," as well as his desire to raise his soon-to-be-born child in the

mainland United States near family. 7/22/20 Tr. at 225:25–227:4. In fact, the sale was not

completed until January 2016 due to tax concerns unrelated to any litigation or enforcement

---

[6] As Martorello elaborated for the Court, he was never concerned that Operation Chokepoint
might suggest that the lending operations were illegal; rather, his concern was that there was "not
enough depth in the bench with ACH and banks… all they had to do was call the bank and turn
off your bank account, and we couldn't defend ourselves" 7/21/20 Tr. at 125:8-18; *see also* ECF
No. 847-26 (Martorello_011255-63) (Mar. 10, 2017 email from Martorello sharing a report on
tribal lending volume increasing late 2014 and Martorello detailing how Operation Choke Point
and potential CFPB rule were mitigated well before the sale, such that Martorello could not
justify to the accountants that a FMV buyer's public perception would even deem the existing
operation a non-going concern.

JA1202

actions. *Id.* at 226:14–227:4; *see also* ECF No. 844-36 (CW_01786) (April 6, 2015 email from Martorello: "closing can't happen until 1/1/16. . . . If it happens in 2015, I'm locked onto this island until the year 2020. If it closes 2016, I am set free."); DX 202 (ROSETTE_REVISED_044639–42) (███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ The "motivating factors" Plaintiffs suggest—"Operation Choke Point, the *Otoe-Missouria* litigation, and the New York DFS actions to choke off the banks with the cease and desist"—had ceased to be important factors eighteen to three months before the sale closed—exactly as Martorello stated in his declaration. *See* 7/22/20 Tr. at 228:1–9.[7]

The notion that the sale of the business was motivated by Martorello's desire to evade regulatory threats is simply baseless. Martorello knew states would contest tribal law, but those concerns over regulatory issues did not prevent Martorello from entering the relationship with LVD in 2011. It did not keep him from exploring opportunities to expand his involvement in the Tribal lending industry, even during the height of Operation Choke Point. *See, e.g.*, ECF No. 847-10 (ROSETTE_REVISED_048681) (██████████████████████████████████

█████████████████████████████████ "); ECF No. 847-15 (PHEN0001869) ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ ). Indeed, at one point, Martorello contemplated

---

[7] In fact, as described in Martorello's Brief, he considered the Second Circuit's *Otoe-Missouria* decision in late 2014 to be an "excellent result" that "outright demonstrate[s] the legality of tribal lending" and a victory for LVD and Native American lending. ECF No. 844 at 23–24. He even suggested "face to face meetings with State DFIs" to discuss the decision and LVD's business. DX 187 (ROSETTE_REVISED_001110).

selling only a portion of his businesses to the Tribe and keeping the remainder. *See* ECF 844-28 – Middlemarch 00270 (███████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████ And even in its final form, the sale of Bellicose and SourcePoint was not intended to be the end of Martorello's involvement in the industry. *See* ECF No. 847-27 (ROSETTE_REVISED_045282) (███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████ ). Had he been concerned by ongoing regulatory pressure, Martorello could have insisted that the sale be structured so as to leave him in a position to invoke immunity as an officer of an arm of the Tribe, as individuals such as Mr. McFadden had done. Martorello did none of that, because, as he stated in his declaration and testimony at the hearing—and as all evidence confirms—the 2016 sale was not motivated by impending threats of litigation or regulatory pressure. Once again, Martorello's statements are true.

## C.  Control Factor

1. *"I have never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock." (Martorello Decl. ¶ 26)*

    *"I have never collected any debts from any consumers in Virginia." (Martorello Decl. ¶ 107)*

    *"Bellicose has never accepted or collected a consumer loan payment under any loan agreement originated by Big Picture or Red Rock." (Martorello Decl. ¶ 105)*

These statements are true, notwithstanding Plaintiffs' attempts to contort them. As the Court noted, the term "collection" could mean different things; but as Martorello testified, in his statements, he referred to "the receipt of money" in the "ordinary course." 7/21/20 Tr. at 181:21–183:4; *see also* 7/22/20 Tr. at 184:16–25 (Martorello clarifies he is discussing a collection action

**JA1204**

in the context of the allegation of "collection of an unlawful debt").[8] Neither he nor Bellicose nor SourcePoint ever took or received any cash from the customers of LVD's lending businesses. *Id.* at 79:17–24. Rather, "Red Rock was the entity that would collect through taking, receiving, or demanding payment." *Id.* at 80:1–3. It would initiate this collection process through the "batch renewal process," which Red Rock and the Tribe, not Martorello and his companies, performed. *Id.* at 81:3–13. This meant that money flowed to and from consumers via the Tribe's bank account—never the account of Bellicose, SourcePoint, or Martorello. *See* DX 333 (Mansfield Dep.) at 112:19–113:2, 115:24–116:1 (███████████████████████████).[9]

Documentary evidence shows the same facts. *See, e.g.*, ECF No. 844-52 (ROSETTE_REVISED_014047) (Nov. 2, 2012 discussion of activities taking place on-reservation including "payment processing," inputting payments into customer accounts, and depositing physical checks into bank account); ECF No. 845-46 (LVD-DEF00018890–94) (███ ███████████████████████████).

Once again, Plaintiffs strip Martorello's statement from the rest of his Declaration to suggest that these statements are misleading because Bellicose and SourcePoint had limited access to the Tribe's bank accounts. Martorello expressly acknowledged this fact in his declaration, (*see* PX 123 ¶¶ 27–28), so this hardly supports claims that the *Williams* decision was procured through material misrepresentations. Furthermore, this access was "limited," just as

---

[8] Even to the extent "collection" refers to the collection of bad debt, this was done by a third party pursuant to a contract with the Tribe—not Martorello—and the Tribe "would have had to approve the debt collection contract." 7/21/20 Tr. at 82:17–22, 83:4.

[9] Plaintiffs have also noted that the original servicing agreement between Bellicose and Red Rock provided that the servicer would collect gross revenues. *See* 7/21/20 Tr. at 94:9–95:1. However, as Martorello testified, Bellicose never actually did so, notwithstanding the contractual provision. *Id.* at 95:1–5. And there is no evidence suggesting otherwise. And there is overwhelming evidence demonstrating that only RRTL accounts collected or received loan payments, notably the Red Rock bank statements themselves.

Martorello said, both in the sense that the companies had access to only one of Red Rock's multiple accounts—the operating account (7/21/20 Tr. at 72:3–5)—and had constrained authority as to what they could do with that access—constrained both by the deposit account control agreement (*id.* at 73:1–12) and the fact that the Tribe could have decided to terminate Bellicose and SourcePoint at its own discretion (*see id.* at 76:2–9; DX 328 (Dowd Dep.) at 202:2–7). Notwithstanding Bellicose and SourcePoint's access to the accounts, the fact remains that collection—the act of taking, receiving, and demanding payment—was done by Red Rock and Big Picture, not any of Martorello's entities (or Ascension post-sale).

2.  *"I have never had any control over Red Rock or Big Picture's lending decisions, including the decision to lend in any particular state." (Martorello Decl. ¶ 107)*

   *"Neither I nor Bellicose have 'controlled' any underwriting criteria used by and of LVD's lending businesses – at all times the LVD business retained full control over the underwriting criteria used to make loans to consumers." (Martorello Decl. ¶ 101)*

   *"Under the Servicing Agreement, Red Rock paid SourcePoint to develop underwriting criteria to recommend for implementation by Red Rock. SourcePoint did not simply implement these underwriting criteria on behalf of Red Rock, but instead presented the underwriting criteria to Red Rock's co-managers for their evaluation and ultimate approval or rejection." (Martorello Decl. ¶ 45)*

These statements are true, as confirmed not only during the hearing but also the briefing Martorello recently filed showing that the Tribe owned and had ultimate authority over the origination and underwriting criteria (*see* ECF No. 895). Red Rock and Big Picture had the right to determine what interest rate to charge (7/22/20 Tr. at 206:7–24); could settle claims and lawsuits (*id.* at 206:2–207:13); and could control its own business (*id.* at 208:15–18)—with or without Martorello's approval. *See* ECF No. 847-29 (Hazen 9/28/17 Aff.) ¶ 9 ("While Red Rock received advice and consulted with Bellicose about operations, all final decisions about operations were made by Red Rock managers."); ECF No. 845-8 (Justin Martorello 6/12/19 Decl.) at 6 ("Throughout my employment with BVI and BC, LVD's operational decisions were

made by managers which were appointed by the LVD Tribal Council."); DX 330 (Weddle Dep.) at 110:8–15 ("[A]t all times it was clear to me that I was advising Bellicose, as a service provider, who was in turn providing that information and advice to Red Rock and Duck Creek, and that the individuals responsible for decision-making for Duck Creek and for Red Rock were at all times tribal officials.").

In particular, the underwriting criteria was "part of their [i.e., Red Rock's] underwriting process. That's all their intellectual property." 7/21/20 Tr. at 59:17–60:13. Thus, Red Rock and Duck Creek ultimately determined, by approving or rejecting Bellicose and SourcePoint's recommendations, the parameters for whether Red Rock should make a loan (and did not always accept those recommendations). *See* DX 328 (Dowd Dep.) at 36:2–10; DX 332 (Hazen Dep.) at 144:13–145:4 (Ascension reviews and recommends underwriting strategies and models "after discussion with me"); DX 333 (Mansfield Dep.) at 58:9–59:19 (ultimate decision "as to whether to do anything in the funding sphere" was up to the co-managers, not the people at Bellicose and SourcePoint). In addition, Red Rock could have altered the underwriting procedures without Bellicose/SourcePoint's approval; Bellicose and SourcePoint could have "expressed distaste in it and ma[d]e a recommendation that they don't do that," but had no formal right to do anything more than make a recommendation. DX 328 (Dowd Dep.) at 197:16–198:08. Whether to accept or reject those recommendations was entirely up to the discretion of the Tribal co-managers. *See* DX 333 (Mansfield Dep.) at 60:13–61:01, 61:12–17, 62:6–88 (co-managers would receive and review recommendation; if it made sense they would approve, and if not they would not).

Documentary evidence shows the same. *See, e.g.,* ECF No. 844-42 (ROSETTE_REVISED_037655) (███████████████████████████████████

████████████████████████████████████████████████████)



); ECF No. 844-50 (ROSETTE_REVISED_036363) (

); ECF No. 845-46 (LVD-DEF00018890–4) (

); ECF No. 847-5 (LVD-DEF00006043) (

); DX 129 (LVD-DEF00017189) (

); DX 191 (LVD-DEF00016838) (

); ECF No. 845-5- MARTORELLO_003936 (April 15, 2014 email from Martorello to potential investor: "My job is to provide . . . services to Tribal government lenders and I get paid for my services. I don't buy the loans they originate and then collect them. The tribe owns, manages, collects, and underwrites on tribal land, etc. My objective is to help the Tribe build their business in a self-sufficient manner."); ECF No. 847-4 (LVD-DEF00018915) (

).

The evidence thus confirms that Martorello, Bellicose, and SourcePoint never controlled the underwriting criteria or lending decisions; those decisions were made by Red Rock and Big Picture and implemented only if the Tribal entities expressly approved the recommendations. Martorello's statements are true.

3. *"As I understand LVD's lending, all loans are made from LVD's reservation" (Martorello Decl. ¶ 107)*

20

**JA1208**

This statement is true. Witness testimony shows loans were only made on the LVD reservation, the Fourth Circuit decided so based on evidence provided by the Tribe, and the briefing Martorello recently filed (ECF No. 895) shows the same. *See, e.g.*, 7/21/20 Tr. at 60:3–5 (referring to "the final process to do the final verifications on the reservation"); DX 328 (Dowd Dep.) at 50:08–23 (describing application process, including "final approval process that happens at the office on the reservation"), 82:11–20 (team that does this final verification is located "[i]n the Big Picture Loans office in the reservation for Lac Vieux."), 183:09–15 (final decision as to the origination of any loans rested with Red Rock, and was made on reservation); DX 332 (Hazen Dep.) at 186:2–18, 189:13–20, 192:18–193:2 (final verification done by Big Picture on tribal land), 197:15–20 (no employees that are not located on tribal land would ever perform the final verification).

Documentary evidence confirms this fact. *See, e.g.*, ECF No. 844-42 (ROSETTE_REVISED_037655) (



); ECF No. 844-50 (ROSETTE_REVISED_036363) (

); ECF No. 844-52 (ROSETTE_REVISED_014047) (Nov. 2, 2012 email listing lending activities performed in office on LVD reservation); ECF No. 845-46 (LVD-DEF00018890–94) (                                        ).[10]

---

[10] The Office of the Comptroller of the Currency ("OCC") recently proposed regulation to determine when a lender is the "true lender" in the context of a partnership between a bank and third party. Under this proposal, the entity is the "true lender" "if, as of the date of origination, it

*Footnote continues….*

**JA1209**

## D.    Tribal Intent Factor

As far as Martorello can tell, Plaintiffs raise no challenge to the fourth *Breakthrough* factor, concerning the Tribe's intent to extend its immunity to the entities. As *Williams* held, "[t]he Tribe unequivocally stated its intention to share its immunity in Big Picture and Ascension's formation documents," and "[t]his factor thus weighs in favor of immunity for both entities." *Williams*, 929 F.3d at 184.

## E.    Financial Relationship Factor

1.   *"Contrary to what Plaintiffs have represented to the Court, Red Rock did not receive two percent of the net revenues under the terms of the Servicing Agreements. Instead, as the documents I have reviewed that were provided in discovery demonstrate LVD chose to structure their arrangement to stabilize their monthly income as a percentage of gross revenues, adjusted for bad debts." (Martorello Decl. ¶ 34)*

This statement is true. The evidence is clear that Red Rock received two percent of **gross**, not net, as calculated by "Tribal Net Profits," a defined term under the Servicing Agreement that the Tribe agreed upon to stabilize monthly income to its government. *See* DX 332 (Hazen Dep.) at 36:15–36:19 (Tribe received "2 percent of the gross revenue minus bad debt, expenses, and then a 2 percent reinvestment into Big Picture Loans"); *see also* DX 058 (Red Rock-SourcePoint Servicing Agreement) § 2.25 (defining Tribal Net Profits).

2.   *"LVD suggested this form of revenue split as it guaranteed LVD's lending entities would always generate income for LVD's general fund while simultaneously incentivizing SourcePoint to assist LVD in the growth and the maintenance of an efficient and successful business for the benefit of LVD." (Martorello Decl. ¶ 36)*

This statement is also true. Plaintiffs appear fixated on Martorello's statement that "LVD chose to structure their arrangement" as a percentage of gross revenues, suggesting that this was

---

is named as the lender in the loan agreement or funds the loan." Office of the Comptroller of the Currency Issues Proposed True Lender Rule, OCC NR 20-97 (July 20, 2020). This proposed regulation further corroborates that Red Rock and Big Picture are the "true lender," not Bellicose or SourcePoint (and certainly not Martorello).

**JA1210**

actually Martorello's idea based on evidence that he suggested the specific two-percent figure. Plaintiffs confuse who proposed the **structure** with who proposed the specific two-percent number. *See* 7/21/20 Tr. at 83:22–25 ("Two percent was my counteroffer to their offer."). All the evidence is that the **Tribe** proposed the "structure of the arrangement," just as Martorello said in his declaration. 7/21/20 Tr. at 83:17–21 ("Q And when you say LVD chose, you are not suggesting that this is a structure LVD wanted and it was their idea, are you? A It was their idea. Q It was their idea. LVD said we want to pay two percent. A No, I'm talking about the structure of the arrangement."); DX 331 (Rosette Dep.) at 177:6–20 ("the tribe was looking for a minimum payment, guaranteed revenue. And I think the numbers came from their—the tribe's discussion with Scott Merritt and what would be palatable for them."); DX 326 (Merritt Dep.) at 50:18–51:02 (Martorello asked Merritt about two percent, not necessarily the revenue sharing structure), 97:24–98:02 (admitting that there may have been a prior offer of which he was unaware).

In fact, contemporaneous documents show that LVD already had minimum Tribal Net Profits requirements—a concept with which Martorello was previously unfamiliar and which Tribal agents explained to him. *See* ECF No. 845-20 (ROSETTE_REVISED_048835) (Aug. 5, 2011 email informing Martorello of Tribe's fee structure, including that "we have a very low minimum of $10,000 per month. So, it is the greater of 2% or $10,000 per month."); ECF No. 847-7 (ROSETTE_REVISED_052537–38) (



ECF No. 847-8 (ROS002-0000694) (

).

Plaintiffs also seem to suggest that Martorello's statement is misleading because the

Tribe paid half of the two percent it received to TLM. This suggestion is baseless for at least three reasons. First, this arrangement only lasted until July 2012, when the Tribe renegotiated its arrangement with TLM. *See* 7/21/20 Tr. at 96:4–15. Second, what the Tribe did with the two percent it received does not change the fact that it in fact received two percent. Finally, none of this changes the fact that matters to the *Breakthrough* analysis: the Tribe "depends . . . on the [entity] for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities." *Williams*, 929 F.3d at 184; *see also* DX 333 (Mansfield Dep.) at 32:23–33:6 ("The businesses help fund a lot of the things that we do for our community. It helps, you know, with the funding. . . . I know it helped with our—building of our new clinic. I know it has helped with helping our elders, helping with our youth. The basic infrastructure of running of the government, in itself, it helped immensely. I mean without this the tribe would be in dire straits.").

3. *Bellicose "was valued at just over $100 million" at the time of the sale. (Galloway I, ECF No. 40 at 7)*

This statement (which is not even a statement made by Martorello) is true. In fact, the fair market value of Bellicose equity was valued for tax purposes in January 2016, the date of the sale to the tribe, at $108 million. 7/22/20 Tr. at 216:8–25. Similarly, documents show many contemporaneous valuations at or above $100 million. *See, e.g.*, ECF No. 845-11 (LVD-DEF00022047) (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); ECF No. 847-47 (Middlemarch 000642) (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); ECF No. 845-1 (ROSETTE_REVISED_048541) (Aug. 26, 2014 email from Martorello to LVD forecasting revenues of over $58 million each year); ECF No. 844-37 (BDO-Bellicose000065) (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); DX

230 (Martorello_009769) (Dec. 5, 2015 email exchange in which Martorello asks how the fair market value tax valuation will change if the probability of impact from Operation Chokepoint or rulemaking is set to 49% or less and valuation expert responds: "The value is well above 100 million even with a CSRP of 50%.").

Here, too, Plaintiffs raise nothing to suggest that the Tribe did not receive significant value from its purchase. This is especially true considering the way the purchase was structured—through a monthly payment which can be as low as zero if there is not sufficient revenue, and which ends after seven years even if there is an unpaid balance on the purchase loan. *See* Tr. at 248:20–249:10. Once again, there is no impact of any purported misrepresentation on the relevant *Breakthrough* factors—though the evidence confirms that these statements are in fact true nonetheless.

## F.    Federal Policies Factor

The "sixth *Breakthrough* factor"—"whether the purposes underlying tribal sovereign immunity would be served by granting an entity immunity"—is in reality "too important to constitute a single factor and will instead inform the entire analysis." *Williams*, 929 F.3d at 170. As the Fourth Circuit observed, "[t]he evidence here shows that the Entities have increased the Tribe's general fund, expanded the Tribe's commercial dealings, and subsidized a host of services for the Tribe's members." *Id.* at 185. The evidence presented at the hearing confirms all of this. *See*, *e.g.*, DX 333 (Mansfield Dep.) at 32:23–33:06 (revenue from lending has "helped with helping our elders, helping with our youth. The basic infrastructure of running of the government, in itself, it helped immensely. I mean without this the tribe would be in dire straits."). Thus, none of the alleged misrepresentations have any impact on this critical factor.

In sum, each of the *Breakthrough* factors is unaffected by Martorello's alleged misstatements, which are in any event absolutely true.

## G.     Plaintiffs' Spoliation Argument may be Rejected as Baseless

Finally, Plaintiffs' desperate attempt to argue that material evidence was destroyed may be disregarded outright. Plaintiffs made essentially no effort at all at the hearing to show proof that Martorello directed or participated in the destruction of material evidence. In fact, the evidence belies the suggestion that *any* documents or emails were even destroyed, much less that Martorello had anything to do with it. *See* DX 329 (Karam Dep.) at 148:17–22 (all files relating to Bellicose were retained); DX 330 (Weddle Dep.) at 195:16–19 (Martorello never directed Weddle to destroy Bellicose docs), 197:1–20 (because merger agreement required transfer or destruction of pre-existing Bellicose files, Weddle offered to transfer them, but was encouraged by Wichtman to delete and recycle as the documents were duplicative of materials already in Tribe's possession); DX 327 (Wichtman Dep.) at 257:16–19 ("I don't know that those emails were deleted.").[11] Plaintiffs' spoliation argument, like the rest of their accusations, appear intended to raise mere inferences of untoward behavior yet lack any evidentiary support or basis in reality. Yet even after an extensive period of discovery focused on the spoliation issue (including an invasive seven-hour deposition of Martorello), they have raised nothing to suggest either that Martorello's conduct was in any way inappropriate or that there is any basis on which this Court may disregard *Williams*.

## IV.   CONCLUSION

Not only were the alleged misrepresentations irrelevant to the Fourth Circuit's

---

[11] Plaintiffs may attempt to resurrect this argument by pointing to Section 2.6(d) of the merger agreement, as they have done in the past. But as Martorello testified, the reason that provision 2.6(d) was included was stated in the same email where the provision was suggested: the provision was to protect sensitive information that was not part of the sale, such as information that belonged to non-lending businesses affiliated with Bellicose or former customers other than LVD, and to ensure a complete transfer of confidential intellectual property to the Tribe. *See* 7/21/20 Tr. at 169:1–25.

JA1214

methodology in applying the *Breakthrough* factors, but the record also shows that Martorello's statements at issue are entirely truthful and accurate. Plaintiffs' baseless attempts to question Martorello's truthful testimony, depending primarily from conflation and sleight of hand, is wholly unsupported. The Court should reject Plaintiffs' attempt to disregard the binding conclusions in *Williams*, award Martorello his fees and costs expended in order to respond to Plaintiffs' baseless accusations, and move this case forward toward trial with all possible haste.

Respectfully submitted,

MATT MARTORELLO

By:/s/  *John M. Erbach*  _____
M. F. Connell Mullins, Jr. (VSB No. 47213)
Email: cmullins@spottsfain.com
Hugh McCoy Fain, III (VSB No. 26494)
Email: hfain@spottsfain.com
John Michael Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100

Richard L. Scheff (admitted *pro hac vice*)
Jon Boughrum (admitted *pro hac vice*)
Michael Witsch (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone: 267.780.2000
Facsimile: 215.405.9070
Email: RLScheff@atllp.com
        JBoughrum@atllp.com
        MWitsch@atllp.com

Douglas N. Marsh (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
4643 South Ulster Street Suite 800
Denver, Colorado 80237
Telephone: 720.200.0676
Facsimile: 720.200.0679
Email: dmarsh@armstrongteasdale.com

*Counsel for Defendant Matt Martorello*

JA1216

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on this 31st day of July, 2020, the foregoing was filed using the Court's CM/ECF system, thereby serving a copy on all counsel of record electronically.

By: */s/ John M. Erbach*
John M. Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, VA 23219
(804) 697-2000 (Telephone)
(804) 697-2100 (Facsimile)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

LULA WILLIAMS,
et al.,

     Plaintiffs,

v.                                    Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.

---

RENEE GALLOWAY,
et al.,

     Plaintiffs,

v.                                    Civil Action No. 3:18cv406

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.

**MEMORANDUM OPINION**

In Williams, et al. v. Big Picture Loans, LLC, et al.,
3:17cv461 (E.D. Va.) ("Williams"), Renee Galloway, et al. v. Big
Picture Loans, LLC, et al., 3:18cv406 (E.D. Va.) ("Galloway I")
and Renee Galloway, et al. v. Martorello, et al., 3:19cv314 (E.D.
Va.) ("Galloway II"), the Plaintiffs filed three similar, but in
some respects substantively quite different, actions arising out
of a so-called "Rent A Tribe" scheme allegedly orchestrated by
Matt Martorello ("Martorello"), members of his family, companies

**JA1218**

that he controls, and investors who allegedly funded the scheme (the "Martorello Defendants"). Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, Inc. ("Ascension") (collectively sometimes referred to as the "Tribal Defendants") are entities formed under the tribal laws of the Lac View Band of Lake Superior Chippewa Indians ("LVD"). Big Picture and Ascension are also defendants in Williams and Galloway I, and both entities are alleged to be implicated in the Rent A Tribe scheme that lies at the core of the Plaintiffs' claims on those cases.

In Williams, Big Picture and Ascension claimed to share LVD's sovereign immunity and, on that basis, those entities sought dismissal of the case against them. This Court rejected that argument.[1] On appeal, the United States Circuit Court of Appeals for the Fourth Circuit[2] held that Big Picture and Ascension were entitled to the protection of LVD's sovereign immunity.[3]

---

[1] Williams v. Big Picture Loans, LLC, 329 F.Supp.3d 248 (E.D. Va. 2018).

[2] Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019). In so ruling, the Fourth Circuit made clear that its decision does not affect the merits of the Plaintiffs' claims. Id. at 185. It appears that the Fourth Circuit relied on this Court's findings of fact, finding no clear error in those findings. Williams v. Big Picture Loans, LLC, 929 F.3d at 177.

[3] Those entities also claimed sovereign immunity in Galloway I. Big Picture, Ascension and many other defendants since have reached a class action settlement of Williams, Galloway I, and Galloway II that was filed in yet another case, Renee Galloway, et al. v. James Williams, Jr., et al., 3:19cv470 (E.D. Va.) ("Galloway III"). That

2

JA1219

Following the decision of the Fourth Circuit in Williams, the Court directed that the parties file Statements of Position explaining, how, if at all, the decision of the Fourth Circuit affected these proceedings and pending motions (ECF Nos. 599 and 601).[4]  In his Statement of Position, Martorello argued that the holding that Big Picture and Ascension are protected from suit by LVD's sovereign immunity has substantive and procedural consequences that necessitate dismissal of the case against them. MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECH NOS. 599 & 601 (ECF No. 613).  In their response to MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECH NOS. 599 & 601, the Plaintiffs asserted, inter alia, that Martorello and others made material misrepresentations to this Court and to the Fourth Circuit about the facts pertaining to sovereign immunity and that, as a result, the Fourth Circuit's decision on that issue cannot be relied on by Martorello.  PLAINTIFFS' RESPONSE TO MATT MARTORELLO'S STATEMENT OF POSITION (ECF No. 624).  This Memorandum Opinion addresses the alleged misrepresentations and their effect in these proceedings.[5]

---

settlement has been preliminary approved and a hearing on a motion for final approval is set for December 15, 2020.

[4] Although this ORDER was not entered in Galloway I, the parties have briefed the misrepresentations issues in the same way as in Williams.

[5] There are pending other motions in which the parties take the same positions.

3

## BACKGROUND

The facts of Williams and Galloway I, insofar as they pertain to Martorello, have their genesis in the efforts of so-called payday lenders to evade state usury laws by using, as loan conduits, national banks, which, by virtue of the National Bank Act, 12 U.S.C. § 85, are exempt from the interest rate caps set by state laws. Under those arrangements, the payday lenders funded, serviced, and collected loans that were nominally made by the national banks which received a small payment in return for fronting the loans. Those schemes were known commonly as "Rent A Bank" schemes. The payday lenders had to abandon Rent A Bank schemes when federal regulators intervened and put a stop to them.

When that happened, payday lenders then segued into the so-called "Rent A Tribe" scheme. This new device to evade state usury laws used Native American tribal entities (rather than banks) as the nominal lender in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in so doing, to preclude enforcement of the interest rate caps in state usury laws. Nathalie Martin & Joshua Swartz, The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?, 69 Wash. & Lee L. Rev. 751, 785 (2012).

In 2008, Martorello became involved in payday lending using a company called MMP Finance and an internet domain

**JA1221**

(www.peppercash.com, ECF No. 784, Ex.3; Ex. 4)  The interest rates on those loans would be usurious under state laws in the United States.    Therefore, the loans were to be governed by the laws of Costa Rica.    Later, in 2011, Martorello became interested in the tribal lending concept.    That, in turn, led him to the LVD and to the formation of Red Rock Tribal Lending ("Red Rock") and Duck Creek Tribal Lending ("Duck Creek").

Many of the alleged misrepresentations made by Martorello and others pertain to the formation and operation of Red Rock and Duck Creek.    Although Red Rock and Duck Creek are not parties to these actions, they later were supplanted by Big Picture and Ascension in the Rent A Tribe scheme at issue in Williams and Galloway I. Thus, why and how they were formed, how they were operated, and what happened to them are material matters in assessing the claims made against Martorello and the Tribal Defendants in these cases.

With this background in mind, it is necessary to identify the alleged misrepresentations and then to determine whether the record shows that the allegations of misrepresentation have been proved.    Thereafter, the Court will undertake to assess the consequences that flow from any proven misrepresentation.

### THE ALLEGED MISREPRESENTATIONS

The charge that material misrepresentations of fact have been made to a Court in pursuit of a favorable ruling is a most serious

**JA1222**

matter. Therefore, the Plaintiffs were ordered to specify the alleged misrepresentations and to submit proof in support of their assertions. A number of filings were made as a result of those orders.[6] In addition to the briefing, the parties presented documentary and deposition evidence and in-person testimony at an evidentiary hearing. Supplemental briefs were filed (MATT MARTORELLO'S SUPPLEMENTAL BRIEF REGARDING ALLEGED MISREPRESENTATIONS, ECF No. 907 in Williams; ECF No. 562 in Galloway I; PLAINTIFFS' SUPPLEMENTAL MEMORANDUM SUMMARIZING ADMITTED EVIDENCE AT JULY 21 and 22, 2020 MISREPRESENTATIONS HEARING, ECF No. 910 in Williams; ECF No. 566 in Galloway I).[7]

---

[6] In Williams, those filing are the redacted and sealed versions of PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT (ECF Nos. 784 and 788, respectively) and 98 exhibits thereto. Three of the exhibits were sealed (ECF No. 788-1, 788-2, and 788-3), but have been removed from seal. In Galloway I, that pleading is ECF Nos. 432 and 436, respectively. The sealed exhibits are 436-1, 436-2, and 436-3.

[7] In this Memorandum Opinion, the citation to the Plaintiffs' initial statement will be to the unredacted version (ECF No. 788). However, the Plaintiffs filed their supporting exhibits with the redacted version of their Statement which is ECF No. 784. Because of limitations in the CM/ECF System, it was necessary to file the first batch of exhibits as ECF Nos. 784-1 through 784-50. The second batch was filed under ECF No. 785 and are ECF Nos. 785-1 through 785-48. The exhibits are all referred to in ECF No. 788 only by number, without regard to whether the exhibit was filed with ECF No. 784 or 785. For convenience, the Memorandum Opinion uses ECF No. 788-1, No. 788-2, etc.

The alleged material misrepresentations were claimed to have been made by Martorello and others in support of the Tribal Defendants' Motion to Dismiss which the Fourth Circuit held should have been granted on the assertion of tribal sovereign immunity. According to the Plaintiffs, the misrepresentations "were designed to deliberately and materially mislead the Court" and to create a fictious storyline designed to convince this Court and the Fourth Circuit that:

> (1) the Lac Vieux Desert Band of Lake Superior Chippewa Indians ('LVD') created Red Rock to 'learn the lending industry;' (2) Red Rock was 'managed by appointed LVD members and under the control of the LVD Council;' (3) LVD 'had acquired years of knowledge and business acumen related to the online lending industry,' thereby prompting it to purchase Bellicose 'to begin in-housing services;' and ultimately, '[t]hrough Ascension, LVD would be able to 'in-house' many of the activities previously performed by its third-party vendors, including Bellicose, resulting in significant cost savings and efficiencies.'

PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT (ECF No. 788, p. 1).[8]

---

[8] There is no allegation that counsel of record for Martorello or the Tribal Defendants with Troutman Pepper Hamilton Sanders LLP, Christian & Barton, LLP, Spotts Fain PC, or Armstrong Teasdale LLP were knowledgeable of the misrepresentations discussed herein, and the record shows no indication that any lawyer with those firms knew that what was being asserted by Martorello and Hazen were misrepresentations.
(footnote continued on next page)

7

The plaintiffs identified several misrepresentations, four of which have become the focus of the evidentiary hearing and the briefing.  They are:

1.  Misrepresentations About Martorello's Involvement in the Creation of Red Rock

2.  Misrepresentations About the Control of Red Rock's Lending Operations

3.  Misrepresentations About How and Why Bellicose was Sold to LVD

4.  Misrepresentations About the Creation of Big Picture

Each asserted misrepresentation will be examined in turn.

**1.  Martorello's Involvement In The Creation Of Red Rock**

Martorello filed a declaration in support of the Tribal Defendants' Reply in Support of the Motion to Dismiss (ECF No. 106-1 (Plfs Ex. 103) in <u>Williams</u>).  Therein, Martorello swore that "I was not involved in the creation of Red Rock, but made aware Red Rock had been formed."  <u>Id.</u> ¶ 17.  The Tribal Defendants made the same argument to this Court and to the Fourth Circuit.  (ECF 784, in <u>Williams</u>, Ex. 9, Reply Brief, at 10, note 7.)  "The Tribe

---

The record contains documents from Martorello to lawyers in Rosette LLP (some of whose partners or associates are counsel of record) and from lawyers in that firm to Martorello that are pertinent to some of the alleged misrepresentations.  However, plaintiffs do not allege that lawyers in Rosette LLP who are counsel of record were knowledgeable of the alleged misrepresentations.

approached Martorello in 2011 after independently deciding to explore tribal lending, not the other way around." Id.

The record shows that, contrary to these representations, Martorello was heavily involved in the creation of Red Rock. To begin, Martorello's legal counsel prepared the documents for the formation of Red Rock, and Martorello reviewed those documents for substantive comment. (July 21, 2020 Hearing Tr. pp 51-52); see also Plfs Hearing Ex 3 (Martorello wrote that he would "like to keep the legal documents all completed and ready for signature ASAP. Then on that week in Sept. we can execute the agreements with an October 1 launch date." (Plfs Hearing Ex. 5) Additionally, before the Red Rock formation documents were executed, counsel for the Tribe, Karrie Wichtman, sent to Martorello's attorney, Jennifer Weddle, a copy of the proposed Tribal resolution to review and asked for any changes that Weddle wanted to make. Martorello reviewed and commented on these documents as well.

The record is clear that Martorello actually selected the name "Red Rock." (ECF No. 788, Ex. 10) ("Matt has indicated that the intended tribal LLC should be established as 'Red Rock Lending, LLC,' a tribal entity.") See also ECF No. 788, Ex. 11 in which "Martorello was told that he could name the tribal entity." Thereafter, Martorello sent an email stating "I like the name Red

**JA1226**

Rock Tribal Cash, LLC (or Corp.)" (ECF No. 788, Ex. 12). At the July 21-22 evidentiary hearing, Martorello admitted that he had picked the name "Red Rock." July 21, 2020 Hearing Tr., p. 41.

Martorello's declaration clearly stated that he "was not involved in the creation of Red Rock . . . ." (Martorello Decl. ¶ 17) The word "involved" is defined as "having a part in something; included in something." INVOLVED, Merriam-Webster, https://www.merriam-webster.com/dictionary/involved. The facts that Martorello's counsel prepared the formational documents for Red Rock and that Martorello reviewed them before they were sent to LVD Tribal Council for approval, and the fact that Martorello chose the name "Red Rock" show that his representation that he "was not involved in the creation of Red Rock" is not true.

The record reflects also that Martorello was involved in the formation of Red Rock in an even more fundamental sense, contrary to assertions made in his affidavit on which this Court relied in making its decision. In particular, in Martorello's affidavit there is a subheading entitled "**LVD Approached Martorello in 2011 to assist them create and grow online lending businesses.**" The first paragraph under that heading says: "In mid-2011, I learned that LVD had identified me as a potential consultant." Then, in the next paragraph (15), Martorello swore that, "[b]efore LVD

10

**JA1227**

approached me in 2011, I was not familiar with the issues of Indian sovereignty."

The record demonstrates that those representations simply were not true. In fact, the record shows that Martorello sought out a connection with the LVD so that he could get into the Tribal lending business.

Joette Pete, former Vice-Chairman of LVD, testified that the "Tribal Council was approached by Matt Martorello with an opportunity to participate in a lending business." (July 21, 2020 Hearing, Plfs Ex. 129, August 20, 2019 Declaration of Joette Pete and its exhibits).    Scott Merritt confirmed Pete's declaration when he testified that Martorello was the one who reached out to him seeking a Tribal connection for his lending business.    (July 21, 2020 Hearing Tr., Plfs Ex. 139, Merritt's Dep 32:7-23)    The record is clear that, Merritt, who had long been a proponent of the Tribal lending model, was sought out by Martorello and asked to give Martorello an introduction to a Tribe so that Martorello could enter the Tribal lending business.    To that end, and at Martorello's request, Merritt introduced Martorello to Rob Rosette, a lawyer who was known as a "matchmaker" who put potential lenders together with Indian tribes.    Merritt's testimony on that score illustrates the point.

11

JA1228

> Question: Okay.  So what made you – what led you, then,
>           to introduce him [Martorello] to Mr. Rosette?

> Answer:   Just his - [Martorello's] interest in working
>           with the Tribe.  I knew Rob – Rob's a very
>           well known attorney in that space.

Id.  At the time of that introduction, Merritt had not been told
by Rosette or Ms. Wichtman (the LVD lawyer) or anyone else that
"LVD was interested in finding a service provider."  Merritt's
testimony further undercuts Martorello's assertion that the Tribe
approached him with respect to an existing Tribal lending business.

> Question: So if Mr. Martorello said that, Scott Merritt
>           approached me indicating that he represented
>           the Tribe, that would be inaccurate; right?

> Answer:   Inaccurate.

> Question: And it would also be inaccurate if – that,
>           Scott Merritt told Mr. Martorello that the LVD
>           was involved in the -- in an online lending
>           business and was looking for a servicer?

> Answer:   Inaccurate as well.

> Question: Okay, and it also would be inaccurate that you
>           told him [Martorello] the LVD had a Tribal
>           code and was set to make loans?

> Answer:   Inaccurate.

July 21, 2020 Hearing, Plfs Ex. 139, Merritt Dep. at 92:16-93:3.

The testimony of Pete and Merritt, supported by the
documentary record, demonstrate that this Court incorrectly found
that there was a lending operation underway when the Tribe was put

12

**JA1229**

in touch with Martorello and that the Tribe had identified
Martorello as a potential consultant.[9]

## 2. Misrepresentations About the Control of Red Rock's Lending Operations

Previously, the Court held that "the company [Red Rock] was
managed by two members of the Tribe and the Tribe was Red Rock's
sole member." <u>Williams</u>, 329 F. Supp.3d at 255. Martorello also
asserted that Red Rock's co-managers were ultimately responsible
for all decisions regarding Red Rock's operations (ECF No. 106-1,
¶ 22). In pressing their motion to dismiss on the basis of
sovereign immunity, the Tribal Defendants argued that Red Rock's
managers made all final decisions about operations and that
Martorello was a consultant. And, the Court accepted those
representations in making findings about the control of Red Rock,
relying principally on Martorello's affidavit.

Considered as a whole, Martorello's affidavit and the
position of the Tribal defendants on the issue of sovereign
immunity are premised on representations that the Tribal entities
controlled LVD's lending operations. The record disproves those
representations.

_____

[9] Those findings were based on misrepresentations made in
Martorello's declaration, ¶¶ 14, 15 and 17, and were argued by the
Tribal Defendants in seeking dismissal of the case against them.

13

**JA1230**

At the outset, it is appropriate to note that, contrary to what was represented to the Court, at the time of the initial formation of Red Rock, Martorello understood that his company, Bellicose, would operate the lending business in which Red Rock was to be engaged completely and that the "Tribe's managers are not involved in the business." July 21, 2020 Hearing, Plfs Ex 4, August 26, 2011 email correspondence between M. Martorello and R. Richardson; see also July 21, 2020 Hearing Transcript, 54:14-19.

The rather meaningless role played by the Tribe's co-managers is manifest in an email exchange between Martorello and the Tribe's lawyers, wherein Martorello refused to respond substantively when the Tribe asked him to identify what the co-managers were being asked to approve. A part of that exchange illustrates how little the Tribe's managers knew when the Tribe's lawyers posited a number of questions that needed to be answered so that the Tribe's managers could understand the lending operation and what the lawyers were asking them to approve. (July 21 Hearing Ex. 56).

Evidence at the July 21 hearing also established the very limited involvement of the Red Rock employees in the lending operation. Specifically, what they did was: to verify the bank data submitted by borrowers, ascertain whether the borrowers were employed, and to determine whether the bank account was really the borrower's bank account. July 21, 2020 Hearing Tr. 59:23-60:1.

14

**JA1231**

Neither the establishment of the actual underwriting criteria for making the loans nor the decision actually to make them (or not) was done by the Tribal entity or by its employees.

Joette Pete, Vice-Chairman of the LVD Tribal Council, explained that, while she was on the Tribal Council (from 2010 to 2016), Martorello operated the Tribe's lending business. She said:

> after the inception of the business, it was operated completely by Martorello until Government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement but the Tribe had no substantive involvement.

Plfs Ex. 126, at ¶ 4, July 21, 2020 Hearing (emphasis added).

Collection of the consumer loans was a key component of the lending operation. Martorello swore that neither he nor his company ever collected any consumer loan originated by Red Rock. In particular, in paragraph 26 of his declaration, Martorello swore that:

> I have never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock. No company I own or manage has ever taken any action to collect, in whole or in part, any consumer loan originated by Red Rock.

ECF No. 106-1, p. 5, ¶ 26 (emphasis added). That statement is squarely at odds with the Servicing Agreement which, in paragraph 4.9, provides that the servicer shall collect all the gross

15

**JA1232**

revenues.    The servicer was Bellicose, a company owned and controlled by Martorello.

At the evidentiary hearing it was established that money paid by consumers went into the Bellicose bank account over which only Martorello and his employees had control and access.    That, of course, is collection under the plain meaning of the word.

At the evidentiary hearing Martorello attempted to justify the statement in paragraph 26 of his declaration by saying:  "What I meant was that we did not take or receive any cash from the consumer."    That is a fascile, unconvincing explanation, considering that there is no evidence that any consumer ever delivered cash to satisfy a payment obligation.    Nor is there evidence that the Servicing Agreement established a cash collection system.[10]    Moreover, the Court is constrained to conclude that Martorello's demeanor and conduct when answering questions on this topic of the evidentiary hearing compels the conclusion that Martorello was not telling the truth and that, in fact, contrary to the affidavit, Bellicose collected the consumer loans originated by Red Rock.

The initial draft of the Servicing Agreement reflected the following:

---

[10] And, considering that the borrowers lived all over the country, it is illogical to believe that payments could have been made in cash.

16

JA1233

> It is the Party's intentions [sic] that all business and [sic] affairs in connection with day-to-day operation, management, and maintenance [of Red Rock] including the establishment of operating days and hours, shall be the responsibility of the servicer [Bellicose which is controlled by Martorello].

(ECF No. 788, Ex. 15) (emphasis added). Although Martorello insisted on taking the word "management" out of the agreement, the concept embodied in that email was, in fact, the way that Red Rock operated. This was confirmed by the testimony of LVD's Vice-Chairman, Pete Joette, (who was on the Tribal Council from 2010 to 2016). Pete testified:

> For Martorello to be able to claim that LVD law applied to the consumer loans, the deal required that Red Rock 'originate' the loans. But this responsibility was immaterial because Red Rock would have no reason to reject a loan that satisfied Martorello's lending criteria because Martorello ran the business and bore all the risk. After the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement.

July 21, 2020 Hearing, Plfs Ex 129 at ¶ 4 (emphasis added). Several years afterward, in explaining the role of the managers (Hazen and Williams), Martorello confirmed that to be the case, saying that, "[a]s far as I know, the Managers' [sic] don't really do anything." (ECF No. 788, Ex 14, emphasis added).

17

**JA1234**

At this point, it is appropriate to note that Bellicose assigned the Servicing Agreement between it and the Tribe to SourcePoint VI ("SourcePoint"), a wholly owned subsidiary of Bellicose. And, it is important to understand that the key to the operation of the lending business was the intellectual property (sometimes called the "special sauce") which Martorello's company kept for itself. That intellectual property was the basis for underwriting loans, the heart of the lending operation. The record shows that the intellectual property was kept by Martorello's company, Sourcepoint, and was not known by, or available to, the Tribal entities that nominally were making the loans at issue.

Martorello, who had controlling interest in Bellicose, told Wichtman:

> Remember when we started that [] all of these vendors and systems were 'tied internally within SourcePoint's systems' behind the scenes. . . . the vendor contracts and formulas used [were are] very closely guarded internal IP and entirely unobtainable" by Red Rock.

(ECF No. 788, Ex. 8). The "formulas used" referred to the formulas for underwriting recommendations.

As Martorello made clear, this intellectual property was quite valuable to Bellicose/SourcePoint (Martorello companies running the LVD lending operation) and was "guarded" and "unobtainable" to Red Rock. Without access to those formulas that

18

**JA1235**

established the underwriting criteria, there would be no way for Red Rock's managers meaningfully to participate in the lending process. And, even though in 2014, Martorello had explained quite clearly that this intellectual property was closely guarded and unobtainable by the Tribal entities or managers, in his declaration, he said quite the contrary:

> [u]nder the Servicing Agreement, Red Rock paid SourcePoint to develop underwriting criteria to recommend for implementation by Red Rock. SourcePoint did not simply implement these underwriting criteria on behalf of Red Rock, but instead presented the underwriting criteria to Red Rock's co-managers for their evaluation and ultimate approval or rejection.

ECF No. 106-1 at ¶ 45.

And, later Martorello represented that:

> [n]either I nor Bellicose have 'controlled' any underwriting criteria used by and of LVD's lending businesses—at all times the LVD business retained full control over the underwriting criteria used to make loans.

ECF No. 106-1 at ¶ 101 (emphasis added).

The close guarding and unobtainability of intellectual property developed by SourcePoint, as described by Martorello in the written record, is also entirely at odds with his assertion in his declaration that "LVD received and retained the significant additional economic value of ownership of all intellectual property developed under the agreement by SourcePoint." That

19

**JA1236**

simply did not happen.  In other words, Martorello misrepresented the pertinent facts.

The Tribal Defendants and Martorello claimed that "Red Rock consulted with Bellicose about day-to-day operations, but all decisions were either made by Red Rock's managers or expressly delegated and overseen by Red Rock's managers."  (ECF No. 40 at 5, Hazen Declaration at ¶ 11; ECF No. 106-1 at ¶ 22)  The record shows that is not true.  This is well-illustrated by the testimony of Craig Mansfield, a co-manager for Red Rock.  Mansfield admitted that he did not know "how the decision of whether to fund the loan occurred" or whether that process occurred on the reservation.  He did not know how loans were originated or how verifications of loans were completed.  He did not know how Red Rock obtained the money it needed to fund the loans and did not know how the call centers in the Philippines operated (Mansfield Dep. 114:25-115:3; 115:4-14; 115:15-22; 112:15-18; 128:24-129:12; 119:20-120:1)  That is fully consistent with Martorello's understanding that the Tribal managers do nothing.

The negotiations respecting the sale of Bellicose and its conversion into Big Picture are instructive.  When discussing the sale, in August 2014, Martorello informed LVD that, in any sale, "the seller will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner

JA1237

before being paid." (July 21, 2020 Hearing, Plfs Ex 57, August 26, 2014 email between M. Martorello, K. Wichtman, D. Gravel, and Giizhigookway) (emphasis added). Then, in September 2014, Martorello informed Wichtman that:

> After further discussions, the Bellicose companies will be sold only 'as is,' with existing capital management in place and the company remaining substantially the same. Of course, a purchase, merger and dissolution are required for a tribal buyer, so the name will/jurisdiction of the LLC will change . . . it also needs to be run in the same format it is today.

(July 21, 2020 Hearing, Plfs Ex 60, September 15, 2014 email between M. Martorello and K. Wichtman) (emphasis added). In August 2014, Martorello informed the Tribe's Council that:

> We respectfully opt to continue to keep any details of [SourcePoint] IP (including DM) explicitly for internal eyes only, both for the protection of our business and maintaining the integrity of an acquisition of the SourcePoint business. Should an acquisition actually transpire, obviously these will be relevant questions for the eyes of Management and those in the acquiring company on a need to know basis as well (I.e [sic] Certain IP, even in small doses should at all times be aggressively protected when the result is such a massive competitive advantage, like the process of even just utilizing DM itself which SourcePoint owns and created.

(July 21, 2020 Hearing, Plf Ex 56, August 26, 2014 email between M. Martorello, K. Wichtman, D. Gravel, and Giizhigookway) (emphasis added). During the discussions and negotiations for the

21

**JA1238**

sale of Bellicose to become Big Picture, the intellectual property was referred to as the "secret sauce." LVD's lawyer made the comment:

> I wasn't recommending that [SourcePoint] disclose its secret sauce but only that [SourcePoint] will be willing to explain to the co-managers what exactly they [the managers] are approving.

Id.

All of this shows quite clearly that the key ingredient of the lending operation, the underwriting criteria or "secret sauce," was SourcePoint's,[11] not that of any Tribal Entity. And, the record shows that Martorello controlled the lending operations of LVD because, inter alia, he controlled the secret sauce (the key loan underwriting criteria), the linchpin to the lending operations.

In sum, the record establishes that the Plaintiffs have established, quite clearly, that the representations made to the Court about who controlled the LVD lending operations at Red Rock were not true. And, it is not disputed that Red Rock later was "rebranded" to become Big Picture. And, except for a few cosmetic changes (or "otpics" as Martorello described them), the LVD lending

---

[11] A wholly owned subsidiary of Bellicose, a company controlled by Martorello.

operation by way of Big Picture continued as it had under the Red Rock structure.

## 3.    Misrepresentations About Why Bellicose was Sold to LVD

In his declaration in support of the Tribal Defendants' Motion to Dismiss on the ground of sovereign immunity, Martorello swore that:

> [c]ontrary to the allegations of Plaintiffs, the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement action by government agencies. Indeed much of the discussions as to the motivation behind the sales transactions described by the Plaintiffs' Complaint are nonsensical and are temporally problematic. Plaintiffs' claim there were certain 'motivating factors' for the sale which, in reality, occurred eighteen months to three years before the sale transaction closed.

ECF No. 106-1, ¶ 69 (emphasis added). That representation was not true.

The record shows that the negotiations for the sale of Bellicose began in 2012 (Martorello Declaration, ¶ 49). Negotiations continued for four years. Karrie Wicthman, counsel for LVD, testified that the sale "was a long, long, long negotiated transaction with many moving parts and many changes over a four year period." (Defs Ex. 327, Wictman Depo. at 31:07-12). Thus, although the terms of the sale changed over time, evolving from the sale of Bellicose's intellectual property (the so-called "secret sauce," which lay at the heart of the lending business),

23

to the sale of an ownership interest in Bellicose, and then to the sale of Bellicose itself, those changes were all part of Martorello's desire to evade liability by trying to use LVD's sovereign immunity. And the motivation for the sale, contrary to Martorello's declaration, were not distantly removed in time from the consummation of the sale.[12]

What then, according to the record, was the motivation for the sale of Bellicose to LVD?  Some history is required to discern the truth as to why Bellicose was sold to LVD.

Red Rock began operation in approximately 2011.  In December 2012, slightly a year into the lending business, Martorello became concerned about the liability presented by the Tribal lending model.  (ECF No. 788, Ex. 43, December 10, 2012 email from Martorello to Arqyros).

These concerns were magnified when, on August 6, 2013, the New York Department of Financial Services ("NYDFS") issued cease and desist orders to 35 online lending companies, including Red Rock, alleging violations of New York's usury laws.  Shortly after the issuance of the cease and desist orders, counsel for several

---

[12] At the July 21-22, 2020 hearing, Martorello sought to characterize the sale discussions as occurring in three discreet periods.  However, Wichtman's testimony refutes that; Martorello's own affidavit refutes it; and there is nothing in the record to support Martorello's view.  Nor, in his declaration, did Martorello make any reference to the three different phases.

tribes, including LVD, had prepared for LVD's consideration the draft of a Complaint to be filed against NYDFS. (ECF No. 788, Ex. 45)

Rosette, counsel for LVD, wrote to Martorello recommending strongly that a lawsuit should be filed against NYDFS asserting that sovereign immunity rendered New York law inapplicable. Rosette urged that Red Rock should be part of that suit. Wichtman, counsel for the Tribe, shared that view in an email to Martorello. However, she made clear to Martorello that nothing would be filed "unless and until fully vetted with the Tribe and you." (ECF No. 788, Ex. 46, emphasis added).

Martorello expressed concern about joining the litigation and about the reaction of the regulators to such a lawsuit. Nonetheless, Martorello ultimately agreed to the filing of the lawsuit. Once he had given assent, it was filed on August 21, 2013.[13]

However, the tactic was unsuccessful and, in fact, it was counterproductive because the district court found that plaintiffs, including Red Rock, were "subject to the States' non-discriminatory anti-usury laws" because the "undisputed facts demonstrate" that the illegal activity was "taking place in New

---

[13] That evidence, of course, is highly probative of the extent of Martorello's control over the Tribe's lending operation.

25

York off of the Tribe's lands." Otoe-Missouria Tribe v. N.Y. Dept. of Fin. Servs., 974 F. Supp.2d 353, 361 (S.D.N.Y. 2013). On the latter point, the district court noted that the plaintiffs, which included Red Rock, had "built a wobbly foundation for their contention" that the activity was occurring "on the Tribes' lands." Id. at 360.

Under the then-existing structure of the Tribal lending operation in the Red Rock mold, neither Martorello nor Bellicose had any colorable claim of sovereign immunity. Thus, within two days of the district court's decision in Otoe-Missouria Tribe, Martorello wrote that the decision "presents a significant liability for [Bellicose] and we do not believe that we should service any New York loans." (ECF No. 788, Ex 49)

At this point, it is appropriate to note that the Tribal Defendants argued in the Fourth Circuit that "there was no evidence" that the restructure was intended to provide Martorello or his companies with immunity."[14]  That, of course, is what Martorello asserted in his declaration in support of the Tribal Defendants' Motion to Dismiss on the ground of sovereign immunity (¶ 69).

---

[14] United States Court of Appeals for the Fourth Circuit, oral argument/listen to oral arguments, opening argument of William Hurd, audio file at 13:35-14:30, http//www.ca4.uscourts.gov/ OArchive/mp3/1827-20190507.mps.

26

**JA1243**

Contrary to the statement in Martorello's declaration to this Court and to the argument made to the Fourth Circuit, two weeks after the district court had decided Otoe-Missouria Tribe, Martorello sent an email to Rosette proposing a restructure of the lending arrangement with LVD for the purpose of protecting Martorello and Bellicose from liability arising out of the Tribal lending arrangement.  The subject line of that email was "LVD to take ownership of Bellicose VI."  One of the options presented was for "Bellicose to immediately assign LVD 51% of Bellicose via Equity only membership interest tied to the SPVI [Source Point Virgin Islands] subsidiary only."  (ECF No. 788, Ex 50).[15] Importantly, Martorello's proposal included the requirement that the restructure would provide all entities with sovereign immunity protection.

Not long thereafter, Martorello once again explained to Wichtman his concerns over the liability created by the various pending investigations and legal actions against Rent A Tribe operations.  In particular, Martorello told Wichtman that the result of affirmance of the New York ruling would be "certain death."  He further said that "all vendors including [Source

---

[15] Source Point Virgin Islands, sometimes referred to as SPVI, was owned by Bellicose which was controlled by Martorello.

27

**JA1244**

Point],[16] banks, ACH processors, bureaus, etc. would all obviously

shut down if it were considered off reservation activity." (ECF

No. 788, Ex. 52) Martorello commented, as well, upon his personal

liability when he observed that class actions and "personal threats

of enforcement action against individuals by regulators has

everyone spooked." Id.

In subsequent communications between Martorello and Rosette,

Martorello underscored the urgency of reaching an agreement to

restructure his lending arrangement with LVD in the effort to

secure sovereign immunity for Martorello and his entities that

were central to the Red Rock lending activity.

> Clock is ticking before I end up in a Cash
> Call attack though, at which point, I think
> the deal is about dead.

(ECF No. 788, Ex 54) "Cash Call" was a decision arising out of

Colorado in which a similarly structured lending operation and its

owner had been held to have violated Colorado law. (ECF No. 788,

Ex. 54).

In fact, after Martorello learned of the Cash Call ruling in

Colorado, he wrote to Rosette stating:

> Let's zero in ASAP on minimizing my risk for
> being individually liable like CO [Colorado]
> just successfully did to Butch Webb . . . I
> don't want my company on anything that goes to
> the CFPB. This may mean DCTF [Duck Creek]

---

[16] A company owned by Martorello that was a key player in the Red
Rock lending scheme.

**JA1245**

                    needs to do a lot more on [its] own including
                    its compliance program.

ECF No. 788, Ex. 54 (emphasis added).  Confronted with the email

communications described above, Martorello admitted that he "was

alarmed in 2012/13" about several court rulings against lenders

including in Colorado [Cash Call].  (July 21 Hearing Trans. at

122).

        The record also reflects that Martorello told others with

whom he interacted during the applicable time that he was concerned

about the threat of litigation and the consequences thereof.  For

example, Wichtman testified that Martorello was concerned about

Operation Choke Point, "a campaign initiated by the United States

Department of Justice to force banks to terminate their business

relationships with payday lenders."  Advanced Am. Cash Advance

CTRS, Inc. v. FDIC, 251 F. Supp. 3d, 78, 79 (D.D.C. 2017).

According to Wichtman, Martorello's concerns were both operational

for the business ventures as well his personal liability.  (Def Ex

327, Wichtman Dep. at 55:22-56:07).  Rob Rosette, the lender/tribal

matchmaker and lawyer of LVD in the potential purchase of

Bellicose, observed that Martorello was motivated to sell because

he wanted to avoid a "CashCall type of attack."  (July 21 Hearing,

ex. 142).  And, in an email exchange with a business associate on

December 31, 2013, Martorello expressed his concern, stating

"Clock is ticking before I end up in a Cash Call type attack."
(July 21 Hearing, Ex. 43).

The record is thus clear beyond serious question that
Martorello was motivated to sell Bellicose to LVD because of the
threats of litigation and enforcement actions against him and his
entities under the then-current lending arrangement between him,
his entities, and LVD. Nonetheless, Martorello, at the evidentiary
hearing, testified that his motivations for the sale included "the
attractive offer that [he] received from the Tribes' Council and
the Tribe, and his wish to raise his child in the mainland United
States." (Hearing Trans. at 225:25-27:4) That testimony is simply
not credible in view of the substantial record written at the time
by Martorello and the evidence presented at the evidentiary
hearing. Nor, judged by his demeanor when testifying on the point
at the evidentiary hearing, can the Court accept Martorello's
testimony as credible.

## 4.    Misrepresentation Respecting the Creation of Big Picture

In support of the sovereign immunity argument and with respect
to the analysis to be made under applicable law,[17] the Court was
told that the Tribe created Big Picture "to be an online lending
business in order to bring revenue to LVD." (ECF No. 788., Ex.

---

[17] Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort,
629 F.3d 1173 (10th Cir. 2010).

**JA1247**

40; ECF No. 788, Ex. 48, Hazen Declaration at ¶ 16)  The Court

also was told that "LVD began by creating Big Picture in August

2014."  (DEFENDANT BIG PICTURE LOANS, LLC'S FINANCIAL INTEREST

DISCLOSURE STATEMENT, ECF No. 38 at 5)  Additionally, Hazen, the

Chairman of the Tribe, was deposed and asked whose idea was it to

create Big Picture Loans.  Hazen responded that it was the Tribe's

idea.  (ECF No. 38, Ex. 33, at Hazen Depo. 34:4-8).  Hazen also

was asked who selected the name for Big Picture and she testified

that it was "kind of a group discussion."  (Id. at 38:7-9)  These

representations were made as part of the story presented to this

Court (and to the Fourth Circuit) to create the appearance that

LVD was the driving force behind the creation of Big Picture.

Martorello supported this story line in his declaration supporting

the Tribal Defendants' motion to dismiss on grounds of sovereign

immunity.   There, Martorello swore that:   "Neither I nor any

company I own or manage directed or controlled the creation of Big

Picture."  (ECF No. 106-1, ¶ 67).

        The record shows that the representations as to the overall

concept respecting the creation of Big Picture and the specific

representations made by Hazen and Martorello on the subject were

untrue.   In fact, the record shows that Martorello created the

entity, Big Picture Loans, at least a year before LVD says that it

created or formed the entity.  Specifically, the internet domain

**JA1248**

name for Big Picture Loans was registered on September 18, 2013. (ECF No. 788, Ex 59)    The record shows that Martorello and Bellicose (one of Martorello's companies) had anticipated using the Big Picture company with another tribe (not LVD) that was located at Fort Belknap Indian Reservation (ECF No. 788, Ex 60) However, the launch of the Fort Belknap enterprise had to be put on hold.

Nonetheless, Martorello was able to put the entity and domain in use in the lending operations of LVD.    In particular, in the aftermath of the Otoe-Missouria decision in the district court in New York, and, while that case was pending on appeal, Martorello urged Wichtman, Hazen and Williams to "rebrand" Red Rock.    (ECF No. 788, Ex 62)    In a memorandum in July 2014, Martorello observed that Red Rock [which had been a party in the Otoe-Missouria case] had been blacklisted and rolled through the mud in the press and asserted that "it's time to get away from the word payday and the black mark of [Red Rock] before rules come out and things get hotter."    Id.    Accordingly, Martorello suggested forming "ASAP a new LLC with a new domain/brand for purposes of transferring all contracts, assets, bank accounts, liabilities, etc. over to the new entities when ready."    Id.    Martorello urged that the parties get moving on this project forthwith and volunteered that his

32

**JA1249**

company, Bellicose, would facilitate the work.  Id.  The "rebrand"
was Big Picture.

    The evidence at the July 21-22 hearing also proved that
Martorello registered the Big Picture website on September 18,
2013 (July 21-22 Hearing, Plfs Ex 33, September 18, 2013 Big
Picture Loans domain registration).  Then, on September 30, 2013,
a vendor, hired by Martorello, created a full design and
operational materials for Big Picture Loans which Martorello
intended to use to add an Indian tribe other than LVD as a business
partner (July 21, 2020 Hearing, Plfx Ex 35, September 20, 20103
email between M. Icardo, M. Hona A. Mein) ("Bellicose has procured
additional tribal business with entities not related to LVD or
Midletown-I.E. Fort Belknap (Big Picture Loans) and Chorus
Loans.")[18]

    The record thus proves the falsity of the assertions made in
Martorello's declaration that "neither I nor any company I owned,
managed, directed or controlled the creation of Big Picture" and

_____

[18] The record shows that Martorello also wanted LVD to buy
Sourcepoint VI.  But, if that did not work out, he was prepared to
sell Sourcepoint to another tribe.  As Martorello wrote:

> So here's what I'm thinking (for now) if we
> can't reach terms with LVD to buy SPVI, then
> SPVI will be sold to another tribe (likely
> Midletown).

(July 21, 2020 Hearing, Plfs Ex 53, August 25, 2014 email between
M. Martorello and R. Rosette).

33

"neither I, nor Bellicose, helped form Big Picture." (ECF No. 106-1, Martorello Decl. ¶¶ 67 and 102). And, the record shows convincingly that Big Picture was not created by LVD as the result of the Tribe's years of knowledge and business acumen related to online lending. In fact, Big Picture was created by Martorello for use with a different tribe and, when that fell through, Big Picture, at Martorello's instruction, was used to rebrand Red Rock. In other words, the record shows convincingly that Martorello was the driving force in the creation of Big Picture and Ascension, just as he was in the creation of Red Rock.

In sum, the record convincingly confirms that misrepresentations respecting the genesis of Big Picture were made by Martorello and Hazen. Those misrepresentations were presented to, and relied on, by this Court in making its factual findings which were undisturbed by the Court of Appeals.

## THE EFFECT OF THE MISREPRESENTATIONS

To analyze whether the Tribal Defendants (Big Picture and Ascension) shared LVD's sovereign immunity, this Court and the Fourth Circuit used the test in Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173 (10th Cir. 2010). Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019). "Those non-exhaustive factors are: (1) the method of the entities' creation; (2) their purpose; (3) their structure,

34

**JA1251**

ownership, and management; (4) the tribe's intent to share its sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) the policies underlying tribal sovereign immunity and the entities' connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019) (quoting Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1187 (10th Cir. 2010)) (internal quotation marks omitted). The Fourth Circuit adopted the first five of these factors. Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019). As to the "sixth Breakthrough factor, the Fourth Circuit held that whether the purposes underlying tribal sovereign immunity would be served by granting an entity immunity, overlaps significantly with the first five Breakthrough factors. Thus, the extent to which a grant of arm-of-the-tribe immunity promotes the purposes of tribal sovereign immunity is too important to constitute a single factor and will instead inform the entire analysis." Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019).

In one way or another, the misrepresentations now proved by the record are related to the Breakthrough factors and thus to the determination whether the Tribal Defendants shared the sovereign immunity of LVD. The four misrepresentations pressed by the

35

**JA1252**

Plaintiffs, individually and taken as a whole, are relevant to determining:

> (1) the method of creation of the entities (Big Picture and Ascension);
>
> (2) the purpose for the creation of those entities;
>
> (3) the structure, ownership and management of those entities;
>
> (4) the intent of LVD in creating the entities;
>
> (5) the financial relationship between the Tribe and those entities;
>
> (6) the policies underlying tribal sovereign immunity and the connection of those entities to LVD economic development and whether those policies are served by granting LVD's sovereign immunity to those entities.

The record shows that the misrepresentations produced significantly erroneous findings by this Court. Williams v. Big Picture Loans, LLC, 329 F. Supp.3d 248, (E.D. Va. 2018). Reviewing the findings made by this Court in Williams v. Big Picture Loans, LLC, 329 F. Supp.3d 248, 253-265 (E.D. Va. 2018), in perspective of the record made on the topic of the misrepresentations both in the exhibits and in the evidentiary hearing, the Court concludes that had the facts not been misrepresented to it, there are certain findings that simply could not have been made. Thus, the Court could not have found that:

36

**JA1253**

The company was managed by two members of the Tribe.

_Williams_, 329 F. Supp.3d at 255.

Nor could the Court have found that:

- Red Rock subsequently decided to contract with an outside entity to better learn the lending industry. The Tribe had identified Martorello has a potential consultant in mid-2011, but he was not involved in the creation of Red Rock.

_Williams_, 329 F. Supp.3d at 255.

- In addition, aside from these distributions, Red Rock received and retained ownership of all intellectual property development under the Servicing Agreement by SourcePoint.

_Williams_, 329 F. Supp.3d at 256.

- Final determination as to whether to lend to a consumer rest[ed] with [Red Rock].

_Williams_, 329 F. Supp.3d at 257.

- All decisions about operations were made by Red Rock's managers . . . or that Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operations.

_Williams_, 329 F. Supp.3d at 257.

- Martorello, Bellicose and SourcePoint never, on Red Rock's behalf, made lending decisions; originated a consumer loan; purchased a loan originated by Red Rock; or took any action to collect a Red Rock loan.

_Williams_, 329 F. Supp.3d at 257.

**JA1254**

- After 2011, through its operation of Red Rock and relationship with Bellicose and Martorello, the Tribe gained knowledge of the online lending industry . . . the Tribe wanted to apply that knowledge to expand its online lending platform and increase profitability for the Tribe, employ more Tribal members, and acquire its vendors' businesses so the Tribe would earn more money.

<u>Williams</u>, 329 F. Supp.3d at 258.

- LVD Council organized Big Picture, was 'meant to serve as an independent Tribal lending entity,' that 'would ultimately consolidate the business of the Tribe's other lending entities, Red Rock and Duck Creek Financial, LLC.

<u>Williams</u>, 329 F. Supp.3d at 258.

- [Martorello] never provided any consulting services to Big Picture or Ascension; suggested marketing strategies, underwriting criteria or other policies to them; accessed any of their software systems, databases, bank accounts, or records, or hired or fired their employees.

<u>Williams</u>, 329 F. Supp.3d at 263.

Further, the entire section of the opinion describing Big Picture's lending process, <u>Williams</u>, 329 F. Supp.3d at 264, was materially erroneous because of the misrepresentations.

The established misrepresentations strongly suggest that the Fourth Circuit's decision on the Tribal Defendants' entitlement to share LVD's sovereign immunity is open to question. But, that is not a matter for this Court to decide.

38

**JA1255**

However, in analyzing all pending and future motions in which
Martorello argues that his position is supported by the Fourth
Circuit's decision, this Court will now be required to take into
account the record about the misrepresentations and the findings
about them that are made herein.[19]  And, now that the record on the
misrepresentations has been made, the Court will turn to the
various pending motions and this record is available to help
resolve those motions.

It is so ORDERED.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  November 18, 2020

_____

[19] As the Plaintiffs correctly point out, the Fourth Circuit's
decision on sovereign immunity does not confer on Martorello the
immunity claimed by the Tribal Defendants.   When, and as, it
becomes necessary to assess that question, the record on the
misrepresentations is now available.

JA1256

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, et al.,

    Plaintiffs,

v.                       Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.

### ORDER

Having decided the misrepresentations issues (ECF No. 944), it is now appropriate, as set out in the last paragraph of the ORDER (ECF No. 697), to set a schedule for the filing and briefing on an Amended Motion for Class Certification. Accordingly, it is hereby ORDERED that counsel shall confer and submit, by December 31, 2020, a schedule for the filing and briefing of an Amended Motion for Class Certification.

It is so ORDERED.

                     /s/   REP
                 Robert E. Payne
                 Senior United States District Judge

Richmond, Virginia
Date: November 24, 2020

JA1257

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| LULA WILLIAMS, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:17-cv-00461 (REP) |
| v. | ) | |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| RENEE GALLOWAY, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:18-cv-00406 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DEFENDANT MATT MARTORELLO'S MEMORANDUM IN SUPPORT OF HIS**
**MOTION FOR ORDER CERTIFYING NOVEMBER 18, 2020 MEMORANDUM**
**OPINION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)**

## I.     PRELIMINARY STATEMENT

On November 18, 2020, this Court issued a memorandum opinion (the "11/18 Opinion")

finding that Matt Martorello ("Martorello") made misrepresentations of fact pertaining to the

Fourth Circuit Court of Appeals' determination that Big Picture Loans, LLC and Ascension

Technologies, Inc. (the "Tribal Entities") are government arms of the Lac Vieux Desert Band of

Lake Superior Chippewa Indians ("the Tribe"), based on its analysis of the factors set forth in

*Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173

(10th Cir. 2010).  Case No. 3:17-cv-00461, ECF No. 944; Case No. 3:18-cv-00406, ECF No.

581.  In reaching its findings, the Court stated that it considered allegedly conflicting evidence

**JA1258**

and assessed Martorello's credibility, thereby depriving Martorello of his right to have a jury decide factual questions raised by the Plaintiffs' claims. This error merits appellate review and issuance of an order certifying its determinations for immediate appeal under 28 U.S.C. § 1292(b), which will materially advance the termination of this case. In addition, the Court expressly overruled its previous factual findings in *Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248 (E.D. Va. 2018), which were affirmed by the Fourth Circuit in *Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019). In doing so, the Court violated the mandate rule requiring district courts to consider only issues expressly remanded following appeal.

## II.    BACKGROUND

In its 2018 *Williams* decision denying the Tribal Entities' motions to dismiss based on sovereign immunity, this Court made several factual findings after the Plaintiffs and Tribal Entities engaged in extensive discovery and presented evidence to the Court. *Williams*, 329 F. Supp. 3d at 255-67. Although the Plaintiffs now maintain those factual findings are based on purported misrepresentations by numerous Defendants, they failed to raise this issue before this Court reached its decision in *Williams*, and presented a belated objection to the Fourth Circuit while the decision was pending on appeal. Specifically, the Plaintiffs informed the Fourth Circuit by letter filed on June 4, 2019 that, in *Galloway v. Big Picture Loans, LLC*, No. 3:18-cv-00406 ("*Galloway I*"), this Court ordered additional briefing on the issue of potential "material misrepresentations" by Martorello and other Defendants. Case No. 18-1827, ECF No. 125-1.[1]

---

[1] A copy of plaintiffs' letter is submitted, without the Court's May 29, 2019 order in *Galloway I* [ECF No. 246] that was originally submitted as an attachment, as Exhibit 1. On June 7, 2019, the Tribal Entities' counsel responded (Exhibit 2) by pointing out, among other things, that the plaintiffs had remained silent despite the fact that "the vast majority" of the documents that formed the basis for their misrepresentation allegations were in their possession prior to the May 2, 2019 argument on the appeal.

2

The Plaintiffs' letter contended that according to this Court, discovery had revealed "significant new and important evidence," which "rais[ed] substantive doubts about the accuracy of evidence presented in [*Galloway I*] and the *Williams* Case." *Id*. Given these alleged misrepresentations, the Plaintiffs made the following request to the Fourth Circuit: "if this Court concludes that, on the original record, the district court erred in denying sovereign immunity, it should consider remanding to allow the district court to re-evaluate that decision in light of any new and relevant evidence." *Id*.

The Fourth Circuit rejected the Plaintiffs' request. Instead, it affirmed this Court's factual findings, held the Tribal Entities were entitled to sovereign immunity, and remanded with express "instructions to grant the Entities' motion to dismiss for lack of subject matter jurisdiction." *Williams*, 929 F.3d at 177, 185. After the Fourth Circuit entered judgment in accordance with its opinion, the Plaintiffs did not file a petition for rehearing and, consequently, the Court issued a mandate rendering its judgment effective. Case No. 18-1827, ECF Nos. 128-1, 129. Thereafter, the Plaintiffs did not appeal, thereby waiving any further challenges to the Fourth Circuit's rulings.

Following remand, this Court directed the Defendants to file statements of position explaining the effect of the Fourth Circuit's decision on the case. Case No. 3:17-cv-00461, ECF Nos. 599 & 601. In his statement of position, Martorello argued the decision had procedural and substantive consequences that required the case to be dismissed with prejudice. Case No. 3:17-cv-00461, ECF No. 613. The Plaintiffs had previously filed briefs in *Galloway I*, opposing the Tribal Entities' motion to dismiss based on sovereign immunity in that case, in which they argued the Tribal Entities had made material misrepresentations in support of their motion to dismiss. Case No. 3:18-cv-00406, ECF Nos. 232, 233, 249. The Plaintiffs filed a similar brief in

3

**JA1260**

*Williams* following remand, and asserted in response to Martorello's statement of position that additional evidence undermined the factual findings affirmed by the Fourth Circuit. Case No. 3:17-cv-00461 ECF Nos. 784, 624; Case No. 3:18-cv-00406, ECF Nos. 432, 436.

After holding an evidentiary hearing over Martorello's objection,[2] the Court issued the 11/18 Opinion, in which it found that Martorello and others made material misrepresentations that were "related" to the exact question decided by the Fourth Circuit, namely, "the determination whether the Tribal Defendants shared the sovereign immunity of [the Tribe]." Case No. 3:17-cv-00461, ECF No. 944, at 35; Case No. 3:18-cv-00406, ECF No. 581, at 35. The Court also identified several factual findings, which were previously affirmed by the Fourth Circuit, that it considered "significantly erroneous" in light of the misrepresentations. Case No. 3:17-cv-00461, ECF No. 944, at 36-39; Case 3:18-cv-00406, ECF No. 581, at 36-39.

## III.    ARGUMENT

The Court deprived Martorello of his right to a jury trial by assessing his credibility and weighing allegedly conflicting evidence in order to alter the Court's prior factual findings. Whether the Court had authority to alter these findings raises questions that warrant certification for immediate appeal under 28 U.S.C. § 1292(b). Therefore, the Court should enter an order in accordance with its memorandum opinion that certifies these questions for appeal.[3] The Court

---

[2] *See* Case No. 3:17-cv-00461, ECF No. 843, at 2 (asserting the Plaintiffs' allegations regarding misrepresentations were "an improper collateral attack on the binding holding" of the Fourth Circuit's opinion); *see also* Case No. 3:17-cv-00461, ECF Nos. 664, at 16-17; 679, at 3-4; 720, at 11; 722, at 3.

[3] Martorello reserves the right to separately seek reconsideration of the findings articulated in the 11/18 Opinion.

JA1261

also exceeded the scope of the Fourth Circuit's mandate by reconsidering factual findings affirmed on appeal.

###### A.  The Court Deprived Martorello of his Right to a Jury Trial by Assessing his Credibility and Making Factual Findings that Are Intertwined with the Merits of the Plaintiffs' Claims.

When this Court made factual findings in *Williams*, it did so to decide if the Tribal Entities' are arms of the Tribe in their motion to dismiss challenging jurisdiction under Rule 12(b)(1).  329 F. Supp. 3d at 253.  The Fourth Circuit has held repeatedly that when resolving a motion made under Rule 12(b)(1) where there are disputed jurisdictional facts

> A trial court may consider evidence by affidavit, depositions or live testimony without converting the proceeding to one for summary judgment.  Unlike the procedure in a 12(b)(6) motion where there is a presumption *reserving the truth finding role to the ultimate factfinder*, the court in a 12(b)(1) hearing weighs the evidence to determine its jurisdiction. This does not usually present a serious problem *except in those cases where the jurisdictional facts are intertwined with the facts central to the merits of the dispute*. It is the better view that in such cases the entire factual dispute is appropriately resolved *only by a proceeding on the merits*.

*Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) (citations omitted) (emphasis added); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006) ("[I]n some instances, if subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own.  If *satisfaction of an essential element of a claim* for relief is at issue, however, *the jury is the proper trier of contested facts*.") (emphasis added); *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009) ("[N]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction . . . the defendant is forced to proceed under Rule 12(b)(6) . . . or Rule 56 . . . both of which place greater restrictions on the district court's discretion.") (citation and internal quotation marks omitted); *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) ("If the jurisdictional facts 'are so intertwined with the

**JA1262**

facts upon which the ultimate issues on the merits must be resolved,' the entire factual dispute is appropriately resolved only by a proceeding on the merits.") (quoting *Adams*, 697 F.2d at 1219-20) (emphasis added); *Kuntze v. Josh Enters.*, 365 F. Supp. 3d 630, 645 (E.D. Va. 2019) ("[W]hen facts are intertwined (meaning that the facts necessary to prove jurisdiction overlap with the facts necessary to prove the merits of the claims), a trial court should not weigh evidence and make findings of fact at the 12(b)(1) stage because doing so would deprive the parties of discovery and the right to a jury that parties are afforded in proceedings on the merits.") (citing *Arbaugh*, 546 U.S. at 514; *Kerns*, 585 F.3d at 193).

After the post-*Williams* evidentiary hearing, even though jurisdiction over the Tribe was no longer in question, this Court not only reconsidered its previous factual findings, it made additional factual findings and credibility determinations on matters that are intertwined with the merits of the Plaintiffs' claims. Among other elements, the merits of Plaintiffs' case against Martorello requires a jury to find that he conducted or participated in the conduct of the Tribe's lending entities' affairs and that he did so *through* the collection of an unlawful debt. *Fed. Jury Prac. & Instr.*, § 161:22 (6th Ed. 2013); 18 U.S.C. § 1962(c). These are issues for the jury to decide, not the trial judge. *See Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 340 (S.D.N.Y. 2009) ("[C]ivil RICO actions under § 1964(c) are legal, and the jury right attaches."). Yet, in its 11/18 Opinion (Case No. 3:17-cv-00461, ECF No. 944; Case 3:18-cv-00406, ECF No. 581), the Court made findings that go to the heart of these merits issues, including:

- "Martorello was heavily involved in the creation of Red Rock [Tribal Lending ("Red Rock")]." *Id*. at 9.

- "Neither the establishment of the actual underwriting criteria for making the loans nor the decision actually to make them (or not) was done by the Tribal entity [Red Rock] or by its employees." *Id*. at 15.

**JA1263**

- Bellicose Capital, LLC ("Bellicose"), "a company owned and controlled by Martorello," "collected the consumer loans originated by Red Rock." *Id*. at 15-16.

- "[T]he record shows that Martorello controlled the lending operations of the LVD because, <u>inter alia</u>, he controlled the secret sauce (the key loan underwriting criteria), the linchpin of the lending operations." *Id*. at 22.

- Martorello's statement that "the decision to sell Bellicose [Capital, LLC] to LVD was not motivated by impending threats of litigation or enforcement action by government agencies" was "not true." *Id*. at 23, 30.

- The record "proves the falsity of the assertions made in Martorello's declaration that 'neither I nor any company I owned, managed, directed, or controlled the creation of Big Picture' and 'neither I, nor Bellicose, helped form Big Picture.'" *Id*. at 33-34.

The Court also stated that it resolved conflicting evidence by making credibility determinations.

For example, the Court concluded:

- Martorello's statement that the Tribe approached him in 2011 regarding the creation of an online lending business was "not true." *Id*. at 10-11. In doing so, the Court credited the testimony of Joette Pete and Scott Merritt over Martorello's sworn declaration to the contrary and dispositive documentary evidence. *Id*. at 11-12.

- Martorello's "demeanor and conduct when answering questions on this topic [the collection of consumer loans] at the evidentiary hearing compels the conclusion that Martorello was not telling the truth." *Id*. at 16.

- Martorello's testimony that his motivation for selling Bellicose to the Tribe "included 'the attractive offer that [he] received from the Tribes' Council'" was "simply not credible." *Id*. at 30.

It is well-settled that the "controlling distinction between the power of the court and that of the jury is that the former is the power to determine the law and the latter to determine the facts." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935); *Byrd v. Blue Ridge Rural Elec. Co-op., Inc*., 356 U.S. 525, 537 (1958) ("[A]n essential characteristic of th[e] [federal] system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of

**JA1264**

disputed questions of fact to the jury."); *Walker v. New Mexico & S P R Co.*, 165 U.S. 593, 596 (1897) ("The Seventh Amendment . . . . requires that questions of fact in common-law actions shall be settled by a jury, and that the court shall not assume, directly or indirectly, to take from the jury or to itself such prerogative.").

In its 11/18 Opinion, the Court contended that its factual findings were intertwined with the merits of the Plaintiffs' claims. Case No. 3:17-cv-00461, ECF No. 944, at 5; Case No. 3:18-cv-00406, ECF No. 581, at 5 (explaining "why and how [Red Rock Tribal Lending and Duck Creek Tribal Lending] were formed, how they were operated, and what happened to them *are material matters in assessing the claims made against Martorello*" (emphasis added)). As such, the Court deprived Martorello of his right to have a jury decide factual questions raised by the Plaintiffs' claims.

### B.    The Question Presented by the Court's 11/18 Opinion Warrants Certification for Appeal Under 28 U.S.C. § 1292(b).

In its 11/18 Opinion, the Court erred by making factual findings that the Court stated are intertwined with the merits of the Plaintiffs' claims. When the Court enters an order in accordance with its 11/18 Opinion, it should certify the order for appeal under 28 U.S.C. § 1292(b).[4] That statute permits district courts to certify an order for immediate interlocutory appeal if the court concludes the order (1) involves a controlling question of law, (2) presents substantial ground for difference of opinion as to its correctness, and (3) if appealed immediately, would materially advance the ultimate termination of the litigation:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate

---

[4] Alternatively, if the Court does not intend to enter a separate order, it should amend its 11/18 Opinion to include certification for appeal pursuant to 28 U.S.C. § 1292(b).

termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, [t]hat application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b); *see, e.g. United States v. B.C. Enters., Inc*., 696 F. Supp. 2d 593, 599 (E.D. Va. 2010) (certifying order for appeal despite finding precedent relied upon by moving party was "entirely distinguishable" due to substantial ground for difference of opinion). The question presented by the Court's 11/18 Opinion—whether it had authority to make factual findings that are intertwined with the merits—meets the three elements of certification under § 1292(b).

### 1. The Memorandum Opinion Implicates Controlling Questions of Law.

"A question of law may be deemed 'controlling' if its resolution is quite likely to affect the further course of the litigation, even if not certain to do so." *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc*., 86 F.3d 656, 659 (7th Cir. 1996); *LaFleur v. Dollar Tree Stores, Inc*., No. 2:12-CV-00363, 2014 WL 2121721, at *2 (E.D. Va. May 20, 2014) ("[A]n issue need not be dispositive in order to be controlling" under § 1292(b)); *Gilmore v. Jones*, No. 3:18-CV-00017, 2019 WL 4417490, at *3 (W.D. Va. Sept. 16, 2019) ("[A] a question may be 'controlling' under § 1292(b) even if it is not completely dispositive to the litigation; an issue is sufficiently controlling if its resolution would 'substantially shorten the litigation.'" (quoting *In re Trump*, 928 F.3d 360, 371 (4th Cir. 2019)).

In its 11/18 Opinion, the Court acknowledged that its findings will affect the course of litigation, stating, "in analyzing all pending and future motions in which Martorello argues that his position is supported by the Fourth Circuit's decision, this Court will now be required to take into account the record about the misrepresentations and the findings about them that are made therein." Case No. 3:17-cv-00461, ECF No. 944, at 39; Case No. 3:18-cv-00406, ECF No. 581,

9

**JA1266**

at 39.  Martorello has argued that the Fourth Circuit decision requires dismissal of all claims against him and rulings in his favor on several pending motions, including the Plaintiffs' motions for class certification and sanctions, and Martorello's motion for reconsideration of the order compelling disclosure of information withheld on the basis of attorney client-privilege.  Case No. 3:17-cv-00461, ECF No. 613, at 4-6.  Thus, the findings in the memorandum opinion involve controlling questions.  And the Court's authority to make these findings present questions of law. *See Doe*, 511 F.3d at 464 (compliance with mandate rule is reviewed *de novo*); *Simler v. Conner*, 372 U.S. 221, 222 (1963) ("[T]he right to a jury trial in the federal courts is to be determined as a matter of federal law.").

### 2.    There Is Substantial Ground for Difference of Opinion.

There is substantial ground for difference of opinion where "the controlling circuit has made no comment on conflicting opinions among the various circuits . . . or where the dispute raises a novel and difficult issue of first impression."  *Hutchens v. Capital One Servs., LLC*, No. 3:19CV546, 2020 WL 6121950, at *5 (E.D. Va. Oct. 16, 2020) (alteration in original); 2 Fed. Proc., L. Ed. § 3:218 ("A 'substantial ground for difference of opinion' exists under 28 U.S.C. § 1292(b) where reasonable jurists might disagree on an issue's resolution and not merely where they have already disagreed." (citation omitted)).  "The level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case."  *Coal. For Equity & Excellence In Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*, No. CIV. CCB-06-2773, 2015 WL 4040425, at *6 (D. Md. June 29, 2015) (quoting 16 Charles Alan Wright, et al., Fed. Prac. & Proc. § 3930).

Here, the Court initially made factual findings to resolve the Tribal Entities' motion to dismiss under Rule 12(b)(1).  In reconsidering those findings, the Court stated that it assessed

Martorello's credibility and considered allegedly conflicting evidence, despite recognizing that its findings were intertwined with the merits of the Plaintiffs' claims.  Case No. 3:17-cv-00461, ECF No. 944; Case 3:18-cv-00406, ECF No. 581 (stating that circumstances of Red Rock's formation "*are material matters in assessing the claims made against Martorello*" (emphasis added)).  It appears that neither the Fourth Circuit, nor the United States District Courts for the Eastern or Western Districts of Virginia have considered whether a court can properly make factual findings in these circumstances.  "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care."  *Dimick*, 293 U.S. at 485-86.  Because the authority of the Court to make findings of fact under these circumstances has not previously been considered, and concerns a right of substantial importance, the Court's authority to make factual findings raises a novel and difficult issue that should be certified for appeal.

**3.    An Immediate Appeal Would Materially Advance the Ultimate Termination of the Litigation.**

"In determining whether immediate appeal would advance termination of the litigation, courts may look to whether 'early appellate review might avoid protracted and expensive litigation.'"  *Hutchens v. Capital One Servs., LLC*, No. 3:19CV546, 2020 WL 6121950, at *6 (E.D. Va. Oct. 16, 2020) (citation omitted); *Smith v. Center Ford, Inc*., 71 F. Supp. 2d 530, 537 (E.D. Va. 1999) (certifying order where "an immediate appeal will best serve the interests of judicial economy and avoid unnecessary expense to the parties if decided by the Court of Appeals on an [i]nterlocutory basis"); *Gilmore*, 2019 WL 4417490, at *6 ("Congress passed § 1292(b) at least in part to promote efficiency in the federal court system and to avoid 'protracted and expensive litigation.'" (citation omitted)).

JA1268

In his statement of position regarding the effect of the Fourth Circuit's decision in *Williams*, Martorello argued that the decision requires ruling in his favor on almost a dozen motions. Case No. 3:17-cv-00461, ECF 613, at 4-5. The Court's ruling on each of these motions could serve as grounds for appeal following final judgment, potentially resulting in reversal and multiple trials. In addition, determining whether the Court lacked authority to assess Martorello's credibility on matters related to the merits of this dispute may streamline the issues for trial. *Hutchens*, 2020 WL 6121950, at *6 (certifying order for appeal where doing so "'might avoid protracted and expensive litigation' caused by potentially duplicative trials" (citation omitted)). Therefore, the Court should enter an order in accordance with its memorandum opinion certifying the issues therein for immediate appeal.

### C.  The Court Violated the Mandate Rule by Altering Factual Findings Affirmed by the Fourth Circuit.

If this Court declines to certify an order for interlocutory appeal, it should vacate all findings in the 11/18 Opinion because it violated the mandate rule when altering factual findings affirmed on appeal. "Few legal precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'" *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)). "The mandate rule prohibits lower courts, with limited exceptions, from considering questions that the mandate of a higher court has laid to rest." *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007); *Bell* 5 F.3d at 66 (mandate rule "compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.") Accordingly, "[w]hen matters are decided by an appellate court, its rulings, unless reversed by it or a superior court, bind the lower court." *Ins. Group Comm. v. Denver & Rio Grande W. R.Co*., 329 U.S. 607, 612 (1947).

In *Williams*, the Fourth Circuit affirmed this Court's factual findings and reversed its legal conclusions. 929 F.3d at 177 ("[W]e find no clear error in the district court's factual findings. Reviewing the district court's legal conclusions de novo, however, we hold that the Entities are entitled to sovereign immunity as arms of the Tribe and therefore reverse the district court's decision."). In addition to these rulings, the Fourth Circuit disregarded the Plaintiffs' invitation to remand for consideration of purported "new evidence," and instead remanded with clear and unambiguous instructions, which directed this Court to do only one thing on remand—"grant the [Tribal] Entities motion to dismiss for lack of subject matter jurisdiction." *Id*. at 185. These instructions did not authorize reconsideration of factual findings the Fourth Circuit found supported by the record. Notably, the Plaintiffs pursued none of the procedural vehicles that could have allowed for legitimate review or reconsideration of this Court's prior findings. *See* Fed. R. Civ. P. 60; Fed. R. App. P. 35.

The mandate rule "restricts the district court's authority on remand from the court of appeals," barring consideration of "any issue conclusively decided" by an appellate court. *Doe*, 511 F.3d at 465; *see, e.g. id*. at 466 (finding violation of mandate rule where appellate court remanded with instructions to consider attorneys' fees under particular law and district court awarded attorneys' fees under different law); *United States v. Apple*, 962 F.2d 335, 337 (4th Cir. 1992) (holding district court correctly refused to consider defendant's mitigating conduct on remand for resentencing, where mandate required determination of specific evidentiary issue and enhancement applied in original sentencing). This Court had no authority to reconsider its factual findings on remand and doing so violated the mandate rule. When an "appellate court determines questions put before it, the orderly resolution of the litigation requires the district court to recognize th[e] interests served by final judgments and to implement the appellate

mandate faithfully." *Doe*, 511 F.3d at 466. Faithful implementation of the Fourth Circuit's mandate did not permit reconsideration of factual findings affirmed by the Fourth Circuit.

## **CONCLUSION**

For the foregoing reasons, Martorello respectfully requests that that Court enter an order in accordance with its memorandum opinion certifying the issues therein for immediate appeal under 28 U.S.C. § 1292(b).

Respectfully submitted,
MATT MARTORELLO

By: /s/ Jon Hollis
       Of Counsel

Jon Hollis (VSB No. 84908)
J. Benjamin Rottenborn (VSB No. 84796)
Karen M. Stemland (VSB No. 47167)
**Woods Rogers PLC**
901 East Byrd Street, Suite 1550
Richmond, Virginia 23219
Telephone: (804) 343-5020
Facsimile: (804) 343-5021
jhollis@woodsrogers.com
brottenborn@woodsrogers.com
kstemland@woodsrogers.com

M.F. Connell Mullins, Jr. (VSB No. 47213)
cmullins@spottsfain.com
Hugh McCoy Fain, III (VSB No. 26494)
hfain@spottsfain.com
John Michael Erbach (VSB No. 76695)
jerbach@spottsfain.com
**SPOTTS FAIN PC**
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100

*Counsel for Matt Martorello*

JA1271

## CERTIFICATE OF SERVICE

The undersigned council hereby certifies that on this 30th day of November, 2020, the foregoing was filed using the Court's EM/ECF system, thereby serving a copy on all counsel of record electronically.


/s/ Jon Hollis _____

**JA1272**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

LULA WILLIAMS, *et al.*,

Plaintiffs,

v.                                              CIVIL ACTION NO. 3:17-CV-461

BIG PICTURE LOANS, LLC, *et al.*,

Defendants.

_____

RENEE GALLOWAY, *et al.*,

Plaintiffs,

v.                                              CIVIL ACTION NO. 3:18-CV-406

BIG PICTURE LOANS, LLC, *et al.*,

Defendants.

_____

## RESPONSE IN OPPOSITION TO DEFENDANT MATT MARTORELLO'S MOTION FOR ORDER CERTIFYING NOVEMBER 18, 2020 MEMORANDUM OPINION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)

Plaintiffs, by and through counsel, submit this response in opposition to Defendant Matt

Martorello's Motion for Order Certifying November 18, 2020 Memorandum Opinion for

Interlocutory Appeal Under 28 U.S.C. § 1292(b).[1]

---

[1] Martorello's motions are filed at ECF No. 946 in *Williams v. Big Picture Loans, LLC*, Case No. 3:17cv461 (E.D. Va.) ("*Williams*") and at ECF No. 582 in *Galloway v. Big Picture Loans, LLC*, Case No. 3:18-cv-406 (E.D. Va.) ("*Galloway I*").  Martorello's memoranda in support of his motions are referred to as "Def.'s Mem." and are filed at *Williams,* ECF No. 944 and *Galloway I,* ECF No. 583.

1

**JA1273**

## INTRODUCTION

Martorello falls far short of the high burden necessary to justify an interlocutory appeal. Nowhere in his motion, memorandum, or proposed order does Martorello articulate precisely which questions he would like the Court to certify for interlocutory appeal. Instead, Martorello insists that the Court somehow deprived Martorello his jury trial rights by assessing his credibility and violated the Fourth Circuit's mandate from the *Williams* appeal. These contentions are fundamentally flawed and without legal or factual merit. Interlocutory appeal is not warranted.

After a two-day evidentiary hearing, and pre-hearing and post-hearing submissions, this Court found that Matt Martorello and Michelle Hazen made "misrepresentations respecting the genesis of Big Picture" and "those misrepresentations were presented to, and relied on, by this Court in making its factual finding" in its ruling on Big Picture's and Ascension's motion to dismiss on sovereign immunity grounds. (Memorandum Opinion at 34 ("Opinion"), *Williams*, ECF No. 944; *Galloway I*, ECF No. 581.)

Martorello believes that by assessing his credibility, the Court deprived Martorello of his right to have a jury trial. But nowhere in the Court's opinion does the Court state that it found facts that are binding on a jury. Courts frequently are called upon to make factual determinations pre-trial, including determining credibility, for example at class certification and in sanctions proceedings, that do not bind the ultimate finder of fact. Indeed, Martorello requested that the Court engage in an evidentiary hearing if it were to consider Plaintiffs' filing regarding misrepresentations, asking that he "be provided a full and fair opportunity to respond through an evidentiary hearing and briefing." (*Williams,* ECF No. 679 at 5; *see also Williams*, ECF No. 664 at 16-17 (stating "Martorello should be provided a full and fair opportunity to respond through

**JA1274**

briefing and an evidentiary hearing and that a schedule be set to address any purported 'new evidence' submitted by Plaintiffs")).

Nor did the Court stray from the mandate of the Fourth Circuit. The Fourth Circuit ordered that Big Picture and Ascension be dismissed from *Williams* and remanded for further proceedings consistent with its opinion. That has been done. Martorello essentially is arguing this Court is bound by the factual record as it existed at the time that the Court decided the sovereign immunity issue in *Williams,* despite the fact that Martorello was not a party to the Fourth Circuit's decision in *Williams,* that *Galloway I* is a different case than *Williams* with different plaintiffs, and that the appellate record in *Williams* was based on misrepresentations. Martorello cites no authority that applies the mandate rule in such a broad and inflexible fashion.

In any event, Martorello does not meet the standard for an interlocutory appeal. He does not identify any "controlling questions of law." The issues presented in the Court's Opinion are fact-intensive and the product of an extensive evidentiary hearing. Issues that require an appellate court to dive deep into a factual record are not appropriate for interlocutory review. Nor does Martorello identify any "substantial ground for difference of opinion," and further cites no authority that suggests that this Court did not have the power to determine whether Martorello had made misrepresentations to the Court. Finally, interlocutory appeal will in no way materially advance the ultimate termination of this litigation. Instead, no matter the result on appeal, the litigation will be in largely the same place that it is now, with many pre-trial issues left to be resolved before potentially a trial and post-trial motions

This motion is simply another attempt by Martorello to delay proceedings. It should be denied.

## BACKGROUND

The Court is familiar with the facts and claims in this litigation and they will only be briefly summarized here. There are four ongoing cases in this district involving the lending scheme at issue. *Williams* was filed on June 22, 2017, by five plaintiffs from Virginia seeking relief on behalf of themselves and classes of Virginia consumers against Matt Martorello, Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, Inc. ("Ascension"). *Galloway I* was filed nearly a year later on June 11, 2018 against the same defendants. There are seventeen plaintiffs in *Galloway I*, four from Virginia, two each from Texas, Illinois, and North Carolina, and additional plaintiffs from California, Washington, Indiana, New Jersey, Ohio, Florida, and Maryland. (*Galloway I*, ECF No. 30.) None of the named plaintiffs in *Galloway I* are named plaintiffs in *Williams*.[2]

In *Williams,* Big Picture and Ascension ("Tribal Defendants") moved to dismiss arguing that they were entitled to sovereign immunity. After a brief period of jurisdictional discovery, the parties briefed the sovereign immunity issue based on the limited record available. This Court found that the Tribal Defendants were not arms of the tribe entitled to sovereign immunity. *Williams v. Big Picture Loans, LLC,* 329 F. Supp. 3d 248 (E.D. Va. 2018). The Tribal Defendants immediately appealed to the Fourth Circuit. The Tribal Defendants also moved to dismiss in *Galloway I* for the same reasons.

The Fourth Circuit issued its decision in *Williams* on July 3, 2020, reversing this Court and ordering the Tribal Defendants be dismissed from this matter. *Williams v. Big Picture Loans, LLC,* 929 F.3d 170 (4th Cir. 2019). During the pendency of the appeal and afterwards, discovery

---

[2] As the Court is well aware, there are two other cases related to the Big Picture lending scheme in this district: *Galloway v. Martorello,* Case No. 3:18-cv-406 (E.D. Va.) ("*Galloway II*"), and *Galloway v. Williams, Jr.,* Case No. 3:19-cv-470 (E.D. Va.) ("*Galloway III*").

JA1276

continued as to the claims against Martorello and a substantial amount of third party discovery was conducted, including discovery of the Rosette law firm, which produced thousands of pages of emails, many of which were communications with Martorello.  Discovery and depositions of important witnesses also took place, including the depositions of former tribal council member Joette Pete, Craig Mansfield (former co-manager of Red Rock Tribal Lending), and Scott Merritt, who introduced Martorello to the Tribe.  Plaintiffs alleged that certain representations made to the Court by Martorello and the Tribal Defendants in connection with the motion to dismiss on sovereign immunity grounds were false or misleading.  The Court ordered an evidentiary hearing in *Galloway I* to determine the factual record on the Tribal Defendants then-pending motions to dismiss on sovereign immunity grounds.  (*Galloway I*, ECF No. 270.)

Before the hearing took place in *Galloway I,* the plaintiffs in *Williams, Galloway I,* and the two other cases in this district and five other cases filed across the country reached a class action settlement with the Tribal Defendants and other defendants.  The Court has dismissed the Tribal Defendants from *Williams* pursuant to the mandate of the Fourth Circuit. (*Williams*, ECF No. 668.) The Tribal Defendants were also dismissed from *Galloway I* pursuant to the settlement, and the other settling defendants were dismissed from *Galloway II*. (S*ee Galloway I,* ECF No. 371; *Galloway II,* ECF No. 324).

After the Fourth Circuit's decision in *Williams,* Martorello insisted, as he does here, that the Fourth Circuit's decision in *Williams* requires resolution of many pending motions in his favor despite the fact that Martorello has no colorable argument that he is entitled to sovereign immunity and was not a party to the appeal in *Williams*.  (*Williams,* ECF No. 613.)  Plaintiffs asserted the Fourth Circuit's decision in *Williams* did not meaningfully affect the claims against Martorello and that the factual record on appeal in *Williams* was based in part on misrepresentations made by

Martorello and the Tribal Defendants regarding the lending scheme. (*Williams,* ECF No. 624). Martorello repeatedly asked the Court that if it were to consider Plaintiffs' evidence regarding misrepresentations, that the Court conduct an evidentiary hearing. (*Williams,* ECF No. 679 at 5; *Williams*, ECF No. 664 at 16-17).  The Court thus ordered an evidentiary hearing to determine whether misrepresentations had been made. (*Williams*, ECF No. 697).

The Court held a two-day evidentiary hearing in July 2020 and, after reviewing the numerous pre-hearing and post-hearing submissions, issued a decision on November 18, 2020 finding "the record convincingly confirms that misrepresentations respecting the genesis of Big Picture were made by Martorello and [Michelle] Hazen." (Opinion at 34.) The Court stated that the effect of its opinion was not to revisit the Fourth Circuit's ruling, but instead "in analyzing all pending and future motions in which Martorello argues that his position is supported by the Fourth Circuit's decision, the Court will be required to take into account the record about the misrepresentations." (Opinion at 39.)

Martorello now argues in his present motions that the Court's Opinion somehow deprived him of his jury trial rights and violated the mandate of the Fourth Circuit in *Williams.*  Martorello states "[i]n reaching its findings, the Court stated that it considered allegedly conflicting evidence and assessed Martorello's credibility, thereby depriving Martorello of his right to have a jury decide factual questions raised by the Plaintiffs' claims." (Def.'s Mem. at 1-2.)  Martorello further argues  that "[i]n addition, the Court expressly overruled its previous factual findings in *Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248 (E.D. Va. 2018), which were affirmed by the Fourth Circuit in *Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019). In doing so, the Court violated the mandate rule requiring district courts to consider only issues expressly remanded following appeal."  (Def.'s Mem. at 2.)  Martorello asks the Court to certify its Opinion

JA1278

for interlocutory appeal or to vacate all factual findings set forth in its Opinion because the Opinion violated the mandate of the Fourth Circuit's decision in *Williams.*

## ARGUMENT

In any event, Martorello's motion falls far short of his heavy burden to show that interlocutory review is appropriate. To grant an interlocutory appeal, a district court must certify that the order sought to be appealed (1) involves a controlling question of law (2) as to which there is substantial ground for difference of opinion and (3) that an immediate appeal from the order may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b). "[B]ecause § 1292(b) is contrary to the general rule that appeals may be had only after a final judgment, it should be used sparingly and its requirements must be strictly construed." *Difelice v. U.S. Airways, Inc.*, 404 F. Supp. 2d 907, 908–09 (E.D. Va. 2005). "[T]he certification of an interlocutory appeal requires 'exceptional circumstances that justify a departure from the basic policy limiting appellate review to final judgments.'" *Id.* (quoting *Terry v. June,* 368 F. Supp. 2d 538, 539 (W.D. Va. 2005)). "Section 1292(b) is meant to be used sparingly, and appeals under it are, accordingly, hen's-teeth rare." *Camacho v. Puerto Rico Ports Auth.*, 369 F.3d 570, 573 (1st Cir. 2004).

"[T]he kind of question best adapted to discretionary interlocutory review is a narrow question of pure law whose resolution will be completely dispositive of the litigation, either as a legal or practical matter, whichever way it goes." *Difelice,* 404 F. Supp. 2d at 908–09 (quoting *Fannin v. CSX Transp., Inc.,* 873 F.2d 1438, 1989 WL 1438, at *2 (4th Cir. 1989)). "Even if the requirements of Section 1292(b) are satisfied, the district court has 'unfettered discretion' to decline to grant leave for an interlocutory appeal if exceptional circumstances are absent." *Rogers*

JA1279

*v. Barrett*, No. 3:20CV380 (DJN), 2020 WL 3980029, at *5 (E.D. Va. July 14, 2020) (internal quotations and modifications omitted).

As an initial matter, nowhere in his motion, memorandum or proposed order does Martorello state precisely which questions on which he seeks interlocutory review.  The Fourth Circuit has stated that "[c]lear presentation of the reasons for granting relief under § 1292(b) is an essential part of a prospective appellant's burden to demonstrate the propriety of interlocutory review." *Fannin,* 1989 WL 1438, at *2.  Martorello's failure to clearly articulate the proposed questions for interlocutory review is reason enough to deny relief.  Moreover, Martorello has not carried his burden to show that interlocutory appeal is appropriate.

## I.  MARTORELLO HAS NOT MET HIS BURDEN TO CERTIFY QUESTIONS FOR INTERLOCUTORY APPEAL

### A.  Martorello Has Not Identified a Controlling Question of Law.

First, the party seeking an interlocutory must identify a "controlling question of law." 28 U.S.C. §1292(b).  "This element may be divided into two requirements: the question must be 'controlling' and it must be one 'of law.'" *Commonwealth of Virginia ex rel. Integra Rec LLC v. Countrywide Sec. Corp.*, No. 3:14CV706, 2015 WL 3540473, at *4 (E.D. Va. June 3, 2015).  "In order for a question to be 'controlling,' the district court must actually have decided such question."  *Id.* "'[A] question of law would not be controlling if the litigation would necessarily continue regardless of how that question were decided.'"  *Id.* (quoting *Wyeth v. Sandoz, Inc.,* 703 F.Supp.2d 508, 525 (E.D.N.C. 2010)).

Here, Martorello has not identified any "controlling questions of law."  Martorello states: "Martorello has argued that the Fourth Circuit decision requires dismissal of all claims against him and rulings in his favor on several pending motions, including the Plaintiffs' motions for class certification and sanctions, and Martorello's motion for reconsideration of the order compelling

**JA1280**

disclosure of information withheld on the basis of attorney client-privilege. Thus, the findings in the memorandum opinion involve controlling questions." (Def's Mem. at 10.)

This logic does not follow. Even if the Fourth Circuit were to find that the Court has impermissibly deprived Martorello of his right to have the jury find facts or had disregarded the mandate of the Fourth Circuit in *Williams*, this case would still continue. At best, the Court's Opinion would be vacated, and the Court would still have to decide class certification, summary judgment, and other pre-trial and potentially post-trial motions before final judgment can be reached. In other words, the case would proceed in largely the same manner even on a different record. Nothing about the Court's Opinion is dispositive and review of such order by the Court of Appeals would also not be dispositive of any claim in this case. There simply is no controlling question of law at issue in the Opinion.

Further, the Court's Opinion was the product of two-day evidentiary hearing with extensive live testimony, deposition testimony, and documentary exhibits. In order to make any determination on the propriety of the Court's Opinion, the Court of Appeals will necessarily have to review an extensive factual record. The Court's Opinion simply does not present "pure" questions of law that are appropriate for interlocutory appeal. *See LaFleur v. Dollar Tree Stores, Inc.*, No. 2:12-CV-00363, 2014 WL 2121721, at *2 (E.D. Va. May 20, 2014) ("'[A] pure question of law [is] something the court of appeals could decide quickly and cleanly without having to study the record.'") (quoting *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626 (7th Cir.2010)). Any review of the Opinion would require "the court of appeals to hunt through the record" and thus there are no issues that are "appropriate for interlocutory appeal." *Id.*

JA1281

**B.  There are No Grounds for Substantial Differences of Opinion**

Second, Martorello has failed to show that there are any grounds for substantial differences of opinion for any of the questions that Martorello may seek to certify.  Substantial grounds for differences of opinion "must arise 'out of a genuine doubt as to whether the district court applied the correct legal standard in its order.'"  *Commonwealth of Virginia ex rel. Integra Rec LLC*, 2015 WL 3540473, at *5 (quoting *Wyeth*, 703 F. Supp. at 527).  "A mere lack of unanimity or opposing decisions outside of the governing circuit, need not persuade a court that a substantial ground for disagreement exists."  *Id.* (internal citation omitted).  "[T]he fact that the parties happen upon an issue never before decided by a controlling authority is insufficient to merit certification."  *Cooke-Bates v. Bayer Corp.*, No. 3:10BCVB261, 2010 WL 4789838, at *4 (E.D. Va. Nov. 16, 2010)

Here, Martorello has not established that there are substantial grounds for a difference in opinion.  Martorello argues that the Court somehow has usurped his jury rights and **"**[b]ecause the authority of the Court to make findings of fact under these circumstances has not previously been considered, and concerns a right of substantial importance, the Court's authority to make factual findings raises a novel and difficult issue that should be certified for appeal."  (Def.'s Mem. at 11.)

Defendant's argument is fundamentally flawed.  Nothing in the Court's Opinion states that the Court has made factual findings that are binding on the ultimate trier of fact.  Courts frequently are required to make pre-trial findings of fact that are nonetheless not binding on the ultimate fact-finder, including weighing issues of credibility.  For example, courts are tasked with making credibility determinations at class certification which do not bind the ultimate fact-finder. *See In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2020 WL 5778756, at *3 (E.D. Va. Aug. 14, 2020) ("'Rigorous analysis need not be hampered by a concern for avoiding credibility issues; as noted, findings with respect to class certification do not bind the ultimate fact-finder on the

merits.'" (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 324 (3d Cir. 2008)); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 340 (D. Md. 2012) (making "necessary factual findings" in course of deciding class certification). Credibility determinations can also be made during sanctions hearings without usurping a party's jury trial rights, even when the court dismisses case or enters a default judgment as a discovery sanction. *See Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 592 (9th Cir. 1983) (finding in context of motion for sanctions "[i]n the course of such hearings, a court will make inferences and credibility determinations from evidence received" and that such proceeding do not violate a party's jury trial rights). Martorello repeatedly requested that an evidentiary hearing be conducted. He cannot be surprised that the Court evaluated his credibility in that hearing.

Martorello further makes no argument regarding how the Court's application of the Fourth Circuit's mandate raises a question on which "substantial grounds for disagreement" exist. Nor could he. As explained below, the Court did not violate the mandate.

## C. Interlocutory Appeal Will Not Materially Advance the Ultimate Termination of This Litigation

Lastly, section 1292(b) also requires finding that "an immediate appeal may materially advance the ultimate termination of the litigation." Martorello does not argue that any appeal will result in the termination of this litigation. Instead, he argues that the Fourth Circuit's decision in *Williams* "requires ruling in his favor on almost a dozen motions." (Def.'s Mem. at 11.) Further, Martorello claims that absent interlocutory appeal now "[this] Court's ruling on each of these motions could serve as grounds for appeal following final judgment, potentially resulting in reversal and multiple trials," and that "determining whether the Court lacked authority to assess Martorello's credibility on matters related to the merits of this dispute may streamline the issues for trial." (*Id.*)

In other words, Martorello is requesting an immediate appeal now before the Court rules on nearly a "dozen motions." But regardless of the outcome of any appeal, the Court would still have to rule on those before the case even gets to trial. Further, in any litigation, any erroneous ruling could result in "reversal and multiple trials." Martorello presents no argument as to why this Court in this case should deviate from the rule disfavoring interlocutory appeals. This case has been going on for over three years and has been delayed significantly by Martorello's obstructive discovery responses, misrepresentations to the Court, and various other attempts to derail the progress in this litigation, such as filing a bad faith bankruptcy for his company Eventide. An appeal now will not move this case forward. It will simply delay matters further. *See Difelice*, 404 F. Supp. 2d at 910 (denying motion for immediate interlocutory appeal when "no Court of Appeals decision is likely to resolve all remaining issues in the litigation; instead, an interlocutory appeal will simply add unnecessary delay and cost to the resolution of the remaining issues in this case").

## II.    THE COURT DID NOT VIOLATE THE FOURTH CIRCUIT'S MANDATE.

Alternatively, Martorello asks that if the Court does not certify its Opinion for interlocutory appeal, Martorello requests the Court "vacate all findings in the 11/18 Opinion because it violated the mandate rule when altering factual findings affirmed on appeal." (Def's Mem. at 12.) Once again, Martorello is wrong. The Court did not violate the mandate.

To explain, the "'mandate rule' is a more powerful version of the law of the case doctrine and is based on the principle that an inferior tribunal is bound to honor the mandate of a superior court within a single judicial system." *Invention Submission Corp. v. Dudas*, 413 F.3d 411, 414 (4th Cir. 2005) (internal quotations omitted). "The law of the case doctrine is not an 'inexorable

**JA1284**

command' but rather a prudent judicial response to the public policy favoring an end to litigation." *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 68 (4th Cir. 1988).

The mandate of the Fourth Circuit in *Williams* was to "grant the [Tribal Defendants] motion to dismiss for lack of subject matter jurisdiction" and the case was "remanded to the district court for further proceedings consistent with the court's decision. *Williams*, 929 F.3d at 185; *Williams* ECF No. 582. The Court has complied with that mandate. The Tribal Defendants have been dismissed.

Martorello nevertheless argues that the Court was not authorized to reconsider the factual record on which the Fourth Circuit based its ruling, stating "[t]his Court had no authority to reconsider its factual finding on remand and doing so violated the mandate rule." (Def.'s Mem. at 13.). This argument fails.

First, it must be noted that the Fourth Circuit's decision and mandate in *Williams* is not law-of-the-case in *Galloway I,* which has different plaintiffs than *Williams* and who were not a party to the appeal in *Williams.* See *Acosta v. Target Corp.*, 281 F.R.D. 314, 319 (N.D. Ill. 2012) (refusing to apply law of the case principles to case that "same defendant, same opposing lawyers and the same assigned magistrate judge" when there were different plaintiffs).

Second, the issues decided by the Fourth Circuit in *Williams* were narrow and limited to the issues of the Tribal Defendants' sovereign immunity. Martorello was not a party to the appeal and the Fourth Circuit was clear that the potential merits of the claims did not affect the sovereign immunity analysis. *Williams*, 929 F.3d at 185 ("[T]he potential merit of the borrowers' claims against Big Picture and Ascension–and the lack of a remedy for those alleged wrongs–does not sway the tribal immunity analysis.")

Matters not considered or determined by the appellate court are not part of the mandate. *See Walker v. Kelly*, 589 F.3d 127, 137 (4th Cir. 2009) (rejecting that lower court violated mandate rule when prior appellate opinion "did not hold—and could not have held—that [appellant] was entitled to relief"); *see also Consolidation Coal Co. v. Latusek*, 717 F. App'x 207, 209–10 (4th Cir. 2018) (finding mandate rule not to be implicated when plaintiff submitted new evidence to administrative law judge that caused administrative law judge to award benefits even though Fourth Circuit had previously found that plaintiff was not entitled to benefits in prior appeal). The mandate only extends to issues actually decided on appeal and "[w]hen further trial-court proceedings are appropriate after remand, the appellate mandate commonly leaves the trial court free to decide matters that were not resolved on appeal." Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478.3 (2d ed.); *In re Purdy*, 870 F.3d 436, 444 (6th Cir. 2017) ("In the absence of an explicit limitation, the remand order is presumptively a general one."). The Fourth Circuit's opinion did not reach the claims against Martorello nor definitely determine the factual record on which those claims are to be evaluated. The Fourth Circuit's mandate has little, if any, impact on the claims against Martorello.

Finally, even if the mandate rule were implicated, the Court is allowed to consider new facts and evidence in re-evaluating its findings without implicating or running afoul of the mandate rule. "Deviation from the mandate rule is permitted only in a few exceptional circumstances, which include (1) when controlling legal authority has changed dramatically; (2) when significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light; and (3) when a blatant error in the prior decision will, if uncorrected, result in a serious injustice." *Invention Submission Corp. v. Dudas*, 413 F.3d 411, 415 (4th Cir. 2005).

JA1286

Here, far more discovery in this case has been conducted since the Court's decision in 2018 on sovereign immunity. Significant new evidence came to light during post-jurisdictional fact discovery that was not available when this Court made its decision on sovereign immunity, including emails produced by the Rosette Law Firm, and the testimony of Joette Pete, Craig Mansfield, and Scott Merritt. This new evidence demonstrated that Martorello and Michelle Hazen made misrepresentations to the Court during the jurisdictional discovery phase of the case. It would be a serious injustice for Martorello to continue to benefit from the record before the Fourth Circuit which was based in part on misrepresentations made by Martorello to the Court. Even if the mandate were implicated (which it is not), deviation from the mandate would be appropriate.

## CONCLUSION

For all of the above reasons, Martorello's motion should be denied.

RESPECTFULLY SUBMITTED AND DATED this 14th day of December, 2020.

CONSUMER LITIGATION ASSOCIATES, P.C.

By: /s/ Leonard A. Bennett, VSB #37523
   Leonard A. Bennett, VSB #37523
   Email: lenbennett@clalegal.com
   Craig C. Marchiando, VSB #89736
   Email: craig@clalegal.com
   Amy Austin, VSB #46579
   Email: amyaustin@clalegal.com
   763 J. Clyde Morris Boulevard, Suite 1-A
   Newport News, Virginia 23601
   Telephone: (757) 930-3660
   Facsimile: (757) 930-3662

Kristi C. Kelly, VSB #72791
Email: kkelly@kellyguzzo.com
Andrew J. Guzzo, VSB #82170
Email: aguzzo@kellyguzzo.com
Casey S. Nash, VSB #84261
Email: casey@kellyguzzo.com
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167

E. Michelle Drake, *Admitted Pro Hac Vice*
Email: emdrake@bm.net
John G. Albanese, *Admitted Pro Hac Vice*
Email: jalbanese@bm.net
BERGER & MONTAGUE, P.C.
43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470

Beth E. Terrell, *Admitted Pro Hac Vice*
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Email:  jmurray@terrellmarshall.com
Elizabeth A. Adams, *Admitted Pro Hac Vice*
Email: eadams@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Matthew Wessler, *Admitted Pro Hac Vice*
Email: matt@guptawessler.com
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

16

**JA1288**

Michael Allen Caddell, *Admitted Pro Hac Vice*
Email: mac@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston, Texas 77007-1722
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

*Attorneys for Plaintiffs and Proposed Classes*

JA1289

CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2020, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

attorneys of record for Matt Martorello.

DATED this 14th day of December, 2020.

CONSUMER LITIGATION ASSOCIATES, P.C.

By: /s/ Leonard A. Bennett, VSB #37523
    Leonard A. Bennett, VSB #37523
    Email: lenbennett@clalegal.com
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

*Attorneys for Plaintiffs and Proposed Classes*

JA1290

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| LULA WILLIAMS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:17-cv-00461 (REP) |
| v. | ) | |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| RENEE GALLOWAY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:18-cv-00406 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DEFENDANT MATT MARTORELLO'S REPLY IN SUPPORT OF HIS MOTION FOR
CERTIFICATION OF INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)**

## I.     PRELIMINARY STATEMENT

"[D]istrict courts should not hesitate to certify an interlocutory appeal" under 28 U.S.C.

§ 1292(b) "when a decision 'involves a new legal question or is of special consequence.'"  *In re*

*Trump*, 928 F.3d 360, 369 (4th Cir. 2019), *reh'g en banc*, 958 F.3d 274 (4th Cir. 2020) (quoting

*Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009)).  In its memorandum opinion issued

on November 18, 2020 (the "11/18 Opinion"),[1] the Court made both findings of fact and

assessments of Matt Martorello's ("Martorello") credibility on issues purportedly related to the

---

[1] The Court issued the 11/18 Opinion in *Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-
00461 ("*Williams*"), at ECF No. 944; and in *Galloway v. Big Picture Loans, LLC*, Case No.
3:18-cv-00406 ("*Galloway I*"), at ECF No. 581.

merits of the Plaintiffs' claims.  Whether the Court deprived Martorello of his right to a jury trial

when making these findings is a question of first impression that is of special consequence.  This

question therefore warrants certification of an order for immediate appeal under § 1292(b).  In

addition, the Court expressly overruled its previous factual findings in *Williams v. Big Picture*

*Loans, LLC*, 329 F. Supp. 3d 248 (E.D. Va. 2018),[2] which were affirmed by the Fourth Circuit in

*Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019).  In overruling its previous

factual findings, the Court violated the mandate rule requiring district courts to consider only issues

expressly remanded following appeal.

## II.    ARGUMENT

### A.    Whether the Court Properly Made Factual Findings and Assessed Martorello's Credibility in the 11/18 Opinion Warrants Certification for Immediate Appeal.

A district court may certify a non-final order for interlocutory appeal under § 1292(b) when

the order involves (1) a controlling question of law (2) about which there is a substantial ground

for difference of opinion and (3) an immediate appeal therefrom may materially advance the

termination of the litigation.  *Gilmore v. Jones*, No. 3:18-CV-00017, 2019 WL 4417490, at *3

(W.D. Va. Sept. 16, 2019).  Whether the Court had authority to make factual findings and assess

---

[2] Notably, in addition to Martorello's declaration, the Court's previous findings were primarily based upon the Plaintiffs' extensive discovery efforts, including declarations given by and multiple depositions of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribe") and its arm of the Tribe subsidiaries, Big Picture Loans, LLC and Ascension Technologies, LLC ("Tribal Entities").  Since the stay of discovery from those parties, Martorello has asserted that those entities were necessary and indispensable parties from whom his discovery has been substantially impaired.  *See, e.g., Williams*, ECF No. 613, at 2.  Without those indispensable parties, Martorello has been denied a full and fair opportunity to defend the merits of Plaintiffs' claims, including the limited presentation allowed before the Court in his allotted four-hour presentation at the hearing. In light of the Court's final approval of the Tribal defendants and the Plaintiffs' settlement agreement, and their corresponding dismissal from these cases, Martorello intends to move the Court for dismissal pursuant to Rule 19.

{2790152-1, 122274-00001-05}

2

JA1292

Martorello's credibility on issues related to the merits of the Plaintiffs' claims meets these elements. Accordingly, the Court should enter an order in accordance with its 11/18 Opinion certifying the rulings therein for immediate appeal.

### 1. The 11/18 Opinion Presents a Controlling Question of Law.

The Plaintiffs improperly claim that a question of law is not controlling "if the litigation would necessarily continue regardless of how that question was decided." *Williams*, ECF No. 959, at 8; *Galloway I*, 589, at 8 (quoting *Commonwealth of Virginia ex rel. Integra Rec LLC v. Countrywide Sec. Corp.*, No. 3:14CV706, 2015 WL 3540473, at *4 (E.D. Va. June 3, 2015). While their quote from *Countrywide* is accurate, as far as it goes, Plaintiffs overlook that a dispositive issue is only *one kind* of "controlling question" under § 1292(b). *Countrywide*, 2015 WL 3540473, at *4 ("Controlling questions *include* those 'whose resolution will be completely dispositive of the litigation, either as a legal or practical matter, whichever way it goes.'" (emphasis added) (citation omitted)); *LaFleur v. Dollar Tree Stores, Inc.*, No. 2:12-CV-00363, 2014 WL 2121721, at *2 (E.D. Va. May 20, 2014) ("[A]n issue need not be dispositive in order to be controlling" under § 1292(b)).

"When the resolution of a question would not completely end the litigation altogether, district courts look to whether the immediate appeal would be 'serious to the conduct of the litigation, either practically or legally.'" *Countrywide*, 2015 WL 3540473, at *4 (citation omitted); *Gilmore*, 2019 WL 4417490, at *3 ("[A]n issue is sufficiently controlling if its resolution would 'substantially shorten the litigation.'" (quoting *In re Trump*, 928 F.3d at 371)); *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656, 659 (7th Cir. 1996) ("A question of law may be deemed 'controlling' if its resolution is quite likely to affect the further course of the litigation, even if not certain to do so.").

Whether the Court properly made the findings in its 11/18 Opinion is a question "serious to the conduct of th[is] litigation," *Countrywide*, 2015 WL 3540473, at *4, will "substantially shorten the litigation", *Gilmore*, 2019 WL 4417490, at *3, and is "quite likely to affect the further course of the litigation," *Sokaogon Gaming*, 86 F.3d at 659. Martorello has argued that the Fourth Circuit's decision in *Williams* requires dismissal of all claims against him and rulings in his favor on several pending motions. *Williams*, ECF No. 613, at 4-6, ECF No. 629, at 1-5. In its 11/18 Opinion, the Court stated that when "analyzing all pending and future motions in which Martorello argues that his position is supported by the Fourth Circuit's decision, this Court will now be required to take into account the record about the misrepresentations and the findings about them that are made therein." *Williams*, ECF No. 944, at 39; *Galloway I*, ECF No. 581, at 39. Therefore, at a minimum, the factual findings in the 11/18 Opinion will affect resolution of the pending motions in which Martorello contends his position is supported by the Fourth Circuit's decision in *Williams*. In light of the breadth and importance of these pending motions, some of which may be dispositive, whether the Court had authority to make factual findings on issues related to the merits is a controlling question of law within the meaning of § 1292(b).

In addition, the Plaintiffs incorrectly maintain that Martorello has asked the Court to certify factual questions, claiming that "in order to make any determination on the propriety of the Court's [11/18] Opinion, the Court of Appeals will necessarily have to review an extensive factual record." *Williams*, ECF No. 959, at 9; *Galloway I*, ECF No. 589, at 9. Contrary to this assertion, Martorello is challenging whether the Court had authority to make factual findings and assess his credibility on issues related to the merits. Martorello is not asking the Court to certify whether those findings have evidentiary support. The Court acknowledged that its factual findings were material and intertwined with the merits of the Plaintiffs' claims. *Williams*, ECF No. 944, at 5; *Galloway I*,

**JA1294**

ECF No. 581, at 5 ("[W]hy and how [Red Rock Tribal Lending and Duck Creek Tribal Lending] were formed, how they were operated, and what happened to them *are material matters in assessing the claims made against Martorello.*" (emphasis added)).  As such, if the Court certifies an order, the Court of Appeals will not review any factual findings; instead, it will review whether the Court had authority to make those findings.

### 2.    There Is Substantial Ground for Difference of Opinion.

The Plaintiffs argue there is no ground for difference of opinion because "[n]othing in the Court's [11/18] Opinion states that the Court has made factual findings that are binding on the ultimate trier of fact."  *Williams*, ECF No. 959 at 10; *Galloway I*, ECF No. 589, at 10.  While Martorello agrees that the Court's findings are not binding on the ultimate trier of fact, this argument fails to address whether there is substantial ground for difference of opinion as to whether the Court had authority to make factual findings in its 11/18 Opinion.

The "controlling distinction between the power of the court and that of the jury is that the former [ha]s the power to determine the law and the latter to determine the facts."  *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935); *Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*, 356 U.S. 525, 537 (1958) ("[A]n essential characteristic of th[e] [federal] system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury."); *Walker v. New Mexico & S P R Co.*, 165 U.S. 593, 596 (1897) ("The Seventh Amendment . . . . requires that questions of fact in common-law actions shall be settled by a jury, and that the court shall not assume, directly or indirectly, to take from the jury or to itself such prerogative.").

The Court initially made factual findings to resolve the Tribal Entities' motion to dismiss

under Rule 12(b)(1). The Court resolved that motion and its findings were affirmed on appeal. *Williams*, 929 F.3d at 177. The Court then altered those findings in its 11/18 Opinion, after they were affirmed, without stating any basis for its authority to do so, and acknowledged that its findings were "material" to "the claims made against Martorello." *Williams*, ECF No. 944, at 5; *Galloway I*, ECF No. 581, at 5. Whether the Court had authority to make factual findings in these circumstances appears to be a matter of first impression.

Courts have certified questions of first impression under § 1292(b) where the issue is "particularly difficult." *Cooke-Bates v. Bayer Corp.*, 2010 WL 4789838, at *4 (E.D. Va. Nov. 16, 2010); *Hutchens v. Capital One Servs., LLC*, No. 3:19CV546, 2020 WL 6121950, at *5 (E.D. Va. Oct. 16, 2020) (a substantial ground for difference of opinion exits where "the dispute raises a novel and difficult issue of first impression"); 2 Fed. Proc., L. Ed. § 3:218 ("A 'substantial ground for difference of opinion' exists under 28 U.S.C. § 1292(b) where reasonable jurists might disagree on an issue's resolution and not merely where they have already disagreed." (citation omitted)). "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick*, 293 U.S. at 485-86. Given the importance of the right to trial by jury, and the dearth of authority addressing whether the Court properly made factual findings in these circumstances, the issues raised by the 11/18 Opinion present substantial ground for difference of opinion.

### 3.    An Immediate Appeal Would Materially Advance the Ultimate Termination of this Litigation.

In his memorandum in support of his motion for certification of an interlocutory appeal, Martorello reiterated that the Fourth Circuit's decision requires dismissal of all claims against him and rulings in his favor on almost a dozen motions. *Williams*, ECF No. 944, at 10, 12; *Galloway*

*I*, ECF No. 583, at 10, 12.  The Plaintiffs contend that an interlocutory appeal will not advance the ultimate termination of this litigation because the Court will rule on these motions before trial "regardless of the outcome of any appeal."  *Williams*, ECF No. 959 at 12; *Galloway I*, ECF No. 589, at 12. This argument misses the point.  An interlocutory appeal would resolve whether the Court properly made factual findings in its 11/18 Opinion, which altered previous findings that were affirmed on appeal and formed the basis for several binding conclusions made by the Fourth Circuit.  Thus, an interlocutory appeal would clarify what facts the Court can look to when ruling on motions in which Martorello relies on the Fourth Circuit's decision.

Certification of an interlocutory appeal is warranted when "early appellate review might avoid protracted and expensive litigation."  *Hutchens v. Capital One Servs., LLC*, No. 3:19CV546, 2020 WL 6121950, at *6 (E.D. Va. Oct. 16, 2020) (citation omitted); *Smith v. Center Ford, Inc.*, 71 F. Supp. 2d 530, 537 (E.D. Va. 1999) (certifying order where "an immediate appeal will best serve the interests of judicial economy and avoid unnecessary expense to the parties if decided by the Court of Appeals on an [i]nterlocutory basis").  Because the Court's ruling on each motion in which Martorello argues his position is substantially affected by the Fourth Circuit's decision could serve as grounds for appeal following final judgment, potentially resulting in reversal and multiple trials, certifying an order for interlocutory appeal would materially advance the ultimate termination of this litigation.

### B.  The Court Violated the Mandate Rule by Altering Factual Findings Affirmed by the Fourth Circuit.

The Plaintiffs maintain that the Fourth Circuit's decision does not implicate the mandate rule because the Fourth Circuit considered only whether the Tribal Entities are afforded sovereign immunity.  *Williams*, ECF No. 959 at 12-15; *Galloway I*, ECF No. 589, at 12-15.

The mandate rule "compels compliance on remand with the dictates of a superior court and

forecloses relitigation of issues expressly or impliedly decided by the appellate court." *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993). *Warfaa v. Ali*, 811 F.3d 653, 661 (4th Cir. 2016) (explaining that when a panel of the Court of Appeals announces a decision, the "panel's 'decision is binding, not only upon the district court, but also upon another panel of this court—unless and until it is reconsidered *en banc*'" (citation omitted)). In *Williams*, the Fourth Circuit expressly held that this Court's factual findings were supported by the record. 929 F.3d at 177 ("[W]e find no clear error in the district court's factual findings.") The Court remanded with instructions to "grant the [Tribal] Entities motion to dismiss for lack of subject matter jurisdiction." *Id*. at 185. That this Court made factual findings for the purposes of determining if the Tribal Entities were arms of the Tribe is irrelevant when assessing whether the Fourth Circuit's mandate permitted this Court's *reconsideration* of those findings. The Fourth Circuit's mandate did not authorize the Court to alter its factual findings, and the Court violated the mandate rule by doing so.

While the Plaintiffs have correctly observed that *Galloway I* involves different parties than *Williams*, that fact does not suggest the Court was permitted to alter its factual findings in *Williams*. In its 11/18 Opinion, the Court identified specific factual findings that "could not have been made" in *Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248 (E.D. Va. 2018). *Williams*, ECF No. 944, at 36; *Galloway I*, ECF No. 581, at 36. By issuing its 11/18 Opinion in both *Galloway I* and *Williams*, the Court made clear that in its view, Martorello is bound by its findings in *both* cases. The Court improperly altered its findings in *Williams*, and improperly extended them to *Galloway I*, a different case involving different parties.

Finally, no exceptions to the mandate rule apply here. "Deviation from the mandate rule is permitted only in a few exceptional circumstances, which include (1) when 'controlling legal authority has changed dramatically'; (2) when 'significant new evidence, not earlier obtainable in

the exercise of due diligence, has come to light'; and (3) when 'a blatant error in the prior decision will, if uncorrected, result in a serious injustice.'" *Doe v. Chao*, 511 F.3d 461, 467 (4th Cir. 2007) (citation omitted).  The Plaintiffs assert that significant new evidence, which was "not available" when this Court made its decision on sovereign immunity came to light during fact discovery. *Williams*, ECF No. 959 at 15; *Galloway I*, ECF No. 589, at 15.  The Plaintiffs have presented no argument as to why this evidence was not obtainable in the exercise of due diligence.  Nor have they addressed why it is "significant."  In fact, when the Plaintiffs raised the issue of potential "material misrepresentations" to the Fourth Circuit, the Tribal Entities pointed out that the Plaintiffs "had the vast majority (34/40) [of the documents that formed the basis of their misrepresentation allegations] in their possession well before [the Fourth Circuit held oral] argument in *Williams*; indeed, many since October 2018." *Williams*, ECF No. 947-2; *Galloway I*, ECF No. 583-2.

Yet Plaintiffs never advised the Fourth Circuit before or at oral argument of their position, or filed a petition for rehearing or rehearing *en banc*.  Moreover, the Fourth Circuit rejected Plaintiffs' invitation to remand with instructions to reconsider these very facts.  This further supports the insignificance of the factual subject matter asserted and the Court's error in considering the issues already addressed by the Fourth Circuit.  Accordingly, there are no "exceptional circumstances" permitting deviation from the mandate rule here.

## CONCLUSION

For the foregoing reasons, Martorello respectfully requests that this Court enter an order in accordance with its 11/18 Opinion certifying the issues therein for immediate appeal under 28 U.S.C. § 1292(b).

Respectfully submitted,
MATT MARTORELLO

By: /s/ Jon Hollis
   Of Counsel

Jon Hollis (VSB No. 84908)
J. Benjamin Rottenborn (VSB No. 84796)
Karen M. Stemland (VSB No. 47167)
**Woods Rogers PLC**
901 East Byrd Street, Suite 1550
Richmond, Virginia 23219
Telephone: (804) 343-5020
Facsimile: (804) 343-5021
jhollis@woodsrogers.com
brottenborn@woodsrogers.com
kstemland@woodsrogers.com

*Counsel for Matt Martorello*

JA1300

## <u>CERTIFICATE OF SERVICE</u>

The undersigned council hereby certifies that on this 21th day of December, 2020, the

foregoing was filed using the Court's CM/ECF system, thereby serving a copy on all counsel of

record electronically.

/s/ Jon Hollis                                    

**JA1301**