RECORD NO. 21-2116

# In the United States Court of Appeals for the Fourth Circuit

LULA WILLIAMS; GLORIA TURNAGE;
GEORGE HENGLE; DOWIN COFFY; MARCELLA P. SINGH,
ON BEHALF OF THEMSELVES AND ALL INDIVIDUALS SIMILARLY SITUATED,

*Plaintiffs-Appellees*

v.

MATT MARTORELLO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, NO. 3:17-CV-00461 (PAYNE, R.)

## JOINT APPENDIX VOL. III

Bernard R. Given II
William N. Grosswendt
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
(310) 282-2000

John D. Taliaferro
LOEB & LOEB LLP
901 New York Ave. NW, Suite 300
Washington, DC 20001
(202) 618-5000
***Counsel for Appellants***

Matthew W.H. Wessler
GUPTA WESSLER PLLC
2001 K Street, NW,
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Kristi C. Kelly
Andrew Guzzo
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7570
***Counsel for Appellees***

# TABLE OF CONTENTS

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | **VOLUME I OF VIII** | |
| | Docket Sheet | 1 |
| 06/22/2017 | Class Action Complaint (ECF 1) | 131 |
| 09/29/2017 | Defendant Big Picture Loans, LLC's Brief in Support of Its Motion to Dismiss for Failure to Exhaust Tribal Remedies and Under the Doctrine of *Forum Non Conveniens* (ECF 27) | 163 |
| 12/21/2017 | Defendants Big Picture Loans, LLC, Ascension Technologies, LLC, James Williams, Jr., Gertrude McGeshick, Susan McGeshick, and Giiwegiizhigookway Martin's Reply Memorandum in Support of Motion to Dismiss (ECF 99) | 198 |
| 12/21/2017 | Big Picture Loan's Reply in Support of Its Motion to Dismiss for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens (ECF 100) | 220 |
| 07/27/2018 | Memorandum and Opinion Re: Defendants' Big Picture Loans and Ascension Technologies' Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 146) | 236 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 10/23/2018 | Defendant Matt Martorello's Opposition to Plaintiffs' Motion for Class Certification (ECF 222) | 317 |
| 12/20/2018 | Plaintiffs-Appellees' Response Brief (USCA4 18-1827, Dkt. 33) | 368 |
| 05/20/2019 | Plaintiffs' Memorandum in Support of Motion for Leave to File Supplemental Evidence in Support of Oppositions to Motion to Dismiss (Case No. 3:18-cv-00406-REP, Dkt. 233) | 433 |
| 06/04/2019 | Plaintiffs-Appellees' Supplemental Letter under Rule 28 (j) (USCA4 18-1827, Dkt. 125) | 455 |
| 06/07/2019 | Defendants-Appellants' Response to Plaintiffs-Appellees' Supplemental Letter under Rule 28 (j) (USCA4 18-1827, Dkt. 126) | 464 |
| 06/28/2019 | Plaintiffs' Statement of Position Regarding Material Misrepresentations Made to the Court in Support of Their Motions to Dismiss for Lack of Jurisdiction (Case No. 3:18-cv-00406-REP, Dkt. 249) | 466 |
| 07/03/2019 | Published Decision - Fourth Circuit Case No. 18-1827 (ECF 581) | 500 |
| 07/03/2019 | Judgment - Fourth Circuit Case No. 18-1827 (ECF 582) | 528 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 07/23/2019 | Order Setting Evidentiary Hearing on Subject Matter Jurisdiction on October 28, 2019 (Case No. 3:18-cv-00406-REP, Dkt. 270) | 530 |
| 07/24/2019 | Defendants Big Picture Loans and Ascension Technologies' Statement Regarding Plaintiffs' Claims of Material Misrepresentation (Case No. 3:18-cv-00406-REP, Dkt. 271) | 534 |
| 07/25/2019 | Mandate - Fourth Circuit Case No. 18-1827 (ECF 600) | 585 |
| 08/09/2019 | Defendant Matt Martorello's Response to Plaintiffs' Statement of Position Regarding Purported Material Misrepresentations Made to the Court (Case No. 3:18-cv-00406-REP, Dkt. 272) | 587 |
| 08/23/2019 | Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Statement of Position to Court's July 22, 2019 Order (ECF 611) | 622 |
| 08/23/2019 | Defendants Brian McFadden and Simon Liang's Joint Statement of Position (ECF 612) | 631 |
| 08/23/2019 | Defendant Matt Martorello's Statement of Position (ECF 613) | 640 |
| **VOLUME II OF VIII** | | |
| 09/16/2019 | Plaintiffs' Response to Matt Martorello's Statement of Position (ECF 624) | 650 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 09/16/2019 | Plaintiffs' Response to Brian McFadden and Simon Liang's Joint Statement of Position (ECF 626) | 669 |
| 09/23/2019 | Defendants Big Picture Loans' and Ascension Technologies' Reply in Support of their Statement of Position (ECF 630) | 676 |
| 10/04/2019 | Memorandum in Support of Motion to Strike (1) Declaration of Joette Pete, (2) Documents Produced By Joette Pete, and (3) Joette Pete from Plaintiffs' Witness List (Case No. 3:18-00406-REP, Dkt. 325) | 685 |
| 10/21/2019 | Order Re: Extension of Time to Accommodate Finalization of Settlement Between Plaintiffs and Defendants Big Picture Loans, LLC and Ascension Technologies, LLC (ECF 637) | 702 |
| 02/18/2020 | Order Re: Dismissal of Action Against Defendants Big Picture Loans, LLC and Ascension Technologies, LLC for Lack of Subject Matter Jurisdiction Pursuant to Judgment of the United States Court of Appeals for the Fourth Circuit (ECF 668) | 705 |
| 02/20/2020 | Order Re: Necessity of Holding an Evidentiary Hearing on Plaintiffs' Misrepresentation Filing (ECF 673) | 706 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 03/04/2020 | Defendant Matt Martorello's Notice Regarding Evidentiary Hearing (ECF 679) | 710 |
| 03/05/2020 | Plaintiffs' Notice Regarding Evidentiary Hearing (ECF 680) | 717 |
| 05/21/2020 | Plaintiffs' Response to Defendant Matt Martorello's Supplemental Brief Re: Effect of the Fourth Circuit's Decision on Class Certification (ECF 734) | 722 |
| 06/17/2020 | Plaintiffs' Statement of Position Regarding Material Misrepresentations and Omissions Made to the Court (ECF 784) | 759 |
| 07/13/2020 | Defendant Matt Martorello's Response to Plaintiffs' Statement of Position (ECF 843) | 812 |
| 07/25/2020 | Transcript of Evidentiary Hearing (ECF 882) | 873 |
| 07/25/2020 | Transcript of Evidentiary Hearing (ECF 883) | 1047 |
| 07/26/2020 | Plaintiff's Reply to Defendant Matthew Martorello's Statement of Position with Respect to Plaintiffs' Motion for Leave to File Supplemental Authority (ECF 884) | 1144 |
| 07/29/2020 | Defendant Matt Martorello's Statement of Position in Response to July 23, 2020 Order (Paragraph 4) (ECF 895) | 1149 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 07/30/2020 | Matt Martorello's Statement of Position in Response to July 23, 2020 Order (Paragraph 2) (ECF 902) | 1161 |
| 07/31/2020 | Matt Martorello's Supplemental Brief Regarding Alleged Misrepresentations (ECF 909) | 1186 |
| 11/18/2020 | Memorandum and Opinion Re: Misrepresentations (ECF 944) | 1218 |
| 11/24/2020 | Order Re: Amended Schedule for Amended Motion for Class Certification (ECF 945) | 1257 |
| 11/30/2020 | Defendant Matt Martorello's Memorandum in Support of his Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 947) | 1258 |
| 12/14/2020 | Plaintiffs' Response in Opposition to Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 959) | 1273 |
| 12/21/2020 | Defendant Matt Martorello's Reply in Support of his Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 962) | 1291 |
| **VOLUME III OF VIII** | | |
| 12/23/2020 | Plaintiffs' Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 967) | 1302 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 12/23/2020 | Plaintiffs' Memorandum in Support of Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | 1305 |
| 02/03/2021 | Matt Martorello's Opposition to Plaintiffs' Renewed Motion for Class Certification (ECF 999) | 1347 |
| 02/23/2021 | Opposition to Plaintiffs' Renewed Motion For Class Certification Against Matt Martorello (ECF 1007) | 1377 |
| 03/22/2021 | Plaintiffs' Reply in Support of Renewed Motion for Class Certification Against Defendant Matt Martorello (ECF 1055) | 1427 |
| 05/19/2021 | Memorandum and Opinion Re: Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 1090) | 1467 |
| 05/19/2021 | Order Denying Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 1091) | 1476 |
| 06/29/2021 | Transcript of Hearing on Plaintiffs' Renewed Motion for Class Certification (ECF 1104) | 1478 |
| 07/12/2021 | Memorandum Opinion Re: Class Certification Waiver (ECF 1106) | 1656 |

| DATE FILED | DESCRIPTION | JA NO. |
|:---:|:---|:---:|
| 07/12/2021 | Appendix to Memorandum Opinion Re: Class Certification Waiver (ECF 1106-1) | 1675 |
| 07/20/2021 | Memorandum Opinion Re: Plaintiffs' Motion for Class Certification (ECF 1110) | 1689 |
| 07/20/2021 | Order Granting Plaintiffs' Renewed Motion to Certify a Class (ECF 1111) | 1725 |
| 08/04/2021 | Notice of Appeal (ECF 1119) | 1729 |
| 08/04/2021 | Defendant Matt Martorello's Petition for Permission to Appeal (ECF 1119-2) | 1730 |
| 10/07/2021 | Order on Permission to Appeal (USCA4 21-2116, Dkt. 16) | 1873 |

## TABLE OF CONTENTS – EXHIBITS

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | **VOLUME IV OF VIII** | |
| 12/21/2017 | Exhibits to Defendants Big Picture Loans and Ascension Technologies' Reply in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 106) | |
| | 1.   Matt Martorello Declaration (ECF 106-1) | 1874 |
| 10/22/2018 | Exhibits to Defendant Matt Martorello's Memorandum in Opposition to Plaintiffs' Motion for Class Certification (ECF 216) | |
| | 11.  Demand Letter (ECF 216-11) | 1891 |
| 10/23/2018 | Exhibits to Defendant Matt Martorello's Memorandum in Opposition to Plaintiffs' Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 222) | |
| | F.   The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (ECF 222-7) | 1896 |
| 05/21/2020 | Exhibits to Plaintiffs' Response to Matt Martorello's Addressing the Effect of the Fourth Circuit's Decision on Plaintiffs' Class Certification (ECF 734) | |
| | 1.   Big Picture Loans Transaction Consent (ECF 734-1) | 1932 |

9

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 06/08/2020 | Exhibits to Matt Martorello's Supplemental Memorandum in Support of Motion Under Rule 30(d) for Further Deposition (ECF 769) | |
| | 1. Excerpt of Joette Pete Deposition (ECF 769-1) | 1939 |
| 06/17/2020 | Exhibits to Plaintiffs' Statement of Position Regarding Materials Misrepresentations and Omissions Made to the Court (ECF 784) | |
| | 17. Declaration of Joette Pete (ECF 784-17) | 1993 |
| 07/13/2020 | Exhibits to Matt Martorello's Response to Plaintiffs' Statement of Position (ECF 844) | |
| | 1. Summary of Facts in Support of Martorello's Response to Plaintiffs' Statement of Position (ECF 844-1) | 2003 |
| 07/17/2020 | Exhibits to Plaintiffs' Reply in Support of Statement of Position Regarding Material Misrepresentations Made to the Court by Defendants (ECF 864) | |
| | 1. Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Reply in Support of Their Motion to Dismiss For Lack of Subject Matter Jurisdiction (ECF 864-1) | 2053 |
| | 2. 12/31/2013 Email from Martorello re: Memo Regarding Structure of | 2071 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Possible Acquisition of SPVI (ECF 864-2) | |
| | 3. 12/08/2013 Email from Martorello re: Bellicose Capital Valuation (ECF 864-3) | 2074 |
| | 4. 04/18/2016 Email to Martorello re: Project (ECF 864-4) | 2078 |
| | 5. 08/26/2015 Email from Martorello re: Forecasts for Evaluation (ECF 864-5) | 2080 |
| | 6. 03/10/2017 Email to Martorello re: DRAFT memorandum regarding timing of evolution of CFPB rule (ECF 864-6) | 2083 |
| | 7. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 864-7) | 2093 |
| | 8. 01/14/2016 Email from Martorello re: AT BPL SA (ECF 864-8) | 2098 |
| | 9. 12/17/2016 Email to Martorello re: PR Hybrid (ECF 864-9) | 2108 |
| | 10. Michelle Hazen Affidavit (ECF 864-10) | 2115 |
| | 11. 07/22/2014 Email from Wichtman (ECF 864-11) | 2122 |
| | 12. The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal | 2127 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Government Resolution No. T2014-066 (ECF 864-12) | |
| | 13. Excerpt of Testimony from Deposition of James Williams (ECF 864-13) | 2131 |
| | 14. 08/22/2014 Email from Martorello re: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final (ECF 864-14) | 2135 |
| | 15. 04/16/2013 Email from Martorello re: Significant Ruling in Colorado Western Sky Case (ECF 864-15) | 2138 |
| | 16. 10/03/2013 Email attaching Notice to Cease Servicing Origination of New Loans to NY Consumers (ECF 864-16) | 2156 |
| | 17. 10/14/2013 Email from Martorello re: LVD to take ownership of Bellicose VI (ECF 864-17) | 2167 |
| | 18. 10/14/2013 Email from Martorello re: SPVI Equity Transfer to LVD (ECF 864-18) | 2169 |
| | 19. 10/29/2013 Email from Martorello re: Payday US Offer Deactivation Notice (ECF 864-19) | 2172 |
| | 20. 08/26/2014 Email from Martorello re: Modal for Tribal Council to Review (ECF 864-20) | 2177 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 21. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 864-21) | 2193 |
| | 22. 10/10/2014 Email from Martorello re: AG Letters (ECF 864-22) | 2199 |
| | 23. 11/04/2014 Email from Martorello re: WSJ Press (ECF 864-23) | 2206 |
| | 24. Joette Pete Declaration (ECF 864-24) | 2211 |
| | 25. Spreadsheet of texts (ECF 864-25) | 2221 |
| | 26. 09/15/2014 Email from Martorello re: Docs (ECF 864-26) | 2224 |
| | 27. 08/26/2011 Email from Martorello re: Question on Docs (ECF 864-27) | 2227 |
| | 28. 02/23/2015 Email from Martorello re: New Agreement with O2 (ECF 864-28) | 2235 |
| | 29. 09/03/2015 Email from Martorello re: Attached Image (ECF 864-29) | 2240 |
| | 30. 07/09/2015 Email from Martorello re: M-1, Agreement and Plan of Merger (ECF 864-30) | 2246 |
| | 31. 08/20/2014 Agreement and Plan of Merger (ECF 864-31) | 2257 |
| | 32. Excerpt of Testimony from Martorello Deposition (ECF 864-32) | 2274 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 33. 09/14/2015 Agreement and Plan of Merger ECF 864-33 | 2278 |
| | 34. Excerpt of Testimony from Deposition of John Williams (ECF 864-34) | 2300 |
| | 35. Subpoena to Produce Documents Issued to Rosette, LLP (ECF 864-35) | 2304 |
| | 36. 03/01/2019 Email from T. Nelson re: Williams v. Big Picture Loans, Subpoena to Rosette, LLP: First Wave of Production (ECF 864-36) | 2315 |
| | 37. 05/31/2019 Email from T. Nelson re: Williams v. Big Picture Loans, Subpoena to Rosette, LLP: First Wave of Production (ECF 864-37) | 2322 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Loan Criteria (ECF 886) | |
| | 1. Big Picture Website re: Rates (ECF 886-1) | 2324 |
| | 2. Excerpt of Testimony from Deposition of Michelle Hazen (ECF 886-2) | 2331 |
| | 3. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 886-3) | 2345 |
| | 4. Excerpt of Testimony from Deposition of Karrie Wichtman ECF 886-4 | 2351 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 5.   Excerpt of Testimony from Deposition of Craig Mansfield (ECF 886-5) | 2354 |
| | 6.   Employee Profiles - Bellicose VI, LLC and Bellicose Capital, LLC (ECF 886-6) | 2358 |
| | 7.   Excerpt of Testimony from Deposition of James Williams (ECF 886-7) | 2367 |
| | 8.   Excerpt of Testimony from Deposition of Susan McGeshick (ECF 886-8) | 2373 |
| | 9.   Excerpt of Testimony from Deposition of Gertrude McGeshick (ECF 886-9) | 2377 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Structure of Martorello's Companies and Flow of Funds (ECF 896) | |
| | 1.   Bellicose Capital Corporate Structure (ECF 896-1) | 2380 |
| | 2.   Bluetech Irrevocable Trust Registration (ECF 896-2) | 2392 |
| | 3.   Amended and Restated Operating Agreement of Bellicose Capital, LLC (ECF 896-3) | 2393 |
| | 4.   Operating Agreement of Bellicose VI, LLC (ECF 896-4) | 2419 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 5. Secured Promissory Note (ECF 896-5) | 2438 |
| | 6. Addendum to Secured Promissory Note (ECF 896-6) | 2446 |
| | 7. Summary of Payments and Distributions from Tribal Lending Businesses from 01/01/2012 – 01/31/2016 (ECF 896-7) | 2447 |
| | 8. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 896-8) | 2448 |
| | 9. Statement of Financial Affairs of Eventide Credit Acquisitions, LLC (ECF 896-9) | 2449-2470 |
| | 10. Eventide Distribution Calculation (ECF 896-10) | 2471 |
| **VOLUME V OF VIII** | | |
| 12/23/2020 | Exhibits to Plaintiffs' Memorandum in Support of Renewed Motion For Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | |
| | 1. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 968-1) | 2472 |
| | 2. Excerpt of Testimony from Deposition of Warren Scott Merritt (ECF-986-2) | 2473 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 3. 08/26/2011 Email from Martorello re: Question on Docs (ECF 986-3) | 2481 |
| | 4. Declaration of Joette Pete (ECF 986-4) | 2491 |
| | 5. Servicing Agreement dated 10/25/2011 (ECF 986-5) | 2501 |
| | 6. 12/21/2012 Email from Martorello re: Valuation Method (ECF 986-6) | 2542 |
| | 7. 04/16/213 Email from Martorello re: Order Granting Plaintiffs' Motion for Summary Judgment (ECF 986-7) | 2547 |
| | 8. Letter from state of Connecticut dated 05/07/2013 (ECF 968-8) | 2565 |
| | 9. 08/12/2013 Email from Martorello re: Draft Complaint (ECF 968-9) | 2567 |
| | 10. 08/09/2013 Email from Martorello re: NY AG Letter Cease & Desist Letter (ECF 968-10) | 2595 |
| | 11. 08/09/2013 Email from Martorello re: Tribal Lawsuit (ECF 968-11) | 2600 |
| | 12. 10/03/2013 Email from Duck Creek Tribal re: Notice to Cease Servicing Origination of New Loans to NY consumers (ECF 968-12) | 2605 |
| | 13. 10/14/2013 Email from Martorello re: LVD to take ownership of Bellicose VI (ECF 968-13) | 2616 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 14. 10/29/2013 Email from Martorello re: Payday Deactivation Notice (ECF 968-14) | 2618 |
| | 15. 11/08/2013 Email from Martorello re: LVD and legal bills (ECF 968-15) | 2620 |
| | 16. 12/31/2013 Email from Martorello re: Memo Regarding Structure of Possible Acquisition of SPVI (ECF 968-16) | 2624 |
| | 17. 01/06/2014 Email from Martorello re: Meeting with Cheryl Parker Rose @ CFPB (ECF 968-17) | 2627 |
| | 18. 01/08/2014 Email re: Justice Department Action (ECF 968-18) | 2636 |
| | 19. 01/09/2014 Email from Kim Anderson re: DOJ filing (ECF 968-19) | 2639 |
| | 20. 02/12/2014 Email from Martorello re: ACH Pre Application (ECF 968-20) | 2641 |
| | 21. 07/22/2014 Email from Wichtman re: Rebrand from Payday (ECF 968-21) | 2645 |
| | 22. 08/22/2014 Email re: Martorello re: TC Resolution 2014 (ECF 968-22) | 2650 |
| | 23. The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal | 2674 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Government Resolution No. T2014-066 (ECF 968-23) | |
| | 24. 10/10/2014 Email from Martorello re: AG Letters (ECF 968-24) | 2678 |
| | 25. 11/04/2014 Email from Wichtman re: WSJ Press (ECF 968-25) | 2685 |
| | 26. 12/01/2014 Email from Wichtman re: EIN Big Picture Loans (ECF 968-26) | 2690 |
| | 27. Resolution #2015-10 Approving the Creation of the Wholly Owned and Operated Tribal Servicing Entity Ascension Technologies, LLC (ECF 968-27) | 2695 |
| | 28. 02/19/2015 Meeting Minutes – Ascension (ECF 968-28) | 2700 |
| | 29. 02/24/2015 Email from J. Martorello re: Sourcepoint VI Assignment Notification: DRAFT REVIEW - Acquisition of Source Point VI US173700 - Assignment letter (ECF 968-29) | 2703 |
| | 30. Operating Agreement of Eventide Credit Acquisitions, LLC (ECF 968-30) | 2709 |
| | 31. Agreement and Plan of Merger dated 09/14/2015 (ECF 968-31) | 2728 |
| | 32. 10/02/2015 Email from Martorello re: Forecasts (ECF 968-32) | 2750 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
|  | 33.  12/05/2015 Email from Martorello re: Bellicose Capital Valuations (ECF 968-33) | 2753 |
|  | 34.  12/07/2016 Email from Martorello re: PR Hybrid (ECF 968-34) | 2757 |
|  | 35.  08/26/2015 Email from Martorello re: Forecasts for Valuation (ECF 968-35) | 2764 |
|  | 36.  03/10/2017 Email from Martorello re: Draft Memorandum re: timing of evolution of CFPB Rule (ECF 968-36) | 2767 |
|  | 37.  08/26/2014 Email from Martorello re: DM Recommendation (ECF 968-37) | 2777 |
|  | 38.  09/15/2014 Email from Martorello re: Docs (ECF 968-38) | 2784 |
|  | 39.  09/03/2015 Email from Martorello attaching Image (ECF 968-39) | 2787 |
|  | 40.  01/15/2016 Email from John Williams re: Delegation of Authority (ECF 968-40) | 2793 |
|  | 41.  01/14/2016 Email from Wichtman re: Ascension Manager Issue (ECF 968-41) | 2795 |
|  | 42.  Recorded Certificate of Merger date 01/26/2016 (ECF 968-41) | 2801 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 43. Ascension Technologies Designation of Authority Policy (ECF 968-43) | 2805 |
| | 44. Loan and Security Agreement dated 09/14/2015 (ECF 968-44) | 2810 |
| | 45. Intratribal Servicing Agreement dated 02/16/2016 (ECF 968-45) | 2840 |
| | 46. Secured Promissory Note (ECF 968-46) | 2855 |
| | 47. Eventide Distribution Calculation (ECF 968-47) | 2863 |
| | 48. Timeline (ECF 968-48) | 2864 |
| | 49. Declaration of George Hengle (ECF 968-49) | 2871 |
| | 50. Big Picture Loans Confidential Investment Opportunity (ECF 968-50) | 2874 |
| | 51. Supplemental Declaration of American Legal Claim Services, LLC Regarding Notice of Dissemination (ECF 968-51) | 2878 |
| | 52. 02/11/2020 Letter from Rosette Firm re: Request for Consumer Loan Data (ECF 968-52) | 2882 |
| | 53. Order Granting Renewed Motion to Certify Class (ECF 968-53) | 2886 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
|  | 54. Declaration of Kristi C. Kelly (ECF 968-54) | 2910 |
|  | 55. Declaration of Leonard A. Bennett (ECF 968-55) | 2918 |
|  | 56. Declaration of E. Michelle Drake in Support of Plaintiffs' Renewed Motion for Class Certification (ECF 968-56) | 2928 |
|  | 57. Declaration of Beth E. Terrell in Support of Plaintiffs' Renewed Motion for Class Certification Claims Against Defendant Matt Martorello (ECF 968-57) | 2980 |
|  | 58. Declaration of Matthew W. H. Wessler (ECF 968-58) | 2988 |
|  | 59. Declaration of Michael A. Caddell (ECF 968-59) | 2995 |
|  | 60. Declaration of American Legal Claim Services, LLC (ECF 968-60) | 3013 |
| 02/03/2021 | Exhibits to Matt Martorello's Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF 999) |  |
|  | 11. Resolution #2011-041 Approving the Creation of the Lac Vieux Desert Band of Lake Superior Indians Tribal Enterprise – Red Rock Tribal Lending, Inc. (ECF 999-11) | 3015 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 12. Articles of Organization of Red Rock Tribal Lending (ECF 999-12) | 3017 |
| | 14. Deposition of Jennifer Weddle (ECF 999-14) | 3019 |
| | 15. Email from Martorello to Wichtman (ECF 999-15) | 3056 |
| | **VOLUME VI OF VIII** | |
| 02/23/2021 | Exhibits to Opposition to Plaintiffs' Renewed Motion For Class Certification Against Matt Martorello (ECF 1007) | |
| | A. Affidavit of Michelle Hazen (ECF 1007-1) | 3064 |
| | D. The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (ECF 1007-5) | 3070 |
| | E. Affidavit of Jennifer Weddle in Support of Motion to Quash (ECF 1007-6) | 3105 |
| | F. Default Letter dated December 12, 2019 (ECF 1007-7) | 3114 |
| | G. Transcript of Deposition of Michelle Hazen (ECF 1007-8) | 3127 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | H.   Transcript of Deposition of Matt Martorello (ECF 1007-9)[1] | 3377 |
| | G.   Excerpt of Transcript of Deposition of Daniel Gravel (ECF 1007-12)[2] | 3485 |
| | **VOLUME VII OF VIII** | |
| | H.   Transcript of Deposition of Craig Mansfield (ECF 1007-13) | 3538 |
| | N.   Red Rock Capital Lending Closing Checklist (ECF 1007-23) | 3762 |
| | M.   Deposition of James Dowd (ECF 1007-24)[3] | 3765 |
| | YY. Declaration of James Williams, Jr. in Support of Motion for Preliminary Injunction (ECF 1007-32) | 4004 |
| | ZZ.  Affidavit of Brian McFadden (ECF 1007-33) | 4037 |

---

[1] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

[2] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

[3] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 03/22/2021 | Exhibits to Plaintiffs' Reply in Support of Renewed Motion For Class Certification Against Defendant Matt Martorello (ECF 1055) | |
| | 1. Consent to Electronic Communications (ECF 1055-1) | 4041 |
| | 2. 08/27/2012 Email from Martorello re: SourcePoint – Tribal Consumer Financial Services Regulatory Code (ECF 1055-2) | 4048 |
| | 3. 04/02/2013 Email from Daniel Gravel re: TCFSR Code (ECF 1055-3) | 4051 |
| | 4. 08/27/2012 Email from Blake Sims re: SourcePoint – Tribal Consumer Financial Services Regulatory Code (ECF 1055-4) | 4053 |
| | 5. The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (part 1) (ECF 1055-5) | 4055 |
| | 5. The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (part 2) (ECF 1055-6) | 4075 |
| | 6. Otoe Missouria Tribe of Indians Resolution OMTC#050341 FY-2018 (ECF 1055-7) | 4091 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 7. Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LL's Reply in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 1055-8) | 4120 |
| | 8. Consent to Electronic Communications (ECF 1055-9) | 4138 |
| | 9. 12/12/2011 Email from J. Weddle re: RRTL and Pepper Cash Loan Docs (ECF 1055-10) | 4145 |
| | 10. Class Action Settlement Agreement and Release (ECF 1055-11) | 4166 |
| | 11. 01/14/2016 Email from Martorello re: AT BPL SA (ECF 1055-12) | 4224 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| **VOLUME VIII OF VIII (SEALED EXHIBITS)** | | |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Loan Criteria (ECF 886) | |
| | 2.  Excerpt of Testimony from Deposition of Michelle Hazen (ECF 886-2) | 4232 |
| | 5.  Excerpt of Testimony from Deposition of Craig Mansfield (ECF 886-5) | 4246 |
| | 8.  Excerpt of Testimony from Deposition of Susan McGeshick (ECF 886-8) | 4250 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Structure of Martorello's Companies and Flow of Funds (ECF 896) | |
| | 7.  Summary of Payments and Distributions from Tribal Lending Businesses from 01/01/2012 – 01/31/2016 (ECF 896-7) | 4254 |
| | 8.  Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 896-8) | 4260 |
| | 10. Eventide Distribution Calculation (ECF 896-10) | 4268 |
| 12/23/2020 | Plaintiffs' Memorandum in Support of Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | |

| | | |
|---|---|---|
| | 1. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 968-1) | 4271 |
| | 47. Eventide Distribution Calculation (ECF 968-47) | 4279 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, *et al.*,         ) | |
|         ) | |
|       Plaintiffs,       ) | |
|    v.          ) | Civil Action No. 3:17-cv-461 (REP) |
|         ) | |
| BIG PICTURE LOANS, LLC, *et al.*,   ) | |
|         ) | |
|      Defendants.     ) | |

**PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION OF**
**CLAIMS AGAINST DEFENDANT MATT MARTORELLO**

Plaintiffs, on behalf of themselves and all other similarly situated individuals, pursuant to

Rule 23 of the Federal Rules of Civil Procedure, respectfully move to certify their claims against

Defendant Matt Martorello, for the reasons identified in the concurrently filed Memorandum of

Law in support of this motion.

Respectfully submitted,
**PLAINTIFFS**

By: /s/ *Leonard A. Bennett*, VSB #37523
    Leonard A. Bennett, VSB #37523
    Email: lenbennett@clalegal.com
    Craig C. Marchiando, VSB #89736
    Email: craig@clalegal.com
    Amy Austin, VSB #46579
    Email: amyaustin@clalegal.com
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

    Kristi C. Kelly, Esq., VSB #72791
    Andrew J. Guzzo, Esq., VSB #82170
    Casey Nash, Esq., VSB #84261
    KELLY & CRANDALL, PLC
    3925 Chain Bridge Road, Suite 202

JA1302

Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com


E. Michelle Drake, *Admitted Pro Hac Vice*
Email: emdrake@bm.net
John G. Albanese, *Admitted Pro Hac Vice*
Email: jalbanese@bm.net
BERGER & MONTAGUE, P.C.
43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470


Beth E. Terrell, *Admitted Pro Hac Vice*
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Email:  jmurray@terrellmarshall.com
Elizabeth A. Adams, *Admitted Pro Hac Vice*
Email: eadams@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450


Matthew Wessler, *Admitted Pro Hac Vice*
Email: matt@guptawessler.com
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

JA1303

Michael Allen Caddell, *Admitted Pro Hac Vice*
Email: mac@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston, Texas 77007-1722
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

*Attorneys for Plaintiffs and Proposed Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd of December 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_____/s/_____

Leonard A. Bennett, VSB #37523
**CONSUMER LITIGATION ASSOCIATES, P.C.**
Email: lenbennett@clalegal.com
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662

JA1304

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

LULA WILLIAMS, *et al.*,

        Plaintiffs,

    v.

BIG PICTURE LOANS, LLC, *et al.*,

        Defendants.

Case No. 3:17-cv-00461 (REP)

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR CLASS
CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO**

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and all other similarly situated individuals, submit this memorandum of law in support of their Motion for Class Certification as to Defendant Matt Martorello ("Martorello")

## I. INTRODUCTION

This case involves an illegal tribal lending enterprise created and operated by Martorello—a Chicago entrepreneur with no lineage to the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD"). Over the past nine years, the Martorello made and collected on high-interest loans to consumers originated in the name of Red Rock Tribal Lending, LLC and Big Picture Loans, LLC—two entities organized under the LVD's laws. Although the tribal lenders claimed to be owned and operated by the LVD, Martorello performed and controlled significant aspects of the lending businesses and, most importantly, received the vast majority of the profits (98% of the net income) from the lending enterprise.

The enterprise made loans with annual percentage rates greater than 700%, *i.e.*, more than 55 times higher than Virginia's 12% interest rate cap on these loans. *See* Va. Code § 6.2-1541(A);

1

Va. Code § 6.2-303. If a lender makes a loan exceeding 12% APR without a license in Virginia, Virginia law mandates that the "loan contract shall be void," and it prohibits the collection of "any principal, interest, or charges whatsoever with respect to the loan." Va. Code 6.2-1541(A)-(B). Virginia law further allows recovery of "[t]wice the total amount of interest paid" to a person "taking or *receiving* such payments." Va. Code § 6.2-305 (emphasis added). This class action seeks to recover all amounts paid on these illegal loans from Martorello, who has personally pocketed tens of millions of dollars as a result of his role in this scheme. (Ex. 1 at Int. No. 1).

In addition to the violations of Virginia's usury laws, Martorello's conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), a statute enacted with the "principal aim" of eliminating "loansharking." *United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986) (citing S.Rep. No. 617, 90th Cong., 2d Sess. 78–80; H.R.Rep. No. 1574, 90th Cong., 2d Sess. 5). To achieve this goal, RICO prohibits both the participation in an enterprise involved in the collection of and the conspiracy to collect "unlawful debt," 18 U.S.C. § 1962(c)-(d), which RICO defines as a debt incurred where the usurious rate "is at least twice the enforceable rate" under state or federal law. 18 U.S.C. § 1961(6). As a participant (and the primary beneficiary) of this contemporary loansharking enterprise, Martorello is jointly and severally liable to Plaintiffs and the class members for the collection of the unlawful debt.[1]

This case is particularly appropriate for class certification due to Martorello and the enterprise's uniform practice of evading Virginia's usury laws. Similar cases have been certified, including where the motion was contested. *See, e.g.*, *MacDonald v. Cashcall, Inc.*, 333 F.R.D. 331

---

[1] *See, e.g., States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) ("Every circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations.").

(D.N.J. 2019) (granting a contested motion for class certification and certifying both usury and RICO claims in a comparable tribal lending case); *Inetianbor v. CashCall, Inc.*, No. 13-cv-60066-JIC, (S.D. Fla. Sept. 19, 2016) (granting a contested class certification motion in a case alleging violations of Florida's usury laws); *Henry v. Cash Today, Inc.*, 199 F.R.D. 566 (S.D. Tex. 2000) (granting a contested motion for class certification in a case alleging, *inter alia*, the defendant's usurious loans violated RICO and Texas's usury laws); *Upshaw v. Georgia (GA) Catalog Sales, Inc.,* 206 F.R.D. 694 (M.D. Ga. 2002) (granting a contested motion for class certification in a case alleging a company and its principal violated RICO and Georgia's usury laws).

## II.    FACTUAL BACKGROUND

### A.    The tribal lending enterprise is created under the erroneous belief that Martorello could control operations so long as the final act of loan origination occurred on the reservation.

Martorello became interested "in working with Native American tribes" at a 2011 online lending conference. Ex. 2, Merritt Dep. 31:3-4; 93:16-20. Introductions from several acquaintances led Martorello to Robert Rosette, who was "a very well-known attorney in that space." *Id.* at 28:16-21; 32:7-11. In August 2011, Martorello received a draft of the initial agreement providing the structure for the tribal lending enterprise. *See* Ex. 3 at Rosette_Revised_052504, Aug. 25, 2011 E-mail from Martorello. After reviewing the draft of the "servicing" agreement, Martorello asked several questions to Rosette and his business partner, Flint Richardson, about this new business model. *Id.* at 052501. One of those questions was whether "the Tribal Lending entity" would have "a Tribal Management Company, which is going to be the Bellicose customer[?]" *Id.* In response, Richardson said "NO," and clarified that Martorello's "ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE

3

BUT ARENT INVOLVED IN THE BUSINESS." *Id*. at 052500 (caps in original). And, when asked by Martorello to further elaborate on this point, Richardson explained that "REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S 'MANAGERS'. THE SERVICER, BELLICOSE OPERATES THE BUSINESS COMPLETELY." *Id*. at 052498. In their view, this structure was legitimate because the "cornerstone of the sovereign model," Richardson explained, was the delegation of "Loan Originations" to the tribal lending entity. *Id*. at 052497. Delegating originations to the tribal lender, according to Richardson and Rosette, purportedly exempted the loans from state interest rates. *Id*. at 052497.

Richardson's e-mail describing the structure is consistent with the sworn declaration of Joette Pete, who served as the Vice Chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians between 2010 and 2016, *i.e.*, from the inception of Red Rock through the restructure of Big Picture. Ex. 4 at ¶ 1. As the former Vice Chairwoman explained: "When Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." *Id*. at ¶ 3.

**B.    Although entitled "servicing agreement," the initial contract between Bellicose and Red Rock provided Martorello with complete control over the business, as well as virtually all profits.**

Martorello was involved from the outset in the Tribe's creation of the nominal lending entity. As the Court recently found, Martorello chose the name "Red Rock," and he and his counsel prepared and reviewed the formational documents before they were sent to Tribal Council for approval. Dkt. 944 at 9-10. On October 25, 2011, Martorello's company, Bellicose VI, LLC, executed the "servicing agreement" with Red Rock Tribal Lending, LLC, which provided

**JA1308**

Martorello with the authority to exercise almost exclusive control over Red Rock's operations. *See generally* Ex. 5, Oct. 25, 2011 Servicing Agreement.[2] Martorello not only had the contractual authority to control the lending business, but as detailed by the former Tribal Vice Chairwoman: "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." Ex. 4 at ¶ 4. Although the Tribe's co-managers held titles supposedly giving them a voice in Red Rock's lending operation, the co-managers actually played a "rather meaningless role" with limited involvement in or knowledge about the lending enterprise. Dkt. 944 at 14. As the Court recently found, "[n]either the establishment of the actual underwriting criteria for making the loans nor the decision actually to make them (or not) was done by the Tribal entity or by its employees."

---

[2] For example, the contract provided that Bellicose VI "shall have the authority and responsibility over all communication and interaction whatsoever between [Red Rock] and each service provider, lender and other agents of [Red Rock]." Ex. 5 at § 3.1; *see also id.* at § 4.1.1 (granting Bellicose VI "the necessary power and authority to act in order to fulfill its responsibilities" under the contract). Consistent with Bellicose VI's "authority and responsibility over all communication and interaction whatsoever" between Red Rock and others, the contract further specified that Bellicose VI was responsible for: (1) selecting and negotiating with service providers and lenders; (2) "[d]evelopment and promotion of sound and positive business relationships," including "the enforcement or termination of agreements with such service providers and lenders;" (3) preparation of regulatory, compliance, training, education, and accounting standards, as well as standards for "screening and review of" "website contents, marketing and consumer relations practices;" (4) providing "pre-qualified leads" and the "credit-modeling data and risk assessment strategies;" (5) oversight of Red Rock's call center in the Philippines; and (6) sales to third-party debt collectors. *Id.* § 4.2.1.

Bellicose VI also had the authority to "collect all gross revenues and other proceeds connected with or arising from the operation" of Red Rock. *Id.* § 4.9. Bellicose VI also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id.* § 3.5. Bellicose VI had "sole signatory and transfer authority over such bank accounts." *Id.* §§ 3.5; 4.4. The Court recently summarized findings on this issue: "money paid by consumers went into the Bellicose bank account over which only Martorello and his employees had control and access. (Dkt. 944 at 16.)

*Id.* at 15. In fact, the relevant "intellectual property was kept by Martorello's company, Sourcepoint, and was not known by, or available to, the Tribal entities that nominally were making the loans at issue." *Id.* at 18. In exchange for running virtually all aspects of the business, Bellicose VI received 98% of the net income collected on the loans. Ex. 5 at §§ 2.25; 3.5.1. By contrast, Red Rock received 2% of the net revenue from the loans, less charge offs.[3] *Id.* § 2.25.

### C. Regulators began attacking the business model in 2012 and 2013, prompting the LVD and Red Rock to file a lawsuit against the New York Department of Financial Services.

As early as December 2012—a little over a year into the business—Martorello had concerns about the viability of the tribal lending model. Ex. 6 at Martorello_038990. In an e-mail from December 2012 to a business valuation expert, Martorello wrote that he had "some urgent questions" for them "on valuation" of his business. *Id.* Among other things, Martorello asked how to value illegal businesses, such as online poker sites, medical marijuana stores, and a drug cartel. *Id.* Martorello further added that "[t]his industry is going to be living in the grey area of its legality for another year or two," and that they had already "received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders." *Id.*, 038991. In Martorello's view, there was "no business with such risk to it" as the tribal lending model, and the "[b]ottom line" was that "this business will simply not exist in 2 to 3 years," at least how it did then. *Id.* In addition to this risk, Martorello further explained that Greenberg Traurig provided him with a 20-page legal opinion, concluding that Martorello could be liable "for aiding and abetting felony crime[s]" in states like Georgia. *Id.* The term of the arrangement between Martorello and Red Rock

---

[3] However, Red Rock's compensation was reduced by 50% to pay a brokerage fee to another company owned by Rosette, Tribal Loan Management, LLC. *Id.* § 7.15. Rosette's 50% brokerage fee was paid directly by Bellicose VI. *Id.* ("[Red Rock] has authorized that fifty percent (50%) of the Tribal Net Profits due to the Tribe pursuant to Section 3.5.1 with the minimum set forth therein be paid directly to Tribal Loan Management, LLC by [Bellicose VI] on behalf of [Red Rock][.]").

was supposed to last until December 31, 2018, per an express term of the Servicing Agreement, Ex. 5 at § 3.2, but Martorello knew it would not make it more than "2 to 3 years." Ex. 6 at 038991. As early as April 2013, Martorello began e-mailing Rosette about restricting the arrangement to reduce Martorello's liability, writing: "Let's zero in asap on minimizing my risk for being individually liable like [Colorado] just successfully did to Butch [W]ebb." Ex. 7 at Rosette_Revised_048497.

Over the next six months, regulators continued to threaten to take action to stop Red Rock's illegal business practices. *See, e.g.*, Ex. 8, May 2013 Ltr. from Conn. Dep't of Banking. While the cease and desists were a risk, the biggest threat to Martorello's illegal lending enterprise came on August 6, 2013, when the New York Department of Financial Services ("NY DFS") issued a cease and desist to 35 online lending companies, including Red Rock. *See*, *e.g*., The Official Website of New York State, Press Room, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans. Unlike other letters from state regulatory authorities, the NY DFS posed the biggest threat as it also sent letters to 117 banks and the National Automated Clearinghouse Association, requesting that "they work with DFS to cut off access to New York customer accounts for illegal payday lenders." *Id*.

Six days after the issuance of the cease and desist, Rosette had already drafted a complaint against the NY DFS "for LVD's consideration." Ex. 9 at Rosette 041064. In his e-mail to Martorello, Rosette—who was receiving 50% of Tribal profits for brokering the partnership— wrote that he "believe[d] strongly if we do nothing we may forever lose the tribal online lending opportunity." *Id*. In a separate e-mail to Martorello, Karrie Wichtman, the Tribe's lawyer, echoed

JA1311

these concerns, writing "what do we achieve by laying low waiting for the next bomb to drop -
hoping that it doesn't blow us up?" Ex. 10 at Rosette_Revised_049126.

Martorello expressed concern with joining the litigation. *Id*. at 049125. According to
Martorello, the filing would "open the doors" and result in "counter attacks from all sides," and it
would be "game over really quick." *Id*. Additionally, Martorello added that the "LVD's house"
was not "completely in order yet," which was a concern he raised on multiple occasions. *Id*.
Because of Martorello's dominance over operations, he further cautioned that "LVD" did not
"represent the best facts" at the moment because they were not originating the loans on the
reservation. Ex. 11 at Rosette_Revised_046605. Ultimately, Martorello became comfortable
enough with the lawsuit, and it was filed on August 21, 2013, including a request for a preliminary
injunction to prevent the NY DFS from interfering with the lending operation.

As Martorello had feared, the lawsuit backfired—the district court not only denied Red
Rock's motion for a preliminary injunction, but its findings jeopardized the entire business model
and opened Martorello to potential prosecution. *See* Ex. 12 at Rosette 006304-5. Most notably, the
court found that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because
the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off
of the Tribes' lands." *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361
(S.D.N.Y. Sept. 2013). The court further noted that Red Rock "built a wobbly foundation for their
contention" that the activity was occurring "on the Tribes' lands," and contrary to their argument,
consumers did not "in any legally meaningful sense, travel[] to Tribal land." *Id*. at 360.

Two days after the ruling, Martorello wrote that the decision "presents a significant
potential liability for [Bellicose] and we do not believe that we should service any new New York
loans." Ex. 12, Rosette 06304-5. Martorello further added that they were willing to see existing

loans through completion, "but [they] simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be." *Id*. Martorello expressed concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final… such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue" to conduct business in New York. *Id*.

    **D.**    **Two weeks after the district court's decision, Martorello contacts Rosette regarding a potential restructure to provide immunity to all entities involved in the illegal enterprise.**

    Two weeks after the district court's decision, Martorello had come up with a solution and approached Rosette regarding a restructure to protect Martorello/Bellicose. *See generally* Ex. 13. In an e-mail dated October 14, 2013, with a subject matter entitled "LVD to take ownership of Bellicose VI," Martorello presented options for a restructure so that Bellicose could attempt to share in the LVD's immunity. *Id*. Martorello proposed that Bellicose would "[a]ssign today LVD 51% of Bellicose via Equity only membership interest tied to the SPVI subsidiary only." *Id*. (underline in original). Additionally, Martorello also proposed assigning 51% of the interests in his other businesses involved in the scheme. *Id*. Anticipating the business would be shut down, Martorello further proposed that BlueTech, his trust, would "own 49% equity, but 100% profits interests until month 49," *i.e.*, ensuring Martorello would retain the profits until the business was gone. *Id*. Martorello's e-mail candidly explained that the transaction must be "structured to provide all entities sovereign immunity." *Id*.

    Martorello also sent a similar e-mail to the members of LVD's Tribal Council, entitled "SPVI Equity Transfer to LVD." Ex. 4 at JPB 00988. Martorello wrote: "Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses." *Id*. This concept, as described by Martorello, was to "[a]ssign today to LVD – 51% of Bellicose VI, LLC," but "0%

profits interest" until four years after the restructure. *Id*. Martorello further added: the "Current Manager (myself) will be locked in as the decision maker for 48 months, at which point they will hire a new Manager to replace me." *Id*. According to the former Vice Chairwoman of LVD, this e-mail was "the first time [they] were ever presented with the opportunity 'to own' the business, but it would still be controlled by Martorello as proposed." Ex. 4 at ¶ 9.

In an email two weeks later, Martorello continued to voice his concerns to Wichtman, noting that vendors and debt providers of Red Rock were "asking what would happen to everything if the ruling in NY were upheld[?]" Ex. 14. The repercussions, according to Martorello, would be "certain death" and "all vendors including [SourcePoint], banks, ACH processors, bureaus etc would all obviously[ ]shut down if it were considered off reservation activity[.]" *Id*. Martorello added that "class actions" and "personal threats of enforcement actions against individuals by regulators" have "everyone spooked," causing "several of the biggest servicers" to "shut down." *Id*. In closing, Martorello proclaimed "[d]esperately hoping that Rule 19 works and a favorable outcome on the appeal!" *Id*.

On November 8, 2013, Martorello sent a similar e-mail to Wichtman, noting that SourcePoint was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims" coming in the first quarter of 2014. Ex. 15 at Rosette_Revised_052787. And similar to his earlier emails, Martorello reiterated that there was a "very significant possibility that should we even survive long enough to get there," he would need "to defend [him]self even personally (in more than civil matters), with no ongoing business or revenue at all should the decision be made in the appeal that the activity is in fact OFF reservation (a certain end to the industry)." *Id*. (capitals in original).

JA1314

**F.    In December 2013, Rosette circulates a memorandum regarding a potential restructure to provide Martorello's entities with sovereign immunity.**

On December 30, 2013, Rosette circulated a legal memorandum regarding Martorello's proposed transaction, analyzing "whether formation of a new entity that is co-owned by the Tribe and Source Point and subject to the proposed profit, management and voting controls" suggested by Martorello would be "sufficient to pass muster with the 'arm of the tribe' test to extend the Tribe's sovereign immunity from suit to the new LLC." Ex. 16 at Rosette_Revised_052248. On proposed changes to the structure, Martorello commented that the tribe's percentage of ownership of the company "could easily be increased to whatever the benchmark of confidence is, since equity and profits interest differ." *Id*. at 052247. He further added that he did not think "100%" ownership was "out of reach," and "some caveats could simply be made." *Id*. Martorello, however, took issue with Rosette's proposed revenue changes, writing "10% [to the tribal entity] certainly isn't going to work from a business standpoint," and he "might as well be a state licensed lender, as a comp[arison]." *Id*. Martorello also rejected Rosette's proposed management structure, writing "[a]ll the investors (institutional, personal, and myself) won't allow the deal to occur without being 100% certain adequate [m]anagement resources are in control," *id*. at 052248, *i.e.*, unless non-tribal members like Martorello continued to have final say over operations. And if challenged, Martorello explained that "[w]hat I think you'd tell a court" is "that if the deal were not done," then the tribe would not know: (1) "if SPVI would be around in 10 days given the industry," (2) execute "its termination provision in accordance with the" servicing agreement, or (3) "hike rates as risk has gone through the roof with detractors now seeking out SPVI's of the world for major attacks." *Id*. at 052247. Martorello stressed the deal's urgency, writing: "Clock is ticking before I end up in a Cash Call type attack though, at which point, I think the deal is about dead." *Id*.

A few days after receiving Rosette's memorandum analyzing the potential transaction,

Martorello sent an e-mail regarding the Consumer Financial Protection Bureau's civil complaint against CashCall, which was filed on December 16, 2013. *Consumer Fin. Protection Bureau v. CashCall, Inc.*, No. 1:13-cv-13167 (Mass) (complaint filed on Dec. 16, 2013). Ex 17. In this e-mail, Martorello characterized the CFPB's position as "without question a major attack on legit tribal lending operations." *Id*. at LVD-DEF00018128. Martorello's e-mail also expressed concern with cooperating with the CFPB's investigative demands, explaining that it would "come with an almost identical suit against the [tribal lending entities] as they just did against Cash Call." *Id*. at 00018129. If an "attack" on the Red Rock operation happened, Martorello warned, "the stakes are very literally everything." *Id*. at 00018128.

Less than a week later, things got worse for the industry and Martorello when the Department of Justice announced a consent decree with a major ACH provider. *See generally* Ex. 18 at Rosette_Revised_052155. Rosette described this consent decree as "the most disastrous result we have seen yet," and he predicted that he "would not be [] surprise[d] if we lost the last remaining banks and ach processors servicing tribal accounts after reading the consent decree." *Id*. Sure enough, the enterprise lost its only ACH processer the following day, which "obviously ha[d] major implications for [M]att since he ha[d] no other processors." Ex. 19. And, when Martorello attempted to hire another processor, one bank explained that they were told "if the bank so much as processes a single transaction [t]he DOJ will be relentless in shutting them down under the full weight of the US government." Ex. 20 at Rosette 036580-2. By this time, Red Rock had also received more than a dozen warnings from state attorney generals' offices. Ex. 6 at 038991.

### G. Martorello pushed for re-branding of Red Rock to Big Picture Loans, a lending platform he had already developed.

Without any significant progress on the restructure, Martorello e-mailed Hazen and Wichtman in July 2014, urging that Red Rock "needs a rebrand." Ex. 21 at

**JA1316**

Rosette_Revised_058409. Martorello further explained that "RRTL ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. *Id*. He added that "it's time to get away from the word '[p]ayday' and the black mark of RRTL before rules come out and things get hotter." *Id*. To accomplish the rebrand, Martorello suggested "forming ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id*. Martorello's e-mail concluded that Bellicose would "gladly facilitate the work," but it needed "the entity formed and approv[ed] to begin doing" the rest of the work. *Id*. Shortly thereafter, Martorello had "the work and imaging done for ChorusLoans." *Id*. at 058407. Martorello further claimed that "[d]omain names in this space" were "very very rare and hard to come by" and "trying to get a [trademark] to protect it from competition" was "another issue," and "SPVI did a lot of work" to create "Chorus[.]" *Id*. On August 25, 2014, Martorello e-mailed Wichtman that "Chorus has been sold." Ex. 22 at Rosette 043437. But Martorello had "another really great brand" known as Big Picture Loans. *Id*. In this e-mail, Martorello attached a document, "Big Picture Site Designs," showing a fully developed website and brand for Big Picture. *Id*. at 043437-57. Wichtman, who was drafting the resolution for approval by tribal council, responded, "Which one do you want me to use?" *Id.* at 043435. It was left up to Martorello to decide on "BigPictureLoans.com." *Id*. The following day, Wichtman presented a resolution for the creation of Big Picture, as well as approving its Articles of Organization and Operating Agreement. Ex. 23, Resolution # T2014-066 ("the Council has been presented with Articles of Organization and an Operating Agreement for the tribally chartered business entity to be known as Big Picture Loans, LLC…."). As the Court recently found, "the record shows convincingly that Martorello was the driving force in the creation of Big Picture and Ascension, just as he was in the creation of Red Rock" (Dkt. 944 at 34), and "except for a few

13

JA1317

cosmetic changes (or 'optics' as Martorello described them), the LVD lending operation by way of Big Picture continued as it had under the Red Rock structure." *Id.* at 22-23.

### H.    Restructuring became urgent after the Second Circuit's decision.

Over the next month, the parties did not make significant progress on the key terms or mechanics of the sale, but on October 1, 2014, it became urgent when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. In doing so, the Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014). The Second Circuit also observed that "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] … otherwise applicable to all citizens of that [State]." *Id.* (citations omitted). Against this backdrop, the Second Circuit observed that "[m]uch of the commercial activity at issue takes place in New York." *Id.* It reached these conclusions even though LVD/Red Rock never disclosed to the district court or Second Circuit the role of Martorello's companies in the operations.

After the Second Circuit issued its decision, Martorello wrote an e-mail to Wichtman on October 10, 2014, urging her to drop the case. Ex. 24 at Rosette 043659 ("I can't urge any stronger that LVD not proceed even if [O]toe does."). Martorello also indicated that "SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id*. Ultimately, Wichtman agreed, and as she explained in a subsequent e-mail to Martorello, their best option was to "go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation." Ex. 25 at Rosette 001130. Following the Second Circuit's decision, the parties started moving quickly to restructure the business—even though the parties had not reached an agreement in principle to

USCA4 Appeal: 21-2116    Doc: 26-3       Filed: 02/07/2022    Pg: 47 of 601

the major terms of the restructure, including the price to be paid. For example, Wichtman obtained an employer tax identification number for Big Picture on December 1, 2014. Ex. 26.

On February 5, 2015, the LVD's Tribal Council adopted a resolution creating Ascension Technologies and designating Brian McFadden as its president. Ex. 27. Similarly, even though they were employed by a different company, Ascension designated McFadden and Liang as the signatories on Ascension's bank account on February 19, 2015. Ex 28 at LVD-DEF00000229. And immediately following its creation, SourcePoint began assigning its contracts to Ascension—another sign that the restructure was not an arm's length transaction, but a façade designed to protect Martorello and his team. *See, e.g.*, Ex. 29 at Rosette 035776. All of these steps—creation of Ascension, designation of McFadden as its president, assignment of contracts, adding signatories to bank accounts—were taken months before the parties entered into the Agreement and Plan of Merger dated September 14, 2015.

I.  **Martorello forms Eventide Credit Acquisitions on February 9, 2015, to facilitate the sham sale of his company, which was worthless as reflected by Martorello's communications with advisors.**

On February 9, 2015, Martorello created a new company, Eventide Credit Acquisitions, to facilitate the continuation of the illegal lending enterprise. *See generally* Ex. 30. On September 14, 2015, Eventide, Bellicose, and a company formed by LVD to effectuate the merger, Tribal Acquisition Company, LLC, executed the "Agreement and Plan of Merger." *See generally* Ex. 31. Pursuant to § 2.7 of the Agreement and Plan of Merger, the "consideration to be paid to" Eventide was "an amount equal to three hundred million dollars, $300,000,000 (the 'Acquisition Amount')." *Id.* § 2.7.

The $300 million acquisition price was just an elaborate opportunity for Eventide and Martorello to be the targeted recipient of all of the net profits from the lending operation for the

JA1319

anticipated life cycle of the enterprise. Martorello engineered the superficial changes to the structure of the operation—characterizing his interest as a $300 million debt rather than equity—in a vain attempt to avoid accountability for his oversight of the lending operation and blatant violations of state and federal lending laws. Through the inflated "sales" price with an accompanying sunset provision to "forgive" any remaining "debt," Martorello intended to receive all the net profits from the lending operation while maintaining the "status quo" of his oversight and management of the illegal scheme.

Approximately three weeks after the Agreement and Plan of Merger, Martorello wrote an e-mail providing his thoughts on the "FMV vs FV" of Bellicose, *i.e.*, its fair market value v. future value. Ex. 32 at Liont_09845. As for its low fair market value, Martorello stated "[e]veryone knows the CFPB rule shuts down the business and there is a court decision that shows the CFPB does control Tribes." *Id*. Martorello wrote that they could "provide all the support in the world for this." *Id*. And if "someone asks," Martorello provided 11 points for the low fair market value assigned to the business, including "1) the Tribe is buying it b/c our contract gets terminated and they want this to continue[,] 2) Operation Choke Point is a risk for SPVI owners but not for the Tribe[,] 3) All the lawsuits against Servicers is removed from the equation for the Tribe to lose us… 7) They risk that they lose their debt investors if we go away, this deal keeps debt investors comfortable to remain, whereas they'd leave if a new vendor replaced us… 10) IN THE UNLIKELY EVENT that the CFPB rule doesn't take them down, then they pay as they go via a Seller financed deal rather than taking risk. . . ." *Id*. at 09845-6. In closing, Martorello further added "there is the risk that we get shut off from banking immediately (or the Tribe does) and we suffer catastrophic damages even worse than CFPB rule." *Id*. at 09846.

Martorello sent a similar e-mail to a business valuation firm on December 5, 2015, *i.e.*,

about six weeks before the closing. Ex. 33 at Martorello_05530-2. In this e-mail, Martorello explained that "efforts would be attempted by [s]tate governments to shut down tribal lenders (and are being attempted in fact)." *Id*. One of those was an action filed by the Pennsylvania Attorney General, which Martorello characterized as "the most significant issue/risk to SPVI" as "PA could bring the same claims against SPVI for sure." *Id*. Martorello further added that Red Rock had already "received threats from several state AGs demanding they stop lending or they will come after them." *Id*. In addition to attorney general threats, Martorello further explained that the NY DFS has "issues too" with tribal lending "and they could go after SPVI as well." *Id*. Martorello encouraged the firm to include all "of the support [] that says the CFPB rule will shut this business down, and how operation choke point is hurting everyone." *Id*.

In another email dated December 6, 2016, Martorello similarly wrote that "It was estimated that the industry would be wiped out in Feb 2014 by the new CFPB, and/operation chokepoint tactics." Ex. 34 at Martorello_011446. Martorello further explained that "[a]ccurately enough, the clients lost the ability to debit borrower bank accounts in January 2014" and they "made no loans for many months after out of fear banking would be fully cut off for good." *Id*.

There are multiple e-mails reiterating this position that the tribal lending would be shut down and the restructure was simply a disguise to allow Martorello to continue to make millions until his prediction came true. *See also* Ex. 35, at Liont_05387 ("Lawsuits by AGs and regulators against SPVI, myself, or the client (as the reports and cases filed to date against competitors supports) may end the business or seriously shrink the business"); Ex. 36 at Martorello_011671 (e-mail from Martorello explaining that "we thought (and data supported) 'end of days in 2015'" because of Operation Chokepoint). In a review of this record, the Court recently found, "The record is thus clear beyond serious question that Martorello was motivated to sell Bellicose to LVD

**JA1321**

because of the threats of litigation and enforcement actions against him and his entities under the then-current lending arrangement between him, his entities, and LVD." Dkt. 944 at 30.

> **J.** **During the negotiations, Martorello insists on retaining control over the business after the restructure.**

Although Martorello "sold" his companies to LVD, he insisted on control over the business until the expiration or repayment of the $300,000,000.00 promissory note. For example, in an e-mail dated August 26, 2014, Martorello insisted "the seller," "will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid." Ex. 37 at 045272. And, Martorello made clear he did not want any changes, explaining there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id*.

Similarly, in an e-mail to Wichtman, Hazen, and Chairman Williams dated September 15, 2014, Martorello insisted that "the Bellicose Companies will be sold only 'as is', with existing Management in place and the company remaining substantially the same." Ex. 38 at Rosette_Revised 040179. Despite servicing through a new entity, Martorello insisted that it needed to "remain an independent cutting edge" company, which "needs to be run in the same format it is today." *Id*. Although technically tribally owned, remaining separately managed by the servicer would aid the "PR effect" on hiring and retaining professionals "who will understand they risk being labeled by peers as working for some 'illegal' lender" if the companies were combined. *Id*.

They maintained the status quo even though one of Rosette's lawyers, Tanya M. Gibbs, identified the structure—requiring Big Picture "to establish certain relationships with a servicer"—as opening them up to rent-a-tribe arguments similar to "the current class action litigation pending in Vermont, *Gingras & Givens v. Rosette*." Ex. 39 at Rosette_Revised 043997. To avoid this, Ms. Gibbs wondered whether they needed to "to put these things in writing." *Id*. Martorello insisted on

JA1322

formal control in writing, saying it was "take it or leave it[.]" *Id*. at 043996. Martorello further added that "Servicer comfort" was the "only way" that an important investor would "be involved." *Id*. From "their perspective," if LVD "was to cut SPVI out of the picture, then [it] simply cannot perform as a business." *Id*.

The parties' intent to restructure the form of the arrangement, but not its substance, is further demonstrated by an e-mail exchange dated January 14, 2016, *i.e.*, two weeks before closing. As a part of the email exchange, Martorello explained that the enterprise's lenders "care about the person who runs the business at AT." *Id*. So long as the restructure documents were "clear that the position in question and under scrutiny to the lenders is President and CEO (Brian)," it was sufficient according to Martorello. *Id*. Martorello further wrote "[a]s far as I know, the Manager[s]," *i.e.*, Hazen and Chairman Williams, "don't really do anything." *Id*. In closing, Martorello explained that he would leave it up to his attorney, John Williams, on what the transaction documents "say if that jives, and what the authority is of BMF [Brian McFadden] vs the Managers, but if Managers are really only involved per the [operating agreement] to get feedback from the CEO/President" then that seemed "OK." *Id*. If the managers did "more than that" or the governing documents "say the position of concern are the Managers," then there was "some cleaning up to do" according to Martorello. *Id*. A day after this exchange, John Williams e-mailed Wichtman a draft of the Delegation of Authority Policy to ensure it was clear who had operational control. Ex. 40. The Delegation of Authority policy ensured that "The Tribal Council does not get to make the decision regarding [McFadden's] employment nor determine his salary other than through the budgeting process [which involves Eventide]" as explained by Wichtman's email dated January 14, 2016. Ex. 41 at Rosette_Revised_020473. Put differently, Wichtman explained that this structure ensured that "Tribal Council can't get a wild hair up their hiny and

pass a resolution or motion to fire [Brian] because they do not have the authority to act in that capacity as Member." *Id*.

### K.    As demanded by Martorello, the restructuring documents are crafted to ensure Martorello's control over operations and retention of profits.

In an effort to exploit sovereign immunity and conceal Martorello's role, the lending enterprise completed the merger on January 26, 2016. Ex. 42. On paper, the LVD now appeared to own the business, ostensibly shielding Bellicose/Martorello from any pre-merger claims—as desired by Martorello almost immediately after he read the district court's decision in *Otoe-Missouria*. Ex. 13 (proposing "LVD to take ownership of Bellicose VI," and "[a]ll structured to provide all entities sovereign immunity."). And as designed by Martorello, LVD contractually relinquished any right to control the business through the restructuring documents, namely: (1) the Delegation of Authority Policy, (2) the Intratribal Servicing Agreement, (3) the Loan and Security Agreement, and (4) Eventide's Operating Agreement. Each of these documents worked together to ensure Martorello's control.

*First*, LVD contractually relinquished any right to control Ascension through the Delegation of Authority Policy. *See generally* Ex. 43. Under this policy, Ascension delegated McFadden with the authority to: (1) handle Ascension's "strategic direction, goals and targets," (2) execute documents on behalf of Ascension, (3) open and maintain bank accounts, (4) adopt employee benefit plans and programs, and (5) "authority regarding all matters necessary for the day to day management of Ascension." *Id*. at § 1.4(a)-(e)). By contrast, the only matters designated to the tribal co-managers are: (1) approval of contracts in excess of $100,000 in a calendar year, (2) appointment of the president, and (3) approval of any "new major employee benefit plans." *Id*. at § 1.2(a)-(c). And, while the authority to appoint the president seems to provide some control, the Loan Agreement takes this control away—to appoint a new president, Hazen and Williams

**JA1324**

must receive the approval of Eventide, *i.e.*, Martorello. *See* Ex. 44 at Martorello_000080 ("Management. Neither [TED] nor [Big Picture or Ascension] shall terminate or replace any manager, director or officer of [TED] or [Big Picture or Ascension] or modify delegations of authority without the prior written consent of [Eventide], which shall not be unreasonably withheld, conditioned or delayed.").

*Second*, because of McFadden's *de facto* control of Ascension, the restructuring documents were designed to provide Ascension with control over Big Picture's operations—no different than the relationship between SourcePoint and Red Rock. *See generally*, Ex. 45. Indeed, Ascension and Big Picture entered into a "Intratribal Servicing Agreement," which is virtually identical to the prior servicing agreement between SourcePoint and Red Rock. *Compare id.*, *with* Ex. 5 at § 4.2.1. Like the prior arrangement, this agreement grants Ascension "all the necessary power and authority to act in order to fulfill its responsibilities," which includes the enumerated responsibilities previously designated to SourcePoint. Ex. 5 at §§ 4.1, 4.2; *compare with* Ex. 45, at §§ 4.1, 4.2. And, just like the Delegation of Authority Policy, LVD cannot amend, modify, or terminate the Intratribal Servicing Agreement until satisfaction of the $300 million-dollar promissory note.[4] Ex. 44 at § 5.12. The Delegation of Authority Policy and Intratribal Servicing Agreement work in tandem to ensure that Martorello's designee, McFadden, has control over Ascension, and Ascension has control over the lending business.

Further, Eventide's operating agreement ensures that Martorello has control over McFadden. *See generally* Ex. 30 at § II(I). In particular, to ensure control over McFadden, Eventide's operating agreement allows Martorello to unilaterally revoke his shares in Eventide

---

[4] If TED breaches the Intratribal Servicing Agreement, it would forfeit the reinvestment amounts, as well as its ownership interest in Ascension. (Ex. 46, Secured Promissory Note at § 1.2(b)(2)).

JA1325

with 14-days notice. *Id.* ("The Manager, in his sole and absolute discretion, may require a Member to sell all or a portion of the Interest" within 14 days). In other words, if Martorello disagrees with any action by McFadden, including in his capacity as president of Ascension, Martorello possesses the sole discretion to revoke his primary economic interest in the lending enterprise, *i.e.*, McFadden's profit interest as a shareholder of Eventide. Ex. 30. And those profits have been substantial, such as monthly distributions to McFadden ranging from $18,000-$50,000. *See* Ex. 47. The evidence shows that Martorello has already considered wielding this power, including in August 2016, when Martorello texted his brother and business partner, expressing concern that "Brian [McFadden] and James [Dowd] are getting too big for their britches." Ex. 48 at Justin_Martorello_00157. Martorello further explained that "they see monthly wires and are starting to think they deserve a lot more of it now than the $1mm a year Brian makes for being a hired CEO." *Id*. Martorello further wrote that McFadden "may have to be disappointed somewhere down the near term road," as "he's not the founder and $1mm a year buys a lot of very capable replacements." *Id*. In short, even after the sale, Martorello believed that he controlled the business, including the ability to remove the president of Ascension, who possesses the authority to run the lending business free from interference by the co-managers or Tribal Council—exactly as Martorello had insisted.

### III.     NATURE OF PLAINTIFFS' CLAIMS AND THE PROPOSED CLASSES

Plaintiffs, each from Virginia, obtained loans from Big Picture and Red Rock. Each of the loans imposed an interest rate higher than 12%. Williams' loan was subject to an APR of 649.8%; Turnage's loan had an APR of 693.2%; Hengle's loan had an APR of 607.5%; Coffy's loan had an APR of 607.5%; and Gillison, Jr.'s loan had an APR of 627.2%. Each of the Plaintiffs made payments on these loans. For example, Mr. Hengle paid at least $12,698.75 on his loans with Red

JA1326

Rock and Big Picture. Ex. 49, Decl. of George Hengle ¶ 8. Plaintiffs' claims are simple and straightforward—they accuse Martorello of engaging in a scheme to lend to and collect from Virginia consumers at interest rates far exceeding those permitted by Virginia law.

In response to Plaintiffs' initial motion for class certification, Martorello argued that consumers who borrowed from Red Rock differ from consumers who borrowed from Big Picture loans. *See, e.g.,* Dkt. 216 at 26 ("Class members who took loans or made payments after January 26, 2016, are thus very differently situated vis-à-vis SourcePoint and Martorello from class members who took out loans or made payments beyond that date."). Because the title of his role changed—from owner of the "servicer" to owner of the "creditor"—Martorello contended that common issues at trial would not predominate. Plaintiffs disagree. The sale restructured the enterprise on paper but not how it operated in practice (and certainly not with respect to the elements and evidence pertinent to each claim). In fact, the sale agreements allowed Martorello to continue to have complete management control over the enterprise, retain the majority of the profits, and retake the business (including the LVD's investment) if his instructions were not followed or any material changes to the business occurred. *See* Sections J & K, *supra*, Exs. 37-48. That said, to address any risk that the consumers are differently situated, Plaintiffs request that the Court certify two separate classes for Virginia consumers with Red Rock and Big Picture loans,[5]

---

[5] The Court retains its discretion to adapt or modify the class definition to resolve typicality, predominance or other defense concerns it concludes have merit. Fed. R. Civ. P. 23(c)(1)(C) gives District Courts broad discretion to modify the class definition until there is a decision on the merits. *See* 2 H. NEWBERG AND A. CONTE, NEWBERG ON CLASS ACTIONS § 6.14 (4th ed. 2006) ("broad discretion [under Rule 23] to modify the definition of the class even after certification."). *See e.g. Branch v. Gov't Employees Ins. Co. Branch v. Gov't Employees Ins. Co.*, 323 F.R.D. 539 (E.D. Va. 2018); *Williams v. LexisNexis Risk Mgmt. Inc.*, No. CIV A 306CV241, 2007 WL 2439463, at *8 (E.D. Va. Aug. 23, 2007).

with sub-classes of each to address the different statute of limitations periods for each of the three claims:

> **Big Picture RICO Class:** All Virginia consumers who entered into a loan agreement with Big Picture where a payment was made from June 22, 2013 to December 20, 2019.
>
> > **Big Picture Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture from June 22, 2015 to December 20, 2019.
> >
> > **Big Picture Unjust Enrichment Sub-class**: All Virginia consumers who paid any amount on their loan with Big Picture from June 22, 2014 to December 20, 2019.
>
> **Red Rock RICO Class:** All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made from June 22, 2013 to December 20, 2019.
>
> > **Red Rock Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock from June 22, 2015 to December 20, 2019.
> >
> > **Red Rock Unjust Enrichment Sub-class**: All Virginia consumers who paid any amount on their loan with Red Rock from June 22, 2014 to December 20, 2019.

Plaintiffs and the Classes seek damages consisting of any illegal amounts paid on these loans as part of the illegal lending scheme, plus any doubling or trebling of damages as permitted under the applicable statutes and attorneys' fees and costs. Plaintiffs seek certification of all Classes under Fed. R. Civ. P. 23(b)(3).

## IV.    ARGUMENT

"To obtain class certification, a plaintiff must satisfy the four requirements" of Rule 23(a) of the Federal Rules of Civil Procedure, and the case "must also fall within at least one of the types of class actions defined in Rule 23(b)." *Branch v. Gov't Employees Ins. Co.*, 323 F.R.D. 539, 544, (E.D. Va. 2018). The Court must undertake a "rigorous analysis" as to each requirement. *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 351 (2011) (internal quotations omitted). Because of the rigorous analysis required by *Dukes*, "the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of

**JA1328**

certification." *Branch*, 323 F.R.D. at 545 (quoting *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006)). Although this analysis may "overlap into the merits of the underlying case," the "likelihood of the plaintiff's success on the merits . . . is not relevant to the issue of whether certification is proper." *Id.* (quoting *Thorn*, 445 F.3d at 319). Stated differently, Rule 23 does not provide courts with a "license to engage in free-ranging merits inquiries at the certification stage," and merits questions should only be considered "only to the extent" that "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

Federal courts have long regarded "consumer claims" as "particularly appropriate for class resolution." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *In re Mexican Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001); *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 395-96 (N.D. Ill. 2006) ("Consumer claims are among the most commonly certified for class treatment"). As explained below, this case is no different as Plaintiffs' claims satisfy the four prerequisites of Rule 23(a) and fall within two of the types of class actions allowed by Rule 23(b).

## A. The Classes meet the requirements of Rule 23(a).

### 1. Numerosity is easily met.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a). There is no set minimum number of potential class members that fulfills the numerosity requirement. *See Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984) (citing *Kelley v. Norfolk & Western Ry. Co.*, 584 F.2d 34 (4th Cir. 1978)). Where the class numbers 25 or more, joinder is usually impracticable. *Cypress v. Newport News Gen'l & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (finding that 18 class members was sufficient to fulfill the numerosity requirement); *In re Zetia (Ezetimibe) Antitrust Litig.*, MDL No.

2:18md2836, 2020 WL 4917625, at * (E.D. Va. Aug. 21, 2020) (finding 35 class members satisfied numerosity); *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 199 (E.D. Va. 2015) (granting class certification where class included roughly 1,000 persons).

Here, the numerosity requirement is easily met. Everyone now knows who these Class members are, as they were noticed and participated in the separate settlement with the Tribal defendants in *Galloway v. Williams*, No. 3:19-cv-00470-REP, Dkt. 108-1 (E.D. Va. Dec. 1, 2020) ("*Galloway III*"). The *Galloway III* "class list" provided by Big Picture Loans showed that the national class consisted of 491,018 class members. *See* Ex. 51, *Galloway v. Williams*, No. 3:19-cv-00470-REP, Dkt. 108-1 (E.D. Va. Dec. 1, 2020). At least 12,530 of these class members are from Virginia. Ex. 60 at ¶ 5, Declaration from American Legal Claims. Accordingly, Rule 23(a)(1)'s numerosity prerequisite is satisfied.[6]

Here, class membership is also readily ascertainable as the definition is based entirely on objective criteria and class members are identifiable, mostly through electronic data analysis. Identification of the class members involves a handful of discrete steps: (1) determining whether a consumer had a loan with Big Picture and/or Red Rock, (2) for all such consumers, determining whether they had a Virginia address when they executed the loan, and (3) identifying any payments made by those consumers from June 22, 2013 to December 20, 2019. The answers to these questions was and is readily ascertainable through loan records that the Tribe has agreed to provide voluntarily. *See* Ex. 52, Rosette letter (representing that "the data related to the alleged Virginia class in Williams exists, is held by TranDotCom, and [] my clients consent to TranDotCom

---

[6] Although it is not required by the plain language of Rule 23(a)(1), the Fourth Circuit has created an implicit requirement that a plaintiff "readily identify class members in reference to objective criteria." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014); *see also* 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1760 (3d ed. 2005). This is not an issue in this case, as each class member has already been identified in *Galloway III*.

supplying that information according to the Court's order (ECF No. 415)"). And as noted, the majority of information has already been produced in connection with the *Galloway III* settlement. Ex. 51, *Galloway v. Williams*, No. 3:19-cv-00470-REP at Dkt. 108-1.

## 2. Common questions of law and fact bind the Class Members together.

Rule 23(a)(2) requires the court to find that there are questions of law or fact common to the class, but complete congruence of those questions is not necessary. *Lienhart v. Dryvit Sys. Inc.,* 255 F.3d 138, 146 (4th Cir. 2001); *Centr. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993). "Commonality is satisfied where there is one question of law or fact common to the class, and a class action will not be defeated solely because of some factual variances in individual grievances." *Jeffreys v. Commc'ns Workers of Am.*, 212 F.R.D. 320, 322 (E.D. Va. 2003); *Manuel v. Wells Fargo Bank, Nat. Ass'n*, No. 3:14CV238, 2015 WL 4994549, at *9 (E.D. Va. Aug. 19, 2015) ("To satisfy [the commonality] requirement, there need be only a single issue common to the class.").

In this instance, all liability questions of fact and law are entirely common. The claims asserted by Plaintiffs and the class members originate from the same conduct, practice, and procedure on the part of Martorello, namely the use of the tribal lending scheme in an attempt to evade interest rate laws in Virginia. Pursuant to this scheme, the lending operation used a uniform pricing structure when issuing loans that universally resulted in each class member receiving a loan with an illegal interest rate under Virginia law.[7] Based on these facts, Plaintiffs and the class members share a number of common questions of law that can all be decided with common proof, including: (1) whether their interest rates violate Virginia's usury laws; (2) whether the choice-of-law provision in their loan agreements bar enforcement of Virginia's

---

[7] *See, e.g.*, *Rates*, Big Picture Loans, https://www.bigpictureloans.com/loan-rates-2 (last visited Aug. 28, 2018).

usury laws; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Martorello participated or operated in the management of the enterprise; (5) whether Martorello had knowledge of and agreed to the overall objective of the enterprise; and (6) whether the amounts paid by each consumer are recoverable against Martorello.

Courts have found common questions in cases based on similar factual allegations and legal claims. This includes certification of classes in cases alleging that the defendants used a subterfuge, such as a purported tribal lender, to conceal the fact that they were making unlawful loans. For example, in *Inetianbor v. CashCall, Inc.*, a case involving a similar rent-a-tribe scheme, the court found that:

> The proposed class' claims share multiple questions of law and fact. For example, it is a common question of fact whether CashCall improperly used Western Sky as a "front" for its lending business, invoking Tribal law in an attempt to shield the enterprise from State regulation and consumer laws. Additionally, all class members entered into loan agreements with materially similar terms; therefore, whether the loan contracts are void for charging usurious interest rates is a legal question common to all or nearly all members of the class. Further, whether the loans violated Florida lending and consumer protection law and whether Reddam can be held personally liable are legal questions common to the class.

No. 13-cv-60066-JIC, Doc. 284 at 17–18 (S.D. Fla. Sept. 19, 2016) (attached as Ex. 53). The facts in this case are comparable to those in *Inetianbor* and similarly warrant a finding of commonality.

Another court has also recently held:

> As to each class, the questions of whether Defendants charged interest at rates in excess of those permitted by New Jersey law will be common, as will questions of whether Defendants and Western Sky together formed an enterprise sufficient for liability under RICO.

*MacDonald*, 333 F.R.D. at 343.

Other decisions involving non-tribal usurious loans are in accord. *See, e.g., Purdie v. Ace Cash Express*, 2003 WL 22976611, at *3 (N.D. Tex. Dec. 11, 2003) ("Here, the members of the

JA1332

putative class share a common factual circumstances of having obtained payday loans that were originated, serviced and collected in a uniform manner according to policies and procedures implemented by Defendants on a nationwide basis."); *Upshaw*, 206 F.R.D. at 699 (M.D. Ga. 2002). As to the commonality element, *Upshaw* identified "numerous common issues," including, among others, "[w]hether the interest charged on the loans violates the Georgia usury laws" and "[w]hether the loans and interest are unlawful debts, the collection of which violates RICO." *Id.* at 699; *Madden*, 237 F. Supp. at 155 (finding commonality in a case alleging violations of New York's usury laws based on the "common injury" of "the attempted collection of interest at a usurious rate"). Because there are multiple common questions of law and fact, commonality is easily satisfied.

### 3.    Plaintiffs' claims are typical of the Classes' claims.

A class representative's claims or defenses must be "typical" of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). The Fourth Circuit has described the typicality requirement as "the heart of a representative [party's] ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). Typicality demands "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.*; *accord Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 264 (4th Cir. 2012); *Lienhart*, 255 F.3d at 146. A plaintiff's interest in prosecuting her case must advance the interests of the Class. *Soutter*, 498 F. App'x at 264.

Nonetheless, typicality does not require that a class representative's claims be perfectly identical to the class members' claims. *See, e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998); *Deiter*, 436 F.3d at 467; *Soutter*, 498 F. App'x at 265; *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 105 (E.D. Va. 2009). Rather, "the interests of the party representing a class must be substantially similar to those of the unrepresented parties." *Id.*; *see*

**JA1333**

*also In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006). However, "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification." *In re BearingPoint,* 232 F.R.D. at 538 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 178 (2d Cir. 1990)). As the Fourth Circuit explained:

> To determine if [the plaintiff] has shown typicality, we compare her claims and [the opposing party's] defenses to her claims with those of purported class members by reviewing the elements of [the plaintiff's] prima facie case and the fact supporting those elements and examining "the extent" to which those facts "would also prove the claims of the absent class members."

*Soutter*, 498 F. App'x at 265.

Plaintiffs' claims satisfy the typicality requirement of Rule 23. Here, Plaintiffs assert a uniform practice of charging usurious loans to consumers using the now-rejected rent-a-tribe model. RICO defines "unlawful debt" as a debt incurred in connection where the usurious rate "is at least twice the enforceable rate" under state or federal law. 18 U.S.C. § 1961(6). In other words, § 1962(c) "encompasses efforts to collect on a usurious loan" such as the predatory loans made to Plaintiffs in this case. *See Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148 (3d Cir. 2016). Plaintiffs and the class members are all in the same boat; they were all subject of the making and collection of the usurious loans, and the only genuine difference from one member to another is the level of financial harm incurred.

Again, *Inetianbor* is instructive. There, the court found that the plaintiffs' claims, based on usurious loans were "typical of those of the proposed class" because the plaintiffs all "entered into Western Sky loan agreements with materially similar terms, including interest rates that allegedly exceeded the allowable rate under Florida law," and "all members of the proposed class may allege similar damages as a result of Defendants' actions." *Inetianbor*, Ex. 53, at 19. Similarly, another court has explained "[t]ypicality is inherent in the class definition because each member entered

JA1334

into the same type of transaction, a payday loan, with Defendants and his/her claims arose from the same practices of Defendants." *Henry*, 199 F.R.D. at 571–72; *see also MacDonald*, 333 F.R.D. at 343 ("Plaintiffs have shown that their claims are legally identical to those of the class, as they obtained loans from Western Sky at allegedly usurious interest rates, under loan agreements purporting to be governed exclusively by [tribal] law. These are precisely the theories and claims under which each class seeks to recover.").

Like *Inetianbor* and *MacDonald*, Plaintiffs' claims for usury violations are typical of those of the proposed classes. In relevant part, this statute provides that "[i]f interest in excess of that permitted by an applicable statute is paid upon any loan," the borrower may bring an action "to recover from the person taking or ***receiving***" such payments. Va. Code. § 6.2-305 (emphasis added). Broken down, a claim under § 6.2-305 requires proof of two elements: (1) payment of interest at a rate greater than 12% per year and (2) taking or receipt of such payments. Va. Code § 6.2-305. If Plaintiffs prove that Martorello violated Virginia's usury laws by receiving amounts in excess of 12%, they will advance the claims of all of the proposed class members to the same degree. *Milbourne v. JRK Residential Am., LLC*, 2014 WL 5529731, at *7 (E.D. Va. Oct. 31, 2014) ("Because there are no factual differences between claims and the members all raise the same legal issue as [the Plaintiff], there are no factual or legal differences between the class members' claims and [Plaintiff's'] claim. … For the foregoing reasons, the typicality factor is satisfied." (citations omitted)); *Dreher v. Experian Info. Sols., Inc.*, 2014 WL 2800766, at *2 (E.D. Va. June 19, 2014) ("The evidence [Plaintiffs] will rely on to establish each element of the case will similarly establish the claims of each absent class member."). The same is true for the RICO claims, which revolve around the making and collection of unlawful debt under state law.

Martorello has maintained that his conduct toward Class members who took out loans

**JA1335**

with Red Rock differed from his conduct toward Class members who took out loans with Big Picture. *See* Dkt. 216 at 25-26. Discovery conducted in this case over the past several years has demonstrated that this contention is false and, regardless, any purported differences are immaterial to the claims in this case. *See* Factual Background, *supra*, §§ J & K, Exs. 37-48. However, even if the Court found Martorello's liability materially different between the Red Rock and Big Picture Loan periods, the certification of separate classes resolves this concern. *See, e.g., EQT Prod. Co.*, 764 F.3d at 369 (explaining a "district court may also be able to craft more definite class definitions, thus eliminating or mitigating some of the problems" with certification"); *Hawkins v. Cohen*, No. 5:17-CV-581-FL, 2018 WL 3785398, at *13 (E.D.N.C. Aug. 9, 2018) (reconstructing the plaintiff's definition into "two independent classes").

### 4. Plaintiffs and their Counsel will adequately represent the Classes.

Rule 23(a)'s final component requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This prerequisite is met if: "(1) the named plaintiff[s] [have] interests common with, and not antagonistic to, the Class' interests; and (2) the plaintiff[s'] attorney is qualified, experienced and generally able to conduct the litigation." *In re Se. Hotel Props. Ltd. P'ship Investor Litig.*, 151 F.R.D. 597, 607 (W.D.N.C. 1993).

Plaintiffs' counsel are experienced in class-action work as well as consumer protection issues and have been approved as class counsel in numerous cases before this Court. *Clark v. Trans Union, LLC*, 3:15-cv-391, 2017 WL 814252, at *13 (E.D. Va. Mar. 1, 2017) (collecting cases and stating "This Court has repeatedly found that [proposed Class Counsel] is qualified to conduct such litigation. . . . This Court echoes the sentiments previously stated about [proposed Class

JA1336

Counsel] because they pertain here with equal vigor." (citations omitted)).[8] They have already been found adequate in *Galloway III*, as well as other tribal lending matters. *Galloway v. Williams, Jr.*, 2020 WL 7482191, at *8 (E.D. Va. Dec. 18, 2020) (finding "Class Counsel and their firms have extensive backgrounds in complex and class action litigation and consumer protection litigation" and further noting that counsel "have significant experience in litigating class action lawsuits against tribal lenders.") (*citing, e.g., Hayes, et al. v. Delbert Servs. Corp.*, 3:14-cv-00258-JAG, Dkt. No. 193 ¶ 4, 14 (Jan. 20, 2017)).

Plaintiffs' interests and those of members of the proposed classes are fully aligned. And both Classes and all sub-classes are represented. Ex. 54, Kelly Decl. ¶¶ 15-20. Moreover, each Paintiff shares the Class interest in obtaining a determination that Martorello violated § 1962(c) of RICO through management and participation in the affairs of an enterprise involved in the "collection of unlawful debt," that Martorello further violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c), that the loans made to Virginia consumers used an interest rate in excess of what is legal under Virginia law, and that the loan agreements are void under Va. Code § 6.2-1541(A). Further, Plaintiffs and the proposed class members share identical interests in establishing Martorello's liability for his role in the scheme. Additionally, Plaintiffs have vigorously prosecuted this case, answered discovery, sat for depositions, and filed claims against the other participants involved. They have assisted and cooperated from the beginning to benefit all Virginia consumers similarly situated. Ex. 54, Kelly Decl. ¶ 14.

---

[8] Declarations from each firm seeking to serve as class counsel setting forth their experience and ability to serve as class counsel are attached. Ex. 54, Kelly Declaration; Ex. 55, Bennett Declaration; Ex. 56, Drake Declaration; Ex. 57, Terrell Declaration; Ex. 58, Wessler Declaration; Ex. 59, Caddell Declaration.

JA1337

**B.      The classes likewise meet the demands of Rule 23(b)(3).**

**1.      Common questions predominate over individual ones.**

Under Rule 23(b)(3), the common questions found under Rule 23(a)(2) "must predominate over any questions affecting only individual members." *Amchem,* 521 U.S. at 615. Whether common questions predominate over individual questions "is a separate inquiry, distinct from the requirements found in Rule 23(a)." *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 304 (4th Cir. 2013) (citing *Wal–Mart,* 131 S. Ct. at 2556). This requirement is "even more demanding than Rule 23(a)," *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem,* 521 U.S. at 623. This analysis is not simply a matter of counting common versus noncommon questions and checking the final tally. *Soutter*, 307 F.R.D. at 214. Instead, "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." *Stillmock v. Weis Markets, Inc.*, 385 Fed. App'x. 267, 272 (4th Cir. 2010) (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003)). In other words, Rule 23(b)(3) "compares the quality of the common questions to those of the noncommon questions." *Soutter*, 307 F.R.D. at 214 (quoting *Newberg* § 3:27); *see also Karkauer*, 925 F.3d at 658 (observing "the predominance inquiry 'calls upon courts to give careful scrutiny to the relation between common and individual questions in the case.'") (quoting *Tyson Foods, Inc. v. Bouaphakeo*, --- U.S. ---, 136 S. Ct. 1036, 1045 (2016)).

If the "qualitatively overarching issue" in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues. *See Ealy*, 514 Fed. App'x. at 305 ("Indeed, common issues of liability may still predominate even when some individualized inquiry is required."). For example, if "common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Stillmock,* 385 Fed. App'x. at 273 (citing *Smilow v. Southwestern Bell Mobile Systems,*

**JA1338**

*Inc.*, 323 F.3d 32, 40 (1st Cir. 2003)). This is because class certification in those cases will still "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Gunnells,* 348 F.3d at 424 (citing *Amchem,* 521 U.S. at 615); *see also id.* at 426 ("Proving these issues in individual trials would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues. Consolidation of these recurring common issues will also conserve important judicial resources.").

Here, common issues necessarily predominate because Plaintiffs' claims are all based on standardized conduct by Martorello toward them and fellow class members: namely, using a Native American Tribe to evade state laws in order to issue and collect on usurious loans in Virginia. As the court found in *Intetianbor*, common issues predominate in rent-a-tribe schemes for usurious loans because of "the standardized nature of the loan transactions and the uniform manner in which defendants made, processed and collected on the loans," such that "few variations exist in the claims and the legal claims and theories asserted." *Inetianbor*, Ex. 53, at 21; *see also Purdie*, 2003 WL 22976611, at *4 (finding predominance in a payday lending case based on standardized loan transactions); *Upshaw*, 203 F.R.D. at 700–01 (finding predominance in a payday lending case because "Defendants' conduct was substantially the same with respect to all members of the class," and "[t]his conduct gives rise to Plaintiffs' class-wide liability claims for violation of the Georgia usury laws and RICO"). Martorello's conduct was not only substantially the same as to all members of the classes, but there are also no material individual defenses to Plaintiffs' usury and RICO claims. *Henry*, 199 F.R.D. at 572 ("[T]he common questions are whether Defendants were engaged in racketeering activity or collecting an unlawful debt, whether an

35

**JA1339**

enterprise exists, and whether defendants conducted or participated in an enterprise. ***No reliance or causation need be shown***…." (emphasis added)).

RICO claims like Plaintiffs' are particularly well-suited for class treatment because "common issues of fact in a RICO action, concerning the existence of an enterprise and a pattern of racketeering activity are quite substantial" and "would tend to predominate over all but the most complex individual issues." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357-58 (11th Cir. 2009). In a RICO action, "[t]he existence of a conspiracy, and whether the defendants aided and abetted each other" are "issues common to all of the plaintiffs" that "tend[] to predominate." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004). And as a sister court recently explained:

> Here, Plaintiffs have shown that common questions predominate for each of the elements of their RICO claim. Whether Defendants engaged in conduct as part of RICO enterprise is common to the class (and raises no individual issues whatsoever), as is whether they did so through the collection of unlawful debt. Plaintiffs can show that Defendants conducted their alleged RICO enterprise through common documentary evidence concerning the relationships between Western Sky Financial and Defendants and the testimony of their officers and employees.

*MacDonald*, 333 F.R.D. at 353.

Finally, this case is also similar to other cases where a defendant's lending practices or other financial misconduct predominates because the defendant's uniform treatment of the plaintiffs caused them harm. As another court explained:

> Given the standardized nature of the payday loan transactions and the uniform manner in which Defendants made, processed and collected on the loans, and that few variations exist in the claims or the factual bases underlying the claims and the legal claims and theories asserted, the court finds that the factual and legal issues in this case would be subject to generalized proof applicable to the entire class, and that such issues predominate over any issue that may be subject only to individualized proof.

*Purdie*, 2003 WL 22976611, at *4. Like the plaintiffs in *Purdie* and similar cases, Plaintiffs and the classes have been subjected to the same usurious lending practices by Martorello and the other

**JA1340**

enterprise participants, and therefore, common issues predominate. *See also Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D. 572, 579 (M.D. Fla. 2006) (finding that common issues predominated with respect to claims under the Truth in Lending Act, Finance Act, FDUPTA, and unjust enrichment based on defendant's "deceptive acts common to the purported class"); *Spinelli v. Capital One Bank*, 265 F.R.D. 598, 610 (M.D. Fla. 2009) (adopting report and recommendation to certify class claims alleging sale of deceptive credit protection product); *see also Madden*, 237 F. Supp. 3d at 160–61 (finding predominance in a case based on violations of New York's usury laws).

As for damages, Plaintiffs are seeking unlawful amounts paid in connection with their loans. With electronic records from the lenders, this amount can be calculated easily for all class members. *See Krakauer*, 925 F.3d at 658 (finding predominance satisfied where "all of the major issues in the case could be shown through aggregate records"). Even if damages did require some evidence from individual consumers, this is not a case where the determination of damages awarded will largely depend on individualized testimony, such as in a case where the consumer is seeking compensation for emotional distress or physical injuries. Because the loans were credited and debited using ACH transactions to and from the consumers' bank accounts, bank records will show the relevant transactions that could be used to calculate damages. More simply, the *Galloway III* "class list" provided by Big Picture Loans can be used to determine which class members made payments on a Big Picture or Red Rock loan and when a class member made those payments. Ex. 60, Pirrung Decl. ¶¶ 9-13.

To the extent that there might be some individualized damage determinations, in no event would those issues predominate over the common liability issues. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("If the issues of liability are genuinely common issues, and the

damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.").

### 2. Class treatment is the superior method for litigating the classes' claims.

Finally, the Court must determine whether a class action is superior to other methods for the fair and efficient adjudication of the controversy under Fed. R. Civ. P. 23(b)(3). *Lienhart*, 255 F.3d at 142; *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 713 (4th Cir. 1989). The factors to be considered in determining the superiority for the class mechanism are: (1) the interest in controlling individual prosecutions; (2) the existence of other related litigation; (3) the desirability of concentrating the litigation in the forum; and (4) manageability. *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997); *Newsome v. Up_To_Date Laundry, Inc.*, 219 F.R.D. 356, 365 (D. Md. 2004).

In examining these factors, it is proper for a court to consider the "inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *CitiFinancial v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1164 (7th Cir. 1974). "Class actions are particularly appropriate" where, as here, "multiple lawsuits would not be justified because of the small amount of money sought by the individual plaintiffs." *See Advisory Committee Note* to 1996 Amendment to Rule 23.

Class litigation is not only the most efficient means of adjudicating these disputes; it is the only means. Separately litigating the common issues that bind the class, whether in hundreds or tens of thousands of individual lawsuits would be a practical impossibility—even assuming it were economically feasible for consumers to pursue these claims on their own. Here, even on Plaintiffs' counsel have taken dozens of depositions, reviewed hundreds of thousands of pages of documents, had to brief multiple dispositive motions, spending thousands of hours doing so. Given the amount

38

**JA1342**

of work involved in unraveling this scheme, an individual case worth a few thousand dollars simply is not a viable alternative to a class proceeding. There simply is no other practical means for these classes—mostly low-income consumers—to challenge a practice that stands in uniform violation of Virginia's usury laws. "The desirability of providing recourse for the injured consumer who would otherwise be financially incapable of bringing suit and the deterrent value of class litigation clearly render the class action a viable and important mechanism in challenging fraud on the public."  6 H. Newberg and A. Conte, Newberg on Class Actions § 21:30 (4th ed. 2003).

Furthermore, even if just a small fraction of the class were to bring individual suits, the adjudication of common issues in a single proceeding would be infinitely more efficient than would be the separate adjudication of thousands of individual claims.[9] Additionally, there "is a strong presumption in favor of a finding of superiority" where, as here, "the alternative to a class action is likely to be no action at all for the majority of class members." *Cavin*, 236 F.R.D. at 396. This presumption is rooted in the policy that lies "at the very core of the class action mechanism"— namely, "overcom[ing] the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 625; *see also Henry*, 199 F.R.D. at 573 (finding a class action was superior because "the potential class is composed of individuals so financially strapped that they would borrow money at extremely usurious rates."); *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 880 (7th Cir. 2000) (stating in "small-stakes cases, a class suit is the best, and perhaps the only, way to proceed").

---

[9] *See, e.g.*, *White v. E-Loan, Inc.,* 2006 WL 2411420, at *9 (N.D. Cal. 2006)("given that thousands of consumers may have suffered identical injury, a class action is certainly the most efficient way to adjudicate disputes over those consumers' rights"); *Cavin*, 236 F.R.D. at 396; *White v. Imperial Adjustment Corp.*, 2002 WL 1809084, at *15 (E.D. La. Aug. 6, 2002), ("the piecemeal approach is rife with shortcomings, not the least of which is the possibility of inconsistent adjudications with regard to an identical course of conduct"), *aff'd in part*, 75 Fed. Appx. 972 (5th Cir. 2003).

Given the commonality that characterizes all of the issues in these cases, such treatment will not raise any significant manageability hurdles. Even if it did, however, "[a] class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the . . . wrongdoing that will go unpunished if class treatment is denied—to no litigation at all." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

## CONCLUSION

Plaintiffs respectfully request the Court to grant this motion for class certification.

RESPECTFULLY SUBMITTED AND DATED this 23rd day of December, 2020.

CONSUMER LITIGATION ASSOCIATES, P.C.


By: /s/ *Leonard A. Bennett*, VSB #37523
    Leonard A. Bennett, VSB #37523
    Email: lenbennett@clalegal.com
    Craig C. Marchiando, VSB #89736
    Email: craig@clalegal.com
    Amy Austin, VSB #46579
    Email: amyaustin@clalegal.com
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

    Kristi C. Kelly, VSB #72791
    Email: kkelly@kellyguzzo.com
    Andrew J. Guzzo, VSB #82170
    Email: aguzzo@kellyguzzo.com
    Casey S. Nash, VSB #84261
    Email: casey@kellyguzzo.com
    KELLY GUZZO, PLC
    3925 Chain Bridge Road, Suite 202
    Fairfax, Virginia 22030
    Telephone: (703) 424-7572
    Facsimile: (703) 591-0167

    E. Michelle Drake, *Admitted Pro Hac Vice*
    Email: emdrake@bm.net
    John G. Albanese, *Admitted Pro Hac Vice*
    Email: jalbanese@bm.net

JA1344

BERGER & MONTAGUE, P.C.
43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470

Beth E. Terrell, *Admitted Pro Hac Vice*
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Email: jmurray@terrellmarshall.com
Elizabeth A. Adams, *Admitted Pro Hac Vice*
Email: eadams@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Matthew Wessler, *Admitted Pro Hac Vice*
Email: matt@guptawessler.com
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

Michael Allen Caddell, *Admitted Pro Hac Vice*
Email: mac@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston, Texas 77007-1722
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

*Attorneys for Plaintiffs and Proposed Classes*

**JA1345**

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2020, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to all

counsel of record.

DATED this 23rd day of December, 2020.

CONSUMER LITIGATION ASSOCIATES, P.C.


By: /s/ Leonard A. Bennett, VSB #37523
    Leonard A. Bennett, VSB #37523
    Email: lenbennett@clalegal.com
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

*Attorneys for Plaintiffs and Proposed Classes*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| LULA WILLIAMS, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:17-cv-00461 (REP) |
| v. | ) | |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MATT MARTORELLO'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Matt Martorello, by counsel, respectfully submits this Opposition to Plaintiffs' Motion for Preliminary Injunction.

## I.  INTRODUCTION

At heart, Plaintiffs' claim is for money damages.  Despite an adequate remedy at law, Plaintiffs improperly seek to shut down the business-as-usual of a <u>non-party</u> limited liability company, Eventide Credit Acquisitions, LLC ("Eventide").  (ECF 990, p. 17)  Plaintiffs seek to halt Eventide's ability to fulfill *any* of its obligations from Eventide's only source of income – a promissory Note from Lac Vieux Desert Band of Lake Superior Chippewa Indians' (the "Tribe's") wholly-owned entity, Big Picture Loans, LLC ("Big Picture").

Freezing Eventide's assets would cut off indemnification of Martorello's defense in pending Tribal litigation (in three forums) and payment of Martorello's managerial salary, on which Martorello (in part) lives.  Eventide currently indemnifies defense costs of Matt Martorello, Justin Martorello, Rebecca Martorello, Gallant Capital, LLC, and Liont, LLC, which indemnification would be impossible if the Court were to freeze Eventide's only source of income.  Eventide also must pay its own legal costs, which are ongoing and substantial.  In

addition, Eventide must pay corporate creditors, including Martorello's former legal counsel and may have future indemnity obligations to additional indemnitees and future legal costs.

Plaintiffs' attempt to freeze Eventide's assets and push ahead of Eventide's creditors is particularly unjust because Plaintiffs have <u>no</u> equity interest in the funds.  Plaintiffs could not possibly have any equity interest because the Tribe's Note payments are derived from *other borrowers* – with post-2019 Tribal Loans (which could not have qualified for Plaintiffs' pre-2019 purported class).

The extraordinary remedy of an injunction is improper here because (1) the statutes underlying Plaintiffs' claims provide exclusive remedies and preclude the injunctive relief requested; (2) plaintiffs have no equitable claim against Note payments *derived from other borrowers* outside of Plaintiffs' class; (3) an adequate remedy at law exists (money), and there is no likelihood for irreparable harm (Eventide is not making and is willing to refrain from making member distributions or transfers off-shore); (4) Plaintiffs cannot show likelihood of success on the merits, especially with respect to Martorello personally and Eventide (a non-party); (5) the balance of equities favors allowing Eventide to fulfill its usual business obligations (including regular expenses) and avoid default; (6) the public interest weighs against cutting off defense funding mid-suit, especially where novel and important federal Indian law and policy issues are at stake; and (7) the proposed injunction is not reasonably tailored in scope.

## II.  FACTUAL BACKGROUND

Eventide is <u>not</u> a party to this suit.  It is a limited liability company with the following six (6) members: Breakwater Holdings, LLC (59.6%); Gallant Capital (25.5%); Justin Martorello (9.9%); Brian McFadden (2.0%); James Dowd (1.5%); and Simon Liang (1.5%).  (ECF 990-10).  Eventide has one Class A voting member, Breakwater Holdings, LLC, which is not controlled by

**JA1348**

Martorello.  Eventide pays Martorello a monthly salary to manage the company and its affairs, including litigation and the Tribe's compliance with its debtor obligations.  Eventide also has several ongoing obligations, including defense of other pending matters, contractual obligations, and payment of creditors including Eventide's prior legal counsel.  The affidavit of one of several unpaid legal creditors, Bernard R. Given, Esq. of Loeb & Loeb LLP, is attached as Exhibit 1.

Money paid into Eventide from the Note is almost certainly from post-2019 borrowers of Tribal loans.  This is because all of Big Picture's loans are short term loans, with an average pay-off duration of several months.  *See* Affidavit of Matt Martorello, attached as Exhibit 2.  Due to the short duration of interest payments, the future payments from the Tribe would be comprised of interest payments from recent (post-2019) Tribal borrowers.  Such borrowers are *outside* of Plaintiffs' class, which is confined to borrowers from June 22, 2013 to December 31, 2019. (ECF 968, p.24); *see, e.g.,* ECF 1-1, p.2  (Williams loan's maturity date was May 3, 2018); Exhibit 3 (Dowin Coffy's loan's maturity date was July 14, 2017); Exhibit 4 (George Hengle's loan's maturity date was April 27, 2018); Exhibit 5 (Gloria Turnage's loan maturity date was February 28, 2018).  In effect, Plaintiffs are seeking an equitable remedy from *other* potential borrowers' interest payments (not their own).

The post-2019 money flowing into Eventide pays for company operations and obligations, including payments to lawyers, accountants, management, and creditors.  *See* Exhibit 2.  Though Eventide historically made distributions to its members, there have been no distributions since after August of 2019.  *See* Exhibit 2.  In addition, in an attempt to avoid unnecessary motion practice, Eventide offered to prevent (by resolution or otherwise) distributions to its members or payments abroad during the pendency of this case.  Plaintiffs

**JA1349**

unreasonably rejected that offer, and instead seek a complete shutdown of Eventide, including

payment of Martorello's salary and defense costs.

The Note payments to Eventide derive from Tribal loans issued by Big Picture and

formerly by the wholly-owned Tribal entity Red Rock Tribal Lending, LLC ("RRTL")

(collectively, the "Tribal entities") and consummated on the Tribal Reservation in Michigan.  As

this Court found and the Fourth Circuit affirmed:

> Big Picture has its principal place of business on the Reservation, and its
> employees are all located there. The servers for Big Picture's websites are
> also stored on the Reservation. And, because all loan applications are
> approved by Big Picture employees on the Reservation, all consumer
> loans are originated there.

*Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 264 (E.D. Va. 2018), rev'd and

remanded, 929 F.3d 170 (4th Cir. 2019); *see also* Exhibit 6, Interrogatories, p. 1311-1312

(describing acceptance process); also Exhibit 7, LVD Chairman Williams 8/22/13 Decl., p. 5, ¶

19; Exhibit 8 Hazen Dec., p.5-6, ¶ 34, c. (detailing eight-step process for acceptance of consumer

loan applications all of which is handled by RRTL).  In addition, the loan payment's place of

performance was also on the Reservation.  *See* Exhibit 9, Mansfield 1/18/19 Dep. at 112:23-

113:2. (Red Rock's original Operations Manager testified, "we [Red Rock] had the account the

money went through, we were the ones that would actually put the money in and take the money

out of the accounts.  That was done at the tribe, at the call center.").

The Tribal entities were organized under Tribal law, were wholly owned and operated by

the Tribe, and functioned as an arm of the Tribe in all operations of business and at all times on

the Reservation.  *See* Exhibit 10, *Galloway v Big Picture* ECF 38-15 (summarizing 246

resolutions of Tribal Council(s) spanning eight years, beginning March 30, 2010); Exhibit 7,

LVD Chairman Williams 8/22/13 Decl., p. 5, ¶ 11-18 and 21-26; ¶ 6; *See generally* Exhibit 11,

LVD Resolution # 2011-041; Exhibit 12, Articles of Organization of the Red Rock Tribal

Lending, LLC; Exhibit 13, Articles of Organization of Big Picture Loans, LLC, p. 2, Art. 6;

*Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 185 (4th Cir. 2019) (Big Picture was an arm

of the Tribe).

      The Tribal entities are managed by Tribal members – not Martorello. *See* Exhibit 7,

LVD Chairman Williams 8/22/13 Decl., p. 5, ¶ 19 – 20 ("Red Rock is managed by Tribal

members who are engaged in business decisions for each company on a day to day basis"); *see*

*also* Weddle Dep., 110:4-15 (testifying that "the tribe's control over decision-making" was

"clear," and "that the individuals responsible for decision-making for Duck Creek and Red Rock

were at all times tribal officials").

      All decisions about the loans were either made by Tribal entities' managers or expressly

delegated and overseen by Tribal entities' managers. *See* Exhibit 7, LVD Chairman Williams

8/22/13 Decl., p. 5, ¶ 19 – 20 ("Red Rock is managed by Tribal members who are engaged in

business decisions for each company on a day to day basis"); Exhibit 14, Weddle Dep., 110:4-15

(testifying that tribal officials controlled decision-making for RRTL); Exhibit 15, June 15, 2012

Email from K. Wichtman to Martorello, ROSETTE_ REVISED_ 044598 ("…our model is one

of the best there is, we have made every effort to ensure tribal control, and are tweaking things

almost constantly, it seems, to allow for more tribal control."); Exhibit 16, November 1, 2011

Job Description of Red Rock Operations Manager, ROSETTE_REVISED_037655 (providing

the job description for Operations Manager of RRTL day-to-day operations as responsible for

"all . . . aspects" of the RRTL call center, customer communications, review of daily loan

applications, and daily origination of loans and ACH files).

**JA1351**

All funds for the loans came from the Tribal lender and returned to the Tribal lender's bank accounts. *See* Exhibit 17, Hazen Aff. ¶¶26-28; Exhibit 18, Williams Aff. ¶ 19; Exhibit 9, Mansfield 1/18/19 Dep. at 112:23-113:2. The Tribal lender also collected the loans. *See* Exhibit 9, Mansfield 1/18/19 Dep. At 112:23-113:2.

Several steps removed from the Tribal lending, Martorello managed a company named Bellicose that contracted with the Tribal lender to provide vendor services and assistance. *See, Williams*, 929 F.3d at 175 (outside vendors managed by Martorello were "support services"). In accordance with the Servicing Agreement between Bellicose and Tribal entities, Martorello did not manage Tribal entities' operations. *See* Exhibit 17, Hazen Aff., p. 2, ¶¶ 8-9; *See generally* Exhibit 19, Red Rock-Bellicose Servicing Agreement, MARTORELLO_026256; Exhibit 16, November 1, 2011 Job Description of RRTL Operations Manager, ROSETTE_REVISED _037655 (providing the job description for Operations Manager of RRTL day-to-day operations as responsible for "all . . . aspects" of the RRTL call center, customer communications, review of daily loan applications, and daily origination of loans and ACH files); Exhibit 20, Red Rock Lending Operation Chart, ROSETTE_REVISED_034686.

Big Picture purchased the equity of Bellicose from Eventide in a seller-financed loan transaction on January 26, 2016. Since the Tribe's acquisition of Bellicose in January 2016, Eventide is nothing more than a creditor of the Tribal lender.

### III. STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7,

22, 129 S.Ct. 365, 172 L.Ed. 2d 249 (2008); *accord Levisa Coal Co. v. Consolidation Coal Co.*,

276 Va. 44, 60 n. 6 (2008) ("the granting of an injunction is an extraordinary remedy").

To obtain a preliminary injunction, Plaintiffs must show: (1) likelihood of success on the

merits; (2) likelihood for irreparable harm absent preliminary relief; (3) "that the balance of

equities tips in his favor;" and (4) "that an injunction is in the public interest." *Dewhurst*, 649

F.3d at 290. In addition, "unless a party is entitled to an injunction pursuant to a statute, a party

must establish the traditional prerequisites, i.e. irreparable harm and lack of adequate remedy at

law before injunctive relief will be sustained." *Levisa*, 276 at 61.

In addition, because Plaintiffs attempt to freeze specific assets (Loan payments),

Plaintiffs must show: (1) a lien or equitable interest in the property; (2) a "sufficient nexus"

between the assets sought and plaintiffs' claim; and (3) that the interim relief is a "reasonable

measure to preserve the status quo." *See Travelers Cas. & Sur. Co. of Am. v. Beck Dev. Corp.*,

95 F. Supp. 2d 549, 552 (E.D. Va. 2000) (noting additional requirements for equitable interests).

If there is no sufficient lien or equitable interest in the property, a district court would

lack the power to issue an injunction preventing transfer of assets. *Id.* ("district court lacks

power under Rule 65 of the Federal Rules of Civil Procedure and the court's equitable authority

to issue an injunction preventing the transfer of assets in an action solely for money damages

where the party seeking the injunction has no lien or equitable interest in the property").

## IV. ARGUMENT

Plaintiffs are not entitled to injunctive relief because (1) the statutes underpinning their

claims preclude the injunctive relief requested; (2) plaintiffs have no equitable claim to interest

payments derived from *other borrowers* outside of Plaintiffs' class; (3) there is an adequate

remedy at law (money) and no irreparable harm (Eventide and Martorello are not sending

Eventide's money off-shore); (4) Plaintiffs cannot show likelihood of success on the merits *against Martorello*; (5) the balance of equities favor continued payment by Eventide of indemnity obligations and legal defense costs; (6) the public interest favors continuation of mid-litigation defense costs, especially where Tribal issues are concerned; (7) the proposed injunction is overbroad; and (8) an injunction would cause significant harm, requiring a substantial bond.

## 1.  Statutory Remedies Effectively Exclude the Injunctive Relief Requested.

In Virginia, "when a statute creates a right and provides a remedy for vindication of that right, then that remedy is <u>exclusive</u> unless the statute says otherwise."  *Concerned Taxpayers of Brunswick Cty. v. County of Brunswick*, 249 Va. 320, 455 S.E.2d 712, 717 (1995) (quoting *Vansant Gusler, Inc. v. Washington*, 245 Va. 356, 429 S.E.2d 31, 33 (1993) (emphasis added, internal quotations and citations omitted).

In a parallel Tribal lending case, the Eastern District of Virginia recently ruled that Plaintiffs were not entitled to the injunctive relief they sought because they "must rely exclusively on the remedies provided" by Virginia usury statutes.  *Hengle v. Asner*, 433 F. Supp. 3d 825, 879 (E.D. Va. 2020*), motion to certify appeal granted*, No. 3:19CV250 (DJN), 2020 WL 855970 (E.D. Va. Feb. 20, 2020).  The statutory remedies for violation of Virginia's usury cap are:

> A. A loan contract shall be void if any act has been done in the making or collection thereof that violates § 6.2-1501.

> B. The **lender** on any loan for which a person has taken any action in its making or collection in violation of § 6.2-1501 shall not collect, receive, or retain any principal, interest, or charges whatsoever **with respect to the loan**, and any principal or interest paid on the loan shall be recoverable **by the person** by or for whom payment was made.

Va. Code § 6.2-1541 (emphasis added).

**JA1354**

The Virginia Supreme Court has found that § 6.2-1541(B) permits "a recovery of **restitution only from the lender**," which excludes members, officers, directors, agents and employees of that lender. *Greenberg v. Commonwealth ex rel. Att'y Gen. of Va.*, 255 Va. 594, 499 S.E.2d 266, 270 (1998) (emphasis added). Restitution allows for only retrospective relief by returning to the plaintiff what the defendant rightfully owes her. Restatement (Third) of Restitution § 1 cmt. a (Am. Law Inst. 2019); *Hengle*, 433 F.Supp.3d at 879 (quoting Restatement (Third) of Restitution).

There is no potential for injunctive relief against future usurious loans or ongoing lending with other borrowers. *Hengle*, 433 F.Supp.3d at 879 (finding that § 6.2-1541(B) did not permit prospective relief of enjoining Tribal Officials from issuing usurious loans in Virginia). Plaintiffs, therefore, have no right to injunctive relief pertaining to interest from prospective loans of other borrowers outside of Plaintiffs' class.

In addition, the Virginia usury statute only provides for relief against the lender (Big Picture) – not Martorello. *See* Va. Code § 6.2-1541; *Greenberg*, 255 Va. at 600, 499 S.E.2d at 270 (Consumer Finance Act "permits a recovery of restitution only from the lender," which "does not include any individual, officer, director, or entity other than the lender"). This statutory scope cannot be expanded, without legislative approval. *See Greenberg*, 255 Va. at 601-602 (Virginia usury statute permits "recovery of restitution solely from the 'lender' and does not impose liability on 'any person;'" to allow broader scope would be to "invade the province of the legislature").

Similarly, RICO does not expressly provide for injunctive or declaratory relief. *Hengle*, 433 F.Supp.3d at 879 (finding that the Ninth Circuit authority was persuasive that RICO did not include a private right to injunctive relief) (referencing *Religious Tech. Ctr. v. Wollersheim*, 796

**JA1355**

F.2d 1076, 1088 (9th Cir. 1986)); *Religious Tech.*, 796 F.2d at 1088 ("Congress did not intend to give private RICO plaintiffs any right to injunctive relief"); *Johnson v. Collins Entm't Co.,* 199 F.3d 710, 726 (4th Cir. 1999) (RICO "makes no mention whatever of injunctive or declaratory relief").

In short, Plaintiffs are limited to the statutory remedies, including potential for treble damages and restitution against the lender of past loans (i.e., their own loans). This relief is exclusive, meaning there is no basis to seek an injunction of future interest payments from other borrowers outside of Plaintiffs' class, or to seek those payments from anyone other than the lender, Big Picture. *Concerned Taxpayers*, 249 Va. at 330, S.E.2d at 717 (statutory "remedy is exclusive unless statute says otherwise").

Though Plaintiffs also allege "unjust enrichment," this claim is based wholly on the usury statute, and there is no common law corollary. *See, e.g., Hengle*, 433 F.Supp. 879 (plaintiffs "fail to point to any equitable remedy concerning usurious lending that preexists those enumerated in the VCFA. Indeed, as mentioned, usury regulation in Virginia has been a creature of statute since the colonial period"). Notably, *Hengle* also involved claims of unjust enrichment but, regardless, the Court refused to grant injunctive relief for ongoing/future usurious operations. *Hengle,* 433 F. Supp. 3d at 879 (plaintiffs "must exclusively rely on the remedies provided by" Virginia usury statutes). The heart and substance of Plaintiffs' claims are statutory (dependent on Virginia's usury law), and Plaintiffs therefore are limited to statutory remedies.

Martorello cannot be held liable for unjust enrichment, in any case. "Where a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi-contract or unjust enrichment does not lie." *WRH Mortg., Inc. v. S.A.S. Assocs*., 214 F.3d 528, 534 (4th Cir. 2000); *Jones v. Bank of Am. Corp*., No. 4:09CV 162, 2010 WL 6605789, at *7

(E.D. Va. Aug. 24, 2010) (In cases where there is "an express contract" governing the parties'

relationship, a claim for unjust enrichment cannot stand). "This rule applies regardless whether

the defendant is a party to the contract." *United States v. Savannah River Nuclear Sols., LLC,*

No. 1:16-CV-00825-JMC, 2016 WL 7104823, at *26 (D.S.C. Dec. 6, 2016)

### 2. Plaintiffs Have No Equitable Interest in the Note Payments Derived from Other Borrowers Outside of Their Class.

Plaintiffs fail to show (1) a lien or equitable interest in the Loan Payments; (2) a

"sufficient nexus" between the assets sought and Plaintiffs' claim; and (3) that the interim relief

is a "reasonable measure to preserve the status quo." *See Travelers Cas. & Sur. Co. of Am. v.*

*Beck Dev. Corp.,* 95 F. Supp. 2d 549, 552 (E.D. Va. 2000) (noting additional requirements for

equitable interests).

### A.  Plaintiffs Cannot Have an Equitable Claim to Other Borrower's Payments Because There is No Sufficient "Nexus."

An injunction freezing assets may not be entered in an action for damages where no lien

or equitable interest in the assets is claimed. *Grupo Mexicano de Desarrollo S.A. v. All. Bond*

*Fund, Inc*., 527 U.S. 308, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999) ("prior to entry of money

judgment, district court lacked power to issue a preliminary injunction preventing operator from

transferring assets in which no lien or equitable interest was claimed"); *Travelers Cas. & Sur.*

*Co. of Am. v. Beck Dev. Corp.*, 95 F. Supp. 2d 549, 552 (E.D. Va. 2000) (a district court "lacks

the power … to issue an injunction preventing the transfer of assets in an action solely for money

damages where the party seeking the injunction has no lien or equitable interest in the property").

"A debt claim leads only to a money judgment and does not in its own right constitute an

interest in specific property." *U.S. ex rel. Rahman v. Oncology Assocs*., 198 F.3d 489, 496 (4th

Cir. 1999).  "Where a plaintiff creditor has no lien or equitable interest in the assets of a

defendant debtor, the creditor may not interfere with the debtor's use of his property before obtaining judgment." *Id.*

Here, Plaintiffs can have no lien or equitable interest in the money coming into Eventide from the Note because those funds derive from post-2019 borrowers of Tribal loans. The funds from the Note are not derived from Plaintiffs – they are derived from continuing Tribal lending after the close of Plaintiffs' purported class. Because Plaintiffs have no claim to those specific funds, they have no potential for an equitable interest in the current Note payments.

By attempting to seize assets derived from *other* borrowers of Tribal loans, Plaintiffs effectively are attempting exactly what they claim is illegal – benefiting from high-interest loan payments from other borrowers. Because the Note payments that Plaintiffs seek to enjoin originate from post-2019 Tribal borrowers outside of Plaintiffs' class, the Note Payments contain interest from other borrowers. If Plaintiffs freeze Tribal interest payments from other borrowers, they would be engaging in precisely the conduct they allege constitutes criminal activity. Indeed, Plaintiffs already are taking interest payments from other borrowers through their settlement with the Tribe, which includes payments derived from other borrowers over the next two years. *See Galloway et al. v. Williams et al.,* 3:19-cv-00470 (E.D. Va.), ECF No. 55-1 (Settlement Agreement §§ 1.6, 3.1-3.3, 10.2).

**B.  There Is No Sufficient Nexus or Reasonably Narrow Tailoring**.

Even if there were a nexus between the Note payments from other borrowers and Plaintiffs' claim (which there is not), the next step would be to determine whether the interim relief sought "is a reasonable measure to preserve the status quo." *Travelers Cas. & Sur. Co. of Am. v. Beck Dev. Corp.*, 95 F. Supp. 2d 549, 553 (E.D. Va. 2000) (identifying a two-step

process: first finding the nexus between the assets and equitable relief; and second making sure the relief is adequately tailed to preserve the status quo).

Any injunction must be narrowly tailored to fit the specific circumstances at issue. *Madison v. Bd. of Supervisors of Loudoun Cty.*, 296 Va. 73, 77, 817 S.E.2d 818, 821 (2018). "Absent this narrowing, a prefiling injunction, like any other injunction, will not survive appellate review." *Adkins v. CP/IPERS Arlington Hotel LLC*, 293 Va. 446, 452, 799 S.E.2d 929, 933 (2017).

Here Plaintiffs' motion is not narrowly tailored. It seeks to cut off any use by Eventide (a non-party) of its only income source, including payment of Eventide's ongoing obligations, such as legal fees and indemnification costs. Appropriate tailoring would limit any injunction to offshore transfers only – not actions in the ordinary course of business, like paying salaries, accountants, debts, legal costs, and indemnity obligations.

### C.  There Is No Fraud Here or Other Basis for Exception.

Plaintiffs cite cases involving fraud, but these do not apply because there is no fraud here – just claims based on Tribal interest rates, to which consumers agreed. For example, *Raham* is different because it involved fraudulent billing. *Rahman*, 198 F.3d at 496 (involving alleged fraudulent billing schemes involving Medicare and other programs). Unlike in *Rahman*, Martorello and Eventide are not even alleged to be engaged in any fraud – at the most the allegations arise from interest rates that are legal under Tribal law (not fraud). In addition, there is no transferring of assets obtained by fraud. *Rahman*, 198 F.3d at 494 (where Defendants charged with fraudulent billing were selling their equipment and transferring money to the Caribbean). Here, Eventide is using its assets only in the usual course of business, including payment of salaries, creditors, and indemnification of Martorello's defense. It is not making

member distributions or payments abroad (and its money is not derived by fraud regardless). It also has offered to withhold any member/shareholder distributions or transfers during the pendency of this litigation, but Plaintiffs unreasonably rejected this offer.

Similarly, *Amazon.com, Inc. v. WDC Holdings LLC,* 2020 WL 4353563, *4 (E.D. Va. 2020), involved a "widespread scheme of kickbacks and fraudulent transactions," which is not the case here. In *Amazon*, the alleged irreparable harm involved "threats to evidence," including deletion of files relating to kickbacks. *Id.* at *8. There were also threats of "loss of customer good will" and claims of detinue, i.e. "withholding personal property of another." *Id.* at *9. Here, there are no fraudulent transactions or kickbacks (just allegations of alleged usury). The case does not apply.

### 3. There is An Adequate Remedy at Law and No Potential for Irreparable Harm.

Plaintiffs must establish "irreparable harm and lack of an adequate remedy at law before a request for injunction relief will be sustained." *Levisa*, 276 Va. at 61; *eBay Inc. v. MercExchange*, LLC, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (injunctive relief requires "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury"). Plaintiffs cannot meet this burden because there is an adequate remedy at law – money, and there is no irreparable harm.

Here, money damages (and the potential for treble damages) constitute an adequate remedy at law. *Hengle v. Asner*, 433 F. Supp. 3d at 885 (finding that there was an adequate remedy at law in a similar tribal lending case because Congress "provided an adequate remedy at law that would seemingly preclude equitable relief"). And a "party may not obtain injunctive relief where it is claiming a loss that can be adequately remedied by an award of money damages." *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985).

The adequacy of money damages generally signifies there is no irreparable injury, because the injury is fixable.  *See, e.g.*, *Ducard v. Lazy Creek*, 99 Va. Cir. 449 (2018) ("irreparable injury, [is] one that cannot be compensated adequately by damage"); *see also JPMCCM 2010-C1 Aquia Office LLC v. Mosaic Aquia Owner, LLC,* 101 Va. Cir. 34 (2019) (equity jurisdiction, being supplemental to the older common law, cannot be invoked where the remedies of the common law provide adequate relief to the plaintiff).

Here, there is no potential for insolvency (unless Plaintiffs' motion is granted), due to the monthly Note payments.  Even if there were any potential for insolvency (which there should not be, given the Note), there would be no basis for irreparable harm here.  *See, e.g., Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.,* 452 Fed. App'x 351, 354 (4th Cir. Oct. 26, 2011) (alleged insolvency did not warrant a finding of irreparable harm).

### A.  There Have Been No Post-August 2019 Distributions; Eventide's Money Remains in This Country.

It is incorrect that Eventide's assets "are being secreted to the Cook Islands;" there have been no post-August 2019 distributions or transfers abroad.  *See* Affidavit of Matt Martorello, at Exhibit 2.  From after August 2019 to present (February 2021), neither Martorello nor Eventide transferred assets out of this jurisdiction.  *Id.*  Eventide also offered to refrain from any future distributions or transfers during the course of litigation, but Plaintiffs rejected the offer.  *See* ECF 997 (transcript from January 21 telephonic proceeding).  Instead, Plaintiffs unreasonably seek to enjoin all company functions, including payment of litigation costs.

### B.  There is No Irreparable Harm from Eventide's Usual Course of Business.

Plaintiffs' required showing of irreparable harm must be substantial and imminent, measured by the harm arising during the interim between the request for an injunction and the final disposition of the case.  *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802,

812 (4th Cir. 1991) (the "required irreparable harm must be neither remote nor speculative, but actual and imminent") (internal quotes and citations omitted); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:20-CV-98, 2020 WL 1844791, at *23 (E.D. Va. Apr. 10, 2020), *appeal dismissed*, No. 20-1425, 2020 WL 6039118 (4th Cir. Apr. 30, 2020) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough.") (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 228 (4th Cir. 2020)); *Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir. 1995) ("irreparable harm is measured in terms of the harm arising during the interim between the request for an injunction and final disposition of the case on the merits").

Plaintiffs cannot show any such substantial and imminent irreparable harm from Eventide's money that remains in this country and is used in the ordinary course of business. Plaintiffs' cases regarding asset freezes are inapposite, including because they involve a *party's* assets.  Here, Plaintiffs seek to freeze a non-party's (Eventide's) assets.  *C.f. USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982) (injunction power related to "defendants' property").

Further evidence of lack of any urgency here is that Plaintiffs' waited approximately eight months after Eventide emerged from bankruptcy before it filed its motion.  This shows that there is no urgent need for protection.  *See, e.g., Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) ("Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required.").

**4.  Plaintiffs Cannot Show Likelihood of Success on the Merits against Martorello.**

Plaintiffs cannot demonstrate a likelihood of success on the merits, especially with respect to Martorello *in his personal capacity* and against the assets of a non-party limited liability company, Eventide.

**A.  Tribal Law Applies to the Loans and Therefore There is No Usury or RICO Predicate Offense**.

The Virginia Supreme Court has held that choice-of-law clauses designating application of another sovereign's law should be enforced even if that law does not contain an interest rate cap.  *See Settlement Funding, LLC v. Van Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007).  Here, the Tribal loans contained Tribal choice-of-law provisions, to which all borrowers agreed.  These Tribal choice-of-law provisions should be enforced pursuant to *Settlement Funding*.  *Id.*  Failure to honor choice of law provisions and apply Tribal law would infringe on Tribal self-governance without Congressional authorization; conflict with NABDA, 25 U.S.C. § 4301 (encouraging tribes to export services, trade freely, and use the resources of the private market) and numerous federal policies to protect and promote these efforts; improperly restrict the Tribal sovereign's ability to contract according to its laws; and undermine freedom of contractual choice for Virginia citizens.

**B.  Even under Traditional Choice of Law Principals, Tribal Law Applies.**

Even if the Court struck down the choice of law provisions (which it should not), Tribal law should apply based on Virginia's choice-of-law rules.  For contracts, Virginia applies "lex loci contractus," whereby the "nature, validity and interpretation of contracts are governed by the law of the place where made, unless the contrary appears to be the express intention of the parties."  *C. I. T. Corp. v. Guy*, 170 Va. 16, 16, 195 S.E. 659 (1938); *see also Insteel Indus., Inc. v. Costanza Contracting Co*., 276 F. Supp. 2d 479, 484 (E.D. Va. 2003) ("the law of the place

where the contract was made governs questions of interpretation, validity, and enforceability of a contract."). Here, facts indicate that the contract was made on the Tribe's reservation because that is the place of final approval and issuance of the loan. Tribal law should apply.

Similarly, Tribal law would prevail pursuant to the dormant commerce clause. *See, e.g., Titlemax of Delaware Inc. et al. v. Weissmann*, No. CV 17-1325-MPT, 2020 WL 7186833, at *4 (D. Del. Dec. 7, 2020) (attempt to apply state usury laws to the loans issued in other states violated the Commerce Clause; under the Commerce Clause, "the 'critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the state…'" (emphasis added). This is true regardless of "whether or not the commerce has effects in the state." *Id.*

### C.  There is No Prospective Waiver By Virtue of Recognizing Tribal Law.

The prospective waiver exception is not, as Plaintiffs argue, a generalized contract defense that can invalidate choice of law globally. Rather, the prospective waiver exception is a judge-made exception applicable only to whether choice-of-law and choice of forum clauses *in an arbitration agreement* prevent a litigant from *pursuing* his or her federal claims. *See Italian Colors*, 570 U.S. at 235-36 (prospective waiver is a "judge-made exception" to the Federal Arbitration Act).

Here, the Tribe's law incorporates federal law; the Tribe's dispute resolution procedures are not illusory; and Plaintiffs failed to exhaust tribal remedies, *after which* they could have pursued claims in federal court. *See, e.g.,* LVD Code, ECF 958-1 (¶1.1 (f) "It is essential that the Tribal Council regulate consumer financial services in a manner commensurate with Tribal law and policy ***and applicable federal law***" and ¶ 9.3(h) "Relief"). Because Tribal law incorporates federal law, the prospective waiver doctrine does not apply. *See, e.g. Hengle v. Asner*, 433 F.

Supp. 3d 825, 865 (E.D. Va. 2020), *motion to certify appeal granted*, No. 3:19CV250 (DJN),

2020 WL 855970 (E.D. Va. Feb. 20, 2020) (though loan agreements indicated they "shall be

governed by applicable tribal law," this did not expressly disavow the application of federal law,

and the prospective waiver doctrine did not apply).

In addition, the provision of a different or smaller remedy is not sufficient to invoke the

preemptive waiver doctrine. *See, e.g., Vimar Seguros y Reaseguros, S.A. v. M/V/ Sky Reefer*, 515

U.S. 528, 540-41 (1995) (no prospective waiver, though Japanese law provided defenses to

liability that were unavailable under U.S. law); *Richards v. Lloyd's of London*, 135 F.3d 1289,

1295-96 (9th Cir. 1998) (requiring enforcement of choice of law and forum provisions selecting

United Kingdom law though enforcement of those clauses would "deprive [plaintiffs] of

important remedies provided by our securities laws" as well as a wholesale inability to assert

their RICO claims).

### D.  State Regulatory Laws Should Not Burden Loans Because the Loans Are Firmly Rooted on the Reservation.

The Second Circuit has acknowledged that "[a] court might well find that the tribes'

sovereign interest in raising revenue militate[s] in favor of prohibiting a separate sovereign from

interfering in their affairs." *Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Serv.*,

769 F.3d 105, 112, n.4 (2d Cir. 2014).   Although part of the loan transaction occurred in the

state where the borrower lived, "[a] court might ultimately conclude that, despite these

circumstances, the transaction … **could be regarded as on-reservation**, based on the extent to

which one side of the transaction is firmly rooted on the reservation." *Id.* at 115. (emphasis

added).

"[I]n cases involving a contract formed on the reservation in which the parties agree to

tribal jurisdiction, treating the nonmember's physical presence as determinative ignores the

realities of our modern world that a [person], through the internet or phone, can conduct business on the reservation and can affect the Tribe and tribal members without physically entering the reservation.  The proper focus [of the *Montana* exceptions] is on the nonmember Borrower's '*activities'* or '*conduct*,' not solely the nonmember Borrower's *physical location.*"  *F.T.C. v. Payday Financial, LLC*, 935 F.Supp.2d 926, 939-40 (D.S.D. 2013) (emphasis in the original; citations omitted).  "When a nonmember enters into a commercial transaction with a tribal member or reservation-based tribal business, receives a benefit coming from the reservation as a result, and consents in a written contract to tribal jurisdiction, that nonmember seems to have engaged in the sort of 'consensual relationship with the tribe or its members, through commercial dealing' that would subject the nonmember to tribal jurisdiction." *Id.* at 936 (quoting *Montana*, 450 U.S. at 565).

In this case, it is established that the loans at issue are indeed "firmly rooted" on the Tribe's Reservation.  First, all of the loans were made and collected by Big Picture and Red Rock, which are arms of the Tribe and from both of which LVD indeed has raised substantial revenue.  Second, all of the loans are originated on the Reservation where the lenders are headquartered. *Williams v. Big Picture Loans, LLC*, 329 F.Supp.3d 248, 264 (E.D. Va. 2018).  Because the loans are firmly rooted on the Tribe's Reservation, the Tribe is entitled to regulate them through Tribal law.  *See, e.g.,California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 222 (1987) (exercise of "state regulatory authority" barred where it is "pre-empted by federal law" or infringes on Indians' right "to make their own laws and be ruled by them").

As the Second Circuit noted, "once a state reaches across a reservation's borders its power diminishes" whereas "[a] tribe's [sovereign] interest peaks when a [state] regulation threatens a venture in which the tribe has invested significant resources."  *Otoe-Missouria Tribe*, 769 F.3d at

108, 113.  Here, state lending regulatory laws apply to the *lenders*, not the borrowers.  This lending

operation serves the purposes of tribal economic development and self-governance, in which "[t]he

Tribe itself has invested over $7 million."  *Williams*, 329 F.Supp.3d at 263.  Thus, the Tribe has

indeed "built the electronic equivalent of 'modern[,] ... comfortable, clean, attractive facilities' like

the ones in *Cabazon,* and … ha[s] 'engaged in a concerted and sustained undertaking to develop

and manage' its limited capital resources."  *Otoe-Missouria Tribe*, 769 F.3d at 116.

In sum, because the loans at issue here were originated on the Reservation by an

instrumentality of the Tribe they come within the jurisdiction of the Tribe, which is entitled to

regulate them through tribal law.  Because the lending operations are the Tribe's effort to make

money for use in essential government services (and it does so substantially), and in which the

Tribe has invested significant resources, the application of state law to the on reservation lending

conduct would impermissibly infringe on tribal government.  *See Cabazon*, 480 U.S. 202, 222

(1987)*; see also White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142 (1980) (exercise of

"state regulatory authority" barred where it is "pre-empted by federal law" or infringes on

Indians' right "to make their own laws and be ruled by them.").

Accordingly, Tribal law governs the on-reservation lending activity.  *See, e.g.,*

*McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 170–171, 93 S.Ct. 1257, 1261–1262,

36 L.Ed.2d 129 (1973) ([s]tate laws generally are not applicable to tribal Indians on an Indian

reservation except where Congress has expressly provided that State laws shall apply");

*Seminole Tribe v. Florida*, 517 U.S. 44, 62, 116 S. Ct. 1114, 1126 (1996) (states "have been

divested of virtually all authority over Indian commerce and Indian tribes"); *Cabazon*, 480 U.S.

at 222 (state's interest did not justify regulation of tribe's gambling business); *C.f. Marquette*

*Nat'l Bank*, 439 U.S. at 311 (National Bank Act – 12 U.S.C. § 85- allowed banks to charge

**JA1367**

customers interest rate allowed by law of the state where the bank is located, regardless of where the consumer is located – even if consumers use interstate commerce but never actually set foot in the bank's home state).

### E.  Even if Virginia Law Did Apply (Which it Should Not) Plaintiffs Cannot Show Likelihood of Success with Respect to Martorello *Personally*, Who Was Not the Lender or the Proximate Cause.

Martorello is not the lender on Plaintiffs' loans; the Tribal entity Big Picture is.  Because Martorello is not the lender, there should be no recovery under Virginia usury law against Martorello because Virginia's usury statutes limit recovery to the lender only.  *See* Va. Code 6.2-1541 (B) (identifying the "lender"); *Greenberg,* 255 Va. at 499 S.E.2d at 270 (finding that § 6.2-1541(B) permits "a recovery of **restitution** only from the **lender**," which does not include members, officers, directors, agents and employees of that lender).

At most, Plaintiffs have spotted a conflict of law problem between Indian and Virginia law – this does not equate with an illegal scheme.  *See, e.g. Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n,* 840 F.2d 653, 666 (9th Cir. 1988) (RICO is concerned with evils far more significant than the simple practice of usury"); *Gregoria v. Total Asset Recovery, Inc*., No. CIV.A. 12-4315, 2015 WL 115501, at *5, n.8 (E.D. Pa. Jan. 7, 2015) (questioning and casting doubt on whether Congress intended to impose RICO liability for usury where there was just a conflict of law problem).  Here, federal Indian law is undeveloped, and a conflict of law problem between Indian and Virginia law must not equate to a RICO liability.

Martorello could not be liable under RICO for providing routine services so essential in Indian country and strongly encouraged under the NABDA and federal policy as such.  *See, e.g., US Airline Pilots Ass'n v. Awappa, LLC,* 615 F.3d 312, 317 (4th Cir. 2010) ("we must also exercise caution to ensure that RICO's extraordinary remedy does not threaten the ordinary run

of commercial transactions") (internal quotation omitted). Martorello only contracted with the Tribe to provide assistance for his own independent purposes, which is not improper.

The Court should not find Martorello liable for criminal conduct, where Martorello meant to and was complying with Indian law and policy. *See, e.g.*, *United States v. Grote*, 961 F.3d 105, 117-18 (2d Cir. 2020) (without resolving whether there is a willfulness element of racketeering, the court noted the Supreme Court's "recent reaffirmation of a 'presumption in favor of scienter requirement,'" and described difficulties if scienter were not taken into account, such as "criminal liability for racketeering for unexceptionable conduct" or "otherwise innocent conduct") (quoting *Elonis v. United States*, 575 U.S. 723, 135 S. Ct. 2001, 2011 (2015); *see also Staples v. United States*, 511 U.S. 600, 619, 114 S. Ct. 1793, 1804 (1994) (applying "the usual presumption that a defendant must know the facts that make his conduct illegal should apply"); *see also* Va. Code (c) § 6.2-305 (establishing a bona fide error defense to a claim of usury).

Rather, RICO was not intended to cover actions in good faith compliance with one sovereign's (the Tribe's) law. Any other outcome could not be foreseeable, willful, or knowing, because there is no Congressional authority restricting sovereignty in tribal lending or ecommerce, and no Supreme Court authority on the issue. *See, e.g., Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 114 (2d Cir. 2014) ("Neither our court nor the Supreme Court has confronted a hybrid transaction like the loans at issue here… We need not resolve that novel question today.").

Plaintiffs also cannot satisfy the RICO proximate cause requirement *with respect to Martorello.* For RICO liability, a plaintiff must demonstrate that each defendant – not the enterprise as a whole – meets the proximate cause requirement. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir.

JA1369

1997), *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896, 927 (9th Cir. 2012) ("plaintiff must show not only that the defendant's violation was a 'but for' cause of his injury but that it was the proximate cause as well"). The proximate cause requirement is not satisfied "if it required the Court to move beyond the first step in the casual chain." *Fields v. Twitter, Inc.*, 881 F.3d 739, 745 (9th Cir. 2018) (citing *Hemi*, 559 U.S. at 8-12).

Where a plaintiff fails to demonstrate proximate cause as to a defendant, the plaintiff cannot recover from that defendant. *See Anza v. Idael Steel Supply Corp.*, 547 U.S. 451, 659-60 (2006) (affirming district court's dismissal of claim as having a too attenuated causal connection between the injury and the alleged injurious conduct).

Here, Plaintiffs cannot show that Martorello, as opposed to the Tribal lender, proximately caused the alleged harm. Only the Tribal lender issued the loans and collected the debt at issue by processing ACH files and receiving payments all from the Tribe's reservation and managing those reservation processes – not Martorello. *See* Exhibit 9, Mansfield 1/18/19 Dep. At 112:23-113:2. Any damages allegedly suffered by Plaintiffs are at best indirectly linked to Martorello. As such, it would be difficult "to ascertain the amount of damages attributable" to Martorello, "as distinct from other, independent, factors," such as the conduct of the tribal lending entities. *Holmes*, 503 U.S. at 269. The injury is too remote to attribute proximate causation to Martorello. *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002) (identifying factors where injury is too remote, including where it is difficult to attribute causation to a particular defendant and where courts would need complicated apportioning rules to obviate risk of multiple recoveries); *Holmes*, 503 U.S. 258 (link between alleged stock manipulation and loss was too remote to satisfy proximate cause).

JA1370

Even if the Court viewed Martorello's conduct as aiding and abetting the Tribe, this would not be enough for RICO liability. *See, e.g., Pa. Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 840 (3d Cir. 2000) (holding Congress did not extend aiding and abetting liability to private RICO civil actions); *see also Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997) ("[t]o prove a violation of § 1962 (c), [plaintiff] must show that each RICO defendant conducted an enterprise through a pattern of racketeering activity").

### F.  There is No Likelihood of Success Against a Non-Party (Eventide); and There Is No Basis to Freeze Eventide's Assets.

There is no likelihood of success against the non-party target of Plaintiffs' proposed injunction, creditor Eventide.  In *Pennsylvania v. Think Finance*, a case which also involved an online tribal lender, a Pennsylvania court dismissed both substantive and conspiracy-based state-RICO claims against a lender because "a defendant does not incur liability under the COA for merely funding an alleged unlawful enterprise." No. 14-CV-7139, 2018 WL 637656, at *9 (E.D. Pa. Jan. 31, 2018) (citing *Dongelewicz v. PNC Bank Nat'l Ass'n*, 104 F. App'x 811, 817-18 (3d Cir. 2004).  The court's citation to the reasoning in *Dongelwicz* is particularly important. In that case, the Third Circuit emphasized that even where the terms of a loan agreement granted a lender certain approval rights for the underlying project, no RICO liability would exist, because to hold otherwise "would wreak havoc on the lending industry, for any lender who reasonably wished to protect itself would be forced to run the risk of being sued for the unknown fraudulent acts of its borrowers." *Dongelewicz*, 104 F. App'x at 817.

There is no adequate justification for freezing Eventide's assets.  Eventide is *not* a bank; it is a creditor to the Tribal lender and an independent business with ongoing obligations and expenses.  Plaintiffs' cases on this issue are inapposite.  For example, in *U.S. First National City Bank*, 379 U.S. 378, 384 (1965), the temporary injunction enjoined a bank from transferring any

sums held for the account of a corporation, pending service of process on the corporation and

trial on the merits. Freezing Eventide's assets would have implications far beyond Martorello –

it would negatively impact significant creditors (including former lawyers) and ongoing business

operations (including defense of this suit and contractual obligations).

In addition, there is no basis for disgorgement because the money Plaintiffs seek from the

Note derives from *other borrowers*. Disgorgement is wholly improper where Plaintiffs have no

specific claim thereto. In addition, the remedy of disgorgement generally is limited to dissimilar

contexts, such as securities law. *E.g. Sec. & Exch. Comm'n v. Penn, No*. 14-CV-0581 (VEC),

2020 WL 1272285, at *6 (S.D.N.Y. Mar. 17, 2020) ("Disgorgement serves to remedy securities

law violations"); *C.f.  S.E.C. v. Contorinis*, 743 F.3d 296, 307 (permitting disgorgement of

identifiable profits derived from insider trading).

### 5.  The Balance of Equities Favors Permitting Martorello to Fund his Defense.

Plaintiffs cannot shut down Eventide, a limited liability company and non-party to this

action. Eventide is a business with contractual and indemnity obligations, including but not

limited to indemnification of defense costs. *See* Exhibits 1 and 2. The balance of equities and

public interest favor Eventide's ability to continue funding its corporate obligations, including

funding Martorello's defense costs and living expenses. *See, e.g., Cf. Luis v. United States*, 136

S. Ct. 1083, 1088 (2016) ("[T]he pretrial restraint of legitimate, untainted assets needed to retain

counsel of choice violates the Sixth Amendment."); *Hughes Network Sys., Inc. v. InterDigital

Commc'ns Corp*., 17 F.3d 691, 696 (4th Cir. 1994) (in considering potential for preliminary

injunction, court "must evaluate the effect of injunctive relief on [defendant's] ability to continue

dealing with the suppliers and customers necessary to its operation"); *see also Virginia Carolina*

**JA1372**

*Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 120 (4th Cir. 1993) (denying preliminary injunction where defendant "might be driven to insolvency by a preliminary injunction").

Contrary to Plaintiffs' accusations that Eventide has "no employees or business operations," Eventide has a manager (Martorello) and business operations and obligations. For example, there is a Loan and Security Agreement containing obligations between Eventide and an arm of the Tribe. In addition, Eventide has numerous legal bills associated with Tribal litigation, including significant debts to prior legal counsel. Freezing Eventide's assets would push Eventide into default on numerous obligations. *See* Exhibit 1 and 2. It also would undermine Eventide's ability to protect itself – i.e. by paying legal counsel. Equity weighs against Plaintiffs' attempt to jump in front of Eventide's creditors; shut down a business that is not a party; and prevent Note payments derived from other borrowers that would post-date Plaintiffs' class.

Plaintiffs will not be harmed by waiting until trial. Plaintiffs have waited approximately *eight months* since Eventide emerged from bankruptcy prior to filing its motion for preliminary injunction. This shows there is no urgency and Plaintiffs can wait longer without harm.

### 6.  The Public Interest Favors Martorello's Funding of His Defense and Expenses During the Pendency of Litigation.

Public interest favors allowing litigants to defend themselves in pending litigation, as such fosters constitutional due process of law and, in this case, it furthers tribal interests. *C.f. Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012) ("it is always in the public interest to prevent the violation of a party's constitutional rights"). Martorello's defense is particularly important because significant and novel federal Indian law issues are at stake. Martorello cannot adequately defend several ongoing important tribal sovereignty matters in *three forums* without indemnification from Eventide.

**JA1373**

Public interest also should support the federal policy of promoting self-governance, self-sufficiency, and the economic development of Indian tribes, including their commercial dealings with non-Indians like Martorello.  This policy is furthered by enabling a proper defense of Indian-related issues.  Given that the Tribe and its arms (including the lender) have been dismissed on grounds of sovereign immunity, public policy would support continued defense of issues pertinent to Tribal law and business.  *See, e.g., Hughes*, 17 F.3d at 696  ("court should consider the effects of preliminary injunctive relief on any nonparties who may possess a significant interest in the outcome").

### 7.  An Injunction Would Cause Significant Harm, Warranting a Substantial Bond.

Virginia Code § 8.01-631 provides that with limited exceptions, "no temporary injunction shall take effect until the movant gives bond with security in an amount that the trial court considers proper to pay the costs and damages sustained by any party found to have been incorrectly enjoined…"; *see also* Fed. R. Civ. P. 65 (c) ("court may issue a preliminary injunction or temporary restraining order **only** if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by a party found to have been wrongfully enjoined or restrained") (emphasis added).  In the event the Court enjoins Eventide's business operations (which it should not) several creditors would have claims, some of which would become immediately payable in the event of default.  A bond, therefore, should be in amount sufficient to cover outstanding creditor debts.

Though Plaintiffs request a waiver, there is no basis for a waiver.  (ECF 990, p.12, n.4).  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999)* (the court is "not free to disregard the bond requirement;" failure to require a bond upon issuing injunctive relief is "reversible error").  Here, the risk of harm to Eventide is great, and any bond should be

in an amount sufficient to cover Eventide's default on its obligations– including to former counsel. *See, e.g.* Exhibit 1 and 2. The bond should also be in sufficient amount to cover indemnification of ongoing defense costs for Martorello, Rebecca Martorello, Justin Martorello, Gallant Capital, LLC, and Liont, LLC, and Martorello's managerial salary.

## V. CONCLUSION

Plaintiffs seek a money judgment, and there is an adequate remedy at law. Nonetheless, Plaintiffs seek equitable relief that is unjustified and overbroad in scope. Plaintiffs impermissibly seek to prohibit a non-party, Eventide, from operating in the usual course of business. Unlike in *Rahman*, Plaintiffs' proposed injunction goes far beyond preserving the status quo. Here, Plaintiffs seek to prevent Eventide from paying Martorello's defense costs and salary, which he (in part) lives upon. Moreover, Plaintiffs have no equitable claim to funds derived from interest payments on Tribal loans from *other borrowers* – with loans outside the window of Plaintiffs' purported class.

**JA1375**

Respectfully submitted,

MATT MARTORELLO

By: /s/ Jon Hollis
        Of Counsel

Jon Hollis (VSB No. 84908)
J. Benjamin Rottenborn (VSB No. 84796)
Karen M. Stemland (VSB No. 47167)
WOODS ROGERS PLC
901 East Byrd Street, Suite 1550
Ricmond, Virginia 23219
Telephone: (804) 343-5020
Facsimile: (804) 343-5021
jhollis@woodsrogers.com
brottenborn@woodsrogers.com
kstemland@woodsrogers.com

*Counsel for Defendant Matt Martorello*

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of February, 2021, a true and correct copy of the foregoing

was served upon all parties that are registered to receive electronic service through the Court's

ECF notice system in the above case.


/s/ Jon Hollis

**JA1376**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA RICHMOND DIVISION

| | |
|---|---|
| LULA WILLIAMS, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 3:17-cv-00461 (REP) |
| v. | ) |
| | ) |
| BIG PICTURE LOANS, LLC, *et al*., | ) |
| | ) |
| Defendants. | ) |

## OPPOSITION TO PLAINTIFFS' RENEWED MOTION
## FOR CLASS CERTIFICATION AGAINST MATT MARTORELLO

Matt Martorello, by counsel, respectfully submits this Opposition to Plaintiffs' Renewed

Motion for Class Certification against Matt Martorello.

## I.  INTRODUCTION

This case arises out of loan agreements between the Plaintiffs and Big Picture Loans,

LLC ("Big Picture" or "Tribal Lender"), which is wholly owned and operated by the Lac Vieux

Desert Band of Lake Superior Chippewa Indians (the "Tribe" or "LVD").  The loan agreements

provide that they are governed by Tribal and applicable federal law, and include interest rates

that are legal according to the Tribe's laws and policies.  The loan agreements also include

waivers of class action claims.

After Plaintiffs settled with the Tribal Lender in a related proceeding (and after the

dismissal of the Tribal Lender from this case due to sovereign immunity), Plaintiffs now seek to

certify a class action against Matt Martorello personally, even though Martorello was never the

lender or collector on the loans.  They target Martorello because, for a portion of the class period

(not all), Martorello managed an outside vendor that assisted the Tribe with developing its

lending business, furthering the federal policy of Tribal economic development.  In 2016, the

Tribe purchased that outside vendor, and Martorello's assistance with the Tribe's lending

business ceased.

Class certification against Martorello personally fails for a number of reasons including: (1) Plaintiffs waived class action claims; (2) Plaintiffs cannot show ascertainability without loan data, which is inaccessible and under Tribal control; and (3) Plaintiffs cannot show predominance or superiority *with respect to Martorello,* whose involvement in the lending business varied significantly over time. For any given year, individualized inquiries are required, including to assess (A) whether Martorello *could have* participated in the Tribal Lender's affairs "through a pattern of racketeering activity or collection of unlawful debt," as Plaintiffs allege; (B) whether Martorello received any payments derived from interest from the class borrowers per class-year or month; and (C) whether Martorello could have proximately caused the alleged injury. The need for individualized mini-trials defeats predominance and renders the purported class unmanageable.

## II. PRELIMINARY ARGUMENT

### A.  PLAINTIFFS WAIVED THE ABILITY TO PURSUE A CLASS ACTION.

In their loan agreements, each of the Plaintiffs expressly agreed not to pursue class action litigation. Specifically, Plaintiffs' loan agreements provide:

> **WAIVER OF JURY TRIAL**:
> ...
> 2. You acknowledge and agree that by agreeing to this Waiver of Jury Trial provision:
> **(a) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES;**
> …
> 3....**NO JUDGE OR ARBITRATOR SHALL CONDUCT CLASS PROCEEDINGS; THAT IS, YOU SHALL BE INELIGIBLE TO SERVE AS A CLASS ACTION REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN LITIGATION OR ARBITRATION.**

ECF 222, Ex. DD, Williams Loan Agmt. at 000075.  All named Plaintiffs have agreed to loan

contracts with similar or identical waiver provisions.[1]  *See* ECF 222, Ex. EE, Coffy Loan Agmt.

at Williams 000010; Ex. FF, Turnage Loan Agmt. at 000040–41; Ex. GG, Hengle Loan Agmt. at

Williams 000020; Ex. HH, Gillison Loan Agmt. at 009955.[2]

Here, Plaintiffs voluntarily "contracted away the right to pursue [a] class" action.

*Freeman v. Capital One Bank*, 2008 WL 2661990, at *3 (E.D. Va. July 3, 2008).  That the

agreement was online makes no difference.  *See, e.g. In re Online Travel Co*., 953 F. Supp. 2d

713, 718 (N.D. Tex. 2013) (website users contractually agreed to Travelocity's user agreement,

including class action waiver, by clicking on the button that said "agree").

**1.  The Class Action Waivers Apply to Martorello**.

Though Martorello is a non-party to the loan agreements, the class-action waivers

expressly apply to him because the waivers apply to "*disputes and claims related to* or arising

under this Agreement."  *See* ECF No. 734-1 at 5.  The loan agreements further provide:

> **All disputes** including any Representative Claims **against Us and
> related third parties** shall be resolved by the TRIBAL DISPUTE
> RESOLUTION PROCEDURE only on an individual basis with You
> as provided for pursuant to Tribal law. THEREFORE, NO
> LITIGATION OR ARBITRATION IS AVAILABLE AND NO
> JUDGE OR ARBITRATOR SHALL CONDUCT CLASS
> PROCEEDINGS; THAT IS, YOU SHALL BE INELIGIBLE TO
> SERVE AS A CLASS ACTION REPRESENTATIVE, AS A
> PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER
> REPRESENTATIVE CAPACITY FOR OTHERS IN LITIGATION
> OR ARBITRATION.

---

[1] At their depositions, each Plaintiff (except for Coffy, an attorney who has taken a dozen small-dollar loans) testified that he/she read the loan agreement, including the waiver provision prior to signing.  *See* Hengle Dep. Tr. 28:2-10; Williams Dep. Tr. 50-18-51:16; Turnage Dep. Tr. 42:7-46:19.

[2] Martorello lacks access to loan agreements beyond those of the named Plaintiffs but believes that similar or identical class action waivers appear in all LVD loan agreements.  To the extent the waiver provisions are not identical, individual variations would weigh against predominance of common issues and militate against class certification.

ECF No. 734-1 at 5 (capitalization in original; other emphasis added).  The words "dispute" and "disputes" "are given the broadest possible meaning and include, without limitation . . . all claims, disputes, or controversies involving the parties to this Agreement and Our employees, **servicers** and agents including but not limited to consultants. . . ." *Id.* (emphasis added).  Martorello-managed companies were "servicers" and consultants to the Tribe's business.

The class action waiver also applies to Martorello because he is a "related third party" which is defined to include any of Big Picture's "employees, agents, directors, officers, shareholders, governors, managers, members, parent company or affiliated entities."  ECF No. 734-1 at 5.  Martorello is both an "affiliated entity" and an alleged agent.  Martorello and companies he managed were "affiliated entities" because they provided consulting and servicing assistance to the Tribal Lender prior to the sale of Bellicose.[3]  In addition, Plaintiffs allege (incorrectly) that Martorello and businesses he managed were agents behind the entire lending business.  *See, e.g.,* ECF 1, ¶ 3, 14.

## 2.  The Class Action Waivers Are Valid and Enforceable.

Class action waivers are valid and enforceable under Tribal law, and are repeatedly upheld in federal courts.  *See, e.g.*, *Freeman*, 2008 WL 2661990, at *3 ("class action arbitration waiver is enforceable"); *see also Fielding v. Dolgen, LLC*, 2018 WL 3091012, at *2 (E.D. Va., June 21, 2018) ("inability to bring a class action ... cannot by itself suffice to render the provision unenforceable"); *Adkins v. Labor Ready, Inc.,* 303 F.3d 496, 503 (4th 2002) (waiver of class

---

[3] The term "entity" includes both legal organizations and natural persons.  *See, e.g.*, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158 (2001) ("[T]o establish liability under RICO § 1962 (C) one must allege and prove the existence of two distinct entities:  (1) a 'person'; and (2) and 'enterprise'); *Armstrong v. NewVA Entp.*, 23 Va. Cir. 352 (1991) (noting statutes "referring to a requirement that an entity state whether it is a 'natural person' or some other entity such as a partnership").

action "cannot by itself suffice to defeat the strong congressional preference for an arbitral

forum");  (*Convergys Corp. v. Nat'l Labor Relations Bd.,* 866 F.3d 635, 638-640 (5th Cir. 2017)

(class action waiver "must be enforced according to its terms;" class actions are not a substantive

right; and class action waivers are enforceable outside of the arbitration context because "FAA

places arbitration agreements 'on equal footing with other contracts'" and "there is no logical

reason to distinguish a waiver in the context of an arbitration agreement from a waiver in the

context of any other contract") (internal citations omitted); *ConRoman v. Spirit Airlines, Inc.*,

No. 19-CIV-61461-RAR, 2020 WL 5746830, *8 (S.D. Fla. Aug. 31, 2020) (enforcing

contractual class action waiver in action against airline); *Am. Express Co. v. Italian Colors Rest.*,

570 U.S. 228, 238 (2013) (enforcing contractual waiver of class arbitration, though plaintiff's

cost of individually arbitrating federal statutory claim exceeded potential recovery).

     Any contrary view would be preempted by federal law and policy, including federal

policies favoring agreements to alternate dispute resolution and favoring Indian tribes' self-

sufficiency and self-governance.[4]  *See, e.g., AT&T Mobility*, 563 U.S. 333 (Federal Arbitration

Act preempted unconscionability of class-action waivers); *Litman v. Cellco P'ship*, 655 F.3d 225,

231 (3d Cir. 2011) ("state law that seeks to impose class arbitration despite a contractual

agreement for individualized arbitration is inconsistent with, and therefore preempted by, the

FAA"); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351–52 (2011) (Federal Arbitration

Act preempted California's judicial rule regarding the unconscionability of class arbitration

waivers in consumer contracts); *Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 180 (4th Cir.

2013) (defense of unconscionability could not be applied to invalidate arbitration agreement

---

[4] Congress views alternate dispute resolution as a "more efficient dispute resolution process than litigation."  *Adkins*, 303 F.3d at 500 (addressing liberal federal policy favoring arbitration agreements).

barring class-wide procedures); *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 638 (4th

Cir. 2002) (arbitration agreement was not unconscionable merely because it excluded class

actions); *Abdul-Hasib v. Aerotek, Inc.*, 2017 WL 5903555, at *3 (D. Md. Nov. 30, 2017) ("class

action waivers have been held permissible").

Federal policy strongly favors Tribal self-governance, and the Tribal loans further that

purpose.  *See Williams v. Big Picture Loans*, 929 F.3d 170, 179-182 (4th Cir. 2019) (Big

Picture's profits "constituted a significant percentage of the Tribe's general fund;" and "Big

Picture and Ascension serve the purpose of tribal economic development and self-governance");

*see also Cabazon Band of Mission Indians v. Smith,* 34 F. Supp. 2d 1201, 1206 (C.D. Cal. 1998),

*aff'd*, 249 F.3d 1101 (9th Cir. 2001), opinion withdrawn, 271 F.3d 910 (9th Cir. 2001) (state law

may be preempted by federal law "if it interferes or is incompatible with federal and tribal

interests reflected in federal law, unless the State interests at stake are sufficient to justify the

assertion of State authority"); *Three Affiliated Tribes of Fort Berthold Reservation v. Wold

Eng'g*, 476 U.S. 877, 884, 106 S. Ct. 2305, 2309 (1986) ("…considerations of tribal sovereignty,

.. form an important backdrop"); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 170-

171, 93 S.Ct. 1257, 1261-1262 ("[s]tate laws generally are not applicable to tribal Indians on an

Indian reservation except where Congress has expressly provided that State laws shall apply");

*Seminole Tribe v. Florida*, 517 U.S. 44, 62 (1996) (similar); *Montana v. U.S.,* 450 U.S. 544, 565

(1981) ("A tribe may regulate … the activities of nonmembers who enter consensual

relationships with the tribe … through commercial dealing, contracts…"); *see generally*

NABDA, 25 U.S.C. § 4301.

### 3.  The Class Action Waivers Are Reasonable and Not Unconscionable.

The class action waivers are reasonable under the circumstances and not unconscionable.

*See, e.g.*, *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 877 (11th Cir. Feb. 18, 2005) ("inclusion of a class action waiver in the Arbitration Agreements did not render those Agreements substantively unconscionable"); *Korea Week, Inc. v. Got Capital, LLC*, No. CV 15-6351, 2016 WL 3049490, at *9 (E.D. Pa. May 27, 2016) (class action waivers by small business managers were not unconscionable where they could "communicate, at least partially, in English;" understood the terms of the repayment; and met the terms of the repayment); *Carson v. LendingTree LLC*, 456 F. App'x 234, 236 (4th Cir. 2011) (concluding that contract with online lender was not unconscionable because, *inter alia*, plaintiff was "able to peruse the application from her home computer at her leisure, with no external pressure" and "visited the website on her own and applied for LendingTree's service for free"); *see also Forbes v. SeaWorld Parks & Ent't,* 2017 WL 2437348, at *5 (E.D. Va. June 2, 2017) (stating that unconscionability is "a narrow doctrine" that "requires a showing of inequality so gross as to shock the conscience") (internal citations omitted); *Lee v. Fairfax Cty. Sch. Bd.*, 621 F.App'x 761, 762 (4th Cir. 2015) (an unconscionable contract is one that "no man in his senses" would make).

### 4. The Class Action Waivers Do Not Affect Any Substantive Rights.

The class action waiver does not affect "the substantive rights of the parties"— only the manner in which those rights can be pursued. *DeLuca v. Royal Caribbean Cruises, Ltd.*, 244 F. Supp. 3d 1342, 1348 (S.D. Fla. 2017); *see also D.R. Horton, Inc. v. N.L.R.B.*, 737 F.3d 344, 357 (5th Cir. 2013) ("The use of class action procedures . . . is not a substantive right"); *Palmer v. Convergys Corp.*, No. 7:10-CV-145 HL, 2012 WL 425256, at *2 (M.D. Ga. Feb. 9, 2012) ("class action waivers are upheld because they are contractual provisions that do not affect any substantive rights"); *Deposit Guaranty Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 332 (1980) ("[T]he right of a litigant to employ Rule 23 is a procedural right only"); *Dimery v.*

*Convergys Corp.*, No. 4:17-CV-00701-RBH, 2018 WL 1471892, at *7 (D.S.C. Mar. 26, 2018)

(upholding class action waiver, explaining, "Clearly, the right to employ Rule 23 is a procedural

right only. As such, it can be waived.").

### 5.  RICO Is Compatible with Enforcement of Class Action Waivers.

Assertion of RICO claims does not weigh against enforcing class action waivers.  *See*

*Korea Week,* No. CV 15-6351, 2016 WL 3049490, at *10  (finding that *"*RICO does not,

through legislative intent, policy, or through the volumes of case law from other courts, weigh

against enforcing the class action waiver"); *U1it4Less, Inc. v. FedEx Corp.*, No. 11-CV-1713

KBF, 2015 WL 3916247, at *5 (S.D.N.Y. June 25, 2015) ("Nothing in that statute [RICO] favors

class claims versus pursuit of individual ones"); *see also Shetiwy v. Midland Credit Mgmt.*, 959

F.Supp.2d 469, 475 (S.D.N.Y. 2013) (civil RICO contains no statutory preference for proceeding

on a class basis); *Khanna v. American Exp. Co.,* No. 11 Civ. 6245(JSR), 2011 WL 6382603

(S.D.N.Y. Dec. 14, 2011) ("In any event, in the absence of any evidence that Congress intended

that RICO require the availability of class-based proceedings, the Court declines to find that

RICO invalidates private agreements that render such proceedings unavailable.").

### 6.  The Class-Action Waivers Are Part of Valid and Enforceable Loan Agreements.

#### A.  Tribal Law Applies to the Loans.

Plaintiffs have sought to circumvent the class-waivers by trying to invalidate the loan

agreements in their entirety.  But the loan agreements contain enforceable Tribal choice of

law provisions, and the agreements are legal under Tribal law.  *See, e.g.*, *Bremen v. Zapata*

*Off-Shore Co.*, 407 U.S. 1, 9 (1972) (choice of law provisions are presumptively valid, which

presumption can only be overcome by a "clear showing that they are 'unreasonable under the

circumstances;'"); *Settlement Funding, LLC v. Van Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007)

**JA1384**

(that choice-of-law clauses designating application of another sovereign's law should be enforced despite usury claims).

Even aside from the choice of law provision, Tribal law would apply under the doctrine of "lex loci contractus," whereby the "nature, validity and interpretation of contracts are governed by the law of the place where made, unless the contrary appears to be the express intention of the parties." *C. I. T. Corp. v. Guy*, 170 Va. 16, 16, 195 S.E. 659 (1938); *Insteel Indus., Inc. v. Costanza Contracting Co.*, 276 F. Supp. 2d 479, 484 (E.D. Va. 2003) ("the law of the place where the contract was made governs questions of interpretation, validity, and enforceability of a contract.").

Tribal law further applies because the Tribal lending is firmly rooted on the Reservation, and state regulatory laws should not burden lending rooted on the Reservation. *See, e.g.*, *Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Serv.*, 769 F.3d 105, 115, n.4 (2d Cir. 2014) ("[a] court might ultimately conclude that, despite these circumstances, the transaction … **could be regarded as on-reservation**, based on the extent to which one side of the transaction is firmly rooted on the reservation"); *F.T.C. v. Payday Fin., LLC*, 935 F. Supp. 2d 926, 939–40 (D.S.D. 2013) (the "proper focus is on the nonmember Borrower's 'activities ' or 'conduct,' … not solely the nonmember Borrower's physical location") (internal citations omitted); *see also White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) (exercise of "state regulatory authority" barred where it is "pre-empted by federal law" or infringes on Indians' right to "make their own laws and be ruled by them"). In short, because the loans at issue here originated on the Reservation by an instrumentality of the Tribe they come within the jurisdiction of the Tribe, which is entitled to regulate them through Tribal law. *See, e.g.*, *Montana v. United States*, 450 U.S. 544, 565 (1981) ("A tribe may regulate … the activities of nonmembers who

**JA1385**

enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangement").

Finally, Tribal law applies because the Indian Commerce Clause precludes application of Virginia law to the Tribal loans. *See, e.g., Titlemax of Delaware Inc. et al. v. Weissmann*, No. CV 17-1325-MPT, 2020 WL 7186833, at *4 (D. Del. Dec. 7, 2020) (attempt to apply state usury laws to the loans issued in other states violated the Commerce Clause; under the Commerce Clause, "the 'critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the state…'") (emphasis added). This is true regardless of "whether or not the commerce has effects in the state." *Id.*; *see also Seminole Tribe v. Florida*, 517 U.S. 44, 62, 116 S. Ct. 1114, 1126 (1996) (Indian Commerce clause divests states of "virtually all authority over Indian Commerce and Indian tribes"); *c.f. Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966 (10th Cir. 2005) (tribal billboards could not be regulated by a state's police power).

### B.  The Prospective Waiver Exception Does Not Invalidate the Loans or Class Action Waivers.

The prospective waiver exception does not apply because (1) the class action waivers do not affect substantive rights; (2) the loans expressly incorporate federal law;[5]  (3) there is no elimination of the right to pursue a remedy in a Tribal forum; (4) the prospective waiver exception is a narrow judge-created exception in the arbitration context and should not be expanded to limit tribal jurisdiction; and (5) plaintiffs failed to exhaust Tribal remedies, after

---

[5] The loan contracts are distinguishable from those in the cases like *Hayes* and *Dillon*, where there was an express statement that no federal law would apply to the agreement.  *C.f. Hayes v. Delbert Serv. Corp.*, 811 F.3d 666 (4th Cir. 2016) (arbitration agreement that purported to renounce any application of federal law to borrowers' claims was unenforceable); *Dillon v. BMO Harris, N.A.,* 856 F.3d 330 (4th Cir. 2017) (loan agreement precluded application of federal law).

which they would have been free to pursue their claims in federal courts.[6]  *See, e.g., DeLuca*, 244 F. Supp. 3d at 1348 (class action waiver "does not affect substantive liability or rights"); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 865 (E.D. Va. 2020), *motion to certify appeal granted*, No. 3:19CV250 (DJN), 2020 WL 855970 (E.D. Va. Feb. 20, 2020) (though loan agreements indicated they "shall be governed by applicable tribal law," this did not expressly disavow the application of federal law, and the prospective waiver doctrine did not apply to the Mobiloans Contract); *Gibbs v. Stinson*, 421 F.Supp.3d 267 (E.D. Va. 2019), *affirmed sub nom., Gibbs v. Sequoia Capital Operations, LLC*, 966 F.3d 286 (4th Cir. 2000) (holding that "the phrase 'applicable federal law' renders the Mobiloans Contract subject to federal law, seemingly without qualification" and the prospective waiver doctrine did not apply); *Am. Express Co. v. Italian Colors Rest*., 570 U.S. 228, 236, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013) (class-action waiver did not eliminate plaintiffs' right to pursue statutory remedy in arbitration); *see also* LVD Code, ECF 958-1 (¶1.1 (f) "It is essential that the Tribal Council regulate consumer financial services in a manner commensurate with Tribal law and policy ***and applicable federal law***" and ¶ 9.3(h) "Relief"); ECF No. 734-1 at 5 ("**GOVERNING LAW AND FORUM SELECTION:** This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Indians ("Tribal law"), including but not limited to the Code **as well as applicable federal law**") (emphasis added);  *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235-36 (2013) (noting prospective waiver is a "judge-made exception" to the Federal Arbitration Act); *Vimar Seguros y Reaseguros, S.A. v. M/V/ Sky Reefer*, 515 U.S. 528, 540-41 (1995) (holding no prospective waiver, even though Japanese law provided defenses to liability that were unavailable under U.S.

---

[6] Failure to exhaust Tribal remedies is a prerequisite to a federal court's exercise of jurisdiction. *See, e.g.*, *Watterson v. Fritcher*, No. 1:17-CV-01020-DAD-JLT, 2018 WL 5880776, at *3 (E.D. Cal. Nov. 8, 2018).

**JA1387**

USCA4 Appeal: 21-2116    Doc: 26-3    Filed: 02/07/2023    Pg: 116 of 601

law).

### C.  Virginia's Consumer Finance Act Does Not Invalidate Loans or Waiver.

The class action waiver is not void based on any alleged violation of Virginia Code § 6.2-1501.  As discussed above, Tribal law (not Virginia law) applies.  But even if Virginia law applied, the Virginia Consumer Finance Act would not invalidate the loans or waiver including because at the applicable time, it did not require a license for online lenders without a physical presence in the Commonwealth.  *See, e.g.*, Va. Code § 6.2-1507 (setting forth procedures for license applicant with "another location in the Commonwealth"); *accord id.* § 6.2-1508, *see also id.* §6.2-1517; *accord id.* § 6.2-1518.  In 2020, the Code was amended to make it applicable to online lending, but the modified Code section did not apply during the applicable class period.  *C.f.* Va. Code § 6.2-1523.2.

### III. FACTUAL BACKGROUND

To the extent this matter is not resolved summarily based upon Plaintiffs' waiver of a class action, we next proceed to the facts that inform the Rule 23 analysis.

### A.  History of the Tribe's Lending.

LVD is a federally-recognized Indian tribe whose members reside near their ancestral home in Watersmeet, Michigan (the "Reservation").  *See* ECF No. 146, at 3; Federal Register Vol. 83, No.20, pp 4235-4241 (January 30, 2018).  LVD is a sovereign "independent tribal entity" and governs itself according to its own laws and regulations.  *See* ECF No. 146, at 3; *Cherokee Nation v. State of Ga.*, 30 U.S. 1, 8, 8 L. Ed. 25 (1831).[7]

### 1.  LVD Needed to Develop New Businesses Due to its Struggling Economy.

---

[7] On May 14, 1992, LVD adopted its constitution, which, among other things, establishes LVD's Tribal Council and grants the Tribal Council the authority to enact laws, manage the economic affairs of LVD, and to promote the health, safety, education and general welfare of LVD and its members.  *See* ECF No. 23-1, at 1.

For many years, LVD's economic well-being depended largely upon federal funds and profits from its casino.  *See* Ex. A, Hazen Aff., p. 1, ¶ 3; ECF No. 999-18, at, ¶ 10.  LVD casino profits sharply declined after the 2008 recession, however, forcing LVD to look elsewhere for a stable source of income and to achieve their goals of self-sufficiency and self-determination.  *See* Ex. B, Aug. 22, 2013 Dec. Chairman Williams ¶ 7-10; Ex. A, p. 1, ¶ 4; ECF No. 999-18, p. 2, ¶ 12; ECF No. 999-14, at 75:17-78:6 (LVD wanted a consumer lending business due to the tribes geographical isolation, lack of reliable income, and insufficient local population to support their casino business); Ex. C, Email from K. Wichtman to M. Martorello, LVD-DEF00006161 (LVD's counsel describing how declining revenues in gaming and tourism motivated LVD's interest in online lending).

Thereafter, LVD took a series of steps to facilitate the development of new business opportunities, including online lending.[8]  *See* Ex. A, p.1, ¶ 5; *See generally* ECF No. 999-11, (forming RRTL under LVD tribal authority).  In March 2010, LVD enacted the LVD Limited Liability Code.  Then, on July 8, 2011, LVD enacted the Tribal Consumer Financial Services Regulatory Code ("LVD Regulatory Code"), which authorizes consumer lending entities that are (i) wholly owned by LVD, (ii) operate from the Reservation, and (iii) operate exclusively to "improve [LVD's] economic self-sufficiency, to enable [LVD] to better serve the social, economic, educational, and health and safety needs." Ex. D, LVD Regulatory Code, pp. 3-5, 17, §§ 1.1(a), (d), (h); 1.3: 2.4; 5.1.

### 2.  With Outside Assistance, LVD Organized Red Rock Tribal Lending, LLC.

In September 2011, in consultation with lawyers and outside consultants including Martorello, LVD's Tribal Counsel formed Red Rock Tribal Lending, LLC ("RRTL") to provide

---

[8] In 2009, LVD asked its general counsel, Rob Rosette, to partner with Scott Merritt and research tribal online lending model.  *See* Ex. J Rosette Dep. (6/29/20), at 170:3-172-13, 73:10-23).

consumers with unsecured, small-dollar loans pursuant to the LVD Regulatory Code and applicable Federal law.  *See generally* ECF No. 999-11; ECF No. 999-12.  In the fall of 2011, Martorello engaged the most prominent Indian law lawyer that he could find, Jennifer Weddle, co-head of Greenberg Traurig's ("GT") Indian law department, to help ensure the loans and relationships were lawful.  See ECF No. 999-14 at 31:14-25; 47:19-50:24; 55:5-57:17; *see also* Ex. E, Weddle Aff., ¶  6, 13; Ex. LLL Rosette_Revised_002831 (GT Law task list).

RRTL was organized under LVD law, wholly owned by LVD, and functioned as an arm of LVD on the Reservation. *See* Ex. A, p. 2, ¶ 6; *see generally* ECF No. 999-11; ECF No. 999-12.  RRTL's appointed co-managers were LVD members and under the control of the LVD Council.  *See* Ex. F, Hazen Dep. (10/16/2017), p.129:11-15; Ex. G, Mansfield Dep. (1/18/19), at 45:7-47:8 (testifying that as co-manager of RRTL he procured equipment, organized RRTL's call center, hired personnel, authored employee handbooks, reviewed contracts, discussed marketing strategies, developed call center scripts and interviewed and hired employees); *see generally* ECF No. 999-11; ECF 999-12; ROSETTE_REVISED_ 002601 RRTL Sep. 14, 2011 Operating Agreement.

For assistance developing and growing the online lending business, LVD worked with outside consultants, including companies managed by Martorello.  ECF No. 146 at 8; ECF No. 999-14, at 116:11-117:18 (testifying that tribes followed a known model which required finding, vetting and hiring service providers to help the tribe reach self-sufficiency); Ex. A, p. 2, ¶ 10.

### 3.  Red Rock Tribal Lending Contracted with Bellicose VI, LLC for Assistance.

Using a contract based upon the National Indian Gaming Commission ("NIGC") template, RRTL contracted with Bellicose VI, LLC ("Bellicose"), which Martorello managed, for vendor management services, compliance management assistances, marketing material

development, pre-qualified leads, and the development of risk modeling and data analytics. *See* ECF No. 999-14, at p.117:11-119:13; Ex. A, p. 2, ¶ 10. In October 2011, after six months of legal counsel negotiations and review, LVD and Martorello agreed Bellicose would provide service and support for LVD's new consumer lending business. *See* RRTL Servicing Agreement, MARTORELO_003598, previously filed under seal at ECF No. 216. RRTL consulted with Bellicose regarding day-to-day operations, and RRTL's managers approved operations. *See* Ex. A, p. 2, ¶ 8-9; Ex. H, Gravel Dep. (4/5/19), at 36:2-22 (testifying that co-managers of RRTL could approve recommendations to RRTL).

Bellicose provided vendor services and assistance, but could not sell RRTL's assets, could not waive RRTL's immunity, and could not originate loans on behalf of RRTL.[9] *See* Ex. A, p. 2, ¶ 8; Ex. I, Hazen Dec. (Galloway), ¶ 8.c. (detailing eight-step process for loan origination all of which is handled by RRTL); Ex. H, at 158:1-19 (testifying that loan applications were reviewed and approved by RRTL on LVD land prior to approval); Ex. J, Rosette Dep. (6/29/20), at 124:15-125:6 (testifying to the importance of LVD originating the loans and LVD's efforts to structure the business accordingly).

## 4. Money From the Loans Flowed Into Red Rock Tribal Lending Accounts.

RRTL collected the loans on the Reservation, as evidenced by four years of RRTL bank statements showing borrower payments directly to the RRTL bank account. *See generally* Ex. K, November 30, 2015 Chippewa Valley Bank Statement of RRTL Account, Chippewa_000013 (showing cash flows to and from consumer loans into RRTL's banking accounts); *see also* Ex.

---

[9]  These witnesses contradict the testimony of Joette Pete, a witness who is biased and who the Tribal Counsel involuntarily removed from her role on the basis of misconduct. *See, e.g.,* Ex. RRR (Motion for the Resignation of Joette Pete Baldwin due to an unlawful incident). As shown below, other witnesses have also directly contradicted Pete's testimony on other significant matters.

G, at 106:6-12 ("we [LVD] had the account the money went through that we were the ones that

would actually put the money in and take the money out of the accounts.  That was done at the

tribe, at the call center"); Ex. M, Dowd Dep. (11.13.18) At 185:15-23 ("Q: Did Sourcepoint ever

collect on any Red Rock loan? A: No, I don't believe so."); Ex N, Justin Martorello Dep.

(1/9/19), at 46:20-47:3 ("I can tell you that the servicer SourcePoint never collected any amounts

ever." … "Red Rock Tribal Lending or – or Duck Creek would have used payment processors

that would debit consumers' accounts, and those funds would settle into Red Rock's bank

account"); *Id.* at 52:14-20 (RRTL submitted the debit and credit files on the reservation); Ex. O,

ROSETTE_REVISED _014047 (Nov. 2, 2012 discussion of activities taking place on the

reservation including "payment processing" inputting payments into customer accounts, and

depositing physical checks into bank account); Ex. P, LVD-DEF00018890-4 (April 4, 2013

batch renewal payment processing manual); Ex. Q, Wichtman Dep. (7/14/20) at 205:1-16 (the

money went into the Chippewa Valley RRTL account); Ex. R, ROSETTE_REVISED_036363

(January 6, 2012 RRTL's loan origination and payment processing instructions).

  The Servicing Agreement between RRTL and SourcePoint VI, LLC gave SourcePoint

certain revocable depository account control access for purposes of processing accounts payable,

but in practice this did not affect collections and the access could be terminated by the Tribe at

will upon 180-days' notice.  *See* Ex. H, p. 152:12-18; *see also* Servicing Agreement § 9.2

(regarding terminating upon 180-day notice), previously filed under seal at ECF No. 216.

Borrowers paid directly into RRTL accounts.  *See generally* Ex. K. (showing cash flows to and

from consumer loans into RRTL's banking accounts); *see also* Ex. G, at 106:6-12.

  **5.  Pertinent Lending Activities Occurred on the Tribal Reservation**.

  RRTL's lending operations were on the Reservation under the supervision of LVD's

appointed managers and Tribal Council. *See e.g.* Ex. S, Gerber Dep., 59:9-53:18 (testifying that

it was important that lending activities occur on Tribal soil and the lender would only deal with

customers who conducted business on Tribal soil); Ex. H, 158:1-19 (testifying that after loan

applications passed the underwriting process, all loan applications were reviewed and approved

by RRTL or Duck Creek on Tribal land before the loan was actually originated); *Galloway v. Big

Picture*, Case No. 3:18-cv-00406, ECF 38-15 (summarizing 246 resolutions of Tribal Council

regarding lending); Ex. T, ROSETTE_REVISED_037655 (Nov. 1, 2011 Operations Manager's

job described as responsibility for "all … aspects" of Red Rock call center, including "handling

of all customer communications," "review of daily applications," and daily origination of loans

and ACH files); Ex. U, MidMarch DD 000536 p.3-4 (list of activities occurring at Red Rock);

Ex. MMM, LVD-DEF00006043 and LVD-DEF00022840 (over 300 pages of LLC manager

approvals); Ex. M, Dowd Dep. (11/13/18) at 74:18-75:7 (there was a team of RRTL "going

through, checking to make sure all of those verifications were completed and completed to their

satisfaction …. If all those requirements had been met, then they would originate the loan from

the office on the reservation"); Ex. S, 59:9-53:18 (regarding importance of lending activities on

Tribal soil). In addition, funds for LVD's lending operation flow to and from LVD-owned bank

accounts. *See* Ex. G, at 106:6-12.

     Although Bellicose consulted on behalf of RRTL, ultimately RRTL employees processed

the loans. *See* Ex. A, p. 2, ¶¶ 8-9; Ex. M. (11/13/18), at 74:18-74:7 (testifying about the team of

RRTL employees on the reservation conducting the loan process); *id.* at 58:12-59-19 (RRTL's

review and approval includes "every single loan that gets made by [RRTL]);" *id.* at 79:19-80:1

(the loan will never originate if the verification process is not completed); Ex. H, 158:1-19 (all

loan applications were reviewed and completed by RRTL or Duck Creek on Tribal land before

the loan was actually originated); Ex. W, December 16, 2015 email from K. Wichtman to

Martorello, LVD-DEF00018915 (Tribal Council stated that "all recommendations related to

underwriting are approved by the Co-Managers of the business within the tribal offices before

use").

On-Reservation Tribal activity also includes collection of payments, payment processing,

management of the loan origination software, and negotiation of debt settlements. *See* Ex. X,

June 13, 2012 Email from K. Wichtman to Martoerello, ROSETTE_REVISED-045131

(discussing debt settlement authority for the co-managers of LVD's online lending business

through RRTL); Ex. R, (explaining how to utilize RRTL's online loan origination software); Ex.

Y, Nov. 2, 2012 Email from Martorello to K. Wichtman and C. Mansfield, 37053772-1-DI 505-

52, (discussing activities occurring on reservation including payment processing and depositing

funds into bank accounts); *See generally* Ex. K, (cash flows to and from consumer loans into

RRTL's banking accounts).

### 6.  RRTL Issues Loans in 2012.

On January 17, 2012, RRTL began making loans, all of which were authorized and

extended by RRTL.  *See* Ex. A, ¶¶26-28; Ex. Z, Williams Aff. ¶ 19.  All funds for these loans

came from LVD-owned and controlled bank accounts. *Id.*

Also in 2012, Bellicose assigned its rights under its servicing contracts to its affiliate,

SourcePoint VI, LLC ("SourcePoint"). SourcePoint's relationship with RRTL mirrored

Bellicose's, and although SourcePoint could make recommendations, "all final decisions about

operations were made by [RRTL's] managers."  *See* Ex. A, p. 2; Ex. M, 197:16-198:8; Ex. H,

Gravel Dep., 152:12-18.  Both Bellicose and SourcePoint had access to RRTL's bank accounts,

but that access was limited by deposit access control agreements provided by [RRTL], which

[RRTL] or the Tribe could terminate at any time. *See* Servicing Agreement Section 9.2 (RRTL could terminate its servicing relationship with Bellicose upon 180-days notice), previously filed under seal at ECF No. 216.[10]

### 7.  Over time, RRTL Learned and Expanded the Online Lending Business.

RRTL learned from the consulting services and expanded its operations with LVD employees under LVD employed management. *See* Ex. AA, Oct. 5, 2012 Email between Bellicose and LVD officials, ROSETTE_REVISED_037729 (explaining LVD's need for more office space due to growing size of lending operation);  Ex. BB, May 14, 2015, Email between Bellicose and LVD officials, ROSETTE_REVISED_031665 (discussing RRTL's ability to identity and implement improvements to its day-to-day lending operations); ROSETTE_REVISED_044773 (July 30, 2013 email from Hazen, "me, and all the LVD regulators are [at compliance university] learning stuff"); ROSETTE_REVISED_045267 (Aug. 24, 2014 email from Wichtman "I have tribal leaders in my ear eager to learn").

### B.    LVD's Entities Evolved from 2012 through 2016, and Martorello Reduced his Involvement.

As LVD learned the lending business, SourcePoint's guidance became less necessary, and its involvement in LVD's business decreased. *See, e.g.*, Ex. H, 63:2-63:13 ("Q. Now, Matt Martorello, what role did he play once you got to Puerto Rico? A. I'm not sure.  I saw a lot less of Matt after we moved to Puerto Rico.  Q. Was Mr. Martorello devoting more of his time to other businesses? A. That was my understanding.  Q. What was the basis of your understanding?

---

[10] Per the requirements of the Servicing Agreement between SourcePoint and RRTL, Iron Fence Investments, LLC ("Iron Fence") was formed to identify and aggregate capital sources for LVD. In January 2011, RRTL entered into an up-to-$30,000,000 line of credit agreement which required Iron Fence to raise capital for RRTL's operations – capital which was raised from third parties and which RRTL could draw upon and pay down at its discretion. *See* Loan Agreement MARTORELLO_003564, previously filed under seal at ECF No. 216.

A. That I saw him in the office a lot less and that day to day I believe I was reporting to Brian

McFadden.").

　　During this period, RRTL actively managed and changed the loan collections practices.

*See* ECF No. 216-11, (LVD's outside legal counsel managing dispute with debt purchaser on

behalf of RRTL).  RRTL also became more active in the hiring, firing, and overseeing of

collections vendors.  *Id.*  RRTL also managed the frequency of communications to debtors, the

content of those communications and tracking the debt to learn if it was sold to third-parties.

*See, e.g.*, *Id.* at LVD-DEF00016826 (debt sale to third party); *see also* ECF No. 216-12,

(describing RRTL's operations as separate from SourcePoint).  RRTL also increased its direct

involvement in selecting and purchasing consumer loan leads, and required SourcePoint to end

its relationship with certain lead sources.  *See* ECF No. 216-11, at LVD-DEF00018579 (May 11,

2015, RRTL firing its outside compliance vendor to perform those services at RRTL).

　　In addition to Big Picture, LVD also formed Tribal Economic Development Holdings,

LLC ("TED") to "operate the Tribe's current and future lending companies." ECF No. 146, at 16

(citing ECF. No. 23 at 13).  LVD was the sole member of TED with Michele Hazen and James

Williams, Jr. as co-managers. *Id.* (citing ECF No. 23, at 14); Ex. I, p. 3, ¶ 15.; Williams Dec., p

2, ¶ 4.  LVD also formed Ascension, a subsidiary of TED, "for the purpose of engaging in

marketing, technological and vendor services" to support LVD's lending entities. *See* Ex. CC,

Feb. 5, 2015, Ascension Resolution, at 1.  Ascension was a "wholly owned and operated

instrumentality of the Tribe" and, just like Big Picture, it had TED as its sole member and its

appointed co-managers were Hazen and Williams.  *Id.* at 2-3, Ex. DD, Ascension Arts. of Org,

Arts. 8-9.  Ascension's president was Brian McFadden ("McFadden"). Ex. CC, at 3.

　　LVD supervised the front-line customer service employees and made steps to increase the

number of employees operating on Tribal land to over a dozen. *See* Ex. EE, 8/20/2014 Email

from Wichtman to Martorello, ROSETTE_REVISED_046799 (positive training and professional

results from new employees from the Tribe); ECF No. 845-40, ROSETTE_REVISED_045267

(LVD leaders to continue to learn about the online lending business).

     LVD routinely revised its consumer policies, including developing a complete

compliance management program internally and, in late 2012, LVD replaced a SourcePoint/

Bellicose recommended compliance program with the program it developed internally. *See* Ex.

FF, Aug. 30, 2013 Email from K. Wichtman to J. Martorello, ROSETTE_REVISED_030201

(approving new policies and management program by LVD counsel).  Policies which

SourcePoint helped RRTL create, such as loan underwriting processes, were instituted after

approval from RRTL managers.  *See* Ex. M, at 36:2-22, 37:3-20 (explaining how RRTL applied

SourcePoint's recommendations after RRTL approval, and RRTL rejected certain

recommendations).  LVD's plan was "to expand its online lending platform and increase

profitability for the Tribe, employ more tribal members, and acquire its vendors' businesses."

ECF No. 146 at 15-16.

     In 2013, RRTL increased its direct involvement in selecting and purchasing consumer

loan leads, and required SourcePoint to end its relationship with certain lead sources.  ECF 216-

11.  While SourcePoint would continue to recommend strategies to RRTL on marketing leads,

RRTL decided on marketing of its product. *Id.*; *see* Ex. M,  at 36:2-22, 37:3-20 (explaining how

SourcePoint's recommendations were applied after RRTL approval).

     RRTL's Co-Managers increasingly became the point people dealing directly with

vendors. *See* Ex. GG, June 3, 2014 Email from Dowd LVD-DEF00017101 (requesting direct

meeting with RRTL co-management).  RRTL also began directly contracting with other vendors,

**JA1397**

including check verification services (May 2014), Ex. HH, LVD Resolution # 2014-070, at LVD-DEF00010607, and new sources of consumer leads (May 2014), *id.*, at LVD-DEF00017226. RRTL entered into two settlement agreements with an ACH provider that had provided services to LVD's lending entities prior to 2014. *See* Ex. II, LVD Resolution # 2014-071, LVD-DEF00010623. RRTL's legal counsel advised as to negotiating the terms of each new vendor contract.

LVD continued developing its lending business over time with assistance from SourcePoint and Bellicose. *See* ECF No. 506-22, ROSETTE_REVISED_052365 (showing conversations between Martorello, LVD counsel and LVD officials regarding origination occurring on Tribal lands under Tribal authority and supervision); Ex. JJ, Aug. 29, 2013 Email from SourcePoint to LVD leaders and LVD counsel, ROSETTE_REVISED_030201 (regarding a recommended addition to the online lending process).

Co-managing LVD officials oversaw LVD's online lending process. *See* Ex. W, (Tribal Council explicitly stating "all recommendations related to underwriting are approved by the Co-Managers of the business within the tribal offices before use."); Ex. KK, LVD-DEF000006043 (over 150 pages of recommendations from Martorello to LVD's co-managers starting in January 2014); LVD-DEF00022840, Official Approval Request to Tribal Officials (requesting approval for SourcePoint recommendations); Ex. M, at 50:8-23, 58:12-59:19, 74:18-75:7; Ex. LL, May 14, 2015 Email From J. Martorello to LVD Officials, ROSETTE_REVISED_031665 (RRTL identifying and implementing its own improvements to lending operations).

SourcePoint and Bellicose maintained strict separation of consulting and management duties throughout the lifetime of those two entities. *See* Ex. M, at 37:3-20. 185:10-12, 193:14-194:2, 197:16-198:8; Ex. H, at, 22:20-23:4; Mar. 18, 2014 Recommendation to Take Action and

Request for Approval from SourcePoint to RRTL officials, LVD-DEF00017189; Ex. MM, June

3, 20114 Email from Dowd to LVD officials and counsel, LVD-DEF00017101 (regarding

request for approval of SourcePoint recommendation).

The nuts and bolts of LVD's online lending business were conducted on Reservation

land, by LVD employees under LVD supervision.  *See* Ex. NN, Nov. 1, 2011 Email from

Martorello to K. Wichtman, ROSETTE_REVISED_037655 (discussing the job description of

Operations Manager for RRTL as responsible for all aspects of the RRTL call center including

handling of customer communications, review of daily loan applications, and daily origination of

loans and ACH files); Ex. OO, June 15, 2012 Email from K. Wichtman to Martorello,

ROSETTE_REVISED _044598 ("…our model is one of the best there is, we have made every

effort to ensure tribal control, and are tweaking things almost constantly, it seems, to allow for

more tribal control.").

Changes to the servicing relationship that occurred between January 2012 and January

2016 included: (1) Increasing involvement of the Tribal Council and co-managers in the

selection of vendors utilized by RRTL.  *See* Ex. J, at 146:4-147:11 (discussing purchase of

Bellicose/SourcePoint and LVD's desire to purchase its third-party vendors).  Ex. PP, Oct. 14,

2014 Emails between Martorello and LVD Officials, LVD-DEF00017855 (expressing LVD's

desire to prioritize bringing collection of debts in-house from third-party vendors); (2) LVD's

increasing use of outside legal counsel unaffiliated with Martorello in compliance, management,

contract negotiations, regulatory audits, and marketing. *See generally* Ex. QQ, Mar. 28, 2012

from K. Wichtman to Martorello, ROSETTE_REVISED_043977 (Rosette Law counsel with

draft of Assistant Manager position); Ex. RR, Sept. 30, 2014 Email between Martorello, K.

Wichtman and LVD officials, ROSETTE_REVISED_037429 (regarding discussion of possible

LVD purchase of part-ownership structure in a bank for online lending purposes); (3) RRTL's direct involvement in marketing operations for the online lending business.  Down, Ex. M, at 175:4-176:7, 186:2-12 (testifying that RRTL co-managers approved direct mail marketing campaigns for RRTL; testifying Hazen would review and approve marketing materials prior to implementation); Ex. G, at 47:3-7 (testifying that Mansfield, as Tribal co-manager, reviewed contracts, marketing strategies, and call center scripts for LVD's online lending business); RRTL and LVD officials managed employee training and employee management. *See* A ECF No. 506-22 at ROSETTE_REVISED_052365 (showing conversations between Martorello, LVD counsel and LVD officials regarding origination occurring on Tribal lands under Tribal authority and supervision); *See* Ex. GG (requesting direct meeting with RRTL co-management).

C.     **Over Time, Online Lending Industry Became Increasingly Targeted, and a Projected CFPB Small Dollar Loan Rule Threatened Business.**

LVD closely tracked federal regulatory efforts with potential impacts on the online and tribal lending industries.  LVD was aware of a new effort by federal and state regulators called "Operation Chokepoint."  *See* Ex. SS, Comm. On Oversight and Gov't Reform, *The Department of Justice's "Operation Choke Point": Illegally Choking Off Legitimate Businesses?*, May 29, 2014, *available at* https://republicans-oversight.house.gov/wp-content/uploads/2014/12/Staff-Report-FDIC-and-Operation-Choke-Point-12-8-2014.pdf.  The State of New York employed a similar strategy and sent cease-and-desist letters to 32 online lenders, including RRTL.  *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs*, 974 F. Supp. 2d 353, 356-357 (S.D.N.Y. 2013), aff'd, 769 F.3d 105 (2d Cir. 2014).  LVD voted to sue the State of New York to preserve its right to self-determination and Indian e-commerce.  LVD sought to "permanently enjoin the New York State Department of Financial Services . . . from interfering with [tribal] lending activities." *Id.* at 355-56.  To counter the threat of overreaching state regulatory attacks,

**JA1400**

LVD began to accelerate its business strategy to internalize vendor services and acquire vendors and prevent regulators from interfering with its Tribal lending by threatening third-party vendors.

Despite regulatory pressure, Martorello's Indian-law attorneys continued to assert that the regulation "must yield to the inherent and fundamental political independence of tribes" and "tribes' freedom of contract and sovereign right to trade freely." *See* Greenburg Traurig, LLP, 1017 Brief of the National Congress of Am. Indians, D. Kan., Case No. 2:17-cv-02521-JAR-JPO, authored by Ms. Weddle; *see also* Weddle Dep. 178:24-184:10 (discussing her view that Tribal loans remain lawful).

### D.  LVD Purchased Bellicose and its Subsidiaries on January 26, 2016, after Years of Negotiations and Plans for LVD to Own Its Outside Vendors.

Starting in 2012, LVD and Martorello consistently engaged in conversations regarding the potential sale of Martorello' s consulting companies to LVD, giving the Tribe the ability to engage in online lending without relying on outside vendors for support services. ECF No. 146, at 17.  This sale closed in January 2016, but had been discussed between LVD, SourcePoint and Martorello since at least 2012.  *See* Ex. UU, Oct. 5, 2012 Email from Martorello to LVD (officials discussing drafting of sale documents of Bellicose to LVD); Ex. VV, Hazen Dep. (Smith) page 81:8-82:3 (Hazen and Wichtman first asked Martorello to consider selling Bellicose in 2012); Ex. WW, ROSETTE REVISED 053374-6 (Nov. 2, 2012 email stating "research is underway on this IP sale option").  At the time of the sale, LVD expected the purchase of Bellicose to allow the Tribe to generate over $50 million per year by January 2023, if not sooner.  Ex. XX, September 2014 Pro Forma Report, LVD-DEF00014706 (showing yearly profits to LVD after payment of note or expiration of seven-year term).  LVD created new entities under LVD law to complete the sale in compliance with Tribal law.  Ex. A, ¶¶ 14, 16-17, 22-23.

**JA1401**

After LVD's purchase of Bellicose on January 26, 2016, Martorello's involvement with LVD's lending operations ended. Martorello has no involvement in the day-to-day activities of any entity owned or operated by LVD, including Big Picture and Ascension. *See* Ex. ZZ, McFadden Dec, ¶ 10; ECF No.146, at 27-28; *see also* Ex. M, Dowd Dep. 11/13/2018 at 208:18-210:20.

### E.   The Formation of Eventide Credit Acquisitions, LLC Enabled the Sale of Bellicose and its Subsidiaries to the Tribe.

As discussed above, in January 2016 LVD purchased Bellicose and its subsidiaries. Around the same time, LVD formed Big Picture, its new lending entity and Ascension, its new servicing company; Big Picture and Ascension assumed assets and liabilities of Duck Creek and RRTL; Eventide Credit Acquisitions, LLC ("Eventide") formed to sell Bellicose to LVD in exchange for a Note requiring Big Picture to make contingent loan payments which would sunset after seven years; SourcePoint and its subsidiaries merged into Bellicose; the Tribal entity TED acquired Bellicose; Bellicose ceased to exist; and RRTL and Duck Creek dissolved. *See generally* Ex. AAA, Promissory Note.

Whether the sale was motivated in part by regulatory pressure makes no difference. Ultimately the sale allowed the Tribe build their businesses "in a self-sufficient manner [and] learn and hire for all the various business components, and then [Martorello would] walk away leaving them with a business that literally transforms an impoverished Tribe to one of financial stability." Ex. BBB, Apr. 15, 2014 Email from Martorello to P. Wilson, MARTORELLO_003731.

Though there may have been regulatory uncertainty, Martorello and the Tribe in good faith made every effort to navigate and comply with a very uncertain legal landscape. *See, e.g.,* Ex. C, at 00006162 ("I am confident that if we can survive the payment processing storm, Tribal

**JA1402**

lending will ultimately prevail."); ECF No. 506-40, Liont_05387 (discussing the *possible* end of

tribal lending but always referring to this conclusion as only a possibility, and never a certainty);

Ex. DDD, Mar. 10, 2017 Email from Martorello to other employees, MARTORELLO_011671

("You'll notice that the rule went from shutting everyone down, to shutting down the storefront

payday product (meaning that entire demand and market opens up to online install, as a massive

competitive advantage!").

### F. For A Period Between 2018-2020 the Tribal Lender Stopped Paying Eventide.

Between approximately November 2018 to July 2020, the Tribal Lender stopped paying

Eventide, defaulting on its Note with Eventide.  *See, e.g.*, Ex. EEE, December 12, 2019 Notice of

Default; *see also* Ex. FFF, Dep. Matt Martorello, Arbitration: Eventide v. TED, June 25, 2020, p.

99, ln 25- p.100 ln 2 ("Q. …When was the last time that ECA actually got a waterfall payment

from the tribe.  A. Probably October or so of 2018");  *id.* p. 101, ln 6-8 ("Has ECA received any

payments from the tribe since the MOU [Memorandum of Understanding] was executed? A. No,

it has not."); Ex. GGG, Dep. Michelle Hazen, Arbitration: Eventide v. TED, July 7, 2020, p. 79,

ln. 16-23 ("Q. Isn't it true that the litigation expenses you've just described as being through the

roof, those were deducted from the payments that would have otherwise gone to Eventide,

correct? A. …  Once the bad debts and any expenses are taken out of the gross revenue, if there's

anything left, that goes to the note payment for Eventide."); *id.* p. 80-81 ("Q… So it's your

position that the tribe can offset an additional two million, five hundred thousand plus before it

has to pay any monies to Eventide; is that correct? A. Yes").

### G. Throughout the Course of its Online Lending, LVD Has Acted Through its Independent Tribal Authority by Resolutions Approved by the LVD Council.

LVD legislates and speaks through the Tribal Council and its resolutions, which are

consensus documents of all of the Tribal Council members.  The online lending enterprise has and continues to be performed through valid Tribal Authority and resolutions.[11]  There are many examples of such independent Tribal resolutions.  *See, e.g., Galloway v. Big* Picture, Case No. 3:18-cv-00406, ECF 38-15 (summarizing 246 resolutions of Tribal Council regarding lending).

### H.  LVD's Ownership and Operation of RRTL and Big Picture has Provided Tremendous Benefits to the Tribe

LVD has realized tens of millions of dollars in profit since beginning its online lending business in 2012.[12]  LVD has used that revenue for the construction and purchase of housing on the reservation, the development of youth programs for LVD members, assisting in the construction of an on-reservation health clinic, the funding of college scholarships for LVD members, the purchasing of new vehicles for the LVD police department, the modernization of LVD's court system, the enhancement of cultural programs targeted at the preservation of LVD's Ojibwe language, providing elder care services, and a propane purchasing assistance program to enable LVD members to stay warm during the Upper Peninsula's harsh winters.  Ex. A, ¶ 31(a)-(l); Ex. Z, at ¶¶ 21-23, 25.  Both RRTL and Big Picture have provided jobs for LVD members on the reservation. *See generally id.*  Through new products and investments from third-parties, LVD predicts it could make up to $200,000,000 of net income per year within five years, at which point LVD's longstanding objective of creating a self-determined and self-sufficient

---

[11] Any individual Tribal Council member's motives or intent is wholly irrelevant to the Tribe's purpose or intent. *See Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 598 (4th Cir. 2017) ("adher[ing] to the edict that courts 'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'") (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)).  Thus the testimony of Joette Pete, who was never subject to cross-examination and cannot credibly be claimed to reflect the Tribe's purpose and intent.

[12] *See* Ex. HHH., Chico Harlan, *Indian Tribes Gambling on High-Interest Loans to Raise Revenue*, Wash. Post, Mar. 1, 2015, available at https://www.washingtonpost.com/business/economy/indian-tribes-gambling-on-high-interest-loans-to-raiserevenue/2015/03/01/8551642d-e51b-4d3a-89c6-4de0d3bdf385_story.html.

**JA1404**

Tribal business will be fully realized. *See* Ex. III, Big Picture Confidential Investment Opportunity Powerpoint Presentation, LVD-DEF00022047 (predicting almost $486,000,000 in gross revenue from Big Picture in 2022 and $196,542,290.68 in profits). LVD's lending business has provided upwards of 46% of LVD's government budget at various times. *See* Williams Aff. ¶ 22; *see also* Ex. OOO Cowhey report, p. 20 (showing how much value LVD had created).

Under the contingent Note payment arrangement, Big Picture earned millions and its equity value continues to benefit the Tribe. The payment structure was standard for tribal online lending and other types of online lending. *See* Ex. JJJ, Merritt Dep. (3/21/19) at 53:4-20 (testifying that LVD's 2% of revenue distribution to owner was similar to revenue sharing in state licensed small dollar lending operations); *see also* Ex. KKK, Ross Dep. (3/15/19) at 134:1-25.

**I. Settlement of Purported Class with the Tribal Lender**.

Plaintiffs have already settled their usury claims with Tribal entities, including the lending entity, Big Picture. *Galloway et al. v. Williams et al.*, 3:19-cv-00470 ("*Galloway III*"), ECF No. 55-1 ("Settlement Agreement"). By settling with the Tribal lender for $8,700,000, to be paid over two years, Virginia plaintiffs in *Galloway III* endorsed continued collection of loans at interest rates exceeding Virginia usury laws. Specifically, for any loan executed between June 2013 and December 2020, Big Picture and Ascension may collect "2.5 times the original principal amount of the loan in payments over the life of the loan," but otherwise the operations of Big Picture are not materially changed. (Settlement Agmt. § 11.2.)

The proposed class in *Williams* overlaps with the purported class of settling plaintiffs in *Galloway III* by including borrowers who executed loans on or after June 22, 2013. Notably,

**JA1405**

however, only 4245 out of the 491,018 who received notice in *Galloway III* opted into receiving restitution from the Tribal lender (and 486,773 never responded). *See* ECF 105-4. This Court approved the *Galloway III* settlement on December 18, 2020, by preliminary approval order dated December 20, 2019. *Galloway III*, ECF Nos. 65, 114, 115.

### III. ARGUMENT

Determining whether Plaintiffs have met the required showing as to each class certification factor requires the Court to perform a "rigorous analysis." *Branch v. Gov't Employees Ins. Co*., 323 F.R.D. 539, 544 (E.D. Va. 2018) (citing *WalMart Stores, Inc. v. Dukes*, 564 U.S. 338, 351, 131 S.Ct. 2541 (2011). The "Court is not required 'to accept plaintiff['s] pleadings when assessing whether a class should be certified.'" *Branch*, 323 F.R.D. at 545. Instead, the Court must take a "close look" at the facts relevant to the certification. *In re Safety-Kleen Corp. Bondholders Litig.*, 2004 WL 3115870 (D.S.C. Nov. 1, 2004); *see also Branch*, 323 F.R.D. at 545 ("[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule–that is, he must be prepared to prove that there are <u>in fact</u> sufficiently numerous parties, common questions of law or fact, etc." (emphasis in original) (quoting *Dukes*, 564 U.S. at 350)).

### A.  THE PROPOSED CLASSES ARE NOT ASCERTAINABLE.

"Ascertainability," i.e., the ability to actually and readily identify class members, is a "threshold requirement" for class certification. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). It is satisfied only if "it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* at 358 (quoting 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1760 (3d ed. 2005)). It is not satisfied if "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials.'" *Id.*; *see*

*also Branch*, 323 F.R.D. at 545 (same).  It is also not satisfied if the information is not **actually available**, such that the class is not **"currently and readily** ascertainable."  *Marcus*, 687 F.3d at 593 (3d Cir. 2012)(emphasis added); *Brooks,* 2012 WL 5195982, *3.

Plaintiffs cannot demonstrate ascertainability here for at least four reasons.  **First**, the loan information is largely under Tribal control (subject to sovereign immunity); Martorello has not been able to obtain it in discovery; and there is no assurance that all relevant loan data will be timely obtainable.[13]  *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (ascertainability problematic where requisite information was in possession of third-party foreign corporation).  The specific loan information for each proposed class member (including residency, date of borrowing; payment histories; and balances) is currently unknown by either Martorello or Plaintiffs.  Martorello sought this information from the Tribe without success.  *See* AAA Arbitration Decision (arbitrator ruled that Eventide is not entitled to provide loan data).  Plaintiffs also apparently cannot obtain loan information until *after a class is* certified, according to § 6.3 of Plaintiffs' settlement with the Tribe.  *See* ECF 55-1.

Without timely access to loan information, Martorello is not able to properly identify and evaluate the purported class especially *as it relates to Martorello*.  Forcing Martorello to defend against certification of a class where the loans are unavailable is contrary to ascertainabilty, fairness, and due process.[14]  *See, e.g. Brooks v. GAF Materials Corp.,* No. 8:11-

---

[13] Though Plaintiffs contend that non-tribal entities TranDotCom and DataX have the information, the loan data remains presently unavailable to Martorello.  To the extent Plaintiffs had an agreement with TranDotCom sanctioned by the Court (see ECF 415), no loan data has been produced to Martorello.  If Plaintiffs secured the loan data from TranDotCom, they should have produced it in response to Martorello's discovery requests.  If Plaintiffs have not secured the loan data, they cannot satisfy ascertainability without evidentiary support.  *See Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d 2013) ("A Plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful.")

[14] For this and other reasons, Martorello continues to assert that this case should be dismissed under Rule 19 of the Federal Rules of Civil Procedure, in accordance with Martorello's pending

CV-00983-JMC, 2012 WL 5195982, at *3 (D.S.C. Oct. 19, 2012), *clarified on denial of reconsideration*, No. 8:11-CV-00983-JMC, 2013 WL 461468 (D.S.C. Feb. 6, 2013) ("Ascertainability serves several critical purposes including … allowing adequate opportunity for defendants to protect themselves by confirming that those bound by the class proceedings are easily identifiable").

Without the loan records, the only way to identify class members is to seek documents and testimony regarding loan and payment details from each putative class member.  This is exactly the type of individualized review that renders a class not ascertainable.  *See Adair*, 764 F.3d at 358 (rejecting ascertainability where identification of class members would have required a "complicated and individualized process" of reviewing records); *Supler v. FKAACS, Inc.*, 2012 WL 5430328, at *3 (E.D.N.C. 2012) (ascertainability was "impossible" for lack of records).

***Second***, even if the loan information could be acquired, its review and application to Martorello likely would be so individualized and complicated that the class still would not be readily ascertainable *as to Martorello*.  This is primarily because Martorello was <u>not the lender</u>, and Martorello's assistance to the Tribe (as manager of outside vendors for a portion of the class period) varied considerably over time.  Due to this variance, each member of the putative class would be differently situated vis-à-vis Martorello, depending on when his or her loans and each payment was made and whether any interest payments ever reached Martorello at all.  Application of loan information to Martorello would be complicated and indirect, militating against ascertainability.  *See, e.g., Adair*, 764 F.3d at 359 (4th Cir. 2014) (vacating class certification and finding that complications associated with the land records "pose[d] a

---

motion at ECF 987.  Other reasons include that Martorello has had very limited opportunity for discovery from Tribal entities (in contrast to Plaintiffs), and his defense is thereby prejudiced.

significant administrative barrier to ascertaining the ownership classes"); *Inetianbor v. Cashcall, Inc.,* 314 F.R.D. 535, 537 (S.D. Fla. 2016) (there was no ascertainability of the class because the proposed definition would require the Court to determine on a loan-by-loan basis whether each class member's loan agreement was "substantially similar" to Plaintiff); *see also Supler v. FKAACS, Inc.*, 2012 WL 5430328, at *3 (E.D.N.C. Nov. 6, 2012) (concluding ascertainability was "impossible" for lack of records identifying the specific autodialer at issue).

Plaintiffs cannot satisfy their burden of showing that the sought-after records clearly and feasibly will offer the information needed to ascertain the class, without individualized review. *See Piotrowski v. Wells Fargo Bank, NA*, No. CIV.A. DKC 11-3758, 2015 WL 4602591, at *18 (D. Md. July 29, 2015)(quoting *Karhu v. Vital Pharm., Inc*., 621 F. App'x 945, 958 (11th Cir. 2015) ("A plaintiff cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible").  Without actually having the loan information or the ability to assess its complexity, Plaintiffs cannot reliably assert that the information will be "readily obtainable" through "electronic data analysis." *See, e.g.*, *Dykes v. Portfolio Recovery Associates, LLC*, 2016 WL 346959 (E.D. Va., Jan. 28, 2016), at *4–5 (rejecting ascertainability of a class that, although theoretically identifiable by available records, would require examination of each putative member's file); *Piotrowski*, 2015 WL 4602591, at *16–18 (rejecting class that would have required "loan by loan review" of defendant's data).

Plaintiffs likewise cannot surmount the likely need for individualized review of loan records by relying only on putative class members' "say so," because such would be unreliable. *Marcus*, 687 F.3d at 594 ("Forcing [defendants] to accept as true absent persons' declarations

**JA1409**

that they are members of the class, without further indicia of reliability, would have serious due

process implications"); *see also In re Asacol Antitrust Litigation*, 2018 WL 4958856 (1st Cir.

Oct. 15, 2018) ("A 'claims administrator's' review of contested forms completed by consumers

concerning an element of their claims would fail to be "protective of defendants' Seventh

Amendment and due process rights").

      **Third**, even if Martorello could acquire the requisite loan information (which he has not

been able to do as of this date, despite Eventide's unsuccessful attempt to secure loan

information by initiating an arbitration with the Tribe), individualized mini-trials likely still

would be necessary to verify purported class members have not released their rights, already

recovered, or are otherwise estopped through settlement in *Galloway III*.[15]  (ECF 968, p. 26).

      **Fourth,** analysis of whether "the loan or payment occurred within the statute of

limitations would require an individual analysis of the timeliness of individual claims to

determine class membership."  *Inetianbor*, 314 F.R.D. at 537  (internal quotations omitted); *see

also Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 295 (1st Cir. 2000) ("because a

time bar constitutes an affirmative defense, see Fed.R.Civ.P. 8(c), statute-of-limitations defenses

are appropriate for consideration in the class certification calculus").  This is relevant to

inquiries including usury (2 years statute of limitations) and unjust enrichment (three-year

statute of limitations).  *See E. W., LLC v. Rahman*, 873 F. Supp. 2d 721, 731 (E.D. Va. 2012)

(dismissing unjust enrichment claim because it was filed more than three years after accrual);

Va. Code 6.2-305 (two year limitations period for usury).

---

[15] The Settlement requires Big Picture to pay the proposed class members $8,700,000 over two years from funds derived from continued lending, after the 2013-2019 class period and obtain ownership in the alleged lynchpin, Eventide.  In effect, many or all in the proposed class will be deriving interest *from other post-2019 borrowers* outside of Plaintiffs' class.  They therefore will be engaging in what they condemn (receiving interest derived from other borrowers' Tribal loans) and should be estopped.

**JA1410**

## B.  COMMON ISSUES DO NOT PREDOMINATE.

Federal Rule of Civil Procedure 23(b)(3) requires "questions of law or fact common to class members [to] predominate over any questions affecting only individual members."  This test is "even more demanding" than the commonality requirement in Rule 23 (a).  *Branch,* 323 F.R.D. at 550 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).  The Supreme Court has noted that "[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045, 194 L.Ed.2d 124 (2016) (internal quotation marks omitted).  The "predominance requirement applies to damages as well, because the efficiencies of the class action mechanism would be negated if '[q]uestions of individual damage calculations ... overwhelm questions common to the class.'"  *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 260 (3d Cir. 2016), as amended (Sept. 29, 2016) (quoting *Comcast*, 133 S.Ct. at 1433).

The predominance "inquiry is especially dependent upon the merits of a plaintiff's claim, since the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual."  *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009) (internal quotation marks omitted).

For liability against Martorello personally, Plaintiffs must show predominance of questions relating to the elements of usury, RICO, and unjust enrichment *as to Martorello*.  Here, as explained below, predominance is not satisfied.  Martorello *personally* was never the lender or loan collector, and the analysis *relating to Martorello* requires individualized inquiries by year.

### 1. Plaintiffs Cannot Show that Martorello Throughout the Class Period Uniformly Received Loan Payments from Borrowers in the Purported Class.

For usury, Plaintiffs cannot show Martorello personally is the lender or collector, so they argue that Martorello indirectly received loan proceeds (which is still insufficient for liability but is Plaintiffs' proffered theory).[16]  Plaintiffs cannot show that Martorello throughout the class period uniformly received loan payments from borrowers in the purported class, and the usury and damages questions *as to Martorello* therefore do not predominate.

Whether Martorello received payments derived from the purported class of borrowers varied over the class period.  As a preliminary matter, Martorello was not "the person" receiving interest payments.  The "person" receiving interest payments was the Tribal Lender.  And to the extent the Tribe used any money derived from borrowers to pay companies Martorello managed, the path and activity varied over time, including a complete cessation of Tribal payments to Eventide from November 2018 to July 2020.  Even before the sale, the variable payment provisions in the Servicing Agreement yielded changing or no payments because they depended <u>not</u> on loan repayment, but rather on the total profitability (or not) of the lender.  *See* Ex. NNN, ROSETTE_REVISED_030897 (in a 2014 email, Martorello stated "[Red Rock Tribal Lending] for example, [Bellicose] had losses in the millions for well over a year before [we] ever saw a penny of profit!").  A substantial number of short-term consumer loans never provided any financial benefit to Martorello.

The issue of whether the specific interest payments, therefore, ever reached Martorello

---

[16] Even if Virginia law applied (which it does not), Virginia Code § 6.2-305 does not apply to non-lender and non-collector, Martorello, because Martorello was never "the person taking or receiving such payments" under that Section.  *See also id.* (referencing "creditor" regarding "bona fide error" defense to usury).  The Tribal entities took and received payments on Tribal loans, and whether any money derived from the loans ever reached Martorello requires an individualized analysis.  *See also* Va. Code 6.2-1541 (B) (listing remedies against the lender only); *Greenberg v. Commonwealth ex rel. Att'y Gen. of Va.*, 255 Va. 594, 499 S.E.2d 266, 270 (1998) (§ 6.2-1541(B) permits "a recovery of **restitution only from the lender**," which excludes members, officers, directors, agents and employees of that lender) (emphasis added).

over the class period requires individualized analysis and does not predominate throughout the class period. *See Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) ("What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."); *Pearce v. UBS PaineWebber, Inc.,* 2004 WL 5282962, at *8 (D.S.C. Aug. 13, 2004) (proposed class failed to satisfy predominance requirement, where individual issues overwhelmed common questions).

Plaintiffs cannot ignore changes over time through mere *allegations* of uniformity. *See Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 359 (4th Cir. 2004) (vacating class certification where "the district court's reliance on the mere assertions did not fulfill the requirements that the district court take a 'close look' …, conduct a 'rigorous analysis,' and make findings … that the requirements of Rule 23 (b) (3) have been satisfied").

### 2. Whether Martorello Conducted or Participated in Tribal Affairs "Through A Pattern of Racketeering Activity or Collection of Unlawful Debt" Cannot Be Evaluated in the Same Manner Over the Class Period.

For RICO under Section 1962 (c) of RICO, Plaintiffs must prove that Martorello was a "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the *conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt*." (emphasis added.) Here, whether Martorello conducted or participated in Tribal affairs "through a pattern of racketeering activity or collection of unlawful debt" cannot be evaluated in the same manner over the class period, due to Martorello's decreasing involvement and ultimate 2016 sale of Bellicose to the Tribe. The analysis (application of facts to law) will substantially vary by year, militating against predominance.

Martorello's support for the Tribe's lending business declined considerably over time, and ceased after Martorello's 2016 sale of Bellicose to the Tribe.[17]  For example, between January 2012 and January 2016, Red Rock developed more and more knowledge and capacity and internalized third party services.  These changes in Martorello's role with respect to the Tribe's business militate against predominance of common questions *relating to Martorello*.

The changing analysis *as to Martorello* signifies that the RICO question cannot be evaluated similarly with respect to each borrower each month or year of the class period.  The analysis of whether Martorello could have participated (indirectly) in the Tribe's lending business or collected any money derived from the Tribe's lending business varies by month.[18]  Initially, the Tribal Lender paid its outside vendors (Bellicose and Sourcepoint), then internalized third party vendor services (unaffiliated with Martorello) and used less assistance from outside vendors.  Then, the Tribal Lender purchased Bellicose from Eventide such that Martorello was no longer involved with the consumer lending operations of the Tribe.  Payments from the Tribal Lender also varied, including a default on the Tribal Lender's Note to Eventide from approximately November 2018 to at least July 2020.

### 3. Individualized Issues Regarding "True Lender" Questions Predominate Over Common Questions.

Questions relating to attributing the acts of a tribal government and a corporation to Martorello, i.e. the "true lender" inquiry (which is Plaintiffs' flawed theory of the case), require a

---

[17] This case is different from cases like *Henry v. Cash Today, Inc.*, 199 F.R.D. 566 (S.D. Tex. 2000) because that case involved common questions of lender activity, i.e. "whether  Defendants were engaged in making consumer loans").  In contrast, here, questions relating to Martorello do not involve lender activity because Martorello was never the lender.  Questions relating to Martorello are much more complicated, as facts pertinent to Martorello (receipt of money, assistance with the Tribe's lending business) changed over time.

[18]   The relevant time frame is monthly because the Tribe's loans are short-term, often being paid off or charged off in a matter of weeks or most often, months.

**JA1414**

changing analysis over time.  To prove "true lender," Plaintiff would need to bypass deference to

the Tribal sovereign, ignore corporate formalities, and argue that Martorello personally and

uniformly "committed" or "authorized" the Tribal loans at issue.[19]  *See McFarland,* 477 F. Supp.

2d at 738-739 (E.D. Va. 2007) (officers could only be liable for intentional torts "he or she

commits or authorizes on behalf of the corporation.").  Plaintiffs cannot show *for each purported*

*class member* that Martorello **committed or authorized** any intentional tort(s) on behalf of the

lender.  *McFarland* at 739 ("an officer or director of a corporation is liable only for those

***intentional torts*** he or she ***commits or authorizes*** on behalf of the corporation.") (emphasis

added).  Indirect facilitation or "setting the stage" would not suffice.  *Airlines Reporting Corp. v.*

*Pishvaian*, 155 F. Supp. 2d 659, 666–67 (E.D. Va. 2001).  The analysis is particularly indirect

with respect to Martorello because Martorello was never an officer, director, or employee of a

Tribal Lender or servicer.

      Facts relevant to whether Martorello personally could have **committed or authorized**

any intentional torts toward all members of the proposed class varied over time.  Martorello's

knowledge and personal engagement significantly declined over time and effectively ceased after

the January 2016 sale of Bellicose to the Tribe.

      Plaintiffs incorrectly argue that there were no meaningful changes over time because

Martorello indirectly controlled Tribal lending even after the sale of Bellicose.  Plaintiffs allege

that McFadden (not Martorello) effectively controlled Ascension, and that Martorello effectively

---

[19] *See, e.g., McFarland v. Virginia Ret. Servs. of Chesterfield, L.L.C.*, 477 F. Supp. 2d 727, 738-739 (E.D. Va. 2007) (members of LLC are not personally liable for actions of the company; and officers of a corporation are "liable only for those intentional torts he or she commits or authorizes on behalf of the corporation."); Va. Code Ann. § 13.1-1019 ("no member, manager, organizer or other agent of a limited liability company ... shall have any personal obligation for any liabilities of a limited liability company, whether such liabilities arise in contract, tort or otherwise, solely by reason of being a member, manager, organizer or agent of a limited liability company.").

controlled McFadden through Eventide's ability to buy back McFadden's membership interest. *See* ECF 968, p.21-22. This assertion is wrong. Eventide could not buy back any member's interest without paying "the Fair Market Value of the interest." *See* ECF 968, Ex. 30 (I), p.5. The value for McFadden's interest would have been approximately two million dollars ($2,000,000.00), making it very expensive buy McFadden's interest.[20] Moreover, there is no evidence that Martorello ever exercised or threatened any post-sale buy-out of McFadden's shares. Plaintiffs therefore are wrong that Martorello exercised control of Tribal lending after the sale of Bellicose to the Tribal Lender. *See also Williams*, 929 F.3d at 182–83 (the Servicing Agreement allows Big Picture "within [its] sole and absolute discretion" to "change the criteria used to extend funds when and if it deems such change appropriate. In other words, the fact that Big Picture currently chooses to utilize Ascension's criteria does not mean that it does not have the power to choose differently in the future); *see also* Ex. YY Dep. McFadden, 86:18-24 (Q….What role, if any does Eventide or Matt Martorello have in the day-to-day operations of Ascension Technologies? A. None. Q. Has that always been the case? A. Correct); *Id.* at 70:17-21 (McFadden did not know that his interest in Eventide could be bought out).

Tribal outsourcing of certain aspects of operations varied over time, especially after the Tribe purchased its outside vendors. Martorello's assistance to the Tribe's lending business also varied over time. Any "true lender" theory questions, therefore, would vary over time.

### 4. Individualized Issues Regarding RICO's Causation Requirement Preclude Predominance.

Plaintiffs fail to demonstrate predominance with respect to RICO's causation

---

[20] The approximate two million is calculated by multiplying McFadden's 2 % ownership interest in Eventide by the value of the Note. *See* Ex. PPP- Aranca - Bellicose Capital, LLC Business Valuation as of January 26, 2016, p. 97 (identifying "sum of present values" of Bellicose as 107,684 million); Ex. OOO Cowhey Report, p. 21 (finding present value of the Eventide Note to be $164,578,000 in 2016).

requirement.  To prevail on a civil RICO claim, "it is not enough that a RICO plaintiff prove that, but for the defendant's violation, he would not have been injured; he must also show that the violation **proximately** caused the harm."  *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996) (emphasis in original).  "Proximate cause is a necessary element of analysis to 'limit a person's responsibility for the consequences of that person's own act,'" and requires "some **direct relation** between the injury asserted and the injurious conduct alleged." *Slay's Restoration*, *LLC v. Wright Nat'l Flood Ins. Co*., 226 F. Supp. 3d 589, 595 (E.D. Va. 2017), aff'd, 884 F.3d 489 (4th Cir. 2018) (emphasis added).

A RICO action cannot lie where "[t]he causal connection [is] considered too tenuous, and the Plaintiffs' theory ignore[s] the more immediate causes of their injuries" or "[w]here the injuries [are] more appropriately attributable to intervening causes." *Mid Atlantic Telecom, Inc. v. Long Distance Serv., Inc*., 18 F.3d 260, 263 (4th Cir. 1994); *see also Mendelovitz v. Vosicky*, 40 F.3d 182, 185 (7th Cir. 1994) (failure to satisfy proximate cause where representations themselves did not cause harm; rather, intermediary was necessary before harm would occur).

Failure to show a direct relationship between Martorello's conduct and each purported class member's alleged harm will preclude liability under RICO.  For example, in *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), though the Supreme Court found a RICO predicate act in the cigarette vendor's failure to report cigarette sales, the plaintiff failed to establish proximate cause because "the City's harm was directly caused by the customers, not [the vendor]."  *Hemi*, 559 U.S. at 11.  Proximate cause did not exist where the link was "too remote," "purely contingent," or "indirect."  *Id.* at 9.  Proximate cause required *more than* likelihood that the harm was "foreseeable" or "intended," or even "desired."  *Id.* at 12.

Plaintiffs fail adequately to address whether RICO's causation question predominates

over the class period, instead arguing that "[n]o reliance or causation need be shown."  ECF 968, p.36.  Plaintiffs rely, however, on an inapposite case.  In *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 572 (S.D. Tex. 2000), the plaintiffs "provided evidence … that demonstrate[d] that Defendants operated in essentially the same manner … with regard to all customers."  199 F.R.D. at 572.  The *Henry* case does not apply here because there could be no showing that *Martorello individually* (as opposed to the lending entities) acted causally and materially in essentially the same manner with respect to each proposed class member.

The RICO proximate cause question weighs strongly against predominance.  *See, e.g., Sunbird Air Servs., Inc. v. Beech Aircraft Corp.,* No. CIV. A. 89-2181-V, 1992 WL 193661, at *5 (D. Kan. July 15, 1992) ("individual issues of causation and reliance as to each class member would predominate over the common issues of liability and legal elements of RICO"); *Grider v. Texas* Oil & Gas Corp., 868 F.2d 1147, 1150-51 (10th Cir.), *cert. denied*, 493 U.S. 820 (1989) (to state a claim under RICO, plaintiff must allege it was harmed by defendants' acquisition or maintenance of an interest in or control of the alleged enterprise, rather than alleging injury from the racketeering activity itself).

The Court will need to consider each class member's claims and *connect them to actions by Martorello* to determine whether the alleged conduct "led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (analysis of proximate causation is necessary for Plaintiffs to fulfill their "responsibility to prove that the amount of damages … is fairly attributable to the defendant"); *Slay's,* 884 F.3d at 494  ("without a direct-relationship requirement, to avoid the risk of multiple recoveries, courts would need to engage in the complicated task of apportioning damages among plaintiffs along the causal chain of the defendant's violation").  In addition, the Court will need to analyze what happened to borrower's

**JA1418**

interest payments to the Tribal lender and whether and to what extent any interest payments ended up with Martorello.

**5. Common Questions Do Not Predominate As To Unjust Enrichment Claims**.

To prevail on an unjust enrichment claim in Virginia, a "plaintiff must prove (1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Quick Serve Concepts, LLC v. Cedar Fair*, L.P., 83 Va. Cir. 59 (Va. Cir. Ct. 2011). These are necessarily fact-specific inquiries; "an 'unjust enrichment' claim would typically require a factual inquiry into the circumstances of each [transaction] to determine whether it would be 'unjust' for the defendant to retain the alleged benefit." *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 62–63 (D.N.H. 2015) (denying class certification for unjust enrichment claims); *see also Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014) (issue of whether receipt of benefit was unjust or inequitable "necessarily rests on individualized determinations"); *Covert v. LVNV Funding,* LLC, 779 F.3d 242, 247 (4th Cir. 2015); *Doe I v. Wal–Mart Stores, Inc.,* 572 F.3d 677, 684 (9th Cir. 2009).

Because of the need for such individual-specific considerations, unjust enrichment claims are especially poor candidates for class certification. "[D]emonstrating that individual questions will not predominate common questions is particularly problematic where a claim of unjust enrichment is asserted." *Hegel v. Brunswick Corp.*, 2010 WL 2900379, at *5 (E.D. Wis. July 20, 2010). There is widespread agreement that "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009); *see also Douglas Cty.*

*Fed'n v. Douglas Cty. Sch. Dist. RE-1*, 325 F.R.D. 355, 367 (D. Colo. 2018) ("Because of the individualized nature of each class member's intentions and expectations, courts generally find that unjust enrichment claims are not appropriately certified for class treatment, as common questions will rarely, if ever, predominate.") (internal quotation marks omitted); *In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 145 (D.D.C. 2016) (collecting cases and noting that "courts often refuse to certify classes for unjust enrichment claims because these equitable claims require courts to evaluate the plaintiffs' individual circumstances"). As a leading treatise observes,

> [t]he majority view is that unjust enrichment claims usually are not amenable to class treatment because the claim requires evaluation of the individual circumstances of each claimant to determine whether a benefit was conferred on

1 McLaughlin on Class Actions § 5:60 (11th ed.).

Plaintiffs here fail to show that their unjust enrichment claims are an exception to this rule. For example, with respect to the first element, not every putative class member paid interest that ultimately could be traceable to Martorello. The putative class members paid the Tribal Lender (not Martorello), and whether any interest ultimately reached Martorello depended upon the given loan, Martorello's role at the time, whether the Tribal Lender made contractual payments to Eventide (which it did not from November 2018-July 2020), and whether Eventide made any distributions to Martorello. In short, whether Martorello has been enriched at all depends on the specific borrower, time period, and whether Martorello indirectly received any money. Plaintiffs cases on this issue are inapposite because they involve the lender or bank. *See, e.g. In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 675 (S.D. Fla. 2015) (customers formed a class against their bank). Martorello is not the lender.

In addition, many putative class members did not confer a benefit on anyone (including

**JA1420**

the Tribal lender) because they paid back less than the principal on their loans.  *See In re Citizens Corp.,* 2013 WL 4039048, at *8 (Bankr. M.D. Tenn. Aug. 7, 2013) ("Fi–Data paid far more than what it received ... and was not unjustly enriched") (citing *Black v. Boyd*, 248 F.2d 156, 162 (6th Cir. 1957) (no unjust enrichment where bank applied monies received against a loan previously made); *see also Pro Bono Inv., Inc. v. Gerry*, 2005 WL 2429777, at *9 (S.D.N.Y. Sept. 30, 2005) ("[If] funds were paid ... and never repaid, the [lender] may have a valid claim of unjust enrichment.  Indeed, if [the borrower] really borrowed money but failed to repay the loan, then those funds should arguably be returned even though the Note itself fails."); *DAGS II, LLC v. Huntington Nat'l Bank, NA,* 2016 WL 4536328, at *17 (W.D. Mich. Aug. 31, 2016) (similar).

     Because the equities of each loan can only be determined on a case-by-case basis, Plaintiffs cannot establish predominance with respect to unjust enrichment.  Unjust enrichment claims should not be collectivized, especially where some putative class members may even have been grateful for the loans, to avert short-term crises.[21]  Different levels of loan satisfaction militate against a finding of predominance, damages, harm, and injury.  *See Bearden v. Honeywell Int'l, Inc.*, 2010 WL 1223936, at *10–11 (M.D. Tenn. Mar. 24, 2010) (finding no predominance where "there are undoubtedly many other class members who are satisfied with" the product); *see also* https://www.trustpilot.com/review/bigpictureloans.com (over 94% of Big Picture reviews as "great" or "excellent"); *see also* ECF 105-4 (only 4245 out

---

[21] For example, despite he and his wife having a combined annual income of over $90,000, Ex. II, Hengle Dep. Tr. at 12:13–14:1, Plaintiff George Hengle took ten separate loans from Defendants and other loans from at least five other on-line lenders to help his brother make his mortgage payments and to pay his personal bills. Id. at 18:15–21:12; Ex. JJ, Hengle Interrog. Resp. at 11. In addition, the loans helped certain borrowers avoid eviction, foreclosure, and repossession, and similar emergencies.

of the 491,018 who received notice in *Galloway III* opted into receiving restitution from the Tribal lender (and 486,773 never responded).

**6. Common Questions Do Not Predominate Regarding Alleged RICO Conspiracy**.

Regarding RICO 1962(d), questions pertinent to conspiracy do not predominate because Martorello's consulting services significantly decreased over the class period and ceased upon the 2016 sale of Bellicose. Martorello could not be conspiring with the Tribe after the sale because Martorello had and continues to have no involvement with lending operations. *See, e.g.*, *Parm v. Nat'l Bank of California,* N.A., No. 4:14-CV-0320-HLM, 2015 WL 11605748, at *26 (N.D. Ga. May 20, 2015), aff'd, 835 F.3d 1331 (11th Cir. 2016) (RICO conspiracy claim against bank failed, where Defendant solely originated entries on the ACH Network on behalf of the payday lenders). The conspiracy question, therefore, does not predominate throughout the class period.

## C.  THE CLASS DEFINITION FAILS BECAUSE MANY PROPOSED MEMBERS WERE NOT INJURED BY MARTORELLO

### 1.  The Proposed Classes Include Members Who Were Not Injured.

A class cannot be defined so broadly that it includes "a great number of members who for some reason could not have been harmed by the defendant's alleged unlawful conduct." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824-25 (7th Cir. 2012). Because Plaintiffs' proposed classes include consumers who paid "any amount" and "any principal, interest, *or* fees," Plaintiffs classes are impermissibly broad. They are not adequately limited to injured parties, i.e. parties paying back more than principal on loans.[22] Those class members who paid less than the full amount of the loan principal have had no concrete injury, and are

---

[22] According to ALCS settlement processor in *Galloway III*, only 26.33% of the purported settling class (1) repaid his or her loan in full, and also (2) paid more than 2.5 times their original principal amount of the loan.  *Galloway III,* Case 3:19-cv-00470-REP, *ECF* 105-4.

therefore different than members who paid both principal and interest. This difference will be important in evaluating the claims. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 137 (2d Cir. 2016) ("a federal court is authorized to grant equitable relief to a private plaintiff **who has proven injury** to his business or property by reason of defendant's violation of … § 1962).

## 2. There Was No Uniformity of Benefit to Martorello throughout the Proposed Class Period.

In addition, any payment of interest would have been to the Tribal Lender, and Plaintiffs cannot show without individualized analysis whether any particular interest is legally attributable to Martorello. For example, from November 2018 to July 2020, the lending entities paid Eventide nothing and in the first year of Red Rock's operations, Bellicose lost money for providing services. In addition, certain distributions during the class period were invested in non-lending subsidiaries of Bellicose and *never reached Martorello*. In short, each borrower dollar is uniquely situated with respect to Martorello.

## 3. Many Purported Class Members Have Already Recovered Via the Settlement in Galloway III.

As Plaintiffs admit, thousands of Virginia residents within Plaintiffs' purported class here have already settled. In so settling, Virginia plaintiffs in *Galloway III* endorsed continued collection of loans at interest rates exceeding Virginia usury laws. (Settlement Agreement § 11.2.). This shows that some of Plaintiffs' proposed classes likely already recovered and discerning which have already fully recovered would take individualize review of loans and payments. *See, e.g., Slay's,* 884 F.3d at 494 (noting the goal of "avoid[ing] the risk of multiple recoveries"); *Comcast*, 133 S.Ct. at 1433 (class action mechanism would be negated if "[q]uestions of individual damage calculations ... overwhelm questions common to the class.").

## D. A CLASS ACTION AGAINST MARTORELLO WOULD NOT BE SUPERIOR.

The second prong of Rule 23 (b)(3) requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Principal among the "superiority" considerations are the "likely difficulties in managing the class action." *Id.* Manageability "is perhaps the most important consideration in a Rule 23(b)(3) determination." *Pitt v. City of Portsmouth, Va.*, 221 F.R.D. 438, 446 (E.D. Va. 2004); *accord* William B. Rubenstein, Newberg on Class Actions § 4:72 (5th ed.) (manageability is "the most critical concern" in determining superiority). Manageability "'encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit.'" *Fisher v. Virginia Elec. & Power Co.*, 217 F.R.D. 201, 213 (E.D. Va. 2003) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974)).

Crucially, Rule 23(b)(3) speaks in terms of "fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3) (emphasis added), not "disputes against some of the defendants" or "part of the controversy." Thus, the Fourth Circuit directs that "[a] trial judge cannot, in determining the manageability ... look exclusively to only one aspect of the case ... he can and must look at the case as a whole...." *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 71 (4th Cir. 1977) (en banc), *cert. denied*, 435 U.S. 968 (1978).

A variety of issues likely defeat manageability here. As mentioned, 98% of the 2013-2019 proposed class *never* signed up for restitution from the Tribal Lender and consequently could still bring claims individually (though not as a class action). *See* ECF 105-4. Specifically, only 4245 out of the 491,018 who received notice opted into receiving restitution from the Tribal lender (and 486,773 never responded). *Id.* The class is not superior and manageable where 98% of the purported class could still bring individual claims (due to never opting into restitution from the Tribal lender).

In addition, because Plaintiffs are asking the Court to look beyond the sovereign Tribal lenders and only at Martorello personally, there will need to be "highly individualized ... proof of injury and damages," which defeats manageability. *Windham*, 565 F.2d at 66. This will be especially difficult because discovery will be limited due to Tribal sovereign immunity. In addition, there are significant "intraclass differences" in the proposed classes, including whether any injury occurred, which further reduces manageability. *See Petersen v. Am. Gen. Life Ins. Co*., 2016 WL 7365187, at *14 (M.D. Fla. Mar. 30, 2016) ("intraclass differences may affect the manageability of this proposed class and individualized inquiries could indeed overwhelm common questions"). Here, the purported class cannot uniformly attribute liability to Martorello (absent any tribal entities left to bolster his defense), particularly considering the ever-shifting roles, relationships, and responsibilities over time. Lack of uniformity militates against superiority of the class. *See Windham,* 565 F.2d 59, 71–72 (denying class certification where "no severance of issues could remove or even alleviate the overwhelming burden of damage mini-trials that class certification would impose").

### E. THE ADMINISTRATOR OF MR. GILLISON'S ESTATE IS NOT AN ADEQUATE CLASS REPRESENTATIVE.

Plaintiffs substituted the administrator of Mr. Gillison's estate, Marcella Singh, for Mr. Gillison. See Dkt. #200. As this Court has observed, "the administrator of the deceased plaintiff's estate is not an adequate [class] representative for obvious reasons." *Chappelle v. E. I. DuPont DeNemours & Co*., 75 F.R.D. 74, 79 n.10 (E.D. Va. 1977). Ms. Singh is also not an adequate class representative because she has virtually no knowledge—firsthand or otherwise— of any facts relating to this case. Ex. QQ, Singh Dep. Tr. at 12:17–25, 20:8–17, 18:19–19:8, 22:18–22. Her lone source of information, records she obtained through Plaintiffs' counsel, *id.* at 23:1–7, is insufficient. *Shiring v. Tier Techs., Inc*., 244 F.R.D. 307, 316 (E.D. Va. 2007).

## IV.  CONCLUSION

Plaintiffs have not satisfied their burden to certify a class against Martorello in his personal capacity.  In addition to having waived class actions in their loan agreements, Plaintiffs cannot satisfy the requirements of Rule 23.  For example, Plaintiffs cannot establish ascertainability without pertinent loan data (controlled by the sovereign Tribe).  In addition, because Martorello was never the lender and his assistance to the Tribe varied significantly over time, common questions *relating to Martorello* do not predominate throughout the class period. Instead, an individualized loan-by-loan assessment will be required to assess questions relating to Martorello (including whether he received any financial benefit derived from borrowers in any a given month).

Respectfully submitted,

MATT MARTORELLO

By: /s/ Jon Hollis
       Of Counsel

Jon Hollis (VSB No. 84908)
J. Benjamin Rottenborn (VSB No. 84796)
Karen M. Stemland (VSB No. 47167)
WOODS ROGERS PLC
901 East Byrd Street, Suite 1550
Ricmond, Virginia 23219
Telephone: (804) 343-5020
Facsimile: (804) 343-5021
jhollis@woodsrogers.com
brottenborn@woodsrogers.com
kstemland@woodsrogers.com

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of February, 2021, a true and correct copy of the foregoing was served upon all parties that are registered through the Court's ECF notice system.

/s/ Jon Hollis

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, et al., | Case No. 3:17-cv-00461-REP-RCY |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| BIG PICTURE LOANS, LLC, et al., | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS**
**CERTIFICATION AGAINST DEFENDANT MATT MARTORELLO**

## INTRODUCTION

Martorello's opposition raises three primary challenges to this motion for class certification. First, Martorello contends that the loan contract's class waiver provisions are enforceable. Second, Martorello contends that the class is not ascertainable because the data needed to identify class members belongs to Big Picture and Ascension Technologies. And third, without identifying a single individualized question, Martorello points to a few immaterial differences between class members—almost all of which have nothing to do with the elements and evidence needed to establish the claims in this case. For the reasons explained below, none of these challenges present a legitimate obstacle to class certification in this case.[1]

## ARGUMENT

### I.      THE CLASS ACTION WAIVER IS UNENFORCEABLE.

#### A.      The loan contracts' plain language prospectively waives all federal rights.

The Supreme Court has repeatedly recognized that, where "choice-of-forum and choice-of-law clauses" operate "in tandem as a prospective waiver of a party's right to pursue statutory remedies," they are unenforceable. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *see also Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2313–

---

[1] Plaintiffs' opening brief contained 20 pages of facts regarding the initial structure of the enterprise, the events leading to the change in structure, and the new structure of the enterprise. *See* Dkt. 968 at 2-22. Martorello's statement of facts does not address or acknowledge these objective facts. Dkt 1007 at 12-29. Rather, Martorello provides his own farcical background, almost all of which have no relevance to Plaintiffs' motion for class certification. *Id.* Moreover, the Court has rejected Martorello's false narrative after an extensive review of this same evidence, as well as a two-day hearing that included live testimony from Martorello. *See* Dkt. 944 (finding that Martorello misrepresented: (1) his involvement in the creation of Red Rock; (2)  his control over Red Rock's lending operations; (3) the reasons why Bellicose was "sold" to LVD; and (4) the reasons for the creation of Big Picture). Because the Court has indicated that it will "take into account the record about the misrepresentations and the findings about them," Plaintiffs will not again rehash these issues except where they have any relevance to *this* motion. *Id.* at 39.

14 (2013) ("[C]ourts will not enforce a prospective waiver of the right to gain redress for an antitrust injury, whether in an arbitration agreement or *any other contract*." (emphasis added)); *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) ("[A] substantive waiver of federally protected civil rights will not be upheld."). Here, the loan contract's choice-of-law and forum selection provisions unambiguously waive a consumer's federal rights and remedies prospectively.

Prospective waiver of a consumer's rights and remedies is a hallmark feature of tribal lending agreements that has been rejected by the Fourth Circuit *in four cases*. In each case, the Fourth Circuit applied the prospective waiver doctrine to invalidate arbitration provisions that have the same effect of the agreement here— "mak[ing] unavailable to the borrowers the effective vindication of federal statutory protections and remedies." *Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 344 (4th Cir. 2020); *see also Gibbs v. Sequoia Capital Operations, LLC*, 966 F.3d 286, 293 (4th Cir. 2020); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 332 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 673 (4th Cir. 2016).

In *Hayes*, the Fourth Circuit refused to enforce an arbitration agreement that expressly stated that no federal law or regulation would apply to the agreement. *Hayes*, 811 F.3d at 669. The Fourth Circuit reasoned that "a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of federal statutes to which it is and must remain subject." *Id.* at 675. The Fourth Circuit expanded on this principal in *Dillon*, holding that a loan agreement that even "implicitly accomplishes" what the agreement in *Hayes* expressly stated was likewise unenforceable. *Dillon*, 856 F.3d at 336.

Like *Hayes and Dillon*, the lending agreement's choice-of-law and forum selection are spread out across three different provisions that are closely intertwined and, at times, repetitive, *i.e.*, the "Governing Law and Forum Selection" provision, the "Tribal Dispute Resolution

JA1429

Procedure" provision, and the "Waiver of Jury Trial" provision. These provisions must be considered together because they work together to prospectively waive all of a consumer's federal rights and remedies.

First, the "Governing Law and Forum Selection" provision, which precludes the application of any law other than tribal law, states,

> This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for your convenience.

Ex. 1 at 5 (emphasis added). Although the first sentence of this provision seems to suggest that the contract is governed by "applicable federal law," the very next sentence takes this away by restricting any disputes to be "solely and exclusively resolved" by tribal law. The restriction on the application of federal law is further clarified throughout the contract, including a provision in bold font that provides:

> You acknowledge and agree that this Agreement is subject _solely_ and _exclusively_ _to the Tribal law_ and jurisdiction of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

Ex. 1 at 6 (emphasis added). Requiring the "exclusive" application of tribal law clarifies "that only the laws of the Tribe" shall apply to the dispute "to the exclusion" of any other laws, including federal laws. _Hengle v. Asner_, 2020 WL 113496, at *14 (E.D. Va. 2020) (explaining why two similar provisions in an arbitration agreement operated in tandem to waive federal law); _see also Hayes_, 811 F.3d at 676 (interpreting a clause that forbid the application of "any other law other than the law of the [tribe]" as a clause that "almost surreptitiously waives a potential claimant's federal rights" and "flatly and categorically renounce[s]" the authority of federal law).

**JA1430**

In another similar case, this Court refused to enforce a nearly identical contract, explaining that a "solitary mention" that the loan was governed by "Tribal Law and such federal law as is applicable" could not save the contract when read as a whole. *Solomon v. Am. Web Loan*, 375 F. Supp. 3d 638, 672 (E.D. Va. 2019); *see also Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 970 (N.D. Cal. 2019) (finding choice-of-law provision unenforceable by reading contract in its entirety and rejecting argument use of "tribal law and such federal law as is applicable" language salvaged the provision).

If the Court has doubt on the effect of the "sole and exclusive" application of tribal law, there will be no uncertainty after review of the contract's "Tribal Dispute Resolution Procedure" and "Waiver of Jury Trial" provisions. The Tribal Dispute Resolution Procedure provides:

> A person's complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, <u>and does not create any binding procedural or substantive rights for a petitioner</u>.

Ex. 1 at 5 (emphasis added). This means precisely what it says—tribal law "does not create any binding procedural or substantive rights" for borrowers beyond the sham dispute resolution procedures. The Waiver of Jury Trial provision reiterates that the Tribal Dispute Resolution Procedure is the sole forum for the adjudication of all of a consumer's claims for all claims relating to the transaction. *Id*. The Waiver of Jury Trial provision, which includes the class waiver clause, is intertwined with the Tribal Dispute Resolution Procedure provision. *Id*.

When considered together (and often alone), these provisions in the contract operate in tandem to prospectively waive federal rights and remedies. First, the "Governing Law and Forum Selection" clause requires the sole and exclusive use of the Tribal Dispute Resolution Procedure. *Id*. at 5. Next, the "Tribal Dispute Resolution Procedure" clause provides that it "does not create any binding procedural or substantive rights for the petitioner," and the "Waiver of Jury Trial"

4

JA1431

provision defines covered disputes broadly to include all federal claims. *Id*. And finally, the "Important Acknowledgments" section clarifies that the "Agreement is subject solely and exclusively to Tribal law" and reiterates that the "Tribal Dispute Resolution Procedure is the sole and exclusive forum for resolving disputes and/or claims[.]" *Id*. at 6.

Five years ago, the Fourth Circuit labeled a similar contract a "farce" designed specifically "to avoid state and federal law," and deployed "to game the entire system." *Hayes*, 811 F.3d at 674-76. It surmised that its decision might prompt "future companies" to craft their contracts "on the up-and-up and avoid the kind of mess" confronting the defendants in that case. *Id*. at 676. Not here. Because the class action waiver is part of a contract that attempts to waive all federal rights and remedies, it cannot be enforced.

**B.    The Tribe's law—which was partially crafted by Martorello—also prospectively waives federal rights and remedies.**

Within the past year, the Fourth Circuit in *Haynes* and *Sequoia Captial* delved deeper into the prospective waiver issue, examining the tribal law to support its holdings that an arbitration agreement prospectively waived federal rights and remedies. Even though the arbitration agreements did not "explicitly disclaim the applicability of federal law," they still operated as a prospective waiver because the tribal law itself "prevent[ed] claimants from vindicating a RICO claim for treble damages against entities and individuals" such as the non-tribal participants in the scheme. *See Sequoia*, 966 F.3d at 293 (describing and applying the analysis in *Haynes*). In so holding, the Fourth Circuit took issue with three sections of the Otoe-Missouria Tribe's code—all of which mirror the Tribal Code "enacted" by the LVD.[2]

---

[2] Although the Tribe officially enacted the law, Martorello had a significant role in drafting the Code to ensure that tribal law rigged the system, including the claims against him. *See* Exs. 2-4.

In particular, the Fourth Circuit observed that "although § 5.1 of the Otoe-Missouria Tribal Consumer Financial Services Ordinance" provided that lenders shall comply with "federal laws as applicable," that the Racketeer Influence and Corrupt Organizations Act was "noticeably absent from the list of federal consumer protection statutes with which a lender must apply." *Id.* at 343 (citing Otoe-Missouria Tribal Consumer Fin. Servs. Ord. §§ 5.2(a) (2018)). "And even for the laws listed," the Fourth Circuit noted that the "Ordinance makes clear that a lender's compliance does not constitute 'consent . . . related to the applicability of federal laws[.]" *Id.* (citing § 5.2(a)). Since both tribes were represented by Rosette, it is no surprise that § 6.2 of the LVD's Tribal Code is identical in this respect. *Compare* Ex. 5 at pg. 21 (providing that a licensee "shall conduct business in a manner consistent with the principles of federal consumer protection law" and omitting any reference to RICO in the list of statutes); *with* Ex. 6 at pg. 10-11.

In addition, although tribal law allowed for a claim against the lending entity, the Fourth Circuit further found a prospective waiver occurred because tribal law did not allow for claims against individuals or non-tribal entities, such as Martorello, explaining "a borrower's ability to assert a federal statutory claim under tribal law against an individual or entity (such as the Haynes Defendants) related to a lender remains even more elusive: although the Ordinance governs 'licensed lenders' and mandates their compliance with tribal and applicable federal law, it says nothing about non-tribal entities or individuals associated with the lenders who may have violated RICO." *Id*. Again, the Tribal Code in this case is identical in this respect. *See* Ex. 5 at pg. 21.

And "even if the borrowers could assert a RICO claim against the Haynes Defendants under tribal law," the Fourth Circuit concluded that "the rest of the Ordinance fail[ed] to clarify how any consumer could meaningfully pursue any claims under it." *Id*. at 344. Stated differently, "[a]lthough the Ordinance contain[ed] a consumer complaint procedure," the tribal code "does not

JA1433

provide for or establish a private right of action for violations of any provisions, let alone any federal laws." *Id.* (citing §§ 8.1-8.4). The same is true here—the Tribal Code only allows for the imposition of fines against the lender. *See* Ex. 5 at pgs. 25-26 (detailing fines and penalties permitted to be imposed by the Commission). Worst yet, just as in this case, the Fourth Circuit found it problematic that the "tribal commission overseeing such a claim" was permitted to "grant or deny any relief as the Commission deems appropriate," thereby making it "clear that a claimant would be unable to assert a RICO claim against entities associated with a tribal lender." *Id*. The same is true here—just as in *Haynes*, § 9.3(f) of the Tribal Code likewise provides that the "The Authority may grant or deny any relief as the Authority determines appropriate." Ex. 5 at 28.

These recent decisions in *Haynes* and *Sequoia* completely foreclose any attempt by Martorello to enforce any portion of the contract's dispute resolution procedure, including the class action waiver provision. To find otherwise, the Court must blue pencil this "integrated scheme to contravene public policy." *Hayes*, 811 F.3d at 676. The Fourth Circuit's controlling authority prohibits any such attempts to sever any provisions from these contracts that have been deployed "to game the entire system." *Id*.; *see also Dillon*, 856 F.3d at 336-337 (refusing to sever any provisions of the contract and finding it was unenforceable "in its entirety.").[3]

---

[3] Every circuit to have considered a request for severance has agreed. *See, e.g., Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (4th Cir. 2019) (finding no basis for severance of provisions because "given the pervasive, unconscionable effects of the arbitration agreement interwoven within it, nothing meaningful would be left to enforce"); *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 232 (3d Cir. 2018) (joining "sister circuits in concluding that the CRST arbitral forum clause is integral to the entire arbitration agreement and cannot be severed"); *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 243-44 (3d Cir. 2020) (refusing to sever "the invocations of tribal law").

JA1434

C.      **The class action waiver is unenforceable because the entire contract is void under Virginia law.**

1.      **No federal policy favoring enforcement of the class action waiver exists.**

Before explaining why Virginia law renders the class waiver unenforceable, it is important to note that the vast majority of class waiver provisions are contained in arbitration agreements and thus trigger the "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quotation omitted); *see also Davis v. Oasis Legal Fin. Operating Co.*, 936 F.3d 1174, 1183 (11th Cir. 2019) (explaining that "[t]he Supreme Court, in multiple cases, has ruled that § 2 of the FAA overrides a state statute or common-law doctrine that attempts to undercut the enforceability of an arbitration agreement."). Where, as here, the "class action waiver is not contained in an arbitration agreement," the "FAA does not stand in the way of enforcing" state statutes or common law regarding the enforceability of contracts. *Davis*, 936 F.3d at 1183.

Of course, the lack of an arbitration agreement does not automatically invalidate a class-action waiver. But, the "logic behind the Supreme Court decisions on FAA preemption of class arbitration waivers is not readily transferable to class actions outside the arbitration setting." *Meyer v. Kalanick*, 185 F. Supp. 3d 448, 458 (S.D.N.Y. 2016); *see also Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1144 (2013). Instead, when a class waiver is included without "an accompanying arbitration agreement, the appropriate test of determining the enforceability of a class-action waiver has two steps." *U1it4Less, Inc. v. FedEx Corp.*, 2015 WL 3916247, at *4 (S.D.N.Y. June 25, 2015). First, a court must ask if the class-action waiver is unenforceable "under applicable state law," and, if not, the second step asks if the statute at issue "suggests legislative intent or policy reasons" weighing against enforcement. *Id*. "If the answer to both questions is

**JA1435**

'no,'" then the waiver may be enforced without an arbitration agreement. *Id*. Here, the class waiver is unenforceable "under applicable state law" and the Court need not go beyond the first step.

### 2. Virginia's anti-waiver statute renders the contract void.

The class action waiver is also unenforceable because it is part of a contract that violates § 6.2-306(A), which is a law of general applicability that applies to all lenders. This statutory section found in Virginia's chapter entitled "Interest and Usury," provides:

> Any agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and void.

Va. Code § 6.2-306(A) (emphasis added). This statute, often referred to as an anti-waiver provision, renders the entire lending agreement void and unenforceable. *See Rahmani v. Resorts Intern. Hotel, Inc.*, 20 F. Supp. 2d 932, at 935-936 (E.D. Va. 1998) (explaining a void contract under Virginia law "is a complete legal nullity, one that has no legal force or binding effect").

Here, the contracts are unenforceable in their entirety because they violate the Virginia's legislature's anti-waiver provision. Through a choice-of-law provision selecting tribal law, the enterprise sought to waive, disclaim, and release all benefits and rights created by Virginia's usury laws, such as the 12% interest rate cap mandated by § 6.2-303(A) and the double recovery permitted by § 6.2-305(A). Dkt. 1007 at 8-10 (arguing that state law does not apply to the loans); *see also* Dkt. 664 at 10-11; Dkt. 487 at pg. 13 (arguing that state law does not apply to the loans). Because the anti-waiver provision is a "non-discriminatory state law otherwise applicable to all citizens," *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973), it applies to all contracts, including the loan contracts provided to Plaintiffs.

Both the Fourth Circuit and the Virginia Supreme Court have strictly enforced similar anti-waiver provisions. For example, in *Volvo Construction Equipment North America, Inc. v. CLM*

JA1436

*Equipment Company*, the Fourth Circuit held that § 6.2-306(A) precludes waiver of Virginia's interest and usury protections, including through a choice of law provision. 386 F.3d 581, 587-88 (4th Cir. 2004). In *Volvo*, a manufacturer terminated three separate dealer agreements, each of which contained a provision authorizing the manufacturer to unilaterally terminate the agreement. *Id*. at 588. Despite those provisions, the dealers argued that they were "protected by the state dealer protection statutes" of each of their respective states (Texas, Louisiana, and Arkansas). *Id*. at 591. The district court rejected this argument and entered summary judgment in favor of the manufacturer due to the South Carolina choice-of-law provision in the contracts. *Id*.

On appeal, the Fourth Circuit affirmed summary judgment on the Texas and Louisiana plaintiffs' claims. As to the Texas dealer, the Texas statute "excluded from its protection" purchasers of off-road construction equipment, including the plaintiff. *Id*. at 604. And while the Louisiana dealer technically fell within the state's Dealer Act's protections, see La. Stat. Ann. § 51:482, the Court still affirmed the grant of summary judgment because it determined that Louisiana's statute did not embody a fundamental public policy of the state sufficient to "override a choice-of-law contract provision" selecting South Carolina law. *Id*. at 609. Specifically, unlike other dealer protection statutes, Louisiana's statute did "not contain an anti-waiver provision" or equivalent legislative pronouncement that the statute reflected the state's public policy. *Id*. at 608.

The Fourth Circuit, however, reached a different result for the Arkansas dealer. "[U]nlike the Louisiana Act," the Court explained, the Arkansas Act contained "an anti-waiver provision" providing that a franchisor could not "require a franchisee at the time of entering into a franchise agreement to assent to a . . . waiver" that "would relieve any person from liability" under the Arkansas statute. *Id*. at 609. The Arkansas Act also had an "emergency clause" stating it was enacted to preserve "public peace, health, and safety" of its residents. *Id*. at 610. Both of these

10

**JA1437**

provisions rendered the unilateral termination of a dealer agreement to be "a violation of the fundamental policy of Arkansas." *Id*. In reaching this conclusion, the Fourth Circuit noted that "a legislature simplifies the task of determining whether a state statute embodies fundamental policy when it expressly states that the statute constitutes such policy." *Id*. at 609-610; *see also id*. (citing *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376 (7th Cir. 2003) that a provision deeming contracts "in violation of this chapter" to be "against public policy and [] void and unenforceable" meant that Maine law applied despite waiver through a choice-of-law provision).

The Virginia Supreme Court has strictly enforced similar anti-waiver provisions. *See Blake Const. Co. v. Upper Occoquan Sewage Auth.*, 587 S.E.2d 711, 719 (Va. 2003); *see also Martin Bros. Contractors v. Va. Military Inst.*, 675 S.E.2d 183, 186 (Va. 2009). In *Blake Construction*, that court considered a similar anti-waiver statute establishing that any "provision" in a public construction contract that waives or releases rights to damages for unreasonable delay "shall be void and unenforceable as against public policy." *Blake Constr.*, 587 S.E.2d at 715-16 (quoting Va. Code § 2.2-4335(A)). Despite the importance of freedom to contract, the court held that "parties may not contract to the contrary, and undo what the General Assembly has determined to be the public policy of the Commonwealth." *Id*. at 718. The court added that the anti-waiver statute reflected the General Assembly's determination that "damages for unreasonable delay may not be extinguished as a matter of public policy," and that only the "General Assembly and not the parties or the judiciary" could modify that prohibition. *Id*.

Here, the anti-waiver provision is comparable to the statute in *Blake Construction* and *Cromeens* and even stronger than the one in *Volvo Construction*. This provision unequivocally states that a contract that attempts to "waive[] the benefits" or "release[] any rights" provided by Virginia's usury laws is against public policy and void. Va. Code § 6.2-306(A). Because the

JA1438

General Assembly has established this as Virginia' public policy, "the role of the judiciary is the narrow one of determining what [it] meant by the words it used in the statute." *Dionne v. Southeast Foam Converting & Packaging, Inc.*, 397 S.E.2d 110, 114 (Va. 1990); *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 357 (1931) ("Primarily it is for the lawmakers to determine the public policy of the state."). In this case, that task is easy: the contract "shall be deemed to be against public policy and void" because it attempts to waive the rights of Virginia's usury laws.[4]

### D.    The plain language of the class-action waiver does not cover Martorello.

Regardless of the enforceability of the class waiver by others, such as Big Picture, Martorello's bid to enforce it fails because the plain language of the provision does not cover him. In particular, the class waiver provision states:

> **YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST <u>US</u> AND/OR <u>RELATED THIRD PARTIES</u>.**
>
> 3. All disputes including any Representative Claims against <u>us</u> and <u>related third parties</u> shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with you as provided for pursuant to Tribal law.

Ex. 1 at 5 (caps and bold in original; underline added). In turn, the loan contract defines "Us" as Big Picture Loans, *id*. at 1, and the term "related third parties" as "[Big Picture Loans'] employees,

---

[4] Throughout this case, Martorello has repeatedly relied on the Virginia Supreme Court's decision in *Settlement Funding LLC v. Von Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007). According to Martorello, *Settlement Funding* stands for the proposition that any usurious loan does not violate Virginia's public policy against usury so long as the selected law does not have a maximum interest rate. *Settlement Funding* does not stand for this proposition, and this Court and others have repeatedly rejected Martorello's interpretation of *Settlement Funding*. *Gibbs v. Haynes Investments, LLC*, 368 F. Supp. 3d 901, 929 (E.D. Va. 2019); *Hengle*, 2020 WL 113496, at *23; *Commonwealth of Virginia v. NC Fin. Sols., of Utah, LLC*, 2018 WL 9372461 at *12 (Vir. Cir. Oct. 28, 2018) (unpublished). As detailed in these opinions, *Settlement Funding* addressed a narrow issue and did not remotely canvass whether the choice-of-law provision violated Virginia's anti-waiver provision, licensing requirements, or public policy.

agents, directors, officers, shareholders, governors, managers, members, parent company, or affiliated entities." *Id.* at 5 (emphasis added).

Despite devoting the vast majority of his brief to the enforceability of the class action waiver, Martorello's brief only contains underline three sentences attempting to explain how the class waiver applies to him. *See* Dkt. 1007 at 4. Martorello asserts:

> Martorello is both an "affiliated entity" and an alleged agent. Martorello and companies he managed were "affiliated entities" because they provided consulting and servicing assistance to the Tribal Lender prior to the sale of Bellicose. In addition, Plaintiffs allege (incorrectly) that Martorello and businesses he managed were agents behind the entire lending business.

Dkt. 1007 at 4. Other than this conclusory sentence, Martorello fails to establish or even articulate how he falls within these two possible categories. Martorello's silence is not surprising as the evidence unequivocally establishes that he is neither an agent nor an affiliated entity.

***Agent***. "Agency is a fiduciary relationship from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act." *Giordano v. Atria Assisted Living, Va. Beach, L.L.C.*, 429 F. Supp. 2d 732, 736 (E.D. Va. 2006) (quoting *Reistroffer v. Person*, 247 Va. 45, 439 (1994)). In "determining whether an agency relationship exists, the critical test is the nature and extent of control exercised by the purported principal over the agent." *Butterworth v. Integrated Res. Equity Corp.*, 680 F. Supp. 784, 789 (E.D. Va. 1988) (citing *Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 492 (1975)). The "burden of proving agency rests upon the party alleging that agency exists." *Atria Assisted Living*, 429 F. Supp. 2d at 737.

Martorello does not come close to satisfying his burden of proving an agency relationship with Big Picture; nor could he given the positions he has taken throughout this case. Martorello claims only to have "had limited involvement with LVD and its businesses related to the Note and

**JA1440**

at times anecdotal ideas and recommendations to the online lending industry as a whole." Ex. 7 at ¶ 70. Martorello further asserts that he has: (i) "<u>never</u> made any decisions on behalf of Big Picture," (ii) "<u>never</u> provided any consulting services or advice to Big Picture, LLC as to how to operate their business, (iii) "<u>never</u> hired or fired any employee of Big Picture," (iv) "<u>never</u> made the decision whether or not to lend to any consumer on behalf of Big Picture[,]" and (vi) "<u>never</u> provided services of any kind to Big Picture." *Id.* at ¶¶ 76-84 (emphasis added). Unless Martorello retracts these statements, he cannot possibly satisfy his burden of proving that he is an agent.[5]

Martorello's own statements should end this inquiry, but there is more. The Loan and Security Agreement (drafted by Martorello's attorney) between TED and Eventide also expressly states "[n]one of the covenants or other provisions contained in this Agreement or any of the other Transaction Documents shall, or shall be deemed to, give [Eventide] the right or power to exercise control over the day to day affairs or management of" TED or its subsidiaries, including Big Picture. Dkt. 986-44 at § 7.15(a). The Loan Agreement further provides "[t]he relationship between [Eventide], on the one hand, and [TED] and any Subsidiary, on the other hand, is solely that of creditor and debtor. [Eventide] <u>shall not have (or be deemed to have) any fiduciary relationship</u>… and <u>there is no agency or joint venture relationship between</u>" Eventide and TED. *Id.* at § 7.15(b) (emphasis added). Because "there is no agency" relationship between Eventide and Big Picture, there can be no agency relationship between Big Picture and Martorello, who claims to be nothing more than a representative of Eventide.

***Affiliated entity***. The class waiver includes "affiliated entities," but does not define the phrase so it must be interpreted in accordance with its common and ordinary meaning. *See, e.g.,*

---

[5] While much of this is a half-truth—because Martorello was the brains and created the structure— it is certainly inconceivable that Martorello is an "agent."

JA1441

*Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502, 518 (E.D. Va. 2011) (citing *D.C. McClain, Inc. v. Arlington Cnty.*, 249 Va. 131, 135 (1995)) ("Words that the parties used are normally given their usual, ordinary, and popular meaning."). "To determine the common and ordinary meaning, the Court looks to a reputable dictionary and considers a term's common usage." *Nationwide Mut.*, 785 F. Supp. at 518-19.

"The term 'affiliate' carries its own, independent legal significance." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009). It "refers to a 'corporation that is related to another corporation by shareholdings or other means of control. . . .'" *Id.* (quoting *Delaware Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1077 (Del. 2006)); *see also Cacique, Inc. v. Reynaldo's Mexican Food Co., LLC*, 2014 WL 505178, at *5 (C.D. Cal. Feb. 7, 2014) ("There are a number of definitions of 'affiliate,' and all include some element of control."); *Texas Molecular Ltd. P'ship v. Am. Int'l Specialty Lines Ins. Co.*, 424 F. App'x 354, 357 (5th Cir. 2011) (defining an affiliate as a "company effectively controlled by another or associated with others under common ownership or control.") (quotation omitted).

To be clear, Plaintiffs contend that Eventide retained control mechanisms over significant aspects of the business, such as its consent to terminate the co-managers.[6] This type of control, however, does not amount to the type of control necessary to be considered an "affiliate." AFFILIATE, Black's Law Dictionary (11th ed. 2019) ("A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."). Further, the Loan and Security Agreement provides:

    7.15    Lender is Not In Control; Lender-Credit Relationship.

---

[6] Brian McFadden's dual role as Eventide shareholder and Ascension's president—as well as his compensation structure—further ensured that the enterprise would be run in a manner that protected Eventide's interest.

15

JA1442

    (a)     None of the covenants or other provisions contained in this Agreement or any of the other Transaction Documents shall, or shall be deemed to, give Lender <u>the right or power to exercise control</u> over the day to day affairs or management of Borrower or any Subsidiary, the power of Lender being limited to the right to exercise the remedies provided for in this Agreement and the other Transaction Documents.

    (b)     The relationship between Lender, on the one hand, and Borrower and any Subsidiary, on the other hand, is solely that of creditor and debtor. Lender shall not have (or be deemed to have) any fiduciary relationship or duty to any of Borrower or any Subsidiary, arising out of or in connection with, and there is no agency or <u>joint venture relationship</u> between Lender, on the one hand, and Borrower. . .

Dkt. 986-44 at § 7.15(a)-(b) (emphasis added). In light of this provision, neither Eventide nor Martorello can establish the requisite control to be an affiliate or even a "joint venture," which would indicate even less control then affiliation. JOINT VENTURE, Black's Law Dictionary (11th ed. 2019) ("A business undertaking by two or more persons engaged in a single defined project.").

       Martorello has another problem: it is inconceivable that he is an "entity." ENTITY, Black's Law Dictionary (11th ed. 2019) (defining "entity" as an "organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners"). By using the word "entity," the drafter categorically excluded natural persons like Martorello. If the loan contract was intended to cover the affiliated entities' employees, officers, and directors, it could have easily stated so—just as it did for Big Picture's employees, officers, and directors. Because the language "could not be any plainer or less ambiguous," it must be enforced as written to exclude individuals. *Nat'l Am. Ins. Co.v. Ruppert Landscaping Co.*, 25 F. App'x 116, 120–21 (4th Cir. 2001).

       ***Red Rock***. The same analysis applies to those consumers, like Mr. Hengle, who had loans with Red Rock. Dkt. 986-49. Drafted largely by Martorello's attorney,[7] Red Rock's class waiver

---

[7] *See generally* Ex. 9 at Rosette 010990 (email from Jennifer Weddle, Martorello's attorney, with changes to the template contract); *id.* at Rosette 10998 (showing Weddle's substantial edits to the Tribal Dispute Resolution Procedure).

JA1443

provision is virtually identical to Big Picture's, *i.e.*, waiving the right to bring a class action against Red Rock and "related third parties," which is expressly defined as its "employees, agents, directors, officers, shareholders, governors, managers, members, parent company, or affiliated entities." Ex. 8 at 5.

With respect to Red Rock consumers, Martorello cannot establish agency or affiliation for similar reasons identified above. The Servicing Agreement between SourcePoint and Red Rock repeatedly identifies SourcePoint's relationship (and, thus, potentially Martorello) as that of an "independent contractor." Dkt. 986-5 at § 1.4 ("[Red Rock], through a contractual relationship, desires to retain and engage [SourcePoint] as its independent contractor. . . ."); *id*. at § 3.1 ("[Red Rock] hereby retains and engages [SourcePoint] as its independent contractor . . . .); *id*. ("[SourcePoint] hereby acknowledges such retention and engagement as an independent contractor."); *id*. at § 13 (same). Further, the agreement further provides SourcePoint with complete autonomy in performing its obligations. *Id*. at § 4.1.1.

Martorello has failed to establish that he is either an agent or authorized entity as posited in the single sentence of his submission. To the extent the Court finds any ambiguity, it should be construed against the drafters, including Martorello. *Verizon Virginia, LLC v. XO Commc'ns, LLC*, 144 F. Supp. 3d 850, 867 (E.D. Va. 2015) ("In the case of contracts, ambiguity is construed against the drafter under the rule of contra proferentem." (citations omitted)).

## II.     THE PROPOSED CLASSES ARE ASCERTAINABLE.

Martorello contends that Plaintiffs "cannot demonstrate ascertainability" for "at least four reasons." Dkt. 1007 at 31. Each of these should be rejected. First, Martorello contends that the classes are not ascertainable because "the loan information is largely under Tribal control" and, thus, "subject to sovereign immunity." *Id*. As explained in Plaintiffs' opening brief, however, the

JA1444

tribal entities have agreed to voluntarily provide the data. *See, e.g.*, Dkt. 986-52 (indicating the Tribal Defendants "will ensure the appropriate class data is supplied" in the event the Court certifies the class). Indeed, this was an integral and material term of the Settlement Agreement between Plaintiffs and the Tribal Defendants. *See* Ex. 10 at § 6.3.

Martorello's complaint regarding the current restriction on Plaintiffs' access to the class list confuses the requirement that a class can be ascertained with Defendants' apparent belief that the class be identified before certification. Rule 23 only requires the former, namely that a court be *able* to "identify the class members in reference to objective criteria." *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 196 (E.D. Va. 2015). The fact that it may be difficult or time consuming to identify class members is of no moment. Big Picture and Ascension currently possess the information. While more litigation is required to obtain that information, "the time and effort required have no bearing on whether the individuals are or are not objectively ascertainable." *Id.* (citation omitted).[8]

Here, Plaintiffs have identified a clear method for objectively determining class membership that involves three discrete steps: (1) determining whether a person had a loan with

---

[8] In this section, Martorello also complains that the unavailability of the data violates his rights to due process. Dkt. 1007 at 31. But if a class is certified, Big Picture and Ascension will provide this unremarkable data, which will simply confirm the names, addresses, and amounts paid by each of the class members. With this information, Martorello will be in the same position as every other defendant in any class case. Moreover, the Fourth Circuit has expressly permitted a post-trial claims process to identify class members and their damages. *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659 (4th Cir.) ("The court left the question of whether particular names and addresses matched those numbers to the post-trial claims process. This was appropriate."), *cert. denied*, 140 S. Ct. 676 (2019). Other courts have similarly rejected alleged due process violations based on unidentified class members. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 670 (7th Cir. 2015) ("The due process question is not whether the identity of class members can be ascertained with perfect accuracy at the certification stage but whether the defendant will receive a fair opportunity to present its defenses when putative class members actually come forward.").

Big Picture or Red Rock; (2) for all such consumers, determining whether they had a Virginia address when they executed their loan agreement; and (3) identifying any payments made after June 22, 2013. The answers to these questions are "readily discernible" and "always binary." *See Soutter,* 307 F.R.D. at 197; *see also MacDonald v. CashCall, Inc.*, 333 F.R.D. 331, 347 (D.N.J. 2019) (ascertainability satisfied in similar case because classes "defined by reference to objective criteria, namely, whether a borrower made payments on a loan, originated during a given time period, and was a New Jersey resident."); *Inetianbor v. CashCall*, *Inc.*, Case No. 13-cv-60066-JIC (S.D. Fla. Sept. 19, 2016), Dkt. 284 at 8 (similar class definition "readily ascertainable"). And in fact, this Court has already found that a similar class is ascertainable, and certainly it has been successfully identified in the class certification and approved settlement directly with the Big Picture defendants. *Galloway v. Williams*, 2020 WL 7482191, at *1 (E.D. Va. Dec. 18, 2020).[9]

Martorello's first argument is nothing more than "a paper obstacle," which is "insufficient to defeat class certification." *Soutter,* 307 F.R.D. at 197. Although Big Picture has not produced the data at this stage, a plaintiff "need not be able to identify every class member at the time of certification." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014).[10]

---

[9] Martorello's claim that his "due process" rights may be somehow infringed by his inability to discover the class data is also disproven by the Big Picture settlement. Now, the class data is now in the possession of the non-Tribal class administrator. In a comparable case now defended by Martorello's previous counsel here, those non-Tribal investor defendants obtained the class data from the settlement administrator by subpoena and featured whatever challenges they could contrive in their class certification opposition. *See Gibbs v. Stinson*, Case No. 3:18-cv-676 at ECF 210. While the opposition arguments in that matter will not go any further than Martorello's here, the point is that if Martorello really wanted the Big Picture loan data, he could have done something to obtain it.

[10] Martorello mis-cites the now largely rejected decision in *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3rd Cir. 2012) as standing for the proposition that ascertainability is "problematic where requisite parts manifest was in possession of third-party foreign corporation." Dkt. 1007 at 21. But the problem in that case was not that the "parts manifest" was in the possession of a third party; it was that the BMW vehicles did not have the same tires on each of its cars. 687 F.3d at 594. "To complicate matters further," dealerships changed tires at a customer's request and the

JA1446

Second, Martorello contends that "even if the loan information could be acquired, its review and application to Martorello likely would be individualized and complicated" because "Martorello was <u>not the lender</u>, and Martorello's assistance to the Tribe… varied considerably over time." Dkt. 1007 at 32 (emphasis in original). This argument is misplaced because it does not concern the "inability to determine the members of the class by reference to objective criteria." *Soutter,* 307 F.R.D. at 197. What Martorello "is really arguing when it laments the burden imposed is manageability" and predominance, "not ascertainability." *Id.* Because Plaintiffs propose "objective criteria capable of identifying those individuals described in the class definition, the ascertainability requirement is satisfied." *Id.* at 199. "The fact that applying the criteria could take a significant time and effort may be a relevant consideration for weighing the manageability of the class device," but it is "not a factor" in the "ascertainability determination." *Id.*

Third, Martorello spends a single sentence arguing that "individualized mini-trials" would be likely "to verify proposed class members have not released their rights, already recovered, or are otherwise estopped through settlement in *Galloway III*." Dkt. 1007 at 34. But again: this argument does not concern the ability to determine members of the class by objective criteria. It is also disingenuous as Martorello is well aware that he was expressly carved out of that settlement, which prompted him to attempt to intervene and block it. *See* Ex. 10 at §§ 2.16, 2.22; *Galloway v. Williams*, 3:19-cv-00470-REP, Dkt. 43 (E.D. Va. Dec. 18, 2019).

Finally, Martorello contends that whether a loan payment occurred within the statute of limitations requires individual analysis. Again, this argument does not concern the ability to determine class members by objection criteria. It also ignores that Plaintiffs' class definitions take

---

defendant's records would not indicate which tires had been replaced. *Id.* Here, there are no comparable issues.

into account the applicable statute of limitations for each one of the claims. *See* Mtn. at 24. The classes will not implicate any statute of limitations issues because Plaintiffs have tailored their class definitions to account for these differences. Thus, "the statute-of-limitations question is straightforward and susceptible to class-wide determination." *Alig v. Quicken Loans Inc.*, --- F.3d ---, 2021 WL 899305, at *6 (4th Cir. Mar. 10, 2021).

## III. MARTORELLO FAILS TO IDENTIFY ANY INDIVIDUALIZED ISSUES THAT PREDOMINATE.

In his opposition, Martorello raises six challenges to Rule 23(b)(3)'s predominance element. These largely ignore the facts, elements, and evidence that matter, *i.e.*, those that state a violation of §§ 1692(c)-(d) of RICO, as well as Virginia's usury and unjust enrichment laws. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."). Martorello focuses on largely irrelevant differences between class members. But the "entire notion of predominance implies that the plaintiffs' claims need not be identical, and, as the Supreme Court has noted, a class can meet this requirement 'even though other important matters will have to be tried separately.'" *Krakauer*, 925 F.3d at 658  (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045, (2016)). Because "all of the major issues in the case" revolve around common questions, *id.*, none of Martorello's challenges present an obstacle to class certification.

### A. Martorello's receipt of loan payments is irrelevant, and the minor changes to payment allocation does not create individualized issues that will predominate.

Martorello contends that individual issues will predominate because "Plaintiffs cannot show that Martorello throughout the class period uniformly received loan payments from borrowers in the purported class, and the usury and damages questions as to Martorello therefore

JA1448

do not predominate." Dkt. 1007 at 36. According to Martorello, "the issue of whether the specific interest payments" reached him "requires individualized analysis." *Id*. at 36-37. That is wrong.

*First*, members of the enterprise have joint and several liability for the damages under RICO, negating any need to apportion damages based on Martorello's receipt of the proceeds. *See United States v. Philip Morris*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) ("Every circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations."); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir. 1989) (same). Because Martorello is liable as a participant for all damages arising from the usurious loans, it makes no difference if he received 98% of the proceeds or some lesser amount.

*Second*, with respect to the usury claim, questions regarding Martorello's liability under the statute predominate. In relevant part, this statute provides that "[i]f interest in excess of that permitted by an applicable statute is paid upon any loan," the borrower may bring an action "to recover from the person taking or ***receiving***" such payments. Va. Code. § 6.2-305 (emphasis added). Broken down, a claim under § 6.2-305 requires proof of two elements: (1) payment of interest at a rate greater than 12% per year and (2) taking or receipt of such payments. *Id*.[11]

The first element is an individualized issue, but it is quantitative rather than qualitative. And the evidence shows that all loans had interest rates greater than 12%, and thus, this is not an individualized *question* that will predominate.[12] The second element then determines liability, *i.e.*,

---

[11] Martorello also contends that individualized issues regarding the identity of the "true lender" predominate common questions. Dkt. 1007 at 38. Unlike some other jurisdictions, Virginia law imposes liability on the recipient of the money and, thus, there is no need to identify the "true lender." *Id*. Because Plaintiffs seek to impose liability under Va. Code § 6.2-305, the true lender theory is irrelevant.

[12] *See* Dkt. 986-50 (stating that Big Picture loans have interest rates ranging from 499% to 768%).

JA1449

whether Martorello was "taking" or "receiving" the payments within the meaning of the statute. This is a common question because Martorello received (or did not receive) the payments in the same way: (1) through the servicing agreement between SourcePoint and Red Rock; or (2) through the promissory note between Big Picture and Eventide. *See* Dkt. 986-5 (Servicing Agreement); Dkt. 986-46 (Promissory Note). The Red Rock Servicing Agreement provides:

### 3.5    <u>Servicing Fee</u>.

The parties hereto have agreed that the success of the business is based in large part upon the services provided to [Red Rock] by [SourcePoint]. As a result, [Red Rock] has agreed to a performance-basis fee equal to cash basis revenue remaining after payment of Tribal Net Profits, Servicer advances, and all Servicing Expenses.

Dkt. 986-5 § 3.5.1. "Tribal Net Profits," in turn, was calculated as two percent of the gross revenues of the loans, minus charge offs. *Id.* at § 2.25. Because Red Rock always received the same allocation of the proceeds—2% of the revenue—whether Martorello took or received the remaining 98% is a common question for each class member. The same is true for borrowers who had loans with Big Picture except that it received 5% of the gross revenues on the loans. Dkt. 986-46. Because the allocation of the proceeds was the same for each consumer, Martorello's liability (or lack thereof) will be a common question for each class member.

Ignoring the uniform nature of the allocation, Martorello contends that individualized issues predominant because "the variable payment provisions in the Servicing Agreement yielded changing or no payments" because "they depended not on loan repayment, but rather on the total profitability (or not) of the lender." Dkt. 1007 at 36. This is a distinction without a meaningful difference. A company still "takes" or "receives" a payment even if it is used to pay expenses, such as an internet bill or marketing expenses. Here, Red Rock only received 2% of the gross revenues; Martorello's companies were entitled to the remaining amounts. And if Martorello paid some expenses (such as the call center), it does not change the fundamental allocation of the

23

distribution of payments between the members of the enterprise. Between 2013 and 2016, Red Rock received 2% of the gross revenue on the loans, the rest went to Martorello. Between 2016 and 2020, Big Picture received 5% of the gross revenue on the loans, the rest went to Martorello.

Tracking these nominal changes to the allocation does not create individualized issues that predominate, especially because "it is black-letter law in Virginia that although a plaintiff 'must show the amount of [her] damages with reasonable certainty, [p]roof with mathematical precision is not required.'" *Allan v. United States*, 401 F. Supp. 3d 681, 718 (E.D. Va. 2019) (quoting *Hailes v. Gonzales*, 207 Va. 612, 151 S.E.2d 388, 390 (1966)); *see also Higgins v. John Hancock Mut. Life Ins. Co.*, 1988 WL 214513, at *6 (E.D. Va. Oct. 19, 1988) ("Proof with mathematical precision is not required, but there must be sufficient evidence to permit an intelligent and probable estimate of the amount of damage."). Here, there is sufficient evidence to permit an intelligent and probable estimate of the amount of damages that should be attributable to Martorello. This evidence will be the same as to each class member and, thus, is one of several common questions that predominate.

What's more, Martorello's assertion that any estimate of his proportion of culpability is too speculative does him no favors. Instead, "under Virginia law, when two or more tortfeasors cause a single indivisible injury to a third-party and 'it is impossible to determine in what proportion each contributed to the injury,' then an individual tortfeasor can be held liable for the entire injury." *Gross v. Shearson Lehman Bros. Holdings, Inc.*, 43 F. App'x 672, 677 (4th Cir. 2002) (quoting *Dickenson v. Tabb*, 156 S.E.2d 795, 801 (Va.1967)); *see also AdvanFort Co. v. Int'l Registries, Inc.*, 2015 WL 4254988, at *10 (E.D. Va. July 13, 2015). Here, Plaintiffs and the class members suffered a single indivisible injury: the payment of usurious interest that was then distributed to multiple joint tortfeasors. Because Virginia law imposes joint and several liability where "it is impossible to determine" the proportion to allocate to each joint tortfeasor, Martorello

JA1451

can be held liable for the full amount of usurious interest paid by each borrower (as opposed to the 90%+ he received pursuant to the revenue distribution).

**B.    Martorello's purported "decreasing involvement" in the enterprise does not create any individualized issues.**

Next, Martorello claims that "whether Martorello conducted or participated in the enterprise cannot be "evaluated in the same manner over the class period, due to Martorello's *decreasing involvement* and ultimate 2016 sale of Bellicose to the Tribe." Dkt. 1007 at 37 (emphasis added). This argument not only ignores the substantial evidence of Martorello's continued involvement, but it is disconnected from the actual elements needed to establish a violation of § 1962(c). In order to establish a § 1962(c) violation, Plaintiffs must prove that: (1) Martorello is a person; (2) associated with an enterprise engaged in interstate commerce; (3) he participated, directly or indirectly, in the conduct of the enterprise's affairs; and (4) collection of unlawful debt. *See D'Addario v. Geller*, 264 F. Supp. 2d 367, 396 (E.D. Va. 2003) ("[P]laintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"); *Salinas v. United States*, 522 U.S. 52, 62 (1997) (same).

Here, Martorello only takes issue with the third element—whether Martorello conducted or participated in the enterprise's affairs. To satisfy § 1962(c)'s participation requirement, it must be established that the person "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (citation omitted) (quoting § 1962(c)). The purpose of the "operation or management test" assures that § 1962(c) claims "do not reach complete 'outsiders,'" such as an auditor that merely prepared the enterprise's financial statements. *Reves*, 507 U.S. at 185; *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 633 F. Supp. 2d 214, 230 (E.D. Va. 2008) (*Reves* "made clear that it is necessary to distinguish between an individual or entity 'acting in an advisory professional capacity (even if in a knowingly

**JA1452**

fraudulent way) and [one] acting as a direct participant in corporate affairs.'" (quoting *In re Am. Honda Motor Co. Inc. Dealerships Relations Litig.*, 941 F. Supp. 528, 560 (D.Md.1996))).

Martorello's "operation or management" of the enterprise is established by the Servicing Agreement between SourcePoint and Red Rock. In his capacity as the president and owner of SourcePoint, Martorello executed the servicing agreement and, among other things, agreed that his company would provide "managerial, technical and financial experience and expertise for the development and operation of the new Unsecured Lending Business." Dkt. 986-5 at § 1.3. To that end, Martorello agreed that SourcePoint would "develop, manage, and provide operational guidelines regarding the Unsecured Lending Business," as well as "investment and capital management services, management, operations, and marketing consulting." *Id.* § 1.4. The servicing agreement further outlined the extensive duties performed by SourcePoint, including its authority to "collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock.]" *Id.* § 4.9. This agreement remained in effect from 2012 through the sale of Bellicose. Thus, this same evidence—as well as other evidence showing the implementation of the same—may be used by each class member to establish that Martorello participated in the "operation or management" of the enterprise.

Beyond the Servicing Agreement, there is a substantial amount of common evidence further showing that Martorello participated in the operation and management of the enterprise between 2011 and 2016. For example, when negotiating the initial terms of the Servicing Agreement, Red Rock's representatives explained that Martorello's "ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS." Dkt. 986-3 at 052500 (caps in original). And, when asked by Martorello to further

26

JA1453

elaborate on this point, Richardson explained that "REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S 'MANAGERS'. THE SERVICER, BELLICOSE OPERATES THE BUSINESS COMPLETELY." *Id.* at 052498. This is also consistent with the declaration of Joette Pete, the Tribe's former Vice Chairwoman, who attested: that the Tribal Counsel "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Dkt. 986-4 at ¶ 3.

Although the Tribe's co-managers held titles supposedly giving them a voice in Red Rock's lending operation, the Court has also found that the co-managers actually played a "rather meaningless role" with limited involvement in or knowledge about the lending enterprise. Dkt. 944 at 14. Martorello's own internal emails unequivocally confirm that "as far as [he] knows," the co-managers "don't really do anything." Ex. 11 at ROSETTE43978. And as the Court recently found, "[n]either the establishment of the actual underwriting criteria for making the loans nor the decision actually to make them (or not) was done by the Tribal entity or by its employees." Dkt. 944 at 15. In fact, the relevant "intellectual property was kept by Martorello's company, SourcePoint, and was not known by, or available to, the Tribal entities that nominally were making the loans at issue." *Id.* at 18.

Martorello's *purported* diminished role between 2014 and 2016 makes no difference to whether he meets the "operation or management" test. While he claims to have "decreasing involvement" in the day-to-day operations, this hurts rather than helps his cause as it shows that Martorello held the highest position within the enterprise, capable of directing the activities of the other members. Even if these others performed the day-to-day activities, those acts were performed on behalf of Martorello, who established the operational guidelines of the companies and oversaw

**JA1454**

the work of lower-rung members of the enterprise. Dkt. 986-5 at § 1.4. Accordingly, Martorello's purported diminished role does not create any individualized issues because RICO prohibits "operation or management" of the enterprise, not completion of the daily minutia needed to run the day-to-day operations. *Robinson v. Fountainhead Title Grp. Corp.*, 257 F.R.D. 92, 94 (D. Md. 2009) ("the crux of a RICO claim based on mail fraud is the fraudulent scheme itself."). If Martorello is liable to any class member for a § 1962(c) violation, it is because of his high-level involvement as the leader of SourcePoint, Bellicose, and Eventide; not due to his specific interaction with any consumer.

Even if the court finds the vague changes sufficient to create individualized issues as to the § 1962(c) claim for Red Rock loans, it may still certify a class as to Big Picture loans because Martorello fails to identify a single post-restructure change that would create an individualized issue. Instead, Martorello's entire defense to the post-restructure aspect of the case is uniform— he claims he "was no longer involvement with the consumer lending operations" of Big Picture and Ascension. Dkt. 1007 at 38. While Plaintiffs disagree, the more Martorello premises his entire defense on his complete lack of involvement with Big Picture, the more it creates a single common question: whether Martorello participates in the operation and management of the enterprise through Eventide and its significant control over the operations of Big Picture and Ascension.

### C.    Common questions predominate as to RICO's proximate cause requirement.

Without identifying any specific individualized questions, Martorello contends that RICO's proximate cause requirement predominates over common questions. Dkt. 1007 at 42. Martorello asserts that proximate cause requires consideration of "each class member's claims" and whether they are "connected" to "actions by Martorello" to determine whether the alleged conduct caused the borrower's injuries. *Id*. This overstates RICO's proximate cause requirement,

JA1455

which merely requires a direct connection between the misconduct and the injury. In this case, the direct connection between Martorello's misconduct and Plaintiffs' injuries is straightforward: Martorello participated in the operations and management of the rent-a-tribe enterprise and worked together with the other members of the enterprise to facilitate the unlawful debt collection scheme.

Martorello mischaracterizes "proximate cause" as requiring consumer-by-consumer determination of whether a defendant's misconduct the sole cause of a class member's injury. But proximate cause "is not the same thing as a sole cause." *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994). And of course, "[P]roximate cause is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." William Keeton et al., *Prosser & Keeton on the Law of Torts § 42*, at 279 (5th ed. 1984). Proximate cause "must be assessed on a case-by-case basis." *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008)).

In *this* case, the class definitions—segregating borrowers who had loans with Red Rock and Big Picture—overcomes any possibility that there will be any individualized issues with respect to RICO's proximate cause requirement. While it is theoretically possible Plaintiffs may fail on the merits on their claims, there are no individualized differences between Martorello's conduct, *i.e.*, executive-level management of an enterprise, and each class member's injuries, *i.e.*, "payment of interest at excessive rates." *Gingras v. Rosette,* 2016 WL 2932163, at *29 (D. Vt. May 18, 2016). In fact, as Martorello never directly interacted with any consumer, his misconduct at the highest control level of the enterprise—as its developer and primary beneficiary—creates no individualized questions as to whether Defendant's conduct proximately caused the harm to every class member. *See Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 985 (N.D. Cal. 2019)

JA1456

(finding that defendants who "were instrumental in setting up, and knowingly set up, an enterprise whose sole purpose was to collect illegal debts" were the proximate cause of plaintiff's injury).

The Tenth Circuit's opinion in *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076 (10th Cir. 2014), is instructive on this point. There, real estate purchasers brought a RICO class action against "a group of lenders, claiming the lenders conspired to create a fraudulent scheme to obtain non-refundable up-front fees in return for loan commitments the lenders never intended to fulfill." *Id.* at 1081. On appeal of the district court's class certification decision, the Tenth Circuit considered whether the "the defendants' actions and the class's injuries can be adduced through common evidence" to satisfy RICO's proximate cause requirement. *Id.* at 1088. The court found that "the putative class members are permitted to use the common fact that they all forfeited advanced fees as evidence that the class's damages were caused 'by reason of' defendants' alleged RICO violations." *Id.* at 1093. In reaching this conclusion, the court explained that the "plaintiffs will still have to prove RICO causation" to "win on the merits," but the nature of their injuries permitted the plaintiffs "to utilize it as common evidence to establish the class's prima facie claims under RICO." *Id.* Other courts have reached similar conclusions.[13]

This Court's decision in *Solomon* also is instructive. 2019 WL 1320790 (E.D. Va. Mar. 22, 2019). In that case, a financier of a tribal lending enterprise argued that the plaintiffs failed to allege facts sufficient to show that the financier—rather than the tribal lender or its operator—caused the plaintiff's injury. *Id.* at *11. In other words, the financier asserted that their role did not

---

[13] *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 640–41 (5th Cir. 2016) (finding "individualized issues of causation" would not predominate where the "participant's injuries arise from the [pyramid] scheme's payment structure"); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 122 (2d Cir. 2013) (holding that RICO causation was "a question subject to generalized proof—and a question that, barring class action treatment, will have to be endlessly re-litigated in individual actions."); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 492 (C.D. Cal. 2006) (same); *Robinson*, 257 F.R.D. at 95 (same).

have a "direct, first-step relation to Plaintiffs' alleged injury" as "they did not collect usurious interest from Plaintiffs." *Id*. In rejecting this argument, this Court found that the financiers' "participated in extensive ongoing monitoring and rigorous oversight" regarding the loans, and "Plaintiffs would not have been subjected to the allegedly usurious loans if Medley did not incentivize the profitability of those loans." *Id*. The same is true here—if Martorello did not create, develop, implement, and finance the scheme, Plaintiffs would not have been subject to the loans. And regardless, answering this question is the same for all class members.

Because Plaintiffs suffered the same injuries and will utilize common evidence to establish the RICO claims, RICO's proximate cause requirement does not create individualized questions that will predominate. Instead, the proximate cause question is an overarching liability question that is the same for Plaintiffs and all class members. If a jury finds that Martorello proximately caused Plaintiffs' injuries by creating, developing, implementing, overseeing, and facilitating the enterprise, the same is true for the remaining members of the class. And if a jury finds that Martorello was too far removed to be held liable, it will be the same result for Plaintiffs and the class members. Thus, RICO's proximate cause requirement does not create any individualized issues that will predominate.

### D.    Common questions predominate as to Plaintiffs' unjust enrichment claims.

Despite Martorello's assertion to the contrary, courts routinely grant class certification of unjust enrichment claims. *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 925 (10th Cir. 2018) ("Because the class members' theory of unjustness depends on shared rather than individualized circumstances, the unjustness question is common to the class and does not defeat

**JA1458**

predominance."), *cert. denied*, No. 17-1648, 2018 WL 2875867 (U.S. Oct. 1, 2018).[14] Like these cases, the benefit conferred on Martorello, *i.e.*, the receipt of unlawful debt, is the same for all class members. And Martorello's conduct was the same in all relevant respects, *i.e.*, receipt of the proceeds as the owner of SourcePoint or Eventide. Thus, the question of whether it is equitable for Martorello to retain the amounts is a common question that will predominate.

Here again, Martorello rehashes his argument that "whether any interest ultimately reached Martorello depended upon the given loan, Martorello's role at the time," including whether Big Picture made a payment to Eventide. Dkt. 1007 at 44. But again: Plaintiffs are not required to directly trace the money to Martorello's bank account. And more importantly for Rule 23 purposes, Plaintiffs cannot trace their commingled payments to Martorello's bank account any more than the next borrower. Instead, Plaintiffs intend to use common evidence—the Servicing Agreement and Promissory Note—to broadly establish "an intelligent and probable estimate of the amount of damage" to be allocated to Martorello. *Higgins*, 1988 WL 214513, at *6 ("Proof with mathematical precision is not required, but there must be sufficient evidence to permit an intelligent and probable estimate of the amount of damage."). And to the extent this intelligent estimate is insufficient, it naturally follows that Plaintiffs and the class members suffered a single indivisible injury caused by joint tortfeasors, including Martorello. Because Virginia law imposes joint and several liability where it is impossible to determine the proportion to allocate to each joint tortfeasor, Martorello

---

[14] *In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 675 (S.D. Fla. 2015) ("Unjust enrichment claims can be certified for class treatment where common circumstances bear upon whether the defendant's retention of a benefit from class members was unjust."); *Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 517 (7th Cir.2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim."); *James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecommunications, Inc.,* 275 F.R.D. 638, 647 (M.D. Fla.2011) (same).

JA1459

can be held liable for the full amount of usurious interest paid by each borrower regardless of whether he specifically received the funds.[15]

### E.     Common questions predominate regarding the RICO conspiracy claims.

There are no material individualized issues as to the alleged conspiracy claim, which "does not require that a defendant have a role in directing an enterprise." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012). Rather, in the Fourth Circuit, "simply agreeing to advance a RICO undertaking is sufficient." *Id*. "Once it has been shown that a conspiracy exists, the evidence need only establish ***a slight connection*** between the defendant and the conspiracy" to support a violation of § 1962(d). *See United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992) (emphasis added). A "slight connection" is satisfied by showing "knowledge of the essential nature of the plan." *United States v. Morrow*, 914 F.2d 608, 612 (4th Cir. 1990).

Ignoring this low threshold, Martorello spends a few sentences arguing that "questions pertinent to conspiracy do not predominate because Martorello's consulting services significantly decreased over the class period." Dkt. 1007 at 47. But the level of services is irrelevant to the elements needed to establish a RICO conspiracy claim. Even assuming it is accurate, this is immaterial because "a defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence,' and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot." *United States v. Cornell*, 780 F.3d 616, 631–32 (4th Cir. 2015) (alteration in original) (citations omitted).

---

[15] Martorello further contends that "many putative class members did not confer a benefit on anyone" because "they paid back less than the principal on their loans." Dkt. 1007 at 45. This is not an individualized issue. If the Court determines that these individuals did not confer a benefit, they will not be entitled to an award of damages. Rather than creating an individualized issue that predominates, this is a common question that will resolve the claims of thousands of class members—even assuming that repayment of principal on a *void* loan is found to have inured no benefit to the recipient. The Court also could adjust the class definition to account for this issue.

**JA1460**

"Once it is proven" through the Servicing Agreement that Martorello "was a member of the conspiracy," his "'membership in the conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action.'" *Id.* at 632 (quoting *United States v. Bennett*, 984 F.2d 597, 609 (4th Cir. 1993)); *see also United States v. DePriest*, 6 F.3d 1201, 1206 (7th Cir. 1993) (same); *United States v. Starrett*, 55 F.3d 1525, 1550 (11th Cir. 1995) (same). Because Martorello never withdrew from the conspiracy—and the evidence shows his continued connection to the conspiracy through Eventide—he is liable for the actions of the co-conspirators regardless of whether his active involvement diminished over the years.

## IV.    MARTORELLO'S SUPERIORITY CHALLENGES LACK MERIT.

Martorello raises two challenges related to Rule 23(b)(3)'s superiority requirement. First, Martorello contends that "98%" of the "proposed class never signed up for restitution" in connection with settlement with the tribal entities and, thus, "the purported class could still bring individual claims." Dkt. 1007 at 48. Second, Martorello claims that Plaintiffs "cannot uniformly attribute liability to Martorello" because of the "ever-shifting roles, relationships, and responsibilities over time." *Id.* at 49.

Both of Martorello's arguments misunderstand the superiority requirement, which does not consider whether class treatment would be superior *for a defendant*. It would rarely be so. Instead, the superiority element asks whether class treatment would be superior for the class and for the judicial system generally. As noted in Plaintiffs' opening brief, there "is a strong presumption in favor of a finding of superiority" where, as here, "the alternative to a class action is likely to be no action at all for the majority of class members." *Cavin v. Home Loan Center, Inc.*, 236 F.R.D. 387, 396 (N.D. Ill. 2006); *Soutter*, 307 F.R.D. at 218. Here, the low number of consumers who signed up for restitution demonstrates that the alternative is likely no action at all. "Furthermore, even if

JA1461

just a fraction of the class members were to bring individual suits," such as the thousands that did sign up for restitution, "the adjudication of the common issues in a single proceeding would be more efficient than the separate adjudication of individual claims," *id.*, where courts would need to resolve similar motions to dismiss, motions to stay, discovery disputes, and the same basic presentation of the merits of a case to a jury. This Court certainly understands the burden that this one case—with over 1,000 docket entries—has placed on the judiciary.

Martorello's manageability complaint really boils down to the same flawed arguments in his predominance section, *i.e.*, that it will be potentially difficult to determine his damages liability due to his vague assertions regarding his ever-shifting role, authority, and control over time. Dkt. 1007 at 49. But as explained at length above, RICO imposes joint and several liability on members of the enterprise. *Philip Morris*, 316 F. Supp. 2d at 27 (gathering cases); *Fleischhauer*, 879 F.2d 1290 at 1301. Similarly, the Virginia usury and unjust enrichment claims are based on his *receipt* of 90% proceeds from the usurious loans as the owner of Bellicose/Eventide. Put differently, Martorello's "ever-shifting role" or control would have a bearing on the underlying claims if, and only if: (1) Martorello withdrew from the enterprise or (2) stopped receiving proceeds from usurious loans in violation of Virginia's usury laws. Neither of these events occurred. Accordingly, manageability will not be a serious problem because the claims rely "on basic legal principles applied to a case-specific set of facts." *Souter*, 307 F. R.D. at 219.[16]

For all these reasons, Plaintiffs' motion should be granted, the Classes certified.

---

[16] Martorello also contends that an administrator of an estate may not serve as a class representative. Dkt. 1007 at 49. *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 277 F.R.D. 52, 60–61 (D.Mass.2011); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 2013 WL 3353852, at *4 (C.D. Cal. July 3, 2013); *see also* 1 Newberg on Class Actions § 3:71 (5th ed.) (observing that courts "will normally permit the estate's representative to be substituted for the decedent as the class's representative.").

**JA1462**

RESPECTFULLY SUBMITTED AND DATED this 22nd day of March, 2021.

CONSUMER LITIGATION ASSOCIATES, P.C.

By: /s/ Leonard A. Bennett, VSB #37523
  Leonard A. Bennett, VSB #37523
  Email: lenbennett@clalegal.com
  Craig C. Marchiando, VSB #89736
  Email: craig@clalegal.com
  Amy Austin, VSB #46579
  Email: amyaustin@clalegal.com
  763 J. Clyde Morris Boulevard, Suite 1-A
  Newport News, Virginia 23601
  Telephone: (757) 930-3660
  Facsimile: (757) 930-3662

  Kristi C. Kelly, VSB #72791
  Email: kkelly@kellyguzzo.com
  Andrew J. Guzzo, VSB #82170
  Email: aguzzo@kellyguzzo.com
  Casey S. Nash, VSB #84261
  Email: casey@kellyguzzo.com
  KELLY GUZZO, PLC
  3925 Chain Bridge Road, Suite 202
  Fairfax, Virginia 22030
  Telephone: (703) 424-7572
  Facsimile: (703) 591-0167

  E. Michelle Drake, *Admitted Pro Hac Vice*
  Email: emdrake@bm.net
  John G. Albanese, *Admitted Pro Hac Vice*
  Email: jalbanese@bm.net
  BERGER & MONTAGUE, P.C.
  43 SE Main Street, Suite 505
  Minneapolis, Minnesota 55414
  Telephone: (612) 594-5999
  Facsimile: (612) 584-4470

  Beth E. Terrell, *Admitted Pro Hac Vice*
  Email: bterrell@terrellmarshall.com
  Jennifer Rust Murray, *Admitted Pro Hac Vice*
  Email: jmurray@terrellmarshall.com
  Elizabeth A. Adams, *Admitted Pro Hac Vice*
  Email: eadams@terrellmarshall.com
  TERRELL MARSHALL LAW GROUP PLLC

**JA1463**

936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Matthew Wessler, *Admitted Pro Hac Vice*
Email: matt@guptawessler.com
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

Michael Allen Caddell, *Admitted Pro Hac Vice*
Email: mac@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston, Texas 77007-1722
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

*Attorneys for Plaintiffs and Proposed Classes*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2021, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the

following:

David N. Anthony, VSB #31696
Email: david.anthony@troutmansanders.com
Timothy J. St. George, VSB #77349
Email: tim.stgeorge@troutmansanders.com
Julie D. Hoffmeister, VSB #87634
Email: julie.hoffmeister@troutman.com
William H. Hurd, VSB #16769
Email: william.hurd@troutman.com
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118

Jon Hollis, VSB #84908
Email: jhollis@woodsrogers.com
Karen M. Stemland, VSB #47167
Email: kstemland@woodsrogers.com
John Benjamin Rottenborn, VSB #84796
Email: brottenborn@woodsrogers.com
WOODS ROGERS PLC
901 East Byrd Street, Suite 1550
Richmond, Virginia 23219
Telephone: (804) 343-5020
Facsimile: (804) 343-5021

*Attorneys for Defendant Matt Martorello*

JA1465

DATED this 22nd day of March, 2021.

CONSUMER LITIGATION ASSOCIATES, P.C.

By: /s/ Leonard A. Bennett, VSB #37523
  Leonard A. Bennett, VSB #37523
  Email: lenbennett@clalegal.com
  763 J. Clyde Morris Boulevard, Suite 1-A
  Newport News, Virginia 23601
  Telephone: (757) 930-3660
  Facsimile: (757) 930-3662

*Attorneys for Plaintiffs and Proposed Classes*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


LULA WILLIAMS, <u>et al.</u>,

    Plaintiffs,

v.                                    Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
<u>et al.</u>,

    Defendants.



RENEE GALLOWAY, <u>et al.</u>,

v.                                    Civil Action No. 3:18cv406

BIG PICTURE LOANS, LLC,
<u>et al.</u>,

    Defendants.


**MEMORANDUM OPINION**

    This matter is before the Court on DEFENDANT MATT MARTORELLO'S
MOTION FOR ORDER CERTIFYING NOVEMBER 18, 2020 MEMORANDUM OPINION
FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b) (the "Motion"),
ECF No. 946 in <u>Williams, et al v. Big Picture Loans, LLC, et al.</u>,
3:17cv461 ("Williams") and ECF No. 582 in <u>Galloway, et al v. Big
Picture Loans, LLC, et al.</u>, 3:18cv406 ("<u>Galloway I</u>").  Having
considered  the  Motion,  the  supporting,  opposing  and  reply

memoranda, the Motion (ECF No. 946 in <u>Williams</u> and ECF No. 582 in <u>Galloway</u>) will be denied.

BACKGROUND

In <u>Williams</u>, <u>Galloway I</u> and <u>Renee Galloway</u>, et al. v. Martorello, et al., 3:19cv314 (E.D. Va.) ("<u>Galloway II</u>"), the Plaintiffs filed three similar, but in some respects substantively quite different, actions arising out of a so-called "Rent A Tribe" scheme allegedly orchestrated by Matt Martorello ("Martorello"), members of his family, companies that he controls, and investors who allegedly funded the scheme (the "Martorello Defendants"). Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, Inc. ("Ascension") (collectively sometimes referred to as the "Tribal Defendants") are entities formed under the tribal laws of the Lac View Band of Lake Superior Chippewa Indians ("LVD"). Big Picture and Ascension are also named defendants in <u>Williams</u> and <u>Galloway I</u>, and both entities are alleged to be implicated in the Rent A Tribe scheme that lies at the core of the Plaintiffs' claims in those cases.

In <u>Williams</u>, Big Picture and Ascension claimed to share LVD's sovereign immunity and, on that basis, those entities sought dismissal of the case against them.  The Court rejected that

2

JA1468

argument.[1]  On appeal, the United States Circuit Court of Appeals for the Fourth Circuit[2] held that Big Picture and Ascension were entitled to the protection of LVD's sovereign immunity.[3]

Following the decision of the Fourth Circuit in Williams, the Court directed that the parties file Statements of Position explaining, how, if at all, the decision of the Fourth Circuit affected these proceedings and pending motions (ECF Nos. 599 and 601).[4]  In his Statement of Position, Martorello argued that the holding that Big Picture and Ascension are protected from suit by LVD's sovereign immunity has substantive and procedural consequences that necessitate dismissal of the case against them. MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECF NOS. 599 & 601

---

[1] Williams v. Big Picture Loans, LLC, 329 F.Supp.3d 248 (E.D. Va. 2018).

[2] Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019). In so ruling, the Fourth Circuit made clear that its decision does not affect the merits of the Plaintiffs' claims.  Id. at 185.  It appears that the Fourth Circuit relied on this Court's findings of fact, finding no clear error in those findings.  Williams v. Big Picture Loans, LLC, 929 F.3d at 177.

[3] Those entities also claimed sovereign immunity in Galloway I. Big Picture, Ascension and many other defendants since have reached a class action settlement of Williams, Galloway I, and Galloway II that was filed in yet another case, Renee Galloway, et al. v. James Williams, Jr., et al., 3:19cv470 (E.D. Va.) ("Galloway III").  That settlement has been preliminary approved and a hearing on a motion for final approval is set for December 15, 2020.

[4] Although this ORDER was not entered in Galloway I, the parties have briefed that topic and the misrepresentations issues in that case in the same way as they briefed them in Williams.

3

(ECF No. 613). In their response to MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECF NOS. 599 & 601, the Plaintiffs asserted, inter alia, that Martorello and others made material misrepresentations to this Court and to the Fourth Circuit about the facts pertaining to sovereign immunity and that, as a result, the Fourth Circuit's decision on that issue cannot be relied on by Martorello. PLAINTIFFS' RESPONSE TO MATT MARTORELLO'S STATEMENT OF POSITION (ECF No. 624).[5]

At the urging of Martorello, the Court held a two-day evidentiary hearing and accepted post-hearing briefs. That was done so that Martorello, in his words, "be provided a full and fair opportunity to respond [to plaintiffs' alleged misrepresentations] through an evidentiary hearing and briefing."[6]

After conducting the requested evidentiary hearing and reviewing the requested briefing, the Court issued a MEMORANDUM OPINION (Williams, ECF No. 944; Galloway, ECF. No 581). Therein, the Court found that Martorello had made certain of the misrepresentations asserted by the plaintiffs. The MEMORANDUM OPINION explained that, as a result of the evidentiary hearing,

---

[5] There are pending other motions in which the parties take the same positions.

[6] Williams, NOTICE OF MATT MARTORELLO REGARDING EVIDENTIARY HEARING (ECF No. 679 at 5); Williams, MATT MARTORELLO'S SUPPLEMENTAL BRIEF ADDRESSING THE EFFECT OF THE FOURTH CIRCUIT'S DECISION ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (ECF No. 664 at 16-17); Williams, ORDER (ECF No. 697).

"in analyzing all pleadings and future motions in which Martorello argues that his position is supported by the Fourth Circuit's [sovereign immunity] decision, this Court will now be required to take into account the record about the misrepresentations and the findings about them that are made herein." MEMORANDUM OPINION (Williams, ECF No. 944 at 39; Galloway I, ECF. No 581 at 39).

Contrary to Martorello's brief, the MEMORANDUM OPINION did not expressly overrule its previous factual findings in Williams v. Big Picture Loans, LLC, 329 F. Supp.3d 248 (E.D. Va. 2018), which were affirmed, and relied on, by the Fourth Circuit in Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019). What the Court did is say that, had it known the truth about representations proved at the evidentiary hearing, it could not have made certain of those factual findings.

## DISCUSSION

Martorello seeks an interlocutory appeal of the MEMORANDUM OPINION.[7]  Martorello seeks an interlocutory appeal because:

> In reaching its findings, the Court stated that it considered allegedly conflicting evidence and assessed Martorello's credibility, thereby depriving Martorello his right to have a right to have a jury decide factual questions raised by the Plaintiffs' claims. This error merits appellate review

---

[7]  It is appropriate to note that the Order followed the Memorandum Opinion (Williams, ECF No. 945) merely required counsel to set a schedule for the filing of briefs on an Amended Motion for Class Certification.

and issuance of an Order certifying its
determination for immediate appeal under 28
U.S.C. § 1292(b), which will materially
advance the termination of this case. In
addition, the Court expressly overruled its
previous factual findings in Williams v. Big
Picture Loans, LLC, 329 F. Supp.3d 248 (E.D.
Va. 2018), which were affirmed by the Fourth
Circuit in Williams v. Big Picture Loans, LLC,
929 F.3d 170 (4th Cir. 2019). In doing so,
the Court violated the mandate rule requiring
district courts to consider only issues
expressly remanded following appeal. In doing
so, the Court violated the mandate rule
requiring district courts to consider only
issues expressly remanded following appeal.

The fundamental premise for the reasons for seeking appeal

ignore what actually happened. In sum, the plaintiffs asserted

that Martorello had made misrepresentations of fact to the Court

in securing certain legal rulings from the Court. Martorello

vigorously asserted that he had not made misrepresentations and

had demanded an evidentiary hearing, a request the Court granted.

He also demanded full briefing on the misrepresentations issue

after a transcript was prepared. The Court granted that request

as well. As a result of the hearing, the Court determined, in

fact, that Martorello had made certain misrepresentations of fact.

The end result was that, in analyzing pending and future motions

on a limited topic (whether Martorello's position in any particular

motion is supported by the Fourth Circuit's decision), the Court

will be required to take into account the record on the

6

misrepresentations and findings about them.   To date, nothing of
the sort has happened.

Moreover, Martorello's brief illustrates the fundamental
misunderstanding of what is required to secure an order permitting
an interlocutory appeal.

Under 28 U.S.C. § 1292(b), a district court must certify that
any order sought to be appealed:    (1) involves a controlling
question of law; (2) as to which there is substantial ground for
difference of opinion; and (3) that an immediate appeal from the
order  may  materially  advance  the  ultimate  termination  of
litigation.    Those  prerequisites  are  important  because  an
interlocutory appeal under § 1292(b) is an exception to the general
rule  that  appeals  are  to  be  had  only  after  final  judgment.
Accordingly, the appellate device created by § 1292(b) "should be
used sparingly and its requirement must be strictly construed."
Difelice v. U.S. Airways, 404 F. Supp. 2d 907, 908-909 (E.D. Va.
2005).   As Difelice explained, the kind of question best suited
for interlocutory review "is a narrow question of pure law whose
resolution will be completely dispositive of the litigation, even
as a legal or practical matter, whichever way it goes." Difelice
v. U.S. Airways, Inc., 404 F. Supp. 2d at 908-909.   Martorello's
motion fails these tests.

To  begin,  Martorello's  vaguely  identified  "controlling
question of law" is not a controlling question of law.   Indeed,

7

Martorello actually seeks to appeal matters of fact, not a question of law. Nor has Martorello shown any ground for substantial difference of opinion on any question that he asserts should be examined on interlocutory appeal; third, Martorello has not shown how an interlocutory appeal would materially advance the ultimate termination of the litigation and, to the contrary, an appeal of this stage would be slow the litigation further than it already has been slowed.

The closest that Martorello comes to specifying a question of law for review is in his assertion that the mandate rule was violated because the Court overruled previous factual findings on which the Court of Appeals relied. That simply is not true. What the Court did was find that, in the face of the evidence presented at the evidentiary hearing (that was requested by Martorello), it could not have been able to make findings that it had made. Nothing was reversed. Nothing was changed.

In sum, there is no reason to grant an interlocutory appeal in this case.

### CONCLUSION

For the reasons set forth above, DEFENDANT MATT MARTORELLO'S MOTION FOR ORDER CERTIFYING NOVEMBER 18, 2020 MEMORANDUM OPINION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b), ECF No. 946 in Williams, et al v. Big Picture Loans, LLC, et al., 3:17cv461

8

JA1474

and ECF No. 582 in <u>Galloway, et al v. Big Picture Loans, LLC, et al.</u>, 3:18cv406, will be denied.

It is so ORDERED.

_____ /s/ *RεΡ*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May ___18___, 2021

9

JA1475

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


LULA WILLIAMS, <u>et al.</u>,

    Plaintiffs,

v.                                        Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
<u>et al.</u>,

    Defendants.



RENEE GALLOWAY, <u>et al.</u>,

v.                                        Civil Action No. 3:18cv406

BIG PICTURE LOANS, LLC,
<u>et al.</u>,

    Defendants.


## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED that DEFENDANT MATT MARTORELLO'S MOTION FOR ORDER CERTIFYING NOVEMBER 18, 2020 MEMORANDUM OPINION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b), (ECF No. 946 in <u>Williams, et al v. Big Picture Loans, LLC, et al.</u>, 3:17cv461) (ECF No. 582 in <u>Galloway, et al v. Big Picture Loans, LLC, et al.</u>, 3:18cv406) is denied.

It is further ORDERED that the facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process.

It is so ORDERED.

/s/                    REP

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:  May __18__, 2021

2

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                    RICHMOND DIVISION

4

5    ---------------------------------------
                                            :
6    LULA WILLIAMS, et al., on behalf       :
     of themselves and all individuals      :    Civil Action No.
7    similarly situated                     :    3:17cv461
                                            :
8    vs.                                     :
                                            :    June 29, 2021
9    BIG PICTURE LOANS, LLC, et al.         :
                                            :
10   ---------------------------------------

11

12          COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

13          BEFORE THE HONORABLE ROBERT E. PAYNE

14              UNITED STATES DISTRICT JUDGE

15

16   APPEARANCES:

17   Leonard A. Bennett, Esquire
     Consumer Litigation Associates, PC
18   763 J Clyde Morris Boulevard
     Suite 1A
19   Newport News, Virginia  23601

20   Amy L. Austin, Esquire
     Consumer Litigation Associates, PC
21   626 East Broad Street
     Suite 300
22   Richmond, Virginia  23219

23

24                  Peppy Peterson, RPR
                    Official Court Reporter
25              United States District Court

**JA1478**

2

```
1   APPEARANCES:  (cont'g)

2   Kristi C. Kelly, Esquire
    Casey S. Nash, Esquire
3   Kelly Guzzo, PLC
    3925 Chain Bridge Road
4   Suite 202
    Fairfax, Virginia  22030
5   Counsel for the plaintiffs

6

7

8   William N. Grosswendt, Esquire
    Loeb & Loeb, LLP
9   10100 Santa Monica Boulevard
    Suite 2200
10  Los Angeles, California  90067

11  John D. Taliaferro, Esquire
    Loeb & Loeb, LLP
12  901 New York Avenue NW
    Suite 300 East
13  Washington, D.C.  20001
    Counsel for defendant Matt Martorello

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA1479**

3

```
1                    P R O C E E D I N G S

2

3            THE CLERK:  Case number 3:17CV461, Lula Williams, et

4    al., versus Big Picture Loans, LLC, et al.  The plaintiffs are

5    represented by Leonard Bennett, Kristi Kelly, Amy Austin, and

6    Casey Nash.  The defendant Matt Martorello is represented by

7    William Grosswendt and John Taliaferro.  Are counsel ready to

8    proceed?

9            MR. BENNETT:  Plaintiffs are, Your Honor.

10           MR. GROSSWENDT:  Defendant is, Your Honor.

11           THE COURT:  All right.  This is a motion for class

12   certification, preliminary approval of class certification.

13   Mr. Bennett.  Who is going to speak for the defendant?

14           MR. TALIAFERRO:  Good morning, Your Honor.  This is

15   JD Taliaferro.  My colleague Mr. Grosswendt has been admitted

16   pro hac vice and with the Court's permission will present

17   argument for defendants.

18           THE COURT:  Mr. Taliaferro, before I get started with

19   Mr. Bennett, you've read all these papers?

20           MR. TALIAFERRO:  Yes, sir.

21           THE COURT:  And, Mr. Grosswendt, have you decided, in

22   having studied these papers, that some of the things that were

23   said by the people that wrote the brief probably ought to be

24   abandoned?

25           MR. GROSSWENDT:  No, Your Honor.
```

**JA1480**

4

1          THE COURT:  You haven't?

2          MR. GROSSWENDT:  I have read --

3          THE COURT:  You adopt -- okay, I want to know.

4          MR. GROSSWENDT:  Yes, Your Honor.

5          THE COURT:  You adopt everything these people who

6    preceded you have said; is that right?

7          MR. GROSSWENDT:  Yes, Your Honor.

8          THE COURT:  Okay.  It's your choice and your

9    consequence.  All right.  Mr. Bennett.

10          MR. BENNETT:  Good morning, Your Honor.  May it

11    please the Court, we are at a point in the case filed in 2017

12    with over a thousand docket entries, multiple distinguished

13    appearances by numerous defense teams, and both factual and

14    legal hearings in this court where I don't believe there is

15    significant dispute, or at least meritorious dispute, as to the

16    facts in the case.

17          At its core, we represent four Virginians who paid

18    each in excess of hundred percent interest on loans in a state

19    that limits interest to 12 percent.  Mr. Martorello, not a

20    member of any Indian tribe to my knowledge, not a member of the

21    Indian tribe that owned Big Picture, conspired to create a

22    business model he believed would insulate him from exposure for

23    this usurious and conspiratorial conduct.

24          And he did that as the Court has already found at

25    docket number 944 of this Court's extensive 39-page memorandum

1    opinion after multiple days during the pandemic of in-court

2    factual testimony.  The Court has already found that Mr.

3    Martorello was untruthful in how he characterized this

4    structure where he claimed he was not a principal architect,

5    that he was not a participant in the lending scheme, and that

6    it was otherwise run by the tribe.

7         This motion today seeks to certify a class to put

8    those same questions before a jury or before this Court --

9         THE COURT:  If they're at issue in the liability

10   phase of the case, they have to be decided by a jury.  That

11   determination was simply for the purpose of ascertaining the

12   extent to which, in briefing, the Court could rely on matters

13   that were subject to allegations that misrepresentations were

14   being made in briefs that were presented to the Court on legal

15   matters.  So that would all have to be decided by a jury at

16   some point.

17        MR. BENNETT:  Yes, sir.  We expect that.  We don't

18   believe this Court's decision on the misrepresentation

19   arguments is a final adjudication of those factual questions.

20   Respectfully, I disagree that the jury would need to decide all

21   the factual issues --

22        THE COURT:  They may not.  Let's get down to what

23   we've got here.  We've got a class to certify.

24        MR. BENNETT:  We have a class to certify with four

25   individuals who would represent that class.

6

1            THE COURT:  Excuse me a minute.

2            MR. BENNETT:  There's no dispute as to numerosity.

3    Let's start with the elements that the Court is already

4    familiar with.  We have to establish that a class is

5    appropriate under Rule 23(a) which requires that we establish

6    four elements:  One, that the class is sufficiently numerous,

7    the joinder of all class members --

8            THE COURT:  Excuse me.  Numerosity is not in dispute;

9    is that right, sir?

10           MR. GROSSWENDT:  Correct, Your Honor.

11           THE COURT:  All right.

12           MR. BENNETT:  Number two, the question of adequacy

13   really in two parts:  First, do the individual plaintiffs

14   adequately represent the class and do their counsel adequately

15   represent the class.  Here, there's no dispute except as to one

16   of the plaintiffs who, during this three-year endurance match,

17   has passed away.  And in a halfhearted end-of-the-brief

18   challenge, the defendant argues that Mr. Gillison's estate

19   cannot pursue his claims.

20           There's no law, there's no argument except legal

21   argument except the assertion that somehow, as a witness, Mr.

22   Gillison wouldn't be available now because he's deceased.

23           There isn't any legal basis by which the executor

24   could not serve in that capacity.  The facts are on paper.  Mr.

25   Gillison took out a loan, it's not disputed that he did, it's

**JA1483**

1  not disputed what the interest rate is and won't be disputed as

2  to what he paid.  He could certainly continue to serve as a

3  rep, and other than that, there is no adequacy challenge.  I

4  don't think there fairly could be.

5       These individuals have stuck with this on behalf of

6  the class.  Their lawyers are -- you know, putting myself

7  aside, there is no better team that you could put together

8  that's on this docket right now for prosecution of consumer

9  cases, tribal lending specifically as well.

10      The third element -- and I may have missed it, but I

11  don't believe the word typicality made it in the defense

12  opposition brief at all.  There is no challenge to typicality.

13  The facts as they pertain to the individual plaintiffs are

14  typical, the facts for everyone else.  There isn't any of the

15  assertion that the elements would make -- the facts and the

16  application of those facts to the elements in these causes of

17  action would make these plaintiffs atypical or the claims

18  atypical.

19      But I would note, defense team, they're big boys.

20  They can live by what arguments they choose to make.  A lot of

21  their positions seem to me in this case to have been

22  mistargeted to ascertainability; that is, the argument that you

23  can't identify class members, for example, because the

24  individuals in 2018 might have different facts than individuals

25  in 2017 because Mr. Martorello restructures his business.

1          A proper argument, wrong but more proper than

2   ascertainability might have been typicality, but that has not

3   been asserted.  It's not in the briefs.  It's not in the

4   previous set of briefs, the original motions.  Typicality is

5   argued, established in our brief, on our record, and it is

6   uncontested, it is undisputed, and if the defendant can't tell

7   the difference between typicality and ascertainability, it's

8   waived the right to try to challenge that at some later point

9   in time.

10         Lastly is commonality which is also not challenged.

11  There are arguments about predominance.  That is, there are

12  arguments that there are individual issues that would be --

13  that would be cumbersome and difficult to adjudicate on a class

14  basis, and we'll deal with those briefly or as we need to when

15  we get to them.  But there is no challenge to commonality.

16  That is, there is no challenge that the questions of whether or

17  not Mr. Martorello was a participant in the enterprise, whether

18  or not state law applies, whether or not these loans were

19  usurious, whether or not there was a willful violation of RICO,

20  whether or not there was an unjust entitlement, or claim

21  rather, and no just entitlement to the money, all of those

22  facts are conceded to be common.  All those questions are

23  conceded to be common.

24         Now, in a world in which a defendant defaults so

25  comprehensively as it has in opposing class certification here,

1    we still have to prove our case.  The Court here is protecting

2    the class, not the defendant, but it does bear noting that with

3    all of the defense teams that have come and gone and all of the

4    paper in this 1,000-plus docket, that the omission of

5    numerosity, largely adequacy, typicality, and commonality

6    should speak volumes to the Court, and we certainly have proven

7    it even by default, even with their default under Rule 23(a).

8              THE COURT:  You mean notwithstanding their default.

9              MR. BENNETT:  Notwithstanding their default, we have

10   not simply come to the Court and said, they didn't say

11   anything, therefore we win.  Instead, we have our own 90 pages

12   of briefing where we've established those elements, 60

13   exhibits, and quite a long, extensive factual record in this

14   case.

15             So then we turn to Rule 23(b)(3), and this Court, of

16   course, is well familiar with the requirements there.  Overall,

17   with any class certification decision, the Court is aware that

18   it must rigorously examine the facts and the arguments in the

19   case.  In addition, the Court is aware of the caution against

20   delving deeply into facts beyond those necessary to decide the

21   element of class certification.

22             And I think that much of Mr. Martorello's arguments

23   against Rule 23(b)(3) ignore that latter point.  That is, the

24   first half of his brief continues to relitigate facts that are

25   obviously contested.  We contest that Mr. Martorello was a

1    passive investor.  We contest the motivations for his creation

2    of this model and this enterprise, etcetera, etcetera, but the

3    Court doesn't decide those on class certification.  To the

4    contrary --

5            THE COURT:  Excuse me.  All right.

6            MR. BENNETT:  To the contrary, the Court can't decide

7    these issues at this stage for the reasons -- the dialogue

8    between Your Honor and myself opening this very argument.  That

9    is, most of these issues have to be decided either on summary

10   judgment because there's no material dispute or by a

11   fact-finder.

12           But at this stage of the litigation on the questions

13   of ascertainability and the questions of predominance, those

14   issues raised by the defendant, the record is significant and

15   established and, I think, largely ignored by my opponents as

16   we've gone through this.

17           If I could go through the arguments in the order

18   under Rule 23(b)(3), and I would retain the class action waiver

19   argument either in response to the defendant or at the end of

20   the argument with the Court's preference.

21           With respect to ascertainability, this has been an

22   issue that the courts, I think, have had to explore and flesh

23   out over the last six, seven years.  Really, the point of

24   ascertainability prior this wave and certainly prior to the *EQT*

25   case in Virginia, or in the Fourth Circuit, was whether or not

JA1487

1  you could objectively define a class.

2        The classic instance of not ascertainable was an old

3  case in which the class had been attempted as individuals that

4  opposed the Vietnam War which was so soft, subjective, and

5  indeterminant that the class could not be ascertained.  And

6  that has been sort of merged now with the separate question of

7  identifiability.

8        Identifiability is really a superiority and

9  predominance question.  It's a manageability question.  The

10  question is, is it worth the trouble.  Ascertainability

11  generally means you can't theoretically define the class.

12  Here, that, of course, isn't true because the class definitions

13  and the subclass definitions are consumers who paid an amount

14  of money to the defendant between date A and date B.  Easy,

15  black and white, mathematically determinable, objectively

16  determinable.

17        So what the defendant is arguing is identifiability.

18  What the defendant is arguing, in significant part, is, for

19  example, with respect to the data, that we could not easily

20  identify the individuals who were from Virginia, who paid

21  interest, principal, or fees based on a loan from Big Picture

22  and who paid the money during this time period.  That's

23  ridiculous.

24        The argument that the defendant is making, the first

25  argument as to this, and I'm going to call it identifiability

1  notwithstanding its use of ascertainability, is largely a

2  complaint about the quality of the work of its prior lawyers,

3  because the complaint they have is that they don't have access

4  to the data that's in the possession of this non-tribal

5  third-party class administrator, a non-tribal third-party

6  vendor.  The competence --

7          THE COURT:  Where do you understand the argument

8  about ascertainability that the defendant is making to be

9  placed structurally in the analytical process?  It is Roman

10 numeral III, argument A, but there's no presentation in that

11 paper about whether it's made under Rule 23(a) analysis or Rule

12 23(b) analysis.  It just is there like a big blob sitting there

13 to be dealt with.  So where -- I can't tell there in that paper

14 where it is that they're asking me to look at this.

15         MR. BENNETT:  Yes, sir.  I agree with you.

16         THE COURT:  Where do you understand, from reading

17 their papers, it might be analyzed?

18         MR. BENNETT:  This is that long-winded introduction

19 to the subject I offered.  It is clearly a manageability

20 question.  It is clearly a predominance question.  It is not

21 ascertainability.  Ascertainability --

22         THE COURT:  Which is it, predominance or

23 manageability which is a function of superiority?  You're

24 trying to make a canasta deck of the factors here, too.

25         MR. BENNETT:  Yes, sir.

**JA1489**

```
1            THE COURT:  We don't do that.  I had to yesterday
2   call upon both of you to give me the elements of the claims
3   which nobody seems to be discussing except by incidental
4   measures as cases are discussed.  That's how we do things.  We
5   have elements -- all claims have elements, and all class
6   actions have an analytical structure that the Fourth Circuit
7   follows, the Supreme Court follows.
8            So you are saying that their argument on pages 30
9   through 35 entitled Proposed Classes Are Not Ascertainable is
10  actually an argument under what rule?
11           MR. BENNETT:  Rule 23(b)(3).  And their argument is
12  both -- it's predominance and manageability.  The one part is
13  manageability in that -- the argument about identification of
14  class members.  The other part that Mr. Martorello's role has
15  changed over time or whether a class member has released their
16  rights are predominance questions.  So is the statute of
17  limitations issues.  Those are not even identifiability
18  questions.
19           The only identifiability question of this chunk of
20  argument that the defendant has under A, ascertainability, the
21  only -- that's even a cousin of ascertainability and that is
22  manageability is --
23           THE COURT:  Let's take what it is.  Let's take what
24  they say it is.  They say it's ascertainability, and you say,
25  well, it's identifiability really, that that's what they're
```

```
1    arguing.
2            MR. BENNETT:  Yes, sir.
3            THE COURT:  And all this boils down to whether or not
4    you can get the loan data according to you.
5            MR. BENNETT:  Yes, sir.
6            THE COURT:  You can get the loan data from the tribal
7    defendants who have settled, and they've agreed as part of the
8    settlement to provide it.
9            MR. BENNETT:  Yes, sir.
10           THE COURT:  That's it.
11           MR. BENNETT:  That's it.
12           THE COURT:  Let me ask you something.  Have you got
13   the data?
14           MR. BENNETT:  A non-tribal entity has the data.
15           THE COURT:  What?
16           MR. BENNETT:  A non-tribal entity, the class
17   administrator in Galloway 3 has the data.
18           THE COURT:  Have you given the data to the defendant?
19           MR. BENNETT:  We, under the protective order, do not
20   have ourselves direct access to the data.  We have samples of
21   the data.
22           THE COURT:  I didn't ask you that.
23           MR. BENNETT:  Yes, sir.
24           THE COURT:  Is the data available to Mr. Martorello?
25   Let me try it another way.
```

```
 1            MR. BENNETT:  Sure.  If he litigates, he has to ask
 2     for it.  Maybe subpoena --
 3            THE COURT:  Has he asked for it?
 4            MR. BENNETT:  No, sir.
 5            THE COURT:  He has not filed a single interrogatory
 6     or request for production to anybody, either you or the claim
 7     administrator in Galloway 3 or the tribe, asking for the data?
 8     Are you telling me that?
 9            MR. BENNETT:  And -- yes, sir, that's correct, nor
10     TranDotCom nor when Mr. Martorello --
11            THE COURT:  Wait a minute.  What does that mean, nor
12     trans.com?
13            MR. BENNETT:  The non-tribal vendor that held all the
14     data.
15            THE COURT:  What do you mean when you say nor
16     TranDotCom?  You mean they haven't asked for it or --
17            MR. BENNETT:  The defendant hasn't asked for it from
18     the non-tribal vendor that held the data and that was already
19     before this Court.
20            THE COURT:  TranDotCom.
21            MR. BENNETT:  TranDotCom.  Nor when Mr. Martorello
22     and his company Eventide were deep engaged in full-blown
23     discovery and in negotiations to settle their arbitration
24     matter with the tribe, why wasn't a condition of that
25     settlement that Mr. Martorello and his lawyers in that case
```

**JA1492**

1  have access to this data?  Or this Court has a record before

2  it, as it already heard in the misrepresentation hearing and

3  other pleadings, that under the Eventide agreement, Mr.

4  Martorello can request and receive data on his requested

5  instructions from the Eventide -- I mean from the Big Picture

6  and Ascension management.

7          THE COURT:  Has he asked for it?

8          MR. BENNETT:  If he has not asked for it -- I don't

9  know what he's asked for, but he hasn't asked for it in front

10  of us, and he has not complained that he has asked for it and

11  not received it.  So --

12          THE COURT:  So what right is -- where does he have

13  that right?  Where does he have that right?  Where do I find

14  it?

15          MR. BENNETT:  He has that right in the Eventide loan

16  where he can ask for information and data, and I apologize, I

17  don't have amongst all my documents the Eventide servicing

18  agreement, but we know that he has asked for accounting records

19  for his valuation.  So when he wanted to lower his tax burden,

20  we have seen the communications where he's requested --

21          THE COURT:  Excuse me.  As I understand it, the

22  Eventide loan agreement, the servicing agreement, gives

23  Martorello the right to ask for what amounts to the ability to

24  identify the class; is that what you are saying?

25          MR. BENNETT:  Yes, sir.  He can ask for any of the

1  data or information that he believes necessary.

2          THE COURT:  So he could ask for, for example, all the

3  loan documents.

4          MR. BENNETT:  He certainly could.

5          THE COURT:  And all the applications.

6          MR. BENNETT:  Yes, sir.

7          THE COURT:  And, to your knowledge, has he done that?

8          MR. BENNETT:  No, sir.  Now, beyond even that, that's

9  not what the law requires.  This Court, the Fourth Circuit,

10  every court to my knowledge that has considered the question of

11  whether you have to have identified information pre class

12  certification has said it's not required.

13          I can tell you that if Mr. Martorello had this

14  information instead of his tribal entity and we demanded it

15  from Mr. Martorello, we would get the same argument we got from

16  the tribal entity, we would get from any defendant which is,

17  Judge, we shouldn't have to give that class list to Mr. Bennett

18  yet because you haven't even certified a class.

19          THE COURT:  That's a fairly typical objection to

20  requests for class members' identities and documents in almost

21  all class actions, certifications, is it not?

22          MR. BENNETT:  It is almost universally made.

23          THE COURT:  But it hasn't been presented to me here,

24  has it?

25          MR. BENNETT:  It was presented by the tribal

```
 1   entities --
 2           THE COURT:  Excuse me, by Mr. Martorello.
 3           MR. BENNETT:  No, sir, it was not presented by Mr.
 4   Martorello.
 5           THE COURT:  So the bottom line on ascertainability is
 6   twofold:  A, the law doesn't require what he wants now, and, B,
 7   all he has to do is ask for it and he hasn't.  In the ordinary
 8   course of litigation he hasn't, and he has a contractual right
 9   through Eventide which he controls to ask for it, and he
10   apparently hasn't asked for it or he wouldn't be here
11   complaining and moaning he can't get it.
12           MR. BENNETT:  Yes, sir.
13           THE COURT:  Is that it?
14           MR. BENNETT:  That's it on that.  I would add two
15   other important points.  Mr. Martorello makes two other
16   arguments.  One is a due process complaint.  He says, well, my
17   due process is violated because I don't know what's in the loan
18   documents.
19           THE COURT:  Of course he knows what's in the loan
20   documents.
21           MR. BENNETT:  Of course he knows what's in the loan
22   documents.
23           THE COURT:  What does the record say about who
24   prepares the form of the loan documents?
25           MR. BENNETT:  The record shows that it was Mr.
```

1   Martorello, his companies, and his retained lawyers that

2   prepared those documents.  I would -- we certainly have

3   amongst --

4          THE COURT:  What's the citation on that?  If I wanted

5   to check it, where would I go to see what it is that says that

6   his companies prepared -- lawyers prepared the loan documents

7   that are used by these -- in these loans?

8          MR. BENNETT:  I apologize, Judge.  Once I'm not in

9   front of the microphone, if I can have a minute and give you

10  the specific document cites.  I don't want to refer back to --

11         THE COURT:  Excuse me, you can give them to me.  Ms.

12  Kelly can give them to me later, and that's all right.  My

13  understanding, my recollection is that the assertion is made

14  that Mr. Martorello's counsel either prepared or was intimately

15  involved in the preparing of the form loan documents that are

16  used in this case, and I would like to know if that's correct,

17  and, if so, what's the authority that supports that if it is

18  correct.  Ms. Kelly is getting that together so she can give it

19  to me, and you can go on.

20         MR. BENNETT:  Yes, sir.

21         THE COURT:  But I want Mr. Grosswendt to be prepared

22  to respond and say if there's anything that's not right about

23  that.

24         MR. BENNETT:  So two other points --

25         THE COURT:  He needs to have the citation, too.  So

**JA1496**

1   the due process argument that he makes about the what?  What's

2   the due process argument have to do with?  It's a sub argument

3   relating to ascertainability?

4           MR. BENNETT:  Yes, sir.

5           THE COURT:  And it is -- I don't know what's in the

6   loan documents, so I'm denied due process.  How is that -- I

7   don't understand that argument.  Can you help me understand it?

8           MR. BENNETT:  I cannot understand it.  The best I can

9   tell, Mr. Martorello's lawyers or former lawyers were arguing

10  in their brief that he would be blind-sided and wouldn't have

11  an opportunity to be heard before some deprivation of his

12  rights in the event there was no such data that could be used

13  to notice -- identify and notice a class.

14          THE COURT:  Well, if that comes up -- suppose that

15  all the data went away in the ether.  I certify the class, and

16  all of the data somehow goes away to the great hacker in the

17  sky and it's not available.  At that point, does a litigant

18  have the right to come back to court and say, look, king's X,

19  Judge, the decision you made presupposes that this would occur,

20  but now it can't occur and, therefore, we need to revisit this

21  whole thing?  Doesn't any litigant have that right at any time

22  if an unforeseen circumstance like that should occur?

23          MR. BENNETT:  Absolutely.  In fact, even

24  certification of a class is -- while there is an

25  interlocutory -- a right to seek interlocutory appeal under

1    Rule 23(f), it's not a final adjudication of anything at all.

2    Certainly if the facts change, this Court is obligated to

3    reconsider its decision --

4            THE COURT:  As a general proposition, were something

5    like that to occur -- I've had this kind of thing happen

6    before, not in respect of the disappearance of data but in

7    other factors that are important to the class action decision.

8    There's a mechanism that's sanctioned by the Federal Rules of

9    Civil Procedure called a motion to decertify the class, isn't

10   there?

11           MR. BENNETT:  Yes, sir.

12           THE COURT:  One of the reasons that could be offered

13   is that, look, you held that the class was identifiable and

14   ascertainable, and the basis of it was this data was available

15   in two or three different ways, but the fact of the matter is

16   it's all kept on computer, and the computer's gone, and there's

17   no way to get it in the ether or anywhere else.  Now we're in a

18   posture that's different.  You move to decertify the class.

19   Isn't that available?

20           MR. BENNETT:  Yes, sir, that is available.

21           THE COURT:  Is there any other point on

22   ascertainability you want to make?

23           MR. BENNETT:  Well, other than that the Court's not

24   the first judicial official to reach those conclusions.  The

25   Fourth Circuit in the *Dish Network* case, 925 F.3d 643, and even

**JA1498**

1    in its discussion of ascertainability, the Fourth Circuit in

2    the *EQT* case, 764 F.3d 347, and though it's from the Seventh

3    Circuit a very detailed analysis of the due process argument in

4    the *Mullins v. Direct Digest*, 795 F.3d 654 -- these are cited

5    in our papers -- rejected this argument that you have to have

6    identified class members and that it's a due process argument

7    or defense made here.

8            THE COURT:  Is there any case that actually holds on

9    the other side -- the Fourth Circuit, the Seventh Circuit have

10   clearly rejected the argument.  Is there any case law that

11   supports the argument that they cite, do you think?

12           MR. BENNETT:  Well, they do.  They cite -- it doesn't

13   support the argument.  They've --

14           THE COURT:  Is there any case that they cite that is

15   on point that actually holds, A, that you have to have the

16   class identification data before class certification?  Let's

17   take that.

18           MR. BENNETT:  No, sir.

19           THE COURT:  I didn't find one.  I'm sure Mr.

20   Grosswendt will tell me if there is one.  Is there anything

21   else on ascertainability?

22           MR. BENNETT:  The only other thing I would note for

23   the Court is that you don't have to guess as to whether you can

24   identify a notice of class.  I've already provided this, and,

25   of course, counsel is already aware of it, but from *Galloway v.*

1    *Williams*, Galloway 3, docket number 105-4, Exhibit 4 of

2    document 105 filed in this court October 30th, 2020, is the

3    declaration of American Legal Claims regarding notice

4    dissemination.  American Legal Claims administered, put

5    together the class list and sent notice to the national

6    class -- a much more challenging task than just Virginia -- in

7    that case using the very same data here.

8            And while if you look just at paragraph seven, just

9    from that data they were able to confirm or it was able to

10   confirm delivery to 99.67 percent of the class.  So you've got

11   the facts in paragraphs four, five, six, and seven of that

12   declaration, so you don't have to take it from Len, Mr.

13   Bennett, from plaintiffs.  You can take it from the neutral

14   third-party administrator that looked at the data, used the

15   data, successfully satisfied Rule 23.  This Court held on final

16   approval that Rule 23(b)(3) and Rule 23(c) there were

17   satisfied.

18           I don't have other arguments as to the data.  There

19   are other arguments the defendant makes as to ascertainability

20   that I don't think are appropriately shelved there or housed

21   there, but I would address them.

22           THE COURT:  What are they?

23           MR. BENNETT:  One of them is the defendant argues

24   that Mr. Martorello's role changed over time.  That is, I guess

25   the argument is that he was not involved in the beginning and

not involved at the end but that his concession is that if

we've shown that he was involved, for example with the Red Rock

loan product, he had restructured after the regulators started

to crack down into this Big Picture product.  And his argument

is that you couldn't identify class members because his role

changed over time.

I don't understand how that's an ascertainability or

identifiability argument.  We'll address it in predominance in

a bit, but it ignores the elements of the cause of actions.

There isn't any, you know -- it's a binary question, for each

cause of action was he involved or was he not involved.  It

isn't -- there's no comparative negligence analysis where you

figure out who is more at fault or the like.

This is joint and several claims, and even under his

facts, which are not the facts that the jury will find, the

fact that his role changed in some structural way but not

substantive way is meaningless, particularly so under a heading

ascertainability.

Mr. Martorello also argues that class members

released their rights under Galloway 3 and that somehow you

would have to determine that.  I don't know what to say.  Our

brief says they didn't because that's what's in the settlement

agreement.  We carved out expressly Mr. Martorello and his

company.  So I don't know what that means, and I'm sorry I

can't argue against an argument that makes no sense to me.

```
1              And then the last --
2              THE COURT:  That's one of the reasons why I asked Mr.
3    Grosswendt if he wanted to walk away from some of the arguments
4    that had been made, because there's some of them that looks to
5    me like were just put to bed when the sword was put to them.
6              When that happens, particularly when you're coming
7    into a case, what you do is you say, look, I'm not pursuing
8    that argument anymore, and that's your job.  Mr. Taliaferro,
9    you are the local counsel, aren't you?
10             MR. TALIAFERRO:  Yes, Your Honor.
11             THE COURT:  Did you read these papers before they
12   were filed?
13             MR. TALIAFERRO:  Since I've been in the case?
14             THE COURT:  No.  Before they -- just so we understand
15   each other, Judge Williams put it this way, and I think it's a
16   good analogy.  You are not hired from the neck down, and that
17   means in the old days local counsel walked the papers to the
18   clerk's office.
19             Judge Williams held that local counsel are not
20   limited to walking.  Their responsibility is to read the papers
21   and to not sign them if they're not right which puts a
22   tremendous responsibility on the local counsel, and I've been
23   there where lawyers from outside want to make arguments that
24   don't make any sense, 28 3
25             As to which there's no basis at all.  In that event,
```

**JA1502**

1    what you do is say I'm not signing this paper, and if they

2    won't change it, then you say I'm getting out of the case.

3         Now, that's the role local counsel have, and I don't

4    know how all of that was done in the precursor papers that have

5    come to me, but that's the job you have.  Do you understand it?

6         MR. TALIAFERRO:  I do, Your Honor.

7         THE COURT:  All right, thank you.  Sit down, please.

8    And there are, as Judge Williams held, consequences to the

9    local lawyers when they sign on to things that have no merit

10   whatsoever.  And you need to make clear with Mr. Martorello and

11   with the lawyers you are working with in any situation, this

12   one or any other, that that is what you sign on for.

13        If they don't want to pay you to do that and they

14   want to find somebody else who will be a thrill-seeker and take

15   the risk, then let them do it, but don't sell your signature.

16        MR. TALIAFERRO:  I understand, Your Honor.

17        THE COURT:  That's Judge Williams' admonition, and

18   it's a well-taken one, and I agree with it.  All right,

19   let's -- are you finished with ascertainability?

20        MR. BENNETT:  I'll put on the record in answering,

21   because Ms. Kelly's knowledge is greater than mine, the

22   document to which I had referred that Mr. Martorello and his

23   company Eventide have retained the right to request any

24   documents about consumer loans at any point from Big Picture.

25   That document itself, the title of it is Loan and Security

1    Agreement, and these changed only slightly and not in a

2    substantive way, but the one I'm going to refer to is dated

3    September 14th, 2015, between Eventide and the tribal

4    lending -- the LVD company, and it is document 968, Exhibit 44,

5    PACER 968, Exhibit 44 in this case.  Exhibit 44, this loan

6    agreement, it includes, and it's a defined term, consumer loan,

7    which is anything about --

8              THE COURT:  I think I've got the information.

9              MR. BENNETT:  Yes, sir.

10             THE COURT:  Is there anything else about

11   ascertainability?

12             MR. BENNETT:  The statute of limitation argument is

13   also -- I think it's a throwaway.

14             THE COURT:  How is the statute of limitations

15   argument pertinent to ascertainability?

16             MR. BENNETT:  It's not.  It's not true, but it's

17   also not -- it's argued by the defendant in that big letter A,

18   but --

19             THE COURT:  How do they say it applies?

20             MR. BENNETT:  They say we haven't shown that the

21   statute of limitations is satisfied, and the Court would have

22   to --

23             THE COURT:  Let me get to that particular argument.

24   Where is it?

25             MR. BENNETT:  It is at page 34 of document 1007.

1    That's the defendant's brief, page 34, and PACER 34.

2            THE COURT:  It says, Fourth, analysis of whether the

3    loan or payment occurred within the statute of limitations

4    would require an additional analysis of the timeliness of

5    individual claims to determine class membership.  And they cite

6    *Inetianbor, Waste Management*, and *Rahman*.  Any of those cases,

7    what do those cases hold?

8            MR. BENNETT:  That if you have to have mini trials,

9    for example, in a discovery question, whether the discovery

10   triggered the running of the statute of limitations, those

11   could be mini trials.  Those cases don't talk about this as an

12   ascertainability question.  They also don't apply.  They're

13   apposite here because there's an objective, mathematically

14   determinable boundary that is built into each of the class

15   definitions and subclass definitions.

16           I thought, when this argument and then the Court's

17   order yesterday saying -- asking two sides to state the

18   elements and the statute of limitations for each count, there

19   must be some difference of opinion as to the law between the

20   two parties, and there isn't.  We all agree.

21           The statute of limitation runs from when payments are

22   made, and our class definitions proposed at page 24 of document

23   968, our memorandum in support of class certification, are

24   defined at two years -- respectively two years, three years,

25   and four years from the filing of the cause of action in June

```
1    of 2017.  So a payment that was made in 2012 --
2            THE COURT:  I have to tell you that I really am
3    confused by this question of the statute of limitations.  Every
4    case, every claim ever brought by anybody in a class or
5    otherwise is subject to some statute of limitations.  What's
6    the deal here on statute of limitations in these cases, and why
7    is it important?  I don't understand it.
8            And you are addressing it, so tell me why I have to
9    look at the statute of limitations in this case.  What do you
10   do?  How do you try this issue?
11           MR. BENNETT:  You don't.  The class data that is
12   submitted to the jury, the class list is built solely,
13   entirely, cleanly off of loan payments that are on this side or
14   not jeopardized by the statute of limitations.
15           THE COURT:  In putting on the case, I assume you have
16   some expert or guy to go through all the data and say I've
17   checked all these things, and every one of these things is
18   filed by X date.
19           MR. BENNETT:  Yes, sir.  And we did that, in fact,
20   already in the Galloway 3 matter in order to send notice to
21   define a class and send money to people.
22           THE COURT:  So I just am having trouble understanding
23   how the class definitions avoid the statute of limitations
24   issue though.  How does that do it?
25           MR. BENNETT:  Because the statute of limitations is
```

**JA1506**

1   only an issue for payments that predate a four-year period or,

2   in usury, two-year period.  So a payment that is made three

3   years prior to the filing of the action, prior to the start of

4   tolling is not recoverable under Virginia's usury statute.

5           So we've used a two-year statute of limitations, a

6   cutoff a date within the statute, June 2015.  Payments that

7   were made after '15 you can recover under Virginia's state

8   usury law.

9           The RICO statute is four years.  You can recover --

10  and, again, the cause of action is for loans illegally

11  transacted within the four years preceding the filing of the

12  lawsuit.  So if the loan was transacted four years and a day

13  prior to the filing of the lawsuit, they won't be in the class

14  by definition.

15          THE COURT:  So how does that get dealt with and

16  determined?  You look at what data to determine whether

17  somebody's claim has been barred -- is barred by the statute of

18  limitation if you're Mr. Martorello?

19          MR. BENNETT:  You look at the class loan documents,

20  the consumer loan documents that Mr. Martorello has access to

21  if he had requested them.

22          THE COURT:  And what do you see?  What documents do

23  you look at, what do you see, and how do you then come to the

24  Court and say these people can't recover because the statute of

25  limitations bars their claim?  How do you do that?

**JA1507**

1          You have to understand something.  You all know this
2     stuff inside and out, but don't suppose I know the lending
3     business.  Don't suppose I know how your case works.
4          MR. BENNETT:  There won't be a question the jury or
5     any fact-finder has to decide.  The only individuals that will
6     be in the class are individuals who have a loan that was
7     transacted during the open statutory period.
8          THE COURT:  Okay.  Well, suppose I read the
9     documents.  I'm Mr. Martorello, and there's a dispute about
10    whether the loan was within the statutory period or not.  Who
11    decides that and when?
12         MR. BENNETT:  Then there would be a factual question
13    as to whether a particular individual is a class member, but
14    that isn't decided by the fact-finder at trial.
15         THE COURT:  No, what happens is what?
16         MR. BENNETT:  Mr. Martorello would file a motion to
17    challenge the inclusion of John Doe, person A, in that class.
18         THE COURT:  And the Court decides that.
19         MR. BENNETT:  The Court decides that, but --
20         THE COURT:  Are you telling me from what you said
21    earlier that the class data has been successfully used in
22    Galloway 3 in order to make sure that claims -- that notices
23    are sent to people only who fall within the statutory
24    limitations -- statute of limitations?
25         MR. BENNETT:  Yes, sir.  And if you were --

```
1              THE COURT:  How do I know that?  You say that, but
2    how do I know it?
3              MR. BENNETT:  Because I've filed the declaration from
4    Galloway 3 here six, seven minutes ago.
5              THE COURT:  Yes.  Where in there does it say that?
6              MR. BENNETT:  In paragraph three, page one, of
7    Galloway 3's docket number 105-4, American Legal Claims, the
8    class administrator, details that it received the files that
9    contained all the loan information and created the list
10   associated with 491,018 class members.  Paragraphs four, five,
11   six, and seven, they outline the success at noticing those same
12   individuals.
13             THE COURT:  Where does it say they used it to limit
14   the sending of the notice to people whose claims fell outside
15   the statute of limitation or fell inside the statute of
16   limitation?  It doesn't say that.
17             MR. BENNETT:  It doesn't in this declaration say
18   that.
19             Judge, at ECF 303, this Court, in this case, entered
20   a consent order regarding the discovery of the class member
21   data from TranDotCom, and the Court has found, in entering that
22   order which was agreed and a case in which Mr. Martorello was a
23   party and did not contest this, that the consumer data includes
24   information relevant to identifying class members and
25   calculating damages including the consumers' identifying
```

**JA1509**

33

1    information and other nonpublic personal information and that

2    TranDot would provide this data, as it did, in the event that a

3    class is certified.

4            THE COURT:  So far you've said a lot, but you haven't

5    said anything relating to the statute of limitations, so that's

6    a bunch of words that don't mean anything in response to my

7    question.

8            MR. BENNETT:  This Court has entered an order, an

9    agreed order, that said that TranDotCom possesses the consumer

10   loan data, and that includes all the data surrounding the

11   loans.  We've also received a sample for our individual

12   plaintiffs of all of the data that exists for each of these

13   individuals which includes the date the loan was transacted,

14   the address as this Court found in that order of where the

15   consumer transacted that, whether they're in Virginia.

16           THE COURT:  So what?  Help me.

17           MR. BENNETT:  Well, if the loan was transacted in

18   2016, it is within the statute of limitations because by

19   definition --

20           THE COURT:  Ms. Kelly wants to talk to you.

21           (Counsel conferring.)

22           MR. BENNETT:  Ms. Kelly is pointing out that we all

23   have the TransDot loan level data which includes --

24           THE COURT:  Martorello has it?

25           MR. BENNETT:  Mr. Martorello has it.

**JA1510**

1           MS. KELLY:  If I may, Judge, as part of this case at

2    ECF 303, prior to Your Honor entering that order, we had a

3    hearing with TranDotCom where Big Picture and Mr. Martorello

4    all presented argument on the production of the data.

5           Prior to entry of the order, there were multiple

6    meet-and-confers and a third-party subpoena where plaintiffs

7    obtained data samples from TranDotCom of the type of data that

8    it maintained.  It also provided a certification under oath

9    saying it would maintain and store the data and would not

10   destroy it during the pendency of our case.

11          THE COURT:  Does that mean that Martorello has the

12   sample data and the right to get the data if I order it?

13          MS. KELLY:  Of course, yes.

14          THE COURT:  So you can tell the statute of

15   limitations from the documents.

16          MR. BENNETT:  If the class was defined of people that

17   entered a loan on March 1, 2019, then the only question, and

18   it's not a merits question, it's a determination of class list

19   question, are which consumers entered a loan March 10, 2013, or

20   whatever day I gave.  That's true here.  We have loans, they

21   have dates on them, we have the actual records, we have history

22   of payments, we have the interest rates.

23          THE COURT:  I know you have them.  I didn't ask you

24   that.  Does he have them?

25          MR. BENNETT:  He does.

```
1                THE COURT:  Now, are you finished with
2    ascertainability now?
3                MR. BENNETT:  I am.
4                THE COURT:  All right, you say in your papers that
5    there are at least 12,530 class members.  Why, at this stage,
6    do you not know exactly how many there are?
7                MR. BENNETT:  We can give you an exact number.  We
8    just didn't do it in our papers.  If the Court says file a
9    supplemental pleading, we would get from the class
10   administrator the exact number of individuals within these date
11   periods.
12               THE COURT:  How many people in the class, in your
13   judgment, would be non-injured people as Martorello alleges?
14               MR. BENNETT:  Zero, Judge.
15               THE COURT:  Why?  You're aware of the *TransUnion* case
16   that was just decided by the Supreme Court, aren't you?
17               MR. BENNETT:  Very aware, yes, sir.  With respect to
18   the question of injury right here, you would put that into two
19   categories -- not the TransUnion Ramirez case, but you would
20   put Your Honor's point into two categories:  Those individuals
21   that paid usurious interest and those individuals who did not
22   pay usurious interest but entered -- were transacted into a
23   loan that was illegal.  The defendant has not --
24               THE COURT:  They were all illegal according to you.
25               MR. BENNETT:  They were all illegal.  So if you
```

1  engage with someone, a loan shark, and that loan shark -- your

2  transaction with the loan shark, the loan shark said --

3  THE COURT:  Wait a minute.  Let's get back to square

4  one.  You say there are no members of the class, as you defined

5  them, who would not -- who would not have sustained injury

6  because they all signed an illegal loan.

7  MR. BENNETT:  Yes, sir.

8  THE COURT:  And they all paid on an illegal loan.

9  MR. BENNETT:  They either all signed it and paid

10  something on it.  In addition, they are on the hook for a loan.

11  Question whether it's an illegal loan, much like a loan

12  shark --

13  THE COURT:  No, no, no, no.  Stay away from the

14  tangents and answer the question.

15  MR. BENNETT:  The fact that someone is asserted to be

16  obligated on a debt that is, under RICO, criminal, and that

17  itself is injury.

18  THE COURT:  What do you know about the assertion that

19  Martorello was not receiving loan payments from November '18 to

20  July 2020?  What does that -- there's this assertion, but I

21  don't understand what it means.

22  MR. BENNETT:  What it means is -- what he's saying is

23  that Mr. Martorello and his company Eventide were in

24  arbitration with the tribe and only worked out a settlement to

25  release the funds that Mr. Martorello believes he's entitled in

1   the end of 2020 --

2          THE COURT:  He got them ultimately by virtue of a

3   settlement.

4          MR. BENNETT:  They did.  They got value and

5   obligations on paper.  What he's really saying is, the consumer

6   paid this dollar bill, this serial number, and that dollar bill

7   with that serial number didn't make it into Mr. Martorello's

8   personal pocket.

9          That's not the standard under the usury provision in

10  Virginia.  The money is paid through a series, a network, a

11  system that he designed, and they end up to his benefit.  If he

12  says give it to my wife, give it to my trustee in the Cook

13  Islands so that Ms. Kelly can't go get it, that's still payment

14  under Virginia's usury law even if it's not the dollar bill

15  that the consumer mailed in.

16         The class definition is people who paid.  That's it.

17  So all of those individuals paid.  Mr. Martorello's point is

18  that he did not take the money himself.

19         THE COURT:  As to the issue of composition of the

20  class, well, he didn't get what money himself?

21         MR. BENNETT:  He did not get direct-line payments for

22  loan X, Y, Z.  That payment went into the machine, and it came

23  out as one big check.  His argument is that you would have to

24  see whether that check, that $100,000 check, does that include

25  consumer A's payment, consumer B's payment, consumer C's.

1    Maybe consumer D's was used to cover the internet marketing

2    bill to try to lure more people into this.  That's his

3    argument.

4              THE COURT:  That's what I thought it was.  What

5    difference does it make as to whether or not people have

6    already received some payments out of the Galloway 3

7    settlement, or will have received, to the definition of the

8    class?

9              MR. BENNETT:  It doesn't -- it's not argued, it's

10   certainly not argued in a comprehensible way by the defendant,

11   but it does not make any argument -- to the extent that's the

12   Court's question, it does not make any argument because there

13   are remedies --

14             THE COURT:  You mean doesn't make any difference.

15             MR. BENNETT:  Doesn't make any difference.  There are

16   remedies in the claims that were brought against Big Picture

17   and Ascension and the investors that are not liquidated, and to

18   the extent that they're not liquidated -- there's no assertion

19   here of contribution setoff, one payment, none of that.

20             THE COURT:  All right.

21             MR. BENNETT:  They have to make those arguments.

22   They never made those arguments, and we would effectively rebut

23   them if they tried.

24             THE COURT:  So tell me just real quickly with respect

25   to ascertainability, exactly what has to happen before

1    Martorello no longer has an argument that class members can't

2    be identified?  I'm hearing from you that he actually already

3    has a sample of the data through ECF number 303 and that he has

4    under that order an entitlement to receive the whole if the

5    class is certified; is that correct or not correct?

6                MR. BENNETT:  That's correct.

7                THE COURT:  And then in addition to that, he has the

8    contract right through his servicing agreement with Eventide to

9    get them directly from whoever he wants to ask for them.

10               MR. BENNETT:  Yes, sir.

11               THE COURT:  All right.

12               MR. BENNETT:  I all-capped in my chicken scratch in

13   my notes from yesterday that the defendant does not argue that

14   the data or the process for identifying class members is

15   flawed, only the timing.

16               For someone who has 20 pages of detail about how

17   these loans came to be in his brief, or his view of that, this

18   omission, the -- there's not even a theoretical, hey, the data

19   is flawed because some of it got wiped in 2018.  There's no

20   argument about it doesn't contain element A or element B or

21   element C.

22               Mr. Martorello knows, if you have to bring him back

23   to court here and put him under penalty of perjury, there is no

24   way Mr. Martorello could truthfully testify that he doesn't

25   know the data that is maintained by his company, now Big

1    Picture.

2            THE COURT:  Let me ask you this question, and I guess

3    it goes mostly to typicality.  Are the loan agreements that Big

4    Picture and Red Rock used as people get loans from Red Rock and

5    people get loans from Big Picture, are those agreements form

6    agreements?

7            MR. BENNETT:  Yes, sir.

8            THE COURT:  So you and I go the same day to Red Rock,

9    and we apply and get approved.  Your loan agreement is the same

10   as mine; is that right?

11           MR. BENNETT:  That is true.

12           THE COURT:  You go to Red Rock and you get yourself a

13   loan, and I go to Big Picture years later and I get myself a

14   loan.  Are those agreements the same?

15           MR. BENNETT:  Those are the same.  There was a

16   different agreement for Red Rock versus Big Picture.

17           THE COURT:  Then how can they be the same?

18           MR. BENNETT:  Those two agreements will be different,

19   not substantively or materially different for the purposes of

20   this cause of action.

21           THE COURT:  Just a minute.  So the agreements on the

22   Red Rock loans and the Big Picture loans are different.  Now,

23   the question is, what is the record about what is the

24   difference between the Red Rock loan documents and the Big

25   Picture loan documents, and that -- you said they are not

1    materially different.  How are they different?

2              MR. BENNETT:  They're different fonts.  They have

3    some different language, but they're not --

4              THE COURT:  Wait a minute.  Some different language

5    could be significant.  Language is significant.  You just said

6    to me there's some different language.  Different fonts doesn't

7    make any difference, but some different language could be a

8    difference.  Has anybody done an analysis of what the documents

9    are like and whether or not they are different in any

10   substantive way?

11             MR. BENNETT:  We did early in the case.

12   Respectfully, I didn't prepare for that today because it's

13   never been argued as a basis for challenging class

14   certification.  But, in fact, the defendant's argument is that

15   the business model for how Martorello tried to insulate himself

16   changed between Red Rock and Big Picture, because after the

17   regulators cracked down and Mr. Martorello was afraid of being

18   prosecuted, in his words, like a drug dealer, then he

19   restructured it into what the Court is now familiar with with

20   the Big Picture/Ascension model, but there's no argument that

21   the loan structures were any materially different or the

22   interest rates were materially different or otherwise.  So I

23   haven't prepared on that.

24             If the defendant wants to make that argument, we

25   would have to answer it, but the documents are not materially

1    different for the purposes of governance of the Virginia usury

2    statute and RICO.

3                    THE COURT:  All right.

4                    MR. BENNETT:  All of these, all of the arguments as

5    to predominance, like those before on some of the

6    ascertainability arguments, ignore -- by Mr. Martorello ignore

7    the fact that governance, whether he violated the statute, is a

8    binary question.  It's not a -- I said this before.  There's no

9    you must be 67 percent responsible before you are liable.

10                    These are joint and several claims, and he doesn't

11    have to receive all the money, most of the money, much of the

12    money.  He has to receive money.

13                    And so the question of whether or not he became less

14    culpable from a RICO enterprise from which he never withdrew,

15    never made an effort to withdraw, whether he became less

16    culpable does not matter.  It does not matter on class

17    certification, will not matter to the jury.  He was a

18    participant, he created, operated, and managed the scheme, the

19    enterprise.  He did it to the end, and --

20                    THE COURT:  What do you mean the end?  When's the

21    end?

22                    MR. BENNETT:  Certainly did it to 2019 which is the

23    end of the purported class period that we're alleging, and that

24    was really the breakaway between Big Picture and Eventide

25    finally.  So those questions, and we've answered these

```
1    significantly in our papers, the question of whether or not Mr.
2    Martorello participated in the enterprise and the question for
3    the usury claim of whether or not he received payment, that's a
4    common question.  It's not a consumer-by-consumer question.
5    It's not going to change even -- we've used proposed subclasses
6    with Red Rock and --
7              THE COURT:  It won't change between Big Picture and
8    Red Rock.
9              MR. BENNETT:  It will not change at all.
10             THE COURT:  Why is there a subclass then?  Why don't
11   we just have the one class?
12             MR. BENNETT:  Because we want belt and suspenders to
13   make sure --
14             THE COURT:  Let me tell you about belts and
15   suspenders.  I hate them.  The Court of Appeals hates them.
16   Pick a belt or pick a suspender.  Because it's the way out of
17   facing an argument that's made, and you say, oh, we solved the
18   problem by changing the class, and it becomes a pattern, a
19   pattern that is sufficient to make you a RICO participant if
20   RICO applied to the filing of papers in this court, and I'm
21   tired of it.
22             I want to know one question.  I want the answer to
23   one question.  If I don't separate these things into these
24   separate classes, is it still a viable class if you keep them
25   together because your charge is Big Picture is Red Rock with a
```

1    new dress on.  That's a whole case that you make.  So why do I

2    change one for the other?

3             MR. BENNETT:  You do not need to.  In fact, again,

4    the Court heard the evidence the jury will hear, but at the

5    misrepresentation hearing, the Court will recall the original

6    declarations and testimony of Mr. Martorello prior to the

7    hearing, unchallenged then declaration, was that there was this

8    discrete cutoff time period where he, for reasons unrelated to

9    regulatory pressure, just decided he was going to create a

10   whole new entity.

11            At the hearing, we were, I think, effective in

12   showing the Court what we will show the jury.  That is, it was

13   one long, seamless enterprise by Mr. Martorello without any

14   abrupt changes, just tinkering and adjusting the same course as

15   he went through from Red Rock to Big Picture.  The evidence has

16   shown that.  There's no evidence to the contrary that hasn't

17   been fabricated or that has not been --

18            THE COURT:  What does that mean?  Are you saying that

19   any evidence that shows otherwise is fabricated?  What does

20   that mean?

21            MR. BENNETT:  I'm trying to come up with a word that

22   is more cordial or less confrontational than fabricated, but I

23   can't come up with one.  A declaration that says I created this

24   business model in two separate stages is a false statement that

25   was manufactured for the litigation.  That is what the

1    declaration of Mr. Martorello that has been rejected properly

2    by this Court held.

3            THE COURT:  All right.  That's what he said.

4            MR. BENNETT:  That's what he said.  So answering Your

5    Honor's question, I am unaware of any evidence that would make

6    a material distinction between Red Rock and Big Picture.

7            THE COURT:  But you want me to have a separate

8    subclass.

9            MR. BENNETT:  Well, when you -- as me, when you lost

10   a class certification -- had class certification reversed as I

11   did in my *Soutter* decision, my *Soutter* case, you become a

12   little more gun shy and hedging your bets a little bit because

13   you don't know what a Court of Appeals panel might -- how they

14   might see it differently.

15           But I'm unaware of any factual material facts that

16   would change the cause of action between or require individual

17   mini trials between Red Rock and Big Picture.  But we propose

18   subclasses because it was simple and clean and rational to

19   address this argument that is being made that Mr. Martorello

20   changed his way of doing business between those two business

21   names.

22           THE COURT:  Well, why would it address that?  Why

23   would that even be the issue, because you say that it doesn't

24   make any difference if he changed it, but -- he was part of the

25   enterprise for RICO if he received the money, any part of it,

**JA1522**

1   then he's liable for the usury and the unjust enrichment.  So

2   what difference does it make what suit he had on when he was

3   receiving it and when he was doing what he was doing?

4             MR. BENNETT:  Again, I don't believe it makes a

5   difference, but I'm not sitting on a panel.  The argument that

6   we're making --

7             THE COURT:  You can't try cases in anticipation of

8   something that will happen on the basis of a case you lost

9   seven years ago when the reason you lost it is because somebody

10  made a misrepresentation that you didn't catch.  That's what

11  happened in the *Soutter* case; right?

12            MR. BENNETT:  That is what happened.

13            THE COURT:  They ultimately had to come back and

14  admit they made a misrepresentation.  You need to get some

15  blinders, to use a horse-racing analogy, and keep your eye on

16  the ball and not be thinking about what's coming off the side

17  of the rebound from a case eight, ten years ago, because it

18  makes my job harder.  Otherwise, I wouldn't care, but --

19            MR. BENNETT:  Well, I do think the presentation to a

20  jury, notwithstanding for purposes of class certification it is

21  not a material fact or an individualized, important

22  individualized fact, but I do think the presentation to a jury

23  logically will say here is what Mr. Martorello did under the

24  brand name Red Rock, and here is how he tried to restructure

25  his Red Rock business into this Big Picture label.

```
1            We'll have to tell that to the jury.  We'll have to
2   explain it.  So for the Court to set a subclass, particularly
3   since class members who receive notice, some of them will have
4   signed a loan that says Red Rock, and some will have signed a
5   loan that says Big Picture, and so the notice --
6            THE COURT:  Those are valid reasons for a separate
7   class, because the contract documents are with different
8   people, and the people who are going to be making claims need
9   to know that, and the people who are deciding the case need to
10  know what the evidence is.  It pertains to different entities
11  in somewhat different ways.
12           That has to do with another factor, not
13  ascertainability.  It has to do with manageability and
14  superiority, but those are legitimate reasons for changing --
15  for having the class split up.  Just to avoid a problem is not
16  a good reason.
17           Do we know for this unjust enrichment class, does it
18  matter if some of the class members didn't actually pay back
19  more money to the tribes than they got?
20           MR. BENNETT:  For the unjust enrichment count, it
21  does not matter, because under the law, Mr. Martorello should
22  not have received any payments on those loans.
23           THE COURT:  All right.  Do we know how many of the
24  class members did not pay back an amount equal to their
25  principal?
```

1          MR. BENNETT:  We can determine that.  We do not have
2     that for Your Honor until we have all of the class data in our
3     own possession.
4          THE COURT:  Did the people who did not pay back an
5     amount equal to their principal, were they injured?
6          MR. BENNETT:  Yes, sir.  They were transacted to a
7     loan that was illegal, and under Virginia's usury statute, it's
8     entirely voidable.  They don't owe any money.  Now, the
9     question is some moral question of who deserves benefit, but
10    that's -- the legal question is clean.  The legal question is
11    they all are injured because they all paid money the law does
12    not require them to pay, and it was retained and kept by Mr.
13    Martorello who the law would not allow to keep the money.
14          There was a really good decision cited from the Tenth
15    Circuit, 2018 decision, in our papers on unjust enrichment
16    argument, *Menocal*, M-e-n-o-c-a-l, 882 F.3d 905, that said these
17    arguments about an individualized question for unjust
18    enrichment don't apply in circumstances like in that case, and
19    certainly like here, where the theory of why it's unjust is
20    shared between class members.
21          That is, when you have an individualized group of
22    people, some of whom might have had rights violated and others
23    might not have, then that might matter, but in circumstances
24    where there's a single argument as to why all class members
25    were unjustly forced to pay this money and that money was paid

1    to and enriched Mr. Martorello, that is a shared theory that

2    the jury will consider, and there is no individualized question

3    there.

4        By the way, consistent with the manner of argument

5    throughout the defendant's motion, there's no analogy, example,

6    or fleshing out of what this means.  You can't just cite a case

7    that says some court in Ohio said unjust enrichment is an

8    individualized question why.  And "why" here would there be

9    individualized facts.

10        We make the argument against this shell that there is

11    no individualized question.  It's a shared question of the

12    legality of the loan, but, you know, I don't know how I -- I

13    can't answer a straw man that's an invisible man.

14        THE COURT:  What does that mean?

15        MR. BENNETT:  Meaning there's no argument as to what

16    is individualized about the unjust enrichment facts or theory

17    here.  You can't just say -- I mean, I don't believe the

18    defendant could credibly argue that there's a per se rule

19    against certifying an unjust enrichment count.  Some courts

20    found it's individualized.  Some courts found it's common, and

21    that depends on the facts like in every issue.

22        Here, we've outlined why these are shared.  Legality

23    is a shared question.  The defendant hasn't offered an

24    individualized alternative to that.  There are other arguments

25    which we briefed in the paper on predominance, and I would

**JA1526**

1   argue them, but if the Court is past them, then I would answer
2   the Court's questions about them.
3              THE COURT:  You make your argument.  How much more do
4   you have to go?
5              MR. BENNETT:  On predominance --
6              THE COURT:  On whatever you've got.  We've been in
7   here an hour and a half, and it's not a bad time to take a
8   break.
9              MR. BENNETT:  I have about 20 more minutes, Judge.
10             THE COURT:  Let's take a break, 20-minute recess.
11             (Recess taken.)
12             THE COURT:  All right, Mr. Bennett.
13             MR. BENNETT:  Judge, finishing up the Rule 23(b)(3)
14  argument, the defendant also asserts as a predominance
15  challenge that because Mr. Martorello's role changed, his
16  participation as a conspirator might be different between
17  years, but, again, this ignores the elements and the binary
18  question of whether he was a participant.  Liability is joint
19  and several.  That's never been challenged.  It can't be.
20             If Mr. Martorello is the third most important person
21  in the enterprise, he has the same liability as if he's the
22  sixth most important.  Of course, here, the allegation and what
23  we think the jury will ultimately find is he's the number one
24  most important person.  But Mr. Martorello's role, once he is a
25  participant in the RICO enterprise and so conspires, is not an

1  element of degree.

2      The *U.S. v. Mouzone*, M-o-u-z-o-n-e, Fourth Circuit

3  decision, 687 F.3d 207, and the language at 218 just requires a

4  slight connection, and the slight connection is satisfied if

5  the defendant, in this case Mr. Martorello, had knowledge of

6  the essential nature of the plan.  Certainly he did.  He can't

7  contend otherwise.  He hasn't contended that he did not have

8  knowledge of the essential plan.

9      Now, Mr. Martorello suggests that as time went on,

10  his role changed.  Maybe he wasn't -- he didn't get his hands

11  dirty quite as much, but what he's really saying, and they

12  don't know how to argue this, is that he had withdrawn from the

13  conspiracy.  That is at some point in time he was no longer

14  part of the enterprise.  The criminal enterprise goes on for

15  ten years, and somebody is involved at year one, they can

16  withdraw so they're not liable year ten.

17      But the question is whether he's withdrawn, and the

18  established case law, *U.S. v. Cornell*, 780 F.3d 616, for

19  example, is that he has to make an affirmative declared

20  statement or effort of withdrawal.

21      THE COURT:  Is there any proffer in the record about

22  there being such a thing?

23      MR. BENNETT:  There is not.  For the class period

24  through 2019, all the evidence says the contrary.  In fact, he

25  continued -- in the arbitration in 2020, he's demanding payment

1    for class member loans from the enterprise itself.

2            THE COURT:  This is a different question, but the

3    waiver argument being made says that he is, Martorello is a

4    related person within the meaning of the document that gives

5    him the protection of the waiver clauses of which there are

6    many.  Do you agree he's a related person?

7            MR. BENNETT:  No, sir.

8            THE COURT:  Why not?  I don't understand either one

9    of you.  If I were they, I wouldn't be arguing he's a related

10   person because it throws him right under the bus of the

11   enterprise, and if I were you, I would be arguing he was for

12   the same reason.  I don't understand your position.

13           MR. BENNETT:  Because these -- because related person

14   is not -- does not mean he's connected in some fashion with the

15   entity.  It's a specific category of a relationship, a legal

16   relationship shared by ownership and shared by supervision.

17           THE COURT:  No.  It includes a servicer among other

18   things.  It depends on where you read -- these documents look

19   to me like that somebody started -- used a base document and

20   then stuck in isolated phrases as cases came along or notions

21   came along so that they kind of form this whole concept of what

22   is being referred to as the waiver under really choice of law

23   and lots of other things, but in one place they define why he's

24   protected as a servicer, and you say he's a servicer, the

25   head of the -- he was the servicer.  So I don't understand.

1           MR. BENNETT:  Well, we don't contend he's the

2   servicer.  We contend he is the mastermind that controlled Big

3   Picture.  He's not the agent of Big Picture.  Big Picture might

4   be the agent of it, of Eventide, but it certainly was never the

5   servicer.

6           Our contention is to the contrary.  The language that

7   Mr. Martorello would try to grasp onto is a lawsuit filed

8   against us and/or any related third party, and then the

9   question, and we analyze this I think effectively, is whether

10  he is a related third party, and he contends that he's not any

11  of these things.

12          THE COURT:  What does that contract say the related

13  third party is?

14          MR. BENNETT:  It includes Big Picture employees, he's

15  not; agents, he's not; director, officer, shareholder,

16  governor, manager, member, parent company, or affiliated

17  entity.

18          THE COURT:  What paragraph are you reading from?

19          MR. BENNETT:  In the brief, I'm at page 12.

20          THE COURT:  I'm talking about the document.  I got

21  number 1055-1 in front of me.

22          MR. BENNETT:  Page 12 of that document.

23          THE COURT:  They don't have any page 12.

24          MR. BENNETT:  PACER 13 --

25          THE COURT:  What paragraph number?

1          MR. BENNETT:  I'm sorry, of the contract?

2          THE COURT:  Yeah.

3          MR. BENNETT:  Paragraph five.

4          THE COURT:  Where it just says related third parties.

5    It doesn't define them.  Where does it define them; somewhere

6    else?

7          MR. BENNETT:  It continues after that.

8          THE COURT:  No, it doesn't.  I'm reading ECF 1055-1

9    which is captioned -- it's Exhibit 1 to 1055, and it's

10   captioned Consumer Installment Loan Agreement.  The first page

11   of it is consent to electronic communications.  Then it's

12   consumer installment loan agreements, scroll down and read

13   through it says.

14         So as I read through it -- this is a document we're

15   talking about here; right?

16         MR. BENNETT:  It is.  1055-1.

17         THE COURT:  In paragraph (g) it says -- just a

18   minute.  I need to get my magnifying glass here.  Paragraph

19   1(g), For purposes of this waiver of jury trial provision and

20   tribal dispute resolution procedure provision above, the words

21   "dispute" and "disputes" are given the broadest possible

22   meaning and include, without limitation, and then (g) is, all

23   claims asserted -- no, that's not what I'm looking for.

24         Oh, they then say, all claims asserted by you

25   individually -- that's (h) -- against us and any of our

1    employees, agents, directors, officers, shareholders,

2    governors, managers, members, parent company, or affiliated

3    entities (hereinafter collectively referred to as related third

4    parties).  That's where I see a definition of related third

5    parties --

6              MR. BENNETT:  That's it, Judge.

7              THE COURT:  There's -- the paragraph you were talking

8    about, paragraph five, says these procedures are binding upon

9    and benefit you, your respective heir, etcetera.  And then it

10   says or binding upon and benefit us, our successors, assigns,

11   and related third parties.  It doesn't define them.  Is the

12   only definition of related third parties that which appears in

13   paragraph 1(h)?

14             MR. BENNETT:  Yes, sir.  It's clearly a definition.

15   It's collectively referred to as, quote, related third parties.

16             THE COURT:  Where does the servicer come in, because

17   I read one language that had the servicer.  This is

18   remarkably -- yeah, okay.  Thank you.  All claims (a) --

19   without limitation, (a) all claims, disputes, or controversy

20   involving the parties to this agreement, our employees,

21   servicers, and agents, including but not limited to

22   consultants, banks, payment processors, software providers,

23   data providers, and credit bureaus.  That's where it has

24   servicers.

25             MR. BENNETT:  Yes, sir.  But Mr. Martorello's --

```
 1   nobody's contending he's a servicer.  He said he's not, nor is
 2   Eventide a servicer --
 3              THE COURT:  Ascension is the servicer.
 4              MR. BENNETT:  And Bellicose, it contends, was the
 5   servicer.  We say, no, it was never the servicer.  It was the
 6   lender, but nobody has ever contended that Mr. Martorello was
 7   the servicer.  Neither side.
 8              THE COURT:  All right, go ahead.
 9              MR. BENNETT:  He certainly doesn't fit any of those
10   definitions of related third parties.  Given he wrote these
11   documents, might have a claim against his lawyers that wrote
12   it, but the documents, to be construed against or --
13              THE COURT:  We'll do that when we get into the waiver
14   issue.  That's their issue.
15              MR. BENNETT:  Yes, sir.
16              THE COURT:  What else?  Do I have to decide the
17   waiver issue now?  Can I put it off until later?
18              MR. BENNETT:  I do think that it's -- it will be a
19   jury question.  You would put it off until later.
20              THE COURT:  Why are they raising it now?  Why do I
21   have to decide it now?  It seems to me they want me to hold
22   that there's a waiver and, therefore, they haven't moved for
23   arbitration.  It's all bound up in the jury trial language and
24   waivers of class actions, etcetera.
25              MR. BENNETT:  I think you have to decide it
```

JA1533

```
1   rationally.  It's not an element of Rule 23 except that the
2   plaintiffs -- what the defendant is really saying is that the
3   plaintiffs are not allowed to move for class certification and
4   serve as representative parties.
5              THE COURT:  That's the issue.
6              MR. BENNETT:  That's the issue.
7              THE COURT:  So I have to decide that now.
8              MR. BENNETT:  Yes, sir.  Not under Rule 23 but a
9   contract defense.
10             THE COURT:  Why do I decide it at class certification
11  stage?  Because they're not eligible to be class plaintiffs,
12  and so there can be no class.
13             MR. BENNETT:  Yes, sir.
14             THE COURT:  That's what I have to decide; right?
15             MR. BENNETT:  Yes, sir.
16             THE COURT:  Do you want to argue that now?
17             MR. BENNETT:  Yes, sir.
18             THE COURT:  What about it?
19             MR. BENNETT:  So I cannot do our papers justice, so
20  I'll try to stay largely out of the way except to emphasize the
21  overview of the points that were made before.  The first thing,
22  though, I would note is that --
23             THE COURT:  Analytically where does it fit?  Let's
24  start with that.
25             MR. BENNETT:  Really, if I were a defendant and
```

**JA1534**

1    wanted to make that argument and wanted to fit into a Rule 23

2    motion, I would make it as to adequacy or typicality.  I would

3    say that these plaintiffs are inadequate because they can't

4    serve as class representatives because they're contractually

5    bound not to pursue class --

6              THE COURT:  How was it raised in *Gibbs*, the two *Gibbs*

7    cases in the Fourth Circuit -- what's the other case?

8              MR. BENNETT:  In each of these.

9              THE COURT:  How was it raised?

10             MR. BENNETT:  It was raised in a Rule 12 posture in

11   the beginning, the way you would challenge with arbitration.

12             THE COURT:  Some of it was referring to it goes to

13   arbitration, but that's not what we have in this case.

14             MR. BENNETT:  Yes, sir, you're right, but it was like

15   filing a motion to strike the complaint as opposed to --

16             THE COURT:  What kind of motion to strike a

17   complaint -- what rule does that come under?  Because it's got

18   scandalous material in it, or are you talking about a

19   Rule 12(b)(6) motion?

20             MR. BENNETT:  It would be a Rule 12(b)(6) motion or

21   jurisdictional motion.  They all argue different things, but

22   they're all Rule 12 motions.

23             THE COURT:  How do they argue it here?  How does it

24   come up here?

25             MR. BENNETT:  It's come up as just a paragraph within

**JA1535**

1    their opposition to class certification.  There's no posture,

2    there's no rule.  Really what they're doing is seeking to

3    enforce a contract term.

4            THE COURT:  What page are we talking about here?

5    I've gotten it marked all over the place.

6            MR. BENNETT:  It begins at --

7            THE COURT:  On page one --

8            MR. BENNETT:  I have page two under preliminary

9    argument at docket number 10007 A, Plaintiffs Waive the Ability

10   to Pursue a Class Action.

11           THE COURT:  Wait a minute, what page?

12           MR. BENNETT:  Page two of the defense memo.

13           THE COURT:  All right.  And so where does it fit,

14   though?  I can't understand from them where it fits in the

15   analysis.  It's as if whoever wrote these briefs never had a

16   class in class actions or believes that they can just structure

17   class actions analyses any way they want to as opposed to

18   paying attention to the way the Fourth Circuit did it.  That's

19   why I asked him if he wanted to drop this nonsense and tell me

20   something that made sense.

21           Do you read this to apply?  We have page two of that

22   document -- what did you say the number is?  1007.  Is that

23   right, 10007, or is it 10 --

24           MR. BENNETT:  1007.

25           THE COURT:  Then it says it -- they apply to

```
 1   Martorello, and that's got the third-party language that we
 2   were talking about.  Then they're valid and enforceable is the
 3   next thing, and they're reasonable and not unconscionable, the
 4   next thing.  Do not affect substantive rights is the next
 5   thing.  RICO is compatible with enforcement of class waivers.
 6   Next one, the class action waivers are part of a valid
 7   enforceable loan agreement, and it goes on to page -- and that
 8   ends it, page 11.  So it's page two to 11, but where does it
 9   fit in the class action analytical structure?
10            MR. BENNETT:  Well, if I were a defendant, I would
11   argue differently than here, either a Rule 12 motion or a
12   motion for summary judgment, or, if you want to fit it within a
13   Rule 23 motion, maybe they could argue adequacy, that there was
14   some defect in the rights of these plaintiffs to pursue a class
15   on behalf of others.
16            THE COURT:  Is it discussed anywhere else in the
17   brief that I've missed?
18            MR. BENNETT:  No, sir.
19            THE COURT:  I'll let them deal with it then, tell me
20   what to do.  Are you through, or anything else?
21            MR. BENNETT:  I'm through if you want me to respond
22   to the class waiver argument after they make it.
23            THE COURT:  After they make it, yeah.
24            MR. BENNETT:  Yes, sir, that's fine.
25            THE COURT:  Okay, let's hear from the defendant.  Mr.
```

1   Grosswendt, does Mr. Martorello now have a Virginia lawyer

2   here, a Richmond law firm involved in the case?  He's with your

3   firm, Mr. Taliaferro?

4              MR. GROSSWENDT:  That's correct.

5              THE COURT:  I'm not asking that.  Do you have a

6   Richmond law firm?

7              MR. GROSSWENDT:  We do not have a Richmond law firm.

8              THE COURT:  At all.

9              MR. GROSSWENDT:  At all.

10             THE COURT:  I'm going to suggest to you that if

11  you're going to stay in the case, it's probably not a bad idea

12  to get somebody, because I'm not quite sure you all know

13  exactly how things proceed here, and Mr. Taliaferro is from

14  Washington and he's admitted to practice so he qualifies, and

15  there isn't any requirement that you have a person with an

16  office in Richmond to do it, but it's been my experience that

17  maybe you would be better off if you had somebody in a case of

18  this complexity.  And, after all, you're adopting somebody

19  else's pleadings.  I think they were signed off on by local

20  counsel, but I'm not sure.

21             So, anyway, let's take the class waiver.  What are

22  you doing there?  On your paper number 1007, your opposition,

23  and from pages two to 11, you talk about waive the ability to

24  pursue a class action.  Where in the class action analytical

25  calculus does that fall so I can know where to put it, because

1    it isn't put that way in this brief.

2        MR. GROSSWENDT:  Yes, Your Honor.  So you are correct

3    that it's not put that way in the brief.  I think that if we

4    were to put it in the class action calculus under Rule 23 --

5        THE COURT:  It has to be there.  It has to be

6    somewhere under the Federal Rules, or are you bringing a

7    hidden, a stealth motion to dismiss under Rule 12(b)(6) or

8    something as part of this paper here?  What is this?

9        MR. GROSSWENDT:  We are not bringing a stealth

10   12(b)(6) motion.  I think this would fit either under Rule 23

11   under the adequacy of the representatives to pursue a class

12   action as well as under 23(b)(2), the superiority of class

13   action proceedings given that it's been contracted away.

14       THE COURT:  All right, now, argue it in those --

15   that's the ones that now you are bound to.  So when I write the

16   opinion, I know have it structured.  I know where to put it.

17   Is that right?

18       MR. GROSSWENDT:  Yes, Your Honor.

19       THE COURT:  Now argue it.  What does this class

20   action waiver have to do with adequacy?  Adequacy of who?

21   There's two people, one is plaintiff, one is counsel.

22       MR. GROSSWENDT:  Yes.  Of the plaintiffs.  They're

23   inadequate to serve as representatives of the class given that

24   they have contracted away their right to pursue class actions.

25   So on this point, the loan agreements do not prospectively

1    waive federal law as the plaintiffs have alleged.  The

2    prospective waiver only applies -- the prospective waiver

3    doctrine more generally only applies in the context of

4    arbitration agreements and not tribal forum selection clauses.

5              THE COURT:  What case holds that?

6              MR. GROSSWENDT:  So in the *American Express* case, you

7    have -- the majority opinion has Justice Scalia referring to

8    the limited judge-made exception to the FAA of the prospective

9    waiver doctrine.

10             THE COURT:  Is there a case that holds that the

11   prospective waiver doctrine applies only to waivers of the

12   right to arbitration?  That's what you're saying; right?

13             MR. GROSSWENDT:  Yes, Your Honor.

14             THE COURT:  Is there a case that holds that?

15             MR. GROSSWENDT:  There is not a case holding that,

16   but every case I have seen is in the arbitration context, and

17   that's -- there's a reason for that given the underlying

18   rationales of the prospective waiver doctrine.  It seems

19   like -- if you look at both the majority in the *American*

20   *Express* case and in the dissent, the unanimous opinion of the

21   Supreme Court is that this operates in the context of

22   arbitration agreements and the parties' right to effectively

23   vindicate their claims under federal law, and those concerns

24   just are not present in a tribal forum selection clause as it

25   is here.

1          THE COURT:  But no case has held that.

2          MR. GROSSWENDT:  No case has expressly held that, but

3     in every single case cited by plaintiffs regarding prospective

4     waiver and every single case that we cite, it's in the

5     arbitration context.  I'm not aware of cases applying the

6     prospective waiver doctrine in the tribal context or any other

7     forum selection context outside of arbitration.

8          So stepping back to validity of the class action

9     waivers and walking through why the prospective waiver doctrine

10    does not apply, in the loan agreement that Your Honor

11    referenced, docket number 1055 --

12         THE COURT:  Assuming it applies to the tribal forum

13    selection and jury waiver here, you're going to argue why it

14    really doesn't apply because of the text of your agreement; is

15    that right?

16         MR. GROSSWENDT:  Yes, Your Honor.

17         THE COURT:  A, you have an argument that the doctrine

18    itself doesn't apply except in arbitration; B, you are now

19    making the argument that assuming for the purposes of the

20    argument that it applies, the doctrine of prospective waiver

21    applies to this contract, here's why this contract isn't

22    subject to the doctrine; is that what you are doing now?

23         MR. GROSSWENDT:  That's correct.  I'm going to that

24    now.

25         THE COURT:  This is all part of adequacy.

**JA1541**

```
1              MR. GROSSWENDT:  Yes, Your Honor, as well as the
2    superiority of class.
3              THE COURT:  Let's talk about the superiority later.
4    We're talking about adequacy now, and that's a different
5    proposition.  That's because you can't -- we can't have a class
6    certification here because you're not an adequate plaintiff
7    because you have foregone your right to be a class plaintiff;
8    right?
9              MR. GROSSWENDT:  Yes, Your Honor.
10             THE COURT:  Let's talk about that.
11             MR. GROSSWENDT:  As I mentioned -- so in plaintiffs'
12   reply attempting to distinguish -- sorry.  Stepping back, Your
13   Honor.
14             THE COURT:  First let's take the contract.  What part
15   of the contract renders it not applicable assuming now the
16   doctrine applies?
17             MR. GROSSWENDT:  Assuming the doctrine applies, Your
18   Honor, it's the -- this is on ECF -- so it's at page five of
19   seven at the bottom of the page, the governing law and forum
20   selection provision.
21             THE COURT:  Just a minute.  I need to get there.
22   We're in ECF 1055-1, paragraph what?
23             MR. GROSSWENDT:  Paragraph governing law and forum
24   selection.  It is not numbered.
25             THE COURT:  And it says the agreement will be
```

JA1542

1   governed by the laws of the Lac Vieux Desert Band of Lake

2   Superior Chippewa Indians (tribal law), including but not

3   limited to the Code, which is short form, but it's for the

4   regulatory code; right?

5           MR. GROSSWENDT:  That's correct.  And the definition

6   of tribal law --

7           THE COURT:  Wait a minute.  As well as applicable

8   federal law.

9           MR. GROSSWENDT:  Yes, Your Honor.

10          THE COURT:  And then, all disputes shall be solely

11  and exclusively resolved pursuant to the tribal dispute

12  resolution procedure set forth in Section 9 of the code and

13  summarized below for your convenience.

14          MR. GROSSWENDT:  That's correct.

15          THE COURT:  Tribal dispute resolution procedure

16  appears two headings down under the heading tribal dispute

17  resolution procedure on the next page.  Is that it?

18          MR. GROSSWENDT:  That's correct.

19          THE COURT:  All right.

20          MR. GROSSWENDT:  As we just went over in the

21  contract, the loan agreement expressly includes application of

22  both LVD code and applicable federal law as it defines -- when

23  it uses the defined term tribal law in the governing law

24  section, and under the prospective waiver doctrine, a party has

25  to waive their -- waive the application of federal law in order

1    for there to be prospective waiver, and so that they cannot

2    effectively vindicate their federal statutory rights.

3         So, here, plaintiffs claim that the second sentence

4    of the governing law and forum selection provision takes away

5    from the governing -- takes away from the first sentence, and

6    that's just -- that's a misleading reading of the governing law

7    and forum selection provision.

8         As the argument -- or as the provision says, it's

9    covering two things, what law governs and what forum is

10   correct.  And so by first saying that LVD code and federal law

11   applies, saying it has to then -- the forum has to be the

12   tribal dispute resolution procedures doesn't take anything away

13   from which law applies.

14        The tribal entities agreeing to submit to suit via

15   the TDRP, which is first the informal dispute resolution, the

16   formal dispute resolution, and then being able to appeal to

17   tribal court doesn't change that they agreed to be subject to

18   federal law, and this argument relies entirely on reading out

19   the meaning of a defined term in the contract.

20        THE COURT:  What's a defined term that's read out?

21        MR. GROSSWENDT:  The defined term is that tribal law

22   in the governing law provision -- so the first sentence in

23   governing law and forum selection, tribal law is defined to

24   include both the tribal as well as applicable federal law.  So

25   to say that federal law --

```
1              THE COURT:  Where does it do that?
2              MR. GROSSWENDT:  It says that where it says this
3    agreement will be governed by the law of the Lac Vieux Desert
4    Bank of Lake Superior Chippewa Indians tribal law including,
5    but not limited to, the code as well as applicable federal law.
6              THE COURT:  Why is that a defined term?
7              MR. GROSSWENDT:  Because it places it in quotes, Your
8    Honor, as tribal law --
9              THE COURT:  That doesn't make it a defined term.
10   What you've got here is it waives tribal law including, but not
11   limited to, the code.  And then there should be, in the
12   ordinary scheme of things, a comma there, but there isn't, but
13   the meaning of the phrase "as well as" connotes an addition,
14   not an inclusion.  So it's -- to the code, and the code is a
15   defined term.
16             MR. GROSSWENDT:  Yes, Your Honor.
17             THE COURT:  The definition of the code itself, where
18   is the definition of the code?
19             MR. GROSSWENDT:  The definition of the code is --  I
20   have to find that.  I don't know offhand.
21             THE COURT:  But then as well as applicable federal
22   law.  Now, how do we know what is applicable federal law?
23             MR. GROSSWENDT:  So, Your Honor, several of the
24   cases, I think -- I'll find in my notes, but several of the
25   cases say that the limitation applicable federal law is really
```

```
 1   a relatively meaningless distinction versus federal law that
 2   applies.  It just means federal law, in essence, and here --
 3              THE COURT:  That's not giving every word of a
 4   contract reasonable meaning.  It's applicable federal law is
 5   what it says, so given the language that you all have
 6   constructed here in this agreement, it seems to me we have to
 7   know what applicable federal law might be, and -- I haven't
 8   been able to find out anything that teaches me what the term
 9   applicable federal law is.
10              MR. GROSSWENDT:  So, Your Honor, another Eastern
11   District of Virginia decision addressed this, and the Court
12   there canvassed it and said it could find nothing in the case
13   law that says what applicable federal law --
14              THE COURT:  What case are you talking about?
15              MR. GROSSWENDT:  I believe that that is -- I will
16   confirm, but I believe it's the *Gibbs v. Stinson* case.  It may
17   also be another one.  So, Your Honor, it is in the *Gibbs v.*
18   *Stinson* case.
19              THE COURT:  Where is Section 9 of the code?
20              MR. GROSSWENDT:  Section 9 of the code is in document
21   958-1.  Then it begins on page 26.
22              THE COURT:  Section 9, resolving borrower disputes;
23   is that what we're talking about?
24              MR. GROSSWENDT:  Yes, Your Honor.  And, Your Honor --
25              THE COURT:  Page 27 of the document I have, but the
```

JA1546

 1    document I have actually isn't numbered.

 2          MR. GROSSWENDT:  So, Your Honor, so you have it, the

 3    reference about applicable federal law that I was talking about

 4    is in the *Gibbs v. Stinson* case at footnote 56 where the Court

 5    wrote that federal courts' usage of the term applicable federal

 6    law bolsters the conclusion that applicable federal law simply

 7    refers to federal law having direct relevance to the issue at

 8    hand and that courts employ the phrase as a modifier to narrow

 9    the annals of U.S. Codes of the federal law having direct

10    relevance to the situation at hand --

11          THE COURT:  Slow down.

12          MR. GROSSWENDT:  Apologies, Your Honor.  It says that

13    it applies to the federal law --

14          THE COURT:  *Gibbs*, which one?

15          MR. GROSSWENDT:  *Gibbs v. Stinson*, Your Honor, and

16    it's discussed at footnote 56.

17          THE COURT:  What page?

18          MR. GROSSWENDT:  Page 57.

19          THE COURT:  All right.

20          MR. GROSSWENDT:  This is when the Court was

21    discussing why the prospective waiver doctrine did not apply to

22    the Mobiloans contract there.  That included governing law

23    designating both the law of the tribe at issue there as well as

24    applicable federal law to govern the loan agreement at issue,

25    and that was where the Court held that there was no prospective

```
 1    waiver.
 2              And I think that actually the Gibbs v. Stinson case
 3    is illustrative of why there is no prospective waiver here.  In
 4    Gibbs v. Stinson, the Court considered several different loan
 5    agreements and came to different conclusions under the
 6    prospective waiver doctrine based on the language of those
 7    agreements.
 8              As I just mentioned, the Mobiloans agreement, the
 9    Court held there was no prospective waiver of applying federal
10    law because the actual text of the agreement at issue stated
11    that the consumer agreed that any dispute would be resolved by
12    arbitration in accordance with tribal law and applicable
13    federal law, and that, as we just went over, is identical -- is
14    almost identical --
15              THE COURT:  Are you saying that's what Stinson held?
16              MR. GROSSWENDT:  Yes, Your Honor, in the context of
17    the Mobiloans decision.  It went on to differentiate that from
18    finding there prospective waiver with respect to the Great
19    Plains and Plain Green agreements at issue, but those were
20    meaningfully different than what we're dealing with in our
21    case.
22              So in the Gibbs v. Stinson Mobiloans section, the
23    Court, as I just said, agreed that the parties would proceed to
24    arbitrate under applicable -- under tribal law and applicable
25    federal law.
```

72

1              THE COURT:  Tell me something.  What does Section 9

2      of the code have to say about tribal law -- I mean about

3      applicable federal law and what law that's going to be applied

4      in the hearing that's specified in Section 9?

5              MR. GROSSWENDT:  So under Section 9, the authority

6      has broad -- the tribal dispute resolution authority has broad

7      discretion, but it's looking to violations of the code, and the

8      code itself --

9              THE COURT:  What code?

10             MR. GROSSWENDT:  The LVD code, the tribal code, the

11     document as a whole.  I'm referring to the Tribal Consumer

12     Financial Services regulatory code.

13             THE COURT:  But I'm asking you what part of that

14     code, including -- I mean Section 9 of that code, which is

15     referred to in the text of the agreement you are referring to,

16     specifies what federal law or any law applies to the resolution

17     of claims.

18             MR. GROSSWENDT:  Yes, Your Honor.  So it doesn't --

19     in that section, it doesn't expressly say one way or another

20     what law applies, but you have to look at the entirety of the

21     contract for this --

22             THE COURT:  Entirety of which contract?

23             MR. GROSSWENDT:  Sorry, of the code.  The code in

24     Section 6.1 requires licensees to, at all times, comply with

25     provisions of this code, rules and regulations promulgated

**JA1549**

1    pursuant to this code, and all other applicable and tribal laws
2    as applicable.
3          So this is where federal law applies to the code as a
4    whole.  It goes on then to give a non-exhaustive list of
5    federal consumer protection laws that a licensee shall comply
6    with, and these are -- anticipating, perhaps, rebuttal on this,
7    RICO is not included in the list of federal consumer protection
8    laws, but that doesn't -- that does not mean that there is
9    prospective waiver of RICO claims because of 6.1 and 6.2.  6.1
10   clearly says you have to comply with all federal law, and so a
11   non-exhaustive list does not exclude RICO.
12         And, again, this is also different from the *Gibbs v.*
13   *Haynes* case as well as the *Gibbs v. Sequoia* case in which the
14   Court said that the absence of RICO in the listed statutes
15   closed off the right to receive that because that was in the
16   arbitration context whereas here, there's no -- there's no
17   waiver of a borrower's RICO claims because unlike an
18   arbitration, if a borrower goes through the tribal forum
19   process, it brings an informal dispute.  If they're not
20   satisfied with that, they bring a formal dispute, and then if
21   not satisfied with that, they bring an appeal to the tribal
22   court at which point there's been no waiver because they can
23   still, having exhausted their tribal remedies, bring a claim in
24   federal court at that point.
25         Unlike arbitration which if you couldn't bring a RICO

74

1   claim, you couldn't bring it anywhere, here, you can come to

2   federal court after you've exhausted your tribal remedies.

3        THE COURT:  Where does it say that?  Where does

4   anything in the loan agreement or the tribal code say that, I

5   can come to federal court?

6        MR. GROSSWENDT:  It doesn't say that, but under the

7   tribal exhaustion doctrine, it's the tribal -- the tribal code

8   says that --

9        THE COURT:  You just told me you could.  You just

10  told me that the tribal code said that you could come to

11  federal court to bring your RICO claim after you've been

12  through the tribal procedure on your other claims.  Now, where

13  does the code say that?

14       MR. GROSSWENDT:  I misspoke.  I misspoke, Your Honor.

15       THE COURT:  The papers that were filed that you

16  adopted say the same thing.

17       MR. GROSSWENDT:  I don't believe it says that the --

18       THE COURT:  It doesn't say it, does it?

19       MR. GROSSWENDT:  Say what, Your Honor?

20       THE COURT:  What you said is not in the code or the

21  contract.  That is, there's nothing in the code or the contract

22  that says you can go to federal court after you exhaust the

23  tribal code procedures.

24       MR. GROSSWENDT:  No, but, Your Honor, at the end of

25  Section 9, at Section 9. -- and this is of the code, at

1    Section 9.4(g), the last line is, upon issuance of a tribal

2    Court's opinion and order, a consumer's administrative remedies

3    are exhausted.

4        At that point -- it doesn't say it in the code, but

5    at that point, the borrower can file suit in federal court

6    having exhausted his or her tribal remedies.  It does not say

7    that in the code.

8        THE COURT:  Let me ask you this:  How can you make

9    the argument you're making when it says in paragraph (g) that

10   the tribal court's opinion and order may not be appealed?  It

11   says consumers' administrative remedies are exhausted, but

12   there's also several places in the tribal code that says -- and

13   in the contract that says sovereign immunity is not waived.

14       So if you read all that together, to me it says you

15   can go to the tribal code, but you can't sue us in federal

16   court because of sovereign immunity, and so how can you then

17   say you can bring a RICO claim in federal court?

18       MR. GROSSWENDT:  A RICO claim against Mr. Martorello,

19   Your Honor, or against the tribal entities?

20       THE COURT:  You're asserting -- you're asserting that

21   Martorello is entitled as a related party to the benefit of all

22   this.

23       MR. GROSSWENDT:  Yes, Your Honor.

24       THE COURT:  You're asserting that he's entitled to

25   the sovereign immunity.

```
 1              MR. GROSSWENDT:  No, Your Honor.

 2              THE COURT:  You're not asserting that he's entitled

 3    to sovereign immunity?

 4              MR. GROSSWENDT:  No, Your Honor.  Mr. Martorello, we

 5    agree he's not a member of any Indian tribe, but --

 6              THE COURT:  I know that.  That's not in dispute, but

 7    you're not claiming he gets, as a related third party, the

 8    tribal immunity of the tribe.

 9              MR. GROSSWENDT:  No, Your Honor, but what I am --

10              THE COURT:  You filed a bunch of papers in here that

11    say he does.  That's why I'm confused.  So you are dropping

12    that whole theory.

13              MR. GROSSWENDT:  I'm sorry, the theory that?

14              THE COURT:  That Martorello is somehow entitled to

15    the tribe's tribal immunity.  That's no longer part of this

16    case.

17              MR. GROSSWENDT:  Our position is --

18              THE COURT:  You just told me that he wasn't claiming

19    tribal immunity.  You have to be clear, and either he is still

20    claiming he gets tribal immunity or he's not.  That's all I'm

21    trying to find out what your position is.

22              MR. GROSSWENDT:  The reason, Your Honor, that I'm

23    struggling to answer this is because it's not that he shares in

24    the tribe's sovereign immunity.  It's that the tribe's immunity

25    as a sovereign, not just immunity from suit but immunity from
```

1   state regulation, makes tribal law apply, not state law, and so

2   it's not that he is sharing in that but it's the effect of it.

3            THE COURT:  I'm taking from what you're saying that

4   you don't believe that Martorello has any of the tribe's

5   sovereign immunity.

6            MR. GROSSWENDT:  Yes, Your Honor.  No, he does not

7   share in the tribe's sovereign immunity, but what he does share

8   in is the effect of the tribe being sovereignly immune.

9            THE COURT:  No, he doesn't share in that.  You're

10  saying he gets the benefit of the application of the tribe's

11  sovereign immunity in some way; right?

12           MR. GROSSWENDT:  It's not that narrow, Your Honor.

13  It's that the tribe -- it's not just that the tribe is

14  sovereignly immune.  It's that the tribal entities are arms of

15  the tribe and so share in the tribe's sovereignty.  That's not

16  just sovereignty from suit here in court, but it's sovereignty

17  to be free of regulation of state laws.

18           So because the tribal entities are arms of the tribe,

19  state law doesn't apply to them.  It doesn't apply to the law

20  under which the loans were made and does not -- so Virginia law

21  then would not apply.

22           THE COURT:  None of that has to do with the class

23  certification process.  You are arguing on the merits of the

24  claim now.

25           MR. GROSSWENDT:  Not entirely, Your Honor, and some

1   of this was laid out --

2           THE COURT:  Where does this appear in your papers?

3   Where is this argument in your papers?  Where does it appear in

4   your class certification papers?

5           MR. GROSSWENDT:  This appears in docket number 664

6   and 785 which were previously briefed on the effects --

7           THE COURT:  All of those are gone.  I asked you to

8   file something that had to do with class certification and

9   re-file everything because everything was all fouled up anyway.

10  I'm asking you now, on your papers having to do with class

11  certification, where is this argument made.  And the class

12  certification papers that I'm asking you about are numbered

13  1007, and where in there is that argument made?

14          MR. GROSSWENDT:  I mean, it's throughout.  It's in

15  the entire fact background section of our brief, Your Honor.

16  It goes into, I think, the predomination of issues.

17          THE COURT:  Where?  Give me a page and a reference.

18  We are not going to go down the road you are suggesting by just

19  making some general statement that it's throughout the papers.

20  I want to know where it is so I can read it and analyze it and

21  they can respond to it, because you haven't asserted this,

22  insofar as I have read, in this page 1007.

23          MR. GROSSWENDT:  Yes, Your Honor, and page 1007 --

24          THE COURT:  I mean document 1007.

25          MR. GROSSWENDT:  Agreed.  At page 40 in the

1   discussion of who is the true lender.

2           THE COURT:  Just a minute.  Let me find page 40.

3   What sentence on page 40?

4           MR. GROSSWENDT:  Plaintiffs, therefore, are wrong

5   that Martorello exercised control of tribal lending --

6           THE COURT:  Hold on.  I need to find it.  What line

7   is this?

8           MR. GROSSWENDT:  It's about seven lines down.

9           THE COURT:  Plaintiffs, therefore, are wrong that

10  Martorello exercised control of tribal lending after the sale

11  of Bellicose to the tribal lender.

12          So "therefore" suggests that there's a preceding

13  sentence or something.  It seems to me that the "therefore"

14  refers to the antecedent sentence moreover there is no evidence

15  that Martorello ever exercised or threatened any post-sale

16  buyout of McFadden's shares.  Plaintiffs, therefore, are wrong

17  that Martorello exercised control of tribal lending after the

18  sale of Bellicose to the tribal lender.

19          Is that what that whole -- is that what we're talking

20  about there, those two sentences?

21          MR. GROSSWENDT:  So this gets at the --

22          THE COURT:  Yes or no?  Get your tongue wrapped

23  around the words yes or no when you're going to answer the

24  question.  Then I understand what your position is.

25          MR. GROSSWENDT:  Yes, Your Honor.

```
 1            THE COURT:  The "therefore" sentence that you cite

 2    refers to the antecedent sentence that begins "moreover."

 3            MR. GROSSWENDT:  Yes, Your Honor.

 4            THE COURT:  Where else does it appear, the point that

 5    you were making?  I've read it fairly carefully, and it's not

 6    there, so let's move on to another topic.  Leave the topic

 7    alone and go on.  You are bound by what's in your papers, and

 8    that's what I'm going to consider.

 9            MR. GROSSWENDT:  Yes, Your Honor.

10            THE COURT:  Now, get on with your argument about the

11    class action waiver, please.

12            MR. GROSSWENDT:  Yes.

13            THE COURT:  I'm not going to sit here and wait while

14    you thumb through papers trying to come up with something that

15    doesn't exist.

16            MR. GROSSWENDT:  Yes, Your Honor.  Back to the class

17    action waiver, the class action -- so on the class action

18    waiver, I believe we were talking last about whether or not

19    borrowers could file a RICO suit at some point, and to the

20    extent that's where we were, then, yes, nothing about the LVD

21    code prevents them from doing so after having exhausted their

22    tribal remedies.

23            THE COURT:  So the argument is the code does not

24    explicitly prevent filing a RICO suit.

25            MR. GROSSWENDT:  That's correct, Your Honor.
```

**JA1557**

```
1              THE COURT:  All right.

2              MR. GROSSWENDT:  So, Your Honor, if you contrast the

3    Gibbs v. Stinson decision with the -- even within -- sorry,

4    apologies.  Moving back to the Gibbs v. Stinson decision, that

5    was where the Court contrasted the Mobiloans loan agreement

6    with the Great Plains and Plain Green loan agreement, and,

7    there, the loan agreement didn't look anything like the one

8    that we're dealing with here.

9              There, the arbitration agreements at issue said that

10   the arbitrator shall apply tribal law in the terms of the

11   agreement.  The arbitration agreement shall be governed by

12   tribal law.  The arbitrator was authorized to award all

13   remedies available under tribal law whether at law or in equity

14   and that taken as a whole, the Court found that this -- well,

15   going on --

16             THE COURT:  You do look at the contract as a whole;

17   is that what you said?

18             MR. GROSSWENDT:  Absolutely, Your Honor.  And going

19   on within the Great Plains and the Plain Green loan agreements,

20   there the truth in lending disclosure cautioned that the tribal

21   entities did not consent to any application of state or federal

22   law, that no federal law --

23             THE COURT:  What point are you making here?  Help me

24   with that.

25             MR. GROSSWENDT:  Yes, Your Honor.  So the point I'm
```

1    making is that there was no waiver of applicable federal law in
2    the loan agreement.
3              THE COURT:  This loan agreement.
4              MR. GROSSWENDT:  In the Big Picture loans and Red
5    Rock tribal loans.
6              THE COURT:  Is it possible to delay the decision on
7    the class action waiver, choice of law, and forum selection
8    clauses until after certification?
9              MR. GROSSWENDT:  No, Your Honor.
10             THE COURT:  Why?
11             MR. GROSSWENDT:  Because I think this -- because this
12   just gets at the adequacy of the representatives to serve as
13   class representatives.
14             THE COURT:  All right.  Is there anything in the
15   record about use of the tribal dispute resolution procedure?
16             MR. GROSSWENDT:  Not that I'm aware of, Your Honor.
17             THE COURT:  Do you know of -- does the record show
18   whether the choice of forum/choice of law language in the loan
19   contracts changed over time?
20             MR. GROSSWENDT:  I'm not aware of any.
21             THE COURT:  Does the record show how the code, the
22   tribe's code changed over time during the class periods?
23             MR. GROSSWENDT:  I know that in the -- I believe --
24   I'm not sure, Your Honor.  I would just say, Your Honor, this
25   relates -- this is plaintiff Williams' loan agreement, so it

1    certainly applies to her.

2          THE COURT:  The plaintiffs, in their reply brief,

3    talk about conflicting language about federal law applying to

4    loans.

5          MR. GROSSWENDT:  Yes, Your Honor.

6          THE COURT:  That's at number 1055, pages four through

7    six.

8          MR. GROSSWENDT:  Yes, Your Honor.

9          THE COURT:  What's your view on all that?

10         MR. GROSSWENDT:  To the extent there's any conflict,

11   it's a result purely of not reading a defined term to be a

12   defined term.  Tribal law, as defined in the loan agreement,

13   includes both the LVD code and applicable federal law.

14         THE COURT:  If there is a conflict, what happens in

15   that event?

16         MR. GROSSWENDT:  If there's a conflict between?

17         THE COURT:  If there's a conflict between provisions

18   about what law applies and what's the effect of the waiver,

19   etcetera, what's the legal principle that I apply in connection

20   with that conflict?

21         MR. GROSSWENDT:  I wouldn't want to answer that in

22   the abstract.  I'd like to look at each individual place where

23   it allegedly conflicts, because I don't think there is any

24   conflict.

25         THE COURT:  That's a different answer, so answer it

1    as I asked it.  What legal principle do I apply if I find there
2    is a conflict?
3         MR. GROSSWENDT:  If there's a conflict, then I guess
4    that would be -- it would be ambiguous terms of a contract.
5         THE COURT:  And then how -- what principle applies to
6    the resolution of an ambiguity in a contract?
7         MR. GROSSWENDT:  I guess there wouldn't be any --
8    there's no extrinsic evidence, I don't think, we would get at
9    here.  I'm not sure, Your Honor.
10        THE COURT:  Is there any reason that the general
11   principle that the ambiguity is resolved against the drafter
12   wouldn't apply?  Or would it -- it seems to me that the general
13   rule is that an ambiguity in a contract which is not mutually
14   agreed upon in a process of give-and-take but is prepared by
15   one side, the ambiguity is resolved against the drafter.  Would
16   that principle apply here?
17        MR. GROSSWENDT:  Yes, Your Honor, but, again, I don't
18   think there are any ambiguities about application of federal
19   law, especially contrasting this loan agreement with all of the
20   cases in which various courts have found there was waiver
21   prospectively.  And, again, the ambiguities I'd like to
22   emphasize are --
23        THE COURT:  How do you deal with *Solomon against*
24   *American Web Loan* --
25        MR. GROSSWENDT:  Yes, Your Honor.

```
1              THE COURT:  -- in which the Court held that a single
2    mention about governing -- the law governing was tribal law and
3    such federal law as applicable could not save the contract when
4    read as a contract -- when read as a whole, the contract?
5              MR. GROSSWENDT:  Yes, Your Honor.  So in the Solomon
6    decision, I believe that the loan agreement at issue there said
7    that it was governed only by tribal law and such federal law as
8    is applicable under the Indian commerce clause which is the
9    entirety of that quote which other courts have said is a
10   meaningless invocation, because the issue there, and I think
11   this is discussed in the Brice opinion with saying -- subject
12   to the Indian commerce clause is that nobody can say what law
13   that would even be as opposed to applicable federal law as a
14   whole.
15             THE COURT:  How can somebody say what applicable
16   federal law is contemplated for this contract?
17             MR. GROSSWENDT:  It just merely means federal law.
18   This is, again, the footnote that I provided --
19             THE COURT:  Applicable federal law is, for example,
20   the right to bring a class action.
21             MR. GROSSWENDT:  Yes, Your Honor.
22             THE COURT:  But you say here the class action can't
23   be brought, so you are negating applicable federal law if the
24   right to bring a class action is included in the term
25   applicable federal law.
```

```
 1              MR. GROSSWENDT:  Yes, Your Honor, but the parties can
 2     contract around that as they did, and there's --
 3              THE COURT:  That's what they did here?
 4              MR. GROSSWENDT:  Absolutely Your Honor.  And there's
 5     no suggestion that a class action waiver prospectively waives
 6     rights.  It's just --
 7              THE COURT:  Wait a minute.  Whoa.
 8              MR. GROSSWENDT:  I misspoke, Your Honor.
 9              THE COURT:  You sure did.
10              MR. GROSSWENDT:  The class action waiver, it waives
11     procedural rights, but -- and it changes the type of -- the way
12     you can seek relief, but it doesn't affect the underlying
13     claims.  That's all I meant, Your Honor.  Apologies.
14              So again, yes, in the Solomon decision, that's -- it
15     has the qualification as as applicable under the Indian
16     commerce clause which isn't in our contract, and, again, this
17     goes back to the -- as is applicable under the Indian commerce
18     clause is also discussed in the Brice v. Plain Green decision
19     in which the Court found there was prospective waiver, and this
20     is where the Court read that to mean that was effectively a
21     disclaimer of federal law.
22              THE COURT:  What's the significance in the important
23     acknowledgements section of your contract that says that the
24     agreement is subject solely and exclusively to the tribal law?
25              MR. GROSSWENDT:  Yes, Your Honor.  That's just
```

**JA1563**

1    another example of them -- of the contract continuing to

2    consistently apply a defined term.  Our position is that

3    throughout, when the contract says tribal law as is defined in

4    the governing law section, that means the LVD code and

5    applicable federal law, meaning federal law, so that's not a

6    restriction on anything.

7          And there was a helpful discussion in the *Hengle*

8    district court opinion in which, before going on to address the

9    settlement funding case issues, the Court looked at whether

10   the -- the loan agreements at issue for Mobiloans in that case

11   which said just that tribal law governs the terms of the

12   contract but did not disclaim application of federal law was

13   akin to any sort of contract where that designates that certain

14   states' law would apply.

15         So under contract -- for example, if it said

16   California law governs this agreement, that doesn't close off

17   your right to -- absent a disclaimer of the application of

18   federal law, that doesn't mean that federal remedies -- or that

19   federal rights are being disclaimed.

20         So, again, here, if you go back and look at the other

21   cases that are cited in which there was found to be prospective

22   waiver, the *Dillon v. BMO Harris* decision, the *Hayes v. Delbert*

23   decision, both of these are distinguishable for the same

24   reason.  Both of them included language, and I'll give you the

25   specifics, but to the effect that they disclaimed the

1    application of federal law.

2            In the *Hayes* opinion, it said that no other state or

3    federal law or regulation shall apply to this loan agreement,

4    its enforcement, or interpretation and that the governing law

5    section of that loan agreement stated that no United States or

6    federal law applies to this agreement.

7            THE COURT:  Let me ask you something.  What's the

8    significance of the waiver of jury trial, paragraph 1(a), where

9    it says all -- purposes of waiver of jury trial provision and

10   tribal dispute resolution provision above, the words "dispute"

11   and "disputes" are given the broadest possible meaning and

12   include, without limitation, all claims, disputes, or

13   controversies, including, but not limited to, all kinds of

14   people.  And then (b) says, all claims, disputes, controversies

15   arising or related directly to your application, the agreement,

16   any claim to set it aside, and then (c) says, all tribal and

17   U.S. federal state law claims, disputes, controversies,

18   etcetera, all common law claims under (e), all claims based on

19   a violation of state or federal, constitution, statute,

20   regulation, or ordinance, what's the significance of those

21   broad terms in the jury waiver clause here?

22           MR. GROSSWENDT:  Your Honor, the significance of

23   those terms is just which disputes are subject to the class

24   action waiver, and, as it says, it's all disputes.

25           THE COURT:  So all disputes, the class action waiver

1    is -- covers all federal law and state law claims.

2          MR. GROSSWENDT:  No.  This just goes towards who --

3    sorry, Your Honor.  I was looking for my copy of this while you

4    were reading it so I could read along.  So all this is saying

5    is just that all federal or state disputes have to be brought

6    in the tribal forum.  It's not that they are waiving their

7    right, their application of federal law at all.  This goes

8    also --

9          THE COURT:  What do you mean?  If you are giving up

10   your right to bring a jury trial to federal state claims, then

11   you're giving that right up.  That's what this says, doesn't

12   it?  Then it goes on, and you have to read, your right to file

13   suit against us for any claim or dispute arising from or

14   relating to this agreement is limited by the waiver of jury

15   trial and the tribal dispute resolution provisions.

16         So it makes -- it integrates the class action and the

17   jury trial part of this document, the waiver documents

18   together, doesn't it?

19         MR. GROSSWENDT:  It does, Your Honor, but there's no

20   waiver of federal claims.  It's waiving a right to jury trial,

21   but they can still file a federal suit.

22         THE COURT:  All right, anything else?

23         MR. GROSSWENDT:  While we're here, I think it makes

24   sense to discuss why the class action waiver applies to Mr.

25   Martorello as well.

```
1              THE COURT:  I don't think it does, because I think
2    probably it makes more sense to have lunch.
3              MR. GROSSWENDT:  Thank you, Your Honor.
4              THE COURT:  One hour.
5              (Luncheon recess.)
6              THE COURT:  All right, sir.  You were talking about
7    related as it appears in the loan agreement, I believe you
8    wanted to talk about next.
9              MR. GROSSWENDT:  So I believe -- so we -- when we
10   left off, we were talking about the language of the waiver and
11   whether or not Martorello was covered under the class action
12   waiver, and --
13             THE COURT:  How does he get covered?
14             MR. GROSSWENDT:  He gets covered in a variety of
15   ways, Your Honor, but, first and foremost, there's a subject
16   matter category over -- the class action waiver, so if you look
17   at waiver --
18             THE COURT:  Tell me where to look.
19             MR. GROSSWENDT:  Yes.  In the waiver -- so this is in
20   document 1055-1 at the waiver of jury trial at paragraph one.
21   This is the section that discusses the definitions of dispute.
22   If you look at subparts (b) and (c), so this is -- so to start
23   with the beginning of part one where it says, for purposes of
24   this waiver of jury trial provision and tribal dispute
25   resolution provision above, the words "dispute" and "disputes"
```

**JA1567**

1    are given the broadest possible meaning and include, without

2    limitation, and then if you go to part (b), it is all claims

3    disputes, or controversies arising from or relating directly or

4    indirectly to your application, this agreement, and the

5    validity and scope of these provisions and any claim or attempt

6    to set aside these provisions.

7            THE COURT:  How does that relate to -- how does that

8    pick up Martorello?

9            MR. GROSSWENDT:  That picks up Mr. Martorello because

10    it relates to the subject matter of the dispute and applies to

11    all parties.

12            THE COURT:  No.  You can't get all parties -- I don't

13    know where you are getting that from, but he isn't a party to

14    the loan.

15            MR. GROSSWENDT:  That's correct, Your Honor.

16            THE COURT:  You have to get him in there somehow.

17            MR. GROSSWENDT:  Yes.

18            THE COURT:  And if he were a party to the loan, then

19    your argument would be good.  But he's not a party to the loan.

20    You just said it applies to all parties, but that doesn't apply

21    to him, so that's a loser.  The next one?

22            MR. GROSSWENDT:  So on that note, the plaintiff --

23    well, Mr. Martorello is not bound by the loan agreement.  The

24    plaintiffs are.  They signed it, and they promised to litigate

25    all claims arising under this agreement in the tribal dispute

```
 1  resolution procedure.  So our position would just be --
 2              THE COURT:  It's unilaterally binding?
 3              MR. GROSSWENDT:  Yes, Your Honor.
 4              THE COURT:  That one, in my judgment, doesn't apply,
 5  so let's go to the next one.
 6              MR. GROSSWENDT:  So the next one is similar, and I'll
 7  just state it for the record.  It is subsection (c), and it
 8  includes similar language, but I can read it again, but it
 9  involves all -- it involves all tribal and U.S. federal or
10  state law claims, disputes, or controversies arising from or
11  relating directly or indirectly to your application, the
12  agreement, the information you gave us before entering into the
13  agreement including all -- including the customer information
14  application and any past agreement or agreements between you
15  and us.
16              THE COURT:  What does that mean?
17              MR. GROSSWENDT:  To me it means the same thing as the
18  previous one, and I understand that you disagree, Your Honor.
19              THE COURT:  It doesn't mean the same thing as the
20  previous one.  It's a completely different subparagraph.  That
21  says for purposes of this waiver and a tribal dispute
22  resolution procedure.  Does that include the class action
23  waiver?
24              MR. GROSSWENDT:  Yes, Your Honor.
25              THE COURT:  Then it says, you give "disputes" the
```

**JA1569**

1    broadest possible meaning including all tribal and U.S. federal

2    or state law claims, disputes, or controversies, but how does

3    that get Martorello in?

4            MR. GROSSWENDT:  For the same reason as the previous,

5    Your Honor, and I know that you do not like belt-and-suspenders

6    approaches.  Your point was taken on that earlier.  I think

7    here this was -- again, this is an attempt to give "dispute" or

8    "disputes" the broadest possible meaning and was just an

9    attempt to include all disputes arising under the agreement.

10           THE COURT:  This whole thing includes the class

11   action waiver.

12           MR. GROSSWENDT:  Yes, Your Honor.

13           THE COURT:  Okay.  All right, I understand how you

14   get Martorello in there.  Wait just a minute.  Then, what else?

15           MR. GROSSWENDT:  So he's also bound by the provisions

16   that relate to agents, related third parties, and affiliated

17   entities.

18           THE COURT:  Give me the --

19           MR. GROSSWENDT:  Yes, Your Honor.  So this is

20   subsection (a), and we went over this earlier.  We're in the

21   same provision still.

22           THE COURT:  (a)?

23           MR. GROSSWENDT:  Correct.

24           THE COURT:  Involving the parties and our -- is he an

25   employee?

1           MR. GROSSWENDT:  He's not an employee.

2           THE COURT:  Is he a servicer?  He's not.

3           MR. GROSSWENDT:  No.

4           THE COURT:  And agents.  Is he an agent?

5           MR. GROSSWENDT:  Yes, Your Honor.

6           THE COURT:  How is he an agent?

7           MR. GROSSWENDT:  He's an agent as a -- through

8    Bellicose who provided consulting services to the tribal

9    entities pre-transaction.

10          THE COURT:  Wait a minute.  So he's an agent because

11   -- the next thing, it says including but not limited to

12   consultants.  He is a consultant.

13          MR. GROSSWENDT:  Yes, Your Honor.

14          THE COURT:  He's not a bank.

15          MR. GROSSWENDT:  No, but --

16          THE COURT:  He's not a payment processor.

17          MR. GROSSWENDT:  That's correct.

18          THE COURT:  He's not a software provider.

19          MR. GROSSWENDT:  That's correct.

20          THE COURT:  He's not a data provider.

21          MR. GROSSWENDT:  That's correct.

22          THE COURT:  And he's not a credit bureau.

23          MR. GROSSWENDT:  That's correct.

24          THE COURT:  So he is an agent because he is a

25   consultant.

```
 1              MR. GROSSWENDT:  Yes, Your Honor.

 2              THE COURT:  How does he become a consultant?  What

 3      evidence in the record makes him a consultant?

 4              MR. GROSSWENDT:  This just goes to his -- the

 5      intertribal servicing agreement between the tribal entity Red

 6      Rock and Bellicose.  And so through the provision of

 7      services --

 8              THE COURT:  Which provision of the agreement makes

 9      him a consultant, Martorello personally a consultant so he's

10      their agent?

11              MR. GROSSWENDT:  I don't have that exact cite in

12      front of me.

13              THE COURT:  You better find it, have your compatriot

14      find it then.  Look for it while he's arguing.  Is that, then,

15      the extent of what hooks Martorello in?

16              MR. GROSSWENDT:  There's that as well, but also he is

17      an affiliated entity.

18              THE COURT:  So now that takes us to (h); right?

19              MR. GROSSWENDT:  That's correct.

20              THE COURT:  In (h), it's all claims asserted by you

21      individually against us and any of our employees.  He's not an

22      employee.

23              MR. GROSSWENDT:  That's correct.

24              THE COURT:  Again, he's an agent?

25              MR. GROSSWENDT:  Yes, Your Honor.
```

JA1572

```
 1              THE COURT:  Is he a manager?

 2              MR. GROSSWENDT:  He is not.

 3              THE COURT:  Is he a member?

 4              MR. GROSSWENDT:  No.

 5              THE COURT:  Is he a parent company?

 6              MR. GROSSWENDT:  He is not.

 7              THE COURT:  Is he an affiliated entity?

 8              MR. GROSSWENDT:  Yes, sir.

 9              THE COURT:  How is Martorello an affiliated entity?

10   What proof do you rely on for that?

11              MR. GROSSWENDT:  It's going to be the same.  It will

12   not be the same as the previous.  It will be either through

13   Bellicose as an affiliated entity of Red Rock tribal lending

14   or --

15              THE COURT:  But you are saying -- are you saying in

16   this that as to -- that Martorello is the same as Bellicose?

17   Is that what you are saying?

18              MR. GROSSWENDT:  No, Your Honor.

19              THE COURT:  Then some part of the agreement would

20   have to make him an affiliated entity.  What part of the

21   agreement makes him an affiliated entity?

22              MR. GROSSWENDT:  I don't have a specific citation in

23   the agreement.

24              THE COURT:  Do you even know a citation and you've

25   forgotten it, or you just don't know it?
```

97

```
1              MR. GROSSWENDT:  I don't have it in front of me, Your

2    Honor.

3              THE COURT:  Did you ever know it?  Did you ever look

4    it up and say -- before you made this argument to me today, did

5    you look it up and say, yeah, I looked at this agreement, and

6    I'm relying on the Bellicose agreement and this makes him an

7    affiliated entry?

8              MR. GROSSWENDT:  I believe I did, Your Honor.

9              THE COURT:  Well, then, you better get it out and

10   find it.

11             MR. GROSSWENDT:  If it's not in there, apologies.

12             THE COURT:  I'm not going -- we're not going through

13   all this.  You have to tell me now what it's all about.  This

14   stuff was briefed, and you were making the arguments.  You're

15   on notice that you should be able to tell me what you're

16   talking about because that's the linchpin that makes him --

17   that makes him a related party, I guess; is that your theory?

18             MR. GROSSWENDT:  Yes, Your Honor.

19             THE COURT:  Is there anything else that brings

20   Martorello in to the protection of the class action waiver, the

21   jury trial waiver, and other things?

22             MR. GROSSWENDT:  Those are the provisions.

23             THE COURT:  All right.

24             MR. GROSSWENDT:  I was next going to proceed to the

25   discussion of whether or not the choice of law provision was
```

JA1574

1   void under Virginia law --

2            THE COURT:  What choice of law provision?

3            MR. GROSSWENDT:  Excuse me?

4            THE COURT:  Which choice of law provision?

5            MR. GROSSWENDT:  The choice of law provision that

6   designates tribal and federal law to apply.

7            THE COURT:  So what paragraph is that?

8            MR. GROSSWENDT:  That would be governing law and

9   forum selection provision.

10           THE COURT:  At the bottom of ECF 1055-1, page five of

11  seven; is that right?

12           MR. GROSSWENDT:  Yes, Your Honor.

13           THE COURT:  All right.

14           MR. GROSSWENDT:  So in the reply, plaintiffs argue

15  that the waiver -- so that's -- I got ahead of myself.  That

16  was designating tribal law, but the waiver of class action --

17           THE COURT:  I didn't follow what you said.

18           MR. GROSSWENDT:  I was just getting into the class

19  action waiver more generally and why plaintiffs contend that

20  it's unenforceable because of the waiver provisions in the

21  Virginia usury law.

22           THE COURT:  You are addressing some argument they

23  made in a reply brief, you said?

24           MR. GROSSWENDT:  Yes, Your Honor.

25           THE COURT:  How about helping me what argument you

1   are talking about.

2          MR. GROSSWENDT:  Yes.

3          THE COURT:  Let me get to their reply brief.  I've

4   got it.  What page?

5          MR. GROSSWENDT:  The page on this begins at the top

6   of page nine of 40.

7          THE COURT:  Nine?

8          MR. GROSSWENDT:  Yes, Your Honor.

9          THE COURT:  Virginia anti-waiver statute; right?

10         MR. GROSSWENDT:  Yes, Your Honor.

11         THE COURT:  Page nine of ECF number 1055.

12         MR. GROSSWENDT:  I would --

13         THE COURT:  Heading two.

14         MR. GROSSWENDT:  Yes.  So this is the Virginia's

15  anti-waiver statute renders the contract void.

16         THE COURT:  Okay.

17         MR. GROSSWENDT:  And so the reason that this argument

18  fails, Your Honor, is that Virginia law does not apply to the

19  loans because the loans designate tribal and federal law to

20  apply and that under the Virginia Supreme Court's decision in

21  *Settlement Funding*, a choice of law clause that designates

22  another sovereign's law should be enforced despite usury claims

23  being at issue.

24         And in that case, the borrower entered into a loan

25  agreement that was completed in Utah, the lender was based in

1   Utah, and the parties agreed that Utah law would apply here,

2   and the borrower was located in Virginia.  The borrower

3   challenged the loan agreement for exceeding rates allowed under

4   the Virginia usury statute, and the Virginia Supreme Court held

5   that the Court of Appeal erred in refusing to apply Utah law in

6   construing the loan agreement.

7            THE COURT:  What is the cite again?

8            MR. GROSSWENDT:  *Settlement Funding*.  That is --

9   *Settlement Funding, LLC, v. Neumann-Lillie*, 274 VA 76.

10           THE COURT:  All right.

11           MR. GROSSWENDT:  It's a 2007 decision.  As the Court

12  may be aware, the Fourth Circuit is currently hearing an appeal

13  of the *Hengle v. Asner* decision in which one of the issues

14  presented is whether enforcement of a loan agreement's choice

15  of law provision specifying that tribal law applies, whether

16  that violates Virginia public policy and so is void.

17           THE COURT:  The district court held it was?

18           MR. GROSSWENDT:  The district court held it was, and

19  that was argued, I believe, on January 26th of this year, and

20  there will be a decision issued at some point, possibly soon on

21  that, but they squarely were addressing that issue.

22           THE COURT:  It was in the argument?

23           MR. GROSSWENDT:  Yes, it was, Your Honor.

24           THE COURT:  Did you attend the argument?

25           MR. GROSSWENDT:  I did not attend the argument.  I

1   just read the briefing.

2            THE COURT:  Did you listen to it?

3            MR. GROSSWENDT:  I did not listen to it.

4            THE COURT:  So you can't tell me whose ox was being

5   gored at that argument, can you?

6            MR. GROSSWENDT:  I can't, and I wouldn't predict on

7   how the Fourth Circuit --

8            THE COURT:  One would be fool-hearty to listen to

9   arguments and predict a result, wouldn't one?

10           MR. GROSSWENDT:  Absolutely, Your Honor.  And so in

11  that *Hengle* opinion, it relies on there's three different

12  opinions that try to artificially limit the scope of the

13  Virginia Supreme Court's holding in *Settlement Funding*.  It's

14  that *Hengle* --

15           *THE COURT:  Hengle*'s district court's opinion has

16  three ways to say *Settlement Funding* is limited to certain

17  circumstances.  Is that what you are saying?

18           MR. GROSSWENDT:  It's that there are three cases

19  cited in the reply brief where *Settlement Funding* is more

20  narrowly read than it should be, and *Hengle* cites to two of

21  them.  So that's where we get the three.  There's *Hengle*,

22  there's the *Gibbs v. Haynes* district court opinion, and there's

23  an unpublished Virginia circuit court opinion that all restrict

24  the scope of the holding in *Settlement Funding*.

25           THE COURT:  Okay.  And that is -- those decisions are

1    discussed in the *Hengle* district court opinion.

2              MR. GROSSWENDT:  Yes, Your Honor, that's correct.

3              THE COURT:  And you think those decisions -- what are

4    the three topics that they use to restrict it, do you think?

5              MR. GROSSWENDT:  So in those decisions, Your Honor,

6    they limit the Supreme Court's holding to an evidentiary issue

7    rather than a choice of law issue, and it gets at whether the

8    lender's successor met its burden in proving the substance of

9    Utah law, the Utah usury law, but that misconstrues the

10   holding.  *Settlement Funding* is a very short opinion.  It gets

11   to it very quickly and that --

12             THE COURT:  I thought that in other cases, the

13   Virginia Supreme Court had held that usury, usurious interest

14   was against public policy of Virginia.

15             MR. GROSSWENDT:  That may be so, Your Honor, but what

16   *Settlement Funding* held -- and, again, it may be against

17   Virginia's public policy, but that Virginia courts or that

18   Virginia -- yeah, courts applying Virginia law will respect a

19   choice of law provision designating another sovereign's law to

20   apply even in the context of a usury agreement.

21             THE COURT:  But the law, I thought, in Virginia was

22   we will recognize forum selection clauses unless it violates

23   Virginia public policy.  So what I'm trying to do is ask you

24   how you harmonize your argument about *Settlement Funding* with

25   the general law that says we, as Virginia courts, will enforce

1    the choice of law provisions in the contract unless that

2    provision offends Virginia public policy.  So how did the

3    *Settlement Funding* case deal with that issue?

4          MR. GROSSWENDT:  So I don't think that -- so

5    *Settlement Funding*, I think, also gets into how -- I think

6    that -- I shouldn't speak to what it says without knowing, but

7    I think the other policy --

8          THE COURT:  That's a good idea.

9          MR. GROSSWENDT:  Yes, Your Honor.  But the other

10   policy at play is that courts will respect the parties, what

11   they agreed to in a contract.

12         THE COURT:  No, but Virginia doesn't follow that rule

13   as simply as you said.  Virginia follows the rule, I thought,

14   and it may have changed, but the last time I looked at it, it

15   followed the rule that we will follow what you select as a

16   forum in your contract unless doing that offends Virginia

17   public policy.

18         And so the issue then becomes does that particular

19   provision offend public policy, and you are saying that in

20   *Settlement Funding*, the -- my question is, in *Settlement*

21   *Funding*, did they explain how the usury provision there did not

22   offend Virginia public policy?

23         MR. GROSSWENDT:  I don't believe it did, Your Honor.

24   I think it went right to just saying that the Circuit Court

25   erred in refusing to apply Utah law in the construction of the

```
 1    loan agreement that involved interest rates that would have
 2    been usurious under Virginia law because it designated Utah
 3    law.  I don't think there's more detailed discussion --
 4              THE COURT:  No explanation of why, you say?
 5              MR. GROSSWENDT:  No.  It's a short opinion.  The
 6    discussion of it is about one page long.
 7              THE COURT:  Do you have it?
 8              MR. GROSSWENDT:  Yes, Your Honor.
 9              THE COURT:  May I see it?  I remember it at the time,
10    but I can't remember looking at it in preparation for this
11    argument.  I just like to refresh my memory.  I may have.
12              MR. GROSSWENDT:  If you'll ignore my underlining,
13    Your Honor.
14              THE COURT:  What?
15              MR. GROSSWENDT:  If you'll ignore my underlining.
16              THE COURT:  It will help me get to where I need to
17    go.  Okay.  I see.  All right, thank you very much.  Anything
18    else on that point?
19              MR. GROSSWENDT:  Yes, Your Honor.  I would just say
20    that tribal law would also apply even in the absence of a
21    choice of law provision given that under the *Insteel* decision,
22    a contract in Virginia is governed by the law of the place
23    where the loan is made unless the parties expressly say
24    otherwise, and, here, the final act of contract formation is
25    Big Picture Loan's verification which occurs on reservation,
```

1    and so tribal law applies.

2            I would also say that as recognized in the Fourth

3    Circuit's opinion, tribal lending is -- that the tribal lending

4    at issue here is firmly rooted on the reservation, and Virginia

5    state regulatory laws may not burden the activity on

6    reservation in that way.

7            And that is it for my points on the validity of the

8    loan agreements under Virginia law.

9            THE COURT:  Okay.  Where are you going next?

10           MR. GROSSWENDT:  I was going to go to whether or not

11   common issues predominated with respect to Mr. Martorello, but

12   I was going to put aside the class action waiver.

13           THE COURT:  Okay.  I just want to know where you are

14   going.  Need a roadmap.

15           MR. GROSSWENDT:  Absolutely.  Thank you, Your Honor.

16           THE COURT:  Mr. Bennett said that you don't really

17   dispute that there are common issues, that your argument is

18   that common issues do not predominate.

19           MR. GROSSWENDT:  Yes, Your Honor.

20           THE COURT:  That's correct, isn't it?

21           MR. GROSSWENDT:  Yes, Your Honor.

22           THE COURT:  That's what I thought.

23           MR. GROSSWENDT:  So here, one of the things that I

24   would like to discuss is that plaintiffs can't show that

25   Martorello uniformly received loan payments from borrowers in

1    the purported classes throughout the class period, and, in
2    particular, this relates to the usury class.
3              THE COURT:  So it just relates to the usury class.
4              MR. GROSSWENDT:  It predominantly does.  It also
5    relates --
6              THE COURT:  You can't waffle.  We're not at the
7    Waffle House.  We're here.  It's all right if you define that's
8    where it applies.  I'll be glad to consider it that way.
9    Either you want it to apply across the board or two of them or
10   one of them, but you have to be firm in what you say.
11             MR. GROSSWENDT:  Yes, Your Honor.
12             THE COURT:  What does it apply to?
13             MR. GROSSWENDT:  It also applies to damages related
14   to RICO.  It also applies --
15             THE COURT:  What's "it"?  Why do we even care about
16   the damages?
17             MR. GROSSWENDT:  Well, because -- so under RICO, I
18   don't think it's so settled that joint and several liability
19   applies for 1962(c) violations which relates just to his
20   conduct in the enterprise, and so, there, if he's -- his
21   liability is premised on receipt of funds, and there's time
22   periods where he is not receiving funds --
23             THE COURT:  He did receive the funds, though,
24   according to the record.  There was a time period during which
25   there was a dispute that he wasn't receiving funds, but then in

```
1    the settlement, he got the funds.  So basically it's just that

2    he -- his receipt of the funds was delayed, if I understand

3    what your argument is.  The time that he didn't receive the

4    funds was while they were in that arbitration; is that right?

5              MR. GROSSWENDT:  It predated that as well, Your

6    Honor.

7              THE COURT:  But the dispute that was the subject of

8    the arbitration and during the arbitration, that time frame.

9              MR. GROSSWENDT:  Yes, Your Honor.

10             THE COURT:  After -- when it was settled, then he got

11   the funds.

12             MR. GROSSWENDT:  He agreed to --

13             THE COURT:  He got money.

14             MR. GROSSWENDT:  He got money, yes, sir.

15             THE COURT:  He got the same kind of money, may not

16   have got even the same dollar bill, but he got the same kind of

17   money he was demanding originally, i.e., the money that came

18   from the loans; right?

19             MR. GROSSWENDT:  Yes, Your Honor, and I think that

20   here I may have been unclear when I was referring to Martorello

21   uniformly receiving loan payments from borrowers, and it's

22   undisputed that Martorello, over time, through various

23   entities, there was some money that passed from be it Red Rock

24   or Big Picture that got to him.  Some money went from A to B.

25             But there's no way of knowing which borrower, where
```

JA1584

```
 1    the money -- which borrower's repayments made their way to

 2    Martorello because Martorello's receipt of funds was based on

 3    the overall profitability of the lending operation and not

 4    on --

 5              THE COURT:  Why don't you save that one for the

 6    Fourth Circuit and let them see -- you can make that to Judge

 7    Niemeyer or Judge Wilkinson or somebody.

 8              MR. GROSSWENDT:  Absolutely, Your Honor.

 9              THE COURT:  And I'd think twice before I did if I

10    were you.

11              MR. GROSSWENDT:  Absolutely.  The only reason I

12    raised it here, and I'll drop it, it was the language in

13    particular of the usury statute in Virginia about requiring

14    that the person take or receive the payments.  I understand

15    your position.  I'm just making my record.

16              THE COURT:  He got money from the loans throughout

17    the period except for the hiatus when they were holding back on

18    him, and then he got money from the loans after that; is that

19    correct?

20              MR. GROSSWENDT:  Yes, Your Honor.

21              THE COURT:  But we just can't tell whose money he

22    got.

23              MR. GROSSWENDT:  We can't tell whose money went to

24    him.  The other issue with that is, and some of this was

25    discussed at length in the July 2020 opinion following the
```

```
 1   misrepresentation -- not opinion, the July 2020 submission, the
 2   statement of position that mapped how funds made their way from
 3   the tribal entities to Martorello, and this just -- and this
 4   just gets at the issue of it's impossible to trace.
 5        THE COURT:  What is that exhibit number?
 6        MR. GROSSWENDT:  So it's Exhibit A to docket number
 7   895.  So, here, it's undisputed --
 8        THE COURT:  That's the chart.
 9        MR. GROSSWENDT:  Yes, Your Honor.  Red Rock made
10   distributions to Bellicose, but Bellicose also received monies
11   from non-lending industries as well, and it reinvested monies.
12   Some of the money -- and I understand there's disagreement on
13   the trust, but --
14        THE COURT:  If I'm a bank and I send out some
15   collection people to you and get my money from you and the
16   collection people take the money from you, and then they
17   collect it from Mr. Bennett and they collect it from Mr.
18   Taliaferro and they put it all in the bag and they give it to
19   me, does that same argument obtain as to that situation?
20   They're not going to be able to tell what was your money, what
21   was Mr. Bennett's money, what was Mr. Taliaferro's money.
22        MR. GROSSWENDT:  Yes, Your Honor, but here I --
23        THE COURT:  I receive it.
24        MR. GROSSWENDT:  Yes, Your Honor, but here it would
25   be -- it's that in your position in this example would be
```

1    Bellicose or Eventide at a later date, and then beyond that is

2    Mr. Martorello, and at that intermediate stage there are

3    different inputs going in, there's different outputs going out.

4              THE COURT:  Suppose this:  Suppose that they take

5    that money, $500, and it's all in ones.  They go to the bank

6    and get five $100 bills, and they give me five $100 bills.  I'm

7    receiving money, but you can't tell who it came from.  Does it

8    make a difference as to my liability under the Virginia usury

9    statute if I receive all that money?

10             MR. GROSSWENDT:  I would say -- I think it -- I don't

11   think that would affect your liability under the Virginia

12   statute.  I think that your liability under the -- I think that

13   you wouldn't have liability under the Virginia statute because

14   you were not the person taking or receiving the proceeds.

15             THE COURT:  I was receiving.  I was getting $500.

16             MR. GROSSWENDT:  And we may just -- we just may

17   disagree, Your Honor, on the Virginia law, and that's okay.

18             THE COURT:  It's okay, but what about -- what are you

19   disagreeing about?

20             MR. GROSSWENDT:  I disagree that the second part of

21   the Virginia law, the first part being payment of interest

22   above 12 percent and then a person taking or receiving that

23   payment, if it's not you taking or receiving the payment that

24   you have liability, that you satisfy that second element.

25             THE COURT:  In this instance, somebody is actually

1    receiving the payment.  The hit man is going out, and he's

2    getting -- the knee knocker is getting the payment, it's $1

3    bills.  Then he converts them to five one hundreds, and he

4    gives them to me.  I'm the guy who said, hey, go out and knock

5    their knees to give me the money.  I'm receiving that money, so

6    am I not liable under the Virginia statute and it's only the

7    knee knockers who are liable?

8            MR. GROSSWENDT:  I'm not sure, Your Honor.

9            THE COURT:  All right, go ahead.  Anything else?

10   Common issues do not predominate.  You can't tell whether he

11   received loan payments.  Any others that --

12           MR. GROSSWENDT:  Yeah.  And so the next thing that

13   I'd proceed to in terms of common issues that predominate or

14   whether common issues predominate are Martorello's changing

15   participation in tribal affairs over time due to his decreasing

16   involvement and ultimate sale in 2016 of Bellicose to the

17   tribe.

18           And that -- I would first say that our position is

19   that none of his involvement rises to the level of operation or

20   management necessary under RICO to show participation in the

21   enterprise.

22           THE COURT:  That's a question for the merits, isn't

23   it?

24           MR. GROSSWENDT:  Absolutely, Your Honor.  I just

25   wanted to make that clear that I wasn't conceding that, of

1  course.

2         THE COURT:  I think we can probably take that, that

3  you're not conceding.

4         MR. GROSSWENDT:  Thank you, Your Honor.  So

5  plaintiffs respond to our argument that Martorello participates

6  in the operation or management -- they make three arguments.

7  The first is that it's through the servicing agreement between

8  Red Rock and Bellicose.  The second is that they claim that

9  there actually was actual participation throughout time that

10 contradicts the claim that it was declining, and the third is

11 that maybe he was declining, but that doesn't matter because he

12 was the mastermind.  He was the brains of the operation.

13        And so taking that in turn, the servicing agreement

14 doesn't establish operation or management -- maybe this goes to

15 the merits but --

16        THE COURT:  That's the merits, isn't it?  You may be

17 correct that their theory is wrong on the merits, but how does

18 that have to do with whether or not that issue has to be

19 decided on the merits?

20        MR. GROSSWENDT:  Yes, Your Honor.  I think that's

21 probably correct, and --

22        THE COURT:  Okay.

23        MR. GROSSWENDT:  So the other claim, and maybe you'll

24 say this is the merits as well, and maybe it is, but his

25 decreasing involvement over time shows a lack of operations or

1    management.  All this is --

2            THE COURT:  Isn't that a fact issue as to how he's

3    involved and that's an element of the claim and so it goes to

4    the merits?

5            MR. GROSSWENDT:  It is, Your Honor.

6            THE COURT:  How is it not a common issue for

7    everybody in the class?  Seems to me that either he had this

8    level or X level or Y level or he didn't, and that's a fact

9    question for the jury to decide, and -- but the one thing is

10   that he didn't have, at any given point in time, level A for

11   consumer one and level B for consumer two.

12           MR. GROSSWENDT:  That's what I was going to get to,

13   Your Honor, is if he did have decreasing involvement over time,

14   and we say that all of that was below the level for liability.

15   They probably say all that is above the level for liability.

16   If we're saying that it's decreasing, there's going to be --

17   borrowers who are differently situated with respect to

18   different parts of the time period based on his -- that can be

19   a matter --

20           THE COURT:  They are differently situated.  I assume

21   different borrowers are always differently situated in some

22   respects, but it doesn't make any difference if -- if he's in

23   for a penny, he's in for a pound under RICO, and it's the same

24   penny and the same pound for all of the consumers, it seems to

25   me, according to your own brief.  Am I wrong about that?

1          MR. GROSSWENDT:  No, Your Honor.

2          THE COURT:  All right, let's go on to something else.

3          MR. GROSSWENDT:  The next one is that -- it's their

4    claim that his decreasing involvement doesn't matter because he

5    was the kingpin of the operation, and, again, I -- and maybe

6    this goes to merits, but this is the exact -- this is the

7    allegation that was featured in the appeal to the Fourth

8    Circuit that the Fourth Circuit rejected in finding that the

9    tribal entities were arms of the tribe and were not controlled

10   by Martorello.  Perhaps that's --

11         THE COURT:  Maybe you read a decision different than

12   I read, but I think that decision probably went off on a little

13   bit different question.  We have got the predominant issue.

14   Anything else under -- we're now under 23(a).  You've done

15   adequacy.  You don't contest typicality or numerosity, and

16   commonality has not changed so we've got that done, and now

17   we're under 23(b)(3), predominance.

18         MR. GROSSWENDT:  Yes, Your Honor.

19         THE COURT:  What else -- and 23(b)(3), we did

20   ascertainability.  You talked about that.

21         MR. GROSSWENDT:  I still had a few more for

22   predominance.  I'm sorry for getting ahead of myself there.

23         THE COURT:  What else?

24         MR. GROSSWENDT:  So, here, the plaintiffs alleged

25   that Martorello was the true lender, and this inquiry requires

1 changing analysis over time, and this may be pre- and

2 post-transaction, but whether or not he could have or did

3 authorize intentional torts towards the members of the class

4 is subject -- and this piggybacks on what we were just talking

5 about in terms of his actual role in the enterprise.

6          THE COURT:  What's this true lender theory?  I've

7 never heard it applied in individual cases.  It's applied in

8 entity cases like rent-a-bank.  Is there any case applying it

9 to individuals?

10          MR. GROSSWENDT:  Not that I'm aware of, Your Honor.

11          THE COURT:  Why would I even get into it here?

12          MR. GROSSWENDT:  I guess I don't think you have to.

13          THE COURT:  As I understand it, they're not arguing

14 that he's the lender.  They're arguing that he was a recipient

15 for the usury claim.  So why are we getting into the lender

16 part of it?

17          MR. GROSSWENDT:  I think it goes towards his

18 participation in the RICO enterprise.

19          THE COURT:  That's just a fact issue as to what his

20 role was; right?

21          MR. GROSSWENDT:  Yes, Your Honor.

22          THE COURT:  Okay.  Is he even contending he was the

23 lender there?  They're contending, as I understand it, that

24 Eventide loaned them what?  $300 million or something to get

25 started.

```
 1            MR. GROSSWENDT:  That was as part of the transaction
 2   to acquire the company.  So, yes, he loaned them money which
 3   was paid back in the waterfall note payments over seven years.
 4   So I would also say that individualized issues exist about RICO
 5   causation, and, again, this might piggyback on what we've been
 6   talking about, his role changing over time.
 7            THE COURT:  It seems to me like the way your argument
 8   is pitched in your papers, it is nothing but the changing role.
 9   It's dressed up in a little bit different skirt and blouse, but
10   it's basically the changing role issue revisited.
11            MR. GROSSWENDT:  I think it's that, Your Honor.  It
12   is also the -- the legal effect of the servicing agreement as
13   well and whether that conferred control to Martorello over the
14   entities.
15            THE COURT:  Okay.
16            MR. GROSSWENDT:  And so, again, just Martorello -- so
17   for RICO, but for proximate causation, and maybe this is a fact
18   issue again, but Martorello's role changing over time changes
19   the but-for causation for various borrowers, the directness of
20   his actions to the alleged harms, the foreseeability of his
21   actions leading to those harms --
22            THE COURT:  I don't understand how you are working
23   that notion.  All he has to do is be part of the enterprise.
24   If the cause of the damage is part of the enterprise, that's
25   the end of it.
```

1           MR. GROSSWENDT:  That -- yes and no.  It varies by

2    whether if it's RICO conspiracy or individual RICO liability.

3    If there's no knowledge of the illegality of the enterprise,

4    unlawfulness of the loans being collected --

5           THE COURT:  That's a fact issue.  He's going to come

6    in and say -- they're going to say he knew about what was going

7    on the whole time.  You're going to come in and say he didn't

8    know about it because his role diminished.  The jury decides.

9           So it goes to the jury, and we put a special

10   interrogatory, when did his knowledge stop:  A, never; B, X

11   date; C, Y date, but that's a fact issue, not an uncommon

12   issue.  And it's a common question, and the common question is

13   -- questions generally predominate over the uncommon questions.

14          MR. GROSSWENDT:  Yes, Your Honor, but it's going to

15   have -- there's going to be wholly uncommon answers, is our

16   position, over time because of that.

17          THE COURT:  But uncommon answers and uncommon issues

18   are somewhat different, aren't they?  That gets into

19   manageability, doesn't it?

20          MR. GROSSWENDT:  Okay.

21          THE COURT:  Anything else?

22          MR. GROSSWENDT:  Again, this relates, perhaps, to the

23   usury claim and -- it's similar to the argument I made about

24   the usury claim, and I'll make this for the record, but that we

25   think there's no predomination of common questions related to

118

```
 1   his unjust enrichment claim, and, again, this is similar, and
 2   it's that plaintiffs can't show retention of a benefit by
 3   Martorello specific to particular loans.
 4            THE COURT:  Okay.
 5            MR. GROSSWENDT:  It's the same thing as before.  It's
 6   that monies repaid by borrowers, you can't trace that from any
 7   particular borrowers to Mr. Martorello.
 8            THE COURT:  Suppose a bank gets unjustly enriched.
 9   In order to recover, does the plaintiff have to show exactly
10   where the money was that the bank got unjustly?
11            MR. GROSSWENDT:  In this hypothetical is that -- I
12   guess I would need some more details to answer that question.
13   Is it that the bank -- is this a loan that the bank collected
14   on from a borrower?
15            THE COURT:  Some theory the bank gets unjust
16   enrichment for some reason, and it takes the money and it pools
17   it with all its other money.  On any given day, it goes into
18   the branch over there, down here, comes out, goes into a bank's
19   main depository system, and they haven't got the first idea
20   where the money comes from.
21            Do they have to know where the money comes from in
22   order to be unjustly enriched if you can show that they got the
23   money through some kind of unfair and unjust way?
24            MR. GROSSWENDT:  I would say the bank does not have
25   to show that or the bank -- in your scenario --
```

JA1595

1      THE COURT:  The plaintiff would have to show it in a
2  suit against the bank.
3      MR. GROSSWENDT:  But here, what differs in this
4  scenario is that our position is that Big Picture Loans and Red
5  Rock stand in the position of the bank in your scenario, Your
6  Honor, where they're -- they were the ones collecting the loans
7  from the borrowers, from the plaintiffs here, and Martorello is
8  another step removed.  So there's no showing because of that
9  intermediate step where, again, the proceeds were --
10      THE COURT:  Suppose I'm a joint venture with the
11  bank.  I'm working with the bank on a project, and they're
12  giving me a little cut of the unjust enrichment.  I don't know
13  where it's coming from.  What case holds that you have to know
14  where -- that you have to actually get the money, results from
15  the unjust enrichment dollar by dollar?  What holds that?  They
16  say there isn't, and I didn't see any in your papers, but I
17  could be wrong.
18      MR. GROSSWENDT:  If it's not in our papers, it's not
19  in our papers, Your Honor.
20      THE COURT:  Is that it on your common issues do not
21  predominate?
22      MR. GROSSWENDT:  My only -- the last, and I promise
23  this is the last one on predomination, and this gets at the
24  alleged RICO conspiracy, the 1962(d) claim in that -- our
25  claim --

JA1596

```
 1              THE COURT:  Say that again.  I lost all of what you
 2    said.  Don't wind up so fast.
 3              MR. GROSSWENDT:  Yes, Your Honor.
 4              THE COURT:  You don't need to go from zero to 60 in
 5    record speed.
 6              MR. GROSSWENDT:  Will do, Your Honor.  So this
 7    follows our arguments related to the 1962(c) claim, and it's
 8    that Martorello's participation in the alleged RICO enterprise
 9    changed over time, and his role as the alleged mastermind would
10    have changed over time.  And so it follows our prior argument.
11              THE COURT:  All right.  What else under 23(b)(3)?
12              MR. GROSSWENDT:  That is all, Your Honor, for
13    23(b)(2).  Again, so moving back to ascertainability --
14              THE COURT:  We already did that.
15              MR. GROSSWENDT:  Ascertainability?
16              THE COURT:  Yeah.
17              MR. GROSSWENDT:  I don't think I responded to that.
18    I was thinking about the loan agreements that we were
19    discussing earlier about and, like, whether Martorello has
20    access to them to determine -- to evaluate ascertainability of
21    the class.
22              THE COURT:  You can get them.  You signed a consent
23    agreement that you're getting the rough data, and you're going
24    to get the other data.  So what's your complaint?
25              MR. GROSSWENDT:  So after that, and this was, I
```

```
 1   think, back in 2018 in the case, and the tribe -- and
 2   Martorello asked to get that information and ended up having to
 3   go to AAA arbitration with the tribe whether he could have
 4   access to that information under the loan and security
 5   agreement, and Mr. Martorello lost that arbitration against the
 6   tribe.  The arbitrator ruled that he couldn't get that
 7   information.  So we haven't asked for it again.
 8               THE COURT:  The tribe is going to provide it pursuant
 9   to the settlement agreement in Galloway 3, Mr. Bennett said.
10   So you'll get it then.
11               MR. GROSSWENDT:  We'll get it eventually, and maybe
12   the remedy for this, as you were alluding to earlier, is a
13   motion to decertificate.
14               THE COURT:  It seems to me that is what you do.  If
15   you don't get what you're supposed to get, that seems to me to
16   be what your remedy is; is that right?
17               MR. GROSSWENDT:  Yes, Your Honor.
18               THE COURT:  All right, anything else?
19               MR. GROSSWENDT:  Again, and we may also just disagree
20   on the impact, and perhaps this goes to merits, but we also
21   just think that the class ultimately shouldn't be certified --
22               THE COURT:  What?
23               MR. GROSSWENDT:  The class should not be certified
24   because much of this just rests on the servicing agreement that
25   the Fourth Circuit ruled was not control over Big Picture Loans
```

```
1    by Ascension.  That's identical, essentially, to the Red Rock
2    tribal loans servicing agreement with Bellicose, and so --
3              THE COURT:  Where is that in your paper?
4              MR. GROSSWENDT:  It's not our papers, Your Honor.
5              THE COURT:  I'm not going to consider it.  I don't
6    consider things you raise for the first time during oral
7    argument.  The Fourth Circuit is deaf on that, too, and rightly
8    so.
9              MR. GROSSWENDT:  The only reason I brought it up, and
10   I will not get into bringing up particulars or anything, was
11   just giving plaintiffs' dispute of our account of the relevant
12   facts saying that there was no basis for them.  And so -- that
13   came up on reply.  I guess the only other thing -- and this
14   doesn't relate to class cert itself, but it is if Your Honor
15   does grant the class certification motion, we need to be able
16   to obtain additional discovery in order to defend himself on
17   the merits, so I just wanted to preview that for the Court as
18   well.
19             THE COURT:  I'm not going to consider that.  I can't
20   imagine not dealing with it when the time comes.  I don't want
21   to consider it as part of the certification.
22             MR. GROSSWENDT:  With that, that's all, Your Honor.
23             THE COURT:  All right.  All right, I want to focus,
24   at this juncture, on the class action waiver.  I apparently
25   skipped part of the plaintiffs' papers or didn't give them
```

```
1    proper credence -- I mean of the defendant's papers, excuse me.
2    But they did raise, at page ten of 1007, the prospective waiver
3    exception does not invalidate the loans or class action
4    waivers.  Section four, the prospective waiver exception is a
5    narrowed judge-created exception in the arbitration context and
6    should not be expanded to limit tribal jurisdiction.
7           What is your response to that?  That's in their
8    response on page ten, ECF number 1007.  What did you say in
9    response to that?  I may have missed yours, too.
10          MR. BENNETT:  I'm trying -- I'm looking on page ten,
11   their specific assertion.
12          THE COURT:  It's under preliminary argument,
13   plaintiffs waive ability to pursue a class action, and in
14   the -- that heading, and then if you go over to -- wait a
15   minute.  Sorry.
16          MR. BENNETT:  It wasn't ten, I'm sorry.
17          THE COURT:  It's page ten.  Sorry.  Page ten is the
18   heading, B, the prospective waiver exception does not
19   invalidate the loans or class action waivers, and I think that
20   is section B of the so-called preliminary argument.
21          MR. BENNETT:  Yes, sir.  So your question to me
22   that's standing is what do we have to say about their statement
23   which is numbered four of that paragraph, the prospective
24   waiver exception is a narrow judge-created exception in the
25   arbitration context and should not be expanded to limit tribal
```

```
1    jurisdiction.
2              THE COURT:  Where did you address that?
3              MR. BENNETT:  Well --
4              THE COURT:  In your reply?
5              MR. BENNETT:  Yes, sir, we did address it.
6              THE COURT:  Where is it, and what did you say?
7              MR. BENNETT:  The top of page three -- ECF 3 which is
8    numbered page two, you'll see the citation to Penn Plaza and
9    the citation to the Italian Colors, what the defendant calls
10   the American Express case.  The actual parenthetical --
11             THE COURT:  Penn Plaza is at the top of page three.
12             MR. BENNETT:  Go right above Penn Plaza.  The
13   defendant's argument is that the -- somehow that because the
14   American Express case, or the Italian Colors case, was an
15   arbitration case, that addressed the question or actually that
16   just had language that the defendant uses that says this is a
17   judge-created exception, that somehow it only applies to
18   arbitration because that was an arbitration case.
19             If that was a case about blue automobiles, the
20   defendant would argue that the doctrine only applies to blue
21   automobiles.  There was no limitation in Justice Scalia's
22   opinion, and, here, the parenthetical that we include at the
23   top of PACER number three is the actual text from that
24   decision.  It's whether in an arbitration agreement or in any
25   other contract.
```

```
1            You can go further, because if you look at the Fourth
2    Circuit's decision -- any of these decisions, by the way, but
3    I'm referring to Gibbs v. Sequoia Capital, 966 F.3d 286, all of
4    these decisions that deal with arbitration, the reason they're
5    rejecting arbitration clauses because of prospective waiver is
6    not because they're arbitration clauses.  They're rejecting
7    them because their choice of law is the issue.
8            So the fact that -- in fact, in the Sequoia decision
9    at page -- well, IIIA begins with the Fourth Circuit saying we
10   turn now to the question of whether the choice of law
11   provisions amount to a prospective waiver rendering the
12   delegation clause unenforceable.
13           The defendant has it completely backward.  The reason
14   that arbitration clauses can be unenforceable because of
15   prospective waiver is because the choice of law itself is the
16   prospective waiver pointing to arbitration.  That's it.
17           THE COURT:  So it's not that it's confined to
18   arbitration cases.  It's whether a choice of law provision
19   operates as a prospective waiver.
20           MR. BENNETT:  Yes, sir.
21           THE COURT:  Either together with a loan or together
22   with other provisions.
23           MR. BENNETT:  Yes, sir.  They could say you have to
24   go to North Korea court, not arbitration but you have to go to
25   North Korea court in order to vindicate your rights.  That
```

```
 1    would be prospective waiver, not arbitration.  You have to go
 2    to the Indian reservation and petition your grievance there,
 3    that's an instance of prospective waiver.  You have to go to
 4    some sham arbitration company or Hooters.  You have to go to
 5    the Hooters manager, the Fourth Circuit decision.
 6             Now, you also don't have to rely on logic.  You can
 7    rely on law, because you have in the Fourth Circuit, and we've
 8    cited at ECF 1055, our brief, reply, page 11 of 40, PACER page
 9    11, the Volvo v. CLM case, several paragraphs outlining it.
10    The Fourth Circuit's 2004 decision, 386 F.3d 581, with the
11    relevant discussion at 587, in which the Fourth Circuit was
12    considering not an arbitration clause but provisions that would
13    have required, in that context, dealer agreement plaintiffs to
14    go to different venues by choice of forum clauses and finding
15    that it would operate to waive the plaintiff's rights to send
16    it to a state that did not allow the vindication of those
17    rights.  No arbitration.  It's not a hard question.
18             THE COURT:  Where are you citing?
19             MR. BENNETT:  We cited page 11 of 40, PACER 11 --
20             THE COURT:  Quit citing PACER.
21             MR. BENNETT:  The problem is the way it was filed,
22    the page numbers don't comport with the PACER number.  So it
23    would actually be page --
24             THE COURT:  PACER 11 is page ten of your brief.
25             MR. BENNETT:  Yes, sir, that's the page.
```

```
 1              THE COURT:  What case are you talking about there?

 2              MR. BENNETT:  The Volvo decision.  I'm sorry --

 3              THE COURT:  The Volvo decision is not on my page ten

 4    or page 11 --

 5              MR. BENNETT:  I'm sorry, page nine.  It's the last --

 6              THE COURT:  Wait a minute.  Page nine of PACER?

 7              MR. BENNETT:  No, sir.  From here on out, I'm using

 8    the actual page number in our document on the bottom center.

 9              THE COURT:  Volvo against CLM.  So it's not confined

10    to arbitrations.

11              MR. BENNETT:  No.

12              THE COURT:  That doesn't relate to arbitration?

13              MR. BENNETT:  No, sir.  And you can close your eyes,

14    pick a dart, and throw it at any of these choice of law tribal

15    lending cases, and they will always -- they have a separate

16    discussion of the choice of law.  It's not subject to

17    arbitration.  In fact, even the American Express v. Italian

18    Colors decision says or other contract.  It doesn't, itself,

19    limit it the way that defense counsel would suggest.

20              THE COURT:  All right, now, I think the thing that

21    I'm having some problem with is these contract provisions here,

22    what are you relying on?  You're relying on all of them, you're

23    relying on part of them, and how do you deal with his argument

24    that the governing law and forum selection clause is the driver

25    of this whole argument because it defines tribal law to include
```

1   applicable federal law, and every time that it refers to tribal

2   law elsewhere herein, in the clauses that you think are --

3   effectuate the prospective waiver doctrine, it really means

4   tribal law and applicable federal law.  That's the first

5   question.

6          The second question is, you told me Martorello's

7   people drafted this contract.  What proof in the record is

8   there that Martorello is responsible for this contract such

9   that the rule that ambiguity in a contract can be construed

10  against a drafter?  What's the record that permits application

11  of that rule?  Maybe take that one first.

12         MR. BENNETT:  Well, I have to retreat from that one

13  and hope that folks behind me can pull through my 60-page

14  binder, but we put the evidence before this Court ad nauseam in

15  support of our position regarding the statement, the claim that

16  Mr. Martorello had made misrepresentations to the Court.

17         THE COURT:  Where are they?  Where's the evidence

18  that Martorello prepared this contract?  I thought Rosette

19  prepared it.

20         MR. BENNETT:  Mr. Rosette prepared this contract as

21  well as most of the contracts that are in the various Fourth

22  Circuit decisions unrelated to this.  Mr. Martorello's lawyer

23  participated in editing and submitting this and the related

24  documents.  Jennifer Weddle, I believe --

25         THE COURT:  What evidence is there --

1          MR. BENNETT:  We have the evidence on the

2    misrepresentation hearing.  I'm not sitting at the podium with

3    my ability to recall it.  I will provide it.

4          THE COURT:  That's fine.  Are you saying that

5    Martorello put these provisions in?

6          MR. BENNETT:  I'm saying that Mr. Martorello oversaw

7    this contract, his lawyers did.  It was core drafted, primarily

8    drafted by Mr. Rosette and his law firm which is why -- similar

9    to these other contracts these other tribes use.

10          THE COURT:  Let me ask you this:  Are you arguing

11    that the principle applies here that any ambiguity found in the

12    contract must be resolved against the drafter and that,

13    therefore, that would mean in this instance Martorello,

14    according to your argument?  It would seem to me that if

15    Rosette and the tribe drafted the contract, would you not apply

16    that principle in interpreting the contract vis-a-vis

17    Martorello?

18          MR. BENNETT:  It's a different principle, and, of

19    course, it's not in the papers and we can supplement, but it's

20    broader than Your Honor suggests.  Your Honor's basic core

21    contract question of drafter presumption here is modified by a

22    cousin where you have adhesion contract presented to a

23    consumer.

24          There's significant case law that in circumstances

25    where a known negotiation contract is presented from the

1    business side to a consumer, particularly in circumstances

2    where there's a difference in sophistication, in interpreting

3    conflict in the contract, you would presume in favor of the

4    consumer or the adhesionee, the contract party.

5            In addition --

6            THE COURT:  Is that in your brief?

7            MR. BENNETT:  It is not, but it was not in -- this

8    issue wasn't briefed by anybody.  We certainly can brief --

9            THE COURT:  You make the argument that some of these

10   contracts, some of these provisions create an ambiguity, and --

11           MR. BENNETT:  Yes, sir.  What we say, though, is the

12   second point is the defendant here is advocating for

13   application of a waiver of our right to bring a class action.

14   They're trying to prove existence of a contract term.  It's

15   their burden, it's their burden to prove the contract, what it

16   means, and how it applies.

17           To the extent there's ambiguity and the Court can't

18   rule, you don't even need to rely on the adhesion or the

19   draftee/drafter presumption law which already is significant.

20   You also have a failure of proof on the part of defendant in

21   its ability to convince this Court, both factually and legally,

22   that it's entitled to this overcoming a presumption that our

23   clients have rights they can pursue in federal court.

24           In answering -- there are multiple questions, and

25   they all interrelate.  Thinking about this, Judge, I would ask

1    if the Court will allow me to go through, first, the actual

2    language of the contract in its -- in order of the relevant

3    sections and then briefly, one paragraph, the relevant

4    paragraph from the tribal code, and then I can tell you more

5    coherently in response to each of the arguments.

6         The arguments, the first is the use -- I want to

7    address the issue of inclusion of the phrase applicable federal

8    law.  Second is I want to address the failure of any remedy.

9    So independent of inclusion of federal law, the failure of your

10   ability to remedy and vindicate your rights, and, third, I want

11   to address the question of whether Mr. Martorello was covered.

12        To do that, I first want to go through the order of

13   this very incoherently and I think poorly drafted document, the

14   contract, so that we can at least make sure -- because I think

15   you've heard argument from the defendant that summarizes parts

16   of it without actually looking at the specific relevant

17   language in context.

18        So the first -- and I'm starting -- and we're

19   referring to the document that is PACER number 1055-1, and I'm

20   starting at page five of the document.  Page five of the

21   document --

22        THE COURT:  The document I have actually isn't

23   numbered except the PACER number.

24        MR. BENNETT:  Yes, sir.  Here I am relying on the

25   PACER number.

```
 1              THE COURT:  That's the only number there is.  All
 2    right, I'm with you.
 3              MR. BENNETT:  The second to last section below with
 4    the heading Governing Law and Forum Selection, this is -- you
 5    hear a lot about the inclusion of the "as well as applicable
 6    federal law."  Two points to make on this.  The first is the
 7    agreement will be governed by the laws of the LVD, tribal law.
 8    So that is what -- the agreement is completely governed by
 9    those laws.  It's not governed by those laws plus federal law
10    or state law.
11              THE COURT:  Wait a minute.  You didn't read the rest
12    of it.
13              MR. BENNETT:  I am.  I am referring to Sister Robert
14    Terez's diagramming sentences.  The rest of this but not
15    limited to is a dependent clause here.
16              THE COURT:  Wait a minute.  You left out one word.
17    Tribal law, it says, will be governed by the laws of the, and
18    then spells out the tribe, and that's then short form to be,
19    quote, tribal law.
20              MR. BENNETT:  Yes, sir.
21              THE COURT:  Comma, including but not limited to the
22    code as well as applicable federal law.  His point is that
23    tribal law, the short formed version, includes applicable
24    federal law.  Why isn't that right?
25              MR. BENNETT:  Well, it probably also includes
```

```
1    applicable North Korean law.

2              THE COURT:  That, in the words of Bear Bryant, and a

3    nickel will get you a Coke.

4              MR. BENNETT:  And applicable federal law in a

5    contract that says there is no applicable federal law means

6    zero.  Five plus zero is zero.

7              THE COURT:  That's a different point.  That's using

8    other sections of the statute to say that that negates -- I

9    mean of the contract that says those other sections negate this

10   clause.

11             Looking at this clause on its own, if we interpreted,

12   how do you interpret "including but not limited to the code as

13   well as applicable federal law"?

14             MR. BENNETT:  So the governing law, and the only

15   governing law, and we know this from the first and last

16   sentences, the only governing law is tribal law, the laws of

17   the LVD.  Then the question is what is tribal law.  Tribal law

18   consists of two things according to this.  It consists of the

19   code and law that the tribe has applied.

20             THE COURT:  Where does it say that?

21             MR. BENNETT:  Tribal law including but not limited to

22   the code and as well as applicable federal law.  The only law,

23   federal law that would be applicable is federal law that is

24   part of tribal law.

25             THE COURT:  Where do we get that?
```

1          MR. BENNETT:  Because of the sentence structure.

2    Because it the tribal law, and here is the parts of tribal law.

3    Here's why it's different.  In these other cases, like the

4    Mobiloans discussion which I will get to from Judge Lauck's

5    district court opinion in *Gibbs v. Stinson*, that said that the

6    contract was governed by the tribal law, and it was also

7    governed by federal law.

8          Here, it's governed by tribal law including the part

9    of federal law that the tribe has accepted or tolerated.  It

10   isn't coequal or superior.  Federal law is only applicable if

11   it's subsumed and part of and adopted as part of tribal law,

12   and you know that -- to make that point, Mr. Rosette and Mr.

13   Martorello follow with the next sentence which says, all

14   disputes shall be solely and exclusively, which seems to me to

15   be they really want to make a point with both adverbs saying

16   the same thing, resolve pursuant to the tribal dispute

17   resolution procedure as set forth in Section 9.

18         This Court notes at the end of this that that same

19   language is repeated as is the tribal law in the acknowledgment

20   sections.  Well, we'll go through this in the next -- so

21   then --

22         THE COURT:  Going through what?

23         MR. BENNETT:  The next section of the contract, page

24   six, PACER page six at the top.  Tribal dispute resolution --

25         THE COURT:  Have you actually gone through and

**JA1611**

1    diagrammed this?

2              MR. BENNETT:  Yes, sir.

3              THE COURT:  Where is it?

4              MR. BENNETT:  I wrote it on my notes.

5              THE COURT:  What's her name?  Sister what?

6              MR. BENNETT:  Oh, Sister Robert Terez.  No, I didn't

7    diagram this from -- this is my --

8              THE COURT:  I want to see the diagram.

9              MR. BENNETT:  I had to diagram the Declaration of

10   Independence.  I don't know that I got it right, but, yes.

11             THE COURT:  I'm quite serious.  What is the word

12   "including"?  What part of speech is the word "including"?

13             MR. BENNETT:  Participle.

14             THE COURT:  A participle?

15             MR. BENNETT:  Yes, sir.

16             THE COURT:  That's what it is?

17             MR. BENNETT:  I don't know.

18             THE COURT:  Where would we put this?  This modifies

19   tribal law.  Where would we put it?  Including something.

20   Including --

21             MR. BENNETT:  Well, it would be a preposition.  So it

22   would be.  You have tribal law including code and --

23             THE COURT:  Do you have somebody checking whether or

24   not "including" is a preposition?

25             MR. BENNETT:  It's a preposition.

1           THE COURT:  It is?

2           MR. BENNETT:  I'm betting it's a preposition, but

3    I...

4           THE COURT:  Including used as a preposition.  So

5    we've got a preposition, and we've got the object of the

6    preposition.  The object of the preposition is the code, and

7    now something modifies the code, as well as.  What part of

8    speech is that?  As well as applicable federal law.

9           MR. BENNETT:  As well as would be a conjunction, used

10   as a conjunction.

11          THE COURT:  So it's the same thing as having and.

12          MR. BENNETT:  Yes, sir.

13          THE COURT:  Now we have including what?  Code and

14   federal law.  So this means the same thing, applicable federal

15   law.

16          MR. BENNETT:  Yes, sir.

17          THE COURT:  And you want me to read this as federal

18   law that the tribe has determined is appropriate in the code.

19          MR. BENNETT:  It's the only way, because otherwise

20   the way to diagram that sentence would be -- the way this would

21   be placed is you would write, this agreement will be governed

22   by the laws -- or by tribal law and applicable federal law.  By

23   putting applicable federal law as a submissive possible

24   description within tribal law and particularly qualified with

25   the adjective applicable, it clearly limits the expansion and

137

```
 1    interpretation of what federal law could apply.  The only
 2    federal law that would be apply would be tribal law that is --
 3    or federal law that the tribe has adopted as applicable.
 4              You see this later when we get --
 5              THE COURT:  Would you like to go to the Supreme Court
 6    of the United States on that issue?  Let's go to the rest of
 7    the contract because the law teaches that we look at what the
 8    practical effect of the whole is as I understand the Fourth
 9    Circuit's decision in Haley and Dillon, and what's the one that
10    begins with S?
11              MR. BENNETT:  Sequoia and Haynes which also has a lot
12    of the meat we referenced in Sequoia.
13              THE COURT:  What other parts do you want me to look
14    at?
15              MR. BENNETT:  Tribal dispute resolution procedure.
16    So the question is can you vindicate your rights.  The first
17    question above the what law applies deals with the rights.
18    This section deals with whether you can vindicate those rights.
19              THE COURT:  All right.
20              MR. BENNETT:  And it says, and the important part for
21    me is halfway into the paragraph, right in the middle, the
22    sentence after in writing, the sentence begins a person's
23    complaint.
24              THE COURT:  Let me get there.  All right, a person's
25    complaint to the lender shall be considered similar in nature
```

1    to a petition for redress submitted to a foreign government.

2              MR. BENNETT:  Or a sovereign government.

3              THE COURT:  Sovereign government without waiver of

4    sovereign immunity and exclusive jurisdiction and does not

5    create any binding procedural or substantive rights for a

6    petitioner.

7              MR. BENNETT:  This is the remedy.  This is how a

8    consumer would vindicate the rights.  We spent so much time

9    talking earlier and in briefing about what law applies.  Here

10   you have -- this language, Judge, our firm and Ms. Kelly's firm

11   were lead in most of these Fourth Circuit decisions, most of

12   the district court decisions that we've cited about prospective

13   waiver.

14             Here, this is worse than any paragraph I recall.

15   This sentence says you have no rights except to ask us for our

16   generosity like you are appearing before a king, and you are

17   asking for the mercy of the sovereign to decide if you have any

18   redress, and this is being -- this language is used by the

19   defendant whose counsel here argues in their brief expressly

20   that this has no impact on substantive rights.

21             This contract limitation waiver has no limitation on

22   substantive rights, but here you've got the very language does

23   not create any binding procedural or substantive rights for

24   petitioner.

25             THE COURT:  So your redress is at the mercy of the

1    sovereign.

2        MR. BENNETT:  Without any binding procedural or

3    substantive rights at all.  If we were try to come up with a

4    law school hypothetical explaining the worst possible waiver

5    language you could use, this is it.  This is far worse than any

6    of those Fourth Circuit decisions that you'd have.  At least

7    they pretended to have a tribunal available.

8        And you continue now under the paragraph that says

9    waiver of jury trial, this is even more -- frankly, this is

10   demeaning, belligerent to consumers because it's waiver jury

11   trial.  The tribal dispute resolution procedure has been

12   created by the tribe as a courtesy to consumers and is the sole

13   and exclusive dispute resolution mechanism for disputes and

14   claims related to or arising under this agreement.

15       It's not a right.  There are zero rights.  It said

16   that above, and it is provided as a courtesy by the sovereign.

17   You can ask us, and we'll decide, which, in fact, is what the

18   code says, too.  There's no appeal right.  The tribe decides.

19   The opposite of due process.

20       Now, on this subject, I'm skipping the to whom it

21   applies section for the moment, and recall this argument that

22   was made about exhaustion of tribal remedies.  I have no idea

23   where that comes from, but this doesn't accommodate the idea

24   that you try to work it out through the tribe, and if that

25   doesn't work, you go to federal court.

1          Numbered paragraph two says you give up your right to

2    trial by a jury.  Paragraph three includes the sentence in the

3    first all caps, all bold, therefore, no litigation or

4    arbitration is available.  At least in these other decisions,

5    there was a sham arbitration option.  Here, there's not even

6    that.  It's you ask the sovereign for its courtesy.

7          Now, the idea of exhaustion -- of these consumers

8    that have already been -- from whom 600-plus percent interest

9    has been taken, would theorize that under some obscure

10   principle the defense counsel has contrived that there's an

11   exhaustion of tribal remedy right to go to federal court, you

12   read the paragraph under number five, just above telephone

13   communications, and it begins your right to file suit against

14   us.  Your right to file suit against us is limited by the

15   above, which includes the tribunal dispute resolution procedure

16   provisions, and to hammer this point home that this is it,

17   says, in the event the lender engages legal counsel to protect

18   its right, title, and interest in this agreement or otherwise

19   litigate, protect, or defend its rights outside of the tribal

20   dispute resolution procedure agreed to herein, you hereby agree

21   that the lender may recover reasonable costs and fees from you.

22         Mr. Martorello, we know, I assume we all know, has

23   been sued by Mr. Scheff for millions of dollars.

24         THE COURT:  Who is Scheff?

25         MR. BENNETT:  Mr. Scheff was the preceding law firm

1    that left and sued Mr. Martorello for nonpayment, but I'm

2    assuming that if he were to sue the consumers --

3                  THE COURT:  Nonpayment of fees?

4                  MR. BENNETT:  Yes, sir.

5                  THE COURT:  Okay, but what does that have to do with

6    anything?

7                  MR. BENNETT:  It's a lot of money for these consumers

8    to be exposed for recovery of million of dollars of Mr. Scheff

9    fees.  That certainly does not accommodate the possibility of

10   exhaustion of tribal remedies which you would then be able to

11   go to federal court if you weren't happy with the courtesy the

12   sovereign offered.

13                  Continuing down the same paragraph, I mean the same

14   contract, Judge, you have the last two provisions on PACER page

15   seven which this Court has already mentioned, and hammering it

16   home, you acknowledge and agree that this agreement is subject

17   solely and exclusively to the tribal law and jurisdiction of

18   the tribe.

19                  THE COURT:  Where is that?

20                  MR. BENNETT:  That is under important

21   acknowledgements on page PACER seven of seven.  The sentence

22   after it addresses counsel's -- again, addresses counsel's

23   exhaustion of tribal remedies point.  You acknowledge and agree

24   that the tribal dispute resolution procedure is the sole and

25   exclusive forum for resolving disputes and/or claims arising

1   from or relating to this agreement.

2           Now, the only other -- the question the Court had is

3   about the code, and the code, section -- the code document is

4   at docket number 1055-6, PACER page two of 16.

5           THE COURT:  What paragraph is it?  What's the number?

6   I've got a non -- what is it?  ECF what?

7           MR. BENNETT:  ECF 1055-6.

8           THE COURT:  What page?

9           MR. BENNETT:  PACER page two of 16.  Numbered

10  paragraph or Section 6.2.

11          THE COURT:  6.2.  I must not have the right thing

12  because I've got something that has -- 6.2 is all the way over

13  here on page 21.  Okay.  Section 6.2.

14          MR. BENNETT:  6.2.

15          THE COURT:  What about it?

16          MR. BENNETT:  So I don't want the defendant to get

17  away with the assertion that it agrees that federal laws will

18  apply to it, because that's not what it says in this code.  In

19  fact, it says the opposite just by its language that says a

20  licensee, which is a lender like Big Picture that gets approved

21  as part of this code, a licensee shall conduct business in a

22  manner consistent with principles of federal consumer

23  protection law including, and it lists some of the laws, and

24  the last sentence says, notwithstanding the above, the

25  authority has in no way waived any defenses or position related

1    to the applicability of the above laws to the tribe or any

2    financial services licensee.

3          So defendant has tried to sell this Court on the

4    misreading that the definition of tribal law that includes

5    applicable federal law is a concession that federal consumer

6    protection laws and RICO would apply.  This says, no, we do not

7    so admit that, and, in fact, it says the licensee -- they're

8    not saying it's subject to these laws.  It just says shall

9    conduct business in a manner consistent -- by the way, not even

10   with the language of the statute, with the principles of it,

11   whatever that means.

12         If we were to come in here and sue because the

13   principles of the Fair Credit Reporting Act will be violated,

14   we'd be run out of court.  So the law doesn't apply, and to

15   make sure that this Court does not mistakenly think that the

16   tribal law definition in the contract implies the application

17   of these laws, the LVD code says the authority in no way waived

18   any defenses or position related to the applicability of the

19   above laws to the tribe or any financial services licensee.

20         The point about tribal law was, I think, made better

21   by the Fourth Circuit than me in *Gibbs v. Sequoia*, and I have

22   page five in my Westlaw, and I'm sorry I don't have the Westlaw

23   page, but it's at section IIIB, and it reads, in addressing

24   this question -- exactly the same type of argument about

25   whether you can effectively vindicate your federal statutory

1  rights --

2         THE COURT:  Just tell me what the first paragraph is.

3         MR. BENNETT:  Specifically, so for me, I'm looking at

4  specifically all of the Great Plains and Plain Green.

5         THE COURT:  I have to find it.  I've got the Westlaw.

6         MR. BENNETT:  My Westlaw printout is page five.

7  There we are.  It's 292.

8         THE COURT:  Specifically all of the Great Plains.

9         MR. BENNETT:  Yes, sir.  Addressing this question,

10  the very same arguments about the acceptance in the Great

11  Plains and Plain Green contract of the possibility of federal

12  law applying, the paragraph above that framed that issue for

13  us.  It says because the choice of law provisions in both of

14  these, the Great Plains and Plain Green, arbitration agreements

15  prevent the borrowers from effectively vindicating any federal

16  statutory claims, they violate the prospective waiver rule.

17         THE COURT:  Where is that?

18         MR. BENNETT:  That's the paragraph above

19  specifically.  So that's -- the Fourth Circuit summary intro is

20  that prospective waiver applies if you cannot effectively

21  vindicate your federal statutory claims.

22         So the question you're going to look at in any of

23  this with respect to the contract here and the code is whether

24  the consumers could effectively vindicate their federal

25  statutory claims, and if we go down to the next paragraph, the

1    one that originally I told you I'd start with specifically, but

2    halfway down it begins although such provisions.

3              Although such provisions do not explicitly disclaim

4    the applicability of federal law, they mandate the primacy and

5    effective control of tribal law in resolving any disputes

6    arising from these agreements.  That's the legal question.

7    That's the standard.

8              The question is not does -- does the word federal

9    appear anywhere in the contract.  The question is, does the

10   tribe make tribal law, does it give it primacy over federal

11   statutory rights.

12             Now, you heard mention of the one time that a tribal

13   lending entity has gotten -- has avoided prospective waiver,

14   and that was one of the defendants in the *Gibbs v. Stinson*

15   matter, Judge Lauck considered, you heard, *Mobiloans*.  And the

16   *Mobiloans* opinion of this Court, of *Gibbs v. Stinson*, the

17   decision starts -- it's 421 F.Supp.3d 267

18             THE COURT:  This is *Mobiloans*.

19             MR. BENNETT:  This is -- Mobiloans is one of the

20   three defendants.  In *Mobiloans*, the Court did not find

21   prospective waiver.  Mobiloans, ultimately there was an appeal,

22   but Mobiloans ultimately resolved its case and has now settled.

23   But there's a discussion that this Court has with respect to

24   Mobiloans which was the issue, the argument the defendant was

25   attempting to present to the Court, and I have this at page --

1    starting at 302 of the decision that I'm looking at.  And I

2    want to make sure the Court understands how you do it in a way

3    to avoid prospective waiver versus how it was done here.

4         THE COURT:  Page 302 of 421 F.Supp.2d of the

5    Mobiloans agreement.

6         MR. BENNETT:  That's right.  So the defendant in

7    argument today and in their brief, its brief, holds its hat on

8    the fact that there was -- in the Mobiloans contract, it said,

9    and I'm reading from page 302 under little sub b text of the

10   Mobiloans agreement, that paragraph, the court says, first, the

11   actual text of the arbitration agreement states that the

12   consumer must, quote, agree that any dispute will be resolved

13   by arbitration in accordance with tribal law and applicable

14   federal law.

15        I'm not a word parser normally, but this is pretty

16   important because the example I gave Your Honor above the

17   explanation, the defendant expressly elevates tribal law and

18   makes applicable federal law merely a subpart of what tribal

19   law would be.

20        Here, in *Mobiloans*, tribal law applies and applicable

21   federal law.  Still a bad argument, but it worked here first

22   because of that, and if you skip to the right of your opinion

23   to the paragraph that begins fifth, fifth, the arbitration

24   agreement, this is the language.  It says, the arbitration

25   agreement permits the arbitrator to, quote, award statutory

1    damages and/or reasonable attorneys' fees and expenses if

2    allowed by tribal or federal statute or applicable law.

3            This is not -- the Mobiloans contract is not what is

4    in front of this Court right now.  Here, you expressly can't

5    use those things.  Statutory rights cannot be vindicated.  In

6    fact, no substantive or procedural rights are allowed and

7    merely the courtesy of the authority to decide whether to give

8    you any relief.

9            The other point -- the Court has it in front of

10   you --

11           THE COURT:  It seems to me as if the other point

12   ought to abide a recess.

13           MR. BENNETT:  Yes, sir.

14           (Recess taken.)

15           THE COURT:  All right.

16           MR. BENNETT:  Judge, one other point with respect to

17   this tribal exhaustion argument, Ms. Kelly wisely to me points

18   out that the parties, way back at ECF 142, had presented this

19   Court with this issue, the tribe-argued tribal exhaustion.  Mr.

20   Martorello still was a party to the case at the time.  The

21   Court rejected that argument then at ECF 142 finding that the

22   tribal dispute resolution procedure here did not allow for

23   vindication of rights.

24           Now, a good segue to the last argument I'd like to

25   cover, which is the application of any of this to Mr.

1    Martorello, is the overview point that when you put these two

2    things together -- we have is there an effective way to

3    vindicate your rights, and does it apply to Mr. Martorello.

4    The defendant is arguing these in separate pieces.  They're

5    saying it applies to Mr. Martorello, and there is a way to

6    vindicate your rights.

7            What's missing and what's very clear and will be

8    forever missing under this scheme in the contract is there is

9    no means, 0.00, there is no means for a consumer to vindicate

10   their federal rights against Matt Martorello.  If somehow this

11   tribal dispute procedure sham was real --

12           THE COURT:  Let me ask you something.

13           MR. BENNETT:  Yes, sir.

14           THE COURT:  How does Martorello get before the tribal

15   court?  How does it go?  He's not a party to the contract.  So

16   at the beginning, I don't know why anything in the contract

17   even applies to him unless he's a related party.  Let's assume

18   for the moment that he's a related party.  How do you get him

19   in front of the court?  How does that work?

20           MR. BENNETT:  First of all, there is no jurisdiction.

21   The tribe has no jurisdiction to bring him there.  Good thing,

22   though, because the code doesn't allow you to bring any claims

23   against third parties.  It's only against the licensee, and

24   it's not even a claim against the licensee.  You can only make

25   a complaint about the licensee's failure to comply with the

1    principles.  That all you can do.

2           THE COURT:  Does the code prevent you from bringing a

3    claim against third parties?

4           MR. BENNETT:  The code itself doesn't prohibit that.

5    The tribal dispute procedure in the contract does.

6           THE COURT:  How?

7           MR. BENNETT:  It says you can't bring a claim against

8    third parties.  It provides up top the procedure that you can

9    make is to complain about the lender.  Under this procedure --

10          THE COURT:  What are you reading from?

11          MR. BENNETT:  At 1055-1, PACER six of seven, headed

12   section Tribal Dispute Resolution Procedure.

13          THE COURT:  Where does it say that?

14          MR. BENNETT:  It says the tribe and lender intend and

15   require, to the extent permitted by tribal law, that any

16   complaint lodged, filed, or otherwise submitted by you or on

17   your behalf to follow this procedure.  Under the procedure, a

18   consumer who, in the course of his otherwise lawful and proper

19   use of lender's business, believes himself to be harmed by some

20   aspect of the operation of any part of lender's business shall

21   direct his concerns or dispute to lender in writing.  A

22   person's complaint to the lender shall be considered similar in

23   nature to request for redress submitted to a sovereign

24   government.

25          And then the lender will investigate the complaint.

```
 1   And if you are dissatisfied with the lender's determination,
 2   initiate -- go to the tribe and initiate a procedure to ask the
 3   tribe's authority to reconsider the lender's determination.
 4           THE COURT:  Well, they say that Martorello is an
 5   agent because he's a consultant.  And I asked him to tell me
 6   where that was, and he said something about a Bellicose
 7   agreement.
 8           MR. BENNETT:  Yes, sir.
 9           THE COURT:  So where is -- did you -- in the break,
10   did you get that page, citation?
11           MR. GROSSWENDT:  Yes, Your Honor.
12           THE COURT:  Hand it to me.  Show it to Mr. Bennett
13   first.  This is ECF 968-5.  968 isn't your petition -- I mean
14   your brief -- no, 968 is your brief there, Mr. Bennett.  So
15   what paragraph are you talking about?
16           MR. GROSSWENDT:  Your Honor, I was looking at
17   paragraph 2.1.
18           THE COURT:  Affiliate means, as to servicer or
19   enterprise, any corporation, partnership, limited liability
20   company, joint venture, trust, department, or agency or
21   individual controlled by, under common control with, or which
22   controls directly or indirectly servicer or enterprise.
23   Control means ownership, control, or power to vote 25 percent
24   or more of the outstanding shares of any class of voting
25   securities.
```

JA1627

151

1          This is the servicing agreement between Red Rock and

2    the tribe and Bellicose -- Red Rock is the enterprise.  LVD is

3    the tribe.  It's not between Red Rock and the tribe.  It's

4    between Red Rock, a development arm of the tribe, and Bellicose

5    on the other hand who is the servicer.

6          Now, an affiliate means as to servicer or

7    enterprise -- that's as to Red Rock or Bellicose -- a number of

8    things, and the only one it could be is individual, and the

9    phrase controlled doesn't apply to the individual, so it would

10   be an individual which controls, directly or indirectly,

11   servicer or enterprise.  Is it your contention that Martorello

12   qualifies as an individual who controls directly or directly

13   Bellicose?

14          MR. GROSSWENDT:  Yes, Your Honor.

15          THE COURT:  Well, you agree with that then, don't

16   you?

17          MR. BENNETT:  I do.

18          THE COURT:  So everybody is in agreement that he is

19   an individual who controls, directly or indirectly, Bellicose.

20   So he's an affiliate, but that's not the argument you've made.

21   You made the argument that he's an agent.  He's an agent

22   because he is a consultant.  So how does this paragraph help

23   me?

24          MR. GROSSWENDT:  Your Honor, we also made the

25   argument that he was a related entity.

JA1628

```
 1              THE COURT:  No, no, no.  Don't change the ground on
 2    me.  I'm dealing with these things one at a time.  So this
 3    document does not in any way help your argument insofar as I
 4    can tell that Mr. Martorello is an agent because he's a
 5    consultant.  You told me that this was the document that gave
 6    you -- that provided that.  So are you now acknowledging that
 7    this does not show he's an agent?
 8              MR. GROSSWENDT:  Yes, Your Honor.
 9              THE COURT:  Now, you made another argument.  I have
10    to find it.
11              MR. GROSSWENDT:  This is in subsection (h) of the
12    loan agreement.
13              THE COURT:  Yes.  Just give me a minute.  I know
14    where it is.  I just need to get there.  Now 1(h), that's what
15    we're talking about; right?
16              MR. GROSSWENDT:  Yes, Your Honor.
17              THE COURT:  1(h), for purposes of this waiver of jury
18    trial provision and tribal dispute resolution procedure
19    provision above, the words "dispute" and "disputes" are given
20    the broadest possible meaning and include, without limitation,
21    and now we are going to (h).  And (h) is all claims asserted by
22    you individually against us and any of our employees, agents,
23    directors, officers, shareholders, governors, managers,
24    members, parent company, or affiliated entities hereafter
25    collectively referred to as related third parties.
```

JA1629

153

1          Okay, that's where you are now; right?

2          MR. GROSSWENDT:  Yes, Your Honor.

3          THE COURT:  Well, (h) says affiliated entities.  It

4    does not say affiliates.  Is there a significant difference

5    there?  Usually the word entity, if given its normal meaning,

6    is that it is some kind of corporation, LLC, partnership, some

7    entity that is an artificial person, and that being the case,

8    an artificial person ordinarily is differentiated and

9    delineated from the word individual which means a person.

10          So in the definition you are relying on in 2.1 of

11   affiliate, you said he was an individual which controls,

12   directly or indirectly, a servicer.  But the language of

13   paragraph (h) would not include an individual, it would include

14   an entity the way it reads.

15          I'll let Mr. Bennett address that, and then you can,

16   because it's your contention that 2.1 of ECF 968-5, paragraph

17   2.1, the definition of affiliate includes Martorello, and my

18   initial reading of 1(h) does not have -- does not pick Mr.

19   Martorello up because he's an individual, and 1(h) refers to

20   affiliated entities as a related third party.  So what's your

21   view on that?  Is that how many angels can stand on the head of

22   a pin or wrong or what, Mr. Bennett?

23          MR. BENNETT:  I think it's right, but it's also not

24   the strongest argument.  It's the second strongest argument.

25   The strongest argument is the context for the use of the word

1    "affiliate."  The contract itself, in paragraph (h), says all

2    claims asserted by you individually against us and any of our

3    employees, agents, etcetera, and affiliated entities.

4             THE COURT:  All right.  So in order to be an

5    affiliated entity under (h), it would have to be an affiliated

6    entity of ours; is that right?

7             MR. BENNETT:  Yes, sir.

8             THE COURT:  Who is our?

9             MR. BENNETT:  Here, our is defined as Big Picture

10   Loans.

11            THE COURT:  Where?

12            MR. BENNETT:  Page three of seven, but the top of the

13   contract, so document 1055-1, three of seven, the words we, us,

14   our, lender mean Big Picture Loans, Inc.

15            THE COURT:  I have yet to find that.

16            MR. BENNETT:  Above the payment schedule.

17            THE COURT:  Just a minute.  Which paragraph?

18   Important notice or in the agreement the words you -- okay.

19   The words you, your, and I -- the words our mean Big Picture.

20   Okay.  All right, so that's the strongest argument that the

21   definition of affiliated entity has to be an affiliated entity

22   of Big Picture.

23            MR. BENNETT:  Yes, sir.

24            THE COURT:  And that Mr. Martorello is not an

25   affiliated entity.  And the other argument that is -- is the

1    difference between the meaning of affiliate in 2.1.  Is that
2    your point?
3              MR. BENNETT:  Yes.  Not just the meaning, the
4    language in 2.1 of document 968-5 says affiliate means as to
5    servicer or enterprise which above are defined to be Bellicose.
6              THE COURT:  So clearly --
7              MR. BENNETT:  I'm wrong, because enterprise is
8    defined to be Red Rock here.  So affiliate would be defined as
9    Red Rock or, in this case, Bellicose.  But it would still be an
10   affiliate who exercises control as to servicer of servicer or
11   as to enterprise of enterprise.
12             So that -- the definition of affiliate in the
13   contract at 2.1 is governing the relationship between Red Rock
14   and Bellicose.  And it's saying, all right, when we're talking
15   about our affiliate, Red Rock's affiliate, this is what it
16   means, and when we're talking about Bellicose's affiliate, this
17   is what it means.  But the point is it's not defined as a
18   comprehensive term, and our, Big Picture Loans or Red Rock as
19   the other contract would have, did so limit it.
20             THE COURT:  Well, the third party, related third
21   party definition appears in ECF 1055-1.  He was using the word
22   affiliate in 986-5 paragraph 2.1 to try to get Martorello to
23   qualify as an affiliate.  So the point is there there's two
24   different things.  Do you want this back?
25             MR. GROSSWENDT:  Yes, Your Honor.

```
1              MR. BENNETT:  I have to --
2              THE COURT:  So go ahead.
3              MR. BENNETT:  The point I started this discussion
4    with I have to repeat, and I know the Court's tolerance for
5    that, but the question of -- if it is that Mr. Martorello is
6    governed by a contract that says you can't sue Mr. Martorello,
7    that is plainly a prospective waiver of all rights, federal
8    statutory rights and other rights, to sue Mr. Martorello.
9              Don't even have to go any further.  I think plainly
10   they're trying to shoehorn in someone who is not there.  Mind
11   you, a contract that has -- lists every conceivable person they
12   would want in does not find an appropriate category for Mr.
13   Martorello.  That speaks volumes about whether he should be
14   included.
15             But if he is, the effect of including him and using
16   the defendant's interpretation of affiliate or agent or related
17   party, the effect is there is total waiver of any rights to sue
18   Mr. Martorello, a hundred percent waiver, which means all of
19   the law that we're talking about as to prospective waiver with
20   respect to Mr. Martorello applies.
21             The fact that the defendant can conceive of a way to
22   seek redress or courtesy grievance to the tribe about the
23   tribal lender, about Big Picture, does not address the question
24   of whether or not there is a total waiver of any federal
25   statutory rights against Mr. Martorello.
```

1           The other, the last point to make on this category,
2     the defendant suggests that the definition of dispute and of
3     the subject matter would somehow mean you couldn't sue anyone
4     anywhere about an issue related to the loan.  So imagine that
5     Ms. Kelly and I had a falling out with our client, which does
6     not happen but if we did have that falling out, our client
7     could not bring a malpractice claim about how we litigated this
8     or a fee dispute between the parties --
9           THE COURT:  Aren't you going a little far with that?
10          MR. BENNETT:  It's just as far as saying that any
11    subject covered against any party, even if they're not included
12    as a defined party --
13          THE COURT:  It's a defined party because he's a
14    related third party under their theory.
15          MR. BENNETT:  Well, true, but the first argument was
16    independent of that.  Defense counsel's first argument was the
17    definition of dispute defined -- there's two arguments -- were
18    because the definition of the category of coverage meant all
19    disputes regardless of who they're against, whether against a
20    bank, lawyers, credit bureaus, Mr. Martorello, or anyone else.
21    If they're subject to the coverage, the subject matter
22    coverage, the defense argues that somehow you can't bring your
23    claims.  That's waiver.
24          There is no possibility of seeking any redress,
25    courtesy or otherwise, against anyone other than the lender

1   under this regime, under the code, the tribal code.  And that

2   is not effective relief.  But there's certainly zero relief

3   that you could seek against Martorello and against any

4   non-lender.

5           THE COURT:  Has any other court addressed this

6   contract?

7           MR. BENNETT:  I have never -- I'm unaware of that.

8           THE COURT:  What about in Oregon?

9           MR. BENNETT:  Well --

10          THE COURT:  Or California.

11          MR. BENNETT:  Yes.  Well, Oregon has addressed the

12  application of state law, but the *Brice* decision, which did not

13  address this specific contract --

14          THE COURT:  What was the case in Oregon about,

15  because it named Mr. Martorello as a defendant.

16          MR. BENNETT:  That's the same case that's brought by

17  our co-counsel.

18          THE COURT:  Same case as what?

19          MR. BENNETT:  It's a case brought against Mr.

20  Martorello --

21          THE COURT:  You're saying it's the same case.  It's

22  the same case as what?

23          MR. BENNETT:  I'm sorry.  Our co-counsel, Caddell

24  Chapman, is prosecuting a claim against Mr. Martorello and the

25  Martorello affiliated entities based on an Oregon class in

159

1   Oregon.

2          THE COURT:  Is it the LVD contract?

3          MR. BENNETT:  Yes, sir, Big Picture Loans.

4          THE COURT:  What has that Court done?

5          MR. BENNETT:  That Court rejected the challenge to

6   jurisdiction and ordered that -- and found that the tribal

7   jurisdiction couldn't be ordered.

8          THE COURT:  Why?

9          MR. BENNETT:  For the same reasons we've been arguing

10  throughout this case which is that Mr. Martorello's not subject

11  to sovereign immunity, Mr. Martorello's -- that Oregon law

12  would apply, but it hasn't considered the class action

13  waiver --

14         THE COURT:  What's the status of that case?

15         MR. BENNETT:  It cleared the jurisdictional motions

16  practice.  They've done jurisdictional discovery, and they

17  are -- they're also present in the Galloway decision --

18         THE COURT:  Why did you send me that case to read?

19         MR. BENNETT:  Excuse me, Judge.  I sent you that case

20  to read because the people that work with me are smarter than

21  me.

22         THE COURT:  That's always a good thing to happen.

23         MR. BENNETT:  Yes, sir.  The *Smith* case is, in

24  relevant part, and I am at page -- it dealt with -- it found

25  that the choice of law and forum selection clause was

**JA1636**

1    unenforceable.

2            THE COURT:  Where did it find that?

3            MR. BENNETT:  For the record, it is District of

4    Oregon, PACER number 3:18CV1851, and I'm looking at document

5    146 which is a January 5, 2021, finding and recommendation by

6    the magistrate judge there.

7            And it first dealt with the question of whether or

8    not -- the 12(b)(6) decision with respect to Mr. Martorello,

9    and they cite Your Honor's previous decisions favorably.

10           THE COURT:  I guess what I'm getting at is, it looks

11   like the judge accepted part of the magistrate judge's finding.

12   The judge's decision is 156, and that's what was sent to me.  I

13   fished for the other one.  I didn't.  Ms. Ramsey did, and she

14   caught it.

15           But I'm a little confused about what that decision

16   did about the class action waiver.  It says Martorello argues

17   that the Court should enforce the choice of law and forum

18   selection clause, and failure to do so ignores the tribe's

19   sovereign interest in enforcing its contracts.  The findings

20   and recommendations, however, identified four independently

21   sufficient bases for declining to enforce the choice of law and

22   forum selection clause.  The Court declines to adopt a portion

23   of the findings and recommendation finding that the choice of

24   law and forum selection clause is unenforceable because it

25   requires Smith to seek relief through tribal dispute

1    resolution.  Unlike tribal choice of law provisions in online

2    payday loan agreements that other courts have rejected as

3    unenforceable, prospective waiver, see e.g., *Gibbs v. Haynes*

4    *Investment*, and citing that, the choice of law and forum

5    selection clause here does not state that federal law is

6    inapplicable to resolution of disputes arising from the loan.

7    Indeed, the loan agreement states that the loan is covered by

8    tribal law including the tribal financial services regulatory

9    code as well as applicable federal law.

10          The code further provides that a tribal council must

11   enforce a non-exhaustive list of federal consumer protection

12   laws.  In cases involving choice of law and forum selection

13   clauses, with similar language courts have found that the

14   clause is not an unenforceable prospective waiver, citing *Gibbs*

15   *v. Stinson*.  For now, the Court concludes that the more prudent

16   approach is simply to decline to find that the choice of law

17   and forum selection clause is an unenforceable prospective

18   waiver.

19          So that Court bought the argument that they're making

20   here today, it looks to me like, or declined to accept it.

21   It's kind of a strange decision.

22          MR. BENNETT:  They're not pending on class

23   certification, so what the Court -- the Court rejected

24   essentially the motion to dismiss for improper venue saying it

25   should have to go to the tribal authority, and the Court --

**JA1638**

162

```
1              THE COURT:  But in doing that, they place great --
2    placed emphasis in this footnote on the fact that the tribal
3    code says that you're supposed to abide by these federal
4    consumer laws which you criticize because what the text
5    actually says is not that they have to but that they need to
6    take into account the principles of those laws.
7              Nonetheless, it looks to me like the Court over there
8    interpreted Gibbs v. Stinson as finding that it wasn't
9    unenforceable prospective waiver.  Now, the Fourth Circuit, I
10   thought, in Stinson, found that it was an unenforceable
11   prospective waiver, so I'm confused about this case and what's
12   going on with it and why I have it.  It looks to me like it
13   mis-cites what the Fourth Circuit said, but I may be wrong.
14             MR. BENNETT:  Well --
15             THE COURT:  Citing the district court decision.
16             MR. BENNETT:  Citing the district court decision.
17             THE COURT:  Did the Fourth Circuit, in Stinson,
18   reverse the district court?
19             MR. BENNETT:  It didn't -- well, it didn't, but,
20   again, you're only talking about the Mobiloans contract which
21   we had resolved before the Court of Appeals ruled as to
22   Mobiloans.
23             THE COURT:  How do we know that it's the Mobiloans?
24             MR. BENNETT:  Because that's what Judge Lauck said in
25   Stinson.
```

JA1639

```
 1              THE COURT:  No.  How do you know that this opinion,
 2    this footnote four in the Oregon case is referring to that part
 3    of the Stinson decision that refers to Mobiloans?  Have you got
 4    Mobiloans -- there it is, I think.  Page 303 and 304, which are
 5    cited in the Oregon opinion as to Stinson, are really just a
 6    little bit off.  It's the Mobiloans agreement.  303 and 304 is
 7    the Mobiloans.
 8              So it boils down to the fact, maybe, that in
 9    Mobiloans, the language was X, and that judge out in Oregon
10    says that the language in X is functionally the same as in the
11    contract here, and you say the Mobiloans language in that
12    contract is functionally different than the language here.
13              So the whole thing -- I've got two competing views on
14    what this language means.
15              MR. BENNETT:  Not effectively.  You have the decision
16    that is the Mobiloans published F.Supp. decision that this
17    Court wrote.  And Judge Lauck noted at page 32 -- she quoted
18    verbatim the language from the Mobiloans agreement in the
19    sections at page 302 I previously cited.
20              I'm not sure because I don't -- I'm sorry, I don't
21    have the district court's partial adoption of the magistrate's
22    decision.  I have the magistrate's decision.
23              THE COURT:  You don't have what?
24              MR. BENNETT:  I don't have the Smith -- the decision
25    that Your Honor just went through, I don't have it in front of
```

1  me, and I'm sorry.

2          THE COURT:  That's the one you all gave me.

3          MR. BENNETT:  Yes, sir.  I don't have it in front of

4  me.

5          THE COURT:  Do you have it?

6          MR. GROSSWENDT:  I don't believe I do, Your Honor.  I

7  think you might have caught this in the briefing, but I think

8  there might have been a slight difference in just the citation.

9  I think it was -- the case number there is 3:18CV1651.  I heard

10  otherwise, but I think you've got that.

11          THE COURT:  Yeah, I've got it.  Do you have it for

12  him?  Footnote doesn't help you too much, does it?

13          MR. BENNETT:  Help me?

14          THE COURT:  Because that judge cited Stinson and the

15  Mobiloans as functionally equivalent to this agreement on

16  choice of law forum or not.  What do you think?

17          MR. BENNETT:  I think that every federal judge can

18  make a mistake, but whoever briefed it amongst probably our

19  co-counsel didn't give you the same analysis showing you what

20  was actually in the Stinson/Mobiloans contract and walk you

21  through what is in the actual contract here.

22          THE COURT:  Okay.  Let's say that's the case.  What I

23  put to you was this question:  I don't know that I put it this

24  way, so I'll try it again.

25          MR. BENNETT:  Judge, I don't think this footnote

165

1    hurts us.  It's just the Court deferred that question.

2         THE COURT:  The Court deferred the question, but the

3    one that hurts you is in cases involving choice of law and

4    forum selection clauses with similar language, courts have

5    found that the clause is not an unenforceable prospective

6    waiver, and they cite *Gibbs*, and they cite page 303 and 304,

7    and that's the Mobiloans part of *Gibbs*, but this footnote and

8    this opinion, the footnote relates, in its essence, to the LVD

9    contract.

10        So it's saying that the LVD contract is similar to

11   the Mobiloans contract, and you're saying it's not similar.

12   You're saying that the fact that the Mobiloans contract uses

13   the words "and" and "or" when it talks about federal applicable

14   law is different than the language of this contract which says

15   tribal law including the code as well as applicable federal

16   law.  That's the point you were making, and that footnote four

17   is rejecting that premise.

18        MR. BENNETT:  Respectfully, it's not.  It's just the

19   musings that the last sentence that Your Honor is dealing with.

20   That one sentence says courts have rejected similar language.

21   The Court, if the Court accepted that as some definitive

22   finding which would be factually wrong, objectively factually

23   wrong because we have the actual two contracts to look at, if

24   the Court made that ruling, then it would have found the -- it

25   would have rejected prospective waiver.  Instead, it just

```
1    simply says I agree with the consumer that tribal jurisdiction

2    is a sham, I'm not going to order that, I agree with the

3    magistrate about that, I'm not going to go ahead and decide the

4    question of prospective waiver, and then there's the sentence

5    in footnote four, the last that says courts with similar

6    language have rejected.  That's all it said.

7              THE COURT:  Did I hear you say that what was in that

8    footnote was a musing?

9              MR. BENNETT:  It was --

10             THE COURT:  A musing, m-u-s-i-n-g, not amusing.

11             MR. BENNETT:  Yes.

12             THE COURT:  But the musing was that the Mobiloans

13   language and the LVD language are similar.  That's the musing.

14             MR. BENNETT:  Actually says cases with similar

15   language have found there wasn't prospective waiver.  Didn't

16   even say this is the same fact pattern.  It just said cases,

17   and it cites the one case that you have to look at.

18             THE COURT:  It cites *Gibbs*.

19             MR. BENNETT:  That's right.  That's not cases.

20   That's one.  And we have *Gibbs* to look at.  We have the actual

21   language.

22             THE COURT:  So is your argument that this footnote is

23   wrong?

24             MR. BENNETT:  Absolutely.

25             THE COURT:  Well, tell me this:  But it does bring
```

167

1    into focus that one court has compared the LVD contract as
2    compared to cited language in the Mobiloans contract and found
3    they were similar language.  They are similar in that they have
4    a lot of the same words, but what it does, this whole thing
5    does, in my mind, is it highlights that your argument about the
6    case, the effect of the governing law clause here hangs on the
7    thread of what including tribal law -- what including but not
8    limited to the code as well as applicable federal law means,
9    because in the other case, Mobiloans, the language was in
10   accordance with tribal law and applicable federal law.
11            MR. BENNETT:  As well, yes, sir.
12            THE COURT:  Then they went on over in the next
13   section under -- beginning paragraph fifth talking about
14   statutory damages and attorneys' fees if allowed by tribal or
15   federal statute or applicable law, and in -- those clauses were
16   found not to be a prospective waiver whereas the mere -- the
17   similar language in the other one, you are telling me, is a
18   prospective waiver.  And the other one is what I just read you.
19            MR. BENNETT:  Yes, for that -- yes, and, in fact, if
20   you go to the next page, Judge, of the *Gibbs v. Stinson*
21   decision, my top it says this agreement has the actual
22   language.  It says this agreement and the arbitration clause
23   are governed by.
24            THE COURT:  Yes.
25            MR. BENNETT:  And the part that this Court italicized

**JA1644**

1   says, and any applicable federal law necessary to uphold

2   federal substantive statutory rights.

3           THE COURT:  So?

4           MR. BENNETT:  All of that's lacking here.  In fact,

5   to the contrary.  This dispute procedure says there are no

6   federal -- there are no substantive rights, there are no

7   procedural rights, you simply have the courtesy of the

8   sovereign, and, on top of that, you have tribal law standing

9   over and above any other law including federal law.  I also

10  note --

11          THE COURT:  But you do have to agree that the Oregon

12  court doesn't quite see things your way.

13          MR. BENNETT:  I'm sure when the Oregon court has that

14  issue before it, briefed like we've done it and argued, they'll

15  come to the same conclusion.  I don't think this is

16  controversial.  I think that that was a side dicta sentence and

17  not even dicta.  It was just a statement.  But if the court in

18  Oregon, if the district court in Oregon had actually concluded

19  that Mr. Martorello -- that consumers could vindicate their

20  federal rights in tribal court, then none of the other

21  conclusions, the refusal to require consumers to go to tribal

22  court to vindicate their rights would make any sense.

23          So that court, the Oregon court, held that it was not

24  going to enforce the forum selection provision because

25  consumers wouldn't be able to vindicate their rights there.  It

1  doesn't make any sense to suggest that the Oregon court is

2  presuming that this is somehow in this case -- that you could.

3  And, in fact, that footnote doesn't say that.  It says I'm not

4  going to decide the issue right now, other courts with similar

5  language have declined to find prospective waiver.  That's all

6  it says.  It doesn't say I'm persuaded, I may be persuaded.

7  The safer thing right now is to not find prospective waiver

8  even though I found in every other way --

9          THE COURT:  So it's, in essence, a nondecision

10  decision.

11          MR. BENNETT:  I don't want to use dicta, I don't want

12  to insult the Oregon court by using the word musing --

13          THE COURT:  You already did that.

14          MR. BENNETT:  I know the court reporter.  I said

15  something else.  I just mispronounced it.  I think that the

16  district court wasn't -- it wasn't even part of its decision.

17  It wasn't even analyzing it.  It was just making an

18  observation.  That's what I meant to say.  Just a general

19  observation of a matter that obviously had not been briefed or

20  argued or certainly briefed and argued well.

21          THE COURT:  Maybe it's a little more than that,

22  because in that observation, the Court rejected a very explicit

23  finding to the contrary by the magistrate judge.  So it may be

24  a little more than that.  But, anyway, what else?  Anything

25  else?

170

1          MR. BENNETT:  I don't have anything else, Your Honor.

2    The only thing I would say in reply with respect -- and the

3    last thing I'll say with respect to the predominance issue, all

4    these matters related to whether or not -- the question of what

5    does it mean to receive money under the usury statute, for

6    example, it's glaringly obvious that's a common question, the

7    dialogue between Your Honor and defense counsel.

8          So the question of what is receipt, is it sufficient,

9    do you have to be the actual bagman, or can you be the mafia

10   don that collects the money from the bagman who is receiving in

11   an unlawful usurious or unlawful loan context, but that's a

12   common question.  If Mr. Martorello is not liable because he's

13   not the one that got the dollar bill from John Smith, then he's

14   not liable at all for anybody under the receipt provision under

15   the usury statute.

16         THE COURT:  If that's the law, isn't it the case that

17   most of the people who have been convicted for money laundering

18   and various and sundry things under the RICO statute are not

19   guilty and they need to pursue writs of actual innocence?

20         MR. BENNETT:  That would have to be the case which I

21   know not to be.

22         THE COURT:  All right.  Well, I need to ask you all

23   some questions here now.

24         MR. BENNETT:  Do you want me to stay at the podium or

25   sit down?

**JA1647**

```
 1              THE COURT:  I have the following thing:  Martorello's
 2   motion for partial reconsideration of the Court's 529 order on
 3   ESI protocol; plaintiffs' renewed motion for class
 4   certification.  I just got that.  Plaintiffs' motion for a
 5   preliminary injunction filed in January.
 6              Now, plaintiffs Rule 37 motion filed in January,
 7   Martorello's motion requesting oral argument on pending
 8   motions, it looks to me like I don't know what all that's
 9   about, but we're doing -- do we need a hearing on the
10   preliminary injunction, evidentiary hearing on that motion?
11              MR. BENNETT:  I believe that we have the record
12   already in front of us.  I don't believe we need a further
13   evidentiary hearing.
14              THE COURT:  The Court can hear preliminary
15   injunctions on affidavits, but also it's been my practice to
16   ask the parties if you want evidence in injunctions, and
17   particularly in a case like this I probably ought to ask it of
18   the defendants.  From your standpoint, you don't need an
19   evidentiary hearing or any discovery for your motion; is that
20   right?
21              MR. BENNETT:  We don't need argument, Judge.
22              THE COURT:  Argument or hearing.
23              MR. BENNETT:  Or a hearing, Your Honor.
24              THE COURT:  All right.  What did you do; file that to
25   get me off the dime or something?
```

1          MR. BENNETT:  No, sir.

2          THE COURT:  How can I issue an injunction on this

3    case?

4          MR. BENNETT:  Well, that injunction is just with

5    respect to freezing the money.

6          THE COURT:  I know.  It's a pretty severe remedy, I

7    thought.  Somebody freezes my money, it kind of bothers me.  So

8    let me ask the defendant do they want a hearing, because I have

9    to deal with it.  On the other hand, since you filed it in

10   January, if you think really it's probably something we ought

11   not to get around to, then there's a remedy for that, and that

12   is to say withdraw it with right to submit it later if you need

13   to.  Then we don't have to worry about it.

14         MR. BENNETT:  Judge, if the Court would indulge us,

15   we would like to have oral argument and hearing.  We believe we

16   submitted evidence already as part of the memorandum.

17         THE COURT:  Let me see what they think.  Do you want

18   to present evidence?  They want argument.  They didn't want it

19   until they found out -- I didn't want to be looking at his

20   notes.

21         MR. BENNETT:  Nobody can read my notes.

22         THE COURT:  I don't think you're at high risk of

23   exposure to anything great.  Don't worry about it.  He said so.

24         MR. BENNETT:  Your Honor, I'm vaccinated, and my

25   notes are entirely illegible.

1          MR. GROSSWENDT:  It was more professional courtesy.

2   Your Honor, I don't think we need a hearing on this.  If they

3   would like to hear argument or a hearing, we'll fly back out.

4   We'll do it.

5          THE COURT:  You're not going to want to put on

6   evidence?

7          MR. GROSSWENDT:  No.

8          THE COURT:  And you don't need -- whatever you've put

9   on in response is satisfactory.

10          MR. GROSSWENDT:  Yes, Your Honor.

11          THE COURT:  All right.  When do you all want me to

12   hear the argument on that motion?

13          MR. BENNETT:  I'll answer generally as soon as

14   possible, but we also have the motion to compel the arbitration

15   related evidence.

16          THE COURT:  Is that the Rule 37 motion, number 991?

17          MR. BENNETT:  Yes, sir.

18          THE COURT:  I haven't read that yet.  I skimmed it

19   when it came in, but I'm not up to speed on it.  What's it all

20   about?

21          MR. BENNETT:  The defendant reached an agreement with

22   Big Picture Loans in settlement, and we sought to discover that

23   agreement and the documents related to it.

24          THE COURT:  Is it confidential or something?

25          MR. BENNETT:  I think they want it confidential.

1           THE COURT:  Is it subject to an order in the

2    arbitration that it's confidential, or is it just a document

3    they don't want to turn over?

4           MR. BENNETT:  Our understanding is it's a document

5    they don't want to turn over.  We haven't seen anything that

6    says it's subject to a confidentiality order.  I suspect only

7    because of the way that such documents are drafted that they

8    might have built into their contract some confidentiality

9    language that neither will share it with us.

10           THE COURT:  Is that language in the briefing?

11           MR. BENNETT:  We don't have their settlement

12    documents.

13           THE COURT:  No, let me try again.  In many instances,

14    there is language in an agreement that this agreement is

15    subject to confidentiality, and if you get a demand for it you

16    have to go to court and you have the right to have a court

17    decide the thing, etcetera, etcetera, and that's a fairly

18    standard provision in a lot of agreements.

19           Do we know -- have they asserted in their papers, and

20    I'm sorry I haven't read them, the argument that there's

21    something in the settlement agreement itself which either

22    controls confidentiality or provides a mechanism for having

23    confidentiality adjudicated?  Is there anything in the papers?

24           MR. BENNETT:  There's nothing that I'm aware of --

25           THE COURT:  Ask Ms. Hooper if I can have that

```
1   notebook.
2           MR. BENNETT:  I don't believe, Judge, there's any
3   language.
4           THE COURT:  How about you, sir?  Is there any such
5   language in there?  Do you need evidence on that motion?
6           MR. BENNETT:  No, sir.
7           THE COURT:  How about you, sir?
8           MR. GROSSWENDT:  I don't believe we need evidence on
9   the motion.
10          THE COURT:  Come on up, Mr. Grosswendt.  Do you
11  pronounce the -- what kind of name is that?  I don't believe
12  I've ever seen it before.
13          (Discussion off the record.)
14          THE COURT:  All right, what is it you all are doing
15  that you won't give them these documents, settlement agreement?
16          MR. GROSSWENDT:  I'll confess that I need to get more
17  familiar with this with it not being on the calendar today.  I
18  can't speak to that in detail right now.
19          THE COURT:  We're in a bad situation.  Everybody in
20  the courtroom is ignorant including the judge.  Can't do much
21  about it.  I'm going to get my copy of the pleadings and go
22  look at them.
23          MR. BENNETT:  Your Honor.
24          THE COURT:  It wasn't on the calendar, and I didn't
25  say anything.  So that's all right for you to be ignorant of
```

1    it, but it really is not all right for me to be.

2            MR. BENNETT:  If the Court would permit it,

3    plaintiffs would propose that we confer with defendant and, by

4    this Friday, file a status report on those motions, on the

5    Rule 37 motion and on the injunction and state each other's

6    position as to whether it still needs to be heard and a

7    timeframe that the parties believe we would ask the Court to

8    hear it.

9            THE COURT:  So when are you going to file that?

10           MR. BENNETT:  By Friday, this Friday.

11           THE COURT:  That would be a July 4th present for me?

12           MR. BENNETT:  We'll file it by Thursday, Your Honor,

13   July 3rd.

14           THE COURT:  We can still read it on the 2nd.  Can you

15   file it by Thursday?

16           MR. BENNETT:  Yes.

17           MR. GROSSWENDT:  Yes, Your Honor.

18           THE COURT:  Then do that by the evening of Thursday

19   so we'll have it.

20           MR. BENNETT:  Yes, sir.

21           THE COURT:  Is there anything else you all need to

22   take up?  What motion do you want oral argument on, number

23   1074?  Your motion on five motions.  I've resolved three of

24   them by court orders, and I concluded that in each of those,

25   there wasn't any need for argument.  Do you know -- the ones

 1   that remain is the class certification, and that's what we did

 2   today, and the other one is the preliminary injunction motion.

 3   So you all are going to give me a further report on that?

 4            MR. GROSSWENDT:  Yes, Your Honor.

 5            THE COURT:  So are you in charge of this case?

 6            MR. GROSSWENDT:  I am not in charge.

 7            THE COURT:  Who is in charge?

 8            MR. GROSSWENDT:  Barney Given, Bernard Given.

 9            THE COURT:  Has he been here?

10            MR. GROSSWENDT:  He has been here, yes, but not

11   recently.  I think his last appearance was on the motion to

12   intervene in the Galloway 3 case which was held in July of

13   2020, I believe.

14            THE COURT:  That was by remote, was it?

15            MR. GROSSWENDT:  I don't recall, but given the

16   timing, probably.

17            THE COURT:  Where is Mr. Given?

18            MR. GROSSWENDT:  He's in Los Angeles.

19            THE COURT:  All right, is there anything else that

20   you all need to take up?

21            MR. GROSSWENDT:  No, Your Honor.

22            MR. BENNETT:  No, sir.

23            THE COURT:  All right, thank you very much.  May I

24   ask you if you have considered the possibility of settling the

25   case?

```
1              MR. GROSSWENDT:  Are we on the record still?
2              THE COURT:  No, we don't have to have it on the
3     record.
4              (Discussion off the record.)
5              THE COURT:  All right, we'll be in adjournment.
6
7
8                   (End of proceedings.)
9
10
11             I certify that the foregoing is a correct transcript
12    from the record of proceedings in the above-entitled matter.
13
14
15    _____/s/_____              _____
      P. E. Peterson, RPR              Date
16
17
18
19
20
21
22
23
24
25
```

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**



LULA WILLIAMS, et al.,

    Plaintiffs,

v.

Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, et al.,

    Defendants.

## MEMORANDUM OPINION

This Memorandum Opinion address an objection tendered by Defendant Matt Martorello in opposition to PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO ("Motion for Class Certification") (ECF No. 967). The objection, which is laid out in Martorello's OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AGAINST MATT MARTORELLO ("Response Memorandum") (ECF No. 1007), argues that the proposed class members waived their right to serve as class representatives. Plaintiffs responded to that objection in PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AGAINST DEFENDANT MATT MARTORELLO ("Reply Memorandum") (ECF No. 1055). And, on June 29, 2021, the Court heard argument on, inter alia, the objection in question.

Having considered all of the submitted information, including the information set forth on the record during the hearing on June 29, 2021, the Court finds that the proposed

**JA1656**

class members did not waive their right to participate in a class action against Defendant Matt Martorello ("Martorello"). The remainder of the Court's analysis of Plaintiffs' Motion for Class Certification will be addressed in a separate memorandum opinion.

## I. BACKGROUND

The facts surrounding this lawsuit have been recounted by this Court on numerous occasions. See, e.g., MEM. OP., ECF No. 944. For the purposes of deciding the enforceability of the class action waiver (which is primarily a question of contract interpretation), it suffices here to provide only a brief summary of the broader merits dispute. The relevant text of the loan contract is provided in the Appendix.

This case is one of four similar, but distinct, actions[1] "arising out of a so-called 'Rent a Tribe' scheme allegedly orchestrated by Matt Martorello ('Martorello'), members of his family, companies that he controls, and investors who allegedly funded the scheme (the 'Martorello Defendants')" along with two "entities formed under the tribal laws of the Lac View Band of

---

[1] In addition to this case, i.e., Williams, et al. v. Big Picture Loans, LLC, et al., 3:17-cv-461 (E.D. Va.) ("Williams"), the other related cases are (1) Renee Galloway, et al. v. Big Picture Loans, LLC, et al., 3:18-cv-406 (E.D. Va.) ("Galloway I"), (2) Renee Galloway, et al. v. Martorello, et al., 3:19-cv-314 (E.D. Va.) ("Galloway II"), and (3) Renee Galloway, et al. v. James Williams, Jr., et al., 3:19-cv-470 (E.D. Va.) ("Galloway III").

2

Lake Superior Chippewa Indians ('LVD')," i.e., "Big Picture
Loans, LLC ('Big Picture') and Ascension Technologies, Inc.
('Ascension') (collectively sometimes referred to as the 'Tribal
Defendants')." Williams v. Big Picture Loans, LLC, 3:17-cv-461,
2020 U.S. Dist. LEXIS 216792, 2020 WL 6784352, at *1-2 (E.D. Va.
Nov. 18, 2020) (Payne, J.). The term "Rent-a-Tribe" refers to
the practice of so-called payday lenders partnering with Native
American tribes "in an effort to cloak the payday lenders in the
sovereign immunity of Native American tribes, and, in so doing,
to preclude enforcement of the interest rate caps in state usury
laws." See MEM. OP. at 4, ECF No. 944. Plaintiffs' basic
contention across all four cases is that Martorello (and the
now-dismissed Tribal Defendants) were involved in such a scheme.

The lending operations evolved over time, but they began
with the use of a so-called tribal lending entity named Red Rock
Lending, LLC ("Red Rock") which used Bellicose, LLC, a non-
tribal entity owned and operated by Martorello, to handle the
lending operations and the servicing of loans. For reasons that
need not be discussed here, around 2013, Red Rock, Bellicose,
and another corporate entity were restructured into a new
lending entity — i.e., Big Picture.

The loan contracts at issue in this Opinion are the loan
contracts by which Plaintiffs received high-interest small-
dollar loans from either Red Rock or Big Picture. See Ex. 1,

3

JA1658

ECF No. 1055-1.[2] A very high percentage of the payments on those loan contracts made their way to Martorello through a rather byzantine corporate structure.

Martorello's objection is based on the "class action waiver" in the "Waiver of Jury Trial" provision of the contract; however, that heading is misleading because the "Waiver of Jury Trial" provision actually contains, for disputes arising from the loan contract: (1) an agreement that the LVD's Tribal Dispute Resolution Procedure will be the "sole and exclusive dispute resolution mechanism"; (2) a waiver of the right to a trial by jury; (3) language consenting to the jurisdiction of the LVD; (4) a waiver of the right to serve as a class action representative or to participate in a class; and (5) a waiver of the right to pursue "litigation or arbitration." See Ex. 1 at 6, ECF No. 1055-1. This Opinion will use the term "waiver" or "class action waiver" to refer to all of the waivers contained in the discussion of the several provisions because that is how the parties have presented them.

_____

[2]   Martorello refers to an ostensibly identical loan contract in his response brief (ECF No. 734-1), but that version of the contract has one fewer page than Plaintiffs' version.  Compare Ex. 1, ECF No. 734-1 with Ex. 1, ECF No. 1055-1.  In any case, Martorello appears to accept that the sample loan contract in ECF No. 1055-1 is an accurate and representative copy of the loan contracts from both lenders over the relevant class period (i.e., 2013-2019).   See Hearing Tr. 65:21-24, 90:19-91:6, ECF No. 1104; see also Hearing Tr. 40:2-41:14, ECF No. 1104.

4

## II. DISCUSSION

Deciding whether the class action waiver applies to block Plaintiffs' ability to serve as class action representatives involves two distinct questions: does the class action waiver apply to claims against Martorello? And, if it does, is the waiver, nevertheless, unenforceable? For the reasons set forth below, the Court finds that the waiver does not apply to Martorello, and even if it did, the waiver is unenforceable.[3]

## A. Does the waiver of class certification apply to Martorello?

Martorello asserts that the class action waivers apply to him,[4] a non-party to the loan agreement, for two reasons.[5]

---

[3]     "Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings." Amato v. City of Richmond, 875 F. Supp. 1124, 1139 (E.D. Va. 1994) (Payne, J.). However, because these issues are highly amenable to appeal — particularly at this stage in the litigation, "this case presents one of those unusual circumstances where it is appropriate to articulate an alternative ground of decision." Id.

[4]     Martorello's Response Memorandum did not explain how this argument related to the Rule 23 factors governing class certification. See Fed. R. Civ. P. Rule 23(a)-(b). At oral argument, Martorello's counsel clarified that the waiver arguments related to the adequacy of the class representatives under Rule 23(a)(3) and the superiority of the class action vehicle under Rule 23(b)(3). Hearing Tr. 62: 2-13, ECF No. 1104.

[5]     Martorello's Response Memorandum also attempted to argue that he could enforce the contract because he was a "servicer," but at oral argument, both parties expressly denied that Martorello was a servicer. Hearing Tr. 55:16-56:7, 94:2-3, ECF No. 1004.

First, the class action waivers apply to "disputes and claims related to or arising under this Agreement[,]" and according to Martorello, Plaintiffs' claims constitute disputes arising under the loan agreement.  Ex. 1 at 6, ECF No. 1055-1.  And, second, the class action waivers apply to "related third parties" (a defined term in the contract), and Martorello asserts that he is a related third party by virtue of being an "affiliated entity" and an "alleged agent."  Resp. Mem. at 4, ECF No. 1007.  Neither argument is persuasive.

**1.  The waiver cannot apply to strangers to the contract.**

First, it is axiomatic that a contract is only binding on the parties to the contract, absent certain limited exceptions. 13 WILLISTON ON CONTRACTS § 37.1 (4th ed.) ("The mere fact of entering into a contract gives rise to a relationship between or among the contracting parties known as 'privity.' Under the traditional common-law rule, only parties in privity of contract could sue on the contract[.]") (footnote omitted); see also Privity of Contract, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so."). Martorello admits, as he must, that he was not a party to the loan contracts.  See Resp. Mem. at 3, ECF No. 1007.  And, he provides no explanation for why the general rule of privity of contract would not apply merely because of the subject matter of

6

Plaintiffs' lawsuit. Martorello cannot, therefore, claim a right to enforce any part of the loan contract purely because the current suit is a dispute or claim arising from the loan contract.

### 2. **Martorello is not a related third party.**

Of course, it is possible that third-parties can be made beneficiaries of a contract. 13 WILLISTON ON CONTRACTS § 37.1 (4th ed.). And, if a third-party is a beneficiary of a contract, the third-party may claim its benefits. However, to do that, the third party must be designated a beneficiary in the contract. 13 WILLISTON ON CONTRACTS § 37.29 (4th ed.). Martorello was not so named and thus cannot claim third-party beneficiary status unless he is a "related third party" under the loan agreement.

For the reasons that follow, Martorello is not a "related third party" within the meaning of the loan contract. The loan contract states:

> For purposes of this Waiver of Jury Trial provision and Tribal Dispute Resolution Procedure provision above, the words 'dispute' and 'disputes' are given the broadest possibly meaning and include, without limitation, . . . (h) all claims asserted by You individually against Us and <u>any of Our employees, **agents**, directors, officers, shareholders, governors, managers, members, parent company or **affiliated entities** (hereinafter collectively referred to as **'related third parties'**)</u>, including claims for money damages and/or equitable or injunctive relief;

7

Ex. 1 at 6, ECF No. 1055-1 (emphasis added).[6]   The phrase

"related third parties" subsequently appears six times in the

loan contract and is never redefined or used in a manner that

would contradict this definition.   In his Response Memorandum,

Martorello asserts that he was both an "agent" and an

"affiliated entity."   Resp. Mem. at 4, ECF No. 1007.   Martorello

argues that he and the companies "he managed were 'affiliated

entities' because they provided consulting and servicing

assistance to the Tribal Lender prior to the sale of Bellicose."

Resp. Mem. at 4, ECF No. 1007 (footnote omitted).   And,

according to Martorello, he should be viewed as an "agent"

because of Plaintiffs' own arguments.[7]   Resp. Mem. at 4, ECF No.

_____

[6] The fact that several provisions of the loan contract specify
exactly to which non-parties they apply (e.g., managers,
shareholders, etc.) further undermines Martorello's prior
argument that the waiver is over a "subject matter category"
that could apply to him despite his lack of privity.

[7]    At oral argument, counsel for Martorello stated, arguably
for the first time, that Martorello was an agent because he was
a consultant.    Hearing Tr. 94:24-25, ECF No. 1104; see also
Resp. Mem. at 4, ECF No. 1007 (arguing that Martorello-managed
companies were consultants to the Tribe's business and that
Martorello and his companies were 'affiliated entities' because
they provided consulting services to the Tribal Lender prior to
the sale of Bellicose).   This argument was based on a separate
clause in the same Waiver of Jury Trial provision which states
that the waiver applies to "(a) all claims, disputes or
controversies involving the parties to this Agreement and Our
employees, servicers, and agents, including but not limited to
consultants, banks, payment processors, software providers, data
providers and credit bureaus[.]"   Ex. 1 at 6, ECF No. 1055-1
(emphasis added).   Arguments presented for the first time at
oral argument will not be considered.   First Tennessee Bank Nat.

8

1007 ("Plaintiffs allege[d] (incorrectly) that Martorello and businesses he managed were agents behind the entire lending business."). Martorello is mistaken on all counts.

At this point it is appropriate to clarify that the loan contract explicitly states that the words "We," "Us," "Our," and "Lender" all refer to one of the two tribal lenders, i.e. Big Picture or Red Rock. Ex. 1 at 3, ECF No. 1055-1. Thus, the phrases "Our . . . agent" and "Our . . . affiliated entities" refer to the lender's (i.e., Big Picture or Red Rock's) agent or affiliated entity, not the agent or affiliated entity of the LVD or any other entity involved in the loan scheme. And, the term "affiliated entity" is not defined in the loan contract. See Ex. 1, ECF No. 1055-1.

### a. Martorello is not an "affiliated entity."

Martorello is not an affiliated entity of either lender (i.e., Red Rock or Big Picture Loans). In his Response Memorandum, Martorello argued, without any citation to the record, that he and his companies were "affiliated entities" to Red Rock and Big Picture Loans because he and his companies

---

Ass'n v. Global Title, LLC, 3:09-cv-550, 2010 WL 5187834, *1 (Nov. 16, 2010) (citing North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. Of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010)). Even if the Court were prepared to consider such an argument, counsel for Martorello were not able to identify specific portions of the record that would show that Martorello was a consultant (and therefore an agent) of either lender. Hearing Tr. 94:24-95:14, 152:1-8, ECF No. 1104.

9

"provided consulting and servicing assistance to the Tribal Lender prior to the sale of Bellicose." Resp. Mem. at 4, n.3, ECF No. 1007 (footnote omitted).

At oral argument, counsel for Martorello argued, for the first time, that evidence of the alleged affiliate relationship can be found in the servicing agreement between Red Rock (the lender) and Bellicose (a Martorello company). Hearing Tr. 150:9-151:14, ECF No. 1104. Because the argument was presented for the first time at oral argument, it cannot be considered. First Tennessee Bank Nat. Ass'n v. Global Title, LLC, 3:09-cv-550, 2010 WL 5187834, *1 (Nov. 16, 2010) (citing North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. Of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010)). But, even if it were considered, it would fail.

In the 2011 servicing agreement, the term "affiliate" is defined in reference to the "Enterprise" (i.e., Red Rock) and the "Servicer" (i.e., Bellicose):

> "Affiliate" means as to Servicer or Enterprise, any corporation, partnership, limited liability company, joint venture, trust, department or agency or individual controlled by, under common control with, or which controls, directly or indirectly Servicer or Enterprise. "Control" means (i) ownership, control, or power to vote twenty five percent (25%) or more of the outstanding shares of any class of voting securities, directly or indirectly or acting through one (1) or more persons, (ii) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions), or (iii)

10

> the power to exercise, directly or indirectly, a
> controlling influence over management or policies."

Ex. 5 at 5, ¶ 2.1, ECF No. 968-5 (emphasis added); accord
Affiliate, BLACK'S LAW DICTIONARY (11th ed. 2019). Both parties
agree that under the aforementioned definition, Martorello would
be an "affiliate." Hearing Tr. 151:11-20, ECF No. 1104.

However, they differ on how that definition of "affiliate"
compares to the term "affiliated entity" in the loan contract.
Martorello argues that the term "entity" can include a natural
person, Resp. Mem. at 4, n.3, ECF No. 1007, and thus, appears to
be saying that the term "affiliated entity" is equivalent to the
term "affiliate" as used in the 2011 servicing agreement.
Plaintiffs argue that the term "affiliated entity," as opposed
to the term "affiliate," is more naturally read to refer to a
corporate entity that is related to Red Rock or Big Picture
through some kind of control relationship. See Reply Mem. at
14-18, ECF No. 1055.

Because there is no definition of "affiliated entity" in
the contract, the Court must look to the common and ordinary
meaning the term, which can include referring to dictionary
definitions. Nationwide Mut. Ins. Co. v. Overlook, LLC, 785 F.
Supp. 2d 502, 518 (E.D. Va. 2011). The common and ordinary
meaning of "affiliate" is essentially what the 2011 servicing
agreement stated, i.e., "A corporation that is related to

11

another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation," and in certain contexts, the term "affiliate" could include an individual. Affiliate, BLACK'S LAW DICTIONARY (11th ed. 2019). However, the common and ordinary meaning of "entity" is "an organization (such as a business or governmental unit) that has a legal identity apart from its members or owners."[8]  Although both "affiliate" and "entity" can sometimes refer to individuals, the common and ordinary meaning of "affiliated entity" refers to a business organization, not an individual. And, at least one court that has had occasion to consider the plain and ordinary meaning of "affiliated entities" has come to the same conclusion.[9]  Under this reading, the term "affiliated entities" cannot refer to Martorello.

---

[8] Entity, BLACK'S LAW DICTIONARY (11th ed. 2019); accord Entity, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/entity (last visited July 6, 2021); but see Entity, AMERICAN HERITAGE DICTIONARY, https://www.ahdictionary.com/word/search.html?q=entity (last visited July 6, 2021) (using "entity" in a sentence to refer to an individual).

[9] See Bd. of Trustees of Leland Stanford Junior Univ. v. Agilent Techs., Inc., No. 18-CV-01199-VC, 2019 WL 4729602, at *1 (N.D. Cal. Aug. 13, 2019) ("If one company owns another, those companies are affiliated entities in the ordinary sense of the term."); see also Silva v. Butori Corp., No. CV-19-04904-PHX-MTL, 2020 U.S. Dist. LEXIS 81367, *12 (D. Ariz., May 8, 2020) (referring to the Black's Law and Merriam Webster definitions of "affiliate" and "affiliated," respectively, to determine the plain and ordinary meaning of the term "affiliated entity").

**b. Martorello is not an "agent" of either lender.**

Additionally, Martorello is not an agent of either lender. To begin, notwithstanding Martorello's assertions to the contrary, Resp. Mem. at 4, ECF No. 1007, Plaintiffs never alleged that Martorello was an agent of the LVD (quite the opposite actually). See, e.g., Compl. ¶ 3, ECF No. 1 (describing Martorello as the mastermind behind the LVD's lending operations). And, in any case, the loan contract uses "agent" to refer to an agent of the lender, not the LVD. Martorello has not pointed the Court to any evidence in the record that he was an agent of Red Rock or Big Picture.

Based on the loan contract and the parties' written and oral arguments, the "Waiver of Jury Trial" provision, which includes the class action waiver, does not apply to Martorello.

**B. Is the waiver valid and enforceable?**

Even if the "Waiver of Jury Trial" provision somehow could be construed to apply to Martorello, the waiver is, nevertheless, unenforceable. According to Plaintiffs, this is because of the prospective waiver doctrine. Although the prospective waiver doctrine has most commonly been associated with arbitration agreements, the rationale behind the doctrine supports its application in contexts beyond mandatory arbitration agreements.

13

**JA1668**

From its origins in Mitsubishi Motors Corp. v. Soler
Chrysler-Plymouth, Inc., the prospective waiver inquiry has
focused on whether a party has waived, in advance, its right to
pursue federal statutory remedies.    473 U.S. 614, 637 n.19
(1985) ("[I]n the event the choice-of-forum and choice-of-law
clauses operated in tandem as a prospective waiver of a party's
right to pursue statutory remedies for antitrust violations, we
would have little hesitation in condemning the agreement as
against public policy.").    Though decisional law has been
concentrated on mandatory arbitration claims, it is the waiver
of important federal rights that is at issue, not merely the
suitability of arbitral forums.    Am. Exp. Co. v. Italian Colors
Rest., 570 U.S. 228, 240 (2013) (Kagan, J. dissenting)
("[C]ourts will not enforce a prospective waiver of the right to
gain redress for an antitrust injury, whether in an arbitration
agreement or any other contract.").    This understanding is
reflected in the recent cases of the Fourth Circuit examining
the enforceability of various Tribal lending contracts.
Hayes v. Delbert Servs. Corp., 811 F.3d 666, 673 (4th Cir. 2016)
("This arbitration agreement fails for the fundamental reason
that it purports to renounce wholesale the application of any
federal law to the plaintiffs' federal claims."); Dillon v. BMO
Harris Bank, N.A., 856 F.3d 330, 335 (4th Cir. 2017) ("These
terms throughout the underlying loan agreement further

14

illustrate that the choice of law provision in the arbitration agreement 'disavow[s] the application of all state and federal law' and 'unambiguously forbids an arbitrator from even applying the applicable law.'"); Gibbs v. Haynes Invs., LLC, 967 F.3d 332, 340-41, 343-44 (4th Cir. 2020) (describing a tribal loan contract as problematic because consumers were functionally prohibited from enforcing the federal RICO statute); Gibbs v. Sequoia Capital Operations, LLC, 966 F.3d 286, 294 (4th Cir. 2020) ("In summary, because the effect of the choice-of-law provisions is to stymie the vindication of the federal statutory claims that the borrowers seek to enforce, they amount to a prospective waiver and render the delegation provisions unenforceable."). Therefore, where a provision of a contract mandates an alternative dispute resolution procedure that amounts to a substantive waiver of federally protect rights, the provision is unenforceable. See Hayes v. Delbert Servs. Corp., 811 F.3d 666, 674-75 (4th Cir. 2016).

When viewed in the context of the Tribal Financial Services Regulatory Authority Code (the "Code") and the loan agreement as a whole, the "Waiver of Jury Trial" provision clearly amounts to a substantive waiver of federally protected rights. Although there is no express renunciation of federal law, the net result of the loan contract is that the consumers have no meaningful

15

**JA1670**

way to vindicate their federal rights. This is demonstrated by

the following provisions:

- o The governing law of the contract, by its terms, is "the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ('Tribal law'),[10] including but not limited to the Code as well as applicable federal law." Ex. 1 at 5, ECF No. 1055-1.

- o The Code states that the lender must "conduct business in a manner consistent with the principles of federal consumer protection law, including, without limitation" ten enumerated federal consumer financial protection laws or regulations.[11] Ex. 6 ¶ 6.2, ECF No. 1055-6 (emphasis added).

- o The Tribal Dispute Resolution Procedure is the sole method of resolving any disputes any under the contract. Ex. 1 at 5, ECF No. 1055-1 ("All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code . . . .") Ex. 1 at 5, ECF No. 1055-1. This sentiment is repeated at least four times in the contract. See Ex. 1 at 6 ¶ 2(c), ECF No. 1055-1 ("YOU CONSENT TO THE JURISDICTION OF THE TRIBE AND HAVE READ AND AGREE TO BE BOUND SOLELY BY THE TRIBAL DISPUTE RESOLUTION PROCEDURE FOUND IN THE CODE[.]"); Ex. 1 at 6 ¶ 4, ECF No. 1055-1 ("All disputes arising out of, relating to, or in connection with this Agreement shall be finally settled under the Tribal Dispute Resolution Procedure."); Ex. 1 at 7, ECF No. 1055-1 ("You acknowledge and agree that this Agreement is subject solely and exclusively to the Tribal law and jurisdiction of the Lac Vieux Desert Band of Lake Superior Chippewa Indians."); Ex. 1 at 7, ECF No. 1055-1 ("[T]he Tribal Dispute Resolution Procedure is the sole and exclusive forum for resolving disputes and/or claims arising from or relating to this Agreement.").

---

[10] Neither party has submitted any Tribal law (that is, other than the Code) for this Court's consideration.

[11] Notably, the list of federal consumer financial protections, while not exhaustive, does not include the federal RICO statute which Plaintiffs are suing under in this case.

16

o "The Tribal Dispute Resolution Procedure has been created by the Tribe as a courtesy to consumers and is the sole and exclusive dispute resolution mechanism for disputes and claims related to or arising under this Agreement." Ex. 1 at 6, ECF No. 1055-1 (emphasis added).

o Under the Tribal Dispute Resolution Procedure, consumers must first lodge an informal complaint with the lender. Ex. 1 at 6, ECF No. 1055-1. The lender will then investigate the complaint and respond. Id. If the consumer is unhappy with the lender's response, the consumer can initiate a Formal Dispute Resolution by requesting that the Tribal Financial Services Regulatory Authority ("Authority") review the lender's decision. Id. The Authority will decide if the consumer can have a hearing or not and will ultimately render its own decision. Id. An Authority decision may be appealed to the Tribal Court, id., but the scope of the Tribal Court's review is roughly that of a federal court reviewing a federal agency's decision. See Ex. 6 at 29, ECF No. 1055-6. And, the Tribal Court's decision may not be appealed. Ex. 6 at 30, ECF No. 1055-6.

o Under the Tribal Dispute Resolution Procedure, "[a] person's complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner." Ex. 1 at 6, ECF No. 1055-1 (emphasis added).

o The Tribe and the Lender (i.e., Big Picture or Red Rock) both "express" their "intention" "to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign immunity, and any other rights, titles, privileges and immunities to which they are entitled." Ex. 1 at 6, ECF No. 1055-1.

o The loan contract also waives a consumer's right to a trial by jury, the right to serve as a class representative, and the right to arbitration. Ex. 1 at 6, ECF No. 1055-1.

o The contract then explicitly adds that "NO LITIGATION OR ARBITRATION IS AVAILABLE[.]" Ex. 1 at 6, ECF No. 1055-1.

17

In conjunction, these provisions operate to functionally waive a consumer's right to vindicate federally protected statutory rights. Here, as in Hayes v. Delbert Servs. Corp., the animating purpose of these provisions is to allow the making of consumer loans free from the strictures of federal law. 811 F.3d 666, 676 (4th Cir. 2016). And, as in Gibbs v. Haynes Invs., LLC, the practical effect of these provisions is that "tribal law preempts the application of any contrary law – including contrary federal law." 967 F.3d 332, 342 (4th Cir. 2020). In short, the system set up here prevents borrowers from effectively vindicating any federal statutory claim. Indeed, the remedial procedures outlined in the contract are courtesies, not rights. See, e.g., Ex. 1 at 6, ECF No. 1055-1 ("A person's complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner."). Taken together, these provisions violate the prospective waiver rule.[12]

---

[12] Neither party requested severance of any part of the loan contract, but in any case, because these issues are pervasive throughout the loan contract, there would be no way to sever the offending provisions. See Dillon v. BMO Harris Bank, N.A., 856 F.3d 330, 335 (4th Cir. 2017).

18

## CONCLUSION

For the foregoing reasons, the Court finds that the waiver does not apply to Martorello, and even if it did, the waiver is, nevertheless, unenforceable. Martorello's objection to class certification on the waiver theory will be rejected.

It is so ORDERED.

                                    /s/
                    Robert E. Payne
                    Senior United States District Judge

Richmond, Virginia
Date: July /5, 2021

19

## APPENDIX

**IMPORTANT NOTICE: This Loan Agreement (hereinafter, the "Agreement") is governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippawa Indians. There will be no binding contract formed between You and Us until this Agreement is electronically signed by You and then is received and verified by Us on the Lac Vieux Desert Reservation.**

\*\*\*

In this Agreement the words "You", "Your" and "I" mean the borrower who has electronically signed it. The words "We", "Us," "Our," "Lender" mean Big Picture Loans, LLC. Big Picture Loans, LLC is a duly licensed Financial Services Licensee of the Lac Vieux Desert Tribal Financial Services Regulatory Authority, an independent regulatory body of the Lac Vieux Desert Band of Lake Superior Chippewa Indians. Lender is an economic development arm and instrumentality of, and limited liability company wholly owned and operated by, the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribe"), created for the benefit of the Tribe and operating pursuant to Tribal Law. Lender is licensed and regulated by the Tribal Financial Services Regulatory Authority and operates in accordance with the Tribal Consumer Financial Services Regulatory Code ("Code").

\*\*\*

Once You sign and submit this Agreement, We will confirm Your information and either approve or deny Your loan request from Our office located on tribal land in Watersmeet, Michigan.

\*\*\*

Ex. 1 at 3, ECF No. 1055-1 (emphasis in original).

\*\*\*

**GOVERNING LAW AND FORUM SELECTION:** This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal

law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for Your convenience.

**SOVEREIGN IMMUNITY:** This Agreement and all related documents are being submitted by You to Big Picture Loans, LLC at its office on Tribal land. The Lender is an economic development arm, instrumentality, and limited liability company wholly owned and operated by the Tribe. The Tribe is a federally recognized Indian Tribe and enjoys tribal sovereign immunity. Because the Tribe and Lender are entitled to sovereign immunity, You will be limited in what claims, if any, You may be able to assert against them. To encourage resolution of consumer complaints, and pursuant to Section 9 of the Code, all complaints lodged, filed, or otherwise submitted by You or on Your behalf must follow the Tribal Dispute Resolution Procedure, as described herein.

Ex. 1 at 5, ECF No. 1055-1 (emphasis in original).

\*\*\*

**TRIBAL DISPUTE RESOLUTION PROCEDURE:** The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by You or on Your behalf relating to or arising from this Agreement. The Procedure is found at Section 9 of the Code. You can find the Code at Our website, www.BigPictureLoans.com, at 2015 11 03 Tribal Consumer Financial Services Regulatory Code, or You may request a physical copy by written request mailed along with a self-addressed postage paid return envelope to the Tribal Financial Services Regulatory Authority, P.O. Box 249, Watersmeet, Michigan 49969. The Tribe and Lender intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by You or on Your behalf to follow the Procedure. Under the Procedure, a consumer who, in the course of his otherwise lawful and proper use of Lender's business believes himself

2

**JA1676**

to be harmed by some aspect of the operation of any part of Lender's business, shall direct his concerns or dispute to Lender in writing. A person's complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner. The Lender will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of the written

complaint. In the event that the consumer is dissatisfied with the Lender's determination, he may initiate Formal Dispute Resolution by requesting an administrative review of Lender's determination by submitting such request in writing to the Tribal Financial Services Regulatory Authority ("Authority"), P.O. Box 249, Watersmeet, MI 49969, no later than ninety (90) days after receiving Lender's determination.

At a hearing, You may be represented by legal counsel at Your own expense. The administrative review hearing will occur within sixty (60) days after the Authority receives Your written request. The Authority will send notice to You and Us when a request for a hearing is granted or denied.
A consumer may appeal an Authority decision and order by filing a written petition for review with the Tribal Court within ninety (90) days after the Authority issued its decision
and order.

**For important information about the specific procedures that You must follow in order to request review by the Authority of an Lender determination, and to appeal a decision of the Authority to the Tribal Court, please review the Code at Our website, www.BigPictureLoans.com, or http://www.lvdtribal.com/tfsra.html or request a physical copy by written request mailed along with a self-addressed postage paid return envelope to Tribal Consumer Financial Services Code Request, Attn: Regulatory Agent, P.O. Box 249, Watersmeet, Michigan 49969.**

3

**JA1677**

**WAIVER OF JURY TRIAL:** The Tribal Dispute Resolution Procedure has been created by the Tribe as a courtesy to consumers and is the sole and exclusive dispute resolution mechanism for disputes and claims related to or arising under this Agreement. **THEREFORE, YOU ACKNOWLEDGE AND AGREE AS FOLLOWS:**

1. For purposes of this Waiver of Jury Trial provision and Tribal Dispute Resolution Procedure provision above, the words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation, (a) all claims, disputes, or controversies involving the parties to this Agreement and Our employees, servicers and agents, including but not limited to consultants, banks, payment processors, software providers, data providers and credit bureaus; (b) all claims, disputes, or controversies arising from or relating directly or indirectly to Your application, this Agreement, the validity and scope of these provisions and any claim or attempt to set aside these provisions; (c) all Tribal and U.S. federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to Your application, the Agreement, the information You gave Us before entering into the Agreement, including the customer information application, and any past Agreement or Agreements between You and Us; (d) all counterclaims, crossclaims and third-party claims; (e) all common law claims, based upon contract, tort, fraud, or other intentional torts; (f) all claims based upon a violation of any Tribal, state or federal constitution, statute, regulation or ordinance; (g) all claims asserted by Us against You, including claims for money damages to collect any sum We claim You owe Us; (h) all claims asserted by You individually against Us and any of Our employees, agents, directors, officers, shareholders, governors, managers, members, parent company or affiliated entities (hereinafter collectively referred to as "related third parties"), including claims for money damages and/or equitable or injunctive relief; (i) all claims asserted on Your behalf by another person; (j) all claims asserted by You as a private attorney general, as a representative and member of a class of persons, or

4

in any other representative capacity, against Us and/or related third parties (hereinafter referred to as "Representative Claims"); (k) all claims arising from or relating directly or indirectly to the disclosure by Us or related third parties of any nonpublic personal information about You; (l) all claims related to or arising from loan extensions or payment plans; (m) all claims related to collections, privacy, and customer information; and (n) all claims related to setting aside the Waiver of Jury Trial provision or the Tribal Dispute Resolution Procedure provision, including claims about such provisions' validity and scope.

2. You acknowledge and agree that by agreeing to this Waiver of Jury Trial provision:
**(a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**

**(b) YOU CONSENT TO THE JURISIDCTION** [sic] **OF THE TRIBE AND HAVE READ AND AGREE TO BE BOUND SOLELY BY THE TRIBAL DISPUTE RESOLUTIUON** [sic] **PROCEDURE FOUND IN THE CODE; and**

**(c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

3. All disputes including any Representative Claims against Us and related third parties shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with You as provided for pursuant to Tribal law. **THEREFORE, NO LITIGATION OR ARBITRATION IS AVAILABLE AND NO JUDGE OR ARBITRATOR SHALL CONDUCT CLASS PROCEEDINGS; THAT IS, YOU SHALL BE INELIGIBLE TO SERVE AS A CLASS ACTION REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN LITIGATION OR ARBITRATION.**

4. All disputes arising out of, relating to, or in connection with this Agreement shall be finally

5

settled under the Tribal Dispute Resolution
Procedure.

5. This Waiver of Jury Trial provision and Tribal
Dispute Resolution Procedure provision are binding
upon and benefit You, Your respective heirs,
successors and assigns. This Waiver of Jury Trial
provision and Tribal Dispute Resolution Procedure
provision are binding upon and benefit Us, Our
successors and assigns, and related third parties.
Both provisions continue in full force and effect,
even if Your obligations have been paid or
discharged through bankruptcy. Both provisions
survive any cancellation, termination, amendment,
expiration or performance of any transaction between
You and Us and continues in full force and effect
unless You and We otherwise agree in writing.

**Your right to file suit against Us for any claim or
dispute arising from or relating to this Agreement
is limited by the WAIVER OF JURY TRIAL AND THE
TRIBAL DISPUTE RESOLUTION PROCEDURE provisions. In
the event the Lender engages legal counsel to
protect its right, title and interest in this
Agreement or otherwise litigate, protect or defend
its rights outside of the Tribal Dispute Resolution
Procedure agreed to herein, You hereby agree that
the Lender may
recover reasonable costs and fees from You.**

\*\*\*

Ex. 1 at 6, ECF No. 1055-1 (emphasis in original)

\*\*\*

IMPORTANT ACKNOWLEDGEMENTS:

You acknowledge and agree that this Agreement is
subject solely and exclusively to the Tribal law and
jurisdiction of the Lac Vieux Desert Band of Lake
Superior Chippewa Indians.

You acknowledge and agree that the Tribal Dispute
Resolution Procedure is the sole and exclusive forum
for resolving disputes and/or claims arising from or
relating to this Agreement.

6

You acknowledge and agree to the Waiver of Jury
Trial provision.

You acknowledge and understand that You selected
Your loan repayment method during the application
process and that Your loan was not conditioned on
repayment of Your loan by ACH.

BY CLICKING THE SUBMIT BUTTON YOU HAVE
ELECTRONICALLY SIGNED THIS AGREEMENT. YOU AGREE THAT
YOUR ELECTRONIC SIGNATURE HAS THE FULL FORCE AND
EFFECT OF YOUR PHYSICAL SIGNATURE AND THAT IT BINDS
YOU TO THIS AGREEMENT IN THE SAME MANNER A PHYSICAL
SIGNATURE WOULD DO SO. YOU CERTIFY THAT THE
INFORMATION GIVEN IN CONNECTION WITH THIS AGREEMENT
IS TRUE AND CORRECT. YOU AUTHORIZE US TO VERIFY THE
INFORMATION GIVEN IN CONNECTION WITH THIS AGREEMENT
AND GIVE US CONSENT TO OBTAIN INFORMATION ON YOU
FROM CONSUMER REPORTING AGENCIES OR OTHER SERVICES.
YOU ACKNOWLEDGE THAT:
(A) YOU HAVE READ, UNDERSTAND, AND AGREE TO ALL OF
THE TERMS AND CONDITIONS OF THIS AGREEMENT INCLUDING
THE WAIVER OF JURY TRIAL AND PROCEDURE PROVISIONS AS
WELL AS THE PRIVACY POLICY, (B) THIS AGREEMENT
CONTAINS NO BLANKS AND WAS FILLED IN BY YOU BEFORE
YOU SIGNED IT, AND (C) THAT YOU HAVE PRINTED OR
DOWNLOADED A COMPLETED COPY OF THIS AGREEMENT FOR
YOUR RECORDS. YOU FURTHER ACKNOWLEDGE THAT THIS
AGREEMENT IS SUBJECT TO APPROVAL BY US AND ALL LOANS
ARE APPROVED OR DENIED ON TRIBAL LAND AT OUR OFFICE
LOCATED IN WATERSMEET, MICHIGAN AND ARE SUBJECT TO
FINAL DETERMINATION BY US.

Ex. 1 at 7, ECF No. 1055-1 (emphasis in original).

**JA1681**

## APPENDIX

**IMPORTANT NOTICE: This Loan Agreement (hereinafter, the "Agreement") is governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippawa Indians. There will be no binding contract formed between You and Us until this Agreement is electronically signed by You and then is received and verified by Us on the Lac Vieux Desert Reservation.**

\*\*\*

In this Agreement the words "You", "Your" and "I" mean the borrower who has electronically signed it. The words "We", "Us," "Our," "Lender" mean Big Picture Loans, LLC. Big Picture Loans, LLC is a duly licensed Financial Services Licensee of the Lac Vieux Desert Tribal Financial Services Regulatory Authority, an independent regulatory body of the Lac Vieux Desert Band of Lake Superior Chippewa Indians. Lender is an economic development arm and instrumentality of, and limited liability company wholly owned and operated by, the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribe"), created for the benefit of the Tribe and operating pursuant to Tribal Law. Lender is licensed and regulated by the Tribal Financial Services Regulatory Authority and operates in accordance with the Tribal Consumer Financial Services Regulatory Code ("Code").

\*\*\*

Once You sign and submit this Agreement, We will confirm Your information and either approve or deny Your loan request from Our office located on tribal land in Watersmeet, Michigan.

\*\*\*

Ex. 1 at 3, ECF No. 1055-1 (emphasis in original).

\*\*\*

**GOVERNING LAW AND FORUM SELECTION:** This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal

**JA1682**

law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for Your convenience.

**SOVEREIGN IMMUNITY:** This Agreement and all related documents are being submitted by You to Big Picture Loans, LLC at its office on Tribal land. The Lender is an economic development arm, instrumentality, and limited liability company wholly owned and operated by the Tribe. The Tribe is a federally recognized Indian Tribe and enjoys tribal sovereign immunity. Because the Tribe and Lender are entitled to sovereign immunity, You will be limited in what claims, if any, You may be able to assert against them. To encourage resolution of consumer complaints, and pursuant to Section 9 of the Code, all complaints lodged, filed, or otherwise submitted by You or on Your behalf must follow the Tribal Dispute Resolution Procedure, as described herein.

Ex. 1 at 5, ECF No. 1055-1 (emphasis in original).

\*\*\*

**TRIBAL DISPUTE RESOLUTION PROCEDURE:** The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by You or on Your behalf relating to or arising from this Agreement. The Procedure is found at Section 9 of the Code. You can find the Code at Our website, www.BigPictureLoans.com, at 2015 11 03 Tribal Consumer Financial Services Regulatory Code, or You may request a physical copy by written request mailed along with a self-addressed
postage paid return envelope to the Tribal Financial Services Regulatory Authority, P.O. Box 249, Watersmeet, Michigan 49969. The Tribe and Lender intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by You or on Your behalf to follow the Procedure. Under the Procedure, a consumer who, in the course of his otherwise lawful and proper use of Lender's business believes himself

2

JA1683

to be harmed by some aspect of the operation of any
part of Lender's business, shall direct his concerns
or dispute to Lender in writing. A person's
complaint to the Lender shall be considered similar
in nature to a petition for redress submitted to a
sovereign government, without waiver of sovereign
immunity and exclusive jurisdiction, and does not
create any binding procedural or substantive rights
for a petitioner. The Lender will investigate the
complaint and respond as soon as reasonably
practicable, but no later than thirty (30) days from
the receipt of the written

complaint. In the event that the consumer is
dissatisfied with the Lender's determination, he may
initiate Formal Dispute Resolution by requesting an
administrative review of Lender's determination by
submitting such request in writing to the Tribal
Financial     Services     Regulatory     Authority
("Authority"), P.O. Box 249, Watersmeet, MI 49969,
no later than ninety (90) days after receiving
Lender's determination.

At a hearing, You may be represented by legal
counsel at Your own expense. The administrative
review hearing will occur within sixty (60) days
after the Authority receives Your written request.
The Authority will send notice to You and Us when a
request for a hearing is granted or denied.
A consumer may appeal an Authority decision and
order by filing a written petition for review with
the Tribal Court within ninety (90) days after the
Authority issued its decision
and order.

**For important information about the specific
procedures that You must follow in order to request
review by the Authority of an Lender determination,
and to appeal a decision of the Authority to the
Tribal Court, please review the Code at Our website,
www.BigPictureLoans.com,                              or
http://www.lvdtribal.com/tfsra.html   or   request   a
physical copy by written request mailed along with a
self-addressed postage paid return envelope to
Tribal Consumer Financial Services Code Request,
Attn: Regulatory Agent, P.O. Box 249, Watersmeet,
Michigan 49969.**

3

**JA1684**

**WAIVER OF JURY TRIAL:** The Tribal Dispute Resolution Procedure has been created by the Tribe as a courtesy to consumers and is the sole and exclusive dispute resolution mechanism for disputes and claims related to or arising under this Agreement. **THEREFORE, YOU ACKNOWLEDGE AND AGREE AS FOLLOWS:**

1. For purposes of this Waiver of Jury Trial provision and Tribal Dispute Resolution Procedure provision above, the words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation, (a) all claims, disputes, or controversies involving the parties to this Agreement and Our employees, servicers and agents, including but not limited to consultants, banks, payment processors, software providers, data providers and credit bureaus; (b) all claims, disputes, or controversies arising
from or relating directly or indirectly to Your application, this Agreement, the validity and scope of these provisions and any claim or attempt to set aside these provisions; (c) all Tribal and U.S. federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to Your application, the Agreement, the information You gave Us before entering into the Agreement, including the customer information application, and any past Agreement or Agreements between You and Us; (d) all counterclaims, crossclaims and third-party claims; (e) all common law claims, based upon contract, tort, fraud, or other intentional torts; (f) all claims based upon a violation of any Tribal, state or federal constitution, statute, regulation or ordinance; (g) all claims asserted by Us against You, including claims for money damages to collect any sum We claim You owe Us; (h) all claims asserted by You individually against Us and any of Our employees, agents, directors, officers, shareholders, governors, managers, members, parent company or affiliated entities (hereinafter collectively referred to as "related third parties"), including claims for money damages and/or equitable or injunctive relief; (i) all claims asserted on Your behalf by another person; (j) all claims asserted by You as a private attorney general, as a representative and member of a class of persons, or

4

in any other representative capacity, against Us and/or related third parties (hereinafter referred to as "Representative Claims"); (k) all claims arising from or relating directly or indirectly to the disclosure by Us or related third parties of any nonpublic personal information about You; (l) all claims related to or arising from loan extensions or payment plans; (m) all claims related to collections, privacy, and customer information; and (n) all claims related to setting aside the Waiver of Jury Trial provision or the Tribal Dispute Resolution Procedure provision, including claims about such provisions' validity and scope.

2. You acknowledge and agree that by agreeing to this Waiver of Jury Trial provision:
**(a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**

**(b) YOU CONSENT TO THE JURISIDCTION** [sic] **OF THE TRIBE AND HAVE READ AND AGREE TO BE BOUND SOLELY BY THE TRIBAL DISPUTE RESOLUTIUON** [sic] **PROCEDURE FOUND IN THE CODE; and**

**(c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

3. All disputes including any Representative Claims against Us and related third parties shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with You as provided for pursuant to Tribal law. **THEREFORE, NO LITIGATION OR ARBITRATION IS AVAILABLE AND NO JUDGE OR ARBITRATOR SHALL CONDUCT CLASS PROCEEDINGS; THAT IS, YOU SHALL BE INELIGIBLE TO SERVE AS A CLASS ACTION REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN LITIGATION OR ARBITRATION.**

4. All disputes arising out of, relating to, or in connection with this Agreement shall be finally

5

settled under the Tribal Dispute Resolution Procedure.

5. This Waiver of Jury Trial provision and Tribal Dispute Resolution Procedure provision are binding upon and benefit You, Your respective heirs, successors and assigns. This Waiver of Jury Trial provision and Tribal Dispute Resolution Procedure provision are binding upon and benefit Us, Our successors and assigns, and related third parties. Both provisions continue in full force and effect, even if Your obligations have been paid or discharged through bankruptcy. Both provisions survive any cancellation, termination, amendment, expiration or performance of any transaction between You and Us and continues in full force and effect unless You and We otherwise agree in writing.

**Your right to file suit against Us for any claim or dispute arising from or relating to this Agreement is limited by the WAIVER OF JURY TRIAL AND THE TRIBAL DISPUTE RESOLUTION PROCEDURE provisions. In the event the Lender engages legal counsel to protect its right, title and interest in this Agreement or otherwise litigate, protect or defend its rights outside of the Tribal Dispute Resolution Procedure agreed to herein, You hereby agree that the Lender may**
**recover reasonable costs and fees from You.**

\*\*\*

Ex. 1 at 6, ECF No. 1055-1 (emphasis in original)

\*\*\*

IMPORTANT ACKNOWLEDGEMENTS:

You acknowledge and agree that this Agreement is subject solely and exclusively to the Tribal law and jurisdiction of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

You acknowledge and agree that the Tribal Dispute Resolution Procedure is the sole and exclusive forum for resolving disputes and/or claims arising from or relating to this Agreement.

6

**JA1687**

You acknowledge and agree to the Waiver of Jury Trial provision.

You acknowledge and understand that You selected Your loan repayment method during the application process and that Your loan was not conditioned on repayment of Your loan by ACH.

BY CLICKING THE SUBMIT BUTTON YOU HAVE ELECTRONICALLY SIGNED THIS AGREEMENT. YOU AGREE THAT YOUR ELECTRONIC SIGNATURE HAS THE FULL FORCE AND EFFECT OF YOUR PHYSICAL SIGNATURE AND THAT IT BINDS YOU TO THIS AGREEMENT IN THE SAME MANNER A PHYSICAL SIGNATURE WOULD DO SO. YOU CERTIFY THAT THE INFORMATION GIVEN IN CONNECTION WITH THIS AGREEMENT IS TRUE AND CORRECT. YOU AUTHORIZE US TO VERIFY THE INFORMATION GIVEN IN CONNECTION WITH THIS AGREEMENT AND GIVE US CONSENT TO OBTAIN INFORMATION ON YOU FROM CONSUMER REPORTING AGENCIES OR OTHER SERVICES. YOU ACKNOWLEDGE THAT:
(A) YOU HAVE READ, UNDERSTAND, AND AGREE TO ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT INCLUDING THE WAIVER OF JURY TRIAL AND PROCEDURE PROVISIONS AS WELL AS THE PRIVACY POLICY, (B) THIS AGREEMENT CONTAINS NO BLANKS AND WAS FILLED IN BY YOU BEFORE YOU SIGNED IT, AND (C) THAT YOU HAVE PRINTED OR DOWNLOADED A COMPLETED COPY OF THIS AGREEMENT FOR YOUR RECORDS. YOU FURTHER ACKNOWLEDGE THAT THIS AGREEMENT IS SUBJECT TO APPROVAL BY US AND ALL LOANS ARE APPROVED OR DENIED ON TRIBAL LAND AT OUR OFFICE LOCATED IN WATERSMEET, MICHIGAN AND ARE SUBJECT TO FINAL DETERMINATION BY US.

Ex. 1 at 7, ECF No. 1055-1 (emphasis in original).

JA1688



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

LULA WILLIAMS, et al.,

    Plaintiffs,

v.                            Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, et al.,

    Defendants.

## MEMORANDUM OPINION

This Memorandum Opinion addresses PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO ("Motion for Class Certification") (ECF No. 967) in which Plaintiffs, on behalf of themselves and all other similarly situated individuals, request that this Court certify their claims against Defendant Matt Martorello ("Martorello"). Martorello opposes class certification on four main grounds: (1) Plaintiffs waived the ability to pursue a class action;[1] (2) the class members are not readily ascertainable; (3) common issues do not predominate; and (4) a class action is not a superior method of bringing suit. OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AGAINST MATT MARTORELLO

---

[1] A separate Memorandum Opinion supplies the reasons for overruling Martorello's objection to class certification on the ground that the proposed class representatives (as well as all of the proposed class members) waived their right to participate in a class action. See MEM. OP., ECF No. 1106.

("Response Memorandum"), ECF No. 1007. Notwithstanding Martorello's arguments in opposition, for the reasons that follow, Plaintiffs' Motion for Class Certification will be granted.

## I. BACKGROUND

### A. Statement of Facts

The facts surrounding this lawsuit have been recounted by the Court on numerous occasions. See, e.g., MEM. OP., ECF No. 944. The facts of this case are, therefore, presumed known, and it suffices here to provide only a brief summary.

This case is one of four similar, but distinct, actions[2] "arising out of a so-called 'Rent a Tribe' scheme allegedly orchestrated by Matt Martorello ('Martorello'), members of his family, companies that he controls, and investors who allegedly funded the scheme (the 'Martorello Defendants')" along with two "entities formed under the tribal laws of the Lac View Band of Lake Superior Chippewa Indians ('LVD')," i.e., "Big Picture Loans, LLC ('Big Picture')[3] and Ascension Technologies, Inc.

---

[2] In addition to this case, i.e., Williams, et al. v. Big Picture Loans, LLC, et al., 3:17-cv-461 (E.D. Va.) ("Williams"), the other related cases are (1) Renee Galloway, et al. v. Big Picture Loans, LLC, et al., 3:18-cv-406 (E.D. Va.) ("Galloway I"), (2) Renee Galloway, et al. v. Martorello, et al., 3:19-cv-314 (E.D. Va.) ("Galloway II"), and (3) Renee Galloway, et al. v. James Williams, Jr., et al., 3:19-cv-470 (E.D. Va.) ("Galloway III").

[3] The LVD's lending operations evolved over time, but they began with the use of a so-called tribal lending entity named Red Rock.

2

('Ascension') (collectively sometimes referred to as the 'Tribal Defendants')." Williams v. Big Picture Loans, LLC, 3:17-cv-461, 2020 U.S. Dist. LEXIS 216792, 2020 WL 6784352, at *1-2 (E.D. Va. Nov. 18, 2020) (Payne, J.). The term "Rent-a-Tribe" refers to the practice of so-called payday lenders partnering with Native American tribes "in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in so doing, to preclude enforcement of the interest rate caps in state usury laws." See MEM. OP. at 4, ECF No. 944.

Plaintiffs are all Virginia citizens who took out small-dollar high-interest loans from one of two LVD-affiliated entities (i.e., Red Rock or its successor Big Picture). Plaintiffs' basic argument is that the loans from these entities were made in violation of Virginia's usury laws, and Martorello, who is not a member of any Native American tribe, was both the de facto head and primary beneficiary of the LVD's lending operations. PLS.' MEM. IN SUPP. OF RENEWED MOT. FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEF. MATT MARTORELLO ("Prelim. Approval Mem.") at 27, ECF No. 968.

---

Lending, LLC ("Red Rock") which used Bellicose, LLC, a non-tribal entity owned and operated by Martorello, to handle the lending operations and the servicing of loans. For reasons that need not be discussed here, around 2013, Red Rock, Bellicose, and another corporate entity were restructured into a new lending entity — i.e., Big Picture.

## B. Plaintiff's Claims

Plaintiffs are pursuing five claims against Martorello:

* First, Plaintiffs are seeking declaratory judgment that the choice of law and forum-selection provisions in their loan contracts are void and unenforceable under Virginia law and Virginia's "well-established public policy." Compl. ¶ 94, ECF No. 1.

* Second, Plaintiffs allege that Martorello violated 18 U.S.C. § 1962(c) of the RICO statute (which prohibits the collection of unlawful debt). Compl. ¶¶ 103-104, ECF No. 1. Plaintiffs seek actual damages, treble damages, costs, and attorney's fees. Compl. ¶ 109, ECF No. 1.

* Third, Plaintiffs allege that Martorello violated 18 U.S.C. § 1962(d) of the RICO statute (by conspiring to violate 18 U.S.C. § 1962(c)). Compl. ¶ 117, ECF No. 1. Plaintiffs seek actual damages, treble damages, costs, and attorney's fees. Compl. ¶ 118, ECF No. 1.

* Fourth, Plaintiffs allege that Martorello violated Virginia's usury law, namely Va. Code § 6.2-305(A). Compl. ¶¶ 127-28, ECF No. 1. Plaintiffs seek damages "equal to the total amount of interest paid in excess of 12% plus twice the amount of such usurious interest that was paid in the two years preceding [the] filing of this action, attorney's fees, and costs." Compl. ¶ 128, ECF No. 1.

* Finally, Plaintiffs allege that Martorello was unjustly enriched because he received payments from illegal and unenforceable loan contracts. Compl. ¶¶ 137-139, ECF No. 1. Plaintiffs seek all amounts repaid on loans with Big Picture or Red Rock. Compl. ¶ 139, ECF No. 1.

Counts II through V are the subject of this Opinion.

4

**JA1692**

**C. Proposed Classes**

Proposed Class Counsel,[4] representing Plaintiffs, who are the Proposed Class Representatives,[5] propose the following classes:

> **Big Picture RICO Class:** All Virginia consumers who entered into a loan agreement with     Big     Picture where a payment was made from June 22, 2013 to December 20, 2019.
>
>> **Big Picture Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture from June 22, 2015 to December 20, 2019.
>>
>> **Big Picture Unjust Enrichment Sub-class:** All Virginia consumers who paid any amount on their loan with Big Picture from June 22, 2014 to December 20, 2019.
>
> **Red Rock RICO Class:** All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made from June 22, 2013 to December 20, 2019.
>
>> **Red Rock Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock from June 22, 2015 to December 20, 2019.
>>
>> **Red Rock Unjust Enrichment Sub-class:** All Virginia consumers who paid any amount on their

_____

[4] That is, Amy Leigh Austin, Craig Carley Machiando, Kristi Cahoon Kelly, Andrew Joseph Guzzo, Beth Ellen Terrell, Casey Shannon Nash, Eleanor Michelle Drake, Elizabeth Anne Adams, James Wilson Speer, Jennifer Rust Murray, John Albanese, Leonard Anthony Bennett, Matthew William Wessley, and Michael Allen Caddell. Prelim. Approval Mem. at 27, ECF No. 968.

[5] That is, Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix M. Gillison, Jr. (represented by Marcella P. Singh, the administrator of the Estate of Felix M. Gillison, Jr.). Prelim. Approval Mem. at 27, ECF No. 968.

loan with Red Rock from June 22, 2014 to December 20, 2019.

Prelim. Approval Mem. at 24, ECF No. 968. At bottom, all proposed class members are (or were) Virginia citizens who took out loans with interest rates above 12% from entities affiliated with the LVD tribe (i.e., Big Picture or Red Rock) and who made payments on those loans. Prelim. Approval Mot. at 22, ECF No. 968.

## D. Martorello's Involvement Over Time

For nearly every argument Martorello makes in opposition to class certification, Martorello asserts that, because his role in the lending scheme changed between 2013 and 2019, the class members will be situated differently vis-à-vis each other across different time periods, and those differences between class members will result in a need for a series of complicated mini-trials to determine which class members can recover.[6] Not so.

Shortly after the Fourth Circuit's decision in Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019), the Plaintiffs alleged that Martorello and others had made material misrepresentations to this Court and the Fourth Circuit on which this Court and the Fourth Circuit had relied in making their

---

[6] This "non-uniformity" argument is addressed in Martorello's positions on (1) ascertainability, Resp. Mem. at 32-33, ECF No. 1007; (2) commonality, id. at 35-42; (3) predominance (unjust enrichment), id. at 44, 47; (4) predominance (RICO), id. at 46; and (5) superiority, id. at 49.

6

respective decisions. At Martorello's request, this Court subsequently held a hearing on the alleged misrepresentations; thereafter received briefing; and then issued an opinion finding that several material misrepresentations had been made to the Court. MEM. OP. at 8, ECF No. 944 ("November 18 Opinion"). For a detailed description of all of the facts, see the November 18 Opinion (ECF No. 944).

As explained fully in the November 18 Opinion, there is substantial (and largely unrebutted) evidence that, throughout the relevant class periods, Martorello had de facto control of Red Rock and Big Picture's lending operations. To begin, there is unrebutted evidence that Martorello was both highly instrumental and heavily involved in the LVD's entrance into the business of payday lending. Nov. 18 OP. at 9-12, ECF No. 944. And, contrary to what the LVD and Martorello previously represented, there is proof that Martorello was functionally in charge of the lending business and the Tribal "managers" were "rather meaningless." Nov. 18 OP. at 13-15, 20, ECF No. 944. And, even after the LVD restructured the lending operations to avoid regulatory scrutiny, the evidence strongly shows that Martorello was still running the show. Nov. 18 OP. at 15, ECF No. 944 ("Efforts were made to create the appearance of the Tribe's involvement but the Tribe had no substantive involvement."). "[E]xcept for a few cosmetic changes . . ., the

7

**JA1695**

LVD lending operation by way of Big Picture continued as it had under the Red Rock structure." Nov. 18 OP. at 22-23, ECF No. 944.

Notwithstanding that Martorello's Response Memorandum was filed after the November 18 Opinion was issued, the Response Memorandum fails to take any of the Court's findings into account and continues to advance some of the very same misrepresentations addressed in the November 18 Opinion.[7]

On the current record, no credence can be given to Martorello's arguments challenging class certification on the ground that, because of his changing roles, Plaintiffs' claims will not be susceptible to class-wide proof. Certainly, Martorello's conclusory assertions do not overcome the Plaintiffs' evidence that disproves the need for the "mini-trials" that Martorello's arguments attempt to conjure.

## II. DISCUSSION

A class can be certified if plaintiffs show that the four requirements of Fed. R. Civ. P. 23(a) are met and that the class fits the requirements of at least one of the class types outlined in Fed. R. Civ. P. 23(b). Branch v. Gov't Emples. Ins.

---

[7] For example, Martorello asserts that his role in the LVD's "lending business declined considerably over time, and ceased after Martorello's 2016 sale of Bellicose to the Tribe." Resp. Mem. at 38 (emphasis added), ECF No. 1007. The evidence of record shows otherwise. Nov. 18 OP. at 22-23, ECF No. 944. And, Martorello's Response Memorandum offers no viable evidence to disprove that showing.

8

Co., 323 F.R.D. 539, 544 (E.D. Va. 2018). The Court's analysis
for each requirement must be "rigorous." Wal-Mart Stores, Inc.
v. Dukes, 564 U.S. 338, 350-51 (2011). And, plaintiffs bear the
burden of demonstrating that all of the Rule 23 requirements
have been satisfied. Branch, 323 F.R.D. at 545.

## A. Rule 23(a) Analysis

Under Rule 23(a), class certification is appropriate if
"(1) the class is so numerous that joinder of all members is
impracticable; (2) there are questions of law or fact common to
the class; (3) the claims or defenses of the representative
parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately
protect the interests of the class." Fed. R. Civ. P. 23(a).

### 1. Ascertainability

Although not self-evident on the face of Fed. R. Civ. P.
23, it is inherent in the concept of class certification that
there must be a "readily identifiable" set of putative class
members. EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir.
2014). This is sometimes referred to as the "ascertainability"
requirement. Id. Plaintiffs need not be able to identify each
and every class member at the time of class certification, but
class members must be identifiable by reference to objective
criteria without "extensive and individualized fact-finding or
'mini-trials[.]'" Id. (citation omitted).

9

Here, Plaintiffs assert that they can readily identify the class through objective, electronic data analysis of data that will be voluntarily provided by Big Picture and Ascension once the class has been certified. Prelim. Approval Mot. at 26, ECF No. 968. Specifically, Plaintiffs explain that:

> Identification of the class members involves a handful of discrete steps: (1) determining whether a consumer had a loan with Big Picture and/or Red Rock, (2) for all such consumers, determining whether they had a Virginia address when they executed the loan, and (3) identifying any payments made by those consumers from June 22, 2013 to December 20, 2019.

Prelim. Approval Mot. at 26, ECF No. 968.

Martorello, nevertheless, attacks the ascertainability of the proposed class on four grounds: (1) the loan information is largely under Tribal control, and neither party will have access to it until after the class is certified; (2) even if the loan information were provided, because Martorello's involvement in the lending scheme changed over time, mini-trials will be needed to understand each proposed class members' claims as to Martorello himself (as opposed to any other defendant); (3) mini-trials would be needed to determine if proposed class members have already released their rights, have already recovered, or have been estopped from recovering as a result of the Galloway III settlement; and (4) mini-trials would be needed to determine if proposed class members' claims are time-barred

10

because of the statute of limitations. Resp. Mem. at 30-34, ECF No. 1007. These arguments are not persuasive.

First, the requirement that a class be readily identifiable does not mean that Plaintiffs must present the Court (or Martorello) with a list of each and every proposed class member at the time of class certification. EQT, 764 F.3d at 358. And, while the parties are not presently in possession of the detailed loan data for each of the proposed class members, that is not to say that they are totally ignorant of the likely candidates for class membership. The putative class members in this case are a subset of the class members defined by the Galloway III settlement (and the proposed class counsel in this case were also class counsel in Galloway III). Prelim. Approval Mem. at 26-27, ECF No. 968. As part of the Galloway III settlement, the Tribal Defendants turned over "the majority of the information" Plaintiffs would need to identify the class members. Prelim. Approval Mem. at 27, ECF No. 968; see also Ex. 51 ¶ 3, ECF No. 968-51 (describing the customer loan data turned over to the Settlement Administrator in Galloway III). Furthermore, the Tribal Defendants have already agreed to turn over the necessary data if the Court certifies the class in this case. Ex. 52, ECF No. 968-52 (showing counsel for the Tribal Defendants agreeing, on behalf of Ascension and Big Picture, to

11

turn over the necessary loan data once a class has been certified in this case).

The cases Martorello cites to defend his position are clearly distinguishable. Unlike in Marcus v. BMW of N. Am., LLC, the third parties with possession of the data (i.e., Big Picture and Ascension) have ready access to the necessary data and have voluntarily agreed to turn it over to Plaintiffs if this Court certifies the proposed class. 687 F.3d 583, 594 (3d Cir. 2012). Unlike in Supler v. FKAACS, Inc., it is, in fact, possible to determine who the class members would be. 2012 WL 5430328, at *4, *9 (E.D.N.C. Nov. 6, 2012). And, unlike in Carrera v. Bayer Corp., 727 F.3d 300, 308-09 (3d Cir. 2013), Plaintiffs are not basing their ascertainability arguments on hypothetical data that may or may not exist or relying on class members to self-identify themselves through affidavits. Rather, Plaintiffs propose to use objective factors (i.e., whether an individual had a loan with a given company, whether that individual's home address was in Virginia when the loan was executed, and whether any loan payments were made after June 22, 2013) to analyze data that they have confirmed exists (and that they have confirmed they will have access to),[8] and that data is

---

[8] Martorello attempts to argue that "[w]ithout the loan records, the only way to identify the class members is to seek documents and testimony regarding loan and payment details from each putative class member. This is exactly the type of

12

comparable to data that they successfully have used in a related case before this Court. Prelim. Approval Mem. at 26-27, ECF No. 968; PLS.' REPLY IN SUPP. OF RENEWED MOT. FOR CLASS CERTIFICATION AGAINST DEF. MATT MARTORELLO ("Reply Mem.") at 18-19, ECF No. 1055. Thus, contrary to what Martorello implies in his briefs, Plaintiffs are not just spitballing here.

Furthermore, the fact that Martorello will not have access to the loan data until after certification is not a violation of his due process rights. Martorello asserts that "forcing" him "to defend against certification of a class where the loans are unavailable is contrary to ascertainability, fairness, and due process." Resp. Mem. at 31, ECF No. 1007. Not so. "The due process question is not whether the identity of class members can be ascertained with perfect accuracy at the certification stage but whether the defendant will receive a fair opportunity to present its defenses when putative class members actually come forward." Mullins v. Direct Digital, LLC, 795 F.3d 654, 670 (7th Cir. 2015). So long as Martorello has an opportunity to challenge each purported class member's claim to recover against him specifically (as opposed to any other defendant),

___

individualized review that renders a class not ascertainable." Resp. Mem. at 32, ECF No. 1007. The operative phrase, of course, is "without the loan records." If, for some reason, the loan records are not turned over by Big Picture and Ascension, the Court can reconsider its class certification decision. See Fed. R. Civ. P. 23(c)(1)(C).

13

JA1701

his due process rights have not been violated. See Mullins, 795 F.3d at 671. To hold that Martorello would suffer a due process violation if he were not given "[t]he specific loan information for each proposed class member (including residency, date of borrowing; payment histories; and balances)[,]" Resp. Mem. at 31, ECF No. 1007, would run contrary to the Fourth Circuit's clear explanation of the ascertainability requirement. See EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014) ("The plaintiffs need not be able to identify every class member at the time of certification.").

Martorello's second and third challenges to ascertainability can be more quickly dispensed with.[9] Martorello's second argument against the ascertainability of the class is that, because his involvement in the lending scheme changed over time, mini-trials will be needed to understand whether each putative class member has a claim against Martorello himself (as opposed to any other defendants). As discussed above in Part I.D, there is no evidence that Martorello's role in the LVD's lending scheme materially changed over time, and as discussed later in Part II.B.1, Plaintiffs'

---

[9] Martorello also repeats these two arguments again in a section of his Response Memorandum titled "THE CLASS DEFINITION FAILS BECAUSE MANY PROPOSED MEMBERS WERE NOT INJURED BY MARTORELLO." Resp. Mem. at 47, ECF No. 1007. The arguments in that section fail for the same reasons.

14

theory of the case lends itself to class-wide proof on all four of Plaintiffs' legal theories.

Martorello's third claim (i.e., that mini-trials would be needed to ascertain whether proposed class members have already waived their right to recover by joining the Galloway III settlement) is also clearly incorrect. No proposed class member has released their rights to pursue a suit against Martorello; the Galloway III settlement, by its terms, applied to 25 enumerated defendants (none of which were Martorello). MEM. OP., Galloway III, 3:19-cv-470, ECF No. 114 (E.D. Va. Dec. 18, 2020).

Martorello's fourth and final attack on ascertainability (i.e., that mini-trials will be needed to ascertain whether proposed class members' claims are barred by the statute of limitations) will require more analysis.

### Statute of Limitations

With respect to Plaintiffs' usury and unjust enrichment claims, Martorello asserts that the claims of some proposed class members may be barred by the statute of limitations. Resp. Mem. at 34, ECF No. 1007. According to Martorello, because class members took out loans at different times with different payment schedules, the Court would essentially need to have complex mini-trials to determine which class members are still eligible to recover. Plaintiffs respond that having

15

separate subclasses – with separate class periods – for both the usury and unjust enrichment claims will avoid any statute of limitations issues.

The class period for the proposed usury subclasses runs from June 22, 2015 to December 22, 2019. Prelim. Approval Mem. at 24, ECF No. 968. The statute of limitations for a claim based on a violation of Virginia state usury law is two-years after the last scheduled loan payment or the date of payment of the loan in full – whichever comes first. Va. Code. Ann. § 6.2-305. Because the case was filed on June 22, 2017 (i.e., two years after June 22, 2015), even the members of the proposed class who were making payments on their loans as far back as June 22, 2013 fall within the statute of limitations period.

Similarly, the class period for the proposed unjust enrichment subclasses runs from June 22, 2014 to December 20, 2019. The statute of limitations for a claim based on a violation of Virginia's unjust enrichment law is three years from accrual. Hengle v. Asner, 433 F. Supp. 3d 825, 893 (E.D. Va. 2020); see also 12A Michie's Jurisprudence § 12 (Limitation of Actions) (2021). As with the usury claim, because this case was filed on June 22, 2017 (i.e., three years after June 22, 2014), even the members of the proposed class who made payments on their loans as far back as June 22, 2014 fall within the statute of limitations period.

16

There are, therefore, no statute of limitations problems for the usury or unjust enrichment subclasses even though Plaintiffs entered into loan contracts at different times.

### 2. Numerosity

There is no bright-line threshold at which point a class is so numerous that joinder of all members is impracticable. Brown v. Transurban USA, Inc., 318 F.R.D. 560, 566 (E.D. Va. 2016). Whether joinder is impracticable is a fact-specific inquiry that depends not only on the number of class members but also on the circumstances of the case. Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 199 (E.D. Va. 2015). "'Courts consider a number of factors in considering whether joinder is practicable including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion.'" Soutter, 307 F.R.D. at 199 (quoting Adams v. Henderson, 197 F.R.D. 162, 170 (D. Md. 2000)).

Here, the numerosity requirement is easily met; the putative class consists of at least 12,530 individuals. Prelim. Approval Mem. at 26, ECF No. 968. Joinder of over 12,000 individuals would undoubtedly be impracticable. See Soutter, 307 F.R.D. at 199 (granting class certification for a class of approximately 1,000 consumers); see also William B. Rubenstein, 1 Newberg on Class Actions § 3:11 (5th ed. 2021) ("No specific

17

number alone is determinative of whether numerosity is present, but joinder is generally deemed practicable in classes with fewer than 20 members and impracticable in classes with more [than] 40 members.").

**3. Commonality**

The commonality requirement necessitates that there be common questions of law or fact among the class members such that common treatment is "necessary and beneficial."[10] Jeffreys v. Communs. Workers of Am., 212 F.R.D. 320, 322 (E.D. Va. 2003); Fed. R. Civ. P. 23(a)(2) (emphasis added). Accordingly, class members need not have suffered a violation of the same law. Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 546 (E.D. Va. 2018). And, "a class action will not be defeated solely because of some factual variances in individual grievances." Jeffreys, 212 F.R.D. at 322. As long as claims "arise from the same isolated set of facts," differences in the extent of each class member's injuries or damages will not prevent a finding that commonality exists." Jeffreys, 212 F.R.D. at 322.

Plaintiffs have met their burden of showing that commonality exists among the proposed classes. The proposed

---

[10] In a class action brought under Rule 23(b)(3) the commonality requirement will be "subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." Lienhart v. Dryvit Sys., 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting Amchem Prods. v. Windsor, 521 U.S. 591, 609 (1997)). Nevertheless, the inquiries are distinct.

18

class members' claims are all based on the same tribal lending
scheme, and in particular, on "the same conduct, practice, and
procedure on the part of Martorello." Prelim. Approval Mem. at
27, ECF No. 968. The class members, therefore, share a common
set of legal and factual questions. According to Plaintiffs,
these include:

> (1) whether their interest rates violate Virginia's
> usury laws; (2) whether the choice-of-law provision
> in their loan agreements bar[s] enforcement of
> Virginia's usury laws; (3) whether the relationship
> between the various participants constitutes an
> enterprise as defined under RICO; (4) whether
> Martorello participated or operated in the
> management of the enterprise; (5) whether Martorello
> had knowledge of and agreed to the overall objective
> of the enterprise; and (6) whether the amounts paid
> by each consumer are recoverable against Martorello.

Prelim. Approval Mem. at 27-28, ECF No. 968. Moreover, several
courts have found that commonality existed in comparable cases
where class members brought suits challenging various tribal
lending schemes. See Inetianbor, et al. v. Cashcall, Inc., et
al., 13-6066-CIV-COHN/SELTZER (S.D. Fla., Sept. 19, 2016), Ex.
53, ECF No. 968-53; Macdonald v. CashCall, Inc., 333 F.R.D. 331,
342-43 (D.N.J. 2019). The same is true here.

### 4. Typicality

The typicality requirement necessitates that the claims of
the representative plaintiffs be typical of those of the class.
The typicality requirement does not require that the class
representative's claims be identical to those of the class, but

19

USCA4 Appeal: 21-2116    Doc: 26-3    Filed: 02/07/2022    Pg: 436 of 601
Case 3:17-cv-00461-REP    Document 1110    Filed 07/20/21    Page 20 of 36 PageID# 47380

the representative's claims "cannot be so different from the
claims of absent class members that their claims will not be
advanced by plaintiff's proof of [her] own individual claim.'"
Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 547 (E.D. Va.
2018) (quoting Deiter v. Microsoft Corp., 436 F.3d 461, 466-67
(4th Cir. 2006)) (alteration in original). A class
representative must generally be part of the class and have "the
same interest and suffer the same injury as the class members."
Deiter, 436 F.3d at 466. "The essence of the typicality
requirement is captured by the notion that 'as goes the claim of
the named plaintiff, so go the claims of the class.'" Id.
(citation omitted).

The Court finds that the typicality requirement has been
met. The Plaintiffs and proposed class representatives are Lula
Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix
M. Gillison, Jr. (represented by Marcella P. Singh, the
administrator of the Estate of Felix M. Gillison, Jr.).[11] See
Prelim. Approval Mem. at 27, ECF No. 968. Plaintiffs are indeed

---

[11] Martorello objects to having the deceased Felix M. Gillison
represent the class by way of his estate's administrator,
Marcella P. Singh. Because the Court interprets this as a
challenge to the representativeness of Singh, not whether
Gillison's claims are typical of those of the class, the Court
will confine its analysis of Singh's suitability as a class
representative to the representativeness prong.

20

**JA1708**

part of the proposed classes,[12] and all five Plaintiffs, as well as the proposed classes, obtained loans, with interest rates above 12%, from either Big Picture or Red Rock (i.e., the two lending entities affiliated with the LVD tribe).[13]    Prelim. Approval Mem. at 27, ECF No. 968.  Therefore, the proposed class representatives suffered the same injury and have the same basic legal claims as those of the proposed class members.  The only difference across class members would be the actual damages they are asserting which will not preclude a finding of typicality. Accordingly, as go the claims of the five Named Plaintiffs, so go the claims of the class.

### 5. Representativeness

The representativeness requirement ensures that the class will be adequately represented by the named plaintiffs and class counsel.  Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 548-49 (E.D. Va. 2018).  The requirement is satisfied "when: (1) the

---

[12] Williams and Turnage would be part of the Big Picture Loans RICO Class and the Usury and Unjust Enrichment Sub-classes. DECL. KRISTI KELLY ¶¶ 16-17, ECF No. 968-54.  Hengle would be part of the Red Rock RICO Class and the Usury and Unjust Enrichment Sub-classes.    DECL. KRISTI KELLY ¶ 18, ECF No. 968-54.  Coffy would actually be a part of all six classes.  DECL. KRISTI KELLY ¶ 19, ECF No. 968-54.  And, Gillison would only be a part of the Red Rock RICO class.  DECL. KRISTI KELLY ¶ 20, ECF No. 968-54.

[13] "Williams' loan was subject to an APR of 649.8%; Turnage's loan had an APR of 693.2%; Hengle's loan had an APR of 607.5%; Coffy's loan had an APR of 607.5%; and Gillison, Jr.'s loan had an APR of 627.2%."  Prelim. Approval Mem. at 22, ECF No. 968.

21

named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are qualified, experienced, and generally able to conduct the litigation." Brown v. Transurban USA, Inc., 318 F.R.D. 560, 567 (E.D. Va. 2016) (internal quotation marks omitted).

The Court finds that the representativeness requirement is satisfied for both the proposed Class Representatives and proposed Class Counsel. As noted under the analysis of the commonality and typicality factors, Plaintiffs' interests are in line with those of the broader classes, and Plaintiffs were, in fact, already named as class representatives in a related case. See Galloway III, 3:19-cv-470, ORDER ¶ 5, ECF No. 115. Accordingly, the Court finds that the proposed Class Representatives will adequately represent the interests of the class (including Felix Gillison, Jr. who will be discussed further below).

Proposed Class Counsel have extensive experience with class actions, consumer financial protection law, and tribal lending operations. See DECL. KRISTI C. KELLY ¶¶ 4-6, 8-13, ECF No. 968-54; DECL. LEONARD A. BENNETT ¶¶ 4-7, 9-17, 19-23, ECF No. 968-55; DECL. MICHELLE DRAKE ¶¶ 3-9, 11-12, ECF No. 965-56; DECL. BETH E. TERRELL ¶¶ 2-6, ECF No. 968-57; DECL. MATTHEW W.H. WESSLER ¶¶ 2-10, ECF No. 968-58; DECL. MICHAEL A. CADDELL ¶¶ 3-19, 22-33, ECF No. 968-59. The Court has already found them

22

competent in a related case, Galloway III, 2020 WL 7482191, at
*8 (E.D. Va. Dec. 18, 2020), and the Court reaffirms that
finding here.

### *Adequacy of Administrator*

Martorello challenges the appointment of Marcella Singh,
administrator of Felix Gillison, Jr.'s estate, as a class
representative on the ground that Singh has almost no first-hand
knowledge of the facts of the case. Resp. Mem. at 49, ECF No.
1007. The Court does not find this argument persuasive for
several reasons. First, Martorello consented to the
substitution of Marcella P. Singh for Felix Gillison, Jr.
following Gillison's death in June 2018. ORDER, ECF No. 200;
see also MEM. IN SUPP. OF MOT. TO SUBSTITUTE PARTY, ECF No. 187.
Second, allowing an estate administrator to serve as a class
representative in place of a deceased plaintiff is a generally
accepted practice.[14] See Rubenstein, 1 Newberg on Class Actions
§ 3.71 (5th ed.); but see Chappelle v. E.I. Du Pont de Nemours &
Co., 75 F.R.D. 74, 79 n.10 (E.D. Va. 1977) (Merhige, J.)

---

[14] Some courts (though, to the Court's knowledge, none in this
circuit) have only allowed an executor to serve as a class
representative where (1) the beneficiaries of the estate consent
to the administrator's participation in the lawsuit and (2) the
executor assumes the costs of litigation personally so that the
estate will not bear the costs. Rubenstein, 1 Newberg on Class
Actions § 3.71 (5th ed.). The Court will decline to apply that
test in this case because it has no bearing on the substance of
the Defendant's argument.

JA1711

(finding administrator of a deceased plaintiff's estate inadequate to serve as a class representative in a Title VII discrimination suit for "obvious reasons"[15]). Third, on the facts of this case, it is not even clear what Martorello finds lacking in Singh's testimony.[16] A class representative's knowledge of the case "need not be robust." Rubenstein, 1 Newberg on Class Actions § 3:67 (5th ed.). "It is hornbook law . . . that '[i]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.'" Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003) (citation omitted). Plaintiffs' claims have never been based on any personal interactions with Martorello or any personalized knowledge of the internal workings of the LVD's lending operations, see Compl., ECF No. 1;

---

[15] With respect to Judge Merhige, the Court does not find the reasons obvious.

[16] If the Court has the deposition transcript of Marcella Singh, the Court is not aware of it. The Court only knows of what Martorello reports regarding Singh's testimony. See Resp. Mem. at 49, ECF No. 1007 ("Ms. Singh is also not an adequate class representative because she has virtually no knowledge—firsthand or otherwise—of any facts relating to this case. Ex. QQ, Singh Dep. Tr. at 12:17-25, 20:8-17, 18:19-19:8, 22:18-22. Her lone source of information, records she obtained through Plaintiffs' counsel, id. at 23:1-7, is insufficient.").

24

that information has come from discovery. Named Plaintiffs' personal narratives have generally been confined to the fact that they (1) applied for and received a loan from either Red Rock or Big Picture — with an interest rate well above 12% and (2) made payments on that loan.[17]   See, e.g., GEORGE HENGLE DECL., ECF No. 190-20. Moreover, Plaintiffs have represented to the Court that Singh, along with the other proposed class representatives, has actively participated in the management of the case. See DECL. KRISTI KELLY ¶ 14, ECF No. 968-54. Under the circumstances, the Court finds that Marcella Singh, acting as the administrator of the estate of Felix Gillison, Jr., is an adequate class representative.

**B.   Rule 23(b)(3) Analysis**

In addition to satisfying the Rule 23(a) factors, a class must fit into one of the three Rule 23(b) class types. Fed. R. Civ. P. 23(b).   Here, the class is purported to be a Rule 23(b)(3) class.   Class certification under Rule 23(b)(3) is appropriate if (1) questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

---

[17]   As noted in the discussion of ascertainability, that information can also be verified with the LVD's loan records.

25

The Rule 23(b)(3) analysis will sometimes overlap with the merits of the underlying case, but "[t]hat cannot be helped." Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 545 (E.D. Va. 2018) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011)). However, "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" Branch, 323 F.R.D. at 545 (quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013)).

## 1. **Predominance**

Rule 23(b)'s inquiry into whether common questions of law or fact predominate over individual issues is distinct from the Rule 23(a) commonality requirement in that the predominance inquiry is more demanding. Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013). The more demanding standard is a function of the more "adventuresome" nature of Rule 23(b)(3) relative to Rules (b)(1) and (b)(2): Rule 23(b) "allows class certification in a much wider set of circumstances but with greater procedural protections." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 362 (2011).

The predominance inquiry is fundamentally qualitative. Gunnells v. Healthplan Servs., 348 F.3d 417, 429 (4th Cir.

26

2003). That is to say, the predominance inquiry "is not simply a matter of counting common versus noncommon questions and checking the final tally." Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 214 (E.D. Va. 2015). Rather, a court must look at the relationship between the common questions and the individual questions in the context of the case as whole. Krakauer v. Dish Network, LLC, 925 F.3d 643, 658 (4th Cir. 2019). "An individual question is one where a 'member of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will be sufficient for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036 (2016). So long as the overarching issue in a case is common to the class, class certification is still appropriate even if there are some individual issues (e.g., damages) that will need to be resolved. Krakauer, 925 F.3d at 658; Ealy v. Pinkerton Gov't Servs., 514 Fed. Appx. 299, 305 (4th Cir. 2013).

Here, Plaintiffs assert that common issues predominate because Plaintiffs' claims are entirely based on standardized loan contracts and standardized conduct by Martorello.

First, as a general matter, Courts have found that the predominance factor has been met in comparable cases, albeit in unpublished opinions. See, e.g., Inetianbor, et al. v. Cash

27

Call Inc., et al., 13-60066-CIV, at *3, *22 (Dec. 23, 2020), ECF No. 958-53 (finding predominance met where plaintiff's legal claims were against an alleged tribal lender and based on violation of Florida's usury statute and Florida's Deceptive and Unfair Trade Practices Act); Upshaw v. Ga. Catalog Sales, Inc., 206 F.R.D. 694, 700-01 (M.D. Ga. 2002) (finding predominance met in a payday lending case where plaintiffs' claims were based on statute usury laws and RICO, defendants' conduct was substantially the same with respect to all members of the class, and defendants' primary defense applied to the class as a whole). For example, in Purdie v. Ace Cash Express, Inc., the court found that the predominance standard was met because of (1) "the standardized nature of the payday loan transactions", (2) "the uniform manner in which Defendants made, processed, and collected on the loans", (3) the fact that "few variations exist in the claims or the factual bases underlying the legal claims", and (4) "the legal claims and theories asserted," namely violations of "the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), (c)& (d), the Truth in Lending Act ("TILA"), 15 U.S.C. § 1602 et seq., the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq., state statutes regulating small loans, the Texas Deceptive Trade Practices Act[, and] other state

28

consumer protection laws." 2003 U.S. Dist. LEXIS 22547, at *5, *13-14 (N.D. Tex. Dec. 11, 2003). As in those cases, here, there is strong and unrebutted evidence that Martorello's conduct was substantially the same with respect to all proposed class members.

Furthermore, as Plaintiffs correctly point out, "[c]ourts, when faced with class certification in RICO claims, often find that 'common issues predominate over individualized ones.'" Solomon v. Am. Web Loan, 2020 U.S. Dist. LEXIS 112782, *9 (E.D. Va. June 26, 2020) (Morgan, J.) (quoting Robinson v. Fountain Title Group Corp., 257 F.R.D. 92, 94 (D. Md. 2009)). This is due to the elements of the federal RICO statute and the proof necessary to make out a RICO claim. Williams v. Mohawk Indus., 568 F.3d 1350, 1357-58 (11th Cir. 2009).

And finally, although, for all of Plaintiffs' claims, damages for each proposed class member would need to be calculated on an individual basis, those damages could likely be calculated straight from the loan records that Plaintiffs anticipate receiving from Big Picture and Ascension (as opposed to damages for claims like emotional distress which might require extensive evidence for all individuals involved). Under these circumstances, Plaintiffs have met their burden to show that the predominance requirement is met, despite Martorello's many many arguments to the contrary.

29

Martorello attacks the predominance requirement on six, overlapping, grounds. Plaintiffs respond that the Defendant is misstating the law or the facts in all of these arguments, and they are correct.

### a. Tracing Proposed Class Members' Payments

First, with respect to Plaintiffs' usury and unjust enrichment claims, Martorello argues that Plaintiffs cannot show that Martorello uniformly received loan payments from all of the proposed class members for the entire class period. Resp. Mem. at 36, 44, ECF No. 1007. According to Martorello, this is because loan payments were directly received by various tribal lending entities and only then passed to Martorello in a formula based on the total profitability of the lender.[18]  Resp. Mem. at 36, ECF No. 1007. Therefore, says Martorello, "[t]he issue of whether specific interest payments . . . ever reached Martorello over the class period requires individualized analysis and does not predominate through the class period." Resp. Mem. at 35-36, ECF No. 1007.

To be clear, it is undisputed that, over time, substantial parts of the loan payments passed from Red Rock and Big Picture to Martorello through various entities. See Hearing Tr. 107:19-25, ECF No. 1104. Martorello is simply trying to argue that

---

[18] And, to further complicate matters, as the LVD's lending operations evolved so did the path by which money made its way from consumer loan payments to Martorello's financial accounts.

Plaintiffs have no way of knowing which borrower's repayments made their way into Martorello's pocket because Martorello was paid based on the overall profitability of the lending operation. Hearing Tr. 107:19-108:4, ECF No. 1104. Martorello may very well be right that Plaintiffs cannot track the dollars paid by each individual class member straight into Martorello's financial accounts. However, that is not how Plaintiffs propose to prove that Martorello received payments on usurious loans. Rather, Plaintiffs propose to look to the contracts between each lender (i.e., Red Rock and Big Picture) and the Martorello Defendants to show that between 2013 and 2016, Martorello received 98% of Red Red's gross revenue from loans, and between 2016 and 2020, Martorello received 95% of Big Picture's gross revenue from loans. That, says Plaintiffs, is sufficient to show that Martorello was receiving payments on usurious loans, and therefore, being unjustly enriched. See Reply Mem. at 21-24, ECF No. 1055.

The Court agrees with Plaintiffs. Based on the proof that Plaintiffs propose to offer, it is clear that common facts will predominate and those facts are highly susceptible to class-wide proof.

### b. Martorello's Allegedly Changing Role

Next, Martorello makes the same basic argument three times: because of his changing role over time, class members will be

31

situated differently vis-à-vis each other over the class period with respect to several elements of Plaintiffs' claims. These elements include (1) whether Martorello participated in the collection of unlawful debt in the same manner over the relevant class periods, Resp. Mem. at 41, 46, ECF No. 1007; (2) whether Martorello participated in the conspiracy to collect unlawful debt in the same manner over the relevant class periods, Resp. Mem. at 46, ECF No. 1007; and (3) whether "Martorello committed or authorized any intentional tort(s) on behalf of the lender," Resp. Mem. at 39, ECF No. 1007. As noted in Part I.D, the Court does not credit Martorello's arguments that Martorello played only a minor, supporting role in the LVD's lending operations or that his role changed meaningfully between June 22, 2013 and December 22, 2019. Martorello was the de facto head of the LVD's lending operations at all relevant times. At trial, Plaintiffs would, nevertheless, still need to prove that Martorello was sufficiently involved in the LVD's lending operations to be liable under each of Plaintiff's four legal theories for the duration of the relevant class periods, but facts surrounding Martorello's involvement will be highly amenable to class-wide proof.

### c. Proximate Cause and Plaintiffs' RICO Injuries

With respect to Plaintiffs' RICO claims, Martorello argues that, because he was never really in charge of the LVD's lending

32

**JA1720**

operations, he could not have "proximately caused" harm to Plaintiffs. Resp. Mem. at 41, ECF No. 1007. Whether Martorello caused the class members' injury is a merits question to be resolved at a later stage. Martorello has not credibly explained why the facts surrounding "proximate cause" would create individualized issues.

### d. Injury to Plaintiffs/Benefit Conferred

With respect to Plaintiffs' unjust enrichment claims, Martorello also attempts to argue that some Plaintiffs did not confer a benefit on Martorello because they paid back less than they received on their loans.[19] Plaintiffs' respond that, under Virginia law, a contract with an interest rate above the legal limit (here 12%) is void. Hearing Tr. 48:4-10, ECF No. 1104. To make out a claim for unjust enrichment under Virginia law, a plaintiff must show that he or she (1) conferred a benefit on the defendant; (2) the defendant knew of the benefit; and (3) the defendant accepted or retained the benefit "under circumstances that 'render it inequitable for the defendant to retain the benefit without paying for its value.'"

---

[19]    Martorello also repeats a version of this argument in a section of his Response Memorandum titled "THE CLASS DEFINITION FAILS BECAUSE MANY PROPOSED MEMBERS WERE NOT INJURED BY MARTORELLO," but there, the argument appears to apply to more than just unjust enrichment claims. Resp. Mem. at 46, ECF No. 1007. The distinction will not save the argument. If the loan contracts were usurious, they were void, and any payment on them was an injury to Plaintiffs.

33

Microstrategy, Inc. v. Netsolve, Inc., 368 F. Supp. 2d 533, 536 (E.D. Va. 2005) (quoting Nossen v. Hoy, 750 F. Supp. 740, 744-45 (E.D. Va. 1990)). Under Virginia law, "[a]ny contract made in violation of [Virginia's usury laws] is void and no person shall have the right to collect, receive, or retain any principal, interest, fees, or other charges in connection with the contract." Va. Code. Ann. § 6.2-303(F). So, says Plaintiffs, any money paid on a void contract could constitute a benefit for the purposes of an unjust enrichment. Hearing Tr. 48:4-10, ECF No. 1104. The Court agrees. Moreover, Martorello has not explained why the Plaintiffs are not correct.

## 2. Superiority

The superiority element requires that a class action be superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Relevant factors include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Although the factors in Rule 23(b)(3)(A)-(D) theoretically apply to predominance and superiority, most courts

use the factors exclusively for the superiority analysis. Rubenstein, 2 Newberg on Class Actions § 4.64 (5th ed.).

A class action would clearly be a superior method of fairly and efficiently adjudicating this case. First, the key factual issues for each putative class member would be the same, with only damage amounts changing from person to person. Reply Mem. at 35, ECF No. 1055. Second, there are 12,530 putative class members, and re-litigating the same issues even 100 times would be an unnecessary and untenable burden on the judicial system.[20] Third, it is not likely that class members' individual damages, which are tied to their relatively small-dollar loans, would be enough to justify bringing individual lawsuits. Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 218 (E.D. Va. 2015) (quoting Calvin v. Home Loan Ctr., Inc., 236 F.R.D. 387, 396 (N.D Ill. May 10, 2006)) ("[T]here is a strong presumption in favor of finding superiority" where "the alternative to a class action is likely to be no action at all for the majority of class members."). Under these circumstances, a class action is both fair and efficient.

Martorello asserts that a class action would not be superior due to manageability issues. Resp. Mem. at 48, ECF No. 1007. Martorello bases this challenge on two arguments. First,

---

[20] This case (not to mention its brethren) has now been litigated for four years and involves over 1,000 electronic filings.

35

he appears to be arguing that there is a risk that a significant number of proposed class members could bring suits individually. See Resp. Mem. at 48, ECF No. 1007. But, as noted above, the Court does not find that likely. Second, Martorello asserts, as he has before, that there will be intraclass differences due to his "ever-shifting, relationships, and responsibilities over time." As noted in Part I.D, the Court does not find that argument credible.

## CONCLUSION

For the foregoing reasons, PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO (ECF No. 967) ("Preliminary Approval Motion") will be granted.

It is so ORDERED.

/s/
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July _19_, 2021

36

**JA1724**



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

LULA WILLIAMS, *et al.*,

    Plaintiffs,

v.                          Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, *et al.*,

    Defendants.

### ORDER

This matter comes before the Court on Plaintiffs' Renewed Motion to Certify a Class (ECF No. 967). Upon consideration of the Motion, and Defendant's opposition thereto, the Court hereby GRANTS the Motion.

1. For the reasons stated in the Court's prior Memorandum Opinion (ECF No. 1106), the Court finds that Plaintiffs have not waived their right to bring a class action.

2. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court certifies the following Classes ("Classes"):

    (a) **Big Picture RICO Class**: All Virginia consumers who entered into a loan agreement with Big Picture where a payment was made from June 22, 2013 to December 20, 2019.

        (i) **Big Picture Usury Sub-class**: All

**JA1725**

> > Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture from June 22, 2015 to December 20, 2019.
> >
> > (ii) **Big Picture Unjust Enrichment Sub-class:** All Virginia consumers who paid any amount on their loan with Big Picture from June 22, 2014 to December 20, 2019.
>
> (b) **Red Rock RICO Class:** All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made from June 22, 2013 to December 20, 2019.
>
> > (i) **Red Rock Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock from June 22, 2015 to December 20, 2019.
> >
> > (ii) **Red Rock Unjust Enrichment Sub-class:** All Virginia consumers who paid any amount on their loan with Red Rock from June 22, 2014 to December 20, 2019.

3. As detailed in the accompanying Memorandum Opinion, the prerequisites to a class action under Fed. R. Civ. P. 23(a) have been preliminarily satisfied in that:

> (a) the Classes are so numerous that joinder would be impractical;
>
> (b) the claims of the Plaintiffs are typical of those of the other members of the Classes;
>
> (c) there are questions of fact and law that are common to all members of the Classes; and
>
> (d) the Plaintiffs will fairly and adequately protect the interests of the Classes and have

retained counsel experienced in consumer class action litigation who have and will continue to adequately represent the Classes.

4. Pursuant to Fed. R. Civ. P. 23(b)(3), the Court further finds that this action is maintainable as a class action because: (1) a class action is a fair and efficient adjudication of this controversy; and (2) questions of fact and law common to the members of the Classes predominate over any questions affecting only individual members.

5. The Court appoints Lula Williams, George Hengle, Gloria Turnage, Dowin Coffy and Marcella Singh, as administrator for Felix Gillison, Jr.'s estate as the Class Representatives. The Court also appoints the law firms of Kelly Guzzo, PLC, Consumer Litigation Associates, P.C., Terrell Marshall Law Group, PLLC, Berger Montague, P.C., and Caddell & Chapman as counsel for the Class ("Class Counsel").

6. Pursuant to the Court's March 12, 2019 Order (ECF No. 416), Class Counsel shall notify TranDotCom Solutions, LLC of this decision to arrange for the transmission of the necessary data to notify the Classes.

7. Class Counsel and Defendant Martorello shall confer to file a Notice Plan no later than two weeks from the date

of the entry of this Order. If the parties cannot agree on a Notice Plan, each side shall submit a pleading no longer than five pages no later than 21 days after the entry of this Order.

   **IT IS SO ORDERED.**

                                    /s/
                         Robert E. Payne
                         Senior United States District Judge

Richmond, Virginia
Date: July __19__, 2021

FILED:  August 4, 2021

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 21-211
(3:17-cv-00461-REP)

_____

MATT MARTORELLO

        Petitioner

v.

LULA WILLIAMS, on behalf of themselves and all individuals similarly situated;
GLORIA TURNAGE; GEORGE HENGLE; DOWIN COFFY; MARCELLA P.
SINGH, Administrator of the Estate of Felix M. Gillison, Jr.

        Respondents

---

This case has been opened as an original proceeding in this court. The district court
is receiving this notice for informational purposes.

| Originating Court | United States District Court for the Eastern District of Virginia at Richmond |
|---|---|
| Date Petition Filed: | 08/03/2021 |
| Petitioner | Matt Martorello |
| Appellate Case Number | 21-211 |
| Case Manager | Cyndi Halupa 804-916-2704 |

**JA1729**

No. _____

---

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

---

MATT MARTORELLO,

*Petitioner,*

v.

LULA WILLIAMS, ET AL.,

*Respondents.*

---

On Petition to Appeal from the United States District Court for the
Eastern District of Virginia, Hon. Robert E. Payne, Senior District Judge
No. 17-cv-461-REP

---

### PETITION FOR PERMISSION TO APPEAL UNDER RULE 23(f)

---

BERNARD R. GIVEN II
WILLIAM N. GROSSWENDT
LOEB & LOEB LLP
10100 Santa Monica Blvd., Ste. 2200
Los Angeles, CA 90067
(310) 282-2000
bgiven@loeb.com

JOHN D. TALIAFERRO
*Counsel of Record*
LOEB & LOEB LLP
901 New York Ave. NW, Ste. 300
Washington, DC 20001
(202) 618-5000
jtaliaferro@loeb.com

*Counsel for Petitioner*

---

JA1730

# CORPORATE DISCLOSURE STATEMENT

Matt Martorello is an individual, not a nongovernmental corporation, so there is nothing for him to disclose pursuant to Federal Rule of Appellate Procedure 26.1(a).

JA1731

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

INTRODUCTION ............................................................................................1

STATEMENT OF FACTS .................................................................................5

QUESTIONS PRESENTED................................................................................8

STATEMENT OF JURISDICTION........................................................................9

STANDARD OF REVIEW ................................................................................10

REASONS FOR GRANTING INTERLOCUTORY REVIEW ...........................10

I.    The Borrowers Waived The Right To Bring A Class Action.............10

    A.    The Borrowers May Not Participate In Class Actions Related To The Validity Of Provisions In The Loan Agreement And Are Estopped From Disclaiming This With Respect To Martorello. ....................................................11

    B.    The Borrowers Also Waived Their Ability To Participate In Class Proceedings Against A Consultant, Servicer, Or Affiliated Entity Of Red Rock And Big Picture. ...................................................................................13

II.   The Class Action Waiver Is Valid And Enforceable. ........................15

    A.    The District Court Extended The Prospective Waiver Doctrine From Arbitration To Tribal Forums For The First Time Without The Participation Of Any Tribal Party. ......................................................................................15

    B.    Even If The Prospective Waiver Doctrine Could Apply, The Loan Agreement Does Not Waive Federal Rights. ........................................................................16

III.  Common Issues Do Not Predominate ................................................19

**JA1732**

# TABLE OF CONTENTS CONTINUED

**Page**

     A.    Red Rock And Big Picture Made Payments Based On The Overall Profitability Of The Tribal Lending Business, Not Interest Payments By Individual Borrowers. .................................................................................19

     B.    As Recognized By This Court, Martorello Was Not The "De Facto Head" Of The Tribal Lending Business And His Role Changed During The Class Period. ..................20

  IV.    The District Court Violated The Mandate Rule By Altering Conclusions Affirmed On Appeal By This Court And Then Relied On Its New Conclusions To Grant Class Certification ..........22

CONCLUSION ......................................................................................23


CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ATTACHMENT 1:  ORDER GRANTING CLASS CERTIFICATION

ATTACHMENT 2:  MEMORANDUM OPINION ON CLASS CERTIFICATION

ATTACHMENT 3:  MEMORANDUM OPINION ON CLASS WAIVER

ATTACHMENT 4:  MEMORANDUM OPINION ON MISREPRESENTATIONS

JA1733

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aggarao v. MOL Ship Mgmt. Co., Ltd.,*
    675 F.3d 355 (4th Cir. 2012) .................................................................12

*Am Bankers Ins. Group v. Long,*
    453 F.3d 623 (4th Cir. 2006) .............................................................12, 13

*Am. Express v. Italian Colors Rest.,*
    570 U.S. 228 (2013).............................................................................15

*Brantley v. Republic Mortg. Ins. Co.,*
    424 F.3d 392 (4th Cir. 2005) ...............................................................12

*Breakthrough Mgmt. Grp., Inc. v. Chukchansi*
    *Gold Casino & Resort,*
    629 F.3d 1173 (10th Cir. 2010) ...............................................6, 7, 9, 23

*Cedric Kushner Promotions, Ltd. v. King,*
    533 U.S. 158 (2001)............................................................................15

*Dillon v. BMO Harris Bank, N.A.,*
    856 F.3d 330 (4th Cir. 2017) ...............................................................16

*Doe v. Chao,*
    511 F.3d 461 (4th Cir. 2007) ...............................................................22

*EQT Prod. Co. v. Adair,*
    764 F.3d 347 (4th Cir. 2014) .................................................................9

*Galloway v. Big Picture Loans, LLC, et al.,*
    No.3:18-cv-00406-REP, Dkt.233 ...................................................6, 7, 22

*Gibbs v. Haynes,*
    967 F.3d 332 (4th Cir. 2020) ...............................................................16

*Gibbs v. Sequoia Capital Operations, LLC,*
    966 F.3d 286 (4th Cir. 2020) ...............................................................16

JA1734

*Gibbs v. Stinson*,
421 F. Supp. 3d 267 (E.D. Va. 2019) ...........................................................16, 17

*Hayes v. Delbert Servs. Corp.*,
2015 U.S. Dist. LEXIS 6715
(E.D. Va. Jan. 21, 2015), *rev'd and remanded on other grounds*,
811 F.3d 666 (4th Cir. 2016) ..................................................................16

*Hayes v. Delbert Servs. Corp.*,
811 F.3d 666 (4th Cir. 2015) ..................................................................16

*Jackson v. Payday Fin., LLC*,
764 F.3d 765 (7th Cir. 2014) ..................................................................16

*Lienhart v. Dryvit Sys.*,
255 F.3d 138 (4th Cir. 2001) ..................................................................10

*Rux v. Republic of Sudan*,
461 F.3d 461 (4th Cir. 2006) ....................................................................9

*In re Titanium Dioxide Antitrust Litig.*,
962 F. Supp. 2d 840 (D. Md. 2013).........................................................13

**Statutes**

27 U.S.C. § 1292(b) ....................................................................................9

Tribal Consumer Financial Services Regulatory Code § 4.13(i)...........................19

Tribal Consumer Financial Services Regulatory Code § 6.1 ...............................18

Tribal Consumer Financial Services Regulatory Code § 6.2 ...............................18

Tribal Consumer Financial Services Regulatory Code § 9.3(f) ...........................19

Tribal Consumer Financial Services Regulatory Code § 9.3(i)............................19

**Other Authorities**

Fed. R. App. P. 5(a) ....................................................................................9

Fed. R. App. P. 35........................................................................................23

Fed. R. Civ. P. 23 ........................................................................................4

Fed. R. Civ. P. 23(b) ................................................................................................8

Fed. R. Civ. P. 23(f) ...........................................................................................9, 10

Fed. R. Civ. P. 60 ..................................................................................................23

JA1736

## INTRODUCTION

Petitioner Matt Martorello ("Martorello") seeks review of classes ("the Borrowers") that should not have been certified because the Borrowers waived their right to participate in class proceedings.  Also, the only way to find that common issues predominate is to credit an Order that wrongly disturbed conclusions of this Court to reach contrary and inaccurate conclusions based on "misrepresentations" made by Martorello that supposedly showed, among other things, that he was the "de facto" head of the lending business of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("the Tribe") between 2013 and 2019.  That contradicts this Court's July 2019 conclusions that the Tribe controlled Big Picture Loans, LLC ("Big Picture") and created Big Picture and Ascension Technologies, Inc. ("Ascension") to further tribal economic development in holding that Big Picture and Ascension proved that they were arms of the Tribe.

Martorello, whom the Borrowers still allege was the "mastermind" of an illegal lending operation despite this Court's decision, was the founder and chief executive officer of Bellicose, a non-tribal LLC, that, along with its subsidiary SourcePoint, provided steadily decreasing consulting services between 2011 and 2016 to Red Rock Tribal Lending ("Red Rock"), Big Picture's predecessor also owned and controlled by the Tribe, until the Tribe acquired Bellicose in 2016. Martorello and Bellicose never lent to or collected from any Borrowers.

1

**JA1737**

The current state of the claims against Martorello originates in May 2019, when the Borrowers—accurately anticipating how this Court would soon rule—immediately after oral argument raised to the District Court that the Tribal entities had made misrepresentations impacting the decision being appealed. The Borrowers alerted this Court to the alleged misrepresentations, but to no avail, and this Court reversed the District Court and remanded with the instruction to dismiss the Tribal entities in July 2019. The District Court did not follow that instruction, and instead ordered briefing on the Tribal entities' alleged misrepresentations and set an evidentiary hearing for October 2019. Although the Tribal entities strenuously denied making any misrepresentations, with no end in sight before the District Court despite this Court's ruling finding them immune, they settled with the Borrowers before the hearing. In February 2020, the District Court followed this Court's July 2019 mandate and dismissed them.

Two days after dismissing the Tribal entities, the District Court pivoted to whether Martorello had made misrepresentations material to the conclusion that the Tribal entities were arms of the Tribe. Over Martorello's objection that this Court's decision was binding, the District Court held an evidentiary hearing in July 2020 and issued an Opinion in November 2020 (the "Misrepresentation Opinion") that reached erroneous conclusions and made inaccurate factual findings that

JA1738

contradicted this Court's conclusions and the facts it relied upon in its July 2019

opinion.

On July 20, 2021, based on the conclusions in the Misrepresentation

Opinion, the District Court entered an Order granting certification of a "Big Picture

class" and "Red Rock class," and subclasses for both, as follows:

> **(a)    Big Picture RICO Class: All Virginia consumers who entered into a loan agreement with Big Picture where a payment was made from June 22, 2013 to December 20, 2019.**
>
> > **(i)    Big Picture Usury Sub-class: All Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture from June 22, 2015 to December 20, 2019.**
> >
> > **(ii)    Big Picture Unjust Enrichment Subclass: All Virginia consumers who paid any amount on their loan with Big Picture from June 22, 2014 to December 20, 2019.**
>
> **(b)    Red Rock RICO Class: All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made from June 22, 2013 to December 20, 2019.**
>
> > **(i)    Red Rock Usury Sub-class: All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock from June 22, 2015 to December 20, 2019.**
> >
> > **(ii)    Red Rock Unjust Enrichment Sub-class: All Virginia consumers who paid any amount on their loan with Red Rock from June 22, 2014 to December 20, 2019.**  Dkt.1111 (attached) at 1-2.

The Class Certification Order contains material errors that if not remedied

now will cause considerable confusion as to proper legal standards, waste judicial

JA1739

resources and force Martorello and the certified classes to litigate class claims that fall short of the requirements of Rule 23.

The Class Certification Order errs in determining that the Borrowers may participate in class proceedings against Martorello. They may not, because they waived their right to do so by signing the loan agreement. The Class Certification Order also errs in the alternative finding that the loan agreement prospectively waives federal law and so the class waiver is unenforceable. The loan agreement does no such thing and the Class Certification Order can only conclude this by ignoring the agreement's explicit statement that federal law applies. These are paramount threshold issues, because there can be no class if the Borrowers may not participate in class proceedings against Martorello.

The Class Certification Order also errs by finding that common issues predominate. They do not. There is no way of tracing whether interest payments made by individual Borrowers to the lenders got to Martorello, because Bellicose and Eventide Credit Acquisitions, LLC ("Eventide")—a company managed by Martorello that sold Bellicose to the Tribe in a seller-financed deal in which the Tribe repaid Eventide via seven years of variable monthly payments—were paid based on the profitability of the lending business, not collecting on individual loans, which often resulted in no revenue to Bellicose or payments to Eventide. Further, notwithstanding the unsupported and blatantly wrong assertion that

4

**JA1740**

Martorello was the "de facto" head of the lending business between 2013 and 2019, Martorello's role changed drastically over time.

Finally, the Misrepresentation Opinion should be discarded in its entirety because in it the District Court exceeded its authority by reconsidering the conclusions reached and factual findings relied on by this Court.

## STATEMENT OF FACTS

In 2011, the Tribe organized Red Rock as a tribally owned LLC managed by two members of the Tribal council with the Tribe as its sole member. Dkt.581 at 4-5. As a new entrant into online lending, Red Rock contracted with Bellicose, a non-tribal LLC, for various consulting services. Dkt.581 at 5.

Martorello is a non-tribe member who founded and was the chief executive officer of Bellicose, a non-tribal LLC. Dkt.581 at 5. In 2016, the Tribe acquired Bellicose from Eventide, a company managed by Martorello, in a seller-financed deal in which Eventide provided a loan to the Tribe to be repaid in seven years of variable repayments based on the overall monthly profitability of the lending business. Dkt.581 at 6-7. At the end of the seven years, the remaining balance would be forgiven. Dkt.581 at 6. After the 2016 sale, Martorello had no role in the Tribe's business. Dkt.1007-33 at ¶¶ 10-16; Dkt.1007-24 at 208:18-210:20.

In June 2017, the Borrowers brought a putative class action against Big Picture, Ascension, Martorello, and other individuals, alleging that Big Picture

JA1741

charged interest rates higher than would be allowed "if Virginia law were applicable." Dkt.581 at 4. Big Picture and Ascension appealed the District Court's denial of their motion to dismiss. Dkt.581 at 6.

On May 3, 2019, after oral argument before this Court, the Borrowers claimed for the first time that the Tribal entities made misrepresentations to the District Court that impacted various of the factors set forth in *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010). *Galloway v. Big Picture Loans, LLC, et al.*, No.3:18-cv-00406-REP ("*Galloway I*"), Dkt.233 at 1-2. On June 4, 2019, the Borrowers raised these allegations with this Court and requested this Court allow the District Court to re-evaluate its denial of sovereign immunity in light of new and relevant evidence. *Williams v. Big Picture Loans, et al.*, No.18-1827, Dkt.125-1.

On July 3, 2019, this Court held that the Tribal entities were arms of the Tribe entitled to share in the Tribe's immunity. Dkt.581 at 11. This Court reversed and remanded and instructed the District Court to grant the Tribal entities' motion to dismiss. Dkt.581 at 28. The Borrowers did not seek *en banc* review to press their contention.

On remand, however, the District Court instead ordered briefing and set an evidentiary hearing on the claimed misrepresentations by the Tribal entities for October 28, 2019. *Galloway I*, Dkt.270. The Tribal entities filed an extensive

6

JA1742

response to the claimed misrepresentations and laid out why the allegations were spurious and sanctionable. *Galloway I*, Dkt.270. In advance of the hearing, the Borrowers and the Tribal entities settled. Dkt.637. On February 18, 2020, the District Court dismissed Big Picture and Ascension for lack of subject matter jurisdiction "[i]n accordance with, and as instructed by, the Judgement of the United States Court of Appeals for the Fourth Circuit entered on July 3, 2019, (ECF No. 582), and the mandate entered on July 25, 2019 (ECF No. 600)." Dkt.668.

After dismissing Big Picture and Ascension, two days later the District Court requested briefing on whether Martorello had made misrepresentations material to the *Breakthrough* factors and if an evidentiary hearing on the alleged misrepresentations was necessary. Dkt.673 at 3-4. Martorello responded that the Borrowers were "not permitted to relitigate the Fourth Circuit's conclusions in this case with new evidence" and that the misrepresentations were a sham. Dkt.679 at 3-4. "No evidentiary hearing is needed to reach the conclusion that Plaintiffs' Filing, on the whole, lacks merit." Dkt.679 at 4-5. Martorello closed by saying:

> [I]f the Court is inclined to consider Plaintiffs' Filing in relation to this matter (which Martorello contends it should not), Martorello should be provided a full and fair opportunity to respond through an evidentiary hearing and briefing.

Dkt.679 at 4. The Borrowers requested an evidentiary hearing to address the alleged misrepresentations. Dkt.680 at 1. After extensive pre-hearing briefing in

7

JA1743

which Martorello refuted the allegations, Dkt.843, in July 2020 the District Court held an evidentiary hearing to address the alleged misrepresentations, ordered post-hearing briefing in which Martorello again rebutted the allegations, Dkt.909, and entered the Misrepresentation Order on November 18, 2020.  Dkt.944 (attached). The District Court then ordered new briefing on class certification.  Dkt.945.

## QUESTIONS PRESENTED

1.    May the Borrowers participate in a class action against Martorello despite waiving the ability to do so in the loan agreement?

2.    Does the loan agreement prospectively waive rights of the Borrowers to pursue federal statutory remedies, rendering the class action waiver unenforceable?

3.    Do common issues predominate under Rule 23(b) given the Tribe's control of Red Rock and Big Picture and Martorello's non-lending role during the entire class period?

4.    Did the District Court violate the mandate rule in the Misrepresentation Opinion by altering binding conclusions and factual findings that were affirmed on appeal by this Court , which the District Court then relied on as the basis for granting class certification?

JA1744

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to Federal Rule of Civil Procedure 23(f) and Federal Rule of Appellate Procedure 5(a).  This petition is timely filed within fourteen days of the District Court's July 20, 2021, Order certifying the Big Picture and Red Rock classes.  Dkt.1111.

This Court may exercise pendent jurisdiction over issues "so interconnected with immediately appealable issues that they warrant concurrent review."  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 364 (4th Cir. 2014).  Exercising jurisdiction is appropriate where issues are "so intertwined that [the Court] must decide the pendent issue in order to review the claims properly raised on interlocutory appeal."  *Rux v. Republic of Sudan*, 461 F.3d 461, 476 (4th Cir. 2006).

Martorello asks the Court to exercise jurisdiction over the Misrepresentation Opinion, which found that Martorello made misrepresentations material to deciding whether the Tribal entities met the *Breakthrough* factors and were arms of the Tribe.  This Opinion is a faulty basis for the District Court granting class certification.  Dkt.1110 ("Cert.Op.") (attached) at 6-8.  Despite previously stating that it was not overruling previous findings that this Court relied on and that "[n]othing was reversed" and "[n]othing was changed" in denying Martorello's Motion for Interlocutory Appeal Under 27 U.S.C. § 1292(b), Dkt.1090 at 8, the District Court now reprimands Martorello for "fail[ing] to take any of the Court's

JA1745

findings into account" and relying on evidence to the contrary and findings and conclusions affirmed on appeal and reached by this Court. Cert.Op.11.

## STANDARD OF REVIEW

This Court has "unfettered discretion" to "permit an appeal from an order granting or denying class-action certification." Fed. R. Civ. P. 23(f), Adv. Comm. Notes to 1998 Amendments. Interlocutory appeal is appropriate when "a District Court's certification decision is manifestly erroneous." *Lienhart v. Dryvit Sys.*, 255 F.3d 138, 145 (4th Cir. 2001). Requiring otherwise "would waste, rather than conserve, judicial resources, because self-evidently defective classes would proceed through trial to final judgment, only to face certain decertification on appeal and a requirement that the process begin again from square one." *Id.*

## REASONS FOR GRANTING INTERLOCUTORY REVIEW

### I.    The Borrowers Waived The Right To Bring A Class Action

To conclude that the Borrowers could maintain a class action against Martorello, the District Court incorrectly interpreted the loan agreement to find that Martorello was not covered by their waiver of the right to participate in all class actions relating to disputes "related to or arising under" the loan agreement. In doing so, the District Court narrowly interpreted "disputes" to exclude claims against Martorello, ignoring that the Borrowers agreed "the words 'dispute' and 'disputes' are given the broadest possible meaning." Dkt.734-1 at 6.

JA1746

The Borrowers waived their ability to bring or participate in a class action

for "disputes" related to or arising under the loan agreement:

> **WAIVER OF JURY TRIAL:** The Dispute Resolution Procedure has been created by the Tribe as a courtesy to consumer and is the sole and exclusive dispute resolution mechanism for disputes and claims relate to or arising under this Agreement. **THEREFORE, YOU ACKNOWLEDGE AND AGREE AS FOLLOWS:**
>
> \*         \*         \*
>
> 2. You acknowledge and agree that by agreeing to this Waiver of Jury Trial provision: . . . **(c) you are giving up your right to serve as a representative, as a private attorney general, or in any other representative capacity, and/or to participate as a member of a class of claimants, in any lawsuit filed against us and/or related parties.**
>
> 3. All disputes, including any Representative Claims against Us and related third parties shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with You as provided for pursuant to Tribal law. **THEREFORE, NO LITIGATION OR ARBITRATION IS AVAILABLE AND NO JUDGE OR ARBITRATOR SHALL CONDUCT CLASS PROCEEDINGS; THAT IS, YOU SHALL BE INELIGIBLE TO SERVE AS A CLASS ACTION REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN LITIGATION OR ARBITRATION.**

Dkt.734-1 at 6 (emphasis in original).

> **A.** **The Borrowers May Not Participate In Class Actions Related To The Validity Of Provisions In The Loan Agreement And Are Estopped From Disclaiming This With Respect To Martorello.**

The loan agreement lists non-exhaustive categories of "disputes" the

Borrowers may not participate in via a class action, including:

JA1747

all claims, dispute, or controversies arising from or relating directly or indirectly to Your application, this Agreement, the validity and scope of these provisions and any claim or attempt to set aside these provisions.

Dkt.734-1 at 6, Waiver of Jury Trial at ¶ 1(b).  The District Court raised *sua sponte* that this provision did not cover Martorello because he was not party to the agreement.  Dkt.1104 at 90:6-93:11.  The District Court concluded Martorello lacked privity of contract and so could not rely on this provision.  Dkt.1106 ("Waiver.Op.") (attached) at 6-7.  That conclusion erroneously burdens Martorello and, instead, the Borrowers must prove that they are not estopped from disclaiming the waiver.

A nonsignatory may compel a signatory to comply with contractual provisions despite not being party to the contract.  *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 373 (4th Cir. 2012).  This arises most often when a nonsignatory seeks to compel arbitration and holds that a signatory is equitably estopped from disclaiming application of a contract's term if the claims "arise out of and relate directly to the written agreement" or the signatory alleges "substantially interdependent or concerted misconduct" by the nonsignatory defendant and another signatory.  *Am Bankers Ins. Group v. Long*, 453 F.3d 623, 627-28 (4th Cir. 2006) (estoppel does not require breach of contract, only claim based on contract); *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 395-56 (4th Cir. 2005).

JA1748

Estoppel also applies when a signatory tries to avoid a class action waiver at class certification, because signatories may not "rely on their contracts to assert [their claims], yet repudiate the clauses within those contracts that preclude certain members from participating in [] class action litigation." *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 852-53 (D. Md. 2013).

The Borrowers' claims indisputably arise out of and relate directly to the loan agreement. *See Am. Bankers*, 453 F.3d at 630. The District Court conceded this. Dkt.1104 at 90:14-91:21 ("[I]f he were a party to the loan, then your argument would be good. But he's not a party to the loan.").) This Court and the District Court recognized the centrality of the tribal loan agreement to this case. Dkt.581 at 4; Dkt.1104 at 3.

The Borrowers' overarching theory alleges "substantial interdependent or concerted misconduct" between a nonsignatory and signatories, because despite this Court's conclusion otherwise, they still claim that the Tribe rented its sovereignty so that Martorello could "cloak [himself] in the sovereign immunity of" the Tribe to preclude enforcement of state law interest rate caps. Waiver.Op.3.

**B.    The Borrowers Also Waived Their Ability To Participate In Class Proceedings Against A Consultant, Servicer, Or Affiliated Entity Of Red Rock And Big Picture.**

Other categories of "disputes" that the Borrowers may not participate in via class action are:

JA1749

(a) all claims, dispute, or controversies involving the parties to this Agreement and Our employees, servicers and agents, including but not limited to consultants, banks, payment processors, software providers, data providers and credit bureaus . . . [and] (j) all claims asserted by You as a private attorney general, as a representative and member of a class of persons, or in any other representative capacity, against Us and/or [any of Our employees, agents, directors, officers, shareholders, governors, managers, members, parent company or affiliated entities] . . .

Dkt.734-1 at 6, Waiver of Jury Trial at ¶¶ 1(a), (j).

In the Class Certification Order, the District Court found that Martorello was the "de facto head of the LVD's lending operations at all relevant times." Cert.Op.32. Yet in the Class Waiver Opinion, the District Court concluded that Martorello was not a consultant, agent, servicer, or affiliated entity of Red Rock or Big Picture that the Borrowers waived their right to bring class proceedings against. Waiver.Op.7-13. This differential treatment is error.

Martorello was a consultant via his role at Bellicose, through which the Borrowers allege he exerted "de facto" control over the lending operations, because Bellicose and its subsidiary providing consulting services to Red Rock. Dkt.581 at 5. Martorello did not raise this "arguably for the first time" at oral argument. Waiver.Op.8. His Opposition to Plaintiffs' Motion, Dkt.1007 at 4, and this Court's prior order both state he was a consultant. Dkt.581 at 5.

Martorello was a servicer because of the Servicing Agreement between Bellicose and Red Rock and his role at Bellicose. Dkt.968-5.

14

Martorello is an affiliated entity because he had a connection to Red Rock and Big Picture, which varied over time, either as a consultant and servicer to Red Rock or as a creditor to Big Picture through Eventide and because a person can be an "entity." *See, e.g., Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). To find "affiliated entity" only meant a business entity, Waiver.Op.12, the District Court did not construe "disputes" broadly. Dkt.734-1 at 6.

## II. The Class Action Waiver Is Valid And Enforceable.

Anticipating appeal, the District Court determined that, even if the Borrowers waived their right to bring a class action, the waiver was unenforceable under the prospective waiver doctrine. Waiver.Op.5. That is also wrong.

### A. The District Court Extended The Prospective Waiver Doctrine From Arbitration To Tribal Forums For The First Time Without The Participation Of Any Tribal Party.

The prospective waiver doctrine is a "judge-made exception to the FAA" in which courts may invalidate arbitration agreements that prospectively waive a party's right to pursue federal statutory remedies. *Am. Express v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013).

Without any tribal party involved to defend sovereign interests, the District Court broke new ground by finding the prospective waiver doctrine applies to tribal forums and not just arbitration. Waiver.Op.14-15. The District Court then concluded that the class action waiver provision in Red Rock and Big Picture's

15

JA1751

loan agreement was unenforceable.  Waiver.Op.14-15.  In doing so, the District

Court did not address a critical difference between arbitration and a tribal forum—

under the tribal exhaustion doctrine, a party may sue in federal court after

exhausting remedies available to them in a tribal forum.  *Hayes v. Delbert Servs.*

*Corp.*, Civil Action No. 3:14-cv-258, 2015 U.S. Dist. LEXIS 6715, at *6-9 (E.D.

Va. Jan. 21, 2015), *rev'd and remanded on other grounds*, 811 F.3d 666 (4th Cir.

2016) (quoting *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 784 (7th Cir. 2014)).

There is no waiver if the Borrowers may later sue in federal court.

> **B.     Even If The Prospective Waiver Doctrine Could Apply, The Loan Agreement Does Not Waive Federal Rights.**

In finding the loan agreement prospectively waived federal rights, the

District Court cited recent decisions from this Circuit but not the only one that also

expressly invoked federal law.  Waiver.Op.14-15.  Rather, the District Court found

more compelling the cases involving loan agreements that disclaim or do not

address application of federal law.  *See Hayes v. Delbert Servs. Corp.*, 811 F.3d

666, 669-70 (4th Cir. 2015); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 335

(4th Cir. 2017); *Gibbs v. Haynes*, 967 F.3d 332, 342 (4th Cir. 2020); *Gibbs v.*

*Sequoia Capital Operations, LLC*, 966 F.3d 286, 293 (4th Cir. 2020).

*Gibbs v. Stinson*, unmentioned by the District Court, is the only decision in

this Circuit involving a loan agreement that expressly incorporates federal law and

so concluded there was no prospective waiver.  421 F. Supp. 3d 267, 303-04 (E.D.

JA1752

Va. 2019).  Here, because the loan agreement expressly states that it is governed by federal law by defining "Tribal law" to include "the [Tribal Consumer Financial Services Regulatory Code (the "Code")] and applicable federal law," there is no prospective waiver since it "does not expressly disavow the application of federal law."  *Id.* at 303 n.4.

Simply put, a court will enforce a forum selection provision in a loan agreement that contemplates application of federal law in the designated forum. The District Court concluded otherwise by reading the provisions of the loan agreement together with the Code in an unexplained way.  Waiver.Op.15-16.  But the loan agreement and the Code repeatedly say that federal law applies, so the District Court conclusion that the "net result of the loan contract is that the consumers have no meaningful way to vindicate their federal rights" is unsupported.  Waiver.Op.15-16.

Nothing in the loan agreement prospectively waives the right to pursue federal statutory remedies; instead, the agreement invokes federal law.  Dkt.734-1 at 5.  Other provisions cited by the District Court plainly do not waive federal rights—not being able to file litigation or arbitration, have a trial by jury, or be a class representative is irrelevant if the Borrowers can pursue federal rights in the designated tribal forum ("the TDRP").  Waiver.Op.17.

JA1753

Aside from those provisions, the District Court focused on the loan agreement's high-level description of the TDRP rather than the detailed TDRP procedures enumerated in the Code. Waiver.Op.16-17. But that description of the TDRP does not override the TDRP and, in any event, does not prospectively waive federal rights. As previously described by Big Picture, the TDRP "mirrors federal and state administrative procedures by empowering an administrative executive body—the TFSRA—to sit in a quasi-judicial capacity and preside over consumer dispute hearings with ultimate oversight through an administrative appeal to a court—the LVD Court." Dkt.27 at 12.

All that is left is whether Borrowers can pursue federal statutory remedies under the TDRP. Despite the District Court saying they may not because "the remedial procedures outlined in the contract are courtesies, not rights," they can. Waiver.Op.18. Underpinning the District Court's conclusion seems to be the belief that the TDRP treats federal law as optional, because section 6.2 of the Code states that licensees shall conduct business "consistent with the principles of federal consumer protection law." Waiver.Op.16. That ignores the preceding section, which requires licensees to "at all times comply with the provisions of this Code, rules and regulations promulgated pursuant to this Code, and all other applicable Tribal, and federal laws as applicable." Dkt.1007-5 at 21, ¶ 6.1. In other words, Red Rock, Big Picture, Ascension, and Martorello must comply with

JA1754

federal law.  If they do not, the TFSRA, the tribal entity tasked with "disciplin[ing]
any Licensee or Person engaging or participating in financial services in violation
of this Code" may hold them liable and grant any relief except legal fees.
Dkt.1007-5 at 11, ¶ 4.13(i), and 28-29, ¶¶ 9.3(f), (i).  There is no waiver.

## III.  Common Issues Do Not Predominate

### A.  Red Rock And Big Picture Made Payments Based On The Overall Profitability Of The Tribal Lending Business, Not Interest Payments By Individual Borrowers.

Unlike in other tribal lending cases, Red Rock or Big Picture—not
Martorello—is the lender and originated and collected on the loans.  Dkt.581 at 22-
23.  Borrowers' interest payments were not made to Bellicose or Eventide and
those companies were not paid based on the individual loans, but instead based on
the overall profitability of the lending business in a given month, if any.
Cert.Op.30; Dkt.902 (explaining how money flows from a borrower's payment to
distribution to Martorello).  But for stretches during the class period, Bellicose and
Eventide did not receive any transfers, meaning that some of the short-term interest
payments made by individual Borrowers never reached Bellicose or Eventide, let
alone Martorello.  Dkt.1007-7 at 1.

Whether some portion of the interest payments of individual Borrowers ever
reached Martorello or not over the class period requires individualized tracing that
does not predominate.  *See Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011)

JA1755

("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers"). The District Court concluded otherwise because Bellicose and Eventide received a certain percentage of revenue over the whole of the class period. Cert.Op.31. But that only shows that interest payments made by some indefinite sub-set of the Borrowers made it to Bellicose or Eventide, not all Borrowers.

## B.    As Recognized By This Court, Martorello Was Not The "De Facto Head" Of The Tribal Lending Business And His Role Changed During The Class Period.

This Court has already concluded that the Tribe, not Martorello, controlled the lender, Big Picture. Dkt.581 at 22-23. This conclusion applies equally to Red Rock because its formal governance structure and identical servicing agreement ensured it was answerable to the Tribe. But outsourcing day-to-day management of the lender does not determine Tribal control. Dkt.581 at 21-25.

The District Court rejected this conclusion to find that Martorello was the "de facto head of the LVD's lending operations" between June 22, 2013 and December 22, 2019. Cert.Op.32. As a result, the District Court concluded that Martorello's participation in the collection of, or conspiracy to collect, unlawful debt and commission or authorization of any intentional torts committed by Red Rock or Big Picture did not change from 2013 through 2019. Cert.Op.32.

20

In addition to ignoring the substantial evidence regarding the Tribe's growing role, and the sale of his business to the Tribe in 2016, the District Court found that Martorello's role did not change by ascribing Martorello a constant role in the lending operation between 2013 and 2019. Dkt.581 at 6-7. Calling him the "de facto head of the LVD's lending operations" without supporting evidence ignores that his role was waning before and different after the sale.

The District Court also clearly erred by relying on erroneous conclusions in the Misrepresentation Opinion: (1) over both class periods, "Martorello was functionally in charge of the lending business and the Tribal 'mangers' were 'rather meaningless'"; (2) "even after the LVD restructured the lending operations to avoid regulatory scrutiny, the evidence strongly shows that Martorello was still running the show"; and (3) "[e]xcept for a few cosmetic changes . . ., the LVD lending operation by way of Big Picture continued as it had under the Red Rock structure." Cert.Op.6-8. Each conflicts with this Court's ruling and substantial corroborating evidence submitted by Martorello, Dkt.843 and Dkt.909, and affects whether Martorello uniformly participated in collecting, or conspiring to collect, unlawful debt, commissioned or authorized intentional torts, and proximately caused any harm.

To reach these conclusions in the Misrepresentation Opinion, the District Court improperly relied on a September 2019 Declaration of a former Tribal

JA1757

councilmember, who was involuntarily removed from the Tribal Council in 2016

and whose Declaration the Tribal entities moved to strike, *Galloway I*, Dkt.325,

and discounted contradictory evidence submitted by Martorello.  Dkt.944.11-12,

15, 17; Dkt.784-17; Dkt.769-1 at 15.  At her deposition, the former councilmember

admitted that the Borrowers' counsel (*i.e.*, Plaintiffs' counsel) drafted her

Declaration and disclaimed personal knowledge relating to much of its content.

Dkt.769-1 at 22-25, 26, 28-29, 81, 88-89.  The District Court's heavy reliance on

this unreliable Declaration is unjustified.

## IV.  The District Court Violated The Mandate Rule By Altering Conclusions Affirmed On Appeal By This Court And Then Relied On Its New Conclusions To Grant Class Certification

The District Court altered conclusions related to the Tribe's control over and

purpose in creating the Tribal entities and factual findings affirmed on appeal in

the Misrepresentation Opinion and so violated the mandate rule, which "prohibits

lower courts . . . from considering questions that the mandate of a higher court has

laid to rest."  *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007).

In *Williams*, this Court affirmed this the District Court's factual findings,

reached its own conclusions, and reversed the District Court. Dkt.581 at 11.  This

Court also disregarded the Borrowers' invitation to remand to consider "new

evidence," and instead gave clear instruction to "grant the [Tribal] Entities motion

to dismiss for lack of subject matter jurisdiction."  Dkt.581 at 28.  This did not

authorize reconsideration of conclusions and factual findings relating to the *Breakthrough* factors that this Court found supported by the record. The Borrowers pursued none of the vehicles that could have allowed for legitimate review or reconsideration of this Court's prior findings with the participation of the Tribe. *See* Fed. R. Civ. P. 60; Fed. R. App. P. 35.

## CONCLUSION

This Court should grant permission to appeal and vacate the Class Certification Order and Misrepresentation Opinion.

Dated: August 3, 2021

LOEB & LOEB LLP
JOHN D. TALIAFERRO

By: /s/ *John D. Taliaferro*
John D. Taliaferro
Attorneys for Defendant and Petitioner
Matt Martorello

JA1759

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 5(c)(1) because it contains 5,184 words, excluding parts exempted by Federal Rule of Appellate Procedure 5(b)(1)(E).

I further certify that the text of this petition complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it is set in Times New Roman and is proportionately spaced with a typeface of 14 points or more.

Dated:  August 3, 2021        LOEB & LOEB LLP
                                      JOHN D. TALIAFERRO

                               By: /s/ *John D. Taliaferro*
                                  John D. Taliaferro
                                  Attorneys for Defendant and Petitioner
                                  Matt Martorello

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
Amy Austin, VSB #46579
CONSUMER LITIGATION ASSOCIATES
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
lenbennett@clalegal.com
craig@clalegal.com
amyaustin@clalegal.com

Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
kkelly@kellyguzzo.com
aguzzo@kellyguzzo.com
casey@kellyguzzo.com

JA1761

E. Michelle Drake, *Admitted Pro Hac Vice*
John G. Albanese, *Admitted Pro Hac Vice*
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
emdrake@bm.net
jalbanese@bm.net

Beth E. Terrell, *Admitted Pro Hac Vice*
Jennifer Rust Murray, *Admitted Pro Hac Vice*
Elizabeth A. Adams, *Admitted Pro Hac Vice*
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450
bterrell@terrellmarshall.com
jmurray@terrellmarshall.com
eadams@terrellmarshall.com

Matthew Wessler, *Admitted Pro Hac Vice*
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792
matt@guptawessler.com

*Attorneys for Plaintiffs and Classes*

David N. Anthony, Virginia State Bar #31696
Timothy J. St. George, Virginia State Bar #77349
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com

*Attorneys for Defendants*

Justin Alexander Gray, *Admitted Pro Hac Vice*
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, Michigan 49071
Telephone: (269) 283-5005
Facsimile: (517) 913-6443
jgray@rosettelaw.com

*Attorneys for Defendants Big Picture Loans, LLC and Ascension Technologies, LLC*


/s/ *John D. Taliaferro*
John D. Taliaferro

**ATTACHMENT 1:**

**ORDER GRANTING CLASS CERTIFICATION**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, *et al.*,

    Plaintiffs,

v.                                          Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, *et al.*,

    Defendants.

### ORDER

This matter comes before the Court on Plaintiffs'
Renewed Motion to Certify a Class (ECF No. 967). Upon
consideration of the Motion, and Defendant's opposition
thereto, the Court hereby GRANTS the Motion.

1. For the reasons stated in the Court's prior
Memorandum Opinion (ECF No. 1106), the Court finds that
Plaintiffs have not waived their right to bring a class
action.

2. Pursuant to Rule 23 of the Federal Rules of Civil
Procedure, the Court certifies the following Classes
("Classes"):

> (a) **Big Picture RICO Class**: All Virginia consumers
> who entered into a loan agreement with Big
> Picture where a payment was made from June 22,
> 2013 to December 20, 2019.
>
> > (i) **Big Picture Usury Sub-class**: All

Virginia consumers who paid any
principal, interest, or fees on their
loan with Big Picture from June 22, 2015
to December 20, 2019.

(ii) **Big Picture Unjust Enrichment Sub-
class:** All Virginia consumers who paid
any amount on their loan with Big
Picture from June 22, 2014 to December
20, 2019.

(b) **Red Rock RICO Class:** All Virginia consumers
who entered into a loan agreement with Red Rock
where a payment was made from June 22, 2013 to
December 20, 2019.

(i) **Red Rock Usury Sub-class:** All Virginia
consumers who paid any principal,
interest, or fees on their loan with Red
Rock from June 22, 2015 to December 20,
2019.

(ii) **Red Rock Unjust Enrichment Sub-class:** All
Virginia consumers who paid any amount on
their loan with Red Rock from June 22,
2014 to December 20, 2019.

3. As detailed in the accompanying Memorandum Opinion,
the prerequisites to a class action under Fed. R. Civ. P.
23(a) have been preliminarily satisfied in that:

(a) the Classes are so numerous that joinder would
be impractical;

(b) the claims of the Plaintiffs are typical of
those of the other members of the Classes;

(c) there are questions of fact and law that are
common to all members of the Classes; and

(d) the Plaintiffs will fairly and adequately
protect the interests of the Classes and have

JA1766

retained counsel experienced in consumer class
action litigation who have and will continue
to adequately represent the Classes.

4. Pursuant to Fed. R. Civ. P. 23(b)(3), the Court
further finds that this action is maintainable as a class
action because: (1) a class action is a fair and efficient
adjudication of this controversy; and (2) questions of fact
and law common to the members of the Classes predominate
over any questions affecting only individual members.

5. The Court appoints Lula Williams, George Hengle,
Gloria Turnage, Dowin Coffy and Marcella Singh, as
administrator for Felix Gillison, Jr.'s estate as the Class
Representatives. The Court also appoints the law firms of
Kelly Guzzo, PLC, Consumer Litigation Associates, P.C.,
Terrell Marshall Law Group, PLLC, Berger Montague, P.C., and
Caddell & Chapman as counsel for the Class ("Class
Counsel").

6. Pursuant to the Court's March 12, 2019 Order (ECF No.
416), Class Counsel shall notify TranDotCom Solutions, LLC
of this decision to arrange for the transmission of the
necessary data to notify the Classes.

7. Class Counsel and Defendant Martorello shall confer
to file a Notice Plan no later than two weeks from the date

of the entry of this Order. If the parties cannot agree on a
Notice Plan, each side shall submit a pleading no longer
than five pages no later than 21 days after the entry of
this Order.

   **IT IS SO ORDERED.**

                                          /s/            _REP_
_____

                          Robert E. Payne
                          Senior United States District Judge

Richmond, Virginia
Date: July _19_, 2021

**ATTACHMENT 2:**

**MEMORANDUM OPINION ON CLASS CERTIFICATION**

USCA4 Appeal: 21-2116    Doc: 226-3    Filed: 08/09/2021    Pg: 499 of 601
Case 3:17-cv-00461-REP    Document 1119    Filed 07/20/21    Page 1 of 3 PageID# 47642



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

LULA WILLIAMS, et al.,

    Plaintiffs,

v.                             Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, et al.,

    Defendants.

### MEMORANDUM OPINION

This Memorandum Opinion addresses PLAINTIFFS' RENEWED
MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT
MARTORELLO ("Motion for Class Certification") (ECF No. 967) in
which Plaintiffs, on behalf of themselves and all other
similarly situated individuals, request that this Court certify
their claims against Defendant Matt Martorello ("Martorello").
Martorello opposes class certification on four main grounds: (1)
Plaintiffs waived the ability to pursue a class action;[1] (2) the
class members are not readily ascertainable; (3) common issues
do not predominate; and (4) a class action is not a superior
method of bringing suit. OPPOSITION TO PLAINTIFFS' RENEWED
MOTION FOR CLASS CERTIFICATION AGAINST MATT MARTORELLO

---

[1] A separate Memorandum Opinion supplies the reasons for
overruling Martorello's objection to class certification on the
ground that the proposed class representatives (as well as all
of the proposed class members) waived their right to participate
in a class action. See MEM. OP., ECF No. 1106.

**JA1770**

("Response Memorandum"), ECF No. 1007. Notwithstanding Martorello's arguments in opposition, for the reasons that follow, Plaintiffs' Motion for Class Certification will be granted.

## I. BACKGROUND

### A. Statement of Facts

The facts surrounding this lawsuit have been recounted by the Court on numerous occasions. See, e.g., MEM. OP., ECF No. 944. The facts of this case are, therefore, presumed known, and it suffices here to provide only a brief summary.

This case is one of four similar, but distinct, actions[2] "arising out of a so-called 'Rent a Tribe' scheme allegedly orchestrated by Matt Martorello ('Martorello'), members of his family, companies that he controls, and investors who allegedly funded the scheme (the 'Martorello Defendants')" along with two "entities formed under the tribal laws of the Lac View Band of Lake Superior Chippewa Indians ('LVD')," i.e., "Big Picture Loans, LLC ('Big Picture')[3] and Ascension Technologies, Inc.

---

[2] In addition to this case, i.e., Williams, et al. v. Big Picture Loans, LLC, et al., 3:17-cv-461 (E.D. Va.) ("Williams"), the other related cases are (1) Renee Galloway, et al. v. Big Picture Loans, LLC, et al., 3:18-cv-406 (E.D. Va.) ("Galloway I"), (2) Renee Galloway, et al. v. Martorello, et al., 3:19-cv-314 (E.D. Va.) ("Galloway II"), and (3) Renee Galloway, et al. v. James Williams, Jr., et al., 3:19-cv-470 (E.D. Va.) ("Galloway III").

[3] The LVD's lending operations evolved over time, but they began with the use of a so-called tribal lending entity named Red Rock

2

('Ascension') (collectively sometimes referred to as the 'Tribal Defendants')." <u>Williams v. Big Picture Loans, LLC</u>, 3:17-cv-461, 2020 U.S. Dist. LEXIS 216792, 2020 WL 6784352, at *1-2 (E.D. Va. Nov. 18, 2020) (Payne, J.).  The term "Rent-a-Tribe" refers to the practice of so-called payday lenders partnering with Native American tribes "in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in so doing, to preclude enforcement of the interest rate caps in state usury laws."  See MEM. OP. at 4, ECF No. 944.

Plaintiffs are all Virginia citizens who took out small-dollar high-interest loans from one of two LVD-affiliated entities (i.e., Red Rock or its successor Big Picture). Plaintiffs' basic argument is that the loans from these entities were made in violation of Virginia's usury laws, and Martorello, who is not a member of any Native American tribe, was both the de facto head and primary beneficiary of the LVD's lending operations.   PLS.' MEM. IN SUPP. OF RENEWED MOT. FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEF. MATT MARTORELLO ("Prelim. Approval Mem.") at 27, ECF No. 968.

---

Lending, LLC ("Red Rock") which used Bellicose, LLC, a non-tribal entity owned and operated by Martorello, to handle the lending operations and the servicing of loans.  For reasons that need not be discussed here, around 2013, Red Rock, Bellicose, and another corporate entity were restructured into a new lending entity — i.e., Big Picture.

3

## B. Plaintiff's Claims

Plaintiffs are pursuing five claims against Martorello:

- First, Plaintiffs are seeking declaratory judgment that the choice of law and forum-selection provisions in their loan contracts are void and unenforceable under Virginia law and Virginia's "well-established public policy." Compl. ¶ 94, ECF No. 1.

- Second, Plaintiffs allege that Martorello violated 18 U.S.C. § 1962(c) of the RICO statute (which prohibits the collection of unlawful debt). Compl. ¶¶ 103-104, ECF No. 1. Plaintiffs seek actual damages, treble damages, costs, and attorney's fees. Compl. ¶ 109, ECF No. 1.

- Third, Plaintiffs allege that Martorello violated 18 U.S.C. § 1962(d) of the RICO statute (by conspiring to violate 18 U.S.C. § 1962(c)). Compl. ¶ 117, ECF No. 1. Plaintiffs seek actual damages, treble damages, costs, and attorney's fees. Compl. ¶ 118, ECF No. 1.

- Fourth, Plaintiffs allege that Martorello violated Virginia's usury law, namely Va. Code § 6.2-305(A). Compl. ¶¶ 127-28, ECF No. 1. Plaintiffs seek damages "equal to the total amount of interest paid in excess of 12% plus twice the amount of such usurious interest that was paid in the two years preceding [the] filing of this action, attorney's fees, and costs." Compl. ¶ 128, ECF No. 1.

- Finally, Plaintiffs allege that Martorello was unjustly enriched because he received payments from illegal and unenforceable loan contracts. Compl. ¶¶ 137-139, ECF No. 1. Plaintiffs seek all amounts repaid on loans with Big Picture or Red Rock. Compl. ¶ 139, ECF No. 1.

Counts II through V are the subject of this Opinion.

4

**C. Proposed Classes**

Proposed Class Counsel,[4] representing Plaintiffs, who are the Proposed Class Representatives,[5] propose the following classes:

> **Big Picture RICO Class:** All Virginia consumers who entered into a loan agreement with Big Picture where a payment was made from June 22, 2013 to December 20, 2019.
>
> > **Big Picture Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture from June 22, 2015 to December 20, 2019.
> >
> > **Big Picture Unjust Enrichment Sub-class:** All Virginia consumers who paid any amount on their loan with Big Picture from June 22, 2014 to December 20, 2019.
>
> **Red Rock RICO Class:** All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made from June 22, 2013 to December 20, 2019.
>
> > **Red Rock Usury Sub-class:** All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock from June 22, 2015 to December 20, 2019.
> >
> > **Red Rock Unjust Enrichment Sub-class:** All Virginia consumers who paid any amount on their

---

[4] That is, Amy Leigh Austin, Craig Carley Machiando, Kristi Cahoon Kelly, Andrew Joseph Guzzo, Beth Ellen Terrell, Casey Shannon Nash, Eleanor Michelle Drake, Elizabeth Anne Adams, James Wilson Speer, Jennifer Rust Murray, John Albanese, Leonard Anthony Bennett, Matthew William Wessley, and Michael Allen Caddell. Prelim. Approval Mem. at 27, ECF No. 968.

[5] That is, Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix M. Gillison, Jr. (represented by Marcella P. Singh, the administrator of the Estate of Felix M. Gillison, Jr.). Prelim. Approval Mem. at 27, ECF No. 968.

5

loan with Red Rock from June 22, 2014 to December 20, 2019.

Prelim. Approval Mem. at 24, ECF No. 968. At bottom, all proposed class members are (or were) Virginia citizens who took out loans with interest rates above 12% from entities affiliated with the LVD tribe (i.e., Big Picture or Red Rock) and who made payments on those loans. Prelim. Approval Mot. at 22, ECF No. 968.

## D. Martorello's Involvement Over Time

For nearly every argument Martorello makes in opposition to class certification, Martorello asserts that, because his role in the lending scheme changed between 2013 and 2019, the class members will be situated differently vis-à-vis each other across different time periods, and those differences between class members will result in a need for a series of complicated mini-trials to determine which class members can recover.[6] Not so.

Shortly after the Fourth Circuit's decision in Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019), the Plaintiffs alleged that Martorello and others had made material misrepresentations to this Court and the Fourth Circuit on which this Court and the Fourth Circuit had relied in making their

---

[6] This "non-uniformity" argument is addressed in Martorello's positions on (1) ascertainability, Resp. Mem. at 32-33, ECF No. 1007; (2) commonality, id. at 35-42; (3) predominance (unjust enrichment), id. at 44, 47; (4) predominance (RICO), id. at 46; and (5) superiority, id. at 49.

6

respective decisions. At Martorello's request, this Court subsequently held a hearing on the alleged misrepresentations; thereafter received briefing; and then issued an opinion finding that several material misrepresentations had been made to the Court. MEM. OP. at 8, ECF No. 944 ("November 18 Opinion"). For a detailed description of all of the facts, see the November 18 Opinion (ECF No. 944).

As explained fully in the November 18 Opinion, there is substantial (and largely unrebutted) evidence that, throughout the relevant class periods, Martorello had de facto control of Red Rock and Big Picture's lending operations. To begin, there is unrebutted evidence that Martorello was both highly instrumental and heavily involved in the LVD's entrance into the business of payday lending. Nov. 18 OP. at 9-12, ECF No. 944. And, contrary to what the LVD and Martorello previously represented, there is proof that Martorello was functionally in charge of the lending business and the Tribal "managers" were "rather meaningless." Nov. 18 OP. at 13-15, 20, ECF No. 944. And, even after the LVD restructured the lending operations to avoid regulatory scrutiny, the evidence strongly shows that Martorello was still running the show. Nov. 18 OP. at 15, ECF No. 944 ("Efforts were made to create the appearance of the Tribe's involvement but the Tribe had no substantive involvement."). "[E]xcept for a few cosmetic changes . . ., the

7

LVD lending operation by way of Big Picture continued as it had under the Red Rock structure." Nov. 18 OP. at 22-23, ECF No. 944.

Notwithstanding that Martorello's Response Memorandum was filed after the November 18 Opinion was issued, the Response Memorandum fails to take any of the Court's findings into account and continues to advance some of the very same misrepresentations addressed in the November 18 Opinion.[7]

On the current record, no credence can be given to Martorello's arguments challenging class certification on the ground that, because of his changing roles, Plaintiffs' claims will not be susceptible to class-wide proof. Certainly, Martorello's conclusory assertions do not overcome the Plaintiffs' evidence that disproves the need for the "mini-trials" that Martorello's arguments attempt to conjure.

## II. DISCUSSION

A class can be certified if plaintiffs show that the four requirements of Fed. R. Civ. P. 23(a) are met and that the class fits the requirements of at least one of the class types outlined in Fed. R. Civ. P. 23(b). Branch v. Gov't Emples. Ins.

---

[7] For example, Martorello asserts that his role in the LVD's "lending business declined considerably over time, and ceased after Martorello's 2016 sale of Bellicose to the Tribe." Resp. Mem. at 38 (emphasis added), ECF No. 1007. The evidence of record shows otherwise. Nov. 18 OP. at 22-23, ECF No. 944. And, Martorello's Response Memorandum offers no viable evidence to disprove that showing.

8

Co., 323 F.R.D. 539, 544 (E.D. Va. 2018). The Court's analysis for each requirement must be "rigorous." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011). And, plaintiffs bear the burden of demonstrating that all of the Rule 23 requirements have been satisfied. Branch, 323 F.R.D. at 545.

## A. Rule 23(a) Analysis

Under Rule 23(a), class certification is appropriate if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

### 1. Ascertainability

Although not self-evident on the face of Fed. R. Civ. P. 23, it is inherent in the concept of class certification that there must be a "readily identifiable" set of putative class members. EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014). This is sometimes referred to as the "ascertainability" requirement. Id. Plaintiffs need not be able to identify each and every class member at the time of class certification, but class members must be identifiable by reference to objective criteria without "extensive and individualized fact-finding or 'mini-trials[.]'" Id. (citation omitted).

9

JA1778

Here, Plaintiffs assert that they can readily identify the class through objective, electronic data analysis of data that will be voluntarily provided by Big Picture and Ascension once the class has been certified.  Prelim. Approval Mot. at 26, ECF No. 968.  Specifically, Plaintiffs explain that:

> Identification of the class members involves a handful of discrete steps: (1) determining whether a consumer had a loan with Big Picture and/or Red Rock, (2) for all such consumers, determining whether they had a Virginia address when they executed the loan, and (3) identifying any payments made by those consumers from June 22, 2013 to December 20, 2019.

Prelim. Approval Mot. at 26, ECF No. 968.

Martorello, nevertheless, attacks the ascertainability of the proposed class on four grounds: (1) the loan information is largely under Tribal control, and neither party will have access to it until after the class is certified; (2) even if the loan information were provided, because Martorello's involvement in the lending scheme changed over time, mini-trials will be needed to understand each proposed class members' claims as to Martorello himself (as opposed to any other defendant); (3) mini-trials would be needed to determine if proposed class members have already released their rights, have already recovered, or have been estopped from recovering as a result of the Galloway III settlement; and (4) mini-trials would be needed to determine if proposed class members' claims are time-barred

because of the statute of limitations.  Resp. Mem. at 30-34, ECF
No. 1007.  These arguments are not persuasive.

First, the requirement that a class be readily identifiable
does not mean that Plaintiffs must present the Court (or
Martorello) with a list of each and every proposed class member
at the time of class certification.  EQT, 764 F.3d at 358.  And,
while the parties are not presently in possession of the
detailed loan data for each of the proposed class members, that
is not to say that they are totally ignorant of the likely
candidates for class membership.  The putative class members in
this case are a subset of the class members defined by the
Galloway III settlement (and the proposed class counsel in this
case were also class counsel in Galloway III).  Prelim. Approval
Mem. at 26-27, ECF No. 968.  As part of the Galloway III
settlement, the Tribal Defendants turned over "the majority of
the information" Plaintiffs would need to identify the class
members.  Prelim. Approval Mem. at 27, ECF No. 968; see also Ex.
51 ¶ 3, ECF No. 968-51 (describing the customer loan data turned
over to the Settlement Administrator in Galloway III).
Furthermore, the Tribal Defendants have already agreed to turn
over the necessary data if the Court certifies the class in this
case.  Ex. 52, ECF No. 968-52 (showing counsel for the Tribal
Defendants agreeing, on behalf of Ascension and Big Picture, to

JA1780

turn over the necessary loan data once a class has been certified in this case).

The cases Martorello cites to defend his position are clearly distinguishable. Unlike in <u>Marcus v. BMW of N. Am., LLC</u>, the third parties with possession of the data (i.e., Big Picture and Ascension) have ready access to the necessary data <u>and</u> have voluntarily agreed to turn it over to Plaintiffs if this Court certifies the proposed class. 687 F.3d 583, 594 (3d Cir. 2012). Unlike in <u>Supler v. FKAACS, Inc.</u>, it is, in fact, possible to determine who the class members would be. 2012 WL 5430328, at *4, *9 (E.D.N.C. Nov. 6, 2012). And, unlike in <u>Carrera v. Bayer Corp.</u>, 727 F.3d 300, 308-09 (3d Cir. 2013), Plaintiffs are not basing their ascertainability arguments on hypothetical data that may or may not exist or relying on class members to self-identify themselves through affidavits. Rather, Plaintiffs propose to use objective factors (i.e., whether an individual had a loan with a given company, whether that individual's home address was in Virginia when the loan was executed, and whether any loan payments were made after June 22, 2013) to analyze data that they have confirmed exists (and that they have confirmed they will have access to),[8] and that data is

---

[8] Martorello attempts to argue that "[w]ithout the loan records, the only way to identify the class members is to seek documents and testimony regarding loan and payment details from each putative class member. This is exactly the type of

12

comparable to data that they successfully have used in a related case before this Court.  Prelim. Approval Mem. at 26-27, ECF No. 968;  PLS.' REPLY IN SUPP. OF RENEWED MOT. FOR CLASS CERTIFICATION AGAINST DEF. MATT MARTORELLO ("Reply Mem.") at 18-19, ECF No. 1055.  Thus, contrary to what Martorello implies in his briefs, Plaintiffs are not just spitballing here.

Furthermore, the fact that Martorello will not have access to the loan data until after certification is not a violation of his due process rights.  Martorello asserts that "forcing" him "to defend against certification of a class where the loans are unavailable is contrary to ascertainability, fairness, and due process."  Resp. Mem. at 31, ECF No. 1007.  Not so.  "The due process question is not whether the identity of class members can be ascertained with perfect accuracy at the certification stage but whether the defendant will receive a fair opportunity to present its defenses when putative class members actually come forward."  Mullins v. Direct Digital, LLC, 795 F.3d 654, 670 (7th Cir. 2015).  So long as Martorello has an opportunity to challenge each purported class member's claim to recover against him specifically (as opposed to any other defendant),

---

individualized review that renders a class not ascertainable."  Resp. Mem. at 32, ECF No. 1007.  The operative phrase, of course, is "without the loan records."  If, for some reason, the loan records are not turned over by Big Picture and Ascension, the Court can reconsider its class certification decision.  See Fed. R. Civ. P. 23(c)(1)(C).

13

his due process rights have not been violated. See Mullins, 795
F.3d at 671.  To hold that Martorello would suffer a due process
violation if he were not given "[t]he specific loan information
for each proposed class member (including residency, date of
borrowing; payment histories; and balances)[,]" Resp. Mem. at
31, ECF No. 1007, would run contrary to the Fourth Circuit's
clear explanation of the ascertainability requirement.  See EQT
Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014) ("The
plaintiffs need not be able to identify every class member at
the time of certification.").

    Martorello's    second    and    third    challenges    to
ascertainability  can  be  more  quickly  dispensed  with.[9]
Martorello's second argument against the ascertainability of the
class is that, because his involvement in the lending scheme
changed over time, mini-trials will be needed to understand
whether each putative class member has a claim against
Martorello himself (as opposed to any other defendants).  As
discussed above in Part I.D, there is no evidence that
Martorello's role in the LVD's lending scheme materially changed
over time, and as discussed later in Part II.B.1, Plaintiffs'

---

[9] Martorello also repeats these two arguments again in a section
of his Response Memorandum titled "THE CLASS DEFINITION FAILS
BECAUSE MANY PROPOSED MEMBERS WERE NOT INJURED BY MARTORELLO."
Resp. Mem. at 47, ECF No. 1007.  The arguments in that section
fail for the same reasons.

14

theory of the case lends itself to class-wide proof on all four of Plaintiffs' legal theories.

Martorello's third claim (i.e., that mini-trials would be needed to ascertain whether proposed class members have already waived their right to recover by joining the Galloway III settlement) is also clearly incorrect.  No proposed class member has released their rights to pursue a suit against Martorello; the Galloway III settlement, by its terms, applied to 25 enumerated defendants (none of which were Martorello).  MEM. OP., Galloway III, 3:19-cv-470, ECF No. 114 (E.D. Va. Dec. 18, 2020).

Martorello's fourth and final attack on ascertainability (i.e., that mini-trials will be needed to ascertain whether proposed class members' claims are barred by the statute of limitations) will require more analysis.

### Statute of Limitations

With respect to Plaintiffs' usury and unjust enrichment claims, Martorello asserts that the claims of some proposed class members may be barred by the statute of limitations. Resp. Mem. at 34, ECF No. 1007.  According to Martorello, because class members took out loans at different times with different payment schedules, the Court would essentially need to have complex mini-trials to determine which class members are still eligible to recover.  Plaintiffs respond that having

15

separate subclasses - with separate class periods - for both the usury and unjust enrichment claims will avoid any statute of limitations issues.

The class period for the proposed usury subclasses runs from June 22, 2015 to December 22, 2019. Prelim. Approval Mem. at 24, ECF No. 968. The statute of limitations for a claim based on a violation of Virginia state usury law is two-years after the last scheduled loan payment or the date of payment of the loan in full - whichever comes first. Va. Code. Ann. § 6.2-305. Because the case was filed on June 22, 2017 (i.e., two years after June 22, 2015), even the members of the proposed class who were making payments on their loans as far back as June 22, 2013 fall within the statute of limitations period.

Similarly, the class period for the proposed unjust enrichment subclasses runs from June 22, 2014 to December 20, 2019. The statute of limitations for a claim based on a violation of Virginia's unjust enrichment law is three years from accrual. Hengle v. Asner, 433 F. Supp. 3d 825, 893 (E.D. Va. 2020); see also 12A Michie's Jurisprudence § 12 (Limitation of Actions) (2021). As with the usury claim, because this case was filed on June 22, 2017 (i.e., three years after June 22, 2014), even the members of the proposed class who made payments on their loans as far back as June 22, 2014 fall within the statute of limitations period.

16

There are, therefore, no statute of limitations problems for the usury or unjust enrichment subclasses even though Plaintiffs entered into loan contracts at different times.

## 2. **Numerosity**

There is no bright-line threshold at which point a class is so numerous that joinder of all members is impracticable. Brown v. Transurban USA, Inc., 318 F.R.D. 560, 566 (E.D. Va. 2016). Whether joinder is impracticable is a fact-specific inquiry that depends not only on the number of class members but also on the circumstances of the case. Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 199 (E.D. Va. 2015). "'Courts consider a number of factors in considering whether joinder is practicable including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion.'" Soutter, 307 F.R.D. at 199 (quoting Adams v. Henderson, 197 F.R.D. 162, 170 (D. Md. 2000)).

Here, the numerosity requirement is easily met; the putative class consists of at least 12,530 individuals. Prelim. Approval Mem. at 26, ECF No. 968. Joinder of over 12,000 individuals would undoubtedly be impracticable. See Soutter, 307 F.R.D. at 199 (granting class certification for a class of approximately 1,000 consumers); see also William B. Rubenstein, 1 Newberg on Class Actions § 3:11 (5th ed. 2021) ("No specific

17

number alone is determinative of whether numerosity is present, but joinder is generally deemed practicable in classes with fewer than 20 members and impracticable in classes with more [than] 40 members.").

### 3. Commonality

The commonality requirement necessitates that there be common questions of law or fact among the class members such that common treatment is "necessary and beneficial."[10]   Jeffreys v. Communs. Workers of Am., 212 F.R.D. 320, 322 (E.D. Va. 2003); Fed. R. Civ. P. 23(a)(2) (emphasis added).   Accordingly, class members need not have suffered a violation of the same law. Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 546 (E.D. Va. 2018).   And, "a class action will not be defeated solely because of some factual variances in individual grievances."   Jeffreys, 212 F.R.D. at 322.   As long as claims "arise from the same isolated set of facts," differences in the extent of each class member's injuries or damages will not prevent a finding that commonality exists."   Jeffreys, 212 F.R.D. at 322.

Plaintiffs have met their burden of showing that commonality exists among the proposed classes.   The proposed

---

[10]   In a class action brought under Rule 23(b)(3) the commonality requirement will be "subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." Lienhart v. Dryvit Sys., 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting Amchem Prods. v. Windsor, 521 U.S. 591, 609 (1997)). Nevertheless, the inquiries are distinct.

18

class members' claims are all based on the same tribal lending
scheme, and in particular, on "the same conduct, practice, and
procedure on the part of Martorello." Prelim. Approval Mem. at
27, ECF No. 968. The class members, therefore, share a common
set of legal and factual questions. According to Plaintiffs,
these include:

> (1) whether their interest rates violate Virginia's
> usury laws; (2) whether the choice-of-law provision
> in their loan agreements bar[s] enforcement of
> Virginia's usury laws; (3) whether the relationship
> between the various participants constitutes an
> enterprise as defined under RICO; (4) whether
> Martorello participated or operated in the
> management of the enterprise; (5) whether Martorello
> had knowledge of and agreed to the overall objective
> of the enterprise; and (6) whether the amounts paid
> by each consumer are recoverable against Martorello.

Prelim. Approval Mem. at 27-28, ECF No. 968. Moreover, several
courts have found that commonality existed in comparable cases
where class members brought suits challenging various tribal
lending schemes. See Inetianbor, et al. v. Cashcall, Inc., et
al., 13-6066-CIV-COHN/SELTZER (S.D. Fla., Sept. 19, 2016), Ex.
53, ECF No. 968-53; Macdonald v. CashCall, Inc., 333 F.R.D. 331,
342-43 (D.N.J. 2019). The same is true here.

### 4. Typicality

The typicality requirement necessitates that the claims of
the representative plaintiffs be typical of those of the class.
The typicality requirement does not require that the class
representative's claims be identical to those of the class, but

19

JA1788

the representative's claims "cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [her] own individual claim.'" Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 547 (E.D. Va. 2018) (quoting Deiter v. Microsoft Corp., 436 F.3d 461, 466-67 (4th Cir. 2006)) (alteration in original). A class representative must generally be part of the class and have "the same interest and suffer the same injury as the class members." Deiter, 436 F.3d at 466. "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" Id. (citation omitted).

The Court finds that the typicality requirement has been met. The Plaintiffs and proposed class representatives are Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, and Felix M. Gillison, Jr. (represented by Marcella P. Singh, the administrator of the Estate of Felix M. Gillison, Jr.).[11]   See Prelim. Approval Mem. at 27, ECF No. 968.   Plaintiffs are indeed

---

[11] Martorello objects to having the deceased Felix M. Gillison represent the class by way of his estate's administrator, Marcella P. Singh.   Because the Court interprets this as a challenge to the representativeness of Singh, not whether Gillison's claims are typical of those of the class, the Court will confine its analysis of Singh's suitability as a class representative to the representativeness prong.

part of the proposed classes,[12] and all five Plaintiffs, as well
as the proposed classes, obtained loans, with interest rates
above 12%, from either Big Picture or Red Rock (i.e., the two
lending entities affiliated with the LVD tribe).[13]   Prelim.
Approval Mem. at 27, ECF No. 968.  Therefore, the proposed class
representatives suffered the same injury and have the same basic
legal claims as those of the proposed class members.  The only
difference across class members would be the actual damages they
are asserting which will not preclude a finding of typicality.
Accordingly, as go the claims of the five Named Plaintiffs, so
go the claims of the class.

### 5. Representativeness

The representativeness requirement ensures that the class
will be adequately represented by the named plaintiffs and class
counsel.  Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 548-
49 (E.D. Va. 2018).  The requirement is satisfied "when: (1) the

---

[12] Williams and Turnage would be part of the Big Picture Loans
RICO Class and the Usury and Unjust Enrichment Sub-classes.
DECL. KRISTI KELLY ¶¶ 16-17, ECF No. 968-54.  Hengle would be
part of the Red Rock RICO Class and the Usury and Unjust
Enrichment Sub-classes.   DECL. KRISTI KELLY ¶ 18, ECF No. 968-
54.  Coffy would actually be a part of all six classes.  DECL.
KRISTI KELLY ¶ 19, ECF No. 968-54.  And, Gillison would only be
a part of the Red Rock RICO class.  DECL. KRISTI KELLY ¶ 20, ECF
No. 968-54.

[13] "Williams' loan was subject to an APR of 649.8%; Turnage's
loan had an APR of 693.2%; Hengle's loan had an APR of 607.5%;
Coffy's loan had an APR of 607.5%; and Gillison, Jr.'s loan had
an APR of 627.2%."  Prelim. Approval Mem. at 22, ECF No. 968.

21

named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are qualified, experienced, and generally able to conduct the litigation." Brown v. Transurban USA, Inc., 318 F.R.D. 560, 567 (E.D. Va. 2016) (internal quotation marks omitted).

The Court finds that the representativeness requirement is satisfied for both the proposed Class Representatives and proposed Class Counsel. As noted under the analysis of the commonality and typicality factors, Plaintiffs' interests are in line with those of the broader classes, and Plaintiffs were, in fact, already named as class representatives in a related case. See Galloway III, 3:19-cv-470, ORDER ¶ 5, ECF No. 115. Accordingly, the Court finds that the proposed Class Representatives will adequately represent the interests of the class (including Felix Gillison, Jr. who will be discussed further below).

Proposed Class Counsel have extensive experience with class actions, consumer financial protection law, and tribal lending operations. See DECL. KRISTI C. KELLY ¶¶ 4-6, 8-13, ECF No. 968-54; DECL. LEONARD A. BENNETT ¶¶ 4-7, 9-17, 19-23, ECF No. 968-55; DECL. MICHELLE DRAKE ¶¶ 3-9, 11-12, ECF No. 965-56; DECL. BETH E. TERRELL ¶¶ 2-6, ECF No. 968-57; DECL. MATTHEW W.H. WESSLER ¶¶ 2-10, ECF No. 968-58; DECL. MICHAEL A. CADDELL ¶¶ 3-19, 22-33, ECF No. 968-59. The Court has already found them

22

competent in a related case, Galloway III, 2020 WL 7482191, at
*8 (E.D. Va. Dec. 18, 2020), and the Court reaffirms that
finding here.

### Adequacy of Administrator

Martorello challenges the appointment of Marcella Singh,
administrator of Felix Gillison, Jr.'s estate, as a class
representative on the ground that Singh has almost no first-hand
knowledge of the facts of the case. Resp. Mem. at 49, ECF No.
1007. The Court does not find this argument persuasive for
several reasons. First, Martorello consented to the
substitution of Marcella P. Singh for Felix Gillison, Jr.
following Gillison's death in June 2018. ORDER, ECF No. 200;
see also MEM. IN SUPP. OF MOT. TO SUBSTITUTE PARTY, ECF No. 187.
Second, allowing an estate administrator to serve as a class
representative in place of a deceased plaintiff is a generally
accepted practice.[14] See Rubenstein, 1 Newberg on Class Actions
§ 3.71 (5th ed.); but see Chappelle v. E.I. Du Pont de Nemours &
Co., 75 F.R.D. 74, 79 n.10 (E.D. Va. 1977) (Merhige, J.)

---

[14] Some courts (though, to the Court's knowledge, none in this
circuit) have only allowed an executor to serve as a class
representative where (1) the beneficiaries of the estate consent
to the administrator's participation in the lawsuit and (2) the
executor assumes the costs of litigation personally so that the
estate will not bear the costs. Rubenstein, 1 Newberg on Class
Actions § 3.71 (5th ed.). The Court will decline to apply that
test in this case because it has no bearing on the substance of
the Defendant's argument.

23

(finding administrator of a deceased plaintiff's estate inadequate to serve as a class representative in a Title VII discrimination suit for "obvious reasons"[15]).   Third, on the facts of this case, it is not even clear what Martorello finds lacking in Singh's testimony.[16]   A class representative's knowledge of the case "need not be robust."   Rubenstein, 1 Newberg on Class Actions § 3:67 (5th ed.).   "It is hornbook law . . . that '[i]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.'"   Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003) (citation omitted).   Plaintiffs' claims have never been based on any personal interactions with Martorello or any personalized knowledge of the internal workings of the LVD's lending operations, see Compl., ECF No. 1;

---

[15] With respect to Judge Merhige, the Court does not find the reasons obvious.

[16] If the Court has the deposition transcript of Marcella Singh, the Court is not aware of it.   The Court only knows of what Martorello reports regarding Singh's testimony.   See Resp. Mem. at 49, ECF No. 1007 ("Ms. Singh is also not an adequate class representative because she has virtually no knowledge—firsthand or otherwise—of any facts relating to this case. Ex. QQ, Singh Dep. Tr. at 12:17-25, 20:8-17, 18:19-19:8, 22:18-22. Her lone source of information, records she obtained through Plaintiffs' counsel, id. at 23:1-7, is insufficient.").

that information has come from discovery.   Named Plaintiffs'
personal narratives have generally been confined to the fact
that they (1) applied for and received a loan from either Red
Rock or Big Picture — with an interest rate well above 12% and
(2) made payments on that loan.[17]   See, e.g., GEORGE HENGLE
DECL., ECF No. 190-20.  Moreover, Plaintiffs have represented to
the Court that Singh, along with the other proposed class
representatives, has actively participated in the management of
the case.  See DECL. KRISTI KELLY ¶ 14, ECF No. 968-54.   Under
the circumstances, the Court finds that Marcella Singh, acting
as the administrator of the estate of Felix Gillison, Jr., is an
adequate class representative.

**B.    Rule 23(b)(3) Analysis**

    In addition to satisfying the Rule 23(a) factors, a class
must fit into one of the three Rule 23(b) class types.  Fed. R.
Civ. P. 23(b).   Here, the class is purported to be a Rule
23(b)(3) class.   Class certification under Rule 23(b)(3) is
appropriate if (1) questions of law or fact common to class
members predominate over any questions affecting only individual
members, and (2) a class action is superior to other available
methods for fairly and efficiently adjudicating the controversy.
Fed. R. Civ. P. 23(b)(3).

---

[17]  As  noted  in  the  discussion  of  ascertainability,  that
information can also be verified with the LVD's loan records.

25

The Rule 23(b)(3) analysis will sometimes overlap with the merits of the underlying case, but "[t]hat cannot be helped." Branch v. Gov't Emples. Ins. Co., 323 F.R.D. 539, 545 (E.D. Va. 2018) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011)). However, "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" Branch, 323 F.R.D. at 545 (quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013)).

**1. Predominance**

Rule 23(b)'s inquiry into whether common questions of law or fact predominate over individual issues is distinct from the Rule 23(a) commonality requirement in that the predominance inquiry is more demanding. Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013). The more demanding standard is a function of the more "adventuresome" nature of Rule 23(b)(3) relative to Rules (b)(1) and (b)(2): Rule 23(b) "allows class certification in a much wider set of circumstances but with greater procedural protections." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 362 (2011).

The predominance inquiry is fundamentally qualitative. Gunnells v. Healthplan Servs., 348 F.3d 417, 429 (4th Cir.

26

2003).  That is to say, the predominance inquiry "is not simply a matter of counting common versus noncommon questions and checking the final tally." Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 214 (E.D. Va. 2015).  Rather, a court must look at the relationship between the common questions and the individual questions in the context of the case as whole. Krakauer v. Dish Network, LLC, 925 F.3d 643, 658 (4th Cir. 2019).  "An individual question is one where a 'member of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will be sufficient for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036 (2016).  So long as the overarching issue in a case is common to the class, class certification is still appropriate even if there are some individual issues (e.g., damages) that will need to be resolved. Krakauer, 925 F.3d at 658; Ealy v. Pinkerton Gov't Servs., 514 Fed. Appx. 299, 305 (4th Cir. 2013).

Here, Plaintiffs assert that common issues predominate because Plaintiffs' claims are entirely based on standardized loan contracts and standardized conduct by Martorello.

First, as a general matter, Courts have found that the predominance factor has been met in comparable cases, albeit in unpublished opinions.  See, e.g., Inetianbor, et al. v. Cash

Call Inc., et al., 13-60066-CIV, at *3, *22 (Dec. 23, 2020), ECF No. 958-53 (finding predominance met where plaintiff's legal claims were against an alleged tribal lender and based on violation of Florida's usury statute and Florida's Deceptive and Unfair Trade Practices Act); Upshaw v. Ga. Catalog Sales, Inc., 206 F.R.D. 694, 700-01 (M.D. Ga. 2002) (finding predominance met in a payday lending case where plaintiffs' claims were based on statute usury laws and RICO, defendants' conduct was substantially the same with respect to all members of the class, and defendants' primary defense applied to the class as a whole). For example, in Purdie v. Ace Cash Express, Inc., the court found that the predominance standard was met because of (1) "the standardized nature of the payday loan transactions", (2) "the uniform manner in which Defendants made, processed, and collected on the loans", (3) the fact that "few variations exist in the claims or the factual bases underlying the legal claims", and (4) "the legal claims and theories asserted," namely violations of "the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), (c)& (d), the Truth in Lending Act ("TILA"), 15 U.S.C. § 1602 et seq., the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq., state statutes regulating small loans, the Texas Deceptive Trade Practices Act[, and] other state

28

consumer protection laws." 2003 U.S. Dist. LEXIS 22547, at *5, *13-14 (N.D. Tex. Dec. 11, 2003). As in those cases, here, there is strong and unrebutted evidence that Martorello's conduct was substantially the same with respect to all proposed class members.

Furthermore, as Plaintiffs correctly point out, "[c]ourts, when faced with class certification in RICO claims, often find that 'common issues predominate over individualized ones.'" Solomon v. Am. Web Loan, 2020 U.S. Dist. LEXIS 112782, *9 (E.D. Va. June 26, 2020) (Morgan, J.) (quoting Robinson v. Fountain Title Group Corp., 257 F.R.D. 92, 94 (D. Md. 2009)). This is due to the elements of the federal RICO statute and the proof necessary to make out a RICO claim. Williams v. Mohawk Indus., 568 F.3d 1350, 1357-58 (11th Cir. 2009).

And finally, although, for all of Plaintiffs' claims, damages for each proposed class member would need to be calculated on an individual basis, those damages could likely be calculated straight from the loan records that Plaintiffs anticipate receiving from Big Picture and Ascension (as opposed to damages for claims like emotional distress which might require extensive evidence for all individuals involved). Under these circumstances, Plaintiffs have met their burden to show that the predominance requirement is met, despite Martorello's many many arguments to the contrary.

29

Martorello attacks the predominance requirement on six, overlapping, grounds.  Plaintiffs respond that the Defendant is misstating the law or the facts in all of these arguments, and they are correct.

### a. Tracing Proposed Class Members' Payments

First, with respect to Plaintiffs' usury and unjust enrichment claims, Martorello argues that Plaintiffs cannot show that Martorello uniformly received loan payments from all of the proposed class members for the entire class period.  Resp. Mem. at 36, 44, ECF No. 1007.  According to Martorello, this is because loan payments were directly received by various tribal lending entities and only then passed to Martorello in a formula based on the total profitability of the lender.[18]  Resp. Mem. at 36, ECF No. 1007.  Therefore, says Martorello, "[t]he issue of whether specific interest payments . . . ever reached Martorello over the class period requires individualized analysis and does not predominate through the class period."  Resp. Mem. at 35-36, ECF No. 1007.

To be clear, it is undisputed that, over time, substantial parts of the loan payments passed from Red Rock and Big Picture to Martorello through various entities.  See Hearing Tr. 107:19-25, ECF No. 1104.  Martorello is simply trying to argue that

---

[18] And, to further complicate matters, as the LVD's lending operations evolved so did the path by which money made its way from consumer loan payments to Martorello's financial accounts.

30

Plaintiffs have no way of knowing which borrower's repayments made their way into Martorello's pocket because Martorello was paid based on the overall profitability of the lending operation. Hearing Tr. 107:19-108:4, ECF No. 1104. Martorello may very well be right that Plaintiffs cannot track the dollars paid by each individual class member straight into Martorello's financial accounts. However, that is not how Plaintiffs propose to prove that Martorello received payments on usurious loans. Rather, Plaintiffs propose to look to the contracts between each lender (i.e., Red Rock and Big Picture) and the Martorello Defendants to show that between 2013 and 2016, Martorello received 98% of Red Red's gross revenue from loans, and between 2016 and 2020, Martorello received 95% of Big Picture's gross revenue from loans. That, says Plaintiffs, is sufficient to show that Martorello was receiving payments on usurious loans, and therefore, being unjustly enriched. See Reply Mem. at 21-24, ECF No. 1055.

The Court agrees with Plaintiffs. Based on the proof that Plaintiffs propose to offer, it is clear that common facts will predominate and those facts are highly susceptible to class-wide proof.

### b. Martorello's Allegedly Changing Role

Next, Martorello makes the same basic argument three times: because of his changing role over time, class members will be

31

situated differently vis-à-vis each other over the class period
with respect to several elements of Plaintiffs' claims. These
elements include (1) whether Martorello participated in the
collection of unlawful debt in the same manner over the relevant
class periods, Resp. Mem. at 41, 46, ECF No. 1007; (2) whether
Martorello participated in the conspiracy to collect unlawful
debt in the same manner over the relevant class periods, Resp.
Mem. at 46, ECF No. 1007; and (3) whether "Martorello committed
or authorized any intentional tort(s) on behalf of the lender,"
Resp. Mem. at 39, ECF No. 1007. As noted in Part I.D, the Court
does not credit Martorello's arguments that Martorello played
only a minor, supporting role in the LVD's lending operations or
that his role changed meaningfully between June 22, 2013 and
December 22, 2019. Martorello was the de facto head of the
LVD's lending operations at all relevant times. At trial,
Plaintiffs would, nevertheless, still need to prove that
Martorello was sufficiently involved in the LVD's lending
operations to be liable under each of Plaintiff's four legal
theories for the duration of the relevant class periods, but
facts surrounding Martorello's involvement will be highly
amenable to class-wide proof.

### c. Proximate Cause and Plaintiffs' RICO Injuries

With respect to Plaintiffs' RICO claims, Martorello argues
that, because he was never really in charge of the LVD's lending

32

operations, he could not have "proximately caused" harm to Plaintiffs. Resp. Mem. at 41, ECF No. 1007. Whether Martorello caused the class members' injury is a merits question to be resolved at a later stage. Martorello has not credibly explained why the facts surrounding "proximate cause" would create individualized issues.

### d. Injury to Plaintiffs/Benefit Conferred

With respect to Plaintiffs' unjust enrichment claims, Martorello also attempts to argue that some Plaintiffs did not confer a benefit on Martorello because they paid back less than they received on their loans.[19] Plaintiffs' respond that, under Virginia law, a contract with an interest rate above the legal limit (here 12%) is void. Hearing Tr. 48:4-10, ECF No. 1104. To make out a claim for unjust enrichment under Virginia law, a plaintiff must show that he or she (1) conferred a benefit on the defendant; (2) the defendant knew of the benefit; and (3) the defendant accepted or retained the benefit "under circumstances that 'render it inequitable for the defendant to retain the benefit without paying for its value.'"

---

[19] Martorello also repeats a version of this argument in a section of his Response Memorandum titled "THE CLASS DEFINITION FAILS BECAUSE MANY PROPOSED MEMBERS WERE NOT INJURED BY MARTORELLO," but there, the argument appears to apply to more than just unjust enrichment claims. Resp. Mem. at 46, ECF No. 1007. The distinction will not save the argument. If the loan contracts were usurious, they were void, and any payment on them was an injury to Plaintiffs.

33

Microstrategy, Inc. v. Netsolve, Inc., 368 F. Supp. 2d 533, 536
(E.D. Va. 2005) (quoting Nossen v. Hoy, 750 F. Supp. 740, 744-45
(E.D. Va. 1990)). Under Virginia law, "[a]ny contract made in
violation of [Virginia's usury laws] is void and no person shall
have the right to collect, receive, or retain any principal,
interest, fees, or other charges in connection with the
contract." Va. Code. Ann. § 6.2-303(F). So, says Plaintiffs,
any money paid on a void contract could constitute a benefit for
the purposes of an unjust enrichment. Hearing Tr. 48:4-10, ECF
No. 1104. The Court agrees. Moreover, Martorello has not
explained why the Plaintiffs are not correct.

### 2. Superiority

The superiority element requires that a class action be
superior to other available methods for fairly and efficiently
adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).
Relevant factors include: "(A) the class members' interests in
individually controlling the prosecution or defense of separate
actions; (B) the extent and nature of any litigation concerning
the controversy already begun by or against class members; (C)
the desirability or undesirability of concentrating the
litigation of the claims in the particular forum; and (D) the
likely difficulties in managing a class action." Fed. R. Civ.
P. 23(b)(3). Although the factors in Rule 23(b)(3)(A)-(D)
theoretically apply to predominance and superiority, most courts

34

use the factors exclusively for the superiority analysis. Rubenstein, 2 <u>Newberg on Class Actions</u> § 4.64 (5th ed.).

A class action would clearly be a superior method of fairly and efficiently adjudicating this case. First, the key factual issues for each putative class member would be the same, with only damage amounts changing from person to person. Reply Mem. at 35, ECF No. 1055. Second, there are 12,530 putative class members, and re-litigating the same issues even 100 times would be an unnecessary and untenable burden on the judicial system.[20] Third, it is not likely that class members' individual damages, which are tied to their relatively small-dollar loans, would be enough to justify bringing individual lawsuits. <u>Soutter v. Equifax Info. Servs., LLC</u>, 307 F.R.D. 183, 218 (E.D. Va. 2015) (quoting Calvin v. Home Loan Ctr., Inc., 236 F.R.D. 387, 396 (N.D Ill. May 10, 2006)) ("[T]here is a strong presumption in favor of finding superiority" where "the alternative to a class action is likely to be no action at all for the majority of class members."). Under these circumstances, a class action is both fair and efficient.

Martorello asserts that a class action would not be superior due to manageability issues. Resp. Mem. at 48, ECF No. 1007. Martorello bases this challenge on two arguments. First,

---

[20] This case (not to mention its brethren) has now been litigated for four years and involves over 1,000 electronic filings.

35

he appears to be arguing that there is a risk that a significant number of proposed class members could bring suits individually. See Resp. Mem. at 48, ECF No. 1007.  But, as noted above, the Court does not find that likely.  Second, Martorello asserts, as he has before, that there will be intraclass differences due to his "ever-shifting, relationships, and responsibilities over time."  As noted in Part I.D, the Court does not find that argument credible.

**CONCLUSION**

For the foregoing reasons, PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO (ECF No. 967) ("Preliminary Approval Motion") will be granted.

It is so ORDERED.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July _19_, 2021

36

**JA1805**

**ATTACHMENT 3:**

**MEMORANDUM OPINION ON CLASS WAIVER**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, et al.,

    Plaintiffs,

v.                                         Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, et al.,

    Defendants.

### MEMORANDUM OPINION

This Memorandum Opinion address an objection tendered by Defendant Matt Martorello in opposition to PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION OF CLAIMS AGAINST DEFENDANT MATT MARTORELLO ("Motion for Class Certification") (ECF No. 967). The objection, which is laid out in Martorello's OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AGAINST MATT MARTORELLO ("Response Memorandum") (ECF No. 1007), argues that the proposed class members waived their right to serve as class representatives. Plaintiffs responded to that objection in PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AGAINST DEFENDANT MATT MARTORELLO ("Reply Memorandum") (ECF No. 1055). And, on June 29, 2021, the Court heard argument on, inter alia, the objection in question.

Having considered all of the submitted information, including the information set forth on the record during the hearing on June 29, 2021, the Court finds that the proposed

**JA1807**

class members did not waive their right to participate in a class action against Defendant Matt Martorello ("Martorello"). The remainder of the Court's analysis of Plaintiffs' Motion for Class Certification will be addressed in a separate memorandum opinion.

## I. BACKGROUND

The facts surrounding this lawsuit have been recounted by this Court on numerous occasions. See, e.g., MEM. OP., ECF No. 944. For the purposes of deciding the enforceability of the class action waiver (which is primarily a question of contract interpretation), it suffices here to provide only a brief summary of the broader merits dispute. The relevant text of the loan contract is provided in the Appendix.

This case is one of four similar, but distinct, actions[1] "arising out of a so-called 'Rent a Tribe' scheme allegedly orchestrated by Matt Martorello ('Martorello'), members of his family, companies that he controls, and investors who allegedly funded the scheme (the 'Martorello Defendants')" along with two "entities formed under the tribal laws of the Lac View Band of

---

[1] In addition to this case, i.e., Williams, et al. v. Big Picture Loans, LLC, et al., 3:17-cv-461 (E.D. Va.) ("Williams"), the other related cases are (1) Renee Galloway, et al. v. Big Picture Loans, LLC, et al., 3:18-cv-406 (E.D. Va.) ("Galloway I"), (2) Renee Galloway, et al. v. Martorello, et al., 3:19-cv-314 (E.D. Va.) ("Galloway II"), and (3) Renee Galloway, et al. v. James Williams, Jr., et al., 3:19-cv-470 (E.D. Va.) ("Galloway III").

Lake Superior Chippewa Indians ('LVD')," i.e., "Big Picture
Loans, LLC ('Big Picture') and Ascension Technologies, Inc.
('Ascension') (collectively sometimes referred to as the 'Tribal
Defendants')." Williams v. Big Picture Loans, LLC, 3:17-cv-461,
2020 U.S. Dist. LEXIS 216792, 2020 WL 6784352, at *1-2 (E.D. Va.
Nov. 18, 2020) (Payne, J.). The term "Rent-a-Tribe" refers to
the practice of so-called payday lenders partnering with Native
American tribes "in an effort to cloak the payday lenders in the
sovereign immunity of Native American tribes, and, in so doing,
to preclude enforcement of the interest rate caps in state usury
laws." See MEM. OP. at 4, ECF No. 944. Plaintiffs' basic
contention across all four cases is that Martorello (and the
now-dismissed Tribal Defendants) were involved in such a scheme.

The lending operations evolved over time, but they began
with the use of a so-called tribal lending entity named Red Rock
Lending, LLC ("Red Rock") which used Bellicose, LLC, a non-
tribal entity owned and operated by Martorello, to handle the
lending operations and the servicing of loans. For reasons that
need not be discussed here, around 2013, Red Rock, Bellicose,
and another corporate entity were restructured into a new
lending entity — i.e., Big Picture.

The loan contracts at issue in this Opinion are the loan
contracts by which Plaintiffs received high-interest small-
dollar loans from either Red Rock or Big Picture. See Ex. 1,

3

ECF No. 1055-1.[2]  A very high percentage of the payments on those

loan contracts made their way to Martorello through a rather

byzantine corporate structure.

Martorello's objection is based on the "class action

waiver" in the "Waiver of Jury Trial" provision of the contract;

however, that heading is misleading because the "Waiver of Jury

Trial" provision actually contains, for disputes arising from

the loan contract: (1) an agreement that the LVD's Tribal

Dispute Resolution Procedure will be the "sole and exclusive

dispute resolution mechanism"; (2) a waiver of the right to a

trial by jury; (3) language consenting to the jurisdiction of

the LVD; (4) a waiver of the right to serve as a class action

representative or to participate in a class; and (5) a waiver of

the right to pursue "litigation or arbitration."  See Ex. 1 at

6, ECF No. 1055-1.  This Opinion will use the term "waiver" or

"class action waiver" to refer to all of the waivers contained

in the discussion of the several provisions because that is how

the parties have presented them.

---

[2]   Martorello refers to an ostensibly identical loan contract
in his response brief (ECF No. 734-1), but that version of the
contract has one fewer page than Plaintiffs' version.  Compare
Ex. 1, ECF No. 734-1 with Ex. 1, ECF No. 1055-1.  In any case,
Martorello appears to accept that the sample loan contract in
ECF No. 1055-1 is an accurate and representative copy of the
loan contracts from both lenders over the relevant class period
(i.e., 2013-2019).   See Hearing Tr. 65:21-24, 90:19-91:6, ECF
No. 1104; see also Hearing Tr. 40:2-41:14, ECF No. 1104.

4

## II. DISCUSSION

Deciding whether the class action waiver applies to block Plaintiffs' ability to serve as class action representatives involves two distinct questions: does the class action waiver apply to claims against Martorello? And, if it does, is the waiver, nevertheless, unenforceable? For the reasons set forth below, the Court finds that the waiver does not apply to Martorello, and even if it did, the waiver is unenforceable.[3]

### A. Does the waiver of class certification apply to Martorello?

Martorello asserts that the class action waivers apply to him,[4] a non-party to the loan agreement, for two reasons.[5]

---

[3]    "Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings." Amato v. City of Richmond, 875 F. Supp. 1124, 1139 (E.D. Va. 1994) (Payne, J.). However, because these issues are highly amenable to appeal — particularly at this stage in the litigation, "this case presents one of those unusual circumstances where it is appropriate to articulate an alternative ground of decision." Id.

[4]    Martorello's Response Memorandum did not explain how this argument related to the Rule 23 factors governing class certification. See Fed. R. Civ. P. Rule 23(a)-(b). At oral argument, Martorello's counsel clarified that the waiver arguments related to the adequacy of the class representatives under Rule 23(a)(3) and the superiority of the class action vehicle under Rule 23(b)(3). Hearing Tr. 62: 2-13, ECF No. 1104.

[5]    Martorello's Response Memorandum also attempted to argue that he could enforce the contract because he was a "servicer," but at oral argument, both parties expressly denied that Martorello was a servicer. Hearing Tr. 55:16-56:7, 94:2-3, ECF No. 1004.

5

First, the class action waivers apply to "disputes and claims related to or arising under this Agreement[,]" and according to Martorello, Plaintiffs' claims constitute disputes arising under the loan agreement. Ex. 1 at 6, ECF No. 1055-1. And, second, the class action waivers apply to "related third parties" (a defined term in the contract), and Martorello asserts that he is a related third party by virtue of being an "affiliated entity" and an "alleged agent." Resp. Mem. at 4, ECF No. 1007. Neither argument is persuasive.

### 1. The waiver cannot apply to strangers to the contract.

First, it is axiomatic that a contract is only binding on the parties to the contract, absent certain limited exceptions. 13 WILLISTON ON CONTRACTS § 37.1 (4th ed.) ("The mere fact of entering into a contract gives rise to a relationship between or among the contracting parties known as 'privity.' Under the traditional common-law rule, only parties in privity of contract could sue on the contract[.]") (footnote omitted); see also Privity of Contract, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so."). Martorello admits, as he must, that he was not a party to the loan contracts. See Resp. Mem. at 3, ECF No. 1007. And, he provides no explanation for why the general rule of privity of contract would not apply merely because of the subject matter of

6

Plaintiffs' lawsuit.   Martorello cannot, therefore, claim a
right to enforce any part of the loan contract purely because
the current suit is a dispute or claim arising from the loan
contract.

   **2.  Martorello is not a related third party.**

   Of course, it is possible that third-parties can be made
beneficiaries of a contract.   13 WILLISTON ON CONTRACTS § 37.1 (4th
ed.).   And, if a third-party is a beneficiary of a contract, the
third-party may claim its benefits.   However, to do that, the
third party must be designated a beneficiary in the contract.
13 WILLISTON ON CONTRACTS § 37.29 (4th ed.).   Martorello was not so
named and thus cannot claim third-party beneficiary status
unless he is a "related third party" under the loan agreement.

   For the reasons that follow, Martorello is not a "related
third party" within the meaning of the loan contract.   The loan
contract states:

> For purposes of this Waiver of Jury Trial provision
> and Tribal Dispute Resolution Procedure provision
> above, the words 'dispute' and 'disputes' are given
> the broadest possibly meaning and include, without
> limitation, . . . (h) all claims asserted by You
> individually against Us and <u>any of Our employees,</u>
> <u>**agents**,    directors,    officers,    shareholders,</u>
> <u>governors,  managers,  members,  parent  company  or</u>
> <u>**affiliated    entities**    (hereinafter    collectively</u>
> <u>referred to as **'related third parties'**)</u>, including
> claims  for  money  damages  and/or  equitable  or
> injunctive relief;

7

Ex. 1 at 6, ECF No. 1055-1 (emphasis added).[6]    The phrase

"related third parties" subsequently appears six times in the

loan contract and is never redefined or used in a manner that

would contradict this definition.    In his Response Memorandum,

Martorello asserts that he was both an "agent" and an

"affiliated entity." Resp. Mem. at 4, ECF No. 1007. Martorello

argues that he and the companies "he managed were 'affiliated

entities' because they provided consulting and servicing

assistance to the Tribal Lender prior to the sale of Bellicose."

Resp. Mem. at 4, ECF No. 1007 (footnote omitted).    And,

according to Martorello, he should be viewed as an "agent"

because of Plaintiffs' own arguments.[7]  Resp. Mem. at 4, ECF No.

---

[6] The fact that several provisions of the loan contract specify
exactly to which non-parties they apply (e.g., managers,
shareholders, etc.) further undermines Martorello's prior
argument that the waiver is over a "subject matter category"
that could apply to him despite his lack of privity.

[7]    At oral argument, counsel for Martorello stated, arguably
for the first time, that Martorello was an agent because he was
a consultant.    Hearing Tr. 94:24-25, ECF No. 1104; see also
Resp. Mem. at 4, ECF No. 1007 (arguing that Martorello-managed
companies were consultants to the Tribe's business and that
Martorello and his companies were 'affiliated entities' because
they provided consulting services to the Tribal Lender prior to
the sale of Bellicose).    This argument was based on a separate
clause in the same Waiver of Jury Trial provision which states
that the waiver applies to "(a) all claims, disputes or
controversies involving the parties to this Agreement and Our
employees, servicers, and agents, including but not limited to
consultants, banks, payment processors, software providers, data
providers and credit bureaus[.]"    Ex. 1 at 6, ECF No. 1055-1
(emphasis added).    Arguments presented for the first time at
oral argument will not be considered.    First Tennessee Bank Nat.

8

1007 ("Plaintiffs allege[d] (incorrectly) that Martorello and businesses he managed were agents behind the entire lending business."). Martorello is mistaken on all counts.

At this point it is appropriate to clarify that the loan contract explicitly states that the words "We," "Us," "Our," and "Lender" all refer to one of the two tribal lenders, i.e. Big Picture or Red Rock. Ex. 1 at 3, ECF No. 1055-1. Thus, the phrases "Our . . . agent" and "Our . . . affiliated entities" refer to the lender's (i.e., Big Picture or Red Rock's) agent or affiliated entity, not the agent or affiliated entity of the LVD or any other entity involved in the loan scheme. And, the term "affiliated entity" is not defined in the loan contract. See Ex. 1, ECF No. 1055-1.

### a. Martorello is not an "affiliated entity."

Martorello is not an affiliated entity of either lender (i.e., Red Rock or Big Picture Loans). In his Response Memorandum, Martorello argued, without any citation to the record, that he and his companies were "affiliated entities" to Red Rock and Big Picture Loans because he and his companies

---

Ass'n v. Global Title, LLC, 3:09-cv-550, 2010 WL 5187834, *1 (Nov. 16, 2010) (citing North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. Of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010)). Even if the Court were prepared to consider such an argument, counsel for Martorello were not able to identify specific portions of the record that would show that Martorello was a consultant (and therefore an agent) of either lender. Hearing Tr. 94:24-95:14, 152:1-8, ECF No. 1104.

9

"provided consulting and servicing assistance to the Tribal Lender prior to the sale of Bellicose." Resp. Mem. at 4, n.3, ECF No. 1007 (footnote omitted).

At oral argument, counsel for Martorello argued, for the first time, that evidence of the alleged affiliate relationship can be found in the servicing agreement between Red Rock (the lender) and Bellicose (a Martorello company). Hearing Tr. 150:9-151:14, ECF No. 1104. Because the argument was presented for the first time at oral argument, it cannot be considered. First Tennessee Bank Nat. Ass'n v. Global Title, LLC, 3:09-cv-550, 2010 WL 5187834, *1 (Nov. 16, 2010) (citing North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. Of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010)). But, even if it were considered, it would fail.

In the 2011 servicing agreement, the term "affiliate" is defined in reference to the "Enterprise" (i.e., Red Rock) and the "Servicer" (i.e., Bellicose):

> "Affiliate" means as to Servicer or Enterprise, any corporation, partnership, limited liability company, joint venture, trust, department or agency or individual controlled by, under common control with, or which controls, directly or indirectly Servicer or Enterprise. "Control" means (i) ownership, control, or power to vote twenty five percent (25%) or more of the outstanding shares of any class of voting securities, directly or indirectly or acting through one (1) or more persons, (ii) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions), or (iii)

10

the power to exercise, directly or indirectly, a
controlling influence over management or policies."

Ex. 5 at 5, ¶ 2.1, ECF No. 968-5 (emphasis added); accord
Affiliate, BLACK'S LAW DICTIONARY (11th ed. 2019).  Both parties
agree that under the aforementioned definition, Martorello would
be an "affiliate."  Hearing Tr. 151:11-20, ECF No. 1104.

However, they differ on how that definition of "affiliate"
compares to the term "affiliated entity" in the loan contract.
Martorello argues that the term "entity" can include a natural
person, Resp. Mem. at 4, n.3, ECF No. 1007, and thus, appears to
be saying that the term "affiliated entity" is equivalent to the
term "affiliate" as used in the 2011 servicing agreement.
Plaintiffs argue that the term "affiliated entity," as opposed
to the term "affiliate," is more naturally read to refer to a
corporate entity that is related to Red Rock or Big Picture
through some kind of control relationship.  See Reply Mem. at
14-18, ECF No. 1055.

Because there is no definition of "affiliated entity" in
the contract, the Court must look to the common and ordinary
meaning the term, which can include referring to dictionary
definitions.  Nationwide Mut. Ins. Co. v. Overlook, LLC, 785 F.
Supp. 2d 502, 518 (E.D. Va. 2011).  The common and ordinary
meaning of "affiliate" is essentially what the 2011 servicing
agreement stated, i.e., "A corporation that is related to

11

another corporation by shareholdings or other means of control;
a subsidiary, parent, or sibling corporation," and in certain
contexts, the term "affiliate" could include an individual.
Affiliate, BLACK'S LAW DICTIONARY (11th ed. 2019).   However, the
common and ordinary meaning of "entity" is "an organization
(such as a business or governmental unit) that has a legal
identity apart from its members or owners."[8]   Although both
"affiliate" and "entity" can sometimes refer to individuals, the
common and ordinary meaning of "affiliated entity" refers to a
business organization, not an individual.   And, at least one
court that has had occasion to consider the plain and ordinary
meaning of "affiliated entities" has come to the same
conclusion.[9]   Under this reading, the term "affiliated entities"
cannot refer to Martorello.

---

[8] Entity, BLACK'S LAW DICTIONARY (11th ed. 2019); accord Entity,
MERRIAM-WEBSTER.COM,                        https://www.merriam-
webster.com/dictionary/entity (last visited July 6, 2021); but
see     Entity,     AMERICAN     HERITAGE     DICTIONARY,
https://www.ahdictionary.com/word/search.html?q=entity     (last
visited July 6, 2021) (using "entity" in a sentence to refer to
an individual).

[9] See Bd. of Trustees of Leland Stanford Junior Univ. v. Agilent
Techs., Inc., No. 18-CV-01199-VC, 2019 WL 4729602, at *1 (N.D.
Cal. Aug. 13, 2019) ("If one company owns another, those
companies are affiliated entities in the ordinary sense of the
term."); see also Silva v. Butori Corp., No. CV-19-04904-PHX-
MTL, 2020 U.S. Dist. LEXIS 81367, *12 (D. Ariz., May 8, 2020)
(referring to the Black's Law and Merriam Webster definitions of
"affiliate" and "affiliated," respectively, to determine the
plain and ordinary meaning of the term "affiliated entity").

JA1818

### b. Martorello is not an "agent" of either lender.

Additionally, Martorello is not an agent of either lender. To begin, notwithstanding Martorello's assertions to the contrary, Resp. Mem. at 4, ECF No. 1007, Plaintiffs never alleged that Martorello was an agent of the LVD (quite the opposite actually). See, e.g., Compl. ¶ 3, ECF No. 1 (describing Martorello as the mastermind behind the LVD's lending operations). And, in any case, the loan contract uses "agent" to refer to an agent of the lender, not the LVD. Martorello has not pointed the Court to any evidence in the record that he was an agent of Red Rock or Big Picture.

Based on the loan contract and the parties' written and oral arguments, the "Waiver of Jury Trial" provision, which includes the class action waiver, does not apply to Martorello.

### B. Is the waiver valid and enforceable?

Even if the "Waiver of Jury Trial" provision somehow could be construed to apply to Martorello, the waiver is, nevertheless, unenforceable. According to Plaintiffs, this is because of the prospective waiver doctrine. Although the prospective waiver doctrine has most commonly been associated with arbitration agreements, the rationale behind the doctrine supports its application in contexts beyond mandatory arbitration agreements.

13

From its origins in <u>Mitsubishi Motors Corp. v. Soler</u> <u>Chrysler-Plymouth, Inc.</u>, the prospective waiver inquiry has focused on whether a party has waived, in advance, its right to pursue federal statutory remedies. 473 U.S. 614, 637 n.19 (1985) ("[I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."). Though decisional law has been concentrated on mandatory arbitration claims, it is the waiver of important federal rights that is at issue, not merely the suitability of arbitral forums. <u>Am. Exp. Co. v. Italian Colors</u> <u>Rest.</u>, 570 U.S. 228, 240 (2013) (Kagan, J. dissenting) ("[C]ourts will not enforce a prospective waiver of the right to gain redress for an antitrust injury, whether in an arbitration agreement or any other contract."). This understanding is reflected in the recent cases of the Fourth Circuit examining the enforceability of various Tribal lending contracts. <u>Hayes v. Delbert Servs. Corp.</u>, 811 F.3d 666, 673 (4th Cir. 2016) ("This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims."); <u>Dillon v. BMO</u> <u>Harris Bank, N.A.</u>, 856 F.3d 330, 335 (4th Cir. 2017) ("These terms throughout the underlying loan agreement further

14

illustrate that the choice of law provision in the arbitration agreement 'disavow[s] the application of all state and federal law' and 'unambiguously forbids an arbitrator from even applying the applicable law.'"); Gibbs v. Haynes Invs., LLC, 967 F.3d 332, 340-41, 343-44 (4th Cir. 2020) (describing a tribal loan contract as problematic because consumers were functionally prohibited from enforcing the federal RICO statute); Gibbs v. Sequoia Capital Operations, LLC, 966 F.3d 286, 294 (4th Cir. 2020) ("In summary, because the effect of the choice-of-law provisions is to stymie the vindication of the federal statutory claims that the borrowers seek to enforce, they amount to a prospective waiver and render the delegation provisions unenforceable."). Therefore, where a provision of a contract mandates an alternative dispute resolution procedure that amounts to a substantive waiver of federally protect rights, the provision is unenforceable. See Hayes v. Delbert Servs. Corp., 811 F.3d 666, 674-75 (4th Cir. 2016).

When viewed in the context of the Tribal Financial Services Regulatory Authority Code (the "Code") and the loan agreement as a whole, the "Waiver of Jury Trial" provision clearly amounts to a substantive waiver of federally protected rights. Although there is no express renunciation of federal law, the net result of the loan contract is that the consumers have no meaningful

15

way to vindicate their federal rights.  This is demonstrated by
the following provisions:

o The governing law of the contract, by its terms, is "the
  laws of the Lac Vieux Desert Band of Lake Superior
  Chippewa Indians ('Tribal law'),[10] including but not
  limited to the Code as well as applicable federal law."
  Ex. 1 at 5, ECF No. 1055-1.

o The Code states that the lender must "conduct business in
  a manner consistent with <u>the principles of</u> federal
  consumer protection law, including, without limitation"
  ten enumerated federal consumer financial protection laws
  or regulations.[11]   Ex. 6 ¶ 6.2, ECF No. 1055-6 (emphasis
  added).

o The Tribal Dispute Resolution Procedure is the sole
  method of resolving any disputes any under the contract.
  Ex. 1 at 5, ECF No. 1055-1 ("All disputes shall be solely
  and exclusively resolved pursuant to the Tribal Dispute
  Resolution Procedure set forth in Section 9 of the Code .
  . . .")  Ex. 1 at 5, ECF No. 1055-1.  This sentiment is
  repeated at least four times in the contract.  <u>See</u> Ex. 1
  at 6 ¶ 2(c), ECF No. 1055-1 ("YOU CONSENT TO THE
  JURISDICTION OF THE TRIBE AND HAVE READ AND AGREE TO BE
  BOUND SOLELY BY THE TRIBAL DISPUTE RESOLUTION PROCEDURE
  FOUND IN THE CODE[.]"); Ex. 1 at 6 ¶ 4, ECF No. 1055-1
  ("All disputes arising out of, relating to, or in
  connection with this Agreement shall be finally settled
  under the Tribal Dispute Resolution Procedure."); Ex. 1
  at 7, ECF No. 1055-1 ("You acknowledge and agree that
  this Agreement is subject solely and exclusively to the
  Tribal law and jurisdiction of the Lac Vieux Desert Band
  of Lake Superior Chippewa Indians."); Ex. 1 at 7, ECF No.
  1055-1 ("[T]he Tribal Dispute Resolution Procedure is the
  sole and exclusive forum for resolving disputes and/or
  claims arising from or relating to this Agreement.").

---

[10] Neither party has submitted any Tribal law (that is, other
than the Code) for this Court's consideration.

[11] Notably, the list of federal consumer financial protections,
while not exhaustive, does not include the federal RICO statute
which Plaintiffs are suing under in this case.

o  "The Tribal Dispute Resolution Procedure has been created by the Tribe <u>as a courtesy</u> to consumers and is the sole and exclusive dispute resolution mechanism for disputes and claims related to or arising under this Agreement." Ex. 1 at 6, ECF No. 1055-1 (emphasis added).

o  Under the Tribal Dispute Resolution Procedure, consumers must first lodge an informal complaint with the lender. Ex. 1 at 6, ECF No. 1055-1. The lender will then investigate the complaint and respond. <u>Id.</u> If the consumer is unhappy with the lender's response, the consumer can initiate a Formal Dispute Resolution by requesting that the Tribal Financial Services Regulatory Authority ("Authority") review the lender's decision. <u>Id.</u> The Authority will decide if the consumer can have a hearing or not and will ultimately render its own decision. <u>Id.</u> An Authority decision may be appealed to the Tribal Court, <u>id.</u>, but the scope of the Tribal Court's review is roughly that of a federal court reviewing a federal agency's decision. <u>See</u> Ex. 6 at 29, ECF No. 1055-6. And, the Tribal Court's decision may not be appealed. Ex. 6 at 30, ECF No. 1055-6.

o  Under the Tribal Dispute Resolution Procedure, "[a] person's complaint to the Lender <u>shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner</u>." Ex. 1 at 6, ECF No. 1055-1 (emphasis added).

o  The Tribe and the Lender (i.e., Big Picture or Red Rock) both "express" their "intention" "to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign immunity, and any other rights, titles, privileges and immunities to which they are entitled." Ex. 1 at 6, ECF No. 1055-1.

o  The loan contract also waives a consumer's right to a trial by jury, the right to serve as a class representative, and the right to arbitration. Ex. 1 at 6, ECF No. 1055-1.

o  The contract then explicitly adds that "NO LITIGATION OR ARBITRATION IS AVAILABLE[.]" Ex. 1 at 6, ECF No. 1055-1.

17

In conjunction, these provisions operate to functionally waive a consumer's right to vindicate federally protected statutory rights. Here, as in Hayes v. Delbert Servs. Corp., the animating purpose of these provisions is to allow the making of consumer loans free from the strictures of federal law. 811 F.3d 666, 676 (4th Cir. 2016). And, as in Gibbs v. Haynes Invs., LLC, the practical effect of these provisions is that "tribal law preempts the application of any contrary law – including contrary federal law." 967 F.3d 332, 342 (4th Cir. 2020). In short, the system set up here prevents borrowers from effectively vindicating any federal statutory claim. Indeed, the remedial procedures outlined in the contract are courtesies, not rights. See, e.g., Ex. 1 at 6, ECF No. 1055-1 ("A person's complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner."). Taken together, these provisions violate the prospective waiver rule.[12]

---

[12] Neither party requested severance of any part of the loan contract, but in any case, because these issues are pervasive throughout the loan contract, there would be no way to sever the offending provisions. See Dillon v. BMO Harris Bank, N.A., 856 F.3d 330, 335 (4th Cir. 2017).

**CONCLUSION**

For the foregoing reasons, the Court finds that the waiver does not apply to Martorello, and even if it did, the waiver is, nevertheless, unenforceable. Martorello's objection to class certification on the waiver theory will be rejected.

It is so ORDERED.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 12, 2021

19

**APPENDIX**

**IMPORTANT NOTICE: This Loan Agreement (hereinafter, the "Agreement") is governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippawa Indians. There will be no binding contract formed between You and Us until this Agreement is electronically signed by You and then is received and verified by Us on the Lac Vieux Desert Reservation.**

                        ***

In this Agreement the words "You", "Your" and "I" mean the borrower who has electronically signed it. The words "We", "Us," "Our," "Lender" mean Big Picture Loans, LLC.  Big Picture Loans, LLC is a duly licensed Financial Services Licensee of the Lac Vieux Desert Tribal Financial Services Regulatory Authority, an independent regulatory body of the Lac Vieux Desert Band of Lake Superior Chippewa Indians. Lender is an economic development arm and instrumentality of, and limited liability company wholly owned and operated by, the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribe"), created for the benefit of the Tribe and operating pursuant to Tribal Law. Lender is licensed and regulated by the Tribal Financial Services Regulatory Authority and operates in accordance with the Tribal Consumer Financial Services Regulatory Code ("Code").

                        ***

Once You sign and submit this Agreement, We will confirm Your information and either approve or deny Your loan request from Our office located on tribal land in Watersmeet, Michigan.

                        ***

Ex. 1 at 3, ECF No. 1055-1 (emphasis in original).

                        ***

**GOVERNING LAW AND FORUM SELECTION:** This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal

law"), including but not limited to the Code as well
as applicable federal law. All disputes shall be
solely and exclusively resolved pursuant to the
Tribal Dispute Resolution Procedure set forth in
Section 9 of the Code and summarized below for Your
convenience.

**SOVEREIGN IMMUNITY:** This Agreement and all related
documents are being submitted by You to Big Picture
Loans, LLC at its office on Tribal land. The Lender
is an economic development arm, instrumentality, and
limited liability company wholly owned and operated
by the Tribe. The Tribe is a federally recognized
Indian Tribe and enjoys tribal sovereign immunity.
Because the Tribe and Lender are entitled to
sovereign immunity, You will be limited in what
claims, if any, You may be able to assert against
them.    To   encourage   resolution   of   consumer
complaints, and pursuant to Section 9 of the Code,
all complaints lodged, filed, or otherwise submitted
by You or on Your behalf must follow the Tribal
Dispute Resolution Procedure, as described herein.

Ex. 1 at 5, ECF No. 1055-1 (emphasis in original).

                              ***

**TRIBAL DISPUTE RESOLUTION PROCEDURE:** The Tribe has
established a Tribal Dispute Resolution Procedure
(the "Procedure") to review and consider any and all
types of complaints made by You or on Your behalf
relating to or arising from this Agreement.   The
Procedure is found at Section 9 of the Code. You can
find    the    Code    at    Our    website,
www.BigPictureLoans.com, at 2015 11 03 Tribal
Consumer Financial Services Regulatory Code, or You
may request a physical copy by written request
mailed along with a self-addressed
postage paid return envelope to the Tribal Financial
Services   Regulatory   Authority,   P.O.   Box   249,
Watersmeet, Michigan 49969. The Tribe and Lender
intend and require, to the extent permitted by
Tribal law, that any complaint lodged, filed, or
otherwise submitted by You or on Your behalf to
follow   the   Procedure.   Under   the   Procedure,   a
consumer who, in the course of his otherwise lawful
and proper use of Lender's business believes himself

                               2

to be harmed by some aspect of the operation of any part of Lender's business, shall direct his concerns or dispute to Lender in writing. A person's complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner. The Lender will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of the written
complaint. In the event that the consumer is dissatisfied with the Lender's determination, he may initiate Formal Dispute Resolution by requesting an administrative review of Lender's determination by submitting such request in writing to the Tribal Financial Services Regulatory Authority ("Authority"), P.O. Box 249, Watersmeet, MI 49969, no later than ninety (90) days after receiving Lender's determination.

At a hearing, You may be represented by legal counsel at Your own expense. The administrative review hearing will occur within sixty (60) days after the Authority receives Your written request. The Authority will send notice to You and Us when a request for a hearing is granted or denied.
A consumer may appeal an Authority decision and order by filing a written petition for review with the Tribal Court within ninety (90) days after the Authority issued its decision
and order.

**For important information about the specific procedures that You must follow in order to request review by the Authority of an Lender determination, and to appeal a decision of the Authority to the Tribal Court, please review the Code at Our website, www.BigPictureLoans.com, or http://www.lvdtribal.com/tfsra.html or request a physical copy by written request mailed along with a self-addressed postage paid return envelope to Tribal Consumer Financial Services Code Request, Attn: Regulatory Agent, P.O. Box 249, Watersmeet, Michigan 49969.**

JA1828

**WAIVER OF JURY TRIAL:** The Tribal Dispute Resolution Procedure has been created by the Tribe as a courtesy to consumers and is the sole and exclusive dispute resolution mechanism for disputes and claims related to or arising under this Agreement. **THEREFORE, YOU ACKNOWLEDGE AND AGREE AS FOLLOWS:**

1. For purposes of this Waiver of Jury Trial provision and Tribal Dispute Resolution Procedure provision above, the words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation, (a) all claims, disputes, or controversies involving the parties to this Agreement and Our employees, servicers and agents, including but not limited to consultants, banks, payment processors, software providers, data providers and credit bureaus; (b) all claims, disputes, or controversies arising
from or relating directly or indirectly to Your application, this Agreement, the validity and scope of these provisions and any claim or attempt to set aside these provisions; (c) all Tribal and U.S. federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to Your application, the Agreement, the information You gave Us before entering into the Agreement, including the customer information application, and any past Agreement or Agreements between You and Us; (d) all counterclaims, crossclaims and third-party claims; (e) all common law claims, based upon contract, tort, fraud, or other intentional torts; (f) all claims based upon a violation of any Tribal, state or federal constitution, statute, regulation or ordinance; (g) all claims asserted by Us against You, including claims for money damages to collect any sum We claim You owe Us; (h) all claims asserted by You individually against Us and any of Our employees, agents, directors, officers, shareholders, governors, managers, members, parent company or affiliated entities (hereinafter collectively referred to as "related third parties"), including claims for money damages and/or equitable or injunctive relief; (i) all claims asserted on Your behalf by another person; (j) all claims asserted by You as a private attorney general, as a representative and member of a class of persons, or

4

in any other representative capacity, against Us and/or related third parties (hereinafter referred to as "Representative Claims"); (k) all claims arising from or relating directly or indirectly to the disclosure by Us or related third parties of any nonpublic personal information about You; (l) all claims related to or arising from loan extensions or payment plans; (m) all claims related to collections, privacy, and customer information; and (n) all claims related to setting aside the Waiver of Jury Trial provision or the Tribal Dispute Resolution Procedure provision, including claims about such provisions' validity and scope.

2. You acknowledge and agree that by agreeing to this Waiver of Jury Trial provision:
**(a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**

**(b) YOU CONSENT TO THE JURISIDCTION [sic] OF THE TRIBE AND HAVE READ AND AGREE TO BE BOUND SOLELY BY THE TRIBAL DISPUTE RESOLUTIUON [sic] PROCEDURE FOUND IN THE CODE; and**

**(c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

3. All disputes including any Representative Claims against Us and related third parties shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with You as provided for pursuant to Tribal law. **THEREFORE, NO LITIGATION OR ARBITRATION IS AVAILABLE AND NO JUDGE OR ARBITRATOR SHALL CONDUCT CLASS PROCEEDINGS; THAT IS, YOU SHALL BE INELIGIBLE TO SERVE AS A CLASS ACTION REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN LITIGATION OR ARBITRATION.**

4. All disputes arising out of, relating to, or in connection with this Agreement shall be finally

5

settled under the Tribal Dispute Resolution Procedure.

5. This Waiver of Jury Trial provision and Tribal Dispute Resolution Procedure provision are binding upon and benefit You, Your respective heirs, successors and assigns. This Waiver of Jury Trial provision and Tribal Dispute Resolution Procedure provision are binding upon and benefit Us, Our successors and assigns, and related third parties. Both provisions continue in full force and effect, even if Your obligations have been paid or discharged through bankruptcy. Both provisions survive any cancellation, termination, amendment, expiration or performance of any transaction between You and Us and continues in full force and effect unless You and We otherwise agree in writing.

**Your right to file suit against Us for any claim or dispute arising from or relating to this Agreement is limited by the WAIVER OF JURY TRIAL AND THE TRIBAL DISPUTE RESOLUTION PROCEDURE provisions. In the event the Lender engages legal counsel to protect its right, title and interest in this Agreement or otherwise litigate, protect or defend its rights outside of the Tribal Dispute Resolution Procedure agreed to herein, You hereby agree that the Lender may**
**recover reasonable costs and fees from You.**

\*\*\*

Ex. 1 at 6, ECF No. 1055-1 (emphasis in original)

\*\*\*

IMPORTANT ACKNOWLEDGEMENTS:

You acknowledge and agree that this Agreement is subject solely and exclusively to the Tribal law and jurisdiction of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

You acknowledge and agree that the Tribal Dispute Resolution Procedure is the sole and exclusive forum for resolving disputes and/or claims arising from or relating to this Agreement.

You acknowledge and agree to the Waiver of Jury
Trial provision.

You acknowledge and understand that You selected
Your loan repayment method during the application
process and that Your loan was not conditioned on
repayment of Your loan by ACH.

BY CLICKING THE SUBMIT BUTTON YOU HAVE
ELECTRONICALLY SIGNED THIS AGREEMENT. YOU AGREE THAT
YOUR ELECTRONIC SIGNATURE HAS THE FULL FORCE AND
EFFECT OF YOUR PHYSICAL SIGNATURE AND THAT IT BINDS
YOU TO THIS AGREEMENT IN THE SAME MANNER A PHYSICAL
SIGNATURE WOULD DO SO. YOU CERTIFY THAT THE
INFORMATION GIVEN IN CONNECTION WITH THIS AGREEMENT
IS TRUE AND CORRECT. YOU AUTHORIZE US TO VERIFY THE
INFORMATION GIVEN IN CONNECTION WITH THIS AGREEMENT
AND GIVE US CONSENT TO OBTAIN INFORMATION ON YOU
FROM CONSUMER REPORTING AGENCIES OR OTHER SERVICES.
YOU ACKNOWLEDGE THAT:
(A) YOU HAVE READ, UNDERSTAND, AND AGREE TO ALL OF
THE TERMS AND CONDITIONS OF THIS AGREEMENT INCLUDING
THE WAIVER OF JURY TRIAL AND PROCEDURE PROVISIONS AS
WELL AS THE PRIVACY POLICY, (B) THIS AGREEMENT
CONTAINS NO BLANKS AND WAS FILLED IN BY YOU BEFORE
YOU SIGNED IT, AND (C) THAT YOU HAVE PRINTED OR
DOWNLOADED A COMPLETED COPY OF THIS AGREEMENT FOR
YOUR RECORDS. YOU FURTHER ACKNOWLEDGE THAT THIS
AGREEMENT IS SUBJECT TO APPROVAL BY US AND ALL LOANS
ARE APPROVED OR DENIED ON TRIBAL LAND AT OUR OFFICE
LOCATED IN WATERSMEET, MICHIGAN AND ARE SUBJECT TO
FINAL DETERMINATION BY US.

Ex. 1 at 7, ECF No. 1055-1 (emphasis in original).

JA1832

**ATTACHMENT 4:**

**MEMORANDUM OPINION ON MISREPRESENTATIONS**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS,
et al.,

     Plaintiffs,

v.                                    Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.

_____

RENEE GALLOWAY,
et al.,

     Plaintiffs,

v.                                    Civil Action No. 3:18cv406

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.

**MEMORANDUM OPINION**

In Williams, et al. v. Big Picture Loans, LLC, et al.,
3:17cv461 (E.D. Va.) ("Williams"), Renee Galloway, et al. v. Big
Picture Loans, LLC, et al., 3:18cv406 (E.D. Va.) ("Galloway I")
and Renee Galloway, et al. v. Martorello, et al., 3:19cv314 (E.D.
Va.) ("Galloway II"), the Plaintiffs filed three similar, but in
some respects substantively quite different, actions arising out
of a so-called "Rent A Tribe" scheme allegedly orchestrated by
Matt Martorello ("Martorello"), members of his family, companies

that he controls, and investors who allegedly funded the scheme (the "Martorello Defendants").  Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, Inc. ("Ascension") (collectively sometimes referred to as the "Tribal Defendants") are entities formed under the tribal laws of the Lac View Band of Lake Superior Chippewa Indians ("LVD").  Big Picture and Ascension are also defendants in <u>Williams</u> and <u>Galloway I</u>, and both entities are alleged to be implicated in the Rent A Tribe scheme that lies at the core of the Plaintiffs' claims on those cases.

In <u>Williams</u>, Big Picture and Ascension claimed to share LVD's sovereign immunity and, on that basis, those entities sought dismissal of the case against them.  This Court rejected that argument.[1]  On appeal, the United States Circuit Court of Appeals for the Fourth Circuit[2] held that Big Picture and Ascension were entitled to the protection of LVD's sovereign immunity.[3]

---

[1] <u>Williams v. Big Picture Loans, LLC</u>, 329 F.Supp.3d 248 (E.D. Va. 2018).

[2] <u>Williams v. Big Picture Loans, LLC</u>, 929 F.3d 170 (4th Cir. 2019). In so ruling, the Fourth Circuit made clear that its decision does not affect the merits of the Plaintiffs' claims.  <u>Id.</u> at 185.  It appears that the Fourth Circuit relied on this Court's findings of fact, finding no clear error in those findings.  <u>Williams v. Big Picture Loans, LLC</u>, 929 F.3d at 177.

[3] Those entities also claimed sovereign immunity in <u>Galloway I</u>. Big Picture, Ascension and many other defendants since have reached a class action settlement of <u>Williams</u>, <u>Galloway I</u>, and <u>Galloway II</u> that was filed in yet another case, <u>Renee Galloway, et al. v. James Williams, Jr., et al.</u>, 3:19cv470 (E.D. Va.) ("<u>Galloway III</u>").  That

2

Following the decision of the Fourth Circuit in <u>Williams</u>, the Court directed that the parties file Statements of Position explaining, how, if at all, the decision of the Fourth Circuit affected these proceedings and pending motions (ECF Nos. 599 and 601).[4]  In his Statement of Position, Martorello argued that the holding that Big Picture and Ascension are protected from suit by LVD's sovereign immunity has substantive and procedural consequences that necessitate dismissal of the case against them. MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECH NOS. 599 & 601 (ECF No. 613).  In their response to MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECH NOS. 599 & 601, the Plaintiffs asserted, <u>inter alia</u>, that Martorello and others made material misrepresentations to this Court and to the Fourth Circuit about the facts pertaining to sovereign immunity and that, as a result, the Fourth Circuit's decision on that issue cannot be relied on by Martorello.  PLAINTIFFS' RESPONSE TO MATT MARTORELLO'S STATEMENT OF POSITION (ECF No. 624).  This Memorandum Opinion addresses the alleged misrepresentations and their effect in these proceedings.[5]

---

settlement has been preliminary approved and a hearing on a motion for final approval is set for December 15, 2020.

[4] Although this ORDER was not entered in <u>Galloway I</u>, the parties have briefed the misrepresentations issues in the same way as in <u>Williams</u>.

[5] There are pending other motions in which the parties take the same positions.

JA1836

## BACKGROUND

The facts of Williams and Galloway I, insofar as they pertain to Martorello, have their genesis in the efforts of so-called payday lenders to evade state usury laws by using, as loan conduits, national banks, which, by virtue of the National Bank Act, 12 U.S.C. § 85, are exempt from the interest rate caps set by state laws. Under those arrangements, the payday lenders funded, serviced, and collected loans that were nominally made by the national banks which received a small payment in return for fronting the loans. Those schemes were known commonly as "Rent A Bank" schemes. The payday lenders had to abandon Rent A Bank schemes when federal regulators intervened and put a stop to them.

When that happened, payday lenders then segued into the so-called "Rent A Tribe" scheme. This new device to evade state usury laws used Native American tribal entities (rather than banks) as the nominal lender in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in so doing, to preclude enforcement of the interest rate caps in state usury laws. Nathalie Martin & Joshua Swartz, The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?, 69 Wash. & Lee L. Rev. 751, 785 (2012).

In 2008, Martorello became involved in payday lending using a company called MMP Finance and an internet domain

4

(www.peppercash.com, ECF No. 784, Ex.3; Ex. 4)  The interest rates on those loans would be usurious under state laws in the United States.  Therefore, the loans were to be governed by the laws of Costa Rica.  Later, in 2011, Martorello became interested in the tribal lending concept.  That, in turn, led him to the LVD and to the formation of Red Rock Tribal Lending ("Red Rock") and Duck Creek Tribal Lending ("Duck Creek").

Many of the alleged misrepresentations made by Martorello and others pertain to the formation and operation of Red Rock and Duck Creek.  Although Red Rock and Duck Creek are not parties to these actions, they later were supplanted by Big Picture and Ascension in the Rent A Tribe scheme at issue in Williams and Galloway I. Thus, why and how they were formed, how they were operated, and what happened to them are material matters in assessing the claims made against Martorello and the Tribal Defendants in these cases.

With this background in mind, it is necessary to identify the alleged misrepresentations and then to determine whether the record shows that the allegations of misrepresentation have been proved.  Thereafter, the Court will undertake to assess the consequences that flow from any proven misrepresentation.

### THE ALLEGED MISREPRESENTATIONS

The charge that material misrepresentations of fact have been made to a Court in pursuit of a favorable ruling is a most serious

JA1838

matter. Therefore, the Plaintiffs were ordered to specify the alleged misrepresentations and to submit proof in support of their assertions. A number of filings were made as a result of those orders.[6] In addition to the briefing, the parties presented documentary and deposition evidence and in-person testimony at an evidentiary hearing. Supplemental briefs were filed (MATT MARTORELLO'S SUPPLEMENTAL BRIEF REGARDING ALLEGED MISREPRESENTATIONS, ECF No. 907 in Williams; ECF No. 562 in Galloway I; PLAINTIFFS' SUPPLEMENTAL MEMORANDUM SUMMARIZING ADMITTED EVIDENCE AT JULY 21 and 22, 2020 MISREPRESENTATIONS HEARING, ECF No. 910 in Williams; ECF No. 566 in Galloway I).[7]

---

[6] In Williams, those filing are the redacted and sealed versions of PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT (ECF Nos. 784 and 788, respectively) and 98 exhibits thereto. Three of the exhibits were sealed (ECF No. 788-1, 788-2, and 788-3), but have been removed from seal. In Galloway I, that pleading is ECF Nos. 432 and 436, respectively. The sealed exhibits are 436-1, 436-2, and 436-3.

[7] In this Memorandum Opinion, the citation to the Plaintiffs' initial statement will be to the unredacted version (ECF No. 788). However, the Plaintiffs filed their supporting exhibits with the redacted version of their Statement which is ECF No. 784. Because of limitations in the CM/ECF System, it was necessary to file the first batch of exhibits as ECF Nos. 784-1 through 784-50. The second batch was filed under ECF No. 785 and are ECF Nos. 785-1 through 785-48. The exhibits are all referred to in ECF No. 788 only by number, without regard to whether the exhibit was filed with ECF No. 784 or 785. For convenience, the Memorandum Opinion uses ECF No. 788-1, No. 788-2, etc.

The alleged material misrepresentations were claimed to have
been made by Martorello and others in support of the Tribal
Defendants' Motion to Dismiss which the Fourth Circuit held should
have been granted on the assertion of tribal sovereign immunity.
According to the Plaintiffs, the misrepresentations "were designed
to deliberately and materially mislead the Court" and to create a
fictitious storyline designed to convince this Court and the Fourth
Circuit that:

> (1) the Lac Vieux Desert Band of Lake Superior
> Chippewa Indians ('LVD') created Red Rock to
> 'learn the lending industry;' (2) Red Rock was
> 'managed by appointed LVD members and under
> the control of the LVD Council;' (3) LVD 'had
> acquired years of knowledge and business
> acumen related to the online lending
> industry,' thereby prompting it to purchase
> Bellicose 'to begin in-housing services;' and
> ultimately, '[t]hrough Ascension, LVD would be
> able to 'in-house' many of the activities
> previously performed by its third-party
> vendors, including Bellicose, resulting in
> significant cost savings and efficiencies.'

PLAINTIFFS'   STATEMENT   OF   POSITION   REGARDING   MATERIAL
MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT (ECF No. 788,
p. 1).[8]

---

[8] There is no allegation that counsel of record for Martorello or
the Tribal Defendants with Troutman Pepper Hamilton Sanders LLP,
Christian & Barton, LLP, Spotts Fain PC, or Armstrong Teasdale LLP
were knowledgeable of the misrepresentations discussed herein, and
the record shows no indication that any lawyer with those firms
knew that what was being asserted by Martorello and Hazen were
misrepresentations.
(footnote continued on next page)

7

The plaintiffs identified several misrepresentations, four of which have become the focus of the evidentiary hearing and the briefing.  They are:

1.  Misrepresentations About Martorello's Involvement in the Creation of Red Rock

2.  Misrepresentations About the Control of Red Rock's Lending Operations

3.  Misrepresentations About How and Why Bellicose was Sold to LVD

4.  Misrepresentations About the Creation of Big Picture

Each asserted misrepresentation will be examined in turn.

**1.  Martorello's Involvement In The Creation Of Red Rock**

Martorello filed a declaration in support of the Tribal Defendants' Reply in Support of the Motion to Dismiss (ECF No. 106-1 (Plfs Ex. 103) in <u>Williams</u>).  Therein, Martorello swore that "I was not involved in the creation of Red Rock, but made aware Red Rock had been formed."  <u>Id.</u> ¶ 17.  The Tribal Defendants made the same argument to this Court and to the Fourth Circuit.  (ECF 784, in <u>Williams</u>, Ex. 9, Reply Brief, at 10, note 7.)  "The Tribe

---

The record contains documents from Martorello to lawyers in Rosette LLP (some of whose partners or associates are counsel of record) and from lawyers in that firm to Martorello that are pertinent to some of the alleged misrepresentations.  However, plaintiffs do not allege that lawyers in Rosette LLP who are counsel of record were knowledgeable of the alleged misrepresentations.

approached Martorello in 2011 after independently deciding to explore tribal lending, not the other way around." Id.

The record shows that, contrary to these representations, Martorello was heavily involved in the creation of Red Rock. To begin, Martorello's legal counsel prepared the documents for the formation of Red Rock, and Martorello reviewed those documents for substantive comment. (July 21, 2020 Hearing Tr. pp 51-52); see also Plfs Hearing Ex 3 (Martorello wrote that he would "like to keep the legal documents all completed and ready for signature ASAP. Then on that week in Sept. we can execute the agreements with an October 1 launch date." (Plfs Hearing Ex. 5) Additionally, before the Red Rock formation documents were executed, counsel for the Tribe, Karrie Wichtman, sent to Martorello's attorney, Jennifer Weddle, a copy of the proposed Tribal resolution to review and asked for any changes that Weddle wanted to make. Martorello reviewed and commented on these documents as well.

The record is clear that Martorello actually selected the name "Red Rock." (ECF No. 788, Ex. 10) ("Matt has indicated that the intended tribal LLC should be established as 'Red Rock Lending, LLC,' a tribal entity.") See also ECF No. 788, Ex. 11 in which "Martorello was told that he could name the tribal entity." Thereafter, Martorello sent an email stating "I like the name Red

JA1842

Rock Tribal Cash, LLC (or Corp.)" (ECF No. 788, Ex. 12). At the July 21-22 evidentiary hearing, Martorello admitted that he had picked the name "Red Rock." July 21, 2020 Hearing Tr., p. 41.

Martorello's declaration clearly stated that he "was not involved in the creation of Red Rock . . . ." (Martorello Decl. ¶ 17) The word "involved" is defined as "having a part in something; included in something." INVOLVED, Merriam-Webster, https://www.merriam-webster.com/dictionary/involved. The facts that Martorello's counsel prepared the formational documents for Red Rock and that Martorello reviewed them before they were sent to LVD Tribal Council for approval, and the fact that Martorello chose the name "Red Rock" show that his representation that he "was not involved in the creation of Red Rock" is not true.

The record reflects also that Martorello was involved in the formation of Red Rock in an even more fundamental sense, contrary to assertions made in his affidavit on which this Court relied in making its decision. In particular, in Martorello's affidavit there is a subheading entitled "**LVD Approached Martorello in 2011 to assist them create and grow online lending businesses.**" The first paragraph under that heading says: "In mid-2011, I learned that LVD had identified me as a potential consultant." Then, in the next paragraph (15), Martorello swore that, "[b]efore LVD

10

**JA1843**

approached me in 2011, I was not familiar with the issues of Indian
sovereignty."

The record demonstrates that those representations simply
were not true.  In fact, the record shows that Martorello sought
out a connection with the LVD so that he could get into the Tribal
lending business.

Joette Pete, former Vice-Chairman of LVD, testified that the
"Tribal Council was approached by Matt Martorello with an
opportunity to participate in a lending business." (July 21, 2020
Hearing, Plfs Ex. 129, August 20, 2019 Declaration of Joette Pete
and its exhibits).  Scott Merritt confirmed Pete's declaration
when he testified that Martorello was the one who reached out to
him seeking a Tribal connection for his lending business.  (July
21, 2020 Hearing Tr., Plfs Ex. 139, Merritt's Dep 32:7-23)  The
record is clear that, Merritt, who had long been a proponent of
the Tribal lending model, was sought out by Martorello and asked
to give Martorello an introduction to a Tribe so that Martorello
could enter the Tribal lending business.  To that end, and at
Martorello's request, Merritt introduced Martorello to Rob
Rosette, a lawyer who was known as a "matchmaker" who put potential
lenders together with Indian tribes.  Merritt's testimony on that
score illustrates the point.

11

JA1844

```
Question: Okay.  So what made you - what led you, then,
          to introduce him [Martorello] to Mr. Rosette?

Answer:   Just his - [Martorello's] interest in working
          with the Tribe.  I knew Rob - Rob's a very
          well known attorney in that space.
```

Id.  At the time of that introduction, Merritt had not been told

by Rosette or Ms. Wichtman (the LVD lawyer) or anyone else that

"LVD was interested in finding a service provider."  Merritt's

testimony further undercuts Martorello's assertion that the Tribe

approached him with respect to an existing Tribal lending business.

```
Question: So if Mr. Martorello said that, Scott Merritt
          approached me indicating that he represented
          the Tribe, that would be inaccurate; right?

Answer:   Inaccurate.

Question: And it would also be inaccurate if - that,
          Scott Merritt told Mr. Martorello that the LVD
          was involved in the -- in an online lending
          business and was looking for a servicer?

Answer:   Inaccurate as well.

Question: Okay, and it also would be inaccurate that you
          told him [Martorello] the LVD had a Tribal
          code and was set to make loans?

Answer:   Inaccurate.
```

July 21, 2020 Hearing, Plfs Ex. 139, Merritt Dep. at 92:16-93:3.

The testimony of Pete and Merritt, supported by the

documentary record, demonstrate that this Court incorrectly found

that there was a lending operation underway when the Tribe was put

in touch with Martorello and that the Tribe had identified Martorello as a potential consultant.[9]

## 2.   Misrepresentations About the Control of Red Rock's Lending Operations

Previously, the Court held that "the company [Red Rock] was managed by two members of the Tribe and the Tribe was Red Rock's sole member."   Williams, 329 F. Supp.3d at 255.   Martorello also asserted that Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operations (ECF No. 106-1, ¶ 22).   In pressing their motion to dismiss on the basis of sovereign immunity, the Tribal Defendants argued that Red Rock's managers made all final decisions about operations and that Martorello was a consultant.   And, the Court accepted those representations in making findings about the control of Red Rock, relying principally on Martorello's affidavit.

Considered as a whole, Martorello's affidavit and the position of the Tribal defendants on the issue of sovereign immunity are premised on representations that the Tribal entities controlled LVD's lending operations.   The record disproves those representations.

---

[9] Those findings were based on misrepresentations made in Martorello's declaration, ¶¶ 14, 15 and 17, and were argued by the Tribal Defendants in seeking dismissal of the case against them.

JA1846

At the outset, it is appropriate to note that, contrary to what was represented to the Court, at the time of the initial formation of Red Rock, Martorello understood that his company, Bellicose, would operate the lending business in which Red Rock was to be engaged completely and that the "Tribe's managers are not involved in the business." July 21, 2020 Hearing, Plfs Ex 4, August 26, 2011 email correspondence between M. Martorello and R. Richardson; see also July 21, 2020 Hearing Transcript, 54:14-19.

The rather meaningless role played by the Tribe's co-managers is manifest in an email exchange between Martorello and the Tribe's lawyers, wherein Martorello refused to respond substantively when the Tribe asked him to identify what the co-managers were being asked to approve. A part of that exchange illustrates how little the Tribe's managers knew when the Tribe's lawyers posited a number of questions that needed to be answered so that the Tribe's managers could understand the lending operation and what the lawyers were asking them to approve. (July 21 Hearing Ex. 56).

Evidence at the July 21 hearing also established the very limited involvement of the Red Rock employees in the lending operation. Specifically, what they did was: to verify the bank data submitted by borrowers, ascertain whether the borrowers were employed, and to determine whether the bank account was really the borrower's bank account. July 21, 2020 Hearing Tr. 59:23-60:1.

14

**JA1847**

Neither the establishment of the actual underwriting criteria for making the loans nor the decision actually to make them (or not) was done by the Tribal entity or by its employees.

Joette Pete, Vice-Chairman of the LVD Tribal Council, explained that, while she was on the Tribal Council (from 2010 to 2016), Martorello operated the Tribe's lending business. She said:

> after the inception of the business, it was <u>operated completely by Martorello</u> until Government regulators and litigation against competitors began. As these cases proceeded, efforts were made to <u>create the appearance of the Tribe's involvement</u> but the Tribe had no substantive involvement.

Plfs Ex. 126, at ¶ 4, July 21, 2020 Hearing (emphasis added).

Collection of the consumer loans was a key component of the lending operation. Martorello swore that neither he nor his company ever collected any consumer loan originated by Red Rock. In particular, in paragraph 26 of his declaration, Martorello swore that:

> I have never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock. <u>No company I own or manage has ever taken any action to collect</u>, in whole or in part, <u>any consumer loan</u> originated by Red Rock.

ECF No. 106-1, p. 5, ¶ 26 (emphasis added). That statement is squarely at odds with the Servicing Agreement which, in paragraph 4.9, provides that the servicer shall collect all the gross

15

JA1848

revenues.    The servicer was Bellicose, a company owned and controlled by Martorello.

At the evidentiary hearing it was established that money paid by consumers went into the Bellicose bank account over which only Martorello and his employees had control and access.    That, of course, is collection under the plain meaning of the word.

At the evidentiary hearing Martorello attempted to justify the statement in paragraph 26 of his declaration by saying:    "What I meant was that we did not take or receive any cash from the consumer."    That is a fascile, unconvincing explanation, considering that there is no evidence that any consumer ever delivered cash to satisfy a payment obligation.    Nor is there evidence that the Servicing Agreement established a cash collection system.[10]    Moreover, the Court is constrained to conclude that Martorello's demeanor and conduct when answering questions on this topic of the evidentiary hearing compels the conclusion that Martorello was not telling the truth and that, in fact, contrary to the affidavit, Bellicose collected the consumer loans originated by Red Rock.

The initial draft of the Servicing Agreement reflected the following:

---

[10] And, considering that the borrowers lived all over the country, it is illogical to believe that payments could have been made in cash.

JA1849

> It is the Party's intentions [sic] that all
> business and [sic] affairs in connection with
> day-to-day    operation,    management,    and
> maintenance   [of Red Rock]   including   the
> establishment of operating days and hours,
> shall be the responsibility of the servicer
> [Bellicose which is controlled by Martorello].

(ECF No. 788, Ex. 15) (emphasis added).    Although Martorello

insisted on taking the word "management" out of the agreement, the

concept embodied in that email was, in fact, the way that Red Rock

operated.    This was confirmed by the testimony of LVD's Vice-

Chairman, Pete Joette, (who was on the Tribal Council from 2010 to

2016).    Pete testified:

> For Martorello to be able to claim that LVD
> law applied to the consumer loans, the deal
> required that Red Rock 'originate' the loans.
> But this responsibility was immaterial because
> Red Rock would have no reason to reject a loan
> that satisfied Martorello's lending criteria
> because Martorello ran the business and bore
> all the risk.    After the inception of the
> business,  it  was  operated  completely  by
> Martorello until government regulators and
> litigation against competitors began.    As
> these cases proceeded, efforts were made to
> create   the   appearance   of   the   Tribe's
> involvement, but the Tribe had no substantive
> involvement.

July 21, 2020 Hearing, Plfs Ex 129 at ¶ 4 (emphasis added).    Several

years afterward, in explaining the role of the managers (Hazen and

Williams), Martorello confirmed that to be the case, saying that,

"[a]s far as I know, the Managers' [sic] don't really do anything."

(ECF No. 788, Ex 14, emphasis added).

17

**JA1850**

At this point, it is appropriate to note that Bellicose assigned the Servicing Agreement between it and the Tribe to SourcePoint VI ("SourcePoint"), a wholly owned subsidiary of Bellicose. And, it is important to understand that the key to the operation of the lending business was the intellectual property (sometimes called the "special sauce") which Martorello's company kept for itself. That intellectual property was the basis for underwriting loans, the heart of the lending operation. The record shows that the intellectual property was kept by Martorello's company, Sourcepoint, and was not known by, or available to, the Tribal entities that nominally were making the loans at issue.

Martorello, who had controlling interest in Bellicose, told Wichtman:

> Remember when we started that [] all of these vendors and systems were 'tied internally within SourcePoint's systems' behind the scenes. . . . the vendor contracts and formulas used [were are] very closely guarded internal IP and entirely unobtainable" by Red Rock.

(ECF No. 788, Ex. 8). The "formulas used" referred to the formulas for underwriting recommendations.

As Martorello made clear, this intellectual property was quite valuable to Bellicose/SourcePoint (Martorello companies running the LVD lending operation) and was "guarded" and "unobtainable" to Red Rock. Without access to those formulas that

18

established the underwriting criteria, there would be no way for Red Rock's managers meaningfully to participate in the lending process. And, even though in 2014, Martorello had explained quite clearly that this intellectual property was closely guarded and unobtainable by the Tribal entities or managers, in his declaration, he said quite the contrary:

> [u]nder the Servicing Agreement, Red Rock paid SourcePoint to develop underwriting criteria to recommend for implementation by Red Rock. SourcePoint did not simply implement these underwriting criteria on behalf of Red Rock, but instead presented the underwriting criteria to Red Rock's co-managers for their evaluation and ultimate approval or rejection.

ECF No. 106-1 at ¶ 45.

And, later Martorello represented that:

> [n]either I nor Bellicose have 'controlled' any underwriting criteria used by and of LVD's lending businesses—at all times the LVD business retained full control over the underwriting criteria used to make loans.

ECF No. 106-1 at ¶ 101 (emphasis added).

The close guarding and unobtainability of intellectual property developed by SourcePoint, as described by Martorello in the written record, is also entirely at odds with his assertion in his declaration that "LVD received and retained the significant additional economic value of ownership of all intellectual property developed under the agreement by SourcePoint." That

19

simply did not happen.  In other words, Martorello misrepresented
the pertinent facts.

The Tribal Defendants and Martorello claimed that "Red Rock
consulted with Bellicose about day-to-day operations, but all
decisions were either made by Red Rock's managers or expressly
delegated and overseen by Red Rock's managers."  (ECF No. 40 at 5,
Hazen Declaration at ¶ 11; ECF No. 106-1 at ¶ 22)  The record shows
that is not true.  This is well-illustrated by the testimony of
Craig Mansfield, a co-manager for Red Rock.  Mansfield admitted
that he did not know "how the decision of whether to fund the loan
occurred" or whether that process occurred on the reservation.  He
did not know how loans were originated or how verifications of
loans were completed.  He did not know how Red Rock obtained the
money it needed to fund the loans and did not know how the call
centers in the Philippines operated (Mansfield Dep. 114:25-115:3;
115:4-14; 115:15-22; 112:15-18; 128:24-129:12; 119:20-120:1)  That
is fully consistent with Martorello's understanding that the
Tribal managers do nothing.

The negotiations respecting the sale of Bellicose and its
conversion into Big Picture are instructive.  When discussing the
sale, in August 2014, Martorello informed LVD that, in any sale,
"the seller will have to keep a final say so in business decisions
to protect the business from being destroyed by the new owner

20

**JA1853**

before being paid." (July 21, 2020 Hearing, Plfs Ex 57, August 26, 2014 email between M. Martorello, K. Wichtman, D. Gravel, and Giizhigookway) (emphasis added).  Then, in September 2014, Martorello informed Wichtman that:

> After further discussions, the Bellicose companies will be <u>sold only 'as is,'</u> with existing capital management in place and the company remaining <u>substantially the same.</u>  Of course, a purchase, merger and dissolution are required for a tribal buyer, so the name will/jurisdiction of the LLC will change . . . <u>it also needs to be run in the same format it is today</u>.

(July 21, 2020 Hearing, Plfs Ex 60, September 15, 2014 email between M. Martorello and K. Wichtman) (emphasis added).  In August 2014, Martorello informed the Tribe's Council that:

> <u>We respectfully opt to continue to keep any details of [SourcePoint] IP (including DM) explicitly for internal eyes only, both for the protection of our business and maintaining</u> the integrity of an acquisition of the SourcePoint business.  Should an acquisition actually transpire, obviously these will be relevant questions for the eyes of Management and those in the acquiring company on a need to know basis as well (I.e [sic] Certain IP, even in small doses should at all times be aggressively protected when the result is such a massive competitive advantage, like the process of even just utilizing DM itself which SourcePoint owns and created.

(July 21, 2020 Hearing, Plf Ex 56, August 26, 2014 email between M. Martorello, K. Wichtman, D. Gravel, and Giizhigookway) (emphasis added).  During the discussions and negotiations for the

21

JA1854

sale of Bellicose to become Big Picture, the intellectual property was referred to as the "secret sauce." LVD's lawyer made the comment:

> I wasn't recommending that [SourcePoint] disclose its secret sauce but only that [SourcePoint] will be willing to explain to the co-managers what exactly they [the managers] are approving.

Id.

All of this shows quite clearly that the key ingredient of the lending operation, the underwriting criteria or "secret sauce," was SourcePoint's,[11] not that of any Tribal Entity. And, the record shows that Martorello controlled the lending operations of LVD because, inter alia, he controlled the secret sauce (the key loan underwriting criteria), the linchpin to the lending operations.

In sum, the record establishes that the Plaintiffs have established, quite clearly, that the representations made to the Court about who controlled the LVD lending operations at Red Rock were not true. And, it is not disputed that Red Rock later was "rebranded" to become Big Picture. And, except for a few cosmetic changes (or "otpics" as Martorello described them), the LVD lending

---

[11] A wholly owned subsidiary of Bellicose, a company controlled by Martorello.

JA1855

operation by way of Big Picture continued as it had under the Red
Rock structure.

**3.   Misrepresentations About Why Bellicose was Sold to LVD**

In his declaration in support of the Tribal Defendants' Motion
to Dismiss on the ground of sovereign immunity, Martorello swore
that:

> [c]ontrary to the allegations of Plaintiffs,
> the decision to sell Bellicose to LVD was not
> motivated by impending threats of litigation
> or enforcement action by government agencies.
> Indeed much of the discussions as to the
> motivation behind the sales transactions
> described by the Plaintiffs' Complaint are
> nonsensical and are temporally problematic.
> Plaintiffs' claim there were certain
> 'motivating factors' for the sale which, in
> reality, occurred eighteen months to three
> years before the sale transaction closed.

ECF No. 106-1, ¶ 69 (emphasis added).  That representation was not
true.

The record shows that the negotiations for the sale of
Bellicose began in 2012 (Martorello Declaration, ¶ 49).
Negotiations continued for four years.  Karrie Wicthman, counsel
for LVD, testified that the sale "was a long, long, long negotiated
transaction with many moving parts and many changes over a four
year period."  (Defs Ex. 327, Wictman Depo. at 31:07-12).  Thus,
although the terms of the sale changed over time, evolving from
the sale of Bellicose's intellectual property (the so-called
"secret sauce," which lay at the heart of the lending business),

JA1856

to the sale of an ownership interest in Bellicose, and then to the
sale of Bellicose itself, those changes were all part of
Martorello's desire to evade liability by trying to use LVD's
sovereign immunity. And the motivation for the sale, contrary to
Martorello's declaration, were not distantly removed in time from
the consummation of the sale.[12]

What then, according to the record, was the motivation for
the sale of Bellicose to LVD? Some history is required to discern
the truth as to why Bellicose was sold to LVD.

Red Rock began operation in approximately 2011. In December
2012, slightly a year into the lending business, Martorello became
concerned about the liability presented by the Tribal lending
model. (ECF No. 788, Ex. 43, December 10, 2012 email from
Martorello to Arqyros).

These concerns were magnified when, on August 6, 2013, the
New York Department of Financial Services ("NYDFS") issued cease
and desist orders to 35 online lending companies, including Red
Rock, alleging violations of New York's usury laws. Shortly after
the issuance of the cease and desist orders, counsel for several

---

[12] At the July 21-22, 2020 hearing, Martorello sought to
characterize the sale discussions as occurring in three discreet
periods. However, Wichtman's testimony refutes that; Martorello's
own affidavit refutes it; and there is nothing in the record to
support Martorello's view. Nor, in his declaration, did Martorello
make any reference to the three different phases.

JA1857

tribes, including LVD, had prepared for LVD's consideration the draft of a Complaint to be filed against NYDFS. (ECF No. 788, Ex. 45)

Rosette, counsel for LVD, wrote to Martorello recommending strongly that a lawsuit should be filed against NYDFS asserting that sovereign immunity rendered New York law inapplicable. Rosette urged that Red Rock should be part of that suit. Wichtman, counsel for the Tribe, shared that view in an email to Martorello. However, she made clear to Martorello that nothing would be filed "unless and until fully vetted with the Tribe and you." (ECF No. 788, Ex. 46, emphasis added).

Martorello expressed concern about joining the litigation and about the reaction of the regulators to such a lawsuit. Nonetheless, Martorello ultimately agreed to the filing of the lawsuit. Once he had given assent, it was filed on August 21, 2013.[13]

However, the tactic was unsuccessful and, in fact, it was counterproductive because the district court found that plaintiffs, including Red Rock, were "subject to the States' non-discriminatory anti-usury laws" because the "undisputed facts demonstrate" that the illegal activity was "taking place in New

---

[13] That evidence, of course, is highly probative of the extent of Martorello's control over the Tribe's lending operation.

JA1858

York off of the Tribe's lands." <u>Otoe-Missouria Tribe v. N.Y. Dept.</u> <u>of Fin. Servs.</u>, 974 F. Supp.2d 353, 361 (S.D.N.Y. 2013). On the latter point, the district court noted that the plaintiffs, which included Red Rock, had "built a wobbly foundation for their contention" that the activity was occurring "on the Tribes' lands." <u>Id.</u> at 360.

Under the then-existing structure of the Tribal lending operation in the Red Rock mold, neither Martorello nor Bellicose had any colorable claim of sovereign immunity. Thus, within two days of the district court's decision in <u>Otoe-Missouria Tribe</u>, Martorello wrote that the decision "presents a significant liability for [Bellicose] and we do not believe that we should service any New York loans." (ECF No. 788, Ex 49)

At this point, it is appropriate to note that the Tribal Defendants argued in the Fourth Circuit that "there was no evidence" that the restructure was intended to provide Martorello or his companies with immunity."[14] That, of course, is what Martorello asserted in his declaration in support of the Tribal Defendants' Motion to Dismiss on the ground of sovereign immunity (¶ 69).

---

[14] United States Court of Appeals for the Fourth Circuit, oral argument/listen to oral arguments, opening argument of William Hurd, audio file at 13:35-14:30, http//www.ca4.uscourts.gov/ OArchive/mp3/1827-20190507.mps.

Contrary to the statement in Martorello's declaration to this Court and to the argument made to the Fourth Circuit, two weeks after the district court had decided Otoe-Missouria Tribe, Martorello sent an email to Rosette proposing a restructure of the lending arrangement with LVD for the purpose of protecting Martorello and Bellicose from liability arising out of the Tribal lending arrangement. The subject line of that email was "LVD to take ownership of Bellicose VI." One of the options presented was for "Bellicose to immediately assign LVD 51% of Bellicose via Equity only membership interest tied to the SPVI [Source Point Virgin Islands] subsidiary only." (ECF No. 788, Ex 50).[15] Importantly, Martorello's proposal included the requirement that the restructure would provide all entities with sovereign immunity protection.

Not long thereafter, Martorello once again explained to Wichtman his concerns over the liability created by the various pending investigations and legal actions against Rent A Tribe operations. In particular, Martorello told Wichtman that the result of affirmance of the New York ruling would be "certain death." He further said that "all vendors including [Source

---

[15] Source Point Virgin Islands, sometimes referred to as SPVI, was owned by Bellicose which was controlled by Martorello.

JA1860

Point],[16] banks, ACH processors, bureaus, etc. would all obviously
shut down if it were considered off reservation activity." (ECF
No. 788, Ex. 52)  Martorello commented, as well, upon his personal
liability when he observed that class actions and "personal threats
of  enforcement  action  against  individuals  by  regulators  has
everyone spooked."  Id.

    In subsequent communications between Martorello and Rosette,
Martorello underscored the urgency of reaching an agreement to
restructure his lending arrangement with LVD in the effort to
secure sovereign immunity for Martorello and his entities that
were central to the Red Rock lending activity.

> Clock is ticking before I end up in a Cash
> Call attack though, at which point, I think
> the deal is about dead.

(ECF No. 788, Ex 54)   "Cash Call" was a decision arising out of
Colorado in which a similarly structured lending operation and its
owner had been held to have violated Colorado law.  (ECF No. 788,
Ex. 54).

    In fact, after Martorello learned of the Cash Call ruling in
Colorado, he wrote to Rosette stating:

> Let's zero in ASAP on minimizing my risk for
> being individually liable like CO [Colorado]
> just successfully did to Butch Webb . . . I
> don't want my company on anything that goes to
> the CFPB.   This may mean DCTF [Duck Creek]

---

[16] A company owned by Martorello that was a key player in the Red
Rock lending scheme.

> needs to do a lot more on [its] own including
> its compliance program.

ECF No. 788, Ex. 54 (emphasis added). Confronted with the email
communications described above, Martorello admitted that he "was
alarmed in 2012/13" about several court rulings against lenders
including in Colorado [Cash Call]. (July 21 Hearing Trans. at
122).

The record also reflects that Martorello told others with
whom he interacted during the applicable time that he was concerned
about the threat of litigation and the consequences thereof. For
example, Wichtman testified that Martorello was concerned about
Operation Choke Point, "a campaign initiated by the United States
Department of Justice to force banks to terminate their business
relationships with payday lenders." Advanced Am. Cash Advance
CTRS, Inc. v. FDIC, 251 F. Supp. 3d, 78, 79 (D.D.C. 2017).
According to Wichtman, Martorello's concerns were both operational
for the business ventures as well his personal liability. (Def Ex
327, Wichtman Dep. at 55:22-56:07). Rob Rosette, the lender/tribal
matchmaker and lawyer of LVD in the potential purchase of
Bellicose, observed that Martorello was motivated to sell because
he wanted to avoid a "CashCall type of attack." (July 21 Hearing,
ex. 142). And, in an email exchange with a business associate on
December 31, 2013, Martorello expressed his concern, stating

29

"Clock is ticking before I end up in a Cash Call type attack."
(July 21 Hearing, Ex. 43).

The record is thus clear beyond serious question that
Martorello was motivated to sell Bellicose to LVD because of the
threats of litigation and enforcement actions against him and his
entities under the then-current lending arrangement between him,
his entities, and LVD. Nonetheless, Martorello, at the evidentiary
hearing, testified that his motivations for the sale included "the
attractive offer that [he] received from the Tribes' Council and
the Tribe, and his wish to raise his child in the mainland United
States." (Hearing Trans. at 225:25-27:4) That testimony is simply
not credible in view of the substantial record written at the time
by Martorello and the evidence presented at the evidentiary
hearing. Nor, judged by his demeanor when testifying on the point
at the evidentiary hearing, can the Court accept Martorello's
testimony as credible.

**4.  Misrepresentation Respecting the Creation of Big Picture**

In support of the sovereign immunity argument and with respect
to the analysis to be made under applicable law,[17] the Court was
told that the Tribe created Big Picture "to be an online lending
business in order to bring revenue to LVD."  (ECF No. 788., Ex.

---

[17] Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort,
629 F.3d 1173 (10th Cir. 2010).

JA1863

40; ECF No. 788, Ex. 48, Hazen Declaration at ¶ 16)   The Court
also was told that "LVD began by creating Big Picture in August
2014." (DEFENDANT BIG PICTURE LOANS, LLC'S FINANCIAL INTEREST
DISCLOSURE STATEMENT, ECF No. 38 at 5)  Additionally, Hazen, the
Chairman of the Tribe, was deposed and asked whose idea was it to
create Big Picture Loans.  Hazen responded that it was the Tribe's
idea.  (ECF No. 38, Ex. 33, at Hazen Depo. 34:4-8).  Hazen also
was asked who selected the name for Big Picture and she testified
that it was "kind of a group discussion."  (Id. at 38:7-9)  These
representations were made as part of the story presented to this
Court (and to the Fourth Circuit) to create the appearance that
LVD was the driving force behind the creation of Big Picture.
Martorello supported this story line in his declaration supporting
the Tribal Defendants' motion to dismiss on grounds of sovereign
immunity.   There, Martorello swore that:   "Neither I nor any
company I own or manage directed or controlled the creation of Big
Picture." (ECF No. 106-1, ¶ 67).

The record shows that the representations as to the overall
concept respecting the creation of Big Picture and the specific
representations made by Hazen and Martorello on the subject were
untrue.  In fact, the record shows that Martorello created the
entity, Big Picture Loans, at least a year before LVD says that it
created or formed the entity.  Specifically, the internet domain

JA1864

name for Big Picture Loans was registered on September 18, 2013.
(ECF No. 788, Ex 59)    The record shows that Martorello and
Bellicose (one of Martorello's companies) had anticipated using
the Big Picture company with another tribe (not LVD) that was
located at Fort Belknap Indian Reservation (ECF No. 788, Ex 60)
However, the launch of the Fort Belknap enterprise had to be put
on hold.

Nonetheless, Martorello was able to put the entity and domain
in use in the lending operations of LVD.    In particular, in the
aftermath of the Otoe-Missouria decision in the district court in
New York, and, while that case was pending on appeal, Martorello
urged Wichtman, Hazen and Williams to "rebrand" Red Rock.    (ECF
No. 788, Ex 62)    In a memorandum in July 2014, Martorello observed
that Red Rock [which had been a party in the Otoe-Missouria case]
had been blacklisted and rolled through the mud in the press and
asserted that "it's time to get away from the word payday and the
black mark of [Red Rock] before rules come out and things get
hotter."    Id.    Accordingly, Martorello suggested forming "ASAP a
new LLC with a new domain/brand for purposes of transferring all
contracts, assets, bank accounts, liabilities, etc. over to the
new entities when ready."    Id.    Martorello urged that the parties
get moving on this project forthwith and volunteered that his

32

**JA1865**

company, Bellicose, would facilitate the work. Id. The "rebrand"
was Big Picture.

The evidence at the July 21-22 hearing also proved that
Martorello registered the Big Picture website on September 18,
2013 (July 21-22 Hearing, Plfs Ex 33, September 18, 2013 Big
Picture Loans domain registration). Then, on September 30, 2013,
a vendor, hired by Martorello, created a full design and
operational materials for Big Picture Loans which Martorello
intended to use to add an Indian tribe other than LVD as a business
partner (July 21, 2020 Hearing, Plfx Ex 35, September 20, 20103
email between M. Icardo, M. Hona A. Mein) ("Bellicose has procured
additional tribal business with entities not related to LVD or
Midletown-I.E. Fort Belknap (Big Picture Loans) and Chorus
Loans.")[18]

The record thus proves the falsity of the assertions made in
Martorello's declaration that "neither I nor any company I owned,
managed, directed or controlled the creation of Big Picture" and

---

[18] The record shows that Martorello also wanted LVD to buy
Sourcepoint VI. But, if that did not work out, he was prepared to
sell Sourcepoint to another tribe. As Martorello wrote:

> So here's what I'm thinking (for now) if we
> can't reach terms with LVD to buy SPVI, then
> SPVI will be sold to another tribe (likely
> Midletown).

(July 21, 2020 Hearing, Plfs Ex 53, August 25, 2014 email between
M. Martorello and R. Rosette).

JA1866

"neither I, nor Bellicose, helped form Big Picture." (ECF No. 106-1, Martorello Decl. ¶¶ 67 and 102). And, the record shows convincingly that Big Picture was not created by LVD as the result of the Tribe's years of knowledge and business acumen related to online lending. In fact, Big Picture was created by Martorello for use with a different tribe and, when that fell through, Big Picture, at Martorello's instruction, was used to rebrand Red Rock. In other words, the record shows convincingly that Martorello was the driving force in the creation of Big Picture and Ascension, just as he was in the creation of Red Rock.

In sum, the record convincingly confirms that misrepresentations respecting the genesis of Big Picture were made by Martorello and Hazen. Those misrepresentations were presented to, and relied on, by this Court in making its factual findings which were undisturbed by the Court of Appeals.

## THE EFFECT OF THE MISREPRESENTATIONS

To analyze whether the Tribal Defendants (Big Picture and Ascension) shared LVD's sovereign immunity, this Court and the Fourth Circuit used the test in Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173 (10th Cir. 2010). Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019). "Those non-exhaustive factors are: (1) the method of the entities' creation; (2) their purpose; (3) their structure,

JA1867

ownership, and management; (4) the tribe's intent to share its sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) the policies underlying tribal sovereign immunity and the entities' connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019) (quoting Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1187 (10th Cir. 2010)) (internal quotation marks omitted). The Fourth Circuit adopted the first five of these factors. Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019). As to the "sixth Breakthrough factor, the Fourth Circuit held that whether the purposes underlying tribal sovereign immunity would be served by granting an entity immunity, overlaps significantly with the first five Breakthrough factors. Thus, the extent to which a grant of arm-of-the-tribe immunity promotes the purposes of tribal sovereign immunity is too important to constitute a single factor and will instead inform the entire analysis." Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019).

In one way or another, the misrepresentations now proved by the record are related to the Breakthrough factors and thus to the determination whether the Tribal Defendants shared the sovereign immunity of LVD. The four misrepresentations pressed by the

JA1868

Plaintiffs, individually and taken as a whole, are relevant to determining:

      (1)    the method of creation of the entities (Big Picture and Ascension);

      (2)    the purpose for the creation of those entities;

      (3)    the structure, ownership and management of those entities;

      (4)    the intent of LVD in creating the entities;

      (5)    the financial relationship between the Tribe and those entities;

      (6)    the policies underlying tribal sovereign immunity and the connection of those entities to LVD economic development and whether those policies are served by granting LVD's sovereign immunity to those entities.

The record shows that the misrepresentations produced significantly erroneous findings by this Court. <u>Williams v. Big Picture Loans, LLC</u>, 329 F. Supp.3d 248, (E.D. Va. 2018). Reviewing the findings made by this Court in <u>Williams v. Big Picture Loans, LLC</u>, 329 F. Supp.3d 248, 253-265 (E.D. Va. 2018), in perspective of the record made on the topic of the misrepresentations both in the exhibits and in the evidentiary hearing, the Court concludes that had the facts not been misrepresented to it, there are certain findings that simply could not have been made. Thus, the Court could not have found that:

The company was managed by two members of the Tribe.

Williams, 329 F. Supp.3d at 255.

Nor could the Court have found that:

- Red Rock subsequently decided to contract with an outside entity to better learn the lending industry. The Tribe had identified Martorello has a potential consultant in mid-2011, but he was not involved in the creation of Red Rock.

Williams, 329 F. Supp.3d at 255.

- In addition, aside from these distributions, Red Rock received and retained ownership of all intellectual property development under the Servicing Agreement by SourcePoint.

Williams, 329 F. Supp.3d at 256.

- Final determination as to whether to lend to a consumer rest[ed] with [Red Rock].

Williams, 329 F. Supp.3d at 257.

- All decisions about operations were made by Red Rock's managers . . . or that Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operations.

Williams, 329 F. Supp.3d at 257.

- Martorello, Bellicose and SourcePoint never, on Red Rock's behalf, made lending decisions; originated a consumer loan; purchased a loan originated by Red Rock; or took any action to collect a Red Rock loan.

Williams, 329 F. Supp.3d at 257.

- After 2011, through its operation of Red Rock and relationship with Bellicose and Martorello, the Tribe gained knowledge of the online lending industry . . . the Tribe wanted to apply that knowledge to expand its online lending platform and increase profitability for the Tribe, employ more Tribal members, and acquire its vendors' businesses so the Tribe would earn more money.

Williams, 329 F. Supp.3d at 258.

- LVD Council organized Big Picture, was 'meant to serve as an independent Tribal lending entity,' that 'would ultimately consolidate the business of the Tribe's other lending entities, Red Rock and Duck Creek Financial, LLC.

Williams, 329 F. Supp.3d at 258.

- [Martorello] never provided any consulting services to Big Picture or Ascension; suggested marketing strategies, underwriting criteria or other policies to them; accessed any of their software systems, databases, bank accounts, or records, or hired or fired their employees.

Williams, 329 F. Supp.3d at 263.

Further, the entire section of the opinion describing Big Picture's lending process, Williams, 329 F. Supp.3d at 264, was materially erroneous because of the misrepresentations.

The established misrepresentations strongly suggest that the Fourth Circuit's decision on the Tribal Defendants' entitlement to share LVD's sovereign immunity is open to question. But, that is not a matter for this Court to decide.

38

JA1871

However, in analyzing all pending and future motions in which Martorello argues that his position is supported by the Fourth Circuit's decision, this Court will now be required to take into account the record about the misrepresentations and the findings about them that are made herein.[19]  And, now that the record on the misrepresentations has been made, the Court will turn to the various pending motions and this record is available to help resolve those motions.

It is so ORDERED.

_____ /s/        ЯЕЧ

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  November 18, 2020

---

[19] As the Plaintiffs correctly point out, the Fourth Circuit's decision on sovereign immunity does not confer on Martorello the immunity claimed by the Tribal Defendants.  When, and as, it becomes necessary to assess that question, the record on the misrepresentations is now available.

FILED: October 7, 2021

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 21-211
(3:17-cv-00461-REP)

———————————

MATT MARTORELLO

　　　　Petitioner

v.

LULA WILLIAMS, on behalf of themselves and all individuals similarly situated;
GLORIA TURNAGE; GEORGE HENGLE; DOWIN COFFY; MARCELLA P.
SINGH, Administrator of the Estate of Felix M. Gillison, Jr.

　　　　Respondents

———————————

O R D E R

———————————

Upon consideration of submissions relative to the petition for permission to

appeal, the court grants the petition. This case is transferred to the regular docket

and assigned docket number 21-2116.  The record shall be retained in the court

below unless requested by this court.

A copy of this order shall be sent to the clerk of the district court.

For the Court

/s/ Patricia S. Connor, Clerk

**JA1873**