RECORD NO. 21-2116

# In the United States Court of Appeals for the Fourth Circuit

LULA WILLIAMS; GLORIA TURNAGE;
GEORGE HENGLE; DOWIN COFFY; MARCELLA P. SINGH,
ON BEHALF OF THEMSELVES AND ALL INDIVIDUALS SIMILARLY SITUATED,

*Plaintiffs-Appellees*

v.

MATT MARTORELLO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA, NO. 3:17-CV-00461 (PAYNE, R.)

## JOINT APPENDIX VOL. VI

Bernard R. Given II
William N. Grosswendt
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
(310) 282-2000

John D. Taliaferro
LOEB & LOEB LLP
901 New York Ave. NW, Suite 300
Washington, DC 20001
(202) 618-5000
***Counsel for Appellants***

Matthew W.H. Wessler
GUPTA WESSLER PLLC
2001 K Street, NW,
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Kristi C. Kelly
Andrew Guzzo
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7570
***Counsel for Appellees***

# TABLE OF CONTENTS

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | **VOLUME I OF VIII** | |
| | Docket Sheet | 1 |
| 06/22/2017 | Class Action Complaint (ECF 1) | 131 |
| 09/29/2017 | Defendant Big Picture Loans, LLC's Brief in Support of Its Motion to Dismiss for Failure to Exhaust Tribal Remedies and Under the Doctrine of *Forum Non Conveniens* (ECF 27) | 163 |
| 12/21/2017 | Defendants Big Picture Loans, LLC, Ascension Technologies, LLC, James Williams, Jr., Gertrude McGeshick, Susan McGeshick, and Giiwegiizhigookway Martin's Reply Memorandum in Support of Motion to Dismiss (ECF 99) | 198 |
| 12/21/2017 | Big Picture Loan's Reply in Support of Its Motion to Dismiss for Failure to Exhaust Tribal Remedies and Under the Doctrine of Forum Non Conveniens (ECF 100) | 220 |
| 07/27/2018 | Memorandum and Opinion Re: Defendants' Big Picture Loans and Ascension Technologies' Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 146) | 236 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 10/23/2018 | Defendant Matt Martorello's Opposition to Plaintiffs' Motion for Class Certification (ECF 222) | 317 |
| 12/20/2018 | Plaintiffs-Appellees' Response Brief (USCA4 18-1827, Dkt. 33) | 368 |
| 05/20/2019 | Plaintiffs' Memorandum in Support of Motion for Leave to File Supplemental Evidence in Support of Oppositions to Motion to Dismiss (Case No. 3:18-cv-00406-REP, Dkt. 233) | 433 |
| 06/04/2019 | Plaintiffs-Appellees' Supplemental Letter under Rule 28 (j) (USCA4 18-1827, Dkt. 125) | 455 |
| 06/07/2019 | Defendants-Appellants' Response to Plaintiffs-Appellees' Supplemental Letter under Rule 28 (j) (USCA4 18-1827, Dkt. 126) | 464 |
| 06/28/2019 | Plaintiffs' Statement of Position Regarding Material Misrepresentations Made to the Court in Support of Their Motions to Dismiss for Lack of Jurisdiction (Case No. 3:18-cv-00406-REP, Dkt. 249) | 466 |
| 07/03/2019 | Published Decision - Fourth Circuit Case No. 18-1827 (ECF 581) | 500 |
| 07/03/2019 | Judgment - Fourth Circuit Case No. 18-1827 (ECF 582) | 528 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 07/23/2019 | Order Setting Evidentiary Hearing on Subject Matter Jurisdiction on October 28, 2019 (Case No. 3:18-cv-00406-REP, Dkt. 270) | 530 |
| 07/24/2019 | Defendants Big Picture Loans and Ascension Technologies' Statement Regarding Plaintiffs' Claims of Material Misrepresentation (Case No. 3:18-cv-00406-REP, Dkt. 271) | 534 |
| 07/25/2019 | Mandate - Fourth Circuit Case No. 18-1827 (ECF 600) | 585 |
| 08/09/2019 | Defendant Matt Martorello's Response to Plaintiffs' Statement of Position Regarding Purported Material Misrepresentations Made to the Court (Case No. 3:18-cv-00406-REP, Dkt. 272) | 587 |
| 08/23/2019 | Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Statement of Position to Court's July 22, 2019 Order (ECF 611) | 622 |
| 08/23/2019 | Defendants Brian McFadden and Simon Liang's Joint Statement of Position (ECF 612) | 631 |
| 08/23/2019 | Defendant Matt Martorello's Statement of Position (ECF 613) | 640 |
| **VOLUME II OF VIII** | | |
| 09/16/2019 | Plaintiffs' Response to Matt Martorello's Statement of Position (ECF 624) | 650 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 09/16/2019 | Plaintiffs' Response to Brian McFadden and Simon Liang's Joint Statement of Position (ECF 626) | 669 |
| 09/23/2019 | Defendants Big Picture Loans' and Ascension Technologies' Reply in Support of their Statement of Position (ECF 630) | 676 |
| 10/04/2019 | Memorandum in Support of Motion to Strike (1) Declaration of Joette Pete, (2) Documents Produced By Joette Pete, and (3) Joette Pete from Plaintiffs' Witness List (Case No. 3:18-00406-REP, Dkt. 325) | 685 |
| 10/21/2019 | Order Re: Extension of Time to Accommodate Finalization of Settlement Between Plaintiffs and Defendants Big Picture Loans, LLC and Ascension Technologies, LLC (ECF 637) | 702 |
| 02/18/2020 | Order Re: Dismissal of Action Against Defendants Big Picture Loans, LLC and Ascension Technologies, LLC for Lack of Subject Matter Jurisdiction Pursuant to Judgment of the United States Court of Appeals for the Fourth Circuit (ECF 668) | 705 |
| 02/20/2020 | Order Re: Necessity of Holding an Evidentiary Hearing on Plaintiffs' Misrepresentation Filing (ECF 673) | 706 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 03/04/2020 | Defendant Matt Martorello's Notice Regarding Evidentiary Hearing (ECF 679) | 710 |
| 03/05/2020 | Plaintiffs' Notice Regarding Evidentiary Hearing (ECF 680) | 717 |
| 05/21/2020 | Plaintiffs' Response to Defendant Matt Martorello's Supplemental Brief Re: Effect of the Fourth Circuit's Decision on Class Certification (ECF 734) | 722 |
| 06/17/2020 | Plaintiffs' Statement of Position Regarding Material Misrepresentations and Omissions Made to the Court (ECF 784) | 759 |
| 07/13/2020 | Defendant Matt Martorello's Response to Plaintiffs' Statement of Position (ECF 843) | 812 |
| 07/25/2020 | Transcript of Evidentiary Hearing (ECF 882) | 873 |
| 07/25/2020 | Transcript of Evidentiary Hearing (ECF 883) | 1047 |
| 07/26/2020 | Plaintiff's Reply to Defendant Matthew Martorello's Statement of Position with Respect to Plaintiffs' Motion for Leave to File Supplemental Authority (ECF 884) | 1144 |
| 07/29/2020 | Defendant Matt Martorello's Statement of Position in Response to July 23, 2020 Order (Paragraph 4) (ECF 895) | 1149 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 07/30/2020 | Matt Martorello's Statement of Position in Response to July 23, 2020 Order (Paragraph 2) (ECF 902) | 1161 |
| 07/31/2020 | Matt Martorello's Supplemental Brief Regarding Alleged Misrepresentations (ECF 909) | 1186 |
| 11/18/2020 | Memorandum and Opinion Re: Misrepresentations (ECF 944) | 1218 |
| 11/24/2020 | Order Re: Amended Schedule for Amended Motion for Class Certification (ECF 945) | 1257 |
| 11/30/2020 | Defendant Matt Martorello's Memorandum in Support of his Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 947) | 1258 |
| 12/14/2020 | Plaintiffs' Response in Opposition to Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 959) | 1273 |
| 12/21/2020 | Defendant Matt Martorello's Reply in Support of his Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 962) | 1291 |
| **VOLUME III OF VIII** | | |
| 12/23/2020 | Plaintiffs' Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 967) | 1302 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 12/23/2020 | Plaintiffs' Memorandum in Support of Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | 1305 |
| 02/03/2021 | Matt Martorello's Opposition to Plaintiffs' Renewed Motion for Class Certification (ECF 999) | 1347 |
| 02/23/2021 | Opposition to Plaintiffs' Renewed Motion For Class Certification Against Matt Martorello (ECF 1007) | 1377 |
| 03/22/2021 | Plaintiffs' Reply in Support of Renewed Motion for Class Certification Against Defendant Matt Martorello (ECF 1055) | 1427 |
| 05/19/2021 | Memorandum and Opinion Re: Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 1090) | 1467 |
| 05/19/2021 | Order Denying Defendant Matt Martorello's Motion for an Order Certifying November 18, 2020 Memorandum Opinion for Interlocutory Appeal (ECF 1091) | 1476 |
| 06/29/2021 | Transcript of Hearing on Plaintiffs' Renewed Motion for Class Certification (ECF 1104) | 1478 |
| 07/12/2021 | Memorandum Opinion Re: Class Certification Waiver (ECF 1106) | 1656 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 07/12/2021 | Appendix to Memorandum Opinion Re: Class Certification Waiver (ECF 1106-1) | 1675 |
| 07/20/2021 | Memorandum Opinion Re: Plaintiffs' Motion for Class Certification (ECF 1110) | 1689 |
| 07/20/2021 | Order Granting Plaintiffs' Renewed Motion to Certify a Class (ECF 1111) | 1725 |
| 08/04/2021 | Notice of Appeal (ECF 1119) | 1729 |
| 08/04/2021 | Defendant Matt Martorello's Petition for Permission to Appeal (ECF 1119-2) | 1730 |
| 10/07/2021 | Order on Permission to Appeal (USCA4 21-2116, Dkt. 16) | 1873 |

## TABLE OF CONTENTS – EXHIBITS

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | **VOLUME IV OF VIII** | |
| 12/21/2017 | Exhibits to Defendants Big Picture Loans and Ascension Technologies' Reply in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 106) | |
| | 1.    Matt Martorello Declaration (ECF 106-1) | 1874 |
| 10/22/2018 | Exhibits to Defendant Matt Martorello's Memorandum in Opposition to Plaintiffs' Motion for Class Certification (ECF 216) | |
| | 11.  Demand Letter (ECF 216-11) | 1891 |
| 10/23/2018 | Exhibits to Defendant Matt Martorello's Memorandum in Opposition to Plaintiffs' Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 222) | |
| | F.    The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (ECF 222-7) | 1896 |
| 05/21/2020 | Exhibits to Plaintiffs' Response to Matt Martorello's Addressing the Effect of the Fourth Circuit's Decision on Plaintiffs' Class Certification (ECF 734) | |
| | 1.    Big Picture Loans Transaction Consent (ECF 734-1) | 1932 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 06/08/2020 | Exhibits to Matt Martorello's Supplemental Memorandum in Support of Motion Under Rule 30(d) for Further Deposition (ECF 769) | |
| | 1.  Excerpt of Joette Pete Deposition (ECF 769-1) | 1939 |
| 06/17/2020 | Exhibits to Plaintiffs' Statement of Position Regarding Materials Misrepresentations and Omissions Made to the Court (ECF 784) | |
| | 17. Declaration of Joette Pete (ECF 784-17) | 1993 |
| 07/13/2020 | Exhibits to Matt Martorello's Response to Plaintiffs' Statement of Position (ECF 844) | |
| | 1.  Summary of Facts in Support of Martorello's Response to Plaintiffs' Statement of Position (ECF 844-1) | 2003 |
| 07/17/2020 | Exhibits to Plaintiffs' Reply in Support of Statement of Position Regarding Material Misrepresentations Made to the Court by Defendants (ECF 864) | |
| | 1.  Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Reply in Support of Their Motion to Dismiss For Lack of Subject Matter Jurisdiction (ECF 864-1) | 2053 |
| | 2.  12/31/2013 Email from Martorello re: Memo Regarding Structure of | 2071 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Possible Acquisition of SPVI (ECF 864-2) | |
| | 3.  12/08/2013 Email from Martorello re: Bellicose Capital Valuation (ECF 864-3) | 2074 |
| | 4.  04/18/2016 Email to Martorello re: Project (ECF 864-4) | 2078 |
| | 5.  08/26/2015 Email from Martorello re: Forecasts for Evaluation (ECF 864-5) | 2080 |
| | 6.  03/10/2017 Email to Martorello re: DRAFT memorandum regarding timing of evolution of CFPB rule (ECF 864-6) | 2083 |
| | 7.  08/26/2014 Email from Martorello re: DM Recommendation (ECF 864-7) | 2093 |
| | 8.  01/14/2016 Email from Martorello re: AT BPL SA (ECF 864-8) | 2098 |
| | 9.  12/17/2016 Email to Martorello re: PR Hybrid (ECF 864-9) | 2108 |
| | 10.  Michelle Hazen Affidavit (ECF 864-10) | 2115 |
| | 11.  07/22/2014 Email from Wichtman (ECF 864-11) | 2122 |
| | 12.  The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal | 2127 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
|  | Government Resolution No. T2014-066 (ECF 864-12) |  |
|  | 13. Excerpt of Testimony from Deposition of James Williams (ECF 864-13) | 2131 |
|  | 14. 08/22/2014 Email from Martorello re: 2014 08 22 TC Resolution 2014____ Approving Chorus Loans_final (ECF 864-14) | 2135 |
|  | 15. 04/16/2013 Email from Martorello re: Significant Ruling in Colorado Western Sky Case (ECF 864-15) | 2138 |
|  | 16. 10/03/2013 Email attaching Notice to Cease Servicing Origination of New Loans to NY Consumers (ECF 864-16) | 2156 |
|  | 17. 10/14/2013 Email from Martorello re: LVD to take ownership of Bellicose VI (ECF 864-17) | 2167 |
|  | 18. 10/14/2013 Email from Martorello re: SPVI Equity Transfer to LVD (ECF 864-18) | 2169 |
|  | 19. 10/29/2013 Email from Martorello re: Payday US Offer Deactivation Notice (ECF 864-19) | 2172 |
|  | 20. 08/26/2014 Email from Martorello re: Modal for Tribal Council to Review (ECF 864-20) | 2177 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 21. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 864-21) | 2193 |
| | 22. 10/10/2014 Email from Martorello re: AG Letters (ECF 864-22) | 2199 |
| | 23. 11/04/2014 Email from Martorello re: WSJ Press (ECF 864-23) | 2206 |
| | 24. Joette Pete Declaration (ECF 864-24) | 2211 |
| | 25. Spreadsheet of texts (ECF 864-25) | 2221 |
| | 26. 09/15/2014 Email from Martorello re: Docs (ECF 864-26) | 2224 |
| | 27. 08/26/2011 Email from Martorello re: Question on Docs (ECF 864-27) | 2227 |
| | 28. 02/23/2015 Email from Martorello re: New Agreement with O2 (ECF 864-28) | 2235 |
| | 29. 09/03/2015 Email from Martorello re: Attached Image (ECF 864-29) | 2240 |
| | 30. 07/09/2015 Email from Martorello re: M-1, Agreement and Plan of Merger (ECF 864-30) | 2246 |
| | 31. 08/20/2014 Agreement and Plan of Merger (ECF 864-31) | 2257 |
| | 32. Excerpt of Testimony from Martorello Deposition (ECF 864-32) | 2274 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 33. 09/14/2015 Agreement and Plan of Merger ECF 864-33 | 2278 |
| | 34. Excerpt of Testimony from Deposition of John Williams (ECF 864-34) | 2300 |
| | 35. Subpoena to Produce Documents Issued to Rosette, LLP (ECF 864-35) | 2304 |
| | 36. 03/01/2019 Email from T. Nelson re: Williams v. Big Picture Loans, Subpoena to Rosette, LLP: First Wave of Production (ECF 864-36) | 2315 |
| | 37. 05/31/2019 Email from T. Nelson re: Williams v. Big Picture Loans, Subpoena to Rosette, LLP: First Wave of Production (ECF 864-37) | 2322 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Loan Criteria (ECF 886) | |
| | 1. Big Picture Website re: Rates (ECF 886-1) | 2324 |
| | 2. Excerpt of Testimony from Deposition of Michelle Hazen (ECF 886-2) | 2331 |
| | 3. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 886-3) | 2345 |
| | 4. Excerpt of Testimony from Deposition of Karrie Wichtman ECF 886-4 | 2351 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 5. Excerpt of Testimony from Deposition of Craig Mansfield (ECF 886-5) | 2354 |
| | 6. Employee Profiles - Bellicose VI, LLC and Bellicose Capital, LLC (ECF 886-6) | 2358 |
| | 7. Excerpt of Testimony from Deposition of James Williams (ECF 886-7) | 2367 |
| | 8. Excerpt of Testimony from Deposition of Susan McGeshick (ECF 886-8) | 2373 |
| | 9. Excerpt of Testimony from Deposition of Gertrude McGeshick (ECF 886-9) | 2377 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Structure of Martorello's Companies and Flow of Funds (ECF 896) | |
| | 1. Bellicose Capital Corporate Structure (ECF 896-1) | 2380 |
| | 2. Bluetech Irrevocable Trust Registration (ECF 896-2) | 2392 |
| | 3. Amended and Restated Operating Agreement of Bellicose Capital, LLC (ECF 896-3) | 2393 |
| | 4. Operating Agreement of Bellicose VI, LLC (ECF 896-4) | 2419 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 5.    Secured Promissory Note (ECF 896-5) | 2438 |
| | 6.    Addendum to Secured Promissory Note (ECF 896-6) | 2446 |
| | 7.    Summary of Payments and Distributions from Tribal Lending Businesses from 01/01/2012 – 01/31/2016 (ECF 896-7) | 2447 |
| | 8.    Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 896-8) | 2448 |
| | 9.    Statement of Financial Affairs of Eventide Credit Acquisitions, LLC (ECF 896-9) | 2449-2470 |
| | 10.  Eventide Distribution Calculation (ECF 896-10) | 2471 |
| **VOLUME V OF VIII** | | |
| 12/23/2020 | Exhibits to Plaintiffs' Memorandum in Support of Renewed Motion For Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | |
| | 1.    Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 968-1) | 2472 |
| | 2.    Excerpt of Testimony from Deposition of Warren Scott Merritt (ECF-986-2) | 2473 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 3. 08/26/2011 Email from Martorello re: Question on Docs (ECF 986-3) | 2481 |
| | 4. Declaration of Joette Pete (ECF 986-4) | 2491 |
| | 5. Servicing Agreement dated 10/25/2011 (ECF 986-5) | 2501 |
| | 6. 12/21/2012 Email from Martorello re: Valuation Method (ECF 986-6) | 2542 |
| | 7. 04/16/213 Email from Martorello re: Order Granting Plaintiffs' Motion for Summary Judgment (ECF 986-7) | 2547 |
| | 8. Letter from state of Connecticut dated 05/07/2013 (ECF 968-8) | 2565 |
| | 9. 08/12/2013 Email from Martorello re: Draft Complaint (ECF 968-9) | 2567 |
| | 10. 08/09/2013 Email from Martorello re: NY AG Letter Cease & Desist Letter (ECF 968-10) | 2595 |
| | 11. 08/09/2013 Email from Martorello re: Tribal Lawsuit (ECF 968-11) | 2600 |
| | 12. 10/03/2013 Email from Duck Creek Tribal re: Notice to Cease Servicing Origination of New Loans to NY consumers (ECF 968-12) | 2605 |
| | 13. 10/14/2013 Email from Martorello re: LVD to take ownership of Bellicose VI (ECF 968-13) | 2616 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 14. 10/29/2013 Email from Martorello re: Payday Deactivation Notice (ECF 968-14) | 2618 |
| | 15. 11/08/2013 Email from Martorello re: LVD and legal bills (ECF 968-15) | 2620 |
| | 16. 12/31/2013 Email from Martorello re: Memo Regarding Structure of Possible Acquisition of SPVI (ECF 968-16) | 2624 |
| | 17. 01/06/2014 Email from Martorello re: Meeting with Cheryl Parker Rose @ CFPB (ECF 968-17) | 2627 |
| | 18. 01/08/2014 Email re: Justice Department Action (ECF 968-18) | 2636 |
| | 19. 01/09/2014 Email from Kim Anderson re: DOJ filing (ECF 968-19) | 2639 |
| | 20. 02/12/2014 Email from Martorello re: ACH Pre Application (ECF 968-20) | 2641 |
| | 21. 07/22/2014 Email from Wichtman re: Rebrand from Payday (ECF 968-21) | 2645 |
| | 22. 08/22/2014 Email re: Martorello re: TC Resolution 2014 (ECF 968-22) | 2650 |
| | 23. The LAC Vieux Desert Band of Lake Superior Chippewa Indians Tribal | 2674 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | Government Resolution No. T2014-066 (ECF 968-23) | |
| | 24. 10/10/2014 Email from Martorello re: AG Letters (ECF 968-24) | 2678 |
| | 25. 11/04/2014 Email from Wichtman re: WSJ Press (ECF 968-25) | 2685 |
| | 26. 12/01/2014 Email from Wichtman re: EIN Big Picture Loans (ECF 968-26) | 2690 |
| | 27. Resolution #2015-10 Approving the Creation of the Wholly Owned and Operated Tribal Servicing Entity Ascension Technologies, LLC (ECF 968-27) | 2695 |
| | 28. 02/19/2015 Meeting Minutes – Ascension (ECF 968-28) | 2700 |
| | 29. 02/24/2015 Email from J. Martorello re: Sourcepoint VI Assignment Notification: DRAFT REVIEW - Acquisition of Source Point VI US173700 - Assignment letter (ECF 968-29) | 2703 |
| | 30. Operating Agreement of Eventide Credit Acquisitions, LLC (ECF 968-30) | 2709 |
| | 31. Agreement and Plan of Merger dated 09/14/2015 (ECF 968-31) | 2728 |
| | 32. 10/02/2015 Email from Martorello re: Forecasts (ECF 968-32) | 2750 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 33. 12/05/2015 Email from Martorello re: Bellicose Capital Valuations (ECF 968-33) | 2753 |
| | 34. 12/07/2016 Email from Martorello re: PR Hybrid (ECF 968-34) | 2757 |
| | 35. 08/26/2015 Email from Martorello re: Forecasts for Valuation (ECF 968-35) | 2764 |
| | 36. 03/10/2017 Email from Martorello re: Draft Memorandum re: timing of evolution of CFPB Rule (ECF 968-36) | 2767 |
| | 37. 08/26/2014 Email from Martorello re: DM Recommendation (ECF 968-37) | 2777 |
| | 38. 09/15/2014 Email from Martorello re: Docs (ECF 968-38) | 2784 |
| | 39. 09/03/2015 Email from Martorello attaching Image (ECF 968-39) | 2787 |
| | 40. 01/15/2016 Email from John Williams re: Delegation of Authority (ECF 968-40) | 2793 |
| | 41. 01/14/2016 Email from Wichtman re: Ascension Manager Issue (ECF 968-41) | 2795 |
| | 42. Recorded Certificate of Merger date 01/26/2016 (ECF 968-41) | 2801 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 43. Ascension Technologies Designation of Authority Policy (ECF 968-43) | 2805 |
| | 44. Loan and Security Agreement dated 09/14/2015 (ECF 968-44) | 2810 |
| | 45. Intratribal Servicing Agreement dated 02/16/2016 (ECF 968-45) | 2840 |
| | 46. Secured Promissory Note (ECF 968-46) | 2855 |
| | 47. Eventide Distribution Calculation (ECF 968-47) | 2863 |
| | 48. Timeline (ECF 968-48) | 2864 |
| | 49. Declaration of George Hengle (ECF 968-49) | 2871 |
| | 50. Big Picture Loans Confidential Investment Opportunity (ECF 968-50) | 2874 |
| | 51. Supplemental Declaration of American Legal Claim Services, LLC Regarding Notice of Dissemination (ECF 968-51) | 2878 |
| | 52. 02/11/2020 Letter from Rosette Firm re: Request for Consumer Loan Data (ECF 968-52) | 2882 |
| | 53. Order Granting Renewed Motion to Certify Class (ECF 968-53) | 2886 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 54. Declaration of Kristi C. Kelly (ECF 968-54) | 2910 |
| | 55. Declaration of Leonard A. Bennett (ECF 968-55) | 2918 |
| | 56. Declaration of E. Michelle Drake in Support of Plaintiffs' Renewed Motion for Class Certification (ECF 968-56) | 2928 |
| | 57. Declaration of Beth E. Terrell in Support of Plaintiffs' Renewed Motion for Class Certification Claims Against Defendant Matt Martorello (ECF 968-57) | 2980 |
| | 58. Declaration of Matthew W. H. Wessler (ECF 968-58) | 2988 |
| | 59. Declaration of Michael A. Caddell (ECF 968-59) | 2995 |
| | 60. Declaration of American Legal Claim Services, LLC (ECF 968-60) | 3013 |
| 02/03/2021 | Exhibits to Matt Martorello's Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF 999) | |
| | 11. Resolution #2011-041 Approving the Creation of the Lac Vieux Desert Band of Lake Superior Indians Tribal Enterprise – Red Rock Tribal Lending, Inc. (ECF 999-11) | 3015 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 12. Articles of Organization of Red Rock Tribal Lending (ECF 999-12) | 3017 |
| | 14. Deposition of Jennifer Weddle (ECF 999-14) | 3019 |
| | 15. Email from Martorello to Wichtman (ECF 999-15) | 3056 |
| | **VOLUME VI OF VIII** | |
| 02/23/2021 | Exhibits to Opposition to Plaintiffs' Renewed Motion For Class Certification Against Matt Martorello (ECF 1007) | |
| | A. Affidavit of Michelle Hazen (ECF 1007-1) | 3064 |
| | D. The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (ECF 1007-5) | 3070 |
| | E. Affidavit of Jennifer Weddle in Support of Motion to Quash (ECF 1007-6) | 3105 |
| | F. Default Letter dated December 12, 2019 (ECF 1007-7) | 3114 |
| | G. Transcript of Deposition of Michelle Hazen (ECF 1007-8) | 3127 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | H.  Transcript of Deposition of Matt Martorello (ECF 1007-9)[1] | 3377 |
| | G.  Excerpt of Transcript of Deposition of Daniel Gravel (ECF 1007-12)[2] | 3485 |
| | **VOLUME VII OF VIII** | |
| | H.  Transcript of Deposition of Craig Mansfield (ECF 1007-13) | 3538 |
| | N.  Red Rock Capital Lending Closing Checklist (ECF 1007-23) | 3762 |
| | M.  Deposition of James Dowd (ECF 1007-24)[3] | 3765 |
| | YY. Declaration of James Williams, Jr. in Support of Motion for Preliminary Injunction (ECF 1007-32) | 4004 |
| | ZZ. Affidavit of Brian McFadden (ECF 1007-33) | 4037 |

---

[1] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

[2] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

[3] Appellant filed a condensed transcript with the district court for this exhibit, but the Joint Appendix includes the same pages from the regular transcript to comply with this Court's Local Rules.

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| 03/22/2021 | Exhibits to Plaintiffs' Reply in Support of Renewed Motion For Class Certification Against Defendant Matt Martorello (ECF 1055) | |
| | 1. Consent to Electronic Communications (ECF 1055-1) | 4041 |
| | 2. 08/27/2012 Email from Martorello re: SourcePoint – Tribal Consumer Financial Services Regulatory Code (ECF 1055-2) | 4048 |
| | 3. 04/02/2013 Email from Daniel Gravel re: TCFSR Code (ECF 1055-3) | 4051 |
| | 4. 08/27/2012 Email from Blake Sims re: SourcePoint – Tribal Consumer Financial Services Regulatory Code (ECF 1055-4) | 4053 |
| | 5. The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (part 1) (ECF 1055-5) | 4055 |
| | 5. The LAC Vieux Dessert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code (part 2) (ECF 1055-6) | 4075 |
| | 6. Otoe Missouria Tribe of Indians Resolution OMTC#050341 FY-2018 (ECF 1055-7) | 4091 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| | 7. Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LL's Reply in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 1055-8) | 4120 |
| | 8. Consent to Electronic Communications (ECF 1055-9) | 4138 |
| | 9. 12/12/2011 Email from J. Weddle re: RRTL and Pepper Cash Loan Docs (ECF 1055-10) | 4145 |
| | 10. Class Action Settlement Agreement and Release (ECF 1055-11) | 4166 |
| | 11. 01/14/2016 Email from Martorello re: AT BPL SA (ECF 1055-12) | 4224 |

| DATE FILED | DESCRIPTION | JA NO. |
|---|---|---|
| **VOLUME VIII OF VIII (SEALED EXHIBITS)** | | |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Loan Criteria (ECF 886) | |
| | 2. Excerpt of Testimony from Deposition of Michelle Hazen (ECF 886-2) | 4232 |
| | 5. Excerpt of Testimony from Deposition of Craig Mansfield (ECF 886-5) | 4246 |
| | 8. Excerpt of Testimony from Deposition of Susan McGeshick (ECF 886-8) | 4250 |
| 07/29/2020 | Exhibits to Plaintiffs' Statement of Position Regarding the Structure of Martorello's Companies and Flow of Funds (ECF 896) | |
| | 7. Summary of Payments and Distributions from Tribal Lending Businesses from 01/01/2012 – 01/31/2016 (ECF 896-7) | 4254 |
| | 8. Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 896-8) | 4260 |
| | 10. Eventide Distribution Calculation (ECF 896-10) | 4268 |
| 12/23/2020 | Plaintiffs' Memorandum in Support of Renewed Motion for Class Certification of Claims Against Defendant Matt Martorello (ECF 968) | |

| | | |
|---|---|---|
| | 1.  Defendant Matt Martorello's Revised Objections and Responses to Plaintiff Lula Williams' First Set of Interrogatories (ECF 968-1) | 4271 |
| | 47.  Eventide Distribution Calculation (ECF 968-47) | 4279 |

USCA4 Appeal: 21-2116      Doc: 26-6      Filed: 02/07/2022      Pg: 30 of 503

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

LULA WILLIAMS, GLORIA TURNAGE,
GEORGE HENGLE, DOWIN COFFY, and          Civil Case No. 3:17-cv-00461-REP
FELIX GILLISON, JR., *on behalf of themselves*
*and all individuals similarly situated*, :

                  Plaintiffs,          Hon. Robert E. Payne

v.

BIG PICTURE LOANS, LLC; MATT MARTORELLO;
ASCENSION TECHNOLOGIES, INC.;
DANIEL GRAVEL; JAMES WILLIAMS, JR.;
GERTRUDE MCGESHICK; SUSAN MCGESHICK;
and GIIWEGIIZHIGOOKWAY MARTIN,

                  Defendants.

_____ /


### AFFIDAVIT OF MICHELLE HAZEN

    I, Michelle Hazen, affirm that I have personal knowledge of the matters set forth in this Affidavit and if I am called as a witness I will testify competently to these matters based on my personal knowledge:

    1.     I am a member of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD"), a federally recognized Indian tribe.

    2.     I have served on the LVD Tribal Council, the governing body of LVD, from 1994 to 2014 as the Tribal Secretary, and most recently as a Tribal Council member from 2016 to present.

    3.     Since it opened in the late 1990's, LVD's casino was a significant source of revenue for LVD.

    4.     After the 2008 recession, after making significant cuts to government programs and services due to drastically decreased casino revenue, the LVD Tribal Council began to explore other options to support its goals of self-sufficiency and self-determination.

**EXHIBIT 2**

JA3064

5.     The LVD Tribal Council decided to start tribal online lending businesses to bring revenue to LVD that would advance the public health, safety, and welfare of LVD's citizens through provision of essential governmental services.

6.     In July 2011, the LVD Tribal Council passed LVD Council Resolution 2011-044 to create Red Rock Tribal Lending, LLC ("Red Rock"), as a wholly-owned tribal business entity authorized to engage in online lending.

7.     I served as manager of Red Rock since its inception in 2011 until its dissolution on February 16, 2016.

8.     Red Rock provided short-term consumer financial services online from its offices on LVD's reservation lands.  All of Red Rock's employees, computers, and records were on LVD's reservation lands at all times.

9.     Red Rock's business was regulated by the Tribal Financial Services Regulatory Authority under the LVD Tribal Consumer Financial Services Regulatory Code.

10.     In order to learn the lending industry, Red Rock contracted with Bellicose VI, LLC ("Bellicose VI") for vendor management services, compliance management assistance, marketing material development, and development of risk modeling and data analytics.

11.     While Red Rock received advice and consulted with Bellicose about operations, all final decisions about operations were made by Red Rock's managers.

12.     As Red Rock's manager, I was notified that Bellicose VI assigned its interest in the contract with Red Rock to SourcePoint VI, LLC ("SourcePoint") on April 15, 2012.  Red Rock has no role in Bellicose or SourcePoint's decisions about the assignment.

13.     After four years of operating Red Rock, LVD had gained considerable experience and knowledge of the online lending industry. LVD looked to expand its online lending business to earn more money for LVD, to employ more members and area residents, and to acquire our vendors' businesses so the lending would be more profitable.

14.     In August 2014, LVD created Big Picture Loans, LLC ("Big Picture"), by passing LVD Council Resolution 2014-044.

15.     I have served as the manager of Big Picture since August 2014.

USCA4 Appeal: 21-2116      Doc: 26-6      Filed: 02/07/2022      Pg: 31 of 503

**JA3065**

16.     Big Picture was created to be an online lending business in order to bring revenue to LVD that would advance the public health, safety, and welfare of LVD's citizens through provision of essential governmental services.

17.     In early 2015, LVD created Tribal Economic Development Holdings, LLC ("TED"), a wholly-owned and operated economic arm and instrumentality of LVD and as Ascension Technologies, LLC, a wholly owned and operated subsidiary of TED.

18.     Since February 2015, I have served as manager of TED.

19.     Since February 2015, I have served as manager of Ascension.

20.     Since December 2015, I have served as the Chief Executive Officer of Big Picture.

21.     In my management roles for TED, Big Picture Loans, and Ascension, I am responsible for the day to day operations and management of each business entity.

22.     To help reach the LVD's long term economic development goals, LVD bought Bellicose Capital ("Bellicose") which included SourcePoint. Through the purchase, LVD acquired all of Bellicose's existing data, software, and corporate goodwill.

23.     On February 16, 2016, Red Rock assigned most of its consumer loans and obligations to Big Picture and wrote off the unassigned loans as bad debt. Then Red Rock dissolved.

24.     Big Picture currently employs fifteen individuals that all work on LVD's reservation.

25.     Ascension is headquartered on LVD's reservation and currently employs thirty-one individuals, most of which are at Ascension's satellite locations.

26.     Big Picture currently maintains an operating account with Chippewa Valley Bank, and all consumer loans are funded through this operating account. All consumer payments, payroll, vendor payments, investment deposits, and distributions to TED are made through this account. At all times, the account maintains sufficient funds to support Big Pictures operations.

27.     Big Picture uses capital from private investors such as hedge funds, individuals, trusts, and businesses. These investments are made through loan and security agreements and

USCA4 Appeal: 21-2116      Doc: 26-6      Filed: 02/07/2022      Pg: 32 of 503

**JA3066**

promissory notes, and Big Picture bears the responsibility to its investors.

28.     All Big Picture consumer loans are originated on LVD tribal lands by Big Picture employees.

29.     Big Picture provides consumer installment loans in amounts allowed under LVD law.

30.     The process for taking out a loan from Big Picture loans is as follows:

a.      Consumers can apply for loans on Big Picture's website: www.bigpictureloans.com,   The website's servers are located on the LVD reservation.

b.      A completed loan application is reviewed by Big Picture using an extensive software-based underwriting process until Big Picture either accepts or declines the loan application.

c.      If the loan application is accepted several additional steps take place for each and every loan transaction.

1.  First, the website prompts the applicant to select their desired loan amount.

2.  Second, the website prompts the applicant to select the term of the loan and Big Picture provides an estimated annual percentage rate depending on the underwriting determination of the consumer's ability and willingness to repay.

3.  Third, the website requires the applicant to review the loan agreement contains the annual percentage rate of the loan, the payment schedule and several other disclosures contained in the loan agreement.

4.  Fourth, the website requires the applicant to acknowledge and agree to the loan agreement, including but not limited to the governing law and forum selection, waiver of jury trial, and tribal dispute resolution procedure.

5.  Fifth, the website requires the applicant to acknowledge and agree that they have read and agree to Big Picture's Privacy Disclosures.

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 33 of 503

**JA3067**

USCA4 Appeal: 21-2116   Doc: 26-6   Filed: 02/07/2022   Pg: 34 of 503

6. Sixth, before electronically signing the loan agreement, the website requires the applicant to selects their payment method.

7. Seventh, once the applicant signs the loan agreement, Big Picture's on-Reservation employees perform a final verification of the applicant's information in the loan agreement, the e-signature, the due dates, the payment schedule, bank information, that the terms and conditions of the loan were agreed to as well as other personally identifying information.

8. Eighth, Big Picture's on-Reservation employees approve the loan transaction by reviewing the loan agreement one last time, and manually typing in the date to disburse the funds thereby authorizing the electronic approval of the loan agreement. This approval results in loan origination and causes the loan proceeds to be sent to the customer through a contracted third-party payment processor receiving instructions and information created and sent by Big Picture's on-Reservation employees.

d. If the loan application is denied, the consumer receives a notice of the denial.

31. Big Picture's revenue goes to support LVD government essential services and support the LVD community in the following ways:

a. Big Picture provides funds that support for more than twenty essential tribal government services, including LVD's housing program, the tribal court, the tribal police department, LVD's new health clinic and pharmacy, member enrollment services, family services, infrastructure, cultural and historical preservation, education, and basic government operations;

b. Big Picture helped the tribe meet requirements necessary to secure $14.1MM in financing for LVD's new health clinic and to refinance casino debt;

c. The money helps fund college scholarships and pay for educational costs for members such as student housing, books, school supplies and equipment;

d. It has helped create home ownership opportunities for members through tribally-purchased homes and also subsidized members' home purchases and rentals;

e. Big Picture provided a bridge loan to complete the new LVD health clinic that offers medical, dental, optical, chiropractic, pharmacy, and cultural healing

JA3068

services to the regional community;

f.    It has helped fund new vehicles for the LVD Police Department;

g.    It has helped fund an Ojibwe language program and other cultural programs;

h.    Several social services programs receive revenue: foster care payments for eligible children, propane purchase assistance, assistance for family care outside of the community, as well as cover burial and other funeral expenses for members' families;

i.    Money has helped fund renovations and new office space for the Tribe's Social Services Department;

j.    It has helped fund youth activities;

k.    The tribal court has been able renovate a new space and bring in telecom services for remote court proceedings: and,

l.    Big Picture has helped funds Tribal Elder nutrition programs and Tribal Elder home care and transport services.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

By: _Michelle Hazen_

Michelle Hazen

GIIWEGIIZHIGOOKWAY MARI
NOTARY PUBLIC, STATE OF MI
COUNTY OF GOGEBIC
MY COMMISSION EXPIRES Jun 12, 2019
ACTING IN COUNTY OF

Sworn and subscribed before me _Giiwegiizhigookway Martin_ Notary Public,

On this 28th day of _September_, 2017, in the county of _Gogebic_.

Filed: 02/07/2022     Pg: 35 of 503

Doc: 26-6

USCA4 Appeal: 21-2116

**JA3069**

# THE LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS

## TRIBAL CONSUMER FINANCIAL SERVICES REGULATORY CODE

### SECTION 1. FINDINGS, INTENT AND POLICY

1.1    <u>Findings.</u> The Tribal Council of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, the primary governing body of the Tribe, finds that:

(a)    The Tribe desires to expedite the development of the economy of the Tribe in order to improve the Tribe's economic self-sufficiency, to enable the Tribe to better serve the social, economic, educational, and health and safety needs of its members and visitors, and to provide its members with opportunities to improve their own economic circumstances.

(b)    Tribal operation and licensing of one (1) or more consumer financial services businesses is a legitimate means of generating revenue to address the aforementioned needs and pursuing the Tribe's goal of self-sufficiency and self-determination.

(c)    The Tribe has the legal authority to license and regulate consumer financial services businesses within its jurisdiction.

(d)    Properly licensed and regulated consumer financial services is consistent with announced federal policy promoting tribal self-government and economic self-sufficiency.

(e)    Tribal regulation and control of consumer financial services businesses within the  jurisdiction of the Tribe is essential for the protection of the public welfare.

(f)    It is essential that the Tribal Council regulate consumer financial services in a manner commensurate with Tribal law and policy and applicable federal law.

(g)    It is essential that public confidence in consumer financial services that takes place within the Tribe's jurisdiction be maintained.

(h)    Adoption of a Tribal Consumer Financial Services Regulatory Code by the Tribal Council is a necessary condition for the legal operation of consumer financial services within the Band's reservation and is in the best interest of the Tribe.

(i)    Establishment of a Tribal Consumer Financial Services Regulatory Authority to implement the purpose and intent of the Tribal Financial Services Regulatory Code within the Band's reservation is in the best interest of the Tribe.

1.2    <u>Intent.</u> The Tribal Council, on behalf of the Tribe, declares that the intent of this Code is to:

(a)    Diversify and expedite the development of the economy of the Lac Vieux Desert Band of Lake Superior Chippewa Indians for the purposes described in section 1.1(a) above.

Tribal Consumer Financial Services Regulatory Code                    Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal
Council Resolution T2014-019; and Tribal Council Resolution T2014-091

(b)    Define general regulatory powers to be exercised by a Tribal Financial Services Regulatory Authority ("Authority") in relation to the regulation, control, and oversight of consumer financial services businesses and their vendors.

(c)    Ensure that all consumer financial services profits are used for the benefit of the Tribe and the Band's community.

(d)    Ensure that consumer financial services is conducted appropriately by Licensees and borrowers and that it remains free from corrupt, incompetent, unconscionable and dishonest practices.

(e)    Protect the interests of the public in the offering of consumer financial services.

(f)    Ensure the maintenance of public confidence in Tribal consumer financial services practices.

(g)    Ensure that the Tribe provides a Tribal-based forum for the fair and orderly resolution of consumer financial services disputes consistent with the Tribe's preservation of sovereign immunity.

(h)    Ensure that Tribal consumer financial services laws are enforced by the Tribe upon Persons involved in Tribal consumer financial services.

1.3    Policy.

(a)    Tribal Policy of Self-Government.    The Tribe is firmly committed to the principle of Tribal self-government. Profits from consumer financial services shall be utilized and expended only for the following purposes:

(1)    To fund the Tribe's government operations or programs.

(2)    To provide for the public health and general welfare of the Tribe and its members and visitors to the Tribal community.

(3)    To promote Tribal economic development and self-sufficiency.

(4)    To donate to charitable organizations.

(b)    Tribal Consumer Financial Services Policy.    The establishment, promotion and operation of consumer financial services are necessary, provided that such consumer financial services are regulated and controlled by the Tribe pursuant to this Code and the profits of such consumer financial services are used exclusively for the benefit of the Tribe.

(c)    Responsibility for Regulation.  The Tribe shall have sole proprietary interest in and responsibility for the conduct of consumer financial services authorized by this Code

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

(d)    <u>Consumer Financial Services Authorized.</u> Consumer financial services that are subject to licensing under this Code are authorized and permitted only as described in this Code and any regulations of the Authority adopted under this Code.

## SECTION 2. DEFINITIONS

In this Code, except where otherwise specifically provided or unless the context otherwise requires, the following terms and expressions shall have the following meanings:

2.1    "Applicant" means any Person who has applied for a License under the provisions of this Code.

2.2    "Application" means a request for the issuance of a License under the provisions of this Code.

2.3    "Consumer" means a natural person who acquires goods, services, or credit primarily for personal, family or household purposes. The term does not include a person who acquires goods, services, or credit primarily for business, commercial, or investment purposes.

2.4    "Consumer financial services" or "Tribal consumer financial services" means the business of providing goods, services, or credit to consumers in transactions subject to this Code in exchange for interest, finance charges, fees, rent, or other form of consideration on the Band's reservation or within the Tribe's jurisdiction, including transactions originated from the Band's reservation or Tribe's jurisdiction. The term includes, without limitation, loans, payday loans, credit sales, pawn transactions, sale-leaseback transactions, rent-to-own transactions, guaranties, letters of credit, or other forms of consumer financial services.

2.5    "Small Loan Transaction" means any form of consumer financial services transaction provided by a financial services provider to a consumer, in an amount of at least $50.00 but no more than $5,000 that is secured, at the time the transaction is entered into, in whole or in part, by a check, Electronic Funds Transfer, or other payment device. A Small Loan Transaction does not include a Vehicle Transaction.

2.6    "Electronic Funds Transfer" means a draft or agreement for an electronic debit authorized by a borrower and made payable to a Financial Services Licensee.

2.7    "Employee Licensee" means a person that is licensed by the Authority to be employed by a Financial Services Licensee.

2.8    "Gross Revenues" means all consumer financial services revenues collected or received by a Licensee.

2.9    "Financial Services Licensee" means a person that is licensed by the Authority to engage in the business of providing Tribal consumer financial services.

Tribal Consumer Financial Services Regulatory Code                Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal
Council Resolution T2014-019; and Tribal Council Resolution T2014-091

2.10   "License" means the official, legal and revocable Financial Services License, Vendor License or Employee License, issued by the Authority. A License relating to consumer financial services is a revocable privilege.

2.11   "Licensee" means any Financial Services Licensee, Vendor Licensee, and Employee Licensee whenever used generally in this Code.

2.12   "Code" means this Tribal Consumer Financial Services Regulatory Authority

2.13   "Person" means any natural person, partnership, joint venture, association, trust, firm, estate, club, society, receiver, assignee, trustee in bankruptcy, political entity, company, corporation or other group, however organized, and any owner, director, officer or employee of any such entity or any group of individuals acting as a unit, whether mutual, cooperative, fraternal, nonprofit, or otherwise, the government of the Tribe, any governmental entity of the Tribe or any of the above listed forms of business entities that are wholly owned or operated by the Tribe, or any other entity whatsoever, who engages or seeks to engage in the business of consumer financial services pursuant to this Code; provided, that the term does not include the Federal Government or any agency thereof.

2.14   "Title Transaction Business" means the activities of a financial services provider in providing Vehicle Transactions and other related financial services to consumers or other persons.

2.15   "Tribal Council" means the Lac Vieux Desert Band of Lake Superior Chippewa Indians Tribal Council, the governing body of the Tribe as defined and described in Article IV, Section 1 of the Tribe's Constitution.

2.16   "Tribal Financial Services Regulatory Authority" or "Authority" means the regulatory authority established and described in Section 4 of this Code.

2.17   "Tribe," "Band" or "LVD" means the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

2.18   "Vendor" means any natural person, partnership, joint venture, association, trust, firm, estate, club, society, receiver, assignee, trustee in bankruptcy, political entity, company, corporation or other group, however organized, who engages or seeks to engage in the business of providing services to a Licensee pursuant to this Code.

2.19   "Vendor Licensee" means a Person or entity that is licensed by the Authority to provide services to a Financial Services Licensee in connection with the marketing, origination, processing, or collecting consumer financial services.

2.20   "Vehicle Transaction" means any form of consumer financial services transaction provided by a financial services provider to a consumer that is secured, in whole or in part, by a

**JA3073**

Tribal Consumer Financial Services Regulatory Code        Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

motor vehicle, regardless of whether title is held in the name of the consumer financial services provider or consumer. The term includes, without limitation, a transaction in which title, a security interest, or other interest is obtained in favor of a financial services provider, in and to a motor vehicle. A Vehicle Transaction is not a Small Loan Transaction even if the Vehicle Transaction is secured in part by a check or Electronic Funds Transfer. The term does not include a consumer financial services transaction financing the purchase of a motor vehicle.

## SECTION 3. GENERAL PROVISIONS

3.1    Authority. This Code is enacted pursuant to the inherent sovereign powers of the Lac Vieux Desert Band of Lake Superior Chippewa Indians and in accordance with Article IV(b) of the Tribe's Constitution.

3.2    Construction. In construing the provisions of this Code, the following shall apply:

(a)    The provisions of this Code, being necessary for the benefit of the Tribe and its members, shall be liberally construed to effectuate its purpose and to promote substantial justice.

(b)    The Findings, Intentions, and Policies stated in Section 1 constitute the standards to be observed by the Authority in the exercise of its discretionary powers under the Code, in the adoption of implementing regulations, in the issuance of orders and declaratory statements, in the examination and supervision of Licensees, and in all matters of construction and application of the Code required for any determination or action by the Authority.

(c)    No Person acting, or who has acted, in good faith reliance upon a rule, order, or declaratory statement issued by the Authority shall be subject to any criminal, civil, or administrative liability for such action, notwithstanding a subsequent decision by a court of competent jurisdiction invalidating the rule, order, or declaratory statement. In the case of an order or a declaratory statement that is not of general application, no Person other than the Person to whom the order or declaratory statement was issued is entitled to rely upon it, except upon material facts or circumstances that are substantially the same as those upon which the order or declaratory statement was based.

(d)    Words of the masculine gender or neuter include masculine and feminine genders and or the neuter.

(e)    Words in the present tense include the future and past tenses.

(f)    Words in the singular number include the plural, and words in the plural number include the singular.

3.3    Severability. If any section of this Code is invalidated by a court of competent jurisdiction, the remaining sections shall not be affected thereby.

JA3074

Tribal Consumer Financial Services Regulatory Code                    Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal
Council Resolution T2014-019; and Tribal Council Resolution T2014-091

3.4     Effective Date.  This Code shall take effect and be in full force and effect from and after the date of its final passage and approval by the Tribal Council.

## SECTION 4. TRIBAL FINANCIAL SERVICES REGULATORY AUTHORITY

4.1     Establishment and Purpose. The Tribal Council hereby charters, creates and establishes the Tribal Financial Services Regulatory Authority as a governmental subdivision of the Tribe. The Authority has charge of the implementation of the Code and regulations of the Tribe relating to consumer financial services activities and associated licensing requirements.

4.2     Location and Place of Business. The Authority may maintain its headquarters, principal place of business and office within the Tribal offices. The Authority may, however, with a majority vote from the Tribal Council, establish other places of business in such other locations as the Authority may from time to time determine to be in the best interest of the Tribe.

4.3     Duration. The Authority shall have perpetual existence and succession in its own name, unless dissolved by the Tribal Council pursuant to Tribal law.

4.4     Attributes. As a governmental subdivision of the Tribe, the Authority is under the direction and control of the Tribal Council, and it is the purpose and intent of the Tribal Council that the operations of the Authority be conducted on behalf of the Tribe for the sole benefit and interests of the Tribe, its members and residents of and visitors to the Tribe's reservation.

(a)     Arm of Tribe. In carrying out its purposes under this Code, the Authority shall function as an arm of the Tribe.

(b)     Tribal Actions.  Notwithstanding any authority delegated to the Authority under this Code, the Tribe reserves to itself the right to bring suit against any Person or entity in its own right, on behalf of the Tribe or on behalf of the Authority whenever the Tribe deems it necessary to protect the sovereignty, rights and interests of the Tribe or the Authority.

4.5     Sovereign Immunity of the Authority.

(a)     Immunity from Suit. The Authority is cloaked by Tribal and federal law with all the privileges and immunities of the Tribe, except as specifically limited by this Code, including sovereign immunity from suit in any tribal, federal or state court.

(b)     No Waiver. Nothing in this Code shall be deemed or construed to be a waiver of sovereign immunity of the Authority from suit, which shall only be waived pursuant to subsection 4.5.

(c)     No Consent to Jurisdiction.  Nothing in this Code shall be deemed or construed to be consent of the Authority to the jurisdiction of the United States or of any state or of any other tribe with regard to the business or affairs of the Authority.

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

(d)    Waiver of Sovereign Immunity of the Authority. Sovereign immunity of the Authority may be waived upon the recommendation of the Authority and only by express resolution of the Tribal Council.

(1)    Resolution Effecting Waiver.  All waivers of sovereign immunity must be preserved with resolutions of continuing force and effect issued by the Tribal Council.

(2)    Policy on Waiver.  Waivers of sovereign immunity are disfavored and shall be granted only when necessary to secure a substantial advantage or benefit to the Authority or the Tribe.

(3)    Limited Nature to Waiver. Waivers of sovereign immunity shall not be general but shall be specific and limited as to duration, grantee, transaction, property or funds, if any, of the Authority subject thereto, and the court having jurisdiction pursuant thereto and law applicable thereto.

(4)    Limited Effect of Waiver. Neither the power to sue and be sued provided in subsection 4.12 herein, nor any express waiver of sovereign immunity by resolution of the Tribal Council shall be deemed a consent to the levy of any judgment, lien or attachment upon property of the Authority other than property specifically pledged or assigned, a consent to suit with respect to any land within the exterior boundaries of the Tribe's reservation, or a consent to the alienation, attachment or encumbrance of any such land.

4.6    Sovereign Immunity of the Tribe. With respect to the existence and activities of the Authority, all inherent sovereign rights of the Tribe as a Federally-recognized Indian Tribe are hereby expressly reserved, including sovereign immunity from suit in any state, Federal or Tribal court. Nothing in this Code nor any action of the Authority shall be deemed or construed to be a waiver of sovereign immunity from suit or counterclaim of the Tribe, a consent of the Tribe to the jurisdiction of the United States, any state or other tribe with regard to the business or affairs of the Authority or the Tribe, a consent of the Tribe to any cause of action, counterclaim, case or controversy, or to the levy of any judgment, lien or attachment upon any property of the Tribe, a consent to suit or counterclaim in respect to any land within the exterior boundaries of the Tribe's reservation, or to be a consent to the alienation, attachment or encumbrance of any such land.

4.7    Assets of the Authority. The Authority shall have only those assets specifically assigned to it by the Tribal Council, acquired in its name by the Tribe, or acquired by the Authority on its own behalf. No activity of the Authority or any indebtedness incurred by it shall implicate or in any way involve any assets of tribal members or the Tribe not assigned in writing to the Authority.

4.8    Regulatory Agent; Compensation, Duties.

(a)    Regulatory Agent; Term of Office. The Authority shall initially be governed by one (1) Agent appointed by the Tribal Council. The Tribal Council may increase the number of Agents by Resolution as it deems necessary to conduct the governmental

Tribal Consumer Financial Services Regulatory Code                    Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal Council Resolution T2014-019; and Tribal Council Resolution T2014-091

operations of the Authority.  The Tribal Council shall determine an Agent's term of office.

(b)     Compensation. The compensation of the Agent shall be established from time to time by the Tribal Council.

(1) Duties.  The Agent shall have the following responsibilities:

(2) Oversee and have responsibility for the day-to-day operations of the Authority, including supervision of Authority employees;

(3)     Serve as the agent for service of process; and

(4)     Conduct or oversee the conduct of any meetings or hearings held by the Authority in accordance with this Code or further directive of the Tribal Council.

(c)     Agent Qualifications.  Any person appointed as an Agent of the Authority shall meet the following qualifications:

(1)     The Agent shall be an enrolled member of the Tribe.

(2)     The Agent shall have expertise, experience, education or a combination thereof in the following areas: financial services, finance, management, business, governmental regulation, law, and/or Tribal policy.

(3)     The Agent shall be at least twenty-one (21) years of age and show proof of High School Diploma or equivalent.

(4)     No person shall serve as Regulatory Agent if:

A.     His/her prior activities, criminal record, if any, or reputation, habits or associations:

i.     Pose a threat to the public interest; or
ii.     Threaten the effective regulation and control of financial services; or

iii.     Enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of financial services.

B.     He/she has been convicted of or entered a plea of no contest to any felony or to a misdemeanor involving breach of trust or dishonesty in any jurisdiction; or

4.9                    He/she, or any member of his or her Immediate Family has an ownership, partnership or other direct monetary or financial interest in the conduct of any Licensee or is in privity with a Financial Services Licensee, Vendor Licensee or one of its agents, contractors, or sub-contractors; or if he or she has any other personal or legal relationship

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

that places him/her in a conflict of interest with any Licensee. For purposes of this subsection, "Immediate Family" includes spouse or significant other, parents, children, and siblings. Ownership of a Licensee by virtue of membership in the Tribe is not a per se monetary or financial interest in the conduct of any Licensee.

    4.10     <u>Meetings.</u>  The Authority shall hold or participate in such meetings with the Tribal Council as are necessary and appropriate.

    4.11   <u>Prohibited Acts.</u>  The Agent and Authority employees shall not do any of the following with respect to any Licensee under the jurisdiction of the Authority:

    (a)    Be indebted, either directly or indirectly, as borrower, accommodation endorser, surety or guarantor to any Licensee unless such indebtedness was contracted before becoming employed by or appointed to the Authority and is fully disclosed to the Authority. Notwithstanding the foregoing, an employee of the Authority other than a Commissioner may become so indebted; provided that, while the debt is outstanding, the borrower shall not participate in any examination of any Licensee conducted by the Authority and the indebtedness is:

        (1)    Incurred on terms no more favorable than those available to the general public, and

        (2)    Fully disclosed to and approved by the Chairperson before funding, including the following information:

            A.    The date of the indebtedness;

            B.    The amount;

            C.    The interest rate; and
            D.    Security.

    (b)    Be an officer, director, or employee of any Licensee.

    (c)    Own or deal in, directly or indirectly, the shares or obligations of any Vendor Licensee.

    (d)    Be interested in, directly or indirectly, or receive from any Licensee or any officer, director, or employee of any Licensee any salary, fee, compensation or other valuable thing by way of gift, donation, credit, or compensation for services or otherwise; except that an Agent or Authority employee is permitted to receive his or her pro-rata share of revenue that has been generated by a Licensee and is distributed among all eligible Tribal members by virtue of membership in the Tribe.

    4.12   <u>Removal of Regulatory Agent / Vacancy.</u>

    (a)    <u>Removal.</u> The Agent may be removed by the Tribal Council for the following reasons: serious inefficiency, neglect of duty, malfeasance, misfeasance, nonfeasance,

**JA3078**

Tribal Consumer Financial Services Regulatory Code                Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal Council Resolution T2014-019; and Tribal Council Resolution T2014-091

misconduct in office, or for any conduct which threatens the honesty and integrity of financial services or the Authority or violates the letter or intent of this Code. The decision of the Tribal Council concerning removal of a Regulatory Agent shall be final.

(b)    <u>Vacancy.</u> If the Regulatory Agent shall die, resign, be removed or for any reason be unable to serve as an Agent, the Tribal Council shall declare his or her position vacant and shall appoint another qualified Tribal member to fill the position within thirty (30) days of the vacancy. The term of office of the person appointed to replace the Agent shall be for the balance of the unexpired term for the position.

4.13    <u>Powers of the Authority.</u> The Authority has the authority and responsibility for the discharge of all duties imposed by law and this Code on the Authority. In furtherance, but not in limitation of, the Authority's purposes and responsibilities, and subject to any restrictions contained in this Code or other applicable law, the Authority shall have, and is authorized to exercise the following powers and responsibilities in addition to all powers already conferred by this Code:

(a)    To promulgate, adopt, and enforce regulations and rules furthering the purpose and provisions of this Code; provided that such regulations shall take effect only upon approval of the Tribal Council.

(b)    To examine or inspect or cause to be examined or inspected each Licensee annually and more frequently if the Authority considers it necessary.

(c)    To make or cause to be made reasonable investigations of any Licensee or Person as it deems necessary to ensure compliance with this Code or any order of the Authority, to determine whether any Licensee or Person has engaged, is engaging or is about to engage in any act, practice or transaction that constitutes an unsafe or unsound practice or violation of this Code or any order of the Authority; or to aid in adopting rules or regulations pursuant to this Code.

(d)    To establish procedures designed to permit detection of any irregularities, fraud, or the like.

(e)    Upon prior explicit resolution and approval of the Tribal Council, to employ such advisors as it may deem necessary. Advisors may include, but are not limited to, lawyers, accountants, law enforcement specialists and financial services professionals.

(f)    To accept, review, approve or disapprove any Application for a License, including conducting or arranging for background investigations of all Applicants.

(g)    To examine under oath, either orally or in writing, in hearings or otherwise, any Licensee or Person, or agent, officer or employee of any Licensee or Person, or any other witness with respect to any matters related to this Code and to compel by subpoena the attendance of witnesses and the production of any books, records, and papers with respect thereto. Upon refusal to appear or produce, the Authority may apply to a court of competent

Tribal Consumer Financial Services Regulatory Code                Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

jurisdiction to compel appearance or production.

(h)      To make, or cause to be made by its agents or employees, an examination or investigation of the place of business, equipment, facilities, tangible personal property and the books, records, papers, vouchers, accounts, documents and financial statements of any Licensee or Person engaging or participating in, or suspected to be engaging or participating in, consumer financial services.

(i)      To discipline any Licensee or Person engaging or participating in consumer financial services in violation of this Code by ordering immediate compliance, issuing fines and sanctions, and suspending or revoking any License pursuant to the hearings and due process required by Section 4.18 of this Code.

(j)      To sue or be sued in courts of competent jurisdiction within the United States and Canada, subject to Section 4.6 herein; provided, that no suit shall be brought by the Authority without the prior explicit written approval of the Tribal Council.

(k)      To arbitrate, compromise, negotiate or settle any dispute to which it is a party relating to the Authority's authorized activities, subject to any approval of the Tribal Council that may be required by the Tribal Council.

(l)      To adopt a schedule of fees to be charged for the processing, issuance and renewal of Licenses, including fees or charges associated with conducting background checks; for reasonable examinations of Licensees; and for services rendered relating to transcripts and the furnishing or certifying of copies of proceedings, files, and records and to impose the forgoing fees as applicable.

(m)      To establish and maintain such bank accounts as may be necessary or convenient.

(n)      To make such findings as may be necessary to implement the Authority's duties and powers, with such findings to be given deference as the legally binding findings of a governmental entity.

4.14      Investigations, Right of Entrance.

(a)      Investigations.  The Authority, upon complaint or upon its own initiative or whenever it may deem it necessary in the performance of its duties or the exercise of its powers, may investigate and examine the operation and premises of any Licensee or Person engaging or suspected to be engaging in consumer financial services within its jurisdiction.

(1)      In undertaking such investigations, the Authority may request the assistance of federal or local law enforcement officials, legal counsel and/or other third parties.

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 47 of 503
Case 3:17-cv-00461-REP    Document 1007-15    Filed 12/23/20    Page 122 of 355 PageID# 34193

Tribal Consumer Financial Services Regulatory Code                    Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal
Council Resolution T2014-019; and Tribal Council Resolution T2014-091

(2)    In conducting such investigation, the Authority shall make no order or final decisions without affording any affected party notice and a hearing pursuant to Section 4.18 of this Code.

(3)    This power to investigate does not authorize the Authority to manage the day-to-day operations of a Licensee or Vendor Licensee.

(b)    <u>Right of Entrance.</u> The Authority and duly authorized employees or agents of the Authority, during regular business hours, may reasonably enter upon any premises of any Licensee, Vendor Licensee, or Person engaging in or suspected to be engaging in Tribal consumer financial services for the purpose of making inspections and examining the accounts, books, papers and documents relating to consumer financial services of any such Licensee, Vendor Licensee, or Person.

(c)    <u>Aid to Entry.</u> The staff of the Licensee, Vendor Licensee, or Person engaging in or suspected to be engaging in Tribal consumer financial services shall facilitate such inspection or examinations by giving every reasonable aid to the Authority and to any properly authorized officer or employee.

4.15    <u>Annual Budget.</u> The Authority shall prepare an annual operating budget for all Authority activities and present it to the Tribal Council no less than thirty (30) days prior to the commencement of each operating year or part thereof.

4.16    <u>Authority Regulations.</u>

(a)    Regulations necessary to carry out the implementation and orderly performance of the Authority's duties and powers shall include, but shall not be limited to, the following:

(1)    The making of findings or other information required by or necessary to implement this Code;

(2)    Interpretation and application of this Code, as may be necessary to enforce the Authority's duties and exercise its powers;

(3)    A regulatory system for overseeing consumer financial services, including accounting, contracting, management and supervision;

(4)    The conduct of inspections, investigations, hearings, enforcement actions and other powers of the Authority authorized by this Code; and

(5)    Specification of the amount and the schedule of applicable Licensing and examination fees that shall be imposed by the Authority.

(b)    No regulation of the Authority shall be of any force or effect unless it is adopted by the Authority by written resolution and subsequently approved by a resolution of the Tribal Council.

4.17   Quarterly Report to the Tribal Council. The Authority shall file a quarterly report with the Tribal Council summarizing reports received from each Licensee and make such comments as it deems necessary to keep the Tribal Council fully informed as to the status of the Authority's activities. The Authority shall define by regulation, subject to the approval of the Tribal Council, the schedule for the submission of such reports.

4.18   Notice and Opportunity to Cure; Due Process; Notice; Hearings; Examiner. The Authority shall provide notice and a reasonable opportunity of at least sixty (60) days to cure when enforcement action of the Authority involves suspension or revocation of a License, for all other enforcement actions a reasonable cure period, as established within the discretion of the Authority, before it initiates any action to utilize any of its enforcement capabilities in the administration of its powers and duties hereunder absent exigent circumstances or other good cause. If the matter is not satisfactorily cured within that period, the Authority shall provide notice and the opportunity for a hearing comporting with notions of due process if it is to utilize any of its enforcement capabilities in the administration of its powers and duties hereunder. If enforcement action is taken based upon a showing of exigent circumstances or good cause, an aggrieved party shall be given an opportunity to object to the enforcement action and the Authority shall provide notice and an opportunity to be heard within fourteen (14) days of the occurrence of such enforcement action.

(a)   No Hearing, Voluntary Resolution.      Whenever it shall appear to the satisfaction of the Authority that all of the interested parties involved in any dispute or concern have agreed concerning the matter at hand, the Authority may dismiss or approve resolution of the issue, as appropriate, without a hearing.

(b)   Notice of Hearing. The Authority shall, within a reasonable length of time after learning of the event giving rise to the concern, provide a written notice setting forth, with specificity, the issues to be resolved and the date and time at which a hearing shall be conducted.

(c)   Hearing.   Except as determined by the Authority, the hearing shall be scheduled to take place no less than ten (10) and no more than thirty (30) business days after the notice of hearing is delivered. At the hearing, the affected parties shall be provided the opportunity to present oral or written testimony to all people interested therein as determined by the Authority.

(d)   Examiner. The Authority's Agent shall act as examiner for the purpose of holding any hearing, or the Agent may appoint an examiner qualified in the law or possessing knowledge or expertise in the subject matter of the hearing for the purpose of conducting any hearing. Any such appointment shall constitute a delegation to such examiner of the powers of the Authority under this Code with respect to any such hearing.

(e)   Decision. The Authority shall issue a written decision to all affected parties

Tribal Consumer Financial Services Regulatory Code                    Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal
Council Resolution T2014-019; and Tribal Council Resolution T2014-091

within thirty (30) days after the hearing.

     (f)    **Administrative Appeal**.  Pursuant to Section 4.18 of the Code affected parties may appeal an Authority decision and order by filing a written petition for review with the Tribal Court within ninety (90) days after the Authority issued its decision and order.

1) A petition for review must include a statement describing the Licensee's complaint, the determination of the Authority and must include the type of relief the consumer is requesting and a copy of the Authority's decision and order.

2) The Licensee must mail a copy of the petition for review and all attachments to the Authority.  The Authority may file a response within fifteen (15) days of receiving the petition for review.  The Authority must forward the record of the proceedings to the Tribal Court within thirty (30) days of receiving the petition for review.

3) An administrative appeal under this Section is not a matter before the Tribal Court as contemplated by LVD Tribal Court Rule 1.006 or an action as contemplated by LVD Tribal Court Rule 2.201.  As such, an administrative appeal is not a suit against the Tribe, does not challenge the Tribe's sovereignty, and cannot be used as a means to circumvent the Tribe's sovereignty.  By allowing an administrative appeal, the Tribe in no way waives its sovereign immunity because an administrative appeal is not a suit against the Tribe.

4) The Tribal Court will schedule oral argument within a reasonable time.

5) Appeal Standards.

    (i)  The Tribal Court shall limit its review to the record below.

    (ii) The Tribal Court shall give deference to the Authority's reasonable interpretation and application of the Code.

    (iii) If the Tribal Court concludes that the Authority's decision and order is arbitrary and capricious, or that it is not supported by the evidence, the Tribal Court may reverse and/or remand the Authority's decision and order.  Mere disagreement with the Authority's factual findings is not a basis for reversal.

    (iv) If the Tribal Court concludes that the Authority's conclusions of law conflict with Tribal law or the Tribal Constitution, the Tribal Court shall reverse and remand the Authority's decision.

6) Within a reasonable time after oral argument, the Tribal Court shall issue an opinion and order.  The Tribal Court's opinion and order may not be appealed.  Upon issuance of the Tribal Court's opinion and order, a consumer's administrative remedies are exhausted

## SECTION 5. LICENSES

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

5.1     Applicability.

(a)     Subject to the exemptions set forth in Section 5.1(b) herein, any Person seeking to engage in consumer financial services subject to this Code or, when applicable, any Vendor seeking to provide services to a Licensee, shall apply for and receive all required licenses prior to engaging in consumer financial services, providing services to a Financial Services Licensee, or being employed by a Financial Services Licensee.

(1)     Every Vendor that receives, or is likely to receive at least Twenty-Five Thousand ($25,000) Dollars in any twelve (12) month period from a Financial Services Licensee in exchange for directly providing origination, processing, or collection services relating to consumer financial services subject to this Code is required to have a current and valid Vendor License as issued by the Authority.

(2)     Every Person employed by a Financial Services Licensee in a position that routinely has substantive interaction with the consumer financial services public, is required to have a current and valid Employee License issued by the Authority.

(b)     The following Persons are not required to obtain a License to aid a Financial Services Licensee in the provision of consumer financial services; however, said Persons are not otherwise exempt from any other provision or application of this Code:

(1)     A Person or Vendor who engages in consumer financial services without charging or collecting interest or other consideration for a transaction or charges or collects nominal or incidental consideration.

(2)     A Person or Vendor who is a bank, savings bank, or savings and loan association organized under the laws of the United States.

(3)     A Person or Vendor who provides financial services to a Licensee and who is licensed, registered, or otherwise subject to the regulatory supervision and oversight of an agency of the United States in order to engage in such financial services.

(4)     A or Vendor Person licensed or otherwise authorized to engage in payment processing, money transmission, tax preparation, or the practice of law.

(5)     Any Person or Vendor providing solely pre-origination services including but not limited to credit bureaus, lead generators, marketing companies or similar third-party service providers to a Licensee.

(c)     A License is a revocable privilege to do business within the jurisdiction of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

5.2     Application Procedure.

**JA3084**

Tribal Consumer Financial Services Regulatory Code                    Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal Council Resolution T2014-019; and Tribal Council Resolution T2014-091

(a)     <u>Submission to Authority</u>.  An Applicant seeking a License shall submit an Application to the Authority on such form as the Authority may require.

(b)     <u>Application Contents</u>.  At a minimum, the Application shall contain the following information:

(1)     For Applicants that are other than natural persons, each of the Applicant's owners, officers and/or directors; and principal management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager;

(2)     Each of its owners or partners, if an unincorporated business;

(3)     Each of its shareholders who own more than ten (10) percent of the shares of the corporation;

(4)     For each person listed in sub-Sections 5.1(a) above, and for all Applicants that are natural persons, an Application for a Financial Services License, Vendor Licensee, or Employee License shall include each person's criminal and civil record, if any, and an explanation of any crimes for which he has been convicted or civil suits in which a judgment has been entered against him or to which he has entered a plea of no contest in any jurisdiction and a complete disclosure of any pending or anticipated civil or criminal action in any jurisdiction against the Applicant. The Applicant shall provide written permission giving the Authority or its designees the right to the Applicant's background, including his criminal record;

(5)     An Applicant for an Employee License shall provide all necessary information and written permission for the Authority or its designee to obtain the Applicant's credit history and/or credit score;

(6)     A list of all consumer financial services-related licenses the Applicant has ever applied to the Authority for, whether or not such licenses were issued;

(7)     The disclosure of whether there is a previous contractual relationship with an Indian tribe; and

(8)     A sworn statement that if the License applied for is issued, the Applicant will submit to the jurisdiction of the Tribe; the Applicant will abide by all applicable Tribal and Federal laws, regulations and policies; and the information contained in the Application is true and correct to the best of Applicant's knowledge.

(c)     Each Application shall be accompanied by an application fee, the amount of which shall be set by the Authority.

5.3     <u>Review, Issuance and Denial, Term.</u>

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

    (a)    <u>Consumer Financial Services License.</u> A consumer financial services License shall automatically issue if the following criteria are met:

    (1)    The Applicant complied with the provisions of Section 5.2;

    (2)    No owner, partner, officer and/or director; or principal management employee of the Applicant or a shareholder who owns more than ten percent (10%) of the shares of Applicant has been, in any jurisdiction, charged with a felony or any other crime involving breach of trust or dishonesty; been convicted or entered a plea of no contest of any felony or any other crime involving breach of trust or dishonesty; had an order entered against it by an administrative agency based on conduct that involved fraud, deceit or misrepresentation by the Applicant; or had a financial judgment ordered against it in a civil action based on fraud, deceit or misrepresentation;

    (3)    The consumer financial services are authorized pursuant to this Code;

    (4)    The consumer financial services are authorized by a Tribal Council Resolution; and

    (5)    The Tribe has the sole ownership interest in the Tribal enterprise that provides the consumer financial services.

    (b)    <u>Vendor License, Employee License.</u> Upon compliance with Section 5.2, the Authority shall review the qualifications of the Applicant sufficient to make a determination of eligibility as required under this Code.

    (c)    <u>Issuance.</u> Upon completion of any necessary background investigation, the Authority may issue a License on a conditional or unconditional basis. The Authority shall have the final word on whether to license an Applicant. Nothing herein creates a property right in the License. The Authority may in its discretion grant a temporary License after submission of a completed application and a preliminary determination of suitability by the Authority.

    (d)    <u>Denial.</u> The Authority, when it does not license an Applicant shall notify the Applicant in writing, provide the basis for the denial of the License, and otherwise comply with the procedural requirements of section 4.18 of this Code.

    (e)    <u>Term</u>. Any License issued pursuant to this section shall be effective for a period of two (2) years from the date of issuance. A temporary License may be issued for such period of time as determined by the Authority, but not to exceed sixty (60) days, with a possible sixty-(60)-day renewal for cause.

    (f)    <u>License Substance and Classification.</u> The License shall bear on its face the name of the Licensee, the Tribal Logo, the issue date, the license number, and the applicable classification of the License. Subject to this Code, the Authority may issue Licenses that

Tribal Consumer Financial Services Regulatory Code                     Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal Council Resolution T2014-019; and Tribal Council Resolution T2014-091

authorize a Licensee to provide all types of consumer financial services under this Code or a limited-purpose License that only authorizes certain types of consumer financial services under this Code.  Each License shall specify its scope.

(g)      Record Retention.  The Authority shall maintain the Applicant's file, including applications, background investigation reports, and eligibility determination reports for no less than three (3) years from the date of termination of the relationship with Applicant.

5.4      License Denial, Suspension or Revocation of License.

(a)      Denial; Temporary Suspension or Revocation.  The Authority shall not unreasonably withhold issuance or renewal of a License. The Authority may deny a License or suspend or revoke a License, after notice and an opportunity for a hearing pursuant to Section 4.18 herein, if the Authority finds that an Applicant or Licensee:

(1)      Failed to pay initial Application or renewal fees;

(2)      Made a material misstatement or omission on the Application or on any document required to be filed with the Authority; Withheld or provided incomplete or insufficient pertinent information;

(3)      Is not a Person of honesty, truthfulness or good character;

(4)      Violated or aided, abetted, or conspired with another Licensee or Person or knowingly or knowingly caused any Licensee or Person to or otherwise participated in violate this Code or the rules and regulations of the Authority;

(5)      Participated in consumer financial services that was not authorized by this Code;

(6)      Knowingly falsified books or records that relate to a transaction connected with the operation of consumer financial services;

(7)      Failed to keep sufficient books and records to substantiate receipts, disbursements, and expenses incurred or paid by a Licensee authorized pursuant to this Code or to substantiate, by the Authority, compliance with this Code;

(8)      Failed to take reasonable measures to ensure that an agreement with a consumer is not materially breached;

(9)      Is insolvent;

(10)      Is charged in any jurisdiction with a felony or any other crime involving breach of trust or dishonesty, so long as any temporary suspension is removed if the charges are subsequently dismissed;

(11)      Has been convicted or has entered a plea of no contest in any jurisdiction of any felony or any other crime involving breach of trust or dishonesty;

(12)      Has had an order entered against it by an administrative agency of any

**JA3087**

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

jurisdiction and the order is based on conduct that involved fraud, deceit or misrepresentation by the Applicant or Licensee and it entered after notice and an opportunity to be heard;

(13)    When the Licensee is a Licensee or Licensee Applicant, has had a financial judgment ordered against it in a civil action based on fraud, deceit or misrepresentation;

(14)    Employed any Person in a consumer financial services business whom the Licensee knew or should have known was convicted of fraud, theft, or embezzlement;

(15)    Refused to comply with any lawful order, inquiry or directive of the Authority or the Tribal Council;

(16)    Attempted to bribe or offer something of value to any Person, Tribal Council member, or a Commissioner in an attempt to avoid or circumvent Tribal law;

(17)    Stole or attempted to steal funds or other items of value from the Authority or the Tribe;

(18)    Poses a threat to the public interest or the effective regulation of Tribal consumer financial services;

(19)    Creates or enhances the danger of unsuitable, unfair or illegal practices and methods and activities in the conduct of Tribal consumer financial services;

(20)    Was a former Licensee pursuant to this Code whose License was suspended or revoked and not subsequently reinstated; or

(21)    Has demonstrated an inability to manage the Applicant's personal or business finances or demonstrates a sufficient indebtedness in relation to income so as to cause concern for the Applicant's ability to fulfill its responsibilities under this Code.

(b)    <u>Acts of Controlling Persons.</u> It is sufficient cause for denial, suspension or revocation of a License if an officer, director, partner, employee or controlling person of the Licensee or Applicant acted or failed to act in a manner that if the Licensee or Applicant acted or failed to act in that manner would be cause for denial, suspension or revocation of the License. For purposes of this Subsection, "controlling person" means a person who owns more than twenty-five percent (25%) equity interest in the Licensee or who has the ability to affect one or more significant business decisions of the Licensee or Applicant

(c)    Procedure for Suspension or Revocation.

(1)    Upon reasonable basis for belief that a violation of the Code has occurred, the Authority or its designee may either undertake an investigation of the Licensee, or

Tribal Consumer Financial Services Regulatory Code                 Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal
Council Resolution T2014-019; and Tribal Council Resolution T2014-091

serve upon such Licensee an order to show cause why the Licensee's License should not be suspended or revoked, or why the Licensee should not be enjoined from conducting consumer financial services under this Code.

(2)     Such notice shall state the reason for the suspension and/or order, and the time and place for the hearing before the Authority pursuant to Section 4.18 herein.

(3)     The Licensee shall have an opportunity to present testimony and cross-examine opposing witnesses, and to present any other evidence as to why a suspension, revocation order or injunction should not be issued.

(4)     The hearing shall be governed in all respects in accordance with Tribal law and Authority regulations. Any suspension or revocation decision of the Authority after hearing may be appealed in accordance with the provisions of Section 4.18.

5.5     Renewal.

(a)     Renewals. A Licensee shall petition to have the License renewed by applying to the Authority for a renewal before the License expires. Applicants may be required to provide updated material as requested.

(b)     Non-renewal. The Authority may deny renewal of a License or suspend or revoke a license with prior written notice to Licensee if the Authority finds the existence of any circumstance listed in section 5.4(a) above, or that any other fact or condition exists that, if it had existed at the time of the original application for the License, would have warranted the Authority to refuse to issue the License.

5.6     Voluntary Surrender of License. Any Licensee registered pursuant to this Code may voluntarily surrender its License at any time by giving written notice of the surrender to the Authority.

5.7     Assignment or Transfer. A License is not salable, lendable, transferable or assignable and control of a License shall not be acquired through any stock purchase or other devise without the prior written consent of the Authority. The Authority shall not give consent if the Authority finds that the acquiring Person does not meet the qualifications described in this Code. For the purposes of this Subsection, "control means the power to vote more than twenty-five percent (25%) of the outstanding voting shares of a licensed corporation, partnership, association or trust.

5.8     Deposits of Fees and Assessments. Application fees, renewal fees, late payment penalties, civil penalties, administrative fines and other fees or penalties provided for in this Code shall in all cases be paid directly to the Authority. The Authority shall deposit such proceeds into an account or fund designated by the Tribal Council.

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

## SECTION 6. LICENSEES

6.1    Compliance. Licensees shall at all times comply with the provisions of this Code, rules and regulations promulgated pursuant to this Code, and all other applicable Tribal, and federal laws as applicable.

6.2    Federal Consumer Protection Laws.    A Licensee shall conduct business in a manner consistent with principles of federal consumer protection law, including, without limitation, the following, as applicable: Truth in Lending Act, 15 U.S.C. § 1601 et seq., and related regulations at 12 C.F.R. Part 226; Consumer Leasing Act, 15 U.S.C. §§ 1667 et seq., and related regulations at 12 C.F.R. Part 213; Fair Credit Billing Act, 15 U.S.C. § 1666a; Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., and related regulations at 15 C.F.R. Part 202; Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq., and related regulations at 12 C.F.R. Part 205; Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. and related regulations at 12 C.F.R. Part 222); privacy provisions of Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 et seq., and related regulations at 16 C.F.R. Part 313 and 16 C.F.R. Part 314; Fair Debt Collection Practices Act , 15 U.S.C. § 1692 et seq., and related regulations at 16 C.F.R. Part 901; Talent Amendment, 10 U.S.C § 987, and related regulations of the Department of Defense at 32 C.F.R. part 232; and Servicemembers' Civil Relief Act, 50 U.S.C. App. §§ 501-596.  Notwithstanding the above, the Authority has in no way waived any defenses or position related to the applicability of the above laws to the Tribe or any Financial Services Licensee.

6.3    Prohibited Acts by Licensees.

(a)    A Person shall not engage in the business of consumer financial services subject to this Code without first obtaining a License pursuant to this Code. A separate License is not required for each location that the Financial Services Licensee operates and deals in person with the consumers, but each location must be approved in advance by the Authority. The Financial Services Licensee shall post its License issued pursuant to this Code at each location or, if the location is a website, said License shall be posted electronically on each website. For purposes of this Section 6.3, the term "location" or "a location" includes a website maintained for the purpose of participating in consumer financial services pursuant to this Code.

(b)    A Licensee shall not:

(1)    Engage in any Tribal consumer financial services other than those allowed under this Code.

(2)    Assess any interest, fee, or charge that is greater than any applicable limitation, if any, prescribed in this Code.

(3)    Use or cause to be published or disseminated any advertisement that contains false, misleading or deceptive statements or representations.

Tribal Consumer Financial Services Regulatory Code                 Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal Council Resolution T2014-019; and Tribal Council Resolution T2014-091

(4)    Engage in unfair, deceptive or fraudulent practices.

6.4    <u>Minimum Internal Control Systems.</u> Each Financial Services Licensee and Vendor Licensee shall maintain a system of minimum internal control systems as specified by regulation promulgated by the Authority.

6.5    <u>Books, Accounts and Records, Examinations, Costs.</u>

(a)    A Financial Services Licensee and Vendor Licensee shall maintain all books, accounts and records that the Authority reasonably requires.  Each Financial Services License and Vendor Licensee shall:

(1)    Ensure that the books, accounts and records are sufficiently detailed to comply with the Code and all applicable Tribal and federal laws.

(2)    Maintain the books, accounts and records separately from any other business in which the Licensee is engaged and shall retain the books, accounts and records for at least three years.

(b)    The Authority may examine or cause to be examined each Financial Services and Vendor Licensee annually and more frequently if the Authority considers it necessary. In conducting such examination, the Authority or its agent may examine the books, accounts and records to determine if the Licensee has complied with this Code and any implementing regulations adopted pursuant to this Code. The Licensee shall pay the cost of the examination as may be required by the Authority in accordance with its regulations. In connection with the foregoing, the Authority may include direct examination of a Financial Services Licensee or Vendor Licensee.

6.6    <u>Reports.</u>

(a)    <u>Annual Reports.</u> Every Financial Services Licensee and Vendor Licensee shall file an initial  report with the Authority containing the information below in 6.6(a) in a time and manner specified by the Authority and thereafter annually at the end of each calendar year if changes are made to said information. Each report shall contain information specified by the Authority sufficient for the Authority to determine compliance with this Code including, at a minimum, the following:

(1)    The name, address and telephone number of the Licensee;

(2)    The name, address and title of the principal employee of the Licensee;

(3)    A sworn statement that the Licensee has complied and will continue to comply with all applicable Tribal and federal laws applicable to consumer financial services; and

(4)    The name, address and signature of the agent who will accept service of

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

process on behalf of the Licensee.

(b)    Monthly Reports.    Every Financial Services Licensee shall file a monthly report with the Authority in a time and manner specified by the Authority. Each report shall contain information specified by the Authority sufficient for the Authority to determine compliance with this Code. The report shall include, at a minimum, the following information:

(1)    The name, address and telephone number of the Licensee;

(2)    The names, addresses and titles of all of the current managers of the Licensee;

(3)    A description of the consumer financial services conducted, its Gross Revenue from the consumer financial services operation, the number of consumers served, a summary of any consumer complaints and other problems experienced by the Financial Services Licensee, and a description of any substantive changes in management personnel or practices related to the consumer financial services;

(4)    The number of full-time equivalent people, on an annualized basis, employed by the operation during the past twelve (12) months, together with a projection of the number of full-time equivalent people who are expected to be employed during the next license period;

(5)    A sworn statement that the Licensee, to the best of its knowledge, has complied and will continue to comply with all Tribal and federal laws applicable to consumer financial services;

(6)    The name, address and signature of the agent who will accept service of process on behalf of the Licensee; and

(7)    The name and address of the individual appointed by the Financial Services Licensee to perform or oversee the Financial Services Licensee's compliance function.

6.7    Audit requirements. Each Financial Services Licensee, or Vendor Licensee, with the exception of those Vendor Licensees who solely provide funds to a Financial Services Licensee for the operation of the business, shall provide to the Authority annually a copy of an independent audit designed to reflect compliance with applicable law, including such information and in a format required by the Authority.

6.8    Public Notice. Each Financial Services Licensee shall have a copy of this Code and any implementing regulations readily available for inspection by any person at each authorized consumer financial services site.

## SECTION 7. AUTHORIZED CONSUMER FINANCIAL SERVICES TRANSACTIONS

USCA4 Appeal: 21-2116 Doc: 26-6 Filed: 02/07/2022 Pg: 59 of 503

Tribal Consumer Financial Services Regulatory Code                  Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal
Council Resolution T2014-019; and Tribal Council Resolution T2014-091

7.1     General Authority. Subject to this Code, a Licensee may engage in the business of providing Tribal consumer financial services as provided in this Code according to the applicable License classification.

7.2     General Terms, Conditions, and Practices.

(a)     Preservation of Tribal sovereign immunity and exclusive jurisdiction. The consumer must be provided a notice in a form approved by the Authority regarding preservation of tribal sovereign immunity and exclusive jurisdiction and a consumer's limited and exclusive rights to submit complaints to a Tribal dispute resolution process in accordance with this Code and regulations of the Authority. The notice may be contained within the consumer credit agreement and need not be provided separately.

(b)     Fees and charges. Except as otherwise specified in this Code, a consumer financial services transaction may provide for such price, interest, time price differential, rent, fees, filing fees, and other charges as agreed upon by the parties.

(c)     Attorneys' fees and Costs. A consumer financial services licensee may provide for payment by the consumer of any reasonable expenses incurred by the Licensee in connection with origination, servicing, protecting, collecting or enforcing any transaction, or any rights with respect to property or security for the transaction, including, without limitation, attorneys' fees and reasonable costs to insure, recover, store, or fix-up, or dispose of any property or security.

(d)     No oral agreements. A consumer financial services transaction may provide that it represents the entire agreement of the parties and may not be contradicted by evidence of prior or contemporaneous oral agreements of the parties. Such provisions are enforceable and disallow evidence of prior or contemporaneous oral agreements.

(e)     Late charges. A consumer financial services transaction may provide for a late payment charge of the amount equal to the greater of 5% of the payment amount or $30.00 whichever is greater.

(f)     Dishonor item fees. A consumer financial services transaction may provide that, on return of a payment device to a holder of a consumer financial services obligation following dishonor of the payment device, the holder, the holder's assignee, agent, or representative, or any other person retained by the holder to seek collection of the dishonored payment device, may charge the drawer or endorser a reasonable processing fee of not more than fifty dollars ($50). For purposes of this section, "payment device" means any check, item, paper or electronic payment, or other payment device used as a medium for payment.

(g)     Enforcement of Licensee's rights and remedies. In any proceeding in which a Licensee is a party in interest with respect to any transactions with a consumer under this Code, the Licensee's rights and remedies shall be granted based upon prima facie proof and entitlement based upon the terms of the written transaction documents and the payment and

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

business records maintained by the Licensee in the ordinary course of business. The consumer may only defend on the basis of payment. Except for payment, any claims or defenses whatsoever asserted by or on behalf of a consumer shall be subject to the sole and exclusive jurisdiction of the Tribal Dispute Resolution Procedure under this Code.

## SECTION 8. ENFORCEMENT

8.1    Jurisdiction. Except as provided otherwise in this Code, the Authority shall have jurisdiction over all violations of this Code.

8.2    Guidelines. In imposing any administrative remedy or civil penalty provided for in this Code, the Authority shall take into account the appropriateness of the remedy or penalty with respect to the size of the financial resources and good faith of the Financial Services Licensee or Vendor Licensee charged, the extent to which the violation was intentional, the gravity of the violation, the history or previous violations, and such other matters as justice may require.

8.3    Civil Violations. Any Financial Services Licensee or Vendor Licensee who violates or fails to comply with any provision of this Code or who fails or neglects to comply with any final order of the Authority may be charged with a violation and given due process pursuant to Section 4.18 herein. If the Financial Services Licensee or Vendor Licensee is found to have committed a violation, he/it may be required to pay a civil fine to the Authority not to exceed Five Thousand Dollars ($5,000) for each violation. Each day during which any such violation or failure to comply continues may be treated as a separate violation of this Code, but not to exceed $100,000. A violation or series of violations related to the same act or omission may be treated as one violation.

(a)    A Financial Services Licensee, Vendor Licensee, or Employee Licensee found responsible for a material violation pursuant to this Section may also be subject to revocation of the Licensee's License.

(b)    If an officer or agent of a Licensee knowingly or recklessly participates in a material violation of this Code, then the Authority may immediately revoke the License of the Licensee thereby terminating said relationship. .

8.4    Cumulative Fines. All civil fines accruing under this Code shall be cumulative and a suit for the recovery of one fine shall not bar or affect the recovery of any other fine, or judgment, penalty, forfeiture or damages nor bar the power of a court of competent jurisdiction to enter an order of contempt, nor bar any criminal prosecution against any officer, director, agent, or employee of any Licensee, or any other Person.

8.5    Purpose of Civil Penalties. The civil fines imposed under this Code are intended to be remedial and not punitive and are designed to compensate the Tribe for the damage done to the peace, security, economy and general welfare of the Tribe, and to compensate the Tribe for costs incurred by the Tribe in enforcing this Code. The civil fines under this Code are also

Tribal Consumer Financial Services Regulatory Code                    Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal
Council Resolution T2014-019; and Tribal Council Resolution T2014-091

intended to coerce all people into complying with this Code and Authority regulations and not to punish such people for violation of such laws and regulations.

       8.6    <u>Civil Action for Penalties.</u> In enforcing the civil infraction provisions of this Code, the Authority may proceed, in the name of the Tribe against a Person for violation of such provision by civil complaint in a court of competent jurisdiction pursuant to the provisions of this Code.

       8.7    <u>Seizure and Forfeiture of Property.</u> Property of a Licensee utilized in violation of this Code shall be subject to seizure and forfeiture by order of the Authority pursuant to such implementing regulations as the Authority shall promulgate.

## SECTION 9. RESOLVING BORROWER DISPUTES

       9.1    <u>General Principles.</u> The Tribe values its customers and intends, at all times, to see that questions, concerns, issues, and/or complaints raised by consumer borrowers are addressed in a fair and orderly manner. However, nothing in this Section shall be construed as a waiver of the Tribe's, the Authority's, a Financial Services Licensee's, its managers', or its employees' sovereign immunity or any of the rights and privileges attendant thereto.

       9.2    <u>Informal Dispute Resolution Procedure.</u>

       (a) Consumers who are aggrieved by an action or inaction of a Licensee may raise the complaint with the Financial Services Licensee in writing pursuant to the terms of the consumer's loan agreement.

       (b) Upon receipt of a written complaint the Financial Services Licensee must expediently gather sufficient facts to make a determination about the complaint. The Financial Services Licensee must respond to the consumer in writing with its determination as soon as is reasonably practicable. If the Financial Service Licensee fails to respond to a written complaint within thirty (30) days, a consumer may choose to initiate the Formal Dispute Resolution process in Section 9.3. Such a failure to respond may subject the Financial Services Licensee to fines as determined by the Authority to be reasonable under the circumstances which shall equal the outstanding principal loan amount of the consumer or $1,500.00, whichever is greater. The Financial Services Licensee may not appeal the Authority's decision to fine or otherwise penalize a Licensee's failure to respond within the timeframes in this subsection.

       (c) The Financial Services Licensee must retain all records of all consumer complaints in accordance with applicable law. Electronic storage of consumer complaint records is acceptable.

       9.3    <u>Formal Dispute Resolution Procedure.</u>

       (a) Consumers who have followed the informal dispute resolution procedure described in Section 9.2 and who are dissatisfied with a Financial Services Licensee's determination may request an administrative review by the Authority of the Financial Services Licensee's determination of compliance with the Code by submitting a written request to the Authority

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

within ninety (90) days of the Financial Services Licensee's determination.  The Consumer's
written request must include the following information:

i.    The consumer's full name, as it appears on the consumer's loan contract, as well as the
      consumer's address, email address, and phone number.

ii.   A copy of the consumer's loan agreement, or otherwise identify the loan agreement.

iii.  A copy of the Licensee's determination.

iv.   A written request that summarizes with specificity the events and circumstances
      giving rise to the alleged wrongful action or inaction of the Financial Services
      Licensee and the relief requested.

v.    A statement requesting an administrative review hearing before the Authority.  If a
      hearing is requested, the consumer must indicate whether he will appear personally or
      if he would prefer to appear by telephone.  The consumer must also indicate whether
      he will be represented by an attorney or if he will represent himself.

vi.   Any other information the consumer feels may be relevant to the complaint or that
      may assist the Authority evaluate the complaint.

(b) The Authority may investigate the dispute in any manner it chooses, and may request
a written response to the complaint from the Financial Services Licensee.  The Authority may
also request additional documentation or information from the consumer or Licensee, conduct
interviews as needed, require sworn statements, or take other action necessary or advisable to
make its determination.  A failure to respond to a request by the Authority may result in a default
pursuant to Section 9.3(h).

(c) Either before or after the Authority makes its own inquiries, the Authority may grant a
written request for an administrative review hearing to resolve a consumer's complaint.   At a
hearing, a consumer may be represented by legal counsel at the consumer's own expense. The
administrative review hearing will occur within sixty (60) days after the Authority receives the
consumer's written request.  The Authority will send notice to the consumer and Licensee when
a request for a hearing is granted or denied.

(d)   When an administrative review hearing is granted, the Authority may schedule a
prehearing conference with the interested parties to discuss such matters as motions, discovery,
witnesses, exhibits, and any other procedural matters the Authority deems necessary or
advisable.   Following a prehearing conference, the Authority will issue a case management
order.  If the parties agree a prehearing conference is unnecessary, the parties may file a signed
stipulated proposed case management order before the scheduled date of a prehearing
conference.

(e) Hearing Procedure.

i.    Every contested case hearing will be before the Authority.  The Authority may
      designate one agent as the Presiding Officer, who will conduct the hearing, administer

Tribal Consumer Financial Services Regulatory Code                Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal Council Resolution T2014-019; and Tribal Council Resolution T2014-091

oaths, admit or refuse evidence, and control any other aspect of the hearing he deems necessary.

ii.   A Financial Services Licensee may appear and be represented by someone knowledgeable and capable of testifying about the consumer's complaint.

iii.  A Financial Services Licensee must provide the Licensee's records pertaining to the consumer.

iv.   The parties may make opening and closing statements, call witnesses and provide physical evidence.  The Authority will administer an oath to any witness and the witness must confirm the testimony will be truthful.  All physical evidence will be admitted and considered as long as it is the type of evidence a reasonable person would find relevant to the consumer's complaints.  Objections to evidence will be noted on the record.  No Authority agent may be called to testify.

v.    The Authority may request the parties submit post-hearing briefs or evidence.

vi.   Hearings will be recorded by the Authority.  The recording and all physical evidence will constitute the record.  The Authority is responsible to preserve all hearing records for six (6) years after the Authority's decision is issued.

(f) Within a reasonable time after an administrative review hearing, the Authority will issue a written decision and order that will include its factual findings and conclusions of law. Factual findings may be based on the Authority's investigation as well as the testimony and evidence presented by the parties.  The Authority will mail a copy of the decision and order to all parties.  The Authority may grant or deny any relief as the Authority determines appropriate. The decision and order must inform the consumer of the opportunity to appeal the Authority's decision and order pursuant to Section 9.4.

(g) A consumer or Financial Services Licensee may request a rehearing within thirty (30) days after the Authority issues a decision and order.  A request for a rehearing must provide a justifiable reason for a rehearing.  The Authority may grant or deny a request for a rehearing at its discretion.

(h) On its own or upon request, the Authority may issue a default decision under any of the following circumstances:

i.    a party fails to comply with the Authority's investigatory requests;

ii.   a Financial Services Licensee fails to answer a consumer's complaint; or

iii.  a party fails to appear at a prehearing conference or hearing.

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

A default and default judgment may not be set aside but may be appealed pursuant to Section 9.4.

(i) No attorney fees or costs incurred may be awarded.

9.4    <u>Administrative Appellate Procedure.</u>

(a) A consumer may appeal an Authority decision and order by filing a written petition for review with the Tribal Court within ninety (90) days after the Authority issued its decision and order.

(b) A petition for review must include a statement describing the consumer's complaint, the Financial Services Licensee's determination at the contested case hearing, and must include the type of relief the consumer is requesting and include a copy of the Authority's decision and order.

(c) The consumer must mail a copy of the petition for review and all attachments to the Financial Services Licensee and to the Authority.  The Financial Services Licensee may file a response within fifteen (15) days of receiving the petition for review.  The Authority must forward the record of the proceedings to the Tribal Court within thirty (30) days of receiving the petition for review

(d) An administrative appeal under this Section is not a matter before the Tribal Court as contemplated by LVD Tribal Court Rule 1.006 or an action as contemplated by LVD Tribal Court Rule 2.201.  As such, an administrative appeal is not a suit against the Tribe, does not challenge the Tribe's sovereignty, and cannot be used as a means to circumvent the Tribe's sovereignty.  By allowing an administrative appeal, the Tribe in no way waives its sovereign immunity because an administrative appeal is not a suit against the Tribe.

(e)  The Tribal Court will schedule oral argument within a reasonable time.

(f) Appeal Standards.

i.    The Tribal Court shall limit its review to the record created pursuant to Section 9.

ii.    The Tribal Court shall give deference to the Authority's reasonable interpretation and application of the Code.

iii.    If the Tribal Court concludes that the Authority's decision and order is arbitrary and capricious, or that it is not supported by the evidence, the Tribal Court may reverse and/or remand the Authority's decision and order.  Mere disagreement with the Authority's factual findings is not a basis for reversal.

iv.    If the Tribal Court concludes that the Authority's conclusions of law conflict with Tribal law or the Tribal Constitution, the Tribal Court shall reverse and remand the Authority's decision.

(g) Within a reasonable time after oral argument, the Tribal Court shall issue an opinion and order.  The Tribal Court's opinion and order may not be appealed.  Upon issuance of the Tribal Court's opinion and order, a consumer's administrative remedies are exhausted.

Tribal Consumer Financial Services Regulatory Code                    Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal Council Resolution T2014-019; and Tribal Council Resolution T2014-091

## SECTION 10. SECURED TRANSACTIONS WITH RESPECT TO TRIBAL CONSUMER FINANCIAL SERVICES

10.1    Adoption by Reference.    The Tribe adopts and incorporates by reference Article 9 of the Michigan Uniform Commercial Code, MCL §440.9001 *et seq*., as it may be amended from time to time (the "Michigan UCC9"), but subject to the exceptions and qualifications provided in this Code. In the event of any conflict between this Code and Michigan UCC9, this Code shall control.  This Section 10 may be referred to as the "Tribal UCC9."

10.2    References.  All references to the State of Michigan in the Michigan UCC 9 shall mean the Tribe for purposes of this Code.  Any references to sections in the Michigan UCC 9 may be referenced for purposes of this Code with the prefix 10 instead of 440. For example, Section 404.9101 of the Michigan UCC may be cited as Section 10.9101 of this Code.

10.3    Characterization of transactions.    Any characterization in this Code of a transaction as a sale, lease, pawn, or other transaction shall control over any contrary provision in the Tribal UCC9.

10.4    Exceptions.    The Tribe's adoption of the Michigan UCC9 is subject to the exceptions and comments listed in Appendix 1 to this Code.

10.5    Preservation of Sovereign Immunity and Exclusive Jurisdiction. Nothing in the Section or the Michigan UCC9 as adopted in this Section shall be construed: (a) as a waiver of the Tribe's sovereign immunity or exclusive jurisdiction, including, but not limited to the immunity of its entities, agents, officers, employees, or elected officials; or (b) to grant jurisdiction to any other governmental agency or entity other than the Tribe.

## SECTION 11.SMALL LOAN TRANSACTIONS

11.1    Applicability.  This Section applies to Small Loan Transactions.

11.2    Regulations. The Authority is authorized to adopt regulations with respect to Small Loan Transactions. Any Financial Services Licensee, Vendor Licensee, or Employee Licensee must comply with any regulations adopted by the Authority.

11.3.    Small Loan Transactions amounts, finance charges and other requirements.

(a) Transaction amount. A Financial Services Licensee may issue Small Loan Transactions in an amount of at least fifty dollars ($50.00) but not more than five thousand dollars ($5,000.00), excluding the finance charges, fees and other charges permitted in this Code.

(b) Finance Charge. A Financial Services Licensee may not enter into a Small Loan Transaction with a consumer in which the scheduled finance charges exceed fifty dollars ($50.00) per one hundred dollars ($100.00) of principal per installment period. The finance charge may be calculated, earned and

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

scheduled for payment as agreed by the parties as long as the finance charges as originally scheduled for payment do not exceed the maximum allowable amount set forth above.

(c) Number of transactions at one time. A Licensee may enter into no more than three internet-based Small Loan Transactions with any consumer at any time.

(d) Duration. A Licensee may not provide Small Loan Transactions for a term of less than three (3) days or more than forty-eight (48) months.

11.4.   Reserved.

## SECTION 12. VEHICLE TRANSACTIONS

12.1   Applicability.  This Section applies to Vehicle Transactions.

12.2   Vehicle Transactions amounts; interest; fees; and other requirements.

(a) Transaction amount. A Financial Services Licensee may provide a Vehicle Transaction in an amount of not more than twenty thousand dollars ($20,000.00), excluding the interest and fees permitted in this Code.

(b) Maximum interest rate. A Financial Services Licensee shall not charge a rate of interest on a Vehicle Transaction greater than three hundred ninety percent (390%) simple interest per annum.

(c) Processing fee. A Financial Services Licensee may charge a processing fee of up to one hundred and twenty-five dollars ($125.00). This fee does not constitute interest.

(d) Number of transactions at one time. A Licensee may enter into no more than three Vehicle Transactions with any consumer at any time.

(e) Duration. Vehicle Transactions shall not exceed thirty six (36) months in duration.

12.3   Regulations.  The Authority is authorized to adopt regulations with respect to Vehicle Transactions in accordance with this Section. Any Financial Services Licensee, Vendor Licensee, or Employee Licensee must comply with any regulations adopted by the Authority.

12.4   Types of Vehicle Transactions.

(a)   Title Pawns. A Licensee may engage in vehicle pawn transactions in which a loan is made upon the pledge of a motor vehicle or a motor vehicle certificate of title. It is not required that the Licensee hold possession of the motor vehicle in order to

constitute a valid vehicle pawn transaction provided the Licensee holds possession of the certificate of title to the motor vehicle. For purposes of this Section, a "Vehicle Pawn Transaction" means any loan on the security of a pledged motor vehicle or any purchase of a pledged motor vehicle on the condition that the pledged goods may be redeemed or repurchased by the consumer pledgor or seller for a fixed price within a fixed period of time. The term does not include a Vehicle- Secured Loan or a Vehicle Sale-Leaseback Transaction. Unless otherwise agreed, a Licensee in a Vehicle Pawn Transaction has upon default the right to take possession of the motor vehicle. In taking possession, the Licensee or its agent may proceed without judicial process if this can be done without breach of the peace or may proceed by action. A pledgor shall have no obligation to redeem the pledged motor vehicle or make any payment on a Vehicle Pawn Transaction. A Vehicle Pawn Transaction not redeemed by the pledgor within the time specified in the transaction documents, or any renewal, or extension, shall automatically be forfeited to the Licensee, and unqualified right, title, and interest in and to the goods shall automatically vest in the Licensee. The Licensee shall provide the consumer with a disclosure regarding any time limit for redemption.

(b)     Vehicle Secured Loans. A Licensee may engage in the business of making vehicle secured loans. For purposes of this Section, a "Vehicle Secured Loan" means a loan in which the consumer has an absolute obligation to repay, whether or not with full or limited recourse for any deficiency, and that is secured, in whole or in part, by a security interest in favor of the Licensee in a motor vehicle. A Vehicle Secured Loan does not include a Vehicle Pawn Transaction or a Vehicle Sale-Leaseback Transaction. Unless otherwise agreed, a Licensee in a Vehicle Secured Loan has upon default the right as a secured party to take possession of the motor vehicle in accordance with Tribal UCC9. In taking possession, the Licensee or its agent may proceed without judicial process if this can be done without breach of the peace or may proceed by action.

(c)     Vehicle Sale-Leaseback Transactions. A Licensee may engage in vehicle sale-leaseback transactions. For purposes of this Section, a "Vehicle Sale-Leaseback Transaction" is a transaction in which a Licensee purchases a motor vehicle from a consumer for a price agreed upon the parties and then leases the motor vehicle to the consumer for rentals and other terms agreed upon by the parties. The term does not include a Vehicle Secured Loan or a Vehicle Pawn Transaction. A Vehicle Sale- Leaseback Transaction must be documented with a bill of sale from the consumer to the Licensee and transfer of title. The consumer lessee shall have no obligation to purchase the leased motor vehicle at the end of the lease term. A consumer lessee may be required to maintain the leased motor vehicle in good condition and repair, normal wear and tear excepted, and may be assessed by the Licensee based upon the condition of the leased vehicle as returned. A consumer lessee may be required to maintain insurance on the leased vehicle at the lessee's expense. Unless otherwise agreed, a Licensee in a Vehicle Sale-Leaseback Transaction has upon default the right to take possession of the motor vehicle. In taking possession, the Licensee or its agent may proceed without judicial process if this can be done without breach of the peace or may proceed by action. A

Tribal Consumer Financial Services Regulatory Code                    Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October,
9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution
2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and
Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

consumer may be provided an option to purchase the leased motor vehicle at the end of the
lease upon such terms as may be agreed upon by the parties. Any repurchase by the
consumer must be documented by a bill of sale from the Licensee to the consumer.

     (d)    <u>Other Vehicle-Secured Transactions.</u> A Licensee is authorized to engage in
other forms of Vehicle Secured Transactions, subject to any regulations adopted by the
Authority.

JA3102

Tribal Consumer Financial Services Regulatory Code          Page 28 of 28
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-037, Tribal Council Resolution T2014-019; and Tribal Council Resolution T2014-091

## Appendix 1

The Tribe's adoption of the Michigan UCC9 as set forth in Section 10 of this Code is subject to the exceptions and comments listed in this Appendix 1.

| Michigan UCC 9 Reference | Tribal UCC9 Exception or Comment |
|---|---|
| §440.9501 Filing Office | Tribal UCC 9 §10.9501 shall read as follows:<br><br>Sec. 9501.<br><br>(1) Unless otherwise provided by Tribal law, the office in which to file a financing statement to perfect any security interest is the office of the Tribal Secretary in all cases. The Tribal Secretary shall mark any security interests so filed with the date and time such security interest was received and maintain any such recorded interests in searchable files so that members of the public may reasonably research the priority of security interests with respect to any property subject to the Tribe's jurisdiction that has also been the subject of some financing statement filed with the Tribal Secretary.<br><br>(2) If the Tribal Secretary receives a financing statement under subsection (1) for filing, and any debtor identified on the financing statement is an individual, the Tribal Secretary shall provide written notice of the filing of the financing statement to that debtor. The Tribal Secretary shall determine the form of the written notice and the written notice shall contain at least all of the following information:<br><br>(a) The debtor's name and address as shown on the financing statement.<br><br>(b) The secured party's name and address as shown on the financing statement.<br><br>(c) The remedies available to the debtor under this act if he or she believes that the financing statement is erroneously or fraudulently filed.<br><br>(3) In addition to the written notice described in subsection (2), the Tribal Secretary shall provide at no charge to a debtor described in that subsection a copy or image of the filed financing statement and any attachments. If the debtor requests additional copies or searches, the fees provided in section 9525 apply to that request.<br><br>(4) A person shall not knowingly or intentionally file a false or fraudulent financing statement with the office of the secretary of state under subsection (1). A violation of this subsection is punishable under Tribal law and/or other applicable laws. |

Tribal Consumer Financial Services Regulatory Code                Appendix 1
Originally Enacted Pursuant to Tribal Council Resolution 2011-030
Amended Pursuant to Tribal Council Resolutions 2011-043, 2011-053, and 2012-055; October, 9, 2012 Motion to allow amendments to 7.2(e) and 12.2 (g) to be included under Resolution 2012-055, Tribal Council Resolution 2012-073, Tribal Council Resolution T2013-039; and Tribal Council Resolution T2014-019, Tribal Council Resolution T2014-091

| | |
|---|---|
| §440.9612 Timeliness of notification before disposition of collateral | Tribal UCC 9 §10.9612 shall read as follows:<br>Timeliness of notification before disposition of collateral.<br>Sec. 9612. A notification of disposition sent after default and 10 days or more before the earliest time of disposition set forth in the notification is sent within a reasonable time before the disposition. |
| §440.9620 Acceptance of collateral in full or partial satisfaction of obligation; compulsory disposition of collateral | Tribal UCC 9 §10.9620 shall not include subsections (5) or (7) and any related references to those subsections. |
| §440.9624 Waiver | Tribal UCC9 §440.9624 shall not include any special treatment with respect to consumer-goods transactions. |
| §440.9625 Remedies for secured party's failure to comply with article | Tribal UCC9 does not incorporate §440.9624. |
| §440.9626 Action in which deficiency or surplus is in issue. | Tribal UCC9 does not incorporate §440.9626. |
| PART 7 TRANSITION | Tribal UCC9 does not incorporate Part 7. |
| [Reserved for expansion] | |

**JA3104**

USCA4 Appeal: 21-2166   Doc: 26-6      Filed: 12/03/2021   Pg: 7 of 513
Case 1:18-mc-00225-RBJ-KLM   Document 1-1   Filed 12/13/18   USDC Colorado   Page 1 of 9
Case 3:17-cv-00461-REP   Document 1007-6   Filed 02/23/21   Page 1 of 9 PageID# 34217

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-mc-_____

JENNIFER WEDDLE,

               Movant,

v.

LULA WILLIAMS,
GLORIA TURNAGE,
GEORGE HENGLE,
DOWIN COFFY, and
MARCELLA P. SINGH,
on behalf of themselves and all others similarly situated,

               Respondents.

---

**AFFIDAVIT OF JENNIFER WEDDLE IN SUPPORT OF MOTION TO QUASH**

---

Jennifer Weddle, being duly sworn, states as follows:

1.      My name is Jennifer Weddle. I am above the age of eighteen years and am competent to testify to the matters stated in this affidavit.

2.      Since 2000, I have been a member of the Colorado bar, Attorney No. 32068. I am also admitted to practice in tribal courts, before the U.S. Supreme Court and before this District Court and the Tenth Circuit, as well as the Fourth, Sixth, Eighth, Ninth, and DC Circuits. I am a shareholder in the Denver office of Greenberg Traurig, LLP ("Greenberg Traurig") and the Co-Chair of Greenberg Traurig's nationwide American Indian Law Practice, a role I have held since I joined the firm in 2009.

3.      My eighteen-year practice has focused extensively on tribal economic development and complex regulatory and jurisdictional issues affecting tribal and non-tribal

clients. This work includes U.S. Supreme Court and other federal appellate litigation, corporate and transaction work, and advice on regulatory matters, including advocacy before federal and state agencies.

4.     I have significant experience representing American Indian tribes, tribal entities and companies working with tribes in a wide variety of economic development contexts including but not limited to tourism, real estate development, gaming, minerals development, manufacturing, agriculture and consumer lending.

5.     The Subpoena issued to me in *Williams et al. v. Big Picture Loans, LLC et al.*, No. 3:17-cv-00461 (E.D. Va.) implicates my and Greenberg Traurig's representation of not only named Defendants in the Complaint in that case, but also Greenberg Traurig's work in dozens of other matters, many not involving named Defendants at all, but nonetheless involving dozens of Greenberg Traurig attorneys, current and former. This Subpoena was never served on me or Greenberg Traurig. A process server handed the Subpoena to a Denver office secretary, who is not my secretary, on November 29, 2018 when I was out of state on client business. No one contacted me or Greenberg Traurig regarding any authorization to accept service.

6.     Since 2011, Greenberg Traurig has represented, with respect to a variety of different matters, entities with respect to which Mr. Matt Martorello is or was a principal, including Bellicose Capital, LLC ("Bellicose Capital"), SourcePoint VI, LLC, ("SourcePoint') and Eventide Credit Acquisitions, LLC. Over an eight-year period, Greenberg Traurig has been retained on 11 different matters involving entities in which Mr. Martorello is or was a principal, nine of which were multi-year representations, each involving numerous Greenberg Traurig attorneys, in all more than two dozen attorneys, current and former.

Case 1:18-mc-00225-RBJ-KLM   Document 1-1   Filed 12/13/18   USDC Colorado   Page 4 of 9
USCA4 Appeal: 21-2170 Doc: 26-6   Filed: 12/01/2021   Pg: 75 of 503
Case 3:17-cv-00461-REP   Document 1007-6   Filed 02/23/21   Page 4 of 9 PageID# 34220

7.      The Subpoena also implicates Greenberg Traurig's current representation of Mr. Martorello individually in *Cumming et al. v. Big Picture Loans, LLC et al.*, No. 5:18-cv-03476 (N.D. Cal.), a class-action lawsuit with allegations nearly identical to those that the issuers of the Subpoena assert in their Eastern District of Virginia litigation.

8.      While the Subpoena indicates it is issued to me, the cover letter accompanying it indicates the issuers would "like to review [my] company's records relevant to this action." Regardless of whether the Subpoena is intended to be personal to me or to be a subpoena upon my law firm, I have no responsive documents that are personal or unrelated to my employment by Greenberg Traurig.

9.      I could not comply with the Subpoena's demands without divulging information that is protected by the attorney-client privilege or by my duty of confidentiality to certain clients.

10.     In addition, compliance with the Subpoena would impose an undue burden on me, dozens of current and former attorneys at Greenberg Traurig, and Greenberg Traurig support staff.

11.     First, without date limitations whatsoever, the Subpoena demands six categories of documents "pertaining to tribal lending" without defining "tribal lending" in any manner.  The vast majority of the hundreds of matters I have worked on in my 18-year career involve monies borrowed by or lent to tribes and tribal entities, ranging from multi-million-dollar casino financings to housing construction contracts to environmental studies associated with multistate energy infrastructure.

12.     But even if Greenberg Traurig were to assume from the context of the Subpoena issuers' Complaint that they seek the firm's production of documents related to tribal consumer lending, meaning tribes' economic development involving offering consumer credit of any sort, that too would be unduly burdensome.

13.     Specifically, I have worked on more than 70 different matters relating to tribal consumer lending (many of which are also multi-year representations involving dozens of Greenberg Traurig lawyers from offices across the United States, as well as international offices). I have worked on approximately eight matters involving the Lac Vieux Desert Band of Lake Superior Chippewa Indians, ("the Tribe), the owner of the corporate defendants listed in the Complaint. Half of those matters do not involve Mr. Martorello or entities with respect to which he is or was a principal in any way, but do involve dozens of Greenberg Traurig lawyers from across the country and indeed, numerous international office attorneys as well. Because demand for production No. 4 of the Subpoena requests any documents in my possession "pertaining to tribal lending," I reviewed a sample of these dozens of matters, and they contain thousands of documents each, and some, tens of thousands of documents each. Even if my colleagues and I could review one document per minute for purposes of assessing relevance and preparing a privilege log, it would take months to review all of the documents and it would be impossible to do without hiring an e-discovery vendor, as most files are electronic. And it would cost Greenberg Traurig at least several hundred thousand dollars to accomplish, based on the numerosity of our files and our experience with e-discovery vendors handling similarly gargantuan projects for litigation clients. Most of these documents from firm files belong to

4

dozens of different clients not associated with Mr. Martorello or any with which he is or was associated or any entities named in the Subpoena or the Complaint.

14.     In addition to the more than 100,000 documents in client files that would be responsive to the Subpoena, documents I have as a result of my participation in volunteer bar activities would also be implicated, and require further burden on additional third-party organizations.  Specifically, and for example, I served as President of the National Native American Bar Association ("NNABA") in 2016-2017 and otherwise as a NNABA officer and board member for many years prior to and subsequent to my term as President.  I was also the President of the National Native American Bar Association Foundation.  I also served as Chair of the 800+-member Federal Bar Association Indian Law Section from 2011-2013 and likewise as an officer and board member thereof for many years prior and subsequently to my two terms as Chair.  I also served as President of the Colorado Indian Bar Association from 2009-2012, and was otherwise an officer thereof for an additional eight years.  With all of those bar association capacities, I have thousands of communications "pertaining to tribal lending," whether understood broadly or narrowly under the Subpoena, and likewise communications with Indian law practitioners named in demand for production No. 6 of the Subpoena.  This includes communications relative to continuing legal education activities I organized, chaired or presented at, articles I wrote or edited for professional publications and bar association board and membership communications.  In addition, I have been a frequent speaker on tribal consumer lending, including as an adjunct professor for the University of Colorado School of Law and guest lecturer or speaker at numerous law school classes at Harvard Law School, the University of Denver Sturm College of Law, Arizona State University Law School, as well as other law

JA3110

schools, CLE events of the American Bar Association and other bar and legal education organizations, industry conferences and inter-tribal association gatherings. Another example of the overbreadth of the Subpoena is that, by demanding production of documents for basically the subject-matter of a significant portion of my career (and that of many other lawyers), it implicates confidential peer reviews of federal judicial nominees which I have as a result of my service as the Tenth Circuit Representative on the American Bar Association Standing Committee in the Federal Judiciary (e.g., involving nominees who adjudicated tribal consumer lending matters or represented litigants in tribal consumer lending cases). Simply put, demand for production No. 4 of the Subpoena encompasses many thousands of additional documents broadly "pertaining to tribal lending" in my possession which are not my documents or Greenberg Traurig's documents; they are confidential bar association documents I have as a result of my professional activities.

15. With respect to demand for production No. 6, the issuers seek communications between myself and two attorneys active in the Indian Law space, Ms. Karrie Wichtman and Mr. Rob Rosette. I have engaged in very frequent communications with both attorneys throughout the course of my career on numerous matters "pertaining to tribal lending," again whether understood broadly or narrowly under the Subpoena, but the vast majority of those communications relate to other firm clients not including Mr. Martorello or any of the entities named in the Subpoena or the Complaint. The vast majority of responsive documents in my possession have nothing whatsoever to do with the Subpoena issuers' litigation.

16. Greenberg Traurig has been instructed by the holder of the privileged documents which might have anything do to with the Subpoena issuers' litigation not to produce privileged

JA3111

Case 1:18-mc-00225-RBJ-KLM   Document 1-1   Filed 12/13/18   USDC Colorado   Page 8 of 9
Case 3:17-cv-00461-REP   Document 1007-6   Filed 02/23/21   Page 8 of 9 PageID# 34224
USCA4 Appeal: 21-2116   Doc: 26-6   Filed: 12/03/21   Pg: 78 of 503

documents.  Any production under the Subpoena would require us to violate Colorado Rule of

Professional Responsibility 1.6.  That includes but is not limited to Greenberg Traurig's ongoing

litigation defense of Mr. Martorello in *Cumming*.

FURTHER AFFIANT SAYETH NOT.

_Jennifer Weddle_
Jennifer Weddle

STATE OF _Colorado_ )
                    ) ss:
COUNTY OF _Denver_ )

SUBSCRIBED and sworn to before me on this 10th day of _December_____, 2018 by Jennifer Weddle.

> **SEAL**
> **AMBER R BUSTOS**
> **NOTARY PUBLIC**
> **STATE OF COLORADO**
> **NOTARY ID 20084022782**
> **MY COMMISSION EXPIRES JULY 27, 2020**

_Amber R. Bustos_
Notary Public

My commission expires: _July 27, 2020_

7



BERNARD R. GIVEN II
Partner

10100 Santa Monica Blvd.          **Direct**   310.282.2235
Suite 2200                        **Main**    310.282.2000
Los Angeles, CA 90067             **Fax**     310.734.1686
                                  bgiven@loeb.com

December 12, 2019

Karrie S. Wichtman, General Counsel
Lac Vieux Desert Band of Lake Superior
Chippewa Indians
N4698 US 45, P.O. Box 249
Watersmeet, Michigan 49969

Re:   Notice of Default

Dear Ms. Wichtman:

I am writing on behalf of Eventide Credit Acquisitions, LLC ("ECA") in connection with that

certain Loan and Security Agreement ("LSA") and related transaction documents entered into by

and between ECA and The Lac Vieux Desert Band of Lake Superior Chippewa Indians (the

"Tribe") on or about October 7, 2015.  As you are aware, ECA has long inquired about

suspicions of longstanding material defaults under those agreements, as indicated to ECA by

the substantial degradation in long-term performance trends at BPL.  Such was revealed

through your regular monthly creditor reporting to ECA.

The Tribe has been in breach of numerous material contractual Obligations, in what appears to

be a blatant disregard of its Obligations to ECA and causing the minimization of the value of the

ECA Secured Promissory Note, or in an effort to elicit other value to the Tribe.  The culmination

of these recently unveiled violations resulted in full termination of ECA Secured Promissory

Note payments for more than one year.  ECA expects damages extend much longer, and are

approaching more than twenty-million dollars ($20,000,000) to date.

Los Angeles   New York   Chicago   Nashville   Washington, DC   San Francisco   Beijing   Hong Kong   www.loeb.com

For the United States offices, a limited liability partnership including professional corporations. For Hong Kong office, a limited liability partnership
18533103.1      JA3114



As detailed below, these violations include undisclosed "reserves" against ECA note payments,
wholesale undisclosed changes to product and business policy to the detriment of LVD's
Obligations for its purchase of the equity, the subsequent cementing of the foregoing
degradations with a change in Tribal Law, and multiple gross misrepresentations about the
forecasts of the business in efforts to elicit: concessions for much needed increased
governmental revenue via BPL distributions; approval of additional indebtedness; and to
renegotiate the payment model to that of minimal fixed payments. It does not go unnoticed that
while non-cash reserves implicate the note payments leaving excess cash, and concessions
asked of ECA by the Tribe due to great need, it appears LVD's "excess cash" has allowed it to
retire its $30 million dollar casino debt two years early, and additionally save for a "rainy day", as
recently announced in the press.

Therefore, despite the Tribe's contractual obligations to ECA including its duty to defend the
Collateral, the Lender and the Consumer Loans, rather than LVD using these "rainy day" funds
to honor its obligation to ECA, LVD has now advise ECA that it intends to proceed with the
Settlement Agreement with the Plaintiffs as memorialized in writing and that certain Motion for
Preliminary Approval of Class Action Settlement (the "Settlement Agreement").

Notwithstanding the prospective breaches, LVD has already committed the following list of non-
exhaustive breaches and/or defaults under the Secured Promissory Note, LSA and/or the
Parental Guarantee. The most material of which were only recently identified by ECA:



| Document/Provision | Text of Provision | Breach/Default |
|---|---|---|
| Secured Promissory Note § 4(b) | Borrower agrees that it and each Subsidiary shall have a fiduciary duty to the Lender to ensure that neither Borrower nor any Subsidiary or affiliates shall undermine the Parties' intent to maximize the cash flows directed to retire the Note as soon as possible . | Without any disclosure or notice to ECA, LVD has long been deducting monies from waterfall note payment calculations as "bad debt reserves". See also numerous other breaches detailed herein. |
| Secured Promissory Note § 5 | "It shall be considered an Event of Default under the Transaction Documents, if the non-deductible expenses exceed the Tribal distribution or accumulated reinvestment portion." Attorneys' fees can be considered non-deductible expenses if they are "in excess of an aggregate of twenty-five thousand dollars ($25,000) per year, unless otherwise agreed by the Parties..." (SPN § 5(c)), and payment of those expenses may be considered an event of default. | Without seeking agreement of ECA, attorneys' fees paid by LVD ahead of ECA have greatly exceeded $25,000 per year. In Addition, LVD unilaterally has deducted monies from waterfall note payment calculations as litigation "reserves" without ever notifying ECA of those adjustments to the calculation. |
| LSA § 2.2(h) | "Material Adverse Effect" shall mean, with respect to Borrower, any event; occurrence, development, fact, condition or change that individually or in the aggregate is or would be reasonably likely to be materially adverse to the operations or financial performance of Borrower or any of Borrower's Subsidiaries. | See herein breaches of LSA § 4.2, LSA § 5.13, LSA § 5.16, Parental Guarantee §2. |
| LSA § 3.11 | Lender, by accepting such security interest in the Collateral owned by Borrower or a Subsidiary, or by releasing any Collateral to Borrower or Subsidiary, shall not be deemed to have assumed any obligation or liability to any Consumer or to any third party, and Borrower and each Subsidiary agree to indemnify and defend Lender and hold Lender harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph | LVD refused to honor its indemnity obligations. LVD refused to honor its duty to defend Lender. |



Karrie S. Wichtman, General Counsel
Lac Vieux Desert Band of Lake Superior Chippewa Indians
December 12, 2019
Page 4

| Document/Provision | Text of Provision | Breach/Default |
|---|---|---|
| LSA § 3.10 | The Collateral is valid and genuine in all respects. Excepts as to claims by a Senior Lender, Borrower and each Subsidiary will warrant and defend Lender's right to and interest in the Collateral against all claims and demands of any persons whatsoever. | LVD refused to honor its indemnity obligations. <br><br> LVD refused to honor its duty to defend the Consumer Loan Collateral is valid and genuine. |
| LSA § 4.2 | Borrower and/or each Subsidiary shall deliver to Lender from time to time promptly at its request, all invoices, original documents of title, contracts, chattel paper, instruments and any other writings relating thereto, and other evidence of performance of contracts, or evidence of the rendering of services of Borrower, or Subsidiary" | LVD refused to provide evidence of legal expenses incurred to Rosette Law |
| LSA § 4.2 | "Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's or a Subsidiary's records relating to its accounts and contract rights are kept, and shall not remove such records to another jurisdiction without giving the Lender at least thirty (30) days prior written notice thereof." | LVD has never provided notice relating to location and relocation of its records, accounts and its Collateral, and changes made thereto. |
| LSA § 4.3 | All information submitted pursuant to this Section 4.3 shall be certified as true, accurate, and complete in all material respects by Borrower or the respective Subsidiary. | Including for purposes of: eliciting ECA approval for additional indebtedness; eliciting LVD's Tribal Net Profit increase from 4% to 6% given government hardship; and conversations relating to the parties negotiation of revising the note to fixed payment structure, at multiple times the Tribe has provided vastly inaccurate financial forecasts to ECA. <br><br> ECA further notes that LVD has recently published the successful early retirement of debt on its casino as a result of "excess cash" received from its lending business, which additionally now provides a "rainy day" fund for LVD. |



| Document/Provision | Text of Provision | Breach/Default |
|---|---|---|
| LSA § 4.3(a) | "real-time, read-only, online access to information concerning sums on deposit (including credits and debits) to any Collateral Account or other pertinent accounts and other information contained in technology used to monitor the Collateral; | LVD refused to provide read-only access to the consumer loan software systems for purposes of ECA inquiry about the quality of the Consumer Loans.<br><br>LVD has never provided read-only access to accounts concerning sums on deposit that ECA requires to track the cash leftover from "reserves" taken against note payments as detailed herein. |
| LSA § 4.3(b) | "Borrower and each Subsidiary will furnish to Lender: as soon as available to Borrower and each Subsidiary, but in any event within thirty (30) days after the close of each calendar month, a full and complete signed copy of financial statements, which shall include a balance sheet of Borrower and each Subsidiary, as at the end of such month, and statement of profit and loss of Borrower and each Subsidiary reflecting the results of its operations during such month and shall be prepared by Borrower and 'each Subsidiary and certified by a senior officer of Borrower or each Subsidiary as appropriate having primary responsibility for the preparation of such financial statements as to correctness in accordance with Borrower's standard practices, consistently applied, subject to year-end adjustments" | LVD has failed to provide regular monthly reporting in the form and manner required by LSA §4.3(b).<br><br>No reporting as it relates to the entities TED and Ascension Technologies has been provided. |



| Document/Provision | Text of Provision | Breach/Default |
|---|---|---|
| LSA § 4.3(c) | "Borrower and each Subsidiary will furnish to Lender: as soon as available to Borrower or a Subsidiary, but in any event within thirty (30) days after the close of each calendar quarter, a full and complete signed copy of financial statements, which shall include a balance sheet of Borrower and each Subsidiary, as at the end of such quarter, and statement of profit and loss of Borrower and each Subsidiary reflecting the results of its operations during such quarter and shall be prepared by Borrower or the respective Subsidiary and certified by a senior officer of Borrower or the respective Subsidiary having primary responsibility for the preparation of such financial statements as to correctness in accordance with Borrower's standard practices, consistently applied, subject to year-end adjustments." | LVD has failed to provide regular quarterly reporting in the form and manner required by LSA §4.3(b). No reporting as it relates to the entities TED and Ascension Technologies has been provided. |
| LSA § 4.4 | Borrower and/or its Subsidiaries shall maintain a range of the cumulative loan portfolio (all Consumer Loans on Borrower's or a Subsidiary's balance sheet current up to sixty (60) days past due) of a minimum portfolio size of fifteen million dollars ($15,000,000) to a maximum portfolio size in any given month equal to 1.1 times the previous month's portfolio size. All funds in excess of those required for (a) balancing requirements of Senior Lenders and (b) monthly maximum portfolio size, shall be applied to Note payments. | LVD has repeatedly exceeded the 1.1 times monthly growth limitation, without seeking the consent of ECA. LVD has not been calculating excess funds as having application to the monthly note payment, as is required. |
| LSA § 4.14 | Borrower and each Subsidiary shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's and each Subsidiary's records relating to its accounts and contract rights, including Consumer Loans, respectively, are kept, and shall not remove such records or any of them to another location without giving Lender at least thirty (30) days prior written notice thereof. | LVD has never provided ECA with notice relating to location of its records, accounts and its Collateral, and changes made thereto. |



| Document/Provision | Text of Provision | Breach/Default |
|---|---|---|
| LSA § 4.16(a) | Unless waived in writing by Lender or as otherwise limited pursuant to Section 6.4, the Borrower and each Subsidiary will enter into (1) a deposit account control agreement (or maintain existing deposit account control agreements) for any bank account(s) in which the Subsidiary conducts its business" | LVD failed to return duly executed DACAs upon ECA's express request.<br><br>Additional new accounts were formed by LVD, for which DACAs have never been provided, and no waiver of such obligation requested from ECA. |
| LSA § 4.17 | The Borrower and each Subsidiary will maintain a fiduciary duty to the Lender to keep costs and expenses (including any capital expenses or other investments) associated with operations within industry standards and that all transactions with affiliates shall occur at no more than arms-length, market rates, and Borrower will not allow any movement of assets or liabilities between affiliates (such movement shall not include payment of affiliates for services rendered under contracts for services) unless approved by Lender | LVD has paid subordinated insider debt ahead of ECA without consent or notice to ECA, deducted non-authorized "reserves" from waterfall and has paid attorneys' fees in excess of $25,000 per year. |
| LSA § 5.1 | Neither Borrower nor any Subsidiary will incur additional indebtedness nor take any action that could negatively affect payment under the Note or dilute or burden the equity of Borrower without the express written approval of Lender. | LVD incurred fifteen million ($15,000,000) dollars of Senior Debt ahead of ECA, without its consent. |



Karrie S. Wichtman, General Counsel
Lac Vieux Desert Band of Lake Superior Chippewa Indians
December 12, 2019
Page 8

| Document/Provision | Text of Provision | Breach/Default |
|---|---|---|
| LSA § 5.13 | Neither the Borrower nor any Subsidiary shall make any internal policy decisions which could dilute the value of the Collateral unless such changes are made to mitigate a Material Adverse Effect. | As early as 2017, LVD began unilaterally changing its business policy pertaining to new customer Consumer Loan originations to operating those loans at a net loss (i.e. cognizant of the January 26, 2023 sunset of the Obligations, BPL decided to target a two-year break-even, per new customer loan). ECA has never been notified. |
| | | LVD also changed its loan product entirely, beginning sometime in 2017. Its Consumer Loans changed from a periodic interest product to a simple interest product, and numerous business policies to support such product also require substantial change. This wholesale change in product and policies was never disclosed to ECA. |
| | | LVD continued providing ECA with substantially false forecasts in violation of LSA § 4.3, as detailed herein. LSA § 4.15 further requires that LVD notify ECA in regards to any Material Adverse Effect as occurred. |
| LSA § 5.16 | There will be no changes to Tribal law or regulations that would materially adversely impact Borrower's or a Subsidiary's performance under the Transaction Documents, unless such changes are caused by applicable requirements outside the Tribe's sovereign authority. | Notwithstanding new customer Consumer Loans pricing of $35 per $100 borrowed per two-weeks (910% APR), and to cement the tangential business policy and wholesale product changes discussed above in breach of LSA § 5.13, LVD changed its laws to dampen new customer origination profitability with a 699% APR cap, while offsetting those reductions to TNP with "reserves" against the waterfall calculations. |
| | | LVD never notified ECA of the change in law, uncovered nearly one year later. |
| LSA § 6.1(a) | failure to make any payment of principal or interest within three (3) days of the due date, whether at maturity, by acceleration or otherwise under the Note, | Payments have not been made to ECA because of non-deductible payments (such as attorneys' fees) and various long undisclosed "reserves." |



| Document/Provision | Text of Provision | Breach/Default |
|---|---|---|
| Parental Guarantee §2 | TED and the Tribe acknowledge that the Subsidiaries have a commitment to maintain business operations to repay the Note and agree that they will make no changes in any Subsidiary or TED corporate structures or documents that would materially adversely impact their operations or the Loan repayment under the Transaction Documents. The Tribe agrees to maintain regulatory stability and to make no substantive changes in Tribal law or regulations that would materially adversely impact Borrower's or a Subsidiary's performance under the Transaction Documents, unless such changes are caused by applicable requirements outside the Tribe's sovereign authority. | LVD unilaterally changed its entire business model, which caused reserves to diminish.  See breaches of LSA § 5.13 and 5.16 herein. |



| Document/Provision | Text of Provision | Breach/Default |
|---|---|---|
| Parental Guarantee §8 | Borrower and each Subsidiary shall protect, defend (by counsel selected by Lender and reasonably acceptable to Borrower), indemnify and hold harmless Lender and Lender's officers, directors, partners, members, employees, attorneys, successors and permitted assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, members, employees, attorneys, successors and assigns (collectively, the "Indemnitees") from and against all liabilities (including sums paid in settlement of claims), claims brought or threatened against Lender (as well as from reasonable attorneys' fees and expenses in connection therewith), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine, penalty, restitution or damages) arising as a direct or indirect result of (a) the Tribe's, the Borrower's or any of the Subsidiary's Event of Default or (b) as a direct result of any investigative demand or enforcement proceeding initiated by any governmental entity into the Borrower's and/or any Subsidiary business. | Demand for indemnity has been made upon LVD and LVD has refused to honor. LVD has refused its duty to defend. See also other indemnity provisions across transaction documents, including LSA § 3.10 and 3.11, as detailed herein, and LSA § 4.8, 4.18 and 7.5. |

Prospectively, if the Tribe enters into the Settlement Agreement, it will be in default under the related transaction documents, for the non-exclusive following reasons:

1.     Section 3.10 of the LSA provides "The Collateral is valid and genuine in all respects. Excepts as to claims by a Senior Lender, Borrower and each Subsidiary will warrant and defend Lender's right to and interest in the Collateral against all claims and demands of all persons whatsoever". The Settlement Agreement's contemplation of diminution of the Consumer Loan Collateral though implication of a 2.5x rate cap is a violation of Section 3.10.

2.     Section 3.11 of the LSA provides that the Tribe has a duty to defend Lender, to hold Lender harmless, and to indemnify in respect to any claim or proceeding pertaining to the



correctness, genuineness, or validity of its Collateral. Or for the value or character of the Collateral, including to any Consumer or to any third party. "Borrower and each Subsidiary agree to indemnify and defend Lender and hold Lender harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph". Execution of the Settlement Agreement's obligations violates these obligations to ECA, along with numerous other indemnity and duty to defend obligations in the transaction documents.

3.      Section 3.13 of the LSA provides "Funds received under this Agreement may only be used for the acquisition of Bellicose Capital, LLC by TAC, and Borrower and/or Subsidiary shall receive good and valuable consideration in connection with such acquisition". You have specifically advised us that $6.7 million out of the $8.7 million settlement will be coming from the operations of Big Picture Loans ("BPL") and not from concessions and/or payments from other Lenders such as Amlar or Columbia, as was repeatedly and falsely represented to Eventide in violation of Section 4.3. Accordingly, use of funds which constitute the cash collateral of ECA to pay Plaintiffs under the LSA is in direct violation of Section 3.13.

4.      Section 4.18 of the LSA provides "The Collateral and each item thereof will be and shall continue to be free of all restrictions, liens, encumbrances or other rights, title or interests, credits, defenses, recoupments, set-offs or counterclaims whatsoever, other than the security interests granted to Lender hereby and the Permitted Liens... Borrower and each Subsidiary will warrant and defend Lender's right to and interest in the Collateral acquired against all claims and demands of all persons whatsoever." The Settlement Agreement's provision to not collect more than 2.5x on the Collateral represents an impermissible restriction.

5.      Section 4.4 of the LSA provides in pertinent part that LVD and its subsidiaries shall only use the Collateral for the benefit of TED and its subsidiaries and to meet their fiduciary obligations to ECA under the LSA. The use of ECA's cash collateral to make



payments to Plaintiffs, and the use of ECA's non-cash collateral to implement a 2.5x restriction on Consumer Loans for the benefit of the Borrower per the Settlement Agreement is a clear violation of Section 4.4 of the LSA.

6.      Section 5.2 of the LSA specifically provides that there shall not be any sale or transfer of ownership of any interest, whether direct or indirect, in Borrower or any subsidiary without Lenders prior written consent, unless Lender is paid in full for all obligations under the transaction documents in accordance with the provisions of the LSA. ECA believes that the payment to Plaintiffs in conjunction with agreeing to a 2.5 times restriction on the Collateral constitutes a violation of Section 5.2 of the LSA as an indirect sale of interest in the Collateral.

7.      Section 5.7 of the LSA provides in pertinent part that LVD and each subsidiary shall not sell, lease "or otherwise dispose of any of its assets including the collateral". The disposition of ECA's cash collateral by means of the settlement payments to Plaintiff and the obligation to devalue the existing outstanding Consumer Loans via a 2.5x rate cap, violates Section 5.7 of the LSA.

8.      Section 6.1(j) of the LSA provides that occurrence of a Material Adverse Effect shall constitute a default. ECA believes that each the payment to Plaintiffs and the agreement to a 2.5 times cap constitutes a violation of Section 6.1(j) of the LSA.

9.      Section 5(c) of the Note provides that any ordinary and necessary expenses not agreed to in Section 4 above and in excess of an aggregate of twenty-five thousand dollars ($25,000) per year, unless otherwise agreed to by the Parties, shall be a non-deductible expense. The cost of a 2.5x restriction on the Collateral, and the cash payments contemplated, do not constitute "ordinary and necessary expenses" and are not deductible. This prospective and inevitable default of the Settlement Agreement's obligation in turn gives rise to a Material Adverse Effect under Section 6.1(j) of the LSA.



Karrie S. Wichtman, General Counsel
Lac Vieux Desert Band of Lake Superior Chippewa Indians
December 12, 2019
Page 13

If you have any questions or comments regarding the Notice of Default herein, please contact

me in writing at your earliest convenience.

Sincerely,

Bernard R. Given II
Partner

cc:    Richard Scheff
       James Walesa

18533103.1 233993-10001

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 93 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 1 of 250 PageID# 34239

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Virginia

-------------------------------X

LULA WILLIAMS, ET AL. ON BEHALF

OF THEMSELVES AND ALL OTHER

SIMILARLY SITUATED INDIVIDUALS,

           Plaintiffs,        Civil Action No.

       v.                  3:17-CV-461 (REP)

BIG PICTURE LOANS, LLC, ET AL.,

           Defendants.

-------------------------------X


Deposition of MICHELLE HAZEN

October 16, 2017

10:18 a.m.


Troutman Sanders, LLP

1850 Towers Crescent Plaza, Suite 500

Tysons Corner, Virginia 22182


Lisa R. Barbera           JOB NO. 182180

## A P P E A R A N C E S

On Behalf of the Plaintiffs: LULA WILLIAMS, ET AL.

      KELLY & CRANDALL, PLC

      3925 Chain Bridge Road, Suite 202

      Fairfax, Virginia 22030

      (703)424-7576

BY:   KRISTI CAHOON KELLY, ESQUIRE

      KKELLY@KELLYANDCRANDALL.COM

      ANDREW J. GUZZO, ESQUIRE

      AGUZZO@KELLYANDCRANDALL.COM

On Behalf of the Defendants: BIG PICTURE LOANS, LLC,

              ASCENSION TECHNOLOGIES, LLC,

              JAMES WILLIAMS, JR., GERTRUDE

              McGESHICK, SUSAN McGESHICK,

              GIIWEGIIZHIGOOKWAY MARTIN

      ROSETTE, LLP

      25344 Red Arrow Highway

      Mattawan, Michigan 49071

      (269)283-5005

BY:   JUSTIN ALEXANDER GRAY, ESQUIRE

      JGRAY@ROSETTELAW.COM

      KARRIE SUE WICHTMAN, ESQUIRE

      KWICHTMAN@ROSETTELAW.COM

      ERIKA WEISS, ESQUIRE

      EHUNTING@ROSETTELAW.COM

APPEARANCES CONT.


On Behalf of the Defendants:

        TROUTMAN SANDERS, LLP

        1001 Haxall Point

        Richmond, Virginia 23219

        (804)697-1200


BY:    DAVID N. ANTHONY, ESQUIRE

       DAVID.ANTHONY@TROUTMANSANDERS.COM


On Behalf of Matt Martorello:

        MONTGOMERY MCCRAKEN WALKER & RHOADS, LLP

        123 South Broad Street

        Philadelphia, Pennsylvania 19109

        (215)772-1500


BY:    RICHARD L. SCHEFF, ESQUIRE

       RSCHEFF@MMWR.COM


Also Present:

        T.J. O'TOOLE, VIDEOGRAPHER


**JA3129**

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 96 of 503

1          C O N T E N T S

2    WITNESS                          PAGE

3    MICHELLE HAZEN

4    DIRECT EXAMINATION BY MS. KELLY              9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 5

1          E X H I B I T S

2              (Attached)

3

4   HAZEN DEPOSITION                    PAGE

5

6   Exhibit 1- Affidavit              47

7   Exhibit 2- Servicing Agreement        53

8   Exhibit 3- Letter              85

9   Exhibit 4- E-mail              87

10   Exhibit 5- Loan and Security Agreement      88

11   Exhibit 6- Deposit Account Control Agreement    94

12   Exhibit 7- E-mail              100

13   Exhibit 8- Secured Promissory Note        109

14   Exhibit 9- Letter              117

15   Exhibit 10- Letter              124

16   Exhibit 11- Servicing Agreement        128

17   Exhibit 12- Chart              152

18   Exhibit 13- E-mail              159

19   Exhibit 14- Salaries              162

20   Exhibit 15- Salaries              162

21   Exhibit 16- E-mail              178

22   Exhibit 17- Manual              179

Page 6

1   Exhibit 18- Script                    180

2   Exhibit 19- E-mail                    200

3   Exhibit 20- Appendix A                   205

4   Exhibit 21- Request for Approvals          206

5   Exhibit 22- Request Log                  211

6   Exhibit 23- Various Documents               214

7   Exhibit 24- E-mail                    227

8   Exhibit 25- E-mail                    228

9   Exhibit 26- E-mail                    234

10   Exhibit 27- E-mail                   242

11

12

13

14

15

16

17

18

19

20

21

22

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 99 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 7 of 250 PageID# 34245
10/16/2017                                Hazen, Michelle

Page 7

1          P R O C E E D I N G S

2               - - -

3          THE VIDEOGRAPHER:  On the record with

4    Disk 1 of the video deposition of Michelle

5    Hazen taken in the matter of Sula [sic]

6    Williams, et al. versus Big Picture Loans, LLC,

7    et al.  Being heard before the United States

8    District Court, for the Eastern District of

9    Virginia, Richmond division.  This case number

10    3-17-CV-461.

11         This deposition is being held at the Law

12    Offices of Troutman Sanders located at 1850

13    Towers Crescent Plaza in Tysons Corner on

14    October 16, 2017, at approximately 10:18 a.m.

15    My name is T.J. O'Toole, I am the certified

16    legal video specialist.  The court reporter is

17    Lisa Barbera.  We are both here representing

18    Huseby Court Reporting.

19         Will Counsel please introduce themselves

20    and indicate which parties they represent?

21         MS. KELLY:  Good morning.  Kristi Kelly

22    with Kelly & Crandall on behalf of the

Page 8

1    plaintiff.

2        MR. GUZZO:  Andrew Guzzo with Kelly &

3    Crandall on behalf of the plaintiffs.

4        MR. GRAY:  Justin Gray with Rosette on

5    behalf of the tribal defendants.

6        MR. ANTHONY:  David Anthony with Troutman

7    Sanders on behalf of the defendants.

8        MS. WICHTMAN:  Karrie Wichtman with

9    Rosette, LLP, on behalf of the tribal

10    defendants.

11        MS. WEISS:  Erika Weiss with Rosette on

12    behalf of the tribal defendants.

13        MR. SCHEFF:  Richard Scheff, Montgomery

14    McCracken, representing Matt Martorello.  And

15    on the telephone is my colleague, David Herman,

16    also from Montgomery McCracken and also

17    representing Matt Martorello.

18        THE VIDEOGRAPHER:  Thank you.  Will the

19    court reporter please swear in the witness?

20  Whereupon,

21            MICHELLE HAZEN

22  being first duly sworn or affirmed to testify to the

Page 9

1   truth, the whole truth, and nothing but the truth,

2   was examined and testified as follows:

3              DIRECT EXAMINATION

4   BY MS. KELLY:

5        Q.   Good morning.  Can you please state your

6   full name for the record?

7        A.   (Speaking in Ojibwe and later spelled out

8   by Ms. Hazen.)  Boozhoo giizhigookway nindiizhnikaaz

9   getekitigaaning nindoonjibaa agaashk nindoodem

10  Michelle Hazen.

11       Q.   Have you ever gone by any other names?

12       A.   Yes.

13       Q.   And what name was that?

14       A.   Michelle Allen and Giizhigookway.

15       Q.   When did you -- when did you go by

16  Michelle Allen?

17       A.   When did I get married?  2000 -- 2008.  I

18  don't recall when I got married.  Sorry.

19       Q.   And so you became Michelle Allen through

20  marriage; is that correct?

21       A.   Yes.

22       Q.   And then when did you start going by

Page 10

1   Michelle Hazen?

2       A.   I don't recall the exact date or even the

3   year.

4       Q.   What prompted you to change your name to

5   Michelle Hazen?

6       A.   Well, when I went through my divorce I

7   actually went to Giizhigookway --

8       Q.   Okay.

9       A.   -- which is my Objibwe Indian name.  And

10  then my father became ill and I chose to go back to

11  my maiden name --

12      Q.   Okay.

13      A.   -- so I went back to Michelle Hazen.

14      Q.   So you were Michelle Allen and then you

15  were Giizhigookway?

16      A.   Giizhigookway.

17      Q.   And then Michelle Hazen --

18      A.   Yes.

19      Q.   -- is that correct?

20      A.   Yes.

21      Q.   What is your current address?

22           And you can provide your business address

JA3136

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 103 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 11 of 250 PageID# 34249

1   if you're more comfortable with that.

2       A.   My personal, physical address, that's

3   N 4915 Gallagher Street, Watersmeet, Michigan 49969.

4       Q.   And who is your employer?

5       A.   Big Picture Loans.

6       Q.   Are you employed by any other entity?

7       A.   I am also a tribal council member.

8       Q.   And can you tell me the name of the tribe?

9       A.   Lac Vieux Desert Brand of Lake Superior

10   Chippewa Indians.

11      Q.   Are you employed by anyone in addition to

12   Big Picture Loans and your service to the tribal

13   council?

14      A.   No.

15      Q.   Do you have any other employment

16   responsibilities for any other entity or leadership

17   positions?

18      A.   I am the comanager of Big Picture Loans as

19   well as Tribal Economic Development Holdings and

20   Ascension Technologies.

21      Q.   Do you have any other business entities

22   for which you have any leadership positions?

Page 12

1    A.   No.

2    Q.   Okay.  What is your job title with Big

3   Picture?

4    A.   I am the CEO and the comanager.

5    Q.   And what sort of compensation do you

6   receive for each of those two different job

7   descriptions?

8    A.   I'm compensated as the CEO.  I do not

9   receive compensation as the comanager.

10   Q.   And in -- for Tribal Economic Development

11  Holdings, is it okay if we just call it TED --

12   A.   That's fine.

13   Q.   -- for short for the purposes of this

14  deposition?

15   A.   Yes.

16   Q.   Okay.  For TED, as a comanager, do you

17  receive any compensation?

18   A.   No, I do not.

19   Q.   Okay.  As a comanager of Ascension

20  Technologies, do you receive any compensation?

21   A.   No, I do not.

22   Q.   As a tribal council member, do you receive

Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 13 of 250 PageID# 34251

1   any compensation?

2       A.   From the tribe, yes, I do.

3       Q.   And how much is that?

4       A.   I get paid for attendance of meetings, so

5   it's per meeting.

6       Q.   Approximately, how many meetings a year do

7   you have?

8       A.   It varies depending on what the tribe has

9   going on.

10      Q.   So let's take year 2016.

11          Were you a tribal council member in 2016?

12      A.   December of 2016 I was sworn in.

13      Q.   Okay.  So can you estimate how much income

14  you've made since December of 2016 for being a

15  tribal council member?

16      A.   I'd say roughly $12,000.

17      Q.   Okay.  And you indicated that you get paid

18  based on attendance at meetings?

19      A.   Yes.

20      Q.   Is there any other activities, as a tribal

21  council member, for which you would have received

22  payment?

Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 14 of 250 PageID# 34252

1    A.   No.

2    Q.   Okay.  As the CEO of Big Picture, do you

3  report to anybody?

4    A.   Yes.

5    Q.   Who do you report to?

6    A.   The tribal council.

7    Q.   Okay.  As the comanager of Big Picture, do

8  you report to anybody?

9    A.   Yes, the tribal council.

10    Q.   And as the comanager of Ascension

11  Technologies, do you report to anybody?

12    A.   Yes, the tribal council.

13    Q.   As the comanager of TED, do you report to

14  anybody?

15    A.   Yes, the tribal council.

16    Q.   Okay.  And can you briefly describe to me

17  the nature of any reporting that you would do to the

18  tribal council for either of those three entities?

19    A.   So we're required to meet on a monthly

20  basis with the tribal council.  And that normally

21  consists of financial reporting, any operational

22  strategies, updates, any major personnel issues

Page 15

1   or -- that's all I can think of at the moment.

2       Q.   Okay.  When you meet with the tribal

3   council as -- for either Big Picture, Ascension, or

4   TED, are those in the same meeting or do each of

5   those three entities have different meetings on a

6   monthly basis?

7       A.   Normally, the financial reporting is all

8   done at one time, at the same meeting.

9       Q.   For all three entities?

10      A.   Yes.

11      Q.   Okay.  And are there any other planned

12   meetings that you would have as comanager of TED,

13   Ascension, or Big Picture with the tribe on a

14   regular basis?

15      A.   As issues come up that the tribal council

16   may need to deal with.

17      Q.   Okay.  So -- but it wouldn't be a regular

18   occurrence, like these monthly meetings; correct?

19      A.   We do have regular monthly meetings.

20      Q.   Okay.  At the regular monthly meetings,

21   are meetings for TED, Big Picture, and Ascension all

22   done at the same meeting?

JA3141

Page 16

1    A.   Yes.

2    Q.   Okay.  And aside from those monthly

3   meetings where you discuss financial reporting of

4   those entities, do you have other regular meetings

5   throughout the year?

6    A.   We do an annual strategic planning

7   meeting.

8    Q.   And who is present at the annual strategic

9   planning meeting?

10    A.   The tribal council, usually myself, and

11   then members of Ascension Technologies.

12    Q.   When was the last annual strategic

13   planning meeting?

14    A.   May of 2017.

15    Q.   And where was that meeting held?

16    A.   In the Puerto Rico office.

17    Q.   And who from Ascension was present at that

18   meeting?

19    A.   Brian McFadden, Ivelisse Morales, Lori

20   Alsterberg, Alan Reeves, Karrie Wichtman, Tanya

21   Gibbs -- oh, sorry.  I was supposed to be doing

22   Ascension.

Page 17

1      Q.   It's okay.  I'll go back through and you

2   can identify.  That's not a problem.

3      A.   Just trying to go around the table.

4      Q.   I would just have to ask you another

5   question anyways, so.

6      A.   That's it.

7      Q.   Okay.  So Karrie Wichtman and Tanya Gibbs

8   don't work for Ascension, do they?

9      A.   No, they don't.

10      Q.   Who do they work for?

11      A.   They're general counsel for Big Picture

12   Loans.

13      Q.   Okay.  And they're also your lawyers in

14   this case; correct?

15      A.   Yes.

16      Q.   Okay.  And --

17      A.   Or Karrie is.

18      Q.   And she works at the law firm of Rosette;

19   right?

20      A.   Yes, she does.

21      Q.   And so does Ms. Gibbs; correct?

22      A.   Yes.

Page 18

1    Q.   And then are Alan Reeves and Lori

2    Alsterberg employees of Ascension?

3    A.   Yes.

4    Q.   And so is Brian McFadden and Ivelisse

5    Morales; correct?

6    A.   Yes.

7    Q.   How many tribal council members are there?

8    A.   Nine.

9    Q.   And can you name them for me, please?

10   A.   James Williams, Jr.; Giiwegiizhigookway

11   Martin, Gertrude McGeshick, Susan McGeshick,

12   Michelle Hazen, Tyrone McGeshick, Henry Smith, and

13   Michael Hazen, Jr.

14        Is that nine?

15   Q.   I think it's -- it's eight.

16   A.   Gerdy, Suzie, Shelly, Mike, Tyrone,

17   Henry -- who am I forgetting?

18   Q.   It's okay.  We can come back to it.  It's

19   not a big deal.

20   A.   Tyrone, Henry, Mike -- did I say Mike

21   Hazen?

22   Q.   You did.  Michael Hazen, Jr.?

Page 19

1    A.  Yes.

2    Q.  Yes.

3    A.  That's nine.  I counted nine.

4         Did you list me, Michelle Hazen?

5    Q.  Uh-huh.  Yes.

6    A.  James Williams, Jr., Giiwegiizhigookway

7  Martin, Susan McGeshick, Gertrude McGeshick -- oh,

8  Mitchell McGeshick.  I'm sorry.

9    Q.  Okay.  So at the tribal council meetings

10  that we discussed earlier, are all the tribal

11  council members invited to attend?

12    A.  Yes.

13    Q.  And who would be there for Big Picture on

14  the monthly meetings?

15    A.  I would.

16    Q.  Anybody else?

17    A.  No.

18    Q.  So at the monthly meetings with the tribal

19  council, the only attendees would be the tribal

20  council members and yourself; is that correct?

21    A.  Yes, most of the time.

22    Q.  Are notes taken of those meetings?

**JA3145**

1    A.   Yes.

2    Q.   And who takes the notes?

3    A.   The secretary.

4    Q.   And who is that?

5    A.   Gertrude McGeshick.

6    Q.   And are the notes provided to you at the

7  end of the meeting?

8    A.   They are provided usually the next month,

9  at the next meeting.

10    Q.   And are they -- are they something that

11  you would keep in your office at Big Picture?

12    A.   No.  We usually leave them on the -- or I

13  usually leave them on the table at the meeting to be

14  destroyed.

15    Q.   So you get the meeting minutes and you

16  just leave them there?

17    A.   Well, after we read them and approve them.

18    Q.   Okay.  You said usually it's just the

19  tribal council and yourself that would attend the

20  meetings?

21    A.   Yes.

22    Q.   When would someone else also be in

Page 21

1  attendance at the meetings?

2      A.  Well, there's occasions that Brian may be

3  on-site at Big Picture and he will attend the

4  meeting with me as well.

5      Q.  And you're referring to Brian McFadden?

6      A.  Yes.

7      Q.  Has there ever been anyone else that you

8  know of in attendance at the meetings?

9      A.  Karrie Wichtman or Tanya occasionally have

10  been --

11     Q.  Okay.

12     A.  -- at a meeting.

13     Q.  And that's Tanya Gibbs; correct?

14     A.  Tanya Gibbs.

15     Q.  How long did the annual strategic planning

16  meeting last?

17     A.  Actually, it was scheduled over three

18  days.

19     Q.  And what -- what was the purpose of the

20  annual strategic planning meeting?

21     A.  Can you be more specific?

22     Q.  Why do you have an annual strategic

Page 22

1   planning meeting?

2       A.   To discuss operational strategies,

3   marketing strategies, where the business is moving

4   and how it's going to move forward in the future.

5       Q.   Is there someone at -- is there an agenda

6   for the meeting?

7       A.   Yes.

8       Q.   And who created the agenda?

9       A.   We worked collectively, Ascension and Big

10  Picture.

11      Q.   Okay.  And were there notes taken of the

12  different meetings and -- and sessions that were

13  held at the strategic planning meeting?

14      A.   Yes.

15      Q.   And do you know who took the notes?

16      A.   I mean several people, probably, took

17  their own notes.

18      Q.   Did you take notes?

19      A.   Yes.

20      Q.   Okay.  And did you bring those back with

21  you from Puerto Rico?

22      A.   Yes.

Page 23

1      Q.   Was anyone else at the meeting from Big

2   Picture, the annual strategic planning meeting in

3   May 2017?

4      A.   No.

5      Q.   Did all of the tribal officials attend?

6      A.   Not all of them.

7      Q.   Who attended?

8      A.   James Williams Jr.; Henry Smith; myself,

9   Michelle Hazen; Susan McGeshick; Gertrude McGeshick,

10   and I believe that was all of them.

11     Q.   Okay.  Thank you.  How long -- I

12   understand the meeting lasted three days.

13          How long were you in Puerto Rico for?

14     A.   Four days, I think.

15     Q.   When did you become the CEO of Big

16   Picture?

17     A.   August of 2014 or -- I'm sorry, did you

18   say CEO?

19     Q.   Yes.

20     A.   Oh.  I strike that.

21     Q.   Okay.  That's fine.

22     A.   December of 2015.

Hazen, Michelle

Page 24

1    Q.  When did you become the comanager of Big

2  Picture?

3    A.  August of 2014.

4    Q.  What happened in August of 2014 that

5  prompted you to become the comanager?

6    A.  What happened?

7    Q.  Yes.

8    A.  What do you mean by that?

9    Q.  Well, that was a bad question.  I'll just

10  withdraw my question for that.

11      When was Big Picture Loans created?

12    A.  August of 2014.

13    Q.  Okay.  What about TED?

14      When did you become the comanager of TED?

15    A.  Early 2015.  I don't recall the exact

16  date.

17    Q.  When was TED created?

18    A.  Early 2015 --

19    Q.  Okay.

20    A.  -- I don't recall the month.

21    Q.  When was Ascension created?

22    A.  Early 2015.

Page 25

1      Q.   And when did you become the comanager of

2   Ascension?

3      A.   When it was created.

4      Q.   Prior to being comanager of Big Picture,

5   what did you do for work?

6      A.   I was the CEO of the tribal lending --

7   tribal lending entities.

8      Q.   What were the names of those entities?

9      A.   Red Rock Tribal Lending and Duck Creek

10   Tribal Financial.

11      Q.   And how long were you the CEO of those

12   tribal entities?

13      A.   Actually, I strike that too.  I was only

14   the CEO of Duck Creek.

15      Q.   And what was your position at Red Rock?

16      A.   I was the comanager.

17      Q.   Okay.  Who -- when we say "comanager," who

18   was the other manager that was the other comanager?

19      A.   James Williams, Jr.

20      Q.   And is he the comanager for TED, Big

21   Picture, and Ascension?

22      A.   Yes.

JA3151

USCA4 Appeal: 21-2116    Doc: 26-6      Filed: 02/07/2022    Pg: 118 of 503
Case 3:17-cv-00461-REP  Document 1007-8  Filed 02/23/21  Page 26 of 250 PageID# 34264

1     Q.   And was he also a comanager of Red Rock

2  Tribal Lending with you?  Actually, I'll withdraw my

3  question.

4         Do you know if Mr. Williams or Craig

5  Mansfield were a comanager of Red Rock Tribal

6  Lending with you?

7     A.   I don't recall.

8     Q.   Okay.  When did you become a comanager or

9  CEO of the tribal lending entities?

10        MR. GRAY:  Objection to the form.  Can you

11    clarify which entities?

12        MS. KELLY:  Either one.

13        THE WITNESS:  Can you repeat your

14    question?  I'm sorry.

15  BY MS. KELLY:

16     Q.   At what time did you get involved with

17  either of the tribal lending entities, either as a

18  CEO or comanager?

19     A.   2011.

20     Q.   And in 2011, which tribal lending entity

21  were you involved with?

22     A.   Red Rock Tribal Lending.

10/16/2017

Hazen, Michelle

Case 3:17-cv-00461-REP  Document 100-8  Filed 02/23/21  Page 27 of 250 PageID# 34265

Page 27

1     Q.   And were you also the CEO of Duck Creek at

2   that time?

3     A.   I don't recall the date.

4     Q.   Okay.

5     A.   I don't recall the date that I became a

6   CEO.

7     Q.   So in 2011 you became a comanager at Red

8   Rock; correct?

9     A.   Yes.

10     Q.   Prior to that, what did you do for

11   employment?

12     A.   I was a tribal council member, an

13   executive officer from 1994 to 2014.

14     Q.   So from 2014 till December 2016, you were

15   not a tribal council member?

16     A.   2015 and 2016 I was not.

17     Q.   Okay.  Why were you not a tribal council

18   member during that time?

19     A.   I was not reelected.

20     Q.   Okay.  What did you -- did you do anything

21   for employment during the time that you were a

22   tribal council member in 1994 to 2014?

1    A.   Yes.  I also worked in accounting for nine

2   years in that time frame.

3    Q.   Where did you work?

4    A.   At the Lac Vieux Desert Public Enterprise

5   & Finance Commission.

6    Q.   And what time frame did you work there?

7    A.   From 1993 to 2002.

8    Q.   And from 2002 to 2011, did you have any

9   other employment?

10    A.   Tribal council secretary.

11    Q.   Anything else?

12    A.   No.

13    Q.   Okay.  Are you a member of any

14   professional organizations?

15    A.   Like, can you be more specific?

16    Q.   Like the Online Lenders Alliance?

17    A.   Online Lenders Association.

18    Q.   Okay.

19    A.   The Native American Financial Services

20   Association.

21    Q.   How long have you been a member of the

22   Online Lenders?

1        MR. GRAY:  Objection to form.  Are you

2    asking her personally or in her capacity as a

3    CEO?

4        MS. KELLY:  I will rephrase my question.

5    BY MS. KELLY:

6    Q.   Are you or one of the entities you work

7  for a member of the Online Lenders?

8    A.   Oh, Big Picture is.

9    Q.   Okay.  And how long has Big Picture been a

10  member?

11   A.   Since its creation.

12   Q.   And prior to that, has any other entity

13  you've worked for been a member of the Online

14  Lenders?

15   A.   Yes.

16   Q.   What other entities?

17   A.   Red Rock Tribal Lending.

18   Q.   Anything else?

19   A.   I don't -- I don't recall if Duck Creek

20  was.

21   Q.   Okay.  When did you first hear about this

22  lawsuit?

Page 30

1    A.   When I was served.

2    Q.   Was that sometime in the summer of 2017?

3    A.   Yes.

4    Q.   In late June or early July?

5    A.   I don't recall.

6    Q.   Okay.  What is your understanding of the

7   allegations as to Big Picture in this lawsuit?

8        MR. GRAY:  Objection.  Calls for a legal

9    conclusion.

10   BY MS. KELLY:

11    Q.   You can answer.

12    A.   Basically, violation of the usury laws.

13    Q.   Okay.  Have you ever been deposed before?

14    A.   Pardon me?

15    Q.   Have you ever had your deposition taken

16   before?

17    A.   No, I have not.

18    Q.   Okay.  Did you do anything to prepare for

19   your deposition today?

20    A.   Yes, I did.

21    Q.   What did you do?

22    A.   Met with my attorneys.

JA3156

Page 31

1      Q.   Did you do anything else?

2      A.   No, I did not.

3      Q.   Did you speak to anyone, aside from your

4   lawyers, about this deposition?

5      A.   I was in a meeting with -- that Richard

6   Scheff was in.  I don't remember the other attorneys

7   that were in the room.

8      Q.   Okay.  Did you review any documents?

9      A.   No.

10     Q.   How many --

11     A.   Or I'm sorry.  Yes, we did.

12     Q.   Okay.  What documents did you review?

13     A.   I don't recall.

14     Q.   Can you think of any of the documents you

15   reviewed?

16     A.   I don't recall.

17     Q.   So sitting here today, you can't think of

18   a single document that you looked at to prepare for

19   this deposition?

20     A.   Specifically, no.  I don't recall.

21     Q.   Okay.  Since you've never been deposed

22   before, I'm just going to go through a couple ground

JA3157

1    rules.

2        A.   Okay.

3        Q.   Since Lisa is our court reporter, she's

4    typing down everything you say.  So just continue to

5    answer with a verbal answer rather than head nodding

6    or shaking your head, which you've been doing very

7    well so far.  If you need a break, you can take one

8    at any time.  As -- if I have a question pending,

9    though, I would just ask that you would answer the

10    question prior to taking a break.

11        A.   Okay.

12        Q.   And then if you don't understand a

13    question, then ask me to rephrase it and I'm happy

14    to do it.  But if you answer my question, I'm going

15    to assume that you understand what I was asking.

16        Okay?

17        A.   Okay.

18        Q.   Aside from the affidavit that you signed

19    in this case, have you ever signed an affidavit or

20    any other statements under oath before?

21        A.   I don't recall.

22        Q.   Okay.  So in this case, there's -- your

Page 33

1   lawyers have filed a motion asserting factors that

2   would make Big Picture immune from the lawsuit.

3        And so I'm going to ask you some questions

4   about the various factors that --

5        MR. ANTHONY:  Can I -- can we take a short

6    break because I need to fill you in on

7    something.

8        MS. KELLY:  Sure.

9        THE VIDEOGRAPHER:  The time is 10:52:15.

10    Off the record.

11       (Off the record at 10:52 a.m.)

12        (Back on the record at 12:42 p.m.)

13        THE VIDEOGRAPHER:  On the record.  The

14    time is 12:42:37.

15  BY MS. KELLY:

16    Q.   Ms. Hazen, we were just about to start

17  talking about what is -- the lawyers are referring

18  to as breakthrough factors for purposes of one of

19  the briefs that was filed in this matter.  So I just

20  want to start by talking through the first factor

21  and ask you some questions about how Big Picture

22  Loans was created.

Page 34

1          Can you walk me through when you -- can

2    you walk me through how the tribe -- I'm going to

3    strike -- withdraw that.

4          Whose idea was it for -- to create Big

5    Picture Loans?

6      A.   The tribe's.

7      Q.   Who in the tribe, specifically?

8      A.   Tribal council.

9      Q.   Which specific tribal council member

10   brought it up?

11     A.   What was your question?

12     Q.   Which specific tribal council member

13   brought it up?

14     A.   I don't recall.

15     Q.   Do you recall when the idea was first

16   mentioned?

17     A.   I don't specifically recall.

18     Q.   So how do you know it was the tribe's

19   idea?

20     A.   Because I was on the tribal council and

21   part of the discussions.

22     Q.   Okay.  Tell me which discussions you can

**JA3160**

Page 35

1  recall?

2      A.   There was several discussions as far as a

3  long-term economic development plan and the fact

4  that we need to diversify in economic development.

5      Q.   Why wasn't Red Rock and Duck Creek

6  providing you with the economic development that you

7  needed and why did you feel like you needed to

8  create Big Picture Loans?

9      A.   To further our economic development

10  efforts.

11      Q.   How would the creation of Big Picture

12  Loans further it?

13      A.   It would help us reach our long-term goals

14  of self-sufficiency and self-determination for our

15  tribal members.

16      Q.   So was Red Rock and Duck Creek not meeting

17  your long-term goals for self-sufficiency?

18      A.   They were contributing to the government

19  budget to help us provide essential government

20  services to our people.

21      Q.   What percentage contribution would you

22  receive on a monthly basis from Red Rock Tribal

Page 36

1  Lending out of the revenue?

2      A.  2 percent of the gross.

3      Q.  Okay.  And when Big Picture Loans was

4  created, what percentage of the revenue would the

5  tribe end up receiving from the proceeds of Big

6  Picture Loans?

7      A.  I'm sorry, can you repeat your question?

8      Q.  Sure.  What percentage of the revenue

9  would the tribe receive when Big Picture Loans was

10  created?

11         MR. GRAY:  Objection to the form,

12          "revenue."

13  BY MS. KELLY:

14      Q.  It's the same measure of revenue as Red

15  Rock.  What was the percentage that the tribe would

16  receive from Big Picture?

17      A.  It was gross -- or 2 percent of the gross

18  revenue minus bad debt, expenses, and then a

19  2 percent reinvestment into Big Picture Loans.

20      Q.  Okay.  So it was the same 2 percent of the

21  gross revenue as Red Rock, but there was also a

22  2 percent reinvestment into Big Picture Loans;

**JA3162**

Page 37

1    correct?

2         MR. GRAY:  Objection to the form.

3         THE WITNESS:  I'm not understanding your

4      question.

5    BY MS. KELLY:

6      Q.  Okay.  Then why don't you walk me through

7    the financials of Big Picture.

8         What does the tribe get each month?

9         MR. ANTHONY:  Are you speaking now or are

10      you speaking in 2015, '16?

11   BY MS. KELLY:

12     Q.  When Big Picture was created, what were

13   the financials?  What would the tribe receive?

14     A.  2 percent of the gross.

15     Q.  Okay.

16     A.  And then 2 percent reinvestment back into

17   BPL.

18     Q.  Okay.  And was the tribe allowed to take

19   the reinvestment percentage back into BPL any time

20   it wanted to?

21     A.  I don't understand your question.

22     Q.  If the tribe wanted money from BPL, could

Page 38

1  it just take it at any time?

2      A.  It was reinvested into the portfolio.

3      Q.  And so if the tribe needed money, and BPL

4  had money in its portfolio, could the tribe take it

5  at any time?

6      A.  I don't know.  That never happened.

7      Q.  Okay.  Who picked the name "Big Picture

8  Loans"?

9      A.  It was kind of a group discussion, idea.

10      Q.  Who suggested the name "Big Picture

11  Loans"?  Who did you first hear that name from?

12      A.  I don't recall.

13      Q.  Okay.  Who was in the group when you

14  picked the name "Big Picture Loans"?

15      A.  I don't recall.  I just know I was part of

16  that conversation at some point.

17      Q.  Do you know when that was?

18      A.  Before Big Picture was formed.

19      Q.  When did the tribe decide to create Big

20  Picture Loans?

21      A.  I don't recall.

22      Q.  And you don't recall whose idea it was to

JA3164

Page 39

1   create Big Picture Loans; correct?

2      A.   No, I don't.  No.

3      Q.   When -- after the tribe decided to create

4   Big Picture Loans, what happened next?

5         MR. GRAY:  Objection to form.

6         THE WITNESS:  Can you be more specific?

7      There's several things that happened.

8   BY MS. KELLY:

9      Q.   Can you walk me through each one, please?

10        MR. GRAY:  Objection to the form.

11        THE WITNESS:  I -- it was a long process.

12      I --

13   BY MS. KELLY:

14      Q.   Okay.  Who was involved in the process?

15      A.   The tribal council.

16      Q.   Okay.  And so after the tribe decided to

17   create Big Picture Loans, what was the next step?

18        The tribe makes a decision, we're going to

19   create this lending entity, then what happened?

20        MR. GRAY:  Objection to the form and asked

21       and answered.

22        THE WITNESS:  There were documents drafted

Page 40

1      by legal.

2   BY MS. KELLY:

3      Q.   Who drafted the documents?

4         MR. GRAY:  Asked and answered.

5         THE WITNESS:  Karrie Wichtman.  I mean, I

6      don't know which attorney she had help her, but

7      I know Karrie.

8   BY MS. KELLY:

9      Q.   Okay.  And who negotiated the amount that

10   the tribe would receive?

11         MR. GRAY:  Objection to form.

12   BY MS. KELLY:

13      Q.   Whose idea was it for the tribe to get

14   2 percent of the revenue?

15         MR. GRAY:  Same objection.

16         THE WITNESS:  The tribe negotiated that.

17   BY MS. KELLY:

18      Q.   Okay.  Did the tribe try to get more than

19   2 percent?

20      A.   There were other -- I don't know if you

21   want to call them provisions that we would get more,

22   at a certain point.

JA3166

USCA4 Appeal: 21-2116   Doc: 26-6   Filed: 02/07/2022   Pg: 133 of 503
Case 3.17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 41 of 250 PageID# 34279
10/16/2017
Hazen, Michelle

Page 41

1    Q.   When would that point be when the tribe

2   would get more?

3    A.   When the loan was 50 percent paid.

4    Q.   Okay.  So you mentioned a loan, who --

5   what kind of loan are you talking about?

6    A.   Acquisition loan.

7    Q.   And who is that with?

8    A.   Bellicose and Eventide and Lac Vieux

9   Desert.

10    Q.   And how much was the loan for?

11    A.   Up to 300 million.

12    Q.   And what was the tribe purchasing for

13   $300 million?

14    A.   The intellectual property of Bellicose

15   which included the existing software and data and

16   the expertise to run a successful business.

17    Q.   Why did you need the expertise of

18   Bellicose to run Big Picture Loans?

19    A.   The tribe was still learning the business.

20    Q.   So when Big Picture Loans was created, the

21   tribe still needed Bellicose employees' expertise to

22   run the business; correct?

JA3167

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 134 of 503

1        MR. GRAY:  Objection.  That

2     mischaracterizes her testimony.

3        THE WITNESS:  Can you repeat your

4     question?

5  BY MS. KELLY:

6     Q.   Sure.  So when the tribe created Big

7  Picture Loans, it needed the expertise of the

8  Bellicose employees to successfully run the tribal

9  lending business; correct?

10       MR. GRAY:  Same objection.

11       THE WITNESS:  No.  I don't think that's

12     what I'm saying.

13  BY MS. KELLY:

14     Q.   Okay.  What were you trying to say?

15     A.   The tribe was operating a successful

16  business.  The -- the -- some of the expertise, yes,

17  I guess we did need still.  The -- I don't know what

18  the word is.  Yes, we did.

19     Q.   Okay.  And what -- so your understanding

20  is the $300 million loan was to purchase Bellicose;

21  correct?  And all that came with it, the expertise

22  of the employees, the intellectual property, all of

USCA4 Appeal: 21-2116    Doc: 26-6      Filed: 02/07/2022    Pg: 135 of 503
10/16/2017                          Hazen, Michelle
Case 3.17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 43 of 250 PageID# 34281

1   that; correct?

2           MR. GRAY:  Objection to the form.

3           THE WITNESS:  Yes.

4   BY MS. KELLY:

5       Q.   Do you -- have you ever heard of the name

6   "Eventide"?

7       A.   Eventide.

8       Q.   Eventide.

9       A.   Yes.

10       Q.   What is Eventide?

11       A.   It was the seller in the transaction.

12       Q.   And so Eventide is the entity that sold

13   Bellicose; is that correct?

14       A.   Yes.

15       Q.   Okay.  And do you know who one of the

16   principal owners of Eventide is?

17           MR. GRAY:  Objection to form.

18           THE WITNESS:  Yes.

19   BY MS. KELLY:

20       Q.   And who is that?

21       A.   Matt Martorello.

22       Q.   Do you know if Eventide has any other

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 136 of 503
Case 3.17-cv-00461-REP   Document 10p7-8   Filed 02/23/21   Page 44 of 250 PageID# 34282
10/16/2017
Hazen, Michelle

Page 44

1   owners?

2       A.   I don't know.

3       Q.   Do you know if Brian McFadden is an owner

4   in Eventide?

5       A.   Yes.

6       Q.   And is James Dowd?

7       A.   Yes.

8       Q.   And is Simon Liang?

9       A.   Yes.

10       Q.   Okay.  You said that you purchased

11   Bellicose for up to $300 million.

12           Can you explain to me why you say "up to

13   $300 million," and not a set sum of $300 million?

14       A.   That was the maximum.  There's a chance we

15   may not pay that much based on how the business does

16   because it sunsets after 7 years.

17       Q.   Okay.  Is there a minimum amount that Big

18   Picture will pay?

19       A.   No.

20       Q.   Okay.  Are you aware the conditions that

21   Eventide sent -- has in the agreement for Big

22   Picture Loans in terms of the day-to-day operations?

Page 45

1          MR. GRAY:  Objection to the form.

2          THE WITNESS:  I mean I've seen the

3     documents, but I don't recall specifically.

4  BY MS. KELLY:

5      Q.   Okay.  What happened to Red Rock when the

6  tribe created Big Picture Loans?

7      A.   It wound up and dissolved.

8      Q.   And what happened to the outstanding loans

9  that consumers had taken out with Red Rock?

10      A.   They were assigned to Big Picture Loans.

11      Q.   Okay.  About how -- how much was that

12  portfolio worth at the time those loans were

13  assigned?

14      A.   I don't recall.

15      Q.   Does 15- to $23 million refresh your

16  recollection?

17          MR. GRAY:  Objection to form.

18          THE WITNESS:  I don't recall.

19  BY MS. KELLY:

20      Q.   Okay.  What happened to the loan that the

21  tribe had with Iron Fence Investments when Red Rock

22  dissolved?

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 138 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 46 of 250 PageID# 34284

Page 46

1          MR. GRAY:  Objection.  Form of the

2     question.

3          THE WITNESS:  I don't recall.

4   BY MS. KELLY:

5     Q.   Do you know who one of the owners of Iron

6   Fence Investments is?

7          MR. GRAY:  Objection to the form of the

8     question.

9          THE WITNESS:  Yes.

10  BY MS. KELLY:

11    Q.   Who is that?

12    A.   Matt Martorello.

13    Q.   What was the amount of the loan that was

14  outstanding to Red Rock at the time of the transfer

15  to Big Picture Loans?

16         MR. GRAY:  Objection to the form of the

17    question.

18         THE WITNESS:  I don't recall.

19  BY MS. KELLY:

20    Q.   Does $30 million sound familiar?

21         MR. GRAY:  Objection to the form of the

22    question.

Page 47

1          THE WITNESS:  I don't recall.

2    BY MS. KELLY:

3      Q.   Okay.  Did Big Picture Loans pay Red Rock

4    for anything?

5          MR. GRAY:  Objection to the form of the

6      question.

7          THE WITNESS:  No.

8          (Whereupon, the Affidavit was marked as

9    Plaintiffs' Exhibit 1 for Identification by the

10   Reporter.)

11   BY MS. KELLY:

12     Q.   Okay.  Ms. Hazen, I've just handed you a

13   document entitled "Affidavit of Michelle Hazen" that

14   was filed in this matter in support of Big Picture's

15   motion for sovereign immunity.

16          Have you seen this document before?

17     A.   Yes.

18     Q.   And is this your signature on Page 6?

19     A.   Yes.

20     Q.   Did you type up this document?

21     A.   Did I type it?  No.

22     Q.   Where did you -- did you make any edits to

USCA4 Appeal: 21-2116    Doc: 26-6       Filed: 02/07/2022    Pg: 140 of 503
10/16/2017
Hazen, Michelle
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 48 of 250 PageID# 34286

1  this document?

2     A.  Yes, work with my -- yes.

3     Q.  What edits did you make to this document?

4       MR. GRAY:  Objection to the extent that

5  it's calling for some privilege.  But to the

6  extent it doesn't, you can answer.

7       THE WITNESS:  Specifically to the process

8  to take out the loan.

9  BY MS. KELLY:

10     Q.  Is that paragraph 30?

11     A.  Yes.  I don't recall any other specific --

12     Q.  If I can direct your attention to

13  paragraph 9?

14     A.  What was that?

15     Q.  Paragraph 9, please.

16       It says "Red Rock's business was regulated

17  by the Tribal Financial Services Regulatory

18  Authority."

19     A.  Yes.

20     Q.  What is that?

21       MR. GRAY:  Objection to the form.

22       MS. KELLY:  What's the objection to the

Page 49

1      form?

2          MR. GRAY:  Are you asking her what the

3      Tribal Financial Services Regulatory Authority

4      is or what the regulation means?  There's also

5      part of that question --

6          MS. KELLY:  It's the authority.

7          MR. GRAY:  You're asking her what the

8      authority is?

9          MS. KELLY:  Yes.

10          MR. GRAY:  Okay.

11          THE WITNESS:  It's the regulatory

12      authority.

13   BY MS. KELLY:

14      Q.  For what?

15      A.  It regulates the lending entity.

16      Q.  Who is on the authority?

17      A.  Lily Williams and Mesobi McGeshick

18   (phonetic).

19      Q.  Are those the only two individuals on the

20   authority?

21      A.  Currently, yes.

22      Q.  Okay.  Is Ms. Williams related to

Page 50

1   cochairman James Williams?

2       A.   Yes.

3       Q.   And he's the cochairman of Big Picture,

4   TED, and Ascension; correct?

5       A.   No, he's the comanager.

6       Q.   Sorry, the comanager?

7       A.   Yes.

8       Q.   Okay.  How are they related?

9       A.   Brother and sister.

10      Q.   Okay.  Does Big Picture Loans have to pay

11   anything to the Tribal Financial Services Regulatory

12   Authority?

13      A.   Yes.

14      Q.   What does it have to pay?

15      A.   Quarterly fee.

16      Q.   How much is that?

17      A.   36,000 per quarter.

18      Q.   And what does that amount go to?

19          MR. GRAY:  Objection to the form.

20          THE WITNESS:  I don't know.

21   BY MS. KELLY:

22      Q.   Does the tribe end up getting that money

**JA3176**

Page 51

1    or does it stay with those officials?

2        A.   Oh, it goes to the tribe's general fund.

3        Q.   Are you sure about that?

4        A.   Yes.

5        Q.   Okay.  Paragraph 10, if you look at

6    paragraph 10, "In order to learn the lending

7    industry, Red Rock contracted with Bellicose VI,

8    LLC, for vendor management services, compliance

9    management assistance, marketing material

10   development, and development of risk modeling and

11   data analytics."

12           Do you see that?

13       A.   Yes.

14       Q.   What were the terms of the contract with

15   Bellicose?

16           MR. GRAY:  Objection to the form.

17           THE WITNESS:  I don't recall.

18   BY MS. KELLY:

19       Q.   Have you ever heard of an entity called

20   SourcePoint?

21       A.   Yes.

22       Q.   What is SourcePoint?

JA3177

1      A.   SourcePoint was the servicer for Red Rock.

2      Q.   And under the agreement that Red Rock had

3   with SourcePoint -- well, can you tell me what your

4   understanding was of the agreement Red Rock had with

5   SourcePoint?

6           MR. GRAY:  Objection to the form.

7           THE WITNESS:  It was a servicing agreement

8     to provide the service -- the vendor management

9     service, compliance services.

10   BY MS. KELLY:

11     Q.   Isn't it true that SourcePoint received

12   anything above the 2 percent that was given to the

13   tribe?

14         MR. GRAY:  Objection to the form.

15         THE WITNESS:  I don't understand your

16     question.

17   BY MS. KELLY:

18     Q.   Have you ever heard of a term called "to

19   sweep a bank account"?

20     A.   Yes.

21     Q.   And what is your understanding of what

22   that term means?

Page 53

1      A.   The money that's in the account is swept.

2      Q.   And taken out of that account and put

3   somewhere else; right?

4      A.   Yes.

5      Q.   And so in Red Rock's agreement with

6   SourcePoint, after payment of the 2 percent, isn't

7   it true that the remaining funds were swept and

8   provided to SourcePoint?

9          MR. GRAY:  Objection.  Mischaracterizes

10      testimony.

11          THE WITNESS:  I don't recall.

12          MS. KELLY:  I'm marking this Exhibit 2.

13          (Whereupon, the Servicing Agreement was

14   marked as Plaintiffs' Exhibit 2 for Identification

15   by the Reporter.)

16   BY MS. KELLY:

17      Q.   I've just handed you a document called

18   "Amended and Restated Servicing Agreement between

19   Red Rock Tribal Lending and SourcePoint VI, LLC."

20      Do you see that?

21      A.   Yes.

22      Q.   Have you seen this document before?

Page 54

1    A.   Yes.

2    Q.   Okay.  Can you turn to Page 5 of this

3    document?  Paragraph 2.25, tribal net profits.  It

4    states "Tribal net profits is calculated by adding

5    the sum of gross revenues, plus bad debt recoveries,

6    minus the sum of charge-backs and bad debt charge

7    offs and multiplying the sum of this amount by

8    2 percent, calculated on a monthly basis, all

9    calculated on a cash basis."

10         Do you see that?

11   A.   Yes.

12   Q.   And that is -- that reflects your

13   understanding of what the tribe would receive under

14   this agreement; correct?

15         MR. GRAY:  Objection to the form.

16         THE WITNESS:  Yes.

17   BY MS. KELLY:

18   Q.   If you turn to Page 8 of this document,

19   paragraph 3.5 called "servicing fee."  Paragraph

20   3.5.1 states "The parties hereto have agreed that

21   the success of the business is based in large part

22   upon the services provided to the enterprise by the

**JA3180**

Page 55

1  servicer.  As a result, enterprise has agreed to a

2  performance-based fee, equal to cash basis revenue,

3  remaining after payment of tribal net profits,

4  servicer advances, and servicing expenses.

5          The servicing fees shall be paid monthly

6  with the servicer having the ability to sweep

7  enterprise bank account amounts into the servicer's

8  bank account, on or before the 15th day of the

9  ensuing month."

10          Do you see that?

11     A.  Yes.

12     Q.   So after the 2 percent in tribal net

13  profits is paid, nothing else from Red Rock would go

14  to the tribe; correct?

15          MR. GRAY:  Objection to the form.

16          THE WITNESS:  No.

17  BY MS. KELLY:

18     Q.  What was --

19     A.  Oh, I'm sorry, yes.

20     Q.  Okay.  Do you know if SourcePoint had any

21  employees?

22     A.  Yes.

JA3181

Page 56

1    Q.   Who were SourcePoint's employees?

2    A.   Brian McFadden, Ivelisse Morales, James

3  Dowd, Simon Liang.

4    Q.   What did you do in -- well, I'm going to

5  withdraw that question.

6        If you look at paragraph 11 of your

7  affidavit, it states "While Red Rock received advice

8  and consulted with Bellicose about operations, all

9  final decisions about operations were made by Red

10  Rock managers."

11        Do you see that?

12    A.   Yes.

13    Q.   Was that you, one of the managers?

14    A.   Yes.

15    Q.   "As Red Rock's manager, I was notified

16  that Bellicose VI assigned its interest in the

17  contract with Red Rock to SourcePoint VI, LLC, on

18  April 15th, 2012.  Red Rock has no role in Bellicose

19  or SourcePoint's decisions about the assignment."

20        Do you see that?

21    A.   Yes.

22    Q.   "After four years of operating Red Rock,

JA3182

Page 57

1   LVD had gained considerable experience and knowledge

2   of the online lending industry."

3          Who at LVD had gained considerable

4   knowledge and experience in the online lending

5   industry at that time?

6      A.   The employees of Red Rock at that time

7   included myself and other tribal members.

8      Q.   So who were the other employees of Red

9   Rock that were tribal members at that time?

10     A.   Amber McGeshick, Ashley White, Chelsea

11  Edwards.  That's all I can recall at the moment.

12     Q.   And what experience did Amber have at that

13  time?

14         MR. GRAY:  Objection to the form.

15         THE WITNESS:  What -- experience in what?

16  BY MS. KELLY:

17     Q.   What was her job title?

18     A.   She was a customer service representative.

19     Q.   And what did she do as a customer service

20  representative for Red Rock?

21     A.   Several processes.

22     Q.   Can you just describe to me, in general,

Page 58

1   the different processes that she completed or

2   functions that she --

3       A.   Answered e-mails --

4       Q.   Go ahead.

5       A.   -- customer complaints, payment

6   arrangements, dealing with CFPB and BBB complaints,

7   bankruptcies.  I can't think of any more right now.

8       Q.   What about Ashley White, what did she do?

9   What was her job title?

10      A.   She was also a customer service

11  representative.

12      Q.   And did she have the same or different

13  responsibilities than Amber?

14      A.   Same.

15      Q.   What about Chelsea Edwards, was she also a

16  customer service representative?

17      A.   Yes.

18      Q.   Did she have the same or different job

19  responsibilities of Amber and Ashley?

20      A.   Same.

21      Q.   Were Amber, Ashley, and Chelsea kept on as

22  employees of Big Picture?

Page 59

1         MR. GRAY:  Objection to the form.

2         THE WITNESS:  They are Big Picture

3      employees.

4   BY MS. KELLY:

5      Q.   Okay.  How have their job responsibilities

6   changed since they became employees of Big Picture?

7         MR. GRAY:  Objection to the form.

8         THE WITNESS:  Their responsibilities and

9      their expertise has evolved, so with that their

10      responsibilities and duties have changed

11      accordingly.

12   BY MS. KELLY:

13      Q.   Okay.  What are Amber's responsibilities

14   at Big Picture now?

15      A.   Still handling e-mails, but e-mails --

16   there's different levels of e-mails that different

17   CSRs handle based on training and how they evolve.

18      Q.   So Amber is still a customer service

19   representative; correct?

20      A.   Yes, she is.

21      Q.   And she still handles e-mails, payment

22   arrangements?

JA3185

Page 60

1    A.   Yes.

2    Q.   Does she handle correspondence with the

3  CFPB or Better Business Bureau?

4    A.   Yes.

5    Q.   Does she also deal with bankruptcies?

6    A.   Yes.

7    Q.   Does she have any additional job

8  responsibilities?

9    A.   Not that I can think of right now.

10    Q.   Moving to Ashley.  Was she a customer

11  service representative for Big Picture?

12    A.   She actually was promoted to a senior

13  customer service representative of Big Picture.

14    Q.   Okay.  And what, if anything, changed in

15  her job responsibilities as a senior customer

16  service representative?

17    A.   Training other customer service

18  representatives is probably the biggest thing.

19    Q.   Can you think of any -- anything else?

20    A.   No.

21    Q.   Okay.  Chelsea Edwards, did she also

22  become a customer service representative for Big

Page 61

1   Picture?

2        A.   She also promoted to a senior customer

3   service representative.

4        Q.   And did -- how, if at all, did her job

5   responsibilities change at Big Picture?

6        A.   Training other customer service

7   representatives.

8        Q.   Is there anything else that changed about

9   her job responsibilities aside from the training

10   component?

11        A.   No.

12        Q.   Okay.  Going back to your affidavit in

13   paragraph 13.  It goes on to say that "LVD looked to

14   expand its online lending business to earn more

15   money for LVD, to employ more members and area

16   residents, and to acquire our vendors' businesses so

17   the lending would be more profitable."

18        Do you see that?

19        A.   Yes.

20        Q.   How did LVD intend to expand its online

21   lending business?

22        A.   By growing its portfolio.

Page 62

1      Q.   And how did it -- how did it do that with

2   Big Picture?

3           A.   The reinvestment into Big Picture.

4        Q.   Under the terms of the loan agreement with

5   Eventide, do you know if Eventide is entitled to the

6   reinvestment money if the tribe or Big Picture were

7   unable to meet its obligations?

8           MR. GRAY:  Objection to the form.

9           THE WITNESS:  I don't know.

10   BY MS. KELLY:

11      Q.   Okay.  So how is Big Picture expanding its

12   portfolio from where it was with Red Rock?

13           MR. GRAY:  Objection to the form.

14           THE WITNESS:  Reinvestment back into the

15       business and also seeking out other investors.

16   BY MS. KELLY:

17      Q.   Can you think of anything else?

18      A.   Well, a big piece is the tribe has also

19   invested.

20      Q.   Anything else?

21      A.   No.

22      Q.   Okay.  And then you also state here "and

1   to acquire our vendors' businesses so the lending

2   would be more profitable."

3           How does the acquisition of lenders'

4   businesses lead to lending being more profitable?

5       A.   Bringing things in-house so we're not

6   using third parties.

7       Q.   How have you -- how has Big Picture

8   brought things in-house?

9       A.   With the employees of Ascension

10   Technologies, doing the marketing, risk modeling and

11   data analytics, IT.

12       Q.   Are any employees or -- are any employees

13   of Ascension members of the tribe?

14       A.   Of which tribe?

15       Q.   Of the Lac Vieux Desert Band of Lake

16   Superior Chippewa Indians?

17       A.   Well, the comanagers are.

18       Q.   Right.  Are any of the employees?

19       A.   No.

20       Q.   Okay.  Do you get paid at all for being

21   the comanager of Ascension?

22       A.   No.

USCA4 Appeal: 21-2116    Doc: 26-6       Filed: 02/07/2022    Pg: 156 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 64 of 250 PageID# 34302

1      Q.   Okay.  When you say you brought things

2   in-house with marketing, is the marketing for Big

3   Picture done exclusively by Ascension?

4      A.   No.

5      Q.   Who else does the marketing for Big

6   Picture?

7      A.   Well, we work together to do the

8   marketing.

9      Q.   Okay.  What -- who at Big Picture -- which

10   Big Picture employees work with the employees of

11   Ascension to do the marketing?

12      A.   Myself and Brittany Pole, the compliance

13   specialist.

14      Q.   What specific duties of yours have you

15   done as part of the marketing component for Big

16   Picture?

17      A.   Well, always collaborating and discussion

18   and reviewing and approving any marketing that --

19   before it's released.

20      Q.   Is there anything else that you can think

21   of?

22      A.   No.

JA3190

Page 65

1    Q.   Okay.  In terms of risk modeling, who, at

2   either Big Picture or Ascension, is responsible for

3   risk modeling?

4    A.   At Ascension, would be John Norris and

5   Alan Reeves -- work together.  And then I am

6   involved in that at Big Picture.

7    Q.   And what do you do in terms of risk

8   modeling?

9    A.   Again, involved in the discussions and

10   collaborating on the models and then reviewing and

11   approving them before they're implemented.

12    Q.   Can you walk me through the last

13   discussion you had about risk modeling?

14    MR. GRAY:  Objection to the form.

15    THE WITNESS:  Actually, I can't

16   remember -- I can't remember which day last

17   week, but I had a discussion with Alan Reeves

18   to walk through a proposed underwriting model

19   that we're looking at implementing.

20   BY MS. KELLY:

21    Q.   Can you describe the model for me?

22    MR. GRAY:  Objection to the form.

JA3191

Page 66

1          THE WITNESS:  Basically, it's different

2     levels of credit scores.

3   BY MS. KELLY:

4      Q.   And what do you mean by "different levels

5   of credit scores"?

6      A.   I don't remember the exact tiers, but

7   it's -- I don't recall the exact tiers.

8      Q.   Okay.  In terms of data analytics, who at

9   Big Picture handles data analytics?

10      A.   What do you mean by "handles"?

11      Q.   You testified that you brought these

12   categories of things in-house at -- and with the

13   acquisition and creation of Big Picture Loans, and

14   one of them was data analytics.

15          So I'm asking who handles that?

16          MR. GRAY:  I'm going to object to that.

17     It mischaracterizes the deposition.

18          THE WITNESS:  I don't recall if that's

19     what I said.

20   BY MS. KELLY:

21      Q.   You said you brought four things in-house

22   and one of them was data analytics.  Who --

**JA3192**

Page 67

1        MR. GRAY:  I'll object to the form.

2   BY MS. KELLY:

3     Q.   Who handles data analytics?

4     A.   Alan Reeves at Ascension.

5     Q.   Do you -- does anyone at Big Picture

6   handle data analytics?

7     A.   Yes, I do.

8     Q.   And what -- what specifically do you do

9   for data analytics?

10      A.   Involved in conversation on those models

11   and reviewing and approving before they're

12   implemented.

13        MR. GRAY:  I don't want to interrupt your

14      flow, but can we take a break in the next half

15      hour?

16        MS. KELLY:  Oh, sure.

17   BY MS. KELLY:

18     Q.   In paragraph 13, you said that LVD looked

19   to expand its online lending business to earn more

20   money for LVD.

21        And we've previously discussed this, but

22   did LVD think that the 2 percent it was getting from

Page 68

1   Red Rock was not enough money to support the tribe?

2         MR. GRAY:  Object to the form.

3         THE WITNESS:  I don't know.

4   BY MS. KELLY:

5      Q.   Well, you were on the tribal council;

6   right?

7         MR. GRAY:  Object to the form.

8         THE WITNESS:  Yes, I was.

9   BY MS. KELLY:

10      Q.   And so LVD was getting 2 percent from Red

11   Rock, and you have here in your declaration that you

12   wanted to get more money for LVD.

13         So was 2 percent from Red Rock not enough?

14         MR. GRAY:  Object to the form.

15         THE WITNESS:  I think this was long term

16      and what it would mean for the benefit to the

17      tribe once we paid the loan off and 100 percent

18      of the profit went to the tribe.

19   BY MS. KELLY:

20      Q.   So 2 percent wasn't enough for the tribe;

21   right?

22         MR. GRAY:  Object to the form.  Asked and

JA3194

Page 69

1    answered.

2        THE WITNESS:  That's not what I said.

3    BY MS. KELLY:

4        Q.   Okay.  So LVD was fine continuing to make

5    200 percent until it -- 2 percent, until it paid off

6    the $300 million loan or until the end of 7 years;

7    is that correct?

8        MR. GRAY:  Object to the form.

9        Mischaracterization.

10        THE WITNESS:  That's not what I said.

11    BY MS. KELLY:

12        Q.   Okay.  Can you explain to me why my

13    statement was incorrect?

14        A.   Because I did not say that the 2 percent

15    was not enough.

16        Q.   So the tribe is fine with making 2 percent

17    from Red Rock and that kind of makes sense because

18    it continued to make 2 percent with Big Picture;

19    correct?

20        MR. GRAY:  Object to the form.

21        THE WITNESS:  That's not correct.

22

JA3195

Page 70

1   BY MS. KELLY:

2       Q.   It also had the opportunity to reinvest

3   2 percent; correct?

4           MR. GRAY:  Object to the form.

5           THE WITNESS:  Yes.

6   BY MS. KELLY:

7       Q.   Okay.  When you started Big Picture, do

8   you feel as though the contributions that the tribe

9   and the employees at the Big Picture Loans' offices

10  contributed was the equivalent of 2 percent of the

11  work of all the other entities, like, Ascension and

12  everybody else?

13          MR. GRAY:  Object to the form.  What are

14   you asking?

15          THE WITNESS:  I don't understand your

16   question.

17  BY MS. KELLY:

18      Q.   Okay.  Well, I'll withdraw that question.

19          When did Big Picture Loans start lending?

20      A.   December 1st, 2015.

21      Q.   What -- why did you wait so long from when

22  Big Picture was created, from the time you started

Page 71

1   lending?

2       A.   We were in the process of working out all

3   of the details on Big Picture Loans.

4       Q.   Are you referring to the acquisition or

5   purchase?

6       A.   Yes.

7       Q.   When Big Picture Loans started lending in

8   December 2015, was it licensed by the Tribal

9   Financial Services Regulatory Authority?

10      A.   Yes.

11      Q.   Was Ascension licensed as a vendor with

12   the Tribal Financial Services Regulatory Authority

13   in December 2015?

14      A.   Yes.

15      Q.   Do you ever recall receiving a notice of

16   violation from the Tribal Financial Services

17   Regulatory Authority?

18      A.   Yes.

19      Q.   And what was the reason for the violation?

20      A.   I don't recall.

21      Q.   What is TED?

22      A.   Tribal Economic Development Holdings.

JA3197

1    Q.   And why was TED created?

2    A.   To promote economic development for Lac

3  Vieux Desert Band and to hold tribal lending

4  entities.

5    Q.   So what tribal lending entities does TED

6  hold?

7    A.   Big Picture Loans.

8    Q.   Any others?

9    A.   No.

10    Q.   What is the purpose of having -- why does

11  the tribe need to have TED?  Why not just have Big

12  Picture Loans?

13      MR. GRAY:  Asked and answered.

14      THE WITNESS:  That's how the tribe chose

15    to structure it.

16  BY MS. KELLY:

17    Q.   Was it the tribe who made the decision on

18  the structure of entities?

19    A.   Yes.

20    Q.   Who at the tribe specifically made that

21  decision?

22    A.   The tribal council.

Page 73

1      Q.   And whose idea was it to create TED as the

2   holding company?

3          MR. GRAY:  Asked and answered.

4          THE WITNESS:  I believe it was a

5   recommendation from our legal team.

6          MS. KELLY:  Okay.  Sure.  We're going to

7   go off the record.  We're going to go off the

8   record.

9          THE VIDEOGRAPHER:  This ends Disk 1.  The

10   time is 1:38:37.  Off the record.

11          (Off the record at 1:38 p.m.)

12          (Back on the record at 1:48 p.m.)

13          THE VIDEOGRAPHER:  On the record with

14   Disk 2 of the testimony of Michelle Hazen in

15   the matter of Williams, et al. versus Big

16   Picture, et al.  The date is October 16th,

17   2017.  The time is 1:48:27.

18   BY MS. KELLY:

19      Q.   Ms. Hazen, we -- earlier we were talking

20   about your affidavit and I was referencing paragraph

21   13 about LVD looking to expand its online lending

22   business to earn more money for LVD.

Page 74

1          Are you aware if the tribe ever did any

2    studies or projections to try to figure out how much

3    money it could potentially earn?

4        A.   I know there was a pro forma done at one

5    time.

6        Q.   And who -- who did that?

7        A.   I don't recall.

8        Q.   What did those projections indicate the

9    tribe could earn in the first year of business?

10          MR. GRAY:  I'm going to object that those

11          records are held by the tribe.  But to the

12          extent that she can remember, I'm not going to

13          interfere with the answer.

14        MS. KELLY:  So your objection is she might

15          not remember?

16          MR. GRAY:  That's a record held by the

17          tribe, and -- that record's held by the tribe.

18        MS. KELLY:  But I'm not asking her for the

19          record.

20          MR. GRAY:  And that's why I --

21          MS. KELLY:  Your objection is she might

22          not recall?

JA3200

1        MR. GRAY:  To the extent that she

2   remembers --

3        MS. KELLY:  Well, I don't think that's an

4   appropriate objection.

5        MR. GRAY:  I understand.

6   BY MS. KELLY:

7      Q.   You can answer the question.

8      A.   I don't recall.

9      Q.   Do you know how much the tribe made in

10   fiscal year 2014 from its lending business with Red

11   Rock?

12      A.   I don't recall.

13      Q.   So when you state here in paragraph 13

14   that "LVD was trying to expand its online business

15   to earn more money for LVD," do you know how much

16   more money the tribe was trying to earn?

17      A.   No.  I just know that the potential is

18   millions.

19      Q.   And so is it fair to say that the tribe

20   was not making millions prior to the creation of Big

21   Picture Loans?

22        MR. GRAY:  Object to the form.

JA3201

Page 76

1          THE WITNESS:  I don't know.

2    BY MS. KELLY:

3      Q.   So you don't -- so you don't know how much

4    the tribe was making on Red Rock prior to the

5    creation of Big Picture Loans; correct?

6          MR. GRAY:  Asked and answered.

7          THE WITNESS:  I don't recall.

8    BY MS. KELLY:

9      Q.   Do you have a ballpark estimate?

10          MR. GRAY:  Asked and answered.

11          THE WITNESS:  I don't recall.

12   BY MS. KELLY:

13     Q.   Do you know how much the tribe has made

14   since the creation of Big Picture Loans, prior to

15   the filing of this lawsuit?

16     A.   Yes.

17     Q.   How much is that?

18     A.   3 million, approximately.

19     Q.   That's through the current date; correct?

20     A.   Through September 29th.

21     Q.   Okay.  And Big Picture has been in

22   business since December of 2015; correct?

JA3202

Hazen, Michelle

Page 77

1     A.   Yes.

2     Q.   Okay.  Do you know if that is -- that if

3  the tribe is making more now with Big Picture or did

4  it make more with Red Rock?

5          MR. GRAY:  Asked and answered.

6          MR. ANTHONY:  Can I ask one clarifying

7     question?  Are you speaking about Virginia --

8          MS. KELLY:  No --

9          MR. ANTHONY:  Generally, cumulatively,

10     annually?  I'm a little confused by the

11     question.

12          MS. KELLY:  No, I'm asking overall.

13          MR. ANTHONY:  Okay.

14          MS. KELLY:  Your client has objected to

15     giving me Virginia-specific information.

16          THE WITNESS:  What was your question

17     again?

18  BY MS. KELLY:

19     Q.   Overall.  So do you know if the tribe made

20  more in the Red Rock -- made more with the Red Rock

21  lending enterprise or has it made more with the Big

22  Picture lending enterprise?

JA3203

Page 78

1          MR. GRAY:  Objection to the form.

2          THE WITNESS:  I -- I guess is there a

3     specific timeframe or --

4  BY MS. KELLY:

5     Q.   For -- so we're looking at about a

6  two-year period -- right -- where the tribe made

7  approximately $3 million; correct?

8     A.   Yes.

9     Q.   And that amount reflects 2 percent of the

10  revenue; correct?

11         MR. GRAY:  Objection to the form.

12         THE WITNESS:  Yes.

13  BY MS. KELLY:

14    Q.   Okay.  So prior to December of 2015, in

15  the two-year period prior to that -- so from -- or,

16  I guess, 2014 to 2015 -- do you know how much the

17  tribe made from Red Rock?

18         MR. GRAY:  Asked and answered.

19         THE WITNESS:  I don't recall.

20  BY MS. KELLY:

21    Q.   Okay.  When you just testified to the

22  $3 million that the tribe has made to -- as of

Case 3:17-cv-00461-REP  Document 1007-8  Filed 02/23/21  Page 79 of 250 PageID# 34317
10/16/2017
Hazen, Michelle

Page 79

1   September 29th as part of Big Picture, that is just

2   the 2 percent tribal net profits; correct?

3        MR. GRAY:  Objection to form.

4        THE WITNESS:  No.

5   BY MS. KELLY:

6        Q.   That includes the reinvestment?

7        A.   No.

8        Q.   Okay.  So what -- what is included in the

9   $3 million?

10       A.   There was an amendment to the percentage

11   that was effective January 1st of 2017.  So that

12   increase is also included in there.

13       Q.   And that increase was how much?

14       A.   It's 3 percent now.

15       Q.   So effective January 31st, 2017, the

16   tribal net profit went from 2 percent to 3 percent;

17   correct?

18       MR. GRAY:  Objection to the form.

19       THE WITNESS:  No, January 1st, 2017.

20   BY MS. KELLY:

21       Q.   All right.  So from January 1st, 2017, to

22   the present, the tribal net profit increased from

JA3205

1   2 percent to 3 percent; correct?

2        MR. GRAY:  Objection to the form.

3        THE WITNESS:  Yes.

4   BY MS. KELLY:

5     Q.  And what prompted that increase?

6     A.  I don't recall.

7     Q.  Who prompted or what prompted the increase

8   in the amount of money going to the tribe, you're

9   saying you don't know at all?

10        MR. GRAY:  Asked and answered.

11        THE WITNESS:  I don't recall specifically

12      what prompted that.

13   BY MS. KELLY:

14     Q.  Did Mr. Martorello, the president and

15   manager of Eventide, say "I just want to get less

16   money each month"?

17        MR. GRAY:  Objection to form.

18        THE WITNESS:  No.

19   BY MS. KELLY:

20     Q.  Did the tribe say "I think we need more

21   money.  We're not making enough money as part of

22   this deal"?

Page 81

1          MR. GRAY:  Objection to form.

2          THE WITNESS:  No.

3   BY MS. KELLY:

4      Q.   Then what happened?

5      A.  I don't recall.

6      Q.   So you signed an addendum to the secured

7   promissory note giving an increase in the percentage

8   that the tribe can receive on a monthly basis, and

9   you have no idea why you signed that?

10         MR. GRAY:  Objection to form.

11         THE WITNESS:  I signed the finished

12      agreement, the addendum.  Yes, I did.

13  BY MS. KELLY:

14     Q.   So if you weren't involved in this change,

15  who was?

16         MR. GRAY:  Objection to form,

17      argumentative.

18         THE WITNESS:  I was involved.  I said I

19      don't recall --

20  BY MS. KELLY:

21     Q.   Why it happened?

22     A.   Specifically.

JA3207

Page 82

1      Q.   Why it changed?  You don't recall why this

2   provision of the agreement changed?

3          MR. GRAY:  Objection.  You're

4      mischaracterizing and you're not letting her

5      answer the questions.

6          THE WITNESS:  I don't recall.

7   BY MS. KELLY:

8      Q.   Who would know, since you don't know?

9          MR. GRAY:  Objection.  Argumentive.

10          THE WITNESS:  I don't know.

11   BY MS. KELLY:

12      Q.   So your testimony is you don't know what

13   prompted the change in the promissory note to allow

14   the tribe to increase its distribution from

15   2 percent to 3 percent; correct?

16          MR. GRAY:  Objection to the form and

17      mischaracterizing.

18          THE WITNESS:  I don't recall,

19      specifically, what started that conversation.

20   BY MS. KELLY:

21      Q.   Can you recall any conversations you had

22   with anyone about that?

USCA4 Appeal: 21-2116    Doc: 26-6      Filed: 02/07/2022    Pg: 175 of 503
Case 3:17-cv-00461-REP    Document 1007-8   Filed 02/23/21   Page 83 of 250 PageID# 34321
10/16/2017
Hazen, Michelle

Page 83

1        MR. GRAY:  Objection.  Argumentive.

2        THE WITNESS:  Specifically, no.

3  BY MS. KELLY:

4     Q.   So prior to January 1, 2017, how much

5  money had the tribe received from Big Picture Loans?

6        MR. GRAY:  Asked and answered.

7        THE WITNESS:  Sorry, can you repeat the

8     question?

9  BY MS. KELLY:

10     Q.   Sure.  Prior to January 1, 2017, how much

11  had the tribe received from Big Picture Loans'

12  business?

13     A.   I don't recall that number off the top of

14  my head.

15     Q.   Was it more than a million?

16        MR. GRAY:  Asked and answered.

17        THE WITNESS:  I don't recall.

18  BY MS. KELLY:

19     Q.   Who was in charge of the financials at Big

20  Picture Loans?

21     A.   I work with Simon Liang.

22     Q.   But you're the CEO and the comanager;

JA3209

Hazen, Michelle

Page 84

1  correct?

2      A.  Yes.

3      Q.  Do you know how much money Big Picture

4  Loans made for the tribe in 2016?

5          MR. GRAY:  Asked and answered.

6          THE WITNESS:  Off the top of my head, I do

7      not know.

8  BY MS. KELLY:

9      Q.  Do you have any guess, or idea --

10         MR. GRAY:  Asked and answered.

11  BY MS. KELLY:

12      Q.  -- estimation, of how much money the

13  company that you run made for your tribe?

14         MR. GRAY:  Argumentive.  Asked and

15      answered.

16         THE WITNESS:  I don't recall off the top

17      of my head.

18  BY MS. KELLY:

19      Q.  Okay.  And if you had to find out, you

20  would ask Simon Liang; correct?

21      A.  Yes.

22         MR. GRAY:  Mischaracterization.

Page 85

1          THE WITNESS:  Or I can look at my

2     financial reports that I don't have in front of

3     me.

4   BY MS. KELLY:

5       Q.   You have your own financial reports?

6       A.   That I get, yes.

7       Q.   And do you have financial reports that you

8     provide to the tribe?

9       A.   Yes.

10       Q.   On a monthly basis?

11       A.   Yes.

12       Q.   And you keep those documents?

13       A.   Yes.

14       Q.   Okay.  So we talked briefly about a loan

15     for $30 million that Iron Fence had provided to Red

16     Rock.

17          Do you remember that?

18          MR. GRAY:  Objection to the form.  I

19     believe that mischaracterizes prior testimony.

20          MS. KELLY:  I'm going to mark this Exhibit

21     3.

22          (Whereupon, the Letter was marked as

1  Plaintiffs' Exhibit 3 for Identification by the

2  Reporter.)

3  BY MS. KELLY:

4      Q.   I just put in front of you a document

5  called Exhibit 3.  It's a letter to you from

6  Mr. Martorello.  It states -- it's dated

7  December 11, 2015.

8          It says "As you are aware, Iron Fence

9  Investments, Inc. entered into a loan agreement with

10  Red Rock Tribal Lending, LLC, dated January 3rd,

11  2012.  Under which, IFI, Inc. agreed to loan Red

12  Rock the principal amount of $30 million.

13  SourcePoint Virgin Islands, or VI, a successor to

14  IFI, now holds the note on that loan."

15          Do you see that?

16      A.   Yes.

17      Q.   So was that $30 million still outstanding

18  on December 11th, 2015?

19          Does this refresh your recollection?

20      A.   That's what it says here.

21      Q.   Okay.  What -- what is the status of that

22  note now?  What happened to it?

Page 87

1    A.  I don't recall.

2        MS. KELLY:  Okay.  I'm going to mark this

3    Exhibit 4.

4        (Whereupon, the E-mail was marked as

5    Plaintiffs' Exhibit 4 for Identification by the

6    Reporter.)

7    BY MS. KELLY:

8    Q.  Have you ever seen this document before?

9    A.  I'm CC'd on it, but I don't specifically

10   recall this document.

11   Q.  So that's your e-mail, the GKWAY at

12   "redacted"?

13   A.  Yes.

14   Q.  What is the domain name of your e-mail on

15   this document?

16   A.  I don't recall.

17   Q.  Okay.  If you look at the e-mail here from

18   Mr. Martorello, it looks like he is discussing the

19   sale of Bellicose; correct?

20   A.  Yes.

21   Q.  And he's having this e-mail conversation

22   with you and Mr. Williams; is that correct?

Page 88

 1      A.   I'm copied on it, but I don't see a

 2   response from me.

 3      Q.   Did you ever have any other communications

 4   or correspondences with Mr. Martorello about the

 5   purchase of Bellicose?

 6         MR. GRAY:  Objection to form.

 7         THE WITNESS:  I don't recall.

 8         MS. KELLY:  Okay.  I'm going to mark this

 9   Exhibit 5, please.

10           (Whereupon, the Loan and Security

11   Agreement was marked as Plaintiffs' Exhibit 5 for

12   Identification by the Reporter.)

13   BY MS. KELLY:

14      Q.   Have you seen this document before,

15   Ms. Hazen?

16      A.   Yes.

17      Q.   If you look on the last page of this

18   document, is that your signature under borrower

19   Tribal Economic Development Holdings, LLC?

20      A.   Yes.

21      Q.   In your capacity as comanager?

22      A.   Yes.

Page 89

1      Q.   And also under subsidiary Big Picture

2   Loans, LLC?

3      A.   Yes.

4      Q.   In your capacity as comanager and CEO?

5      A.   Yes.

6      Q.   Okay.  What is the purpose of this

7   document, as you understand it?

8      A.   It's the loan and security agreement for

9   the acquisition -- loan acquisition.

10     Q.   Okay.  And what were -- what was TED

11   acquiring?

12     A.   SourcePoint.

13     Q.   Okay.  And how much was -- is the note for

14   on this -- as part of this agreement?

15     A.   Up to $300 million.

16     Q.   Okay.  Do you know what the minimum

17   portfolio you can maintain at Big Picture Loans is?

18     A.   I don't recall.

19     Q.   Who would be in charge of that at Big

20   Picture Loans?

21     A.   I would.

22     Q.   But you don't know the minimum portfolio

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 182 of 503
Case 3:17-cv-00461-REP    Document 1007-8   Filed 02/23/21   Page 90 of 250 PageID# 34328
10/16/2017
Hazen, Michelle

1  amount?

2      A.   Off the top of my head, no.

3      Q.   What is the amount of the portfolio today?

4      A.   Off the top of my head, I don't know.  I

5  don't have that information here in front of me.

6      Q.   Okay.  So if you go to Page 9 of this

7  document, paragraph 4.4, financial and operational

8  performance.  It requires a minimum portfolio size

9  of $15 million, and a maximum portfolio size of any

10   given month equal to 1.1 times the previous month's

11   portfolio size.

12       Do you see that?

13     A.   Yes.

14     Q.   Do you agree that you cannot change the

15   size of the portfolio unless it's in accordance with

16   this provision of the contract?

17       MR. GRAY:  Objection to form.

18   BY MS. KELLY:

19     Q.   Well, let me ask it a different way.

20       If you had a portfolio of $15 million in

21   January, and you had a great opportunity to double

22   your portfolio $30 million the month of February,

Page 91

1   could you, as CEO, decide to do that?

2        MR. GRAY:  Objection to form.

3        THE WITNESS:  According to this -- I mean,

4    according to this it says I couldn't as the

5    CEO.

6   BY MS. KELLY:

7    Q.   So you couldn't do that; right?

8        Could not; correct?

9    A.   I think the tribe always has a choice.

10    Q.   So you think you could double the size of

11   the portfolio and still be in compliance with this

12   agreement?

13    A.   I think the tribe could always choose to

14   do that.

15    Q.   Okay.  Do you know what would happen if

16   you were to do that under this agreement?

17        MR. GRAY:  Objection to form.

18        THE WITNESS:  I'm not sure that's the

19    responsible thing to do.

20   BY MS. KELLY:

21    Q.   Because it would be breaching this

22   agreement?

**JA3217**

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 184 of 503
Case 3.17-cv-00461-REP    Document 1007-8    Filed 02/23/21    Page 92 of 250 PageID# 34330
10/16/2017
Hazen, Michelle

1    A.   No.  Because you want to grow your

2  portfolio at a responsible rate.

3    Q.   Okay.  If you go to Page 11 of this

4  document, paragraph 4.17.  It says "cost and

5  expenses."  It states "For the term of the note,

6  neither borrower nor any subsidiary shall make any

7  charitable donations or any investments in excess of

8  an aggregate of 5,000 per year for all entities

9  unless approved by lender."

10       Do you see that?

11    A.  Yes.

12    Q.   So can you explain to me what that means?

13    A.   There was $5,000 in the budget for

14  charitable donations.

15    Q.   That's your understanding of what that

16  sentence means?

17       MR. GRAY:  Asked and answered.

18       THE WITNESS:  Yes.

19  BY MS. KELLY:

20    Q.   If you wanted to hire ten more employees

21  for Big Picture, and it was going to cost more than

22  $5,000, could you do that without approval by your

Page 93

1    lender?

2       A.   If it was within the budget, yes.

3       Q.   Do you know what a deposit account control

4    agreement is?

5       A.   Yes.

6       Q.   What is it?

7       A.   It is an agreement that involves bank

8    accounts.

9       Q.   And does it give control of certain

10   components of the bank accounts for Big Picture to

11   someone else other than Big Picture?

12          MR. GRAY:  Objection to form.

13          THE WITNESS:  No.

14   BY MS. KELLY:

15      Q.   So as CEO of Big Picture, you could write

16   a check out of your Big Picture bank account for

17   however much you want; correct?

18          MR. GRAY:  Objection to form,

19       mischaracterizes testimony.

20          THE WITNESS:  I don't understand your

21       question.

22

JA3219

1  BY MS. KELLY:

2      Q.   If you wanted to write a check for your

3  Big Picture bank account for all the money in your

4  account, could you do that without the permission of

5  your lender?

6          MR. GRAY:  Objection to form.

7          THE WITNESS:  The -- I guess, what

8      account?

9          MS. KELLY:  Okay.  Well, let's look at

10      your deposit account control agreement then.

11          Let's mark this Exhibit 6, please.

12          (Whereupon, the Deposit Account Control

13  Agreement was marked as Plaintiffs' Exhibit 6 for

14  Identification by the Reporter.)

15  BY MS. KELLY:

16      Q.   Have you seen this document before?

17      A.   Yes.

18      Q.   If you look on Page 10 of this document --

19      A.   Which page?

20      Q.   Page 10.  That's your signature for Big

21  Picture Loans as CEO; correct?

22      A.   Yes.

Page 95

1     Q.   And this is Big Picture Loans' operating

2   account, do you see that?

3     A.   Yes.

4     Q.   Are you able to wire money in and out of

5   this account?

6     A.   No.

7     Q.   Who is allowed to wire money in and out of

8   this account?

9     A.   Brian McFadden and Simon Liang.

10    Q.   Okay.  What is your understanding of the

11  purpose of a deposit control agreement?

12    A.   I'm not sure how to answer that.

13    Q.   Okay.  When Mr. Liang or Mr. McFadden send

14  wires, do they need to get the amounts or the entity

15  to whom a wire goes to approved by you?

16       MR. GRAY:  Objection to form.

17       THE WITNESS:  No.

18  BY MS. KELLY:

19    Q.   Do they copy you on e-mails approving

20  distribution so that at least you know when wires

21  are going out and who's getting what amount?

22       MR. GRAY:  Objection to form.

Page 96

1          THE WITNESS:  Can you be more specific?

2   BY MS. KELLY:

3      Q.   Sure.  On a monthly basis there are

4   numerous wires going in and out of Big Picture

5   Loans' operating account, are you copied on those

6   e-mails where Mr. McFadden or Mr. Liang seek

7   approval to wire certain amounts to different

8   entities?

9          MR. GRAY:  Objection to form and

10      foundation.

11         THE WITNESS:  Yes, I am copied and I get

12      the bank statement as well.

13      Q.   Does the bank statement tell you where

14   each wire goes to?

15      A.   There are descriptions on there.

16      Q.   That say the entity that receives the

17   wire?

18      A.   Not all of them, but those are walked

19   through.  Simon and I walk through those.

20      Q.   And you said you are copied on the e-mails

21   where the wires are approved?

22      A.   I don't know about every single one, I

JA3222

Page 97

1   can't tell you.  But I know I am copied on

2   transactions.

3       Q.   Okay.  Can you think of the last time that

4   you were copied on an e-mail where it was discussing

5   wires going out to different entities and seeking

6   approval?

7       A.   I can't recall.

8       Q.   Okay.  Do you know if Mr. Liang and

9   Mr. McFadden send e-mails every month to

10  Mr. Martorello seeking permission to approve wires

11  that are going to go out to each entity?

12      MR. GRAY:  Objection to form and

13      foundation.

14      THE WITNESS:  I don't know.

15  BY MS. KELLY:

16      Q.   Have you ever been copied on any of those

17  e-mails?

18      MR. GRAY:  Asked and answered.

19      THE WITNESS:  I don't recall.

20  BY MS. KELLY:

21      Q.   Okay.  Turning back to Exhibit 5, the

22  Eventide credit agreement -- or the Eventide

JA3223

Page 98

1    security agreement.

2         If you turn to Page 13, paragraph 5.11

3    called "payment processers."  Actually, before we go

4    there, I wanted to talk about paragraph 5.6 "capital

5    expenditures," up higher in the page.

6         It states "Borrower and each subsidiary

7    shall not directly or indirectly make or commit to

8    make capital expenditures by lease, purchase, or

9    otherwise, except in the ordinary course of

10   business, for the purpose of replacing machinery,

11   equipment, or other personal property necessary for

12   operating the business, unless pursuant to section

13   1.2(b)(4)(b) of the note."

14        What does that paragraph mean to you?

15   A.   That there are no capital expenditures

16   other than running the business.  What are needed to

17   run the business.

18   Q.   And if you were to need to make some sort

19   of expenditure, or say you wanted to hire another

20   employee and that would exceed your budget, what

21   would you do?

22   A.   If it exceeded the budget?

Page 99

1    Q.   Right.  If it was going to exceed the

2   budget --

3        MR. GRAY:  Objection.

4   BY MS. KELLY:

5    Q.   -- that the lender had approved, what

6   would you do?

7        MR. GRAY:  Objection to form.  Foundation.

8    Mischaracterizes.

9        THE WITNESS:  I don't know.  I've never

10    experienced that.

11   BY MS. KELLY:

12    Q.   Would you ask permission from

13   Mr. Martorello?

14        MR. GRAY:  Objection to form.

15        THE WITNESS:  No.

16   BY MS. KELLY:

17    Q.   Okay.  Have you ever thought that if you

18   wanted to hire more people that you might need to

19   ask permission from Mr. Martorello?

20    A.   No.

21    Q.   You don't think you've ever thought of

22   that idea before?

1          MR. GRAY:  Asked and answered.

2          THE WITNESS:  Not to ask permission, no.

3   BY MS. KELLY:

4      Q.  Okay.  What about to ask for approval?

5      A.  No.

6          MS. KELLY:  Okay.  I'm going to mark this

7   Exhibit 7.

8          (Whereupon, the E-mail was marked as

9   Plaintiffs' Exhibit 7 for Identification by the

10   Reporter.)

11         MR. GRAY:  Seven?

12         MS. KELLY:  Uh-huh.

13   BY MS. KELLY:

14     Q.   This is an e-mail chain between you and

15   Brian McFadden; correct?

16     A.   Yes.

17         MS. KELLY:  I'm sorry, I made the copies.

18   It is Bates number LVD defendant 7951.

19         MR. SCHEFF:  791?

20         MS. KELLY:  7951.  This is a lack of

21   ability on my part to make proper copies.

22         MR. ANTHONY:  Duly noted.

Page 101

1        MS. KELLY:  My office staff is way better

2    than I am at this.

3        MR. ANTHONY:  Is there anyway we can blame

4    Andrew for this?

5        MS. KELLY:  He is above reproach.  Okay.

6  BY MS. KELLY:

7    Q.   This appears to be a follow-up call -- a

8  follow-up e-mail from a meeting or a call that you

9  and Mr. McFadden had?

10    A.   Yes.

11    Q.   Does this now refresh your recollection?

12    A.   Yes.

13    Q.   And would you like to change your prior

14  testimony?

15    A.   Which prior testimony?

16    Q.   So you have here, in the second paragraph

17  at the bottom of the page, you state "I know we

18  talked about hiring an administrative assistant to

19  share."  And you're talking about maybe hiring one

20  for yourself and one for Ascension in Puerto Rico;

21  correct?

22    A.   Yes.

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 194 of 503

Page 102

1    Q.  And then Mr. McFadden says, "Come up with

2  a job description to work with the accounting and

3  we'll have to get 'redacted' approval."

4      Do you know what the name of the redacted

5  entry is?

6     MR. GRAY:  Can we take a break to talk

7    about whether or not that's privileged based on

8    the decision the court made today?

9     MS. KELLY:  No.  After she answers this

10    question we can take a break.

11     THE WITNESS:  I don't know, it's redacted.

12    I don't know what's under there.

13  BY MS. KELLY:

14    Q.  You have no idea?

15     MR. ANTHONY:  What was the question?

16     MS. KELLY:  Whose approval they were

17    seeking to hire a new position.

18     MR. GRAY:  Based on the court's decision

19    today, we'll remove the redaction when we have

20    time to do so.

21     MS. KELLY:  All right.  I'm asking her

22    what it says --

10/16/2017                    Hazen, Michelle

Page 103

1          MR. GRAY:  I understand.

2          MS. KELLY:  I'm trying to ask questions

3      about it.  If she doesn't know whose permission

4      would need to be obtained to hire a new person,

5      that's fine.  That could be her testimony.  Or

6      she could recall what is under that redaction.

7          THE WITNESS:  I don't know what it --

8   BY MS. KELLY:

9      Q.  Okay.  That's fine.  Going back to Exhibit

10  5, Page 13, paragraph 5.11.

11     A.  Which one now?

12     Q.  Exhibit 5.

13     A.  Okay.

14     Q.  It's the --

15         MR. GRAY:  Loans --

16  BY MS. KELLY:

17     Q.  -- security agreement.

18     A.  Uh-huh.  What was the --

19     Q.  Paragraph 5.11.

20     A.  Oh, okay.

21     Q.  Regarding payment processers.

22     A.  Okay.

Page 104

1    Q.   Can you -- it says "No subsidiary shall

2  enter into, or modify, or permit the modification of

3  any payment processer agreements.  And all such

4  agreements must require that all transactions must

5  settle into the collateral accounts."

6         Do you see that?

7    A.  Yes.

8    Q.   So Big Picture could not change the

9  payment processer agreements that were in place at

10  this time; correct?

11    A.  Can you repeat your question?

12    Q.   Big Picture Loans was not allowed, under

13  this agreement, to change the payment processer

14  agreements in place at the time of the purchase?

15        MR. GRAY:  Objection to the form.

16  BY MS. KELLY:

17    Q.   At the time Big Picture acquired -- well,

18  let's look at the date.

19        The date of this is September 14, 2015.

20  At that time, Big Picture Loans entered into an

21  agreement where it cannot modify or permit the

22  modification of any payment processer agreements;

JA3230

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 197 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 105 of 250 PageID# 34343
10/16/2017                          Hazen, Michelle

Page 105

1  correct?

2      A.   That's what it says here.

3      Q.   Okay.  And Big Picture was also required

4  to make sure that all transactions settle into the

5  collateral account; correct?

6      A.   That's what this says.

7      Q.   So Big Picture Loans could not change

8  where money that it collected from consumers went,

9  it had to go into designated bank accounts; correct?

10      MR. GRAY:  Asked and answered.

11      THE WITNESS:  Collateral accounts that

12      were opened up by the tribe, yes.

13  BY MS. KELLY:

14      Q.   Okay.  What -- what accounts is this

15  agreement referring to?  Is it referring to the

16  account where there's a deposit control agreement?

17      A.   I'm not sure if there's DCAs on there or

18  not.

19      Q.   Okay.  Turning to the next page of Exhibit

20  5, 5.14, management.  It states "Neither the

21  borrower, nor any subsidiary, shall terminate or

22  replace any manager, director, or officer of

Page 106

1   borrower, or of their respective subsidiary, or

2   modify delegations of authority without prior

3   written consent of the lender."

4           Do you see that?

5       A.   Yes.

6       Q.   Does that mean you couldn't fire certain

7   employees of Ascension unless you got

8   Mr. Martorello's permission?

9           MR. GRAY:  Objection to the form.

10           THE WITNESS:  No.

11   BY MS. KELLY:

12       Q.   So if you wanted to, you could fire Brian

13   McFadden today and you wouldn't need your lender's

14   consent?

15           MR. GRAY:  Objection to the form.

16           THE WITNESS:  I couldn't.

17   BY MS. KELLY:

18       Q.   The tribe could.  Who could fire Brian

19   McFadden today without the lender, Mr. Martorello's

20   consent?

21       A.   The tribe appointed him, I believe the

22   tribe could fire him.

Page 107

1      Q.   So the tribe wouldn't be bound by this

2   paragraph in your understanding?

3      A.   I didn't say that.

4      Q.   Would the tribe be complying with this

5   agreement if it were to fire Brian McFadden without

6   Mr. Martorello's consent?

7         MR. GRAY:  Objection to form.

8         THE WITNESS:  I guess we'd need legal

9      advice on that.

10  BY MS. KELLY:

11     Q.   Okay.  If you look at paragraph 5.12,

12  servicing agreement.  It states "Neither borrower

13  nor any subsidiary shall amend, modify, or terminate

14  the servicing agreement between that subsidiary and

15  Ascension Technologies during the term of the loan

16  without prior written consent of lender."

17        Do you see that?

18     A.   Yes.

19     Q.   So could you change the duties of

20  Ascension, if you wanted to, as CEO of Big Picture

21  without the consent of Mr. Martorello?

22        MR. GRAY:  Objection to the form.

Page 108

1          THE WITNESS:  As the CEO, no.

2   BY MS. KELLY:

3      Q.   In what regard do you think you could

4   terminate or change the duties of Ascension without

5   the consent of Mr. Martorello?

6          MR. GRAY:  Objection to the form,

7      mischaracterizes the testimony and contract.

8          THE WITNESS:  I think the tribe would be

9      able to do that.  They signed the agreement.

10  BY MS. KELLY:

11     Q.   The tribe signed the servicing agreement?

12     A.   Or authorized for the agreement to be

13  signed.

14     Q.   So it's your understanding that the tribe

15  could change the duties of Ascension Technologies if

16  it wanted to without breaching this agreement?

17         MR. GRAY:  Objection to form.  Asked and

18     answered.

19         THE WITNESS:  I believe if it was in the

20     best interest of the business, yes.

21  BY MS. KELLY:

22     Q.   Okay.  When -- when the tribe -- or when

JA3234

10/16/2017                          Hazen, Michelle

                                                                    Page 109

1   Big Picture Loans acquired -- I'm going to -- let me

2   rephrase that.  Sorry.

3          When Big Picture Loans was created, and

4   Ascension Technologies, did the responsibilities of

5   the employees of Bellicose that became Ascension

6   change at all?

7          MR. GRAY:  Objection to form and

8     foundation.

9          THE WITNESS:  I don't know.

10  BY MS. KELLY:

11    Q.   Okay.  Who would know that?

12    A.   I believe Brian McFadden.

13         MS. KELLY:  Okay.  Exhibit 7.

14         MR. GRAY:  Eight, I think.

15         MS. KELLY:  Eight.  Sorry.

16         (Whereupon, the Secured Promissory Note

17   was marked as Plaintiffs' Exhibit 8 for

18   Identification by the Reporter.)

19  BY MS. KELLY:

20    Q.   Ms. Hazen, have you seen this document

21   before?

22    A.   Yes.

Page 110

1    Q.   What is it?

2    A.   Secured promissory note.

3    Q.   And is this the note for the purchase of

4    Bellicose; correct?

5    A.   Yes.

6    Q.   And we previously discussed that this note

7    entitles Eventide up to $300 million in payments;

8    correct?

9         MR. GRAY:  Objection.  That's a

10        mischaracterization.

11        THE WITNESS:  What was your question?

12   BY MS. KELLY:

13   Q.   This note entitles Eventide payments up to

14   $300 million; correct?

15   A.   Yes.

16   Q.   And it also provides for interest on the

17   $300 million loan at the amount of 1.8 percent a

18   year; correct?

19   A.   Yes.

20   Q.   Do you know how much the tribe has paid in

21   interest so far --

22        MR. GRAY:  Objection to form.

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 203 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 111 of 250 PageID# 34349
10/16/2017                              Hazen, Michelle

Page 111

1          MS. KELLY:  -- on this loan -- or TED --

2    I'm sorry.  I'll rephrase.

3          How much has TED paid in interest on this

4    loan so far?

5          THE WITNESS:  Off the top of my head, I do

6    not know.

7  BY MS. KELLY:

8    Q.   Do you know what the monthly interest

9  payments are, approximately?

10          MR. GRAY:  Asked and answered.

11          THE WITNESS:  Off the top of my head, no.

12  BY MS. KELLY:

13    Q.   Okay.  How much in principal of the loan

14  has been paid back so far?

15    A.   Approximately 20.5 million.

16    Q.   Okay.  And what entity made those payments

17  on the principal of the loan?

18    A.   TED.

19    Q.   Okay.  If you turn to Page 3 of this

20  promissory note, paragraph 4(b), discusses the

21  expenses.  And we mentioned this before when we were

22  talking about Exhibit 5, and it referenced this

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 204 of 503
Case 3:17-cv-00461-REP    Document 1007-8    Filed 02/23/21    Page 112 of 250 PageID# 34350
10/16/2017                                    Hazen, Michelle

Page 112

1   provision of this note.

2        Do you recall that?

3        A.   Where's 5?  What section referenced it in

4   Exhibit 5?

5        Q.   It was the discussion about capital

6   expenditures.  I'll pull it up for you.  5.6.

7        A.   1.2(b).  This is 4(b).  Oh, 1.2(b) --

8   4(b) -- I'm sorry.  Okay.  Got it.

9        Q.   Do you agree here that this puts a

10   restriction on the operating expenses for Big

11   Picture Loans?

12        MR. GRAY:  Objection to form.

13        THE WITNESS:  What was your question

14   again?

15   BY MS. KELLY:

16        Q.   Do you agree that this provision, 4(b),

17   puts a restriction on the operating expenses for Big

18   Picture Loans?

19        A.   No.

20        Q.   Okay.  What is Capstone Opportunities?

21        A.   It was a -- it was an investor.

22        Q.   Is it no longer an investor?

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 205 of 503

1    A.  No.

2    Q.  How did you find Capstone Opportunities as

3  an investor?

4        MR. GRAY:  Objection to form.

5        THE WITNESS:  I don't recall.

6  BY MS. KELLY:

7    Q.  Who found Capstone Opportunities as the

8  investor in your business, Big Picture Loans?

9        MR. GRAY:  Objection to form.  Asked and

10     answered.

11       THE WITNESS:  I don't recall.

12  BY MS. KELLY:

13    Q.  Was it you?

14    A.  No.

15    Q.  Was it your cochairman?

16       MR. GRAY:  Asked and answered.

17       THE WITNESS:  I don't recall.

18  BY MS. KELLY:

19    Q.  Who -- do you know if Mr. Martorello is

20  affiliated with Capstone Opportunities?

21    A.  I believe so.

22    Q.  When did Big Picture Loans borrow money

Page 114

1  from Capstone Opportunities?

2       MR. GRAY:  Objection to form and

3    foundation.

4       THE WITNESS:  I don't recall.

5  BY MS. KELLY:

6    Q.   Do you know how much money Big Picture

7  Loans borrowed?

8       MR. GRAY:  Objection to form and

9    foundation.

10       THE WITNESS:  No, I don't recall.

11  BY MS. KELLY:

12    Q.   Do you know why Big Picture Loans borrowed

13  $30 million --

14       MR. GRAY:  Objection to form and

15    foundation.

16  BY MS. KELLY:

17    Q.   -- from Capstone Opportunities?

18    A.  I don't recall.

19    Q.   Did Big Picture Loans take any draws on a

20  note with Capstone Opportunities?

21    A.  I don't recall.

22    Q.   Has the note with Capstone Opportunities

Page 115

1  been paid in full?

2      A.  Yes.

3      Q.  When was it paid in full?

4      A.  I don't recall the date.  2016.

5      Q.  Okay.  Do you know the purpose of the loan

6  with Capstone Opportunities?  Do you know what the

7  purpose was?

8      A.  Investment.

9      Q.  And what sort of investment?

10      A.  Investment into the portfolio.

11      Q.  But it's a loan and it was paid back, so

12  the investment was paid back; is that your

13  testimony?

14      A.  Can you rephrase your question?

15      Q.  Yeah.  What was the purpose of the loan

16  agreement with Capstone Opportunities and Big

17  Picture Loans?

18          MR. GRAY:  Asked and answered.

19          THE WITNESS:  It was an investment.

20  BY MS. KELLY:

21      Q.  Okay.  And when you paid off this loan,

22  how much did you pay?

JA3241

Page 116

1        MR. GRAY:  Objection to form.

2        THE WITNESS:  I don't recall.

3   BY MS. KELLY:

4     Q.   Okay.  Do you know the amount of the

5   investment that Capstone Opportunities made into Big

6   Picture Loans?

7     A.   I don't recall off the top of my head.

8        MS. KELLY:  Okay.  Why don't we take a

9   quick break?

10        MR. ANTHONY:  Sure.

11        THE VIDEOGRAPHER:  The time is 2:54:39.

12    Off the record.

13        (Off the record at 2:54 p.m.)

14        (Back on the record at 3:09 p.m.)

15        THE VIDEOGRAPHER:  On the record.  The

16    time is 3:09:05.

17   BY MS. KELLY:

18     Q.   Good afternoon, Ms. Hazen.  I have a

19   couple questions about the TFSRA agents.

20        How are they appointed?

21     A.   They were appointed by the tribal council.

22     Q.   Do people run for the position or the

USCA4 Appeal: 21-2116    Doc: 26-6      Filed: 02/07/2022    Pg: 209 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 117 of 250 PageID# 34355
10/16/2017
Hazen, Michelle

Page 117

1  tribal council just appoints them based on who they

2  think is most qualified?

3      A.   They applied or put in their application

4  of interest and then the tribal council appointed

5  them.

6      Q.   Okay.  How long are the appointments for a

7  TFSRA agent?

8      A.   Until they're removed.

9      Q.   So it's, like, a lifetime appointment?

10     A.   Unless they're removed.

11     Q.   Okay.  We had talked before about whether

12  or not Ascension or Big Picture was not licensed.

13      And I wanted to just show you these

14  documents and see if it refreshes your recollection,

15  if Big Picture and Ascension were licensed to do

16  business in December of 2015.

17      MS. KELLY:  Let me just make this one

18   exhibit, Exhibit 9.

19      (Whereupon, the Letter was marked as

20  Plaintiffs' Exhibit 9 for Identification by the

21  Reporter.)

22

Page 118

1    BY MS. KELLY:

2        Q.   What are these notice of violation letters

3    in reference to?

4        A.   One of the entities was unlicensed.

5        Q.   Which entity?

6            MR. GRAY:  I'm going to object --

7            THE WITNESS:  I'm not sure --

8            MR. GRAY:  The judge told us that the

9    vendors were still -- identities were still

10    excluded.

11            MS. KELLY:  From written discovery?

12            MR. GRAY:  Didn't the judge say the

13    identity of the vendors were off limits?

14            MS. KELLY:  Well, like the vendor

15    documents, like the contracts.  But when

16    it's --

17            MR. ANTHONY:  Is it sufficient to simply

18    say "vendor"?

19            MS. KELLY:  Well, I'm just trying to

20    understand what aspect of the business was --

21            MR. ANTHONY:  Right.  I'm just -- is there

22    a way that she can answer the question without

**JA3244**

Page 119

1    giving the name of the vendor, I guess is my

2    point.  Just say a vendor who did X.

3  BY MS. KELLY:

4    Q.   Well, I mean, I just would like to know.

5  What did the vendor do?  Like, what type of services

6  did the vendor provide?

7    A.   I can't tell you unless I know what's

8  under this redaction.

9        MS. KELLY:  So just for the record, I

10    don't think Judge Payne was saying that tribal

11    documents, that are in the possession of Big

12    Picture, should be redacted vender names that

13    are otherwise responsive.  I'm fine if you

14    don't produce the contracts or other documents

15    with the vendors for whatever reason.

16        But these documents are very difficult to

17    use because of the amount of redactions.  If a

18    vendor name is in there we're -- I'm telling

19    you, we're not going to subpoena them for the

20    purposes of jurisdictional discovery.  But I

21    can't even ask a witness questions about a

22    violation letter -- a lending violation letter

JA3245

1      because it's so heavily redacted.

2          So that's our position, just for the

3      record.

4   BY MS. KELLY:

5      Q.   Okay.  What is the role of TED?

6          MR. GRAY:  Asked and answered.

7          THE WITNESS:  TED is the parent and

8      holding company.

9   BY MS. KELLY:

10      Q.   And it does not have any employees;

11   correct?

12      A.   No.

13      Q.   Okay.  How's the tribal council appointed?

14          MR. GRAY:  Objection to form.

15          THE WITNESS:  Pardon me?

16   BY MS. KELLY:

17      Q.   How's is the tribal council appointed?

18      A.   They're elected.

19      Q.   And how does the election process work?

20      A.   What do you mean?

21      Q.   I mean, is it every two years?  Four

22   years?

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 213 of 503
10/16/2017
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 121 of 250 PageID# 34359
Hazen, Michelle

Page 121

1      A.   Every two years.

2      Q.   And are all of the tribal members allowed

3   to vote in the election?

4      A.   All of the eligible tribal members, yes.

5      Q.   Okay.  How many -- approximately, how many

6   eligible tribal members are there?

7      A.   I don't know.

8      Q.   How many -- what makes a tribal member

9   eligible to vote in a tribal council election versus

10   not eligible?

11      A.   They have to be an enrolled member of the

12   Lac Vieux Desert tribe and at least 18 years of age.

13      Q.   Do you know how many tribal members in

14   general there are?

15      A.   Approximately, 750.

16      Q.   What prompted the creation of the LVD

17   Tribal Acquisition Company?

18      MR. GRAY:  Objection to form.

19      THE WITNESS:  What do you mean by what

20      prompted it?  Can you be more specific?

21   BY MS. KELLY:

22      Q.   What was the need to create a company

Page 122

1   called the LVD Tribal Acquisition Company?

2        MR. GRAY:  Same objection.

3        THE WITNESS:  It was created to acquire

4      Bellicose in the acquisition.

5   BY MS. KELLY:

6      Q.   Why didn't TED acquire it directly or Big

7   Picture?

8      A.   I don't know.

9      Q.   Do you recall a time after the creation of

10   Big Picture Loans where the tribe needed a loan?

11        MR. GRAY:  Objection to form and

12       foundation.

13        THE WITNESS:  Can you be more specific?

14   BY MS. KELLY:

15      Q.   Do you -- do you recall a time where the

16   tribe asked to take out a loan from TED or Big

17   Picture?

18      A.   The tribe made a bridge loan to complete

19   the construction of the new health clinic.

20      Q.   And when was that?

21      A.   2016.

22      Q.   Does April 2016 sound right?

**JA3248**

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 215 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 123 of 250 PageID# 34361
10/16/2017                          Hazen, Michelle

1    A.   I don't remember the month.

2    Q.   And do you recall if the loan amount was

3  for $600,000?

4    A.   Yes.

5    Q.   And you're saying it was a bridge loan to

6  help create the health clinic; is that correct?

7    A.   Yes.

8    Q.   Do you know how much the tribe needed to

9  put down in order to start the building of the

10  health clinic?

11   A.   No.

12   Q.   Do you know why the tribe didn't have

13  $600,000 of its own in April of 2016 and why it

14  needed to borrow money?

15       MR. GRAY:  Objection to form and

16    foundation.

17       THE WITNESS:  All of the money is put into

18    government services, essential government

19    services for programs.

20  BY MS. KELLY:

21   Q.   Okay.  When TED or Big Picture provided

22  the $600,000 loan in April of 2016, did -- did they

JA3249

1    need to get permission from Mr. Martorello to do so?

2        MR. GRAY:  Objection to form and

3      foundation.

4        THE WITNESS:  I don't recall.

5    BY MS. KELLY:

6      Q.   Okay.  The -- so I made a clerical error

7    when I was making exhibits.  And behind the deposit

8    account control agreement there is the documentation

9    about -- what I would like to direct your attention

10    to.

11        MR. GRAY:  So you're looking at Exhibit 6?

12        MS. KELLY:  Correct.

13        MR. GRAY:  And if I'm correct, you're

14      looking at what would be Page 11 on Exhibit 6?

15        MS. KELLY:  Correct.

16        MR. GRAY:  Do you want to mark that

17      independently?

18        MS. KELLY:  No, it's okay.  Let's --

19        MR. ANTHONY:  Just mark it so --

20        MS. KELLY:  Okay.  We can tear it off

21      then.  So it's Exhibit 10.

22        (Whereupon, the Letter was marked as

Page 125

1  Plaintiffs' Exhibit 10 for Identification by the

2  Reporter.)

3  BY MS. KELLY:

4      Q.  Does this document refresh your

5  recollection about whether or not you needed the

6  consent of Mr. Martorello to make the loan to the

7  tribe?

8      A.  I've seen this document before, yes.

9      Q.  Okay.  Well, let me direct your attention

10  to the second paragraph.  It states "Pursuant to

11  section 4.17 of the loan and security agreement,

12  executed on October 7th, 2015, by and between

13  Eventide and TED, Eventide must provide written

14  consent before borrower or any of its subsidiaries

15  moves any assets between themselves and any

16  affiliate outside the ordinary course of business."

17      Do you see that?

18      A.  Yes.

19      Q.  And then if you look down, it says "By way

20  of this letter, Eventide agrees as follows:  One,

21  Eventide consents to BPL's distribution to TED in

22  the amount of $600,000 for the purpose of making a

JA3251

Page 126

1  loan to the tribe.  Number two, Eventide grants a

2  one-time limited waiver of section 4.4 of the

3  agreement for the sole purposes of the distribution

4  of 600,000 to TED."

5        Do you see that?

6    A.  Yes.

7    Q.  So does this refresh your recollection

8  now?

9    A.  Yes.

10    Q.  And so in order to give the loan to the

11  tribe, TED needed the permission from

12  Mr. Martorello; correct?

13      MR. GRAY:  Objection to form.

14      THE WITNESS:  That's what this says here.

15  BY MS. KELLY:

16    Q.  Okay.  And when -- I don't recall if I

17  already asked this, and if I did, I'm sorry.

18        When TED granted the loan to the tribe,

19  did it charge the tribe interest?

20    A.  Yes.

21    Q.  How much interest did it charge the tribe?

22        Does 33 percent sound correct?

1    A.   I don't recall exactly.

2    Q.   Okay.  I understand that the LVD has a

3  tribal court; correct?

4    A.   Yes.

5    Q.   Has a consumer with Big Picture Loans ever

6  had a dispute resolved in tribal court that you're

7  aware of?

8    A.   No, not that I'm aware of.

9    Q.   What about a consumer with Red Rock Tribal

10  Loans.

11        Are you aware of any consumer resolving a

12  dispute in tribal court with Red Rock?

13    A.   No.

14    Q.   Is that something that you would generally

15  be aware of?

16    A.   Yes.

17        MS. KELLY:  Okay.  I'm going to mark this

18  Exhibit 11.

19        MR. GRAY:  Kristi, so I'm sure, the 10 now

20  has four pages; right?

21        MS. KELLY:  Yeah.  It's just my bad

22  copying skills.

Page 128

1          MR. GRAY:  Okay.  I just want to make

2     sure.

3          MS. KELLY:  Yeah.

4          (Whereupon, the Servicing Agreement was

5     marked as Plaintiffs' Exhibit 11 for Identification

6     by the Reporter.)

7     BY MS. KELLY:

8          Q.   Ms. Hazen, have you seen this document

9     before?

10         A.   Yes.

11         Q.   And is this the servicing agreement

12    between Big Picture and Ascension?

13         A.   Yes.

14         Q.   And on the last page of this document,

15    that's your signature as CEO of Big Picture Loans;

16    correct?

17         A.   Yes.

18         Q.   In paragraph 1 of your affidavit, you

19    state "In my management roles for TED, Big Picture

20    Loans, and Ascension, I'm responsible for the

21    day-to-day operations and management of each

22    business entity."

Hazen, Michelle

Page 129

1        Do you recall that?

2        A.   Yes.

3        Q.   And is that an accurate statement?

4        A.   Yes.

5        Q.   Would that have been true when you were

6   involved with Red Rock or Duck Creek, prior to the

7   creation of Big Picture Loans?

8        MR. GRAY:  Objection to form.

9        THE WITNESS:  Yes.

10  BY MS. KELLY:

11       Q.   So you were responsible for the day-to-day

12  operations and management of Red Rock and Duck

13  Creek; is that correct?

14       MR. GRAY:  Asked and answered.

15       THE WITNESS:  Yes.

16  BY MS. KELLY:

17       Q.   Okay.  So what changed then when Big

18  Picture Loans was created?  From the -- what changed

19  about the day-to-day operations or structure of

20  those entities?

21       MR. GRAY:  Objection to form, foundation,

22       mischaracterization.

**JA3255**

1        THE WITNESS:  Can you be more specific?

2   BY MS. KELLY:

3     Q.   Well, you're saying your responsibilities

4   were the same when you were at Red Rock, now you're

5   at Big Picture.

6        So I'm just trying to understand what

7   changed.

8        MR. GRAY:  Objection to form and

9    mischaracterization.

10       THE WITNESS:  I don't know how to answer

11    that unless you ask me a specific question.

12   BY MS. KELLY:

13     Q.   So -- okay.  Well, let's talk about the

14   tribe.

15       The tribe received 2 percent, the same as

16   Red Rock, but they also had the opportunity to

17   reinvest in Big Picture; correct?

18       MR. GRAY:  It's a mischaracterization.

19    It's been asked and answered.

20       THE WITNESS:  Yes.

21   BY MS. KELLY:

22     Q.   Okay.  But the tribal net profit and the

Page 131

1    payout was the same?

2          MR. GRAY:  Asked and answered.

3          THE WITNESS:  Can you --

4    BY MS. KELLY:

5      Q.   So the monthly payment to the tribe

6    continued to be 2 percent because it did not receive

7    the reinvestment payments, those stayed with TED;

8    correct?

9          MR. GRAY:  Objection to the form.

10          THE WITNESS:  That's a confusing question.

11      Can you ask it in another way?

12    BY MS. KELLY:

13      Q.   The tribal net profits when there was Red

14    Rock was 2 percent; correct?

15          MR. GRAY:  Objection to form.

16          THE WITNESS:  Yes.

17    BY MS. KELLY:

18      Q.   The tribal net profits with Big Picture is

19    2 percent; correct?

20          MR. GRAY:  Objection to form.

21          THE WITNESS:  2 percent of gross profit,

22      yes.

JA3257

1  BY MS. KELLY:

2     Q.   And then there's also the requirement that

3  2 percent be reinvested into Big Picture; correct?

4        MR. GRAY:  Objection to form.

5        THE WITNESS:  Yes.

6  BY MS. KELLY:

7     Q.   Okay.  So in general, the tribe still gets

8  2 percent that it did from Red Rock as it does now,

9  or it did at the creation of Big Picture; correct?

10       MR. GRAY:  Objection to form.

11       THE WITNESS:  Can you repeat that

12    question?  I --

13  BY MS. KELLY:

14    Q.   Sure.  The tribe got 2 percent under the

15  Red Rock agreement; right?

16    A.   Yes.

17    Q.   And the tribe also received 2 percent when

18  Big Picture was created?  It was increased to

19  3 percent at the beginning of the year; correct?

20    A.   Yes.

21    Q.   Okay.  So I'm trying to go through what is

22  different about the entities.  And so I'm just --

Page 133

1  because you wanted me to ask you specific questions,

2  so I'm starting with the finances; right?

3        It's a similar setup in my opinion; do you

4  agree with that?

5     A.  No.

6     Q.  What's different?

7     A.  Several things, I'd say.

8     Q.  Can you name them for me, please?

9     A.  The structure.

10    Q.  Anything else?

11    A.  The distributions.

12    Q.  In what way are the distributions

13  different?

14    A.  The increase in percentage.

15    Q.  From 2 percent to 3 percent, is that what

16  you're referring to?

17    A.  And the 2 percent reinvestment.

18    Q.  Okay.  Anything else you can think of?

19    A.  No.  Not off the top of my head.

20    Q.  Did the responsibilities of the employees

21  at Ascension -- with the creation of Ascension

22  change?  So for example, when they were an employee

JA3259

Page 134

1   of Bellicose, did their responsibilities as now an

2   employee of Ascension change at all?

3        MR. GRAY:  Objection to form and

4     foundation.

5        THE WITNESS:  Yes.

6   BY MS. KELLY:

7     Q.  In what way?

8        MR. GRAY:  Objection to form.

9        THE WITNESS:  The expertise that is now

10    in-house that, before, was done by third-party

11    service providers.

12   BY MS. KELLY:

13     Q.  So is it your testimony that Ascension has

14   less responsibility than it did when it was

15   Bellicose?

16        MR. GRAY:  Objection.  That

17     mischaracterizes the testimony.

18        THE WITNESS:  No.

19   BY MS. KELLY:

20     Q.  Okay.  So is it your testimony that the

21   employees of Big Picture have more responsibility --

22        MR. GRAY:  Same objection.

Page 135

1  BY MS. KELLY:

2      Q.  -- than they did -- than prior to the

3  creation of Big Picture?

4          MR. GRAY:  Same objection.  Objection to

5      form.

6          THE WITNESS:  I'd say yes.

7  BY MS. KELLY:

8      Q.  Okay.  Do you think that the employees of

9  Ascension have less responsibilities than they did

10  when it was Bellicose?

11         MR. GRAY:  Objection to form, foundation.

12         THE WITNESS:  No.

13  BY MS. KELLY:

14     Q.  Are their responsibilities the same

15  between the employees of Bellicose and -- from when

16  they were employees at Bellicose to the creation of

17  Ascension?

18         MR. GRAY:  Same objection.  Asked and

19      answered.

20         THE WITNESS:  Can you repeat that?

21  BY MS. KELLY:

22     Q.  Sure.  The servicing responsibilities of

Page 136

1  Bellicose, are they the same as the servicing

2  responsibilities of Ascension?

3          MR. GRAY:  Objection to form, foundation,

4      mischaracterizes testimony.

5          THE WITNESS:  I'd say no.

6  BY MS. KELLY:

7    Q.   What is different?

8          MR. GRAY:  Same objections.

9          THE WITNESS:  There's more that's being

10     provided in-house by Ascension.

11  BY MS. KELLY:

12    Q.   So is it your testimony that -- well --

13  you say "there's more that's being provided in-house

14  by Ascension."

15          What do you mean by that?

16    A.   Well, that was the purpose.  They provide

17  services at Ascension that used to be provided by

18  third-party service providers, which results in a

19  cost savings to the company.

20    Q.   Okay.  But the entity Ascension provides

21  the same services as Bellicose did for Red Rock;

22  correct?

**JA3262**

USCA4 Appeal: 21-2116    Doc: 26-6      Filed: 02/07/2022    Pg: 229 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 137 of 250 PageID# 34375
10/16/2017                          Hazen, Michelle

Page 137

1        MR. GRAY:  Objection to form,

2     mischaracterization.

3        THE WITNESS:  No, I don't think so.

4  BY MS. KELLY:

5     Q.   All right.  Well, let's walk through this

6  then.  I gave you the servicing agreement between

7  Big Picture and Ascension.  And you have, as a prior

8  exhibit, the servicing agreement between Red Rock --

9  when Red Rock had it; right?

10        MR. GRAY:  What number is that?

11        MS. KELLY:  I believe it's 2.

12  BY MS. KELLY:

13     Q.   So if you look on exhibit -- the Red Rock

14  servicing agreement, Page 11, and you go to the

15  Ascension servicing agreement, Page 4.

16        So if you go to the current agreement,

17  operations, paragraph 4.2.1(a).  "It's Ascension's

18  responsibility to screen and select vendors,

19  negotiate agreements as it may reasonably determine

20  to be appropriate."

21        Do you see that?

22     A.   Yeah -- well, there's some more other

Page 138

1  words in there, but, yes, I see that.

2      Q.  And you agree that that's the

3  responsibility of Ascension right now?

4          MR. GRAY:  I believe that mischaracterizes

5      her previous testimony.

6          THE WITNESS:  What was your question?

7  BY MS. KELLY:

8      Q.  Is this the responsibility of Ascension?

9      A.  That's what it says here.

10      Q.  Okay.  It also -- little paragraph B.

11  "Development and promotion of sound and positive

12  business relationships on behalf of the enterprise

13  with the designated vendors and commercial finance

14  providers.  Including but not limited to, the

15  enforcement or termination of agreements with such

16  vendors and commercial finance providers."

17          Do you see that?

18      A.  Yes.

19      Q.  And is that a responsibility of Ascension?

20      A.  That's what this says.

21      Q.  And little paragraph C.  "Identification

22  of vendors needed for the small loan transaction

JA3264

Page 139

1   business."

2        Do you see that?

3   A.   Yes.

4   Q.   Is that a responsibility of Ascension?

5   A.   That's what it says here.

6   Q.   Little paragraph D.  "Preparation of

7   suggested practices and recommendations of suggested

8   practices, governing the operations of the

9   enterprise, and its subsidiaries, to provide that

10  operations are conducted in a manner that are

11  consistent with the best interest of the enterprise

12  and its subsidiaries, and generally accepted

13  industry standards."

14        Is that the responsibility of Ascension?

15   A.   That's what this says.

16   Q.   Little paragraph E.  "Preparation of

17  regulatory and compliance standards and practices

18  and recommendations to the enterprise, and its

19  subsidiaries, of such standards and practices to be

20  adopted by the enterprise, and its subsidiaries,

21  provided that such operations are conducted in a

22  manner consistent with the best interest of the

Page 140

1  enterprise, and its subsidiaries, and generally

2  accepted industry standards."

3        Is that the responsibility of Ascension?

4    A.   That's what it says here.

5    Q.   (f) "Preparation of training and education

6  standards and recommendations to the enterprise and

7  its subsidiaries of suggested practices to be

8  adopted by the designated vendors to provide that

9  such vendor -- such designated vendors are

10  conducting business with the enterprise in a manner

11  that is consistent with the best interest of

12  enterprise and its subsidiaries and generally

13  accepted industry standards."

14        Is that the responsibility of Ascension?

15    A.   That's what this says.

16    Q.   Little paragraph G.  "Assistance to the

17  CEO at his or her request, in the selection, hiring,

18  training, control, and discharge of employees

19  performing regular services for enterprise, and its

20  loan subsidiaries, in connection with the

21  maintenance, operation, and management of the small

22  loan transaction business."

JA3266

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 233 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 141 of 250 PageID# 34379
10/16/2017                          Hazen, Michelle

1          Is that the responsibility of Ascension?

2     A.  That's what it says.

3     Q.  Little paragraph H.  "Preparation of

4  standards for financial reporting and accounting,

5  and recommendations to the enterprise and its

6  subsidiaries, of best practices to be adopted by

7  designated vendors and commercial finance providers

8  of the enterprise, and its subsidiaries, to provide

9  that such designated vendors and commercial

10  financial providers are conducting business in a

11  manner that is consistent with the best interest of

12  the enterprise and its subsidiaries and generally

13  accepted accounting standards presented on a cash

14  basis."

15          Is that the responsibility of Ascension?

16     A.  That's what it says here.

17     Q.  Little I.  "Preparation of standards and

18  screening and review of and making recommendations

19  to the enterprise and its subsidiaries regarding the

20  website contents, marketing, and consumer relations

21  practices, and designated vendors to provide that

22  such designated vendors are conducting business in a

Page 142

1  manner that is consistent with the best interest of

2  enterprise, and its subsidiaries, and generally

3  accepted industry standards."

4        Is that the responsibility of Ascension?

5     A.   That's what it says.

6     Q.   Little J.  "Monitoring and supervision of

7  and reporting to the enterprise, and its

8  subsidiaries, regarding the designated vendors to

9  provide that such designated vendors are conducting

10  business in the manner that is consistent with the

11  standards, best practice policies, and requirements

12  established by the enterprise and its subsidiaries."

13        Is that the responsibility of Ascension?

14     A.   That's what it says.

15     Q.   Little K.  "Coordinating prequalified

16  leads to enterprise, and its subsidiaries, and

17  providing the next -- necessary credit-modeling data

18  and risk assessment strategies by which the

19  enterprise, and its subsidiaries, may evaluate

20  whether or not to extend funds to an individual

21  borrower based on criteria that has been established

22  by the enterprise and its subsidiaries.

Page 143

1          The criteria used to extend funds to

2    individual borrowers will remain within the sole and

3    absolute discretion of the enterprise and/or its

4    subsidiaries.  And the enterprise, and/or its

5    subsidiaries, shall execute all necessary loan

6    documentation."

7          Is that your understanding of what

8    Ascension does?

9      A.   That's what it says here.

10      Q.   Little L.  "May be responsible for certain

11    training and monitoring employees of enterprise, and

12    its subsidiaries, that operate the enterprise's call

13    center on behalf of itself and its subsidiaries."

14          Is that your understanding of what

15    Ascension does?

16      A.   That's what it says here.

17      Q.   Little M.  "Coordinating sale of consumer

18    loan transactions and defaults at prevailing market

19    rates to third-party debt collector vendors of the

20    enterprise."

21          Is that your understanding of what

22    Ascension does?

JA3269

Page 144

1      A.   That's what it says here.

2      Q.   And all of these things, little A through

3   M, I know you said that that's what the document

4   says, but is that your understanding of how the

5   business operates on a day-to-day basis?

6      A.   From the Ascension side, yes.

7      Q.   Okay.  So Ascension reviews and recommends

8   underwriting strategies and models; correct?

9         MR. GRAY:  Objection to form, asked and

10      answered.

11        THE WITNESS:  Can you repeat that?

12   BY MS. KELLY:

13      Q.   Does Ascension review and recommend

14   underwriting strategies and models?

15      A.   After discussion with me, yes.

16      Q.   Okay.  And is Ascension responsible for

17   reviewing and recommending different marketing

18   strategies, like, website updates, direct mail,

19   designs, et cetera?

20      A.   After discussion with me, yes.

21      Q.   What about collection strategies, is

22   Ascension responsible for that?

1      A.   That's collective, Ascension/BPL.

2      Q.   Okay.  What about financing options for

3   operational cash, who is responsible for that?

4      A.   I'd say collectively, Ascension and BPL.

5      Q.   Okay.  What -- what are the various

6   financing operations that you've considered at Big

7   Picture -- Big Picture Loans?

8         MR. GRAY:  Objection to form and

9      foundation.

10         THE WITNESS:  Several investment options.

11   BY MS. KELLY:

12      Q.   Can you name one?

13      A.   One that we're utilizing right now or one

14   that we've looked into?

15      Q.   Either.

16      A.   Yes.  Lac Vieux Desert tribe.

17      Q.   Okay.  Aside from the tribe, can you name

18   another financing option that Big Picture Loans has

19   looked into?

20      A.   Is this a current investor that you're --

21      Q.   No.  I'm just asking in general if you

22   know the different financing options that have been

USCA4 Appeal: 21-2116     Doc: 26-6      Filed: 02/07/2022     Pg: 238 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 146 of 250 PageID# 34384
10/16/2017                          Hazen, Michelle

1  looked into by Big Picture Loans.  Because you just

2  testified that it's something that you do with

3  Ascension.

4         So I want to understand what you know

5  about that.

6         MR. GRAY:  Object to the form.

7         THE WITNESS:  I guess I don't know if

8     I'm -- if naming investors is appropriate.

9  BY MS. KELLY:

10    Q.  You can --

11    A.  That's confidential information,

12   proprietary information.

13    Q.  Your lawyers can designate that subject to

14   a protective order.  And there's no objection, and

15   your lawyers aren't instructing you not to answer.

16        MR. GRAY:  I did object to form.  I'm not

17     sure what you're asking her.

18        MS. KELLY:  She just testified that she

19     works with Ascension to consider financing

20     options, and I'm inquiring about her knowledge

21     of that.  So I'm asking her --

22

10/16/2017                        Hazen, Michelle

Page 147

1    BY MS. KELLY:

2        Q.   What financing options have you, as CEO of

3    Big Picture Loans, considered?

4        A.   There are several.  I mean, we get on the

5    phone with several potential investors and --

6        Q.   So what --

7        A.   -- look at those financing options.

8        Q.   So what different options do you consider?

9        A.   Different investment options.

10       Q.   Such as?

11       A.   Whether or not to renew current investors,

12   extend, or look for other investments.

13       Q.   What kind of other investments do you look

14   for?

15       A.   Other investors.

16       Q.   How do you look for them?  Where do you

17   start?

18       A.   The tribe might contact us and say there's

19   an interested investor.

20       Q.   Okay.

21       A.   Ascension might bring one forward.  I

22   might be out in Indian country networking.  I may

JA3273

Page 148

1    be -- one may approach me.

2        Q.   How many investors are there in Big

3    Picture Loans or TED right now?

4        A.   I don't know the exact number.

5        Q.   Do you have --

6        A.   Several.

7        Q.   Do you have an estimate?

8        A.   I'd say at least ten.

9        Q.   What's the amount of money that the

10   investors have put up in Big Picture Loans or TED?

11       A.   The amounts vary by investor.

12       Q.   What's the cumulative amount?

13       A.   I don't know the exact amount of the

14   portfolio right now.

15       Q.   In general, what's the approximate amount

16   of the portfolio?

17           MR. GRAY:  Asked and answered.

18           THE WITNESS:  I don't know off the top of

19       my head.

20   BY MS. KELLY:

21       Q.   And how much of that portfolio, by

22   estimation, do you have non-tribal investors?

Page 149

1      A.   What do you mean by "non-tribal"?

2      Q.   How much of the tribe have invested in Big

3   Picture Loans or TED right now?

4      A.   Approximately $7 million.

5      Q.   And how much, approximately, do other

6   investors have in Big Picture Loans or TED?

7          MR. GRAY:  Asked and answered.

8          THE WITNESS:  All but the 7 million.

9   BY MS. KELLY:

10     Q.   Is it more than 7 million --

11         MR. GRAY:  Asked and answered.

12   BY MS. KELLY:

13     Q.   -- that other investors cumulatively have?

14     A.   Yes.

15     Q.   Have you paid off any of the notes that

16   were acquired at the acquisition of Red Rock and

17   Bellicose?

18         MR. GRAY:  Objection to form and

19     foundation.

20         THE WITNESS:  Yes.

21   BY MS. KELLY:

22     Q.   Which notes were paid off?

Page 150

1     A.   Capstone Opportunities is the one I can

2  recall.

3     Q.   Okay.  But to confirm, the tribe has

4  approximately $7 million invested in the Big Picture

5  portfolio, and it's your testimony that other

6  private investors have more than $7 million,

7  cumulatively, invested in the Big Picture portfolio;

8  is that correct?

9        MR. GRAY:  Objection.

10     Mischaracterization.

11        THE WITNESS:  Yes.

12        MS. KELLY:  Okay.  We're going to take a

13     quick break.

14        THE WITNESS:  Okay.

15        THE VIDEOGRAPHER:  This ends Disk 2 of the

16     Hazen deposition.  The time is 4 p.m. and 59

17     seconds.  Off the record.

18        (Off the record at 4:00 p.m.)

19        (Back on the record at 4:11 p.m.)

20        THE VIDEOGRAPHER:  On the record with

21     Disk 3 of the testimony of Michelle Hazen in

22     the matter of Williams versus Big Picture.  The

Page 151

1      date is October 16th, 2017.  The time is

2      4:11:44.

3    BY MS. KELLY:

4      Q.   Ms. Hazen, I was -- before the break I was

5    trying to get an idea of what was -- what is

6    different in your job responsibilities at Big

7    Picture than they were at Red Rock.

8         Can you -- was there a large difference in

9    your job responsibilities from Big Picture -- at Big

10   Picture than there was at Red Rock?

11     A.   What do you mean by "large difference"?

12     Q.   So the servicing responsibility with Red

13   Rock and SourcePoint or Bellicose and the servicing

14   responsibilities with Big Picture and Ascension are

15   largely the same, do you agree with that?

16        MR. GRAY:  Objection.  Mischaracterizes

17      the testimony.

18        THE WITNESS:  They're similar.

19   BY MS. KELLY:

20     Q.   Okay.  And so your position at Red Rock

21   versus your position at Big Picture, are they also

22   similar in your responsibilities?

Page 152

1      A.   Yes.

2           MS. KELLY:  Okay.  I'm going to mark this

3      Exhibit 12.

4           (Whereupon, the Chart was marked as

5      Plaintiffs' Exhibit 12 for Identification by the

6      Reporter.)

7      BY MS. KELLY:

8      Q.   Have you ever seen this document before?

9      A.   Yes.

10      Q.   And this is a document, Big Picture Loans

11     and Ascension Technologies compliance organization

12     chart.

13          Do you see that?

14      A.   Yes.

15      Q.   Do you know who created this chart?

16      A.   I believe Brian McFadden put it in this

17     chart.

18      Q.   Okay.  And so let's look at the chart.

19          We have the BPL compliance management

20     board, and that includes you, Chairman Williams, and

21     Brian McFadden; correct?

22      A.   Yes.

Page 153

1    Q.  And then over to the left, we have -- the

2  far left -- we have the Big Picture employees that

3  are on tribal land; correct?

4    A.  Big Picture employees that are what?

5    Q.  Located on tribal land.

6    A.  Yes.

7    Q.  Okay.  And that starts with Brittany Pole?

8    A.  Yes.

9    Q.  Then Donna Kenney, and then there's --

10    A.  Yes.

11    Q.   -- senior CSRs and CSRs.

12      Do you see that?

13    A.  Yes.

14    Q.  Who is Jennifer Galloway?

15    A.  She's the compliance counsel.

16    Q.  And she is not an employee of Big Picture;

17  correct?

18    A.  An employee, no.

19    Q.  Okay.  The compliance testing assistant

20  Maisi Ramiraz, is she an employee of Big Picture?

21    A.  No.

22    Q.  Is Ms. Galloway or Maisi Ramiraz located

USCA4 Appeal: 21-2116   Doc: 26-6   Filed: 02/07/2022   Pg: 246 of 503
Case 5:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 154 of 250 PageID# 34392
10/16/2017                                Hazen, Michelle

Page 154

1   on tribal land?

2      A.   No.

3      Q.   So are any of the rest of the pieces of

4   this chart located on tribal land?

5      A.   They're all headquartered on tribal land.

6      Q.   I understand that, but I'm asking where

7   they're actually located.

8         MR. GRAY:  Object to form.

9         THE WITNESS:  And currently, actually,

10      there are -- oh, let me put my glasses on.

11   BY MS. KELLY:

12      Q.   And just to be clear, I'm not asking

13   because -- I'm going to ask at the time the lawsuit

14   was filed because I understand in Puerto Rico there

15   was just a large hurricane and some of those

16   employees may have relocated for a period of time.

17      A.   Yes.

18      Q.   But I'm asking prior to Hurricane Maria or

19   Hurricane Irma where -- were any of these employees,

20   aside from the ones we just mentioned, located on

21   tribal land?

22      A.   There are several that are at the

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 247 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 155 of 250 PageID# 34393
10/16/2017                          Hazen, Michelle

1  headquarters on a regular basis.

2     Q.  So my question is:  Is any of their

3  principal office located on tribal land?

4     A.  Ascension Technologies has an office at

5  the headquarters.

6     Q.  We'll just go through them one by one

7  then.

8        President, Brian McFadden, where does he

9  work out of?

10    A.  Currently downstate.

11    Q.  Prior to this lawsuit being filed, where

12  did -- where was Brian McFadden's office that he

13  went to work on the majority of days?

14    A.  Puerto Rico.

15    Q.  Okay.  Ivelisse Morales.  Prior to this

16  lawsuit being filed, where was her office that she

17  went to work on the majority of days?

18    A.  Puerto Rico.

19    Q.  Greg Johnson, same question.  Where was

20  his office, where he went to work, the majority of

21  days, prior to this lawsuit being filed?

22    A.  Atlanta.

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 248 of 503
10/16/2017
Case 3:17-cv-00461-REP    Document 1007-8    Filed 02/23/21    Page 156 of 250 PageID# 34394
Hazen, Michelle

1    Q.   James Dowd.  Prior to this office --

2  lawsuit being filed, where was his office that he

3  went to work regularly?

4    A.   Puerto Rico.

5    Q.   Adil Karam.  Prior to this lawsuit being

6  filed, where was his lawsuit located that he went to

7  work regularly?

8    A.   Puerto Rico.

9    Q.   Lori Alsterberg.  Prior to this lawsuit

10  being filed, where was her office located that she

11  went to work regularly?

12    A.   Atlanta.

13    Q.   I see on here you have general counsel and

14  assistant general counsel.  Karrie Wichtman and

15  Tanya Gibbs.  Is their principal office located on

16  your tribal lands?

17    A.   No.

18    Q.   And Ms. Galloway's office, we've already

19  discussed, is not located on tribal lands; correct?

20    A.   Correct.

21    Q.   Ben Underwood.  Prior to this lawsuit

22  being filed, what was the office that he regularly

USCA4 Appeal: 21-2116    Doc: 26-6      Filed: 02/07/2022    Pg: 249 of 503
Case 3:17-cv-00461-REP    Document 1007-8    Filed 02/23/21    Page 157 of 250 PageID# 34395
10/16/2017                          Hazen, Michelle

Page 157

1  worked out of?

2     A.  Atlanta.

3     Q.  Alan Reeves.  Prior to this lawsuit being

4  filed, what was the office that he regularly worked

5  out of?

6     A.  Atlanta.

7     Q.  John Norris.  Prior to this lawsuit being

8  filed, what was the office that he regularly worked

9  out of?

10    A.  Puerto Rico.

11    Q.  Senior analyst, Amber Jones.  Prior to

12  this lawsuit being filed, what was the office that

13  she regularly worked out of?

14    A.  Atlanta.

15    Q.  Simon Liang.  Prior to this lawsuit, what

16  was the office that he regularly worked out of?

17    A.  Puerto Rico.

18    Q.  Kym Bunn.  Prior to this lawsuit, what was

19  the office that she regularly worked out of?

20    A.  St. Croix.

21    Q.  Quality assurance analysts.  All the

22  quality assurance analysts that worked for Ascension

Page 158

1   or Big Picture, what office did they work out of

2   prior to the filing of this lawsuit?

3       A.  St. Croix.

4       Q.  How many are there?

5       A.  Nine.

6       Q.  Monique Martinez.  Prior to this lawsuit,

7   what was the office that Ms. Martinez regularly

8   worked out of?

9       A.  Puerto Rico.

10      Q.  Jeannie Cartagena.  Prior to this lawsuit,

11  what was the office that Ms. Cartagena regularly

12  worked out of?

13      A.  Puerto Rico.

14      Q.  Okay.  How many people are located in the

15  call center that is used by Big Picture?

16      MR. GRAY:  Objection to form.

17      THE WITNESS:  I'm not sure of that number.

18      MR. GRAY:  Real quick.  This copy's not

19  Bates-stamped, is that a copying error?

20      MS. KELLY:  Yeah.  It's my error.

21      MR. GRAY:  Okay.  Do we know the Bates

22  number?

Page 159

1    MS. KELLY:  No.  I don't have it on mine

2    either.

3    MR. GRAY:  Okay.  Just making sure.

4    MS. KELLY:  I did not make it up, though

5    so.

6    MR. GRAY:  We'll trace it back.

7    MS. KELLY:  It's legit.

8    Mark this Exhibit 13.

9    (Whereupon, the E-mail was marked as

10   Plaintiffs' Exhibit 13 for Identification by the

11   Reporter.)

12   BY MS. KELLY:

13   Q.   And this is an e-mail that you are not

14   copied on, but it is with Brian McFadden and Kym

15   Bunn and it's from February 8, 2016.

16   If you look at the middle of the first

17   page, it says "At the call center there's a total of

18   269 staff, not including work force."

19   Do you see that?

20   A.  Yes.

21   Q.  And then there's a breakdown of what the

22   different roles are at the call center.  And you see

1  208 CSRs?

2      A.  Yes.

3      Q.  Which means customer service

4  representative; correct?

5      A.  Yes.

6      Q.  And what does TL mean?

7      A.  Team leads.

8      Q.  And there's 43 of those?

9      A.  That's what is says.

10     Q.  What does S-T-L-S -- STLs mean?

11     A.  Senior team leads.

12     Q.  And there's eight of those, do you see

13  that?

14     A.  Yes.  That's what this says.

15     Q.  And what does AM mean?

16     A.  I'm not sure.

17     Q.  Maybe assistant manager or something?

18       MR. GRAY:  Objection.

19       THE WITNESS:  I'm not sure.

20  BY MS. KELLY:

21     Q.  Okay.  But there's two of those positions,

22  do you see that?

USCA4 Appeal: 21-2116    Doc: 26-6       Filed: 02/07/2022    Pg: 253 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 161 of 250 PageID# 34399
10/16/2017                                    Hazen, Michelle

Page 161

1      A.   Yes.

2      Q.   And then -- at the bottom, there's SQAs.

3   Do you see that?

4      A.   Yes.

5      Q.   What does that stand for?

6      A.   Senior quality assurance.

7      Q.   And do you know where those individuals

8   are located?

9      A.   St. Croix.

10     Q.   So those people are not located at the

11   call center; is that correct?

12     A.   Yes.

13     Q.   Do you know where the 269 call center

14   employees are located?

15     A.   Philippines.

16     Q.   Okay.  And then below that, you see junior

17   QAs.  Do you see that?

18     A.   Yes.

19     Q.   And there's eight of those people listed.

20   Do you know where those junior QAs are located?

21     A.   St. Croix.

22          MS. KELLY:  Okay.  Mark this, please.

Page 162

1  and I'm going to mark this next.  So I'm marking --

2  sorry.  I'm marking Exhibits 14 and 15.

3         MR. GRAY:  15.  Thank you.

4         (Whereupon, the Salaries were marked as

5  Plaintiffs' Exhibit 14 for Identification by the

6  Reporter.)

7         (Whereupon, the Salaries were marked as

8  Plaintiffs' Exhibit 15 for Identification by the

9  Reporter.)

10  BY MS. KELLY:

11     Q.  Ms. Hazen, have you had a chance to look

12  at these documents?

13     A.  Yes.

14     Q.  Okay.  And it -- this first document on

15  Exhibit 14 lists you as CEO of Big Picture; correct?

16     A.  Yes.

17     Q.  And it says your salary is 90,000 a year;

18  is that correct?

19     A.  Approximately.

20     Q.  Okay.  And then below your name it lists

21  various other employees.  And you have a manager, a

22  compliance specialist, and then you have six CSRs

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 255 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 163 of 250 PageID# 34401

10/16/2017                          Hazen, Michelle

Page 163

1   and two senior CSRs.

2        Do you see that?

3     A.   Yes.

4     Q.   Is that similar to the current setup of

5   Big Picture Loans today?

6     A.   Now we have more employees, but --

7     Q.   Okay.  If you look on the third page of

8   Exhibit 14, is that what -- accurately reflects

9   today's employees?

10    A.   No.  The third page or the fourth page?

11    Q.   Maybe the fourth page then.

12    A.   Okay.  It's not accurate.

13    Q.   What's inaccurate about the fourth page?

14    A.   Starrline Behrens is no -- Starrline

15   Behrens.

16    Q.   But this was accurate as of May 31st,

17   2017, correct?  If you look at the top of the page.

18    A.   Yes.

19    Q.   Why was Starrline Behrens placed on

20   administrative leave?

21        MR. GRAY:  Object to the form.

22        THE WITNESS:  There was a TFSRA licensing

Page 164

1    issue.

2   BY MS. KELLY:

3      Q.   Based on what conduct of hers?

4       MR. GRAY:  Object to the form.

5       THE WITNESS:  Something popped up on her

6    record that she was no longer able to hold a

7    TFSRA license.

8   BY MS. KELLY:

9      Q.   Was she accused of theft in some regard;

10  is that correct?

11      MR. GRAY:  Objection to form, foundation.

12      THE WITNESS:  I don't recall if --

13  BY MS. KELLY:

14     Q.   So you don't know why your employee was

15  placed on administrative leave; is that correct?

16      MR. GRAY:  Objection to form,

17   argumentative.

18      THE WITNESS:  She wasn't able to be

19   licensed by the TFSRA, that's why she was

20    placed on administrative leave.

21  BY MS. KELLY:

22     Q.   Okay.  And so in looking at this list of

**JA3290**

Page 165

1   employees, it looks like the CSRs make between 10-

2   to $13 an hour, depending on whether or not they are

3   a senior CSR; is that correct?

4      A.   Regular CSRs, 11 to 14.

5      Q.   Okay.  So looking back at the first page

6   of this, at the time this chart was created you had

7   six CSRs, and they were making between 10- to $12 an

8   hour.

9         Do you see that?

10     A.   Yes.

11     Q.   And you had two senior CSRs who were

12  making 12- and $13 an hour.

13        Do you see that?

14     A.   Yes.

15     Q.   Okay.  And as CEO, you were making 90,000

16  a year at the time this was created; is that

17  correct?

18     A.   Approximately, yes.

19     Q.   Okay.  Did you ever try to give the CSRs a

20  raise?

21        MR. GRAY:  Objection to the form.

22        THE WITNESS:  I didn't try, I did give

Page 166

1      them a raise.

2   BY MS. KELLY:

3      Q.   And what did their raise -- what did the

4   raise leave their wages at?  How much of a raise did

5   they receive?

6      A.   It varied.

7      Q.   What was the variance?

8      A.   It went from 10 to 12.50, to 11 to 14.

9      Q.   Okay.  So it was between a dollar and a

10   dollar fifty an hour raise?

11      A.   Yes.

12      Q.   Okay.  And this chart shows the annual

13   salary for a CSR making $10 an hour as $20,800.

14         Do you see that?

15      A.   Yes.

16      Q.   And a CSR who makes $11 an hour could make

17   $22,880.

18         Do you see that?

19      A.   Yes.

20      Q.   Have you ever heard of a video called

21   "Frozen Homeland"?

22      A.   Yes.

Page 167

1    Q.   And can you explain to me what that video

2   is about and what the purpose of that video is?

3        MR. GRAY:  Objection to form.

4        THE WITNESS:  It was to indicate the

5        hardships that the Lac Vieux Desert tribal

6        members experience.

7   BY MS. KELLY:

8    Q.   And what was -- who was the audience for

9   that video?

10        MR. GRAY:  Objection to form.

11        THE WITNESS:  I'd have to say those that

12        were opposing tribal lending.

13   BY MS. KELLY:

14    Q.   Okay.  In the video, it was saying that

15   many tribal members couldn't afford to pay for oil

16   during the winter because the cost of one shipment

17   of oil would be, like, $900; do you recall that?

18        MR. GRAY:  Object to form and foundation.

19        THE WITNESS:  Yes.

20   BY MS. KELLY:

21    Q.   So my question is:  Why do you only pay

22   your employees $11 an hour if the purpose is to help

Page 168

1  them be able to sustain themselves and pay for their

2  oil and different needs?

3       MR. GRAY:  Objection to form, foundation.

4    It's argumentive, it's provocative.

5       THE WITNESS:  That's the amount that I

6    have budgeted for them.

7  BY MS. KELLY:

8    Q.  And if you wanted to increase your budget

9  by more than 5 percent on a yearly basis, you would

10  need permission from Eventide or Mr. Martorello;

11  correct?

12       MR. GRAY:  Objection to form, foundation,

13    mischaracterizes evidence, assumes facts.

14       THE WITNESS:  I don't know, I've never

15    tried.

16  BY MS. KELLY:

17    Q.  Well, we can go through the documents

18  again, if you want to look at them again, if you

19  don't know that in order to increase your budget by

20  more than 5 percent, you would need permission from

21  Eventide or Mr. Martorello.

22       MR. GRAY:  Asked and answered.  Objection

Page 169

1     to form.  Objection to foundation.

2         THE WITNESS:  That's what the document

3     states.

4  BY MS. KELLY:

5     Q.   And you understand that that's what the

6  document states; correct?

7         MR. GRAY:  Asked and answered.

8         THE WITNESS:  That's what the document

9     states.

10  BY MS. KELLY:

11    Q.   Okay.  Now, looking at Exhibit 15,

12  these -- I've noticed that these employees, in the

13  Virgin Islands, Puerto Rico, and Atlanta, make more

14  than your CSRs.

15        Do you know why that is?

16        MR. GRAY:  Objection to form, foundation,

17    mischaracterizes evidence.

18        MS. KELLY:  How is that a

19    mischaracterization?  What's your basis for

20    your objection?

21        MR. GRAY:  Well, there's a lot more

22    employees on here with a much greater pay

Page 170

1      range.  So you can't carte blanche say they

2      universally make more than the Big Picture

3      employees.

4          MS. KELLY:  All right.  Find me someone

5      that makes less than 22,000 on this list.

6          MR. GRAY:  I'll find you someone who makes

7      less than 90,000.

8          MS. KELLY:  I'm saying the CSRs.  Listen

9      to my question and stop making these random

10      objections when you haven't even looked at the

11      document.

12          MR. GRAY:  Okay.

13   BY MS. KELLY:

14      Q.   Okay.  So my question is:  Why do these

15   employees on this list make more than all of your

16   CSRs?

17      A.   Because that's what's in the budget, the

18   Ascension budget.

19      Q.   Have you ever seen this document, Exhibit

20   15, prior to today?

21      A.   Yes.

22      Q.   And when you saw this, did you do anything

**JA3296**

Page 171

1  to try to increase the pay of the employees for Big

2  Picture?

3        MR. GRAY:  Objection to form.

4        THE WITNESS:  The wages will be addressed

5     in the next budget year.  We do it on an annual

6     basis.

7  BY MS. KELLY:

8     Q.   So my question was:  When you saw this,

9  did you do anything to try to increase the wages for

10   the Big Picture employees?

11       MR. GRAY:  Asked and answered.

12       THE WITNESS:  No.

13  BY MS. KELLY:

14    Q.   What is the purpose of having employees on

15  tribal land or employees who are members of the

16  tribe?

17       MR. GRAY:  Objection to form.

18       THE WITNESS:  To allow them to make a

19     better life for themselves.

20  BY MS. KELLY:

21    Q.   Okay.  If you look on Exhibit 15, how many

22  people on this list make more than the CEO of Big

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 264 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 172 of 250 PageID# 34410
10/16/2017                          Hazen, Michelle

Page 172

1  Picture Loans?

2     A.  Twelve.

3     Q.  And do you know why those 12 people make

4  more money than you do as the CEO?

5        MR. GRAY:  Objection.  Argumentive.

6        THE WITNESS:  Because of their area of

7     expertise.

8  BY MS. KELLY:

9     Q.  Do you know if any of the employees listed

10  on Exhibit 15 are members of the tribe?

11    A.  Of which tribe?

12    Q.  The LVD, your tribe.

13    A.  No.

14    Q.  Going back to Exhibit 14, on Page 4.

15       How many of these members of Big Picture,

16  as of May 31st, 2017, are members of the tribe,

17  i.e., LVD, your tribe?

18    A.  Five tribal members -- or Lac Vieux Desert

19  tribal members.

20    Q.  And is that including you?

21    A.  Yes.

22    Q.  Okay.  Do you recall a time where Big

Page 173

1  Picture and Ascension sought to expand offices to

2  Atlanta?

3      A.  Yes.

4      Q.  And whose idea was that?

5      A.  A collective conversation.

6      Q.  Who came up with the idea in that

7  collective conversation?

8          MR. GRAY:  Asked and answered.

9          THE WITNESS:  Brian McFadden.

10  BY MS. KELLY:

11     Q.  And what was the -- why would you create

12  an office in Atlanta rather than hire people on

13  tribal land?

14     A.  The scope of expertise that you need for

15  these positions, we collectively decided that we

16  would not be able to get somebody to move to

17  Watersmeet and provide that expertise for the

18  business.

19     Q.  What expertise did the business need that

20  prompted it to create an Atlanta office?

21     A.  Expertise in marketing, risk modeling and

22  data analytics, IT.

JA3299

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 266 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 174 of 250 PageID# 34412
10/16/2017                          Hazen, Michelle

1    Q.  Did you or any of the tribal members not

2    have that expertise?

3    A.  I don't.

4    Q.  Did you try to hire those positions

5    locally prior to creating an Atlanta office?

6    A.  No, I don't believe so.

7    Q.  And why not?

8    A.  I think just based on the fact that we

9    have a hard time getting employees into Big Picture

10   Loans in Watersmeet.  I mean --

11   Q.  So you didn't even bother because it

12   was -- it's been hard in the past?

13       MR. GRAY:  Objection to form.

14       THE WITNESS:  Well, we always make sure

15        that our tribal members are aware of

16        opportunities.

17   BY MS. KELLY:

18   Q.  Did you list these opportunities or let

19   tribal members know of these potential opportunities

20   before deciding to open an Atlanta office?

21   A.  I don't think they were posted in the

22   community, no.

Page 175

1     Q.   Was anything done, that you can recall, to

2   let tribal members know of these opportunities prior

3   to deciding to create an Atlanta office?

4     A.   I believe there was discussion about

5   possibly mentoring and encouraging tribal members to

6   pursue an education to fill some of these positions.

7     Q.   Who did you have that discussion with?

8     A.   The tribal council discussed it.

9     Q.   Did they -- did you let any tribal members

10   know about the opportunities prior to deciding to

11   open an Atlanta office?

12        MR. GRAY:  Asked and answered.

13        THE WITNESS:  I think it's part of the

14    long-term strategic plan.

15   BY MS. KELLY:

16     Q.   What is?

17     A.   To mentor and encourage tribal members to

18   pursue the education to fill these positions.

19     Q.   So are you aware of any tribal members

20   that you have mentored or have pursued education to

21   fulfill the opportunities that were positions that

22   were open in the Atlanta office?

**JA3301**

Page 176

1     A.   Not to this day.  I continue to encourage

2   Big Picture Loan employees.

3     Q.   Okay.  When Brian suggested opening the

4   Atlanta office, you said you were part of that

5   conversation and you agreed; correct?

6     A.   Yes.  After we talked about several -- or

7   different locations, we collectively agreed on

8   Atlanta.

9     Q.   And in order to open the Atlanta office,

10   you had to find office space; correct?

11     A.   Yes.

12     Q.   And prior to entering into a lease

13   agreement, did you need to ask permission from

14   Mr. Martorello to do so?

15        MR. GRAY:  Objection.  Form and

16     foundation.

17        THE WITNESS:  I believe, according to the

18     agreement, we consulted with Eventide to incur

19     that additional expense of the Atlanta office

20     in the best interest of the business.

21   BY MS. KELLY:

22     Q.   And when you say you consulted, what do

Page 177

1  you mean by that?

2      A.  We made him aware of what we were planning

3  on doing.

4      Q.  Did you ask for his approval to do so?

5      A.  I think we gave him the plan with the

6  justification and how it was going to better the

7  business.

8      Q.  But you had to ask for his approval;

9  correct?

10         MR. GRAY:  Asked and answered.

11         THE WITNESS:  I'd say common courtesy to

12     let him know what the plan was moving forward.

13  BY MS. KELLY:

14     Q.  All right.  Let's go back to the agreement

15  then.

16         So you're sitting here today telling me

17  you don't recall if -- pursuant to the agreement you

18  have, if you have to ask for permission to do so?

19         MR. GRAY:  Objection.  Argumentative.

20         THE WITNESS:  I know what it says.

21  BY MS. KELLY:

22     Q.  Okay.

Page 178

1    A.   What the agreement says.

2    Q.   Okay.  And what does it say?  That you

3  need to get his permission or approval; correct?

4        MR. GRAY:  Objection.

5    Mischaracterization.

6        MS. KELLY:  Well, let's just look at the

7    letter then.

8        MR. GRAY:  What number are we on?

9        MS. KELLY:  We've marked this Exhibit 16.

10        (Whereupon, the E-mail was marked as

11  Plaintiffs' Exhibit 16 for Identification by the

12  Reporter.)

13  BY MS. KELLY:

14    Q.   Ms. Hazen, have you ever seen this

15  document before?

16    A.   The letter, yes.

17    Q.   So this is a letter to you, and the

18  subject line is "Consent to Ascension Technologies,

19  LLC, Atlanta office expansion."  It states "Pursuant

20  to loan and security agreement, dated October 7th,

21  2015, and, more specifically section 4(b), of the

22  related promissory note, dated January 26, 2016, by

Page 179

1   and between 'redacted,'" but I'm sure it says

2   Eventide credit -- whatever -- acquisition, "and

3   Tribal Economic Development Holdings, LLC, together

4   with its subsidiaries, including Big Picture Loans,

5   LLC, and Ascension Technologies, LLC."

6        "Eventide," or redacted -- but I'm sure it

7   says Eventide, "must provide written consent and

8   approval of a budget before borrower or its

9   subsidiaries expand the business in such a manner as

10   to materially reduce payments under the note."

11        Do you see that?

12   A.  Yes.

13   Q.  So do you agree that you needed to obtain

14   written consent prior to expanding to an Atlanta

15   office from Mr. Martorello?

16   A.  That's what it says here.

17        (Whereupon, the Manual was marked as

18   Plaintiffs' Exhibit 17 for Identification by the

19   Reporter.)

20   BY MS. KELLY:

21   Q.  Ms. Hazen, have you ever seen what has

22   been marked Exhibit 17 prior to today?

JA3305

Page 180

1    A.  I don't recall.

2    Q.  Okay.  This is a document called "CSR

3   Procedural Training Manual."  It's dated

4   September 2013, and it's a SourcePoint document

5   which would have been when the -- when it was

6   Bellicose.

7        You don't recall seeing this before?

8    A.  I don't recall.

9    Q.  Okay.

10       MR. GRAY:  Objection to the form.

11   MS. KELLY:  Let's mark this Exhibit 18.

12       (Whereupon, the Script was marked as

13   Plaintiffs' Exhibit 18 for Identification by the

14   Reporter.)

15   BY MS. KELLY:

16    Q.  This is -- I've just marked this Exhibit

17   18.

18       Have you ever seen this document before?

19    A.  Yes.

20    Q.  What is this document?

21    A.  This is a proposed template that Big

22   Picture Loans put together to go through the

**JA3306**

Page 181

1  approval process.

2      Q.   Would CSRs at Big Picture Loans' office on

3  tribal land use this script?

4      A.   Yes.

5      Q.   If a consumer were to call the phone

6  number on Big Picture Loans' website, where would it

7  take them?

8          MR. GRAY:  Objection to form and

9      foundation.

10         THE WITNESS:  To the call center.

11  BY MS. KELLY:

12     Q.   Located in the Philippines?

13     A.   Yes.

14     Q.   Okay.  How would a consumer be able to

15  call and get in contact with Big Picture Loans on

16  tribal land directly?

17     A.   By calling our office.

18     Q.   Where do you put the office number so that

19  consumers know how to reach the office on tribal

20  land?

21     A.   We don't put it out there.  We're e-mail

22  support.

Page 182

1     Q.   Okay.  So is it fair say that if I'm a

2   consumer and I go online to your website and I see

3   the phone number, and I call it, I would go to the

4   call center in the Philippines, not to the office in

5   Watersmeet, Michigan; correct?

6     A.   Yes.

7        MR. GRAY:  Objection to form.

8   BY MS. KELLY:

9     Q.   Okay.  Now, if I had a current loan with

10  Big Picture Loans and I responded to e-mails, where

11  would I -- where would those e-mails take me?

12       MR. GRAY:  Objection to form.

13       THE WITNESS:  E-mail support.

14  BY MS. KELLY:

15    Q.   And where are the people that respond

16  to -- where are the e-mail support employees

17  located?

18    A.   Big Picture Loans' office on the

19  reservation.

20    Q.   Anywhere else?

21    A.   No.

22    Q.   So the office in Watersmeet, Michigan

1    responds to all consumer e-mails; is that correct?

2           MR. GRAY:  Asked and answered.

3           THE WITNESS:  The St. Croix office

4       employees may temporarily answer e-mails if

5       we're more than a certain number of hours

6       behind.

7    BY MS. KELLY:

8       Q.   What's the number of hours behind you

9    would have to be for St. Croix to help?

10      A.   Twenty-four hours.

11      Q.   Okay.  So if I'm a consumer and I get a

12   loan, and I call the office in the Philippines

13   because I've received a letter from Big Picture and

14   I want to get that loan, what would be my next step

15   after I talk to the person in the Philippines?

16          MR. GRAY:  Objection to form and

17      foundation.

18          THE WITNESS:  Go on the website and fill

19      out an application.

20   BY MS. KELLY:

21      Q.   Do I still have to do that if I get a

22   prescreened letter from Big Picture?

Page 184

1        MR. GRAY:  Objection to form.

2        THE WITNESS:  Yes.

3  BY MS. KELLY:

4     Q.   And then when I went and filled out the

5  application online, there would immediately be a

6  decision based on different risk analysis credit

7  scoring models; correct?

8        MR. GRAY:  Objection to form.

9        THE WITNESS:  It's either accepted or

10    denied.

11  BY MS. KELLY:

12     Q.   Okay.  And then in that same time I'm on

13  the website, would the agreement pop up that I would

14  sign if I'm accepted?

15        MR. GRAY:  Objection to form.

16        THE WITNESS:  After you select the loan

17    amount and the term of the loan.

18  BY MS. KELLY:

19     Q.   So I select the loan amount, the term of

20  the loan, and then the agreement pops up; is that

21  correct?

22        MR. GRAY:  Objection to form.

**JA3310**

Page 185

1          THE WITNESS:  An estimated APR will pop

2     up.

3  BY MS. KELLY:

4     Q.   And I click "I accept"?

5          MR. GRAY:  Objection to form.

6          THE WITNESS:  You're required to review

7     the loan agreement that has the APR and the

8     payment schedule in it.

9  BY MS. KELLY:

10     Q.   Uh-huh.  And then I check the box to

11  accept?

12          MR. GRAY:  Objection to form.

13          THE WITNESS:  After you agree to the

14     disclosures.

15  BY MS. KELLY:

16     Q.   Uh-huh.

17     A.   Which are governing law and form

18  selections, waiver of jury trial, and the tribal

19  dispute resolution procedure.

20     Q.   Okay.

21     A.   And privacy disclosure.

22     Q.   Okay.

**JA3311**

Page 186

1     A.   And then you would be asked to sign.

2     Q.   So then I sign the loan agreement --

3     A.   Well, you check a box --

4     Q.   -- by checking a box.

5     A.   Yes.

6     Q.   And I sign the loan agreement.  Then when

7   do I get the money?

8         MR. GRAY:  Objection to form.

9         THE WITNESS:  So after that happens, Big

10     Picture does a final verification.

11   BY MS. KELLY:

12     Q.   After I've signed the agreement?

13     A.   Well, before you sign the agreement,

14   actually, you're asked to pick your payment method

15   and then Big Picture does a final verification.

16     Q.   So is the final verification done after I

17   sign the agreement and check that box?

18     A.   After you sign the agreement, yes.

19     Q.   So I sign -- I go online.  I say I need

20   500 bucks, I'm fine with the APR.  I scroll through

21   all the disclosures, everything.  I check the box,

22   and then -- and by checking the box, I sign and

Page 187

1  agree to the terms; correct?

2     A.  Yes.

3     Q.   And then after that Big Picture -- prior

4  to giving me the money, Big Picture would do a final

5  verification of my bank account or proof of funds --

6     A.  Yes.

7     Q.   -- is that correct?  So I've already

8  signed, and I already think I'm getting the money,

9  and then Big Picture will do its final verification;

10  correct?

11        MR. GRAY:  Objection, form.

12        THE WITNESS:  Yes.

13  BY MS. KELLY:

14     Q.   And that's because you don't want me to go

15  to a different website while I'm waiting for Big

16  Picture to do its final verification.  You want to

17  close the deal; right?

18        MR. GRAY:  Objection --

19  BY MS. KELLY:

20     Q.   Because there's a lot of competitors in

21  this market space?

22        MR. GRAY:  Objection.  Form.  Foundation.

**JA3313**

Page 188

1      Mischaracterization.

2           THE WITNESS:  No.

3   BY MS. KELLY:

4      Q.   Okay.  So then why -- why don't you verify

5   the bank information prior to having me sign an

6   agreement?

7           MR. GRAY:  Objection.

8      Mischaracterization.

9           THE WITNESS:  There is bank information

10       that's verified as part of the application

11       process when it's run through the underwriting.

12   BY MS. KELLY:

13      Q.   I understand that.  But I'm asking about

14   the final verification that you said -- you just

15   testified to -- is done after I sign the agreement.

16        Why is that done after I sign the

17   agreement?

18      A.   The final verification is to make sure

19   that the due dates are correct according to the

20   information that you gave us.

21      Q.   But why is that done after I sign the

22   agreement?  Wouldn't you want to make sure before I

Page 189

1  sign the agreement?

2       MR. GRAY:  Objection.  Form.

3       THE WITNESS:  That's the process.

4  BY MS. KELLY:

5    Q.   Okay.  So if I were to just go online,

6  apply for a loan, sign the agreement online -- I

7  never have to interact with a single human being;

8  correct?  I can just get money deposited into my

9  bank account?

10       MR. GRAY:  Objection.  Form.

11       THE WITNESS:  In some cases, yes.

12  BY MS. KELLY:

13    Q.   Okay.  So I'm going to direct you back to

14  Exhibit 1, which is your affidavit.  And I'm on Page

15  4, paragraph 28.

16       It says "All Big Picture consumer loans

17  are originated on LVD tribal lands by Big Picture

18  employees."

19       Do you see that?

20    A.   Yes.

21    Q.   How many loans did you originate in the

22  month of June 2017?

Page 190

1           MR. GRAY:  Objection.  Form.

2           THE WITNESS:  Off the top of my head, I

3      don't know.

4    BY MS. KELLY:

5      Q.   On average, what's the monthly average of

6    loans originated by Big Picture?

7      A.   The average is -- I'd say roughly, 10,000.

8      Q.   And of those 10,000 loans, can you tell me

9    what the Big Picture employees on tribal land do for

10   each of those 10,000 loans?

11          MR. GRAY:  Objection to form.

12          THE WITNESS:  After they do the final

13      verification, they manually type in the ACH

14      date, that then causes the loan to be

15      originated and goes into the customer's

16      account.

17   BY MS. KELLY:

18      Q.   So the Big Picture employees on tribal

19   land just deal with the loan after the consumer

20   signs -- checks the box to sign the agreement; is

21   that correct?

22          MR. GRAY:  Objection.  That's a

JA3316

Page 191

1    mischaracterization of testimony.

2        THE WITNESS:  No.  After the application

3    is completed, that underwriting -- step number

4    two in the underwriting.

5   BY MS. KELLY:

6        Q.   Okay.  What's the underwriting process?

7        A.   It's -- it's a decision engine where all

8   of the models, that are approved by Big Picture

9   Loans, are put into a decision engine.

10       Q.   Right.  But it's an automated process.

11       A.   Yes.

12       Q.   When I type my information in on the

13  website, and I put it all in, a decision is made and

14  then the loan agreement pops up and then I scroll

15  through it; right?

16       MR. GRAY:  Objection to form.

17       THE WITNESS:  Yes.

18  BY MS. KELLY:

19       Q.   And I check the box to sign my name;

20  right?

21       MR. GRAY:  Asked and answered.

22       THE WITNESS:  Yes.

JA3317

Page 192

1  BY MS. KELLY:

2     Q.  And none of that is handled by Big Picture

3  employees because it is an automated process;

4  correct?

5        MR. GRAY:  Objection.

6     Mischaracterization.

7        THE WITNESS:  Yes.

8  BY MS. KELLY:

9     Q.  Okay.  And so after a consumer signs the

10  loan agreement, Big Picture then checks the document

11  to make sure it looks right and calls to verify

12  their bank information; correct?

13        MR. GRAY:  Objection.  That's a

14     mischaracterization of testimony.  It's asked

15     and answered already.

16        THE WITNESS:  Can you repeat the question?

17  BY MS. KELLY:

18     Q.  Sure.  After I sign the agreement, it then

19  goes to Big Picture employees on tribal land to look

20  over the agreement, make sure everything's in the

21  right spot, and verify the bank information I

22  provided?

JA3318

Page 193

1        MR. GRAY:  Same objection.

2        THE WITNESS:  Yes.

3  BY MS. KELLY:

4      Q.  Do any employees that are not located on

5  the reservation, ever call the banks to verify bank

6  information?

7        MR. GRAY:  Objection to form.

8        THE WITNESS:  Yes.

9  BY MS. KELLY:

10     Q.  Which employees do that?

11     A.  The call center.

12     Q.  The call center in the Philippines?

13     A.  Yes.

14     Q.  And is that done by other CSRs?

15       MR. GRAY:  Objection, form.

16       THE WITNESS:  By other CSRs?  What do you

17     mean, in the Philippines?

18  BY MS. KELLY:

19     Q.  Other -- yes.  CSRs located in the

20  Philippines.  Is that the job title that handles

21  that, a customer service representative?

22     A.  Yes.

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 286 of 503
Case 3:17-cv-00461-REP    Document 1007-8    Filed 02/23/21    Page 194 of 250 PageID# 34432
10/16/2017                          Hazen, Michelle

Page 194

1      Q.   Okay.  How many -- in terms of a breakdown

2   on at monthly basis, there's 10,000, on average,

3   loans originated, or loans that are accepted -- let

4   me rephrase that.

5          There's approximately 10,000 loans on

6   average a month.  Of those 10,000, how many would

7   the employees on tribal land call to verify the bank

8   information for versus employees located elsewhere?

9          MR. GRAY:  Objection to form and

10          mischaracterizes testimony.

11          THE WITNESS:  I don't know.

12   BY MS. KELLY:

13      Q.   Do you have any idea what percentage the

14   employees on tribal land -- what percentage they

15   handle versus what the percentage in the other

16   offices handle?

17          MR. GRAY:  Asked and answered.

18          THE WITNESS:  Off the top of my head, no.

19   BY MS. KELLY:

20      Q.   So looking at your declaration, paragraph

21   30, we just went over the process for taking out a

22   loan online.  And so items A, B, and C, are all part

Page 195

1   of this -- or items A and B, are all part of this

2   automated process; correct?

3        MR. GRAY:  Objection to form.

4        THE WITNESS:  Yes.  That's what this says.

5   BY MS. KELLY:

6     Q.   And then C, numbers 1, 2, 3, 4, 5, 6 are

7   also part of this online process that is all

8   automated; correct?

9        MR. GRAY:  Objection to form.

10        THE WITNESS:  Did you say 1 through 6?

11  BY MS. KELLY:

12     Q.   Correct.

13     A.   Yes.

14     Q.   And then number 7, it says "Once the

15   applicant signs the loan agreement, Big Picture's

16   on-reservation employees perform a final

17   verification of the applicant's information and the

18   loan agreement, the e-signature, the due dates, the

19   payment schedule, bank information, and the terms

20   and conditions of the loan were agreed to, as well

21   as other personal identifying information."

22        Do you see that?

USCA4 Appeal: 21-2116    Doc: 26-6      Filed: 02/07/2022    Pg: 288 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 196 of 250 PageID# 34434
10/16/2017                                    Hazen, Michelle

Page 196

 1      A.   Yes.

 2        Q.   So based on your earlier testimony, is it

 3   fair to say that Big Picture's on-reservation

 4   employees, in addition to CSRs that are located not

 5   on the reservation, perform the items in number 7?

 6   The tasks in number 7?

 7        MR. GRAY:  Objection to form.

 8        THE WITNESS:  No.

 9   BY MS. KELLY:

10        Q.   What -- why is that statement incorrect?

11        A.   Because only the BPL employees do the

12   e-signature, check the due dates, the payment

13   schedule as part of the payment verification -- or

14   the final verification.

15        Q.   So the Big Picture employees on tribal

16   land will review the loan agreement once the

17   consumer signs it to make sure everything looks

18   right?

19        MR. GRAY:  Objection to form.

20        THE WITNESS:  Can you repeat your

21      question?

22

Page 197

1   BY MS. KELLY:

2      Q.   Sure.  Only the Big Picture employees on

3   tribal land review the loan agreement once a

4   consumer signs it to make sure everything kind of

5   looks right?  The box is checked, there's an

6   e-signature, there's a payment schedule -- stuff

7   like that.

8      A.   Yes.

9      Q.   So no employees anywhere but on tribal

10  land will review that; correct?

11       MR. GRAY:  Asked and answered.

12       THE WITNESS:  Can you repeat your

13    question?  I didn't hear the whole question.

14  BY MS. KELLY:

15     Q.   Okay.  So no employees that are not

16  located on tribal land would ever review a contract

17  that a consumer has signed to make sure all the

18  fields are properly filled out, the box is checked,

19  there's an e-signature; is that correct?

20     A.   Yes.

21     Q.   Okay.  In terms of verifying bank

22  information, that can happen by CSRs on tribal land

JA3323

Page 198

1   and CSRs that are not on tribal land; is that

2   correct?

3        MR. GRAY:  Objection to form.

4        THE WITNESS:  I'm rethinking this.

5   BY MS. KELLY:

6    Q.   So just -- before you answer -- so I did

7   some math.  And if you're talking 10,000 loans a

8   month and you have 20 working days a month, that's

9   500 loans that your CSRs on tribal land will review

10   and 500 calls to banks that would be made for just

11   those that are accepted.

12        MR. GRAY:  Objection to form, foundation,

13        mischaracterization of testimony.

14   BY MS. KELLY:

15    Q.   So does that seem right to you?

16    A.   I couldn't tell you off the top of my

17   head.

18    Q.   So when you said you're rethinking what

19   you had said, what part of what you had testified to

20   are you rethinking?

21    A.   The bank verification.

22    Q.   Okay.  So you don't know if employees not

Page 199

1    located on tribal land call to verify bank

2    information?

3         MR. GRAY:  Objection.  That's a

4    mischaracterization of testimony.

5         THE WITNESS:  Actually, it's a software

6    that we use and it's -- it's in the notes

7    indicated.  I'm getting confused.

8         MS. WICHTMAN:  Do you need to take a

9    break?

10        THE WITNESS:  I have to say that -- yes,

11   I'm getting --

12        MS. KELLY:  Okay.  We can take a break.

13        THE VIDEOGRAPHER:  This ends Disk 3 of the

14   Hazen deposition.  The time is 5:21:59.  Off

15   the record.

16        (Off the record at 5:21 p.m.)

17        (Back on the record at 5:37 p.m.)

18        THE VIDEOGRAPHER:  On the record with

19   Disk 4 of the testimony of Michelle Hazen in

20   the matter of Williams versus the Big Picture.

21   The date is October 16th, 2017.  The time is

22   5:37:14.

Page 200

1        MS. KELLY:  I'm going to mark this, 19.

2        (Whereupon, the E-mail was marked as

3    Plaintiffs' Exhibit 19 for Identification by the

4    Reporter.)

5    BY MS. KELLY:

6      Q.   Ms. Hazen, I just want to direct your

7    attention to Page 3 of this document, which is an

8    e-mail chain that you are copied on.  But on Page 3,

9    there is, what appears to be, a cut and paste from

10    some sort of database.

11        Do you see that?

12      A.  Yes.

13      Q.   What is the purpose of this database for

14    Big Picture?

15      A.  This is the loan management system.

16      Q.   Okay.  So this is your loan management

17    database that I'm looking at; right?

18      A.  Yes.

19      Q.   And if you look at this, it looks like it

20    starts from the bottom, in terms of chronology, and

21    works its way to the top; is that correct?

22      A.   Yes.

Page 201

1      Q.   Okay.  Is Deberalyn Hermoso someone at --

2   that was ever employed by Big Picture Loans on

3   tribal land?

4      A.   No.

5      Q.   Do you know who that is?

6      A.   No.

7      Q.   Do you know if that individual was ever

8   employed by Ascension Technologies in the Virgin

9   Islands, Puerto Rico, or Atlanta?

10     A.   No.

11     Q.   So then is it fair to say that this is

12  likely the name of an individual that's at the call

13  center in the Philippines?

14        MR. GRAY:  Objection to form.

15        THE WITNESS:  Yes.

16  BY MS. KELLY:

17     Q.   And if you could just walk me through,

18  kind of, the process so I understand what happened.

19  So it appears that a customer probably called the

20  Philippines.

21        And then based on what you see here, can

22  you walk me through the rest?

JA3327

Page 202

1      A.   So it appears that they're talking about a

2   verification of consistent deposits.

3      Q.   Well, I guess -- so let me just start from

4   the first -- the bottom here.  It says "Customer has

5   three direct deposits through her name."

6          Do you see that?

7      A.  Yes.

8      Q.  Do you know what that means?

9      A.   She shows three direct deposits.

10     Q.   As income each month; is that correct?

11     A.  Yes.

12     Q.   Okay.  And then the next block, it says

13   "Bank of America, NA at decisionlogic.com."

14         Do you see that?

15     A.  Yes.

16     Q.   "Account and routing number verified."

17     A.  Yes.

18     Q.   "Three most recent direct deposits from

19   McGrath Law," which if you read the e-mail chain, it

20   seems to be the employer; correct?

21     A.  Yes.

22     Q.  And so -- then the next rung above that is

Page 203

1    verified through direct deposits and online banking.

2         Do you see that?

3    A.  Yes.

4    Q.   And then above that, it says "Add note:

5    CSR clarify to the customer if she is self-employed.

6    Customer agreed and said that she's a lawyer on her

7    court.  CSR acknowledge and asked if she have

8    third-party income.  Customer said, 'no.'  CSR

9    acknowledge, apologize to customer since we can no

10   longer proceed with the process of her loan and

11   informed customer that we will withdraw the

12   application.  Explain customer the reason why,

13   customer was upset.  CSR apologized once again.

14   Customer suddenly hung up.  CSR leave ghost spiel."

15        Do you see that?

16   A.  Yes.

17   Q.   So what -- can you explain to me what

18   happened there?

19   A.   I wasn't directly involved, so I don't

20   know.

21   Q.   Okay.  If you go up.  It says "Note:

22   Forwarded to TL Jessan for TBW."

Page 204

1          Do you know what TL means?

2     A.   Team lead.

3     Q.   And what does TBW mean?

4     A.   To be withdrawn.

5     Q.   Okay.  Does Jessan work on tribal land?

6     A.   No.

7     Q.   Do you know if Jessan is an employee of

8  Ascension out of the Virgin Islands, Puerto Rico, or

9  Atlanta offices?

10     A.   I don't believe so.

11     Q.   Okay.  So is it fair to assume that he

12   must be a call center employee?

13        MR. GRAY:  Objection to form.

14        THE WITNESS:  Yes.

15  BY MS. KELLY:

16     Q.   Okay.  And looking here, if you look on

17   the bottom, the third line from the bottom.  It said

18   "Verified direct deposits and online banking."

19          Do you see that?

20     A.   Yes.

21     Q.   Is that something that your CSRs on tribal

22   land would also do?

**JA3330**

Page 205

1          MR. GRAY:  Objection to form.

2          THE WITNESS:  I'm not sure.

3          MS. KELLY:  Okay.  I'm going to give you

4     this, mark it Exhibit 20.

5          (Whereupon, the Appendix A was marked as

6   Plaintiffs' Exhibit 20 for Identification by the

7   Reporter.)

8   BY MS. KELLY:

9      Q.   Ms. Hazen, have you ever seen this

10   document before?

11     A.  Yes.

12     Q.   What is this?

13     A.   It's the three processing levels for the

14   CSRs.

15     Q.   And is this an accurate identification of

16   the different processing levels for the CSRs that

17   are employed on tribal land by Big Picture Loans?

18     A.  Yes.

19     Q.   Okay.  Can you think of anything that the

20   CSRs on tribal land do that's not listed in these

21   three levels?

22     A.   Not off the top of my head.

JA3331

Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 206 of 250 PageID# 34444
10/16/2017                             Hazen, Michelle

Page 206

1    Q.   Okay.  We had spoken about how now that

2   Big Picture is created, as the CEO and comanager you

3   have to approve any real changes to different

4   processes.

5        Do you recall?

6    A.   I don't recall exactly.

7    Q.   When -- whenever there's a change in

8   process or procedure, what is -- what is done to

9   request your approval?

10       MR. GRAY:  Objection to form.

11       THE WITNESS:  Normally there's an RA form.

12  BY MS. KELLY:

13   Q.   Okay.  And when you would receive an RA

14  form -- well, let me just --

15       MS. KELLY:  I will mark this 21.

16       (Whereupon, the Request for Approvals were

17  marked as Plaintiffs' Exhibit 21 for Identification

18   by the Reporter.)

19  BY MS. KELLY:

20   Q.   So I've given you Exhibit 21, which is a

21  compilation of different request for approvals that

22  I've pulled from the documents.  And if you just --

Page 207

1   there's some to execute a contract over $100,000 and

2   there's some that are just considered requests for

3   an approval.

4         If you could just look through them and

5   let me know if all these documents seem familiar to

6   you.

7         MS. WICHTMAN:  What's the ending Bates

8     number?  Are they all out of order?

9         MS. KELLY:  Yes.  It's a compilation.

10        MS. WICHTMAN:  Oh, okay.

11        THE WITNESS:  Yes.

12  BY MS. KELLY:

13    Q.   Okay.  And so you -- the first two are

14  requests to approve Brian McFadden to execute a

15  contract over $100,000.

16        Do you see that?

17  A.   Yes.

18        MR. ANTHONY:  When you say the first two

19    pages, do you mean the first two pages or the

20    first two on the first page?

21        MS. KELLY:  The first two requests for

22    approvals.  The first four pages are two --

10/16/2017                              Hazen, Michelle

Page 208

1          MR. ANTHONY:  The first four pages.

2          MS. KELLY:  -- separate requests.

3          MR. ANTHONY:  Okay.

4   BY MS. KELLY:

5      Q.   So is it your understanding if Brian

6   McFadden were to execute a contract under $100,000,

7   he would not need comanager approval to do so?

8      A.   Yes.

9          MR. GRAY:  Objection to form.

10  BY MS. KELLY:

11     Q.   If you turn to the next page, it's a

12  recommendation to take action and request for

13  approval.

14         Do you see that?

15     A.   On which page?

16     Q.   It's the fifth page of this document.

17         MR. GRAY:  Do you have the Bates number on

18  that?

19         MS. KELLY:  It's 78 -- 7980.

20         THE WITNESS:  Yes.

21  BY MS. KELLY:

22     Q.   And if you look on the second page of this

**JA3334**

1  document, it says "if compliance approval is

2  required, compliance officer must sign below to

3  indicate review and approval."

4        Do you see that?

5    A.  Yes.

6    Q.  Whose signature is that?

7    A.  Ivelisse Morales.

8    Q.  And then under that it says "If legal

9  approval is required, legal representative must sign

10  below to indicate review and approval."

11       Do you see that?

12   A.  Yes.

13   Q.  Whose signature is that?

14   A.  Tanya Gibbs.

15   Q.  Okay.  And then when you receive this

16  document, are the compliance officer and legal

17  representative already have their signature on

18  here [sic]?

19   A.  Yes.

20   Q.  Okay.  And if you turn to the next page.

21  There's another request for approval and is the

22  compliance officer again Ivelisse Morales?

Page 210

1    A.   Yes.

2    Q.   And who is a legal representative that

3  signed approving?

4    A.   Karrie Wichtman.

5    Q.   If you turn to the next page.

6       MR. GRAY:  That was the one -- June 27,

7  2017, the last one?  I just want to make sure.

8       MS. WICHTMAN:  What was the Bates number

9  on that one?

10       MR. GRAY:  7445.

11       MS. KELLY:  Yes.

12       MR. GRAY:  Thank you.

13  BY MS. KELLY:

14    Q.   Again, you have Ivelisse Morales signing

15  on behalf of the compliance officer.

16       Do you see that?

17    A.   Is it the last page?

18    Q.   Yes.

19    A.   Yes.

20    Q.   And I assume that's Ms. Gibbs' signature

21  on behalf of legal.

22       Do you see that?

Page 211

1     A.   Yes.

2     Q.   And are those signatures always filled in

3   when you would sign a request for approval, prior to

4   you receiving the request?

5         MR. GRAY:  Objection to form.

6         THE WITNESS:  Yes, I'm the final

7     signature.

8   BY MS. KELLY:

9     Q.   Okay.  And have you ever not approved a

10   request for approval that was sent to you?

11    A.   Yes.

12    Q.   When was that?

13    A.   I don't recall.

14        MS. KELLY:  Okay.  I'm going to mark this

15    22.

16        (Whereupon, the Request Log was marked as

17   Plaintiffs' Exhibit 22 for Identification by the

18   Reporter.)

19        MS. WICHTMAN:  Do you have a Bates number

20    on that?

21        MS. KELLY:  No.

22

1  BY MS. KELLY:

2      Q.  Have you ever seen this document before?

3      A.  Yes.

4      Q.  And the first four pages, it's BPL

5  comanager's request log.

6          Do you see that?

7      MR. ANTHONY:  Where'd this come from?

8      MS. KELLY:  Your client.

9      MR. ANTHONY:  Okay.

10      MS. KELLY:  I did not create it.

11      MR. ANTHONY:  No, no.  I just -- just

12   wanted to make sure.

13  BY MS. KELLY:

14      Q.  Have you seen this document before?

15      A.  Yes.

16      Q.  Okay.  And the first four pages are BPL

17  comanager's request log, do you see that?

18      A.  Yes.

19      Q.  And in this document, in the first column,

20  it identifies the project task or recommendation.

21          Do you see that?

22      A.  Yes.

Page 213

1    Q.   And then the next column talks about the

2   status.  The third column is the date it's sent to

3   comanagers.  The fourth column is the response sent

4   back to the requester.  And the fifth column is

5   whether it was approved or denied.

6        Do you see that?

7    A.   Yes.

8    Q.   If you look at the first four pages of BPL

9   comanager's request log, do you see an instance

10  where it is listed as "denied"?

11   A.   No.

12   Q.   Okay.  If you go to the last two pages,

13  there's another comanager's request log.

14        Do you know what entity this request log

15  was for?  Some of the dates go back to 2014, so --

16   A.   No, it doesn't say, so --

17   Q.   Okay.  Was there one of these for Red

18  Rock?

19   A.   I don't recall.

20   Q.   Okay.  Well, looking again, it has the

21  same setup as the prior comanager request log.  And

22  in the fourth column it shows whether a request was

Page 214

1  approved or denied.

2      Do you see any "denies" in this column?

3  A.  No.

4      MS. KELLY:  Okay.  I will mark this

5  Exhibit 22.

6      MR. GRAY:  23.  Sorry.

7      MS. KELLY:  Right, 23.  Sorry.

8      (Whereupon, the Various Documents were

9  marked as Plaintiffs' Exhibit 23 for Identification

10  by the Reporter.)

11  BY MS. KELLY:

12    Q.  So this is a compilation of some e-mails

13  that I pulled that your lawyers produced in this

14  case.

15      The first is an e-mail that you forwarded

16  to Simon because there was a question about taxes,

17  do you see that?

18  A.  Yes.

19    Q.  And you asked for him to -- you said

20  "please advise."

21      Was it -- why did you ask him if Big

22  Picture should pay its tax bill or not?

Page 215

1      A.   I wasn't asking if I should pay the tax

2   bill.  He's the accountant and I wanted to make sure

3   these numbers were correct.

4      Q.   Okay.  The second page, it's an e-mail

5   between you and Donna, one of the Big Picture

6   employees.

7          What was the purpose of this e-mail?

8      A.   This was in preparation of working on the

9   employee handbooks and trying to get them close to

10   the same.

11     Q.   Okay.  So you were trying to make sure the

12   Big Picture employees have the same procedures as

13   the Ascension employees; correct?

14     A.   The same accrual time.

15     Q.   Okay.  The next page is Brittany Pole,

16   who's an employee of Big Picture on tribal land and

17   she is asking James Dowd to have access to a test

18   loan agreement or a dummy loan agreement to review.

19   She's saying "A large number of our Big Picture CFPB

20   complaints are regarding customers not being able to

21   see the TILA disclosures on the loan agreement.  We

22   want to review the loan agreement to see where these

1   complaints are stemming from and if there's anything

2   we can do to fix it."

3        Do you see that?

4   A.  Yes.

5   Q.  Why didn't Big Picture Loans have a loan

6   agreement that it could have reviewed if the CSRs

7   review loan agreements as part of the final process

8   for a consumer's application?

9        MR. GRAY:  Objection to form.

10        THE WITNESS:  We did have a loan agreement

11        that was reviewed and approved by Big Picture

12        Loans.  This is -- we wanted to actually go

13        through the process on the website to see

14        exactly what the customers were seeing.

15   BY MS. KELLY:

16   Q.  So when she asked for a dummy loan

17   agreement to review, what -- you're saying she's

18   asking for something other than a copy of a loan

19   agreement?

20   A.  Yes.  To go onto the website and run

21   through the process as a practice loan to see

22   exactly what they're seeing when that TILA pops up.

Hazen, Michelle

Page 217

1      Q.   Okay.  And why did you need to ask James

2   Dowd for that?  Why couldn't you have gotten it from

3   the Big Picture offices?  Why did you need to go to

4   Ascension?

5         MR. GRAY:  Objection to form.

6         THE WITNESS:  Because we needed the link.

7      We didn't have the link.

8   BY MS. KELLY:

9      Q.   Okay.  Next page, if you just review this

10   e-mail thread, and it's just the one page, and then

11   I have a couple of questions.

12         Do you remember this e-mail?

13      A.   Yes.

14      Q.   And you were e-mailing Brian because Donna

15   Kenney at Big Picture offices on tribal land

16   received an e-mail that said she's no longer on the

17   compliance board.  And then you e-mailed Brian to

18   ask, essentially -- to clarify because you told

19   Donna that she still was on the compliance board;

20   correct?

21      A.   Could you restate your question, please?

22

JA3343

10/16/2017                                    Hazen, Michelle

Page 218

1    BY MS. KELLY:

2        Q.   Sure.  You're asking -- your e-mail is

3    asking Brian -- or your e-mail is telling Brian that

4    Donna was told she's no longer on the compliance

5    board and you said she was; right?

6            MR. GRAY:  Objection to form.

7    BY MS. KELLY:

8        Q.   And Brian responds that there's a new

9    structure and she would be on the compliance working

10   group, but not the board.

11           MR. GRAY:  Objection to

12       mischaracterization.

13   BY MS. KELLY:

14       Q.   You see that?

15       A.   So what was the question?

16       Q.   Right.  So what I'm saying is:  You were

17   not aware of that change until you got his e-mail;

18   correct?

19           MR. GRAY:  Objection to form.

20           THE WITNESS:  No, that's not true.

21   BY MS. KELLY:

22       Q.   Your response to Brian is, "No, that's

1  fine.  I was just caught off guard when she sent

2  that e-mail to me.  That's all.  I will explain it

3  to her."

4      A.   We were in the process of combining the

5  compliance management board, the Ascension and BPL,

6  so the structure was changing.  We, as Ascension and

7  BPL, were in the middle of that structure change,

8  but we had already planned on going to this and so

9  that's what caught me off guard.  Was I -- we were

10  all going and then I got this e-mail --

11     Q.   Okay.

12     A.   -- so I was just clarifying.

13     Q.   Okay.  So you're -- you were actually

14  shrinking the compliance board, not expanding it or

15  combining it; correct?

16        MR. GRAY:  Objection.  It's a

17     mischaracterization of testimony.

18        THE WITNESS:  We were restructuring.

19  BY MS. KELLY:

20     Q.   You shrunk the compliance board to be just

21  you, Mr. Williams, and Brian McFadden, and then you

22  created a compliance working group; correct?

Page 220

1         MR. GRAY:  Objection.  That's a

2    mischaracterization of testimony.

3         THE WITNESS:  We restructured.

4  BY MS. KELLY:

5    Q.   How did you restructure?

6    A.   By making the compliance board the working

7  group and the compliance management board as myself,

8  Brian, and James Williams, Jr.

9    Q.   Okay.  So the restructure was that you,

10  Mr. Williams, and Mr. McFadden were on the

11  compliance board, and everyone else was in the

12  working group; correct?

13        MR. GRAY:  Asked and answered.

14        THE WITNESS:  Yes.

15  BY MS. KELLY:

16    Q.   You go to the next e-mail.  You write to

17  Simon, "Can you tell me if the company pays for cell

18  phones for Brian or anyone else, please?  I'm just

19  wondering if this is a possibility."

20        Do you see that at the bottom of the page?

21    A.   Where?

22    Q.   You say "Also, can you tell me if the

**JA3346**

Hazen, Michelle

Page 221

1  company pays for cell phones for Brian or anyone

2  else.  Just wondering if this is a possibility."

3      A.  I'm on the wrong page?  What page are you

4  on?

5      Q.  It's 8191.  It looks like the one you

6  have -- let me see.  It's right here.

7      A.  Oh, you weren't -- I thought you were

8  reading just that e-mail.  Sorry.  Okay.

9      Q.  Prior to this, were you not aware if the

10  company would pay for your cell phone or not?

11     A.  For my cell phone?

12     Q.  Correct.

13     A.  I've never tried to pay my cell phone

14  before.

15     Q.  And if you wanted to pay your cell phone,

16  as the CEO, couldn't you just pay for your cell

17  phone?  Why did you ask Simon?

18        MR. GRAY:  Objection to form.

19        THE WITNESS:  Because I didn't have it in

20     the budget.

21  BY MS. KELLY:

22     Q.  So as CEO, you could not change the budget

Page 222

1   to even allow for the payment of your cell phone?

2        MR. GRAY:  Objection.  That's a

3     mischaracterization of testimony.

4        THE WITNESS:  In the next budget, yes.

5   BY MS. KELLY:

6     Q.   But for that budget year, you could not

7   change the budget to allow for the payment of your

8   cell phone; is that correct?

9        MR. GRAY:  Asked and answered.

10        THE WITNESS:  Yes, I could have.  I was

11      trying to get a feel for what the practice

12      was --

13   BY MS. KELLY:

14     Q.   Okay.

15     A.   -- at Ascension.

16     Q.   If you go to the next page, you will see

17   that the number of -- you're asking Simon for the

18   number of the loans originated in June of 2017.

19        Did you have access to that information

20   without going through Simon?

21     A.  Yes.

22     Q.   So why did you ask Simon for it?

Page 223

1      A.   Because he's the accountant and he keeps

2   these numbers.

3      Q.   Okay.  And it says that your current loan

4   portfolio is $33,626,096.

5          Does that refresh your recollection about

6   the size of the Big Picture Loans portfolio?

7      A.   Yes.

8      Q.   Okay.  And so for the 21,794 loans that

9   were originated in June, is it your testimony that

10   the CSRs on tribal lands reviewed all those loan

11   contracts and verified that bank account information

12   for each of those loans that were originated?

13          MR. GRAY:  Objection to form.

14          THE WITNESS:  They originated all of those

15       loans, yes.

16   BY MS. KELLY:

17      Q.   That wasn't my question.

18          My question was:  Did they review all of

19   those loan agreements and verify -- do the final

20   verification for bank information for each of those

21   loans in the month of June?

22      A.   Is it possible to separate those

JA3349

Page 224

1   questions?

2       Q.   Sure.  You can answer it however it would

3   be accurate.

4       A.   They originated all of the 20,000 loans,

5   yes.

6       Q.   I didn't ask you anything about

7   origination.

8           My question was:  For the 21,794 loans

9   that were originated in the month of June, did the

10  CSR employees on tribal land review each loan

11  document and then verify the bank information for

12  each of those loans?

13      A.   Yes.

14      Q.   Okay.  Next e-mail.  It says -- you're

15  writing to Simon saying that you do not have access

16  to monthly financials on the MI drive, and you ask

17  who has access to that file.

18          Do you see that?

19      A.   Yes.

20      Q.   Why, as CEO of Big Picture Loans, did you

21  not have access to the monthly financials?

22          MR. GRAY:  Objection to form.

 1        THE WITNESS:  I receive the monthly

 2     financials, this is just where they were being

 3     stored.

 4  BY MS. KELLY:

 5     Q.   Right.  So my question was:  Why, as CEO,

 6  did you not have access to the monthly financials at

 7  that time?

 8        MR. GRAY:  Same objection.

 9        THE WITNESS:  I did have access.

10  BY MS. KELLY:

11     Q.   So then why are you writing to Simon, "I

12  still do not have access to the monthly financials

13  on the MI drive"?

14     A.   On that specific drive, I did not have

15  access at that time.

16     Q.   Okay.  The next e-mail is an e-mail

17  between you and Chairman Williams and Will Londo.

18  You are replying to an e-mail chain about the

19  financials and financial reports of Big Picture.

20        You write "I think it would be good to get

21  you on board so that I can feel like I have

22  somewhere to go with questions.  I have not been

Page 226

1  talked through the financials since the structure

2  has changed, so I think it would be a good thing.  I

3  will ask Simon when he has time and then I can come

4  to your office to get on a call with him."

5        Do you see that?

6     A.  Yes.

7     Q.  So at that time, did you feel like you

8  could ask Simon questions about the financials of

9  Big Picture Loans?

10       MR. GRAY:  Objection to the form and

11     foundation.

12       THE WITNESS:  Yes.

13  BY MS. KELLY:

14    Q.  Your -- in your e-mail to Mr. Londo,

15  you're saying "I think it would be good to get you

16  on board so that I feel like I have somewhere to go

17  with questions."

18       Is it your testimony that you believed

19  that you could go to Mr. Liang with questions at

20  that time?

21    A.  No.

22       MR. GRAY:  Objection.  Form and

Page 227

1    foundation.

2   BY MS. KELLY:

3     Q.   Okay.  And your next sentence is, "I have

4   not been talked through the financials since the

5   structure has changed, so I think it would be a good

6   thing."

7        What did you mean by that statement?

8     A.   With everybody's schedule it's hard to

9   always get on a call.  And Will is at the tribe, so

10  I could go to his office and talk through them.

11       MS. KELLY:  Okay.  This is Exhibit 24.

12       (Whereupon, the E-mail was marked as

13  Plaintiffs' Exhibit 24 for Identification by the

14  Reporter.)

15  BY MS. KELLY:

16    Q.   Have you ever seen this e-mail before,

17  Ms. Hazen?

18    A.   No, I have not.

19    Q.   This is an e-mail where TED Holdings is

20  requesting to retain $5,000 in cash for reinvestment

21  into Big Picture Loans.

22       Do you see that?

Page 228

1    A.  Yes.

2    Q.  And it has to request permission from

3  Mr. Martorello to do so, do you see that?

4        MR. GRAY:  Objection.  Form.

5        THE WITNESS:  I see what it says.  I don't

6    see it specifically asking for approval.

7  BY MS. KELLY:

8    Q.  It says "TED Holdings is requesting to

9  retain $5,000 cash for reinvestment to Big Picture

10  Loans, LLC."

11       Do you see that?

12   A.  Yes.

13   Q.  And who are they making this request to?

14   A.  It's to Mr. Martorello.

15       MS. KELLY:  Okay.  This is 25.

16       (Whereupon, the E-mail was marked as

17  Plaintiffs' Exhibit 25 for Identification by the

18  Reporter.)

19  BY MS. KELLY:

20   Q.  Ms. Hazen, have you ever seen this e-mail

21  before?

22   A.  Yes.

Page 229

1    Q.   In this e-mail, you're asking Mr. McFadden

2   about the -- you say "What is the possibility of the

3   tribe investing in the portfolio?"

4        Do you see that?

5    A.   Yes.

6    Q.   And so prior -- so let me ask you -- did

7   you know the -- whether the tribe would be able to

8   invest in the portfolio or not when you wrote this

9   e-mail to Mr. McFadden?

10   A.   Yes.

11   Q.   Then why did you ask him, "What is the

12   possibility of the tribe investing in the

13   portfolio," if you already knew the answer?

14   A.   At that moment, based on where the

15   portfolio was, there's a plan to grow responsibly

16   and that's what I was referring to.  If we're -- if

17   we were able to take an additional investment at

18   that time.

19   Q.   Okay.  Where was the portfolio at that

20   time, then, that prompted that concern of yours?

21   A.   I don't know, off the top of my head.

22   Q.   Okay.  So is it your testimony that

JA3355

Page 230

1    Mr. McFadden would have a better understanding of

2    the portfolio in what -- who could -- what would

3    be -- whether it could take investments on or not --

4        MR. GRAY:  Objection.

5    BY MS. KELLY:

6        Q.   -- in order to grow responsibility --

7    responsibly?

8        MR. GRAY:  Mischaracterization.

9        THE WITNESS:  Better understanding than

10    who?

11   BY MS. KELLY:

12       Q.   Than you.

13       A.   I would certainly consult with Brian about

14   growing responsibly before I decided to take on any

15   investment.

16       Q.   Did you -- prior to sending this e-mail,

17   did you look at numbers or look at the portfolio

18   size or anything to determine whether you thought it

19   would be appropriate for the tribe to invest at that

20   time?

21       A.   I don't recall.

22       Q.   Okay.  How many days on an average week do

Page 231

1   you spend at the office?

2       A.  Five.

3       Q.   Okay.  When you meet with your comanager,

4   Mr. Williams, and you have special meetings, do you

5   meet in person?

6       A.   In person or over the phone.

7       Q.   Okay.  Can you explain to me if I'm -- now

8   that the tribe invests in the Big Picture Loans

9   portfolio, how does it make money?

10          Can you walk me through when the

11   distributions happen and what factors go into

12   whether or not an investor gets a distribution?

13          MR. GRAY:  Objection to the form.

14          THE WITNESS:  Can you break those down to

15          specific questions, one question at a time?

16   BY MS. KELLY:

17       Q.   Sure.  When you're making a pitch to

18   investors or you're talking to the tribe about

19   investing in the portfolio, what did you tell them

20   about the return on the investment or different

21   variables that they should consider prior to

22   investing?

JA3357

Page 232

1          MR. GRAY:  Objection to the form.

2          THE WITNESS:  Different variables.  What

3      do you mean by "different variables"?

4   BY MS. KELLY:

5      Q.  I don't know.  What are the variables that

6   affect the value of your portfolio?

7          MR. GRAY:  Objection to form.

8          THE WITNESS:  I know we talked about

9      interest rate.

10  BY MS. KELLY:

11     Q.  Okay.  What's the average rate of return

12  that an investor receives on their investment?

13     A.  Anywhere from 22 to 30 percent.

14     Q.  And what makes it variable?

15         What factors come into play for the

16  business that may lower the rate of return or

17  increase it?

18     A.  I guess it varies based on when you

19  came -- invested into the portfolio.

20     Q.  In what way would it vary based on when

21  you invested into the portfolio?

22     A.  The higher interest rates were paid based

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 325 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 233 of 250 PageID# 34471
10/16/2017                          Hazen, Michelle

Page 233

1  on risk of investment.

2     Q.  Okay.  Are there documentations between

3  the investors and Big Picture or Ascension that

4  detailed the rates of return for various investors?

5     A.  Yes.

6     Q.  Okay.  And are those kept in Big Picture

7  or Ascension's possession?

8     A.  Big Picture.

9     Q.  Who creates the Big Picture loan budget?

10     A.  The office budget is a -- collaboratively

11  between me, Brian, and Simon.

12     Q.  Okay.  What input did you have on the

13  proposed budget for 2017?

14        MR. GRAY:  Objection to form.

15        THE WITNESS:  Collaborative discussion and

16     the specific line items and --

17  BY MS. KELLY:

18     Q.  Okay.  Please -- please tell me the

19  specifics of the discussion you had when the 2017

20  budget was created.

21        Can you think of anything specifically?

22     A.  Not specifically, just know that we got on

Page 234

1   a call and walked through every line item and I

2   asked questions.

3       Q.   So there was already a budget proposal in

4   place that you reviewed with either Mr. McFadden or

5   Mr. Liang; correct?

6       MR. GRAY:  Objection to the form.

7       THE WITNESS:  Based on the previous year's

8    budget, yes.  That was the starting point.

9   BY MS. KELLY:

10      Q.   And using the previous year's budget, are

11   you aware of restrictions on the next year's budget

12   based on the security or -- security agreement or

13   note that you have with Mr. Martorello?

14      MR. GRAY:  Objection to form.

15      THE WITNESS:  I don't specifically recall

16    what it is.

17      MS. KELLY:  Okay.  Mark this Exhibit 26.

18      (Whereupon, the E-mail was marked as

19   Plaintiffs' Exhibit 26 for Identification by the

20   Reporter.)

21   BY MS. KELLY:

22      Q.   Ms. Hazen, have you seen this document

1    before?

2        A.   Yes.

3        Q.   And if you look on the third page, it's

4    Big Picture Loans' 2017 business plan, do you see

5    that?

6        A.   Yes.

7        Q.   And it goes through revenue projections on

8    the first line item, do you see that?

9        A.   Yes.

10       Q.   And do you agree that the average revenue

11   projection for 2017 is about $10 million a month?

12       A.   Yes.

13       Q.   Okay.  And if you look at expenses, call

14   center expense, it has a monthly expense of $300,000

15   each month of 2017.

16            Do you see that?

17       A.   Yes.

18       Q.   And marketing expense, each month is a

19   little over a million dollars.

20            Do you see that?

21       A.   Yes.

22       Q.   And underwriting expense is approximately

1  $200,000 a month.  Do you see that?

2     A.  Yes.

3     Q.  And you have a legal service fee of

4  $75,000 a month, do you see that?

5     A.  Yes.

6     Q.  Who does that get paid to?

7     A.  Rosette, LLP.

8     Q.  So Rosette gets paid $75,000 a month as

9  part of Big Picture Loans' budget; is that correct?

10    A.  A majority of it.  I'm not -- I can't

11  recall off the top of my head if any other legal --

12  legal entities have been paid out of that or not.

13    Q.  And then there's a line item for

14  consulting service, and it's $562,000 a month.

15       Who does that go to?

16       MR. GRAY:  I'm going to object.  The court

17    kept the identity of the vendors.

18       MS. KELLY:  Right.  I don't consider a

19    consultant a vendor.

20       MR. GRAY:  What do you consider a

21    consultant?

22       MS. KELLY:  I don't know, but I want to

Page 237

1    know who makes $562,000 a month for consulting.

2         MR. GRAY:  Can we revisit that then?

3         MS. KELLY:  No, I want to know if

4    Ms. Hazen --

5         MR. GRAY:  Then I'm going to object based

6    on the court's decision and instruct her not to

7    answer.

8         MS. KELLY:  Okay.  Then we'll leave this

9    deposition open.

10   BY MR. GRAY:

11    Q.   Interest expense, it's 859,000 a month.

12        Can you explain to me what -- where that

13   is allocated and who that gets paid to?

14        MR. GRAY:  I'll continue the objection on

15    the identity of third-party vendors.  If it's

16    not a third-party vendor, she can answer.

17        MS. KELLY:  It's interest expense, so I

18    would assume that would be from investors.

19   BY MS. KELLY:

20    Q.   Do you pay interest to third-party

21   vendors, Ms. Hazen?

22    A.   No.

Page 238

1      Q.   Okay.  So who does the interest expense

2   get paid to?

3      A.   A majority of it would be to investors.

4      Q.   And you see there's the BPL payroll

5   expense, do you see that?

6      A.   Yes.

7      Q.   And that's 60,000 a month?

8      A.   Yes.

9      Q.   And you see a line for charity

10  sponsorship?

11     A.   Yes.

12     Q.   And that's 2,000 a month.

13          So if you look down, you see there's a

14  line for tribal distribution at 3 percent, do you

15  see that?

16     A.   Yes.

17     Q.   And that is about -- just under $200,000 a

18  month; correct?

19     A.   Yes.

20     Q.   And it's actually less than the expense

21  for the call center in the Philippines, do you see

22  that?

JA3364

 1          MR. GRAY:  Objection to the form.

 2    BY MS. KELLY:

 3      Q.   So the tribe makes, in its tribal

 4    distribution, less than the call center in the

 5    Philippines gets?

 6          MR. GRAY:  It's a mischaracterization

 7       objection.

 8          THE WITNESS:  That's what this indicates,

 9       yes.

10    BY MS. KELLY:

11      Q.   And there's a line called "repayment to

12    ECA."  And do you understand that to be the note

13    that Matt Martorello provided as part of the

14    acquisition?

15      A.   Yes.

16      Q.   And he, for 2017, is projected to receive

17    approximately $31 million, do you see that?

18      A.   ECA, yes.

19      Q.   When we were talking about interest paid

20    on the interest payments in the budget, I know I

21    asked you earlier if you were aware of the amount of

22    interest -- the 1.8 percent interest that the

Page 240

1   Eventide note received a month.

2        Do you recall that?

3    A.  Yes.

4    Q.   Was the approximate $130,000 a month

5   interest charge included in the "repayment to

6   Eventide" line or was it included in the "interest

7   payment" line?

8        MR. GRAY:  Objection to form.

9        THE WITNESS:  I'm not sure.  I'd have to

10    consult with Simon.

11   BY MS. KELLY:

12    Q.   Okay.

13        MR. GRAY:  Kristi, can we take a minute

14    and read back that portion to see if there's a

15    chance for her to provide a answer?

16        MS. KELLY:  I already know the answer,

17   it's Ascension's expense, correct?  I mean --

18        MR. GRAY:  And if that's accurate, you can

19    answer.

20        THE WITNESS:  Which one?

21        MR. GRAY:  All I was trying to object to

22    is to the extent that there's a third party

Page 241

1    that's part of that, based on the judge's

2    instruction today.

3        MS. KELLY:  All right.

4        MR. GRAY:  To the extent that she can

5    answer, if she can, we can answer the question.

6        THE WITNESS:  Which one was it?

7        MS. KELLY:  Okay.  I already know the

8    answer, it's not a big deal.

9  BY MS. KELLY:

10      Q.   But in the -- your attorney instructed you

11  not to answer who Big Picture Loans paid consulting

12  expenses to.

13          Do you know if the recipients of those

14  payments was Ascension Technologies?

15      A.   A majority of the consulting services is

16  to Ascension.

17      Q.   Who would the other portion go to?

18      A.   I don't know off the top of my head; I'd

19  have to consult with Simon.

20      MS. KELLY:  Okay.

21      MR. GRAY:  Do you have a Bates number on

22    this one?

Page 242

1          MS. KELLY:  It's LVD 9299.

2          MR. GRAY:  929?

3          MS. KELLY:  9299.

4          MR. GRAY:  It is sequential following that

5     then.

6          MS. KELLY:  No, no -- maybe.  Yeah,

7     probably.  9300.

8          (Whereupon, the E-mail was marked as

9   Plaintiffs' Exhibit 27 for Identification by the

10   Reporter.)

11   BY MS. KELLY:

12     Q.   Ms. Hazen, have you ever seen this

13   document before?

14     A.   No.

15     Q.   If you look on this e-mail, they're

16   talking about Big Picture Loans, account number

17   638882.

18        Do you see that in the e-mail?

19     A.   Yes.

20     Q.   And you also see that on the Chippewa

21   Valley Bank, where the account numbers are listed?

22     A.   Yes.

**JA3368**

Page 243

1      Q.   And what is that account number for Big

2   Picture Loans?

3           Isn't it the account number where all the

4   deposits must go to pursuant to the security

5   agreements?

6           MR. GRAY:  Object to the form.

7           THE WITNESS:  We have two accounts at

8      Chippewa Valley, so I'm not sure if this is --

9      which account number this is.

10  BY MS. KELLY:

11     Q.   Which account would Simon and Brian be the

12  only authorized people to issue payment orders under

13  an account for?  Issue payment under -- issue

14  payment orders under an account for?

15     A.   They are the two signers on both accounts

16  at CVB.

17     Q.   Okay.  And so for the Big Picture Loan

18  accounts at Chippewa Valley Bank, only employees of

19  Ascension are the authorized signers for those

20  accounts; correct?

21     A.   Yes.

22     Q.   And so you, as CEO of Big Picture Loans,

Page 244

1  could not sign a check for this account number here;

2  correct?

3       MR. GRAY:  Objection, argumentative.

4       THE WITNESS:  No, I'm not a signature --

5    or authorized signature on this account.

6  BY MS. KELLY:

7    Q.   And you couldn't initiate a wire for this

8  account; correct?

9       MR. GRAY:  Objection to form.

10       THE WITNESS:  I'm not an authorized signer

11     on this account.

12  BY MS. KELLY:

13    Q.   Okay.  And is it your testimony that for

14  the Big Picture Loans at Chippewa Valley Bank you're

15  not an authorized signer on either of those two

16  accounts; correct?

17    A.   No, I am not.

18       MS. KELLY:  Okay.  I'm going to take a

19     quick break.

20       MR. GRAY:  Yeah, can we get a time?

21       THE VIDEOGRAPHER:  The time is -- this

22     ends Disk 4 of the Hazen deposition.  The time

Page 245

1        is 6:43:19.  Off the record.

2             (Off the record at 6:43 p.m.)

3             (Back on the record at 6:51 p.m.)

4             THE VIDEOGRAPHER:  On the record with

5        Disk 5 of the testimony of Michelle Hazen in

6        the matter of Williams versus Big Picture.  The

7        date is October 16, 2017.  The time is 6:51:59.

8             MS. KELLY:  Ms. Hazen, I have no further

9        questions.  Thank you.

10            THE WITNESS:  Thank you.

11            MR. SCHEFF:  I have no questions.

12            MR. GRAY:  I have no questions.

13            MR. ANTHONY:  We'll read.

14            MR. GRAY:  And we'd just like to

15       discuss -- just keep this confidential under

16       the protective order until otherwise decided.

17            MS. KELLY:  Sure.

18            THE VIDEOGRAPHER:  This ends Disk 5 and

19       concludes the testimony of Michelle Hazen in

20       the matter of Williams versus Big Picture.  The

21       date is October 16, 2017.  The time is 6:52:36.

22       Off the record.

JA3371

Page 246

1          (Thereupon; the video deposition was

2    concluded at 6:52 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Lisa Barbera, Shorthand Reporter and

3   Notary Public, the officer before whom the

4   foregoing deposition was taken, do hereby

5   certify that the foregoing transcript is a true

6   and correct record of the testimony given; that

7   said testimony was taken by me stenographically

8   and thereafter reduced to typewriting under my

9   supervision; and that I am neither counsel for

10   or related to, nor employed by any of the

11   parties to this case and have no interest,

12   financial or otherwise, in its outcome.

13        IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 19th day

15   of October, 2017.

16        My commission expires:

17        April 30, 2022

18

19

20   _____

21   NOTARY PUBLIC IN AND FOR THE

22   STATE OF DISTRICT OF COLUMBIA

USCA4 Appeal: 21-2116    Doc: 26-6    Filed: 02/07/2022    Pg: 340 of 503
Case 3:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 248 of 250 PageID# 34486
10/16/2017                                    Hazen, Michelle

1        DEPOSITION ERRATA SHEET

2

3

4    Our Assignment No.  182180

5    Case Caption: Williams v. Big Picture Loans

6        DECLARATION UNDER PENALTY OF PERJURY

7         I declare under penalty of perjury

8    That I have read the entire transcript of

9    My deposition taken in the captioned matter or the

10    same has been read to me, and

11    The same is true and accurate, save and

12    Except for changes and/or corrections, if

13    Any, as indicated by me on the DEPOSITION ERRATA

14    SHEET hereof, with the understanding

15    That I offer these changes as if still under

16    Oath.

17

18        Signed on the _____ day of

19    _____, 20____.

20

21    _____

22        MICHELLE HAZEN

Page 249

1        DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20

21   SIGNATURE:_____DATE:_____

22        MICHELLE HAZEN

**JA3375**

USCA4 Appeal: 21-2116   Doc: 26-6      Filed: 02/07/2022   Pg: 342 of 503
Case 5:17-cv-00461-REP   Document 1007-8   Filed 02/23/21   Page 250 of 250 PageID# 34488

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

MICHELLE HAZEN

AMERICAN ARBITRATION ASSOCIATION

Re:  Cause No. 01-19-0004-5187

Eventide Credit Acquisitions, LLC

-vs-

Lac Vieux Desert Band of Lake Superior Chippewa Indians,

Tribal Economic Development Holdings, LLC,

Big Picture Loans, LLC, and

Ascension Technologies, LLC

------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

MATT MARTORELLO

June 25, 2020

(REPORTED REMOTELY)

------------------------------------------


ORAL AND VIDEOTAPED DEPOSITION OF MATT MARTORELLO, produced as a witness at the instance of the Respondents, and duly sworn, was taken in the above-styled and numbered cause on the June 25th, 2020, from 9:15 a.m. to 12:28 p.m., before Toi Isabel, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Forshey Prostok, LLP, 500 Crescent Court, Suite 240, Dallas, Texas, 75201, pursuant to the Federal Rules of Civil Procedure and the provisions, if any, stated on the record of attached hereto.

```
 1              A P P E A R A N C E S

 2    FOR THE CLAIMANT:

 3          Mr. Bernard R. Given (Via Zoom)
            LOEB & LOEB L.L.P.
 4          10100 Santa Monica Boulevard
            Suite 2200
 5          Los Angeles, California 90067
            Tel: 310-282-2000
 6          Fax: 310-282-2200
            bgiven@loeb.com
 7

 8    FOR THE CLAIMANT:

 9          Mr. William Grosswendt (Via Zoom)
            LOEB & LOEB L.L.P.
10          10100 Santa Monica Boulevard
            Suite 2200
11          Los Angeles, California 90067
            Tel: 310-282-2000
12          Fax: 310-282-2200
            wgrosswendt@loeb.com
13

14    FOR THE RESPONDENTS:

15          Mr. Robert A. Rosette (Via Zoom)
            ROSETTE, L.L.P.
16          565 W. Chandler Boulevard
            Suite 212
17          Chandler, Arizona 85225
            Phone:  480-778-8990
18          Fax:  480-899-8997
            rosette@rosettelaw.com
19

20    FOR THE RESPONDENTS:

21          Ms. Tanya Gibbs (Via Zoom)
            ROSETTE, L.L.P.
22          44 Grandview Avenue Southwest
            Suite 300
23          Grand Rapids, MI 49503
            Phone:  616-655-1601
24          Fax:  517-913-6443
            tgibbs@rosettelaw.com
25
```

```
                                                      Page 3

 1   FOR THE RESPONDENTS:

 2           Ms. Anna Bruty (Via Zoom)
             ROSETTE, L.L.P.
 3           44 Grandview Avenue Southwest
             Suite 300
 4           Grand Rapids, MI 49503
             Phone:  616-655-1601
 5           Fax:  517-913-6443
             abruty@rosettelaw.com
 6

 7   FOR THE RESPONDENTS:

 8           Ms. Lauren Mulhern (Via Zoom)
             ROSETTE, L.L.P.
 9           44 Grandview Avenue Southwest
             Suite 300
10           Grand Rapids, MI 49503
             Phone:  616-655-1601
11           Fax:  517-913-6443
             lmulhern@rosettelaw.com
12

13   FOR THE RESPONDENTS:

14           Ms. Nicole St. Germain (Via Zoom)
             ROSETTE, L.L.P.
15           1415 L. Street
             Suite 450
16           Sacramento, CA 95814
             Phone:  916-353-1084
17           Fax:  916-353-1085
             nstgermain@rosettelaw.com
18

19

20   Also Present:

21   Mr. Kevin M. DeRita-Litigation Presentation Specialist

22   Mr. Brian McFadden

23

24

25
```

Page 4

```
 1                         INDEX
 2                                               PAGE
 3   Appearances. . . . . . . .                   2
 4   Stipulations . . . . . . . .                 6
 5   MATT MARTORELLO
 6          Examination by Mr. Rosette            7
 7          Examination by Mr. Given             89
 8
 9   Signature and Changes. . . .               104
10   Reporter's Certificate. . . .              106
11
12                      EXHIBITS
13   No.     DESCRIPTION                          PAGE
14   30      Email FW Strategy                     32
15   31      Email FW Eventide Repayment 201705    39
16   37      Eventide's Amended Arbitration Demand 57
17
18
19
20
21
22
23
24
25
```

JA3380

Page 5

```
 1                    P R O C E E D I N G S
 2                    THE VIDEOGRAPHER:  Today is Thursday, June
 3  25th, 2020.  The time is 9:15 a.m.  This is the video and oral
 4  deposition of Matt Martorello.
 5          Would the court reporter, please, swear in the witness.
 6                    MATT MARTORELLO,
 7  having been first duly sworn, testified as follows:
 8                    THE REPORTER:  Would all parties present
 9  like for me to read the FRCP, or will you be waiving the FRCP?
10                    MR. GIVEN:  Well, Rob, I don't care.  We're
11  going under AAA.  So whatever you think, Rob.  I'm agnostic
12  about it.
13                    MR. ROSETTE:  I am as well.  I think we're
14  fine.  We can just waive that.
15                    MR. GIVEN:  I agree.
16                    THE REPORTER:  Okay.  Let me just read this
17  piece.
18          Today is June 25th, 2020.  The time is 9:16.  This is
19  the oral and video deposition of Matt Martorello, and it is
20  being conducted remotely in accordance with the Emergency Order
21  Regarding the COVID-19 State of Disaster.
22          My name is Toi Isabel, CSR No. 8080.  I am
23  administering the oath and reporting the deposition remotely by
24  stenographic means from my residence within Tarrant County,
25  Texas.  The witness has been identified.
```

Page 6

1          Would counsel please state their appearances and

2     locations for the record.

3                    MR. ROSETTE:  Good morning.  My name is

4     Robert Rosette, and I'm the attorney for the Big Picture Loans

5     and the Lac Vieux Desert Band of Lake Superior Chippewa

6     Indians.  I'm in our Grand Rapids, Michigan office, Rosette,

7     LLP.

8          I'm accompanied by Tanya Gibbs, who is my law partner,

9     also with Rosette, LLP.  She's also an attorney of record for

10    Big Picture Loans and the Lac Vieux Desert Band of Lake

11    Superior Chippewa Indians.

12         Also accompanied here in Grand Rapids, Michigan is Anna

13    Bruty, who is an attorney at Rosette, LLP; and Lauren Mulhern,

14    who is an attorney at Rosette, LLP.

15         In the room with us in Grand Rapids, Michigan is Brian

16    McFadden.  And then on the telephone is an attorney at Rosette,

17    LLP, Nicole St. Germain, who is at the Sacramento, California

18    office of Rosette, LLP.

19                    MR. GIVEN:  Hey, Rob.  Rob, I do have one

20    concern.  You know, I designated the transcript yesterday AEO.

21    And I'm going to do the same today.  So I'm not sure why Brian

22    McFadden's in the room.

23         And, in fact, Matt Martorello was required to not even

24    be at Justin's or Allen Reed's or anybody else.  So I'm going

25    to have to actually respectfully request that Brian leave the

1   room.  He should not be in there.  We're AEO on this.

2                   MR. ROSETTE:  Actually, Barney, we did

3   allow Matt Martorello to be in the room.  We were unaware,

4   actually, of him being in the room with Simon Liang.  And we

5   did allow him to be in the room with Brian McFadden on a

6   deposition.  And then --

7                   THE WITNESS:  That's true.

8                   MR. GIVEN:  That's true.  I forgot it was

9   Brian's.  I was thinking about Allen Reed's.  That's fine.

10  Let's just proceed.  Sorry.  Go ahead.

11       But I am designating -- Court Reporter, I'm designating

12  once the witness is sworn in, I'm just going to put a thing on

13  the record that I'm designating attorneys' eyes only the

14  transcript, but go ahead.

15                   THE WITNESS:  I'm sworn in.

16                   MR. GIVEN:  Oh, I'm sorry.  Let's proceed.

17                   MR. ROSETTE:  Okay.  All right.  Thank you.

18                        EXAMINATION

19  BY MR. ROSETTE:

20       Q.    And Matt, good morning.  Did you -- did you

21  speak to anybody about your deposition since we broke

22  yesterday?

23       A.    No -- other than Mr. Given, no.

24       Q.    Okay.  And did you review any materials since

25  yesterday regarding this deposition?

Page 8

 1          A.      No.

 2          Q.      Okay.

 3                  MR. ROSETTE:  Ms. Isabel, can we hear the

 4   last question I asked yesterday, and Mr. Martorello's response

 5   just so there can be some sort of check as to my questioning

 6   today?

 7                  THE REPORTER:  I'm sorry, I wasn't your

 8   reporter yesterday.

 9                  MR. ROSETTE:  Oh, so you don't have that?

10                  THE REPORTER:  No.

11                  MR. ROSETTE:  Okay.  Well, thank you.

12          Q.      (BY MR. ROSETTE)  Matt, I think yesterday I had

13   asked you something along the lines of -- well, I'll ask this.

14          In the online lending industry, is it common for

15   lending companies to test new products?

16          A.      Yes.

17          Q.      And is that -- why is that?

18          A.      Just an effort to optimize the business.

19   Sometimes diversification as well.

20          Q.      Okay.  I mean, does it have anything at all to

21   do with just innovation, and remaining competitive, and things

22   like that as well?

23          A.      It could.  There's, you know, a whole number of

24   potential reasons a company could test different products.

25   That could be one of them.

1          Q.      What are other reasons?

2          A.      Well, like I said, I think just enhancing the

3    business, itself, or diversification into other segments.

4    Things like that.

5          Q.      Going back in time, say 2011/2012 when you were

6    a servicer for Duck Creek and Red Rock, was there a shift from

7    payday loan products to installment products from the tribally

8    owned portfolios?

9          A.      If I recall, I think it was originally a payday

10   product.  It's similar to the Delaware-type structure.  And

11   then it changed at some point to a periodic interest rate

12   product as an installment loan.

13         Q.      And what were the reasons why the tribe made

14   that change in their tribally owned portfolios?

15         A.      I think the objective was for the TILA to be

16   presented differently.  I know OLA and others were proponents

17   of the consumer installment loan product.

18         So the foundational benefits were just, you know, more

19   information for the consumer in the TILA, and being certain as

20   to clarity in that regard.  Although, the economics were

21   substantially the same if not identical due to periodic

22   infrastructure.

23         Q.      And when you -- and when you say the word

24   "TILA," that's an acronym, T-I-L-A, meaning the Truth in

25   Lending Act?

1          A.      That's correct.

2          Q.      And is that -- that's a federal law, correct?

3          A.      Yes.

4          Q.      And so, you know, is some of the reason, Matt,

5    that there was a recommendation to shift the tribal portfolios

6    from payday products to installment products was because of,

7    you know, the influence of federal laws and the shifting legal

8    landscape regarding online lending?

9          A.      Yes.  I think that's a fair assessment.

10         Q.      Also, was part of it due to, you know, consumer

11   complaints, and their concern, and policy concerns regarding

12   payday lending products?

13         A.      Yes.  Managing to minimize consumer confusion or

14   complaints was one of the targeted objectives.

15         Q.      Was the transition from payday products to

16   installment products in LVD's in their tribally owned

17   portfolio's best interest?

18                 MR. GIVEN:  Object to form.

19                 THE WITNESS:  Yes.  I would say the change

20   that we've been talking about it -- I think that's what you're

21   saying -- that was, you know, I think recommended of course by

22   us for that reason.

23         Q.      (BY MR. ROSETTE)  Okay.  And then just for the

24   court reporter's edification.  Yesterday, we talked about a

25   precomputed interest short-term loan product.  And we referred

1    to those products with the acronym STL.  And we refer to simple

2    interest loan products with the acronym SIL.

3              Would you agree with that, Matt?

4         A.    Yes.

5         Q.    Okay.  So is it your understanding that the

6    tribe and Big Picture Loans moved from an STL to an SIL?

7         A.    At some later point in time, I think 2017 or so

8    is my understanding.

9         Q.    Were you aware of any need to continue

10   innovating the products or remaining competitive in online

11   lending industry at this time?

12        A.    Not particularly.

13        Q.    Well, why would lending companies ever change

14   their products then?

15        A.    Like I said, you might find some optimization

16   benefits, diversification benefits.  The same reasons.

17        Q.    And then you also listen to your consumers,

18   correct?

19        A.    I'm sorry?

20        Q.    You ever listen to consumers, generally, and

21   what their concerns are?  Complaints on the products?

22        A.    Yes.

23        Q.    And so if you know those -- that the change

24   might be required, do you test new ideas?

25        A.    I'm sorry, could you repeat that?

1          Q.      When you are making a determination whether to

2     change a lending product, do you usually test those new

3     products first before launching them?

4          A.      Yes.

5          Q.      And how often do you tweak the testing of those

6     products?

7          A.      You know, it really just depends on what you're

8     doing.  I couldn't give you a generalized answer to that.

9          Q.      Okay.  Do you test underwriting models?

10         A.      You can.  Sure.  Yeah.

11         Q.      What happens if the testing doesn't work?

12         A.      Well, I guess you would probably meet and decide

13    if it was worth some sort of a revised effort.  If there's

14    anything to learn from it, to do something differently, or if

15    it looks like you need to abandon the concept all together.

16         Q.      Okay.  And also, as far as wondering whether you

17    should change or modify your test products, we talked about

18    legality issues surrounding the tribal online lending model

19    earlier.  Do those issues ever impact whether a product should

20    change?

21         A.      No, I don't think so.

22         Q.      If there were enforcement actions on a

23    competitor or within your own portfolio, or enforcement

24    inquiries, would that prompt you to want to change product?

25         A.      If in any, you know, whether it's tribal or a

1    bank, or, you know, business loans or whatever, if there is

2    some federal law that applies to a lender, and any agency

3    raises a concern about it, I think it's prudent to take into

4    consideration what their -- what their thoughts and concerns

5    are.  Even if it's something new, to try and understand what it

6    is.

7            Q.     What about new rules that may not be adopted

8    that are being promulgated and moving through the system?

9    Would you start to understand those rules and test products

10   that might be compliant with those rules?

11           A.     Yes.  That would be prudent to the ongoing

12   operation ability of the business.

13           Q.     And I think that, just looking back on it, with

14   regard to the LVD Tribe, that may be some of the reasons why

15   they changed from a payday loan product verses an installment

16   loan product for their own portfolios, correct?

17                   MR. GIVEN:  Objection; calls for

18   speculation.

19                   THE WITNESS:  Excuse me.  When you said,

20   "What," can you -- what were you referring to as the causation?

21           Q.     (BY MR. ROSETTE) Sure.  Yeah.  And I don't want

22   you to speculate.  So I'm happy --

23                   MR. ROSETTE:  Thank you for pointing that

24   out, Barney.

25           Q.     (BY MR. ROSETTE)  In your role as the servicer

Page 14

1   for the tribally owned portfolios at Duck Creek or Red Rock,

2   I'm sure these were some of the -- these legal issues were some

3   of the considerations that drove the tribe to make a decision

4   to move from a payday loan product to an installment loan

5   product; is that correct?

6       Was that your understanding as the servicer?

7              MR. GIVEN:  I'm going to object to form,

8   but go ahead.

9              THE WITNESS:  It was kind of a broad

10  question for me to acknowledge my general understanding of.

11  You know, like I said, I think you listen to what concerns

12  regulators have, you listen to your consumers, and you try to

13  do what's -- and I know LVD always did, and so did we.  We

14  always tried to put our best foot forward from a legal

15  perspective and compliance perspective.

16      Q.    (BY MR. ROSETTE)  So do you think that influence

17  with regard to your understanding of the tribe and being a

18  servicer of the tribe, do you think those legal issues

19  influenced the tribe's change from a payday product to an

20  installment product?

21      A.    You mean the purview of the regulators at that

22  point in time?  Yes.

23      Q.    Yes.

24      A.    Yes, I think that's what I was saying would be

25  considered and analyzed.

1          Q.      Do you believe the LVD Tribe to be a good

2     steward of tribal-lending products in the businesses they

3     operate?

4          A.      I always have understood them to be -- not

5     withstanding, obviously, the dispute at hand here, but yes.

6          Q.      But they do their best to comply with their own

7     tribal federal laws?

8          A.      Yes.

9          Q.      And they stay aware of regulatory-type issues to

10    ensure that they -- consumer complaints, and stay out of the

11    IRA or the State AGs and federal regulators?

12         A.      Yes.  The State AG thing, I think, will just

13    sort of, you know, be a feud until you have some Cabazon-like

14    case or IGRA.  But, you know, avoiding fights with regulators

15    is a valuable effort.

16         Q.      Do you know what UDAAP is?

17         A.      Yes.

18               MR. ROSETTE:  For the court reporter's

19    edification, UDAAP is an acronym, U-D-A-A-P.

20         Q.      (BY. MR. ROSETTE)  I'm sorry to interrupt you,

21    Matt.  Do you know what UDAAP is?

22         A.      Yes.

23         Q.      What does UDAAP mean in the context of

24    continuing to evolve and test new products?

25         A.      Well, I mean, UDAAP is Uniformed Deceptive Acts

1   and Practices.  And, you know, I think it's -- I don't know how

2   it's applied.  I don't know if it's consistently applied, you

3   know, by different -- leadership, for example, it may be the

4   CFPB or things.  So it's hard for me to interpret all of the

5   different ways or any of the ways that that might be imputed

6   onto a lending product.

7         But I'm trying -- I don't recall any specific UDAAP

8   issues in the industry that I can recall at this time.

9         Q.    Okay.  And were you aware of the plan to

10  transition to an SIL product shortly after the merger?

11        A.    I think I had mentioned yesterday that there

12  was a conversation, and I don't remember the time.  I thought

13  it was -- I thought it was maybe before, maybe it was after --

14  about the transition being an objective at some point in time.

15  And my just, you know, comment.  And just from my learnings and

16  experience of how that played out into a financial model.

17        And -- but I don't know that -- I didn't really -- I

18  don't recall, like, being informed or kept abreast, or really,

19  you know, thinking that that was really anything that I needed

20  to pay any attention to anyway after that.

21        Q.    Okay.  When you -- when you say that you had a

22  conversation of the objective to go to a simple interest loan,

23  are you kind of thinking not just one specific conversation,

24  but just a conversation amongst the parties?  Or was it a

25  specific conversation?

1          A.      I'm just thinking -- I'm recalling a specific

2    conversation.

3          Q.      And was the conversation with the Lac Vieux

4    Desert Tribe, the future owner of Big Picture Loans?

5          A.      Well, I remember one conversation with Shelly

6    about it much earlier on.  And then I remember -- and I think

7    that's one I did sort of an analysis of it.  And mentioned that

8    the impact to the tribe's profits and distributions would be

9    significantly affected.

10          And then at some point, materially later on, I

11    remembered discussing, or Brian mentioning that, you know, that

12    they were going to do that in some capacity, casually.  And

13    that was kind of it.

14          Q.      Okay.  When you said that you did the analysis

15    of it -- well, okay.  So that was the conversation with Shelly.

16    That's a conversation with the tribe, correct?

17          A.      That's correct.

18          Q.      Were you also having conversations about it

19    internally at Bellicose with your team?

20          A.      Likely, at that time.  I'm not sure.  I don't

21    recall.  But it would seem probable.

22          Q.      And when you said that you did an analysis, did

23    you seek the assistance from any folks in your Bellicose team?

24    Specifically, like, James Dowd or Brian McFadden, or Simon

25    Liang, in exploring the SIL product?

1          A.     I don't recall involving them in the model.

2          Q.     Okay.  So who did you involve with regard to the

3     analysis you did on the SIL product?

4          A.     I'm trying to think if I did it by myself, but

5     it's a long time ago.  It wasn't something that really sticks

6     in my head as a clear answer for if that's entirely accurate or

7     not.

8          Q.     Okay.  That's fine.  And so you didn't include

9     your team.  Did you include attorneys or any policy-minded

10    people with regard to the industry that we talked about that

11    could also influence those changes?

12         A.     Well, I didn't say I didn't include my team.  I

13    said --

14         Q.     Oh, okay.

15         A.     -- I don't recall actually how that came

16    together.  But I feel like building the model to find out the

17    economic impact might have been something that I had done

18    personally.

19         Q.     All right.  Go ahead.  Sorry.

20         A.     What was your -- you had a next question about

21    other --

22         Q.     Yeah.  So your analyst looked at the economic

23    impact.  Did you do any analysis from a policy-perspective

24    impact with regard to some of the policy legality issues we

25    were discussing earlier?

```
 1         A.    Well, I mean, there are kind of two different
 2   eras.  One is, obviously, the payday product to a periodic
 3   interest installment product in 2012.  Then you move to second
 4   time from STL to SIL in 2017.  Regarding the latter, I don't --
 5   I don't recall any conversations about that --
 6         Q.    Okay.
 7         A.    -- from a policy perspective or compliance
 8   perspective.
 9         Q.    And then when you were doing the analysis and
10   running the test from the prior shift from a payday product to
11   an installment loan product, did you include your team in those
12   discussions and testing?
13         A.    That was a long time ago.  I don't remember the
14   details of how that transfer happened, or change of products
15   happened.
16         Q.    Okay.  Do you recall working with James Dowd at
17   all on that issue?
18         A.    No.  I mean, you know, like I said, the
19   economics of it didn't fundamentally change.  It was more just
20   a, you know, a product TILA change with maybe some different
21   consumer notifications that would be required through the
22   website, or emails, or communications and things.  So I don't
23   know that there would have been much for James to do from an
24   analytic standpoint.
25         Q.    Okay.  What about Simon?  Did you work closely
```

1  with Simon in understanding the financial impacts or anything

2  along those lines from going to a payday product to an

3  installment product?

4          A.     I don't recall.

5          Q.     Okay.  You did just mention that risk analytics

6  may not have been involved.  But as far as marketing, did you

7  meet with marketing people and tweak and test marketing from a

8  payday product to an installment product?

9          A.     I don't know that we did any testing of the

10  marketing or anything at that time.  I don't recall doing any.

11         Q.     Okay.  And what about -- what about CMS?  What

12  does CMS stand for?

13         A.     To me, I think it means Compliance Management

14  System.

15         Q.     And did you do any tweaks, or have discussions

16  with your team, or anything along those lines regarding CMS

17  when you were shifting from a payday product to an installment

18  product?

19         A.     I'm sorry.  Did we do any tweaks to the CMS

20  around the product change?

21         Q.     Yeah.  Just consultation with your team on how

22  it will impact the CMS and whether it needs to be modified.

23                MR. GIVEN:  Object to form.

24                THE WITNESS:  I just -- I don't remember

25  when the formalization of the CMS program itself came about in

1   a more sort of robust way than, obviously, you know, a -- it

2   may have been earlier in time.

3          So I don't know -- that's a hard one for me to sort of

4   put a date in communications around.  But, obviously,

5   compliance is paramount.

6          Q.     (BY MR. ROSETTE)  So do you know whether you

7   worked with any compliance counsel with regard to those issues

8   or the compliance director?

9          A.     I remember forming the CMS and discussing -- I

10  don't know if that was part of the conversation.  But Hudson

11  Cook was very involved in the formation of the CMS.  And so I

12  don't know if they were involved at that specific time when the

13  change occurred.  So I don't know when that change occurred off

14  the top of my head.

15         Q.     Okay.  And then with regards to your

16  conversation with Shelly of the -- actually, let me pull up

17  Exhibit 9 from yesterday.

18                MR. ROSETTE:  So I will repost

19  Exhibit 9.  It's already marked.  And Barney, we will email

20  that to you.

21                MR. GIVEN:  Thank you.

22         Q.     (BY MR. ROSETTE)  And Matt, these are emails.  I

23  will give you an opportunity to read through them from Justin

24  Martorello to the tribe with you copied.

25         So when you get the email, why don't you just spend

1    some time going through the chain, and let me know when you're

2    ready.

3            A.      I'm getting there.

4            Q.      You're getting there?

5            A.      Yeah.  Sorry.  Just one more minute.  Okay.

6    I've read it.

7            Q.      Okay.  So I'll draw your attention to the email

8    sent on -- it's on page 3 of the .pdf.  The email sent,

9    Tuesday, July 14th from -- it's from Justin Martorello, sent to

10   tribal representatives.  And then copying, you, Matt

11   Martorello.

12           Do you see that one?

13           A.      Yes.

14           Q.      Okay.  And the subject line is "BPL Roadmap."

15   Do you see that one?

16           A.      Yes.

17           Q.      And so it appears that BPL has a new tribal

18   portfolio.  And at least, initially, it appears to be serviced

19   by SourcePoint VI.

20           Would you agree to that?

21           A.      I don't recall if that happened or not.

22   And I know this is sort of, like -- it looks like the beginning

23   of some discussion for the tasks that need to be considered and

24   resolved as a sort of final task list.  I don't recall if that

25   happened or not.  I don't know.  But I see it in here.

1          Q.      Did SPVI ever have a servicing agreement with

2   BPL?

3          A.      That's what I don't recall.

4          Q.      Okay.  That's fine.  Now, BPL is a tribal online

5   lending portfolio, correct?

6          A.      That's correct.

7          Q.      Was SPVI -- did SPVI have servicing contracts

8   with the tribe on Tuesday, July 14th of 2015?

9          A.      Yes.  With an entity of the tribe, sure.

10          Q.      And so as part of those services, it's basically

11  providing services and recommendations to the tribe with regard

12  to their wholly 100 percent all tribal portfolios, correct?

13          A.      Yes.  I think, you know, we talked a little

14  about service agreement yesterday.  A lot of the develop,

15  recommend, and pre-qualified leads and other things go into

16  that, yes.

17          Q.      And so on this specific email referenced to you

18  on Tuesday, July 14th from Justin to the tribe in which you're

19  copied, it's called the "BPL Roadmap".

20          It sets forth at least from Tuesday, July 14th forward,

21  kind of an outline of activities for BPL.  Beginning in quarter

22  three of 2015, and continuing to quarter four.  Ending in -- if

23  you turn the page, you'll see it goes into calendar year 2016

24  and includes Q-1 and Q-2.  Is that correct?

25          A.      You know, like I said, I think this looks like

1   it was just sort of a concept to have a meeting to discuss a

2   proposed roadmap.  I don't know that this is the actual

3   roadmap.

4        It just looks like this was the beginning as prompted

5   by Karrie's email prior.  So I don't think the way you

6   classified it is accurate.  I don't know what the actual task

7   list ended up being.

8        Q.    Okay.  Let's go back to page 1 of the .pdf's

9   then.  Make sure we have this document for you.

10       A.    Okay.

11       Q.    This is an email on July 29th from Justin

12  Martorello to the tribe, with you copied.  In the first bullet,

13  it says, "BPL" -- can you read the first bullet of that email?

14       A.    "BPL, CVB," -- which is the Chippewa Valley Bank

15  -- "account requires minimum funding.  I think LVD should fund

16  the account with $100 for the purpose of establishing equity in

17  BPL."

18       Q.    Okay.  So that's a real task to -- is that a

19  real task required in order to get BPL launched?

20                  MR. GIVEN:  Object to form.

21                  THE WITNESS:  No.  I think when

22  a -- you know, when you form a company, obviously the first

23  thing you have to -- one of the first things you have to do

24  maybe typically in the operating agreement would be figuring

25  out what the initial capital contribution is going to be.

Page 25

1        So, no, it's not the first step in really getting it

2   launched.  That's sort of a different subject matter.  This is

3   just sort of, you know, giving it life, I guess.

4        Q.    (BY MR. ROSETTE)  Okay.  So could BPL ever

5   launch its business without finishing this task?

6        A.    It would have to provide some initial capital

7   contribution to be existent, so.  Not necessarily this task,

8   but, yeah, something in some form, they had to figure out what

9   they wanted to do.  And maybe was advised that they'd probably

10  want to do it with as minimal cash as possible.

11       Q.    Okay.  And so -- and so this first bullet was

12  sort of checking that box so that BPL could accomplish that

13  task, correct?

14                  MR. GIVEN: Object to form.

15       Q.    (BY MR. ROSETTE)  You can answer.

16       A.    Yeah.  I mean, you know, I think it was a

17  suggestion.  I don't know if they did that or they did a

18  thousand or 10,000 or what.

19       But, you know, generally the business needs the equity

20  funding from initial capital contribution to get started.  And

21  I think BPL did that.

22       Q.    Okay.  And would BPL need a bank account in

23  order to get started?

24       A.    Yes.

25       Q.    Okay.  Can you read the second bullet?

1           A.      "SPVI can use the existing SA as a draft for

2      BPL.  We will begin a review."

3           Q.      In that context, does SA meet servicing

4      agreement?

5           A.      Yes.

6           Q.      Okay.  And so, would -- do you think that was a

7      step that was needed to take place in order for BPL to begin

8      launching?

9           A.      I guess.  And I don't know where it actually

10     ended up.  I don't know.

11          Q.      Who would know how that ended up?  Who would we

12     talk to?

13          A.      Well, someone probably at BPL and TED that has

14     the detail.

15          Q.      Okay.  All right.  Thank you.  So from these two

16     bullet points, it looks like there's an establishment of a bank

17     account, funding of a bank account for the equity, and a

18     service agreement that may be drafted with BPL.  Does it seem

19     like the BPL roadmap is moving forward?

20          A.      It seems like the parties are, you know, working

21     on the roadmap to move the roadmap forward.  And, you know, I'm

22     guessing subsequently completed tasks according to that

23     roadmap, whatever roadmap that is.

24          Q.      Okay.  And then do you know when BPL launched?

25          A.      By "launch," I'm guessing you mean when it made

Page 27

1    its first loan?

2          Q.    Sure.

3          A.    No, not off the top of my head.

4          Q.    Let's go back to the -- to the first email that

5    we were originally looking at on page 3.  Tuesday, July 14th,

6    2015.  And on the roadmap on the last page, so page 4 under

7    "2016, Q-1."

8          A.    I see it.

9          Q.    Okay.  It talks about closed transaction in

10   early January of '16.  Do you know whether BPL was involved in

11   a transaction with -- related to Bellicose in January of 2016?

12                MR. GIVEN:  Object to form, Counsel.  Just

13   "transaction."  Can you be more specific?

14                MR. ROSETTE:  Sure.

15         Q.    (BY MR. ROSETTE)  Did the merger between

16   Bellicose Capital and the tribe, the wholly BPL occur in

17   January of 2016?

18         A.    I think the merger agreement is dated January

19   2016.

20         Q.    Okay.  Thank you.  And in that merger agreement

21   and other transactions, was -- and let's look at the second

22   line of Quarter 1.  "BPL buy or assigned RRTL assets on close."

23         Do you know whether or not eventually BPL wound up with

24   Red Rock Travel Lending assets in the first quarter of 2016?

25         A.    I believe it did.  Yeah, I think it was Q-1

1    2016.

2          Q.     Okay.  So did that help you with the context of

3    the BPL roadmap a little better?

4          A.     I mean --

5                 MR. GIVEN:  Object to form.

6                 THE WITNESS:  Not really.  I don't remember

7    the roadmap discussion --

8          Q.     (BY MR. ROSETTE)  Okay.

9          A.     -- evolution stuff.  But, you know.

10         Q.     So let's go back to page 3.  At the bottom of

11   page 3 under "Quarter 4."  Can you read the last line of the

12   Q-4 roadmap?

13         A.     "Launch BPL 'test' portfolio on new LMS on

14   simple interest."

15         Q.     Oh, okay.  I'm sorry, Matt.  I wanted you to go

16   to page 2, first.  The page prior to that under Q-4, and read

17   the bottom line.

18                MR. GIVEN:  You're talking about,

19   Counselor, where it starts with "Prepare materials"?

20                MR. ROSETTE:  Yes, sir.  I'm sorry.

21                MR. GIVEN:  Okay.

22                THE WITNESS:  Sorry.  You said

23   page -- page -- what page?

24                MR. GIVEN:  Just right above it.

25                MR. ROSETTE:  Page 2.

Page 29

1                          MR. GIVEN:  Q-4.  Q-4 at the bottom of the

2   page.

3                          THE WITNESS:  "Prepare materials for

4   simple interest product launch.  Parenthesis CMS, consumer

5   docs, marketing, et cetera."

6          Q.     (BY MR. ROSETTE)  Okay.  Did you tell Justin

7   Martorello to put that line in there?  To insert that line in

8   there?

9          A.     I don't recall.

10         Q.     Okay.  So why would -- why would Justin insert

11  that line in there?

12         A.     I don't know.  I'm supposing there was some

13  conversation regarding BPL launching on a simple interest

14  product.

15         Q.     Do you think that -- what do you mean by

16  "conversation"?

17         A.     I mean, there was obviously a catalyst for him

18  to put this in here.  So there must have been some kind of

19  communication or conversation that led to this item being here

20  on the list.

21         Q.     Do you think -- do you think the decision was

22  already made as to whether or not to do this simple interest

23  product launch?

24                         MR. GIVEN:  Object to form.

25                         THE WITNESS:  I don't know.  It's possible.

1    I'm not sure.  I don't -- like I said, I remember the one

2    conversation with Brian that we mentioned.

3           And, you know, I wasn't really -- like I said, with the

4    leads, I wasn't one to necessarily get in Brian's way if it's

5    something that he wanted to do.

6           So it's possible that had evolved sort of beyond my --

7    you know, I don't want to say my care, but my involvement.

8    Excuse me.

9           Q.    (BY MR. ROSETTE)  And, you know, it has in the

10   parenthesis, "CMS consumer docs, marketing, et cetera."

11          You wouldn't prepare CMS materials unless you knew you

12   were going to launch the product, would you?

13          A.    Sorry.  You wouldn't do what?

14          Q.    You wouldn't prepare CMS materials unless you

15   knew you were going to launch the product, would you?  I mean,

16   you wouldn't do that up front, would you?

17          A.    Well, that's a good question.  I think you would

18   -- if you're going to do a test, you still have to be

19   compliant.  So I think you would, you know, have some rules

20   around things and make sure you're doing them the right way.

21   Even if it's just a test launch.

22          Q.    Okay.  What about the consumer documents?  You

23   would do those if you were going to do a test launch, correct?

24          A.    Yeah.  You would need those.  Those would be the

25   loan agreements that would detail --

1          Q.     As well as the --

2          A.     I'm sorry?

3          Q.     As well as the marketing materials?

4          A.     Yes.  Same.  Yeah, they'd all have to tie

5     together and make sense in order to do the launch.

6          Q.     Okay.  And so understanding -- and I don't want

7     to put words in your mouth.  But you weren't involved.

8          You think Justin was utilizing any of James Dowd or

9     Simon Liang or Brian with regard to his team?  With regard to

10    putting this together?

11         A.     You know, I don't know.  It launched in 2017.  I

12    don't know if this proceeded further.

13         And I know it talked about a new LMS, but I don't know

14    if the LMS changed.  So I don't know -- I don't know what

15    happened.

16         Q.     Would Justin typically be responsible for

17    putting all of this together and independently launching the

18    test?

19         A.     Independently launching the test?  If there was

20    a test, there would be multiple persons and parties involved.

21         Q.     Okay.  So if you go to the next page and read

22    the second line from the top, what does that say?

23         A.     "Launch BPO" -- parenthesis -- "test portfolio

24    on new LMS, on simple interest."

25         Q.     Okay.

Page 32

1                     MR. GIVEN:  And just for the

2   record -- sorry.  Just for the record, Matt said "parenthesis,"

3   but I think it's quotes.

4                     THE WITNESS:  Sorry.

5                     MR. ROSETTE:  Okay.  Let me get another

6   document and list this as Exhibit 30.

7                     (Deposition Exhibit No. 30 marked.)

8          Q.     (BY MR. ROSETTE)  And while that's coming up,

9   Matt.  Isn't it true that you wanted LVD or Big Picture Loans

10  to "evolve" to a constant payment simple interest installment

11  loan product?

12         A.     You know, I don't know.  At what point in time?

13  I mean, obviously I would have been interested in it to have

14  considered the financial impact, so...

15         Q.     Let's say around the same time.  Middle of 2015,

16  around the same time.  Did you want the tribe or LVD to evolve

17  to a simple interest installment loan product?

18         A.     I mean, I know -- like I said, I remember

19  talking about it with Ms. Hazen.  I don't remember what the

20  time or date was.

21         And, obviously, I would have mentioned it because maybe

22  it was something that was really good and I was for.  And then

23  I just -- like I said, I just remember realizing the financial

24  impact was sort of unexpected.

25         Q.     Through the testing?

1          A.      No.  Through the financial modeling of -- you

2    know, I detailed a little bit yesterday.  You know, the

3    front-end payments are higher in the STL product.  And they're

4    much lower on the back end.

5          And so when you're targeting minimization of that first

6    payment default, you usually get this really nice flat curve.

7    Verses SIL, you get this -- you're more likely to have some

8    sort of payment fatigue because the payment's the same at the

9    end as it is in the beginning.

10          But the extra dollars on the front end allows you to

11    grow faster.  And that compound rate of return in a long-term

12    model, I remember showing somebody and

13    Ms. Hazen that there would be that issue.

14          Q.      Okay.

15          A.      Which was something I know I realized later on

16    obviously after I had assessed its practicality and economic

17    impact.

18          Q.      Were there -- were there any other reasons that

19    could be contemplated similar that we've just talked about when

20    you went from payday loan to installment loan?

21          Could there be other considerations, other than the

22    relativity that you've just mentioned with regard to concerns

23    about the change?

24          A.      Can you please maybe rephrase the question?

25          Q.      Well, what do you think other reasons may have

Page 34

1   been for BPL to transition from an STL to an SIL?

2          A.      Sorry.  Did you say what other reasons would

3   there be?

4          Q.      Yes.

5          A.      Outside economics.  Excuse me.  The consistent

6   payment is something that's easy for the consumer to

7   understand.  This is the one that comes to mind.

8          Q.      Okay.  And so if the consumers understand the

9   payments better, would that drag down consumer complaints?

10         A.      Yeah, it should.

11         Q.      Do you think -- in your experience, do you think

12  SIL products may be subject to less FTC suits as opposed to STL

13  products?

14                 MR. GIVEN:  Object to form, and may call

15  for expert testimony.

16         You can answer.

17                 THE WITNESS:  Not necessarily.

18                 MR. ROSETTE:  I'm asking his experience.

19                 THE WITNESS:  You know, not necessarily.

20  Only because I know the periodic interest product is, you know,

21  commonplace.  And even the, you know, the old payday renewal

22  product is in various states.  So it's been around -- has been

23  around for a long time.  So I don't know that, you know -- I

24  don't know that I'd go that far.

25         Q.      (BY MR. ROSETTE)  So the FTC is currently, even

1  today, critical of short-term lending generally, regardless of

2  the product; is that right?

3      A.    I don't know that I would say that I'd concur in

4  federal policy environment around small-dollar lending that

5  they're intricately involved today.  I don't know that I'd

6  agree with that.

7      Q.    Okay.  Can you look at Exhibit 30?  I think

8  Barney's got that by now.

9          MR. GIVEN:  I've got it.  And I just have

10  one question, Rob.  I don't see a Bates stamp.  Do you know if

11  this was produced by you-all in the litigation?

12          MR. ROSETTE:  No.  This is a

13  Bellicose-privileged document that we're just now producing

14  now.

15          MR. GIVEN:  Okay.

16      Q.    (BY MR. ROSETTE)  And on page 2 of that

17  document, Matt, you'll see some bullet points.  Can you go to

18  3.2 and count down on the bullets one, two, three -- the

19  fourth?  And this is an email from you.  Can you read that

20  bullet?

21      A.    Hold on one second.  I want to talk --

22          MR. GIVEN:  He just wants to consult with

23  me about the privilege issue real quick.  So just one second.

24          THE WITNESS:  Are we on mute?

25          THE VIDEOGRAPHER:  Are we going to go off

Page 36

1   the record?

2                   MR. GIVEN:  Yeah.  Well, well -- yeah,

3   let's go off the record for a sec, sorry.

4                   THE VIDEOGRAPHER:  The time is

5   10:13 a.m.  We are off the record.

6                   (Break taken 10:13 a.m. to 10:20 a.m.)

7                   THE VIDEOGRAPHER:  The time is

8   10:20 a.m.  This is the beginning of Media No. 2.

9                   MR. GIVEN:  So I was asking -- I was asking

10  Mr. Rosette why this document -- why he claims it's a Bellicose

11  privilege.  Because again, our intent for the record, as well,

12  is not to waive any privilege that belongs to my client.

13          But please provide your explanation, sir.  I know you

14  wanted to do so on the record, and then we can make a decision.

15                  MR. ROSETTE:  Sure, Barney.  As you know,

16  when BP- -- when -- excuse me.  When Bellicose Capital,

17  Bellicose VI, and SourcePoint VI were sold to the Travel

18  Acquisition Company, the tribe became the owner of these

19  documents.  And this document here specifically was with regard

20  to Bellicose.

21                  MR. GIVEN:  I'm sorry.  I'm sorry.  I think

22  there's some confusion.  Go ahead.  I know what happened.  She

23  sent me -- Rob, hang on one second.  Your assistant sent me two

24  documents, and I was looking at 29.

25          Are you talking about 30 now?

1                    MR. ROSETTE:  Yeah.

2                    MR. GIVEN:  Okay.  Yeah, no, we definitely

3    then -- we definitely -- I will instruct the witness -- sorry.

4    I just saw 30.  She sent me 29 and 30.

5         We definitely are not going to waive the privilege on

6    Number 30.  Go ahead and put your explanation on the record.

7    But I know we need to preserve the record, but go ahead.

8         So my apologies that your assistant sent me two, and I

9    opened 29 instead of 30.  But go ahead.

10                   MR. ROSETTE:  Yes.  So the parties agreed

11   to this.  But also under Delaware law, the tribe now owns the

12   Bellicose privilege.  And the tribe can waive the Bellicose

13   privilege.

14        And further, the tribe shared all of these emails with

15   Armstrong Teasdale last December for Armstrong Teasdale to

16   review for their own privilege.

17        And this is one that they did not mark or take, and

18   remained specifically in the tribe's possession because these

19   emails deal specifically on behalf of Bellicose, which the

20   tribe owns now.

21        Again, you know, I've received permission from the

22   clients to waive privilege as to John Williams.

23                   MR. GIVEN:  Okay.  And for the record, we

24   believe that that's an incorrect assessment of the situation.

25   I'm going to instruct the witness not to answer.

1        I understand you're going to take it before the panel.

2   And if the panel determines that the privilege belongs to

3   you-all and has been waived, obviously, you will be -- I will

4   allow you to redepose Mr. Martorello on those matters.

5        But I'm going to -- for today's purpose, I'm going to

6   instruct Mr. Martorello not to answer any questions regarding

7   Exhibit 30.

8                    MR. ROSETTE:  Okay.  That's fine, Barney.

9   Thank you.

10                   MR. GIVEN:  Okay.

11        Q.   (BY MR. ROSETTE)  So Matt, were you made aware

12   at all regarding the change towards an SL product before the

13   merger occurred?

14        A.   I think I've given you all I have to offer from

15   my recollection on that.  We've kind of gone back over that.

16   That's the best that I can offer.

17        Q.   All right.  And under the penalty of perjury,

18   was it your understanding ever that you wanted LVD or BPL to

19   evolve to a constant-payment-simple-interest-installment-loan

20   product?

21        A.   Was it my understanding ever -- well, like I

22   said, I don't suspect I would have brought it up to

23   Ms. Hazen if I didn't believe in it at some point in time.

24                   MR. ROSETTE:  All right.  Let me mark a new

25   exhibit.  This is a new document.  I'm going to mark it as

1    Exhibit No. 31.  And so we'll put that up on the chat, as well

2    as also email it to Barney.

3                (Deposition Exhibit No. 31 marked.)

4        Q.    (BY MR. ROSETTE)  Why don't you just start

5    reviewing that while Barney's waiting for his email and pulling

6    it up.

7             Did you read it, Matt?

8        A.    I'm still going.  I'm sorry.  I know.  I'm

9    having coffee.  Almost done.

10       Q.    Take your time, please.

11       A.    Okay.  I'm good.

12       Q.    Okay.  Matt, so I want to go to the email from

13   James Dowd on -- sent on Monday, June 19th, 2017.  And it's to

14   you as well as to Simon Liang, Brian McFadden, and Luis

15   Jimenez.  Do you see that?

16       A.    Yes.

17       Q.    And did you receive this email?

18       A.    Yeah.

19       Q.    Okay.  And did you read it?  Was is your

20   practice to read these emails when you would receive them?

21       A.    Yeah.  I don't specifically recall this email

22   until just now.  But it was sent to me.  I remember June 2017

23   asking for and receiving a forecast of what the note payments

24   would be.

25             And I don't remember the reason why I made the request

1    for that.  And maybe this is -- I assume this is associated

2    with that.

3           Q.    Right above that email -- I'm assuming you've

4    read it because you responded to that email, correct, on

5    Monday, June 19th, 2017?

6           A.    Right; agreed.

7           Q.    And could you read your response to that email?

8           A.    "Thanks, James.  Very helpful reports."

9           Q.    Okay.  And James's email was sent on

10   June 19th of 2017, correct?

11          A.    Correct.

12          Q.    So as early as June 19th in 2017, were you aware

13   that BPL had, in fact, switched to an SIL product?

14          A.    I must have been aware at that time that the

15   switch had occurred, yes.

16          Q.    Okay.  Thank you.  All right.

17          Now, earlier, we discussed your current employment with

18   Braviant.  Do you recall that?

19          A.    Yes.

20          Q.    And at Braviant, I think -- again, I don't want

21   to put words in your mouth.  But you're the director of

22   business development?

23          A.    Yeah, that's my title.

24          Q.    And as part of your job duties, you're in charge

25   of raising capital?

Page 41

1        A.     I'm not in charge of raising capital.  It's a

2   very part-time minimal-salaried position, minimally involved.

3   But introductions to potential capital sources is basically --

4   I would say that's the bulk of my involvement.  And it's very

5   periodic.

6        Q.     Okay.  And you said your paychecks actually

7   comes from a subsidiary.  Do you remember who that subsidiary

8   is today?

9        A.     No.  There's probably some -- well, I

10  know -- I think it's Insperity or something.  And that's like

11  ADP.  Like, an outsourced PEO or something.  I don't know the

12  name of the entity that it draws from.

13       Q.     Okay.  Matt, I don't want you to guess.  But

14  does Braviant have any connection or provide any services to

15  any lending entities?

16                    MR. GIVEN:  Object to form.

17                    THE WITNESS:  You mean consumer lending

18  entities?

19       Q.     (BY MR. ROSETTE)  Any lending entities.

20       A.     In the consumer lending industry -- well, I

21  don't even know if there's any outside of consumer lending.

22  But in the consumer lending, they are a credit access business

23  in the state of Texas.  So, you know -- excuse me -- so that

24  could be considered inappropriate relationship to your

25  question.

1          Q.      Have they ever helped a consumer lending entity

2     provide consulting services or anything like that with regards

3     to credit access?

4                          MR. GIVEN:  Object to form.

5                          THE WITNESS:  I'm sorry.  Can you repeat

6     that?

7          Q.      (BY MR. ROSETTE)  Yes.  Has Braviant provided

8     services to consumer lending entities?

9          A.      Well, that would be the credit access business

10    that I mentioned in Texas.

11         Q.      Okay.  Have they done that for tribal lending

12    entities?

13         A.      No.

14         Q.      Have they done that for state licensing

15    entities?

16         A.      That would be the credit access business Texas

17    thing.  They also had a similar model -- I don't know what it

18    was called -- that was in Ohio until a new legislation was

19    passed recently.  And so that was kind of similar to the credit

20    access business.  But some different code or title to that law

21    in the state of Ohio.

22         Q.      Okay.  And are you familiar with the -- with

23    those state license entities that have utilized Braviant for

24    credit access?

25         A.      You mean the ones in Texas and Ohio that I'm

Page 43

1    talking about?

2              Q.     Sure.

3              A.     I'm familiar -- I think I'm familiar with some

4    of them, yes.

5              Q.     And what type of state compliant lending

6    products do they have?  Is it an SIL?

7              A.     I believe so.  You know, you would have to check

8    the website.  But I'm pretty sure.  I'm pretty sure it is.

9    Actually, I'm sorry let me take that back.

10             There are -- certain states have, obviously, different

11   structure requirements.  I know there's been you know, like, a

12   line-of-credit product per state.

13             And some may have, you know, kind of like the old

14   STL-type thing and limitations that allow for legislation for

15   that.

16             And so I think there is some variance to what they

17   offer, and it depends on the state.  So frankly, you'd just

18   have to check the website and see.  I don't know that

19   information off the top of my head.

20             Q.     Okay.  Can you give me the name of the website

21   so I can check?

22             A.     It's balancecredit.com.

23             Q.     Okay.  Thank you.  Are you -- one second.

24   Excuse me.

25             A.     You okay?

Page 44

1           MR. GIVEN:  You okay?

2           MR. ROSETTE:  Yeah, I was choking

3    there.

4           Q.    (BY MR. ROSETTE)  Are you familiar with the term

5    "risk-base pricing"?

6           A.    Yes.

7           Q.    Is it your understanding that the goal of

8    risk-base pricing in the most general sense is to make sure

9    that the most appropriate rate in loan terms are offered to a

10   customer?

11          A.    I don't know.  I wouldn't call it appropriate

12   rate.  It's just that based on the rate of risk, you determine

13   the price, and whatever sort of what your objective is.

14          Q.    Okay.  So generally speaking, you would offer a

15   customer that has a better ability to pay a lower rate than one

16   that doesn't have as good of an ability to pay, correct?

17          A.    If -- yeah.  If you associate the term "risk"

18   with "ability to pay."

19          Q.    Okay.

20          A.    I think we're saying the same thing.  I think --

21   yeah, it's, you know, a higher-risk guy might deserve a higher

22   cost.  And a lower-risk guy might deserve a lower cost.

23          Q.    Is risk-base pricing a tool that can help

24   optimize the lending portfolio?

25          A.    It depends on the -- sort of the nature or

Page 45

1  status of the business.  For example, a small portfolio where,

2  you know, you can have one product, one model, one price.

3         And, you know, some billion-dollar portfolio or

4  something, building that market cap, I guess.  But might have

5  -- you know, obviously, they've probably got, like, a dozen

6  different products and risk-base pricing models up and down all

7  over.  Because they're probably dealing with concentration

8  issues and things.  So it can vary from one end of the spectrum

9  to the other.

10        Q.    So understanding that, is risk-base pricing a

11 normal industry standard way to test changes?

12        A.    I don't know that I think of it as testing

13 changes.  I don't think of it as testing changes.

14        Q.    Okay.  Is risk-base pricing, I guess, something

15 that you would test in order to optimize revenues or

16 potentially drive revenue?

17        A.    If you want to test a risk-base pricing strategy

18 -- well, if you want to deploy a specific risk-based pricing

19 strategy for your business or portfolio, you, you know, would

20 try to test it and optimize it, and make sure it fits whatever

21 your goals and objectives are.

22        Q.    So who typically would be responsible for that

23 testing in an organizational structure?

24        A.    Well, there are obviously smaller structures

25 that are probably much more entrepreneurial.  And, you know,

1   there might just be a few folks who do wear many hats but in a
2   bigger structure.
3           You know, I mean, you could -- the sky's the limit.
4   You know, you could have meetings with managers and folks who
5   share input or do the analysis and convene, and make decisions
6   on how to edit, or evolve, or to abandon or whatever you want
7   to do.  So there's no real direct answer to that question.
8           Q.    Okay.  Recognize, you have a team -- would you
9   say you have a team to do that, that includes
10  multi-disciplines?
11          A.    Who is -- who is "you"?  Who are you talking
12  about?  Oh, just hypothetical?
13          Q.    Yeah.  Just hypothetically.  If you're going to
14  -- it sounds like the testing of new products or concepts like
15  risk-base pricing, first of all that it requires tests.
16          Is it fair to say that the team that is responsible for
17  that testing takes a very multi-disciplinary approach?
18                      MR. GIVEN:  Object to form.
19                      THE WITNESS:  It's --
20          Q.    (BY MR. ROSETTE)  Let me ask just to clarify
21  that and maybe make it easier.
22          Would you have risk analytic folks involved in the
23  testing of risk-base pricing?
24          A.    Folks who know -- who know risks and analytics,
25  I mean, title-wise, whatever.  It could be -- like I said, an

1   entrepreneurial shop may be just a couple of guys or something.

2          Folks with that knowledge-set would, obviously, want to

3   be doing the analytics and measuring the performance.

4          Q.     Okay.  Do you know whether -- do you believe

5   that that testing in that environment of wanting to improve

6   your products is considered normal or ordinary course of the

7   business?

8          A.     I think -- you know, if your -- it depends on

9   the business.  Like, a smaller shop just may not have the

10  funding, or the capital, or wherewithal to be able to do that

11  on some regular occurrence.

12         Whereas larger companies, you know, like, public

13  companies in a small dynamic space would have or often have

14  some, you know, small allocation of the portfolio, that's sort

15  of just for research and development purposes.  So it depends.

16         Q.     Well, let me -- let me ask -- and it doesn't

17  have to be with regard to risk-base pricing, per se.

18         But did Bellicose VI, back in 2015 pre-merger, did they

19  engage in this teamwork of conducting tests when they were

20  servicing Red Rock and Duck Creek portfolios to improve

21  products?

22         A.     Yes.

23         Q.     How about -- how about balancecredit.com?  Do

24  they test its funding products to make adjustments in an

25  attempt to improve their products?

Page 48

1          A.      I actually don't know the inner details of what

2    they do in the operations to say yes.  But, you know, I would

3    -- I don't recall being told of any specific examples.

4          But given the, like I said, different states, different

5    models and products and structures, it would be a little

6    reckless to come out with some new concept or product that fits

7    some state model that was a disaster.

8          So I would hope that they would find that prudent.

9          Q.      Okay.  I mean, your position related to

10   balancecredit.com is introducing capital sources to them,

11   correct?

12         A.      Generally.  I've -- yeah.  Periodically, and I'm

13   trying to think of what other -- I've asked some questions.

14   You know, I've received, like, board reports, although I don't

15   participate in the board.

16         And just if I have a question or something, or try to

17   -- that I think is going to be helpful or insightful, I just

18   try to ask it.  And usually, they've already figured out

19   everything that I could ask.

20         So that's probably like my -- develop my business

21   strategy role is really in that regard, I'd say.

22         Q.      So if you're going to introduce investors to

23   them and bring real money to that -- to balancecredit.com.  I

24   think you'd want to, if it's reasonable and prudent, you would

25   want to make sure balancecredit.com tests its lending products

Page 49

1   to attempt to improve their products, correct?

2        A.      No, not really.  I mean, the nature of the

3   introduction is literally just an email or a phone call to

4   introduce the parties.  And that's about the end of my

5   involvement.

6        At that point, they're well-staffed and capable.  And

7   they've got their own materials, you know, that I don't really

8   participate in editing or anything.  And they're just sort of,

9   you know, their own -- their own operation.

10       Q.      Well, does Balance Credit have a payday lending

11  product?

12       A.      It may.  You have to look at the website and see

13  if maybe they do in Delaware or something.  I don't know.

14       Q.      Okay.  Does Balance Credit do risk-base pricing?

15       A.      That term can be so easy to fulfill, that I

16  would say I'd be shocked.  I mean, I can't specifically say how

17  or what they do.  But I'd be shocked if they did not within

18  some definition of that terminology.

19       Q.      When you were the CEO of Bellicose -- Bellicose

20  VI, and Bellicose Capital, all the way to the merger -- I guess

21  that's my question.  Excuse me.

22       With regard to Bellicose VI, Bellicose Capital, all the

23  way to the merger, were you always the CEO?

24       A.      I don't remember.  I was actually wondering that

25  recently.  Because I remember appointing Brian to president at

1   some point.  And I don't know if I had that role or if I was a

2   CEO, or what I was after that.

3           So it may be that I was CEO and then he became

4   president.  But I'm just -- I don't recall.

5           Q.   Do you recall if when Brian was president,

6   whether he answered to you?

7           A.   You know, like I said, I think, you know, he was

8   -- I wasn't looking over his shoulder.  And he was allowed to

9   be autonomous and things.  And that's always, I think, kind of

10  my nature.

11          But technically, he may -- he may have been a

12  subordinate in some way to whatever position I was in.

13          Q.   Okay.  All right.  And then post-merger, was

14  Brian now the president of Ascension Technologies for the

15  tribe?

16          A.   Post-merger, he was president of Ascension, yes.

17          Q.   And then what about James Dowd?  Was he in

18  charge of risk analytics in testing something of these products

19  while at Bellicose VI and Bellicose Capital?

20          A.   He was on the team.  And I don't know -- he may

21  have had a higher title than some.  There were, you know, John

22  Norris, for example, PhD.  And other guys who -- I just don't

23  remember if they reported to James in, like, a silo or if they

24  reported to me or Brian depending on time.  So I can't really

25  -- can't say.

1          But he was, you know, part of the risk team, analytics

2     team for obviously quite some time.

3          Q.     And so post-merger, was James Dowd still part of

4     the risk team of Ascension Technologies?

5          A.     I believe so.

6          Q.     Okay.  All right.  Given your experience in the

7     industry generally, do risks and response models or

8     underwriting models deteriorate over time?

9          A.     They can, yes.  I think it's -- not necessarily

10     all of them.  But if there, they can.

11          Q.     Is that one way -- because they can deteriorate,

12     what do you need to do to stay competitive?

13          A.     You know, I don't know that I can really point

14     to, like, a model-specific experience of degradation.  Because

15     I feel like you get so much information that comes in, and

16     you're evolving the models and the formulas just naturally

17     regularly.

18          So, I guess, if you're -- and this again is assuming

19     you're sort of at that level of operation.  But -- sorry.  I

20     may not have answered your question exactly.  I was pondering

21     risk and response models.

22          Q.     No.  We're kind of learning as we go.  Go ahead.

23          A.     Repeat what you said, please.  The question,

24     please.

25          Q.     Well, have you ever heard of the

1   Champion/Challenger testing?

2          A.      Yes.

3          Q.      Okay.  What is that?

4          A.      I think we use that term for different formulas

5   for lead acquisitions, from third-party lead providers, and

6   sort of the pre-qualified lead subject matter.

7          Q.      Okay.  Where did you use that before?

8          A.      Well, so you have different lead providers.  And

9   they go through different channels that, you know, would work

10  best for that lead provider to sort of qualify the lead.

11         And then if it was acceptable, it would go to the

12  lender's underwriting box.  And we would -- for that process,

13  for each of those, you know, you might have a different idea or

14  different way of qualifying the lead.

15         So you might look at, you know, a lead from LeadFlash

16  instead of going to -- you know, one credit bureau first, and

17  then another credit bureau second.  And, you know, whatever

18  rules are within those bureaus.  You rearrange things and set

19  different rules and parameters in there to get -- to run the

20  data through a different flow and see if the Challenger is

21  surpassing the Champion.

22         Q.      Did Bellicose VI or Bellicose Capital ever

23  utilize this test?

24         A.      I'm speaking specifically to my experience.

25  That would have been, like, 2013 or so.  And maybe prior at

 1  Bellicose.

 2          Q.      Okay.  So you're alleging that TED is refusing

 3  to give you current and accurate information about the location

 4  and relocation of records, accounts, and collateral, correct?

 5          A.      Yes.  I don't know if it was TED specifically.

 6  But TED or one of the subs or something.  I don't remember the

 7  details, but something along those lines.

 8          Q.      So where is the last place that you knew the

 9  records, accounts, or collaterals to be located?

10          A.      That's a -- let me think about that.  There's a

11  lot of collateral and separate entities.  So that's quite a

12  large scope to question.

13          I think it may be Ascension that had some changes to

14  collateral location.  I wouldn't say that -- go ahead.

15          Q.      I'm sorry.  And I'm just trying to understand,

16  because I had a hard time understanding this part of the

17  demand.

18          Are you talking about physical location?

19          A.      Well, I mean, you know, data is, you know,

20  barely physical.  But maybe, I don't know.  I don't know.

21          I remember that somebody had noticed us in one of those

22  business meetings that the Ascension collateral and things were

23  relocated to the reservation.  And -- I think it was Ascension.

24  Because I believe TED and BPL were always on reservation.  So,

25  I don't know.

Page 54

1          Q.      So is that move, is that the basis of your

2    demand?

3          A.      Yeah.  That was the basis for it.  It was a

4    comment.  Somebody had said that it had moved at one of those

5    meetings.

6          Q.      Okay.  And when you filed the demand, obviously,

7    you must have been upset about it.  How is it causing you harm?

8          A.      Well, I mean enforcing compliance of the note is

9    an expensive process.  And, obviously, if there were an issue

10   of foreclosure, then obviously the ability to monetize can have

11   a financial impact on timing and things, and locating

12   collateral.

13         Q.      Was the prior location before the move you're

14   talking about, was the prior location of the collateral on the

15   reservation?

16         A.      I don't know.  Like I said, I just remember

17   hearing what I heard.  And I don't know, you know, what the

18   exact collateral or reference about it entailed.

19         Q.      Okay.  And did you ever try to resolve the

20   relocation of the records, accounts, and collateral informally

21   with the tribe?

22         A.      Informally, well -- I mean, you know, I think

23   the -- I'm trying to think if there was any discussions about

24   it, you know, through the dispute resolution process that we

25   went through.

1          There may have been -- I don't know if you're

2     considering that formal or not either, I guess.  But I'm

3     thinking of informalizing a pre-arbitration.

4          And I think that was part of the notice of default or

5     maybe -- I don't know.  I don't remember if it was.

6          Q.     In this case?

7          A.     Yes.  In the arbitration.

8          Q.     Okay.  So you -- when did you have the

9     conversation where you heard about it?

10         A.     You know, I know there were, like, three

11    litigation meetings where we broke out for subsequent business

12    discussions.  And, I guess, maybe it was the mediation.  But I

13    don't remember which one that I noted that.

14         Q.     And did you express your displeasure with the

15    tribe when you heard about it?

16         A.     No, I didn't.  No, I didn't say anything

17    specifically when it was said.

18         Q.     How long ago were those litigation meetings when

19    you learned about it?

20         A.     I think one was April.  Was in 2019.  The one

21    before that might have been November or December 2018.

22         Q.     Okay.

23         A.     And then also I think the mediations were in

24    mid-2019 probably.  So somewhere in there I would presume.

25         Q.     Did you have business meetings with the tribe

1   between learning of the relocation and filing of the

2   arbitration?

3         A.      Well, again, I don't know if it -- for example,

4   if it was in June of 2019, then the last, you know, litigation

5   session that had a breakout for business was -- that I recall

6   was in April.  So I definitely can't tell you.

7         Q.      Okay.  With regards to the indemnification

8   claim, yesterday when I was asking you questions, Barney said

9   on the record that there's no claim in this arbitration where

10  TED is being asked to indemnify Matt personally.

11        Do you recall that?

12        A.      Yeah, I recall that.

13        Q.      Okay.  Eventide has brought indemnification

14  claims for both Eventide and Bellicose officers; is that

15  correct?

16                    MR. GIVEN:  You can answer.  And I can --

17                    Mr. ROSETTE:  Barney might want to testify.

18                    MR. GIVEN:  No, I'm not testifying.  I'm

19  telling Matt he can go ahead and answer if he understands.

20                    THE WITNESS:  I don't know what the exact

21  language says, but I don't know that the terminology used, it

22  probably isn't what's in there.

23                    MR. ROSETTE:  If it's helpful, I can

24  introduce the demand.  I'll just do that.  Can I -- let me get

25  the demand.

Page 57

1           Let me mark this as Exhibit 37.  And then I'll go ahead

2    and post it in the chat, and also email it to you, Barney.

3                 (Deposition Exhibit No. 37 marked.)

4                 THE WITNESS:  Can we take a quick bathroom

5    break real quick while you're doing that?

6                 MR. ROSETTE:  Of course.  Yes.  Thank you,

7    Matt.

8                 THE VIDEOGRAPHER:  The time is 11:02 a.m.

9    We are off the record.

10                (Break taken from 11:02 a.m. to 11:07 a.m.)

11                THE VIDEOGRAPHER:  The time is 11:07.  We

12   are back on the record.  This is the beginning of Media 3.

13          Q.    (BY MR. ROSETTE)  Okay.  Do you have

14   Exhibit 37, your arbitration demand in front of you?

15          A.    I've just opened it up.

16          Q.    Okay.  When you get it open, under the fourth

17   "Cause of action," turn to page 23.

18          A.    Okay.  I'm there.

19          Q.    Okay.  At the very top with little "A," could

20   you read what that says?

21          A.    "Failing to indemnify Bellicose Capital's former

22   officers and members, an obligation it assumed as part of the

23   agreement and plan of merger."

24          Q.    Okay.  Does that sound consistent with the claim

25   you're bringing?

Page 58

```
 1         A.      You know, I don't know.  I mean, obviously, it's

 2    in here in the claim.  My interpretation would have been

 3    through the indemnity of Bellicose -- I'm sorry.  The indemnity

 4    Eventide provides through its indemnification obligations and

 5    losses that it incurred to the folks who are indemnified by

 6    Eventide.  So I don't know if this is clarifying that or

 7    something different than that.

 8         Q.      Okay.  Did you ever formally request

 9    indemnification from Eventide?

10         A.      Formally, you know, I think as the manager and

11    president, I didn't necessarily, you know, write a resolution

12    to myself to document it.

13         I was just aware of the intent of the indemnity and the

14    transfer of the obligation of the Bellicose indemnity

15    obligation from Bellicose to Eventide in the assignment.

16         And so I know because I, you know, was involved in the

17    operating agreement, and making sure that the indemnity would

18    be as broad as possible.  Because we had indemnity, and we

19    weren't going to, you know, give up that indemnity.  That that

20    was always the intent.  So I just kind of knew already that

21    that's what -- what it was or how it was.

22         Q.      Okay.  For what cases do you believe you should

23    be indemnified from?

24              MR. GIVEN:  And Counsel, just -- are you

25    meaning Mr. Martorello, individually, or you're meaning ECA?
```

Page 59

1   Sorry.

2                      MR. ROSETTE:  Mr. Martorello individually.

3                      MR. GIVEN:  Okay.  Thank you.  Go ahead.

4                      THE WITNESS:  All of the cases in, I guess,

5   that I've been named in.  All of the cases that exist.  You

6   know, I don't think there's any that I'm excluded from.

7            Q.    (BY MR. ROSETTE)  Okay.  And so I'm happy Barney

8   clarified that.  Because -- let me ask the prior question

9   again.

10           Did you personally, not in your role as ECA, request --

11   formally request indemnification from Eventide?

12           A.    I'm sorry.  Can you please repeat that?  You cut

13   out a little.

14           Q.    Did you personally ever formally request

15   indemnification from Eventide?

16           A.    That was the question that I was answering.

17           Q.    Okay.  Thank you.  Did Justin Martorello ever

18   request indemnification from Eventide?

19           A.    Now, we may have had a conversation about it.  I

20   don't recall specifically.  But again, he would have been -- I

21   knew the intent of the indemnity and transfer through the

22   assignment and operating agreement.  And so I just would have

23   honored what I knew it was for anybody that's covered.

24           Q.    Okay.  When did you have that conversation?

25           A.    Well, like I said, I mean, he's my brother.  We

Page 60

1   talk.  I don't recall specifically that conversation.  But I'm

2   sure we've talked about him being indemnified, you know, maybe

3   more than once.  I don't know.

4           Q.      Okay.  You don't have anything in writing to

5   that effect?

6           A.      No.

7           Q.      How about Rebecca Martorello?  Did she ever

8   request indemnification from Eventide?

9           A.      By the way, I'm sorry.  Technically, there are

10  proof of claims filed in Texas, too, which are, I think,

11  probably these folks filing their formal requests in some

12  fashion.  I don't want to overlook those.

13          And Rebecca is one who did file that with -- each

14  person had supporting documents.  I don't know what her

15  supporting documents exactly were off the top of my head.  But

16  -- you know, and other than that, prior to that, I don't, you

17  know, recall there being a discussion about indemnity other

18  than that.  You know, kind of like the sanctions motion

19  basically says is, it's kind of ridiculous that she's being

20  harassed and brought into it.  It's really just an extension of

21  suing me or some of the other defendants, so...

22          Q.      Did Rebecca become aware of her indemnification

23  -- her alleged indemnification right from you?

24          A.      It's possible, you know.  I would think that's

25  quite likely.

1       Q.    And were you the person that decided who would

2  be indemnified?

3       A.    When --

4              MR. GIVEN:  Objection; what point in time,

5  Counsel?

6              MR. ROSETTE:  Since the first lawsuit was

7  filed.

8              THE WITNESS:  You know, I think kind of the

9  -- sorry.  So since the first lawsuit was filed, was I the

10  person who decided who had indemnity?  Is that your question?

11       Q.    (BY MR. ROSETTE) Yeah.  Under Eventide, yes.

12       A.    Yes.  At the time of the lawsuits, yeah.  I was

13  the manager.  President or the manager through Liont, LLC as

14  the manager.  And shortly after, the president.

15      And so, obviously, there were other managers that came

16  in, you know, in 2019 as you're aware.  But we're talking prior

17  to that.  So specific to that timeframe, yes, that was me that

18  makes that decision.

19       Q.    Okay.  I just have a few more questions.

20  These are sort of yes-or-no questions I'd like to ask so that

21  we can wrap this deposition up.

22      Yes or no, in your opinion, Big Picture can take

23  additional debt, or borrow money, without ECA's permission?

24       A.    You must be aware that it's hard for me to say

25  yes and no.  So your question is:  Yes or no, can -- there's so

1    much context --

2        Q.    It kind of goes to what the tribe can do to

3    operate its business.  But, yes, go ahead.  I don't want to

4    influence your answers.

5        A.    Okay.  So your question was:  Can the tribe take

6    on additional indebtedness without Eventide's consent?

7        And, you know, I would obviously look to the documents

8    to decide that.  And it says I think in there, that Eventide's

9    consent must be written, but it cannot be unreasonably

10   withheld, conditioned, or delayed, if I recall correctly.  So,

11   you know, there's context there that could go either way.

12       Q.    Okay.  So what if BPL is going to dip below the

13   $15 million minimum portfolio size?  Could Big Picture then

14   take additional debt without ECA's permission?

15       A.    I don't know.  I've never considered that issue.

16   I'd have to sort of look at the totality of the documents and

17   ask for a legal conclusion from the attorneys on that.

18       Q.    Okay.  But generally speaking, even under those

19   circumstances, you're in control as to whether or not they can

20   borrow their money, correct?

21            MR. GIVEN:  Object to form.

22            THE WITNESS:  I disagree with the term

23   entirely.  You know, we have creditor rights.  And those are

24   whatever we've agreed to.

25       The tribe can do anything that it wants to.  And some

Page 63

1   things that it does may trigger defaults or certain rights and

2   remedies that were granted.

3       Q.    (BY MR. ROSETTE)  Okay.  And what happens if it

4   triggers a default?  If their actions trigger a default?

5       A.    Throughout the term of the documents, I think

6   there are procedures in place for what happens there that I

7   couldn't detail for you off the top of my head.

8       Q.    Is one of the remedies you could pursue is

9   seizing the collateral on their default?

10      A.    Yes.

11      Q.    Okay.  So if BPL was going to dip below the 15

12  million portfolio size, and they took out a loan without your

13  permission, would that be a default?

14      A.    Well, that's the same question you asked me.

15  I'd have to look at the documents.

16      Q.    Not really.

17      A.    Well, you asked me if -- well, you asked me two

18  questions that this is sort of combining them.

19          And I mentioned there's context to the additional

20  indebtedness question.  And then you asked about the dipping

21  below 15 million.  And maybe you asked in the context of

22  raising debt to that end.

23          But I've never looked at the documents to try to see

24  what -- you know, to answer that with legal clarity.  I would

25  read them and talk with the attorneys about them.  And then

1  they'd basically probably give me an opinion.

2      Q.    So on these types of business decisions that the

3  tribe has to make, some of it is going to depend on legal

4  advice provided to you.

5      A.    No.  Like I said, the tribe can make whatever

6  decisions it wants to.  If it has an interpretation that it has

7  and it wanted to discuss it, you know, I think creditors are

8  always willing to discuss those things, which is probably

9  pretty common.

10     But, no, I disagree with your characterization.

11     Q.    Okay.  Let me ask another example.

12     If LVD wanted to invest its own tribal dollars into its

13  own company to cure an anticipated default, could it do so

14  without ECA's permission?

15         MR. GIVEN:  Object to form.

16         THE WITNESS:  Do you mean, like, if it

17  wanted to make an equity investment into the portfolio, or to

18  TED, or BPL or something?  Can it do so; is that your question?

19     Q.    (BY MR. ROSETTE)  No.  To lend its own tribal

20  dollars into its own tribal company.  I'm sorry.  I used the

21  word "invest," so thank you.  Let me re-ask the question.  I

22  think that's fair.

23     Can LVD lend its own tribal dollars to its own tribal

24  company, BPL, to cure an anticipated default without ECA's

25  permission?

1          A.     I would -- you know, I don't want to speculate

2     on the legal documents without them in front of me.  But that

3     would be -- you know, obviously, we haven't experienced -- not

4     in that scenario.  But we've experienced LVD providing debt

5     capital before.

6          And I think we all agreed that, you know, there were

7     some back and forth on those, and we got consent.

8          In the context that you're talking about, I would have

9     to look at the full documentation of what the documents say.

10    Because I think they -- yeah, I don't know the answer to that

11    without seeing what it says in there specifically.

12          Q.     So are these business decisions, then, governed

13    by the legal documents and your consent?

14          A.     No.  There are business decisions that are

15    governed by the people who make the business decisions.  And,

16    you know, I think, you know, the creditor rights and things are

17    just separate -- just a separate body of consideration, I

18    guess.

19          Q.     Okay.  Can the LVD Tribe take out a Paycheck

20    Protection Program loan, otherwise known as a PPP loan under

21    the CARES Act, which is fully forgivable, without ECA's

22    permission?

23               MR. GIVEN:  Okay.  And I'm going to object

24    to form because that misstates the law.  It can be fully

25    forgivable, but it may not be.  So -- he can answer the

1  question, but I disagree with your characterization of the

2  program.

3          But subject to that, Matt, you can answer.

4                  THE WITNESS:  Sorry.  I was going to answer

5  it.  I was actually going to say that from my understanding,

6  the PPP loans are not guaranteed to be forgiven.  And so it is

7  indebtedness, which may end up not becoming indebtedness, I

8  suppose?

9          Q.    (BY MR. ROSETTE)  What is your understanding

10  with regards to whether these loans are forgivable or not?

11          A.    From what I remember, it has something to do

12  with maintaining employees for some period of time.

13          Q.    Okay.  So if LVD was able to meet those

14  conditions, would they be able to take out one of these

15  forgivable loans without ECA's permission?

16                  MR. GIVEN:  Objection; calls for

17  speculation, calls for legal conclusion.

18          You can answer.

19                  MR. ROSETTE:  Okay.  Barney, you know, it's

20  really not speculation.  But you know this occurred.

21          Q.    (BY MR. ROSETTE)  So you can answer.

22          A.    So you're asking -- sorry.  Just repeat the

23  question, please.

24          Q.    We're asking whether the tribe, in the time of a

25  world pandemic, can tap into the Paycheck Protection Program,

1    and meet the qualifications to have it fully forgivable?  Can

2    it do that without your permission?

3         A.    I think that -- you know, like I said, it's

4    indebtedness unless it's not indebtedness.  And it's just an

5    uncertain outcome as if it is or isn't.  And so I would expect,

6    you know, under the terms as I understand them, for the

7    borrower and the creditor to have a conversation about that.

8    And understand, you know, for all -- for example, does BPL or

9    TED or whoever borrows money, intend on meeting the

10   obligations?  Does it not?

11        You know, you would have these sort of conversations, I

12   think, to get the consent.  And then through those discussions,

13   you might find that consent, or if there was withholding of

14   consent, was it reasonable or unfairly conditioned and, you

15   know -- or delayed or something, so...

16        Q.    So the tribe can't even take out a PPP loan to

17   pay its employees under the CARES Act unless you give them

18   their consent?

19             MR. GIVEN:  Object.  Object to form.

20        You can answer.

21        Q.    (BY MR. ROSETTE)  You can answer.

22        A.    The documents say what they say.  Like I said, I

23   think there would be conversations.  Somebody would have, you

24   know, discussed it with their creditor or creditors.

25        I don't even know, honestly, if it's subordinate or

Page 68

1    senior.  And I just don't know enough to sort of delve into the
2    whole ball of wax there.
3          Q.     Were you aware that -- have you or your
4    representative ever demanded all of the proceeds to be
5    immediately paid over to ECA, from those PPP loans?
6          A.     I think I remember seeing an email, was it?
7          Q.     Correct.
8          A.     Yeah.  I think I remember seeing an email
9    between the attorneys -- Logan and Rosette.  Something like
10   that.
11         Q.     And are those your attorneys that sent that
12   email to Rosette?
13         A.     By "your," you mean Eventide?
14         Q.     Yes.  Eventide's attorneys, yes.
15         A.     Yes.  Yeah.  Barney -- yes.
16         Q.     And so if you don't give consent for the PPP
17   loan, then you believe you're entitled to all proceeds of the
18   PPP loan, correct?
19                     MR. GIVEN: Object to form.
20                     THE WITNESS: I'm sorry.  You said, "If you
21   don't give consent," then what?
22         Q.     (BY MR. ROSETTE) If you don't give consent for
23   the tribe's PPP loan in this pandemic, then you believe that
24   that money should be immediately given to you; is that correct?
25                     MR. GIVEN: Object to form.

1                    THE WITNESS: I don't know.  I'd have to

2    look through the -- you know, like, the waterfall calculation

3    of cash and flow comes to mind.

4         I don't know how all that comes together as a -- from a

5    legal standpoint.

6         Q.    (BY MR. ROSETTE)  I mean, these are business

7    people -- the tribe are business people making business

8    decisions for their company.  Your demand is to have them

9    immediately send that money to you instead of pay their

10   employees.

11                   MR. GIVEN:  Object to --

12        Q.    (MR. ROSETTE)  Do you believe that's a

13   reasonable --

14                   MR. GIVEN:  Object to form.  Assumes facts

15   not in evidence.

16        You can answer.

17                   THE WITNESS:  I mean, I'm not even sure if

18   that money went to pay the employees.  I think the business

19   generates significant revenue to pay the employees and always

20   has.

21        So, again, there's so much context in there, that I

22   just -- you know, I can't tell you the sort of legal outcome of

23   all that.

24        Q.    (BY MR. ROSETTE)  Okay.  So regardless of

25   whether it was used for the employees, Matt, you believe that

1   money belongs to you, correct?

2                        MR. GIVEN:  Object to form.

3                        THE WITNESS:  You said regardless of

4   whether it's used to pay employees --

5        Q.    (BY MR. ROSETTE)  Regardless of -- sure, sure.

6   I mean, you have currently a demand on the business leaders of

7   BPL to send the PPP loan to you, correct?

8                        MR. GIVEN:  Objection.  Do you mean ECA?

9                        MR. ROSETTE:  Yes.

10                       THE WITNESS:  Yes, yes.

11       Q.    (MR. ROSETTE)  Do you think that's a reasonable

12  position to take?

13                       MR. GIVEN:  Object to form.

14                       THE WITNESS:  It's a loan.  And there's

15  provisions requiring additional indebtedness and written

16  consent for it.

17       So the PPP loan is a very unique thing.  I know there's

18  a forgiveness provision relative to maintaining employees.

19       You know, I don't -- so I think from the language of

20  the documents, it is a reasonable position.  Because additional

21  indebtedness requires written consent.  And there are reasons

22  that that consent, from my recollection at least, cannot be --

23  it cannot be unreasonably withheld, conditioned, or delayed.

24       And maybe through those conversations, or maybe subject

25  to the use of the capital or the reason for it, or the grant of

1  it, that it would be unreasonable to withhold the consent.

2  We've never had those discussions, so I don't know.

3           Q.     (BY MR. ROSETTE)  Okay.  Let me move on.

4           Yes or no, in your opinion, Big Picture can change its

5  lending products without ECA's permission?

6           A.     Yes.

7           Q.     Yes or no, BPL, in your opinion, can evolve its

8  underwriting criteria with risk-base pricing without ECA's

9  permission?

10          A.     I don't recall any consent requirements in the

11 documents, so I believe so.

12          Q.     Yes or no, Big Picture can book past bad debt

13 expense without ECA's permission?

14          A.     Can book bad past, bad debt expense?  Can you be

15 more particular about what you mean?

16          Q.     Yes.  The $2 million that carried over from the

17 merger from Bellicose VI and Bellicose Capital books, that

18 carried over onto the merger with TAC, eventually BPL.

19          A.     Okay.  I would like to -- I don't want to do

20 this, but I would like to look at the note.  Because I --

21          Q.     Sure.

22          A.     It may be in there that it's supposed to be

23 written off if it's greater than 60 days or something.  I can't

24 remember what the language is.

25          Q.     It's Exhibit 3, Matt.  Can you pull that back up

Page 72

1    if you've got it?

2            A.      You know I probably can.  I think I can, Rob.

3    Hold on one second.  Okay.

4            Q.      I'm looking for it as well, the section.  Okay.

5    If you go to page 3 of the .pdf, I believe section 3.  Going

6    through the waterfall and deductions.

7            One of the deductions is, "All interest accrued and

8    scheduled principle payments on any senior debt for the terms

9    of the respective debt instrument, and any debt balancing

10   requirements."

11           A.      That wouldn't be -- that wouldn't be it.  That's

12   relative to a creditor, accrued interest, and scheduled

13   principle payments.

14           Q.      Okay.  You want to work through the rest of the

15   note and tell me where you think it might be or if it's not in

16   there?  If it's not in there, that's fine.

17           A.      Yeah.  I'm trying to check, like, some of the

18   definitions.

19           Q.      Okay.  Take your time, please.

20           A.      I'm sorry.  I thought it would be much clearer

21   than this.  I don't see any specific language about -- about

22   bad debt in this provision unless I'm missing something.

23           So I would have to do a little more diligence to answer

24   that question specifically.

25           Q.      Okay.  Let me ask this:  Is Eventide in control

1  of how bad debt is booked?

2          A.      No.

3          Q.      Yes or no, in your opinion, if TED overpays on

4  the ECA note, can it correct the mistake without ECA's

5  permission?

6                  MR. GIVEN:  Object to form.

7                  THE WITNESS:  If it overpays.  You mean to,

8  like -- can you give me an example of what that would look

9  like?

10         Q.      (BY MR. ROSETTE)  Yeah.  Let's say if bad debt,

11 for example, was not booked.  It could potentially create a

12 situation where it wasn't deducted out of the waterfall, and

13 then result in a higher payment to Eventide.

14         A.      Okay.  And then the question was?

15         Q.      If TED overpays on the ECA note, can it correct

16 the mistake without ECA's permission?

17         A.      I don't know.  That's a little too technical of

18 a legal question for me.  I don't -- you know, I know there's,

19 like, provisions around, like, set-offs and things.  I don't

20 know if those are relevant or not.  And I'm not a lawyer to be

21 able to say that.

22         But, you know, obviously I just think in terms of if I

23 had accidentally overpaid my car payment or something.  I don't

24 know what the process would be.  I'd probably have a

25 conversation, and then somehow that's resolved.  I don't know

1  how legally that works, or what the rights are around that.

2      Q.    Okay.  Yes or no, in your opinion, Big Picture

3  can pay attorneys or settle the nine RICO cases around the

4  United States using Big Picture's revenue without ECA's

5  permission.

6              MR. GIVEN:  Object to form.

7              THE WITNESS:  The settlement agreement is

8  additional indebtedness and impairment of collateral, and

9  probably some other issues or things that we've pointed out in

10 the complaint.  And additional indebtedness requires consent.

11 And some of the other provisions are at play, too.

12     So that, you know, again, the tribe can do whatever it

13 wants to do.  There are just, you know, covenants to lenders

14 that could be triggered for things that it does.

15     Q.    (BY MR. ROSETTE)  So yes or no in your opinion,

16 Big Picture can pay attorneys or settle the nine RICO cases

17 around the United States, using Big Picture's revenue without

18 ECA's permission.

19              MR. GIVEN:  Object to form.

20     Q.    (BY MR. ROSETTE)  Yes or no?

21     A.    Can you repeat the question, please?  They can

22 pay the legal expenses related to what --

23              MR. GIVEN:  No.  Listen carefully to the

24 question, Matt.  That's not what he's asking.

25     Can you repeat the question, please?

1              MR. ROSETTE:  Yes.  Thank you, Barney.

2        Q.    (BY MR. ROSETTE)  In your opinion, Big Picture

3   can pay attorneys or settle the nine RICO cases around the

4   United States using BPL's revenue without ECA's permission?

5              MR. GIVEN:  Object to form.

6        Q.    (BY MR. ROSETTE)  Let me restate that question,

7   because I stuttered.

8        A.    Okay.

9        Q.    Big Picture can pay the legal fees, or settle

10  the nine RICO cases around the United States using Big

11  Picture's revenue without ECA's permission?

12             MR. GIVEN:  Object to form.

13             THE WITNESS:  Well, it's sort of two parts.

14  I think the second part about the settlement, we just talked

15  about.

16        The first part about the legal fees, I don't think that

17  -- I think those were a breach of the transaction documents.

18        Q.    (BY MR. ROSETTE)  Why do you believe that?

19        A.    There's -- you know, the litigations are not

20  necessarily a ordinary expense.  And also may rise to the event

21  of material adverse effect.

22        I think there's some provisions about what would be

23  allowable in those contexts, if at all.  And so I'd have to go

24  back and look at the documents.  But those are the things that

25  first come to mind.

Page 76

1          Q.    So -- I don't want to take your testimony out of

2    context.  But you're saying that if the legal expenses are an

3    unordinary expense, then we would need ECA's permission?

4                         MR. GIVEN:  Object to form.

5                         THE WITNESS:  I'd have to look through the

6    documents exactly how it all ties together.  But I think the

7    deductible expense is under the waterfall is what I'm talking

8    about.

9          You know, as I've said repeatedly, I think the tribe

10   can do anything that it wants to do.  But the documents, you

11   know, have certain rights and remedies.  And so, you know, if

12   it triggers those, then that's the decision.

13         Q.    (BY MR. ROSETTE)  Okay.  So the tribe is really

14   trying to understand the claims against it.  So let me break it

15   into -- handle these legal expenses first on these nine RICO

16   cases.

17         Do you believe that the tribe can pay its legal

18   expenses without your permission?

19                         MR. GIVEN:  Object to form.

20         You can go.

21                         THE WITNESS:  In regards to those RICO

22   cases, the tribe -- I mean, obviously, again, it can do what it

23   wants to do.  If it's a default, that's a different question.

24         Q.    (BY MR. ROSETTE)  Well, if the tribe can't use

25   the revenue to pay for litigation expenses, where are they

1  supposed to get the money?

2              MR. GIVEN:  Object to form.  Assumes facts

3  not in evidence.

4              THE WITNESS:  To pay the legal expenses?

5  Yeah, I don't know.  I would have to, you know, do an analysis

6  about what borrowing capabilities or equity value.  Or maybe

7  they, you know, have capital.  I don't know the scenario.  I

8  don't know the situation.

9      Q.    (BY MR. ROSETTE)  Well, if they don't have the

10  money to pay for litigation expenses out of revenues, are they

11  supposed to go bankrupt?

12              MR. GIVEN:  Object to form.  Calls for

13  speculation.  Assumes facts not in evidence.

14              THE WITNESS:  Well, like I said, I know I

15  would expect some analysis that would check what sort of

16  borrowing capabilities or capitalization.  You know, same thing

17  I'd just said.

18      I would look at -- if I were in their shoe, I guess,

19  that's what I would analyze or, you know, try to figure out

20  what my options were.

21      Q.    (BY MR. ROSETTE)  So the legal expenses would

22  probably have to come from a third-party, correct?

23              MR. GIVEN:  Object to form.

24              THE WITNESS:  No.  I think you're -- no.

25  No, no.  You're saying the legal expenses would be paid by

1  whoever pays them, right?  I think in terms of capitalization

2  or funding of it, like I said, it could come from a number of

3  sources.

4      I don't know the, you know, financial wherewithal or

5  liquidity of the tribe or its assets, or its ability to

6  collateralize things, or its interest even in doing so.

7      You know, there's potentially -- businesses can just

8  decide that, you know, it's not worth capitalizing a business

9  for some event, and maybe there's another path.

10     So those are all just things that I think a business

11 owner would assess in a liquidity situation for something in

12 that capacity.

13     Q.    (BY MR. ROSETTE)  So if the tribe, as business

14 owners, didn't have your permission to pay legal expenses out

15 of revenue, and the tribe -- after all, we're talking about the

16 LVD Tribe in Upper Peninsula here -- didn't have the money to

17 pay for those legal expenses, then they would have to -- is one

18 option the ability to seek a loan?

19             MR. GIVEN:  Object to form.

20             THE WITNESS:  You know, I hate to be

21 repetitive, but there could be other options.  I don't know how

22 many different options there are for LVD's choosing or what the

23 worth of it is to them to make those choices.

24     But they really could, or theoretically should or

25 would, analyze what those options are, and decide if that's an

1  investment they want to undertake.

2          Q.      (BY MR. ROSETTE)  Is one option to take a loan

3  from a third party?

4                      MR. GIVEN:  Object to form.

5                      THE WITNESS:  I mean, of course they could

6  consider in some form how they could borrow money.  Like I

7  said, I think the equity -- you could borrow against the

8  equity, or maybe, you know, work something out with your

9  creditors.  Or, you know, pure equity investment, of course.

10         Debt comes in all different shapes and sizes.  And

11  there's different ways to do things.  So, yeah, there's a lot

12  of options.

13         Q.      (BY MR. ROSETTE)  And even that loan would need

14  your permission, correct?

15         A.      And again, I think the provision is probably

16  subject to a reasonability standard that would have to be

17  assessed.

18         And so in the context of what we're talking about, we

19  probably would look to that and, you know, have discussions

20  about it.

21         Q.      But regardless of reasonability standard,

22  whether it's reasonable or unreasonable, it needs your

23  permission, correct?

24         A.      The provision says, "Written consent required

25  for additional indebtedness."  And I think it says something

Page 80

1    about, "Unless the consent is unreasonably withheld,

2    conditioned, or delayed."

3         Q.    So it's your testimony, then, that the payment

4    of these legal expenses requires your consent?

5              MR. GIVEN:  Object to form.  That misstates

6    his testimony.

7              THE WITNESS:  It does misstate my

8    testimony.  I think I've said a couple of times.

9         Q.  (BY MR. ROSETTE) Let me ask:  Do you believe the

10   legal expenses for this litigation requires your consent?

11             MR. GIVEN:  Objection; asked and answered.

12             THE WITNESS:  I agree.  I think I've

13   answered it a couple of times.  As I said, the tribe can do

14   whatever it wants to do.  There are rights, and remedies, and

15   obligations that it has agreed to.

16        And, you know, it's its own decision if it decides to

17   do something.  And, you know, creditors have certain rights

18   granted to it that, you know, are part of that equation.

19        Q.    (BY MR. ROSETTE)  And if the tribe decides to

20   pay those litigation expenses, then ECA has the right to sue

21   them, correct?

22        A.    If it's -- yeah.  If it's a breach, then yes.

23        Q.    Okay.  And yes or no, in your opinion, did the

24   tribe have the right to settle the nine RICO cases around the

25   United States using BPL's revenue without your permission?

JA3456

1          A.     I think that was a breach of the transaction

2    documents.

3          Q.     And so if they do that without your permission,

4    then you could sue them, correct?

5          A.     Yes, that's correct.

6          Q.     And so where would the tribe get the money to

7    pay that settlement, if not out of the business?

8                      MR. GIVEN:  Objection; calls for

9    speculation.

10                      THE WITNESS:  Yeah.  I think we -- I feel

11   like I've answered that a couple of times.  I don't know.  That

12   would be for the tribe to assess the things I've -- the various

13   things I've talked about, I don't want to repeat again.  We can

14   refer to those again, but -- I'd just repeat that answer.

15         Q.     (BY MR. ROSETTE)  If the tribe doesn't have the

16   money to pay for the settlement towards this, then are they

17   just forced to continue litigating?

18                      MR. GIVEN:  Object to form.

19                      THE WITNESS:  No, there are a lot of other

20   options I'm sure.  You know, like, negotiating a settlement

21   that it can afford, or that it's going to pay out of its, you

22   know, its future cash flows that are not part of the collateral

23   or something.

24         I mean, like I said, there's -- there's a number of

25   considerations and options.

1          Q.      (BY MR. ROSETTE)  So there are other options

2    that you might consent to?

3          A.      Maybe, yeah.

4          Q.      And so if the tribe pursued one of those other

5    options, you would consent to the settlement with the

6    plaintiffs essentially?

7                  MR. GIVEN:  Object to form.  Calls for --

8    it's an incomplete hypothetical.  He would need to know what

9    the context of those options are.

10         Q.      (BY MR. ROSETTE)  What are your problems --

11                 MR. ROSETTE:  I can do a better job,

12   Barney.  Thank you for pointing that out.

13         Q.      (BY MR. ROSETTE)  What are your issues with the

14   settlement, itself, that the tribe negotiated?

15         A.      Well, I think they, you know -- it's a breach of

16   the documents, and the various ways laid out within the

17   complaint.  So that's one issue.

18         I think the total dollar impact is, in my opinion, is

19   high.  And especially relative to, you know, the facts and the

20   reality, and the Fourth Circuit's opinion.

21         I think the other problem is that it doesn't really

22   resolve anything for the continuity of the tribe's business.

23   Because the non-tribal defendants are left trying to defend the

24   legality and propriety of not just the Choice-of-Law provision

25   or tribal lending, or the use of the internet generally in some

1    respects in Indian country.

2        But also the TFSRA and the LVD court, with its hands

3    tied behind its back because it doesn't have access to any of

4    that data or information, and doesn't have the defendant -- the

5    primary defendant for those sort of tribal issues to be there

6    to do anything to help it.

7        So it's a -- there's no -- it's a worst-case scenario

8    going forward.  And for the tribe included.  And for those

9    legal arguments.  And does nothing for the continuity.

10       Because if the rulings come down unfavorably, then,

11   obviously, the tribe is out of business and maybe -- you know,

12   maybe it's even a broader implication on, you know, travel use

13   of the internet or something.

14       Q.    And so are those some of the reasons why you

15   won't provide your consent for the settlement?

16       A.    Well -- yeah.  I mean, they're all sort of part

17   of a discussion that would go towards, like, a consent

18   discussion.  And I know, obviously, all those factors come to

19   mind.

20       Q.    And so regardless of whether the tribe meets or

21   has its own reasons for settling nine RICO lawsuits, at the end

22   of the day, it's going to be driven by your reasons, correct?

23              MR. GIVEN:  Object to form.

24              THE WITNESS:  No, that's incorrect.

25       Q.    (BY MR. ROSETTE)  So they can settle the lawsuit

Page 84

1  without your consent?

2               MR. GIVEN:  Object to form.  This has been

3  asked and answered now at least five times.

4               MR. ROSETTE:  It's been asked, it's been

5  answered differently at least five times, Barney.

6               MR. GIVEN:  Well, you're asking the same

7  question five different ways seeking a different answer.  Go

8  ahead.

9               MR. ROSETTE:  I've been asking the same

10  yes-or-no question five times, I think you said.

11     Q.    (BY MR. ROSETTE)  Matt, can the tribe settle

12  nine RICO lawsuits around the United States for racketeering

13  and corruption without your consent?

14     A.    You know, the same answer.  The tribe can do

15  anything it wants to.  You know, that's a separate issue then.

16  Consent in the transaction documents.

17     Q.    But if the tribe doesn't get your consent, you

18  can sue them, correct?

19     A.    That's correct.

20     Q.    Thank you.  So given your past and present

21  experience acting as an executive, owing a company a fiduciary

22  duty, in your opinion, do you believe the co-managers of BPL

23  owe BPL a fiduciary duty?

24               MR. GIVEN:  Objection.  Calls for legal

25  conclusion.

1                     MR. ROSETTE:  I'm asking about his own

2  opinion given his experience.

3                     MR. GIVEN:  Okay.  Same objection.

4          You can answer.

5                     THE WITNESS:  I don't really -- I've never

6  delved into the fiduciary duty, you know, legal obligations or

7  how any of that works.  So I can't -- even in my experience,

8  I've never -- I don't have any experience to answer that with.

9          Q.    (BY MR. ROSETTE)  Okay.  That's fair.

10         Given your experience and then your opinion, if an

11  executive owes a fiduciary duty to its company, in your

12  opinion, is that duty supplanted by a contractual obligation

13  the company owes a third party --

14                     MR. GIVEN:  Objection --

15         Q.    (BY MR. ROSETTE)  -- or a lender?

16                     MR. GIVEN:  I'm sorry.  Objection.  Calls

17  for legal conclusion, and it's a hypothetical.

18                     THE WITNESS:  Again --

19         Q.    (BY MR. ROSETTE)  You can answer the question,

20  though.

21         A.    Yeah, same answer.  I think -- that's -- I don't

22  know.  It's a legal conclusion, I agree.  It's beyond my scope

23  of expertise.

24         Q.    Okay.

25                     MR. ROSETTE:  Can I have just a two-minute

Page 86

1    break, Barney?  We might be finished.

2                        MR. GIVEN:  Sure.  Okay.

3                        THE VIDEOGRAPHER:  The time is 11:59.  We

4    are off the record.

5         (Break taken from 11:59 a.m. to 12:03 p.m.)

6                        THE VIDEOGRAPHER:  12:03, we're back on the

7    record.

8                        MR. ROSETTE:  Barney, do you have any

9    questions?

10                        MR. GIVEN:  I do.  I do.  I just have a

11   few.

12                        MR. ROSETTE:  Okay.  Would you mind if I

13   just ask one more, and then turn it over to you?

14                        MR. GIVEN:  Sure.  Not a problem.  Go

15   ahead.

16        Q.    (BY MR. ROSETTE)  Okay.  Matt, if BPL continues

17   to fight the eight RICO in corruption claims against it and

18   lost, would it have a material adverse effect on the ECA loan?

19        A.    If it fights and loses in regards to the

20   breakthrough factors or a different issue?

21        Q.    With regards to any one of the racketeering and

22   corruption lawsuits around the United States.  If it lost any

23   one of those, would it have a material adverse effect on the

24   ECA loan?

25        A.    And so you're not talking about immunity, you're

1    talking about the actual merits, right?

2         Q.      I'm talking about immunity, merits.  Any kind of

3    loss.

4         A.      I guess -- well, frankly, I think there's no way

5    you lose on any breakthrough factors.  Two of them weren't even

6    disputed.  But -- and some of them just simply can't be --

7    can't be changed.  And that, I think, is solid.

8            I guess moving to the merits then, you know, if there

9    were -- again, I don't -- obviously wouldn't think you would

10   lose.  It would be an incorrect decision if you did.  But it

11   would be a material adverse event per the definition of that

12   term.

13           And then, you know, obviously we'd have to have a

14   discussion about what happens from that.

15        Q.      Right.  If we lost.  But, you know, it's because

16   you don't think we'll lose, that's why you don't want to give

17   your consent for the settlement; is that right?

18                   MR. GIVEN:  Object to form.

19                   THE WITNESS:  No, that's not -- that's not

20   accurate.

21        Q.      (BY MR. ROSETTE)  Okay.  Explain.  Why don't you

22   want to give consent to the settlement?

23                   MR. GIVEN:  I just -- asked and answered.

24   It misstates the testimony.  He didn't -- he wasn't saying

25   about consent.  He explained consent and a breach are two

Page 88

1   different things.  My God.  We've gone over this.

2          Go ahead, Matt.

3                    MR. ROSETTE:  Barney.

4                    MR. GIVEN:  One more time.  Go ahead, Matt.

5   One more time.

6                    MR. ROSETTE:  And he said I was wrong.

7                    MR. GIVEN:  Right.

8          Go ahead, Matt.

9                    THE WITNESS:  What's the open question?

10  I'm sorry.

11         Q.    (BY MR. ROSETTE)  Okay.  You've just stated that

12  you think we'll win.  Is that part of the reason why you would

13  not consent to a settlement?

14                    MR. GIVEN:  Object to form.

15                    THE WITNESS:  Part of the reason, I guess

16  -- you know, there's a lot to consider.  And, you know, the

17  situation, the circumstance, everything.  I mean, I don't know

18  that I could pin that down.

19         Q.    (BY MR. ROSETTE)  But that's part of the reason?

20         A.    Is that I think you'll win?  Yes.  I would agree

21  that, yeah, there probably is not a hard road for you ahead.

22         Q.    Matt, that's good.  Thank you.  I hope you're

23  right.

24                    MR. ROSETTE:  Barney, go ahead and ask your

25  questions, please.

1                          MR. GIVEN:  Sure.  Can you-all put Exhibit

2   3 up?  The promissory note?

3                          MR. ROSETTE:  Sure.

4                          MR. GIVEN:  Thanks.  Or Matt, can you find

5   it?  Sorry, Matt can you find it?

6                          THE WITNESS:  I've got it.

7                          MR. GIVEN:  He's got it.  Okay.

8                               EXAMINATION

9   BY MR. GIVEN:

10          Q.     Mr. Martorello, you have Exhibit 3 in front of

11   you?

12          A.     Yes.

13          Q.     Can you please turn to section 4 under

14   "Expenses"?

15          A.     Yes, I'm there.

16          Q.     And does this provide that in order to be

17   deductible with respect to a non-affiliate, that they need to

18   be ordinary and necessary business expenses?

19          A.     Yes.

20          Q.     Does it also require that the expenses not

21   exceed the market price under which a prudent operator would

22   acquire such services?

23          A.     Market price and market service level under

24   which, yes.

25          Q.     Okay.  Do you know if the Rosette Law Firm was

Page 90

1    ever affiliated with the tribe?

2         A.    No.  I think they're an independent law firm.

3         Q.    Okay.  And, sir, with respect to -- I'm going to

4    have you turn now --

5              MR. GIVEN:  And I don't know what the

6    number is, guys, I'm sorry.  It is the Loan and Security

7    Agreement.  I'm not sure what number it is.

8              THE WITNESS:  I think it's 7.

9              MR. GROSSWENDT:  Yes.  This is Exhibit 7.

10              MR. GIVEN:  Okay.

11         Q.    (BY MR. GIVEN)  Mr. Martorello, please turn to

12    Exhibit 7, Section 4.20.

13         A.    I'm sorry.  I see 4.19.

14         Q.    No, 4.20.

15              MR. GIVEN:  Am I looking at the wrong

16    document?  Hang on.

17              THE WITNESS:  What's the title of the

18    provision?

19              MR. GIVEN:  The Loan and Security

20    Agreement.  Wait one second.  Yeah, I'm looking at the thing in

21    back.  Hang on.

22         Well, it's all part of the same -- hang on.  Bear with

23    me one second.

24         Q.    (BY MR. GIVEN)  Can you go to page seven- -- is

25    there a page 17 on that document?

Page 91

1        A.    Yes.

2        Q.    And is there a section 4.21 on page 17?

3        A.    Not on this document.  Not on the one on the

4    screen right here.

5        Q.    Looking for the additional --

6              MR. GIVEN:  Looking for the additional --

7    Will, can you help me?  The Additional Indebtedness section,

8    please?  What section that is?

9              MR. GROSSWENDT:  5.1.

10             THE WITNESS:  5.1.  I think it's 5.1,

11   Limitations on Indebtedness?

12             MR. GIVEN:  Yes.  Okay.  Thank you.  Thank

13   you.

14             MR. ROSETTE:  Thank you.

15             MR. GIVEN:  Okay.  Thank you so much.

16       Q.    (BY MR. GIVEN)  Sir, and thank you.  I had this

17   sort of in the wrong section.

18       Sir, 5.1 is a negative covenant executed by the

19   borrower, correct?

20       A.    Correct.

21       Q.    Now, with respect to the -- there was a

22   Memorandum of Understanding entered into between the tribe and

23   the consumer borrowers.  Are you aware of that?

24       A.    Yes.

25       Q.    When did you first become aware of that?

JA3467

Page 92

1        A.    I don't remember.  It was an unfolding of

2   events.  Maybe it was in the fall of 2019.

3        Q.    Did the tribe advise you prior to entering into

4   the MOU that they were going to?

5        A.    Yes.

6        Q.    Wait a second.  They advised you before they

7   signed the MOU they were entering into the MOU?

8        A.    Well, through the mediation, I think we had

9   discussions about a settlement agreement.

10        Q.    Okay.  Did you see a copy of the MOU

11   before -- were you provided a copy of the MOU before they

12   signed it?

13        A.    Oh, no, I was not.

14        Q.    Okay.  And does the MOU cause the tribe to incur

15   additional indebtedness?

16        A.    Yes.

17        Q.    In what ways?

18        A.    I think the two provision that I remember off

19   the top of my head is there's a term for $8.7 million to be

20   paid over two years.

21        And then there's a cap on the amount that can be

22   collected up to 2.5 times the principle lent.

23        Q.    And do you have any understanding as to what the

24   economic effect of the cap is?  That dollar amount?

25        A.    I do.

1          Q.      Well, what is that?

2          A.      I think it was explained as somewhere in the 13

3    million, 13.2 million or so range.

4          Q.      And has the tribe ever advised you that

5    notwithstanding their commitment now to pay, essentially, give

6    $20 million in value to the consumer borrowers, that they're

7    still going to pay ECA first on its obligations as the first

8    lienholder?

9          A.      Sorry.  Can you please repeat that?

10                 MR. GIVEN:  Court reporter, can you please

11   read that question back?

12                 THE REPORTER:  "Has the tribe ever advised

13   you not withstanding their commitment to pay essentially --

14   give $20 million in value to consumers -- they're going to pay

15   ECA first under obligations to the first lienholder."

16         Q.      (BY MR. GIVEN)  Do you need me to rephrase?

17         A.      Yes

18                 THE REPORTER:  Sorry.

19                 MR. GIVEN:  I'll just rephrase.

20         Q.      (BY MR. GIVEN)  Does ECA have a lien on

21   collateral of the tribe?

22         A.      Yes.

23         Q.      Does that include the proceeds from the

24   operation of the business?

25         A.      Yes.

Page 94

1          Q.      And if EC- -- if the tribe pays the

2    consumer/borrowers and does not pay ECA, is that a breach of

3    the secured promissory note, Loan and Security Agreement?

4          A.      Yes.

5          Q.      Sir, with respect to the PPP loans, did the

6    tribe advise you -- give you any notice before it sought those

7    loans?

8          A.      No.

9          Q.      Did it seek your consent after the fact?

10         A.      No.

11         Q.      Okay.  Sir, do you have any idea of

12   approximately how much cash was on hand as of the last monthly

13   report you received from Ms. Hazen?

14         A.      It was somewhere around $20 million.

15         Q.      Okay.  So according to what Ms. Hazen told you,

16   there was $20 million cash on hand, but yet the tribe took

17   approximately $1 million in loans; is that your understanding?

18         A.      If you're referring to the PPP loans, yes.

19         Q.      Okay.  And the loan that was discussed

20   yesterday, I believe it's PMOF or PMOS.  Did the tribe notify

21   you -- did they seek your consent in advance of taking that

22   loan?

23         A.      I believe the process to seek consent began, and

24   documents were exchanged.  And then for whatever reason, I

25   guess they never really specifically asked for consent.  They

Page 95

1    just did the deal.

2         Q.    Okay.  Sir, there were some testimony yesterday

3    about -- in an exchange you had with Simon Liang about some tax

4    issues.  Do you recall that testimony, or that line of

5    questioning?

6         A.    I do.

7         Q.    And part of the exchange involved a discussion

8    about, possibly, about clarifications to the note.  Do you

9    recall that exchange?

10        A.    Yes.

11        Q.    Did you ever direct Simon Liang or anybody at

12   the tribal entities to change the terms of the note?

13        A.    No.

14        Q.    Did you ever even ask Simon Liang or anybody at

15   the tribe to change the terms of the note?

16        A.    No.

17        Q.    Well, have the terms of the note ever been

18   changed?

19        A.    I just want to clarify:  There was the issue we

20   were talking about.  We were contemplating if changes were

21   necessary.  And that discussion happened as well with Karrie.

22   And so I don't know how that fits into your question.

23        Q.    Well, did the note ever change?

24        A.    No.

25        Q.    Did the note ever get changed?

1          A.      No.

2          Q.      Okay.  And I think Mr. Rosette yesterday was

3    asking you about what -- you know, how this settlement may

4    actually be a good deal for ECA.  Do you think the settlement

5    is a good deal for ECA?

6          A.      No.  I just articulated, I think, the details of

7    that.  And I think yesterday, the specific question maybe he

8    asked was a little different.

9          I thought it was that some of what came out of the case

10   supported the defense.

11         Q.      Okay.  Sir, do you think that the tribe paying

12   legal fees to fight ECA is an ordinary necessary business

13   expense?

14         A.      No.

15         Q.      And has the tribe been deducting those legal

16   fees from what otherwise would go to ECA?

17         A.      Yes, I believe so.

18         Q.      Okay.  Did you or your counsel at the mediation

19   before Judge Novak -- well, strike that.

20         Did you or your counsel after ECA learned that the MOU

21   was entered into, request that the tribe send a copy of the

22   MOU?  Provide us a copy?

23         A.      I think we had requested the MOU, yes.

24         Q.      And did the tribe honor that request?

25         A.      No.

1        Q.     Was the first time you saw the MOU when the

2    interim settlement approval was filed with Judge Payne?

3        A.     Yes.

4        Q.     And was that several months after the MOU

5    appeared to have been entered into?

6        A.     Yes.  I think that was around Thanksgiving.

7        Q.     Okay.  And, sir, Mr. Rosette kept asking about

8    consent for loans.  But the additional indebtedness is --

9    strike that.

10            Does ECA have the ability to hire and fire tribal

11    employees?

12        A.     No.

13        Q.     Does ECA control what contracts with third-party

14    vendors that the tribe enters into?

15        A.     No.

16        Q.     Does ECA negotiate, like, leases for office

17    space of the tribe?

18        A.     No.

19        Q.     Does ECA direct the tribe on how it should deal

20    with any pension plans or retirement plans?

21        A.     No.

22        Q.     Does ECA have any involvement in the tribe's HR

23    operations?  How it deals with its human resources?

24        A.     No.

25        Q.     Do you believe that ECA controls the tribe's

1    operations?

2          A.    No.

3              MR. GIVEN:  One second.  I only have a few

4    more questions, Rob, and then I'm done.

5          Q.    (BY MR. GIVEN)  There was discussion yesterday,

6    and I think we talked about it a moment ago.  Just right now

7    about this, you know, this -- you had some exchange with -- let

8    me ask it this way.  It's poorly worded.

9          Why would you contact -- I'm sorry.  Why would you have

10   a communication with Simon Liang without the involvement of the

11   co-managers?

12         A.    I think Simon had sent -- I think Zira

13   (phonetic) had emailed Simon about the waterfall and OID and

14   things.  And I think Simon had sent the waterfall calculations

15   at the direction of the co-managers.  He did that routinely

16   every month for the first year-and-a-half.

17         He was also involved in the waterfall provision

18   documentation process when we negotiated the documents.  And

19   he'd been involved with the waterfall for years prior under the

20   servicing agreement.

21         Q.    Okay.  Yesterday there was some discussion about

22   -- you recall there was an exhibit that had a bunch of text

23   exchanges between you and your brother Justin Martorello.

24         Do you recall about that exchange?

25         A.    I do.

1          Q.     Okay.  And I think that Mr. Rosette asked you

2    about why you gave Brian McFadden an equity interest.

3          And can you just -- I'm not sure if it was clear on the

4    record to me.  Can you just tell the panel why you gave Brian

5    McFadden an equity interest?

6          A.     I wanted to give him an equity interest, I

7    think, before the relocation to Puerto Rico.  But it was more

8    tax advantageous to wait until 2014.

9          But he had, you know, done very well, and worked hard,

10   and moved his whole family down to the Virgin Islands, and

11   deserved it.

12         And so he had earned it long prior.  And it was just a

13   matter of timing that he was going to get it.  So it was for

14   his work that he had performed to date.  And I think he also

15   got -- similarly he got equity interest in SunUp Financial as

16   well.

17         Q.     When Mr. McFadden decided to go work for the

18   tribal entities post-merger, did you ever demand that he give

19   up his equity interest in ECA?

20         A.     No.

21         Q.     Have you ever demanded that to date?

22         A.     No.

23         Q.     Sir, has the -- has the tribe advised

24   you -- strike that.

25         When was the last time that ECA actually got a

1   waterfall payment from the tribe?

2           A.      Probably October or so of 2018.

3           Q.      And there are still over two years left on that

4   note, correct?

5           A.      It's January 2023.  So that's two-and-a-half

6   years.

7           Q.      Okay.  Has the tribe advised you at any time,

8   even in the last six months, that it intends to resume making

9   payments under the waterfall?

10          A.      I'm sorry.  Can you repeat the question?

11          Q.      I'll withdraw.  Let me ask a different question.

12          Do you know if the tribe has taken a position in this

13  arbitration that it has no further obligations to ECA under the

14  note?

15          A.      Not that I'm aware of.

16          Q.      Okay.  Has the tribe advised you that it's going

17  to resume payments under the note?

18          A.      I think the intention is to continue to resume

19  the waterfall --

20          Q.      No, that wasn't my question.  My question is:

21  Has the tribe advised you that it will resume payments under

22  the note?

23          A.      I feel like -- there's been a communication that

24  the waterfall would be honored going forward.  But no one's

25  actually said that would result in a payment or not.  I don't

1    --

2        Q.    And has ECA, in fact, received any payment since

3    the MOU was executed?  It's a yes-or-no question.

4        A.    Sorry.  I was still thinking on the prior one.

5        Q.    Yeah, no.  Please focus on the current question.

6    Has ECA received any payments from the tribe since the MOU was

7    executed?

8        A.    No, it has not.

9        Q.    Okay.  And one last question there.  Can you

10   just tell the panel how this, you know, $300-million note

11   amount or note value came into being?  Just so we can have some

12   context around that.

13       A.    Yeah.  It was a multiple of revenue based on a

14   multiple that was done in the prior deal with a different

15   tribe.

16       And so that was to be the total of payments maxed at a

17   cap.  And it wasn't necessarily -- it isn't present value or

18   valuation.  But that's what the structure just was.  So it was

19   a multiple of revenue to be some cap.

20       Q.    And was the tribe aware of that methodology?

21       A.    Yes.

22       Q.    Okay.  I have no further questions, sir.

23            MR. GIVEN:  Rob, thank you.

24            MR. ROSETTE:  Okay.  Barney, Matt, I have

25   no further questions at this time.  And unfortunately, we're

1   going to have to keep this deposition open until we figure out

2   the attorney-client privilege issues that were preserved on the

3   record.

4           I also, you know, would like to keep it open because

5   we're missing the 2019 and 2020 Eventide financial statements

6   that Eventide has refused to produce.

7           So the court reporter in the meantime will provide a

8   copy of the transcript for you to review.  And your counsel

9   will advise you off the record with regard to reviewing the

10  transcript.

11          You have the opportunity to sign off on the deposition

12  and make it final, or you can make some alterations.

13          If you make any material changes, then we have the

14  right to depose you again with regard to those specific

15  changes.  But for now, we will be keeping the deposition open.

16                  MR. GIVEN:  Okay.  I'm sorry, Robert.  And

17  I agree with you.  Your comments that we're keeping it open for

18  the purposes of the, you know, the attorney-client privilege.

19          I just want to make one correction.  We have not

20  refused to turn over the 2019 and 2020 financials.  They are

21  not ready yet.  But we will -- as soon as they are ready, we

22  will turn them over.  I just want the record to reflect it

23  wasn't a refusal.  They don't exist yet.

24          But other than that, I agree, and we will adjourn the

25  deposition and keep it open.  Thank you.

Page 103

```
 1                      THE VIDEOGRAPHER:  Anything further?

 2                      MR. ROSETTE:  Okay.  Nothing further.

 3                      THE VIDEOGRAPHER:  Mr. Rosette, before you

 4    --

 5                      MR. GIVEN:  Hey, Rob.  The videographer has

 6    questions.

 7                      MR. ROSETTE:  Yeah.

 8                      THE VIDEOGRAPHER:  Before you leave, and

 9    before we go off the record, how do you want your copy of the

10    video?  Do you want it synced with the transcript, or do you

11    just want the .mp4 file?

12                      MR. ROSETTE:  Let me ask Anna Bruty that

13    question.

14                      MS. BRUTY:  When you mean synced with the

15    transcript, what do you mean?

16                      THE VIDEOGRAPHER:  So that you can take it

17    in to, like, TrialDirector or OnCue, so that the words come up

18    at the same time, and you can edit it that way.

19                      MS. BRUTY:  No.  No, thank you.

20                      THE VIDEOGRAPHER:  Okay.

21                      MR. GIVEN:  I'll have to let you know.  I'm

22    not the tech guy.

23                      THE VIDEOGRAPHER:  Okay.  All right.  With

24    that it's 12:28.  We are off the record.

25                      (End of proceedings.)
```

Page 104

```
 1                  CHANGES AND SIGNATURE WITNESS

 2   NAME:_____ DATE OF DEPOSITION:_____

 3

 4   PAGE    LINE       CHANGE        REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1          I, MATT MARTORELLO, have read the foregoing deposition

2    and hereby affix my signature that same is true and correct,

3    except as noted above.

4

5

6                              _____
                               MATT MARTORELLO

7    THE STATE OF _____)

8    COUNTY OF _____)

9          Before me,_____, on

10   this day personally appeared MATT MARTORELLO) known to me (or

11   proved to me under oath or through

12   _____) (description of identity card

13   or other document) to be the person whose name is subscribed to

14   the foregoing instrument and acknowledged to me that they

15   executed the same for the purposes and consideration therein

16   expressed.

17         Given under my hand and seal of office this _____

18   day of _____, _____.

19

20

21

22

23                             _____
                               NOTARY PUBLIC IN AND FOR
                               THE STATE OF _____
24                             COMMISSION EXPIRES: _____

25   ____No Changes Made  _____Amendment Sheet(s) Attached

Page 106

1              AMERICAN ARBITRATION ASSOCIATION

2                  Re:  Cause No. 01-19-0004-5187

3              Eventide Credit Acquisitions, LLC

4                            -vs-

5     Lac Vieux Desert Band of Lake Superior Chippewa Indians,

6             Tribal Economic Development Holdings, LLC,

7                  Big Picture Loans, LLC, and

8                  Ascension Technologies, LLC

9                    REPORTER'S CERTIFICATION
                  DEPOSITION OF MATT MARTORELLO
10                       JUNE 25, 2020
                     (REPORTED REMOTELY)
11

12         I, Toi Isabel, Certified Shorthand Reporter in and for

13    the State of Texas, hereby certify to the following:

14         That the witness, MATT MARTORELLO, was duly sworn by

15    the officer and that the transcript of the oral and videotaped

16    deposition is a true record of the testimony given by the

17    witness;

18         That the original deposition transcript was delivered

19    to Mr. Robert Rosette.

20         That a copy of this certificate was served on all

21    parties and/or the witness shown herein on

22    _____.

23         That the amount of time used by each party at the

24    deposition is as follows:

25

Page 107

1  Mr. Robert A. Rosette ..... 02 HOUR(S):54 MINUTE(S)
   Mr. Bernard R. Given ..... 00 HOUR(S):18 MINUTE(S)

2

3          That pursuant to information given to the deposition

4  officer at the time said testimony was taken,

5  the following includes counsel for all parties of record:

6  FOR THE CLAIMANT:

7          Mr. Bernard R. Given (Via Zoom)
           LOEB & LOEB L.L.P.
8          10100 Santa Monica Boulevard
           Suite 2200
9          Los Angeles, California 90067
           Tel: 310-282-2000
10         Fax: 310-282-2200
           bgiven@loeb.com

11

12 FOR THE RESPONDENTS:

13         Mr. Robert A. Rosette (Via Zoom)
           ROSETTE, L.L.P.
14         565 W. Chandler Boulevard
           Suite 212
15         Chandler, Arizona 85225
           Phone:  480-778-8990
16         Fax:  480-899-8997
          rosette@rosettelaw.com

17

18         I further certify that pursuant to FRCP Rule 30(f)(1)

19 that the signature of the deponent:

20         XXXXX was requested by the deponent or a party before

21 the completion of the deposition and that the signature is to

22 be before any notary public and returned within 30 days from

23 date of receipt of the transcript.  If returned, the attached

24 Changes and Signature Page contains any changes and the reasons

25 therefore:

Page 108

1              _____was not requested by the deponent or a party

2      before the completion of the deposition.

3              I further certify that I am neither counsel for,

4      related to, nor employed by any of the parties or attorneys in

5      the action in which this proceeding was taken, and further that

6      I am not financially or otherwise interested in the outcome of

7      the action.

8              Certified to by me this 29th day of June, 2020.

9

10

11

12                         _____

13                         TOI ISABEL, Texas CSR 8080
                           Expiration Date:  10/31/21
14                         National Court Reporters Inc
                           Firm Registration No. CFR-682
15                         1-888-800-9656

16

17

18

19

20

21

22

23

24

25

USCA4 Appeal: 21-2116   Doc: 26-6       Filed: 02/07/2022    Pg: 451 of 503

 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF VIRGINIA

 3   LULA WILLIAMS, GLORIA TURNAGE,    ) CASE NO: 3:17-cv-461

 4   GEORGE HENGLE, DOWIN COFFY, and   )

 5   FELIX GILLISON, JR. on behalf of  )

 6   themselves and all individuals    )

 7   similarly situated,               )

 8                    Plaintiffs,      )

 9   -vs-                              )

10   BIG PICTURE LOANS, LLC; MATT      )

11   MARTORELLO; ASCENSION TECHNOLOGIES)

12   INC.; DANIEL GRAVEL; JAMES        )

13   WILLIAMS, JR.; GERTRUDE McGESHICK;)

14   SUSAN McGESHICK; and              )

15   GIIWEGHZHIGOOKWAY MARTIN,         )

16                    Defendants.      )

17   _____  )

18          VIDEOTAPED DEPOSITION OF DANIEL GRAVEL

19                    Washington, DC

20                    April 5th, 2019

21                    10:00 a.m.

22   REPORTED BY:  ALEXANDRIA KAAN



1   sure I understand that.

2       A.   Sure.  We give banks who don't currently have the

3   ability, who want to partner with us the ability on

4   their website, to have customers apply to them for small

5   business lens.  We provide the software, the digital

6   solution, in order for those customers to complete and

7   submit applications.

8       Q.   Has that been part of the business of Fundation

9   since you joined the company?

10      A.   The first -- when I first started, we were just a

11  direct lender.  We started offering the solution to

12  banks a few months after I started.

13      Q.   So if I'm understanding this correctly -- but I

14  want you to correct me if I'm wrong -- it sound like

15  Fundation has two lines of business.  Is that right?

16      A.   Yes.

17      Q.   And one of them is as a direct lender?

18          MR. ANTHONY:  You need to say "yes" or "no".

19      A.   Yes.

20  BY MR. SCHEFF:

21      Q.   How would you describe the second line of

22  business?



1    A.  We call ourselves a credit solutions provider,

2  basically providing digital capability to banks and

3  other partners who want to partner with us.

4    Q.  So when you say "Providing digital capabilities",

5  what does that mean?

6    A.  It means customers are able to go to those bank

7  websites, fill out their applications, get their

8  applications decision'ed [sic], at least an initial

9  decision, relatively quickly.

10    Q.  Through the software platform that you've

11  licensed to the bank?

12    A.  Yes.

13    Q.  Is it a licensing relationship with the bank?

14    A.  Yes, it is a licensing relationship.

15    Q.  In this latter second line of business that we're

16  talking about now, who's the lender in those instances?

17    A.  So it depends.  The banks would be the lender if

18  a particular application meets their credit

19  criteria/fits their credit box.  We would be the lender

20  in the case of if the application does not fit their

21  credit criteria but the applicant has opted in to have

22  us view their application.



1   Q.  So when the applicant goes online, they have an

2   option of the bank, some other lender, or both?

3   A.  Yes, yes.

4   Q.  And does the bank sort of get the first

5   opportunity, and then if the bank chooses not to lend it

6   flips over if the business elects?

7   A.  So it depends, because we have several bank

8   partners.  So it just depends on the partnership.

9   Q.  So it's different with each bank?

10  A.  Yes.

11  Q.  Other than providing the digital platform that

12  you're describing, what other services does Fundation

13  provide to its bank partners in this what I'll call

14  "Other line of business", not direct-lending line of

15  business?

16  A.  I would say just sort of general advice on how to

17  -- marketing advice, advice on like disclosures on the

18  application and what the application should look like,

19  and sometimes compliance matters.

20  Q.  And again, I'm going to ask you a question based

21  on my understanding of what you've said, but if that's

22  not accurate just tell me, please.  Okay?  So when you



 1 | say that Fundation's in this second line of business,

 2 | not direct-lending line of business, provides advice to

 3 | your bank partners in connection with marketing,

 4 | disclosures, and the other things you testified to,

 5 | could you also call that advice a "Recommendation"?

 6 |    A.  Yes.

 7 |    Q.  And the bank then decides whether to accept the

 8 | recommendation or not accept the recommendation?

 9 |    A.  That's right.

10 |    Q.  In the instance where Fundation is a direct

11 | lender, is it state licensed?

12 |    A.  We're licensed in several states, yes.

13 |    Q.  What states are you licensed in?

14 |    A.  We're licensed in California, Vermont, North

15 | Dakota, South Dakota, and Tennessee.

16 |    Q.  Does that mean you, as a direct lender, only lend

17 | into those states, or do you lend across the country?

18 |    A.  No, we lend into 49 states.

19 |    Q.  What's the state you don't lend?

20 |    A.  Nevada.

21 |    Q.  With the bank partner relationships that you've

22 | described -- and I don't care what banks they, are it



DANIEL GRAVEL                                          April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                              21

1      Q.   What were the services that Bellicose VI and

2   Bellicose Capital provided, as best as your memory

3   allows you to tell us?

4      A.   So, expertise in the lending industry.

5      Q.   Can you be more specific?

6      A.   So I guess, marketing materials, underwriting

7   information, general know-how in the lending industry.

8      Q.   And over the course of the almost three years

9   that you worked for Bellicose VI and Bellicose Capital,

10   did those entities as a servicer provide recommendations

11   to the lender that had hired Bellicose VI and then

12   Bellicose Capital?

13          MS. KELLY:   Object to the form.

14   BY MR. SCHEFF:

15      Q.   What was your answer?

16      A.   Yes, they did.

17      Q.   Who were the lenders, or who was the lender?

18      A.   The lenders were two companies:   One called

19   Capital Payday; and another called Pepper Cash.

20      Q.   And have you ever heard of Duck Creek Financial

21   or Red Rock Financial?

22      A.   I have.



1    Q.  And did those entities have any relationship, as

2    far as you know, to Payday --

3        What was it called, Payday?

4    A.  Capital Payday and Pepper Cash.

5    Q.  -- Capital Payday or Pepper Cash?

6    A.  Yes, those were the entities that owned those two

7    companies.

8    Q.  In that relationship as servicer-to-lender, would

9    it be accurate to say that the servicer Bellicose VI and

10   Bellicose Capital made recommendations to Red Rock and

11   Duck Creek --

12           MS. KELLY:  Object to the form.

13   BY MR. SCHEFF:

14   Q.  -- with respect to its lending operation?

15           MS. KELLY:  Sorry, Richard.

16           Object to the form.

17           MR. SCHEFF:  It's okay.

18   A.  Yes.

19   BY MR. SCHEFF:

20   Q.  Based on your experience, who had the

21   decisionmaking authority, Bellicose VI and Bellicose

22   Capital, the lending entities?  Which one?



1    A.   Decisionmaking authority with respect to how they

2  acted on their recommendations?

3    Q.   Yes.

4    A.   The tribal entities did.

5    Q.   And so this is the first time either in my

6  question or answer that you've made a reference, or

7  anyone has made a reference, to "Tribal entities."  Did

8  you have an understanding -- strike that.

9         If you know, did a Native-American tribe own Red

10  Rock and Duck Creek?

11    A.   Yes.

12    Q.   What was the name of that Native-American tribe?

13    A.   That was the Locviex Desert Band of Lake Superior

14  Chippewa Indians.

15    Q.   And how did you come to know that?

16    A.   I think when I started working at Bellicose, that

17  was something that became clear to me.  I don't know

18  exactly how.

19    Q.   Did you interact with people from the tribe?

20    A.   I did.

21    Q.   Who did you interact with?

22    A.   I interacted with Shelly Hazen, Michelle Hazen,



1  primarily though infrequently.

2     Q.  And did you understand that Red Rock and Duck

3  Creek had counsel/had lawyers?

4     A.  Yes.

5     Q.  And who did you understand, if you did, to

6  represent Red Rock and Duck Creek?

7     A.  Primarily Karrie Witchman at Rosette, and then

8  Tanya Gibbs at Rosette.

9     Q.  And if you know, was Bellicose VI and Bellicose

10  Capital represented as well?  Did they have counsel?

11     A.  We did.

12     Q.  And can you identify counsel for Bellicose and

13  Bellicose VI and Bellicose Capital?

14     A.  Yes.  So we had local counsel in the Virgin

15  Islands Keller Hals Ferguson I believe was the name.  We

16  were also represented by Jennifer Galloway, PC, I

17  believe was the name of the law firm; Hudson Cook; and

18  Greenberg Traurig; and maybe Pepper Hamilton.

19     Q.  I'm not looking for privileged communications;

20  just you, as a lawyer, understand what a privileged

21  communication is?

22     A.  I do.



1    A.   There was a golf course I think on the hotel

2   property.

3    Q.   What was the purpose of you going to the

4   reservation, LVD's reservation, on the approximate three

5   occasions that you did?

6    A.   So I don't remember the purpose the first time I

7   was there; it might have been just to meet the people at

8   the entities.  I was there one time to sit with a

9   third-party compliance consultant, that I don't recall

10  whether they had been hired by Bellicose or by the

11  tribe.  But we sat with Shelly Hazen, and I believe

12  Karrie Witchman and maybe others, to review compliance

13  policies that I believe the compliance consultant had

14  developed.

15   Q.   Who was the compliance consultant?

16   A.   I believe it was called VP Compliance Services,

17  or I think I'm getting that wrong.

18   Q.   Is it VP or BP [sic]?

19   A.   V.

20   Q.   "V" as in Victor?

21   A.   Yeah.

22   Q.   Where were they located, if you know?



DANIEL GRAVEL                                    April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                        38

1    A.  I believe the people who I met who worked for

2    them just worked sort of remotely.  I don't know if they

3    all had offices or if they worked remotely.

4    Q.  Were they hired on a project basis or did they

5    provide continuing services over a period of time to Red

6    Rock and Duck Creek?

7    A.  They provided continuing services.

8    Q.  And what were the nature of the services they

9    provided, if you can recall?

10   A.  So I recall them helping to create compliance

11   policies, and then doing sort of ongoing monitoring of

12   compliance.

13   Q.  When you say "Compliance policies", what are you

14   referring to?  What subject areas?

15   A.  Compliance with federal lending law.

16   Q.  And did you have an understanding as to whether

17   or not Red Rock and Duck Creek were intending to comply

18   with federal lending laws?

19   A.  Yes.

20   Q.  What's the basis of your understanding?  Again, I

21   don't want privileged information; I just want to again

22   give you that admonition throughout.



1    A.  Because they took part in developing the

2   policies.  The only reason to develop compliance

3   policies is if you intend to comply with what they say.

4    Q.  And were you privy to the monitoring efforts or

5   monitoring work that VP provided to Red Rock and Duck

6   Creek?

7    A.  Yes.

8    Q.  And did VP, as a general matter, find that Red

9   Rock and Duck Creek were in compliance with federal laws

10   or not in compliance with federal laws?

11    A.  My recollection is they found they were generally

12   in compliances with federal lending laws.

13    Q.  And did they on occasion make recommendations for

14   changes in the way Red Rock and Duck Creek operated the

15   business from a compliance perspective when they found

16   what they believed might be deficiencies?

17    A.  I'm sure that they did.

18    Q.  Why are you sure that they did?

19    A.  We would have calls -- I would be involved with

20   calls that they were on.  There would be a

21   representative from VP Compliance Services, and then

22   Michelle Hazen and I believe either Carrie or Tanya



1  would be on the calls periodically following the review

2  that VP Compliance services would do.  And my

3  recollection is if they found any deficiencies or areas

4  where there was room for improvement, they would make

5  recommendations on how to deal with and solve those

6  issues.

7     Q.  At the point in time that you left the employment

8  --

9        At that point, I guess it would have been

10  Bellicose Capital?

11    A.  Yes.

12    Q.  -- was VP still providing services to Red Rock

13  and Duck Creek?

14    A.  That is what -- actually, I don't recall,

15  actually.

16    Q.  What about Jennifer Galloway?  Was she still

17  providing compliance services?

18    A.  I believe she was providing -- well, it depends

19  on how we define "Compliance services."  I believe up

20  until I left the employment of Bellicose Capital that I

21  would call her as things came up and ask for advice.

22    Q.  Ms. Galloway was located in Florida.  Is that



1  right?

2     A.  That's right.

3     Q.  So she was providing advice and direction

4  remotely?

5     A.  Primarily remotely.  I believe she came to the

6  Virgin Islands once, maybe twice.

7     Q.  Do you know how many times Jennifer Galloway went

8  to the reservation, LVD reservation?

9     A.  I don't believe she ever went to the reservation.

10    Q.  Was Jennifer Galloway providing compliance advice

11 to Bellicose, to Red Rock and Duck Creek, or both?

12    A.  To Bellicose.

13    Q.  Now, again, the same way you described the types

14 of compliance services that VP was providing to Red Rock

15 and Duck Creek, can you also describe the type of

16 compliance services that Ms. Galloway or Jennifer

17 Galloway, PC, was providing to Bellicose?

18    A.  Yes.  So she helped us develop compliance

19 policies.  And I believe she conducted some compliance

20 trainings and was -- we would contact her for advice on

21 different issues from time to time.

22    Q.  So what was it that Bellicose was trying to be



1   compliant with?

2       A.  We were trying to be compliant with federal

3   lending law.

4       Q.  Same as Red Rock and Duck Creek?

5       A.  Yes.

6       Q.  And why is that?  Why was Bellicose trying to

7   comply with federal law?

8       A.  Because part of the services were providing

9   advice and other materials to the lending entities.  And

10  I think it would have been negligent for us to be

11  providing advice or materials that were not compliant

12  with the law.

13      Q.  What was your role, if any, with compliance or in

14  the compliance field for Bellicose?

15      A.  My title was compliance director.

16      Q.  So what were your duties and responsibilities as

17  compliance director?

18      A.  It was to sort of to implement the compliance

19  policies, make sure they were being followed, review

20  internal compliance from time to time, provide advice

21  internally.

22      Q.  During the time period you were employed by



1  Bellicose VI and Bellicose Capital, did you ever have a

2  sense that the people at Red Rock and Duck Creek did not

3  want to comply with federal law?

4     A.  No.

5     Q.  Did you ever have a sense that the people at

6  Bellicose VI and Bellicose Capital did not want to

7  comply with federal law?

8     A.  No.

9     Q.  Let me go back to the visits you had at the

10  reservation.  Did Red Rock and Duck Creek have employees

11  located on the reservation?

12    A.  Yes.

13    Q.  And if you know, can you identify any of those

14  people by name?

15    A.  No.

16    Q.  Do you know what duties and responsibilities they

17  had?

18    A.  I don't recall.

19    Q.  Did you ever meet with the tribal council?

20    A.  So on one of my visits, I believe my last visit

21  to LVD, I attended a tribal council meeting.

22    Q.  And what was your understanding, if any, of the



 1  function of the tribal council?

 2      A.  With regard to the lending entities?

 3      Q.  Just with regard to the tribe.

 4      A.  Just that they essentially were responsible for

 5  overseeing a high level, the governance and functioning

 6  of the tribe.

 7      Q.  And would that include the lending operation?

 8      A.  Yes.

 9      Q.  So what did you observe at the tribal council

10  meeting?

11      A.  I don't recall the specifics of the meeting.

12      Q.  Was Mr. Martorello present?

13      A.  Yes.

14      Q.  What did he do at the tribal council meeting?

15      A.  I know he spoke for a bit, but I don't recall the

16  contents of what he said.

17      Q.  While the business was located in the Virgin

18  Islands, that is the business of Bellicose VI, can you

19  identify as many employees as you can that you recall?

20      A.  Yes.  So aside from myself and Matt Martorello,

21  Justin Martorello, James Dowd, Brian McFadden, Simon

22  Liang, Chelsea Wever, Lincoln Walker, Brian Burdick,



DANIEL GRAVEL                                      April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                           69

1    A.  Yes, the name is familiar.

2    Q.  What do you understand about the Arenbergs, if

3  anything?

4    A.  My recollection is that it was several members of

5  the Arenberg family were investors in -- I'm not sure

6  which entity that may have been related to Bellicose.

7    Q.  Now, from your involvement with Bellicose VI and

8  Bellicose Capital during the almost three years, did you

9  ever -- well, strike that.

10       You testified in the first segment of your

11  deposition that you did review the consumer lending

12  contract or contracts between Red Rock and consumers,

13  and Duck Creek and consumers, and on occasion would make

14  recommendations for changes.  Did I recall that

15  testimony correctly?

16    A.  Yes.

17    Q.  To whom were those recommendations made?

18    A.  They would have been made to Michelle Hazen, with

19  a cc -- perhaps a cc -- to Karrie Witchman.

20    Q.  So would I have a correct understanding that you

21  have read the consumer lending contracts between Red

22  Rock and consumers, and Duck Creek and consumers?



DANIEL GRAVEL                                        April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                           70

1    A.  Yes.

2    Q.  Do you have an understanding as to what law

3    governed those contracts?

4    A.  I recall it was the law of LVD.

5    Q.  Did you ever see the LVD law/actually read it?

6    A.  Yes, I did.

7    Q.  Did you have any role in drafting it?

8    A.  No.

9    Q.  Did you ever have a concern that tribal law

10   actually did not apply the lending relationship between

11   Red Rock and consumers, and Duck Creek and consumers?

12   A.  No.

13   Q.  Why not?

14   A.  Because it a was the law stated in the contract

15   that consumers agreed to.

16   Q.  Did you ever talk to Karrie Wichtman about why

17   tribal law applied to that lending relationship between

18   Duck Creek and consumers, or Red Rock and consumers?

19   A.  My guess is that we discussed it at some point.

20   I'm not sure exactly what the context of the discussion

21   would have been.

22   Q.  Do you consider yourself an expert in tribal law?



DANIEL GRAVEL                                    April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                        71

1     A.  No.

2     Q.  Do you consider yourself an expert in the

3   relationship -- strike that.

4        Do you have an understanding of the term "Tribal

5   sovereign unity"?

6     A.  Yes.

7     Q.  What is your understanding?

8     A.  That the tribe is an entity that has its own laws

9   and regulations that apply to anyone on tribal land who

10  might agree to abide by tribal law, essentially.  And

11  that state law cannot supersede tribal law.

12    Q.  When you were with Bellicose VI or Bellicose

13  Capital, did you believe that the lending activities of

14  Red Rock and Duck Creek were illegal?

15    A.  No.

16    Q.  At any time that you were with Bellicose Capital

17  or Bellicose VI, did you believe that you were engaging

18  in any illegal activity?

19    A.  No.

20    Q.  During the time that you worked at Bellicose

21  Capital and Bellicose VI, did you believe that Bellicose

22  VI or Bellicose Source Point as an entity was engaging



DANIEL GRAVEL                                    April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                        72

1  | in illegal activity?

2  |     A.  No.

3  |     Q.  Did anyone ever suggest to you that in fact Red

4  | Rock and Duck Creek were engaging in illegal activity?

5  |     A.  No.

6  |     Q.  Did anyone suggest to you that you were engaging

7  | in illegal activity?

8  |     A.  No.

9  |     Q.  Did anyone suggest to you that Bellicose VI and

10 | Bellicose Capital were engaging in illegal activity?

11 |     A.  No.

12 |     Q.  Did Matt Martorello ever say anything to you that

13 | suggested to you that Mr. Martorello believed that

14 | tribal law did not apply to the lending contracts

15 | between Red Rock and consumers, and Duck Creek and

16 | consumers?

17 |     A.  No.

18 |     Q.  Did Mr. Martorello ever say anything or do

19 | anything which led you to believe that he believed that

20 | his conduct in connection with Bellicose VI and

21 | Bellicose Capital was in any way illegal?

22 |     A.  No.



DANIEL GRAVEL                                    April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                          73

1    Q.  You're familiar -- well, I'll ask it:  Have you

2    ever heard of the CFPB?

3    A.  Yes.

4    Q.  What is your understanding of what the CFPB is?

5    A.  It's a governmental agency.  Part of its mandate

6    is to regulate lenders.

7    Q.  In connection with your employment at Bellicose

8    VI and Bellicose Capital in the compliance field, was

9    any of the compliance work that you did that outside

10   vendors did for Bellicose VI and Bellicose Capital

11   relate in any way to the fact that the CFPB was a

12   governmental agency that had some sort of regulatory

13   authority?

14   A.  Yes.

15   Q.  Describe what that was.

16   A.  So some of our -- a couple of our compliance --

17   or we had compliance policies, among other things, fair

18   lending, FCRA, and UDAAP.

19            MR. ANTHONY:  Give her the acronym.

20   A.  Fair Credit Reporting Act is FCRA, and UDAAP is

21   Unfair Deceptive and Abusive After-Practices.

22            And because it was my understanding that the CFPB



 1  had authority to regulate those laws, that we needed to

 2  comply with those in order to satisfy the regulator.

 3  BY MR. SCHEFF:

 4      Q.  As far as you -- well, strike that.

 5          Did any of the compliance work that you either

 6  did or managed or was provided by third-party vendors to

 7  Bellicose VI or Bellicose Capital related to an effort

 8  to prepare for a potential CFPB audit?

 9      A.  Yes, that's my recollection.

10      Q.  Was there ever a CFPB audit?

11      A.  No, there wasn't.

12      Q.  In connection with whatever work was done by the

13  compliance people that you've identified, either

14  internal or external, did you have any understanding or

15  belief that in preparation for the CFPB audits there was

16  ever any intention to mislead or deceive the CFPB if it

17  came in to audit?

18      A.  No.

19      Q.  Was there anything that you did or that you

20  understood the third-party vendors you had assisted with

21  compliance did that was done in an effort to not comply

22  with what you understood to be CFPB regulations or



1  guidance?

2          MS. KELLY:  Object to the form.

3     A.  No.  The whole purpose of the compliance program

4  and engaging with the third-party compliance consultant

5  was to ensure compliance with federal law and

6  regulation.

7  BY MR. SCHEFF:

8     Q.  Have you ever heard of Operation Chokepoint?

9     A.  Yes.

10    Q.  What did you have an understanding of what

11  Operation Chokepoint was?

12    A.  My recollection is that it was an effort by the

13  Department of Justice, I believe, to influence banks and

14  payment processors not to work with certain lending

15  entities.

16    Q.  Including tribal lending entities?

17    A.  From what I remember, yes.

18    Q.  Let's go back to the CFPB for a second.  Based on

19  your understanding of CFPB guidance or regulations, did

20  that in any way change your view as to whether or not

21  you were engaging in any illegal activity?

22    A.  No.



DANIEL GRAVEL                                     April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                          76

1    Q.  Did it change your belief as to whether or not

2    Bellicose VI or Source Point was engaging in illegal

3    activity?

4    A.  No.

5    Q.  Did it change your belief as to whether Red Rock

6    or Duck Creek was engaging in any illegal activity?

7    A.  No.

8    Q.  Same questions for Operation Chokepoint:

9    Anything you understand for Operation Chokepoint impact

10   or change or affect your belief in whether or not

11   Bellicose VI or Source Point were engaging in illegal

12   activity?

13   A.  No.

14   Q.  What about Red Rock or Duck Creek?

15   A.  No.

16   Q.  Do you have an understanding of what happened

17   with Operation Chokepoint?

18   A.  I don't recall what happened.

19   Q.  Does it still exist today, as far as you know?

20   A.  I don't believe it does, but I'm not sure.

21   Q.  Have you ever heard that Congress has criticized

22   Operation Chokepoint as an overreaching activity by the



DANIEL GRAVEL                                          April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                              77

1  Department of Justice and FDIC?

2      A.  I believe I did hear that.

3      Q.  When did you hear that?

4      A.  I believe sometime after I left Bellicose.

5      Q.  Are you familiar with a lawsuit that LVD and

6  another tribe called the Otto Missouri filed against the

7  New York Division of Financial Services?

8      A.  I have a vague recollection of it.

9      Q.  What do you remember about it, if anything?

10     A.  Nothing really.  I saw an e-mail yesterday sort

11 of related to that, but I don't recall what the case was

12 about or really what LVD's involvement was.

13     Q.  Is there anything that you remember about the

14 case against the New York Division of Financial Services

15 which either changed your view, then or now, about

16 whether or not you were engaging in any illegal

17 activity?

18     A.  No.

19     Q.  Is there anything about the New York Division of

20 Financial Services case that you knew, then or now,

21 which affected your belief about whether the activities

22 of Bellicose VI or Bellicose Capital were illegal?



DANIEL GRAVEL                                          April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                              78

1    A.  No.

2    Q.  What about Red Rock or Duck Creek?

3    A.  No.

4    Q.  Can we mark this as Exhibit 1, Exhibit 2, and

5  Exhibit 3, please?

6    (Whereupon Exhibit Nos. 1 through 3 are marked for

7                    identification.)

8    Q.  So Mr. Gravel, I'd like you to take a look at

9  what's been marked as Exhibit 1, which bears -- you're

10  familiar with Bates labelling.  Is that right?

11    A.  Yes.

12    Q.  Lower right-hand corner of the first page says

13  Rosette 002699.  Do you have that?

14    A.  Yes, I do.

15    Q.  And where it all starts is on the last page,

16  which is Rosette 002705.  Can you look at this document

17  and just familiarize yourself with this document,

18  please?

19    A.  Okay, I've read it.

20    Q.  Does reading Exhibit 1 refresh your recollection,

21  in any respect, with respect to the New York litigation?

22    A.  No, it doesn't.



1    Q.  It sounds to me -- tell me if I'm wrong -- that

2  the New York litigation, whatever it was, was not a

3  significant event for you?

4    A.  That's correct.

5    Q.  Now, I want you to look -- did Red Rock and Duck

6  Creek stop lending in New York?

7    A.  I'm not sure.

8    Q.  Take a look at Bates No. 002703, the first e-mail

9  in the chain goes from Matt to Chairman Williams to

10  Craig Mansfield.  Can you pronounce the other person who

11  it went to?

12    A.  That's Michelle Hazen.

13    Q.  That's Michelle Hazen?

14    A.  Yes.

15    Q.  cc'd to Karrie Witchman, Justin Martorello and

16  yourself.  Is that correct?

17    A.  Correct.

18    Q.  And it's dated October 2nd, 2013?

19    A.  Correct.

20    Q.  Can you look at the next page, please?

21         MR. ANTHONY:  Being 274?

22         MR. SCHEFF:  Yes.  I'm sorry.



1          MR. ANTHONY:  No worries.

2   BY MR. SCHEFF:

3      Q.  Do you know who wrote this e-mail, actually wrote

4   the words?

5      A.  It was sent by Matt Martorello.  I'm not sure if

6   he wrote it or if someone else did.

7      Q.  I want you to look please at 002704, the

8   second-to-last paragraph, the one that starts:  "We

9   might be able to resume servicing New York loans at some

10  point in the future."

11     A.  Yes.

12     Q.  The second sentence of that paragraph says:  "We

13  are willing to wind down our New York services and see

14  existing loans through to their completion, but we

15  simply cannot flaunt the clear ruling of Judge

16  Sullivan's order, however incorrect we believe it might

17  be."  Did I read that correctly?

18     A.  Yes.

19     Q.  The intention -- strike that.

20         Is this sentence, in the e-mail that you've

21  identified, consistent with your belief of Matt

22  Martorello's intent with respect to complying with the



DANIEL GRAVEL                                    April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                        81

```
 1   law?

 2           MS. KELLY:  Objection to the form.

 3      A.  I'm not sure.  I mean, typically at Bellicose if

 4   we saw that certain states were more aggressive, we may

 5   have recommended the tribe not lending to borrowers

 6   based in those states.

 7   BY MR. SCHEFF:

 8      Q.  I think I asked you a different question, but I

 9   am going to follow up on your question [sic] in just a

10   minute.  Did anything you ever observe or hear from Matt

11   Martorello or read what he wrote suggest to you that he

12   didn't want to comply with any law?

13      A.  No, no.

14      Q.  Now, let's talk about what you were talking about

15   with respect to recommendations not to lend in certain

16   states.  Tell me about that.  What do you mean by that?

17      A.  If we saw that certain states -- I guess Attorney

18   Generals are aggressive in prosecuting usury cases, we

19   might have recommended the tribe didn't lend in those

20   states.

21      Q.  Why?

22      A.  To avoid the headache of having to deal with an
```



1  AG that was being aggressive.

2     Q.  Were those recommendations, if any that were made

3  like that, made because of a belief that you had that

4  Bellicose VI or Bellicose Capital was engaging in

5  illegal activity?

6            MS. KELLY:  Object to the form.

7     A.  No.

8  BY MR. SCHEFF:

9     Q.  So how can you reconcile the recommendation with

10  not having a belief that Bellicose VI or Bellicose

11  Capital was engaging in illegal activity?

12     A.  Because while we believed that Bellicose VI and

13  Bellicose Capital were engaging in perfectly legal

14  activities and that the tribal entities were engaging in

15  perfectly legal activities, my recollection is that we

16  may have decided it wasn't worth the time and effort of

17  having to deal with state regulators who disagreed with

18  us.

19     Q.  And -- strike that.

20        Take a look, would you please, at Exhibit 2.

21  Just if you could read that and familiarize yourself

22  with that.  We're going to need to take a break soon



DANIEL GRAVEL                                             April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                              83

1  because we're running out of video.

2      A.  Okay.  I read it.

3      Q.  What is Phenomenon Marketing?

4      A.  I don't recall.

5      Q.  Do you remember writing this letter?

6      A.  No, I don't.

7      Q.  Do you remember what types of services Phenomenon

8  provided?

9      A.  Based on their name, I assume marketing.  But I

10  don't know specifically.

11      Q.  In the first line you said:  "Given the various

12  challenges and legal uncertainty in the lending

13  industry, Bellicose L.L.C. is in the process of

14  assessing and re-prioritizing its prior projects and

15  relationships with third-party vendors."  Have I read

16  that correctly?

17      A.  Yes.

18      Q.  What were the "challenges in and the legal

19  uncertainty in the lending industry" that you were

20  referring to, that you can recall as you sit here today?

21      A.  I don't recall what I was referring to.

22      Q.  Do you know whether the termination of the



1  relationship with Phenomenon was based on any belief

2  that Bellicose VI or Bellicose Capital was engaging in

3  illegal activity?

4      A.  No, it wasn't.

5      Q.  Do you know whether "the various challenges and

6  legal uncertainty in the lending industry" that you're

7  referring to relates to a belief or a conclusion that

8  you had made that Bellicose VI and Bellicose Capital

9  were engaging in illegal activity?

10     A.  No, it wasn't.

11         MR. SCHEFF:  Let's take the break you need

12 for the tape.

13         VIDEOGRAPHER:  Going off the record at 12:09

14 p.m.  This marks the end of DVD No. 1.

15     (Whereupon a short recess is taken.)

16         VIDEOGRAPHER:  Going back on the record at

17 12:40 p.m.  This marks the beginning of DVD No. 2.

18 BY MR. SCHEFF:

19     Q.  Mr. Gravel, take a look at Exhibit 3 that has

20 been previously marked, and just familiarize yourself

21 with it, please, your copy of it.

22     A.  Did you want me to read the other documents as



1  well, or just the e-mail?

2      Q.  Review as much as you need to familiarize

3  yourself with the document.

4      A.  Okay.  I've read it.

5      Q.  The e-mail, the first page, which is from Karrie

6  Witchman to a list of people including yourself dated

7  October 14th, 2014, are you familiar with this e-mail?

8      A.  No, I'm not.

9      Q.  Do you know what the Jackson versus Cash Call

10  case that's referred to on the first page?

11      A.  No.

12      Q.  Do you know the second Cash Call case,

13  Inetianborr versus Cash Call?  Do you know what that one

14  is?

15      A.  I'm not familiar with that.

16      Q.  "The decision in our case in the Second and Third

17  Court" referred to in the second and third line, do you

18  know what that means/what that refers to?

19      A.  No.

20      Q.  Did any case law during the time period that you

21  were employed by Bellicose VI or Bellicose Capital that

22  was coming out impact your belief that the conduct of



DANIEL GRAVEL                                        April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                        86

1  Bellicose VI and Bellicose Capital was legal?

2      A.  No.

3      Q.  Did any of the case law that came out impact your

4  view as to whether the conduct of Red Rock or Duck Creek

5  was lawful?

6      A.  No.

7      Q.  Why not?

8      A.  We had gotten the advice of many different

9  attorneys that the conduct of Bellicose as a service

10 provider and the conduct of the tribal lending entities

11 was legal.

12     Q.  Let me ask you about what you just said:  You

13 talked about Bellicose as the servicer and Red Rock and

14 Duck Creek as the tribal lender.  Were they the same

15 entity or separate entities?

16     A.  They were separate entities.

17     Q.  As far as you know, did Mr. Martorello control

18 Red Rock?

19     A.  No.

20     Q.  Did he control Duck Creek?

21     A.  No.

22     Q.  Who did?



1    A.  Well, the co-managers had management

2  responsibilities of those entities, as far as I know;

3  and then the tribal council had sort of oversight of the

4  entities themselves at a higher level.

5    Q.  From your involvement in the lending industry,

6  generally while you were at Bellicose and Source Point

7  and since you've left, are you familiar with the idea

8  that there are entities out there that serve as

9  servicers to lending entities?

10   A.  Yes.

11   Q.  Is that common or uncommon?

12   A.  It's extremely common.

13   Q.  Is that in part what Fundation does with respect

14  to the banks that it partners with?

15   A.  Yes.

16   Q.  Do you have any specific understanding of the

17  economics that were in place or negotiated between

18  Bellicose and the tribal lending entities?

19   A.  No.

20   Q.  Do you have a general understanding?

21   A.  I wasn't aware of how the finances worked, no.

22   Q.  Do you know, on a rough percentage basis, who got



DANIEL GRAVEL                                        April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                            88

1   what?

2       A.   No, not specifically.

3       Q.   What about generally?

4       A.   Generally, no.

5       Q.   Did anything about the economics cause you to

6   believe that the conduct of Bellicose VI or Bellicose

7   Capital was illegal?

8       A.   No.

9       Q.   What about with respect to Red Rock or Duck

10  Creek, anything about that, about the economics, suggest

11  to you or cause you to the believe that the conduct of

12  Red Rock or Duck Creek was illegal?

13          MS. KELLY:   Object to the form:   Lack of

14  foundation.

15      A.   No.

16  BY MR. SCHEFF:

17      Q.   Are you aware that at some point Mr. Martorello

18  sold Bellicose to a tribal entity?

19      A.   Yes, I am aware.

20      Q.   And did that occur while you were employed at

21  Bellicose?

22      A.   So I believe I saw an e-mail recently where I had



 1  with Bellicose VI and Bellicose Capital, was that

 2  document honored/was it complied with?

 3      A.  Yeah, as far as I know.

 4      Q.  Could you go back to Exhibit 4 for a second,

 5  please?  It's the October -- not that one, Exhibit 3, I

 6  apologize.  Do you got that?

 7      A.  Yes.

 8      Q.  Two more questions about that:  Do you know whose

 9  handwriting is on the document?

10      A.  No, I have no idea.

11      Q.  "The meeting" it refers to in the e-mail, did you

12  ever attend that meeting?

13      A.  It's possible that I did.  I had mentioned

14  earlier that I had been to LVD maybe about three times.

15  I don't think we talked about the third time.  The last

16  time I was there was to attend a meeting.  Maybe we did

17  talk about it, I don't know.  But it was to attend a

18  tribal council meeting.

19      Q.  You did mention that.  What relation, if any,

20  does that have to the meeting that's referred to in

21  Exhibit 3?

22      A.  It's possible that this was the meeting I



1 | attended.

2 |   Q.  Now, Mr. Gravel, when this case was filed you

3 | were a Defendant in this case.  Correct?

4 |   A.  Correct.

5 |   Q.  And you were dismissed at some point without

6 | prejudice?

7 |   A.  Correct.

8 |   Q.  Did you meet with Ms. Kelly?

9 |   A.  Yes.

10 |   Q.  She asked you a series of questions and you

11 | provided answers?

12 |   A.  Yes.

13 |   Q.  Since that time, you have not been rejoined as a

14 | Defendant in this case.  Correct?

15 |   A.  That is correct.

16 |   Q.  Let me mark whatever the next exhibit is.  Is

17 | that 6?

18 | (Whereupon Exhibit No. 6 is marked for identification.)

19 |   Q.  Mr. Gravel, you're familiar with this document.

20 | Correct?

21 |   A.  Yes.

22 |   Q.  This is the complaint that was filed against you?



1    A.  Yes.

2    Q.  Can you turn to the second page, please?  Let me

3  ask you a different question:  You became employed by

4  Bellicose VI and Bellicose Source Point, as you said, in

5  or about early August 2012.  Correct?

6    A.  Correct.

7    Q.  So in terms of how it was that LVD and Bellicose

8  came to have a business relationship, as you've been

9  testifying about today, you don't have any personal

10  knowledge about that.  Is that correct?

11    A.  That's correct.

12    Q.  Because you weren't around at that time?

13    A.  That's correct.

14    Q.  Have you heard people talk about that?

15    A.  No, I have not.

16    Q.  Take a look please at page 3, paragraph 5.  And

17  read the first sentence of that to yourself of that

18  complaint.

19    A.  Okay.

20    Q.  Do you believe that you participated in an

21  unlawful lending enterprise which violated Virginia's

22  usury laws?



1    A.  No.

2    Q.  Why not?

3    A.  Because we were a service provider to a lender

4  who we believed was lending lawfully.

5    Q.  Under tribal law?

6    A.  Under tribal law.

7    Q.  Can you read the next sentence to yourself,

8  please, in paragraph 5?

9    A.  I would say also with respect to the first

10  sentence:  I wasn't around, I hadn't been involved with

11  Big Picture or Ascension Technologies, so.

12       Okay.

13    Q.  Do you believe you violated Virginia's usury laws

14  in Rico's prohibition against the collection of unlawful

15  debts?

16    A.  No.

17    Q.  Based on what you know, do you believe Mr.

18  Martorello violated Virginia usury laws in participating

19  in an unlawful lending enterprise?

20    A.  No.

21    Q.  Based on what you know, do you believe Mr.

22  Martorello violated Rico's prohibition against



DANIEL GRAVEL                                       April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                          133

 1      A.  That sounds familiar, yes.

 2      Q.  I'm going to mark this Exhibit 7.

 3    (Whereupon Exhibit No. 7 is marked for identification.)

 4      Q.  Do you recognize this document?

 5      A.  I believe so.

 6      Q.  You produced this document in response to a

 7    subpoena we served to you.  Correct?

 8      A.  Yes.

 9      Q.  And this is an e-mail that Mr. Martorello sent to

10    you on August 1, 2012.  Correct?

11      A.  Yes.

12      Q.  And you had this e-mail in your possession and

13    you produced it as part of a response to a subpoena we

14    sent.  Correct?

15      A.  Yes.

16      Q.  Does this refresh your recollection as to whether

17    or not Mr. Martorello considered PlainGreenLoans.com a

18    competitor?

19      A.  No.

20      Q.  What did Mr. Martorello ever say to you about

21    Think Finance?

22      A.  I don't recall any specific conversations about



1   Think Finance.

2       Q.  How did you first hear about Think Finance?

3       A.  It would have been from Matt.

4       Q.  And what is your knowledge of what Think Finance

5   did?

6       A.  I'm sure I knew at one point.  I guess they're a

7   service provider or a lender.

8       Q.  Have you ever discussed any litigation related to

9   Think Finance with Mr. Martorello?

10      A.  It's possible.

11      Q.  Do you have any recollection of ever having

12  discussions of litigation regarding Think Finance with

13  Mr. Martorello?

14      A.  I don't recall any specific conversations about

15  it.

16      Q.  When Mr. Scheff asked you if Mr. Martorello ever

17  said anything to you about tribal law may not apply, you

18  give a very definitive response.  How can you be sure

19  about that?

20      A.  About Matt's -- can you repeat the question?

21      Q.  Yes.  Mr. Scheff asked you if Mr. Martorello ever

22  said anything to you that tribal law might not apply to



DANIEL GRAVEL                                        April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                              135

1  the Red Rock and Duck Creek partnership, and you

2  responded that he never did.  Do you recall that?

3     A.  Yes.

4     Q.  How can you be sure that he never said anything?

5     A.  I just don't recall him ever saying anything like

6  that, that didn't apply.

7     Q.  And you don't ever recall any communications with

8  him about Think Finance.  Correct?

9     A.  No specific conversations.

10    Q.  And you don't recall any specific conversations

11 with him about Cash Call.  Correct?

12    A.  Correct.

13    Q.  And do you recall any specific conversations with

14 him about the Department of Financial Services New York

15 case?

16    A.  No.

17    Q.  Do you recall any specific conversations with him

18 about Operation Chokepoint?

19    A.  No, I don't.

20    Q.  Do you recall any specific conversations with him

21 about potential CFPB audits?

22    A.  Nothing specific.



DANIEL GRAVEL                                        April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                        136

```
 1      Q.  So you, sitting here today, can you testify what
 2   you understood Mr. Martorello's state of mind to be
 3   regarding the legality of what he believed the Bellicose
 4   and Red Rock/Duck Creek relationship was without any
 5   specific recollection about those types of
 6   conversations?
 7             MR. SCHEFF:  Objection:  Asked and answered.
 8             He can answer.
 9      A.  His state of mind with regard to you said the
10   legality of --
11   BY MS. KELLY:
12      Q.  His belief about the legality.
13             MR. ANTHONY:  Just to be clear:  Of the
14   loans that were being served by Bellicose?
15             MS. KELLY:  The Bellicose/Red Rock/Duck
16   Creek relationship.
17      A.  My impression of his state of mind is that the
18   relationship was perfectly legal.
19   BY MS. KELLY:
20      Q.  Under what laws?
21      A.  Under federal law and tribal law.
22      Q.  Do you know if Mr. Martorello believed the
```



1   Bellicose relationship with Duck Creek/Red Rock was

2   legal under state laws?

3     A.  When you say "The relationship", are you talking

4   about -- I'm not sure what would have been illegal about

5   the relationship.  Are you referring to usury rates or

6   interest rates?

7     Q.  Yes, yes.

8     A.  So I think it wasn't that the relationship was

9   illegal under state laws, it's just that state laws

10  didn't apply.

11    Q.  And what did Mr. Martorello base that

12  understanding on, to the extent you're able to speak to

13  the state of mind?

14    A.  I think he would have based that understanding on

15  the advice of legal experts in the area.

16    Q.  Which legal experts?

17    A.  Probably Jennifer Weddle at Greenberg Traurig;

18  possibly attorneys at Hudson Cook; possibly Karrie

19  Witchman in the Rosette firm.

20    Q.  Did you ever draft any policies or procedures to

21  attempt to comply with usury laws of any state?

22    A.  No, I did not.



DANIEL GRAVEL                                          April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                              138

1          MS. KELLY:  We'll take a brief recess.

2          VIDEOGRAPHER:  Going off the record at 2:12

3  p.m.  This marks the end of DVD No. 2.

4          (Whereupon a short recess is taken.)

5          VIDEOGRAPHER:  Going back on the record at

6  2:19 p.m.  This marks the beginning of DVD No. 3.

7  BY MS. KELLY:

8     Q.  Were you involved in any way in the decision of

9  Red Rock to bring the case against the New York

10  Department of Financial Services?

11     A.  No, I don't believe so.

12     Q.  Were you involved in any conversations about

13  that?

14     A.  I actually don't recall the specifics of the

15  case, but it's possible I was involved in some

16  discussions.

17     Q.  When the District Court made the decision on

18  December 30th, 2013, did you have any conversations with

19  Matt after that about the decision of the New York

20  Court?

21     A.  It's very possible, but I don't recall any

22  specific conversations about it.



 1  Q.  If you'd look at Exhibit 1, if you'd go to the

 2  e-mail that Mr. Martorello sent that started off this

 3  chain, it was sent on October 2nd, 2013, a few days

 4  after the decision.

 5  A.  Yes.

 6  Q.  Did you help draft this e-mail that Mr.

 7  Martorello sent on October 2nd?

 8  A.  It's possible, but I have no recollection of this

 9  e-mail.

10  Q.  And in reading this, Mr. Martorello states --

11        MR. SCHEFF:  Where are you reading from?

12  BY MS. KELLY:

13  Q.  "While we understand an appeal of Judge

14  Sullivan's order is imminent, our concern is that Judge

15  Sullivan's order when you meant that tribal enterprises

16  are subject to New York's anti-usury laws, will be

17  regarded as sufficiently final by the State of New York

18  such that it will precipitate their potential

19  investigation and potential prosecution of us personally

20  and our companies if we continue to provide New

21  York-related services at this time."  Do you see that?

22  A.  I do.

1    Q.  Does that statement at all refresh your

2  recollection about whether or not you had any

3  involvement in drafting this e-mail?

4    A.  No, it doesn't.

5    Q.  Does that statement refresh your recollection of

6  any conversations you and Mr. Martorello might have had

7  after the Judge Sullivan decision?

8    A.  No, it doesn't.

9    Q.  Are you aware of any differences between New

10  York's usury laws and Virginia's usury laws?

11    A.  No, I'm not.

12    Q.  Did you have any involvement in the decision to

13  cease lending in New York after this, Judge Sullivan's

14  decision?

15          MR. SCHEFF:  Whose decision to cease

16  lending?

17          MS. KELLY:  Mr. Martorello's in this

18  document.

19          MR. SCHEFF:  Objection:  Misstates the

20  testimony and misstates the document.

21          You can answer, if you can.

22    A.  My guess is that considering that I was General



DANIEL GRAVEL                                     April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                        153

1    A.  I'm not aware of the particular laws or states

2  that you're referring to.

3    Q.  As part of your tenure as compliance director,

4  did you ever undertake to learn what state usury laws

5  would apply to Bellicose?

6    A.  I don't recall doing that.

7    Q.  Why not?

8    A.  It just wasn't on our radar.  Our efforts were

9  towards ensuring compliance with federal law.

10    Q.  Why did Bellicose not have compliance with state

11  laws on its radar?

12    A.  Because the tribe was not required to comply with

13  state law, was our understanding.  So the

14  recommendations we would make to them, given that fact,

15  were just based on federal law.

16    Q.  So is it fair to say that because the tribe did

17  not need to comply with state law, that Bellicose

18  believed that its conduct did not need to comply with

19  state law because it was affiliated with a

20  Native-American tribe for purposes of servicing the

21  loans?

22          MR. SCHEFF:  Objection:  Misstates the



1 | testimony.

2 |        You can answer.

3 |    A.  Can you repeat the question?

4 | BY MS. KELLY:

5 |    Q.  Is it fair to say that Bellicose did not believe

6 | it had to concern itself with compliance with state law

7 | because it had a partnership with two lending entities

8 | that asserted sovereign unity?

9 |        MR. SCHEFF:  Objection:  Misstates the

10 | testimony.

11 |        You can answer the question.

12 |    A.  I think it's fair to say that we weren't focused

13 | on compliance with state law because, like I said, it

14 | was not applicable to the tribal entities, and one of

15 | our jobs or the services we provided was making sure the

16 | services we provided to them, to the tribes.  Tribal

17 | entities were compliant with federal law because that's

18 | what they needed to comply with.

19 | BY MS. KELLY:

20 |    Q.  Are you aware that the LVD paid or has agreed to

21 | pay up to $300 million for the purchase of Bellicose?

22 |    A.  No.



DANIEL GRAVEL                                    April 05, 2019
LULA WILLIAMS vs BIG PICTURE LOANS                        155

1      Q.  You were not aware of that?

2      A.  Am I aware of it now or was I aware of it at the

3   time?

4      Q.  Are you aware of it now?

5      A.  Now that you told me.

6      Q.  But before today you did not know that?

7      A.  No.  I mean, I remember reading a Bloomberg

8   article about it.  I can't remember if that contained

9   like a purchase price or something.  But no, I don't

10  think I ever heard that number before you just mentioned

11  it.

12          MS. KELLY:  I'm just going to take a

13  few-minute break.  We'll go off the record.

14          VIDEOGRAPHER:  Going off the record at 2:55

15  p.m.

16      (Whereupon the a short recess is taken.)

17          VIDEOGRAPHER:  Going back on the record at

18  2:58 p.m.

19  BY MS. KELLY:

20      Q.  Do you know who Josh Landy is?

21      A.  No.

22      Q.  Do you know who Scott Asmer is?



```
 1      A.  No.

 2      Q.  In your role at Fundation as General Counsel, if

 3   they were to get into consumer lending would you

 4   recommend that it lend at the rates that Red Rock or

 5   Duck Creek 100 percent interest or higher?

 6             MR. ANTHONY:  Object to the form of the

 7   question.

 8      A.  Would I recommend it?

 9   BY MS. KELLY:

10      Q.  Yes.

11      A.  No.

12      Q.  Why not?

13      A.  Because we would be lending at usury rates.

14      Q.  And if Fundation were to partner with another

15   lending entity where it just provided servicing

16   activity, would it partner with a lending entity that

17   lended [sic] at interest rates of 100 percent or more?

18             MR. ANTHONY:  Object to the form the

19   question.

20      A.  No, I don't think so.

21   BY MS. KELLY:

22      Q.  Why not?
```

